# EXHIBIT 5

Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries vs Fisher-Price, Inc. and Mattel, Inc. Case number CV-19-02689-GMS in the United States District Court for the District of Arizona

*a report prepared for*

Greenberg Traurig, LLP
2101 L St. NW, Suite 1000
Washington, DC. 20037

*by*

Dorothy A. Drago, MA, MPH
11 Brookside Ave.
Plymouth, MA 02360

*May 7, 2021*

# **TABLE OF CONTENTS**

Introduction ............................................................................................................................. 1

The Product Design History ................................................................................................... 2

Product Safety: CPSC............................................................................................................. 7

      CPSC: Authority, Structure, and Data Collection ........................................................ 7

      CPSC: Mandatory Reporting Requirements.................................................................. 9

      CPSC: Rulemaking .......................................................................................................... 12

Product Safety: ASTM ............................................................................................................ 13

      ASTM: Organization ....................................................................................................... 13

      ASTM: Standards Development..................................................................................... 13

      ASTM: Ballots .................................................................................................................. 15

Interaction Between CPSC and Voluntary Standards Organizations ........................... 16

Standards Relevant to the Rock 'n Play Sleeper ............................................................... 17

Incident Details ........................................................................................................................ 18

Fisher-Price Knew of Only One Fatality Before Zoey's Death ....................................... 20

The CPSC's Annual Reports Further Confirmed No Fatalities Allegedly Associated With The Rock 'n Play
Sleeper ....................................................................................................................................... 21

Discussion ................................................................................................................................. 23

      Rock 'n Play Sleeper's Intended Users......................................................................... 23

      The Role of the Rock 'n Play Sleeper's Warnings and Instructions........................ 23

      Comparing the Rock 'n Play Sleeper to Other Inclined Products .......................... 26

      The Product's Angle of Incline ...................................................................................... 28

      AAP Safe Sleep Guidelines ............................................................................................ 31

      Rock 'n Play Sleeper and CPSC Actions ..................................................................... 32

      Rock 'n Play Sleeper and F3118 ................................................................................... 33

Additional Rebuttals to Dr. Vredenburgh and Dr. Singhose ........................................ 36

Opinions .................................................................................................................................... 39

Summary and Conclusions..................................................................................................... 41

Exhibits....................................................................................................................................... 42

The following report is provided pursuant to Rule 26 of the Federal Rules of Civil Procedure. All of the opinions that I have offered in this report are given to a reasonable degree of probability and/or certainty, and they are based on my education, training, knowledge, experience and/or materials that I have reviewed in connection with this litigation, which are substantial and have allowed me to perform a complete analysis of each of Plaintiff's allegations related to the subject Rock 'n Play Sleeper. This report is not meant to be an exhaustive recitation of all my opinions in the above-referenced case. My *curriculum vitae*, which details my education and experience, and includes a list of all publications authored by me in the past 10 years, is attached to this report as Exhibit A. A list of the materials upon which I have considered is attached to this report as Exhibit B. Citations to specific reference material also are offered in this report, where I believe it necessary to cite a specific source; otherwise, my opinions are derived from a combination of reference sources, my own professional experience, and general professional knowledge. I reserve the right to supplement this list, as well as to amend and supplement the opinions expressed in this report. I also reserve the right to respond to and rebut all information provided in discovery, which I understand is ongoing, and any opinions offered by Plaintiff's experts at their depositions or at trial. My fee schedule is attached as Exhibit C. My list of prior testimony is attached as Exhibit D. This report is being produced in this case only and is subject to the confidential Protective Order applicable to this case.

## Introduction

It is my understanding that on June 19, 2014, Zoey Olson (dob 9/30/2013) was discovered by her mother, Kathleen Courkamp, in her Rock 'n Play Sleeper, non-responsive. According to Ms. Courkamp's deposition testimony, Zoey had been placed on her back in the Rock 'n Play Sleeper around 1:30 a.m., slept through the night, and was alive, on her back, at 6 a.m. when she checked on her, visually. According to the police report and autopsy report, at approximately 8 a.m. Zoey was found positioned semi-prone/semi-left-lateral, cold to the touch, with the restraint not fastened, and with nothing obstructing her nose or mouth. The cause and manner of death were found to be unknown and undetermined, respectively, and are reported as such on the death certificate. The US Consumer Product Safety Commission (CPSC) investigated the incident in 2019 (190502CBB3348), noting it was a manufacturer reported incident.

The product involved was a Rock 'n Play Sleeper, Model BHL58, purchased by Zoey's paternal grandmother in 2013 as a gift. This incident and the surrounding circumstances will be discussed in more detail later in this report.

I have been retained as a consumer product safety expert by the law firm Greenberg Traurig, LLP, representing the Defendants, Fisher-Price, Inc. and Mattel, Inc. I am qualified to act as an expert in this matter based on my extensive experience in product safety, in particular the safety of infants' and children's products. My experience in product safety spans over forty years, during which time I have worked in both the Division of Hazard Analysis and the Division of Human Factors at CPSC and operated my own consumer product safety consulting business. My responsibilities at CPSC included critical review of injury data and in-depth investigation reports as well as hands-on evaluation of products. My particular role in Human Factors was to provide technical support for the Directorate for Compliance, and in particular for Section 15(b) determinations of product defects and substantial product hazards. I am familiar with CPSC rulemaking, regulations, reporting requirements, recall process, and databases. In my consulting business I have provided regulatory guidance, including for the filing of Section 15(b) reports. I have also provided injury analysis and human factors guidance to manufacturers for the safe design of products for infants and children, including their instructions and warnings, and for addressing various issues including asphyxiation. I have served as a product safety expert for both plaintiffs and defendants.

In addition to my experience, I have extensive knowledge and education in the field of injury prevention and control. My graduate studies at Johns Hopkins University, which culminated with a Master of Public Health Degree, included, among others, principles of epidemiology, epidemiology of injuries, injury prevention and control, biomechanical epidemiology, biostatistics, health information systems, and survey sampling. I am an active, voting member of ASTM (Committee F15) and as a member of several subcommittees, have contributed to the development of consumer product safety standards for, among other things, infant products and toys. I have authored two books on product safety/injury prevention, both published by Johns Hopkins University Press: From Crib to Kindergarten: The Essential Child Safety Guide, which is written for parents and caregivers of infants and young children; Living Safely, Aging Well, which is written for seniors and their caregivers. In addition, I have co-authored a book chapter (for two editions) on the safety of nursery products, and authored/co-authored peer reviewed articles on the subject of injury and injury prevention, including infant mechanical suffocation.  These accomplishments are reflected in my curriculum vitae.

**The Product Design History**

The product at issue is a Fisher-Price Rock 'n Play Sleeper, Model BHL58, manufactured on July 16, 2013 (Steinwachs 01/22/21 testimony, p. 154). Fisher-Price initially marketed the Rock 'n Play Sleeper in

2009, after having researched and tested the product. Mr. Steinwachs was the Fisher-Price principal quality engineer responsible for guiding a team to develop a product that would be reasonably safe for its intended and foreseeable use, and meet all applicable government and industry safety standards as well as Fisher-Price internal safety and quality standards. The process included, among other things, design reviews, consultation with an outside medical/biomechanics expert, safety/hazard analyses, play lab observational testing at Fisher-Price headquarters by child development experts, in-home consumer testing, and third party testing. This process was reasonable, rational, and logical. It was meant to ensure that products introduced to the marketplace had undergone stringent safety and usability evaluation and review, and is consistent with the process a reasonable manufacturer would undertake in developing a product such as the Rock 'n Play Sleeper.

The pre-market research and testing were performed by senior engineers, senior safety staff thoroughly familiar with infant safety standards and infant safe sleep guidelines, and child development specialists with advanced degrees. The process of product development specifically included a series of hazard analyses and safety audits in 2008 and 2009[1] as well as prototype testing in homes of employees and other consumers during 2009.[2] The product was placed in homes for a period of one or two weeks; 56 infant subjects ranged in age from 2 weeks to six months and in weight from 8 to 20 lbs. The testing yielded overall satisfaction with the product and in particular with the inclined back support (especially to prevent spit-up and for babies with reflux) and the raised height for the easy access it provided. During in-home testing, some babies slept in the product overnight, while others used it only for daytime play or napping. Although the restraint was reportedly not used or used sometimes by some parents, there was no information on the circumstances under which that occurred. The context of non-use of the restraint is important to assess related risks. For example, if a parent were playing directly with an infant in the sleeper while the infant was not restrained, that would not be surprising and would not create a risk of injury. In no instance did any parent raise a concern for safety.

Restraints are a common component of juvenile products, intended to keep an occupant safely secured within the product. For example, standards for products such as carriages and strollers (ASTM F833), infant swings (ASTM F2088), and infant bouncer seats (ASTM F2167) require restraints. All Fisher-Price

---

[1] See Mattel-COU0003033; Mattel-COU0003122 – Mattel-COU0003140
[2] See Mattel-COU000663 – Mattel-COU000674; Mattel-COU0000669 – Mattel-COU0000674; Mattel-COU0000675 – Mattel-COU0000980; Mattel-COU0002089 – Mattel-COU0002148

products with an incline have a restraint to keep a baby in place and prevent a baby from falling out (Pilarz 11/9/20 testimony, p. 66).

In the case of the Rock 'n Play Sleeper, the restraint was designed to keep the baby in position so as not to slouch downward into a position that could potentially affect breathing or fall out of the product. Although non-use of the restraint necessarily removes its protective function, that does not necessarily render the Rock 'n Play Sleeper unsafe. Other inherent design features offered complementary protection: raised sides and a head dam mitigated the potential for falling out of the product; the defined, narrow seat area created a natural area of containment; and the angled footrest minimized the ability to push off.

Based on inputs from all its sources during the development of the Rock 'n Play Sleeper, Fisher-Price appropriately: found a hammock design (which is not rigid) to be unacceptable due to the potential for suffocation; ensured there were no entrapment, strangulation or rebreathing hazards; added a design feature to ensure the baby could not come out of the product at the "head" end; utilized an obtuse angle to mitigate the risk of pushing off from the foot-rest; ensured that the product did not encourage a chin-to-chest position by incorporating a firm, flat backrest; and ensured supine positioning by design. Further, Fisher-Price designed the product to be narrower at the hip than shoulder, which in concert with the three-point restraint would keep the baby in position.

In deciding on product dimensions, Fisher-Price took into consideration infant anthropometry data[3] and developmental milestones, and for performance testing and labeling issues took into consideration ASTM and EN safety standards as well as internal Fisher-Price methods and guidelines.[4] Prior to production, models were tested for compliance with internal requirements and by third party for compliance with applicable industry and government standards.

The outside expert Fisher-Price consulted with was Dr. Gary Deegear, a medical consultant with pediatric and biomechanical training, who had a well-established relationship with Fisher-Price dating back to the late 1990s—nearly two decades before the development of the Rock 'n Play Sleeper. Dr. Deegear first became aware that Fisher-Price was developing a new product (later known as the Rock 'n Play Sleeper) in December, 2008 (MATTEL-COU-0000560). At that time, Ms. Pilarz sent Dr. Deegear a

---

[3] Mattel-COU0003143 – Mattel-COU0003152
[4] See Mattel-COU0012505 – Mattel-COU0012515; Mattel-COU0003153 – Mattel-COU0003187

"description" of the Rock 'n Play Sleeper to which Dr. Deegear replied, requesting information regarding product specifications, including "height, when fully extended upright," "assembled weight," and "length and width of the sling area and the rocker bottom" (MATTEL-COU-0003047). Ms. Chapman sent Ms. Pilarz a sketch that contained the dimensions of the Rock 'n Play Sleeper, which explicitly showed the reclining back angle as 32 degrees (MATTEL-COU-0000562 - MATTEL-COU-0000564). Ms. Pilarz then forwarded that sketch to Dr. Deegear (MATTEL-COU-0960471).[5]

A December 17, 2008 e-mail from Ms. Pilarz summarizes a telephone conversation she had with Dr. Deegear. Ms. Pilarz's email suggests that Dr. Deegear was aware of the product's intended use for sleep. She specifically notes "Regarding marketing claims, the doctor suggested we [m]ay advise that the product allows [a] child to sleep with his head elevated, when he needs to sleep in that way... We can say the product provides a comfortable sleep environment. Overall Dr. Deegear did not have issues with the product" (MATTEL-COU-0003038). There are multiple other e-mails, invoices, and even FedEx delivery notifications showing Dr. Deegear provided consultation and reviewed the Rock 'n Play Sleepers from 2009 until at least 2012—two years after the product was first introduced on the market. These documents are consistent with Ms. Pilarz's belief and understanding that Dr. Deegear was aware of and satisfied with the design of the Rock 'n Play Sleeper (including the approximate 30-degree angle) and its intended use (including unattended, overnight sleep).[6]

According to Ms. Pilarz's deposition testimony, Dr. Deegear consulted on a number of products that had babies at an incline—not just the Rock 'n Play Sleeper.[7] Ms. Pilarz was familiar with Dr. Deegear from their prior history of working on other products together; she had a good rapport with him; they had good communications and understood how to communicate with each other; if Dr. Deegear had concerns, he expressed them to her.[8] Ms. Pilarz testified that Dr. Deegear even evaluated the warnings and commented that he liked the developmental warning Fisher-Price intended to include on the Rock 'n Play Sleeper.[9] When asked whether she discussed with Dr. Deegear whether the Rock 'n Play Sleeper

---

[5] *See also* Pilarz Dep. (01/21/2021), 296-300.
[6] Pilarz Dep. (01/21/2021), 286-287, 321-322, 383.
[7] Pilarz Dep. (01/21/2021). 280.
[8] Pilarz Dep. (01/21/2021), 281-284.
[9] Pilarz Dep. (01/21/2021), 313.

was safe for overnight sleep, she testified "yes."[10] Dr. Deegear never told Ms. Pilarz that he had safety concerns about a 30-degree angle.[11]

Dr. Deegear was recently deposed in March, 2021. While he did not recall specifically consulting on behalf of Fisher-Price, and only "kind of" and "very vaguely" remembered consulting on the Rock 'n Play Sleeper, documents I reviewed, in addition to Ms. Pilarz's testimony, support the conclusion that Dr. Deegear was aware of the design of the Rock 'n Play Sleeper (including the approximate 30-degree angle) and its intended use (including unattended, overnight sleep).

Consistent with the American Academy of Pediatrics (AAP) guidelines recommending infants sleep on their backs on a firm surface, the Fisher-Price design included a rigid plastic back for the Rock 'n Play Sleeper that keeps the infant's head and torso on the same plane, in a reclined supine position. The AAP never uses the word horizontal to describe an appropriate surface; instead, the focus has always been on "firm." The 2011 recommendation was "Use a firm sleep surface: Soft materials or objects such as pillows, quilts, comforters, or sheepskins should not be placed under a sleeping infant."[12] The 2016 recommendation (the most recent) was "Infants should be placed on a firm sleep surface" and the rationale was "A firm surface maintains its shape and will not indent or conform to the shape of the infant's head when the infant is placed on the surface."[13]

Fisher-Price's focus on safety resulted in the Rock 'n Play Sleeper's offering these beneficial features: a fully open design allowing access to ambient air, eliminating rebreathing possibilities; a rigid back that fully supports the torso/head in the same, gentle approximate 30° plane, eliminating chin-to-chest positioning; a seat area that naturally positions the baby supine, with baby's bottom and center of gravity at a low point, making turning over or climbing out more difficult; a crotch restraint designed to keep a baby from slouching and to keep a baby in position on its back; a minimal range of head-to-toe rocking to preclude any sliding out of position; the absence of shoulder straps which eliminates any strangulation potential; and a raised design which precludes the product's being placed on an elevated

---

[10] Pilarz Dep. (01/21/2021), 322.
[11] Pilarz Dep. (01/21/2021), 287.
[12] Task Force on Sudden Infant Death Syndrome. SIDS and other sleep-related infant deaths: expansion of recommendations for a safe infant sleeping environment. DOI: 10.1542/peds.2011-2284
[13] Task Force on Sudden Infant Death Syndrome. SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment. DOI: 10.1542/peds.2016-2938

surface, thereby eliminating the fall hazard sometimes presented by products like bouncers or other infant carriers.

The corporate (Fisher-Price) attitude towards designing safe products is evidenced by the type of seminar given to employees.[14] The referenced pages reflect the implementation of a logical approach to product development and marketing, including identifying factors relevant to anticipated users, addressing hazards, conducting valid product safety/injury research, understanding the role of warnings, and recognizing the importance of regulations and standards.

When first produced in 2009, the Rock 'n Play Sleeper complied with the relevant bassinet standard ASTM F2194-07, which addressed the known hazards of suffocation, tip over, and collapse. The suffocation hazard was addressed through requirements for pad dimension and thickness. Tip over was addressed through product stability tests using a CAMI dummy. Collapse was addressed through the use of static loads. In addition, warning labels were required to address the fall hazard, the suffocation hazard associated with bedding, and the recommendation to place infants supine to reduce the risk of SIDS. The specific language for these statements was required, verbatim.

My review of Fisher-Price's internal documents, such as the Product Requirements Document for this particular model (Mattel_COU0040365-40402), demonstrate that there are various internal procedures that go above and beyond what is required in the ASTM standards.

In short, Fisher-Price acted responsibly to address all the known and foreseeable hazards associated with infant sleep.

**Product Safety: CPSC**

***CPSC: Authority, Structure, and Data Collection***

The CPSC is an independent federal regulatory agency, created by the Consumer Product Safety Act of 1972[15] (CPSA) to protect the public against unreasonable risks of injury associated with consumer products, to develop safety standards, and to promote research and investigation into the causes and prevention of consumer product-related deaths, illnesses, and injuries. The CPSC is headed by five Commissioners (although on occasion there are vacancies) appointed by the President of the United

---

[14] See Mattel-COU00076210, Mattel-COU00076214, Mattel-COU00076234, Mattel-COU00076247, Mattel-COU00076288-76290, Mattel-COU00076334-5, Mattel-COU00076359
[15] Public Law 92-573; 86 Stat. 1207. Oct. 27. 1972. (15 U.S.C.)

States. Among other authorities, CPSC has the authority to create mandatory safety regulations—so-called rulemaking—and to recall or ban products. By law (Section 5. [15 U.S.C. 2054]), the CPSC must collect, investigate, analyze and disseminate injury data associated with consumer products. To that end, it maintains NEISS, the National Electronic Injury Surveillance System, to track, on a daily basis, about 100 hospital emergency-departments nationwide for reports of injuries associated with consumer products. It also collects, online and via hotline, consumer complaints, medical examiners' reports, industry and government reports, states' death certificates, and other sources of reports of injuries associated with consumer products. CPSC's Office of Hazard Identification and Reduction routinely reviews all the collected injury, potential injury, and death data.

This information serves as a first alert. To fully understand the circumstances of a consumer product-related injury or death, the CPSC assigns follow-up investigations (In-Depth-Investigations (IDIs)). These detailed investigations are conducted by trained staff from the Office of Compliance and Field Operations. Investigators typically conduct an on-site visit (or phone interview) where the incident occurred, interviewing all persons with knowledge of the incident, photographing the scene, identifying and photographing the product involved, and photographing a reenactment of the incident, if possible. The investigators also obtain any police reports and photos, and in the case of a death, the medical examiner's autopsy report. When available, they collect product samples to send back to headquarters for study.  For deaths of infants under twelve months of age occurring suddenly and unexpectedly, investigators also obtain answers to a 49-question standardized death scene investigation report. That report is divided into five sections: description of the product/infant interaction pre-death and at death (e.g. position when last seen alive and position at death); description of the products (including manufacturer, how the product was obtained, and condition of product integrity); description of the infant (e.g. whether full term or premature, developmental skills, illnesses); maternal history (e.g. age); and environmental factors (e.g. smoking, heat).

All of the information gathered is documented in an "Epidemiologic Investigation Report" (the IDI), which is reviewed and signed off on by a Regional Office Director, and then sent to CPSC headquarters. The IDI is essentially the cornerstone that gives the CPSC technical staff the ability to understand how a product may or may not have contributed to an injury or death. The CPSC technical staff resides in various Directorates, including the Directorate for Engineering Sciences, Directorate for Health Sciences, Directorate for Epidemiology, and Directorate for Economic Analysis. Divisions exist within the Directorates. For example, under the Directorate for Engineering Sciences are the Human Factors and

8

Mechanical Engineering Divisions; under the Directorate for Health Sciences is the Division of Pharmacology and Physiology; under the Directorate for Epidemiology is the Division of Hazard Analysis. In addition, the CPSC maintains a testing laboratory where staff examine, test and evaluate products. The technical staff includes epidemiologists, human factors psychologists, statisticians, economists, engineers, and health scientists, including physiologists. Many on the technical staff hold PhDs and Master's Degrees in their specialties, giving the agency the expertise required to evaluate data and make science-based decisions regarding product safety. The various Divisions prepare memos to document their findings and understanding of a product's role in an incident. These documents, in turn, guide the CPSC to identify products or product categories that require regulatory intervention either because they violate an existing standard or because they pose a substantial risk of injury. When appropriate, these detailed memos from the various Divisions and Directorates are organized into a Briefing Package for the Commissioners, which summarizes the supporting data and outlines options for Commission action. The Commissioners rely on these reports to make agency decisions, including rulemaking.

### *CPSC: Mandatory Reporting Requirements*

In addition to the data collected via NEISS (which operates under contracts with hospitals) and consumer complaints (which are voluntarily submitted), the CPSC requires mandatory reporting by manufacturers through the mechanism of Section 15(b) of the CPSA [15 U.S.C. 2064] which states, "Every manufacturer of a consumer product distributed in commerce, and every distributor and retailer of such product, who obtains information which reasonably supports the conclusion that such product— (1) fails to comply with an applicable consumer product safety standard upon which the Commission has relied under section 9; (2) contains a defect which could create a substantial product hazard described in subsection (a)(2); or (3) creates an unreasonable risk of serious injury or death, shall immediately inform the Commission of such failure to comply, of such defect, or of such risk, unless such manufacturer, distributor, or retailer, has actual knowledge that the Commission has been adequately informed of such defect, failure to comply, or such risk." Section 15(a) defines "substantial product hazard" as "(1) a failure to comply with an applicable consumer product safety rule which creates a substantial risk of injury to the public, or (2) a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public."

Section 15(d) goes on to say that if the Commission determines that a product presents a substantial product hazard it may offer the manufacturer, distributor, or retailer to take "whichever of the following actions the person to whom the order is directed elects: (1) To bring such product into conformity with the requirements of the applicable consumer product safety rule or to repair the defect in such product. (2) To replace such product with a like or equivalent product which complies with the applicable consumer product safety rule or which does not contain the defect. (3) To refund the purchase price (less a reasonable allowance for use, if such product has been in the possession of a consumer for one year or more (A) at the time of public notice under subsection (c), or (B) at the time the consumer receives actual notice of the defect or noncompliance, whichever first occurs)."

Section 15(c) addresses public notice when required to adequately protect the public from a substantial product hazard. The Commission may order any one or more of three options: "(1) To give public notice of the defect or failure to comply. (2) To mail notice to each person who is a manufacturer, distributor, or retailer of such product. (3) To mail notice to every person to whom the person required to give notice knows such product was delivered or sold." "Any such order shall specify the form and content of any notice required to be given under such order."

Details for Section 15(b) reporting are outlined at 16CFR1115. Section 1115.4 offers examples of "defects" and notes that "In determining whether the risk of injury associated with a product is the type of risk which will render the product defective, the Commission and staff will consider, as appropriate: the utility of the product involved; the nature of the risk of injury which the product presents; the necessity for the product; the population exposed to the product and its risk of injury; the obviousness of such risk; the adequacy of warnings and instructions to mitigate such risk; the role of consumer misuse of the product and the foreseeability of such misuse; the Commission's own experience and expertise; the case law interpreting Federal and State public health and safety statutes; the case law in the area of products liability; and other factors relevant to the determination."

Section 1115.12 discusses which information should be reported and how to evaluate a substantial product hazard. "The obligation to report arises upon receipt of information from which one could reasonably conclude the existence of a reportable non-compliance, defect which could create a substantial product hazard, or unreasonable risk of injury or death." "A subject firm in its report to the Commission need not admit, or may specifically deny, that the information it submits reasonably supports the conclusion that its consumer product … contains a defect which could create a substantial

product hazard…" After receiving the report, the CPSC "may conduct further investigation and will preliminarily determine whether the product reported upon presents a substantial product hazard."

Section 1115.13 (c) outlines what is required in the initial report: an identification and description of the product; name and address of the manufacturer; nature and extent of the possible defect or risk; nature of the injury risk; and name and address of the person reporting. If CPSC preliminarily determines that there is no substantial product hazard, it may inform the company that no further reporting is necessary; otherwise, CPSC requires the filing of a full report per 1115.13 (d). A full report is more detailed, asking for, e.g., the retail price of the product, the number of units involved and where they are in the distribution chain, an explanation of the marketing, or other information as the Commission may request. Section 1115.14 (e) specifies the time frame within which reporting is required: "Immediately, that is, within 24 hours, after a subject firm has obtained information which reasonably supports the conclusion that its consumer product fails to comply with an applicable consumer product safety rule or voluntary consumer product safety standard, contains a defect which could create a substantial risk of injury to the public, or creates an unreasonable risk of serious injury or death…"

Section 1115.20 outlines the voluntary remedies the Commission can seek, which include corrective action plans and consent order agreements. A corrective action plan (CAP) is "a document, signed by a subject firm, which sets forth the remedial action which the firm will voluntarily undertake to protect the public, but which has no legally binding effect."  A CAP shall include: a statement of the nature of the alleged hazard associated with the product, including the nature of the alleged defect or noncompliance and the type(s) of potential injury presented; a detailed statement of the means to notify the public (e.g. letter, press release, advertising), including who will receive the notice, and a copy of the notice; the specific models affected; any necessary instructions regarding use or handling of the product pending correction; an explanation of the specific cause of the alleged substantial product hazard, if known; a statement of the corrective action to eliminate the alleged substantial product hazard; a statement of the steps that have been or will be taken to prevent re-occurrence of the alleged substantial product hazard; a statement of the action to correct products in the distribution chain, including a timetable and information about the number and location of those units; signatures of representatives of the firm; an acknowledgement by the firm that CPSC may monitor the CAP; and an agreement that CPSC can publicize the terms of the plan to the extent necessary to inform the public. Upon receipt of a proposed corrective action plan CPSC staff considers it and makes a recommendation: the CPSC may approve the plan, reject the plan and issue a complaint (which would be followed by an administrative and/or judicial

proceeding), or take other action. A plan becomes effective only upon final acceptance by the Commission. As part of the CAP the company may include a statement indicating that the plan does not constitute an admission by the company that either reportable information or a substantial product hazard exists.

A consent order agreement is a document "executed by a subject firm (Consenting Party) and a Commission staff representative which incorporates both a proposed complaint setting forth the staff's charges and a proposed order by which such charges are resolved."  Section 1115.29 (c) establishes that the Commission will make the final determination as to the form and content of a recall notice for the purposes of an order under section 15(c) or (d) [15 U.S.C. 2064]. CPSC must review and agree in writing to all aspects of a recall notice to be issued pursuant to an order under section 15(c) or (d) [15 U.S.C. 2064].

### CPSC: Rulemaking

If the Commissioners vote to initiate rulemaking, the staff follows a formal process described in Section 9 [15 U.S.C. 2058], Procedure for Consumer Product Safety Rules. To briefly summarize the process, first the CPSC must issue in the Federal Register an ANPR (Advance Notice of Proposed Rulemaking) which: identifies the product and the nature of the risk; summarizes regulatory alternatives under consideration, including voluntary standards; discusses why existing relevant standards, if any, are considered inadequate to address the stated hazard and eliminate or reduce associated injuries; invites public comment with respect to the risk of injury and regulatory alternatives; invites submission of existing standard(s) or portions thereof as a proposed standard; and invites statements of intent to modify or develop a voluntary standard to address the hazard, along with descriptions of a plan to modify or develop such standard. If in response to the ANPR, the CPSC determines that compliance with an existing/proposed standard is likely to eliminate or adequately reduce the risk of injury, and if it is likely that there will be substantial compliance with such standard, the CPSC must terminate any rulemaking and notify the public through a Federal Register Notice. The public will then have an opportunity to comment on that intent. On the other hand, if after the back-and-forth between the Commission and the public a final regulation is drafted, the full text of that too must be published in the Federal Register as an NPR (Notice of Proposed Rulemaking) with a similar comment period as given the ANPR. Usually, proposed regulations are issued within twelve months after the date of the ANPR. Prior to promulgating a new rule, the CPSC must conduct a regulatory analysis which describes the potential benefits and costs of the rule, addresses why alternatives were not chosen, and summarizes comments

raised during the comment period. The Commission also has the authority to amend or revoke a safety rule.

**Product Safety: ASTM**

*ASTM: Organization*

ASTM International is a non-profit, voluntary standards developing organization, founded in the late 1800s. Its membership is open and voluntary and includes individuals from various sectors, including producers, users, consumers, government, and academia. Producers are defined as individuals who represent an organization that produces or sells materials, products, systems or services covered by the scope of the committee; users are individuals who represent an organization that purchases or uses materials, products, systems or services, other than for household use, covered by the scope of the committee; consumers are individuals who primarily purchase or represent products and services for household use within the scope of the committee; and general interest members are individuals who do not fit into any of the other categories.

ASTM members belong to Committees in which they have an interest. Committees must have a balanced membership so that all sectors are represented according to ASTM by-laws. Producers cannot outnumber the user, consumer and general interest members of a subcommittee and producers can have only 50% or less of the vote. Main committees are subject-area specific, for example, consumer products, agriculture, energy & utilities, etc.; subcommittees focus on the development of specific standards within the broader subject areas of committees.

*ASTM: Standards Development*

Standards development work begins when a need for a standard is recognized. ASTM subcommittees are the basic units of standards development work. The executive subcommittee establishes subcommittees with specific purposes as described in their scope. The scope is generally balloted within the subcommittee and approved by the executive subcommittee. Subcommittees must have a chairman and should have a vice chairman and a secretary. Division of responsibility between the subcommittee officers is up to the individual subcommittee. The ASTM Technical Committee Officer Handbook (from which the information for these ASTM sections was taken) helps committee officers better understand their duties and responsibilities.

Standards' writing begins within a technical subcommittee, or task group, which prepares a draft standard. Discussions that occur at this level ensure that the standard will address all concerns, and

reflect the categories of members who do the work as including CPSC staff (e.g., Celestine Kish) and consumer advocates (e.g., Nancy Cowles) as well as industry representatives. The draft standard is reviewed and voted on by the parent subcommittee. After the subcommittee approves the document, it is voted on by the main committee.

The chairman has responsibilities in four broad areas: meetings, standards development, administration and membership. The chairman must either perform or see to it that certain duties are performed. Briefly, some meetings related duties include: preparing and posting an agenda; setting the meeting time and place; keeping attendance sheets; chairing the meeting; preparing minutes; and reporting meeting highlights back to the main committee. Standards development duties include: reviewing existing standards and requests for standards actions; submitting ballot items; presiding over subcommittee consideration of votes to ensure that the subcommittee properly considers all negative votes and comments cast on ballot items originating from the subcommittee, whether the vote is cast at subcommittee, main committee, or Society Review; and assuring that all standards are reviewed for revision, reapproval, or withdrawal at least every five years.  Some administration duties include reviewing the organization and scope of the subcommittee and monitoring assigned tasks, ballots and negative resolutions. As far as membership related duties, the Chairman reviews rosters and voting lists for balance.

This last responsibility of the Chairman—maintaining balance in voting members—is important because ASTM standards are consensus standards. This means that no one group monopolizes the process of developing standards. While it is not unusual for a committee or subcommittee chairperson to be a member of the industry affected by the standard, this by no means implies that such industries control or manipulate the outcome of standards development. Industry individuals often occupy chairmanships because typically they are the most knowledgeable about the products being discussed. For example, the chair of F15.10 on flammable liquid containers is affiliated with the gasoline can industry, and the chair of F15.22 on toys is a Vice President of the Toy Association. The F15.18 subcommittee on inclined sleep products was chaired for a period of time by Mike Steinwachs, a former engineer at Fisher-Price, which at the time was a major manufacturer of inclined sleepers. Many other manufacturers of infant sleep products are members of F15.18, as well as are consumers and general interest members, including CPSC staff.

Subcommittees may be further divided into task groups, which are small working groups responsible for a specific assignment. Task groups also have a chairman and are made up of members assigned by the subcommittee chair or volunteers who may or may not be ASTM members.  Subcommittee chairmen must monitor the progress of task groups through verbal or written reports and progress should be documented in the minutes.

Many layers of rigorous review and balloting ensure that the final published standards are as accurate and valid as possible. More than 12,000 ASTM standards operate globally. Standards are living documents. They are routinely reviewed and can be modified, re-approved, or withdrawn.

### *ASTM: Ballots*

Once a standard is developed (or revised) within a subcommittee, the balloting process begins. There are three levels of balloting: at the subcommittee, the main committee, and Society Review. The basic principles of all ASTM ballots are as follows: the ballot must contain a cover letter explaining the reason for the proposed action; all ballots are posted and voting is conducted on the ASTM website, ensuring that every member has an opportunity to vote; all ballots are issued for not less than 30 days, allowing members adequate time to critically review the balloted documents; voting options include affirmative, affirm with comment, negative with statement, abstain, and abstain with comment; negative votes and statements must be considered by the originating subcommittee; whenever a ballot leads to substantive changes in a document, the revised version must be re-balloted at all levels to ensure that the technical changes to a document are made on a consensus basis within the subcommittee.

Sixty percent of the official voting members must return ballots before the subcommittee ballot can close. Abstention votes are counted towards the requirement. An affirmative vote of at least two-thirds of the combined affirmative and negative votes cast by the official voting members on each ballot item is required for a successful ballot of that item. Abstentions do not count in the calculation. The ballot results, negatives, and comments are included in a closing report which all subcommittee members can access via the ASTM website once the ballot is closed.

Negative votes received on subcommittee ballots are considered and ruled on by the subcommittee that initiated the item. Negative votes can be withdrawn by the voter, or deemed not related, persuasive, or non-persuasive by the subcommittee. If substantive changes to a document are made in response to a persuasive negative vote, the item must be re-balloted. If all negative votes are withdrawn or ruled not related or not persuasive, the ballot item may go on to the next level—the main committee ballot. Items

that have passed subcommittee ballot without any negatives are automatically forwarded to main committee ballot. Negative votes from the subcommittee ballot that were ruled not persuasive or not related by the subcommittee must be included on the main committee ballot, where voting members can either agree or disagree with the subcommittee's decisions. That main committee ballot item must include the subcommittee's vote counts and rationale for determining not persuasive and not related negatives. Society members have an opportunity to participate in the balloting process during the main committee ballot. If a voter disagrees with the decision about his or her negative vote—not with the technical content, but with the review process—he or she can ask for a formal review to ensure that the process was handled correctly.

At least 60% of the official voting members must return ballots before a main committee ballot return is valid. Abstentions count in this calculation. Approval of each main committee ballot item requires an affirmative vote of at least 90% of the combined affirmative and negative votes cast by official voting members. Abstentions do not count in this calculation. The number of affirmative, negative, and abstaining votes on each ballot item is reported to the committee in the closing report.

Following a successful main committee ballot and Society Review, a ballot summary detailing returns and handling of negative votes is submitted to the Committee on Standards (COS) by the Standards Coordination Department. COS determines whether all procedural requirements were met. If COS approves the standards action, the document is published by ASTM.

**Interaction Between CPSC and Voluntary Standards Organizations**

By law, the Commission must rely on voluntary standards whenever compliance with such standards eliminates or adequately reduces the risk of injury addressed, and when it is likely that there will be substantial compliance with such standards.[16] The Commission must also, to the extent practicable, assist public and private organizations or groups of manufacturers, administratively and technically, in the development of product safety standards and test methods.[17] In fact, the Executive Director of the Commission appoints a Voluntary Standards Coordinator, currently Patricia L. Edwards from the Office of Hazard Identification and Reduction, to manage CPSC's involvement so that effective use is made of CPSC personnel and resources. The Voluntary Standards Coordinator is responsible for preparing semi-annual reports for the Commission that summarize staff voluntary standards activities, goals of each

---

[16] 15 U.S.C. 2056 Sec 7(b)1 (Consumer Product Safety Act)
[17] 15 U.S.C. 2054 Sec 5(a)(4)

voluntary standard under development, status of standards development and implementation, and recommendations for additional CPSC action, if warranted.

To that end, the CPSC has a long-standing relationship with ASTM, providing injury/fatality data and technical expertise to the development of ASTM standards. According to 16CFR1031.7, CPSC support of voluntary standards can include: providing epidemiological and health science information; identifying specific risks of injury; performing or subsidizing technical assistance, including research, data, and engineering support; evaluating adequacy of a standards to reduce injury risks identified by CPSC; monitoring the number and market share of products conforming to a voluntary standard; and hosting meetings.

It is not unusual for CPSC to initiate a request for a standard to be developed, based on injury epidemiology, and it is routine for CPSC to actively contribute to the development and revision of ASTM standards for consumer products. For example, in the case of the development of ASTM F3118, Standard Consumer Safety Specification for Inclined Sleep Products, Celestine Kish, Division of Human Factors, worked closely with subcommittee F15.18.

**Standards Relevant to the Rock 'n Play Sleeper**

At the time the original Rock 'n Play Sleeper was released in 2009, it was subject to ASTM F2194-07, Standard Consumer Safety Specification for Bassinets and Cradles, which defined a bassinet/cradle as follows: "small bed for infants supported by free standing legs, a wheeled base, a rocking base, or which can swing relative to a stationary base." The standard required a product and its instructions to warn about: the suffocation hazard associated with adding pillows, comforters, or padding; the fall hazard associated with infants who can push up on hands and knees; the strangulation hazard associated with strings and window cords; and the recommendation to place babies to sleep on their backs to reduce the risk of SIDS.  There was no limitation to the product incline in the ASTM F2194-07 standard.

When it became evident that inclined sleep products required a separate standard, ASTM Subcommittee F15.18, which is responsible for bassinets, among other products, began developing F3118 (Standard Consumer Safety Specification for Inclined Sleep Products) in 2011, and the CPSC, working with that subcommittee, intended to incorporate that standard as a mandatory regulation. Following the procedures for ASTM standards development and balloting described above, F3118 was first approved as F3118-15 on April 1, 2015 and published in May 2015. The scope (Section 1.3) of

17

F3118-15 included products with "an inclined sleep surface primarily intended and marketed to provide sleeping accommodations for an infant up to 5 months old or when the infant begins to roll over or pull up on sides, whichever comes first." The standard defined an infant inclined sleep product as "a freestanding product, intended to provide a [sic] sleeping accommodations for an infant up to approximately 5 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal."

The Rock 'n Play Sleeper at issue was manufactured during the timeframe that it was no longer covered under the bassinet standard (F2194-12) and before F3118 was published. In ASTM F2194-12, the definition of bassinet/cradle was clarified in Section 3.1.1.1: "While in a rest (non-rocking or swinging) position, a bassinet/cradle is intended to have a horizontal sleep surface." This change is what caused the Rock 'n Play Sleeper to no longer be covered by the standard.  That does not mean the product suddenly was required to be manufactured differently or was unsafe when manufactured. Nor did this change impact previously sold Rock 'n Play Sleepers. Fisher-Price could still test to all the relevant sections of the standard and could still sell the product; it just could not "either by label or other means, indicate compliance" with F2194-12 (Section 1.4 of the bassinet standard). Further, the hazards identified in F3118 (falls, positional asphyxiation, and obstruction of the nose and mouth by bedding) had already been addressed in the Rock 'n Play Sleeper.

**Incident Details**

In the early morning hours of June 19, 2014, Zoey and her mother (Kathleen Courkamp) and father (Andrew Olson) arrived at her father's home in Tempe, AZ. Zoey and her father had driven to pick up her mother from work. Zoey was asleep in her car seat during the ride, and when they arrived home about 1:00 or 1:30 a.m., her father took her from the vehicle and into the home. Zoey woke up briefly and her father placed her supine in her Rock 'n Play Sleeper (Model BHL58), located next to her parents' bed, and she went right back to sleep. Mother and father went to bed shortly thereafter. At approximately 8 a.m. Kathleen woke to discover Zoey was cold to the touch and not breathing. (Although in her deposition Ms. Courkamp testified that she had woken up around 6 a.m. to check on Zoey and found her alive, all other summaries of the event note the wake-up time to be approximately 8 a.m.) Andrew picked Zoey up, called 911, and started CPR. Police and emergency services arrived. Zoey was pronounced dead at approximately 8:06 a.m.

There were conflicting reports of the position in which Zoey was found. According to the Tempe Police Department Report (ZO-TempePD-000036), when Kathleen Courkamp woke at approximately 8 a.m. she checked on Zoey and she was still on her back. In the same report (ZO-TempePD-000039), Andrew Olson stated that Kathleen noticed that Zoey was face down. The Fire Department Report stated the parents found the baby prone (ZO-TempeFD-000001). In the Infant Death Investigation Checklist, which was part of the police report, it was noted that the infant was found on her side (ZO-TempePD-000083).

A reenactment was performed on site the same day as the event, utilizing the second (non-incident) Rock 'n Play Sleeper available in the home. According to the Tempe Police Report (ZO-TempePD-000011) the father, demonstrating the "placed" position, put the substitute doll in the Rock 'n Play Sleeper face up, buckled with the single strap fastening device attached to the Rock 'n Play Sleeper as part of product; demonstrating the "found" position, the mother placed the substitute doll, still buckled, on its left side with the face and abdomen towards the bottom of the Rock 'n Play Sleeper. This description of the reenactment does not match other narrative or the reenactment photos. According to Mr. Olson's deposition testimony (p. 161) he did not recall whether he buckled Zoey in or not when he put her to sleep, but according to his recorded interview with Detective Akey on June 19, 2014 (Exhibit 3 to A. Olson deposition; p. 11), Zoey was unbuckled in the morning when found. According to Ms. Courkamp's deposition testimony (p. 154) Zoey was not strong enough and did not know how to unbuckle the restraint herself. Ms. Courkamp also testified that she had no specific recollection of Mr. Olson buckling Zoey into the Rock 'n Play Sleeper (p. 148). Both parents knew of and understood the restraint warning, and Ms. Courkamp specifically testified using the restraint was an "absolute warning" (pg. 102).

Further, the Rock 'n Play Sleeper restraint is a three-point, crotch restraint, not a "single strap fastening device." Photos of the reenactment show the substitute doll not restrained both when placed (ZO-TempePD-000145) and found (ZO-TempePD-000152). The position in which Zoey was found was shown as unrestrained, semi-prone, semi-lateral-left, with her nose and mouth unobstructed (ZO-TempePD-000156).

The Maricopa County Office of the Medical Examiner's report described the incident reenactment as follows (ZO-MCOME-000020). Mr. Olson placed the substitute doll in the second Rock 'n Play Sleeper supine. The mother then placed the doll in a semi-left lateral semi-prone position. She stated that the infant's mouth was not obstructed. Mr. Olson believed Zoey had undone the restraint during the night.

However, Ms. Courkamp testified that Zoey was not strong enough to unbuckle the restraint (Kathleen Courkamp 10/21/2020 testimony p. 154).

Based on the reenactment photographs, the recorded detective's interview, and sworn testimony, I believe Zoey was placed unrestrained, just as she was found. Exhibit 16, Courkamp (COU007089), is a photo that shows Zoey at some earlier date, asleep in the incident Rock 'n Play Sleeper, unrestrained and in a similar lateral position to that in which she was found at incident.

Consistent with Ms. Courkamp's description of unobstructed breathing, the Infant Death Investigation Checklist's section on "suffocation/asphyxia" was left blank (ZO-TempePD-000083). The Medical Examiner's Report noted cause of death unknown, manner of death undetermined.

In 2019, the incident was reported to CPSC (ZO-MCOME-000010). The CPSC conducted an in-depth investigation (IDI) of the incident (190502CBB3348; Mattel-COU0012399-12409). The IDI stated the investigation was initiated from a manufacturer reported incident to the Commission. The report was brief and essentially relied on the Medical Examiner's Report.

**Fisher-Price Knew of Only One Fatality Before Zoey's Death**

It is important to consider the event at issue in the context of what was known to Fisher-Price and CPSC as of 2013, when the subject Rock 'n Play Sleeper was manufactured and sold.  As of an October 12, 2015 email (Mattel-COU0048954), Fisher-Price knew of only one fatality reportedly associated with the Rock 'n Play Sleeper that occurred before June 19, 2014. The report was received December 7, 2012. The event involved a 15-week-old whose death was ruled SIDS.[18] The death was investigated by the CPSC in 2013 (IDI# 130103CCC1391). The CPSC investigation noted the infant was three months old, had been swaddled, with an additional blanket present. The infant was not restrained and had been laid down on his side. The description illustrates a completely different scenario from the Courkamp incident.

According to this same October 12, 2015 email, Fisher-Price knew of two potential suffocations that occurred prior to Zoey's death in June 2014. From the information available, no infant was in the position that Zoey Olson was allegedly found.

---

[18] According to this same e-mail, Fisher-Price learned of another alleged fatality that was reported in June 9, 2013, but it was later confirmed that this incident did not involve a Rock 'n Play Sleeper.

None of these events was deemed directly correlated with the product's attributes (Deposition Testimony of Joel Taft, p. 202). Indeed, the December, 2012 reported incident confirmed that the product was misused—the infant was not restrained and was laid down on his side with an additional blanket. The clear and unambiguous warnings and instructions explain that the restraint is to "ALWAYS" be used, that infants should be "placed on their backs to sleep" and to not add extra bedding because soft bedding can pose a suffocation hazard.

Dr. Vredenburgh's opinion that Fisher-Price "was aware of at least 66 incidents with the sleeper prior to Zoey's death" is not supported by any data; she offers this opinion without providing any support for it. She provides no assessment or analysis of whether any of these incidents are substantially similar to Zoey's and thus relevant to this case. In citing Mr. Taft's testimony where he discusses incidents reported to Fisher-Price in 2014 of babies falling out of the Rock 'n Play Sleeper, she ignores entirely Mr. Taft's testimony that their investigation did not reveal an association between the incidents and the design of the Rock 'n Play Sleeper and none involved a fatality or serious injury.[19]

***The CPSC's Annual Reports Further Confirmed No Fatalities Allegedly Associated with the Rock 'n Play Sleeper***

The CPSC is also a source for what was known (and therefore foreseeable) to Fisher-Price as of June 19, 2014.  The CPSC publishes an annual report, Injuries and Deaths Associated with Nursery Products among Children Younger than Age Five, which covers incidents identified through CPSC's databases. In these reports, the CPSC does not identify products by brand or manufacturer, and includes this or similar language: "The hazard patterns described indicate that although a nursery product was involved, many of the fatalities were not caused by failures of the product." Prior to 2018, fatalities associated with inclined sleep products were reported under the product category "Other." As of the December 2013 report, which covered fatalities reported during 2008-2010, the CPSC knew of two deaths that involved an inclined sleep product that was being used inside a crib. There were no fatalities involving the Rock 'n Play Sleeper or any similar products. As of the CPSC's December 2014 report, which covered fatalities reported during 2009-2011, the CPSC knew of three deaths that involved an inclined sleep product which was being used inside a crib. There were no fatalities involving the Rock 'n Play Sleeper or any similar inclined sleeper. As of the December 2015 report, which covered fatalities reported during 2010-2012, the CPSC knew of seven deaths that involved an inclined sleeper, "most of them a foam

---

[19] Taft Dep. (11.12.2020), 274-275.

sleep product which was being used inside a crib." There were no fatalities involving the Rock 'n Play Sleeper or any similar products. The first appearance of an inclined rocking sleeper-related fatality was in the December 2016 report, which covered fatalities reported during 2011-2013, the CPSC knew of five deaths that involved "an inclined sleeper, such as a foam sleep product or a rocking sleeper." The CPSC's December 2017 report, which covered fatalities reported during 2012-2014 reported six deaths in an inclined sleeper, noting they were associated with products "such as a foam sleep product or a rocking sleeper." In the CPSC's December 2018 report, the product category "Inclined Sleep Products" was used for the first time, and it included products that had "one or more inclined sleep surface adjustment positions for the seat back that are greater than 10 degrees but do not exceed 30 degrees." The specific examples provided of such products were "infant hammocks, recliner seats, and nappers, among others." These products had formerly been reported in the product category "Other." This 2018 report covered inclined sleeper fatalities reported in the overlapping time frames 2012-2014 (n=6) and 2013-2015 (n=7) and did not describe the fatality pattern(s). Thus, from the time Fisher-Price manufactured the Rock 'n Play Sleeper at issue through December 2018, the CPSC knew of only a few inclined sleeper-related fatalities, and there was not an identified fatality pattern(s). Therefore, Dr. Vredenburgh's opinion that Fisher-Price failed to warn of the "high risk of the suffocation hazard" is completely without factual basis. (The 2018 report included a total of 296 fatalities for the period 2013-2015, the majority (73%) of which involved cribs (n=103), bassinets/cradles (n=60), and playpens (n=52)).

Note that it took until 2018 for the CPSC to recognize inclined sleepers as a distinct product category for this annual publication—nine years after the introduction of the Rock 'n Play Sleeper to the marketplace, and three years after the promulgation of the ASTM inclined sleeper safety standard. Bear in mind that Fisher-Price reported all the fatalities to the CPSC that had been reported directly to the company. In addition, and beyond any reporting requirement, Fisher-Price developed a protocol to provide CPSC with weekly reports that included information about serious injuries and patterns of similar consumer complaints (Pilarz 1/21/21 deposition, pp. 48-9, 193). It is reasonable, therefore, that these deaths that did not raise a concern for the CPSC also did not raise a concern for Fisher-Price and never gave Fisher-Price any indication that there was an issue with the manufacture or design of the Rock 'n Play Sleeper.

**Discussion**

***Rock 'n Play Sleeper's Intended Users***

The product at issue is a Fisher-Price Rock 'n Play Sleeper, Model BHL58, given as a gift to Ms. Courkamp and her then boyfriend, Andrew Olson, by Mr. Olson's mother some time in 2013. Based on photos, it appears that Zoey used a Rock 'n Play Sleeper from an early age (COU_007134, COU_007139).

Intended users of the product are infants who are not yet able to push up, pull up or sit up unassisted. The on-product warnings (see COU_005582) include these statements, among others: "[alert symbol] WARNING Failure to follow these warnings and the instructions could result in serious injury or death." "FALL HAZARD—to prevent falls DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs. (11.3kg), whichever comes first." "Always provide the supervision necessary for the continued safety of your child."

From her medical records, at age 4 months, Zoey was beginning to roll front to back (ZO-ClearPFH-000034); and at age 6 months she could roll over (ZO-ClearPFH-000033). Photos show that before the incident, Zoey could push up (COU_007173, _007182, _007217, _007244), sit up unassisted (COU_007092, _007281, _007286, _007295) and stand, holding on (COU_007095).

At incident, when she was 8 ½ months old, Zoey clearly had reached and exceeded all the developmental milestones noted on the Rock 'n Play Sleeper warning label as milestones at which the product was no longer appropriate and should not be used. At incident, Zoey was definitely not an intended user. Dr. Singhose tries to argue that Zoey was an intended user based on the 25lb weight limit for the product, but he fails to acknowledge the phrase, "whichever comes first," meaning an infant could exceed the developmental milestones warned about on the product *before* she reached 25 lbs— as was the case with Zoey.

***The Role of the Rock 'n Play Sleeper's Warnings and Instructions***

The on-product warnings of the Rock 'n Play Sleeper at issue (COU_005582) include these statements, among others: "[alert symbol] WARNING Failure to follow these warnings and the instructions could result in serious injury or death." "ALWAYS use the restraint system." "ALWAYS use the pad provided, which includes the restraint." "NEVER add a mattress, pillow, comforter, or padding." "SUFFOCATION HAZARD—infants can suffocate: in gaps between an extra pad and the side of the product—on soft bedding." "FALL HAZARD—to prevent falls DO NOT use this product when the infant begins to push up

on hands and knees, can pull up or sit unassisted or has reached 25 lbs. (11.3kg), whichever comes first." "Always provide the supervision necessary for the continued safety of your child."

The intent of warnings is to inform about how to avoid potential hazards associated with a product that could not be removed through design. They also address consumer behaviors that introduce hazards not inherent in the product. By default, warnings require the consumer to take the recommended actions in order to avoid injury or fatality. The on-product Rock 'n Play Sleeper label warns about a fall hazard if the restraint is not used and provides the consumer guidance as to the developmental stage (push up on hands and knees, pull up, or sit unassisted) or weight at which the product can no longer be used safely. In regard to the motor milestones and weight, the warning label specifically says "whichever comes first." Dr. Vredenburgh stated that Fisher-Price should have included in its warning a reference to rollover risk. I disagree. By using the milestone "pushing up on hands and knees," Fisher-Price's warning subsumes the milestone of rolling, which is developmentally more advanced. Generally, pushing up on hands and knees occurs developmentally *before* rolling prone to supine, which occurs developmentally *before* rolling supine to prone. It is an appropriate and conservative milestone that indicates increasing infant mobility and signals the time to stop using the product. Therefore, when the Rock 'n Play Sleeper warning label is complied with regarding when to stop using the product, it protects infants not only from falling out but also from any rollover scenarios.  Thus, even though rollover was not specifically referenced, the warning label actually accounted for it. Dr. Vredenburgh also states that the warning should have included a specific "age of use" limitation on the warning. As Ms. Pilarz testified, however, it is Fisher-Price's standard procedure to include "developmental level" for juvenile products.[20] This approach is reasonable because children of the same age often have reached very different developmental milestones. The warning was appropriate.

Additionally, the CPSC annual report, Injuries and Deaths Associated with Nursery Products among Children Younger than Age Five, includes fatality data associated with bouncers, infant carriers and car seats, strollers/carriages, and swings, all products that position infants reclined supine. In reviewing the reports for the years 2010 through 2014, which included fatalities reported during 2005-2011, I found no rollover deaths were reported in any of those categories. Most deaths occurred in infant carriers and car seats, where the major patterns of death included strangulation from entanglement in restraint straps, product tip-over on a soft surface, and unrestrained unsupervised infants in a compromising

---

[20] Kitty Pilarz Dep. (11/09/2020), 37:18-38:19.

position. Note the "compromising position" was not further described. It was not until the 2018 report that eight deaths associated with bouncers were described; they included rolling to prone, tipping over on a non-rigid surface, and falls from the product. The frequency distribution of the fatality patterns was not noted.

Further, both Mr. Olson (p. 129-130; 149-150; 192-193) and Ms. Courkamp (p. 99-102) acknowledged that they understood the Rock 'n Play Sleeper warnings. Mr. Olson testified (p. 129-130) that he absolutely believed it was important to familiarize himself with warnings for every product; Ms. Courkamp testified (p. 101-102) the warning was a standard warning, similar to what she had seen on other infant products. She also understood the warning about using the restraint to be an "absolute warning" (p. 102). Yet, she testified at deposition that she could not recall whether Mr. Olson buckled Zoey into the Rock 'n Play Sleeper. Similarly, Mr. Olson testified that he could not recall whether he buckled Zoey into the Rock 'n Play Sleeper. Additionally, and contrary to the warnings, Zoey is shown in her Rock 'n Play Sleeper at various times unrestrained (COU_7089, 7134, 7139), swaddled (COU_7139), which prevents use of the restraint, and with bedding added (COU_7132).

The instructions accompanying the Rock 'n Play Sleeper repeat the on-product warning language (Mattel-COU_0001788) and show clearly how to position the infant and how to secure the restraint (Mattel-COU_0001790).

Despite Dr. Vredenburgh's opinions, the on-product warnings were also conspicuous. On-product warnings are considered conspicuous[21] if they are visible "when the unit is in a manufacturer's recommended use position, to a person standing near the unit at any one position around the infant inclined sleep products but not necessarily visible from all positions." This definition of conspicuous has been used in ASTM standards for years. There is no guarantee that a warning label located on the "reverse" side, as Dr. Vredenburgh suggests, will be any more complied with. Consider the ASTM F2167-15 fall hazard warning label for bouncers, which was required to be located on the front surface and not be obscured by the occupant. The warning informs of the potential for skull fractures and warns to use the product only on the floor, to secure the restraint snugly, and not to lift or carry the bouncer with baby in it. Bouncer related injuries reported through NEISS for 2013 (before the label location requirement) and 2018 (three years after the requirement) were reviewed. The major patterns of injury were the same in both time frames: falls from a height (e.g., a countertop) and falling out of the product

---

[21] ASTM Standard F3118-16, section 3.1.3

on ground level. These patterns of injury accounted for 70% of bouncer related injuries in 2013 and 66% of injuries in 2018. The estimated number of injuries in each time frame was also the same, approximately 2,400. Thus, it appears that the change in warning label location did not affect consumer behavior. Moreover, based on the parents' own testimony in this case, there is no indication that they would have changed their behavior had the warning been placed in a different location on the Rock 'n Play Sleeper or contained different or additional language.

Ms. Courkamp and Mr. Olson misused the Rock 'n Play Sleeper by using it in a manner contrary to the warnings and instructions, and their failure to follow the warnings and instructions led to their placing Zoey, an 8 ½ month old unintended user, unrestrained in the product for overnight sleep. Zoey's motor skill level far exceeded all the developmental milestones noted on the warning label. She was too developed to use the product safely. Such unreasonable misuse was not foreseeable to Fisher-Price and was the underlying cause of the alleged event.

***Comparing the Rock 'n Play Sleeper to Other Inclined Products***

Myriad inclined products manufactured not only by Fisher-Price, but also by several other manufacturers, have been marketed for years—and infants have fallen asleep over and over again in them. Such products include strollers, bouncers, day sleepers/loungers, swings, infant carriers, infant rockers and so on. Such products are covered under various voluntary and mandatory standards. Were there an inherent hazard associated with the angle of incline per se it would have been evidenced in the injury data long ago. None of these products has been declared defective or recalled based on their angles of incline. Further, it is erroneous to conclude that the Rock 'n Play Sleeper presents the same hazards as those associated with the types of inclined products the AAP guidelines address:

-Strollers can pose an entrapment/strangulation/hanging hazard when children slip into leg openings and become trapped by the head. *The Rock 'n Play Sleeper has no entrapment areas.*

-Swings can pose an entrapment/strangulation hazard when children become lodged between supports and the swing seat. *This scenario is not possible with the Rock 'n Play Sleeper.*

-Infant carriers can pose hazards similar to those associated with car seats. *The Rock 'n Play Sleeper: is stable; possesses no shoulder restraints or other loops; and would not be expected to be placed on an elevated or soft surface.*

26

-Infant slings can pose a suffocation hazard due to re-breathing, and a positional asphyxia hazard due to a risk of a chin-to-chest position created by an unsupported neck/torso. *The Rock 'n Play Sleeper has an open design that allows free movement of ambient air and a hard plastic insert that fully supports the neck/torso in the same plane.*

These products are appropriately not recommended as unsupervised sleep environments and the relevant hazards associated with these products are not presented by the Rock 'n Play Sleeper.

In addition, products that are not inherently hazardous can become hazardous when used inappropriately or outside their intended environment. For example, failure to use a restraint or to inappropriately secure a restraint can turn strollers and car seats into hazardous products. The majority of incidents associated with car seats typically happen when the car seat is taken into the home, the restraint loosened or not used, and placed on the floor, a bed, or an elevated surface. In this kind of environment, the seat is no longer locked in its angled position or stable as it is when inside a vehicle, nor is the child adequately secured. The major patterns of injury are falling from the car seat; the seat falling from an elevated surface, and the seat overturning on a soft surface.[22,23]  The Rock 'n Play Sleeper does not present these hazards because: it is stable; it would not be expected to be placed on an elevated surface or on top of a bed or other soft surface; and it maintains the infant restrained in a position (buttocks low and legs at an upward angle) that minimizes the likelihood that an infant could attempt to climb out and fall. In addition, it possesses no shoulder restraints or other loops that would present a strangulation hazard.

Although decreased oxygen levels,[24,25,26] positional asphyxia, and unexplained deaths[27] have been reported with car seats, in many cases, the more vulnerable infants are premature or less than one month old (Willett et al and Cote et al); in other cases, an additional factor of the infant's position is

---

[22] Pollack-Nelson C. Fall and suffocation injuries associated with in-home use of car seats and baby carriers. Pediatr Emerg Care 2000 Apr; 16(2):77-9

[23] Parikh SN and Wilson L. Hazardous use of car seats outside the car in the United States, 2003-2007. Pediatrics 2010; 126(2):352-57

[24] Bass JL and Bull M. Oxygen desaturation in healthy term infants in car safety seats. Pediatrics 2002; 110(2):401-402

[25] Merchant JR, Worwa C, Porter S, Coleman JM et al. Respiratory instability of term and near-term healthy newborn infants in car safety seats. Pediatrics 2001; 108(3):647-52

[26] Willett LD, Leuschen MP, Nelson RS, Nelson RM. Risk of hypoventilation in premature infants in car seats. J Pediatr 1986; 109(2):245-48

[27] Cote A, Bairam A, Deschenes M et al. Sudden infant deaths in sitting devices. Arch Dis Child 2008; 93:384-9

noted (Bass et al and Merchant et al). Bull and Stroup[28] illustrate how different designs of car seats can present positional/slouching problems. The problems are related to how the shoulder and crotch restraints support the baby. They found that short (5.5 inches or less) seat back to crotch restraint distances fit small infants well and provided relatively good support. Note that the seat back to crotch distance in the Rock 'n Play Sleeper (measured perpendicularly from the junction of the seatback and seat to the seam of attachment of the crotch strap) is approximately 2 inches. Thus, when properly secured the crotch restraint offers an effective means to keep even small infants in position without slouching.

### The Product's Angle of Incline

In a study of inclined sleepers, including the Rock 'n Play Sleeper, conducted under contract with the CPSC (the "Mannen study"), it has been alleged that a 30° angle of incline per se is hazardous[29] because "infants could not maintain a lying posture at the 30-degree crib mattress incline and began to slide off the mattress." This rationale simply does not apply to the Rock 'n Play Sleeper, which prevents sliding by incorporating a defined seating area. Further, the published literature does not condemn a 30° degree angle, and Dr. Mannen does not cite any published literature to support the position that a 30° degree angle is not safe. While flexion of the neck has been demonstrated to have an adverse effect on breathing,[30,31,32, 33,34,35] tilting of the body has not. In fact, studies by Thorensen et al[36] and Dellagrammaticas et al[37] demonstrate that a tilt from the horizontal actually improves oxygenation in infants. Thorensen's study measured $PO_2$ (which reflects the amount of dissolved oxygen in the blood) at horizontal (0°) and 30°, demonstrating that $PO_2$ increased with head up tilting; Dellagrammaticas'

[28] Bull MJ and Stroup KB. Premature infants in car seats. Pediatrics 1985; 75(2):336-39
[29] Mannen EM et al. Biomechanical analysis of inclined sleep products – Final Report 09.18.2019
[30] Reiterer F, Abbasi S, Bhutani VK. Influence of head-neck posture on airflow and pulmonary mechanics in preterm infants. Pediatric Pulmonology 1994; 17:149-54
[31] Carlo WA, Beoglos A, Siner ES et al. Neck and body position effects on pulmonary mechanism in infants. Pediatrics 1989; 84(4):670-4
[32] Merchant JR, Worwa C, Porter S, Coleman JM et al. Respiratory instability of term and near-term healthy newborn infants in car safety seats. Pediatrics 2001; 108(3):647-52
[33] Willett LD, Leuschen MP, Nelson RS, Nelson RM. Risk of hypoventilation in premature infants in car seats. J Pediatr 1986; 109(2):245-48
[34] Cote A, Bairam A, Deschenes M et al. Sudden infant deaths in sitting devices. Arch Dis Child 2008; 93:384-9
[35] Tonkin, SL, Gunn TR, Bennet L, et al. A review of the anatomy of the upper airway in early infancy and its possible relevance to SIDS. Early Human Development 2002;66:107-121
[36] Thorensen M, Cowan F, Whitelaw A. Effect of tilting on oxygenation in newborn infants. Arch Dis Child 1988; 63:315-7
[37] Dellagrammaticas HD, Kapetanakis J, Papadimitriou M, Kourakis G. Effect of body tilting on physiological functions in stable very low birth weight neonates. Arch Dis Child 1991; 66:429-32

study measured oxygenation at 0°, 10°, 20°, 30°, and 45° and demonstrated that oxygenation improved as the angle of tilt increased from 0° to 45°. Even the Mannen study found that in the supine position, the intended use position of the Rock 'n Play Sleeper, there was no problem with oxygen desaturation in any of the tested products. Drs. Fox and Shaffer also report no decrease in oxygen saturation among infants in the Rock 'n Play Sleeper (Mattel_COU0020130-131).

In her report, Dr. Vredenburgh references a study done in the mid-90s using live infants in frame-suspended rocking cradles to imply a risk associated with the incline of the Rock 'n Play Sleeper. It appears she is referencing the study by Beal et al[38] which describes a completely different tilt. The implication of similarity with the Rock 'n Play Sleeper is completely erroneous; the Rock 'n Play Sleeper inclines in a different plane and shares no design features with the rocking cradle used in the study.

The Mannen study documented falls in oxygen saturation in infants placed in the prone position. While the study findings emphasized (as did Dr. Singhose and Dr. Goodstein in their reports) that babies were "more than twice as likely to experience $SpO_2$ readings of <95% while lying prone in an inclined sleep product compared to prone on a crib mattress," the findings noted that in cases of lower oxygen saturation the baby's face appeared to be in contact with the surface of the product. This is clearly a suffocation by obstruction of the nose/mouth position and not a reflection of the effect of the incline. Further, the findings could just as easily have been reported as 90% of infants experienced no lowered oxygenation saturation while prone in a 0° crib compared with 80% of infants in a Rock 'n Play Sleeper. The difference is not so striking when stated in this manner.

For babies who sleep better on an incline, the Rock 'n Play Sleeper offers a safer alternative to positioning devices intended to be placed under a crib mattress because they can shift and pose asphyxiation hazards.[39]  Further support for the safety of inclined sleep surfaces lies in the fact that ASTM F 3118, the standard for inclined sleep products, was published in 2015. The existence of this standard, which does not warn against prolonged or overnight sleep, supports the fact that inclined products can be designed as safe sleep environments and are not inherently dangerous due to the incline.

---

[38] Beal SM, Moore L, Collett M et al. The danger of freely rocking cradles. J Paediatr Child Health 1995;31:38-40
[39] Centers for Disease Control and Prevention. Suffocation deaths associated with the use of infant sleep positioners—United States, 1997-2011. MMWR November, 2012; 61(46):933-937

Despite the claims by Dr. Goodstein and Dr. Singhose that the Mannen study demonstrated that infants "could" more easily roll from supine to prone in an inclined sleeper, the study used the term "may." In fact, both the study and the published article[40] based on the Mannen study concluded "it is not fully understood how infants achieve a roll from supine to prone…" Note that infants studied in the prone position in the Mannen study were placed prone; they did not roll over on their own. No independent infant rollovers occurred during the study. The study neither documented rollover nor explained the biomechanics of rollover in any inclined sleeper.

The study reported that with the infant in the prone position, only products with a rigid plastic surface showed no difference in the number of times babies lifted the trunk/neck compared with the prone position on a $0^o$ crib. Those "rigid" products included the Rock 'n Play Sleepers. Also, there was reduced trunk range of motion in the Rock 'n Play Sleepers compared with the $0^o$ crib: "…something about the design of inclined sleep products is preventing trunk motion during supine lying in a way that an inclined crib mattress surface does not." This suggests that rolling over in the Rock 'n Play Sleeper would actually be more difficult than rolling over in a crib. In addition, the space required to rollover, as measured during the study (Section 4.4.3 Space Required to Roll), was greater than any space in any of the sleepers they studied, including Rock 'n Play Sleepers. Thus, in theory, the design of the Rock 'n Play Sleeper prohibited rollover. When this is considered, it further supports that the product was designed safely and indeed was safe when used as instructed.

Dr. Singhose misrepresents the Mannen study's findings when applying them to the Rock 'n Play Sleeper. On page 39 of his report he quotes the Mannen study's findings about rolling on a "non-rigid" surface, but the Rock 'n Play Sleeper is rigid. While Dr. Singhose's study proposes an explanation of rollover, he is silent as to whether the infants shown in the photos in his figures 23, 24, 33 or 38 were placed in those positions, encouraged to move to those positions, or were actually observed to have rolled to those positions. He notes (p. 29) that he used a doll as a representative infant in his stop-action video to illustrate rollover but does not report video recording of live infants' rolling behavior.

---

[40] Wang J et al. Do inclined sleeping surfaces impact infants' muscle activity and movement? A safe sleep product design perspective. J Biomechanics 111 (2020); 109999

*AAP Safe Sleep Guidelines*[41]

Sleep positions include supine, prone, and on a side. The AAP recommends an infant be placed in the supine (wholly on the back) position until age one year. Once an infant can roll on its own from supine (on the back) to prone (on the stomach), and from prone to supine, the infant can be allowed to remain in the sleep position that he or she assumes.  Side sleeping is not safe and is not recommended. Elevating the head of an infant in a crib, for example by the use of wedges, while the infant is supine is not recommended because it could result in the infant's sliding to the foot of the crib into a position that might compromise respiration.  The Rock 'n Play Sleeper does not elevate the head while the occupant is in a reclined supine position. The defined seating area precludes slipping, and thus does not present the same hazard that a crib with a wedge or sleep positioner would.

As far as a firm sleep surface is concerned, AAP recommends a "crib, bassinet, or portable crib/play yard that conforms to the safety standards of CPSC or ASTM …"  (2011 AAP Policy Recommendation 2a). The Rock 'n Play Sleeper has a firm sleep surface and did conform to the ASTM Standard F2194-07 for bassinets when first released and later to F2194-10. Thus, at the time the 2011 AAP policy was issued, the Rock 'n Play Sleeper was considered a recommended sleep environment by AAP's own guidelines. Dr. Vredenburgh's, Dr. Goodstein's, and Dr. Christensen's opinions that the Rock 'n Play Sleeper is neither "firm or flat"—and thus violates AAP guidelines—are incorrect and a misreading of the AAP guidelines. As explained above, the Rock 'n Play Sleeper has a hard plastic back that is indeed "firm." Additionally, the infant is placed "flat" in the Rock 'n Play Sleeper, despite being at an angle. Even the Mannen study (Section 6.2) uses the term "flat" (as opposed to "concave") to describe inclines.

The AAP guidelines further recommend that soft materials or objects such as pillows, quilts, comforters, or sheepskins, even if covered by a sheet, should not be placed under a sleeping infant. These kinds of items should not be added to the sleep environment at all because they can present the risk of SIDS, suffocation, strangulation, and entrapment. The Rock 'n Play Sleeper warned against soft bedding.

Furthermore, Dr. Vredenburgh's, Dr. Goodstein's, and Dr. Christensen's opinions that the Rock 'n Play Sleeper violates AAP guidelines because it is a "sitting device" are incorrect and yet another misreading of the AAP guidelines. Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings are not recommended for routine sleep. Previously, this report addressed these products

---

[41] Task Force on Sudden Infant Death Syndrome. SIDS and other sleep-related infant deaths: expansion of recommendations for a safe infant sleeping environment. DOI: 10.1542/peds.2011-2284

and demonstrated that the Rock 'n Play Sleeper is different and does not present the hazards associated with these products. The Rock 'n Play Sleeper is not a sitting device within the meaning of the AAP guidelines.

***Rock 'n Play Sleeper and CPSC Actions***

CPSC has the authority to ban products that present an unreasonable risk of injury and to order recalls, replacements or refunds for products that present a substantial risk of injury. At the time of Zoey's incident, the Commission was aware of only a few fatalities associated with inclined sleep products, as reported through its Nursery Products annual report and/or Section 15(b) reports from manufacturers. Since there was no regulatory action, it means that the level of risk did not rise to that of a substantial product hazard.

On April 5, 2019, the CPSC and Fisher-Price issued an alert (Mattel-COU0018169) warning consumers to not use the Rock 'n Play Sleeper for infants who can roll, noting that rollover behavior begins at around three months of age. The alert stated that CPSC was aware of eight deaths in a Rock 'n Play Sleeper that occurred since 2015. The infants were unrestrained and aged three months or older.  The alert further said CPSC had previously warned consumer to use restraints in inclined sleep products. Because deaths continued to occur, CPSC was now recommending consumers stop using the product by the time infants are three months old.

On April 12, 2019, ten years after the Rock 'n Play Sleeper was introduced to the marketplace, nearly six years after the subject Rock 'n Play Sleeper was manufactured, and one week after the joint alert, CPSC and Fisher-Price announced a recall (Recall 19-05) of the Rock 'n Play Sleeper. The press release referenced deaths that occurred after infants rolled over while unrestrained, or under other circumstances, and there was no indication that the fatalities were caused by the Rock 'n Play Sleeper. Fisher-Price conducted the recall voluntarily, and on a fast-track basis. For fast-track recalls, the CPSC does not make a determination as to product defect or substantial product hazard. The CPSC did not see the need to take regulatory action prior to April, 2019, and in fact, as discussed below, worked closely with ASTM to develop the standard (F3118-15) for inclined sleepers like the Rock 'n Play Sleeper. Clearly, the injury data the CPSC obtained from Fisher-Price and on its own did not sufficiently demonstrate evidence that the product itself needed to be recalled prior to 2019.

**Rock 'n Play Sleeper and F3118**

ASTM F3118 was developed because market forces created a new kind of infant product that did not fall into the scope of any existing standard. This reason is completely compatible with the ASTM process that says, "Standards development work begins when a need for a standard is recognized." CPSC confirms this in its October 2019 Supplemental Notice of Proposed Rulemaking for Infant Sleep Products, wherein it states, CPSC staff, when it began work on the bassinet and cradle standard, "considered infant inclined sleep products to fall within the scope of the bassinet/cradle standard. However, because the bassinet/cradle standard did not address products on the market that had a sleep incline greater than 10 degrees, the Commission directed staff to initiate a separate rulemaking effort for infant inclined sleep products. Accordingly, the infant inclined sleep products safety standard was an outgrowth of the bassinet/cradle safety standard, intended to address products with an incline greater than 10 degrees from horizontal. In 2011, at the time CPSC separated infant inclined sleep products from the bassinet/cradle standard, ASTM simultaneously began work on developing a voluntary standard for infant inclined sleep products."

The development of F3118 was done following the same set of procedures as any other ASTM standard. The CPSC actively participated in the development of F3118.  The following excerpts from CPSC's midyear and annual Voluntary Standards Reports reflect that CPSC was involved in developing F3118 from the very beginning and that the process followed ASTM procedures:

*From the FY 2011 midyear report dated Sep 7, 2011:*

Product: Inclined Sleep Products (Infant Hammocks)

Staff Contact: Edwards, Patty

Purpose: To develop a new ASTM safety standard and test methods for products intended to provide inclined sleeping surfaces for infants.

Activities: Staff participated in meetings of the subcommittee for inclined sleep products on 11/9/10 and 1/12/11. The subcommittee reviewed a draft standard. Both the warnings and the surface angle test were identified for revision.

Next Actions: CPSC staff will monitor the development of this draft standard and participate in an ASTM subcommittee meeting to be held in 4/11.

*From the FY 2011 annual report dated January 5, 2012:*

Product: Inclined Sleep Products (Infant Hammocks)

Staff Contact: Edwards, Patty

Purpose: To develop a new ASTM safety standard and test methods for products intended to provide inclined sleeping surfaces for infants.

Activities: Staff participated in meetings of the subcommittee for inclined sleep products on 11/9/10 and 1/12/11. The subcommittee reviewed a draft standard. Both the warnings and the surface angle test were identified for revision. On 4/11/11, the subcommittee reviewed methods for measuring the seat back angles and the research supporting limits on seat back angles. Further research was needed. At the meeting on 6/14/11, the scope of the standard and the definition of "restraints" were discussed.

Next Action: The task group chairman will present a proposal at the next meeting. CPSC staff will monitor the development of this draft standard and participate in an ASTM.

*From the FY 2012 annual report dated Mar 18, 2013:*

Product: Inclined Sleep Products (Infant Hammocks)

Activities: The subcommittee also looked at a proposal for measuring the tilt angles of a sleeping surface. At the 1/23/12 subcommittee meeting, a firm showed an inclined sleeper for inclusion in the scope of the standard. No objections to inclusion were voiced, but restrictions on containment and warnings were discussed, even though such products are intended for use on the floor only. Such products will need to have a maximum 3-inch height at the seat bight and side containments to prevent occupants from falling out. The subcommittee met in 4/12 and in 6/12. The draft standard was revised and reviewed. Task group work continued on the draft standard.

Next Action: CPSC staff will monitor the development of this draft standard and participate in an ASTM subcommittee meeting on 10/23/12.

*From the FY 2014 annual report dated Nov 10, 2015:*

Product: Inclined Sleep Products (Infant Hammocks)

Staff Contact: Kish, Celestine

Purpose: To develop a new ASTM safety standard and test methods for products intended to provide inclined sleeping surfaces for infants.

Activities: The task group for warnings conducted two telephone conferences during this reporting period on 12/5/13 and 1/16/14. During the calls, the warning section of the draft standard was finalized, and the task group agreed that the draft standard was ready to go to ballot. On 3/10/14, the draft standard was submitted for ballot vote. The ballot closed on 4/9/14. Several task group conference calls were held to address negative comments received on the ballot. A new ballot closed on 9/17/14. During

the subcommittee meeting on 9/29/14, comments, negative votes, and editorial changes were addressed.

Next Action: The subcommittee chair will submit a proposed standard to the ASTM F15 Committee on Consumer Products for approval. CPSC staff will monitor the development of this draft standard and participate in the next ASTM subcommittee meeting.

And finally, the Introduction to the published standard itself reflects CPSC involvement: "This consumer safety specification addresses incidents associated with infant inclined sleep products identified by the U.S. Consumer Product Safety Commission (CPSC). In response to incident data compiled by the CPSC, this consumer safety specification attempts to minimize the following: (1) fall hazards, (2) positional asphyxia, and (3) obstruction of nose and mouth by bedding. This consumer safety specification is intended to cover normal use and reasonably foreseeable misuse or abuse of inclined sleep products. This specification does not cover inclined sleep products that are blatantly misused or used in a careless manner that disregards the safety instructions and warnings provided with each inclined sleep product. This consumer safety specification is written within the current state-of-the-art of infant sleep product technology and will be updated whenever substantive information becomes available that necessitates additional requirements or justifies the revision of existing requirements." The existence of this standard, which does not warn against prolonged or overnight sleep, supports the fact that inclined products can be designed as safe sleep environments and are not inherently dangerous due to the incline. It is noteworthy that rollover was not listed among the hazards identified by CPSC, and in fact, in responding to a negative comment to the ASTM inclined sleeper ballot, the subcommittee concluded, "The confining nature of compliant products prevents infants from rolling over…" (Mattel-COU-0010196)

It is also noteworthy that the AAP did not provide any comments or negative votes when the standard was being developed and balloted (Steinwachs 1/22/21 testimony, p. 271). Further, while inclined sleep products were not explicitly listed among the recommended sleep environments of the 2016 AAP safe sleep guidelines[42] ("A crib, bassinet, portable crib, or play yard that conforms to the safety standards of the Consumer Product Safety Commission…is recommended."), they are not called out as products to

---

[42] Task Force on Sudden Infant Death Syndrome. SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment. DOI: 10.1542/peds.2016-2938

avoid. The sitting devices to avoid (recommendation 2) are the same kinds as described in the 2011 guidelines.

**Additional Rebuttals to Dr. Vredenburgh and Dr. Singhose**

In designing and testing new products, manufacturers have access to existing standards and regulations, current and historic literature, anthropometric data, in-house procedures for product review and testing, injury and fatality data, experience with similar products, their collective experience with the types of products they have produced in the past, and so on. Utilizing existing resources, a manufacturer does not necessarily have to start from scratch or design tests for outcomes already known. Fisher-Price has been in the business of making children's products since 1930—nearly one hundred years. It has extensive experience with product design, testing, and safety.

Nonetheless, in her report, Dr. Vredenburgh stated she had not received evidence that key testing was performed by Fisher-Price, despite Mr. Steinwachs' testimony that "If we needed testing done, we did it." Dr. Vredenburgh listed 13 tests she believed should have performed to identify potential hazards associated with the Rock 'n Play Sleeper. I paraphrase these below, and respond in italics:

1. Conduct biomechanical analyses of infants in the product, including mechanical strength and respiration analyses of infants in the prone and side positions.

*Mechanical strength data already exist and are utilized in testing protocols. For example, classic sources for such data include CPSC's Strength Characteristics of U.S. Children for Product Safety Design (1975) and the UK's Department of Trade and Industry's CHILDATA, The Handbook of Child Measurements and Capabilities—Data for Design Safety (1995). The latter contains data on 187 measurements of children's characteristics and abilities from several countries and was "produced to meet the needs of manufacturers, designers, standards bodies and research organizations for the ergonomics and performance data which are fundamental to the design of products and environments suitable for children." There are numerous other sources of similar data.  As for respiration analyses, there is much published research available and I have referenced several relevant journal articles (e.g., Thorensen et al and Reiterer et al) in my discussion of the 30-degree angle of incline.*

2. Testing or analysis of infants rolling from prone or side to supine.

*The Rock 'n Play Sleeper by design positions infants supine and does not provide space for recognized infant rollover maneuvers. No pre-market consumer testing of the product, including Fisher-Price Play Lab observations, indicated rollovers. No pre-market injury or fatality data suggested the potential for rollover. There would have been no reason to test rolling from a prone position with live infants.*

3. Testing if infants prone can self-correct to avoid injury.

*There would be no reason to place infants prone for testing because the prone position was not expected or reasonably foreseeable by design or by injury or fatality data.*

4. Testing whether side constraints play a role in impeding infant's ability to self-correct.

*Historically, side constraints are intended and tested to prevent the infant from falling out of the product. Their role in self-correction has never been identified as relevant.*

5. Impact of sleep stages/fatigue on infant's ability to self-correct.

*Such testing is in the realm of basic research and completely beyond any reasonable product testing requirements.*

6. Conduct positioning tests.

*It is not clear what positioning Dr. Vredenburgh believes should have been tested or how the tests would be performed.*

7. Analyze whether consumers would use restraints.

*Information on consumers' use of restraints was collected during in-home testing. Restraints are a common component of juvenile products; parents and caregivers are expected to secure restraints and the Rock 'n Play Sleeper included a specific, prominent warning to always use the restraints. The Rock 'n Play Sleeper also had complementary features in place (e.g., the head dam, raised sidewalls, and defined "seating" area) to help account for potential non-use of the restraint, albeit contrary to the warnings and instructions always requiring the use of the restraint.*

8. Conduct studies with restraints off.

37

*In-home tests documented use and experience with the restraints secured and not secured. Restraints are a common component of juvenile products; parents and caregivers are expected to secure restraints and the Rock 'n Play Sleeper included a specific, prominent warning to always use the restraints. The Rock 'n Play Sleeper also had complementary features in place (e.g., the head dam, raised sidewalls, and defined "seating" area) to help account for potential non-use of the restraint, albeit contrary to the warnings and instructions always requiring the use of the restraint.*

9. Conduct testing to see if sleep stages affect infant's ability to self-correct.

*Such testing is in the realm of basic research and completely beyond any reasonable product testing requirements.*

10. Determine if consumers would recognize warnings.

*Decades of research have led to well-recognized formatting and content of warnings per ANSI Z535 standards, which were first published in the early 1990s. Warnings required per ASTM standards have consistently required formatting based on Z535, and often require specific, verbatim wording, as is the case with the bassinet standard, F2194. Fisher-Price complied with that warning, as exactly required. Consumers, including Ms. Courkamp who testified (p. 101) the on-product warning was standard and familiar, are used to seeing this format. There is no indication in this case that a different warning would have changed the parents' behavior.*

11. Determine if consumers would comply with warnings.

*Based on the repeated use, over decades, of the format recommended by ANSI Z535 for consumer product warnings, one can assume consumers are familiar with the recognizable presentation (alert symbol, signal word, message panel). Compliance with warnings is up to the consumer. To study compliance is nearly impossible to do in the real world because it would require a tester to be present to observe every action by every consumer over time.  Furthermore, there is no indication in this case that a different warning would have changed the parents' behavior.*

12. Determine if consumers would recognize that not using restraints would/could result in baby rolling over and dying.

*The Rock 'n Play Sleeper included complementary features (e.g., the head dam, raised sidewalls, and defined "seating" area) to help account for potential non-use of the restraint, albeit contrary to the warnings and instructions always requiring the use of the restraint. Further, Fisher-Price warned consumers to stop using the Rock 'n Play Sleeper when the infant began to push up on hands and knees, a motor milestone that occurs before infants can roll. Thus, Fisher-Price's warning in fact accounted for it.*

13. Determine if consumers should be told of the rollover risk.

*Fisher-Price warned consumers to stop using the Rock 'n Play Sleeper when the infant began to push up on hands and knees, a motor milestone that occurs before infants can roll. Thus, Fisher-Price's warning in fact accounted for it.*

It seems that many of Dr. Vredenburgh's testing suggestions are rooted in the Mannen study, conducted in 2019, and many require research using live infants. Routine hazard analyses in the field of injury prevention consider these sources of energy that can cause potential injury: mechanical, thermal, electrical, chemical, and radiation. In addition, they consider the absence of life requirements, such as oxygen.  Both CPSC and industry safety standards identify relevant hazards through injury and fatality data as well as past experience with products, and include specific requirements and tests to eliminate or reduce those hazards. They do not identify hazards by experimenting with live infants, as Dr. Vredenburgh suggests; they utilize CAMI dummies when testing products.

Dr. Singhose stated that Fisher-Price did not test for neck entanglement in the restraint. In fact, this was specifically something that the Fisher-Price team was aware of when designing the product (Pilarz 11/09/20 testimony p. 65) and thus avoided including shoulder straps. Many standards' requirements (e.g., the toy standard and the play yard standard) define what the hazardous lengths of available loose strings/cords are. The Rock 'n Play Sleeper restraint did not include any hazardous lengths of strap and did not pose an entanglement hazard.

**Opinions**

Based on the information and materials reviewed and my education, training, and experience, it is my opinion to a reasonable degree of regulatory and scientific certainty that:

1. Fisher-Price exercised systematic, responsible principles in designing the Rock 'n Play Sleeper,

which ensured the product was safe for its intended uses. Fisher-Price's design/review team included highly experienced individuals, who are keenly aware of hazards, including asphyxia hazards, to avoid in infant products, and who are thoroughly familiar with existing safety standards that apply to infants' products. The team also included Fisher-Price's in-house child development experts.

2. The Rock 'n Play Sleeper does not present an inherent defect due to the angle of incline. Products with inclines from 0° to 45° have been used safely for decades and published literature demonstrates that inclined surfaces can improve respiratory function in infants. The incline of the product is not a defect, nor does it present a risk of positional asphyxia or oxygen desaturation.

3. Including a restraint in the Rock 'n Play Sleeper was appropriate and was intended to keep the occupant from slouching down, falling out, or pushing out the head end of the product. Non-use of the restraint does not make the product unsafe (although it can expose the infant to hazards to which she otherwise would not be exposed if the restraint is properly used). Any injury risk associated with the non-use of the restraint would need to be evaluated on a case-by-case basis. Had the restraint been properly secured in this case, as the warnings mandate, that would have eliminated both the known fall hazard and any hazard associated with rollover.

4. The Rock 'n Play Sleeper is not at odds with AAP safe sleep guidelines. At the time of the original marketing of the product, when it fell under and complied with the ASTM bassinet standard, it was considered a recommended sleep product such as a "crib, bassinet, or portable crib/play yard that conforms to the safety standards of CPSC and ASTM…" (2011 AAP Policy Statement, SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment, Recommendation 2a).

5. As of May, 2015, with the promulgation of F3118-15, inclined sleepers had their own safety standards and continued to be recognized as safe products for infant sleep, including overnight and unsupervised sleep.

6. The warnings accompanying the Rock 'n Play Sleeper were clear, unambiguous, and conspicuous as defined by ASTM and adequate to inform about known hazards and foreseeable consumer behaviors and misuses that introduce hazards to the sleep environment.

7. The Rock 'n Play Sleeper, when used as intended and as instructions and warnings dictated, was safe

for prolonged/overnight sleep, did not present an inherent rollover or asphyxiation hazard, and was neither defective nor unreasonably dangerous.

8. The parents' failure to follow the warnings and instructions led to their placing Zoey, an 8 ½ month old unintended user, unrestrained in the product for overnight sleep. Zoey's motor skill level far exceeded all the developmental milestones noted on the warning label and made her too developed to be able to use the product safely.

9. Placing Zoey for overnight sleep in the Rock 'n Play Sleeper, given her developmental milestones, and failing to secure the restraint system was not reasonably foreseeable to Fisher-Price. This unforeseeable and unreasonable misuse of the product was the underlying cause of the alleged event.

10. The cause of Zoey's death remains unknown. Her position did not result in occlusion or obstruction of her face, nose or mouth. There was no demonstrable evidence that the Rock 'n Play Sleeper was causally related to Zoey's death.

11. There is no evidence of defective material, design, or manufacturing in the Rock 'n Play Sleeper, including the subject Sleeper used by Zoey Olson. Neither the Rock 'n Play Sleeper, nor any action or inaction on the part of Fisher-Price and Mattel related to this product, caused the alleged injuries to the Plaintiff.

12. The Voluntary Recall by Fisher-Price of the Rock 'n Play Sleeper was timely and appropriate and is not evidence that the product was defective or unreasonably dangerous.

13. Based on my work experience with Section 15(b) activities while on the staff of the CPSC, I am confident that had the CPSC determined, prior to Zoey's death, that the product contained a defect that created a substantial risk of injury, it would have taken regulatory action.

**<u>Summary and Conclusions</u>**

Manufacturers have an obligation to design products that are reasonably safe and consumers have an obligation to follow product instructions and warnings. For a variety of reasons (product age, product integrity, consumer behavior, introduction of other hazards, etc.) no product can be 100% safe at all times. Even products covered by mandatory standards (e.g., cribs) as well as products covered by voluntary standards (e.g., toy chests) still are associated with reported injuries and deaths. These incidents do not necessarily render these products defective.

Fisher-Price undertook a systematic process to develop the Rock 'n Play Sleeper which included, among other things, safety reviews, in-home consumer testing, and a medical/biomechanical consultation. Mr. Olson and Ms. Courkamp repeatedly placed Zoey unrestrained in a product that was not appropriate for her age and developmental status. Consumer misuse of products is beyond the control of manufacturers and the introduction of hazards because of such misuse must be considered as potentially causal or contributory to resulting injuries and deaths.

**Exhibits**

I may use any of the following exhibits as a summary or in support of all of my opinions: (1) any of the materials, or excerpts therefrom, identified in this report and attachments, including the materials considered list; (2) excerpts from scientific articles or learned treatises; (3) demonstrative models; (4) exhibits used by Plaintiffs' experts, or other witnesses; (5) Plaintiffs' medical records; and (6) any exhibit used in or identified at any deposition taken in this litigation.

Date: May 7, 2021

Dorothy Drago, MA, MPH

42

# **EXHIBIT A**

**Dorothy A. Drago, MA, MPH**
*Product Safety Consultant*

*11 Brookside Ave.*                                  *Phone/Fax 508-591-7427*
*Plymouth, MA 02360*                                      *Cell 781-504-9996*
*USA*                                    *e-mail Dotty@DragoExpertServices.com*

## Experience

*May, 1987 to present: Self-employed, dba Drago Expert Services*

**Product Safety**: evaluate consumer product safety from design, use, and regulatory compliance points of view; provide guidance on age grading of children's products; prepare hazard/injury analyses; research applicable standards and regulations; provide guidance on section 15 reporting to the Consumer Product Safety Commission; conduct tailored seminars; specialty in infants' and children's products.

**Safety Communication**: design, evaluate, and test safety labels, symbols, instructions, and user manuals.

**Litigation Support**: provide guidance, reports and expert testimony.

*November, 1978 to May, 1987: U.S. Consumer Product Safety Commission*

**Senior analyst**: evaluated consumer product safety through injury data analysis and human factors analysis; provided key technical support to develop corrective actions to mitigate product hazards.

*June, 1968 to November, 1978: Hospitals and Other Research Organizations*

**Research Assistant/Technical Information Specialist**: conducted laboratory experiments and literature research in the biomedical field; abstracted and indexed biomedical literature; developed technical databases.

## Formal Education

*Master of Public Health (injury prevention and control)*: Johns Hopkins University, 1995
*Master of Arts (education)*: The American University, 1973
*Bachelor of Arts (biology)*: Boston University, 1968

## Continuing Education

The National Action Plan for Child Injury Prevention. The Way Forward. Webinar May 18, 2012

Children's Advocacy Network. Child Health Policy Training Institute. (five-session advocacy training program, April-May, 2011, *Children's Hospital, Boston*)

Consumer Product Safety Law Seminar. (Feb 20, 2008: *International Consumer Product Health and Safety Organization*)

National Playground Safety School. (Aug 3-6, 2005: *National Program for Playground Safety, University of Northern Iowa)*

U.S. Consumer Product Safety Commission Seminar and Consumer Product Safety Law Seminar. (Feb 23, 2005: *International Consumer Product Health and Safety Organization*)

U.S. Consumer Product Safety Commission Compliance Course. (Mar *2, 2004: International Consumer Product Health and Safety Organization*)

U.S. Consumer Product Safety Commission Compliance Course. (Feb *27, 2003: International Consumer Product Health and Safety Organization*)

U.S. Consumer Product Safety Commission Compliance Course and ABA Consumer Product Safety Law Seminar. (Feb 28, 2001*: International Consumer Product Health and Safety Organization*)

U.S. Consumer Product Safety Commission Compliance Course and ABA Consumer Product Safety Law Seminar. (Feb 17, 1999*: International Consumer Product Health and Safety Organization*)

Establishing and Implementing the Product Safety Program. (Aug 24-27, 1992: *University of Wisconsin*)

Product Safety and Liability Prevention: The Role of Warnings. (Oct 27-28, 1986: *University of Wisconsin*)

## Certifications

SAFE Certified (Aug 2005-Aug 2009) through the National Program for Playground Safety, University of Northern Iowa

## Awards and Recognition

1980: Meritorious Service Award, US Consumer Product Safety Commission
1998: Certificate of Recognition and Appreciation of Participation in Montgomery County, Maryland, Public Health Week activities
2011: CPSC's Chairman's Circle of Commendation Award to members of ASTM committee F15.18 (cribs, play pens, cradles, changing tables, and toddler beds)

## Publications

Drago, D.A. (2018) Gasoline-related injuries and fatalities in the United States, 1995-2014. International Journal of Injury Control and Safety Promotion. https://doi.org/10.1080/17457300.2018.1431947

Drago, D. Drowning awareness month. Old Colony Memorial Newspaper, Vol. 192, No. 43, May 28-30, 2014.
http://plymouth.wickedlocal.com/article/20140529/OPINION/140527050/0/SEARCH

Drago, Dorothy A, MPH. Living Safely, Aging Well: A Guide to Preventing Injuries at Home. Baltimore (MD): The Johns Hopkins University Press, 2013 (216 pages).

Drago, D. A., May is drowning awareness month. Old Colony Memorial Newspaper, Vol. 191, No. 37, May 8-10, 2013.
http://www.wickedlocal.com/plymouth/opinion/opinion_columnists/x522267904/YOUR-VIEW-May-is-Drowning-Awareness-Month#axzz2SzxEn4q9

Pollack-Nelson, C. and Drago, D.
Hazards associated with common nursery products. In: K.D. Liller, Editor. Injury Prevention for Children and Adolescents. Research, Practice, and Advocacy, Second Edition. Washington: American Public Health Association, 2011. pp 83-119.

Drago, D. A., Pool safety starts with prevention. Old Colony Memorial Newspaper, Vol. 189, No. 55, July 6, 2011.

(http://www.wickedlocal.com/plymouth/opinion/opinion_columnists/x1672983843/YOUR-VIEW-Pool-safety-starts-with-prevention#axzz1RWncskEh)

Drago, Dorothy, MA, MPH
Safety—Is it just common sense? Pediatrics for Parents, Vol 25, No. 3-4, pp3-5, 2009 [newsletter].

Drago, Dorothy, MPH
From Crib to Kindergarten: The Essential Child Safety Guide. Baltimore (MD): The Johns Hopkins University Press, 2007 (195 pages).

Pollack-Nelson, C. and Drago, D.
Hazards associated with common nursery products. In: K.D. Liller, Editor. Injury Prevention for Children and Adolescents. Research, Practice, and Advocacy. Washington: American Public Health Association, 2006. pp 65-90

Drago DA, MA, MPH
Kitchen Scalds and Thermal Burns in Children Five and Younger
*Pediatrics* January 2005;115(1):10-16

Pollack-Nelson C, PhD and Drago DA, MA, MPH
Supervision of Children Aged Two through Six Years
*Injury Control and Safety Promotion* 2002;9(2):121-126

Drago DA, MA, MPH, Dannenberg AL, MD, MPH
Infant Mechanical Suffocation Deaths in the United States, 1980-1997
*Pediatrics* May 1999;103(5):e 59 (8 pages)

Drago DA, MA, MPH, Winston FK, MD, PhD, Baker SP, MPH
Clothing Drawstring Entrapment in Playground Slides and School Buses: Contributing Factors and Potential Interventions. *Archives of Pediatrics & Adolescent Medicine* January 1997;151:72-77

**Articles Contributed to by Interview**

The Child-Safety Issue No One Wants to Talk About by Karen Weese. EverydayFamily.com. December, 2014

Find the Hidden Drowning Hazards in Your Home by Kyla Steinkraus in Birmingham Parent,  January, 2008, p23 (www.birminghamparent.com)

Danger Zones by Kim Acosta in Fit Pregnancy, Vol. 14, No. 6, December/January 2008, p132-5

Bunk Bed Safety by Kathy Cassel in Focus on your Child [newsletter], 2007

Is Anything Safe these Days? by Genoa Sibold-Cohn in Tri-city Herald, Kennewick, WA, Oct 23, 2007, Section D, pages 1, 2.

Summer Outdoor Hazards by Shannon McKelden at iParenting Media, 2007
http://homestyletoday.com/articles/4780.php?wcat=137

**Presentations**

Drowning Prevention—Where Are We? Where Are We Headed? (*September 25, 2013: A National Discussion of Injury Prevention, hosted by The Safety Institute; Hilton Hotel, Rosemont, IL*)

Drowning Prevention in the Young Child (*March 27, 2013: Massachusetts Child Fatality Review Conference/Hoagland Pincus Conference Center, Shrewsbury, MA*)

Safe Sleeping Strategies to Reduce Infant Mechanical Suffocation (*October, 2000: Holy Cross Hospital Maternal/Child Health Nursing Conference, College Park,* MD)

Unintentional Injury: Causes and Control (Parts I and II) (*November, 1999: Safety Management Conference, College Park, MD*)

Safe Kids Panel Participant: Topic - Playground Safety (*November, 1999: Safety Management Conference, College Park, MD*)

Infant and Toddler Safety - Environments and Practices (*February, 1999: Montgomery County Maryland Adult Education Programs*)

Safety and Human Factors in Product Design (*October, 1996: Binney & Smith, Inc., Easton, PA*)

Designing and Testing Safety Labels (*October, 1996: DAEWOO Motor Co., Gaithersburg, MD*)

Structure and Authority of U.S. Consumer Product Safety Commission (for graduate course on "Safety Management" (*February, 1993: University of West Virginia-Extension, Shepardstown, WV*)

Infant and Toddler Safety (*October and November, 1992; February and April, 1991: Montgomery County Maryland Adult Education Programs*)

Product Recall: Prevention and Preparation (*June, 1991: International Institute for Research, New York, NY*)

The Mechanics of Developing a Corporate Safety Policy (*January, 1990: International Institute for Research, New York, NY*)

Procedures and Methods for Managing a Recall (*January, 1990: International Institute for Research, New York, NY*)

Product Safety and Regulatory Compliance (*February, 1989: Toys R Us, Paramus, NJ*)

**Peer Reviewer for Original Articles Submitted to:**

Pediatrics
Social Science and Medicine

**Professional Memberships**

American Public Health Association (1995-2015)
International Consumer Product Health and Safety Organization (1993-2015)

**Elected Office**

American National Standards Institute (ANSI) Board of Directors
*October, 1998 - December, 1999*

**Voluntary Committee Participation**

ASTM Committee F-15 on Consumer Products (1988- )

ANSI Consumer Interest Council (1989-1999)

Montgomery County, Maryland, Safe Kids Campaign (1996-1999)

Montgomery County, Maryland, Child Fatality Review Team (1998-1999)

International Organization for Standardization (ISO), Joint Technical Advisory Group for the revision of Guide 50-Child safety and standards-General Guidelines (1996-2001)

Massachusetts Prevent Injuries Now Network (http://www.masspinn.org/) (2009- )

**Board of Directors (Vice President as of September 2012)**

Drowning Prevention Foundation, Benecia, CA

*September 2006-present*

**Other**

Participation by Invitation to Stakeholder Working Session for the National Action Plan for Childhood Injury Prevention hosted by CDC (Centers for Disease Control and Prevention), Atlanta, GA., Aug 23-24, 2010

Pedsforparents Podcast #88, Nov 30, 2009 on Childhood Safety

(As interviewed by Rich Sagall, MD (www.pedsforparents.com))

TV appearance on Channel 5 (Boston) on Nov 24, 2009 to discuss the recall of Stork Craft Cribs

Participation in Preventing Unsupervised Medication Ingestions and Overdoses in Children: A Stakeholder Meeting hosted by CDC (Centers for Disease Control and Prevention), Atlanta, GA., Nov 13-14, 2008

TV appearance on NECN on Nov 8, 2007 to discuss the recall of Aqua-Dots

TV appearance on NECN's Wired Segment, Aug 15, 2007, 4 to 5pm on the topic of toys recalled due to lead in paint and hazardous magnets

# **EXHIBIT B**

**Mattel/Courkamp**

**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES (IF APPLICABLE) |
|---|---|---|
| **COMPLAINT** | | |
| Second Amended Complaint | 08/07/19 | N/A |
| **DISCOVERY RESPONSES** | | |
| Andrew Olson's Responses to Defendants' First Interrogatories | 12/10/19 | N/A |
| Kathleen Courkamp's Responses to Defendants' First Interrogatories | 12/10/19 | N/A |
| Andrew Olson's Responses to Defendants' First Request for Production of Documents | 12/10/19 | N/A |
| Kathleen Courkamp's Responses to Defendants' First Request for Production of Documents | 12/10/19 | N/A |
| Plaintiff's 1st Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 09/30/19 | N/A |
| Plaintiff's 2nd Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 11/11/19 | N/A |
| Plaintiff's 3rd Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 12/10/19 | N/A |
| Plaintiff's 4th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 12/31/19 | N/A |
| Plaintiff's 5th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 01/22/20 | N/A |
| Plaintiff's 6th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 02/24/20 | N/A |
| Plaintiff's 7th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 03/19/20 | N/A |
| Plaintiff's 8th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 05/27/20 | N/A |
| Plaintiff's 9th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 06/09/20 | N/A |
| Plaintiff's 10th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 08/21/20 | N/A |
| Plaintiff's 11th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 10/13/20 | N/A |
| Plaintiff's 12th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 11/04/20 | N/A |
| Plaintiff's 13th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 02/18/21 | N/A |
| Plaintiff's 14th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 04/02/21 | N/A |
| Plaintiff's 15th Suppl to Plaintiff's MIDP & Initial Disclosure Statement | 04/23/21 | N/A |
| **DEPOSITIONS WITH EXHIBITS** | | |
| Swope, Farrel | 06/12/20 | N/A |
| Ferenc, Michael | 08/12/20 | N/A |
| Akey, Alan | 08/17/20 | N/A |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES (IF APPLICABLE) |
|---|---|---|
| Reyes, Michelle | 08/17/20 | N/A |
| O'Brien, Thomas | 08/18/20 | N/A |
| Williams, Torin | 08/18/20 | N/A |
| Courkamp, Kathleen | 10/21/20 | N/A |
| Olson, Andrew | 10/22/20 | N/A |
| Olson, Daniel | 10/27/20 | N/A |
| Pilarz, Catherine - Vol I | 11/09/20 | N/A |
| Chapman, Linda | 11/10/20 | N/A |
| Steinwachs, Michael | 11/11/20 | N/A |
| Taft, Joel | 11/12/20 | N/A |
| Lohiser, Lisa | 11/13/20 | N/A |
| Martin, Lynn | 11/13/20 | N/A |
| Pilarz, Catherine - Vol II | 01/21/21 | N/A |
| Pilarz, Catherine | 01/21/21 | N/A |
| Steinwachs, Michael | 01/22/21 | N/A |
| Deegear, Gary | 03/12/21 | N/A |
| Cleary, Kevin | 04/29/21 | N/A |
| RECORDS | | |
| ARUP Laboratories | Multiple | ZO-ARUPL-MD-000001 - ZO-ARUPL-MD-000004 |
| Banner Thunderbird Medical Center | Multiple | ZO-BTMC-BD-000001 - ZO-BTMC-BD-000003 |
| Banner Thunderbird Medical Center | Multiple | ZO-BTMC-MD-000001 - ZO-BTMC-MD-000060 |
| Care 7 Response Unit | Multiple | ZO-CARE7RU-000001 - ZO-CARE7RU-000003 |
| ClearPath Family Healthcare | Multiple | ZO-CLEARPFH-000001 - ZO-CLEARPFH-000041 |
| Maricopa County Office of the Medical Examiner | Multiple | ZO-MCOME-000001 - ZO-MCOME-000182 |
| Maricopa County Office of the Medical Examiner - Radiology CD | Multiple | ZO-MCOME-000183 - ZO-MCOME-000183 |
| Phoenix Baptist Hospital | Multiple | ZO-PBH-CD-000002 - ZO-PBH-CD-000004 |
| Phoenix Baptist Hospital | Multiple | ZO-PBH-MD-000001 - ZO-PBH-MD-000113 |
| Phoenix Baptist Hospital | Multiple | ZO-PBH-RD-000001 - ZO-PBH-RD-000003 |
| PerkinElmer Genetics, Inc. | Multiple | ZO-PGENETICS-000001 - ZO-PGENETICS-000004 |
| Tempe Fire Department | Multiple | ZO-TEMPEFD-000001 - ZO-TEMPEFD-000003 |
| Tempe Police Department | Multiple | ZO-TEMPEPD-000001 - ZO-TEMPEPD-000366 |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES (IF APPLICABLE) |
|---|---|---|
| AmeriPath Colorado (Kathleen Courkamp) | Multiple | KCOURKAMP-AMERIPC-000001 - KCOURKAMP-AMERIPC-000005 |
| Cleary, Kevin W., DO (Kathleen Courkamp) | Multiple | KCOURKAMP-KWCLEARY-000001 - KCOURKAMP-KWCLEARY-000040 |
| LabCorp Denver (Kathleen Courkamp) | Multiple | KCOURKAMP-LABCORPD-000001 - KCOURKAMP-LABCORPD-000007 |
| Mountain View Medical Group (Kathleen Courkamp) | Multiple | KCOURKAMP-MVIEWMG-00000001 - KCOURKAMP-MVIEWMG-00000038 |
| Phoenix Baptist Hospital (Kathleen Courkamp) | Multiple | KCOURKAMP-PBH-MD-000001 - KCOURKAMP-PBH-MD-000271 |
| Sonora-Quest Laboratory (Kathleen Courkamp) | Multiple | KCOURKAMP-SQL-MD-000001 - KCOURKAMP-SQL-MD-000005 |
| **PLAINTIFF PRODUCED RECORDS** | | |
| Plaintiff Produced Records | Multiple | COU_000001 - COU_000632 |
| Plaintiff Produced Records | Multiple | COU_000633 - COU_000656 |
| Plaintiff Produced Records | Multiple | COU_000657 - COU_001023 |
| Plaintiff Produced Records | Multiple | COU_001024 - COU_002106 |
| Plaintiff Produced Records | Multiple | COU_002107 - COU_002321 |
| Plaintiff Produced Records | Multiple | COU_002322 - COU_002555 |
| Plaintiff Produced Records | Multiple | COU_002556 - COU_002617 |
| Plaintiff Produced Records | Multiple | COU_002618 - COU_005515 |
| Plaintiff Produced Records | Multiple | COU_005516 - COU_005804 |
| Plaintiff Produced Records | Multiple | COU_005805 - COU_005816 |
| Plaintiff Produced Records | Multiple | COU_005817 - COU_007084 |
| Plaintiff Produced Records | Multiple | COU_007085 - COU_007314 |
| Plaintiff Produced Records | Multiple | COU_007315 - COU_007417 |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES (IF APPLICABLE) |
|---|---|---|
| Plaintiff Produced Records | Multiple | COU_007418 - COU_008154 |
| Plaintiff Produced Records | Multiple | COU_008155 - COU_008770 |
| Plaintiff Produced Records | Multiple | COU_008780 - COU_009015 |
| DEFENDANTS PRODUCED RECORDS | | |
| Defense Produced Records | Multiple | Mattel-COU0000001 - Mattel-COU0007541 |
| Defense Produced Records | Multiple | Mattel-COU0007542 - Mattel-COU0012398 |
| Defense Produced Records | Multiple | Mattel-COU0012399 - Mattel-COU0012416 |
| Defense Produced Records | Multiple | Mattel-COU0012417 - Mattel-COU0026866 |
| Defense Produced Records | Multiple | Mattel-COU0026867 - Mattel-COU0027931 |
| Defense Produced Records | Multiple | Mattel-COU0027932 - Mattel-COU0027945 |
| Defense Produced Records | Multiple | Mattel-COU0027946 - Mattel-COU0028502 |
| Defense Produced Records | Multiple | Mattel-COU0028503 - Mattel-COU0041253 |
| Defense Produced Records | Multiple | Mattel-COU0041254 - Mattel-COU0150020 |
| Defense Produced Records | Multiple | Mattel-COU0150021 - Mattel-COU0364543 |
| Defense Produced Records | Multiple | Mattel-COU0364544 - Mattel-COU0843171 |
| Defense Produced Records | Multiple | Mattel-COU0843172 - Mattel-COU0843261 |
| Defense Produced Records | Multiple | Mattel-COU0843262 - Mattel-COU1026679 |
| Defense Produced Records | Multiple | Mattel-COU1026680 - Mattel-COU1028457 |
| Defense Produced Records | Multiple | Mattel-COU1028548 - Mattel-COU1037247 |
| Defense Produced Records | Multiple | Mattel-COU1037248 - Mattel-COU1037249 |
| Defense Produced Records | Multiple | Mattel-COU1037250 - Mattel-COU1104993 |
| Defense Produced Records | Multiple | Mattel-COU1104994 - Mattel-COU1131925 |
| Defense Produced Records | Multiple | Mattel-HC-COU-0000001 - Mattel-HC-COU-0004604 |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES (IF APPLICABLE) |
|---|---|---|
| Defense Produced Records | Multiple | Mattel-DGR- COU-0000001 - Mattel-DGR- COU-0000043 |
| **OTHER MATERIALS** | | |
| Courkamp Product Case History Report (CHR) | Multiple | Mattel-COU0012410 - Mattel-COU0012411 |
| Courkamp Epidemiological Investigation Report (IDI) | Multiple | Mattel-COU0012399 - Mattel-COU0012409 |
| Courkamp Matter Details Report (MDR) | Multiple | Mattel-COU0012412 - Mattel-COU0012416 |
| Rock 'n Play Sleeper Model BHL58 Product Requirements Document | Multiple | Mattel-COU0040365 - Mattel-COU0040402 |
| Rock 'n Play Sleeper Model BHL58 Production Start Summary Report | Multiple | Mattel-COU0843172 - Mattel-COU0843245 |
| Rock 'n Play Sleeper Hazard Analyses and Safety Audit Reports | Multiple | Mattel-COU0003033 - Mattel-COU0003140 |
| Rock 'n Play Sleeper In-Home Testing Reports | Multiple | Mattel-COU0000663 - Mattel-COU0000980 |
| Rock 'n Play Sleeper In-Home Testing Reports | Mulitple | Mattel-COU0002089 - Mattel-COU0002148 |
| Fox/Shaffer December 2017 Report | 12/15/17 | Mattel-COU0020114 - Mattel-COU0020236 |
| Fox/Shaffer Rock 'n Play Sleeper Videos | 11/30/17 | MATTEL-COU-0002209 - MATTEL-COU-0002215 |
| Instruction Manual for Rock 'n Play Model BHL58 | N/A | MATTEL-COU001786 - MATTEL-COU001801 |
| Exponent PowerPoint to CPSC | 06/09/18 | Mattel-COU0018571 - Mattel-COU0018636 |
| Exponent PowerPoint to CPSC | 04/06/18 | Mattel-COU0012443 - Mattel-COU0012476 |
| Photo of Sewn-in Warning for Rock 'n Play Model BHL58 | N/A | COU_005582 - COU_005582 |
| Photos of Subject Rock 'n Play Model BHL58 | N/A | COU_005563 - COU_005623 |
| Arizona Child Fatality Review Program - 22nd Annual report | 11/15/15 | N/A |
| Child Fatality Review Report for Maricopa County | 07/06/05 | N/A |
| **EXPERT REPORTS INCLUDING EXHIBITS** | | |
| Plaintiff's Fourteenth Supplement to Mandatory Initial Discovery disclosing experts | 04/02/21 | N/A |
| Erik Christensen, M.D.'s Expert Report | 03/31/21 | COU_008268 - COU_008286 |
| Michael Goodstein, M.D.'s Expert Report | 04/01/21 | COU_008224 - COU_008267 |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES (IF APPLICABLE) |
|---|---|---|
| William Singhose, Ph.D.'s Expert Report | 04/02/21 | COU_008287 - COU_008429 |
| Alison Vredenburgh's Expert Report | 04/01/21 | COU_008155 - COU_008223 |
| William Singhose, Ph.D.'s Updated CV | 04/15/21 | COU_008794 - COU_008836 |
| Michael Goodstein, M.D.'s Updated CV | 04/15/21 | COU_008837 - COU_008857 |
| Michael Goodstein, M.D.'s Index of Materials Reviewed | 04/15/21 | COU_008793 - COU_008793 |
| Alison Vredenburgh's Updated CV | 04/15/21 | COU_008858 - COU_008876 |
| Erik Christensen, M.D.'s Updated CV | 04/21/21 | COU_008780 - COU_008791 |
| Erik Christensen, M.D.'s Updated Fee Schedule | 04/21/21 | COU_008792 - COU_008792 |
| **STANDARDS AND PROCEDURES** | | |
| ASTM F2194-07 | 2007 | N/A |
| ASTM F2194-10 | 2010 | N/A |
| ASTM F2194-12a | 2012 | N/A |
| ASTM F3118-15 | 2015 | N/A |
| ASTM F833 | N/A | N/A |
| ASTM F2088 | N/A | N/A |
| ASTM F2167-15 | 2015 | N/A |
| ANSI Z535 | N/A | N/A |
| **INCIDENT DATA REPORTS** | | |
| Multiple Incident Report Data from Defense Production | Multiple | Multiple |
| **MISCELLANEOUS** | | |
| Exemplar Rock 'n Play Sleeper | N/A | N/A |
| Any and all articles I have published, any articles Plaintiff relies upon or that any parties plan to use at trial | N/A | N/A |
| Any and all demonstratives or videos to be used at trial | N/A | N/A |
| Any and all materials cited or referenced in my Expert Report | N/A | N/A |
| Any and all materials cited or referenced in Plaintiff's Expert Reports | N/A | N/A |
| Any and all expert reports, disclosures, and depositions and exhibits thereto provided and taken in this case, including but not limited to those referenced in Plaintiff's Expert Disclosures and MIDP & Initial Disclosure Statements | N/A | N/A |

**Mattel/Courkamp**

**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES BEGIN (IF APPLICABLE) |
|---|---|---|
| **GUIDELINES AND POLICY STATEMENTS** | | |
| AAP - Positioning and SIDS | 1992 | N/A |
| AAP - Positioning and SIDS: update | 1996 | N/A |
| AAP - Policy Statement - Changing concepts of SIDS: implications for infant sleeping environment and sleep position | 2000 | N/A |
| AAP - Policy Statement - SIDS and other sleep related infant deaths: expansion of recommendations for a safe infant sleeping environment | 2005 | N/A |
| AAP - Technical report - SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment | 2011 | N/A |
| AAP - The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment and New Variables to Consider in Reducing Risk | 2011 | N/A |
| AAP - Policy Statement - SIDS and other sleep-related infant deaths: updated 2016 recommendations for a safe infant sleeping environment | 2016 | N/A |
| AAP - Technical Report - SIDS and other sleep-related infant deaths: updated 2016 recommendations for a safe infant sleeping environment | 2016 | N/A |
| **CPSC** | | |
| CPSC Physical & Mechanical, Flammability, Lead content test requirements for CFR | N/A | N/A |
| CPSC Report: Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five | 2013 | N/A |
| CPSC Report: Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five | 2014 | N/A |
| CPSC Report: Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five | 2015 | N/A |
| CPSC Report: Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five | 2016 | N/A |
| CPSC Report: Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five | 2017 | N/A |
| CPSC Report: Injuries and Deaths Associated with Nursery Products Among Children Younger than Age Five | 2018 | N/A |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES BEGIN (IF APPLICABLE) |
|---|---|---|
| Consumer Product Safety Commission, Safety Standard Proposed Rule 2019 | 2019 | N/A |
| CPSC Commisioned Study: "Biomechanical Analysis of Inclined Sleep Products" | 2019 | N/A |
| The October 16, 2019, Staff Briefing Package: Draft Supplemental Notice of Proposed Rulemaking for Infant Sleep Products under the Danny Keysar Child Product Safety Notification Act (incl. Mannen EM et al. Biomechanical analysis of inclined sleep products - Final Report) | 2019 | N/A |
| Consumer Product Safety Commission. Safety standards for bedside sleepers. Fed Reg. 2014 | 2014 | N/A |
| LITERATURE | | |
| Bass JL and Bull M. Oxygen desaturation in healthy term infants in car safety seats | 2002 | N/A |
| Bass, Oxygen Desaturation of Selected Term Infants in Car Seats | 1995 | N/A |
| Beal SM, Moore L, Collett M et al. The danger of freely rocking cradles | 1995 | N/A |
| Bull MJ and Stroup KB. Premature infants in car seats | 1985 | N/A |
| Carlo WA, Beoglos A, Siner ES et al. Neck and body position effects on pulmonary mechanism in infants | 1989 | N/A |
| Centers for Disease Control and Prevention. Suffocation deaths associated with the use of infant sleep positioners—United States | 2012 | N/A |
| Cote, Sudden Infant Deaths in Sitting Devices | 2007 | N/A |
| Dellagrammaticas HD, Kapetanakis J, Papadimitriou M, Kourakis G. Effect of body tilting on physiological functions in stable very low birth weight neonates | 1991 | N/A |
| Kornhauser, A comparison of Respiratory Patterns in Healthy Term Infants Placed in Car Safety Seats and Beds | 2009 | N/A |
| Merchant JR, Worwa C, Porter S, Coleman JM et al. Respiratory instability of term and near-term healthy newborn infants in car safety seats | 2001 | N/A |
| Parikh SN and Wilson L., Hazardous use of car seats outside the car in the United States | 2010 | N/A |
| Pollack-Nelson C., Fall and suffocation injuries associated with in-home use of car seats and baby carriers | 2000 | N/A |
| Reiterer F, Abbasi S, Bhutani VK. Influence of head-neck posture on airflow and pulmonary mechanics in preterm infants | 1994 | N/A |

**Mattel/Courkamp**
**Dorothy Drago, M.A., M.P.H.**

| DESCRIPTION | DATE | BATES BEGIN (IF APPLICABLE) |
|---|---|---|
| Royal College of Midwives Trust: Review of the Fisher-Price Rock N' Play Sleeper Product R6070 | 2011 | N/A |

# **EXHIBIT C**

**Drago Expert Services**

*Consulting Services in Product Safety*

**Dorothy A. Drago, MA, MPH**

---

*11 Brookside Ave.*                                                              *Phone/Fax 508-591-7427*
*Plymouth, MA 02360*                                                                    *Cell 781-504-9996*
*USA*                                                              *e-mail Dotty@DragoExpertServices.com*

**2020-2021 Fee/Payment Schedule**

<u>**Fees:**</u>
**Retainer:** negotiable, based on start-up tasks

**$400 per hour:**

>   Labor (except testimony)

>   Travel (door-to-door)

**$450 per hour:**

>   Deposition Testimony

>   Court Testimony

**Expenses:**

>   Direct costs

>   Travel at Business or First Class

# **EXHIBIT D**

**Drago Expert Services**
*Consulting Services in Product Safety*

**Dorothy A. Drago, MA, MPH**

---

*11 Brookside Ave.*                                                                 *Phone/Fax 508-591-7427*
*Plymouth, MA 02360*                                                                        *Cell 781-504-9996*
*USA*                                                                       *e-mail Dotty@DragoExpertServices.com*

## Expert Testimony January, 2017 through Present

for the defense in Scepter in Grubbs v Scepter, In the Court of Common Pleas, State of South
Carolina, County of Barnwell, Case No. 2016-CP-06-00150. Deposition September 8, 2017

for the Defense in Evan Amber Overton and John Keenan Overton co-Administrators for the
Estate of Ezra Michael Overton, Deceased vs Fisher-Price, Inc. and Mattel, Inc. in the United
States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action File
No. 1:19-cv-751. Deposition March 13, 2020

# EXHIBIT 6

000001



# Vredenburgh & Associates, Inc.
## Human Factors, Safety, Biomechanics and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA  92008
(442) 222-8289
avredenburgh@gmail.com
www.hfexpert.com

June 7, 2021

Kristin Schriner, Esq.
Goldberg & Osborne LLP
698 E. Wetmore Rd., Suite 200
Tucson, AZ 85705

Re:      Courkamp v. Fisher Price

At your request, I have prepared the following supplemental report with respect to the above-referenced case which is based on an inspection of the exemplar Fisher Price Rock 'n Play inclined sleeper and a review of additional materials including:

1. Drago ballot 4/29/19 for F15 (COU0839240-2)
2. Email chain (COU-1149138)
3. Rollover Hazard Rollover Visibility Test (COU-0843402)

### FINDINGS AND CONCLUSIONS

Proposed warnings have been discussed at FP. An employee email chain indicates that they discussed the age limit for the product to be around 5 months; moreover, FP was aware prior to Zoey's death that the 25lb weight limit was "disingenuous" and should not have been part of the warnings on a product meant for infants 0-5 months; "In my opinion, we should remove the weight altogether." Moreover, he acknowledged that "locating the developmental statements on the PDP aids parents in their purchase decision."[150] As Dorothy Drago stated in her negative comment, the "rollover hazard label must be conspicuous and permanent."[151]

**I have drafted 2 warnings for the RNP based on the additional material provided that, in my opinion, would have provided critical information and have been conspicuous and permanent.**

---

[150] COU-1149138
[151] COU0839240; COU-0843402

000002

I have drafted warnings (see Figures 1-4), based ASTM subcommittee draft warnings and on new FP documents,[152] and attached them to an exemplar RNP sleeper to depict a conspicuous and permanent placement.



| ⚠ WARNING |
|---|
| **Suffocation Hazard**: Babies have <u>suffocated</u> and <u>died</u> from **rolling over** on added pillows, blankets, and extra padding in inclined sleep products. |
| To prevent **falls** and **suffocation**:<br>• **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.<br>• NEVER place pillows, blankets, or extra padding in inclined sleep product.<br>• **Always** place baby on back to sleep.<br>• Stop using product when baby begins to roll over or can pull up on sides. |
| • **Stop using** when baby reaches <u>5 months</u>. |

Figure 1. New label above head on reverse side of existing "warning."

---

[152] COU0839240; COU-1149138

000003

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price supplement
Page 3 of 4

---

**⚠ WARNING**

<u>Suffocation Hazard</u>: Babies have suffocated and **died** from **rolling over** in inclined sleep products.

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

Figure 2. New belt label



COU_009018

000004

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price supplement
Page 4 of 4



Figures 3a and 3b. Exemplar RNP with labels

All of my opinions are expressed to a reasonable degree of professional certainty. I reserve the right to modify the opinions in this report if additional information becomes available.

### Qualifications and Publications

My expertise is based upon a combination of education, original theoretical research, and professional employment.  Please refer to my enclosed Curriculum Vitae for detailed qualifications and publications.

I appreciate the opportunity to assist you in this case and am available for any further work that may be required.

Sincerely,

Alison Vredenburgh, Ph.D., CPE
Vredenburgh & Associates, Inc.

AV/ibz