1  Nicole M. Goodwin (SBN 024593)
2  Aaron J. Lockwood (SBN 025599)
   **GREENBERG TRAURIG, LLP**
3  2375 E. Camelback Road, Suite 800
   Phoenix, AZ 85016
4  Tel: (602) 445-8000
   Facsimile: (602) 445-8100
5  goodwinn@gtlaw.com
   lockwooda@gtlaw.com

6  Lori G. Cohen *(pro hac vice)*
   Brandon D. Cox *(pro hac vice)*
7  **GREENBERG TRAURIG, LLP**
   3333 Piedmont Road NE, Suite 2500
8  Atlanta, GA 30305
   Telephone: (678) 553-2100
9  Facsimile: (678) 553-2212
   cohenl@gtlaw.com
10 coxb@gtlaw.com

11 Mary-Olga Lovett *(pro hac vice)*
   **GREENBERG TRAURIG, LLP**
12 1000 Louisiana Street, Suite 1700
   Houston, TX 77002
13 Telephone: (713) 374-3541
   Facsimile: (713) 754-7541
14 lovettm@gtlaw.com

15 *Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>Plaintiff,<br><br>v.<br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation,<br><br>Defendants. | No. 2:19-cv-02689-GMS<br><br>**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT, MICHAEL GOODSTEIN, M.D.**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1
FACTUAL BACKGROUND ............................................................................................. 3
LEGAL STANDARD ........................................................................................................ 3
ARGUMENT ...................................................................................................................... 4
    I.    Dr. Goodstein's Limited and Narrow SIDS Opinion Should Be Excluded as Unreliable. ................................................................................................................ 4
    II.   Dr. Goodstein's Infant Safe Sleep Recommendations Should Be Excluded as Irrelevant. ............................................................................................................... 11
    III.  Dr. Goodstein Should Not Be Permitted to Opine on New Subjects Not Disclosed in His April 2021 Expert Report. ........................................................... 15
    IV.  Dr. Goodstein Should Be Precluded from Offering Any Opinions He Has Disclaimed. ............................................................................................................. 17
CONCLUSION ................................................................................................................ 17

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

Defendants Mattel, Inc. and Fisher-Price, Inc., (collectively "Defendants"), by and through their undersigned counsel, and pursuant to Fed. R. Evid. 702, move to exclude Plaintiff's proposed expert, Michael Goodstein, M.D. ("Dr. Goodstein"). In support of this Motion, Defendants rely on the following Memorandum of Points and Authorities.

## INTRODUCTION

Plaintiff disclosed Michael Goodstein, M.D. as her expert in the areas of pediatric medicine/neonatology, Sudden Infant Death Syndrome (SIDS), and infant sleep safety. In April 2021, Dr. Goodstein served a nineteen-page expert report in which he spends over fourteen pages generally discussing infant sleep safety recommendations. (Goodstein Report, **Ex. A**). He then dedicates roughly four pages to a review of Z.O.'s medical records and concludes his report with a one paragraph, nine-line summary that consists of his only opinions in this case. Specifically, he purports to offer a very limited and narrow opinion that Z.O. was not at an increased risk of SIDS, but fails to support this opinion with a competent and reliable scientific methodology. Additionally, nowhere in his entire nineteen-page report does he ever offer any case specific opinions about the cause of Z.O.'s death. Nor did he connect any of his general discussion about infant sleep safety recommendations to a defect in the Rock 'n Play Sleeper ("RNPS") or to the cause of Z.O.'s death, making these recommendations irrelevant to the issues in this case.

In July 2021, Dr. Goodstein served a ten-page rebuttal report that purports to rebut the opinions of several of Defendants' experts, including Defendants' neuropathologist, epidemiologist, and CPSC regulatory expert. (Goodstein Rebuttal Report, **Ex. B**). Setting aside the fact that Dr. Goodstein admits he has no expertise in these areas and thus is not qualified to offer rebuttal opinions on these subjects, Dr. Goodstein again never offered any opinions about the cause of Z.O.'s death—just as he failed to do in his April 2021 expert report.

Dr. Goodstein's flawed and unreliable methodology regarding his limited and narrow opinion that Z.O. was not at an increased risk of SIDS, together with his complete failure to connect his infant safe sleep recommendations to the facts of this case—

1

specifically, the cause of Z.O.'s death—renders all of his opinions unreliable and irrelevant under Rule 702. The Court should exclude them for the following reasons.

***First***, Dr. Goodstein's limited and narrow opinion that Z.O. was not at an increased risk of SIDS or Sudden Unexplained Infant Death (SUID) is based on a flawed and unreliable methodology in which he considered only intrinsic risk factors for SIDS and ignored entirely any and all extrinsic risk factors that could have increased Z.O.'s risk of SIDS. Why? Because Plaintiff's counsel did not ask him to include such an analysis in either of his reports, despite Dr. Goodstein's unequivocal testimony that extrinsic risk factors are critically important to any SIDS analysis and thus may have significantly affected his limited and narrow opinion. Dr. Goodstein's conclusion that Z.O. was not at an increased risk of SIDS is therefore unreliable and should be excluded.

***Second***, Dr. Goodstein's general infant sleep safety recommendations do not "fit" the facts of this case because Dr. Goodstein fails to connect these recommendations to a defect in the RNPS or to the cause of Z.O.'s death. Dr. Goodstein admits he is offering no opinions about what caused Z.O.'s death—let alone any opinions about whether the RNPS caused her death. Dr. Goodstein also admits he is not aware of any peer reviewed literature that supports the position that a 30-degree incline (as in the RNPS) increases the risk of SIDS. He further admits that SIDS can happen in ***any*** sleep environment—even in what he claims to be "safe" sleep environments. These admissions make clear that Dr. Goodstein's infant sleep safety recommendations are not relevant to the issues in this case and will not help the jury determine whether the RNPS was defective and whether a defect caused Z.O.'s death. These recommendations should therefore be excluded.

***Third***, Dr. Goodstein offered new opinions about "rebreathing" during his September 2021 deposition that were never included in either his original expert report or his rebuttal report. These new opinions are improper under Rule 26 and prevailing Ninth Circuit precedent, and should be excluded under Rule 37.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

*Fourth and finally*, Dr. Goodstein should be precluded from offering any opinions he has disclaimed. Specifically, Dr. Goodstein admits he has no expertise in pathology/neuropathology, epidemiology, or Consumer Products Safety Commission ("CPSC") regulatory standards, or any other regulatory issues related to the RNPS. To the extent Dr. Goodstein's original or rebuttal reports suggest he is offering opinions in these areas, the Court should exclude them.

## FACTUAL BACKGROUND

To avoid repetition, Defendants fully incorporate by reference Sections I and II of their Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, which provides a detailed factual background about the RNPS and the incident that is the basis of this lawsuit.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, the Court acts as a "gatekeeper" to first determine whether an expert is qualified; then the Court determines whether an expert's proposed opinions are reliable and relevant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 597; *see also Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir.) cert. denied, 132 S. Ct. 120 (2011); *Contreras v. Brown*, CV-17-08217-PHX-JAT, 2019 WL 2080143, at *1 (D. Ariz. May 10, 2019) ("Rule 702 imposes a special gatekeeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert [] testimony."); *In re Apollo Grp., Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 962 (D. Ariz. 2007) (confirming the gatekeeping obligation outlined in *Daubert* applies to all expert testimony); *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) ("In exercising this gatekeeping function, a court must determine that the experts are qualified, that their opinions are reliable, and that their testimony fits the case.").

To determine whether an expert is qualified, the Court must decide whether the individual has the requisite qualifications. *Skinner v. Tuscan, Inc.*, No. CV-18-00319-

3

TUC-RCC, 2020 U.S. Dist. LEXIS 186308, at *23-24 (D. Ariz. Oct. 7, 2020). The Court's review of an expert's qualifications also defines the scope of the expert's permissible testimony. *Swift v. Wesco Ins. Co.*, No. CV-18-01531-PHX-RM, 2021 U.S. Dist. LEXIS 34808, * 19 (D. Ariz. Feb. 23, 2021).

Next, the Court evaluates the reliability and relevancy of the expert's proposed opinions. *Daubert* articulated several inquiries for a district court to consider in determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the expert's theory or technique can and has been tested; (2) whether it has been subjected to peer review and publication; (3) what the technique's known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field. 509 U.S. at 593-94; *see also Brown*, 415 F.3d at 1267.

Finally, the Court must determine whether the expert's reasoning or methodology is relevant. *Sampedro v. ODR Mgmt. Grp. LLC*, No. CV-18-04811-PHX-SPL, 2021 U.S. Dist. LEXIS 96323, at *5 (D. Ariz. May 19, 2021). The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *Roosevelt Irrigation Dist. v. United States*, No. CV-15-00448-PHX-JJT, 2019 U.S. Dist. LEXIS 36530, at *5-6 (D. Ariz. Mar. 7, 2019). In doing so, the court must determine whether the opinions being offered are sufficiently tied to the facts in issue and whether the expert's testimony will aid the jury. *Daubert*, 509 U.S. at 591 (stating that the district court's "gatekeeping role" requires ensuring that the expert's testimony "is relevant to the task at hand" and will assist the trier of fact to understand the evidence).

## ARGUMENT

**I.    Dr. Goodstein's Limited and Narrow SIDS Opinion Should Be Excluded as Unreliable.**

Dr. Goodstein admits that all of his opinions in this case are summarized in one paragraph, nine lines of his April 2021 report. (Dr. Goodstein's April 2021 Report at

4

COU_008242, **Ex. A**; *see also* M. Goodstein, MD, Dep. at 100:1-3; 111:6-14, **Ex. C**) (admitting that the "entirety" of his opinions are in the last paragraph of his report). Specific to the issue of SIDS, Dr. Goodstein states: "[Z.O.] had no obvious intrinsic risk factors (such as intrauterine growth restriction or maternal use of cigarettes or alcohol) that would increase her risk of SIDS." (Dr. Goodstein's April 2021 Report at COU_008242, **Ex. A**). Importantly, as related to SIDS, even Dr. Goodstein concedes that an expert must consider both intrinsic and extrinsic risk factors. (Dr. Goodstein's April 2021 Report at COU_008225, **Ex. A**; *see also* M. Goodstein, MD, Dep., at 169:5-14; 169:20-22; 173:20-174:3; 191:11-14, **Ex. C**). But Dr. Goodstein's purported limited and narrow opinion that Z.O. was not at an increased risk of SIDS fails to include an assessment of critical *extrinsic* risk factors, which Dr. Goodstein defines as "things particular to the environment." (M. Goodstein, MD, Dep., at 230:25-231:1, **Ex. C**). In this case, examples of extrinsic risk factors that should have been considered by Dr. Goodstein, but were not, include Z.O.'s exposure to secondhand smoke/marijuana and the temperature in the room in which she was found deceased.

Dr. Goodstein admits that extrinsic risk factors are important to any analysis about SIDS risk factors, despite his failure to account for them in his reports:

> Q. In your opinions in your report in this case, you're not addressing extrinsic risk factors. Correct?
> A. I did not.
>
> * * *
>
> Q. [J]ust to be clear, you're not saying that extrinsic risk factors are not important, are you?
> A. Of course not. Extrinsic risk factors are important.
> Q. Every article you're written on SIDS and SUIDs cover extrinsic. Right?
> A. Of course. I'm not saying that they're causative, but they are risk factors.

5

> Q. And in fact, you would take issue with somebody who wrote an article about risk factors for SIDS and didn't address extrinsic risk factors. True?
>
> A. True.

(*Id.* at 100:10-13; 120:21-121:8).

Dr. Goodstein further admitted his reports do not address critical record evidence that would have given him a comprehensive picture of all the pertinent facts in this case, including SIDS risk factors. Specifically, he admits he did not address in his reports the relevant police reports and supporting investigation documents, the medical examiner's records, and deposition testimony from investigating personnel associated with the police department and medical examiner's office:

> Q. Okay. You don't address the police or the autopsy or the medical examiner's records. Correct?
>
> A. Correct.
>
> * * *
>
> Q. You don't have anything in here about the night in question . . . June 19th, 2014, you don't address that in here, do you?
>
> A. No.
>
> * * *
>
> Q. Deposition of Detective O'Brien, Detective Michelle Reyes . . . ME Dr. Michael Ferenc, ME Investigator Farrel Swope, you don't address any of those in your report. Correct?
>
> A. Not the initial report . . . .
>
> * * *
>
> Q. Tempe Fire Department records, you didn't reference those in your report. Correct?

6

>   A. I don't believe so.
>
>   Q. Sergeant Alan Akey, the same thing, you didn't reference that in the report. Correct?
>
>   A. Correct.

(*Id.* at 100:17-19; 100:23-101:4; 104:25-106:5; 106:5-12).

Instead, Dr. Goodstein admits he only reviewed and relied on Z.O.'s medical records, Plaintiff's discovery responses, and some parts of Plaintiff's and Mr. Olson's depositions:

>   Q. Okay. So in terms of this list, just to recap, and your report—your official report in this case, the only things you rely upon in here were the medical records and maybe plaintiffs' discovery responses and maybe parts of the depositions. Is that a fair recap?
>
>   A. I think so.
>
>   Q. And the other things were not—were not part of what you relied upon and not part of your opinions in the case. Correct?
>
>   A. Correct.

(*Id.* at 109:16-110:1).

Why did Dr. Goodstein fail to discuss extrinsic risk factors and fail to address and rely on critical record evidence? Because Plaintiff's counsel told him not to consider them:

>   Q. And that paragraph contains your opinions in this case. Correct?
>
>   A. Yes.
>
>   Q. And you don't address in here at all any extrinsic risk factors. Correct?
>
>   A. **I was not asked to comment on that**.

7

\* \* \*

Q. Well, you don't address any extrinsic risk factors in your report. True?

A. **I wasn't asked to discuss that until the rebuttals**.

\* \* \*

Q. Okay. And you do agree that there were extrinsic risk factors like we talked about. Correct?

A. **Yes**.

\* \* \*

Q. Did you ever ask counsel who retained you in this case, Hey, can I add extrinsic risk factors to the report?

A. **I did not ask that. And they didn't say that I should do that. I just did the report as per I was asked**.

\* \* \*

Q. So you didn't include all of [the intrinsic and extrinsic risk factors] is what you're saying because you weren't asked to do that?

A. **Correct**.

\* \* \*

Q. All right. Were you specifically told to just include intrinsic risk factors? I don't really understand?

A. It went to the health of the baby. That's why that's included.

Q. Okay?

A. I was asked to comment on the medical records and how it purports to this case. . . . [T]he health records are not relevant in terms of extrinsic risk factors at the scene of the

event. **So it is a separate issue that I was not asked to comment on.**

(*Id.* at 100:1-6; 120:17-20; 175:2-4; 75:12-17; 232:23-25;233:1-15) (emphasis added).

Unsurprisingly, Dr. Goodstein admitted he certainly would have included a discussion about extrinsic risk factors like secondhand smoke and the temperature in the room in which Z.O. died if he had been told to include those factors:

> Q. -- Exhibit 2A, your conclusion talks about only intrinsic risk factors of SIDS. And you explained you were only asked to include intrinsic.
>
> A. Yes.
>
> Q. If you had been asked to do your full assessment on risk factors, you would have had to include smoking, secondary smoke?
>
> A. **Yes**.
>
> Q. No question?
>
> A. **No question** . . . .
>
> \* \* \*
>
> Q. You wouldn't have risked your reputation by leaving it off; you would have included it?
>
> A. **Absolutely**.
>
> \* \* \*
>
> Q. Now, did you see there was a heating issue in the Courkamp house?
>
> A. Yes.
>
> Q. And you factored that in?
>
> A. **I wasn't asked to talk about that**.
>
> Q. I'm sorry. That would have been another thing that if you included extrinsic risk factors, you would have included that?

9

| | |
|---|---|
| 1 | A. **Yes**. |
| 2 | * * * |
| 3 | Q. And, in fact, if you were including not just intrinsic, but |
| 4 | extrinsic rick factors, you would have included [smoking] on |
| 5 | your list in your report? |
| 6 | A. **Yes, I would have**. |

(*Id.* at 169:5-14; 169:20-22; 173:20-174:3; 191:11-14) (emphasis added).

Dr. Goodstein's testimony confirms that his limited and narrow opinion that Z.O. was not at an increased risk of SIDS is based on a flawed and unreliable methodology that does not pass muster under Rule 702. Ignoring critical extrinsic risk factors such as Z.O.'s exposure to secondhand smoke/marijuana and the temperature in the room in which she was found deceased means that Dr. Goodstein did not properly consider whether and how these factors could have increased her risk of SIDS, and therefore calls into question his limited and narrow opinion that Z.O. was not at an increased risk of SIDS. It is equally telling that Dr. Goodstein failed to address critical record evidence like the relevant police reports and supporting investigation documents, the medical examiner's records, and deposition testimony from investigating personnel associated with the police department and medical examiner's office.

That Dr. Goodstein unequivocally admitted the important role extrinsic risk factors play into a SIDS risk factors analysis but still chose to ignore them demonstrates he cherry-picked record evidence that was helpful to Plaintiff and ignored record evidence that was not. This is particularly alarming for a physician who holds himself out as an expert in SIDS and has been a member of the American Academy of Pediatrics ("AAP") for 31 years. Dr. Goodstein's testimony that he "wasn't asked" to discuss extrinsic risk factors or address crucial record evidence does not save his opinions from exclusion.

"[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data" in an effort to support the conclusions provided to them. *EEOC v. Freeman*, 778

F.3d 463, 469 (4th Cir. 2015) (collecting cases); *see also Claar v. Burlington N.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007) (excluding expert opinion when she "ignore[d] all the evidence that contradict[ed] her litigation-created conclusion"); *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("[A] selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'").

Dr. Goodstein's intentional disregard of significant facts at the direction of Plaintiff's counsel illustrates that he did not employ a scientifically reliable methodology under Rule 702 in reaching his limited and narrow opinion that Z.O. was not at an increased risk of SIDS. His failure to consider critical record evidence and multiple extrinsic risk factors casts doubt on this opinion, and the Court should exclude it.

## II. Dr. Goodstein's Infant Safe Sleep Recommendations Should Be Excluded as Irrelevant.

Other than the roughly four pages summarizing Z.O.'s medical records and the one paragraph, nine-line summary of his conclusion, Dr. Goodstein's April 2021 report consists of nearly fifteen-pages about infant safe sleep recommendations, none of which advance Plaintiff's (meritless) theory that the RNPS was defective or that a specific *defect* in the RNPS caused Z.O.'s death. While Dr. Goodstein broadly states in his report that the RNPS "did not comply with the AAP safe sleep guidelines[,]" (Goodstein Report, at COU_008237, **Ex. A**), he admittedthis is *not a formal opinion* he is offering here. As noted above, Dr. Goodstein testified at his deposition that he was not offering any opinions on safe sleep recommendations or practices—only an opinion on intrinsic risk factors for SIDS. (M. Goodstein, MD, Dep., at 100:1-3; 111:6-14, **Ex. C**) (admitting that the "entirety" of his opinions are in the last paragraph of his report). Similarly, to the extent Dr. Goodstein's report purports to opine that the RNPS is unsafe because it does not comply with the AAP safe sleep guidelines, Dr. Goodstein expressly disclaimed any

11

such opinion at his deposition when he admitted his only opinion is about intrinsic risk factors for SIDS. (*Id.*). Even still, this purported opinion is separately excludable because Dr. Goodstein unequivocally admitted he is not aware of any peer reviewed literature that supports the proposition that a 30-degree incline (as in the RNPS) is unsafe. (*See* M. Goodstein, MD, Dep., at 68:20-69:13; 152:21-153:1; 153:9-16, **Ex. B**).

Simply put, Dr. Goodstein does not explain in his report or deposition how these safe sleep recommendations prove the RNPS was defective and that a specific defect caused Z.O.'s death—a burden Plaintiff must meet with expert testimony as explained in Defendants' Memorandum in Support of Their Motion for Summary Judgment, which is contemporaneously being filed with this Motion and incorporated by reference herein.

Dr. Goodstein does, however, admit in no uncertain terms that is he is **not offering any cause of death opinions in this case and did not conduct a differential diagnosis to opine on causation**:

> Q. Okay. You don't address cause of death. Correct?
> A. No, I did not.
>
> * * *
>
> Q. Okay. And again, in your official report that you signed off on April 1st, 2021, you do not address cause of death in here. Correct?
> A. Correct.
>
> * * *
>
> Q. This conclusion comprises your opinions in your rebuttal report. Right?
> A. Yes.
> Q. This is a section that covers your opinions. True?
> A. Yes.
> Q. And you don't get into cause of death here at all. Correct?
> A. Correct.

12

Q. And in neither report—just again to be very clear, in neither report do you include a differential diagnosis of what happened in this case. True?

A. I was not asked to do that. So it's not included in the report.

* * *

Q. I'm going to ask very clearly. There is not a differential diagnosis in either of these reports in Exhibit 2 [original report] or Exhibit 3 [rebuttal report]. Correct?

A. Correct.

Q. And you did not offer up in your opinions a differential diagnosis. Correct?

A. Correct.

(*Id.* at 100:14-16; 101:5-8; 143:19-144:5; 144:13-19).

These admissions confirm that Dr. Goodstein is not going to tell the jury that some alleged unsafe or defective aspect of the RNPS caused Z.O.'s death or somehow increased her risk of SIDS. Indeed, he admits there is no peer reviewed medical literature supporting the proposition that a 30-degree incline (as in the RNPS) increases the risk of SIDS or SUIDs and admits that an infant can die of SIDS in *any* sleep environment:

Q. My question was, do you know of any—you're not aware of any peer review study to support the position that a 30-degree incline increases the risk of SIDS?

…A. I don't know what—I don't know what degree constitutes an increased risk. It could. I don't know. I don't know of a specific study to do that, but I don't know of any studies that have looked at it in—in general?

Q. So the answer is yes?

…A. Okay?

13

|   |   |
|---|---|
| 1 | Q. Do you agree with me? |
| 2 | …A. Okay. Yes. |
| 3 | * * * |
| 4 | Q. [I]s it true that SIDS can happen in any sleep |
| 5 | environment? |
| 6 | A. Yes. |
| 7 | Q. And SIDS can happen even in a safe sleep environment. |
| 8 | Correct? |
| 9 | A. Yes. |
| 10 | * * * |
| 11 | Q. But you agree that even in the most careful circumstance |
| 12 | with a sleep product or a crib and even in the best of care, |
| 13 | SIDS can happen and SUIDs can happen? |
| 14 | A. Yes. That's why it's SIDS. Yeah, we can't prevent SIDS. |
| 15 | We can just minimize the risk. We can prevent suffocation, |
| 16 | strangulation, and some asphyxias; but SIDS itself we cannot |
| 17 | prevent yet. |

(*Id.* at 68:20-69:13; 152:21-153:1; 153:9-16).

Rule 702 requires an expert's testimony "fit" the facts of the case and assist the trier of fact understand the evidence. This requires an expert's opinions and testimony be "relevant to the task at hand." *Daubert*, 509 U.S. at 591. Here, Dr. Goodstein's admissions that he is not offering any opinions about safe sleep recommendations coupled with his failure to connect his fifteen-page general discussion about infant safe sleep recommendations to the issues in this case means these recommendations are irrelevant and do not "fit" the facts of this case and thus will not assist the jury understand the evidence. The Court should exclude them.

14

**III.  Dr. Goodstein Should Not Be Permitted to Opine on New Subjects Not Disclosed in His April 2021 Expert Report.**

Federal Rule of Civil Procedure 26 requires that each expert prepare a written report, which includes "a complete statement of all opinions the witness will express and the basis and reasons for them." "The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). Here, Dr. Goodstein testified he understood the importance of his report being truthful and accurate. (Goodstein Dep. Tr. at 14:20-24; 133:2-134:6, **Ex. C**). Dr. Goodstein also understood his expert report should include all the opinions he intended to offer in this case. (*Id.* at 14:25-15:3). Yet, during his deposition he offered a new opinion about "rebreathing" (and referenced a video on the subject), which was never discussed in either his original or rebuttal reports:

> Q.  That video [about rebreathing] is not cited in either of your reports, is it?
>
> A.  It is not.  I don't believe so?
>
> Q.  Okay.  And also as I look through your reports, your reports don't address rebreathing, do they?  The word rebreathing is not in either report, is it?
>
> A.  I just addressed the things that I was asked to address.
>
> Q.  . . . I'm just asking a simple question.  Rebreathing is not in your report, Exhibit 2, is it?
>
> A.  I just addressed the things that I was asked to address.
>
> Q.  . . . I'm just asking a simple question.  Rebreathing is not in your report, Exhibit 2, is it?
>
> A.  I don't believe so.
>
> Q.  Rebreathing is not in your [rebuttal] report, Exhibit 3, is it?

        A. I don't believe so.

        Q. So it's a new topic that hasn't been addressed before. Correct?

        A. In relation to what I was asked to write, yes. . . .

        Q. But it's not an opinion that you offered in your report, is it, sir?

        A. No.

        Q. And the video is not offered in your—in either of your reports or referenced. Correct?

        A. No. It is something that was thought of after submission that I thought was relevant.

(*Id.* at 270:17-271:19).

        Dr. Goodstein's new "rebreathing" opinion disclosed for the first time at his deposition is untimely under Rule 26(a)(2) and should be excluded under Federal Rule of Civil Procedure 37, especially in light of the fact that Dr. Goodstein's deposition occurred on September 30, 2021–one day before the close of discovery in this matter. *See Krause v. Cty. Of Mohave*, 459 F. Supp. 3d 1258, 1268-70 (D. Ariz. 2020) (excluding expert opinion offered for the first time during deposition four days before close of discovery); *Universal Engraving, Inc. v. Metal Magic, Inc.*, No. 08-1944-PHX-GMS, 2010 U.S. Dist. LEXIS 146741, at *7 (D. Ariz. Jan. 14, 2010) ("As both parties are by now aware, the Court takes the deadlines and procedures set forth in its Case Management Orders seriously, and expects that all parties will do the same. Thus, in the absence of good cause, Plaintiff was not permitted to supplement the opinions of its expert trial witness after the time required for doing so in the Court's Case Management Order had expired.") (Snow, J.); *Ariz. Oil Holdings LLC v. BP W. Coast Prods. LLC*, No. CV-14-00569-PHX-GMS, 2015 U.S. Dist. LEXIS 194151, at *5 (D. Ariz. May 29, 2015) (striking Plaintiffs' supplemental report that proffered additional opinions on damages based on material "Plaintiffs were either aware or should have reasonably become aware

16

of") (Snow, J.); *see also Mitchell v. Ford Motor Co.*, 318 F. Appx. 821, 824-825 (11th Cir. 2009) (striking untimely disclosure of expert opinions).

### IV. Dr. Goodstein Should Be Precluded from Offering Any Opinions He Has Disclaimed.

Finally, in his deposition Dr. Goodstein expressly disclaimed having expertise in several areas upon which his original and rebuttal reports ostensibly touches. Specifically, Dr. Goodstein conceded that he is not an "expert pathologist," "neuropathologist," "engineer[]," "epidemiologist," "statistician," "biostatistician," and has never been a member of the CPSC or the Juvenile Products Manufacturers Association ("JPMA"). (*Id.* at 21:1-22:1; 138:25-139:8; 141:18-22). And while he purports to have "a deep understanding of epidemiology of SIDS from [his] work with the [AAP] taskforce," he admits he did not include in his original report a full epidemiological assessment of SIDS because he "was not asked to do that." (*Id.* at 139:16-25). By his own admissions and testimony, Dr. Goodstein should not be permitted to testify on any of these subjects.

### CONCLUSION

For the reasons stated herein, Defendants respectfully request that the Court grant this Motion, exclude the opinions and testimony of Dr. Goodstein, and grant all other relief to which Defendants may be entitled.

RESPECTFULLY SUBMITTED this 19th day of November 2021.

GREENBERG TRAURIG LLP

By: */s/ Lori G. Cohen*
Lori G. Cohen*
Mary-Olga Lovett*
Brandon D. Cox*
Nicole M. Goodwin
Aaron J. Lockwood
**Pro Hac Vice*
*Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

**Certificate of Service**

☒   I hereby certify that on November 19, 2021, I electronically transmitted the attached document by email to the following recipients:

John E. Osborne
William C. Bacon
GOLDBERG & OSBORNE LLP
698 E. Wetmore Road, Ste. 200
Tucson, Arizona 85705
josborne@goldbergandosborne.com
wbacon@goldbergandosborne.com
*Attorneys for Plaintiff*

By: */s/ Lori G. Cohen*
Greenberg Traurig, LLP

61166970