# **EXHIBIT C**



Deposition of:
# Michael Goodstein, M.D.

*September 30, 2021*

In the Matter of:

# In Re: Fisher-Price/Mattel

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 1

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA
2                      - - - - -
        KATHLEEN COURKAMP, FOR        :
3       HERSELF AND ON BEHALF OF      :
        OTHER STATUTORY               :
4       BENEFICIARIES,                :
                    Plaintiff,        :
5                                     : CASE NO.
              -vs-                    : 2:19-CV-02689-GMS
6                                     :
        FISHER-PRICE, INC., A         :
7       FOREIGN CORPORATION;          :
        MATTEL, INC., A FOREIGN       :
8       CORPORATION                   :
                    Defendants.       :
9
                         -   -   -
10
                Thursday, September 30, 2021
11
                         -   -   -
12
13            VIDEOTAPED deposition of MICHAEL
14      GOODSTEIN, M.D., held at the Hershey Hotel, 100
15      Hotel Road, Hershey, Pennsylvania, commencing at
16      9:28 a.m., on the above date, before Denise L.
17      Travis, RPR, Court Reporter and Notary Public in
18      the Commonwealth of Pennsylvania.
19                       -   -   -
20
21
22
23
24
25

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 2

1   APPEARANCES:
2       GOLDBERG & OSBORNE
        BY: JOHN E. OSBORNE, ESQUIRE
3       698 East Wetmore Road
        Suite 200
4       Tuscon, AZ  85705
        (520) 620-3980
5       josborne@goldbergandosborne.com
        Representing the Plaintiff
6
        GREENBERG TRAURIG, LLP
7       BY: LORI COHEN, ESQUIRE
        ALLISON NG, ESQUIRE
8       Terminus 200
        3333 Piedmont Road NE, Suite 2500
9       Atlanta, GA  30305
        (678) 553-2100
10      cohenl@gtlaw.com
        Representing the Defendants
11
12
13
    ALSO PRESENT:
14      Robert Irvin, Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 3

1               I N D E X
2   WITNESS:  MICHAEL GOODSTEIN, M.D.      PAGE
3     EXAMINATION
        By Ms. Cohen               7
4       By Mr. Osborne             244
        By Ms. Cohen               265
5       By Mr. Osborne             274
        By Ms. Cohen               277
6
7           E X H I B I T S
8   EXHIBIT       DESCRIPTION        PAGE
    Exhibit 1    *Dr. Goodstein's orange folder
9       containing his composite file    10
10  Exhibit 2    Original Report, 4/1/21     11
11  Exhibit 2A   Original Report, 4/1/21 with
        Attachments            125
12
    Exhibit 3    Rebuttal Report, 7/16/21     15
13
    Exhibit 3A   Rebuttal Report, 7/16/21 with
14      Attachments            126
15  Exhibit 4    Article, "While They Were
        Sleeping," 12/30/19        23
16
    Exhibit 5    SIDS Task Force 2005 Policy
17      Statement              25
18  Exhibit 6    SIDS Task Force 2011 Policy    25
        Statement
19
    Exhibit 7    SIDS Task Force 2016 Policy
20      Statement              26
21  Exhibit 8    Article by Goldstein, et al.   26
22  Exhibit 9    Article, "Half Century Since SIDS:
        A Reappraisal of Terminology"      28
23
24      *(Only a copy of the cover of the folder is
        attached as Exhibit 1.  The contents of the folder
25      are marked individually as Exhibits 2 through 15.)

Page 4

1           E X H I B I T S (Cont'd)
2   EXHIBIT      DESCRIPTION          PAGE
3   Exhibit 10   Journal of Biomechanics Junsig
        Wang article          30
4
    Exhibit 11   Kinney and Thach Article, "The
5       Sudden Infant Death Syndrome."    33
6   Exhibit 12   Page from the book Investigation
        of Sudden Infant Death Syndrome    34
7
    Exhibit 13   Section from Investigation of
8       Sudden Infant Death Syndrome     39
9   Exhibit 14   Article from Children's Safety
        Network, "Sudden Unexpected Infant
10      Deaths in the United States,"     49
11  Exhibit 15   Quote from 2011 SIDS Task Force
        Recommendations          58
12
    Exhibit 16   Seventeenth Supplement to
13      Plaintiff's Mandatory Initial
        Discovery Responses and
14      Plaintiff's Initial Disclosure
        Statement             70
15
    Exhibit 17   Amended Notice of Videotaped
16      Deposition of Michael Goodstein,
        M.D.                72
17
    Exhibit 18   Curriculum Vitae          73
18
    Exhibit 19   List of Materials Reviewed     86
19
20  Exhibit 20   Invoice              116
21  Exhibit 21   Invoice              116
22  Exhibit 22   Article, "A Parent's Guide to a
        Safe Sleep Environment,"      161
23  Exhibit 23   Color Copy of Photograph of
        Warning Label          165
24
25

Page 5

1           E X H I B I T S (Cont'd)
2   EXHIBIT      DESCRIPTION          PAGE
3   Exhibit 24   Tempe Police Department Records    178
4   Exhibit 25   Maricopa County Medical Examiner's
        Records               178
5
6   Exhibit 26   Banner Thunderbird Medical Records  185
7   Exhibit 27   Erich Batra, et al., Journal of
        Pediatrics Article        192
8   Exhibit 28   2011 Technical Report        204
9   Exhibit 29   2016 Technical Report        204
10  Exhibit 30   Policy Statement titled, "Expert
        Witness Participation in Civil and
11      Criminal Proceedings"        220
12  Exhibit 31   Thomas Bajanowski, et al., Article  241
13
14
15
    REQUESTS FOR INFORMATION OR DOCUMENTS:
16  PAGES: 74
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 6

1    THE VIDEOGRAPHER: Good morning. We
2    are going on the record at 9:28 a.m. on September
3    30th, 2021. This is the video recorded deposition of
4    Dr. Michael Goldstein --
5    THE WITNESS: Goodstein. No.
6    Goodstein.
7    THE VIDEOGRAPHER: -- excuse me --
8    Dr. Michael Goodstein taken by counsel for the
9    defendant in the matter of Kathleen Courkamp, et al.
10   V. Fisher-Price, Incorporated, et al., in the United
11   States District Court for the District of Arizona,
12   Case No. 2:19-CV-02689-GMS. This deposition is being
13   held at The Hotel Hershey located at 100 Hotel Road,
14   Hershey, Pennsylvania.
15   My name is Robert Irvin with the
16   firm of Veritext Legal Solutions, and I am the
17   videographer. The court reporter is Denise Travis
18   also from the firm of Veritext Legal Solutions.
19   Counsel and all present in the room
20   and everyone attending remotely will now state their
21   appearances and affiliations for the record.
22   MR. OSBORNE: This is John Osborne
23   on behalf of Katie Courkamp and Andrew Olson.
24   MS. COHEN: And this is Lori Cohen
25   on behalf of the defendants in this case.

Page 7

1    MS. NG: Allison Ng on behalf of the
2    defendants.
3    THE VIDEOGRAPHER: Would the court
4    reporter please swear in the witness?
5    - - -
6    MICHAEL GOODSTEIN, M.D., having
7    been duly sworn, was examined and testified as
8    follows:
9    - - -
10   EXAMINATION
11   BY MS. COHEN:
12   Q.    Good morning, Dr. Goodstein. How are you?
13   A.    Good morning. What's the proper way to
14   address you?
15   Q.    Lori or Ms. Cohen, either way is fine.
16   A.    Okay. Thank you.
17   Q.    You will not offend me at all.
18   A.    Okay. I certainly hope not.
19   Q.    Thank you for being here. And thank you for
20   coming all this way, you know, because we wanted to do
21   your deposition in person. We're here in Hershey,
22   Pennsylvania, which I know was a little bit of a drive
23   for you. So we appreciate you coming here.
24   A.    No worries. Thank you so much for moving it
25   from Philadelphia. That was a little bit of a

Page 8

1    stretch.
2    Q.    So have you given a deposition before?
3    A.    I've not given expert testimony for a
4    deposition. I did do one deposition where I was not
5    being sued, but my hospital was. And so I did do a
6    one piece deposition for that.
7    Q.    That was, like, as a treating physician, as a
8    fact witness in the --
9    A.    Yes.
10   Q.    -- hospital?
11   Okay. Just for our court reporter,
12   because the one thing we have going on today is we do
13   have masks, all of us. I know I'm going to try and be
14   mindful and helpful to our court reporter. So one
15   thing to keep in mind is -- is I should finish my
16   question before you start talking and vice versa. It
17   will be a little bit more challenging today. But if I
18   say something like, you know, let me finish, I don't
19   mean for rude to you at all. It's really so I don't
20   get something thrown at me by the court reporter --
21   A.    Okay.
22   Q.    -- because she wants to get a good transcript
23   down. And I know you've given one other test --
24   tran -- deposition as you just said. So hopefully,
25   today will not be much different from that. I'm just

Page 9

1    going to ask a series of questions. Obviously, I'll
2    wait for you to answer. I'll try not to interrupt
3    you.
4    If you have any questions of me, if
5    I don't give you something or you want to see
6    something or you want me to slow down, just let me
7    know and I'll be glad to accommodate you.
8    A.    Um-hum.
9    Q.    If you want to take a break at all, you know,
10   if you are getting tired or you just need to stretch
11   your legs, please let me know and I'll be happy to
12   accommodate you with that, too?
13   A.    Great. Thank you.
14   Q.    It's definitely not meant to be a marathon.
15   So just --
16   A.    Okay.
17   Q.    -- let me know if your needs are not being
18   met or if you, you know, need anything from my end.
19   All right?
20   A.    Thank you.
21   Q.    Yeah.
22   MS. COHEN: And just to start off,
23   the deposition will be taken pursuant to the
24   protective order in the case, in case I didn't say
25   that already, and also pursuant to notice and all

3 (Pages 6 - 9)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 10

1  formalities waived except those as to form of the
2  question and responsiveness of answer.
3          And I understand that you are
4  reserving -- you are waiting until the end of the
5  deposition to decide whether you'll reserve his
6  signature.
7          MR. OSBORNE:  Correct.
8          MS. COHEN:  Okay.  Good.
9          MR. OSBORNE:  All objections
10 according to the rules is what I'm understanding.
11         MS. COHEN:  Yes.
12         (Exhibit 1, Dr. Goodstein's orange
13 folder containing his composite file, marked for
14 identification.)
15 BY MS. COHEN:
16 Q.     I'm going to go ahead and mark your bright
17 orange folder that you have so kindly brought with you
18 today and put a one on it on the top of it.  And
19 again, inside of it -- I guess we'll get the whole
20 thing marked as a composite Exhibit 1.  And we'll get
21 it copied here, and you can take ownership.  Whatever
22 you're comfortable with is fine with me.
23         MR. OSBORNE:  Um-hum.  Thank you.
24         MS. COHEN:  Yep.
25 BY MS. COHEN:

Page 11

1  Q.     Let me just go through what you've brought in
2  here.  First of all, you brought -- starting from the
3  back, I think you brought your report.  Is that right?
4  A.     Yes.  Would it be helpful to tell you what's
5  in this?
6  Q.     Yes.  I just want to maybe go through -- I
7  see you have your report.
8  A.     I have my original report and the rebuttal
9  report --
10 Q.     Okay.
11 A.     -- as well.
12 Q.     Let me just go through so I can get
13 organized.  And we'll mark the original report in a
14 few moments separately.  But your original report will
15 be Exhibit 2 in there.  Do you want me to mark on this
16 copy?  Is that all right?
17 A.     That's fine.  Yep.
18         (Exhibit 2, Original Report, 4/1/21,
19 marked for identification.)
20 Q.     Okay.  So your original report, just as we go
21 through it, was dated April 16th, 2021.  Does that
22 make -- is that what you recall?
23 A.     I'll take your word for you it on the -- on
24 the date.
25 Q.     Let's check and make sure.  And I'll let you

Page 12

1  look at it as well.  Oh, I'm sorry.  April 1st, 2021.
2  Okay.  You see, I already made my first mistake.
3          And this, you understand, is your --
4  what we call your official Rule 26 expert report in
5  this litigation?
6  A.     Okay.
7  Q.     Is that -- do you understand that this is
8  what this is?
9  A.     Um-hum.  Yes.
10 Q.     And this was the original report.  Is that
11 your signature on there?
12 A.     Yes, it is.
13 Q.     And that was the date you signed it?
14 A.     Yes, it is.
15 Q.     Okay.  We'll obviously come back to that.
16         Was this the first time you've ever
17 done an expert witness report?
18 A.     I've done one other report; but that -- I was
19 not asked to do a deposition or testify.
20 Q.     In that case where you did the other report,
21 was that for Mr. Osborne and his firm or a
22 different --
23 A.     No, it was a different firm.
24 Q.     And did that relate at all to the Rock n'
25 Play Sleeper device that's at issue in this case?

Page 13

1  A.     No, it did not.  It had to do with
2  SleepSacks, HALO SleepSacks.
3  Q.     SleepSacks?
4  A.     Yeah.  Basically, it's a wearable blanket.
5  Q.     Okay.  So was -- was it another alleged
6  products liability situation?
7  A.     Yes, it was.  Yes.  There was a death of an
8  infant who was wearing one of those wearable blankets,
9  and the company was accused of having an unsafe
10 product.  And I was asked to talk about what the AAP
11 recommendations were regarding that -- that product.
12 Q.     And what was the time frame when you did that
13 report?
14 A.     I'd have to go and look through my records to
15 tell you exactly when that is.  It was a few years --
16 it was within the five-year period, I believe, that
17 you asked for information in terms of litigation.
18 Q.     Okay.  You're saying it was within or
19 without?
20 A.     It was within the five years, I believe.
21 Q.     Did you notice -- did you list that one?
22 A.     Um-hum.  Yes.  Yes, ma'am.
23 Q.     Okay.  Can you show me -- I'm sorry.  Was
24 that listed in the report?
25 A.     No.  I was asked separately from Attorney

4 (Pages 10 - 13)

Michael Goodstein, M.D.                     September 30, 2021
In Re: Fisher-Price/Mattel

Page 14

1   Osborne's staff to give all of that information.  And
2   I did that.
3   Q.      Okay.
4   A.      It was probably by e-mail to them.
5   Q.      Got it.  And so that one was a report that
6   did not go to deposition or any further?
7   A.      For me, no.  I don't know what happened with
8   that case, if it went to trial or what happened beyond
9   my giving them the report.
10  Q.      So given that you've had that other
11  situation --
12          MR. OSBORNE:  I'm sorry.  I don't
13  know how --
14          MS. COHEN:  It's okay, John.
15          MR. OSBORNE:  -- to turn that off.
16          MS. COHEN:  Do you want me to stop?
17          MR. OSBORNE:  No.
18          MS. COHEN:  It's okay?
19  BY MS. COHEN:
20  Q.      But given that you've done that one other
21  report, you understand the importance of -- of the
22  expert report, in other words, that it contains your
23  true and accurate opinions?
24  A.      Yes, ma'am.
25  Q.      And when you signed off on it on April 1st,

Page 15

1   2021, you understood that this was expressing your
2   full opinions in this case at that time?
3   A.      At that time.
4   Q.      Okay.
5   A.      Obviously, new information continues to come
6   out.  We do not have a complete understanding of these
7   sleep-related deaths.  So that's why one of the first
8   things in my folder was an article that just came to
9   press this past week.
10  Q.      Understood.  But in terms of the scope of
11  your opinions and -- and, again, what you're covering
12  in the case, this was meant to be the -- again, the
13  full scope of your opinions, the areas you're covering
14  and addressing?
15  A.      Yes, as I was asked to.
16  Q.      Okay.  And then I'm going from the backwards,
17  because I know there's the rebuttal here.
18          (Exhibit 3, Rebuttal Report,
19  7/16/21, marked for identification.)
20  Q.      I'm going to mark as Exhibit 3, this is your
21  rebuttal report on July 16th, 2021?
22  A.      Yes.
23  Q.      Okay.  And that's the next item in here.
24          Now, this one has at the top
25  WellSpan Neonatology.  And the first one, your

Page 16

1   original report has no sort of header.  Is there any
2   reason for that?
3   A.      No.  I -- I believe that Attorney Osborne
4   asked me to put a formal -- as part of the rebuttal to
5   put it in a letter format.  So I just did that with
6   what's used at my hospital where I work.
7   Q.      Okay.  And I'm not intending to be super
8   suspicious.  I just was wondering if there's anything
9   new that happened about your employment that changed
10  between there?
11  A.      No.  I've been in the same place for 28
12  years.
13  Q.      Okay.  And again, in terms of your rebuttal
14  report, which we'll come back to and has been produced
15  to us, that, again, was your true and correct and full
16  opinions as of the time you signed it on July 16th,
17  2021?
18  A.      As of the time.
19  Q.      Okay.  And you weren't trying to expand the
20  scope of what you were looking at in the case.  You
21  were just trying to, I guess, as it's said, rebut
22  other experts?
23  A.      That is correct.  I was asked by the
24  attorneys to look at the other reports that were given
25  and to rebut comments that -- that I might have felt

Page 17

1   were not fully accurate or were misleading.  And so I
2   responded to them accordingly.
3   Q.      I take it in terms of your rebuttal
4   opinions -- and you list here -- we'll go through
5   this.  You were trying to stick to the doctors to
6   rebut who were within your specialty, is that -- or
7   within the field of your specialty?
8   A.      Um --
9   Q.      Let me ask that a better way.
10  A.      Yeah.
11  Q.      So again, you're a neona -- neonatologist.
12  Correct?
13  A.      Yes.
14  Q.      The opinions you're expressing in this case
15  are related to neonatology?
16  A.      I wouldn't say just neonatology, no.  I'm an
17  expert in SIDS and infant sleep safety.  So that's a
18  rather broad range.
19          Now, granted, I'm not a pathologist.
20  I'm not a physiologist.  However, because of the broad
21  range of scope, I do have knowledge in these areas.
22  So I can discuss them to some extent.
23  Q.      You hold yourself out -- what do you hold
24  yourself out to the world in terms of your specialty?
25  You hold yourself out as a neonatologist in terms of

5 (Pages 14 - 17)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 18

1    your certification and training.  Is that correct?
2    A.    Yeah.  That's my employment and my
3    certification.
4    Q.    And then you say you also have expertise in
5    SIDS.  Correct?
6    A.    Correct.
7    Q.    That's -- that's encompassed within
8    neonatology.  Correct?
9    A.    I don't think that's totally accurate, no.
10   SIDS is -- encompasses a very wide range of fields
11   from, you know, areas of safety, biomechanics,
12   pathology.  And there's education pieces.  There's
13   social components to this.  Media is involved with it.
14   It is a broad encompassing area.
15           If you look at the NIH report back
16   in the 1970s when they first put the SIDS Act, I
17   believe, of 1974 in place, it asked for researchers
18   from all over the world to submit studies.  And they
19   broke it down into eight different areas of research
20   that they were interested in following.
21           Back -- back in the time, we really
22   knew nothing about SIDS.  It was really a black box
23   that struck fear in the heart of every parent.  And in
24   the reports as they were moving forward with this law,
25   one that always struck me was that they said we -- the

Page 19

1    number of people dying from SIDS -- the number of
2    babies dying from SIDS was on par with the number of
3    people dying from lung cancer.  And there was a huge,
4    massive volume of literature on lung cancers and yet
5    almost nothing on SIDS.  And that needed to -- to
6    change.  So it's a very wide ranging field.
7    Q.    I don't mean to interrupt you.  My question
8    was basically neonatologists -- it's not unusual for a
9    neonatologist to look at SIDS?
10   A.    That is correct.
11   Q.    Okay.  That's what --
12   A.    I'm sorry.
13   Q.    No.  No.  No apologies needed.  I know you
14   want to explain, and I'm going to let you explain.
15   But my question was more, you know, SIDS is something
16   that neonatologists look at.
17   A.    They do.  But being a neonatologist doesn't
18   make you an expert in SIDS, far from it.
19   Q.    Right.  Okay.  And in terms of infancy -- you
20   name neonatology, SIDS, and infant sleep safety as
21   your three areas of expertise.  Is that correct?
22           MR. OSBORNE:  Form.
23           Go ahead.
24           THE WITNESS:  Those are my areas of
25   expertise.  I have other areas of expertise as well,

Page 20

1    but they're not relevant in this case.
2    BY MS. COHEN:
3    Q.    Okay.  We'll look at your CV.  But when
4    you -- when you go to a community or go to talk about
5    your expertise and your certification and what your
6    specialty is, what you say is, I'm a neonatologist.
7    Correct?
8    A.    I don't think that's a yes or no answer.  I
9    don't -- I don't introduce -- I do say that I am a
10   neonatologist, but frequently what I'm there to speak
11   about is sleep -- sleep-related deaths, SIDS, SUID.  I
12   do a lot of education and lecturing on this -- this
13   topic.  But there is no special -- there's no
14   SIDSology.
15   Q.    Yeah.
16   A.    There's not a specific --
17   Q.    When I look you up on-line and go to the
18   website of the hospital, you're listed as a
19   neonatologist?
20   A.    Of course.  Yes.
21   Q.    You're certified as a neonatologist?
22   A.    Yes, I am.
23   Q.    Okay.  And as you said already, you're not a
24   pathologist.  Correct?
25   A.    That is correct.

Page 21

1    Q.    And you're not an expert pathologist.
2    Correct?
3    A.    That is correct.
4    Q.    You're not an engineering.  Correct?
5    A.    Yes.  Correct.
6    Q.    You're not an epidemiologist.  Correct?
7    A.    Correct.
8    Q.    You're not a statistician.  Correct?
9    A.    Correct.
10   Q.    And you're not an expert in any of those
11   areas.  Correct?
12   A.    I have expertise related to SIDS in some of
13   those areas.
14   Q.    But you're not -- you don't hold yourself out
15   as an expert in epidemiology, do you?
16   A.    No.
17           MR. OSBORNE:  Form.
18   BY MS. COHEN:
19   Q.    You don't hold yourself out as an expert
20   biostatistician -- biostatistics.  Correct?
21           MR. OSBORNE:  Form.
22           THE WITNESS:  Correct.
23   BY MS. COHEN:
24   Q.    And you don't hold yourself out as an expert
25   of engineering of any kind.  Correct?

6 (Pages 18 - 21)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 22

1  A.     Correct.
2  Q.     Okay.
3  A.     You don't want me -- I'm a dangerous person
4  with a hammer.
5  Q.     I'm probably worse. Let's agree on that one.
6         Okay. So in terms of your rebuttal
7  report again what I was trying to get at is you're not
8  rebutting every expert in the case, you're trying to
9  rebut the experts who you thought were giving opinions
10 that covered areas you were addressing, I guess, is
11 what I'm trying --
12 A.     That --
13 Q.     -- to say.
14 A.     -- would be fair.
15 Q.     Okay.
16 A.     I don't know if I over -- overstepped on some
17 things.
18        MR. OSBORNE: There's not an
19 overstepping, Doctor.
20        MS. COHEN: All good.
21 BY MS. COHEN:
22 Q.     And then so those were the two things that we
23 started with in your orange folder here that we marked
24 as Exhibit 1.
25 A.     Yeah.

Page 23

1  Q.     And then let's talk about what you have here.
2  So this is a -- we marked this as the next exhibit,
3  which is --
4  A.     It's the article from Consumer Reports giving
5  the historical review of the Rock 'n Play and other
6  litigations and such.
7         (Exhibit 4, Article, "While They
8  Were Sleeping," 12/30/19, marked for identification.)
9  Q.     I'm going to mark it as Exhibit 4. And
10 you're saying this is just an article that you had on
11 your list and relied upon?
12 A.     Um-hum. Yes.
13 Q.     Okay.
14        MR. OSBORNE: That is the Consumer
15 Reports?
16        THE WITNESS: Yes.
17        MR. OSBORNE: All right. Thank you.
18        MS. COHEN: It's called, "While They
19 Were Sleeping," December 30th, 2019.
20 BY MS. COHEN:
21 Q.     So this wasn't anything new that you hadn't
22 seen before?
23 A.     Correct.
24 Q.     You just pulled it for purposes of today's
25 deposition --

Page 24

1  A.     Correct.
2  Q.     -- so you would have it handy?
3  A.     Yes.
4  Q.     Okay. And it's something that you cited to
5  in your report?
6  A.     Yes. I believe so. I would have to -- I
7  would have to look specifically; but I do believe it's
8  amongst my references. But I would have to
9  double-check.
10 Q.     We'll get to -- did you see the Notice of
11 Deposition that we served in this case for your
12 deposition that asked for you to bring certain things
13 today?
14 A.     I was given an e-mail that had the request
15 for deposition, yes.
16 Q.     Okay.
17        MR. OSBORNE: And -- and just for
18 the record, he provided us his file; and we reviewed
19 and provided it as you're entitled to under the rules.
20 BY MS. COHEN:
21 Q.     Was this provided to us before today, the
22 folder?
23 A.     The folder?
24 Q.     Yeah, and the things in it.
25 A.     The folder is a smaller part of a large

Page 25

1  collection of information that I have.
2  Q.     Okay. I'm just trying to get an
3  understanding whether this is new or we already had
4  this.
5  A.     No, there's -- there's nothing new. This is
6  all just supporting articles that are all mentioned in
7  one way or another in the report.
8         The rest of those things are the
9  SIDS Task Force reports, the policy statements from
10 2005, '11, and '16.
11 Q.     And we'll get to that.
12        (Exhibit 5, SIDS Task Force 2005
13 Policy Statement, marked for identification.)
14 Q.     So Exhibit 5, tell us what this is just so I
15 can a --
16 A.     That is a policy statement from 2005 --
17 Q.     Okay.
18 A.     -- on SIDS.
19        MS. COHEN: That's five.
20        MR. OSBORNE: That's Exhibit 5?
21        MS. COHEN: Yes.
22        (Exhibit 6, SIDS Task Force 2011
23 Policy Statement, marked for identification.)
24 BY MS. COHEN:
25 Q.     Exhibit 6 I'm going to mark within the folder

7 (Pages 22 - 25)

Michael Goodstein, M.D.                           September 30, 2021
In Re: Fisher-Price/Mattel

Page 26

1  is -- is this the 2011 AAP --
2  A.      Policy statement.
3  Q.      -- policy statement?
4  A.      -- on SIDS.  Correct.
5  Q.      And do you have the technical report in here
6  as well?
7  A.      I did not.  It's very long.  So I did not
8  pull that.
9  Q.      Okay.
10  A.      But that's also part of my file of work.
11          (Exhibit 7, SIDS Task Force 2016
12  Policy Statement, marked for identification.)
13  Q.      And then you have the 2016 policy statement,
14  which I'll mark as Exhibit 7, you had in here.
15  Correct?
16  A.      Yes.
17  Q.      You do not have the technical report in here?
18  A.      I did not bring it along, again, because of
19  the significant length of the report.
20  Q.      Not to worry.  We have it here --
21  A.      I'm sure you do.
22  Q.      -- in our various boxes.
23          (Exhibit 8, Article by Goldstein, et
24  al., marked for identification.)
25  Q.      Eight you have as the -- okay.  Tell me what

Page 27

1  eight is, please.
2  A.      Certainly.
3  Q.      Um-hum.
4  A.      This is a more recent article by Goldstein,
5  et al., that is from the Harvard Radcliffe
6  International Congress on Unexplained Deaths that just
7  reviewed terminology and suggested changes to make
8  things more consistent.
9  Q.      Okay.  Thank you.  And so we have -- that I'm
10  marking as Exhibit 8.  So that's not Goodstein and not
11  Goldsmith, but Goldstein?
12  A.      Correct.  Not that it's confusing to anybody.
13  Q.      And this is -- Rachel Moon is one of the
14  authors of this?
15  A.      That is correct.
16  Q.      And is she on your task force?
17  A.      She is the head of the task -- she's the
18  chair of the task force.
19  Q.      How long has she been the head of the task
20  force?
21  A.      I don't know the exact date, but it would be
22  somewhere around 2010 or so.  Before that, she had
23  been a member when Dr. Kattwinkel was the chair of the
24  task force.  That goes back to 2005.  I don't know how
25  long he was chair, but he had been involved with that

Page 28

1  work for a long time.
2  Q.      Kattwinkel?
3  A.      Um-hum.  John Kattwinkel, Dr. Kattwinkel.
4          (Exhibit 9, Article, "Half Century
5  Since SIDS:  A Reappraisal of Terminology," marked for
6  identification.)
7  Q.      Exhibit 9 is the AAP -- it's a clinical
8  report, half century since SIDS, a reappraisal of
9  terminology?
10  A.      Yes.  That's the article that's brand new
11  that just came out this past week.  My friend, Carrie
12  Shapiro-Mendoza from the CDC, is the prime author; but
13  the task force is part of the authorship of this
14  article.
15  Q.      And Dr. Mendoz -- Shapiro-Mendoza is in
16  Atlanta at the CDC?
17  A.      That is correct.
18  Q.      My hometown.
19  A.      It's a great place.
20  Q.      Anything new come out in this that -- of
21  course, I haven't read it.  I'll read it today during
22  the break.
23          MR. OSBORNE:  Form.  Go ahead.
24  BY MS. COHEN:
25  Q.      Anything that -- that was different in here,

Page 29

1  that struck you as different?
2          MR. OSBORNE:  Form.
3          Go ahead.
4          THE WITNESS:  It -- I think it
5  updates and enhances the -- the report from Gold --
6  Goldstein.  It is a bit of a review article; but it's
7  also looking at where we're moving towards the future
8  in terms of terminology and...
9          COURT REPORTER:  I'm sorry.  You're
10  turning away and --
11          THE WITNESS:  I'm sorry.
12          COURT REPORTER:  All right.  I need
13  you to start from "we're moving towards the future in
14  terms of terminology and."
15          THE WITNESS:  And also looking at
16  the historic past, but it's focusing on where things
17  are moving in the future with -- with terminology.
18          COURT REPORTER:  Thank you.
19          THE WITNESS:  I'm sorry.  Should I
20  be looking towards you?
21          COURT REPORTER:  At the camera, but
22  keep your voice up.
23          THE WITNESS:  All right.  Sometimes
24  I speak softly.  If I am, just ask me to speak up.  I
25  apologize.

8 (Pages 26 - 29)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

1           (Exhibit 10, Journal of Biomechanics
2   Junsig Wang article, marked for identification.)
3   BY MS. COHEN:
4   Q.      Exhibit 10 from the Journal of Biomechanics
5   is another article, the Junsig Wang article.  Is that
6   correct?
7   A.      That is correct.
8   Q.      Did you -- did you -- had you read that
9   before this week?
10  A.      I have had the abstract, and I have the
11  information behind it.  But I didn't have the full
12  article, because I did not have access to it.  So I
13  did seek that out.
14  Q.      Okay.  And did you cite to this in your
15  report?
16  A.      Yes.  Mostly from the summary of it, but not
17  all of the details.  I wanted to look at it closer for
18  some of the details.
19  Q.      So you cited to this, but you only had the
20  abstract?
21  A.      I had the abstract plus the interpretation
22  of -- of that from other sources.
23  Q.      What does that mean, from what other sources?
24  A.      From the -- from the Consumer Product Safety
25  Commission and -- I believe -- I'm not sure if the AAP

1   or CDC also made commentary about it.
2   Q.      Are you referring to the Mannen study?
3   A.      Yes.
4   Q.      The one that was published or the initial one
5   that was then changed and published?
6           MR. OSBORNE:  Form.
7           THE WITNESS:  I don't understand
8   what -- what you're suggesting; but this is the
9   article that I know that was published.
10  BY MS. COHEN:
11  Q.      But you know that the original one was not
12  published.  The original Mannen study was changed
13  before it was published.  Do you know that?
14          MR. OSBORNE:  Foundation.
15          THE WITNESS:  I -- I did not.  I'm
16  not sure.
17  BY MS. COHEN:
18  Q.      Okay.
19  A.      Quite honestly, many articles go through an
20  editorial process before publication and get modified.
21  So I don't see anything unusual in that.
22  Q.      Did my question say anything about unusual?
23          MR. OSBORNE:  Form.
24          THE WITNESS:  Sorry.
25  BY MS. COHEN:

1   Q.      I'm just saying.
2   A.      Well, the -- the question struck me a little
3   unusual.  I'm sorry.
4   Q.      It's okay.  You definitely don't have to
5   apologize; but I'm just making clear I did not -- did
6   not say it was unusual.
7           But Exhibit 10, I'm asking -- you're
8   saying that prior to this week, you had read the
9   abstract only?
10          MR. OSBORNE:  Form.
11          THE WITNESS:  No, that's not what
12  I'm saying.  I read the abstract; and I also read
13  other people's interpretation of the -- of the data.
14  BY MS. COHEN:
15  Q.      Okay.  We'll look at that in your report.
16  But in terms of this one, when did you pull this one?
17  A.      This week.
18  Q.      Okay.  And when is the first time you read
19  it?
20  A.      This week.
21  Q.      Do you know which day?  I mean, today is
22  what, Thursday?  Was it yesterday?
23  A.      I don't know.
24  Q.      Was there anything that you read for the
25  first time yesterday that you had never read before in

1   this case?
2   A.      Before yesterday?
3   Q.      Yeah.
4   A.      No.  No.
5   Q.      Any new materials received this week that you
6   hadn't seen before?
7   A.      No.
8   Q.      And then we have -- let me see.
9           (Exhibit 11, Kinney and Thach
10  Article, "The Sudden Infant Death Syndrome," marked
11  for identification.)
12  Q.      Eleven is the Kinney and Thach, "The Sudden
13  Infant Death Syndrome."  I'm marking it as 11.  Is
14  that something that you pulled this week?
15  A.      Yes.
16  Q.      And had you seen this before this week?
17  A.      Yes.  I've referred to that many times over
18  the years.
19          MR. OSBORNE:  What's the year of it?
20          THE WITNESS:  2006, I believe.
21          MS. COHEN:  2009, August 20th, 2009.
22  BY MS. COHEN:
23  Q.      Thach is somebody who has published on
24  Sudden -- on SIDS previously?
25  A.      Yes.  He is very well known in the SIDS

9 (Pages 30 - 33)

Page 34

literature and is considered an expert, yes.
Q. He's a pathologist. Correct?
A. I don't know all of his titles.
Q. Okay. Is he in the pathology department at Harvard?
A. He's retired now; but if that's what the article says at the time, then, yes.
Q. Okay. And then -- that's 11. I want to make sure I don't mess this up at all. These are some printouts of yours. Are they separate from --
A. No. They're different citings from the same book on investigation of SIDS.
Q. Okay. And I don't want to put anything on top of the writing.
(Exhibit 12, Page from the book Investigation of Sudden Infant Death Syndrome, marked for identification.)
Q. So Exhibit 12, can you tell me what that is?
A. It is a page from the book that I just referred to.
Q. Which book? What's the name of it?
A. I believe the official title, Investiga -- Investigate -- Investigation of SIDS; but I could -- I'd have to look to give you the official title. It's Marta Cohen, Fern Hauck, and a couple other people are

Page 35

the editors of the book.
Q. Is that a book that you have at your office?
A. Yes, it is.
Q. And you copied it for purposes of today to put in the folder?
A. Yes, I did.
Q. Okay. And this has a reference to the brain -- I'm trying to understand the section that you copied was Section 5, "Autopsy Findings," Brainstem. And is the red marking here yours?
A. Um-hum. Yes, it is.
Q. And the part you marked says, "Chapter 31. These observations have been made in the research setting and cannot be reproduced in routine diagnostic study. However, it's important to establish that the anatomy is normal and look for evidence of acquired damage which may compromise brainstem function."
So you were focusing on the brainstem section?
A. Yes.
Q. And why was that?
A. Because of the deposition I had read and the materials I had read from the report from Dr. Fuller. And I did not know what you were going to ask me about. Obviously, this -- again, I'm not a

Page 36

pathologist. So it's not my area. But having not done this before, I just wanted to be prepared if you were to ask me something about that.
Q. About the brainstem?
A. About the brainstem, because I know -- I know that, you know, Dr. Fuller made some comments in her surrebuttal to me that there are tests that can be done to evaluate the brainstem in terms of trying to make a decision as to whether or not it's a true SIDS case. And I know from talking with -- with people that -- that I know who are experts in this area that -- that the -- a lot of findings that you're looking for to be definitive as having a brainstem abnormality that you would say makes it more likely that it was SIDS are only done in specific research labs and that many of these findings are nonspecific otherwise. So I just wanted to be able to address that accurately if you were to ask about it.
Q. Okay. So No. 1, you've already said a couple times you're not a pathologist. Correct?
A. Correct.
Q. And this is not your area of specialty. Correct?
A. Correct.
Q. You're certainly not a neuropathologist.

Page 37

Correct?
A. Correct.
Q. You know that Dr. Fuller is actually not just a pathologist, but a neuropathologist. Correct?
A. Yes.
Q. Now, did you look at her deposition as well as her two reports? because I think you reference her deposition. So I want to make sure I understand.
A. I can't recall how much of what I read through. I mean, there's hours and hours and hours of information. So I cannot -- I can't say with certainty whether it was just her report or deposition. It was probably more reports than deposition.
Q. I don't want to confuse this. I want to get through this folder first. And I'll come back to what you have reviewed and haven't to keep us straight. This is just you pulling out a section of your textbook on the brainstem to be ready in case a question was posed to you about the brainstem?
A. Correct.
Q. Because you didn't feel comfort that that was an area that was within your normal parlance. Correct?
MR. OSBORNE: Form.

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 38

1            THE WITNESS:  No.  I just wanted to
2    be accurate.
3    BY MS. COHEN:
4    Q.      Okay.  And this says refer to Chapter 31,
5    but you didn't bring Chapter 31 with you.  Correct?
6    A.      No, I did not.
7    Q.      And Plaintiffs' expert witness, who is a
8    pathologist, is Dr. Christensen.  Are you familiar
9    with Dr. Christiansen?
10   A.      I don't know him personally.  I've never
11   worked with him directly.  I've not met him, but I
12   know his name from this case.
13   Q.      The same as Dr. Fuller.  Correct?
14   A.      That is correct.
15   Q.      And have you read Dr. Christiansen's two
16   reports?
17   A.      I -- I've -- I believe I've read both -- both
18   reports.  I know I read his main report.  I don't know
19   if I read a rebuttal report.  I would have to go
20   look -- I would have to look at it to be sure.
21   Q.      Did you look at his deposition that was
22   taken?
23   A.      I did look at the deposition, yes.
24   Q.      Okay.  So you definitely have received recent
25   depositions that were taken?

Page 39

1    A.      I don't know what the date is on the
2    deposition.
3    Q.      Okay.  You don't have any better
4    understanding of Dr. Christiansen's -- let me ask it
5    better.
6            You don't know Dr. Christiansen
7    outside of this litigation?
8    A.      That is true.
9    Q.      Just like you don't know Dr. Fuller outside
10   of this litigation.  Correct?
11   A.      Correct.
12   Q.      You have no reason to trust one's judgment
13   over the other.  Correct?
14   A.      Correct.
15   Q.      You treated both of them equally in terms of
16   reading their reports and information?
17   A.      Yes.
18   Q.      And then you had -- let's see, 12.
19           (Exhibit 13, Section from
20   Investigation of Sudden Infant Death Syndrome, marked
21   for identification.)
22   Q.      Thirteen is -- is pretty much the same thing,
23   that you pulled --
24   A.      Yes.
25   Q.      -- a section out of -- you're already reading

Page 40

1    my mind.  This is good.
2            You pulled a section out of the
3    pathology book where you thought maybe I would ask a
4    question and you wanted to be accurate.  Right?
5    A.      Correct.
6    Q.      And this one relates to microscopical
7    examination.  It says -- I'll put it on the record.
8    The red markings are yours, I take it?
9    A.      Correct.
10   Q.      "There are no specific histologic findings in
11   SIDS.  Petechiae and small hemorrhages may be seen in
12   the thymus, lungs, along coronary arteries, renal
13   interstitium, and other organs.  The lungs frequently
14   show some degree of edema and alveolar macrophages.
15   Minor laryngeal and peribronchial inflammation with
16   expansion of the mucosa-associated lymphoid tissue,
17   MALT, may be seen with nonlethal viral infections."
18           So, again, this is, again, something
19   you wanted to have in your back pocket or -- or in
20   your orange folder in case I asked you questions about
21   this?
22   A.      Correct.  And I think Dr. Goldsmith actually
23   did make comment about this.  So I particularly wanted
24   to be able to say something about it accurately.
25   Q.      Okay.  And also Dr. Fuller addressed

Page 41

1    petechiae.  Do you recall that?
2    A.      Yes.
3            MR. OSBORNE:  Did you mark that as
4    13?
5            MS. COHEN:  Yes.
6            MR. OSBORNE:  Thank you.
7            MS. COHEN:  Um-hum.
8    BY MS. COHEN:
9    Q.      Do you know Dr. Goldsmith?
10   A.      I know his name.  We have our names on a
11   paper together because of work with the task force and
12   when he was on the Committee on Fetus and Newborn.
13   Q.      Um-hum.
14   A.      I may have seen him in passing at a meeting
15   here or there.  Neonatologists run in the same circles
16   at meetings, but I don't really know him personally.
17   Q.      How long have you been part of AAP, American
18   Academy of Pediatrics?
19   A.      Probably 31 years.
20   Q.      And how long have you been practicing
21   medicine?
22   A.      Including training time?
23   Q.      Sure.
24   A.      Oh, my gosh.  I will I have to think about
25   that.  It's well over 30 years, 34 years.

11 (Pages 38 - 41)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 42

1  Q.    Okay.
2  A.    Thirty-four -- I think that's without medical
3  school.  So it would be 38, I guess, with medical
4  school.
5        I'm sorry if I'm speaking too low.
6  Q.    So, again, you've known Dr. Goldsmith for
7  many years or you've known of him?
8  A.    I've known of him.  I can't tell you when
9  along my career path that I've met him.  I've probably
10 heard him speak, but I -- I couldn't give you any
11 dates or times to that.
12 Q.    Is he more senior than you are within the
13 world of neonatology and American Academy of
14 Pediatrics?
15 A.    If you mean is he older than me, I think so.
16 Q.    So I take it you have respect for him?
17 A.    Absolutely.
18 Q.    And you said you've probably seen him speak?
19 A.    I believe so.  I couldn't quote you anything,
20 times and dates.  But again, neonatology is a small
21 collection of people.  It's only a few thousand
22 people.
23 Q.    And have you two talked about SIDS at any
24 point?
25 A.    No.

Page 43

1  Q.    Have you two talked about the fetus and
2  newborn task force you mentioned?
3  A.    No.  Again -- again, he is -- so he was on
4  the committee -- Committee on Fetus and Newborn for
5  the AAP.
6  Q.    Um-hum.
7  A.    That happened to coincide with the time that
8  I was -- that I had been on the AAP Task Force on
9  SIDS.  They are separate entities within the AAP.
10 They sometimes cross over to work together.
11 Q.    Um-hum.
12 A.    But it's not like we're sitting in a room
13 spending time together.
14 Q.    Is the SIDS -- AAP SIDS Task Force subsumed
15 within the fetus and newborn?
16 A.    No, it's not.  It's a separate entity all
17 onto itself.
18 Q.    And I know we'll get into this; but
19 obviously, you and he have very different opinions in
20 this case.  I'm sure you surmise that as well.  Right?
21 A.    Yes.
22 Q.    You two have a healthy disagreement within
23 the field of neonatology.  Correct?
24 A.    Regarding this case.
25 Q.    This case, yes.

Page 44

1  A.    Yeah.
2  Q.    But my question is, you don't have any
3  criticism of him as a physician or as a -- as a -- as
4  a scholar, do you?
5  A.    No.
6        MR. OSBORNE:  Go ahead.
7        THE WITNESS:  No.  He's an excellent
8  neonatologist.  I mean, he's incredibly respected in
9  the field.
10 BY MS. COHEN:
11 Q.    And just to finish up here, then you have
12 a --
13 A.    That's different.  That's just a one-page
14 reprint.  I believe that came from the Children's
15 Safety Network.  And it's a handout for parents and
16 such.  But the reason I picked it was for something
17 towards the bottom of the page on the left with a
18 little image that has some of the things that we try
19 to educate people on about a safe sleep environment.
20 And that circle in the middle that looks like a minus
21 sign is a flat surface.  And that kind of gets to the
22 crux of the case.  Apparently, there's different
23 definitions of flat.  And so I just wanted a pictorial
24 image of what flat is.  And it's non-inclined.
25 Q.    Understood.  And we'll -- well, your position

Page 45

1  is that flat is 100 percent horizontal; that is, zero
2  incline.  Is that what you're saying?
3  A.    That's what we prefer.  The Consumer Product
4  Safety Commission allows up to 10 degrees of incline,
5  but that's it.
6  Q.    And again, just to be clear, I am -- I'm not
7  asking for we.  I'm asking for -- you're here as an
8  expert on behalf of yourself.  Correct?
9        MR. OSBORNE:  Form.
10 BY MS. COHEN:
11 Q.    You're here testifying as an expert as Dr.
12 Goodstein.  Right?
13 A.    Yes.
14 Q.    You're not here as a we.  You're not here to
15 talk about from the AAP or anything else.  Right?
16       MR. OSBORNE:  Form.
17       THE WITNESS:  I'm not -- I'm not
18 representing the AAP here today; but what I am saying
19 reflects what the AAP says is the correct thing to do.
20 And I can say that because I wrote the report.
21 BY MS. COHEN:
22 Q.    Yes.  But you don't have the authority to
23 speak on behalf of the --
24 A.    No, I do not.
25 Q.    -- AAP here today, do you?

12 (Pages 42 - 45)

Michael Goodstein, M.D.                              September 30, 2021
In Re: Fisher-Price/Mattel

Page 46

1  A.      I'm not speaking on behalf of the AAP, not by
2  any means, no.
3  Q.      And the AAP you're current -- you've been a
4  member, you said, for 31 years, I think you said, or
5  thereabouts.  I won't hold you to that exact --
6  A.      Thank you.
7  Q.      I want to be very fair with you.
8          You've been a member of the SIDS
9  Task Force.  And congratulations.  I mean, it's
10 obviously very important and something that's very
11 important to you.  Correct?
12         MR. OSBORNE:  Form.
13         THE WITNESS:  I'm -- I'm honored to
14 be a part of it.
15 BY MS. COHEN:
16 Q.      How long have you been a member of that?
17 A.      Since 2010, I believe.
18 Q.      And are you the chair of that?
19 A.      No.  Dr. Moon is the chair.
20 Q.      Have you ever been the chair of it?
21 A.      No.
22 Q.      How many members are there?
23 A.      That has changed over time.
24 Q.      Currently, how many members are there?
25 A.      I'd have to actually count out.  We just

Page 47

1  added members this year.  So there are -- there are
2  members.  And then there are other people who work
3  with the task force but are considered liaisons but
4  are part of the reports.
5          So I believe there are six -- it's
6  either six or seven on the task force right now.  And
7  then there are people who have been there for long
8  periods of time who are consultants and liaisons.  And
9  that would include Dr. Shapiro-Mendoza.
10 Q.      Have you asked the other members of the task
11 force whether you can speak on their behalf in this
12 case?
13 A.      No.
14 Q.      So you're not intending to do so.  Correct?
15 A.      No.
16 Q.      That's recollect what I said?
17 A.      That is correct.
18 Q.      And did you tell them you were going to an
19 expert witness in a civil lawsuit --
20 A.      No.
21 Q.      -- brought by a family?
22 A.      No.
23 Q.      And you didn't feel you had to, I take it?
24 A.      I'm not sure what the relevance would be.
25 Q.      Some organizations have specific requirements

Page 48

1  like, you know, you can't speak or you can't testify.
2  I'm just wondering does AAP have anything like that in
3  your role?
4  A.      No.  But if you do something like this, you
5  would want to report.  If you were doing anything that
6  might be a conflict of interest in other work, you
7  would report that.
8  Q.      Well, in other words, if you -- for example,
9  if you were to write something about the Rock n' Play
10 Sleeper, you would probably have to note that you were
11 an expert in this case.  Right?
12         MR. OSBORNE:  Form.
13         THE WITNESS:  You would -- you would
14 make note that -- yeah, you would have to notify that,
15 yeah.
16 BY MS. COHEN:
17 Q.      In other words, if you -- if you wrote an
18 article at all about the Rock n' Play Sleeper or
19 inclined sleepers, would you have to put a notation
20 and disclose that you were actually serving as an
21 expert witness for one side of the litigation?
22 A.      When asked -- every year we have to do a
23 conflict of interest form.  So I guess that would be
24 part of that, yeah.  Sure.
25 Q.      Okay.  I take it to date you have not

Page 49

1  notified anyone within AAP?
2  A.      No.  I don't believe my conflict of interest
3  form has come up for that yet.
4  Q.      Okay.  When it does, you'll intend to -- to
5  notify them of this litigation?
6  A.      Of course.
7          (Exhibit 14, Article from Children's
8  Safety Network, "Sudden Unexpected Infant Deaths in
9  the United States," marked for identification.)
10 Q.      And one thing you mentioned while we move --
11 so 14 is --
12         MS. COHEN:  I don't know, John, if I
13 mentioned that.  But 14 is this article which we'll
14 have marked.  And it's entitled, "Sudden Infant" --
15 "Sudden Unexpected Infant Deaths in the United
16 States."
17 BY MS. COHEN:
18 Q.      And it's a one sheeter that you said is
19 educational?
20 A.      Correct.
21         MS. COHEN:  And this is the one he
22 pulled to show the little diagrams over there.
23 BY MS. COHEN:
24 Q.      So where did you get this from? just so I
25 know where this source is.

13 (Pages 46 - 49)

Michael Goodstein, M.D.                      September 30, 2021
In Re: Fisher-Price/Mattel

Page 50

1  A.     That's from the Children's Safety Network.
2  Q.     Is that a website?
3  A.     It has a website, but it's an organization
4  that focuses all on children's safety issues.
5  Q.     Are you part of that organization?
6  A.     I am not.
7  Q.     Okay.  Are there some neonatologists who are
8  part of that?
9  A.     I couldn't tell you the answer to that.
10  Q.     And so one thing that you -- and I can do a
11  search on the screen; but you mentioned education
12  earlier today.  I caught that word.  You said that.
13  And this is obviously parental educational tool.  Is
14  that right?
15  A.     Yes.
16  Q.     And that's very important, isn't it?
17  A.     Yes.
18  Q.     In terms of SIDS and SUID and prevention of
19  those long-standing yet tragic -- what do we call
20  them, conditions?
21  A.     Deaths.
22  Q.     Tragic deaths, parental education is very key
23  from your perspective, isn't it?
24  A.     Yes, it is.
25  Q.     And you've even written about it.  Right?

Page 51

1  A.     Yes, I have.
2  Q.     And, in fact, you have specific -- even in
3  this one sheeter that you pulled, specific educational
4  notes that go to the parents.  Correct?
5  A.     Yes.
6  Q.     One of the things, for example, is it says,
7  "Resources on Reducing SUID and Promoting Safe Sleep,"
8  one thing it says is "avoidance of pre and postnatal
9  exposure to tobacco smoke."  Correct?
10  A.     Yeah.  That is true.
11  Q.     And you agree with that?
12  A.     I agree with it.
13  Q.     Something you counsel your patients on, I
14  would assume?
15  A.     Of course.
16  Q.     So you pulled this off the website.  Is that
17  right?
18  A.     There was a link on the web to it, yes.
19  Q.     Okay.  And you pulled it for the purpose of
20  showing that -- that the horizontal line?
21  A.     Yes.
22  Q.     What you said is CPSC has -- allows for a
23  10-degree incline, I think, is what you just said?
24  A.     Yes.
25  Q.     And this shows a zero-degree incline.

Page 52

1  Correct?
2  A.     Yes.
3  Q.     What does AAP allow for?
4  A.     The AAP says flat.  They do not specify the
5  degree of incline.  They say flat.
6  Q.     Okay.  And you understand that the Rock n'
7  Play Sleeper, which we'll talk about, is roughly a
8  30-degree incline.  Correct?
9  A.     Correct.
10  Q.     You understand that car seats are what?
11  A.     Up to 50, 30 to 50.
12  Q.     And what hospitals do you work at here?
13  A.     I work at York Hospital.  I have privileges
14  at other -- the York Hospital is part of WellSpan
15  Health System.  So I do have privileges at their other
16  sites, but I don't currently practice at them.  My
17  time is mostly spent at York Hospital.  But there's
18  Ephrata Hospital, Gettysburg Hospital, Good Samaritan
19  Hospital, and Chambersburg Hospital.  And we also used
20  to have a nursery out at Waynesboro Hospital, but
21  that's closed.
22  Q.     Now, when you send patients home with their
23  newborns either who have been in the NICU or who don't
24  need the NICU and they go home, you allow for them to
25  go home in a car seat.  Correct?

Page 53

1  A.     Well, that's the safest way to transport a
2  baby; and that's law.  You have to be in a car seat.
3  But we do not recommend that one sleep in the car
4  seat.  As a matter of fact, we give very specific
5  instructions that you should never have a baby sleep
6  in a car seat and that once you get to your
7  destination, you should transfer the baby into a safe
8  sleep environment if they are going to be sleeping.
9  And that would be a crib or bassinet or playard.
10  Q.     Okay.  And a couple things in this Exhibit 14
11  while I have it out:  So one of the things that -- it
12  has a section on racial and ethnic differences in
13  SUID.  Is that something that's well known?
14  A.     Yes, it is.  But that does not make it a risk
15  factor per se.  It is something that -- that we note
16  that there are differences; but, you know, race is a
17  social construct and really doesn't per se represent a
18  risk factor but a marker for other things that are
19  risk factors.
20  Q.     Right.  You put, in fact, on this -- this
21  document Exhibit 14 that you pulled and you put in
22  your orange folder for purposes of today, it includes
23  a whole section on racial and ethnic differences in
24  SUID.  Correct?
25  A.     Yeah, the numbers are different.  That's

14 (Pages 50 - 53)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 54

1    correct.
2    Q.    And then it has a section on risk factors for
3    SUID.  Right?
4    A.    Okay.
5    Q.    And I don't mean to hold this from you.
6    Right?
7    A.    Sorry.
8    Q.    It has a whole section.  I don't have a copy
9    of it, but you obviously just brought it today.
10    A.    Yes.  Um-hum.  Yes.  Those are risk factors,
11    yes.
12    Q.    Okay.  And then one of the -- one of the
13    things -- at another bullet, it says "sleep
14    environment free of objects."
15          That's another thing that's
16    educational for parents.  Correct?
17    A.    Yes.  That is correct.
18    Q.    And another risk factor of SUID is, again,
19    "soft bedding," it says there.  Correct?
20    A.    Yes.
21    Q.    And under the little -- what do we call this
22    little picture that has the --
23    A.    Pictogram.
24    Q.    Pictogram that has the horizontal line there.
25    It actually says "firm sleep surface."  Right?

Page 55

1    A.    That is correct.
2    Q.    And that's one of the things that the AAP
3    talks about.  Correct?
4    A.    Yes, it does.
5    Q.    But it doesn't talk about no bedding at all
6    or no mattress, correct, on the AAP.  We can pull up
7    2011 and 2016.  But when it talks about firm sleep
8    surface, it is not intended to suggest or it doesn't
9    mean no mattress and no -- no -- at all.  Correct?
10    A.    We talk about having a firm mattress that is
11    appropriate to the crib that you're using.
12    Q.    Right.  Well, I guess my point is firm does
13    not mean for you or the AAP no padding.  Correct?
14    A.    I would not answer the question that way.
15    You're not supposed to have anything soft.
16    Q.    Um-hum.
17    A.    So you are supposed to use what was intended
18    for that surface.
19    Q.    Right.
20    A.    And it needs to be firm.  One of the problems
21    with firm -- we've tried to define firm.
22    Q.    Um-hum.
23    A.    Unfortunately, the -- the testing for that is
24    a trade secret from the ASTM International.  So we had
25    to come up with a way to define firm, because people

Page 56

1    want to know what's firm, because you test different
2    mattresses and firm can mean different things to
3    different people.  So we did -- and I could -- to give
4    you the exact wording, we would have to read it from
5    the report.  But we talked about it being
6    nondeformable, that it maintains its shape.
7    Q.    Okay.
8    A.    There was a clinician who -- I'm not sure how
9    he got -- I'm making an assumption that he got ahold
10    of what the testing looks like, because he gave some
11    specific instruction on how to make a measurement that
12    was a bit convoluted but involved taking a certain --
13    this is really antiquated -- a certain number of CDs
14    and putting them into a milk carton and then taping a
15    tape measure and putting it on the bed and if it sunk
16    in a certain amount on the tape measure, that was too
17    soft.
18          So, you know, unless you have the
19    information from ASTM, it's hard to define.  So we did
20    the best we could with that.
21    Q.    But you agree that firm does not mean no
22    padding at all.  Correct?
23    A.    I don't think padding is a good word.  I
24    wouldn't use the word padding.
25    Q.    Well, firm does not mean on a wood surface,

Page 57

1    correct, or on a metal surface or on a surface without
2    any padding at all or any softness at all?  Correct?
3    A.    The product -- the product should be designed
4    so it creates a safe sleep environment for the baby.
5    There are different products.  But all I can say is
6    that needs to be a firm -- that if it's a mattress, it
7    needs to be firm.
8          You know, there are some products
9    out there that I question whether their pad -- if they
10    do have padding in there.  And it's a concern with
11    those products in terms of whether they really are
12    safe or not.
13    Q.    So I think by your answer, you agree that --
14    you're not saying that it has to be no mattress at
15    all.  It just needs to be a firm mattress?
16          MR. OSBORNE:  Form.
17          THE WITNESS:  It has to be a firm
18    mattress.
19    BY MS. COHEN:
20    Q.    Okay.
21    A.    Yes.
22    Q.    I understand there are these -- what is it,
23    Denmark that has the boxes?
24    A.    That's -- I had a feeling you were -- not
25    that I can read your mind.

15 (Pages 54 - 57)

Michael Goodstein, M.D.                                      September 30, 2021
In Re: Fisher-Price/Mattel

---

Page 58

1  Q.     Oh, you've done it now today.  We're on a
2  good path.  But I think, you know, other countries --
3  let's just say Denmark, for example -- I've been
4  trained by Dr. Goldsmith have these boxes, I guess,
5  that the neonatology and medical community suggest
6  babies be put in.
7  A.     No, they don't.  No, they don't.  As a matter
8  of fact, the international society for SIDS
9  prevention, ISPID, came out with a specific statement
10 saying don't use these and this is why.
11 Q.     Okay.  So you're not -- you're not suggesting
12 that you have to have a box-like environment for the
13 baby.  You're okay as long as the mattress is firm?
14          MR. OSBORNE:  Form.
15          THE WITNESS:  It needs to be -- it
16 needs to be firm, yes.
17          (Exhibit 15, Quote from 2011 SIDS
18 Task Force Recommendations, marked for
19 identification.)
20 BY MS. COHEN:
21 Q.     And the last thing you have here is -- and I
22 can give you your orange folder back -- 15.
23 A.     It's really just a quote from the task force
24 statement.  And then I just wanted to pull the
25 definition for myself of flat from the dictionary.  So

Page 59

1  that's all that is.
2  Q.     Merriam-Webster Dictionary, which you have
3  the definition of flat, but you agree that flat in
4  terms of its use by the AAP and for purposes of
5  inclined sleep issues does not mean zero percent.
6          MR. OSBORNE:  Form.
7  BY MS. COHEN:
8  Q.     You've already said that?
9  A.     I don't know what I'm allowed to say, because
10 there is a new task force policy statement coming out
11 and it's not available to the public.  It is
12 quarantined.  And I'm not allowed to say the wording,
13 but we were very specific in our wording.  And we
14 made, you know, the -- we were more strict or we're
15 going to be more strict than the CPSC.
16 Q.     Okay.
17 A.     So for us non-inclined-- flat means
18 non-inclined.  Non-inclined means zero degrees.  So
19 the product may have up to a 10-degree incline, but
20 the preference is for it to be flat.
21 Q.     Okay.  When is that coming out?
22 A.     I can't tell you the exact date.  We don't
23 know.  They just went through the final -- and that's
24 another thing I don't have it in my report.  It was
25 something I would refer back to, because things like

Page 60

1  this that have been in the news have gotten the
2  attention of the task force.  And so some things
3  that -- every -- every iteration of the policy
4  statement and technical report updates not just the
5  literature, but we also see what's going on in the
6  community.  And sometimes we find that we need to have
7  clear or different language because we find that
8  people have sometimes misinterpreted things.
9          So flat seemed pretty -- pretty
10 straightforward to us; but apparently, it's not as
11 straightforward as we thought.  And -- and that's why
12 the wording will change to make it crystal clear on
13 this out-coming report.  But there are plenty of other
14 places in the report beyond firm mattress where we say
15 flat.  And that's why I pulled that little quote there
16 about transfer from car seats to a flat surface.
17 Q.     Okay.  But what I'm saying to you is, I know
18 you have the definition from Merriam-Webster; but as
19 of right now using the CPSC and the ASTM and the AAP
20 existing guidelines, flat is not zero per -- flat is
21 not zero?
22          MR. OSBORNE:  Form.
23          THE WITNESS:  Well, we don't say
24 anything about using any incline.  So, no, there's
25 nothing -- there's nothing in the report that says use

Page 61

1  an incline regardless of whether it's 10 degree, 20
2  degree, 50 degree.  We say flat.
3  BY MS. COHEN:
4  Q.     Well, there's nothing in the report that says
5  you cannot use a 30-degree incline.  Correct?
6          MR. OSBORNE:  Form.
7  BY MS. COHEN:
8  Q.     And we can pull it out.  And there's nothing
9  in it that says that flat -- that 30 degrees is not
10 flat.
11 A.     Well, cribs -- I don't know any cribs that
12 exist at a 30-degree angle.  So there is some element
13 of common sense to this.  And we can't -- if we were
14 to explain the definition of "the," we would never be
15 able to get the report done.
16 Q.     Well, you've read Dr. Goldsmith's report.
17 Correct?
18 A.     Yes, I have.
19 Q.     And you understand that he believes that the
20 Rock n' Play Sleeper at 30 degrees as it's designed
21 meets the -- conforms with and complies with the AAP
22 2011, 2016 guidelines.  Right?
23 A.     I know what he thinks, but he's wrong.  I
24 don't agree with that.  The report doesn't say that,
25 and the report never intended to mean that.  He's made

16 (Pages 58 - 61)

Michael Goodstein, M.D.                                September 30, 2021
In Re: Fisher-Price/Mattel

Page 62

1  assumptions.
2  Q.    Well, you disagree with him.
3         MR. OSBORNE: Form.
4         THE WITNESS: I -- I know what the
5  facts are. And the facts are that we say a flat
6  surface and not a 30-degree incline or anything in
7  between. The fact is the report says flat.
8  BY MS. COHEN:
9  Q.    You agree that there's no peer review
10 literature that exists anywhere that has studied the
11 30-degree incline.
12        MR. OSBORNE: Form.
13 BY MS. COHEN:
14 Q.    Correct?
15        MR. OSBORNE: Form.
16        THE WITNESS: I know that there's no
17 literature showing that a 30-degree incline is safe
18 for a baby to sleep on is what I know.
19        MR. OSBORNE: Wait. You're
20 interrupting him. Let him finish what he thinks your
21 question was.
22        THE WITNESS: So that's not --
23 that's not how this -- that's not how research on SIDS
24 works. So if you have an expect -- you may
25 unfortunately have an unrealistic expectation of what

Page 63

1  the research should look like to determine safety.
2  And the research is not based on randomized
3  double-blind controlled trials. Those do not exist in
4  the SIDS literature, because it's unethical and we
5  can't do that. So there's no way to do a test where
6  we're going to put a bunch of babies at 30 degrees and
7  put a bunch of babies who are flat and see which is
8  safer.
9         So I know what's safe. I don't
10 know -- I do know that an incline is unsafe. At what
11 degree you can say an incline is safe I can't tell
12 you, because I don't know of any literature on it one
13 way or the other in terms of the risk of SIDS.
14 BY MS. COHEN:
15 Q.    So you don't know of any literature one way
16 or the other. Correct?
17 A.    Correct.
18 Q.    And you're not aware --
19 A.    Well, I would like to change that. That's
20 not correct.
21 Q.    Well --
22        MR. OSBORNE: Let him finish,
23 please.
24 BY MS. COHEN:
25 Q.    No. I'm sorry. He'll have a chance to ask

Page 64

1  you on redirect. I'm not going to let you just --
2         MR. OSBORNE: No. No. You are
3  interrupting the hell out of him. Stop it.
4         MS. COHEN: That's not -- that's not
5  appropriate.
6         MR. OSBORNE: It sure is. Let him
7  finish his answer --
8         MS. COHEN: Like, you saying
9  interrupting the hell?
10        MR. OSBORNE: He gets to answer. He
11 gets to speak.
12        MS. COHEN: Wow, that's not how we
13 do things in Georgia, John.
14        MR. OSBORNE: Well, it's the way we
15 do it Arizona. We don't get to interrupt the damn
16 witness.
17        MS. COHEN: Oh, my God, that's twice
18 now. Okay. I'm sure Judge Snow will appreciate that
19 attitude, that -- that approach.
20        MR. OSBORNE: Go ahead, sir.
21        MS. COHEN: Well, you can ask him on
22 redirect.
23 BY MS. COHEN:
24 Q.    So now you want to go back and change your
25 answer? Is that what you're doing now? You want to

Page 65

1  change your answer that you just gave under oath. I
2  just want to know what we're doing here.
3         MR. OSBORNE: I want you to state it
4  correctly --
5         MS. COHEN: Well --
6         MR. OSBORNE: -- as you said you
7  were.
8         MS. COHEN: No. No. He just said,
9  "I'm going to change my answer."
10 BY MS. COHEN:
11 Q.    "I would like to change that." Is that what
12 you want to do?
13 A.    I want to add to the answer.
14 Q.    Oh, really? Okay.
15 A.    Yeah, I want to add to the answer. Yeah.
16        MR. OSBORNE: Go ahead, please.
17        MS. COHEN: Please don't interrupt.
18 Don't interrupt my cross examination. You'll have
19 redirect, I assume.
20        MR. OSBORNE: I don't think you can
21 interrupt the witness. And if we're going to do it
22 this way, I'll fly back and the doctor can leave or
23 you can call the Court and we'll talk about it.
24        MS. COHEN: You just told me
25 about -- you just used profanity in my deposition at

17 (Pages 62 - 65)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 66

1  me. I don't appreciate that.
2  BY MS. COHEN:
3      Q.     Okay. Go ahead. If you want to change your
4  answer, go ahead.
5      A.     I'm not changing my answer. I am being -- I
6  am being more specific about my answer, because the
7  answer is if you're looking at SIDS cases in terms of
8  incline -- specific SIDS cases, then there are no
9  reports related to that. However, however, when you
10 look to see if there are potential risks to the baby
11 at an incline, there are -- there are specific data
12 that show that at as little as a 30-degree incline,
13 the baby can start to have desaturation events.
14           In the Mannen study, I believe at 20
15 degrees, they had some lower saturations in the
16 babies -- oxygen saturations in the babies and that as
17 little as 20 degrees, you can start to see fatigue of
18 muscles when the babies are in prone positions in
19 terms of respiratory muscles, neck muscles.
20           So if -- if that were a contributory
21 factor to a child either having SIDS, a suffocation,
22 some sort of asphyxia event, that angle of a product
23 could contribute to that child's death.
24           So, yes, there is this relatively
25 new -- new data, some of that. So I apologize for not

Page 67

1  being specific enough. But that -- but that -- there
2  is data to support that idea of that there's increased
3  risk at -- at an angle.
4      Q.     Okay. Let me go back to what you said in the
5  transcript now.
6           Have I given you a chance to fully
7  answer that now?
8      A.     Yes.
9      Q.     Okay. What you said at 5369, I would like to
10 change that. Do you recall making that statement?
11     A.     I asked to add -- I asked to add to that,
12 yes. I misspoke.
13     Q.     But you used, quote, I would like to change
14 that. Correct?
15     A.     If that's what it says, then, yes that's what
16 I said.
17     Q.     And what you said earlier is that basically,
18 "I don't know of any literature on that one way or the
19 other on the risk of SIDS." Do you recall saying
20 that?
21     A.     Yes. But then it occurred to me that I was
22 misspeaking. So I just wanted to clarify that.
23 That's all.
24     Q.     And sitting here, do you agree that there's
25 no peer review study to support the position that a

Page 68

1  30-degree incline increases the risk of SIDS?
2      A.     I don't know -- I don't know of any
3  literature that supports that that's a safe thing to
4  do. I just look at it differently than you do,
5  because we can't comment on this -- this is the reason
6  why you can't say things with certainty with this,
7  because most of the studies that were done -- these
8  are case control studies. And the case control
9  studies that we make recommendations off of are based
10 on the things that people are using in the home. And
11 this product didn't exist when most of the studies
12 were done. So it makes it difficult to know one way
13 or the other if isn't. The studies don't address it
14 because the product didn't exist.
15     Q.     Was my question unclear to you?
16           MR. OSBORNE: Form.
17 BY MS. COHEN:
18     Q.     I'll -- I'll ask it again, because you
19 changed it.
20           My question was, do you know of
21 any -- you're not aware of any peer review study to
22 support the position that a 30-degree incline
23 increases the risk of SIDS?
24           MR. OSBORNE: Form.
25 BY MS. COHEN:

Page 69

1      Q.     That's the question I asked you.
2      A.     I don't know what -- I don't know what degree
3  constitutes an increased risk. It could. I don't
4  know. I don't know of a specific study to do that,
5  but I don't know of any studies that have looked at it
6  in -- in general.
7      Q.     So the answer is yes?
8           MR. OSBORNE: Form.
9           THE WITNESS: Okay.
10 BY MS. COHEN:
11     Q.     Do you agree with me?
12           MR. OSBORNE: Form.
13           THE WITNESS: Okay. Yes.
14 BY MS. COHEN:
15     Q.     I'm going to give you back your orange
16 folder, Exhibit 1, that has all the markings inside of
17 it; and we'll figure out how to address that later.
18           Let me pull out -- we marked your
19 report and your rebuttal report.
20           MS. COHEN: I want to go ahead and
21 mark as an exhibit -- this is the plaintiff's seventh
22 (sic) supplemental response to what he's disclosed.
23 I'm going to have that marked for the record. I'll
24 show this to you.
25           Okay. This is page 59 on this

18 (Pages 66 - 69)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 70

1  document.
2         MR. OSBORNE:  We're going to mark
3  this as 16?
4         (Exhibit 16, Seventeenth Supplement
5  to Plaintiff's Mandatory Initial Discovery Responses
6  and Plaintiff's Initial Disclosure Statement, marked
7  for identification.)
8         MS. COHEN:  Yes.  Thank you.
9  BY MS. COHEN:
10 Q.     I'm going to hand that to you, Doctor.
11 A.     Yes.
12 Q.     And I don't know if you have seen that
13 before, if you turn to page 59 of Exhibit 16.  I'll
14 just state -- and Mr. Osborne will certainly correct
15 me if I get this wrong.  But this is where you were
16 officially identified as an expert witness on behalf
17 of the plaintiffs.
18 A.     Okay.
19 Q.     And I don't know if -- have you seen this
20 document before?
21 A.     I don't recognize it off the top of my head.
22 But I -- if this was something that was provided to me
23 from the attorneys, then, yes.
24 Q.     Okay.  And it's not a huge deal.  I just want
25 to get a reference for when you were disclosed.

Page 71

1         This document is dated July 16th,
2  2021.  And it describes you and your expertise as
3  pediatric medicine/neonatology and sudden infant death
4  syndrome --
5  A.     Yes.
6  Q.     -- as your areas in this case?
7  A.     Yes.
8  Q.     Okay.  And you don't have any quarrel with
9  that, I take it?
10 A.     No.
11 Q.     Okay.  And then your report is referenced as
12 sort of including the basis for your opinions,
13 methodology, and the facts and data considered in
14 forming your opinions?
15 A.     Okay.
16 Q.     Is that accurate, that the report -- that is
17 your first report, Exhibit 2, sets out your opinions,
18 your methodology, and the facts and data supporting
19 your opinions?
20 A.     Okay.
21 Q.     Is that -- do you agree with that statement
22 about you?
23 A.     Yes.
24 Q.     Okay.
25        MS. COHEN:  We'll go ahead and mark

Page 72

1  the notice.  Thank you.
2         I'll mark it as Exhibit 17.  It's
3  always dangerous to put me in change of exhibits.  I
4  don't know what is going to happen today.
5         (Exhibit 17, Amended Notice of
6  Videotaped Deposition of Michael Goodstein, M.D.,
7  marked for identification.)
8  BY MS. COHEN:
9  Q.     Here is Exhibit 17.  This is what is called a
10 Notice of Deposition.  I think we talked about a lot
11 of this; but just for sake of completion, have you
12 seen this document?  This is where we ask you to bring
13 your file, etc.?
14 A.     I believe the attorney shared this with me.
15 Q.     Okay.  Very good.  I'll just run through this
16 quickly and see what we have.
17        So the section on starting at about
18 page 6?
19 A.     Is this something that I have?
20 Q.     Yeah.  It's in this document, in 17, about
21 page 6 of that asking you for some information to
22 bring today.  And the plaintiffs have produced to us
23 through Share File, whatever the right -- yeah, I
24 think it was Share File.  I just want to go through it
25 and see if this sparks a memory of anything.

Page 73

1         No. 1, "your current and up-to-date
2  resume or curriculum vitae."
3         And let me make sure I have your
4  most current and up-to-date one.  We'll mark this one.
5         The one we have is -- I have one
6  from April of 2021 -- I mean -- yeah, 2021.  Is there
7  a further updated one?
8  A.     Yes.  Yeah.
9  Q.     Okay.  Have you provided that to counsel?
10 A.     Yes, I did.
11 Q.     Is that the one -- is this the way -- do we
12 have one after April?
13        This is going to be Exhibit 18,
14 which is your current CV.
15        (Exhibit 18, Curriculum Vitae,
16 marked for identification.)
17 Q.     You are saying there is a further updated one
18 beyond that one?
19 A.     Yes.  There are a couple more articles.  And
20 I need to update it again to reflect this article that
21 just came out.
22        MS. COHEN:  Is that the one we had
23 yesterday?
24        MS. NG:  Yes.
25 BY MS. COHEN:

19 (Pages 70 - 73)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 74

1   Q.      What is the most recent one?  Do you know?
2   A.      It's probably from August of this year.  I
3   would have to look.
4          MR. OSBORNE:  Are we at exhibit --
5   what exhibit number are we --
6          MS. COHEN:  Eighteen.
7          THE WITNESS:  Eighteen.
8          MR. OSBORNE:  Okay.
9          MS. COHEN:  I think, John, there is
10  a further updated one that he's saying that he gave to
11  you that we didn't get.  It's not a huge deal, but
12  could you send it to us.
13         MR. OSBORNE:  I don't know if we
14  have a further updated one than we've given you.
15         THE WITNESS:  I think I provided
16  that.  I mean, it's not terribly different.  I just
17  added some more articles.
18         MS. COHEN:  And again, I'm not
19  fussing.  Maybe just make -- you know, maybe you could
20  just make sure you send the most updated one and then
21  if counsel we agree with --
22         THE WITNESS:  Sure.
23  BY MS. COHEN:
24  Q.      All right.  And the articles that would bring
25  it more up to date, do you know which ones you have

Page 75

1   added to this since April?
2   A.      Yes.  There would be a clinical report and
3   technical report on the transition of the NICU infant
4   to a home safe sleep environment.
5   Q.      Okay.
6   A.      That was written by the task force in
7   conjunction with the Committee of Fetus and Newborn.
8   And I'm the lead author on both of those articles.
9   They were published in Pediatrics.  They became
10  available on-line, I think, in early June.  I believe
11  it's the July issue of Peds where those can be found.
12  Q.      Okay.
13  A.      And --
14  Q.      -- I take it you don't have a copy of that
15  with you?
16  A.      No.
17  Q.      You don't carry it with you?
18  A.      No.
19  Q.      That's fine.  A laminated version?  Sorry?
20  A.      Not really.  And of course, the article that
21  is in the folder on the history of SIDS, as a task
22  force member, I would be considered an author on that.
23  Q.      So you would have put that on your CV, too?
24  A.      Yes.
25  Q.      Okay.  Let's make sure we have the right cite

Page 76

1   for that one.  So that would have been -- can you tell
2   me which exhibit that one is?
3   A.      Um-hum.
4          MR. OSBORNE:  I'm checking if we
5   have a more updated CV.
6          MS. COHEN:  Okay.  Thank you.  And
7   again, it's not a huge deal.  We can certainly get it.
8          THE WITNESS:  It would be this one,
9   the "Half Century Since SIDS:  A Reappraisal of
10  Terminology."
11  BY MS. COHEN:
12  Q.      You're saying Exhibit 9 that we marked --
13  A.      Yeah.
14  Q.      -- has been added to your curriculum vitae
15  because you were a member of the task force under the
16  confines of the AAP?
17  A.      Yes.
18  Q.      And then this other article about
19  transitioning to safe sleep environment at home?
20  A.      Um-hum.  Yes.
21  Q.      And in that, do you talk at all about --
22  specifically about the Rock n' Play Sleeper?
23  A.      No.
24  Q.      Do you talk at all about inclined sleep in
25  that?

Page 77

1   A.      We talk about the appropriate sleep surfaces.
2   Q.      And there again, I take it you follow the
3   flat --
4   A.      Correct.
5   Q.      -- firm?
6   A.      Correct.
7   Q.      No soft bedding?
8   A.      Correct.
9   Q.      And the reason you don't want soft bedding is
10  you don't want the bedding to get enveloped around the
11  baby's face.  Is that my understanding?
12  A.      Yes.  Soft bedding, loose bedding, loose
13  blankets, you don't want anything that can get around
14  the baby's face and reduce their ability to have gas
15  exchange when they're breathing.
16  Q.      And my understanding, again, of the soft is
17  that's the reason -- if it's too plush a mattress --
18  you'll explain to me if I'm getting this wrong.  You
19  don't want it to cover the baby's face.  Is that
20  correct?
21  A.      You -- there are a couple of issues.  That's
22  part of it.  You are correct.  You don't want anything
23  that can get over the nose and mouth.
24  Q.      Um-hum.
25  A.      You don't want anything that can conform to

20 (Pages 74 - 77)

Page 78

1  the baby's nose and mouth so they press up against it.
2          You also want to have an environment
3  that is basically free of anything that the baby could
4  get up against that can inhibit the airflow for their
5  breathing.  So it doesn't necessarily have to
6  completely cover their nose and mouth to cause
7  potential harm.  That's one of the reasons why we
8  don't like crib bumpers either.
9  Q.     Because they can get stuck on them or put
10  their face --
11  A.     There are multiple ways that are proposed for
12  mechanisms of harm from crib bumpers.  One is getting
13  entrapped between the bumper and the mattress.
14  Another is a bumper could get around the neck or cover
15  the nose and mouth.  Another could be they could get
16  up -- get pressed up against it and get compressed
17  that way as well.  And also in the older ones, they
18  had ties.  And when there were long ties, a tie
19  could -- could wrap around a baby's neck and cause
20  strangulation potentially.
21  Q.     And when is the last time you read Dr.
22  Goldsmith's reports in this case?
23  A.     I reviewed his reports this week in
24  preparation for this.
25  Q.     I take it one of the things you agree with

Page 79

1  him on is it's important to have a -- a hard -- like,
2  the hard shell plastic back that provides firm, flat
3  alignment of the head and torso.  That's important --
4          MR. OSBORNE:  Form.
5  BY MS. COHEN:
6  Q.     -- I guess it what you're saying?
7  A.     I don't agree with how he's wording that.  I
8  don't think it's not -- it's not just about the -- the
9  alignment of the head and -- and torso.  It is
10  important for it to be -- to be firm.
11  Q.     But you think that's a good thing, don't you,
12  to -- to have it, as he did say it -- let me go back
13  to that page.
14          "The Rock 'n Play Sleeper's hard
15  classic shell back provides a firm, flat alignment of
16  the head and torso so there's no flexion of the neck,
17  airway while in use."
18          That is an important feature, isn't
19  it?
20          MR. OSBORNE:  Form.
21          THE WITNESS:  A firm -- firmness is
22  important.  I don't know if that necessarily means if
23  the baby will stay in an aligned position, because
24  babies move.  So I'm not sure -- I'm not sure how to
25  interpret what he's saying.

Page 80

1  BY MS. COHEN:
2  Q.     Have you ever had any patients or friends or
3  family who have use the Rock n' Play Sleeper?  Do you
4  know?
5  A.     I have -- I don't know anybody in my personal
6  circle --
7  Q.     Okay.
8  A.     -- who used that product.  I do know some
9  families have asked about it, and I've made comment
10  for them on that.
11  Q.     I just wondered if you had anybody that you
12  knew who had used it through the years when it was on
13  the market?
14  A.     I don't believe so.  I mean, there's always
15  somebody who may have used it and I didn't know they
16  were using it.
17  Q.     All right.  Let me not get us, as I normally
18  do, get us off track.  Let me finish what we're doing
19  here, which is the -- I have a little ADD going on
20  here.  I apologize.  Let's finish up the -- the
21  notice.
22          So we talked about -- let's see.  So
23  one thing we asked for is your CV we talked about.
24          Then No. 2, "a list of all articles;
25  seminar materials, presentations, or writings."  Is

Page 81

1  that all encompassed in your curriculum vitae?
2  A.     Yes.
3  Q.     Do you have another list at all?  I know some
4  doctors or some witnesses have, like, a separate list
5  of things.  Do you have anything outside of that?
6  A.     I -- I don't have a separate list.  I may not
7  have every single thing recorded.  I try to stay
8  focused on the things that are more academic.  So
9  there may be other presentations that I may not have
10  included on that that may have been more media
11  related.  I would have to look to see if I included
12  every single one of them.
13  Q.     So infant sleep safety, which is one of the
14  topics you said -- obviously, it's an area of your
15  focus.  You mentioned that earlier?
16  A.     Yes.
17  Q.     Do you have, like, a standard -- I'm not
18  meaning to be insulting.  But do you have, like, a
19  standard presentation, PowerPoint that you use on that
20  -- I don't mean to suggest that you just recycle your
21  work; that's not what I meant -- that you kind of
22  build from?  Do you know what I'm saying?
23  A.     I'm always updating my talks to reflect the
24  latest literature.  So it just continues to evolve.
25  And it also depends on the target audience and --

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 82

1  Q.      Do you have a set of slides that you use as a
2  base that you build from is what I'm asking.
3  A.      I have multiple sets of slides that are a
4  base.
5  Q.      Okay.
6  A.      Again, it depends on what the purpose of the
7  talk is. There are many different areas of safe sleep
8  that I talk about.
9  Q.      Okay. Do you have -- do you present to -- I
10 take it you present to different groups is what you're
11 saying.
12 A.      Yes.
13 Q.      You present to your colleagues at AAP
14 meetings, for example?
15 A.      Yes.
16 Q.      And do you present to patients as an
17 educational series?
18 A.      Some -- sometimes, yes.
19 Q.      What do you tell patients in terms of how
20 they should behave and what they should do to be
21 compliant with safe sleep practices?
22 A.      Behave?
23 Q.      Okay. How they should -- maybe behave wasn't
24 an appropriate word. How they should act to be
25 compliant with safe sleep practices.

Page 83

1          MR. OSBORNE: Form.
2          THE WITNESS: That question seems
3  really straightforward to answer, but it isn't.
4  BY MS. COHEN:
5  Q.      Okay.
6  A.      Fifteen years ago maybe I would have said I
7  tell people specific recommendations.
8  Q.      Um-hum.
9  A.      Now I have a more nuanced approach to that,
10 because we know that parents often -- or anybody as a
11 caregiver may disengage if you're telling them what to
12 do. So what we really recommend is to have a
13 conversation and to understand where they're at, what
14 they're reality is and their needs and to be
15 nonjudgmental --
16 Q.      Um-hum.
17 A.      -- and to then really have permission to have
18 a discussion about the things that we feel are safest
19 to provide them with information to help them with
20 their decision-making, which at the end of the day,
21 parents have the right to decide how they care for
22 their children.
23 Q.      And you're basically trying to educate
24 parents on safe sleep and also how to avoid risk
25 factors for SIDS and SUID. Correct?

Page 84

1  A.      That would be true, yes.
2  Q.      They go -- they go hand in hand, don't they?
3  A.      Yes, they do.
4  Q.      Okay. And why -- why don't we come back to
5  that after we get through the notice then. I was
6  going to ask, do you have a standard -- do you have
7  any kind of presentation that you use on that that
8  sets forth what you think --
9  A.      Talking with families?
10 Q.      Yeah.
11 A.      I -- I have certain key themes that I like to
12 address, yes.
13 Q.      But do you have any materials that you hand
14 out to them?
15 A.      We do hand out a book to every family who
16 delivers at our hospital. We don't like brochures
17 because people take brochures and they put them in a
18 pile somewhere and they gather dust and they throw
19 them out.
20 Q.      It sounds like me.
21 A.      I mean, it's what we all do. I have plenty
22 of piles that my wife would like me to clean up.
23 Q.      She can talk to my husband today. Right?
24          What kind of book do you have?
25 A.      So we have a book -- I believe the title is

Page 85

1  called, Baby Sleeps Safe and Sound. I may not have
2  that exactly right. But it's a book -- it's a
3  children's book that was developed by Charlie's Kids
4  Foundation, Sam Hanke and his wife. And that book has
5  been shown in clinical studies to help parents
6  remember safe sleep recommendations.
7          But it's done in a bedtime story in
8  a children's card -- you know a big cardboard book.
9  So it helps with reading to their children and also
10 has images that are consistent with safe sleep. And
11 it reinforces the messaging. And on the back of the
12 book, it has the things that are helpful and things
13 that can be harmful as well.
14 Q.      Is that a book that we can get on-line?
15 A.      Of course.
16 Q.      And that's something that you -- you believe
17 is instructive and consistent with your opinions?
18 A.      Yes.
19 Q.      So I'll also go through the rest of this
20 notice here. Your entire file, you know, we asked
21 for. And again, we've been working that out with
22 counsel for the plaintiffs to share other witnesses'
23 files.
24 A.      Sure.
25 Q.      So I want to understand what you have listed

22 (Pages 82 - 85)

Michael Goodstein, M.D.
September 30, 2021
In Re: Fisher-Price/Mattel

Page 86

1 and what you haven't.  And I see what's in your orange
2 file here.
3           Let me also mark -- let's see --
4 materials that you reviewed.
5           I'm going to mark this as Exhibit --
6 I think this is 19, unless someone tells me it's not.
7           MR. OSBORNE:  It looks like it.
8           (Exhibit 19, List of Materials
9 Reviewed, marked for identification.)
10 BY MS. COHEN:
11 Q.     I'm going to hand you Exhibit 19.  It came to
12 us with your report.  And my question now to you is
13 just to try and understand what you had in hand at the
14 time you did your report, which is Exhibit 2, and what
15 materials you had at that point in time.  Okay?  I
16 know there's been things that have come since that
17 I'll ask you about.  But the time you gave your
18 report, which you already talked about was April --
19 A.     April, yeah, the beginning of April.
20 Q.     Yeah.  And we had your curriculum vitae
21 attached.
22           Oh, I want -- before I get into
23 this, you mentioned that you had given information
24 about prior testimony --  not -- prior reports that
25 you had given?

Page 87

1 A.     Yes.
2 Q.     And one of the questions we asked was, again,
3 during the past five years, what -- I guess No. 3 was
4 that you've given -- provided to the court or counsel
5 an expert disclosure or expert report or in which
6 you've given a deposition or testified in court.  So
7 you're saying that you have not done anything in terms
8 of testimony in deposition or in court, just the one
9 dep -- just the one report?
10 A.     Correct.
11 Q.     Okay.  Do you know what state that was in?
12 A.     I couldn't tell you.  I didn't travel
13 anywhere for that.  I wouldn't know.
14 Q.     And do you know -- I'm not allowed to get
15 into, like, if you're still consulting with attorneys.
16 So in that case, you had actually given a report that
17 was disclosed.  Do you know?
18 A.     I don't know what was done with the report.
19 I was just asked to -- to give a report.
20 Q.     Okay.
21 A.     I gave my expert opinion on the report.  And
22 that was it.
23 Q.     Do you know which attorneys you were working
24 with on that?  I don't want to ask anything if it's
25 work product.

Page 88

1           MR. OSBORNE:  I understand what you
2 were asking.  Thank you very much.
3           MS. COHEN:  I don't want to --
4           THE WITNESS:  Yeah, I -- honestly, I
5 don't know who it was who even asked me initially for
6 this case.  It was an outside firm that got me in
7 touch with this -- this team.  So I don't -- I mean, I
8 know the people who are involved with the HALO --
9 BY MS. COHEN:
10 Q.     Um-hum.
11 A.     -- because obviously they're around at these
12 meetings -- at some of these meetings, the AAP
13 meetings.  So they knew my name.
14 Q.     I want to make sure I understand what you
15 said.  You said, "I know the people" -- well, you
16 said, "I don't know who it was that even asked
17 honestly for this case.  It was an outside firm that
18 got me in touch with this team."
19           Are you saying this team in Courkamp
20 or -- is there any crossover between them?
21 A.     No.  No, there's no crossover.  I'm just
22 saying that in general, I've not been -- I don't -- I
23 don't know of any attorney who has approached me to do
24 any work.  Somebody did recently which I said no,
25 because I'm too busy.  But -- I don't know where the

Page 89

1 origin of the ask for on that case came from.  I
2 have -- I have notification in my billing who paid it;
3 but I would have to look that up.  I couldn't tell you
4 off the top of my head.  I have to search for that.
5 Q.     I'm sorry if I asked you this earlier.  Were
6 you -- were you hired to do a report for the plaintiff
7 side or the defense side in that case?
8 A.     That case was for the defense.
9 Q.     Okay.  So it was for the company?
10 A.     Correct.
11 Q.     Okay.
12 A.     Um-hum.
13 Q.     And you don't know who the lawyers are who
14 represented the company in that case?
15 A.     I can give you the information.  If I have
16 to, I can find the information of who the report went
17 to; but I don't know that -- I don't know who that
18 was.
19 Q.     Okay.  And did it come through your work as
20 the -- on the AAP committee is what you're saying?
21 A.     No.
22 Q.     Okay.  They just found you somehow.  You just
23 don't know how?
24 A.     Yeah.  Yes.
25 Q.     Do you know how this case came to you?

23 (Pages 86 - 89)

Michael Goodstein, M.D.                     September 30, 2021
In Re: Fisher-Price/Mattel

Page 90

1   A.     Somebody contacted me.  I don't know how they
2   got my information.  It wasn't through the AAP.
3   Q.     Okay.  But from what you know, there's no
4   crossover between these cases at all?
5   A.     Not that I'm aware of, no.
6   Q.     And you're actually on different sides?
7   A.     Correct.
8   Q.     And what was that case you gave the report
9   in, what was the device again?
10  A.     It was a wearable blanket.  The brand was
11  HALO SleepSack.
12  Q.     And was that a death case?
13  A.     Yes.
14  Q.     In that case, did you say that basically the
15  product was safe as it was designed?
16  A.     I don't remember what the specific
17  question -- how they wanted -- you know, what their
18  ask was.  But the SleepSack is considered a safe
19  device when used properly.  And I don't remember in
20  that case if it was just a regular SleepSack or if it
21  was the swaddling SleepSack, because there's some -- a
22  little controversy with swaddling now.
23  Q.     Okay.  So in that case -- I think what you
24  said your report says is something to the effect of
25  the SleepSack, the HALO SleepSack is a safe device

Page 91

1   when used properly.  Correct?
2   A.     The gist of it, I believe, yes.
3   Q.     And when you say "when used properly," that
4   means when used in accordance with the warnings and
5   instructions that the company puts out?
6   A.     Yes.
7   Q.     And that's important to you.  Correct?
8   A.     Yes.
9   Q.     You believe parents should use devices in
10  accordance with the warnings and instructions as
11  they're put out.  Correct?
12  A.     I think everybody should following the
13  instructions to use things safely.
14  Q.     And again, in that other case, when used
15  properly means just that, the parents should follow
16  the instructions and warnings.  Correct?
17  A.     That would be the safest thing to do, not
18  that people always follow the instructions.
19  Q.     But you as a neonatologist and a proponent of
20  safe sleep and safe sleep devices believe that that's
21  part of the job of the parents.  Correct?
22  A.     Yes.
23  Q.     And that's part of why you educate them?
24  A.     Correct.
25  Q.     If they're going to use something, they

Page 92

1   better follow the instructions that are put out by the
2   company.  Correct?
3   A.     They should; but I can tell you -- and the
4   literature supports this -- that people are constantly
5   using things either improperly or not follow -- not
6   following the safest recommendations.  That's a common
7   occurrence.
8   Q.     Right.  And then that's their responsibility
9   if they do that, correct --
10        MR. OSBORNE:  Foundation.
11        Go ahead.
12  BY MS. COHEN:
13  Q.     -- if they don't follow it?
14  A.     Parents should -- the safest thing for
15  parents to do is to follow the instructions for proper
16  use of products.
17  Q.     And that's exactly what you said in your
18  expert report in the HALO SleepSack case?
19  A.     Again, I don't remember the details; but it
20  means -- I don't want to --
21  Q.     Okay.
22  A.     You're very exact with wording.
23  Q.     That's what we lawyers are all about, I know.
24  A.     Yeah.
25  Q.     I can tell you I live with a dentist, and it

Page 93

1   makes him crazy.
2   A.     So I believe that's the gist of it; but I
3   would want to, you know, confirm that.  If you really
4   wanted me to -- to be specific and accurate, I would
5   have to look at it.
6   Q.     No.  I was just picking up on what you said.
7   You said "safe device when used properly."  And that
8   means consistent with the warnings and instructions?
9   A.     Yes.
10  Q.     And you've agreed with that?
11  A.     Yes.
12  Q.     And that's what you expect parents to do
13  generally?
14  A.     That's what I hope.
15  Q.     Right.
16  A.     But I know the reality is it's frequently not
17  the case.
18  Q.     And then that gets back to my point.  When
19  it's not the case, then that becomes their
20  responsibility if they don't do what they're supposed
21  to do.  Correct?
22        MR. OSBORNE:  Foundation.
23        THE WITNESS:  I'm not -- I guess --
24  I'm not an expert in product label and warnings.
25  BY MS. COHEN:

24 (Pages 90 - 93)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 94

1  Q.    Um-hum.
2  A.    So I -- I get a sense of what you're getting
3  at; but I think you're asking me to make responses
4  that might be out of my area of specific expertise.
5  I'm not sure.
6  Q.    But that is -- I'm sorry. It's hard --
7  A.    I'm done.
8  Q.    That is part of infant sleep safety --
9           MR. OSBORNE: Form and foundation.
10  BY MS. COHEN:
11  Q.    -- is what the parents are doing with their
12  children. Correct?
13  A.    Yes.
14  Q.    All right. So in terms -- let me go back to
15  where I was, which is Exhibit 19. And this is the
16  list of materials that were provided to us with your
17  report. So I want to go through this.
18           You obviously looked at the Tempe
19  Police materials, that whole file?
20  A.    Yes.
21  Q.    I don't think I saw you reference them in
22  your report, but you read them is what you're saying?
23  A.    Yes.
24  Q.    And you can certainly -- am I correct that
25  you did not reference them in your report?

Page 95

1  A.    I may not have -- I may not have listed it as
2  a reference; but I suspect that I made comment about
3  the information.
4  Q.    Okay. Well --
5  A.    I reviewed the records, some of the things
6  with the death scene. So I -- you have to look at the
7  specifics of the report. But I didn't make -- for me,
8  references generally are referring to medical,
9  scientific journals. So I didn't look at it as a
10  reference. I did see that other people did do that.
11  So maybe that was my error in form. I apologize for
12  that, if I made a mistake in how I reference in my
13  report.
14  Q.    I'm definitely not criticizing or picking on
15  you for that. You know, how you do your report is
16  totally up to you, of course, and counsel who hires
17  you. So no need to apologize. I'm just -- I'm just
18  suggesting if you look at Exhibit -- you probably have
19  this in front of you somewhere -- Exhibit 2. And I
20  just didn't see any discussion -- and I may have
21  missed it -- about the police report in this.
22           Let me help you there. It would
23  be -- Exhibit 2 would be your -- your -- maybe it's
24  out there. There it is. Right there.
25  A.    Yeah. Right on top. Um-hum.

Page 96

1  Q.    And again, I don't want to get us distracted.
2  But in this Exhibit 2 -- you can correct me if I'm
3  wrong. But the whole -- the whole -- let's see, pages
4  1 -- I don't even know if they're -- if they're page
5  numbered. But that is one tip I'll give you for
6  future --
7  A.    Sure.
8  Q.    -- if John allows me to say that.
9           But they're Bates numbered. Mine
10  has Bates numbers. But if you look at it from the
11  first page, which is 224 in my Bates numbers, it goes
12  to -- it's the whole first section. And that relates
13  to literature and safe sleep studies. Correct?
14  A.    Well, what I was asked to do was to make
15  comment about safe sleep recommendations.
16  Q.    Um-hum.
17  A.    And that's really why I focused on that.
18  Q.    Sure.
19  A.    And furthermore, I was asked to review the
20  medical records. And so I spent time looking at all
21  of those as well.
22  Q.    Understood. So that's what I was going to
23  say. So up until you get to the part that says
24  "review medical records," the prior part is all about
25  the safe sleep -- safe sleep studies. Right?

Page 97

1  A.    Yes.
2  Q.    In other words, pages 220 -- on mine at least
3  it 224 --
4           MS. COHEN: Do we have one with
5  Bates numbers that we can give him?
6           MS. NG: Yes.
7           MS. COHEN: And then we'll have the
8  same. I think they were produced yesterday with Bates
9  numbers.
10  BY MS. COHEN:
11  Q.    It might make it easier for you.
12  A.    Sure. Thank you.
13  Q.    Yep. It's the same thing but in color with
14  Bates numbers.
15  A.    Okay.
16  Q.    So page 224 up to -- up to 238, if you look
17  at the bottom number, it's about the safe sleep
18  studies. Is that right?
19  A.    Yes.
20  Q.    I'm trying to understand the methodology.
21           And when we get to 238, you describe
22  the medical records like you just said. Right?
23  A.    Correct.
24  Q.    And then that goes up until page 242, the top
25  of it going through the records. Right?

25 (Pages 94 - 97)

Michael Goodstein, M.D.    September 30, 2021
In Re: Fisher-Price/Mattel

Page 98

1  A.      Okay.
2  Q.      And then you have a summary paragraph where
3  you give your opinion.  Right?  I'm just trying to
4  understand the approach you took.
5  A.      Yes.
6  Q.      So you did the safe sleep studies, and then
7  you did the medical records.  And then you get to your
8  summary paragraph of your opinions.  Correct?
9  A.      Correct.
10 Q.      And so my question is, I was looking at
11 Exhibit 19, which is your materials reviewed.  In
12 terms of the police materials, the autopsy report, the
13 toxicology report, you don't reference them in your
14 report, which is where we started this.  Is that fair?
15 A.      I read through them.  They weren't -- they
16 weren't relevant to the question I was asked to
17 answer.
18 Q.      Okay.
19 A.      But in the rebuttals, that material became
20 very relevant to discuss.
21 Q.      Okay.  But in your initial report, just so I
22 can understand this, you don't reference any of the
23 police or autopsy or medical examiner reports.
24 Correct?
25 A.      Correct.

Page 99

1  Q.      And also you do not -- in the summary
2  paragraph -- let's look at that really quickly before
3  we go through this.  You say, "In summary, based on my
4  education, experience, knowledge, and training, Zoey
5  was a healthy child who was born to a healthy mother
6  after uncomplicated pregnancy."
7          That's your starting point.
8  Correct?
9  A.      Correct.
10 Q.      "Zoey had some transitional issues during the
11 first 24 hours of life that resolved without
12 intervention.  She had a structurally normal heart as
13 confirmed by echocardiography.  She was a healthy
14 child with normal growth, and she was well cared for.
15 She was within normal limits for achieving her
16 developmental milestones.  She had no obvious
17 intrinsic risk factors, such as intrauterine growth
18 restriction or maternal use of cigarettes or alcohol,
19 that would increase her risk of the SIDS.  She was
20 also out of the range of most cases of SIDS, which
21 typically 90 percent occur within the first six months
22 of life.  All of my opinions are stated to a
23 reasonable degree of medical certainty."
24         Did I read that right?
25 A.      Yes.

Page 100

1  Q.      And that paragraph contains your opinions in
2  this case.  Correct?
3  A.      Yes.
4  Q.      And you don't address in here at all any
5  extrinsic risk factors.  Correct?
6  A.      I was not asked to comment on that.
7  Q.      Right.  And again, I'm not fussing at you.
8  I'm just clarifying what's -- what's in here and
9  what's not.
10         In your opinions in your report in
11 this case, you're not addressing extrinsic risk
12 factors.  Correct?
13 A.      I did not.
14 Q.      Okay.  You don't address cause of death.
15 Correct?
16 A.      No, I did not.
17 Q.      Okay.  You don't address the police or the
18 autopsy or the medical examiner's records.  Correct?
19 A.      Correct.
20 Q.      Okay.  And at the time your original report
21 went out, none of that is in here.  Correct?
22 A.      Correct.
23 Q.      You don't have anything in here about the
24 night in question; that is -- let me make sure I have
25 the date on that.  The specific night or date, let me

Page 101

1  just see.  I have it right here.
2          June 19th, 2014, you don't address
3  that in here, do you?
4  A.      No.
5  Q.      Okay.  And again, in your official report
6  that you signed off on on April 1st, 2021, you do not
7  address cause of death in here.  Correct?
8  A.      Correct.
9  Q.      And let's look back at 19 again just to
10 finish going through this.
11         Dr. Cleary's medical records you
12 reviewed.  Right?
13 A.      Yes.
14 Q.      And that's where you sort of described why
15 you thought she was a healthy, normal baby?
16 A.      Yes.
17 Q.      Have you read his deposition?
18 A.      I have read -- did he have a report or just
19 deposition?
20 Q.      Just a deposition.
21 A.      I did read -- I don't know if I read every
22 page of it; but I do recall going through it, yes.
23 Q.      The next section -- well, let's see.  Just to
24 be fair, that may have been taken after you issued
25 your report.

26 (Pages 98 - 101)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

1   A.      Yeah, I think it might have been after the
2   report.  I think you're correct.  At some point, I did
3   read it.  I just can't tell you the date.
4   Q.      One of the things on page 241 in your
5   report -- if you can just flip back to that little
6   page there, 241.
7           One of the things you did get from
8   Dr. Cleary's records is, again, you sit here -- you
9   sit here -- you say here -- these masks are going to
10  kill me.
11  A.      Sorry.
12  Q.      That's okay.  "At the six month visit, the
13  notes state that Zoey was babbling more, rolling over,
14  and transferring small objects by hand."
15          That's taken from Dr. Cleary's
16  records.  Right?
17  A.      Yes.
18  Q.      And that's what you're -- you interpret them
19  as, that baby was rolling over.  Correct?
20  A.      Yeah.  It was pretty hard to read the
21  records, but that's what I --
22  Q.      Okay.
23  A.      -- got out of it.
24  Q.      Okay.  That's part of what you relied upon.
25  Correct?

1   A.      Yes.
2   Q.      And when you said, again, earlier that what
3   you were asked to do, were you -- were you
4   communicating with counsel who used to be in this
5   case, Kristin Schriner?
6   A.      Yes.
7   Q.      She's the one that retained to you, I take
8   it?
9   A.      I don't know exactly who it was in the firm,
10  but I worked with her.
11  Q.      Okay.  And you were asked to look at, again,
12  safe sleep studies and then basically review of
13  medical records?
14  A.      Yes.
15  Q.      The two parts that we just talked about?
16  A.      Yes.
17  Q.      That are in this original report.  Correct?
18  A.      Correct.
19  Q.      All right.  And then also on Exhibit 19, you
20  looked at -- let's see -- okay -- the autopsy photos,
21  autopsy report, toxicology report from Maricopa
22  County, and the whole ME file.  You looked at it, but
23  you did not address that in your report.  Correct?
24  A.      Correct.
25  Q.      You looked at medical records from Phoenix

1   Baptist and Mountain View Medical Group?
2   A.      Yes.
3   Q.      And those you covered generally.  Right?
4   A.      Yes.
5   Q.      Additional ME reports pursuant to Plaintiffs'
6   subpoena, again, that wouldn't have been covered in
7   here.  Correct?
8   A.      Um --
9   Q.      I think that refers to medical examiner.
10  Yeah.
11  A.      I'm not sure -- yeah, whatever files I was
12  given from -- from that I would have reviewed, yeah.
13  Q.      The protective order and scheduling order,
14  obviously you're not going to comment on those in your
15  report.
16          But let's look at the next part.
17  The deposition of Detective Thomas O'Brien, Detective
18  Michelle Reyes, Detective -- or Officer Torin
19  Williams, ME --
20          MS. COHEN:  Slow down?
21          COURT REPORTER:  Yeah.  Start over
22  with the names.
23          MS. COHEN:  Yeah.
24  BY MS. COHEN:
25  Q.      Deposition of Detective O'Brien, Detective

1   Michelle Reyes -- and we'll give you a copy of this,
2   too -- ME Dr. Michael Ferenc, ME Investigator Farrel
3   Swope, you don't address any of those in your report.
4   Correct?
5   A.      Not the initial report.  I was not asked to
6   do that.
7   Q.      And then plaintiffs' answers to discovery
8   requests, I take it those are not covered in the
9   report.  Correct?
10  A.      If those materials were given to me, I
11  reviewed them.
12  Q.      Okay.
13  A.      But I don't think they were specific -- I
14  don't think that information was necessarily specific.
15  There might have been something that would have been
16  involved with determining the child's health, some of
17  those.
18  Q.      Got it.
19  A.      Yeah.
20  Q.      All right.  When you talk about healthy
21  child, that might have come from -- I see what you're
22  saying.
23  A.      They sent me pictures of Zoey at different
24  stages in her life.  There's all kinds of information
25  from the mother's diaries, and there's a whole lot of

27 (Pages 102 - 105)

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

Page 106

1  information there. But there were -- there was
2  information that would attest -- that helped me
3  determine that Zoey was a thriving child, which is
4  what I stated in the report.
5  Q.      Tempe Fire Department records, you didn't
6  reference those in your report. Correct?
7  A.      I don't believe so.
8  Q.      Sergeant Alan Akey, the same thing, you
9  didn't reference that in the report. Correct?
10 A.      Correct.
11 Q.      Depositions of -- of Mr. Osborne's clients,
12 Mr. Olson and Ms. Courkamp?
13 A.      I reviewed that information. And again, it
14 was just used towards determining the child's health.
15 Q.      Did you glean from their transcripts as well
16 as the -- all of the police reports and medical
17 examiner's reports that the dad -- what happened on
18 the night in question?
19 A.      There was a lot of information that -- yeah,
20 that went through all of the details of that night,
21 sure.
22 Q.      And from your perspective in your official
23 report that you were giving in this case, you weren't
24 getting into what happened that night, I take it.
25 Correct?

Page 107

1  A.      That was not my purpose for -- for my being
2  hired as a consultant here.
3  Q.      Okay. And you did see that the police, the
4  medical examiner, Mr. Olson, Ms. Courkamp all
5  basically concluded or all noted that the baby was
6  found not restrained. Did you see that?
7          MR. OSBORNE: Form and foundation.
8          THE WITNESS: From the information
9  that I read, when the baby was found, she was not
10 restrained.
11 BY MS. COHEN:
12 Q.      Right. And you saw Mom's report to the
13 medical examiner and the police she didn't think the
14 father restrained her the night before. Did you see
15 that?
16         MR. OSBORNE: Form. Foundation.
17 BY MS. COHEN:
18 Q.      I can pull it out, if we need to.
19 A.      I saw conflicting information about that.
20 There was a lot of conflicting information about what
21 happened that night.
22 Q.      You think it was conflicting?
23 A.      I believe the dad said that he usually did
24 put the baby in buckle but that he didn't always. And
25 I can't remember what Ms. Courkamp said. I'd have to

Page 108

1  look at specific -- I think she felt that -- her
2  recollection was that the baby was not restrained that
3  night.
4  Q.      Okay.
5  A.      But I think Andrew thought he may have
6  restrained the baby but really wasn't sure. He
7  didn't --
8  Q.      Right.
9  A.      -- remember.
10 Q.      Okay. And we'll pull those out as we go
11 through the day. But again, that wasn't something you
12 were called on to address in this case. Correct?
13 A.      On initial report, no. On rebuttal, there
14 was a lot of things I was asked to look at.
15 Q.      Sure. But your initial report is where you
16 disclosed -- you understand you were disclosed to give
17 opinions based --
18 A.      Yes.
19 Q.      -- on your initial report. Correct?
20 A.      Yes.
21 Q.      And then you -- let's see. You also received
22 the recorded statement of Gary Deegear?
23 A.      Yes.
24 Q.      And did you receive his three depositions
25 that were taken?

Page 109

1  A.      There was a huge -- huge amount of
2  information and files on him. I can't tell you
3  specifically, you know. There was a couple of things.
4  And then there was, like, an abridged version of some
5  of the -- some key information.
6  Q.      But again, that's not something you covered
7  in here?
8  A.      I don't think I even had that available to me
9  when I made my initial report.
10 Q.      Okay. And then the deposition exhibits of
11 Kitty Pilarz, 30(b)(6), you didn't address those in
12 here?
13 A.      I didn't have those at the time of the
14 report. I don't think I received those until very
15 recently actually.
16 Q.      Okay. So in terms of this list, just to
17 recap, and your report -- your official report in this
18 case, the only things you rely upon in here were the
19 medical records and maybe the plaintiffs' discovery
20 responses and maybe parts of the depositions. Is that
21 a fair recap?
22 A.      I think so.
23 Q.      And the other things were not -- were not
24 part of what you relied upon and not part of your
25 opinions in the case. Correct?

28 (Pages 106 - 109)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 110

1  A.    Correct.
2  Q.    Now, let me just finish up the notice here.
3  I know we've been going for a while.  So you just let
4  me know when you want to takes a break.  I'm not
5  trying to --
6  A.    Thank you.
7  Q.    -- punish anybody.
8  A.    Thank you for asking.  I'm good whenever
9  everybody else wants to.  I'm okay.  But I'm fine to
10 continue.
11 Q.    Have you taken any notes in this case?
12 A.    Not really.  I just wrote up my report.
13 There were rough drafts, but they just evolved into
14 the final report.  So I don't have any separate
15 information.
16 Q.    And there's a lot -- a lot of questions about
17 materials you relied upon.  So is it fair to say
18 that -- that between your orange folder here and the
19 list we went over -- and we'll cover a couple other
20 things -- that that covers everything you looked at in
21 this case?
22        MR. OSBORNE:  Form.
23        THE WITNESS:  I would -- I would say
24 there are many articles that I reviewed to form my
25 opinion and they're not all here.

Page 111

1  BY MS. COHEN:
2  Q.    Okay.  That would go in the front part of the
3  report; that is, the safe sleep part.  Is that
4  correct?
5  A.    Correct.
6  Q.    But in terms of what -- in terms Zoey and
7  your opinions that are -- you agree your opinions on
8  Zoey are captured in this last paragraph on page 242.
9  Right?
10 A.    Yes.
11 Q.    That's the entirety of your opinions on her.
12 Correct?
13 A.    Of what I was asked to make an opinion about.
14 Q.    Yes.
15 A.    Obviously, there is a lot more information.
16 And I suspect you may ask questions about it later in
17 terms of risk factors and intrinsic and extrinsic --
18 Q.    Sure.
19 A.    -- and such and so forth that I certainly can
20 talk to but was not asked to do so for this report.
21        I mean, it was a criticism of some
22 of the rebuttals that I didn't have the response to.
23 Q.    Yeah.  Right now we're just focused on what
24 your opinions are in this report, but we'll certainly
25 get to that.

Page 112

1        Let me see where I was up there.
2        So -- and then since the first
3  report -- I'm just trying to do this sequentially --
4  you have had a chance to look at the other reports
5  that were given in this case.  So, first of all,
6  Plaintiffs' expert witnesses, they have Dr.
7  Singhose -- and I think if I get any of this wrong,
8  I'm sure Mr. Osborne will correct me -- who is an
9  engineering -- I may not be stating the entirety of
10 his -- he's an engineering type; Dr. Brandenburg
11 (phonetic), who is human factors and warnings; and
12 then Dr. Christiansen, who is a pathologist are the
13 other Plaintiffs' expert witnesses along with you.
14 Have you read all of their reports?
15 A.    I've looked at all the reports.  I don't know
16 if I've read every single page.  I do believe the
17 product expert's report was a couple hundred pages or
18 something.  And honestly, some of the information gets
19 into a level of detail that's beyond my pay grade.
20 And that's why he's the expert in that and I don't
21 comment on it.
22 Q.    I'm just trying to figure out what you have
23 reviewed.  But you're aware that there's other
24 Plaintiffs' expert witnesses.
25 A.    Yes.

Page 113

1  Q.    You've read some of them, but you've focused
2  on probably more on the medical ones?
3  A.    I've looked at all everything, but my focus
4  would be more on the medical information.
5  Q.    So those were the plaintiffs' experts.  And
6  on the defense side, we seven experts.  And I know you
7  read -- looking at your rebuttal report, you read Dr.
8  Goldsmith's report.  We talked about Dr. Fuller you
9  mentioned today?
10 A.    Yes.
11 Q.    Dr. Gibb, who is the epidemiologist?
12 A.    Yes.
13 Q.    Were those the primary ones you focused on?
14 A.    Yes.  You would have to tell me who the other
15 people's names were for me to comment, but I
16 definitely looked at all of those.
17 Q.    Well, in your rebuttal report, you actually
18 list the ones you reviewed.  So maybe that gives me
19 the answer on page -- yeah.
20 A.    Because there was somebody else on --
21 Q.    Dr. Drago's you looked --
22 A.    Yeah.  I received that one very late; but I
23 did end up making comments on that, yes.
24 Q.    So then my question is -- oh, yeah.  I don't
25 mean to hide this from you.  You have this in front of

29 (Pages 110 - 113)

Michael Goodstein, M.D.                          September 30, 2021
In Re: Fisher-Price/Mattel

Page 114

1 you, too, Exhibit 3, I think.
2          You also here state that you did
3 look at the deposition of Kevin Clearly -- Cleary --
4 A.    Yes.
5 Q.    -- in between Report 1 and Report 2. So that
6 gives us that answer.
7 A.    Yes.
8 Q.    Okay. Yeah, three is right there.
9          What about recent depositions that
10 have been given all over the country in this case that
11 I've missed many of, which depositions have you seen?
12 Do you know?
13 A.    I know I reviewed Dr. Christiansen's
14 deposition; but I don't know -- I know Dr. Cleary's
15 deposition, not just report. I don't -- I don't --
16 who is the -- the product expert? I'm forgetting --
17 Q.    On which -- on the defense side?
18 A.    Who was involved from the beginning of
19 determining whether the product was safe when it was
20 being developed? He recently retired. You had a
21 really long -- you had a really long deposition with
22 him. Oh, Dr. Drager (phonetic), yeah.
23          MR. OSBORNE: Drago.
24          THE WITNESS: Drager -- Deegear --
25          MS. COHEN: Yeah.

Page 115

1          THE WITNESS: -- Deegear. I'm
2 sorry. Deegear.
3          MR. OSBORNE: However you pronounce
4 it.
5          THE WITNESS: I did look at
6 information from Dr. Deegear. I think that was
7 deposition, not report.
8          MS. COHEN: It was pretty long. It
9 was three -- three days.
10          MR. OSBORNE: How do you pronounce
11 it any way?
12          MS. COHEN: Deegear.
13          MR. OSBORNE: Deegear?
14          MS. COHEN: Yeah.
15 BY MS. COHEN:
16 Q.    Let me get out your invoices, because we
17 marked those.
18 A.    Yeah, I'll just tell you right now my
19 invoices are not completely up to date, because I just
20 haven't had a chance to -- to do it, so the recent
21 work that I've done in preparation for today.
22 Q.    I'd bill him. Make him pay you.
23          MS. COHEN: So we should be up to 20
24 now. I'll mark the exhibits. And we got these last
25 night from Plaintiffs' counsel. I just want to make

Page 116

1 sure I understand what these are.
2          Twenty and 21 we'll mark --
3 actually, 20, 21, and 22.
4          MR. OSBORNE: You're marking them
5 separately? Okay.
6          MS. COHEN: I would mark them
7 together, if it's easier.
8          MR. OSBORNE: It's whatever you want
9 to do. I just want to make sure my notes are
10 accurate.
11          MS. COHEN: Just two. Right?
12          MS. NG: Um-hum.
13          MS. COHEN: Sorry. So 20 and 21.
14 I'll mark them separately --
15          MR. OSBORNE: Okay.
16          MS. COHEN: -- just because I don't
17 have any clip over here.
18          (Exhibit 20, Invoice, marked for
19 identification.)
20          (Exhibit 21, Invoice, marked for
21 identification.)
22 BY MS. COHEN:
23 Q.    So I'm handing you 20 and 21. And these are
24 what was produced to us as your invoices. And so my
25 question is on -- I guess since this is marked as

Page 117

1 Exhibit 1 -- Bates 1, the one that says, "Courkamp
2 expert report by Michael Goodstein, M.D." And then
3 Exhibit 2 is on the bottom. This one didn't have a
4 year on it. I'm trying to understand. Do these go in
5 order?
6 A.    It says, 2020, 2021.
7 Q.    Look at the next page.
8 A.    Oh.
9 Q.    There may be a simple explanation. And I'm
10 not catching on it. Do you know where those fit?
11 A.    This is probably from 2019 and I didn't put a
12 date on it, because I didn't -- I thought --
13 Q.    You didn't think it would go into other
14 years?
15 A.    Yes, exactly. I thought I was going to be
16 writing a report --
17 Q.    Okay.
18 A.    -- and it wouldn't go too much further than
19 that. This has been a whole new world. So, yeah,
20 that's why I believe it's -- yeah, literature review,
21 report. Yeah, it's all 2019.
22 Q.    Okay. So the one that starts with Bates No.
23 2 on the bottom is actually 2019. Is that right?
24 A.    Yes.
25 Q.    And it starts with, "Hours for Rock 'n Play

30 (Pages 114 - 117)

Michael Goodstein, M.D.                              September 30, 2021
In Re: Fisher-Price/Mattel

---

Page 118

1  Litigation, 9/26." That would have been, again, as
2  you said, 2019. So that was before COVID hit. And I
3  think that was also what sort of slowed us down in
4  this case.
5            9/26 was the first phone meeting.
6  Would that have been Ms. Schriner?
7  A.      I -- I don't know who was on the call with
8  me; but it was the legal team.
9  Q.      Okay. And there it looks like from September
10  to December you did 7.5 hours and you were -- is that
11  correct?
12  A.      Yes.
13  Q.      Phone meeting, then literature review one
14  hour and then review and report work is another 5.5
15  hours there -- if am I adding that up right --
16  A.      Yes.
17  Q.      -- before another phone meeting?
18            Was that the report that turned out
19  to be this Exhibit 2 that we have in front of us?
20  A.      Yes. It would be work on that, yes.
21  Q.      Okay. And again, your charge, that is your
22  charge -- what you were assigned to do was tell me
23  about safe sleep practices --
24  A.      Yes.
25  Q.      -- your literature on that and then look at

---

Page 119

1  the intrinsic risk factors for Zoey?
2  A.      It was to review her medical records.
3  Q.      Okay.
4  A.      It wasn't -- can I look at my report?
5  Q.      Sure. Of course. There you go. And we're
6  looking at page 242.
7  A.      Yeah, I put in the wording, which I don't
8  know if that's the way it was asked for in the report.
9  But it's review her medical records and to comment on
10  her health.
11  Q.      Okay.
12  A.      And I just tied that to the topic that we're
13  all here to talk about is, you know, SIDS.
14  Q.      When we talk about -- not we, when the world
15  talks about SIDS and SUIDs -- and I think I saw this
16  in your report or one of your writings, that in your
17  mind -- in your opinion, I should say, SUIDs -- SIDS
18  is part of SUIDs. Correct?
19  A.      There's a subcategory. That's correct.
20  Q.      So when we, again you, talk about SIDS and
21  SUIDs, there are -- you agree there are intrinsic risk
22  factors as well as extrinsic risk factors?
23  A.      That is true.
24  Q.      And when we talk about the Triple Risk
25  Theory, that includes both intrinsic and extrinsic.

---

Page 120

1  Correct?
2  A.      That's correct.
3  Q.      In your report -- your official expert report
4  in this case, which is Exhibit 2, you only address
5  intrinsic risk factors, though. Correct?
6  A.      Yes, because intrinsic risk factors are
7  internal to the baby and referring to the child's
8  health as opposed to the ex -- I tripped over my
9  tongue -- extrinsic risk factors, which are exogenous
10  or outside of the baby and typically refer to the
11  environment and don't include some of the things I
12  have to say that are in the other reports.
13            I think there are some -- I'm sure
14  we'll address it later; but I think there is some
15  mistaken understanding with your experts in terms of
16  intrinsic and extrinsic factors.
17  Q.      Well, you don't address any extrinsic risk
18  factors in your report. True?
19  A.      I wasn't asked to discuss that until the
20  rebuttals.
21  Q.      I understand. I'm just saying, just to be
22  clear, you're not saying that extrinsic risk factors
23  are not important, are you?
24  A.      Of course not. Extrinsic risk factors are
25  important.

---

Page 121

1  Q.      Every article you've written on SIDS and
2  SUIDs covers extrinsic. Right?
3  A.      Of course. I'm not saying that they're
4  causative, but they are risk factors.
5  Q.      And in fact, you would take issue with
6  somebody who wrote an article about risk factors for
7  SIDS and didn't address extrinsic risk factors. True?
8  A.      True.
9  Q.      Now, let me -- let's just finish up these.
10  So we have 2019. We've covered that. And then 2020,
11  again, I think looking back -- and John can correct
12  me -- we had COVID issues and delays and things like
13  that. So that's kind of what happened.
14            But it looks like come 2020, though,
15  you started picking things up in terms of more hours,
16  in fact, 27.5 more hours. Correct?
17  A.      Correct.
18  Q.      And your fee -- I think I saw this somewhere
19  what your fee schedule was. And this would be on the
20  back of Exhibit 2, fee schedule -- it's on page 267 in
21  the back. Yeah, the back of that page. That's your
22  fee schedule there. Correct?
23  A.      Yes.
24  Q.      And you include your wife's name and your
25  son's -- I take it that's your son, Jonathan?

---

31 (Pages 118 - 121)

Michael Goodstein, M.D.                         September 30, 2021
In Re: Fisher-Price/Mattel

Page 122

1  A.    Yes.  I don't know why that's attached to
2  that.  That's kind of weird.
3  Q.    It's nice, though.
4  A.    That's the beginning of my CV.  So I'm not
5  sure how that --
6  Q.    That was nice you had them on your fee
7  schedule.
8  A.    That's just the front page of my CV.  It
9  looks like something got out of order and attached on
10  incorrectly.
11  Q.    Okay.
12  A.    It looked like somebody typed that in,
13  because that's not what I printed out.
14  Q.    I just want to make sure I have this.  So
15  your fee schedule, $700 an hour for review, phone
16  calls, literature review, and report preparation.
17  Right?
18  A.    Yes.
19  Q.    And then for deposition, you charge $1,400 an
20  hour?
21  A.    Yes.
22  Q.    Plus a two-hour minimum, plus travel
23  expenses.  Right?
24  A.    Yes.
25  Q.    So am I getting charged for travel expenses

Page 123

1  today for your drive here?
2  A.    I think I can afford the gas.
3  Q.    I'm just wondering.  $3,000 a day or partial
4  day if you go to court.  Correct?
5  A.    Yes.
6  Q.    And travel expenses?
7  A.    Yes.
8  Q.    So if you come to Arizona to testify in this
9  case, if we ever get a trial date, it would be $3,000
10  a day plus travel expenses?
11  A.    Yes.
12  Q.    And even if you don't testify for an entire
13  day, you'll be charging $3,000?
14  A.    Yes.
15  Q.    Now, to go back to the invoice, there's a lot
16  of hours in 2020 on writing of report.  I see one,
17  two, three, four -- five different entries on that.
18  So is this still the same report you're writing,
19  because I --
20  A.    Well, at some point, it turned into the
21  rebuttal.  So this is before April.  So this would
22  have been the initial report.  So, yeah, I was writing
23  everything from scratch and reviewing the literature
24  and making sure that everything I said was completely
25  accurate.

Page 124

1  Q.    Okay.  Let's think about the timing.  So
2  April --
3  A.    Okay.
4  Q.    -- the first report is April 2021.  The
5  second report is just the rebuttal part.  Right?  It's
6  July 2021.  Is it fair to say that everything on
7  page 1 here relates to the first report?
8  A.    Yes.
9  Q.    Okay.  And so the invoice that you said that
10  you haven't got caught up on yet would go for the
11  rebuttal report?
12  A.    Yes.
13  Q.    We don't have those yet.  Right?
14  A.    Yes.
15  Q.    Do you know how many hours it's been since
16  March 30th?  So that would be basically looking at all
17  the reports; that is, your co-plaintiff expert
18  reports, the other plaintiff expert reports, three of
19  them, plus the seven defense reports plus all the
20  depositions coming in.  Do you know how many hours you
21  spent and then writing the report?
22  A.    Right.  I -- I couldn't tell you off the top
23  of my head.  It's probably somewhere around 20 hours,
24  but I couldn't say with certainty about that.
25  Q.    Okay.  Twenty more hours?

Page 125

1  A.    Yes.
2  Q.    We can put that away here.
3        MS. COHEN:  Should we take a quick
4  break now?
5        MR. OSBORNE:  Sure.  It's up to you.
6        MS. COHEN:  11:30.  So we've been
7  going about two hours.
8        THE WITNESS:  Sure.
9        THE VIDEOGRAPHER:  We're going off
10  the video record.  The time is 11:31.
11        (Brief recess from the record.)
12        THE VIDEOGRAPHER:  We're back on the
13  video record.  The time is 11:50.
14        MS. COHEN:  Thank you.
15        (Exhibit 2A, Original Report,
16  4/1/21, with Attachments, marked for identification.)
17  BY MS. COHEN:
18  Q.    So one thing I did while we were on the break
19  is you had Exhibit 2 in your -- in your folder there,
20  which was your original report.  And I went ahead and
21  marked 2A just to confirm that this has more stuff to
22  do, because the one that was in your folder didn't
23  have, like, your attachments and everything.
24  A.    Okay.
25  Q.    So if we could just confirm this is your

32 (Pages 122 - 125)

Michael Goodstein, M.D.                                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 126

1  official report with the attachments that were
2  produced.  And then we'll do the same thing with
3  three, I think.
4     A.     This looks okay.
5     Q.     I don't want to find out later that we didn't
6  attach a full one.
7            (Exhibit 3A, Rebuttal Report,
8  7/16/21, with Attachments, marked for identification.)
9     Q.     And then for your -- why don't we go ahead
10  and do Exhibit 3A also.  We have the one in the
11  folder, but this is the official one with attachments
12  for 3A for the July rebuttal report.
13    A.     Okay.
14           MS. COHEN:  Does John need a copy of
15  that?
16           MR. OSBORNE:  I don't really need a
17  copy of that.  I mean, we're already burning trees
18  here.
19           MS. COHEN:  We want you to carry
20  this back.
21           THE WITNESS:  That's kind of what I
22  was trying to, minimize some of the stuff I was
23  making.
24           MS. COHEN:  I know.  We failed,
25  yeah.

Page 127

1            THE WITNESS:  Yeah.
2  BY MS. COHEN:
3     Q.     Can you confirm that is your July rebuttal
4  report?
5     A.     Yes.
6     Q.     And while -- let's look at this for a moment.
7  This is Exhibit 3A.  One thing you mention here is you
8  did inspection of the exemplar Fisher-Price Rock 'n
9  Play inclined sleeper.  When did you do that?  When
10  and where did you do that?
11    A.     Did you say --
12    Q.     Do you want me to ask that again?
13    A.     Yeah, I'm not sure what --
14    Q.     Your rebuttal report on July 16, 2021,
15  starts -- Exhibit 3A, starts with, "At your request, I
16  prepared the following rebuttal report with respect to
17  the above referenced case, which is based on an
18  inspection of exemplar Fisher-Price Rock 'n Play
19  inclined sleeper and a review of the materials
20  including" -- and then I'll list them.
21           In terms of the inspection, where
22  did you do that?  Was that at Mr. Osborne's office?
23  Was that sent to you here?
24    A.     No.  But I have examined -- I have examined
25  Rock 'n Plays.  So I've seen them locally in -- in the

Page 128

1  stores.  I did not take one home and buy one.  I
2  know -- I know what the product looks like.  I've seen
3  pictures of the product.  And I've examined -- and
4  I've examine the product.  I didn't -- I don't have a
5  specific model that I, you know, sat and played with.
6     Q.     That's what I was trying to ask.
7     A.     Yeah.
8     Q.     So you're saying that generally you
9  understand what they look like?
10    A.     Yes, very much.
11    Q.     You've seen them in boxes in the store?
12    A.     I've seen them on display, yeah.
13    Q.     But when you say here on page 1 "based on an
14  inspection of the exemplar Fisher-Price Rock 'n Play,"
15  did you actually have a Rock 'n Play that you looked
16  at and touched and measured?
17    A.     I did not have one to measure, no.
18    Q.     When it says "exemplar," does that mean the
19  same model as the one that was in the Courkamp case?
20    A.     No, because I don't know the specific model
21  in the Courkamp case, no.
22    Q.     And again, other than seeing it in stores --
23  I'm trying to understand what is meant by your
24  discussion.
25    A.     I guess I'm not sure what you mean by

Page 129

1  exemplar.
2     Q.     Let me try this again, because this is
3  your -- I'm just using your words.  You said you did
4  an inspection of the exemplar.  So did you actually
5  look at a Rock 'n Play?
6     A.     With regarding to this case?
7     Q.     Yeah.
8     A.     No.  And I probably misunderstood the -- the
9  wording, because I guess there is standard wording
10  that's used in the reports that for the cover letter
11  the team gave me some assistance with.  So if -- so if
12  you're asking if I specifically had a model to look at
13  and examine top to bottom, I did not do that.
14    Q.     Okay.
15    A.     So this would not be quite as --
16    Q.     I think I understand basically.  This was
17  like --
18    A.     I didn't take one apart from an engineering
19  point of view.
20    Q.     Right.  And I'm even asking that.  Did you
21  actually have a Rock 'n Play to look at?
22    A.     I did not purchase one to look at, no.
23    Q.     Was one sent to you?
24    A.     No, they did not send one to me.
25    Q.     So really you did not do an inspection of an

33 (Pages 126 - 129)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 130

1  exemplar Rock 'n Play here.  Correct?
2  A.      I did not -- I know what the product is.  I
3  did not take it apart to do it.  But I have looked at
4  them.  I've reviewed the product.  So I know what the
5  product is.  And I have had hands on with it, just
6  not -- not to the point of -- I don't know what you
7  want me -- I don't know what to say to this.  I
8  guess --
9  Q.      I can ask you.
10  A.      Yeah.  Did I sit down with one that was sent
11  to me to -- to look at?  No.  But I know the product.
12  I know information about the product, the dimensions
13  of the product, and the materials of the product.  But
14  did I sit and do what the -- what our product expert
15  does with putting dolls in and reenactment?  No, I
16  didn't do anything like that.
17  Q.      We know you started working on this
18  litigation in 2019.  Right?
19  A.      Yes.
20  Q.      Since 2019, have you looked at a Rock 'n Play
21  device?
22  A.      I have not.
23  Q.      And since you got involved in this litigation
24  in 2019, have you inspected a Rock 'n Play device?
25  A.      I have not needed to look at another one.  I

Page 131

1  already had formed an opinion on that based on what I
2  know of the product and having seen the product.
3  Q.      Okay.  But since you got involved in this and
4  were retained in 2019, have you ever inspected a Rock
5  'n Play device?
6  A.      No.
7  Q.      And you when say that you already knew what a
8  Rock 'n Play looked like, you've seen pictures of it.
9  Right?
10  A.      More than pictures.  I've physically seen the
11  product and looked at the product.  I just -- I've
12  seen -- I've had them in my office when I've looked at
13  them.  So, yes, I've inspected a Rock 'n Play.
14  Q.      What year?
15  A.      I don't recall.
16  Q.      So sometime --
17  A.      I get all kinds of products sent to me to --
18  to look at.  And so I couldn't tell you that.
19  Q.      I think what you're telling me is sometime
20  long before this case started, so before 2019 --
21  A.      Um-hum.
22  Q.      Before you got involved as an expert in this
23  case, at some point, you would have seen a Rock 'n
24  Play as part of your work on the AAP?
25  A.      Absolutely.

Page 132

1  Q.      And that's what you're referring to?
2  A.      Yes.
3  Q.      You didn't actually inspect one for this
4  case, though?
5  A.      Inspect for this case?
6  Q.      Yeah.
7  A.      No.
8  Q.      So when you say, "I prepared the following
9  rebuttal report based on inspection," that's not true.
10  Correct?
11  A.      I wouldn't say that.  I mean, I know what a
12  Rock 'n Play is.  I know what it looks like.  So --
13  Q.      I'm going to use -- I'm going to use your
14  friend, Merriam-Webster.
15  A.      Okay.
16  Q.      Let's look up what inspection says, and then
17  I'll ask you if you had that in this case.
18          Merriam-Webster, "inspection, the
19  act of inspecting."  Very good.  "Checking or testing
20  of an individual against established standards."
21          You didn't do that with a Rock 'n
22  Play in this case, did you?
23  A.      There's nothing to check against the
24  standard, because it doesn't conform to the standard.
25  So I've looked at it.  I've -- I have examined it.

Page 133

1  I've done that.
2  Q.      Let me ask.  I know this is only your second
3  time you've done an expert report.  Right?
4  A.      Sure.
5  Q.      But you understand that it's an official
6  document that goes to the Court in this case.  Right?
7  A.      Yes.
8  Q.      You understand that it's important to be
9  truthful in that?
10  A.      I am being truthful.  I've examined and
11  looked at them.  I've seen them.  I think they're
12  really kind of poorly put together.  The first time I
13  grabbed ahold of one, I was shocked at how -- how
14  light the construction was on it.  It was very -- it
15  was not sturdy.  And I felt the thing could have
16  easily fallen apart.  So, yeah, I've had my hands on
17  them.  I don't know them in terms of what year it was,
18  but I've seen them.
19          Again, I get different products sent
20  to me all the time.  I examine them, and I comment on
21  them.  I didn't put a baby in one of them; but, yeah,
22  I've had my hands on them.
23  Q.      And again, you say things in your report, and
24  I'm entitled to ask about them --
25  A.      Of course.

34 (Pages 130 - 133)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 134

1  Q.      -- you understand.  Right?
2  A.      Sure.
3  Q.      You understand you took the oath today --
4  A.      Sure.
5  Q.      -- to be truthful?
6  A.      Yes.  Of course, I'm being truthful, yeah.
7  Q.      It says, "I've prepared the following
8  rebuttal report with respect to the above-referenced
9  case which is based on an inspection of the exemplar
10 Fisher-Price Rock 'n Play inclined sleeper."
11 A.      Right.
12 Q.      You did not do an inspection in this case?
13 A.      Maybe inspection isn't the -- the correct
14 word, okay; but I examined it.  Your definition of
15 inspection wasn't very helpful.  So I --
16 Q.      It wasn't mine; but, yes.
17 A.      I understand.  So did I do -- if you're
18 saying by inspecting did I test, I did not test.  If
19 you mean by inspecting that I've had my hands on a
20 unit and looked at it, then, yes, I have -- I have
21 done that.
22 Q.      It says to inspect, Merriam-Webster, "to look
23 at something" -- "someone or something closely to
24 assess their condition."
25         Did you do that in this case?

Page 135

1  A.      For -- for since this project started, no.
2  But why do I need to do that more than once?  I've
3  already seen the product, and I made my assessment of
4  it.
5  Q.      Can you tell me which -- which -- which
6  product you looked at?
7  A.      Which model of it?
8  Q.      Yes.
9  A.      I have no idea which model it was.
10 Q.      Can you tell me where you were when you
11 looked at it?
12 A.      No, I cannot.
13 Q.      Can you tell me what year it was?
14 A.      No.  Like I said, I get asked to look at all
15 kinds of product, breathable bumpers, breathable
16 mattresses.  And I couldn't tell you what year or what
17 model those products were.  I get asked to look at --
18 there's a Paci Animal product, which is a pacifier
19 with an animal on it.  So I've seen all kinds of
20 products over the years.
21 Q.      I understand that.  And please understand,
22 you know, you are an expert against my client in this
23 case.
24 A.      Sure.
25 Q.      It's a serious case, and I'm entitled to ask

Page 136

1  you about your report.  And that's all I'm doing.
2  A.      Of course.
3  Q.      Okay.  When you make a statement in a report,
4  I'm just asking about it.  All right?
5  A.      Okay.  I just can't give you the specifics
6  you're asking.  If you're asking for that after I was
7  employed by Attorney Osborne did I take a Rock 'n Play
8  and examine it specifically for this proceeding, no, I
9  did not do that.  Okay?  But I have examined them
10 before, and I know what the product is.  And I've had
11 my hands on the product.
12 Q.      Okay.
13 A.      So I'm able to make an assessment.
14 Q.      Sometime long before 2019, but you can't tell
15 me when.  Correct?
16         MR. OSBORNE:  Form.
17         THE WITNESS:  I don't know what
18 year.  I don't know if it's long before.  It's
19 somewhere in my tenure of being on the task force I've
20 looked at this product.
21 BY MS. COHEN:
22 Q.      Do you know what model was involved in the
23 Courkamp case?
24         MR. OSBORNE:  Form.
25         THE WITNESS:  No, I don't know which

Page 137

1  model it is.  I'm not sure.  I don't know if that's
2  relevant to the case.
3  BY MS. COHEN:
4  Q.      And just to be clear, let's look at your --
5  your Exhibit 3A, your rebuttal report that you did.
6  And both your reports 2A and 3A that we've marked, did
7  you do the typing yourself?
8  A.      Yes.
9  Q.      Okay.  Did you have any help -- I don't mean
10 by counsel.  Did you have any assistant or a grad
11 assistant help with either of these?
12 A.      I wish.  Are you kidding me?  I stayed at
13 home and did this on my own time.
14 Q.      That you get paid $700 an hour for.  Right?
15 True?
16 A.      True.  True.  The only thing I didn't do was
17 I had to do an E-signature, but it's my signature.
18 Q.      I understand.
19 A.      I did get some help with that.
20 Q.      All right.  Let me -- let me just make
21 sure -- so again, in the first part -- in looking at
22 this rebuttal report -- and we don't have your time.
23 So I don't know how long you spent writing the report
24 itself.  But the first -- let's see 9151 is the intro
25 part.  Let me ask -- so the inspection of the exemplar

35 (Pages 134 - 137)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 138

1    we already talked about. The review materials that's
2    listed there one to eight, is that list accurate or
3    not accurate?
4    A.    Yes, it's been a while. There's some reports
5    I know more about than others that I focused on. But
6    these are all the documents that I had access to.
7    Q.    Did you since this time look at their
8    rebuttal reports? In other words, this talks about
9    their reports. What about their surrebuttal reports,
10   have you seen them?
11   A.    I was sent a document. I did look at some of
12   it, but the attorneys told me that I didn't need to
13   make further comment on -- on that. So I didn't focus
14   extensively on -- on that. I focused a little bit
15   more probably on Dr. Goldsmith and Dr. Fuller and
16   maybe Mr. Gibb.
17          I mean, my report is here. So the
18   people -- the pieces that I did focus on are here in
19   the report.
20   Q.    So let's walk through this for a minute.
21   A.    Sure.
22   Q.    9152 Dr. Fuller, you know she's a
23   pathologist. Correct?
24   A.    Yes.
25   Q.    We talked about that earlier. And then she's

Page 139

1    a neuropathologist. Correct?
2    A.    Yes.
3    Q.    And you don't pretend to be a pathologist or
4    a neuropathologist. Correct?
5          MR. OSBORNE: Form.
6    BY MS. COHEN:
7    Q.    You don't hold yourself out as either of
8    those, do you?
9          MR. OSBORNE: Form.
10         THE WITNESS: I'm not.
11   BY MS. COHEN:
12   Q.    Okay. Herman Gibb is an epidemiologist.
13   You're not an epidemiologist. True?
14         MR. OSBORNE: Form.
15         THE WITNESS: I'm not an
16   epidemiologist, but I have a deep understanding of
17   epidemiology of SIDS from my work with the task force.
18   And that's my area of expertise with regard to SIDS.
19   BY MS. COHEN:
20   Q.    Right. And you did not include in your
21   original report conclusion a full epidemiological
22   assessment, correct, of SIDS?
23   A.    Only because I was not asked to do that. I
24   certainly could have done that, but I was not asked to
25   do that.

Page 140

1    Q.    I understand that. I'm not the one that
2    hired you. You understand that. Right?
3    A.    Yes.
4    Q.    I didn't set out your tasks. Right?
5    A.    Yes.
6    Q.    I didn't set out your mission. Correct?
7    A.    Yes.
8          MR. OSBORNE: Form.
9    BY MS. COHEN:
10   Q.    The issue here where you talk about Dr. Gibb
11   and race, ethnicity on page 1954, that was one of the
12   things that was listed on the document you presented
13   earlier today. Correct? Race and ethnicity was one
14   of the factors?
15   A.    Yes.
16   Q.    Okay.
17   A.    Um-hum. But the way he is presenting it is
18   inaccurate.
19   Q.    Well, Mr. Osborne can ask you more about that
20   later.
21         On the bottom of 154 -- let's see.
22   Dr. Goldsmith we've talked before. He comes up on
23   9155.
24         Dr. Drago is a regulatory safety
25   expert. Do you know of her?

Page 141

1    A.    I really did not know much about her until
2    this case.
3    Q.    You never heard of her before?
4    A.    I think I may have recollected her name in
5    passing somewhere along the way, but she's not
6    somebody whose name jumps off the page in terms of
7    SIDS research and the work that I focus on. I think
8    she might have -- wasn't she with CPSC for a while?
9    Q.    Exactly.
10   A.    I probably recognize her name from somewhere
11   with that somewhere along the way.
12   Q.    You've never been with CPSC, have you?
13   You've never been part of that?
14   A.    No. But the conferences I go to often
15   involve having people from CPSC. And I've worked with
16   them to try to answer certain questions for them when
17   they're reviewing things.
18   Q.    So here is my question. Have you ever been
19   part of CPSC?
20   A.    Am I a member? No.
21   Q.    Okay. Have you ever been part of JPMA?
22   A.    No.
23   Q.    There are AAP members on J -- JPMA. Right?
24   A.    Um-hum. I've worked with them on particular
25   products like review of The Baby Box.

Michael Goodstein, M.D.                        September 30, 2021
In Re: Fisher-Price/Mattel

Page 142

1  Q.      Have you ever been part of the task force
2  that goes to JPMA and participates on their panels?
3  A.      I've been on -- they had open -- I don't know
4  what you mean by panel.  But there was open forum for
5  discussion.  They've had routine meetings on The Baby
6  Box that was the run by the head of JPMA.  And I was
7  involved with those phone calls, yes.
8  Q.      Have you ever been the AAP member that goes
9  and attends the JPMA meeting?
10 A.      Not as an AAP representative.
11 Q.      Have you ever been an AAP representative that goes
12 to CPSC meetings on baby products?
13 A.      No.
14 Q.      And let's get to page 1.  And you've never
15 been part of the ASTM, I take it?
16 A.      No.
17 Q.      Let's get to your conclusion of your rebuttal
18 report.  This is page 9160.  Again, earlier today
19 regarding your original report which sets out your
20 opinions, you talk about how safe sleep was the first
21 part and the second part was about -- about the baby's
22 medical history.  Right?
23 A.      Yes.
24 Q.      And the intrinsic risk factors for SIDS.
25 That's how you described it?

Page 143

1  A.      Yes.
2  Q.      Now, we look at this conclusion.  And again,
3  just to be clear, you address here safety issues,
4  correct, safe sleep issues?
5  A.      Yes.
6  Q.      You don't get to in any which way the medical
7  history here.  Correct?
8  A.      I'm not sure I understand.
9  Q.      You're not addressing -- you're not
10 addressing baby Zoey's medical history here, correct,
11 in this conclusion?
12 A.      Correct.
13 Q.      This conclusion comprises your opinions in
14 your rebuttal report.  Right?
15 A.      Yes.
16 Q.      This is a section that covers your opinions.
17 True?
18 A.      Yes.
19 Q.      And you don't get into cause of death here at
20 all.  Correct?
21 A.      Correct.
22 Q.      And in neither report -- just again to be
23 very clear, in neither report do you include a
24 differential diagnosis of what happened in this case.
25 True?

Page 144

1  A.      I was not asked do that.  So I...
2          COURT REPORTER:  I'm sorry.  I
3  couldn't hear that.
4          THE WITNESS:  I said, I was not
5  asked to do that.  So it's not included in the report.
6  BY MS. COHEN:
7  Q.      I just want to make perfectly clear.  It's
8  not that you weren't asked, you did not include a
9  differential diagnosis in either of your reports
10 because you didn't do one.  Correct?
11 A.      I certainly have a differential diagnosis,
12 but I was not asked to put it in this report.
13 Q.      I'm going to ask very clearly.  There is not
14 a differential diagnosis in either of these reports in
15 Exhibit 2 or Exhibit 3.  Correct?
16 A.      Correct.
17 Q.      And you did not offer up in your opinions a
18 differential diagnosis.  Correct?
19 A.      Correct.
20 Q.      I just want to make sure I covered your
21 curriculum vitae before we move on to something else.
22 I want to make sure I've adequately cover it.
23          You are -- did you tell me earlier
24 that York Hospital is the --
25 A.      Yes.

Page 145

1  Q.      -- one that you spend a hundred percent of
2  your time?
3          MR. OSBORNE:  Form.
4          THE WITNESS:  Not a hundred -- I do
5  not spend a hundred -- that's where I spend the
6  majority of may clinical time.  But I have oversight
7  at these other hospitals.  And I also have many other
8  things that I do.  So if you're referring to my work
9  time, it's not just clinical; but I'm a full-time
10 clinician.  But I'm not sure what you're -- also I
11 have an administer role and other things that I do
12 that are part of the work that I do and volunteer on
13 this with these things.
14 BY MS. COHEN:
15 Q.      Okay.  So you told me earlier you've been
16 practicing as a neonatologist for 30 years.  Correct?
17 A.      Yes.
18 Q.      Your training is as a pediatrician and
19 neonatologist?
20 A.      Yes.
21 Q.      In terms of your current professional time,
22 you said it's not all clinical.  Right?
23 A.      Correct.
24 Q.      What percentage is clinical?
25 A.      Well, it depends how you want to put that,

37 (Pages 142 - 145)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 146

1  because if you're talking about a 40-hour workweek,
2  it's a -- it's a lot more than that.
3  Q.    I'm guessing by your laughter, you don't have
4  any 40-hour workweeks?
5  A.    I'm sure you don't either.  So you
6  understand.
7        So I'm a full-time clinic.  I have a
8  full-time clinical position.  I'm the director of NICU
9  and all newborn services.  So in addition to the
10  full-time clinical role, I also have an administrative
11  role that takes up additional time.  And then I also
12  have my role in terms of SIDS work, in terms of
13  education, research.
14        So, you know, really if you want to
15  look at an 80-hour workweek, okay, then, you know --
16  for a 40-hour workweek, I'm a hundred percent
17  clinical.  If you add in the other stuff that I'm
18  doing, in that other 40 hours, probably half of it is
19  administrative things that I'm doing and the other
20  half is focused on SIDS and education and students and
21  training, research.
22  Q.    I always think I understand what doctors tell
23  me about.  And then I get home, and I read the
24  deposition.  And I haven't asked good questions.  So
25  let me try and --

Page 147

1  A.    Okay.  I'm sorry.
2  Q.    No.  No.  Don't apologize.  It's my fault
3  usually.
4        So clinical is what percentage --
5  what percentage roughly of your time would you say is
6  clinical?
7  A.    Of all that I'm doing, it's probably 75
8  percent of my time.
9  Q.    Okay.  In that 75 percent of the time, you're
10  taking care of babies in the NICU --
11  A.    Yes.
12  Q.    -- at York Hospital?
13  A.    Yes.
14  Q.    And in the clinical that comprises 75 percent
15  of your time, do you have an office practice at all?
16  A.    No.  In neonatology, it's all inpatient.
17  Q.    Okay.  You're not seeing pediatric patients
18  like baby Zoey --
19  A.    No.
20  Q.    -- at the time she was alive and seeing Dr.
21  Cleary?
22  A.    No.  I take care of babies until they leave
23  the NICU and I turn them over to the pediatricians
24  like Dr. Cleary --
25  Q.    Okay.

Page 148

1  A.    -- or family doctors.
2  Q.    Do you believe that you do what Dr. Goldsmith
3  does in terms of clinical practice, or do you not know
4  enough --
5  A.    I would say that's an overly broad question
6  to answer.  You know, if you put ten neonatologists in
7  a room --
8  Q.    Okay.
9  A.    -- just like if you put ten lawyers in a
10  room, they wouldn't agree on every aspect of the law.
11  Q.    A fair point.  Let's just stick with clinical
12  75 percent of your time, no office practice, NICU?
13  And you said you're the director --
14  A.    Yes.
15  Q.    -- of the NICU at York?
16  A.    Yes.
17  Q.    Have you ever in your practice treated
18  pediatric patients, that is, like Dr. Cleary did?
19  I'll just use that as an example, seeing patients who
20  come in.
21  A.    During my training.
22  Q.    Okay.  And then in the other 25 percent of
23  your professional time, I take it you do -- I wrote
24  down administrative work, education, training of --
25  and we'll get back to your training -- and then SIDS

Page 149

1  work?
2  A.    Yes.
3  Q.    And that includes AAP and writings?
4  A.    Yes.  And research.
5  Q.    Okay.  How much of your time -- and within
6  the AAP, is it true that your -- I don't mean -- I'm
7  not being pejorative.  Your only task force you're on
8  is the SIDS Task Force, not that that's not enough?
9  A.    That's plenty.
10  Q.    I know.  That's why I said it that way.
11  A.    Yeah.
12  Q.    So that's -- that's your focus is with an AAP
13  task force on SIDS?
14  A.    Yes.
15  Q.    Have you ever had any other titles,
16  positions, honors within AAP?
17  A.    That's -- that's kind of broad.  So I would
18  have to go through and look at my CV.
19  Q.    Okay.
20  A.    But I've gotten a couple of awards from the
21  AAP for my work on safe sleep.
22  Q.    Yep.
23  A.    I don't know.  Do we need to go through it?
24  Q.    That's -- suffice it to say that SIDS has
25  been the primary focus with AAP.  Is that right?

38 (Pages 146 - 149)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 150

1  A.      For the AAP.  I mean, I've also done other
2  research.  I've done research on standardization of
3  care in the delivery room for resuscitation.  I've
4  done some research on the use of electronic devices
5  for education.  I've done research on anemia of
6  prematurity and red blood cell transfusions.  I've
7  actually written a book chapter on that.  So I have
8  other areas that I focus on as well.
9  Q.      Expert witness work seems like it's a very
10  small percentage of what you do, given that this is
11  the first deposition you're giving as an expert?
12  A.      Yes.  And it's going to stay small.
13  Q.      Okay.
14  A.      It's interesting.  It's been a great learning
15  experience.  Hopefully, I'm doing a good job for my --
16  for my team.  But, you know, this -- this is -- you
17  guys have a hard job.  It's hard work.  And it's very
18  time-consuming.
19  Q.      So it's a small percentage of what you do?
20  A.      Yeah.
21  Q.      Did we miss anything else in terms of your
22  professional time?
23  A.      I think that --
24          MR. OSBORNE:  Form.
25          THE WITNESS:  -- that about covers

Page 151

1  it all.
2  BY MS. COHEN:
3  Q.      When you say training, as I understood it --
4  well, you tell me, what did you mean when you said
5  training?
6  A.      Training?  I educate medical students.  I
7  educate nurse practitioner students.  I train
8  residents.  We're a teaching institution.  We're not
9  just a clinical hospital.  We've got nine residencies
10  or ten residencies at our hospital.  So education is
11  very important to me.  There are people who put their
12  time in to making me a better doctor.  And I feel a
13  strong obligation to do the same for the next
14  generation, not just because they're going to have to
15  take care of me at some point.
16  Q.      And training also includes parents like we
17  talked about earlier potentially, or is that a
18  different category?
19  A.      That's a different category.
20  Q.      Okay.
21  A.      I mean, you know, taking care of babies is
22  not just taking care of babies.  It's taking care of
23  the family.  And taking care of the family includes
24  preparing for taking their baby home from the
25  hospital.  So it's a ton of education.  I don't do it

Page 152

1  myself directly, but we make sure that we do all of
2  the appropriate education to make sure the parents are
3  well prepared for life after the NICU.
4  Q.      And you have even written a parent guide to
5  safe sleep environment.  Right?
6  A.      Yes.
7  Q.      It's one of the things that you've actually
8  written?
9  A.      Yes.
10  Q.      And is this something that you published
11  or -- I'll come back to that in just a minute.  Let me
12  finish the CV on that.
13          When you're teaching -- I wrote down
14  when you're teaching the medical students and nurse
15  practitioners and residents, I think you said, SIDS is
16  one of the things you talk about?
17  A.      It depends on what they are there for to
18  learn about.  It's not something that always comes up.
19  But it is something that in the appropriate setting I
20  do teach about, yes.
21  Q.      Okay.  And it's true that -- well, is it true
22  that SIDS can happen in any sleep environment?
23  A.      Yes.
24  Q.      And SIDS can happen even in a safe sleep
25  environment.  Correct?

Page 153

1  A.      Yes.
2  Q.      SIDS can happen -- and I think -- have you --
3  have you read -- you've read Dr. Gibb's report in this
4  case?  We talked about that?
5  A.      Yes.
6  Q.      Have you also read Dr. Ruani's (phonetic)?
7  A.      I don't know who Dr. Ruani is actually.  So
8  the first time I heard that name is today.
9  Q.      But you agree that even in the most careful
10  circumstance with a sleep product or a crib and even
11  in the best of care, SIDS can happen and SUIDs can
12  happen?
13  A.      Yeah.  That's why it's SIDS.  Yeah, we can't
14  prevent SIDS.  We can just minimize the risk.  We can
15  prevent suffocation, strangulation, and some
16  asphyxias; but SIDS itself we cannot prevent yet.
17  Q.      In the American Academy of Pediatrics, are
18  you a familiar with the expert witness guidelines and
19  the expert witness affirmation signed by members?
20  A.      I've heard of it.  I can't say that I've read
21  it in any detail.
22  Q.      Have you -- have you signed that affirmation
23  that some of the members of AAP have signed?
24  A.      Nobody has ever given me that to do.  I
25  wasn't made aware that was something that I should do

39 (Pages 150 - 153)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 154

1  if I'm going to be doing this, not that I wouldn't
2  sign it.
3  Q.    No, I understand.  I'm just asking if you
4  happened to have signed it along the way.
5  A.    No.
6  Q.    And that's just -- again, you would sign it,
7  though?
8  A.    I would think so, yeah.  I mean, I don't know
9  what's on it; but I don't see any reason why I
10 wouldn't -- wouldn't do that.
11 Q.    And you're aware of that as part of the
12 guidelines that AAP puts out?
13 A.    AAP puts out hundreds of guidelines every
14 year.  So I don't know the detail on every single
15 detail.  I don't know if anybody does.
16 Q.    Well, even safe sleep guidelines, all of them
17 say -- I'm going to ask if you agree with the AAP
18 statements or guidelines on safe sleep, the ones that
19 you've referenced and the ones that are in your
20 report.  "The recommendations in this publication do
21 not indicate an exclusive course of treatment or serve
22 as a standard of medical care.  Variations taking into
23 account individual circumstances may be appropriate."
24 A.    I believe that's something that is said on
25 clinical reports, not policy statements.

Page 155

1  Q.    You don't think that's in the policy
2  statements?
3  A.    No.  Policy statements are standard of care.
4  Clinical reports have those kind of things.  They give
5  you more leeway to follow them as you wish and allow
6  for more practice variation.
7  Q.    Okay.  So you don't think those are on any of
8  the safe sleep forms were talking about?
9         MR. OSBORNE:  Form.
10        THE WITNESS:  I would have to look
11 -- I would have to -- I mean, I would have to look at
12 it.  I mean, I know that -- you know, you went through
13 that wording very quickly.  So I do know that -- you
14 don't need to show me the very specific wording.
15 BY MS. COHEN:
16 Q.    Sure.
17 A.    But as I caught what you're you were saying,
18 that strikes me as the wording that's put onto
19 clinical reports.
20 Q.    I'll come back to that when we pull those out
21 and mark them.
22        The -- one of the things Dr. Ruani
23 in his report that I know you didn't get said is
24 basically that fatality rates allegedly associated
25 with RNPS, Rock 'n Play Sleepers, are much lower than

Page 156

1  SUID rates in cribs, bassinets, and playpens.  The
2  likelihood of an infant perishing unexpectedly in a
3  crib, bassinet, or playpen was far greater than the
4  likelihood of a fatality in a Rock n' Play Sleeper.
5         You don't have any basis to dispute
6  that, do you?
7         MR. OSBORNE:  Form.  Foundation.
8         THE WITNESS:  I can't make comment
9  on that without having the -- all of the information
10 that he based that off of.
11 BY MS. COHEN:
12 Q.    Okay.  Well, let me ask you a few follow-up
13 questions.
14 A.    And another thing that's of concern with this
15 in terms of getting to numbers is if this doesn't get
16 reported specifically to Consumer Product Safety
17 Commission, there can be deaths that involve different
18 products that we're just not -- not aware of.
19 Q.    That wasn't part of my question.  Let me
20 ask --
21 A.    But it affects the numbers.  So for him to
22 make a comment about numbers, he's making -- he's
23 making an assump -- he's making a couple of
24 assumptions.  And this is epidemiology.  It's not my
25 area of expertise.  But you have to know a numerator

Page 157

1  and a denominator.  And I'm not sure we have the full
2  numerator.  And I sure as heck know we don't have the
3  denominator, because I don't know how often these
4  products with being used.  You can't figure out a rate
5  for something unless you know how often the product is
6  being used and with what consistency it's being used.
7         You can have -- you can have a
8  product like a Rock 'n Play and it may never be used.
9  And so you would say, Well, we didn't have an event
10 with that.  Well, it wasn't being used.  So I don't
11 see how he's reaching that conclusion, to be honest.
12 Q.    Well, let me ask you this:  I know you
13 haven't done much expert work before.
14 A.    Sure.
15 Q.    But do you agree that to be an expert witness
16 you're supposed to provide -- let me ask this:  Do you
17 agree with the AAP that says you're supposed to
18 provide objective opinions well supported by
19 experience and best evidence-based medical literature
20 regardless of who hires you?
21 A.    Yes.
22 Q.    Do you agree with that statement?
23 A.    Yes.
24 Q.    Are you trying to advocate today, or are you
25 trying to give honest, unbiased opinions?  What is

40 (Pages 154 - 157)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 158

1   your role here?
2   A.      My role is to give honest opinions about the
3   information. You're asking me something in a report
4   that I haven't even seen.
5   Q.      Exactly.
6   A.      I know that in order to figure out rates, you
7   need to have accurate information. And I'm just
8   pointing out that you need to know -- you need to know
9   all the cases. You need to know how many cases are
10  involved with a certain product or not to try to
11  determine whether or not there's a higher or lower
12  rate compared to other products.
13  Q.      Have you ever gone to any of the committee
14  meetings or the meetings or the talks within the AAP
15  on expert witness work?
16  A.      No, I have not.
17  Q.      Okay. And you did say earlier -- and I heard
18  this a few minutes. I can pull it up. You said, I
19  hope I'm doing a good job for my team. Did I hear
20  that right?
21  A.      Yes. Answering -- answering the questions in
22  an appropriate way.
23  Q.      When you say "team," you're referring to Mr.
24  Osborne and his firm. Right?
25  A.      Well, he's -- he's hired me; but I'm giving

Page 159

1   you the answers to the best of my ability that are
2   honest and correct.
3   Q.      You don't truly think I'm part of your team,
4   do you?
5   A.      No.
6   Q.      You know that -- you think Mr. Osborne is
7   your team and you want to do a good job for him.
8   Right?
9   A.      Well, I don't want to make mistakes and say
10  things that are out of the purview of what I'm
11  supposed to be discussing.
12  Q.      Do you agree that SIDS happen in cribs?
13  A.      Yes, it does.
14  Q.      And SUIDs?
15  A.      Yes.
16  Q.      And bassinets?
17  A.      Yes.
18  Q.      And playpens?
19  A.      Yes.
20  Q.      And in car seats?
21  A.      Yes.
22  Q.      And you haven't studied what those numbers
23  are, have you?
24  A.      I know that there are risks involved with
25  different environments that make something safer than

Page 160

1   others. You can use a lot of different products that
2   can have different degrees of safety. And it doesn't
3   mean that something bad will happen in it on any given
4   day. That doesn't mean -- you can -- you know, you
5   can sleep babies prone; and we don't recommend that.
6   But there are a number of people that do that, and
7   babies don't die because of that. So --
8   Q.      And I think my last question was, you haven't
9   studied the numbers on those SIDS rates, have you?
10  A.      SIDS rates regarding what?
11  Q.      Cribs, playpens, bassinets.
12  A.      I know what the overall rates are of SIDS and
13  SUID, yes.
14  Q.      Okay. In the United States you're talking
15  about?
16  A.      Yes.
17  Q.      Do you know them broken down by the different
18  environments that they're in?
19  A.      No. That would be information that I would
20  have to talk to my colleagues at the CDC and the SUID
21  registry. There are a couple of articles on that. So
22  I would have to review the articles to give you those
23  numbers.
24  Q.      You would have to talk to an epidemiologist.
25  Is that what you are saying?

Page 161

1           MR. OSBORNE: Form.
2           THE WITNESS: I would have to review
3   the articles to get the numbers.
4   BY MS. COHEN:
5   Q.      Written by the epidemiologists, the data
6   provided from them?
7   A.      Written by the people at the CDC.
8   Q.      Are they epidemiologists or statisticians, or
9   what are they?
10  A.      Dr. Shapiro-Mendoza does have a very strong
11  background in epidemiology. I don't know her CV. So
12  I can't say for sure. And some of the other people, I
13  don't know what's on their -- their CVs. So I can't
14  say with certainty that they're all epidemiologists.
15  I suspect -- I know they have very strong backgrounds
16  in that, because that's what the work is about.
17          MS. COHEN: I'm going to mark this
18  one as an exhibit. What exhibit are we on? Maybe 20?
19          THE WITNESS: We already did 20.
20          MS. COHEN: Thank you.
21          (Exhibit 22, Article, "A Parent's
22  Guide to a Safe Sleep Environment," marked for
23  identification.)
24  BY MS. COHEN:
25  Q.      Twenty-two I'll hand you. And, Doctor, this

41 (Pages 158 - 161)

Michael Goodstein, M.D.                      September 30, 2021
In Re: Fisher-Price/Mattel

Page 162

1 is, I think, what we're talking about before. This is
2 the Family Teaching Toolbox, and you wrote this with
3 one of the nurses, Barbara Dibara (phonetic)?
4 A.    Brandi Ibarra.
5 Q.    Brandi Ibarra. Saving my eyesight.
6         This was 2011. Is that right?
7 A.    Yes.
8 Q.    And the purpose of this was to guide parents
9 on safe sleep environment?
10 A.    Yes.
11 Q.    Okay. And what you say here -- let's go
12 through this a little bit. In your writing, you say,
13 "Tragically, sudden infant death syndrome is the most
14 common cause of death in infants between one month and
15 one year of age." Right?
16 A.    True, at the time. Now we say SUID; but,
17 yeah.
18 Q.    Okay. "And around 4500 babies die in the
19 United States each year because of sudden unexpected
20 infant deaths. Not all sudden unexpected infant
21 deaths are SIDS; some of them of these deaths are
22 accidental suffocation." Correct?
23 A.    Correct.
24 Q.    "There are many things that can be done by
25 yourself and others caring for your baby to reduce the

Page 163

1 risk of these things happening."
2         And then you go through a list that
3 you came up with. Right?
4 A.    Yes.
5 Q.    And, "Top-10 things that promote a safe sleep
6 environment: Always place your baby on the back at
7 bedtime and at nap time."
8         Number 1. Right?
9 A.    Yes.
10 Q.    And you agree that in the Rock 'n Play, the
11 baby is on its back?
12 A.    Yes. Whether the baby stays on the back,
13 but, yes, if you're using it properly, you do have the
14 baby on the back.
15 Q.    And you've read the warning on Rock n' Play
16 Sleeper, the warning that's been on the Rock n' Play
17 Sleeper and also in the pamphlet materials?
18 A.    I've seen it. I can't recall it off, you
19 know, with any accuracy off the top of my head.
20 Q.    Sure. We can show it to you. But you do
21 know it's says, "Always restrain the baby." Correct?
22 A.    Yes.
23 Q.    You've seen that in countless depositions and
24 all the police reports. Right?
25 A.    Yes.

Page 164

1 Q.    And --
2 A.    I also saw in the report from our product
3 expert that when the testing was done with
4 Fisher-Price that I believe up to half of the families
5 who tested it didn't use it properly.
6 Q.    And my question was, does it say, "Always
7 restrain the baby"?
8 A.    I believe so.
9 Q.    Okay. That was my only question.
10 A.    That's what it says. Sure.
11 Q.    I may have used it earlier. You don't
12 consider yourself a human factors expert.
13 A.    Okay.
14 Q.    Is that correct?
15 A.    Correct.
16 Q.    Just so we have this in the record since
17 we're talking about this.
18        MS. COHEN: This is exhibit?
19        MS. NG: Twenty-three.
20        MS. COHEN: Twenty-three.
21        MR. OSBORNE: It's the warning?
22        MS. COHEN: Yes.
23        MR. OSBORNE: While you're doing
24 that, I don't have your 2A. I think it's the rebuttal
25 report. I don't think I got the full one.

Page 165

1        MS. COHEN: Okay. I'll wait until
2 you're done. Tell me when you have that.
3        MR. OSBORNE: Well, you're doing
4 something else.
5        MS. COHEN: Sure.
6        MR. OSBORNE: So I just thought I
7 would --
8        MS. COHEN: Should I proceed? I
9 just didn't want to start --
10        MR. OSBORNE: You can go right
11 ahead.
12        (Exhibit 23, Color Copy of
13 Photograph of Warning Label, marked for
14 identification.)
15 BY MS. COHEN:
16 Q.    So just on 22 (sic), we're talking about.
17 You've seen this one before. Right?
18 A.    Yes.
19 Q.    And I think everyone agrees this is the
20 applicable one. And what it says is, "Failure to
21 follow these warnings and the instructions could
22 result in serious injury or death," at the top.
23 Correct?
24 A.    Yes.
25 Q.    And then it says, "Always use restraint

42 (Pages 162 - 165)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 166

1    system." Right?
2    A.    Yes.
3    Q.    And you understand that in this case, Mr.
4    Courkamp -- Olson did not use the restraint system?
5            MR. OSBORNE: Form.
6            THE WITNESS: That's -- again, the
7    testimony seems conflicting on that.
8    BY MS. COHEN:
9    Q.    We can pull that out if we need to. But
10   going back to the parent guide, your article here, No.
11   2 says, "Always place your baby on a firm mattress
12   with a tightly fitted sheet in a safety-approved
13   crib." That was your No. 2.
14   A.    Okay.
15   Q.    And then you say, "Never use soft bedding,
16   comforters, pillows, loose sheets, blankets,
17   sheepskins, toys, or bumpers in the crib" -- that's
18   kind of what you talked about before -- "or sleep
19   area." Right?
20   A.    Yes.
21   Q.    Always -- No. 4, "Always put your baby to
22   sleep in a separate but close sleep environment."
23   A.    Yes.
24   Q.    Five, "Never allow anyone to smoke around
25   your baby. Passive smoke near your baby doubles the

Page 167

1    risk of dying of SIDS."
2    A.    Yes.
3    Q.    You still believe that. Right?
4    A.    Yes.
5    Q.    All right. Did you read in this case about
6    all the passive smoke and indirect smoke?
7    A.    Yes.
8            MR. OSBORNE: Foundation.
9            Go ahead.
10           THE WITNESS: Yes.
11   BY MS. COHEN:
12   Q.    Okay. Did that trouble you?
13           MR. OSBORNE: Foundation. Form.
14           THE WITNESS: I'm not -- I would
15   always encourage people to mitigate the risk of
16   cigarette exposure for the baby. The best would be no
17   smoke exposure. You want to avoid secondary
18   exposures. So I do believe Mr. Olson did take steps
19   to mitigate against exposing Zoey directly to
20   cigarette smoke. My understanding is -- from the
21   depositions is that he always smoked outside is what
22   he said.
23           And I would have probably taken it
24   one step further if I had somebody who was going to
25   smoke and tell them to change into different clothing

Page 168

1    or specific sleep -- I'm sorry -- smoke clothing so
2    that when they come back in and hold their baby, they
3    wouldn't expose them to that tertiary smoke.
4    BY MS. COHEN:
5    Q.    Did you see the report of the police
6    investigators who said in the room where baby Zoey was
7    sleeping, that it smelled like smoke?
8            MR. OSBORNE: Form.
9    BY MS. COHEN:
10   Q.    Did you see that?
11   A.    Yes.
12   Q.    Did you see where they reported on the nine
13   bongs that were in the closet?
14           MR. OSBORNE: Form.
15           THE WITNESS: Yes.
16   BY MS. COHEN:
17   Q.    And again, if you had been asked to include
18   extrinsic evidence of risk factors for SIDS in your
19   report, you would have had to include that. Correct?
20           MR. OSBORNE: Form. And foundation,
21   I guess.
22           Go ahead.
23           THE WITNESS: So I guess -- I -- I
24   would -- I'm sorry. Can you ask that question again,
25   please?

Page 169

1    BY MS. COHEN:
2    Q.    Sure. We already talked about earlier
3    today -- and I'll help you out with this --
4    A.    Sure.
5    Q.    -- Exhibit 2A, your conclusion talks about
6    only intrinsic risk factors of SIDS. And you
7    explained you were only asked to include intrinsic.
8    A.    Yes.
9    Q.    If you had been asked to do your full
10   assessment on risk factors, you would have had to
11   include smoking, secondary smoke?
12   A.    Yes.
13   Q.    No question?
14   A.    No question. No. Nope. No. Causation and
15   is another issue, but risk --
16   Q.    Sure.
17   A.    -- risk can -- you know, risk can cause
18   different -- different animals. But, yes, that would
19   be an extrinsic risk factor, yes.
20   Q.    You wouldn't have risked your reputation by
21   leaving it off; you would have included it?
22   A.    Absolutely.
23           MR. OSBORNE: Form.
24           THE WITNESS: Sure.
25   BY MS. COHEN:

43 (Pages 166 - 169)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 170

1  Q.    In 2014, you agree there was no -- no -- I
2  think you said this in your report -- no specific CPSC
3  requirements for inclined sleepers in 2014?
4  A.    I don't know the exact year, but it sounds
5  right. I do know -- now, yeah, basically it wasn't a
6  category that existed beforehand. There were -- there
7  were products -- hold that thought.
8          MR. OSBORNE: Do we want to go off
9  the record?
10         MS. COHEN: Yeah.
11         (Off the record at 12:40 due to
12  technical difficulties.)
13         (Brief recess from the record.)
14         THE VIDEOGRAPHER: Due to technical
15  difficulties which made us go off the video record, we
16  are now back on the record. And the time is 12:48.
17         MS. COHEN: Thank you.
18  BY MS. COHEN:
19  Q.    So we're going to pick up where we -- sort of
20  where we left off or maybe go to a new topic.
21  A.    Okay.
22  Q.    Your report, which is the main report is 2 or
23  2A -- you can move that aside. Well, you know, I want
24  to make sure. Did I finish the last comment on that?
25         MR. OSBORNE: We could reed it back.

Page 171

1          THE WITNESS: You didn't get down to
2  pacifier.
3  BY MS. COHEN:
4  Q.    That was the one, the pacifier one. I don't
5  even know what I did with my --
6  A.    Yeah. You got down to at least through No.
7  4.
8  Q.    You also had on there about clean, dry
9  pacifier. Right?
10  A.    Correct.
11  Q.    Okay. So now let's move to your report.
12  A.    Okay.
13  Q.    Exhibit 2 or 2A, whichever one you have
14  handy.
15  A.    Okay.
16  Q.    And I want to ask you about the Triple Risk
17  Hypothesis.
18  A.    Okay.
19  Q.    That's obviously something that's well known
20  to all neonatologists and people who study SIDS.
21  Correct?
22  A.    Yes.
23  Q.    And is this from a specific book that you
24  pulled this from, or do they all pretty much follow
25  the same?

Page 172

1  A.    This is amended. Myself and some other
2  people I work with put some of the detailed work on
3  the sites. But essentially the circles are the basics
4  of it. And it is adopted from an article by Hannah
5  Kinney and Filiano. Hannah Kinney is kind of one of
6  the people who developed this hypothesis. She's a
7  renowned -- a renowned researcher.
8  Q.    Do you believe in this hypothesis?
9  A.    Yes.
10  Q.    And you saw Dr. Goldsmith also addressed it
11  and talked about it in his report?
12  A.    Yes.
13  Q.    And isn't that nice you're both in sync on
14  that point?
15  A.    Yeah.
16  Q.    So critical developmental period, you say
17  here first six months; but I mean, your paper we just
18  looked at talked about one year. Right?
19  A.    Well, the risk of SIDS is --
20  Q.    Um-hum.
21  A.    -- out through one year. The risk -- the
22  risk of SIDS and SUID goes out two years just by
23  definition of SIDS. But we know that 90 percent of
24  the deaths occur in the first six months. And that is
25  a critical developmental period for babies. There are

Page 173

1  a lot of changes going on in their brain and brainstem
2  and autonomic nervous system and muscle control and
3  sleep development that make the first six months a
4  critical period.
5  Q.    0kay. The paper we just looked at which is
6  Exhibit 22 says, "Tragically, sudden infant death
7  syndrome, SIDS, is the most common cause of death in
8  infants between one month and one year of age."
9  Correct?
10  A.    Yes.
11  Q.    And then we looked here. So that covers the
12  first circle. Exogenous stressors, that would be the
13  extrinsic risk factors. Correct?
14  A.    Yes.
15  Q.    And those are the things that were not
16  covered in your report earlier. Correct?
17  A.    Yes.
18  Q.    "Prone/side sleep position, No. 1; soft
19  bedding; overbundling/overheating."
20         Now, did you see there was a heating
21  issue in the Courkamp house?
22  A.    Yes.
23  Q.    And you factored that in?
24  A.    I wasn't asked to talk about that.
25  Q.    I'm sorry. That would be another thing that

44 (Pages 170 - 173)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 174

1  if you included extrinsic factors, you would have
2  included that?
3  A.     Yes.
4  Q.     Okay.  "Bed sharing plus smoking and/or
5  alcohol," I guess that was not at play here.  But
6  the --
7  A.     No.
8  Q.     And you have the "vulnerable infant,
9  brainstem dysfunction, intrinsic risk factors," which
10 ones do you believe apply to baby Zoey on that list?
11         MR. OSBORNE:  Extrinsic?
12         MS. COHEN:  Intrinsic.
13         MR. OSBORNE:  Oh, okay.
14         THE WITNESS:  Well, she was normal
15 size, so no growth restriction.  I can't make any
16 comment about hypoxia.  She had been pretty normal
17 growth during the pregnancy.  They're kind of tied
18 together.  She was not premature.  And Katie did not,
19 as far as I know from the records I could see, smoke
20 or drink or use illicit drugs.  She did not do those
21 things.  So I would say there are no intrinsic risk
22 factors in this case.
23         I know that other reports suggest
24 other things that are intrinsic risk factors, but I
25 don't those comments are accurate.

Page 175

1  BY MS. COHEN:
2  Q.     Okay.  And you do agree there were extrinsic
3  risk factors like we talked about.  Correct?
4  A.     Yes.
5  Q.     Did you ever say to --
6  A.     Can I add to that, please, just in terms of
7  the extrinsic?  There are also -- there are also
8  things in the environment that were protective as well
9  in this case.  We talked about no bed sharing in this
10 case.  So that's actually a protective factor for this
11 case.
12 Q.     Did you ever ask counsel who retained you in
13 this case, Hey, can I add my extrinsic risk factors to
14 the report?
15 A.     I did not ask that.  And they didn't say that
16 I should do that.  I just did the report as per I was
17 asked.
18 Q.     You disagree that cigarettes, alcohol, and
19 illicit drug use are risk factors as you say in your
20 supplemental report?
21 A.     In that Ms. Courkamp was not using any of
22 those things from everything I read.  She tried to
23 have a very healthy pregnancy.  I believe she even
24 moved away at some point to be away from Mr. Olson,
25 who was having some problems.

Page 176

1  Q.     You say on a page of your report talking
2  about Dr. Goldsmith, you say, "Dr. Goldsmith
3  accurately describes the vulnerable infant, intrinsic
4  risk factors, which is in contradiction to Dr. Gibb's
5  testimony"?
6  A.     Yes.
7  Q.     You also disagree with the issues taken by
8  the defense experts about the fact that baby Zoey had
9  coughing, wheezing, and a raspy cough since birth.
10 You seem to disavow that?
11 A.     Yeah.  There's no mention of that in any of
12 the normal, healthy visits, except there's one where I
13 think -- and I don't even know -- I know Dr. Goldsmith
14 found something -- and I don't know if there was a
15 note in the chart -- found some sort of billing that
16 had a billing for allergic rhinitis.  So it suggested
17 there was something there.  Did she have an episode of
18 a respiratory illness a couple of months before her
19 death?  Yes, absolutely.  From what I read from all of
20 the reports, the parents were pretty clear that the
21 child was in good health and not having any health
22 issues the days before the death.
23         The only place I saw about any kind
24 of suggestion what you're getting at with something
25 that was chronic was through the grandparents.  I

Page 177

1  don't know how frequently they spent time with the
2  child.  But, you know, constant is kind of an
3  interesting word.  That would mean nonstop to me.  So
4  I just wonder how accurate that description is when
5  the parents and others and the doctors didn't really
6  report that as an issue.
7  Q.     So do you disagree with what the grandparents
8  are saying about what they heard and saw since birth?
9         MR. OSBORNE:  Form and foundation.
10         THE WITNESS:  I'm not going to argue
11 with what the grandparents say.  I'm going by what the
12 parents say.  I think the parents know best.
13         MS. COHEN:  Pardon?
14         THE VIDEOGRAPHER:  Your microphone.
15         MS. COHEN:  Oh, sorry.
16         Twenty-four is the next one?
17         MS. NG:  Um-hum.
18         THE WITNESS:  Oh, no.
19         MR. OSBORNE:  Let's go off the
20 record, please.  The power just had an interruption.
21         (Off the record at 1:02 due to
22 technical difficulties.)
23         (Discussion held off the record.)
24         (Lunch break taken from 1:02 p.m. to
25 1:41 p.m.)

45 (Pages 174 - 177)

Michael Goodstein, M.D.                                    September 30, 2021
In Re: Fisher-Price/Mattel

---

Page 178

1          THE VIDEOGRAPHER:  Due a power
2   failure.  We went off video record.  We're back on.
3   The time is now 1:41 p.m.
4          MS. COHEN:  Okay.  Thank you.
5          (Exhibit 24, Tempe Police Department
6   Records, marked for identification.)
7          (Exhibit 25, Maricopa County Medical
8   Examiner's Records, marked for identification.)
9   BY MS. COHEN:
10  Q.     And, Doctor, we're back on after a short
11  lunch break.  So thank you.  Let's continue on.
12         I put before you Exhibit 24, which
13  is the police records, and Exhibit 25, which are the
14  Maricopa County ME's office records.  So we now should
15  have both of those in front of you.  They were both on
16  Exhibit 19, your list of materials reviewed.
17  A.     Um-hum.
18  Q.     Have you seen them before?
19  A.     Yes.
20  Q.     All right.  First, I want to go through on
21  the issue of whether baby Zoey was, in fact,
22  restrained the night in question.  Let's go through a
23  couple of the -- let me see that what the record said
24  next.  I think you said it was an issue of dispute
25  maybe.

Page 179

1   A.     I just read different things about in.
2   Q.     Let's pull out of police department, which is
3   24, and page 8 is Bates stamped at the bottom, which
4   will hopefully make this easy to go through this.
5          And what it says in the first
6   paragraph is -- third line down, "Andrew noticed that
7   Zoey was not buckled in and usually is when she
8   sleeps."  This was the next morning.
9   A.     Right.
10  Q.     You agreed that -- and I think other experts
11  have been asked the question -- that a baby of her age
12  would not be able to unbuckle herself?
13  A.     I would think that would be unusual.
14  Q.     Right.  And I think that the parents also
15  said that she was not able to do that.  Do you recall
16  that testimony?
17  A.     Yes.
18         THE VIDEOGRAPHER:  Pardon me.  I
19  need to go off the video record.
20         MS. COHEN:  Oh, I'm sorry.
21         THE VIDEOGRAPHER:  Going off the
22  video record.  The time is 1:42.
23         (Brief recess from the record.)
24         THE VIDEOGRAPHER:  We're back on the
25  video record.  The time is 1:44.

Page 180

1          MS. COHEN:  Thank you very much.
2   BY MS. COHEN:
3   Q.     And then the next citation I want you to turn
4   to is on page 17 in the same Tempe police records,
5   Exhibit 24.  And on the bottom of this, it says in
6   the -- I think this is Detective Reyes.  But in the
7   police records general offense report, it says on the
8   bottom, "According to Andrew, when Zoey was put to
9   bed, she was buckled in the bassinet.  However, he had
10  seen her get out of this buckle on her own on one
11  other occasion."
12         I'll read you his testimony on that
13  later.  But he said she was not buckled in and they
14  found her unresponsive on 6/19/2014.  You had seen
15  that before?
16  A.     Yes.
17  Q.     And then in his testimony when he was
18  deposed, the question was posed to him, "Had you seen
19  her unbuckle herself in her Rock 'n Play before?"
20         And he says, "No, not unbuckle
21  herself, no."
22         It was page 161, 1315.  I don't know
23  if you had seen his testimony on that.
24  A.     Yeah.
25  Q.     And then if we pull out ME records, which is

Page 181

1   25, I want to just point you to a couple things in
2   here.  Did you get that one?
3   A.     Yes.
4   Q.     Page 18 we'll turn to first.  We'll go in
5   sequence.
6          And in the bottom paragraph, it
7   says, "The following morning Kathleen woke up at
8   approximately 8:00 hours and found the subject in
9   semiprone, semi left lateral position with the
10  seatbelt undone."  Do you see that?
11  A.     No, because it's all one big paragraph.
12  Sorry.
13  Q.     If John doesn't mind me just pointing you to
14  where it is.
15         MR. OSBORNE:  I don't mind.
16         THE WITNESS:  Okay.  Got it.  Thank
17  you.
18  BY MS. COHEN:
19  Q.     And then let's go to one more on page 20 on
20  this, and here's the part that, again, under the doll
21  reenactment, it says, "Mr. Olson stated he believed
22  his daughter unfastened the seatbelt sometime through
23  the night.  Kathleen seemed to be under the impression
24  the seatbelt was not used when the baby was placed at
25  1:40 hours."  Do you see that?

46 (Pages 178 - 181)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 182

1          MR. OSBORNE:  Page 20?
2          MS. COHEN:  Yeah, page 20.
3    BY MS. COHEN:
4    Q.    Here it is.  Okay.  Under the doll
5    reenactment part.
6    A.    Under the impression?
7    Q.    Yeah.
8    A.    (Witness nods head up and down.)
9    Q.    Okay.  So now that I've shown you the
10   father's testimony, the police records, and the ME
11   records, would you agree that at the end of the day,
12   the evidence is that she was not restrained --
13         MR. OSBORNE:  Form.
14   BY MS. COHEN:
15   Q.    -- in the Rock 'n Play?
16         MR. OSBORNE:  Form.
17         THE WITNESS:  These comments suggest
18   that that would be the case.
19   BY MS. COHEN:
20   Q.    Okay.  Now, I want -- while we have these
21   out, let's go to another topic we talked about
22   earlier, which is the issue about coughing and raspy.
23   I want to cover that a little bit.  I think we'll
24   start with Exhibit 24 again, which is the police
25   records.

Page 183

1          And let's turn to page 49.  I think
2    what started us on this path was your report Exhibit 2
3    or 2A, as I keep referring to both of them, where you
4    said, "healthy child, healthy mother."  And I think
5    you referenced this.  So let's look at what the
6    records show here, the police records.
7          Page 49 at the top, "Zoey had no
8    known recent illnesses.  She had a cough and was
9    feverish a couple months ago.  They called the doctor
10   and was advised to give her Tylenol."
11         So that's the first.  And it goes on
12   to say, "According to Andrew, when Zoey was born, she
13   had trouble breathing.  She was monitored at the
14   hospital for three days before she was sent home."
15         Are you familiar with the facts?
16   A.    Yes.  The two have nothing to do with each
17   other.
18   Q.    Let's move to page 50 in the police report.
19   A.    Are we going to talk more about this or --
20   Q.    I'm trying and go through all of these here.
21   Page 50 at the top -- and this is talking about the
22   grandparents, which came up earlier.  "They were aware
23   she had a cold approximately two to three months ago
24   and she has had raspy breathing in the past.
25   Otherwise, she was a healthy, normal baby.  They

Page 184

1    believed she had a heart murmur when she was born,
2    believed it was due to a valve in her heart taking
3    longer than normal to close."
4          That was not a comment that was in
5    this.  That may not have been the -- let me move to
6    the next page.
7    A.    Yeah.  Can I comment on this?  Am I allowed?
8          MR. OSBORNE:  Actually, I have the
9    opportunity to ask you some questions after counsel is
10   done.
11         THE WITNESS:  Okay.  All right.  I
12   apologize.  Excuse me.
13   BY MS. COHEN:
14   Q.    No worries.  And then on page 51 -- I'm not
15   trying to keep you from commenting.  I just want to --
16   A.    Sure.
17   Q.    Page 51 in the same report.
18   A.    I can't lick my fingers with a mask on.
19   Q.    That's true.  Okay.
20   A.    Okay.
21   Q.    51 is where the grandparents come in.  "Arnet
22   further advised that when Zoey was born, she had
23   fluids on her lung and was not breathing.  She was
24   monitored" -- I'm sorry.  About four paragraphs down.
25         MR. OSBORNE:  What page are we on?

Page 185

1          MS. COHEN:  Fifty-one.
2    BY MS. COHEN:
3    Q.    "She was monitored three days in the hospital
4    in ICU."
5          Do you recall that from the records?
6    A.    Yes, of course.
7    Q.    And then, "Arnet and Robert were also aware
8    that Zoey had a constant raspy cough.  According to
9    Arnet, per Dr. Clear" -- it should be Cleary -- "this
10   was due to allergies and teething.  Arnet believed
11   that Kathleen took Zoey to an urgent care for a second
12   opinion.  However, she was unable to provide any
13   further details.  Detective Reyes interviewed
14   Kathleen.  Refer to her interview for further
15   information about pertaining to Zoey's health and
16   medical care."
17         Are you familiar with that in your
18   background?
19   A.    Yes.
20         MS. COHEN:  I'm going to go ahead
21   and mark this as Exhibit 26.
22         (Exhibit 26, Banner Thunderbird
23   Medical Records, marked for identification.)
24   Q.    You've looked at these Banner Thunderbird
25   medical records?

47 (Pages 182 - 185)

Michael Goodstein, M.D.                                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 186

1  A.      At some point, yes.  There's a lot of
2  repetition of pages that look like this.
3  Q.      And I'll hand that to you as Exhibit 26.
4  These are the records that happened between, I'll
5  state, April 21st, 2014.  So these were after the
6  six-month visit with Dr. Cleary and before her
7  unfortunate death.
8  A.      Yes.
9  Q.      And this is where she came in for upper --
10 viral upper respiratory illness.
11 A.      Okay.
12 Q.      Do you recall that?
13 A.      Yes, I do.
14 Q.      And you saw these records and reviewed them?
15 A.      Yes, I did.
16 Q.      And they talked about her cough.  Right?
17 A.      Yes.
18 Q.      They talked about her upper respiratory
19 infection?
20 A.      Yes.  New onset.  It had been for, like, four
21 days, I think.
22 Q.      Yeah.
23 A.      So it wasn't a chronic thing.  She had a new
24 finding and brought her in because there was a new
25 illness.

Page 187

1  Q.      Okay.  There's a lot of repetition.
2  A.      Oh, it's terrible.  This happens with
3  records.  Oh, my God.  I don't know if that's what
4  they use, but it just repeats and repeats and repeats.
5  Q.      Okay.  But they diagnosed her with an upper
6  respiratory illness.  Correct?
7  A.      Um-hum.  Yeah.  On average, children the
8  first year of life get diagnosed with eight to nine
9  infections.  So it would be nothing unusual.  And it
10 could also make some people who are not primary
11 caregivers think that the child is always sick when
12 they're not.
13 Q.      And how much -- or how long before her --
14 again, her unfortunate death did this happen?  This
15 was April 21st, 2014.
16 A.      I believe it was approximately two months,
17 give or take.  I don't know what the exact timing was,
18 but she died in June.  Right?
19 Q.      Page 31 -- they talk on page 31 about
20 congestive cough.  Do you see that?
21 A.      No, I don't know where you're at.
22 Q.      Bates No. 31 at the bottom.  Yeah, June 19th.
23 Okay.
24 A.      This says April 21st.
25         MR. OSBORNE:  Yeah, you mean date of

Page 188

1  death was June 19th?
2         MS. COHEN:  Yeah.
3  BY MS. COHEN:
4  Q.      Sorry about that.
5  A.      Yes, so approximately two months.
6  Q.      So page 31, "The child has had congestive
7  cough."
8  A.      That's why she brought her in.
9  Q.      All right.  So we can put those to the side
10 for right now.
11         Let me have you pull out the police
12 records again.  This is 24.  Do you have those there
13 before you get rid of them completely?
14 A.      Yes.
15 Q.      And again, you've seen all the discussion
16 about the marijuana that they found and the smell of
17 smoke in their house?
18 A.      Yes.
19 Q.      Page 49, if you could look at that for a
20 second.  Do you see that the father had researched
21 sudden infant death syndrome on-line?
22 A.      Yes.
23 Q.      Did you find that unusual?
24 A.      I don't think so.  I think every parent is
25 worried about what bad things can happen to their

Page 189

1  children.  And that's the No. 1 cause of death.  So it
2  doesn't surprise me if a patient wants to, you know,
3  look for ways to make their child safer, if they can.
4  Q.      Page 14, we can take a look at the general
5  offense report for a second.
6  A.      Is this --
7         MR. OSBORNE:  Which page 14 of what?
8         MS. COHEN:  The police report.  So
9  24, page 14.  Sorry about that.
10         MR. OSBORNE:  Okay.
11 BY MS. COHEN:
12 Q.      And page -- yeah, if we look at the top, it's
13 description of the bedroom.  You understand this is
14 where Zoey was sleeping?
15 A.      Yes.
16 Q.      And it talks about starting at the first full
17 paragraph, "The bed was unmade and appeared to have
18 been recently slept in."
19 A.      Page 14?
20         MR. OSBORNE:  No, I'm not seeing it.
21         THE WITNESS:  "The east bedroom had
22 a queen size bed."
23 BY MS. COHEN:
24 Q.      Oh, yes.  And then the second sentence, "Bed
25 was unmade."

48 (Pages 186 - 189)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 190

1  A.      Oh, I'm sorry.
2  Q.      Let me start is that over.  Page 14, starts
3  with, "The east bedroom had a queen size bed in the
4  southeast corner of the room.  The bed was unmade and
5  appeared to have been recently slept in.  Three
6  sleeping pillows were at the head of the bed.  And a
7  black and white comforter and sheet were balled up at
8  the foot of the bed.  A used diaper was on the floor
9  near the head of the bed.  The nightstand was next to
10  the bed along with south wall.  An open container of
11  Similac baby formula was on top of nightstand.  The
12  top drawer of nightstand contained numerous empty
13  medical marijuana containers and a usable quantity of
14  suspected marijuana.  A desk was next to the foot of
15  the bed along the east wall.  A glass pipe that had
16  burnt residue in the bowl and smelled like burnt
17  marijuana was on top of the desk, another glass pipe
18  located in the top drawer of desk" -- and I could keep
19  reading.  And then the last sentence of the paragraph
20  says, "The room had an odor of burnt marijuana."
21          And you would agree that that's an
22  extrinsic factor that should have been -- that would
23  have been included on any type of SIDS factors report.
24  Correct?
25  A.      I don't know if he was actively smoking

Page 191

1  around the child.  You know, once you get the small of
2  smoke in a room, it's there forever.
3  Q.      Right.
4  A.      So I can't say if he did anything that --
5  that night, because -- you know, cumulative smoke is
6  definitely an -- smoking is an extrinsic risk factor.
7  But again, it also depends on how much exposure and
8  the chronicity of it.  But, yeah, it is a risk factor.
9  Q.      It is an extrinsic risk factor of SIDS?
10  A.      Yes, it is.
11  Q.      And, in fact, if you were including not just
12  intrinsic, but extrinsic risk factors, you would have
13  included that on your list in your report?
14  A.      Yes, I would have.
15  Q.      Let me -- we can put that aside for right
16  now.
17          I want to go to 2011 and 2000 -- you
18  know what?  Let me do this first.
19          The Batra, are you familiar with
20  that?  You cited to that in your report, Batra Journal
21  of Pediatrics article?
22  A.      Which one?  He's got a few.
23          MS. COHEN:  I'll mark this as
24  Exhibit Twenty --
25          MR. OSBORNE:  Five.

Page 192

1          MS. COHEN:  Thank you.
2          MS. NG:  No.
3          MS. COHEN:  Oh, 26?
4          MS. NG:  Twenty-seven.
5          MR. OSBORNE:  I'm sorry.
6          MS. COHEN:  Oh, my God.  I was about
7  to say thank you for the help.
8          THE WITNESS:  He's not helping.
9          MR. OSBORNE:  You've got me confused
10  now.  It's my fault.  I'm sure.
11          (Exhibit 27, Erich Batra, et al.,
12  Journal of Pediatrics Article, marked for
13  identification.)
14  BY MS. COHEN:
15  Q.      Let me hand you that.
16  A.      Sure.
17  Q.      And I want to --
18          MS. COHEN:  It's in his main report.
19  Right?
20          MS. NG:  Yes.  Footnote 50.
21  BY MS. COHEN:
22  Q.      Footnote 50 in your main report.
23  A.      Yes.
24  Q.      Here it is, yeah.  On the Bates No. 231 into
25  232 --

Page 193

1          MS. COHEN:  Is that right?
2          MS. NG:  Yep.  At the very bottom
3  and very top.
4  BY MS. COHEN:
5  Q.      So what you say in your report, "A 2015
6  article," which presumably is this one -- yep.  "A
7  2015 article reviewing deaths in these devices
8  reported to the CPSC found that of the 31 deaths in
9  car seats, 52 percent were due to strangulation.  The
10  rest were attributed to positional asphyxia."
11          So that's on 232 in your first
12  report, which is 2A?
13  A.      You have me looking at the article and then
14  the --
15  Q.      I'm just putting this on the reference for
16  the deposition so people will be able to find this
17  later.
18          And then basically this is the
19  article that we pulled.  This is the article that you
20  cited.  Right?
21          MR. OSBORNE:  Referring to 27?
22          MS. COHEN:  Yes.
23          THE WITNESS:  Yes.  Yes.
24  BY MS. COHEN:
25  Q.      Okay.  It seems a little awkward that I do

49 (Pages 190 - 193)

Michael Goodstein, M.D.                        September 30, 2021
In Re: Fisher-Price/Mattel

Page 194

1   this, but it's for later when we read the deposition.
2   We'll all know what we're looking at.
3   A.      Okay.
4   Q.      So this is an article you cited in the first
5   part of your report where you were talking about
6   safety issues.  Correct?
7   A.      Yes.
8   Q.      And you agree that the Rock 'n Play is not
9   the equivalent to a car seat.  Correct?
10  A.      It is not a car seat.  It's an inclined
11  device.  It is -- it does different that it's a little
12  less of an angle than a car seat would be at.  But
13  it's an inclined device.
14  Q.      Let's talk what a little less is.  It's a 30
15  degree angle.  Correct?
16  A.      Yes.
17  Q.      A car seat is what, a 52 degree angle?
18  A.      Yes.  It could be that.  It depends on how
19  it's set up.
20  Q.      There's a significant difference in the
21  angle.  Correct?
22  A.      It is a difference in the angle.
23  Q.      You won't agree with me that it's a
24  significance difference?
25  A.      I don't know.  If I look at a 30 degree

Page 195

1   angle, actually, in the Mannen study, they couldn't
2   test 30 degree because the babies slid right out of it
3   because it was such a sharp angle.
4   Q.      Well, you know in the Mannen study, they
5   never tested with restraints, did they?
6   A.      No, they didn't.
7   Q.      Okay.  And if the parents are following the
8   warnings and instructions, they are going to restrain
9   the baby in the -- in the Rock 'n Play?
10  A.      True.  But you're asking me about an incline.
11  And I'm just stating that a 30 degree incline is a
12  significant incline.
13  Q.      It's not as significant as a car seat.
14  Correct?
15  A.      Yes.
16  Q.      And it's -- you know, to be clear, it's 22
17  degrees difference.  Correct?
18  A.      Yes.
19  Q.      All right.  So then we pull out your article
20  that you cited to.  And on page 183 of this article,
21  it says -- you didn't write this one.  Right?
22  A.      No.
23  Q.      Dr. Moon wrote it.  Correct?
24  A.      She's one of the authors, yes.
25  Q.      She's the last author.  It was also Dr.

Page 196

1   Batra, Dr. Midgett, and Dr. Moon.  Correct?
2   A.      Yes.
3   Q.      All right.  And the conclusion at the top --
4   we can go through some of this -- is, "Infants and
5   children two years of age and younger should be
6   properly restrained and not be left unsupervised in
7   sitting and carrying devices."  Right?
8   A.      Yes.
9   Q.      You would agree that the Rock 'n Play is not
10  a sitting device.  Correct?
11  A.      It is the same as a bouncer seat.  So these
12  are things that babies are put in.  So it's not a flat
13  surface.  And it's somewhere in between.  But it's an
14  inclined device.  It's not the same as a car seat.
15  But it is -- it's an inclined device.
16  Q.      Okay.  So let's be very -- I want to make
17  this clear.
18  A.      Yes.
19  Q.      You and I agree it's an inclined device.
20  Right?
21  A.      Yes.
22  Q.      It's a 30-degree incline.  Correct?
23  A.      Yes.
24  Q.      A car seat is called a sitting device.
25  Right?

Page 197

1   A.      Yes.
2   Q.      And the AAP in their bulletins talk about --
3   also talk about what are sitting devices.  Correct?
4   A.      The AAP bulletin.
5   Q.      The AAP sets out what are sitting devices.
6   Correct?
7   A.      I don't know.  I would have to see what
8   you're pointing to.
9   Q.      Okay.  But you agree that the Rock 'n Play is
10  not a sitting device.  Correct?  It's not a seat.
11          MR. OSBORNE:  Form.
12          THE WITNESS:  It's the -- it's a
13  device that is meant to keep babies at an incline.
14  And that's what I'm going to say.
15  BY MS. COHEN:
16  Q.      Okay.  Let me ask this:  Have you seen any
17  literature, article, statement, technical position,
18  anything from the AAP or anyone that defines a Rock n'
19  Play Sleeper as a sitting device?
20  A.      I don't think the AAP generally defines those
21  devices.  I don't know.  I'll put it in the same
22  category as a bouncer --
23  Q.      Sure.
24  A.      -- that kind of thing, yeah.  So -- so I
25  guess if you want to say that it's different from a

50 (Pages 194 - 197)

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

Page 198

1  sitting device, then, you know, it would be a -- an
2  inclined, like, bouncer, sitting, angled device.
3  Q.    It's an -- you agree it's an inclined device?
4  A.    Yes.
5  Q.    Do you also agree it's not a sitting device
6  as that term is used.  Correct?
7          MR. OSBORNE:  Form.
8          THE WITNESS:  If you're talking
9  about sitting straight upright, no, it doesn't do
10  that.
11  BY MS. COHEN:
12  Q.    Have you ever used the term "sitting device"?
13  A.    Awkward term.  Probably not.  I would refer
14  to a specific product.
15  Q.    Okay.  When the AAP or journals use the term
16  "sitting device," you agree it's not a Rock n' Play
17  Sleeper?
18          MR. OSBORNE:  Form.
19          THE WITNESS:  I don't know what
20  their -- I guess I would have to read more carefully
21  to see what specific things they list in here.  I
22  don't know if -- yeah.  I'm sorry.  I just want to be
23  accurate.
24  BY MS. COHEN:
25  Q.    We're going to get to the article, but I'm

Page 199

1  just talking --
2  A.    Okay.
3  Q.    -- in general terms.
4  A.    Okay.
5  Q.    The term "sitting device," you don't use that
6  to describe the Rock n' Play Sleeper.  Correct?
7  A.    I described it as an inclined device.  So
8  that's my answer.  I mean, sitting, it's not -- it's
9  an in between.  So it's not straight up sitting, but
10  it's certainly not flat.  So it's as inclined device
11  that props babies up.
12  Q.    And you agree it's not a sitting device then?
13          MR. OSBORNE:  Form.
14          THE WITNESS:  I don't know what I'm
15  supposed to do with that.
16  BY MS. COHEN:
17  Q.    Have you ever used the term "sitting device"
18  to describe it?
19  A.    I just refer to it as a Rock 'n Play.  I
20  don't really use it in other terminology.
21  Q.    Do you agree when the AAP uses the term
22  "sitting device" that they're not talking about the
23  Rock n' Play Sleeper?
24  A.    I would have to look specifically -- well,
25  give where the AAP states it; and I'll look at it and

Page 200

1  decide what -- what they're getting at.
2  Q.    Well, we are going to get to that, but I just
3  want to make sure you're not calling it a sitting
4  device.
5          MR. OSBORNE:  Form.
6          THE WITNESS:  So it is not a seat.
7  BY MS. COHEN:
8  Q.    Okay.
9  A.    Okay.
10  Q.    Yes.
11  A.    It's an inclined device.
12  Q.    Okay.
13  A.    Okay.
14  Q.    Now, the conclusion here is, again on this --
15  on this Exhibit 27, "Infants and children two years of
16  age and younger should be properly restrained and not
17  left unsupervised in sitting and carrying devices."
18          You agree with that.  Right?
19  A.    Yes.
20  Q.    "Car seats should not be used as sleeping
21  areas outside of the vehicle.  Children should never
22  be in a car seat with unbuckled or partially buckled
23  straps.  Infants in slings should have their faces
24  visible and above the edge of the sling and should not
25  have their faces covered by fabric and their chin

Page 201

1  should not be compressing into her chest."
2          And that's what the conclusion of
3  this article is.  And I assume you agree with all of
4  that?
5  A.    Yes.
6  Q.    Down at the bottom of this page, the
7  paragraph that starts with, "There is potential."
8  Tell me when you get there.
9  A.    Yes.
10  Q.    "There's potential for injury when sitting
11  devices are not used for their intended purpose or as
12  originally designed.  Closed head injuries, skull
13  factures, broken bones, and suffocation have been
14  reported in various sitting and carrying devices.  In
15  addition, others have discussed SIDS and sudden
16  unexplained deaths in sitting devices."
17          I'm going to have you turn to page
18  185 under the discussion section in this article that
19  you cited to.  I assume if you cited to an article you
20  read it.  Right?
21  A.    Yes.
22  Q.    Okay.  Under Discussion -- and here it talks
23  about the 2011 American Academy of Pediatrics Task
24  Force on SIDS.  Are you on that Task Force?
25  A.    Yes.

51 (Pages 198 - 201)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

1  Q.      Okay.  So this is something you would have
2  looked at.  Right?
3  A.      Yes.
4  Q.      And then it says, next paragraph, "It's
5  possible that most, if not all, of these deaths might
6  have been prevented had the device been used properly
7  and/or had there been adequate supervision.  Although
8  restraints, car seats, swings, bouncers, and strollers
9  in design all devices may keep infants and young
10  children contained in the general sense, there is both
11  the need for proper restraints and appropriate
12  supervision that has to be considered when the devices
13  are used as currently designed."
14  A.      That is correct.  So you will note it's not
15  just about car seats.  They mention swings and
16  bouncers.  So they're all -- they're all devices that
17  can be problematic.
18  Q.      Right.  And what this article, I guess, under
19  your task force is saying here and that you cited to
20  is that the restraints are -- the restraints have to
21  be used and instructions and warnings have to be
22  followed.
23  A.      Yes.  No question about that.
24  Q.      And if we go back to the warning, which was
25  Exhibit --

1          MS. NG:  Twenty-three.
2          MS. COHEN:  Twenty-three?
3          THE WITNESS:  It's 23, yeah.
4  BY MS. COHEN:
5  Q.      One of the things the warning says -- and I
6  don't mean to hold it; I just want to read it and I'll
7  show you --
8  A.      That's okay.  I have it.
9  Q.      -- is that, "Do not use this product when
10  infant begins to push up on hands and knees, can pull
11  up, or sit unassisted or has reached 25 pounds."
12          So that's when the babies age out of
13  this developmentally.  Correct?
14  A.      Correct.
15  Q.      And you noted here, from looking at Dr.
16  Cleary's records, this baby was able to pull up or sit
17  unassisted --
18  A.      Yeah.
19  Q.      -- at that age as expected.  Correct?
20  A.      Correct.
21  Q.      And the warning made clear that this bed
22  should not be used unsupervised in babies that could
23  do that.  Right?
24  A.      Yes.
25  Q.      And certainly not without restraints.  It's a

1  double mistake.  Right?
2          MR. OSBORNE:  Form.
3          THE WITNESS:  I mean, you're
4  supposed to use the product as its intended to be
5  used.
6  BY MS. COHEN:
7  Q.      And follow those warnings.  Correct?
8          MR. OSBORNE:  Form.
9          THE WITNESS:  Yes.
10          MS. COHEN:  Let's put that one
11  aside.
12  BY MS. COHEN:
13  Q.      I want to move on to technical bulletins,
14  2011, 2016.  Now, you had in your orange folder --
15  A.      Yeah.  It's kind of gotten buried in other --
16  Q.      Sorry.
17  A.      That's okay.
18          MS. COHEN:  I'm marking 28 next.
19  Right?
20          MS. NG:  Yes.
21          MS. COHEN:  See.  Okay.
22  Twenty-eight and 29 are going to be marked next.
23          (Exhibit 28, 2011 Technical Report,
24  marked for identification.)
25          (Exhibit 29, 2016 Technical Report,

1  marked for identification.)
2  BY MS. COHEN:
3  Q.      You had the policy statements, right, in
4  there --
5  A.      Yes.
6  Q.      -- which were, you said, the shorter, more
7  concise versions, I guess?
8  A.      Yes.
9  Q.      I'm going -- and I think I promised you at
10  the time that we're going to look at the 2011, 2016
11  technical reports.
12  A.      Sure.
13          MS. COHEN:  Here you go, John.
14  BY MS. COHEN:
15  Q.      And you have in front of you 28?
16          MR. OSBORNE:  So this is?
17          MS. COHEN:  Twenty-eight and 29.
18          MR. OSBORNE:  Okay.  Which one is
19  SIDS?  Oh, they're both --
20          MS. COHEN:  I probably marked them
21  wrong.  2011 should be 28, and 2016 should be 29.
22  BY MS. COHEN:
23  Q.      And you've seen those before?
24  A.      I hope so.  I'm the author.
25  Q.      Okay.  You're one of the authors of these?

52 (Pages 202 - 205)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 206

1  A.      Yes.
2  Q.      It's your task force?
3  A.      It's not my task force. I'm a member of the
4  task force. I'm an author. We all take components of
5  it. We all review it together. There's not really --
6  the lead author gets noted as the author; but this was
7  a true work of collaboration which included -- if
8  you'll look at the back, it says the lead author is
9  Dr. Moon. But she's not the only author. It includes
10  Bob Darnall and myself and Fern Hauck as well as a
11  consultant Marian Willinger from the NICHD and Carrie
12  Shapiro-Mendoza, who I mentioned before.
13  Q.      Just a couple of questions. Again, both the
14  technical reports are the larger versions from what
15  you brought with you in the orange folder?
16  A.      They go into more vivid -- they're the
17  supporting -- it gives us supporting data for the
18  shorter policy statement.
19  Q.      They're both cited in your official report,
20  the first one --
21  A.      Yes.
22  Q.      -- Exhibit 2, 2A. And earlier today when I
23  asked you about some language I read from it, you
24  said, "I think that only goes to clinical issues."
25         Do you remember that part of our

Page 207

1  discussion today?
2  A.      Sure.
3  Q.      So now let's look at what these say. These
4  actually have that a language on it.
5  A.      Okay. I said I wasn't sure if it was the
6  same for a policy report. And they may have changed
7  this language recently; but, yes, it is here.
8  Q.      Okay. But let's look at this to confirm
9  that. On 2011, which is 28, it says over in the
10  left-hand side, "The guidance in this report does not
11  indicate an exclusive course of treatment or serve as
12  a standard of medical care. Variations, taking into
13  account individual circumstances, may be appropriate."
14  Right?
15  A.      Yes. Is that what it says on the policy
16  statement?
17  Q.      Well, let's look at the 2016 one that we
18  marked as 29.
19  A.      Is that the policy -- you're reading the
20  technical report.
21  Q.      I'm reading the technical reports right now.
22  A.      Okay. Because, as I said, technical reports
23  get a different listing as opposed to policy
24  statements. A technical report is supporting
25  information. A policy statement doesn't -- I would

Page 208

1  like to pull out my report on the policy statement --
2  Q.      We certainly can.
3  A.      -- if I can.
4  Q.      We'll pull it out in just a minute; but --
5  A.      Okay.
6  Q.      -- but let's look at -- let's finish up what
7  we're doing here --
8  A.      Sure.
9  Q.      -- because you're talking about this one
10  being on clinic. So here's -- it's the same language
11  on page 1 of Exhibit 29, 2016, "The guidance of this
12  report does not indicate an exclusive course of
13  treatment or serve as a standard of medical care.
14  Variations, taking into account individual
15  circumstances, may be appropriate." Right?
16  A.      Yes.
17  Q.      They both say that. And then if you want to
18  pull out your --
19  A.      Sure.
20  Q.      How many times have you seen these before?
21  A.      Do you know how long those reports are? I
22  don't have every detail of it memorized. That's why I
23  go back and recheck things to be certain.
24  Q.      These aren't the details. These are right in
25  the front page of both of them?

Page 209

1  A.      They're still details. Actually, that's not
2  something that we write. It's something the AAP
3  writes. So it would not be part of what we wrote.
4  Q.      Did you sign off on these?
5  A.      Yes, of course.
6  Q.      Did you put your name on them?
7  A.      Yes, I did.
8  Q.      Do I stand by them?
9  A.      I sure do.
10  Q.      You cited them to in this case?
11  A.      Hold on a sec, please.
12         And you'll see on the policy
13  statement, it does not have that on there, because
14  policy statements are standards of care and they're
15  different than technical reports. That is standard
16  writing they put on a technical report. A policy
17  statement is a standard of care. And the technical
18  report is only a supporting document to the policy
19  report. The policy report is the standard.
20  Q.      Okay.
21  A.      And on this, it does not have that writing on
22  there, because it's a policy. And it just talks about
23  when policies expire. So this -- if you -- if you
24  read, you know, A -- whatever the AAP has in terms of
25  their bylaws and whatnot in terms of their

53 (Pages 206 - 209)

Michael Goodstein, M.D.                          September 30, 2021
In Re: Fisher-Price/Mattel

Page 210

1  publications, they have different markings for
2  different levels of reports.  And the policy statement
3  is a standard.  So they don't have that marking on it.
4  So a policy statement is what is recommended.  It's a
5  recommendation.
6  Q.    Had you forgotten that these technical
7  reports had these on the front page?
8           MR. OSBORNE:  Object to form.  I
9  mean, he explained this to you.  That's exactly what
10 he said before.  I don't understand --
11          THE WITNESS:  It's not a matter of
12 remembering or not remembering.  It's -- from -- from
13 my perspective, it's a matter of what's relevant
14 information that I need to stay informed about.  That
15 marking is not relevant.  It might be relevant to this
16 proceeding, but it's not relevant to the work that I
17 do day to day in terms of education for people.
18 BY MS. COHEN:
19 Q.    Okay.  But the technical reports are
20 important documents for AAP, aren't they?
21 A.    Yes.
22 Q.    Okay.  And they're -- obviously, they're the
23 longer more detailed versions.  Correct?
24 A.    They are supporting documentation.  So it
25 goes into more detail, yes.

Page 211

1  Q.    And it says, "This document" -- let me look
2  at this --- "This document is property of the American
3  Academy of Pediatrics and its Boards of Directors.
4  All authors have filed conflict of interest statements
5  with the American Academy of Pediatrics.  Any
6  conflicts have been resolved through a process of
7  review by the Board of Directors."
8           "Technical reports from the American
9  Academy of Pediatrics benefit from expertise and
10 resources of liaisons and internal (AAP) and external
11 reviewers.  However, technical reports from the
12 American Academy of Pediatrics may not reflect the
13 views of the liaisons or the organization or
14 governmental agencies that they represent."
15          Are you familiar with that language?
16 A.    It's not something that rings right off the
17 top of my head, but you have it there.
18 Q.    Okay.  And then let's look at the -- we'll
19 use the 2011.  You agree that's the one that was
20 applicable at the time of Zoey Olson's death as
21 opposed to 2016?
22 A.    Sure.
23 Q.    We can put that aside.  So let's look at the
24 2011.  And I want to look at --
25 A.    Which one are we looking at technical or --

Page 212

1  Q.    Technical report that I marked, yeah, as 28.
2           And this is the section on page
3  e1349.  This is the part that talks about car seats
4  and other sitting devices not recommended for routine
5  sleep at home or in the hospital particularly for
6  young infants.  Was this is a section that was yours
7  or somebody else, if you know?
8  A.    I couldn't tell you off the top of my head.
9  Q.    I didn't know -- do you know which sections
10 are yours in any of them?
11 A.    You're asking me to remember a report from
12 ten -- from ten years ago.  I mean, some pieces I
13 know.  Some pieces are more kind of done together.
14 Q.    Okay.
15 A.    The most recent one, it was all
16 collaborative.  We had different groups of people
17 working on each one.
18          Regardless of who wrote it, we all
19 review it and then there's a very lengthy process
20 before this can be approved as publication.
21 Q.    So the part here says, let's see, "Some
22 parents let their infants sleep in a car seat" --
23          (Inaudible discussion between Ms.
24 Cohen and Ms. Ng.)
25 Q.    It says, "Some parents let their infants

Page 213

1  sleep in a car seat or other sitting devices.  Sitting
2  devices include but are not restricted to car seats,
3  strollers, swings, infant carriers, and infant swings.
4  Parents and caregivers often use these devices even
5  when not traveling because they're convenient."
6           And it goes on to say, "One study
7  found that the average young infant spends 5.7 hours a
8  day in a car seat or similar sitting device."
9           COURT REPORTER:  I'm sorry.  Can you
10 slow down?  The masks --
11          MS. COHEN:  Yeah.
12          COURT REPORTER:  You're probably not
13 going to be able to read it.
14          MS. COHEN:  I'm trying to figure out
15 where I was.
16 BY MS. COHEN:
17 Q.    "The average young infant spends 5.7 hours a
18 day in a car set or similar sitting device.  However,
19 there are multiple concerns about using a sitting
20 devices as a usual infant sleep location.  Placing an
21 infant in such devices can potentiate gastroesophageal
22 reflux and positional plagiocephaly."
23          And that's one of the concerns that
24 was raised in this.  Correct?
25 A.    It is, yeah.

54 (Pages 210 - 213)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 214

1  Q.    And then e1355. Let's switch over to that
2  one with the part that talks about the overheating.
3  And that's part of this one as well. Right?
4  A.    Um-hum. Yes.
5  Q.    And so my question is that -- my question for
6  you is that neither the 2011 policy statement which
7  you have in your orange folder nor the technical
8  support on SIDS and/or other sleep related infant
9  deaths, the two documents we looked at, neither of
10 them are prohibit sleep on an incline, do they?
11       MR. OSBORNE: Form.
12       THE WITNESS: You know in 2011, this
13 product did not exist. We don't have it because the
14 product didn't exist. And so -- so you can't talk
15 about something that isn't out there.
16       Our goal is in reviewing these, we
17 make use of the -- of the available studies. And
18 those studies are based on case control. And so if a
19 product doesn't exist, you have nothing to compare
20 for -- for cases.
21       Just because we don't make mention
22 about an incline doesn't mean it's something we
23 approve of. And there are other places in here where
24 we specifically say baby should be flat to sleep.
25 It's the safest thing.

Page 215

1  BY MS. COHEN:
2  Q.    So let's go back to my question.
3  A.    Okay.
4  Q.    You would agree that in the 2011 AAP policy
5  statement and technical report and also 2016 -- let's
6  just stick with 2011. The 2011 policy statement or
7  technical report, neither one of them prohibits sleep
8  on an incline?
9        MR. OSBORNE: Form.
10       THE WITNESS: No. We -- just
11 because we didn't say it doesn't mean that we agree
12 that it's a proper thing to do. No.
13 BY MS. COHEN:
14 Q.    No what?
15 A.    Cribs -- cribs -- cribs are designed to be
16 flat. And the safest place is in a safety-approved
17 crib. At that point, there was no rule in terms of
18 angles of bassinets. Bassinets typically are -- are
19 flat. So just because we did -- we didn't
20 specifically say about the firmness, didn't also say
21 flat, there are other places where we make it very
22 clear it's meant to be flat.
23       It's such a common sense thing that
24 you wouldn't think you would have to write specifics
25 that it's flat, because we know that cribs have a flat

Page 216

1  surface. When we heard started hearing more about
2  this, then it caught our attention to talk about. And
3  the same is true for side cars and other than devices
4  like baby boxes. So when we get word about them, then
5  if there's an issue, we start to talk about them.
6  Q.    So you yelled out, no, no a couple times. I
7  want to understand if I can understand what you're
8  saying.
9  A.    Sure.
10 Q.    My question was -- and I can read it back --
11 in 2011, the AAP policy statement, technical report,
12 both of which you have in front of you on the table --
13 one is marked as 28. And one is in your orange folder
14 marked as something else. Neither one of them
15 specifically prohibits sleep on an incline. True?
16 A.    Yeah, the answer is it says to sleep on a
17 flat surface.
18 Q.    Do either of them say you cannot sleep on an
19 incline?
20       MR. OSBORNE: Form.
21       THE WITNESS: Why would I need to
22 include that -- that kind of discussion when the
23 recommendation is to be flat?
24 BY MS. COHEN:
25 Q.    Do you think -- do you want me -- I mean, I

Page 217

1  can take it to the judge. I mean, I'm asking a simple
2  question.
3        MR. OSBORNE: Wait. Wait. You can
4  take anything you want to the judge, but the witness
5  gets to answer the way he answers. You don't get to
6  control how he answers. You can ask your question.
7  He can answer.
8        MS. COHEN: I'm going to keep asking
9  it then.
10 BY MS. COHEN:
11 Q.    First of all, are you here as an advocate?
12 A.    I'm here to tell the truth about what the
13 report is.
14 Q.    Okay.
15 A.    And the report is that the baby is supposed
16 to sleep on a flat surface.
17 Q.    Is there anything in this -- in the technical
18 report or the policy statement that says that you
19 cannot sleep on an incline?
20       MR. OSBORNE: Form.
21       THE WITNESS: I'm sticking by the
22 answer that I gave you.
23 BY MS. COHEN:
24 Q.    Is there --
25 A.    There's not --

55 (Pages 214 - 217)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 218

1  Q.    Show me -- show me where it says anything
2  about incline in the report.
3  A.    If the product doesn't exist, how can we talk
4  about it?  It doesn't say anything and it's not
5  mentioned because it is not something that we had
6  access to information on.  I'm not saying that we're
7  condoning it.  The safe -- the safe thing for babies
8  to do is sleep on a flat surface.  And that's all over
9  the report.  It should be a flat surface.  It doesn't
10 say anything -- it should be a flat surface and --
11 Q.    And your answer was -- and your answer was --
12 A.    It's a flat surface.
13 Q.    And your answer was the product wasn't on the
14 market, so how could you guys know about it.  That's
15 what you just said.  Right?
16 A.    Well, there's nothing to -- there's nothing
17 to address if people -- if people are not making a
18 product we don't even know about, we can't say
19 anything about it.  If we learn that a product is
20 coming out on the market that we have concerns about,
21 then we can address that specifically.  And that's
22 what happens over time.  We start talking about
23 different product.
24 Q.    Listen carefully to my question.  I'm asking
25 you about 2011.  Right?  Do you understand that?

Page 219

1  A.    Yes.
2  Q.    Do you know when the Rock 'n Play was on the
3  market?
4  A.    It went on 2009; but we had to data -- no
5  data on that.  So just because the product is on the
6  market, doesn't mean there's any articles or anything
7  to discuss about it.  There's no information.
8  Q.    Did the AAP put out any prohibition in 2011
9  in any of their documents that said babies should not
10 sleep on an incline?
11        MR. OSBORNE:  Form.
12        THE WITNESS:  I can't answer for the
13 entire AAP whether or not they made a comment about
14 that.  What I can tell you is what we recommend as a
15 safe sleep surface.
16 BY MS. COHEN:
17 Q.    And I've read every page of those two
18 documents.  And there's not a single statement in
19 there from the AAP that prohibits an inclined sleep.
20 Do you agree with that?
21        MR. OSBORNE:  Form.
22        THE WITNESS:  There is also nothing
23 in there that says -- there are a lot of things that
24 it doesn't say.  What's important to me is what it
25 does say.

Page 220

1  BY MS. COHEN:
2  Q.    And you've said that today.  And I've let
3  you, haven't I?
4  A.    Yes.  Yes.
5        MR. OSBORNE:  Form.
6  BY MS. COHEN:
7  Q.    Now, I'm asking you to comment to that.
8        MR. OSBORNE:  Form.  Form.
9  BY MS. COHEN:
10 Q.    Let me tell you what.  Let me do this.
11 You've been a member what, 30 years, you said, of the
12 AAP?
13 A.    Yes.  If we were recommending that an
14 inclined surface was safe to sleep on, we would
15 specifically say an inclined surface is safe to sleep
16 on.
17        (Exhibit 30, Policy Statement
18 titled, Expert Witness Participation in Civil and
19 Criminal Proceedings, marked for identification.)
20 Q.    I'm going to hand you Exhibit 30, which is
21 your organization's policy statement.  It's one of the
22 policy statements that you can't veer from.  That's
23 what you said.  Right?  It's the policy statement.
24 And title is, Expert Witness Participation in Civil
25 and Criminal Proceedings.  You've looked at those?

Page 221

1  You've seen this before?
2  A.    Yes.
3  Q.    And you said you have not signed the
4  affirmation piece.  So I won't give you that.  Is that
5  right?
6  A.    Right.
7  Q.    And on the second page here under Standards
8  of Testimony, No. 4 says that -- I don't know if
9  you're there.
10 A.    Yeah.  "Objective valid opinion."
11 Q.    Okay.  "That are well supported by clinical
12 experience and the best evidence-based medical
13 literature regardless of whether it's to be used by
14 the plaintiff/prosecutor or defendant."  Do you see
15 that?
16 A.    Yes.
17 Q.    And under Providing Proper Testimony on the
18 next page, it says, "Must take all necessary steps to
19 provide expert work that is relevant, reliable,
20 honest, unbiased and based upon sound scientific
21 principles."
22 A.    Yes.  And being honest and unbiased, we would
23 never recommend to put the baby at elevation.  We
24 don't do that.  We know from other products that were
25 taken off the market by the FDA because they were

56 (Pages 218 - 221)

Michael Goodstein, M.D.                          September 30, 2021
In Re: Fisher-Price/Mattel

Page 222

1  medically unsound that babies shouldn't be at an
2  angle. And we say that babies should be flat. So it
3  seems to add on additional statement to that is really
4  superfluous.
5  Q.    Is e1349 that we looked at on the technical
6  report, which is Exhibit 28, where it says placing
7  infant in such device can potentiate gastroesophageal
8  reflux --
9          MR. OSBORNE: I'm sorry. What page
10 are we on?
11         MS. COHEN: E1349 on 28.
12         MR. OSBORNE: All right.
13 BY MS. COHEN:
14 Q.    And again, the concern here references
15 potentiating gastroesophageal reflux -- reflux and
16 positional plagiocephaly. Correct?
17 A.    Correct.
18 Q.    Okay. Did you see Dr. Good -- Goldsmith's
19 test -- report on this point?
20 A.    Yes.
21 Q.    And what he said was -- you're talking about
22 the 2011 policy statement and technical report. He
23 said, "To the extent such guideline addresses sleeping
24 on an incline, it only addresses concern that
25 elevating the head of the infant -- I'm reading.

Page 223

1  Let's see.
2          Let me start back there. He said,
3  "I" -- it's in his surrebuttal report; and I don't
4  know if you have that here. "I disagree with Dr.
5  Goodstein's opinion that the 2011 AAP guideline for
6  infant sleep, which is the guideline for the relevant
7  period, prohibits sleep on an incline. Neither the
8  AAP's 2011 policy statement, nor technical report
9  prohibits sleep on an incline. To the extent such
10 guideline addresses such sleep on incline, it only
11 addressed the concern that elevating the head of the
12 infant's crib while the infant is supine is not
13 effective in reducing gastroesophageal reflux. In
14 addition, this elevation can result in the infant
15 sliding to the foot of the crib into a position that
16 may compromise respiration and, therefore, is not
17 recommended. In this guideline, it's clear the AAP is
18 concerned with an infant sleeping on an inclined
19 surface and the possibility of the infant sliding to
20 the foot of the crib, which would not occur with a
21 Rock 'n Play when its restraint system is properly
22 used."
23         MR. OSBORNE: Form.
24         THE WITNESS: There was concern
25 about the airway occlusion as well.

Page 224

1  BY MS. COHEN:
2  Q.    But Dr. Goldsmith who has been part of the
3  infant and child task force, a member of the AAP for
4  even look longer than you, someone you respect in
5  terms of his credentials and opinions states clearly
6  that the AAP 2011 statement does not address the issue
7  of incline.
8          MR. OSBORNE: Form.
9          THE WITNESS: It is -- it is
10 addressed, just not there. It is addressed in that in
11 that the baby should be on a flat surface. He's kind
12 of cherry picking a little bit.
13         It says if you're in one of these
14 devices, don't let them sleep in it. Put them on a
15 flat surface. It says it in every single iteration of
16 this. It says keep the baby on a flat surface. It
17 doesn't say flat or inclined. It says put them on a
18 flat surface.
19 BY MS. COHEN:
20 Q.    It doesn't define flat, does it?
21         MR. OSBORNE: Form.
22         THE WITNESS: Wow.
23 BY MS. COHEN:
24 Q.    You earlier said flat --
25 A.    Flat is -- yes. Flat is not inclined.

Page 225

1  Q.    But you earlier said it was up to a 10-degree
2  incline.
3  A.    The CPSC says up to 10 degrees.
4  Q.    So that's not not zero, is it?
5  A.    It's not 30 degrees. The reason we state
6  flat is because that's what we know is safe. And,
7  again, nobody is doing studies to see what angle is
8  the angle at which it becomes critical that you can
9  harm someone.
10 Q.    There's no study on that at all, is there?
11 A.    There's data -- supporting data. There's no
12 specific study to look at how that could cause --
13 there's no studies that have done randomized
14 controlled trials to compare whether babies would be
15 more likely to die in an incline than not.
16         What has been done is there's been
17 studies looking at whether or not babies can start to
18 have compromise to their breathing and airway and
19 mus -- muscle strength if they are put at various
20 degrees of incline.
21         And in most cases, we do see as
22 little as, I believe, 20 degrees -- I would have to
23 look at the article to be sure -- that you can start
24 to see desaturation events, which can be a trigger and
25 tied to SIDS. And we certainly see issues with muscle

57 (Pages 222 - 225)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 226

1  fatigue, especially in a prone position that if the
2  baby could not escape from in a small space could
3  certainly be part of a cascade of events that leads to
4  a SUID event.
5  Q.      Do you know Dr. Fox, who is --
6  A.      Yes.
7  Q.      -- in the field of pediatrics and
8  neonatology, respiratory physiology, prevention of
9  injury alleged in suffocation at U of Penn?
10  A.     Yeah, I do.
11  Q.     Do you respect him?
12  A.     I do.
13  Q.     Do you collaborate with him at all?
14  A.     On rare occasions, yes.
15  Q.     Do you know Dr. Shaff -- what do you
16  collaborate with him on?
17  A.     He provides us some reports on babies that
18  we're evaluating for apnea and other issues.
19  Q.     So you rely on his data is what you're
20  saying?
21  A.     I use him as a consultant --
22  Q.     Okay.
23  A.     -- because they have a machine that we don't
24  have access to at our hospital.
25  Q.     So that means you use his data as reliable?

Page 227

1  A.      I don't -- I don't think data is the right
2  word. I ask for his opinion regarding pneumogram
3  results.
4  Q.      Okay. So you rely on his opinion?
5          MR. OSBORNE:  Form.
6          THE WITNESS:  I use him as a
7  consultant to -- I use him as a consultant to assist
8  me with some clinical decision-making.
9  BY MS. COHEN:
10  Q.     Okay. And do you know Dr. Schaeffer?
11  A.     I know Tom Schaeffer.
12  Q.     And do you collaborate with him at all?
13  A.     No. He just happened to be at the same
14  institution where I trained at. But I know other of
15  my colleagues have worked with him in his lab.
16  Q.     Okay. Both Dr. Fox and Dr. Schaeffer are
17  well respected in their fields. Correct?
18  A.     Yes.
19  Q.     And in this case, I know you didn't get all
20  of the materials; but were you provided by the counsel
21  who retained you with Drs. Fox and Schaeffer's report
22  and their videotapes of what -- of their --
23  A.     No.
24  Q.     You didn't see that?
25  A.     No.

Page 228

1  Q.      Okay. I'm sure you would have been
2  interested in seeing what they studied in this case on
3  infants, wouldn't you?
4  A.      Sure.
5  Q.      In terms of risk factors for SIDS and SUIDs,
6  I want to go through -- did you look at the list
7  that -- I know you and Dr. Goldsmith have different
8  opinions about different issues; but did you look at
9  his risk factor list to see if you two agreed on that?
10  A.     Yes, I did look at it.
11  Q.     And do you agree with him on that?
12  A.     I would like to see the list. I think
13  there's one or two things that I do not agree with him
14  about.
15  Q.     I'll be happy to go through it. So his
16  report is one of the things you looked at, but I take
17  it you don't have it here with you?
18  A.     No, I don't.
19  Q.     Okay.
20          MS. COHEN:  We don't have an extra?
21          MS. NG:  No.
22  BY MS. COHEN:
23  Q.     So I just have the one with my writing on it;
24  but we'll -- we'll -- I'll read it to you.
25  A.     Most of them are accurate. He has one with

Page 229

1  anemia that's not.
2  Q.      Well, he says, Patient factors sleep apnea
3  and/or medical conditions, in parens, acid reflux,
4  anemia, post-anesthesia states -- I'll let you look at
5  it, too, so you know I'm looking reading it right.
6  A.      Yeah, if I could.
7  Q.      Yes.
8  A.      Okay.
9  Q.      It would be easier.
10  A.     Yes, it would.
11          I don't agree with his patient
12  factors. Acid reflux doesn't cause SIDS. Reflux is
13  extremely common. Anemia doesn't cause SIDS. It's in
14  our report as a potentiating factor. I looked at --
15  he had one article from one very minor journal that I
16  would not really agree with. I'm not sure why he
17  would put post-anesthesia states here, because these
18  deaths occur generally in the home environment. So
19  that's a little odd. And there are a lot of things in
20  here that I think are strange.
21          The things I do agree with is the
22  things that are the standard that we all put in our
23  report, prone positioning; soft bedding; unsafe beds,
24  couches, daybeds -- those are all true-- loosing
25  bedding materials; overheating and room temperature.

58 (Pages 226 - 229)

Michael Goodstein, M.D.                                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 230

1        I take -- let's go through the ones
2    I agree with; and then we can circle back to what is
3    of contention.  Mothers smoking during the pregnancy,
4    there's a direct correlation with that.  Mothers
5    receiving late or no prenatal care are an association
6    but not necessarily cause of.  I would not even refer
7    to that as an extrinsic risk factor.  Prematurity, as
8    we mentioned low birth rate those are intrinsic
9    factors.  Secondhand smoke is an extrinsic factor.
10   Parental alcohol and drug use can play a role.
11       So some of these other ones are not
12   extrinsic risk factors.  They are separate
13   associations with a higher risk but have no causation
14   whatsoever.  So that would be the maternal marital
15   status, education level, socioeconomic status.  These
16   are absolutely not causative or actually intrinsic as
17   to causing.  But they are things that are associated.
18   They are flags that could put the baby at increased
19   risk but are not direct -- but are not direct in terms
20   of --
21   Q.      I don't mean to grab.  I'm trying to --
22   A.      No.  So those are some of the ones that I
23   would -- and the mother's age as well.  Those are not
24   extrinsic risk factors.  They associate risk, but they
25   are not extrinsic risk factors.  Extrinsic risk

Page 231

1    factors are things particular to the environment.  And
2    those are specifically the ones that we've already
3    talked about, which include soft bedding and pillows
4    and an over-warm environment, the smoke in the
5    environment.  Those are all things that have some
6    relationship -- not causation but some relationship as
7    opposed to these other things that are just kind of
8    social constructs that are markers for other things
9    that are probably going on for risk.
10   Q.      So he said the risk factors related to SIDS
11   include but are not limited to the following.  That's
12   what he said, not -- he didn't use the word extrinsic.
13   A.      Well, again, the risk --
14   Q.      Let me --
15   A.      It's statistically correct that -- that if
16   you're a person of color that as a population, there's
17   a higher rate of SIDS, none of that to be -- none of
18   that's causative.  There are other reasons for that.
19       And just because you're young
20   doesn't mean your baby is going to die of -- a young
21   mother doesn't mean your baby going to die of SIDS.
22   That in itself is the true risk.  It is an
23   association.  It is a statistical association.  But in
24   terms of -- if you want to think it through all of the
25   way, the way that I would put this is that a young

Page 232

1    mother -- and there's studies looking at this -- they
2    are less likely to listen to what their doctor has to
3    say.  There are other factors that go into this.  And
4    if you're putting your baby, you know, prone because
5    you're not listening to your doctor, it's not about
6    the age.  It's about the fact that you did a behavior
7    that then created a higher risk situation.
8    Q.      Where in your chart do you list your risk
9    factors -- in your report?
10   A.      They're -- the risk factors in this case or
11   risk factors in general?
12   Q.      Either.
13   A.      Oh, for in general, it's with the information
14   on the Triple Risk Hypothesis.
15   Q.      So you're saying this is all you list on page
16   225?  That's it?
17   A.      I wasn't asked to go into detail on that.
18   That was not the purpose of my -- of the report I was
19   writing.
20   Q.      Okay.
21   A.      But I'm happy to talk about intrinsic or
22   extrinsic factors.
23   Q.      So you didn't include all of them is what
24   you're saying because you weren't asked to do that?
25   A.      Correct.

Page 233

1    Q.      All right.  Were you specifically told to
2    just include intrinsic risk factors?  I don't really
3    understand.
4    A.      It went to the health of the baby.  That's
5    why that's included.
6    Q.      Okay.
7    A.      I was asked to comment on the medical records
8    and how it purports to this case.  And so intrinsic
9    risk factors play a role in terms of my interpretation
10   of the mother's and the baby's health records.  So
11   that's why I included that.  But that was not -- those
12   records were not -- you know, the health records are
13   not relevant in terms of extrinsic risk factors at the
14   scene of the event.  So it's a separate issue that I
15   was not asked to comment on.
16   Q.      In the recent case where you did the
17   report -- I don't remember the name of the product
18   anymore -- were you directed not to include certain
19   things or was it a similar exercise?
20   A.      I couldn't tell you that.  It's at least four
21   years -- it's about four years ago.
22   Q.      Dr. Goldsmith says on page 5 of his
23   surrebuttal report, "I disagree with Dr. Goodstein's
24   opinion regarding physiologic anemia and reflux as
25   risk factors of SIDS.  There's indirect evidence that

59 (Pages 230 - 233)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 234

1  suggests a relationship between physiologic anemia and
2  SIDS and infants in their first" -- and then he cites
3  to the Jeffrey Page article. Are you familiar with
4  that?
5  A.     I've not read the whole article, but I saw
6  the journal it came from. And it's not really a high
7  repeatable journal. So of all the hundreds of
8  thousands of studies there are on SIDS, that's the
9  only one he can reference. We don't talk about --
10 Q.     Which journal --
11       MR. OSBORNE: You're interrupting.
12       Please finish your answer.
13       THE WITNESS: So you can -- you can
14 evaluate journals. They have impact factor listings
15 that -- that give you a sense of how good of a journal
16 it is and how good the information is coming out of
17 said journal. And that journal -- I don't even know
18 if it has an impact factor. All I can tell you is
19 I've never heard of the journal he's quoting from.
20 BY MS. COHEN:
21 Q.     Which journal? That's the question.
22 A.     Well, look at the footnote.
23 Q.     You pointed over to me and said, "That
24 journal." Which one are you talking about?
25 A.     The article that you just mentioned about

Page 235

1  anemia.
2  Q.     Do you know which journal it was?
3  A.     Do you want to let me look at his footnotes,
4  and I can tell you?
5  Q.     You decried it. You said it was a horrible
6  journal, whatever you said. I'm trying to ask what
7  journal it was.
8  A.     I need to look at it to see. I looked at the
9  journal. I don't -- you know, I didn't memorize the
10 name of the journal. So I need to see it.
11 Q.     It's more than one. One is the International
12 Journal of Pediatrics. Is that a horrible journal?
13 A.     I would say it's not a highly regarded
14 journal.
15       MR. OSBORNE: Do you want to let him
16 see what he's reading from, counsel?
17       MS. COHEN: He could have brought it
18 today. You could have brought it for him.
19       MR. OSBORNE: Why should I? This is
20 your deposition, ma'am.
21       MS. COHEN: Surrebuttal, surrebuttal
22 report.
23       MR. OSBORNE: If you wanted him --
24 to give him documents, I believe under the rules of
25 evidence, he has the right to see a document you're

Page 236

1  confronting him with.
2       MS. COHEN: He sure does. And he
3  looks --
4       MR. OSBORNE: And you're not
5  permitting him to. What's fair about that?
6       MS. COHEN: Please. I've given him
7  everything all day. You didn't give me all the
8  documents he had here today. Talk about fair about
9  that.
10       MR. OSBORNE: Because I probably
11 never saw them until today.
12       MS. COHEN: Well, and I've been very
13 nice about that.
14 BY MS. COHEN:
15 Q.     The second article was --
16       MR. OSBORNE: Do you want to tell
17 him which journal it is? And he can tell you which
18 one he's referring to.
19       MS. COHEN: Early Human Development,
20 is that -- is that a terrible journal, too?
21       THE WITNESS: That one is a probably
22 a little more respected.
23       But I will tell you if you look --
24 if you look through the technical reports, the
25 policies statements, you don't see anything anywhere

Page 237

1  about anemia, because that's not considered a
2  significant factor.
3  BY MS. COHEN:
4  Q.     And the third one they cite to in this first
5  paragraph of his -- and I'm happy -- mine has notes on
6  it and highlights -- is Pediatrics. Obviously, that's
7  a reputable journal.
8  A.     That is a reputable journal.
9  Q.     So the one you take issue with is the
10 International Journal of Pediatrics?
11 A.     Yes.
12 Q.     And you did read the surrebuttal report?
13 A.     Yes.
14       MS. COHEN: Do we have that here?
15       MS. NG: I'm trying.
16       MS. COHEN: It's okay if we don't.
17 BY MS. COHEN:
18 Q.     Did you read this one this week the
19 surrebuttal report?
20 A.     I believe I read it this week. And I
21 probably looked at it a while before when I first got
22 it, but it wasn't too long ago.
23 Q.     Yeah. I'll give you a date on this one.
24 July 30th, 2021.
25       Have you ever talked to the

60 (Pages 234 - 237)

Michael Goodstein, M.D.                              September 30, 2021
In Re: Fisher-Price/Mattel

Page 238

1   plaintiffs; that is, Mr. Olson and Ms. Courkamp?
2   A.      No.
3   Q.      Did you ever ask to talk to them?
4   A.      No.
5   Q.      Did you inquire whether there was any history
6   of SIDS or faulty issues or issues --
7   A.      It was her first child.  So there would be no
8   other children to compare it with but her.
9   Q.      I'm asking about in the family?
10  A.      I only have access to the medical records
11  that I was given.
12  Q.      Okay.  And what about is it relevant to ask
13  about subsequent pregnancies and subsequent births?
14  A.      For what?
15  Q.      For risk factors for SIDS.
16  A.      It's not a question that I -- that makes
17  sense to me --
18  Q.      Okay.
19  A.      -- because generally --
20  Q.      Um-hum.
21  A.      -- SIDS doesn't run in families.
22          There are some -- we're still trying
23  to figure out what all the causes of SIDS are, because
24  there's a multitude.  And we're still in the infancy
25  of this.  So there are some occasional rare genetic

Page 239

1   disorders that can initially be listed as SIDS; but
2   sometimes are picked up later on as something else
3   that led to a sudden -- so it's a SUID, but not a
4   SIDS.
5          So, for example, spinal muscular
6   atrophy, I know of a case where a child died and it
7   was called SIDS.  The woman had another child and
8   became sick actually in an office where they were
9   doing a bereavement session, went to the hospital, and
10  eventually was saved but was diagnosed as having SMA.
11  So there are rare cases; but when you start seeing
12  things within a family, often that leads the medical
13  examiners to start wondering about other diagnoses
14  like infanticide.  It is very rare for this to run in
15  a family.
16          It's -- so in that regard -- and I
17  always do ask -- I always do ask when I take a history
18  if there's any history of SIDS in the family; but
19  there usually isn't, I know.
20  Q.      When you're trying to assess for SIDS, you
21  usually ask about a SIDS history in the family?
22  A.      No.  Every patient I take care of, I ask them
23  an extensive family history; and that's just a part of
24  it, so to help me understand if there's anything that
25  I might need to dig into further, because sometimes

Page 240

1   SIDS is not SIDS.
2   Q.      In terms of all the materials that were
3   provided to you that didn't make it into the small
4   orange file for today, do you keep them all on your
5   computer?  Is that where you keep them all, or are
6   they hard copy?
7   A.      No.  It's just on the computer.  I don't
8   print all that stuff out.  My God I'd kill a tree and
9   wouldn't have anyplace to store it.
10  Q.      What is the last time you worked with Dr.
11  Schaeffer or Dr. Fox?  Is that something that happens
12  often?
13  A.      Dr. Schaeffer I have not worked directly
14  with.  He just happens to work at the same institution
15  where I trained at at Saint Christopher's.  He's
16  Temple University.  So some of my friends worked in
17  his lab, but I did not work directly with him.
18          And Dr. Fox, I haven't worked with
19  him recently.  Sometimes it's -- he's not the only
20  person there in the apnea center.  So I've worked with
21  a couple of other people that are on staff maybe
22  sometime in the last two years.  He just sends a
23  report, and sometimes we talk for one minute.
24  Q.      So it's kind of a regular thing over the
25  years?

Page 241

1   A.      No.
2   Q.      I mean, it's not regular -- I mean, it has
3   gone on over the years.
4   A.      We've used other sources in years past.  So
5   it's not always been with their service, no.  We used
6   to do our own reports for many years.
7   Q.      Are you familiar with -- is it Dr.
8   Bajanowski --
9   A.      No.
10  Q.      -- who has written about the need for a
11  complete autopsy in --
12  A.      Oh, okay.  I didn't recognize the name right
13  off the top of my head.
14          MS. COHEN:  We're going to go ahead
15  and mark this Exhibit 30?
16          MR. OSBORNE:  I thought that was the
17  expert witness.
18          THE WITNESS:  Yeah, 30 was the
19  expert witness.
20          MS. COHEN:  All right.  Thirty-one.
21          MR. OSBORNE:  The AAP article.
22          MS. COHEN:  Thirty-one.  Thirty-one.
23  All right.
24          (Exhibit 31, Thomas Bajanowski, et
25  al., Article, marked for identification.)

61 (Pages 238 - 241)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 242

1  BY MS. COHEN:
2  Q.    It's Dr. Bajanowski, "Sudden infant death
3  syndrome - Standardised investigations and
4  classification." Have you seen this before?
5  A.    Not this article. It's from 2006. So there
6  are other things that have certainly been put in place
7  since this article.
8  Q.    You would agree that investigation of infant
9  death for SIDS or SUIDs requires specific diagnostic
10  methods in terms of forensic pathology?
11  A.    I'm not a pathologist. But, yes, I would say
12  there should be some standards to how an autopsy is
13  done for SIDS that's different than your standard
14  autopsy, yes.
15  Q.    And you would agree that what was done by Dr.
16  Frank in this case was not a complete SIDS autopsy.
17  You agree with Dr. Fuller. Correct?
18  A.    Again, I'm not a pathologist. So I can -- I
19  can tell you -- what I can tell you is as somebody who
20  works in the field and sits on child death review and
21  works with our coroner that sometimes there are
22  limitation to what is able to be done because it's not
23  a legal matter. And so they may not do every single
24  test that's available. But there's a fairly good
25  standard battery of tests. And I think, you know, the

Page 243

1  pathologist did many of them, but I think there is
2  probably a little more that could have been done.
3  Q.    In other words, the pathologist here, Dr.
4  Frank and his team, did a standard autopsy but not a
5  standard SIDS autopsy. Correct?
6       MR. OSBORNE: Form.
7       THE WITNESS: I can't answer -- I
8  can't answer that question.
9  BY MS. COHEN:
10  Q.    You would defer to the pathologist for that?
11  A.    I defer to the pathologist.
12  Q.    Fair enough. We'll get that marked now.
13       Your report -- page -- this is your
14  official first report. So 2 and 2A. Do you have that
15  handy?
16  A.    Yeah.
17  Q.    It's probably over here. Let's see.
18  A.    I think it might be in this pile. Here is
19  the one and -- yeah. Here they are.
20  Q.    232, if you could look for that page.
21  A.    On which that report?
22  Q.    On that report.
23  A.    Okay. Yes.
24  Q.    You talk about the concept of an inclined
25  sleeper has always been a concern, but it's something

Page 244

1  that even before the Rock 'n Play came out in 2009.
2  Correct? What are you talking about -- what are you
3  talking about there?
4  A.    I'm just talking about the -- again products
5  shouldn't be on an incline for sleep. So I can't tell
6  you an exact year when that, you know, elevated to a
7  higher level of concern. I can tell you that all of
8  the reports will talk about having a firm and flat
9  surface. So anything that deviates from that is a
10  concern to us whether it's a car seat or a bouncer.
11  Q.    You haven't talked to any of the plaintiff
12  expert witnesses. Is that right?
13  A.    Yes.
14  Q.    You only people you've talked about to in
15  this case are Ms. Schriner and Mr. Osborne?
16  A.    Yes, one of the other partners was on the
17  line for a call once, but I don't know his name.
18       MS. COHEN: I think those are all of
19  the questions that I have for you. I thank you very
20  much for your time today.
21       THE WITNESS: Thank you.
22  EXAMINATION
23  BY MR. OSBORNE:
24  Q.    Doctor, did you bring a reference that
25  discusses pathology reports?

Page 245

1  A.    A reference? I did -- I did bring a couple
2  of pieces from a book on investigation of SIDS, yes.
3  Q.    And what was it that was important to you
4  with respect to normal pathology reports in the
5  references you brought?
6  A.    The one is that there's no specific
7  histologic finding that defines SIDS. So there are
8  often common findings that are nonspecific such as
9  some hemorrhage in the thymic tissue and some
10  congestion in the lungs are pretty routine in deaths
11  that are not necessarily -- that are not defined SIDS.
12  It's a common finding.
13  Q.    In which of the articles that you brought
14  with you in Exhibit 1 makes that reference?
15  A.    That -- well, it's just a page that I
16  photocopied out of that book on SIDS investigation.
17  Q.    I don't know if we marked it or --
18       MS. COHEN: We did.
19       THE WITNESS: It's marked, but I'm a
20  little about harried and -- hold on.
21       MR. OSBORNE: Can we go off the
22  record and let you organize?
23       THE WITNESS: I think I'll be able
24  to get it here pretty quick.
25       MR. OSBORNE: Okay. Then let's not

62 (Pages 242 - 245)

Page 246

go off.
THE VIDEOGRAPHER: Go off?
MR. OSBORNE: No.
THE WITNESS: Sure. There are a couple of things that I thought were specifically relevant to what I had read in the reports. And the one was that there's no specific -- illnesses...
COURT REPORTER: I'm sorry. What --
MR. OSBORNE: Yeah. Slow down just a little bit, please.
THE WITNESS: Sure.
COURT REPORTER: There's no specific what illnesses?
THE WITNESS: Specific histologic findings in SIDS. Sorry.
BY MR. OSBORNE:
Q. And it's from a report, you said?
A. This is from a book. This is from a book I actually wrote a chapter in on the epidemiology of SIDS. And it's from a chapter from one of the editors, Marta Cohen, who is internationally renowned as an expert -- expert in this area. And just to quote, There's no specific histological findings in SIDS. Petechiae and small hemorrhages may be seen in the thymus, lungs, along coronary arteries, renal

Page 247

interstitium, and other organs. The lungs frequently show some degree of edema and alveolar macrophages, minor laryngeal and peribronchial inflammation with expansion of the mucosa associated lymphoid tissue, or MALT, may be seen with nonlethal viral infections.
Q. And did Ms. Cohen put an exhibit sticker on the one you're reading from?
A. Yeah. It's -- is that a 12?
MS. COHEN: My Sharpie.
THE WITNESS: You were doing this early on. Is that a 12?
MS. COHEN: 13.
THE WITNESS: 13.
MS. COHEN: I'm not under the influence.
THE WITNESS: Let me see -- hold on. This is 14. And I think --
MS. NG: I think it's 13.
THE WITNESS: Well, I don't know -- what number. That's 15. And that's 14. So that must be --
MR. OSBORNE: It's your writing. I didn't do that.
THE WITNESS: And there should be one more page. Here is 12.

Page 248

MS. COHEN: I think I'm getting penmanship shamed.
THE WITNESS: Oh, you have nothing to be ashamed about. Us doctors are known -- I teach a course in bad, illegible handwriting. Off the record.
The other comment was just about in relation to doing autopsies and completeness of autopsies. And it is very well known that certain features that you're looking for to define a true SIDS death require an expertise that's only in a handful of labs across the world. And that would include Hannah Kinney's lab and Dr. Byard's lab down in New Zealand where they do this very difficult staining of areas in the brainstem with serotonin reuptake inhibitors that are important in triggering an arousal reflex that protects the baby from -- from a SIDS-like or SUID event.
BY MR. OSBORNE:
Q. And which exhibit are you holding that you found --
A. This is No. 12. It just says specifically, "These observations have been made in the research setting and cannot be reproduced in routine diagnostic study."

Page 249

Q. You were asked a series of questions about not -- no prohibition of -- of incline in the policy in the AAP policy statements. Did the AAP policy statements say flat?
A. Yes.
Q. Did you bring a definition of flat that you meant when you wrote that?
A. Yes.
Q. And what exhibit is that?
A. This is -- I think this one is 15. Sorry.
Q. We can read it?
A. Twelve, 13, 14 -- yeah, this is 15.
Q. All right. And what was the definition?
A. They had three: lying at full length or spread out upon the ground, having a continuous horizontal surface, and arranged or laid out as to be level or even.
And that's what we kind of -- that's what we kind of meant all along.
Just to go back to the things that you -- you don't put in things that aren't necessary, because they're either obvious -- we get a certain -- we get a restricted word count on this. So we've got to be as concise as possible, although I know that report looks like it's a bazillion pages long. But we

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 250

1  do try to be concise and say, you know -- I can take
2  an extreme example. It would be unsafe to put a knife
3  in the bed with the baby. You know, that's kind of
4  obvious. It's the same effect. You know, it's
5  recommended that the baby sleep surface is flat. We
6  just didn't include the inclines because products
7  generally don't have inclines. And the ones that do
8  we tell you not to use for sleep. They're used for
9  other purposes.
10        I mean, this product was not used
11  for sleep in many other countries. And I would really
12  like to know why they didn't allow that. There must
13  be some reason that there were other concerns in other
14  countries regarding this in terms of its safety. So I
15  think that's -- in my mind, that's a bit of a red
16  flag.
17  Q.    You made reference to a study on child seats,
18  and you were questioned at some length by Ms. Cohen
19  regarding whether the Rock 'n Play was a child seat or
20  not. Do you recall those questions?
21  A.    Yes.
22  Q.    And specifically, in terms of being inclined
23  devices, do you have an opinion whether the Rock 'n
24  Play and a child's seat are similar?
25        MS. COHEN: Objection. Foundation.

Page 251

1        THE WITNESS: I think anything
2  that's on an incline -- I guess there's a -- you know,
3  I'll be fair. There's a range of degrees of incline.
4  And I wouldn't say it's an identical product but the
5  concerns are the same. I think the greater the
6  incline, the greater the concern you're going to have
7  about it. I don't know what degree above zero is
8  okay. You know the CPSC has come upon 10 degrees.
9  And that's pretty darn flat.
10        You know, we can't really comment on
11  how we came to what's going to come out in the next
12  report; but we didn't want to create confusion. If
13  you tell somebody a little incline is okay, they might
14  think a bigger incline is okay, too. So we know flat
15  is safe. So we stick with flat.
16  BY MR. OSBORNE:
17  Q.    All right. In terms of -- I take it that the
18  child seat study found that there was an increased
19  risk of asphyxiation in a child seat?
20  A.    There was increased risk of -- of death. And
21  a part of all of this death is some sort of
22  asphyxiation. It's kind of a broad category. I guess
23  it's kind of a little separate -- even strangulation
24  at the end because asphyxia. That's the inability to
25  get air and get gas exchanged. So I think all of

Page 252

1  these things have that component of the truth to them.
2  And it doesn't necessarily have to be this complete
3  occlusion, because I think that was something that was
4  kind of brought up earlier in the -- the deposition.
5        But even if you just have an
6  enclosed space with something you're breathing up
7  against, it could start to cause rebreathing. And I
8  do have a video that shows how that happens. You
9  know, we want an open crib. That's why we don't have
10  any -- we don't recommend any bumper pads or anything
11  around a baby on the back so they can breath freely
12  and not get their face against something that -- that
13  can be problematic with rebreathing.
14        I mean, that was -- there are cases
15  with even getting face down with hard plastic and hard
16  surfaces in some playards that have caused concern
17  because of the effect of eventual rebreathing and
18  potential asphyxia.
19  Q.    And could you explain for the jury how the
20  article on child seats informed your report's
21  commentary about an inclined sleep product like the
22  Rock 'n Play?
23        MS. COHEN: Objection. Form.
24  Foundation.
25  BY MR. OSBORNE:

Page 253

1  Q.    You may go ahead.
2  A.    That article is extremely concerning because
3  it's not just about seats. It also includes
4  strollers, and it also included wraps. And it
5  included bouncers as well. So we typically say if
6  you're going to be sleeping, it should be not with
7  something that's strapping you in, for one thing.
8  That would not be considered a -- a good surface,
9  because we know that sometimes babies are little
10  Houdinis. They try to twist and get out of things and
11  sometimes become entangled. And depending on where
12  the straps are that entanglement can lead to
13  strangulation or suffocation. So we typically
14  recommend that the baby is not attached to anything
15  while their asleep to be considered a safe surface.
16  Q.    You mentioned that you brought an
17  illustrative exhibit to demonstrate the dangers of
18  rebreathing. Did you bring that with you?
19  A.    I don't have it; but if we have access to the
20  internet, I could pull that up to show it to you.
21  Q.    So you're referring to a video that you
22  produced with my firm and that we produced to the
23  defendant about the dangers of rebreathing?
24  A.    Yes. It's through an article that was in my
25  list of articles from Dr. David Greenblatt at one of

64 (Pages 250 - 253)

Michael Goodstein, M.D.                      September 30, 2021
In Re: Fisher-Price/Mattel

Page 254

1    the -- it's a physics institute of technol -- the
2    Israeli physics institute or physiology institute.
3    I'm not sure of the name of the institute, but that's
4    where -- where they do that work.
5    Q.    Could you verbally describe for the jury
6    since they'll have that exhibit available to them as a
7    demonstrative what that video shows?
8    A.    Sure.
9          MS. COHEN:  Objection.
10   BY MR. OSBORNE:
11   Q.    Go ahead.  You get to answer.
12   A.    Okay.  Yes.  It shows using physics and fluid
13   dynamics.  And I actually spoke with Dr. Greenblatt
14   about this, because they used a model that was a
15   liquid model so you could see it better.  But
16   essentially the physics between the air and the liquid
17   models are quite similar.
18          So for demonstrating the issue, he
19   had a recreation of a doll -- a doll in proportion to
20   a human head and nostrils.  And what they did is they
21   created some breathing movement along with a dye kind
22   of replicating breathing that would come out of
23   infant's nose, since babies are obligate nose
24   breathers.  And what you can see is when the baby is
25   laying on the back -- or the doll recreation is on the

Page 255

1    back with the head up, the material just diffuses out
2    up through the tank.  It does not stay around the
3    baby's nostrils.
4          When you put the baby lying -- in
5    this case, they did it in a prone position.  I suspect
6    they probably did something similar with a side
7    position as well.  We see a lack of movement.  And
8    what the dye, which is essentially the rebreathe, the
9    exhaled air which would be full of carbon dioxide and
10   deficient of oxygen, just sits around the baby's nose.
11   Q.    I believe that you went over several pages
12   from Exhibit 24 and 25 and -- with Ms. Cohen.  And
13   those are the Tempe Police Department report and the
14   medical examiner's report.  Do you remember covering
15   those?
16   A.    Yes.
17   Q.    And I mean, she went through those pages
18   very, very fast.  But I remember she cut you off on
19   some additional information that you wanted to discuss
20   with respect to her questions.  Do you recall that?
21          MS. COHEN:  Objection to form.
22          THE WITNESS:  I don't remember all
23   the questions anymore.
24   BY MR. OSBORNE:
25   Q.    Right.  That's the problem with redirect.

Page 256

1    But I would like to give you the chance to address
2    those and -- as best you can, considering that the
3    moment is not present right now but was well over an
4    hour ago.
5    A.    I guess I would just need a little more
6    guidance here.
7    Q.    Let me -- let me first direct you to page 49;
8    and we're going to talk a little bit about Zoey's
9    health condition as reported by family members.
10   A.    Sure.  Yeah.  I think I see what you're
11   talking about.  Yeah, there was a lot of information,
12   I guess, in the reports.
13   Q.    Police report?
14   A.    Actually -- well, not just the police report,
15   but some of the other reports from the defense.  I
16   don't know if I can talk specifically about that.
17   Q.    Do you mean the expert reports?
18   A.    The expert reports.
19   Q.    Oh, okay.
20   A.    But in terms of the baby's health, there were
21   a lot of things that were suggested and implied that,
22   I think, are not relevant to the case and give the
23   suggestion that the child was not a well child and
24   that there are predisposing factors related to her
25   health that might have played a role in this that, I

Page 257

1    would say, are completely unfounded and untrue.
2    Q.    Could you express for the jury your views on
3    those issues that you feel are unfounded and untrue?
4    A.    Sure.
5          MS. COHEN:  Objection to form.
6          THE WITNESS:  Well, there was a lot
7    of discussion about the baby's birth history.  And I
8    think that those kind of things that occurred eight
9    months earlier I would be really hard-pressed to
10   associate that.
11          Specifically, there's this focus
12   about suggesting that the baby's got lung problems;
13   there's something wrong with her lungs; she had fluid
14   on the lungs when she was born.  Yes.  She had
15   something called transient tachypnea in a newborn.
16   That's also in Dr. Goldsmith's report.  And that is a
17   transient problem.
18   BY MR. OSBORNE:
19   Q.    What does that mean, transient?
20   A.    It is a rapidly resolving problem.  It -- it
21   goes away, and it doesn't come back.  It's related to
22   fetal lung -- retained fetal lung fluid.  And babies
23   can clear that in anywhere from hours to two to three
24   days, usually within 24 to 48 hours, sometimes a
25   little longer.  And once that's done with, there is --

65 (Pages 254 - 257)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 258

1  you know, it's -- it's done.  The lungs are always
2  healthy.  So trying to tie transient tachypnea in a
3  newborn to an eight-month-old is not logical, okay,
4  and not realistic.
5          They also -- there's a big focus on
6  the heart murmur.  And she had an echocardiogram done
7  and that echocardiogram, I believe -- I have to go
8  back -- can I look at my report?
9  Q.    Yes.
10  A.    Was it --
11  Q.    I have Exhibit 2 here.  Do you have it?
12  A.    If you have it to get to it quicker, I'll
13  take your copy.
14  Q.    Yeah.  I was looking for 2A.  It may be 2A.
15  I don't know if I wrote it down properly or not.
16          MS. COHEN:  Do you want me to help?
17          MR. OSBORNE:  It might help.  But I
18  think he'll actually not need to distinguish 2 and 2A.
19          THE WITNESS:  Yeah.  Okay.  So
20  there.  So, yes, she did have a heart murmur while she
21  was in the nursery and an echocardiogram, which
22  revealed normal cardiac anatomy.  So, you know, from a
23  cardiac standpoint, she was healthy.  It's another
24  transitional issue.  And I don't want to bore
25  everybody with details about the whys of the differing

Page 259

1  murmurs that we hear in newborns.  But they -- they
2  come and go.  Sometimes older infants have innocent
3  murmurs.  But basically, there's normal cardiac
4  anatomy.  So there is no concerns there.
5          Basically, all the things that
6  happened to her around the time of her first days of
7  life were all common issues that completely resolved,
8  a little bit of jaundice and such, and really have no
9  bearing whatsoever on the discussion about her death.
10  Q.    There were a series of questions about the --
11  did I, by the way, interrupt you?  Were there other
12  issues that you wanted to address with respect to the
13  things defense expert said that were unfounded and
14  untrue?
15  A.    We can talk a little bit more about -- about
16  her health.  There -- there are some interesting
17  comments about weight and head size that -- that there
18  were some suggestions that somehow that this might
19  have meant that the child was very ill or had
20  neurodegenerative disease.  And really those are kind
21  of farfetched ideas.  And really if you're looking
22  at -- there's an old medical saying, if you hear
23  hooves -- hoof beats, it's probably horses, not
24  zebras.
25          So, you know, in terms of her head

Page 260

1  size measurement, I think that's a difficult
2  measurement to make.  And with a child who is moving
3  around, it's not just a flat thing.  You're measuring
4  around different sides of the head.  And Dr. Goldsmith
5  brought up that maybe the baby's head size was
6  shrinking and that there was something
7  neurodevelopmentally wrong, but the baby was on target
8  for all of her milestones.
9          And I see this all the time in the
10  NICU -- and I'm sure he does, too -- that if you have
11  a baby in the hospital for a while, you'll see these
12  measurements are all over the place.  But you look for
13  trends over time.  And in Zoey's case, she was hitting
14  her milestones.  There should be somewhere in there
15  her growth curve.  And her head circumference was
16  following a particular percentile.  And at the sixth
17  month, it jumped up.  And I think that might have been
18  a misread on it.  So I think there may be some
19  confusion, because if the next one is the same or
20  smaller, it might have been based off the fact that
21  that other one was the one that wasn't accurate.
22          There is that.  And also the idea of
23  baby's growth in terms of her weight.  You know,
24  everybody described this child as growing, thriving,
25  meeting developmental milestones.  So it is not

Page 261

1  uncommon for an error to be made in terms of weighing
2  a child.  I know it happens in the pathology lab.  I
3  can't speak to their weight.  But I know that even
4  with an electronic scale, if something is leaning
5  against it, you pump up against it, you don't zero it
6  properly, it could be way off.  And sometimes there
7  are transcription errors in terms of writing down a
8  number.  So it's very hard for me to understand how
9  she would have lost four or five pounds when being
10  reported as basically healthy, except for that
11  intercurrent cold.
12          I would also comment that the cold
13  happened way too far out from when the baby's tragic
14  death occurred to tie those two things together.
15  Q.    That's of interest to me, what the medical
16  records actually show versus what was reported in
17  the -- by some of the family members in Exhibit 24,
18  for example, the Tempe police report, or Exhibit 25,
19  the medical examiner's report.
20          Let's take a quick look at Bates 51
21  on Exhibit 24 of the police report.  And there in the
22  middle of the page is a discussion and speaking with
23  the Lawtons, Katie's parents.  Do you see that general
24  reference?  I think it's, like, the third full
25  paragraph?

66 (Pages 258 - 261)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 262

1  A.    Yes.
2  Q.    And then the following paragraph talks about
3  how, "Arnet further advised that when Zoey was born,
4  she had fluid in her lungs and was not breathing, she
5  was monitored for three days in the hospital ICU.
6  Arnet and Robert were also aware that Zoey had a
7  constant raspy cough. According to" Dr. Arnet -- or
8  "Dr. Cleary, this was due to allergies and teething.
9  Arnet believed that Kathleen took Zoey to an urgent
10 care for a second opinion. However, she was unable to
11 provide any further details."
12         Do you have a -- with that in mind,
13 you have a section in your report -- your first
14 report, Exhibit 2, 2A, that has a complete review of
15 the medical records. I don't think you need to
16 specifically look at it. But do you agree that you
17 do?
18 A.    Yes.
19 Q.    Okay. And your opinions are based on -- at
20 least in part on that complete review of the medical
21 records?
22 A.    Yes.
23         MS. COHEN: Objection to form.
24 BY MR. OSBORNE;
25 Q.    And considering the paragraph of what Arnet

Page 263

1  advised the police in June shortly after her
2  granddaughter had died, to what extent does this
3  paragraph, "Arnet further advised," appear consistent
4  with -- with what your review of the medical records
5  show?
6  A.    Well, he's bringing up information that I
7  guess he thought might have been useful or helpful as
8  somebody who is, you know, a family member but was
9  really not relevant to what happened.
10 Q.    Okay. Would you defer to the medical records
11 over a verbal report after losing a granddaughter on
12 June 19th about the development and health of Zoey?
13 A.    Yes.
14         MR. OSBORNE: Objection.
15 Foundation. Form.
16         THE WITNESS: Yeah. I mean, it's
17 very -- you know, people are -- as well they would be
18 in shock. So you know, I'm not -- I can't comment on
19 his state of mind or what he was getting at. But it
20 does kind of stick out a little unusual to me when the
21 parents as well as the medical records really don't
22 show anything about that. It seems like an outlier
23 just the same way as whether the baby was belted or
24 not. You know, Mr. Andrew Olson kind of gave that
25 conflicting answer; but the preponderance of the

Page 264

1  reports was that the seatbelt wasn't, you know, put
2  on. And in this case, the preponderance of the
3  information is not that she had this, quote/unquote,
4  constant cough.
5         And honestly, even if she did have a
6  cough, if it was thought to be allergic in nature, it
7  wouldn't be relevant to this anyway.
8  BY MR. OSBORNE:
9  Q.    Why?
10 A.    I don't know of a SIDS allergy.
11         MR. OSBORNE: Those are my
12 questions. I'll reserve the remaining for trial and
13 subject to whatever you do next.
14         MS. COHEN: Thank you, John.
15         I just have a few follow-up
16 questions, not too many, if you can withstand a few
17 more minutes before we take a break. Or do you want
18 to take a break first.
19         THE WITNESS: No. We're good. I
20 wanted to joke, but I'll tell you off the record.
21         MS. COHEN: Is it about my
22 penmanship, my questions? What? I'm just teasing.
23 I'll finish up quickly.
24         THE WITNESS: You're all good.
25 EXAMINATION

Page 265

1  BY MS. COHEN:
2  Q.    Dr. Goodstein, just so I make sure I know
3  this, the book that pulled -- I took your copies back.
4  I'm going to give them back to you. But the book that
5  you reference, I just want to make sure I've got the
6  title of the book so I have it.
7  A.    I can look it up for you to make sure I have
8  it.
9         MS. COHEN: Is it okay if he looks
10 it up and gives it to you?
11         MR. OSBORNE: Sure.
12         MS. COHEN: Sends a picture of the
13 cover or something like that?
14         MR. OSBORNE: Do you want to look in
15 that exhibit and look it up?
16         THE WITNESS: Um --
17         MS. COHEN: Or did you want to look
18 at the book itself?
19         THE WITNESS: The book is sitting in
20 my car, if you want to come out to my car.
21         MR. OSBORNE: We're talking about
22 Footnote 50 or something else?
23         MS. COHEN: It was the book that he
24 pulled things from.
25         THE WITNESS: The single pages.

67 (Pages 262 - 265)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 266

1          MR. OSBORNE:  Well, if we promise
2    not to attach it in its entirety to the deposition, I
3    don't have any problem with getting it right.
4    BY MS. COHEN:
5    Q.     Yeah.  I just want to have you give me the --
6    A.     If you want to give me a second, I can try
7    and --
8          MR. OSBORNE:  Okay.
9    BY MS. COHEN:
10   Q.     Do you want me to finish the questions, and
11   then you can go get it?
12   A.     Sure.  Let's do that.
13   Q.     I won't attach it.  Or you can always take a
14   picture and send it to John.
15   A.     Yeah, whether is easier for you.
16   Q.     Okay.  I just didn't want to forget to ask
17   that.
18   A.     Sure.
19   Q.     The flat definition that is also included in
20   one, that, again, was from the dictionary.  Right?
21   A.     Yep.
22   Q.     That definition did not appear in the AAP
23   bulletins, right, or reports?
24        MR. OSBORNE:  Form.
25        THE WITNESS:  Well, to answer the

Page 267

1    question, it's true, because it would seem
2    self-explanatory that flat is flat and flat isn't just
3    at an incline but horizontal.
4    BY MS. COHEN:
5    Q.     And I just want to have that clear again.
6    It's not about -- about what's -- what's obvious.
7    It's just my question is that definition that you read
8    is not contained in the AAP materials.  Correct?
9    A.     Correct.  One would think you wouldn't need
10   to put that in there.  I can tell you in the future,
11   it will be.
12   Q.     So the -- the child seat study that was
13   referenced and Mr. Osborne asked you about, can you
14   tell me which one that was?  I want to make sure I
15   have the cite.
16   A.     I'm not sure which one you're referring to.
17   Q.     He talked about it in the last part of his
18   questioning.
19        MR. OSBORNE:  I thought it was
20   Footnote 50.
21        MS. COHEN:  I just want to make sure
22   I have that right.
23        MR. OSBORNE:  But that might not be
24   correct, because that may have been the journal
25   article you didn't want to show him the name of.

Page 268

1    I'm looking at my notes.
2          MS. COHEN:  No problem.  And I have
3    the Goldsmith surrebuttal.  I just couldn't give him
4    my marked-up copy of it.
5          Do you remember you and Mr. Osborne
6    were talking about a car seat study?
7          THE WITNESS:  Yes.
8          MR. OSBORNE:  Okay.  It was right
9    about Exhibit 27, Footnote 50.
10        MS. NG:  It might be the Batra.
11        MS. COHEN:  Oh, the Batra.
12        MR. OSBORNE:  It is Batra.  It must
13   have been in your report Footnote 50.
14        MS. COHEN:  Oh, I have his report
15   here so maybe.
16        Is that it?
17        MR. OSBORNE:  Yeah.  It's Batra,
18   "Hazards Associated with Sitting and Carrying Devices
19   for Children Two Years and Younger," Journal of
20   Pediatrics 2015, as I believe you got into the sitting
21   and carrying devices, incline versus not inclined
22   issue.
23        MS. COHEN:  That was it.  Okay.
24        Thank you.  I just wanted to make
25   sure we had that on the record.

Page 269

1          THE WITNESS:  Because as some point
2    we talked about desaturation events on an incline.
3          MR. OSBORNE:  Yes.
4          THE WITNESS:  But that's a
5    different -- that's a different article.  And that
6    would just be an abstract and not a full article.  I'm
7    not sure.
8          MS. COHEN:  Which one is that one?
9          MR. OSBORNE:  It was the child seat
10   and the similarity between child seats and any
11   inclined product that I was addressing in my
12   questions.
13   BY MS. COHEN:
14   Q.     So then I want to get to this video that was,
15   I guess, given to you -- given by you to Mr. Osborne
16   and sent to us last night for the first time.  And I
17   think you said that was something from Professor
18   Greenblatt from the Israel Institute of Technology.
19   Is that right?
20   A.     That's not the formal name, but it's an
21   institute of technology in Israel.  I think it's,
22   like, the Technion Institute.  I'm not sure.
23   Q.     Okay.  It's from the institute of technology
24   in Israel, but not the Israel Institute of Technology?
25   A.     Yeah.  I don't know -- we could look up his

68 (Pages 266 - 269)

Michael Goodstein, M.D.                          September 30, 2021
In Re: Fisher-Price/Mattel

Page 270

1  article --
2  Q.      Okay.
3  A.      -- to find it out.
4  Q.      Yeah.  So the question is, that's not your
5  video.  You didn't create that.  Right?
6  A.      No.
7  Q.      You borrowed it from -- you got it on-line
8  from him?
9  A.      It's available on-line.  I have used it to
10  discuss rebreathing in education from time to time.
11  Q.      Okay.  And why did you send that to counsel?
12  A.      Because I think it's really hard to
13  understand without a physical or visual reference to
14  understand what happens, that it doesn't mean that you
15  have to have a complete occlusion of the nostrils to
16  have issues that can cause rebreathing and such.
17  Q.      That video is not cited to in either of your
18  reports, is it?
19  A.      It is not.  I don't believe so.
20  Q.      Okay.  And also as I look through your
21  reports, your reports don't address rebreathing, do
22  they?  The word "rebreathing" is not on either report,
23  is it?
24  A.      I just addressed the things that I was asked
25  to address.

Page 271

1  Q.      I know.  And I'm not fussing at you.  I'm
2  just asking a simple question.  Rebreathing is not in
3  your report, Exhibit 2, is it?
4  A.      I don't believe so.
5  Q.      Rebreathing is not in your report, Exhibit 3,
6  is it?
7  A.      I don't believe so.
8  Q.      So it's a new topic that hasn't been
9  addressed before.  Correct?
10  A.      In relation to what I was asked to write,
11  yes.  In relation to the idea of asphyxia and some of
12  the things that people wrote about, not -- not really.
13  Q.      But it's not an opinion that you offered in
14  your report, is it, sir?
15  A.      No.
16  Q.      And the video is not offered in your -- in
17  either of your reports or referenced.  Correct?
18  A.      No.  It is something that was thought of
19  after submission that I thought was relevant.
20  Q.      And is the -- the issue with Dr. Goldsmith
21  and the head size -- you agree that there were errors
22  on the head size that was referenced?
23  A.      Somewhere in there there are measurement
24  errors, but that's very common.
25  Q.      I know.  But they were objective inaccuracies

Page 272

1  that he pointed out.  Correct?
2          MR. OSBORNE:  Form.
3          THE WITNESS:  Yeah.  I just don't
4  know if he's putting them in the right order or making
5  assumptions about the error, that it wasn't just an
6  error in measurement, that otherwise it could be that
7  the child really did have that much of a weight loss.
8  BY MS. COHEN:
9  Q.      Did you see what he said about it his
10  surreply?
11  A.      I would have to reread it again to see.  He's
12  made different comments about it at different places
13  in his report.  I think at one point he did
14  acknowledge that it was probably an error and likely
15  to be related to --
16  Q.      And he said he would be remiss if he didn't
17  raise in his report as a reviewing expert.  Did you
18  see that?
19          MR. OSBORNE:  Form.
20          THE WITNESS:  Somewhere in there.
21  You're taking it out of context.  So I don't know the
22  specific writing off the top of my head.
23  BY MS. COHEN:
24  Q.      I would be happy to pull it out and show you
25  what it said.  Did you see the factual errors in what

Page 273

1  you looked at?
2          MR. OSBORNE:  Form.
3          THE WITNESS:  Yes, I think there
4  errors in measurements, yes.
5  BY MS. COHEN:
6  Q.      He said, "Dr. Goodstein takes issue with my
7  documentation of the factual record in this case.
8  These are notes based on my objective review the
9  factual record in this case.  I would remiss to regard
10  these potentially salient facts as mere errors as
11  characterized by Dr. Goodstein."
12          That's what he said.  Did you read
13  that?
14  A.      Yes.
15  Q.      Now, I know you talked about medical records
16  and the accuracy of them and how you relied on them in
17  terms of your recitation of the facts related to
18  Baby -- Baby Zoey.  Right?
19  A.      Yes.
20  Q.      You would expect police records to be
21  accurate, too, wouldn't you?
22          MR. OSBORNE:  Form.  Foundation.
23          THE WITNESS:  Not any more accurate
24  than any other records.
25  BY MS. COHEN:

69 (Pages 270 - 273)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 274

1  Q.      Okay.
2  A.      I mean, errors can happen.  Sure.
3  Q.      Errors can happen in medical records?
4  A.      Yep.  Errors can happen in any records.
5  We're all human.  I don't know of anybody that doesn't
6  have the potential for error.
7          MS. COHEN:  I think that's all I
8  have.
9  EXAMINATION
10 BY MR. OSBORNE:
11 Q.      With respect to the video that you found from
12 the Israeli institute, does that video fairly
13 illustrate the concept of rebreathing in your opinion?
14 A.      Yes.
15 Q.      How so?
16 A.      I think it -- well, the physics are the
17 physics.  It just shows the physics in a way that to
18 put on paper might be very hard to understand.
19          I think for a lot of people the idea
20 of asphyxia or suffocation has this kind of movie
21 connotation of somebody taking a pillow and shoving it
22 over your face.  And I just wanted to bring to light
23 that it's not always like that.  You don't have to
24 have complete occlusion of the airway for it to have
25 an impact that can lead down the scenario that ends up

Page 275

1  in SUID.
2  Q.      Does the video illustrate the exhaled of
3  breath of an infant in a supine position on the one
4  hand and a prone position on the other into fabric?
5  A.      Yes.
6  Q.      And what is the important about the
7  difference between what the physics show the breath
8  does in one position versus the other as illustrated
9  in the Israeli video?
10          MS. COHEN:  Objection.  Scope.
11 Foundation.  Form.
12          THE WITNESS:  Again, I'm not -- I'm
13 not a physiologist.  I certainly would be -- my forte
14 is not to be in a lab like that.  But from talking to
15 Dr. Greenblatt, reading the article to the best of my
16 ability, what you see is when the baby has nothing
17 around it, there's no accumulation of toxins or a
18 decrease in oxygenation for the baby to breathe in;
19 but in that prone position when there's less space,
20 that gas doesn't move.  It becomes trapped.  And so
21 the baby starts rebreathing that.
22          And the -- you know, although we
23 don't understand everything about how SIDS occurs and
24 how these deaths with asphyxia occur, certainly
25 intermittent rebreathing of gases or intermittent

Page 276

1  episodes of low oxygen levels and hypoxemia, some
2  People conjecture -- Karl Hunt, who is a big SIDS
3  researcher, and Juno (phonetic) Ramirez up in Seattle,
4  they think that these intermittent episodes of low
5  oxygen levels can cause an ongoing process of damage
6  to these areas in the brain that they see on, you
7  know, Dr. Kinney's evaluation and such that may lead
8  to damage to the areas where arousal -- you know, an
9  arousal correction response occurs.  So even if it's
10 not a straightforward one-time event, repetitive
11 insults of poor oxygenation can cause injury in the
12 brain.  And one of the theories is that could lead to
13 a future event where the baby does not respond to a
14 threatening environment and may become asphyxiated
15 and -- and die.
16 BY MR. OSBORNE:
17 Q.      And just to be clear for the jury, what is it
18 about the exhaled air that is rebreathed that is bad?
19          MS. COHEN:  Objection to form.
20 Foundation.  Beyond the scope of his reports.  And --
21 yeah, that's it.
22          THE WITNESS:  Well, if you keep
23 rebreathing the same air, the oxygen content goes down
24 and carbon dioxide levels go up.  And that will
25 eventually to cause organ injury and eventual death.

Page 277

1          It's kind of what's the shown in the
2  Thach and Kinney article from the New England Journal,
3  that there's this kind of asphyxiation that if the
4  baby doesn't resuscitate and escape from the
5  environmental factors that are causing the problem,
6  that eventually they'll go into hypoxic coma.  And
7  then a lot of times there will be, like, a last gasp.
8  We see that in the delivery room, too, with asphyxia.
9  If they don't respond and escape from that, then they
10 would die.
11          MR. OSBORNE:  Those are my questions
12 for now.  Anything further?
13          MS. COHEN:  I'm sorry to do this.
14          THE WITNESS:  That's okay.  And
15 those are kind of basic things from even a neonatal
16 resuscitation program with the concept of last gasp
17 and asphyxia in utero.  That's kind of a similar
18 thing.
19 EXAMINATION
20 BY MS. COHEN:
21 Q.      Doctor, when did you first learn about the
22 video?  When did you first see it?
23 A.      Actually, interestingly enough, Dr.
24 Greenblatt reached out to me before he even published,
25 because he thought he was on to something and he

70 (Pages 274 - 277)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 278

1    wanted to talk to me about it. So I had a
2    conversation. I thought his theory was really
3    interesting and that he should pursue it.
4             And then he did just his own thing.
5    After his article came out, he -- I think he put this
6    because he's -- he takes -- I think he takes to heart
7    wanting to put out good science that can be used to
8    save baby's lives. And if that video can help people
9    understand the dangers of the prone positioning and
10   such, I think he put it out there as a public service.
11   And it's out there for people to use. And I've made
12   use of it on and off.
13   Q.    Do remember my question? When did you first
14   become aware of this video?
15   A.    I don't know what year it came out. It was
16   after his article was published, maybe a couple of
17   years ago. I don't know.
18   Q.    Okay. Long before you did your report in
19   this case in April of 2021. Correct?
20   A.    Yes.
21   Q.    And when were you first aware of the concept
22   of rebreathing?
23   A.    That's a common concept in the SIDS -- 20
24   years ago.
25   Q.    Twenty years ago?

Page 279

1    A.    I don't know. It's something that people
2    have written about for a long time. It certainly goes
3    back to the 2006 Kinney article. And there's data
4    before that from Dr. Kemp and others. So I don't know
5    the exact year of it.
6    Q.    Were you aware of it before you wrote your
7    original report in April 2021?
8    A.    Yes.
9    Q.    And you said you're not a physiologist.
10   Correct?
11   A.    That's true.
12   Q.    Dr. Schaeffer, who we talked about before, is
13   a physiologist. Correct.
14   A.    That's true.
15   Q.    And you consult with him to do the physiology
16   work in your own --
17   A.    No, I do not work with Dr. Schaeffer. I know
18   him because he does work at where I trained at. Some
19   of my colleagues work with him in the lab. I have not
20   worked with him in the lab. Maybe once or twice he
21   came to the hospital to give a lecture on respiratory
22   physiology, but I have not worked with him.
23   Q.    Maybe it was Dr. Fox then. Is he a
24   physiologist?
25   A.    Dr. Fox, I think, is a neonatologist. He's

Page 280

1    certainly written textbooks, you know, Fox and Polin
2    on neonatology. It might be specifically to
3    respiratory care. I don't know all of his texts, but
4    he is an expert in the care of the newborn and
5    respiratory issues, I guess.
6    Q.    Pediatric, neonatology, respiratory
7    physiology.
8    A.    Okay.
9    Q.    So he would be in that specialty?
10   A.    Yes. You could have made that easier on me
11   and just read it.
12   Q.    Sorry. And again, there's nothing in your
13   report about rebreathing. Correct?
14   A.    Correct.
15   Q.    And there's nothing in your report about
16   the -- what you said the repeated -- the repeated
17   insults the poor oxygenation. Correct?
18   A.    That's correct.
19         MS. COHEN: And those are all of the
20   questions I have.
21         MR. OSBORNE: I thought we were
22   going to go out and get the book.
23         MS. COHEN: Yep.
24         MR. OSBORNE: And I might as well
25   say now for the record I reserve signature. The

Page 281

1    doctor will read and sign.
2          MS. COHEN: We'll just add the book.
3          MR. OSBORNE: And we can go off the
4    record until he can retrieve that and show it to her.
5          THE VIDEOGRAPHER: Going off the
6    video record. The time is 3:44.
7          (Brief recess from the record.)
8          THE VIDEOGRAPHER: We're back on
9    video record. The time is 3:42 (sic).
10         THE WITNESS: Sure. The name of the
11   book that I pulled the information from as referenced
12   was Investigation of Sudden Infant Death Syndrome from
13   Cambridge University Press. And Marta Cohen and
14   Sheimberg, Beckwith, and Hauck are the editors.
15         MR. OSBORNE: Is that in your
16   curriculum vitae?
17         THE WITNESS: Yes. And that book
18   was from 2019. It's listed under Book Chapters.
19         MS. COHEN: Thank you, guys.
20         MR. OSBORNE: All right. Off the
21   record.
22         THE VIDEOGRAPHER: This concludes
23   the deposition of Dr. Michael Goodstein. The time is
24   3:43 (sic).
25         (Discussion held off the record.)

71 (Pages 278 - 281)

Michael Goodstein, M.D.
September 30, 2021
In Re: Fisher-Price/Mattel

Page 282

1    MR. OSBORNE: So I will take a mini
2 and a computer. And if she gets a rough, I'll get a
3 rough, too.
4    MS. COHEN: Yeah, we'll get a rough.
5    COURT REPORTER: She also wants it
6 expedited. Do you need it expedited?
7    MR. OSBORNE: No expedite.
8    MS. COHEN: We just want a rough
9 E-Tran right away and then a rush.
10    (Discussion held off the record.)
11    MS. COHEN: So by agreement of
12 counsel, we are releasing the original exhibits, which
13 would be 1 through 15 to Dr. Goodstein, which includes
14 his orange folder, which is the No. 1 and then the
15 contents will be 2 through 15 in there. And then
16 you'll mark as the Exhibits 1 through 15 that you have
17 exact copies of that that you have in your pile.
18    MR. OSBORNE: And we agree.
19    [MICHAEL GOODSTEIN, M.D.]
20    (Witness excused.)
21    (Deposition concluded at 3:57 p.m.)
22
23
24
25

Page 283

1    [MICHAEL GOODSTEIN, M.D.]
2    C E R T I F I C A T E
3
4    I do hereby certify that I am a
5 Notary Public in good standing, that the aforesaid
6 testimony was taken before me, pursuant to notice, at
7 the time and place indicated; that said deponent was
8 by me duly sworn to tell the truth, the whole truth,
9 and nothing but the truth; that the testimony of said
10 deponent was correctly recorded in machine shorthand
11 by me and thereafter transcribed under my supervision
12 with computer-aided transcription; that the deposition
13 is a true and correct record of the testimony given
14 by; and that I am neither of counsel nor kin to any
15 party in said action, nor interested in the outcome
16 thereof.
17    WITNESS my hand and official seal
18 this 5th day of October, 2021.
19
20
21    _____
        Denise L. Travis, RPR
22    Notary Public
23
24 My commission expires
    April 20, 2022.
25

Page 284

1    ERRATA SHEET
2
3 Kathleen Courkamp v. Fisher-Price, Inc., et al.
4 Michael Goodstein, M.D.
5
6 INSTRUCTIONS TO THE WITNESS
7    Please read your deposition over carefully
8 and make any necessary corrections. You should
9 state the reason in the appropriate space on the
10 errata sheet for any corrections that are made.
11    After doing so, please sign the errata
12 sheet and date it.
13    You are signing the same subject to the
14 changes you have noted on the errata sheet, which
15 will be attached to your deposition.
16    It is imperative that you return the
17 original errata sheet to the deposing attorney
18 within thirty (30) days of receipt of the
19 deposition transcript to you. If you fail to do
20 so, the deposition transcript may be deemed to be
21 accurate and may be used in court.
22
23
24
25

Page 285

1 Kathleen Courkamp v. Fisher-Price, Inc., et al.
2 Michael Goodstein, M.D.
3
4    E R R A T A
5
6    - - - - -
7 PAGE    LINE    CHANGE
8 --- ---    -----------------
9 Reason:
10 --- ---    -----------------
11 Reason:
12 --- ---    -----------------
13 Reason:
14 --- ---    -----------------
15 Reason:
16 --- ---    -----------------
17 Reason:
18 --- ---    -----------------
19 Reason:
20 --- ---    -----------------
21 Reason:
22 --- ---    -----------------
23 Reason:
24 --- ---    -----------------
25 Reason:

72 (Pages 282 - 285)

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

Page 286

1   Kathleen Courkamp v. Fisher-Price, Inc., et al.
2   Michael Goodstein, M.D.
3
4           ACKNOWLEDGMENT OF DEPONENT
5               I, MICHAEL GOODSTEIN, M.D.,
6   do hereby certify that I have read the foregoing
7   pages and that the same is a correct transcription
8   of the answers given by me to the questions therein
9   propounded, except for the corrections or changes
10  in form or substance, if any, noted in the attached
11  Errata Sheet.
12
13
14   DATE            MICHAEL GOODSTEIN, M.D.
15
16  Subscribed and sworn to before me this
17        day of          , 20  .
18
19  My commission expires:
20
21
     Notary Public
22
23
24
25

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Michael Goodstein, M.D.
September 30, 2021
In Re: Fisher-Price/Mattel

[& - 23]

Page 1

**&**

**&** 2:2

**0**

**02689** 1:5 6:12
**0kay** 173:5

**1**

**1** 3:8,24 10:12,20
22:24 36:19 69:16
73:1 96:4 114:5
117:1,1 124:7
128:13 142:14
163:8 173:18
189:1 208:11
245:14 282:13,14
282:16
**1,400** 122:19
**10** 3:9 4:3 30:1,4
32:7 45:4 51:23
59:19 61:1 163:5
225:1,3 251:8
**100** 1:14 6:13 45:1
**11** 3:10 4:4 25:10
33:9,13 34:8
**116** 4:19,20
**11:30** 125:6
**11:31** 125:10
**11:50** 125:13
**12** 4:6 34:15,18
39:18 247:8,11,25
248:22
**12/30/19** 3:15 23:8
**125** 3:11
**126** 3:14
**12:40** 170:11
**12:48** 170:16
**13** 4:7 39:19 41:4
247:12,13,18
249:12
**1315** 180:22

**14** 4:9 49:7,11,13
53:10,21 189:4,7,9
189:19 190:2
247:17,20 249:12
**1423** 283:20
**15** 3:12,25 4:11
58:17,22 247:20
249:10,12 282:13
282:15,16
**154** 140:21
**16** 4:12 25:10 70:3
70:4,13 127:14
**161** 4:22 180:22
**165** 4:23
**16th** 11:21 15:21
16:16 71:1
**17** 4:15 72:2,5,9,20
180:4
**178** 5:3,4
**18** 4:17 73:13,15
181:4
**183** 195:20
**185** 5:5 201:18
**19** 4:18 86:6,8,11
94:15 98:11 101:9
103:19 178:16
**192** 5:7
**1954** 140:11
**1970s** 18:16
**1974** 18:17
**19th** 101:2 187:22
188:1 263:12
**1:02** 177:21,24
**1:40** 181:25
**1:41** 177:25 178:3
**1:42** 179:22
**1:44** 179:25
**1st** 12:1 14:25
101:6

**2**

**2** 3:10,25 11:15,18
71:17 80:24 86:14
95:19,23 96:2
114:5 117:3,23
118:19 120:4
121:20 125:19
144:15 166:11,13
170:22 171:13
183:2 206:22
243:14 258:11,18
262:14 271:3
282:15
**20** 4:19 61:1 66:14
66:17 115:23
116:3,13,18,23
124:23 161:18,19
181:19 182:1,2
225:22 278:23
283:24 286:17
**200** 2:3,8
**2000** 191:17
**2005** 3:16 25:10,12
25:16 27:24
**2006** 33:20 242:5
279:3
**2009** 33:21,21
219:4 244:1
**2010** 27:22 46:17
**2011** 3:18 4:11 5:8
25:22 26:1 55:7
58:17 61:22 162:6
191:17 201:23
204:14,23 205:10
205:21 207:9
211:19,24 214:6
214:12 215:4,6,6
216:11 218:25
219:8 222:22
223:5,8 224:6

**2014** 101:2 170:1,3
186:5 187:15
**2015** 193:5,7
268:20
**2016** 3:19 5:9
26:11,13 55:7
61:22 204:14,25
205:10,21 207:17
208:11 211:21
215:5
**2019** 23:19 117:11
117:21,23 118:2
121:10 130:18,20
130:24 131:4,20
136:14 281:18
**2020** 117:6 121:10
121:14 123:16
**2021** 1:10 6:3
11:21 12:1 15:1
15:21 16:17 71:2
73:6,6 101:6
117:6 124:4,6
127:14 237:24
278:19 279:7
283:18
**2022** 283:24
**204** 5:8,9
**20th** 33:21
**21** 4:20 116:2,3,13
116:20,23
**21st** 186:5 187:15
187:24
**22** 4:21 116:3
161:21 165:16
173:6 195:16
**220** 5:11 97:2
**224** 96:11 97:3,16
**225** 232:16
**23** 3:15 4:23
165:12 203:3

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[231 - aap]

**231**  192:24
**232**  192:25 193:11
  243:20
**238**  97:16,21
**24**  5:3 99:11 178:5
  178:12 179:3
  180:5 182:24
  188:12 189:9
  255:12 257:24
  261:17,21
**241**  5:12 102:4,6
**242**  97:24 111:8
  119:6
**244**  3:4
**25**  3:17,18 5:4
  148:22 178:7,13
  181:1 203:11
  255:12 261:18
**2500**  2:8
**26**  3:20,21 5:5
  12:4 185:21,22
  186:3 192:3
**265**  3:4
**267**  121:20
**27**  5:6 192:11
  193:21 200:15
  268:9
**27.5**  121:16
**274**  3:5
**277**  3:5
**28**  3:22 5:8 16:11
  204:18,23 205:15
  205:21 207:9
  212:1 216:13
  222:6,11
**29**  5:9 204:22,25
  205:17,21 207:18
  208:11
**2:19**  1:5 6:12
**2a**  3:11 125:15,21
  137:6 164:24

169:5 170:23
171:13 183:3
193:12 206:22
243:14 258:14,14
258:18 262:14

**3**

**3**  3:12 15:18,20
  87:3 114:1 144:15
  271:5
**3,000**  123:3,9,13
**30**  1:10 4:3 5:10
  41:25 52:8,11
  61:5,9,12,20 62:6
  62:11,17 63:6
  66:12 68:1,22
  109:11 145:16
  194:14,25 195:2
  195:11 196:22
  220:11,17,20
  225:5 241:15,18
  284:18
**30305**  2:9
**30th**  6:3 23:19
  124:16 237:24
**31**  5:12 35:12 38:4
  38:5 41:19 46:4
  187:19,19,22
  188:6 193:8
  241:24
**33**  4:5
**3333**  2:8
**34**  4:6 41:25
**38**  42:3
**39**  4:8
**3:42**  281:9
**3:43**  281:24
**3:44**  281:6
**3:57**  282:21
**3a**  3:13 126:7,10
  126:12 127:7,15
  137:5,6

**4**

**4**  3:15 23:7,9
  166:21 171:7
  221:8
**4/1/21**  3:10,11
  11:18 125:16
**40**  146:1,4,16,18
**4500**  162:18
**48**  257:24
**49**  4:10 183:1,7
  188:19 256:7

**5**

**5**  3:16 25:12,14,20
  35:9 233:22
**5.5**  118:14
**5.7**  213:7,17
**50**  52:11,11 61:2
  183:18,21 192:20
  192:22 265:22
  267:20 268:9,13
**51**  184:14,17,21
  261:20
**52**  193:9 194:17
**520**  2:4
**5369**  67:9
**553-2100**  2:9
**58**  4:11
**59**  69:25 70:13
**5th**  283:18

**6**

**6**  3:18 25:22,25
  72:18,21 109:11
**6/19/2014**  180:14
**620-3980**  2:4
**678**  2:9
**698**  2:3

**7**

**7**  3:3,19 26:11,14
**7.5**  118:10

**7/16/21**  3:12,13
  15:19 126:8
**70**  4:14
**700**  122:15 137:14
**72**  4:16
**73**  4:17
**74**  5:16
**75**  147:7,9,14
  148:12

**8**

**8**  3:21 26:23 27:10
  179:3
**80**  146:15
**85705**  2:4
**86**  4:18
**8:00**  181:8

**9**

**9**  3:22 28:4,7
  76:12
**9/26**  118:1,5
**90**  99:21 172:23
**9151**  137:24
**9152**  138:22
**9155**  140:23
**9160**  142:18
**9:28**  1:16 6:2

**a**

**a.m.**  1:16 6:2
**aap**  13:10 26:1
  28:7 30:25 41:17
  43:5,8,9,14 45:15
  45:18,19,25 46:1,3
  48:2 49:1 52:3,4
  55:2,6,13 59:4
  60:19 61:21 76:16
  82:13 88:12 89:20
  90:2 131:24
  141:23 142:8,10
  142:11 149:3,6,12
  149:16,21,25

Case 2:19-cv-02689-GMS    Document 191-3    Filed 11/19/21    Page 78 of 132

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[aap - air]

Page 3

150:1 153:23
154:12,13,17
157:17 158:14
197:2,4,5,18,20
198:15 199:21,25
209:2,24 210:20
211:10 215:4
216:11 219:8,13
219:19 220:12
223:5,17 224:3,6
241:21 249:3,3
266:22 267:8
**aap's** 223:8
**ability** 77:14 159:1
275:16
**able** 36:17 40:24
61:15 136:13
179:12,15 193:16
203:16 213:13
242:22 245:23
**abnormality** 36:14
**abridged** 109:4
**absolutely** 42:17
131:25 169:22
176:19 230:16
**abstract** 30:10,20
30:21 32:9,12
269:6
**academic** 81:8
**academy** 41:18
42:13 153:17
201:23 211:3,5,9
211:12
**access** 30:12 138:6
218:6 226:24
238:10 253:19
**accidental** 162:22
**accommodate** 9:7
9:12
**account** 154:23
207:13 208:14

**accumulation**
275:17
**accuracy** 163:19
273:16
**accurate** 14:23
17:1 18:9 38:2
40:4 71:16 93:4
116:10 123:25
138:2,3 158:7
174:25 177:4
198:23 228:25
260:21 273:21,23
284:21
**accurately** 36:18
40:24 176:3
**accused** 13:9
**achieving** 99:15
**acid** 229:3,12
**acknowledge**
272:14
**acknowledgment**
286:4
**acquired** 35:16
**act** 18:16 82:24
132:19
**action** 283:15
**actively** 190:25
**add** 65:13,15
67:11,11 80:19
146:17 175:6,13
222:3 281:2
**added** 47:1 74:17
75:1 76:14
**adding** 118:15
**addition** 146:9
201:15 223:14
**additional** 104:5
146:11 222:3
255:19
**address** 7:14
36:17 68:13 69:17

84:12 100:4,14,17
101:2,7 103:23
105:3 108:12
109:11 120:4,14
120:17 121:7
143:3 218:17,21
224:6 256:1
259:12 270:21,25
**addressed** 40:25
172:10 223:11
224:10,10 270:24
271:9
**addresses** 222:23
222:24 223:10
**addressing** 15:14
22:10 100:11
143:9,10 269:11
**adequate** 202:7
**adequately** 144:22
**administer** 145:11
**administrative**
146:10,19 148:24
**adopted** 172:4
**advised** 183:10
184:22 262:3
263:1,3
**advocate** 157:24
217:11
**affiliations** 6:21
**affirmation**
153:19,22 221:4
**afford** 123:2
**aforesaid** 283:5
**age** 162:15 173:8
179:11 196:5
200:16 203:12,19
230:23 232:6
**agencies** 211:14
**ago** 83:6 183:9,23
212:12 233:21
237:22 256:4

278:17,24,25
**agree** 22:5 51:11
51:12 56:21 57:13
59:3 61:24 62:9
67:24 69:11 71:21
74:21 78:25 79:7
111:7 119:21
148:10 153:9
154:17 157:15,17
157:22 159:12
163:10 170:1
175:2 182:11
190:21 194:8,23
196:9,19 197:9
198:3,5,16 199:12
199:21 200:18
201:3 211:19
215:4,11 219:20
228:11,13 229:11
229:16,21 230:2
242:8,15,17
262:16 271:21
282:18
**agreed** 93:10
179:10 228:9
**agreement** 282:11
**agrees** 165:19
**ahead** 10:16 19:23
28:23 29:3 44:6
64:20 65:16 66:3
66:4 69:20 71:25
92:11 125:20
126:9 165:11
167:9 168:22
185:20 241:14
253:1 254:11
**ahold** 56:9 133:13
**aided** 283:12
**air** 251:25 254:16
255:9 276:18,23

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**airflow** 78:4
**airway** 79:17
  223:25 225:18
  274:24
**akey** 106:8
**al** 3:21 5:6,12 6:9
  6:10 26:24 27:5
  192:11 241:25
  284:3 285:1 286:1
**alan** 106:8
**alcohol** 99:18
  174:5 175:18
  230:10
**aligned** 79:23
**alignment** 79:3,9
  79:15
**alive** 147:20
**alleged** 13:5 226:9
**allegedly** 155:24
**allergic** 176:16
  264:6
**allergies** 185:10
  262:8
**allergy** 264:10
**allison** 2:7 7:1
**allow** 52:3,24
  155:5 166:24
  250:12
**allowed** 59:9,12
  87:14 184:7
**allows** 45:4 51:22
  96:8
**alveolar** 40:14
  247:2
**amended** 4:15
  72:5 172:1
**american** 41:17
  42:13 153:17
  201:23 211:2,5,8
  211:12

**amount** 56:16
  109:1
**anatomy** 35:16
  258:22 259:4
**andrew** 6:23 108:5
  179:6 180:8
  183:12 263:24
**anemia** 150:5
  229:1,4,13 233:24
  234:1 235:1 237:1
**anesthesia** 229:4
  229:17
**angle** 61:12 66:22
  67:3 194:12,15,17
  194:21,22 195:1,3
  222:2 225:7,8
**angled** 198:2
**angles** 215:18
**animal** 135:18,19
**animals** 169:18
**answer** 9:2 10:2
  20:8 50:9 55:14
  57:13 64:7,10,25
  65:1,9,13,15 66:4
  66:5,6,7 67:7 69:7
  83:3 98:17 113:19
  114:6 141:16
  148:6 199:8
  216:16 217:5,7,22
  218:11,11,13
  219:12 234:12
  243:7,8 254:11
  263:25 266:25
**answering** 158:21
  158:21
**answers** 105:7
  159:1 217:5,6
  286:8
**antiquated** 56:13
**anybody** 27:12
  80:5,11 83:10

110:7 154:15
  274:5
**anymore** 233:18
  255:23
**anyplace** 240:9
**anyway** 264:7
**apart** 129:18
  130:3 133:16
**apnea** 226:18
  229:2 240:20
**apologies** 19:13
**apologize** 29:25
  32:5 66:25 80:20
  95:11,17 147:2
  184:12
**apparently** 44:22
  60:10
**appear** 263:3
  266:22
**appearances** 2:1
  6:21
**appeared** 189:17
  190:5
**applicable** 165:20
  211:20
**apply** 174:10
**appreciate** 7:23
  64:18 66:1
**approach** 64:19
  83:9 98:4
**approached** 88:23
**appropriate** 55:11
  64:5 77:1 82:24
  152:2,19 154:23
  158:22 202:11
  207:13 208:15
  284:9
**approve** 214:23
**approved** 166:12
  212:20 215:16

**approximately**
  181:8 183:23
  187:16 188:5
**april** 11:21 12:1
  14:25 73:6,12
  75:1 86:18,19,19
  101:6 123:21
  124:2,4 186:5
  187:15,24 278:19
  279:7 283:24
**area** 18:14 36:1,11
  36:22 37:23 81:14
  94:4 139:18
  156:25 166:19
  246:22
**areas** 15:13 17:21
  18:11,19 19:21,24
  19:25 21:11,13
  22:10 71:6 82:7
  150:8 200:21
  248:14 276:6,8
**argue** 177:10
**arizona** 1:1 6:11
  64:15 123:8
**arnet** 184:21
  185:7,9,10 262:3,6
  262:7,9,25 263:3
**arousal** 248:16
  276:8,9
**arranged** 249:16
**arteries** 40:12
  246:25
**article** 3:15,21,22
  4:3,4,9,21 5:7,12
  15:8 23:4,7,10
  26:23 27:4 28:4
  28:10,14 29:6
  30:2,5,5,12 31:9
  33:10 34:7 48:18
  49:7,13 73:20
  75:20 76:18 121:1

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[article - babies]

Page 5

121:6 161:21
166:10 172:4
191:21 192:12
193:6,7,13,19,19
194:4 195:19,20
197:17 198:25
201:3,18,19
202:18 225:23
229:15 234:3,5,25
236:15 241:21,25
242:5,7 252:20
253:2,24 267:25
269:5,6 270:1
275:15 277:2
278:5,16 279:3
**articles**  25:6 31:19
73:19 74:17,24
75:8 80:24 110:24
160:21,22 161:3
219:6 245:13
253:25
**ashamed**  248:4
**aside**  170:23
191:15 204:11
211:23
**asked**  12:19 13:10
13:17,25 15:15
16:4,23 18:17
24:12 40:20 47:10
48:22 67:11,11
69:1 80:9,23
85:20 87:2,19
88:5,16 89:5
96:14,19 98:16
100:6 103:3,11
105:5 108:14
111:13,20 119:8
120:19 135:14,17
139:23,24 144:1,5
144:8,12 146:24
168:17 169:7,9

173:24 175:17
179:11 206:23
232:17,24 233:7
233:15 249:1
267:13 270:24
271:10
**asking**  32:7 45:7,7
72:21 82:2 88:2
94:3 110:8 129:12
129:20 136:4,6,6
154:3 158:3
195:10 212:11
217:1,8 218:24
220:7 238:9 271:2
**asleep**  253:15
**aspect**  148:10
**asphyxia**  66:22
193:10 251:24
252:18 271:11
274:20 275:24
277:8,17
**asphyxias**  153:16
**asphyxiated**
276:14
**asphyxiation**
251:19,22 277:3
**assess**  134:24
239:20
**assessment**  135:3
136:13 139:22
169:10
**assigned**  118:22
**assist**  227:7
**assistance**  129:11
**assistant**  137:10
137:11
**associate**  230:24
257:10
**associated**  40:16
155:24 230:17
247:4 268:18

**association**  230:5
231:23,23
**associations**
230:13
**assume**  51:14
65:19 201:3,19
**assump**  156:23
**assumption**  56:9
**assumptions**  62:1
156:24 272:5
**astm**  55:24 56:19
60:19 142:15
**atlanta**  2:9 28:16
**atrophy**  239:6
**attach**  126:6 266:2
266:13
**attached**  3:24
86:21 122:1,9
253:14 284:15
286:10
**attachments**  3:11
3:14 125:16,23
126:1,8,11
**attending**  6:20
**attends**  142:9
**attention**  60:2
216:2
**attest**  106:2
**attitude**  64:19
**attorney**  13:25
16:3 72:14 88:23
136:7 284:17
**attorneys**  16:24
70:23 87:15,23
138:12
**attributed**  193:10
**audience**  81:25
**august**  33:21 74:2
**author**  28:12 75:8
75:22 195:25
205:24 206:4,6,6,8

206:9
**authority**  45:22
**authors**  27:14
195:24 205:25
211:4
**authorship**  28:13
**autonomic**  173:2
**autopsies**  248:8,9
**autopsy**  35:9
98:12,23 100:18
103:20,21 241:11
242:12,14,16
243:4,5
**available**  59:11
75:10 109:8
214:17 242:24
254:6 270:9
**average**  187:7
213:7,17
**avoid**  83:24
167:17
**avoidance**  51:8
**awards**  149:20
**aware**  63:18 68:21
90:5 112:23
153:25 154:11
156:18 183:22
185:7 262:6
278:14,21 279:6
**awkward**  193:25
198:13
**az**  2:4

| **b** |
| --- |

**b**  3:6 4:1 5:1
109:11
**babbling**  102:13
**babies**  19:2 58:6
63:6,7 66:16,16,18
79:24 147:10,22
151:21,22 160:5,7
162:18 172:25

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[babies - believed]**

Page 6

195:2 196:12
197:13 199:11
203:12,22 218:7
219:9 222:1,2
225:14,17 226:17
253:9 254:23
257:22
**baby** 53:2,5,7 57:4
58:13 62:18 66:10
66:13 78:3 79:23
85:1 101:15
102:19 107:5,9,24
108:2,6 120:7,10
133:21 141:25
142:5,12 143:10
147:18 151:24
162:25 163:6,11
163:12,14,21
164:7 166:11,21
166:25,25 167:16
168:2,6 174:10
176:8 178:21
179:11 181:24
183:25 190:11
195:9 203:16
214:24 216:4
217:15 221:23
224:11,16 226:2
230:18 231:20,21
232:4 233:4
248:17 250:3,5
252:11 253:14
254:24 255:4
260:7,11 263:23
273:18,18 275:16
275:18,21 276:13
277:4
**baby's** 77:11,14
77:19 78:1,19
142:21 233:10
255:3,10 256:20

257:7,12 260:5,23
261:13 278:8
**back** 11:3 12:15
16:14 18:15,21,21
27:24 37:16 40:19
58:22 59:25 64:24
65:22 67:4 69:15
79:2,12,15 84:4
85:11 93:18 94:14
101:9 102:5
121:11,20,21,21
123:15 125:12
126:20 148:25
152:11 155:20
163:6,11,12,14
166:10 168:2
170:16,25 178:2
178:10 179:24
202:24 206:8
208:23 215:2
216:10 223:2
230:2 249:20
252:11 254:25
255:1 257:21
258:8 265:3,4
279:3 281:8
**background**
161:11 185:18
**backgrounds**
161:15
**backwards** 15:16
**bad** 160:3 188:25
248:5 276:18
**bajanowski** 5:12
241:8,24 242:2
**balled** 190:7
**banner** 5:5 185:22
185:24
**baptist** 104:1
**barbara** 162:3

**base** 82:2,4
**based** 63:2 68:9
99:3 108:17
127:17 128:13
131:1 132:9 134:9
156:10 157:19
214:18 221:12,20
260:20 262:19
273:8
**basic** 277:15
**basically** 13:4 19:8
67:17 78:3 83:23
90:14 103:12
107:5 124:16
129:16 155:24
170:5 193:18
259:3,5 261:10
**basics** 172:3
**basis** 71:12 156:5
**bassinet** 53:9
156:3 180:9
**bassinets** 156:1
159:16 160:11
215:18,18
**bates** 96:9,10,11
97:5,8,14 117:1,22
179:3 187:22
192:24 261:20
**batra** 5:6 191:19
191:20 192:11
196:1 268:10,11
268:12,17
**battery** 242:25
**bazillion** 249:25
**bearing** 259:9
**beats** 259:23
**beckwith** 281:14
**bed** 56:15 174:4
175:9 180:9
189:17,22,24
190:3,4,6,8,9,10

190:15 203:21
250:3
**bedding** 54:19
55:5 77:7,9,10,12
77:12 166:15
173:19 229:23,25
231:3
**bedroom** 189:13
189:21 190:3
**beds** 229:23
**bedtime** 85:7
163:7
**beginning** 86:19
114:18 122:4
**begins** 203:10
**behalf** 1:3 6:23,25
7:1 45:8,23 46:1
47:11 70:16
**behave** 82:20,22
82:23
**behavior** 232:6
**believe** 13:16,20
16:3 18:17 24:6,7
30:25 33:20 34:22
38:17 42:19 44:14
46:17 47:5 49:2
66:14 72:14 75:10
80:14 84:25 85:16
91:2,9,20 93:2
106:7 107:23
112:16 117:20
148:2 154:24
164:4,8 167:3,18
172:8 174:10
175:23 187:16
225:22 235:24
237:20 255:11
258:7 268:20
270:19 271:4,7
**believed** 181:21
184:1,2 185:10

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**[believed - called]**

262:9
**believes** 61:19
**belted** 263:23
**beneficiaries** 1:4
**benefit** 211:9
**bereavement** 239:9
**best** 56:20 153:11
167:19 159:1
167:16 177:12
221:12 256:2
275:15
**better** 17:9 39:3,5
92:1 151:12
254:15
**beyond** 14:8 60:14
73:18 112:19
276:20
**big** 85:8 181:11
258:5 276:2
**bigger** 251:14
**bill** 115:22
**billing** 89:2 176:15
176:16
**biomechanics** 4:3
18:11 30:1,4
**biostatistician** 21:20
**biostatistics** 21:20
**birth** 176:9 177:8
230:8 257:7
**births** 238:13
**bit** 7:22,25 8:17
29:6 56:12 138:14
162:12 182:23
224:12 246:10
250:15 256:8
259:8,15
**black** 18:22 190:7
**blanket** 13:4 90:10

**blankets** 13:8
77:13 166:16
**blind** 63:3
**blood** 150:6
**board** 211:7
**boards** 211:3
**bob** 206:10
**bones** 201:13
**bongs** 168:13
**book** 4:6 34:12,15
34:19,21 35:1,2
40:3 84:15,24,25
85:2,3,4,8,12,14
150:7 171:23
245:2,16 246:18
246:18 265:3,4,6
265:18,19,23
280:22 281:2,11
281:17,18
**bore** 258:24
**born** 99:5 183:12
184:1,22 257:14
262:3
**borrowed** 270:7
**bottom** 44:17
97:17 117:3,23
129:13 140:21
179:3 180:5,8
181:6 187:22
193:2 201:6
**bouncer** 196:11
197:22 198:2
244:10
**bouncers** 202:8,16
253:5
**bowl** 190:16
**box** 18:22 58:12
141:25 142:6
**boxes** 26:22 57:23
58:4 128:11 216:4

**brain** 35:8 173:1
276:6,12
**brainstem** 35:9,17
35:19 36:4,5,8,13
37:19,20 173:1
174:9 248:15
**brand** 28:10 90:10
**brandenburg** 112:10
**brandi** 162:4,5
**break** 9:9 28:22
110:4 125:4,18
177:24 178:11
264:17,18
**breath** 252:11
275:3,7
**breathable** 135:15
135:15
**breathe** 275:18
**breathers** 254:24
**breathing** 77:15
78:5 183:13,24
184:23 225:18
252:6 254:21,22
262:4
**brief** 125:11
170:13 179:23
281:7
**bright** 10:16
**bring** 24:12 26:18
38:5 72:12,22
74:24 244:24
245:1 249:6
253:18 274:22
**bringing** 263:6
**broad** 17:18,20
18:14 148:5
149:17 251:22
**brochures** 84:16
84:17

**broke** 18:19
**broken** 160:17
201:13
**brought** 10:17
11:1,2,3 47:21
54:9 186:24 188:8
206:15 235:17,18
245:5,13 252:4
253:16 260:5
**buckle** 107:24
180:10
**buckled** 179:7
180:9,13 200:22
**build** 81:22 82:2
**bullet** 54:13
**bulletin** 197:4
**bulletins** 197:2
204:13 266:23
**bumper** 78:13,14
252:10
**bumpers** 78:8,12
135:15 166:17
**bunch** 63:6,7
**buried** 204:15
**burning** 126:17
**burnt** 190:16,16
190:20
**busy** 88:25
**buy** 128:1
**byard's** 248:13
**bylaws** 209:25

**c**

**c** 283:2,2
**call** 12:4 50:19
54:21 65:23 118:7
244:17
**called** 23:18 72:9
85:1 108:12 183:9
196:24 239:7
257:15

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[calling - changed]                                                              Page 8

calling  200:3
calls  122:16 142:7
cambridge  281:13
camera  29:21
cancer  19:3
cancers  19:4
captured  111:8
car  52:10,25 53:2
  53:3,6 60:16
  159:20 193:9
  194:9,10,12,17
  195:13 196:14,24
  200:20,22 202:8
  202:15 212:3,22
  213:1,2,8,18
  244:10 265:20,20
  268:6
carbon  255:9
  276:24
card  85:8
cardboard  85:8
cardiac  258:22,23
  259:3
care  83:21 147:10
  147:22 150:3
  151:15,21,22,22
  151:23 153:11
  154:22 155:3
  185:11,16 207:12
  208:13 209:14,17
  230:5 239:22
  262:10 280:3,4
cared  99:14
career  42:9
careful  153:9
carefully  198:20
  218:24 284:7
caregiver  83:11
caregivers  187:11
  213:4

caring  162:25
carrie  28:11
  206:11
carriers  213:3
carry  75:17
  126:19
carrying  196:7
  200:17 201:14
  268:18,21
cars  216:3
carton  56:14
cascade  226:3
case  1:5 6:12,25
  9:24,24 12:20,25
  14:8 15:2,12
  16:20 17:14 20:1
  22:8 24:11 33:1
  36:10 37:19 38:12
  40:20 43:20,24,25
  44:22 47:12 48:11
  68:8,8 71:6 78:22
  87:16 88:6,17
  89:1,7,8,14,25
  90:8,12,14,20,23
  91:14 92:18 93:17
  93:19 100:2,11
  103:5 106:23
  108:12 109:18,25
  110:11,21 112:5
  114:10 118:4
  120:4 123:9
  127:17 128:19,21
  129:6 131:20,23
  132:4,5,17,22
  133:6 134:9,12,25
  135:23,25 136:23
  137:2 141:2
  143:24 153:4
  166:3 167:5
  174:22 175:9,10
  175:11,13 182:18

209:10 214:18
227:19 228:2
232:10 233:8,16
239:6 242:16
244:15 255:5
256:22 260:13
264:2 273:7,9
278:19
cases  66:7,8 90:4
  99:20 158:9,9
  214:20 225:21
  239:11 252:14
catching  117:10
category  151:18
  151:19 170:6
  197:22 251:22
caught  50:12
  124:10 155:17
  216:2
causation  169:14
  230:13 231:6
causative  121:4
  230:16 231:18
cause  78:6,19
  100:14 101:7
  143:19 162:14
  169:17 173:7
  189:1 225:12
  229:12,13 230:6
  252:7 270:16
  276:5,11,25
caused  252:16
causes  238:23
causing  230:17
  277:5
cdc  28:12,16 31:1
  160:20 161:7
cds  56:13
cell  150:6
center  240:20

century  3:22 28:4
  28:8 76:9
certain  24:12
  56:12,13,16 84:11
  141:16 158:10
  208:23 233:18
  248:9 249:22
certainly  7:18
  27:2 36:25 70:14
  76:7 94:24 111:19
  111:24 139:24
  144:11 199:10
  203:25 208:2
  225:25 226:3
  242:6 275:13,24
  279:2 280:1
certainty  37:12
  68:6 99:23 124:24
  161:14
certification  18:1
  18:3 20:5
certified  20:21
certify  283:4
  286:6
chair  27:18,23,25
  46:18,19,20
challenging  8:17
chambersburg
  52:19
chance  63:25 67:6
  112:4 115:20
  256:1
change  19:6 60:12
  63:19 64:24 65:1
  65:9,11 66:3
  67:10,13 72:3
  167:25 285:7
changed  16:9 31:5
  31:12 46:23 68:19
  207:6

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**changes** 27:7
173:1 284:14
286:9
**changing** 66:5
**chapter** 35:12
38:4,5 150:7
246:19,20
**chapters** 281:18
**characterized**
273:11
**charge** 118:21,22
122:19
**charged** 122:25
**charging** 123:13
**charlie's** 85:3
**chart** 176:15
232:8
**check** 11:25 24:9
132:23
**checking** 76:4
132:19
**cherry** 224:12
**chest** 201:1
**child** 66:21 99:5
99:14 105:21
106:3 176:21
177:2 183:4
187:11 188:6
189:3 191:1 224:3
238:7 239:6,7
242:20 250:17,19
251:18,19 252:20
256:23,23 259:19
260:2,24 261:2
267:12 269:9,10
272:7
**child's** 66:23
105:16 106:14
120:7 250:24
**children** 83:22
85:9 94:12 187:7

189:1 196:5
200:15,21 202:10
238:8 268:19
**children's** 4:9
44:14 49:7 50:1,4
85:3,8
**chin** 200:25
**christensen** 38:8
**christiansen** 38:9
39:6 112:12
**christiansen's**
38:15 39:4 114:13
**christopher's**
240:15
**chronic** 176:25
186:23
**chronicity** 191:8
**cigarette** 167:16
167:20
**cigarettes** 99:18
175:18
**circle** 44:20 80:6
173:12 230:2
**circles** 41:15 172:3
**circumference**
260:15
**circumstance**
153:10
**circumstances**
154:23 207:13
208:15
**citation** 180:3
**cite** 30:14 75:25
237:4 267:15
**cited** 24:4 30:19
191:20 193:20
194:4 195:20
201:19,19 202:19
206:19 209:10
270:17

**cites** 234:2
**citings** 34:11
**civil** 5:10 47:19
220:18,24
**clarify** 67:22
**clarifying** 100:8
**classic** 79:15
**classification**
242:4
**clean** 84:22 171:8
**clear** 32:5 45:6
60:7,12 120:22
137:4 143:3,23
144:7 176:20
185:9 195:16
196:17 203:21
215:22 223:17
257:23 267:5
276:17
**clearly** 114:3
144:13 224:5
**cleary** 114:3
147:21,24 148:18
185:9 186:6 262:8
**cleary's** 101:11
102:8,15 114:14
203:16
**client** 135:22
**clients** 106:11
**clinic** 146:7
208:10
**clinical** 28:7 75:2
85:5 145:6,9,22,24
146:8,10,17 147:4
147:6,14 148:3,11
151:9 154:25
155:4,19 206:24
221:11 227:8
**clinician** 56:8
145:10

**clip** 116:17
**close** 166:22 184:3
**closed** 52:21
201:12
**closely** 134:23
**closer** 30:17
**closet** 168:13
**clothing** 167:25
168:1
**cohen** 2:7 3:3,4,5
6:24,24 7:11,15
9:22 10:8,11,15,24
10:25 14:14,16,18
14:19 20:2 21:18
21:23 22:20,21
23:18,20 24:20
25:19,21,24 28:24
30:3 31:10,17,25
32:14 33:21,22
34:25 38:3 41:5,7
41:8 44:10 45:10
45:21 46:15 48:16
49:12,17,21,23
57:19 58:20 59:7
61:3,7 62:8,13
63:14,24 64:4,8,12
64:17,21,23 65:5,8
65:10,17,24 66:2
68:17,25 69:10,14
69:20 70:8,9
71:25 72:8 73:22
73:25 74:6,9,18,23
76:6,11 79:5 80:1
83:4 86:10 88:3,9
92:12 93:25 94:10
97:4,7,10 104:20
104:23,24 107:11
107:17 111:1
114:25 115:8,12
115:14,15,23
116:6,11,13,16,22

Case 2:19-cv-02689-GMS   Document 191-3   Filed 11/19/21   Page 85 of 132

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[cohen - comprises]

Page 10

125:3,6,14,17
126:14,19,24
127:2 136:21
137:3 139:6,11,19
140:9 144:6
145:14 151:2
155:15 156:11
161:4,17,20,24
164:18,20,22
165:1,5,8,15 166:8
167:11 168:4,9,16
169:1,25 170:10
170:17,18 171:3
174:12 175:1
177:13,15 178:4,9
179:20 180:1,2
181:18 182:2,3,14
182:19 184:13
185:1,2,20 188:2,3
189:8,11,23
191:23 192:1,3,6
192:14,18,21
193:1,4,22,24
197:15 198:11,24
199:16 200:7
203:2,4 204:6,10
204:12,18,21
205:2,13,14,17,20
205:22 210:18
212:24 213:11,14
213:16 215:1,13
216:24 217:8,10
217:23 219:16
220:1,6,9 222:11
222:13 224:1,19
224:23 227:9
228:20,22 234:20
235:17,21 236:2,6
236:12,14,19
237:3,14,16,17
241:14,20,22

242:1 243:9
244:18 245:18
246:21 247:6,9,12
247:14 248:1
250:18,25 252:23
254:9 255:12,21
257:5 258:16
262:23 264:14,21
265:1,9,12,17,23
266:4,9 267:4,21
268:2,11,14,23
269:8,13 272:8,23
273:5,25 274:7
275:10 276:19
277:13,20 280:19
280:23 281:2,13
281:19 282:4,8,11
**cohenl** 2:10
**coincide** 43:7
**cold** 183:23
261:11,12
**collaborate** 226:13
226:16 227:12
**collaboration**
206:7
**collaborative**
212:16
**colleagues** 82:13
160:20 227:15
279:19
**collection** 25:1
42:21
**color** 4:23 97:13
165:12 231:16
**coma** 277:6
**come** 12:15 15:5
16:14 28:20 37:16
49:3 55:25 84:4
86:16 89:19
105:21 121:14
123:8 148:20

152:11 155:20
168:2 184:21
251:8,11 254:22
257:21 259:2
265:20
**comes** 140:22
152:18
**comfort** 37:22
**comfortable** 10:22
**comforter** 190:7
**comforters** 166:16
**coming** 7:20,23
59:10,21 60:13
124:20 218:20
234:16
**commencing** 1:15
**comment** 40:23
68:5 80:9 95:2
96:15 100:6
104:14 112:21
113:15 119:9
133:20 138:13
156:8,22 170:24
174:16 184:4,7
219:13 220:1
233:7,15 248:7
251:10 261:12
263:18
**commentary** 31:1
252:21
**commenting**
184:15
**comments** 16:25
36:6 113:23
174:25 182:17
259:17 272:12
**commission** 30:25
45:4 156:17
283:24 286:19
**committee** 41:12
43:4,4 75:7 89:20

158:13
**common** 61:13
92:6 162:14 173:7
215:23 229:13
245:8,12 259:7
271:24 278:23
**commonwealth**
1:18
**communicating**
103:4
**community** 20:4
58:5 60:6
**company** 13:9
89:9,14 91:5 92:2
**compare** 214:19
225:14 238:8
**compared** 158:12
**complete** 15:6
241:11 242:16
252:2 262:14,20
270:15 274:24
**completely** 78:6
115:19 123:24
188:13 257:1
259:7
**completeness**
248:8
**completion** 72:11
**compliant** 82:21
82:25
**complies** 61:21
**component** 252:1
**components** 18:13
206:4
**composite** 3:9
10:13,20
**compressed** 78:16
**compressing**
201:1
**comprises** 143:13
147:14

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[compromise - correct]

Page 11

compromise 35:17
223:16 225:18
computer 240:5,7
282:2 283:12
concept 243:24
274:13 277:16
278:21,23
concern 57:10
156:14 222:14,24
223:11,24 243:25
244:7,10 251:6
252:16
concerned 223:18
concerning 253:2
concerns 213:19
213:23 218:20
250:13 251:5
259:4
concise 205:7
249:24 250:1
concluded 107:5
282:21
concludes 281:22
conclusion 139:21
142:17 143:2,11
143:13 157:11
169:5 196:3
200:14 201:2
condition 134:24
256:9
conditions 50:20
229:3
condoning 218:7
conferences
141:14
confines 76:16
confirm 93:3
125:21,25 127:3
207:8
confirmed 99:13

conflict 48:6,23
49:2 211:4
conflicting 107:19
107:20,22 166:7
263:25
conflicts 211:6
conform 77:25
132:24
conforms 61:21
confronting 236:1
confuse 37:15
confused 192:9
confusing 27:12
confusion 251:12
260:19
congestion 245:10
congestive 187:20
188:6
congratulations
46:9
congress 27:6
conjecture 276:2
conjunction 75:7
connotation
274:21
consider 164:12
considered 34:1
47:3 71:13 75:22
90:18 202:12
237:1 253:8,15
considering 256:2
262:25
consistency 157:6
consistent 27:8
85:10,17 93:8
263:3
constant 177:2
185:8 262:7 264:4
constantly 92:4
constitutes 69:3

construct 53:17
construction
133:14
constructs 231:8
consult 279:15
consultant 107:2
206:11 226:21
227:7,7
consultants 47:8
consulting 87:15
consumer 23:4,14
30:24 45:3 156:16
consuming 150:18
cont'd 4:1 5:1
contacted 90:1
contained 190:12
202:10 267:8
container 190:10
containers 190:13
containing 3:9
10:13
contains 14:22
100:1
content 276:23
contention 230:3
contents 3:24
282:15
context 272:21
continue 110:10
178:11
continues 15:5
81:24
continuous 249:15
contradiction
176:4
contribute 66:23
contributory
66:20
control 68:8,8
173:2 214:18
217:6

controlled 63:3
225:14
controversy 90:22
convenient 213:5
conversation
83:13 278:2
convoluted 56:12
copied 10:21 35:4
35:9
copies 265:3
282:17
copy 3:24 4:23
11:16 54:8 75:14
105:1 126:14,17
165:12 240:6
258:13 268:4
corner 190:4
coronary 40:12
246:25
coroner 242:21
corporation 1:7,8
correct 10:7 16:15
16:23 17:12 18:1
18:5,6,8 19:10,21
20:7,24,25 21:2,3
21:4,5,6,7,8,9,11
21:20,22,25 22:1
23:23 24:1 26:4
26:15 27:12,15
28:17 30:6,7 34:2
36:20,21,23,24
37:1,2,4,21,24
38:5,13,14 39:10
39:11,13,14 40:5,9
40:22 43:23 45:8
45:19 46:11 47:14
47:17 49:20 51:4
51:9 52:1,8,9,25
53:24 54:1,16,17
54:19 55:1,3,6,9
55:13 56:22 57:1

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[correct - crux]

Page 12

57:2 61:5,17
62:14 63:16,17,20
67:14 70:14 77:4
77:6,8,20,22 83:25
87:10 89:10 90:7
91:1,7,11,16,21,24
92:2,9 93:21
94:12,24 96:2,13
97:23 98:8,9,24,25
99:8,9 100:2,5,12
100:15,18,19,21
100:22 101:7,8
102:2,19,25
103:17,18,23,24
104:7 105:4,9
106:6,9,10,25
108:12,19 109:25
110:1 111:4,5,12
112:8 118:11
119:18,19 120:1,2
120:5 121:11,16
121:17,22 123:4
130:1 132:10
134:13 136:15
138:23 139:1,4,22
140:6,13 143:4,7
143:10,12,20,21
144:10,15,16,18
144:19 145:16,23
152:25 159:2
162:22,23 163:21
164:14,15 165:23
168:19 171:10,21
173:9,13,16 175:3
187:6 190:24
194:6,9,15,21
195:14,17,23
196:1,10,22 197:3
197:6,10 198:6
199:6 202:14
203:13,14,19,20

204:7 210:23
213:24 222:16,17
227:17 231:15
232:25 242:17
243:5 244:2 267:8
267:9,24 271:9,17
272:1 278:19
279:10,13 280:13
280:14,17,18
283:13 286:7
**correction** 276:9
**corrections** 284:8
284:10 286:9
**correctly** 65:4
283:10
**correlation** 230:4
**couches** 229:24
**cough** 176:9 183:8
185:8 186:16
187:20 188:7
262:7 264:4,6
**coughing** 176:9
182:22
**counsel** 6:8,19
51:13 73:9 74:21
85:22 87:4 95:16
103:4 115:25
137:10 175:12
184:9 227:20
235:16 270:11
282:12 283:14
**count** 46:25
249:23
**countless** 163:23
**countries** 58:2
250:11,14
**country** 114:10
**county** 5:4 103:22
178:7,14
**couple** 34:25
36:19 53:10 73:19

77:21 109:3
110:19 112:17
149:20 156:23
160:21 176:18
178:23 181:1
183:9 206:13
216:6 240:21
245:1 246:5
278:16
**courkamp** 1:2 6:9
6:23 88:19 106:12
107:4,25 117:1
128:19,21 136:23
166:4 173:21
175:21 238:1
284:3 285:1 286:1
**course** 20:20
28:21 49:6 51:15
75:20 85:15 95:16
119:5 120:24
121:3 133:25
134:6 136:2
154:21 185:6
207:11 208:12
209:5 248:5
**court** 1:1,17 6:11
6:17 7:3 8:11,14
8:20 29:9,12,18,21
65:23 87:4,6,8
104:21 123:4
133:6 144:2 213:9
213:12 246:8,12
282:5 284:21
**cover** 3:24 77:19
78:6,14 110:19
129:10 144:22
182:23 265:13
**covered** 22:10
104:3,6 105:8
109:6 121:10
144:20 173:16

200:25
**covering** 15:11,13
255:14
**covers** 110:20
121:2 143:16
150:25 173:11
**covid** 118:2
121:12
**cpsc** 51:22 59:15
60:19 141:8,12,15
141:19 142:12
170:2 193:8 225:3
251:8
**crazy** 93:1
**create** 251:12
270:5
**created** 232:7
254:21
**creates** 57:4
**credentials** 224:5
**crib** 53:9 55:11
78:8,12 153:10
156:3 166:13,17
215:17 223:12,15
223:20 252:9
**cribs** 61:11,11
156:1 159:12
160:11 215:15,15
215:15,25
**criminal** 5:11
220:19,25
**critical** 172:16,25
173:4 225:8
**criticism** 44:3
111:21
**criticizing** 95:14
**cross** 43:10 65:18
**crossover** 88:20
88:21 90:4
**crux** 44:22

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[crystal - depends]                                                          Page 13

**crystal** 60:12
**cumulative** 191:5
**current** 46:3 73:1
73:4,14 145:21
**currently** 46:24
52:16 202:13
**curriculum** 4:17
73:2,15 76:14
81:1 86:20 144:21
281:16
**curve** 260:15
**cut** 255:18
**cv** 1:5 6:12 20:3
73:14 75:23 76:5
80:23 122:4,8
149:18 152:12
161:11
**cvs** 161:13

**d**

**d** 3:1
**dad** 106:17 107:23
**damage** 35:17
276:5,8
**damn** 64:17
**dangerous** 22:3
72:3
**dangers** 253:17,23
278:9
**darn** 251:9
**darnall** 206:10
**data** 32:13 66:11
66:25 67:2 71:13
71:18 161:5
206:17 219:4,5
225:11,11 226:19
226:25 227:1
279:3
**date** 1:16 11:24
12:13 27:21 39:1
48:25 59:22 73:1
73:4 74:25 100:25

100:25 102:3
115:19 117:12
123:9 187:25
237:23 284:12
286:14
**dated** 11:21 71:1
**dates** 42:11,20
**daughter** 181:22
**david** 253:25
**day** 32:21 83:20
108:11 123:3,4,10
123:13 160:4
182:11 210:17,17
213:8,18 236:7
283:18 286:17
**daybeds** 229:24
**days** 115:9 176:22
183:14 185:3
186:21 257:24
259:6 262:5
284:18
**deal** 70:24 74:11
76:7
**death** 4:5,6,8 13:7
33:10,13 34:16
39:20 66:23 71:3
90:12 95:6 100:14
101:7 143:19
162:13,14 165:22
173:6,7 176:19
186:7 187:14
188:1,21 189:1
211:20 242:2,9,20
248:11 251:20,21
259:9 261:14
276:25 281:12
**deaths** 4:10 15:7
20:11 27:6 49:8
49:15 50:21,22
156:17 162:20,21
162:21 172:24

193:7,8 201:16
202:5 214:9
229:18 245:10
275:24
**december** 23:19
118:10
**decide** 10:5 83:21
200:1
**decision** 36:9
83:20 227:8
**decrease** 275:18
**decried** 235:5
**deegear** 108:22
114:24 115:1,2,6
115:12,13
**deemed** 284:20
**deep** 139:16
**defendant** 6:9
221:14 253:23
**defendants** 1:8
2:10 6:25 7:2
**defense** 89:7,8
113:6 114:17
124:19 176:8
256:15 259:13
**defer** 243:10,11
263:10
**deficient** 255:10
**define** 55:21,25
56:19 224:20
248:10
**defined** 245:11
**defines** 197:18,20
245:7
**definitely** 9:14
32:4 38:24 95:14
113:16 191:6
**definition** 58:25
59:3 60:18 61:14
134:14 172:23
249:6,13 266:19

266:22 267:7
**definitions** 44:23
**definitive** 36:13
**degree** 40:14
51:23,25 52:5,8
59:19 61:1,2,2,5
61:12 62:6,11,17
63:11 66:12 68:1
68:22 69:2 99:23
194:15,17,25
195:2,11 196:22
225:1 247:2 251:7
**degrees** 45:4 59:18
61:9,20 63:6
66:15,17 160:2
195:17 225:3,5,20
225:22 251:3,8
**delays** 121:12
**delivers** 84:16
**delivery** 150:3
277:8
**demonstrate**
253:17
**demonstrating**
254:18
**demonstrative**
254:7
**denise** 1:16 6:17
283:21
**denmark** 57:23
58:3
**denominator**
157:1,3
**dentist** 92:25
**dep** 87:9
**department** 5:3
34:4 106:5 178:5
179:2 255:13
**depending** 253:11
**depends** 81:25
82:6 145:25

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[depends - director]                                                      Page 14

152:17 191:7
194:18
**deponent** 283:7,10
286:4
**deposed** 180:18
**deposing** 284:17
**deposition** 1:13
4:16 6:3,12 7:21
8:2,4,4,6,24 9:23
10:5 12:19 14:6
23:25 24:11,12,15
35:22 37:6,8,13,14
38:21,23 39:2
65:25 72:6,10
87:6,8 101:17,19
101:20 104:17,25
109:10 114:3,14
114:15,21 115:7
122:19 146:24
150:11 193:16
194:1 235:20
252:4 266:2
281:23 282:21
283:12 284:7,15
284:19,20
**depositions** 38:25
106:11 108:24
109:20 114:9,11
124:20 163:23
167:21
**desaturation**
66:13 225:24
269:2
**describe** 97:21
199:6,18 254:5
**described** 101:14
142:25 199:7
260:24
**describes** 71:2
176:3

**description** 3:7
4:2 5:2 177:4
189:13
**design** 202:9
**designed** 57:3
61:20 90:15
201:12 202:13
215:15
**desk** 190:14,17,18
**destination** 53:7
**detail** 112:19
153:21 154:14,15
208:22 210:25
232:17
**detailed** 172:2
210:23
**details** 30:17,18
92:19 106:20
185:13 208:24
209:1 258:25
262:11
**detective** 104:17
104:17,18,25,25
180:6 185:13
**determine** 63:1
106:3 158:11
**determining**
105:16 106:14
114:19
**developed** 85:3
114:20 172:6
**development**
173:3 236:19
263:12
**developmental**
99:16 172:16,25
260:25
**developmentally**
203:13
**deviates** 244:9

**device** 12:25 90:9
90:19,25 93:7
130:21,24 131:5
194:11,13 196:10
196:14,15,19,24
197:10,13,19
198:1,2,3,5,12,16
199:5,7,10,12,17
199:22 200:4,11
202:6 213:8,18
222:7
**devices** 91:9,20
150:4 193:7 196:7
197:3,5,21 200:17
201:11,14,16
202:9,12,16 212:4
213:1,2,4,20,21
216:3 224:14
250:23 268:18,21
**diagnosed** 187:5,8
239:10
**diagnoses** 239:13
**diagnosis** 143:24
144:9,11,14,18
**diagnostic** 35:14
242:9 248:24
**diagrams** 49:22
**diaper** 190:8
**diaries** 105:25
**dibara** 162:3
**dictionary** 58:25
59:2 266:20
**die** 160:7 162:18
225:15 231:20,21
276:15 277:10
**died** 187:18 239:6
263:2
**difference** 194:20
194:22,24 195:17
275:7

**differences** 53:12
53:16,23
**different** 8:25
12:22,23 18:19
28:25 29:1 34:11
43:19 44:13,22
53:25 56:1,2,3
57:5 60:7 74:16
82:7,10 90:6
105:23 123:17
133:19 151:18,19
156:17 159:25
160:1,2,17 167:25
169:18,18 179:1
194:11 197:25
207:23 209:15
210:1,2 212:16
218:23 228:7,8
242:13 260:4
269:5,5 272:12,12
**differential** 143:24
144:9,11,14,18
**differently** 68:4
**differing** 258:25
**difficult** 68:12
248:14 260:1
**difficulties** 170:12
170:15 177:22
**diffuses** 255:1
**dig** 239:25
**dimensions** 130:12
**dioxide** 255:9
276:24
**direct** 230:4,19,19
256:7
**directed** 233:18
**directly** 38:11
152:1 167:19
240:13,17
**director** 146:8
148:13

Veritext Legal Solutions

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[directors - easier]**                                                                 Page 15

**directors** 211:3,7
**disagree** 62:2
  175:18 176:7
  177:7 223:4
  233:23
**disagreement**
  43:22
**disavow** 176:10
**disclose** 48:20
**disclosed** 69:22
  70:25 87:17
  108:16,16
**disclosure** 4:14
  70:6 87:5
**discovery** 4:13
  70:5 105:7 109:19
**discuss** 17:22
  98:20 120:19
  219:7 255:19
  270:10
**discussed** 201:15
**discusses** 244:25
**discussing** 159:11
**discussion** 83:18
  95:20 128:24
  142:5 177:23
  188:15 201:18,22
  207:1 212:23
  216:22 257:7
  259:9 261:22
  281:25 282:10
**disease** 259:20
**disengage** 83:11
**disorders** 239:1
**display** 128:12
**dispute** 156:5
  178:24
**distinguish** 258:18
**distracted** 96:1
**district** 1:1,1 6:11
  6:11

**doctor** 22:19
  65:22 70:10
  151:12 161:25
  178:10 183:9
  232:2,5 244:24
  277:21 281:1
**doctors** 17:5 81:4
  146:22 148:1
  177:5 248:4
**document** 53:21
  70:1,20 71:1
  72:12,20 133:6
  138:11 140:12
  209:18 211:1,2
  235:25
**documentation**
  210:24 273:7
**documents** 5:15
  138:6 210:20
  214:9 219:9,18
  235:24 236:8
**doing** 48:5 64:25
  65:2 80:18 94:11
  136:1 146:18,19
  147:7 150:15
  154:1 158:19
  164:23 165:3
  208:7 225:7 239:9
  247:10 248:8
  284:11
**doll** 181:20 182:4
  254:19,19,25
**dolls** 130:15
**double** 24:9 63:3
  204:1
**doubles** 166:25
**dr** 3:8 6:4,8 7:12
  10:12 27:23 28:3
  28:15 35:23 36:6
  37:3 38:8,9,13,15
  39:4,6,9 40:22,25

41:9 42:6 45:11
46:19 47:9 58:4
61:16 78:21
101:11 102:8,15
105:2 112:6,10,12
113:7,8,11,21
114:13,14,22
115:6 138:15,15
138:22 140:10,22
140:24 147:20,24
148:2,18 153:3,6,7
155:22 161:10
172:10 176:2,2,4
176:13 185:9
186:6 195:23,25
196:1,1 203:15
206:9 222:18
223:4 224:2 226:5
226:15 227:10,16
227:16 228:7
233:22,23 240:10
240:11,13,18
241:7 242:2,15,17
243:3 248:13
253:25 254:13
257:16 260:4
262:7,8 265:2
271:20 273:6,11
275:15 276:7
277:23 279:4,12
279:17,23,25
281:23 282:13
**drafts** 110:13
**drager** 114:22,24
**drago** 114:23
  140:24
**drago's** 113:21
**drawer** 190:12,18
**drink** 174:20
**drive** 7:22 123:1

**drs** 227:21
**drug** 175:19
  230:10
**drugs** 174:20
**dry** 171:8
**due** 170:11,14
  177:21 178:1
  184:2 185:10
  193:9 262:8
**duly** 7:7 283:8
**dust** 84:18
**dye** 254:21 255:8
**dying** 19:1,2,3
  167:1
**dynamics** 254:13
**dysfunction** 174:9

**e**

**e** 2:2 3:1,6 4:1 5:1
  14:4 24:14 137:17
  282:9 283:2,2
  285:4
**e1349** 212:3 222:5
  222:11
**e1355** 214:1
**earlier** 50:12
  67:17 81:15 89:5
  103:2 138:25
  140:13 142:18
  144:23 145:15
  151:17 158:17
  164:11 169:2
  173:16 182:22
  183:22 206:22
  224:24 225:1
  252:4 257:9
**early** 75:10 236:19
  247:11
**easier** 97:11 116:7
  229:9 266:15
  280:10

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[easily - ex]

easily 133:16
east 2:3 189:21
190:3,15
easy 179:4
echocardiogram
258:6,7,21
echocardiography
99:13
edema 40:14
247:2
edge 200:24
editorial 31:20
editors 35:1
246:21 281:14
educate 44:19
83:23 91:23 151:6
151:7
education 18:12
20:12 50:11,22
99:4 146:13,20
148:24 150:5
151:10,25 152:2
210:17 230:15
270:10
educational 49:19
50:13 51:3 54:16
82:17
effect 90:24 250:4
252:17
effective 223:13
eight 18:19 26:25
27:1 138:2 187:8
204:22 205:17
257:8 258:3
eighteen 74:6,7
either 7:15 47:6
52:23 66:21 78:8
92:5 137:11 139:7
144:9,14 146:5
216:18 232:12
249:22 270:17,22

271:17
electronic 150:4
261:4
element 61:12
elevated 244:6
elevating 222:25
223:11
elevation 221:23
223:14
eleven 33:12
employed 136:7
employment 16:9
18:2
empty 190:12
enclosed 252:6
encompassed 18:7
81:1
encompasses
18:10
encompassing
18:14
encourage 167:15
ends 274:25
engineering 21:4
21:25 112:9,10
129:18
england 277:2
enhances 29:5
entangled 253:11
entanglement
253:12
entire 85:20
123:12 219:13
entirety 111:11
112:9 266:2
entities 43:9
entitled 24:19
49:14 133:24
135:25
entity 43:16

entrapped 78:13
entries 123:17
enveloped 77:10
environment 4:22
44:19 53:8 54:14
57:4 58:12 75:4
76:19 78:2 120:11
152:5,22,25
161:22 162:9
163:6 166:22
175:8 229:18
231:1,4,5 276:14
environmental
277:5
environments
159:25 160:18
ephrata 52:18
epidemiological
139:21
epidemiologist
21:6 113:11
139:12,13,16
160:24
epidemiologists
161:5,8,14
epidemiology
21:15 139:17
156:24 161:11
246:19
episode 176:17
episodes 276:1,4
equally 39:15
equivalent 194:9
erich 5:6 192:11
errata 284:1,10,11
284:14,17 286:11
error 95:11 261:1
272:5,6,14 274:6
errors 261:7
271:21,24 272:25
273:4,10 274:2,3,4

escape 226:2
277:4,9
especially 226:1
esquire 2:2,7,7
essentially 172:3
254:16 255:8
establish 35:15
established 132:20
et 3:21 5:6,12 6:9
6:10 26:23 27:5
192:11 241:24
284:3 285:1 286:1
ethnic 53:12,23
ethnicity 140:11
140:13
evaluate 36:8
234:14
evaluating 226:18
evaluation 276:7
event 66:22 157:9
176:22 226:4
233:14 248:18
276:10,13
events 66:13
225:24 226:3
269:2
eventual 252:17
276:25
eventually 239:10
276:25 277:6
everybody 91:12
110:9 258:25
260:24
evidence 35:16
157:19 168:18
182:12 221:12
233:25 235:25
evolve 81:24
evolved 110:13
ex 120:8

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[exact - exposure]**                                                                   Page 17

exact   27:21 46:5
  56:4 59:22 92:22
  170:4 187:17
  244:6 279:5
  282:17
exactly   13:15 85:2
  92:17 103:9
  117:15 141:9
  158:5 210:9
examination   3:3
  7:10 40:7 65:18
  244:22 264:25
  274:9 277:19
examine   128:4
  129:13 133:20
  136:8
examined   7:7
  127:24,24 128:3
  132:25 133:10
  134:14 136:9
examiner   98:23
  104:9 107:4,13
examiner's   5:4
  100:18 106:17
  178:8 255:14
  261:19
examiners   239:13
example   48:8 51:6
  58:3 82:14 148:19
  239:5 250:2
  261:18
excellent   44:7
exchange   77:15
exchanged   251:25
exclusive   154:21
  207:11 208:12
excuse   6:7 184:12
excused   282:20
exemplar   127:8,18
  128:14,18 129:1,4
  130:1 134:9

137:25
exercise   233:19
exhaled   255:9
  275:2 276:18
exhibit   3:7,8,10,11
  3:12,13,15,16,18
  3:19,21,22,24 4:2
  4:3,4,6,7,9,11,12
  4:15,17,18,19,20
  4:21,23 5:2,3,4,5,6
  5:8,9,10,12 10:12
  10:20 11:15,18
  15:18,20 22:24
  23:2,7,9 25:12,14
  25:20,22,25 26:11
  26:14,23 27:10
  28:4,7 30:1,4 32:7
  33:9 34:15,18
  39:19 49:7 53:10
  53:21 58:17 69:16
  69:21 70:4,13
  71:17 72:2,5,9
  73:13,15 74:4,5
  76:2,12 86:5,8,11
  86:14 94:15 95:18
  95:19,23 96:2
  98:11 103:19
  114:1 116:18,20
  117:1,3 118:19
  120:4 121:20
  125:15,19 126:7
  126:10 127:7,15
  137:5 144:15,15
  161:18,18,21
  164:18 165:12
  169:5 171:13
  173:6 178:5,7,12
  178:13,16 180:5
  182:24 183:2
  185:21,22 186:3
  191:24 192:11

200:15 202:25
  204:23,25 206:22
  208:11 220:17,20
  222:6 241:15,24
  245:14 247:6
  248:20 249:9
  253:17 254:6
  255:12 258:11
  261:17,18,21
  262:14 265:15
  268:9 271:3,5
exhibits   3:25 72:3
  109:10 115:24
  282:12,16
exist   61:12 63:3
  68:11,14 214:13
  214:14,19 218:3
existed   170:6
existing   60:20
exists   62:10
exogenous   120:9
  173:12
expand   16:19
expansion   40:16
  247:4
expect   62:24 93:12
  273:20
expectation   62:25
expected   203:19
expedite   282:7
expedited   282:6,6
expenses   122:23
  122:25 123:6,10
experience   99:4
  150:15 157:19
  221:12
expert   5:10 8:3
  12:4,17 14:22
  17:17 19:18 21:1
  21:10,15,19,24
  22:8 34:1 38:7

45:8,11 47:19
  48:11,21 70:16
  87:5,5,21 92:18
  93:24 112:6,13,20
  112:24 114:16
  117:2 120:3
  124:17,18 130:14
  131:22 133:3
  135:22 140:25
  150:9,11 153:18
  153:19 157:13,15
  158:15 164:3,12
  220:18,24 221:19
  241:17,19 244:12
  246:22,22 256:17
  256:18 259:13
  272:17 280:4
expert's   112:17
expertise   18:4
  19:21,25,25 20:5
  21:12 71:2 94:4
  139:18 156:25
  211:9 248:11
experts   16:22 22:9
  36:11 113:5,6
  120:15 176:8
  179:10
expire   209:23
expires   283:24
  286:19
explain   19:14,14
  61:14 77:18
  252:19
explained   169:7
  210:9
explanation   117:9
explanatory   267:2
expose   168:3
exposing   167:19
exposure   51:9
  167:16,17 191:7

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[exposures - fine]                                                Page 18

**exposures** 167:18
**express** 257:2
**expressing** 15:1
  17:14
**extensive** 239:23
**extensively** 138:14
**extent** 17:22
  222:23 223:9
  263:2
**external** 211:10
**extra** 228:20
**extreme** 250:2
**extremely** 229:13
  253:2
**extrinsic** 100:5,11
  111:17 119:22,25
  120:9,16,17,22,24
  121:2,7 168:18
  169:19 173:13
  174:1,11 175:2,7
  175:13 190:22
  191:6,9,12 230:7,9
  230:12,24,25,25
  231:12 232:22
  233:13
**eyesight** 162:5

**f**

**f** 283:2
**fabric** 200:25
  275:4
**face** 77:11,14,19
  78:10 252:12,15
  274:22
**faces** 200:23,25
**fact** 8:8 51:2 53:4
  53:20 58:8 62:7
  121:5,16 176:8
  178:21 191:11
  232:6 260:20
**factor** 53:15,18
  54:18 66:21

169:19 175:10
190:22 191:6,8,9
228:9 229:14
230:7,9 234:14,18
237:2
**factored** 173:23
**factors** 53:19 54:2
  54:10 83:25 99:17
  100:5,12 111:17
  112:11 119:1,22
  119:22 120:5,6,9
  120:16,18,22,24
  121:4,6,7 140:14
  142:24 164:12
  168:18 169:6,10
  173:13 174:1,9,22
  174:24 175:3,13
  175:19 176:4
  190:23 191:12
  228:5 229:2,12
  230:9,12,24,25
  231:1,10 232:3,9
  232:10,11,22
  233:2,9,13,25
  238:15 256:24
  277:5
**facts** 62:5,5 71:13
  71:18 183:15
  273:10,17
**factual** 272:25
  273:7,9
**factures** 201:13
**fail** 284:19
**failed** 126:24
**failure** 165:20
  178:2
**fair** 22:14 46:7
  98:14 101:24
  109:21 110:17
  124:6 148:11
  236:5,8 243:12

251:3
**fairly** 242:24
  274:12
**fallen** 133:16
**familiar** 38:8
  153:18 183:15
  185:17 191:19
  211:15 234:3
  241:7
**families** 80:9 84:9
  164:4 238:21
**family** 47:21 80:3
  84:15 148:1
  151:23,23 162:2
  238:9 239:12,15
  239:18,21,23
  256:9 261:17
  263:8
**far** 19:18 156:3
  174:19 261:13
**farfetched** 259:21
**farrel** 105:2
**fast** 255:18
**fatality** 155:24
  156:4
**father** 107:14
  188:20
**father's** 182:10
**fatigue** 66:17
  226:1
**fault** 147:2 192:10
**faulty** 238:6
**fda** 221:25
**fear** 18:23
**feature** 79:18
**features** 248:10
**fee** 121:18,19,20
  121:22 122:6,15
**feel** 37:22 47:23
  83:18 151:12
  257:3

**feeling** 57:24
**felt** 16:25 108:1
  133:15
**ferenc** 105:2
**fern** 34:25 206:10
**fetal** 257:22,22
**fetus** 41:12 43:1,4
  43:15 75:7
**feverish** 183:9
**field** 17:7 19:6
  43:23 44:9 226:7
  242:20
**fields** 18:10
  227:17
**fifteen** 83:6
**fifty** 185:1
**figure** 69:17
  112:22 157:4
  158:6 213:14
  238:23
**file** 3:9 10:13
  24:18 26:10 72:13
  72:23,24 85:20
  86:2 94:19 103:22
  240:4
**filed** 211:4
**files** 85:23 104:11
  109:2
**filiano** 172:5
**final** 59:23 110:14
**find** 60:6,7 89:16
  126:5 188:23
  193:16 270:3
**finding** 186:24
  245:7,12
**findings** 35:9
  36:12,16 40:10
  245:8 246:15,23
**fine** 7:15 10:22
  11:17 75:19 110:9

**fingers** 184:18
**finish** 8:15,18
44:11 62:20 63:22
64:7 80:18,20
101:10 110:2
121:9 152:12
170:24 208:6
234:12 264:23
266:10
**fire** 106:5
**firm** 6:16,18 12:21
12:23 54:25 55:7
55:10,12,20,21,21
55:25 56:1,2,21,25
57:6,7,15,17 58:13
58:16 60:14 77:5
79:2,10,15,21 88:6
88:17 103:9
158:24 166:11
244:8 253:22
**firmness** 79:21
215:20
**first** 11:2 12:2,16
15:7,25 18:16
32:18,25 37:16
71:17 96:11,12
99:11,21 112:2,5
118:5 124:4,7
133:12 137:21,24
142:20 150:11
153:8 172:17,24
173:3,12 178:20
179:5 181:4
183:11 187:8
189:16 191:18
193:11 194:4
206:20 217:11
234:2 237:4,21
238:7 243:14
256:7 259:6
262:13 264:18

269:16 277:21,22
278:13,21
**fisher** 1:6 6:10
127:8,18 128:14
134:10 164:4
284:3 285:1 286:1
**fit** 117:10
**fitted** 166:12
**five** 13:16,20
25:19 87:3 123:17
166:24 191:25
261:9
**flag** 250:16
**flags** 230:18
**flat** 44:21,23,24
45:1 52:4,5 58:25
59:3,3,17,20 60:9
60:15,16,20,20
61:2,9,10 62:5,7
63:7 77:3 79:2,15
196:12 199:10
214:24 215:16,19
215:21,22,25,25
216:17,23 217:16
218:8,9,10,12
222:2 224:11,15
224:16,17,18,20
224:24,25,25
225:6 244:8 249:4
249:6 250:5 251:9
251:14,15 260:3
266:19 267:2,2,2
**flexion** 79:16
**flip** 102:5
**floor** 190:8
**fluid** 254:12
257:13,22 262:4
**fluids** 184:23
**fly** 65:22
**focus** 81:15 113:3
138:13,18 141:7

149:12,25 150:8
257:11 258:5
**focused** 81:8 96:17
111:23 113:1,13
138:5,14 146:20
**focuses** 50:4
**focusing** 29:16
35:18
**folder** 3:8,24,24
10:13,17 15:8
22:23 24:22,23,25
25:25 35:5 37:16
40:20 53:22 58:22
69:16 75:21
110:18 125:19,22
126:11 204:14
206:15 214:7
216:13 282:14
**follow** 77:2 91:15
91:18 92:1,5,13,15
155:5 156:12
165:21 171:24
204:7 264:15
**followed** 202:22
**following** 18:20
91:12 92:6 127:16
132:8 134:7 181:7
195:7 231:11
260:16 262:2
**follows** 7:8
**foot** 190:8,14
223:15,20
**footnote** 192:20,22
234:22 265:22
267:20 268:9,13
**footnotes** 235:3
**force** 3:16,18,19
4:11 25:9,12,22
26:11 27:16,18,20
27:24 28:13 41:11
43:2,8,14 46:9

47:3,6,11 58:18,23
59:10 60:2 75:6
75:22 76:15
136:19 139:17
142:1 149:7,8,13
201:24,24 202:19
206:2,3,4 224:3
**foregoing** 286:6
**foreign** 1:7,7
**forensic** 242:10
**forever** 191:2
**forget** 266:16
**forgetting** 114:16
**forgotten** 210:6
**form** 10:1 19:22
21:17,21 28:23
29:2 31:6,23
32:10 37:25 45:9
45:16 46:12 48:12
48:23 49:3 57:16
58:14 59:6 60:22
61:6 62:3,12,15
68:16,24 69:8,12
79:4,20 83:1 94:9
95:11 107:7,16
110:22,24 136:16
136:24 139:5,9,14
140:8 145:3
150:24 155:9
156:7 161:1 166:5
167:13 168:8,14
168:20 169:23
177:9 182:13,16
197:11 198:7,18
199:13 200:5
204:2,8 210:8
214:11 215:9
216:20 217:20
219:11,21 220:5,8
220:8 223:23
224:8,21 227:5

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**[form - go]**

Page 20

243:6 252:23
255:21 257:5
262:23 263:15
266:24 272:2,19
273:2,22 275:11
276:19 286:10
**formal** 16:4
269:20
**formalities** 10:1
**format** 16:5
**formed** 131:1
**forming** 71:14
**forms** 155:8
**formula** 190:11
**forte** 275:13
**forth** 84:8 111:19
**forum** 142:4
**forward** 18:24
**found** 75:11 89:22
107:6,9 176:14,15
180:14 181:8
188:16 193:8
213:7 248:21
251:18 274:11
**foundation** 31:14
85:4 92:10 93:22
94:9 107:7,16
156:7 167:8,13
168:20 177:9
250:25 252:24
263:15 273:22
275:11 276:20
**four** 42:2 123:17
177:16 184:24
186:20 233:20,21
261:9
**fox** 226:5 227:16
227:21 240:11,18
279:23,25 280:1
**frame** 13:12

**frank** 242:16
243:4
**free** 54:14 78:3
**freely** 252:11
**frequently** 20:10
40:13 93:16 177:1
247:1
**friend** 28:11
132:14
**friends** 80:2
240:16
**front** 95:19 111:2
113:25 118:19
122:8 178:15
205:15 208:25
210:7 216:12
**full** 15:2,13 16:15
30:11 126:6
139:21 145:9
146:7,8,10 157:1
164:25 169:9
189:16 249:14
255:9 261:24
269:6
**fuller** 35:23 36:6
37:3 38:13 39:9
40:25 113:8
138:15,22 242:17
**fully** 17:1 67:6
**function** 35:17
**further** 14:6 73:7
73:17 74:10,14
117:18 138:13
167:24 184:22
185:13,14 239:25
262:3,11 263:3
277:12
**furthermore**
96:19
**fussing** 74:19
100:7 271:1

**future** 29:7,13,17
96:6 267:10
276:13

**g**

**ga** 2:9
**gary** 108:22
**gas** 77:14 123:2
251:25 275:20
**gases** 275:25
**gasp** 277:7,16
**gastroesophageal**
213:21 222:7,15
223:13
**gather** 84:18
**general** 69:6 88:22
180:7 189:4 199:3
202:10 232:11,13
261:23
**generally** 93:13
95:8 104:3 128:8
197:20 229:18
238:19 250:7
**generation** 151:14
**genetic** 238:25
**georgia** 64:13
**getting** 9:10 77:18
78:12 94:2 106:24
122:25 156:15
176:24 200:1
248:1 252:15
263:19 266:3
**gettysburg** 52:18
**gibb** 113:11
138:16 139:12
140:10
**gibb's** 153:3 176:4
**gist** 91:2 93:2
**give** 9:5 14:1 34:24
42:10 53:4 56:3
58:22 69:15 87:19
89:15 96:5 97:5

98:3 105:1 108:16
136:5 155:4
157:25 158:2
160:22 183:10
187:17 199:25
221:4 234:15
235:24 236:7
237:23 256:1,22
265:4 266:5,6
268:3 279:21
**given** 8:2,3,23
14:10,20 16:24
24:14 67:6 74:14
86:23,25 87:4,6,16
104:12 105:10
112:5 114:10
150:10 153:24
160:3 236:6
238:11 269:15,15
283:13 286:8
**gives** 113:18 114:6
206:17 265:10
**giving** 14:9 22:9
23:4 106:23
150:11 158:25
**glad** 9:7
**glass** 190:15,17
**glean** 106:15
**gms** 1:5 6:12
**go** 10:16 11:1,6,12
11:20 13:14 14:6
17:4 19:23 20:4,4
20:17 28:23 29:3
31:19 38:19 44:6
51:4 52:24,25
64:20,24 65:16
66:3,4 67:4 69:20
71:25 72:24 79:12
84:2,2 85:19
92:11 94:14,17
99:3 108:10 111:2

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[go - halo]

Page 21

117:4,13,18 119:5
123:4,15 124:10
126:9 141:14
149:18,23 162:11
163:2 165:10
167:9 168:22
170:8,15,20
177:19 178:20,22
179:4,19 181:4,19
182:21 183:20
185:20 191:17
196:4 202:24
205:13 206:16
208:23 215:2
228:6,15 230:1
232:3,17 241:14
245:21 246:1,2
249:20 253:1
254:11 258:7
259:2 266:11
276:24 277:6
280:22 281:3
**goal** 214:16
**god** 64:17 187:3
192:6 240:8
**goes** 27:24 96:11
97:24 133:6 142:2
142:8,11 172:22
183:11 206:24
210:25 213:6
257:21 276:23
279:2
**going** 6:2 8:12,13
9:1 10:16 15:16
15:20 19:14 23:9
25:25 35:24 47:18
53:8 59:15 60:5
63:6 64:1 65:9,21
69:15,23 70:2,10
72:4 73:13 80:19
84:6 86:5,11

91:25 96:22 97:25
101:10,22 102:9
104:14 110:3
117:15 125:7,9
132:13,13 144:13
150:12 151:14
154:1,17 161:17
166:10 167:24
170:19 173:1
177:10,11 179:21
183:19 185:20
195:8 197:14
198:25 200:2
201:17 204:22
205:9,10 213:13
217:8 220:20
231:9,20,21
241:14 251:6,11
253:6 256:8 265:4
280:22 281:5
**gold** 29:5
**goldberg** 2:2
**goldbergandosb...**
2:5
**goldsmith** 27:11
40:22 41:9 42:6
58:4 138:15
140:22 148:2
172:10 176:2,2,13
224:2 228:7
233:22 260:4
268:3 271:20
**goldsmith's** 61:16
78:22 113:8
222:18 257:16
**goldstein** 3:21 6:4
26:23 27:4,11
29:6
**good** 6:1 7:12,13
8:22 10:8 22:20
40:1 52:18 56:23

58:2 72:15 79:11
110:8 132:19
146:24 150:15
158:19 159:7
176:21 222:18
234:15,16 242:24
253:8 264:19,24
278:7 283:5
**goodstein** 1:14 3:2
4:16 6:5,6,8 7:6
7:12 27:10 45:12
72:6 117:2 265:2
273:6,11 281:23
282:13,19 283:1
284:4 285:2 286:2
286:5,14
**goodstein's** 3:8
10:12 223:5
233:23
**gosh** 41:24
**gotten** 60:1 149:20
204:15
**governmental**
211:14
**grab** 230:21
**grabbed** 133:13
**grad** 137:10
**grade** 112:19
**granddaughter**
263:2,11
**grandparents**
176:25 177:7,11
183:22 184:21
**granted** 17:19
**great** 9:13 28:19
150:14
**greater** 156:3
251:5,6
**greenberg** 2:6
**greenblatt** 253:25
254:13 269:18

275:15 277:24
**ground** 249:15
**group** 104:1
**groups** 82:10
212:16
**growing** 260:24
**growth** 99:14,17
174:15,17 260:15
260:23
**gtlaw.com** 2:10
**guess** 10:19 16:21
22:10 42:3 48:23
55:12 58:4 79:6
87:3 93:23 116:25
128:25 129:9
130:8 168:21,23
174:5 197:25
198:20 202:18
205:7 251:2,22
256:5,12 263:7
269:15 280:5
**guessing** 146:3
**guidance** 207:10
208:11 256:6
**guide** 4:21 152:4
161:22 162:8
166:10
**guideline** 222:23
223:5,6,10,17
**guidelines** 60:20
61:22 153:18
154:12,13,16,18
**guys** 150:17
218:14 281:19

---

**h**

**h** 3:6 4:1 5:1
**half** 3:22 28:4,8
76:9 146:18,20
164:4
**halo** 13:2 88:8
90:11,25 92:18

Michael Goodstein, M.D.                    September 30, 2021
In Re: Fisher-Price/Mattel

[hammer - hopefully]                                                    Page 22

**hammer** 22:4
**hand** 70:10 84:2,2
84:13,15 86:11,13
102:14 161:25
186:3 192:15
207:10 220:20
275:4 283:17
**handful** 248:11
**handing** 116:23
**handout** 44:15
**hands** 130:5
133:16,22 134:19
136:11 203:10
**handwriting**
248:5
**handy** 24:2 171:14
243:15
**hanke** 85:4
**hannah** 172:4,5
248:12
**happen** 72:4
152:22,24 153:2
153:11,12 159:12
160:3 187:14
188:25 274:2,3,4
**happened** 14:7,8
16:9 43:7 106:17
106:24 107:21
121:13 143:24
154:4 186:4
227:13 259:6
261:13 263:9
**happening** 163:1
**happens** 187:2
218:22 240:11,14
252:8 261:2
270:14
**happy** 9:11 228:15
232:21 237:5
272:24

**hard** 56:19 79:1,2
79:14 94:6 102:20
150:10,17 240:6
252:15,15 257:9
261:8 270:12
274:18
**harm** 78:7,12
225:9
**harmful** 85:13
**harried** 245:20
**harvard** 27:5 34:5
**hauck** 34:25
206:10 281:14
**hazards** 268:18
**he'll** 63:25 258:18
**head** 27:17,19
70:21 79:3,9,16
89:4 124:23 142:6
163:19 182:8
190:6,9 201:12
211:17 212:8
222:25 223:11
241:13 254:20
255:1 259:17,25
260:4,5,15 271:21
271:22 272:22
**header** 16:1
**health** 52:15
105:16 106:14
119:10 120:8
176:21,21 185:15
233:4,10,12 256:9
256:20,25 259:16
263:12
**healthy** 43:22 99:5
99:5,13 101:15
105:20 175:23
176:12 183:4,4,25
258:2,23 261:10
**hear** 144:3 158:19
259:1,22

**heard** 42:10 141:3
153:8,20 158:17
177:8 216:1
234:19
**hearing** 216:1
**heart** 18:23 99:12
184:1,2 258:6,20
278:6
**heating** 173:20
**heck** 157:2
**held** 1:14 6:13
177:23 281:25
282:10
**hell** 64:3,9
**help** 83:19 85:5
95:22 137:9,11,19
169:3 192:7
239:24 258:16,17
278:8
**helped** 106:2
**helpful** 8:14 11:4
85:12 134:15
263:7
**helping** 192:8
**helps** 85:9
**hemorrhage** 245:9
**hemorrhages**
40:11 246:24
**herman** 139:12
**hershey** 1:14,15
6:13,14 7:21
**hey** 175:13
**hide** 113:25
**high** 234:6
**higher** 158:11
230:13 231:17
232:7 244:7
**highlights** 237:6
**highly** 235:13
**hired** 89:6 107:2
140:2 158:25

**hires** 95:16 157:20
**histologic** 40:10
245:7 246:14
**histological**
246:23
**historic** 29:16
**historical** 23:5
**history** 75:21
142:22 143:7,10
238:5 239:17,18
239:21,23 257:7
**hit** 118:2
**hitting** 260:13
**hold** 17:23,23,25
21:14,19,24 46:5
54:5 139:7 168:2
170:7 203:6
209:11 245:20
247:16
**holding** 248:20
**home** 52:22,24,25
68:10 75:4 76:19
128:1 137:13
146:23 151:24
183:14 212:5
229:18
**hometown** 28:18
**honest** 157:11,25
158:2 159:2
221:20,22
**honestly** 31:19
88:4,17 112:18
264:5
**honored** 46:13
**honors** 149:16
**hoof** 259:23
**hooves** 259:23
**hope** 7:18 93:14
158:19 205:24
**hopefully** 8:24
150:15 179:4

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[horizontal - included]

Page 23

**horizontal** 45:1
51:20 54:24
249:16 267:3
**horrible** 235:5,12
**horses** 259:23
**hospital** 8:5,10
16:6 20:18 52:13
52:14,17,18,18,19
52:19,20 84:16
144:24 147:12
151:9,10,25
183:14 185:3
212:5 226:24
239:9 260:11
262:5 279:21
**hospitals** 52:12
145:7
**hotel** 1:14,15 6:13
6:13
**houdinis** 253:10
**hour** 118:14
122:15,20,22
137:14 146:1,4,15
146:16 256:4
**hours** 37:10,10,10
99:11 117:25
118:10,15 121:15
121:16 123:16
124:15,20,23,25
125:7 146:18
181:8,25 213:7,17
257:23,24
**house** 173:21
188:17
**huge** 19:3 70:24
74:11 76:7 109:1
109:1
**hum** 9:8 10:23
12:9 13:22 23:12
27:3 28:3 35:11
41:7,13 43:6,11

54:10 55:16,22
76:3,20 77:24
83:8,16 88:10
89:12 94:1 95:25
96:16 116:12
131:21 140:17
141:24 172:20
177:17 178:17
187:7 214:4
238:20
**human** 112:11
164:12 236:19
254:20 274:5
**hundred** 112:17
145:1,4,5 146:16
**hundreds** 154:13
234:7
**hunt** 276:2
**husband** 84:23
**hypothesis** 171:17
172:6,8 232:14
**hypoxemia** 276:1
**hypoxia** 174:16
**hypoxic** 277:6

**i**

**ibarra** 162:4,5
**icu** 185:4 262:5
**idea** 67:2 135:9
260:22 271:11
274:19
**ideas** 259:21
**identical** 251:4
**identification**
10:14 11:19 15:19
23:8 25:13,23
26:12,24 28:6
30:2 33:11 34:17
39:21 49:9 58:19
70:7 72:7 73:16
86:9 116:19,21
125:16 126:8

161:23 165:14
178:6,8 185:23
192:13 204:24
205:1 220:19
241:25
**identified** 70:16
**illegible** 248:5
**illicit** 174:20
175:19
**illness** 176:18
186:10,25 187:6
**illnesses** 183:8
246:7,13
**illustrate** 274:13
275:2
**illustrated** 275:8
**illustrative** 253:17
**image** 44:18,24
**images** 85:10
**impact** 234:14,18
274:25
**imperative** 284:16
**implied** 256:21
**importance** 14:21
**important** 35:15
46:10,11 50:16
79:1,3,10,18,22
91:7 120:23,25
133:8 151:11
210:20 219:24
245:3 248:16
275:6
**impression** 181:23
182:6
**improperly** 92:5
**inability** 251:24
**inaccuracies**
271:25
**inaccurate** 140:18
**inaudible** 212:23

**incline** 45:2,4
51:23,25 52:5,8
59:19 60:24 61:1
61:5 62:6,11,17
63:10,11 66:8,11
66:12 68:1,22
195:10,11,12
196:22 197:13
214:10,22 215:8
216:15,19 217:19
218:2 219:10
222:24 223:7,9,10
224:7 225:2,15,20
244:5 249:2 251:2
251:3,6,13,14
267:3 268:21
269:2
**inclined** 44:24
48:19 59:5,17,18
59:18 76:24 127:9
127:19 134:10
170:3 194:10,13
196:14,15,19
198:2,3 199:7,10
200:11 219:19
220:14,15 223:18
224:17,25 243:24
250:22 252:21
268:21 269:11
**inclines** 250:6,7
**include** 47:9
120:11 121:24
139:20 143:23
144:8 168:17,19
169:7,11 213:2
216:22 231:3,11
232:23 233:2,18
248:12 250:6
**included** 81:10,11
144:5 169:21
174:1,2 190:23

Veritext Legal Solutions

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

191:13 206:7
233:5,11 253:4,5
266:19
**includes** 53:22
119:25 149:3
151:16,23 206:9
253:3 282:13
**including** 41:22
71:12 127:20
191:11
**incorporated** 6:10
**incorrectly** 122:10
**increase** 99:19
**increased** 67:2
69:3 230:18
251:18,20
**increases** 68:1,23
**incredibly** 44:8
**indicate** 154:21
207:11 208:12
**indicated** 283:7
**indirect** 167:6
233:25
**individual** 132:20
154:23 207:13
208:14
**individually** 3:25
**infancy** 19:19
238:24
**infant** 4:5,6,8,9
13:8 17:17 19:20
33:10,13 34:16
39:20 49:8,14,15
71:3 75:3 81:13
94:8 156:2 162:13
162:20,20 173:6
174:8 176:3
188:21 203:10
213:3,3,7,17,20,21
214:8 222:7,25
223:6,12,14,18,19

224:3 242:2,8
275:3 281:12
**infant's** 223:12
254:23
**infanticide** 239:14
**infants** 162:14
173:8 196:4
200:15,23 202:9
212:6,22,25 228:3
234:2 259:2
**infection** 186:19
**infections** 40:17
187:9 247:5
**inflammation**
40:15 247:3
**influence** 247:15
**information** 5:15
13:17 14:1 15:5
25:1 30:11 37:11
39:16 56:19 72:21
83:19 86:23 89:15
89:16 90:2 95:3
105:14,24 106:1,2
106:13,19 107:8
107:19,20 109:2,5
110:15 111:15
112:18 113:4
115:6 130:12
156:9 158:3,7
160:19 185:15
207:25 210:14
218:6 219:7
232:13 234:16
255:19 256:11
263:6 264:3
281:11
**informed** 210:14
252:20
**inhibit** 78:4
**inhibitors** 248:15

**initial** 4:13,14 31:4
70:5,6 98:21
105:5 108:13,15
108:19 109:9
123:22
**initially** 88:5
239:1
**injuries** 201:12
**injury** 165:22
201:10 226:9
276:11,25
**innocent** 259:2
**inpatient** 147:16
**inquire** 238:5
**inside** 10:19 69:16
**inspect** 132:3,5
134:22
**inspected** 130:24
131:4,13
**inspecting** 132:19
134:18,19
**inspection** 127:8
127:18,21 128:14
129:4,25 132:9,16
132:18 134:9,12
134:13,15 137:25
**institute** 254:1,2,2
254:3 269:18,21
269:22,23,24
274:12
**institution** 151:8
227:14 240:14
**instruction** 56:11
**instructions** 53:5
91:5,10,13,16,18
92:1,15 93:8
165:21 195:8
202:21 284:6
**instructive** 85:17
**insulting** 81:18

**insults** 276:11
280:17
**intend** 49:4
**intended** 55:8,17
61:25 201:11
204:4
**intending** 16:7
47:14
**intercurrent**
261:11
**interest** 48:6,23
49:2 211:4 261:15
**interested** 18:20
228:2 283:15
**interesting** 150:14
177:3 259:16
278:3
**interestingly**
277:23
**intermittent**
275:25,25 276:4
**internal** 120:7
211:10
**international** 27:6
55:24 58:8 235:11
237:10
**internationally**
246:21
**internet** 253:20
**interpret** 79:25
102:18
**interpretation**
30:21 32:13 233:9
**interrupt** 9:2 19:7
64:15 65:17,18,21
259:11
**interrupting** 62:20
64:3,9 234:11
**interruption**
177:20

[interstitium - kinney] Page 25

**interstitium** 40:13
247:1
**intervention** 99:12
**interview** 185:14
**interviewed**
185:13
**intrauterine** 99:17
**intrinsic** 99:17
111:17 119:1,21
119:25 120:5,6,16
142:24 169:6,7
174:9,12,21,24
176:3 191:12
230:8,16 232:21
233:2,8
**intro** 137:24
**introduce** 20:9
**investiga** 34:22
**investigate** 34:23
**investigation** 4:6,7
34:12,16,23 39:20
242:8 245:2,16
281:12
**investigations**
242:3
**investigator** 105:2
**investigators**
168:6
**invoice** 4:19,20
116:18,20 123:15
124:9
**invoices** 115:16,19
116:24
**involve** 141:15
156:17
**involved** 18:13
27:25 56:12 88:8
105:16 114:18
130:23 131:3,22
136:22 142:7
158:10 159:24

**irvin** 2:14 6:15
**ispid** 58:9
**israel** 269:18,21
269:24,24
**israeli** 254:2
274:12 275:9
**issue** 12:25 75:11
121:5 140:10
169:15 173:21
177:6 178:21,24
182:22 216:5
224:6 233:14
237:9 254:18
258:24 268:22
271:20 273:6
**issued** 101:24
**issues** 50:4 59:5
77:21 99:10
121:12 143:3,4
176:7,22 194:6
206:24 225:25
226:18 228:8
238:6,6 257:3
259:7,12 270:16
280:5
**item** 15:23
**iteration** 60:3
224:15

**j**

**j** 141:23
**jaundice** 259:8
**jeffrey** 234:3
**job** 91:21 150:15
150:17 158:19
159:7
**john** 2:2 6:22
14:14 28:3 49:12
64:13 74:9 96:8
121:11 126:14
181:13 205:13
264:14 266:14

**joke** 264:20
**jonathan** 121:25
**josborne** 2:5
**journal** 4:3 5:6
30:1,4 191:20
192:12 229:15
234:6,7,10,15,17
234:17,19,21,24
235:2,6,7,9,10,12
235:12,14 236:17
236:20 237:7,8,10
267:24 268:19
277:2
**journals** 95:9
198:15 234:14
**jpma** 141:21,23
142:2,6,9
**judge** 64:18 217:1
217:4
**judgment** 39:12
**july** 15:21 16:16
71:1 75:11 124:6
126:12 127:3,14
237:24
**jumped** 260:17
**jumps** 141:6
**june** 75:10 101:2
187:18,22 188:1
263:1,12
**juno** 276:3
**junsig** 4:3 30:2,5
**jury** 252:19 254:5
257:2 276:17

**k**

**karl** 276:2
**kathleen** 1:2 6:9
181:7,23 185:11
185:14 262:9
284:3 285:1 286:1
**katie** 6:23 174:18

**katie's** 261:23
**kattwinkel** 27:23
28:2,3,3
**keep** 8:15 29:22
37:17 183:3
184:15 190:18
197:13 202:9
217:8 224:16
240:4,5 276:22
**kemp** 279:4
**kevin** 114:3
**key** 50:22 84:11
109:5
**kidding** 137:12
**kids** 85:3
**kill** 102:10 240:8
**kin** 283:14
**kind** 21:25 44:21
81:21 84:7,24
121:13 122:2
126:21 133:12
149:17 155:4
166:18 172:5
174:17 176:23
177:2 197:24
204:15 212:13
216:22 224:11
231:7 240:24
249:18,19 250:3
251:22,23 252:4
254:21 257:8
259:20 263:20,24
274:20 277:1,3,15
277:17
**kindly** 10:17
**kinds** 105:24
131:17 135:15,19
**kinney** 4:4 33:9,12
172:5,5 277:2
279:3

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**kinney's** 248:13
  276:7
**kitty** 109:11
**knees** 203:10
**knew** 18:22 80:12
  88:13 131:7
**knife** 250:2
**know** 7:20,22 8:13
  8:18,23 9:7,9,11
  9:17,18 14:7,13
  15:17 18:11 19:13
  19:15 22:16 27:21
  27:24 31:9,11,13
  32:21,23 34:3
  35:24 36:5,5,6,10
  36:11 37:3 38:10
  38:12,18,18 39:1,6
  39:9 41:9,10,16
  43:18 48:1 49:12
  49:25 53:16 56:1
  56:18 57:8 58:2
  59:9,14,23 60:17
  61:11,23 62:4,16
  62:18 63:9,10,10
  63:12,15 65:2
  67:18 68:2,2,12,20
  69:2,2,4,4,5 70:12
  70:19 72:4 74:1
  74:13,19,25 79:22
  80:4,5,8,15 81:3
  81:22 83:10 85:8
  85:20 86:16 87:11
  87:13,14,17,18,23
  88:5,8,15,16,23,25
  89:13,17,17,23,25
  90:1,3,17 92:23
  93:3,16 95:15
  96:4 101:21 103:9
  109:3 110:3,4
  112:15 113:6
  114:12,13,14,14

117:10 118:7
119:8,13 122:1
124:15,20 126:24
128:2,2,5,20 130:2
130:4,6,7,11,12,17
131:2 132:11,12
133:2,17 135:22
136:10,17,18,22
136:25 137:1,23
138:5,22 140:25
141:1 142:3
146:14,15 148:3,6
149:10,23 150:16
151:21 153:7
154:8,14,15
155:12,12,13,23
156:25 157:2,3,5
157:12 158:6,8,8,9
159:6,24 160:4,12
160:17 161:11,13
161:15 163:19,21
169:17 170:4,5,23
171:5 172:23
174:19,23 176:13
176:13,14 177:1,2
177:12 180:22
187:3,17,21 189:2
190:25 191:1,5,18
194:2,25 195:4,16
197:7,21 198:1,19
198:22 199:14
208:21 209:24
212:7,9,9,13
214:12 215:25
218:14,18 219:2
221:8,24 223:4
225:6 226:5,15
227:10,11,14,19
228:7 229:5 232:4
233:12 234:17
235:2,9 239:6,19

242:25 244:6,17
245:17 247:19
249:24 250:1,3,4
250:12 251:2,7,8
251:10,14 252:9
253:9 256:16
258:1,15,22
259:25 260:23
261:2,3 263:8,17
263:18,24 264:1
264:10 265:2
269:25 271:1,25
272:4,21 273:15
274:5 275:22
276:7,8 278:15,17
279:1,4,17 280:1,3
**knowledge** 17:21
  99:4
**known** 33:25 42:6
  42:7,8 53:13
  171:19 183:8
  248:4,9
**kristin** 103:5

---

           **l**

**l** 1:16 283:21
**lab** 227:15 240:17
  248:13,13 261:2
  275:14 279:19,20
**label** 4:23 93:24
  165:13
**labs** 36:16 248:12
**lack** 255:7
**laid** 249:16
**laminated** 75:19
**language** 60:7
  206:23 207:4,7
  208:10 211:15
**large** 24:25
**larger** 206:14
**laryngeal** 40:15
  247:3

**late** 113:22 230:5
**lateral** 181:9
**latest** 81:24
**laughter** 146:3
**law** 18:24 53:2
  148:10
**lawsuit** 47:19
**lawtons** 261:23
**lawyers** 89:13
  92:23 148:9
**laying** 254:25
**lead** 75:8 206:6,8
  253:12 274:25
  276:7,12
**leads** 226:3 239:12
**leaning** 261:4
**learn** 152:18
  218:19 277:21
**learning** 150:14
**leave** 65:22 147:22
**leaving** 169:21
**lecture** 279:21
**lecturing** 20:12
**led** 239:3
**leeway** 155:5
**left** 44:17 170:20
  181:9 196:6
  200:17 207:10
**legal** 6:16,18 118:8
  242:23
**legs** 9:11
**length** 26:19
  249:14 250:18
**lengthy** 212:19
**letter** 16:5 129:10
**level** 112:19
  230:15 244:7
  249:17
**levels** 210:2 276:1
  276:5,24

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

[liability - lot]                                                                 Page 27

**liability** 13:6
**liaisons** 47:3,8
   211:10,13
**lick** 184:18
**life** 99:11,22
   105:24 152:3
   187:8 259:7
**light** 133:14
   274:22
**likelihood** 156:2,4
**limitation** 242:22
**limited** 231:11
**limits** 99:15
**line** 20:17 51:20
   54:24 75:10 85:14
   179:6 188:21
   244:17 270:7,9
   285:7
**link** 51:18
**liquid** 254:15,16
**list** 4:18 13:21
   17:4 23:11 80:24
   81:3,4,6 86:8
   94:16 109:16
   110:19 113:18
   127:20 138:2
   163:2 174:10
   178:16 191:13
   198:21 228:6,9,12
   232:8,15 253:25
**listed** 13:24 20:18
   85:25 95:1 138:2
   140:12 239:1
   281:18
**listen** 218:24
   232:2
**listening** 232:5
**listing** 207:23
**listings** 234:14
**literature** 19:4
   34:1 60:5 62:10

62:17 63:4,12,15
67:18 68:3 81:24
92:4 96:13 117:20
118:13,25 122:16
123:23 157:19
197:17 221:13
**litigation** 12:5
   13:17 39:7,10
   48:21 49:5 118:1
   130:18,23
**litigations** 23:6
**little** 7:22,25 8:17
   32:4 44:18 49:22
   54:21,22 60:15
   66:12,17 80:19
   90:22 102:5
   138:14 162:12
   182:23 193:25
   194:11,14 224:12
   225:22 229:19
   236:22 243:2
   245:20 246:10
   251:13,23 253:9
   256:5,8 257:25
   259:8,15 263:20
**live** 92:25
**lives** 278:8
**llp** 2:6
**locally** 127:25
**located** 6:13
   190:18
**location** 213:20
**logical** 258:3
**long** 26:7 27:19,25
   28:1 41:17,20
   46:16 47:7 50:19
   58:13 78:18
   114:21,21 115:8
   131:20 136:14,18
   137:23 187:13
   208:21 237:22

249:25 278:18
279:2
**longer** 184:3
   210:23 224:4
   257:25
**look** 12:1 13:14
   16:24 18:15 19:9
   19:16 20:3,17
   24:7 30:17 32:15
   34:24 35:16 37:6
   38:20,20,21,23
   63:1 66:10 68:4
   74:3 81:11 89:3
   93:5 95:6,9,18
   96:10 97:16 99:2
   101:9 103:11
   104:16 108:1,14
   112:4 114:3 115:5
   117:7 118:25
   119:4 127:6 128:9
   129:5,12,21,22
   130:11,25 131:18
   132:16 134:22
   135:14,17 137:4
   138:7,11 143:2
   146:15 149:18
   155:10,11 183:5
   186:2 188:19
   189:3,4,12 194:25
   199:24,25 205:10
   206:8 207:3,8,17
   208:6 211:1,18,23
   211:24 224:4
   225:12,23 228:6,8
   228:10 229:4
   234:22 235:3,8
   236:23,24 243:20
   258:8 260:12
   261:20 262:16
   265:7,14,15,17
   269:25 270:20

**looked** 69:5 94:18
   103:20,22,25
   110:20 112:15
   113:3,16,21
   122:12 128:15
   130:3,20 131:8,11
   131:12 132:25
   133:11 134:20
   135:6,11 136:20
   172:18 173:5,11
   185:24 202:2
   214:9 220:25
   222:5 228:16
   229:14 235:8
   237:21 273:1
**looking** 16:20 29:7
   29:15,20 36:13
   66:7 96:20 98:10
   113:7 119:6
   121:11 124:16
   137:21 193:13
   194:2 203:15
   211:25 225:17
   229:5 232:1
   248:10 258:14
   259:21 268:1
**looks** 44:20 56:10
   86:7 118:9 121:14
   122:9 126:4 128:2
   132:12 236:3
   249:25 265:9
**loose** 77:12,12
   166:16
**loosing** 229:24
**lori** 2:7 6:24 7:15
**losing** 263:11
**loss** 272:7
**lost** 261:9
**lot** 20:12 36:12
   72:10 105:25
   106:19 107:20

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[lot - meant]

Page 28

108:14 110:16,16
111:15 123:15
146:2 160:1 173:1
186:1 187:1
219:23 229:19
256:11,21 257:6
274:19 277:7
**low** 42:5 230:8
276:1,4
**lower** 66:15
155:25 158:11
**lunch** 177:24
178:11
**lung** 19:3,4 184:23
257:12,22,22
**lungs** 40:12,13
245:10 246:25
247:1 257:13,14
258:1 262:4
**lying** 249:14 255:4
**lymphoid** 40:16
247:4

**m**

**m.d.** 1:14 3:2 4:16
7:6 72:6 117:2
282:19 283:1
284:4 285:2 286:2
286:5,14
**ma'am** 13:22
14:24 235:20
**machine** 226:23
283:10
**macrophages**
40:14 247:2
**mail** 14:4 24:14
**main** 38:18 170:22
192:18,22
**maintains** 56:6
**majority** 145:6
**making** 32:5 56:9
67:10 83:20

113:23 123:24
126:23 151:12
156:22,23,23
218:17 227:8
272:4
**malt** 40:17 247:5
**mandatory** 4:13
70:5
**mannen** 31:2,12
66:14 195:1,4
**marathon** 9:14
**march** 124:16
**marian** 206:11
**maricopa** 5:4
103:21 178:7,14
**marijuana** 188:16
190:13,14,17,20
**marital** 230:14
**mark** 10:16 11:13
11:15 15:20 23:9
25:25 26:14 41:3
69:21 70:2 71:25
72:2 73:4 86:3,5
115:24 116:2,6,14
155:21 161:17
185:21 191:23
241:15 282:16
**marked** 3:25
10:13,20 11:19
15:19 22:23 23:2
23:8 25:13,23
26:12,24 28:5
30:2 33:10 34:16
35:12 39:20 49:9
49:14 58:18 69:18
69:23 70:6 72:7
73:16 76:12 86:9
115:17 116:18,20
116:25 125:16,21
126:8 137:6
161:22 165:13

178:6,8 185:23
192:12 204:22,24
205:1,20 207:18
212:1 216:13,14
220:19 241:25
243:12 245:17,19
268:4
**marker** 53:18
**markers** 231:8
**market** 80:13
218:14,20 219:3,6
221:25
**marking** 27:10
33:13 35:10 116:4
204:18 210:3,15
**markings** 40:8
69:16 210:1
**marta** 34:25
246:21 281:13
**mask** 184:18
**masks** 8:13 102:9
213:10
**massive** 19:4
**material** 98:19
255:1
**materials** 4:18
33:5 35:23 80:25
84:13 86:4,8,15
94:16,19 98:11,12
105:10 110:17
127:19 130:13
138:1 163:17
178:16 227:20
229:25 240:2
267:8
**maternal** 99:18
230:14
**mattel** 1:7
**matter** 6:9 53:4
58:7 210:11,13
242:23

**mattress** 55:6,9,10
57:6,14,15,18
58:13 60:14 77:17
78:13 166:11
**mattresses** 56:2
135:16
**me's** 178:14
**mean** 8:19 19:7
30:23 32:21 37:10
42:15 44:8 46:9
54:5 55:9,13 56:2
56:21,25 59:5
61:25 73:6 74:16
80:14 81:20 84:21
88:7 111:21
113:25 126:17
128:18,25 132:11
134:19 137:9
138:17 142:4
149:6 150:1 151:4
151:21 154:8
155:11,12 160:3,4
172:17 177:3
187:25 199:8
203:6 204:3 210:9
212:12 214:22
215:11 216:25
217:1 219:6
230:21 231:20,21
241:2,2 250:10
252:14 255:17
256:17 257:19
263:16 270:14
274:2
**meaning** 81:18
**means** 46:2 59:17
59:18 79:22 91:4
91:15 92:20 93:8
226:25
**meant** 9:14 15:12
81:21 128:23

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[meant - moon]**

197:13 215:22
249:7,19 259:19
**measure** 56:15,16
128:17
**measured** 128:16
**measurement**
56:11 260:1,2
271:23 272:6
**measurements**
260:12 273:4
**measuring** 260:3
**mechanisms** 78:12
**media** 18:13 81:10
**medical** 5:4,5 42:2
42:3 58:5 95:8
96:20,24 97:22
98:7,23 99:23
100:18 101:11
103:13,25 104:1,9
106:16 107:4,13
109:19 113:2,4
119:2,9 142:22
143:6,10 151:6
152:14 154:22
157:19 178:7
185:16,23,25
190:13 207:12
208:13 221:12
229:3 233:7
238:10 239:12
255:14 259:22
261:15,19 262:15
262:20 263:4,10
263:21 273:15
274:3
**medically** 222:1
**medicine** 41:21
71:3
**meeting** 41:14
118:5,13,17 142:9
260:25

**meetings** 41:16
82:14 88:12,12,13
142:5,12 158:14
158:14
**meets** 61:21
**member** 27:23
46:4,8,16 75:22
76:15 141:20
142:8 206:3
220:11 224:3
263:8
**members** 46:22,24
47:1,2,10 141:23
153:19,23 256:9
261:17
**memorize** 235:9
**memorized** 208:22
**memory** 72:25
**mendoz** 28:15
**mendoza** 28:12,15
47:9 161:10
206:12
**mention** 127:7
176:11 202:15
214:21
**mentioned** 25:6
43:2 49:10,13
50:11 81:15 86:23
113:9 206:12
218:5 230:8
234:25 253:16
**mere** 273:10
**merriam** 59:2
60:18 132:14,18
134:22
**mess** 34:9
**messaging** 85:11
**met** 9:18 38:11
42:9
**metal** 57:1

**methodology**
71:13,18 97:20
**methods** 242:10
**michael** 1:13 3:2
4:16 6:4,8 7:6
72:6 105:2 117:2
281:23 282:19
283:1 284:4 285:2
286:2,5,14
**michelle** 104:18
105:1
**microphone**
177:14
**microscopical**
40:6
**middle** 44:20
261:22
**midgett** 196:1
**milestones** 99:16
260:8,14,25
**milk** 56:14
**mind** 8:15 40:1
57:25 119:17
181:13,15 250:15
262:12 263:19
**mindful** 8:14
**mine** 96:9 97:2
134:16 237:5
**mini** 282:1
**minimize** 126:22
153:14
**minimum** 122:22
**minor** 40:15
229:15 247:3
**minus** 44:20
**minute** 138:20
152:11 208:4
240:23
**minutes** 158:18
264:17

**misinterpreted**
60:8
**misleading** 17:1
**misread** 260:18
**missed** 95:21
114:11
**mission** 140:6
**misspeaking** 67:22
**misspoke** 67:12
**mistake** 12:2
95:12 204:1
**mistaken** 120:15
**mistakes** 159:9
**misunderstood**
129:8
**mitigate** 167:15,19
**model** 128:5,19,20
129:12 135:7,9,17
136:22 137:1
254:14,15
**models** 254:17
**modified** 31:20
**mom's** 107:12
**moment** 127:6
256:3
**moments** 11:14
**monitored** 183:13
184:24 185:3
262:5
**month** 102:12
162:14 173:8
186:6 258:3
260:17
**months** 99:21
172:17,24 173:3
176:18 183:9,23
187:16 188:5
257:9
**moon** 27:13 46:19
195:23 196:1
206:9

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**morning** 6:1 7:12
7:13 179:8 181:7
**mother** 99:5 183:4
231:21 232:1
**mother's** 105:25
230:23 233:10
**mothers** 230:3,4
**mountain** 104:1
**mouth** 77:23 78:1
78:6,15
**move** 49:10 79:24
144:21 170:23
171:11 183:18
184:5 204:13
275:20
**moved** 175:24
**movement** 254:21
255:7
**movie** 274:20
**moving** 7:24 18:24
29:7,13,17 260:2
**mucosa** 40:16
247:4
**multiple** 78:11
82:3 213:19
**multitude** 238:24
**murmur** 184:1
258:6,20
**murmurs** 259:1,3
**mus** 225:19
**muscle** 173:2
225:19,25
**muscles** 66:18,19
66:19
**muscular** 239:5

**n**

**n** 3:1 12:24 23:5
48:9,18 52:6
61:20 76:22 79:14
80:3 117:25 127:8
127:18,25 128:14

128:15 129:5,21
130:1,20,24 131:5
131:8,13,23
132:12,21 134:10
136:7 155:25
156:4 157:8
163:10,15,16
180:19 182:15
194:8 195:9 196:9
197:9,18 198:16
199:6,19,23 219:2
223:21 244:1
250:19,23 252:22
**name** 6:15 19:20
34:21 38:12 41:10
88:13 121:24
141:4,6,10 153:8
209:6 233:17
235:10 241:12
244:17 254:3
267:25 269:20
281:10
**names** 41:10
104:22 113:15
**nap** 163:7
**nature** 264:6
**ne** 2:8
**near** 166:25 190:9
**necessarily** 78:5
79:22 105:14
230:6 245:11
252:2
**necessary** 221:18
249:21 284:8
**neck** 66:19 78:14
78:19 79:16
**need** 9:10,18 29:12
52:24 60:6 73:20
95:17 107:18
126:14,16 135:2
138:12 149:23

155:14 158:7,8,9
166:9 179:19
202:11 210:14
216:21 235:8,10
239:25 241:10
256:5 258:18
262:15 267:9
282:6
**needed** 19:5,13
130:25
**needs** 9:17 55:20
57:6,7,15 58:15,16
83:14
**neither** 143:22,23
214:6,9 215:7
216:14 223:7
283:14
**neona** 17:11
**neonatal** 277:15
**neonatologist**
17:11,25 19:9,17
20:6,10,19,21 44:8
91:19 145:16,19
279:25
**neonatologists**
19:8,16 41:15
50:7 148:6 171:20
**neonatology** 15:25
17:15,16 18:8
19:20 42:13,20
43:23 58:5 71:3
147:16 226:8
280:2,6
**nervous** 173:2
**network** 4:9 44:15
49:8 50:1
**neurodegenerative**
259:20
**neurodevelopme...**
260:7

**neuropathologist**
36:25 37:4 139:1
139:4
**never** 32:25 38:10
53:5 61:14,25
141:3,12,13
142:14 157:8
166:15,24 195:5
200:21 221:23
234:19 236:11
**new** 15:5 16:9
23:21 25:3,5
28:10,20 33:5
59:10 66:25,25
117:19 170:20
186:20,23,24
248:13 271:8
277:2
**newborn** 41:12
43:2,4,15 75:7
146:9 257:15
258:3 280:4
**newborns** 52:23
259:1
**news** 60:1
**ng** 2:7 7:1,1 73:24
97:6 116:12
164:19 177:17
192:2,4,20 193:2
203:1 204:20
212:24 228:21
237:15 247:18
268:10
**nice** 122:3,6
172:13 236:13
**nichd** 206:11
**nicu** 52:23,24 75:3
146:8 147:10,23
148:12,15 152:3
260:10

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**night** 100:24,25
  106:18,20,24
  107:14,21 108:3
  115:25 178:22
  181:23 191:5
  269:16
**nightstand** 190:9
  190:11,12
**nih** 18:15
**nine** 151:9 168:12
  187:8
**nods** 182:8
**non** 44:24 59:17
  59:18,18
**nondeformable**
  56:6
**nonjudgmental**
  83:15
**nonlethal** 40:17
  247:5
**nonspecific** 36:16
  245:8
**nonstop** 177:3
**nope** 169:14
**normal** 35:16
  37:23 99:12,14,15
  101:15 174:14,16
  176:12 183:25
  184:3 245:4
  258:22 259:3
**normally** 80:17
**nose** 77:23 78:1,6
  78:15 254:23,23
  255:10
**nostrils** 254:20
  255:3 270:15
**notary** 1:17 283:5
  283:22 286:21
**notation** 48:19
**note** 48:10,14
  53:15 176:15

202:14
**noted** 107:5
  203:15 206:6
  284:14 286:10
**notes** 51:4 102:13
  110:11 116:9
  237:5 268:1 273:8
**notice** 4:15 9:25
  13:21 24:10 72:1
  72:5,10 80:21
  84:5 85:20 110:2
  283:6
**noticed** 179:6
**notification** 89:2
**notified** 49:1
**notify** 48:14 49:5
**nuanced** 83:9
**number** 19:1,1,2
  56:13 74:5 97:17
  160:6 163:8
  247:20 261:8
**numbered** 96:5,9
**numbers** 53:25
  96:10,11 97:5,9,14
  156:15,21,22
  159:22 160:9,23
  161:3
**numerator** 156:25
  157:2
**numerous** 190:12
**nurse** 151:7
  152:14
**nursery** 52:20
  258:21
**nurses** 162:3

**o**

**o'brien** 104:17,25
**oath** 65:1 134:3
**object** 210:8
**objection** 250:25
  252:23 254:9

255:21 257:5
  262:23 263:14
  275:10 276:19
**objections** 10:9
**objective** 157:18
  221:10 271:25
  273:8
**objects** 54:14
  102:14
**obligate** 254:23
**obligation** 151:13
**observations**
  35:13 248:23
**obvious** 99:16
  249:22 250:4
  267:6
**obviously** 9:1
  12:15 15:5 35:25
  43:19 46:10 50:13
  54:9 81:14 88:11
  94:18 104:14
  111:15 171:19
  210:22 237:6
**occasion** 180:11
**occasional** 238:25
**occasions** 226:14
**occlusion** 223:25
  252:3 270:15
  274:24
**occur** 99:21
  172:24 223:20
  229:18 275:24
**occurred** 67:21
  257:8 261:14
**occurrence** 92:7
**occurs** 275:23
  276:9
**october** 283:18
**odd** 229:19
**odor** 190:20

**offend** 7:17
**offense** 180:7
  189:5
**offer** 144:17
**offered** 271:13,16
**office** 35:2 127:22
  131:12 147:15
  148:12 178:14
  239:8
**officer** 104:18
**official** 12:4 34:22
  34:24 101:5
  106:22 109:17
  120:3 126:1,11
  133:5 206:19
  243:14 283:17
**officially** 70:16
**oh** 12:1 41:24 58:1
  64:17 65:14 86:22
  113:24 114:22
  117:8 174:13
  177:15,18 179:20
  187:2,3 189:24
  190:1 192:3,6
  205:19 232:13
  241:12 248:3
  256:19 268:11,14
**okay** 7:16,18 8:11
  8:21 9:16 10:8
  11:10,20 12:2,6,15
  13:5,18,23 14:3,14
  14:18 15:4,16,23
  16:7,13,19 19:11
  19:19 20:3,23
  22:2,6,15 23:13
  24:4,16 25:2,17
  26:9,25 27:9
  30:14 31:18 32:4
  32:15,18 34:4,8,13
  35:7 36:19 38:4
  38:24 39:3 40:25

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[okay - osborne]**                                                                 Page 32

| | | | |
|---|---|---|---|
| 42:1 48:25 49:4 | 166:14 167:12 | 181:21 238:1 | **orange** 3:8 10:12 |
| 50:7 51:19 52:6 | 170:21 171:11,12 | 263:24 | 10:17 22:23 40:20 |
| 53:10 54:4,12 | 171:15,18 174:4 | **olson's** 211:20 | 53:22 58:22 69:15 |
| 56:7 57:20 58:11 | 174:13 175:2 | **once** 53:6 135:2 | 86:1 110:18 |
| 58:13 59:16,21 | 178:4 181:16 | 191:1 244:17 | 204:14 206:15 |
| 60:17 64:18 65:14 | 182:4,9,20 184:11 | 257:25 279:20 | 214:7 216:13 |
| 66:3 67:4,9 69:9 | 184:19,20 186:11 | **one's** 39:12 | 240:4 282:14 |
| 69:13,25 70:18,24 | 187:1,5,23 189:10 | **ones** 74:25 78:17 | **order** 9:24 104:13 |
| 71:8,11,15,20,24 | 193:25 194:3 | 113:2,13,18 | 104:13 117:5 |
| 72:15 73:9 74:8 | 195:7 196:16 | 154:18,19 174:10 | 122:9 158:6 272:4 |
| 75:5,12,25 76:6 | 197:9,16 198:15 | 230:1,11,22 231:2 | **organ** 276:25 |
| 80:7 82:5,9,23 | 199:2,4 200:8,9,12 | 250:7 | **organization** 50:3 |
| 83:5 84:4 86:15 | 200:13 201:22 | **ongoing** 276:5 | 50:5 211:13 |
| 87:11,20 89:9,11 | 202:1 203:8 | **onset** 186:20 | **organization's** |
| 89:19,22 90:3,23 | 204:17,21 205:18 | **open** 142:3,4 | 220:21 |
| 92:21 95:4 97:15 | 205:25 207:5,8,22 | 190:10 252:9 | **organizations** |
| 98:1,18,21 100:14 | 208:5 209:20 | **opinion** 87:21 98:3 | 47:25 |
| 100:17,20 101:5 | 210:19,22 211:18 | 110:25 111:13 | **organize** 245:22 |
| 102:12,22,24 | 212:14 215:3 | 119:17 131:1 | **organized** 11:13 |
| 103:11,20 105:12 | 217:14 221:11 | 185:12 221:10 | **organs** 40:13 |
| 107:3 108:4,10 | 222:18 226:22 | 223:5 227:2,4 | 247:1 |
| 109:10,16 110:9 | 227:4,10,16 228:1 | 233:24 250:23 | **origin** 89:1 |
| 111:2 114:8 116:5 | 228:19 229:8 | 262:10 271:13 | **original** 3:10,11 |
| 116:15 117:17,22 | 232:20 233:6 | 274:13 | 11:8,13,14,18,20 |
| 118:9,21 119:3,11 | 237:16 238:12,18 | **opinions** 14:23 | 12:10 16:1 31:11 |
| 122:11 124:1,3,9 | 241:12 243:23 | 15:2,11,13 16:16 | 31:12 100:20 |
| 124:25 125:24 | 245:25 251:8,13 | 17:4,14 22:9 | 103:17 125:15,20 |
| 126:4,13 129:14 | 251:14 254:12 | 43:19 71:12,14,17 | 139:21 142:19 |
| 131:3 132:15 | 256:19 258:3,19 | 71:19 85:17 98:8 | 279:7 282:12 |
| 134:14 136:3,5,9 | 262:19 263:10 | 99:22 100:1,10 | 284:17 |
| 136:12 137:9 | 265:9 266:8,16 | 108:17 109:25 | **originally** 201:12 |
| 139:12 140:16 | 268:8,23 269:23 | 111:7,7,11,24 | **osborne** 2:2,2 3:4 |
| 141:21 145:15 | 270:2,11,20 274:1 | 142:20 143:13,16 | 3:5 6:22,22 10:7,9 |
| 146:15 147:1,9,17 | 277:14 278:18 | 144:17 157:18,25 | 10:23 12:21 14:12 |
| 147:25 148:8,22 | 280:8 | 158:2 224:5 228:8 | 14:15,17 16:3 |
| 149:5,19 150:13 | **old** 258:3 259:22 | 262:19 | 19:22 21:17,21 |
| 151:20 152:21 | **older** 42:15 78:17 | **opportunity** 184:9 | 22:18 23:14,17 |
| 155:7 156:12 | 259:2 | **opposed** 120:8 | 24:17 25:20 28:23 |
| 158:17 160:14 | **olson** 6:23 106:12 | 207:23 211:21 | 29:2 31:6,14,23 |
| 162:11,18 164:9 | 107:4 166:4 | 231:7 | 32:10 33:19 37:25 |
| 164:13 165:1 | 167:18 175:24 | | 41:3,6 44:6 45:9 |

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[osborne - parents]**                                              Page 33

45:16 46:12 48:12
57:16 58:14 59:6
60:22 61:6 62:3
62:12,15,19 63:22
64:2,6,10,14,20
65:3,6,16,20 68:16
68:24 69:8,12
70:2,14 74:4,8,13
76:4 79:4,20 83:1
86:7 88:1 92:10
93:22 94:9 107:7
107:16 110:22
112:8 114:23
115:3,10,13 116:4
116:8,15 125:5
126:16 136:7,16
136:24 139:5,9,14
140:8,19 145:3
150:24 155:9
156:7 158:24
159:6 161:1
164:21,23 165:3,6
165:10 166:5
167:8,13 168:8,14
168:20 169:23
170:8,25 174:11
174:13 177:9,19
181:15 182:1,13
182:16 184:8,25
187:25 189:7,10
189:20 191:25
192:5,9 193:21
197:11 198:7,18
199:13 200:5
204:2,8 205:16,18
210:8 214:11
215:9 216:20
217:3,20 219:11
219:21 220:5,8
222:9,12 223:23
224:8,21 227:5

234:11 235:15,19
235:23 236:4,10
236:16 241:16,21
243:6 244:15,23
245:21,25 246:3,9
246:16 247:22
248:19 251:16
252:25 254:10
255:24 257:18
258:17 262:24
263:14 264:8,11
265:11,14,21
266:1,8,24 267:13
267:19,23 268:5,8
268:12,17 269:3,9
269:15 272:2,19
273:2,22 274:10
276:16 277:11
280:21,24 281:3
281:15,20 282:1,7
282:18
**osborne's** 14:1
106:11 127:22
**outcome** 283:15
**outlier** 263:22
**outside** 39:7,9
81:5 88:6,17
120:10 167:21
200:21
**overall** 160:12
**overbundling**
173:19
**overheating**
173:19 214:2
229:25
**overly** 148:5
**oversight** 145:6
**overstepped** 22:16
**overstepping**
22:19

**ownership** 10:21
**oxygen** 66:16
255:10 276:1,5,23
**oxygenation**
275:18 276:11
280:17

**p**

**p.m.** 177:24,25
178:3 282:21
**paci** 135:18
**pacifier** 135:18
171:2,4,9
**pad** 57:9
**padding** 55:13
56:22,23,24 57:2
57:10
**pads** 252:10
**page** 3:2,7 4:2,6
5:2 34:15,19
44:13,17 69:25
70:13 72:18,21
79:13 96:4,11
97:16,24 101:22
102:4,6 111:8
112:16 113:19
117:7 119:6
121:20,21 122:8
124:7 128:13
140:11 141:6
142:14,18 176:1
179:3 180:4,22
181:4,19 182:1,2
183:1,7,18,21
184:6,14,17,25
187:19,19 188:6
188:19 189:4,7,9
189:12,19 190:2
195:20 201:6,17
208:11,25 210:7
212:2 219:17
221:7,18 222:9

232:15 233:22
234:3 243:13,20
245:15 247:25
256:7 261:22
285:7
**pages** 5:16 96:3
97:2 112:17 186:2
249:25 255:11,17
265:25 286:7
**paid** 89:2 137:14
**pamphlet** 163:17
**panel** 142:4
**panels** 142:2
**paper** 41:11
172:17 173:5
274:18
**par** 19:2
**paragraph** 98:2,8
99:2 100:1 111:8
179:6 181:6,11
189:17 190:19
201:7 202:4 237:5
261:25 262:2,25
263:3
**paragraphs**
184:24
**pardon** 177:13
179:18
**parens** 229:3
**parent** 18:23
152:4 166:10
188:24
**parent's** 4:21
161:21
**parental** 50:13,22
230:10
**parents** 44:15 51:4
54:16 83:10,21,24
85:5 91:9,15,21
92:14,15 93:12
94:11 151:16

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[parents - physiology]**                                                Page 34

152:2 162:8
176:20 177:5,12
177:12 179:14
195:7 212:22,25
213:4 261:23
263:21
**parlance** 37:23
**part** 16:4 24:25
26:10 28:13 35:12
41:17 46:14 47:4
48:24 50:5,8
52:14 77:22 91:21
91:23 94:8 96:23
96:24 102:24
104:16 109:24,24
111:2,3 119:18
124:5 131:24
137:21,25 141:13
141:19,21 142:1
142:15,21,21
145:12 154:11
156:19 159:3
181:20 182:5
194:5 206:25
209:3 212:3,21
214:2,3 224:2
226:3 239:23
251:21 262:20
267:17
**partial** 123:3
**partially** 200:22
**participates** 142:2
**participation** 5:10
220:18,24
**particular** 141:24
231:1 260:16
**particularly** 40:23
212:5
**partners** 244:16
**parts** 103:15
109:20

**party** 283:15
**passing** 41:14
141:5
**passive** 166:25
167:6
**path** 42:9 58:2
183:2
**pathologist** 17:19
20:24 21:1 34:2
36:1,20 37:4 38:8
112:12 138:23
139:3 242:11,18
243:1,3,10,11
**pathology** 18:12
34:4 40:3 242:10
244:25 245:4
261:2
**patient** 189:2
229:2,11 239:22
**patients** 51:13
52:22 80:2 82:16
82:19 147:17
148:18,19
**pay** 112:19 115:22
**pediatric** 71:3
147:17 148:18
280:6
**pediatrician**
145:18
**pediatricians**
147:23
**pediatrics** 5:7
41:18 42:14 75:9
153:17 191:21
192:12 201:23
211:3,5,9,12 226:7
235:12 237:6,10
268:20
**peds** 75:11
**peer** 62:9 67:25
68:21

**pejorative** 149:7
**penmanship** 248:2
264:22
**penn** 226:9
**pennsylvania** 1:15
1:18 6:14 7:22
**people** 19:1,3
34:25 36:10 42:21
42:22 44:19 47:2
47:7 55:25 56:3
60:8 68:10 83:7
84:17 88:8,15
91:18 92:4 95:10
138:18 141:15
151:11 160:6
161:7,12 167:15
171:20 172:2,6
187:10 193:16
210:17 212:16
218:17,17 240:21
244:14 263:17
271:12 274:19
276:2 278:8,11
279:1
**people's** 32:13
113:15
**percent** 45:1 59:5
99:21 145:1
146:16 147:8,9,14
148:12,22 172:23
193:9
**percentage** 145:24
147:4,5 150:10,19
**percentile** 260:16
**perfectly** 144:7
**peribronchial**
40:15 247:3
**period** 13:16
172:16,25 173:4
223:7

**periods** 47:8
**perishing** 156:2
**permission** 83:17
**permitting** 236:5
**person** 7:21 22:3
231:16 240:20
**personal** 80:5
**personally** 38:10
41:16
**perspective** 50:23
106:22 210:13
**pertaining** 185:15
**petechiae** 40:11
41:1 246:24
**philadelphia** 7:25
**phoenix** 103:25
**phone** 118:5,13,17
122:15 142:7
**phonetic** 112:11
114:22 153:6
162:3 276:3
**photocopied**
245:16
**photograph** 4:23
165:13
**photos** 103:20
**physical** 270:13
**physically** 131:10
**physician** 8:7 44:3
**physics** 254:1,2,12
254:16 274:16,17
274:17 275:7
**physiologic**
233:24 234:1
**physiologist** 17:20
275:13 279:9,13
279:24
**physiology** 226:8
254:2 279:15,22
280:7

Case 2:19-cv-02689-GMS    Document 191-3    Filed 11/19/21    Page 110 of 132

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[pick - potential]

Page 35

**pick** 170:19
**picked** 44:16
    239:2
**picking** 93:6 95:14
    121:15 224:12
**pictogram** 54:23
    54:24
**pictorial** 44:23
**picture** 54:22
    265:12 266:14
**pictures** 105:23
    128:3 131:8,10
**piece** 8:6 221:4
**pieces** 18:12
    138:18 212:12,13
    245:2
**piedmont** 2:8
**pilarz** 109:11
**pile** 84:18 243:18
    282:17
**piles** 84:22
**pillow** 274:21
**pillows** 166:16
    190:6 231:3
**pipe** 190:15,17
**place** 16:11 18:17
    28:19 163:6
    166:11 176:23
    215:16 242:6
    260:12 283:7
**placed** 181:24
**places** 60:14
    214:23 215:21
    272:12
**placing** 213:20
    222:6
**plagiocephaly**
    213:22 222:16
**plaintiff** 1:4 2:5
    89:6 124:17,18
    221:14 244:11

**plaintiff's** 4:13,14
    69:21 70:5,6
**plaintiffs** 38:7
    70:17 72:22 85:22
    104:5 105:7
    109:19 112:6,13
    112:24 113:5
    115:25 238:1
**plastic** 79:2
    252:15
**play** 12:25 23:5
    48:9,18 52:7
    61:20 76:22 79:14
    80:3 117:25 127:9
    127:18 128:14,15
    129:5,21 130:1,20
    130:24 131:5,8,13
    131:24 132:12,22
    134:10 136:7
    155:25 156:4
    157:8 163:10,15
    163:16 174:5
    180:19 182:15
    194:8 195:9 196:9
    197:9,19 198:16
    199:6,19,23 219:2
    223:21 230:10
    233:9 244:1
    250:19,24 252:22
**playard** 53:9
**playards** 252:16
**played** 128:5
    256:25
**playpen** 156:3
**playpens** 156:1
    159:18 160:11
**plays** 127:25
**please** 7:4 9:11
    27:1 63:23 65:16
    65:17 135:21
    168:25 175:6

177:20 209:11
    234:12 236:6
    246:10 284:7,11
**plenty** 60:13 84:21
    149:9
**plus** 30:21 122:22
    122:22 123:10
    124:19,19 174:4
**plush** 77:17
**pneumogram**
    227:2
**pocket** 40:19
**point** 42:24 55:12
    86:15 93:18 99:7
    102:2 123:20
    129:19 130:6
    131:23 148:11
    151:15 172:14
    175:24 181:1
    186:1 215:17
    222:19 269:1
    272:13
**pointed** 234:23
    272:1
**pointing** 158:8
    181:13 197:8
**police** 5:3 94:19
    95:21 98:12,23
    100:17 106:16
    107:3,13 163:24
    168:5 178:5,13
    179:2 180:4,7
    182:10,24 183:6
    183:18 188:11
    189:8 255:13
    256:13,14 261:18
    261:21 263:1
    273:20
**policies** 209:23
    236:25

**policy** 3:16,18,19
    5:10 25:9,13,16,23
    26:2,3,12,13 59:10
    60:3 154:25 155:1
    155:3 205:3
    206:18 207:6,15
    207:19,23,25
    208:1 209:12,14
    209:16,18,19,22
    210:2,4 214:6
    215:4,6 216:11
    217:18 220:17,21
    220:22,23 222:22
    223:8 249:2,3,3
**polin** 280:1
**poor** 276:11
    280:17
**poorly** 133:12
**population** 231:16
**posed** 37:20
    180:18
**position** 44:25
    67:25 68:22 79:23
    146:8 173:18
    181:9 197:17
    223:15 226:1
    255:5,7 275:3,4,8
    275:19
**positional** 193:10
    213:22 222:16
**positioning** 229:23
    278:9
**positions** 66:18
    149:16
**possibility** 223:19
**possible** 202:5
    249:24
**post** 229:4,17
**postnatal** 51:8
**potential** 66:10
    78:7 201:7,10

252:18 274:6
**potentially** 78:20
151:17 273:10
**potentiate** 213:21
222:7
**potentiating**
222:15 229:14
**pounds** 203:11
261:9
**power** 177:20
178:1
**powerpoint** 81:19
**practice** 52:16
147:15 148:3,12
148:17 155:6
**practices** 82:21,25
118:23
**practicing** 41:20
145:16
**practitioner** 151:7
**practitioners**
152:15
**pre** 51:8
**predisposing**
256:24
**prefer** 45:3
**preference** 59:20
**pregnancies**
238:13
**pregnancy** 99:6
174:17 175:23
230:3
**premature** 174:18
**prematurity** 150:6
230:7
**prenatal** 230:5
**preparation** 78:24
115:21 122:16
**prepared** 36:2
127:16 132:8
134:7 152:3

**preparing** 151:24
**preponderance**
263:25 264:2
**present** 2:13 6:19
82:9,10,13,16
256:3
**presentation**
81:19 84:7
**presentations**
80:25 81:9
**presented** 140:12
**presenting** 140:17
**press** 15:9 78:1
281:13
**pressed** 78:16
257:9
**presumably** 193:6
**pretend** 139:3
**pretty** 39:22 60:9
60:9 102:20 115:8
171:24 174:16
176:20 245:10,24
251:9
**prevent** 153:14,15
153:16
**prevented** 202:6
**prevention** 50:18
58:9 226:8
**previously** 33:24
**price** 1:6 6:10
127:8,18 128:14
134:10 164:4
284:3 285:1 286:1
**primary** 113:13
149:25 187:10
**prime** 28:12
**principles** 221:21
**print** 240:8
**printed** 122:13
**printouts** 34:10

**prior** 32:8 86:24
86:24 96:24
**privileges** 52:13
52:15
**probably** 14:4
22:5 37:13 41:19
42:9,18 48:10
74:2 95:18 113:2
117:11 124:23
129:8 138:15
141:10 146:18
147:7 167:23
198:13 205:20
213:12 231:9
236:10,21 237:21
243:2,17 255:6
259:23 272:14
**problem** 255:25
257:17,20 266:3
268:2 277:5
**problematic**
202:17 252:13
**problems** 55:20
175:25 257:12
**proceed** 165:8
**proceeding** 136:8
210:16
**proceedings** 5:11
220:19,25
**process** 31:20
211:6 212:19
276:5
**produced** 16:14
72:22 97:8 116:24
126:2 253:22,22
**product** 13:10,11
30:24 45:3 57:3,3
59:19 66:22 68:11
68:14 80:8 87:25
90:15 93:24
112:17 114:16,19

128:2,3,4 130:2,4
130:5,11,12,13,13
130:14 131:2,2,11
131:11 135:3,6,15
135:18 136:10,11
136:20 153:10
156:16 157:5,8
158:10 164:2
198:14 203:9
204:4 214:13,14
214:19 218:3,13
218:18,19,23
219:5 233:17
250:10 251:4
252:21 269:11
**products** 13:6
57:5,8,11 92:16
131:17 133:19
135:17,20 141:25
142:12 156:18
157:4 158:12
160:1 170:7
221:24 244:4
250:6
**profanity** 65:25
**professional**
145:21 148:23
150:22
**professor** 269:17
**program** 277:16
**prohibit** 214:10
**prohibition** 219:8
249:2
**prohibits** 215:7
216:15 219:19
223:7,9
**project** 135:1
**promise** 266:1
**promised** 205:9
**promote** 163:5

**[promoting - quote]**                                                                 Page 37

promoting 51:7
prone 66:18 160:5
  173:18 226:1
  229:23 232:4
  255:5 275:4,19
  278:9
pronounce 115:3
  115:10
proper 7:13 92:15
  202:11 215:12
  221:17
properly 90:19
  91:1,3,15 93:7
  163:13 164:5
  196:6 200:16
  202:6 223:21
  258:15 261:6
property 211:2
proponent 91:19
proportion 254:19
proposed 78:11
propounded 286:9
props 199:11
prosecutor 221:14
protective 9:24
  104:13 175:8,10
protects 248:17
provide 83:19
  157:16,18 185:12
  221:19 262:11
provided 24:18,19
  24:21 70:22 73:9
  74:15 87:4 94:16
  161:6 227:20
  240:3
provides 79:2,15
  226:17
providing 221:17
public 1:17 59:11
  278:10 283:5,22
  286:21

publication 31:20
  154:20 212:20
publications 210:1
published 31:4,5,9
  31:12,13 33:23
  75:9 152:10
  277:24 278:16
pull 26:8 32:16
  55:6 58:24 61:8
  69:18 107:18
  108:10 155:20
  158:18 166:9
  179:2 180:25
  188:11 195:19
  203:10,16 208:1,4
  208:18 253:20
  272:24
pulled 23:24 33:14
  39:23 40:2 49:22
  51:3,16,19 53:21
  60:15 171:24
  193:19 265:3,24
  281:11
pulling 37:18
pump 261:5
punish 110:7
purchase 129:22
purports 233:8
purpose 51:19
  82:6 107:1 162:8
  201:11 232:18
purposes 23:24
  35:4 53:22 59:4
  250:9
pursuant 9:23,25
  104:5 283:6
pursue 278:3
purview 159:10
push 203:10
put 10:18 16:4,5
  18:16 34:13 35:5

40:7 48:19 53:20
  53:21 58:6 63:6,7
  72:3 75:23 78:9
  84:17 91:11 92:1
  107:24 117:11
  119:7 125:2
  133:12,21 144:12
  145:25 148:6,9
  151:11 155:18
  166:21 172:2
  178:12 180:8
  188:9 191:15
  196:12 197:21
  204:10 209:6,16
  211:23 219:8
  221:23 224:14,17
  225:19 229:17,22
  230:18 231:25
  242:6 247:6
  249:21 250:2
  255:4 264:1
  267:10 274:18
  278:5,7,10
puts 91:5 154:12
  154:13
putting 56:14,15
  130:15 193:15
  232:4 272:4

**q**

quantity 190:13
quarantined 59:12
quarrel 71:8
queen 189:22
  190:3
question 8:16 10:2
  19:7,15 31:22
  32:2 37:20 40:4
  44:2 55:14 57:9
  62:21 68:15,20
  69:1 83:2 86:12
  90:17 98:10,16

100:24 106:18
  113:24 116:25
  141:18 148:5
  156:19 160:8
  164:6,9 168:24
  169:13,14 178:22
  179:11 180:18
  202:23 214:5,5
  215:2 216:10
  217:2,6 218:24
  234:21 238:16
  243:8 267:1,7
  270:4 271:2
  278:13
questioned 250:18
questioning
  267:18
questions 9:1,4
  40:20 87:2 110:16
  111:16 141:16
  146:24 156:13
  158:21 184:9
  206:13 244:19
  249:1 250:20
  255:20,23 259:10
  264:12,16,22
  266:10 269:12
  277:11 280:20
  286:8
quick 125:3
  245:24 261:20
quicker 258:12
quickly 72:16 99:2
  155:13 264:23
quite 31:19 129:15
  254:17
quote 4:11 42:19
  58:17,23 60:15
  67:13 246:23
  264:3

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**[quoting - record]**                                                      Page 38

**quoting** 234:19

**r**

**r** 283:2 285:4,4
**race** 53:16 140:11
  140:13
**rachel** 27:13
**racial** 53:12,23
**radcliffe** 27:5
**raise** 272:17
**raised** 213:24
**ramirez** 276:3
**randomized** 63:2
  225:13
**range** 17:18,21
  18:10 99:20 251:3
**ranging** 19:6
**rapidly** 257:20
**rare** 226:14
  238:25 239:11,14
**raspy** 176:9
  182:22 183:24
  185:8 262:7
**rate** 157:4 158:12
  230:8 231:17
**rates** 155:24 156:1
  158:6 160:9,10,12
**reached** 203:11
  277:24
**reaching** 157:11
**read** 28:21,21 30:8
  32:8,12,12,18,24
  32:25 35:22,23
  37:9 38:15,17,18
  38:19 56:4 57:25
  61:16 78:21 94:22
  98:15 99:24
  101:17,18,21,21
  102:3,20 107:9
  112:14,16 113:1,7
  113:7 146:23
  153:3,3,6,20

163:15 167:5
175:22 176:19
179:1 180:12
194:1 198:20
201:20 203:6
206:23 209:24
213:13 216:10
219:17 228:24
234:5 237:12,18
237:20 246:6
249:11 267:7
273:12 280:11
281:1 284:7 286:6
**reading** 39:16,25
  85:9 190:19
  207:19,21 222:25
  229:5 235:16
  247:7 275:15
**ready** 37:19
**realistic** 258:4
**reality** 83:14
  93:16
**really** 8:19 18:21
  18:22 41:16 53:17
  56:13 57:11 58:23
  65:14 75:20 83:3
  83:12,17 93:3
  96:17 99:2 108:6
  110:12 114:21,21
  126:16 129:25
  133:12 141:1
  146:14 177:5
  199:20 206:5
  222:3 229:16
  233:2 234:6
  250:11 251:10
  257:9 259:8,20,21
  263:9,21 270:12
  271:12 272:7
  278:2

**reappraisal** 3:22
  28:5,8 76:9
**reason** 16:2 39:12
  44:16 68:5 77:9
  77:17 154:9 225:5
  250:13 284:9
  285:9,11,13,15,17
  285:19,21,23,25
**reasonable** 99:23
**reasons** 78:7
  231:18
**rebreathe** 255:8
**rebreathed** 276:18
**rebreathing** 252:7
  252:13,17 253:18
  253:23 270:10,16
  270:21,22 271:2,5
  274:13 275:21,25
  276:23 278:22
  280:13
**rebut** 16:21,25
  17:6 22:9
**rebuttal** 3:12,13
  11:8 15:17,18,21
  16:4,13 17:3 22:6
  38:19 69:19
  108:13 113:7,17
  123:21 124:5,11
  126:7,12 127:3,14
  127:16 132:9
  134:8 137:5,22
  138:8 142:17
  143:14 164:24
**rebuttals** 98:19
  111:22 120:20
**rebutting** 22:8
**recall** 11:22 37:9
  41:1 67:10,19
  101:22 131:15
  163:18 179:15
  185:5 186:12

250:20 255:20
**recap** 109:17,21
**receipt** 284:18
**receive** 108:24
**received** 33:5
  38:24 108:21
  109:14 113:22
**receiving** 230:5
**recess** 125:11
  170:13 179:23
  281:7
**recheck** 208:23
**recitation** 273:17
**recognize** 70:21
  141:10 241:12
**recollect** 47:16
**recollected** 141:4
**recollection** 108:2
**recommend** 53:3
  83:12 160:5
  219:14 221:23
  252:10 253:14
**recommendation**
  210:5 216:23
**recommendations**
  4:11 13:11 58:18
  68:9 83:7 85:6
  92:6 96:15 154:20
**recommended**
  210:4 212:4
  223:17 250:5
**recommending**
  220:13
**record** 6:2,21
  24:18 40:7 69:23
  125:10,11,13
  164:16 170:9,11
  170:13,15,16
  177:20,21,23
  178:2,23 179:19
  179:22,23,25

Case 2:19-cv-02689-GMS    Document 191-3    Filed 11/19/21    Page 114 of 132

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

[record - report]

Page 39

245:22 248:6
264:20 268:25
273:7,9 280:25
281:4,6,7,9,21,25
282:10 283:13
**recorded** 6:3 81:7
108:22 283:10
**records** 5:3,4,5
13:14 95:5 96:20
96:24 97:22,25
98:7 100:18
101:11 102:8,16
102:21 103:13,25
106:5 109:19
119:2,9 174:19
178:6,8,13,14
180:4,7,25 182:10
182:11,25 183:6,6
185:5,23,25 186:4
186:14 187:3
188:12 203:16
233:7,10,12,12
238:10 261:16
262:15,21 263:4
263:10,21 273:15
273:20,24 274:3,4
**recreation** 254:19
254:25
**recycle** 81:20
**red** 35:10 40:8
150:6 250:15
**redirect** 64:1,22
65:19 255:25
**reduce** 77:14
162:25
**reducing** 51:7
223:13
**reed** 170:25
**reenactment**
130:15 181:21
182:5

**refer** 38:4 59:25
120:10 185:14
198:13 199:19
230:6
**reference** 35:7
37:7 70:25 94:21
94:25 95:2,10,12
98:13,22 106:6,9
193:15 234:9
244:24 245:1,14
250:17 261:24
265:5 270:13
**referenced** 71:11
127:17 134:8
154:19 183:5
267:13 271:17,22
281:11
**references** 24:8
95:8 222:14 245:5
**referred** 33:17
34:20
**referring** 31:2
95:8 120:7 132:1
145:8 158:23
183:3 193:21
236:18 253:21
267:16
**refers** 104:9
**reflect** 73:20 81:23
211:12
**reflects** 45:19
**reflex** 248:16
**reflux** 213:22
222:8,15,15
223:13 229:3,12
229:12 233:24
**regard** 139:18
239:16 273:9
**regarded** 235:13
**regarding** 13:11
43:24 129:6

142:19 160:10
227:2 233:24
250:14,19
**regardless** 61:1
157:20 212:18
221:13
**registry** 160:21
**regular** 90:20
240:24 241:2
**regulatory** 140:24
**reinforces** 85:11
**relate** 12:24
**related** 15:7 17:15
20:11 21:12 66:9
81:11 214:8
231:10 256:24
257:21 272:15
273:17
**relates** 40:6 96:12
124:7
**relation** 248:8
271:10,11
**relationship** 231:6
231:6 234:1
**relatively** 66:24
**releasing** 282:12
**relevance** 47:24
**relevant** 20:1
98:16,20 137:2
210:13,15,15,16
221:19 223:6
233:13 238:12
246:6 256:22
263:9 264:7
271:19
**reliable** 221:19
226:25
**relied** 23:11
102:24 109:24
110:17 273:16

**rely** 109:18 226:19
227:4
**remaining** 264:12
**remember** 85:6
90:16,19 92:19
107:25 108:9
206:25 212:11
233:17 255:14,18
255:22 268:5
278:13
**remembering**
210:12,12
**remiss** 272:16
273:9
**remotely** 6:20
**renal** 40:12 246:25
**renowned** 172:7,7
246:21
**repeatable** 234:7
**repeated** 280:16
280:16
**repeats** 187:4,4,4
**repetition** 186:2
187:1
**repetitive** 276:10
**replicating** 254:22
**report** 3:10,11,12
3:13 5:8,9 11:3,7
11:8,9,13,14,18,20
12:4,10,17,18,20
13:13,24 14:5,9,21
14:22 15:18,21
16:1,14 18:15
22:7 24:5 25:7
26:5,17,19 28:8
29:5 30:15 32:15
35:23 37:12 38:18
38:19 45:20 48:5
48:7 56:5 59:24
60:4,13,14,25 61:4
61:15,16,24,25

62:7 69:19,19
71:11,16,17 75:2,3
86:12,14,18 87:5,9
87:16,18,19,21
89:6,16 90:8,24
92:18 94:17,22,25
95:7,13,15,21
98:12,13,14,21
100:10,20 101:5
101:18,25 102:2,5
103:17,21,21,23
104:15 105:3,5,9
106:4,6,9,23
107:12 108:13,15
108:19 109:9,14
109:17,17 110:12
110:14 111:3,20
111:24 112:3,17
113:7,8,17 114:5,5
114:15 115:7
117:2,16,21
118:14,18 119:4,8
119:16 120:3,3,18
122:16 123:16,18
123:22 124:4,5,7
124:11,21 125:15
125:20 126:1,7,12
127:4,14,16 132:9
133:3,23 134:8
136:1,3 137:5,22
137:23 138:17,19
139:21 142:18,19
143:14,22,23
144:5,12 153:3
154:20 155:23
158:3 164:2,25
168:5,19 170:2,22
170:22 171:11
172:11 173:16
175:14,16,20
176:1 177:6 180:7

183:2,18 184:17
189:5,8 190:23
191:13,20 192:18
192:22 193:5,12
194:5 204:23,25
206:19 207:6,10
207:20,24 208:1
208:12 209:16,18
209:19,19 212:1
212:11 215:5,7
216:11 217:13,15
217:18 218:2,9
222:6,19,22 223:3
223:8 227:21
228:16 229:14,23
232:9,18 233:17
233:23 235:22
237:12,19 240:23
243:13,14,21,22
246:17 249:25
251:12 255:13,14
256:13,14 257:16
258:8 261:18,19
261:21 262:13,14
263:11 268:13,14
270:22 271:3,5,14
272:13,17 278:18
279:7 280:13,15
**report's** 252:20
**reported** 156:16
  168:12 193:8
  201:14 256:9
  261:10,16
**reporter** 1:17 6:17
  7:4 8:11,14,20
  29:9,12,18,21
  104:21 144:2
  213:9,12 246:8,12
  282:5
**reports** 16:24
  18:24 23:4,15

25:9 37:7,13
38:16,18 39:16
47:4 66:9 78:22
78:23 86:24 98:23
104:5 106:16,17
112:4,14,15
120:12 124:17,18
124:18,19 129:10
137:6 138:4,8,9,9
144:9,14 154:25
155:4,19 163:24
174:23 176:20
205:11 206:14
207:21,22 208:21
209:15 210:2,7,19
211:8,11 226:17
236:24 241:6
244:8,25 245:4
246:6 256:12,15
256:17,18 264:1
266:23 270:18,21
270:21 271:17
276:20
**represent** 53:17
  211:14
**representative**
  142:10,11
**represented** 89:14
**representing** 2:5
  2:10 45:18
**reprint** 44:14
**reproduced** 35:14
  248:24
**reputable** 237:7,8
**reputation** 169:20
**request** 24:14
  127:15
**requests** 5:15
  105:8
**require** 248:11

**requirements**
  47:25 170:3
**requires** 242:9
**reread** 272:11
**research** 18:19
  35:13 36:15 62:23
  63:1,2 141:7
  146:13,21 149:4
  150:2,2,4,5 248:23
**researched** 188:20
**researcher** 172:7
  276:3
**researchers** 18:17
**reserve** 10:5
  264:12 280:25
**reserving** 10:4
**residencies** 151:9
  151:10
**residents** 151:8
  152:15
**residue** 190:16
**resolved** 99:11
  211:6 259:7
**resolving** 257:20
**resources** 51:7
  211:10
**respect** 42:16
  127:16 134:8
  224:4 226:11
  245:4 255:20
  259:12 274:11
**respected** 44:8
  227:17 236:22
**respiration** 223:16
**respiratory** 66:19
  176:18 186:10,18
  187:6 226:8
  279:21 280:3,5,6
**respond** 276:13
  277:9

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[responded - robert]**                                          Page 41

responded  17:2
response  69:22
  111:22 276:9
responses  4:13
  70:5 94:3 109:20
responsibility
  92:8 93:20
responsiveness
  10:2
rest  25:8 85:19
  193:10
restrain  163:21
  164:7 195:8
restrained  107:6
  107:10,14 108:2,6
  178:22 182:12
  196:6 200:16
restraint  165:25
  166:4 223:21
restraints  195:5
  202:8,11,20,20
  203:25
restricted  213:2
  249:23
restriction  99:18
  174:15
result  165:22
  223:14
results  227:3
resume  73:2
resuscitate  277:4
resuscitation
  150:3 277:16
retained  103:7
  131:4 175:12
  227:21 257:22
retired  34:6
  114:20
retrieve  281:4
return  284:16

reuptake  248:15
revealed  258:22
review  23:5 29:6
  62:9 67:25 68:21
  96:19,24 103:12
  117:20 118:13,14
  119:2,9 122:15,16
  127:19 138:1
  141:25 160:22
  161:2 206:5 211:7
  212:19 242:20
  262:14,20 263:4
  273:8
reviewed  4:18
  24:18 27:7 37:17
  78:23 86:4,9 95:5
  98:11 101:12
  104:12 105:11
  106:13 110:24
  112:23 113:18
  114:13 130:4
  178:16 186:14
reviewers  211:11
reviewing  123:23
  141:17 193:7
  214:16 272:17
reyes  104:18 105:1
  180:6 185:13
rhinitis  176:16
rid  188:13
right  9:19 11:3,16
  19:19 23:17 29:12
  29:23 40:4 43:20
  45:12,15 47:6
  48:11 50:14,25
  51:17 53:20 54:3
  54:6,25 55:12,19
  60:19 61:22 72:23
  74:24 75:25 80:17
  83:21 84:23 85:2
  92:8 93:15 94:14

95:24,25 96:25
97:18,22,25 98:3
99:24 100:7 101:1
101:12 102:16
103:19 104:3
105:20 107:12
108:8 111:9,23
114:8 115:18
116:11 117:23
118:15 121:2
122:17,23 124:5
124:13,22 129:20
130:18 131:9
133:3,6 134:1,11
136:4 137:14,20
139:20 140:2,4
141:23 142:22
143:14 145:22
149:25 152:5
158:20,24 159:8
162:6,15 163:3,8
163:24 165:10,17
166:1,19 167:3,5
170:5 171:9
172:18 178:20
179:9,14 184:11
186:16 187:18
188:9,10 191:3,15
192:19 193:1,20
195:2,19,21 196:3
196:7,20,25
200:18 201:20
202:2,18 203:23
204:1,19 205:3
207:14,21 208:15
208:24 211:16
214:3 218:15,25
220:23 221:5,6
222:12 227:1
229:5 233:1
235:25 241:12,20

241:23 244:12
249:13 251:17
255:25 256:3
266:3,20,23
267:22 268:8
269:19 270:5
272:4 273:18
281:20 282:9
rings  211:16
risk  53:14,18,19
  54:2,10,18 63:13
  67:3,19 68:1,23
  69:3 83:24 99:17
  99:19 100:5,11
  111:17 119:1,21
  119:22,24 120:5,6
  120:9,17,22,24
  121:4,6,7 142:24
  153:14 163:1
  167:1,15 168:18
  169:6,10,15,17,17
  169:19 171:16
  172:19,21,22
  173:13 174:9,21
  174:24 175:3,13
  175:19 176:4
  191:6,8,9,12 228:5
  228:9 230:7,12,13
  230:19,24,24,25
  230:25 231:9,10
  231:13,22 232:7,8
  232:10,11,14
  233:2,9,13,25
  238:15 251:19,20
risked  169:20
risks  66:10 159:24
rnps  155:25
road  1:15 2:3,8
  6:13
robert  2:14 6:15
  185:7 262:6

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**rock** 12:24 23:5
48:9,18 52:6
61:20 76:22 79:14
80:3 117:25 127:8
127:18,25 128:14
128:15 129:5,21
130:1,20,24 131:4
131:8,13,23
132:12,21 134:10
136:7 155:25
156:4 157:8
163:10,15,16
180:19 182:15
194:8 195:9 196:9
197:9,18 198:16
199:6,19,23 219:2
223:21 244:1
250:19,23 252:22
**role** 48:3 145:11
146:10,11,12
158:1,2 230:10
233:9 256:25
**rolling** 102:13,19
**room** 6:19 43:12
148:7,10 150:3
168:6 190:4,20
191:2 229:25
277:8
**rough** 110:13
282:2,3,4,8
**roughly** 52:7
147:5
**routine** 35:14
142:5 212:4
245:10 248:24
**rpr** 1:17 283:21
**ruani** 153:7
155:22
**ruani's** 153:6
**rude** 8:19

**rule** 12:4 215:17
**rules** 10:10 24:19
235:24
**run** 41:15 72:15
142:6 238:21
239:14
**rush** 282:9

**s**

**s** 3:6 4:1 5:1
**safe** 4:22 44:19
51:7 53:7 57:4,12
62:17 63:9,11
68:3 75:4 76:19
82:7,21,25 83:24
85:1,6,10 90:15,18
90:25 91:20,20
93:7 96:13,15,25
96:25 97:17 98:6
103:12 111:3
114:19 118:23
142:20 143:4
149:21 152:5,24
154:16,18 155:8
161:22 162:9
163:5 218:7,7
219:15 220:14,15
225:6 251:15
253:15
**safely** 91:13
**safer** 63:8 159:25
189:3
**safest** 53:1 83:18
91:17 92:6,14
214:25 215:16
**safety** 4:9 17:17
18:11 19:20 30:24
44:15 45:4 49:8
50:1,4 63:1 81:13
94:8 140:24 143:3
156:16 160:2
166:12 194:6

215:16 250:14
**saint** 240:15
**sake** 72:11
**salient** 273:10
**sam** 85:4
**samaritan** 52:18
**sat** 128:5
**saturations** 66:15
66:16
**save** 278:8
**saved** 239:10
**saving** 162:5
**saw** 94:21 107:12
107:19 119:15
121:18 164:2
172:10 176:23
177:8 186:14
234:5 236:11
**saying** 13:18 23:10
32:1,8,12 45:2,18
57:14 58:10 60:17
64:8 67:19 73:17
74:10 76:12 79:6
79:25 81:22 82:11
87:7 88:19,22
89:20 94:22
105:22 120:21,22
121:3 128:8
134:18 155:17
160:25 177:8
202:19 216:8
218:6 226:20
232:15,24 259:22
**says** 34:7 35:12
38:4 40:7 45:19
51:6,8 52:4 54:13
54:19,25 60:25
61:4,9 62:7 67:15
90:24 96:23 117:1
117:6 128:18
132:16 134:7,22

157:17 163:21
164:10 165:20,25
166:11 173:6
179:5 180:5,7,20
181:7,21 187:24
190:20 195:21
202:4 203:5 206:8
207:9,15 211:1
212:21,25 216:16
217:18 218:1
219:23 221:8,18
222:6 224:13,15
224:16,17 225:3
229:2 233:22
248:22
**scale** 261:4
**scenario** 274:25
**scene** 95:6 233:14
**schaeffer** 227:10
227:11,16 240:11
240:13 279:12,17
**schaeffer's** 227:21
**schedule** 121:19
121:20,22 122:7
122:15
**scheduling** 104:13
**scholar** 44:4
**school** 42:3,4
**schriner** 103:5
118:6 244:15
**science** 278:7
**scientific** 95:9
221:20
**scope** 15:10,13
16:20 17:21
275:10 276:20
**scratch** 123:23
**screen** 50:11
**se** 53:15,17
**seal** 283:17

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[search - sheet]**                                                                 Page 43

| | | | |
|---|---|---|---|
| **search**  50:11 89:4 | 39:18 60:5 63:7 | 138:10 158:4 | **series**  9:1 82:17 |
| **seat**  52:25 53:2,4,6 | 66:10,17 72:16,25 | 163:18,23 165:17 | 249:1 259:10 |
| 194:9,10,12,17 | 80:22 81:11 86:1 | 178:18 180:10,14 | **serious**  135:25 |
| 195:13 196:11,14 | 86:3 95:10,20 | 180:18,23 188:15 | 165:22 |
| 196:24 197:10 | 96:3 101:1,23 | 197:16 205:23 | **serotonin**  248:15 |
| 200:6,22 212:22 | 103:20 105:21 | 208:20 221:1 | **serve**  154:21 |
| 213:1,8 244:10 | 107:3,6,14 108:21 | 242:4 246:24 | 207:11 208:13 |
| 250:19,24 251:18 | 112:1 123:16 | 247:5 | **served**  24:11 |
| 251:19 267:12 | 137:24 140:21 | **self**  267:2 | **service**  241:5 |
| 268:6 269:9 | 154:9 157:11 | **semi**  181:9 | 278:10 |
| **seatbelt**  181:10,22 | 168:5,10,12 | **seminar**  80:25 | **services**  146:9 |
| 181:24 264:1 | 173:20 174:19 | **semiprone**  181:9 | **serving**  48:20 |
| **seats**  52:10 60:16 | 178:23 181:10,25 | **send**  52:22 74:12 | **session**  239:9 |
| 159:20 193:9 | 187:20 188:20 | 74:20 129:24 | **set**  82:1 140:4,6 |
| 200:20 202:8,15 | 197:7 198:21 | 266:14 270:11 | 194:19 213:18 |
| 212:3 213:2 | 204:21 209:12 | **sends**  240:22 | **sets**  71:17 82:3 |
| 250:17 252:20 | 212:21 221:14 | 265:12 | 84:8 142:19 197:5 |
| 253:3 269:10 | 222:18 223:1 | **senior**  42:12 | **setting**  35:14 |
| **seattle**  276:3 | 225:7,21,24,25 | **sense**  61:13 94:2 | 152:19 248:24 |
| **sec**  209:11 | 227:24 228:9,12 | 202:10 215:23 | **seven**  47:6 113:6 |
| **second**  124:5 | 235:8,10,16,25 | 234:15 238:17 | 124:19 192:4 |
| 133:2 142:21 | 236:25 243:17 | **sent**  105:23 127:23 | **seventeenth**  4:12 |
| 185:11 188:20 | 247:16 254:15,24 | 129:23 130:10 | 70:4 |
| 189:5,24 221:7 | 255:7 256:10 | 131:17 133:19 | **seventh**  69:21 |
| 236:15 262:10 | 260:9,11 261:23 | 138:11 183:14 | **shaff**  226:15 |
| 266:6 | 272:9,11,18,25 | 269:16 | **shamed**  248:2 |
| **secondary**  167:17 | 275:16 276:6 | **sentence**  189:24 | **shape**  56:6 |
| 169:11 | 277:8,22 | 190:19 | **shapiro**  28:12,15 |
| **secondhand**  230:9 | **seeing**  128:22 | **separate**  34:10 | 47:9 161:10 |
| **secret**  55:24 | 147:17,20 148:19 | 43:9,16 81:4,6 | 206:12 |
| **section**  4:7 35:8,9 | 189:20 228:2 | 110:14 166:22 | **share**  72:23,24 |
| 35:19 37:18 39:19 | 239:11 | 230:12 233:14 | 85:22 |
| 39:25 40:2 53:12 | **seek**  30:13 | 251:23 | **shared**  72:14 |
| 53:23 54:2,8 | **seen**  23:22 33:6,16 | **separately**  11:14 | **sharing**  174:4 |
| 72:17 96:12 | 40:11,17 41:14 | 13:25 116:5,14 | 175:9 |
| 101:23 143:16 | 42:18 70:12,19 | **september**  1:10 | **sharp**  195:3 |
| 201:18 212:2,6 | 72:12 114:11 | 6:2 118:9 | **sharpie**  247:9 |
| 262:13 | 127:25 128:2,11 | **sequence**  181:5 | **sheepskins**  166:17 |
| **sections**  212:9 | 128:12 131:2,8,10 | **sequentially**  112:3 | **sheet**  166:12 190:7 |
| **see**  9:5 11:7 12:2 | 131:12,23 133:11 | **sergeant**  106:8 | 284:1,10,12,14,17 |
| 24:10 31:21 33:8 | 133:18 135:3,19 | | 286:11 |

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

| | | | |
|---|---|---|---|
| **sheeter** 49:18 51:3 | 20:11 21:12 25:9 | **sidsology** 20:14 | 201:14,16 212:4 |
| **sheets** 166:16 | 25:12,18,22 26:4 | **sign** 44:21 154:2,6 | 213:1,1,8,18,19 |
| **sheimberg** 281:14 | 26:11 28:5,8 | 209:4 281:1 | 265:19 268:18,20 |
| **shell** 79:2,15 | 33:24,25 34:12,23 | 284:11 | **situation** 13:6 |
| **shock** 263:18 | 36:9,15 40:11 | **signature** 10:6 | 14:11 232:7 |
| **shocked** 133:13 | 42:23 43:9,14,14 | 12:11 137:17,17 | **six** 47:5,6 99:21 |
| **short** 178:10 | 46:8 50:18 58:8 | 280:25 283:20 | 102:12 172:17,24 |
| **shorter** 205:6 | 58:17 62:23 63:4 | **signed** 12:13 14:25 | 173:3 186:6 |
| 206:18 | 63:13 66:7,8,21 | 16:16 101:6 | **sixth** 260:16 |
| **shorthand** 283:10 | 67:19 68:1,23 | 153:19,22,23 | **size** 174:15 189:22 |
| **shortly** 263:1 | 75:21 76:9 83:25 | 154:4 221:3 | 190:3 259:17 |
| **shoving** 274:21 | 99:19,20 119:13 | **significance** | 260:1,5 271:21,22 |
| **show** 13:23 40:14 | 119:15,17,20 | 194:24 | **skull** 201:12 |
| 49:22 66:12 69:24 | 121:1,7 139:17,18 | **significant** 26:19 | **sleep** 4:22 15:7 |
| 155:14 163:20 | 139:22 141:7 | 194:20 195:12,13 | 17:17 19:20 20:11 |
| 183:6 203:7 218:1 | 142:24 146:12,20 | 237:2 | 20:11 44:19 51:7 |
| 218:1 247:2 | 148:25 149:8,13 | **signing** 284:13 | 53:3,5,8 54:13,25 |
| 253:20 261:16 | 149:24 152:15,22 | **similac** 190:11 | 55:7 57:4 59:5 |
| 263:5,22 267:25 | 152:24 153:2,11 | **similar** 213:8,18 | 62:18 75:4 76:19 |
| 272:24 275:7 | 153:13,14,16 | 233:19 250:24 | 76:24 77:1 81:13 |
| 281:4 | 159:12 160:9,10 | 254:17 255:6 | 82:7,21,25 83:24 |
| **showing** 51:20 | 160:12 162:21 | 277:17 | 85:6,10 91:20,20 |
| 62:17 | 167:1 168:18 | **similarity** 269:10 | 94:8 96:13,15,25 |
| **shown** 85:5 182:9 | 169:6 171:20 | **simple** 117:9 | 96:25 97:17 98:6 |
| 277:1 | 172:19,22,23 | 217:1 271:2 | 103:12 111:3 |
| **shows** 51:25 252:8 | 173:7 190:23 | **singhose** 112:7 | 118:23 142:20 |
| 254:7,12 274:17 | 191:9 201:15,24 | **single** 81:7,12 | 143:4 149:21 |
| **shrinking** 260:6 | 205:19 214:8 | 112:16 154:14 | 152:5,22,24 |
| **sic** 69:22 165:16 | 225:25 228:5 | 219:18 224:15 | 153:10 154:16,18 |
| 281:9,24 | 229:12,13 231:10 | 242:23 265:25 | 155:8 160:5 |
| **sick** 187:11 239:8 | 231:17,21 233:25 | **sir** 64:20 271:14 | 161:22 162:9 |
| **side** 48:21 89:7,7 | 234:2,8 238:6,15 | **sit** 102:8,9 130:10 | 163:5 166:18,22 |
| 113:6 114:17 | 238:21,23 239:1,4 | 130:14 203:11,16 | 166:22 168:1 |
| 173:18 188:9 | 239:7,18,20,21 | **sites** 52:16 172:3 | 173:3,18 212:5,22 |
| 207:10 216:3 | 240:1,1 242:9,13 | **sits** 242:20 255:10 | 213:1,20 214:8,10 |
| 255:6 | 242:16 243:5 | **sitting** 43:12 67:24 | 214:24 215:7 |
| **sides** 90:6 260:4 | 245:2,7,11,16 | 196:7,10,24 197:3 | 216:15,16,18 |
| **sids** 3:16,18,19,22 | 246:15,20,24 | 197:5,10,19 198:1 | 217:16,19 218:8 |
| 4:11 17:17 18:5 | 248:10,17 264:10 | 198:2,5,9,12,16 | 219:10,15,19 |
| 18:10,16,22 19:1,2 | 275:23 276:2 | 199:5,8,9,12,17,22 | 220:14,15 223:6,7 |
| 19:5,9,15,18,20 | 278:23 | 200:3,17 201:10 | 223:9,10 224:14 |

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[sleep - standard]**                                                                 Page 45

229:2 244:5 250:5
250:8,11 252:21
**sleeper** 12:25
  48:10,18 52:7
  61:20 76:22 80:3
  127:9,19 134:10
  156:4 163:16,17
  197:19 198:17
  199:6,23 243:25
**sleeper's** 79:14
**sleepers** 48:19
  155:25 170:3
**sleeping** 3:15 23:8
  23:19 53:8 168:7
  189:14 190:6
  200:20 222:23
  223:18 253:6
**sleeps** 85:1 179:8
**sleepsack** 90:11,18
  90:20,21,25,25
  92:18
**sleepsacks** 13:2,2
  13:3
**slept** 189:18 190:5
**slid** 195:2
**slides** 82:1,3
**sliding** 223:15,19
**sling** 200:24
**slings** 200:23
**slow** 9:6 104:20
  213:10 246:9
**slowed** 118:3
**sma** 239:10
**small** 40:11 42:20
  102:14 150:10,12
  150:19 191:1
  226:2 240:3
  246:24
**smaller** 24:25
  260:20

**smell** 188:16
**smelled** 168:7
  190:16
**smoke** 51:9 166:24
  166:25 167:6,6,17
  167:20,25 168:1,3
  168:7 169:11
  174:19 188:17
  191:2,5 230:9
  231:4
**smoked** 167:21
**smoking** 169:11
  174:4 190:25
  191:6 230:3
**snow** 64:18
**social** 18:13 53:17
  231:8
**society** 58:8
**socioeconomic** 230:15
**soft** 54:19 55:15
  56:17 77:7,9,12,16
  166:15 173:18
  229:23 231:3
**softly** 29:24
**softness** 57:2
**solutions** 6:16,18
**somebody** 33:23
  80:15 88:24 90:1
  113:20 121:6
  122:12 141:6
  167:24 212:7
  242:19 251:13
  263:8 274:21
**son** 121:25
**son's** 121:25
**sorry** 12:1 13:23
  14:12 19:12 29:9
  29:11,19 31:24
  32:3 42:5 54:7
  63:25 75:19 89:5

94:6 102:11 115:2
116:13 144:2
147:1 168:1,24
173:25 177:15
179:20 181:12
184:24 188:4
189:9 190:1 192:5
198:22 204:16
213:9 222:9 246:8
246:15 249:10
277:13 280:12
**sort** 16:1 66:22
  71:12 101:14
  118:3 170:19
  176:15 251:21
**sound** 85:1 221:20
**sounds** 84:20
  170:4
**source** 49:25
**sources** 30:22,23
  241:4
**south** 190:10
**southeast** 190:4
**space** 226:2 252:6
  275:19 284:9
**sparks** 72:25
**speak** 20:10 29:24
  29:24 42:10,18
  45:23 47:11 48:1
  64:11 261:3
**speaking** 42:5
  46:1 261:22
**special** 20:13
**specialty** 17:6,7,24
  20:6 36:22 280:9
**specific** 20:16
  36:15 40:10 47:25
  51:2,3 53:4 56:11
  58:9 59:13 66:6,8
  66:11 67:1 69:4
  83:7 90:16 93:4

94:4 100:25
105:13,14 108:1
128:5,20 155:14
168:1 170:2
171:23 198:14,21
225:12 242:9
245:6 246:7,12,14
246:23 272:22
**specifically** 24:7
  76:22 109:3
  129:12 136:8
  156:16 199:24
  214:24 215:20
  216:15 218:21
  220:15 231:2
  233:1 246:5
  248:22 250:22
  256:16 257:11
  262:16 280:2
**specifics** 95:7
  136:5 215:24
**specify** 52:4
**spend** 145:1,5,5
**spending** 43:13
**spends** 213:7,17
**spent** 52:17 96:20
  124:21 137:23
  177:1
**spinal** 239:5
**spoke** 254:13
**spread** 249:15
**staff** 14:1 240:21
**stages** 105:24
**staining** 248:14
**stamped** 179:3
**stand** 209:8
**standard** 81:17,19
  84:6 129:9 132:24
  132:24 154:22
  155:3 207:12
  208:13 209:15,17

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[standard - suggest]**                                                Page 46

209:19 210:3
229:22 242:13,25
243:4,5
**standardised**
242:3
**standardization**
150:2
**standards** 132:20
209:14 221:7
242:12
**standing** 50:19
283:5
**standpoint** 258:23
**start** 8:16 9:22
29:13 66:13,17
104:21 165:9
182:24 190:2
216:5 218:22
223:2 225:17,23
239:11,13 252:7
**started** 22:23
98:14 121:15
130:17 131:20
135:1 183:2 216:1
**starting** 11:2
72:17 99:7 189:16
**starts** 117:22,25
127:15,15 190:2
201:7 275:21
**state** 6:20 65:3
70:14 87:11
102:13 114:2
186:5 225:5
263:19 284:9
**stated** 99:22 106:4
181:21
**statement** 3:17,18
3:20 4:14 5:10
25:13,16,23 26:2,3
26:12,13 58:9,24
59:10 60:4 67:10

70:6 71:21 108:22
136:3 157:22
197:17 206:18
207:16,25 208:1
209:13,17 210:2,4
214:6 215:5,6
216:11 217:18
219:18 220:17,21
220:23 222:3,22
223:8 224:6
**statements** 25:9
154:18,25 155:2,3
205:3 207:24
209:14 211:4
220:22 236:25
249:3,4
**states** 1:1 4:10
6:11 49:9,16
160:14 162:19
199:25 224:5
229:4,17
**stating** 112:9
195:11
**statistical** 231:23
**statistically**
231:15
**statistician** 21:8
**statisticians** 161:8
**status** 230:15,15
**statutory** 1:3
**stay** 79:23 81:7
150:12 210:14
255:2
**stayed** 137:12
**stays** 163:12
**step** 167:24
**steps** 167:18
221:18
**stick** 17:5 148:11
215:6 251:15
263:20

**sticker** 247:6
**sticking** 217:21
**stop** 14:16 64:3
**store** 128:11 240:9
**stores** 128:1,22
**story** 85:7
**straight** 37:17
198:9 199:9
**straightforward**
60:10,11 83:3
276:10
**strange** 229:20
**strangulation**
78:20 153:15
193:9 251:23
253:13
**strapping** 253:7
**straps** 200:23
253:12
**strength** 225:19
**stressors** 173:12
**stretch** 8:1 9:10
**strict** 59:14,15
**strikes** 155:18
**strollers** 202:8
213:3 253:4
**strong** 151:13
161:10,15
**struck** 18:23,25
29:1 32:2
**structurally** 99:12
**stuck** 78:9
**students** 146:20
151:6,7 152:14
**studied** 62:10
159:22 160:9
228:2
**studies** 18:18 68:7
68:8,9,11,13 69:5
85:5 96:13,25
97:18 98:6 103:12

214:17,18 225:7
225:13,17 232:1
234:8
**study** 31:2,12
35:15 66:14 67:25
68:21 69:4 171:20
195:1,4 213:6
225:10,12 248:25
250:17 251:18
267:12 268:6
**stuff** 125:21
126:22 146:17
240:8
**sturdy** 133:15
**subcategory**
119:19
**subject** 181:8
264:13 284:13
**submission** 271:19
**submit** 18:18
**subpoena** 104:6
**subscribed** 286:16
**subsequent** 238:13
238:13
**substance** 286:10
**subsumed** 43:14
**sudden** 4:5,6,8,9
33:10,12,24 34:16
39:20 49:8,14,15
71:3 162:13,19,20
173:6 188:21
201:15 239:3
242:2 281:12
**sued** 8:5
**suffice** 149:24
**suffocation** 66:21
153:15 162:22
201:13 226:9
253:13 274:20
**suggest** 55:8 58:5
81:20 174:23

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

182:17
**suggested** 27:7
176:16 256:21
**suggesting** 31:8
58:11 95:18
257:12
**suggestion** 176:24
256:23
**suggestions**
259:18
**suggests** 234:1
**suid** 20:11 50:18
51:7 53:13,24
54:3,18 83:25
156:1 160:13,20
162:16 172:22
226:4 239:3
248:17 275:1
**suids** 119:15,17,18
119:21 121:2
153:11 159:14
228:5 242:9
**suite** 2:3,8
**summary** 30:16
98:2,8 99:1,3
**sunk** 56:15
**super** 16:7
**superfluous** 222:4
**supervision** 202:7
202:12 283:11
**supine** 223:12
275:3
**supplement** 4:12
70:4
**supplemental**
69:22 175:20
**support** 67:2,25
68:22 214:8
**supported** 157:18
221:11

**supporting** 25:6
71:18 206:17,17
207:24 209:18
210:24 225:11
**supports** 68:3 92:4
**supposed** 55:15,17
93:20 157:16,17
159:11 199:15
204:4 217:15
**sure** 11:25 26:21
30:25 31:16 34:9
37:8 38:20 41:23
43:20 47:24 48:24
56:8 64:6,18 73:3
74:20,22 75:25
79:24,24 85:24
88:14 94:5 96:7
96:18 97:12
100:24 104:11
106:21 108:6,15
111:18 112:8
116:1,9 119:5
120:13 122:5,14
123:24 125:5,8
127:13 128:25
133:4 134:2,4
135:24 137:1,21
138:21 143:8
144:20,22 145:10
146:5 152:1,2
155:16 157:1,2,14
161:12 163:20
164:10 165:5
169:2,4,16,24
170:24 184:16
192:10,16 197:23
200:3 205:12
207:2,5 208:8,19
209:9 211:22
216:9 225:23
228:1,4 229:16

236:2 246:4,11
254:3,8 256:10
257:4 260:10
265:2,5,7,11
266:12,18 267:14
267:16,21 268:25
269:7,22 274:2
281:10
**surface** 44:21
54:25 55:8,18
56:25 57:1,1
60:16 62:6 196:13
216:1,17 217:16
218:8,9,10,12
219:15 220:14,15
223:19 224:11,15
224:16,18 244:9
249:16 250:5
253:8,15
**surfaces** 77:1
252:16
**surmise** 43:20
**surprise** 189:2
**surrebuttal** 36:7
138:9 223:3
233:23 235:21,21
237:12,19 268:3
**surreply** 272:10
**suspect** 95:2
111:16 161:15
255:5
**suspected** 190:14
**suspicious** 16:8
**swaddling** 90:21
90:22
**swear** 7:4
**swings** 202:8,15
213:3,3
**switch** 214:1
**swope** 105:3

**sworn** 7:7 283:8
286:16
**sync** 172:13
**syndrome** 4:5,6,8
33:10,13 34:16
39:20 71:4 162:13
173:7 188:21
242:3 281:12
**system** 52:15
166:1,4 173:2
223:21

|   | t |   |
|---|---|---|

**t** 3:6 4:1 5:1 283:2
283:2 285:4
**table** 216:12
**tachypnea** 257:15
258:2
**take** 9:9 10:21
11:23 17:3 40:8
42:16 47:23 48:25
71:9 75:14 77:2
78:25 82:10 84:17
103:7 105:8
106:24 121:5,25
125:3 128:1
129:18 130:3
136:7 142:15
147:22 148:23
151:15 167:18
187:17 189:4
206:4 217:1,4
221:18 228:16
230:1 237:9
239:17,22 250:1
251:17 258:13
261:20 264:17,18
266:13 282:1
**taken** 6:8 9:23
38:22,25 101:24
102:15 108:25
110:11 167:23

176:7 177:24
221:25 283:6
**takes** 110:4 146:11
273:6 278:6,6
**talk** 13:10 20:4
23:1 45:15 52:7
55:5,10 65:23
76:21,24 77:1
82:7,8 84:23
105:20 111:20
119:13,14,20,24
140:10 142:20
152:16 160:20,24
173:24 183:19
187:19 194:14
197:2,3 214:14
216:2,5 218:3
232:21 234:9
236:8 238:3
240:23 243:24
244:8 256:8,16
259:15 278:1
**talked** 42:23 43:1
56:5 72:10 80:22
80:23 86:18
103:15 113:8
138:1,25 140:22
151:17 153:4
166:18 169:2
172:11,18 175:3,9
182:21 186:16,18
231:3 237:25
244:11,14 267:17
269:2 273:15
279:12
**talking** 8:16 36:10
84:9 146:1 155:8
160:14 162:1
164:17 165:16
176:1 183:21
194:5 198:8 199:1

199:22 208:9
218:22 222:21
234:24 244:2,3,4
256:11 265:21
268:6 275:14
**talks** 55:3,7 81:23
119:15 138:8
158:14 169:5
189:16 201:22
209:22 212:3
214:2 262:2
**tank** 255:2
**tape** 56:15,16
**taping** 56:14
**target** 81:25 260:7
**task** 3:16,18,19
4:11 25:9,12,22
26:11 27:16,17,18
27:19,24 28:13
41:11 43:2,8,14
46:9 47:3,6,10
58:18,23 59:10
60:2 75:6,21
76:15 136:19
139:17 142:1
149:7,8,13 201:23
201:24 202:19
206:2,3,4 224:3
**tasks** 140:4
**teach** 152:20
248:4
**teaching** 151:8
152:13,14 162:2
**team** 88:7,18,19
118:8 129:11
150:16 158:19,23
159:3,7 243:4
**teasing** 264:22
**technical** 5:8,9
26:5,17 60:4 75:3
170:12,14 177:22

197:17 204:13,23
204:25 205:11
206:14 207:20,21
207:22,24 209:15
209:16,17 210:6
210:19 211:8,11
211:25 212:1
214:7 215:5,7
216:11 217:17
222:5,22 223:8
236:24
**technion** 269:22
**technol** 254:1
**technology** 269:18
269:21,23,24
**teething** 185:10
262:8
**tell** 11:4 13:15
25:14 26:25 34:18
42:8 47:18 50:9
59:22 63:11 76:1
82:19 83:7 87:12
89:3 92:3,25
102:3 109:2
113:14 115:18
118:22 124:22
131:18 135:5,10
135:13,16 136:14
144:23 146:22
151:4 165:2
167:25 201:8
212:8 217:12
219:14 220:10
233:20 234:18
235:4 236:16,17
236:23 242:19,19
244:5,7 250:8
251:13 264:20
267:10,14 283:8
**telling** 83:11
131:19

**tells** 86:6
**tempe** 5:3 94:18
106:5 178:5 180:4
255:13 261:18
**temperature**
229:25
**temple** 240:16
**ten** 148:6,9 151:10
212:12,12
**tenure** 136:19
**term** 198:6,12,13
198:15 199:5,17
199:21
**terminology** 3:22
27:7 28:5,9 29:8
29:14,17 76:10
199:20
**terminus** 2:8
**terms** 13:17 15:10
16:13 17:3,24,25
19:19 22:6 29:8
29:14 32:16 36:8
39:15 50:18 57:11
59:4 63:13 66:7
66:19 82:19 87:7
94:14 98:12
109:16 111:6,6,17
120:15 121:15
127:21 133:17
141:6 145:21
146:12,12 148:3
150:21 156:15
175:6 199:3
209:24,25 210:17
215:17 224:5
228:5 230:19
231:24 233:9,13
240:2 242:10
250:14,22 251:17
256:20 259:25
260:23 261:1,7

273:17
terrible 187:2
236:20
terribly 74:16
tertiary 168:3
test 8:23 56:1 63:5
134:18,18 195:2
222:19 242:24
tested 164:5 195:5
testified 7:7 87:6
testify 12:19 48:1
123:8,12
testifying 45:11
testimony 8:3
86:24 87:8 166:7
176:5 179:16
180:12,17,23
182:10 221:8,17
283:6,9,13
testing 55:23
56:10 132:19
164:3
tests 36:7 242:25
textbook 37:19
textbooks 280:1
texts 280:3
thach 4:4 33:9,12
33:23 277:2
thank 7:16,19,19
7:24 9:13,20
10:23 23:17 27:9
29:18 41:6 46:6
70:8 72:1 76:6
88:2 97:12 110:6
110:8 125:14
161:20 170:17
178:4,11 180:1
181:16 192:1,7
244:19,21 264:14
268:24 281:19

themes 84:11
theories 276:12
theory 119:25
278:2
thereabouts 46:5
thereof 283:16
thing 8:12,15
10:20 39:22 45:19
49:10 50:10 51:8
54:15 58:21 59:24
68:3 79:11 80:23
81:7 91:17 92:14
97:13 106:8
125:18 126:2
127:7 133:15
137:16 156:14
173:25 186:23
197:24 214:25
215:12,23 218:7
240:24 253:7
260:3 277:18
278:4
things 15:8 22:17
22:22 24:12,24
25:8 27:8 29:16
44:18 51:6 53:10
53:11,18 54:13
55:2 56:2 59:25
60:2,8 64:13 68:6
68:10 78:25 81:5
81:8 83:18 85:12
85:12 86:16 91:13
92:5 95:5 102:4,7
108:14 109:3,18
109:23 110:20
120:11 121:12,15
133:23 140:12
141:17 145:8,11
145:13 146:19
152:7,16 155:4,22
159:10 162:24

163:1,5 173:15
174:21,24 175:8
175:22 179:1
181:1 188:25
196:12 198:21
203:5 208:23
219:23 228:13,16
229:19,21,22
230:17 231:1,5,7,8
233:19 239:12
242:6 246:5
249:20,21 252:1
253:10 256:21
257:8 259:5,13
261:14 265:24
270:24 271:12
277:15
think 11:3 18:9
20:8 29:4 37:7
40:22 41:24 42:2
42:15 46:4 51:23
56:23 57:13 58:2
65:20 72:10,24
74:9,15 75:10
79:8,11 84:8 86:6
90:23 91:12 94:3
94:21 97:8 102:1
102:2 104:9
105:13,14 107:13
107:22 108:1,5
109:8,14,22 112:7
114:1 115:6
117:13 118:3
119:15 120:13,14
121:11,18 123:2
124:1 126:3
129:16 131:19
133:11 141:4,7
146:22 150:23
152:15 153:2
154:8 155:1,7

159:3,6 160:8
162:1 164:24,25
165:19 170:2
176:13 177:12
178:24 179:10,13
179:14 180:6
182:23 183:1,4
186:21 187:11
188:24,24 197:20
205:9 206:24
215:24 216:25
227:1 228:12
229:20 231:24
242:25 243:1,18
244:18 245:23
247:17,18 248:1
249:10 250:15
251:1,5,14,25
252:3 256:10,22
257:8 258:18
260:1,17,18
261:24 262:15
267:9 269:17,21
270:12 272:13
273:3 274:7,16,19
276:4 278:5,6,10
279:25
thinks 61:23 62:20
third 179:6 237:4
261:24
thirteen 39:22
thirty 42:2 241:20
241:22,22 284:18
thomas 5:12
104:17 241:24
thought 22:9 40:3
60:11 101:15
108:5 117:12,15
165:6 170:7
241:16 246:5
263:7 264:6

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**[thought - travis]**

Page 50

267:19 271:18,19
277:25 278:2
280:21
**thousand** 42:21
**thousands** 234:8
**threatening**
276:14
**three** 19:21 108:24
114:8 115:9,9
123:17 124:18
126:3 164:19,20
183:14,23 185:3
190:5 203:1,2
249:14 257:23
262:5
**thriving** 106:3
260:24
**throw** 84:18
**thrown** 8:20
**thunderbird** 5:5
185:22,24
**thursday** 1:10
32:22
**thymic** 245:9
**thymus** 40:12
246:25
**tie** 78:18 258:2
261:14
**tied** 119:12 174:17
225:25
**ties** 78:18,18
**tightly** 166:12
**time** 12:16 13:12
15:2,3 16:16,18
18:21 28:1 32:18
32:25 34:7 41:22
43:7,13 46:23
47:8 52:17 78:21
86:14,15,17 96:20
100:20 109:13
125:10,13 133:3

133:12,20 137:13
137:22 138:7
145:2,6,9,9,21
146:7,8,10,11
147:5,8,9,15,20
148:12,23 149:5
150:18,22 151:12
153:8 162:16
163:7 170:16
177:1 178:3
179:22,25 205:10
211:20 218:22
240:10 244:20
259:6 260:9,13
269:16 270:10,10
276:10 279:2
281:6,9,23 283:7
**times** 33:17 36:20
42:11,20 208:20
216:6 277:7
**timing** 124:1
187:17
**tip** 96:5
**tired** 9:10
**tissue** 40:16 245:9
247:4
**title** 34:22,24
84:25 220:24
265:6
**titled** 5:10 220:18
**titles** 34:3 149:15
**tobacco** 51:9
**today** 8:12,17,25
10:18 24:13,21
28:21 32:21 35:4
45:18,25 50:12
53:22 54:9 58:1
72:4,22 84:23
113:9 115:21
123:1 134:3
140:13 142:18

153:8 157:24
169:3 206:22
207:1 220:2
235:18 236:8,11
240:4 244:20
**today's** 23:24
**told** 65:24 138:12
145:15 233:1
**tom** 227:11
**ton** 151:25
**tongue** 120:9
**tool** 50:13
**toolbox** 162:2
**top** 10:18 15:24
34:14 70:21 89:4
95:25 97:24
124:22 129:13
163:5,19 165:22
183:7,21 189:12
190:11,12,17,18
193:3 196:3
211:17 212:8
241:13 272:22
**topic** 20:13 119:12
170:20 182:21
271:8
**topics** 81:14
**torin** 104:18
**torso** 79:3,9,16
**totally** 18:9 95:16
**touch** 88:7,18
**touched** 128:16
**toxicology** 98:13
103:21
**toxins** 275:17
**toys** 166:17
**track** 80:18
**trade** 55:24
**tragic** 50:19,22
261:13

**tragically** 162:13
173:6
**train** 151:7
**trained** 58:4
227:14 240:15
279:18
**training** 18:1
41:22 99:4 145:18
146:21 148:21,24
148:25 151:3,5,6
151:16
**tran** 8:24 282:9
**transcribed**
283:11
**transcript** 8:22
67:5 284:19,20
**transcription**
261:7 283:12
286:7
**transcripts** 106:15
**transfer** 53:7
60:16
**transferring**
102:14
**transfusions** 150:6
**transient** 257:15
257:17,19 258:2
**transition** 75:3
**transitional** 99:10
258:24
**transitioning**
76:19
**transport** 53:1
**trapped** 275:20
**traurig** 2:6
**travel** 87:12
122:22,25 123:6
123:10
**traveling** 213:5
**travis** 1:17 6:17
283:21

**[treated - unfortunately]**

**treated**  39:15
  148:17
**treating**  8:7
**treatment**  154:21
  207:11 208:13
**tree**  240:8
**trees**  126:17
**trends**  260:13
**trial**  14:8 123:9
  264:12
**trials**  63:3 225:14
**tried**  55:21 175:22
**trigger**  225:24
**triggering**  248:16
**triple**  119:24
  171:16 232:14
**tripped**  120:8
**trouble**  167:12
  183:13
**true**  14:23 16:15
  36:9 39:8 51:10
  84:1 119:23
  120:18 121:7,8
  132:9 137:15,16
  137:16 139:13
  143:17,25 149:6
  152:21,21 162:16
  184:19 195:10
  206:7 216:3,15
  229:24 231:22
  248:10 267:1
  279:11,14 283:13
**truly**  159:3
**trust**  39:12
**truth**  217:12 252:1
  283:8,8,9
**truthful**  133:9,10
  134:5,6
**try**  8:13 9:2 44:18
  81:7 86:13 129:2
  141:16 146:25

158:10 250:1
  253:10 266:6
**trying**  16:19,21
  17:5 22:7,8,11
  25:2 35:8 36:8
  83:23 97:20 98:3
  110:5 112:3,22
  117:4 126:22
  128:6,23 157:24
  157:25 183:20
  184:15 213:14
  230:21 235:6
  237:15 238:22
  239:20 258:2
**turn**  14:15 70:13
  147:23 180:3
  181:4 183:1
  201:17
**turned**  118:18
  123:20
**turning**  29:10
**tuscon**  2:4
**twelve**  249:12
**twenty**  116:2
  124:25 161:25
  164:19,20 177:16
  191:24 192:4
  203:1,2 204:22
  205:17 278:25
**twice**  64:17 279:20
**twist**  253:10
**two**  22:22 37:7
  38:15 42:23 43:1
  43:22 103:15
  116:11 122:22
  123:17 125:7
  161:25 172:22
  183:16,23 187:16
  188:5 196:5
  200:15 214:9
  219:17 228:9,13

240:22 257:23
  261:14 268:19
**tylenol**  183:10
**type**  112:10
  190:23
**typed**  122:12
**typically**  99:21
  120:10 215:18
  253:5,13
**typing**  137:7

**u**

**u**  226:9
**um**  9:8 10:23 12:9
  13:22 17:8 23:12
  27:3 28:3 35:11
  41:7,13 43:6,11
  54:10 55:16,22
  76:3,20 77:24
  83:8,16 88:10
  89:12 94:1 95:25
  96:16 104:8
  116:12 131:21
  140:17 141:24
  172:20 177:17
  178:17 187:7
  214:4 238:20
  265:16
**unable**  185:12
  262:10
**unassisted**  203:11
  203:17
**unbiased**  157:25
  221:20,22
**unbuckle**  179:12
  180:19,20
**unbuckled**  200:22
**unclear**  68:15
**uncommon**  261:1
**uncomplicated**
  99:6

**understand**  10:3
  12:3,7 14:21 31:7
  35:8 37:8 52:6,10
  57:22 61:19 83:13
  85:25 86:13 88:1
  88:14 97:20 98:4
  98:22 108:16
  116:1 117:4
  120:21 128:9,23
  129:16 133:5,8
  134:1,3,17 135:21
  135:21 137:18
  140:1,2 143:8
  146:6,22 154:3
  166:3 189:13
  210:10 216:7,7
  218:25 233:3
  239:24 261:8
  270:13,14 274:18
  275:23 278:9
**understanding**
  10:10 15:6 25:3
  39:4 77:11,16
  120:15 139:16
  167:20
**understood**  15:1
  15:10 44:25 96:22
  151:3
**undone**  181:10
**unethical**  63:4
**unexpected**  4:9
  49:8,15 162:19,20
**unexpectedly**
  156:2
**unexplained**  27:6
  201:16
**unfastened**  181:22
**unfortunate**  186:7
  187:14
**unfortunately**
  55:23 62:25

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**unfounded** 257:1
257:3 259:13
**unit** 134:20
**united** 1:1 4:10
6:10 49:9,15
160:14 162:19
**university** 240:16
281:13
**unmade** 189:17,25
190:4
**unquote** 264:3
**unrealistic** 62:25
**unresponsive**
180:14
**unsafe** 13:9 63:10
229:23 250:2
**unsound** 222:1
**unsupervised**
196:6 200:17
203:22
**untrue** 257:1,3
259:14
**unusual** 19:8
31:21,22 32:3,6
179:13 187:9
188:23 263:20
**update** 73:20
**updated** 73:7,17
74:10,14,20 76:5
**updates** 29:5 60:4
**updating** 81:23
**upper** 186:9,10,18
187:5
**upright** 198:9
**urgent** 185:11
262:9
**usable** 190:13
**use** 55:17 56:24
58:10 59:4 60:25
61:5 79:17 80:3
81:19 82:1 84:7

91:9,13,25 92:16
99:18 132:13,13
148:19 150:4
160:1 164:5
165:25 166:4,15
174:20 175:19
187:4 198:15
199:5,20 203:9
204:4 211:19
213:4 214:17
226:21,25 227:6,7
230:10 231:12
250:8 278:11,12
**useful** 263:7
**uses** 199:21
**usual** 213:20
**usually** 107:23
147:3 179:7
239:19,21 257:24
**utero** 277:17

**v**

**v** 6:10 284:3 285:1
286:1
**valid** 221:10
**valve** 184:2
**variation** 155:6
**variations** 154:22
207:12 208:14
**various** 26:22
201:14 225:19
**veer** 220:22
**vehicle** 200:21
**verbal** 263:11
**verbally** 254:5
**veritext** 6:16,18
**versa** 8:16
**version** 75:19
109:4
**versions** 205:7
206:14 210:23

**versus** 261:16
268:21 275:8
**vice** 8:16
**video** 6:3 125:10
125:13 170:15
178:2 179:19,22
179:25 252:8
253:21 254:7
269:14 270:5,17
271:16 274:11,12
275:2,9 277:22
278:8,14 281:6,9
**videographer** 2:14
6:1,7,17 7:3 125:9
125:12 170:14
177:14 178:1
179:18,21,24
246:2 281:5,8,22
**videotaped** 1:13
4:15 72:6
**videotapes** 227:22
**view** 104:1 129:19
**views** 211:13
257:2
**viral** 40:17 186:10
247:5
**visible** 200:24
**visit** 102:12 186:6
**visits** 176:12
**visual** 270:13
**vitae** 4:17 73:2,15
76:14 81:1 86:20
144:21 281:16
**vivid** 206:16
**voice** 29:22
**volume** 19:4
**volunteer** 145:12
**vs** 1:5
**vulnerable** 174:8
176:3

**w**

**wait** 9:2 62:19
165:1 217:3,3
**waiting** 10:4
**waived** 10:1
**walk** 138:20
**wall** 190:10,15
**wang** 4:3 30:2,5
**want** 9:5,6,9 11:6
11:15 14:16 19:14
22:3 34:8,13 37:8
37:15,15 46:7
48:5 56:1 64:24
64:25 65:2,3,12,13
65:15 66:3 69:20
70:24 72:24 77:9
77:10,13,19,22,25
78:2 85:25 86:22
87:24 88:3,14
92:20 93:3 94:17
96:1 110:4 115:25
116:8,9 122:14
126:5,19 127:12
130:7 144:7,20,22
145:25 146:14
159:7,9 165:9
167:17 170:8,23
171:16 178:20
180:3 181:1
182:20,23 184:15
191:17 192:17
196:16 197:25
198:22 200:3
203:6 204:13
208:17 211:24
216:7,25 217:4
228:6 231:24
235:3,15 236:16
251:12 252:9
258:16,24 264:17
265:5,14,17,20

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel

September 30, 2021

**[want - wording]**

266:5,6,10,16
267:5,14,21,25
269:14 282:8
**wanted** 7:20 30:17
36:2,17 38:1 40:4
40:19,23 44:23
58:24 67:22 90:17
93:4 235:23
255:19 259:12
264:20 268:24
274:22 278:1
**wanting** 278:7
**wants** 8:22 110:9
189:2 282:5
**warm** 231:4
**warning** 4:23
163:15,16 164:21
165:13 202:24
203:5,21
**warnings** 91:4,10
91:16 93:8,24
112:11 165:21
195:8 202:21
204:7
**way** 7:13,15,20
17:9 25:7 53:1
55:14,25 63:5,13
63:15 64:14 65:22
67:18 68:12 73:11
78:17 115:11
119:8 140:17
141:5,11 143:6
149:10 154:4
158:22 217:5
231:25,25 259:11
261:6,13 263:23
274:17
**waynesboro** 52:20
**ways** 78:11 189:3
**we've** 55:21 74:14
85:21 110:3

121:10 125:6
137:6 140:22
151:9 231:2 241:4
249:23
**wearable** 13:4,8
90:10
**wearing** 13:8
**web** 51:18
**website** 20:18 50:2
50:3 51:16
**webster** 59:2
60:18 132:14,18
134:22
**week** 15:9 28:11
30:9 32:8,17,20
33:5,14,16 78:23
237:18,20
**weighing** 261:1
**weight** 259:17
260:23 261:3
272:7
**weird** 122:2
**wellspan** 15:25
52:14
**went** 14:8 59:23
89:16 100:21
106:20 110:19
125:20 155:12
178:2 219:4 233:4
239:9 255:11,17
**wetmore** 2:3
**whatnot** 209:25
**whatsoever**
230:14 259:9
**wheezing** 176:9
**whichever** 171:13
**white** 190:7
**whys** 258:25
**wide** 18:10 19:6
**wife** 84:22 85:4

**wife's** 121:24
**williams** 104:19
**willinger** 206:11
**wish** 137:12 155:5
**withstand** 264:16
**witness** 3:2 5:10
6:5 7:4 8:8 12:17
19:24 21:22 23:16
29:4,11,15,19,23
31:7,15,24 32:11
33:20 38:1,7 44:7
45:17 46:13 47:19
48:13,21 57:17
58:15 60:23 62:4
62:16,22 64:16
65:21 69:9,13
70:16 74:7,15,22
76:8 79:21 83:2
88:4 93:23 107:8
110:23 114:24
115:1,5 125:8
126:21 127:1
136:17,25 139:10
139:15 144:4
145:4 150:9,25
153:18,19 155:10
156:8 157:15
158:15 161:2,19
166:6 167:10,14
168:15,23 169:24
171:1 174:14
177:10,18 181:16
182:8,17 184:11
189:21 192:8
193:23 197:12
198:8,19 199:14
200:6 203:3 204:3
204:9 210:11
214:12 215:10
216:21 217:4,21
219:12,22 220:18

220:24 223:24
224:9,22 227:6
234:13 236:21
241:17,18,19
243:7 244:21
245:19,23 246:4
246:11,14 247:10
247:13,16,19,24
248:3 251:1
255:22 257:6
258:19 263:16
264:19,24 265:16
265:19,25 266:25
268:7 269:1,4
272:3,20 273:3,23
275:12 276:22
277:14 281:10,17
282:20 283:17
284:6
**witnesses** 81:4
85:22 112:6,13,24
244:12
**woke** 181:7
**woman** 239:7
**wonder** 177:4
**wondered** 80:11
**wondering** 16:8
48:2 123:3 239:13
**wood** 56:25
**word** 11:23 50:12
56:23,24 82:24
134:14 177:3
216:4 227:2
231:12 249:23
270:22
**wording** 56:4
59:12,13 60:12
79:7 92:22 119:7
129:9,9 155:13,14
155:18

Michael Goodstein, M.D.
In Re: Fisher-Price/Mattel
September 30, 2021

**[words - zebras]**                                                        Page 54

| | | | |
|---|---|---|---|
| **words** 14:22 48:8 48:17 97:2 129:3 138:8 243:3 | **wow** 64:12 224:22 **wrap** 78:19 **wraps** 253:4 **write** 48:9 195:21 209:2 215:24 271:10 | 51:10 53:25 65:15 65:15 72:20,23 73:6,8 76:13 84:10 86:19,20 88:4 89:24 92:24 | **year** 13:16 33:19 47:1 48:22 74:2 117:4 131:14 133:17 135:13,16 136:18 154:14 |
| **work** 16:6 26:10 28:1 41:11 43:10 47:2 48:6 52:12 52:13 81:21 87:25 88:24 89:19 115:21 118:14,20 131:24 139:17 141:7 145:8,12 146:12 148:24 149:1,21 150:9,17 157:13 158:15 161:16 172:2,2 206:7 210:16 221:19 240:14,17 254:4 279:16,17 279:18,19 | **writes** 209:3 **writing** 34:14 117:16 123:16,18 123:22 124:21 137:23 162:12 209:16,21 228:23 232:19 247:22 261:7 272:22 **writings** 80:25 119:16 149:3 **written** 50:25 75:6 121:1 150:7 152:4 152:8 161:5,7 241:10 279:2 280:1 | 95:25 102:1,20 104:10,11,12,21 104:23 105:19 106:19 111:23 113:19,22,24 114:8,22,25 115:14,18 117:19 117:20,21 119:7 121:21 123:22 126:25 127:1,13 128:7,12 129:7 130:10 132:6 133:16,21 134:6 149:11 150:20 153:13,13 154:8 | 162:15,19 170:4 172:18,21 173:8 187:8 244:6 278:15 279:5 **years** 13:15,20 16:12 33:18 41:19 41:25,25 42:7 46:4 80:12 83:6 87:3 117:14 135:20 145:16 172:22 196:5 200:15 212:12 220:11 233:21,21 240:22,25 241:3,4 |
| **worked** 38:11 103:10 141:15,24 227:15 240:10,13 240:16,18,20 279:20,22 | **wrong** 61:23 70:15 77:18 96:3 112:7 205:21 257:13 260:7 | 162:17 170:5,10 171:6 172:15 176:11 180:24 182:2,7 184:7 186:22 187:7,22 | 241:6 268:19 278:17,24,25 **yelled** 216:6 **yep** 10:24 11:17 |
| **working** 85:21 87:23 130:17 212:17 | **wrote** 45:20 48:17 110:12 121:6 148:23 152:13 162:2 195:23 | 187:25 188:2 189:12 191:8 192:24 197:24 198:22 203:3,18 | 97:13 149:22 193:2,6 266:21 274:4 280:23 |
| **works** 62:24 242:20,21 | 209:3 212:18 246:19 249:7 | 204:15 212:1 213:11,25 216:16 | **yesterday** 32:22 32:25 33:2 73:23 97:8 |
| **workweek** 146:1 146:15,16 **workweeks** 146:4 | 258:15 271:12 279:6 | 221:10 226:10 229:6 237:23 241:18 243:16,19 | **york** 52:13,14,17 144:24 147:12 148:15 |
| **world** 17:24 18:18 42:13 117:19 119:14 248:12 | **x** | 246:9 247:8 249:12 256:10,11 258:14,19 263:16 | **young** 202:9 212:6 213:7,17 231:19 231:20,25 |
| **worried** 188:25 **worries** 7:24 | **x** 3:1,6 4:1 5:1 | 266:5,15 268:17 269:25 270:4 | **younger** 196:5 200:16 268:19 |
| 184:14 **worry** 26:20 **worse** 22:5 | **y** **yeah** 9:21 13:4 17:10 18:2 20:15 22:25 24:24 33:3 44:1 48:14,15,24 | 272:3 276:21 282:4 | **z** **zealand** 248:13 **zebras** 259:24 |

Michael Goodstein, M.D.                          September 30, 2021
In Re: Fisher-Price/Mattel

**[zero - zoey's]**                                        Page 55

**zero**   45:1 51:25
  59:5,18 60:20,21
  225:4 251:7 261:5
**zoey**   99:4,10
  102:13 105:23
  106:3 111:6,8
  119:1 147:18
  167:19 168:6
  174:10 176:8
  178:21 179:7
  180:8 183:7,12
  184:22 185:8,11
  189:14 211:20
  262:3,6,9 263:12
  273:18
**zoey's**   143:10
  185:15 256:8
  260:13

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

(2) Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.