Nicole M. Goodwin (SBN 024593)
Aaron J. Lockwood (SBN 025599)
**GREENBERG TRAURIG, LLP**
2375 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Tel:  (602) 445-8000
Facsimile:  (602) 445-8100
goodwinn@gtlaw.com
lockwooda@gtlaw.com

Lori G. Cohen *(pro hac vice)*
Brandon D. Cox *(pro hac vice)*
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone:  (678) 553-2100
Facsimile:  (678) 553-2212
cohenl@gtlaw.com
coxb@gtlaw.com

Mary-Olga Lovett *(pro hac vice)*
**GREENBERG TRAURIG, LLP**
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone:  (713) 374-3541
Facsimile:  (713) 754-7541
lovettm@gtlaw.com

*Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>Plaintiff,<br><br>v.<br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation,<br><br>Defendants. | No. 2:19-cv-02689-GMS<br><br>**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF WILLIAM SINGHOSE, PH.D.**<br><br>**ORAL ARGUMENT REQUESTED** |

<mark>‍</mark><mark>‍</mark><mark>‍</mark>
<mark>‍</mark>
<mark>‍</mark>
<mark>‍</mark>
<mark>‍</mark>
<mark>‍</mark>
<mark>‍</mark>

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 2

LEGAL STANDARD ....................................................................................................... 2

ARGUMENT .................................................................................................................... 4

    I.   Dr. Singhose's Opinions About the Design of the RNPS Should Be Excluded Because His Research Methodology Was Flawed and Because They Are Unreliable and Irrelevant. ........................................................................................ 4

        A.   Dr. Singhose did not utilize a scientifically reliable methodology to test his criticisms about the design of the RNPS. ................................................. 4

        B.   Dr. Singhose's breathability opinion is unreliable and irrelevant. .................. 8

    II.   Dr. Singhose's Opinion That Fisher-Price Did Not Test the RNPS During the Design Process Is Speculative and Unreliable and Should Be Excluded. ................... 9

    III.   Dr. Singhose's Opinion About a Safer Alternative Design Should Be Excluded Because It Is Not Based on a Scientifically Reliable Methodology ........................... 12

    IV.   Dr. Singhose Should Be Precluded from Offering Any Opinions He Has Disclaimed, Including Any Opinion About the Cause of Z.O.'s Death ...................... 13

CONCLUSION ............................................................................................................... 14

Defendants Mattel, Inc. ("Mattel") and Fisher-Price, Inc., ("Fisher-Price") (collectively "Defendants"), by and through the undersigned counsel, and pursuant to Fed. R. Evid. 702, move to exclude the Opinions of Plaintiff's proposed expert, William Singhose, Ph.D. ("Dr. Singhose"). In support of this Motion, Defendants rely on the following Memorandum of Points and Authorities.

## INTRODUCTION

Plaintiff disclosed Dr. Singhose as an expert in the field of mechanical engineering. In his Report, Dr. Singhose opines about the design of the Fisher-Price Rock 'n Play Sleeper ("RNPS"), alleging the RNPS was defectively designed because of the 30-degree incline, criticizing testing conducted during the design process, and purporting to offer an opinion about a safer alternative design to the RNPS. (*See generally* Singhose April 2, 2021 Report, at COU_008358, COU_008360, **Ex. A**). All of Dr. Singhose's opinions should be excluded because they are not based on a competent and scientifically sound methodology and will not assist the jury in evaluating the evidence. The Court should exclude his opinions for the following reasons.

*First*, Dr. Singhose's opinions about the design of the RNPS—specifically, that the 30-degree incline is unsafe and exposes infants to a rollover/suffocation hazard and that the fabric on the RNPS is not breathable—should be excluded because his research methodology was flawed and because they are unreliable and irrelevant. For example, Dr. Singhose did not observe a single infant roll on an inclined surface to test his theories, but instead performed rolls himself—as a six-foot-tall, 54-year-old man who weighs 190 pounds—on a flat floor to test the rolling ability of infants on an inclined surface. Dr. Singhose failed to perform any scientifically reliable tests to support his opinions and thus should not be permitted to offer them.

*Second*, Dr. Singhose's opinion that Fisher-Price did not adequately test the safety of the RNPS during the design process is speculative, outside the scope of his expertise, and unreliable. It should therefore be excluded.

***Third***, Dr. Singhose's purported opinion that a safer alternative design existed should be excluded because it is not based on a scientifically reliable methodology.

***Fourth and finally***, Dr. Singhose should be precluded from offering any opinions he has disclaimed. Specifically, Dr. Singhose admits he has no expertise in SIDS or SUID, infant product labels or warnings, infant product packaging, infant product marketing, accident reconstruction involving infant products, and legal standards. Additionally, Dr. Singhose admitted he is not qualified, nor is it his "role" in this case, to opine about the cause of Z.O.'s death. (W. Singhose, PhD, Dep., at 331:10-332:1, **Ex. B**). Lastly, Dr. Singhose expressly stated in his deposition—twice—that it is not his opinion that it is easier to roll from supine to prone position in the RNPS than it is to roll from supine to prone in a flat crib. (*Id.* at 369:25–370:11). To the extent Dr. Singhose's original or rebuttal reports suggest he is offering opinions on these areas, the Court should exclude them.

## FACTUAL BACKGROUND

To avoid repetition, Defendants fully incorporate by reference Sections I and II of their Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, which provides a detailed factual background about the RNPS and the incident that is the basis of this lawsuit.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, the Court acts as a "gatekeeper" to first determine whether an expert is qualified; then the Court determines whether an expert's proposed opinions are reliable and relevant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 597; *see also Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir.) cert. denied, 132 S. Ct. 120 (2011); *Contreras v. Brown*, CV-17-08217-PHX-JAT, 2019 WL 2080143, at *1 (D. Ariz. May 10, 2019) ("Rule 702 imposes a special gatekeeping obligation upon

a trial judge to make a preliminary assessment of the admissibility of expert [] testimony."); *In re Apollo Grp., Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 962 (D. Ariz. 2007) (confirming the gatekeeping obligation outlined in *Daubert* applies to all expert testimony); *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) ("In exercising this gatekeeping function, a court must determine that the experts are qualified, that their opinions are reliable, and that their testimony fits the case.").

To determine whether an expert is qualified, the Court must decide whether the individual has the requisite qualifications. *Skinner v. Tuscan, Inc.*, No. CV-18-00319-TUC-RCC, 2020 U.S. Dist. LEXIS 186308, at *23-24 (D. Ariz. Oct. 7, 2020). The Court's review of an expert's qualifications also defines the scope of the expert's permissible testimony. *Swift v. Wesco Ins. Co.*, No. CV-18-01531-PHX-RM, 2021 U.S. Dist. LEXIS 34808, * 19 (D. Ariz. Feb. 23, 2021).

Next, the Court evaluates the reliability and relevancy of the expert's proposed opinions. *Daubert* articulated several inquiries for a district court to consider in determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the expert's theory or technique can and has been tested; (2) whether it has been subjected to peer review and publication; (3) what the technique's known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field.  509 U.S. at 593-94; *see also Brown*, 415 F.3d at 1267. This list in non-exhaustive, and there may be some overlap between the factors. Thus, while problems with a witness's proffered testimony might not neatly fit into one or other of these elements, it is abundantly clear that if there is simply too great an analytical gap between the data and the opinion proffered, a court may exclude expert testimony. *Joiner*, 522 U.S. at 146. Further, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit [expert] opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

Finally, the Court must determine whether the expert's reasoning or methodology is relevant. *Sampedro v. ODR Mgmt. Grp. LLC*, No. CV-18-04811-PHX-SPL, 2021 U.S. Dist. LEXIS 96323, at *5 (D. Ariz. May 19, 2021). The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *Roosevelt Irrigation Dist. v. United States*, No. CV-15-00448-PHX-JJT, 2019 U.S. Dist. LEXIS 36530, at *5-6 (D. Ariz. Mar. 7, 2019). In doing so, the court must determine whether the opinions being offered are sufficiently tied to the facts in issue and that the expert's testimony will aid the jury. *Daubert*, 509 U.S. at 591 (stating that the district court's "gatekeeping role" requires ensuring that the expert's testimony "is relevant to the task at hand" and will assist the trier of fact to understand the evidence).

## ARGUMENT

**I.    Dr. Singhose's Opinions About the Design of the RNPS Should Be Excluded Because His Research Methodology Was Flawed and Because They Are Unreliable and Irrelevant.**

Dr. Singhose offers two primary criticisms about the design of the RNPS: (1) the 30-degree incline renders it a defective and unreasonably dangerous product because the incline allows an infant to roll from the supine (face-up, on their back) position to the prone (face-down, on their stomach) position and makes it difficult for an infant to correct themselves back into the supine position, thereby increasing the infant's risk of suffocating in the product; and (2) the fabric of the RNPS is not breathable, so when an infant is in the prone position (and cannot correct themselves back into the supine position), they can suffocate from the fabric of the RNPS. Both opinions are flawed.

**A.    Dr. Singhose did not utilize a scientifically reliable methodology to test his criticisms about the design of the RNPS.**

Dr. Singhose's design opinions should be excluded because he failed to use a scientifically reliable methodology to reach them. All of Dr. Singhose's opinions—particularly those that posit the RNPS "poses a significant hazard" and that it is "defective

4

and unreasonably dangerous"—rest on the untested theory that the 30-degree incline presents an alleged rollover/suffocation hazard that increases the risk of infants rolling from supine (on their back) to prone (on their stomach) in the RNPS and not being able to get themselves back into the supine position. (Singhose Report, COU_008299-008300, COU_008315, **Ex. A**; Singhose Rebuttal Report, COU_009090, **Ex. C**). He explains in his report that the "critical design defect of the RNPS" is that its "design allows the infant to push with their legs to initiate and power a supine-to-prone roll; however, once the infant is prone on their stomach, they may not be able to use their legs, or arms, to turn back to the supine position." (*Id.* at COU_008315). On this point, Dr. Singhose initially testified as follows:

> Q. And in terms of mechanical defect, you contend that the Rock 'n Play sleeper makes it easier for an infant to roll from supine to prone, correct?
>
> A. Easier than what?
>
> Q. Easier than a flat surface.
>
> A. Yeah, easier than a flat surface in the Rock 'n Play sleeper. I mean if you have the Rock n Play sleeper, and rather than having that 30 degree incline, if the Rock 'n Play sleeper had a flat back, that would be harder to turn over. **But they've raised it up 30 degrees, and during that raising up process, it becomes progressively easier to perform a roll.**

(W. Singhose, PhD, Dep., at 365:18 – 366:6, **Ex. B**) (emphasis added).

But Dr. Singhose backtracks on this position later in his deposition:

> Q: Do you have any empirical data… that supports your conclusion that it is easier to roll from supine to prone in the Rock 'n Play sleeper than in a flat crib?
>
> A: I don't understand the question because that's not my opinion. So I – I'm not –
>
> Q: Okay. It is not your opinion that it is easier to roll from supine to prone position in the Rock 'n Play sleeper than it is to roll from supine to prone in a crib that's flat?
>
> A: Yeah, that's, that's not my opinion.

(*Id.* at 369:25–370:11).

This alone is sufficient to exclude his opinion as he has expressly disclaimed it. Nevertheless, this opinion must also be excluded because it is unreliable. Dr. Singhose admitted he **never tested this theory**. (*Id.* at 237:11–16, 366:7–12, 375:22–25, 380:22–25). While he placed three live infants in an exemplar RNPS for only a couple of minutes and took some photographs of them in the prone position, he did not actually test their ability to roll in the RNPS—either restrained or unrestrained:

> Q. Yes. And so -- but you did -- she was not able to roll over in your observation when she was in the restraints; correct?
>
> * * *
>
> THE WITNESS: I don't know if she was able to. **We didn't do that test.** Again, she was only in that position for a couple of minutes, and we tried to keep her calm so I could take the measurements. The point is I was taking measurements of the belt restraint at that time.
>
> * * *
>
> Q. Right. And as we've, as we've established, I think the infants were -- **the infants used in your demonstration were placed prone or partially prone at the beginning**. I think we established that last time. Not by you in one case, but at least by -- whoever was there with them as a caregiver.
>
> A. **That's correct.**

(*Id.* at 368:19 – 369:1, 237:11–16) (emphasis added).

Likewise, Dr. Singhose **never tested or examined any live infant's ability to roll over on a horizontal plane**, which he touts as a safer safe sleep environment to the RNPS:

> Q. Obviously, from our perspective coming in, you're relying on the photographs you gave us. And so I did not see any photographs of -- that's why I'm asking you. I didn't see any photographs as part of your opinion of them on the floor or rolling over. Those were not provided, correct?
>
> A. That's correct. **Actually, neither one of them were able to roll over at that time**, and I did not photograph them laying on the carpet.

6

(*Id.* at 374:23 – 375:6) (emphasis added).

Remarkably, instead of testing this purported "critical design defect" theory by examining whether infants—the intended users of the RNPS—can more easily correct themselves when they roll into the prone position on a horizontal sleep surface as compared to the RNPS, Dr. Singhose instead ***tested his own rolling ability*** on the flat floor. (*Id.* at 381:15 – 382:12). In other words, Dr. Singhose's testing methodology was literally to roll on the floor himself. Unsurprisingly, he conceded that, unlike an infant, he is 54 years old, six-foot-tall, weighs 190 lbs, and has been rolling over on his own for "fifty-three and a half years"—demonstrating his ability to rollover is unquestionably not comparable to an infant's ability to rollover. (*Id.* at 382:15-25). As he stated in his own words, he has "superior ability to roll compared to babies." (*Id.* at 383:19-20). Importantly, Dr. Singhose also conducted his rolling "test" on a flat surface, not an inclined surface. So even in the unlikely event that it is somehow scientifically valid for a 54-year-old man to gather data on infant rollover behavior from himself rolling on the floor, Dr. Singhose did not gather any of that same data at an incline.

Aside from analyzing his own "superior" rolling abilities, Dr. Singhose relies only on a series of two-dimensional statics analysis of an object rolling on an inclined surface to support his criticisms about the design of the RNPS and the 30-degree incline. (Singhose Report, at COU_008302 - 008309; **Ex. A,** W. Singhose, PhD Dep., at 366:22-368:7, **Ex. B**). But these models do not account for the complex geometry of the RNPS, including but not limited to its high side walls and restraint system—both of which are features that Dr. Singhose admitted ***inhibits*** rolling behavior in the product. (W. Singhose, PhD, Dep., at 181:6 – 11, 381:22-24, **Ex. B**). Further, these models do not account for the complex physical composition of an infant—involving multiple limbs capable of independent movement, unequal weight distribution, and unique anatomy—and instead assume that the infant's body is "perfectly rigid." (Singhose Report, at COU_008304, **Ex. A**).

7

In sum, Dr. Singhose's testimony confirms he failed to use a scientifically sound methodology to support his criticisms about the design of the RNPS. His opinion is based on a methodology that involved zero testing on actual infants, rolling himself on a flat floor to "test" an inclined infant sleeper, and a overly simplistic two-dimensional study that admittedly ignores vital components of infant anatomy and the RNPS's geometry. Given these flaws, is abundantly clear that there is simply too great an analytical chasm between the utterly inadequate "research data" Dr. Singhose gathered and the opinions he proffers in this case. *Joiner*, 522 U.S. at 146. These opinions are therefore unreliable and should be excluded.

**B.     Dr. Singhose's breathability opinion is unreliable and irrelevant.**

Dr. Singhose further claims the design of the RNPS was defective because of the lack of "breathable materials on the concave inclined sleeping surface." (Singhose Report, at COU_008328, **Ex. A**). This theory, however, is also unsupported by any reliable testing other than Dr. Singhose pressing the fabric against ***his own face***. (*Id.* COU_008330). Dr. Singhose fails to show how his self-smothering "test"—which has no objective results—is based on a scientific methodology that is generally accepted in the scientific community.

Setting aside the shortcomings of this self-smothering "test," it is not even consistent with the position in which Plaintiff claims Z.O. was found in the RNPS, and thus does not "fit" the facts of this case and will not help the jury understand the evidence:

> Q. When testing for the impact of breathability in the Rock 'n Play in your report, you did not test for an infant found in this position in Exhibit 15 at Page 362 with her face turned to the side?
>
> A. Well, I tested, you know, breathing. As you know, I placed my face into this Rock 'n Play sleeper at about the middle and breathed through it. This one has the mannequin turned in some sort of unnatural, you know, way to the right. I don't think I could even turn my neck that much. **So no, I didn't replicate this exact position.**

(W. Singhose, PhD, Dep., at 276:18 – 277:5, **Ex. B**) (emphasis added).

8

Dr. Singhose's purported breathability opinions—like all of his design opinions—fail because they are not based on a scientifically sound methodology and do not "fit" the facts of this case and thus are irrelevant. The Court should exclude them.

**II.  Dr. Singhose's Opinion That Fisher-Price Did Not Test the RNPS During the Design Process Is Speculative and Unreliable and Should Be Excluded.**

In addition to criticizing the actual design of the RNPS, Dr. Singhose seeks to opine that Defendants' pre-release and post-launch testing of the RNPS was inadequate. (Singhose Report, at COU_008336, 008339, **Ex. A**). Specifically, he opines that Defendants should have tested "the hazard of infants rolling over into the prone position." (*Id.* at COU_008336).  But as his Report acknowledges, "Fisher-Price hired Exponent to perform testing" with regard to infant rolling in 2018. (*Id.*) Unlike Dr. Singhose–who conducted no observational studies of infant roll over behavior in the RNPS–the Exponent testing found that it is actually much more difficult for an infant to roll over from supine to prone in the RNPS as compared to an open horizontal surface like a crib. (*See* C. Pilarz Ind. Dep., at 35; **Ex. D**).Further, Dr. Singhose fails entirely to establish any reliable methodology to support his "lack of testing" opinions. He identifies no regulation, federal statute, international standard, industry standard, or scientific literature to support his opinion that Defendants did not adequately test the RNPS and/or that Defendants were required to do more testing than they did before the product was released into the market and even while it was on the market. Nor does he identify any internal standard or protocol developed by Fisher-Price that suggests additional testing should have been performed but was not.

Instead, Dr. Singhose claims the following types of testing should have been done by Defendants, all the while admitting that he himself did no such testing to support these opinions:

9

| Type of "testing" Dr. Singhose claims Defendants should have done | Dr. Singhose's admissions about his own "testing" |
|---|---|
| ". . . the ability of an infant to roll from supine to sideways to prone should have been tested." (Singhose Report, COU_008337, **Ex. A**). | "Q. Yes. And so -- but you did -- she was not able to roll over in your observation when she was in the restraints; correct?<br>* * *<br>A: I don't know if she was able to. **We didn't do that test."**<br><br>(W. Singhose, PhD, Dep., at 237:11–16, **Ex. B**) (emphasis added). |
| "They should have done rebreathing tests." (W. Singhose, PhD, Dep., at 291:2, **Ex. B**). | "Q. Your test for rebreathing was pressing your face into the fabric and trying to breathe for a minute; right?<br><br>A. Yes. I mean, **I'm doing a test very similar to what the people at Fisher-Price did when they tested the swatches**. I just put my face into it and breathed.<br><br>Q. Yeah. What scientific article or standard is that test for rebreathing based on?<br><br>A. **I don't think it's based on anything."**<br><br>(W. Singhose, PhD, Dep., at 279:1-10, **Ex. B**) (emphasis added). |
| "They should have noted that the arms babies [sic] could be blocked when they're in the prone position." (W. Singhose, PhD, Dep., at 291:3-5, **Ex. B**). | "Q. Well, going back on this, so you – you're the person that told me a little bit before the break that you think Fisher-Price should have tested babies in the prone position.<br><br>A. Yeah. That's right.<br><br>Q. So just how long should they have left them there struggling? How would you design that study?<br>* * * |

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

| |
|---|
| A. **So I don't know exactly how they should have done it. . . .** <br><br> * * * <br><br> Q. You didn't attempt to put together any protocol or tempt -- or attempt to test babies. In fact, you said you only had Palmer in there for maybe 45 seconds in the prone position; right? <br><br> A. I don't think I testified on how long I had Palmer in the prone position. <br><br> Q. How long – <br><br> A. But – <br><br> Q. -- was she there? <br><br> A. -- it was probably only a couple of minutes. <br> * * * <br><br> Q. We don't have a video of Palmer, we have just a video of the doll; right? <br><br> A. Yeah. I mean, that video isn't -- you know, that video is not even a video." <br><br> (W. Singhose, PhD, Dep., at 302:21-303:3; 303:12; 303:23-304:8; 304:21-24, **Ex. B**) (emphasis added). |

Dr. Singhose's "lack of testing" opinions are nothing more than *ipse dixit* and pure speculation, and should be excluded. *Domingo ex Rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (upholding trial court's exclusion of testimony that "was nothing but [the expert's] *ipse dixit*"). Dr. Singhose's failure to describe what additional testing should have been conducted renders these opinions unreliable. *See Johnson v. Wyeth LLC*, No. CV 10-02690-PHX-FJM, 2012 U.S. Dist. LEXIS 50645, at *7 (D. Ariz. Apr. 11, 2012) ("Because plaintiff cannot point to any objective standard relied on by Dr.

11

Parisian or Dr. Blume that required defendants to perform additional testing, plaintiff has not shown that the failure to test opinions are anything more than subjective belief or unsupported speculation."); *see also Hines v. Wyeth*, 2:04-0690, 2011 U.S. Dist. LEXIS 74011, 2011 WL 2680842, at *6 (S.D. W.Va. July 8, 2011) (excluding expert's failure to test opinion); *In re Prempro Prods. Liab. Litig.*, 4:03CV01507-WRW, 4:05CV00718-WRW, 2010 U.S. Dist. LEXIS 142558, 2010 WL 5663003, at *3 (E.D. Ark. Sept. 16, 2010) (excluding plaintiffs' experts' failure to test opinions as "their testimony could only be a subjective opinion on what they believe defendants **could have done** rather than what industry or governmental standards **require** them to do") (emphasis in original); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."). Dr. Singhose's "lack of testing" opinions should therefore be excluded.

### III. Dr. Singhose's Opinion About a Safer Alternative Design Should Be Excluded Because It Is Not Based on a Scientifically Reliable Methodology.

Dr. Singhose attempts to opine that safer alternatives to the RNPS existed. Dr. Singhose fails, however, to substantially identify the alternative design he proposes—simply invoking the term "bassinet" is insufficient to identify what the design of the alternative actually entails. As Dr. Singhose himself admits, some bassinets are designed with an inclined surface. (W. Singhose, PhD, Dep., at 52:25–53:2, **Ex. B**) ("I remember looking at that issue quite a few years ago, about the fact that some of these bassinets had a somewhat inclined sleeping surface."). Indeed, Dr. Singhose cannot even commit to whether his proposed design alternative includes a horizonal sleep surface or not, instead articulating both designs in a single sentence: "A design alternative to the RNPS is a bassinet with a level, ***or nearly level sleeping surface***." (Singhose Report, at COU_008358, **Ex. A**) (emphasis added). What Dr. Singhose envisions as "nearly level" is never defined in any way, but by definition "nearly level" is not "level" and according to Dr. Singhose's other arguments, a "nearly level" surface would still present the same

design criticisms he has about the RNPS. Thus, it is unclear how Dr. Singhose's proposed design alternative would mitigate the alleged design flaws in the RNPS and prove a safer product.

Dr. Singhose also failed to test any proposed alternative design. His report's discussion of design alternatives to the RNPS spans only four paragraphs. (*Id.*) The report fails to identify the geometry of the proposed alternative design, its features, how these features are incorporated into the overall design, and how the alternative design preserves the overall intended use of the RNPS.[1]

Dr. Singhose's failure to test his theoretical and unsupported safer alternative design renders this opinion unreliable and subject to exclusion. *Harrison v. Howmedica Osteonics Corp.*, No. CIV 06-0745 PHX RCB, 2008 WL 906585, at * 14 (D. Ariz. Mar. 31, 2008) (stating the failure of plaintiffs' expert to test possible alternative designs "cuts against a finding of reliability").

**IV. Dr. Singhose Should Be Precluded from Offering Any Opinions He Has Disclaimed, Including Any Opinion About the Cause of Z.O.'s Death.**

Dr. Singhose should be precluded from offering any opinions he has disclaimed. Specifically, Dr. Singhose admits he has no expertise in SIDS or SUID (W. Singhose, PhD, Dep., at 113:24–25, 114:1, 133:12–20, 134:19–23, 330:7–25, 331:1–25, 339:23–25, 340:1); infant product labels or warnings (*Id.* at 154:20–25, 156:2–12); infant product packaging (*Id.* at 156:13–20); infant product marketing (*Id.* at 159:14–16); accident reconstruction involving infant products (*Id.* at 158:23–25, 159:1–2); and legal standards (*Id.* at 159:3–8, 345:5–25, 346:1–25).

Dr. Singhose also admitted he is not an expert in the medical field and does not offer any medical causation opinions in this case. (*Id.* at 111, 330-32). He is not a pediatrician. (*Id.* at 330). He is not a neonatologist. (*Id.*). He is not a pulmonologist. (*Id.*). He is not a forensic, anatomic, or clinical pathologist. (*Id.*). And he candidly admitted it

---

[1] Dr. Singhose states the RNPS is "inexpensive, portable, easy to use, and provide[s] a soothing rocking motion." (**Ex. A,** Singhose Report, at p. 72).

13

is not his "role" to provide an opinion as to the cause of Z.O.'s death, and that he will not provide such an opinion here:

> Q. You understand that there is medical cause of death which is determined and has been determined in this case by one medical examiner and then there are experts on both sides. You are aware of that, right?
>
> A. Yes.
>
> Q. And you are not going to be testifying as to the actual medical cause of [Z.O.]'s death, correct?
>
> A. I see what you're saying. No, I'm not going to be doing that.
>
> Q. Thank you. And anything regarding the cause of [Z.O.]'s death in the medical sense, you would defer to a board-certified medical expert in the appropriate fields, correct?
>
> A. Yes, I think so.
>
> **Q. So you cannot offer an opinion to a reasonable degree of medical certainty that [Z.O.]'s death was proximately caused by the Rock 'n Play sleeper, correct?**
>
> **A. No, I don't think that's my role in this case.**

(*Id.* at 331:10-332:1) (emphasis added). Dr. Singhose should not be permitted to testify on any of these subjects or contradict them at trial based on his own admissions and testimony.

## **CONCLUSION**

For the reasons stated herein, Defendants respectfully request the Court grant this Motion, exclude the opinions and testimony of Dr. Singhose, and grant all other relief to which Defendants may be entitled.

RESPECTFULLY SUBMITTED this 19th day of November, 2021.

GREENBERG TRAURIG LLP

By: /s/ *Lori G. Cohen*
    Lori G. Cohen*
    Mary-Olga Lovett*
    Nicole M. Goodwin
    Aaron J. Lockwood
    *Pro Hac Vice
    *Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

**Certificate of Service**

☐     I hereby certify that on the 19th day of November, 2021, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to the following participants of the CM/ECF System:

John E. Osborne
William C. Bacon
Kristin J. Schriner
GOLDBERG & OSBORNE LLP
698 E. Wetmore Road, Ste. 200
Tucson, Arizona 85705
josborne@goldbergandosborne.com
wbacon@goldbergandosborne.com
kschriner@goldbergandosborne.com
*Attorneys for Defendants*

By:   */s/ Lori G. Cohen*
      Greenberg Traurig, LLP

60584893