# **EXHIBIT B**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

KATHLEEN COURKAMP, for   )
herself and on behalf of )
other statutory          )
beneficiaries,           )
                         )
    Plaintiff,           )
                         )
vs.                      )  CASE NO.
                         )
FISHER-PRICE,INC., a     )  2:19-CV-02689-GMS
foreign corporation;     )
MATTEL, INC., a foreign  )
corporation,             )
                         )
    Defendants.          )

VIDEOTAPED DEPOSITION OF WILLIAM E. SINGHOSE, Ph.D.
(Taken by Defendant)
September 14, 2021
9:50 a.m.

Suite 2500
3333 Piedmont Road
Atlanta, Georgia

Reported by:  Debra M. Druzisky, CCR-B-1848

## Page 2

1    APPEARANCES OF COUNSEL
2    On behalf of the Plaintiff:
3        JOHN E. OSBORNE, Esq.
         Goldberg & Osborne
4        698 East Wetmore Road, Suite 200
         Tucson, Arizona  85705
5        (520) 620-3975
         josborne@goldbergandosborne.com
6
7    On behalf of the Defendants:
8        ROBERT BRADY HERMAN, Esq.
         BRANDON D. COX, Esq.
9        3333 Piedmont Road, Suite 2500
         Atlanta, Georgia  30305
10       (678) 553-2100
         hermanb@gtlaw.com
11       coxb@gtlaw.com
12       MARY-OLGA LOVETT, Esq.
         Greenberg Traurig
13       1000 Louisiana Street, Suite 1700
         Houston, Texas  77002
14       (713) 374-3541
         lovettm@gtlaw.com
15
16   Also Present:
17       David Ramirez, videographer
18           --oOo--
19
20
21
22
23
24
25

## Page 3

1              INDEX TO EXAMINATION
2    Witness Name:                       Page
3    WILLIAM E. SINGHOSE, Ph.D.
4    By Ms. Lovett                          5
5
6
7          INDEX TO DEFENDANT'S EXHIBITS
8    No.        Description              Page
9    Exhibit 1   8-25-21, Notice of Videotaped   79
               Deposition  of William Singhose,
10             Ph.D. re: The above-captioned
               action.
11
     Exhibit 2   Curriculum vitae of William      84
12             Singhose, Ph.D.
13   Exhibit 3   4-2-21, Report of William        89
               Singhose, Ph.D. re: The
14             above-captioned action.
15   Exhibit 4   7-16-21, Rebuttal Report of      91
               William Singhose, Ph.D. re: The
16             above-captioned action.
17   Exhibit 5   COU 5582, Photograph of warning 182
               label.
18
     Exhibit 6   6-9-20, MomJunction.com article 191
19             re: When Do Babies Start to Roll
               Over and Tips to Encourage Them,
20             by Dr. Nikolina Zdraveska.
21   Exhibit 7   ZO-ClearPFH 1 thru 41, ClearPath 199
               Family Healthcare Medical
22             Records Re: Zoey Olson.
23   Exhibit 8   COU 7092, Photographs of Zoey    203
               Olson.
24
25

## Page 4

1    INDEX TO DEFENDANT'S EXHIBITS (Continued.)
2    No.        Description              Page
3    Exhibit 9   8-8-20, Journal of Biomechanics  208
               article re: Do inclined sleeping
4              surfaces impact infants' muscle
               activity and movement, by Wang,
5              et al.
     Exhibit 10  Mattel-COU 12444 thru 476,       213
6              4-6-18, Exponent PowerPoint re:
               Fisher-Price Rock 'n Play
7              Sleeper Assessment.
8
     Exhibit 11  COU 8143, video file.            241
9
     Exhibit 12  COU 8144 thru 8154, Photographs  244
10             of doll in exemplar
               Rock 'n Play.
11
     Exhibit 13  American Academy of Pediatrics   250
12             Policy Statement re: SIDS and
               Other Sleep-Related Infant
13             Deaths.
     Exhibit 14  10-25-19, University of Arkansas 255
14             for Medical Sciences letterhead
               from Erin Mannen to U.S.
15             Consumer Product Safety
               Commission re: Biomechanical
16             analysis of inclined sleep
               products.
17
     Exhibit 15  ZO-TempePD 355 thru 362,         271
18             Photographs of exemplar
               Rock 'n Play with doll.
19
     Exhibit 16  Mattel-COU 23498, video file.    296
20
21
22
23
24
25

Page 5

1    THE VIDEOGRAPHER:  We are on the
2  record, and the time is approximately 9:51
3  a.m.  This is the beginning of the
4  videotaped deposition for Dr. William
5  Singhose.
6    Would counsel present please identify
7  themselves and who they represent for the
8  record?
9    MR. OSBORNE:  This is John Osborne on
10  behalf of Katie Courkamp and Andrew Olson.
11    MS. LOVETT:  Mary-Olga Lovett,
12  Brandon Cox and Brady Herman for
13  defendants Mattel and Fisher-Price.
14    THE VIDEOGRAPHER:  Thank you,
15  Counsel.
16    Would the court reporter please swear
17  in the witness?
18    WILLIAM E. SINGHOSE, Ph.D.,
19  having been first duly sworn, was examined and
20  testified as follows:
21         EXAMINATION
22  BY MS. LOVETT:
23    Q.  Would you give us your full name, sir?
24    A.  My name is William Singhose.
25    Q.  And Dr. Singhose -- is it correct to call

Page 6

1  you Dr. Singhose?
2    A.  Yes.  That would be fine.
3    Q.  By virtue of a Ph.D. that you have?
4    A.  Yes.  That's correct.
5    Q.  All right.  And tell me your current
6  professional address.
7    A.  My professional address would be 813 Ferst
8  Drive, that's F-E-R-S-T, Atlanta, Georgia, 30322.
9    Q.  And you've been deposed before, so we can
10  dispense with the normal, I think, deposition rules
11  of the road, shall --
12    A.  Okay.
13    Q.  You agree?
14    A.  Sure.
15    Q.  And I'm happy to give you the spiel, but I
16  think you know it quite well.
17    A.  I think it's fine.  We can proceed.
18    Q.  Thanks.
19    All right.  How many times have you been
20  deposed, Doctor, total?
21    A.  Probably about 25 to 30 times.
22    Q.  Okay.  How many of those were product
23  cases?
24    A.  I'd say roughly half of those.
25    Q.  Okay.  You also do work in patent cases?

Page 7

1    A.  Yes.  That's correct.
2    Q.  Would that make up the other half or is
3  there a third component?
4    A.  That would make up most of the second
5  half.  I mean, I've been deposed as a -- as a fact
6  witness or a material witness before.
7    Q.  As an inventor?
8    A.  Yes.
9    Q.  All right.
10    A.  That's right.
11    Q.  And by patent -- patent work's my day job.
12  So about how -- so you say about half the
13  depositions have been patent-related as in your
14  capacity as an expert, half product-related, and
15  then you've also been deposed as an inventor in
16  your individual capacity?
17    A.  Yes.  That's correct.
18    Q.  Deposed in your individual capacity in any
19  other type of litigation?
20    A.  No.
21    Q.  So you have created, obviously, reports
22  and given deposition, sworn testimony, both --
23  well, let me start with that.
24    You've created reports; correct?
25    A.  Yes.

Page 8

1    Q.  That have been filed with courts; correct?
2    A.  Yes.
3    Q.  In the patent context you've used --
4  you've filed Markman reports or expert reports,
5  similar to that?
6    A.  Yes.
7    Q.  And then you've given depositions both --
8  or you've given testimony both in deposition and at
9  trial; true?
10    A.  Yes.
11    Q.  And you stand by everything you've said in
12  your prior reports?
13    A.  You mean --
14    MR. OSBORNE:  Form.
15    THE WITNESS:  -- the entire history
16  of my life?
17  BY MS. LOVETT:
18    Q.  In your --
19    A.  Or in this case?
20    Q.  Well, that's -- well, let's break that
21  down.  So are there some profession -- in your
22  capacity as an expert witness, are there some
23  reports that you don't stand by anymore?
24    A.  Nothing comes to mind, but I hadn't
25  actually reflected on that question before.

Page 9

1    Q.  Okay.  I think I assumed that, as a
2    professional expert witness, that you'd stand by
3    every opinion you've given.
4        Am I wrong?
5    A.  I think if I was provided wrong, I
6    wouldn't stand by that opinion anymore.
7    Q.  All right.  So you agree that you may be
8    proven wrong although you're an expert?
9    A.  I think it's possible that one could be
10   proven wrong.  And I would take that information
11   into account and consider it.  I just can't recall
12   anything like that happening.
13   Q.  Okay.  Do you think you've ever been
14   proven wrong in a professional capacity?
15   A.  As an expert witness, I don't think I've
16   been proven wrong, no.
17   Q.  Not a single time, you're always right?
18   A.  Nothing's coming to mind right now where
19   someone has proven one of my opinions was wrong.
20   Q.  Okay.  You understand the importance of
21   the question, I think, because you're under oath
22   here and you've been under oath in the other
23   context.
24       So if I ask you about other testimony
25   you've given in other cases, you agree with me that

Page 10

1    the testimony that you've given under oath you
2    certainly took seriously and as you're taking your
3    deposition seriously here today; true?
4    A.  Yes.  That's correct.
5    Q.  All right.  So we've got one day to ask
6    you questions.  I hope that it will not be a
7    terribly long one.  But you understand this is
8    Mattel and Fisher-Price's one opportunity to learn
9    all of your opinions in this case and figure out
10   everything that you're going to say when you come
11   to trial.
12       You understand that concept?
13   A.  I, yes, I understand --
14       MR. OSBORNE:  Well, I'll --
15       THE WITNESS:  -- the concept.
16       MR. OSBORNE:  -- object to the form.
17   And remember, there are a bunch of reports
18   in this case.  Go ahead.
19       MS. LOVETT:  Yeah.  I think I said,
20   John, it's my only chance to ask questions
21   before trial.  Because that is true, at
22   least for my 28 years' worth of doing
23   this.  But you may -- you may know some
24   other -- some other way.  Let me know.
25   BY MS. LOVETT:

Page 11

1    Q.  So let me ask you, Doctor, is there
2    anything that might affect your ability to testify
3    today?
4        I took Claritin, so there may be problems
5    with me taking your deposition, but is there any
6    reason you may not be able to give your best,
7    clearest testimony today?
8    A.  No.
9    Q.  If you don't answer -- understand a
10   question that I ask, I'm not an engineer, which
11   will become rapidly apparent, if you don't
12   understand my question, would you ask me to
13   rephrase it?
14       Otherwise, I'm going to assume that you've
15   understood it and meant your answer.  Okay?
16   A.  Okay.
17       MS. LOVETT:  John, you want to read
18   and sign?
19       MR. OSBORNE:  Let me listen to the
20   deposition and how I think our ebullient
21   court reporter will do, and I'll make my
22   decision at the end.
23       MS. LOVETT:  All right.  We're open
24   to read and sign under the rules.
25   BY MS. LOVETT:

Page 12

1    Q.  Doctor, have you ever been a party to a
2    lawsuit in your individual capacity?
3    A.  I don't think so as an individual, no.
4    Q.  All right.  You hesitate.  Is there
5    something as a -- as part of a company or a group?
6    A.  Yes.  I worked for a start-up company for
7    several years, and that start-up company became
8    involved in patent litigation involving one of my
9    patents.
10   Q.  Okay.
11   A.  And that's why I was deposed before on
12   that issue.
13   Q.  Right.  What was the name of the start-up?
14   A.  Convolve, Incorporated.
15   Q.  And what was the technology of Involve
16   [sic], Incorporated?
17   A.  That technology involved controlling
18   machines so they would not vibrate.
19   Q.  What type of machines?
20   A.  A whole range of machines from very small,
21   accurate manufacturing machines to cranes to
22   satellite.
23   Q.  Anti-sway control?
24   A.  That's correct.
25   Q.  Were you the lead inventor on that patent?

Page 13

1    A.  I was the lead inventor on one of the
2  patents involved in that litigation.  I think there
3  was initially three.  But I didn't follow it all
4  the way through, and I'm not sure what the final
5  disposition of what that was after -- but I know it
6  went on for 17 or 18 years, something like that.
7    Q.  Did -- what went on for 17 or 18 years?
8    A.  Litigation involving the technology that I
9  was involved in developing at Convolve.
10    Q.  Okay.  So did the patent issue?
11    A.  Yes.  The patent that I was the lead
12  author on issued and it became involved in that
13  case.
14    Q.  Okay.
15    A.  There were other patents involved in that
16  case.
17    Q.  And do you recall the name or description
18  in the Patent Office of that patent?
19    A.  The name was something like minimizing
20  residual vibration.
21    Q.  And give me a brief description of the
22  claims of that patent.
23    A.  I'm not sure I can do that.  I think that
24  was back in the day when you could have, like, a
25  hundred claims.

Page 14

1    Q.  You still can.
2    A.  A brief description of the claims would be
3  methods of controlling machines by generating
4  inputs into those machines such that they respond
5  without residual vibration.
6    Q.  And how was that patent put into use as a
7  functional device?
8    A.  The technology in that patent is
9  programmed into a control computer that is
10  controlling a machine.  And that control
11  commuter -- computer has to issue voltages or
12  currents to the machine's motors or actuators.  And
13  the technology properly shapes those voltages or
14  currents so that the machine moves and doesn't
15  vibrate.
16    Q.  And in the litigation, were you a party as
17  well as deposed?  Was your start-up a party?
18    A.  I mean, I was deposed a couple of times in
19  that case, but I'm not sure what you mean by "a
20  party."  I didn't have a personal stake in it.  The
21  patent was assigned to the company.
22    Q.  Right.  And so the -- then that's what I
23  was asking is whether you had any stake in the
24  company.
25    A.  No, I did not.

Page 15

1    Q.  You were an employee of the company --
2    A.  Yes.  I was --
3    Q.  -- and had a standard assignment agreement
4  as an engineer?
5    A.  I guess.  I mean, I was employee number
6  one.  It was just a few of us starting it.  But my
7  friend who was the C.E.O., he brought all the money
8  to the table and got the company off the ground.
9    Q.  So how did that -- how did that litigation
10  come out?  Was your friend's company the plaintiff,
11  Involve, or the defendant?
12    A.  My company was the plaintiff.
13    Q.  All right.
14    A.  Yes.
15    Q.  And where was the suit brought?
16    A.  The lawsuit was actually initiated after I
17  left the company.
18    Q.  Uh-huh.
19    A.  So I'm not sure that I can testify with
20  100 percent accuracy on the details.
21    Q.  Sure.
22    A.  But I think it was filed in maybe the,
23  something like the Western District of New York.
24    Q.  Okay.  And do you know how that case came
25  out?  Who was the defendant?

Page 16

1    A.  The initial defendants were C8 and Compaq
2  Computer.  Compaq Computer was acquired by H.P., so
3  I think H.P. became a defendant.  There was also
4  auxiliary lawsuits that were filed against Western
5  Digital.  I did not be deposed in that case, but I
6  think it was the same sort of technology was being
7  asserted.
8    So the cast -- the case got quite
9  extensive and messy.  And like I -- like I said, I
10  think it went for 17 or 18 years.  And it was,
11  portions of it were passed up to the Supreme Court
12  for consideration.  I didn't follow all of --
13    Q.  I --
14    A.  -- those details.
15    Q.  I know the second case rather well.
16    A.  Yeah?
17    Q.  Tell me -- so tell me the name of the
18  company one more time.
19    A.  My company was Convolve.
20    Q.  Convolve.  I was -- I wrote down Involve.
21  This is why I like to have the -- but C8, the C8
22  case I certainly know.  It set a lot of standards
23  for us.
24    Do you know how your -- is your friend
25  still your friend?

Page 17

1  A.  Yes.
2  Q.  And how did -- how did the case ultimately
3  end?
4  A.  That, I actually don't know.  I mean, it
5  went on so long, he stopped sending me updates.
6  After the lawyers made 30 or 40 million dollars, I
7  think he became annoyed with it.
8  Q.  In patent law, the case, you'll be
9  interested to know, or you may not be, affirms that
10  contractual terms override trade secret law.
11  That's why it's important for us.
12  But was that something that you did -- was
13  that something that you did -- I know that you
14  started out at the University of Oregon; is that
15  right?
16  A.  Yes.
17  Q.  What was your major there?
18  A.  I guess track and field.  I mean, I was
19  undeclared.
20  Q.  You were a Prefontaine?
21  A.  Yeah.  I was on the track and field team.
22  So at that time, you didn't declare a major --
23  Q.  Right.
24  A.  -- because it was complicated in terms of
25  the N.C.A.A. rules.

Page 18

1  Q.  What was your event?
2  A.  I was a decathlete.
3  Q.  All right.  And --
4  A.  So I did all of the events, basically.
5  Q.  That sounds -- I'm familiar with my -- the
6  Greek meaning of that term.  So you transferred to
7  M.I.T. why?
8  A.  To be an engineer.  There's no engineering
9  at the University of Oregon.
10  Q.  Like, zero?
11  A.  Exactly zero.  It's at Oregon State, which
12  is up the road.
13  Q.  Okay.
14  A.  And no Oregon Duck would ever transfer to
15  Oregon State.
16  Q.  Now, that I can understand.
17  So, but so there's literally not any
18  engineering classes available at the University of
19  Oregon or there aren't any that suited your needs?
20  A.  I think at that time there was actually no
21  engineering program at all.  They may have started,
22  say, environmental engineering or something since
23  that time.
24  Q.  Okay.  And then you transferred to M.I.T.;
25  is that correct?

Page 19

1  A.  Yes.
2  Q.  By the end you had declared a major, and
3  that was?
4  A.  Mechanical engineering.
5  Q.  And when you arrived at M.I.T., is your
6  friend in the start-up, was this an M.I.T.
7  connection?
8  A.  Yes.  I started doing research my first
9  term as an undergraduate at M.I.T., and he was a
10  graduate student that I worked directly with.  I
11  basically worked for him.
12  Q.  Okay.  And what was his name?
13  A.  Neil Singer.
14  Q.  And so while you were at M.I.T., did
15  you -- well, was this your only patent, the
16  Convolve patent that was assigned?
17  A.  Oh, no.
18  Q.  Oh, you have many patents?
19  A.  Maybe seven or eight.
20  Q.  All right.  Are you the lead inventor on
21  all of those patents?
22  A.  I don't think so, no.
23  Q.  Have all those patents been assigned to
24  others?
25  A.  I think most of them are assigned to

Page 20

1  Georgia Tech.
2  Q.  Okay.  That's part of your employment
3  agreement with Georgia Tech?
4  A.  Yes.  I have an employment agreement with
5  Georgia Tech that says the work that I do as a
6  professor gets assigned to them.  One of those I
7  worked on while I was on a leave of absence, so I'm
8  not sure who that was assigned to.
9  Q.  What was the cause of your leave of
10  absence?
11  A.  I was teaching at Tokyo Tech.
12  Q.  So when you have a -- and you say seven or
13  eight patents.  Have any of those patents resulted
14  in products that were marketed?
15  A.  Yes.
16  Q.  Tell me about those.
17  A.  Well, one of those patents is a patent
18  that controls multi-mode vibration, such as a
19  double pendulum crane.
20  Q.  All right.
21  A.  So if you pick up a payload with a crane,
22  that payload might swing independent of the hook.
23  So instead of getting one nice pendulum swing back
24  and forth that can be controlled easily, you would
25  get a double pendulum, which is two different

Page 21

1  frequencies.  It would be very complicated motion.
2       And so we developed a technology for
3  moving cranes that gets rid of that double pendulum
4  vibration.  And that technology is integrated into
5  a control system used by one of my companies I
6  started and sold, so it's currently licensed by a
7  system -- by a company called PaR.
8       Q.  Okay.  And is that the company that you
9  started?
10      A.  I started a company called CAMotion
11  Cranes, which was acquired by --
12      Q.  Right.
13      A.  -- PaR --
14      Q.  Okay.
15      A.  -- maybe eight or ten years ago.
16      Q.  Okay.
17      A.  And they acquired the, essentially the
18  rights to that patent when they bought our company.
19      Q.  And what did they -- what did they pay for
20  your company?
21      A.  That's hard to say, because there was an
22  initial pay-out of one million dollars plus monies
23  based on how much profit the subsidiary company
24  made.
25      Q.  Right.

Page 22

1       A.  And it was, like, a three- or four-year
2  payout.
3       Q.  Uh-huh.
4       A.  And I don't really know what that was.
5       Q.  Do you have a ballpark of what you
6  realized in total on that invention?
7       A.  What I realized --
8       Q.  Yes.
9       A.  -- personally?
10      Q.  Yes.
11      A.  Probably several hundred --
12          MR. OSBORNE:  Are you asking for his
13  income from the invention?
14          MS. LOVETT:  Yes, I am.  I'm asking
15  about the terms of the licensing deal.  I
16  want to see --
17          MR. OSBORNE:  Well, then --
18          MS. LOVETT:  -- how valuable --
19          MR. OSBORNE:  -- I will object.  I
20  will object and instruct him not to answer
21  that question.
22          MS. LOVETT:  Well, John, I think it's
23  relevant to how good of an inventor he is.
24  It's --
25          MR. OSBORNE:  How what?

Page 23

1          MS. LOVETT:  Yes, to -- I'm
2  interested in how valuable his inventions
3  are.  If you're going to parade around
4  patents or talk about what a great
5  inventor he is, I'm going to find out how
6  good they are.  So I'm entitled to ask
7  that question.
8          MR. OSBORNE:  Okay.  Well, you bring
9  it up to the Court, then.
10  BY MS. LOVETT:
11      Q.  Did you start any other companies, Doctor?
12          I'm sorry, is something funny?
13      A.  Yeah.  It's kind of funny going back and
14  forth and --
15      Q.  Oh.  Well --
16      A.  -- and having these --
17      Q.  -- this is what --
18      A.  -- having these legal arguments.
19      Q.  Yeah, this is what --
20      A.  Kind of funny.
21      Q.  This is what we do.
22          So tell me, do you -- have you -- you said
23  you -- one of several companies you've started.
24      A.  Okay.  I'm not sure I said several.  So
25  the Convolve company that we started that we talked

Page 24

1  about before I wasn't -- I didn't have an
2  ownership, but I helped start that.  I mean, I was
3  employee number one.  It was me and my friend.
4       Q.  Right.
5       A.  Then I started CAMotion Cranes --
6       Q.  Right.
7       A.  -- which got acquired by PaR Systems.  I
8  am currently the C.T.O. of InVekTek, which is
9  another start-up.
10      Q.  That would be the, for the jury, that's
11  the chief technology officer?
12      A.  Yes.
13      Q.  And how are you spelling InVekTek?
14      A.  I-N-V-E-K-T-E-K, InVekTek.
15      Q.  Got it.
16          And what is the -- is there more than one
17  patent that's owned by InVekTek?
18      A.  InVekTek was started with one of my other
19  patents.
20      Q.  All right.
21      A.  That has to do with, again, controlling
22  machines so that they move very quickly and very
23  accurately.
24      Q.  Right.  And so did you -- as -- was
25  InVekTek acquired or is it still your company?

Page 25

1    A. Oh, it's still my company. I mean, I own
2  part of it.
3    Q. Right.
4    A. I have a C.E.O. that runs it. And I have
5  other investors, so they have parts of the company.
6    Q. Who co-owns it with you?
7    A. Well, my C.E.O., Rob Loomis. We have a
8  lawyer who's part of our team, Ralph Loomis. He
9  owns a share of it. He did a lot of work starting
10  it up. Part of our company is owned by the
11  Illinois Energy Foundry --
12    Q. Right.
13    A. -- which is an investment firm that helps
14  start-ups that's based in Illinois. Those are the
15  people that I know own part of it.
16      We've gotten some investments lately. And
17  my C.E.O. handles all that, so I'm not sure if
18  small parts of the company are now owned by our
19  investors.
20    Q. Right. And you have a trademark portfolio
21  with that company; true?
22      That may be too lawyer-ese. Do you know
23  something called SwayMaster?
24    A. Oh, yes. Yes. Yes.
25    Q. Yeah. SwayMaster is your trademark -- the

Page 26

1  trademark for your technology.
2    A. Okay. That's, yeah, I think that's one of
3  our trademarks. I mean, we have various names for
4  things that we've developed.
5    Q. Sure. And these are -- these are huge
6  industrial cranes; right?
7    A. Well, InVekTek's controller can be used on
8  a variety of machines, but they are used on some
9  large cranes, yes.
10    Q. And when we say "large," tell me, what
11  would be the largest crane or apparatus that you --
12  your invention would have impact upon?
13    A. The largest one that -- again, I'm trying
14  to narrow it down to InVekTek. I assume that's
15  what you're talking about.
16    Q. Yes.
17    A. Okay.
18    Q. We're -- I'm going to get into your other
19  companies, too --
20    A. Okay.
21    Q. -- but yeah.
22    A. The largest crane that I know that
23  InVekTek has installed a controller on is a -- is a
24  big crane in South America that handles steel. And
25  it's actually a multi-hoist crane, which means that

Page 27

1  it has more than one drum that can lift stuff up.
2  And each of those drums have a different amount
3  that they can lift.
4    Q. Right.
5    A. And I think that that crane may be rated
6  in total for something like 40 to 50 tons of
7  lifting capacity.
8    Q. In total for --
9    A. Yeah.
10    Q. -- all three --
11    A. For the --
12    Q. -- drums?
13    A. -- two or --
14    Q. -- two drums?
15    A. It has two or three hoists on it.
16    Q. That's a huge crane.
17    A. It's pretty big.
18    Q. Yeah.
19    A. I mean, cranes lift thousands of tons.
20    Q. Yes. Yes.
21    A. So 40 or 50 tons doesn't make it one of
22  the biggest cranes in the world, but it's a large
23  device.
24    Q. Sure.
25      Okay. What other companies are you

Page 28

1  involved in as either an owner or inventor with
2  interest?
3    A. I think currently that -- that would be
4  it --
5    Q. All right.
6    A. -- that I had --
7    Q. Have you had any others in the past that
8  we haven't covered?
9    A. Certainly.
10    Q. Let's go through those.
11    A. Do you want to start at the beginning?
12    Q. I want to -- I want to know -- this is my
13  one shot.
14    A. Okay. I guess the first company that I
15  owned that had a bank account was a golf ball
16  recovery business back in Oregon. So me and my
17  friends started a company where we would go out and
18  scuba dive and collect golf balls and then process
19  those golf balls and sell them to golf courses.
20    Q. That's quite inventive. Why don't
21  we -- I'll narrow my scope to get to --
22    A. Okay.
23    Q. -- things you've actually invented.
24    A. Well, I --
25    Q. I thought -- I thought was -- that was the

## Page 29

1  realm we were in, but --
2      A.  I invent --
3      Q.  -- perhaps we spoke past one another.
4      A.  I invented a lot to pull that off.
5      Q.  I bet.
6      A.  How to -- how to -- how to carry 800 golf
7  balls at one time out of a pond is -- took an
8  invention.  In fact, one time I got stuck in the
9  pond with 800 balls on me.
10     Q.  Some people would say --
11     A.  I couldn't pull all that up.
12     Q.  Some would say you assumed that risk,
13 Doctor.
14     A.  I did.
15         Let's see.  So we talked about Convolve.
16 I -- if you have any questions on that, we can
17 follow up.  We talked about CAMotion Cranes.  We're
18 in InVekTek.  I helped start another company in
19 South Korea called SeAH Mecatec.
20     Q.  You're going to have to really spell that
21 one.
22     A.  S-E-A-H, and then Mecatec --
23     Q.  Okay.
24     A.  -- with a T-E-C at the end.
25         That company, I didn't have an ownership

## Page 30

1  interest, but I had an agreement based on the sales
2  of that company.  So I helped them develop a Korean
3  patent using on my technology.  The patent was
4  assigned to the Korean company, but part of that
5  was I got 5 percent of the sales of this technology
6  for X number of years.
7      Q.  All right.  And how -- has that agreement
8  terminated?
9      A.  Yeah.  After -- that agreement was for
10 five years.
11     Q.  And when --
12     A.  So it was --
13     Q.  Do you recall ballpark when that was?
14     A.  That would have been about 2005 or '6 to
15 about 2010.  It was -- the company was actually
16 acquired by a Japanese company, and that
17 essentially coincided with the termination of my
18 agreement.
19     Q.  Were you a listed patent -- a listed
20 patentor on the Korean patent?
21     A.  Yeah, I think I was.  Yeah, I don't have a
22 copy of that.  I should try to find that.
23     Q.  Probably.
24         What was the technology of that patent?
25     A.  That technology was associated with

## Page 31

1  controlling old types of machines that can only be
2  controlled with on/off actuators, like, you push a
3  button and the motor turns on immediately.
4      So those are notoriously difficult to
5  control, because you can't give it a variable
6  command.  You can't ramp up the speed or ramp down.
7  So it's going full speed forward or zero or full
8  speed in reverse.
9      So we developed a technology to control
10 those kinds of machines.  And there are many of
11 those machines in South Korea.
12     Q.  Give me an example of some of the types of
13 machines you're talking about.
14     A.  Most of these turned out to be cranes, but
15 there are also engine-moving machines in the
16 Hyundai factory.  So they pick up an engine and
17 they move it over and put it into the car.  That's
18 an overhead gantry robot.
19     Q.  All right.
20     A.  And the operator would just push a button
21 that would say go right, and it would pick up this
22 engine and go right.  And it would sit there and
23 vibrate over the top of the car, and they'd have to
24 wait until it stopped vibrating and then drop it
25 down into the car.

## Page 32

1      Q.  So I'm sensing a theme in your patented
2  technology, this -- the anti-vibration.  I know
3  there may be other degree -- may be other areas of
4  interest, but it seems that the patents we've
5  discussed so far involve that technology.
6      A.  Anti-vibration is certainly a part of a
7  lot of these.  In the bigger sense it's making
8  machines move in the way that you want them to.  So
9  you tell a machine to move in a certain way, it's
10 going to move that way, rather than going too far
11 to the right or too far to the left.
12     Q.  And if I asked your -- you to describe to
13 the jury your body of work as a -- as a -- as an
14 inventor, would that be a fair way to describe it,
15 telling machines how to move in a certain way?
16     A.  I'm trying to reflect on all my patents.
17 I think my patents generally have that kind of a
18 theme in them where we try to control the motions
19 of the machine so they don't do something we don't
20 want.
21         A lot of my inventions haven't been
22 patented.  In fact, most of the technology, for
23 example, at my current company InVekTek we've
24 decided to keep as trade secret.
25     Q.  Sure.  Because if you make it patented,

Page 33

1  then you have to make it public and teach it to the
2  world.
3      A.  Yes.  And as you know, patent lawyers --
4      Q.  As --
5      A.  -- cost a lot of money.
6      Q.  Patent lawyers do cost a lot of money.
7  And we're worth it.
8          But all right.  So, so you have -- your
9  current company is protected by trade secret and
10 you do not share, for example, your SwayMaster
11 technology.
12         Tell me what types of patents you have
13     that don't deal with vibration or telling
14 machines -- keeping machine -- big machines from
15 doing something you don't want them to do.
16     A.  Oh, most of them have to -- don't have to
17 do with big machines.  They're any kinds of
18 machines.  So for example, the Convolve lawsuit,
19 the technology we talked about --
20     Q.  Right.
21     A.  -- was controlling very small machines.
22 In fact, the vibration that we were controlling is
23 so small you wouldn't be able to see it.
24     Q.  Right.  What were you con -- and then in
25 what context was that being controlled?

Page 34

1      A.  That particular lawsuit, although the
2  patent was bigger than that particular application,
3  that lawsuit had to do with controlling hard disk
4  drives.  So the reading had hard disk drives move
5  just microns at a time.
6      Q.  Right.  In computers?
7      A.  Yes.  That's right.
8      Q.  Right.  So again, machines?
9      A.  Yes.
10     Q.  All right.  What other types of inventions
11 have you patented or created that are different
12 from telling machines what to do or stopping
13 vibration?
14     A.  I don't have my patents in front of me, so
15 I'm not sure I can give a complete answer to that
16 without looking at my patent portfolio, but a lot
17 of them have that.
18         A lot of my inventions have to do with
19 just product development, so developing features in
20 products.  And a lot of times, that type of
21 material is kept trade secrets and is not patented.
22     Q.  Right.  So --
23     A.  So a lot of my inventions would be in that
24 domain, essentially, developing new features for
25 consumer products.

Page 35

1      Q.  Have you ever invented a consumer product
2  for an infant?
3      A.  I have invented products for invent -- for
4  infants, yes.  They haven't been commercialized and
5  sold.
6      Q.  All right.  So have they been patented?
7      A.  I know that we filed invention disclosures
8  on some of those developments, but I don't think
9  that we pushed those all the way through to a
10 patent.
11     Q.  No applications?
12     A.  I don't understand that question, "no
13 applications."
14     Q.  You haven't filed a patent --
15     A.  Oh.
16     Q.  -- application, a formal patent
17 application with the United States Patent and
18 Trademark Office?
19     A.  That, I'm not sure of.  Because I have
20 co-authors on those patents, other professors and I
21 worked with them.  And we made the invention.  We
22 file invention disclosures.
23         And then I know I went on a leave of
24 absence during that period, and I'm not sure if we
25 followed up and did an application that was -- got

Page 36

1  rejected.  But I'm sure that we don't have an
2  issued patent.
3      Q.  Okay.  Who was your co-applicant?
4      A.  One of them was Dr. Stephen Sprigle.
5      Q.  How are you spelling that?
6      A.  S-P-R-I-G-L-E.
7      Q.  One G?
8      A.  Yes, Sprigle.
9      Q.  And so who else worked with you and
10 Dr. Sprigle on the patent that you came up with for
11 infants, or the idea for infants?
12     A.  I'm not sure who would also be listed on
13 that.  We had a team work on it for a couple of
14 years, and there were some grad students that
15 played a critical role in the development of that
16 technology.  But since we don't have an issued
17 patent, I couldn't remember their names, so I'm not
18 sure how many or which of those got on the
19 invention disclosure.
20     Q.  Dr. Sprigle's patent portfolio appears to
21 be largely wheelchair braking and also spectral
22 technology.  Were you involved in any of that work?
23     A.  Yes.  I was involved in -- with
24 Dr. Sprigle for several years, maybe even what you
25 might call many years, on designing wheelchair

1    features.
2    Q.  All right.  And so that's an area of
3    interest for him?
4    A.  Yes.  And myself as well.
5    Q.  And for you.  So what was the product that
6    you were working on with him for infant use?
7    A.  Well, we did several products that were in
8    the infant space.  Let me see.  I'll just list
9    them, and we can discuss whether or not they're
10   infants or toddlers or what the age range is.
11        But I initially started working with him
12   on designing wheelchair seating systems for young
13   children, because wheelchairs are normally designed
14   for adults.
15   Q.  Right.
16   A.  And so it's notoriously challenging to
17   have small children or toddlers in wheelchairs.
18   And so we worked on seating systems for in --
19   toddlers, small children.
20        We have focused one of those projects on
21   children that have a certain kind of disease where
22   they essentially, their entire body fires all their
23   muscles at once and they go like a plank, and they
24   tend to fall out of wheelchairs.
25        So we designed a seating system that moved

1    to keep the -- to keep the child from falling out
2    of the seat, so sort of a movable cradle or a
3    movable --
4    Q.  Right.
5    A.  -- seat.
6    Q.  For a neuro -- a neuromuscular disorder?
7    A.  Yes.  That's correct.
8        Another project that we worked on for a
9    while was a swing for infants.  It turns out that,
10   when infants are sick, the best thing for them is
11   to go to sleep often so they can rest.  And every
12   baby wants to be swung in a somewhat different
13   manner in terms of being swung at a different
14   frequency and also a different motion.
15        And babies don't necessarily like the
16   straight pendulum swing that you see at a
17   playground swing.  That's not how parents
18   traditionally swung their children for thousands of
19   years.  Parents cradle their children in their arms
20   and then twist their torso.
21        So the directional motion of the swing
22   that a lot of babies like is not a pendulum swing,
23   but rather a torsional motion.  And so we developed
24   a swing that makes that type of motion.  And the
25   swing is also able to change its frequency.

1        And so that project we worked with
2    actually C.H.O.A., Children's Hospital of Atlanta.
3    So we went over there and talked to those
4    caregivers and saw the swings that they were using
5    at the time and developed some prototype swings to
6    address that need.
7    Q.  Did any of those prototypes ever become
8    products?
9    A.  No.
10   Q.  Did any of the infant wheelchair products
11   that you were working on -- or maybe those were
12   more toddler products -- I mean, the neuromuscular
13   focused products become products?
14   A.  No.
15   Q.  Do you -- tell me about any other
16   inventions that you did for infants or children.
17   A.  Another one that we did that I can recall
18   is that we developed a, sort of a play scooter for
19   children with, like, muscular dystrophy that can't
20   play very well, so they tend to be stuck in a
21   wheelchair and off to the side of a playground.
22        So we developed a, sort of a scooter that
23   partially elevates the child so that they're a
24   little bit taller but still doesn't fall over.  And
25   so that's one of the inventions that we developed

1    that we submitted an invention disclosure on.
2    Q.  Right.
3    A.  And so that idea was sponsored by a
4    company, I don't remember the name right now, but
5    the C.E.O. had a child with muscular dystrophy and
6    he wanted this product developed.  So we developed
7    it to a prototype stage, and then I think that we
8    turned it over to him.
9    Q.  All right.
10   A.  But this is when I went on leave.
11   Q.  Right.
12   A.  And so I'm not exactly sure the final
13   resolution of that project.
14   Q.  Okay.  Who was the C.E.O. or company that
15   you were working with there, do you know?
16   A.  I can't remember that name right now.
17   Q.  Okay.  And you can't testify as to whether
18   or not that prototype became an actual product?
19   A.  I'm pretty confident that it did not
20   become an actual product.  I think I would have
21   heard of it.
22   Q.  All right.
23   A.  But we did turn it over to him.  And what
24   he did with it I'm not sure.
25   Q.  Any other inventions or projects directed

1  at products for children?
2      A.  Another project that we did was to try to
3  leverage off of the hoverboards.  The hoverboard
4  craze hit about five or six years ago, and they
5  sold so many of them that they were able to develop
6  a pretty interesting device that was low cost.
7          And so it has a lot of motors, controllers
8  and batteries in there, and you can purchase them
9  quite cheaply, like, for a couple hundred dollars.
10  And so what we did with that was we tried -- now, I
11  wouldn't put a child on a hoverboard.
12      Q.  I was going to say, you wouldn't put a
13  child on the -- on a hoverboard.
14      A.  No.
15      Q.  So I want you to tie this up for me.
16      A.  Yeah.  So what we did is we used that
17  device, those motors, controllers and batteries, in
18  essentially a go-cart, so that way you stabilize
19  it.
20          And again, you can put a child in there,
21  and the child is able to move around in kind of a
22  fun play way at low speed.  And there's really no
23  way for them to tip over if you design the base of
24  that correctly.
25      Q.  What --

1      A.  And so it became a very low cost way to
2  get a, sort of an expensive product.  Because if
3  you designed that from the ground up without the
4  hoverboard, you would be in it for a lot of money.
5      Q.  So you'd be leveraging, of course
6  ethically patently, but you'd be leveraging off the
7  hoverboard concept?
8      A.  Yeah.  I mean, it wouldn't operate like a
9  hoverboard at all.  Hoverboards, you move them by
10  standing on them and flexing your calves.
11      Q.  Right.
12      A.  That part of it goes away, so you don't do
13  that anymore.  But you're using the motors,
14  controllers and the batteries in there, and you
15  acquire those for a low cost.
16      Q.  And were you envisioning this type of
17  product as a -- as a play device for children with
18  disabilities or for all children or children of a
19  certain age?  Give me some context.
20      A.  We initially started with children with
21  disabilities.  That's one of the things that we
22  focused on.  But we quickly realized that it was
23  fun for all children, so we sort of expanded the
24  scope of it.
25          And what that allows you to do is to make

1  the seat and the seating system and the restraint,
2  you know, a seatbelt and stuff different, because
3  you're no longer designing it just for a situation
4  where parents have to lower their child physically
5  in there and strap them on.
6          You can expand it and allow a version
7  where children, like, six years old could climb in
8  and strap themselves in and go.
9      Q.  Right.  What would be the youngest child
10  that could be in that product, you think?
11      A.  We never did those tests.  But I have a
12  three-year-old currently, and he would have been
13  fine in that product.  It was low speeds, so you --
14      Q.  Right.
15      A.  -- you can't go take off and go cruising
16  real fast in these.
17      Q.  Yeah.  That's -- I'm picture -- I'm trying
18  to picture a low speed hoverboard, but.
19      A.  Yeah, you just -- you just cruise in --
20      Q.  I'm a Greek mother, so we have different
21  standards of tolerance on that sort of thing.  I'm
22  not scuba diving for golf balls.
23          Tell me, did that product ever make it to
24  the prototype stage?
25      A.  Yeah.  We made some prototypes of that.

1  And then we found out that a lot of people were
2  doing it.  So if you just go to YouTube and you
3  YouTube that, you're actually going to see a lot of
4  people had that idea and sort of prototyping it
5  out.
6      Q.  Okay.  So that that product, that did not
7  become a product for -- that you developed?
8      A.  Yeah, it's not a product that I developed.
9  But they're actually out there.  You can buy these
10  kits on-line --
11      Q.  Sure.
12      A.  -- with using the same kind of idea.
13      Q.  Sure.
14          Any other inventions directed -- or
15  projects directed at children or infants?
16      A.  So I was kind of answering this question
17  with the assumption that you were talking about
18  what I do with Stephen Sprigle.  Have we -- have we
19  diverged from that requirement?
20      Q.  We have.
21      A.  Okay.
22      Q.  I just -- you mentioned Dr. Sprigle as one
23  of your collaborators on those projects, and so I
24  had his patent portfolio and I wanted to start
25  talking to you about it.  Now I want to know about

Page 45

1   any work that you -- any projects or inventions
2   upon which you've worked that were directed at
3   children or infants.
4       A.   Okay.  Leaving Stephen Sprigle aside --
5       A.   Yes.
6       A.   -- let's see, I've worked a lot on
7   juvenile products in general, such as rockers and
8   swings and playpens.
9       Q.   Right.  Have any of the product -- when
10  you say you've worked on, let's define that for the
11  jury.  Have any of the products that you have,
12  quote, worked on become actual products that are
13  marketed to the con -- to consumers?
14      A.   Well, those projects that I were doing --
15  that I did, I'm referring to, were on products that
16  were on the market.  So I would be investigating a
17  product that was currently on the market.
18          So yeah, they were products in use --
19      Q.   All right.
20      A.   -- and I would be investigating them and
21  establishing how they worked and the problems that
22  they had and specifications they were meeting,
23  things like that.
24      Q.   Sure.
25          For whom were you doing these

Page 46

1   investigations?
2       A.   I think a lot of those investigations were
3   done for Kids2 --
4       Q.   What is is --
5       A.   -- which is a company actually in this
6   building.
7       Q.   All right.  So, so I want to -- I want to
8   talk about this part of your work.  Because I was
9   really asking about what you were developing or a
10  product that you were trying to create directed at
11  children or infants.
12          I think what you're telling me about is
13  that you, when you say you worked with a lot of
14  products, you were investigating for a consumer
15  product safety group.
16          Is that -- is that -- is that how you
17  would define Kids2?  Or how would you define it?
18      A.   How would I define Kids2?  Kids2 is a
19  juvenile products company.  They make --
20      Q.   Oh, I'm sorry.  So they --
21      A.   Yeah.
22      Q.   You're -- they're a competitor, I guess,
23  of my client?
24      A.   That's right.
25      Q.   And so they get you to go out and test

Page 47

1   their competitors' products to see if there's
2   anything that they could do better?
3       A.   I certainly tested their competitors'
4   products.  And I think that's generally what you
5   would do is try to understand what other people are
6   doing and then see if you're doing as well or can
7   you do better.  That was, I think, some part of it,
8   not the main part.
9           The main part of the investigations were
10  whether or not these products practiced patents.
11      Q.   Ah.  So to see if any of the in -- of the
12  products of the competitors might be infringing on
13  any patents held by Kids2?
14      A.   And -- yes.  And the opposite of that
15  where do Kids2 products practice --
16      Q.   Other patents?
17      A.   -- patents.
18      Q.   Other parties' patents?
19      A.   Yes.
20      Q.   Yes.  So you were -- you're essentially,
21  you weren't doing -- these are investigations for,
22  let's break it down.  Are you still -- do you have
23  a retainer agreement with Kids2?
24      A.   No, I do not.
25      Q.   Okay.  So they retain you on a per project

Page 48

1   basis?
2       A.   Yes.
3       Q.   And how long have you worked with Kids2?
4       A.   I think I probably started working with
5   them ten years ago.
6       Q.   All right.  Do you still work with them
7   today?
8       A.   I haven't worked with them I think in
9   three or four years.
10      Q.   All right.  And how are you -- how are you
11  compensated by them?  On an hourly basis?  On a
12  project basis?
13      A.   I mean, normally that would be on an
14  hourly basis.  I, I mean, I would do some
15  consulting, essentially, for free, if you will,
16  just meet with them and talk about the issues and
17  decide whether I would give them some initial
18  feedback, and then I would decide whether I wanted
19  to do more work on that project.
20          But essentially, I think it would boil
21  down to an hourly basis.
22      Q.   Your -- so your -- what is your rate for
23  acting in an expert -- as an expert witness in the
24  capacity that you are here today on behalf of the
25  plaintiffs?

Page 49

1    A.  Oh, I would have to look up -- I think for
2  this case it's probably 600 or 650 an hour.
3    Q.  All right.  And is that for depositions
4  and trial work?
5    A.  Yeah.  It's all the same.
6    Q.  All the same for -- no matter what you're
7  doing, investigating, making a report --
8    A.  If --
9    Q.  -- being deposed?
10    A.  Yes.  I think probably if I travel, I
11  wouldn't charge that much.  I don't know.  I don't
12  have the contract in front of me.
13    Q.  Sure.
14        What do you charge Kids2?
15    A.  Well, I haven't worked with them for
16  several years, so that would have been an older
17  rate, probably in the four or five hundred dollar
18  an hour range.
19    Q.  All right.  And you -- so you've testified
20  that Kids2 -- in your work for Kids2, as I
21  understand it, you've done basically two kinds of
22  work:
23        One, looking at ways to make their
24  products -- to see if their products are as good or
25  better than their competitors or to get new ideas;

Page 50

1  and two, to see if in patent prac -- patent
2  practice either way, whether someone's practicing
3  their patents or whether they're practicing or
4  infringing potentially on anyone else's patents.
5        Is that a fair statement?  And if not,
6  correct it.
7    MR. OSBORNE:  Form.
8    THE WITNESS:  I think it's a fair
9    statement.  I did one project with them
10    that was essentially just developing a
11    patent.  So to the extent that that one
12    doesn't fall in those two categories.
13  BY MS. LOVETT:
14    Q.  Okay.  So I want to take those one at a
15  time.  I'll -- we'll start with the first category,
16  which is where you were investigating other
17  project -- products to compare them to the Kids2
18  products in terms of whether Kids2 could be doing
19  something new or different and comparing products.
20        Did you on behalf of Kids2 investigate any
21  Fisher-Price or Mattel products?
22    A.  That, I don't remember.  One of the first
23  projects I did a long time ago with them, or one of
24  the first projects, was investigating swing
25  dynamics.  Whether or not that was a -- whether

Page 51

1  there was a Fisher-Price product in there, I don't
2  recall.
3        But if Fisher-Price made a swing that was
4  a non-standard swing -- we talked about pendulum
5  swings like at playgrounds or the more torsional
6  swings.  If Fisher-Price had made a torsional
7  swing, I may have looked at it at some point.
8    Q.  All right.  Do you recall specifically
9  looking at any Fisher-Price products in your
10  assignment for Kids2, either on the patent side or
11  on the -- on the product development side?
12    A.  I've done so many products for them, I
13  can't remember all the brands.  I mean, the ones
14  that are coming to mind are Graco and Wonderland
15  products.  But there could have been a Fisher-Price
16  product in that mix at some point.
17    Q.  Had you --
18    A.  I don't recall.
19    Q.  Did -- had you -- had you seen the in --
20  the concept of an incline sleeper before you became
21  involved with this case?
22    A.  Yes.
23    Q.  And where had you seen that?
24    A.  There's at least a couple places that I
25  saw this concept before.  This incline sleeper or

Page 52

1  incline bassinet is, of course, it's not yes or no
2  incline.  It's zero degrees, five, ten, 20.  Right?
3  There's a whole range of --
4    Q.  Uh-huh.
5    A.  -- these products.
6        There is a type of playpen that has
7  auxiliary units that you essentially clip on or
8  attach to the top.  And those can be various kinds
9  of things, like diaper holders and stuff.
10        But one of those, for example, is a
11  changing table that you can pop on to the top of
12  your playpen, change your child, and then put him
13  back in the playpen.
14        Another one of those is a bassinet.  So
15  for a young child that's not ready for the full
16  playpen, for the first couple of months you could
17  put them in a bassinet, which also clips on the
18  top.
19    Q.  Right.
20    A.  And some of those clip-ons actually
21  have -- they're not exactly flat.  They can come in
22  various degrees.  So a lot of them are flat, but
23  some of them have slight inclines of five or ten
24  degrees.
25        So I remember looking at that issue quite

Page 53

1  a few years ago, about the fact that some of these
2  bassinets had a somewhat inclined sleeping surface.
3  And then I reviewed the drafts of the F -- the 3118
4  incline sleeper product.  I reviewed the drafts of
5  those proposed standards back in 2015 or something
6  like that.
7      Q.   And --
8      A.   So I heard of -- I saw that trying to be
9  formalized --
10     Q.   Right.
11     A.   -- through that -- through that process.
12     Q.   That's a -- through the A.S.T.M. process?
13     A.   Yes.
14     Q.   Let's tell the jury what that is.
15     A.   The A.S.T.M. standard process is a -- it's
16  a process wherein groups of people get together and
17  they try to come up with standards such that
18  products within a certain sphere or certain area
19  have sort of consistent features so that someone
20  that buys one of these products, they can be
21  assured that it has a consistent feature from all
22  these different companies.
23     So it's kind of a consistency exercise.
24     Q.   So if -- you recall seeing that when the
25  standard was proposed for development a few years

Page 54

1  ago and reviewing it?
2      A.   Yeah.  I saw, I think it -- I think the
3  first one was -- that actually was approved, I
4  think it was 2015.  And it updated in 2017 is my
5  recollection.
6      But I saw drafts of it before it was
7  approved.  Or I -- or I saw drafts of it before it
8  was approved.  So that would have been in the 2014,
9  2015 time frame I saw those drafts.
10     Q.   And I'm assuming that you don't -- you
11  don't review all the drafts for all the A.S.T.M.
12  standards in every category.  So I'm assuming, but
13  you should correct me, that your particular
14  interest in that standard was related to your work
15  for Kids2.
16     Is that correct?
17     A.   Yes, I think that's correct.  I mean,
18  during that same time frame, I was working not for
19  Kids2 on the baby swing to help comfort sick
20  children.
21     And so I -- there's a chance I also was
22  interested in that standard at the time, because we
23  were considering what sleeping surface that swing
24  should have.  Should you take a child and put him
25  perfectly flat and swing them through this

Page 55

1  rotational motion or should they be slightly
2  inclined?
3      So I think during that time I reviewed the
4  bassinet standards and playpens and swing standards
5  and all those kinds of things to make sure that we
6  were going forward with ideas that were consistent
7  with standards.
8      Q.   The jury's going to learn a lot about the
9  A.S.T.M. process, and probably more than they
10  thought they would ever know.  So they'll be --
11  they'll be somewhat familiar with this by the time
12  that you testify.
13     But in your review of the standard and as
14  an engineer, did you -- did you -- did -- was it --
15  was there an immediate affront to you in terms of
16  safety?  Did you look at it and say, oh, no, this
17  is a bad idea, I must tell someone, or I must tell
18  Kids2?
19     A.   Well, Kids2 knew about it.  I can't
20  testify for certain, but I think there was probably
21  a Kids2 person on that committee --
22     Q.   I think you're right.
23     A.   -- if I had to guess.  They would want to
24  have their hand in that process.
25     I remember my response to this was that

Page 56

1  the draft had a lot of changes.  So I had a red
2  line version.  And so I remember it being very
3  confusing, like, what are they trying to do here.
4  That was my initial response.
5      And I think when I understood it, I
6  wasn't -- I don't remember being affronted, but I
7  remember thinking this is strange, it's -- this is
8  a departure from what they're supposed to be doing.
9      And since I wasn't on the committee at
10  that time, I kind of just left it there, like, I
11  don't know why they're trying to do this.  So I was
12  left with a question more than -- like, I wasn't
13  outraged.
14     Q.   Well, did --
15     A.   I didn't have that response.
16     Q.   Did you think it was dangerous?
17     A.   I don't remember thinking it was
18  dangerous.  I remember thinking this is just a
19  departure from how this is supposed to work.
20  They're supposed to be flat.  And I just couldn't
21  figure out how this standard was going to -- to be
22  consistent with sleeping on a flat surface.
23     So basically, I was left with confusion, I
24  remember, when I first read it.  And I was left
25  with confusion in -- because I was, like, trying to

Page 57

1  use this in the design work I was doing. And so I
2  had this feeling of that, well, they're not
3  finished with this, it's all messed up and I don't
4  understand where they're going with it.
5       So I'd say my main reaction was confusion.
6  Q. Right. But I want to be clear. The
7  responsibility of the committee members is to
8  ensure that the pro -- that the standard provides
9  for a safe product; true?
10  A. That's certainly --
11     MR. OSBORNE: Form.
12     THE WITNESS: That is certainly, I
13  think, one of the goals that they would be
14  shooting for. I mean, I think primarily
15  they're shooting for some conformity.
16  BY MS. LOVETT:
17  Q. Yes. But is there any more important
18  consideration in the execution of that conformity
19  than safety for babies?
20  A. In my opinion, no.
21     MR. OSBORNE: Form.
22  BY MS. LOVETT:
23  Q. All right. So you have been a member of
24  this committee?
25  A. Yes.

Page 58

1  Q. And you were not a member at the time.
2  Had you been a member previously?
3  A. No.
4  Q. And are you a member now?
5  A. No.
6  Q. When were you a member?
7  A. I was a member a few years ago, I think
8  20 -- in the time frame of 2017 to 2019.
9  Q. All right. So while the Rock 'n Play was
10  still on the market?
11  A. Yes.
12  Q. At any time while you were on the
13  committee, did you go to anyone on the committee or
14  go to Kids2 or anyone in the world and say, the
15  standard that was issued by this body is a -- is a
16  dangerous standard, the incline sleeper is a
17  dangerous product?
18  A. I remember having, you know, thoughts
19  along that line. But the truth is, when I was on
20  the committee, the -- that standard, the 3118 never
21  came up for debate in the meetings.
22     There's a lot of other standards that that
23  committee works on. And so the -- when you go to
24  these committees, like you -- I think we went to
25  one in Las Vegas, for example, you meet all these

Page 59

1  people, you go into a room, and there's an agenda
2  that's set by the chairman of the committee, and
3  you go through those agenda items.
4       And at that time when I was serving on
5  this, the meetings that I went to, the 3118 never
6  came up for a debate. It wasn't part of the
7  agenda.
8  Q. Sure.
9       But you'd seen the standard prior to its
10  issuance?
11  A. I saw a draft of it, like I said, that red
12  line draft.
13  Q. Right. You were familiar with it. And so
14  you don't strike me, sir, as the type of man who
15  would be confined to an agenda if you thought there
16  was a real danger to babies in a standard in a
17  committee on which you sat.
18     Fair statement?
19  A. I think that would be fair, yes.
20  Q. All right. So in 2017 to 2019 while you
21  were on the very committee that created that
22  standard, you at no time expressed concerns about
23  its safety to anyone, did you?
24  A. I'm not sure about to anyone, but
25  certainly not on the committee. Again, it wasn't

Page 60

1  on the agenda, and we were dealing with other
2  issues.
3       And truthfully, I'm not sure that I
4  actually read the 20 -- I think the one that would
5  have been in play at that time was the 2017-A. I
6  don't think I read it during that time frame. We
7  were working on other standards.
8  Q. You were -- you were aware that incline
9  sleepers were on the market?
10  A. Yes.
11  Q. You were -- you were aware of that how?
12  A. Well, I was aware because they were
13  developing the standard. And I knew the reason why
14  they were developing it, because they were already
15  on the market and they were trying to justify the
16  existence of these products. I understood that.
17  Q. Was Kids2 involved in trying to develop a
18  similar product?
19  A. Yeah, I think they were. I didn't work on
20  that, but they -- I believe they came out with a
21  similar product.
22  Q. Do you know the name of it?
23  A. No.
24  Q. At any time did you express to Kids2, hey,
25  I think that product you put out on the market is

Page 61

1  dangerous, and I'm on the committee, I think you
2  shouldn't sell it?
3      A.  No.  In fact, I've never reviewed those
4  products that Kids2 have that are in the same --
5  the same style.  I don't know anything about them.
6      Q.  To whom, before this case, to whom have
7  you expressed an opinion that incline sleepers were
8  unsafe?
9      A.  My wife.
10     Q.  When?
11     A.  Numerous times.  Because we have young
12 babies, two of them.  And we went through this
13 whole process of selecting -- an arduous process of
14 selecting the playpens and the car seats and the
15 strollers.
16     Q.  Right.
17     A.  And my wife is a mechanical engineer, and
18 she's an expert in this area.  And we had long
19 talks about how we were not going to put our kid in
20 a sleeper that was inclined.  So the one that we
21 had that's closest, we had a -- it's, like, a ten
22 degree angle.
23     Q.  Right.
24     A.  That's the steepest that she would allow
25 our kids to be put in.

Page 62

1      Q.  So your children are how old?
2      A.  Three and a half and 22 months.
3      Q.  Wow.  Little ones.
4      A.  Yeah.
5      Q.  You are --
6      A.  Little ones.
7      Q.  All right.  So, so you and your wife
8  discussed that you thought the incline sleeper was
9  unsafe for your own children, but it never occurred
10 to you to go to the committee on which you sat and
11 say, these are unsafe projects, my wife, a
12 mechanical engineer, and I think they're unsafe,
13 let's do something about this?
14     A.  That's right.  I think I wasn't even on
15 the committee at that time when we had the young
16 boys.  I think I was getting off of it.  And during
17 that process, my head was spinning trying to keep
18 the boys --
19     Q.  Yeah.  If --
20     A.  -- there.
21     Q.  If you --
22     A.  But I don't recall, yeah, ever having that
23 opportunity or actually thinking about that.  There
24 was just a lot of other issues to deal with during
25 that time.

Page 63

1      Q.  But certainly no one stopped you?
2      A.  No, no one -- I don't think anyone said
3  you can't talk about it.
4      Q.  Right.  Well, certainly you were --
5  certainly you were -- you're holding yourself out
6  as qualified to talk about it.
7      A.  Yes.  Certainly, I am.
8      Q.  And it was something that you discussed
9  with your wife.  But while you were on the
10 committee, or on your segue of the committee, for
11 example, you didn't say, hey, guys, I'm looking at
12 this through fresh eyes, I'm a new dad, and we need
13 to take a hard look at incline sleepers because I
14 have serious concerns.
15         You said that to no one on the A.S.T.M.
16 committee, did you?
17     A.  Oh, that's correct.  That's, yeah, that's
18 not something I would do.  I wasn't in that
19 position to set an agenda item or anything like
20 that.
21     Q.  Well, I'm not talking really about an
22 agenda.  I mean, you and your wife had a hard stop
23 on a sleeper of more than a ten degree incline
24 because of your comfort level for the safety of
25 your own babies; right?

Page 64

1      A.  That's correct.
2      Q.  As a member of the committee, you
3  understand that there was no more important concern
4  than the safety of all of the babies that were --
5  in enacting these standards; true?
6      A.  That's my view of the committee activity,
7  yes.
8      Q.  Okay.  So I want to be clear for the
9  record.  At the time you were aware of incline
10 sleepers on the market for your own children.  You
11 did not consider them safe.  But you did not go to
12 the committee on which you sat which controlled the
13 standard for the incline sleeper and say, we have
14 to get this thing off the market, I wouldn't put my
15 kid in it.
16     A.  That's correct.  I mean, there's a lot of
17 products that I wouldn't use for my kids, but I
18 don't go around telling everyone to get them off
19 the market.  That's --
20     Q.  Sure.
21     A.  That's just an impossible job.
22     Q.  Well, sure.  But I mean, in fairness, not
23 everybody gets to sit on the committee where they
24 get to say that I think this is unsafe.  And you
25 told me you put your three-year-old on the

Page 65

1 hoverboard thing. So.
2 A. No, I did not put my three-year-old --
3 Q. No, I said you --
4 A. -- on a hoverboard.
5 Q. You said you would -- I think what you
6 said was you would, you'd feel comfortable putting
7 him on the hoverboard concept because it's slow
8 motion.
9 A. Yes. It's a go-cart. It's no longer a
10 hoverboard.
11 Q. Right.
12 A. It's now a slow moving -- it's now a slow
13 moving go-cart.
14 Q. Right.
15 A. And there's lots of slow moving products I
16 put my three-year-old on that putt around at one
17 mile an hour.
18 Q. Yeah.
19 A. That's a common children's product.
20 Q. It struck me when you said it just because
21 I think you saw something in my face, and you said,
22 no, it's going to go very slowly, so I'd be
23 comfortable putting my three-year-old in it.
24 A. Yes. The hoverboards actually have a low
25 speed mode.

Page 66

1 Q. Right.
2 A. So that's the mode it would be operating
3 in.
4 Q. All right. So when was the first time --
5 well, I guess so the first time you had criticisms
6 of the safety, that you expressed to anyone outside
7 of your wife, of the Rock 'n Play sleeper or other
8 incline sleep products was as in conjunction with
9 your retention in this case; correct?
10 A. No.
11 Q. When was the first time?
12 A. The first time outside of my wife?
13 Q. Yes.
14 A. Oh, okay. We have very good friends
15 that -- well, the man is a professor of biomedical
16 engineering at Georgia Tech, and we're very good
17 friends with him and his wife. And they had a
18 child the same week as ours. And so we went
19 through this together, and we often had discussions
20 of children's products together.
21 And so me and the husband, Professor David
22 Frakes for the record, we've had a lot of
23 discussions on children products over the years,
24 because he's concerned about that. And he had a
25 boy the exact same age as mine. So him and I have

Page 67

1 definitely talked about incline sleepers.
2 Q. All right. Did you talk to them -- did
3 you talk about them as your -- does he have a child
4 the same age as your three-year-old or as your
5 22-month-old?
6 A. He has a child born the same week five
7 days earlier than my three and a half-year-old. He
8 has twins that are currently one year old.
9 Q. All right.
10 A. So.
11 Q. You guys are --
12 A. We've got it --
13 Q. -- all in this together.
14 A. We've got it covered, yeah.
15 Q. Yes. All right. So in your -- in your
16 discussions with Dr. -- I want to pronounce it
17 correctly, and I'm trying to read it, Dr. -- can
18 you say it for me? Because I've got it
19 phonetically.
20 A. David --
21 Q. Yeah.
22 A. -- Frakes.
23 Q. Frakes.
24 A. F-R-A-K-E-S.
25 Q. Dr. Frakes. Okay.

Page 68

1 So in your discussions with Dr. Frakes
2 around the time that your oldest kids were being
3 born, the two that are three and a half, you
4 discussed that you didn't think incline sleepers
5 were safe?
6 A. Yes. We both actually bought a similar
7 product that rocks a child sort of back and forth,
8 and it's about a -- it's about a ten degree
9 incline. So we actually ended up buying the same
10 product via these discussions --
11 Q. Do you --
12 A. -- with --
13 Q. Do you remember what the product was?
14 A. No. We actually didn't use it that long.
15 Our baby didn't really like it. But we actually
16 bought, I think we bought exactly the same model.
17 And it's essentially for, again, young infants.
18 You put them on there, and there's a slight
19 incline, and it rocks them sort of side to side
20 rather than forward and back.
21 And actually, you can program it to
22 different kinds of motions, like simulating a car
23 ride and stuff like that, so it's got a knob to
24 turn.
25 Q. Right.

Page 69

1    A.  So we both bought that same product for
2  our children.
3    Q.  And you -- but it was during that time
4  frame when you had the young children that you had
5  the discussion with Dr. Frakes about that certain
6  incline sleeper products were not safe?
7    A.  That's correct.  We talked about that.  We
8  talked about, I remember not wanting to use a
9  belted restraint because we were concerned about
10  the child getting it wrapped around their neck.
11        And also, it's just much less convenient
12  to use.  You want to be able to set an infant down
13  and just watch them there rather than kind of strap
14  them in.  So we talked about things like that.  I'm
15  not going to be able to remember word for word
16  those --
17    Q.  Sure.
18    A.  -- kinds of conversations, but.
19    Q.  This would have been, I bet you can tell
20  me in ten seconds your son's birth date.
21    A.  Yeah.  I mean, he was born on March 6th,
22  2018.  So it would have been after that.
23    Q.  All right.  So sometime around the March
24  6th, 2018 timeframe while you were still on the
25  A.S.T.M. committee you had expressed to your

Page 70

1  wife -- what is your wife's name?
2    A.  Dooroo Kim.  D-O-O-R-O-O, last name Kim.
3    Q.  Dr. Kim, I assume?
4    A.  Not yet.  She's working on it.
5    Q.  She has two babies.
6    A.  That's right.  She had a little bit of a
7  delay.
8    Q.  So you spoke to your wife, Ms. Kim, and
9  then you also spoke to Dr. Frakes, your colleague
10  who's a biomedical engineer.  You expressed
11  concerns in 2018 to both of them while you were on
12  the A.S.T.M. committee, but you never told anyone
13  on the A.S.T.M. committee of those concerns at that
14  time.
15    A.  Yes.  That's correct.  I think during that
16  time frame the 3118 standard never came up for
17  discussion in the meetings that I went to.
18    Q.  And I understand that you have an agenda.
19  Any member can put something on the agenda or
20  request to have something put on the agenda; true?
21    A.  I think that's correct, yeah.  I mean,
22  during that time frame, obviously, I wasn't trying
23  to actively put stuff on the committee.  I was
24  dealing with young children.
25    Q.  No.  I understand.  I know the --

Page 71

1    A.  So I would go to the committee and I would
2  just follow along with what was already planned and
3  have discussions --
4    Q.  I mean --
5    A.  -- on those and vote on those kinds --
6    Q.  Yeah.
7    A.  -- of issues.
8    Q.  I understand the pull to your children
9  away from your work, trust me.  I've got three of
10  my own, but.
11        But the question I'm asking you is --
12    A.  Uh-huh.
13    Q.  -- while you're a new dad, you're dealing
14  with this every day, you've already personally
15  decided and talked to your very qualified friend
16  and wife and decided it's not safe, and it did not
17  occur to you to say to the committee that you sat
18  on, because you were in a unique position as a dad
19  and a member of that committee, you never -- it
20  never occurred to you to say, I think these
21  products are [sic] safe, we should revisit this
22  standard or put it on the agenda.
23        That never happened, did it, Dr. Singhose?
24    A.  I can't say that it didn't occur to me.
25    Q.  You just didn't do it?

Page 72

1    A.  I just didn't do it.  I --
2        MR. OSBORNE:  Form.
3        THE WITNESS:  I didn't know the full
4    extent of the dangers associated with this
5    product at the time.  That's just the
6    truth.  I didn't have all the information
7    that I have now.
8  BY MS. LOVETT:
9    Q.  But in your mind, you thought it was too
10  dangerous for your child?
11    A.  That's correct.
12    Q.  So other than talking to Dr. Frakes and
13  your wife, was the first time you decided to opine
14  that the incline sleeper was unsafe for this case?
15    A.  Yeah.  I mean, you're using kind of this
16  legal term opined.
17    Q.  Well, you're giving --
18    A.  And --
19    Q.  Well, you're giving an opinion.
20    A.  And I'll just say that, yeah, the first
21  time I've opined in a report and done an analysis
22  of this and got all the data and analyzed it and
23  made a clear determination that this was dangerous
24  was for this case.  I just didn't have all this
25  information before this case.

Page 73

1  Q. Right. So what I'm -- but I'm saying you
2  did not seek to get more information or data as a
3  member of the committee when you had concerns about
4  it for your own child, the first time that you
5  reviewed it was in your con -- the context of your
6  work as an expert witness for the plaintiffs in
7  this case; correct?
8  A. That was a long question. Could you --
9  Q. Sure.
10 A. -- ask that again?
11 Q. Sure.
12 A. There's a lot going on there.
13 Q. Yeah. No, I agree with you. I'll clean
14 it up.
15     The first time that you pulled together
16 data and did any research or study on this, despite
17 having your own concerns about it before, was for
18 this case?
19 A. I think that's a fair assessment, yes.
20 Q. And you know that when I -- I hate to go
21 to legalese, because I'm really not that
22 lawyer-like. But if -- when I say "opined," you're
23 here -- the jury knows you're here to give an
24 expert opinion; correct?
25 A. Yes.

Page 74

1  Q. And you are now telling us in 2021 you
2  have several criticisms of the Rock 'n Play. There
3  are several things that you find -- that you
4  believe were dangerous about the Rock 'n Play
5  sleeper.
6     And you're giving -- you're here to give
7  that opinion to the jury; true?
8  A. That's correct.
9  Q. And you are going to tell the jury that
10 under oath, and these are opinions that you've
11 developed in conjunction with, not your work on the
12 very committee that created this standard, but in
13 conjunction with your work as an expert witness in
14 this case?
15 A. Yes. That's correct. I had nothing to do
16 with the 3118 standard when I was on that
17 committee.
18 Q. Right. So how did -- how did you come to
19 be acquainted with Mr. Osborne, our friend on the
20 screen?
21 A. Well, he's obviously a lawyer at the law
22 firm that contacted me about this. I'm not sure
23 that the law firm contacted me about. It may have
24 been a -- some sort of medical expertise company,
25 if I recall.

Page 75

1     I think they reached out to me and they
2  said, you seem like you're an expert in this area,
3  would you be interested in talking to these lawyers
4  about this Rock 'n Play sleeper situation.
5  Q. Do you --
6  A. And I think that's how I was then
7  introduced ultimately to this law firm.
8  Q. All right. Do you remember what year that
9  was?
10 A. Probably near the end of 2019 or maybe
11 even the beginning of 2020.
12 Q. Are you listed with any expert referral
13 services?
14 A. Not that I'm aware of.
15 Q. All right. Do you remember the name of
16 the one that connected you with Mr. Osborne and his
17 colleague, Ms. Schriner?
18 A. No. I think it had something like Medical
19 Experts or something like that in its name, but I
20 can't remember exactly.
21 Q. All right. Had you been contacted with
22 them -- by them before?
23 A. No.
24 Q. And we'll get to your entire file in this
25 case, because I know you have a large file. Can

Page 76

1  you -- can you ballpark for us, prior to your
2  deposition today, approximately how many hours
3  you've spent working on this case, in your review,
4  in the preparation of your report, and any other
5  work that you've done?
6  A. Well, in some sense -- in some sense my
7  entire career, you know, was preparing me for this.
8  We talked about all those projects that I worked
9  on. I can't forget all that stuff I learned.
10 Q. No. Sure. But I'm -- you're not --
11 A. But --
12 Q. I don't think Mr. Osborne's going to be
13 very happy if you decide to bill him 650 --
14     MR. OSBORNE: Whoa, whoa, whoa, whoa.
15 BY MS. LOVETT:
16 Q. -- dollars --
17     MR. OSBORNE: That's almost an
18 interrupt. Please let him finish his
19 answer.
20     MS. LOVETT: No. I was --
21     MR. OSBORNE: Thank you.
22     MS. LOVETT: John, I was just saying
23 I don't think you're going to be very
24 happy if he sends you a bill for
25 650 dollars an hour for his entire career.

Page 77

1    So I'm trying to confine it to his work in
2    the case and what he's -- what he's going
3    to bill you for.
4    BY MS. LOVETT:
5        Q.  Can you tell me that, Doctor?
6            MR. OSBORNE:  Well, I'm happy with
7    your inquiring into that area.  But if
8    he's making an answer, I'd prefer you
9    don't start talking.
10           MS. LOVETT:  Well, John, you're
11   not --
12           MR. OSBORNE:  Thank you.
13           MS. LOVETT:  I'm sorry.  You're not
14   in the room with us.  We're having a
15   laugh, and so we were, like, we were both
16   paused.  But I do appreciate the
17   instruction.
18   BY MS. LOVETT:
19       Q.  Dr. Singhose, how many hours have you
20   spent in your preparation for this case, not -- I'm
21   not talking about your whole life, obviously, but
22   what you've done that you're going to bill the
23   Kelly -- the parties for?
24       A.  Okay.  Just focusing on the work
25   specifically on this Rock 'n Play sleeper, I would

Page 78

1    estimate 250 hours.
2        Q.  All right.  Before your deposition today?
3        A.  Yeah.  I mean, 250 is just a ballpark
4    number.
5        Q.  Sure.  No, I -- and we have -- we'll have
6    your invoices, and we'll go through that.  But I
7    just wanted to get a ballpark of the time you've
8    spent over the course of from late 2019 through
9    today.
10           And that's your estimate.  I'm not -- I
11   promise I won't hold you to that estimate, but
12   that's a fair --
13       A.  I think that's a fair estimate.
14       Q.  -- estimate.
15           If we -- if we broke that down into
16   40-hour workweeks, which no one has anymore, I
17   know, but probably eight or nine weeks' worth of
18   work?
19       A.  Yeah.  I mean, six or seven.
20       Q.  Six or seven?  See, this is how much math
21   I can do, Dr. Singhose.  But thank you for letting
22   me off the hook on that.  My team is -- my team is
23   already laughing.
24           MS. LOVETT:  So why don't we take a
25   quick restroom break, if that's okay.

Page 79

1            THE WITNESS:  Sure.
2            MS. LOVETT:  And by the way, anytime
3    that you need a break --
4            MR. OSBORNE:  Sure.
5            MS. LOVETT:  -- anytime you need a
6    break, feel free.  And also, you have two
7    babies at home, so anytime you needed a
8    break just to check in, feel free.
9            THE WITNESS:  Okay.
10           THE VIDEOGRAPHER:  Stand by.
11   The time is 10:59 a.m.  We are off
12   video record.
13           (Whereupon, a discussion ensued
14   off the record.)
15           (Whereupon, there was a brief
16   recess.)
17           THE VIDEOGRAPHER:  The time is 11:11
18   a.m., we are back on video record.
19   BY MS. LOVETT:
20       Q.  Dr. Singhose, we're going to mark what is
21   going to be Exhibit 1 to your deposition.
22           (Whereupon, Defendant's
23           Exhibit 1 was marked for
24           identification.)
25           MR. OSBORNE:  And I should say that

Page 80

1    I've gotten an E-mail indicating I'm
2    getting a login, but I haven't gotten that
3    specific login.  So I am following along
4    on exhibits on-line --
5            MS. LOVETT:  All right.
6            MR. OSBORNE:  -- with you.
7    BY MS. LOVETT:
8        Q.  All right.  So Exhibit 1 to your
9    deposition, Dr. Singhose, is called a notice of
10   deposition.  Have you seen this document before?
11           (Whereupon, the document was
12           reviewed by the witness.)
13           THE WITNESS:  Yeah, I've seen this
14   one.  It just doesn't seem to be the
15   correct one.  I'd received a couple of
16   these.
17   BY MS. LOVETT:
18       Q.  We've had -- we've had a couple of changes
19   of schedule; fair to say?
20       A.  This one appears, the one I'm holding
21   right now appears to be for the other date, the
22   Thursday last week when we were supposed to have
23   it.
24       Q.  Right.  Let's look at the Exhibit A to
25   the -- to the back of that.  That may not be the

1    controlling notice, but I know the request for
2    documents has not changed.
3         Have you reviewed that portion of the
4    exhibit?
5    A.  Yes, I have.
6    Q.  And can you tell me what that is, or what
7    you perceive it to be?  A request for you to bring
8    certain documents to your deposition?
9    A.  Yes.  I mean, that's the way I understand
10   this.  Of course, there's a bunch of depositions --
11   definitions here that I reviewed so I could
12   understand the terms in the request.
13        And then starting on Page 6 going on to I
14   think seven and eight, there are these requests
15   that were made of me.
16   Q.  Have you done your best to comply with
17   those requests today?
18   A.  Yes, I have.
19   Q.  Have you provided --
20        MR. OSBORNE:  And Counsel, just for
21   the record, best -- Dr. Singhose's file
22   was produced in compliance with Rule
23   26(b)(4).  And we have told you in writing
24   what our objections were to your requests.
25        So within that -- those parameters,

1    these questions are being answered.
2         MS. LOVETT:  Yes.  That's understood,
3    Counsel.  We have a digital copy of the
4    doctor's file and have that.  We'll be
5    going through that with him today, but
6    giving him the --
7         MR. OSBORNE:  Of course.
8         MS. LOVETT:  -- chance to tell us on
9    the record that he formally reviewed the
10   definitions and feels that he has provided
11   you with everything that you -- that he
12   needed to provide that was
13   non-objectionable.
14   BY MS. LOVETT:
15   Q.  Is that correct, Dr. Singhose?
16   A.  I didn't follow that.  What I did was I
17   read all this --
18   Q.  There you go.
19   A.  -- and did my best to come up with these
20   materials, and I turned them over to the law firm.
21   And there was some discussion about what was
22   discoverable.  I didn't make that final call, they
23   did.
24   Q.  Understood.
25   A.  Okay.

1    Q.  All right.  So you have to the best of
2    your ability produced everything that's on the
3    list.  Let's go through some categories that you
4    reviewed for the file.
5         And I want to put this into sort of two
6    categories as we go through, that there'll be
7    things that you've reviewed, and then afterwards
8    there'll be things that you have independently done
9    or research that you have pulled.
10        Do those categories make sense to you?
11   A.  Sure.  Somewhat.
12   Q.  Okay.
13   A.  I mean, we'll probably have to clarify
14   it --
15   Q.  Yeah.
16   A.  -- as we go on.
17   Q.  Well, should I add any other categories?
18        I'm looking at your scope of work.  I know
19   that you were provided with a vast amount of
20   information by plaintiff's counsel.  Then you also
21   did, you undertook some independent study and
22   research and testing.
23        Is there any other category I should add
24   to the scope of your work in this case prior to
25   your deposition today?

1    A.  Well, one thing that's jumping out at me,
2    and I don't know how this was resolved, was the --
3    if the subject Rock 'n Play sleeper and the
4    exemplar Rock 'n Play sleeper are subject to being
5    turned over to you.  That doesn't sound like any of
6    the two columns you were -- the two groups you --
7    Q.  Right.
8    A.  -- were just talking about.
9    Q.  Okay.  That's a good distinction to me.
10   A.  Okay.
11   Q.  Okay.  All right.  So we're going to talk
12   about everything that you -- that you reviewed.
13   Let's start with the categories of documents.  You
14   obviously provided us with your C.V.  Do you know
15   whether -- have you provided your most current C.V.
16   to Mr. Osborne?
17   A.  Yes.  Since I thought this was going to be
18   last Thursday, I think I tried to get all this
19   material to them on, like, over the Monday and
20   Tuesday time frame of last week.  And one of the
21   first things I did was provided an updated C.V. at
22   that time.
23   Q.  Right.
24        (Whereupon, Defendant's
25        Exhibit 2 was marked for

Page 85

```
 1              identification.)
 2   BY MS. LOVETT:
 3        Q.  So this is -- Exhibit 2 to your deposition
 4   is your curriculum vitae.  And it's updated as of
 5   last Thursday, which would have been September, oh,
 6   goodness, 9th.
 7            Are there any additions we need to make to
 8   it in the ensuing six or seven days?
 9        A.  I don't think so.
10        Q.  All right.  I wouldn't be surprised.  I'm
11   just checking.
12            So let's talk about articles.  Did you
13   independently pull any articles or research any
14   articles in conjunction with your work in this
15   case?
16        A.  Independent from whom?
17        Q.  Independent -- well, that's a good
18   question.  Just on your own.  Did you -- did you
19   pull some articles in conjunction with the lawyers
20   with whom you're working?
21        A.  I think I made requests to them to send me
22   certain documents.
23        Q.  All right.
24        A.  And so obviously he's provided me with
25   hundreds of thousands of pages, I think.
```

Page 86

```
 1        Q.  Yes.  Yes.
 2        A.  I didn't count them up, but --
 3        Q.  Right.
 4        A.  -- as you know.  Yeah, so a lot of the
 5   documents came from the law firm.
 6        Q.  Right.
 7        A.  But you were asking me a question about
 8   independent.
 9        Q.  Yeah.  So I know the law firm provided you
10   with documents and also at your request may have
11   provided additional documents.
12            Did you do any independent research, in
13   other words, pull learned treatises, journal
14   articles, peer reviewed studies, anything of that
15   nature, to support your opinions and conclusions in
16   this case?
17        A.  Yes.
18        Q.  And tell me briefly what areas you focused
19   on in that process.
20        A.  Well, one area that I looked into was
21   patents on these devices.  So I think the one or
22   two patents that I relied on I cited in my report
23   and turned those over.
24            So that's one area that the lawyers -- I
25   did independent from the lawyers, I guess --
```

Page 87

```
 1        Q.  Right.
 2        A.  -- is what you're asking.
 3        Q.  Right.
 4        A.  So that's one area.  I also looked at the
 5   Mannen report and the Wang paper.  Now, I may have
 6   gotten that from the lawyers at some point, but I
 7   think I independently just downloaded that again.
 8        Q.  Okay.
 9        A.  Because I had kind of a version that was
10   marked up or something, and I just wanted to make
11   sure that the public version was the same as that.
12   I think it's -- I think the public version is,
13   like, a redacted version.
14        Q.  Right.
15        A.  And so I think I independently got the
16   public version just to verify that it was basically
17   what I was getting.
18        Q.  Right.
19        A.  And then the Wang paper, again, I think I
20   just downloaded that because I have access to it.
21            And then there was -- the other category,
22   I think, of things I did independently was the
23   publications by Ms. Drago -- is that how you
24   pronounce her name?
25        Q.  Yes.
```

Page 88

```
 1        A.  Okay.
 2        Q.  Drago, actually.
 3        A.  Drago.  Okay.  So Ms. Drago, I
 4   independently located some of her publications --
 5        Q.  All right.
 6        A.  -- on my own.
 7        Q.  Okay.
 8        A.  I also independently located a textbook
 9   that describes safe sleeping practices, like, the
10   most current up-to-date sleeping practices.  I
11   think that was independent from the lawyers.
12        Q.  All right.
13        A.  Those are the things that are coming to
14   mind right now.
15        Q.  Okay.  Any other articles or peer reviewed
16   papers or anything that you can think of, any other
17   category other than what we've discussed?
18            MR. OSBORNE:  Form.
19            THE WITNESS:  I think, you know,
20        what's coming to mind right now, those are
21        the things that I would characterize as
22        independent from the law firm.
23   BY MS. LOVETT:
24        Q.  All right.  And I'm not going to ask you
25   about things that you -- in other words,
```

Page 89

1    independent materials that you did not receive from
2    the law firm?
3        A.  That's my understanding of your question,
4    yes.
5        Q.  All right.  Is there -- is there anything
6    as we sit here today that you still, that you feel
7    you are lacking or you would still like to see to
8    finalize or confirm your opinion?
9        MR. OSBORNE:  Form.
10       THE WITNESS:  I don't think I need
11       anything additional to finalize or confirm
12       my opinion, but there is stuff I would
13       like to see.
14   BY MS. LOVETT:
15       Q.  Okay.  So your report, I'll go ahead and
16   mark that.  We have a copy of your April 2, 2021
17   report which was produced to us in this case in
18   compliance with the Court's scheduling order.  And
19   that will be Exhibit 3 to your deposition.
20           (Whereupon, Defendant's
21           Exhibit 3 was marked for
22           identification.)
23   BY MS. LOVETT:
24       Q.  This is my work-out carrying around your
25   report, actually.

Page 90

1        So as we discussed at the beginning of the
2    deposition, today's my only day to ask you
3    questions.  The counsel with whom you're working,
4    Mr. Osborne said we also have this report, which we
5    have here in front of us as Exhibit 3.  It's my job
6    to ask you questions and ascertain as many of your
7    opinions as I can.
8        Did you intend for this report to be at
9    least your proffer to the Court and to me, to
10   Fisher-Price and Mattel, of your full opinions in
11   this case?
12       A.  Well, the report I have in front of me is
13   what I'll call my first report.
14       Q.  Yes.  That's your --
15       A.  And the --
16       Q.  -- initial report.
17       A.  -- that was the extent of the opinions
18   that I was offering at that point in time.  But as
19   you know, your experts returned to me even bigger
20   reports, and they introduced new issues and new
21   information.  And so then I needed to respond to
22   that in a rebuttal report.
23       Q.  Yes.
24       A.  And I would think that the combination of
25   this report and the rebuttal report includes the

Page 91

1    sum total of the opinions that I would be pro -- I
2    would be -- did you say pro offering? -- I would
3    be --
4        Q.  Proffering.  That's another --
5        A.  -- I would be proffering.
6        Q.  That's another lawyer word.
7        A.  Okay.
8        Q.  Here's your July 16th, 2021 rebuttal
9    report, which will be Exhibit 4 to your deposition.
10           (Whereupon, Defendant's
11           Exhibit 4 was marked for
12           identification.)
13   BY MS. LOVETT:
14       Q.  And so, Doctor, as we sit here today, your
15   complete opinions are contained, for your work in
16   this case are contained in Exhibits 3 and 4, your
17   report and rebuttal report; correct?
18       A.  Yes.  I think that's the opinions I put in
19   paper and offered in this matter.
20       Q.  Sure.  Okay.  So what else is it as we sit
21   here today that you would still like to see, having
22   offered these reports?
23       A.  Well, in these rebuttal reports I received
24   from, I'll just call them your experts, I don't
25   know if they're yours or Fisher-Price's, they

Page 92

1    presented a lot of experimental data that I don't
2    think was complete, and so it was a bit hard for me
3    to understand some of that.
4        So for example, a lot of the videotapes
5    that I received to review of those testings didn't
6    include audio.  So I would -- I would really like
7    to see [sic] the audio of those.
8        Also, many of the video clips seem to be
9    cut off right when interesting things were
10   happening, so I would have liked to see more of
11   those video clips, like, all the way through a test
12   rather than just the cut-off versions of it.
13       Then there's some other experimental
14   protocols in here that aren't clear to me.  Such as
15   when they secured a baby in the Rock 'n Play with
16   the restraint, I would like to have understood how
17   tight that restraint was.
18       So there's several things like that.  I
19   think I'd have to review my report to make a full,
20   complete list of what I would still be interested
21   in seeing, but those are some examples of things I
22   would like to see.
23       Q.  All right.  You felt that you had
24   sufficient information to author the July 16th
25   surrebuttal report -- or rebuttal report?

Page 93

1    A.  Yeah.  Certainly.  I mean, as you know, in
2  these cases --
3          MR. OSBORNE:  Form.
4          THE WITNESS:  -- we never get all of
5      the information.
6  BY MS. LOVETT:
7    Q.  Sure.
8    A.  But I did have enough to confidently put
9  forth these opinions.
10    Q.  All right.  So let's talk about the --
11  you've given me another -- a number of categories
12  of the work you did.  In addition to your reports
13  and contained within your reports, you did some
14  testing, independent testing; true?
15    A.  Yes.  I mean, testing in the sense that I
16  measured geometry of the device.  I put dolls and
17  live infants in various positions to photograph how
18  they interacted with the device.  I observed live
19  infants and how they pushed and wiggled and moved
20  around in the device.  That's what I think that
21  you're referring to as my testing.
22    Q.  Yes.
23    A.  Yes.
24    Q.  And so when we talked about the exemplars,
25  the subject product or the exemplar product, were

Page 94

1  those tests conducted with an exemplar
2  Rock 'n Play?
3    A.  Yes.  Some of the tests I actually used
4  the subject Rock 'n Play, the actual --
5    Q.  Yes.
6    A.  -- one.
7    Q.  Yes.
8    A.  But I'm not going to put live babies in
9  that, so I asked for an exemplar.  And they sent me
10  one that is quite similar.  And that's when I would
11  put the live babies in that one.
12    Q.  Right.  You -- and to be -- I want to
13  clarify your question.  You wouldn't put live
14  babies in the subject Rock 'n Play because Zoey had
15  passed away in it?
16    A.  Yes.
17    Q.  But you were comfortable putting the live
18  babies in the exemplar Rock 'n Play for the
19  purposes of your testing?
20    A.  Yes.  For the purpose of my short-term
21  testing and photographing and measuring, yes.
22    Q.  Right.  And was your -- and did you take
23  audio recordings of your -- were there video and
24  audio recordings of your testing?
25    A.  I don't think I took any video of those.

Page 95

1  Basically, I just took pictures in order to show
2  the various positions they were in.  And I believe
3  I also took pictures of my measurements.  I would
4  put a measuring tape there and take a picture of it
5  to record what number it was reading.  But I don't
6  recall videotaping it.  Because basically, I'd be
7  really close to the infant when I was putting them
8  there.
9    Q.  Right.
10    A.  I didn't then step back and do a
11  videotape --
12    Q.  Right.
13    A.  -- of that test.
14    Q.  You had said that you would be interested
15  in seeing or having the audio portions of some of
16  our experts' testing.  And I'm just curious how
17  that would -- might impact your analysis one way or
18  the other.
19    A.  Well, to get these babies to roll over or
20  to partially roll, they attempted to entice them.
21  And they used a toy and they used verbal cues, and
22  also it looked like they were using their parents.
23    Q.  Right.
24    A.  I can't tell who those people are, but
25  some of them looked like parents or --

Page 96

1    Q.  Right.
2    A.  -- caregivers.  And so I know from my own
3  personal experience or just common sense that the
4  way that you tempt the baby to move or to roll or
5  to turn is going to determine how much it tries to
6  roll.
7    Q.  Right.
8    A.  And so if I put a baby in this
9  Rock 'n Play sleeper and I stood in front of it and
10  I didn't say anything, the baby's not going to
11  probably move much.
12    Q.  Right.
13    A.  But if I went around to the side and I had
14  a toy and I was shaking it and I was saying come
15  here and I was tempting it with my voice and stuff,
16  then I -- obviously the baby would be more likely
17  to turn over.
18        So I would just like to see that the
19  stimulus to the baby, whether or not that was
20  consistent across all the testing.
21    Q.  All right.
22    A.  And I think there was also important
23  comments made by the parents.  The parents seemed
24  to indicate the level of skill that their infant
25  had, like I think they can turn over or I've seen

Page 97

1    them turn over. And I think that that kind of
2    information was missing.
3        Q. All right. We know in baby Zoey's case,
4    we know her level based on her parents and her --
5    or her parents relating her level of development
6    and her medical records, we know approximately
7    where she was at eight months and 20 days old in
8    terms of benchmarks; correct?
9        A. Yeah, I think we have some approximate
10   information of what she was capable of doing.
11       Q. We know that Zoey could roll over?
12       A. I think that we know that she could
13   possibly roll over on certain kinds of surfaces
14   that may be flat. Like, to me it wasn't clear when
15   they said Zoey can roll over. Like, rolling over
16   on a flat surface is different than rolling over on
17   a couch or rolling over in the Rock 'n Play.
18       So I'm not -- I don't have a clear
19   understanding of just where she could roll over.
20       Q. All right.
21       A. But I think that there are certain
22   conditions that indicate that she might have been
23   able to roll over.
24       Q. Yeah. Her father said she could roll
25   over.

Page 98

1        A. Yes.
2        Q. Her pediatrician said she could roll over
3    two months before she passed away when she was six
4    months old.
5        A. Yeah. So I mean, a pediatrician might see
6    that baby, you know, up on an elevated examination
7    table and be very worried that it was going to roll
8    over and say, that baby can roll over. I mean,
9    that's how our kids are examined.
10       Q. Right.
11       A. And so I know that pediatricians are
12   pretty scared about the baby rolling off the exam
13   table.
14       Q. Uh-huh.
15       A. So certain configurations, I think
16   there's -- people are saying that she could roll
17   over.
18       Q. Right. But also, the pediatrician is
19   noting that as a developmental marker, you realize
20   that; right?
21       A. Yes. I think that's what the pediatrician
22   is saying is that, from their assessment --
23       Q. Right.
24       A. -- she could roll over in some place.
25       Q. Right.

Page 99

1        A. I wasn't sure where the pediatrician was
2    referring to.
3        Q. Okay. The testimony was -- of Zoey's
4    father was that she could sit up.
5        A. Yeah. I remember seeing stuff like that.
6    Again, I have a question of whether -- does that
7    mean you can take the baby and sit it up and plop
8    it down and it not fall over for a while.
9        Q. Right.
10       A. I mean, that's how they start.
11       Q. Right.
12       A. Is that sitting up?
13       Or I think in this case you want to be
14   looking for kids that can be on their back and can
15   sit up. Because that's what would cause the
16   problem here is they would be on this 30 degree
17   incline, and when they're on their back underneath
18   their own power they could then sit up. That, I
19   don't know whether she could do or not.
20       Q. Do you -- did you consult with any other
21   experts or specialists in the area of child
22   development to assess what would be average ages
23   for the benchmarks involved in the time -- the
24   lifetime use of this product?
25       A. I don't think I consulted with other

Page 100

1    experts. I mean, I've reviewed that kind of
2    information for years now --
3        Q. Right.
4        A. -- in my career, so I'm generally
5    knowledgeable about when babies can do certain
6    things. And I happen to know there's a large
7    range --
8        Q. Right.
9        A. -- of which things can happen. I mean,
10   having our boys grow up with our close friends, you
11   can see the development different in your child
12   than somebody else's.
13       Q. Right.
14       A. So I have this practical experience as
15   well. But I've also read many of the papers and
16   texts and descriptions about the general stages
17   through which babies develop.
18       Q. Right.
19       So let's talk about what you did in
20   preparation for your -- for your deposition. Did
21   you review any deposition transcripts prior -- for
22   the purpose of giving your deposition today?
23       A. I think just for the purpose of clarity, I
24   feel like the entire 250 hours --
25       Q. Right.

Page 101

1    A.  -- was preparing for this.
2    Q.  Fair enough.
3    A.  So yeah, I read a lot of depositions.
4    Q.  Okay.
5    A.  But it seems like you may be asking a
6  slightly different question.
7    Q.  No.  That's fine.  We can -- we can
8  certainly --
9    A.  Okay.
10   Q.  We can certainly -- for example, an expert
11 who testified yesterday said, I didn't look at all
12 the depositions again recently.  That gave me some
13 clarity on whether or not he would be -- have
14 details at his fingertips.
15   A.  Okay.
16   Q.  So what -- but let's do this along the
17 250-hour continuum that you've described.  Which
18 deposition transcripts did you review?
19   A.  I think the vast majority that were sent
20 to me.  And that would maybe be in that case file
21 if they turned those over to you.
22   Q.  Yes.
23   A.  I certainly reviewed most of those.  Any
24 ones that I relied on, though, I would have
25 specific quotes from in my -- in my report.  So we

Page 102

1  could just go through there and search for
2  citations of depositions --
3    Q.  Yes.
4    A.  -- and I certainly would have read those.
5    Q.  Yes.
6    A.  I may have read, you know, one or two
7  others that I didn't cite to, but I don't -- if I'm
8  relying on them --
9    Q.  Right.
10   A.  -- then I would have had a citation to
11 them or a description to them in my report.
12   Q.  We know from your report that you read the
13 depositions of Zoey's parents; correct?
14   A.  Yes.
15   Q.  And of Mr. Olson, Zoey's uncle; correct?
16   A.  That's probably correct.
17   Q.  All right.
18   A.  That was a -- this would have been one of
19 those I read a long time ago.
20   Q.  Sure.
21     Did you read the depositions of the first
22 responders -- or of the detectives, I should say?
23   A.  I'm not sure I read their depositions.  I
24 mean, I read the police reports and the incident
25 reports.

Page 103

1    Q.  Okay.
2    A.  So I have quotes from them.
3    Q.  Right.
4    A.  And also one of your experts, Dr. Rundell,
5  also has a factual, detailed factual description,
6  or what I'll call a list of quotes --
7    Q.  Right.
8    A.  -- from all those, and I actually reviewed
9  that recently.
10   Q.  All right.
11   A.  So I'm familiar with a lot of stuff that
12 they said.
13   Q.  But don't know specifically whether you
14 reviewed their entire depositions?  And I'm talking
15 most specifically here about Detective Reyes and
16 Sergeant Akey.
17   A.  Yes.  I know that I read what I'll call
18 statements from them.  Whether those were in
19 deposition form, I can't remember.
20   Q.  All right.  Did you review any of the
21 Mattel -- any of the Fisher-Price company
22 witnesses' depositions?
23   A.  Yes.
24   Q.  Which ones do you recall having reviewed?
25   A.  Kitty Pilarz.  I think I reviewed a couple

Page 104

1  of hers, right, I think for this case.  And I may
2  have also been provided one from an earlier case.
3    Q.  All right.
4    A.  I don't remember.  But depositions by her.
5  Depositions by Michael Steinwachs, if that's how
6  you pronounce it.
7    Q.  It is.
8    A.  Depositions by Joel Taft.  Depositions by
9  Linda Chapman.  Those are the ones I can remember
10 off the top of my head.
11   Q.  Okay.  Did you review the deposition of
12 Lisa Loheiser?
13   A.  Yes, I did.
14   Q.  Any other corporate depositions that you
15 can review off of -- that you can recall off the
16 top of your head?
17   A.  Well, of course I reviewed the deposition
18 or depositions, however you want to define it, of
19 Dr. Deegear.
20   Q.  All right.
21   A.  I'm not sure you're associating him
22 directly with Fisher-Price or not.
23   Q.  Well, I guess the quest -- I'm not
24 currently because he's not worked with Fisher-Price
25 in a while.

Page 105

1       But there were three separate depositions.
2   Did you review the depositions or did you review
3   summaries of those depositions?
4       A.  I think I reviewed all of those
5   depositions.  It was a little confusing, I mean,
6   because it seemed like one was interrupted or
7   something like that --
8       Q.  That's correct.
9       A.  -- and started again.  So I'm not sure how
10  you're defining three different ones, but I think I
11  did receive three different chunks of depositions
12  from him that I reviewed.
13      Q.  All right.  Any other depositions that
14  you -- that you recall reviewing that you would
15  associate with Fisher-Price or Mattel?
16      A.  Not off the top of my head.  But again, if
17  I relied on them, I would -- I would have cited to
18  them --
19      Q.  Sure.
20      A.  -- in my report.
21      Q.  Have you -- have you spoken with or
22  reviewed the report of any of the plaintiff's other
23  experts in this case?
24      A.  I haven't spoken to them.  I was provided
25  at least some of their reports, but I didn't study

Page 106

1   them.  I think I what I'll say perused them or
2   looked at just some parts of them.
3       Q.  All right.  Did you use any of the reports
4   of any of the other plaintiff's experts in this
5   case to form any conclusions in your own reports?
6       A.  I'm not sure I used them to come to any
7   conclusions.  But certainly the -- like, for
8   example, the medical doctor's --
9       Q.  Right.
10      A.  -- report tends to coincide with my
11  opinion, but I can't say that I relied on it
12  heavily.
13      Q.  You reviewed medical records, obviously?
14      A.  Yes.
15      Q.  And obviously you're not a medical doctor,
16  so you were looking for certain specific things, I
17  would think.
18      A.  Yes.  I mean, even though I'm not a
19  medical doctor, you can look at a medical report
20  and you can see mechanical engineering issues in
21  there.
22      Q.  Yes.
23      A.  For example, you can see fluid flow
24  problems --
25      Q.  Right.

Page 107

1       A.  -- and things like that or notes on fluid
2   flow, and that's a mechanical engineering issue.
3   So I would look for things like that.
4           Honestly, if they're making a medical
5   opinion using some fancy medical terms, I probably
6   would just trust them --
7       Q.  Right.
8       A.  -- you know.
9       Q.  Right.  So did -- which of Zoey's medical
10  records do you recall -- because you weren't
11  looking at them from a medical perspective, which
12  of Zoey's medical records do you recall having
13  reviewed?
14      A.  Well, I think the -- I'm not sure exactly
15  how this breaks down, but I think there was
16  basically an initial medical examination or a try
17  to -- an attempt to -- at determining her cause of
18  death and -- soon after.
19      Q.  Yes.
20      A.  And they just attribute it to sudden
21  unexpected infant death.
22      Q.  Actually, I believe they, you're right, in
23  the preliminary report they said they suspected
24  S.I.D.S. and the ultimate manner of death was
25  undetermined.

Page 108

1       A.  Okay.  Yeah.  It was something like that.
2       Q.  Yes.  You're talking about --
3       A.  And I think --
4       Q.  -- her post-mortem reports --
5       A.  Okay.
6       Q.  -- correct, post-mortem medical records?
7       A.  If that's what you call them.  I mean, I
8   don't know if it said "post-mortem" on it.  I'm
9   reading a description of a doctor that was
10  investigating what happened and did some
11  examination in trying to determine what happened.
12          And then I think there's another one, an
13  autopsy report that may be different.  Or I'm not
14  sure if those are separate or part of the same
15  investigation --
16      Q.  Right.
17      A.  -- but I recall those sort of two
18  different things.
19      Q.  Yes.  Did you review any of Zoey's records
20  from when she was alive, her medical records?
21      A.  Yes.  There's a couple of brief reports of
22  her visiting the doctor a couple months before her
23  death.
24      Q.  Yes.
25      A.  I remember reading that.

1    Q.  Okay.  Did you review any of her birth
2  records?
3    A.  Yes.
4    Q.  Okay.  Did you -- for what purpose did you
5  read her neonatal records?
6    A.  I think generally to just understand her,
7  her life, like, what was going on in her life up to
8  that point, again, probably wanting to just
9  understand the accident, the situation, her
10  capabilities.
11    Q.  Have you met or spoken with either of
12  Zoey's parents in an attempt to determine her
13  capabilities or her day-to-day life?
14    A.  No.
15    Q.  Do you think there's anybody more,
16  probably more -- in the -- with more information on
17  that than her parents?
18    A.  No.
19    Q.  Were you provided with any talking points
20  or outlines to use in your deposition?
21    A.  No.
22    Q.  How many times did you meet with
23  Mr. Osborne or someone at his firm in the -- in the
24  course of your engagement?
25    And understanding that we transitioned to

1  a virtual world quite early in your engagement, and
2  so you may have been meeting by Zoom or telephone,
3  can you give us an approximation of those meetings?
4    A.  Yeah, I've never met them in person.
5    Q.  All right.
6    A.  Mr. Osborne, I probably met with him via
7  Zoom or telephone calls five to ten times.  And
8  then there was a lawyer that was working on this
9  more detailed in the initial phases, Kristen
10  Schriner.
11    Q.  Yes.
12    A.  I probably met with her a few times more
13  than that.
14    Q.  All right.
15    A.  So eight to 15 meetings with her.
16    Q.  All right.  I want to -- so we've got your
17  qualifications, and we're going to go through your
18  opinions in detail.  And I think it's important for
19  the jury to understand what you will not be
20  addressing since we all can't be experts in
21  everything, mercifully.
22    So you -- the -- your opinions are limited
23  in this case to the design process of the
24  Rock 'n Play sleeper; correct?
25    A.  No.

1    Q.  All right.  You're not a medical
2  professional; true?
3    A.  That's correct.
4    Q.  You will not be offering medical opinions?
5    A.  No.
6    Q.  You are not an expert in neonatology?
7    A.  What is neonatology?
8    Q.  I think that answers the question.  It's
9  the treatment of neonates or very new babies.
10    A.  Okay.  So medical treatment, no.
11    A.  Yes.
12    A.  Yes.
13    Q.  You are not an expert in pediatric
14  pulmonology?
15    A.  Yeah, well, there's a legal definition of
16  expert.
17    Q.  Yes, there is.
18    A.  And I think we should clarify that.  So it
19  turns out that I've been involved in auxiliary and
20  in research that examines the hearts and lungs of
21  children or babies that are -- that are born with
22  deformities.
23    So I mentioned Dr. David Frakes before.
24  He's a close colleague I've been working with for
25  20 years.  He actually started a company that takes

1  M.R.I. scans of infants and 3D reconstructs their
2  hearts so that some surgeons can plan how they're
3  going to operate on these babies' hearts to change
4  them so they're more efficient, because they're
5  born with a defect.
6    I have some of those 3D hearts in my
7  office sitting on my desk.  So.
8    Q.  The ones that Dr. Frakes made, your
9  friend?
10    A.  Yeah.  He started a company that makes
11  these.  So I've been involved in that in the sense
12  that I've discussed it with him many times and I've
13  gone to his lab and I've saw the M.R.I. machines
14  and how they're 3D printing them.  So in that
15  sense, I know quite a bit about infant hearts.
16    Q.  Okay.  I -- and I understand.  And I have
17  a dear friend who's a hedge fund trader, but I
18  promise you -- and I've been to the floor, but I
19  promise you I can't do it, and I wouldn't hold
20  myself out as an expert in doing it.
21    So to be clear, you are not telling the
22  jury that you are a pediatric pulmonologist or
23  specialist in the treatment of lung ailments in
24  children, are you?
25    A.  No, I'm not a pediatrician.

1    Q.  Nor are you a pathologist?
2    A.  No, I'm not a pathologist.
3    Q.  And you are not holding your out --
4    yourself out as an expert in pathology?
5    A.  No.
6    Q.  You are not an expert in S.I.D.S. or
7    sudden unexplained infant death, are you, sir?
8    A.  I mean, I think I would have to be at this
9    point. I know a great deal about those.
10    Q.  Well, via your -- via your engagement in
11    this case?
12    A.  Oh, no. Well before that. I mean, I've
13    been dealing with these kinds of products for a
14    decade now. And like I said, one of the products I
15    worked on many years ago was the swing that tries
16    to comfort sick children.
17    Q.  How did that make you an expert in sudden
18    infant death or sudden unexplained infant death?
19    A.  Well, those sick children died
20    unexpectedly. So I've studied this issue for a
21    long time, like, what is S.I.D.S., what causes
22    S.I.D.S., what are the contributing factors to
23    S.I.D.S. I know a great deal about that.
24    Q.  Have you authored any peer reviewed
25    articles on S.I.D.S.?

1    A.  No.
2    Q.  Have you conducted any research on
3    S.I.D.S.?
4    A.  I've done a lot of research in terms of
5    determining how many children have it, what causes
6    it, what are -- well, I mean, by definition the
7    causes are unclear. So there's contributing
8    factors and there's correlations. I know a lot of
9    that material.
10    Q.  All right. And when you say you know it,
11    outside of this case, apart from what you've
12    learned in this case, what specific research have
13    you conducted on S.I.D.S. or S.U.I.D.?
14    A.  Well, I read a lot of articles describing
15    the amount of S.I.D.S., articles describing how,
16    when recommendations were changed to put infants on
17    their back, how S.I.D.S. decreased.
18         I have read articles about the
19    ramifications of putting kids on their back for --
20    so when you put kids on their back, different
21    things happen to them. And one thing that happens
22    to them, for example, is their heads can be
23    deformed, because they're now resting on this back
24    of their head and their --
25    Q.  Plagiocephaly.

1    A.  Yeah. My son had that, so I went through
2    that. And we 3D printed him a helmet, for example,
3    to reshape his head. So yeah, I just know a great
4    deal about this issue.
5    Q.  Do you think because you read a lot of
6    articles about something it makes you an expert in
7    it?
8    A.  It can, yes.
9    Q.  So do you consider yourself an expert in
10    S.I.D.S. or S.U.I.D. as you sit here today? Are
11    you -- do you intend to offer opinions to the Court
12    and to the jury that you are an expert in S.I.D.S.
13    and S.U.I.D.?
14    A.  I'm an expert in the sense that I can
15    comment on contributing factors to it, the way that
16    it's changed over the years by different sleep
17    practices.
18         I'm not going to offer myself as a medical
19    expert on trying to track down, you know, the
20    detailed medical reasons why S.I.D.S. occurs or
21    S.U.I.D. occurs. But the truth is I know a lot
22    about this topic.
23    Q.  Doctor, I want to be clear. Do you -- do
24    you hold your out as -- you hold yourself out as a
25    bio -- as a mechanical engineer as an expert --

1    A.  Yes.
2    Q.  -- clearly?
3    A.  Certainly.
4    Q.  You think you're equally a
5    S.I.D.S./S.U.I.D. expert because you've read a lot
6    of articles?
7    A.  Equally? No, I'm not saying that I have
8    the equal expertise in S.I.D.S. as related to
9    mechanical engineering. But the truth is I know a
10    lot about S.I.D.S. and S.U.I.D.
11    Q.  What is the American S.I.D.S. Institute?
12    A.  What is it?
13    Q.  Yes, what is it?
14    A.  It's probably a group of people. I mean,
15    I've never --
16    Q.  It probably is?
17    A.  I've never been a part of that.
18    Q.  Okay.
19    A.  So.
20    Q.  You know nothing about it?
21    A.  It just came out of your mouth and you're
22    describing it, so I know something about it there.
23    But no, I've never been a part of that institute.
24    Q.  Have you been a member of any organization
25    that studies or researches S.I.D.S.?

1    A.   Yeah.  I mean, my research group at
2  Georgia Tech studies S.I.D.S. and sick children and
3  tries to come up with products that will help them.
4    Q.   All right.  Let's break it down.  You said
5  studies S.I.D.S. in sick children.  S.I.D.S. is, of
6  course, Sudden Infant Death Syndrome.  What
7  products does your -- you said S.I.D.S. in sick
8  children.
9      Are you --
10    A.   S.I.D.S. and --
11    Q.   And.  Okay.  S.I.D.S. and --
12    A.   -- sick children.
13    Q.   -- sick children.  What products have you
14  specifically tried to come up with to help or to
15  stop S.I.D.S.?
16    A.   Well, again, I don't think I was directly
17  targeting S.I.D.S.  I was targeting young children
18  and making them more comfortable, helping them
19  recover.  There's a correlation between S.I.D.S.
20  and children of low birth weight, children who have
21  respiratory infections and things like that.
22      So there's all these contributing factors
23  that you can't -- S.I.D.S. just means that you
24  don't -- you can't put a finger on it.  Right?  You
25  don't know --

1    Q.   Right.
2    A.   -- exactly what -- it doesn't mean there's
3  not contributing factors.  And so I've studied
4  those issues and tried to come up with products and
5  inventions and understandings that would help aid
6  those young children so they would not become
7  victims of S.I.D.S.
8    Q.   All right.  Well, I understand.  But I
9  am -- I am focusing in on S.I.D.S. and whether you
10  are holding yourself out as an expert on Sudden
11  Infant Death Syndrome and sudden unexplained infant
12  death.
13    A.   I don't know what you mean by holding
14  my --
15      MR. OSBORNE:  Object to the form.
16      THE WITNESS:  I don't know what you
17    mean by holding myself out as an expert.
18    I think I've made it very clear I know a
19    great deal about these subjects.
20  BY MS. LOVETT:
21    Q.   I understand you -- Dr. Singhose, what
22  I -- what I mean is, are you going to come in and
23  tell the jury whether or not you believe Zoey died
24  of S.I.D.S. and tell them that you -- they can rely
25  on your vast experience in S.I.D.S. and sudden

1  unexplained infant death syndrome to reach the
2  conclusion, the factual conclusion that she did not
3  die of S.I.D.S.?
4    A.   Well, maybe I should clarify my
5  understanding of S.I.D.S.  S.I.D.S. is sudden
6  infant death, when a child dies unexpectedly.  And
7  usually that term is associated when the sudden --
8  the child dies unexpectedly and you can't -- or the
9  doctor at that time can't put their finger on
10  exactly what caused it.
11      That doesn't mean they didn't get
12  suffocated.  As you know, Ms. Drago has already
13  written about this, and she said that sometimes
14  children suffocate and it's attributed to S.I.D.S.
15  I feel perfectly knowledgeable about that area, and
16  that's the kind of thing I would certainly say to a
17  jury.
18      MS. LOVETT:  Okay.  Objection.
19      Non-responsive.
20  BY MS. LOVETT:
21    Q.   Let me ask the question.  I'm asking very
22  specific questions about your work with S.I.D.S.
23  You've been able to tell me chapter and verse today
24  about your work with biomechanical products,
25  engineering products, products for cranes, projects

1  that you've brought to prototype for infants.
2      I'm asking you to apply that lens to your
3  work with S.I.D.S. or sudden unexplained infant
4  death.  Have you conducted any formal research in
5  that area?
6    A.   I've conducted --
7      MR. OSBORNE:  Form.
8      THE WITNESS:  I've conducted a lot of
9    formal investigations into this area in
10    terms of understanding S.I.D.S., how it
11    comes to be, what are the factors that
12    contribute to it, why doctors assign
13    something as a S.I.D.S. when it's
14    actually, for example, suffocation.
15      I know a great deal about those
16    topics.
17  BY MS. LOVETT:
18    Q.   Okay.  Can you direct the -- me to those
19  in your curriculum vitae, which is Exhibit 2?
20    A.   My curriculum vitae doesn't list
21  everything that I've done.  But for example, if --
22  I can direct you to some indications of those
23  activities.
24    Q.   Please.
25    A.   For example, I served on the A.S.T.M.

Page 121

1  F15.18.  That is called Cribs, Toddlers [sic] Beds,
2  Play Yards, Bassinets, Cradles and Changing Tables.
3       Q.  Could you -- could you do -- could you
4  give me the page number, please?
5       A.  42.
6       Q.  All right.  So let's --
7       MR. OSBORNE:  And wait a minute.
8  Wait a minute.  You asked him a question
9  to find where he's worked in this area,
10 and now you've gone on after he provided
11 you one.  I don't know whether he finished
12 that question back then.
13      MS. LOVETT:  John, you don't need
14 to --
15      MR. OSBORNE:  So --
16      MS. LOVETT:  -- coach him.
17      MR. OSBORNE:  -- I object.
18      MS. LOVETT:  I'm asking him to direct
19 me to the page in his report.  That's what
20 I just asked.  And he told me 42.
21      MR. OSBORNE:  No.  It's the question
22 before then.  Do you want to read that
23 back from the court reporter?
24      MS. LOVETT:  You can take your
25 deposition when I'm finished.

Page 122

1       MR. OSBORNE:  So what -- I'm not
2  going to let him answer questions that are
3  interrupted that are basically a
4  purpose -- a strategy to interrupt him in
5  his answer.
6       MS. LOVETT:  John, I don't need
7  strategy in this deposition.  I'm asking
8  him whether he's a S.I.D.S. expert.  He
9  told me he's done formal research, and
10 I've asked him to direct me to it in his
11 C.V., which he'd started to do before you
12 started this.
13      MR. OSBORNE:  Which he's doing, but
14 he started with a list, and you broke him
15 up in the middle of his listing.
16      MS. LOVETT:  Then there's something
17 called redirect where you can fix that.
18      MR. OSBORNE:  Well, there's something
19 called not interrupting the witness, which
20 is common courtesy and professionalism.
21      MS. LOVETT:  John, again, I've done
22 this for 28 years, I know that's not as
23 long as you, but I know how to be
24 courteous and professional.  And if you
25 don't like how the deposition is going,

Page 123

1  this is not the way to disrupt it.
2       I'll ask you to please --
3       MR. OSBORNE:  All right.  Well,
4  I'll --
5       MS. LOVETT:  -- refrain from
6  prompting --
7       MR. OSBORNE:  -- direct him to
8  complete his answer to the question that
9  preceded the one as to page and line
10 number.
11      MS. LOVETT:  And you may ask him that
12 when it is your turn to ask his questions.
13 I don't even recall it.  And this is a
14 waste of my time and the witness's.
15 BY MS. LOVETT:
16      Q.  Doctor, you directed me to --
17      MR. OSBORNE:  I think it's --
18      MS. LOVETT:  I --
19      MR. OSBORNE:  -- the purpose of
20 interrupting him.
21      MS. LOVETT:  John, I'm not interested
22 in your opinions on my advocacy.  Thank
23 you.
24 BY MS. LOVETT:
25      Q.  Page 42, Doctor, you directed me to as --

Page 124

1       A.  So certainly one of these indications of
2  my work in this area is on Page 42, but it's
3  something we already talked about --
4       Q.  Right.
5       A.  -- which is serving on the A.S.T.M. F15.18
6  group, which the F3118 is the subset or produced by
7  that committee.
8       Q.  Yes.  Is that part of your expertise in --
9       A.  Yes.
10      Q.  -- as a S.I.D.S. expert?
11      A.  Certainly the S.I.D.S. is a big part of
12 what's discussed in those committees.  It's a big
13 part of what those committees are directed towards
14 trying to eliminate or to reduce.
15      Q.  Right.  To eliminate or reduce S.I.D.S.?
16      A.  Yes.
17      Q.  And as you testified earlier, despite the
18 fact that you and your wife and your friend,
19 Dr. Frakes, had concerns about incline sleepers
20 while you were on the committee serving as an
21 expert on S.I.D.S., you did not at any time raise
22 the danger of incline sleepers?
23      MR. OSBORNE:  Form.
24      THE WITNESS:  That's correct.
25 Because at that time, I wasn't provided

Page 125

```
 1    all the information that Fisher-Price was
 2    hiding from that committee.
 3         MS. LOVETT:  Objection.
 4    Non-responsive.
 5    BY MS. LOVETT:
 6         Q.  So now you're an advocate, aren't you,
 7    Doctor?  You take the position that Fisher-Price
 8    was hiding information from the committee?
 9         A.  I believe that they did not turn over
10    relevant information to the committee.
11         Q.  Did you think that all incline sleepers
12    were unsafe or just Fisher-Price?
13         A.  Again, I didn't do that investigation.  I
14    just didn't have the information.
15         Q.  Well, when you were sitting on the
16    committee and you already felt that for your own
17    children incline sleepers over ten degrees were not
18    safe, you did not contribute a single agenda item
19    to raising that concern before the committee, did
20    you, sir?
21         A.  That's correct.  I didn't --
22         MR. OSBORNE:  Form.
23         THE WITNESS:  -- have the -- that's
24    correct.  I did not have the information
25    that I have now.
```

Page 126

```
 1    BY MS. LOVETT:
 2         Q.  But you --
 3         A.  I didn't know the full extent of their
 4    danger.
 5         Q.  You knew enough to not want to put your
 6    own child in one and have concerns about it and
 7    raise those concerns with two other very qualified
 8    professionals, but you were in a unique position to
 9    do so as an expert, as you say, on S.I.D.S. in this
10    committee and you didn't do it --
11         MR. OSBORNE:  Form.
12    BY MS. LOVETT:
13         Q.  -- did you, sir?
14         A.  No, I did not do that.  I don't --
15         MR. OSBORNE:  Form.
16         THE WITNESS:  I did not have the
17    information available to me that I have
18    now.  I didn't have the avail -- the
19    information available to me then that I
20    have now.
21    BY MS. LOVETT:
22         Q.  Well, as a -- as a -- as a member of the
23    committee, you certainly could have asked for
24    information.  Did you ask for any information as a
25    member of the committee when you were concerned
```

Page 127

```
 1    about the safety of incline sleepers in 2018?
 2         A.  That's not the way these committees work.
 3         Q.  I understand --
 4         A.  So I don't --
 5         Q.  -- how they work.
 6         A.  -- I don't have a way -- I don't have a
 7    way of forcing Fisher-Price to turn over to me
 8    incident reports I don't even know about.  Right?
 9    They had these incident reports that were
10    indicating this was a very dangerous product.
11         I didn't know about them.  The committee
12    didn't know about them -- well, I take that back.
13    Certain members of the committee didn't know about
14    them.  How would I know to ask for something that I
15    don't even know exists?  That's an --
16         Q.  Have you seen this --
17         A.  That's an unreasonable expectation of my
18    activities on that committee.
19         Q.  All right.  Well, I'm asking if you did
20    anything on that committee at this point.  Did you
21    ever raise a concern about safety?
22         You had concerns about your own child who
23    was of the age.  You made the determination with
24    your -- with your very qualified wife, who is also
25    a mechanical engineer, and discussed it with
```

Page 128

```
 1    Dr. Frakes, who you've discussed is a biomedical
 2    engineer.
 3         What did you do on this committee, which
 4    purpose for which was to lower the incidence of
 5    S.I.D.S., what did you personally do one way or the
 6    other to influence these safety standards?
 7         A.  Well, first of all --
 8         MR. OSBORNE:  Form.
 9         Go ahead.
10         THE WITNESS:  First of all, you're
11    mischaracterizing these as safety
12    standards.  I made a point that these are
13    more like conformity standards.
14         A lot of these standards don't
15    control safety.  There's a lot of other
16    stuff in there.  So they're not safety
17    standards; they're industry standards.
18         What did I do?  I received the
19    agenda.  I reviewed the agenda.  I would
20    go to the meetings.  I would listen to the
21    discussion of various points that were
22    under consideration.
23         Usually those discussions were about
24    how to change a standard, the wording in
25    the standard, and updating the
```

Page 129

1    standard.
2         At no point during my time did we
3    discuss the 3118 standard.  There were
4    many other standards that were being
5    discussed.  And then I would vote on
6    whether or not changes to those standards
7    should be made.
8    BY MS. LOVETT:
9         Q.  I asked you earlier this morning, I'm
10   reading you the question from Page 40, Line 8 of
11   your draft deposition this morning:
12        "Yes, but is there any more
13        important consideration in the
14        execution of that conformity than the
15        safety of babies?"
16        And your answer was:
17        "Not in my opinion."
18        You stand by that answer?
19        A.  Yes, I do.
20        Q.  All right.  So you, I know you corrected
21   me on conformity, but the reality that is you
22   didn't consider there to be any greater mission of
23   what the committee was doing than safety; true?
24        A.  Correct.  That's my personal opinion.
25        Q.  Is it different from your professional

Page 130

1    opinion?
2         A.  No.  It's my personal opinion.  But the
3    work of the committee, I'm trying to get this
4    across because we'll be explaining this to a jury,
5    that this committee is not a committee directed
6    primarily at safety.  It's a committee directed
7    primarily at conformity.
8         Q.  Can you explain to me or show me any other
9    work that you've done as a S.I.D.S. expert here in
10   your C.V.?
11        A.  Oh, the work that I've done that leads me
12   to my knowledge about S.I.D.S.; is that --
13        Q.  To classify --
14        A.  We're returning to that question?
15        Q.  Yes.
16        A.  Sure.
17        Q.  To classify yourself as a S.I.D.S. expert.
18        A.  Sure.  We'll just stay on 42.  The next
19   committee down that I've served on is the A.S.T.M.
20   D13 committee, which is textiles.
21        Q.  All right.
22        A.  This committee is directed at
23   understanding textiles, how to represent textiles,
24   how to evaluate and test textiles.
25        So for example, you know in this case that

Page 131

1    Fisher-Price has a quality safety operating
2    U.S.O.P., if you will, directed at what kind of
3    fabrics they should use in these products.  That's
4    the kind of topic that would be covered by that
5    A.S.T.M. committee, how to test for that kind of
6    thing.
7         So I served on that.  And certainly
8    S.I.D.S. is highly correlated to the type of
9    materials or fabrics or sleeping surfaces that
10   these children are placed on.
11        Q.  What specific work did you do on that
12   committee related to adopting statements -- safety
13   standards for S.I.D.S., or to prevent S.I.D.S.?
14   I'm limiting this to S.I.D.S.
15        A.  Well, I know that you're limiting it to
16   S.I.D.S. -- and I'm just complaining that that
17   committee examines textiles and the properties of
18   textiles.
19        Q.  Yes.
20        A.  And the properties of textiles are
21   important in terms of S.I.D.S.  For example, you
22   want to have these sleeping products made out of
23   breathable materials so that, when the infants move
24   around and they get into a position, they don't get
25   suffocated.

Page 132

1         And as you know by your own expert, that
2    suffocation can be misinterpreted as S.I.D.S.  So
3    there's a direct line to understanding textiles is
4    understanding causation of S.I.D.S.
5         Q.  The A.S.T.M. textile standards cover many
6    things other than infant products, too, don't --
7    true?
8         A.  Yes.
9         Q.  Products found in clothing; yes?
10        A.  Yes.
11        Q.  Home furnishings?
12        A.  Yes.
13        Q.  Vehicles?
14        A.  Yeah.
15        Q.  Cell phones?
16        A.  That, I don't know about.  It could.  It
17   could.  There's a lot of standards under these
18   committees.
19        Q.  Sure.
20        A.  I haven't read them all.
21        Q.  Sure.  Well, can you point me to any
22   specific standard on which you worked related to
23   the prevention of S.I.D.S. via your service on the
24   A.S.T.M. textile committee?
25        A.  Again, I don't think that we had a

1  standard under consideration at that time that was
2  directed to developing fabrics to eliminate
3  S.I.D.S. That's, again, not how this works.
4          But the topics of the committee are
5  measuring the characteristics of fabrics. And
6  those characteristics of fabrics are very
7  important, you know, in relation to S.I.D.S.
8      Q.  There are agendas for these meetings. Did
9  you include or rely on any agenda from any A.S.T.M.
10 textile meeting in your report?
11     A.  No.
12     Q.  Are there any other -- is there anything
13 else in your 43-page C.V. that qualifies you as an
14 expert in S.I.D.S. in your opinion?
15     A.  Well, again, stuff --
16     MR. OSBORNE:  Form.
17     THE WITNESS:  -- stuff in my
18 S.I.D.S. -- stuff in my C.V. doesn't
19 qualify me for it. I don't think that's
20 the question.
21         I think where -- you're asking me to
22 state where my activities or my studies or
23 my acquiring of knowledge in the area of
24 S.I.D.S. would appear in my C.V., and I
25 mentioned a lot of it won't be in my C.V.

1          But we're going through my C.V. and
2  we're looking for things that indicate how
3  I've developed an expertise in this area,
4  so that's what we're doing right now.
5  BY MS. LOVETT:
6      Q.  Yes. And Doctor, I'll tell you this --
7  these are important questions. Because before you
8  ever speak to the jury, the Court is going to make
9  a determination about whether or not you're
10 qualified as an expert to give testimony to lay
11 people on certain topics.
12         The Court is the gatekeeper, and that's a
13 very important function. So that may be something
14 I need to predicate for you in these questions,
15 that we're entitled to probe and test your
16 knowledge so that we can ask the Court to exclude
17 opinions that you may give that are outside your
18 area of expertise.
19         Have you ever been asked to speak at a --
20 at any conference or meeting as an expert on
21 S.I.D.S.?
22     MR. OSBORNE:  Form.
23     THE WITNESS:  No.
24 BY MS. LOVETT:
25     Q.  Have --

1      A.  I've never spoken as an expert on S.I.D.S.
2  And again, you're trying to take what I'm saying
3  and pushing it too far. I'm simply saying I know a
4  lot about S.I.D.S.
5          And I understand the relationship between
6  S.I.D.S. and the design of juvenile products.
7  That's the expertise that I have that I will be
8  going forward and explaining to the jury.
9          I won't be holding myself as an expert on
10 knowing every single thing about S.I.D.S. I
11 understand how S.I.D.S. is related to these
12 sleeping products.
13     Q.  Understood.
14     A.  That's my area of expertise.
15     Q.  And that's -- and that's where I'm trying
16 to get to, Doctor --
17     A.  Yes.
18     Q.  -- is to find the scope of your opinions.
19 Because I'm entitled to know and my client's
20 entitled to know and the Court is certainly
21 entitled to know it as it considers your expertise.
22         So for example, if I asked you if you were
23 a chemical engineer, I think you -- an expert in
24 chemical engineering, you would probably tell me
25 that you are not.

1      A.  No, I'm not an expert in chemical
2  engineering.
3      Q.  Okay. So this is something -- I'm looking
4  specifically at S.I.D.S., the epidemiology behind
5  S.I.D.S., the research into S.I.D.S. And you've
6  shown me the two things on your curriculum vitae,
7  which you updated for us last week, that you
8  believe qualify you to have some expertise in that
9  area.
10     A.  That's incorrect. But we're working
11 through it. I've identified two things for you.
12     Q.  Identify some more.
13     A.  And we're still going through this.
14     Q.  Okay. I was on Page 42 of 43, so I
15 thought that you were --
16     A.  I was.
17     Q.  -- I thought that you were finished?
18     A.  I started at the back. So again, we're
19 looking for things on my résumé that indicates that
20 I know a lot about S.I.D.S. as it's related to
21 juvenile products, juvenile sleeping products. So
22 that's what we're -- that's the exercise that we're
23 undertaking at this point.
24     Q.  Yes. Let's go.
25         (Whereupon, the document was

1    reviewed by the witness.)
2         THE WITNESS: So another indication
3    of my knowledge in this area appears on
4    Page 36. On Page 36 it lists one of the
5    projects I've worked on, the R.E.R.E.C.
6    [sic] on wheeled mobility for everyday
7    life. This is with Dr. Steven Sprigle.
8    Again, this is the project, as you can
9    see, it went on for five years, that we
10   worked on seats for young children.
11        During that investigation, I started
12   looking at car seats for infants, because
13   that's one of the possible things we could
14   do. We could take a car seat for infants
15   or for lung -- young children, we could
16   put that into a wheelchair and we could
17   strap the child in there.
18        So that's one of the things that we
19   considered, and so we studied that issue.
20   And during that investigation, it became
21   very clear that there was association
22   between S.I.D.S. and babies sleeping in
23   car seats.
24        And of course, the distinguish -- one
25   of the distinguishing characteristics is

1    that car seats have a steep back angle.
2    And so I certainly learned through that
3    process that you shouldn't have babies
4    sleeping at highly inclined angles. And
5    babies sleeping at those highly inclined
6    angles had an association with S.I.D.S.
7         So that was starting almost 20 years
8    ago I was, again, learning and studying
9    about that issue there.
10   BY MS. LOVETT:
11        Q.  Did you -- so, so tell me if you -- are
12   you -- what opinions do you intend to give to the
13   jury about S.I.D.S. specifically?
14        A.  I'm not sure that I have any opinions in
15   this case specifically about S.I.D.S. except that
16   Ms. Drago has written that suffocation can be
17   incorrectly classified as S.I.D.S. That's
18   something that's in my report.
19        But I'm not here saying -- I don't think I
20   have any opinions directed at S.I.D.S.
21        Q.  All right. So that's the question with
22   which I started, which is whether you considered
23   yourself an expert at S.I.D.S. And I'm asking you
24   whether you intend to offer any opinions to the
25   jury whatsoever about S.I.D.S., other than to

1    compare it to what Ms. Drago says in her report.
2        A.  Okay. That's a very different question --
3        MR. OSBORNE: Form.
4        THE WITNESS: -- than what I
5    understood before. You were asking
6    whether I was an expert and knew a lot
7    about S.I.D.S. I'm saying I do know a lot
8    about S.I.D.S., but I'm not offering an
9    opinion anywhere in this report or
10   rebuttal report specifically about
11   S.I.D.S.
12   BY MS. LOVETT:
13        Q.  All right. And you are not going to come
14   to court and offer any opinions about S.I.D.S. to
15   the jury?
16        A.  Again --
17        MR. OSBORNE: Form.
18        THE WITNESS: -- I think that my --
19   again, my opinions are in these reports.
20   And one of those opinions or one of my
21   discussions of those opinions is Ms. Drago
22   has contradicted herself or been
23   misleading in the sense that she's written
24   and saying children suffocate in these
25   devices and doctors -- or they suffocate

1    in sleeping environments and doctors don't
2    figure that out and they just say S.I.D.S.
3        I'm perfectly happy to have that
4    opinion or that discussion with the jury.
5    That's the only thing that comes to mind
6    in terms of how S.I.D.S. is going to come
7    into my opinion.
8        MS. LOVETT: Okay. Objection.
9    Non-responsive.
10   BY MS. LOVETT:
11        Q.  To be clear, you've now told us all of
12   your formal work with S.I.D.S., or are we still
13   working our way through your --
14        A.  Oh, we're still going to be working on
15   that question for a while.
16        Q.  Okay. Let's go.
17        A.  Okay. Because again, your question is how
18   did I develop an expertise in S.I.D. or a high
19   level of understanding in it, and so I've just
20   worked on it for 20 years.
21        And so --
22        Q.  You worked on S.I.D.S. for 20 years?
23        A.  I've worked in areas where S.I.D.S. played
24   a prominent role for 20 years, yes, in juvenile
25   products. So that's what we're -- we're working

Page 141

1    through that question right now.
2         Again, I started the answer, just to
3    reiterate, that a lot of that work is not going to
4    show up in a C.V.  But to the extent that it does
5    show up in the C.V., I'm trying to direct you to
6    where that would show up.
7         (Whereupon, the document was
8         reviewed by the witness.)
9         THE WITNESS:  So another place that
10   that shows up is on Page 33.  You can see
11   the third entry on Page 33 is a grant that
12   I received from International Diversified
13   Products.  And the title of that is Design
14   and Development of a Pediatric Personal
15   Transporter for Children With
16   Disabilities.
17        This speaks to that project about
18   having a transporter for a child that
19   can't move very well on their own.
20        And again, part of that investigation
21   was can we take a standard product that's
22   already on the market and can we convert
23   it to be used on one of these
24   transporters.
25        And so again, in that investigation

Page 142

1    we looked at car seats.  And again, you
2    run into the same sort of information,
3    that car seats have certain angles and
4    they have certain restraints and they're
5    applicable to certain kinds of children,
6    but they're not applicable to sleep.
7         So again, that would be another
8    investigation where I would have studied
9    that issue.
10   BY MS. LOVETT:
11        Q.  Did you -- did you produce any work
12   product as a result of that grant?  I mean, there
13   was -- obviously there was a study and there were
14   work papers.
15        A.  Yes.  We probably submitted a final report
16   to International Diversified Products.  This was
17   quite a while ago.  I know what we definitely re --
18   produced was we had a team of graduate students
19   working on that, and they reduced -- they produced
20   a final report on the prototypes that they
21   developed for that.
22        Q.  Did you rely on or cite to the work done
23   in conjunction with this grant anywhere in your
24   expert report or rebuttal report?
25        A.  No.  Only in the sense that I quoted my

Page 143

1    C.V.
2         Q.  Yes.  But I mean, did you specifically
3    refer to this part of your C.V. anywhere in the
4    conclusions and opinions contained in your expert
5    report and rebuttal report?
6         A.  No.
7         Q.  I'm with you and at your leisure.
8         (Whereupon, the document was
9         reviewed by the witness.)
10   BY MS. LOVETT:
11        Q.  Doctor, I'm going to make a suggestion
12   since our time here is limited by the rules and
13   your C.V. is lengthy.  If you like, we can take a
14   break and go off the record while you peruse it,
15   and you can come back with a list of your findings.
16        And that's the way I prefer to proceed
17   since this is eating into my time and I know you're
18   attempting to answer my question.  But I think we
19   can do this more efficiently and perhaps --
20        MR. OSBORNE:  That's fine with me.
21   BY MS. LOVETT:
22        Q.  -- get you lunch if you want.
23        MR. OSBORNE:  I'm sorry.  I didn't
24   mean to interrupt.
25        MS. LOVETT:  No worries.

Page 144

1         MR. OSBORNE:  We can go off the
2    record.
3         MS. LOVETT:  All right.
4         THE VIDEOGRAPHER:  Stand by.
5         THE WITNESS:  Okay.
6         THE VIDEOGRAPHER:  The time is 12:13
7    p.m.  We are off video record.
8         (Whereupon, a discussion ensued
9         off the record.)
10        (Whereupon, there was a brief
11        recess.)
12        THE VIDEOGRAPHER:  The time is 12:36
13   p.m.  We are back on video record.
14   BY MS. LOVETT:
15        Q.  All right.  Dr. Singhose, before the break
16   I had asked you to peruse your curriculum vitae and
17   identify for me anything in it that you believe
18   gives you or references or shows your credentials
19   as a person with expertise in S.I.D.S. or sudden
20   unexplained infant death.
21        Have you done so?
22        A.  Yes, I have.  I made it through most of
23   it.
24        Q.  Okay.  So I think when we stopped, the
25   last reference was the grant reference on Page 33;

Page 145

1    is that correct?
2        A.  Okay.  I'll just go.  I went from the
3    front.  So again, I'm looking for, just to clarify
4    for the record, I'm looking for indications of my
5    experience in how S.I.D.S. interacts with juvenile
6    products.  Right?  We've narrowed it down to that's
7    what I'm saying I know a lot about is how S.I.D.S.
8    interacts with juvenile products.
9        And so if we look on the first page of my
10   C.V., you can see under Georgia Tech, Georgia
11   Institute of Technology, that I developed
12   curriculum and teach courses in rehabilitation
13   engineering.  And rehabilitation engineering has to
14   do with this area of sick children.
15       And then also below that, you'll see that
16   I've done a lot of work in active seating
17   technology.  And this is, again, where you are
18   providing a seat for people and moving it around or
19   changing its configuration to accomplish various
20   things.
21       So again, S.I.D.S. is directly tied to
22   infant seats, so I've had to know a lot about
23   S.I.D.S. when working in those areas.  In addition
24   to those two --
25       Q.  Let me stop you just one --

Page 146

1        A.  Sure.
2        Q.  I want to ask you a question.  And I may
3    do this just to understand.  So when you say
4    S.I.D.S. is tied to infant seats, what -- upon what
5    are you basing that statement?
6        A.  Well, I mean, it's well known that there's
7    a relationship between S.I.D.S. and infants being
8    asleep in seats.  So you'll -- S.I.D.S. will occur
9    when babies are in seats and they die, and there's
10   not a direct causal relationship to that, but there
11   is a correlation between having children in seats,
12   in car seats, for example.
13       So that's why they recommend you don't let
14   infants sleep in seats.  That upright configuration
15   has a correlation with the incidence of S.I.D.S.
16       Q.  Is that a -- is that something that, that
17   specific infant seat issue related to S.I.D.S., is
18   that anything that you discussed in either of your
19   two reports?
20       A.  I'm not sure it's -- I don't think I
21   discussed it directly, no.
22       Q.  All right.
23       A.  Yeah.
24       Q.  Let's go to the next reference.
25       A.  Okay.  And then if we turn to Page 5,

Page 147

1    which has some of my publications on it, if you
2    look near the bottom, you'll see that I published a
3    paper in Clinical Biomechanics.  And the title of
4    that paper is Identification of Human Generated
5    Forces on Wheelchairs During Total Body Extensor
6    Thrusts.
7        This is an investigation of what we talked
8    about before, which is trying to design seats that
9    keep infants or children from falling out of them
10   when they have extensor thrusts.
11       And this particular paper is about
12   analyzing the forces, much like I did in this case
13   where I analyzed the forces that would be required
14   to roll over on the incline plane.  So that would
15   be related to that topic.
16       And again, I had to know quite a bit about
17   S.I.D.S. or look into that issue to make sure that
18   what we were proposing would not develop a strong
19   correlation with S.I.D.S. for those seats that we
20   were working on.
21       Q.  Were those -- were those seats for infants
22   under a year old?
23       A.  You know, I don't think we actually got
24   that specific.  We were really targeting young
25   children, probably in the three-year-old range.

Page 148

1    But we were definitely considering using this for a
2    range of children.  I don't recall saying let's
3    use this for a six-month-old.
4        Q.  Well, you're using it as a mobility
5    device, and six-month-olds are not that --
6        A.  That's right.
7        Q.  -- mobile.
8        A.  Right.
9        Q.  Right?
10       A.  Well, I mean, that's true.  And it's -- at
11   that point, it becomes kind of like a stroller.
12       Q.  Right.
13       A.  Because their peop -- caregivers are
14   pushing these around.  But you want to have a seat
15   in there that effectively cradles the child so they
16   don't fall out.
17       So in that case, you need to know that
18   what you're proposing for the seat does not have a
19   strong correlation to S.I.D.S.  Because as this
20   person's pushing this baby around for two or three
21   hours in the wheelchair, you don't want to, you
22   know, trigger a S.I.D.S. event.
23       Q.  So but with this specific reference,
24   Doctor, the work that you were doing was really
25   targeted at children in wheelchairs, and these

Page 149

1  would be children who would be older than those who
2  would likely die of S.I.D.S.; true?
3      A. Yeah, I think that's true. I mean,
4  S.I.D.S. there's no end game to it. It goes on for
5  a while. And of course, as children get older,
6  they tend to have less and less S.I.D. events.
7      But when you're designing seats for
8  children, you need to understand S.I.D.S. so that
9  what you're proposing, what you're developing does
10 not have these known factors or correlations with
11 S.I.D.S.
12     That's what I'm pointing out is that,
13 during this time frame, I had to study this issue
14 and understand it.
15     Q. What is your understanding of the
16 definition of Sudden Infant Death Syndrome with
17 regard to age?
18     A. It's generally for young children, young
19 babies. It's really for babies. And as you get
20 older and older and older, the incidence of
21 S.I.D.S. goes way down.
22     Q. It's the sudden unexplained death of a
23 child less than one year old; true?
24     A. That may be a definition you see
25 somewhere, yeah. But basically --

Page 150

1      Q. Like in --
2      A. -- unexplained death.
3      Q. -- National Institutes of Health?
4      A. Sure. I think that people talking about
5  S.I.D.S., if some child was 13 months old, they
6  wouldn't say you couldn't have died from S.I.D.S.
7  It would be an infant that died unexpectedly
8  without a known cause.
9      Q. All right. Let's go to your next
10 reference, please.
11     A. Well, 31 under it is a very similar kind
12 of paper, so I won't go into it. It's essentially
13 the same kind of investigation.
14     If we go further on to some other papers,
15 I think I had found some more. Yeah, if we go to
16 Page 15, for example, if you look at paper 190
17 there, again, this is a paper that was presented at
18 a Rehabilitation Engineering and Assistive
19 Technology conference, and the title is Motion
20 Measurement and Force Determination During
21 Uncontained Extensor Thrust.
22     This is actually related to the other
23 research area where we're studying the forces that
24 are generated on seats and attempting to ensure
25 those forces aren't large enough for the -- for the

Page 151

1  child to fall out.
2      And then the paper below it is also
3  related. It's in a biomedical engineering
4  conference, and it's basically talking about an
5  efficient method to identify these forces that
6  occur between the child and the wheelchair seat.
7      Q. All right. And again, we're talking about
8  children here who are not infants; correct?
9      A. Again, we didn't make that -- the method
10 that we developed would not be limited to, say,
11 three-year-olds or something. It would be any
12 human that was in there. Of course, the forces
13 would scale with the ability of the child to move
14 around --
15     Q. Right.
16     A. -- forcefully. So it's not a method
17 specifically for three or four or five years old.
18 It's a method for children in there.
19     Q. Yes.
20     A. But we didn't specifically try to target,
21 like, six-month-old kids for this.
22     Q. Yeah. This is -- and this is the
23 non-engineering common-sense mom part of me
24 thinking about it, that if you're -- if you're
25 targeting a child under a year old with a

Page 152

1  wheelchair, or you -- as you said, I think very
2  appropriately, you're really talking about a
3  stroller at that point since many children can't
4  walk at that stage, or at least don't walk.
5      I -- my last one walked on his first
6  birthday. So their -- the mobility issues are not
7  the same as you might have children with
8  disabilities or who are other abled but who are
9  older. And this would be a way for them to get
10 around without using an alt -- an adult
11 alternative.
12     That was your -- that was the thrust of
13 this research; correct?
14     A. Well, no. This is -- these are actually
15 children, a lot of this was developed for children
16 who can't walk.
17     Q. No. That's what I meant.
18     A. Yeah.
19     Q. Yeah, that's what --
20     A. Okay.
21     Q. -- I meant. But I meant for children who
22 can't walk, this was a mobility -- a mobility
23 device for them that would not put them in an adult
24 sized device that was wrong sized for them?
25     A. Yeah. That's a fair assessment. I mean,

Page 153

1   we were trying to design seating systems for young
2   children that would be wheelchairs that the
3   caregiver would push around.  So it's a seating
4   system for small children.
5       Q.  All right.  Let's go to your next
6   reference, please, with regard to expertise in
7   S.I.D.S. as it relates to juvenile products.
8       A.  I mean, I think that's it.  I mean,
9   that's --
10      Q.  Okay.
11      A.  -- a representative...
12      Q.  All right.
13      A.  That kind of points out where I've worked
14  in this area for a long time.
15      Q.  All right.  So moving on to, I think we've
16  talked about your -- the work that you've done in
17  designing products for children.
18          Have you ever specifically designed an
19  infant sleep product?  And I'm defining infant as a
20  child 12 months or under.
21      A.  Yeah, I mean, specifically designed has a
22  connotation we should clarify.  I mean, products
23  aren't designed by one person.  Right?  You're part
24  of a team.
25      Q.  Right.

Page 154

1       A.  So I've certainly generated data and
2   provided analysis that has been involved in the
3   development process for juvenile products.
4       Q.  Have you -- you are not an expert in
5   C.P.S.C. regulations regarding infant products, are
6   you?
7       A.  Yeah, I've never -- I've never really been
8   that involved with the Consumer Product Safety
9   Commission.  I'm not exactly sure what their
10  process is.  I understand it sort of generally, but
11  I don't think I'm an expert in that process.
12      Q.  Okay.  You do not have inform -- expertise
13  in infant product labeling or warnings; correct?
14      A.  That's not true.
15      Q.  Okay.
16      A.  I am an expert in warnings and labels.
17      Q.  All right.
18      A.  I mean, on this case I wasn't asked to do
19  that, but I am.
20      Q.  Okay.  So you won't be offering any
21  opinions in this case on warnings or labeling;
22  correct?
23      A.  I don't think those are any of my
24  opinions.  Except, again, I think if we looked at
25  my response to Ms. Drago, she may have, you know,

Page 155

1   made statements about the warnings in this product,
2   and I may have found contradictions between those
3   and her previous writings.
4           But I'm not -- I haven't been hired to be
5   the warnings expert on this.  I didn't have time to
6   do all that, so they hired someone else to do that.
7       Q.  You understand there is a warnings expert
8   in this case who will be giving the expert -- the
9   opinion to the jury?
10      A.  That's my understanding, yes.
11      Q.  All right.  And have you reviewed those
12  opinions?
13      A.  Not in any kind of detail.  I think I was
14  provided the report and just basically perused
15  them, but I did not study that in any meaningful
16  way.
17      Q.  Do you know which expert that is?
18      A.  No.
19      Q.  Okay.  You don't know the name?
20      A.  No.  Not off --
21      Q.  All right.
22      A.  -- the top of my head.
23      Q.  Okay.
24      A.  I mean --
25      Q.  All right.

Page 156

1       A.  -- if you told me, I would recognize it.
2       Q.  Sure.  Okay.
3           So but fair to say that you will not be
4   offering any opinions on product warning or
5   labeling to the jury other than as you've
6   described, pointing out what you think are
7   inconsistencies in Ms. Drago's testimony?
8       A.  I think that's what my role would be.  I
9   mean, if you ask me a question about it, I might
10  have an opinion, I mean.  But no, I haven't
11  pro-offered one of those opinions in my reports
12  here.
13      Q.  All right.  You have no expertise in
14  packaging of infant products; correct?
15      A.  What do you mean by "packaging"?
16      Q.  I mean by putting them in the box, putting
17  pictures on them, securing them with tape and
18  putting them on a shelf.
19      A.  I mean, I've never worked as an engineer
20  in that area, no.
21      Q.  All right.  No expertise in accident
22  reconstruction?
23      A.  No, that's not true.  I've reconstructed a
24  lot of accidents.
25      Q.  I know -- I read in some of your previous

Page 157

1    testimony, I've read a lot about you to get ready
2    for this deposition, you testified that you're an
3    expert in accident reconstruction because I think
4    around 30 years ago you worked in an automobile
5    crash testing site in Detroit.
6        A.  Oh, that's not the reason that I'm a
7    reconstruction expert.  But I did do that, yes, I
8    worked in automobile crash testing.
9        Q.  Okay.  What else is your accident
10   reconstruction expertise?  And I'm not talking
11   about automobiles, but general accident
12   reconstruction.
13       A.  Oh, well, one area that I could speak for
14   hours on is the Segway.  I've been asked to
15   investigate numerous accidents with the Segway
16   that -- you know, the transportation device.
17       Q.  Right.
18       A.  And as part of the -- my efforts in that
19   matter, I studied all manner of accidents, accident
20   videos, developed complex simulations of those
21   devices.  And I'll use those simulations to induce
22   a wheel slip.
23           Suppose that you're going on a Segway and
24   you go over sand and one wheel will slip, and
25   I'll -- my simulations will predict what the Segway

Page 158

1    does, how it tips forward and turns sideways.  And
2    those simulations have been used to re-enact
3    accidents that people have had.
4            My simulations of the Segway also allow
5    you to simulate running into the obstacle.  So I've
6    done that both simulation, I've also physically
7    conducted a number of tests on the Segway where
8    I'll run it over different obstacles and measure
9    what it does.
10           At Georgia Tech I have a room filled with
11   very high precision cameras that can track you down
12   to a millimeter a thousand times a second.  So
13   we've gone into that room and we've essentially
14   reconstructed Segway accidents before by putting --
15   arranging obstacles in the same way that occurred
16   in an accident, and we'll run them through there
17   and measure what happens.
18           I've done accident reconstruction on
19   Segway tours where I've gone to the tour site where
20   somebody has hit a root, for example, and I'll
21   reconstruct that accident.  I've reconstructed
22   crane accidents.
23       Q.  Maybe this will narrow it down.  Have you
24   done any accident reconstruction involving infant
25   products?

Page 159

1        A.  No.  I don't think I've reconstructed an
2    infant accident before.
3        Q.  All right.  You do -- I noticed that you
4    do not have a law degree?
5        A.  No.
6        Q.  You will not be offering legal opinions;
7    correct?
8        A.  I hope not.
9        Q.  Some of the -- some of these are -- some
10   of these are pro forma questions, Doctor.  So they
11   don't -- I think you've been deposed enough
12   probably to have heard some of them before.
13           I'd like you to tell us -- well, let me --
14   let me get one other, one other.  Any expertise in
15   marketing of infant products?
16       A.  No.
17       Q.  All right.  Tell us, and I'm asking you a
18   general question, what are your criticisms of the
19   BHL58 Rock 'n Play sleeper, which is the sleeper at
20   issue in this case?
21       MR. OSBORNE:  Form.
22       THE WITNESS:  My criticisms of it?
23   Well, I mean --
24   BY MS. LOVETT:
25       Q.  Do you have any criticisms of it?

Page 160

1        A.  Yes.  And they're documented in these two
2    reports.
3        MR. OSBORNE:  Object to form.
4    BY MS. LOVETT:
5        Q.  I understand.  So Doctor, this is -- this
6    is where you can't just tell me to go read the
7    report, because I have, both of them many times.
8    So I want to hear your criticisms on the record and
9    have a dialogue with you about them in your -- in
10   your words.
11           Because the jury will not see your reports
12   and will not be reading your reports.  They're not
13   admissible before the jury.  So I'd like to hear
14   you tell me like you're going to tell the jury what
15   your criticisms are.
16       MR. OSBORNE:  Form.  And I object to
17   the colliloquy [sic].  Dr. Singhose is
18   here to answer questions, not be
19   instructed on how to answer them.
20       MS. LOVETT:  Did you -- did you say
21   colloquy?
22       MR. OSBORNE:  Go ahead.
23       MS. LOVETT:  Sorry.  It's one of my
24   favorite words.  I just didn't -- I just
25   was happy to hear it.

1  BY MS. LOVETT:
2  Q.  Go ahead.
3  A.  I'm not sure I understand how I'm supposed
4  to answer the question.  Because my understanding
5  of being to trial, and maybe I haven't been to
6  trial as many times as you, certainly I haven't, is
7  that I get asked questions and I answer questions.
8  So how I -- you're asking me how I
9  would -- how I would tell the juries about this.  I
10  think I would have to tell the jury about this in
11  response to questions.
12  Q.  Okay.  So I'm asking you the question,
13  what are the criticisms that you have of the
14  BL58 [sic] Rock 'n Play sleeper?
15  A.  Okay.  Again, I'm just prefacing this with
16  my criticisms --
17  MR. OSBORNE:  Form.
18  THE WITNESS:  -- are in these two
19  reports.  But from the top of my head, I
20  will start making that list for you.
21  BY MS. LOVETT:
22  Q.  All right.
23  A.  One of my -- and just I'm focusing on the
24  product now, not just the design, not the design
25  process, which I also have opinions on --

1  Q.  Yes.
2  A.  -- but just the product itself.
3  One of the criticisms is that, and this is
4  maybe the most important one, is that when the
5  infant gets turned over into the prone position, it
6  traps them in that position in the sense it's very
7  difficult to get out of it.  And while they're in
8  that position, their face is directed towards
9  non-breathable fabric.
10  Q.  All right.  Any other criticisms of the
11  product itself?
12  A.  Sure.  When they're face down in that
13  product, because of the shape of it, because of
14  these steep side walls, their arms, the infant's
15  arms can be trapped either to their sides or under
16  their body.  And that makes it very difficult for
17  them to lift their head out of the fabric.
18  Children will normally be able to lift
19  their head up at an early age, at just a couple of
20  months, but they put their hands up in front of
21  them to do that, and they kind of do a little
22  push-up, a little baby push-up.  It's more of a
23  sort of a back arch.  But because their arms can be
24  trapped to the sides in this device, they're not --
25  they can't bring their arms forward into that

1  position.
2  Related to that is that babies will try to
3  move and turn over using their feet.  And again,
4  given the geometry of this device, when the baby's
5  face down in it, their feet are often pointing up
6  in the air behind them.
7  Because their knees only bend -- and
8  babies' knees only bend in one direction,
9  backwards.  And so when they're face down in this,
10  their knees get bent up and their feet are sticking
11  up in the air.
12  And so you'll see these babies kicking
13  around trying to move, but they're not hitting any
14  surface.  They can't push off of stuff at -- in
15  that configuration.  So again, that is part of this
16  trapping process where the -- basically, it's the
17  geometry of this device.
18  Another geometry of the device is that,
19  when their face is down in this, it conforms, that
20  is, it wraps around their face.  It's not a flat
21  surface.  It's these two angled surfaces.  So those
22  are sort of the criticisms of the device when the
23  child is in the prone position.
24  Q.  All right.
25  A.  That probably is a complete list, but I

1  might have missed one.  The other criticisms I have
2  is that, when you put this -- when you put a baby
3  in this device on their back --
4  Q.  Uh-huh.
5  A.  -- like you should, it doesn't stop the
6  baby from rolling over.  So given that the rolling
7  over or prone position is obviously very, very
8  dangerous, this device should, if they're going to
9  have this device, it should really not allow babies
10  to roll over but, in fact, it does.
11  And there are several aspects of the
12  design that facilitate the baby turning over.  One
13  is the incline slope.  Basically, because it's
14  inclined, it's a little bit easier for the baby to
15  roll over as opposed to -- if the Rock 'n Play had
16  just a flat surface instead of a 30 degree incline,
17  it would actually be harder for the baby to roll
18  over.
19  The other problem with it is that it has
20  the foot plate.  The foot plate is at an angle of
21  about 65 to 70 degrees relative to the baby's body.
22  And that means it's a really good platform for them
23  to push off.  They can push off with their feet
24  with a lot of force.
25  And because they have that surface to push

Page 165

1  off with and they're squirming around and moving
2  how babies do, they're able to create torques,
3  because they're unequal forces, they're able to
4  create torques that rotate their body.
5      Another problem with that foot plate is
6  that, even if the restraint was used, put around
7  the belt, that foot plate allows the baby to push
8  their hips up and out of that restraint.
9      And that's how we're -- these incident
10 reports are explaining that, you know, the
11 restrained infants themselves are pushing up and
12 out the top.  In fact, Fisher-Price had to put a
13 head blocker at the top to try to stop that
14 behavior of the baby pushing up and sliding up.
15     Another problem with this is that the
16 restraint is easily not used.  It's a -- it's a
17 flexible, a fat piece of fabric in that it just
18 lays down flat in the bottom of the Rock 'n Play.
19 So a parent can very easily just put their child in
20 there and it goes on top of the restraint.
21     You know, an alternate to that would be
22 sort of like the high chairs that we have at our
23 house where you have to slide the baby's legs in.
24 There's no way to not use the restraint around the
25 belly.

Page 166

1      So those are -- those are some of them.
2  I'm not sure that's a complete list, but I think
3  that's pretty representative.
4      Q.  All right.  And you also said you had --
5  and we're going to come back to each of those in
6  detail as you would expect.  You also said that you
7  had some criticisms of the design process of the
8  Rock 'n Play.
9      Why don't you walk me through those in
10 general, please?
11     A.  Okay.  In general, without consulting my
12 reports here, off the top of my head, I'm
13 designing a -- I've been on these teams, so you get
14 all these different things.  I know what kind of
15 discussions go on and what kind of processes
16 usually you go through.
17     They're proposing a product that is, quite
18 frankly, deviating from a long period of products
19 in its domain.  Like, there's decades of
20 development in children's sleeping products, and
21 they're deviating from this in a couple of
22 important ways.
23     They're putting this angle in there of 30
24 degrees, and they're putting in a restraint in
25 around the waist.  And they're putting this foot

Page 167

1  blocker in -- or I'm sorry, the foot plate and the
2  head blocker.  So they're adding quite a bit of new
3  features to an otherwise existing let's call it
4  flat bassinet.
5      Given those number of new features, they
6  know that they're introducing possibilities of new
7  kinds of hazards, or they're making existing
8  hazards more prevalent, or the probability goes up
9  of those hazards being -- occurring.
10     And so one of those things they certainly
11 know -- knew was that babies getting in the prone
12 position was a very dangerous thing.  They appear
13 not to have really considered that much in their
14 design process.
15     There are these hazard meetings that they
16 had.  I don't see any record of them saying this is
17 really an important hazard, the baby getting turned
18 over in this, so what are we going to do about it.
19 And in fact, there seems to be testimony that they
20 just very -- considered it very little.
21     The other thing that they didn't do in the
22 design process was apply their own quality safety
23 operating procedures.  For example, the fabric,
24 they have these procedures in place at Fisher-Price
25 that says, if a baby's face can get near this

Page 168

1  fabric, can be pressed into it, then that fabric
2  needs to be breathable.  And they, I don't know if
3  they ignored it or didn't know about it, but they
4  didn't integrate that procedure into the design of
5  this product.
6      And then, again, during the design
7  process, especially of a product of this nature,
8  you should have extend -- you should have
9  extensively tested it, because you have multiple
10 new features in it.
11     And the amount of testing that they did
12 was very, very small.  And additionally, in
13 addition to it being a small amount of testing,
14 they just didn't test for known hazards.
15     They knew these hazards exist, and they
16 didn't set up tests to test for them.  And they
17 didn't even ask, for example, the in-home users
18 whether these hazards appeared or they thought
19 these hazards might appear.
20     So that's some of -- I think that's a good
21 representation of my criticisms of the design
22 process.
23     Q.  All right.  Now, if we turn to your
24 report, which is Exhibit 2 -- oh, sorry, Exhibit 3,
25 your April 2, 2021 report, and if you'll -- I'm

1   going to orient us by paragraph rather than page
2   number. But I can do that difficulty --
3   differently if you prefer.
4       Page 34 of your report -- or Page 30 --
5   Paragraph 34 of your report, which is on Pages 11
6   and 12, you discuss certain issues in Paragraph 34
7   pertaining to the incline angle of incline
8   sleepers; correct?
9       A. Yes.
10      Q. And you tell us that the two main -- you
11  say the two main features were added to secure the
12  sleeping infant. That would be the seat bite -- I
13  think you meant -- that may be a typo.
14      A. B-I-G-H-T would be one --
15      Q. Yeah.
16      A. -- way of spelling it.
17      Q. Yes. Okay.
18      A. I saw the B-I-T-E in somebody's depo, and
19  so I actually just adopted that. But it --
20      Q. It --
21      A. -- quite frankly, you could use either
22  one. It sounds the same.
23      Q. Homonyms are fine.
24      A. But yeah.
25      Q. Yes. All right. So it's the seat bight,

1   B-I-T-E or B-I-G-H-T?
2       A. B-I-G-T-H [sic] is probably the one that's
3   used the most for that feature.
4       Q. All right. And then the belt restraint
5   was the other feature, main feature that was added
6   that you reference in Paragraph 34; correct?
7       A. Let's see. Yes. I think I -- I mean,
8   this whole section I think I mentioned four. We
9   just -- I actually mentioned there was four
10  features, but this part I start out with the two
11  what I'll call the main ones.
12      Q. Right. These are the main features that
13  were added. So if you -- I believe this goes to
14  the issue that you raised earlier. The issue that
15  you had with the seat bight is that it provides a
16  platform for the infant to push off, as you were
17  describing in your general description of your
18  opinions; is that right?
19      A. Yes. That's correct.
20      Q. In Paragraph 37, you say:
21      "The result of unequal forces is
22      that the infant would be propelled not
23      only upward, but would also be
24      subjected to movements that would
25      cause the infant to turn toward the

1       side of the sleeper and also to roll
2       onto their stomachs."
3       Are you saying that, here that the infants
4   can push off the seat bight and roll over in the
5   Rock 'n Play?
6       A. Yes.
7       Q. And have you seen an infant do this?
8       A. Yes.
9       Q. Where?
10      A. One of the infants that I placed in this,
11  I placed them on their side and I just watched them
12  wriggle around for a couple of minutes. And they
13  were pushing with their feet a lot.
14      And it turns out that this baby was kind
15  of missing with one foot a lot and just kicking
16  randomly. And because they were missing with one
17  foot, they tend to sort of pulse themselves around
18  with the one that was getting good traction, and
19  they rolled all the way over.
20      I also saw similar behavior in the videos
21  that were presented by Exponent.
22      Q. Okay. Did you take any videos of the work
23  that you did with the children?
24      A. No. I just put them in there for very
25  short periods of time to, you know, assess the

1   design relative to a few babies.
2       Q. How did you locate subjects for your, I'll
3   call it your study if that's an okay word --
4       A. Sure.
5       Q. -- for me to use?
6       A. Sure. You can say study. I mean, it's
7   just a, you know, a design evaluation.
8       Q. Design eval -- let's call it design
9   evaluation.
10      A. Right.
11      Q. (Inaudible).
12      A. So if we look at -- if we look at Page
13  13 -- we're on Page 13; right?
14      Q. Yes.
15      A. And we were talking about Page [sic] 37.
16  At the top of that is a -- is a picture of one of
17  these infants at Figure 5.
18      Q. Yes. I have it.
19      A. That's the cutest baby in my report. And
20  that's Nicholas James Singhose.
21      Q. That is your baby?
22      A. Which is my baby.
23      Q. Now, he's 22 months old now. How --
24      A. He --
25      Q. He is adorable, I will tell you.

Page 173

1    A.  He was -- he was right at four -- he was
2    between four and five.  I have it written down, but
3    I think he was just before his five months.
4    Q.  Okay.
5    A.  He was four months and something.
6    Q.  All right.
7    A.  Yeah.
8    Q.  And at this point -- so he is really
9    adorable.  You're distracting me.  At this point
10   was Nicholas able to roll over?
11   A.  Yeah.  He was able to roll over on a flat
12   surface at about one month before this.
13   Q.  All right.
14   A.  I did coach him a lot.  I must admit that.
15   And I actually have his first roll-over captured in
16   pictures, because I could see he was getting close.
17   Q.  Right.
18   A.  And so on a flat surface, he could raise
19   his knees up to his -- towards his chest, and then
20   he would just wobble and he would fall over to the
21   side.  And that's how he did his first turn.
22   He's one of the babies that learned to
23   turn from laying on their back to their face
24   earlier than he did from his face.  He didn't like
25   being on his face, and he just would -- he would

Page 174

1    just cry and not do that.  So he did not learn to
2    turn from face to back until after he learned to go
3    from back to face.
4    Q.  All right.  So in this picture -- so
5    you're showing that here infant pushing off seat
6    bight with their feet.  And that's cute, adorable
7    Nicholas pushing with his feet.  I -- from what I
8    can see, he's not restrained in the system at this
9    time.
10   Is that right?
11   A.  That's right.  He did -- I did not put the
12   restraint on him there.
13   Q.  And what specific videos or -- and perhaps
14   you can direct me in your report to the reference,
15   but what specific videos from the studies of our
16   experts did you -- did you see infants replicating
17   the behavior that you tell us you observed with
18   your son here?
19   A.  Those would be two classes that I saw.
20   One is the Exponent videos.  And Exponent, they
21   took all their videos, and as I understand it, they
22   spliced them into three separate videos.
23   One video they put a collection of what
24   they would call non-rolling infants.  And then they
25   had a -- that was, you know, 40 or 50 minutes of

Page 175

1    clips.
2    And then they had another video that was,
3    I think they called it something like partial
4    rollers.  And so you start seeing that behavior in
5    those videos.
6    But certainly the third one, which they
7    said here are the rolling infants, so there's
8    actually video showing these infants squirming
9    around in various ways and rolling over from supine
10   to prone, or from let's just call it back to front.
11   Q.  Have you seen an infant roll over or push
12   up as you're describing here in Figure 5 when
13   restrained by the sys -- by the belt system as
14   intended?
15   A.  I've never seen them roll over when the
16   belt was on them fully.  I just saw them wiggling
17   around and turning and twisting.  But I only have
18   sort of short duration videos of those tests.  So I
19   don't have anything that's, like, here's a baby for
20   ten hours wiggling around in the restraint.
21   We know it happens from the -- for
22   example, from the incident reports tell us that
23   that does happen.  But it requires apparently long
24   duration testing, which wasn't done.
25   Q.  Well, let's break that down.  What --

Page 176

1    you're aware that Fisher-Price tested these
2    products with their own employees in their
3    employees' homes for long durations?
4    A.  I mean, I'm aware of some in-home testing
5    that involved employees, yes.  And I think that
6    they could have used them overnight, yes.  Is that
7    what you're referring to?
8    Q.  Yes.
9    A.  Yes.
10   Q.  I just -- because you made the statement
11   that no long duration testing was done.  Would you
12   agree with me that overnight is long duration
13   testing?
14   A.  I mean, in some sense it's long duration.
15   It's one incident of long duration, right, that one
16   test of ten hours.  There's not a long duration in
17   terms of we're testing this for ten million
18   infinite weeks of use, which is what would be
19   expected sort of in sort of one year of use of
20   this.
21   But you asked me a question, I thought,
22   about do I have videos of that.  I don't have
23   videos of that in-home testing.
24   Q.  No.
25   A.  That's what your question was.

Page 177

1     Q.  Right.
2     Q.  Correct?
3     Q.  No.  My question was directed at
4  whether -- I was actually responding to something
5  that you said about the -- that long duration
6  testing was not done by Fisher-Price.
7        That's not a correct statement, is it?
8     A.  They didn't do long duration testing
9  that's videoed.
10    Q.  Right.
11    A.  Okay.  That's what I thought I was
12  answering.
13    Q.  Okay.
14    A.  And they did long duration in the sense
15  that they did loan this out to people who
16  apparently had some babies sleep in it overnight.
17    Q.  Yes.
18    A.  Each one of those incidents is long
19  duration, I'll say.  If your baby was in it for ten
20  hours, I'll call that a long duration test.
21    Q.  Sure.  Starting with Fisher-Price's own
22  employees?
23    A.  Yes.
24    Q.  All right.
25    A.  I think that's how they started.

Page 178

1     Q.  I think you read maybe Mr. Steinwachs had
2  nine grandchildren that slept in the Rock 'n Play.
3  I think he had one that was not -- had aged out
4  before it was on the market.
5        Do you recall that testimony?
6     A.  I do recall him testifying to that.
7     Q.  All right.  So have you -- you say, you
8  talk about then, you go on to talk about the third
9  restraint.  You told me there were four.  And then
10  you say that the fourth -- the third restraint in
11  the product is the head dam, which is designed to
12  keep the infant in the product and prevent pushing
13  out.
14        I think you referenced that earlier when
15  you said Fisher-Price put something up here above
16  the head.  Is that the third restraint to which --
17    A.  Yeah, I think --
18    Q.  -- you refer?
19    A.  -- that's what I called the third
20  restraint in there.
21    Q.  Okay.  And then in Paragraph 39, you note
22  that the fourth restraint is keeping the infant
23  secure, which you call steep and high side walls.
24    A.  Yes, that's the -- what I call the fourth
25  restraint, keeping them from falling out sideways,

Page 179

1  basically, as they're wiggling around.
2     Q.  Okay.  So when you look at those four
3  things, and we're talking about the seat belt, the
4  belt restraint, the head dam and the fourth
5  restraint, you say none of these four restraints
6  prevent an infant from rolling onto -- over onto
7  their stomachs.
8     A.  Yeah.  That's correct.
9     Q.  All right.  But you --
10    A.  (Inaudible).
11    Q.  Go ahead.
12    A.  We know that -- we know that babies roll
13  over in this, so we know that they don't work all
14  the time.
15    Q.  You told me you've never seen a restrained
16  baby roll over in this.
17    A.  You know, I think the videos that I --
18  again, I don't have very many videos of restrained
19  babies wiggling around in this for a long duration.
20  So I don't recall a video that showed a restrained
21  baby pushing up the slope that they -- the way they
22  can, getting their hips above and then kind of
23  rotating out.  I don't think I have a video of
24  that.
25    Q.  Did you restrain Nicholas and see if he

Page 180

1  could roll in it?
2     A.  He didn't like this at all.  And I tried
3  to restrain him and he just started crying.  So he
4  was restrained only for a couple of minutes.
5     Q.  Okay.  So but while -- but he was rolling
6  over at this point, but while restrained he did
7  not, you did not observe him roll over either?
8     A.  Right.  I mean, I had him in the restraint
9  for, like, two minutes.
10    Q.  Okay.  You --
11        THE VIDEOGRAPHER:  Excuse me.  Your
12  paper is on the mike.
13        MS. LOVETT:  I'm sorry.
14  BY MS. LOVETT:
15    Q.  You have not observed any infant at any
16  time properly restrained in the device used as
17  intended roll over, you in your personal experience
18  as an expert in this case?
19    A.  I mean, you threw -- you threw a lot of
20  words in there and you said "used as intended."
21  It's pretty clear that a lot of parents, a lot of
22  caregivers use this without the restraint.
23        So to the extent that you're saying that's
24  not an intended use --
25    Q.  Yes.

1    A.  -- let's just make that definition, no, I
2  haven't seen a baby that was restrained in there.
3  I haven't, I just haven't seen many babies
4  restrained in there for very long periods of time.
5  So no, I have not seen that.
6    Q.  All right.  Let's go to -- is it your
7  position that, based on what you have seen, the
8  restraint system does inhibit rolling over in the
9  product?
10    A.  Yes.  From what I've seen, the restraint
11  definitely provides some restraint to rolling over.
12  They have to -- they'll have to sort of wiggle out
13  of it to some degree before they can roll over.  If
14  it's cinched down tight, I don't think they're
15  going anywhere.
16    Q.  Right.  I think --
17    A.  Yeah.
18    Q.  Yeah, if it's cinched down tight, they're
19  definitely not moving anywhere.
20    A.  Yeah.
21    Q.  You're not suggesting that the restraint
22  system only prevents rolling from the prone to
23  supine -- from the prone to supine and not the
24  other way around, are you?
25    A.  I don't understand the question.

1    MR. OSBORNE:  Form.
2  BY MS. LOVETT:
3    Q.  Yeah.  Well, so no reasonable parent would
4  place an infant in the product prone and then
5  restrain the baby; right?
6    A.  I wouldn't call that a reasonable parent.
7    Q.  Okay.  So before we get to the next
8  section of the report, I want to talk about sort of
9  the intended use.  Because that -- we were starting
10  down that road.
11    MS. LOVETT:  So let's get to Tab 10,
12  please.
13  BY MS. LOVETT:
14    Q.  Dr. Singhose, I'm -- this is going to be
15  Exhibit 5 to your deposition.
16      (Whereupon, Defendant's
17      Exhibit 5 was marked for
18      identification.)
19  BY MS. LOVETT:
20    Q.  I know you've seen this before.  This is
21  the BHL58 R.N.P.S. warning label.  This is the
22  warning label that was on the Rock 'n Play involved
23  in this case.
24      Did you consider this in rendering your
25  opinions in this case?

1    A.  Yes.
2    MR. OSBORNE:  I don't see an Exhibit
3  5 in my list here of marked exhibits.
4    MR. HERMAN:  It's coming in, John.
5    MS. LOVETT:  It should pop up any
6  second.  It's the warning label.
7    MR. OSBORNE:  So let me take a look
8  at it before we answer that question,
9  then.
10    MS. LOVETT:  It's the warning label.
11    MR. OSBORNE:  There's a delay and --
12    MS. LOVETT:  Yeah, it's the warning
13  label.
14    MR. OSBORNE:  -- it hasn't come in
15  yet.
16    MS. LOVETT:  Yeah.  It's just the
17  warning label.
18    MR. OSBORNE:  Then please proceed.
19    MS. LOVETT:  Thank you.  All right.
20    MR. OSBORNE:  I have it now.
21    MS. LOVETT:  Okay.
22  BY MS. LOVETT:
23    Q.  You see at the very top -- and I'm reading
24  you the English -- the English version, although we
25  can see the Spanish version corresponding on the

1  right.  At the very top, it says:
2      "Always use the restraint system."
3      Do you see that?
4    A.  Yes, I do.
5    Q.  And you see in the -- the international
6  symbol for warning there, the exclamation point in
7  the triangle, it says:
8      "Failure to follow these warnings
9      and the instructions could result in
10      serious injury or death."
11      Do you see that?
12    A.  Yes.
13    Q.  And you see that the very first
14  instruction is:
15      "Always use the restraint system."
16      Correct?
17    A.  Yes, I see that.
18    Q.  So the intended use for the product was
19  that the baby be used with the crotch restraint --
20  the product be used with the crotch restraint?
21  Sorry.
22    A.  I mean, I think that's a desired way of
23  using it.  I think the intended use, what I call
24  the intended use is long duration sleeping.  That's
25  what they intended this for.

Page 185

1    So from my perspective and my analysis in
2  this case, the intention of this device is to put a
3  baby in there and have them sleep for ten or 12
4  hours.  That's the intended use.
5    Q.  Right.  That's an -- it's an unequivocal
6  instruction, though, "always use the restraint"?
7    A.  Yeah.  I mean, I'm reading the words, and
8  it says "always," and it's even capitalized.
9    Q.  Yeah, in all caps "always"?
10   A.  And it says:
11    "Always use the restraint system."
12  Yeah, I see that.
13   Q.  Okay.  And you would also agree with me
14  that the warning system says in all caps:
15    "Do not," those are the all caps
16    words, "use this product when the
17    infant begins to push up on hands and
18    knees, can pull up or sit unassisted
19    or has reached 25 pounds, whichever
20    comes first."
21    Correct?
22   A.  Yes.  I think you read that correctly.
23   Q.  All right.  According -- so according to
24  the intended use, if an infant has reached any of
25  these developmental mind -- milestones, they should

Page 186

1  not even be in this product; true?
2    A.  I mean, I think this is --
3    MR. OSBORNE:  Form.
4    THE WITNESS:  I think this is the
5  warning.  The intended use, as I said, is
6  overnight sleep.  I think this is a
7  warning saying you shouldn't use this --
8  "when the infant begins to push up on
9  their hands and knees."
10   I mean, I'm really not sure what that
11  means.  And "can pull up or sit
12  unassisted," I'm not exactly sure what
13  that means.  "Or has reached 25 pounds."
14  I understand that one.
15  BY MS. LOVETT:
16   Q.  All right.
17   A.  If your baby is 25 -- over 25 pounds,
18  don't put it in here.  I understand that one
19  perfectly well.
20   Q.  Okay.  So you understand what pulling up
21  is?  I'm sure you've seen some of that recently.
22   A.  Yeah.
23    MR. OSBORNE:  Form.
24    THE WITNESS:  But I -- I mean, I
25  understand "pull up."  I, you know, I do

Page 187

1  pull-ups as an exercise, and I see babies
2  pulling up on stuff.
3    What I'm not sure here is whether
4  this warning means when your baby is,
5  like, going around your house, can they
6  pull themselves up on the edge of the
7  couch.
8  BY MS. LOVETT:
9    Q.  Yes.
10   A.  Or does it mean that, when the baby's in
11  here, can they, I mean, can they reach across their
12  body and grab this deep side wall and pull up
13  there.  It might mean that.
14   Q.  All right.
15   A.  And that's the same problem I have with
16  not quite understanding -- oh, and "sit up
17  unassisted," again, does that mean -- we talked
18  about this before.  Does "sit unassisted" mean that
19  the baby can be lying in this device and sit up on
20  their own or would you -- would the parent sit them
21  up and they could stay there?
22    And then I also have some uncertainty with
23  the "hands and knees."  Is that on the flat surface
24  or is that in this product or something?  So I
25  didn't study these warnings in great detail.

Page 188

1    Q.  Right.  No.
2    A.  I'm just saying that --
3    Q.  I'm just asking your -- yeah.
4    A.  -- I don't quite understand that part of
5  it.  I do understand the "25 pounds" part.
6    Q.  All right.  If you -- if we look at it
7  further down, it says:
8    [As read]  "To reduce the risk of
9    Sudden Infant Death Syndrome," and it
10    has the parenthetical there for
11    S.I.D.S., "pediatricians recommend
12    healthy infants be placed on their
13    backs to sleep unless otherwise
14    advised by their physician -- by your
15    physician."
16    Do you see that?
17   A.  Yes.
18   Q.  So absent an instruction by the physician,
19  and there may be reasons for this, no parent
20  according to the intended use of this product
21  should put their infant in the Rock 'n Play sleeper
22  prone or on his or her side; correct?
23   A.  Yeah.  I mean, again, I think if you're
24  trying to put your baby to sleep for ten or 12
25  hours, it should definitely be on their back.

Page 189

1    Q.  All right.  And in the restraint?
2    A.  Yeah.  I mean, that's what this warning
3    label says.  It says, "always use the restraint."
4    Q.  All right.  So I want to talk about the
5    section of your report called Infant Rolling.
6    A.  Okay.
7    Q.  So you told me about precious Nicholas.
8    What is his big brother's name?
9    A.  Oliver Yung.  Oliver Yung Singhose.
10    Q.  Okay.  That's equally cute and
11    distracting.  I'm going to show you pictures of my
12    kids on a break, but they're all very large men.
13       Okay.  So starting with your -- we've
14    talked about when -- the milestones.  So Nicholas
15    was around four months old.  He was rolling over on
16    a flat surface at that time.
17       What about his big brother, did -- was
18    there variance there?  When did -- when did Oliver
19    start rolling over?
20    A.  He started rolling over actually later.
21    He wasn't -- he never learned to crawl really.  He
22    didn't want to roll.  From the time he was two
23    months old, he wanted to stand and walk, and that's
24    all he would do.  So he was a late crawler and a
25    late roller.  He just insisted on trying to walk

Page 190

1    everywhere.
2    Q.  There are big expectations on him,
3    Dr. Singhose.  And I'm sure you -- I'm sure you
4    realize this as we go along.
5       So in Paragraph 44, you say in your
6    report:
7       "One method that infants use to
8       achieve prone to supine rolling is to
9       push upwards with both arms like a
10       push-up."
11       Do you see that?
12    A.  Yes.
13    Q.  And we agreed earlier, on the warning
14    label the product instructed the parents to stop
15    using the product if the infant can push up on
16    hands or knees; correct?
17    A.  Yes.
18    Q.  And then you seem to cite this Mom
19    Junction article on the -- as in support for the --
20    how to teach your -- tips to teach your baby to
21    roll over?
22    A.  Yeah.  This was just an example of -- just
23    to -- it's hard to describe this in words so.
24    Q.  Yeah.  No.
25    A.  So in case you wanted to kind of clarify

Page 191

1    what I was talking about, you could just jump to
2    that Web site and look at it.
3    Q.  No.  I have a feeling you've been to this
4    Web site on your own before.
5    A.  Yeah.
6    Q.  Let's mark this as Exhibit 6 to your
7    deposition, please.
8            (Whereupon, Defendant's
9            Exhibit 6 was marked for
10            identification.)
11    BY MS. LOVETT:
12    Q.  So this is -- this is not your average
13    mommy blog.  This is -- this is actually one
14    medically reviewed by someone named Dr. Nicolina
15    Zdraveska, Ph.D., M.D. and Paed.
16       Do you see that?  I'm reading her
17    credentials from the face page of Exhibit 6.
18    A.  Yes.
19    Q.  Is this a Web site that you and your wife
20    found or one of you found?
21    A.  I don't remember the source of this, but
22    it's very likely that my wife found this.
23    Q.  Yes.
24    A.  She sends me a lot of baby Web sites.
25    Q.  Yes.  Well, and so this -- and this one is

Page 192

1    almost a peer reviewed one.  So let's look at Page
2    5.  There's a section there -- there are 15 pages
3    to this exhibit.  Page 5, there's a section that
4    says, she says:
5       "How will your baby learn rolling
6       over?"
7       Do you see that?
8    A.  Yes.
9    Q.  And it discusses developmental milestones
10    for each month leading up to the rolling over.  So
11    here doctor -- double Dr. Zdraveska reviewed
12    article says, at one month, it can raise the head
13    for a moment, going all the way through to the
14    motions that lead to that.
15       So for example, at three months, it says:
16       "Can bear little weight while
17       standing on both the legs."
18       And you've seen that with your children;
19    right?
20    A.  Yes.
21    Q.  "Can raise head and shoulders for
22       45 to 90 degrees while lying on the
23       belly."
24       And you've seen that with both of your own
25    children; right?

Page 193

1    A.  Head and shoulders to 90 degrees?  I don't
2  recall seeing that.  That's a pretty steep rise.
3  But certainly at three to four months they were
4  raising their heads and shoulders.
5    Q.  Okay.
6    A.  I can't verify these degrees.
7    Q.  Sure.  It also says at three months the
8  baby can carry weight on the forearms; correct?
9    A.  Yep.  That's what it says.
10    Q.  And this, and again, this is something
11  that you provided to us in your report.  By four
12  months, you'd expect your baby to have good head
13  control.  Do you see that?
14    A.  Yes.
15    Q.  Can carry up to a certain weight when held
16  upright on the legs?
17    A.  Yes.
18    Q.  Again, can raise head and chest to 90
19  degrees?
20    A.  Yep.  I see that.
21    Q.  And then here you may start to see some
22  babies rolling from back to side.  Do you see that?
23    A.  Yes.
24    Q.  By five months, the baby can hold the head
25  up while sitting and roll from belly to back;

Page 194

1  right?
2    A.  Yes, I see that.
3    Q.  We're not -- so and I'm going to tell you
4  that, when we're talking to the jury, we're
5  probably going to use belly to back more than prone
6  and supine, but --
7    A.  Sure.
8    Q.  -- I know you're interchangeably versed in
9  those words.
10      At six months, a baby can raise the chest
11  and a part of the belly while lying on the stomach,
12  can lift the head while in a sitting position, and
13  rolls over from back to belly; is that right?
14    A.  Yeah.  I think you read those correctly.
15    Q.  Okay.  So we're seeing that, at two
16  months, some babies can hold their head up and
17  begin to push up while lying on their tummy.
18  That's what some moms call "tummy time," right, why
19  you encourage tummy time; right?
20      THE WITNESS:  Actually, dads call it
21    that --
22      MR. OSBORNE:  Form.
23      THE WITNESS:  Dads call it that, too.
24  BY MS. LOVETT:
25    Q.  That was sexist of me.  Dads call it tummy

Page 195

1  time, too.
2      So at two months you, I'm sure with Oliver
3  and definitely with Nicholas, were encouraging
4  tummy time; right?
5    A.  Yes.  We had to do a lot of tummy time
6  with Oliver, because he had the flattening of the
7  back of his head.
8    Q.  Mine, too.  We didn't have a 3D printed
9  helmet for it, though.  But he's 16.  He turned out
10  okay.
11      Agree that this is a developmental
12  milestone, that -- do you agree that that
13  milestone, once exhibited, beginning to push up
14  should signal a parent to stop using the
15  Rock 'n Play sleeper at the time they start seeing
16  any of the milestones such as pushing up or rolling
17  over?
18    A.  That's not really how I was interpreting
19  the warning label.  I mean, this is at two months
20  old.
21    Q.  Right.
22    A.  I think that this, what they're talking
23  about at two months old is sort of the
24  beginnings --
25    Q.  Right.

Page 196

1    A.  -- of this.
2    Q.  Zoey was -- Zoey was -- do you know how
3  old Zoey was when she --
4    A.  Eight months.
5    Q.  -- passed away?
6      She was eight months and 20 days; right?
7    A.  (Whereupon, there was no audible response
8  by the deponent.)
9    Q.  She was -- she was far past these
10  milestones based on the records you've reviewed;
11  correct?
12      MR. OSBORNE:  Form and foundation.
13      THE WITNESS:  I mean, I think she was
14  well past the two-month ones.  Yeah, when
15  we get into these things like 90 degrees,
16  since I'm an engineer, I'd like to see
17  that.
18  BY MS. LOVETT:
19    Q.  Right.
20    A.  That seems like a really steep angle now
21  that I think about it.
22    Q.  Sure.
23    A.  But certainly she was -- she was past a
24  lot of these milestones.
25    Q.  The hardest roll is the from back to

Page 197

1   belly, that's the most difficult roll; right?
2       A.  Not really.  It depends on the baby.  Like
3   I said, my son actually did that roll first.  In
4   certain populations, they've actually studied this,
5   for example, like in Singapore --
6       Q.  Right.
7       A.  -- babies roll from back to front before
8   front to back.  And I think it's just --
9       Q.  Cultural?
10      A.  -- yeah, cultural, how -- what you're
11  doing with your baby, what you're expecting them to
12  do.  But I think a lot of babies learn to roll from
13  front to back first, because they just push up and
14  they just fall over accidentally.
15      Q.  Right.  So and that's kind of the -- and
16  that's the -- I think the -- you just explained
17  this for me perfectly.  The sequence is you push
18  up, then you roll?
19      A.  Yeah.  You push up, and then they just
20  fall over to one side.
21      Q.  Right.  It's not a -- it's not a full
22  roll, it's sort of a default roll, but it comes
23  from the action of pushing up; right?
24      A.  That's right.
25      Q.  Pushing up on their arms?

Page 198

1       MR. OSBORNE:  Form.
2       THE WITNESS:  Yeah.  I think that's
3   where you have to start with for that kind
4   of a roll, you have to -- the baby has to
5   push up and lift their -- they have to
6   raise their center of gravity up so that
7   it can then have some energy to fall over.
8   BY MS. LOVETT:
9       Q.  Right.  Right.  It's the momentum caused
10  by the pushing up?
11      A.  I will choose not to correct that, but I
12  will agree with the general concept.
13      Q.  Again, I'm talking as a political
14  scientist and --
15      A.  Okay.
16      Q.  -- and a lawyer and not -- and by the way,
17  that's my undergrad degree.  That's not -- I'm
18  not -- I don't hold myself out as a political
19  scientist.
20      A.  Yeah.
21      Q.  -- but not as a mechanical engineer.  So I
22  saw you cringe at me saying "momentum."
23      A.  Okay.
24      Q.  But for the jury's benefit, what has to
25  happen first is you push up, and then that gives

Page 199

1   you the ability to start rolling?
2       A.  That's correct.  When you push up, you
3   raise your center of gravity, and that gives you
4   potential energy.
5       Q.  Right.
6       A.  So you have this potential amount of
7   energy, and then the rolling is the release of that
8   potential, giving you the momentum at that point to
9   roll over.
10      Q.  All right.  This is Exhibit 7 to your
11  deposition.
12      MS. LOVETT:  And John, these will
13  come through.
14  BY MS. LOVETT:
15      Q.  These are Dr. Cleary's medical records for
16  Zoey.  This is Zoey's pediatrician.
17      MR. OSBORNE:  Very well.
18  BY MS. LOVETT:
19      Q.  And if you'll look with me in the --
20      THE REPORTER:  Wait, wait.
21      MS. LOVETT:  Oh.  Sorry about that.
22          (Whereupon, Defendant's
23          Exhibit 7 was marked for
24          identification.)
25  BY MS. LOVETT:

Page 200

1       Q.  Litigators did not design these conference
2   tables, I'll just tell you that right now, because
3   we would not make them these wide -- this wide.
4       So these are some of Zoey's pediatric
5   records with doc -- from Dr. Kevin Cleary.  And I'd
6   like you to look at Bates label 34.
7       MR. OSBORNE:  I haven't -- I don't think
8   I have now.  What number is this?
9       MS. LOVETT:  This is Exhibit 7.  And
10  it's Bates label -- I'm going to Bates 34,
11  John.
12      MR. OSBORNE:  Okay.  Hang on.
13  Because it's -- I'm only up to five, and
14  least as the last time I refreshed.  I'm
15  refreshing again.
16      All right.  Seven and -- one minute.
17  And page number again, please?
18      MS. LOVETT:  Bates 34.
19      MR. OSBORNE:  All right.  Stand by.
20  I'm looking at Bates 30 and 31.  Am I
21  close?
22      MS. LOVETT:  34 is the --
23      MR. OSBORNE:  Oh.
24      MS. LOVETT:  You got it?
25      MR. OSBORNE:  Yeah.  Got it.

Page 201

1       MS. LOVETT:  All right.  Okay to go?
2       MR. OSBORNE:  Yes, you are.
3   BY MS. LOVETT:
4       Q.  All right.  So Doctor, you've got Page 34.
5   And the date at the bottom here is February 4th of
6   2014; right?
7       A.  Yes.
8       Q.  It's a little over four months before Zoey
9   passed away; correct?
10      A.  Yes.
11      Q.  And you obviously would defer to
12  Dr. Cleary, who was her pediatrician, his physical
13  assessment of her, what was going on at that time
14  as reflected in these records; right?
15      A.  Certainly.
16      Q.  And if we start looking at the
17  developmental, there's a Developmental Screen which
18  is contained under the second box that says
19  Nutritional Screen.
20      Do you see that?
21      A.  Yes.
22      Q.  And it says, a mark, "indicates
23  accomplishments."  Do you see that?
24      A.  I -- seems like that's what that would
25  indicate.

Page 202

1       Q.  Okay.  And here at -- on February 4th of
2   2014, which is when she was roughly four months
3   old, we see it says that the -- it's been checked
4   off "begins to roll front to back."
5       Do you see that?
6       A.  Yes.
7       Q.  And that's actually exactly what you'd
8   expect from the Mom Junction blog, roughly that's
9   right about the right time when you start to see
10  the belly to back roll; right?
11      A.  Yeah.  I think she would -- she's about
12  two months old at this time.  Right?
13      Q.  This is February of 2014, and so -- she
14  was born in September.  So this would be --
15      A.  Four months?
16      Q.  Yes.
17      A.  Okay.
18      Q.  Late September, yeah, little over four
19  months.
20      A.  Okay.
21      Q.  All right.  Let's look at some
22  photographs.  And these are hard ones, I know, but.
23      MS. LOVETT:  And these are going to
24  be Exhibit 8, John.  These are photographs
25  of Zoey --

Page 203

1       MR. OSBORNE:  All right.
2       MS. LOVETT:  These are photographs of
3   Zoey that her parents provided for us.
4   This will be Exhibit 8.  And she is
5   precious.
6           (Whereupon, Defendant's
7           Exhibit 8 was marked for
8           identification.)
9       MR. OSBORNE:  Refreshing.  It hasn't
10  come up yet.  I'll refresh again.
11  I've got it now.  Hang on.
12      MS. LOVETT:  Okay.
13      MR. OSBORNE:  Opening.
14      All right.  They're painted.  We can
15  go.
16  BY MS. LOVETT:
17      Q.  All right.  So Dr. Singhose, you have here
18  what I'll represent for you are three pictures of
19  baby Zoey that her parents gave us.  And you'll see
20  in each of them she appears to be sitting up;
21  right?
22      A.  Yes.
23      MR. OSBORNE:  Ah, what a cutie pie.
24      MS. LOVETT:  Isn't she precious?
25      THE WITNESS:  Yes.

Page 204

1       MS. LOVETT:  I mean, she's a really
2   precious baby.  Have you not seen these
3   before, John?
4       MR. OSBORNE:  I just think she's a
5   cutie pie.
6       MS. LOVETT:  She's adorable.
7   BY MS. LOVETT:
8       Q.  Okay.  So in the --
9       MR. OSBORNE:  We've talked about
10  Nicholas and Oliver, I just thought we
11  should give her --
12      MS. LOVETT:  It was just --
13      MR. OSBORNE:  -- her due.
14      MS. LOVETT:  I said it when I passed
15  it over.  You probably couldn't hear me.
16  She's just precious.
17  BY MS. LOVETT:
18      Q.  So in the first para -- in the first
19  photograph here, she's sitting -- looks like she's
20  sitting on a sofa or something.  She's sort of
21  maybe leaning on it; right?
22      A.  Yeah.  I mean, it almost looks like a
23  bed --
24      Q.  Yeah.
25      A.  -- because of the --

1    Q.  You're right.
2    A.  -- the headboard in the back.  It looks
3  like they sat her on there and she's sitting.
4    Q.  Okay.  In the second photo, she's sitting
5  up without anything behind her back; right?
6    A.  I couldn't tell from this picture, but I
7  don't see anything.
8    Q.  Okay.  And the third picture, maybe that's
9  a better angle, she appears to be sitting up on the
10  floor and not falling over.
11    A.  That's correct.
12    Q.  And --
13    A.  Looks like they sat her there and she's
14  not falling over.
15    Q.  She's sitting there by herself.
16    A.  I mean, she might have fell over right
17  after this picture, but it looks like she's sitting
18  there not falling over.
19    Q.  All right.  Sit -- but she's sitting there
20  unassisted without anybody holding her up?
21    A.  Yes.
22    Q.  All right.
23    A.  That's what it looks like.
24    Q.  Okay.  So I want to talk next to you about
25  rolling on inclined surfaces.  And you start off in

1  that section by saying:
2    "Case evidence collected by the
3  C.P.S.C. indicates that some infants
4  that are not capable of rolling on a
5  flat surface can roll on an inclined
6  surface."
7    And this is where you cite to the article
8  that's published in the Journal of Biomechanics.
9  Do you see that?
10    A.  You jumped ahead of me.  I -- what page
11  were you --
12    Q.  Oh, I'm sorry.  I'm sorry.  I was
13  looking --
14    A.  Can you --
15    Q.  -- at the section of your report on
16  Rolling on Inclined Surfaces, and I didn't give
17  you --
18    A.  Yeah.  We -- I think --
19    Q.  -- the page number.
20    A.  -- you're talking about Page 21?
21    Q.  Yes.
22    A.  Or Paragraph 56.
23    Q.  Paragraph 56.
24    A.  Okay.  I just got there.
25    Q.  There we go.

1    A.  Okay.
2    Q.  All right.  So reading from that para --
3    MR. OSBORNE:  On Exhibit 4; correct?
4    MS. LOVETT:  Yes.  Of exhibit --
5  actually, it's Exhibit 3, John.  This is
6  the first report, not the rebuttal.
7    MR. OSBORNE:  I thought it was the
8  rebuttal.  Sorry.  Go ahead.
9  BY MS. LOVETT:
10    Q.  You start off saying here:
11    "Case evidence collected by the
12  C.P.S.C. indicates that some infants
13  that are not capable of rolling on a
14  flat surface can roll on an inclined
15  surface."
16    And then you cited to an article published
17  in the Journal of Biomechanics for that statement;
18  correct?
19    A.  Yes.
20    Q.  And I have that article, actually.  We're
21  going to make that Exhibit 9.  This is the Wang
22  article that you've referenced earlier.
23    MS. LOVETT:  That's Tab 14.
24    MR. HERMAN:  Yeah, you have it.
25    MS. LOVETT:  Oh, I have it in my lap.

1  Sorry.  You were a step ahead of me.
2    MR. HERMAN:  No worries.  I think you
3  said nine.
4    MS. LOVETT:  I sat it down to keep
5  it --
6    MR. HERMAN:  And I already marked it
7  for you, John.
8    MS. LOVETT:  You should have it.
9  BY MS. LOVETT:
10    Q.  Here you go.  This is Exhibit --
11    MR. OSBORNE:  All right.  Let me go
12  look.
13    MS. LOVETT:  -- Exhibit 9.
14    MR. OSBORNE:  I was reading the
15  report there.
16    MS. LOVETT:  Exhibit 9.
17    (Whereupon, Defendant's
18    Exhibit 9 was marked for
19    identification.)
20    MR. OSBORNE:  Let me refresh.
21  Got it.  Opening.
22  Okay.  I have it open.  Thank you.
23    MS. LOVETT:  All right.
24  BY MS. LOVETT:
25    Q.  So here in the Journal of Biomechanics,

1    which I'm going to refer to as the Wang paper if
2    that's all right with you, Doctor, so, but its full
3    title is Do Incline Sleeping Surfaces Impact
4    Infants' Muscle Activity and Movement?  A Safe
5    Sleep Product Design Perspective.
6            Is that the correct title?
7        A.   Yes.
8        Q.   And in the abstract, we see that:
9            "The purpose of the study was to
10           assess muscle activity of healthy
11           infants when they lie supine and prone
12           on different inclined crib mattress
13           surfaces."
14           Right?
15       A.   I didn't follow that exactly, but I know
16   that that's one of the reasons for the study.  I
17   didn't follow where you were reading, but.
18       Q.   It's in the middle, I'm sorry, of the
19   abstract.  It's sort of hard to highlight it for
20   you.
21       A.   Okay.  I see that.  It's actually only,
22   like, the second --
23       Q.   The second --
24       A.   -- sentence.
25       Q.   -- sentence there, yes.  It's some long

1    sentences.
2            Now, you've read this article thoroughly.
3    Wang did not use -- or did not test using a
4    Rock 'n Play sleeper or any other inclined sleep
5    product; correct?
6        A.   Well, that I can't attest to, because I
7    think that he probably did.  But he didn't report
8    on that in this paper.
9        Q.   All right.  And again, we're -- it's the
10   paper that you're directing us to for your opinion.
11   So if we look under Methods, which is Section 2.2,
12   it says Experimental Procedure.  The description
13   is:
14           "A," quote, "crib mattress with a
15           cotton fitted crib sheet was placed
16           inside the crib to serve as the lying
17           surface."
18           Do you see that?
19       A.   Yes.
20       Q.   And then it says:
21           [As read]  "The crib enabled zero
22           degree, ten degree, 20 degree and 30
23           degree inclines, which were chosen to
24           represent a flat crib mattress surface
25           (zero degree) and the range of

1    inclines (ten to 30 degree) of the
2    inclined sleep products."
3            Correct?
4        A.   Yes.
5        Q.   And this is what we call an inclined
6    planar surface; right?
7        A.   Yes.
8        Q.   It does not have the closed heightened
9    walls that the Rock 'n Play provides; right?
10       A.   That's correct.
11       Q.   And you agree with me that the
12   Rock 'n Play would provide far less lateral
13   clearance for rolling than this open planar
14   surface?
15       A.   What do you mean by "lateral clearance"?
16       Q.   Well, this is me using, you know, using
17   terms that may mean something different to you.
18   But I mean it would be much easier for a baby to
19   roll over without the high walls than with them.
20       A.   With everything else staying the same, you
21   mean like they still have the foot blocker to push
22   off of and stuff like that?
23       Q.   Yes.
24       A.   Okay.
25       Q.   And they're wearing the restraints,

1    presumably.
2        A.   Oh, and wearing the restraints?
3        Q.   Yes.
4        A.   Yeah, I think if they've got the
5    restraints cinched down, it's going to be pretty
6    hard for them to roll over.
7        Q.   Okay.  And then would that -- is it --
8    let's take away the restraint for a minute.  You
9    agree that it's easier to roll when you don't have
10   walls to your right and left keeping you from
11   rolling?
12       A.   I think in certain -- that would be true
13   for certain kinds of rolling maneuvers like we were
14   talking about.  But if the infant chose to pull on
15   the edge, then they actually have extra force that
16   they wouldn't have if the wall wasn't there.
17           So if you're talking about the kind of
18   roll where they don't pull on the wall, I think it
19   would be harder, because the wall would kind of
20   push them back.
21       Q.   Right.
22       A.   But if they had thrown their arm over and
23   grabbed on the wall, then in that sense it's easier
24   because they have this additional force that helps
25   roll them over.

Page 213

1     Q.  All right.  Understand.
2         We're going to go to Exhibit 10 to your
3     deposition, which is the Exponent report.  Are you
4     familiar with the Exponent report?
5     A.  Yes, I am.
6         (Whereupon, Defendant's
7             Exhibit 10 was marked for
8             identification.)
9     THE WITNESS:  Can we take a short
10    break at some point?
11    BY MS. LOVETT:
12    Q.  Oh, sure.  Absolutely.  Do you need a
13    little --
14    A.  Yeah.
15    Q.  -- restroom --
16    A.  It's been a --
17    Q.  -- break?
18    A.  It's been a while.
19    Q.  Sorry.
20    THE VIDEOGRAPHER:  The time is 1:38
21    p.m.  We are off video record.
22        (Whereupon, a discussion ensued
23        off the record.)
24        (Whereupon, there was a brief
25        recess.)

Page 214

1     THE VIDEOGRAPHER:  The time is 1:52
2     p.m.  We are back on video record.
3     BY MS. LOVETT:
4     Q.  So Dr. Singhose, you told us beforehand
5     that you're familiar with Exhibit 10, which is the
6     April 6th, 2018 Exponent report; correct?
7     A.  Yes.
8     Q.  And this is the -- Exponent's analysis of
9     infant roll-over behavior in the Rock 'n Play
10    sleeper; right?
11    A.  Yes.
12    Q.  And let's skip to the testing, which is --
13    the results of the testing you can find at Bates
14    label 12465.
15        Now, if we look at the section entitled
16    Observations and Interactions, the report tells us
17    that:
18        "More spontaneous rolling was
19        observed in the crib environment."
20        Correct?
21    A.  I'm not seeing that.  Where?
22    Q.  It's under Observations and Interactions,
23    and the Bates label is 12465.
24    A.  Oh, okay.  Yes.  I can't really read that
25    title.  It's in yellow.  It's --

Page 215

1     Q.  Oh.
2     A.  I couldn't see the --
3     Q.  Oh, you're right.
4     A.  -- label to -- okay.
5     Q.  No.  You're right.
6     A.  I see it now.
7     Q.  Okay.
8     A.  It's actually the very first line --
9     Q.  Right.
10    A.  -- is what --
11    Q.  First line.
12    A.  -- you're reading.  Yes, I see that line.
13    Q.  And then there are some bullet points.
14    The Exponent report tells us that:
15        "Children who were able to roll in
16        the Rock 'n Play also demonstrated the
17        ability to roll in the crib."
18        Correct?
19    A.  Yes.  That's one of their observations.
20    Q.  And so I want to go back to your precious
21    son Nicholas.  When -- the photo that we saw of you
22    taking him, did you observe him rolling, his
23    rolling capability in crib versus Rock 'n Play?
24    A.  No, I didn't make that comparison.
25    Q.  Okay.  If we move on to the other

Page 216

1     observations in this section, the "observations of
2     rolling behavior in the Rock 'n Play," it says:
3         "This behavior was volitional and
4         for many required effort."
5         Do you see that?
6     A.  Yes, I do see that.
7     Q.  And it also says that:
8         "No accidental rolling was
9         observed."
10        Right?
11    A.  Yes.  That's what it says here.
12    Q.  And then if you look down the third -- the
13    third -- the third [sic] bullet point says:
14        "The Rock 'n Play restraint system
15        prevented rolling (even for children
16        whose use of the product was
17        contraindicated given their
18        development)."
19        You've certainly not seen anything to
20    contradict that, based on your prior testimony;
21    right?
22    MR. OSBORNE:  Form.
23    THE WITNESS:  Oh, I've seen a lot of
24    stuff to contradict that.
25    BY MS. LOVETT:

1    Q.  Well, hang on.  I'm not talking about --
2    and I think I asked you and you answered me quite
3    directly that you had not observed any instance of
4    a restrained child in the Rock 'n Play rolling
5    over.
6    A.  Oh, that's correct.
7       MR. OSBORNE:  Form.
8       THE WITNESS:  You were talking about
9    my personal observations.
10   BY MS. LOVETT:
11   Q.  Well, I'm talking -- and I know this is
12   hard to sort of dissect, because you've got
13   personal observations of your children.  And you,
14   like our expert, had used your child, we're going
15   to have a lot of cute babies to look at, in -- as a
16   test subject.
17      So but we've seen the photographs that you
18   took of Nicholas.  And the question I had for you
19   is, as it says in the Exponent report, the
20   restraint system prevents rolling over, this is
21   their observation, even for children whose use of
22   the product was contraindicated.
23      You only observed it with Oliver.
24      MR. OSBORNE:  Form.
25   BY MS. LOVETT:

1    Q.  Right?
2       MR. OSBORNE:  Sorry.  Form.
3    BY MS. LOVETT:
4    Q.  I'm sorry.  Not with Oliver.  With
5    Nicholas.  I'm sorry.  You only observed the
6    rolling over with your child.
7    A.  Okay.  I'm a little confused.  Just to
8    verify --
9       MR. OSBORNE:  Form.
10      THE WITNESS:  -- I didn't
11   observe rolling in the Rock 'n Play with
12   Nicholas because he wasn't in there very
13   long.
14   BY MS. LOVETT:
15   Q.  Right.
16   A.  And I only had him restrained for a couple
17   minutes because he just started fighting and
18   crying.
19   Q.  Right.  So --
20   A.  So I did not see it with him.
21   Q.  All right.  And you have not seen, as you
22   testified before, any baby roll over because I
23   think your exact words were, once you're cinched
24   down in there, you're not going anywhere; right?
25   A.  Yeah, I'm not sure that's my exact

1    testimony.  But my testimony is that, if you
2    cinched them down hard enough, they obviously
3    couldn't get away.  And I think what I was
4    referring to is I haven't seen in videos --
5    Q.  Right.
6    A.  -- of a baby wiggling all the out and
7    turning over.  Because that takes some amount of
8    time, and the videos that I've seen are all short
9    duration videos.
10   Q.  Right.
11   A.  That's what I testified to.
12   Q.  And but you also haven't seen it in your
13   own observation, because you -- the testing that
14   you did with Oliver -- sorry, I mix them up now --
15   A.  That's okay.
16   Q.  -- because I feel like I know them.  Let
17   me make that cleanly for the record.
18      The testing that you did with Nicholas did
19   not give you -- did not give you an opportunity to
20   see him roll over while restrained?
21   A.  That's correct.  I only had him in there
22   for a very short period of time.
23   Q.  All right.  And that is -- that is the
24   extent of the testing that you did to support your
25   opinion was the testing with Nicholas; right?

1    A.  No.  I did a lot --
2       MR. OSBORNE:  Form.
3       THE WITNESS:  I did a lot more
4    testing than that.
5    BY MS. LOVETT:
6    Q.  Okay.  In terms of observing infant
7    behavior, the work that you did, and there may be
8    more cute babies that I missed in here, but I
9    didn't realize he was yours when I was looking at
10   him before, in terms of your opin -- by doing
11   observations of infants where you're laying eyes on
12   infants yourself to assess and make your opinions
13   in this case, did you do anything other than your
14   interactions with Nicholas?
15   A.  Yes.
16   Q.  All right.  What else did you do?
17   A.  Okay.  Just to clear -- I mean, yes, I did
18   a lot of other stuff.  Are you -- but are you
19   trying to focus me down on what other I --
20   observations I did with live infants?
21   Q.  Yes.  I'm not --
22   A.  Okay.
23   Q.  -- talking about dolls.  So I'm talking
24   about --
25   A.  That's fair.

1      Q.  -- what -- I'm talking about with in --
2  with -- that's a much better way to -- the precise
3  question.
4          In testing with live infants, and of
5  course the Exponent study that you're looking at
6  there is observations of live infants, are the
7  exhibits that we previously looked at in your
8  report, the photographs of your son Nicholas in the
9  Rock 'n Play and those interactions, is that the
10 only testing that you did in terms of observing a
11 live infant?
12     A.  No.
13     Q.  What else did you do?
14     A.  I put two other infants into the
15 Rock 'n Play sleeper and observed them and their
16 motions.
17     Q.  All right.  And so where will we find
18 photographs of them in your report?  And you're
19 looking at, for the record, Exhibit 3.
20     A.  Yes.  I was -- I'm looking at my first
21 report.  I think that they're in my rebuttal
22 report, but I'm going to look at my first report.
23 I have a bunch of pictures of other live infants.
24 I think those start -- well, I see one on Page 28.
25     Q.  Are you looking at Exhibit 3?

1      A.  Yes.  So Exhibit 3 on Page 28 at the top,
2  Figure 22 has a picture of a live infant.  That may
3  be -- oh, I'm sorry.  The first ones I think are on
4  Page 27.
5      Q.  Okay.  So if we look at 27, okay, I see
6  Nicholas and one of his friends.
7      A.  That's actually two of his friends.
8      Q.  Two of his friends?
9      A.  Those are twins.
10     Q.  Oh, those are the twins.  Are those Dr. --
11     A.  Frakes.
12     Q.  -- Frakes' twins?
13     A.  Uh-huh.
14     Q.  Yes.  All right.  And so you've got a
15 five-month-old, who is Nicholas; a four-month-old
16 there in the Rock 'n Play.  What is his name?
17     A.  That's Huxley.  And he's a big boy.  So
18 he's 18 pounds at four months, believe it or not.
19     Q.  He's a linebacker?
20     A.  And then his sister Palmer is on the
21 right.  And she's also the same age, of course, but
22 she's only 12 pounds.  So they're actually very
23 different size --
24     Q.  She's --
25     A.  -- babies.

1      Q.  She's four months.  You've got a six-pound
2  differential --
3      A.  Yeah.
4      Q.  -- there between those two babies.  All
5  right.
6      A.  It's big.
7      Q.  All right.  And so these are -- so in
8  your -- in your -- well, I'm looking at there are
9  pictures there on Page 27 and then on Page 28.  And
10 that looks like Huxley.
11     A.  Yep.
12     Q.  And then are there any other live
13 infant --
14     A.  20 --
15     Q.  -- observations?
16     A.  Page 29 has Palmer is actually the really
17 active one.  The smaller one is more active.  And
18 that's actually her doing a rolling movement.
19     Q.  Page 29?
20     A.  Yeah.  The top of Page 29.
21     Q.  Okay.  And that is Palmer doing a rolling
22 movement unrestrained?
23     A.  Yes.
24     Q.  Could Palmer roll over?
25     A.  She -- I placed her in that initial

1  position on the side.
2      Q.  Okay.  So you put her in on the side?
3      A.  Yeah.  I mean, her face wasn't there.  I
4  put her on her side.  But as soon as I got the
5  picture, she had turned her face.  I mean, she
6  started wiggling around and pushing with her legs.
7          So you can see her actually, in this
8  middle one, you can see her pushing up the incline.
9  You can see her head is almost at the head blocker.
10 And then she just basically pushed around a little
11 bit and ended up essentially mostly prone --
12     Q.  But she --
13     A.  -- as you can see.
14     Q.  -- she started out on her side?
15     A.  Yeah.  I put her on her side -- well, her
16 mother.
17     Q.  Yeah, her mother placed her.
18     A.  Her mother was there and --
19     Q.  Yeah.
20     A.  -- she was observing all this.  And I
21 said, can you put her on the side?  And she just --
22 yes, and let's let her wiggle around and see what
23 she does.
24     Q.  And the caption here at the top of the
25 page in Figure 23 is Rolling Movements; right?

Page 225

1    A.  That's correct.
2    Q.  So from your observation, could Palmer
3  roll over?
4    A.  Yes.  I mean, provided I put her on the
5  side.  I didn't test her for that long.  This
6  testing was about 45 minutes --
7    Q.  Okay.
8    A.  -- of testing.  I went to their house and
9  I made measurements and put them in there and
10  observed them, so again, not long duration.  Just
11  part of my evaluation of this product is put babies
12  in and see what they do --
13    Q.  Right.
14    A.  -- just what is possible.
15    Q.  Right.  So other than -- I'm going to run
16  out of adjectives, so I'll just stop saying
17  precious, adorable and everything.
18    But other than Nicholas, Huxley and his
19  sister Palmer, did you in your initial report have
20  any other interactions with live infants that you
21  did to form the conclusions for your report?
22    A.  Those were the three live infants that I
23  used.
24    Q.  Did you put Huxley -- did you restrain
25  either Huxley or Palmer?

Page 226

1    A.  Yes.  I did for a short period of time.  I
2  have a picture of that.  I think it's on Page 36,
3  if I recall.
4    Q.  And again, that looks like Huxley.
5    A.  That's Palmer.
6    Q.  Oh, is that Palmer?
7    A.  Yeah.  If you look at the top, you can see
8  her head barely gets into the horizontal marks.
9    Q.  Right.
10    A.  And his head goes way up into the
11  horizontal --
12    Q.  Yes.
13    A.  -- marks.
14    Q.  Although she's the more active of the
15  two --
16    A.  That's right.
17    Q.  -- I think you said?
18    A.  Yeah.
19    Q.  All right.  So I'm looking here at very
20  active Palmer.  She is -- but with the crotch
21  restraint, as you said, she's not going anywhere?
22    A.  Yeah.  I mean, she actually was pretty
23  calm during this time, and I didn't really try to
24  get her to move.  And I was actually trying to get
25  her to not move so I could take the measurements.

Page 227

1    Q.  Right.
2    A.  So I had her mother try to keep her calm.
3  And I think her mother was standing in front of
4  her --
5    Q.  Right.
6    A.  -- and, say, just cooing at her so I could
7  get the measurements.
8    Q.  Sure.
9    And that's something that we don't -- I
10  guess one of the things that you'd said earlier
11  about some of the videos that didn't have audiotape
12  was you wanted to hear what the interactions were
13  or what was going on.
14    So you didn't videotape any of the live
15  babies in your study; correct?
16    A.  I don't think I did.  I mean, basically, I
17  was just visually watching them.  And then when --
18  I was holding a camera and I wanted to take
19  pictures of them in various positions, so I had it
20  on the picture mode, not the video mode.
21    Q.  Right.  So other than the interactions
22  with your son Nicholas and the Frakes twins, you
23  did not observe any of -- you did not do any other
24  testing of live infants to form your opinions;
25  correct?

Page 228

1    A.  Yeah, those are the three babies I used.
2  I think that was it.
3    Q.  Okay.  And then are there any different
4  babies in your rebuttal report?
5    A.  I don't -- no, not different babies.  I
6  think I reproduced some of the pictures in
7  response.
8    Q.  Okay.  So those came --
9    A.  I think they're actually all the same
10  pictures.  I don't think I --
11    Q.  Yeah.
12    A.  -- even had new pictures.
13    Q.  Okay.  I wanted to see if you had new
14  pictures because --
15    A.  Let me see.
16    Q.  -- I thought you may have alluded to that
17  earlier.  So let me ask it this way.  Did you --
18  did you perform more than one observational session
19  with Nicholas, Huxley and Palmer?
20    A.  Yes.
21    Q.  All right.  And are -- were all of those
22  observations available to you at the time of your
23  initial report?
24    A.  Yes.
25    Q.  Okay.

Page 229

1    A.  I see what you're saying there.
2    Q.  Yes.  Okay.  So in other words, there
3 wasn't anything that you saw in the reports of our
4 experts that caused you to go back and do more live
5 interaction and take photographs?
6    A.  No, I don't think so.
7    Q.  All right.  And so the extent of your
8 testing with live infants is limited to, completely
9 limited to Nicholas, Huxley and Palmer?
10    A.  Yes.  I think that's a fair assessment.
11    Q.  And the photographs that you took of them?
12    A.  Yes.
13    Q.  All right.  So I want us to talk about
14 the -- and you talk about this in your report.  If
15 you look at -- oh, by the way, did you -- did you
16 evaluate whether or not or how Huxley and Palmer
17 rolled over in cribs?
18    A.  No.  I did observe them on a carpet before
19 we started all this.  I mean, I went over there and
20 I -- we were planning to do this, and they were
21 just on a carpet, and so I observed what they were
22 capable of.
23        Quite frankly, the boy, Huxley, is not
24 capable of moving himself around.  He's too big.
25    Q.  He's too big.  He's a big boy.  Right.

Page 230

1    A.  So he just --
2    Q.  He just kind of lies there and eats?
3    A.  He would just lie there and eat.  In about
4 a ten-minute period, the girl, she could -- they
5 were sitting down --
6    Q.  Right.
7    A.  -- you know, on the carpet.  She could
8 wiggle around and change her position.  I think she
9 kind of rotated about 90 degrees --
10    Q.  Right.
11    A.  -- on her back.  That's what I observed.
12        So I didn't do a detailed study of what
13 they were capable of.  But I did talk to the
14 parents, and they said Huxley can't move himself at
15 all.  And Palmer's starting to wiggle around and
16 do -- and do motions, but they didn't say that she
17 could completely roll over at that point.
18    Q.  Right.  No.  So this is what I'm going to
19 ask you.  Did you -- you know, given that you say
20 in your report -- and this is in Paragraph 70 of
21 your report if you want to have it in front of you?
22    MS. LOVETT:  And for you, John, this
23 is Paragraph 70 of Exhibit 3.
24    MR. OSBORNE:  I'm going there.
25 BY MS. LOVETT:

Page 231

1    Q.  You say:
2        "Given that the product can be
3    used for infants up to 25 pounds, I
4    placed three infants of various sizes
5    into the device to evaluate its
6    design, measure its geometry relative
7    to the infants, and to observe the
8    infants' positioning and movements."
9    Correct?
10    A.  Yes.
11    Q.  All right.  So now, we've talked about the
12 various developmental milestones.  Did you try to
13 control for any other developmental milestones when
14 selecting the subjects?
15        And that was my original question for you,
16 but I think you selected the subjects because
17 proximity, familiarity and cuteness.
18    A.  Yes.
19    Q.  All right.
20    A.  And COVIDness.  I mean --
21    Q.  And COVIDness.
22    A.  -- we weren't going to launch a --
23    Q.  Well, again --
24    A.  -- baby study during COVID --
25    Q.  Of course.

Page 232

1    A.  -- I guess.
2    Q.  Right.
3    A.  Yeah.
4    Q.  We had the exact same issue, of course.
5        So could Nicholas push up on his hands and
6 knees at this point?
7    A.  At the picture at five months old, he
8 could not push up on his knees.
9    Q.  Okay.  I guess --
10    A.  But he was definitely pushing up and
11 arching his back.
12    Q.  Because that's how you start to roll?
13    A.  Yeah.
14    Q.  And you've told us he could definitely
15 roll at that point.
16    A.  Well, he could -- I actually don't think
17 he could roll from -- still from front to back at
18 this point.  He could roll from back to front,
19 which he could do at very early on --
20    Q.  Right.
21    A.  -- like at three and a half months or
22 something.
23    Q.  Right.
24    A.  I think at this point he still could
25 not -- or he still did not --

Page 233

```
 1        Q.  Right.
 2        A.  -- roll from front to back.
 3        Q.  Could Huxley push up or push up on hands
 4    at all?
 5        A.  I don't think so.  I mean, he -- he's
 6    just, like, this big guy who would just sit
 7    there --
 8        Q.  Right.
 9        A.  -- and he couldn't move much.  Basically,
10    when I asked the parents what were they capable of,
11    I didn't ask that specific question.
12        Q.  Okay.  Could Palmer -- you said Palmer was
13    wiggling around and starting to -- starting to
14    roll; right?
15        A.  Yeah.  What I saw her do was essentially
16    rotate on her back about 90 degrees --
17        Q.  Right.
18        A.  -- by wiggling around, but I did not see
19    her roll over.
20        Q.  Okay.
21        A.  And the parents said that she wasn't
22    capable of rolling over, but definitely squirming
23    and turning and stuff like that.  Like, I think the
24    assessment was she's likely to roll at some point
25    soon.
```

Page 234

```
 1        Q.  Right.  Could any of them, and if we look
 2    at these sweet pictures of Zoey here in Exhibit 8,
 3    could any of them, and I'm really focused on the
 4    second and third photos, could any of them sit up
 5    like she's doing here in Exhibit 8 on the third
 6    page?
 7        A.  Oh, certainly my son could do that.  And
 8    the girl, Palmer, could do that.  I think Huxley
 9    was not capable of that.  He would fall over.
10        Q.  Right.  Right.
11        A.  So if you plopped them down --
12        Q.  Right.
13        A.  I mean, I know at this time I was still
14    watching Nicholas to make sure he wouldn't fall
15    over.
16        Q.  Right.
17        A.  But I could sit -- I could sit him and he
18    would sit for a long time.
19        Q.  All right.
20        A.  And he --
21        Q.  Unassisted?
22        A.  Yeah.  And -- well, he could sit there
23    unassisted.  He couldn't sit up unassisted.  Right?
24    He couldn't do a sit-up.
25        Q.  Right.
```

Page 235

```
 1        A.  And neither could Palmer.  Her parents
 2    would sit her, you know, manually sit her in a
 3    position and she could stay stable for a while.  I
 4    think she was a lot more tippy than my son.
 5    Because my son was about a month older at this
 6    time.
 7        Q.  Right.  Right.  He was a little bit ahead
 8    of them.
 9        So if we're looking at -- I want to look
10    at Figure 23 in your report.  And we now know this
11    is Palmer.  And you've told us that you placed her
12    on her side; right?
13        A.  Her mother.
14        Q.  Her -- I'm sorry.
15        A.  Yeah.
16        Q.  You told me her mother placed her on her
17    side.
18        Other than Palmer, you have not
19    independently seen the -- any infant replicate this
20    behavior; true?
21        A.  Well, no.  This kind of behavior appears a
22    lot in the Exponent videos.
23        Q.  Yes.  In the Exponent.  I'm talking about
24    in your personal observation.
25        A.  Oh, no.  I just tested -- yeah, I just had
```

Page 236

```
 1    these three infants, and she's the only one that
 2    did that.  My son, I did not do that test with him.
 3        Q.  All right.  In either case you can agree
 4    with me that, if the baby was properly restrained,
 5    and in fact we saw that with Palmer, there's no way
 6    she could execute this maneuver?
 7        MR. OSBORNE:  Form.
 8        THE WITNESS:  I mean, I think there's
 9    a question of what "properly restrained"
10    is.  I think if Palmer was restrained in
11    the way that a lot of people would
12    restrain them, which is to put the lap
13    belt on kind of loose because they don't
14    want to cinch their baby down and they
15    want their baby to go to sleep, and I sat
16    there and watched her for a couple hours,
17    I would not be surprised if she could
18    wiggle out, but that's not a test I did.
19    BY MS. LOVETT:
20        Q.  In fact, when you photographed her, she
21    was cinched down; correct?
22        A.  When I photographed her -- again, I'm not
23    sure what "cinched down" means.
24        Q.  Well --
25        A.  And we're kind of using that
```

Page 237

1  laxadaisically [sic].
2      Q.  Yeah.
3      A.  But she had the restraint across her
4  waist.
5      Q.  Right.
6      A.  And I think I left it to the mother or --
7  actually, I think the grandmother did that part.
8  The grandmother was there, too.  I think they're
9  the ones who basically put the lap restraint around
10 her.
11     Q.  Yes.  And so -- but you did -- she was not
12 able to roll over in your observation when she was
13 in the restraints; correct?
14         MR. OSBORNE:  Form.
15         THE WITNESS:  I don't know if she was
16     able to.  We didn't do that test.  Again,
17     she was only in that position for a couple
18     of minutes, and we tried to keep her calm
19     so I could take the measurements.
20         The point is I was taking
21     measurements of the belt restraint at that
22     time.
23 BY MS. LOVETT:
24     Q.  Right.  You've --
25     A.  I wasn't testing her for whether she could

Page 238

1  wiggle out of it.
2      Q.  Right.  You -- we looked at the warning
3  label, which says "always use the restraint."
4  Correct?
5      A.  Yes.  That's what it says.
6      Q.  And when you photographed Palmer, she was
7  photographed with the restraint on, the crotch
8  restraint on and fastened in a manner at --
9  consistent with the instructions for use; correct?
10         MR. OSBORNE:  Form.
11 BY MS. LOVETT:
12     Q.  You may answer.
13     A.  Yeah, I mean, I -- in con -- it's
14 inconsistent in the sense that we're using the
15 restraint --
16     Q.  Right.
17     A.  -- in some way.
18     Q.  Right.
19     A.  The restraint doesn't tell us how -- that
20 warning or those instructions don't tell us how
21 much to cinch her down.
22     Q.  Right.
23     A.  So I left it to the grandmother, I think,
24 to put her in there and strap her in.
25     Q.  Okay.  So the grandmother strapped her in.

Page 239

1  And you agree with me that if -- when she was
2  strapped in, there was no way that she could find
3  herself in the position that she was in in Figure
4  24?
5          MR. OSBORNE:  Form.
6          THE WITNESS:  No, I wouldn't agree
7      with that.  I mean, she was pretty wiggly.
8      So I think if she was there for several
9      minutes or an hour, I would not be
10     surprised at all if she could wiggle out
11     of that.
12         Because I remember looking, and the
13     grandmother did not really cinch it down
14     very tight.
15 BY MS. LOVETT:
16     Q.  Did you give her an instruction --
17     A.  No.
18     Q.  -- on how to cinch it?
19     A.  No.
20     Q.  Did you adjust it?
21     A.  I did not.  I left --
22     Q.  Did you --
23     A.  I left it to her, I believe.
24     Q.  Did you take your tape measure and measure
25 how much of the strap was pulled or how tightly it

Page 240

1  was cinched at her waist?
2      A.  No, I didn't do that measurement.  What I
3  was trying to do was to measure the distance from
4  the -- from the belt to the foot plate and then
5  also from her head to the -- to the head blocker.
6  I mean, that's -- that was my goal in this test.  I
7  wasn't trying to do a test of how securely she was
8  cinched in.
9      Q.  Right.
10         MS. LOVETT:  All right.  Tab 17,
11     please, Mr. Herman.
12         MR. HERMAN:  17 is the video.
13         MS. LOVETT:  Well, how do we want to
14     do video?
15         MR. HERMAN:  I can give you this to
16     be marked, and then I have the video
17     uploaded on my --
18         MS. LOVETT:  Okay.
19         MR. HERMAN:  -- laptop.
20         MS. LOVETT:  Perfect.  We'll start
21     with that.  So we are going to Exhibit 11?
22         MR. HERMAN:  That's correct.
23         (Whereupon, Defendant's
24         Exhibit 11 was marked for
25         identification.)

Page 241

```
 1          MS. LOVETT:  That is going to be --
 2     we, John, we got that video on a flash
 3     drive.  This is the, it's the Rock 'n Play
 4     Example Roll MP4.  And that's Courkamp
 5     008143.  It's a flash drive.
 6          MR. HERMAN:  I sent it to him, too.
 7          MS. LOVETT:  Brady sent it to you.
 8     He sent the M.P.E. video so you can watch
 9     it.
10          MR. OSBORNE:  When did he send it?
11          MR. HERMAN:  27 seconds ago.
12          MS. LOVETT:  27 seconds ago.
13          MR. OSBORNE:  Oh, gracious.  Okay.
14     Let me refresh.
15          (Whereupon, a discussion ensued
16     off the record.)
17          MR. HERMAN:  Mo, do you want me to
18     E-mail it to you?
19          MS. LOVETT:  Yes, please.  Or you can
20     just show it to me.  Because I've got, I
21     was putting it in my drive, but I've got
22     something else in my drive that I'm using.
23     So.
24          So John, just let me know when --
25          MR. OSBORNE:  Do you have a projector
```

Page 242

```
 1     or how are you showing this to the --
 2          MS. LOVETT:  It's --
 3          MR. OSBORNE:  -- witness --
 4          MS. LOVETT:  It's on a laptop.
 5          MR. OSBORNE:  -- to Dr. Singhose?
 6          MS. LOVETT:  It's on a laptop, and
 7     we're putting it -- we're giving it --
 8     Dr. Singhose the laptop to use.
 9          MR. OSBORNE:  I'm just trying to
10     figure out if there's a way to speed
11     things up for you, but --
12          MS. LOVETT:  Well --
13          MR. OSBORNE:  -- it hasn't come in
14     yet.
15          MS. LOVETT:  We can E-mail it to you,
16     John.
17          MR. OSBORNE:  And you sent it to
18     J-O-S-B-O-R-N-E at Goldberg & Osborne.com;
19     right?
20          MR. HERMAN:  I shared it with you.
21          MR. OSBORNE:  The E was left off one
22     of the E-mails earlier.
23          MS. LOVETT:  No.  He shared it -- he
24     shared it with you in the Exhibit Share.
25     So if you can't access it there, we can
```

Page 243

```
 1     send you a direct E-mail of it.
 2          MR. OSBORNE:  Oh, I'm sorry.  I
 3     thought you meant that you had sent me a
 4     direct E-mail.
 5          MS. LOVETT:  Oh, I'm sorry.  It --
 6          MR. OSBORNE:  I apologize.
 7          MS. LOVETT:  That's --
 8          MR. OSBORNE:  I have it.
 9          MS. LOVETT:  No.  That's terminology.
10     I'm sorry.
11          MR. OSBORNE:  So I got stills.  Say
12     again the exhibit number.  11?
13          MS. LOVETT:  11.
14          MR. OSBORNE:  11.  Yeah, it's a
15     movie.  Hang on.  I've got it.  I'm sorry
16     to have caused that by my misunderstanding
17     what you said.
18          MS. LOVETT:  No.
19          MR. OSBORNE:  All right.  I've got
20     the "play video" ready to go.
21          MS. LOVETT:  Okay.  No problem.  So
22     John, you -- we played the video for
23     Dr. Singhose.  He's obviously familiar
24     with it.  He did this.
25     BY MS. LOVETT:
```

Page 244

```
 1          Q.  Dr. Singhose, here the --
 2          MR. OSBORNE:  It's only 18 seconds.
 3     So.
 4          MS. LOVETT:  Yes.
 5          MR. OSBORNE:  I got it.
 6          (Whereupon, the video recording
 7     was reviewed by the witness.)
 8     BY MS. LOVETT:
 9          Q.  All right.  The video is a doll; correct?
10          A.  Yes.  It's a doll in the subject
11     Rock 'n Play.
12          Q.  Okay.  And then Exhibit 12 is going to be
13     the still photographs that accompany this?
14          (Whereupon, Defendant's
15          Exhibit 12 was marked for
16          identification.)
17          MR. OSBORNE:  Got it.
18     BY MS. LOVETT:
19          Q.  All right.  So and again, Exhibit 12 is
20     you manipulating the doll into these positions;
21     correct?
22          A.  Okay.  So just so I understand, Exhibit 12
23     is the pictures.  Yeah, I took -- I put the doll in
24     these positions and took pictures of it.  Is that
25     what you're asking?
```

Page 245

1    Q.  Yes.
2    A.  Okay.  Yes.
3    Q.  Right.  And this is not the position in
4  which Zoey was found?  If you -- and I'm looking at
5  your -- the last -- the last two or three
6  photographs where the baby is face down.
7        MR. OSBORNE:  You mean pages -- what
8    I have are pages.
9        MS. LOVETT:  151, 152.
10        MR. OSBORNE:  Page, what, nine
11    through 11?
12        MS. LOVETT:  One -- oh, mine are
13    numbered with a Bates 151, 152, 153 and
14    154.
15        MR. OSBORNE:  Okay.  Thank you.
16  BY MS. LOVETT:
17    Q.  Now, you placed the doll in these
18  positions; correct?
19    A.  That's correct.
20    Q.  This is not how Zoey was found, is it?
21    A.  Which -- well, she was, the position that
22  she was found in is, quite frankly, a little
23  uncertain.  But we know that she was partially
24  prone, I guess is the term that people want to use,
25  and her face was, you know, in the fabric.

Page 246

1        So none of these are exactly the
2    representation because we don't know exactly how
3    she was found.
4    Q.  Well, I'm looking at all the pictures.
5  And starting with 147, all of them are the baby
6  completely prone, completely face down, right, the
7  doll?
8    A.  Completely?  I would say they're largely.
9  Yeah, she's -- the doll is largely face down.  It's
10  impossible to put it exactly face down --
11    Q.  Right.
12    A.  -- because it's this valley design, so
13  it's always tilting one way or the other.
14    Q.  But you put the -- you put the doll in
15  these positions; right?
16    A.  Yes.
17    Q.  And you're not telling the jury that this
18  is what Zoey definitively did?
19    A.  That's correct.  She -- we don't know
20  exactly.
21    Q.  We have -- we have no way of knowing;
22  right?
23    A.  Yeah, we don't know exactly how she was,
24  but we do know she was basically in a prone
25  position.

Page 247

1    Q.  All right.  Well, you're saying "basically
2  in a prone position," but you're not suggesting to
3  the jury that you placing the doll in the
4  Rock 'n Play is an approximation of what Zoey did;
5  right?
6    A.  This is an illustration --
7        MR. OSBORNE:  Form.
8        THE WITNESS:  This is an illustration
9    of what could happen.  And something
10    similar to this happened.  But these
11    are -- I did not try to place her exactly
12    how she was found or -- you know, I mean,
13    she was found in a position, but obviously
14    she was moving before that.  Right?
15        So we don't have any information on
16    that except that she got turned over onto
17    her face.  So this is just an illustration
18    of what could happen in this kind of a
19    device, but I'm not saying this is what
20    she did do.
21  BY MS. LOVETT:
22    Q.  Okay.  I want to -- I want to look at
23  Section 8.3 of your report.  This is Page 37 of
24  Exhibit 3.
25        MR. OSBORNE:  Stand by.

Page 248

1        Okay.  Go ahead.
2        MS. LOVETT:  I'm dropping papers
3    everywhere.
4  BY MS. LOVETT:
5    Q.  So if we go to Page 37 of Exhibit 3, this
6  is where we start to get into your analysis of the
7  Rock 'n Play; correct?
8    A.  Yes.
9    Q.  This is where we start to get your
10  opinions.  And so you begin by analyzing the
11  incline sleeping surface; right?
12    A.  Yes.
13    Q.  Your measurement of the Rock 'n Play
14  sleeper yielded a 27 degree incline; correct?
15    A.  Yeah.  When it's nominally flat, you know,
16  it can rock back and forth.  So when it's in its
17  nominal flat position, the back is about 27
18  degrees.
19    Q.  Were these measurements from the subject
20  Rock 'n Play or from an exemplar?
21    A.  You know, I measured them both, and they
22  were about the same.  Let me see what it says in my
23  report.
24        Well, you can see on Page 31 that I
25  measured the actual Rock 'n Play, and I -- you can

1  see I made a measurement of 27.1 degrees there.
2  Then I did a whole series of examinations of that,
3  measuring it many times rocking it back and forth.
4      I think I did that with the exemplar.
5  Basically, I didn't want to use the actual one that
6  much because it has the stain in it.
7      Q.  Right.  Right.
8      A.  So I did it, showed it was 27.1, and then
9  I did -- then I did the many tests rocking it back
10  and forth.  I did the exemplar one.
11      Q.  Okay.  So that's where you got the -- the
12  combination of those measurements is where you
13  arrived at 27 degrees; correct?
14      A.  Yeah.
15      Q.  Were you aware of the and have you
16  reviewed the American Academy of Pediatrics policy
17  statement in effect at the time of Zoey's death?
18      A.  That sounds like something I would have
19  read.
20      Q.  Sure.  It's -- excuse me.
21      A.  Bless you.
22      Q.  I did not sneeze on the documents.  I'm
23  going to hand you --
24      A.  Okay.
25      Q.  -- Exhibit 12 for the record.

1          MR. HERMAN:  13.
2  BY MS. LOVETT:
3      Q.  Sorry.  13.
4          (Whereupon, Defendant's
5          Exhibit 13 was marked for
6          identification.)
7  BY MS. LOVETT:
8      Q.  Exhibit 13 is the 2011 American Academy of
9  Pediatrics Policy Statement on S.I.D.S. and Other
10  Sleep-Related Deaths.  Do you see that?
11      A.  Yes.
12      Q.  And --
13      A.  And just to speed things along in my
14  recollection, isn't this a document that was cited
15  by Dr. Fuller or --
16      Q.  It was a document that was cited by you.
17      A.  Okay.
18      Q.  And I'm looking at, on Page 1033 of the
19  report, if you look at it.
20      A.  Okay.
21      Q.  You see -- if you look where it says the
22  letter E --
23      A.  Yes.
24      Q.  -- it says:
25      "Sitting devices, such as car

1      safety seats, strollers, swings,
2      infant carriers, and infant slings,
3      are not recommended for routine sleep
4      in the hospital or at home."
5      Correct?
6      A.  Yes.
7      Q.  And in 2011, we don't see incline sleepers
8  listed here, do we?
9      A.  No.  Because I think that, as you know,
10  there hadn't been a standard set up using that
11  terminology.  But you know, a sling would probably,
12  you know, have an incline to it, and that would be
13  a sleeper.
14      So I don't think that terminology was
15  being used in this kind of a document at that time.
16      Q.  The Rock 'n Play was on -- a sleeper was
17  on the market at that time?
18      A.  Yes, it was.
19      Q.  We see car seats, strollers, swings,
20  infant carriers, infant slings; right?
21      A.  Yes.
22      Q.  You agree with me that the angle of a car
23  seat is much steeper than 27 degrees?
24      A.  Well, you know, there's a great variety of
25  those angles.  In fact, they're adjustable --

1      Q.  Sure.
2      A.  -- usually.  But I think they would
3  generally be larger than 30 degrees.
4      Q.  Right.  And they could be as high as 45
5  degrees; true?
6      A.  That sounds about right to me.  I haven't
7  reviewed that --
8          MR. OSBORNE:  Form.
9          THE WITNESS:  -- standard in a while.
10  But it -- that would be a good estimate,
11  of a little more than 30, but not 60.  The
12  kid would fall forward all the time.
13  BY MS. LOVETT:
14      Q.  You -- nothing in this statement talks
15  about roll-over risk; correct?
16          (Whereupon, the document was
17          reviewed by the witness.)
18          MR. OSBORNE:  Excuse me.  While he's
19  reading that, what statement are you
20  referring to?
21          MS. LOVETT:  The statement of the
22  American Academy of Pediatrics that is
23  Exhibit 13.
24          MR. OSBORNE:  All right.  It's not up
25  on my list yet.  Stand by.

Page 253

1     All right.  I refreshed once and it
2  didn't come up, but it's here now.
3        (Whereupon, the document was
4     reviewed by the witness.)
5     THE WITNESS:  Okay.  I've reviewed E.
6  BY MS. LOVETT:
7     Q.  Yes.
8     A.  Can you repeat your question?
9     Q.  Yeah.  The question was that E doesn't
10 mention any sort of roll-over risk; correct?
11    A.  Well, I think there's two places that it
12 might.  For example, it says they might assume
13 positions that can create a risk of suffocation.
14 That's clearly a roll-over into the prone position.
15 They may not have used those words --
16    Q.  All right.
17    A.  -- but that's a description that
18 corresponds to that.
19       They're also citing to 19 through 23 and,
20 in fact, 25 through 29.  And there -- those
21 citations may for all I know talk about roll-over.
22 I don't know.  I didn't review all those.
23    Q.  Well, that's what I was going ask.  That's
24 my, actually, my next question.  Because you cite
25 to all of these A.A.P. sources for the statement in

Page 254

1  Footnote 9 of your report, but you said for all I
2  know they could say it.
3        So you didn't review all of the studies in
4  the A.A.P. statement; right?
5     A.  Not all of them.  Let me take a, just a
6  real quick look.  I don't want to waste your time.
7     Q.  Sure.
8        (Whereupon, the document was
9     reviewed by the witness.)
10       THE WITNESS:  I definitely didn't
11    review it in the sense that I relied on
12    it.  I actually may have seen those papers
13    before at some point in my life.  But I'm
14    not citing to there's some piece of
15    evidence in there.
16 BY MS. LOVETT:
17    Q.  All right.  Do you know if any of them
18 analyzed an incline sleeper?
19    A.  I don't know that right now.
20    Q.  Okay.  In Paragraph 99 of your report, you
21 say that, once an infant is rolled over into a
22 prone position, the incline surface poses a
23 hazardous condition; right?
24    A.  Yes.
25    Q.  You then say, you go on to say you

Page 255

1  witnessed this helpless condition for two of three
2  infants you placed in the Rock 'n Play; right?
3     A.  Yes.
4     Q.  But to be clear, they were placed prone in
5  the Rock 'n Play; right?
6     A.  That's certainly true for one of them.  As
7  we talked about, the girl, Palmer, I placed her on
8  her side and she had worked herself into that
9  position prone.
10    Q.  Right.  But none of the infants rolled
11 from supine to prone or from back to belly
12 independently and achieved that position in your
13 observation of live infants; right?
14    A.  Right.  That's correct.  I didn't observe
15 them for that long of a period for them to be able
16 to do that.
17    Q.  Further down in your report, Paragraph
18 100, you talk about the Mannen report.  And this
19 is -- Exhibit 14 will be the 2019 C.P.S.C.
20 commissioned Mannen report.  A copy for you.
21       (Whereupon, Defendant's
22       Exhibit 14 was marked for
23       identification.)
24    MR. OSBORNE:  Are we going to it now?
25 Should I leave Exhibit 3 behind?

Page 256

1     MS. LOVETT:  I'm going to be
2  toggling, John.  So I wish you could see,
3  I mean, just my work space right now.  But
4  I'm toggling back and forth between his
5  report and his finding -- his findings
6  related to the Mannen report, as you'd
7  probably expect I'd do.
8     MR. OSBORNE:  Thank you.
9  BY MS. LOVETT:
10    Q.  All right.  Have you reviewed the Mannen
11 report and relied on it in forming your opinions?
12    A.  I definitely reviewed it.  Did I rely on
13 it?  I think that's a different question.  I don't
14 really think I relied on it except that I cited to
15 it saying it's complementary to my analysis.  But
16 I'm not pointing my finger and saying I needed them
17 to do this --
18    Q.  Right.
19    A.  -- to arrive at my opinions.
20    Q.  Right.  That's a fair point.  This is
21 the -- this is a report that was actually
22 commissioned by the Consumer Product Safety
23 Commission; right?
24    A.  That's my understanding.
25    Q.  I understand that Dr. Mannen has other

Page 257

1    work published in peer review journals on this
2    topic, but this specific study and conclusions that
3    you're citing to here was not published; right?
4        A.  I mean, in a sense -- it was published in
5    the sense that you can go on-line and get it.  It's
6    publicly available.
7        Q.  Right.  I'm talking about --
8        A.  But do you mean it -- was it peer --
9        Q.  Peer reviewed.
10       A.  -- reviewed and go?  Not that I'm aware,
11   but some parts of it were.  The Wang paper, you
12   know, has some of this material in it.
13       Q.  Some of the things that she cited to, but
14   this report actually to your knowledge has not been
15   peer reviewed; right?
16       A.  The entirety of this review -- report as
17   far as I know has not been re -- peer reviewed and
18   published.
19       Q.  All right.  And Dr. Mannen did not
20   evaluate infant behavior in incline sleepers while
21   restrained; right?
22       MR. OSBORNE:  Form.
23       THE WITNESS:  That, I'm not sure of
24   without reviewing all of this.  If you
25   want to point me to the paragraph --

Page 258

1    BY MS. LOVETT:
2        Q.  Sure.
3        A.  -- says we didn't do it, I'll agree with
4    you.
5        Q.  Let's do that.  Let's look at Para -- look
6    at Page 3.
7        A.  Okay.
8        Q.  Dr. Mannen states:
9            "Parents are advised to always use
10           restraints in the products and to
11           discontinue use once an infant has the
12           ability to roll over."
13           Do you see that?
14       A.  No.  Could you tell me --
15       Q.  Yes.
16       A.  -- kind of --
17       Q.  It's on Page 3.  I can --
18       A.  Yep.
19       Q.  I'm going to have to give you a directive.
20       A.  There's a big paragraph at the top.  Is it
21   in that one?
22       Q.  Hang on.  I'm just starting -- this is
23   where the guys start shaking their heads.
24           If you look at -- in the portion about
25   Background, now, it says -- it's about -- there's

Page 259

1    one line that starts with "30 degree incline"?
2        A.  Okay.
3        Q.  Do you see that?  And right after that, it
4    says:
5            [As read]  "Parents are advised to
6            always use the restraints in the
7            products and to discontinue use once
8            an infant has rolled over."
9            Right?
10       A.  "Has the ability to roll over," yes, I see
11   that.
12       Q.  Okay.  If we go back to Page 38 and 39 of
13   your report and Paragraph 100, you cite to
14   Dr. Mannen's statement that, quote:
15           [As read]  "If an infant rolls
16           over within an inclined sleep product,
17           the product design of limited
18           horizontal space and a non-rigid
19           concave surface makes rolling prone to
20           supine difficult or impossible."
21           Right?
22       A.  Yes.  That's -- I'm just quoting from Page
23   47 of this report.
24       Q.  Right.  And the same principle should
25   apply for supine to prone rolling; correct?

Page 260

1        MR. OSBORNE:  Form.
2        THE WITNESS:  No.
3    BY MS. LOVETT:
4        Q.  Why not?
5        A.  Well, when the baby is supine, or let's
6    just say --
7        Q.  On her belly?
8        A.  -- on her back.
9        Q.  On the back, sorry.
10       A.  On her back.
11       Q.  On her back.
12       A.  When the baby's on the back, they're in a
13   biomechanically different position, and their
14   natural motion of pushing with their feet like
15   they -- like the motions they would use for walking
16   or standing, which is already being developed at
17   that age, they're pushing off forming a walking or
18   even a crawling motion, their feet are pushing
19   against the foot blocker.  And they're relatively
20   strong in that position, so they can push off and
21   they can generate forces and torques.
22           When they're on their belly, when they're
23   face down, the biomechanics of a baby would then
24   have them bend at the knee, and the legs would be
25   up in the air.  So if they do this kicking motion,

1 they're just kicking in air and they're not
2 generating any significant forces or torques.
3     So just looking at the lower body force
4 generation of an infant, it's much more efficient
5 for them to generate rolling torques when they're
6 on their back than when they're on their stomach.
7     Q.  Well, where Dr. Mannen -- and we're
8 talking about sort of a limited horizontal space in
9 the sense that, unlike a flat crib or a crib
10 without with walls, the baby would not have as much
11 horizontal space to maneuver because of the high
12 walls; right?
13     A.  I think that's what she's referring to
14 here --
15     Q.  And then a --
16     A.  -- yes.
17     Q.  -- non-rigid concave surface would be
18 that, those walls; right?
19     A.  Yeah.  It's really the walls.  You know,
20 the two walls are about 50 degrees, but they come
21 down and the angle starts changing and it really
22 creates, like, sort of a parabola or a valley, as
23 I've described it.
24     And that's what she's pointing to there
25 is, when the baby's face down in that, it's very

1 hard to turn out of that hammock-like -- they're
2 basically in a hammock configuration.  And when
3 you're on your belly in a hammock, it's just very
4 hard to turn over back on your back.
5     Q.  Let's look at Paragraph 102 where you're
6 discussing the seat bight.  And here you say:
7     "Using repeated leg motions, the
8 infant can make incremental rotations
9 to achieve a supine to prone roll."
10     Again, you've not witnessed any infant
11 display this behavior; right?
12     A.  No, I did see that behavior.
13     Q.  What is your basis for the opinion?
14     A.  I saw that in the Exponent videos.  And I
15 also saw it on the test that I did when the baby
16 started from a side position.
17     Q.  All right.  So we're talking here about a
18 supine to prone roll started on -- starting in the
19 back.  Where did you see in the Exponent data, and
20 did you cite in your report to any of the Exponent
21 data specifically, that references an infant
22 rolling from supine to prone while being placed
23 fully supine?
24     A.  Yes.  I mean, that -- remember, the third
25 video that Exponent gave to us are the cases where

1 the babies were able to do that.  Right?  They
2 broke their baby results down into not being able
3 to roll --
4     Q.  Right.
5     A.  -- being able to roll partially and then
6 rolling all the way over.
7     So that's the characterization of it on
8 videos is that they put babies in here, and they
9 were able to tempt them with the toy to get them to
10 roll over, and it's in those videos.
11     Q.  And your -- and your contention is that
12 the videos, in the third set of the Exponent videos
13 show the babies using repeated leg motions to make
14 incremental rotations to achieve a supine to prone
15 roll?
16     A.  Yeah.  I mean, they were wiggling all
17 around.  But they were doing other things.  It
18 wasn't just their legs --
19     Q.  Now you sound --
20     A.  -- that that's --
21     Q.  -- like me, wiggling all around.
22     A.  Right.
23     Q.  I'm talking about, I'm trying to use
24 your --
25     A.  Yeah.

1     Q.  -- your very precise --
2     A.  Sure.
3     Q.  -- engineering language:
4     "Using repeated leg motions, the
5 infant can make incremental rotations
6 to achieve a supine to prone roll."
7     Is it -- are you telling the jury that you
8 see that in the Exponent video you described?
9     A.  Yes.  I see the babies pushing with their
10 legs multiple times and rolling over.  Now, that's
11 not the only thing that they're doing.  I didn't
12 mean to say that, that they just sit there and
13 don't use their arms or they don't use their head.
14     But that's certainly part of what the baby
15 is doing.  They're kicking their legs and pushing
16 off and -- no baby just magically jumped onto their
17 face in those videos.  Right?
18     Q.  Right.
19     A.  They squirmed.
20     Q.  Right.  It takes more than the leg
21 motions; right?
22     A.  Yeah.  It's -- that's -- but that's part
23 of it.  That's what I'm trying to point out here is
24 that they're able to use their legs to create these
25 torques.  And I just use "torques" to make it clear

Page 265

1  that they're -- it's a rotational motion they're
2  doing, so you need torques for that.
3      So they generate these leg motions and
4  their little bits of torque, and they keep inching
5  over. They're moving their arms and legs and head
6  and all that kind of stuff, and that's how they get
7  turned over.
8      Q. All right. On Paragraph 104 of your
9  report, you agree that the walls do act to impede
10 rolling; correct?
11     A. Again, we talked about this actually
12 before. And I think that in some cases, yes, they
13 definitely impede it. But again, we talked about
14 how they can reach over and grab the wall.
15     Q. Right.
16     A. And we saw that's in the videos, too.
17     Q. Yes.
18     A. But if they're not doing that, then yeah,
19 as they turn to roll, there seems to be a force coming
20 from the side that's kind of keeping them from
21 rolling over. So in those cases, I agree the side
22 walls are impeding some rolling.
23     Q. Yeah. And you certainly agree that, if
24 the restraint is used as instructed, then none of
25 this is an issue; right?

Page 266

1      A. No, I don't agree with that.
2      MR. OSBORNE: Form.
3  BY MS. LOVETT:
4      Q. Well, you, I believe you -- we talked
5  about this at length. But if the baby is using the
6  restraint as instructed and is in -- and you said
7  this early in the deposition, the baby's not going
8  anywhere; right?
9      A. No, I didn't use --
10     MR. OSBORNE: Form.
11     THE WITNESS: -- that term. I was
12 pretty careful about this. If the baby is
13 cinched down really tight, then clearly
14 they can't go anywhere. You're strapping
15 them down. You're gluing them down.
16 BY MS. LOVETT:
17     Q. Yeah, I'm reading your testimony from Page
18 81 of the --
19     MR. OSBORNE: Form.
20 BY MS. LOVETT:
21     Q. -- rough draft.
22     MS. LOVETT: Excuse me. I'm just
23 talking.
24 BY MS. LOVETT:
25     Q. I'm reading your testimony from Page 81 of

Page 267

1  the rough draft at Line 23 from this morning:
2      "But my testimony is that, if you
3  cinch it down hard enough, they're
4  obviously not going to get away."
5      And that was what you said this morning.
6      A. That's right. If you cinch them down
7  really tight --
8      MR. OSBORNE: Form.
9      THE WITNESS: -- they won't get away.
10 But that's not how that's intended to be
11 used, and that's not how a lot of people
12 do use them.
13     So we have plenty of reports that
14 said we restrained our child with the
15 restraint and they worked out of it.
16 BY MS. LOVETT:
17     Q. Well, you said it's not how it's intended
18 to be used. Are you purporting to say how
19 Fisher-Price intended their product to be used, not
20 to be using the restraint securely?
21     A. The intended use of this, as I said --
22     MR. OSBORNE: Form.
23     THE WITNESS: -- I think very
24 clearly, is for overnight sleep.
25     Now, there may be a desire from

Page 268

1  Fisher-Price that people use the restraint
2  all the time, and I respect that and I
3  agree that they've used that.
4      But the intended use is certainly not
5  to restrain your child so much that it
6  makes them uncomfortable, they can't
7  breathe properly, and it would make them
8  squirm even more.
9      So that's clearly not their intent of
10 the restraint to be cinched down really
11 tightly.
12 BY MS. LOVETT:
13     Q. Well, okay. That -- but -- and your --
14 that's your word. What you saw clearly on the
15 warning label was "always use the restraint."
16 Right?
17     A. Yes. That's what the re -- that's what
18 the warning label says, "always use the restraint."
19 How exactly we should use it is not clear in the
20 instructions.
21     Q. Well, and Mr. Olson, I don't know if you
22 recall his deposition testimony, he has quite the
23 engineering background himself, he testified that
24 he had gone on-line, looked at all the instructions
25 for use and had benchmarked Zoey's development to

Page 269

1  not only the Rock 'n Play but other devices that
2  she used.
3        So you would agree with me that someone
4  like you or your wife or someone like Mr. Olson
5  who's coming at this from an engineering
6  perspective may take a look at the instructions,
7  but generally the restraints are intuitive, you
8  know.
9        Have you ever had to look at --
10       MR. OSBORNE:  Form.
11  BY MS. LOVETT:
12       Q.  -- the manual to know how to put, for
13  example, Oliver in the car seat?
14       MR. OSBORNE:  Form.
15       THE WITNESS:  I did not look at the
16  manual.  I think my wife did.  My wife
17  instructed me on how to do that one.
18  BY MS. LOVETT:
19       Q.  Right.
20       A.  But I know, when you put straps on, you
21  normally have to adjust them.  The babies are
22  vastly different size.
23       Q.  Right.
24       A.  And so there's some adjustment there, and
25  it's not clear how a user should adjust that so the

Page 270

1  baby can't get out of that.
2        And I think it's perfectly reasonable that
3  parents are going to put this restraint on their
4  baby and leave it kind of loose, because they want
5  the baby to be comfortable.  And in those
6  situations, it's very clear that the baby can work
7  their -- themselves out of the restraint.
8        Q.  Just nothing you've seen on any video or
9  in any live observation?
10       A.  No.  I don't think anyone has video --
11       MR. OSBORNE:  Form.
12       THE WITNESS:  I don't think anyone
13  has done a test and videotaped that.
14  Clearly it's happened, though.  We have a
15  lot of incident reports that parents are
16  saying that's what happened.
17  BY MS. LOVETT:
18       Q.  Yes.  And there are no photographs or --
19  you're relying on reports that are made by parents
20  in different situations but not with observation;
21  correct?
22       A.  That's right.  I'm relying on those
23  parental reports, as Ms. Drago instructed me that I
24  should.  I mean, those are important pieces of
25  information that are very useful in assessing the

Page 271

1  hazards of a product.
2        Q.  In your report where you talk about
3  breathability, you spend some time discussing that
4  and we've talked about that.  The investigative
5  records and the re-enactment photos show that
6  Zoey's face was not obstructed by the Rock 'n Play
7  fabric; correct?
8        A.  That's not my interpretation.
9        MR. OSBORNE:  Form.
10       MS. LOVETT:  Let's get the
11  re-enactment photos, please.
12       MR. OSBORNE:  Are we going to a new
13  exhibit?
14       MS. LOVETT:  We are.  This is going
15  to be Exhibit 14 --
16       THE REPORTER:  15.
17       MS. LOVETT:  15.  Sorry.
18       MR. OSBORNE:  Stand by.  One moment.
19            (Whereupon, Defendant's
20            Exhibit 15 was marked for
21            identification.)
22       THE WITNESS:  I don't know what this
23  is.
24       MS. LOVETT:  Oh, you know what that
25  is?  That's -- I think that got printed

Page 272

1  out and -- I'll take that.  I don't know
2  what it is, but I'm sure it's highly
3  privileged.
4        It's a totally different case.
5  Sorry.
6        THE WITNESS:  Yes.
7        MR. OSBORNE:  I have it open.
8  BY MS. LOVETT:
9        Q.  All right.  So Exhibit --
10       MR. OSBORNE:  Exhibit 15.
11  BY MS. LOVETT:
12       Q.  -- 15, these are the re-enactment photos
13  from the medical examiner's office in Maricopa
14  County of Zoey.  Have you -- have you seen this
15  before, this file, reviewed it?
16       A.  I think a -- you know, I've seen a lot of
17  these photos.  I've seen something very similar to
18  them.  I think I've seen these.
19       Q.  Okay.  You understand that this is how --
20  Mr. Olson was asked several times to show how Zoey
21  was placed and then how Zoey was found; correct?
22       A.  I don't know that he was asked several
23  times.  I know he was asked to do it.
24       Q.  And did you use these re-enactment photos
25  to form a basis of your opinion?

Page 273

1    A.  Yeah, I mean, I considered them.  I
2  don't -- you know, you value stuff differently.  I
3  mean, clearly this is showing that Zoey was found
4  in a prone position.  There's no indication here
5  this is some sort of accurate representation of her
6  arms and legs and exactly where her face was.
7       I mean, her arms are shown under her body.
8  So that would show that maybe she was entrapped by
9  her arms if that's accurate.
10      But I'm not sure that this is that
11  accurate.  I mean, you're asking parents who just
12  lost their child to do this.  They're not going to
13  do an accurate job of this.  They're going to give
14  you a relative representation --
15      Q.  Sure.
16      A.  -- of what happened.
17      Q.  Sure.  And you see --
18      THE VIDEOGRAPHER:  The paper.
19      MS. LOVETT:  I'm sorry.  In my work
20  space here.
21  BY MS. LOVETT:
22      Q.  If you look at Exhibit 15 and look with me
23  at the -- if you -- the page numbered 357, this is
24  a, for reasons I'm sure you can understand, this is
25  a doll that doesn't even have really human

Page 274

1  features, because you're dealing with the very
2  distraught parent.
3       And so you can see that there are
4  eyelashes basically there to indicate the face of
5  the doll that were sort of drawn on.  Do you see
6  that?
7       A.  Yes.
8       Q.  And so on Page 357, you can see that the
9  eyelashes are facing up, and the placard above that
10  says "placed."  So that indicates how Mr. -- and
11  when it was the freshest in his memory, although
12  certainly traumatic, Mr. Olson says that he placed
13  Zoey.
14      Do you see that?
15      A.  Yes.
16      Q.  And then if you go with me to --
17      MR. OSBORNE:  Form.
18  BY MS. LOVETT:
19      Q.  If you go with me to Page 361 where it
20  shows how Zoey was found, you can see that -- you
21  can see the eyelashes, so her face is turned to the
22  side, and her arm, her left arm is underneath her.
23      Do you see that?
24      A.  I mean, the -- I don't want to call this
25  Zoey, so I'm not going to say "her."

Page 275

1       Q.  I'm sorry.  I'm sorry.
2       A.  The mannequin.
3       Q.  The mannequin, the doll.
4       A.  This mannequin, yeah, has -- the left arm
5  is completely obscured, and the right one is kind
6  of tucked under a little bit.  The legs are kind of
7  extended.  It looks like they're indicating she had
8  pushed up, you know, up the incline like we know
9  that children do, or babies do when they escape
10  these restraints.
11      And then the head is just turned in some
12  weird way.  I mean --
13      Q.  Well, it --
14      A.  -- it's hard for me to tell what's going
15  on there.  I kind of see the ear coming out the
16  side.
17      Q.  Right.  And if you look at the -- if you
18  look at Page 362, which is the last page, it's a
19  little more of a close-up, you can see the ear and
20  you can see the eyelash.
21      So her face is turned to the side; right?
22      A.  Yeah.  I mean, turned to the side right
23  into that 50 degree side wall.
24      Also we need to, you know, point out here
25  for clarity, this isn't the same Rock 'n Play

Page 276

1  sleeper.  It has different soft goods.  It looks to
2  be substantially different in terms of how the soft
3  goods would conform to the face.
4       Q.  So this is a diff -- this is a different
5  sleeper that the -- that the Olsons had in the
6  home.  It's another Rock 'n Play.  For reasons I'm
7  sure that you understand, it was preferable to use
8  this sleeper for Mr. Olson's re-enactment.
9       But you can see here -- you did not test
10  the impact of breathability in the Rock 'n Play for
11  an infant that was -- had her face turned to the
12  side like this as displayed in the "found" placard
13  on Page 362 of Exhibit 15, did you?
14      A.  That was a long question.  Could you
15  repeat that?
16      Q.  Sure.
17      A.  There was a lot going on there.
18      Q.  When testing for the impact of
19  breathability in the Rock 'n Play in your report,
20  you did not test for an infant found in this
21  position in Exhibit 15 at Page 362 with her face
22  turned to the side?
23      A.  Well, I tested, you know, breathing.  As
24  you know, I placed my face into this Rock 'n Play
25  sleeper at about the middle and breathed through

Page 277

1    it.
2        This one has the mannequin turned in some
3    sort of unnatural, you know, way to the right.  I
4    don't think I could even turn my neck that much.
5    So no, I didn't replicate this exact position.
6        And also I don't have these particular
7    soft goods.  This has, like, a monkey in there
8    that, if I had to guess, was a little bit more
9    breathable than --
10       Q.   You're guessing?
11       A.   Yeah.  I'm guessing just based on my
12   knowledge of fabrics is that when you -- this
13   fabric would be a little bit more plush.  But yeah,
14   I'm not -- I didn't -- I don't have this
15   Rock 'n Play.
16       Q.   Right.
17       A.   And I couldn't contort my neck like that
18   and make a breathability test.  So I did not do
19   that.
20       Q.   All right.  Let's talk about rebreathing.
21   You're discussing the potential for rebreathing
22   while prone in the Rock 'n Play in your report.  I
23   think that's in Paragraph 118.  You also mention it
24   in Paragraphs 182 and 183.  I'm not suggesting --
25   I'm just, I'm orienting you.  You don't have to go

Page 278

1    to any of those.
2        So you agree with me that, for a
3    rebreathing event to occur, what we call
4    rebreathing, there has to be an interstitial space
5    that traps expired air, and the space itself has to
6    have restricted air flow?
7        A.   Yep.  That sounds about right.
8        Q.   So for example, an example we all could
9    understand as lay people is like breathing into a
10   paper bag?
11       A.   Yes.  Or breathing into a paper bag that
12   has holes in it, but still it's still restricted
13   air.  You can't get fresh air in.
14       Q.   You can't get fresh air, so you're
15   rebreathing expired air.  And that inter -- that
16   interstitial space is unable to be replenished with
17   fresh air and, instead, you're getting $CO_2$; right?
18       A.   Yes.  But of course, that -- there's a
19   range of that.  Right?  You could -- you could get
20   some fresh air.  But rebreathing hinges on the fact
21   that you expired some air and you breathed at least
22   some of that back in.
23       Q.   So in Paragraph 183 of the report -- your
24   report, which is at Page 68, you indicated that you
25   tested the product.

Page 279

1        Your test for rebreathing was pressing
2    your face into the fabric and trying to breathe for
3    a minute; right?
4        A.   Yes.  I mean, I'm doing a test very
5    similar to what the people at Fisher-Price did when
6    they tested the swatches.  I just put my face into
7    it and breathed.
8        Q.   Yeah.  What scientific article or standard
9    is that test for rebreathing based on?
10       A.   I don't think it's based on anything.
11   It's based on common sense.
12       Q.   Right.  So this isn't a scientific
13   standard of testing rebreathing or evaluating for
14   rebreathing; right?
15       A.   No.  This is the best kind of science,
16   which is based on common sense.  And I'm just doing
17   what Fisher-Price did, only in a slightly different
18   way.  Because instead of just breathing through a
19   swatch that they held to their face, I'm breathing
20   through it actually deployed into the product.
21   It's a great test.
22       Q.   Well, let's talk about how great a test it
23   is.  Because I know in -- you said in your lab that
24   you've got all kinds of cameras and all kind of
25   gadgets and all kinds of different ways to measure

Page 280

1    things.
2        You're an adult male.  How tall are you?
3        A.   Six foot tall.
4        Q.   How much do you weigh?
5        A.   Do I have to disclose that?  190.
6        Q.   I think that's perfectly acceptable.
7        You are -- you agree with me that the head
8    and nasal passages of an adult male such as
9    yourself are not the same as those of an infant;
10   true?
11       A.   Well, I mean, they're largely the same.
12   What do you mean by different?  Different size?
13   Different strengths of breathing?
14       Q.   Size?  Anatomy?
15       A.   Yeah.  I mean, my kid has a big head, so
16   mine's a little bit bigger than his, but.  My son
17   at two years old had a head as big as a lot of
18   people.
19       Q.   So with all of the resources available to
20   you at the University of Georgia and your friend
21   Dr. Frakes --
22       A.   Object to form.
23       Q.   You don't get to do that.
24       A.   Georgia Tech.
25       Q.   Oh, my gosh.  You can -- so oh, my gosh.

1  I did say that.  Georgia Tech.  I'm from Texas.
2  You're all the same.
3      A.  Yeah, that's right.
4      Q.  So let me -- let me -- let me rephrase.
5      With all of the information that you have
6  available to you at Georgia Tech with your good
7  friend Dr. Frake, who is -- Frakes, who is a
8  medical -- biomedical engineer, the best test that
9  you could come up with for rebreathing was placing
10 your face in the Rock 'n Play and attempting to
11 breathe for a minute?
12     A.  I'm not --
13         MR. OSBORNE:  Form.
14         THE WITNESS:  I'm not sure it's the
15 best test I could have came up with, but
16 it's a test that I did.  And I basically
17 just looked at what Fisher-Price had done
18 and did something similar to them.
19     But I think I did it better, because
20 I'm breathing through the fabric in the
21 way that it's used in the product.  So I'm
22 doing something similar to Fisher-Price,
23 but better.
24 BY MS. LOVETT:
25     Q.  All right.  So it's -- but that is the

1  only test that you did for breathability?
2      A.  Well, I mean, I did the test multiple
3  times.  That's the only kind of test.
4      Q.  That's the only kind of test that you did?
5      A.  Yes.
6      Q.  All right.  Let's look at your analysis of
7  the restraint.  I want to -- that starts at Section
8  8.3.5 of your report, which is Exhibit 3.
9      A.  Do you have a page number?
10     Q.  Now you're going to test me.  Because I
11 just threw it on the floor for about the tenth
12 time.  Section 8.3.5.
13     A.  Okay.
14     Q.  I will try to find the page number for
15 you.
16     A.  8.3.5.
17         MR. OSBORNE:  I've got it close on
18 37, so --
19         MS. LOVETT:  36?
20         MR. OSBORNE:  -- getting close.
21         MS. LOVETT:  46.
22         MR. OSBORNE:  I should -- there you
23 go.
24         THE WITNESS:  Okay.  I've got it.
25 BY MS. LOVETT:

1      Q.  All right.  So you start out by saying
2  here:
3         "Belt restraints are not generally
4      considered safe for use in overnight
5      sleepers because the infant can become
6      entangled in the belts."
7      What's your basis for the statement that
8  "belt restraints are not generally considered
9  safe"?  Because I didn't see a citation here?
10     A.  Okay.  Yeah.  That's just, that's general
11 knowledge.  I didn't put a citation there.  But I
12 think this is probably specifically pointed out in
13 the standards for certain bassinets and certain
14 cribs.
15     Q.  Probably?
16     A.  Yeah.  Probably.  I mean, I don't -- I'm
17 not going to be able to pull that for you right
18 now.  But you wouldn't have belts where babies were
19 sleeping because they could roll around, and then
20 the belt could get between their, you know,
21 their -- under their chin and then --
22     Q.  Right.
23     A.  -- they become entangled.  So it's kind of
24 just common knowledge that you wouldn't have
25 entanglement hazards in a sleeping environment.

1      Q.  Entanglement wasn't an issue in this case;
2  right?
3      A.  I don't think so.
4      Q.  In Paragraph 122 of your report, you say:
5         "The geometric design of the
6      Rock 'n Play allows the infant to push
7      upward and out of the belt restraint."
8      What's the basis for that statement?
9      A.  I measured the geometry of it --
10     Q.  Okay.
11     A.  -- and I observed live infants pushing
12 around.  I saw many videos by Exponent, for
13 example.  And then there's numerous incident
14 reports of this happening, and I think that there
15 was 30 before Zoey's death.
16     Q.  Now --
17     A.  Those are the 30 I focused on, but I think
18 there's ones after that as well.
19     Q.  Well, again, that's not really applying to
20 Zoey's death, though, because Zoey wasn't buckled
21 in and she wasn't found buckled; right?
22     A.  I, yeah, I don't think she was found --
23         MR. OSBORNE:  Form.
24         THE WITNESS:  -- buckled.
25         MR. OSBORNE:  I didn't --

Page 285

1    THE WITNESS: Oh. Sorry.
2    MR. OSBORNE: Sorry. I didn't hear
3  that. I didn't hear the question. But it
4  sounds like you did, so go ahead.
5    THE WITNESS: Yeah, I don't think
6  that she was found restrained. There's
7  some conflicting testimony about whether
8  she was originally restrained.
9  BY MS. LOVETT:
10   Q. Right. The -- Ms. -- you -- Mrs. Courkamp
11 testified, and I think you'd agree with me, that
12 Zoey could not have unbuckled herself from that
13 restraint; right?
14   A. Yeah, I don't think there's any way a baby
15 can unbuckle. But they can push out of the
16 restraint with their legs, as we talked about
17 previously.
18   Q. Right. But if you -- if you look at
19 the -- the issue that you're talking about with the
20 restraint was not an issue for Zoey, because Zoey
21 to the best of our knowledge was not restrained and
22 not entangled in the restraints; right?
23   A. I didn't get any evidence that she was
24 entangled. But like I said, there is this
25 possibility that she was restrained and pushed out

Page 286

1  of it. And I'm just pointing out here that that's
2  clearly possible.
3    Q. That's possible, your -- Mrs. Courkamp
4  says that she found Zoey unbuckled; right?
5    A. Maybe she did. I don't remember it with
6  that clarity. I mean, I think they found her
7  outside of the restraint. That's what I recall.
8    Q. Well --
9    A. But as far as unbuckled, I don't know if
10 she used that terminology.
11   Q. Is it your testimony that you said --
12 well, was it your testimony that Zoey at -- that
13 there was -- you've seen some photograph where the
14 restraint was buckled with -- and Zoey had wiggled
15 out. In other words, after the baby was taken out,
16 they performed C.P.R.
17     Is there any evidence that there were
18 photographs taken at the scene that showed the
19 restraints buckled?
20    MR. OSBORNE: Form.
21    THE WITNESS: I don't recall seeing
22 such photographs.
23 BY MS. LOVETT:
24   Q. And you would expect to see that if Zoey
25 had wriggled out; correct?

Page 287

1    MR. OSBORNE: Form and foundation.
2    THE WITNESS: I'm not sure why I
3  would expect to see that. I mean, I think
4  they were probably trying to, you know,
5  save her, and that's probably the main
6  focus.
7    And whether they moved -- they, when
8  they pulled her out of there, I'm sure
9  they dis -- they moved the sleeper in some
10 fashion.
11   I mean, those are soft, flexible
12 goods. So I guarantee that, when they
13 took her out, that the restraint wasn't
14 exactly in the same place as when they
15 found her. This is not realistic. It was
16 moved around to some extent.
17   But I don't remember them taking
18 photographs focusing in on that.
19 BY MS. LOVETT:
20   Q. You're -- but you're speculating what
21 happened when the restraint was moved around and
22 all that, that's not something you have any --
23    MR. OSBORNE: Form.
24 BY MS. LOVETT:
25   Q. -- knowledge of; right?

Page 288

1    A. I don't --
2    MR. OSBORNE: Oops. Sorry.
3    THE WITNESS: I don't think it's
4  speculation.
5    MR. OSBORNE: Form.
6    THE WITNESS: It's just I'm saying
7  when you pick a baby out of this, it's
8  flexible. There's no way that all of
9  those soft goods would stay in the same
10 place. It's not realistic.
11 BY MS. LOVETT:
12   Q. But if the buckle --
13   A. There would be some movement of the soft
14 goods.
15   Q. Right. I understand that. But if the
16 buckle were buckled and the baby had wriggled out,
17 you would expect the buckle to still be buckled;
18 correct?
19    MR. OSBORNE: Form.
20    THE WITNESS: Yes, I would expect
21 that.
22 BY MS. LOVETT:
23   Q. Okay. I want to talk about Section 9 of
24 your report. It talks about Fisher-Price's testing
25 of the Rock 'n Play. And we're folking -- we're

1    focusing about -- we start with pre-release testing
2    before the product was released to the market.  And
3    I think -- I see your first critique here in
4    Paragraph 133 starting with the play lab testing.
5    And you say, quote:
6            "...the ability of an infant to
7        roll from supine to sideways to prone
8        should have been tested."
9        Do you see that?
10   A.  Yes.
11       Q.  And then you later claim that a proper
12   design would have been a test like the ones you
13   conducted.  What exactly are you referring to by
14   the tests you conducted?  Are those the pictures of
15   Nicholas and his friends?
16       A.  Can you point me to where you're referring
17   to that?
18       Q.  Sure.  Paragraph 133.  If you look at --
19   so go one, two, three, four, five -- six lines up,
20   and there's a sentence that starts with:
21       "A proper design process would
22       have certainly involved analyses and
23       tests similar to those I presented
24       above during my evaluation of the
25       Rock 'n Play sleeper in Section 8."

1        Correct?
2        A.  Yes.  That's correct.
3        Q.  And those are the pictures of Nicholas and
4    Huxley and Palmer; right?
5        A.  Well, there I'm presenting -- I mean, I'm
6    referring to Section 8 --
7        Q.  Yes.
8        A.  -- which is a big section --
9        Q.  Yes.
10       A.  -- of stuff.  So I'm referring to all of
11   that.
12       Q.  Well, and I guess I'm asking you which
13   designed -- which test design are you referring to
14   if not the interactions with the doll, you placing
15   the doll and taking the video and Huxley, Palmer
16   and Nicholas being photographed in the
17   Rock 'n Plays?  What other tests or studies did you
18   design?
19       A.  Well, I point, first of all, to analysis.
20   So as you know, I analyzed the effect of laying on
21   an incline plane.  They could have easily done
22   that.  That's within the realm of any engineer.
23       They should have -- they should have done
24   that and noted that we're putting these babies on
25   an incline and it's actually easier to roll over on

1    an incline than a flat surface.
2        They should have done rebreathing tests.
3    They should have noted that the arms babies [sic]
4    could be blocked when they're in the prone
5    position.  I actually don't even --
6        Q.  Do you know what you meant there?
7        A.  Yeah.  I'm --
8        MR. OSBORNE:  Wait.  Wait.  He hasn't
9    done.  "I actually don't," and you
10   interrupted.
11       Please --
12       THE WITNESS:  You --
13       MR. OSBORNE:  -- continue the answer.
14       THE WITNESS:  Yeah.  I mean, I'm
15   telling you that I referred to the entire
16   Section 8.  And I'm just basically -- we
17   talked about this for, like, an hour of
18   the things that are in there, so I'm
19   referring to Section 8.
20       And you said what is that, and I'm
21   just kind of refreshing your memory of all
22   the stuff that I did in Section 8.
23       I measured its geometry.  I put
24   babies in there, I measured how far they
25   had to push to get out of the belt

1    restraint.  I breathed through the fabric.
2        I mean, all of that is in Section 8
3    should have been done.  And quite frankly,
4    they should have done a lot more than
5    that.
6    BY MS. LOVETT:
7        Q.  You're -- there's another criticism here
8    in Paragraph 134.  You say:
9            "...the ramifications of infant
10       rolling should have been tested."
11       Correct?
12       A.  Yes.
13       Q.  You saw the warning label.  Fisher-Price
14   had already warned consumers to always place the
15   infant on his or her back; correct?
16       A.  Yes.
17       Q.  And Fisher-Price had already warned
18   consumers to always use the restraint; correct?
19       A.  Yes.
20       Q.  You're not suggesting that Fisher-Price
21   should have put infants in a prone position in the
22   Rock 'n Play in testing of live infants, are you?
23       A.  They should certainly have done that.
24       Q.  And you say that the -- you're suggesting
25   that Fisher-Price should have placed infants in a

Page 293

```
 1    prone position and then evaluated the ability of
 2    the infant to turn over; that's your testimony?
 3       A.  Yes.
 4          MS. LOVETT:  Can we take a quick
 5    break?  Because I just need to walk around
 6    for a second.  My leg fell asleep.
 7          MR. OSBORNE:  We need to take five
 8    minutes --
 9          MS. LOVETT:  Oh, yeah, five.  Just
10    five.  I've got to --
11          MR. OSBORNE:  -- or less?
12          MS. LOVETT:  I'm just trying to
13    flex -- my foot's fallen asleep.  It's
14    distracting me.  So.
15          THE VIDEOGRAPHER:  The time is 3:01
16    p.m.  We are off video record.
17          (Whereupon, a discussion ensued
18       off the record.)
19          (Whereupon, there was a brief
20       recess.)
21          THE VIDEOGRAPHER:  The time is 3:07
22    p.m.  We are back on video record.
23    BY MS. LOVETT:
24       Q.  Doctor, if you'd find with me Section 9.2
25    of your report.  Discusses -- this discusses
```

Page 294

```
 1    Fisher-Price's post-release testing; right?
 2       A.  Yes.
 3       Q.  And you first discuss case history report
 4    data you've been referring to, which is in
 5    Paragraph 144, which in your opinion reflects what
 6    you call real world usage of the Rock 'n Play;
 7    right?
 8       A.  Yes.  Those case histories, you know, are
 9    reports coming from users of this using it as a --
10    you know, it's naturally used in the real world.
11       Q.  Yes.  The reports do not really provide a
12    full picture, though, do they?
13          MR. OSBORNE:  Form.
14          THE WITNESS:  Yeah, I mean, of course
15       those reports are various lengths of a
16       couple of sentences to a couple of pages.
17       I don't think that any kind of reports --
18    BY MS. LOVETT:
19       Q.  Okay.
20       A.  -- like that could give a full picture,
21    but they give a good picture.
22       Q.  Well, as an example, most don't discuss
23    the age of the infants, do they?
24       A.  I think most of them do.  I know that some
25    of them don't.
```

Page 295

```
 1       Q.  Most don't note whether the infant was
 2    restrained, although some do?
 3       A.  Yes.  That's right.  There's
 4    inconsistent --
 5          MR. OSBORNE:  Form.
 6          THE WITNESS:  -- reporting on whether
 7       or not it was restrained.  I think I
 8       picked out a lot of cases where there was
 9       definitive use of the restraint.
10    BY MS. LOVETT:
11       Q.  Some of the reports involve products by
12    other manufacturers which end up erroneously being
13    involved -- identified as Fisher-Price products;
14    right?
15       A.  That, actually, I'm not sure of.
16       Q.  Okay.
17       A.  Yeah.
18       Q.  You certainly would agree with me that,
19    given the variability among the reports, a prudent
20    manufacturer should vet this data before relying on
21    or discarding any of it?
22       A.  That's correct.
23          MR. OSBORNE:  Form.
24    BY MS. LOVETT:
25       Q.  So I want to look at your critique of the
```

Page 296

```
 1    Exponent testing, which you'll find at Page 60 of
 2    your report.  You believe that the testing is
 3    flawed.  And I'd like to look at the video that you
 4    claim shows the flaws.  This will be Exhibit 16.
 5    It is Bates stamp COU 23498.
 6          (Whereupon, Defendant's
 7       Exhibit 16 was marked for
 8       identification.)
 9          MS. LOVETT:  John, that has been
10    shared with you.
11          MR. HERMAN:  Do the same thing, just
12    press "play."
13    BY MS. LOVETT:
14       Q.  And Doc, I'm going to -- you can -- you
15    can -- I want to watch it with you so that we can
16    talk about it afterward.
17          (Whereupon, the video recording
18       was reviewed by the witness.)
19          MR. HERMAN:  It's pretty long,
20    though.
21          MS. LOVETT:  Yeah.  I -- how long is
22    this one?
23          MR. HERMAN:  I think in total it's
24    around an hour.
25          MS. LOVETT:  Yeah.  I'm not going to
```

Page 297

1    watch it the whole hour.
2  BY MS. LOVETT:
3    Q.  But this video is the -- you're critical
4  of this video.  And I want to walk through the
5  criticisms, and then we can discuss it.  So why
6  don't you press "pause."
7        Have you watched this video in its
8  entirety?
9    A.  Yes.
10    Q.  Your first criticism is that the toy was
11  not lowered enough.  And we can see in the video a
12  toy being sort of used to entice the baby.  Your
13  first criticism is that the toy was not low enough
14  when the infant was in the Rock 'n Play to motivate
15  a full roll-over; is that right?
16    A.  Yes.  You can see here in this video that
17  we're seeing, the toy is brought all the way down
18  to the horizontal.  So to keep it focused on it,
19  the baby has to turn essentially all the way over,
20  all the way onto the side.
21    Q.  Right.
22    A.  And that wasn't done in the Rock 'n Play.
23    Q.  Now, if it -- if you bring it down too
24  low, it's outside the baby's field of vision,
25  though; right?

Page 298

1    A.  That's right.  You only bring it down to
2  about 40 degrees, and then the baby can't really
3  see it anymore.
4    Q.  Okay.  We're going to move to time stamp
5  11:30.
6        MS. LOVETT:  So John, that's where
7  we're going is 11:30.
8        MR. OSBORNE:  Okay.
9        THE WITNESS:  I don't know how to
10  click and drag this one over to 11:30.
11  BY MS. LOVETT:
12    Q.  That's okay.
13    A.  Usually you can click and forward --
14    Q.  Mr. Herman can help you.
15    A.  Okay.  I got it going now.
16    Q.  There you go.  Okay.
17    A.  Oops.  Whoa.  Okay.  I have it, like, at
18  11 --
19        MR. OSBORNE:  This is the supine to
20  prone roll; right?
21        MS. LOVETT:  I don't know.
22        MR. OSBORNE:  Or am I --
23        MS. LOVETT:  I'm --
24        MR. OSBORNE:  -- one too early?
25        THE WITNESS:  That's 11:10.

Page 299

1        MR. OSBORNE:  Okay.
2  BY MS. LOVETT:
3    Q.  We're going to 11:30, supine to prone
4  roll.  There you go.  So here you're going to see
5  the infant stimulated, not restrained; right?
6    A.  Correct.
7    Q.  But when stimulated, the infant eventually
8  does a supine to prone roll; correct?
9    A.  Yeah.  I mean, that's what I would call
10  the prone.  I think some of your experts are saying
11  that's not prone.  But whenever they're kind of
12  face down to the fabric, I would call that prone.
13    Q.  Well, you point out a time stamp, and we
14  might have to go back.  It's 11:35 to 15:27, so
15  it's kind of a long stamp.  But you say the
16  infant's arm is pinned down by her side, making it
17  unable for her to roll back over.
18    A.  I can't get it to go the back.  But yeah,
19  so at some point her arm is pinned under, and that
20  could stop her from rolling back over.  I mean, you
21  can also possibly pull it out --
22    Q.  Well, so when I --
23    A.  -- and roll over.
24    Q.  When I first looked at your report,
25  because it seemed like a long time, you say -- you

Page 300

1  say in your report in Paragraph 163, you say that
2  that condition exists from 11:35 to 15:27.  But
3  actually, if you'll go to from 11:35, go to right
4  at minute 12.
5    A.  Okay.  I'm getting there.  This is 11:40.
6    Q.  Okay.
7    Q.  Okay.  We're coming up on 12.
8    Q.  Right.  There's minute 12.  No arm is
9  pinned by any side there, is it, Doctor?
10    A.  Not in this case, no.
11    Q.  Okay.  So it does not exist in the
12  condition from 11:35 to 15:27, as you say in
13  Paragraph 163 of your report, that the infant's
14  arms are pinned?
15    A.  Oh, I don't think I was meaning that the
16  infant's arms were pinned the entire time.  In that
17  case I'm referring to that they're in that prone
18  position for that entire time.  So I'm sorry if
19  that was confusing.
20    Q.  Okay.  That, yeah, that did confuse me.
21        You agree that the same -- let's go to
22  time stamp ten to 10:07.  Because what I -- what I
23  think we just saw was a sort of temporary arm
24  pinning.  And if you go back to 10:07 in this
25  video, we're going to see infant in a crib.

1    A. 10:07?
2         MR. OSBORNE: Do you want him to play
3    on from 10:07?
4         MS. LOVETT: Yeah, he's manipulating
5    it to 10:07, yes. And I can see it and he
6    can see it.
7         THE WITNESS: Well, I'm just going to
8    let it play on. I'm at 9:40.
9         MS. LOVETT: He's at 9:40. He's
10   going to let it -- he's going to let it...
11        THE WITNESS: But you want to start
12   talking about ten oh, what?
13   BY MS. LOVETT:
14   Q. 10:00.
15   A. Okay. We're almost there. It's at 9:40.
16   Q. All right. So here we have a 4.7-month
17   old, subject nine, in a crib, supine to prone roll.
18   And what we see is, in the crib do you see the arm
19   gets temporarily pinned there also; right?
20   A. Yes.
21   Q. And that's seven seconds there, you see
22   the baby's arm getting pinned under her in a crib.
23   A. Yes.
24   Q. Right?
25   A. That's right.

1    Q. All right. So you agree with me, just
2    because this particular baby chose not to roll back
3    does not mean that she was incapable of doing so,
4    because she's moving around pretty good there?
5    A. Which baby?
6    Q. The baby in the -- I'm sorry. The baby in
7    the -- that first sat in the Rock 'n Play, the baby
8    who was pulling up.
9    A. Oh, yeah, that baby couldn't get out. I
10   mean, they sat there for, like, four minutes and
11   they were, like, trying to do everything they could
12   to get her to roll back and she couldn't. So they
13   had to rescue her. They had to pick her up and
14   pull her out of there.
15   Q. The babe -- they had to rescue the baby?
16   A. Yeah. I mean, the baby was breathing
17   really hard. And it looks like, you know, the
18   experimenters were getting pretty anxious. So they
19   had to -- they had to rescue her, take her out of
20   there.
21   Q. Well, going back on this, so you -- you're
22   the person that told me a little bit before the
23   break that you think Fisher-Price should have
24   tested babies in the prone position.
25   A. Yeah. That's right.

1    Q. So just how long should they have left
2    them there struggling? How would you design that
3    study?
4    A. That's a good question. I mean, I've
5    designed a lot of studies when I have to do what's
6    called an insti -- an I.R.B., an Institutional
7    Review Board plan. And so you plan out the studies
8    and.
9    Q. I'm familiar.
10   A. You make those plans, and other people
11   review them, and you go back and forth.
12        So I don't know exactly how they should
13   have done it. I think they should have done it
14   maybe similar to the way Mannen did it, which was
15   they had oxygen monitors and they limited the
16   amount of time that they were in the prone
17   position.
18        But Mannen was able to do testing like
19   this, so certainly Fisher-Price should have been
20   able to. The exact details I think need to be
21   worked out with a team of people discussing, you
22   know, how to do this safely.
23   Q. You didn't attempt to put together any
24   protocol or tempt -- or attempt to test babies. In
25   fact, you said you only had Palmer in there for

1    maybe 45 seconds in the prone position; right?
2    A. I don't think I testified on how long I
3    had Palmer in the prone position.
4    Q. How long --
5    A. But --
6    Q. -- was she there?
7    A. -- it was probably only a couple of
8    minutes.
9    Q. All right.
10   A. Yeah.
11   Q. And that's all you were comfortable with?
12   A. Yeah, I saw -- again, I wasn't testing for
13   her to roll back over. I wanted to see what kind
14   of motions she would make in that position,
15   how she would push off and how she would interact
16   with it. So after a couple of minutes I got a
17   good -- I got a good idea --
18   Q. Right.
19   A. -- of how babies interact with it. So I
20   wasn't trying to see if she could roll back over.
21   Q. We don't have a video of Palmer, we have
22   just a video of the doll; right?
23   A. Yeah. I mean, that video isn't -- you
24   know, that video is not even a video.
25   Q. Right.

Page 305

1      A.  It's stop action pictures that I put
2  together just to demonstrate the sequence a little
3  bit easier.
4      Q.  In Paragraph 165 you've got a list of
5  similar related infants -- similar related
6  incidents.  Were the incidents in that list
7  provided to you by counsel?
8      A.  In which paragraph?
9      Q.  165.
10     A.  Well, I mean, I have all these reports,
11 and there's hundreds of them, I guess, that were
12 turned over to me, and I reviewed some of them.
13 And we as a team, the lawyers, Kristen Schriner and
14 myself, we found this list.  She definitely gave me
15 some of them.
16     Q.  All right.  Are you aware that, in at
17 least 20 of these incident reports, the infant was
18 placed in the Rock 'n Play with a blanket or
19 additional object?
20     A.  That's not some -- I don't recall that.  I
21 didn't check for that.
22     Q.  Okay.  Do you know that many of the
23 infants in these similar incident reports were
24 swaddled?
25     A.  I know some of them were swaddled, yes.  I

Page 306

1  don't know how many.
2      Q.  Did you know that the majority of them
3  were not restrained?
4      A.  I didn't count that up --
5          MR. OSBORNE:  Form.
6          THE WITNESS:  -- but I'm aware that a
7  fair number were not restrained.  And
8  that's what I would expect.  People use
9  this without the restraints.  That's the
10 expected use.
11 BY MS. LOVETT:
12     Q.  The expected use of Fisher-Price on that
13 warning label is that people are going to ignore
14 the warning that says this can cause injury or
15 death, always use the restraints?
16     A.  Yeah.  Fisher-Price knew they wouldn't use
17 it.  Their testing proved that to them.
18     Q.  That's your interpretation of what
19 Fisher-Price knows?
20     A.  That's not an interpretation of what they
21 know.
22         MR. OSBORNE:  Form.
23         THE WITNESS:  That's exactly what
24 they know.
25 BY MS. LOVETT:

Page 307

1      Q.  And your testimony is, for example, that
2  Mike Steinwachs knowing that let nine of his
3  grandchildren sleep in this product?
4      A.  That's my understanding.  Yeah, he knew
5  that --
6          MR. OSBORNE:  Form.
7          THE WITNESS:  He knew that these
8  restraints would not be used by a large
9  number of people.  Whether or not his
10 grandparent -- his grandkids were
11 restrained, I do not know.
12 BY MS. LOVETT:
13     Q.  Let's look at your rebuttal report,
14 Exhibit 4.  When --
15         MR. OSBORNE:  Since we're kind of in
16 a transition and we're ten minutes away,
17 what, if any, proposal do you make?
18 You're just starting the rebuttal report.
19         MS. LOVETT:  Yeah, my --
20         MR. OSBORNE:  So.
21         MS. LOVETT:  I'm going to have some
22 questions.  But I mean, I'm not going to
23 be pushed on this, John.  I mean, this
24 is -- I didn't agree to waive two and a
25 half hours of deposition time with the

Page 308

1  witness.
2          MR. OSBORNE:  I appreciate that, but
3  I have a hard deadline.  So considering
4  the amount of time that remains in your --
5  in your allowed deposition, it seems
6  likely that we need to come back.
7          I'm not in favor of it, but I'm not
8  denying that you got maybe four-sevenths,
9  a little over four-sevenths of your
10 allotted time.
11         MS. LOVETT:  So well, I'm going to --
12         MR. OSBORNE:  So.
13         MS. LOVETT:  I'm going to move to a
14 different -- I'm going to move to a
15 different area.  But in order to do so, I
16 need to get some basic understandings of
17 his rebuttal report.
18         MR. OSBORNE:  All right.  Well, we
19 don't want to be rude.  And I also want to
20 indicate that, considering the time, I'm
21 open to further deposition.
22         But it needs to happen really soon.
23 Because it's not fair to -- you know,
24 it'll be more of a second bite at the
25 apple if it's too far off in time.

Page 309

1      MS. LOVETT: Right. No, I --
2      MR. OSBORNE: But go ahead.
3  BY MS. LOVETT:
4      Q. All right. So, so with the -- your
5  rebuttal report, when did you write this report?
6      A. Well, I turned it in on July 16th, so I'm
7  sure I spent the three weeks before that writing
8  it.
9      Q. Okay. In Section 3, you outline
10 additional material that was provided to you since
11 the original report; right?
12     A. Yes.
13     Q. And I see that you were provided with five
14 of the defendant's seven expert reports. Do you
15 see that? Or I count five there.
16     A. Yes.
17     Q. Are you aware of the -- Mattel and
18 Fisher-Price's expert Dr. Goldsmith?
19     A. I've heard the name.
20     Q. You've never seen Dr. Goldsmith's report?
21     A. I think I've seen it.
22     Q. All right. And do you know that
23 Dr. Goldsmith's report addressed some of the issues
24 you raised in your report regarding the A.A.P.
25 policy statement?

Page 310

1      A. I don't recall knowing that.
2      Q. Did you ask to see the report of
3  Dr. Goldsmith?
4      A. I think they gave it to me.
5      Q. Okay. Is --
6      A. So I don't think I asked. I think they
7  gave it to me.
8      Q. Okay. Do you -- but you don't list it as
9  something that was provided to you in advance of
10 your rebuttal, do you?
11     A. No. What I'm here -- I think what I'm
12 doing here is listing the stuff that I'm directly
13 rebutting in this report. That's what this -- this
14 is what I'm considering for the opinions in this
15 report.
16     Q. Okay. So you were not choosing to attempt
17 to rebut Dr. Goldsmith's conclusions in his report?
18     A. Yeah. I mean, I think I took a brief look
19 at it and didn't see anything that needed rebutting
20 I guess maybe is my answer to that.
21     Q. Were you provided the report of Dr. Gibb,
22 Mattel's epidemiologist?
23     A. I probably was provided that, but I don't
24 think I looked at that at all.
25     Q. Okay. I want to talk about your rebuttals

Page 311

1  to Dr. Rundell's report for just a second. You've
2  already talked about this. You were talking about
3  that you rather have had the audio.
4      Do you remember that?
5      A. Yes.
6      Q. Your counsel were provided with full video
7  in this case, audio and video. Were you aware of
8  that?
9      A. No. I mean, the -- some of the -- some of
10 the clips that I have actually have audio. I got a
11 big mess of different kinds of videos --
12     Q. Right.
13     A. -- and some of them did have audio. The
14 main three that I interpreted was their where they
15 had -- where they had cut the different things
16 together and made the video for what they called
17 non-rollers and medium rollers and rollers. My
18 video -- my version of that doesn't have the audio.
19     Q. Yeah, the Mannen study --
20     MR. OSBORNE: And without -- wait a
21 minute. Before we get moving on too far,
22 I'm not by my silence agreeing that we
23 have received all that material or not in
24 the, you know, scads of material we've
25 received.

Page 312

1      I'm going to be -- to shut up now and
2  let you continue, but I'm certainly not
3  agreeing to that assertion that you just
4  made.
5      MS. LOVETT: I'm representing by my
6  assertion that we did, indeed, produce
7  that to you. So I'm not being silent
8  about it.
9      MR. OSBORNE: Okay.
10     MS. LOVETT: But that --
11     MR. OSBORNE: Thank you.
12     MS. LOVETT: Since -- I just want you
13 to know that.
14 BY MS. LOVETT:
15     Q. So in Paragraph 49, you're talking about
16 the Fox, Shaffer and the Exponent data, Explico
17 data, E.S.I. data, and you criticize all of them
18 because the infant, each infant was only in there
19 for a span of roughly ten to 60 minutes; right?
20     A. I believe Paragraph 49 I'm just speaking
21 to the Fox and Shaffer --
22     Q. Okay.
23     A. -- I think. I mean, I haven't read all
24 the progress leading up to that, but I think that's
25 what...

Page 313

1    Q.  But your criticism is that the -- these
2  weren't long enough observation periods, because
3  the child was only observed for a span of roughly
4  ten to 60 minutes; correct?
5    A.  Yes.  If what you're trying to prove is
6  that -- a negative, you're trying to prove a
7  negative, this cannot happen, then observing
8  children or babies in these products for very short
9  periods of time is not going to get that done.
10    Q.  Did you know that the Mannen study was
11  based on one-minute increments?
12    A.  Yes, I did.
13    Q.  Does that make the Mannen study deficient?
14    A.  No.  They were testing something
15  different.  They were testing muscle activity, and
16  they were testing oxygen content.  They weren't
17  testing, you know, the ability of the student -- of
18  the babies to roll over.  So it depends on what
19  you're testing for as how long your duration should
20  be.
21    Q.  What were you testing for?
22    A.  I was testing for the geometry, for
23  example, the angles.
24    Q.  When you had the babies in the sleepers,
25  what were you testing for?

Page 314

1    A.  I was testing for the geometry, or the
2  distance from the head to the head blocker, the
3  distance from the belt to the foot blocker.  I was
4  testing for the kinds of motions that a baby would
5  make on their back and on their side and in the
6  prone position.
7    Q.  And you were testing for the ability of
8  infants to push up and roll over; correct?
9    A.  No.  Not really.  I was just testing for
10  what kinds of motions they would make.  I didn't --
11  I didn't try to sit there and tempt them to roll
12  over.  I'm not -- I wasn't doing that test.
13      I was seeing what kinds of forces they
14  would generate and what kind of motions they would
15  make while they were in various positions.
16    Q.  So it was okay for your studies to be 45
17  minutes or under?
18    A.  Yeah.  I'm not trying to test for a
19  negative.  I'm not trying to prove something
20  doesn't happen over a million week uses.  I'm
21  trying to evaluate what does happen when babies are
22  in these positions so you can observe them for
23  shorter periods of time.
24    Q.  You also criticize in your rebuttal report
25  Explico's use of an Owlet Smart Sock monitor.  Do

Page 315

1  you remember that?
2    A.  Yes, I do.
3    Q.  You understand that Dr. Mannen used the
4  same pulse oximeter; right?
5    A.  I know that she used it for part of her
6  tests.  But I think that she used a different one
7  to collect a lot of her data.  I know a lot of
8  people tried to use that Sock several years ago,
9  and sometimes it works, sometimes it doesn't.
10      So I think that she tried to use it, but
11  ultimately she used a different oxygen sensor.
12  That's my understanding.
13    Q.  Are you aware that it has been recently
14  praised as an -- in peer reviewed journals as an
15  excellent pulse oximeter?
16    A.  I've read several journals that talk about
17  the use of it and how it could possibly be useful.
18  Yes, I'm aware of that.
19    Q.  You've -- we've talked about Dr. Drago and
20  your rebuttals to Dr. Drago's report.  On Page 71,
21  you discuss --
22    A.  Just to clarify, is she a doctor?
23    Q.  I'm sorry.  Mrs. -- Ms. Drago.
24    A.  Okay.
25    Q.  I know some people are picky about that.

Page 316

1  I could go by doctor, but I don't.
2    A.  Oh, yeah, I just didn't know --
3    Q.  Brady does.
4    A.  I missed that she was a medical doctor if
5  that's what she was.
6    Q.  No.
7    A.  I didn't think she was.
8    Q.  I'm sorry.  I usually just defer.
9      Page 71 you're talking about Ms. Drago's
10  book From the Crib to Kindergarten; right?
11    A.  Yes.
12    Q.  You understand that the passage you had
13  to -- you quote there had to do with a swinging
14  cradle and not a Rock 'n Play; correct?
15    A.  Yes.  This was written before the
16  Rock 'n Play.
17    Q.  And then Section 6.2 of your rebuttal
18  talks about Ms. Drago's opinion on foreseeability
19  of parental misuse; right?
20    A.  Yes.
21    Q.  You also provide extensive criticism on
22  the foreseeability of the opinions of Mattel's
23  human factors expert, Dr. Arndt; correct?
24    A.  Yes.
25    Q.  You are not a human factors expert, are

Page 317

```
 1   you, sir?
 2       A.  Oh, I certainly am.
 3       Q.  From personal observation?
 4       A.  What?
 5       Q.  From personal observation?
 6       A.  I don't understand what your -- is that a
 7   question?
 8       Q.  Yes.  Have you taken any classes of human
 9   factors?
10       A.  Human factors, not only have I taken
11   classes, I teach classes that have human factors in
12   them.  I teach the material.
13       Q.  In Section 6.3, Paragraph 203, have you --
14   have you ever taught any material -- any classes on
15   human factors in parents and infants?
16       A.  Yes.
17       Q.  Related to use of sleep products?
18       A.  Yes.
19       Q.  What products?  What classes?
20       A.  The classes that I teach that have the
21   material in there are called Rehabilitation
22   Engineering.  That's a graduate course -- a
23   graduate course at Georgia Tech.
24           I also introduce that material in the
25   introductory design class I teach at Georgia Tech
```

Page 318

```
 1   which is ME 2110.  It has about 300 students a
 2   term.  And it's also in a biomedical engineering
 3   course that I co-teach with Dr. Frakes.
 4           So in three different courses --
 5       Q.  Dr. Frakes we discussed.
 6       A.  Yeah, in three different courses I
 7   actually discuss human factors as related to
 8   juvenile products, and specifically sleeping
 9   products and playpens and swings.
10       Q.  Look at Paragraph 2 --
11           MR. OSBORNE:  Okay.  At this point --
12   at this point we've reached 3:30 in the
13   afternoon.  Dr. Singhose has emphasized to
14   me for a week how important it is for him
15   to leave at -- now.
16           And we'll have to go off the record
17   and probably do whatever you want to do
18   next, but the sooner the better as far as
19   any further deposition.
20           MS. LOVETT:  All right.  We'll do
21   that, Dr. Singhose.
22           THE VIDEOGRAPHER:  Stand by.
23           The time is approximately 3:30 p.m.
24   This concludes today's videotaped
25   deposition for Dr. William Singhose.  We
```

Page 319

```
 1   are off video record.
 2           (Whereupon, a discussion ensued
 3   off the record.)
 4           (Whereupon, the reading and
 5   signing of the deposition by the
 6   witness was reserved.)
 7               - - -
 8           (Witness excused.)
 9               - - -
10           (Whereupon, the deposition
11   concluded at 3:30 p.m. Eastern
12   Standard Time.)
13               --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 320

```
 1           VERITEXT LEGAL SOLUTIONS
 2       FIRM CERTIFICATE AND DISCLOSURE
 3
 4       Veritext represents that the foregoing
     transcript as produced by our Production
 5   Coordinators, Georgia Certified Notaries, is a
     true, correct and complete transcript of the
 6   colloquies, questions and answers as submitted by
     the certified court reporter in this case.
 7
 8       Veritext further represents that the
     attached exhibits, if any, are a true, correct and
     complete copy as submitted by the certified
 9   reporter, attorneys or witness in this case;
10       And that the exhibits were handled and
     produced exclusively through our Production
11   Coordinators, Georgia Certified Notaries.  Copies
     of notarized production certificates related to
12   this proceeding are available upon request to
     litsup-ga@veritext.com.
13
         Veritext is not taking this deposition
14   under any relationship that is prohibited by OCGA
     15-14-37(a) and (b).  Case-specific discounts are
15   automatically applied to all parties at such time
     as any party receives a discount.  Ancillary
16   services such as calendar and financial reports are
     available to all parties upon request.
17
18
19
20
21
22
23
24
25
```

## Page 321

```
 1         R E P O R T E R   C E R T I F I C A T E
 2   STATE OF GEORGIA )
     COBB COUNTY     )
 3
 4        I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
 5   certify:
              That prior to being examined, the witness
 6   named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
 7   nothing but the truth;
              That said deposition was taken before me
 8   at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
 9   computerized transcription under my direction and
     supervision. And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.
11        Review of the transcript was requested.
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto.
13        I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case.
          IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 28th day of September,
     2021.
17
18
19
20         <%13053,Signature%>
21         _____
           Debra M. Druzisky
           Georgia CCR-B-1848
22
23
24
25
```

## Page 322

```
 1   To:  Mr. Osborne
 2   Re:  WILLIAM E. SINGHOSE, Ph.D.
 3   Date Errata due back at our offices:  30 Days
 4
 5   Greetings:
 6
 7        This deposition has been requested for read and
     sign by the deponent.  It is the deponent's
 8   responsibility to review the transcript, noting any
     changes or corrections on the attached PDF Errata.
 9   The deponent may fill out the Errata electronically
     or print and fill out manually.
10
          Once the Errata is signed by the deponent and
11   notarized, please mail it to the offices of
     Veritext (below).
12
          When the Errata is returned to us, we will seal
13   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of
14   the Errata to all ordering parties.
15        If the signed Errata is not returned by the
     above date, the original transcript may be filed
16   with the court without the signature of the
     deponent.
17
18   Please send completed Errata to:
19   Veritext Production Facility
20   20 Mansell Court, Suite 300
21   Roswell, Georgia  30076
22   (770) 343-9696
23
24
25
```

## Page 323

```
 1   ERRATA FOR ASSIGNMENT # 4797857
 2        I, the undersigned, do hereby certify that I
     have read the transcript of my testimony, and that
 3
 4   _____ there are no changes noted; or
 5   _____ the following changes are noted:
 6
          Pursuant to Rule 30(7)(e) of the Federal Rules
 7   of Civil Procedure and/or OCGA 9-11-30(e), any
     changes in form or substance which you desire to
 8   make to your testimony shall be entered upon the
     deposition with a statement of the reasons given
 9   for making them.
10        To assist you in making any such corrections,
     please use the form below.  If additional pages are
11   necessary, please furnish same and attach hereto.
12   Page____Line____Change:_ _____
13   Reason for change:_____
14   Page____Line____Change:_ _____
15   Reason for change:_____
16   Page____Line____Change:__ _____
17   Reason for change:_____
18   Page____Line____Change:__ _____
19   Reason for change:_____
20   Page____Line____Change:__ _____
21   Reason for change:_____
22   Page____Line____Change:___ _____
23   Reason for change:_____
24   Page____Line____Change:___ _____
25   Reason for change:_____
```

## Page 324

```
 1   Page____Line____Change:____ _____
 2   Reason for change:_____
 3   Page____Line____Change:_____ _____
 4   Reason for change:_____
 5   Page____Line____Change:_____ _____
 6   Reason for change:_____
 7   Page____Line____Change:_____ _____
 8   Reason for change:_____
 9   Page____Line____Change:_____ _____
10   Reason for change:_____
11   Page____Line____Change:_____ _____
12   Reason for change:_____
13   Page____Line____Change:_____ _____
14   Reason for change:_____
15   Page____Line____Change:_____ _____
16   Reason for change:_____
17   Page____Line____Change:____ _____
18   Reason for change:_____
19   _____
                DEPONENT'S SIGNATURE
20
21   Sworn to and subscribed before me this _____ day of
22   _____, 2021.
23   _____
24   NOTARY PUBLIC
     My Commission Expires: _____.
25   _____ Notary Public
```

Page 325

```
 1        R E P O R T E R   D I S C L O S U R E
 2   DISTRICT COURT  )  DEPOSITION OF
     NORTHERN DISTRICT)   WILLIAM E. SINGHOSE, Ph.D.
 3   ATLANTA DIVISION )
 4        Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
 5   Judicial Council of Georgia, I make the following
     disclosure:
 6        I am a Georgia Certified Court Reporter.
     I am here as a representative of Veritext Legal
 7   Solutions.
          Veritext Legal Solutions was contacted by
 8   the offices of Greenberg Traurig to provide court
     reporting services for this deposition.  Veritext
 9   Legal Solutions will not be taking this deposition
     under any contract that is prohibited by O.C.G.A.
10   9-11-28 (c).
          Veritext Legal Solutions has no contract
11   or agreement to provide court reporting services
     with any party to the case, or any reporter or
12   reporting agency from whom a referral might have
     been made to cover the deposition.
13        Veritext Legal Solutions will charge its
     usual and customary rates to all parties in the
14   case, and a financial discount will not be given to
     any party in this litigation.
15
16           <%13053,Signature%>
17           Debra M. Druzisky
             Georgia CCR-B-1848
18
19
20
21
22
23
24
25
```

**A**

**A.A.P** 253:25
  254:4 309:24
**a.m** 1:16 5:3
  79:11,18
**A.S.T.M** 53:12
  53:15 54:11
  55:9 63:15
  69:25 70:12,13
  120:25 124:5
  130:19 131:5
  132:5,24 133:9
**ability** 11:2 83:2
  151:13 199:1
  215:17 258:12
  259:10 289:6
  293:1 313:17
  314:7
**able** 11:6 33:23
  38:25 41:5,21
  69:12,15 97:23
  119:23 162:18
  165:2,3 173:10
  173:11 215:15
  237:12,16
  255:15 263:1,2
  263:5,9 264:24
  283:17 303:18
  303:20
**abled** 152:8
**above-caption...**
  3:10,14,16
**absence** 20:7,10
  35:24
**absent** 188:18
**Absolutely**
  213:12
**abstract** 209:8
  209:19
**Academy** 4:11
  249:16 250:8
  252:22
**acceptable**
  280:6
**access** 87:20
  242:25
**accident** 109:9
  156:21 157:3,9
  157:11,19
  158:16,18,21

**158:24 159:2**
**accidental** 216:8
**accidentally**
  197:14
**accidents**
  156:24 157:15
  157:19 158:3
  158:14,22
**accompany**
  244:13
**accomplish**
  145:19
**accomplishme...**
  201:23
**account** 9:11
  28:15
**accuracy** 15:20
**accurate** 12:21
  273:5,9,11,13
**accurately**
  24:23
**achieve** 190:8
  262:9 263:14
  264:6
**achieved** 255:12
**acquainted**
  74:19
**acquire** 42:15
**acquired** 16:2
  21:11,17 24:7
  24:25 30:16
**acquiring**
  133:23
**act** 265:9
**acting** 48:23
**action** 3:10,14
  3:16 197:23
  305:1
**active** 145:16
  223:17,17
  226:14,20
**actively** 70:23
**activities** 120:23
  127:18 133:22
**activity** 4:4 64:6
  209:4,10
  313:15
**actual** 40:18,20
  45:12 94:4
  248:25 249:5

**actuators** 14:12
  31:2
**add** 83:17,23
**added** 169:11
  170:5,13
**adding** 167:2
**addition** 93:12
  145:23 168:13
**additional** 86:11
  89:11 212:24
  305:19 309:10
  323:10
**additionally**
  168:12
**additions** 85:7
**address** 6:6,7
  39:6
**addressed**
  309:23
**addressing**
  110:20
**adjectives**
  225:16
**adjust** 239:20
  269:21,25
**adjustable**
  251:25
**adjustment**
  269:24
**admissible**
  160:13
**admit** 173:14
**adopted** 169:19
**adopting** 131:12
**adorable** 172:25
  173:9 174:6
  204:6 225:17
**adult** 152:10,23
  280:2,8
**adults** 37:14
**advance** 310:9
**advised** 188:14
  258:9 259:5
**advocacy**
  123:22
**advocate** 125:6
**affect** 11:2
**affirms** 17:9
**affront** 55:15
**affronted** 56:6

**afternoon**
  318:13
**afterward**
  296:16
**age** 37:10 42:19
  66:25 67:4
  127:23 149:17
  162:19 222:21
  260:17 294:25
**aged** 178:3
**agency** 325:12
**agenda** 59:1,3,7
  59:15 60:1
  63:19,22 70:18
  70:19,20 71:22
  125:18 128:19
  128:19 133:9
**agendas** 133:8
**ages** 99:22
**ago** 21:15 41:4
  48:5 50:23
  53:1 54:1 58:7
  102:19 113:15
  138:8 142:17
  157:4 241:11
  241:12 315:8
**agree** 6:13 9:7
  9:25 73:13
  176:12 185:13
  195:11,12
  198:12 211:11
  212:9 236:3
  239:1,6 251:22
  258:3 265:9,21
  265:23 266:1
  268:3 269:3
  278:2 280:7
  285:11 295:18
  300:21 302:1
  307:24
**agreed** 190:13
**agreeing** 311:22
  312:3
**agreement** 15:3
  20:3,4 30:1,7,9
  30:18 47:23
  325:11
**Ah** 47:11 203:23
**ahead** 10:18
  89:15 128:9

**160:22 161:2**
  179:11 206:10
  207:8 208:1
  235:7 248:1
  285:4 309:2
**aid** 118:5
**ailments** 112:23
**air** 163:6,11
  260:25 261:1
  278:5,6,13,13
  278:14,15,17
  278:20,21
**Akey** 103:16
**al** 4:5
**alive** 108:20
**allotted** 308:10
**allow** 43:6 61:24
  158:4 164:9
**allowed** 308:5
  321:12
**allows** 42:25
  165:7 284:6
**alluded** 228:16
**alt** 152:10
**alternate** 165:21
**alternative**
  152:11
**America** 26:24
**American** 4:11
  116:11 249:16
  250:8 252:22
**amount** 27:2
  83:19 114:15
  168:11,13
  199:6 219:7
  303:16 308:4
**analyses** 289:22
**analysis** 4:16
  72:21 95:17
  154:2 185:1
  214:8 248:6
  256:15 282:6
  290:19
**analyzed** 72:22
  147:13 254:18
  290:20
**analyzing**
  147:12 248:10
**Anatomy**
  280:14

Ancillary 320:15
and/or 323:7
Andrew 5:10
angle 61:22 138:1 164:20 166:23 169:7 196:20 205:9 251:22 261:21
angled 163:21
angles 138:4,6 142:3 251:25 313:23
annoyed 17:7
answer 11:9,15 22:20 34:15 76:19 77:8 122:2,5 123:8 129:16,18 141:2 143:18 160:18,19 161:4,7 183:8 238:12 291:13 310:20
answered 82:1 217:2
answering 44:16 177:12
answers 111:8 320:6
Anti-sway 12:23
anti-vibration 32:2,6
anxious 302:18
anybody 109:15 205:20
anymore 8:23 9:6 42:13 78:16 298:3
anytime 79:2,5 79:7
apart 114:11
apologize 243:6
apparatus 26:11
apparent 11:11
apparently 175:23 177:16
appear 133:24 167:12 168:19
APPEARAN...

2:1
appeared 168:18
appears 36:20 80:20,21 137:3 203:20 205:9 235:21
appended 321:12
apple 308:25
applicable 142:5 142:6
application 34:2 35:16,17,25
applications 35:11,13
applied 320:15
apply 120:2 167:22 259:25
applying 284:19
appreciate 77:16 308:2
appropriately 152:2
approved 54:3,7 54:8
approximate 97:9
approximately 5:2 76:2 97:6 318:23
approximation 110:3 247:4
April 89:16 168:25 214:6
arch 162:23
arching 232:11
arduous 61:13
area 37:2 53:18 61:18 75:2 77:7 86:20,24 87:4 99:21 119:15 120:5,9 121:9 124:2 133:23 134:3 134:18 135:14 136:9 137:3 145:14 150:23 153:14 156:20 157:13 308:15

areas 32:3 86:18 140:23 145:23
arguments 23:18
Arizona 1:1 2:4
Arkansas 4:14
arm 212:22 274:22,22 275:4 299:16 299:19 300:8 300:23 301:18 301:22
arms 38:19 162:14,15,23 162:25 190:9 197:25 264:13 265:5 273:6,7 273:9 291:3 300:14,16
Arndt 316:23
arranging 158:15
arrive 256:19
arrived 19:5 249:13
article 3:18 4:3 190:19 192:12 206:7 207:16 207:20,22 210:2 279:8 325:4
articles 85:12,13 85:14,19 86:14 88:15 113:25 114:14,15,18 115:6 116:6
ascertain 90:6
aside 45:4
asked 32:12 94:9 121:8,20 122:10 126:23 129:9 134:19 135:22 144:16 154:18 157:14 161:7 176:21 217:2 233:10 272:20,22,23 310:6
asking 14:23 22:12,14 46:9

71:11 86:7 87:2 101:5 119:21 120:2 121:18 122:7 127:19 133:21 138:23 139:5 159:17 161:8 161:12 188:3 244:25 273:11 290:12
asleep 146:8 293:6,13
aspects 164:11
asserted 16:7
assertion 312:3 312:6
assess 99:22 171:25 209:10 220:12
assessing 270:25
assessment 4:7 73:19 98:22 152:25 201:13 229:10 233:24
assign 120:12
assigned 14:21 19:16,23,25 20:6,8 30:4
assignment 15:3 51:10 323:1
assist 323:10
Assistive 150:18
associate 105:15
associated 30:25 72:4 119:7
associating 104:21
association 137:21 138:6
assume 11:14 26:14 70:3 253:12
assumed 9:1 29:12
assuming 54:10 54:12
assumption 44:17
assured 53:21
Atlanta 1:20 2:9

6:8 39:2 325:3
attach 52:8 323:11
attached 320:8 322:8
attempt 107:17 109:12 303:23 303:24 310:16
attempted 95:20
attempting 143:18 150:24 281:10
attest 210:6
attorney 322:13
attorneys 320:9
attribute 107:20
attributed 119:14
audible 196:7
audio 92:6,7 94:23,24 95:15 311:3,7,10,13 311:18
audiotape 227:11
author 13:12 92:24
authored 113:24
automatically 320:15
automobile 157:4,8
automobiles 157:11
autopsy 108:13
auxiliary 16:4 52:7 111:19
avail 126:18
available 18:18 126:17,19 228:22 257:6 280:19 281:6 320:12,16
average 99:22 191:12
aware 60:8,11 60:12 64:9 75:14 176:1,4 249:15 257:10 305:16 306:6

309:17 311:7
315:13,18

**B**

**b** 320:14
**B-I-G-H-T**
169:14 170:1
**B-I-G-T-H**
170:2
**B-I-T-E** 169:18
170:1
**babe** 302:15
**babies** 3:19
38:15,22 57:19
59:16 61:12
63:25 64:4
70:5 79:7 94:8
94:11,14,18
95:19 100:5,17
111:9,21
129:15 137:22
138:3,5 146:9
149:19,19
163:2,12 164:9
165:2 167:11
172:1 173:22
177:16 179:12
179:19 181:3
187:1 193:22
194:16 197:7
197:12 217:15
220:8 222:25
223:4 225:11
227:15 228:1,4
228:5 263:1,8
263:13 264:9
269:21 275:9
283:18 290:24
291:3,24
302:24 303:24
304:19 313:8
313:18,24
314:21
**babies'** 112:3
163:8
**baby** 38:12
54:19 68:15
92:15 96:4,8
96:16,19 97:3
98:6,8,12 99:7

148:20 162:22
164:2,6,12,14
164:17 165:7
165:14 167:17
171:14 172:19
172:21,22
175:19 177:19
179:16,21
181:2 182:5
184:19 185:3
186:17 187:4
187:19 188:24
190:20 191:24
192:5 193:8,12
193:24 194:10
197:2,11 198:4
203:19 204:2
211:18 218:22
219:6 231:24
236:4,14,15
245:6 246:5
260:5,23
261:10 262:15
263:2 264:14
264:16 266:5
266:12 270:1,4
270:5,6 285:14
286:15 288:7
288:16 297:12
297:19 298:2
302:2,5,6,6,7,9
302:15,16
314:4
**baby's** 96:10
163:4 164:21
165:23 167:25
187:10 260:12
261:25 266:7
297:24 301:22
**back** 13:24
20:23 23:13
28:16 52:13
53:5 68:7,20
79:18 80:25
95:10 99:14,17
114:17,19,20
114:23 121:12
121:23 127:12
136:18 138:1
143:15 144:13

162:23 164:3
166:5 173:23
174:2,3 175:10
188:25 193:22
193:25 194:5
194:13 195:7
196:25 197:7,8
197:13 202:4
202:10 205:2,5
212:20 214:2
215:20 229:4
230:11 232:11
232:17,18
233:2,16
248:16,17
249:3,9 255:11
256:4 259:12
260:8,9,10,11
260:12 261:6
262:4,4,19
278:22 292:15
293:22 299:14
299:17,18,20
300:24 302:2
302:12,21
303:11 304:13
304:20 308:6
314:5 322:3
**background**
258:25 268:23
**backs** 188:13
**backwards**
163:9
**bad** 55:17
**bag** 278:10,11
**ball** 28:15
**ballpark** 22:5
30:13 76:1
78:3,7
**balls** 28:18,19
29:7,9 43:22
**bank** 28:15
**barely** 226:8
**base** 41:23
**based** 21:23
25:14 30:1
97:4 181:7
196:10 216:20
277:11 279:9
279:10,11,16

313:11
**basic** 308:16
**basically** 18:4
19:11 49:21
56:23 87:16
95:1,6 107:16
122:3 149:25
151:4 155:14
163:16 164:13
179:1 224:10
227:16 233:9
237:9 246:24
247:1 249:5
262:2 274:4
281:16 291:16
**basing** 146:5
**basis** 48:1,11,12
48:14,21
262:13 272:25
283:7 284:8
**bassinet** 52:1,14
52:17 55:4
167:4
**bassinets** 53:2
121:2 283:13
**Bates** 200:6,10
200:10,18,20
214:13,23
245:13 296:5
**batteries** 41:8
41:17 42:14
**bear** 192:16
**bed** 204:23
**Beds** 121:1
**beginning** 5:3
28:11 75:11
90:1 195:13
**beginnings**
195:24
**begins** 185:17
186:8 202:4
**behalf** 1:3 2:2,7
5:10 48:24
50:20
**behavior** 165:14
171:20 174:17
175:4 214:9
216:2,3 220:7
235:20,21
257:20 262:11

262:12
**believe** 60:20
74:4 95:2
107:22 118:23
125:9 136:8
144:17 170:13
222:18 239:23
266:4 296:2
312:20
**belly** 165:25
192:23 193:25
194:5,11,13
197:1 202:10
255:11 260:7
260:22 262:3
**belt** 165:7 170:4
175:13,16
179:4 236:13
237:21 240:4
283:3,8,20
284:7 291:25
314:3
**belted** 69:9
**belts** 283:6,18
**benchmarked**
268:25
**benchmarks**
97:8 99:23
**bend** 163:7,8
260:24
**beneficiaries** 1:4
**benefit** 198:24
**bent** 163:10
**best** 11:6 38:10
81:16,21 82:19
83:1 279:15
281:8,15
285:21
**bet** 29:5 69:19
**better** 47:2,7
49:25 205:9
221:2 281:19
281:23 318:18
**BHL58** 159:19
182:21
**big** 26:24 27:17
33:14,17
124:11,12
189:8,17 190:2
222:17 223:6

229:24,25,25
233:6 258:20
280:15,17
290:8 311:11
**bigger** 32:7 34:2
90:19 280:16
**biggest** 27:22
**bight** 169:25
170:15 171:4
174:6 179:3
262:6
**bill** 76:13,24
77:3,22
**bio** 115:25
**biomechanical**
4:16 119:24
**biomechanica...**
260:13
**biomechanics**
4:3 147:3
206:8 207:17
208:25 260:23
**biomedical**
66:15 70:10
128:1 151:3
281:8 318:2
**birth** 69:20
109:1 117:20
**birthday** 152:6
**bit** 39:24 70:6
92:2 112:15
147:16 164:14
167:2 224:11
235:7 275:6
277:8,13
280:16 302:22
305:3
**bite** 169:12
308:24
**bits** 265:4
**BL58** 161:14
**blanket** 305:18
**Bless** 249:21
**blocked** 291:4
**blocker** 165:13
167:1,2 211:21
224:9 240:5
260:19 314:2,3
**blog** 191:13
202:8

**Board** 303:7
325:4
**body** 32:13
37:22 58:15
147:5 162:16
164:21 165:4
187:12 261:3
273:7
**boil** 48:20
**book** 316:10
**born** 67:6 68:3
69:21 111:21
112:5 202:14
**bottom** 147:2
165:18 201:5
**bought** 21:18
68:6,16,16
69:1
**box** 156:16
201:18
**boy** 66:25
222:17 229:23
229:25
**boys** 62:16,18
100:10
**Brady** 2:8 5:12
241:7 316:3
**braking** 36:21
**Brandon** 2:8
5:12
**brands** 51:13
**break** 8:20
47:22 78:25
79:3,6,8 117:4
143:14 144:15
175:25 189:12
213:10,17
293:5 302:23
**breaks** 107:15
**breathability**
271:3 276:10
276:19 277:18
282:1
**breathable**
131:23 168:2
277:9
**breathe** 268:7
279:2 281:11
**breathed** 276:25
278:21 279:7

292:1
**breathing**
276:23 278:9
278:11 279:18
279:19 280:13
281:20 302:16
**brief** 13:21 14:2
79:15 108:21
144:10 213:24
293:19 310:18
**briefly** 86:18
**bring** 23:8 81:7
162:25 297:23
298:1
**broke** 78:15
122:14 263:2
**brother** 189:17
**brother's** 189:8
**brought** 15:7,15
120:1 297:17
**buckle** 288:12
288:16,17
**buckled** 284:20
284:21,24
286:14,19
288:16,17
**building** 46:6
**bullet** 215:13
216:13
**bunch** 10:17
81:10 221:23
**business** 28:16
**button** 31:3,20
**buy** 44:9
**buying** 68:9
**buys** 53:20

———————
**C**
———————
**c** 321:1,1 325:1
325:10
**C.E.O** 15:7 25:4
25:7,17 40:5
40:14
**C.H.O.A** 39:2
**C.P.R** 286:16
**C.P.S.C** 154:5
206:3 207:12
255:19
**C.T.O** 24:8
**C.V** 84:14,15,21

122:11 130:10
133:13,18,24
133:25 134:1
141:4,5 143:1
143:3,13
145:10
**C8** 16:1,21,21
**calendar** 320:16
**call** 5:25 36:25
82:22 90:13
91:24 103:6,17
108:7 167:3
170:11 172:3,8
174:24 175:10
177:20 178:23
178:24 182:6
184:23 194:18
194:20,23,25
211:5 274:24
278:3 294:6
299:9,12
**called** 21:7,10
25:23 29:19
80:9 121:1
122:17,19
175:3 178:19
189:5 303:6
311:16 317:21
**calls** 110:7
**calm** 226:23
227:2 237:18
**calves** 42:10
**camera** 227:18
**cameras** 158:11
279:24
**CAMotion**
21:10 24:5
29:17
**capabilities**
109:10,13
**capability**
215:23
**capable** 97:10
206:4 207:13
229:22,24
230:13 233:10
233:22 234:9
**capacity** 7:14,16
7:18 8:22 9:14
12:2 27:7

48:24
**capitalized**
185:8
**caps** 185:9,14,15
**caption** 224:24
**captured** 173:15
**car** 31:17,23,25
61:14 68:22
137:12,14,23
138:1 142:1,3
146:12 250:25
251:19,22
269:13
**career** 76:7,25
100:4
**careful** 266:12
**caregiver** 153:3
**caregivers** 39:4
96:2 148:13
180:22
**carpet** 229:18
229:21 230:7
**carriers** 251:2
251:20
**carry** 29:6 193:8
193:15
**carrying** 89:24
**case** 1:6 8:19
10:9,18 13:13
13:16 14:19
15:24 16:5,8
16:15,22 17:2
17:8 49:2
51:21 61:6
66:9 72:14,24
72:25 73:7,18
74:14 75:25
76:3 77:2,20
83:24 85:15
86:16 89:17
90:11 91:16
97:3 99:13
101:20 104:1,2
105:23 106:5
110:23 113:11
114:11,12
130:25 138:15
147:12 148:17
154:18,21
155:8 159:20

180:18 182:23
182:25 185:2
190:25 206:2
207:11 220:13
236:3 272:4
284:1 294:3,8
300:10,17
311:7 320:6,9
321:13,15
325:11,14
**Case-specific**
320:14
**cases** 6:23,25
9:25 93:2
262:25 265:12
265:21 295:8
**cast** 16:8
**categories** 50:12
83:3,6,10,17
84:13 93:11
**category** 50:15
54:12 83:23
87:21 88:17
**causal** 146:10
**causation** 132:4
**cause** 20:9 99:15
107:17 150:8
170:25 306:14
**caused** 119:10
198:9 229:4
243:16
**causes** 113:21
114:5,7
**CCR-B-1848**
1:25 321:21
325:17
**Cell** 132:15
**center** 198:6
199:3
**certain** 32:9,15
37:21 42:19
53:18,18 55:20
69:5 81:8
85:22 97:13,21
98:15 100:5
106:16 127:13
134:11 142:3,4
142:5 169:6
193:15 197:4
212:12,13

283:13,13
**certainly** 10:2
16:22 28:9
32:6 47:3
57:10,12 59:25
63:1,4,5,7 93:1
101:8,10,23
102:4 106:7
116:3 119:16
124:1,11
126:23 131:7
135:20 138:2
154:1 161:6
167:10 175:6
193:3 196:23
201:15 216:19
234:7 255:6
264:14 265:23
268:4 274:12
289:22 292:23
295:18 303:19
312:2 317:2
**CERTIFICA...**
320:2
**certificates**
320:11
**certified** 320:5,6
320:8,11 321:4
325:6
**certify** 321:5,9
321:13 323:2
**chairman** 59:2
**chairs** 165:22
**challenging**
37:16
**chance** 10:20
54:21 82:8
**change** 38:25
52:12 112:3
128:24 230:8
323:12,13,14
323:15,16,17
323:18,19,20
323:21,22,23
323:24,25
324:1,2,3,4,5,6
324:7,8,9,10
324:11,12,13
324:14,15,16
324:17,18

**changed** 81:2
114:16 115:16
**changes** 56:1
80:18 129:6
321:11 322:8
323:4,5,7
**changing** 52:11
121:2 145:19
261:21
**Chapman** 104:9
**chapter** 119:23
**characteristics**
133:5,6 137:25
**characterizati...**
263:7
**characterize**
88:21
**charge** 49:11,14
325:13
**cheaply** 41:9
**check** 79:8
305:21
**checked** 202:3
**checking** 85:11
**chemical** 135:23
135:24 136:1
**chest** 173:19
193:18 194:10
**chief** 24:11
**child** 38:1 39:23
40:5 41:11,13
41:20,21 43:4
43:9 52:12,15
54:24 66:18
67:3,6 68:7
69:10 72:10
73:4 99:21
100:11 119:6,8
126:6 127:22
137:17 141:18
148:15 149:23
150:5 151:1,6
151:13,25
153:20 163:23
165:19 217:4
217:14 218:6
267:14 268:5
273:12 313:3
**children** 37:13
37:17,19,21

38:18,19 39:16
39:19 41:1
42:17,18,18,20
42:23 43:7
44:15 45:3
46:11 54:20
62:1,9 64:10
66:23 69:2,4
70:24 71:8
111:21 112:24
113:16,19
114:5 117:2,5
117:8,12,13,17
117:20,20
118:6 119:14
125:17 131:10
137:10,15
139:24 141:15
142:5 145:14
146:11 147:9
147:25 148:2
148:25 149:1,5
149:8,18 151:8
151:18 152:3,7
152:15,15,21
153:2,4,17
162:18 171:23
192:18,25
215:15 216:15
217:13,21
275:9 313:8
**children's** 39:2
65:19 66:20
166:20
**chin** 283:21
**choose** 198:11
**choosing** 310:16
**chose** 212:14
302:2
**chosen** 210:23
**chunks** 105:11
**cinch** 236:14
238:21 239:13
239:18 267:3,6
**cinched** 181:14
181:18 212:5
218:23 219:2
236:21,23
240:1,8 266:13
268:10

**citation** 102:10
283:9,11
**citations** 102:2
253:21
**cite** 102:7
142:22 190:18
206:7 253:24
259:13 262:20
**cited** 86:22
105:17 207:16
250:14,16
256:14 257:13
**citing** 253:19
254:14 257:3
**Civil** 323:7
**claim** 289:11
296:4
**claims** 13:22,25
14:2
**clarify** 83:13
94:13 111:18
119:4 145:3
153:22 190:25
315:22
**Claritin** 11:4
**clarity** 100:23
101:13 275:25
286:6
**class** 317:25
**classes** 18:18
174:19 317:8
317:11,11,14
317:19,20
**classified** 138:17
**classify** 130:13
130:17
**clean** 73:13
**cleanly** 219:17
**clear** 57:6 64:8
72:23 92:14
97:14,18
112:21 115:23
118:18 137:21
140:11 180:21
220:17 255:4
264:25 268:19
269:25 270:6
**clearance**
211:13,15
**clearest** 11:7

**clearly** 116:2
253:14 266:13
267:24 268:9
268:14 270:14
273:3 286:2
**ClearPath** 3:21
**Cleary** 200:5
201:12
**Cleary's** 199:15
**click** 298:10,13
**client** 46:23
**client's** 135:19
**climb** 43:7
**Clinical** 147:3
**clip** 52:7
**clip-ons** 52:20
**clips** 52:17 92:8
92:11 175:1
311:10
**close** 95:7
100:10 111:24
173:16 200:21
282:17,20
**close-up** 275:19
**closed** 211:8
**closest** 61:21
**clothing** 132:9
**co-applicant**
36:3
**co-authors**
35:20
**co-owns** 25:6
**co-teach** 318:3
**CO2** 278:17
**coach** 121:16
173:14
**COBB** 321:2
**coincide** 106:10
**coincided** 30:17
**collaborators**
44:23
**colleague** 70:9
75:17 111:24
**collect** 28:18
315:7
**collected** 206:2
207:11
**collection**
174:23
**colliloquy**

160:17
**colloquies** 320:6
**colloquy** 160:21
**columns** 84:6
**combination**
90:24 249:12
**come** 10:10
15:10 52:21
53:17 74:18
82:19 96:14
106:6 117:3,14
118:4,22
139:13 140:6
143:15 166:5
183:14 199:13
203:10 242:13
253:2 261:20
281:9 308:6
**comes** 8:24
120:11 140:5
185:20 197:22
**comfort** 54:19
63:24 113:16
**comfortable**
65:6,23 94:17
117:18 270:5
304:11
**coming** 9:18
51:14 88:13,20
183:4 265:19
269:5 275:15
294:9 300:7
**command** 31:6
**comment**
115:15
**comments** 96:23
**commercialized**
35:4
**Commission**
4:16 154:9
256:23 324:24
**commissioned**
255:20 256:22
**committee**
55:21 56:9
57:7,24 58:13
58:13,20,23
59:2,17,21,25
61:1 62:10,15
63:10,10,16

64:2,6,12,23
69:25 70:12,13
70:23 71:1,17
71:19 73:3
74:12,17 124:7
124:20 125:2,8
125:10,16,19
126:10,23,25
127:11,13,18
127:20 128:3
129:23 130:3,5
130:5,6,19,20
130:22 131:5
131:12,17
132:24 133:4
**committees**
58:24 124:12
124:13 127:2
132:18
**common** 65:19
96:3 122:20
279:11,16
283:24
**common-sense**
151:23
**commuter** 14:11
**companies** 21:5
23:11,23 26:19
27:25 53:22
**company** 12:5,6
12:7 14:21,24
15:1,8,10,12
15:17 16:18,19
21:7,8,10,18
21:20,23 23:25
24:25 25:1,5
25:10,18,21
28:14,17 29:18
29:25 30:2,4
30:15,16 32:23
33:9 40:4,14
46:5,19 74:24
103:21 111:25
112:10
**Compaq** 16:1,2
**compare** 50:17
139:1
**comparing**
50:19
**comparison**

215:24
**compensated**
48:11
**competitor**
46:22
**competitors**
47:12 49:25
**competitors'**
47:1,3
**complaining**
131:16
**complementary**
256:15
**complete** 34:15
91:15 92:2,20
123:8 163:25
166:2 320:5,8
**completed**
322:18
**completely**
229:8 230:17
246:6,6,8
275:5
**complex** 157:20
**compliance**
81:22 89:18
**complicated**
17:24 21:1
**comply** 81:16
**component** 7:3
**computer** 14:9
14:11 16:2,2
**computerized**
321:9
**computers** 34:6
**con** 33:24 45:13
73:5 238:13
**concave** 259:19
261:17
**concept** 10:12
10:15 42:7
51:20,25 65:7
198:12
**concern** 64:3
125:19 127:21
**concerned** 66:24
69:9 126:25
**concerns** 59:22
63:14 70:11,13
73:3,17 124:19

126:6,7 127:22
**concluded**
319:11
**concludes**
318:24
**conclusion**
119:2,2
**conclusions**
86:15 106:5,7
143:4 225:21
257:2 310:17
**condition**
254:23 255:1
300:2,12
**conditions** 97:22
**conducted** 94:1
114:2,13 120:4
120:6,8 158:7
289:13,14
**conference**
134:20 150:19
151:4 200:1
**confident** 40:19
**confidently** 93:8
**configuration**
145:19 146:14
163:15 262:2
**configurations**
98:15
**confine** 77:1
**confined** 59:15
**confirm** 89:8,11
**conflicting**
285:7
**conform** 276:3
**conformity**
57:15,18
128:13 129:14
129:21 130:7
**conforms**
163:19
**confuse** 300:20
**confused** 218:7
**confusing** 56:3
105:5 300:19
**confusion** 56:23
56:25 57:5
**conjunction**
66:8 74:11,13
85:14,19

142:23
**connected** 75:16
**connection** 19:7
**connotation**
153:22
**consider** 9:11
64:11 115:9
129:22 182:24
**consideration**
16:12 57:18
128:22 129:13
133:1
**considered**
137:19 138:22
167:13,20
273:1 283:4,8
**considering**
54:23 148:1
308:3,20
310:14
**considers**
135:21
**consistency**
53:23
**consistent** 53:19
53:21 55:6
56:22 96:20
238:9
**consult** 99:20
**consulted** 99:25
**consulting** 48:15
166:11
**consumer** 4:15
34:25 35:1
46:14 154:8
256:22
**consumers**
45:13 292:14
292:18
**contacted** 74:22
74:23 75:21
325:7
**contained** 91:15
91:16 93:13
143:4 201:18
**content** 313:16
**contention**
263:11
**context** 8:3 9:23
33:25 42:19

73:5
**continue** 291:13
312:2
**Continued** 4:1
**continuum**
101:17
**contort** 277:17
**contract** 49:12
325:9,10
**contractual**
17:10
**contradict**
216:20,24
**contradicted**
139:22
**contradictions**
155:2
**contraindicated**
216:17 217:22
**contribute**
120:12 125:18
**contributing**
113:22 114:7
115:15 117:22
118:3
**control** 12:23
14:9,10 21:5
31:5,9 32:18
128:15 193:13
231:13 317:22
**controlled** 20:24
31:2 33:25
64:12
**controller** 26:7
26:23
**controllers** 41:7
41:17 42:14
**controlling**
12:17 14:3,10
24:21 31:1
33:21,22 34:3
81:1
**controls** 20:18
**convenient**
69:11
**conversations**
69:18
**convert** 141:22
**Convolve** 12:14
13:9 16:19,20

19:16 23:25
29:15 33:18
**cooing** 227:6
**Coordinators**
320:5,11
**copies** 320:11
322:13
**copy** 30:22 82:3
89:16 255:20
320:8
**corporate**
104:14
**corporation** 1:7
1:8
**correct** 5:25 6:4
7:1,17,24 8:1
10:4 12:24
18:25 38:7
50:6 54:13,16
54:17 63:17
64:1,16 66:9
69:7 70:15,21
72:11 73:7,24
74:8,15 80:15
82:15 91:17
97:8 102:13,15
102:16 105:8
108:6 110:24
111:3 124:24
125:21,24
129:24 145:1
151:8 152:13
154:13,22
156:14 159:7
169:8 170:6,19
177:2,7 179:8
184:16 185:21
188:22 190:16
193:8 196:11
198:11 199:2
201:9 205:11
207:3,18 209:6
210:5 211:3,10
214:6,20
215:18 217:6
219:21 225:1
227:15,25
231:9 236:21
237:13 238:4,9
240:22 244:9

244:21 245:18
245:19 246:19
248:7,14
249:13 251:5
252:15 253:10
255:14 259:25
265:10 270:21
271:7 272:21
286:25 288:18
290:1,2 292:11
292:15,18
295:22 299:6,8
313:4 314:8
316:14,23
320:5,8 321:10
**corrected**
129:20
**corrections**
322:8 323:10
**correctly** 41:24
67:17 185:22
194:14
**correlated** 131:8
**correlation**
117:19 146:11
146:15 147:19
148:19
**correlations**
114:8 149:10
**corresponding**
183:25
**corresponds**
253:18
**cost** 33:5,6 41:6
42:1,15
**cotton** 210:15
**COU** 3:17,23
4:8,9 296:5
**couch** 97:17
187:7
**Council** 325:5
**counsel** 2:1 5:6
5:15 81:20
82:3 83:20
90:3 305:7
311:6 321:13
321:14
**count** 86:2 306:4
309:15
**County** 272:14

321:2
**couple** 14:18
36:13 41:9
51:24 52:16
80:15,18
103:25 108:21
108:22 162:19
166:21 171:12
180:4 218:16
236:16 237:17
294:16,16
304:7,16
**Courkamp** 1:2
5:10 241:4
285:10 286:3
**course** 42:5 52:1
78:8 81:10
82:7 104:17
109:24 117:6
137:24 149:5
151:12 221:5
222:21 231:25
232:4 278:18
294:14 317:23
318:3
**courses** 28:19
145:12 318:4,6
**court** 1:1 5:16
11:21 16:11
23:9 90:9
115:11 121:23
134:8,12,16
135:20 139:14
320:6 321:4
322:16,20
325:2,4,6,8,11
**Court's** 89:18
**courteous**
122:24
**courtesy** 122:20
**courts** 8:1
**cover** 132:5
325:12
**covered** 28:8
67:14 131:4
**COVID** 231:24
**COVIDness**
231:20,21
**Cox** 2:8 5:12
**coxb@gtlaw.c...**

2:11
**cradle** 38:2,19
  316:14
**cradles** 121:2
  148:15
**crane** 20:19,21
  26:11,22,24,25
  27:5,16 158:22
**cranes** 12:21
  21:3,11 24:5
  26:6,9 27:19
  27:22 29:17
  31:14 119:25
**crash** 157:5,8
**crawl** 189:21
**crawler** 189:24
**crawling** 260:18
**craze** 41:4
**create** 46:10
  165:2,4 253:13
  264:24
**created** 7:21,24
  34:11 59:21
  74:12
**creates** 261:22
**credentials**
  144:18 191:17
**crib** 209:12
  210:14,15,16
  210:21,24
  214:19 215:17
  215:23 261:9,9
  300:25 301:17
  301:18,22
  316:10
**cribs** 121:1
  229:17 283:14
**cringe** 198:22
**critical** 36:15
  297:3
**criticism** 292:7
  297:10,13
  313:1 316:21
**criticisms** 66:5
  74:2 159:18,22
  159:25 160:8
  160:15 161:13
  161:16 162:3
  162:10 163:22
  164:1 166:7

168:21 297:5
**criticize** 312:17
  314:24
**critique** 289:3
  295:25
**crotch** 184:19
  184:20 226:20
  238:7
**cruise** 43:19
**cruising** 43:15
**cry** 174:1
**crying** 180:3
  218:18
**cues** 95:21
**cultural** 197:9
  197:10
**curious** 95:16
**current** 6:5
  32:23 33:9
  84:15 88:10
**currently** 21:6
  24:8 28:3
  43:12 45:17
  67:8 104:24
**currents** 14:12
  14:14
**curriculum** 3:11
  85:4 120:19,20
  136:6 144:16
  145:12
**customary**
  325:13
**cut** 92:9 311:15
**cut-off** 92:12
**cute** 174:6
  189:10 217:15
  220:8
**cuteness** 231:17
**cutest** 172:19
**cutie** 203:23
  204:5

————————
**D**
**D** 2:8 325:1
**D-O-O-R-O-O**
  70:2
**D13** 130:20
**dad** 63:12 71:13
  71:18
**dads** 194:20,23

194:25
**dam** 178:11
  179:4
**danger** 59:16
  124:22 126:4
**dangerous**
  56:16,18 58:16
  58:17 61:1
  72:10,23 74:4
  127:10 164:8
  167:12
**dangers** 72:4
**data** 72:22 73:2
  73:16 92:1
  154:1 262:19
  262:21 294:4
  295:20 312:16
  312:17,17
  315:7
**date** 69:20 80:21
  201:5 322:3,15
**David** 2:17
  66:21 67:20
  111:23
**day** 7:11 10:5
  13:24 71:14
  90:2 321:16
  324:21
**day-to-day**
  109:13
**days** 67:7 85:8
  97:7 196:6
  322:3
**deadline** 308:3
**deal** 22:15 33:13
  62:24 113:9,23
  115:4 118:19
  120:15
**dealing** 60:1
  70:24 71:13
  113:13 274:1
**dear** 112:17
**death** 107:18,21
  107:24 108:23
  113:7,18,18
  117:6 118:11
  118:12 119:1,6
  120:4 144:20
  149:16,22
  150:2 184:10

188:9 249:17
  284:15,20
  306:15
**Deaths** 4:13
  250:10
**debate** 58:21
  59:6
**Debra** 1:25
  321:4,21
  325:17
**decade** 113:14
**decades** 166:19
**decathlete** 18:2
**decide** 48:17,18
  76:13
**decided** 32:24
  71:15,16 72:13
**decision** 11:22
**declare** 17:22
**declared** 19:2
**decreased**
  114:17
**Deegear** 104:19
**deep** 187:12
**default** 197:22
**defect** 112:5
**defendant** 1:14
  15:11,25 16:3
**defendant's** 3:7
  4:1 79:22
  84:24 89:20
  91:10 182:16
  191:8 199:22
  203:6 208:17
  213:6 240:23
  244:14 250:4
  255:21 271:19
  296:6 309:14
**defendants** 1:9
  2:7 5:13 16:1
**defer** 201:11
  316:8
**deficient** 313:13
**define** 45:10
  46:17,17,18
  104:18
**defining** 105:10
  153:19
**definitely** 67:1
  142:17 148:1

181:11,19
  188:25 195:3
  232:10,14
  233:22 254:10
  256:12 265:13
  305:14
**definition**
  111:15 114:6
  149:16,24
  181:1
**definitions**
  81:11 82:10
**definitive** 295:9
**definitively**
  246:18
**deformed**
  114:23
**deformities**
  111:22
**degree** 32:3
  61:22 63:23
  68:8 99:16
  159:4 164:16
  181:13 198:17
  210:22,22,22
  210:23,25
  211:1 248:14
  259:1 275:23
**degrees** 52:2,22
  52:24 125:17
  164:21 166:24
  192:22 193:1,6
  193:19 196:15
  230:9 233:16
  248:18 249:1
  249:13 251:23
  252:3,5 261:20
  298:2
**delay** 70:7
  183:11
**demonstrate**
  305:2
**demonstrated**
  215:16
**denying** 308:8
**departure** 56:8
  56:19
**depends** 197:2
  313:18
**deployed** 279:20

deponent 196:8
321:11 322:7,9
322:10,16
deponent's
322:7 324:19
deposed 6:9,20
7:5,15,18
12:11 14:17,18
16:5 49:9
159:11
deposition 1:13
3:9 5:4 6:10
7:22 8:8 10:3
11:5,20 76:2
78:2 79:21
80:9,10 81:8
83:25 85:3
89:19 90:2
91:9 100:20,21
100:22 101:18
103:19 104:11
104:17 109:20
121:25 122:7
122:25 129:11
157:2 182:15
191:7 199:11
213:3 266:7
268:22 307:25
308:5,21
318:19,25
319:5,10
320:13 321:6,7
321:10 322:7
323:8 325:2,8
325:9,12
depositions 7:13
8:7 49:3 81:10
101:3,12 102:2
102:13,21,23
103:14,22
104:4,5,8,8,14
104:18 105:1,2
105:3,5,11,13
describe 32:12
32:14 190:23
described
101:17 156:6
261:23 264:8
describes 88:9
describing

114:14,15
116:22 170:17
175:12
description 3:8
4:2 13:17,21
14:2 102:11
103:5 108:9
170:17 210:12
253:17
descriptions
100:16
design 41:23
57:1 110:23
135:6 141:13
147:8 153:1
161:24,24
164:12 166:7
167:14,22
168:4,6,21
172:1,7,8,8
200:1 209:5
231:6 246:12
259:17 284:5
289:12,21
290:13,18
303:2 317:25
designed 37:13
37:25 42:3
153:18,21,23
178:11 290:13
303:5
designing 36:25
37:12 43:3
149:7 153:17
166:13
desire 267:25
323:7
desired 184:22
desk 112:7
despite 73:16
124:17
detail 110:18
155:13 166:6
187:25
detailed 103:5
110:9 115:20
230:12
details 15:20
16:14 101:14
303:20

Detective
103:15
detectives
102:22
determination
72:23 127:23
134:9 150:20
determine 96:5
108:11 109:12
determining
107:17 114:5
Detroit 157:5
develop 30:2
41:5 60:17
100:17 140:18
147:18
developed 21:2
26:4 31:9
38:23 39:5,18
39:22,25 40:6
40:6 44:7,8
74:11 134:3
142:21 145:11
151:10 152:15
157:20 260:16
developing 13:9
34:19,24 46:9
50:10 60:13,14
133:2 149:9
development
34:19 36:15
51:11 53:25
97:5 99:22
100:11 141:14
154:3 166:20
216:18 268:25
developmental
98:19 185:25
192:9 195:11
201:17,17
231:12,13
developments
35:8
deviating
166:18,21
device 14:7
27:23 41:6,17
42:17 93:16,18
93:20 148:5
152:23,24

157:16 162:24
163:4,17,18,22
164:3,8,9
180:16 185:2
187:19 231:5
247:19
devices 86:21
139:25 157:21
250:25 269:1
dialogue 160:9
diaper 52:9
die 119:3 146:9
149:2
died 113:19
118:23 150:6,7
dies 119:6,8
diff 276:4
different 20:25
27:2 34:11
38:12,13,14
43:2,20 50:19
53:22 68:22
97:16 100:11
101:6 105:10
105:11 108:13
108:18 114:20
115:16 129:25
139:2 158:8
166:14 209:12
211:17 222:23
228:3,5 256:13
260:13 269:22
270:20 272:4
276:1,2,4
279:17,25
280:12,12,13
308:14,15
311:11,15
313:15 315:6
315:11 318:4,6
differential
223:2
differently
169:3 273:2
difficult 31:4
162:7,16 197:1
259:20
difficulty 169:2
digital 16:5 82:3
direct 120:18,22

121:18 122:10
123:7 132:3
141:5 146:10
174:14 243:1,4
directed 40:25
44:14,15 45:2
46:10 123:16
123:25 124:13
130:5,6,22
131:2 133:2
138:20 162:8
177:3
directing 210:10
direction 163:8
321:9
directional
38:21
directive 258:19
directly 19:10
104:22 117:16
145:21 146:21
217:3 310:12
dis 287:9
disabilities
42:18,21
141:16 152:8
discarding
295:21
disclose 280:5
disclosure 36:19
40:1 320:2
325:5
disclosures 35:7
35:22
discontinue
258:11 259:7
discount 320:15
325:14
discounts
320:14
discoverable
82:22
discuss 37:9
129:3 169:6
294:3,22 297:5
315:21 318:7
discussed 32:5
62:8 63:8 68:4
88:17 90:1
112:12 124:12

127:25 128:1
129:5 146:18
146:21 318:5
**discusses** 192:9
293:25,25
**discussing** 262:6
271:3 277:21
303:21
**discussion** 69:5
70:17 79:13
82:21 128:21
140:4 144:8
213:22 241:15
293:17 319:2
**discussions**
66:19,23 67:16
68:1,10 71:3
128:23 139:21
166:15
**disease** 37:21
**disk** 34:3,4
**disorder** 38:6
**dispense** 6:10
**display** 262:11
**displayed**
276:12
**disposition** 13:5
**disrupt** 123:1
**dissect** 217:12
**distance** 240:3
314:2,3
**distinction** 84:9
**distinguish**
137:24
**distinguishing**
137:25
**distracting**
173:9 189:11
293:14
**distraught**
274:2
**District** 1:1,1
15:23 325:2,2
**dive** 28:18
**diverged** 44:19
**Diversified**
141:12 142:16
**diving** 43:22
**DIVISION**
325:3

**doc** 200:5
296:14
**doctor** 6:20 11:1
12:1 23:11
29:13 77:5
91:14 106:15
106:19 108:9
108:22 115:23
119:9 123:16
123:25 125:7
134:6 135:16
143:11 148:24
159:10 160:5
192:11 201:4
209:2 293:24
300:9 315:22
316:1,4
**doctor's** 82:4
106:8
**doctors** 120:12
139:25 140:1
**document** 80:10
80:11 136:25
141:7 143:8
250:14,16
251:15 252:16
253:3 254:8
**documented**
160:1
**documents** 81:2
81:8 84:13
85:22 86:5,10
86:11 249:22
**doing** 10:22 19:8
33:15 44:2
45:14,25 47:6
47:6,21 49:7
50:18 56:8
57:1 97:10
112:20 122:13
129:23 134:4
148:24 197:11
220:10 223:18
223:21 234:5
263:17 264:11
264:15 265:2
265:18 279:4
279:16 281:22
302:3 310:12
314:12

**doll** 4:10,19
244:9,10,20,23
245:17 246:7,9
246:14 247:3
273:25 274:5
275:3 290:14
290:15 304:22
**dollar** 49:17
**dollars** 17:6
21:22 41:9
76:16,25
**dolls** 93:16
220:23
**domain** 34:24
166:19
**Dooroo** 70:2
**double** 20:19,25
21:3 192:11
**downloaded**
87:7,20
**Dr** 3:20 5:4,25
6:1 36:4,10,20
36:24 44:22
67:16,17,25
68:1 69:5 70:3
70:9 71:23
72:12 77:19
78:21 79:20
80:9 81:21
82:15 103:4
104:19 111:23
112:8 118:21
124:19 128:1
137:7 144:15
160:17 182:14
190:3 191:14
192:11 199:15
200:5 201:12
203:17 214:4
222:10 242:5,8
243:23 244:1
250:15 256:25
257:19 258:8
259:14 261:7
280:21 281:7
309:18,20,23
310:3,17,21
311:1 315:3,19
315:20 316:23
318:3,5,13,21

318:25
**draft** 56:1 59:11
59:12 129:11
266:21 267:1
**drafts** 53:3,4
54:6,7,9,11
**drag** 298:10
**Drago** 87:23
88:2,3,3
119:12 138:16
139:1,21
154:25 270:23
315:19,23
**Drago's** 156:7
315:20 316:9
316:18
**drawn** 274:5
**drive** 6:8 241:3
241:5,21,22
**drives** 34:4,4
**drop** 31:24
**dropping** 248:2
**drum** 27:1
**drums** 27:2,12
27:14
**Druzisky** 1:25
321:4,21
325:17
**Duck** 18:14
**due** 204:13
322:3
**duly** 5:19 321:6
**duration** 175:18
175:24 176:11
176:12,14,15
176:16 177:5,8
177:14,19,20
179:19 184:24
219:9 225:10
313:19
**durations** 176:3
**dynamics** 50:25
**dystrophy** 39:19
40:5

───────
E
───────
**E** 1:13 2:3 3:3
5:18 242:21
250:22 253:5,9
321:1,1,1,1

322:2 325:1,1
325:1,2
**E-mail** 80:1
241:18 242:15
243:1,4
**E-mails** 242:22
**E.S.I** 312:17
**ear** 275:15,19
**earlier** 67:7
104:2 124:17
129:9 170:14
173:24 178:14
190:13 207:22
227:10 228:17
242:22
**early** 110:1
162:19 232:19
266:7 298:24
**easier** 164:14
211:18 212:9
212:23 290:25
305:3
**easily** 20:24
165:16,19
290:21
**East** 2:4
**Eastern** 319:11
**eat** 230:3
**eating** 143:17
**eats** 230:2
**ebullient** 11:20
**edge** 187:6
212:15
**effect** 249:17
290:20
**effectively**
148:15
**efficient** 112:4
151:5 261:4
**efficiently**
143:19
**effort** 216:4
**efforts** 157:18
**eight** 19:19
20:13 21:15
78:17 81:14
97:7 110:15
196:4,6
**either** 28:1 50:2
51:10 109:11

146:18 162:15
169:21 180:7
225:25 236:3
**electronically**
322:9
**elevated** 98:6
**elevates** 39:23
**eliminate**
124:14,15
133:2
**else's** 50:4
100:12
**emphasized**
318:13
**employ** 321:14
**employee** 15:1,5
24:3
**employees** 176:2
176:5 177:22
**employees'**
176:3
**employment**
20:2,4
**enabled** 210:21
**enacting** 64:5
**encourage** 3:19
194:19
**encouraging**
195:3
**ended** 68:9
224:11
**energy** 25:11
198:7 199:4,7
**engagement**
109:24 110:1
113:10
**engine** 31:16,22
**engine-moving**
31:15
**engineer** 11:10
15:4 18:8
55:14 61:17
62:12 70:10
115:25 127:25
128:2 135:23
156:19 196:16
198:21 281:8
290:22
**engineering**
18:8,18,21,22

19:4 66:16
106:20 107:2
116:9 119:25
135:24 136:2
145:13,13
150:18 151:3
264:3 268:23
269:5 317:22
318:2
**English** 183:24
183:24
**ensued** 79:13
144:8 213:22
241:15 293:17
319:2
**ensuing** 85:8
**ensure** 57:8
150:24
**entangled** 283:6
283:23 285:22
285:24
**entanglement**
283:25 284:1
**entered** 323:8
**entice** 95:20
297:12
**entire** 8:15
37:22 75:24
76:7,25 100:24
103:14 291:15
300:16,18
**entirety** 257:16
297:8
**entitled** 23:6
134:15 135:19
135:20,21
214:15
**entrapped** 273:8
**entry** 141:11
**environment**
214:19 283:25
**environmental**
18:22
**environments**
140:1
**envisioning**
42:16
**epidemiologist**
310:22
**epidemiology**

136:4
**equal** 116:8
**equally** 116:4,7
189:10
**Erin** 4:15
**Errata** 322:3,8,9
322:10,12,14
322:15,18
323:1
**erroneously**
295:12
**escape** 275:9
**especially** 168:7
**Esq** 2:3,8,8,12
**essentially** 21:17
30:17 34:24
37:22 41:18
47:20 48:15,20
50:10 52:7
68:17 150:12
158:13 224:11
233:15 297:19
**establishing**
45:21
**estimate** 78:1,10
78:11,13,14
252:10
**et** 4:5
**ethically** 42:6
**eval** 172:8
**evaluate** 130:24
229:16 231:5
257:20 314:21
**evaluated** 293:1
**evaluating**
279:13
**evaluation**
172:7,9 225:11
289:24
**event** 18:1
148:22 278:3
**events** 18:4
149:6
**eventually** 299:7
**everybody**
64:23
**everyday** 137:6
**evidence** 206:2
207:11 254:15
285:23 286:17

**exact** 66:25
218:23,25
232:4 277:5
303:20
**exactly** 18:11
40:12 52:21
68:16 75:20
107:14 118:2
119:10 154:9
186:12 202:7
209:15 246:1,2
246:10,20,23
247:11 268:19
273:6 287:14
289:13 303:12
306:23
**exam** 98:12
**examination** 3:1
5:21 98:6
107:16 108:11
**examinations**
249:2
**examined** 5:19
98:9 321:5
**examiner's**
272:13
**examines**
111:20 131:17
**example** 31:12
32:23 33:10,18
52:10 58:25
63:11 92:4
101:10 106:8
106:23 114:22
115:2 120:14
120:21,25
130:25 131:21
135:22 146:12
150:16 158:20
167:23 168:17
175:22 190:22
192:15 197:5
241:4 253:12
269:13 278:8,8
284:13 294:22
307:1 313:23
**examples** 92:21
**excellent** 315:15
**exclamation**
184:6

**exclude** 134:16
**exclusively**
320:10
**excuse** 180:11
249:20 252:18
266:22
**excused** 319:8
**execute** 236:6
**execution** 57:18
129:14
**exemplar** 4:10
4:18 84:4
93:25 94:1,9
94:18 248:20
249:4,10
**exemplars** 93:24
**exercise** 53:23
136:22 187:1
**exhibit** 3:9,11
3:13,15,17,18
3:21,23 4:3,6,8
4:9,11,14,18
4:20 79:21,23
80:8,24 81:4
84:25 85:3
89:19,21 90:5
91:9,11 120:19
168:24,24
182:15,17
183:2 191:6,9
191:17 192:3
199:10,23
200:9 202:24
203:4,7 207:3
207:4,5,21
208:10,13,16
208:18 213:2,7
214:5 221:19
221:25 222:1
230:23 234:2,5
240:21,24
242:24 243:12
244:12,15,19
244:22 247:24
248:5 249:25
250:5,8 252:23
255:19,22,25
271:13,15,20
272:9,10
273:22 276:13

276:21 282:8
296:4,7 307:14
**exhibited**
195:13
**exhibits** 3:7 4:1
80:4 91:16
183:3 221:7
320:8,10
**exist** 168:15
300:11
**existence** 60:16
**existing** 167:3,7
**exists** 127:15
300:2
**expand** 43:6
**expanded** 42:23
**expect** 166:6
193:12 202:8
256:7 286:24
287:3 288:17
288:20 306:8
**expectation**
127:17
**expectations**
190:2
**expected** 176:19
306:10,12
**expecting**
197:11
**expensive** 42:2
**experience** 96:3
100:14 118:25
145:5 180:17
**experimental**
92:1,13 210:12
**experimenters**
302:18
**expert** 7:14 8:4
8:22 9:2,8,15
48:23,23 61:18
73:6,24 74:13
75:2,12 101:10
111:6,13,16
112:20 113:4,6
113:17 115:6,9
115:12,14,19
115:25 116:5
118:10,17
122:8 124:10
124:21 126:9

130:9,17 132:1
133:14 134:10
134:20 135:1,9
135:23 136:1
138:23 139:6
142:24 143:4
154:4,11,16
155:5,7,8,17
157:3,7 180:18
217:14 309:14
309:18 316:23
316:25
**expertise** 74:24
116:8 124:8
134:3,18 135:7
135:14,21
136:8 140:18
144:19 153:6
154:12 156:13
156:21 157:10
159:14
**experts** 75:19
90:19 91:24
99:21 100:1
103:4 105:23
106:4 110:20
174:16 229:4
299:10
**experts'** 95:16
**expired** 278:5
278:15,21
**Expires** 324:24
**explain** 130:8
**explained**
197:16
**explaining**
130:4 135:8
165:10
**Explico** 312:16
**Explico's** 314:25
**Exponent** 4:6
171:21 174:20
174:20 213:3,4
214:6 215:14
217:19 221:5
235:22,23
262:14,19,20
262:25 263:12
264:8 284:12
296:1 312:16

**Exponent's**
214:8
**express** 60:24
**expressed** 59:22
61:7 66:6
69:25 70:10
**extend** 168:8
**extended** 275:7
**extensive** 16:9
316:21
**extensively**
168:9
**extensor** 147:5
147:10 150:21
**extent** 50:11
72:4 90:17
126:3 141:4
180:23 219:24
229:7 287:16
**extra** 212:15
**eyelash** 275:20
**eyelashes** 274:4
274:9,21
**eyes** 63:12
220:11

**F**
**F** 53:3 321:1
**F-E-R-S-T** 6:8
**F-R-A-K-E-S**
67:24
**F15.18** 121:1
124:5
**F3118** 124:6
**fabric** 162:9,17
165:17 167:23
168:1,1 245:25
271:7 277:13
279:2 281:20
292:1 299:12
**fabrics** 131:3,9
133:2,5,6
277:12
**face** 65:21 162:8
162:12 163:5,9
163:19,20
167:25 173:23
173:24,25
174:2,3 191:17
224:3,5 245:6

245:25 246:6,9
246:10 247:17
260:23 261:25
264:17 271:6
273:6 274:4,21
275:21 276:3
276:11,21,24
279:2,6,19
281:10 299:12
**facilitate** 164:12
**Facility** 322:19
**facing** 274:9
**fact** 7:5 29:8
32:22 33:22
53:1 61:3
124:18 164:10
165:12 167:19
236:5,20
251:25 253:20
278:20 303:25
**factors** 113:22
114:8 115:15
117:22 118:3
120:11 149:10
316:23,25
317:9,10,11,15
318:7
**factory** 31:16
**factual** 103:5,5
119:2
**Failure** 184:8
**fair** 32:14 50:5,8
59:18,19 73:19
78:12,13 80:19
101:2 152:25
156:3 220:25
229:10 256:20
306:7 308:23
**fairness** 64:22
**fall** 37:24 39:24
50:12 99:8
148:16 151:1
173:20 197:14
197:20 198:7
234:9,14
252:12
**fallen** 293:13
**falling** 38:1
147:9 178:25
205:10,14,18

**familiar** 18:5
55:11 59:13
103:11 213:4
214:5 243:23
303:9
**familiarity**
231:17
**Family** 3:21
**fancy** 107:5
**far** 32:5,10,11
135:3 196:9
211:12 257:17
286:9 291:24
308:25 311:21
318:18
**fashion** 287:10
**fast** 43:16
**fastened** 238:8
**fat** 165:17
**father** 97:24
99:4
**favor** 308:7
**favorite** 160:24
**feature** 53:21
170:3,5,5
**features** 34:19
34:24 37:1
53:19 167:3,5
168:10 169:11
170:10,12
274:1
**February** 201:5
202:1,13
**Federal** 323:6
**feedback** 48:18
**feel** 65:6 79:6,8
89:6 100:24
119:15 219:16
**feeling** 57:2
191:3
**feels** 82:10
**feet** 163:3,5,10
164:23 171:13
174:6,7 260:14
260:18
**fell** 205:16 293:6
**felt** 92:23 125:16
**Ferst** 6:7
**field** 17:18,21
297:24

**fighting** 218:17
**figure** 10:9
    56:21 140:2
    172:17 175:12
    222:2 224:25
    235:10 239:3
    242:10
**file** 4:8,20 35:22
    75:24,25 81:21
    82:4 83:4
    101:20 272:15
    322:13
**filed** 8:1,4 15:22
    16:4 35:7,14
    322:15
**fill** 322:9,9
**filled** 158:10
**final** 13:4 40:12
    82:22 142:15
    142:20
**finalize** 89:8,11
**financial** 320:16
    325:14
**financially**
    321:14
**find** 23:5 30:22
    74:3 121:9
    135:18 214:13
    221:17 239:2
    282:14 293:24
    296:1
**finding** 256:5
**findings** 143:15
    256:5
**fine** 6:2,17 43:13
    101:7 143:20
    169:23
**finger** 117:24
    119:9 256:16
**fingertips**
    101:14
**finish** 76:18
**finished** 57:3
    121:11,25
    136:17
**fires** 37:22
**firm** 25:13 74:22
    74:23 75:7
    82:20 86:5,9
    88:22 89:2

109:23 320:2
**first** 5:19 19:8
    28:14 50:15,22
    50:24 52:16
    54:3 56:24
    66:4,5,11,12
    72:13,20 73:4
    73:15 84:21
    90:13 102:21
    128:7,10 145:9
    152:5 173:15
    173:21 184:13
    185:20 197:3
    197:13 198:25
    204:18,18
    207:6 215:8,11
    221:20,22
    222:3 289:3
    290:19 294:3
    297:10,13
    299:24 302:7
**Fisher-Price** 4:7
    5:13 50:21
    51:1,3,6,9,15
    90:10 103:21
    104:22,24
    105:15 125:1,7
    125:12 127:7
    131:1 165:12
    167:24 176:1
    177:6 178:15
    267:19 268:1
    279:5,17
    281:17,22
    292:13,17,20
    292:25 295:13
    302:23 303:19
    306:12,16,19
**Fisher-Price's**
    10:8 91:25
    177:21 288:24
    294:1 309:18
    **FISHER-PRI...**
    1:7
**fitted** 210:15
**five** 30:10 41:4
    49:17 52:2,23
    67:6 110:7
    137:9 151:17
    173:2,3 193:24

200:13 232:7
    289:19 293:7,9
    293:10 309:13
    309:15
**five-month-old**
    222:15
**fix** 122:17
**flash** 241:2,5
**flat** 52:21,22
    54:25 56:20,22
    97:14,16
    163:20 164:16
    165:18 167:4
    173:11,18
    187:23 189:16
    206:5 207:14
    210:24 248:15
    248:17 261:9
    291:1
**flattening** 195:6
**flawed** 296:3
**flaws** 296:4
**flex** 293:13
**flexible** 165:17
    287:11 288:8
**flexing** 42:10
**floor** 112:18
    205:10 282:11
**flow** 106:23
    107:2 278:6
**fluid** 106:23
    107:1
**focus** 220:19
    287:6
**focused** 37:20
    39:13 42:22
    86:18 234:3
    284:17 297:18
**focusing** 77:24
    118:9 161:23
    287:18 289:1
**folking** 288:25
**follow** 13:3
    16:12 29:17
    71:2 82:16
    184:8 209:15
    209:17
**followed** 35:25
**following** 80:3
    323:5 325:5

**follows** 5:20
**foot** 164:20,20
    165:5,7 166:25
    167:1 171:15
    171:17 211:21
    240:4 260:19
    280:3 314:3
**foot's** 293:13
**Footnote** 254:1
**force** 150:20
    164:24 212:15
    212:24 261:3
    265:19
**forcefully**
    151:16
**forces** 147:5,12
    147:13 150:23
    150:25 151:5
    151:12 165:3
    170:21 260:21
    261:2 314:13
**forcing** 127:7
**forearms** 193:8
**foregoing** 320:4
    321:6,9
**foreign** 1:7,8
**foreseeability**
    316:18,22
**forget** 76:9
**form** 8:14 10:16
    50:7 57:11,21
    72:2 88:18
    89:9 93:3
    103:19 106:5
    118:15 120:7
    124:23 125:22
    126:11,15
    128:8 133:16
    134:22 139:3
    139:17 159:21
    160:3,16
    161:17 182:1
    186:3,23
    194:22 196:12
    198:1 216:22
    217:7,24 218:2
    218:9 220:2
    225:21 227:24
    236:7 237:14
    238:10 239:5

247:7 252:8
    257:22 260:1
    266:2,10,19
    267:8,22
    269:10,14
    270:11 271:9
    272:25 274:17
    280:22 281:13
    284:23 286:20
    287:1,23 288:5
    288:19 294:13
    295:5,23 306:5
    306:22 307:6
    323:7,10
**forma** 159:10
**formal** 35:16
    120:4,9 122:9
    140:12
**formalized** 53:9
**formally** 82:9
**forming** 256:11
    260:17
**forth** 20:24
    23:14 68:7
    93:9 248:16
    249:3,10 256:4
    303:11 321:8
**forward** 31:7
    55:6 68:20
    135:8 158:1
    162:25 252:12
    298:13 322:13
**found** 44:1
    132:9 150:15
    155:2 191:20
    191:20,22
    245:4,20,22
    246:3 247:12
    247:13 272:21
    273:3 274:20
    276:12,20
    284:21,22
    285:6 286:4,6
    287:15 305:14
**foundation**
    196:12 287:1
**Foundry** 25:11
**four** 48:9 49:17
    151:17 170:8,9
    173:1,2,5

178:9 179:2,5
189:15 193:3
193:11 201:8
202:2,15,18
222:18 223:1
289:19 302:10
**four-month-old**
222:15
**four-sevenths**
308:8,9
**four-year** 22:1
**fourth** 178:10
178:22,24
179:4
**Fox** 312:16,21
**Frake** 281:7
**Frakes** 66:22
67:22,23,25
68:1 69:5 70:9
72:12 111:23
112:8 124:19
128:1 222:11
227:22 280:21
281:7 318:3,5
**Frakes'** 222:12
**frame** 54:9,18
58:8 60:6 69:4
70:16,22 84:20
149:13
**frankly** 166:18
169:21 229:23
245:22 292:3
**free** 48:15 79:6
79:8
**frequencies** 21:1
**frequency** 38:14
38:25
**fresh** 63:12
278:13,14,17
278:20
**freshest** 274:11
**friend** 15:7
16:24,25 19:6
24:3 71:15
74:19 112:9,17
124:18 280:20
281:7
**friend's** 15:10
**friends** 28:17
66:14,17

100:10 222:6,7
222:8 289:15
**front** 34:14
49:12 90:5,12
96:9 145:3
162:20 175:10
197:7,8,13
202:4 227:3
230:21 232:17
232:18 233:2
**full** 5:23 31:7,7
52:15 72:3
90:10 92:19
126:3 197:21
209:2 294:12
294:20 297:15
311:6 321:10
**Fuller** 250:15
**fully** 175:16
262:23
**fun** 41:22 42:23
**function** 134:13
**functional** 14:7
**fund** 112:17
**funny** 23:12,13
23:20
**furnish** 323:11
**furnishings**
132:11
**further** 150:14
188:7 255:17
308:21 318:19
320:7 321:13

---

**G**

**G** 36:7
**gadgets** 279:25
**game** 149:4
**gantry** 31:18
**gatekeeper**
134:12
**general** 45:7
100:16 157:11
159:18 166:10
166:11 170:17
198:12 283:10
**generally** 32:17
47:4 100:4
109:6 149:18
154:10 252:3

269:7 283:3,8
**generate** 260:21
261:5 265:3
314:14
**generated** 147:4
150:24 154:1
**generating** 14:3
261:2
**generation**
261:4
**geometric** 284:5
**geometry** 93:16
163:4,17,18
231:6 284:9
291:23 313:22
314:1
**Georgia** 1:20
2:9 6:8 20:1,3
20:5 66:16
117:2 145:10
145:10 158:10
280:20,24
281:1,6 317:23
317:25 320:5
320:11 321:2,4
321:21 322:21
325:5,6,17
**getting** 20:23
62:16 69:10
80:2 87:17
167:11,17
171:18 173:16
179:22 278:17
282:20 300:5
301:22 302:18
**Gibb** 310:21
**girl** 230:4 234:8
255:7
**give** 5:23 6:15
11:6 13:21
31:5,12 34:15
42:19 48:17
73:23 74:6
110:3 121:4
134:10,17
138:12 204:11
206:16 219:19
219:19 239:16
240:15 258:19
273:13 294:20

294:21
**given** 7:22 8:7,8
9:3,25 10:1
93:11 163:4
164:6 167:5
216:17 230:19
231:2 295:19
323:8 325:14
**gives** 144:18
198:25 199:3
**giving** 72:17,19
74:6 82:6
100:22 155:8
199:8 242:7
**gluing** 266:15
**go** 10:18 28:10
28:17 31:21,22
37:23 38:11
43:8,15,15
44:2 46:25
58:13,14,23
59:1,3 62:10
64:11,18 65:22
71:1 73:20
78:6 82:18
83:3,6,16
89:15 102:1
110:17 128:9
128:20 136:24
140:16 143:14
144:1 145:2
146:24 150:9
150:12,14,15
153:5 157:24
160:6,22 161:2
166:15,16
174:2 178:8
179:11 181:6
190:4 201:1
203:15 206:25
207:8 208:10
208:11 213:2
215:20 229:4
236:15 243:20
248:1,5 254:25
257:5,10
259:12 266:14
274:16,19
277:25 282:23
285:4 289:19

298:16 299:4
299:14,18
300:3,3,21,24
303:11 309:2
316:1 318:16
**go-cart** 41:18
65:9,13
**goal** 240:6
**goals** 57:13
**goes** 42:12 149:4
149:21 165:20
167:8 170:13
226:10
**going** 10:10
11:14 23:3,5
23:13 26:18
29:20 31:7
32:10,10 41:12
44:3 55:6,8
56:21 57:4
61:19 65:22
69:15 73:12
74:9 76:12,23
77:2,22 79:20
79:21 81:13
82:5 84:11,17
88:24 94:8
96:5,10 98:7
109:7 110:17
112:3 115:18
118:22 122:2
122:25 134:1,8
135:8 136:13
139:13 140:6
140:14 141:3
143:11 157:23
160:14 164:8
166:5 167:18
169:1 181:15
182:14 187:5
189:11 192:13
194:3,5 200:10
201:13 202:23
207:21 209:1
212:5 213:2
217:14 218:24
221:22 225:15
226:21 227:13
230:18,24
231:22 240:21

241:1 244:12
249:23 253:23
255:24 256:1
258:19 266:7
267:4 270:3
271:12,14
273:12,13
274:25 275:14
276:17 282:10
283:17 296:14
296:25 298:4,7
298:15 299:3,4
300:25 301:7
301:10,10
302:21 306:13
307:21,22
308:11,13,14
312:1 313:9
**Goldberg** 2:3
242:18
**Goldsmith**
309:18 310:3
**Goldsmith's**
309:20,23
310:17
golf 28:15,18,19
28:19 29:6
43:22
**good** 22:23 23:6
49:24 66:14,16
84:9 85:17
164:22 168:20
171:18 193:12
252:10 281:6
294:21 302:4
303:4 304:17
304:17
**goodness** 85:6
**goods** 276:1,3
277:7 287:12
288:9,14
**gosh** 280:25,25
**gotten** 25:16
80:1,2 87:6
**grab** 187:12
265:14
**grabbed** 212:23
**gracious** 241:13
**Graco** 51:14
**grad** 36:14

**graduate** 19:10
142:18 317:22
317:23
**grandchildren**
178:2 307:3
**grandkids**
307:10
**grandmother**
237:7,8 238:23
238:25 239:13
**grandparent**
307:10
**grant** 141:11
142:12,23
144:25
**gravity** 198:6
199:3
**great** 23:4 113:9
113:23 115:3
118:19 120:15
187:25 251:24
279:21,22
**greater** 129:22
**Greek** 18:6
43:20
**Greenberg** 2:12
325:8
**Greetings** 322:5
**ground** 15:8
42:3
**group** 12:5
46:15 116:14
117:1 124:6
**groups** 53:16
84:6
**grow** 100:10
**guarantee**
287:12
**guess** 15:5 17:18
28:14 46:22
55:23 66:5
86:25 104:23
227:10 232:1,9
245:24 277:8
290:12 305:11
310:20
**guessing** 277:10
277:11
**guy** 233:6
**guys** 63:11

67:11 258:23
_____
**H**
**H.P** 16:2,3
**half** 6:24 7:2,5
7:12,14 62:2
68:3 232:21
307:25
**half-year-old**
67:7
**hammock** 262:2
262:3
**hammock-like**
262:1
**hand** 55:24
249:23
**handled** 320:10
**handles** 25:17
26:24
**hands** 162:20
185:17 186:9
187:23 190:16
232:5 233:3
**hang** 200:12
203:11 217:1
243:15 258:22
**happen** 100:6,9
114:21 175:23
198:25 247:9
247:18 308:22
313:7 314:20
314:21
**happened** 71:23
108:10,11
247:10 270:14
270:16 273:16
287:21
**happening** 9:12
92:10 284:14
**happens** 114:21
158:17 175:21
**happy** 6:15
76:13,24 77:6
140:3 160:25
**hard** 21:21 34:3
34:4 63:13,22
92:2 190:23
202:22 209:19
212:6 217:12
219:2 262:1,4

267:3 275:14
302:17 308:3
**harder** 164:17
212:19
**hardest** 196:25
**hate** 73:20
**hazard** 167:15
167:17
**hazardous**
254:23
**hazards** 167:7,8
167:9 168:14
168:15,18,19
271:1 283:25
**head** 62:17
104:10,16
105:16 114:24
115:3 155:22
161:19 162:17
162:19 165:13
166:12 167:2
178:11,16
179:4 192:12
192:21 193:1
193:12,18,24
194:12,16
195:7 224:9,9
226:8,10 240:5
240:5 264:13
265:5 275:11
280:7,15,17
314:2,2
**headboard**
205:2
**heads** 114:22
193:4 258:23
**Health** 150:3
**Healthcare** 3:21
**healthy** 188:12
209:10
**hear** 160:8,13
160:25 204:15
227:12 285:2,3
**heard** 40:21
53:8 159:12
309:19
**hearts** 111:20
112:2,3,6,15
**heavily** 106:12
**hedge** 112:17

**heightened**
211:8
**held** 47:13
193:15 279:19
**helmet** 115:2
195:9
**help** 54:19 117:3
117:14 118:5
298:14
**helped** 24:2
29:18 30:2
**helping** 117:18
**helpless** 255:1
**helps** 25:13
212:24
**hereto** 321:12
323:11
**hereunto** 321:15
**Herman** 2:8
5:12 183:4
207:24 208:2,6
240:11,12,15
240:19,22
241:6,11,17
242:20 250:1
296:11,19,23
298:14
**hermanb@gtl...**
2:10
**hesitate** 12:4
**hey** 60:24 63:11
**hiding** 125:2,8
**high** 140:18
158:11 165:22
178:23 211:19
252:4 261:11
**highlight** 209:19
**highly** 131:8
138:4,5 272:2
**hinges** 278:20
**hips** 165:8
179:22
**hired** 155:4,6
**histories** 294:8
**history** 8:15
294:3
**hit** 41:4 158:20
**hitting** 163:13
**hoists** 27:15
**hold** 78:11

112:19 115:24
115:24 193:24
194:16 198:18
**holders** 52:9
**holding** 63:5
80:20 113:3
118:10,13,17
135:9 205:20
227:18
**holes** 278:12
**home** 79:7
132:11 251:4
276:6
**homes** 176:3
**Homonyms**
169:23
**Honestly** 107:4
**hook** 20:22
78:22
**hope** 10:6 159:8
**horizontal** 226:8
226:11 259:18
261:8,11
297:18
**hospital** 39:2
251:4
**hour** 49:2,18
65:17 76:25
239:9 291:17
296:24 297:1
**hourly** 48:11,14
48:21
**hours** 76:2
77:19 78:1
100:24 148:21
157:14 175:20
176:16 177:20
185:4 188:25
236:16 307:25
**house** 165:23
187:5 225:8
**Houston** 2:13
**hoverboard**
41:3,11,13
42:4,7,9 43:18
65:1,4,7,10
**hoverboards**
41:3 42:9
65:24
**huge** 26:5 27:16

**human** 147:4
151:12 273:25
316:23,25
317:8,10,11,15
318:7
**hundred** 13:25
22:11 41:9
49:17
**hundreds** 85:25
305:11
**husband** 66:21
**Huxley** 222:17
223:10 225:18
225:24,25
226:4 228:19
229:9,16,23
230:14 233:3
234:8 290:4,15
**Hyundai** 31:16

---
**I**

**I-N-V-E-K-T-...**
24:14
**I.R.B** 303:6
**idea** 36:11 40:3
44:4,12 55:17
304:17
**ideas** 49:25 55:6
**identification**
79:24 85:1
89:22 91:12
147:4 182:18
191:10 199:24
203:8 208:19
213:8 240:25
244:16 250:6
255:23 271:21
296:8
**identified**
136:11 295:13
**identify** 5:6
136:12 144:17
151:5
**ignore** 306:13
**ignored** 168:3
**Illinois** 25:11,14
**illustration**
247:6,8,17
**immediate**
55:15

**immediately**
31:3
**impact** 4:4
26:12 95:17
209:3 276:10
276:18
**impede** 265:9,13
**impeding**
265:22
**importance** 9:20
**important** 17:11
57:17 64:3
96:22 110:18
129:13 131:21
133:7 134:7,13
162:4 166:22
167:17 270:24
318:14
**impossible**
64:21 246:10
259:20
**in-home** 168:17
176:4,23
**Inaudible**
172:11 179:10
**incapable** 302:3
**inching** 265:4
**incidence** 128:4
146:15 149:20
**incident** 102:24
127:8,9 165:9
175:22 176:15
270:15 284:13
305:17,23
**incidents** 177:18
305:6,6
**incline** 51:20,25
52:1,2 53:4
58:16 60:8
61:7 62:8
63:13,23 64:9
64:13 66:8
67:1 68:4,9,19
69:6 72:14
99:17 124:19
124:22 125:11
125:17 127:1
147:14 164:13
164:16 169:7,7
209:3 224:8

248:11,14
251:7,12
254:18,22
257:20 259:1
275:8 290:21
290:25 291:1
**inclined** 4:3,16
53:2 55:2
61:20 138:4,5
164:14 205:25
206:5,16
207:14 209:12
210:4 211:2,5
259:16
**inclines** 52:23
210:23 211:1
**include** 92:6
133:9
**includes** 90:25
**income** 22:13
**inconsistencies**
156:7
**inconsistent**
238:14 295:4
**Incorporated**
12:14,16
**incorrect** 136:10
**incorrectly**
138:17
**incremental**
262:8 263:14
264:5
**increments**
313:11
**independent**
20:22 83:21
85:16,17 86:8
86:12,25 88:11
88:22 89:1
93:14
**independently**
83:8 85:13
87:7,15,22
88:4,8 235:19
255:12
**INDEX** 3:1,7
4:1
**indicate** 96:24
97:22 134:2
201:25 274:4

308:20
**indicated**
278:24
**indicates** 136:19
201:22 206:3
207:12 274:10
**indicating** 80:1
127:10 275:7
**indication** 137:2
273:4
**indications**
120:22 124:1
145:4
**individual** 7:16
7:18 12:2,3
**induce** 157:21
**industrial** 26:6
**industry** 128:17
**infant** 4:12 35:2
37:6,8 39:10
69:12 95:7
96:24 107:21
112:15 113:7
113:18,18
117:6 118:11
118:11 119:1,6
120:3 132:6
144:20 145:22
146:4,17
149:16 150:7
153:19,19
154:5,13
156:14 158:24
159:2,15 162:5
169:12 170:16
170:22,25
171:7 174:5
175:11 178:12
178:22 179:6
180:15 182:4
185:17,24
186:8 188:9,21
189:5 190:15
212:14 214:9
220:6 221:11
222:2 223:13
235:19 251:2,2
251:20,20
254:21 257:20
258:11 259:8

259:15 261:4
262:8,10,21
264:5 276:11
276:20 280:9
283:5 284:6
289:6 292:9,15
293:2 295:1
297:14 299:5,7
300:25 305:17
312:18,18
**infant's** 162:14
299:16 300:13
300:16
**infants** 35:4
36:11,11 37:10
38:9,10 39:16
44:15 45:3
46:11 68:17
93:17,19 112:1
114:16 120:1
131:23 137:12
137:14 146:7
146:14 147:9
147:21 151:8
165:11 171:3
171:10 172:17
174:16,24
175:7,8 188:12
190:7 206:3
207:12 209:11
220:11,12,20
221:4,6,14,23
225:20,22
227:24 229:8
231:3,4,7
236:1 255:2,10
255:13 284:11
292:21,22,25
294:23 305:5
305:23 314:8
317:15
**infants'** 4:4
209:4 231:8
**infections**
117:21
**infinite** 176:18
**influence** 128:6
**inform** 154:12
**information**
9:10 72:6,25

73:2 83:20
90:21 92:24
93:5 97:2,10
100:2 109:16
125:1,8,10,14
125:24 126:17
126:19,24,24
142:2 247:15
270:25 281:5
**infringing** 47:12
50:4
**inhibit** 181:8
**initial** 16:1
21:22 48:17
56:4 90:16
107:16 110:9
223:25 225:19
228:23
**initially** 13:3
37:11 42:20
**initiated** 15:16
**injury** 184:10
306:14
**inputs** 14:4
**inquiring** 77:7
**inside** 210:16
**insisted** 189:25
**installed** 26:23
**instance** 217:3
**insti** 303:6
**institute** 116:11
116:23 145:11
**Institutes** 150:3
**Institutional**
303:6
**instruct** 22:20
**instructed**
160:19 190:14
265:24 266:6
269:17 270:23
**instruction**
77:17 184:14
185:6 188:18
239:16
**instructions**
184:9 238:9,20
268:20,24
269:6
**integrate** 168:4
**integrated** 21:4

**intend** 90:8
115:11 138:12
138:24
**intended** 175:14
180:17,20,24
182:9 184:18
184:23,24,25
185:4,24 186:5
188:20 267:10
267:17,19,21
268:4
**intent** 268:9
**intention** 185:2
**inter** 278:15
**interact** 304:15
304:19
**interacted** 93:18
**interaction**
229:5
**interactions**
214:16,22
220:14 221:9
225:20 227:12
227:21 290:14
**interacts** 145:5
145:8
**interchangeably**
194:8
**interest** 28:2
30:1 32:4 37:3
54:14
**interested** 17:9
23:2 54:22
75:3 92:20
95:14 123:21
321:14
**interesting** 41:6
92:9
**international**
141:12 142:16
184:5
**interpretation**
271:8 306:18
306:20
**interpreted**
311:14
**interpreting**
195:18
**interrupt** 76:18
122:4 143:24

**interrupted**
105:6 122:3
291:10
**interrupting**
122:19 123:20
**interstitial**
278:4,16
**introduce**
317:24
**introduced** 75:7
90:20
**introducing**
167:6
**introductory**
317:25
**intuitive** 269:7
**InVekTek** 24:8
24:13,14,17,18
24:25 26:14,23
29:18 32:23
**InVekTek's**
26:7
**invent** 29:2 35:3
**invented** 28:23
29:4 35:1,3
**invention** 22:6
22:13 26:12
29:8 35:7,21
35:22 36:19
40:1
**inventions** 23:2
32:21 34:10,18
34:23 39:16,25
40:25 44:14
45:1 118:5
**inventive** 28:20
**inventor** 7:7,15
12:25 13:1
19:20 22:23
23:5 28:1
32:14
**investigate**
50:20 157:15
**investigating**
45:16,20 46:14
49:7 50:16,24
108:10
**investigation**
108:15 125:13
137:11,20

141:20,25
142:8 147:7
150:13
**investigations**
46:1,2 47:9,21
120:9
**investigative**
271:4
**investment**
25:13
**investments**
25:16
**investors** 25:5
25:19
**invoices** 78:6
**involve** 12:15
15:11 16:20
32:5 295:11
**involved** 12:8,17
13:2,9,12,15
28:1 36:22,23
51:21 60:17
99:23 111:19
112:11 154:2,8
176:5 182:22
289:22 295:13
**involving** 12:8
13:8 158:24
**issuance** 59:10
**issue** 12:12
13:10 14:11
52:25 107:2
113:20 115:4
137:19 138:9
142:9 146:17
147:17 149:13
159:20 170:14
170:14 232:4
265:25 284:1
285:19,20
**issued** 13:12
36:2,16 58:15
**issues** 48:16
60:2 62:24
71:7 90:20
106:20 118:4
152:6 169:6
309:23
**it'll** 308:24
**item** 63:19

125:18
**items** 59:3

---

**J**

**J-O-S-B-O-R-...**
242:18
**James** 172:20
**Japanese** 30:16
**job** 7:11 64:21
90:5 273:13
**Joel** 104:8
**John** 2:3 5:9
10:20 11:17
22:22 76:22
77:10 121:13
122:6,21
123:21 183:4
199:12 200:11
202:24 204:3
207:5 208:7
230:22 241:2
241:24 242:16
243:22 256:2
296:9 298:6
307:23
**josborne@gol...**
2:5
**journal** 4:3
86:13 206:8
207:17 208:25
**journals** 257:1
315:14,16
**Judicial** 325:5
**July** 91:8 92:24
309:6
**jump** 191:1
**jumped** 206:10
264:16
**jumping** 84:1
**Junction** 190:19
202:8
**juries** 161:9
**jury** 24:10 32:13
45:11 53:14
73:23 74:7,9
110:19 112:22
115:12 118:23
119:17 130:4
134:8 135:8
138:13,25

139:15 140:4
155:9 156:5
160:11,13,14
161:10 194:4
246:17 247:3
264:7
**jury's** 55:8
198:24
**justify** 60:15
**juvenile** 45:7
46:19 135:6
136:21,21
140:24 145:5,8
153:7 154:3
318:8

---

**K**

**KATHLEEN**
1:2
**Katie** 5:10
**keep** 32:24 38:1
38:1 62:17
147:9 178:12
208:4 227:2
237:18 265:4
297:18
**keeping** 33:14
178:22,25
212:10 265:20
**Kelly** 77:23
**kept** 34:21
**Kevin** 200:5
**kicking** 163:12
171:15 260:25
261:1 264:15
**kid** 61:19 64:15
252:12 280:15
**kids** 61:25 64:17
68:2 98:9
99:14 114:19
114:20 151:21
189:12
**Kids2** 46:3,17
46:18,18 47:13
47:15,23 48:3
49:14,20,20
50:17,18,20
51:10 54:15,19
55:18,19,21
58:14 60:17,24

61:4
**Kim** 70:2,2,3,8
**kin** 321:13
**kind** 23:13,20
32:17 37:21
41:21 44:12,16
53:23 56:10
69:13 72:15
87:9 97:1
100:1 119:16
131:2,4,5
148:11 150:11
150:13 153:13
155:13 162:21
166:14,15
171:14 179:22
190:25 197:15
198:3 212:17
212:19 230:2,9
235:21 236:13
236:25 247:18
251:15 258:16
265:6,20 270:4
275:5,6,15
279:15,24
282:3,4 283:23
291:21 294:17
299:11,15
304:13 307:15
314:14
**Kindergarten**
316:10
**kinds** 31:10
33:17 49:21
52:8 55:5
68:22 69:18
71:5 97:13
113:13 142:5
167:7 212:13
279:24,25
311:11 314:4
314:10,13
**kits** 44:10
**Kitty** 103:25
**knee** 260:24
**knees** 163:7,8,10
173:19 185:18
186:9 187:23
190:16 232:6,8
**knew** 55:19

60:13 126:5
139:6 167:11
168:15 306:16
307:4,7
**knob** 68:23
**know** 6:16 10:23
10:24 13:5
15:24 16:15,22
16:24 17:4,9
17:13 22:4
25:15,22 26:22
28:12 32:2
33:3 35:7,23
40:15 43:2
44:25 49:11
55:10 56:11
58:18 60:22
61:5 70:25
72:3 73:20
75:25 76:7
78:17 81:1
83:18 84:2,14
86:4,9 88:19
90:19 91:25
93:1 96:2 97:3
97:4,6,11,12
98:6,11 99:19
100:6 102:6,12
103:13,17
107:8 108:8
112:15 113:9
113:23 114:8
114:10 115:3
115:19,21
116:9,20,22
117:25 118:13
118:16,18
119:12 120:15
121:11 122:22
122:23 126:3
127:8,11,12,13
127:14,15
129:20 130:25
131:15 132:1
132:16 133:7
135:3,19,20,21
136:20 139:7
142:17 143:17
145:7,22
147:16,23

148:17,22
154:25 155:17
155:19 156:25
157:16 165:10
165:21 166:14
167:6,11 168:2
168:3 171:25
172:7 174:25
175:21 179:12
179:12,13,17
182:20 186:25
194:8 196:2
202:22 209:15
211:16 217:11
219:16 230:7
230:19 234:13
235:2,10
237:15 241:24
245:23,25
246:2,19,23,24
247:12 248:15
248:21 251:9
251:11,12,24
253:21,22
254:2,17,19
257:12,17
261:19 268:21
269:8,12,20
271:22,24
272:1,16,22,23
273:2 275:8,8
275:24 276:23
276:24 277:3
279:23 283:20
286:9 287:4
290:20 291:6
294:8,10,24
298:9,21
302:17 303:12
303:22 304:24
305:22,25
306:1,2,21,24
307:11 308:23
309:22 311:24
312:13 313:10
313:17 315:5,7
315:25 316:2
**knowing** 135:10
246:21 307:2
310:1

**knowledge**
130:12 133:23
134:16 137:3
257:14 277:12
283:11,24
285:21 287:25
**knowledgeable**
100:5 119:15
**known** 146:6
149:10 150:8
168:14
**knows** 73:23
306:19
**Korea** 29:19
31:11
**Korean** 30:2,4
30:20
**Kristen** 110:9
305:13

**L**

**L** 325:1
**lab** 112:13
279:23 289:4
**label** 3:17
182:21,22
183:6,10,13,17
189:3 190:14
195:19 200:6
200:10 214:14
214:23 215:4
238:3 268:15
268:18 292:13
306:13
**labeling** 154:13
154:21 156:5
**labels** 154:16
**lacking** 89:7
**language** 264:3
**lap** 207:25
236:12 237:9
**laptop** 240:19
242:4,6,8
**large** 26:9,10
27:22 75:25
100:6 150:25
189:12 307:8
**largely** 36:21
246:8,9 280:11
**larger** 252:3

**largest** 26:11,13
26:22
**Las** 58:25
**late** 78:8 189:24
189:25 202:18
**lately** 25:16
**lateral** 211:12
211:15
**laugh** 77:15
**laughing** 78:23
**launch** 231:22
**law** 17:8,10
74:21,23 75:7
82:20 86:5,9
88:22 89:2
159:4
**lawsuit** 12:2
15:16 33:18
34:1,3
**lawsuits** 16:4
**lawyer** 25:8
74:21 91:6
110:8 198:16
**lawyer-ese**
25:22
**lawyer-like**
73:22
**lawyers** 17:6
33:3,6 75:3
85:19 86:24,25
87:6 88:11
305:13
**laxadaisically**
237:1
**lay** 134:10 278:9
**laying** 173:23
220:11 290:20
**lays** 165:18
**lead** 12:25 13:1
13:11 19:20
192:14
**leading** 192:10
312:24
**leads** 130:11
**leaning** 204:21
**learn** 10:8 55:8
174:1 192:5
197:12
**learned** 76:9
86:13 114:12

138:2 173:22
174:2 189:21
**learning** 138:8
**leave** 20:7,9
35:23 40:10
255:25 270:4
318:15
**Leaving** 45:4
**left** 15:17 32:11
56:10,12,23,24
212:10 237:6
238:23 239:21
239:23 242:21
274:22 275:4
303:1
**leg** 262:7 263:13
264:4,20 265:3
293:6
**legal** 23:18
72:16 111:15
159:6 320:1
325:6,7,9,10
325:13
**legalese** 73:21
**legs** 165:23
192:17 193:16
224:6 260:24
263:18 264:10
264:15,24
265:5 273:6
275:6 285:16
**leisure** 143:7
**length** 266:5
**lengths** 294:15
**lengthy** 143:13
**lens** 120:2
**let's** 8:20 28:10
29:15 45:6,10
47:22 53:14
62:13 80:24
83:3 84:13
85:12 93:10
100:19 101:16
117:4 121:6
136:24 140:16
146:24 148:2
150:9 153:5
167:3 170:7
172:8 175:10
175:25 181:1,6

182:11 191:6
192:1 202:21
212:8 214:12
224:22 258:5,5
260:5 262:5
271:10 277:20
279:22 282:6
300:21 307:13
**letter** 250:22
**letterhead** 4:14
**letting** 78:21
**level** 63:24
96:24 97:4,5
140:19
**leverage** 41:3
**leveraging** 42:5
42:6
**licensed** 21:6
**licensing** 22:15
**lie** 209:11 230:3
**lies** 230:2
**life** 8:16 77:21
109:7,7,13
137:7 254:13
**lifetime** 99:24
**lift** 27:1,3,19
162:17,18
194:12 198:5
**lifting** 27:7
**liked** 92:10
**limited** 110:22
143:12 151:10
229:8,9 259:17
261:8 303:15
**limiting** 131:14
131:15
**Linda** 104:9
**line** 56:2 58:19
59:12 123:9
129:10 132:3
215:8,11,12
259:1 267:1
323:12,14,16
323:18,20,22
323:24 324:1,3
324:5,7,9,11
324:13,15,17
**linebacker**
222:19
**lines** 289:19

**Lisa** 104:12
**list** 37:8 83:3
92:20 103:6
120:20 122:14
143:15 161:20
163:25 166:2
183:3 252:25
305:4,6,14
310:8
**listed** 30:19,19
36:12 75:12
251:8
**listen** 11:19
128:20
**listing** 122:15
310:12
**lists** 137:4
**literally** 18:17
**litigation** 7:19
12:8 13:2,8
14:16 15:9
325:14
**Litigators** 200:1
**litsup-ga@ver...**
320:12
**little** 39:24 62:3
62:6 70:6
105:5 162:21
162:22 164:14
167:20 192:16
201:8 202:18
213:13 218:7
224:10 235:7
245:22 252:11
265:4 275:6,19
277:8,13
280:16 302:22
305:2 308:9
**live** 93:17,18
94:8,11,13,17
220:20 221:4,6
221:11,23
222:2 223:12
225:20,22
227:14,24
229:4,8 255:13
270:9 284:11
292:22
**loan** 177:15
**locate** 172:2

**located** 88:4,8
**login** 80:2,3
**Loheiser** 104:12
**long** 10:7 17:5
  48:3 50:23
  61:18 68:14
  73:8 102:19
  113:21 122:23
  153:14 166:18
  175:23 176:3
  176:11,12,14
  176:15,16
  177:5,8,14,18
  177:20 179:19
  181:4 184:24
  209:25 218:13
  225:5,10
  234:18 255:15
  276:14 296:19
  296:21 299:15
  299:25 303:1
  304:2,4 313:2
  313:19
**longer** 43:3 65:9
**look** 49:1 55:16
  63:13 80:24
  101:11 106:19
  107:3 145:9
  147:2,17
  150:16 172:12
  172:12 179:2
  183:7 188:6
  191:2 192:1
  199:19 200:6
  202:21 208:12
  210:11 214:15
  216:12 217:15
  221:22 222:5
  226:7 229:15
  234:1 235:9
  247:22 250:19
  250:21 254:6
  258:5,5,24
  262:5 269:6,9
  269:15 273:22
  273:22 275:17
  275:18 282:6
  285:18 289:18
  295:25 296:3
  307:13 310:18

  318:10
**looked** 51:7
  86:20 87:4
  95:22,25 106:2
  142:1 154:24
  221:7 238:2
  268:24 281:17
  299:24 310:24
**looking** 34:16
  49:23 51:9
  52:25 63:11
  83:18 99:14
  106:16 107:11
  134:2 136:3,19
  137:12 145:3,4
  200:20 201:16
  206:13 220:9
  221:5,19,20,25
  223:8 226:19
  235:9 239:12
  245:4 246:4
  250:18 261:3
**looks** 204:19,22
  205:2,13,17,23
  223:10 226:4
  275:7 276:1
  302:17
**Loomis** 25:7,8
**loose** 236:13
  270:4
**lost** 273:12
**lot** 16:22 25:9
  29:4 32:7,21
  33:5,6 34:16
  34:18,20,23
  38:22 41:7
  42:4 44:1,3
  45:6 46:2,13
  52:22 55:8
  56:1 58:22
  62:24 64:16
  66:22 73:12
  86:4 92:1,4
  101:3 103:11
  114:4,8,14
  115:5,21 116:5
  116:10 120:8
  128:14,15
  132:17 133:25
  135:4 136:20

  139:6,7 141:3
  145:7,16,22
  152:15 156:24
  157:1 164:24
  171:13,15
  173:14 180:19
  180:21,21
  191:24 195:5
  196:24 197:12
  216:23 217:15
  220:1,3,18
  235:4,22
  236:11 267:11
  270:15 272:16
  276:17 280:17
  292:4 295:8
  303:5 315:7,7
**lots** 65:15
**Louisiana** 2:13
**Lovett** 2:12 3:4
  5:11,11,22
  8:17 10:19,25
  11:17,23,25
  22:14,18,22
  23:1,10 50:13
  57:16,22 72:8
  76:15,20,22
  77:4,10,13,18
  78:24 79:2,5
  79:19 80:5,7
  80:17 82:2,8
  82:14 85:2
  88:23 89:14,23
  91:13 93:6
  118:20 119:18
  119:20 120:17
  121:13,16,18
  121:24 122:6
  122:16,21
  123:5,11,15,18
  123:21,24
  125:3,5 126:1
  126:12,21
  129:8 134:5,24
  138:10 139:12
  140:8,10
  142:10 143:10
  143:21,25
  144:3,14
  159:24 160:4

  160:20,23
  161:1,21
  180:13,14
  182:2,11,13,19
  183:5,10,12,16
  183:19,21,22
  186:15 187:8
  191:11 194:24
  196:18 198:8
  199:12,14,18
  199:21,25
  200:9,18,22,24
  201:1,3 202:23
  203:2,12,16,24
  204:1,6,7,12
  204:14,17
  207:4,9,23,25
  208:4,8,9,13
  208:16,23,24
  213:11 214:3
  216:25 217:10
  217:25 218:3
  218:14 220:5
  230:22,25
  236:19 237:23
  238:11 239:15
  240:10,13,18
  240:20 241:1,7
  241:12,19
  242:2,4,6,12
  242:15,23
  243:5,7,9,13
  243:18,21,25
  244:4,8,18
  245:9,12,16
  247:21 248:2,4
  250:2,7 252:13
  252:21 253:6
  254:16 256:1,9
  258:1 260:3
  266:3,16,20,22
  266:24 267:16
  268:12 269:11
  269:18 270:17
  271:10,14,17
  271:24 272:8
  272:11 273:19
  273:21 274:18
  281:24 282:19
  282:21,25

  285:9 286:23
  287:19,24
  288:11,22
  292:6 293:4,9
  293:12,23
  294:18 295:10
  295:24 296:9
  296:13,21,25
  297:2 298:6,11
  298:21,23
  299:2 301:4,9
  301:13 306:11
  306:25 307:12
  307:19,21
  308:11,13
  309:1,3 312:5
  312:10,12,14
  318:20
**lovettm@gtla...**
  2:14
**low** 41:6,22 42:1
  42:15 43:13,18
  65:24 117:20
  297:13,24
**lower** 43:4 128:4
  261:3
**lowered** 297:11
**lunch** 143:22
**lung** 112:23
  137:15
**lungs** 111:20
**lying** 187:19
  192:22 194:11
  194:17 210:16

---

**M**

**M** 1:25 321:4,21
  325:17
**M.D** 191:15
**M.I.T** 18:7,24
  19:5,6,9,14
**M.P.E** 241:8
**M.R.I** 112:1,13
**machine** 14:10
  14:14 32:9,19
  33:14
**machine's** 14:12
**machines** 12:18
  12:19,20,21
  14:3,4 24:22

26:8 31:1,10
31:11,13,15
32:8,15 33:14
33:14,17,18,21
34:8,12 112:13
**magically**
264:16
**mail** 322:11
**main** 47:8,9
57:5 169:10,11
170:5,11,12
287:5 311:14
**major** 17:17,22
19:2
**majority** 101:19
306:2
**making** 32:7
49:7 77:8
107:4 117:18
161:20 167:7
299:16 323:9
323:10
**male** 280:2,8
**man** 59:14 66:15
**maneuver** 236:6
261:11
**maneuvers**
212:13
**manipulating**
244:20 301:4
**Mannen** 4:15
87:5 255:18,20
256:6,10,25
257:19 258:8
261:7 303:14
303:18 311:19
313:10,13
315:3
**Mannen's**
259:14
**mannequin**
275:2,3,4
277:2
**manner** 38:13
107:24 157:19
238:8
**Mansell** 322:20
**manual** 269:12
269:16
**manually** 235:2

322:9
**manufacturer**
295:20
**manufacturers**
295:12
**manufacturing**
12:21
**March** 69:21,23
**Maricopa**
272:13
**mark** 79:20
89:16 191:6
201:22
**marked** 79:23
84:25 87:10
89:21 91:11
182:17 183:3
191:9 199:23
203:7 208:6,18
213:7 240:16
240:24 244:15
250:5 255:22
271:20 296:7
**marker** 98:19
**market** 45:16,17
58:10 60:9,15
60:25 64:10,14
64:19 141:22
178:4 251:17
289:2
**marketed** 20:14
45:13
**marketing**
159:15
**Markman** 8:4
**marks** 226:8,13
**Mary-Olga** 2:12
5:11
**material** 7:6
34:21 84:19
114:9 257:12
309:10 311:23
311:24 317:12
317:14,21,24
**materials** 82:20
89:1 131:9,23
**math** 78:20
**Mattel** 18 5:13
10:8 50:21
90:10 103:21

105:15 309:17
**Mattel's** 310:22
316:22
**Mattel-COU** 4:6
4:20
**matter** 49:6
91:19 157:19
**mattress** 209:12
210:14,24
**mean** 7:5 8:13
14:18,19 15:5
17:4,18 24:2
25:1 26:3
27:19 39:12
42:8 48:13,14
51:13 54:17
57:14 63:22
64:16,22 69:21
70:21 71:4
72:15 78:3,19
81:9 83:13
93:1,15 98:5,8
99:7,10 100:1
100:9 102:24
105:5 106:18
108:7 113:8,12
114:6 116:14
117:1 118:2,13
118:17,22
119:11 142:12
143:2,24 146:6
148:10 149:3
152:25 153:8,8
153:21,22
154:18 155:24
156:9,10,15,16
156:19 159:23
170:7 172:6
176:4,14 180:8
180:19 184:22
185:7 186:2,10
186:24 187:10
187:11,13,17
187:18 188:23
189:2 195:19
196:13 204:1
204:22 205:16
211:15,17,18
211:21 220:17
224:3,5 225:4

226:22 227:16
229:19 231:20
233:5 234:13
236:8 238:13
239:7 240:6
245:7 247:12
256:3 257:4,8
262:24 263:16
264:12 270:24
273:1,3,7,11
274:24 275:12
275:22 279:4
280:11,12,15
282:2 283:16
286:6 287:3,11
290:5 291:14
292:2 294:14
299:9,20 302:3
302:10,16
303:4 304:23
305:10 307:22
307:23 310:18
311:9 312:23
**meaning** 18:6
300:15
**meaningful**
155:15
**means** 26:25
117:23 164:22
186:11,13
187:4 236:23
**meant** 11:15
152:17,21,21
169:13 243:3
291:6
**measure** 158:8
158:17 231:6
239:24,24
240:3 279:25
**measured** 93:16
248:21,25
284:9 291:23
291:24
**measurement**
150:20 240:2
248:13 249:1
**measurements**
95:3 225:9
226:25 227:7
237:19,21

248:19 249:12
**measuring**
94:21 95:4
133:5 249:3
**Mecatec** 29:19
29:22
**mechanical** 19:4
61:17 62:12
106:20 107:2
115:25 116:9
127:25 198:21
**medical** 3:21
4:14 74:24
75:18 97:6
106:8,13,15,19
106:19 107:4,5
107:9,11,12,16
108:6,20 111:1
111:4,10
115:18,20
199:15 272:13
281:8 316:4
**medically**
191:14
**medium** 311:17
**meet** 48:16
58:25 109:22
**meeting** 45:22
110:2 133:10
134:20
**meetings** 58:21
59:5 70:17
110:3,15
128:20 133:8
167:15
**member** 57:23
58:1,2,4,6,7
64:2 70:19
71:19 73:3
116:24 126:22
126:25
**members** 57:7
127:13
**memory** 274:11
291:21
**men** 189:12
**mention** 253:10
277:23
**mentioned**
44:22 111:23

133:25 170:8,9
**mercifully**
110:21
**mess** 311:11
**messed** 57:3
**messy** 16:9
**met** 109:11
110:4,6,12
**method** 151:5,9
151:16,18
190:7
**methods** 14:3
210:11
**Michael** 104:5
**microns** 34:5
**middle** 122:15
209:18 222:16
224:8 276:25
**mike** 180:12
307:2
**mile** 65:17
**milestone**
195:12,13
**milestones**
185:25 189:14
192:9 195:16
196:10,24
231:12,13
**millimeter**
158:12
**million** 17:6
21:22 176:17
314:20
**mind** 8:24 9:18
51:14 72:9
88:14,20 140:5
185:25
**mine** 66:25
195:8 245:12
**mine's** 280:16
**minimizing**
13:19
**minute** 121:7,8
200:16 212:8
279:3 281:11
300:4,8 311:21
**minutes** 171:12
174:25 180:4,9
218:17 225:6
237:18 239:9

293:8 302:10
304:8,16
307:16 312:19
313:4 314:17
**mischaracteri...**
128:11
**misinterpreted**
132:2
**misleading**
139:23
**missed** 164:1
220:8 316:4
**missing** 97:2
171:15,16
**mission** 129:22
**misunderstan...**
243:16
**misuse** 316:19
**mix** 51:16
219:14
**Mo** 241:17
**mobile** 148:7
**mobility** 137:6
148:4 152:6,22
152:22
**mode** 65:25 66:2
227:20,20
**model** 68:16
**mom** 151:23
190:18 202:8
**moment** 192:13
271:18
**momentum**
198:9,22 199:8
**MomJunction...**
3:18
**mommy** 191:13
**moms** 194:18
**Monday** 84:19
**money** 15:7 33:5
33:6 42:4
**monies** 21:22
**monitor** 314:25
**monitors** 303:15
**monkey** 277:7
**month** 173:12
192:10,12
235:5
**months** 52:16
62:2 97:7 98:3

98:4 108:22
150:5 153:20
162:20 172:23
173:3,5 189:15
189:23 192:15
193:3,7,12,24
194:10,16
195:2,19,23
196:4,6 201:8
202:2,12,15,19
222:18 223:1
232:7,21
**morning** 129:9
129:11 267:1,5
**mother** 43:20
224:16,17,18
227:2,3 235:13
235:16 237:6
**motion** 21:1
38:14,21,23,24
55:1 65:8
150:19 260:14
260:18,25
265:1
**motions** 32:18
68:22 192:14
221:16 230:16
260:15 262:7
263:13 264:4
264:21 265:3
304:14 314:4
314:10,14
**motivate** 297:14
**motor** 31:3
**motors** 14:12
41:7,17 42:13
**mouth** 116:21
**movable** 38:2,3
**move** 24:22
31:17 32:8,9
32:10,15 34:4
41:21 42:9
96:4,11 131:23
141:19 151:13
163:3,13
215:25 226:24
226:25 230:14
233:9 298:4
308:13,14
**moved** 37:25

93:19 287:7,9
287:16,21
**movement** 4:4
209:4 223:18
223:22 288:13
**movements**
170:24 224:25
231:8
**moves** 14:14
**movie** 243:15
**moving** 21:3
65:12,13,15
145:18 153:15
165:1 181:19
229:24 247:14
265:5 302:4
311:21
**MP4** 241:4
**multi-hoist**
26:25
**multi-mode**
20:18
**multiple** 168:9
264:10 282:2
**muscle** 4:4
209:4,10
313:15
**muscles** 37:23
**muscular** 39:19
40:5

_____
**N**
**n** 4:7,10,19 58:9
66:7 74:2,4
75:4 77:25
84:3,4 92:15
94:2,4,14,18
96:9 97:17
110:24 159:19
161:14 164:15
165:18 166:8
171:5 178:2
182:22 188:21
195:15 210:4
211:9,12 214:9
215:16,23
216:2,14 217:4
218:11 221:9
221:15 241:3
244:11 247:4

248:7,13,20,25
251:16 255:2,5
269:1 271:6
275:25 276:6
276:10,19,24
277:15,22
281:10 284:6
288:25 289:25
290:17 292:22
294:6 297:14
297:22 302:7
305:18 316:14
316:16
**N.C.A.A** 17:25
**name** 3:2 5:23
5:24 12:13
13:17,19 16:17
19:12 40:4,16
60:22 70:1,2
75:15,19 87:24
155:19 189:8
222:16 309:19
321:16
**named** 191:14
321:6
**names** 26:3
36:17
**narrow** 26:14
28:21 158:23
**narrowed** 145:6
**nasal** 280:8
**National** 150:3
**natural** 260:14
**naturally**
294:10
**nature** 86:15
168:7
**near** 75:10
147:2 167:25
**necessarily**
38:15
**necessary**
323:11
**neck** 69:10
277:4,17
**need** 39:6 63:12
79:3,5 85:7
89:10 121:13
122:6 134:14
148:17 149:8

213:12 265:2
275:24 293:5,7
303:20 308:6
308:16
**needed** 79:7
82:12 90:21
256:16 310:19
**needs** 18:19
168:2 308:22
**negative** 313:6,7
314:19
**Neil** 19:13
**neither** 235:1
**neonatal** 109:5
**neonates** 111:9
**neonatology**
111:6,7
**neuro** 38:6
**neuromuscular**
38:6 39:12
**never** 43:11
58:20 59:5
61:3 62:9
70:12,16 71:19
71:20,23 93:4
110:4 116:15
116:17,23
135:1 154:7,7
156:19 175:15
179:15 189:21
309:20
**new** 15:23 34:24
49:25 50:19
63:12 71:13
90:20,20 111:9
167:2,5,6
168:10 228:12
228:13 271:12
**nice** 20:23
**Nicholas** 172:20
173:10 174:7
179:25 189:7
189:14 195:3
204:10 215:21
217:18 218:5
218:12 219:18
219:25 220:14
221:8 222:6,15
225:18 227:22
228:19 229:9

232:5 234:14
289:15 290:3
290:16
**Nicolina** 191:14
**Nikolina** 3:20
**nine** 78:17 178:2
208:3 245:10
301:17 307:2
**nominal** 248:17
**nominally**
248:15
**non-breathable**
162:9
**non-engineeri...**
151:23
**non-objection...**
82:13
**Non-responsive**
119:19 125:4
140:9
**non-rigid**
259:18 261:17
**non-rollers**
311:17
**non-rolling**
174:24
**non-standard**
51:4
**normal** 6:10
**normally** 37:13
48:13 162:18
269:21
**NORTHERN**
325:2
**Notaries** 320:5
320:11
**notarized**
320:11 322:11
**Notary** 324:23
324:25
**note** 178:21
295:1
**noted** 290:24
291:3 323:4,5
**notes** 107:1
321:10
**Nothing's** 9:18
**notice** 3:9 80:9
81:1
**noticed** 159:3

**noting** 98:19
322:8
**notoriously** 31:4
37:16
**number** 15:5
24:3 30:6 78:4
93:11 95:5
121:4 123:10
158:7 167:5
169:2 200:8,17
206:19 243:12
282:9,14 306:7
307:9
**numbered**
245:13 273:23
**numerous** 61:11
157:15 284:13
**Nutritional**
201:19

—————————
## O
**O** 321:1 325:1,1
**O.C.G.A** 325:9
**oath** 9:21,22
10:1 74:10
**object** 10:16
22:19,20
118:15 121:17
160:3,16
280:22 305:19
**Objection**
119:18 125:3
140:8
**objections** 81:24
**obscured** 275:5
**observation**
217:21 219:13
225:2 235:24
237:12 255:13
270:9,20 313:2
317:3,5
**observational**
228:18
**observations**
214:16,22
215:19 216:1,1
217:9,13
220:11,20
221:6 223:15
228:22

**observe** 180:7
215:22 218:11
227:23 229:18
231:7 255:14
314:22
**observed** 93:18
174:17 180:15
214:19 216:9
217:3,23 218:5
221:15 225:10
229:21 230:11
284:11 313:3
**observing** 220:6
221:10 224:20
313:7
**obstacle** 158:5
**obstacles** 158:8
158:15
**obstructed**
271:6
**obviously** 7:21
70:22 74:21
77:21 84:14
85:24 96:16
106:13,15
142:13 164:7
201:11 219:2
243:23 247:13
267:4
**occur** 71:17,24
146:8 151:6
278:3
**occurred** 62:9
71:20 158:15
**occurring** 167:9
**occurs** 115:20
115:21
**OCGA** 320:14
323:7
**offer** 115:11,18
138:24 139:14
**offered** 91:19,22
**offering** 90:18
91:2 111:4
139:8 154:20
156:4 159:6
**office** 13:18
35:18 112:7
272:13
**officer** 24:11

**offices** 322:3,11
325:8
**oh** 19:17,18
23:15 25:1,24
33:16 35:15
46:20 49:1
55:16 63:17
66:14 85:5
113:12 130:11
140:14 157:6
157:13 168:24
187:16 199:21
200:7,23
206:12 207:25
212:2 213:12
214:24 215:1,3
216:23 217:6
222:3,10 226:6
229:15 234:7
235:25 241:13
243:2,5 245:12
271:24 280:25
280:25 285:1
293:9 300:15
301:12 302:9
316:2 317:2
**okay** 6:12,22,25
9:1,13,20
11:15,16 12:10
13:10,14 15:24
18:13,24 19:12
20:2 21:8,14
21:16 23:8,24
26:2,17,20
27:25 28:14,22
29:23 36:3
40:14,17 44:6
44:21 45:4
47:25 50:14
64:8 66:14
67:25 77:24
78:25 79:9
82:25 83:12
84:9,10,11
87:8 88:1,3,7
88:15 89:15
91:7,20 99:3
101:4,9,15
103:1 104:11
108:1,5 109:1

109:4 111:10
112:16 116:18
117:11 119:18
120:18 136:3
136:14 139:2
140:8,16,17
144:5,24 145:2
146:25 152:20
153:10 154:12
154:15,20
155:19,23
156:2 157:9
161:12,15
166:11 169:17
171:22 172:3
173:4 177:11
177:13 178:21
179:2 180:5,10
182:7 183:21
185:13 186:20
189:6,10,13
193:5 194:15
195:10 198:15
198:23 200:12
201:1 202:1,17
202:20 203:12
204:8 205:4,8
205:24 206:24
207:1 208:22
209:21 211:24
212:7 214:24
215:4,7,25
218:7 219:15
220:6,17,22
222:5,5 223:21
224:2 225:7
228:3,8,13
229:2 232:9
233:12,20
238:25 240:18
241:13 243:21
244:12,22
245:2,15
247:22 248:1
249:11,24
250:17,20
253:5 254:20
258:7 259:2,12
268:13 272:19
282:13,24

283:10 284:10
288:23 294:19
295:16 298:4,8
298:12,15,16
298:17 299:1
300:5,6,7,11
300:20 301:15
305:22 309:9
310:5,8,16,25
312:9,22
314:16 315:24
318:11
**old** 31:1 43:7
62:1 67:8 97:7
98:4 147:22
149:23 150:5
151:17,25
172:23 189:15
189:23 195:20
195:23 196:3
202:3,12 232:7
280:17 301:17
**older** 49:16
149:1,5,20,20
149:20 152:9
235:5
**oldest** 68:2
**Oliver** 189:9,9
189:18 195:2,6
204:10 217:23
218:4 219:14
269:13
**Olson** 3:22,23
5:10 102:15
268:21 269:4
272:20 274:12
**Olson's** 276:8
**Olsons** 276:5
**on-line** 44:10
80:4 257:5
268:24
**on/off** 31:2
**once** 37:23
195:13 218:23
253:1 254:21
258:11 259:7
322:10
**one-minute**
313:11
**ones** 51:13 62:3

62:6 101:24
103:24 104:9
105:10 112:8
170:11 196:14
202:22 222:3
237:9 284:18
289:12
**oOo--** 2:18
319:13
**Oops** 288:2
298:17
**open** 11:23
208:22 211:13
272:7 308:21
**Opening** 203:13
208:21
**operate** 42:8
112:3
**operating** 66:2
131:1 167:23
**operator** 31:20
**opin** 220:10
**opine** 72:13
**opined** 72:16,21
73:22
**opinion** 9:3,6
57:20 61:7
72:19 73:24
74:7 89:8,12
106:11 107:5
129:17,24
130:1,2 133:14
139:9 140:4,7
155:9 156:10
210:10 219:25
262:13 272:25
294:5 316:18
**opinions** 9:19
10:9 74:10
86:15 90:7,10
90:17 91:1,15
91:18 93:9
110:18,22
111:4 115:11
123:22 134:17
135:18 138:12
138:14,20,24
139:14,19,20
139:21 143:4
154:21,24

155:12 156:4
156:11 159:6
161:25 170:18
182:25 220:12
227:24 248:10
256:11,19
310:14 316:22
**opportunity**
10:8 62:23
219:19
**opposed** 164:15
**opposite** 47:14
**order** 89:18 95:1
308:15
**ordering** 322:14
**Oregon** 17:14
18:9,11,14,15
18:19 28:16
**organization**
116:24
**orient** 169:1
**orienting** 277:25
**original** 231:15
309:11 322:13
322:15
**originally** 285:8
**Osborne** 2:3,3
5:9,9 8:14
10:14,16 11:19
22:12,17,19,25
23:8 50:7
57:11,21 72:2
74:19 75:16
76:14,17,21
77:6,12 79:4
79:25 80:6
81:20 82:7
84:16 88:18
89:9 90:4 93:3
109:23 110:6
118:15 120:7
121:7,15,17,21
122:1,13,18
123:3,7,17,19
124:23 125:22
126:11,15
128:8 133:16
134:22 139:3
139:17 143:20
143:23 144:1

159:21 160:3
160:16,22
161:17 182:1
183:2,7,11,14
183:18,20
186:3,23
194:22 196:12
198:1 199:17
200:7,12,19,23
200:25 201:2
203:1,9,13,23
204:4,9,13
207:3,7 208:11
208:14,20
216:22 217:7
217:24 218:2,9
220:2 230:24
236:7 237:14
238:10 239:5
241:10,13,25
242:3,5,9,13
242:17,21
243:2,6,8,11
243:14,19
244:2,5,17
245:7,10,15
247:7,25 252:8
252:18,24
255:24 256:8
257:22 260:1
266:2,10,19
267:8,22
269:10,14
270:11 271:9
271:12,18
272:7,10
274:17 281:13
282:17,20,22
284:23,25
285:2 286:20
287:1,23 288:2
288:5,19 291:8
291:13 293:7
293:11 294:13
295:5,23 298:8
298:19,22,24
299:1 301:2
306:5,22 307:6
307:15,20
308:2,12,18

309:2 311:20
312:9,11
318:11 322:1
**Osborne's** 76:12
**Osborne.com**
242:18
**outline** 309:9
**outlines** 109:20
**outraged** 56:13
**outside** 66:6,12
114:11 134:17
286:7 297:24
**overhead** 31:18
**overnight** 176:6
176:12 177:16
186:6 267:24
283:4
**override** 17:10
**Owlet** 314:25
**owned** 24:17
25:10,18 28:15
**owner** 28:1
**ownership** 24:2
29:25
**owns** 25:9
**oximeter** 315:4
315:15
**oxygen** 303:15
313:16 315:11

———————
**P**
**P** 321:1 325:1
**p.m** 144:7,13
213:21 214:2
293:16,22
318:23 319:11
**packaging**
156:14,15
**Paed** 191:15
**page** 3:2,8 4:2
81:13 121:4,19
123:9,25 124:2
129:10 136:14
137:4,4 141:10
141:11 144:25
145:9 146:25
150:16 169:1,4
169:4 172:12
172:13,15
191:17 192:1,3

200:17 201:4
206:10,19,20
221:24 222:1,4
223:9,9,16,19
223:20 224:25
226:2 234:6
245:10 247:23
248:5,24
250:18 258:6
258:17 259:12
259:22 266:17
266:25 273:23
274:8,19
275:18,18
276:13,21
278:24 282:9
282:14 296:1
315:20 316:9
323:12,14,16
323:18,20,22
323:24 324:1,3
324:5,7,9,11
324:13,15,17
**pages** 85:25
169:5 192:2
245:7,8 294:16
323:10
**painted** 203:14
**Palmer** 222:20
223:16,21,24
225:2,19,25
226:5,6,20
228:19 229:9
229:16 233:12
233:12 234:8
235:1,11,18
236:5,10 238:6
255:7 290:4,15
303:25 304:3
304:21
**Palmer's** 230:15
**paper** 87:5,19
91:19 147:3,4
147:11 150:12
150:16,17
151:2 180:12
209:1 210:8,10
257:11 273:18
278:10,11
**papers** 88:16

100:15 142:14
150:14 248:2
254:12
**PaR** 21:7,13
24:7
**para** 204:18
207:2 258:5
**parabola** 261:22
**parade** 23:3
**paragraph**
169:1,5,6
170:6,20
178:21 190:5
206:22,23
230:20,23
254:20 255:17
257:25 258:20
259:13 262:5
265:8 277:23
278:23 284:4
289:4,18 292:8
294:5 300:1,13
305:4,8 312:15
312:20 317:13
318:10
**Paragraphs**
277:24
**parameters**
81:25
**parent** 165:19
182:3,6 187:20
188:19 195:14
274:2
**parental** 270:23
316:19
**parenthetical**
188:10
**parents** 38:17
38:19 43:4
95:22,25 96:23
96:23 97:4,5
102:13 109:12
109:17 180:21
190:14 203:3
203:19 230:14
233:10,21
235:1 258:9
259:5 270:3,15
270:19 273:11
317:15

**part** 12:5 20:2
25:2,8,10,15
30:4 32:6
42:12 46:8
47:7,8,9 59:6
108:14 116:17
116:23 124:8
124:11,13
141:20 143:3
151:23 153:23
157:18 163:15
170:10 188:4,5
194:11 225:11
237:7 264:14
264:22 315:5
**partial** 175:3
**partially** 39:23
95:20 245:23
263:5
**particular** 34:1
34:2 54:13
147:11 277:6
302:2
**parties** 77:23
320:15,16
321:13,14
322:14 325:13
**parties'** 47:18
**parts** 25:5,18
106:2 257:11
**party** 12:1 14:16
14:17,20
320:15 325:11
325:14
**passage** 316:12
**passages** 280:8
**passed** 16:11
94:15 98:3
196:5 201:9
204:14
**patent** 6:25 7:11
7:11 8:3 12:8
12:25 13:10,11
13:18,18,22
14:6,8,21 17:8
19:15,16 20:17
21:18 24:17
30:3,3,19,20
30:24 33:3,6
34:2,16 35:10

35:14,16,17
36:2,10,17,20
44:24 50:1,1
50:11 51:10
**patent-related**
7:13
**patented** 32:1
32:22,25 34:11
34:21 35:6
**patently** 42:6
**patentor** 30:20
**patents** 12:9
13:2,15 19:18
19:21,23 20:13
20:13,17 23:4
24:19 32:4,16
32:17 33:12
34:14 35:20
47:10,13,16,17
47:18 50:3,4
86:21,22
**pathologist**
113:1,2
**pathology** 113:4
**pause** 297:6
**paused** 77:16
**pay** 21:19
**pay-out** 21:22
**payload** 20:21
20:22
**payout** 22:2
**PDF** 322:8
**pediatric** 111:13
112:22 141:14
200:4
**pediatrician**
98:2,5,18,21
99:1 112:25
199:16 201:12
**pediatricians**
98:11 188:11
**Pediatrics** 4:11
249:16 250:9
252:22
**peer** 86:14 88:15
113:24 192:1
257:1,8,9,15
257:17 315:14
**pendulum** 20:19
20:23,25 21:3

38:16,22 51:4
peop 148:13
people 25:15
 29:10 44:1,4
 47:5 53:16
 59:1 95:24
 98:16 116:14
 134:11 145:18
 150:4 158:3
 177:15 236:11
 245:24 267:11
 268:1 278:9
 279:5 280:18
 303:10,21
 306:8,13 307:9
 315:8,25
perceive 81:7
percent 15:20
 30:5
Perfect 240:20
perfectly 54:25
 119:15 140:3
 186:19 197:17
 270:2 280:6
perform 228:18
performed
 286:16
period 35:24
 166:18 219:22
 226:1 230:4
 255:15 321:12
periods 171:25
 181:4 313:2,9
 314:23
person 55:21
 110:4 144:19
 153:23 302:22
person's 148:20
personal 14:20
 96:3 129:24
 130:2 141:14
 180:17 217:9
 217:13 235:24
 317:3,5
personally 22:9
 71:14 128:5
perspective
 107:11 185:1
 209:5 269:6
pertaining

169:7
peruse 143:14
 144:16
perused 106:1
 155:14
Ph.D 1:13 3:3,10
 3:12,13,15
 5:18 6:3
 191:15 322:2
 325:2
phases 110:9
phones 132:15
phonetically
 67:19
photo 205:4
 215:21
photograph
 3:17 93:17
 204:19 286:13
photographed
 236:20,22
 238:6,7 290:16
photographing
 94:21
photographs
 3:23 4:9,18
 202:22,24
 203:2 217:17
 221:8,18 229:5
 229:11 244:13
 245:6 270:18
 286:18,22
 287:18
photos 234:4
 271:5,11
 272:12,17,24
physical 201:12
physically 43:4
 158:6
physician
 188:14,15,18
pick 20:21 31:16
 31:21 288:7
 302:13
picked 295:8
picky 315:25
picture 43:17,18
 95:4 172:16
 174:4 205:6,8
 205:17 222:2

224:5 226:2
 227:20 232:7
 294:12,20,21
pictures 95:1,3
 156:17 173:16
 189:11 203:18
 221:23 223:9
 227:19 228:6
 228:10,12,14
 234:2 244:23
 244:24 246:4
 289:14 290:3
 305:1
pie 203:23 204:5
piece 165:17
 254:14
pieces 270:24
Piedmont 1:19
 2:9
Pilarz 103:25
pinned 299:16
 299:19 300:9
 300:14,16
 301:19,22
pinning 300:24
placard 274:9
 276:12
place 98:24
 141:9 167:24
 182:4 247:11
 287:14 288:10
 292:14 321:8
placed 131:10
 171:10,11
 188:12 210:15
 223:25 224:17
 231:4 235:11
 235:16 245:17
 255:2,4,7
 262:22 272:21
 274:10,12
 276:24 292:25
 305:18
places 51:24
 253:11
placing 247:3
 281:9 290:14
Plagiocephaly
 114:25
plaintiff 1:5 2:2

15:10,12
plaintiff's 83:20
 105:22 106:4
plaintiffs 48:25
 73:6
plan 112:2 303:7
 303:7
planar 211:6,13
plane 147:14
 290:21
plank 37:23
planned 71:2
planning 229:20
plans 303:10
plate 164:20,20
 165:5,7 167:1
 240:4
platform 164:22
 170:16
play 4:7,10,19
 39:18,20 41:22
 42:17 58:9
 60:5 66:7 74:2
 74:4 75:4
 77:25 84:3,4
 92:15 94:2,4
 94:14,18 96:9
 97:17 110:24
 121:2 159:19
 161:14 164:15
 165:18 166:8
 171:5 178:2
 182:22 188:21
 195:15 210:4
 211:9,12 214:9
 215:16,23
 216:2,14 217:4
 218:11 221:9
 221:15 241:3
 243:20 244:11
 247:4 248:7,13
 248:20,25
 251:16 255:2,5
 269:1 271:6
 275:25 276:6
 276:10,19,24
 277:15,22
 281:10 284:6
 288:25 289:4
 289:25 292:22

294:6 296:12
 297:14,22
 301:2,8 302:7
 305:18 316:14
 316:16
played 36:15
 140:23 243:22
playground
 38:17 39:21
playgrounds
 51:5
playpen 52:6,12
 52:13,16
playpens 45:8
 55:4 61:14
 318:9
Plays 290:17
please 5:6,16
 76:18 120:24
 121:4 123:2
 150:10 153:6
 166:10 182:12
 183:18 191:7
 200:17 240:11
 241:19 271:11
 291:11 322:11
 322:18 323:10
 323:11
plenty 267:13
plop 99:7
plopped 234:11
plus 21:22
plush 277:13
point 51:7,16
 87:6 90:18
 109:8 113:9
 127:20 128:12
 129:2 132:21
 136:23 148:11
 152:3 173:8,9
 180:6 184:6
 199:8 213:10
 216:13 230:17
 232:6,15,18,24
 233:24 237:20
 254:13 256:20
 257:25 264:23
 275:24 289:16
 290:19 299:13
 299:19 318:11

318:12
**pointed** 283:12
**pointing** 149:12
  156:6 163:5
  256:16 261:24
  286:1
**points** 109:19
  128:21 153:13
  215:13
**police** 102:24
**policy** 4:12
  249:16 250:9
  309:25
**political** 198:13
  198:18
**pond** 29:7,9
**pop** 52:11 183:5
**populations**
  197:4
**portfolio** 25:20
  34:16 36:20
  44:24
**portion** 81:3
  258:24
**portions** 16:11
  95:15
**poses** 254:22
**position** 63:19
  71:18 125:7
  126:8 131:24
  162:5,6,8
  163:1,23 164:7
  167:12 181:7
  194:12 224:1
  230:8 235:3
  237:17 239:3
  245:3,21
  246:25 247:2
  247:13 248:17
  253:14 254:22
  255:9,12
  260:13,20
  262:16 273:4
  276:21 277:5
  291:5 292:21
  293:1 300:18
  302:24 303:17
  304:1,3,14
  314:6
**positioning**

231:8
**positions** 93:17
  95:2 227:19
  244:20,24
  245:18 246:15
  253:13 314:15
  314:22
**possibilities**
  167:6
**possibility**
  285:25
**possible** 9:9
  137:13 225:14
  286:2,3
**possibly** 97:13
  299:21 315:17
**post-mortem**
  108:4,6,8
**post-release**
  294:1
**potential** 199:4
  199:6,8 277:21
**potentially** 50:4
**pounds** 185:19
  186:13,17
  188:5 222:18
  222:22 231:3
**power** 99:18
**PowerPoint** 4:6
**prac** 50:1
**practical** 100:14
**practice** 47:15
  50:2
**practiced** 47:10
**practices** 88:9
  88:10 115:17
**practicing** 50:2
  50:3
**praised** 315:14
**pre-release**
  289:1
**preceded** 123:9
**precious** 189:7
  203:5,24 204:2
  204:16 215:20
  225:17
**precise** 221:2
  264:1
**precision** 158:11
**predicate**

134:14
**predict** 157:25
**prefacing**
  161:15
**prefer** 77:8
  143:16 169:3
**preferable**
  276:7
**Prefontaine**
  17:20
**preliminary**
  107:23
**preparation**
  76:4 77:20
  100:20
**preparing** 76:7
  101:1
**present** 2:16 5:6
**presented** 92:1
  150:17 171:21
  289:23
**presenting**
  290:5
**press** 296:12
  297:6
**pressed** 168:1
**pressing** 279:1
**presumably**
  212:1
**pretty** 27:17
  40:19 41:6
  98:12 166:3
  180:21 193:2
  212:5 226:22
  239:7 266:12
  296:19 302:4
  302:18
**prevalent** 167:8
**prevent** 131:13
  178:12 179:6
**prevented**
  216:15
**prevention**
  132:23
**prevents** 181:22
  217:20
**previous** 155:3
  156:25
**previously** 58:2
  221:7 285:17

**primarily** 57:14
  130:6,7
**principle** 259:24
**print** 322:9
**printed** 115:2
  195:8 271:25
**printing** 112:14
**prior** 8:12 59:9
  76:1 83:24
  100:21 216:20
  321:5
**privileged** 272:3
**pro** 57:8 91:1,2
  159:10
**pro-offered**
  156:11
**probability**
  167:8
**probably** 6:21
  22:11 30:23
  48:4 49:2,10
  49:17 55:9,20
  75:10 78:17
  83:13 96:11
  102:16 107:5
  109:8,16 110:6
  110:12 116:14
  116:16 135:24
  142:15 147:25
  159:12 163:25
  170:2 194:5
  204:15 210:7
  251:11 256:7
  283:12,15,16
  287:4,5 304:7
  310:23 318:17
**probe** 134:15
**problem** 99:16
  164:19 165:5
  165:15 187:15
  243:21
**problems** 11:4
  45:21 106:24
**procedure** 168:4
  210:12 323:7
**procedures**
  167:23,24
**proceed** 6:17
  143:16 183:18
**proceeding**

320:12
**process** 28:18
  53:11,12,15,16
  55:9,24 61:13
  61:13 62:17
  86:19 110:23
  138:3 154:3,10
  154:11 161:25
  163:16 166:7
  167:14,22
  168:7,22
  289:21
**processes**
  166:15
**produce** 142:11
  312:6
**produced** 81:22
  83:2 89:17
  124:6 142:18
  142:19 320:4
  320:10
**product** 4:15
  6:22 34:19
  35:1 37:5 40:6
  40:18,20 42:2
  42:17 43:10,13
  43:23 44:6,7,8
  45:9,17 46:10
  46:15 51:1,11
  51:16 53:4
  57:9 58:17
  60:18,21,25
  65:19 68:7,10
  68:13 69:1
  72:5 93:25,25
  99:24 127:10
  141:21 142:12
  153:19 154:8
  154:13 155:1
  156:4 161:24
  162:2,11,13
  166:17 168:5,7
  178:11,12
  181:9 182:4
  184:18,20
  185:16 186:1
  187:24 188:20
  190:14,15
  209:5 210:5
  216:16 217:22

225:11 231:2
256:22 259:16
259:17 267:19
271:1 278:25
279:20 281:21
289:2 307:3
**product-related**
7:14
**production**
320:4,10,11
322:19
**products** 4:17
20:14 34:20,25
35:3 37:7 39:8
39:10,12,13,13
41:1 45:7,11
45:12,15,18
46:14,19 47:1
47:4,10,12,15
49:24,24 50:17
50:18,19,21
51:9,12,15
52:5 53:18,20
60:16 61:4
64:17 65:15
66:8,20,23
69:6 71:21
113:13,14
117:3,7,13
118:4 119:24
119:25,25
131:3,22 132:6
132:9 135:6,12
136:21,21
140:25 141:13
142:16 145:6,8
153:7,17,22
154:3,5 156:14
158:25 159:15
166:18,20
176:2 211:2
258:10 259:7
295:11,13
313:8 317:17
317:19 318:8,9
**profession** 8:21
**professional** 6:6
6:7 9:2,14
111:2 122:24
129:25

**professionalism**
122:20
**professionals**
126:8
**professor** 20:6
66:15,21
**professors** 35:20
**proffer** 90:9
**proffering** 91:4
91:5
**profit** 21:23
**program** 18:21
68:21
**programmed**
14:9
**progress** 312:24
**prohibited**
320:14 325:9
**project** 38:8
39:1 40:13
41:2 47:25
48:12,19 50:9
50:17 137:8
141:17
**projector**
241:25
**projects** 37:20
40:25 44:15,23
45:1,14 50:23
50:24 62:11
76:8 119:25
137:5
**prominent**
140:24
**promise** 78:11
112:18,19
**prompting**
123:6
**prone** 162:5
163:23 164:7
167:11 175:10
181:22,23
182:4 188:22
190:8 194:5
209:11 224:11
245:24 246:6
246:24 247:2
253:14 254:22
255:4,9,11
259:19,25

262:9,18,22
263:14 264:6
273:4 277:22
289:7 291:4
292:21 293:1
298:20 299:3,8
299:10,11,12
300:17 301:17
302:24 303:16
304:1,3 314:6
**pronounce**
67:16 87:24
104:6
**propelled**
170:22
**proper** 289:11
289:21
**properly** 14:13
180:16 236:4,9
268:7
**properties**
131:17,20
**proposal** 307:17
**proposed** 53:5
53:25
**proposing**
147:18 148:18
149:9 166:17
**protected** 33:9
**protocol** 303:24
**protocols** 92:14
**prototype** 39:5
40:7,18 43:24
120:1
**prototypes** 39:7
43:25 142:20
**prototyping**
44:4
**prove** 313:5,6
314:19
**proved** 306:17
**proven** 9:8,10
9:14,16,19
**provide** 82:12
211:12 294:11
316:21 325:8
325:11
**provided** 9:5
81:19 82:10
83:19 84:14,15

84:21 85:24
86:9,11 104:2
105:24 109:19
121:10 124:25
154:2 155:14
193:11 203:3
225:4 305:7
309:10,13
310:9,21,23
311:6 321:12
**provides** 57:8
170:15 181:11
211:9
**providing**
145:18
**proximity**
231:17
**prudent** 295:19
**public** 33:1
87:11,12,16
324:23,25
**publications**
87:23 88:4
147:1
**publicly** 257:6
**published** 147:2
206:8 207:16
257:1,3,4,18
**pull** 29:4,11
71:8 85:13,19
86:13 185:18
186:11,25
187:6,12
212:14,18
283:17 299:21
302:14
**pull-ups** 187:1
**pulled** 73:15
83:9 239:25
287:8
**pulling** 186:20
187:2 302:8
**pulmonologist**
112:22
**pulmonology**
111:14
**pulse** 171:17
315:4,15
**purchase** 41:8
**purporting**

267:18
**purpose** 94:20
100:22,23
109:4 122:4
123:19 128:4
209:9
**purposes** 94:19
**Pursuant** 323:6
325:4
**push** 31:2,20
153:3 163:14
164:23,23,25
165:7 170:16
171:4 175:11
185:17 186:8
190:9,15
194:17 195:13
197:13,17,19
198:5,25 199:2
211:21 212:20
232:5,8 233:3
233:3 260:20
284:6 285:15
291:25 304:15
314:8
**push-up** 162:22
162:22 190:10
**pushed** 35:9
93:19 224:10
275:8 285:25
307:23
**pushing** 135:3
148:14,20
165:11,14
171:13 174:5,7
178:12 179:21
195:16 197:23
197:25 198:10
224:6,8 232:10
260:14,17,18
264:9,15
284:11
**put** 14:6 31:17
41:11,12,20
52:12,17 54:24
60:25 61:19,25
64:14,25 65:2
65:16 68:18
70:19,20,23
71:22 83:5

91:18 93:8,16
94:8,11,13
95:4 96:8
114:16,20
117:24 119:9
126:5 137:16
152:23 162:20
164:2,2 165:6
165:12,19
171:24 174:11
174:23 178:15
185:2 186:18
188:21,24
221:14 224:2,4
224:15,21
225:4,9,11,24
236:12 237:9
238:24 244:23
246:10,14,14
263:8 269:12
269:20 270:3
279:6 283:11
291:23 292:21
303:23 305:1
**putt** 65:16
**putting** 65:6,23
94:17 95:7
114:19 156:16
156:16,18
158:14 166:23
166:24,25
241:21 242:7
290:24

─────────
**Q**
─────────

**qualifications**
110:17
**qualified** 63:6
71:15 126:7
127:24 134:10
**qualifies** 133:13
**qualify** 133:19
136:8
**quality** 131:1
167:22
**quest** 104:23
**question** 8:25
9:21 11:10,12
22:21 23:7
35:12 44:16

56:12 71:11
73:8 85:18
86:7 89:3
94:13 99:6
101:6 111:8
119:21 121:8
121:12,21
123:8 129:10
130:14 133:20
138:21 139:2
140:15,17
141:1 143:18
146:2 156:9
159:18 161:4
161:12 176:21
176:25 177:3
181:25 183:8
217:18 221:3
231:15 233:11
236:9 253:8,9
253:24 256:13
276:14 285:3
303:4 317:7
**questions** 10:6
10:20 29:16
82:1 90:3,6
119:22 122:2
123:12 134:7
134:14 159:10
160:18 161:7,7
161:11 307:22
320:6
**quick** 78:25
254:6 293:4
**quickly** 24:22
42:22
**quite** 6:16 16:8
28:20 41:9
52:25 94:10
110:1 112:15
142:17 147:16
166:17 167:2
169:21 187:16
188:4 217:2
229:23 245:22
268:22 292:3
**quote** 45:12
210:14 259:14
289:5 316:13
**quoted** 142:25

**quotes** 101:25
103:2,6
**quoting** 259:22

─────────
**R**
─────────

**R** 321:1,1,1,1
325:1,1,1,1
**R.E.R.E.C**
137:5
**R.N.P.S** 182:21
**raise** 124:21
126:7 127:21
173:18 192:12
192:21 193:18
194:10 198:6
199:3
**raised** 170:14
309:24
**raising** 125:19
193:4
**Ralph** 25:8
**ramifications**
114:19 292:9
**Ramirez** 2:17
**ramp** 31:6,6
**randomly**
171:16
**range** 12:20
37:10 49:18
52:3 100:7
147:25 148:2
210:25 278:19
**rapidly** 11:11
**rate** 48:22 49:17
**rated** 27:5
**rates** 325:13
**re-enact** 158:2
**re-enactment**
271:5,11
272:12,24
276:8
**reach** 119:1
187:11 265:14
**reached** 75:1
185:19,24
186:13 318:12
**reaction** 57:5
**read** 11:17,24
56:24 60:4,6
67:17 82:17

100:15 101:3
102:4,6,12,19
102:21,23,24
103:17 109:5
114:14,18
115:5 116:5
121:22 132:20
156:25 157:1
160:6 178:1
185:22 188:8
194:14 210:2
210:21 214:24
249:19 259:5
259:15 312:23
315:16 322:7
323:2
**reading** 34:4
95:5 108:9,25
129:10 160:12
183:23 185:7
191:16 207:2
208:14 209:17
215:12 252:19
266:17,25
319:4
**ready** 52:15
157:1 243:20
**real** 43:16 59:16
254:6 294:6,10
**realistic** 287:15
288:10
**reality** 129:21
**realize** 98:19
190:4 220:9
**realized** 22:6,7
42:22
**really** 22:4
29:20 41:22
46:9 63:21
68:15 73:21
92:6 95:7
147:24 148:24
149:19 152:2
154:7 164:9,22
167:13,17
173:8 186:10
189:21 195:18
196:20 197:2
204:1 214:24
223:16 226:23

234:3 239:13
256:14 261:19
261:21 266:13
267:7 268:10
273:25 284:19
294:11 298:2
302:17 308:22
314:9
**realm** 29:1
290:22
**reason** 11:6
60:13 157:6
323:13,15,17
323:19,21,23
323:25 324:2,4
324:6,8,10,12
324:14,16,18
**reasonable**
182:3,6 270:2
**reasons** 115:20
188:19 209:16
273:24 276:6
323:8
**rebreathing**
277:20,21
278:3,4,15,20
279:1,9,13,14
281:9 291:2
**rebut** 310:17
**rebuttal** 3:15
90:22,25 91:8
91:17,23 92:25
139:10 142:24
143:5 207:6,8
221:21 228:4
307:13,18
308:17 309:5
310:10 314:24
316:17
**rebuttals** 310:25
315:20
**rebutting**
310:13,19
**recall** 9:11 13:17
30:13 39:17
51:2,8,18
53:24 62:22
74:25 95:6
103:24 104:15
105:14 107:10

107:12 108:17
123:13 148:2
178:5,6 179:20
193:2 226:3
268:22 286:7
286:21 305:20
310:1
**receive** 89:1
105:11
**received** 80:15
91:23 92:5
128:18 141:12
311:23,25
**receives** 320:15
**recess** 79:16
144:11 213:25
293:20
**recognize** 156:1
**recollection**
54:5 250:14
**recommend**
146:13 188:11
**recommendat...**
114:16
**recommended**
251:3
**reconstruct**
158:21
**reconstructed**
156:23 158:14
158:21 159:1
**reconstruction**
156:22 157:3,7
157:10,12
158:18,24
**reconstructs**
112:1
**record** 5:2,8
64:9 66:22
79:12,14,18
81:21 82:9
95:5 143:14
144:2,7,9,13
145:4 160:8
167:16 213:21
213:23 214:2
219:17 221:19
241:16 249:25
293:16,18,22
318:16 319:1,3

**recording** 244:6
296:17
**recordings**
94:23,24
**records** 3:22
97:6 106:13
107:10,12
108:6,19,20
109:2,5 196:10
199:15 200:5
201:14 271:5
**recover** 117:19
**recovery** 28:16
**red** 56:1 59:11
**redacted** 87:13
**redirect** 122:17
**reduce** 124:14
124:15 188:8
**reduced** 142:19
321:8
**refer** 143:3
178:18 209:1
**reference**
144:25,25
146:24 148:23
150:10 153:6
170:6 174:14
**referenced**
178:14 207:22
**references**
144:18 262:21
**referral** 75:12
325:12
**referred** 291:15
**referring** 45:15
93:21 99:2
176:7 219:4
252:20 261:13
289:13,16
290:6,10,13
291:19 294:4
300:17
**reflect** 32:16
**reflected** 8:25
201:14
**reflects** 294:5
**refrain** 123:5
**refresh** 203:10
208:20 241:14
**refreshed**

200:14 253:1
**refreshing**
200:15 203:9
291:21
**regard** 149:17
153:6
**regarding** 154:5
309:24
**regular** 321:14
**regulations**
154:5 325:4
**rehabilitation**
145:12,13
150:18 317:21
**reiterate** 141:3
**rejected** 36:1
**related** 54:14
116:8 131:12
132:22 135:11
136:20 146:17
147:15 150:22
151:3 163:2
256:6 305:5,5
317:17 318:7
320:11
**relates** 153:7
**relating** 97:5
**relation** 133:7
**relationship**
135:5 146:7,10
320:14
**relative** 164:21
172:1 231:6
273:14
**relatively**
260:19
**release** 199:7
**released** 289:2
**relevant** 22:23
125:10
**relied** 86:22
101:24 105:17
106:11 254:11
256:11,14
**rely** 118:24
133:9 142:22
256:12
**relying** 102:8
270:19,22
295:20

**remains** 308:4
**remember**
10:17 36:17
40:4,16 50:22
51:13 52:25
55:25 56:2,6,7
56:17,18,24
58:18 68:13
69:8,15 75:8
75:15,20 99:5
103:19 104:4,9
108:25 191:21
239:12 262:24
286:5 287:17
311:4 315:1
**rendering**
182:24
**repeat** 253:8
276:15
**repeated** 262:7
263:13 264:4
**rephrase** 11:13
281:4
**replenished**
278:16
**replicate** 235:19
277:5
**replicating**
174:16
**report** 3:13,15
49:7 72:21
76:4 86:22
87:5 89:15,17
89:25 90:4,8
90:12,13,16,22
90:25,25 91:9
91:17,17 92:19
92:25,25
101:25 102:11
102:12 105:20
105:22 106:10
106:19 107:23
108:13 121:19
133:10 138:18
139:1,9,10
142:15,20,24
142:24 143:5,5
155:14 160:7
168:24,25
169:4,5 172:19

174:14 182:8
189:5 190:6
193:11 206:15
207:6 208:15
210:7 213:3,4
214:6,16
215:14 217:19
221:8,18,21,22
221:22 225:19
225:21 228:4
228:23 229:14
230:20,21
235:10 247:23
248:23 250:19
254:1,20
255:17,18,20
256:5,6,11,21
257:14,16
259:13,23
262:20 265:9
271:2 276:19
277:22 278:23
278:24 282:8
284:4 288:24
293:25 294:3
296:2 299:24
300:1,13
307:13,18
308:17 309:5,5
309:11,20,23
309:24 310:2
310:13,15,17
310:21 311:1
314:24 315:20
**Reported** 1:25
**reporter** 5:16
11:21 121:23
199:20 271:16
320:6,9 321:4
321:12 325:6
325:11
**reporting** 295:6
325:4,8,11,12
**reports** 7:21,24
8:4,4,12,23
10:17 90:20
91:22,23 93:12
93:13 102:24
102:25 105:25
106:3,5 108:4

108:21 127:8,9
139:19 146:19
156:11 160:2
160:11,12
161:19 165:10
166:12 175:22
229:3 267:13
270:15,19,23
284:14 294:9
294:11,15,17
295:11,19
305:10,17,23
309:14 320:16
**represent** 5:7
130:23 203:18
210:24
**representation**
168:21 246:2
273:5,14
**representative**
153:11 166:3
325:6
**representing**
312:5
**represents**
320:4,7
**reproduced**
228:6
**request** 70:20
81:1,7,12
86:10 320:12
320:16
**requested**
321:11,11
322:7
**requests** 81:14
81:17,24 85:21
**required** 147:13
216:4
**requirement**
44:19
**requires** 175:23
**rescue** 302:13
302:15,19
**research** 19:8
73:16 83:9,22
85:13 86:12
111:20 114:2,4
114:12 117:1
120:4 122:9

136:5 150:23
152:13
**researches**
116:25
**reserved** 319:6
**reshape** 115:3
**residual** 13:20
14:5
**resolution** 40:13
**resolved** 84:2
**resources**
280:19
**respect** 268:2
**respiratory**
117:21
**respond** 14:4
90:21
**responders**
102:22
**responding**
177:4
**response** 55:25
56:4,15 154:25
161:11 196:7
228:7
**responsibility**
57:7 322:8
**rest** 38:11
**restained** 285:8
**resting** 114:23
**restrain** 179:25
180:3 182:5
225:24 236:12
268:5
**restrained**
165:11 174:8
175:13 179:15
179:18,20
180:4,6,16
181:2,4 217:4
218:16 219:20
236:4,9,10
257:21 267:14
285:6,21,25
295:2,7 299:5
306:3,7 307:11
**restraint** 43:1
69:9 92:16,17
165:6,8,16,20
165:24 166:24

170:4 174:12
175:20 178:9
178:10,16,20
178:22,25
179:4,5 180:8
180:22 181:8
181:10,11,21
184:2,15,19,20
185:6,11 189:1
189:3 212:8
216:14 217:20
226:21 237:3,9
237:21 238:3,7
238:8,15,19
265:24 266:6
267:15,20
268:1,10,15,18
270:3,7 282:7
284:7 285:13
285:16,20
286:7,14
287:13,21
292:1,18 295:9
**restraints** 142:4
179:5 211:25
212:2,5 237:13
258:10 259:6
269:7 275:10
283:3,8 285:22
286:19 306:9
306:15 307:8
**restricted** 278:6
278:12
**restroom** 78:25
213:15
**result** 142:12
170:21 184:9
321:15
**resulted** 20:13
**results** 214:13
263:2
**résumé** 136:19
**retain** 47:25
**retainer** 47:23
**retention** 66:9
**returned** 90:19
322:12,15
**returning**
130:14
**reverse** 31:8

**review** 54:11
55:13 76:3
92:5,19 100:21
101:18 103:20
104:11,15
105:2,2 108:19
109:1 253:22
254:3,11 257:1
257:16 303:7
303:11 321:11
322:8
**reviewed** 53:3,4
55:3 61:3 73:5
80:12 81:3,11
82:9 83:4,7
84:12 86:14
88:15 100:1
101:23 103:8
103:14,24,25
104:17 105:4
105:12,22
106:13 107:13
113:24 128:19
137:1 141:8
143:9 155:11
191:14 192:1
192:11 196:10
244:7 249:16
252:7,17 253:4
253:5 254:9
256:10,12
257:9,10,15,17
272:15 296:18
305:12 315:14
**reviewing** 54:1
105:14 257:24
**revisit** 71:21
**Reyes** 103:15
**rid** 21:3
**ride** 68:23
**right** 6:5,19 7:9
7:10 9:7,17,18
10:5 11:23
12:4,13 14:22
15:13 17:15,23
18:3 19:20
20:20 21:12,25
24:4,6,20,24
25:3,12,20
26:6 27:4 28:5

30:7 31:19,21
31:22 32:11
33:8,20,24
34:6,7,8,10,22
35:6 37:2,15
38:4 40:2,4,9
40:11,16,22
42:11 43:9,14
45:9,19 46:7
46:24 48:6,10
49:3,19 51:8
52:2,19 53:10
55:22 57:6,23
58:9 59:13,20
61:16,23 62:7
62:14 63:4,25
65:11,14 66:1
66:4 67:2,9,15
68:25 69:23
70:6 73:1
74:18 75:8,15
75:21 78:2
80:5,8,21,24
83:1 84:7,11
84:23 85:10,23
86:3,6 87:1,3
87:14,18 88:5
88:12,14,20,24
89:5 92:9,23
93:10 94:12,22
95:9,12,23
96:1,7,12,21
97:3,20 98:10
98:18,20,23,25
99:9,11 100:3
100:8,13,18,25
102:9,17 103:3
103:7,10,20
104:1,3,20
105:13 106:3,9
106:25 107:7,9
107:22 108:16
110:5,14,16
111:1 114:10
117:4,24 118:1
118:8 121:6
123:3 124:4,15
127:8,19
129:20 130:21
134:4 138:21

139:13 141:1
144:3,15 145:6
146:22 148:6,8
148:9,12 150:9
151:7,15 153:5
153:12,15,23
153:25 154:17
155:11,21,25
156:13,21
157:17 159:3
159:17 161:22
162:10 163:24
166:4 168:23
169:25 170:4
170:12,18
172:10,13
173:1,6,13,17
174:4,10,11
176:15 177:1
177:10,24
178:7 179:9
180:8 181:6,16
182:5 183:19
184:1 185:5,23
186:16 187:14
188:1,6 189:1
189:4 192:19
192:25 194:1
194:13,18,19
195:4,21,25
196:6,19 197:1
197:6,15,21,23
197:24 198:9,9
199:5,10 200:2
200:16,19
201:1,4,6,14
202:9,9,10,12
202:21 203:1
203:14,17,21
204:21 205:1,5
205:16,19,22
207:2 208:11
208:23 209:2
209:14 210:9
211:6,9 212:10
212:21 213:1
214:10 215:3,5
215:9 216:10
216:21 218:1
218:15,19,21

218:24 219:5
219:10,23,25
220:16 221:17
222:14,21
223:5,7 224:25
225:13,15
226:9,16,19
227:1,5,21
228:21,25
229:7,13,25
230:6,10,18
231:11,19
232:2,20,23
233:1,8,14,17
234:1,10,10,12
234:16,19,23
234:25 235:7,7
235:12 236:3
237:5,24 238:2
238:16,18,22
240:9,10
242:19 243:19
244:9,19 245:3
246:6,11,15,22
247:1,5,14
248:11 249:7,7
251:20 252:4,6
252:24 253:1
253:16 254:4
254:17,19,23
255:2,5,10,13
255:14 256:3
256:10,18,20
256:23 257:3,7
257:15,19,21
259:3,9,21,24
261:12,18
262:11,17
263:1,4,22
264:17,18,20
264:21 265:8
265:15,25
266:8 267:6
268:16 269:19
269:23 270:22
272:9 275:5,17
275:21,22
277:3,16,20
278:7,17,19
279:3,12,14

281:3,25 282:6
283:1,17,22
284:2,21
285:10,13,18
285:22 286:4
287:25 288:15
290:4 294:1,7
295:3,14
297:15,21,25
298:1,20 299:5
300:3,8 301:16
301:19,24,25
302:1,25 304:1
304:9,18,22,25
305:16 308:18
309:1,4,11,22
311:12 312:19
315:4 316:10
316:19 318:20
**rights** 21:18
**rise** 193:2
**risk** 29:12 188:8
252:15 253:10
253:13
**road** 1:19 2:4,9
6:11 18:12
182:10
**Rob** 25:7
**ROBERT** 2:8
**robot** 31:18
**rock** 4:7,10,19
58:9 66:7 74:2
74:4 75:4
77:25 84:3,4
92:15 94:2,4
94:14,18 96:9
97:17 110:24
159:19 161:14
164:15 165:18
166:8 171:5
178:2 182:22
188:21 195:15
210:4 211:9,12
214:9 215:16
215:23 216:2
216:14 217:4
218:11 221:9
221:15 241:3
244:11 247:4
248:7,13,16,20

248:25 251:16
255:2,5 269:1
271:6 275:25
276:6,10,19,24
277:15,22
281:10 284:6
288:25 289:25
290:17 292:22
294:6 297:14
297:22 302:7
305:18 316:14
316:16
**rockers** 45:7
**rocking** 249:3,9
**rocks** 68:7,19
**role** 36:15
140:24 156:8
**roll** 3:19 95:19
95:20 96:4,6
97:11,13,15,19
97:23,24 98:2
98:7,8,16,24
147:14 164:10
164:15,17
171:1,4 173:10
173:11 175:11
175:15 179:12
179:16 180:1,7
180:17 181:13
189:22 190:21
193:25 196:25
197:1,3,7,12
197:18,22,22
198:4 199:9
202:4,10 206:5
207:14 211:19
212:6,9,18,25
215:15,17
218:22 219:20
223:24 225:3
230:17 232:12
232:15,17,18
233:2,14,19,24
237:12 241:4
258:12 259:10
262:9,18 263:3
263:5,10,15
264:6 265:19
283:19 289:7
290:25 298:20

299:4,8,17,23
301:17 302:2
302:12 304:13
304:20 313:18
314:8,11
**roll-over** 173:15
214:9 252:15
253:10,14,21
297:15
**rolled** 171:19
229:17 254:21
255:10 259:8
**roller** 189:25
**rollers** 175:4
311:17,17
**rolling** 97:15,16
97:17 98:12
164:6,6 175:7
175:9 179:6
180:5 181:8,11
181:22 189:5
189:15,19,20
190:8 192:5,10
193:22 195:16
199:1,7 205:25
206:4,16
207:13 211:13
212:11,13
214:18 215:22
215:23 216:2,8
216:15 217:4
217:20 218:6
218:11 223:18
223:21 224:25
233:22 259:19
259:25 261:5
262:22 263:6
264:10 265:10
265:21,22
292:10 299:20
**rolls** 194:13
259:15
**room** 59:1 77:14
158:10,13
**root** 158:20
**Roswell** 322:21
**rotate** 165:4
233:16
**rotated** 230:9
**rotating** 179:23

**rotational** 55:1
265:1
**rotations** 262:8
263:14 264:5
**rough** 266:21
267:1
**roughly** 6:24
202:2,8 312:19
313:3
**routine** 251:3
**rude** 308:19
**Rule** 81:22
323:6
**rules** 6:10 11:24
17:25 143:12
323:6 325:4
**run** 142:2 158:8
158:16 225:15
**Rundell** 103:4
**Rundell's** 311:1
**running** 158:5
**runs** 25:4

**S**

**S** 325:1,1
**S-E-A-H** 29:22
**S-P-R-I-G-L-E**
36:6
**S.I.D** 140:18
149:6
**S.I.D.S** 107:24
113:6,21,22,23
113:25 114:3
114:13,15,17
115:10,12,20
116:8,10,11,25
117:2,5,5,7,10
117:11,15,17
117:19,23
118:7,9,24,25
119:3,5,5,14
119:22 120:3
120:10,13
122:8 124:10
124:11,15,21
126:9 128:5
130:9,12,17
131:8,13,13,14
131:16,21
132:2,4,23

133:3,7,14,18
133:24 134:21
135:1,4,6,10
135:11 136:4,5
136:5,20
137:22 138:6
138:13,15,17
138:20,23,25
139:7,8,11,14
140:2,6,12,22
140:23 144:19
145:5,7,21,23
146:4,7,8,15
146:17 147:17
147:19 148:19
148:22 149:2,4
149:8,11,21
150:5,6 153:7
188:11 250:9
**S.I.D.S./S.U.I.D**
116:5
**S.U.I.D** 114:13
115:10,13,21
116:10
**safe** 57:9 64:11
68:5 69:6
71:16,21 88:9
125:18 209:4
283:4,9
**safely** 303:22
**safety** 4:15
46:15 55:16
57:19 59:23
63:24 64:4
66:6 127:1,21
128:6,11,15,16
129:15,23
130:6 131:1,12
154:8 167:22
251:1 256:22
**sales** 30:1,5
**sand** 157:24
**sat** 59:17 62:10
64:12 71:17
205:3,13 208:4
236:15 302:7
302:10
**satellite** 12:22
**save** 287:5
**saw** 39:4 51:25

53:8 54:2,6,7,9
59:11 65:21
112:13 169:18
171:20 174:19
175:16 198:22
215:21 229:3
233:15 236:5
262:14,15
265:16 268:14
284:12 292:13
300:23 304:12
**saying** 73:1
76:22 96:14
98:16,22 116:7
135:2,3 138:19
139:7,24 145:7
148:2 167:16
171:3 180:23
186:7 188:2
198:22 206:1
207:10 225:16
229:1 247:1,19
256:15,16
270:16 283:1
288:6 299:10
**says** 20:5 139:1
167:25 184:1,7
185:8,10,14
188:7 189:3,3
192:4,4,12,15
193:7,9 201:18
201:22 202:3
210:12,20
216:2,7,11,13
217:19 238:3,5
248:22 250:21
250:24 253:12
258:3,25 259:4
268:18 274:10
274:12 286:4
306:14
**scads** 311:24
**scale** 151:13
**scans** 112:1
**scared** 98:12
**scene** 286:18
**schedule** 80:19
**scheduling**
89:18
**Schriner** 75:17

110:10 305:13
**science** 279:15
**Sciences** 4:14
**scientific** 279:8
279:12
**scientist** 198:14
198:19
**scooter** 39:18,22
**scope** 28:21
42:24 83:18,24
135:18
**screen** 74:20
201:17,19
**scuba** 28:18
43:22
**SeAH** 29:19
**seal** 322:12
**search** 102:1
**seat** 38:2,5 43:1
137:14 145:18
146:17 148:14
148:18 151:6
169:12,25
170:15 171:4
174:5 179:3
251:23 262:6
269:13
**seatbelt** 43:2
**seating** 37:12,18
37:25 43:1
145:16 153:1,3
**seats** 61:14
137:10,12,23
138:1 142:1,3
145:22 146:4,8
146:9,11,12,14
147:8,19,21
149:7 150:24
251:1,19
**second** 7:4 16:15
158:12 183:6
201:18 205:4
209:22,23
234:4 293:6
308:24 311:1
**seconds** 69:20
241:11,12
244:2 301:21
304:1
**secret** 17:10

32:24 33:9
**secrets** 34:21
**section** 170:8
182:8 189:5
192:2,3 206:1
206:15 210:11
214:15 216:1
247:23 282:7
282:12 288:23
289:25 290:6,8
291:16,19,22
292:2 293:24
309:9 316:17
317:13
**secure** 169:11
178:23
**secured** 92:15
**securely** 240:7
267:20
**securing** 156:17
**see** 22:16 29:15
33:23 37:8
38:16 44:3
45:6 47:1,6,11
49:24 50:1
78:20 89:7,13
91:21 92:7,10
92:22 96:18
98:5 100:11
106:20,23
137:9 141:10
145:10,15
147:2 149:24
160:11 163:12
167:16 170:7
173:16 174:8
174:16 179:25
183:2,23,25
184:3,5,11,13
184:17 185:12
187:1 188:16
190:11 191:16
192:7 193:13
193:20,21,22
194:2 196:16
201:20,23
202:3,5,9
203:19 205:7
206:9 209:8,21
210:18 215:2,6

215:12 216:5,6
218:20 219:20
221:24 222:5
224:7,8,9,13
224:22 225:12
226:7 228:13
228:15 229:1
233:18 248:22
248:24 249:1
250:10,21
251:7,19 256:2
258:13 259:3
259:10 262:12
262:19 264:8,9
273:17 274:3,5
274:8,14,20,21
274:23 275:15
275:19,20
276:9 283:9
286:24 287:3
289:3,9 297:11
297:16 298:3
299:4 300:25
301:5,6,18,18
301:21 304:13
304:20 309:13
309:15 310:2
310:19
**seeing** 53:24
92:21 95:15
99:5 175:4
193:2 194:15
195:15 214:21
286:21 297:17
314:13
**seek** 73:2
**seen** 51:19,23
59:9 80:10,13
96:25 127:16
171:7 175:11
175:15 179:15
181:2,3,5,7,10
182:20 186:21
192:18,24
204:2 216:19
216:23 217:17
218:21 219:4,8
219:12 235:19
254:12 270:8
272:14,16,17

272:18 286:13
309:20,21
**segue** 63:10
**Segway** 157:14
157:15,23,25
158:4,7,14,19
**selected** 231:16
**selecting** 61:13
61:14 231:14
**sell** 28:19 61:2
**send** 85:21
241:10 243:1
322:13,18
**sending** 17:5
**sends** 76:24
191:24
**sense** 32:7 76:6
76:6 83:10
93:15 96:3
112:11,15
115:14 139:23
142:25 162:6
176:14 177:14
212:23 238:14
254:11 257:4,5
261:9 279:11
279:16
**sensing** 32:1
**sensor** 315:11
**sent** 94:9 101:19
241:6,7,8
242:17 243:3
**sentence** 209:24
209:25 289:20
**sentences** 210:1
294:16
**separate** 105:1
108:14 174:22
**September** 1:15
85:5 202:14,18
321:16
**sequence** 197:17
305:2
**Sergeant** 103:16
**series** 249:2
**serious** 63:14
184:10
**seriously** 10:2,3
**serve** 210:16
**served** 120:25

130:19 131:7
**service** 132:23
**services** 75:13
320:16 325:8
325:11
**serving** 59:4
124:5,20
**session** 228:18
**set** 16:22 59:2
63:19 69:12
168:16 251:10
263:12 321:8
**seven** 19:19
20:12 78:19,20
81:14 85:8
200:16 301:21
309:14
**sexist** 194:25
**Shaffer** 312:16
312:21
**shaking** 96:14
258:23
**shape** 162:13
**shapes** 14:13
**share** 25:9 33:10
242:24
**shared** 242:20
242:23,24
296:10
**sheet** 210:15
**shelf** 156:18
**shooting** 57:14
57:15
**short** 171:25
175:18 213:9
219:8,22 226:1
313:8
**short-term**
94:20
**shorter** 314:23
**shorthand** 321:8
321:10
**shot** 28:13
**shoulders**
192:21 193:1,4
**show** 95:1 130:8
141:4,5,6
189:11 241:20
263:13 271:5
272:20 273:8

**showed** 179:20
249:8 286:18
**showing** 174:5
175:8 242:1
273:3
**shown** 136:6
273:7
**shows** 141:10
144:18 274:20
296:4
**shut** 312:1
**sic** 12:16 71:21
92:7 121:1
137:6 160:17
161:14 170:2
172:15 216:13
237:1 291:3
**sick** 38:10 54:19
113:16,19
117:2,5,7,12
117:13 145:14
**side** 39:21 51:10
51:11 68:19,19
96:13 162:14
171:1,11
173:21 178:23
187:12 188:22
193:22 197:20
224:1,2,4,14
224:15,21
225:5 235:12
235:17 255:8
262:16 265:20
265:21 274:22
275:16,21,22
275:23 276:12
276:22 297:20
299:16 300:9
314:5
**sides** 162:15,24
**sideways** 158:1
178:25 289:7
**SIDS** 4:12
**sign** 11:18,24
322:7
**signal** 195:14
**signature**
322:16 324:19
**signed** 322:10
322:15

**significant**
261:2
**signing** 319:5
**silence** 311:22
**silent** 312:7
**similar** 8:5
60:18,21 68:6
94:10 150:11
171:20 247:10
272:17 279:5
281:18,22
289:23 303:14
305:5,5,23
**simply** 135:3
**simulate** 158:5
**simulating**
68:22
**simulation**
158:6
**simulations**
157:20,21,25
158:2,4
**Singapore** 197:5
**Singer** 19:13
**Singhose** 1:13
3:3,9,12,13,15
5:5,18,24,25
6:1 71:23
77:19 78:21
79:20 80:9
82:15 118:21
144:15 160:17
172:20 182:14
189:9 190:3
203:17 214:4
242:5,8 243:23
244:1 318:13
318:21,25
322:2 325:2
**Singhose's**
81:21
**single** 9:17
125:18 135:10
**sir** 5:23 59:14
113:7 125:20
126:13 317:1
**sister** 222:20
225:19
**sit** 31:22 64:23
89:6 91:14,20

99:4,7,15,18
115:10 185:18
186:11 187:16
187:18,19,20
205:19 233:6
234:4,17,17,18
234:22,23
235:2,2 264:12
314:11
**sit-up** 234:24
**site** 157:5
158:19 191:2,4
191:19
**sites** 191:24
**sitting** 99:12
112:7 125:15
193:25 194:12
203:20 204:19
204:20 205:3,4
205:9,15,17,19
230:5 250:25
**situation** 43:3
75:4 109:9
**situations** 270:6
270:20
**six** 41:4 43:7
78:19,20 85:8
98:3 194:10
280:3 289:19
**six-month-old**
148:3 151:21
**six-month-olds**
148:5
**six-pound** 223:1
**size** 222:23
269:22 280:12
280:14
**sized** 152:24,24
**sizes** 231:4
**skill** 96:24
**skip** 214:12
**sleep** 4:16 38:11
66:8 115:16
142:6 146:14
153:19 177:16
185:3 186:6
188:13,24
209:5 210:4
211:2 236:15
251:3 259:16

267:24 307:3
317:17
**Sleep-Related**
4:12 250:10
**sleeper** 4:7
51:20,25 53:4
58:16 61:20
62:8 63:23
64:13 66:7
69:6 72:14
74:5 75:4
77:25 84:3,4
96:9 110:24
159:19,19
161:14 171:1
188:21 195:15
210:4 214:10
221:15 248:14
251:13,16
254:18 276:1,5
276:8,25 287:9
289:25
**sleepers** 60:9
61:7 63:13
64:10 67:1
68:4 124:19,22
125:11,17
127:1 169:8
251:7 257:20
283:5 313:24
**sleeping** 4:3
53:2 54:23
56:22 88:9,10
131:9,22
135:12 136:21
137:22 138:4,5
140:1 166:20
169:12 184:24
209:3 248:11
283:19,25
318:8
**slept** 178:2
**slide** 165:23
**sliding** 165:14
**slight** 52:23
68:18
**slightly** 55:1
101:6 279:17
**sling** 251:11
**slings** 251:2,20

**slip** 157:22,24
**slope** 164:13
179:21
**slow** 65:7,12,12
65:15
**slowly** 65:22
**small** 12:20
25:18 33:21,23
37:17,19 153:4
168:12,13
**smaller** 223:17
**Smart** 314:25
**sneeze** 249:22
**Sock** 314:25
315:8
**sofa** 204:20
**soft** 276:1,2
277:7 287:11
288:9,13
**sold** 21:6 35:5
41:5
**Solutions** 320:1
325:7,7,9,10
325:13
**somebody**
100:12 158:20
**somebody's**
169:18
**someone's** 50:2
**somewhat** 38:12
53:2 55:11
83:11
**son** 115:1
174:18 197:3
215:21 221:8
227:22 234:7
235:4,5 236:2
280:16
**son's** 69:20
**soon** 107:18
224:4 233:25
308:22
**sooner** 318:18
**sorry** 23:12
46:20 77:13
143:23 160:23
167:1 168:24
180:13 184:21
199:21 206:12
206:12 207:8

208:1 209:18
213:19 218:2,4
218:5 219:14
222:3 235:14
243:2,5,10,15
250:3 260:9
271:17 272:5
273:19 275:1,1
285:1,2 288:2
300:18 302:6
315:23 316:8
**sort** 16:6 38:2
39:18,22 42:2
42:23 43:21
44:4 53:19
68:7,19 74:24
83:5 108:17
142:2 154:10
162:23 163:22
165:22 171:17
175:18 176:19
176:19 181:12
182:8 195:23
197:22 204:20
209:19 217:12
253:10 261:8
261:22 273:5
274:5 277:3
297:12 300:23
**sound** 84:5
263:19
**sounds** 18:5
169:22 249:18
252:6 278:7
285:4
**source** 191:21
**sources** 253:25
**South** 26:24
29:19 31:11
**space** 37:8 256:3
259:18 261:8
261:11 273:20
278:4,5,16
**span** 312:19
313:3
**Spanish** 183:25
**speak** 134:8,19
157:13
**speaking** 312:20
**speaks** 141:17

**specialist** 112:23
**specialists** 99:21
**specific** 80:3
101:25 106:16
114:12 119:22
131:11 132:22
146:17 147:24
148:23 174:13
174:15 233:11
257:2
**specifically** 51:8
77:25 103:13
103:15 117:14
136:4 138:13
138:15 139:10
143:2 151:17
151:20 153:18
153:21 262:21
283:12 318:8
**specifications**
45:22
**spectral** 36:21
**speculating**
287:20
**speculation**
288:4
**speed** 31:6,7,8
41:22 43:18
65:25 242:10
250:13
**speeds** 43:13
**spell** 29:20
**spelling** 24:13
36:5 169:16
**spend** 271:3
**spent** 76:3 77:20
78:8 309:7
**sphere** 53:18
**spiel** 6:15
**spinning** 62:17
**spliced** 174:22
**spoke** 29:3 70:8
70:9
**spoken** 105:21
105:24 109:11
135:1
**sponsored** 40:3
**spontaneous**
214:18
**Sprigle** 36:4,8

36:10,24 44:18
44:22 45:4
137:7
**Sprigle's** 36:20
**squirm** 268:8
**squirmed**
264:19
**squirming** 165:1
175:8 233:22
**stabilize** 41:18
**stable** 235:3
**stage** 40:7 43:24
152:4
**stages** 100:16
**stain** 249:6
**stake** 14:20,23
**stamp** 296:5
298:4 299:13
299:15 300:22
**stand** 8:11,23
9:2,6 79:10
129:18 144:4
189:23 200:19
247:25 252:25
271:18 318:22
**standard** 15:3
53:15,25 54:14
54:22 55:13
56:21 57:8
58:15,16,20
59:9,16,22
60:13 64:13
70:16 71:22
74:12,16
128:24,25
129:1,3 132:22
133:1 141:21
251:10 252:9
279:8,13
319:12
**standards** 16:22
43:21 53:5,17
54:12 55:4,4,7
58:22 60:7
64:5 128:6,12
128:13,14,17
128:17 129:4,6
131:13 132:5
132:17 283:13
**standing** 42:10

192:17 227:3
260:16
**start** 3:19 7:23
23:11 24:2
28:11 29:18
44:24 50:15
77:9 84:13
99:10 161:20
170:10 175:4
189:19 193:21
195:15 198:3
199:1 201:16
202:9 205:25
207:10 221:24
232:12 240:20
248:6,9 258:23
283:1 289:1
301:11
**start-up** 12:6,7
12:13 14:17
19:6 24:9
**start-ups** 25:14
**started** 17:14
18:21 19:8
21:6,9,10
23:23,25 24:5
24:18 28:17
37:11 42:20
48:4 105:9
111:25 112:10
122:11,12,14
136:18 137:11
138:22 141:2
177:25 180:3
189:20 218:17
224:6,14
229:19 262:16
262:18
**starting** 15:6
25:9 81:13
138:7 177:21
182:9 189:13
230:15 233:13
233:13 246:5
258:22 262:18
289:4 307:18
**starts** 259:1
261:21 282:7
289:20
**state** 18:11,15

133:22 321:2,4
**statement** 4:12
50:5,9 59:18
146:5 176:10
177:7 207:17
249:17 250:9
252:14,19,21
253:25 254:4
259:14 283:7
284:8 309:25
323:8
**statements**
103:18 131:12
155:1
**states** 1:1 35:17
258:8
**statutory** 1:3
**stay** 130:18
187:21 235:3
288:9
**staying** 211:20
**steel** 26:24
**steep** 138:1
162:14 178:23
193:2 196:20
**steeper** 251:23
**steepest** 61:24
**Steinwachs**
104:5 178:1
307:2
**step** 95:10 208:1
**Stephen** 36:4
44:18 45:4
**Steven** 137:7
**sticking** 163:10
**stills** 243:11
**stimulated**
299:5,7
**stimulus** 96:19
**stomach** 194:11
261:6
**stomachs** 171:2
179:7
**stood** 96:9
**stop** 63:22
117:15 145:25
164:5 165:13
190:14 195:14
225:16 299:20
305:1

**stopped** 17:5
31:24 63:1
144:24
**stopping** 34:12
**straight** 38:16
**strange** 56:7
**strap** 43:5,8
69:13 137:17
238:24 239:25
**strapped** 238:25
239:2
**strapping**
266:14
**straps** 269:20
**strategy** 122:4,7
**Street** 2:13
**strengths**
280:13
**strike** 59:14
**stroller** 148:11
152:3
**strollers** 61:15
251:1,19
**strong** 147:18
148:19 260:20
**struck** 65:20
**struggling** 303:2
**stuck** 29:8 39:20
**student** 19:10
313:17
**students** 36:14
142:18 318:1
**studied** 113:20
118:3 137:19
142:8 157:19
197:4
**studies** 86:14
116:25 117:2,5
133:22 174:15
254:3 290:17
303:5,7 314:16
**study** 73:16
83:21 105:25
142:13 149:13
155:15 172:3,6
187:25 209:9
209:16 221:5
227:15 230:12
231:24 257:2
303:3 311:19

313:10,13
**studying** 138:8
150:23
**stuff** 27:1 43:2
52:9 68:23
70:23 76:9
89:12 96:15
99:5 103:11
128:16 133:15
133:17,18
163:14 187:2
211:22 216:24
220:18 233:23
265:6 273:2
290:10 291:22
310:12
**style** 61:5
**subject** 84:3,4
93:25 94:4,14
217:16 244:10
248:19 301:17
**subjected**
170:24
**subjects** 118:19
172:2 231:14
231:16
**submitted** 40:1
142:15 320:6,8
**subscribed**
321:16 324:21
**subset** 124:6
**subsidiary**
21:23
**substance** 323:7
**substantially**
276:2
**sudden** 107:20
113:7,17,18
117:6 118:10
118:11,25
119:5,7 120:3
144:19 149:16
149:22 188:9
**sufficient** 92:24
**suffocate** 119:14
139:24,25
**suffocated**
119:12 131:25
**suffocation**
120:14 132:2

138:16 253:13
**suggesting**
  181:21 247:2
  277:24 292:20
  292:24
**suggestion**
  143:11
**suit** 15:15
**Suite** 1:19 2:4,9
  2:13 322:20
**suited** 18:19
**sum** 91:1
**summaries**
  105:3
**supervision**
  321:9
**supine** 175:9
  181:23,23
  190:8 194:6
  209:11 255:11
  259:20,25
  260:5 262:9,18
  262:22,23
  263:14 264:6
  289:7 298:19
  299:3,8 301:17
**support** 86:15
  190:19 219:24
**Suppose** 157:23
**supposed** 56:8
  56:19,20 80:22
  161:3
**Supreme** 16:11
**sure** 6:14 13:4
  13:23 14:19
  15:19,21 20:8
  23:24 25:17
  26:5 27:24
  32:25 34:15
  35:19,24 36:1
  36:12,18 40:12
  40:24 44:11,13
  45:24 49:13
  55:5 59:8,24
  60:3 64:20,22
  69:17 73:9,11
  74:22 76:10
  78:5 79:1,4
  83:11 87:11
  91:20 93:7

99:1 102:20,23
  104:21 105:9
  105:19 106:6
  107:14 108:14
  130:16,18
  132:19,21
  138:14 146:1
  146:20 147:17
  150:4 154:9
  156:2 161:3
  162:12 166:2
  172:4,6 177:21
  186:10,12,21
  187:3 190:3,3
  193:7 194:7
  195:2 196:22
  213:12 218:25
  227:8 234:14
  236:23 249:20
  252:1 254:7
  257:23 258:2
  264:2 272:2
  273:10,15,17
  273:24 276:7
  276:16 281:14
  287:2,8 289:18
  295:15 309:7
**surface** 53:2
  54:23 56:22
  97:16 163:14
  163:21 164:16
  164:25 173:12
  173:18 187:23
  189:16 206:5,6
  207:14,15
  210:17,24
  211:6,14
  248:11 254:22
  259:19 261:17
  291:1
**surfaces** 4:4
  97:13 131:9
  163:21 205:25
  206:16 209:3
  209:13
**surgeons** 112:2
**surprised** 85:10
  236:17 239:10
**surrebuttal**
  92:25

**suspected**
  107:23
**swaddled**
  305:24,25
**swatch** 279:19
**swatches** 279:6
**SwayMaster**
  25:23,25 33:10
**swear** 5:16
**sweet** 234:2
**swing** 20:22,23
  38:9,16,17,21
  38:22,24,25
  50:24 51:3,4,7
  54:19,23,25
  55:4 113:15
**swinging** 316:13
**swings** 39:4,5
  45:8 51:5,6
  251:1,19 318:9
**sworn** 5:19 7:22
  321:6 324:21
**swung** 38:12,13
  38:18
**symbol** 184:6
**syndrome** 117:6
  118:11 119:1
  149:16 188:9
**sys** 175:13
**system** 21:5,7
  37:25 43:1
  153:4 174:8
  175:13 181:8
  181:22 184:2
  184:15 185:11
  185:14 216:14
  217:20
**systems** 24:7
  37:12,18 153:1

————————
**T**
**T** 321:1,1,1
  325:1
**T-E-C** 29:24
**Tab** 182:11
  207:23 240:10
**table** 15:8 52:11
  98:7,13
**tables** 121:2
  200:2

**Taft** 104:8
**take** 9:10 43:15
  50:14 54:24
  63:13 78:24
  94:22 95:4
  99:7 121:24
  125:7 127:12
  135:2 137:14
  141:21 143:13
  171:22 183:7
  212:8 213:9
  226:25 227:18
  229:5 237:19
  239:24 254:5
  269:6 272:1
  293:4,7 302:19
**taken** 1:14
  286:15,18
  317:8,10 321:7
  321:8,10
**takes** 111:25
  219:7 264:20
**talk** 23:4 46:8
  48:16 63:3,6
  67:2,3 84:11
  85:12 93:10
  100:19 178:8,8
  182:8 189:4
  205:24 229:13
  229:14 230:13
  253:21 255:18
  271:2 277:20
  279:22 288:23
  296:16 310:25
  315:16
**talked** 23:25
  29:15,17 33:19
  39:3 51:4 67:1
  69:7,8,14
  71:15 76:8
  93:24 124:3
  147:7 153:16
  187:17 189:14
  204:9 231:11
  255:7 265:11
  265:13 266:4
  271:4 285:16
  291:17 311:2
  315:19
**talking** 26:15

31:13 44:17,25
  63:21 72:12
  75:3 77:9,21
  84:8 103:14
  108:2 109:19
  150:4 151:4,7
  152:2 157:10
  172:15 179:3
  191:1 194:4
  195:22 198:13
  206:20 212:14
  212:17 217:1,8
  217:11 220:23
  220:23 221:1
  235:23 257:7
  261:8 262:17
  263:23 266:23
  285:19 301:12
  311:2 312:15
  316:9
**talks** 61:19
  252:14 288:24
  316:18
**tall** 280:2,3
**taller** 39:24
**tape** 95:4 156:17
  239:24
**target** 151:20
**targeted** 148:25
**targeting** 117:17
  117:17 147:24
  151:25
**taught** 317:14
**teach** 33:1
  145:12 190:20
  190:20 317:11
  317:12,20,25
**teaching** 20:11
**team** 17:21 25:8
  36:13 78:22,22
  142:18 153:24
  303:21 305:13
**teams** 166:13
**Tech** 20:1,3,5,11
  66:16 117:2
  145:10 158:10
  280:24 281:1,6
  317:23,25
**technology**
  12:15,17 13:8

14:8,13 16:6
21:2,4 24:11
26:1 30:3,5,24
30:25 31:9
32:2,5,22
33:11,19 36:16
36:22 145:11
145:17 150:19
**telephone** 110:2
110:7
**tell** 6:5 16:17,17
20:16 23:22
26:10 32:9
33:12 39:15
43:23 53:14
55:17,17 69:19
74:9 77:5 81:6
82:8 86:18
95:24 118:23
118:24 119:23
134:6 135:24
138:11 159:13
159:17 160:6
160:14,14
161:9,10
169:10 172:25
174:17 175:22
194:3 200:2
205:6 238:19
238:20 258:14
275:14
**telling** 32:15
33:13 34:12
46:12 64:18
74:1 112:21
246:17 264:7
291:15
**tells** 214:16
215:14
**temporarily**
301:19
**temporary**
300:23
**tempt** 96:4
263:9 303:24
314:11
**tempting** 96:15
**ten** 21:15 48:5
52:2,23 61:21
63:23 68:8

69:20 110:7
125:17 175:20
176:16,17
177:19 185:3
188:24 210:22
211:1 300:22
301:12 307:16
312:19 313:4
**ten-minute**
230:4
**tend** 37:24 39:20
149:6 171:17
**tends** 106:10
**tenth** 282:11
**term** 18:6 19:9
72:16 119:7
245:24 266:11
318:2
**terminated** 30:8
**termination**
30:17
**terminology**
243:9 251:11
251:14 286:10
**terms** 17:10,24
22:15 38:13
50:18 55:15
81:12 97:8
107:5 114:4
120:10 131:21
140:6 176:17
211:17 220:6
220:10 221:10
276:2
**terribly** 10:7
**test** 46:25 92:11
95:13 130:24
131:5 134:15
168:14,16
176:16 177:20
210:3 217:16
225:5 236:2,18
237:16 240:6,7
262:15 270:13
276:9,20
277:18 279:1,4
279:9,21,22
281:8,15,16
282:1,2,3,4,10
289:12 290:13

303:24 314:12
314:18
**tested** 47:3
168:9 176:1
235:25 276:23
278:25 279:6
289:8 292:10
302:24
**testified** 5:20
49:19 101:11
124:17 157:2
218:22 219:11
268:23 285:11
304:2
**testify** 11:2
15:19 40:17
55:12,20 321:6
**testifying** 178:6
**testimony** 7:22
8:8 9:24 10:1
11:7 99:3
134:10 156:7
157:1 167:19
178:5 216:20
219:1,1 266:17
266:25 267:2
268:22 285:7
286:11,12
293:2 307:1
323:2,8
**testing** 83:22
93:14,14,15,21
94:19,21,24
95:16 96:20
157:5,8 168:11
168:13 175:24
176:4,11,13,17
176:23 177:6,8
214:12,13
219:13,18,24
219:25 220:4
221:4,10 225:6
225:8 227:24
229:8 237:25
276:18 279:13
288:24 289:1,4
292:22 294:1
296:1,2 303:18
304:12 306:17
313:14,15,16

313:17,19,21
313:22,25
314:1,4,7,9
**testings** 92:5
**tests** 43:11 94:1
94:3 158:7
168:16 175:18
249:9 289:14
289:23 290:17
291:2 315:6
**Texas** 2:13
281:1
**textbook** 88:8
**textile** 132:5,24
133:10
**textiles** 130:20
130:23,23,24
131:17,18,20
132:3
**texts** 100:16
**thank** 5:14
76:21 77:12
78:21 123:22
183:19 208:22
245:15 256:8
312:11
**Thanks** 6:18
**theme** 32:1,18
**they'd** 31:23
**thing** 38:10
43:21 64:14
65:1 84:1
114:21 119:16
131:6 135:10
140:5 167:12
167:21 264:11
296:11
**things** 26:4
28:23 42:21
45:23 52:9
55:5 69:14
74:3 83:7,8
84:21 87:22
88:13,21,25
92:9,18,21
100:6,9 106:16
107:1,3 108:18
114:21 117:21
132:6 134:2
136:6,11,19

137:13,18
145:20 166:14
167:10 179:3
196:15 227:10
242:11 250:13
257:13 263:17
280:1 291:18
311:15
**think** 6:10,16,17
9:1,5,9,13,15
9:21 10:19
11:20 12:3
13:2,23 15:22
16:3,6,10 17:7
18:20 19:22,25
22:22 26:2
27:5 28:3
30:21 32:17
35:8 40:7,20
43:10 46:2,12
47:4,7 48:4,8
48:20 49:1,10
50:8 54:2,2,4
54:17 55:3,20
55:22 56:5,16
57:13,14 58:7
58:24 59:19
60:4,6,19,25
61:1 62:12,14
62:16 63:2
64:24 65:5,21
68:4,16 70:15
70:21 71:20
73:19 75:1,6
75:18 76:12,23
78:13 81:14
84:18 85:9,21
85:25 86:21
87:7,12,12,15
87:19,22 88:11
88:16,19 89:10
90:24 91:18
92:2,19 93:20
94:25 96:22,25
97:1,9,12,21
98:15,21 99:13
99:25 100:23
101:19 103:25
104:1 105:4,10
106:1,17

107:14,15
108:3,12 109:6
109:15 110:18
111:8,18 113:8
115:5 116:4
117:16 118:18
123:17 125:11
132:25 133:19
133:21 135:23
138:19 139:18
143:18 144:24
146:20 147:23
149:3 150:4,15
152:1 153:8,15
154:11,23,24
155:13 156:6,8
157:3 159:1,11
161:10 166:2
168:20 169:13
170:7,8 173:3
175:3 176:5
177:25 178:1,3
178:14,17
179:17,23
181:14,16
184:22,23
185:22 186:2,4
186:6 188:23
194:14 195:22
196:13,21
197:8,12,16
198:2 202:11
204:4 206:18
208:2 210:7
212:4,12,18
217:2 218:23
219:3 221:21
221:24 222:3
226:2,17 227:3
227:16 228:2,6
228:9,10 229:6
229:10 230:8
231:16 232:16
232:24 233:5
233:23 234:8
235:4 236:8,10
237:6,7,8
238:23 239:8
249:4 251:9,14
252:2 253:11

256:13,14
261:13 265:12
267:23 269:16
270:2,10,12
271:25 272:16
272:18 277:4
277:23 279:10
280:6 281:19
283:12 284:3
284:14,17,22
285:5,11,14
286:6 287:3
288:3 289:3
294:17,24
295:7 296:23
299:10 300:15
300:23 302:23
303:13,20
304:2 309:21
310:4,6,6,11
310:18,24
312:23,24
315:6,10 316:7
**thinking** 56:7,17
56:18 62:23
151:24
**third** 7:3 141:11
175:6 178:8,10
178:16,19
205:8 216:12
216:13,13
234:4,5 262:24
263:12
**thoroughly**
210:2
**thought** 28:25
28:25 55:10
59:15 62:8
72:9 84:17
136:15,17
168:18 176:21
177:11 204:10
207:7 228:16
243:3
**thoughts** 58:18
**thousand**
158:12
**thousands** 27:19
38:18 85:25
**three** 13:3 27:10

27:15 48:9
62:2 67:7 68:3
71:9 105:1,10
105:11 148:20
151:17 174:22
192:15 193:3,7
203:18 225:22
228:1 231:4
232:21 236:1
245:5 255:1
289:19 309:7
311:14 318:4,6
**three-** 22:1
**three-year-old**
43:12 64:25
65:2,16,23
67:4 147:25
**three-year-olds**
151:11
**threw** 180:19,19
282:11
**thrown** 212:22
**thrust** 150:21
152:12
**thrusts** 147:6,10
**Thursday** 80:22
84:18 85:5
**tie** 41:15
**tied** 145:21
146:4
**tight** 92:17
181:14,18
239:14 266:13
267:7
**tightly** 239:25
268:11
**tilting** 246:13
**time** 5:2 9:17
16:18 17:22
18:20,23 29:7
29:8 34:5 39:5
50:15,23 54:9
54:18,22 55:3
55:11 56:10
58:1,8,12 59:4
59:22 60:5,6
60:24 62:15,25
64:9 66:4,5,11
66:12 68:2
69:3 70:14,16

70:22 72:5,13
72:21 73:4,15
78:7 79:11,17
84:20,22 90:18
99:23 102:19
113:21 119:9
123:14 124:21
124:25 129:2
133:1 143:12
143:17 144:6
144:12 149:13
153:14 155:5
171:25 174:9
179:14 180:16
181:4 189:16
189:22 194:18
194:19 195:1,4
195:5,15
200:14 201:13
202:9,12
213:20 214:1
219:8,22 226:1
226:23 228:22
234:13,18
235:6 237:22
249:17 251:15
251:17 252:12
254:6 268:2
271:3 282:12
293:15,21
298:4 299:13
299:25 300:16
300:18,22
303:16 307:25
308:4,10,20,25
313:9 314:23
318:23 319:12
320:15 321:8
**timeframe**
69:24
**times** 6:19,21
14:18 34:20
61:11 109:22
110:7,12
112:12 158:12
160:7 161:6
249:3 264:10
272:20,23
282:3
**tip** 41:23

**tippy** 235:4
**tips** 3:19 158:1
190:20
**title** 141:13
147:3 150:19
209:3,6 214:25
**today** 10:3 11:3
11:7 48:7,24
76:2 78:2,9
81:17 82:5
83:25 89:6
91:14,21
100:22 115:10
119:23
**today's** 90:2
318:24
**toddler** 39:12
**toddlers** 37:10
37:17,19 121:1
**toggling** 256:2,4
**Tokyo** 20:11
**told** 64:25 70:12
81:23 121:20
122:9 140:11
156:1 178:9
179:15 189:7
214:4 232:14
235:11,16
302:22
**tolerance** 43:21
**tons** 27:6,19,21
**top** 31:23 52:8
52:11,18
104:10,16
105:16 155:22
161:19 165:12
165:13,20
166:12 172:16
183:23 184:1
222:1 223:20
224:24 226:7
258:20
**topic** 115:22
131:4 147:15
257:2
**topics** 120:16
133:4 134:11
**torque** 265:4
**torques** 165:2,4
260:21 261:2,5

264:25,25
265:2
**torsional** 38:23
51:5,6
**torso** 38:20
**total** 6:20 22:6
27:6,8 91:1
147:5 296:23
**totally** 272:4
**tour** 158:19
**tours** 158:19
**toy** 95:21 96:14
263:9 297:10
297:12,13,17
**track** 17:18,21
115:19 158:11
**traction** 171:18
**trade** 17:10
32:24 33:9
34:21
**trademark**
25:20,25 26:1
35:18
**trademarks**
26:3
**trader** 112:17
**traditionally**
38:18
**transcript** 320:4
320:5 321:10
321:11 322:8
322:13,15
323:2
**transcription**
321:9
**transcripts**
100:21 101:18
**transfer** 18:14
**transferred** 18:6
18:24
**transition**
307:16
**transitioned**
109:25
**transportation**
157:16
**transporter**
141:15,18
**transporters**
141:24

**trapped** 162:15
162:24
**trapping** 163:16
**traps** 162:6
278:5
**traumatic**
274:12
**Traurig** 2:12
325:8
**travel** 49:10
**treatises** 86:13
**treatment** 111:9
111:10 112:23
**trial** 8:9 10:11
10:21 49:4
161:5,6
**triangle** 184:7
**tried** 41:10
84:18 117:14
118:4 180:2
237:18 315:8
315:10
**tries** 96:5 113:15
117:3
**trigger** 148:22
**true** 8:9 10:3,21
25:21 57:9
64:5 70:20
74:7 93:14
111:2 129:23
132:7 148:10
149:2,3,23
154:14 156:23
186:1 212:12
235:20 252:5
255:6 280:10
320:5,8 321:10
**trust** 71:9 107:6
**truth** 58:19 72:6
115:21 116:9
321:6,6,7
**truthfully** 60:3
**try** 30:22 32:18
41:2 47:5
53:17 107:16
151:20 163:2
165:13 226:23
227:2 231:12
247:11 282:14
314:11

**trying** 26:13
32:16 43:17
46:10 53:8
56:3,11,25
60:15,17 62:17
67:17 70:22
77:1 108:11
115:19 124:14
130:3 135:2,15
141:5 147:8
153:1 163:13
188:24 189:25
220:19 226:24
240:3,7 242:9
263:23 264:23
279:2 287:4
293:12 302:11
304:20 313:5,6
314:18,19,21
**tucked** 275:6
**Tucson** 2:4
**Tuesday** 84:20
**tummy** 194:17
194:18,19,25
195:4,5
**turn** 40:23 68:24
96:5,17,25
97:1 123:12
125:9 127:7
146:25 163:3
168:23 170:25
173:21,23
174:2 262:1,4
265:19 277:4
293:2 297:19
**turned** 31:14
40:8 82:20
84:5 86:23
101:21 162:5
167:17 195:9
224:5 247:16
265:7 274:21
275:11,21,22
276:11,22
277:2 305:12
309:6
**turning** 164:12
175:17 219:7
233:23
**turns** 31:3 38:9

111:19 158:1
171:14
**twins** 67:8 222:9
222:10,12
227:22
**twist** 38:20
**twisting** 175:17
**two** 20:25 27:13
27:14,15 49:21
50:1,12 61:12
68:3 70:5 79:6
83:5 84:6,6
86:22 98:3
102:6 108:17
126:7 136:6,11
145:24 146:19
148:20 160:1
161:18 163:21
169:10,11
170:10 174:19
180:9 189:22
194:15 195:2
195:19,23
202:12 221:14
222:7,8 223:4
226:15 245:5
253:11 255:1
261:20 280:17
289:19 307:24
**two-month**
196:14
**type** 7:19 12:19
34:20 38:24
42:16 52:6
59:14 131:8
**types** 31:1,12
33:12 34:10
**typo** 169:13

———————
**U**

**U** 325:1
**U.S** 4:15
**U.S.O.P** 131:2
**Uh-huh** 15:18
22:3 52:4
71:12 98:14
164:4 222:13
**ultimate** 107:24
**ultimately** 17:2
75:7 315:11

**unable** 278:16
299:17
**unassisted**
185:18 186:12
187:17,18
205:20 234:21
234:23,23
**unbuckle**
285:15
**unbuckled**
285:12 286:4,9
**uncertain**
245:23
**uncertainty**
187:22
**uncle** 102:15
**unclear** 114:7
**uncomfortable**
268:6
**Uncontained**
150:21
**undeclared**
17:19
**undergrad**
198:17
**undergraduate**
19:9
**underneath**
99:17 274:22
**undersigned**
323:2
**understand** 9:20
10:7,12,13
11:9,12 18:16
35:12 47:5
49:21 57:4
64:3 70:18,25
71:8 81:9,12
92:3 109:6,9
110:19 112:16
118:8,21 127:3
135:5,11 146:3
149:8,14
154:10 155:7
160:5 161:3
174:21 181:25
186:14,18,20
186:25 188:4,5
213:1 244:22
256:25 272:19

273:24 276:7
278:9 288:15
315:3 316:12
317:6
**understanding**
89:3 97:19
109:25 119:5
120:10 130:23
132:3,4 140:19
149:15 155:10
161:4 187:16
256:24 307:4
315:12
**understandings**
118:5 308:16
**understood**
11:15 56:5
60:16 82:2,24
92:16 135:13
139:5
**undertaking**
136:23
**undertook**
83:21
**undetermined**
107:25
**unequal** 165:3
170:21
**unequivocal**
185:5
**unexpected**
107:21
**unexpectedly**
113:20 119:6,8
150:7
**unexplained**
113:7,18
118:11 119:1
120:3 144:20
149:22 150:2
**unique** 71:18
126:8
**United** 1:1 35:17
**units** 52:7
**University** 4:14
17:14 18:9,18
280:20
**unnatural** 277:3
**unreasonable**
127:17

**unrestrained**
223:22
**unsafe** 61:8 62:9
62:11,12 64:24
72:14 125:12
**up-to-date**
88:10
**updated** 54:4
84:21 85:4
136:7
**updates** 17:5
**updating** 128:25
**uploaded**
240:17
**upright** 146:14
193:16
**upward** 170:23
284:7
**upwards** 190:9
**usage** 294:6
**use** 14:6 37:6
45:18 57:1
64:17 68:14
69:8,12 99:24
106:3 109:20
131:3 148:3
157:21 165:24
169:21 172:5
176:18,19
180:22,24
182:9 184:2,15
184:18,23,24
185:4,6,11,16
185:24 186:5,7
188:20 189:3
190:7 194:5
210:3 216:16
217:21 238:3,9
242:8 245:24
249:5 258:9,11
259:6,7 260:15
263:23 264:13
264:13,24,25
266:9 267:12
267:21 268:1,4
268:15,18,19
268:25 272:24
276:7 283:4
292:18 295:9
306:8,10,12,15

306:16 314:25
315:8,10,17
317:17 323:10
**useful** 270:25
315:17
**user** 269:25
**users** 168:17
294:9
**uses** 314:20
**usual** 325:13
**usually** 119:7
128:23 166:16
252:2 298:13
316:8

_____

**V**

**valley** 246:12
261:22
**valuable** 22:18
23:2
**value** 273:2
**variability**
295:19
**variable** 31:5
**variance** 189:18
**variety** 26:8
251:24
**various** 26:3
52:8,22 93:17
95:2 128:21
145:19 175:9
227:19 231:4
231:12 294:15
314:15
**vast** 83:19
101:19 118:25
**vastly** 269:22
**Vegas** 58:25
**Vehicles** 132:13
**verbal** 95:21
**verify** 87:16
193:6 218:8
**Veritext** 320:1,4
320:7,13
322:11,19
325:6,7,8,10
325:13
**verse** 119:23
**versed** 194:8
**version** 43:6

56:2 87:9,11
87:12,13,16
183:24,25
311:18
**versions** 92:12
**versus** 215:23
**vet** 295:20
**vibrate** 12:18
14:15 31:23
**vibrating** 31:24
**vibration** 13:20
14:5 20:18
21:4 33:13,22
34:13
**victims** 118:7
**video** 4:8,20
79:12,18 92:8
92:11 94:23,25
144:7,13
174:23 175:2,8
179:20,23
213:21 214:2
227:20 240:12
240:14,16
241:2,8 243:20
243:22 244:6,9
262:25 264:8
270:8,10
290:15 293:16
293:22 296:3
296:17 297:3,4
297:7,11,16
300:25 304:21
304:22,23,24
304:24 311:6,7
311:16,18
319:1
**videoed** 177:9
**videographer**
2:17 5:1,14
79:10,17 144:4
144:6,12
180:11 213:20
214:1 273:18
293:15,21
318:22
**videos** 157:20
171:20,22
174:13,15,20
174:21,22

175:5,18
176:22,23
179:17,18
219:4,8,9
227:11 235:22
262:14 263:8
263:10,12,12
264:17 265:16
284:12 311:11
**videotape** 95:11
227:14
**videotaped** 1:13
3:9 5:4 270:13
318:24
**videotapes** 92:4
**videotaping**
95:6
**view** 64:6
**virtual** 110:1
**virtue** 6:3
**vision** 297:24
**visiting** 108:22
**visually** 227:17
**vitae** 3:11 85:4
120:19,20
136:6 144:16
**voice** 96:15
**volitional** 216:3
**voltages** 14:11
14:13
**vote** 71:5 129:5
**vs** 1:6

_____

**W**

**waist** 166:25
237:4 240:1
**wait** 31:24 121:7
121:8 199:20
199:20 291:8,8
311:20
**waive** 307:24
**walk** 152:4,4,16
152:22 166:9
189:23,25
293:5 297:4
**walked** 152:5
**walking** 260:15
260:17
**wall** 187:12
212:16,18,19

212:23 265:14
275:23
**walls** 162:14
178:23 211:9
211:19 212:10
261:10,12,18
261:19,20
265:9,22
**Wang** 4:4 87:5
87:19 207:21
209:1 210:3
257:11
**want** 11:17
22:16 28:11,12
28:12 32:8,20
33:15 41:15
44:25 46:7,7
50:14 55:23
57:6 64:8
67:16 69:12
83:5 94:12
99:13 104:18
110:16 115:23
121:22 126:5
131:22 143:22
146:2 148:14
148:21 160:8
182:8 189:4,22
205:24 215:20
229:13 230:21
235:9 236:14
236:15 240:13
241:17 245:24
247:22,22
249:5 254:6
257:25 270:4
274:24 282:7
288:23 295:25
296:15 297:4
301:2,11
308:19,19
310:25 312:12
318:17
**wanted** 40:6
44:24 48:18
78:7 87:10
189:23 190:25
227:12,18
228:13 304:13
**wanting** 69:8

109:8
**wants** 38:12
**warned** 292:14
292:17
**warning** 3:17
156:4 182:21
182:22 183:6
183:10,12,17
184:6 185:14
186:5,7 187:4
189:2 190:13
195:19 238:2
238:20 268:15
268:18 292:13
306:13,14
**warnings**
154:13,16,21
155:1,5,7
184:8 187:25
**wasn't** 24:1 56:6
56:9,12 59:6
59:25 62:14
63:18 70:22
97:14 99:1
124:25 154:18
175:24 189:21
212:16 218:12
224:3 229:3
233:21 237:25
240:7 263:18
284:1,20,21
287:13 297:22
304:12,20
314:12
**waste** 123:14
254:6
**watch** 69:13
241:8 296:15
297:1
**watched** 171:11
236:16 297:7
**watching** 227:17
234:14
**way** 10:24 13:4
32:8,9,10,14
32:15 35:9
41:18,22,23
42:1 50:2 79:2
81:9 92:11
95:17 96:4

115:15 123:1
127:2,6,7
128:5 140:13
143:16 149:21
152:9 155:16
158:15 165:24
169:16 171:19
179:21 181:24
184:22 192:13
198:16 221:2
226:10 228:17
229:15 236:5
236:11 238:17
239:2 242:10
246:13,21
263:6 275:12
277:3 279:18
281:21 285:14
288:8 297:17
297:19,20
303:14 321:14
**ways** 49:23
166:22 175:9
279:25
**we'll** 50:15
75:24 78:5,6
82:4 83:13
130:4,18
158:16 240:20
318:16,20
**we're** 11:23
26:18 29:17
33:7 66:16
77:14 79:20
84:11 110:17
130:14 134:1,2
134:4,15
136:10,13,18
136:22,22
140:14,25,25
150:23 151:7
165:9 166:5
172:13 176:17
179:3 194:3,4
194:4,15
207:20 210:9
213:2 217:14
235:9 236:25
238:14 242:7,7
261:7 262:17

288:25,25
290:24 297:17
298:4,7 299:3
300:7,25
301:15 307:15
307:16
**we've** 10:5 25:16
26:4 32:4,23
66:22 67:12,14
80:18,18 88:17
110:16 145:6
153:15 158:13
158:13 189:13
204:9 217:17
231:11 271:4
311:24 315:19
318:12
**wearing** 211:25
212:2
**Web** 191:2,4,19
191:24
**week** 66:18 67:6
80:22 84:20
136:7 314:20
318:14
**weeks** 176:18
309:7
**weeks'** 78:17
**weigh** 280:4
**weight** 117:20
192:16 193:8
193:15
**weird** 275:12
**went** 13:6,7
16:10 17:5
35:23 39:3
40:10 58:24
59:5 61:12
66:18 70:17
96:13 115:1
137:9 145:2
225:8 229:19
**weren't** 47:21
107:10 231:22
313:2,16
**Western** 15:23
16:4
**Wetmore** 2:4
**whatsoever**
138:25

**wheel** 157:22,24
**wheelchair**
36:21,25 37:12
39:10,21
137:16 148:21
151:6 152:1
**wheelchairs**
37:13,17,24
147:5 148:25
153:2
**wheeled** 137:6
**WHEREOF**
321:15
**whichever**
185:19
**whoa** 76:14,14
76:14,14
298:17
**wide** 200:3,3
**wife** 61:9,17
62:7,11 63:9
63:22 66:7,12
66:17 70:1,8
71:16 72:13
124:18 127:24
191:19,22
269:4,16,16
**wife's** 70:1
**wiggle** 181:12
224:22 230:8
230:15 236:18
238:1 239:10
**wiggled** 93:19
286:14
**wiggling** 175:16
175:20 179:1
179:19 219:6
224:6 233:13
233:18 263:16
263:21
**wiggly** 239:7
**William** 1:13
3:3,9,11,13,15
5:4,18,24
318:25 322:2
325:2
**wish** 256:2
**witness** 3:2 5:17
7:6,6 8:15,22
9:2,15 10:15

48:23 50:8
57:12 72:3
73:6 74:13
79:1,9 80:12
80:13 88:19
89:10 93:4
118:16 120:8
122:19 124:24
125:23 126:16
128:10 133:17
134:23 137:1,2
139:4,18 141:8
141:9 143:9
144:5 159:22
161:18 186:4
186:24 194:20
194:23 196:13
198:2 203:25
213:9 216:23
217:8 218:10
220:3 236:8
237:15 239:6
242:3 244:7
247:8 252:9,17
253:4,5 254:9
254:10 257:23
260:2 266:11
267:9,23
269:15 270:12
271:22 272:6
281:14 282:24
284:24 285:1,5
286:21 287:2
288:3,6,20
291:12,14
294:14 295:6
296:18 298:9
298:25 301:7
301:11 306:6
306:23 307:7
308:1 319:6,8
320:9 321:5,15
**witness's** 123:14
**witnessed** 255:1
262:10
**witnesses'**
103:22
**wobble** 173:20
**Wonderland**
51:14

**word** 69:15,15
91:6 172:3
268:14
**wording** 128:24
**words** 86:13
88:25 160:10
160:24 180:20
185:7,16
190:23 194:9
218:23 229:2
253:15 286:15
**work** 6:25 20:5
25:9 32:13
36:13,22 45:1
46:8 48:6,19
49:4,20,22
54:14 56:19
57:1 60:19
71:9 73:6
74:11,13 76:5
77:1,24 78:18
83:18,24 85:14
91:15 93:12
119:22,24
120:3 124:2
127:2,5 130:3
130:9,11
131:11 140:12
141:3 142:11
142:14,22
145:16 148:24
153:16 171:22
179:13 220:7
256:3 257:1
270:6 273:19
**work's** 7:11
**work-out** 89:24
**worked** 12:6
19:10,11 20:7
35:21 36:9
37:18 38:8
39:1 45:2,6,10
45:12,21 46:13
48:3,8 49:15
76:8 104:24
113:15 121:9
132:22 137:5
137:10 140:20
140:22,23
153:13 156:19

157:4,8 255:8
267:15 303:21
**working** 37:6,11
39:11 40:15
48:4 54:18
60:7 70:4 76:3
85:20 90:3
110:8 111:24
136:10 140:13
140:14,25
142:19 145:23
147:20
**works** 58:23
133:3 315:9
**workweeks**
78:16
**world** 27:22
33:2 58:14
110:1 294:6,10
**worried** 98:7
**worries** 143:25
208:2
**worth** 10:22
33:7 78:17
**wouldn't** 9:6
33:23 41:11,12
42:8 49:11
64:14,17 85:10
94:13 112:19
150:6 182:6
212:16 234:14
239:6 283:18
283:24 306:16
**Wow** 62:3
**wrapped** 69:10
**wraps** 163:20
**wriggle** 171:12
**wriggled** 286:25
288:16
**write** 309:5
**writing** 81:23
309:7
**writings** 155:3
**written** 119:13
138:16 139:23
173:2 316:15
**wrong** 9:4,5,8
9:10,14,16,19
152:24
**wrote** 16:20

| X |
| --- |
**X** 30:6

| Y |
| --- |
**Yards** 121:2
**yeah** 10:19
16:16 17:21
23:13,19 25:25
26:2,21 27:9
27:18 30:9,21
30:21 41:16
42:8 43:17,19
43:25 44:8
45:18 46:21
49:5 54:2
60:19 62:4,19
62:22 63:17
65:18 67:14,21
69:21 70:21
71:6 72:15,20
73:13 78:3,19
80:13 83:15
86:4,9 93:1
97:9,24 98:5
99:5 101:3
108:1 110:4
111:15 112:10
115:1,3 117:1
132:14 146:23
149:3,25
150:15 151:22
152:18,19,25
153:21 154:7
169:15,24
173:7,11
178:17 179:8
181:17,18,20
182:3 183:12
183:16 185:7,9
185:12 186:22
188:3,23 189:2
190:22,24
191:5 194:14
196:14 197:10
197:19 198:2
198:20 200:25
202:11,18
204:22,24
206:18 207:24
212:4 213:14

218:25 223:3
223:20 224:3
224:15,17,19
226:7,18,22
228:1,11 232:3
232:13 233:15
234:22 235:15
235:25 237:2
238:13 243:14
244:23 246:9
246:23 248:15
249:14 253:9
261:19 263:16
263:25 264:22
265:18,23
266:17 273:1
275:4,22
277:11,13
279:8 280:15
281:3 283:10
283:16 284:22
285:5,14 291:7
291:14 293:9
294:14 295:17
296:21,25
299:9,18
300:20 301:4
302:9,16,25
304:10,12,23
306:16 307:4
307:19 310:18
311:19 314:18
316:2 318:6
**year** 67:8 75:8
147:22 149:23
151:25 176:19
**years** 12:7 13:6
13:7 16:10
21:15 30:6,10
36:14,24,25
38:19 41:4
43:7 48:5,9
49:16 53:1,25
58:7 66:23
100:2 111:25
113:15 115:16
122:22 137:9
138:7 140:20
140:22,24
151:17 157:4

280:17 315:8
**years'** 10:22
**yellow** 214:25
**Yep** 193:9,20
223:11 258:18
278:7
**yesterday**
101:11
**yielded** 248:14
**York** 15:23
**young** 37:12
52:15 61:11
62:15 68:17
69:4 70:24
117:17 118:6
137:10,15
147:24 149:18
149:18 153:1
**youngest** 43:9
**YouTube** 44:2,3
**Yung** 189:9,9

———————
**Z**
———————
**Zdraveska** 3:20
191:15 192:11
**zero** 18:10,11
31:7 52:2
210:21,25
**ZO-ClearPFH**
3:21
**ZO-TempePD**
4:18
**Zoey** 3:22,23
94:14 97:11,15
118:23 196:2,2
196:3 199:16
201:8 202:25
203:3,19 234:2
245:4,20
246:18 247:4
272:14,20,21
273:3 274:13
274:20,25
284:20 285:12
285:20,20
286:4,12,14,24
**Zoey's** 97:3 99:3
102:13,15
107:9,12
108:19 109:12

199:16 200:4
249:17 268:25
271:6 284:15
284:20
**Zoom** 110:2,7

———————
**0**
———————
**008143** 241:5

———————
**1**
———————
**1** 3:9,21 79:21
79:23 80:8
**1:38** 213:20
**1:52** 214:1
**10** 4:6 182:11
213:2,7 214:5
**10-25-19** 4:14
**10.B** 325:4
**10:00** 301:14
**10:07** 300:22,24
301:1,3,5
**10:59** 79:11
**100** 15:20
255:18 259:13
**1000** 2:13
**102** 262:5
**1033** 250:18
**104** 265:8
**11** 4:8 169:5
240:21,24
243:12,13,14
245:11 298:18
**11:10** 298:25
**11:11** 79:17
**11:30** 298:5,7,10
299:3
**11:35** 299:14
300:2,3,12
**11:40** 300:5
**118** 277:23
**12** 4:9 153:20
169:6 185:3
188:24 222:22
244:12,15,19
244:22 249:25
300:4,7,8
**12:13** 144:6
**12:36** 144:12
**122** 284:4
**12444** 4:6

**12465** 214:14,23
**13** 4:11 150:5
172:13,13
250:1,3,5,8
252:23
**13053,Signatu...**
321:20 325:16
**133** 289:4,18
**134** 292:8
**14** 1:15 4:14
207:23 255:19
255:22 271:15
**144** 294:5
**147** 246:5
**15** 4:18 110:15
150:16 192:2
271:16,17,20
272:10,12
273:22 276:13
276:21
**15-14-37(a)**
320:14
**15:27** 299:14
300:2,12
**151** 245:9,13
**152** 245:9,13
**153** 245:13
**154** 245:14
**16** 4:20 195:9
296:4,7
**163** 300:1,13
**165** 305:4,9
**16th** 91:8 92:24
309:6
**17** 13:6,7 16:10
240:10,12
**1700** 2:13
**18** 13:6,7 16:10
222:18 244:2
**182** 3:17 277:24
**183** 277:24
278:23
**19** 253:19
**190** 150:16
280:5
**191** 3:18
**199** 3:21

———————
**2**
———————
**2** 3:11 84:25

85:3 89:16
120:19 168:24
168:25 318:10
**2.2** 210:11
**2:19-CV-0268...**
1:7
**20** 52:2 58:8
60:4 97:7
111:25 138:7
140:20,22,24
196:6 210:22
223:14 305:17
322:20
**200** 2:4
**2005** 30:14
**2010** 30:15
**2011** 250:8
251:7
**2014** 54:8 201:6
202:2,13
**2015** 53:5 54:4,9
**2017** 54:4 58:8
59:20
**2017-A** 60:5
**2018** 69:22,24
70:11 127:1
214:6
**2019** 58:8 59:20
75:10 78:8
255:19
**2020** 75:11
**2021** 1:15 74:1
89:16 91:8
168:25 321:16
324:22
**203** 3:23 317:13
**208** 4:3
**21** 206:20
**2110** 318:1
**213** 4:6
**22** 62:2 172:23
222:2
**22-month-old**
67:5
**23** 224:25
235:10 253:19
267:1
**23498** 4:20
296:5
**24** 239:4

**241** 4:8
**244** 4:9
**25** 6:21 185:19
186:13,17,17
188:5 231:3
253:20
**250** 4:11 78:1,3
100:24
**250-hour** 101:17
**2500** 1:19 2:9
**255** 4:14
**26(b)(4)** 81:23
**27** 222:4,5 223:9
241:11,12
248:14,17
249:13 251:23
**27.1** 249:1,8
**271** 4:18
**28** 10:22 122:22
221:24 222:1
223:9
**28th** 321:16
**29** 223:16,19,20
253:20
**296** 4:20

———————
**3**
———————
**3** 3:13 89:19,21
90:5 91:16
168:24 207:5
221:19,25
222:1 230:23
247:24 248:5
255:25 258:6
258:17 282:8
309:9
**3:01** 293:15
**3:07** 293:21
**3:30** 318:12,23
319:11
**30** 6:21 17:6
99:16 157:4
164:16 166:23
169:4 200:20
210:22 211:1
252:3,11 259:1
284:15,17
322:3
**30(7)(e)** 323:6
**300** 318:1

322:20
**30076** 322:21
**30305** 2:9
**30322** 6:8
**31** 150:11
  200:20 248:24
**3118** 53:3 58:20
  59:5 70:16
  74:16 129:3
**33** 141:10,11
  144:25
**3333** 1:19 2:9
**34** 169:4,5,6
  170:6 200:6,10
  200:18,22
  201:4
**343-9696** 322:22
**355** 4:18
**357** 273:23
  274:8
**36** 137:4,4 226:2
  282:19
**361** 274:19
**362** 4:18 275:18
  276:13,21
**37** 170:20
  172:15 247:23
  248:5 282:18
**374-3541** 2:14
**38** 259:12
**39** 178:21
  259:12
**3D** 112:1,6,14
  115:2 195:8

**4**

**4** 3:15 91:9,11
  91:16 207:3
  307:14
**4-2-21** 3:13
**4-6-18** 4:6
**4.7-month**
  301:16
**40** 17:6 27:6,21
  129:10 174:25
  298:2
**40-hour** 78:16
**41** 3:21
**42** 121:5,20
  123:25 124:2

130:18 136:14
**43** 136:14
**43-page** 133:13
**44** 190:5
**45** 192:22 225:6
  252:4 304:1
  314:16
**46** 282:21
**47** 259:23
**476** 4:6
**4797857** 323:1
**49** 312:15,20
**4th** 201:5 202:1

**5**

**5** 3:4,17 30:5
  146:25 172:17
  175:12 182:15
  182:17 183:3
  192:2,3
**50** 27:6,21
  174:25 261:20
  275:23
**520** 2:5
**553-2100** 2:10
**5582** 3:17
**56** 206:22,23

**6**

**6** 3:18 30:14
  81:13 191:6,9
  191:17
**6-9-20** 3:18
**6.2** 316:17
**6.3** 317:13
**60** 252:11 296:1
  312:19 313:4
**600** 49:2
**620-3975** 2:5
**65** 164:21
**650** 49:2 76:13
  76:25
**678** 2:10
**68** 278:24
**698** 2:4
**6th** 69:21,24
  214:6

**7**

**7** 3:21 199:10,23

200:9
**7-16-21** 3:15
**70** 164:21
  230:20,23
**7092** 3:23
**71** 315:20 316:9
**713** 2:14
**770** 322:22
**77002** 2:13
**79** 3:9

**8**

**8** 3:23 129:10
  202:24 203:4,7
  234:2,5 289:25
  290:6 291:16
  291:19,22
  292:2
**8-25-21** 3:9
**8-8-20** 4:3
**8.3** 247:23
**8.3.5** 282:8,12
  282:16
**800** 29:6,9
**81** 266:18,25
**813** 6:7
**8143** 4:8
**8144** 4:9
**8154** 4:9
**84** 3:11
**85705** 2:4
**89** 3:13

**9**

**9** 4:3 207:21
  208:13,16,18
  254:1 288:23
**9-11-28** 325:10
**9-11-30(e)** 323:7
**9.2** 293:24
**9:40** 301:8,9,15
**9:50** 1:16
**9:51** 5:2
**90** 192:22 193:1
  193:18 196:15
  230:9 233:16
**91** 3:15
**99** 254:20
**9th** 85:6



Deposition of:

**William Singhose, Ph.D., Vol. II**

*September 27, 2021*

In the Matter of:

**In Re: Fisher-Price/Mattel**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 326

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ARIZONA
2

3

4   KATHLEEN COURKAMP, for herself    )
    and on behalf of other statutory  ) Case No.
5   beneficiaries,                     )2:19-cv-02689-GMS
                                       )
6            Plaintiff,                )
                                       )
7   vs.                                )
                                       )
8   FISHER-PRICE, INC., a foreign      )
    corporation; MATTEL, INC., a       )
9   foreign corporation,               )
                                       )
10           Defendants.               )
                                       )
11  - - - - - - - - - - - - - - - - - )
12                      VOLUME II
13           CONTINUED VIDEOTAPE DEPOSITION OF
14                 WILLIAM SINGHOSE, Ph.D.
15
16         Monday, September 27, 2021, 1:32 p.m.
17
18
19
20                 HELD AT:
21                 Greenberg Traurig, LLP
                   3333 Piedmont Road, N.E., Suite 2500
22                 Atlanta, Georgia  30305
23        ---------------------------------------------
24
             WANDA L. ROBINSON, CRR, CCR, No. B-1973
25        Certified Shorthand Reporter/Notary Public

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 327

1       APPEARANCES OF COUNSEL VIA ZOOM
2
3  Appearing on Behalf of the Plaintiff:
4
5       JOHN E. OSBORNE, ESQUIRE
        Goldberg & Osborne LLP
        698 East Wetmore Road, Suite 200
6       Tucson, Arizona 85705
        T: 520.620.3975
7       E-mail: josborne@goldbergandosborne.com
8
9
10 Appearing on Behalf of the Defendants:
11
        MARY-OLGA LOVETT, ESQUIRE
12      Greenberg Traurig LLP
        1000 Louisiana Street, Suite 1700
13      Houston, Texas 77002
        T: 713.374.3541 F: 713.754.7541
14      E-mail: lovettm@gtlaw.com
15           - and -
16      ROBERT BRADY HERMAN, ESQUIRE
        BRANDON D. COX, ESQUIRE (In Person)
17      Greenberg Traurig LLP
        Terminus 200
18      3333 Piedmont Road, N.E., Suite 2500
        Atlanta, Georgia 30305
19      T: 678.553.2100  F: 678.553.2212
        E-mail: hermanb@gtlaw.com
20           coxb@gtlaw.com
21
22
23 ALSO PRESENT:
24      JESS WIGGINS, Videographer
25      BEN JONES, Videographer

Page 328

1           INDEX OF EXAMINATIONS
2
3  WILLIAM SINGHOSE, Ph.D.
4  By Ms. Lovett                    Page 329
5
6           INDEX OF EXHIBITS
7  DEFENDANTS'
8  Exhibit 17 Seventeenth Supplement To        337
        Plaintiff's Mandatory Initial Discovery
9       Responses And Plaintiff's Initial
        Disclosure Statement
10
11
12
13      INDEX OF EXHIBITS (Previously Marked)
14 DEFENDANTS'
15 Exhibit 3  Report of William Singhose, Ph.D.   344
        April 2, 2021
16
   Exhibit 4  Rebuttal Report of William Singhose  363
17      Ph.D., July 16, 2021
18
19
20
21
22
23
24
25

Page 329

1       THE VIDEOGRAPHER:  Today's date is
2  September 27, 2021, and we are on the record at
3  1:32 p.m.
4       This will be the videotape deposition of
5  Dr. William Singhose, Volume II.
6       Would counsel present please identify
7  themselves for the record.
8       MR. OSBORNE:  This is John Osborne on
9  behalf of Katie Courkamp and Andrew Olson.
10      MS. MARY-OLGA LOVETT:  Mary-Olga Lovett
11 and Brady Herman, along with Brandon Cox in
12 Atlanta, on behalf of Fisher-Price and Mattel.
13      THE VIDEOGRAPHER:  Thank you.
14      Would the court reporter please swear in
15 the witness.
16      I'm sorry, the witness is already under
17 oath.
18 EXAMINATION
19 BY MS. LOVETT:
20      Q   Dr. Singhose, you understand that this is
21 a continuation of your deposition, which we began
22 about 10 days ago, and that you are still under
23 oath?
24      A   Yes, I do.
25      Q   We do not need to swear you in again.  You

Page 330

1  acknowledge the oath and you are ready to go,
2  testifying truthfully, correct?
3      A   Yes.
4      Q   So as we've done throughout your
5  deposition, and as is appropriate, I refer to you as
6  Dr. Singhose, because you certainly have a Ph.D.
7      To be clear for the jury, you are not a
8  medical doctor, correct?
9      A   That is correct.
10     Q   You are not a pediatrician, right?
11     A   No.
12     Q   Not a neonatologist?
13     A   No.
14     Q   Not a pulmonologist?
15     A   No.
16     Q   Not a forensic atomic or clinical
17 pathologist, correct?
18     A   No.
19     Q   And you are not board-certified or
20 licensed to practice medicine in any capacity, are
21 you?
22     A   No.
23     Q   And you are not going to offer any opinion
24 regarding the cause of Zoey Olson's death, correct?
25     A   Well, I mean the cause of her death is

2 (Pages 327 - 330)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 331

1 turning into the prone position in the Rock 'n Play
2 sleeper that she was sleeping in.
3    Q    Okay.  So let me back up here.
4         You understand that there is medical cause
5 of death which is determined and has been determined
6 in this case by one medical examiner and then there
7 are experts on both sides.  You are aware of that,
8 right?
9    A    Yes.
10    Q    And you are not going to be testifying as
11 to the actual medical cause of Zoey's death,
12 correct?
13    A    I see what you're saying.  No, I'm not
14 going to be doing that.
15    Q    Thank you.
16         And anything regarding the cause of Zoey's
17 death in the medical sense, you would defer to a
18 board-certified medical expert in the appropriate
19 fields, correct?
20    A    Yes, I think so.
21    Q    So you can not offer an opinion to a
22 reasonable degree of medical certainty that Zoey's
23 death was proximately caused by the Rock 'n Play
24 sleeper, correct?
25    A    No, I don't think that's my role in this

Page 332

1 matter.
2    Q    All right.  Thank you.
3         During the first part of your deposition
4 back on September 14th -- just for the record, it is
5 now September -- I knew I was going to mess this up.
6 What day is it?  September 27th.
7         So 13 days ago, when you testified, you
8 represented to the jury that you are an expert in
9 sudden infant death syndrome, which as we call SIDS,
10 or sudden unexplained infant death syndrome, SUID.
11         Do you recall that testimony?
12    A    Yes, I think I clarified that --
13    MR. OSBORNE:  Object to form.
14    A    -- I clarified that, that I'm an expert in
15 terms of SIDS and the relationship to baby sleeping
16 products because I studied that a great deal.  That
17 was my testimony.
18    Q    I recall your testimony and we have it in
19 the record.
20         You are aware that you were disclosed as
21 an expert witness in this case and information about
22 you was provided to us, true?
23    A    Yes, I do understand that.
24    Q    And you've certainly been disclosed as an
25 expert witness in other cases, and we have your,

Page 333

1 your curriculum vitae, and also your list of cases,
2 correct?
3    A    I mean I don't know what you have.  I
4 submitted all that information.  I'm assuming you
5 had it.
6    MS. LOVETT:  I think we've got some --
7         there we go.
8         Thank you, John.
9 BY MS. MARY-OLGA LOVETT:
10    Q    So, Dr. Singhose, so it's clear for the
11 record, because we had some outside noise, I'll
12 represent to you that whatever -- I'm assuming that
13 whatever you provided to plaintiff's counsel we have
14 been provided with, but you have provided them with
15 a list of your prior testimony, correct?
16    A    Yes.
17    Q    And you have been an expert witness in
18 many other cases, true?
19    A    I'm not sure many.  I think I've been
20 doing this for 20 years and I've probably testified
21 30 times.  So if one and a half times a year is
22 many, then I'll go along with that.
23    Q    I mean many for them.  But 30 -- you've
24 been an expert at least 30 times.
25         You don't dispute that the disclosure of

Page 334

1 an expert witness sets the parameters of his or her
2 expertise, right?
3    A    I think that's -- again, you're asking me
4 a legal question, but my understanding is that I
5 disclosed the information that seems relevant.  If
6 you then ask me questions and elicit from me
7 additional experience, then I think that might
8 expand the envelope.
9    Q    Well, so I'll -- I'll represent for you
10 that under the Federal Rules of Civil Procedure, and
11 certainly in federal court, the report sort of sets
12 the scope.  For example -- I'll give you an example.
13         When we did your deposition on the 14th,
14 you testified that you have warnings expertise but
15 that you were not taking on that role in this case
16 because I think what you said was you didn't have
17 the bandwidth for -- you're very busy, you got a lot
18 going on.  So you were not taking on the role of the
19 labeling expert or the humans factors warning
20 expert, right?
21    A    That's correct.  I don't -- I'm not sure
22 what I said.  I think that they already had a
23 warnings expert chosen to pursue that part of it.  I
24 have of course looked at the warnings and responded
25 to certain aspects of the warnings when it

3 (Pages 331 - 334)

William Singhose, Ph.D., Vol. II    September 27, 2021
In Re: Fisher-Price/Mattel

Page 335

1 overlapped with my analysis of the overall product
2 design.
3    Q   Yeah.  I think I put the warning label in
4 front of you and we had a colloquy about that,
5 right?
6    A   Yes.
7    Q   But clearly this was not -- you know, when
8 we look at your big report and your supplemental
9 report, clearly your, your role in this case was not
10 to take on that already, already addressed by other
11 experts on behalf of the plaintiffs, correct?
12    A   Yes, that's right.  I didn't take on the
13 role of being the co-warnings expert, although some
14 of your experts folded in warnings into their
15 analysis of the product design.  And to that extent,
16 I need to respond to that.
17    Q   I understand your position on that,
18 Doctor.  I'm going to give you an example.
19       For example, you guys have a medical
20 pathology expert, Dr. Christensen.  I deposed him on
21 the 13th, I believe, right before you, out in Salt
22 Lake City, and he gave us his credentials.  He is a
23 very scholarly man and he's got a lot of experience
24 but the one thing he is not is a biomechanical
25 expert, such as yourself.

Page 336

1       So you would expect him to stay in his
2 lane and not testify about your area, right?
3    A   Yeah, I think that's appropriate behavior,
4 but those lines are not always distinct.  There's
5 crossover in terms of this material.
6       So I'm not going to limit him to not being
7 able to, for example, match up the warnings that
8 he's reading to the physical design of the device.
9 I think he should be allowed to do that.
10    Q   Well, sure.  I'm going to tell you that in
11 his deposition he did not purport to have any
12 biomechanical expertise or anything to say about the
13 warnings.  He had limited himself to the review of
14 the medical examiner's report and associated
15 investigative reports, and so he left it -- he left
16 it that, that way.
17       You don't have any quibble with the fact
18 that he is confining his testimony to that relevant
19 to a medical pathologist, right?
20    A   Sure.  I don't think I have any grounds to
21 quibble with what he's saying.
22    Q   Yeah.  Well, I think -- look, and I'm
23 saying this for the benefit of the jury and for you.
24       When, when we see people who have
25 expertise outside that of a layperson, it might

Page 337

1 be -- you know, I think, no offense to all of the
2 great experts in this case, but I think the jury may
3 be seeing people sort of interchangeably.  So that's
4 why I've spent as much time as I have with you, both
5 on the 14th and today, defining the parameters of
6 what your assignment was in this case.
7       So let's talk about -- Exhibit 17 is going
8 to be -- this is a long title, Doctor -- the
9 "Seventeenth Supplement to Plaintiff's Mandatory
10 Initial Discovery Responses and Plaintiff's Initial
11 Disclosure Statement," and then there's a
12 parenthetical "(Rebuttal Expert Reports.)"
13       (Whereupon, Defendants' Exhibit-17 was
14       marked for identification.)
15       MS. LOVETT:  I'm going to ask Mr. Herman,
16       who is here with me, to put that up on the
17       screen.  You should have a hard copy in front
18       of you.
19       It's been shared in Exhibit Share, John,
20       if you want to access that.  Your own MIDR.
21 BY MS. LOVETT:
22    Q   It's a big one, so if you'll go to Page
23 60, Dr. Singhose.
24       Have you seen this disclosure statement
25 before?

Page 338

1       It's okay if you haven't.  This is a lot
2 of lawyer work, so you may not have seen this exact
3 document.
4    A   Yeah, I don't remember seeing this exact
5 document, but I mean I -- they're quoting some
6 material from me that I sent them about what my
7 areas of expertise, being product design,
8 biomechanics, juvenile products.
9       That's a -- those are quotes probably
10 coming from me, but this particular write-up of it
11 I'm not sure that I've seen before.
12    Q   Right.  You'll admit that nowhere in this
13 disclosure does it mention that you were an expert
14 in SIDS or SUID, right?
15    A   Well, it's saying that I'm an expert in
16 juvenile products, and to be an expert in juvenile
17 products you should have some expertise in SIDS.
18       So I think while that may not be stated
19 there, to the extent I'm an expert in juvenile
20 products, I'm an expert in the role of SIDS
21 interplayed with juvenile products.
22    Q   We did establish during your prior
23 deposition, the first part of your deposition, that
24 you had not designed any sleepers, right?
25    A   I mean, sure, I haven't designed them from

4 (Pages 335 - 338)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 339

1 the ground up. I've been involved in evaluating
2 them and using that data, feeding back into the
3 process of designing these. So since I was part of
4 a design team, feeding information back in there,
5 but it's never been my full-time job.
6      Q    Right. Part of your full-time job or at
7 least part of your focus both on the pat side and
8 also in your collaborative and project side, grant
9 side, has been working on mobility issues for
10 children, right?
11         For example, children who are disabled and
12 need wheelchairs or other assistance, specialty --
13 special to children with those sorts of needs,
14 right?
15     A    You kind of cut out there, but, yes, I've
16 been involved in, for example, the seating systems
17 that hold children in mobile products.
18     Q    Right. Exactly. And I recall that
19 testimony well. I looked over your deposition --
20 just so you know, I did re-read Part I of your
21 deposition so that we didn't cover any new ground
22 today.
23         You've never been disclosed as a SIDS or
24 SUID expert in a litigated matter before, correct?
25     A    I don't think that they've used that

Page 340

1 terminology before in disclosing me as an expert.
2 They may have said before that I'm a juvenile
3 products expert, which of course would include some
4 expertise on SIDS.
5      Q    And I understand that's your testimony.
6 So, to your knowledge, you have not offered sworn
7 testimony on the topic of SIDS or SUID in any prior
8 expert engagement, correct?
9      A    Honestly, I couldn't recall that because
10 I've testified a fair amount about children's
11 sleeping products. And whether there are questions
12 involving SIDS and how those relate to the
13 children's sleeping products, I can't remember all
14 those questions off the top of my head.
15     Q    Sure. Well, I mean since you -- I think
16 it follows, since you say you don't recall being
17 disclosed in exactly that way, I think you certainly
18 don't recall any specific testimony, true?
19         Not a case you could point to and say to
20 the jury, hey, in the Smith case I testified about
21 SIDS or SUID?
22     A    I do not recall specific testimony about
23 that. My testimonies have been about sleeping
24 products, cribs, play pens, and rockers, and things
25 like that, but I don't remember specific questions

Page 341

1 about SIDS as I sit here right now.
2      Q    Can you tell me the name of the plaintiff
3 in the last case you testified in where there was a
4 rocker or sleeper involved?
5      A    The plaintiff?
6      Q    Yes. That would be the person you're
7 representing. Anyone. Pick a name.
8      A    Oh, I'm not sure I represented the
9 plaintiffs. I might have represented defendants.
10     Q    Can you pick the name of a defendant you
11 represented as an expert in a sleeper or rocker
12 case?
13     A    Yes.
14     Q    Who is that?
15     A    Kids2.
16     Q    Where is that case pending?
17     A    I'm not sure that it's pending. I think
18 that -- I worked on a number of cases and projects
19 for Kids2, and my understanding is they're all
20 resolved at this point.
21     Q    Yeah. You told us that you did some
22 consulting work for them that was -- not even in the
23 litigation capacity, but can you give us any --
24 because I'd like to find the cases where you've
25 given -- where you've been an expert before, either

Page 342

1 plaintiff or defense, and while we have a list, I'm
2 not sure Kids2 hit my radar. That may be on me.
3         So how long ago were these cases?
4 Ballpark it.
5      A    Probably starting maybe 8 to 10 years ago,
6 and I think the last case I was involved with, or
7 the last project I was involved with with Kids2 was
8 maybe three, three years ago. So Probably 10 years
9 ago to three years ago, in that time frame.
10     Q    And do you remember where that case three
11 years ago for Kids2 was located?
12     A    The one -- the one three years ago that
13 settled most recently, I'm not sure where it was
14 located. It might have been located here in Atlanta
15 because I remember giving a deposition about it here
16 in Atlanta.
17     Q    But you don't know -- so this case --
18 you're giving a deposition here in Atlanta and this
19 case is in Nevada.
20     A    Yes.
21     Q    So any idea -- I'm sorry. Sorry. It's
22 not Nevada. Arizona.
23         MS. LOVETT: So sorry, John. It's kind of
24     funny. I didn't mean to say. I'm just so
25     proud that I --

5 (Pages 339 - 342)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 343

1     MR. OSBORNE:  Ourselves in Southern
2  Arizona to be a wholly part of the Maricopa
3  County stuff.
4     MS. LOVETT:  My husband is there on
5  business this week and owns a company there.
6  He's out there all the time.  I'm just proud
7  that I can say Nevada correctly.  Pardon my
8  bias on that.
9  BY MS. LOVETT:
10     Q    Dr. Singhose, let me clean the record up.
11         So this case is based in Arizona, and
12  you're still an expert -- even though you're deposed
13  in Atlanta, this case for Kids2 that was three years
14  ago, do you have a recollection, other than where
15  you were sitting when were you disposed, about
16  whether or not or where that deposition for Kids2
17  three years ago, where you testified about a sleeper
18  or rocker, was located in terms of the jurisdiction
19  of the proceeding?
20     A    You know, jurisdictions of proceedings
21  aren't usually that important to me, but because
22  that was Kids2 and Graco, I think Kids2 was the
23  defendant, and Graco is based in Atlanta, my guess
24  would be that would be based in the Northern
25  District of Georgia.

Page 344

1     Q    Wow.  Well, that's a specific yes, and we
2  will check that out.
3         So as you know, some of the questions I'm
4  asking are questions of elimination that may sound
5  odd to you, but for our purposes we need to make
6  some specific, some specific questions to sort of
7  delineate.  So if these sound like silly questions,
8  please forgive me, they are proforma at this point.
9         You say in your report -- and let's go
10  ahead.  Your report was previously entered as
11  Exhibit 3, I believe.  This is your original report.
12         (Whereupon, Defendants' Exhibit-3 was
13         previously marked for identification.)
14  BY MS. LOVETT:
15     Q    So before we kind of dive into the report
16  again, you have a section entitled, "Legal
17  Understanding" in your report.
18         Do you have a copy in front of you of your
19  report?
20     A    I don't have a copy of it.
21     Q    Okay.  I'm going to, I'm going to -- I know
22  you're very familiar with your report and we know
23  it's voluminous.  We're going to pull it up for you
24  so you can see that page.
25         MS. LOVETT:  And, John, so you can see it.

Page 345

1     Q    I'm not going to get into the meat of this
2  in terms of --
3         MR. OSBORNE:  All right.
4     Q    -- your whole report.
5         You've got a section called "Legal
6  Understanding," and I know that we've covered before
7  that you never practiced law, which would explain
8  your youthful appearance.
9         There you go.  You got it.
10     A    The youthful appearance is because of the
11  low resolution of the camera.
12     Q    I need some of that because I would enjoy
13  that.
14         But you -- obviously you're -- you were
15  not a lawyer and do not practice law, correct?
16     A    That is correct.
17     Q    You are not offering legal opinions,
18  correct?
19     A    No.  I mean I offer opinions that I think
20  try to meet legal standards, but I'm not --
21     Q    Right.
22     A    -- not offering legal opinions as I think
23  that you're conveying the meaning.
24     Q    Yeah.  I mean so -- really, in terms of
25  instructing the jury and interpreting the law, I'll

Page 346

1  tell you that that's a job for our judge, the
2  Honorable Judge Snow.  And so you're not going to be
3  telling the jury how to interpret the law, correct?
4     A    I don't think so.  I mean I'll be -- if I
5  ask the right question, I will say this is my
6  understanding of the law, and then this is how my
7  analysis feeds into that understanding.
8     Q    Right.  I, I -- I can assure you there
9  will probably be an objection that stops you before
10  you get to that, but as long as we understand one
11  another.
12         You are not offering any opinions as to
13  the standard of care applicable to manufacturers,
14  are you?
15     A    Well, to prove that I'm not a lawyer, I'm
16  not exactly sure what you mean by that.
17     Q    Good.  So you wouldn't answer any
18  questions about something you don't understand,
19  right?
20     A    No.  I would ask for an explanation of
21  what that term meant before I tried to understand --
22  before I tried to answer it.
23     Q    I want to look at your report, in
24  Paragraph 25.  This sounds very legalese-ish to me.
25         You say: "Before a defendant can be found

6 (Pages 343 - 346)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 347

1 at fault on a claim, it must be established the
2 defendant manufactured or sold a product that was
3 defective and unreasonably dangerous at the time it
4 left the defendant's control, and that the defect
5 was a cause of the injury."
6        Do you see that?
7    A   Yes, I do.
8    Q   And I'll represent for you, Doctor, that
9 is completely a legal standard.  So where or how did
10 you learn this information that went into your
11 report?
12   A   I probably learned that concept in about
13 2003, when I first started working on product
14 liability.  The lawyer sent me the sort of, as I
15 recall, the Georgia statutes that cover product
16 liability, and I reviewed that and it probably
17 didn't have this exact same line but it had
18 something similar to that.  And then in each of the
19 cases I worked on, I normally get provided the state
20 statutes that describe product liability.  So I
21 reviewed those in a number of states.
22       And then there's something called, and my
23 understanding, it's sort of a unified code, which is
24 nominally applicable across the United States.  I've
25 also read that before.

Page 348

1        So that sentence there probably comes out
2 of my, I guess, 18-year study of these kind of
3 cases.
4    Q   Yes, understood.  You've got it -- you got
5 the standard from a statute.  You don't interpret
6 statutes in your day-to-day work, correct?
7    A   Again, I'm not sure what you mean by
8 interpret.  I have to understand them so that I can
9 then use them in my technical analysis.
10   Q   Interpret means apply legal training or
11 principles to -- this is my definition but it is the
12 definition -- apply legal training or principles to,
13 to interpret or give effect to statutory language or
14 other legal rights.
15       MR. OSBORNE:  Form.
16 BY MS. LOVETT:
17   Q   -- in your work day to day.
18       MR. OSBORNE:  Form.
19   Q   You may answer.
20   A   That was a long question and there was an
21 interruption.  So it wasn't clear to me what your
22 question is.
23   Q   He gets to interrupt.  Mr. Osborne gets to
24 interrupt and he'll probably interrupt again, but
25 I'll trial to make it more simple.

Page 349

1        In your day-to-day work, you do not look
2 at statutory language and apply legal principle
3 concepts to them, correct?
4        MR. OSBORNE:  Form.
5    A   Again, I'm not sure what it means to apply
6 legal concepts.  I look at these legal definitions a
7 lot, and then I try to do technical work that meets
8 those legal standards.  So I am interpreting them.
9 I guess I'm just not interpreting them using a law
10 degree.
11   Q   There you go.
12   A   If that's what -- if that's what you're
13 getting at.
14   Q   Or any other legal training, correct?
15   A   I'm not sure what any other legal training
16 is.  I mean as far as I'm concerned, reading
17 statutes is a kind of legal training, but if that
18 doesn't raise, to your bar, I'm perfectly willing to
19 admit that.
20   Q   Right.  Thank you.
21       So your, your -- based on your reading of
22 this, and you have it in your report, you agree that
23 any alleged defect in the product must also be shown
24 to cause the alleged injury, correct?
25   A   Yeah, that's my understanding.  I mean

Page 350

1 cause, there's often a percentage.  So I think maybe
2 I could have been clearer if I had written that
3 something like is a contributory cause of the
4 injury.
5    Q   So now we're getting into all kinds of
6 legal definitions, like contributory cause,
7 contributing cause, proximate cause, alternative
8 cause, superseding cause.
9        These are all legal concepts with which
10 you're unfamiliar, true?
11   A   Well, those may be legal concepts but
12 they're also technical concepts.  I mean we analyze
13 products all the time and figure out what percentage
14 of a phenomenon occurs from which component.
15       So they may be legal concepts but they are
16 related concepts that appear in technical analysis
17 all the time.
18   Q   I understand.  But I'm talking about from
19 a legal standard by which the jury is going -- at
20 the end of this trial, the jury is going to be asked
21 questions that the lawyers have carefully crafted
22 and that the court has taken a look at and the court
23 has interpreted and decided to issue based on legal
24 precedent.
25       So your testimony certainly is not that

7 (Pages 347 - 350)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 351

1  you are familiar with the concept of legal causation
2  in the way that the lawyers and the court are, true?
3        MR. OSBORNE: Form.
4     Q   You may answer.
5     A   No, I don't think I'm familiar with it in
6  the way that the lawyers and court are. I'm
7  familiar with it in the way that I use it in my
8  work.
9     Q   All right. So I'm going back to your
10  report, because you say in the report, it has to be
11  "established that the defendant manufactured and
12  sold a product that was defective and unreasonably
13  dangerous at the time it left the defendant's
14  control." There's one.
15        "That the defect was a cause of the" --
16  "and the defect was a cause of the injury."
17        You say that. What do you mean by that?
18     A   The second part of that sentence?
19     Q   Yeah. "That the defect was a cause." And
20  I'm focused on the word "cause" of the injury.
21  Right?
22     A   Yes. What I mean by that is that you --
23  when I analyze this product, I can see that it's got
24  properties that would be a cause of this injury.
25  For example, the fabric within the Rock 'n Play

Page 352

1  sleeper is not breathable. So when the infant gets
2  turned over in there and is trying to breathe, their
3  breathing is restricted by that material.
4        That's a cause of the injury.
5     Q   Okay. So that's -- that is -- that is
6  what you mean in your report. Your understanding of
7  the alleged industry -- injury in this case is
8  Zoey's death?
9     A   Yes.
10     Q   And you already told us that you're not
11  qualified to and will not provide any opinions
12  regarding Zoey's medical conditions or cause of
13  death, correct?
14     A   That's right, I'm not going to offer
15  medical opinions.
16     Q   And you haven't reviewed all of Zoey's
17  medical records? Or have you reviewed any of Zoey's
18  medical records?
19     A   To the best of knowledge, I reviewed all
20  of her medical records, but there may be stuff that
21  wasn't turned over to me.
22     Q   Okay. And the people that have been
23  turning over things to you have been Mr. Osborne,
24  Mr. Bacon, Ms. Shriner, plaintiff's lawyers, right?
25     A   There's also a couple other people that

Page 353

1  work at that firm that have sent me information.
2     Q   But in terms of controlling the
3  information you get, not turning things over to you
4  or turning things over to you, that's coming from
5  the plaintiff's lawyers, correct?
6     A   Yeah, that's my understanding. I haven't
7  received any information directly from you or
8  Fisher-Price, for example.
9     Q   Okay, yeah.
10        So in the time since we last met, just
11  given scheduling issues, the plaintiff's
12  biomechanical expert, Dr. Rundell, was deposed.
13        Have you had a chance to review his
14  deposition transcript?
15     A   I did review what seems like a very rough
16  transcript of that.
17     Q   Right. So -- and through the miracles of
18  modern court reporting, as Ms. Robinson can probably
19  tell you, we are able to get rough transcripts out,
20  but sometimes they are phonetic because of the hard
21  work these folks do and they do polish it up and
22  make it very pretty.
23        So you had a rough draft. Did you, from
24  that opinion, did you learn anything that impacts --
25  from his deposition did you learn anything that

Page 354

1  impacts your own opinions in this case?
2        MR. OSBORNE: Form, but go ahead.
3     A   I don't think so. I'm trying to think
4  back whether there was any new information provided
5  there. It seems like it was, you know, essentially
6  verbalizing Dr. Rundell's previous opinions and
7  analysis. I'm not sure that he brought forth
8  anything new in that.
9     Q   Mr. Osborne was -- was cross-examining
10  him, so it would be Mr. Osborne's job, or whoever
11  deposed him on the plaintiff's side, to elicit
12  opinions, right?
13        MR. OSBORNE: Form.
14     A   Again, I think that you're asking for a
15  legal about eliciting opinions. The transcript that
16  I saw, it was very unusual to me because it seemed
17  like Fisher-Price's lawyer was asking just a large
18  amount of questions and I hadn't seen that before.
19  So in that sense it seems like he was trying to
20  elicit --
21     Q   Yeah.
22     A   -- you know, statements into the record.
23     Q   It's true. We do -- this is called
24  redirect and we do it just like we do in trial, but
25  sometimes when opposing counsel either treetops it

8 (Pages 351 - 354)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 355

1  -- and I'm not making -- I wasn't there, so I have
2  no idea how many questions Mr. Osborne asked, but
3  when opposing counsel asks questions that are pretty
4  broad, sometimes we go in to get other opinions
5  because, as you know -- well, you may not know --
6  there's motion practice before the court that we
7  have to do and it's important for us to get to get
8  the court some information that wouldn't necessarily
9  be, you know, germane to a jury inquiry.
10      Let's talk about some of the concepts
11 there.  We talked about this before the deposition,
12 but you agree that infants are capable of rolling
13 over on both inclined surfaces as well as flat
14 surfaces, true?
15     A   Some infants, yes.  Some are not.  But
16 infants --
17     Q   Right.
18     A   -- yeah, there are infants out there that
19 roll.  They roll a lot, some of them.
20     Q   Yeah.  Either on flat surfaces or on
21 inclined surfaces?
22     A   That's correct.
23     Q   -- baby, right?
24     A   That's correct.
25     Q   And in fact -- you know, we talked about

Page 356

1  how infants develop at different rates, and I think
2  you've seen that in your own family between -- is it
3  Oliver and Matthew?
4      A   Oliver and Nicholas.
5      Q   Oliver and Nicholas.  I'm so sorry.
6          Oliver and Nicholas, who are adorable.
7  But I think you told us that like, you know, even
8  they have been --
9          MS. LOVETT:  John, can you mute the ringer
10 on your phone.  Thank you.
11         Let me ask the question again.
12 BY MS. LOVETT:
13     Q   So you've seen within your own family that
14 infants develop at different rates, right?
15     A   Yes.
16     Q   You got two brothers with all the same DNA
17 and they're developing differently, right?
18     A   Well, I'm a scientist.  So I will say it's
19 not the same DNA.
20     Q   Oh, I'm sorry.
21     A   It came from the same sources but it's a
22 random mixture.
23     Q   Well, you know what, you're right.  I'm
24 saying -- I'm making a point for the jury because
25 what makes a family is not DNA, but from your

Page 357

1  testimony I'm assuming that they have the same two
2  parents.  That would be you and your wife?
3      A   That's correct.
4      Q   And so even brothers might exhibit
5  different development -- different developmental
6  milestones at different times, correct?
7      A   Yes.
8      Q   So you could have an infant who could roll
9  from supine to prone when he or she is three months
10 old and another infant might not be able to roll
11 supine to prone until he or she is six months old,
12 right?
13     A   That's correct.
14     Q   You agree that certain infants prefer the
15 prone position?
16     A   Yeah, I mean I -- you can't ask them
17 whether they prefer it, but you see what position
18 they gravitate towards.  So they're expressing a
19 preference in that way.
20     Q   Sure.  And so has the -- do you agree
21 that -- and this is a more general question.  I'm
22 not restricting it to this case -- that it's
23 difficult to -- if you don't know what the injury
24 is, if the injury hasn't been determined, it's
25 difficult to attribute a biomechanical mechanism to

Page 358

1  that injury?
2      A   Yeah, I think that would be pretty
3  difficult if you have no idea what the injury is.
4  That's kind of a starting point.
5      Q   So I tried to do my homework in deposing
6  you.  Obviously, I'm not a biomechanical engineer.
7  But I've tried to look at some of the steps that a
8  biomechanical engineer takes in formulating his or
9  her opinion, and understanding that you may have
10 taken many more steps than these, I want to walk
11 through a couple of steps because in so many cases
12 where you're acting as an expert in this capacity,
13 in the legal capacity, you're sort of working
14 backward from the injury to see what caused it.
15         Can we agree on that understanding?
16     A   That's part of my job here, yes.  I mean
17 the whole other part is, you know, analyzing design
18 process and the final process.  So that's kind of
19 divorced from the exact causation in this case, but
20 as far as the causation part, I think that's a good
21 characterization.
22     Q   Good.  Okay.
23         So, so in that case you want to
24 characterize the injury first, right?
25     A   Yes.  I think in this case, of course, we,

9 (Pages 355 - 358)

William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

Page 359

1 we have testimony and understanding of where she
2 ended up at the end of her life, and so in that
3 sense we can start an analysis from there. How did
4 she get into that position? We can do that without,
5 you know, having to say exactly how she died.
6     Q   Well, I mean I think -- and that's kind of
7 the question. So you think that you can give your
8 opinion without knowing exactly how Zoey died, fair
9 statement?
10    A   Yeah. I mean as we talked about before,
11 I'm not a medical doctor, but I know how she ended
12 up, like what position she was in and the fact that
13 there was this fluid flow, the stain.
14        I don't need to know exactly how she died
15 in terms of how long it took her to suffocate or
16 what other internal injuries she may have suffered,
17 brain injuries from lack of oxygen.
18        I don't need all of that to do my
19 analysis. I can start from the fact that she was
20 found in a position that all call prone or mostly
21 prone. That's where I can start my investigation
22 and work back from that.
23    Q   All right. And you've testified that you
24 rely on -- you know, you just circle back to what I
25 asked you earlier -- you rely on the medical experts

Page 360

1 to determine the actual cause or the actual injury
2 itself, right? The medical cause?
3        MR. OSBORNE: Object to form.
4     A   Yeah, in terms of the biological cause of
5 that, I didn't delve into that. I'm starting from
6 the physical cause of where she was found.
7     Q   Okay. So let's talk about -- and I'm
8 talking about basically -- I want to go back to the
9 steps that you take.
10        So the first -- one of the first things
11 you do is determine the biomedical environment, that
12 in which the injury took place, right?
13    A   I'm not sure what biomedical environment
14 means.
15    Q   Yeah. So what I mean is the environment
16 in which -- sorry. Biomechanical environment, I
17 should have said.
18    A   Okay.
19    Q   The biomedical -- biomechanical
20 environment is you assess where the baby was and
21 where Zoey was and what her surroundings were,
22 right?
23    A   That's correct. I needed to know her body
24 position, roughly, relative to the Rock 'n Play
25 sleeper, but also the physical evidence of the Rock

Page 361

1 'n Play sleeper itself. You can't do a
2 biomechanical analysis without understanding the
3 environment in which the body is interacting with.
4     Q   Sure.
5     A   So you have to know sort of both of those
6 aspects to start your investigation, to start your
7 understanding.
8     Q   Right. And keeping in mind that you're
9 not offering any opinion about the medical injury
10 for the condition sustained by Zoey, in your
11 original report you did list a cause of death for
12 Zoey Olson upon which you base your biomechanical
13 analysis, right?
14    A   Yeah, I'm not sure exactly what you're
15 referring to, but I think I made it clear that I'm
16 starting with the knowledge that she was turned
17 prone and her face was in this fabric or right up
18 close to this fabric. I'm starting with that is the
19 cause.
20        Downstream from that, biologically,
21 exactly how she died, I'm not going to testify about
22 that.
23    Q   Okay. So did you read the expert reports
24 of your co-experts on the plaintiff's side, Dr. Eric
25 Christensen, who is the pathologist, or Dr. Chris

Page 362

1 Fuller, who is our pathologist?
2     A   Yes, I did.
3     Q   Did you read the transcripts of Dr.
4 Christensen's testimony?
5     A   I don't think so.
6     Q   And --
7     A   When did that happen?
8     Q   That happened the day before you, so
9 September 13. I took his deposition in Salt Lake
10 City.
11    A   I don't think I read it. It may have been
12 sent to me and I may have just taken a quick look at
13 it but I didn't study that.
14    Q   What about Dr. Chris Fuller, who is our
15 expert pathologist, has any of that been provided to
16 you?
17    A   May be provided, but again I didn't study
18 that.
19    Q   One of the things that I came across in
20 looking at your testimony from our first session was
21 you testified that Zoey was, quote -- the position
22 Zoey was found in, quote, "is quite frankly a little
23 uncertain." Right?
24    A   Yes. We have physical evidence, you know,
25 about the stain, for example, and then there's a

10 (Pages 359 - 362)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 363

1 little bit of a discrepancy, in my opinion, there
2 about how the mother claims that she found Zoey.
3        She claims that she found her, apparently,
4 sort of the body face down prone, and then the head
5 turned significantly to the side so that it wasn't
6 directly in contact with the fabric. I think that's
7 the confusing part of the testimony.
8    Q   Exactly, that Ms. Courkamp testified that
9 Zoey's face was free of obstructions, sort of turned
10 to the side, right?
11   A   Yeah, but at the same time she has her
12 body straight down. So in my mind those two things
13 are tough to accomplish without the head being
14 turned really sort of an unnaturally large amount
15 because the side wall of the Rock 'n Play sleeper is
16 so steep that to get the head turned so far as to
17 the mouth and nose to be unobstructed at all is a
18 really -- a large turn of the head, which seems a
19 little unrealistic to me.
20       MS. LOVETT: I'm going to ask Mr. Cox, if
21 you have a copy of Exhibit 4, which is Dr.
22 Singhose's rebuttal report.
23       (Whereupon, Defendants' Exhibit-4 was
24 previously marked for identification.)
25

Page 364

1 BY MS. LOVETT:
2    Q   And, Dr. Singhose, I'd like -- the
3 question I'm asking you, and we may have to go off
4 record if it's going to require a lengthy review of
5 your supplemental report, which is Exhibit 4, what
6 cause of death are you basing your biomedical --
7       MS. LOVETT: Let me strike that so the
8 question is clear.
9    Q   What cause of death are you basing your
10 biomechanical analysis on in this case?
11       If you can show us that in your expert
12 report, if it's in your expert report. I believe --
13 I have looked at it in your surrebuttal report, but
14 I want to make sure we're not talking past one
15 another.
16   A   Well, you're using terms about my report,
17 which I don't understand, because I have a rebuttal
18 report and a regular report, the first report.
19       But the cause of death is that her face
20 was -- she was face down in this fabric and it was
21 hard for her to breathe. That's what I think is the
22 cause of death.
23       Again, I'm not testifying beyond that as
24 to the biology that occurs under those situations.
25   Q   Right, and that's a -- that is a -- that

Page 365

1 is the biomechanical -- or that's the mechanism of
2 injury that you're attributing to Zoey's death, that
3 she had her face in something where she couldn't
4 breathe, simply put?
5    A   Yeah. I mean that's a little bit
6 stronger. I'm saying she had her face in something
7 that was hard to breathe.
8    Q   It wasn't she couldn't breathe, it was she
9 had her face in some soft goods in the product that
10 made it hard to breathe? That's your -- that's the,
11 that's the mechanism of injury that you've
12 identified in your report, correct?
13   A   Yeah, that's correct. So it takes a
14 while, you know, to die under those conditions.
15 It's not like an instantaneous death or it's not
16 like she got plastic stuck in her throat, but she's
17 in an environment where her breathing is restricted.
18   Q   And in terms of mechanical defect, you
19 contend that the Rock 'n Play sleeper makes it
20 easier for an infant to roll from supine to prone,
21 correct?
22   A   Easier than what?
23   Q   Easier than a flat surface.
24   A   Yeah, easier than a flat surface in the
25 Rock 'n Play sleeper. I mean if you have the Rock

Page 366

1 'n Play sleeper, and rather than having that 30
2 degree incline, if the Rock 'n Play sleeper had a
3 flat back, that would be harder to turn over.
4       But they've raised it up 30 degrees, and
5 during that raising up process, it becomes
6 progressively easier to perform a roll.
7    Q   And your opinion is also that the Rock 'n
8 Play sleeper makes it more difficult to roll back
9 from prone to supine, correct?
10   A   Again, you're saying makes it more
11 difficult. We don't have a comparison, but I'm
12 saying it makes it difficult.
13   Q   Sure. In other words -- yeah, and I think
14 that's, I think that's sort of the point.
15       And then you also, as you testified a
16 moment ago, that the infant's head in the Rock 'n
17 Play sleeper gets trapped or engulfed in the soft
18 goods of the --
19   A   Yes.
20   Q   -- product?
21   A   Yes, that's correct.
22   Q   Okay. So your opinion that it's easier to
23 roll from supine to prone than it would be, say, on
24 a flat surface, you base that opinion on your, your
25 2D statics analysis of a rectangular structure on a

11 (Pages 363 - 366)

William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

Page 367

1 planar -- is it plainer or planar surface?
2    A    Most people say planar.
3    Q    Okay.  So the planar surface.  So you base
4 that analysis in part on your 2D statics analysis of
5 a rectangular structure on a planar surface,
6 correct?
7    A    We got broken up there quite a few times.
8 Can you repeat the question?
9    Q    Sure.  You base your opinion that it is
10 easier to roll supine to prone in a Rock 'n Play on
11 a flat surface in part on your 2D statics
12 analysis --
13    A    Again --
14    Q    -- of the rectangular structure on a
15 planar surface?
16    A    Again, you're phrasing your question in a
17 way that I think is, in my opinion, is distorting my
18 opinion.
19        I'm saying that the incline of the Rock 'n
20 Play sleeper, that single part of it, makes it
21 easier to roll over than if the Rock 'n Play had a
22 flat back surface.
23        So there's several aspects of design that
24 are problematic.  I'm just focusing in on that one
25 aspect where you take the Rock 'n Play sleeper,

Page 368

1 instead of laying it flat like you should, you
2 incline the back to 30 degrees.  That portion of it
3 makes it easier than if it was laying back flat.
4        And, yes, then my analysis is based on
5 Newton's laws of motion, and I'm showing quite
6 clearly that it's easier to roll over in that
7 configuration.
8    Q    So in addition to analyzing the data that
9 you had available to you, you -- your own data, the
10 data that you created, and I think we've seen all of
11 this in our prior deposition with your infant and
12 your friend's infants, were performed without -- in
13 part, without the proper use of cross restraint,
14 right?
15    A    Certainly I did some tests, I think like
16 almost everybody involved in this case, with infants
17 in the Rock 'n Play sleeper without the belt
18 constraint cinched down.  Yes, I did that.
19    Q    Right.  And as we've, as we've
20 established, I think the infants were -- the infants
21 used in your demonstration were placed prone or
22 partially prone at the beginning.  I think we
23 established that last time.  Not by you in one case,
24 but at least by -- whoever was there with them as a
25 caregiver.

Page 369

1    A    That's correct.
2        In tests involving my own son, I placed
3 him there.
4    Q    Right.
5    A    And the other two infants, the mother and
6 grandmother were there.
7    Q    Right.  And they were placed prone, they
8 didn't roll to prone or semi-prone?
9    A    Well, the girl in the testing, just
10 reminded me of her name, is Palmer.
11    Q    Palmer.
12    A    She was placed on her side, and through a
13 wiggling motion she then completed to turn over into
14 a prone position.
15    Q    Yes.  And then -- other than your own
16 data, do you have any other empirical evidence that
17 it is easier to roll from supine to prone in the
18 environment of the Rock 'n Play sleeper?
19    A    Again, you're -- you're basing this
20 question as.  Easier than what?
21    Q    Okay.  Easier to roll --
22        MS. LOVETT:  Let me strike the question
23    and start again.
24 BY MS. LOVETT:
25    Q    Do you have any empirical data -- I'm not

Page 370

1 talking about your own studies -- that supports your
2 conclusion that it is easier to roll from supine to
3 prone in the Rock 'n Play sleeper than in a flat
4 crib?
5    A    I don't understand the question because
6 that's not my opinion.  So I -- I'm not --
7    Q    Okay.  It is not your opinion that it is
8 easier to roll from a supine to prone position in
9 the Rock 'n Play sleeper than it is to roll from
10 supine to prone in a crib that's flat?
11    A    Yeah, that's, that's not my opinion.
12    Q    All right.
13    A    I'm not sure where you're getting that.
14    Q    Well, if that's not your opinion, that
15 fixes a lot of questions for me.  We'll be at more
16 quickly, Dr. Singhose.  So thank you.
17        Now, one of the other things we talked
18 about is that once an infant is prone in the Rock 'n
19 Play sleeper, it is more difficult to roll back to
20 supine in the Rock 'n Play sleeper than it might be
21 for that same infant to roll to a supine position
22 from prone in a crib with a flat incline.  Is that
23 your opinion?
24    A    Okay, yeah, that's my opinion, yes.
25    Q    All right.  And for that you -- for that

12 (Pages 367 - 370)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 371

1  you observed your infant and your friend's infants,
2  correct?
3      A   That is certainly a part of the basis of
4  that opinion.  Of course, that opinion also comes
5  from my analysis of the physical design of the Rock
6  'n Play sleeper in terms of its inclines and angles
7  and materials.
8          It also comes from me viewing, as you
9  know, hundreds of video clips that were produced in
10 this case.
11         So there's a large body of evidence that
12 goes into supporting that opinion.
13     Q   Yeah.  So you didn't provide any of your
14 own video evidence of that, of the concept
15 underlying your report, nor did I see you
16 specifically cite to any snippets of the video
17 report, other than the ones that we played in our
18 last deposition, for that specific concept.  Do you
19 agree on that?
20         MR. OSBORNE:  Form.
21     Q   You may answer.
22     A   Yeah, I don't recall what we covered in my
23 last deposition, but there are a lot of video clips
24 of infants struggling to try to turn once they're
25 face down.

Page 372

1          So I didn't need to redo that
2  experimentation.  That experimentation had already
3  been done.
4          Plus, I have other basis for that opinion.
5  For example, just the straight-up analysis of the
6  physical design, the double-V valley of the design,
7  and then when you put a baby in there, the fact that
8  geometric -- or biomechanically the baby's feet are
9  sticking up in the air.  That makes it very hard for
10 them to generate forces.  Also, biomechanically the
11 baby's arms can be pinned to its side by the steep
12 sidewalls.
13         So there's a whole host of evidence that I
14 provided to support that opinion.
15     Q   Yeah.  And I guess in your placement of
16 infants and your observations of your infant, and
17 your friends' infants, on Page 240 of your prior
18 deposition, Lines 3 through 5 of your prior
19 deposition -- and you may not have that.
20         I'm reading you a quote.  You said you
21 didn't -- quote:  You didn't observe them for that
22 long of a period for them to be able to do that, and
23 you were referring to them rolling from supine to
24 prone.
25         MR. OSBORNE:  Counsel -- counsel, if you

Page 373

1  want you to show him that section of his
2  deposition for context, he's entitled to it.
3          MS. LOVETT:  You can show it to him when
4  you redirect him.  I'm asking if that is
5  correct, that he did not leave them in that
6  position for any long period of time, as
7  discussed in his prior deposition.
8  BY MS. LOVETT:
9      Q   In other words, you didn't put Palmer face
10 down or your son face down and leave them to
11 struggle for any significant period of time?
12         MR. OSBORNE:  Object to form.
13         You can go ahead.
14     A   Well, I placed them in that position -- or
15 in the case of Palmer, she worked herself into that
16 position.
17         And, no, I did not let them struggle for
18 long periods of time.  I felt uncomfortable with
19 that because there's non-breathable fabrics there
20 where their face is at.
21         In the case of Palmer, the grandmother
22 also was wanting to grab her, and so I let her grab
23 her and take her out of there because it was
24 obviously not a good position for her to be in.
25     Q   And you didn't -- you did not test these

Page 374

1  infants, yours and your friend, Dr. Frakes',
2  children, you did not test them on a flat crib
3  surface, right?
4      A   Well, I've seen them on a lot of flat
5  surfaces.  In fact, I started out the -- you know, I
6  observe my own son on flat surfaces all the time,
7  but when I went to Dr. Frakes' house to test his
8  infants, the very first thing I did was watch them
9  and observe them.  They were laying on the floor, on
10 a carpeted area, and I specifically talked with him.
11 I want to observe your children to see what
12 capabilities they have.
13         I've actually seen his kids a lot.
14     Q   Now --
15     A   During, during that period of time I was
16 able to get an understanding of the physical
17 capabilities of those two children, those two
18 infants.
19     Q   Sure.  And I understand, Doctor.  I know
20 these are close friends of yours and these babies
21 have known you from the minute they drew their first
22 breath.  So I -- I'm sure you've seen a lot.
23 Obviously, from our perspective coming in, you're
24 relying on the photographs you gave us.  And so I
25 did not see any photographs of -- that's why I'm

13 (Pages 371 - 374)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 375

1  asking you. I didn't see any photographs as part of
2  your opinion of them on the floor or rolling over.
3       Those were not provided, correct?
4     A   That's correct. Actually, neither one of
5  them were able to roll over at that time, and I did
6  not photograph them laying on the carpet.
7     Q   Okay. So these are things I remember from
8  labs, because I didn't -- nowhere near -- like I
9  said, I'm a political scientist, according to my
10  B.A. and that's about it.
11       In order to perform a scientifically valid
12  test, you must also have -- you have to have a
13  control to test your theory against, right?
14     A   That really depends on the kind of test
15  that you're doing.
16     Q   Okay. And so it would have been -- you
17  can agree it would have been instructive for you to
18  include in your report -- I know you're telling us
19  now -- it would have been instructive to include in
20  your report whether or not these infants could roll
21  from prone to supine in another environment, true?
22     A   That's pretty much irrelevant to the
23  testing I was doing because I wasn't testing their
24  ability to roll. I was testing what would happen
25  when they got into various configurations.

Page 376

1       So I'm not doing a test on whether or not
2  they can roll. I'm doing a test on how their face
3  interacts with the Rock 'n Play sleeper and how
4  their body interacts with the Rock 'n Play sleeper.
5  This is -- I did not do a rollover test for this.
6     Q   So in the, in the video -- the video
7  evidence that you saw from the Exponent testing, did
8  you see any evidence that demonstrated that an
9  infant was trapped?
10       I think, quote, "trapped in the Rock 'n
11  Play sleeper after rolling from supine to prone."
12     A   Yes.
13     Q   And would that be -- and you may not
14  remember the baby number, but you actually -- you
15  referred to and we looked at a video of what I'll
16  call Infant No. 9, who you said struggled, turned
17  over, and was trying to reach out and appeared to be
18  trapped, right?
19     A   Yes, I believe that's Infant No. 9.
20       I think in -- I provided video of three
21  infants that were able to turn during the course of
22  their experimentation onto their face, and two of
23  them I think wiggled out a fair amount sideways.
24  And then one never wiggled out, so they had to
25  rescue her or him.

Page 377

1     Q   Yes. You used the word "rescue" and this
2  is Infant No. 9.
3       Did you read the survey and notes filled
4  out by the parents of Infant No. 9, do you recall?
5     A   I probably did at some point but I don't
6  recall what that is right now. I did focus on what
7  was shown to me in the video.
8     Q   If we show the jury evidence that Infant
9  No. 9, according to the parents, preferred to be in
10  the prone, and we talked about infants who might
11  prefer to be in the prone position, could be that
12  the infant remained in the prone position because
13  that was their preferred position and not that they
14  were trapped, true?
15     A   Sure. But that infant was trying to move
16  around, and you can see actually their arms and legs
17  moving, you could see the heavy breathing. But we
18  only have four minutes of that infant.
19     Q   And I just want to be clear because I'm
20  trying -- you're relying on the Exponent data for
21  this opinion, right?
22     A   Oh, I mean only a small part of it. As
23  you know, that Exponent data is not really collected
24  correctly, but what's on tape can be used as a
25  partial support of my opinion in this matter.

Page 378

1     Q   Yeah, I think that's the point. I think
2  you testified before and you say that you think the
3  Exponent data is unreliable and yet here you are
4  relying on it. You see the irony in that, don't
5  you, Doctor?
6     A   I don't see the irony at all. It's
7  unreliable for uses they were trying to do, which is
8  to prove that it's difficult to turn to the prone or
9  impossible and then somehow easy to turn back.
10       That's unreliable, but it's undisputable
11  that when Infant No. 9, for example, was face down,
12  it was struggling and pushing and pulling and it
13  could not or did not turn back to the safety of the
14  front position where their face is up. That's
15  useful. Their data doesn't support their hypothesis
16  at all. But, ironically, if you want to have an
17  irony here, it supports my hypothesis.
18     Q   I understand that you were selecting
19  things that support the conclusion that you have
20  reached.
21       Do you have -- do you have an
22  understanding of the concept of a reasonable degree
23  of scientific certainty?
24     A   Yes, I do.
25     Q   All right. Within a reasonable degree of

14 (Pages 375 - 378)

William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

Page 379

1  scientific certainty, you cannot offer the opinion
2  that the design of the Rock 'n Play sleeper makes it
3  more difficult to roll from prone to supine than
4  other sleep surfaces can be?
5      A   Oh, I have a high degree of certainty of
6  that.
7      Q   Without testing any babies on any other
8  sleep surfaces?
9      A   I don't understand. Is that a question?
10     Q   Yeah. You didn't test -- you didn't test
11  the babies on any other sleep surfaces, did you,
12  sir?
13     A   A lot of babies were tested -- yes, I
14  tested my baby. I observed the Frakes' baby. I see
15  all kinds of testing in the Exponent videos.
16         But also there's just a basic, you know,
17  analysis of this product that is the -- that forms a
18  basis for my opinion here. So that's a test as
19  well.
20         There's huge amounts of data that support
21  my opinion in this case.
22     Q   Well, and I, I appreciate the broad brush,
23  but I'm asking you a specific question, which is
24  that the design of the Rock 'n Play, whether the
25  design of the Rock 'n Play makes it more difficult

Page 380

1  to roll from the baby's back to belly -- sorry, the
2  baby's belly to back --
3         MS. LOVETT: Let me strike that question.
4      Q   I'm asking you specifically whether the
5  Rock 'n Play design makes it more difficult for
6  babies to roll from their belly to their back than
7  other sleep surfaces?
8         What other sleep surfaces did you
9  personally test, Dr. Singhose, other than the Rock
10  'n Play sleeper?
11     A   Did I personally test?
12     Q   Yes.
13     A   And not -- so not, not using my analysis
14  of the videos that were -- the hundreds of videos?
15  So I'm supposed to ignore the hundreds of videos and
16  you want me to --
17     Q   -- because they're unreliable in some
18  parts.
19         I'm talking about what you personally did.
20  You had babies at your disposal. You had presumably
21  multiple sleep surfaces at your disposal.
22         Other than the Rock 'n Play sleeper, what
23  sleep surface did you test?
24     A   Well, I tested flat cribs via looking at
25  the videos produced by your experts.

Page 381

1         But in addition to that, I performed rolls
2  on --
3      Q   Sir --
4         MR. OSBORNE: Hang on. You're
5  interrupting him.
6         MS. LOVETT: I didn't hear that. I'm
7  interrupting him because he's not answering my
8  question.
9      A   I performed rolls --
10         MR. OSBORNE: That's not a reason to do
11  so. That's your opinion.
12     A   I performed --
13         MS. LOVETT: I'll stick with my opinion.
14     Q   Sorry, Dr. Singhose. Do go ahead.
15     A   I personally performed rolling myself on a
16  flat surface, as you saw, and I used that
17  demonstration to show how, for example, your arms
18  can be pinned in front of your body or to the back.
19         I also showed the arm pinning occurring in
20  the infants that I placed in the Rock 'n Play
21  sleeper.
22         Those are tests that clearly demonstrate
23  that the sidewalls do add some restrictions to
24  rolling.
25     Q   I want to make sure I got this right. You

Page 382

1  said -- and I think I heard you correctly before our
2  prior interruption.
3         You said you, you tested rolling yourself.
4  Meaning you yourself, right?
5      A   Yes, that's correct. I performed rolling
6  and I showed -- I did that to show biomechanically
7  how the human body is different in rolling from
8  prone to supine and supine to prone, because the way
9  that your arms are designed to go in front of your
10  body much more easily than behind your body.
11     Q   And I think --
12     A   So I used that as a demonstration.
13     Q   We may not have this in the record. How
14  old are you, Dr. Singhose?
15     A   54 years old.
16     Q   How tall are you?
17     A   Six foot tall.
18     Q   What do you weigh?
19     A   190. That's in the record already.
20     Q   Yes, I'm sorry, but that one I would be
21  proud of if I were you. No harm in getting that in
22  the record.
23         How long have you been rolling over on
24  your own?
25     A   Fifty-three and a half years, probably.

15 (Pages 379 - 382)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 383

1    Q   Do you, do you do any sports?
2    A   Yes, I do, ma'am.
3    Q   Please tell me what you do.
4    A   Well, what I do currently or what I've
5 done during my life?
6    Q   Let's go with what you do currently since
7 that's when you were testing yourself as an exemplar
8 for babies.  What do you do now?
9    A   Oh, I basically run every day with my dog.
10 I play with my kids.  I lift weights.
11        I play a variety of sports, ride bikes.
12   Q   You do a lot of things that an 8-1/2 month
13 old infant can't do, right?
14   A   Yes, that's correct.
15   Q   Including being able to roll over from
16 prone to supine on pretty much any surface you want
17 to given no instructions or anything pressing down
18 on you, correct?
19   A   That's correct.  I have a superior ability
20 to roll as compared to babies, but biomechanically I
21 have a similar structure in my arms and torso, and
22 that's what I was using, is that comparison of how
23 the human body in general moves, not any particular
24 skill at rolling.
25   Q   And I think in order to like talk about

Page 384

1 the momentum, you explained to us before how infants
2 start that process.  They start to push up on their
3 hands and then they push up on their knees, right,
4 and that creates the momentum to roll; is that
5 correct?
6    A   Well, babies actually roll in a variety of
7 ways, but one common way is for babies to do a
8 pushup.  They don't really have to get up on their
9 knees.
10   Q   Right.
11   A   They just raise their shoulders and torso
12 up and then they're wobbly.  And so they kind of
13 naturally fall over one way or the other.
14   Q   Right.
15   A   And the energy from that fall does power a
16 turn either partial or maybe even fully.
17   Q   So we talked about your -- that the
18 opinion that an infant's head could be stuck or
19 engulfed in the sockets of the Rock 'n Play.  You
20 did not conduct any testing to confirm that theory,
21 did you?
22   A   That's incorrect.
23   Q   What specific testing did you do?
24   A   Well, I guess starting with -- I don't
25 quite understand the question, but just to answer, I

Page 385

1 did breathability testing to show that when a face
2 was in that material, it was hard to breathe.
3    Q   Yes.
4    A   And then I placed infants in there and saw
5 that when they were struggling and moving around, it
6 was difficult for them to get their face completely
7 clear of that.
8        And then, of course, the hundreds of video
9 clips show babies, some of them, show the babies'
10 faces pressed into those soft goods or very close to
11 those soft goods as they're moving around.
12   Q   Yeah.  And so I'm talking about -- I'm
13 talking about testing that you did.  And I didn't
14 see --
15   A   That is testing I did.
16   Q   I'm sorry?
17   A   That is testing that I did.
18   Q   Yes.  I don't recall seeing any
19 photographs with either Palmer or her brothers or
20 Nicholas' face engulfed or blocked in goods.
21   A   Well, looking through my report right now,
22 I see a lot of pictures of babies' faces engulfed in
23 the soft goods.  A lot of those, of course, are from
24 the Exponent testing, but I think you were asking
25 specifically about the three infants that I put in

Page 386

1 there.  So I'm looking for those right now.
2        And I think those are in my initial
3 report.
4        Yeah, there's quite a few in my initial
5 report.  Let me just point you to them.
6        I think, for example, Figure 33 shows
7 that.
8        Yeah, 33 shows a couple of the infants
9 with their face engulfed in the fabric.
10       There's also Figure 34 and 35.
11   Q   Mr. Herman is pulling those up.
12       So that's -- so the infant on the left is
13 Matthew -- I mean Nicholas, right?  I don't know why
14 I'm calling him Matthew.
15       Is that Nicholas on the left, your son?
16   A   Which figure are we referring to?  I gave
17 you a lot of figures.
18   Q   In Figure 34.
19   A   Also, Figure 24 shows a lot of that as
20 well.
21   Q   Let me start with the one I've got on the
22 screen, Doc, because I don't have -- I don't have a
23 hard copy in front of me and I want to ask you about
24 the one we've got up on the screen, which is 34.
25 Then I'll go back to 24.

16 (Pages 383 - 386)

Veritext Legal Solutions

William Singhose, Ph.D., Vol. II                          September 27, 2021
In Re: Fisher-Price/Mattel

Page 387

1    A    Okay.  Okay, so, yeah, I'm looking at 34.
2    Q    Yes.  Okay.  So 34, is that Nicholas on
3  the left, your son?
4    A    Yes, on the left.
5    Q    Yes.  And as we've testified, you placed
6  -- the infants were placed in that prone position,
7  correct?
8    A    Well, I mean they were placed somewhere --
9  the baby does not stay in one spot.  So I didn't
10 place him exactly in this position, but I placed him
11 nominally in a prone position.  They're wiggling
12 around and pushing and doing all sorts of things.
13 And this is just a picture I took during that,
14 during that evaluation.
15   Q    That's Palmer on the right, correct?
16   A    Yes, that's Palmer.
17   Q    Dr. Frakes' daughter.  Okay.
18        So -- and, again, just to go back to what
19 you referred to as sort of a discrepancy in the
20 testimony, Ms. Courkamp, Zoey's mother, who found
21 her, has, has testified that, and I can show, that
22 the baby's head, that Zoey's head was turned in a
23 way that it was not obstructed by the soft goods,
24 correct?
25   A    No, I believe that to be incorrect.

Page 388

1    Q    I think you said in your deposition, Page
2  221, Lines 11 through 13, and we talked about this
3  already today, Doctor, that the position that Zoey
4  was found in was, quote, "she was found in is quite
5  frankly a little uncertain."
6        Do you recall talking about that?
7    A    Yes, I do recall talking about.
8    Q    You reviewed the incident reports in this
9  case that came in, in various formats to, to
10 Fisher-Price and Mattel, right?
11   A    Yes.
12   Q    Is it your opinion that the incident
13 reports alone provide a scientific basis for
14 reaching a conclusion about the bio -- biomechanical
15 mechanism of injury in the Rock 'n Play sleeper?
16   A    I didn't follow that question.  Sorry.
17   Q    So do you believe that the incident
18 reports alone provide a scientific basis for your
19 conclusion about the biomechanical mechanism of
20 injury in this case?
21   A    Yes.  I mean I probably wouldn't call it a
22 scientific basis.  I would call it an engineering
23 basis.
24        You know, there's just a lot of reports
25 coming in from parents and caregivers that things

Page 389

1  are going wrong with this device, and there's
2  hundreds of those reports, and I pointed out to you
3  I think 30 reports that indicate, for example, the
4  infants are getting out of the restraint.
5        Those occurred before Zoey's death.
6        See, that's a large data set that has
7  important and valuable information and it has --
8  your own expert, Ms. Drago, has written about.
9        So, yeah, I think it's a real good data
10 set.
11   Q    And so your testimony is that, that only
12 the ones before Zoey's death would be instructive,
13 correct?
14   A    Oh, no.  I mean the whole -- any time you
15 get feedback from your customers, that's
16 instructive.  I'm just pointing out that
17 Fisher-Price knew about these problems well -- you
18 know, preceding Zoey's death, but they continued to
19 get good information after that, all the way up
20 until the recall, and they're probably still getting
21 good information about this because these are
22 probably still in use.
23   Q    When you, when you got the -- when you
24 looked at the incident reports, they were certainly
25 not uniform in terms of the information they

Page 390

1  provided, true?
2    A    Oh, that's correct.  Incident reports are
3  not like that.  You get --
4    Q    Anecdotal, right?  They're coming from
5  parents?
6    A    I'm not sure what you mean by anecdotal.
7  They are information provided by the customers who
8  are testing out this product and they are sending
9  some of that feedback back to Fisher-Price.
10   Q    Correct.  Some parents may tell you -- may
11 give more detail than other parents, right?
12   A    That's correct.
13   Q    So I want to shift briefly to your -- the
14 conclusions reached in your rebuttal report and also
15 following up on your, your opinion on cause of
16 death.
17        You essentially conclude that Zoey Olson
18 died of smothering, correct?
19   A    Yeah.  My opinion is that her face was
20 engulfed to some degree in the soft goods.  That's
21 pretty clear.
22   Q    And you know from Dr. Chris -- sorry, I
23 forget whether you read Dr. Christensen's deposition
24 transcript.  Did you?  He's the pathologist.
25   A    I don't think I read the depo transcript.

17 (Pages 387 - 390)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 391

1    Q   Were you aware that Dr. Christensen
2  testified that there was insufficient evidence to
3  categorize Zoey's death as asphyxia?
4        He couldn't rule out asphyxia, but he
5  couldn't state that that was the cause of death?
6    A   No, I --
7        MR. OSBORNE:  Form.
8    A   I didn't read his deposition.
9    Q   If Dr. Christensen testifies that he can't
10 categorize the cause of death as smothering, and you
11 are deferring to him on medical causation, there's
12 no basis for your conclusion that Zoey might have
13 smothered; is there, sir?
14   A   That's incorrect.
15   Q   So you're --
16       MR. OSBORNE:  Form and foundation.
17   Q   You're going to substitute your judgment
18 for Dr. Christensen's judgment, and even if he says
19 he can't definitively say it was smothering to a
20 reasonable degree of medical certainty, you think
21 that from a degree of scientific certainty as an
22 engineer you can say the cause of death was
23 smothering?
24   A   Well, if we're using that term --
25       MR. OSBORNE:  Form.

Page 392

1    A   -- smothering, yes, because we know her
2  face was in the soft goods and her airflow was
3  restricted by that.
4        Just because this particular doctor is not
5  an engineer and he doesn't understand that part,
6  maybe he can't reach full confidence in that it was
7  smothering.
8        I'm adding information, and that's my roll
9  here, is adding information he doesn't know.  And
10 apparently he doesn't know that her face was in this
11 unbreathable material and she was turned over in the
12 prone position.
13   Q   Or maybe he just listened to her mother,
14 who said that her face was not obstructed?  That's
15 possible, too, isn't it, Doctor?
16   A   I don't know what he based --
17       MR. OSBORNE:  Form.
18   A   -- his opinion on because I didn't read
19 his deposition transcript.
20       MS. LOVETT:  That's all the questions I
21 have for you, Dr. Singhose.  Thank you for your
22 time today.
23       THE WITNESS:  Thank you.
24       MR. OSBORNE:  Well, in that event, I'm
25 going to leave my questions for trial.

Page 393

1        Thank you very much, Dr. Singhose.
2        MS. LOVETT:  Thank you.  Take care, guys.
3        THE VIDEOGRAPHER:  The time is 2:40 p.m.
4  This concludes the videotape deposition.
5        We are off video record.
6        (Whereupon, the deposition concluded at
7  2:40 p.m.)

Page 394

1            C E R T I F I C A T E
2
3  STATE OF GEORGIA:
4  FULTON COUNTY:
5
6        I hereby certify that the foregoing
7  transcript of WILLIAM SINGHOSE, Ph.D. was taken
8  down, as stated in the caption, and the questions
9  and answers thereto were reduced by stenographic
10 means under my direction;
11       That the foregoing Pages 326 through
12 393 represent a true and correct transcript of
13 the evidence given upon said hearing;
14       And I further certify that I am not of kin
15 or counsel to the parties in this case; am not in
16 the regular employ of counsel for any of said
17 parties; nor am I in anywise interested in the
18 result of said case.
19
20       IN WITNESS WHEREOF, I have hereunto
21 subscribed my name this 28th day of September, 2021.
22
23      *Wanda L. Robinson*
24      Wanda L. Robinson, CRR, CCR No. B-1973
        My Commission Expires 10/11/2023
25

18 (Pages 391 - 394)

Page 395

1          D I S C L O S U R E
2 STATE OF GEORGIA  ) VIDEOTAPE DEPOSITION OF
            WILLIAM SINGHOSE, Ph.D. 9/27/21
3 FULTON COUNTY    )
        Pursuant to Article 10.B of the Rules
4 and Regulations of the Board of Court Reporting
5 of the Judicial Council of Georgia, I make the
6 following disclosure:
7      I am a Georgia certified court reporter.
8 I am here as a representative of Veritext Legal
9 Solutions, and Veritext Legal Solutions was
10 contacted by the offices of Greenberg Traurig LLP to
11 provide court reporter services for this deposition.
12 Veritext Legal Solutions will not be taking this
13 deposition under any contract that is prohibited by
14 O.C.G.A. 9-11-28 (c).
15      Veritext Legal Solutions has no
16 contract/agreement to provide court reporter
17 services with any party to the case, or any counsel
18 in the case, or any reporter or reporting agency
19 from whom a referral might have been made to cover
20 this deposition.
21      Veritext Legal Solutions will charge the
22 usual and customary rates to all parties in the
23 case, and a financial discount will not be given to
24 any party to this litigation. *Wanda L. Robinson*
25      Wanda L. Robinson, CRR, CCR No. B-1973

Page 396

1 To:  JOHN E. OSBORNE, ESQUIRE
2 Re:  Signature of WILLIAM SINGHOSE, Ph.D.
3 Errata due back at our offices: 30 Days
4
5 Greetings:
6      This deposition has been requested for read and
7 sign by the deponent.  It is the deponent's
8 responsibility to review the transcript, noting any
9 changes or corrections on the attached PDF Errata.
10 The deponent may fill out the Errata electronically
11 or print and fill out manually.
12      Once the Errata is signed by the deponent and
13 notarized, please mail it to the offices of Veritext
14 (below).
15      When the signed Errata is returned to us, we
16 will seal and forward to the taking attorney to file
17 with the original transcript.  We will also send
18 copies of the Errata to all ordering parties.
19      If the signed Errata is not returned within the
20 time above, the original transcript may be filed
21 with the court without the signature of the
22 deponent.
23      Please send completed Errata to:
        Veritext Production Facility.
24      20 Mansell Court East, Suite 300
        Roswell, GA  30076
25      (770) 343-9696

Page 397

1 ERRATA for ASSIGNMENT #4823674
2 I, the undersigned, do hereby certify that I have
3 read the transcript of my testimony, and that
4 ___ There are no changes noted.
5 ___ The following changes are noted:
6 Pursuant to Rule 30(7)(e) of the Federal Rules of
7 Civil Procedure and/or OCGA 9-11-30(e), any changes
8 in form or substance which you desire to make to
9 your testimony shall be entered upon the deposition
10 with a statement of the reason given for making
11 them.  To assist you in making any such corrections,
12 please use the form below.  If additional pages are
13 necessary, please furnish same and attach.
14 Page _____ Line _____ Change _____
15
16 Reason For Change
17 _____
18 Page _____ Line _____ Change _____
19
20 Reason For Change
21 _____
22 Page _____ Line _____ Change _____
23
24 Reason For Change
25 _____

Page 398

1 Page _____ Line _____ Change _____
2
3 Reason For Change
4 _____
5 Page _____ Line _____ Change _____
6
7 Reason For Change
8 _____
9 Page _____ Line _____ Change _____
10
11 Reason For Change
12 _____
13 Page _____ Line _____ Change _____
14
15 Reason For Change
16 _____
17 Page _____ Line _____ Change _____
18
19 Reason For Change
20 _____
21 Page _____ Line _____ Change _____
22
23 Reason For Change
24 _____
25

19 (Pages 395 - 398)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 399

1  Page _____ Line _____ Change _____

2

3  Reason For Change

4  _____

5  Page _____ Line _____ Change _____

6

7  Reason For Change

8  _____

9  Page _____ Line _____ Change _____

10

11  Reason For Change

12  _____

13

   _____

14  DEPONENT'S SIGNATURE

15

16  Sworn to and subscribed before me this _____ day of

17  _____, _____.

18  _____

19  NOTARY PUBLIC

20  My Commission Expires: _____.

21

22

23

24

25

20 (Page 399)

Case 2:19-cv-02689-GMS   Document 192-4   Filed 11/19/21   Page 150 of 171
William Singhose, Ph.D., Vol. II
September 27, 2021
In Re: Fisher-Price/Mattel

[& - analysis]
Page 1

## &

**&** 327:5

## 0

**02689** 326:5

## 1

**10** 329:22 342:5,8
**10.b** 395:3
**10/11/2023** 394:24
**1000** 327:12
**11** 388:2
**13** 332:7 362:9
 388:2
**13th** 335:21
**14th** 332:4 334:13
 337:5
**16** 328:17
**17** 328:8 337:7,13
**1700** 327:12
**18** 348:2
**190** 382:19
**1973** 326:24
 394:24 395:25
**1:32** 326:16 329:3

## 2

**2** 328:15
**20** 333:20 396:24
**200** 327:5,17
**2003** 347:13
**2021** 326:16
 328:15,17 329:2
 394:21
**221** 388:2
**24** 386:19,25
**240** 372:17
**25** 346:24
**2500** 326:21
 327:18
**27** 326:16 329:2
**27th** 332:6

**28th** 394:21
**2:19** 326:5
**2:40** 393:3,7
**2d** 366:25 367:4
 367:11

## 3

**3** 328:15 344:11,12
 372:18
**30** 333:21,23,24
 366:1,4 368:2
 389:3 396:3 397:6
**300** 396:24
**30076** 396:24
**30305** 326:22
 327:18
**326** 394:11
**329** 328:4
**33** 386:6,8
**3333** 326:21
 327:18
**337** 328:8
**34** 386:10,18,24
 387:1,2
**343-9696** 396:25
**344** 328:15
**35** 386:10
**363** 328:16
**393** 394:12

## 4

**4** 328:16 363:21,23
 364:5
**4823674** 397:1

## 5

**5** 372:18
**520.620.3975**
 327:6
**54** 382:15

## 6

**60** 337:23
**678.553.2100**
 327:19
**678.553.2212**
 327:19
**6961** 394:22
 395:24
**698** 327:5

## 7

**7** 397:6
**713.374.3541**
 327:13
**713.754.7541**
 327:13
**770** 396:25
**77002** 327:13

## 8

**8** 342:5
**8-1/2** 383:12
**85705** 327:6

## 9

**9** 376:16,19 377:2
 377:4,9 378:11
**9-11-28** 395:14
**9-11-30** 397:7
**9/27/21** 395:2

## a

**ability** 375:24
 383:19
**able** 336:7 353:19
 357:10 372:22
 374:16 375:5
 376:21 383:15
**access** 337:20
**accomplish** 363:13
**acknowledge**
 330:1

**acting** 358:12
**actual** 331:11
 360:1,1
**add** 381:23
**adding** 392:8,9
**addition** 368:8
 381:1
**additional** 334:7
 397:12
**addressed** 335:10
**admit** 338:12
 349:19
**adorable** 356:6
**agency** 395:18
**ago** 329:22 332:7
 342:3,5,8,9,9,11
 342:12 343:14,17
 366:16
**agree** 349:22
 355:12 357:14,20
 358:15 371:19
 375:17
**agreement** 395:16
**ahead** 344:10
 354:2 373:13
 381:14
**air** 372:9
**airflow** 392:2
**alleged** 349:23,24
 352:7
**allowed** 336:9
**alternative** 350:7
**amount** 340:10
 354:18 363:14
 376:23
**amounts** 379:20
**analysis** 335:1,15
 346:7 348:9
 350:16 354:7
 359:3,19 361:2,13
 364:10 366:25

William Singhose, Ph.D., Vol. II
September 27, 2021
In Re: Fisher-Price/Mattel

**[analysis - biomedical]**

Page 2

367:4,4,12 368:4
371:5 372:5
379:17 380:13
**analyze** 350:12
351:23
**analyzing** 358:17
368:8
**andrew** 329:9
**anecdotal** 390:4,6
**angles** 371:6
**answer** 346:17,22
348:19 351:4
371:21 384:25
**answering** 381:7
**answers** 394:9
**anywise** 394:17
**apparently** 363:3
392:10
**appear** 350:16
**appearance** 345:8
345:10
**appearances**
327:1
**appeared** 376:17
**appearing** 327:3
327:10
**applicable** 346:13
347:24
**apply** 348:10,12
349:2,5
**appreciate** 379:22
**appropriate** 330:5
331:18 336:3
**april** 328:15
**area** 336:2 374:10
**areas** 338:7
**arizona** 326:1
327:6 342:22
343:2,11
**arm** 381:19

**arms** 372:11
377:16 381:17
382:9 383:21
**article** 395:3
**asked** 350:20
355:2 359:25
**asking** 334:3
344:4 354:14,17
364:3 373:4 375:1
379:23 380:4
385:24
**asks** 355:3
**aspect** 367:25
**aspects** 334:25
361:6 367:23
**asphyxia** 391:3,4
**assess** 360:20
**assignment** 337:6
397:1
**assist** 397:11
**assistance** 339:12
**associated** 336:14
**assuming** 333:4,12
357:1
**assure** 346:8
**atlanta** 326:22
327:18 329:12
342:14,16,18
343:13,23
**atomic** 330:16
**attach** 397:13
**attached** 396:9
**attorney** 396:16
**attribute** 357:25
**attributing** 365:2
**available** 368:9
**aware** 331:7
332:20 391:1

**b**

**b** 326:24 394:24
395:25
**b.a.** 375:10
**babies** 374:20
379:7,11,13 380:6
380:20 383:8,20
384:6,7 385:9,9,22
**baby** 332:15
355:23 360:20
372:7 376:14
379:14,14 387:9
**baby's** 372:8,11
380:1,2 387:22
**back** 331:3 332:4
339:2,4 351:9
354:4 359:22,24
360:8 366:3,8
367:22 368:2,3
370:19 378:9,13
380:1,2,6 381:18
386:25 387:18
390:9 396:3
**backward** 358:14
**bacon** 352:24
**ballpark** 342:4
**bandwidth** 334:17
**bar** 349:18
**base** 361:12
366:24 367:3,9
**based** 343:11,23
343:24 349:21
350:23 368:4
392:16
**basic** 379:16
**basically** 360:8
383:9
**basing** 364:6,9
369:19
**basis** 371:3 372:4
379:18 388:13,18

388:22,23 391:12
**began** 329:21
**beginning** 368:22
**behalf** 326:4 327:3
327:10 329:9,12
335:11
**behavior** 336:3
**believe** 335:21
344:11 364:12
376:19 387:25
388:17
**belly** 380:1,2,6
**belt** 368:17
**ben** 327:25
**beneficiaries**
326:5
**benefit** 336:23
**best** 352:19
**beyond** 364:23
**bias** 343:8
**big** 335:8 337:22
**bikes** 383:11
**bio** 388:14
**biological** 360:4
**biologically**
361:20
**biology** 364:24
**biomechanical**
335:24 336:12
353:12 357:25
358:6,8 360:16,19
361:2,12 364:10
365:1 388:14,19
**biomechanically**
372:8,10 382:6
383:20
**biomechanics**
338:8
**biomedical** 360:11
360:13,19 364:6

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 152 of 171

William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

[bit - comes]

Page 3

**bit** 363:1 365:5
**blocked** 385:20
**board** 330:19
  331:18 395:4
**body** 360:23 361:3
  363:4,12 371:11
  376:4 381:18
  382:7,10,10
  383:23
**brady** 327:16
  329:11
**brain** 359:17
**brandon** 327:16
  329:11
**breath** 374:22
**breathability**
  385:1
**breathable** 352:1
  373:19
**breathe** 352:2
  364:21 365:4,7,8
  365:10 385:2
**breathing** 352:3
  365:17 377:17
**briefly** 390:13
**broad** 355:4
  379:22
**broken** 367:7
**brothers** 356:16
  357:4 385:19
**brought** 354:7
**brush** 379:22
**business** 343:5
**busy** 334:17

**c**

**c** 394:1,1 395:1,14
**call** 332:9 359:20
  376:16 388:21,22
**called** 345:5
  347:22 354:23

**calling** 386:14
**camera** 345:11
**capabilities**
  374:12,17
**capable** 355:12
**capacity** 330:20
  341:23 358:12,13
**caption** 394:8
**care** 346:13 393:2
**carefully** 350:21
**caregiver** 368:25
**caregivers** 388:25
**carpet** 375:6
**carpeted** 374:10
**case** 326:4 331:6
  332:21 334:15
  335:9 337:2,6
  340:19,20 341:3
  341:12,16 342:6
  342:10,17,19
  343:11,13 352:7
  354:1 357:22
  358:19,23,25
  364:10 368:16,23
  371:10 373:15,21
  379:21 388:9,20
  394:15,18 395:17
  395:18,23
**cases** 332:25 333:1
  333:18 341:18,24
  342:3 347:19
  348:3 358:11
**categorize** 391:3
  391:10
**causation** 351:1
  358:19,20 391:11
**cause** 330:24,25
  331:4,11,16 347:5
  349:24 350:1,3,6,7
  350:7,8,8 351:15
  351:16,19,20,24

352:4,12 360:1,2,4
  360:6 361:11,19
  364:6,9,19,22
  390:15 391:5,10
  391:22
**caused** 331:23
  358:14
**ccr** 326:24 394:24
  395:25
**certain** 334:25
  357:14
**certainly** 330:6
  332:24 334:11
  340:17 350:25
  368:15 371:3
  389:24
**certainty** 331:22
  378:23 379:1,5
  391:20,21
**certified** 326:25
  330:19 331:18
  395:7
**certify** 394:6,14
  397:2
**chance** 353:13
**change** 397:14,16
  397:18,20,22,24
  398:1,3,5,7,9,11
  398:13,15,17,19
  398:21,23 399:1,3
  399:5,7,9,11
**changes** 396:9
  397:4,5,7
**characterization**
  358:21
**characterize**
  358:24
**charge** 395:21
**check** 344:2
**children** 339:10
  339:11,13,17

374:2,11,17
**children's** 340:10
  340:13
**chosen** 334:23
**chris** 361:25
  362:14 390:22
**christensen**
  335:20 361:25
  391:1,9
**christensen's**
  362:4 390:23
  391:18
**cinched** 368:18
**circle** 359:24
**cite** 371:16
**city** 335:22 362:10
**civil** 334:10 397:7
**claim** 347:1
**claims** 363:2,3
**clarified** 332:12
  332:14
**clean** 343:10
**clear** 330:7 333:10
  348:21 361:15
  364:8 377:19
  385:7 390:21
**clearer** 350:2
**clearly** 335:7,9
  368:6 381:22
**clinical** 330:16
**clips** 371:9,23
  385:9
**close** 361:18
  374:20 385:10
**code** 347:23
**collaborative**
  339:8
**collected** 377:23
**colloquy** 335:4
**comes** 348:1 371:4
  371:8

William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

**[coming - death]**                                                                 Page 4

**coming** 338:10
353:4 374:23
388:25 390:4
**commission**
394:24 399:20
**common** 384:7
**company** 343:5
**compared** 383:20
**comparison**
366:11 383:22
**completed** 369:13
396:23
**completely** 347:9
385:6
**component** 350:14
**concept** 347:12
351:1 371:14,18
378:22
**concepts** 349:3,6
350:9,11,12,15,16
355:10
**concerned** 349:16
**conclude** 390:17
**concluded** 393:6
**concludes** 393:4
**conclusion** 370:2
378:19 388:14,19
391:12
**conclusions**
390:14
**condition** 361:10
**conditions** 352:12
365:14
**conduct** 384:20
**confidence** 392:6
**configuration**
368:7
**configurations**
375:25
**confining** 336:18

**confirm** 384:20
**confusing** 363:7
**constraint** 368:18
**consulting** 341:22
**contact** 363:6
**contacted** 395:10
**contend** 365:19
**context** 373:2
**continuation**
329:21
**continued** 326:13
389:18
**contract** 395:13
395:16
**contributing**
350:7
**contributory**
350:3,6
**control** 347:4
351:14 375:13
**controlling** 353:2
**conveying** 345:23
**copies** 396:18
**copy** 337:17
344:18,20 363:21
386:23
**corporation** 326:8
326:9
**correct** 330:2,8,9
330:17,24 331:12
331:19,24 333:2
333:15 334:21
335:11 339:24
340:8 345:15,16
345:18 346:3
348:6 349:3,14,24
352:13 353:5
355:22,24 357:3,6
357:13 360:23
365:12,13,21
366:9,21 367:6

369:1 371:2 373:5
375:3,4 382:5
383:14,18,19
384:5 387:7,15,24
389:13 390:2,10
390:12,18 394:12
**corrections** 396:9
397:11
**correctly** 343:7
377:24 382:1
**council** 395:5
**counsel** 327:1
329:6 333:13
354:25 355:3
372:25,25 394:15
394:16 395:17
**county** 343:3
394:4 395:3
**couple** 352:25
358:11 386:8
**courkamp** 326:4
329:9 363:8
387:20
**course** 334:24
340:3 358:25
371:4 376:21
385:8,23
**court** 326:1
329:14 334:11
350:22,22 351:2,6
353:18 355:6,8
395:4,7,11,16
396:21,24
**cover** 339:21
347:15 395:19
**covered** 345:6
371:22
**cox** 327:16 329:11
363:20
**coxb** 327:20

**crafted** 350:21
**created** 368:10
**creates** 384:4
**credentials** 335:22
**crib** 370:4,10,22
374:2
**cribs** 340:24
380:24
**cross** 354:9 368:13
**crossover** 336:5
**crr** 326:24 394:24
395:25
**currently** 383:4,6
**curriculum** 333:1
**customary** 395:22
**customers** 389:15
390:7
**cut** 339:15
**cv** 326:5

**d**

**d** 327:16 395:1
**dangerous** 347:3
351:13
**data** 339:2 368:8,9
368:10 369:16,25
377:20,23 378:3
378:15 379:20
389:6,9
**date** 329:1
**daughter** 387:17
**day** 332:6 348:6,6
348:17,17 349:1,1
362:8 383:9
394:21 399:16
**days** 329:22 332:7
396:3
**deal** 332:16
**death** 330:24,25
331:5,11,17,23
332:9,10 352:8,13
361:11 364:6,9,19

**[death - e]**                                                                Page 5

364:22 365:2,15
389:5,12,18
390:16 391:3,5,10
391:22
**decided** 350:23
**defect** 347:4
349:23 351:15,16
351:19 365:18
**defective** 347:3
351:12
**defendant** 341:10
343:23 346:25
347:2 351:11
**defendant's** 347:4
351:13
**defendants** 326:10
327:10 328:7,14
337:13 341:9
344:12 363:23
**defense** 342:1
**defer** 331:11
**deferring** 391:11
**defining** 337:5
**definition** 348:11
348:12
**definitions** 349:6
350:6
**definitively**
391:19
**degree** 331:22
349:10 366:2
378:22,25 379:5
390:20 391:20,21
**degrees** 366:4
368:2
**delineate** 344:7
**delve** 360:5
**demonstrate**
381:22
**demonstrated**
376:8

**demonstration**
368:21 381:17
382:12
**depends** 375:14
**depo** 390:25
**deponent** 396:7,10
396:12,22
**deponent's** 396:7
399:14
**deposed** 335:20
343:12 353:12
354:11
**deposing** 358:5
**deposition** 326:13
329:4,21 330:5
332:3 334:13
336:11 338:23,23
339:19,21 342:15
342:18 343:16
353:14,25 355:11
362:9 368:11
371:18,23 372:18
372:19 373:2,7
388:1 390:23
391:8 392:19
393:4,6 395:2,11
395:13,20 396:6
397:9
**describe** 347:20
**design** 335:2,15
336:8 338:7 339:4
358:17 367:23
371:5 372:6,6
379:2,24,25 380:5
**designed** 338:24
338:25 382:9
**designing** 339:3
**desire** 397:8
**detail** 390:11
**determine** 360:1
360:11

**determined** 331:5
331:5 357:24
**develop** 356:1,14
**developing** 356:17
**development**
357:5
**developmental**
357:5
**device** 336:8 389:1
**die** 365:14
**died** 359:5,8,14
361:21 390:18
**different** 356:1,14
357:5,5,6 382:7
**differently** 356:17
**difficult** 357:23,25
358:3 366:8,11,12
370:19 378:8
379:3,25 380:5
385:6
**direction** 394:10
**directly** 353:7
363:6
**disabled** 339:11
**disclosed** 332:20
332:24 334:5
339:23 340:17
**disclosing** 340:1
**disclosure** 328:9
333:25 337:11,24
338:13 395:6
**discount** 395:23
**discovery** 328:8
337:10
**discrepancy** 363:1
387:19
**discussed** 373:7
**disposal** 380:20,21
**disposed** 343:15
**dispute** 333:25

**distinct** 336:4
**distorting** 367:17
**district** 326:1,1
343:25
**dive** 344:15
**divorced** 358:19
**dna** 356:16,19,25
**doc** 386:22
**doctor** 330:8
335:18 337:8
347:8 359:11
374:19 378:5
388:3 392:4,15
**document** 338:3,5
**dog** 383:9
**doing** 331:14
333:20 375:15,23
376:1,2 387:12
**double** 372:6
**downstream**
361:20
**dr** 329:5,20 330:6
333:10 335:20
337:23 343:10
353:12 354:6
361:24,25 362:3
362:14 363:21
364:2 370:16
374:1,7 380:9
381:14 382:14
387:17 390:22,23
391:1,9,18 392:21
393:1
**draft** 353:23
**drago** 389:8
**drew** 374:21
**due** 396:3

| **e** |
| --- |
| **e** 327:4,7,14,19 |
| 394:1,1 395:1 |
| 396:1 397:6,7 |

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 155 of 171

William Singhose, Ph.D., Vol. II
September 27, 2021
In Re: Fisher-Price/Mattel

[earlier - feeding]
Page 6

**earlier** 359:25
**easier** 365:20,22
  365:23,24 366:6
  366:22 367:10,21
  368:3,6 369:17,20
  369:21 370:2,8
**easily** 382:10
**east** 327:5 396:24
**easy** 378:9
**effect** 348:13
**either** 341:25
  354:25 355:20
  384:16 385:19
**electronically**
  396:10
**elicit** 334:6 354:11
  354:20
**eliciting** 354:15
**elimination** 344:4
**empirical** 369:16
  369:25
**employ** 394:16
**ended** 359:2,11
**energy** 384:15
**engagement** 340:8
**engineer** 358:6,8
  391:22 392:5
**engineering**
  388:22
**engulfed** 366:17
  384:19 385:20,22
  386:9 390:20
**enjoy** 345:12
**entered** 344:10
  397:9
**entitled** 344:16
  373:2
**envelope** 334:8
**environment**
  360:11,13,15,16
  360:20 361:3

365:17 369:18
  375:21
**eric** 361:24
**errata** 396:3,9,10
  396:12,15,18,19
  396:23 397:1
**esquire** 327:4,11
  327:16,16 396:1
**essentially** 354:5
  390:17
**establish** 338:22
**established** 347:1
  351:11 368:20,23
**evaluating** 339:1
**evaluation** 387:14
**event** 392:24
**everybody** 368:16
**evidence** 360:25
  362:24 369:16
  371:11,14 372:13
  376:7,8 377:8
  391:2 394:13
**exact** 338:2,4
  347:17 358:19
**exactly** 339:18
  340:17 346:16
  359:5,8,14 361:14
  361:21 363:8
  387:10
**examination**
  329:18
**examinations**
  328:1
**examiner** 331:6
**examiner's** 336:14
**examining** 354:9
**example** 334:12
  334:12 335:18,19
  336:7 339:11,16
  351:25 353:8
  362:25 372:5

378:11 381:17
  386:6 389:3
**exemplar** 383:7
**exhibit** 328:8,15
  328:16 337:7,13
  337:19 344:11,12
  357:4 363:21,23
  364:5
**exhibits** 328:6,13
**expand** 334:8
**expect** 336:1
**experience** 334:7
  335:23
**experimentation**
  372:2,2 376:22
**expert** 331:18
  332:8,14,21,25
  333:17,24 334:1
  334:19,20,23
  335:13,20,25
  337:12 338:13,15
  338:16,19,20
  339:24 340:1,3,8
  341:11,25 343:12
  353:12 358:12
  361:23 362:15
  364:11,12 389:8
**expertise** 334:2,14
  336:12,25 338:7
  338:17 340:4
**experts** 331:7
  335:11,14 337:2
  359:25 361:24
  380:25
**expires** 394:24
  399:20
**explain** 345:7
**explained** 384:1
**explanation**
  346:20

**exponent** 376:7
  377:20,23 378:3
  379:15 385:24
**expressing** 357:18
**extent** 335:15
  338:19

**f**

**f** 327:13,19 394:1
**fabric** 351:25
  361:17,18 363:6
  364:20 386:9
**fabrics** 373:19
**face** 361:17 363:4
  363:9 364:19,20
  365:3,6,9 371:25
  373:9,10,20 376:2
  376:22 378:11,14
  385:1,6,20 386:9
  390:19 392:2,10
  392:14
**faces** 385:10,22
**facility** 396:23
**fact** 336:17 355:25
  359:12,19 372:7
  374:5
**factors** 334:19
**fair** 340:10 359:8
  376:23
**fall** 384:13,15
**familiar** 344:22
  351:1,5,7
**family** 356:2,13,25
**far** 349:16 358:20
  363:16
**fault** 347:1
**federal** 334:10,11
  397:6
**feedback** 389:15
  390:9
**feeding** 339:2,4

feeds 346:7
feet 372:8
felt 373:18
fields 331:19
fifty 382:25
figure 350:13
  386:6,10,16,18,19
figures 386:17
file 396:16
filed 396:20
fill 396:10,11
filled 377:3
final 358:18
financial 395:23
find 341:24
firm 353:1
first 332:3 338:23
  347:13 358:24
  360:10,10 362:20
  364:18 374:8,21
fisher 326:8
  329:12 353:8
  354:17 388:10
  389:17 390:9
fixes 370:15
flat 355:13,20
  365:23,24 366:3
  366:24 367:11,22
  368:1,3 370:3,10
  370:22 374:2,4,6
  380:24 381:16
floor 374:9 375:2
flow 359:13
fluid 359:13
focus 339:7 377:6
focused 351:20
focusing 367:24
folded 335:14
folks 353:21
follow 388:16

following 390:15
  395:6 397:5
follows 340:16
foot 382:17
forces 372:10
foregoing 394:6
  394:11
foreign 326:8,9
forensic 330:16
forget 390:23
forgive 344:8
form 332:13
  348:15,18 349:4
  351:3 354:2,13
  360:3 371:20
  373:12 391:7,16
  391:25 392:17
  397:8,12
formats 388:9
forms 379:17
formulating 358:8
forth 354:7
forward 396:16
found 346:25
  359:20 360:6
  362:22 363:2,3
  387:20 388:4,4
foundation 391:16
four 377:18
frakes 374:1,7
  379:14 387:17
frame 342:9
frankly 362:22
  388:5
free 363:9
friend 374:1
friend's 368:12
  371:1
friends 372:17
  374:20

front 335:4 337:17
  344:18 378:14
  381:18 382:9
  386:23
full 339:5,6 392:6
fuller 362:1,14
fully 384:16
fulton 394:4 395:3
funny 342:24
furnish 397:13
further 394:14

**g**

ga 396:24
general 357:21
  383:23
generate 372:10
geometric 372:8
georgia 326:22
  327:18 343:25
  347:15 394:3
  395:2,5,7
germane 355:9
getting 349:13
  350:5 370:13
  382:21 389:4,20
girl 369:9
give 334:12 335:18
  341:23 348:13
  359:7 390:11
given 341:25
  353:11 383:17
  394:13 395:23
  397:10
giving 342:15,18
gms 326:5
go 330:1 333:7,22
  337:22 344:9
  345:9 349:11
  354:2 355:4 360:8
  364:3 373:13
  381:14 382:9

383:6 386:25
  387:18
goes 371:12
going 330:23
  331:10,14 332:5
  334:18 335:18
  336:6,10 337:7,15
  344:21,21,23
  345:1 346:2
  350:19,20 351:9
  352:14 361:21
  363:20 364:4
  389:1 391:17
  392:25
goldberg 327:5
goldbergandosb...
  327:7
good 346:17
  358:20,22 373:24
  389:9,19,21
goods 365:9
  366:18 385:10,11
  385:20,23 387:23
  390:20 392:2
grab 373:22,22
graco 343:22,23
grandmother
  369:6 373:21
grant 339:8
gravitate 357:18
great 332:16 337:2
greenberg 326:21
  327:12,17 395:10
greetings 396:5
ground 339:1,21
grounds 336:20
gtlaw.com 327:14
  327:19,20
guess 343:23
  348:2 349:9
  372:15 384:24

William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

**[guys - irony]**

Page 8

| | | | |
|---|---|---|---|
| **guys** 335:19 393:2 | **human** 382:7 383:23 | **infant** 332:9,10 352:1 357:8,10 | **inquiry** 355:9 |

**h**

**half** 333:21 382:25
**hands** 384:3
**hang** 381:4
**happen** 362:7 375:24
**happened** 362:8
**hard** 337:17 353:20 364:21 365:7,10 372:9 385:2 386:23
**harder** 366:3
**harm** 382:21
**he'll** 348:24
**head** 340:14 363:4 363:13,16,18 366:16 384:18 387:22,22
**hear** 381:6
**heard** 382:1
**hearing** 394:13
**heavy** 377:17
**held** 326:20
**hereunto** 394:20
**herman** 327:16 329:11 337:15 386:11
**hermanb** 327:19
**hey** 340:20
**high** 379:5
**hit** 342:2
**hold** 339:17
**homework** 358:5
**honestly** 340:9
**honorable** 346:2
**host** 372:13
**house** 374:7
**houston** 327:13
**huge** 379:20

**human** 382:7 383:23
**humans** 334:19
**hundreds** 371:9 380:14,15 385:8 389:2
**husband** 343:4
**hypothesis** 378:15 378:17

**i**

**idea** 342:21 355:2 358:3
**identification** 337:14 344:13 363:24
**identified** 365:12
**identify** 329:6
**ignore** 380:15
**ii** 326:12 329:5
**impacts** 353:24 354:1
**important** 343:21 355:7 389:7
**impossible** 378:9
**incident** 388:8,12 388:17 389:24 390:2
**incline** 366:2 367:19 368:2 370:22
**inclined** 355:13,21
**inclines** 371:6
**include** 340:3 375:18,19
**including** 383:15
**incorrect** 384:22 387:25 391:14
**index** 328:1,6,13
**indicate** 389:3
**industry** 352:7

**infant** 332:9,10 352:1 357:8,10 365:20 368:11 370:18,21 371:1 372:16 376:9,16 376:19 377:2,4,8 377:12,15,18 378:11 383:13 386:12
**infant's** 366:16 384:18
**infants** 355:12,15 355:16,18 356:1 356:14 357:14 368:12,16,20,20 369:5 371:1,24 372:16,17 374:1,8 374:18 375:20 376:21 377:10 381:20 384:1 385:4,25 386:8 387:6 389:4
**information** 332:21 333:4 334:5 339:4 347:10 353:1,3,7 354:4 355:8 389:7 389:19,21,25 390:7 392:8,9
**initial** 328:8,9 337:10,10 386:2,4
**injuries** 359:16,17
**injury** 347:5 349:24 350:4 351:16,20,24 352:4,7 357:23,24 358:1,3,14,24 360:1,12 361:9 365:2,11 388:15 388:20

**inquiry** 355:9
**instantaneous** 365:15
**instructing** 345:25
**instructions** 383:17
**instructive** 375:17 375:19 389:12,16
**insufficient** 391:2
**interacting** 361:3
**interacts** 376:3,4
**interchangeably** 337:3
**interested** 394:17
**internal** 359:16
**interplayed** 338:21
**interpret** 346:3 348:5,8,10,13
**interpreted** 350:23
**interpreting** 345:25 349:8,9
**interrupt** 348:23 348:24,24
**interrupting** 381:5 381:7
**interruption** 348:21 382:2
**investigation** 359:21 361:6
**investigative** 336:15
**involved** 339:1,16 341:4 342:6,7 368:16
**involving** 340:12 369:2
**ironically** 378:16
**irony** 378:4,6,17

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 158 of 171
William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

[irrelevant - looking]                                                    Page 9

**irrelevant** 375:22
**ish** 346:24
**issue** 350:23
**issues** 339:9
 353:11

## j

**jess** 327:24
**job** 339:5,6 346:1
 354:10 358:16
**john** 327:4 329:8
 333:8 337:19
 342:23 344:25
 356:9 396:1
**jones** 327:25
**josborne** 327:7
**judge** 346:1,2
**judgment** 391:17
 391:18
**judicial** 395:5
**july** 328:17
**jurisdiction**
 343:18
**jurisdictions**
 343:20
**jury** 330:7 332:8
 336:23 337:2
 340:20 345:25
 346:3 350:19,20
 355:9 356:24
 377:8
**juvenile** 338:8,16
 338:16,19,21
 340:2

## k

**kathleen** 326:4
**katie** 329:9
**keeping** 361:8
**kids** 374:13
 383:10

**kids2** 341:15,19
 342:2,7,11 343:13
 343:16,22,22
**kin** 394:14
**kind** 339:15
 342:23 344:15
 348:2 349:17
 358:4,18 359:6
 375:14 384:12
**kinds** 350:5
 379:15
**knees** 384:3,9
**knew** 332:5
 389:17
**know** 333:3 335:7
 337:1 339:20
 342:17 343:20
 344:3,21,22 345:6
 354:5,22 355:5,5,9
 355:25 356:7,23
 357:23 358:17
 359:5,11,14,24
 360:23 361:5
 362:24 365:14
 371:9 374:5,19
 375:18 377:23
 379:16 386:13
 388:24 389:18
 390:22 392:1,9,10
 392:16
**knowing** 359:8
**knowledge** 340:6
 352:19 361:16
**known** 374:21

## l

**l** 326:24 394:24
 395:1,25
**label** 335:3
**labeling** 334:19
**labs** 375:8

**lack** 359:17
**lake** 335:22 362:9
**lane** 336:2
**language** 348:13
 349:2
**large** 354:17
 363:14,18 371:11
 389:6
**law** 345:7,15,25
 346:3,6 349:9
**laws** 368:5
**lawyer** 338:2
 345:15 346:15
 347:14 354:17
**lawyers** 350:21
 351:2,6 352:24
 353:5
**laying** 368:1,3
 374:9 375:6
**layperson** 336:25
**learn** 347:10
 353:24,25
**learned** 347:12
**leave** 373:5,10
 392:25
**left** 336:15,15
 347:4 351:13
 386:12,15 387:3,4
**legal** 334:4 344:16
 345:5,17,20,22
 347:9 348:10,12
 348:14 349:2,6,6,8
 349:14,15,17
 350:6,9,11,15,19
 350:23 351:1
 354:15 358:13
 395:8,9,12,15,21
**legalese** 346:24
**legs** 377:16
**lengthy** 364:4

**liability** 347:14,16
 347:20
**licensed** 330:20
**life** 359:2 383:5
**lift** 383:10
**limit** 336:6
**limited** 336:13
**line** 347:17 397:14
 397:18,22 398:1,5
 398:9,13,17,21
 399:1,5,9
**lines** 336:4 372:18
 388:2
**list** 333:1,15 342:1
 361:11
**listened** 392:13
**litigated** 339:24
**litigation** 341:23
 395:24
**little** 362:22 363:1
 363:19 365:5
 388:5
**llp** 326:21 327:5
 327:12,17 395:10
**located** 342:11,14
 342:14 343:18
**long** 337:8 342:3
 346:10 348:20
 359:15 372:22
 373:6,18 382:23
**look** 335:8 336:22
 346:23 349:1,6
 350:22 358:7
 362:12
**looked** 334:24
 339:19 364:13
 376:15 389:24
**looking** 362:20
 380:24 385:21
 386:1 387:1

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 159 of 171

William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

[lot - nose]
Page 10

**lot** 334:17 335:23
338:1 349:7
355:19 370:15
371:23 374:4,13
374:22 379:13
383:12 385:22,23
386:17,19 388:24
**louisiana** 327:12
**lovett** 327:11
328:4 329:10,10
329:19 333:6,9
337:15,21 342:23
343:4,9 344:14,25
348:16 356:9,12
363:20 364:1,7
369:22,24 373:3,8
380:3 381:6,13
392:20 393:2
**lovettm** 327:14
**low** 345:11

**m**

**ma'am** 383:2
**mail** 327:7,14,19
396:13
**making** 355:1
356:24 397:10,11
**man** 335:23
**mandatory** 328:8
337:9
**mansell** 396:24
**manually** 396:11
**manufactured**
347:2 351:11
**manufacturers**
346:13
**maricopa** 343:2
**marked** 328:13
337:14 344:13
363:24
**mary** 327:11
329:10,10 333:9

**match** 336:7
**material** 336:5
338:6 352:3 385:2
392:11
**materials** 371:7
**mattel** 326:8
329:12 388:10
**matter** 332:1
339:24 377:25
**matthew** 356:3
386:13,14
**mean** 330:25
333:3,23 338:5,25
340:15 342:24
345:19,24 346:4
346:16 348:7
349:16,25 350:12
351:17,22 352:6
357:16 358:16
359:6,10 360:15
365:5,25 377:22
386:13 387:8
388:21 389:14
390:6
**meaning** 345:23
382:4
**means** 348:10
349:5 360:14
394:10
**meant** 346:21
**meat** 345:1
**mechanical**
365:18
**mechanism**
357:25 365:1,11
388:15,19
**medical** 330:8
331:4,6,11,17,18
331:22 335:19
336:14,19 352:12
352:15,17,18,20

359:11,25 360:2
361:9 391:11,20
**medicine** 330:20
**meet** 345:20
**meets** 349:7
**mention** 338:13
**mess** 332:5
**met** 353:10
**midr** 337:20
**milestones** 357:6
**mind** 361:8 363:12
**minute** 374:21
**minutes** 377:18
**miracles** 353:17
**mixture** 356:22
**mobile** 339:17
**mobility** 339:9
**modern** 353:18
**moment** 366:16
**momentum** 384:1
384:4
**monday** 326:16
**month** 383:12
**months** 357:9,11
**mother** 363:2
369:5 387:20
392:13
**motion** 355:6
368:5 369:13
**mouth** 363:17
**move** 377:15
**moves** 383:23
**moving** 377:17
385:5,11
**multiple** 380:21
**mute** 356:9

**n**

**n** 331:1,23 351:25
360:24 361:1
363:15 365:19,25
366:1,2,7,16

367:10,19,21,25
368:17 369:18
370:3,9,18,20
371:6 376:3,4,10
379:2,24,25 380:5
380:10,22 381:20
384:19 388:15
**n.e.** 326:21 327:18
**name** 341:2,7,10
369:10 394:21
**naturally** 384:13
**near** 375:8
**necessarily** 355:8
**necessary** 397:13
**need** 329:25
335:16 339:12
344:5 345:12
359:14,18 372:1
**needed** 360:23
**needs** 339:13
**neither** 375:4
**neonatologist**
330:12
**nevada** 342:19,22
343:7
**never** 339:5,23
345:7 376:24
**new** 339:21 354:4
354:8
**newton's** 368:5
**nicholas** 356:4,5,6
385:20 386:13,15
387:2
**noise** 333:11
**nominally** 347:24
387:11
**non** 373:19
**normally** 347:19
**northern** 343:24
**nose** 363:17

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 160 of 171
William Singhose, Ph.D., Vol. II
September 27, 2021
In Re: Fisher-Price/Mattel

[notarized - people]
Page 11

**notarized** 396:13
**notary** 326:25
  399:19
**noted** 397:4,5
**notes** 377:3
**noting** 396:8
**number** 341:18
  347:21 376:14

**o**

**o** 395:1
**o.c.g.a.** 395:14
**oath** 329:17,23
  330:1
**object** 332:13
  360:3 373:12
**objection** 346:9
**observations**
  372:16
**observe** 372:21
  374:6,9,11
**observed** 371:1
  379:14
**obstructed** 387:23
  392:14
**obstructions** 363:9
**obviously** 345:14
  358:6 373:24
  374:23
**occurred** 389:5
**occurring** 381:19
**occurs** 350:14
  364:24
**ocga** 397:7
**odd** 344:5
**offense** 337:1
**offer** 330:23
  331:21 345:19
  352:14 379:1
**offered** 340:6
**offering** 345:17,22
  346:12 361:9

**offices** 395:10
  396:3,13
**oh** 341:8 356:20
  377:22 379:5
  383:9 389:14
  390:2
**okay** 331:3 338:1
  344:21 352:5,22
  353:9 358:22
  360:7,18 361:23
  366:22 367:3
  369:21 370:7,24
  375:7,16 387:1,1,2
  387:17
**old** 357:10,11
  382:14,15 383:13
**olga** 327:11
  329:10,10 333:9
**oliver** 356:3,4,5,6
**olson** 329:9 361:12
  390:17
**olson's** 330:24
**once** 370:18
  371:24 396:12
**ones** 371:17
  389:12
**opinion** 330:23
  331:21 353:24
  358:9 359:8 361:9
  363:1 366:7,22,24
  367:9,17,18 370:6
  370:7,11,14,23,24
  371:4,4,12 372:4
  372:14 375:2
  377:21,25 379:1
  379:18,21 381:11
  381:13 384:18
  388:12 390:15,19
  392:18
**opinions** 345:17
  345:19,22 346:12

352:11,15 354:1,6
  354:12,15 355:4
**opposing** 354:25
  355:3
**order** 375:11
  383:25
**ordering** 396:18
**original** 344:11
  361:11 396:17,20
**osborne** 327:4,5
  329:8,8 332:13
  343:1 345:3
  348:15,18,23
  349:4 351:3
  352:23 354:2,9,13
  355:2 360:3
  371:20 372:25
  373:12 381:4,10
  391:7,16,25
  392:17,24 396:1
**osborne's** 354:10
**outside** 333:11
  336:25
**overall** 335:1
**overlapped** 335:1
**owns** 343:5
**oxygen** 359:17

**p**

**p.m.** 326:16 329:3
  393:3,7
**page** 328:4 337:22
  344:24 372:17
  388:1 397:14,18
  397:22 398:1,5,9
  398:13,17,21
  399:1,5,9
**pages** 394:11
  397:12
**palmer** 369:10,11
  373:9,15,21
  385:19 387:15,16

**paragraph** 346:24
**parameters** 334:1
  337:5
**pardon** 343:7
**parenthetical**
  337:12
**parents** 357:2
  377:4,9 388:25
  390:5,10,11
**part** 332:3 334:23
  338:23 339:3,6,7
  339:20 343:2
  351:18 358:16,17
  358:20 363:7
  367:4,11,20
  368:13 371:3
  375:1 377:22
  392:5
**partial** 377:25
  384:16
**partially** 368:22
**particular** 338:10
  383:23 392:4
**parties** 394:15,17
  395:22 396:18
**parts** 380:18
**party** 395:17,24
**pat** 339:7
**pathologist** 330:17
  336:19 361:25
  362:1,15 390:24
**pathology** 335:20
**pdf** 396:9
**pediatrician**
  330:10
**pending** 341:16,17
**pens** 340:24
**people** 336:24
  337:3 352:22,25
  367:2

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 161 of 171
William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

[percentage - product]                                                Page 12

**percentage** 350:1
350:13
**perfectly** 349:18
**perform** 366:6
375:11
**performed** 368:12
381:1,9,12,15
382:5
**period** 372:22
373:6,11 374:15
**periods** 373:18
**person** 327:16
341:6
**personally** 380:9
380:11,19 381:15
**perspective**
374:23
**ph.d.** 326:14 328:3
328:15,17 330:6
394:7 395:2 396:2
**phenomenon**
350:14
**phone** 356:10
**phonetic** 353:20
**photograph** 375:6
**photographs**
374:24,25 375:1
385:19
**phrasing** 367:16
**physical** 336:8
360:6,25 362:24
371:5 372:6
374:16
**pick** 341:7,10
**picture** 387:13
**pictures** 385:22
**piedmont** 326:21
327:18
**pinned** 372:11
381:18

**pinning** 381:19
**place** 360:12
387:10
**placed** 368:21
369:2,7,12 373:14
381:20 385:4
387:5,6,8,10
**placement** 372:15
**plainer** 367:1
**plaintiff** 326:6
327:3 341:2,5
342:1
**plaintiff's** 328:8,9
333:13 337:9,10
352:24 353:5,11
354:11 361:24
**plaintiffs** 335:11
341:9
**planar** 367:1,1,2,3
367:5,15
**plastic** 365:16
**play** 331:1,23
340:24 351:25
360:24 361:1
363:15 365:19,25
366:1,2,8,17
367:10,20,21,25
368:17 369:18
370:3,9,19,20
371:6 376:3,4,11
379:2,24,25 380:5
380:10,22 381:20
383:10,11 384:19
388:15
**played** 371:17
**please** 329:6,14
344:8 383:3
396:13,23 397:12
397:13
**plus** 372:4

**point** 340:19
341:20 344:8
356:24 358:4
366:14 377:5
378:1 386:5
**pointed** 389:2
**pointing** 389:16
**polish** 353:21
**political** 375:9
**portion** 368:2
**position** 331:1
335:17 357:15,17
359:4,12,20
360:24 362:21
369:14 370:8,21
373:6,14,16,24
377:11,12,13
378:14 387:6,10
387:11 388:3
392:12
**possible** 392:15
**power** 384:15
**practice** 330:20
345:15 355:6
**practiced** 345:7
**precedent** 350:24
**preceding** 389:18
**prefer** 357:14,17
377:11
**preference** 357:19
**preferred** 377:9
377:13
**present** 327:23
329:6
**pressed** 385:10
**pressing** 383:17
**presumably**
380:20
**pretty** 353:22
355:3 358:2
375:22 383:16

390:21
**previous** 354:6
**previously** 328:13
344:10,13 363:24
**price** 326:8 329:12
353:8 388:10
389:17 390:9
**price's** 354:17
**principle** 349:2
**principles** 348:11
348:12
**print** 396:11
**prior** 333:15
338:22 340:7
368:11 372:18
373:7 382:2
**probably** 333:20
338:9 342:5,8
346:9 347:12,16
348:1,24 353:18
377:5 382:25
388:21 389:20,22
**problematic**
367:24
**problems** 389:17
**procedure** 334:10
397:7
**proceeding** 343:19
**proceedings**
343:20
**process** 339:3
358:18,18 366:5
384:2
**produced** 371:9
380:25
**product** 335:1,15
338:7 347:2,13,15
347:20 349:23
351:12,23 365:9
366:20 379:17
390:8

William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

production 396:23
products 332:16
338:8,16,17,20,21
339:17 340:3,11
340:13,24 350:13
proforma 344:8
progressively
366:6
prohibited 395:13
project 339:8
342:7
projects 341:18
prone 331:1 357:9
357:11,15 359:20
359:21 361:17
363:4 365:20
366:9,23 367:10
368:21,22 369:7,8
369:8,14,17 370:3
370:8,10,18,22
372:24 375:21
376:11 377:10,11
377:12 378:8
379:3 382:8,8
383:16 387:6,11
392:12
proper 368:13
properties 351:24
proud 342:25
343:6 382:21
prove 346:15
378:8
provide 352:11
371:13 388:13,18
395:11,16
provided 332:22
333:13,14,14
347:19 354:4
362:15,17 372:14
375:3 376:20
390:1,7

proximate 350:7
proximately
331:23
public 326:25
399:19
pull 344:23
pulling 378:12
386:11
pulmonologist
330:14
purport 336:11
purposes 344:5
pursuant 395:3
397:6
pursue 334:23
push 384:2,3
pushing 378:12
387:12
pushup 384:8
put 335:3 337:16
365:4 372:7 373:9
385:25

**q**

qualified 352:11
question 334:4
346:5 348:20,22
356:11 357:21
359:7 364:3,8
367:8,16 369:20
369:22 370:5
379:9,23 380:3
381:8 384:25
388:16
questions 334:6
340:11,14,25
344:3,4,6,7 346:18
350:21 354:18
355:2,3 370:15
392:20,25 394:8
quibble 336:17,21

quick 362:12
quickly 370:16
quite 362:22 367:7
368:5 384:25
386:4 388:4
quote 362:21,22
372:20,21 376:10
388:4
quotes 338:9
quoting 338:5

**r**

r 394:1 395:1
radar 342:2
raise 349:18
384:11
raised 366:4
raising 366:5
random 356:22
rates 356:1,14
395:22
reach 376:17
392:6
reached 378:20
390:14
reaching 388:14
read 339:20
347:25 361:23
362:3,11 377:3
390:23,25 391:8
392:18 396:6
397:3
reading 336:8
349:16,21 372:20
ready 330:1
real 389:9
really 345:24
363:14,18 375:14
377:23 384:8
reason 381:10
397:10,16,20,24
398:3,7,11,15,19

398:23 399:3,7,11
reasonable 331:22
378:22,25 391:20
rebuttal 328:16
337:12 363:22
364:17 390:14
recall 332:11,18
339:18 340:9,16
340:18,22 347:15
371:22 377:4,6
385:18 388:6,7
389:20
received 353:7
recollection
343:14
record 329:2,7
332:4,19 333:11
343:10 354:22
364:4 382:13,19
382:22 393:5
records 352:17,18
352:20
rectangular
366:25 367:5,14
redirect 354:24
373:4
redo 372:1
reduced 394:9
refer 330:5
referral 395:19
referred 376:15
387:19
referring 361:15
372:23 386:16
regarding 330:24
331:16 352:12
regular 364:18
394:16
regulations 395:4
relate 340:12

related 350:16
relationship 332:15
relative 360:24
relevant 334:5 336:18
rely 359:24,25
relying 374:24 377:20 378:4
remained 377:12
remember 338:4 340:13,25 342:10 342:15 375:7 376:14
reminded 369:10
repeat 367:8
report 328:15,16 334:11 335:8,9 336:14 344:9,10 344:11,15,17,19 344:22 345:4 346:23 347:11 349:22 351:10,10 352:6 361:11 363:22 364:5,12 364:12,13,16,18 364:18,18 365:12 371:15,17 375:18 375:20 385:21 386:3,5 390:14
reporter 326:25 329:14 395:7,11 395:16,18
reporting 353:18 395:4,18
reports 336:15 337:12 361:23 388:8,13,18,24 389:2,3,24 390:2
represent 333:12 334:9 347:8

394:12
representative 395:8
represented 332:8 341:8,9,11
representing 341:7
requested 396:6
require 364:4
rescue 376:25 377:1
resolution 345:11
resolved 341:20
respond 335:16
responded 334:24
responses 328:9 337:10
responsibility 396:8
restraint 368:13 389:4
restricted 352:3 365:17 392:3
restricting 357:22
restrictions 381:23
result 394:18
returned 396:15 396:19
review 336:13 353:13,15 364:4 396:8
reviewed 347:16 347:21 352:16,17 352:19 388:8
ride 383:11
right 330:10 331:8 332:2 334:2,20 335:5,12,21 336:2 336:19 338:12,14 338:24 339:6,10

339:14,18 341:1 345:3,21 346:5,8 346:19 349:20 351:9,21 352:14 352:24 353:17 354:12 355:17,23 356:14,17,23 357:12 358:24 359:23 360:2,12 360:22 361:8,13 361:17 362:23 363:10 364:25 368:14,19 369:4,7 370:12,25 374:3 375:13 376:18 377:6,21 378:25 381:25 382:4 383:13 384:3,10 384:14 385:21 386:1,13 387:15 388:10 390:4,11
rights 348:14
ringer 356:9
road 326:21 327:5 327:18
robert 327:16
robinson 326:24 353:18 394:24 395:25
rock 331:1,23 351:25 360:24,25 363:15 365:19,25 365:25 366:2,7,16 367:10,19,21,25 368:17 369:18 370:3,9,18,20 371:5 376:3,4,10 379:2,24,25 380:5 380:9,22 381:20 384:19 388:15

rocker 341:4,11 343:18
rockers 340:24
role 331:25 334:15 334:18 335:9,13 338:20
roll 355:19,19 357:8,10 365:20 366:6,8,23 367:10 367:21 368:6 369:8,17,21 370:2 370:8,9,19,21 375:5,20,24 376:2 379:3 380:1,6 383:15,20 384:4,6 392:8
rolling 355:12 372:23 375:2 376:11 381:15,24 382:3,5,7,23 383:24
rollover 376:5
rolls 381:1,9
roswell 396:24
rough 353:15,19 353:23
roughly 360:24
rule 391:4 397:6
rules 334:10 395:3 397:6
run 383:9
rundell 353:12
rundell's 354:6

**s**

s 395:1,1
safety 378:13
salt 335:21 362:9
saw 354:16 376:7 381:16 385:4
saying 331:13 336:21,23 338:15

**[saying - sorts]**                                                      Page 15

356:24 365:6
366:10,12 367:19
**says** 391:18
**scheduling** 353:11
**scholarly** 335:23
**scientific** 378:23
329:1 388:13,18
388:22 391:21
**scientifically**
375:11
**scientist** 356:18
375:9
**scope** 334:12
**screen** 337:17
386:22,24
**seal** 396:16
**seating** 339:16
**second** 351:18
**section** 344:16
345:5 373:1
**see** 331:13 336:24
344:24,25 347:6
351:23 357:17
358:14 371:15
374:11,25 375:1
376:8 377:16,17
378:4,6 379:14
385:14,22 389:6
**seeing** 337:3 338:4
385:18
**seen** 337:24 338:2
338:11 354:18
356:2,13 368:10
374:4,13,22
**selecting** 378:18
**semi** 369:8
**send** 396:17,23
**sending** 390:8
**sense** 331:17
354:19 359:3

**sent** 338:6 347:14
353:1 362:12
**sentence** 348:1
351:18
**september** 326:16
329:2 332:4,5,6
362:9 394:21
**services** 395:11,17
**session** 362:20
**set** 389:6,10
**sets** 334:1,11
**settled** 342:13
**seventeenth** 328:8
337:9
**share** 337:19
**shared** 337:19
**shift** 390:13
**shorthand** 326:25
**shoulders** 384:11
**show** 364:11 373:1
373:3 377:8
381:17 382:6
385:1,9,9 387:21
**showed** 381:19
382:6
**showing** 368:5
**shown** 349:23
377:7
**shows** 386:6,8,19
**shriner** 352:24
**side** 339:7,8,9
354:11 361:24
363:5,10,15
369:12 372:11
**sides** 331:7
**sidewalls** 372:12
381:23
**sideways** 376:23
**sids** 332:9,15
338:14,17,20
339:23 340:4,7,12

340:21 341:1
**sign** 396:7
**signature** 394:22
395:24 396:2,21
399:14
**signed** 396:12,15
396:19
**significant** 373:11
**significantly** 363:5
**silly** 344:7
**similar** 347:18
383:21
**simple** 348:25
**simply** 365:4
**singhose** 326:14
328:3,15,16 329:5
329:20 330:6
333:10 337:23
343:10 364:2
370:16 380:9
381:14 382:14
392:21 393:1
394:7 395:2 396:2
**singhose's** 363:22
**single** 367:20
**sir** 379:12 381:3
391:13
**sit** 341:1
**sitting** 343:15
**situations** 364:24
**six** 357:11 382:17
**skill** 383:24
**sleep** 379:4,8,11
380:7,8,21,23
**sleeper** 331:2,24
341:4,11 343:17
352:1 360:25
361:1 363:15
365:19,25 366:1,2
366:8,17 367:20
367:25 368:17

369:18 370:3,9,19
370:20 371:6
376:3,4,11 379:2
380:10,22 381:21
388:15
**sleepers** 338:24
**sleeping** 331:2
332:15 340:11,13
340:23
**small** 377:22
**smith** 340:20
**smothered** 391:13
**smothering**
390:18 391:10,19
391:23 392:1,7
**snippets** 371:16
**snow** 346:2
**sockets** 384:19
**soft** 365:9 366:17
385:10,11,23
387:23 390:20
392:2
**sold** 347:2 351:12
**solutions** 395:9,9
395:12,15,21
**son** 369:2 373:10
374:6 386:15
387:3
**sorry** 329:16
342:21,21,23
356:5,20 360:16
380:1 381:14
382:20 385:16
388:16 390:22
**sort** 334:11 337:3
344:6 347:14,23
358:13 361:5
363:4,9,14 366:14
387:19
**sorts** 339:13
387:12

**sound**  344:4,7
**sounds**  346:24
**sources**  356:21
**southern**  343:1
**special**  339:13
**specialty**  339:12
**specific**  340:18,22
340:25 344:1,6,6
371:18 379:23
384:23
**specifically**  371:16
374:10 380:4
385:25
**spent**  337:4
**sports**  383:1,11
**spot**  387:9
**stain**  359:13
362:25
**standard**  346:13
347:9 348:5
350:19
**standards**  345:20
349:8
**start**  359:3,19,21
361:6,6 369:23
384:2,2 386:21
**started**  347:13
374:5
**starting**  342:5
358:4 360:5
361:16,18 384:24
**state**  347:19 391:5
394:3 395:2
**stated**  338:18
394:8
**statement**  328:9
337:11,24 359:9
397:10
**statements**  354:22
**states**  326:1
347:21,24

**statics**  366:25
367:4,11
**statute**  348:5
**statutes**  347:15,20
348:6 349:17
**statutory**  326:4
348:13 349:2
**stay**  336:1 387:9
**steep**  363:16
372:11
**stenographic**
394:9
**steps**  358:7,10,11
360:9
**stick**  381:13
**sticking**  372:9
**stops**  346:9
**straight**  363:12
372:5
**street**  327:12
**strike**  364:7
369:22 380:3
**stronger**  365:6
**structure**  366:25
367:5,14 383:21
**struggle**  373:11,17
**struggled**  376:16
**struggling**  371:24
378:12 385:5
**stuck**  365:16
384:18
**studied**  332:16
**studies**  370:1
**study**  348:2
362:13,17
**stuff**  343:3 352:20
**submitted**  333:4
**subscribed**  394:21
399:16
**substance**  397:8

**substitute**  391:17
**sudden**  332:9,10
**suffered**  359:16
**suffocate**  359:15
**suid**  332:10
338:14 339:24
340:7,21
**suite**  326:21 327:5
327:12,18 396:24
**superior**  383:19
**superseding**  350:8
**supine**  357:9,11
365:20 366:9,23
367:10 369:17
370:2,8,10,20,21
372:23 375:21
376:11 379:3
382:8,8 383:16
**supplement**  328:8
337:9
**supplemental**
335:8 364:5
**support**  372:14
377:25 378:15,19
379:20
**supporting**  371:12
**supports**  370:1
378:17
**supposed**  380:15
**sure**  333:19
334:21 336:10,20
338:11,25 340:15
341:8,17 342:2,13
346:16 348:7
349:5,15 354:7
357:20 360:13
361:4,14 364:14
366:13 367:9
370:13 374:19,22
377:15 381:25
390:6

**surface**  365:23,24
366:24 367:1,3,5
367:11,15,22
374:3 380:23
381:16 383:16
**surfaces**  355:13,14
355:20,21 374:5,6
379:4,8,11 380:7,8
380:21
**surrebuttal**
364:13
**surroundings**
360:21
**survey**  377:3
**sustained**  361:10
**swear**  329:14,25
**sworn**  340:6
399:16
**syndrome**  332:9
332:10
**systems**  339:16

**t**

**t**  327:6,13,19
394:1,1
**take**  335:10,12
360:9 367:25
373:23 393:2
**taken**  350:22
358:10 362:12
394:7
**takes**  358:8 365:13
**talk**  337:7 355:10
360:7 383:25
**talked**  355:11,25
359:10 370:17
374:10 377:10
384:17 388:2
**talking**  350:18
360:8 364:14
370:1 380:19
385:12,13 388:6,7

**tall** 382:16,17
**tape** 377:24
**team** 339:4
**technical** 348:9
  349:7 350:12,16
**tell** 336:10 341:2
  346:1 353:19
  383:3 390:10
**telling** 346:3
  375:18
**term** 346:21
  391:24
**terminology** 340:1
**terminus** 327:17
**terms** 332:15
  336:5 343:18
  345:2,24 353:2
  359:15 360:4
  364:16 365:18
  371:6 389:25
**test** 373:25 374:2,7
  375:12,13,14
  376:1,2,5 379:10
  379:10,18 380:9
  380:11,23
**tested** 379:13,14
  380:24 382:3
**testified** 332:7
  333:20 334:14
  340:10,20 341:3
  343:17 359:23
  362:21 363:8
  366:15 378:2
  387:5,21 391:2
**testifies** 391:9
**testify** 336:2
  361:21
**testifying** 330:2
  331:10 364:23
**testimonies** 340:23

**testimony** 332:11
  332:17,18 333:15
  336:18 339:19
  340:5,7,18,22
  350:25 357:1
  359:1 362:4,20
  363:7 387:20
  389:11 397:3,9
**testing** 369:9
  375:23,23,24
  376:7 379:7,15
  383:7 384:20,23
  385:1,13,15,17,24
  390:8
**tests** 368:15 369:2
  381:22
**texas** 327:13
**thank** 329:13
  331:15 332:2
  333:8 349:20
  356:10 370:16
  392:21,23 393:1,2
**theory** 375:13
  384:20
**thereto** 394:9
**thing** 335:24 374:8
**things** 340:24
  352:23 353:3,4
  360:10 362:19
  363:12 370:17
  375:7 378:19
  383:12 387:12
  388:25
**think** 331:20,25
  332:12 333:6,19
  334:3,7,16,22
  335:3 336:3,9,20
  336:22 337:1,2
  338:18 339:25
  340:15,17 341:17
  342:6 343:22

345:19,22 346:4
  350:1 351:5 354:3
  354:3,14 356:1,7
  358:2,20,25 359:6
  359:7 361:15
  362:5,11 363:6
  364:21 366:13,14
  367:17 368:10,15
  368:20,22 376:10
  376:20,23 378:1,1
  378:2 382:1,11
  383:25 385:24
  386:2,6 388:1
  389:3,9 390:25
  391:20
**three** 342:8,8,9,10
  342:12 343:13,17
  357:9 376:20
  382:25 385:25
**throat** 365:16
**time** 337:4 339:5,6
  342:9 343:6 347:3
  350:13,17 351:13
  353:10 363:11
  368:23 373:6,11
  373:18 374:6,15
  375:5 389:14
  392:22 393:3
  396:20
**times** 333:21,21,24
  357:6 367:7
**title** 337:8
**today** 337:5
  339:22 388:3
  392:22
**today's** 329:1
**told** 341:21 352:10
  356:7
**top** 340:14
**topic** 340:7

**torso** 383:21
  384:11
**tough** 363:13
**training** 348:10,12
  349:14,15,17
**transcript** 353:14
  353:16 354:15
  390:24,25 392:19
  394:7,12 396:8,17
  396:20 397:3
**transcripts** 353:19
  362:3
**trapped** 366:17
  376:9,10,18
  377:14
**traurig** 326:21
  327:12,17 395:10
**treetops** 354:25
**trial** 348:25
  350:20 354:24
  392:25
**tried** 346:21,22
  358:5,7
**true** 332:22
  333:18 340:18
  350:10 351:2
  354:23 355:14
  375:21 377:14
  390:1 394:12
**truthfully** 330:2
**try** 345:20 349:7
  371:24
**trying** 352:2 354:3
  354:19 376:17
  377:15,20 378:7
**tucson** 327:6
**turn** 363:18 366:3
  369:13 371:24
  376:21 378:8,9,13
  384:16

Case 2:19-cv-02689-GMS    Document 192-4    Filed 11/19/21    Page 167 of 171
William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

[turned - written]                                                    Page 18

**turned** 352:2,21
361:16 363:5,9,14
363:16 376:16
387:22 392:11
**turning** 331:1
352:23 353:3,4
**two** 356:16 357:1
363:12 369:5
374:17,17 376:22

**u**

**u** 395:1
**unbreathable**
392:11
**uncertain** 362:23
388:5
**uncomfortable**
373:18
**underlying** 371:15
**undersigned** 397:2
**understand**
329:20 331:4
332:23 335:17
340:5 346:10,18
346:21 348:8
350:18 364:17
370:5 374:19
378:18 379:9
384:25 392:5
**understanding**
334:4 341:19
344:17 345:6
346:6,7 347:23
349:25 352:6
353:6 358:9,15
359:1 361:2,7
374:16 378:22
**understood** 348:4
**undisputable**
378:10
**unexplained**
332:10

**unfamiliar** 350:10
**unified** 347:23
**uniform** 389:25
**united** 326:1
347:24
**unnaturally**
363:14
**unobstructed**
363:17
**unrealistic** 363:19
**unreasonably**
347:3 351:12
**unreliable** 378:3,7
378:10 380:17
**unusual** 354:16
**use** 348:9 351:7
368:13 389:22
397:12
**useful** 378:15
**uses** 378:7
**usual** 395:22
**usually** 343:21

**v**

**v** 372:6
**valid** 375:11
**valley** 372:6
**valuable** 389:7
**variety** 383:11
384:6
**various** 375:25
388:9
**verbalizing** 354:6
**veritext** 395:8,9
395:12,15,21
396:13,23
**video** 371:9,14,16
371:23 376:6,6,15
376:20 377:7
385:8 393:5
**videographer**
327:24,25 329:1

329:13 393:3
**videos** 379:15
380:14,14,15,25
**videotape** 326:13
329:4 393:4 395:2
**viewing** 371:8
**vitae** 333:1
**volume** 326:12
329:5
**voluminous**
344:23
**vs** 326:7

**w**

**walk** 358:10
**wall** 363:15
**wanda** 326:24
394:24 395:25
**want** 337:20
346:23 358:10,23
360:8 364:14
373:1 374:11
377:19 378:16
380:16 381:25
383:16 386:23
390:13
**wanting** 373:22
**warning** 334:19
335:3
**warnings** 334:14
334:23,24,25
335:13,14 336:7
336:13
**watch** 374:8
**way** 336:16 340:17
351:2,6,7 357:19
367:17 382:8
384:7,13 387:23
389:19
**ways** 384:7
**we've** 330:4 333:6
345:6 368:10,19

368:19 386:24
387:5
**week** 343:5
**weigh** 382:18
**weights** 383:10
**went** 347:10 374:7
**wetmore** 327:5
**wheelchairs**
339:12
**whereof** 394:20
**wholly** 343:2
**wife** 357:2
**wiggins** 327:24
**wiggled** 376:23,24
**wiggling** 369:13
387:11
**william** 326:14
328:3,15,16 329:5
394:7 395:2 396:2
**willing** 349:18
**witness** 329:15,16
332:21,25 333:17
334:1 392:23
394:20
**wobbly** 384:12
**word** 351:20 377:1
**words** 366:13
373:9
**work** 338:2 341:22
348:6,17 349:1,7
351:8 353:1,21
359:22
**worked** 341:18
347:19 373:15
**working** 339:9
347:13 358:13
**wow** 344:1
**write** 338:10
**written** 350:2
389:8

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

**[wrong - zoom]**                                                        Page 19

| | |
|---|---|
| **wrong** | 389:1 |

| **y** |
|---|

| **yeah** | 335:3 336:3 |
|---|---|
| | 336:22 338:4 |
| | 341:21 345:24 |
| | 349:25 351:19 |
| | 353:6,9 354:21 |
| | 355:18,20 357:16 |
| | 358:2 359:10 |
| | 360:4,15 361:14 |
| | 363:11 365:5,13 |
| | 365:24 366:13 |
| | 370:11,24 371:13 |
| | 371:22 372:15 |
| | 378:1 379:10 |
| | 385:12 386:4,8 |
| | 387:1 389:9 |
| | 390:19 |
| **year** | 333:21 348:2 |
| **years** | 333:20 |
| | 342:5,8,8,9,11,12 |
| | 343:13,17 382:15 |
| | 382:25 |
| **youthful** | 345:8,10 |

| **z** |
|---|

| **zoey** | 330:24 359:8 |
|---|---|
| | 360:21 361:10,12 |
| | 362:21,22 363:2 |
| | 388:3 390:17 |
| | 391:12 |
| **zoey's** | 331:11,16 |
| | 331:22 352:8,12 |
| | 352:16,17 363:9 |
| | 365:2 387:20,22 |
| | 389:5,12,18 391:3 |
| **zoom** | 327:1 |

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.