# EXHIBIT C



(a) Infant 5 (Mattel-COU0024386.MOV and Mattel-COU0024383.MOV).



(b) Infant 10 (Mattel-COU0024355.MOV and Mattel-COU0024359.MOV).

**Figure 20: Comparison of Toy Altitude Angles Between the Flat Crib and Rock 'n Play Sleeper for Infants 5 and 10 in the Preliminary Observations.**

tirety of the preliminary observations. Additionally, there is also not a single clip provided showing the Infant 1 flat crib or Rock 'n Play sleeper testing. Finally, CCTV angles are also missing from the provided clips. These angles are shown in Dr. Rundell's Report Figures 33, 34, 37, 38, 39, 49, 50, 52, 56, and 60. We have been denied the data needed to properly analyze and respond to the testing. As a result, the data set is both unreliable and not reproducible.

[76]    To reiterate, the full scale testing videos have similar issues, wherein the video

COU_009084

segments showing each subject are edited and cut with parts left out. Moreover, the audio tracks have been completely scrubbed, preventing the kind of insight and review offered here for Infant 7 in the preliminary observations.

### 5.2.3    Engineering Systems, Inc. Testing

[**77**]    Dr. Rundell relies on observational testing performed by Engineering Systems, Inc. Dr. Rundell does not clearly state what the purpose of these test were. However, Dr. Rundell appears to derive some meaning from the tests in terms of how easily an infant can roll over in a Rock 'n Play sleeper when he states,

> Infants demonstrated similar or less ability to turn and roll in the RNPS, restrained and unrestrained, compared to the crib environment. Pelvis lifting and turning movements were limited by use of the restraint. Throughout all restrained evaluations, the restraint remained around the pelvis of the infant, and the knee never rose above the level of the belt portion, despite infants attempting to push up with their legs. (Rundell Report, pg. 100.)

[**78**]    The tests simply are not a reliable source of information about the ability of infants to roll from supine to prone in a Rock 'n Play sleeper. Each test was conducted for only 10 minutes. Given that infants are placed in the Rock 'n Play sleeper for hours on end, any reliable test attempting to show that infants cannot roll over in a Rock 'n Play sleeper would have to be conducted over similar time durations.

[**79**]    Note that the question of whether or not infants can roll supine to prone in a Rock 'n Play sleeper is a settled question. They can - both while restrained and unrestrained by the belt restraint system. The numerous incident reports documenting such cases is irrefutable. Therefore, these tests are largely irrelevant to this case because what they are apparently attempting to show (and doing so in an unreliable manner) is already a settled question. Infants can roll from supine to prone in a Rock 'n Play sleeper. If Engineering Systems wanted to conduct a roll-over test that is more relevant to this matter, then they could have tested infants' abilities to maneuver out of the hazardous prone position and back to the supine position.

[**80**]    Another problem with these tests is that Dr. Rundell does not explain how they were conducted. For example, he refers to infants being "restrained" in the Rock 'n Play sleeper, but he provides no description of how they were restrained. So, the infants might have been cinched down very tightly in the Rock 'n Play sleeper, or they may have been loosely and comfortably restrained. We simply do not know how these tests were conducted, so they are unreproducible.

### 5.2.4    Explico Demonstrations

[**81**]    In his last set of his "Safety Analysis Data," Dr. Rundell presents some demonstrations provided by his company, Explico. Dr. Rundell describes the goal of the demonstrations as:

COU_009085

The primary objective of the testing was to compare an infant's oxygen satura-
tion while in the RNPS when compared to other environments both awake and
asleep. (Rundell Report, pg. 120.)

[82]    Dr. Rundell then summaries the results of these demonstrations with the follow-
ing description:

These data demonstrate that the oxygen saturation levels experienced by the
infants were not sensitive to the sleep environments tested. Specifically, the
oxygen saturation experienced by infants in the RNPS was demonstrably sim-
ilar to other sleep environments, including a flat crib mattress. (Rundell Re-
port, pg. 120.)

*Fundamental Flaw*

[83]    As an initial matter, all the data that they collected are *prima facie* unre-
liable because they used a defective and unreliable oxygen monitor that is not FDA ap-
proved. The Owlet Smart Sock is well known to be an unreliable sensor and gives false
readings on a regular basis.[8] Additionally, the Owlet Smart Sock is the subject of a class
action lawsuit.[9] Finally, the Owlet Smart Sock used by Explico was evaluated by a re-
search group at Google while I worked there from 2017 through 2019. The group evalu-
ated the Owlet in hopes that they could integrate it into a unified home monitoring sys-
tem. However, the Owlet was so unreliable that it was not pursued further. In short, it is
an unreliable sensor. Ironically, the Mannen study that Dr. Rundell attempts to discredit
used a much better oxygen monitor that is FDA approved:

Infants' oxygen saturation (SpO2) during each testing condition was monitored
in real-time using a medical grade pulse oximeter (PM10N; Covidien/Medtronic,
Minneapolis, MN). (Wang et al., Section 2.2.3.)

*Systemic Errors*

[84]    In addition to failing to capture any reliable oxygen saturation levels, as was
their primary objective, the Explico Demonstrations have numerous other failings. First,
their experimental protocol apparently includes a step of "properly restraining"[10] the in-
fant with the belt restraint. However, they do not provide any explanation of their belt-
adjustment procedure or any tightness levels for the belt used on the infant. Of course, if
one straps an infant into the Rock 'n Play sleeper with a very high-level of belt tightness,
then the infant is effectively fixed in place like a prisoner strapped to The Rack. A typi-
cal caregiver would never cinch an infant into the sleeper with a high-level of belt tension.

---

[8]See for example, Fundamentals of Telemedicine and Telehealth, Chapter 4, 2020.
[9]See for example, topclassactions.com/lawsuit-settlements/consumer-products/baby-products/891518-
owlet-class-action-says-smart-sock-doesnt-work-burns-infants-feet/
[10]See for example Rundell Report, Opinion 9, page 15. See also Id. page 142.

COU_009086

Therefore, in order to assess whether or not the "proper restraint" used by Explico was, in fact, proper, we would need to have a measurement of belt tightness, or at least a description of how they set up the belt restraints for each infant. For example, did they measure the infant's waist and then adjust the belt to be 1 inch larger, or 2 inches larger? Or did they place the infant into the Rock 'n Play sleeper and pull on the left and right adjustment straps with 5 lbs of force or 10 lbs of force? Each of these variables in the restraint setup procedure could result in a restraint that was not "proper." That is, the restraint might be too loose or it might be too tight. Given that no description of their adjustment procedure was provided, Explico's demonstrations are not reproducible.

[85]    As a final note on this issue, if Explico cannot explain how an infant is to be "properly restrained" in a technical expert report, then it is very unlikely that Fisher-Price could explain how to "properly restrain" an infant to its intended customers in a user manual. For example, if only a very general instruction such as "tighten each waist belt so that the restraint system is snug against your child" (User Manual, pg. 5) appears in the user manual, then a caregiver would not know how to "properly restrain" an infant in a consistent manner. Certainly, many concerned caregivers are going to interpret "snug" as being fairly loose so that their infant is comfortable. We have no way of knowing if the "snug" fit used by the range of Rock 'n Play users matches up with the "properly restrained" belt tightening used by Explico. It is very possible that Explico over tightened the restraints, above and beyond what concerned caregivers would do when using the product in a reasonable manner.

[86]    Explico could have improved the reliability of their demonstrations by having a sample group of caregivers "snuggly" restrain an infant in the Rock 'n Play sleeper and then measure the resulting belt tightness. Explico did not establish any such measurement standard and did not measure their own experimental setup for belt tightness. As a result, these demonstrations are both not reproducible and unreliable.

[87]    Second, the Explico demonstrations attempt to show that "oxygen saturation levels experienced by the infants were not sensitive to the sleep environments." However, to establish such cross-platform results, the tested environments have to be chosen without bias and the various environments need to be tested in their expected-use conditions. The Explico demonstrations fail on both accounts. How the sleeping environments were chosen and what materials (such as fabric composition) they are constructed from was not reported. Therefore, a non-biased selection of sleeping environments cannot be established.

[88]    Furthermore, the Explico demonstrations certainly do not test the Rock 'n Play sleeper in its expected-use conditions. The Rock 'n Play sleeper was tested only with infants, perhaps tightly, cinched into place. Fisher-Price has known since before the initial release date of the Rock 'n Play sleeper that caregivers would often not use the restraints. This knowledge came from, at least, their limited in-home testing. Additionally, Fisher-Price knew well before Zoey Olson's death that even if the restraints were used, infants could still wiggle out of the restraints. This knowledge came from the numerous incident reports that Fisher-Price received describing just such events. Those incident reports will be reviewed in more detail in Section 5.2.8. Therefore, the expected-use conditions for the

35

Rock 'n Play sleeper include non-use of the restraints, as well as use of the restraints on infants that can wiggle out of the belts. Given that neither of these well-known expected-use conditions were addressed by Explico, the Explico Demonstrations could not possibly support this opinion of Dr. Rundell.

[89]    Third, recall that Dr. Rundell criticized the Mannen study for not demonstrating that infants can roll from supine to prone on the inclined surface of the Rock 'n Play sleeper. The Mannen study placed infants into the prone position and studied their biomechanical responses. To Dr. Rundell, that was a mistake because the Mannen study did not prove that the infants could arrive at the prone position under their own power. Given that numerous infants have been able to wiggle out of restraints (see the numerous incident reports), there is no doubt that infants can maneuver into the prone position studied by Mannen. Therefore, this criticism is unfounded. Ironically, a complimentary criticism can be leveled at the Explico demonstrations for which Dr. Rundell advocates. Those demonstrations fail to show that once in a prone position, infants can complete a prone-to-supine roll in the Rock 'n Play sleeper. In truth, the Explico Demonstrations are simply not relevant to this matter because they do not study any aspect of infants getting into, getting out of, or of being in the prone position within the Rock 'n Play sleeper. While they do not provide relevant information for this case, the Explico Demonstrations seem to indicate that if you strap infants down tight enough, then they cannot roll over. That is self evident.

[90]    Fourth, during his review of the Explico demonstrations, Dr. Rundell repeatedly claims that the "geometry" of the Rock 'n Play sleeper prevents any restrained infants from rolling in the sleeper. These statements are made without any quantitative or even qualitative analysis that clearly ties the "geometry" to the inability to roll. It is clearly not the geometry of the Rock 'n Play sleeper that is restraining the infants in the Explico demonstrations - it is the cinched down belt restraint combined with the very short time durations of the tests. As was thoroughly documented in my Initial Report, the "geometry" of the Rock 'n Play sleeper forms a trap that makes it very difficult for an infant to maneuver out of the prone position. Moreover, assuming that the infants are, in fact, restrained in and lack mobility owing to the restraint and geometry of the Rock 'n Play sleeper, then prone infants will be unable to place their hands under their face to create space between the non-breathable fabric, and their nose and mouth to allow proper ventilation. As shown in Explico demonstration 20200729, some infants prefer to sleep prone with their hands boosting their face above the flat surface of the mattress to allow ventilation. This shows that the geometry of the Rock 'n Play sleeper that Dr. Rundell claims can prevent infant rolling has the corresponding hazard of preventing life-saving motions that infants use to clear their airways during sleep.

[91]    Finally, the Explico demonstrations lack standard experimental design elements. Experimental studies should have clear definitions of test hypotheses, control variables, an experimental versus control group, a justification for sample size, and an explanation of why the subjects are representative of all users of the Rock 'n Play sleeper. Such standard elements of reliable experiments are absent from the Explico Demonstrations. Most impor-

COU_009088

tantly, expected-use cases of the Rock 'n Play sleeper were not tested. The experimental setup did not specify a common time duration for observation, and instead, arbitrarily decided the duration of observation for each individual sleeping environment. Perhaps the demonstrations were halted the moment that dangerous conditions started to arise. The information made available about these demonstrations is simply inadequate to assess its reliability and relevance to this matter.

*Individual Case Errors*

[**92**]     Although the fatal flaw and the systemic errors addressed above are enough to completely discredit the Explico demonstrations, this subsection will briefly point out a few errors in the individual demonstrations.

[**93**]     The Rock 'n Play sleeper is designed for unattended overnight sleep for upwards of 10 hours at a time. However, the Explico demonstrations observed only a few subjects for relatively short periods of time. While the limited co-sleeping demonstrations occurred over a 3 hour period, the "crib mattress asleep" demonstration was only 50 minutes for Infant 20200729 and only 34 minutes for Infant 20200913. The short observation durations within the three sets of Explico demonstrations alone show the unreliability of the conclusions drawn from these demonstrations. Moreover, none of the demonstrations observe the test subjects for long enough to address the intended uses of the Rock 'n Play sleeper.

[**94**]     Infant 20200729's caretaker indicates that Infant 20200729 prefers to sleep "prone with the hands between the face and the sleep surface." Knowing this, the Explico Rock 'n Play sleeper-restrained and asleep demonstrations should have been performed in the prone position as well. This is a specific example of the Explico Demonstrations not testing the expected-use cases. Moreover, the Rock 'n Play sleeper-restrained and asleep demonstration descriptions provided by Dr. Rundell indicate that Infant 20200729's head did not "at any point slump forward into a forward on "chin-to-chest" posture." However, this result was arrived at after observing Infant 20200729 for only 30 minutes. This observation duration is insufficient to conclude that the subject's head is unable to slump forward into a chin-to-chest configuration over 10 hours of unattended sleep, for weeks on end, while strapped to the Rock 'n Play sleeper.

### 5.2.5    CPSC-Commissioned Study

[**95**]     Dr. Rundell attempts to discredit the CPSC-commissioned study performed by Dr. Mannen's research team. I note that Dr. Rundell has a high bar to clear to achieve his goal because the study has been reviewed and endorsed not just by the CPSC, but also by the greater engineering community. Dr. Mannen's group has published elements of this study in a peer-reviewed international engineering journal. (See Wang et al., on which Dr. Mannen is an author.) In my opinion, this endorsement by the engineering community carries much greater weight than anything in Dr. Rundell's report. However, I will address a few of his statements just to make it clear that his criticisms are unfounded and misdirected.

37

[**96**]      As an initial matter that speaks to the overall credibility of the Mannen study, their tests were conducted using a medical grade pulse oximeter (PM10N; Covidien/Medtronic, Minneapolis, MN) that is FDA approved for these types of measurements. On the other hand, recall that the Explico demonstrations that Dr. Rundell bases his opinion on used the unreliable Owlet Smart Sock that is not FDA approved and is well known to be an unreliable sensor that gives false readings on a regular basis.[11] Given that Dr. Rundell advocates for a study that uses defective sensors, yet criticizes one that uses medical-grade sensors for the same type of measurements indicates that he has not properly reviewed, analyzed, and evaluated the experimental studies.

[**97**]      Dr. Rundell appears to criticize the Mannen study for pointing out that it is very hard for infants to maneuver out of the prone position and back to the supine position.[12] This criticism is expressed by Dr. Rundell as:

> The authors therefore state that "the product design of limited horizontal space and a non-rigid concave surface makes rolling prone to supine difficult or impossible - while simultaneously speculating that the **same design features** make rolling from supine to prone *easier*. (Rundell Report, pg. 118) (emphasis in the original.)

[**98**]      Dr. Rundell appears to be objecting to the very idea that a design feature can make motion in one direction easy, yet motion in another direction difficult. Dr. Rundell does not bother to explain why he believes a design feature must allow rolling supine to prone just as easily as rolling prone to supine. In fact, he could never provide such an analysis because it is very far from the truth. The world is filled with features that allow motion in one way much easier than in the opposite way. The most obvious example is rolling a boulder up and down a hill in the manner of Sisyphus. The boulder rolls easily down the hill, but it is torturously difficult to roll it back up.

[**99**]      While an infant can push forcefully with their legs on the foot plate of the Rock 'n Play sleeper to induce supine-to-prone rolling, once the infant has fallen face down into the double-V valley of the Rock 'n Play sleeper, it is very hard for them to generate forces to get back out. As thoroughly explained in my Initial Report, there are mechanical and biomechanical differences to an infant lying on their back and being face down in a Rock 'n Play sleeper. For example, when face down, the infant's legs tend to bend at the knee and their feet stick up in the air, rather than being pressed against the foot plate, as they are when lying in the supine position. Additionally, the infant's arms can be pinned to their sides by the steep walls of the Rock 'n Play sleeper when they are face down. The configuration, kinematics, and dynamics of an infant face down in a Rock 'n Play sleeper are substantially different than when the infant is supine. Therefore, given that he is a mechanical engineer, Dr. Rundell should not be surprised that the **same design features** of the Rock 'n Play sleeper makes it more difficult to roll prone to supine. In fact, what

---

[11]See for example, Fundamentals of Telemedicine and Telehealth, Chapter 4, 2020.

[12]I note that this is a problem with inclined sleeping surfaces that I proved in my Initial Report using Newton's Laws of Motion. While Dr. Mannen's group used a very different experimental approach to show this defect of the Rock 'n Play sleeper, our results are complimentary.

COU_009090

would be truly astounding is if the two directions of rolling had identical levels of difficulty.

### 5.2.6   Wang et al., 2020

[**100**]    One of Dr. Rundell's primary objections to the Mannen study actually comes from his review of the Wang et al. journal article. Wang et al. both presents a subset of the data that was generated for the CPSC study, and adds to that earlier data. However, the core method and results of the Wang paper closely align with the Mannen study commissioned by the CPSC. Dr. Rundell uses the Wang paper in a back-handed attempt to discredit the Mannen CPSC study by pointing to certain reported data sets that are determined to be "statistically significant" and "not statistically significant."

[**101**]    As an initial matter, I have calculated the "statistical significance" of experimental data throughout my career, so I am well aware of the strengths and weaknesses of the process. The process simply applies a mathematical formula to data sets to calculate a number. The value of that number provides a likelihood that a relationship between two or more variables is not purely coincidental, but is actually caused by a pertinent factor. Therefore, the idea of "statistical significance" being an "on-off" or "yes-no" indication of experimental data reliability is simple-minded.

[**102**]    In many cases, the "statistical significance" of data is measured using a probability value (p-value.) The p-value is a number between 0 and 1 indicating how likely it is that the data would have occurred by random chance. The smaller the p-value, the stronger the evidence that the difference in data did NOT occur by chance. It is common practice to use a p-value of less than 0.05 to indicate results are "statistically significant." It is easy to see how such an approach could be misused if a simple-minded "yes-no" interpretation of the calculated p-value is applied. For example, if a data set yielded a p-value of 0.0501 and another data set yielded a value of 0.0499, there would be no practical difference in the "statistical significance" of the two data sets - both would have a very high level of confidence associated with them. However, a simple-minded interpretation of the p-value would result in one being "statistically significant" and the other being "not statistically significant." Dr. Rundell has seized on the simple-minded interpretation of "statistical significance" in his back-handed attempt to call into question the results of the Mannen study:

> These statistically significant differences from the CPSC-commissioned study were found to no longer have statistical significance in the Wang et al., (2020) study. Essentially, the addition of 5 subjects made these differences insignificant. These data demonstrate the tenuous nature of the conclusions drawn from the CPSC-commissioned study based on their sample size. These data also beg the question, "what other findings from the CPSC-commissioned study would no longer maintain statistical significance if more subjects were added?" (Rundell Report, pg. 120.)

[**103**]    I note that Dr. Rundell's back-handed criticism of the Mannen study ends with

COU_009091

a question to which he provides no answer. Nor does he even postulate a possible answer to the question he poses. The truth is, Dr. Rundell has no answer to the damning evidence produced by the Mannen study that proves the Rock 'n Play sleeper is a dangerous sleeping environment for infants.

### 5.2.7   Safety Evaluation Data Neglected by Dr. Rundell

**[104]**    Although Dr. Rundell devotes considerable attention to the unreliable and/or irrelevant testing by, for example, Exponent, Explico, and Fox and Shaffer, he neglects to consider one of the most valuable sources of safety evaluation data that is available to us - the incident reports that were sent to Fisher-Price and the CPSC. While I provided a review of related incidents in my Initial Report, I will provide an additional analysis here that directly rebuts the analysis and opinions submitted by Dr. Rundell in his report.

*Infants Rolling While Restrained*

**[105]**    Dr. Rundell points to the data he reviewed as evidence that infants cannot roll prone when they are secured to the Rock 'n Play sleeper by the belt restraint system. Recall that the data he reviewed was largely based on a small sample size of short-duration tests with only a few tests being more than 1 hour in duration. Given that the Rock 'n Play sleeper is used for overnight sleep, infants can be placed in the sleeper for many consecutive hours. There is no way that the tests relied upon by Dr. Rundell for his opinions could capture the characteristics of the Rock 'n Play sleeper in its intended and foreseeable use cases. This is especially true of the characteristics of the belt restraint. However, the incident reports are data supplied from Fisher-Price customers conducting the long-duration tests that Fisher-Price should have conducted, but failed to do so.

**[106]**    Ironically, one of Fisher-Price's own experts, Dorothy Drago, has previously written that such consumer-reported data is very important to consider. First, she points out that some nursery products get put on the market without appropriate "safety clearance procedures:"

> Consumers are often surprised by dangerous nursery products, and many consumers expect that products intended for use by a baby are tested and their safety assured. However, there is no premarket safety clearance procedure for nursery products... (Injury Prevention for Children and Adolescents, pg. 86.)

**[107]**    Next, Ms. Drago recommends that parents advocate for childrens' safety by filing incident reports:

> Despite the work of the Commission and advocacy groups, the safety of a nursery product is not assured. Consumers must be advocates for their own children's safety. Following are some actions that can be taken:
> 1. Report injuries and safety concerns about products to the CPSC.
> ...
> 4. Petition the CPSC to remedy a product... The petition should identify the consumer product ... along with the basis for the request. This may include

COU_009092

personal experience or published findings. The petition should describe the specific risk of injury, including data on severity and likelihood of injury, along with possible reasons for the injury potential (e.g., product defect, design flaw, unintentional misuse). (Injury Prevention for Children and Adolescents pg. 114.)

[108]    Given that Fisher-Price's own expert, Dorothy Drago, sees immense value in parents filing incident reports involving safety problems with nursery products, Fisher-Price and Dr. Rundell should have given such reports top priority. Unfortunately, Dr. Rundell does not make any real effort to factor this critical data into his opinions of the Rock 'n Play sleeper. The subsection of his report titled, "Alleged Similar Incidents," amounts to less than one page of cursory dismissal of this critical data. Therefore, the bases of Dr. Rundell's opinions are lacking and his opinions are unreliable.

[109]    Given that Dr. Rundell has dismissed the incident report data as virtually inconsequential, I will provide a targeted review of a subset of the incident reports that speak to the issue of infants maneuvering out of the restraint. (Although, I would like to reiterate that Fisher-Price knew the restraints would not be used by a large percentage of their users. Therefore, it was Fisher-Price's responsibility to ensure that the product was safe when the restraint was not in use because this is a natural and foreseeable use case.)

[110]    A restrained infant is not going to wriggle out of the restraint in just a couple of minutes.[13] However, over the course of several minutes, or a few hours, an infant initially placed in the restraint can certainly wriggle free. My Initial Report explained why the geometry of the Rock 'n Play sleeper allows this to occur. To capture this infant behavior and the defective design characteristic of the Rock 'n Play sleeper, long-duration testing with a variety of active infants would have to be conducted. None of the "safety evaluation data" that Dr. Rundell relies on for his opinions was conducted in such a manner as to capture this defect. However, the incident reports describe the outcomes of long-duration tests conducted by customers that purchased the Rock 'n Play sleeper and unwittingly performed human testing on their own infants without informed consent.

### 5.2.8   Incident Reports of Infants Becoming Unrestrained

[111]    The incident reports possessed by Fisher-Price clearly show that restrained infants can wriggle out of the Rock 'n Play sleeper restraint system. In fact, there were approximately 30 reported incidents of restrained infants getting out of position before Zoey Olson's death. Those cases are briefly summarized below.

1. Case History for Case: 19302670 (Mattel-Cou0026559)
MS KATHERINE ALBERS 201 N JACKSON ST, (317) 512-1140 SAINT PAUL IN 47272, swobniarone@gmail.com, Ms. Katherine Albers 4979 Karen Ray Dr, (615) 525-0493 Antioch TN 37013-swobniarone@gmail.com

---

[13]However, some of the incident reports reviewed below indicate an infant can work free from the restraints in approximately 5-10 minutes. See for example, Mattel-COU0026724 and Mattel-Cou0026557.

COU_009093

Text Entry Date: 04/13/2011

Age 4 months.

Regulatory contact # 101221CNE0795. CPSC reported stated that the child was restrained in the product and left unattended. When the consumer returned to the room she found the child on the floor. The child had a contusion and a scratch on his head. This happened on December 18, 2011. CPSC report task number: 101221CNE0795, Mattel-COU0025634

2. Case History for Case: 19451354 (Mattel-COU0026829)

MS NATHALIE CIN 6581 COLBY HILLS DR, (904) 772-4743 JACKSONVILLE FL 32222, nathsexy22@yahoo.com

Text Entry Date: 07/08/2011

Age not listed.

The consumer stated that her active child sat up in the seat and pulled her legs through the restraints and maneuvered upwards toward the top of the seat.

3. Case History for Case: 20071544 (Mattel-COU0026816)

MS KAREN LOGGIA 3509 W 101ST ST, (913) 642-3234 LEAWOOD KS 66206, kloggia@gmail.com

Text Entry Date: 01/03/2012

Age not listed.

The following was reported to us by e-mail. The consumer stated that the child was restrained in the product and he was able to maneuver out of the restraints and roll over.

4. Case History for Case: 20236942 (Mattel-Cou0026814)

MRS NICOLE EGAN 15 CROWN HILL RD, (845) 223-8408 WAPPINGERS FALLS NY 12590, nicole8556@aol.com,

Text Entry Date: 02/09/2012

Age not listed.

The consumer stated that her son was restrained in the sleeper and was able to push himself up and over the top. As a result, he fell onto the floor.

5. Case History for Case: 20709617 (Mattel-Cou0026812)

MS COURTNEY LEWIS 7TH ST, (724) 801-8948 INDIANA PA 15701, courtdee22@live.com

Text Entry Date: 07/25/2012

Date Of Incident: 07/23/2012

Age: 1 month

Event Description: The following was reported to us by e-mail. The consumer stated that the child was restrained in the product and pushed with his feet and ended up face down in the seat tangled in the straps.

6. Case History for Case: 20788298 (Mattel-Cou0026642)

Cassie Alford, 109 MAPLE AVE E, SATSUMA, Alabama 36572 United States, Home Phone: 251-680-0004, Email: cassiealford@gmail.com

COU_009094

Text Entry Date: 09/11/2012
Date Of Incident: 09/08/2012
Age: 6 months.
This consumer Tweeted about the incident and was asked to call us. She was
angered that we didn't ask how her daughter was in our Tweet reply. She was
also angered that we don't provide a written report of our findings. She is a
member of a mommy group on FB and posted a simulated picture of the in-
cident using a doll. She also stated that she will constantly post on FB and
Twitter about this issue until the product is recalled. She will be speaking
with her attorney about her rights. She reported the incident on safterprod-
ucts.gov. — offered a return/refund which she accepted. I was later notified
that RM can provide our findings ""verbally"" so — called the consumer back
and explained this to her. — made this case a 300 so RM can arrange for the
return/refund and the follow-up phone call to share the findings of our evalua-
tion of her product. I explained that RM would be calling her back on 9/10 to
arrange for the return.
Event Description: The consumer stated that she heard her daughter crying
and when she entered the room she found that her daughter's entire body was
positioned over the front end of the sleeper while her right leg remained in the
twisted restraint strap. Her left leg was free from the restraints. She stated
that her daughter cannot sit unassisted or roll over and although she didn't
witness the incident she thinks that her daughter pressed her feet against the
sleeper which raised her body up and over the right side. She thinks that her
daughter then somehow swung her body around to the front which caused the
restraints to twist and tighten around her leg which cut off circulation. As a
result, she had a friction burn on her right calf, the top of her right foot was
swollen and she had a red mark on the left side of her head. The next day, she
noticed a bruise and abrasion on her head.
Update 9/17/2012 JOR
Received Regulatory contact #201220099008-88-38633633-231-42714673496236926
regarding the incident described in safety summary.
Matter Details Report: 20788298 (Mattel-COU0026674): This call came in on
9/10 when CATS was down.
Consumer returned my call, stating she was at the doctor's office with child.
I asked how her daughter was doing and she said ok. She informed me she
could speak with me until the doctor came in. I confirmed the child's name
is "Davey" not "Dazie" as originally noted. Consumer reported she found her
daughter hanging from the Sleeper face up, right leg wrapped tightly in the
restraint, over the left side. She said this was around 7:00 a.m. on Saturday,
09/08/2012. She stated this is the normal time for her daughter to wake up,
but she did not hear her daughter crying until then. She reported top of right
foot and the left side of her head is bruised, and that she has abrasions on her

43

right leg. I asked the consumer how long she thinks the child might have been in that position to sustain bruising on her foot and head, and abrasions, but that she never heard her cry. She then stated the doctor came into the room and she had to call me back.

Consumer called back. I asked what the doctor had to say. She told me he did not feel a CT scan was necessary; no tenderness; he felt there was no concern to do any future tests. Consumer told me child's right calf, per doctor, has erythema due to the restraints being so tight. We again discussed the amount of time the child would have been in that position. She said she didn't think for long, because she told me based on the coloring of her face she was not hanging there long – her face color was good. Consumer first told me child's head hit the floor. She then told me she was only inches away from the floor. Consumer stated she believes child pushed up on the seat with her feet and was able to push herself out of the left side of Sleeper, but that her right leg was caught in the restraints. She said the restraints were around her right calf and due to going out the left side, which was how she got the bruise on the left side of her head, above the ear. At that time I asked how long (height) the child was. She told me she wasn't sure, but that she was 20.5" at birth. I confirmed child's weight: 14.8. She told me child cannot sit up unassisted or roll over. Said child can lean her head forward in the Sleeper. Consumer told me her home is small and that Davey's room is across the hall from hers, only about 5 steps away. I asked if anyone would have been with Davey at the time – whether Davey shared her room with an older sibling, and she informed me no - that her six year old has her own room and does not get up until she gets her up. Consumer stated our instructions should also say the product should no longer be used "if child can push up with their feet." She stated since posting the incident on Twitter, two neighbors have informed her this same thing has happened to them. I encouraged her to have the "neighbors" call Consumer Relations or give them my direct toll-free number and I would assist them. We agreed to issuing a Call Tag (on Wed 9/12/12) for the product return and full refund. I advised consumer I would provide her with verbal evaluation results, once received (I informed consumer results could take 2-4 weeks from the date we receive her product). She was happy with that and told me she will share our findings via social media.

7. Case History for Case: 20802976 (Mattel-COU0026765)
MS JENNIFER HILLMAN 2362 NORTH EATON CT, (949) 254-0727 ORANGE CA 92867, writerjenn@gmail.com
Text Entry Date: 09/19/2012
Date Of Incident: 09/18/2012
Age: 8 months.
Event Description: The following report was received via email: The consumer stated that she restrained her daughter in the Rock 'n Play Sleeper but the

44

nanny found her laying on the floor when she entered the room. She did not witness what happened but thinks that she may have been reaching forward to get out and toppled over the front end. Her daughter is able to sit and crawl. The consumer loves this product and recommends it but she thinks that we should have larger labeling regarding the developmental guidelines on the package, instructions and product.

8. Case History for Case: 20827197 (Mattel-Cou0026809)

MR LUVERT DAIL 17355 BONSTELLE AVE, (248) 866-8620 SOUTHFIELD MI 48075, kinggodail@netzero.net

Text entry: 10/1/2012

Date Of Incident: 09/28/2012

Age: 5 months

Event Description : The consumer stated that his granddaughter fell forward out of the product onto the floor. He stated when this happened one of the restraint straps tore apart. She received a bump on her forehead and a bruise on her left shoulder. They applied a cold compress and witch hazel to the bump and bruise.

Matter Details Report: 20827197 (Mattel-Cou0026729): — called Ms, Jennifer Dail mother) yesterday at 3:34 Pm and left a message on her recorder to call me back. She called me back today. She stated that she was out of town and her parents were watching Laura for her. They put in her in the RNP Sleeper and she fell out bumping her head and shoulder. Ms. Dail told me that when this happened on 2, she could not sit up yet. She mentioned that she felt perhaps the buckle/restraint system had dry rot - product was returned to us before — became involved with the case so no W/E could be done on it. I asked her how her parents treat Laura She told me that they had raised several children so they put an ice pack on her bump and gave her some tylenol– no other treatment. Ms. Dail told me that she had a photo of her daughter's injury so I asked her to please send it to me. She also stated that ...missed having her Gerber photos taken because of her bruise. She strongly feels we owe her something for her daughter's injury. A later, I received via e-mail, two photos from her. One is a cell phone photo and I can barely make out an injury it is so bad. The other photo was a professional one of must be her Gerber photo. I sent her an e-mail reply advising her that — would send her a $50.00 voucher, under separate cover.

Defect Description: 10/31/2012 Restraint strap is frayed and degrading. I noticed that this product was in the CR cage meeting and didn't really feel it required a W/.E did there was no medical treatment. However, since Ms. Jennifer Dail told me the restraint straps dry rotted, — called Mike Steinwachs and asked him to please check this product restraint straps for me. — spoke to Mike the following day and he told me that the restraint straps were dry rotted. We had done a corrective action on this product for this issue but this

COU_009097

one was made before the corrective action. — am sending her a cover letter with a $50.00 voucher and hope all will be well.

9. Case History for Case: 20923719 (Mattel-COU0026666)
Name redacted. 1066 QUESADA ST SE, (321) 676-6141 PALM BAY FL 32909, nthomas011@cfi.rr.com, Pvacy 1066 Quesada
Text Entry Date: 11/02/2012
Date Of Incident: 11/01/2012
Age: 8 months
Event Description: The consumer stated that her daughter fell out of the side of the sleeper and hit her head on the floor. She took her to the pediatrician and was told she had a concussion. She also stated that about one month ago she found her daughter positioned over the front of the sleeper with her feet in the restraints.

10. Case History for Case: 21017425 (Mattel-COU0026724)
MS RENEE SHARPE 355 COLLEGE ST APT 1B, (540) 246-8369 DAYTON VA 22821, Thesharpes623@yahoo.com
Text Entry Date: 11/28/2012
Date Of Incident: 11/26/2012
Age: 7 months
Event Description: The following report was received via email: The consumer stated that after fastening the child in the restraints of the product, she stepped away for about ten minutes. When she returned, the consumer stated that the child had slipped her legs out of the waist harness and fallen onto the floor.

11. Case History for Case: 21150776 (Mattel-0026741)
MS HEIDI WHITACRE 123 BROOKLAND COURT APT 2, (540) 323-8257 WINCHESTER VA 22602, heidi.whitacre@gmail.com
Text Entry Date: 12/19/2012
Date Of Incident: 12/19/2012
Age: 9 months.
Event Description: The consumer stated that her daughter fell out of the product onto the floor. She received a red mark on her forehead. She was restrained at the time she placed her in the product and she stated she cannot sit up unassisted at this time.

12. Case History for Case: 21202319 (Mattel-COU0026638)
MS CHRISSY ALLEN 7258 N DIVISION ST RD, (315) 729-8273 AUBURN NY 13021, GLEASONC@CAYUGA-CC.EDU. Allen 7258 N Division St Rd, Auburn NY 13021
Age: 7 months
Text Entry Date: 01/03/2013
Date Of incident: 12/01/2012
Event Description: The following report was received via email: The consumer

46

stated that her daughter fell out of the front of the product when she leans forward.

Update 1/9/12 TB The consumer called us back in response to our email. Her daughter was restrained at the time of the incident and she fell completely out of the product onto a carpeted surface.

13. Case History for Case: 21218915 (Mattel-Cou0026806)
MS LELA GRAF 6372 B NUEKU ST, (360) 720-8094 KAILUA HI 96734, thatgirl505@gmail.com
Text Entry Date: 01/08/2013
Date Of Incident: 06/30/2012
Age: 8 months
Event Description : The consumer stated that the baby is able to scoot herself up and out of the restraints.

14. Case History for Case: 21223006 (Mattel-COU0026800)
MRS. MELANIE STRECKER 109 TIN CAN ALY, (843) 771-1750 SUMMERVILLE SC 29483, melanieosmond@yahoo.com
Text Entry Date: 01/09/2013
Age:1 year 1 month
Event Description : The consumer stated that about 7 months ago, her daughter rolled in the product and was hanging by the restraint straps.

15. Case History for Case: 21336611 (Mattel-COU26623)
MS LISA FASANO 340 ELMEER AVE, (504) 909-2020 METAIRIE LA 70005, Ick2010@cox.net, Ms Fasano 340 Elmeer Ave, (504) 909-2020 Metairie LA 70005
Text Entry Date: 02/19/2013
Date Of Incident: 02/01/2013
Age: 7 months
Event Description: The consumer stated that her daughter was able to maneuver herself out of the buckled restraint straps while in the sleeper.

16. Case History for Case: 21387348 (Mattel-COU0026709)
MRS. KRISTIN BOIVIN 31 LOCUST ST, (617) 605-2128 WINTHROP MA 02152, kboivino916@gmail.com
Text Entry Date: 03/14/2013
Date Of Incident: 03/14/2013
Age: 7 Months.
Event Description: The consumer stated that her child was able to wiggle herself out of the sleeper and fell to the ground. The restraint straps were in use at the time and were still buckled after the child fell.

17. Case History for Case: 21423127 (Mattel-COU0026654)
MS FATIMA BEIG 2295 E 29TH ST, (516) 316-1971 BROOKLYN NY 11229, fnbeig@gmail.com, 2295 E 29th St

COU_009099

Data text entry: 04/02/2013
Date Of Incident: 03/28/2013
Age: 8 months.
Event Description : The following report was received via email: The consumer stated that she discovered her child leaning over the side of the product, with one leg in the restraint strap. The child hit her head on the floor and sustained a red bump on her forehead. The consumer stated that her child is able to sit up in the product.
UPDATE: 4/2/13 PJK The child was restrained with straps, but she stated that her daughter can sit up in the sleeper.

18.  Case History for Case: 21504147 (Mattel-COU0026752)
MS KRYSTAL LUCERO 3632 HEPBURN ST NE (360) 464-5821 LACEY WA 98516 Krystal@Luceronet.com
Text Entry Date: 04/30/2013
Date Of Incident: 04/19/2013
Age: 1 year
Event Description : Regulatory contact 20130419-728D9-2147456794. CPSC report stated that the consumer discovered her child sitting backwards in the Rock 'N Play Sleeper. She stated that the child was restrained when she put the child down for a nap, but was no longer restrained when she discovered him.

19.  Case History for Case: 21515997 (Mattel-COU0026560)
403 GROVE ST, (715) 514-9756 EAU CLAIRE WI 54703, marcie4200@gmail.com,
Text Entry Date: 05/03/2013
Date Of Incident: 05/02/2013
Age 6 months
Event Description: The consumer stated that her child fell out of the sleeper. The restraint straps were in use at the time. The consumer was asleep at the time of the incident. She woke up and founder her daughter face-down on the floor.

20.  Case History for Case: 21573458 (Mattel-COU0026595)
MS KRISTIN CONTINO 117 CROSSFIELD RD, (610) 265-0535 KING OF PRUSSIA PA 19406, kristinjlarson@yahoo.com.
Text Entry Date: 05/21/2013
Date Of Incident: 05/19/2013
Age: 5 months.
Event Description: The following report was received via email: The consumer stated that her son fell out of the product and hit his head on the floor. The restraint straps were in use at the time.

21.  Case History for Case: 21608231 (Mattel-Cou0026865)
MS ANNIE THRUSH 718 NORTH COURT AVE, (989) 506-9667 ALMA MI

COU_009100

48801, thrushar@gmail.com
Text Entry Date: 06/04/2013
Date Of Incident: 06/03/2013
Age: 5 months
Event Description: The following was reported to us by e-mail. The consumer stated that her child was sleeping in the product and when she came into the room she found her hanging from the restraint strap by her foot.

22. Case History for Case: 21617500 (Mattel-Cou0026737)
MS CAROLINE SMITH 8407 82ND ST SW APT 301, (360) 688-9037 LAKE-WOOD WA 98498, buttons83@hotmail.com
Text Entry Date: 06/07/2013
Date Of Incident: 01/06/2013
Age: 7 months.
Event Description: The consumer stated that the neighbor watching her son found him on the floor with the sleeper on top of him. He was restrained in the seat at the time.

23. Case History for Case: 21625370 (Mattel-COU0026632)
MS ANGELA RIVERA 12 TACA BLVD, (631) 940-1911 DEER PARK NY 11729, angelarivera11@me.com,
Text Entry Date: 06/12/2013
Age: 6 months
Event Description: The consumer stated that her daughter fell out of the sleeper and onto the ground despite being restrained. She immediately took her daughter to the pediatrician and was told that she is okay. I advised the consumer of the developmental recommendations for this product.

24. Case History for Case: 21218244 (Mattel-COU0026763)
MS MEGAN PAPP 61920 SCOTT ST, (574) 344-9012 SOUTH BEND IN 46614, mpapp@keystoneinsgrp.com
Text Entry Date: 06/21/2013
Date Of Incident: 06/17/2013
Age: 7 months.
Event Description: The consumer stated that while her daughter was restrained in the product, she pushed herself up, out of the restraints, and her head was positioned over the top of the seat. Then last night, the consumer put her daughter in the product again and tightened the restraints. She was in another room with her son when she heard her daughter fall out of the product. She found her on the floor in front of the product. The child had fallen face first onto a carpeted floor, and sustained a nosebleed. She believes that her daughter was leaning forward when she fell out of the sleeper.

25. Case History for Case: 21754259 (Mattel-COU26577)
MS BRITTANY HARRIS 2568 SCIOTO VIEW LANE, (614) 288-8232 COLUM-

COU_009101

BUS OH 43221, Brtny23@yahoo.com, Ms. Harris 2568 Scioto View Lane, (614) 288-8232 Columbus OH 43221

Text Entry Date: 08/06/2013

Date Of Incident: 07/29/2013

Age: 2 months

Event Description: The consumer stated that within 1-2 hours of use of the sleeper she finds her daughter at the base of the seat curled up in a ball. She said that because her daughter is swaddled while in the sleeper, she inserts both of her legs through one side of the restraints and then tightens the buckle. I have advised the consumer that each of her daughter's legs should be inserted through the corresponding side of the restraints.

26. Case History for Case: 21664324 (Mattel-COU26570)

Date Of Incident: 07/29/2013

Age: 2 months

Event Description: The consumer stated that her daughter sinks down to the base of the sleeper despite being restrained. This occurs after approximately 20 minutes of use of the sleeper. Confirmed that she is properly using the restraint straps.

27. Case History for Case: 22274281 (Mattel-COU0026686)

MS JENNIFER BLAND 849 CATHEDRAL DR, (757) 201-0819 VIRGINIA BEACH VA 23455, jlmccaughan@email.wm.edu, Ms Bland 934 Geneva Ave

Text Entry Date: 01/15/2014

Date Of Incident: 01/10/2014

Age: 2 months

Event Description: Emailed: The child pushed against the seat and jumped up to the top of the product. He was able to push himself out of the restraints.

28. Case History for Case: 22294786 (Mattel-Cou0026778)

Text Entry Date: 01/23/2014

Date Of Incident: 07/01/2013

Age: 4 months

Event Description: Regulatory Contact: 20140111-D2FE5-2147448266. The CPSC report stated the child fell over the back of the seat by using his feet to push. He was restrained at the time.

29. Case History for Case: 22314034 (Mattel-Cou0026787)

(936) 205-6673 NACOGDOCHES TX 75964, korbin_dallas_23@yahoo.com

Text Entry Date: 01/30/2014

Date Of Incident: 11/01/2013

Age: 5 months

Event Description: The child wiggled her feet out of the restraints and fell over the side of the sleeper. She landed on the floor and hit her head.

30. Case History for Case: 22612452 (Mattel-Cou0026557)

50

Text Entry Date: 05/27/2014
Date Of Incident: 05/18/2014
Age not listed.
Event Description: Regulatory Contact: 20140516-CA294-2147444512. The saferproducts.gov report stated the child was restrained in the Rock 'n Play sleeper when the parents left the room. After about 5 minutes the parents went into the room and found the child on the floor. The child was taken to the emergency room.

### 5.2.9    Dr. Rundell's Analysis of Safety Evaluation Data

[**112**]    Dr. Rundell concludes his "Safety Evaluation Data" section with an analysis section. (Rundell Report, pgs. 139-142). In this section he attempts to combine all the testing he advocates for into an endorsement for the safety of the Rock 'n Play sleeper. For example, Dr. Rundell states:

> Fox-Shaffer, Exponent, ESi, and Explico have all demonstrated the effectiveness of both the geometry of the RNPS, and the belt restraint in mitigating risk of becoming prone in a RNPS device. (Rundell Report, pgs. 142)

[**113**]    Of course, as established above, none of the tests that Dr. Rundell bases his opinion on actually demonstrate that the geometry and the belt restraint of the Rock 'n Play stop infants from maneuvering into the dangerous prone position. All of the tests are improperly conducted, misleading, or mostly just irrelevant. Furthermore, the best dataset that we have concerning this issue - the incident reports documenting numerous cases wherein infants got out of position - is dismissed by Dr. Rundell and not accounted for in his analysis or opinions. Therefore, his opinions are based on unreliable testing and not based on the best and most reliable dataset available.

[**114**]    Correspondingly, Dr. Rundell attempts to denigrate the testing that proves the Rock 'n Play sleeper is hazardous. For example, Dr. Rundell states,

> The claim by the CPSC-commissioned study, parroted by Dr. William Singhose, that rolling supine to prone in an inclined sleep product is easier than on a level mattress is completely unsupported, and demonstrably refuted.

[**115**]    This is false. In my Initial Report, I provided strong support for my opinion that inclined planes make it easier to roll. I provided an analysis based on Newton's Laws of Motion. That analysis is straightforward, correct, and simply beyond questioning. Furthermore, Dr. Rundell does not clarify his statement by listing what evidence "demonstrably" refutes my opinion. However, all he has to point to is the irrelevant and improperly-conducted testing that I have thoroughly discredited above. Therefore, Dr. Rundell has failed to offer any evidence that would refute the well-supported and documented conclusion that rolling supine to prone on an incline plane is easier than rolling on a flat surface.

[**116**]    In this analysis section, Dr. Rundell appears to come out of nowhere with a postulation that "an infant that typically requires a given amount of lateral space to effectuate a supine-to-prone roll may struggle to effectuate that roll if the amount of available

51

lateral space is not present." (Rundell Report, pg. 140.) This statement is made without offering any supporting evidence or quantifiable measure of the lateral space required by the infant to effectuate said roll, nor does Dr. Rundell provide any examples of these possible "struggles" that he envisions. Dr. Rundell completely neglects the fact that infants in a Rock 'n Play sleeper are able to push forcefully with their feet against the foot platform and are able to pull on the side supports with their hands. These methods for generating significant roll-over torques are not available to infants in flat cribs. Even if Dr. Rundell's postulation were correct, he has neglected the corresponding hazard that restrictive geometry poses - when an infant gets into the prone position, the restrictive geometry acts to impede their efforts to escape the trap formed by the double-V valley design of the Rock 'n Play sleeper.

### 5.2.10   Summary of Dr. Rundell's Safety Evaluation Data

[**117**]   Dr. Rundell presents a wide range, and extensive amount, of "Safety Evaluation Data." He relies on this data for his opinions in this matter. As established above, all of this data is problematic in that it is unreliable, not reproducible, or simple irrelevant. In several cases, the data sets suffer from multiple defects.

[**118**]   An unreliable data set is one in which the data was collected incorrectly, such as the Exponent testing that used the toy to entice infants to roll over in the flat crib, but then changed the toy enticements so that infants in the Rock 'n Play sleeper would not roll over. Other sources of unreliable data occur when the experimenters interpret or analyze the resulting data incorrectly. The Exponent testing again provides a good example of this when they concluded from their tests that any infants that could roll supine to prone could also roll prone to supine, even though one of their test subjects had to be rescued from the Rock 'n Play sleeper because the infant could not get turned back over to a supine position.

[**119**]   A data set that is not reproducible is one that is collected in an inconsistent manner or with important details of the tests not reported. For example, Explico gave no description of their belt adjustment procedure when they set up the Rock 'n Play sleeper to "properly restrain" infants. Therefore, other experimenters have no way to verify the results of their demonstrations because belt tightness is clearly a dominant factor in determining how much infants can move. As another example, recall that Fox and Shaffer apparently did not record or collect oxygen saturation measurements for all their subjects, or at least did not record measurements in the same manner. Additionally, Fox and Shaffer used a defective oxygen sensor whose readings are known to fluctuate randomly. Independent researchers could never reproduce and verify such results.

[**120**]   The irrelevant data sets relied upon by Dr. Rundell are produced by tests that simply provide no useful information for the matter at hand. The Fox and Shaffer testing provides a good example of such irrelevant data. Their testing did not evaluate the rebreathing or breath-restricting properties of the Rock 'n Play sleeper because they did not place the infants in a prone position, or even turn the infants enough such that their

COU_009104

**Table 2: Problems with Dr. Rundell's "Safety Evaluation Data"**

| Data Set | Unreliable | Not Reproducible | Irrelevant |
|---|---|---|---|
| Fox & Shaffer | X | X | X |
| Exponent | X | X | |
| Engineering Systems | X | X | X |
| Explico Demonstrations | X | X | |

faces were up against the nonbreathable fabric that Zoey Olson's face was against. There-fore, their tests simply do not test breathability issues and have no relevance to this case. To the extent that such data sets are relied upon for opinions in this matter, they provide no credible bases and the opinions on which they are based are not properly supported. These irrelevant data sets only provide a smokescreen that attempts to portray Fisher-Price as thoroughly testing the Rock 'n Play sleeper. They did not.

[121]    Table 2 summarizes the problems with the "Safety Evaluation Data" that Dr. Rundell relies upon for his opinions in this matter. Each data set is problematic and cannot be used as a reliable basis for opinions that endorse the purported safety of the Rock 'n Play sleeper.

## 5.3   Dr. Rundell's Biomechanical Analysis

[122]    The final substantive section of Dr. Rundell's Report is titled "Biomechanical Analysis." Dr. Rundell explains the purpose of this section as:

> ...the following sections of this report will focus on determining a relationship, or lack thereof, between the biomechanical causation of Zoey Olson's fatal in-juries and any relationship to the design of the RNPS. (Rundell Report, pg. 142.)

[123]    Dr. Rundell again relies on the defective testing addressed above as a bases for his opinions in this section:

> As previously described, extensive empirical testing involving the RNPS and other inclined sleep products has failed to establish that the design of the RNPS presents exceptional exposure to any known sleep hazards. (Rundell Report, pg. 142.)

[124]    Given that Dr. Rundell has based his opinions in this "Biomechanical Analysis" Section on testing that is unreliable, not reproducible, or simply irrelevant, his opinions in this section have no proper bases.

### 5.3.1   Dr. Rundell's Injury Characterization and Causation

[125]    Starting on page 143 of his report, Dr. Rundell provides a section titled "In-jury Characterization and Causation." In this section, he attempts to argue that Zoey

53

 

**Figure 21: Stain Down the Middle of Zoey Olson's Rock 'n Play.**

Olson's face was not pressed into the non-breathable fabric at the center of her Rock 'n Play sleeper. There is simply no doubt that Zoey Olson was face down in the Rock 'n Play sleeper. She had blood in her nostrils and there was a large blood stain in the Rock 'n Play sleeper starting on the upper portion of the center of the inclined sleeping surface and trailing down the incline slope to the seat bite, as shown in Figure 21.

[**126**]    The stain starts at about 12 inches above the seat bite and about 9 inches below the top of the Rock 'n Play sleeper, as shown in Figure 22. The stain is close to the middle of the incline surface, but shifted slightly to the right. Figure 23 shows that the top of the stain is approximately 11 inches from the left edge and approximately 9 inches from the right side. Therefore, the stain is located approximately 1 in right of center.

[**127**]    At the position at which the stain originates, the depth of the Rock 'n Play valley is approximately 6.5 inches, as shown in Figure 24. Given the depth of the Rock 'n Play valley, the curvature of the structure, and the conforming properties of the soft goods, an infant's face would be engulfed by the nonbreathable fabric if their nose was placed at the top of the stain. This face-engulfing property of the Rock 'n Play sleeper is demonstrated in Figure 25, wherein I have put a doll into the Rock 'n Play sleeper with its nose placed at the top of the stain.

[**128**]    There is only one feasible explanation for the stain - Zoey's face was pressed into the nonbreathable fabric and she was bleeding from her nose. Therefore, her nose was located at the top portion of the stain. This realization does not take a forensic scientist with expertise in blood patterns. This is a fact readily understood by the general public, and certainly by mechanical engineers that are well versed in fluid mechanics. For example, even Dr. Rundell admits that, "the stain appears to have been the result of pooling fluid that moved down the sleep surface due to gravity." (Rundell Report, pg. 144.) The only possible source of "pooling fluid" was Zoey Olson.

COU_009106



**Figure 22: Length Measurement of Stain Down the Middle of Zoey Olson's Rock 'n Play.**

 

**Figure 23: Width Measurements of Stain Down the Middle of Zoey Olson's Rock 'n Play.**

[**129**]    Given that the physical evidence proves that Zoey Olson's face was pressed into the middle of the nonbreathable fabric of the inclined sleeping surface, Dr. Rundell relies heavily on a case review provided by Kevin Horn, MD in 2019. Although medical doctors generally have no expertise in product design, hazard analysis, Newton's Laws of Motion, fabric permeability, and other engineering knowledge that is required to properly assess the role of the Rock 'n Play sleeper in Zoey Olson's death, the doctor did attempt to determine a cause of death. He failed to do so. The medical doctor stated that the case "ap-

55

COU_009107



**Figure 24: Depth of Rock 'n Play Valley at the top of the Stain Down the Middle of Zoey Olson's Rock 'n Play.**

 

**Figure 25: The Rock 'n Play Sleeper Engulfing the Face of a Doll Placed in the Prone Position with its Nose at the Top of the Stain.**

pears to represent a SUID (Sudden Unexplained Infant Death) death during sleep in an infant without any significant external or internal trauma or any toxicologic findings."

[130]    Ironically, Ms. Drago, one of Fisher-Price's other experts in this case has published warnings that medical doctors may classify suffocation as SUID. For example, in her previous publications she warns parents that:

> ...several crib deaths that may in fact be mechanical suffocations get classified as SIDS.[14] These two mechanisms of death essentially present identically at

---

[14]Note that the sudden unexpected infant death (SUID) term used by Kevin Horn, MD includes sudden infant death syndrome (SIDS)

COU_009108

autopsy. (Injury Prevention for Children and Adolescents, pg. 101.)

### 5.3.2   Dr. Rundell's Product Hazard and Alleged Defect Analysis

[131]    Dr. Rundell includes a subsection in his biomechanical analysis titled, "Product Hazard and Alleged Defect Analysis" wherein he attempts to establish that the Rock 'n Play sleeper did not result "in forced mechanical obstruction of Zoey's airways." (Rundell Report, pg. 145.) He establishes a criteria for his analysis and provides a summary of his opinion as:

> In order for the RNPS to introduce a greater hazard of smothering, its design must trap or force an infant's head into a position where the mouth and nose are sufficiently blocked. The RNPS provides no such design feature that will cause this biomechanical environment. (Rundell Report, pg. 146.)

[132]    This conclusion is false. As thoroughly established in my Initial Report and further expanded upon in this Rebuttal Report, the design of the Rock 'n Play sleeper traps "an infant's head into a position where the mouth and nose are sufficiently blocked." The physical design of the Rock 'n Play sleeper is a double-V valley structure that traps infants face down with their legs often sticking up in the air, or positioned such that it is difficult to push off the foot plate. Additionally, the steep side walls of the Rock 'n Play sleeper can pin an infants' arms to their side, or under their bodies. Finally, when infants are trapped in this prone position, their faces are engulfed by the non-breathable fabric used to cover the curved inclined sleeper surface.

### 5.3.3   Dr. Rundell's Rollover Ability Analysis

[133]    Following his erroneous statement above, Dr. Rundell provides attempted rebuttals to my analysis of the physical design of the Rock 'n Play sleeper. His first attempt is directed at the "Rollover Ability" of an infant in the Rock 'n Play sleeper. In my Initial Report, I used Newton's Laws of Motion to prove that it is easier to roll over on an inclined surface than on a flat horizontal surface. That analysis proves that the amount of torque required to roll over decreases as the slope of the inclined plane increases. Therefore, the body rolling over does not need to generate as much force (torque) to achieve a roll. That proof was straightforward, correct, and irrefutable - Dr. Rundell does not attempt to refute that analysis. Rather, Dr. Rundell attempts to object to my statement that infants lying supine in the Rock 'n Play sleeper could push with their feet to create, "moments that would cause the infant to turn toward the side of the sleeper and also to roll onto their stomachs." Dr. Rundell does not actually object to the statement (which is indisputably correct), instead he objects to my support for the statement as:

> Dr. Singhose does not provide any quantitative data or testing to support this allegation... (Rundell Report, pg. 148.)

[134]    As an initial matter, this is such a straightforward statement that there is no need for "data" or "testing" to support it. It is well known that infants pushing against a

COU_009109



Foot Push

Unequal Double
Foot Push

**Figure 26: Infant Pushing Off Seat Bite With Their Feet.**

surface with two feet will not push with exactly the same force or direction with both feet. Furthermore, unbalanced forces like this lead to rolling torques. However, even though it is so basic as to stand on its own without further support, I did provide support for the statement in my Initial Report in the form of both photographs and a reasoned explanation. For example, my Initial Report included the following: (Singhose Initial Report, pg. 13.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

One of the drawbacks of the seat bite is that it provides a platform on which the infant can push off with their feet. Example cases of an infant pushing with their feet are shown in Figure 26. [Figure 5 in the original.] The left side shows an overall view of the infant in a Rock 'n Play sleeper and the infant foot forces are represented with a single arrow directed toward the bottom of the sleeper. Such downward forces generated by the infant creates an equal-and-opposite upward force acting to push the infant upwards. The effect of the infant pushing is actually two separate forces - one arising from each foot. These forces would, in general, be unequal in magnitude and would have somewhat different directions, as illustrated by the two arrows shown on the right side of Figure 26. [Figure 5 in the original.]

The leg-pushing forces can propel the infant up the inclined back surface. The result of unequal forces is that the infant would be propelled not only upward, but would also be subjected to moments that would cause the infant to turn

58

toward the side of the sleeper and also to roll onto their stomachs. If left un-restrained, the infant might push themselves up the incline slope, and possibly out the back of the device. Or, with unequal foot forces, they could push them-selves over the side of the device, or roll themselves over onto their stomachs and into a prone position.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[**135**]    Given that he cannot refute my analysis and his objection that I did not sup-port my opinion is untrue, Dr. Rundell resorts to relying on the defective testing once again:

> Dr. Singhose ignores the data from the Exponent and ESi studies indicating that a properly restrained infant is prevented from rolling over in the RNPS, even if that infant was able to roll easily in a crib.(Rundell Report, pg. 148.)

[**136**]    I did not ignore this data, I simply exposed it as unreliable and misleading be-cause the experimenters enticed the infants in the flat crib to roll all the way over, but when the same infant was put in the Rock 'n Play sleeper, the experimenters enticed them to NOT roll over.

[**137**]    Dr. Rundell doubles down on his reliance on the Exponent testing by stating:

> The testing performed by Exponent clearly demonstrated the ease of which in-fants can roll from supine to prone on a crib mattress (Figure 172). Conversely, the Exponent testing also demonstrated advanced rolling infants attempting to roll unsuccessfully in the RNPS (Figure 173) while utilizing the strategy described by Dr. Singhose. The data clearly indicated that utilization of Dr. Singhose's rollover strategy, i.e. unbalanced force generation between the feet and seat bight, only resulted in partial rolling movement of the child. (Rundell Report, pg. 148.)

[**138**]    Contrary to Dr. Rundell's mischaracterization of the test results above, the data does not indicate that unbalanced force generation only results in "partial rolling", rather it indicates that the experimenters only moved the enticing toy "partially down" to an al-titude angle of 40 degrees for the Rock 'n Play sleeper tests, rather than all the way down to 0 degrees, as they did for the flat crib tests.

[**139**]    Even though Dr. Rundell had previously stated that my opinion on infant rolling via unbalanced foot forces was not supported (see above), at this point in his report he admits that it is true:

> Dr. Singhose's opinion that forces generated by the feet can induce rolling mo-ments, *while technically true*, is irrelevant and disingenuous when compared to the ease of rolling from supine to prone in a crib. (Rundell Report, pg. 149.) (*emphasis added.*)

COU_009111

[**140**]    My opinion on rolling induced by feet forces is neither irrelevant (that accusation does not even make sense) nor disingenuous. My opinion on this matter is sincere because I viewed infants using their feet to roll over in the Exponent videos, I personally witnessed live infants pushing with their legs and turning in Rock 'n Play sleepers, and I performed an analysis using Newton's Laws of Motion that proves rolling on an inclined surface is easier than on a flat horizontal surface. Given that Dr. Rundell has, yet again, heavily relied on the defective data generated by the Exponent tests, his opinion on this issue is correspondingly unreliable.

[**141**]    Dr. Rundell attempts to further critique my analysis of infant rolling in a subsection he titled, "Ease of Rolling on an Inclined Surface." His main criticisms in this section are stated as:

> Confusingly, Dr. Singhose's analysis seems to only apply to inclined planar surfaces rather than the more complex geometry of the RNPS. Even more concerning is that Dr. Singhose does not consider the results of Exponent's testing, which specifically documented rolling behavior of infants in both an RNPS and crib. (Rundell Report, pg. 151.)

[**142**]    As an initial matter, a mechanical engineer should not be confused about a planar analysis and how such an analysis applies to more complex geometries. Planar analyses are used throughout the engineering world to establish basic, irrefutable facts. That is what I have done in this case. I established the fact that rolling on an inclined surface is easier than on a flat horizontal plane. That result clearly applies to the Rock 'n Play sleeper because it has an inclined sleeping surface.

[**143**]    In addition to the inclined sleeping surface, the Rock n' Play does have additional "complex" design features that impact infant rolling. For example, it contains a foot plate that provides a surface for infants to push off against to generate rolling torques - a point that Dr. Rundell has admitted to (Rundell Report, pg. 149.) This foot plate allows an infant to generate rolling torques with their feet much more easily than when they are in a flat crib. The Rock 'n Play sleeper also has side walls that allow an infant to grab with their hand and induce additional rolling torques. In the course of developing my opinions, I have considered all of these effects, as well as the Exponent videos, my personal observations, and the incident reports (which Dr. Rundell does not properly consider.)

[**144**]    Dr. Rundell does attempt to measure the forces required to roll over in the Rock 'n Play, and compares them to "corresponding" measurements of rolling in a flat crib. These tests are illustrated in Figures 163 and 164 on page 158 of Dr. Rundell's report. There would be some value in this type of measurements, if they had been conducted correctly, but they were not.

[**145**]    Before discussing the measurement errors, it is important to note that such tests would not be measuring the ability of the infant to create the required rolling torques. For example, an infant in a Rock 'n Play sleeper can push off the foot plate much more easily than when lying in a flat crib - the infant's feet simply cannot get as much traction against the flat crib surface as they can against the upwardly-angled foot plate. An in-

COU_009112



**Figure 27: Illustrations Showing Side Views of Dr. Rundell's Roll-Over Torque Measurements.**

fant in a Rock 'n Play sleeper can also grab and pull on the side walls to perform a roll. Therefore, simply measuring the torque required to roll over does not completely answer the question of how easy it is to roll in the Rock 'n Play sleeper.

[146]    Returning to the roll-over torque measurements made by Dr. Rundell, it is easy to point out one of the errors that he made, and it is related to the errors made in the Exponent testing. He did not take into account the steep side walls of the Rock 'n Play sleeper. Dr. Rundell states that he used an ATD and "a force gauge was coupled to its right shoulder. The force gauge was manually and slowly pulled across the body of the ATD until it experienced a roll." (Rundell Report, pg. 157.) He recorded the force required to perform a roll on a flat carpeted surface. He then conducted a related measurement after placing the ATD in a Rock 'n Play sleeper. What is readily apparent from the photographs is that the force gauge used by Dr. Rundell was *above* the side wall of the Rock 'n Play sleeper. This means that he was not pulling on the ATD in the same manner as he pulled on the ATD while it was laying on the carpet.

[147]    The illustrations provided in Figure 27 show side views of Dr. Rundell's test configuration for the carpet floor and the Rock 'n Play sleeper. I note that these viewpoints were not provided by Dr. Rundell, but my representations fairly represent his test conditions. The top two illustrations show how Dr. Rundell pulled on the force gage to measure the required rolling torque on the carpet surface. I note that the required force changes throughout the rolling motion. That is probably why Dr. Rundell only reported a course

COU_009113

range of measurements from 2-2.5 pounds. The bottom row of illustrations represents the case involving the Rock 'n Play sleeper. Given the high and steep side walls, Dr. Rundell was not able to pull on the ATD in the same way. Therefore, his comparative measurements are unreliable. For example, even if the required rolling torques were exactly the same in the two cases, his force gauge would have produced different measurement values.

**[148]**     While the above error in force measurement is readily apparent, there is another testing error that is more subtle, but also has a correspondingly large effect on the measured forces. Dr. Rundell set up the ATD in a different configuration for the Rock 'n Play test, such that it was harder to roll over. Portions of Dr. Rundell's Figure 163 on page 158 of his report, which shows the ATD on the carpet, is reproduced and annotated here in the top row of Figure 28. The photographs show that the ATD is aligned straight from head to foot. It remains relatively straight through the rolling measurement. This straight configuration is the easiest configuration in which to roll. On the other hand, when he setup the ATD for the Rock n' Play sleeper measurement, Dr. Rundell bent it at the waist. This is shown in the bottom row of Figure 28. This configuration makes it significantly harder to roll. Essentially, the legs of the ATD are pushing against the side wall and adding considerable resistance to the rolling motion. If Dr. Rundell had setup the ATD in the same straight position that he used for the carpet roll measurements, then his measurement value would have decreased.

**[149]**     I note that Dr. Rundell may have felt that he needed to change the configuration of the ATD and bend it at the waist in order to wedge it down into the valley of the Rock 'n Play sleeper. This should not have been done. If Dr. Rundell was familiar with the numerous incident reports that Fisher-Price had received, then he would have realized that infant roll overs were being achieved by infants that had pushed off the foot plate and raised their bodies up the incline sleeping surface. After pushing upward, the infant would be in a nominally straight configuration and rolling would be relatively easy. This is the situation of concern and it is what Dr. Rundell should have measured.

**[150]**     Given that we have no idea what Dr. Rundell's force-gage pulling angles were (except that they varied significantly between the carpet and the Rock 'n Play sleeper), these tests are not reproducible. I also note that the rate of pulling greatly influences the force readings obtained in such tests. Faster rates of pulling lead to higher force readings. Dr. Rundell has provided no measurements or documentation on his pulling speeds, so this important factor is also not reproducible or verifiable. The fact that Dr. Rundell setup the ATD in different configurations, which greatly influences the roll-over torque, he corrupted his measurements and introduced a huge bias in favor of his desired outcome that the ATD would roll easier on the carpet than in the Rock 'n Play. This aspect of the tests renders the measurements simply wrong. In short, these measurements cannot be relied upon as the bases of opinions involving roll-over torques.

### 5.3.4   Dr. Rundell's Belt Restraint Analysis

**[151]**     Dr. Rundell attempts to further critique my analysis of the Rock 'n Play design

COU_009114



**ATD Aligned Straight on Carpet**



**ATD Bent at Waist in Rock 'n Play**

Figure 28: Differences in the ATD Configurations Used in Dr. Rundell's Tests.

in a section he titled, "Belt Restraint." One of his main criticisms of my analysis in this section is stated as:

> Dr. Singhose is critical of the RNPS's belt system. Specifically, he indicated that infants can "push up and out of the lap restraint belt." Dr. Singhose does not provide any physical testing that is supportive of this claim. (Rundell Report, pg. 159.)

[152]    This statement is simply not true. I physically tested the Rock 'n Play sleeper by measuring its geometrical features. My geometrical measurements and reasoned explanation proved that infants can push far enough up the incline plane that they can escape from the belt restraint. In truth, I did not have to perform that analysis because the in-

COU_009115

cident reports that Fisher-Price possessed at the time of Zoey Olson's death had already established this fact beyond question. As I explained above, the incident reports described in Section 5.2.8 are the results of "physical testing" that Fisher-Price's customers unwittingly performed on their own infants without informed consent.

[153]    I note that Dr. Rundell does not address the overwhelming data proving that infants escape the restraint belt that comes to us via the incident reports. (See Section 5.2.8 above.) It appears that Dr. Rundell is of the opinion that the incident reports have little bearing on this issue. In truth, they are the most important source of information at our disposal because they are the long-duration testing under expected-use conditions that Fisher-Price failed to perform. Rather than base his opinions on this excellent source of data, Dr. Rundell, once again, resorts to a reliance on the defective Exponent, ESi, and Explico data for the basis of his opinion:

> The data collected by both [sic] Exponent, ESi, and Explico indicated that the available belt, when properly utilized, is very effective at restraining infants. During Explico's testing (Figure 166), it was clear that no amount of infant-induced upward motion caused the restraint system to move down relative to the child such that they could move out of the restraint. (Rundell Report, pg. 159.)

[154]    As an initial matter, the Explico demonstrations were performed on a very small sample of infants, and over a very short time duration. Therefore, they are not designed to identify restraint-escaping behavior during long-duration use of the Rock 'n Play sleeper. This data cannot be used to establish that infants do not escape the restraint system, especially in light of the overwhelming evidence to the contrary that is provided by Fisher-Price's own incident reports.

[155]    Given that the data Dr. Rundell chose to rely on for his opinion regarding the effectiveness of the belt restraint system is unreliable, not reproducible, and irrelevant (see Section Table 2), and he simultaneously ignored excellent sources of information proving the belt restraint was ineffective in many cases, his opinion on this issue is not reliable.

### 5.3.5   Dr. Rundell's Breathability Analysis

[156]    Dr. Rundell attempts to argue that an infant face down in the Rock 'n Play sleeper is not exposed to a breathability hazard. They certainly are. All Dr. Rundell had to do to understand this problem was to place his face into the curved sleeping surface for one minute and try to breath. This is a test that I performed and Fisher-Price employees did similar tests when they evaluated the breathability of fabrics.

[157]    Rather than perform this simple test, which ends all debate on the issue because it is very hard to breath, Dr. Rundell resorts to i) claiming I did not properly support my opinion, ii) referring to the short-duration Exponent testing, and iii) presenting an artificial 3D model of an infant that he can contort into any position that supports his opinion.

[158]    His claim that I lack support for my opinion is stated as:

COU_009116

Dr. Singhose does not provide any analysis or justification for how this would be different from a crib mattress. (Rundell Report, pg. 160.)

[159]    While this is a very weak criticism, it is also simply not true. As stated above, and in my Initial Report, I placed my face into the Rock 'n Play sleeper and struggled to breath for one minute. I explained how the nonbreathable fabric engulfed my face and greatly reduced the flow of air to my mouth and nose. Such a description is immediately distinguishable from placing one's face on a crib mattress. As is well known to experts, and patents alike, a crib mattress does not engulf your face. Finally, anyone who is familiar with the crib mattress standard would also know that my description is very different than what would occur with a crib mattress.

[160]    Dr. Rundell attempts to bring to bear the defective Exponent testing as a means for rebutting my opinion when he states,

> While in the RNPS, it has been thoroughly demonstrated that a prone child can turn their head to the side and have sufficient clearance for their nose and mouth (Figure 167) (Rundell Report, pg. 160-161.)

[161]    Although Dr. Rundell does not cite the sources of the screenshots he presents in his Figure 167, they appear to be from Exponent test videos. Recall, that these were very short-duration tests that could never capture the effects of an infant struggling for long periods of time to free themselves from the trap formed by the Rock 'n Play sleeper double-V valley structure. So, while there is no doubt that a prone infant could struggle to keep their face out of the engulfing nonbreathable fabrics for short periods of time, there is also no doubt that the infant would fatigue and their face would end up being pressed into the fabric by the weight of their heads. (See the Mannen Study for evidence of infant fatigue.) The Exponent testing simply did not test for a prone infant's ability to keep their head raised above the nonbreathable fabric of the Rock 'n Play for the entire duration of an overnight sleep period. Therefore, once again, Dr. Rundell has based his opinion on unreliable and irrelevant testing.

[162]    As a third attempt at arguing that infants lying prone in a Rock 'n Play do not suffer from restricted breathing, Dr. Rundell resorts to the manipulation of an artificial 3D model of an infant. He places the 3D infant model in a corresponding 3D model of a Rock 'n Play sleeper and then turns the head of the 3D infant model enough so that its mouth and nose are not in direct contact with the fabric. This is irrelevant. Dr. Rundell should have turned the head of the 3D infant model face down, as would certainly be the case for many prone infants. In the face-down position, the mouth and nose of the 3D infant model would certainly have been blocked by the nonbreathable fabric - assuming that Explico had correctly modeled the conforming nature of the fabric, as well as the flexibility of the underlying plastic shell.

[163]    I note that the pictures provided by Dr. Rundell of the 3D model, such as his Figure 168, indicate that Explico incorrectly modeled the fabric conformity and the plastic shell flexibility. The 3D infant model does not compress down into the double-V valley of the Rock 'n Play sleeper as it should. This is immediately obvious to anyone who

65

**Unnaturally smooth
and taut simulated "fabric"**

**Naturally wrinkled and
conforming fabric**



**Rundell
Figure 168**

**Exemplar Rock 'n Play**

**Figure 29: Differences in the Conformity of Explico's Simulated Fabric (left)
and Real Rock 'n Play Fabric (right).**

has personally witnessed an infant in a Rock 'n Play sleeper. However, to clarify this unnatural fabric characteristic, and lack of fabric conformity of the Explico model, I compare it to the real fabric of an exemplar Rock 'n Play sleeper in Figure 29. The left side shows Explico's artificial rendering of an infant lying prone in a simulated Rock 'n Play sleeper. The face of the 3D model does not sink down into the sleeper and the fabric does not conform to the model's face. The right side of Figure 29 shows that a doll placed into the sleeper sinks down much further into the double-V valley structure and the fabric conforms to the doll's face. The Explico models are simply not realistic and they could be manipulated to show just about anything.

[164]    I note here that I worked at Google for about two years (2018-2019) on a project that was directed primarily at simulating the response of fabric to various forces - such as human bodies pushing against it. I am certain that what Explico has attempted to do with its 3D models is far from realistic because a realistic model of this situation would likely take several months of dedicated effort by multiple engineers. I was not provided Explico's 3D model of the infant or Rock 'n Play sleeper. However, if I were given access to those models, I am confident that I could identify their errors and deficiencies, as well as direct their efforts to making it somewhat more realistic. That was my job at Google. Therefore, it is my opinion that the 3D model utilized by Dr. Rundell is not appropriate for this use and produces misleading outcomes.

### 5.3.6  Dr. Rundell's Rebreathing Analysis

[165]    Dr. Rundell attempts to quibble over the meaning of "rebreathing." He implies

66

that I do not understand the term and then he states that:

> The simple restriction of airflow is not a sufficient condition to create a re-breathing hazard. For a rebreathing event to occur, there must be an interstitial space that traps expired air and itself has restricted airflow. In this scenario, such as if breathing into a paper bag, the interstitial space is unable to be replenished with fresh air, and the carbon dioxide level rises. (Rundell Report, pg. 162.)

[166]    Dr. Rundell's description of rebreathing is adequate, yet he fails to understand that rebreathing covers a wide range of situations in which the common denominator is that some of the expelled air is drawn back into the lungs with the following breath. Rebreathing is not an on-off phenomenon, rather it varies by "degrees."[15] When I placed my face into the exemplar Rock 'n Play sleeper and attempted to breath, a significant portion of my expelled air returned to my lungs during my next breath. That is rebreathing. The usefulness of such a test is simple common sense.

[167]    Ironically, Dr. Rundell goes so far in his attempt to discredit my common-sense rebreathing test that, apparently without knowing what he is doing, he completely discredits Fisher-Price's own method for establishing their fabric breathability QSOP. Dr. Rundell's statement that discredits Fisher-Price's Quality and Safety Operating Procedures is:

> Dr. Singhose characterizes an exercise in which he "simply pressed [his] face into the Rock 'n Play Sleeper and tried to breath for 1 minute" as a demonstration that rebreathing testing is not difficult. This does not describe a test for the rebreathing effect, or a test expected to yield any useful information whatsoever. (Rundell Report, pg. 162.)

[168]    Dr. Rundell has made it very clear that he believes my breathability test does not "*yield any useful information whatsoever.*" Now, let us recall that Fisher-Price has a QSOP (3165) that was directed to the breathability of fabric used in its products. (Mattel-COU-1003649-51.) The QSOP uses the test method described in ASTM D737. Joel Taft informed Kitty Pilarz that Fisher-Price submitted 12 different fabrics to an outside testing lab to be evaluated under the ASTM test protocol. When they received the numerical results back for each of the 12 different fabrics, they then covered their mouths with swatches of the fabrics to subjectively test the difficulty of breathing through the fabrics. Based on those subjective tests, they selected an air permeability value that they felt was acceptable in terms of breathability of fabrics used in their infant products. The text of Joel Taft's and Kitty Pilarz's communications of this are as follows:

> We compared the numerical results of the testing with a subjective assessment of how easy/difficult we were able to breathe through the test samples by holding the sample over our mouths. This is how the pass/fail criteria of at least 30 $ft^3/min/ft^2$ was established for the QSOP. (Mattel-COU-1003649.)

---

[15](See for example, *Inspired CO2 and O2 in sleeping infants rebreathing from bedding: relevance for sudden infant death syndrome*, J. of Applied Physiology, 91: 25372545, 2001. "When the infant has the ability to exchange air via air channels, the degree of rebreathing may be limited."

COU_009119

These values were then compared with the ease of which swatches of the materials could be breathed through when pressed against the face (Kitty test). (Mattel-COU-1003651.)

**[169]** If the test that I performed on the Rock 'n Play sleeper fabric *in-situ*, which evaluates both the air permeability and the conformity of the fabric, does not "*yield any useful information whatsoever,*" then the entire basis of Fisher-Price's fabric breathability QSOP also rests on testing that does not "*yield any useful information whatsoever.*" In short, Dr. Rundell's opinion is that Fisher-Price's fabric breathability QSOP has no reasonable basis. I concur with Dr. Rundell's opinion on Fisher-Price's fabric breathability QSOP to a limited extent. It is my opinion that simply breathing through a loose swatch of fabric to test breathability is not as good as performing that breathability test on the fabric after it has been installed, as intended, in the subject product.

**[170]** Given that Dr. Rundell's opinions in this matter conflict with both common sense and Fisher-Price's own Quality and Safety Operating Procedures, it is readily apparent that his opinions on this issue are incorrect.

### 5.3.7 Dr. Rundell's Entrapment Analysis

**[171]** Dr. Rundell attempts to explain away the obvious entrapment hazard posed by the Rock 'n Play sleeper. Unfortunately for Dr. Rundell he, once again, relies heavily on the defective Exponent testing for his opinion that the Rock 'n Play does not pose an entrapment hazard:

> Dr. Singhose's phenomenon is refuted by all of the available physical testing involving live infants in a RNPS, namely the Exponent data. (Rundell Report, pg. 163.)

> Dr. Singhose's opinions are directly contradicted by physical testing involving unrestrained infants in RNPSs and cribs (Exponent testing). (Rundell Report, pg. 164.)

**[172]** Dr. Rundell even goes so far as to cite to the video footage in the Exponent 498 video from 11:35-15:27, as somehow supporting his position that infants cannot get trapped in the double-V valley of the Rock 'n Play sleeper. It is indisputable that the infant gets trapped in the prone position, struggles for approximately 4 minutes, and then has to be rescued by an adult. Screenshots showing the last 5 seconds of the rescue sequence are provided here in Figure 30. The only reasonable explanation for Dr. Rundell's citation to this video sequence to support his opinion that infants do not get trapped in the prone position is that he did not actually view the video sequence.

68



(a) Infant trapped in the prone position.



(b) Experimenter Calls off the Test.



(c) Adult Reaches in to Rescue the Infant.



(d) Adult Lifts out Prone Infant.

**Figure 30: Trapped Infant Being Rescued from the Prone Position (Mattel-COU0023499_CONFIDENTIAL.mp4).**

# 6 Rebuttal to Report of Dorothy Drago

[**173**]    Ms. Dorothy Drago provided a report in support of Defendant's position regarding the safety of the design of the Rock 'n Play sleeper. Ms. Drago's opinions on this matter include:

1. Fisher-Price exercised systematic, responsible principles in designing the Rock 'n Play Sleeper, which ensured the product was safe for its intended uses. Fisher-Price's design/review team included highly experienced individuals, who are keenly aware of hazards, including asphyxia hazards, to avoid in infant products, and who are thoroughly familiar with existing safety standards that apply to infants' products. The team also included Fisher-Price's in-house child development experts.

2. The Rock 'n Play Sleeper does not present an inherent defect due to the angle of incline. Products with inclines from 0 deg to 45 deg have been used safely for decades and published literature demonstrates that inclined surfaces can improve respiratory function in infants. The incline of the product is not a defect, nor does it present a risk of positional asphyxia or oxygen desaturation.

3. Including a restraint in the Rock 'n Play Sleeper was appropriate and was intended to keep the occupant from slouching down, falling out, or pushing out the head end

69

of the product. Non-use of the restraint does not make the product unsafe (although it can expose the infant to hazards to which she otherwise would not be exposed if the restraint is properly used). Any injury risk associated with the non-use of the restraint would need to be evaluated on a case-by-case basis. Had the restraint been properly secured in this case, as the warnings mandate, that would have eliminated both the known fall hazard and any hazard associated with rollover.

4. The Rock 'n Play Sleeper is not at odds with AAP safe sleep guidelines. At the time of the original marketing of the product, when it fell under and complied with the ASTM bassinet standard, it was considered a recommended sleep product such as a "crib, bassinet, or portable crib/play yard that conforms to the safety standards of CPSC and ASTM..." (2011 AAP Policy Statement, SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment, Recommendation 2a).

5. As of May, 2015, with the promulgation of F3118-15, inclined sleepers had their own safety standards and continued to be recognized as safe products for infant sleep, including overnight and unsupervised sleep.

6. The warnings accompanying the Rock 'n Play Sleeper were clear, unambiguous, and conspicuous as defined by ASTM and adequate to inform about known hazards and foreseeable consumer behaviors and misuses that introduce hazards to the sleep environment.

7. The Rock 'n Play Sleeper, when used as intended and as instructions and warnings dictated, was safe for prolonged/overnight sleep, did not present an inherent rollover or asphyxiation hazard, and was neither defective nor unreasonably dangerous.

8. The parents' failure to follow the warnings and instructions led to their placing Zoey, an 8 1/2 month old unintended user, unrestrained in the product for overnight sleep. Zoey's motor skill level far exceeded all the developmental milestones noted on the warning label and made her too developed to be able to use the product safely.

9. Placing Zoey for overnight sleep in the Rock 'n Play Sleeper, given her developmental milestones, and failing to secure the restraint system was not reasonably foreseeable to Fisher-Price. This unforeseeable and unreasonable misuse of the product was the underlying cause of the alleged event.

10. The cause of Zoey's death remains unknown. Her position did not result in occlusion or obstruction of her face, nose or mouth. There was no demonstrable evidence that the Rock 'n Play Sleeper was causally related to Zoey's death.

11. There is no evidence of defective material, design, or manufacturing in the Rock 'n Play Sleeper, including the subject Sleeper used by Zoey Olson. Neither the Rock 'n Play Sleeper, nor any action or inaction on the part of Fisher-Price and Mattel related to this product, caused the alleged injuries to the Plaintiff.

12. The Voluntary Recall by Fisher-Price of the Rock 'n Play Sleeper was timely and appropriate and is not evidence that the product was defective or unreasonably dangerous.

COU_009122

13. Based on my work experience with Section 15(b) activities while on the staff of the CPSC, I am confident that had the CPSC determined, prior to Zoey's death, that the product contained a defect that created a substantial risk of injury, it would have taken regulatory action.

[174]    Unfortunately for Ms. Drago, many of these opinions are contradicted by her own writings published previous to this case, as well as being contradictory to each other. Furthermore, many of these opinions conflict with commonly-accepted best practices.

[175]    The following subsections will document some of these critical contradictions, as well as point out errors in her analysis. Given the extent of the errors and contradictions in Ms. Drago's Report, it is not practical for me to respond to all of them in the course of this Rebuttal Report. I have chosen to address a subset of the problems that I think will paint Ms. Drago's opinions in the correct light. Therefore, if I do not respond to a particular opinion or analysis of Ms. Drago, that should not be interpreted as though I am in agreement with her. On the contrary, I disagree with her every opinion and analysis that attempts to indicate the Rock 'n Play sleeper is a safe contraption that did not contribute to Zoey Olson's death.

## 6.1    Ms. Drago's Opinions on Inclined Sleeping Surfaces

[176]    Ms. Drago's opinion that the Rock 'n Play sleeper "does not present an inherent defect due to the angle of incline" (Drago Report, pg. 40) is factually incorrect, contradicted by her own previous publications, as well as being contradictory to commonly-accepted best practices. The fact that inclined sleeping surfaces present a hazard is not up for debate. I addressed that issue in my Initial Report and it is commonly-held knowledge throughout the world of educated peoples. I will address in this section the fact that Ms. Drago herself has published works that acknowledge, and even emphasize, that inclined sleeping surfaces are hazardous to infants. Finally, I will present some specific examples showing Ms. Drago's opinion on this issue is clearly contradicted by commonly-accepted best practices.

[177]    Ms. Drago published a book titled, "From the Crib to Kindergarten."[16] Chapter two of that book is titled, "Good Night, Sleep Tight: Sleep Safety." In that chapter, Ms. Drago writes:

> Infants can also suffocate if they sleep on a surface that tilts and remains at an angle.
>
> (From the Crib to Kindergarten, pg. 29.)

[178]    She then goes on to describe a case in the 1990's wherein the Consumer Product Safety Commission recalled a cradle because partial or total infant suffocations occurred when it was used. Her explanation of the root cause for this recall is:

---

[16]From the Crib to Kindergarten: The Essential Child Safety Guide, Dorothy Drago. M.P.H., The John Hopkins University Press, 2007.

71

COU_009123



Recalled Fisher-Price Rock 'n Play sleeper

**Figure 31: Consumer Product Safety Commission Recall Notice.**

17

> The cradle would stop rocking and remain at an angle instead of level. The baby inside would be left scrunched down in one corner, unable to move. (*Id.*, pg. 29.)

**[179]**    The main distinguishing characteristic of the Rock 'n Play sleeper is a tilted sleeping surface. The cradle rocks to some extent, but when it stops, it remains at an angle of approximately 30 degrees, instead of level. In cases where the infant gets prone and cannot roll back over (such as demonstrated by both the Exponent testing that Fisher-Price commissioned and numerous incident reports), the baby can be left face down in the valley of the Rock 'n Play sleeper, unable to move. Given that the Rock 'n Play sleeper has been recalled by the CPSC, as shown in Figure 31, the similarities between Ms. Drago's writings in her book and this current case involving Zoey Olson's death in a Rock 'n Play sleeper are undeniable. However, Ms. Drago contradicts her own previously-published opinions in an effort to defend the recalled Rock 'n Play sleeper.

**[180]**    In her earlier publications, Ms. Drago considered an unlevel sleeping surface such an important hazard that she addresses it in her section titled, "Key Actions to Prevent Suffocation." One of her key actions is:

> Make sure that a rocking cradle comes to rest level, not at an angle. (*Id.*, pg. 31.)

72

COU_009124

[**181**]    Ms. Drago also published a book chapter titled, "Hazards Associated with Common Nursery Products," which appeared in a book titled "Injury Prevention for Children and Adolescents." In that book chapter, Ms. Drago indicated that sleep products that are angled are hazardous:

> Other patterns of *asphyxia occur when the baby becomes* entrapped between the mattress and the sidewall in a bassinet, between structural components, such as drop rails on bassinets designed as co-sleepers, or by being *pressed against a side or end of a cradle that comes to rest at an angle, rather than level.* (Hazards Associated with Common Nursery Products, pg. 87.) (emphasis added.)

[**182**]    She goes on to give examples of recalls in the 2000's that occurred because of uneven sleep surfaces:

> Since 2004, there have been three bassinet recalls. One involved an entrapment hazard and two involved the creation of uneven sleep surfaces.
> (*Id.* pg. 87)

One of the recalls she describes as:

> In May 2008, Eddie Bauer Soothe & Sway portable play yards *were recalled because the rocking bassinet accessory could come to rest at an angle.*
> (*Id.* pg. 87.) (emphasis added.)

[**183**]    Given that the Rock 'n Play sleeper comes "to rest at an angle," Ms. Drago's own writings in this book chapter indicate that it is a hazardous sleep environment.
[**184**]    Additionally, Ms. Drago recommends steps for safe sleep that include ensuring that infants sleep on a flat, level surface.

> Sleep Safety Checklist
> 7. Is your baby's sleep surface level?
> Avoid using sleep surfaces that could remain at a tilt and cause your baby to be pushed up against one side. This situation can happen with swinging items, like cradles, that do not automatically stop in a level position.
> (Crib to Kindergarten pg. 41.)

[**185**]    In addition to contradicting her own personal publications, the opinion that Ms. Drago is now asserting for this case on inclined sleeping surfaces is contradicted by commonly-accepted safe sleep practices. Examples of this contradiction are plentiful in "Infant Safe Sleep."[18] This book describes currently accepted best practices. Ms. Drago's opinion on inclined sleeping surfaces is contradicted by several chapters in this book.
[**186**]    Chapter three of "Infant Safe Sleep" is titled "Safe Sleep Recommendations."[19] This chapter presents "A-Level Recommendations" that include "Use of a flat, firm sleep

---

[18]Infant Safe Sleep: A Pocket Guide for Clinicians, Rachel Moon Editor, Springer, 2020.
[19]Chapter 3 is written by T.C. Salam Ward, University of Wisconsin-Milwaukee.

COU_009125

surface." (Infant Safe Sleep, pg. 54.). Although Linda Chapman has previously testified that she believes "flat" can be used to describe an inclined surface up to at least a 30 degree angle[20] - apparently professing the opinion that "flat" just means smooth - this chapter makes it clear that a "flat" sleeping surface is one that is horizontal:

> Infant sleep surfaces should be flat (horizontally placed.) In 2019, the CPSC recalled several models of inclined sleepers due to infants deaths [20].[21]
> (Id., pg. 54)

[187]    This chapter also clarifies the definition of "firm":

> The Task Force defines "firm" as a surface that does not indent or conform to the shape of the infant's head when the infant is laid on the surface [2].[22]
> (Id., pg. 54)

[188]    The Rock 'n Play Sleeper has neither a flat nor a firm surface. Although the Rock 'n Play sleep surface is a complex three-dimensional surface, it has two main components that can be characterized as the "foot platform" and the "seat back." Both of these components are concave "hammock-like" surfaces in the right-left direction and they have nominal fore-aft angles of approximately -40 degrees and 27 degrees, respectively, as was documented in my Initial Report. Therefore, they form a valley with a fore-aft angle of approximately 67 degrees. Taken together, these two components form a sleep surface that is very nearly the opposite of "flat."

[189]    Additionally, the Rock 'n Play sleep surface is not "firm." As shown in my Initial Report, the surface indents and conforms to the shape of the infant's head. The photograph shown in Figure 32 provides an example of this conforming characteristic when a doll is placed into the device. Finally, when I conducted my breathability tests, the fabric conformed to my face.

[190]    Ms. Drago's opinion that the inclined sleeping surface of the Rock 'n Play Sleeper does not carry an inherent risk is also contradicted in Chapter 8 - "Use of Soft Bedding and Other Soft Surfaces"[23] of "Infant Safe Sleep." This chapter clearly states that inclined sleeping surfaces carry an inherent risk:

> Certain potential sleep surfaces also carry inherent risks for suffocation, often because a non-breathable surface (e.g. cushioned chair of soft mattress) can conform to the infant's face, or because the infant is positioned (e.g. on an inclined sleep surface or in a car seat) in such a way that allows the airway to be

---

[20]Chapman Deposition, 11/10/2020, 55:2-6.

[21]The reference [20] is U.S. Consumer Product Safety Commission: Safe Sleep - cribs and infant product information center. 2019. https://www.cpsc.gov/safesleep.

[22]The reference [2] is American Academy of Pediatrics Task Force on Sudden Infant Death Syndrome. SIDS and other sleep-related deaths: Updated 2016 recommendations for a safe infant sleeping environment. Pediatrics. 2016;138(5):e20162938.

[23]Chapter 8 is written by R. Carlin of Columbia University.

COU_009126



**Figure 32: Rock 'n Play Fabric Conforms to the Face.**

| TABLE 8.2  Specific common sleep surfaces to avoid |
| --- |
| Couch or sofa |
| Cushioned chair |
| Soft mattress (including memory foam, air mattresses, and waterbeds) |
| Any inclined (more than 10 degrees from horizontal) sleep surface |
| Car seat |
| Swing |
| Crib, bassinet, or play yard with an ill-fitting mattress |

**Figure 33: Table 8.2 from "Infant Safe Sleep."**

otherwise compromised. The most common of these surfaces are listed in Table 8.2.
(Id., pg. 150)

[191]    Table 2 has been reproduced here in Figure 33, with an annotation that highlights a sleep surface inclined more than 10 degrees should be avoided.

[192]    I note that this chapter also refutes suggestions made by Fisher-Price experts that the inclined sleeping surface of the Rock 'n Play Sleeper is beneficial for infants with gastroesophageal reflux (GER). For example,

...studies looking at placing children supine on an incline to decrease GER have in fact demonstrated increased rather than decreased GER symptoms.
(Id., pg. 157)

75

COU_009127

[193]    Ms. Drago's opinion that the inclined sleeping surface of the Rock n' Play Sleeper does not carry an inherent risk is further contradicted in Chapter 9 - "Baby Products: How to Evaluate them for Potential Safety"[24] of "Infant Safe Sleep." This chapter points out that inclined surfaces may be acceptable for products used by infants while they are traveling, but they are dangerous for infant sleep:

> The elements of those products that improve their safety, such as padding, straps, and an inclined sitting angle, make them more dangerous when the infant is asleep and not traveling.
> (Id., pg. 177)

[194]    Despite her own previously-published recommendations, recommendations from other experts, and the CPSC, Ms. Drago continually contradicts herself when stating that the Rock 'n Play is "safe for prolonged/overnight sleep, did not present an inherent rollover or asphyxiation hazard, and was neither defective nor unreasonably dangerous." It is indisputable that Ms. Drago knows that an infant sleeper with an "angle of incline" poses a suffocation hazard for infants. Therefore, her opinion in this case is irreconcilable with her previously-published opinions, as well as commonly-accepted safe practices.

## 6.2    Ms. Drago's Opinions on Foreseeability of Parental Misuse

[195]    Ms. Drago's opinion that Fisher-Price "ensured the product was safe for its intended uses" is both factually incorrect and contradicted by her own writings. As an initial matter, a product must be designed in light of foreseeable use and misuse. Ms. Drago writes that it is foreseeable for parents to use sleep products incorrectly:

> Parents may be enticed to purchase plush bedding and pillows for an infant, believing that these items will make the sleep environment cozier. Given that mattresses typically provided with bassinets are thin (the voluntary standard for bassinets and cradles limits mattress depth to 1 1/2 inches; American Society for Testing and Materials [ASTM] 2010g), this behavior is foreseeable.
> (Injury Prevention for Children and Adolescents, pg. 87.)

[196]    Although Ms. Drago admits that it is foreseeable behavior for parents to add bedding and pillows to infant sleep environments in an attempt to make it more comfortable, she does not express a similar opinion that it is foreseeable that parents would not use the belted restraint in the Rock 'n Play sleeper - even though Fisher-Price's own testing clearly proves that parents will often not use the restraint.

[197]    Given that parents' behavior of adding plush bedding and pillows to an infant sleep environment is motivated by the desire to make the infant more comfortable, and not using the belted restraint in the Rock 'n Play sleeper is driven by the same desire to improve the comfort of the infant, both of these behaviors are certainly foreseeable, and

---

[24]Chapter 9 is written by J.D. Colvin of Pediatrics, Children's Mercy Kansas City.

COU_009128

foreseeable for the same reason. Additionally, Fisher-Price designed the belted restraint in the Rock 'n Play sleeper such that it easily, and comfortably, lays flat beneath the infant or off to the side when it is not in use. That is, the Rock 'n Play sleeper is designed such that the restraint can easily NOT be used.

[**198**]    When the foreseeable desire to comfort a sleeping infant is combined with Fisher-Price's own test results and design, there is simply no doubt that it is foreseeable that many parents will not use the belted restraint that comes installed in the Rock 'n Play sleeper. Additionally, it is undisputed that an unrestrained infant can roll over in the Rock 'n Play sleeper into the hazardous prone position. Therefore, Ms. Drago's opinion that the Rock 'n Play sleeper is safe for its intended uses, under reasonably foreseeable conditions, is certainly incorrect.

## 6.3    Ms. Drago's Opinions on ASTM Compliance

[**199**]    Ms. Drago's opinions include "The Rock 'n Play sleeper is not at odds with AAP safe sleep guidelines..." and "The warnings accompanying the Rock 'n Play sleeper were clear, unambiguous, and conspicuous..." As a basis for support of these two opinions, Ms. Drago relies on ASTM standards. She cites to the standards as some type of assurance that the Rock 'n Play sleeper is safe. This reliance on standards to ensure product safety is in stark contrast to Ms. Drago's previous writings about standards, wherein she warns parents not to rely on standards to ensure safety. This contradiction will be discussed further below.

[**200**]    However, Ms. Drago's current support for the ASTM process and the ill-fated inclined-sleeping product standard (ASTM F3118) is to be expected given that she is an active and voting member of the group (ASTM F15) that developed and passed that defective standard.[25]

> I am an active, voting member of ASTM (Committee F15) and as a member of several subcommittees, have contributed to the development of consumer product safety standards for, among other things, infant products and toys. (Drago Report, pg. 5.)

[**201**]    Although Ms. Drago has served on ASTM committee F15, she mischaracterizes the standards that have been produced by that committee. For example, she writes,

> When first produced in 2009, the Rock 'n Play Sleeper complied with the relevant bassinet standard ASTM F2194-07, which addressed the known hazards of suffocation, tip over, and collapse. (Drago Report, pg. 7.)

[**202**]    Ms. Drago's characterization of ASTM F2194-07 is simply wrong. It was well-known at the time that infants placed on inclined sleeping surfaces could end up, in Ms. Drago's own words, "scrunched down" at the bottom of the incline in a position that restricts their breathing by either positional asphyxia or pressing their face into nonbreathable fabric.

---

[25]I also served on the ASTM F15.18 committee from 2018-2019, as well as several other standards committees during my career.

COU_009129

ASTM F2194-07 did not address inclined sleeping surfaces, so it certainly did not address this known suffocation hazard. There is simply no doubt that ASTM F2194-07 was not an appropriate standard to govern infant inclined sleeping products, which is precisely why Ms. Drago's ASTM committee developed the disgraced ASTM F3118 standard.

[**203**]    What Ms. Drago apparently did not know during the time period that the ASTM F3118 standard was being developed is that Fisher-Price withheld data from the ASTM committee that they had compiled on the lack of restraint belt use. Thus, when drafting and revising the standard, the committee was not aware that Fisher-Price possessed data that the majority of users would not use the restraint belt all of the time. Fisher-Price also did not share with the ASTM committee the incident reports that were directly reported to Fisher-Price (incident reports that were not reported to the CPSC), proving that infants were coming out of position both while restrained and unrestrained.

[**204**]    Although Ms. Drago's current opinions represent the ASTM standards as a high bar in terms of ensuring safety, she has previously published opinions contrary to that view. For example, she has previously warned parents that products meeting a standard may not be safe:

> Nursery products that meet a standard are not necessarily "safe." A product that complies with a standard will only be as good as that standard's requirements. Standards are not designed for any particular manufacturer's product... As a result, unique characteristics of a product may present unaddressed hazards... Although some manufacturers conduct "hazard analyses" of their designs before production, others do not. (Injury Prevention for Children and Adolescents, pg. 115.)

[**205**]    At the time when the Rock 'n Play sleeper was first put on the market, there was no ASTM standard for infant inclined sleepers. Later, as the ASTM standard evolved in response to the products on the market, it was determined that inclined sleepers should not be classified along with the bassinet standard. As a result, Fisher-Price helped usher in the ASTM F3118 standard for inclined sleepers in 2015. This same F3118 standard was amended in June 2021 to exclude inclined sleepers for infants up to five months. In essence, the ASTM standard that the Rock 'n Play sleeper did comply with during a portion of its time on the market has been effectively withdrawn and is acknowledged by the CPSC to be a defective standard that does not ensure a safe sleeping environment. This is entirely consistent with Ms. Drago's previously-published opinions in *Injury Prevention for Children and Adolescents* that indicate standards do not ensure a product is safe.

[**206**]    In addition, Ms. Drago notes that a large number of products on the market were recalled, even though they complied with their respective ASTM standard:

> By June 2010, the CPSC had issued 40 recalls of more than 11 million cribs (all types) for product defects, not for violation of the crib standard. (Crib to Kindergarten, pg. 24.)

78

[**207**]    Ms. Drago urges parents to continually watch for death reports and recalls and advises parents to use organizations, such as Kids In Danger, who advocates for safer children's products.

> Consumers are often surprised by dangerous nursery products, and many consumers expect that products intended for use by a baby are tested and their safety assured. However, there is no premarket safety clearance procedure for nursery products... (Injury Prevention for Children and Adolescent, pg. 86.)

[**208**]    This same organization, Kids In Danger, that Ms. Drago refers to as a good resource for parents, praised the recent ban of inclined sleepers for infants up to five months old. In a statement regarding this ban, Nancy Cowles, Executive Director of Kids In Danger states that:

> Kids in Danger (KID) was founded by parents whose son died in a dangerous infant sleep product that came to market without meeting any safety standard...This rule will prevent that from continuing to happen to other families. (Statement of American Academy of Pediatrics, Consumer Federation of America, Kids in Danger, Public Citizen, Safe Infant Sleep, and U.S. Public Interest Research Group. June 2, 2021.)

[**209**]    Ms. Drago implies that because the CPSC did not determine the product contained a defect at the time of Zoey's death, and did not pursue regulatory action, that the product did not contain a defect that created a substantial risk of injury.

> ...from the time Fisher-Price manufactured the Rock 'n Play Sleeper at issue through December 2018, the CPSC knew of only a few inclined sleeper-related fatalities, and there was not an identified fatality pattern(s). (Drago report, pg. 22)

[**210**]    However, in Ms. Drago's own previous writings, she states that the actions of the CPSC are reactionary:

> The work of the CPSC, particularly since the passage of the CPSIA in 2008, will likely have a dramatic effect on the number of consumer product injuries and fatalities. However, its effect is not likely to be seen for a number of years since preexisting products linger in the marketplace for some time. Also, there is lag in data reporting to the CPSC. (Injury Prevention for Children and Adolescents, pg. 85.)

[**211**]    Therefore, Ms. Drago knows that simply because the CPSC has not collected enough data, or identified a causal relationship in the collected data, that does not prove that a product is safe.

[**212**]    Ms. Drago also urges parents to be proactive in the safety of children's products. In her chapter on childhood injury prevention, she writes that:

COU_009131

Despite the work of the Commission and advocacy groups, the safety of a nursery product is not assured. Consumers must be advocates for their own children's safety. Following are some actions that can be taken:

1. Report injuries and safety concerns about products to the CPSC.

...

4. Petition the CPSC to remedy a product... The petition should identify the consumer product ... along with the basis for the request. This may include personal experience or published findings. The petition should describe the specific risk of injury, including data on severity and likelihood of injury, along with possible reasons for the injury potential (e.g., product defect, design flaw, unintentional misuse). (Injury Prevention for Children and Adolescents, pg. 114.)

[213]    Zoey's parents are in the process of doing exactly what Ms. Drago herself advises parents to do. As a result of these actions, and actions of many parents effected by the defects in the Rock 'n Play sleeper, the CPSC ushered in amendments to the F3118 standard on inclined sleepers.

## 6.4   Ms. Drago's Opinions on Warnings.

[214]    Ms. Drago's opinion that the "warnings accompanying the Rock 'n Play Sleeper were clear, unambiguous, and conspicuous" seems to be in direct opposition to her recommendations to the F3118-2017A Consumer Safety Specification for Infant Inclined Sleep Products. In her statement, she warns that "fatalities keep on occurring." Ms. Drago indicated that an improvement to the warning label should be "a pictorial that shows a baby correctly placed in an inclined sleep product..." Ms. Drago has the opinion that a pictorial warning is advantageous to parents and has the potential of preventing further deaths in inclined sleepers.

[215]    Even if the warnings complied with the ASTM standard at that time, she states in her book that:

Nursery products that meet a standard are not necessarily "safe." A product that complies with a standard will only be as good as that standard's requirements. Standards are not designed for any particular manufacturer's product... As a result, unique characteristics of a product may present unaddressed hazards... Although some manufacturers conduct "hazard analyses" of their designs before production, others do not. (Injury Prevention for Children and Adolescents, pg. 115.)

## 6.5   Ms. Drago's Opinions on Cause of Death

[216]    Ms. Drago's opinion is that "the cause of Zoey's death remains unknown. Her position did not result in occlusion or obstruction of her face, nose, or mouth." Yet, in her previous publications Ms. Drago warns parents that:

COU_009132

...several crib deaths that may in fact be mechanical suffocation get classified as SIDS. These two mechanisms of death essentially present identically at autopsy.
(Injury Prevention for Children and Adolescents, pg. 101.)

[**217**]    Therefore, under Ms. Drago's own previously-published opinions, Zoey's death could be erroneously classified as SIDS.

## 6.6    Contradictions Within Ms. Drago's Opinions For This Case

[**218**]    As thoroughly documented above, Ms. Drago's opinions in this case clearly contradict her previously-published opinions. Additionally, the opinions that she has provided in this case also contradict each other. For example, her Opinion 3 is contradictory to her Opinion 9. Both of those opinions cannot be correct because if one is correct, then the other one cannot be correct. In truth, both of the opinions are incorrect.

[**219**]    The contradictions between her Opinion 3 and 9 can easily be understood. In Opinion 3, she states, "Non-use of the restraint does not make the product unsafe..." In order to have any basis for this opinion, Ms. Drago would need to rely on some type of analysis from Fisher-Price, such as a hazard analysis or the in-home testing, etc. She cannot simply be conjuring this opinion out of thin air. The existence of Fisher-Price data regarding the non-use of the restraints means that Fisher-Price necessarily foresaw the issue of restraint non-use. In fact, the record is filled with acknowledgements and data that demonstrate Fisher-Price foresaw this issue to be a concern.

[**220**]    However, in Opinion 9, Ms. Drago inexplicably denies that Fisher-Price foresaw this issue when she states, "failing to secure the restraint system was not reasonably foreseeable to Fisher-Price." This opinion is simply false. Furthermore, it is in direct contradiction with her Opinion 3. Ms. Drago's inability to formulate consistent opinions for this case, that do not contradict each other, is a clear indication that her analysis of this matter is unreliable.

## 6.7    Summary of Ms. Drago's Opinions

[**221**]    As thoroughly documented above, Ms. Drago has submitted several opinions in this case that blatantly contradict her own previously-published opinions and recommendations. She has also submitted opinions in this case that contradict each other. Finally, her opinions contradict well-known and commonly-accepted best practices.

81

# 7  Rebuttal to Report of Dr. Christine Fuller

[**222**]    The medical doctor Christine Fuller provided a report ("Fuller Report") in support of the recalled Rock 'n Play sleeper. Dr. Fuller offered opinions on the potential causes of death and the quality of the autopsy performed on Zoey Olson. However, she also offered an opinion on the physical design of the Rock 'n Play sleeper, as well as a rebuttal to my mechanical engineering analysis of the Rock 'n Play sleeper. As an initial matter, it appears that Dr. Fuller is not qualified, nor did she review the appropriate materials, to render a reliable opinion on the physical design of the Rock 'n Play sleeper. Additionally, she is certainly not qualified to offer a reliable rebuttal of my mechanical engineering analysis of the Rock 'n Play sleeper. This section of my report will rebut those areas of the Fuller Report wherein Dr. Fuller offered unreliable and incorrect opinions and rebuttal statements.

[**223**]    Dr. Fuller offered the following opinion regarding the physical design of the Rock 'n Play sleeper:

> Because the Rock 'n Play Sleeper had *restraints* and instructions and warnings to prevent an infant from rolling over to her stomach and based on my inspection of the Rock n' Play Sleeper *materials* and *construction*, it is my opinion to a reasonable degree of medical certainty that no defect, action, or inaction on the part of Defendants or that the Rock 'n Play Sleeper caused or contributed to Zoey Olson's death.
>
> (Fuller Report, pg. 6.) *(emphasis added.)*

[**224**]    This opinion is not a medical opinion. Therefore, Dr. Fuller's statement that she holds this opinion "to a reasonable degree of medical certainty" does not make any sense. This is an opinion about the physical design of the Rock 'n Play sleeper. As is evident from her statement above, the bases of her opinion comes from her inspection of the "restraints," "materials," and "construction."

[**225**]    Even if she was qualified as a product designer, which she is not, Dr. Fuller has offered no evidence that the restraint is designed appropriately to "prevent an infant from rolling over to her stomach." In fact, we know for certain from the incident reports that the Rock 'n Play restraint does not stop all infants from rolling over onto their stomachs. Given that her opinion is based on the falsity that the restraint always works, Dr. Fuller's opinion is unreliable. Additionally, if Dr. Fuller was a product designer, she would understand that it is not enough for a product to simply have a restraint; the restraint has to be designed so that users will use it. Again, we know with certainty that a large percentage of the users do not use the restraint and, furthermore, the restraint is designed such that the product is easily used without engaging the restraint.

[**226**]    As for her reliance on her inspection of the "materials" used in the Rock 'n Play sleeper, Dr. Fuller offers no actual analysis of the materials. She does not appear to have conducted any tests on the materials. For example, she does not present fabric breathability tests or fabric conformity tests. She offers no proof whatsoever that the fabric material used in the Rock 'n Play sleeper is appropriate. The fabric is not appropriate. The fabric

82

is nonbreathable and it conforms to the face of an infant that turns prone.

[**227**]    As for her reliance on her inspection of the "construction" used in the Rock 'n Play sleeper, Dr. Fuller offers no actual analysis of the construction. She does not attempt to explain how the construction of the Rock 'n Play sleeper prevents an infant from rolling prone. It does not. She does not attempt to explain how the construction of the Rock 'n Play sleeper allows a prone infant to easily turn back to the supine position. It does not. In fact, the construction of the Rock 'n Play sleeper acts to trap infants in the prone position.

[**228**]    Given that Dr. Fuller is not a qualified product designer and she offers no analyses of the "restraints," "materials," or "construction" of the Rock 'n Play sleeper, her opinion above is both incorrect and unreliable.

[**229**]    In addition to offering the incorrect and unsubstantiated opinion above, Dr. Fuller goes on to offer a rebuttal to my mechanical engineering analysis of the Rock 'n Play sleeper. She starts her rebuttal by stating:

> Plaintiff's engineering experts, Dr. Vredenburgh and Dr. Singhose, discuss theories about potential risk from the incline in the Rock 'n Play Sleeper. Much of what is presented in those reports, however, is not directly applicable to the current case. For instance, they suggest that the angular incline of the Rock 'n Play Sleeper would place an infant at risk for positional asphyxiation via an airway compromising position (head drop with chin to chest causing airway compromise).
>
> (Fuller Report, pg. 12.)

[**230**]    Dr. Fuller gets her rebuttal off on the wrong foot by mischaracterizing my "theories." I did not point to "head drop" as a cause of Zoey's death. My opinion is that Zoey turned over onto her face and could not right herself.

[**231**]    Dr. Fuller's mischaracterizations of my analysis continue on in the next paragraph of her report when she writes:

> They also offer details relative to mechanisms whereby an infant might more easily be able to roll over into a prone position in the Rock 'n Play Sleeper and get stuck in the prone position, causing a potential situation in which positional asphyxiation or suffocation might occur. They neither give specific details as to the age, height, or weight of the live subjects that they used in their tests, nor do they give details of developmental physical abilities of the subjects.
>
> (Fuller Report, pg. 12.)

[**232**]    While I did offer an analysis that explains why it is easier to roll over on an incline plane, as opposed to a flat surface, I did not use "live subjects." My analysis utilized Newton's Laws of Motion - an irrefutable basis for any analysis. Furthermore, I used Newton's Laws in a correct way to analyze a relevant situation. Newton's Laws of motion apply to individuals of every age, height, and weight. So the above criticism is nonsensical. I

COU_009135

note that in all of the reports offered by Fisher-Price experts, not one was able to, or even attempted to, refute my engineering analysis of this issue.

**[233]**    Within this same paragraph, Dr. Fuller makes the following incorrect statement:

> Relative to the risks of positional asphyxia noted earlier in this paragraph (chin to chest with airway compromise, and getting stuck in prone position), the developmental stage of Zoey as well as the physical evidence at the scene (lividity pattern) refute both hypotheses.
> (Fuller Report, pg. 12.)

**[234]**    This is false. The testing performed by Exponent proved that infants with developmental skills similar to Zoey Olson can get stuck in the prone position. In fact, given the very small sample size and the short duration of the Exponent testing, the fact that it revealed infants could get stuck in the prone position is strong evidence that large numbers of infants, including Zoey Olson, have gotten stuck in the prone position.

**[235]**    Going beyond the Exponent testing, the double-V valley structural design of the Rock 'n Play sleeper makes it difficult for infants of all developmental stages to escape from the prone position. This design defect was clearly documented and explained in my Initial Report. I note that Dr. Fuller has offered no attempted rebuttal to that analysis. For example, she has not explained how a prone infant, with their feet sticking up in the air behind them can use their feet to generate rolling torques. Nor has she explained how a prone infant with their arms pinned at their sides by the steep side walls can use their arms to generate sufficient rolling torques.

**[236]**    Dr. Fuller does attempt to provide a couple pieces of "evidentiary" support for her opinion that Zoey Olson did not get stuck in the prone position. The first such evidence is encapsulated in the following statement:

> It was well established by both Zoey's parents as well as her pediatrician's records that Zoey was able to roll herself both into and out of the prone position, crawl, and transfer small objects, and therefore would be more likely than not able to adjust herself into a supine position had she in fact rolled over fully prone.41,42
> (Fuller Report, pg. 13.)

**[237]**    This is false. There is no evidence that Zoey Olson "*would be more likely than not able to adjust herself into a supine position had she in fact rolled over fully prone*" while in the Rock 'n Play sleeper. Even if there was convincing evidence that Zoey Olson could roll from a prone to a supine position *on a flat level surface*, that provides no evidence whatsoever that Zoey Olson could perform such a maneuver while prone *in a Rock 'n Play sleeper*. The Rock 'n Play sleeper is nothing like a flat surface. The physical design of the Rock 'n Play sleeper traps infants in the prone position and makes it very hard for them to "adjust" back into the supine position for the reasons that I clearly established in my Initial Report. Furthermore, the Exponent testing, independently and apart from my

84

analysis, proved that infants get stuck in prone position. Dr. Fuller has presented no evidence, and certainly none exists, that Zoey Olson was capable of maneuvering out of the prone position and back into the supine position while in a Rock 'n Play sleeper.

[**238**]    The second supporting evidence provided by Dr. Fuller for this opinion is encapsulated in the following statement:

> The position of the Rock 'n Play Sleeper was right next to the bed where her parents had been sleeping. Infants that get into positions creating a struggle often cry or make noise, but Zoey's parents reported no such crying or noise. (Fuller Report, pg. 13.)

[**239**]    Again, this purported evidence is contradicted by the Exponent testing. Although the audio track of the Exponent testing of the trapped infant was scrubbed, the video does not indicate the struggling infant started to cry or make loud noises. In fact, the video indicates the struggling infant was breathing rapidly during the struggles, but not crying out.

[**240**]    Dr. Fuller has provided no credible evidence that would support her opinion that infants in general, and Zoey Olson in particular, have not gotten stuck in the prone position. The irrefutable truth is that infants do get stuck in the prone position while in a Rock 'n Play sleeper.

[**241**]    Dr. Fuller further mischaracterizes my analysis and opinions to the extent that she implies my positions require that Zoey Olson was in a "fully prone" position. My analysis and opinions were not based on an assumption that Zoey Olson was "fully prone."[26] Dr. Fuller's mischaracterization of this issue is expressed as:

> In both the doll reenactment and at her subsequent deposition, Zoey's mother indicated that she found Zoey partially on her left side, not fully prone as are the subjects in the engineers' examples.39,40
> (Fuller Report, pg. 12.)

[**242**]    My examples and analysis were not based on "fully prone" infants. (As detailed in the accompanying footnote, that term is not even defined to within a reasonable degree of certainly that would be needed to make this assertion.) For example, in Figure 6

---

[26]I note that Dr. Fuller does not provide any rigorous criteria for what distinguishes "fully prone" from "partially prone," "semi-prone," or "on the side." Given that she is relying on a clear distinction between these characterizations, she should have provided a definition of these terms. For example, she could have defined "fully prone" to be a position in which the plane of the infant's shoulders is within 3 degrees of horizontal, while simultaneously the plane of the infant's hips is within 5 degrees of horizontal, while simultaneously both of the infant's knees are in contact with the surface, while simultaneously the infant's face is directed within 4 degrees of the downward direction. I do not advocate for this particular definition. This is just an example of the clarity that Dr. Fuller would need to provide in order to make the distinctions she is attempting to rely upon to criticize my analysis. At no point in my analysis did I require an infant's position to be "fully prone," as opposed to "partially prone." I note that Dr. Fuller relies on this distinction to opine that Zoey Olson was not found in a "prone" position, but rather in a "partially prone" position. This distinction is simply irrelevant. Whether an infant is "fully prone" or "partially prone," the design of the Rock 'n Play sleeper can obstruct the infant's breathing.

COU_009137



**Figure 34: Infant Face Down in an Inclined Sleeper. (Reproduced from Figure 6 of Singhose Initial Report.)**

(a)

(b)

**Figure 35: Examples of Prone Infants.(Reproduced from Figures 23 and 24 of Singhose Initial Report.)**

of my Initial Report, reproduced here in Figure 34 for convenience, I showed a photograph of an infant "face down" in a Rock 'n Play sleeper. Note that the infant's face is turned significantly to the right, while simultaneously the infant's knees are directed somewhat to the left. That is, the infant is not "fully prone." I provided additional examples of prone infants in Figures 23 and 24 of my Initial Report. These figures are reproduced here in Figure 35 for convenience. Once again, these infants are not "fully prone" because various parts of their bodies are not directed straight down. Given that these three photographs were part of my examples,[27] Dr. Fuller's statement above is demonstratively false.

**[243]** I note that an infant's airway can be obstructed by the nonbreathable fabric of the Rock 'n Play sleeper even when the infant is indisputably far from the "fully prone" position. Figure 36 illustrates airway blocking using a doll placed at a 50 degree angle rel-

[27] I note that I included additional examples of dolls in prone positions that were not "fully prone." I will not reproduce them here because the photographs of infants that I have provided are dispositive.



(a)    (b)    (c)

**Figure 36: Airway Blocking of a "Partially Prone" Doll.**

ative to the horizontal, which would be the "fully prone" position. Figure 36(a) shows an overhead view of the doll within the Rock 'n Play sleeper. Figure 36(b) shows a digital inclinometer measuring the 50 degree angle of the doll body. Finally, Figure 36(c) shows a side view of the doll wherein the nonbreathable fabric of the Rock 'n Play sleeper is clearly obstructing the nose and mouth of the doll.

**[244]**    In addition to the mischaracterizations and errors described above, Dr. Fuller undermines her own opinions by referencing articles that contradict her opinions. For example, Dr. Fuller cites to "Task Force on SIDS, 2011 and 2016" to support her opinions in four different places. She uses these Task Force references to point out things such as overheating should be avoided and breastfeeding is associated with reduced risks of SIDS. However, Dr. Fuller appears to have failed to read the entirely of these publications because they clearly contradict the opinions she has put forth in this case.

**[245]**    Consider the Task Force publication from 2016.[28] The document states:

> If an infant falls asleep in a sitting device, he or she should be removed from the product and moved to a crib or other appropriate *flat surface* as soon as is safe and practical.
>
> (Task force on SIDS 2016, pg. 4)

**[246]**    This recommendation by the Task Force that sleeping infants should be moved to a *flat surface* a soon as possible is a direct contradiction to Dr. Fuller's position that sleeping on the highly inclined surface of the Rock 'n Play sleeper is safe.

---

[28]SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment, Pediatrics 2016; 138(5).

COU_009139

[**247**]    This Task Force publication also makes it clear that only "firm" sleep surfaces should be used when it states:

> 2. Use a firm sleep surface.
> ... A firm surface maintains its shape and will not indent or conform to the shape of the infant's head when the infant is placed on the surface.
> (Task force on SIDS 2016, pg. 3)

[**248**]    As explained above, the Rock 'n Play sleeper does not have a firm sleeping surface and Dr. Fuller has not attempted to argue that it does provide a firm sleeping surface. Therefore, this is another direct contradiction to the opinions put forth by Dr. Fuller in this case.

[**249**]    In summary, Dr. Fuller presented medical opinions that I have not addressed. However, she also offered opinions and rebuttal statements on the physical design of the Rock 'n Play sleeper and my engineering analysis of the product. As mentioned above, there is no evidence that Dr. Fuller is qualified to render opinions on the physical design of the Rock 'n Play sleeper. Additionally, there is no indication that she has studied the materials that would be required for an expert to render opinions on the design of the Rock 'n Play sleeper. Furthermore, publications to which Dr. Fuller cites actually contradicts her asserted opinions in this case. This lack of expertise and failure to appropriately review relevant materials is borne out by the mischaracterizations and blatant errors in those portions of her report wherein she ventures out of her expertise to render unqualified opinions.

COU_009140

# 8    Rebuttal to Report of Dr. Steven Arndt

**[250]**    Dr. Steven Arndt provided a report ("Arndt Report") in support of the recalled Rock 'n Play sleeper. Dr. Arndt offered opinions on the warnings used on the Rock 'n Play sleeper and the design process used by Fisher-Price to develop the defective product. I will not respond to all of Dr. Arndt's opinions because I have been informed that rebuttals will be prepared by other experts. However, there are two of Dr. Arndt's opinions that I will briefly respond to here because they overlap with opinions submitted by other Fisher-Price experts to which I have responded.

**[251]**    Among the opinions that Dr. Arndt offered in this matter are:

1. Fisher-Price undertook an extensive process in the design and development of the Rock 'n Play Sleeper, consistent with a hierarchical approach to risk reduction and product design.

2. The combined series of misuses in this matter - first, a child exceeding developmental milestones is placed in the Rock 'n Play Sleeper; Second, the restraint system is not used; and then after the first two misuses the child is left unattended and unsupervised for an extended period of time, made an outcome such as the incident in this case not reasonably foreseeable to Fisher-Price during design and sale of the product.

(Arndt Report, pg. 2)

**[252]**    Dr. Arndt's first opinion above is that Fisher-Price undertook an extensive design process consistent with a hierarchical approach to risk reduction and product design. This is incorrect. I refer the reader to my responses to the like opinion of Dr. Rundell in Section 5.1.

**[253]**    I note here that Dr. Arndt bases his favorable opinion of the Fisher-Price design process on his understanding of the following activities:

- Hazard Analysis meetings (also referred to as Safety Audits)

- Creation of the Product Requirements Document (PRD)

- On-site and in-home testing coordinated by Fisher-Price's Play Lab

- Extensive testing performed by third party labs, and

- External medical expertise consultation

(Arndt Report, pg. 41)

**[254]**    Many of these activities were performed insufficiently and incorrectly by Fisher-Price or by the third parties that Fisher-Price paid to perform the activities. For example, the hazard analysis meetings that Dr. Arndt cites to as evidence of an appropriate design process were not actual hazard analysis meetings because they did not consider known hazards. Furthermore, they did not perform a complete hazard analysis on the version of the product that they put on the market. Additionally, the defective nature of the third party tests, such as the Exponent testing, renders that basis unreliable. A detailed description of the failures of Fisher-Price during the design process, including the problems

89

with the design activities that Dr. Arndt relies upon for his opinion, is provided in Section 5.1 of this report, as well as Section 11 of my Initial Report.

[**255**]    Dr. Arndt's incorrect opinion that Fisher-Price utilized an appropriate design process is, at least partially, attributable to the unreliable bases of his opinion listed above. For example, if Dr. Arndt had been made aware of the fact that the Exponent testing proved that infants could get stuck in the prone position, then he could not have relied upon that testing as a basis for his opinion. In fact, the tests would have proven to Dr. Arndt that Fisher-Price's design process was inappropriate because they knew of the roll-over hazard, yet did not test for it until a product recall was imminent. And when the hazard was finally investigated, to a very small degree, by Exponent, the test results proved the defective nature of the physical design of the Rock 'n Play sleeper.

[**256**]    Dr. Arndt's second opinion listed above is that this incident was not "reasonably foreseeable to Fisher-Price during design and sale of the product." This opinion is also incorrect. I refer the reader to my responses to the like opinion of Ms. Drago in Section 6.2.

[**257**]    I note here that Dr. Arndt's opinion on foreseeability is, at least partially, based on his incorrect understanding of the design process for juvenile products. This misconception by Dr. Arndt is evident when he writes:

> In the case of a juvenile product the manufacturer is not in a position to control the environment, the supervision, the organization or the user and *they cannot foresee the capabilities and limitations of those people involved*. (Arndt Report, pg. 18)

[**258**]    Dr. Arndt's opinion that Fisher-Price *cannot foresee the capabilities and limitations of those people involved* is incorrect. Companies that sell juvenile products invest heavily in understanding the capabilities of their customers. One of the primary reasons that Fisher-Price performed in-home testing (which Dr. Arndt knows about and relies upon for his opinions) is to gather information about the "capabilities and limitations" of the users. And although the in-home testing was insufficient and poorly conducted, it still revealed a very important "limitation" of the people who use the Rock 'n Play sleeper - they often do not use the restraint. If Dr. Arndt understood that the in-home testing proved that the restraint would not be used on a consistent basis, then he could not use those tests to support his opinions. Furthermore, he could not cite to the non-use of the restraint as an unforeseeable user misuse. The results of the in-home testing prove, beyond question, that the non-use of the restraint was foreseeable.

[**259**]    Dr. Arndt's opinion on this issue also contains a clause that states placing a child exceeding developmental milestones in the Rock 'n Play sleeper is part of an unforeseeable event. That defies common sense. However, it is also contradicted by third-party testing (which used developmentally advanced infants) and numerous incident reports that Fisher-Price received well before Zoey Olson's death. For example, Section 5.2.8 above listed 30 incidents that Fisher-Price knew about before Zoey Olson's death. Of these 30 incidents, 13 reported that the involved infant was at least 7 months old. If Dr. Arndt had reviewed

COU_009142

the incident reports, then he could not have stated that the placement of developmentally advanced infants into a Rock 'n Play sleeper was not foreseeable.

[**260**]    Given the two factors that Dr. Arndt considers are both easily foreseen, and in fact where well known to Fisher-Price, his "combined series of misuses" can be fairly summarized as:

1) A child exceeding developmental milestones is placed in the Rock 'n Play Sleeper (a well known and foreseeable event).

2) The restraint system is not used (a well known and foreseeable event).

3) The child is left unattended and unsupervised for an extended period of time (the exact use case - overnight sleep - that the product is intended for).

[**261**]    Dr. Arndt's opinion on this issue is that if two well-known and foreseeable events occur and are then followed by the intended use of the product, then this "combined series" of three actions makes the incident "not reasonably foreseeable to Fisher-Price." Such an opinion is not credible. This type of incident was not only foreseeable during the design process, these types of incidents had been reported numerous times to Fisher-Price well before Zoey Olson's death.

91

# 9    Rebuttal to Report of Shahrokh Rouhani, Ph.D., P.E

**[262]**    Dr. Shahrokh Rouhani provided a report ("Rouhani Report") in support of the recalled Rock 'n Play sleeper. The report is titled "Expert Report of Shahrokh Rouhani, Ph.D., P.E " and it was amended on July 12, 2021. In this report, Dr. Rouhani offered an opinion that it is far safer for infants to sleep in a Rock 'n Play sleeper than in cribs, bassinets, or playpens. He expresses this opinion in his conclusion:

> The likelihood of an infant perishing unexpectedly in a crib, bassinet, or playpen was far greater than the likelihood of fatality in the RNPS.

(Rouhani Report, pg. 13)

**[263]**    Unfortunately for Dr. Rouhani, this opinion is obviously incorrect. The falsity of the conclusion arises from the incomplete data that he uses during his analysis and the fact that he applies a very different analysis method to the Rock 'n Play sleeper than he does to cribs, bassinets, or playpens. Given the absurdity of the conclusion, it is not surprising that there are numerous errors in Dr. Rouhani's report. In this section I address only a few of the more obvious errors that are relatively easy to explain to a lay audience. I do not need to address all of his errors because the few that I address below completely discredit his analysis and conclusion.

**[264]**    At a high level, Dr. Rouhani's analysis comes down to simply creating a fatality rate associated with Rock 'n Play sleepers and a fatality rate for standard sleep environments (cribs, bassinets, and playpens.). He then compares those two fatality rates to reach his conclusion that Rock 'n Play sleepers are far safer than standard sleep environments. In order to expose his errors, all we need is to show that his calculation of the fatality rate for the Rock 'n Play sleeper is incorrect, and much too small.

**[265]**    The error in his fatality rate calculation for the Rock 'n Play sleeper is immediately obvious in his culminating table of results, wherein he compares the fatality rates associated with the Rock 'n Play sleeper to the fatality rates for standard sleep environments during the years from 2010 to 2018. That table is reproduced here in Figure 37.

**[266]**    Dr. Rouhani uses this table as the primary basis for his opinion. The column for the Rock 'n Play sleeper has much lower values than the column(s) for the standard sleep environments. Based on the much lower values for the Rock 'n Play sleeper, Dr. Rouhani concludes that the Rock 'n Play sleeper is a far safer sleep environment. This is incorrect.

**[267]**    As an initial matter, note that Dr. Rouhani uses different labels for the columns in his culminating table. He uses "Fatalities Allegedly Associated with RNPS" and "SUID Rates in Cribs, Bassinets, and Playpens." The difference in these labels is a clear indicator that Dr. Rouhani is showing different types of data in the various columns. If he was actually comparing the same type of data for the two categories of products, then he could have used the same labels. Additionally, note that Dr. Rouhani uses only one column to present his data for the Rock 'n Play sleeper, yet he uses three columns to present his data for the standard sleeping environments. This is another dead giveaway that Dr. Rouhani is using very different types of data for the two product categories. If he had the same type

<center>92</center>

Table 9. RNPS v. SUID Fatality Rates in Cribs, Bassinets, and Playpens

| Year | Fatalities Allegedly Associated with RNPS per 100,000 Infants | SUID Rates in Cribs, Bassinets, and Playpens per 100,000 Infants | | |
|---|---|---|---|---|
| | | LCL | Mean | UCL |
| 2010 | 0.0 | 27.2 | 28.2 | 29.2 |
| 2011 | 0.4 | 25.8 | 26.8 | 27.7 |
| 2012 | 0.3 | 26.5 | 27.5 | 28.5 |
| 2013 | 0.4 | 26.3 | 27.3 | 28.3 |
| 2014 | 1.0 | 26.2 | 27.2 | 28.2 |
| 2015 | 1.5 | 27.9 | 28.9 | 29.9 |
| 2016 | 1.5 | 27.7 | 28.7 | 29.7 |
| 2017 | 2.4 | 28.3 | 29.3 | 30.4 |
| 2018 | 4.5 | 27.6 | 28.7 | 29.7 |

**Figure 37: Table Comparing Fatality Rates in the Rouhani Report**



(a) Cribs, Bassinets, and Playpens

(b) Rock 'n Play sleeper

**Figure 38: Fatality Rates Calculated by Dr. Rouhani. (Created from values in Rouhani Table 9.)**

of data for the Rock 'n Play sleeper as he does for the Cribs, Bassinets, and Playpens, then he could have provided the same corresponding three columns of data for the Rock 'n Play sleeper. This simple structural analysis of Dr. Rouhani's culminating data table demonstrates that he is not making a proper comparison.

[268]    The absurdity of Dr. Rouhani's results in his culminating data table can also be graphically demonstrated by plotting the data values within the table. The left side of Figure 38 shows a plot of the fatality rates that Dr. Rouhani calculated for Cribs, Bassinets, and Playpens. The values are nearly constant from 2010 to 2018. This is an expected result because during that time period there were no major changes in our societal behavior or the technology associated with standard sleep environments. In sharp contrast, the right side of Figure 38 shows a plot of the fatality rates that Dr. Rouhani calculated for the Rock 'n Play sleeper. These values indicate a nearly exponential increase in the fatality rates associated with the Rock 'n Play sleeper. During the three years from 2011 to

93

2013, the fatality rate was approximately 0.3-0.4. However, according to Dr. Rouhani's data, by 2018 the Rock 'n Play sleeper had become more than 10 times more dangerous - having a fatality rate of 4.5. Obviously something is very wrong with Dr. Rouhani's analysis. The Rock 'n Play sleeper did not become 10 times more dangerous between 2013 and 2018, as Dr. Rouhani's data indicates.

[**269**]    The root cause of the problem with Dr. Rouhani's data is that his method simply does not capture all of the deaths associated with the Rock 'n Play sleeper. A fundamental problem with his data is that he bases the Rock 'n Play sleeper fatalities on the incidents reported to Fisher-Price. Obviously, a large number of the infant deaths that occur in sleeping products do not get reported to the product manufacturer. To get a meaningful comparison using this approach, Dr. Rouhani would have needed to use the number of crib, bassinet, and playpen fatalities reported to the product manufacturers. He did not do that.

[**270**]    Additionally, infant deaths in Rock 'n Play sleepers is a relatively new issue compared to infant deaths in cribs and other sleep environments. Therefore, it is likely medical examiners did not know to associate specific causes of deaths with the sleeper. This can partially explain the lack of reported Rock 'n Play sleeper fatalities in the early years of Dr. Rouhani's data. Given that the number of fatalities reported to Fisher-Price each year began increasing rapidly indicates that doctors (and parents reading reports on the internet) began to associate more deaths with the sleeper as patterns and trends regarding use of the sleeper and infant deaths emerged. The continuously increasing trend of fatalities in Dr. Rouhani's data makes it clear that the fatalities associated with the sleeper were, and are, underreported and the Fisher-Price fatality reports relied on by Dr. Rouhani are incomplete.

[**271**]    In his report, Dr. Rouhani acknowledges that the available data regarding Rock 'n Play sleeper fatalities is incomplete:

> My review indicates that the available CPSC information only identifies a subset of fatalities specifically associated with the RNPS. For example, NEISS covers injuries from a representative sample of 100 US hospitals and groups injuries according to a broad classification of products. Additionally, I reviewed the CPSC online compilation of incident reports since 2011 and could only identify seven (7) fatality cases specifically associated with the RNPS, which does not appear to be complete based on the information that I received from Mattel and Fisher-Price.
>
> (Rouhani Report, pg. 4)

[**272**]    His acknowledgement of this data being incomplete is used to justify his use of the Mattel and Fisher-Price fatality reports and data regarding annual Rock 'n Play sleeper shipments to U.S. retailers for estimating fatality rates associated with the Rock 'n Play sleeper. However, this is not the correct response to grossly incomplete data. The correct response is to admit that a valid comparison between the fatality rates of Rock 'n Play sleepers and standard sleeping products cannot be performed.

COU_009146

[**273**]    The analyses processes that Dr. Rouhani utilizes to manipulate the data also proves the two data sets are very different and incompatible for comparison purposes. Dr. Rouhani uses an 8-step process to estimate SUID rates in cribs, bassinets, and playpens and the associated standard errors and confidence levels (detailed in Table 6 of his report). These analyses relies on SUID data in CDC-linked death-birth data files, a cross-sectional study by Colvin et al. (2014) used to estimate the percentage of SUID occurrences in cribs, bassinets, and playpens, and a study by Hirai et al. (2019) to obtain the percentage of infants that have slept in cribs, bassinets, and playpens. This available data and literature is thorough enough to enable Dr. Rouhani to estimate standard errors and confidence levels for the SUID fatality rates for each year.

[**274**]    In contrast, Dr. Rouhani only uses a 2-step process to obtain his "Fatalities Allegedly Associated with RNPS" estimate. In the first step, Dr. Rouhani obtains the number of fatalities associated with the Rock 'n Play sleeper, relying only on fatalities reported to Mattel and Fisher-Price. In the second step, Dr. Rouhani normalizes the number of fatalities obtained in the first step based on the number of Rock 'n Play sleepers shipped to U.S. retailers, which he refers to as a "conservative" estimate of the number of infants sleeping in a Rock 'n Play sleepers in any given year.

[**275**]    There is a stark contrast between using extensive and well-documented SUID data from the CDC and peer-reviewed medical studies to estimate SUID rates in cribs, bassinets, and playpens and using a list of fatalities reported to Mattel and Fisher-Price and annual Rock 'n Play sleeper shipments to U.S. retailers to estimate Rock 'n Play sleeper fatality rates.

[**276**]    The fact that the SUID data from the CDC and peer-reviewed medical studies was not used to evaluate Rock 'n Play sleeper fatality rates and confidence levels is indicative that the information available regarding Rock 'n Play sleeper fatalities is incomplete and underreported. Given that infant deaths in Rock 'n Play sleeper are a relatively new issue compared to infant deaths in cribs, bassinets, and playpens, it is not that surprising that there is currently a lack of medical studies related to Rock 'n Play sleeper fatalities.

[**277**]    When faced with the grossly incomplete data he at his disposal for Rock 'n Play sleepers, Dr. Rouhani should never have attempted to make this comparison, nor put forth such an illogical and unfounded opinion.

[**278**]    Although the defect discussed above completely discredits Dr. Rouhani's entire analysis and his resulting opinion, I will briefly point out a couple of other problematic aspects of his analysis.

[**279**]    Dr. Rouhani's data does not account for the fact that cribs are used for much longer time durations than Rock 'n Play sleepers. When a Rock 'n Play sleeper is sold, its useful lifetime is perhaps 4-6 months. On the other hand, cribs are likely to be used for a couple of years. Therefore, infants spend much more time in cribs than in Rock 'n Play sleepers. As a result of the much greater use time, cribs are naturally going to have more associated fatalities per product unit. This effect does not make them more dangerous, it just means that they are used more.

[**280**]    Finally, on page 7, in footnote 19, Dr. Rouhani assumes a normal distribution for

95

the data he is manipulating. However, he did no tests to verify the data is normally distributed. He could have done a normality test, but chose not to check his data. As such, the data manipulation he performs based on the assumption of a normal distribution is not properly justified.

[**281**]    In summary, Dr. Rouhani's analysis and subsequent conclusion are based on incomplete data sets that are processed differently and improperly. As such, his conclusion that Rock 'n Play sleepers are far safer than cribs, bassinets, and playpens is not only incorrect, the opinion is also unreliable and not properly supported.

COU_009148

# 10    Supplement in Response to Dr. Deegear's Deposition

[282]    Dr. Deegear's deposition was taken on May 11-12, 2021. Dr. Deegear's testimony confirmed that he spent less than 3 hours reviewing the Rock 'n Play prototypes prior to production. (453:8-16.) If we add on the time that he spent speaking to Fisher-Price, then he totaled less than 5 hours consulting on the Rock 'n Play project prior to it going into production. (448:25-451:15.) This is a very small amount of time that indicates he had minimal involvement in the product development process.

[283]    Furthermore, Dr. Deegear performed no meaningful testing of the product prior to production. He did no testing with a baby or doll in the prone position. (292:2-8)(543:12-15.) He did not test how the product would perform without the use of the restraint belt system. (302:13-303:1.) He did not test how "a baby would be able to move or maneuver in the Rock 'n Play" (303:22-25.). In addition to not conducting any tests of his own, Dr. Deegear was also not provided the in-home study results that indicated a large percentage of caregivers would not use the restraint belt system. (242:25-243:1) (285:3-10) (374:13-20.)

[284]    However, even with such a small amount of exposure to the product and knowledge about its characteristics, Dr. Deegear did recognize the serious risk of harm or death if a baby were to come out of position while in the Rock 'n Play sleeper. (240:21-241:8) (281:16-282:21) (329:21-331:19) (340:4-341:5- discussion of doll testing) Given his very small involvement and very limited information of the product, he could not have developed a good understanding of the product's characteristics. As such, any advice that he could offer on the physical design of the device would have been poorly informed.

[285]    Dr. Deegear also verified that the Rock 'n Play sleeper was a significant departure from standard and well-tested infant sleep environments. For example, he testified that he was not aware of any other sleeping devices that required a restraint system (304:24-305:5.) He was also not aware of any sleeping devices that included a "foot shelf" that allows the infants to push off against. (305:6-9.) Finally, as for products that angled the baby at approximately 30 degrees, he was not aware of any, except for when parents use a car seat as a sleeper. (305:10-20.) Given that these features were new, untested, and obviously impacted the hazards, Fisher-Price should have conducted extremely thorough testing of the effects of these new product features on the hazards. They did not.

COU_009149

# 11    Summary of Opinions

[**286**]    Based on the body of work I have performed, along with my assistants, my own education, experience, training and knowledge as a mechanical engineer, I have developed certain opinions related to this case. Those opinions have been provided throughout this Rebuttal Report, as well as in my Initial Report. The following list is a summary of my opinions related to this Rebuttal Report.

1. Fisher-Price erred in their design process by not applying their own air permeability QSOP to the design of Zoey Olson's Rock 'n Play sleeper.
2. The "Safety Data" presented by Dr. Rundell is unreliable.
3. The "Safety Data" presented by Dr. Rundell is not reproducible.
4. The "Safety Data" presented by Dr. Rundell is largely irrelevant to this case.
5. The vast majority of Dr. Rundell's opinions are strongly based on the unreliable, not reproducible, and irrelevant "Safety Data."
6. Dr. Rundell did not properly consider Fisher-Price's incident reports that prove numerous infants were coming out of the restraints.
7. Dr. Rundell's biomechanical analysis is fraught with errors.
8. Dr. Rundell's measurements of roll-over torque are incorrect.
9. Explico's 3D model of an infant and Rock 'n Play sleeper are not realistic and provide misleading results.
10. Ms. Drago's opinions contradict her own previous publications.
11. Ms. Drago's opinions for this case contradict each other.
12. Ms. Drago's opinions are contradicted by commonly-accepted best practices.
13. Dr. Arndt's opinion on Fisher-Price's design process is incorrect and based on an unreliable basis.
14. Dr. Arndt's opinion on foreseeability of this incident is incorrect and based on an unreliable basis.
15. Dr. Rouhani's opinion is incorrect, unreliable, and not properly supported.
16. Dr. Deegear's deposition testimony indicates that he had minimal impact on the design of the Rock 'n Play sleeper.
17. Dr. Deegear's testimony confirms that he was not provided the in-home testing results that prove the restraint would not be used by a large percentage of caregivers.

I hold all of the above opinions to a reasonable degree of engineering certainty.

[**287**]    I declare under the laws of the State of Georgia that the foregoing is true and correct, under penalty of perjury.

_____          Atlanta, GA          July 16, 2021
William Singhose, Ph.D.              City                  Date

COU_009150