# **<u>EXHIBIT A</u>**



# Vredenburgh & Associates, Inc.
## Human Factors, Safety, Biomechanics and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA  92008
(442) 222-8289
avredenburgh@gmail.com
www.hfexpert.com

April 1, 2021

Kristin Schriner, Esq.
Goldberg & Osborne LLP
698 E. Wetmore Rd., Suite 200
Tucson, AZ 85705

Re:      Courkamp v. Fisher Price

At your request, I have prepared the following preliminary report with respect to the above-referenced case which is based on an inspection of the actual and exemplar Fisher Price Rock 'n Play inclined sleepers and a review of materials including (for a complete list of materials reviewed, see Appendix A):[1]

1. Deposition of:  Andrew Olson—Father of baby Zoey, October 22, 2020
2. Deposition of:  Kathleen Courkamp—Mother of baby Zoey, October 21, 2020
3. Deposition of:  Linda Chapman—Designer of Rock 'n Play Sleeper, November 10, 2020
4. Deposition of:  Michael Steinwachs—Principal Quality Engineer, November 11, 2020 and January 22, 2021
5. Deposition of:  Kitty Pilarz—VP, Product Safety & Regulatory Compliance Mattel/Fisher-Price, November 9, 2020, January 21, 2021
6. Deposition of:  Lynn Martin—Senior Risk Management liaison, November 13, 2020
7. Deposition of:  Joel Taft—Director of Quality and Product Safety at Fisher Price, November 12, 2020
8. Deposition of:  Lisa Lohiser—Manager of Early Childhood Development Research, November 13, 2020
9. Videoconference Examination of: Gary Deegear, M.D. November 20, 2020

**Depositions from Torres v. Fisher-Price**
10. Deposition of:  Michael Paul Steinwachs—Fisher-Price Senior Quality Manager, July 20, 2016

---

[1] For a complete list of materials reviewed, see Exhibit 1.

11. Deposition of:  Catherine Pilarz—VP Product Safety and Regulatory Compliance, July 19, 2016

**Deposition from Goodrich v. Fisher-Price**
12. Deposition of:  Michael Paul Steinwachs—Fisher-Price Senior Quality Manager, March 22, 2018
13. Deposition of:  Linda Chapman—Design manager for newborn toy group at Fisher-Price, March 21, 2018
14. Deposition of:  Catherine Pilarz—VP Product Safety and Regulatory Compliance, March 12, 2021

**Deposition from Booth v. Fisher-Price**
15. Deposition of:  Gary Deegear, MD – Fisher-Price Medical consultant, March 12, 2021

**Other discovery documents**
16. Recorded statements: Andrew Olson, David Olson, Sarah Olson and Daniel Olson, Kathleen Courkamp
17. Police report
18. Labeling documents
19. Quality documents
20. Other similar incidents (OSI)
21. Case histories
22. Exhibits from current and prior depositions


## SUMMARY OF FACTS


On Thursday, June 19, 2014, at approximately 8:00 a.m., 8-month-old Zoey Olson (DOB 9/30/13) was found deceased face-down[2] by her mother, Kathleen "Katie" Courkamp and her father, Andrew Olson at Andrew's home at 1336 E. Hall, Tempe, AZ.[3] She had been placed to sleep in a Fisher Price Rock n' Play inclined sleeper at about 1:40 a.m. by Andrew Olson who reported buckling her in; however, he reported to the police that morning that in the past, he had seen her get out of the buckle.[4] By the time of his deposition in October 2020 he did not recall if she was buckled when she was found.[5] Katie indicated how she found Zoey, positioned on the left side of her body with her face and abdomen towards the bottom of the sleeper.[6] The sleeper

---

[2] Police report, COU_0000010
[3] Police report, COU_000003
[4] Police report, COU_0000016
[5] Deposition of Olson, p. 176
[6] Police report, COU_0000010

was adjacent to Zoey's father's bed.[7] Zoey slept in a crib at Katie Courkamp's house.[8] At her time of death, Zoey was 27" long and weighed 12.5 lbs. according to the autopsy report.[9] At Zoey's last pediatric checkup, she weighed 14.9 lbs.[10] The weight limit on the subject Rock 'n Play (RNP) label is 25 lbs.[11] Zoey was close to 10 lbs. under the weight limit using either her weight taken at her 6 month appointment or her weight measured at the time of the autopsy. The sleeper was manufactured on 7/6/13[12] and given to them by Andrew's mother after Zoey's birth; it was purchased new.[13] In Oct 2019, the CPSC published proposed rulemaking that banned any inclined product over 10 degrees. The Rock 'n Play places a baby at an approximate 30-degree incline.[14] In December, 2019, the House passed legislation banning inclined products such as the Rock 'n Play.[15] Fisher-Price did a voluntary recall in April, 2019; otherwise the CPSC would have recalled the product.[16]

## FINDINGS AND CONCLUSIONS

**It is my opinion that the Fisher Price (FP) failed to effectively manage the suffocation hazard created by its design of the Rock 'n Play**

The methodology used in forming my opinions is based on the well-recognized human factors hazard control hierarchy and risk management principles.[17]  Risk management is the reduction and control of the adverse effects of the risks to which people are exposed.[18] When products have a hazard associated with their use, as in this instance, there are fundamental hazard control strategies that owner/operators use to reduce exposure. Fisher Price acknowledged that it was

---

[7] Police report, COU_000007; Deposition of Courkamp, p. 71

[8] Deposition of Olson, p. 125; *all deposition page references are for the subject case unless indicated otherwise*

[9] ZO-MCOME-000003

[10] Deposition of Dr. Michael Ferenc, pp. 84-86). Note: records from Banner Thunderbird Medical from an April 21, 2014 visit show Zoey's weight as 6.42 (14.1 lbs.); s*ee* CONFIDENTIAL ZO-BTMC-MD-000023. Medical Examiner Investigator Farrel Swope weighed Zoey's body the day of her death and recorded her weight as 16lbs. *(see* Farrel Swope deposition at p. 109. Dr. Ferenc testified that "The child's fat pad, down under 'Body Walls and Cavities' was 1 centimeter, so that's normal," and that the scale may have been off in terms of the difference in the weight measurement at Zoey's 6-month appointment compared to at the time of the autopsy (*see* Ferenc deposition at 84-86, 214).

[11] Deposition of Pilarz, p. 62

[12] Deposition of Steinwachs January 22, 2021, p. 153-4; Deposition of Pilarz, p. 163

[13] Deposition of K Courkamp, p. 63

[14] Deposition of Chapman, p. 24, 50, 131

[15] Consumer Reports: https://www.consumerreports.org/recalls/graco-recalls-infant-inclined-sleepers-suffocation-risk/#:~:text=In%20October%202019%2C%20the%20CPSC,sleepers%20and%20padded%20crib%20bumpers.

[16] Deposition of Taft, p. 303

[17] Laughery, R.L. & Hammond, A. (1999). Overview. In. Wogalter, DeJoy & Laughery (Eds.). *Warnings and Risk Communication*. Taylor & Francis, p. 4-5; Wogalter, M. (2006). Purposes and Scope of Warnings. In M.S. Wogalter, (Ed.), *Handbook of Warnings*: New Jersey: Lawrence Erlbaum Assoc., p. 4-5.

[18] Zimolong, B. (1997). Occupational Risk Management. In Salvendy (Ed.). *Handbook of Human Factors and Ergonomics, Second Edition.* New York: John Wiley & Sons, Inc.

aware of this hierarchy in 2012, "Warnings should be the last resort! 1. Design the hazard out. 2. Shield or guard the hazard. 3. Warn against the hazard."[19]

Fisher Price was informed of the hazard through incident reports, case histories, communications with international distributors, as well as communication with Dr. Benaroch, a pediatrician, who contacted Fisher Price on several occasions. He cites the American Academy of Pediatrics guidelines from Oct 2011, "'1. To reduce the risk of SIDS, infants should be placed for sleep in a supine position (wholly on the back) for every sleep...until 1 year of life.' The newborn Rock 'n Play sleeper does not keep a baby wholly on the back, but rather in an inclined position. It is not a safe way for babies to sleep . . . 2. 'Use a firm sleep surface…to reduce the risk of SIDS and suffocation' The Newborn Rock 'n Play Sleeper is not a firm crib mattress…your website describing this product… 'the seat is also inclined, which makes napping more comfortable for babies who need their heads elevated' is inconsistent with the safe sleeping guidelines."[20] A second pediatrician, Dr. Burgert wrote in 2012 in an open letter to Fisher Price stating, "I'm deeply concerned, however, that this earned trust is being violated by one of your products, the Rock 'n Play Sleeper (…) The Rock 'n Play Sleeper should not be used for extended, unobserved infant sleep for the following reasons: First, design features of this product are known to increase the risk of Sudden Infant Death Syndrome."[21]

In March 2014, prior to the death of Zoey Olson, a pediatric nurse contacted the CPSC to express concerns about the safety of the Rock 'n Play as a sleeping product. The CPSC sent a report to Fisher-Price that stated:[22]

> I am a pediatric nurse practitioner and provide primary care for many newborns every day in my office. Recently, when discussing safe sleep as recommended by American academy of pediatrics, many families have described a sleeper that they have bought for their babies to sleep. In checking on this product, I have found many concerns that makes this product unsafe ' This is sold by stores in the crib and bassinette sections and labeled as a sleeper. The recommendation for a safe sleeping environment includes a supine position (wholly on back), the sleeper does not keep the baby wholly on the back, but inclined. Also recommended is a firm sleep surface–a firm mattress with a fitted sheet. The newborn sleeper is not a firm crib mattress. Sitting devices, such as car seats, swings, strollers, carries or slings are not recommended and the sleeper by (sic) puts babies in a seated position with the incline.

Fisher Price purports to follow the human factors hazard management hierarchy, which is described in Mattel's 2012 PowerPoint slide "Creating the future of play," "Hazards that exist in products must be addressed! By priority: 1. Design the hazard out; 2. Shield or guard the

---

[19] Mattel Product Safety Presentation, September, 2013, Footnoted date 2012, p. 164

[20] Dr. Benaroch email 2/7/13, FPI_000540
[21] Deposition of Pilarz, p. 130-131
[22] Exhibit 8, Steinwachs January 22, 2021 deposition; Mattel-COU0507986

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 5 of 44

_____

hazard…then and only then…3. Warn against the hazard."[23] As described by FP's director of quality and safety testified about the hierarchy, "If you can't design hazard out of a product, then you end up with a warning statement to warn the consumer of the potential issues associated with use of product (…) if that hazard is significant enough where you wouldn't be able to address it with a warning, then maybe you'd rethink, you know, marketing that product."[24]

_Testing:_ In order to identify potential hazards, it is important to test the product system which includes the sleeper, the instructions, packaging, and warnings. While FP claims it didn't cut on costs; "If we needed testing done, we did it,"[25] I have not received any evidence that key testing was performed; evidence is to the contrary. It is my understanding that:

1. Until the Exponent testing in 2018, FP did not conduct any biomechanical analyses of infants in the product, including mechanical strength and respiration analyses of infants in the prone or side positions. [26]

2. FP did not conduct any testing or other analyses concerning infants rolling from the prone or side positions to the supine position.[27]

3. FP did not do testing/analyses to determine whether infants in prone position can self-correct to avoid injury.[28]

4. FP did not conduct testing or analysis to determine whether side constraints play a role in impeding an infant's ability to self-correct.[29]

5. FP did not conduct testing or analyses to determine whether sleep stages/fatigue can impact and infant's ability to self-correct.[30]

6. FP did not conduct positioning tests as part of development of Rock 'n Play, but was on the ASTM F2194 subcommittee.[31]

_____

[23] COU0076335
[24] Deposition of Taft, p. 250
[25] Deposition of Steinwachs, p. 286
[26] Mattel-COU0017994; Deposition of Taft, p. 242
[27] Mattel-COU0017994
[28] Mattel-COU0017994
[29] Mattel-COU0017994
[30] Mattel-COU0017994
[31] Deposition of Taft, p. 149-55

7. FP did not conduct any studies/analyses related to the use of restraints, whether consumers would use them.[32] Moreover, the In-home testing FP did conduct revealed that the majority of users would not use the restraints all of the time.[33]

8. FP did not conduct any studies/analyses with the restraints off.[34]

9. Fisher-Price did not conduct testing to see if sleep stages of infant affect their ability to self-correct or avoid injury.[35]

10. FP did not conduct any test to determine if warnings could be recognized by consumers.[36]

11. FP did not conduct any test to determine if consumers would comply with warnings.[37]

12. FP did not conduct any test to determine if consumers would recognize that not using restraints would could result in baby rolling over and dying.[38]

13. FP did not conduct any test to determine if consumers should be told of the product rollover risk.[39]

**Design**

The first, and most effective way to eliminate a hazard, is to *design out the hazards* such that it is eliminated or effectively removed.[40]  Fisher Price was aware of the fatality data as its Director of quality and product safety was part of the ASTM subcommittee for inclined sleeper standard development, which was provided this data by the CPSC.[41] Rock 'n Play's had an angle greater than 10 degrees, so it was no longer within the scope of the bassinet standard.[42] "(…) when you put an infant at an incline, they're no longer flat (…) if an infant once they're inclined can start to move forward, that poses a potential risk to the infant (…) that's unique to a product like a Rock 'n Play Sleeper versus a flat product like a bassinet."[43]

---

[32] Mattel-COU0017994; Taft, p. 135
[33] Ex. 14 to Pilarz January 21, 2021 deposition, Mattel-COU0061478
[34] Deposition of Steinwachs, January 22, 2021, p. 89
[35] Deposition of Taft, p. 245
[36] Deposition of Taft, p. 135
[37] Deposition of Taft, p. 135
[38] Deposition of Taft, p. 136
[39] Deposition of Taft, p. 136
[40] Laughery, R.L. & Hammond, A. (1999). Overview. In. Wogalter, DeJoy & Laughery (Eds.). *Warnings and Risk Communication*. Taylor & Francis, p. 4-5; Wogalter, M. (2006). Purposes and Scope of Warnings. In M.S. Wogalter, (Ed.), *Handbook of Warnings*: New Jersey: Lawrence Erlbaum Assoc., p. 4-5.
[41] Deposition of Taft, p. 149-152
[42] Deposition of Steinwachs, November 11, 2020 p. 291
[43] Deposition of Steinwachs, January 22, 2021, p. 75

The new ASTM standard 3118 came out in 2015.[44] Studies done in the mid-90s with live infants aged 44-73 days in frame-suspended rocking cradles found that as the angle of the tilt increases to more than 5-degrees, the risk of the infant rolling to the edge and airway obstruction are increased.[45] Dr. Deegear, FP's expert testified that he doesn't recall telling Fisher-Price that an incline of greater than 15 degrees would be safe for the overnight sleep product,[46] and "the greater the angle, the quicker they can get out of position and the worse the out of position can be (…) the steeper the angle, the more gravity assists them moving out of position."[47] Moreover, he testified that he doesn't know of any testing or research that supports idea of a sleeper at 30-degree incline or greater being safe for babies.[48]

Once a baby rolls over from the back to either the side or stomach in an inclined product, flexible curved soft bottom characteristics can envelop and trap the child in a hazardous position that obstructs breathing.[49] Other infant sleep products, such as cribs and play yards have rigid flat bottoms which reduce the asphyxiation hazard because it gives an infant a firm stable surface from which to push off and is less likely to confirm to an infant's face or obstruct breathing.[50]

The CPSC studied 451 incident reports (1/05 – 6/19) resulting from use of inclined sleepers and identified 3 major design issues leading to injury; 33% "involved infants that rolled over – fully or partially – from their original supine positioned. Reports describe infants as young as 1 or 2-months of age as having rolled over."[51] FP was aware of at least 66 incidents with the sleeper prior to Zoey's death.[52] Moreover, there continued to be incidents subsequent to her death, even after additional warnings were added per ASTM F-3118-17,[53] indicating an unsafe design that should not have been "remedied" through warnings. In 2014, there were 21 reports of babies falling out of product, 8 reports of children sinking down in product, seven reports of children pushing themselves toward top of seat, and 5 reports of children out of position to the side of product, 4 reports of children rolling over in product, and 2 reports of children sitting upright in product.[54] There were 5 potential suffocations in addition to 4 fatalities from 2015 reports.[55] In addition, 7 consumers stated that their restrained child fell out of the product while unattended; FP's director of quality and safety testified that this fact doesn't concern him because he thinks parents just didn't want to admit that they actually forgot to use restraints and that's why the

---

[44] Deposition of Steinwachs, November 11, 2020 p. 294
[45] Deppa; FP006335
[46] Videoconference Examination of Dr. Deegear, 11/20/20, p. 10
[47] Videoconference Examination of Dr. Deegear, 11/20/20, p. 11
[48] Videoconference Examination of Dr. Deegear, 11/20/20, p. 14
[49] Deppa; FP006336
[50] AAP 1996, 2011; FP006336
[51] CPSC draft supplemental notice of proposed rulemaking for infant sleep products, 10/16/19, p. 14-15.
[52] Incident summary spreadsheet; incident reports
[53] COU0012420
[54] Deposition of Taft, p. 190-191
[55] Deposition of Taft, p. 200; COU0048954

child fell out.[56] There were 30 fall-outs of product in 2015 report;[57] however, FP's director of quality and safety testified "I didn't see that there was any direct correlation between any product attribute or design that would be a contributing factor to these incidents."[58] He also testified that out of position reports from 2015 "Usually consists of maneuvering out of restraints, twisting around, or pushing up." In a report FP gave to CPSC, they evaluated how many rollovers were happening in sleepers where babies rolled over all the way into a prone position, but did not account for partial roll overs where baby's face was against the fabric.[59] *Therefore, it is my opinion, if he believed that users were not using restraints or were getting out of restraints, that would be critical safety information that FP should have accounted for.*

On April 12, 2019, Fisher-Price recalled Rock 'n Play Sleepers after 30 infant fatalities;[60] the current number of RNP fatalities in the United States is 94.[61] The only expert Fisher Price consulted with regarding the product development process of the inclined sleeper was Dr. Deegear[62] who stated concerns about children pushing up and out the back of product.[63] Dr. Deegear told Fisher Price that if restraints are not used, a child could fall out of the RNP, and testified that relying on a harness wouldn't be good "because people don't use them"[64] and "If it's a harness, they won't buckle them in, they won't have it adjusted properly."[65] Dr. Deegear also said that even if a child falls out, there is not enough distance to harm a child; a fall from this height will not have a devastating injury – bumps and bruises.[66]

Specific design remedies will be addressed by other witness(es).

**Barrier**

When a design solution is not feasible, a second hazard control strategy is to *guard or place a barrier* to prevent contact between the hazard and people.[67] From 2013 to 2019, there were 81 reports of babies being out of position in the Rock 'n Play. In 42 of those cases, it was claimed that the restraint was used.[68]

---

[56] Deposition of Taft, p. 192
[57] COU0048955
[58] Deposition of Taft, p. 202
[59] Deposition of Taft, p. 213
[60] CPSC memo, 4/20/19, p. 148, COU_002084
[61] Deposition of Pilarz, p. 339; Steinwachs January 22, 2021 deposition, p. 296
[62] Deposition of Taft, p. 15
[63] Deposition of Taft, p. 45-46
[64] Videoconference Examination of Dr. Deegear, 11/20/20, p. 12
[65] Videoconference Examination of Dr. Deegear, 11/20/20, p. 13
[66] COU0000559
[67] Cox, E.P. & Wogalter, M.S. (2006). Warning Source. In M. S. Wogalter (Ed.), *Handbook of Warnings*. New Jersey: Lawrence Erlbaum Associates, p. 113.
[68] Deposition of Taft, p. 208

Specific barrier remedies will be addressed by other witness(es).

## Warnings

If the hazards are not eliminated through design or guarding, then a third strategy is to develop an effective system of communication to inform users about the hazards (and the likely consequences); remind users, including experienced users, of those hazards; and tell them specific ways to avoid being injured. Users have a need to know about the hazards associated with using the inclined sleeper. If a manufacturer is relying on a system of communication to serve as a method to protect people from being unnecessarily harmed, the requisite warnings and instructions must be well designed in appearance, content, and location. Warnings must be designed to catch the attention of the reasonably prudent person in the circumstances of use. In order for warnings to be effective, they must be noticed, encoded and understood.[69] Effective warnings and instructions, when noticed and read, can affect judgments about related consequences for non-compliance.[70]  In 2012, Fisher Price acknowledged the problem with relying on warnings to remedy unsafe design, "There is no solid evidence that on-product warnings have measurably improved the safety of any product"[71] and "Warnings should be the last resort!"[72]

Yet Fisher Price's Director of Quality and Product Safety does not think there was any testing done to see if warnings could be understood by consumer.[73] Regarding what information consumers need to know to determine if their infant can use the sleeper, FP's expert Dr. Deegear testified that, "So you have to give height and weight and development parameters. And along with development parameters, then you get age in there also."[74]

During the development of the Rock 'n Play, FP used the warnings from the ASTM bassinet standards to create the warnings for the Rock 'n Play. Fisher-Price added some additional developmental warnings and included the restraint warning.[75] Although this was the only sleeping device Fisher-Price manufactured that included a restraint belt, Fisher-Price conducted no studies to determine if caregivers would use restraints with a sleeping product.[76] Regarding this issue on a similar product, the "CPSC does not believe that parents and caregivers appreciate the hazard associated with not using the harness or not securing the harness snugly. CPSC

---

[69] Wogalter, M.S., Laughery, K.R. (2006). Designing Effective Warnings. *Reviews of Human Factors and Ergonomics, Volume 2*. Santa Monica, CA: Human Factors and Ergonomics Society, pp. 241-271.
[70] Ayres, T. Warnings, anti-warnings and pacifiers. (2013). In: *Proceedings of the Human Factors and Ergonomics Society 57th Annual meeting*, 1698-1701.
[71] Mattel Product Safety Presentation, September, 2013, Footnoted date 2012, p. 163
[72] Mattel Product Safety Presentation, September, 2013, Footnoted date 2012, p. 164
[73] Deposition of Taft, p. 134
[74] Videoconference Examination of Dr. Deegear, 11/20/20, p. 21
[75] Pilarz January 21, 2021 deposition, p. 25.
[76] Steinwachs January 22, 2021 deposition, pp. 64-65.

believes that it is foreseeable that they will continue to use the product without securing or securing it snugly which can result in death and injury."[77]

At the time Fisher-Price manufactured the subject Rock 'n Play in 2013, the Bassinet Standards prohibited the use of restraints in bassinets.[78] Fisher-Price's employee testing showed 4 out of 5 Fisher-Price employees who brought the Rock 'n Play home to test with their infants did not use the restraints all the time.[79] Fisher-Price's in-home testing with members of the public, as discussed above, also showed the majority of users did not use the restraints all of the time.[80] This testing was conducted prior to the production of the subject Rock 'n Play, and provided Fisher-Price with notice of the hazard prior to Fisher-Price introducing the product to the market, that a majority of users would likely not use the restraints, or would not use the restraints all of the time.

Fisher-Price also did not evaluate whether caregivers who used the Rock 'n Play understood the purpose of the restraints, and/or whether the restraints were included to prevent the risk of death if a child rolled or turned over while in the Rock 'n Play. Information was available to Fisher-Price regarding usage of restraints in other similar juvenile products. For example, a 2012 Federal Register described why restraints should not be permitted in bassinets:[81]

> Issue 1. Proposed Changes in April 2010 NPR Incorporated into ASME F2194-12 Restraints
>
> The 2010 NPR proposed to prohibit bassinets with restraints that require action on the part of the caregiver to secure the restraint. A commenter requested that bassinets be allowed to have restraints and provided several reasons why they should be allowed. **The primary reason that the Commission believes restraints should not be allowed in bassinets is that most bassinet uses do not require a restraint, so consumers have a strong motivation to avoid using restraints, if they are provided**. When unused, restraints have been known to entrap and strangle children in similar products, like swings, handheld infant carriers, and bouncers. While none of the bassinet incidents was associated with restraint harness strangulation, this is probably due to the fact that restraints are rare on bassinets and not because they would not pose a hazard if they were present. The 2012 version of F2194 contains a stronger requirement than that proposed in the April 2010 NPR that prohibits all restraints in bassinets. The Commission supports this change to the standard, and notes that it is more conservative than the restraints requirement proposed in the 2010 NPR.

---

[77] In review of the Nap Nanny; Steinwachs January 22, 2021 deposition, p. 222
[78] ASTM 2194-12a.
[79] Lohiser Exhibit 5, Mattel-COU0000981
[80] Ex. 14 to Pilarz January 21, 2021 deposition; Mattel-COU0061478
[81] Exhibit 13 to Pilarz January 21, 2021 deposition; Mattel-0000377360; Federal Register /Vol. 77, No. 202 / Thursday, October 18, 2012 / Proposed Rules (emphasis added)

COU_008164

Similar concerns about restraints in other inclined products such as bouncers were also brought to Fisher-Price's attention by the CPSC.[82]

> Issue 2: Restraint use warning in 8.3.4.1 Fall Hazard & 8.3.4.2 Suffocation Hazard
>
> The balloted warning language omits any reference to use of the restraints while the child is asleep. The staff recommends that the warnings text include language indicating that the restraints should be adjusted to fit snugly even if the child is sleeping, or similar wording, to reduce the risk of death, as well as falls. Eight of the nine infant bouncer-related deaths between 2006 and 2012 occurred when children were asleep. These included infants who were unrestrained and infants found partially out of the restraints, suggesting that they were not snug at the time. Infants spend more time asleep than awake; it is inevitable that those that spend more than brief periods in an infant bouncer will fall asleep on occasion. Removing or loosening restraints while a child naps or sleeps is a known hazard pattern across infant products that use restraints because caregivers can perceive them as uncomfortable and unnecessary. This is a potentially fatal hazard that is unknown to many caregivers. Staff understands that some manufacturers are concerned that adding such a phrase conveys that the product is intended for long-term sleep. Such concerns are inconsistent with the ways that these products are used, the activity of infants when they sleep, and the deaths and severe injuries reflected in the data. Staff recommends that the warning acknowledge this foreseeable use of infant bouncers, and communicate clearly that it is not safe to loosen or remove the restraints when an infant is sleeping and instruct caregivers to do the opposite.

Fisher-Price did not conduct a study to determine if these same types of issues would relate to the Rock 'n Play.

***Location.*** The location of warnings is critical – if users do not notice the warnings – they cannot be read or complied with. Conspicuity of warnings is critical, as recognized in 2018 email discussions between FP and the CPSC, indicating warnings should be "visible from the front of the product with the cami dummy in place."[83] Moreover, the ASTM F3118 infant inclined sleep products roll over incidents task group suggested "TG may want to consider adding a separate and more prominent suffocation warning label that is visible to the caregiver each time the infant is placed in the product."[84] Moreover, Steinwachs acknowledged that location is key, and is "a reason why we listed that as a prominent warning that was both in the instructions and on the product, telling people – or parents, don't forget this stuff [use a restraint]. It's important."[85]

In this case, to the extent there were warnings, they were located in a location unlikely to be detected by the users. For in-home testing, participants would be given full warning labels with

---

[82] Exhibit 29 to Steinwachs January 22, 2021 deposition; September 16, 2014 letter to Michael Steinwachs from CPSC, Re: Proposed Revision of ASTM F2167 Consumer Safety Specification for Infant Bouncer Seats (Item 6, Labeling)
[83] COU0148962 – Taft ex. 17
[84] COU0148429
[85] Deposition of Steinwachs January 22, 2021, p. 63

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 12 of 44

them and the product. "We had warnings to hand out to the parents, yes;" afterwards, they would hand out a paper survey to participants.[86] This is not a valid test of the warnings. A reliable measure would be to watch to see if they find the warnings on their own, and if they are followed; however, even then there would be a "Hawthorne Effect" since when people know they are being studied, their behavior changes. Even so, 80% of the users did not use the belt at all times.[87] As depicted in Figures 1 and 2, the warning is on the back panel behind the infant's head. Not only was the warning placed in an inconspicuous location, FP did not consider ANSI A535.4 formatting of a corresponding color behind the signal word.[88] For examples of higher conspicuity, ANSI formatted warnings see Figures 8a and 8b.


Figure 1. Warning on actual sleeper


Figure 2. Location of warning behind infant's head

---

[86] Deposition of Lohiser, p. 29
[87] Deposition of Lohiser, p. 81
[88] Deposition of Steinwachs January 22, 2021, p. 226-227

The principal panel, on the reverse side of the sleeper warning (as indicated by an arrow in Figure 3) has ample room for a conspicuous warning.



Figure 3. Conspicuous location for a warning

This poor warning placement is evident in the police photograph showing the placement of the sleeper in the room (see Figure 4). The sleeper is placed with the top against a nightstand with the warning not visible.



Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 14 of 44

---

Figure 4. Place of Sleeper/Zoey in the room.[89]

It is important to consider the foreseeable use of the product. In this case, an infant will be placed in the sleeper; infants do not have strong necks and their heads must be supported at all times. Therefore, infants should be placed in the sleeper from the bottom or side – neither position would expose the user to the existing warning location (see Figures 5a and 5b).



Figures 5a and 5b. front and side placement of baby in sleeper

For the warning to be visible to the users, they would need to place the baby feet-first into the sleeper, which would put pose other risks (see Figure 6).



Figure 6. Placing baby into sleeper with warning visible

Prior to manufacturing the subject Rock 'n Play, Fisher-Price also made the decision to remove the warning that had been on the crotch restraint,[90] leaving the back of the product as the only location providing a warning.

---

[89] Deposition of Courkamp, Ex. 20
[90] Steinwachs January 22, 2021 deposition, pp. 163-164, 172-173

___

**_Content._** The content of a warning is another key factor in informing the user how to safely use the product. **_Warnings are not an effective remedy for poor design;_** the CPSC doesn't believe warning statements are effective in preventing misuse of product,[91] and Fisher Price stated there was no solid evidence that warnings measurably improve safety.[92] Fisher Price did not conduct testing to determine whether warnings could be recognized by consumer or test to see if consumers would follow the warnings[93] or any studies that questioned parents about how well they comprehended the warnings.[94] In this case, the warning does not warn against using the device for sleeping, or using it unattended while infants are sleeping (see Figure 7). FP's senior director of product safety had a discussion with FP engineers about the Quality Safety Operating Procedure (QSOP) 2.3.1.3.1, per the European regulations: "Warning – Failure to follow these warnings and the instructions could result in serious injury or death . . . This product is not intended to replace a cot or bed for prolonged periods of sleep."[95] FP's  3/23/2011 QSOP Labeling Bassinets Cradles/Upright Infant Sleeper Seat, instructs that for the US and Canada the following warnings must be located on the product: "NEVER leave child unattended" and "This product is not intended to replace a crib or bassinet for prolonged periods of sleep."[96] On October 11, 2011, the QSOP deleted these warnings and replaced them with the warnings "Always provide the supervision necessary for the continued safety of your child," and "When used for playing, never leave child unattended."[97]

___

[91] Ex 24 to Steinwachs January 22, 2021 deposition
[92] Mattel Product Safety Presentation, September, 2013, Footnoted date 2012, p. 163; Mattel-COU-0963413
[93] Deposition of Taft, p. 135
[94] Deposition of Steinwachs, p. 150
[95] COU0004186-88
[96] Mattel-Cou0000438
[97] Mattel-COU000449

COU_008169

Figure 7. English section of warning

Moreover, there is no age of use contraindication/warning. While the VP of product safety and regulatory compliance acknowledges that babies rolling over is a risk factor in any product,[98] a rollover contraindication was not included in the warnings. No testing was done to determine whether consumers should be told of rollover risk.[99] The on-product and package insert warning includes development information only about the potential as a fall hazard: "when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs.,"[100] it does not mention rolling over; moreover, there are no benchmarks mentioned for the suffocation hazard, which should include capabilities, such as ability to turn over. Babies have room to roll over in a bassinette and not an RNP;[101] however, the warnings were not changed for this design difference that would not be apparent to parents.

FP knew that 1-year-olds were using the product, but did not add the age limit to the warning because "the developmental statements are very clear as to when to stop using the product."[102] The case history reports also showed that many babies over 5 months of age were being placed in the Rock 'n Play. The warnings were changed 5 months after Zoey died when the CPSC

---

[98] Deposition of Pilarz, p. 68
[99] Deposition of Taft, p. 136
[100] COU0001788
[101] Deposition of Pilarz, January 21, 2021, p. 20-21
[102] Deposition of Taft, p. 224

informed FP the rollover statement was a better description than using the "push up on hands and knees" statement.[103]

As a member of the ASTM committee,[104] Fisher-Price knew as early as 2012 that the ASTM draft standards would include a 5-month age limit requirement for inclined sleep products.[105] However, Fisher-Price did not change its warnings to include an age limit until 2015, which was after Zoey Olson's death.[106] Even when FP did include the 5-month age limit, the age limit was included under the "To Prevent Falls" warning. It was not included as part of the suffocation warning. Fisher-Price also knew by early 2013 that a warning about stopping use once a baby could rollover would be included in the ASTM standards.[107] Fisher-Price chose not to add the rollover warning into the Rock 'n Play warnings until 2015, again, after the death of Zoey Olson.[108] Nothing prevented Fisher-Price from changing its warnings to add an age limit, or a roll over warning to the risk of asphyxiation/suffocation in 2013 when Fisher-Price manufactured the subject Rock 'n Play.[109] Although Fisher-Price claimed the Rock 'n Play warnings were based on the bassinet standards, Fisher-Price chose to add the 25 lbs. limit, the restraint warning, and the developmental warning about stopping use once a baby could pull up; none of which were included in the warnings from the ASTM bassinet standards. Fisher-Price could have included the 5-month age limit and the rollover warning at any point in time, especially given that the Rock 'n Play did not fall under any ASTM standards between 2013 and 2015. However, Fisher-Price did not include the age limit and the rollover warning until six years after the product had gone to market in 2015, and after the death of Zoey Olson. Moreover, FP put a 25 lb. weight limit on the RNP so older children with disabilities could use it;[110] thus not only did FP not warn against older babies using the sleepers, they anticipated them using the Rock 'n Play but did not warn or instruct on how babies with disabilities could safety use the RNP, which disabilities apply, or that only 25 lb. toddler with specific disabilities could use the RNP.

Once Fisher-Price did include the roll over warning, it was only included in the section about preventing falls, and not under the suffocation warning. Shortly before the 2019 recall, it appears that the ASTM subcommittee was working on warnings that would include the rollover warning under the suffocation warnings (see Figures 8a-8c).[111] This was 10 years after the Rock 'n Play was introduced to the market; no evidence suggests that these warnings ever were available on a Rock 'n Play.[112]

---

[103] Deposition of Taft, p. 273
[104] Steinwachs January 22, 2021 deposition, p. 46
[105] October 2012 Talking Point Document. Mattel-COU0007612.
[106] Steinwachs January 22, 2021 deposition, p. 213-214
[107] *e.g.*, Mattel-COU0008065
[108] Steinwachs January 22, 2021 deposition, p. 219
[109] Pilarz January 21, 2021 depo, pp. 108-110
[110] Deposition of Steinwachs January 22, 2021, p. 157
[111] Exhibit 26 to Steinwachs January 22, 2021; Mattel-COU0149643
[112] Pilarz January 21, 2021 deposition, pp. 127-128

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 18 of 44







Figure 8a-8c. Suffocation warnings developed by the ASTM subcommittee; no evidence indicated that they were available on a Rock 'n Play.

In 2019, the CPSC warning states, "CPSC ALERT: CPSC AND FISHERPRICE WARN CONSUMERS NOT TO USE FISHER-PRICE ROCK 'N PLAY FOR INFANTS WHO CAN ROLL OVER DUE TO REPORTS OF DEATH WHEN INFANTS ROLL OVER IN THE PRODUCT. . . Fisher-Price warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers continued to use the product when infants are capable of rolling and without using the three point harness restraint. CPSC had previously warned consumers to use restraints in infant inclined sleep products, "because deaths continue to occur, CPSC is recommending consumers stop use of the product by three months of age."[113]

The label's "fall hazard" states a 25 lb. weight limit, which is twice Zoey's weight – and does not effectively warn of/imply or in any way inform parents of the significant suffocation hazards of using this device; warnings should be conspicuous, clearly worded, and unambiguous. As indicated in the CDC's growth chart (see Figure 9), a 25 lb. 6-month-old would be far outside expected size for girls, with the 97th percentile being about 19 lbs. (97th percentile girl is 23 lbs. at 9 mos.) and would not reach 25 lbs. until she is 11 months old. Boys also do not reach 25 lbs. at 6 months; at 9 months, 97th percentile boys are just over 25 lbs.

---

[113] COU0018169

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 20 of 44



Figure 2. Individual growth chart 3rd, 5th, 10th, 25th, 50th, 75th, 90th, 95th, 97th percentiles, birth to 36 months: Girls weight-for-age

Figure 9. Girls' growth chart showing weight ranges

COU_008174

Therefore, the 25 lb. maximum exceeds expected girl population, even at 9 months, beyond when most can sit and turn over. This is not consistent with FP's presentation to the CPSC, "In 2008, the first concepts of the product were considered and subjected to internal safety reviews as well as internal and external expert consultation. Test models were developed with dimensions that correspond to the 95th percentile for a 5-month-old infant's hip breadth, shoulder breadth and length."[114] The RNP should have had an 18 ½ lbs. weight limit, corresponding to a 97th percentile girl. The weight limit on the subject warnings also indicated to parents that the product could be used for older babies. Michael Steinwachs was aware that the weight limit was for the 50th percentile of a 20 months old.[115] However, the only testing conducted for 25 lbs. was for stability testing.[116] The case history reports also provided Fisher-Price notice that babies over 5 months of age and beyond developmental milestones were being placed in the Rock 'n Play.[117] Fisher-Price had previously been provided with notice that 25 lbs. was an unsafe weight limit for a product meant for younger infants. CPSC addressed this issue in terms of the ASTM bouncer standards, of which Michael Steinwachs was also the chairman:[118]

> Issue 3: Development guidance in 8.3.4.2 Suffocation Hazard
>
> The balloted warning retains the developmental statement: "never use for a child able to sit up unassisted." Some packaging and instructions that staff has reviewed also state that the product is for use from birth until the child is able to sit up unassisted, and use a weight limit (25 1b) that reflects a 50th percentile 18-month-old. It is likely that this guidance leads caregivers to use the product beyond the point that it is safe.

Moreover, the warning does not specify, in any manner, what to do to prevent suffocation. While the warning states, "ALWAYS use the restraint system," it does not describe the nature and extent of the hazard; moreover, Fisher Price is aware through (2009) in-home testing that not all consumers use restraints; in fact, 4 out of 5 Fisher-Price employees reported not always using the restraint belt.[119] Over half of the parents in the In-home tests reported not always using the restraints.[120] These parents would have been provided the warnings when doing the in-home testing.[121] Fisher-Price did not test to determine whether consumers recognized that not using restraints could result in baby rolling over and dying.[122] Fisher-Price did not test whether parents

---

[114] COU0012419, 4/13/18
[115] Steinwachs January 22, 2021 deposition, 235-236
[116] Deposition of Deegear, p. 47, 64-65
[117] Case history reports; CPSC incident reports
[118] Exhibit 29 to Steinwachs January 22, 2021 deposition; September 16, 2014 letter to Michael Steinwachs from CPSC, Re: Proposed Revision of ASTM F2167 Consumer Safety Specification for Infant Bouncer Seats (Item 6, Labeling)
[119] Deposition of Chapman, p. 218; Lohiser Exhibit 5, Mattel-COU0000981
[120] Ex. 14 to Pilarz January 21, 2021 deposition Mattel-COU0061478
[121] Deposition of Lohiser, p. 26
[122] Deposition of Taft, p. 136

would use a restraint in a sleeping device.[123] Fisher-Price manufactured no other sleeping products that required restraints. Even after the completion of the In-home tests showing the majority of users would not always use the belts, Fisher-Price made no changes to the design, and Mike Steinwachs testified he does not remember restraint use being discussed.[124] Moreover, Dr. Deegear told Fisher Price that if restraints are not used, a child could fall out of product, but that the fall height would not cause any serious injuries.[125] Nothing in a bassinet or cribs prevents a baby from rolling over. Fisher-Price recognized that babies are free to rollover in cribs and bassinets.[126] I was not provided with any evidence that caregivers using the Rock 'n Play recognized the risk of death if a baby rolled over in a Rock 'n Play.

**Therefore, it is my opinion that Fisher Price failed to effectively warn parents of the suffocation hazard posed by use of the Rock 'n Play as a sleeper;** development specifications were provided for the fall hazard that Fisher Price considered low risk, per Dr. Deegear, yet it provided no such specifications or warnings (describing the nature and extent of the hazard and how to avoid it) for the high risk of the suffocation hazard.

*Foreign warnings*: While the RNP hazards are universal, parents were better warned outside the United States. In America it is marketed for overnight use, "the Rock 'n Play is intended for overnight sleep."[127] FP's senior director of product safety had a discussion with FP engineers about the Quality Safety Operating Procedure (QSOP) 3597 "Warning – Failure to follow these warnings and the instructions could result in serious injury or death . . . This product is not intended to replace a cot or bed for prolonged periods of sleep" to harmonize with Health Canada's requirement."[128] Kitty Pilarz was unaware of any death occurring in Canada where the Rock 'n Play could only be sold as a "soother" and was not marketed as a sleeping device.[129]

In 2011, Canada informed Fisher Price that the Rock 'n Play sleeper is not safe for sleep because "the currently accepted safe sleep messaging recommends a firm, flat surface for unsupervised sleep."[130] Moreover, the Canadian product deleted the word "sleeper" and eliminated reference to night time and overnight sleep.[131] Fisher-Price considered making the same changes to the American version of the product; however, when Fisher-Price stopped selling the product in Canada rather than reposition it to a soother, it did not change the warnings on the US product.[132]

---

[123] Mattel-COU0017994; Taft, p. 135; Pilarz January 21, 2021 deposition, pp. 88-89, 121
[124] Steinwachs deposition, January 22, 2021, pp. 63-65, 92
[125] Deposition of Taft, p. 57
[126] Pilarz January 21, 2021 deposition, p. 21
[127] Deposition of Taft, p. 176
[128] COU0004191
[129] Pilarz January 21, 2021 deposition, pp. 130, 152.
[130] COU0003324
[131] COU003321
[132] Deposition of Steinwachs, January 22, 2021, p. 121-122

Eventually, Fisher-Price was permitted to sell the Rock 'n Play as a "soothing seat" in Canada, starting approximately between 2016 and 2018.[133]

In 2011, Queensland Government informed FP, "The main concern with the Fisher Price Newborn Rock 'n Play Sleeper is that its promotion is at odds with widely accepted and promoted best practices that these types of products should not be used as an infant bedding alternative. Infant should not be left in these types of products without constant supervision;"[134] Australia and New Zealand changed product labeling; their product is called a "Soother" instead of a "Sleeper"[135] Fisher-Price stopped selling the RNP in Australia, rather than relabeling it as a soother.[136] The Royal College of Midwives informed FP that the product "must only be used for no more than two hours in a day and for the purpose of play/interaction with parents/siblings etc....The image on the information leaflet may be misleading in terms of the purpose of the product; it was suggested that this be removed/reworded."[137] European parents are warned, "This product is not intended to replace a cot or bed for prolonged periods of sleep."[138]

**AAP based on its 2011 study provides a safety specification of a firm, flat surface. It is my human factors opinion that the surface is neither firm or flat**

In 2008, the AAP recommended, "SAFE SLEEP ENVIRONMENT. Place your baby in a safety-approved crib with a firm mattress and a well-fitting sheet."[139] Our human factors testing indicates that the surface is not firm as it changes shape with weight applied that is much less than the 25 lbs. maximum weight. Unweighted, the curve is 5" deep (see figure 10).

---

[133] Mattel-COU0023923; Mattel-COU-0864171; Mattel-COU0144985 at section 1.3.7.
[134] COU0011633
[135] FP009365-67
[136] Pilarz January 21, 2021 deposition, p. 152
[137] COU0000659
[138] Deposition of Pilarz, p. 225
[139] COU0003041

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 24 of 44



Figure 10. 5" deep unweighted

With 10 lbs. applied, the depth is reduced to 4-1/4" (see Figure 10).



Figure 10. 4-1/4" deep unweighted

With 12 lbs. applied, depth is reduced to 3-3/4" (see figure 11).

COU_008178

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 25 of 44



Figure 11. Depth is reduced to 3-3/4"

With 14 and 16 lbs. applied, it is reduced to 3-1/2" (see Figure 12); therefore, there is diminishing returns on the exponential decay, progressively increased resistance after 14 pounds.



Figure 12. 14 and 16 lbs. applied, depth is reduced to 3-1/2"

Our human factors evaluation indicates that the surface is not flat. The bottom is curved as the flexible plastic sheet fits within the fabric housing and attaches to the frame above (see Figure 13).

COU_008179

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 26 of 44



Figure 13. The bottom sheet of plastic supporting the infant is curved

**The behavior of Zoey's parents was foreseeable and expected**

Zoey's parents' behavior was consistent with other parents.[140] Nothing that they did was inconsistent with the instructions and warnings that came with the product. The parents received the product new and looked at packaging and familiarized themselves with instructions for every single product they bought for Zoey, including the Rock 'n Play.[141] They read all the materials and warnings on the Rock 'n Play when they first got it; they did detailed research and waited until appropriate time to put Zoey in it.[142] At the time of her death, Zoey could stand with assistance, but she couldn't balance; she was crawling so she could push up with her arms and could sit up unassisted. And she could roll over from front to back and back to front.[143] Zoey would do a sort of crawl where she would drag her knees and not be totally up in a full crawling position.[144] Nowhere on the warnings did Zoey's father see anything about rolling over or an age limit.[145] While developmentally Zoey was able to sit, this capability was under fall hazard; the parents had a foam mat on the floor under the RNP and did not consider that fall a serious risk – consistent with Dr. Deegear's testimony of his low perceived fall risk; moreover, she weighed only half of the weight limit.  In Zoey's father's research on the Rock 'n Play, he never found anything that discussed a risk of asphyxiation or suffocation if the baby rolled over in the sleeper.[146]

---

[140] Consumer reports article, accident reports.
[141] Deposition of Olson, p. 129
[142] Deposition of Olson, p. 150
[143] Deposition of Olson, p. 143-4
[144] Deposition of Olson, p. 200
[145] Deposition of Olson, p. 259
[146] Deposition of Olson, p. 260

Zoey's parents felt that it was a product where she was going to be very safe within there and she was never able to get out.[147] While Olson doesn't remember buckling her in[148] or unbuckling her,[149] this natural, routine behavior would not be salient given the emotional event.
In summary, Fisher Price did not effectively manage the suffocation hazard caused by the RNP inclined sleeper. Had effective design and warnings been used, this incident could have been averted.

All of my opinions are expressed to a reasonable degree of professional certainty. I reserve the right to modify the opinions in this report if additional information becomes available.

### Qualifications and Publications

My expertise is based upon a combination of education, original theoretical research, and professional employment.  Please refer to my enclosed Curriculum Vitae for detailed qualifications and publications.

I appreciate the opportunity to assist you in this case and am available for any further work that may be required.

Sincerely,

Alison Vredenburgh, Ph.D., CPE
Vredenburgh & Associates, Inc.

AV/ibz

Enclosure

---

[147] Deposition of Olson, p. 167
[148] Deposition of Olson, p. 205
[149] Deposition of Olson, p. 176

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 28 of 44

## APPENDIX A: DOCUMENTS REVIEWED

| Joint Protective Order and Exhibit A | |
|---|---|
| COU_000001 | COU_000026 |
| COU_001877 | COU_002085 |
| Mattel-COU0000071 | Mattel-COU0000077 |
| Mattel-COU0000078 | Mattel-COU0000088 |
| Mattel-COU0000089 | Mattel-COU0000105 |
| Mattel-COU0000449 | Mattel-COU0000459 |
| Mattel-COU0000540 | Mattel-COU0000540 |
| Mattel-COU0000550 | Mattel-COU0000550 |
| Mattel-COU0000555 | Mattel-COU0000555 |
| Mattel-COU0000556 | Mattel-COU0000556 |
| Mattel-COU0000557 | Mattel-COU0000557 |
| Mattel-COU0000559 | Mattel-COU0000559 |
| Mattel-COU0000570 | Mattel-COU0000571 |
| Mattel-COU0000572 | Mattel-COU0000573 |
| Mattel-COU0000574 | Mattel-COU0000575 |
| Mattel-COU0000642 | Mattel-COU0000644 |
| Mattel-COU0000657 | Mattel-COU0000660 |
| Mattel-COU0000983 | Mattel-COU0000997 |
| Mattel-COU0001002 | Mattel-COU0001019 |
| Mattel-COU0001044 | Mattel-COU0001051 |
| Mattel-COU0001054 | Mattel-COU0001092 |
| Mattel-COU0001786 | Mattel-COU0001801 |
| Mattel-COU0002034 | Mattel-COU0002041 |
| Mattel-COU0002042 | Mattel-COU0002047 |
| Mattel-COU0002066 | Mattel-COU0002073 |
| Mattel-COU0002113 | Mattel-COU0002118 |
| Mattel-COU0002131 | Mattel-COU0002136 |
| Mattel-COU0002209 | Mattel-COU0002209 |
| Mattel-COU0002221 | Mattel-COU0002275 |
| Mattel-COU0002276 | Mattel-COU0002280 |
| Mattel-COU0002291 | Mattel-COU0002295 |
| Mattel-COU0002296 | Mattel-COU0002297 |
| Mattel-COU0002304 | Mattel-COU0002305 |
| Mattel-COU0002313 | Mattel-COU0002316 |
| Mattel-COU0002317 | Mattel-COU0002338 |
| Mattel-COU0002339 | Mattel-COU0002343 |
| Mattel-COU0002366 | Mattel-COU0002370 |
| Mattel-COU0002371 | Mattel-COU0002388 |
| Mattel-COU0002389 | Mattel-COU0002393 |
| Mattel-COU0002394 | Mattel-COU0002405 |
| Mattel-COU0002406 | Mattel-COU0002408 |
| Mattel-COU0002417 | Mattel-COU0002421 |
| Mattel-COU0002422 | Mattel-COU0002449 |
| Mattel-COU0002450 | Mattel-COU0002453 |
| Mattel-COU0002463 | Mattel-COU0002464 |
| Mattel-COU0002465 | Mattel-COU0002469 |
| Mattel-COU0002470 | Mattel-COU0002473 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 29 of 44

| | |
|---|---|
| Mattel-COU0002474 | Mattel-COU0002480 |
| Mattel-COU0002481 | Mattel-COU0002482 |
| Mattel-COU0002483 | Mattel-COU0002488 |
| Mattel-COU0002509 | Mattel-COU0002547 |
| Mattel-COU0002605 | Mattel-COU0002607 |
| Mattel-COU0002610 | Mattel-COU0002611 |
| Mattel-COU0003266 | Mattel-COU0003268 |
| Mattel-COU0004095 | Mattel-COU0004097 |
| Mattel-COU0004143 | Mattel-COU0004145 |
| Mattel-COU0004159 | Mattel-COU0004160 |
| Mattel-COU0004186 | Mattel-COU0004192 |
| Mattel-COU0006128 | Mattel-COU0006130 |
| Mattel-COU0007352 | Mattel-COU0007356 |
| Mattel-COU0007374 | Mattel-COU0007375 |
| Mattel-COU0010226 | Mattel-COU0010226 |
| Mattel-COU0010239 | Mattel-COU0010239 |
| Mattel-COU0010240 | Mattel-COU0010241 |
| Mattel-COU0010463 | Mattel-COU0010463 |
| Mattel-COU0011456 | Mattel-COU0011457 |
| Mattel-COU0011620 | Mattel-COU0011621 |
| Mattel-COU0011627 | Mattel-COU0011630 |
| Mattel-COU0011631 | Mattel-COU0011634 |
| Mattel-COU0011654 | Mattel-COU0011659 |
| Mattel-COU0011820 | Mattel-COU0011835 |
| Mattel-COU0011884 | Mattel-COU0011899 |
| Mattel-COU0012240 | Mattel-COU0012245 |
| Mattel-COU0012246 | Mattel-COU0012253 |
| Mattel-COU0012254 | Mattel-COU0012276 |
| Mattel-COU0012399 | Mattel-COU0012409 |
| Mattel-COU0012694 | Mattel-COU0012698 |
| Mattel-COU0012703 | Mattel-COU0013194 |
| Mattel-COU0014331 | Mattel-COU0014332 |
| Mattel-COU0015653 | Mattel-COU0015653 |
| Mattel-COU0015658 | Mattel-COU0015661 |
| Mattel-COU0017988 | Mattel-COU0017989 |
| Mattel-COU0017990 | Mattel-COU0017993 |
| Mattel-COU0017994 | Mattel-COU0018034 |
| Mattel-COU0018210 | Mattel-COU0018212 |
| Mattel-COU0018571 | Mattel-COU0018636 |
| Mattel-COU0018699 | Mattel-COU0018699 |
| Mattel-COU0019192 | Mattel-COU0019203 |
| Mattel-COU0019204 | Mattel-COU0019207 |
| Mattel-COU0022316 | Mattel-COU0022318 |
| Mattel-COU0023403 | Mattel-COU0023405 |
| Mattel-COU0023410 | Mattel-COU0023419 |
| Mattel-COU0023477 | Mattel-COU0023478 |
| Mattel-COU0023481 | Mattel-COU0023481 |
| Mattel-COU0023484 | Mattel-COU0023485 |
| Mattel-COU0023488 | Mattel-COU0023490 |
| Mattel-COU0023491 | Mattel-COU0023492 |

| | |
|---|---|
| Mattel-COU0023498 | Mattel-COU0023498 |
| Mattel-COU0023556 | Mattel-COU0023602 |
| Mattel-COU0024246 | Mattel-COU0024246 |
| Mattel-COU0024271 | Mattel-COU0024271 |
| Mattel-COU0024272 | Mattel-COU0024272 |
| Mattel-COU0024299 | Mattel-COU0024299 |
| Mattel-COU0024331 | Mattel-COU0024331 |
| Mattel-COU0024332 | Mattel-COU0024332 |
| Mattel-COU0024334 | Mattel-COU0024334 |
| Mattel-COU0024336 | Mattel-COU0024336 |
| Mattel-COU0024338 | Mattel-COU0024338 |
| Mattel-COU0024345 | Mattel-COU0024345 |
| Mattel-COU0024347 | Mattel-COU0024347 |
| Mattel-COU0024363 | Mattel-COU0024363 |
| Mattel-COU0024364 | Mattel-COU0024364 |
| Mattel-COU0024375 | Mattel-COU0024375 |
| Mattel-COU0024376 | Mattel-COU0024376 |
| Mattel-COU0024377 | Mattel-COU0024377 |
| Mattel-COU0024384 | Mattel-COU0024384 |
| Mattel-COU0024389 | Mattel-COU0024389 |
| Mattel-COU0024392 | Mattel-COU0024392 |
| Mattel-COU0024401 | Mattel-COU0024401 |
| Mattel-COU0024403 | Mattel-COU0024403 |
| Mattel-COU0024479 | Mattel-COU0024479 |
| Mattel-COU0024508 | Mattel-COU0024508 |
| Mattel-COU0024609 | Mattel-COU0024609 |
| Mattel-COU0025390 | Mattel-COU0025409 |
| Mattel-COU0025410 | Mattel-COU0025429 |
| Mattel-COU0025430 | Mattel-COU0025449 |
| Mattel-COU0025450 | Mattel-COU0025469 |
| Mattel-COU0025470 | Mattel-COU0025490 |
| Mattel-COU0025491 | Mattel-COU0025511 |
| Mattel-COU0025512 | Mattel-COU0025531 |
| Mattel-COU0025532 | Mattel-COU0025551 |
| Mattel-COU0025552 | Mattel-COU0025572 |
| Mattel-COU0025573 | Mattel-COU0025592 |
| Mattel-COU0025593 | Mattel-COU0025612 |
| Mattel-COU0025634 | Mattel-COU0025659 |
| Mattel-COU0025696 | Mattel-COU0025700 |
| Mattel-COU0025701 | Mattel-COU0025725 |
| Mattel-COU0025726 | Mattel-COU0025741 |
| Mattel-COU0025748 | Mattel-COU0025759 |
| Mattel-COU0025760 | Mattel-COU0025792 |
| Mattel-COU0025793 | Mattel-COU0025803 |
| Mattel-COU0025804 | Mattel-COU0025836 |
| Mattel-COU0025837 | Mattel-COU0025850 |
| Mattel-COU0025851 | Mattel-COU0025858 |
| Mattel-COU0025859 | Mattel-COU0025909 |
| Mattel-COU0025910 | Mattel-COU0025932 |
| Mattel-COU0025933 | Mattel-COU0025954 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 31 of 44

| | |
|---|---|
| Mattel-COU0025955 | Mattel-COU0026040 |
| Mattel-COU0026041 | Mattel-COU0026044 |
| Mattel-COU0026045 | Mattel-COU0026106 |
| Mattel-COU0026107 | Mattel-COU0026112 |
| Mattel-COU0026113 | Mattel-COU0026128 |
| Mattel-COU0026129 | Mattel-COU0026142 |
| Mattel-COU0026143 | Mattel-COU0026148 |
| Mattel-COU0026149 | Mattel-COU0026153 |
| Mattel-COU0026154 | Mattel-COU0026177 |
| Mattel-COU0026178 | Mattel-COU0026199 |
| Mattel-COU0026200 | Mattel-COU0026217 |
| Mattel-COU0026218 | Mattel-COU0026226 |
| Mattel-COU0026227 | Mattel-COU0026231 |
| Mattel-COU0026232 | Mattel-COU0026240 |
| Mattel-COU0026241 | Mattel-COU0026252 |
| Mattel-COU0026253 | Mattel-COU0026261 |
| Mattel-COU0026262 | Mattel-COU0026271 |
| Mattel-COU0026272 | Mattel-COU0026279 |
| Mattel-COU0026280 | Mattel-COU0026307 |
| Mattel-COU0026308 | Mattel-COU0026312 |
| Mattel-COU0026313 | Mattel-COU0026323 |
| Mattel-COU0026324 | Mattel-COU0026326 |
| Mattel-COU0026327 | Mattel-COU0026333 |
| Mattel-COU0026334 | Mattel-COU0026335 |
| Mattel-COU0026336 | Mattel-COU0026339 |
| Mattel-COU0026340 | Mattel-COU0026341 |
| Mattel-COU0026342 | Mattel-COU0026345 |
| Mattel-COU0026346 | Mattel-COU0026349 |
| Mattel-COU0026350 | Mattel-COU0026357 |
| Mattel-COU0026358 | Mattel-COU0026360 |
| Mattel-COU0026361 | Mattel-COU0026365 |
| Mattel-COU0026366 | Mattel-COU0026371 |
| Mattel-COU0026372 | Mattel-COU0026382 |
| Mattel-COU0026383 | Mattel-COU0026385 |
| Mattel-COU0026386 | Mattel-COU0026393 |
| Mattel-COU0026396 | Mattel-COU0026401 |
| Mattel-COU0026404 | Mattel-COU0026409 |
| Mattel-COU0026410 | Mattel-COU0026415 |
| Mattel-COU0026416 | Mattel-COU0026425 |
| Mattel-COU0026426 | Mattel-COU0026429 |
| Mattel-COU0026430 | Mattel-COU0026486 |
| Mattel-COU0026487 | Mattel-COU0026488 |
| Mattel-COU0026489 | Mattel-COU0026494 |
| Mattel-COU0026497 | Mattel-COU0026503 |
| Mattel-COU0026507 | Mattel-COU0026514 |
| Mattel-COU0026519 | Mattel-COU0026527 |
| Mattel-COU0026528 | Mattel-COU0026530 |
| Mattel-COU0026531 | Mattel-COU0026536 |
| Mattel-COU0026537 | Mattel-COU0026538 |
| Mattel-COU0026539 | Mattel-COU0026542 |

| | |
|---|---|
| Mattel-COU0026543 | Mattel-COU0026544 |
| Mattel-COU0026545 | Mattel-COU0026548 |
| Mattel-COU0026549 | Mattel-COU0026550 |
| Mattel-COU0026551 | Mattel-COU0026554 |
| Mattel-COU0026555 | Mattel-COU0026556 |
| Mattel-COU0026557 | Mattel-COU0026558 |
| Mattel-COU0026559 | Mattel-COU0026559 |
| Mattel-COU0026560 | Mattel-COU0026561 |
| Mattel-COU0026562 | Mattel-COU0026563 |
| Mattel-COU0026564 | Mattel-COU0026565 |
| Mattel-COU0026566 | Mattel-COU0026569 |
| Mattel-COU0026570 | Mattel-COU0026571 |
| Mattel-COU0026572 | Mattel-COU0026574 |
| Mattel-COU0026575 | Mattel-COU0026576 |
| Mattel-COU0026577 | Mattel-COU0026578 |
| Mattel-COU0026579 | Mattel-COU0026580 |
| Mattel-COU0026581 | Mattel-COU0026582 |
| Mattel-COU0026583 | Mattel-COU0026585 |
| Mattel-COU0026586 | Mattel-COU0026587 |
| Mattel-COU0026588 | Mattel-COU0026591 |
| Mattel-COU0026592 | Mattel-COU0026594 |
| Mattel-COU0026595 | Mattel-COU0026596 |
| Mattel-COU0026597 | Mattel-COU0026600 |
| Mattel-COU0026601 | Mattel-COU0026603 |
| Mattel-COU0026604 | Mattel-COU0026605 |
| Mattel-COU0026606 | Mattel-COU0026607 |
| Mattel-COU0026608 | Mattel-COU0026609 |
| Mattel-COU0026610 | Mattel-COU0026611 |
| Mattel-COU0026612 | Mattel-COU0026613 |
| Mattel-COU0026614 | Mattel-COU0026616 |
| Mattel-COU0026617 | Mattel-COU0026618 |
| Mattel-COU0026619 | Mattel-COU0026620 |
| Mattel-COU0026621 | Mattel-COU0026622 |
| Mattel-COU0026623 | Mattel-COU0026624 |
| Mattel-COU0026625 | Mattel-COU0026627 |
| Mattel-COU0026628 | Mattel-COU0026629 |
| Mattel-COU0026630 | Mattel-COU0026631 |
| Mattel-COU0026632 | Mattel-COU0026633 |
| Mattel-COU0026634 | Mattel-COU0026635 |
| Mattel-COU0026636 | Mattel-COU0026637 |
| Mattel-COU0026638 | Mattel-COU0026640 |
| Mattel-COU0026641 | Mattel-COU0026641 |
| Mattel-COU0026642 | Mattel-COU0026643 |
| Mattel-COU0026644 | Mattel-COU0026644 |
| Mattel-COU0026645 | Mattel-COU0026645 |
| Mattel-COU0026646 | Mattel-COU0026647 |
| Mattel-COU0026648 | Mattel-COU0026649 |
| Mattel-COU0026650 | Mattel-COU0026651 |
| Mattel-COU0026652 | Mattel-COU0026653 |
| Mattel-COU0026654 | Mattel-COU0026656 |

| | |
|---|---|
| Mattel-COU0026657 | Mattel-COU0026658 |
| Mattel-COU0026659 | Mattel-COU0026661 |
| Mattel-COU0026662 | Mattel-COU0026662 |
| Mattel-COU0026663 | Mattel-COU0026664 |
| Mattel-COU0026665 | Mattel-COU0026665 |
| Mattel-COU0026666 | Mattel-COU0026667 |
| Mattel-COU0026668 | Mattel-COU0026670 |
| Mattel-COU0026671 | Mattel-COU0026673 |
| Mattel-COU0026681 | Mattel-COU0026683 |
| Mattel-COU0026684 | Mattel-COU0026685 |
| Mattel-COU0026686 | Mattel-COU0026687 |
| Mattel-COU0026688 | Mattel-COU0026689 |
| Mattel-COU0026699 | Mattel-COU0026701 |
| Mattel-COU0026702 | Mattel-COU0026708 |
| Mattel-COU0026709 | Mattel-COU0026711 |
| Mattel-COU0026712 | Mattel-COU0026714 |
| Mattel-COU0026721 | Mattel-COU0026723 |
| Mattel-COU0026724 | Mattel-COU0026726 |
| Mattel-COU0026727 | Mattel-COU0026728 |
| Mattel-COU0026736 | Mattel-COU0026736 |
| Mattel-COU0026737 | Mattel-COU0026738 |
| Mattel-COU0026739 | Mattel-COU0026740 |
| Mattel-COU0026741 | Mattel-COU0026742 |
| Mattel-COU0026743 | Mattel-COU0026744 |
| Mattel-COU0026745 | Mattel-COU0026746 |
| Mattel-COU0026747 | Mattel-COU0026749 |
| Mattel-COU0026750 | Mattel-COU0026751 |
| Mattel-COU0026752 | Mattel-COU0026752 |
| Mattel-COU0026753 | Mattel-COU0026754 |
| Mattel-COU0026755 | Mattel-COU0026756 |
| Mattel-COU0026757 | Mattel-COU0026758 |
| Mattel-COU0026759 | Mattel-COU0026760 |
| Mattel-COU0026761 | Mattel-COU0026762 |
| Mattel-COU0026763 | Mattel-COU0026764 |
| Mattel-COU0026765 | Mattel-COU0026768 |
| Mattel-COU0026769 | Mattel-COU0026770 |
| Mattel-COU0026771 | Mattel-COU0026775 |
| Mattel-COU0026776 | Mattel-COU0026777 |
| Mattel-COU0026778 | Mattel-COU0026786 |
| Mattel-COU0026787 | Mattel-COU0026789 |
| Mattel-COU0026790 | Mattel-COU0026793 |
| Mattel-COU0026794 | Mattel-COU0026794 |
| Mattel-COU0026795 | Mattel-COU0026797 |
| Mattel-COU0026798 | Mattel-COU0026799 |
| Mattel-COU0026800 | Mattel-COU0026802 |
| Mattel-COU0026803 | Mattel-COU0026805 |
| Mattel-COU0026806 | Mattel-COU0026808 |
| Mattel-COU0026812 | Mattel-COU0026813 |
| Mattel-COU0026814 | Mattel-COU0026815 |
| Mattel-COU0026816 | Mattel-COU0026817 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 34 of 44

| | |
|---|---|
| Mattel-COU0026818 | Mattel-COU0026826 |
| Mattel-COU0026827 | Mattel-COU0026828 |
| Mattel-COU0026829 | Mattel-COU0026830 |
| Mattel-COU0026831 | Mattel-COU0026831 |
| Mattel-COU0026832 | Mattel-COU0026834 |
| Mattel-COU0026835 | Mattel-COU0026837 |
| Mattel-COU0026838 | Mattel-COU0026839 |
| Mattel-COU0026840 | Mattel-COU0026841 |
| Mattel-COU0026842 | Mattel-COU0026844 |
| Mattel-COU0026845 | Mattel-COU0026846 |
| Mattel-COU0026847 | Mattel-COU0026848 |
| Mattel-COU0026849 | Mattel-COU0026850 |
| Mattel-COU0026851 | Mattel-COU0026852 |
| Mattel-COU0026853 | Mattel-COU0026853 |
| Mattel-COU0026854 | Mattel-COU0026856 |
| Mattel-COU0026857 | Mattel-COU0026858 |
| Mattel-COU0026859 | Mattel-COU0026861 |
| Mattel-COU0026862 | Mattel-COU0026864 |
| Mattel-COU0026865 | Mattel-COU0026866 |
| Mattel-COU0026867 | Mattel-COU0026940 |
| Mattel-COU0026941 | Mattel-COU0026944 |
| Mattel-COU0026945 | Mattel-COU0026954 |
| Mattel-COU0026955 | Mattel-COU0026958 |
| Mattel-COU0026959 | Mattel-COU0026960 |
| Mattel-COU0026961 | Mattel-COU0026962 |
| Mattel-COU0026973 | Mattel-COU0026976 |
| Mattel-COU0026977 | Mattel-COU0026980 |
| Mattel-COU0026981 | Mattel-COU0026984 |
| Mattel-COU0026985 | Mattel-COU0026988 |
| Mattel-COU0026989 | Mattel-COU0026990 |
| Mattel-COU0026991 | Mattel-COU0026992 |
| Mattel-COU0026993 | Mattel-COU0026997 |
| Mattel-COU0026998 | Mattel-COU0027000 |
| Mattel-COU0027001 | Mattel-COU0027002 |
| Mattel-COU0027003 | Mattel-COU0027004 |
| Mattel-COU0027005 | Mattel-COU0027007 |
| Mattel-COU0027008 | Mattel-COU0027009 |
| Mattel-COU0027010 | Mattel-COU0027011 |
| Mattel-COU0027012 | Mattel-COU0027013 |
| Mattel-COU0027014 | Mattel-COU0027015 |
| Mattel-COU0027016 | Mattel-COU0027017 |
| Mattel-COU0027018 | Mattel-COU0027021 |
| Mattel-COU0027022 | Mattel-COU0027023 |
| Mattel-COU0027024 | Mattel-COU0027025 |
| Mattel-COU0027026 | Mattel-COU0027027 |
| Mattel-COU0027028 | Mattel-COU0027029 |
| Mattel-COU0027030 | Mattel-COU0027031 |
| Mattel-COU0027032 | Mattel-COU0027033 |
| Mattel-COU0027034 | Mattel-COU0027035 |
| Mattel-COU0027036 | Mattel-COU0027040 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 35 of 44

| | |
|---|---|
| Mattel-COU0027041 | Mattel-COU0027045 |
| Mattel-COU0027046 | Mattel-COU0027049 |
| Mattel-COU0027050 | Mattel-COU0027053 |
| Mattel-COU0027054 | Mattel-COU0027058 |
| Mattel-COU0027064 | Mattel-COU0027067 |
| Mattel-COU0027068 | Mattel-COU0027071 |
| Mattel-COU0027072 | Mattel-COU0027075 |
| Mattel-COU0027076 | Mattel-COU0027079 |
| Mattel-COU0027080 | Mattel-COU0027084 |
| Mattel-COU0027085 | Mattel-COU0027090 |
| Mattel-COU0027091 | Mattel-COU0027101 |
| Mattel-COU0027102 | Mattel-COU0027108 |
| Mattel-COU0027109 | Mattel-COU0027113 |
| Mattel-COU0027114 | Mattel-COU0027117 |
| Mattel-COU0027118 | Mattel-COU0027121 |
| Mattel-COU0027122 | Mattel-COU0027126 |
| Mattel-COU0027127 | Mattel-COU0027131 |
| Mattel-COU0027132 | Mattel-COU0027136 |
| Mattel-COU0027137 | Mattel-COU0027141 |
| Mattel-COU0027142 | Mattel-COU0027146 |
| Mattel-COU0027147 | Mattel-COU0027150 |
| Mattel-COU0027151 | Mattel-COU0027155 |
| Mattel-COU0027156 | Mattel-COU0027159 |
| Mattel-COU0027160 | Mattel-COU0027164 |
| Mattel-COU0027165 | Mattel-COU0027169 |
| Mattel-COU0027170 | Mattel-COU0027174 |
| Mattel-COU0027175 | Mattel-COU0027178 |
| Mattel-COU0027179 | Mattel-COU0027183 |
| Mattel-COU0027184 | Mattel-COU0027207 |
| Mattel-COU0027208 | Mattel-COU0027268 |
| Mattel-COU0027269 | Mattel-COU0027298 |
| Mattel-COU0027321 | Mattel-COU0027338 |
| Mattel-COU0027367 | Mattel-COU0027370 |
| Mattel-COU0027378 | Mattel-COU0027397 |
| Mattel-COU0027398 | Mattel-COU0027424 |
| Mattel-COU0027425 | Mattel-COU0027451 |
| Mattel-COU0027452 | Mattel-COU0027457 |
| Mattel-COU0027491 | Mattel-COU0027498 |
| Mattel-COU0027499 | Mattel-COU0027506 |
| Mattel-COU0027507 | Mattel-COU0027550 |
| Mattel-COU0027551 | Mattel-COU0027564 |
| Mattel-COU0027565 | Mattel-COU0027568 |
| Mattel-COU0027569 | Mattel-COU0027573 |
| Mattel-COU0027574 | Mattel-COU0027578 |
| Mattel-COU0027579 | Mattel-COU0027662 |
| Mattel-COU0027663 | Mattel-COU0027707 |
| Mattel-COU0027708 | Mattel-COU0027732 |
| Mattel-COU0027733 | Mattel-COU0027777 |
| Mattel-COU0027778 | Mattel-COU0027819 |
| Mattel-COU0027832 | Mattel-COU0027836 |

| | |
|---|---|
| Mattel-COU0027837 | Mattel-COU0027847 |
| Mattel-COU0027859 | Mattel-COU0027875 |
| Mattel-COU0027876 | Mattel-COU0027897 |
| Mattel-COU0027898 | Mattel-COU0027931 |
| Amended Scheduling Order (Doc 61) | |
| Photos of Subject RNP COU  005563-5623 | |
| Defendants' responses to Plaintiffs' Discovery Requests. | |
| Plaintiffs' responses to Defendants' Discovery Requests. | |
| Photographs of Baby Z.O. in Rock 'n Play. | |
| Un-redacted Police Report (more complete copy). | |
| All Tempe Police Interviews (audio files). | |
| Transcribed interviews of all Tempe Police Interviews. | |
| Photographs of the subject Rock 'n Play. | |
| Depositions and exhibits for Kitty Pilarz re Torres case | |
| Deposition and exhibits for Linda Chapman re Torres case | |
| Deposition and exhibits for Michael Steinwachs re Torres case | |
| Deposition and exhibits for Kitty Pilarz re Goodrich case | |
| Deposition and exhibits for Michael Steinwachs re Goodrich case | |
| Deposition and exhibits for Linda Chapman re Goodrich case | |
| Mattel documents Bates Range Mattel-COU000001-Mattel-COU0028502 (thumb drive) | |
| At-home testing documents | |
| Mattel-COU0000663 | Mattel-COU0000664 |
| Mattel-COU0000665 | Mattel-COU0000666 |
| Mattel-COU0000667 | Mattel-COU0000668 |
| Mattel-COU0000669 | Mattel-COU0000671 |
| Mattel-COU0000672 | Mattel-COU0000674 |
| Mattel-COU0000675 | Mattel-COU0000680 |
| Mattel-COU0000681 | Mattel-COU0000686 |
| Mattel-COU0000687 | Mattel-COU0000692 |
| Mattel-COU0000693 | Mattel-COU0000698 |
| Mattel-COU0000699 | Mattel-COU0000704 |
| Mattel-COU0000705 | Mattel-COU0000710 |
| Mattel-COU0000711 | Mattel-COU0000716 |
| Mattel-COU0000717 | Mattel-COU0000722 |
| Mattel-COU0000723 | Mattel-COU0000728 |
| Mattel-COU0000729 | Mattel-COU0000734 |
| Mattel-COU0000735 | Mattel-COU0000740 |
| Mattel-COU0000741 | Mattel-COU0000746 |
| Mattel-COU0000747 | Mattel-COU0000752 |
| Mattel-COU0000753 | Mattel-COU0000758 |
| Mattel-COU0000759 | Mattel-COU0000764 |
| Mattel-COU0000765 | Mattel-COU0000770 |
| Mattel-COU0000771 | Mattel-COU0000778 |
| Mattel-COU0000779 | Mattel-COU0000784 |
| Mattel-COU0000785 | Mattel-COU0000790 |
| Mattel-COU0000791 | Mattel-COU0000796 |
| Mattel-COU0000797 | Mattel-COU0000804 |
| Mattel-COU0000805 | Mattel-COU0000811 |
| Mattel-COU0000812 | Mattel-COU0000817 |
| Mattel-COU0000818 | Mattel-COU0000823 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 37 of 44

| | |
|---|---|
| Mattel-COU0000824 | Mattel-COU0000829 |
| Mattel-COU0000830 | Mattel-COU0000835 |
| Mattel-COU0000836 | Mattel-COU0000841 |
| Mattel-COU0000842 | Mattel-COU0000847 |
| Mattel-COU0000848 | Mattel-COU0000853 |
| Mattel-COU0000854 | Mattel-COU0000859 |
| Mattel-COU0000860 | Mattel-COU0000865 |
| Mattel-COU0000866 | Mattel-COU0000871 |
| Mattel-COU0000872 | Mattel-COU0000877 |
| Mattel-COU0000878 | Mattel-COU0000883 |
| Mattel-COU0000884 | Mattel-COU0000889 |
| Mattel-COU0000890 | Mattel-COU0000895 |
| Mattel-COU0000896 | Mattel-COU0000901 |
| Mattel-COU0000902 | Mattel-COU0000908 |
| Mattel-COU0000909 | Mattel-COU0000914 |
| Mattel-COU0000915 | Mattel-COU0000920 |
| Mattel-COU0000921 | Mattel-COU0000926 |
| Mattel-COU0000927 | Mattel-COU0000932 |
| Mattel-COU0000933 | Mattel-COU0000938 |
| Mattel-COU0000939 | Mattel-COU0000944 |
| Mattel-COU0000945 | Mattel-COU0000950 |
| Mattel-COU0000951 | Mattel-COU0000956 |
| Mattel-COU0000957 | Mattel-COU0000962 |
| Mattel-COU0000963 | Mattel-COU0000968 |
| Mattel-COU0000969 | Mattel-COU0000974 |
| Mattel-COU0000975 | Mattel-COU0000980 |
| Mattel-COU0000981 | Mattel-COU0000982 |
| Mattel-COU0000983 | Mattel-COU0000997 |
| Mattel-COU0002089 | Mattel-COU0002094 |
| Mattel-COU0002095 | Mattel-COU0002100 |
| Mattel-COU0002101 | Mattel-COU0002106 |
| Mattel-COU0002107 | Mattel-COU0002112 |
| Mattel-COU0002113 | Mattel-COU0002118 |
| Mattel-COU0002119 | Mattel-COU0002124 |
| Mattel-COU0002125 | Mattel-COU0002130 |
| Mattel-COU0002131 | Mattel-COU0002136 |
| Mattel-COU0002137 | Mattel-COU0002142 |
| Mattel-COU0002143 | Mattel-COU0002148 |
| Mattel-COU0002209 | Mattel-COU0002209 |
| Mattel-COU0002210 | Mattel-COU0002210 |
| Mattel-COU0002211 | Mattel-COU0002211 |
| Mattel-COU0002212 | Mattel-COU0002212 |
| Mattel-COU0002213 | Mattel-COU0002213 |
| Mattel-COU0002214 | Mattel-COU0002214 |
| Mattel-COU0002215 | Mattel-COU0002215 |
| Mattel-COU0003685 | Mattel-COU0003700 |
| Mattel-COU0000400 | Mattel-COU0000405 |
| Mattel-COU0000406 | Mattel-COU0000412 |
| Mattel-COU0000413 | Mattel-COU0000420 |
| Mattel-COU0000421 | Mattel-COU0000428 |

| | |
|---|---|
| Mattel-COU0000429 | Mattel-COU0000437 |
| Mattel-COU0000438 | Mattel-COU0000448 |
| Mattel-COU0000449 | Mattel-COU0000459 |
| Mattel-COU0000460 | Mattel-COU0000474 |
| Mattel-COU0000475 | Mattel-COU0000489 |
| Mattel-COU0000490 | Mattel-COU0000504 |
| Mattel-COU0002635 | Mattel-COU0002653 |
| Mattel-COU0002759 | Mattel-COU0002773 |
| Mattel-COU023491 | Mattel-COU00023492 |
| Amended Scheduling Order dated 9/4/20 | |
| Mattel-COU0004767 | Mattel-COU0004785 |
| Mattel-COU0025634 | Mattel-COU0025659 |
| Mattel-COU0026559 | Mattel-COU0026559 |
| Mattel-COU0026829 | Mattel-COU0026830 |
| Mattel-COU0026827 | Mattel-COU0026828 |
| Mattel-COU0026769 | Mattel-COU0026770 |
| Mattel-COU0026818 | Mattel-COU0026826 |
| Mattel-COU0000377 | Mattel-COU0000399 |
| Mattel-COU0002058 | Mattel-COU0002065 |
| Mattel-COU0026745 | Mattel-COU0026746 |
| Mattel-COU0026755 | Mattel-COU0026756 |
| Mattel-COU0026757 | Mattel-COU0026758 |
| Mattel-COU0026816 | Mattel-COU0026817 |
| Mattel-COU0026814 | Mattel-COU0026815 |
| Mattel-COU0026794 | Mattel-COU0026794 |
| Mattel-COU0026812 | Mattel-COU0026813 |
| Mattel-COU0026642 | Mattel-COU0026643 |
| Mattel-COU0026674 | Mattel-COU0026680 |
| Mattel-COU0026765 | Mattel-COU0026768 |
| Mattel-COU0026809 | Mattel-COU0026811 |
| Mattel-COU0000570 | Mattel-COU0000571 |
| Mattel-COU0026729 | Mattel-COU0026735 |
| Mattel-COU0026666 | Mattel-COU0026667 |
| Mattel-COU0026724 | Mattel-COU0026726 |
| COU_005780 | COU_005787 |
| Mattel-COU0002056 | Mattel-COU0002057 |
| Mattel-COU0002216 | Mattel-COU0002220 |
| Mattel-COU0026741 | Mattel-COU0026742 |
| Mattel-COU0026638 | Mattel-COU0026640 |
| Mattel-COU0026806 | Mattel-COU0026808 |
| Mattel-COU0026800 | Mattel-COU0026802 |
| Mattel-COU0025748 | Mattel-COU0025759 |
| COU_002764 | COU_002765 |
| Mattel-COU0000569 | Mattel-COU0000569 |
| Mattel-COU0003055 | Mattel-COU0003055 |
| COU_002744 | COU_002744 |
| Mattel-COU0026604 | Mattel-COU0026605 |
| Mattel-COU0026623 | Mattel-COU0026624 |
| Mattel-COU0026709 | Mattel-COU0026711 |
| Mattel-COU0026654 | Mattel-COU0026656 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 39 of 44

| | |
|---|---|
| Mattel-COU0026790 | Mattel-COU0026793 |
| Mattel-COU0026752 | Mattel-COU0026752 |
| Mattel-COU0026560 | Mattel-COU0026561 |
| Mattel-COU0026595 | Mattel-COU0026596 |
| Mattel-COU0026865 | Mattel-COU0026866 |
| Mattel-COU0026562 | Mattel-COU0026563 |
| Mattel-COU0026737 | Mattel-COU0026738 |
| Mattel-COU0026699 | Mattel-COU0026701 |
| Mattel-COU0026632 | Mattel-COU0026633 |
| Mattel-COU0002066 | Mattel-COU0002073 |
| Mattel-COU0026763 | Mattel-COU0026764 |
| Mattel-COU0026798 | Mattel-COU0026799 |
| Mattel-COU0000572 | Mattel-COU0000573 |
| Mattel-COU0026404 | Mattel-COU0026409 |
| Mattel-COU0026715 | Mattel-COU0026720 |
| Mattel-COU0026803 | Mattel-COU0026805 |
| Mattel-COU0026577 | Mattel-COU0026578 |
| Mattel-COU0026614 | Mattel-COU0026616 |
| Mattel-COU0026570 | Mattel-COU0026571 |
| Mattel-COU0027425 | Mattel-COU0027451 |
| Mattel-COU0026608 | Mattel-COU0026609 |
| Mattel-COU0026761 | Mattel-COU0026762 |
| Mattel-COU0026686 | Mattel-COU0026687 |
| Mattel-COU0026778 | Mattel-COU0026786 |
| Mattel-COU0026787 | Mattel-COU0026789 |
| Mattel-COU0026610 | Mattel-COU0026611 |
| Mattel-COU0026557 | Mattel-COU0026558 |
| Mattel-COU0012399 | Mattel-COU0012409 |
| Mattel-COU0026759 | Mattel-COU0026760 |
| Mattel-COU0026592 | Mattel-COU0026594 |
| Mattel-COU0026612 | Mattel-COU0026613 |
| Mattel-COU0001002 | Mattel-COU0001019 |
| Mattel-COU0026426 | Mattel-COU0026429 |
| Mattel-COU0026430 | Mattel-COU0026486 |
| Mattel-COU0026671 | Mattel-COU0026673 |
| Mattel-COU0026690 | Mattel-COU0026698 |
| Mattel-COU0003726 | Mattel-COU0003743 |
| Mattel-COU0026619 | Mattel-COU0026620 |
| Mattel-COU0002276 | Mattel-COU0002280 |
| Mattel-COU0026416 | Mattel-COU0026425 |
| Mattel-COU0003060 | Mattel-COU0003061 |
| Mattel-COU0027551 | Mattel-COU0027564 |
| Mattel-COU0026581 | Mattel-COU0026582 |
| Mattel-COU0026227 | Mattel-COU0026231 |
| Mattel-COU0026606 | Mattel-COU0026607 |
| Mattel-COU0026555 | Mattel-COU0026556 |
| Mattel-COU0027569 | Mattel-COU0027573 |
| Mattel-COU0026621 | Mattel-COU0026622 |
| Mattel-COU0027898 | Mattel-COU0027931 |
| Mattel-COU0027208 | Mattel-COU0027268 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 40 of 44

| | |
|---|---|
| Mattel-COU0026586 | Mattel-COU0026587 |
| Mattel-COU0025760 | Mattel-COU0025792 |
| Mattel-COU0026487 | Mattel-COU0026488 |
| Mattel-COU0002296 | Mattel-COU0002297 |
| Mattel-COU0026489 | Mattel-COU0026494 |
| Mattel-COU0002291 | Mattel-COU0002295 |
| Mattel-COU0027574 | Mattel-COU0027578 |
| Mattel-COU0026583 | Mattel-COU0026585 |
| Mattel-COU0026597 | Mattel-COU0026600 |
| Mattel-COU0027837 | Mattel-COU0027847 |
| Mattel-COU0003066 | Mattel-COU0003087 |
| Mattel-COU0026241 | Mattel-COU0026252 |
| Mattel-COU0026721 | Mattel-COU0026723 |
| Mattel-COU0003064 | Mattel-COU0003065 |
| Mattel-COU0026572 | Mattel-COU0026574 |
| Mattel-COU0027269 | Mattel-COU0027298 |
| Mattel-COU0026579 | Mattel-COU0026580 |
| Mattel-COU0002371 | Mattel-COU0002388 |
| Mattel-COU0002339 | Mattel-COU0002343 |
| Mattel-COU0002610 | Mattel-COU0002611 |
| Mattel-COU0000375 | Mattel-COU0000376 |
| Mattel-COU0003056 | Mattel-COU0003057 |
| Mattel-COU0003058 | Mattel-COU0003059 |
| Mattel-COU0003062 | Mattel-COU0003063 |
| Mattel-COU0026702 | Mattel-COU0026708 |
| Mattel-COU0002304 | Mattel-COU0002305 |
| Mattel-COU0026601 | Mattel-COU0026603 |
| Mattel-COU0026712 | Mattel-COU0026714 |
| Mattel-COU0026497 | Mattel-COU0026503 |
| Mattel-COU0002366 | Mattel-COU0002370 |
| Mattel-COU0027832 | Mattel-COU0027836 |
| Mattel-COU0026795 | Mattel-COU0026797 |
| Mattel-COU0002313 | Mattel-COU0002316 |
| Mattel-COU0026657 | Mattel-COU0026658 |
| Mattel-COU0002389 | Mattel-COU0002393 |
| Mattel-COU0027321 | Mattel-COU0027338 |
| Mattel-COU0027733 | Mattel-COU0027777 |
| Mattel-COU0027859 | Mattel-COU0027875 |
| Mattel-COU0025726 | Mattel-COU0025741 |
| Mattel-COU0002406 | Mattel-COU0002408 |
| Mattel-COU0026507 | Mattel-COU0026514 |
| Mattel-COU0026859 | Mattel-COU0026861 |
| Mattel-COU0002417 | Mattel-COU0002421 |
| Mattel-COU0027507 | Mattel-COU0027550 |
| Mattel-COU0026143 | Mattel-COU0026148 |
| Mattel-COU0025696 | Mattel-COU0025700 |
| Mattel-COU0027663 | Mattel-COU0027707 |
| Mattel-COU0027708 | Mattel-COU0027732 |
| Mattel-COU0002450 | Mattel-COU0002453 |
| Mattel-COU0026519 | Mattel-COU0026527 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 41 of 44

| | |
|---|---|
| Mattel-COU0002463 | Mattel-COU0002464 |
| Mattel-COU0002465 | Mattel-COU0002469 |
| Mattel-COU0026659 | Mattel-COU0026661 |
| Mattel-COU0027398 | Mattel-COU0027424 |
| Mattel-COU0027876 | Mattel-COU0027897 |
| Mattel-COU0026862 | Mattel-COU0026864 |
| Mattel-COU0027491 | Mattel-COU0027498 |
| Mattel-COU0027579 | Mattel-COU0027662 |
| Mattel-COU0026549 | Mattel-COU0026550 |
| Mattel-COU0002470 | Mattel-COU0002473 |
| Mattel-COU0027367 | Mattel-COU0027370 |
| Mattel-COU0027499 | Mattel-COU0027506 |
| Mattel-COU0026336 | Mattel-COU0026339 |
| Mattel-COU0002474 | Mattel-COU0002480 |
| Mattel-COU0027778 | Mattel-COU0027819 |
| Mattel-COU0002074 | Mattel-COU0002081 |
| Mattel-COU0025793 | Mattel-COU0025803 |
| Mattel-COU0027452 | Mattel-COU0027457 |
| Mattel-COU0027565 | Mattel-COU0027568 |
| Mattel-COU0026857 | Mattel-COU0026858 |
| Mattel-COU0002483 | Mattel-COU0002488 |
| Mattel-COU0026867 | Mattel-COU0026940 |
| Mattel-COU0027378 | Mattel-COU0027397 |
| Mattel-COU0025851 | Mattel-COU0025858 |
| Mattel-COU0025701 | Mattel-COU0025725 |
| Mattel-COU0002481 | Mattel-COU0002482 |
| Mattel-COU0002483 | Mattel-COU0002488 |
| Mattel-COU0026625 | Mattel-COU0026627 |
| Mattel-COU0027179 | Mattel-COU0027183 |
| Mattel-COU0025910 | Mattel-COU0025932 |
| Mattel-COU0026045 | Mattel-COU0026106 |
| Mattel-COU0026941 | Mattel-COU0026944 |
| Mattel-COU0027036 | Mattel-COU0027040 |
| Mattel-COU0026945 | Mattel-COU0026954 |
| Mattel-COU0027041 | Mattel-COU0027045 |
| Mattel-COU0026280 | Mattel-COU0026307 |
| Mattel-COU0026564 | Mattel-COU0026565 |
| Mattel-COU0026955 | Mattel-COU0026958 |
| Mattel-COU0027046 | Mattel-COU0027049 |
| Mattel-COU0025859 | Mattel-COU0025909 |
| Mattel-COU0026232 | Mattel-COU0026240 |
| Mattel-COU0025837 | Mattel-COU0025850 |
| Mattel-COU0025804 | Mattel-COU0025836 |
| Mattel-COU0026107 | Mattel-COU0026112 |
| Mattel-COU0026262 | Mattel-COU0026271 |
| Mattel-COU0025955 | Mattel-COU0026040 |
| Mattel-COU0026959 | Mattel-COU0026960 |
| Mattel-COU0026961 | Mattel-COU0026962 |
| Mattel-COU0027050 | Mattel-COU0027053 |
| Mattel-COU0027054 | Mattel-COU0027058 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 42 of 44

| | |
|---|---|
| Mattel-COU0026963 | Mattel-COU0026972 |
| Mattel-COU0027059 | Mattel-COU0027063 |
| Mattel-COU0026973 | Mattel-COU0026976 |
| Mattel-COU0027064 | Mattel-COU0027067 |
| Mattel-COU0026977 | Mattel-COU0026980 |
| Mattel-COU0027068 | Mattel-COU0027071 |
| Mattel-COU0026113 | Mattel-COU0026128 |
| Mattel-COU0026551 | Mattel-COU0026554 |
| Mattel-COU0026981 | Mattel-COU0026984 |
| Mattel-COU0027072 | Mattel-COU0027075 |
| Mattel-COU0026200 | Mattel-COU0026217 |
| Mattel-COU0026308 | Mattel-COU0026312 |
| Mattel-COU0025933 | Mattel-COU0025954 |
| Mattel-COU0026628 | Mattel-COU0026629 |
| Mattel-COU0026041 | Mattel-COU0026044 |
| Mattel-COU0026129 | Mattel-COU0026142 |
| Mattel-COU0026253 | Mattel-COU0026261 |
| Mattel-COU0026178 | Mattel-COU0026199 |
| Mattel-COU0026272 | Mattel-COU0026279 |
| Mattel-COU0026630 | Mattel-COU0026631 |
| Mattel-COU0026149 | Mattel-COU0026153 |
| Mattel-COU0026575 | Mattel-COU0026576 |
| Mattel-COU0026218 | Mattel-COU0026226 |
| Mattel-COU0026985 | Mattel-COU0026988 |
| Mattel-COU0027076 | Mattel-COU0027079 |
| Mattel-COU0026776 | Mattel-COU0026777 |
| Mattel-COU0026989 | Mattel-COU0026990 |
| Mattel-COU0027080 | Mattel-COU0027084 |
| Mattel-COU0026646 | Mattel-COU0026647 |
| Mattel-COU0026993 | Mattel-COU0026997 |
| Mattel-COU0026634 | Mattel-COU0026635 |
| Mattel-COU0026636 | Mattel-COU0026637 |
| Mattel-COU0026684 | Mattel-COU0026685 |
| Mattel-COU0026851 | Mattel-COU0026852 |
| Mattel-COU0026991 | Mattel-COU0026992 |
| Mattel-COU0027085 | Mattel-COU0027090 |
| Mattel-COU0027091 | Mattel-COU0027101 |
| Mattel-COU0026528 | Mattel-COU0026530 |
| Mattel-COU0026838 | Mattel-COU0026839 |
| Mattel-COU0026845 | Mattel-COU0026846 |
| Mattel-COU0026854 | Mattel-COU0026856 |
| Mattel-COU0026998 | Mattel-COU0027000 |
| Mattel-COU0026531 | Mattel-COU0026536 |
| Mattel-COU0026681 | Mattel-COU0026683 |
| Mattel-COU0027102 | Mattel-COU0027108 |
| Mattel-COU0026668 | Mattel-COU0026670 |
| Mattel-COU0026537 | Mattel-COU0026538 |
| Mattel-COU0026641 | Mattel-COU0026641 |
| Mattel-COU0026644 | Mattel-COU0026644 |
| Mattel-COU0026645 | Mattel-COU0026645 |

| | |
|---|---|
| Mattel-COU0026665 | Mattel-COU0026665 |
| Mattel-COU0026727 | Mattel-COU0026728 |
| Mattel-COU0026840 | Mattel-COU0026841 |
| Mattel-COU0026842 | Mattel-COU0026844 |
| Mattel-COU0026543 | Mattel-COU0026544 |
| Mattel-COU0026835 | Mattel-COU0026837 |
| Mattel-COU0026539 | Mattel-COU0026542 |
| Mattel-COU0026545 | Mattel-COU0026548 |
| Mattel-COU0026324 | Mattel-COU0026326 |
| Mattel-COU0026648 | Mattel-COU0026649 |
| Mattel-COU0026753 | Mattel-COU0026754 |
| Mattel-COU0026853 | Mattel-COU0026853 |
| Mattel-COU0026327 | Mattel-COU0026333 |
| Mattel-COU0026334 | Mattel-COU0026335 |
| Mattel-COU0026750 | Mattel-COU0026751 |
| Mattel-COU0027001 | Mattel-COU0027002 |
| Mattel-COU0027003 | Mattel-COU0027004 |
| Mattel-COU0026663 | Mattel-COU0026664 |
| Mattel-COU0027109 | Mattel-COU0027113 |
| Mattel-COU0027114 | Mattel-COU0027117 |
| Mattel-COU0026747 | Mattel-COU0026749 |
| Mattel-COU0012412 | Mattel-COU0012416 |
| Mattel-COU0027160 | Mattel-COU0027164 |
| Mattel-COU0026154 | Mattel-COU0026177 |
| Mattel-COU0026743 | Mattel-COU0026744 |
| Mattel-COU0026340 | Mattel-COU0026341 |
| Mattel-COU0026342 | Mattel-COU0026345 |
| Mattel-COU0027005 | Mattel-COU0027007 |
| Mattel-COU0027118 | Mattel-COU0027121 |
| Mattel-COU0027008 | Mattel-COU0027009 |
| Mattel-COU0027122 | Mattel-COU0027126 |
| Mattel-COU0026650 | Mattel-COU0026651 |
| Mattel-COU0026847 | Mattel-COU0026848 |
| Mattel-COU0026346 | Mattel-COU0026349 |
| Mattel-COU0026350 | Mattel-COU0026357 |
| Mattel-COU0026662 | Mattel-COU0026662 |
| Mattel-COU0027010 | Mattel-COU0027011 |
| Mattel-COU0027127 | Mattel-COU0027131 |
| Mattel-COU0026358 | Mattel-COU0026360 |
| Mattel-COU0026361 | Mattel-COU0026365 |
| Mattel-COU0027132 | Mattel-COU0027136 |
| Mattel-COU0027137 | Mattel-COU0027141 |
| Mattel-COU0027142 | Mattel-COU0027146 |
| Mattel-COU0027012 | Mattel-COU0027013 |
| Mattel-COU0027014 | Mattel-COU0027015 |
| Mattel-COU0027016 | Mattel-COU0027017 |
| Mattel-COU0026739 | Mattel-COU0026740 |
| Mattel-COU0027018 | Mattel-COU0027021 |
| Mattel-COU0027147 | Mattel-COU0027150 |
| Mattel-COU0026313 | Mattel-COU0026323 |

Vredenburgh & Associates, Inc.
Courkamp v. Fisher Price
Page 44 of 44

| | |
|---|---|
| Mattel-COU0027022 | Mattel-COU0027023 |
| Mattel-COU0027151 | Mattel-COU0027155 |
| Mattel-COU0026366 | Mattel-COU0026371 |
| Mattel-COU0026372 | Mattel-COU0026382 |
| Mattel-COU0026831 | Mattel-COU0026831 |
| Mattel-COU0026771 | Mattel-COU0026775 |
| Mattel-COU0026688 | Mattel-COU0026689 |
| Mattel-COU0027024 | Mattel-COU0027025 |
| Mattel-COU0027156 | Mattel-COU0027159 |
| Mattel-COU0012410 | Mattel-COU0012411 |
| Mattel-COU0026832 | Mattel-COU0026834 |
| Mattel-COU0026652 | Mattel-COU0026653 |
| Mattel-COU0027028 | Mattel-COU0027029 |
| Mattel-COU0027165 | Mattel-COU0027169 |
| Mattel-COU0026736 | Mattel-COU0026736 |
| Mattel-COU0027170 | Mattel-COU0027174 |
| Mattel-COU0026588 | Mattel-COU0026591 |
| Mattel-COU0027175 | Mattel-COU0027178 |
| Mattel-COU0027032 | Mattel-COU0027033 |
| Mattel-COU0026566 | Mattel-COU0026569 |
| Mattel-COU0026849 | Mattel-COU0026850 |
| Mattel-COU0026383 | Mattel-COU0026385 |
| Mattel-COU0026386 | Mattel-COU0026393 |
| Mattel-COU0027030 | Mattel-COU0027031 |
| Mattel-COU0027034 | Mattel-COU0027035 |

| |
|---|
| Quality and Safety Operations Procedure Documents |
| CPSC Epidemiology Reports |
| Case Histories |
| Matter Detail Reports |
| Subject RNP |
| Exemplar RNP |
| Deposition and exhibits for Kathleen Courkamp |
| Deposition and exhibits for Andrew Olson |
| Deposition and exhibits for Kitty Pilarz |
| Deposition and exhibits for Joel Taft |
| Deposition and exhibits for Linda Chapman |
| Deposition and exhibits for Lynn Martin |
| Deposition and exhibits for Lisa Lohiser |
| Deposition and exhibits for Michael Steinwachs |
| Amended Scheduling Order dated 12/11/20 |
| Recorded Statement of Gary Deegear, M.D. |
| Deposition and exhibits of Michael Steinwachs taken Jan. 22, 2021 |
| Deposition and exhibits of Kitty Pilarz (personal depo) taken Jan. 21, 2021 |
| Deposition and exhibits of Kitty Pilarz 30(b)(6) (Vol. 2) |
| Mattel-COU-0963413 |



# Vredenburgh & Associates, Inc.
## Human Factors, Safety, Biomechanics and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA 92008
(442) 222–8289
avredenburgh@gmail.com
www.hfexpert.com

## ALISON G. VREDENBURGH, Ph.D., CPE
### Curriculum Vitae

## EDUCATION

♦ Post-Doctoral Research Fellow (1999 – 2001)
University of California, San Diego, California
Department of Anesthesiology, School of Medicine
Designed, conducted, published and presented original research concerning issues critical to understanding the role of human error in medicine including how to objectively identify expert clinical performance and to best train clinicians to attain this level of expertise. Areas of study included the impact of performance shaping factors such as workload, fatigue, training and sleep deprivation.

♦ Ph.D. (1998) Industrial-Organizational Psychology
California School of Professional Psychology, San Diego
Dissertation topic: Risk Management Programs

♦ M.S. (1996) Industrial-Organizational Psychology
California School of Professional Psychology, San Diego

♦ M.S. (1987) Systems Management
Systems Technology emphasis
University of Southern California

♦ B.A., with Honors (1984) Organizational Psychology
University of California, Santa Barbara

## LICENSES AND CERTIFICATIONS

♦ Certified Professional Ergonomist (CPE) #237 (1993)
♦ Board Certified Disability Analyst and Fellow #5432-01 (2001)
♦ California Teaching Credential (Secondary Social Science) #910021229 (1990)
♦ Certified NAUI Scuba Instructor #11578 (1989)

COU_008199

## CURRENT POSITION

**Principal, Vredenburgh & Associates, Inc.**
**Carlsbad, CA** (1998 – present)
Consults with businesses and industry in areas including product warning design, injury prevention, machine guarding, job design, job and task analysis, program evaluation, training, risk management, Americans with Disabilities Act (ADA), Fair Housing Act (FHA), Occupational Safety and Health Administration (OSHA), organizational development and assessment, and research instrument development and validation.  Conducts and presents original research.

Serves as a forensic (the application of science to law) consultant for product liability, personal injury, FHA/ADA, and employment cases in the areas of human factors, safety, and industrial-organizational psychology. Collects and reviews case material, inspects accident sites and equipment, and performs testing and evaluation. Issues include hazard management, communication, and warning effectiveness; accessibility of housing and public areas; product/equipment design; reasonableness of conduct; human error; adequacy of supervision and training; behavioral expectations; employee discrimination and harassment; visibility, conspicuity, and lighting; perception/reaction times; and slips and falls.  Since 1990, has consulted on hundreds of cases and qualified as an expert in Municipal, Superior, and Federal District courts.

## PATENTS

**Motorcycle Conspicuity Enhancement System** (Patent #5754097).
Inventor of new system designed to increase motorcycle visibility to other motor vehicle drivers during daytime conditions.

**Coefficient of Friction Tester** (Patent #5736630).
Consulted in the user requirements for the design of a COF tester that can be used to test both static and dynamic COF in both wet and dry conditions.

## UNIVERSITY APPOINTMENTS

**Consultant**
San Diego Center for Patient Safety (2001 – 2010)
A joint effort of UCSD and the VA San Diego Healthcare System
Participates in research design and analysis, manuscript preparation, and grant writing.

**Adjunct Research Associate**
Rensselaer Polytechnic Institute, Troy, New York
Department of Philosophy, Psychology and Cognitive Science (2000 – 2004)
Assisted in the development of the forensic psychology program.  Sat on thesis and dissertation committees.

COU_008200

A. Vredenburgh, page 3

# INDUSTRIAL-ORGANIZATIONAL CONSULTING

**Warnings Consultant**
**Broco, Inc.** (2006)
Developed and tested warnings regarding an underwater cutting torch for the Owner's Manual and packaging.

**Warnings Consultant**
**E-Force** (2002)
Developed and tested warnings regarding protective eyewear for racquetball for the Owner's Manual and other product materials.

**Warnings Consultant**
**American Racing Wheels** (2001-2003)
Developed and tested warnings for the Owner's Manual and other product materials.

**Ergonomics Consultant**
**Cargill Corporation** (2001-2002)
Performed ergonomics and job hazard analyses of railcar unloading, including, hose management, steam cleaning, fall protection, and working under railcars. Developed, conducted and analyzed organizational safety culture study.

**Americans with Disability Act Consultant**
**Union-Tribune Newspaper, San Diego, CA** (1999 – 2004)
Developed an Americans with Disability Act (ADA) plan, which included an evaluation of the accessibility of the production and office facilities, and plan for barrier removal.

**Human Factors and Safety Consultant**
**Ventura County Medical Center** (1999)
Performed an analysis of back injury risk factors for four departments: medical/surgical, housekeeping, maintenance and laundry.  Trained hospital employees in the hazards associated with their jobs and methods to prevent back injuries.

**Human Factors and Safety Consultant**
**County of Ventura** (1999)
Performed a job hazard analysis to determine all potential areas of injury exposure in the performance of the garbage collection job.

**Human Factors and Safety Consultant**
**Stanford Health Services, Department of Radiology, Stanford, CA** (1996)
Determined the physical requirements of the hospital employees in the radiology department by conducting tests and force measurements of the equipment used to perform required tasks. Performed a job analysis in order to determine whether a disabled employee could perform the X-ray technician job based on his capabilities and limitations as specified in his functional capacity evaluation.

COU_008201

**Human Factors and Safety Consultant**
**Bayer, Pharmaceutical Division, San Diego, CA** (1995)
Performed workstation evaluations of both office and industrial employees.  Identified risk factors, and made recommendations to increase safety and performance of employees.

**Human Factors and Safety Consultant**
**Lens Manufacturer, San Diego, CA** (1995)
Developed response to an OSHA Special Order. Developed and implemented a new risk management program, redesigned jobs, and designed new tools.

## EMPLOYMENT HISTORY

**Vice President, Research and Development**
**Error Analysis, Inc.**
**La Mesa, CA** (1990 –1998)
Consulted in industrial-organizational areas including warnings, job and task analysis, job design, training, occupational safety and health (OSHA), and research instrument development and validation. Directed, published, and presented original research studies. Directed Ph.D. internship program between Error Analysis, Inc. and the California School of Professional Psychology. Supervised students' pre-doctoral internship hours. Served as a forensic consultant for product liability and personal injury accident cases in the area of human factors, safety, and industrial-organizational psychology.

**Business Operations**
**Hughes Aircraft Company**
**El Segundo, CA** (1984 –1989)
Developed and implemented emergency preparedness program plan conforming to OSHA requirements. Developed specifications to automate a computer-generated monthly management reporting system. Administrated the performance and cost improvement programs. Researched, documented, and verified implementation of employee recommended system enhancements. Facilitated quality circles. Taught courses in the areas of safety, supervision, quality, computer software, and business writing. Interfaced with the customer (U.S. Army) regarding major proposal status and helped develop Hughes' negotiation position. Developed numerous safety, performance, and quality procedures.

## VOLUNTEER POSITIONS

♦ Chair, HFES Seal of Approval Task Force (2018-present).

♦ Forensics Professional Group (FPG) of the Human Factors and Ergonomics Society, Elected Program Chair (2018 - present). Also elected FPG Chair 2004-2006; 2010-2012; 2014-2016.

♦ Safety Technical Group (STG) of the Human Factors and Ergonomics Society, Elected Chair (2016-2018).

♦ Served as peer reviewer for numerous scientific publications.

♦ Has served as Chair of various technical sessions at Annual Meetings of the HFES.

COU_008202

A. Vredenburgh, page  5

- Served as a judge for the San Diego Science and Engineering Fair (2006 - 2011).
- Served as a judge for the California State Science Fair (2006 - 2011).
- Elected to the Board of the Forensic Expert Witness Association (FEWA), Orange County. Served as delegate to the State FEWA Board (2004).
- Served as Vice-President of the San Diego Forensics Consultants Association (2002-2003).
- Developed the program and coached the Valley Middle School Science Olympiad team. Received the Chamber's *Outstanding Educational Program* award for most Innovative Program (5/20/05).
- Served on the Citizens' Bond Oversight Committee of the Carlsbad City Schools (2000-2001). Met monthly with the Superintendent (specialty area: school safety).
- Served as a member of Carlsbad Unified School District, Parent/Superintendent Advisory Committee (2005-2006).
- Served on the Board of the Carlsbad Strings Education Association (Vice-President 2004-2007).

## MEMBERSHIPS

- Human Factors and Ergonomics Society (HFES)
- Forensics Professional Group of the HFES
- Safety Technical Group of the HFES
- Psi Chi Honors Society

## STUDENT INTERNSHIPS

**Peer Health Educator**
**University of California, Santa Barbara, CA** (1982 –1983)
Received UCSB certification. Developed and conducted seminars to student community on health-related issues.

**Medical Aide**
**Isla Vista Medical Clinic, Goleta, CA** (1982 –1983)
Assisted physicians with medical exams and minor surgeries. Ran lab tests.

## RELATED SKILLS

- Fluent in Spanish for instructions and warnings development and translations
- Photography:  photographs of accident sites, equipment, and the workplace are frequently used for courtroom exhibits, textbooks, lectures and industrial-organizational training.

COU_008203

## PEER REVIEWER

- *Theoretical Issues in Ergonomics Science*. Taylor & Francis / CRC Press.

- *Forensic Human Factors and Ergonomics: Case Studies and Analysis*. Taylor & Francis / CRC Press.

- *Applied Ergonomics* (Journal). Elsevier.

- *Journal of Occupational and Environmental Medicine*. Lippincott Williams & Wilkins.

- *The Handbook of Warnings: Design and Use*. Lawrence Erlbaum Associates, Inc.

- *Human Factors Aspects of Handgun Safety*. Lawrence Erlbaum Associates, Inc.

- *Human Factors Perspectives on Warnings, Volume 2*. Human Factors and Ergonomics Society

- *Human Factors and Ergonomics Society Annual Meeting Proceedings*. Human Factors and Ergonomics Society

- *Regulation & Governance*. Wiley-Blackwell, John Wiley & Sons, Inc.

## PUBLICATIONS

Vredenburgh, A.G., Zackowitz, I.B. & Vredenburgh, A.N. (2019). Colorful Rounded-Tip Scissors: Too sharp for children. M.S. Wogalter (Ed.), In *Forensic Human Factors & Ergonomics: Case Studies and Analyses,* (pp. 123-134). Boca Raton, FL: CRC Press/Taylor & Francis Group.

Zackowitz, I.B., Vredenburgh, A.G., & Vredenburgh, A.N. (2019). Don't Walk: Hazardous to cross mid-block. M.S. Wogalter (Ed.), In *Forensic Human Factors & Ergonomics: Case Studies and Analyses*, (pp. 243-256). Boca Raton, FL: CRC Press/Taylor & Francis Group.

Vredenburgh, A.G. & Zackowitz, I.B. (2018). Forensic Case Study: When labeling leads to wrongful incarceration. In *Proceedings of the Human Factors and Ergonomics Society 2018 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 398-402.

Vredenburgh, M.J., Bench, M.L., Zackowitz, I.B., Runge, K., & Vredenburgh, A.G. (2018). Amusement Park Guest Injured on a Water Ride: A Human Factors and Biomechanics Evaluation. In *Proceedings of the Human Factors and Ergonomics Society 2018 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 440-444.

Vredenburgh, A.G., Young, J., Liske, D. & Young, S. (2017). Cross-Border Testifying Tips: U.S. Experts in Canada and Canadian Experts in the U.S. In *Proceedings of the Human Factors and Ergonomics Society 2017 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 470-473.

Zackowitz, I.B., Kalsher, M.J., Pollack-Nelson, C., Vredenburgh, A. & Miller, J.M. (2017). Adult products that kill and injure children. In *Proceedings of the Human Factors and Ergonomics Society 2017 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 886-889.

COU_008204

Bench, M.L., Vredenburgh, M.J., Zackowitz, I.B. & Vredenburgh, A.G. (2017). An epidemiological perspective of individual and population health risk prevention. Pedro Arezes (ed.), In *Advances in Safety Management and Human Factors*, (pp. 357-368). Warsaw, Poland: Springer International Publishing.

Bench, M.L., Vredenburgh, M.J., Zackowitz, I.B. & Vredenburgh, A.G. (2017). Risk Communication for Consumer Products. Pedro Arezes (ed.), In *Advances in Safety Management and Human Factors*, (pp. 225-235). Warsaw, Poland: Springer International Publishing.

Huyen, C., Vredenburgh, A.N., Zackowitz, I.B. & Vredenburgh, A.G. (2017). Role of emotions in risk perception. Pedro Arezes (ed.), In *Advances in Safety Management and Human Factors*, (pp. 133-143). Warsaw, Poland: Springer International Publishing.

Zackowitz, I.B. Vredenburgh, M.J., Bench, M.L., & Vredenburgh, A.G. (2017). Types of Consumer Products. In G. Emilien, R. Weitkunat & Ludicke (Eds.). *Consumer Perception of Product Risks and Benefits*. (pp. 3-22). Switzerland: Springer.

Brill, J.C., Bliss, J.P., Hancock, P.A., Manzey, D., Meyer, J., & Vredenburgh, A. (2016). Matters of Ethics, Trust, and Potential Liability for Autonomous Systems. *Proceedings of the Human Factors and Ergonomics Society 2016 Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 308-312.

Vredenburgh, A.N., Zackowitz, I.B. & Vredenburgh, A.G. (2015). Air Rage: What factors Influence Airline Passenger Anger? *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 59:400-404.

Rice, J.B.R., Brickman, D., Lueder, R., Smith-Jackson, T., Vredenburgh, A. & Zackowitz, I. (2015). "Conflicting design considerations for children and people with disabilities." In Designing for Children: What Do Human Factors Professional Need to Know? *Proceedings of the Human Factors and Ergonomics Society 59th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 59:413-415.

Wogalter, M.S. Laughery, K.R., Vredenburgh, A.G., Deppa, S.W., Lueder, R. & Zackowitz, I.B. (2014). Child Injury: Forensic human factors points to the need for better product designs and warnings. *Proceedings of the Human Factors and Ergonomics Society 58th Annual Meeting,* Santa Monica, CA: Human Factors and Ergonomics Society, 58:1864-1868.

Vredenburgh, A.G., & Vanderpol, E. (2014). Case Study: A Novice Unlicensed Child Operator of a Motorized Dirt Bike Versus an Ambulance Driver. *Proceedings of the Human Factors and Ergonomics Society 58th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 58:554-558.

Hornick, R.J., Vredenburgh, A.G., Laughery, K.R., Pauls, J.L., & Wogalter, M.S. (2014). Dealing with Dubious Testimony Provided by Opposing Experts. *Proceedings of the Human Factors and Ergonomics Society 58th Annual Meeting*, Santa Monica, CA: Human Factors and Ergonomics Society, 58:559-561.

Vredenburgh, A.G., & Spencer, D.R. (2013). Sophisticated User: When Does a Jury Find Users to Have Sophisticated Knowledge after Determining Liability/Failure to Warn? *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 57:565-569.

Rev. 11/18

COU_008205

Zackowitz, I.B., & Vredenburgh, A.G. (2013). A Forensic Human Factors Analysis of a Playground Designated for Special Needs Children. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 57:585-589.

Runge, K. & Vredenburgh, A.G. (2013). A False Sense of Security: Hazards Associated with Working on Flat Roofs with Parapet Walls. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 57, 590-594.

Vredenburgh, A.G., & Zackowitz, I.B. (2013). Falling from Airstairs while Disembarking from a Commuter Plane. *Proceedings of the Human Factors and Ergonomics Society 57th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 57, 600-604.

Vredenburgh, A.G., & Zackowitz, I.B. (2012). Case Study: Evaluating the Warnings on a Tanning Bed. *Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 56, 671-674.

Vredenburgh, A.G., & Zackowitz, I.B. (2012). When a Dog is Just a Dog? A Case Study Evaluating the ADA service animal rules. *Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, Vol. 56, 720-723.

Vredenburgh, A.G., & Zackowitz, I.B. (2011). Research in Motion: A Case Study Evaluating the Accessibility of Public Transit in our Nation's Capital. In *Proceedings of the Human Factors and Ergonomics Society 55th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 584-588.

Laughery, K., Wogalter, M., Nemire, K., Vredenburgh, A.G., & Kalsher, M.J. (2011). What do human factors/ergonomics experts have to tell juries that they don't know - but may think they know? In *Proceedings of the Human Factors and Ergonomics Society 55th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 604-607.

Vredenburgh, A.G., Williams, K., Zackowitz, I.B., & Welner, J.M. (2010). Evaluation of Wheelchair Users' Perceived Kitchen and Bathroom Usability: Effort and Accessibility. *Journal of Architectural and Planning Research, 27*(3), 219-236.

Zackowitz, I.B., Vredenburgh, A.G., Calkins, L., & Kessler, D. (2010). The current state of legal, design, and residential usability issues for people with various disabilities. In *Proceedings of the Human Factors and Ergonomics Society 54th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 753-756.

Zackowitz, I.B., & Vredenburgh, A.G. (2010). Evaluation of Methods to Remedy Existing Multi-Family Housing to Maximize Accessibility to Residents. In Tadeusz Marek, Waldemar Karwowski & Valerie Rice, (Ed.). *Advances in Understanding Human Performance: Neuroergonomics, Human Factors Design and Special Populations,* 613-623.

Vredenburgh, M.J., Zackowitz, I.B., Spencer, D., DeTaboada, M.R., & Vredenburgh, A.G. (2010). What constitutes typical adolescent behavior and how does it differ from adult conduct? In Waldemar Karwowski & Gavriel Salvendy (Ed.). *Advances in Human Factors, Ergonomics, and Safety Manufacturing and Service Industries,* 927-936.

Vredenburgh, A.G., & Zackowitz, I.B. (2009). Evaluating Common Approaches Used to Accommodate People with Disabilities Residing in Existing Multi-Family Housing. In

COU_008206

A. Vredenburgh, page 9

*Proceedings of the Human Factors and Ergonomics Society 53rd Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society. (Distributed at conference. Not included in proceedings CD due to a technical problem. Paper accepted for publication by reviewers and is available through the HFES central office).

Vredenburgh, A.G., Hedge, A., Zackowitz, I.B., & Welner, J.M. (2009). Evaluation of Wheelchair Users' Perceived Sidewalk and Ramp Slope: Effort and Accessibility. *Journal of Architectural and Planning Research, 26*(2), 145-158.

Vredenburgh, A.G., & Zackowitz, I.B. (2009). Drug Labeling and its Impact on Patient Safety. In Sonja Koneczny (Ed.), *WORK: A Journal of Prevention, Assessment & Rehabilitation,* Volume 33, Number 2. (pp. 169-174). The Netherlands: IOS Press.

Zackowitz, I.B., & Vredenburgh, A.G. (2008). Forensic Human Factors: People, places, products. In C.M. Carswell (Ed.). *Reviews of Human Factors and Ergonomics, Volume 4.* (pp. 75-104). Santa Monica, CA: Human Factors and Ergonomics Society.

Vredenburgh, A.G., & Zackowitz, I.B. (2008). Drug Labeling and its Impact on Patient Safety. In *Proceedings of the Human Factors and Ergonomics Society 52nd Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 842-844.

Vredenburgh, A.G., & Zackowitz, I.B. (2008). Who turned off the lights? *Proceedings of the Applied Human Factors and Ergonomics 2nd International Conference*, Las Vegas, NV.

Zackowitz, I.B., & Vredenburgh, A.G. (2008). When is a Warnings Case Not a Warnings Case? *Proceedings of the Applied Human Factors and Ergonomics 2nd International Conference*, Las Vegas, NV.

Kalsher, M.J., Cao, C.G.L., Weinger, M., Vredenburgh, A.G., Israelski, E., Spyridon, G., Yoshida, D., & McLeod, R. (2007). Mock Trial: Role of Human Factors in Litigation Involving Automated External Defibrillators (AED). In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 1514-1516.

Zackowitz, I.B., & Vredenburgh, A.G. (2007). When Communication Failure Contributes to an Injury: A Case Study of Para-Transportation for Wheelchair Users. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 559-563.

Kalsher, M.J., Van Duijne, F., Waters Deppa, S., Mont.Alvão Pontificia, C., Rother, H.A., Vredenburgh, A.G., & Wogalter, M. (2007). An International Perspective on Risk Communications: Adapting to Safety Demands in the Emerging Global Economy. In *Proceedings of the Human Factors and Ergonomics Society 51st Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 1403-1405.

Vredenburgh, A.G., & Zackowitz, I.B. (2007). Playground: Safety and Ergonomics. In R. Lueder & V. Berg Rice (Eds.). *Ergonomics for Children: Designing products and places for toddler to teens.* (pp. 907-925). London: Taylor & Francis.

Catalano, J.N., & Vredenburgh, A.G. (2007). Trial Demonstration: Cross-examination of an expert witness. *Proceedings of the 16th Annual National Expert Witness Conference*, Falmouth, MA: SEAK, 37-40.

COU_008207

Vredenburgh, A.G. (2007). Advanced expert techniques. *Proceedings of the 16th Annual National Expert Witness Conference*, Falmouth, MA: SEAK, 151-155.

Vredenburgh, A.G., Hedge, A., Zackowitz, I.B., & Welner, J.M. (2007). Vol. 13. Using human factors engineering to evaluate existing walkway accessibility standards. In *Proceedings of the 59th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 172-173.

Vredenburgh, A.G., Vredenburgh, M.J., & Kalsher, M.J. (2006). Adolescent risk perception and self-protective behavior regarding airsoft and paintball Guns. *IEA2006: 16th World Congress on Ergonomics.* Elsevier Ltd.

Vredenburgh, A.G., Kalsher, M.J., & Vredenburgh, M.J., (2006). Evaluating hazard communication of patient medication information sheets for prescription drugs. *IEA2006: 16th World Congress on Ergonomics.* Elsevier Ltd.

Vredenburgh, A.G. (2006). How do consumer expectations affect warning compliance? *The Daily Transcript.* (San Diego Top Attorneys supplement). July 20, 2006.

Vredenburgh, A.G., & Vredenburgh, M.J. (2006). Vol. 12. Human factors evaluation of a steam shower. In *Proceedings of the 58th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 132.

Vredenburgh, A.G., & Zackowitz, I.B. (2006). Expectations. In M. Wogalter (Ed.), *The Handbook of Warnings.* (pp. 345-354). Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Vredenburgh, A.G., & Helmick-Rich, J.A. (2006). Extrinsic nonwarning factors. In M. Wogalter (Ed.), *The Handbook of Warnings.* (pp. 373-384). Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Vredenburgh, A.G., & Williams, K. (2005). Evaluating the effects of frost heave on the feasibility of compliance with existing walkway accessibility standards. In *Proceedings of the Human Factors and Ergonomics Society 49th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 813-817.

Zackowitz, I.B., Vredenburgh, A.G., & Hedge, A. (2005). A critical analysis of the usability and design of aluminum wheelchair ramps. In *Proceedings of the Human Factors and Ergonomics Society 49th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 803-807.

Murphy, W.H., Vredenburgh, A., Weinger, M.G., & Yoshida, D. (2005). Human factors engineering, legal liability, malpractice, and patient safety. *In Human Factors, Ergonomics, and Patient Safety for medical Devices.* Arlington, VA: Association for the Advancement of Medical Instrumentation (AAMI).

Vredenburgh, A.G., Longden, S., Williams, K.J., & Kalsher, M.J. (2005). Evaluating latex glove container warnings in a realistic setting. *International Journal of Industrial Ergonomics*, 35, 559-568.

Vredenburgh, A.G., & Zackowitz, I.B. (2005). Human factors issues to be considered by product liability experts. In Y.I. Noy & W. Karwowski (Eds.), *Handbook of Human Factors in Litigation.* (pp. 26-1 – 26-11). Boca Raton, FL: CRC Press.

Rev. 11/18

COU_008208

Vredenburgh, A.G., & Zackowitz, I.B. (2005). Sexual harassment: A forensic human factors perspective. In Y.I. Noy & W. Karwowski (Eds.), *Handbook of Human Factors in Litigation.* (pp. 36-1 – 36-9). Boca Raton, FL: CRC Press.

Zackowitz, I.B, & Vredenburgh, A.G. (2005). Preschoolers, adolescents and seniors: Age-related factors that pertain to forensic human factors analyses. In Y.I. Noy & W. Karwowski (Eds.), *Handbook of Human Factors in Litigation.* (pp. 35-1 – 35-11). Boca Raton, FL: CRC Press.

Vredenburgh, A.G., & Weinger, M.B. (2004). Communication of drug hazard information: A critical analysis of how the relationship between the pharmaceutical companies, the FDA, clinicians and patients impacts patient safety. In *Proceedings of the Human Factors and Ergonomics Society 48th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 2040-2044.

Hornick, R.J., & Vredenburgh, A.G. (2004). A two-way street – with hazards; Expert/attorney communications. In *Proceedings of the Human Factors and Ergonomics Society 48th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 1129-1130.

Vredenburgh, A.G., & Weinger, M.B. (2004). Examination of apparent flaws in the American drug hazard detection, evaluation, and risk communication system. Abstract in the Program of the *Second Annual Patient Safety Conference: Making care safer one patient at a time.* San Diego, CA, 100.

Vredenburgh, A.G. (2003). Intervention effectiveness: Evaluation of six workplace safety programs to determine their contribution to injury reduction. Abstract in *Proceedings of the National Occupational Injury Research Symposium (NOIRS).* Pittsburgh, PA, 101.

Vredenburgh, A.G., Longden, S., Williams, K.J., & Kalsher, M.J. (2003). Medical product labeling: The evaluation of latex allergy warnings in a realistic setting. In *Proceedings of the Human Factors and Ergonomics Society 47th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 1554-1558.

Vredenburgh, A.G., & Zackowitz, I.B. (2003). Conducting a systems evaluation to address workplace radiation exposure hazard. In *Proceedings of the Human Factors and Ergonomics Society 47th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 1252-1255.

Vredenburgh A.G., & Zackowitz I.B. (2002). Sexual harassment: An organizational safety issue. In *Proceedings of the Human Factors and Ergonomics Society 46th Annual Meeting.* Santa Monica, CA: Human Factors and Ergonomics Society, 915-919.

Vredenburgh, A.G. (2002). Organizational safety: Which management practices are most effective in reducing employee injury rates? *Journal of Safety Research, 33,* 259-276.

Vredenburgh, A.G., & Zackowitz, I.B. (2002). Playground safety: A forensic human factors analysis of fall injuries. In *Proceedings of the 54th Annual Meeting of the American Academy of Forensic Sciences,* Denver, CO: Publication Printers, Corp., 95-96.

Zackowitz, I.B, & Vredenburgh, A.G. (2002). Applying a forensic human factors engineering analysis to falls in elderly people. In *Proceedings of the 54th Annual Meeting of the American Academy of Forensic Sciences,* Denver, CO: Publication Printers, Corp., 96-97.

Vredenburgh, A.G., & Zackowitz, I.B. (2001). Evaluating the effectiveness of a pictorial-only warning on a trolley coupler. In *Proceedings of the Human Factors and Ergonomics Society*

*45th Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 848-851.

Vredenburgh, A. (Feb. 2001) Letter to the Editor: The safety bar. *Consumer Reports*.

Vredenburgh, A.G., & Zackowitz, I. B. (2001). Work-related musculoskeletal disorders: Ergonomic risk to healthcare workers. In D. Alexander & R. Rabourne (Eds.), *Applied Ergonomics*. (pp. 146-155). London: Taylor & Francis.

Vredenburgh, A.G., & Zackowitz, I. B. (2001). Ergonomics programs: Reducing work-related musculoskeletal injuries. In D. Alexander & R. Rabourne (Eds.), *Applied Ergonomics*. (pp. 259-268). London: Taylor & Francis.

Weinger, M.B., Vredenburgh, A.G., Schumann, C.M., Macario, Williams, K.J., Kalsher, M.J., Smith, B., Truong, P.C., & Kim, A. (2000). Quantitative description of the workload associated with airway management procedures. *Journal of Clinical Anesthesiology, 12*(4), 273-82.

Vredenburgh, A., Weinger, M., Macario, A., & Smith, B. (2000). Developing a technique to measure anesthesiologists' real-time workload. In *Proceedings of the XIVth Triennial Congress of the International Ergonomics Association and 44th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, 4-241 – 4-244.

Vredenburgh, A. (2000) Get ready to be challenged: How to prepare for the qualification process. *Forvm, 16*(2), 5. Reprinted in *Council of Technical Groups Digest*, 3(I) March 2001.

Vredenburgh A., Hendrick, H., & Zackowitz, I. (2000). Are personality traits useful predictors of managers' success? In *Proceedings of the XIVth Triennial Congress of the International Ergonomics Association and 44th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, 2-301 – 2-304.

Noy, I., Vredenburgh, A., Hornick, R., Mortimer, R., Olsen, R., Thompson, D., Ryan, P., Savaglio, B. & Spangler, J. (2000). Mock trial: Human factors contributions to litigation involving adaptive cruise control. In *Proceedings of the XIVth Triennial Congress of the International Ergonomics Association and 44th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, 6-398 – 6-401.

Vredenburgh, A., McLeod, J., & Nebeker, D. (1999). Under what circumstances do extrinsic rewards decrease intrinsic motivation? In *Proceedings of the Human Factors and Ergonomics Society 43rd Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 830-834.

Vredenburgh, A. (1999). Risk management: Which management practices are best predictors of employee injury rates? In *Proceedings of the Human Factors and Ergonomics Society 43rd Annual Meeting*. Santa Monica, CA: Human Factors and Ergonomics Society, 902-906.

Vredenburgh, A.G. (1998). *Safety management: Which organizational factors predict hospital employee injury rates?* Doctoral dissertation. California School of Professional Psychology, San Diego, CA.

COU_008210

Vredenburgh, A.G., & Zackowitz, I.B. (1998). Older drivers: A forensic human factors analysis. (Summary) In *Proceedings of the 50th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 91-92.

Vredenburgh, A., Hendrick, H. & Zackowitz, I. (1998). Hotel managers: What personality traits predict their success? (Summary) In *Proceedings of the IO/OB 19th Annual Graduate Conference*, San Diego, CA., 112-114.

Zackowitz, I.B. & Vredenburgh, A.G. (1998). Preschoolers: A forensic human factors analysis. (Summary) In *Proceedings of the 50th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 90-91.

Zackowitz, I. & Vredenburgh, A. (1998). How individuals manage their impressions when presenting to their peers. (Summary) In *Proceedings of the IO/OB 19th Annual Graduate Conference*, San Diego, CA., 94.

Zackowitz, I., Cohen, H. & Vredenburgh, A. (1998). Operationally defining a legal term for forensic human factors. In *Proceedings of the Silicon Valley Ergonomics Conference*, Palo Alto, CA., 185-189.

Vredenburgh, A., Cohen, H.H., Hornick, R., Laughery, K., Leonard, D., Olsen, R., Smith, L., Thompson, D., Wogalter, M. & Zackowitz, I. (1997). Mock trial: How human factors experts contribute to civil litigation. Case 1: A pedestrian's encounter with a tripping hazard. In *Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (1) 524-528.

Vredenburgh, A., Cohen, H.H., Hornick, R., Laughery, K., Leonard, D., Olsen, R., Smith, L., Thompson, D., Wogalter, M., & Zackowitz, I. (1997). Mock trial: How human factors experts contribute to civil litigation. Case 2: Adequacy of warning systems to address product hazards. In *Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (1) 524-528.

Vredenburgh, A.G., Andressen, B. & Cohen, H.H. (1996). The development and testing of a device to enhance motorcycle conspicuity and reduce accident. In *Proceedings of the 48th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 74.

Vredenburgh, A.G. & Plourd, S. (1996). The development of a time-distance factor for car accident reconstruction. In *Proceedings of the 48th Annual Meeting of the American Academy of Forensic Sciences*, Denver, CO: Publication Printers, Corp., 73-74.

Vredenburgh, A.G., & Cohen, H.H. (1996). Human factors analysis applied to a first amendment case: The rights of a few evaluated in terms of public safety. *The Forvm, 12*(2). Santa Monica, CA: Human Factors and Ergonomics Society, 7-10.

Vredenburgh, A.G., Zackowitz, I.B., & Cohen, H.H. (1996). Comparative risk perception of common activities: A forensic perspective. In *Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (1), 520-524.

Vredenburgh, A.G., Saifer, A.G., & Cohen, H.H. (1995). You are going to do what with that thing? An ergonomic analysis of a medical device. *Ergonomics in Design*, April. Santa Monica, CA: Human Factors and Ergonomics Society, 16-20.

COU_008211

Vredenburgh, A.G., & Cohen, H.H. (1995). High-risk recreational activities: Skiing and scuba – What predicts compliance with warnings? *International Journal of Industrial Ergonomics*, *15*, 123-128.

Abstract reprinted (1996), *Journal of Safety Research*, 27(2), 134-135.

Vredenburgh, A.G., & Cohen, H.H. (1995). Does culture affect risk perception?: Comparisons among Mexicans, African-Americans, Asians, and Caucasians. In *Proceedings of the 39th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (2), 1015-1019.

Abstract reprinted (1996), *Journal of Safety Research*, 27(2), 272.

Vredenburgh, A.G., & Cohen, H.H. (1995). Enhanced motorcycle conspicuity through daytime use of the Motorcycle Conspicuity Enhancement System (MCES). In *Proceedings of the 39th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society, (2), 1048-1052.

Vredenburgh, A.G., Plourd, S., Saifer, A.G., & Cohen, H.H. (1994). Collision causation: Time attention is directed away from traffic in front of vehicle while preparing for a lane change. In *Proceedings of the 12th Triennial Congress of the International Ergonomics Association Congress*, Vol. 6. Toronto: Human Factors Association of Canada, 252-254.

Vredenburgh, A.G., & Cohen, H.H. (1993). Compliance with warnings in high-risk recreational activities: Skiing and scuba. In *Proceedings of the 37th Annual Meeting of the Human Factors and Ergonomics Society*. Santa Monica, CA: Human Factors and Ergonomics Society (2), 945-949.

## INVITED LECTURES AND SYMPOSIA

Invited panelist: Forensic Human Factors 101: Interactive Transportation and Product Liability Case Studies, Philadelphia, PA: Human Factors and Ergonomics Society, October 4, 2018.

Trial demonstration: Cross-examination of an expert witness. Presented with Jeffrey Catalano, Esq. at the 16th Annual National Expert Witness Conference (SEAK), Hyannis, Massachusetts, June 21, 2007.

Advanced seminar. Presented at the 16th Annual National Expert Witness Conference (SEAK), Hyannis, Massachusetts, June 22, 2007.

Human factors engineering, legal liability, malpractice, and patient safety. Panel presentation to the Association for the Advancement of Medical Instrumentation (AAMI), Washington, DC, June 28, 2005.

Intervention effectiveness: Evaluation of six workplace safety programs to determine their contribution to injury reduction. Presented to the National Occupational Injury Research Symposium (NOIRS). Hosted by the National Institute for Occupational Safety and Health (NIOSH), Pittsburgh, Pennsylvania, October 29, 2003.

COU_008212

Reducing work-related musculoskeletal injuries. Presented to the San Diego Chapter of the Human Factors and Ergonomics Society, San Diego, March 28, 2000.

Ergonomic risks to healthcare workers. Presented to the San Diego Chapter of the Human Factors and Ergonomics Society, San Diego, March 28, 2000.

Work-related musculoskeletal disorders: Ergonomic risk to healthcare workers. Presented at the Applied Ergonomics Conference, Los Angeles, March 15, 2000.

Ergonomics programs: Reducing work-related musculoskeletal injuries. Presented at the Applied Ergonomics Conference, Los Angeles, March 16, 2000.

Consulting in the real world: A realistic job profile for graduate students. Presented to a graduate seminar in organization development, Rensselaer Polytechnic Institute, Troy, New York, February 17, 2000.


**LECTURES**

Forensic Case Study: When labeling leads to wrongful incarceration. Philadelphia, PA: Human Factors and Ergonomics Society, October 2, 2018.

Cross-Border Testifying Tips: U.S. Experts in Canada and Canadian Experts in the U.S. Austin TX: Human Factors and Ergonomics Society, October 10, 2017.

Adult products that kill and injure children. Austin TX: Human Factors and Ergonomics Society, October 11, 2017.

Matters of Ethics, Trust, and Potential Liability for Autonomous Systems. Washington DC: Human Factors and Ergonomics Society. September 23, 2016.

Air Rage: What factors Influence Airline Passenger Anger? Los Angeles, CA: Human Factors and Ergonomics Society. October 28, 2015.

Conflicting design considerations for children and people with disabilities. Panel discussion: Designing for children. Los Angeles, CA: Human Factors and Ergonomics Society. October 29, 2015.

Child Injury: Forensic human factors points to the need for better product designs and warnings. Panel discussion. Chicago, IL: Human Factors and Ergonomics Society. October 28, 2014.

Case Study: A Novice Unlicensed Child Operator of a Motorized Dirt Bike Versus an Ambulance Driver. Chicago, IL: Human Factors and Ergonomics Society. October 28, 2014.

Dealing with Dubious Testimony Provided by Opposing Experts. Panel discussion. Chicago, IL: Human Factors and Ergonomics Society. October 29, 2014.

COU_008213

Sophisticated User: When Does a Jury Find Users to Have Sophisticated Knowledge after Determining Liability/Failure to Warn? San Diego, CA: Human Factors and Ergonomics Society. October 2, 2013.

Falling from Airstairs while Disembarking from a Commuter Plane. San Diego, CA: Human Factors and Ergonomics Society. October 2, 2013.

Case Study: Evaluating the Warnings on a Tanning Bed. Boston, Massachusetts: Human Factors and Ergonomics Society. October 23, 2012.

When a Dog is Just a Dog? A Case Study Evaluating the ADA service animal rules. Boston, Massachusetts: Human Factors and Ergonomics Society, October 25, 2012.

Research in Motion: A Case Study Evaluating the Accessibility of Public Transit in our Nation's Capital. Las Vegas, Nevada: Human Factors and Ergonomics Society, September 22, 2011.

What do human factors/ergonomics experts have to tell juries that they don't know - but may think they know? Las Vegas, Nevada: Human Factors and Ergonomics Society, September 20, 2011.

The current state of legal, design, and residential usability issues for people with various disabilities. San Francisco, CA: Human Factors and Ergonomics Society, September 30, 2010.

How Best to Accommodate People with Disabilities Residing in Existing Multi-Family Housing. San Antonio, Texas: Human Factors and Ergonomics Society, October 22, 2009.

Mock Trial: Role of Human Factors in Litigation Involving Automated External Defibrillators (AED). Baltimore Maryland: Human Factors and Ergonomics Society, October 5, 2007.

An international perspective on risk communications: Adapting to safety demands in the emerging global economy. Baltimore, Maryland: Human Factors and Ergonomics Society, October 5, 2007.

Using human factors engineering to evaluate existing walkway accessibility standards. San Antonio, Texas: American Academy of Forensic Sciences, February 23, 2007.

From practice to science: How application guides warning research. Panel presentation to the IEA2006: 16th World Congress on Ergonomics, Maastrict, Netherlands, July 14, 2006.

Human factors evaluation of a steam shower. Seattle, Washington: American Academy of Forensic Sciences, February 23, 2006.

Evaluating the effects of frost heave on the feasibility of compliance with existing walkway accessibility standards. Orlando, Florida: Human Factors and Ergonomics Society, September 27, 2005.

Communication of drug hazard information: A critical analysis of how the relationship between the pharmaceutical companies, the FDA, clinicians and patients impacts patient safety. New Orleans, Louisiana: Human Factors and Ergonomics Society, September 21, 2004.

COU_008214

A. Vredenburgh, page 17

A two-way street – with hazards: Expert/attorney communications. New Orleans, Louisiana: Human Factors and Ergonomics Society, September 23, 2004.

Examination of apparent flaws in the American drug hazard detection, evaluation, and risk communication system.  San Diego, California: Second Annual Patient Safety Conference: Making care safer one patient at a time, March 19, 2004.

Medical product labeling: The evaluation of latex allergy warnings in a realistic setting.  Denver, Colorado: Human Factors and Ergonomics Society October 15, 2003.

Conducting a systems evaluation to address workplace radiation exposure hazard. Denver, Colorado: Human Factors and Ergonomics Society, October 17, 2003.

Playground safety: A forensic human factors analysis of fall injuries. Atlanta, Georgia: American Academy of Forensic Sciences, February 15, 2002.

Developing a technique to measure anesthesiologists' real-time workload. San Diego, California: International Ergonomics Association and Human Factors and Ergonomics Society, August 3, 2000.

Are personality traits useful predictors of managers' success? San Diego, California: International Ergonomics Association and Human Factors and Ergonomics Society, August 4, 2000.

Mock trial: Human factors contributions to litigation involving adaptive cruise control. San Diego, California: International Ergonomics Association and Human Factors and Ergonomics Society, August 4, 2000.

Under what circumstances do extrinsic rewards decrease intrinsic motivation? Presented at the Houston, Texas: Human Factors and Ergonomics Society, September 28, 1999

Risk management: Which management practices are best predictors of employee injury rates? Houston, Texas: Human Factors and Ergonomics Society. September 30, 1999.

Falling, the ADA, and the ergonomics of walking.  Los Angeles, California: American Society of Safety Engineers (ASSE), Los Angeles Area Professional Development Conference, April 21, 1998.

Older drivers: A forensic human factors analysis. San Francisco, California: American Academy of Forensic Sciences, February 11, 1998.

Hotel managers:  What personality traits predict their success? San Diego, California: IO/OB 19th Annual Graduate Conference, March 29, 1998.

Mock trial: How human factors experts contribute to civil litigation. Case 1: A pedestrian's encounter with a tripping hazard. Albuquerque, New Mexico: Human Factors and Ergonomics Society. September 24, 1997.

Rev. 11/18

COU_008215

Mock trial: How human factors experts contribute to civil litigation. Case 2: Adequacy of warning systems to address product hazards.  Albuquerque, New Mexico: Human Factors and Ergonomics Society. September 24, 1997.

The development and testing of a device to enhance motorcycle conspicuity and reduce accident. Nashville, Tennessee: American Academy of Forensic Sciences, February 21, 1996.

The development of a time-distance factor for car accident reconstruction. Nashville, Tennessee: American Academy of Forensic Sciences, February 21, 1996.

Comparative risk perception of common activities: A forensic perspective. Philadelphia, Pennsylvania: Human Factors and Ergonomics Society.  September 4, 1996.

Does culture affect risk perception? Comparisons among Mexicans, African-Americans, Asians, and Caucasians. San Diego, California: Human Factors and Ergonomics Society. October 10, 1995.

Enhanced motorcycle conspicuity through daytime use of the Motorcycle Conspicuity Enhancement System (MCES). San Diego, California: Human Factors and Ergonomics Society. October 13, 1995.

Collision causation: Time attention is directed away from traffic in front of vehicle while preparing for a lane change. Presented at the 12th Triennial Congress of the International Ergonomics Association Congress. Toronto, Canada, August 17, 1993.

Compliance with warnings in high-risk recreational activities: Skiing and scuba. Presented at the 37th Annual Meeting of the Human Factors and Ergonomics Society. Seattle, Washington, October 12, 1993.

COU_008216

 **Vredenburgh & Associates, Inc.**
Human Factors, Safety, Biomechanics and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA 92008
(442) 222-8289
avredenburgh@gmail.com
www.hfexpert.com

**Alison Vredenburgh, Ph.D., CPE**
**Trial Testimony (4 years)**

| Case Name | Court | Year |
|-----------|-------|------|
| Pankey v. Petco | SD Superior | 2017 |
| Verrazono v. Gehl | Sonoma Superior | 2017 |
| Anthony Wade v. Terex-Telelect | Indiana, Hamilton Superior Court | 2018 |
| Powell v. AT&T | Ventura Superior | 2019 |
| Vinolo v. SD | SD Superior | 2019 |
| Huerta v. Riverside | Riverside Superior | 2020 |

**Alison Vredenburgh, Ph.D., CPE**
**Deposition Testimony (4 years)**

| Year | Cases |
|---|---|
| 2017 | Berry v. Nakka<br>Michel v. USA<br>Pacific Cheese<br>Pankey v. Petco<br>Renteria v. Albas Trucking<br>Tisnado v. Hytrol<br>Vanhoosier v. Deere & Co. |
| 2018 | AJ v. Torrance Unified School District<br>Gonzalez v. Lifetime Brands<br>Holt v. Marriott<br>Landgraf v. BMW<br>Ocampo v. USA |
| 2019 | Glass v. Sky City Vapor<br>Huerta v. Riverside<br>Powell v. AT&T<br>Vinolo v. SD<br>Young v. NE Electric |
| 2020 | Basaldua v. Prince Minerals<br>U.S. v. Atlantic Development |
| 2021 | Sabordo v. Palm Springs |

COU_008218



# Vredenburgh & Associates, Inc.
## Human Factors, Ergonomics, Safety and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA  92008
(619)300-5316
ilenez@me.com.com
www.hfexpert.com

### Fee Schedule and Retainer Agreement

**Case Name:**   Courkamp vs. Fischer Price

**Consultant:**   Alison G. Vredenburgh, Ph.D., CPE
Ilene B. Zackowitz, Ph.D., CPE
Michael J. Vredenburgh, B.S.

**Client Attorney:** Kristin Schriner, Esq.
Goldberg & Osborne

In order that there be no confusion as to our respective responsibilities, Vredenburgh & Associates, Inc. feels it is appropriate to provide you with this retainer agreement. Vredenburgh & Associates, Inc. looks forward to being able to assist Goldberg & Osborne (the "client") in connection with the Courkamp vs. Fischer Price matter. The purpose of this letter is to set forth the terms under which Vredenburgh & Associates, Inc. is willing to provide such expert witness services.

## 1.  <u>Respective Duties in Connection with the Matter</u>

By entering into this agreement, you agree to provide Vredenburgh & Associates, Inc. with complete and accurate information, and fully and completely assist and cooperate with Vredenburgh & Associates, Inc. in connection with the expert analysis and testimony the Vredenburgh & Associates Consultant is to give.  However, you must understand that any opinions the Vredenburgh & Associates Consultants give will be solely based on our expertise and knowledge, and Vredenburgh & Associates, Inc. will not provide testimony that it believes is inaccurate.

Vredenburgh & Associates, Inc. has made no promise or guaranty regarding the substance of its opinions or the outcome of this matter. In this regard, in entering into this agreement, you acknowledge and agree that you have not relied on any promise, guaranty or opinion by Vredenburgh & Associates, Inc. in deciding to proceed with our services for you in this matter.

You have the right to terminate our services at any time, without limitation.  Additionally, Vredenburgh & Associates, Inc. may withdraw for cause from this engagement, with or without your

COU_008219

consent, if Vredenburgh & Associates, Inc. determines, in its sole discretion, that it need to do so. You will be responsible for paying all fees and all other charges incurred on your behalf up to the date of termination or withdrawal.

Copies of discovery documents are not necessarily retained by Vredenburgh & Associates, will not be returned to you, and are periodically destroyed. All work papers, correspondence, handwritten notes, and other items prepared by Vredenburgh & Associates, Inc. will remain our property and will not be turned over to anyone when our relationship terminates.

## 2. **Fees and Billing**

Vredenburgh & Associates, Inc. will bill you on an hourly basis for our services. Although Vredenburgh & Associates, Inc. normally sends statements on a monthly basis; to the extent the time spent is substantial, Vredenburgh & Associates reserves the right to send statements on a more frequent basis. Checks should be made payable to Vredenburgh & Associates, Inc. We do not charge admin fees; however, all invoicing is sent to one client. If client requests (in writing) that the invoices be split, the time to create specialized invoices will be at associate's hourly rate ($350/hr.); therefore, we request and suggest that when there are multiple clients, they split invoices among themselves.

While Vredenburgh & Associates, Inc. believes that its billing procedures are simple and clear, Vredenburgh & Associates encourages you to ask any questions regarding our statements as soon as they are received. If we do not receive an objection to any statement rendered within fourteen (14) days of its receipt, it will be deemed that you have approved of each such statement. Any outstanding amount that is not paid within 2 months of the submission of our final billing will bear interest at the rate of 1.5% compounded monthly. All past due balances over 60 days will be charged a monthly $50 late fee. All outstanding balances must be paid in full before additional consulting work is performed. In no case will payment be based on contingency, lien, or deferred until settlement of the case. You agree that you are personally liable for any debt incurred by Dr. Vredenburgh and Vredenburgh & Associates, Inc. on this case.

Vredenburgh & Associates, Inc. cannot estimate the amount of time that will be required in providing our expert services in connection with this matter. The amount of time that will be required, and the costs and expenses that will be incurred, will depend, in large part, upon the complexity of the issues, the fact-finding and investigatory needs that arise, and the time spent in preparing for and attending any deposition or hearing.

The following rates are valid for 12 months from date of signature. Consulting services by Dr. Vredenburgh will be invoiced at $450/hour, by Dr. Zackowitz' at $350/hour, by Mr. Vredenburgh's at $150/hour, for investigations, travel, discovery review, and written reports. The rate for Dr. Vredenburgh's testimony as a designated expert is $650 per hour, with a half-day minimum. The rate for Dr. Zackowitz' testimony as a designated expert is $450 per hour, with a half-day minimum. The rate for Mr. Vredenburgh's testimony as a designated expert is $250 per hour, with a half-day minimum.

COU_008220

Vredenburgh & Associates, Inc.
Fee Schedule and Retainer Agreement
Page 3

| | Consulting services: | Testimony: deposition, arbitration, and trial |
|---|---|---|
| Alison G. Vredenburgh, Ph.D., CPE | $425/hr. | $650/hr. (Video depo. is $750/hr) |
| Ilene B. Zackowitz, Ph.D., CPE | $350/hr. | $450/hr. (Video depo. is $550/hr) |
| Michael J. Vredenburgh, B.S. | $150/hr. | $250/hr. (Video depo. is $350/hr) |

Vredenburgh & Associates consultants will not be available for deposition or trial until all invoices have been paid.

**Deposition testimony**: You are responsible for assuring that reasonably estimated deposition fees will be paid by other attorneys and will be paid in advance of deposition testimony; any balances are due within five working days. If payment is not received by this time, you are responsible for any deficiencies in payment by deposing attorneys. If deposition is cancelled within 24 hours of scheduled deposition, there is a 2-hour cancellation fee.

**Trial testimony**: In addition to any outstanding balance, a 3-hour retainer for scheduled trial testimony, estimated expenses (plane fare, hotel), and estimated travel time (based on flight itinerary or Google maps) must be received by five days in advance of the scheduled trial. Any credit balance from a previously received retainer will contribute to this retainer. Additional consulting or testimony (if any) will be invoiced upon completion of consulting activity or oral testimony. An unused balance will be returned within 30 days.

**Expenses:** In addition to hourly consulting service fees, you agree to pay for our out-of-pocket costs and expenses incurred while performing the consulting services under this agreement. These costs and expenses commonly include, but are not limited to, the following: parking, trial exhibits, research costs, and travel expenses (mileage or airline). Travel time and expenses are calculated from portal to portal from Carlsbad, California, and are invoiced at the consulting rate. Necessary travel (trial, site inspection) time in excess of 4 hours on any one day will be invoiced at 2/3 of the consulting rate. There is a three-hour minimum charge for site inspections. Automobile mileage will be invoiced at the prevailing IRS business mileage rate at the time of invoicing. Photographs taken, developed, and labeled will be invoiced at $10.00 per photograph multi-sheets and $50 for a digital CD. There will be a $75.00 equipment charge for production of videos, a $50 equipment charge for coefficient of friction testing, a $50 equipment charge for illumination testing, a $50 equipment charge for UL sharpness testing, and a $50 equipment charge for force measurements. Files provided electronically will be printed by a copy service; invoice will be passed on to client.

**Air Travel:** All air travel will be on non-stop flights (when available). All flights lasting 3 or more hours will be business or first class.

3. **Retainer (Fee Deposit)**

This agreement for human factors and safety consultant services is with <u>you</u>, the attorney, not your client. To bind this agreement, you agree to pay a retainer of $3,500 ($2,000 for Mr.

1/19

COU_008221

Vredenburgh & Associates, Inc.
Fee Schedule and Retainer Agreement
Page 4

Vredenburgh) to Vredenburgh & Associates. $1500 of the retainer is a non-refundable name-disclosure fee ($750 for Mr. Vredenburgh); any additional unused balance of the retainer will be refunded.  Designation can be made, and consulting work will proceed, when Vredenburgh & Associates, Inc. has received the retainer and a signed copy of this agreement.  Consulting work will be debited against the retainer.  Vredenburgh & Associates, Inc. reserves the right to require a further retainer(s) to replenish the initial deposit.  If the retainer is not replenished within ten (10) days of our request, Vredenburgh & Associates reserves the right to terminate our services. Any sum remaining after the Vredenburgh & Associates Consultants complete their work will be returned to you.  Any charges for additional consulting work that exceed the amount of the retainer will be invoiced and will be immediately due and payable.  For cases with a trial within 60 days of retention, the retainer is $5,000.

4.  **Release**

Vredenburgh & Associates, Inc. will at all times operate in a professional manner to provide the highest quality of service possible.  However, no other warranty or representation, either expressed or implied, is included in the consulting work product.  You agree that the aggregate liability of Vredenburgh & Associates, Inc., Alison Vredenburgh, and any other persons or entities arising from performance of this agreement on account of any and all injury or damage to person or property, any defect, error, omission, or professional negligence, including cost of defense and attorney fees, will be limited to a sum not exceeding the contract value.  You hereby release and agree to indemnify and hold Alison Vredenburgh and Vredenburgh & Associates, Inc. free and harmless from any such liability and to third parties to the extent that such liability exceeds the contract amount.

5.  **Effective date**

The effective date of this agreement will be retroactive to the date that Vredenburgh & Associates, Inc. first performed consulting services on your behalf.  Even if this agreement does not take effect, you are obligated to pay the reasonable value of any services, which Vredenburgh & Associates, Inc. has performed on your behalf as well as any costs incurred.

6.  **Applicable Law and Interpretation**

This Agreement shall be construed under and in accordance with California law.  Any action arising from this Agreement shall be filed in California State Court.

7.  **Dispute Resolution**

Vredenburgh & Associates, Inc. appreciates the opportunity to provide expert services and looks forward to a harmonious relationship unmarred by disputes between us.  In the event you become dissatisfied for any reason with the fees charged or the services Vredenburgh & Associates, Inc. has performed, we encourage you to bring that to our attention immediately; Vredenburgh & Associates, Inc. will do the same if we perceive a problem with our services for you.  It is our belief that most such problems can be resolved by good faith discussion between the parties.

COU_008222

Vredenburgh & Associates, Inc.
Fee Schedule and Retainer Agreement
Page 5

## 8.  <u>**Confirmation of Agreement**</u>

Please acknowledge your understanding of and agreement with the terms set forth above (including the attorney fee provisions) by signing in the spaces provided below.  If you have any questions or concerns about anything contained in this agreement, please feel free to discuss it with us before having this letter executed.

We appreciate the opportunity to provide expert witness services for you.

Vredenburgh & Associates, Inc., a California Corporation

By_____

Alison G. Vredenburgh, Ph.D., President


In retaining Vredenburgh & Associates, Inc., I have read and agree to the above-stated terms.


_____          _____

Client signature: Kristin Schriner, Esq.          Date
Goldberg & Osborne

1/19

COU_008223