# **EXHIBIT E**



# Vredenburgh & Associates, Inc.
## Human Factors, Safety, Biomechanics and Organizational Consulting

*Mailing Address*
2588 El Camino Real, F353
Carlsbad, CA  92008
(442) 222-8289
avredenburgh@gmail.com
www.hfexpert.com

July 12, 2021

John Osborne, Esq.
Goldberg & Osborne LLP
698 E. Wetmore Rd., Suite 200
Tucson, AZ 85705

Re:    Courkamp v. Fisher-Price rebuttal

At your request, I have prepared the following rebuttal report with respect to the above-referenced case which is based on interviews with Andrew Olson and Kathleen Courkamp (6/16/21), an inspection of the exemplar Fisher-Price Rock 'n Play inclined sleeper, and a review of materials including:

1. Report of: Dorothy Drago, MA
2. Report of: Steve Arndt, Ph.D.
3. Report of: Christine Fuller, M.D.
4. Report of: Eric Christensen, M.D.
5. Report of: William Singhose, Ph.D.

## FINDINGS AND CONCLUSIONS

**Dr. Arndt and Ms. Drago opine that only the incident information that occurred prior to Zoey's (6/19/14) death is relevant to RNP safety. In my opinion, both experts fail to differentiate between "notice" and "evidence" of a hazardous condition.**

### Notice

Fisher-Price was informed of the suffocation hazard posed by RNP use through incident reports, case histories, communications with international distributors, as well as communications with pediatricians (Dr. Benaroch and Dr. Burgert) and a pediatric nurse. Dr. Benaroch contacted Fisher-Price on several occasions and cited the American Academy of Pediatrics guidelines from

Oct 2011: "'1. To reduce the risk of SIDS, infants should be placed for sleep in a supine position (wholly on the back) for every sleep...until 1 year of life.' The newborn Rock 'n Play sleeper does not keep a baby wholly on the back, but rather in an inclined position. It is not a safe way for babies to sleep . . . 2. 'Use a firm sleep surface…to reduce the risk of SIDS and suffocation.' The Newborn Rock 'n Play Sleeper is not a firm crib mattress…your website describing this product… 'the seat is also inclined, which makes napping more comfortable for babies who need their heads elevated' is inconsistent with the safe sleeping guidelines."[150]

In 2012, Dr. Burgert wrote an open letter to Fisher-Price stating, "The Rock 'n Play Sleeper should not be used for extended, unobserved infant sleep for the following reasons: First, design features of this product are known to increase the risk of Sudden Infant Death Syndrome."[151]

In March 2014, prior to the June 2014 death of Zoey Olson, a pediatric nurse contacted the CPSC to express concerns about the safety of the Rock 'n Play as a sleeping product, which was forwarded by the CPSC to Fisher-Price:[152] "I have found many concerns that makes this product unsafe ' This is sold by stores in the crib and bassinette sections and labeled as a sleeper. The recommendation for a safe sleeping environment includes a supine position (wholly on back), the sleeper does not keep the baby wholly on the back, but inclined. Also recommended is a firm sleep surface–a firm mattress with a fitted sheet. The newborn sleeper is not a firm crib mattress."

FP was aware of at least 66 incidents with the sleeper prior to Zoey's death (notice).[153] In 2014, there were 21 reports of babies falling out of the product, 8 reports of children sinking down in product, seven reports of children pushing themselves toward top of seat, and 5 reports of children out of position to the side of product, 4 reports of children rolling over in product, and 2 reports of children sitting upright in product; some of these incidents occurred in the first half of the year before Zoey's death, providing notice; the remaining 2014 and subsequent incident reports indicate a hazardous condition.[154]

Defense experts contend that the testing was sufficient to ensure product safety.[155] However, they were provided with evidence to the contrary: the in-home studies revealed that parents were using the device without the belt secured,[156] there was no testing without the belt secured, and FP

---

[150] Dr. Benaroch email 2/7/13, FPI_000540
[151] Deposition of Pilarz, p. 130-131
[152] Exhibit 8, Steinwachs January 22, 2021 deposition; Mattel-COU0507986
[153] Incident summary spreadsheet; incident reports
[154] Deposition of Taft, p. 190-191
[155] Reports of Arndt, Drago
[156] Depositions of: Joel Taft, November 12, 2020, p. 291; Kitty Pilarz, November 9, 2020, p. 175; Michael Steinwachs, November 11, 2020, p. 207; Linda Chapman, November 10, 2020, p. 218

acknowledged that the belt was needed to keep infants in position and it is unsafe for babies to be out of position.[157]

While the RNP hazards are universal, parents were better warned outside the United States before Zoey's death. Foreign RNP labeling concerns would have also provided FP with notice of the safety hazard. Pilarz was unaware of any death occurring in Canada where the Rock 'n Play could only be sold as a "soother" and was not marketed as a sleeping device,[158] as opposed to in America, where it was marketed for and "intended for overnight sleep."[159] These data support the hazard of positioning the device as a sleeper to Americans, with expected use while unsupervised; furthermore, its promotion as a sleeper was at odds with widely accepted best practices and was unsafe as an infant bedding alternative; "Infant should not be left in these types of products without constant supervision."[160]

### Evidence of a hazardous condition

There continued to be incidents subsequent to Zoey's death, even after additional warnings were added per ASTM F-3118-17,[161] indicating an unsafe design that was not "remedied" through FP's warnings. Case reports, published papers and articles after the subject incident continued to inform FP of the hazardous condition of the sleeper.

The AAP guidelines, based on its 2011 study, provides a safety specification of a firm, flat surface, which was adopted in the new (2021) CPSC rule that its acting Chairman describes as "one of the strongest, most protective rules I have seen in all my years at CPSC.[162] Yet defense experts continue to opine that the curved, inclined/sloped sides are firm and flat, against all evidence that it is neither firm nor flat.

There were 5 potential suffocations in addition to 4 fatalities from 2015 reports (evidence of a hazardous condition).[163] In addition, 7 consumers stated that their restrained child fell out of the product while unattended; FP's director of quality and safety testified that this fact doesn't concern him because he thinks parents just didn't want to admit that they actually forgot to use restraints and that's why the child fell out.[164] There were 30 fall-outs of product in a 2015 report (evidence of a hazardous condition);[165] however, FP's director of quality and safety testified "I

---

[157] Depositions of: Kitty Pilarz, November 9, 2020, p. 177, 207; Linda Chapman, November 10, 2020, p. 17, 124, 128, 220
[158] Pilarz January 21, 2021 deposition, pp. 130, 152.
[159] Deposition of Taft, p. 176
[160] COU0011633
[161] COU0012420
[162] 6/2/21, Statement of Acting Chairman Robert Adler on the Passage of the Final Rule on Infant Sleep Products
[163] Deposition of Taft, p. 200; COU0048954
[164] Deposition of Taft, p. 192
[165] COU0048955

didn't see that there was any direct correlation between any product attribute or design that would be a contributing factor to these incidents."[166] He also testified that out of position reports from 2015 "Usually consists of maneuvering out of restraints, twisting around, or pushing up." A report FP gave to CPSC evaluated how many rollovers were happening in sleepers where babies rolled over all the way into a prone position, but did not account for partial roll overs where baby's face was against the fabric.[167] Additional evidence of a hazardous condition is supported with 30 infant fatalities in Rock 'n Play Sleepers;[168] the current number of RNP fatalities in the United States is 94.[169]

**Dr. Arndt and Ms. Drago opine that there was sufficient testing prior to bringing the sleeper to market and that additional testing was not needed; their opinions are not consistent with the evidence. Dr. Arndt questioned why I did not do testing myself; I could not test this recalled device on infants due to requirements for protection of human subjects; however, FP could have tested it prior to introduction to the marketplace or any time prior to its recall.**

In order to identify potential hazards, it is important to test the product system which includes the sleeper, the instructions, packaging, and warnings. I have not received any evidence that key testing was performed; all evidence is to the contrary. Had FP done key FMEA and testing, it would have evaluated many critical hazards and user interface considerations:

1. FP did not conduct any biomechanical analyses of infants in the product prior to its introduction to the marketplace (or any time prior to 2018), including mechanical strength and respiration analyses of infants in the prone or side positions – an important evaluation given that inclined sleepers were new devices in the infant marketplace, and thus this testing was needed.[170]

2. FP did not conduct any testing or other analyses concerning infants rolling from the prone or side positions to the supine position – an important evaluation given that inclined sleepers were new devices in the infant marketplace and the design can impact rollover ability, and thus this testing was needed.[171]

3. FP did not do testing/analyses to determine whether infants in prone position can self-correct to avoid injury, or whether sleep stages/fatigue can impact an infant's ability to self-correct, or whether side constraints play a role in impeding an infant's ability to self-correct. These are important analyses given that inclined sleepers were new devices in the

---

[166] Deposition of Taft, p. 202
[167] Deposition of Taft, p. 213
[168] CPSC memo, 4/20/19, p. 148, COU_002084
[169] Deposition of Pilarz, p. 339; Steinwachs January 22, 2021 deposition, p. 296
[170] Mattel-COU0017994; Deposition of Taft, p. 242
[171] Mattel-COU0017994

infant marketplace and information on this new design's impact on rollover ability was critical, and thus this testing was needed.[172]

4. In-home testing FP did conduct revealed that the majority of users would not use the restraints all of the time[173] – yet FP expected that the restraints would be used all the time,[174] contrary to its own testing. Moreover, FP did not conduct any studies/analyses with the restraints off, even after its in-home testing revealed non-use, and thus this testing was needed.[175]

5. FP did not do an evaluation to determine if warnings could be recognized by consumers,[176] if consumers should be told of the product rollover risk,[177] if consumers would comply with warnings,[178] or if consumers would recognize that not using restraints could result in a baby rolling over and dying, and thus this testing was needed.[179]

Dr. Arndt states, "All conscientious design engineers should agree that utilizing the safety engineering hierarchy as a starting point when considering design alternatives is a sound practice. When designing their products, they attempt to *anticipate foreseeable uses and misuses of the product in order to minimize the number of potential hazards through design*;"[180] FP was aware of a misuse, that in-home testing indicated inconsistent restraint use, yet did no testing without restraints.

Dr. Arndt opines that "The surface of the RNPS was designed to be at an angle that was less than 30 degrees. Fisher-Price's experience with many different products at many different angles informed them that an inclined angle at 30 degrees was safe for a child beginning at birth."[181] However, this is the ***first*** inclined sleeper; thus, there is no product that "informed them" that it was safe for overnight use, and thus this testing was needed to inform them.

Dr. Arndt questioned why I did not test babies in the sleeper. This device was recalled, and as of June 2nd, has been banned; thus, I cannot solicit informed consent from parents to put their infants in a recalled/banned device as it would never pass IRB requirements, and would be unethical for me to do so. Moreover, I did not introduce this new type of sleeping device to the market; the time to do this testing was before marketplace introduction and during early post-

---

[172] Mattel-COU0017994
[173] Ex. 14 to Pilarz January 21, 2021 deposition, Mattel-COU0061478
[174] Depositions of: Kitty Pilarz, November 9, 2020, p. 177, 207; Linda Chapman, November 10, 2020, p. 17, 124, 128, 220
[175] Deposition of Steinwachs, January 22, 2021, p. 89
[176] Deposition of Taft, p. 135
[177] Deposition of Taft, p. 136
[178] Deposition of Taft, p. 135
[179] Deposition of Taft, p. 136
[180] Arndt p. 33
[181] Arndt p. 37

market surveillance when there was evidence of parents not using the belt consistently, babies falling, and moving from position.

**Dr. Arndt and Ms. Drago opine that the warnings were seen and understood by Ms. Courkamp and Mr. Olsen and thus were sufficient. These experts did not address the *content* of the warning and if it communicated the nature and extent of the hazard, and how to protect Zoey from the hazard.**

Dr. Arndt acknowledges that both Katie and Andrew read the warning, "Thus per Ms. Courkamp's testimony, she was aware of everything that was on the subject warning, and in sum there was nothing in the warnings that she disagreed with;"[182] the critical issue is not whether she *agrees*, it is whether she has *been informed* of the hazards. Thus, the warning content is at issue.

Fisher-Price did not conduct testing to determine whether warnings could be recognized by consumer or test to see if consumers would follow the warnings.[183] Additionally, FP did not conduct any studies that questioned parents about how well they comprehended the warnings.[184] In this case, the warning does not warn against using the device for sleeping, or using it unattended while infants are sleeping, and in fact it is called a "sleeper." Moreover, Fisher-Price's employee testing showed 4 out of 5 Fisher-Price employees who brought the Rock 'n Play home to test with their infants did not use the restraints all the time[185] and its in-home testing with members of the public, as discussed above, also showed the majority of users did not use the restraints all of the time.[186] This testing was conducted prior to the production of the subject Rock 'n Play, and provided Fisher-Price with notice that the warnings were not sufficient and that a majority of users would likely not use the restraints, or would not use the restraints all of the time. Moreover, regarding a similar product, the CPSC stated that it "does not believe that parents and caregivers appreciate the hazard associated with not using the harness or not securing the harness snugly. CPSC believes that it is foreseeable that they will continue to use the product without securing or securing it snugly which can result in death and injury."[187]

Dr. Arndt provides a figure from the RNPS pamphlet[188] that he opines warns parents, "sufficient for the safe use of the product"[189] and that "had they been supervising her, it is likely that the incident would have been prevented, so they were not providing the supervision necessary for

---

[182] Arndt, p. 22
[183] Deposition of Taft, p. 135
[184] Deposition of Steinwachs, p. 150
[185] Lohiser Exhibit 5, Mattel-COU0000981
[186] Ex. 14 to Pilarz January 21, 2021 deposition; Mattel-COU0061478
[187] Regarding this issue on a similar product, In review of the Nap Nanny; Steinwachs January 22, 2021 deposition, p. 222
[188] Arndt Report p. 14
[189] Arndt Report p. 11

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 7 of 19

the safe use of the product."[190] However, this is marketed as a "sleeper," with intended unsupervised use.

Dr. Arndt provides a diagram and warning from the leaflet in his report (see Figures 1 and 2).



**Securing Your Child**

Waist Belt
Cinturón

Waist Belt
Cinturón

Crotch Pad
Almohadilla de
la entrepierna

**1**

- Place your child in the seat.
- Position the crotch pad between your child's legs.
- Fasten both waist belts to the crotch pad. Make sure you hear a **"click"** on both sides.
- Tighten each waist belt so that the restraint system is snug against your child. Please refer to the next section for instructions to tighten the waist belts.
- Check to be sure the restraint system is securely attached by pulling it away from your child. The restraint system should remain attached.

Figure 1. Figure 4 in Arndt report

The diagram in Figure 1 is a missed opportunity that FP could have used to warn users of the suffocation hazard and why it was critical to tightly secure the restraint. The word "suffocation"

---

[190] Arndt Report p. 12

does not appear anywhere on this diagram – in fact, there is no warning at all. Dr. Arndt opines that Figures 1 and 2 from the leaflet combined with the on-product label (Figure 3) were "sufficient for the safe use of the product." However, the only mention of suffocation in Figures 2 and Figure 3 is to not have gaps between an extra pad and the side of the product or put on soft bedding – neither relevant to Zoey's death.



Figure 2. Leaflet warning from Dr. Arndt's report

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 9 of 19



**⚠WARNING**
**Failure to follow these warnings and the**
**instructions could result in serious injury or death.**
- ALWAYS use the restraint system.
- ALWAYS use the pad provided, which includes the restraint.
  NEVER add a mattress, pillow, comforter, or padding.
- **SUFFOCATION HAZARD** - Infants can suffocate:
  - in gaps between an extra pad and the side of the product - on soft bedding.
- **FALL HAZARD** - To prevent falls, DO NOT use this product when the infant begins
  to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs.
  (11.3 kg), whichever comes first.
- Strings can cause strangulation! NEVER place items with a string around a child's
  neck such as hood strings or pacifier cords. NEVER suspend strings over product or
  attach strings to toys.
- NEVER place product near a window where cords from blinds or drapes can strangle
  a child.
- To reduce the risk of Sudden Infant Death Syndrome (SIDS), pediatricians
  recommend healthy infants be placed on their backs to sleep, unless otherwise
  advised by your physician.
- Always provide the supervision necessary for the continued safety of your child.
- When used for playing, never leave child unattended.

Figure 3. The on-product label under the headrest.

Moreover, the ASTM F3118 Roll over Incidents task group states in its minutes, "Suffocation Warning Revision: Current standard (F3118) has suffocation warnings to address many of the known hazards, but there are none related to roll over potential and use of a restraint to prevent. The present restraint warning is only related to fall hazards. TG should review existing warnings and determine if use of restraint should be linked to the potential for roll over and suffocation. The TG agrees that the present suffocation hazard needs to be revised to warn care givers of the hazard when an infant rolls over in the product. Restraint use needs to be linked with the suffocation hazard."[191]

**Dr. Arndt and Ms. Drago opine that the location of the warning was conspicuous because it complied with Fisher-Price's definition of conspicuity; they failed to address expected user interface and the foreseeable placement of the product in a room.**

According to the ASTM F3118 Roll over Incidents task group, the allowable area for warning label placement starts from the dotted line that crosses the junctions of the underarm and both sides of the torso (see Figure 4).[192] Warnings should be visible from the front of the product, "While standing in front of the product with the Newborn CAMI dummy installed, verify that the required warnings are visible."[193] Moreover, FP's Principal quality engineer testified, "a prominent warning that was both in the instructions and on the product, telling people – or parents, don't forget this stuff [use a restraint]. It's important."[194]

---

[191] COU 0030463; 6/5/18 minutes
[192] COU 0030466; 6/5/18 minutes
[193] COU0148429
[194] Deposition of Steinwachs January 22, 2021, p. 63

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 10 of 19

---

7.11.3.1 *Visibility With CAMI Dummy Restrained in Seat—*
Place the CAMI Newborn Dummy in the product with the restraint system engaged according to the manufacturer's instructions. While standing in front of the product with the Newborn CAMI dummy installed, verify that the required warnings are visible and placed above an imaginary horizontal line that crosses through the junctions of under arm and side of the torso armpits on both left and right sides and not obscured by any part of the dummy (refer to Figure 10). *Note – the placement of the warnings is only applicable to the English language portions of the warning label.*



Fig 10 - Allowable area for warning label placement starts from the dotted line that crosses the junctions of underarm and both sides of the torso.

Figure 4. Diagram from ASTM F3118 Roll over Incidents task group indicating placement of a warning.

In contrast to the inconspicuous RNP label depicted in Figure 4, Figure 5 depicts a FP bouncer with a warning in conspicuous location, using ANSI color behind the signal word. Moreover, the placement was under the sloped side that was the least likely to be viewed with use, in contrast to the more conspicuous label placement on the FP bouncer.

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 11 of 19



Figure 5. FP bouncer with warning in conspicuous location, using ANSI Z535.4 colors consistent with ASTM committee recommendation.

Per ANSI Z535.4 §9.1 Location, "Product safety signs and labels shall be placed such that they will: (1) be *readily visible to the intended viewer* and (2), for hazard alerting signs, alert the viewer to the hazard in time to take appropriate action." Dr. Arndt relies on a "conspicuity" definition, created by FP, to justify the inconspicuous placement of the label: QSOP's definition of "conspicuous" was "visible when the product is in the manufacturer's recommended use position to a person standing near the product *at any one position around it*."[195] However, FP acknowledges the importance of conspicuity of labels on the principal display panel, as discussed in a document I cited in my supplemental report: "I do not know why we decided to make this a requirement on bassinets and RNPs and not on other products. We can probably move to a side panel if it's important to marketing."[196]

Dr. Arndt did not rely on the human factors, *Handbook of Warnings*, which states, "A fairly consistent finding across warning research is that increasing conspicuity increases the likelihood that a warning will be noticed. Conspicuity (also called salience and prominence) attracts attention…Color is another method of enhancing noticeability. ANSI design standards use three main colors to indicate danger…but color can also help signs stand out from most environments in which they are placed…The warning's location can influence whether people notice it. Frantz and Rhodes (1993) increased a warning's noticeability by placing the warning *at a location where it would be seen when the information would be most needed*."[197]

---

[195] COU0000400
[196] COU-1149138
[197] Rousseau, G.K. & Wogalter, M.S. (2006). Research on warning signs. In M.S. Wogalter, (Ed.), *Handbook of Warnings*: New Jersey: Lawrence Erlbaum Assoc., p. 147-158.

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 12 of 19

Dr. Arndt states, "the definition of conspicuous within ASTM juvenile products standards at the time of the RNP's design recognized that a warning label does not need to be visible *from all locations* around the product."[198] However, there are 3 potential positions that a person may place a baby in the sleeper; the warning is not visible *from any of these locations*. This poor warning placement is evident in the police photograph showing the placement of the sleeper in the room. The side containing the label underneath and against a nightstand depicts that the warning was not visible (see Figure 6); this RNP placement is consistent with a location where it affords the user optimal positions to place an infant into the sleeper.



Figure 6. Place of Sleeper/Zoey in the room.[199]

To depict conspicuous placement of warnings on the RNP consistent with ANSI, with content from ASTM draft warnings and FP documents,[200] I attached labels to the sleeper (see Figures 7 and 8).

---

[198] Arndt report, p. 79
[199] Deposition of Courkamp, Ex. 20
[200] COU0839240; COU-1149138

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 13 of 19



**⚠ WARNING**

**Suffocation Hazard**: Babies have <u>suffocated</u> and <u>died</u> from **rolling over** on added pillows, blankets, and extra padding in inclined sleep products.

To prevent **falls** and **suffocation**:

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

Figure 7. New label above head



**⚠ WARNING**

**Suffocation Hazard**: Babies have suffocated and **died** from **rolling over** in inclined sleep products.

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

Figure 8. On belt

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 14 of 19

Figures 9-13 depict the sleeper from the 4 sides of the sleeper, depicting the proposed ASTM labels. The on-product label is not readable from any of these positions.



Figure 9. View from top of sleeper. Both new warnings are visible and conspicuous; actual warning not visible



Figure 10. View from right side of sleeper. Both new warnings are visible and conspicuous; actual warning not visible



Figure 11. View from left side. Both new warnings are visible and conspicuous; actual warning not visible



Figure 12. View from foot. Both new warnings are visible and conspicuous; actual warning not visible

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 16 of 19

From the head of the sleeper, both new warnings are visible and conspicuous; the actual warning is partially visible when standing at the head a distance back, if you are looking for it, but it is not in any way conspicuous (see Figures 13).



Figure 13. View from head of sleeper. Both new warnings are visible and conspicuous; the actual warning is partially visible when standing at the head a distance back, if you are looking for it, but it is not in any way conspicuous.

Figure 14 is a photo of warning on the subject RNP which was taken while sitting on the floor, the only position in which the label is readable, but not usable, or foreseeable.



Figure 14. Photo of warning on the subject RNP was taken while sitting on the floor.

Prior to manufacturing the subject Rock 'n Play, Fisher-Price also made the decision to remove the warning that had been on the crotch restraint,[201] leaving the only location providing any on-product warning under the headrest.

**Dr. Arndt and Ms. Drago opine that format of the warning is consistent with the ANSI Z535.4 standard. An evaluation of the warning evidences that the label behind the headrest is not consistent with ANSI.**

In comparing the product label (Figure 1) with the proposed labels, based on the ASTM draft labels (Figures 3 & 4), the difference in conspicuity becomes readily apparent. ANSI specifies "7. Safety sign and label colors…7.22 WARNING. The word Warning shall be in safety black letters on a safety orange background."[202] The "location" indicated by the standard was not consistent with the product, as discussed above.[203] Moreover, the content of the FP label does not identify the hazard, the consequence of not avoiding the hazard, and how to avoid the hazard, as per ANSI.[204]

**Dr. Arndt and Ms. Drago opine that the behavior of Zoey's parents was not foreseeable or expected, and additional or alternative warnings or instructions would not have altered the behaviors of Andrew Olson and/or Kathleen Courkamp sufficiently to prevent the incident at issue in this case. It is my opinion that their predictions of Mr. Olson and Ms. Courkamp's behavior with additional information is not supported with the case evidence or interviews that include additional warning information not addressed in their depositions.**

The depositions of Katie Courkamp and Andrew Olson indicate that they did read the available warning, and Katie understood to never add a mattress, pillow comforter or padding to the RNP and that infants could suffocate in gaps between an extra pad and the side of the RNP when on soft bedding.[205] They perceived the capability statements to pertain to the risk of a fall hazard,[206] based on the wording of the warning. Andrew focused on age limits on products; not present on the labeling.[207] Olsen also testified that he saw no warning that warned a baby could suffocate if it rolled over, nor saw any mention of rolling over on the label.[208] Dr. Arndt acknowledges that both Katie and Andrew read the warning, "Thus per Ms. Courkamp's testimony, she was aware of everything that was on the subject warning, and in sum there was nothing in the warnings that

---

[201] Steinwachs January 22, 2021 deposition, pp. 163-164, 172-173
[202] ANSI Z535-2011, p. 5. (Earlier versions of the standard have the same specified color panel)
[203] ANSI Z535.4-2011 §9.1 Location, p. 7
[204] Annex B, ANSI Z535.4-2011, p. 15
[205] K. Courkamp, p. 102
[206] K. Courkamp, p. 102 and Olsen, p. 258
[207] Olsen, p. 169, 170
[208] Olsen, p. 157, 259

she disagreed with."[209] The critical issue is not whether she *agrees*; it is whether she has *been informed* of the hazards. The evidence suggests that these are the exact people that need additional hazard information – the rollover hazard and the 5-month age limit – that was missing from the warning's suffocation section.

The parents' depositions did not ask key questions about their understanding of the hazards with use. As a rebuttal to these experts' opinions, I interviewed Mr. Olson and Ms. Courkamp separately using the on-product warning as well as the modified ASTM warnings (provided for interviews; Figures 3, 5, 6, and 7). According to the interviews, Ms. Courkamp "would not have used it [RNP] because of the bold words that babies have suffocated and died. If it did not say 'have died' in it, I would have stopped using it when baby reached 5 months, or when baby could roll over - and made sure the restraint was fit and snug. I would have noticed the warnings and I would have stopped using it when she reached 5 months or could roll over." Mr. Olsen, also would have behaved differently if he had access to the modified ASTM warning, "I would not have bought that product with that label on it."  Referring to the modified ASTM warning, under "suffocation hazard," he also would not have used the device if he knew that babies had died from using the product.

Thus, there is evidence that had there been a conspicuous and informative warning that "babies have suffocated and died," the rollover hazard, and the 5-month age limit, which were all missing from the inconspicuous warning's "suffocation hazard" section, the behavior of both of Zoey's parents would have been different. My interview notes have been attached to this report.

In summary, Fisher-Price's experts did not provide evidence that it effectively managed the suffocation hazard caused by the RNP inclined sleeper. Had effective hazard management been used, Zoey's death could have been avoided.

All of my opinions are expressed to a reasonable degree of professional certainty. I reserve the right to modify the opinions in this report if additional information becomes available.


I appreciate the opportunity to assist you in this case and am available for any further work that may be required.

Sincerely,

Alison Vredenburgh, Ph.D., CPE
Vredenburgh & Associates, Inc.

---

[209] Arndt, p. 22

Vredenburgh & Associates, Inc.
Courkamp v. Fisher-Price Rebuttal
Page 19 of 19

AV/ibz

Enclosure



# Vredenburgh & Associates, Inc.
## Human Factors, Safety, Biomechanics and Organizational Consulting

*Mailing Address*

2588 El Camino Real, F353
Carlsbad, CA 92008
(442) 222-8289
avredenburgh@gmail.com
www.hfexpert.com

**Interview with Andrew Olson** (6/16/21: 4:00-4:20 p.m.)

1. In your mind, what was the warning on the back of the sleeper telling you to do to protect Zoey from a suffocation risk?

She could suffocate in gaps between an extra pad and the side.

2. Did you think the statements under "fall hazard" applied to the possibility of suffocation?

When I got the product, I only saw an issue as a fall hazard. That is why I did not put the sleeper over tile. That was our only concern about falling. That is why it was on a padded surface - and we had her sleeping next to our bed for that reason too.

3. If you saw a sleeper with the attached warnings, would you have done anything differently?

Certainly yes

4. If yes, what?

I would either have not bought the product or done more research how they can still sell the product. I would have bought a different product in which babies have not died. I would not have bought that product with that label on it. If this is an unusual warning on a product, would not have bought it. If given the sleeper as a gift, I would not have used it. The words "have died" would have stuck out, and I would avoid the product.

DocuSigned by:

_____                    6/17/2021
95B271B8506F486...                          _____
Andrew Olson                                Date



## ⚠ WARNING

**Suffocation Hazard**: Babies have suffocated and **died** from **rolling over** in inclined sleep products.

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

COU_009048

## ⚠ WARNING

**Suffocation Hazard**: Babies have <u>suffocated</u> and <u>died</u> from **rolling over** on added pillows, blankets, and extra padding in inclined sleep products.

To prevent **falls** and **suffocation**:

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

## ⚠ WARNING
### Failure to follow these warnings and the instructions could result in serious injury or death.

- ALWAYS use the restraint system.
- ALWAYS use the pad provided, which includes the restraint. NEVER add a mattress, pillow, comforter, or padding.
- **SUFFOCATION HAZARD** - Infants can suffocate:
  - in gaps between an extra pad and the side of the product - on soft bedding.
- **FALL HAZARD** - To prevent falls, DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs. (11.3 kg), whichever comes first.
- Strings can cause strangulation! NEVER place items with a string around a child's neck such as hood strings or pacifier cords. NEVER suspend strings over product or attach strings to toys.
- NEVER place product near a window where cords from blinds or drapes can strangle a child.
- To reduce the risk of Sudden Infant Death Syndrome (SIDS), pediatricians recommend healthy infants be placed on their backs to sleep, unless otherwise advised by your physician.
- Always provide the supervision necessary for the continued safety of your child.
- When used for playing, never leave child unattended.

**Interview with Katie Courkamp** (6/16/21: 5:00 – 5:11 p.m.)

1. In your mind, what was the warning on the back of the sleeper telling you to do to protect Zoey from a suffocation risk?

Not to add mattress, pillow, padding. Not put in extra padding.

2. Did you think the statements under "fall hazard" applied to the possibility of suffocation?

No. Assumed not to fall out of the Rock 'n Play

3. If you saw a sleeper with the attached warnings, would you have done anything differently?

Yes

4. If yes, what?

I would not have used it because of the bold words that "babies have suffocated and died." If it did not say "have died" in it, I would have stopped using it when baby reached 5 months, or when baby could roll over - and made sure the restraint was fit and snug. I would have noticed the warnings and I would have stopped using it when she reached 5 months or could roll over.



| | |
|---|---|
| Katie Courkamp | 6/18/2021 |
| | Date |



**WARNING**

**Suffocation Hazard**: Babies have suffocated and **died** from **rolling over** in inclined sleep products.

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

## ⚠ WARNING

**Suffocation Hazard**: Babies have <u>suffocated</u> and <u>died</u> from **rolling over** on added pillows, blankets, and extra padding in inclined sleep products.

To prevent **falls** and **suffocation**:

- **Always** <u>use restraints</u>. Adjust to <u>fit snugly</u>, even when baby is sleeping.
- NEVER place pillows, blankets, or extra padding in inclined sleep product.
- **Always** place baby on back to sleep.
- Stop using product when baby begins to roll over or can pull up on sides.
- **Stop using** when baby reaches <u>5 months</u>.

## ⚠WARNING
### Failure to follow these warnings and the instructions could result in serious injury or death.

- ALWAYS use the restraint system.
- ALWAYS use the pad provided, which includes the restraint. NEVER add a mattress, pillow, comforter, or padding.
- **SUFFOCATION HAZARD** - Infants can suffocate:
  - in gaps between an extra pad and the side of the product - on soft bedding.
- **FALL HAZARD** - To prevent falls, DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs. (11.3 kg), whichever comes first.
- Strings can cause strangulation! NEVER place items with a string around a child's neck such as hood strings or pacifier cords. NEVER suspend strings over product or attach strings to toys.
- NEVER place product near a window where cords from blinds or drapes can strangle a child.
- To reduce the risk of Sudden Infant Death Syndrome (SIDS), pediatricians recommend healthy infants be placed on their backs to sleep, unless otherwise advised by your physician.
- Always provide the supervision necessary for the continued safety of your child.
- When used for playing, never leave child unattended.