Nicole M. Goodwin (SBN 024593)
Aaron J. Lockwood (SBN 025599)
**GREENBERG TRAURIG, LLP**
2375 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Tel: (602) 445-8000
Facsimile: (602) 445-8100
goodwinn@gtlaw.com
lockwooda@gtlaw.com

Lori G. Cohen *(pro hac vice)*
Brandon D. Cox *(pro hac vice)*
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (310) 553-2100
Facsimile: (310) 553-2212
cohenl@gtlaw.com
coxb@gtlaw.com

Mary-Olga Lovett *(pro hac vice)*
**GREENBERG TRAURIG, LLP**
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 374-3541
Facsimile: (713) 754-7541
lovettm@gtlaw.com

*Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>Plaintiff,<br><br>v.<br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation,<br><br>Defendants. | No. 2:19-cv-02689-GMS<br><br>**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF ERIK CHRISTENSEN, M.D.**<br><br>**ORAL ARGUMENT REQUESTED** |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 3

LEGAL STANDARD ....................................................................................................... 3

ARGUMENT ..................................................................................................................... 5

    I.    Dr. Christensen Failed to Perform a Reliable Differential Diagnosis Because He Did Not Rule Out Other Potential Causes of Z.O.'s Death, and Instead Focused Only on Support for His Own, Preconceived Theory That is Contrary to the Evidence. ............................ 5

        A.    The standard for a differential diagnosis .......................................... 5

        B.    Dr. Christensen's failure to conduct a reliable differential diagnosis renders his causation conclusion unreliable. .................................... 7

            1.    Dr. Christensen failed to adequately account for the objective post-mortem rigor mortis and lividity scientific evidence. ............................................................... 7

            2.    Dr. Christensen failed to adequately account for SIDS environmental risk factors and two different medical examiners' conclusions that Z.O.'s death was consistent with SIDS. ...................................................... 9

            3.    Dr. Christensen failed to adequately account for the conflicting statements about Z.O.'s position when she was found, including Plaintiff's and Mr. Olson's own inconsistent statements. ............................................... 10

            4.    Dr. Christensen's reliance on the unidentified stain on the RNPS does not provide a reliable scientific foundation for his cause of death conclusion and, if anything, casts doubt on his credibility. ............................ 11

    II.   Dr. Christensen Is Not Qualified to Opine on AAP Standards. ............... 13

    III.  Dr. Christensen Should Be Precluded from Offering Any Opinions He Has Disclaimed, Including Any Opinion That a Specific *Defect* in the RNPS Caused Z.O.'s Death. ........................................................ 14

CONCLUSION ................................................................................................................ 14

Defendants Mattel, Inc. and Fisher-Price, Inc., (collectively "Defendants"), by and through their undersigned counsel, and pursuant to Fed. R. Evid. 702, move to exclude Plaintiff's expert, Erik Christensen, M.D. ("Dr. Christensen"). In support of this Motion, Defendants rely on the following Memorandum of Points and Authorities.

## INTRODUCTION

Plaintiff has disclosed Erik Christensen, M.D. as an expert in the area of forensic pathology. All of Dr. Christensen's opinions and testimony should be excluded because they lack any discernible scientific methodology whatsoever and are unreliable under *Daubert* and Rule 702.

In his April 2021 report, Dr. Christensen concludes that Z.O. was in the prone (face-down) or semi-prone position in the Rock 'n Play Sleeper ("RNPS") when she died, causing her to die of what he calls "positional asphyxia" (which he describes as a type of suffocation). (*See generally* Christensen Report, at p. 3, **Ex. A**). Dr. Christensen's conclusion is based primarily on two sources of unreliable information: (1) certain of Plaintiff's and Mr. Olson's statements that Z.O. was found in the face-down or semi-prone position, and (2) a stain on the RNPS in which Z.O. was allegedly found deceased, which Dr. Christensen concludes was Z.O.'s blood stain from her being in the face-down or semi-prone position—*despite zero scientific testing to determine the nature of the stain*. (*Id.*).

In relying on these two sources of information, Dr. Christensen ignored and failed to consider and rule out critical record evidence, including (1) the overwhelming objective, physical evidence relating to rigor mortis (stiffening of the body) and lividity (pooling of the blood) on Z.O.'s body, showing she died in the supine (face-up) position, and not in the face-down or semi-prone position; (2) the official cause of her death reached by two different medical examiners who both concluded Z.O.'s cause of death was "unknown" and consistent with SIDS/SUID, not the positional asphyxia that Dr. Christensen posits here; (3) the presence of multiple environmental factors known to contribute to the likelihood of SIDS, such as smoking and high temperatures; (4)

1

numerous statements of key third-party witnesses demonstrating Z.O. was face-up when she died, and not face-down or semi-prone; (5) and Plaintiff's and Mr. Olson's own inconsistent statements about Z.O.'s position when she was found deceased.

Dr. Christensen provides no basis in fact or science to disregard this evidence and does not explain how he considered and ruled out other potential causes and explanations for Z.O.'s death that logically flow from this evidence. Nor does he describe any discernible scientific methodology whatsoever to otherwise support his positional asphyxia conclusion, which is critically important here where Dr. Christensen is the *only person*—designated expert or otherwise—to conclude Z.O. died of positional asphyxia and not SIDS/SUID. Indeed, Dr. Christensen is Plaintiff's *only expert who purports to address causation or cause of death at all.* Thus, should the Court exclude Dr. Christensen's opinions because they are unreliable and incapable of being tested, *then all of Plaintiff's claims fail for lack of proof of causation.* (*See* Defendants' Memorandum in Support of Their Motion for Summary Judgment, which is being filed contemporaneously with this Motion and incorporated by reference herein).

The Court should exclude all of Dr. Christensen's opinions for the following reasons.

*First*, Dr. Christensen's differential diagnosis failed to consider and rule out other potential causes and explanations for Z.O.'s death, such as the objective physical evidence (rigor mortis and lividity); several known risk factors for SIDS; the objective medical conclusions of two different medical examiners who both concluded Z.O.'s cause of death was "unknown" and consistent with SIDS: and other evidence that contradicts the premise of his conclusion that Z.O. died face-down or semi-prone. He also improperly relied on an unidentified stain that he claims is a "blood" stain, despite it never having been tested.

This flawed methodology does not pass muster under Rule 702 and shows how Dr. Christensen's conclusion is not supported by any scientifically sound methodology, is unreliable, and should be excluded.

2

***Second***, Dr. Christensen is not qualified to opine on AAP standards, and therefore any alleged opinions or testimony on this topic should be excluded.

***Third and finally***, Dr. Christensen should be precluded from offering any opinions he has disclaimed. Specifically, Dr. Christensen concedes he is not qualified to opine that a specific *defect* in the RNPS *proximately caused* Z.O.'s death, and admits his lone causation conclusion is purely a medical one and not at all connected to a specific defect in the RNPS. He also admits he is not qualified to opine on various subjects that are outside his expertise. These opinions should be excluded.

## FACTUAL BACKGROUND

To avoid repetition, Defendants fully incorporate by reference Sections I and II of their Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, which provides a detailed factual background about the RNPS and the incident that is the basis of this lawsuit.

## LEGAL STANDARD

Federal Rule of Evidence 702 controls the admission of expert testimony. Under Rule 702, the Court acts as a "gatekeeper" to first determine whether an expert is qualified; then the Court determines whether an expert's proposed opinions are reliable and relevant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); *see also Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir.) cert. denied, 132 S. Ct. 120 (2011); *Contreras v. Brown*, CV-17-08217-PHX-JAT, 2019 WL 2080143, at *1 (D. Ariz. May 10, 2019) ("Rule 702 imposes a special gatekeeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert [] testimony."); *In re Apollo Grp., Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 962 (D. Ariz. 2007) (confirming the gatekeeping obligation outlined in *Daubert* applies to all expert testimony); *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) ("In exercising this gatekeeping function, a

court must determine that the experts are qualified, that their opinions are reliable, and that their testimony fits the case.").

To determine whether an expert is qualified, the Court must decide whether the individual has the requisite qualifications. *Skinner v. Tuscan, Inc.*, No. CV-18-00319-TUC-RCC, 2020 U.S. Dist. LEXIS 186308, at *23-24 (D. Ariz. Oct. 7, 2020). The Court's review of an expert's qualifications also defines the scope of the expert's permissible testimony. *Swift v. Wesco Ins. Co.*, No. CV-18-01531-PHX-RM, 2021 U.S. Dist. LEXIS 34808, * 19 (D. Ariz. Feb. 23, 2021).

Next, the Court evaluates the reliability and relevancy of the expert's proposed opinions. *Daubert* articulated several inquiries for a district court to consider in determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the expert's theory or technique can and has been tested; (2) whether it has been subjected to peer review and publication; (3) what the technique's known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field. 509 U.S. at 593-94; *see also Brown*, 415 F.3d at 1267.

Finally, the Court must determine whether the expert's reasoning or methodology is relevant. *Sampedro v. ODR Mgmt. Grp. LLC*, No. CV-18-04811-PHX-SPL, 2021 U.S. Dist. LEXIS 96323, at *5 (D. Ariz. May 19, 2021). The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *Roosevelt Irrigation Dist. v. United States*, No. CV-15-00448-PHX-JJT, 2019 U.S. Dist. LEXIS 36530, at *5-6 (D. Ariz. Mar. 7, 2019). In doing so, the court must determine whether the opinions being offered are sufficiently tied to the facts in issue and that the expert's testimony will aid the jury. *Daubert*, 509 U.S. at 591 (stating that the district court's "gatekeeping role" requires ensuring that the expert's testimony "is relevant to the task at hand" and will assist the trier of fact to understand the evidence).

4

**ARGUMENT**

I. **Dr. Christensen Failed to Perform a Reliable Differential Diagnosis Because He Did Not Rule Out Other Potential Causes of Z.O.'s Death, and Instead Focused Only on Support for His Own, Preconceived Theory That is Contrary to the Evidence.**

A. **The standard for a differential diagnosis**

The rule in the Ninth Circuit, as well as a majority of all other federal circuits, is that "a reliable differential diagnosis may form the basis of an expert's causation testimony" but only if the methods used by the expert to conduct that differential diagnosis are reliable. *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014); *see also Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003); *see also Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (noting that "[a] differential diagnosis satisfies a *Daubert* analysis if the expert uses reliable methods"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252 (11th Cir. 2005) (detailing a reliable differential diagnostic process).

"The first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Clausen*, 339 F.3d at 1057-58 (citations omitted). "Expert testimony that neglects to consider a hypothesis that might explain the clinical findings under consideration may also be unreliable." *Id.* (citations omitted). "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Westberry v. Gislaved Gummi AB, et al.*, 178 F.3d 257, 265 (4th Cir. 1999).

After the expert gathers the hypotheses, he or she must then "engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Clausen*, 339 F.3d at 1058. "A district court is justified in excluding evidence if an expert 'utterly fails . . . to offer an explanation for why the proffered alternative cause' was ruled out." *Id.* (quoting *Cooper v. Smith Nephew, Inc.,* 259 F.3d

194, 202 (4th Cir. 2001)). The expert must provide reasons for rejecting alternative hypotheses "using scientific methods and procedures" and the elimination of those hypotheses must be founded on more than "subjective beliefs or unsupported speculation." *Claar v. Burlington N.R.R. Co.,* 29 F.3d 499, 502 (9th Cir. 1994); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (requiring explanations based on "scientifically valid principles").

This Court recently excluded an expert's opinions for failure to conduct a reliable differential diagnosis. *See Alsadi v. Intel Corp.*, No. CV-16-03738-PHX-DGC, 2019 WL 4849482 (D. Ariz. Sep. 30, 2019). In *Alsadi*, an expert was asked to opine as to the causes of a plaintiff's symptoms following an industrial accident where toxic gases were released into the air. *Id.* at *2. The plaintiff claimed the expert's testimony was "reliable because it was based on a differential diagnosis." *Id.* at *8. The court rejected this argument and granted the *Daubert* motion, reasoning that while the expert "identified a host of conditions . . . that potentially could cause Alsadi's symptoms," the expert did nothing to rule them out as causes for the plaintiff's symptoms. *Id.* at *5.

Similarly, in *Heck v. City of Lake Havasu*, this Court excluded an expert's opinions for failure to conduct a reliable differential diagnosis, finding "Plaintiffs [had] not demonstrated the reliability of [the expert's] opinion testimony." No. CV 04-1810-PCT-NVW, 2006 WL 2460917, at *11 (D. Ariz. Aug. 24, 2006). In *Heck*, the defendants sought to exclude a "portion of [the expert's] testimony related to [the plaintiff's] cause of death," namely that [the plaintiff's] death was due to "the toxic effects of carbon monoxide on his central nervous system." *Id.* at *11. This Court noted that while a differential diagnosis "entails making a list of all the likely or even possible causes of death, attempting to gather evidence for each of them, and then one by one crossing them off until the most likely cause is left," the expert in *Heck* provided "no scientific explanation for ruling out the possibility that [the plaintiff] was rendered unconscious and drowned from diving into the water and hitting his head on the bottom" or from the possibility that the decedent "merely slipped and fell, hitting his head on the way to the

6

water." *Id.* at *14–15. As the expert had failed to "provide reasons for rejecting alternative hypotheses using scientific methods and procedures,'" *Heck*, 2006 WL 2460917 at *10 (quoting *Clausen*, 339 F.3d at 1058), and instead "focuse[d] only on support for his own theory." *Id.* at *10. As discussed below, these same conclusions from *Alsadi* and *Heck* are applicable to this case.

    **B.**    **Dr. Christensen's failure to conduct a reliable differential diagnosis renders his causation conclusion unreliable.**

        1.    *Dr. Christensen failed to adequately account for the objective post-mortem rigor mortis and lividity scientific evidence.*

Dr. Christensen disregarded scientific evidence about the objective post-mortem findings on Z.O.'s body that indicates she died face-up, and not face-down or semi-prone as Dr. Christensen posits here. Specifically, evidence relating to the progress of rigor mortis on Z.O.'s body helps to establish a timeline for her passing, which determines the reliability of lividity patterns.

Rigor, or the stiffening of the muscles, begins one to two hours after death, first in the smaller muscles of the face and jaw, then spreading to the extremities. (*Forensic Pathology: Principles and Practice.* Dolinak D., Matshes E.W., Lew E.O., Eds. Boston, MA: Elsevier/Academic Press, 2005, **Ex. B**). It generally becomes maximal at eight to twelve hours. (*Id*.). On the morning Z.O. died, the Tempe Fire Department (TFD) arrived at the scene at 8:06 a.m., six minutes after Plaintiff allegedly found Z.O. unresponsive. (Cert. Recs. Temp Police Dep't, at ZO-TempePD-000006, **Ex. C**). By that time, Z.O. already had rigor present in her upper and lower extremities and some livor in her legs (Cert. Recs. Tempe Fire Dep't, at ZO-TempePD-00001, **Ex. D**). When the ME investigator arrived at approximately 10:00 a.m., he described rigor and lividity as "fixed." *Id*.

If Z.O. had been found face-down as Dr. Christensen posits, then blood would likely have pooled in parts of her face, or on the front side of her body, producing a

bluish-purple discoloration of the skin called "lividity."[1] But the Fire Department did not note any lividity present on Z.O.'s face or the front side of her upper body, which scientifically contradicts Dr. Christensen's conclusion she died face-down or semi-prone. (*See id.*). By contrast, photographs taken of Z.O.'s body at the scene after she died show significant lividity over her *posterior surface and back*—strong evidence showing Z.O. was face-up, on her back when she died.

Even Dr. Christensen admitted this during his deposition:

> Q. Okay. The – Swope [Medical Examiner Investigator] notes that [Z.O.] is found in the supine position; correct?
>
> A. When he gets there, yes.
>
> Q. And that is consistent – that would be consistent, the lividity pattern we do see on baby [Z.O.] is on the posterior or on her back; correct?
>
> A. It would be consistent with that, yes. Uh-huh.
>
> * * *
>
> Q. The next morning, [Z.O.'s] mother Kathleen woke up at 8:00 a.m. and found the subject in a semi-prone, semi-left lateral position with the seatbelt undone.
>
> A. Uh-huh.
>
> Q. Again, if -- and if the -- if Mr. Swope's livor and rigor patterns are correct from the scene, then the finding of semi-prone, semi-left lateral is not supported by that; true?
>
> A. True.

(E. Christensen, MD, Dep., at 171:6–14, 178:13-22, **Ex. E**).

Despite admitting the objective, physical evidence shows Z.O. was face-up when she died and not face-down or semi-prone, Dr. Christensen chose to ignore this evidence entirely in his original report. In his rebuttal report, he dismissed this evidence by

---

[1] *Id.*

8

claiming the medical examiner assessed Z.O. "three hours after her original discovery," speculating that moving Z.O.'s body somehow disrupted the fixed lividity patterns. (Christensen Rebuttal report, at p. 5, **Ex. F**). Thus, according only to Dr. Christensen, "[t]here can be no definitive conclusions drawn about her position" based on this evidence. (*Id.*). Unsurprisingly, Dr. Christensen provides no scientific basis to support this position. Nor can he when it is inconsistent with well-established and generally accepted scientific principles. It defies credulity for Dr. Christensen to conclude that even though Z.O. did not have any lividity on her face, and did have lividity on her posterior and back, that she was somehow face-down or semi-prone in the RNPS when she died. The objective, physical evidence contradicts this conclusion, and Dr. Christensen never provides a scientifically reliable explanation to reconcile the objective, physical evidence with his positional asphyxia conclusion.

These significant flaws render Dr. Christensen's cause of death conclusion unreliable, and the Court should exclude it.

> 2. *Dr. Christensen failed to adequately account for SIDS environmental risk factors and two different medical examiners' conclusions that Z.O.'s death was consistent with SIDS.*

Dr. Christensen also disregarded the existence of several risk factors for Sudden Infant Death Syndrome ("SIDS") or Sudden Unexplained Infant Death ("SUID"), which suggest—similar to the two medical examiners' conclusions—that Z.O.'s death was consistent with SIDS/SUID. *First*, he ignored and did not consider Z.O.'s exposure to secondhand smoke as a risk factor for SIDS/SUID. (E. Christensen, MD, Dep., at 109:17-20, **Ex. E**; *see also* Andrew Olson Dep., at 212:17-19, **Ex. I**). *Second*, he ignored and did not consider heat and environmental temperature as a risk factor for SIDS/SUID, (E. Christensen, MD, Dep., at 115:8-11, **Ex. E**), when the home in which Z.O. died was 87 degrees at the time it was measured by the authorities. (*Id.* at 114:17-21). *Third*, he ignored and did not consider the presence of blankets in Z.O.'s sleep environment as a risk factor for SIDS/SUID when there were pictures of blankets in the RNPS from the

9

day of Z.O.'s death. (*Id.* at 185:14-17). *Fourth*, he ignored and did not consider that Z.O. had been hospitalized for an upper respiratory infection just a few months before she died, and in fact, had not even been provided with the records of this hospitalization. (*Id.* at 107:6-14). *Fifth and finally,* he ignored and did not consider that Z.O. had a constant raspy cough and fluid in her lungs at birth (*Id.* at 108:11-20), and had grown two inches but had lost two pounds in the time between her most recent checkup and her passing. (*Id*. at 140:5-9).

Dr. Christensen further failed to account for two different medical examiners' conclusions that Z.O.'s cause of death was "unknown" and consistent with SIDS or SUID. (Cert. Recs. Maricopa Cty. Off. Med. Examiner, at ZO-MCOME-000009, **Ex. G**; *see also* M. Ferenc, MD, Dep., at 35, **Ex. H**). Indeed, and as mentioned in Defendants' Memorandum in Support of Their Motion for Summary Judgment, both medical examiners confirmed at their depositions that they still believe Z.O.'s death was consistent with SIDS or SUID. Dr. Christensen never provides a scientifically reliable explanation to discount these objective conclusions and explain how his positional asphyxia conclusion still holds water. Once again, Dr. Christensen neglected to "'provide reasons for rejecting alternative hypotheses using scientific methods and procedures,'" *Heck*, 2006 WL 2460917 at *10 (quoting *Clausen*, 339 F.3d at 1058), and instead "focuse[d] only on support for his own theory." *Id.* at *10. Thus, just like the experts in *Alsadi* and *Heck*, Dr. Christensen's failure to grapple with SIDS/SUID as a potential alternate cause of death (indeed, *the* cause of death identified by the medical examiners), let alone exclude it as a possibility, renders Dr. Christensen's cause of death conclusion unscientific and inadmissible.

        3.    *Dr. Christensen failed to adequately account for the conflicting statements about Z.O.'s position when she was found, including Plaintiff's and Mr. Olson's own inconsistent statements.*

For Dr. Christensen's positional asphyxia conclusion to stick, Z.O. must have died in the face-down or semi-prone position. He relies exclusively on certain of Plaintiff's

and Mr. Olson's statements that Z.O. was found in one of these positions, while completing ignoring the scientific evidence discussed above that suggests Z.O. in fact died face-up and even ignores Plaintiff's and Mr. Olson's own contradictory statements about the position in which they found Z.O. For example, Dr. Christensen ignores that one of the officers on the scene noted that he was told by Plaintiff contemporaneously that Z.O. was found "still on her back," suggesting she was in fact face-up when she died. (Christensen Report, at p. 4, **Ex. A**). He also ignores that Plaintiff testified in this case that Z.O.'s nose and mouth were *not* covered or obstructed by the fabric of the RNPS, again suggesting she was in fact face-up when she died. (K. Courkamp Dep., at 173:3-9, **Ex. J**). He further ignores the photographs from the re-enactment, which show no evidence that Z.O.'s face was obstructed by the RNPS. (Maricopa Cty. Off. of the Med. Examiner Photographs, at ZO-MCOME-000174-176, **Ex. K**).

Dr. Christensen does not attempt to resolve this conflicting evidence, much less explain whether or how his conclusion remains intact if Z.O. had been face-up when she died and not face-down or semi-prone as he posits. The obvious answer is that Dr. Christensen's conclusion fails entirely if indeed Z.O. died in the face-up position because she would not have suffocated in the manner Dr. Christensen claims she did. But Dr. Christensen's differential diagnosis fails to include this important analysis, again showing his cause of death opinion is unscientific, unreliable, and should be excluded.

    4.    *Dr. Christensen's reliance on the unidentified stain on the RNPS does not provide a reliable scientific foundation for his cause of death conclusion and, if anything, casts doubt on his credibility.*

Dr. Christensen relied on an unidentified stain on the RNPS—which was never tested to determine what it was or how long it had been on the RNPS—to support his conclusion that Z.O. was in the face-down or semi-prone position when she died. According only to Dr. Christensen, the stain must be a bloodstain from Z.O., which proves she suffocated from the fabric of the RNPS while in the face-down or semi-prone position. (Christensen Report, at p. 4, **Ex. A**). But Dr. Christensen fails to reach this

conclusion to a reasonable degree of scientific or medical certainty. Indeed, Dr. Christensen failed to show—with any scientific evidence—that the stain was in fact a bloodstain from Z.O. This is not surprising because no one, including Dr. Christensen, can reliably reach this conclusion *when the stain was never even tested*. Equally troubling, Dr. Christensen never explained how he considered and ruled out other alternative explanations and potential causes of the stain. This flawed leap in Dr. Christensen's conclusion highlights how his reliance on an unidentified stain does not provide a scientifically reliable foundation for his cause of death conclusion. If anything, it cuts to the heart of Dr. Christensen's credibility that one of the primary bases for his opinion rests on a stain about which he can only speculate.

The record unequivocally shows that Dr. Christensen improperly cherry-picked evidence to fit his preconceived conclusion that Z.O. died of what he calls positional asphyxia. Courts across the country agree that experts are not permitted to "cherry pick" evidence to support their preconceived conclusions, and have excluded opinions for this reason. *See Claar*, 29 F.3d at 502-03 ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method."); *Lust ex rel. Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 596 (9th Cir. 1996) (affirming the district court's finding that an expert may not "pick and [choose] from the scientific landscape and present the Court with what he believes the final picture looks like"); *In re Incretin-Based Therapies Prods. Liab. Litig.*, Case No.: 13-md-2452-AJB-MDD, at *42 (S.D. Cal. Mar. 9, 2021) (the court finds that the expert's analysis consisted of a cherry-picked selection of favorable data; thus it was "unduly results-driven, not good science, and therefore inadmissible"); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert opinion when she "ignore[d] all the evidence that contradict[ed] her litigation-created conclusion"); *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) ("Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in the methods of science."); *Barber v. United*

*Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("[A] selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'"); *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 788 (D. Ariz. 2017) (concluding expert's "presentation of data suggests a cherry-picked methodology" and excluding expert's opinion).

Here, Dr. Christensen committed the same errors as the experts in the above cases and those excluded by this Court in *Alsadi* and *Heck*. *See Alsadi*, No. CV-16-03738-PHX-DGC, 2019 WL 4849482, at *9; *Heck*, No. CV 04-1810-PCT-NVW, 2006 WL 2460917, at *14–15. Dr. Christensen's report, rebuttal report, and deposition testimony confirm that he ignored the objective, physical evidence (rigor mortis and lividity); ignored several risk factors for SIDS; ignored the objective medical findings of two different medical examiners who concluded Z.O.'s death was consistent with SIDS; ignored and failed to address other evidence that contradicts his conclusion that Z.O. died face-down or semi-prone; and improperly relied on a "blood" stain that he does not even know is actually blood (and even if it was blood, whose blood it may be and when the stain occurred).

On these facts, there is no scientifically reliable basis for the cause of death conclusion he purports to offer here. This Court—like the *Alsadi* and *Heck* courts—should therefore exclude Dr. Christensen's cause of death conclusion because he has failed to "provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses" and instead has "focuse[d] only on support for his own theory." *Heck*, 2006 WL 2460917 at *10.

**II.   Dr. Christensen Is Not Qualified to Opine on AAP Standards.**

In one short paragraph in his report, Dr. Christensen opines that the RNPS is not in compliance with the Safe Sleep recommendations of the American Association of Pediatrics ("AAP"). (Christensen Report, at p. 5, **Ex. A**). Dr. Christensen has no credentials that would qualify him to provide such an opinion. He is a forensic pathologist; he is not an expert in pediatrics or on the AAP and its guidelines. (E.

13

Christensen, MD, Dep., at 38:12-15; 38:25-39:3, **Ex. E**). He therefore lacks the required knowledge, skill, experience, training, or education to testify about AAP standards, and under Rule 702 his purported opinions and testimony on this topic should be excluded.

**III.    Dr. Christensen Should Be Precluded from Offering Any Opinions He Has Disclaimed, Including Any Opinion That a Specific *Defect* in the RNPS Caused Z.O.'s Death.**

Finally, in his deposition Dr. Christensen expressly disclaimed having expertise in several areas upon which both his original and rebuttal reports ostensibly touch. Dr. Christensen admits he has no engineering expertise, collected no data on the RNPS, and will not opine that a specific *defect* in the RNPS *proximately caused* Z.O.'s death:

> Q.    And I've asked the question, but you will not be –you will not be telling a jury your opinion on the ultimate conclusion that the Rock 'n Play caused Zoey's death?
>
> A.    *No*.

(E. Christensen, MD, Dep. at 43:11-15; *see also* 41:23-25; 42:8-13, **Ex. E**) (emphasis added). He acknowledged his positional asphyxia conclusion is a medical conclusion only, and not tied to a defect in the RNPS. (*See generally id.*). Furthermore, he admits he is not an expert in the areas of pediatrics, pulmonology, neonatology, infant safe sleep practices, sleep medicine, or the AAP and its guidelines (as discussed above). (*Id.* at 38:12-39:13). Additionally, Dr. Christensen testified he is not an expert on Consumer Product Safety Commission standards, including those for incline infant sleep products, and he is not an expert in human factors or warnings and labeling. (*Id.* at 41:4-22).

Thus, Dr. Christensen should not be permitted to testify on any of these subjects by his own admissions and testimony.

## CONCLUSION

For the reasons stated herein, Defendants respectfully request the Court grant this Motion, exclude the opinions and testimony of Dr. Christensen, and grant all other relief to which Defendants may be entitled.

14

RESPECTFULLY SUBMITTED this 19th day of November 2021.

GREENBERG TRAURIG LLP

By: /s/ *Lori G. Cohen*
    Lori G. Cohen*
    Mary-Olga Lovett*
    Nicole M. Goodwin
    Aaron T. Lloyd
    *Pro Hac Vice
    *Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

15

**Certificate of Service**

£    I hereby certify that on November 19, 2021, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to the following registered participants of the CM/ECF System:

John E. Osborne<br>
William C. Bacon<br>
GOLDBERG & OSBORNE LLP<br>
698 E. Wetmore Road, Ste. 200<br>
Tucson, Arizona 85705<br>
josborne@goldbergandosborne.com<br>
wbacon@goldbergandosborne.com<br>
kschriner@goldbergandosborne.com<br>
*Attorneys for Defendants*

By: */s/ Lori G. Cohen*
     Greenberg Traurig, LLP

60765531