# EXHIBIT B

# Forensic Pathology

## Principles and Practice

David Dolinak    Evan Matshes    Emma Lew

# Forensic Pathology

# Forensic Pathology
## Principles and Practice

David Dolinak, M.D.
*Deputy Chief Medical Examiner*
*Dallas County Medical Examiner Department*
*Assistant Professor of Pathology*
*University of Texas Southwestern Medical Center at Dallas*
*Dallas, Texas*

Evan W. Matshes, M.D.
*Adjunct Professor*
*Department of Anatomy and Cell Biology*
*University of Saskatchewan*
*Saskatoon, Saskatchewan, Canada*
*Resident, Anatomical Pathology*
*Department of Pathology and Laboratory Medicine*
*University of Calgary*
*Calgary, Alberta, Canada*

Emma O. Lew, M.D.
*Deputy Chief Medical Examiner*
*Miami-Dade County Medical Examiner Department*
*Assistant Clinical Professor of Pathology*
*University of Miami School of Medicine*
*Miami, Florida*



ELSEVIER
ACADEMIC
PRESS

Amsterdam   Boston   Heidelberg   London   New York   Oxford
Paris   San Diego   San Francisco   Singapore   Sydney   Tokyo

Acquisitions Editor: Mark Listewnik
Associate Acquisitions Editor: Jennifer Soucy
Developmental Editor: Pamela Chester
Marketing Manager: Christian Nolin
Senior Project Manager: Paul Gottehrer

*Cover Image*: Colin Anderson, Getty Images

Elsevier Academic Press
30 Corporate Drive, Suite 400, Burlington, MA 01803, USA
525 B Street, Suite 1900, San Diego, California 92101-4495, USA
84 Theobald's Road, London WC1X 8RR, UK

This book is printed on acid-free paper. 

Copyright © 2005, Elsevier Inc. All rights reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher.

Permissions may be sought directly from Elsevier's Science & Technology Rights Department in Oxford, UK: phone: (+44) 1865 843830, fax: (+44) 1865 853333, e-mail: permissions@elsevier.com.uk. You may also complete your request on-line via the Elsevier homepage (http://elsevier.com), by selecting "Customer Support" and then "Obtaining Permissions."

**Library of Congress Cataloging-in-Publication Data**
Application submitted

**British Library Cataloguing in Publication Data**
A catalogue record for this book is available from the British Library

ISBN: 0-12-219951-0

For all information on all Elsevier Academic Press publications
visit our Web site at www.books.elsevier.com

Printed in China
05  06  07  08  09  10  9  8  7  6  5  4  3  2  1

Working together to grow
libraries in developing countries

www.elsevier.com | www.bookaid.org | www.sabre.org

ELSEVIER     BOOK AID
             International     Sabre Foundation

To all students of forensic pathology.
—DD

To Belinda for EVERYTHING.
To my family for their support and encouragement.
To Ranjit, Emma, and Valerie.
—EWM

To my Mama May Yen Lew, to whom I owe my existence.
—EOL

He who knows and knows he knows
He is a wise man, seek him.
He who knows and knows not he knows,
He is asleep, wake him.
He who knows not and knows he knows not,
He is a child, teach him.
He who knows not and knows not he knows not,
He is a fool, shun him.

*—Anonymous*

# Contents

Photo Credits                          xiii
Contributors                           xv
About the Authors                      xvii
Acknowledgments                        xix
Foreword                               xxi
Preface                                xxiii

**1  Medicolegal Death Investigation    1**
*Joseph H. Davis*

Case Investigation                     1
Autopsy Report                         2
Correlation                            4
Cognition                              4
Professional Liability                 6
References                             7

**2  Death Scene Investigation    9**
*Emma Lew and Evan Matshes*

Scene Etiquette                        10
Natural Death                          12
Accident                               19
Suicide                                36
Homicide                               48
Homicide-Suicide                       49
References                             64

**3  The Forensic Autopsy    65**
*David Dolinak and Evan Matshes*

The Hospital Autopsy                   65
The Forensic Autopsy                   65

Evidence Collection                    68
The Autopsy Report                     69
Summary                                70
References                             70

**4  Sudden Natural Death    71**
*Graeme Dowling*

Atherosclerotic Cardiovascular Disease    72
Hypertensive Cardiovascular Disease       76
Valvular Disease                          79
Nonatherosclerotic Coronary Artery
  Disease                                 83
Myocarditis                               86
Cardiomyopathy                            88
Cardiac Conduction System Disorders       93
Central Nervous System Disease            95
Respiratory System                        102
Gastrointestinal System                   108
Endocrine System                          110
Sepsis                                    112
Chronic Ethanol Abuse                     114
References                                116

**5  Blunt Force Injury    121**
*David Dolinak and Evan Matshes*

External Examination                   122
Abrasion                               122
Contusion                              125
Laceration                             129

Crush and Chop Injuries                    130
Weapon Identification                      133
Explosive Injury                           134
Internal Examination                       135
Lethal Blunt Chest Trauma and
   the Negative (or Nearly Negative)
   Autopsy                                 136
Medical Complications of Injuries          136
References                                 139

6    Sharp Force Injuries            143
     Emma Lew and Evan Matshes

Physical Features of a Knife               144
Anatomy of a Stab Wound                    144
Notanda about Stab Wounds                  146
Defensive Injuries                         149
Documenting Stab Wounds                    150
Chop Wounds                                150
Sharp Force Injuries Caused by Other
   Objects                                 151
Suicide                                    154
Dissection of Incised Wounds               155
Postinjury Activity                        156
Tool Mark Analysis                         156
Dismembered Bodies                         158
Postmortem Wounds                          160
Decomposing Bodies/Bodies in Water         161
References                                 162

7    Firearm Injuries               163
     Emma Lew, David Dolinak, and
     Evan Matshes

Fundamentals of Wound Ballistics           164
Entrance Gunshot Wounds                    164
Distinguishing Entrance from Exit
   Wounds                                  176
Exit Gunshot Wounds                        178
Gunshot Wounds in Bone                     180
Delayed Gunshot Wound Deaths               184
Other Injuries Associated with Firearms    185
Glaser Safety Slug                         185
Taser                                      186
Technical Approach to Gunshot Wounds       186
Shotguns                                   190

Rifles                                     197
References                                 200

8    Asphyxia                       201
     David Dolinak and Evan Matshes

Petechiae                                  202
Suffocation                                203
Vagal Stimulation and Rapid Death          207
Positional, Mechanical, and Traumatic
   Asphyxia                                208
Hanging and Strangulation                  209
Autoerotic Deaths                          222
Incaprettamento                            223
Carotid Sinus Stimulation                  223
Asphyxial Deaths in Motor Vehicle
   Accidents                               223
Resuscitation Artifact                     223
References                                 224

9    Drowning                       227
     Michael D. Bell

Signs of Drowning                          228
Near Drowning                              230
Other Artifacts of Water Immersion         231
Autopsies of Bodies Found in Water         233
Dangerous Aquatic Life                     234
Scuba Diving                               234
References                                 237

10   Environmental Injury           239
     David Dolinak, Evan Matshes,
     and Emma Lew

Thermal Injury                             239
Cremation                                  246
Spontaneous Human Combustion               246
Identification of Fire Victims             246
Carbon Monoxide                            246
Hyperthermia                               247
Hypothermia                                248
Electrocution                              250
Chemical Burns                             253
Anaphylaxis                                254

Hymenoptera and Venom-Related
  Deaths                                   255
References                                 257

**11  Motor Vehicle Collisions         259**
*Dwayne A. Wolf*

Death Certification in Motor Vehicle
  Accidents                               260
Motor Vehicle Crash Scenes               261
Injuries Sustained in Motor Vehicle
  Crashes                                 264
Other Thoracoabdominal Vehicular
  Occupant Injuries                       271
Ejected Vehicular Occupants              273
Automobile-Pedestrian Fatalities         274
Run Over by Vehicle                      276
Vehicular Conflagration                  281
Motorcycle Fatalities                    283
Head and Neck Injuries in Motor
  Vehicle Fatalities                      284
References                               288

**12  Aviation                          289**
*David Dolinak, Emma Lew,
and Evan Matshes*

What Type of Accident is It?             289
Why Did the Plane Crash?                 289
Who Should be Autopsied and
  What are the Goals of the Autopsy?     290
Toxicology (the TOXBOX)                  291
Manner of Death Determination            291
Falls to Earth                           291
Investigation of Mass Disasters          293
References                               296

**13  Death in Custody                  297**
*David Dolinak, Emma Lew,
and Evan Matshes*

Types of Death in Custody                297
Incongruity Between Incident Account
  and Physical Injury                     302
Police-Involved Shooting                 306

Deaths Occuring During or Shortly
  After a Violent Struggle                307
Restraint Aids                           310
"Negative" Photographs                   311
References                               316

**14  Artifacts of Resuscitation
      and Complications of Medical
      Therapy                           317**
*Michael D. Bell and David Dolinak*

Artifacts of Resuscitation               317
Artifacts of Medical Intervention        324
References                               327

**15  *Apparent* Natural Death in
      Infants                           329**
*David Dolinak, Evan Matshes,
and Emma Lew*

Sudden Infant Death Syndrome             329
Cosleeping/Overlay                       339
Wedging                                  341
Choking                                  342
References                               343

**16  Sudden Natural Death in
      Childhood                         345**
*David Dolinak, Evan Matshes,
and Emma Lew*

Complications of Prematurity             346
Complications of Cerebral Palsy          346
Complications of Down Syndrome           346
Central Nervous System Pathology         347
Cardiovascular Pathology                 350
Respiratory and ENT Pathology            353
Gastrointestinal Pathology               358
Endocrine Pathology                      361
Hematopathology: Sickle Cell Anemia      361
Infectious Disease                       362
References                               366

x | Contents

**17  Child Abuse                369**
*David Dolinak and Evan Matshes*

Introduction                                        370
Child Abuse Through the Age Spectrum                370
Blunt Force Injuries                                377
Forensic Osteology of Child Abuse                   393
CPR-Related Trauma                                  400
Asphyxia                                            401
Thermal Injury                                      402
Sharp Force Injuries and Gunshot
    Wounds                                          403
Neglect                                             405
Other Forms of Abuse                                406
Artifacts and Complications                         406
Summary                                             408
References                                          409

**18  Elder Abuse                413**
*David Dolinak*

The Aging Process                                   414
Types of Elder Abuse                                414
Case Investigation                                  420
References                                          420

**19  Forensic Neuropathology    423**
*David Dolinak and Evan Matshes*

Scalp Injury                                        424
Skull Fractures                                     427
Epidural Hemorrhage                                 429
Subdural Hemorrhage                                 431
Subarachnoid Hemorrhage                             435
Cerebral Contusion                                  437
Diffuse Traumatic Brain Injury                      442
Firearm Injury                                      446
Sequelae of Traumatic Brain Injury                  448
Herniation                                          453
Post-Traumatic Meningitis                           453
Persistent Vegetative State                         453
Respirator Brain                                    454
Neck Injury                                         454
Spinal Cord Injury                                  459
Artifacts                                           461
Spinal Epidural Abscess                             461
References                                          462

**20  Sexual Battery Investigation    467**
*Valerie Rao, Emma Lew, and
Evan Matshes*

Normal Genital Anatomy                              468
Demonstration and Evaluation of
    Trauma to the Vulva and Introitus               471
The Perianal Examination                            475
Examination of Males                                477
The Negative Examination                            477
Adult Victims of Sexual Assault                     477
Medical Therapy and Follow-Up of
    the Assaulted Patient                           484
References                                          485

**21  Toxicology                487**
*David Dolinak*

Collection of Toxicology Specimens                  488
Drug Screening                                      490
Ethanol (Alcohol)                                   490
Ingested Drugs                                      491
Drug Abuse                                          492
Body "Stuffer" versus Body "Packer"                 496
Interpreting Drug Levels                            497
Drug Metabolites                                    498
Limitations of Drug Detection                       498
Poisoning                                           499
Carbon Monoxide Toxicity                            499
Miscellaneous                                       499
References                                          500

**22  Acute Psychiatric and
     Emotional Deaths            503**
*David Dolinak and Evan Matshes*

Conditions with Aberrant Dopamine
    Homeostasis                                     503
Schizophrenia                                       505
Stress Deaths                                       506
References                                          507

**23  Pregnancy                 509**
*David Dolinak*

Pulmonary Artery Thromboemboli                      510
Amniotic Fluid Emboli                               511

Venous Air Emboli                        512
Peripartum Cardiomyopathy                513
Pregnancy and the Long QT Syndrome       513
Coronary Artery Dissection and Aortic
    Dissection                           513
Intracerebral Hemorrhage                 514
Hemoperitoneum                           515
Splenic Artery Aneurysm Rupture          515
Uterine Rupture                          515
Preeclampsia/Eclampsia/
    HELLP Syndrome/Liver Rupture         516
Hepatic Infarction                       517
Acute Fatty Liver of Pregnancy           517
Thrombotic Microangiopathy               518
Disseminated Intravascular Coagulation   519
Fetal Effects of Maternal Injury         519
Complications of Maternal and Fetal
    Injury                               521
Homicidal Maternal Injury                521
Birth Injury in the Neonate              522
References                               524


24    Postmortem Changes                 527
      Emma Lew and Evan Matshes

Algor Mortis                             528
Livor Mortis                             528
Rigor Mortis                             532
Postmortem Drying of the Tissues         533
Putrefactive Decomposition               535
Artifacts of Embalming                   542
Exhumations                              544
Second Autopsies                         545
Cremations                               546
Trauma and the Decomposing Body          546
Animal Scavenging                        548
An Approach to the Autopsy of a
    Decomposing Body                     550
Identification of Decomposing Bodies     551
Postmortem Interval                      552
References                               554


25    Identification                     555
      David Dolinak and Evan Matshes

General Morgue Procedures                555

General and Unique Body
    Characteristics                      555
Fingerprints                             556
Disposition of "Unknown" Bodies          556
Unique Physical Characteristics          557
Implanted Surgical Devices               557
Tattoos                                  558
X-Ray Comparison                         558
Photographic Superimposition             561
Forensic Facial Approximation (Visage)   561
Unknown Persons Databases                561
References                               562


26    Forensic Osteology                 563
      Evan Matshes and Emma Lew

Normal Human Osteology                   564
Recovery of Remains                      566
Documentation of the Scene               567
Skeletal and Evidentiary Inventory       569
Identifying Features                     571
Estimation of Age at Death               583
Estimation of Stature                    590
Bone Trauma                              591
Bone Pathology                           596
Forensic Taphonomy                       598
References                               601


27    Forensic Odontology                605
      Richard Souviron

Postmortem Dental Records                605
Antemortem Dental Records                606
Body Identification without Dental
    Records                              610
Bite Marks                               615
Patterned Injuries from Medical
    Treatment                            620
Bite Mark Analysis                       620
Mistakes in Interpretation: Causes,
    Prevention, and Correction           626
References                               629


28    Forensic Photography               631
      David Dolinak, Emma Lew,
      and Evan Matshes

Photographs to Take                      631

Photography Pitfalls                          632
Photography Tips                             636

**29   Select Autopsy Topics          637**
*David Dolinak, Graeme Dowling,*
*Evan Matshes, and Emma Lew*

General Autopsy Biosafety                    637
Infectious Agents                           638
Personal Protective Equipment               638
Reducing Autopsy Room Hazards               638
Vaccination and Tuberculin Skin Test        639
Note on Prion Diseases                      639
Electrical Concerns in the Mortuary         641
Chemicals                                   641
Radiation                                   641
Facility Design                             641
Autopsy Procedures                          642
Forensic Radiology                          652
Bioterrorism and Chemical Agents            653
The Negative Autopsy                        658
References                                  660

**30   Death Certification           663**
*David Dolinak and Evan Matshes*

Cause of Death                              664

"Contributory Conditions" or "Other
   Significant Conditions"                  664
Delayed Deaths                              664
The Pending and Amended Death
   Certificate                              665
Mechanism of Death                          665
The Manner of Death                         665
The "How Injury Occurred" Box               666
Improper Death Certification                666
Red Flags on Review of a Death
   Certificate                              667
Teaching Proper Death Certification         668
References                                  668

**31   The Pathologist as Expert
      Witness                        669**
*David Dolinak*

Know Your Role                              669
Scientific Validity                         670
Personal Impartiality                       670
Be Prepared                                 670
Learn from Each Experience                  670
References                                  671

Index                                       673

# Photo Credits

Dr. Valerie Rao must be thanked profusely for her dedication to this book and for searching out and donating some of the excellent photographs found in some of the excellent photographs in this volume.

## Chapter 4

**Image 4.10**—The author would like to acknowledge and thank Dr. Brian Chiu of the Division of Anatomical Pathology in the Department of Laboratory Medicine and Pathology at the W. C. Mackenzie Health Sciences Centre and the University of Alberta in Edmonton, Alberta, Canada for contributing this Image.

**Images 4.31 to 4.33**—This case is presented with permission from the American Medical Association's Archives of Pathology and Laboratory Medicine.

**Image 4.61**—The author would like to thank Dr. Wanda Lester of the University of Calgary Department of Laboratory Medicine and Pathology for contributing this Image.

**Images 4.86 and 4.87**—The author would like to acknowledge and thank Dr. Ian Mackenzie of the Division of Neuropathology in the Department of Pathology and Laboratory Medicine at the Vancouver General Hospital and University of British Columbia in Vancouver, British Columbia, Canada for contributing these Images.

**Image 4.99**—The author would like to acknowledge and thank Dr. David Charlesworth of the Department of Pathology and Laboratory Medicine at the Royal Columbian Hospital in New Westminster, British Columbia, Canada for contributing this Image.

**Image 4.123**—The author would like to acknowledge and thank Dr. David Rayner of the Division of Anatomical Pathology at the W.C. Mackenzie Health Sciences Centre and the University of Alberta in Edmonton, Alberta, Canada for contributing this Image.

## Chapter 5

**Image 5.13**—The authors would like to acknowledge Dr. Graeme Dowling for contributing this Image.

## Chapter 10

**Images 10.26 through 10.29**—The authors would like to acknowledge Dr. Graeme Dowling for contributing these Images.

## Chapter 17

**Images 17.114 through 17.116**—The authors would like to acknowledge Dr. Sheldon Wiebe, Pediatric Radiologist, and Dr. Brent Burbridge, Professor and Head of Radiology, University of Saskatchewan, Saskatoon, Saskatchewan, Canada for contributing the Images and text, respectively.

**Images 17.126 and 17.127**—The authors would like to acknowledge Dr. Michael Bell for contributing these Images.

## Chapter 19

**Images 19.45 and 19.46**—the authors would like to acknowledge Dr. Brent Burbridge for contributing these Images.

## Chapter 26

**Images 26.8 and 26.16**—The authors would like to acknowledge Detective Christine Kruse-Feldstein, Crime Scene Investigator, Miami-Dade Police Department, Miami, Florida, for contributing these Images.

# Contributors

**Michael D. Bell, M.D.**
Deputy Chief Medical Examiner
Broward County Medical Examiner Department
Ft. Lauderdale, Florida

**Joseph H. Davis, M.D.**
Director and Chief Medical Examiner, Retired
Miami-Dade County Medical Examiner Department
Miami, Florida

**David Dolinak, M.D.**
Deputy Chief Medical Examiner
Dallas County Medical Examiner Department
Assistant Professor of Pathology
University of Texas Southwestern Medical Center at
   Dallas
Dallas, Texas

**Graeme Dowling, M.D.**
Chief Medical Examiner
Office of the Chief Medical Examiner
Edmonton, AB Canada

**Emma O. Lew, M.D.**
Deputy Chief Medical Examiner
Miami-Dade County Medical Examiner Department
Assistant Clinical Professor of Pathology
University of Miami School of Medicine
Miami, Florida

**Evan W. Matshes, M.D.**
Adjunct Professor
Department of Anatomy and Cell Biology
University of Saskatchewan
Saskatoon, Saskatchewan, Canada
Resident, Anatomical Pathology
Department of Pathology and Laboratory Medicine
University of Calgary
Calgary, Alberta, Canada

**Valerie J. Rao, M.D.**
Medical Examiner for Boone and Calloway Counties
Associate Professor of Pathology and Anatomical
   Sciences
Department of Pathology
Columbia, Missouri

**Richard R. Souviron, D.D.S.**
Chief Forensic Odontologist
Miami-Dade Medical Examiner Department
Miami, Florida

**Dwayne A. Wolf, M.D., Ph.D.**
Deputy Chief Medical Examiner
Harris County Medical Examiner Office
Houston, Texas

# About the Authors

**David Dolinak, M.D.** is the Deputy Chief Medical Examiner at the Dallas County Medical Examiner Department. He did his training in forensic pathology at the Miami-Dade County Medical Examiner Department in Miami, Florida and has since attained the position of Assistant Professor of pathology at the University of Texas Southwestern Medical School. Dr. Dolinak has an interest in a number of forensic pathology topics, but has a special interest in forensic neuropathology. Dr. Dolinak is the author of several articles, and this is his second medical textbook.

**Evan Matshes, B.Sc., M.D.** is an Adjunct Professor in the Department of Anatomy and Cell Biology at the University of Saskatchewan in Saskatoon, Canada, and an anatomic pathology resident at the University of Calgary in Calgary, Canada. Dr. Matshes has an interest in all aspects of forensic pathology and the human anatomical sciences, but particularly in forensic neuropathology and osteology. Dr. Matshes has been involved in teaching university-based medical/nursing and law enforcement groups, and is actively involved in research in various aspects of human fetal/neonatal osteology. This is Dr. Matshes' fourth in-print medical textbook.

**Emma Lew, M.D.** is the Deputy Chief Medical Examiner at the Miami-Dade County Medical Examiner Department, and Assistant Clinical Professor of Pathology at the University of Miami School of Medicine. She has worked in England and Canada. She has consulted in Mexico, the Caribbean, and Central and South America, and has lectured in Jamaica, Colombia, Armenia, and Kazakhstan. Unusual things pique her interest.

# Acknowledgments

Thousands of hours were dedicated to the creation of this volume by countless individuals. We must thank Dr. Belinda Sher for her devotion to this project through proofreading, photography, and various organizational efforts. Without her support, we would have been unable to complete our work.

Our contributing authors, Drs. Joseph H. Davis, Graeme Dowling, Michael D. Bell, Dwayne A. Wolf, Valerie J. Rao and Richard Souviron, must be thanked for their excellent additions to this book. We are well aware of the personal sacrifices made in the process of contributing to a textbook, and will remain indebted to these individuals for their dedication of time (much of it over summer and Christmas holidays) in the production of their chapters.

Much of the literature cited in this volume was obtained by the University of Saskatchewan Forensic Osteology Laboratory summer students Lisa Rudolph, Talina Cyr, Kirsty Taylor, and Sharon Slavik. Their efforts in obtaining and organizing the nearly 3000 journal articles and books reviewed in the writing processes were an integral part of our creative process.

Dr. Brent Burbridge must be recognized for taking the time to locate some of the important radiologic images used in this book.

**With heartfelt thanks:**

*From David Dolinak:*
To my mentors and everyone else at the Miami-Dade County and Dallas County medical examiner departments, and those scattered elsewhere, who provided, and continue to provide the opportunity and stimulation to grow and learn.

*From Evan Matshes:*
Individuals with a mentorship role should never underestimate the influence they may have in forming and shaping the professional (and sometimes personal) lives of their trainees. I am forever indebted to Ranjit Waghray for his many hours of teaching, kindness and friendship, and for the key role he played in helping me choose pathology as a career. Emma Lew and Valerie Rao have been very important mentors and friends, and are responsible for much of my forensic growth over the past few years. As my department head, Bernhard Juurlink has been a great supporter and facilitator of my many projects. Without his help, very few of my academic endeavors would have survived. Graeme Dowling and Bernie Bannach must be thanked for solidifying my interest in forensic pathology so many years ago.

*From Emma Lew:*
Portions of this volume are an embodiment of the spirit of the Miami-Dade County Medical Examiner Department. The technical support from photographers Leonard Wolf, Dominique Schopf, and Heidi Nichols of the Forensic Imaging Bureau was invaluable. Veronica Melton-Lamar in the Records Bureau provided data vital to this book. Executive secretary Leslie Cummings expedited our efforts by being so efficient. With respect and appreciation, a special tribute goes to Dr. Joseph H. Davis and my mentors, colleagues and friends, Charles V. Wetli, Roger E. Mittleman, Valerie J. Rao, Jay S. Barnhart, and Bruce A. Hyma, who so readily shared their experiences with patience and humor. Valerie, you have contributed more to forensic education than you'll ever know!

# Foreword

Forensic pathology is perhaps the smallest of medical specialties, yet it is one that is often in the forefront of intense public interest. Indeed, the forensic pathologist is the community pathologist who relates to the next of kin and allied professionals including law enforcement personnel, public health officials, attorneys in civil and criminal cases, physicians, insurance companies, and many others.

The overall duties of the forensic pathologist or medical examiner are to investigate the death of an individual, assimilate all the medical, scientific and evidentiary information, and relate this to the lay public and, if necessary, to a court of law. It is axiomatic that the death investigation begins at the scene of death (or where the fatal incident began if death occurred at a different time or place). It is frequently at the scene visit that the medical examiner learns about the terminal events preceding death and other critical information about the decedent. Oftentimes, the medical examiner personally responds to the death scene to gain a better appreciation of the circumstances of death and determine the best approach to the autopsy to eventually answer anticipated questions. Therefore, the primary purpose of the scene visit is to guide the further investigation of the pathologist, and this may also incidentally aid law enforcement personnel at the scene as well.

Traditionally, the forensic pathologist has been charged with determining the "cause and manner of death" of those decedents falling within the medical examiner's or coroner's jurisdiction. In reality, the cause and manner of death are already known in a great many, if not the majority, of cases. Indeed, the next of kin may be more concerned with the effects of chronic alcohol or drug abuse than knowing that the actual cause of death was due to coronary artery disease, and a criminal defense attorney may be more concerned about the effects of cocaine than the pathway of the bullets through the body. Hence, the real, but often unstated, focus of the forensic pathologist is to identify, document, and preserve everything of a potentially evidentiary nature. Indeed, the "art of forensic pathology" is to anticipate the questions that will be asked in the future: today, tomorrow, and several years from today. Most importantly, the forensic pathologist must, as accurately as possible, provide answers to such questions and problems which may not be apparent even at the time of the autopsy. For example, an attorney walked into a medical examiner's office one day about an automobile crash that occurred 4 years earlier. The reason for the crash was that a construction company failed to replace a stop sign, and two cars collided at the intersection with one of the vehicles (containing the decedent driver) having a secondary impact with an illegally placed utility pole. Because the scene and autopsy findings were meticulously documented, it could be determined after all this time that it was the impact with the utility pole that resulted in the fatal injury. This, in turn, permitted a wrongful death action against the municipality.

Unfortunately, answers are not always satisfactory, as anyone who has had to express an opinion as to time of death can readily appreciate. Also, answers may not always be easy or readily acceptable to others: a mother may find it difficult or impossible to accept that a death was a suicide, or was the result of drug abuse. Lastly, there are times when the most honest thing to say is "I don't know", *in lieu* of creating a specious theory of death not supported by historical, pathological, or scientific evidence.

This is a time in which "high tech" forensic science has captivated the attention and imagination of the general public and scientists alike. Yet the basic tool of the forensic pathologist is the "low tech" autopsy. The actual autopsy procedure has not substantially changed from the days of Virchow and Rokitansky, yet it readily provides a wealth of information from direct observations to providing the raw material for further, often highly

sophisticated, scientific investigation. At the autopsy table, however, the prosector must be acutely aware of a number of factors. First, that the forensic autopsy is the first laboratory exercise in the death investigation. Second, that what is not found, may have equal or even greater importance than the actual autopsy findings (e.g., there is no evidence of homicidal strangulation). Third, the autopsy findings must be correlated with the terminal events and scene of death, with the lack of correlation mandating additional investigation. Fourth, observations must be objective, allowing room for interpretation as additional information surfaces. Further medical or police investigation, chemical and toxicological analysis, histologic sections, and a host of other potential postmortem procedures will all modify the interpretation of the autopsy findings. Not infrequently, the speculative opinions expressed at a death scene or at the autopsy table lead to additional investigation and testing that generate opinions which may be entirely different from those initially expressed.

The jurisdiction of the coroner or medical examiner is generally divided into three categories: sudden unexpected death while in apparent good health, suspicion for unnatural death, and a potential or perceived threat to public health. Once jurisdiction is assumed, the decision must be made as to how much of an investigation is necessary. Unfortunately, excuses are too frequently conjured to avoid doing an autopsy: the "obvious" suicide, motor vehicle crash victims, the 85-year-old man found dead at home with no medical history, etc. In reality, there are two very good reasons to autopsy the "obvious:" one is that sometimes the "obvious" is not (e.g., the presumed "heart attack" victim has internal evidence of head trauma or strangulation), and the second is that the public we serve expects answers to questions that are not necessarily related to the cause of death.

Only a few decades ago, forensic pathology was a specialty of obscurity that existed in poorly staffed, grossly under-funded, and poorly equipped morgues. Today, the practice of forensic pathology is more sophisticated and better organized with thriving professional organizations and interactions with a host of other organizations. Today, forensic pathologists examine and interpret injury patterns and patterned injuries on living individuals as well as deceased victims of violence, are actively involved in organ and tissue procurement organizations, are central to mass disaster management and scientific victim identification, and, through research, identify hazards in the environment, from dangerous toys to dangerous drugs. Today's heightened awareness of bioterrorism emphasizes the role of the forensic pathologist in medical surveillance.

As forensic pathology has progressed, so have the literature and the texts improved over the years. *Forensic Pathology: Principles and Practice* is an example of such an achievement, being a well-researched text with practical guidelines and numerous, excellent photographs. This is a significant contribution that will help the novice and expert alike achieve the public service goals of forensic pathology: to investigate death for the benefit and protection of the living.

Charles V. Wetli, M.D.
Chief Medical Examiner and Director of Forensic Sciences
Suffolk County, New York
Clinical Professor of Pathology
State University of New York at Stony Brook
Hauppauge, New York
*February 2005*

# Preface

The determination of the cause and manner of sudden, unexpected, and violent deaths represents the practice of a distinct and recognized medical specialty called forensic pathology. Simply speaking, forensic pathology can be defined as the application of knowledge from medicine and pathology to problem solving in the field of law.

Who are forensic pathologists? Contrary to popular belief, forensic pathologists are not socially isolated basement dwellers who perform autopsies in their dimly lit morgues, nor are they flamboyant, volatile celebrities who drive to scenes in Hummers. First and foremost, forensic pathologists are physicians. As such, they are knowledgeable in human form and function, its derangements, and the interrelationship between health, trauma, toxin, and disease at both the individual and community levels. This understanding of medicine is fundamental to the practice of forensic pathology, and must never be subjugated or negated. After training as medical doctors, forensic pathologists undertake a 4-year or longer period of postgraduate training in anatomic and or general/clinical pathology, followed by at least 1 year of subspecialty training in forensic pathology. At each step along the way, these individuals write and pass local, regional, and national examinations and thus, demonstrate their comprehension of the subject matter. The attainment of board certification is a standard and accepted way for physicians in all specialties to demonstrate competency in their area of practice.

Throughout this long training course, the junior forensic pathologist has performed hundreds of autopsy and scene investigations under the direct supervision of trained and certified experts in the field who are also enthusiastic and seasoned educators. In reality, this type of training is not universally available in training programs. To compensate, students turn to books and other literature in hopes of obtaining additional knowledge. When one takes a serious look at the myriad of forensic pathology books available, a few notable publications stand out. Works by DiMaio, Spitz, Polson, Gee, and Knight are among the resources most commonly studied by the neophyte and the experienced pathologist.

We have written this book as an educational aid to help those in the field of medicolegal death investigation learn not only the *principles* of forensic pathology, but also the somewhat more nebulous subtleties of the *practice* of forensic pathology. This is best achieved, we feel, by the careful and thoughtful integration of pictures and text, presented in a clear, succinct format that is useful not only for forensic pathologists, but also for field agents/investigators, homicide detectives and other law enforcement personnel, prosecuting and defense attorneys, clinicians, and all others wishing to advance their knowledge in this demanding yet rewarding field. Photographs are important because a large part of learning is derived from pattern recognition and other visual cues that simply cannot be described, no matter how detailed or colorful a textual description.

We have tremendous respect for this profession and share great enthusiasm in our work. Every day is an opportunity to learn, and provide answers to loved ones, law enforcement officials, and others regarding the untimely demise of an individual. Whether it is helping to positively identify unknown remains, determining how and why a death came about, or providing other important information, knowing that our work benefits others, sometimes in profound and unimaginable ways, is satisfying and humbling at the same time. For the opportunity to provide this expertise, we thank all those who have taught, and continue to teach us—our mentors, colleagues, police detectives, and perhaps most of all, the decedents, who have much to teach us, should we choose to be receptive. With this book, we hope to return some of that knowledge, and help others realize what an enlightening, stimulating, and challenging profession forensic pathology is.

David Dolinak, M.D.
Evan Matshes, M.D.
Emma Lew, M.D.
*February 2005*

# 1 Medicolegal Death Investigation

*Joseph H. Davis, M.D.*

CASE INVESTIGATION    1
AUTOPSY REPORT    2
CORRELATION    4

COGNITION    4
PROFESSIONAL LIABILITY    6
REFERENCES    7

Located within the Medical Examiner Department of Miami-Dade County, Florida, is an unpublished "book" with more than 81,000 "chapters," each "chapter" a separate death investigation file and each containing an integration of circumstance data with autopsy data. This "book" covers four decades of a working career as the director of the agency. Lessons learned from this "book" constitute personal knowledge of the innumerable variations of presentations of disease and injury, and they far exceed space limitations imposed by any atlas, text, or monograph. This "book" has not been published, but portions have been used for training of forensic pathologists, police investigators, and many others engaged in forensic or health-related vocations.

A forensic pathology article or book is never complete. It is impossible to publish everything known on any subject. Each death investigation differs from another in some fashion. Each death investigation contains some unique quality. For this reason, the user of a text or atlas must be aware that a description or illustration represents only one of countless variations. A grievous error is the assumption that an observation at autopsy cannot represent what the circumstances suggest because that pattern does not appear in a book or has not been encountered during prior experience. An autopsy pattern that is new to the observer is most likely associated with the particular case's circumstances. To opine that something is not simply because one has not previously seen or heard of it is illogical.[1] A grievous example occurred in a case of mutilation by dog . Two separate child abuse experts, seeing a localized loss of tissue and flesh on the lower abdomen, entered into the hospital record the same conclusion: "I don't know what it is, but it is not dog" when, in fact, the entire milieu of injury plus circumstance was unequivocally dog induced. An innocent mother was jailed based on this fallacy. Over-reliance on only part of available evidence is perilous. A good forensic pathologist is always capable of learning something valuable from each case investigation.

## Case investigation

A forensic pathology investigation is not merely a matter of autopsy performance and determination of cause and manner of death. A series of steps comprises the totality of the investigation. Fulfillment of these steps strengthens—and omission weakens—the investigation and conclusions of the forensic pathologist, the medical examiner, or the coroner. The case folder of a proper forensic death investigation consists of documentation of scene and circumstances and autopsy using photography, diagrams, and text. The autopsy must not be rote; it must instead be goal oriented. It should demonstrate variations of topic emphasis and be readily understood by the reader. Injuries and medical interventions must be differentiated from each other. Interpretations and conclusions must be based on sound medical principles and cognition. Failure to follow these principles may result in wrongful convictions and liabilities for the forensic pathologist.

The initial step in the logical approach to forensic problem solving is documentation. If one does not recognize something at the death scene, or something on or

in the body, or the significance of a witness statement, proper documentation will ensure that future correct interpretations can be made. If initial documentation is poor, no amount of later intelligent appraisal may correct initial errors of interpretation.

Proper documentation, in terms of clarity, commences with photographs. No word description can ever duplicate that which has been captured by a photograph. Before one writes words of description, thought processes have already altered what the eye may have seen. Subjective influences modify the chosen words. Cameras can record and document patterns without alterations induced by the human mind.

Photographs must be proper. The scene should be documented in an untouched condition before evidence is disturbed. Commence with a distance photograph, then a closer picture, and follow that up with an orientation picture for each close-up or macrophotograph. Without the orientation picture, the close-up may be incomprehensible in its relationships. The same applies to body photographs during the autopsy. Focus and proper lighting are essential. A common error in scene photography, where sunlight and shadow coexist, is underexposure of the shadowed portions. Fill flash during daylight must become part of the photographic routine.

Death scenes are initially filmed undisturbed by the investigator. When the body is removed, its resting place should be photographed. At the morgue, initial "as is" photographs are made for purposes of property management. From this point onward, the untouched rule no longer applies. Subsequent photographs must be properly composed. Extraneous tools, blood, gloved hands, or background must be removed from view before the shutter is activated. The identification number should not detract from photographic quality. A proper ruler should be present if one-to-one photographic comparisons are needed. Lack of proper composition seems most common when police photographers, familiar with the need to leave the scene untouched, continue this practice in the morgue after the body has been altered by an autopsy procedure. Extraneous blood, filth, tools, and background items made clean if one is attempting to document wound details. Photography is a means of communication. Photographic attention to detail serves to document with far greater accuracy than any other forms of communication.

The individual shown in **Image 1.1** committed suicide by shotgun. Unfortunately, an innocent man was wrongfully convicted of this "murder." The photograph has atrocious composition; blood, discarded dura, a needle, a dirty wooden block, and a gloved hand contaminate the autopsy photograph.

Diagrams and measurements are useful to demonstrate relationships of objects that appear in photographs of both scene and body. Autopsy diagrams are of two



1.1

types. One type exists as rough notes useful for subsequent dictation of the report. The other type is the clarification diagram. The reader of the autopsy report of a gunshot wound is assisted by a diagram, free of extraneous notes, which reveals only location and directionality of gunshot wounds. When attached to the final report, these clarification diagrams serve to assist reader comprehension of descriptive text.

Pathologists are taught during residency training to create word descriptions of autopsy observations. Word descriptions tend to become stereotypic rote sayings without purposeful thought. Worse yet, some death investigative agencies use preprinted forms that contain short spaces to be filled in. The autopsy record suffers a lack of orderly description. Although the listed items may consider all the organs, the order of arrangement and contracted space result in a short list of findings that does not create an understanding of the forces that result in associated injuries.

Reprehensible reports are not complete, are disorganized, and commingle irrelevant effects of therapy with lesions of concern. The pathologist must be aware of the particular purpose of the autopsy and how it is to correlate with the circumstances leading up to death. A half century ago, Alan Moritz published an article "Classical Mistakes in Forensic Pathology," which must be studied repeatedly by forensic pathologists during training and thereafter.[2] Errors pointed out by Moritz still contaminate the practice of forensic pathology today and most likely shall continue to do so in the future.

## Autopsy report

An ideal autopsy report is goal oriented and based on awareness of the needs of investigators who must depend on the report. The pathologist should know what occurred prior to the autopsy and should present data in

a clear and logical order specific to case investigative needs. The reader should be able to readily comprehend the thought process and logic of the pathologist.

The report, a word description of the body and its normal and abnormal expressions, is presented in logical order for the benefit of the reader. The report should be comprehensible on first reading. A most useful format starts with an introduction that paints a word picture of physical characteristics and prior skin lesions or other deformities. All too frequently the pathologist demonstrates a lack of clarity of thought by running together into one confusing paragraph all descriptive attributes of the victim. It is suggested that the pathologist acquire and study a readily available small text on grammar and writing style.[3] The paragraph style of a morning newspaper may also serve as a useful model.

The next portion is a logically arranged documentation of external and internal medical intervention, injuries and marks. Separate clusters of procedures, those associated with cardiopulmonary resuscitation[4] and those associated with surgical and other forms of therapy, should be individually grouped. This presupposes that the pathologist has requested and received the terminal medical records of the victim, including rescue paramedic reports. Most reprehensible is the pathologist who assigns evidence of homicide to therapeutic injuries. Endotracheal tubes produce marks on lips and larynx. Adhesive tape on baby skin leaves linear red marks. Cardiopulmonary resuscitation (CPR) can, albeit rarely, rupture the liver or spleen and extravasate blood into the peritoneal cavity. Should internal abdominal injuries and bleeding be present in a child or adult who has been subject to CPR, numerous microscopic slides should be prepared from margins of torn viscera and from retroperitoneal hemorrhagic tissues in a search for healing changes of preexisting injury obscured by CPR artifacts. Never attribute CPR artifacts to preexisting injury.

Innocent people have suffered arrest and incarceration due to negligence by a pathologist who fails to separate cardiopulmonary resuscitation artifacts from those that represent inflicted injury. Invariably the pathologist has violated the cardinal rule of reading and understanding medical records in order to sort injury patterns into categories of relevance.

Next is the evidence of injury section. A wound that penetrates skin must be documented as a single wound from beginning to end. A pathologist who assigns a wound number to the bullet entry and another to the bullet exit while listing the internal injuries elsewhere in the report displays an illogical mind-set and lack of competency to perform forensic investigations. The purpose of the autopsy description is clarity, not confusion. The reader should be able to visualize mentally where the bullet entered, what it did during its passage, and where it exited.

Most forensic pathologists do a reasonable job of documenting the entry and exit portions of a gunshot wound pathway, including listing of internal organ damage. Overlooked are measurements that create the "wound profile."[5] The profile consists of internal measurements of the length and diameter of the residual wound pathway left behind by the bullet. This is useful in assessment of the variables of tissue susceptibility to permanent injury, a factor dependent on elasticity of tissue, energy, and projectile size and configuration. The depth of passage of a bullet within the tissues of the body may offer clues as to range of fire. A bullet traveling a great distance loses velocity due to air resistance. Lack of expected depth of penetration might indicate that the bullet was fired from a great distance instead of from close by, an observation useful to police investigators.

Of little use is the description of the entry as being "15 inches from the top of the head and 4 inches to the right of the midline." What mental image does this description furnish? The initial description should locate the skin defect in relation to nearby anatomic landmarks. The purpose of a measurement from a fixed site on head or heel is to compare entry and exit as to vertical location on the body. It should not be the initial or only description of the skin wounds.

As for range of fire, a mistake seen all too frequently is to attribute irregularity of the entry wound to the muzzle of the gun without consideration of the absence of gunpowder soiling and the presence of an intermediary target through which the bullet passed. Most bullets pass through intermediary targets before reaching skin. Clothing on the torso or hair on the head are common intermediaries and modifiers of patterns needed for range determination. Any item, other than air, between the victim and the shooter may constitute an intermediary target.

Following documentation of injuries, both surface and deep, the general internal observations pertaining to each organ are described. Injuries, presented in the injury section of the report, need not be described again.

A reader of the autopsy report may initially view the listing of the gross findings as a preview of content. These findings should be in a logical order of importance to the needs of the case. Although some might consider a summary of the entry, exit, and pathway injuries of a gunshot wound to be redundant, having already been detailed within the text of the report, the reader will find the short synopsis most useful and time saving. For example: "Perforating gunshot wound (A) of right upper anterior thorax with laceration of right lung and exit right posterior chest" quickly affords the reader a concept of where Wound A bullet struck, what serious damage occurred, and where it exited. Complete details may be found within the injury section of the autopsy description. The purpose of a forensic autopsy report is

to afford the reader a rapid and clear understanding of salient injuries.

Some agencies list samples taken for additional study as part of the autopsy report. If not listed in the autopsy report, such information should be clearly stated somewhere in the case folder. Additional reports, such as neuropathology consultation or microscopic descriptions, follow. These are appended to the body of the report along with subsequent test reports. What results is a complete unified packet of the work product by and under the direction of the forensic pathologist.

Initial anatomic pathology training usually requires the trainee to prepare a summary of the clinical aspects of the case along with an appended clinicopathological summary. This elementary training exercise must not be carried over into the practice of forensic pathology. Initial circumstantial data are derived from other agencies and may be incomplete. They may contain restricted information that should not be released as part of the pathology work product even though the autopsy is public record. The clinicopathology exercise offers potential for error. Speculations by the pathologist contaminate the pathology work product. One may enter preliminary correlative discussions elsewhere in the case folder in keeping with a public record law and in a format subject to future change as new data are received. Problems will be minimized by separation of the autopsy work product from police and medical history information.

Portions of the report must be capable of expansion as need dictates. Certainly someone dying during a stressful event ought to have a large portion of the autopsy devoted to the heart. Is the cardiac description adequate to paint a word picture of the appearance of the heart and its components and lesions? Many autopsy reports lack descriptive detail of the distribution of the epicardial arteries. "Right dominant" is an opinion, not a description. An example of a proper description in a critical case could be "The right coronary artery arises from its aortic ostium, which is located above the right coronary cusp of the aortic valve. It gives rise to the sinoatrial node artery 1.5 cm from its ostium, continues along the atrioventricular groove to the crux of the heart where it gives rise to the posterior descending branch. It continues on to the posterior third of the left ventricle to give rise to two terminal branches." The reader of this autopsy report will visualize the pathway of the right coronary artery and appreciate effects of stenosis or occlusion much better than the reader of the "right dominant" autopsy. Within the body of the report, interpretive opinion should not become a substitute for objective description.

When anticipation of future litigation is considered, each microscopic block and its slide should be separately identified. If microscopic findings are of concern, each slide must be separately described. All too frequently, pathologists combine microscopic slide findings in such a manner that no specific comparison can be made between a pathology report by one expert with the report by another. This promotes confusion.

## Correlation

Before the autopsy is interpreted, circumstances prior to death must be considered. Preliminary information that accompanies the body is often incomplete. Additional data should be sought before completion of final correlation with the autopsy. If the pathologist is also a medical examiner and is in control of data acquisition, a logical approach to the gathering of information by the medical examiner agency should be developed. Normally, historical data consist of two types, demographic data pertaining to the victim profile plus circumstances leading up to death.

Case folder demographic data should be as complete as possible starting with the name, if known, home address, age, race, sex, marital status, occupation, and other facts that delineate which social subset of society this person occupied. Social subsets vary in terms of risks of disease or injury. Even the name denotes ethnicity subset risks or may be critical to the understanding of the purposes of the autopsy. Consider this example: A pathologist performed an autopsy and did not find anything attributable to a cause of death. He telephoned me to request toxicological examination. I requested demographic data commencing with the name. I recognized it as belonging to a family, a social subset, that carried the genetic disposition for primary pulmonary hypertension. I had previously performed an autopsy on the child of the woman. The gross appearance of the lungs in primary pulmonary hypertension appears normal. Diagnosis depends on microscopic study. Cor pulmonale is often subtle and is likely to be overlooked by the pathologist.

Given knowledge of societal subsets and their risks plus the terminal event circumstances, a reasonable forensic pathologist ought to have a good idea of what to search for during the autopsy and how to correlate both the autopsy and historical data into a proper cause and manner of death. All too frequently errors result from failure to anticipate the potential for future problems. To prevent trouble, study and gain familiarity with guidelines that promote a complete investigative approach.[6]

## Cognition

Cognition, a combination of knowledge, perception, and judgment, is an essential attribute of a proper forensic pathologist. Many medicolegal death investigations are simple, self-solving, and forgiving of marginal perfor-

mance by the pathologist. However, some cases are complex, either in the determination of cause and manner of death or in terms of associated controversy and adverse publicity. For these reasons, a competent forensic pathologist should strive for thoroughness of investigation, even in noncontroversial situations. If the agency and its professional personnel have developed a habit of excellence for all investigations, complex cases will cease to be a problem.

The pathologist may fall into the trap of rote thinking and rote methodology where the autopsy lacks ongoing correlation with circumstances or consideration of the needs of those who depend on the autopsy findings. Computer programs that expand the report with fluff and information on procedures that were not conducted are a serious error source that could place the pathologist in legal jeopardy. A mind-set that leads to dictation of nonexistent findings is equally dangerous to the pathologist and others. Pathologists have been disciplined for such errors.

The most common error in medical diagnosis is overreliance on noncontributory data.[7] Consider this example: A small child became ill. During hospitalization the critical status of the child necessitated endotracheal intubation. Adhesive tapes to hold various tubes were applied to the face and upper extremities. An arterial line was placed in the groin. At death, terminal CPR was extensive. The pathologist opined that the child died of inflicted injuries, manner homicide. The mucosa of the upper lip was superficially hemorrhagic but the frenulum was intact. That was not caused by a blow to the mouth but by attempts at intubation. Linear red marks on the face and extremities were not caused by whipping but by adhesive tape on fragile infant skin. A blue color to the base of the scrotum on the side nearest the arterial line was not due to a kick to the perineum, as opined, but was caused by extravasated blood from the site of arterial puncture. Although the chance of such an iatrogenic injury is exceptionally rare, intraperitoneal blood from a ruptured spleen was not the result of a blow to the abdomen before hospitalization, as opined, but was caused by terminal CPR. A CT scan of head, chest, and abdomen prior to the resuscitation demonstrated an intact spleen and an absence of blood in the peritoneal cavity. These grievous errors by the pathologist could have been averted if the hospital record had been carefully evaluated. Some pathologists may possess a peculiar lack of concern for their actions and are too eager to opine inflicted injury and homicide based solely on autopsy patterns.

A cardinal rule of proper forensic pathology is to consider that each chronological step during preautopsy circumstance of treatment of the live victim, or manipulation of the body after death, is a potential source of tissue injury that might be noted at autopsy. Autopsy findings represent a combination of lesions that occurred over time. Circumstantial events may be innocent or malicious and resulting injuries must be carefully segregated as to origin, during the autopsy.

When a pathologist makes grievous errors in autopsy interpretation, one must conclude either that the pathologist lacks cognitive ability, lacks proper autopsy training, or both. The decline in the autopsy rate of hospital deaths, zero in some institutions, serves to reduce the ability of the pathology trainee to gain autopsy skills. When errors occur, it behooves those concerned to assess both the pathologist and the prior training of that pathologist, if remedial action is sought.

Another problem is unquestioned acceptance of publications that repeat concepts that were never really tested. For example, the barbiturate pharmacology literature is contaminated with the concept of "automatism." The patient takes a capsule, forgets and takes another, and this continues under the influence of the drug until a serious or fatal intoxication occurs. What is the evidence for this widely accepted premise? It may be traced to a letter to the editor in the *British Medical Journal* in 1934 when a practitioner speculated about three patients who overdosed on barbiturates.[8] This fallacious medical dogma was traced to its source by an attorney who represented an insurance company. He traced every reference in texts and articles. No studies existed to support the automatism speculation, only the letter to the editor.[9] Although the popularity of short-acting barbiturates as hypnotics is minor compared to a half century ago, this false automatism concept lives on in Internet references concerning barbiturates. Another dogma that achieved a life of its own is "dry drowning," in which 10 percent of drowned victims do not aspirate any fluid. This concept also goes back to the early 1930s when Cot published a review of drowning investigations. However, he did not specifically nor adequately describe the phenomenon attributed to him.[10] The lack of a scientific basis of published literature on shaken baby syndrome (SBS) has been faulted by Donohoe who reviewed all the publications on SBS up to 1998.[11] Also, a position paper should not be relied on as a scientific source. It merely represents a consensus of like believers. Flying saucers containing space aliens and spontaneous human combustion have their believers who could publish consensus-based position papers. Reviews and position papers may be useful as a reference literature start, but only a start. Noncritical acceptance of publications may demonstrate impaired cognition.

Eventually the forensic pathologist should develop enough experience to begin study of the logic of forensic problem solving. A forensic pathology reference library needs a section on logic and the development of cognitive thinking. Logic has been discussed and studied since ancient times. However, application of classic logic theory to the practice of forensic pathology is frustrating. Most that is written has little relevance to daily forensic

problem solving. Jon J. Nordby, Ph.D., is an experienced death scene investigator whose doctoral dissertation dealt with logic. A combination of forensic experience and education has resulted in a practical reference, *Dead Reckoning*, *The Art of Forensic Detection*.[12] Built around 10 case examples, his discussion of proper and improper thought processes can enhance the ability of a forensic pathologist to conduct proper case investigations and to arrive at logical conclusions. Another useful Nordby publication deals with why experts differ in their conclusions when faced with the same data. The eye sees but the conscious observation is shaped by the experience and expectations of the observer.[13] Two persons, of different background and expectations, looking at the same scene or data, will mentally select parts of what exists and may synthesize different observations. In a personal test, I studied a skin slide of a human bite mark. I then showed it to an experienced dermatopathologist who proceeded to observe a single focus of four or five interstitial erythrocytes, one of which was fragmented. Although I had carefully studied this slide, a fragmented erythrocyte seen by my eye did not register at a level of conscious thought. The next time I examined the slide, I readily observed erythrocyte fragmentation. The difference was the experience of it being demonstrated plus a newfound awareness of such a phenomenon.

Available, at no cost other than downloading from a computer, is a book that fully clarifies cognitive interpretation of case investigative data.[14] The book is based on a compilation of analytical staff training articles utilized by the Central Intelligence Agency. The subject matter teaches cognitive analysis of data; in this book of intelligence (spy) data. It teaches how to make proper sense out of incomplete data, a problem faced daily in forensic death investigation. One need only to substitute "death investigation" in place of "intelligence" and the principles apply to forensic problem solving.

## Professional liability

Forensic pathology practice has been relatively free of professional liability claims due to factors that tend to protect the expert witness. That status is subject to change. The forensic pathologist should be aware of potential consequences of deficient death investigations. Expectations are greater today than 50 years ago. Medical examiner facilities and professional training have been greatly expanded and improved. Perceptions of error or deficiencies are more apt to lead to questions of liability. The flood of professional liability claims against clinicians has raised public awareness of liability. Exoneration of a wrongfully convicted, factually innocent person, where deficient forensic pathology practice and opinion were the core of the case, may lead to liability exposure. Fortunately for the forensic pathologist,

most homicide case convictions depend on police, not pathology, investigations. Yet the pathologist must be aware that "thin ice" opinions as to cause might create liability problems later. If the pathologist takes into consideration all the circumstances and correlates these with the autopsy findings, there should be little expectation of liability. When the pathologist pays little heed to the circumstances, the odds of incorrect interpretation of autopsy findings are enhanced.

A coroner pathologist's opinion that a child had died as a result of multiple stab wounds, despite the fact that it had been found in a room occupied by a bloodied dog, led to an innocent mother being jailed for murder of her child. When dog injury experts became involved, it was clear that the dog was responsible. Litigation against the pathologist coupled with widespread adverse publicity ensued. One may expect more liability claims against pathologists whose opinions are based solely on autopsy findings, especially when such findings are unusual.

Another consideration is action by professional licensing agencies against the errant expert witness.[15] Although not a common event, the potential is there. In Florida, the physician licensing agency takes notice of professional liability malpractice claims against physicians and compares these against the specifications of the medical practice act. In the United Kingdom, a recent action by a licensing agency resulted in a loss of license to practice based on the testimony offered by a physician expert witness in a criminal trial. Whether or not the courts shall uphold this action is immaterial. The expert witness was exposed to a most unpleasant hearing, the need to retain legal counsel, and widespread news media scrutiny. Testimony by this and other medical experts has resulted in a judicial review of convictions where parents have been convicted of killing a child.[16]

Potential liability falls into two areas, errors during the autopsy investigation and errors of testimony. One should beware of testifying beyond one's capability and training. The physician in the U.K. case presented misleading statistics testimony, a field in which he was not competent. The Royal Statistical Society demonstrated the fallacy of the testimony. The society stated, "Although many scientists have some familiarity with statistical methods, statistics remains a specialized area. The Society urges the Courts to ensure that statistical evidence is presented only by appropriately qualified statistical experts, as would be the case for any other form of expert evidence."[17] Rendering opinion testimony outside one's area of recognized expertise is not proper.

Forensic pathologists utilize consultant services, neuropathologists, odontologists, anthropologists, and so forth. However, the pathologist does not abrogate accountability when the consultant may be in error. The responsibility for the determination of cause of death

rests with the pathologist, especially when that pathologist acts as a medical examiner in charge of the medicolegal death investigation. In a highly publicized case, the medical examiner accepted the consultant neuropathologist's opinion that the high cervical spinal cord had been contused during police apprehension of a subject who later died in the hospital. What the medical examiner and his consultant failed to note was that the hospital admission neurological examination did not demonstrate a high cervical cord lesion. The patient had suffered hypoxia and developed a "respirator brain." The supposed cord injury was tissue reaction at the interface of the avascular necrotic brain and the viable cord, which had a different and intact blood supply. Tissue reactions and microscopic changes are similar for both direct trauma and the junction between viable and non-viable tissue. This case developed great negative publicity for the medical examiner.

The lesson is that the forensic pathologist must consider all aspects of a case and cannot transfer accountability to the consultant. When hospitalization has occurred, the clinical record must be correlated with the autopsy findings.

An investigative technique useful in a complex case investigation is to pretend that a body is not available for examination. Carefully review all available circumstantial and hospital data and estimate what an autopsy might disclose. Now, compare those historical data with the autopsy findings. This procedural step may prevent errors of interpretation.

The forensic pathologist acquires evidence during the autopsy examination. Evidence must be preserved and not discarded unless proper retention schedules are followed. In the event of litigation that extends beyond the retention period, discarding of evidence needed for litigation may result in a charge of spoliation of evidence against the pathologist. If the spoliation prevented a plaintiff attorney from winning a case, the pathologist may become a defendant in the legal action and assume responsibility for the legal judgment that would be held against the initial defendant, now immunized due to the negligence of the pathologist.

Verily, the forensic pathologist must be well trained in anatomic pathology and its application to forensic pathology, must properly document and investigate the circumstances leading up to death, must exercise proper cognitive judgment in the correlation of circumstance with autopsy, and must be aware of legal pitfalls and how to avoid them. Less than this may result in wrong-ful arrest and imprisonment of innocent persons with adverse consequences for the pathologist.

*Do*

- Conduct an autopsy whenever legally permitted.
- Prepare autopsy reports for easy reader interpretation.
- Consider history and circumstances *before* arriving at an autopsy interpretation.

*Don't*

- Confuse effects of therapy with significant trauma.
- Render cause of death opinions based solely on autopsy findings.
- Determine cause and manner of death from irrelevant data.

## References

1. *Stephen's Guide to the Logical Fallacies*. Retrieved from http://www.datanation.com/fallacies; 2004.
2. Moritz AR. Classical mistakes in forensic pathology: Alan R. Moritz (American Journal of Clinical Pathology, 1956). Am J Forensic Med Pathol 1981;2(4):299–308.
3. Hopper V, Gale C, Roote B. *Essentials of English. A Practical Handbook Considering All the Rules of English Grammar and Writing Style*, 5 ed. Hauppage, NY: Barron's; 2000.
4. Krischer JP, Fine EG, Davis JH, Nagel EL. Complications of cardiac resuscitation. Chest 1987;92(2):287–91.
5. Fackler ML. Wound ballistics. A review of common misconceptions. JAMA 1988;259(18):2730–6.
6. National Medicolegal Review Panel. *Death Investigation: A Guide for the Scene Investigator*. Retrieved from http://www.ncjrs.org; 1999.
7. Elstein A, Shulman L, Sprafka S. *Medical Problem Solving, An Analysis of Clinical Reasoning*. Cambridge, MA: Harvard University Press; 1978.
8. Richards R. Letter to the editor. Br Med J 1934;1:331.
9. Long R. Barbiturates, automatism and suicide. Insurance Counsel J 1959;26(2):299–307.
10. Modell JH, Bellefleur M, Davis JH. Drowning without aspiration: is this an appropriate diagnosis? J Forensic Sci 1999;44(6):1119–23.
11. Donohoe M. Evidence-based medicine and shaken baby syndrome: part I: literature review, 1966–1998. Am J Forensic Med Pathol 2003;24(3):239–42.
12. Nordby JJ. *Dead Reckoning: The Art of Forensic Detection*. Boca Raton, FL: CRC Press; 1999.
13. Nordby JJ. Can we believe what we see, if we see what we believe?—expert disagreement. J Forensic Sci 1992;37(4):1115–24.
14. Heuer R. *Psychology of Intelligence Analysis*. Retrieved from http://www.odci.gov/csi/books/19104/index.html; Central Intelligence Agency; 1999.
15. Carter T. With a mission. ABA J 2004;August:41–45.
16. Editorial. The Lancet 2004;363(9427):2099.
17. News Release. London: Royal Statistical Society; 2001.

# 2 Death Scene Investigation

*Emma Lew, M.D.*
*Evan Matshes, M.D.*

| | | |
|---|---|---|
| SCENE ETIQUETTE   10 | HOMICIDE   48 | |
| NATURAL DEATH   12 | HOMICIDE-SUICIDE   49 | |
| ACCIDENT   19 | REFERENCES   64 | |
| SUICIDE   36 | | |

The scene is pertinent in every death investigation, and is essential for the determination of the cause and manner of death for certain scenarios.[1,2] Medical examiners or their investigators will respond to scenes of nonnatural death to view the body in the context of its surroundings. In fact, nonattendance at death scenes has been regarded as one of the classical mistakes in forensic pathology.[3] Hospital pathologists performing forensic autopsies who are not trained to, or able to, attend death scenes should be provided with information on how, when, and where the body was found, by whom, and under what circumstances. In some deaths, the immediate environment does not contribute to death, such as in cases of metastatic breast carcinoma. In other cases, the environment plays a role although it does not cause the death; for example, consider a case in which a person with marked coronary atherosclerosis collapses with a dysrhythmia while shoveling snow. On the other hand, the scene description and scene photographs are critical in documenting that the physical circumstances and body posture are indicative of death due to positional asphyxia because the autopsy in these cases may yield very few findings. The most meticulous autopsy in all academia will provide only a speculative cause and manner of death in a 30-year-old man with a negative history, negative toxicology, and autopsy findings of visceral congestion. Yet at the scene, a screwdriver is next to an uncovered electrical outlet on a rain-soaked patio at the decedent's house, which is undergoing renovation. The cause and manner of death are provided by the scene.

*Why go to the scene?* The purpose of having the pathologist attend the death scene is severalfold. By viewing the body in the context of its surroundings, the pathologist is better able to interpret certain findings at the autopsy such as a patterned imprint across the neck from collapsing onto an open vegetable drawer in a refrigerator. The pathologist is also able to advise the investigative agency about the nature of the death, whether to confirm a homicide by a specific means, evaluate the circumstances to be consistent with an apparent natural death, or interpret the blood loss from a deceased person as being more likely due to natural disease than to injury. This preliminary information helps the investigative agency to define its perimeter, structure its approach, organize its manpower, secure potentially important evidence, and streamline its efforts.

Last but not least, the opportunity to meet at the scene initiates the collegial working relationship between the pathologist and the detective/investigator, and promotes interagency rapport as both professionals strive to solve the medical mystery of why *that* particular person died at *that* particular time, under *those* particular circumstances. This is not melodrama, just intellectual satisfaction for exploring an extremely important, educational, and fascinating aspect of death investigation. After all, a gunshot wound is a gunshot wound; it is the circumstances behind that gunshot wound that are frequently so compelling and always so instructive about human nature.

## Scene etiquette

Pathologists and law enforcement agents work cooperatively in a team effort. Although the medical expert has jurisdiction over the body, law enforcement has jurisdiction over the entire scene. The pathologist is invited to the scene and, as a guest, must comply with house rules. The lead detective will walk the pathologist through the scene, relaying information and pointing out salient features. The pathologist should realize that the area within the perimeter of the scene is one giant piece of evidence, and restrict his or her physical contact to the body and items immediately touching the body. Photography is a part of the processing of the crime scene and is performed in cooperation with and alongside law enforcement; the scene and body are photographed before anything is moved or removed. Treat the body with respect. Never remove the clothing in full view of onlookers. If it is not feasible to move the body to a secure area of the scene, police officers may hold up sheets around the body, mobile panels may be used, or police vehicles may be used to block visibility from the public.

Homicide victims need to be examined front and back to determine the nature and extent of injuries. For example, once the nature of the injuries is confirmed (gunshot wounds with no casings on the scene), the police will be able to focus their efforts on finding a shooter with a revolver, as opposed to searching for an assailant with another type of weapon such as an ice pick. Once the extent of injuries is seen, the pathologist will know how many radiographs are required. A beating death will alert the team that a struggle may have ensued, and scalp hair and fingernail scrapings/clippings are required, in addition to a blood standard obtained during the autopsy. Whenever sexual assault/battery is a possibility, specimens for a sexual battery kit must be obtained from the deceased victim prior to cleaning the body. Bodies with patterned injuries from an object or weapon still at the scene should be photographed with the object close to, but not touching, the injured part of the body. The patterned injury and the object should be photographed separately with a scale. A weapon may be brought to the autopsy for comparison with the wounds only *after* the weapon has been processed for trace evidence, DNA, and fingerprints to prevent allegations of contamination at the autopsy.

Always be professional—remember that onlookers, including the decedent's family, and news media may be at the perimeter of the scene, so do not say or do anything that would reflect poorly on yourself and the organization you represent. Trash (discarded gloves, etc.) should be placed in bags designated for investigators' refuse, and *not* in the garbage cans that are part of the scene because in actuality, they are evidence. Never remove items from a scene for souvenirs.[4]

### Sample scene report (Images 2.1 through 2.6)

**Case #:**  05-1000
**Date:**  01 June 2005
**Time arrived at scene:**  3:00 p.m.
**Location:**  123 Main Street (at the rear of the building)
**Police agency:**  Smalltown Police Service
**Lead investigator:**  Detective Smith
**Initial information:**  According to the police, the body of a young woman was found at 12:00 noon behind the dumpster in this parking lot at the above location. The woman is presently unidentified and nothing is known surrounding her death. The police, at this time, believe that she may have been dumped at this location.
**Observation of surroundings:**  The body of a young woman is behind a dumpster in the back of the lot. The scene is in a parking lot that is partially fenced and has an opening for vehicles. Close to the body is a small patch of dirt with a rectangular mark that is suggestive of a tire mark. No obvious black tire marks are on the parking lot surface.
**Observation of victim:**  The victim is a young woman face-down on the ground, wearing sneakers, black Levi jeans, and a tube top. The tube top is on inside-out. Short brown and white hairs are on her pants. The police vacuumed the body and the surrounding ground for any trace evidence prior to my examination. Electrocardiogram pads are on her back. The victim is not wearing socks. No money, identification, or other objects are in her pants pockets. Abundant red foam emanates from her mouth and nose. Flies are buzzing around her head. Dried white paint or dust is on her arms and left hand. A small amount of dried blood is on her left arm. No punctures are on her arms. She has an abrasion of her right inner thigh. She is wearing gold-colored panties that are in place and are not damaged. No debris is on the bottom of the sneakers. There are no palpable facial or nasal fractures. The nasal septum is intact. She has brown irides with no conjunctival petechiae. Tache noire is present. She has undamaged natural teeth and her frenula are intact. The victim has curly, dark brown hair that appears to be wet or shiny and, according to the police, appeared to be wet when she was first discovered. She is wearing a bracelet with clear stones on her left wrist. Some of the stones have fallen out of their sockets. The victim has red livor mortis on the dependent portions of her body, consistent with her body position, and faint livor mortis on her left flank. The victim is lying face-down with her left arm bent upward and her right arm bent downward. Her fingernails are intact and undamaged. Some dirt is underneath her fingernails. The victim has generalized rigor mortis, which is broken with difficulty. Her anus, labia, and vagina are uninjured. Specimens for a sexual battery kit are obtained during the scene investigation, prior to taking the rectal temperature. The rectal temperature is 90 degrees Fahrenheit at 4 o'clock in the afternoon. The ambient temperature is 90 degrees Fahrenheit. It is hot, dry, slightly overcast with an occasional wind gust. Paper bags were placed over her hands before I left the scene.
**Scene impression (including probable cause and manner of death):** *Unclassified—cause and manner of death pending autopsy and toxicology.*



2.1



2.4



2.2



2.5



2.3



2.6

Case 2:19-cv-02689-GMS    Document 194-2    Filed 11/19/21    Page 37 of 122

## Natural death

An elderly couple was found at home (**Image 2.7**). The husband's body was semiprone over the wife's legs. The supine body of the wife was in obvious early putrefactive decomposition with bloating, marbling, discoloration, and blister formation (**Image 2.8**). The husband's body did not show evidence of decomposition (**Image 2.9**). As the woman appeared to have died possibly 1 to 2 days prior to the man, it raised the speculation that the husband committed suicide after his wife died.

Autopsy disclosed that the woman died from a ruptured myocardial infarct with resultant hemopericardium (**Image 2.10**). The husband had a dark fluid in the stomach with associated dark staining of the lower esophagus (**Image 2.11**). The husband's cause of death was pended for toxicological analysis to rule out an overdose. Toxicology was negative for both decedents. The husband's cause of death was determined to be hypertensive heart disease with a contributory cause of diabetes mellitus.

### Take-home message

More than one death at a scene suggests an environmental cause such as carbon monoxide toxicity unless obvious trauma (such as gunshot wounds) is involved; the discrepancy in preservation between the husband and the wife made an environmental cause less likely. One should try to explain inconsistencies such as the differential rate of decomposition in this case. The husband's dementia, his own infirmities, and their isolated social existence likely prevented him from responding appropriately when his wife died.



2.9



2.7



2.8



2.10



2.11



2.12



2.13



2.14

**Points to consider**

- Remember that your safety and the safety of others is of primary concern.
- Be sure to consider environmental conditions such as carbon monoxide toxicity, particularly because such conditions can impact the health of investigators (e.g., headaches, nausea, vomiting, etc.).
- Given the above circumstances where the wife appeared to have died first, it was appropriate to rule out an intentional overdose by the husband, especially after finding the dark fluid in the stomach.
- Budgetary constraints aside, it would be ideal if toxicological analyses could be performed on every person who dies outside of a hospital.
- Admission blood should be requested from hospitals for patients dying of nonnatural causes; the limitation here is that many hospitals discard blood specimens after a few days.
- It is recommended that specimens be taken and held, even if toxicological analyses are not requested, because unexpected issues or requests may arise.

## Natural death


An elderly woman had not been seen by her neighbors for 2 days. She was found supine on her bedroom floor in her locked apartment (**Image 2.12**). Her nightgown was displaced upward, exposing the pelvis and genitalia (**Image 2.13**). Contusions and abrasions were on her face (**Image 2.14**), torso, and extremities. White foamy fluid drained from her nostrils. The cords from a radio and a telephone were loosely wrapped around her left wrist and hand. Neighbors did not notice any injuries when she was last seen. A package of cigarettes, an ashtray full

of cigarette butts, and a plastic bag containing ashes and cigarette butts in the living room indicated that she was a heavy smoker (**Image 2.15**).

Autopsy disclosed that the contusions and abrasions on her face and body were symmetrical and located over the bony prominences of the body. The lower labial mucosa had a recent ecchymosis but also had a mucosal scar that aligned with the left upper lateral incisor and the left lower canine (**Image 2.16**). The heart had an old posterior inferior wall infarct (**Image 2.17**), and the lungs were anthracotic and emphysematous (**Image 2.18**). The cause of death was atherosclerotic heart disease with a contributory cause of pulmonary emphysema.

## Take-home message

The scene was suspicious for foul play because of the abrasions and contusions, displacement of the clothing, and the cords wrapped around the left wrist and hand. People dying from natural causes may become hypoxic and confused terminally. They may fall against furniture and knock items over, and the scene may appear ransacked. Note the type and location of injuries to differ-entiate between those that could result from falls and those that are more likely to be inflicted. Police investigation of the terminal events and the autopsy should resolve questions of criminal activity.

## Points to consider

- Do have a look around the rest of the scene because there may be findings pertinent to the cause and/or manner of death.
- Although the woman's body was in the bedroom, evidence of her heavy smoking was in the living room.
- Look for and collect medications belonging to the decedent to accompany the body to the medical examiner.


2.15


2.16


2.17


2.18

- Photograph the body and its surroundings, even in cases of apparent natural death.

## Natural death

An elderly white female was found naked at home (**Image 2.19**). A large puddle of blood was on the bedroom floor carpet, close to the body. Blood on the tops of her feet indicated that she was bleeding from some higher site, down onto her feet (**Image 2.20**). Blood on the soles of her feet indicated that she was walking around in her blood (**Image 2.21**). A loose aspirin tablet and bottles of aspirin were on the kitchen counter, and many more bottles and boxes of aspirin were in a

kitchen cabinet (**Images 2.22** and **2.23**). Aspirin is an anti-inflammatory medication that is also known to be a gastric irritant. Her history of severe arthritis and the finding of numerous aspirin bottles at the scene were suggestive of a natural death, likely associated with a gastrointestinal hemorrhage. Autopsy disclosed a normal stomach; however, a vascular malformation was











in the small bowel (**Image 2.24**). The small bowel proximal to the vascular malformation was normal color. The bowel distal to the bleeding lesion was dark blue from the blood in the lumen (**Image 2.25**). The blood on the scene was red and not black like melena stool, possibly because the vascular malformation bled so profusely prior to death. No additional vascular lesions or polyps, nodules, or masses were anywhere along the gastrointestinal tract, from the mouth to the anus. The cause of death was gastrointestinal hemorrhage due to vascular malformation of the small bowel.

### Take-home message

Blood on the scene is not always indicative of trauma. People with natural disease such as esophageal varices

due to cirrhosis, pulmonary TB, and bronchogenic carcinoma may have hematemesis or hemoptysis leading to death. Tumors under the skin may erode through and bleed externally. Hemodialysis patients have vascular shunts that may erode through the skin and bleed profusely. The speculative cause of death (gastrointestinal hemorrhage) apparent from this scene could only be confirmed or refuted by an autopsy.

### Points to consider

- The entire scene must be examined in any suspicious death.
- Blood at a scene does not always indicate trauma.
- All of the decedent's medications should be collected and submitted with the body to the medical examiner.
- All medication types and dosages should be inventoried and documented in cases of suspected overdose or where narcotics are concerned.
- Discrepancies in the inventory should be noted, such as an empty bottle of Demerol that held 30 pills when the prescription was filled 1 day earlier.

## Natural death

An apartment door was noted to be ajar and there was obvious recent damage to the lock (**Image 2.26**). Smears of blood were on a gray stairwell railing and a window



2.24



2.25



2.26

frame, both of which were close to the apartment. The living room was in disarray with furniture overturned and items strewn on the floor. The elderly male tenant was prone on the living room floor with a small glass tabletop covering the right flank (**Image 2.27** and **2.28**). The bedroom appeared ransacked with drawers pulled out, clothing dumped on the floor, and items thrown on the bed (**Image 2.29**). Autopsy disclosed small abrasions on the right side of the face and the right shoulder, consistent with agonal collapse to the floor. The enlarged heart had pericardial/epicardial adhesions, aortocoronary bypass grafts, and a permanent pacemaker (**Image 2.30**). The native coronary arteries had marked atherosclerosis (**Image 2.31**). Lacunar infarcts were in the left basal ganglia (**Image 2.32**). There was no evidence of trauma contributing to death.

The scene was suggestive of a homicide, possibly during the course of a burglary. Without trauma, homicide was still a consideration if the decedent had been threatened with his life by a burglar with a firearm and suffered a dysrhythmia because of fear and stress above and beyond the usual accepted stresses of life (see Chapter 22).

Police investigation disclosed that a burglary did occur 2 days earlier at this apartment, that the ransacking had occurred during that previous incident, and that the black stains on the door were from police dusting the door for fingerprints. The tenant was not concerned about the mess and did not clean up after the burglary.


2.29


2.27


2.30


2.28


2.31



2.32



2.33



2.34

The following night, voices were heard as three burglars entered the apartment and were scared away by the tenant's body on the floor. The cause of death was atherosclerotic and hypertensive cardiovascular disease. The remote temporal relationship between the first burglary and the deaths did not support a homicide.

## Take-home message

The pathologist must work in conjunction with law enforcement to arrive at the appropriate cause and manner of death. The scene would have been identical had the man died during a burglary where he was threatened. The autopsy findings would also be identical, but the manner of death would be homicide. A direct threat to his life would be all that was required to send this man with extensive cardiac disease into a lethal dysrhythmia.

### Points to consider

- Note the type and location of visible injuries on the body.
- Keep in mind the history and scene findings as you certify the cause and manner of death.
- Death certification should not be made on the basis of the autopsy findings alone, without consideration of the history and scene.

## Natural death

A mother went to check on her 6-week-old baby 3 hours after he was last fed. A blood-tinged stain was on the pillow under the baby's face, and the baby was cool and unresponsive. She called 911, and Fire-Rescue personnel responded and pronounced the baby dead. Homicide detectives requested that the mother re-create the scene exactly as she found her baby. The baby had been covered up to the neck by a light blanket. The body was not moved from its original position prior to examination by the medical examiner.

The baby slept in a crib in the parent's bedroom (**Image 2.33**). The baby was prone inside the crib, with the head turned to the right, and the arms up on either side of the head (**Image 2.34**). A pale red stain was on the pillow below the baby's face (**Image 2.35**). Fire-Rescue personnel checked for cardiac electrical activity by placing electrocardiographic patches on the back (**Image 2.36**). Purple livor mortis on the face spared the left cheek; the area of contact pallor on the left cheek was consistent with the position in which the baby was found (**Image 2.37**).

Full-body radiographs disclosed no fractures, calluses, areas of periosteal irregularity or thickening, or soft tissue masses. Autopsy showed petechiae in the



2.35



2.36



2.37

thymus, epicardium, and visceral pleura. There was no gross evidence of natural disease or trauma. Microscopic examination showed no diagnostic features that were contributory to death. Toxicology was negative. A post-mortem screen for metabolic disorders was negative.

In some jurisdictions, this death would be attributed to SIDS; however, some medical examiners prefer to certify such deaths as undetermined of cause and manner.

**Take-home message**

The position in which an infant is found may be crucial in establishing the cause and manner of death. Because SIDS is a diagnosis of exclusion (see Chapter 15), the history, terminal events, scene findings, autopsy, toxicology, and appropriate ancillary studies must be considered before an infant death is determined to be due to SIDS.

**Points to consider**

- Scene investigation is very important in these cases whether or not the body is located at the scene.

- If the baby has been transported to the hospital, one can use a baby doll to have the parent or guardian demonstrate the exact positions in which the infant, blankets, etc., were found.
- The position of the head and face in the original environment is of great importance and should be demonstrated.
- The pattern of livor and pallor on the face can be very informative.
- Always consider the possibility of asphyxia or conditions conducive to asphyxia such as cosleeping (bedsharing) with adults, wedging, very heavy blankets, etc.
- Bodies at the scene should be examined carefully for evidence of injury.
- Police should be responsible for the initial interview of parents and caregivers; only then should these individuals be asked to reconstruct the scene.
- Observe the surrounding environment for evidence of smoking, ethanol and drug use; note the general state of cleanliness and maintenance; inspect the refrigerator for type and amount of food, etc.

## Accident

A motorcyclist changed lanes on the freeway to avoid stopped traffic ahead of him. As he started to change lanes, he struck the rear of the vehicle in front of him and also another vehicle before traveling into the next lane where he went underneath a tractor-trailer and was rolled over by the rear wheels. The tractor-trailer did not



2.38



2.39



2.40



2.41



2.42

stop. In the foreground of **Image 2.38** is the damaged motorcycle; a trail of tissue leads from the motorcycle to the body covered by a yellow sheet in the center lane. His helmet had been knocked off his head (**Image 2.39**). A compound comminuted fracture of the head and face was obvious (**Image 2.40**). The extruded heart was next to the motorcycle. The interrupted trail of blood leading away from the heart creates the impression that the beating heart skipped along the road to its final resting position (**Image 2.41**). Portions of avulsed bowel were on the road (**Image 2.42**).

The gaping defect adjacent to the left axilla was where the heart was extruded from the chest (**Image 2.43**). An impressive amount of tissue strewn on the road from the crushed victim was collected (**Image 2.44**). The cause of death was blunt trauma.

### Take-home message

Some of the most impressive cases of trauma result from motor vehicle-related incidents. The pathologist will


2.43


2.44

appreciate the nature of the forces involved by viewing the extent of the destruction at these scenes. Traffic investigators can demonstrate markings on the road and other scene findings to explain the events leading to the final resting positions of the vehicle(s) and victim(s).

## Points to consider

- Photography of all traffic scenes should try to capture the circumstances surrounding the cause of the crash.
- Taking photographs from all sides of the vehicle(s) and victim(s) is important.
- Some victims will need to be extricated from their crushed vehicles by the jaws of life.
- Removal of the roof, doors, or body panels will allow visualization of the body *in situ* within a crushed vehicle.
- A pedestrian victim of a hit-and-run incident may harbor physical evidence on his or her body and clothing.
- The clothed body of a hit-and-run victim may be wrapped in a clean, white sheet prior to removal from the scene so that all trace evidence can be recovered under optimal lighting conditions in the morgue.
- The clothing and the white sheet should be receipted to the investigative agency to maintain the proper chain of custody.
- Scalp hair and blood from the victim, which can be used for DNA evidence, should also be receipted to the investigative agency.

## Accident

Four friends came from South America to vacation for a week. When one of the visitors failed to return to work in South America early the following week, worried family members called another woman who went to the vacation house to check on the four visitors. A blue car was parked on the driveway, in front of the closed


2.45

garage. The woman entered the house with a key. By the time she climbed one flight of stairs to the landing on the second floor, she had a headache. She went into the master bedroom, saw two women dead in bed (**Image 2.45**), and ran back downstairs to call the police. A red van parked in the garage had an empty gasoline tank; the keys were in the ignition, and the ignition was turned on. A third female victim was in an upstairs bathroom; she was the person who had driven the van into the garage and apparently forgot to turn it off. A young man dead on the floor of a smaller bedroom had driven the blue car back to the house. All four bodies were in early putrefactive decomposition.











The woman on the right side of the bed in the master bedroom had bright red purge fluid draining from the nostrils. Her hands were clenched in fists on her upper chest (**Image 2.46**). The young woman in the bathroom also had her hands clenched in fists (**Images 2.47** and **2.48**). Her livor mortis was bright red (**Image 2.49**). The young man in the smaller bedroom also had bright red lividity (**Image 2.50**).

Autopsy of the four victims disclosed no anatomic cause of death. All four victims had lethal concentrations of carbon monoxide. The two women with the clenched fists likely suffered seizures prior to death. Investigation

of the house disclosed that the intake for the air conditioner was in the garage, and had sucked in fumes from the running van. The cause of death for all four victims was acute carbon monoxide toxicity.

### Take-home message

When more than one person is dead at a scene with no apparent trauma, and especially if the bodies are in a similar stage of decomposition, think of an environmental cause such as carbon monoxide toxicity, sulfuryl fluoride (insecticide) toxicity, etc. The scene must be made safe and/or the investigators must have personal protective equipment appropriate for the particular safety hazard before they are allowed to make entry.

### Points to consider

- Each victim must be photographed and documented individually.
- Each victim must be autopsied and have specimens taken for toxicology.
- Full toxicology must be requested on the specimens taken from each victim.
- Specimens in addition to the routine vitreous, blood, bile, urine, gastric contents, liver, and brain may need to be collected, depending on the toxic substances involved.
- The terminology carbon monoxide *toxicity* is preferred to carbon monoxide *poisoning* because the word *poisoning* can connote intent.

## Accident

The woman shown in **Image 2.51** was trying to open the electronically controlled iron gate by reaching through the bars to depress the button on the control panel mounted next to the gate. The moving gate crushed her against the frame of the gate, pinning her body in the upright position (**Images 2.52** and **2.53**). Black grease on her left hand was from her efforts to push open the gate. Dirt, a linear indentation, and purple ecchymoses on the left side of the mandible (**Image 2.54**) and neck correlated with internal ecchymoses and a fracture of the hyoid bone at autopsy (**Image 2.55**). Petechiae were evident on the face and in the eyes at the scene (**Image 2.56**), and petechiae in the lining membrane of the sphenoid sinus (**Image 2.57**), subglottic region of the larynx, and posterior hypopharynx were found at autopsy. The cause of death was traumatic (or mechanical) asphyxia.

### Take-home message

A visit to the scene may provide the cause and manner of death at a glance. In the autopsy room, a young woman with neck trauma and facial and conjunctival petechiae would raise the suspicion of a homicide if the history and scene photographs were not available.


2.51


2.52

### Points to consider

- Photograph the body from different angles to demonstrate the upright position of the body pinned in place, the edge of the gate against the neck, and the position of her left hand.
- Look for and photograph pertinent findings on the body such as the conjunctival petechiae and the marks on the left side of her neck.
- Meticulous documentation should be the standard for all cases because it cannot be predicted which cases will undergo major scrutiny in either criminal or civil court.
- Toxicological analyses should be performed on all accidental deaths to evaluate the potential contribution of drugs and ethanol to the fatal event.



2.53



2.54



2.55



2.56



2.57

## Accident

The body of a homeless man was found under a bridge with his face in the water (**Images 2.58** and **2.59**). Drug paraphernalia scattered on the bank behind him included a cigarette lighter, crushed soda can with residue on the bottom, and a needle and syringe with blood in the hub (**Images 2.60** through **2.63**). Autopsy disclosed mild cerebral swelling and marked pulmonary edema. Pulmonary edema is common to drug overdoses and drowning, but not pathognomonic for either because it can also be seen in natural deaths and in any death associated with agonal heart failure.

Because the scene was suspicious for drowning as well as for drug overdose, the sphenoid sinus was examined. The fluid in the sphenoid sinus supported the suspicion of drowning (**Image 2.64**). It is thought that a breath taken while under water may lead to aspiration of fluid into the sphenoid sinus, regardless of the state of consciousness.



Toxicology was positive for morphine and 6-monoacetylmorphine, consistent with recent heroin abuse. Benzoylecgonine in the serum indicated that cocaine had been used, but not immediately prior to death like the heroin. The cause of death was acute heroin toxicity with a contributory cause of submersion in water.


2.64


2.65


2.66

## Take-home message

Scenes often give valuable clues as to the cause of death and can guide the autopsy procedures. Submersion of the face in water prompted the pathologist to examine the sphenoid sinus for fluid. Pulmonary edema in this context was likely due to heroin toxicity and submersion of the face in water. Pulmonary edema, like all autopsy findings, must be evaluated in the context of the history, scene, autopsy, toxicology, and other pertinent studies.

## Points to consider

- It is very important to know the circumstances in which the body was found.
- Look for and collect all drug paraphernalia to be submitted to the toxicology laboratory associated with the medical examiner/pathologist or the laboratory for law enforcement, whichever is appropriate in your jurisdiction.

## Accident

Fire erupted in a house and all occupants were able to escape except an elderly female who was bedridden. The smoke and soot from the fire left a black stain on the outside wall above the windows and doors (**Image 2.65**). Fire gutted the house, including the bedrooms (**Images 2.66** and **2.67**). The body of the elderly invalid woman was in her bed (**Images 2.68** and **2.69**). The metal side rails of the bed were still up and relatively intact. The body is supine and the arms are elevated and flexed at the elbows and wrists (**Image 2.70**). This "pugilistic attitude" is characteristic of heat effect on the muscles to cause contraction and resultant positioning to imitate the stance of a boxer with the arms upheld. The skin is relatively spared around the pelvis where an undergarment was in place (**Image 2.71**). Arson investigators identified what appeared to be an overloaded electrical outlet in the kitchen as the origin of the fire. Autopsy disclosed soot in the upper airways and the intrapulmonary bronchi, and cherry-red coloration of the blood, muscles, and viscera. The carbon monoxide concentration in the blood was 86 percent. The cause of death was house fire. Some jurisdictions prefer an anatomic cause of death such as inhalation of smoke and soot.

## Take-home message

Autopsy findings must correlate with the scene circumstances. If a charred body found in a fire does not have



2.67



2.68



2.69



2.70



2.71

soot in the airways or an elevated concentration of carbon monoxide (greater or equal to 50 percent) in the blood, that person may have been dead before the fire started. A carbon monoxide concentration lower than the usual accepted lethal concentration may be seen in fire deaths involving people with heart and/or lung disease, the very elderly, or the very young. The classical cherry-red coloration is somewhat subjective and may be missed if the lighting is poor.

**Points to consider**

- Look for factors that may have prevented the victim(s) from escaping.

- The manner of death often depends on the findings of arson investigators.
- Intense or prolonged fires can result in heat fractures and detachment of extremities; be sure to collect all body parts.

- Avoid creating additional artifactual disruption, particularly of the jaws and teeth, in order to preserve dental features for identification.
- Full-body radiographs are recommended on charred bodies to rule out gunshot wounds and penetrating wounds with other foreign objects; the cutaneous wounds associated with these injuries would have been eradicated by the fire.

## Accident

A teenage boy was seen working under his car in the afternoon. His motionless legs were protruding from under the fallen left side of his car hours later (**Image 2.72**). Fire-Rescue personnel responded, the left side of the car was jacked up, and the teenager was pulled out from under the car (**Image 2.73**). The small jack that he had been using had collapsed, dropping the car on the teenager's chest. The left side of the car was jacked up properly by the responders to the scene. Once the teenager was pulled out from under the car and determined to be dead, the body and scene were preserved for law enforcement investigators and the medical examiner.

The undercarriage is flush with the side of the car. Dirt and grease stain the arms and the right side of the neck (**Image 2.74**). The fallen car has compressed the torso, leaving patterned lividity with defined areas of contact pallor (**Image 2.75**). The back shows intense purple lividity (**Image 2.76**). Lividity and contact pallor are also prominent on the face and neck (**Image 2.77**). Interestingly, the internal lividity is also intense in the tongue and upper larynx (**Image 2.78**). The sharply defined area of internal pallor corresponds with the external contact pallor across the neck in the previous photograph and is due to compression by some portion of the vehicle. Autopsy disclosed additional findings of petechiae in the lining membrane of the sphenoid sinus, epiglottis, larynx, upper trachea, hypopharynx and epicardium, and pulmonary contusions without rib fractures. The cause of death was traumatic asphyxia.



2.72



2.74



2.73



2.75

## Take-home message

The diagnosis of traumatic asphyxia can often be made at the scene with the body being found pinned underneath a heavy weight, which prevented the victim from breathing. The autopsy will show no other anatomic cause of death.

### Points to consider

- Good photographic documentation of the scene, to illustrate the circumstances of the death, is important to support the diagnosis of traumatic asphyxia.
- Autopsy findings that support the diagnosis should be photographed.
- If additional blunt trauma is identified, such as fractured ribs, lacerated lungs, and a lacerated heart, the cause of death is more appropriately called *crush injuries of chest*.

## Accident

A woman returned from work in the late afternoon to find her garage door open; a ladder was under the entry to the attic of the garage, and a left hand was dangling from the attic (**Image 2.79**). She ran into the house to find her husband, but there was no response. She rushed back to the garage and realized that the dangling arm was wearing her husband's watch (**Image 2.80**). The hand was not moving and there was no response to her shouts


2.78


2.76


2.77


2.79













(**Image 2.81**). She called 911, and Fire-Rescue personnel responded, surveyed the scene, and called the police after shutting off the power. The woman confessed that she had been nagging her husband to fix the garage door opener.

The 28-year-old white male decedent was prone on the garage attic floor with his right hand still loosely grasping a metal utility knife (**Image 2.82**). The blade of the knife had incised the plastic insulation around an electric cord (**Images 2.83** and **2.84**). The electrical cord was the ultimate source of power to the garage door opener. A flashlight by the right hand was on. A screwdriver and a pair of pliers were close by, next to the elec-

trical box. The body had no external evidence of injury; specifically, no burns were seen on the hands.

Autopsy disclosed mild cerebral swelling, slight pulmonary congestion and edema, and no natural disease. The paucity of external and internal findings was consistent with a low-voltage electrocution in the context of the scene. The decedent had no medical history, was a nonsmoker, and drank socially. The cause of death was electrocution.

### Take-home message

The scene findings are absolutely crucial in determining the cause and manner of death in a low-voltage electrocution because, in many cases, the body may have no evidence of injury.

### Points to consider

- Ensure that the scene has been made safe prior to making entry.
- The scene must be photographed meticulously to demonstrate how the electrocution occurred.
- Examine the hands specifically for the presence of electrothermal burns.
- If an electrocution cannot be substantiated by examination of the scene alone, the scene should be secured until the autopsy results are known.
- If a tool or piece of machinery was involved in the electrocution, that item should be impounded and examined by a certified electrician.
- On occasion, the entire wiring system of the building may require inspection.
- It is always informative to consult an electrical engineer or other professional from the local electrical company to educate yourself and your colleagues about the technical aspects of a particular electrocution.

## Accident

Two men were painting a three-story building. The man on the ground heard a yelp from his colleague who was on the roof. He looked up in time to see his colleague give a small jump and fall off the roof, landing on his head 2 to 3 feet from the side of the building (**Image 2.85**). The long aluminum handle from a roller paint brush landed next to the body (**Image 2.86**). The handle was broken and had a brown-black burn mark (**Image 2.87**). High-voltage power lines were located only a few feet away from the side of the building (**Image 2.88**). The victim's 5-gallon paint bucket was next to the low wall around the edge of the roof (**Image 2.89**).

Yellow-brown electrothermal burns across the decedent's right palm and distal right forearm are consistent with having been sustained while holding the aluminum handle of the roller brush (**Image 2.90**). Burn defects in


2.85


2.86


2.87

the right trouser leg were associated with a large burn on the medial aspect of the right knee (**Image 2.91**). It appears that the point of "entry" of the electricity was along the aluminum handle to the right hand and forearm, and the point of "exit" was the right leg where the knee was in contact with the low wall along the edge

of the roof. Blunt head trauma was also present from the three-story fall.

Death was attributed to high-voltage electrocution and blunt head trauma because the head injuries appeared antemortem. Civil attorneys pressured the medical examiner to commit to either the electrocution or the head trauma as being more contributory to death; the issue was settled in civil court.

### Take-home message

The diagnosis of high-voltage electrocution can be made at the scene, from the physical circumstances, and from burns that are usually present on the body. This is in contrast to low-voltage electrocutions where the scene findings are absolutely crucial because the body may not have electrothermal burns.

### Points to consider

- If electrocution is suspected, one must ensure that the power has been turned off before investigators enter the scene.
- Photographically document the physical circumstances that led to the victim's contact with high-voltage power lines.
- The environmental circumstances are important for high-voltage electrocutions, but are actually critical for



2.88



2.89



2.90



2.91

the determination of low-voltage electrocution because there may be no anatomic findings in low-voltage electrocutions.

- Photographically document the energizing source and how the victim was grounded.
- Electrical tools or equipment apparently used by the victim should be impounded and examined by an electrical expert who will look for defects in wiring, etc.

## Accident

A woman could not reach her nephew the previous day, so she went to his home and peeked through the front window; she immediately ran to call police. The young man's body was found naked on the sofa in the living room of his one-bedroom apartment (**Image 2.92**). The apartment appeared ransacked, with furniture and pillows strewn over the floor and along the hallway leading past the bedroom to the bathroom (**Image 2.93**). A needle and syringe were on the floor of the hallway closet (**Image 2.94**). Multiple small abrasions were on the extremities (**Image 2.95**) and a contusion was on the right lower back (**Image 2.96**). Purple livor mortis over the dorsum of the body was fixed. A rectal temperature taken at the scene was 92 degrees Fahrenheit (**Image 2.97**). An ambient temperature taken at the same time was 88 degrees Fahrenheit (**Image 2.98**). Toxicology confirmed cocaine metabolites in the blood. His rectal temperature at the scene and lack of clothing were consistent with hyperthermia, and the ransacked appearance of the



2.92



2.94



2.93



2.95



2.96



2.98



2.97

2.99

apartment and the abrasions on the extremities were consistent with the hyperactivity associated with a cocaine-induced excited delirium. Had police entered during his excited delirium, a struggle would have been likely. The cause of death was cocaine-induced excited delirium.

**Take-home message**

If the circumstances at the scene are consistent with the bizarre behavior associated with an excited delirium, take a rectal temperature and an ambient temperature, noting the date and time of each. This will document hyperthermia associated with cocaine use as well as hyperthermia associated with other illicit drugs, natural psychotic reactions, infection, general hyperactivity, and medications.

**Points to consider**

- Photograph the disarray of the scene as well as the body.
- Photograph the front and back of the body to document injuries.
- Photograph the thermometer registering the body temperature and include a watch in the photograph to doc-

ument the date and time at which the temperature was taken.
- Photograph the thermometer registering the ambient temperature and include a watch in the photograph to document the date and time at which the temperature was taken.
- Collect specimens for full toxicological analyses.

## Accident

A man was bar-hopping with his friends one evening. His body was found on the outdoor patio of his ground-floor apartment the next morning, hidden by the trees and bushes along the wall (**Image 2.99**). He routinely left his key at home and climbed over the iron fence along the patio to enter the apartment without disturbing his parents (**Image 2.100**). The body is seated on the ground with the head between the trunks of two trees (**Image 2.101**), and the neck wedged tightly into the angle where the tree trunks converged (**Image 2.102**). He apparently climbed over the iron fence and slipped, falling into the trees. The only anatomic finding at autopsy was an irreg-



2.100



2.102



2.103



2.101

extricate himself from that position. The cause of death was positional asphyxia.

### Take-home message

Without a scene investigation and appropriate photographic documentation, it would be difficult to certify the cause and manner of death. The diagnosis of positional asphyxia is made by the terminal physical position of the victim, which prevents adequate breathing. That valuable information is lost once the victim's body is moved/removed from that position. The scene circumstances are essential to the diagnosis of positional asphyxia.

ular abrasion diagonally across the front of the neck, caused by the tree trunk (**Image 2.103**). There were no facial or conjunctival petechiae and no injuries in the soft tissues of the neck, hyoid bone, thyroid cartilage or cervical spine. The blood ethanol concentration was 0.54 percent. Because he was so intoxicated, he could not

**Points to consider**

- The scene must be photographed to show the position of the victim in his environment.
- The circumstances at some scenes also reveal why the victim could not extricate himself from his terminal position; photography is essential to document this feature.
- Photograph all injuries.
- The neck should be dissected to look for any injuries in the soft tissues, hyoid bone and thyroid cartilage, and cervical spine.
- The intracranial contents are examined to rule out a subarachnoid hemorrhage due to rupture of one of the vertebral arteries in the neck.
- Toxicology should be requested on all accidental deaths.

## Suicide

Witnesses heard a loud thud and saw the body of a man on the driveway in front of a high-rise apartment (**Images 2.104** and **2.105**). Obvious head trauma was associated with blood and brain spatter on a U.S. mail truck in front of the building, portions of calvarium on the driveway, and extruded cerebrum on the driveway approximately 6 feet from the decedent's feet (**Image 2.106**). A patterned abrasion on the left flank reflected the pattern of the tile comprising the driveway (**Image 2.107**). The decedent lived on the 12th floor, directly above where the body was found. A chair on the balcony had been placed in front of the railing, the seat of which had shoe prints that matched the soles of the shoes worn by the decedent (**Image 2.108**). The cerebellum and brainstem were on the sidewalk, a few yards beyond the decedent's head, in the direction opposite to where the


2.105


2.106


2.107


2.104

cerebrum came to rest. It appears that the decedent landed on his head, resulting in a compound skull fracture which allowed the cerebrum to escape upon impact through the now gaping defect in the skull and scalp. The body bounced once upon initial impact, flipping the head and body in the opposite direction, and flinging the cerebellum and brainstem out through the open calvarium to strike the brick wall before falling onto the sidewalk (**Images 2.109** and **2.110**). The cause of death was blunt trauma.

## Take-home message

A visit to the scene confirmed the man's intent of suicide with the chair placed in front of the balcony railing, his hand prints on the railing, and the contents of his pockets (money) piled on the kitchen counter. It is not unusual for bodies to bounce on impact from a height. People willfully jumping from a height may take a running leap or push themselves off the building, whereas people who fall accidentally frequently just drop close to the side of the building.

## Points to consider

- The person's medical, social (including drug and ethanol use), and psychiatric history should be obtained; there may be accounts of suicide ideation, threats, and even attempts in the past.
- Photographically document the position of the body in relation to the building. The distance between the body and the side of the building should be documented in cases where there is a fall from a height, whether it be a suicide, accident, or a homicide.
- One should go up to the point of origin of the jump/fall, photographing downward onto the body; protruding structures that the individual may strike before the final impact on the ground will be obvious.
- Photograph evidence at the point of origin of the fall (e.g., scuff marks, fingerprints, eyeglasses, suicide notes, etc.).
- Don't limit your investigation to the immediate vicinity of the body because one death may be associated with two or more geographically separate scenes.

## Suicide

This woman was found supine in bed, fully dressed (**Image 2.111**). The upper front of her shirt was heavily blood-stained around six bullet holes. The bullet holes in the shirt, bullet holes in the brassiere, and six gunshot wounds on the left side of the chest were associated with



2.108



2.109



2.110

heavy soot deposition, consistent with contact gunshot wounds (**Images 2.112** and **2.113**). A revolver was loosely grasped in the left hand (**Image 2.114**). Six rounds had been chambered in the cylinder of the revolver, and all six had been fired.

Analysis of the blood spatter on the wall to the left of the bed (**Image 2.115**) was consistent with the woman sitting up in bed as she fired the first shot. She dropped backward onto the bed as she fired the next three shots. Once supine, and realizing that she was not dead, she repositioned the muzzle of the revolver to below the left nipple and fired the last two shots (**Image 2.116**). This explained the similar pathways of the first four bullets that remained in the body (**Image 2.117**), and the parallel pathways of the last two bullets, which were oriented in a different direction to exit the left side of the back and embed in the mattress (**Image 2.118**). The cause of death was gunshot wounds.

### Take-home message

There may be multiple self-inflicted gunshot wounds if the wounds are not immediately incapacitating. The



2.111



2.112



2.113



2.114



2.115

location of self-inflicted gunshot wounds must be anatomically accessible or possible for the decedent to execute. The weapon must be present at the scene of an immediately incapacitating self-inflicted gunshot wound. Gunshot wounds that are immediately incapacitating enter the skull and brain (not just the face or scalp) or the cervical spinal cord. Shots to the heart and aorta leave 10 to 15 seconds where the victim is still capable of potential movement (see Chapter 6).

**Points to consider**

- Examine the immediate surroundings of the body because pertinent evidence may facilitate interpretation of autopsy findings.
- Recognize the positive contribution of crime scene experts—a blood spatter expert in this case.
- For the safety of all scene investigators, firearms and other weapons should be documented photographically and impounded by the police prior to further examination of the scene.

- If the blowback or pattern of blood spatter on the hands is important, it should be photographed prior to swabbing the hands for gunshot residue.[5]
- All gunshot wound deaths should have the hands swabbed for gunshot residue prior to manipulation of the body, regardless of whether it is an apparent homicide, suicide, or accident.
- Allegations may be raised at a future date that it was the decedent who was actually the aggressor and fired a firearm first before the weapon was wrestled away; in other words, the shot that killed the decedent was fired by the subject in self-defense.

## Suicide

The body of a man was found hanging in the small bathroom of his boat. The rope ligature that was around the neck had been draped over the top of the bathroom door (**Image 2.119**), which was then closed to keep the liga-



2.116



2.118



2.117



2.119

ture in place. The man knelt to tighten the noose around his neck as his body became partially suspended. The witness who found the scene opened the door and the decedent's body dropped (**Image 2.120**). Bottles of beer on the sink may have been used to bolster his courage (**Image 2.121**). A handwritten farewell note to his wife on a counter in the kitchen was signed with a diagram of a stick-man with an unhappy face waving goodbye (**Image 2.122**). Multiple crumpled notes were discarded in the trash in the kitchen (**Image 2.123**). He had battled financial difficulties in the past few years.

Autopsy disclosed an abraded, patterned ligature mark across the front of the neck that was consistent with the rope that was used to fashion the noose of the ligature (**Image 2.124**). Internally, the subcutaneous fat deep to the ligature mark was compressed. No ecchymoses were in the soft tissues of the neck, and the hyoid bone and thyroid cartilage were intact. The cause of death was hanging. Possible mechanisms of death in hanging are avoided on the death certificate because it is only speculative whether death was due to compression/obstruction of the airway, occlusion of arterial or venous



2.122



2.123



2.120



2.124

vasculature, or stimulation of the carotid bulbs bilaterally.

### Take-home message

The secured scene, intact clothing, presence of a note of intent, existence of a motive, and no other cause of death are consistent with a suicide. Toxicological analyses should be performed in all suicides.

### Points to consider

- Hangings can be suicidal, occasionally accidental, and rarely homicidal.
- An optimal suicidal hanging scene will include a suicide note, evidence of a secured scene, lack of ransacking or other disturbance, and no other significant injuries to the body, apart from other self-inflicted wounds (e.g., of the wrists) with the weapon present.
- Suicide notes are found in only 30 to 50 percent of cases.
- Hanging is the most common mechanism of autoerotic asphyxia (an accidental death).
- The scene circumstances suggesting an autoerotic death classically include presence of pornography within the victim's view, exposed genitals, a release mechanism for the ligature, protection of the neck from ligature marks, and evidence of previous similar activity.
- Autoerotic asphyxia victims usually do not have a history of suicidal ideation, threats, or attempts.
- Deaths due to hanging do not require that the body be fully suspended. For example, a man tied a rope around his neck, tied the other end to a hot water heater, sat on a chair, and then simply leaned forward.
- Document whether or not the body was suspended.
- If the body was suspended, document from what it was suspended, how high off the ground, and the distance of the feet from the ground.

- Look for incised wounds and scars on the neck, arms, and wrists.
- The ligature furrow pattern should be consistent with the ligature.
- When the ligature is removed, do not disturb the knot. Cut through the ligature away from the knot. (Do *NOT* untie it!)
- The ligature should be submitted to the investigative agency.
- If the body has been suspended at great height, care should be taken to avoid artifactual injury during removal of the body from the scene.

## Suicide

A camper came upon the fully clad, supine, decomposing body of a man in the woods (**Image 2.125**). To add to the witness's alarm, the head was absent. Police responded, and during their search of the area, found the head within several feet of the body. The face, upper chest, and right forearm were skeletonized, and the remainder of the body was in moderate putrefactive decomposition (**Images 2.126** and **2.127**). A rope was



2.126



2.127

2.125

dangling above the legs from a large tree branch (**Image 2.128**). A knotted noose was fashioned in the rope at the approximate height of the body (**Images 2.129** and **2.130**). This man apparently hanged himself. Over time, decomposition loosened the soft tissues and the weight of the hanging body was enough to detach the torso from the head. Postmortem animal scavenging moved the head and defleshed the face, neck, upper chest, and right forearm. The cause of death was hanging.

## Take-home message

The scene is instrumental in determining the cause and manner of death in many cases involving decomposing and skeletonized bodies because the soft tissue indicators of disease and injury are artifactually altered or absent. Postmortem changes may mimic antemortem disease or injury, and examination of the body alone without knowledge of the history and scene findings may be misleading; at best, this results in an inaccurate cause of death, and, at worst, it may result in an innocent person being arrested and charged with murder. An incomplete body does not necessarily indicate intentional dismemberment because postmortem animal activity and weathering by the elements can remove and scatter body parts.

### Points to consider

- Recovery of bodies at night is not optimal because items that are not visible with artificial lighting can be overlooked.
- It is appropriate to return to the scene the following day to ensure that all evidence or body parts have been recovered and to allow for better photography of the surrounding area.
- LOOK UP—evidence may be in the trees, on the ceiling, on the balcony above, etc.



2.128



2.129



2.130

- Postmortem animal scavenging and weathering by the elements may scatter remains at variable distances from the body.

## Suicide

The driver of an 18-wheeler truck saw an oncoming car drifting out of its own lane into his lane. The truck driver swerved and attempted to avoid the car, but his maneuvers were not successful and the two vehicles collided (**Image 2.131**). The frontal impact caused tremendous intrusion that extended into the driver's compartment of the car (**Image 2.132**), fatally injuring the driver. The truck jack-knifed through a retaining wall into a canal (**Image 2.133**), but the truck driver was uninjured.

A scar from a healed incised wound was found on the right wrist during the autopsy (**Image 2.134**) of the car driver. A suicide note was found at his residence (**Image 2.135**). The cause of death was blunt trauma.

### Take-home message

Vehicular suicides are easy to miss, but should be considered when a single-occupant vehicle drives headfirst


2.131


2.132


2.133


2.134

2.135

into a large stationary object (such as a pole, tree, or bridge), striking dead center (**Images 2.136** and **2.137**). Where another vehicle is involved, the second vehicle is noticeably larger and would effectively act as a stationary object. Circumstances that routinely contribute to vehicular collisions such as poor visibility, poor road conditions, and inclement weather may not be present.

**Points to consider**

- Witness accounts (obtained through the traffic homicide investigator) may be very informative about the precrash movement of the vehicle.
- The decedent's medical, social, and psychiatric history may document depression and/or suicidal ideation, threats, and attempts.
- Are the circumstances plausible for an accident?
- Unusual circumstances or features of the scene as noted by the traffic investigator must be documented.
- Be sure to photograph pertinent features as noted by the traffic homicide investigator including tire marks on the road, brake pedal marks on soles of shoes, etc.

- Not only is documentation of injuries important, but also documentation of other anatomic findings on the body (e.g., scars on the wrists).
- A complete autopsy should be performed (from brain to pelvic organs) and full toxicological analysis requested.

## Suicide

The body of a man was seen floating in a lake near the shore (**Image 2.138**). Once the body was recovered, a number of important features were noted. Early putrefactive decomposition with bloating and slippage of the skin was evident (**Image 2.139**). The body was fully clothed and all garments were in place and intact. A diver's weight belt was around the waist. A heavy chain was looped around the neck and fastened around the waist, over the top of the weight belt (**Image 2.140**). A gunshot wound was in the right sideburn area (**Image 2.141**). Another gunshot wound was in the left temporal scalp (**Image 2.142**). The initial impression was that this



2.136



2.138



2.137



2.139

was a homicide. Autopsy disclosed that the gunshot wound on the right was an entrance wound (**Image 2.143**) and the gunshot wound on the left was an exit wound. The radiograph of the head confirmed that no projectile fragments remained in the head (**Image 2.144**). The decedent's wallet was in his back pocket, and it contained a driver's license. Further investigation disclosed that he was an unemployed tugboat captain who had recently been turned down for a job. The mate to the chain around his neck and waist was found at his home. His handgun was missing and was never found. His flashlight was along the shore, not far from the body. His girlfriend indicated that he was feeling old and "dumpy." The cause of death was gunshot wound of head.

## Take-home message

First impressions or presumptions should be supported and validated by physical evidence and history. The



2.142



2.143



2.140



2.141



2.144

initial impression of a suspicious death was dispelled after a thorough investigation of the scene, including a search through the pockets of the clothing on a decomposing body, and a thorough police investigation into the history and circumstances of the decedent's life.

**Points to consider**

- A suspicious death should be treated as a homicide until proven otherwise to ensure proper collection of evidence and documentation of findings.
- It is good policy to respond to scenes of unclassified deaths when law enforcement or the state or district attorney expresses concern and would like a medical opinion.
- Evaluation of gunshot wounds at the scene can be difficult, especially if the body is bloody or undergoing decomposition.
- The nature of the gunshot wounds (entrance or exit) is best evaluated at the autopsy when features such as internal and external beveling can be seen.

## Suicide

Neighbors called the fire department after they saw smoke billowing out of the windows of a second-story apartment. As firefighters started putting out the fire, they found a man on the floor of the master bedroom; he was underneath a closet door. The man was carried out of the apartment but died before he could be transported to the hospital. The bare mattress on the bed had deep slashes across the surface (**Image 2.145**). Arson investigators discovered that fires had been started in at least four separate locations inside the apartment. A fire started in the washer and spread upward to the dryer, which was stacked on top of the washer (**Image 2.146**). A pair of shoes had been set on fire in a second bedroom (**Image 2.147**). The bathroom of the master bedroom had a fire in the cupboard under the sink. Another fire was set in the vicinity of where the victim was found between the bed and the closet. A red container of gasoline was by the victim's head (**Image 2.148**). A half-full red container of gasoline was outside the door of the bathroom in the master bedroom. Pivotal evidence on the dining


2.146


2.147


2.145

room table included the smoke detector that had been removed from the ceiling and a recent store receipt for two gasoline cans (**Images 2.149** and **2.150**). Socks tucked into the front of the decedent's underpants were soaked in gasoline (**Image 2.151**). The cause of death was apartment fire. Some jurisdictions prefer an anatomic cause of death such as inhalation of smoke and soot.

## Take-home message

The cause and manner of death in a fire scene should be certified only after a complete evaluation of the scene, autopsy findings, toxicology, and other pertinent studies. The evaluation must include the assessment by the arson investigators in order to assign the appropriate manner of death.

## Points to consider

- In addition to general overall photographs of the scene, document specifically those features that indicate how or where the fire started; these features, in turn, may help determine the manner of death.
- Full-body radiographs should be taken on charred bodies.
- Look for heat-related changes such as opacity of the eyes (cornea and lens), fractures of the skull and extremities, splitting of the skin, and extrusion of the bowels through the abdominal wall.
- Look for findings that verify that this is a fire-related death such as soot in the airways and cherry-red coloration of the blood, muscles, and viscera.



2.148



2.150



2.149



2.151

- **On external and internal examinations, be wary of trauma above and beyond that of thermal artifact.**
- Toxicology *MUST* be performed and a carbon monoxide concentration requested

## Homicide

A woman was found prone on the floor just inside the front door of her house (**Image 2.152**). A puddle of blood was on the floor under her head. A distinct pattern of blood spatter on the wall above and to the right of the head was consistent with originating from the position of the head on the floor (**Image 2.153**). Blood was smeared on the back of her shirt (**Image 2.154**). Multiple patterned ecchymoses/contusions on the back were consistent with a blood-stained baseball bat on the lawn outside the house (**Images 2.155** and **2.156**). All of the contusions were oriented from left to right and downward.

Autopsy disclosed one right frontal scalp laceration and five additional right parietal scalp lacerations

(**Image 2.157**). The parietal scalp lacerations were in close approximation and parallel with each other. Multiple depressed right calvarial fractures were associated with focal superficial lacerations of the cerebrum.

Most likely, the victim was struck with the baseball bat first on the right frontal scalp. This blow caused her to collapse prone onto the floor. Once she was on the floor, the additional five blows were dealt to the right parietal region. The victim was immediately immobilized from the first or the second blow, allowing the successive impacts to be delivered to virtually the same location on the head.

The blows to the back were delivered after the blows to the head. The blood from the scalp lacerations was



2.154



2.152



2.153



2.155

transferred from the bat to the back of the shirt. The cause of death was blunt craniocerebral trauma.

### Take-home message

The scene findings in conjunction with the autopsy findings may provide evidence of the sequence of terminal events.

### Points to consider

- Photographs are taken of the scene and body before anything is moved or removed.
- The degree of livor and rigor mortis should be noted and will help determine the postmortem interval.
- Jewelry and personal effects from the body and clothing are photographically documented, then removed and submitted to the investigative agency.
- Be careful when searching clothing (and pockets specifically) because sharp objects such as needles and razor blades may injure the investigator.
- The pathologist and law enforcement cooperate in the processing of the body at the scene, for example, collecting trace evidence prior to manipulation and removal of clothing from the body.
- Clothing may mask injuries and should be removed if the body is indoors or if it can be done discretely outdoors (shielded from the eyes of the lay public and news media by sheets, mobile panels, or law enforcement vehicles).

- Removal of the clothing reveals injuries on all parts of the body and can expedite processing of the body if the pathologist requests certain procedures prior to autopsy (e.g., radiography and obtaining specimens for a sexual battery kit).
- Scalp hair samples, nail scrapings/clippings, and blood should be obtained in cases where the victim was in contact with the assailant.

## Homicide-suicide

A 25-year-old woman had moved in with her 34-year-old boyfriend 3 weeks earlier. The brother of the boyfriend came to the house to borrow tools one afternoon and found the couple dead in their bedroom. The man's body was on the floor on the left side of the foot of the bed; a contact gunshot wound was on the right side of his head and a semiautomatic pistol was next to his right hand. The female decedent was on her left side on the bed (**Image 2.158**). An intermediate-range gunshot wound



2.157



2.158

2.156

was behind her right ear (**Image 2.159**) and the exit wound was on the left temple (**Image 2.160**). The exit wound had an irregular abrasion margin, which was more prominent inferiorly. A perforating gunshot wound was on the distal left forearm. The wound on the flexor aspect of the forearm had an irregular abrasion margin and was surrounded by a faint purple ecchymosis (**Image 2.161**). The wound on the extensor aspect of the forearm had a less prominent, irregular, incomplete abrasion margin (**Image 2.162**). Interpretation of the forearm wounds alone for determining direction of bullet travel would be difficult. The scene provided the answers for the atypical exit wound on the left temple and for the two wounds on the left forearm. The woman was wearing a watch on her left wrist. The case of the watch and a projectile were on the bed in a puddle of blood next to the left wrist (**Image 2.163**). An indentation was on the back of the detached case of the wristwatch (**Image 2.164**). The remainder of the metal band of the watch was on the distal left forearm, with the case of the watch absent from the extensor aspect of the forearm. It became

apparent that the woman was lying on her left side with her left wrist under the left side of her head when she was shot. The atypical wound on the left temple is a supported exit wound. The wound on the flexor aspect of the left forearm is a supported reentry wound, and the wound on the extensor aspect of the forearm is another


2.161


2.159


2.162


2.160


2.163

supported exit wound. The indentation on the back of the case of the watch is from the exiting projectile as it tore the case of the watch off the metal band. The projectile path was reconstructed at the end of the autopsy (**Image 2.165**). The cause of death was gunshot wound of the head.

### Take-home message

Gunshot wounds are bloody at the scene and cannot be interpreted accurately in some cases while still at the scene. Careful photographic documentation of the scene can help in the interpretation of atypical wounds found at autopsy.

## Points to consider

- Hand swabs for gunshot residue should be obtained in all gunshot wound victims whether the death is homicidal, suicidal, or accidental because allegations may surface later that the victim was the aggressor and fired a weapon first.

- The pathologist should try to determine whether wounds are *entrance* or *exit* because perforating gunshot wounds mean that the scene must be searched for projectiles.
- Gently blotting excess blood from gunshot wounds in a fresh body will not destroy the features of contact wounds or intermediate-range wounds.
- The locations of blood at a scene should be photographed because the patterns may help to reconstruct the terminal events, including location and movement of the victim during and after the infliction of injuries.
- Although the shooter is dead in a homicide-suicide and the case is considered "closed" by law enforcement, no shortcuts are taken and the homicide victim should be processed and documented as carefully as any victim from an "open" homicide case.

## Homicide

A woman was found prone on the floor next to her bed with her nightgown displaced upward, exposing her naked buttocks and legs (**Image 2.166**). Patches of blood were on the bed near the body (**Image 2.167**), and the back of her nightgown was bloody (**Image 2.168**). A screwdriver was on the carpet next to her face; photographs were taken of this potential weapon (**Image 2.169**). Blood was on the carpet beneath the body (**Image 2.170**). Examination of the body disclosed stab wounds to the neck, chest, abdomen, and back, with defensive


2.164


2.165


2.166

injuries on the hands. A bloody knife on the scene was photographed with a scale (**Image 2.171**). The cause of death was stab wounds.

## Take-home message

The unwitnessed, suspicious death of a female, especially one who is partially clad, must be treated as a potential sex-related homicide. Suspicious deaths of males may also be sex-related homicides. In both cases, specimens should be obtained for a sexual battery kit.

### Points to consider

- The scene of a sharp force injury death may be very bloody.
- Potential weapons at the scene should be photographed with a scale.
- It is prudent to examine and photograph the resting area of the victim (after the body is removed) because items of evidence may have fallen underneath the victim.
- Be vigilant of sharp objects buried or hidden within clothing or the body.

- Look for defensive injuries.
- Clothing may mask injuries and should be removed if the body is indoors or if it can be done discretely outdoors (shielded from the eyes of the lay public and news media by sheets, mobile panels, or law enforcement vehicles).


2.169


2.167


2.170


2.168


2.171

- Removal of the clothing exposes all injuries on the body and can expedite processing of the body if the forensic pathologist requests certain procedures prior to the autopsy (e.g., radiography and obtaining specimens for a sexual battery kit).
- Scalp hair samples, nail scrapings/clippings, and blood should be obtained in cases where the victim was in contact with the assailant.

## Homicide

A toddler was reported missing by his stepfather. Police searched the neighborhood and found the naked body of the 2-year-old boy in a dumpster (**Image 2.172**).

Although abrasions, ecchymoses, and burns were on many areas of the body, the facial and head injuries were the most extensive (**Image 2.173**).

The dumpster was transported to the medical examiner department, and the entire contents of the dumpster were examined for related evidence (**Image 2.174**).

The toddler's home was neat and clean. Toys were organized in piles in the child's room (**Image 2.175**). An indentation was in the wall above the toddler's crib (**Image 2.176**). The indentation was round, and the size of the indentation was consistent with the contour of the child's head (**Images 2.177** and **2.178**). The height of the indentation above the mattress of the crib was consistent with the standing height of the child. The cause of death was multiple injuries due to blunt trauma.



2.172



2.174



2.173



2.175


2.176


2.178


2.177

- Examination of the middle ears should be routine in pediatric cases.
- Not all injuries in child abuse cases are acute.
- Look for healing as well as fresh fractures in the skull, ribs, and extremities.
- Healing rib fractures should be examined microscopically to assist in dating the fractures.
- Examine the radiographs and palpate the extremities to look for soft tissue masses (e.g., myositis ossificans) arising from healing soft tissue and periosteal lesions.
- Identifiable lesions on the extremities such as bruises and masses should be incised to verify the nature of the lesion, and examined microscopically if required.
- A visit to the scene is recommended in cases of apparent natural death in children.

## Take-home message

Homicide victims may be disposed of in a location different from where they were killed. A visit to the original scene of injury (if known) may yield valuable information about the terminal events. One must not underestimate the value of scene investigation.[6]

## Points to consider

- The body should be photographed in the context of its surroundings before it is moved or removed.
- The immediate area around the body may hold items of evidence that should also be photographed.
- Trace evidence and specimens for a sexual battery kit must be obtained from the body before it is cleaned.
- Full-body radiographs are recommended for children up to 5 years of age.
- Remember to look in the eyes and mouth and examine the external genitalia and anus.
- Photograph pertinent negatives as well as identifiable injuries.
- The brain and spinal cord should be removed and examined.

## Homicide

A homeless man strolling through a park at night passed a three-story observation tower and stumbled on the body of a middle-aged white male next to a picnic table at the foot of the tower (**Image 2.179**). The tower was known to be used by the homeless after dark. Personal effects, empty beer cans, and a moderate amount of blood were on the third story of the tower (**Image 2.180**). Drops of blood were on the wooden railing on the third story, directly above the body (**Image 2.181**). The decedent had evidence of attendance by Fire-Rescue personnel with the clothing displaced to allow the application of defibrillator patches to the chest (**Image 2.182**). Purple-red contusions covering the face were distinctively patterned and varied from one area of the face to another (**Image 2.183**). Homicide detectives interviewed people who frequented the area and found witnesses (other homeless people) who recounted a fight between the decedent and "Big Man," an aggressive, belligerent person who was beating the decedent before picking him up and throwing him over the railing. Because the patterned contusions on the face were reminiscent of



2.179



2.181



2.180



2.182



2.183

shoe tread prints, Big Man's lone pair of shoes was impounded once he was arrested. The parallel marks on the left temple were consistent with the lateral or medial treads on the sole of the shoe. The arrow-shaped marks on the left side of the forehead and left cheek were consistent with the central midline treads (**Images 2.184** and **2.185**).

The autopsy disclosed a complete transverse transection of the descending thoracic aorta distal to the origin of the left subclavian artery, a deceleration-type injury consistent with the victim being thrown off the third story of the tower and landing on the ground below. The cause of death was blunt trauma.



2.184



2.185



2.186

fingernail scrapings/clippings should be obtained and receipted to the investigative agency.

- Where possible, a proposed weapon may be brought to the autopsy for comparison with patterned injuries, but only after that weapon has been processed for trace evidence, DNA, and fingerprints to prevent allegations of contamination at the autopsy.

## Homicide

A robber was confronted by a police officer who fell while chasing the robber. As the robber swung a knife at the officer on the ground, the officer opened fire with his semiautomatic pistol and shot the robber several times. The injured robber ran from the area of the shooting, which was behind and to the left of the parked car (**Image 2.186**), up to and around the front of the car, and continued for approximately three dozen more steps until he collapsed and died (**Image 2.187**). The body was on the grass (at the scene) for a few hours while the scene was being processed. Irregular punctate abrasions creating pseudostippling around one gunshot wound were from postmortem ant bites (**Image 2.188**). Although one of the gunshot wounds perforated the descending thoracic aorta (**Image 2.189**), the robber managed to run approximately 30 yards before he collapsed. The cause of death was gunshot wounds.

### Take-home message

Gunshot victims are not blown backward as in the movies, nor are they all immediately incapacitated. Individual victims react differently to gunshots; some people faint at the sight of a pointed gun or the sound of a gunshot, whereas others may run two or more city blocks after being shot in the aorta or the heart. Unless a person is shot in the head or through the cervical spinal cord, there is potential for continued intentional movement whereby the injured subject may return fire or attack the original shooter.

### Take-home message

Autopsies should be performed in all nonnatural deaths, especially homicides. At the scene, this appeared to be a beating death that included stomping. Not until after the autopsy was performed was it learned that the victim may have been thrown from the third story of the tower. The aortic transection, a deceleration-type injury, supported the witnesses' accounts that the victim was thrown off the tower in addition to being beaten. This differentiation may be important legally if more than one person was involved in the fight against the victim. As you are documenting the injuries, try to envision the mechanism of the injury or how it was inflicted. When multiple injuries are involved, evaluate their individual contribution to the death.

#### Points to consider

- Patterned injuries should be photographed with a scale to allow comparison with a proposed weapon.
- In beating deaths where there is potential close contact between the assailant and the victim, a tube of the victim's blood, a sample of the victim's head hair, and



2.187



2.188



2.189

**Points to consider**

- Police-involved shootings are intensely scrutinized, potentially high-profile cases with frequent social, ethnic, and racial overtones.
- Documentation must be meticulous and include a complete autopsy, histology, and toxicological analyses.
- Photographs should include positive and, sometimes more importantly, negative findings, that is, lack of injury to the eyes, nose, mouth, neck, hands, external genitalia, anus, abdomen, back, legs, and feet.
- Note and photograph the location of the casings (if a semiautomatic pistol is involved) relative to the location of the body; this may provide an indication of the postinjury survival period.
- Photographs of the body and swabs of the hands for gunshot residue must be taken before the clothing or body is moved.

## Homicide

A 16-year-old teenager invited his senior high school friend over to the house. The friend became fascinated with a rifle that the teenager's father kept in a corner of the bedroom, and picked up the rifle for closer scrutiny. In the process of manipulating the rifle, the friend aimed at the teenager and depressed the trigger, not realizing that the weapon was loaded. The teenager sustained an intermediate-range gunshot wound to the left cheek, inferolateral to the left eye (**Image 2.190**).

Where rifles, shotguns, or any version of a firearm with a long barrel is involved, it is standard practice to measure the length of the weapon, specifically the distance between the trigger and the muzzle (end of the barrel; **Image 2.191**). The distance between the decedent's axilla (or shoulder) and the thumb and/or index and middle fingertips is also documented. The measurements from the weapon and from the decedent may be useful should allegations arise that the decedent's wound was self-inflicted.



2.190



2.192



2.193



2.191

The teenager's body was in the bedroom where he dropped immediately after being shot (**Image 2.190**). The rifle was usually kept propped up in the corner of the bedroom that is beyond the decedent's right foot in **Image 2.192**. The telephone on the bed was used by the friend to call 911. The intermediate-range gunshot wound is surrounded by punctate abrasions (stippling; **Image 2.193**). The cause of death was gunshot wound of the head.

The manner of death is homicide because the victim died as a result of the actions of another person. The degree of culpability is decided legally. Medically, homicide indicates that one person died at the hands of another; the medical designation does not encroach on the legal jurisdiction of assigning guilt or responsibility (in other words, excusable or justifiable homicides are determined by the legal system).

### Take-home message

Firearm deaths that are not self-inflicted are usually homicides. True accidental gunshot wounds are more rare and would be appropriate in the following example situations: a 4-year-old grabs a loaded semiautomatic pistol, begins to play with the weapon, and somehow manages to depress the trigger, shooting himself; a pet cat jumps onto a table, knocking a loaded semiautomatic pistol to the ground, discharging the weapon and killing the homeowner.

### Points to consider

- In any death from a rifle or shotgun, whether homicide, suicide, or accident, the firearm should be measured and photographed with a scale.
- The length of the victim's upper extremity should also be measured.
- Interpretation of gunshot wounds at the scene can be difficult because such wounds are bloody.
- The hands should be swabbed for gunshot residue before the body is moved.

## Homicide

A 32-year-old woman was found at home by her husband who had been grocery shopping during his lunch break from work. Once he saw the body, he ran for help, not even sure that it was his wife who was supine on the floor of the bedroom (**Image 2.194**). The woman's head was wrapped in two plastic bags, which were knotted at the front of her neck (**Image 2.195**). Around her neck were a T-shirt and a towel, both knotted in front. Her wrists were bound behind her back by a belt over the top of a broken shoelace, which remained around the right wrist (**Image 2.196**). She had been beaten, stabbed 64 times, and finally electrocuted by having the copper wires from a cut electrical cord wrapped around parts of her lower extremities and the cord then plugged into an electric outlet in the wall (**Image 2.197**).

Stabbing scenes are generally very bloody because the bleeding victim is trying to escape or is stumbling around until he or she collapses. This scene was not bloody because the victim was already injured, bound, and moribund on the floor before she was stabbed. Nevertheless, she was alive when she was stabbed because a vital reaction (redness and bleeding) was associated with each wound. The single yellow wound in the right lower corner of the picture (**Image 2.198**) was made postmortem at the scene by the medical examiner; because postmortem interval was a critical issue, every factor was used to help narrow the time since death, including a body core temperature. The small incision in the abdomen was used because specimens for a sexual battery kit had not yet been collected.


2.194


2.195

A simple technique to document multiple stab wounds clustered on a relatively flat region of the body is to trace the wounds onto a translucent plastic sheet placed over the body (**Image 2.199**). The labeled sheet is decontaminated, folded, and added to the case file.











Many of the stab wounds had associated abrasions that varied in size and shape, with some wounds reminiscent of flying saucers or spaceships (**Image 2.200**). The weapon remains unknown. The cause of death was multiple injuries.

## Take-home message

The pathologist and the homicide investigator together decide the best approach to processing the body in the context of the particular scene circumstances. The police requested that the medical examiner take a body temperature prior to complete processing of the scene. After the body temperature was taken, the medical examiner left until police completed their scene documentation, then returned to examine the rest of the body and scene.



2.201



2.202

## Points to consider

- Photograph every aspect of a complex homicide, documenting every mechanism of injury.
- Document photographically as you remove layers of evidence (for example, bags over head and ligatures around neck).
- Remember to obtain fingernail scrapings/clippings and specimens for a sexual battery kit prior to having the body cleaned.
- Remember that determination of postmortem interval is an inexact science at best and is really an *estimation* of postmortem interval; the postmortem interval should be given as a range of time (for example, 6 to 12 hours, as opposed to 8 hours and 45 minutes).

## Homicide

A homeless woman lived in a recessed alcove on the side of a public building (**Image 2.201**). A homeless friend found her unresponsive on her foam mattress in the morning. She was covered up to her neck by a sheet. The decedent had been overheard the previous evening arguing with a man. A junior detective responded to the scene and called the medical examiner department to inform them that the body was being sent in. The medical examiner on call decided to respond to the scene before the body was removed. The supine body was naked on the foam mattress (**Image 2.202**). Abrasions were seen on the face, neck, chest, and extremities at the scene (**Images 2.203** and **2.204**). Ecchymoses were



2.203

in the right eye. These findings alone suggested a non-natural death.

Homicide was confirmed at autopsy with findings of a fractured mandible, subdural (**Image 2.205**) and subarachnoid hemorrhage, ecchymoses in the soft tissues of the neck (**Image 2.206**) with a fracture of the hyoid bone, and intraperitoneal ecchymoses. An abrasion on the

chest was subtly patterned and reminiscent of a shoe print (**Image 2.207**). The cause of death was multiple injuries.

## Take-home message

Homicides are often obvious at the scene and will be treated appropriately by police investigators immediately. It is the unusual or suspicious case with few findings that requires assistance from the pathologist to interpret subtle marks and provide guidance to law enforcement in their investigation. In other words, the pathologist will be able to provide medical interpretation of the body in the context of the scene and advise law enforcement if it is an apparent natural death, undeter-mined cause and manner based on the scene, or suspicious for homicide.

### Points to consider

- Anatomic and circumstantial findings at a scene can be subtle.
- The degree of external trauma on the body is not necessarily reflective of the severity of internal trauma.
- Small lesions on the neck should always be considered significant until proven otherwise because strangulations and asphyxial deaths in general may leave few marks externally.
- The eyes should *always* be examined for petechiae.
- Specimens for a sexual battery kit must be obtained from a naked woman with external injuries.
- Specimens for a sexual battery kit should be obtained from any woman whose death was not witnessed when the circumstances are suspicious.
- Specimens for a sexual battery kit should be obtained from any homosexual man (and any child) whose death occurred under suspicious circumstances.



2.204



2.206



2.205



2.207

## Homicide

A teenage girl was found supine on a mattress in her ransacked home (**Image 2.208**). She was naked, with her arms out to the sides of the head, and her legs flexed and externally rotated, exposing the perineum (**Image 2.209**). Petechiae in the eyes (**Image 2.210**) and labial mucosal abrasions in the mouth were indicative of asphyxia (**Image 2.211**). A large pillow to the right of the head had pink stains. The genitalia were examined at the scene without touching or moving the rest of the body; no trauma or obvious trace evidence was seen (**Image 2.212**). Specimens for a sexual battery kit were taken (**Image 2.213**). The body was then tented by the police to


2.210


2.211


2.208


2.212


2.209



2.213



2.214

contain Superglue fumes in an attempt to raise finger-prints on the body (**Image 2.214**). The body was trans-ported to the medical examiner department once the police completed their examination for latent finger-prints. Autopsy disclosed mild cerebral swelling and pulmonary edema. A layer-by-layer dissection of the neck showed no injuries in the soft tissues, hyoid bone and thyroid cartilage, or the cervical spine. The cause of death was asphyxia due to smothering.

### Take-home message

The pathologist works cooperatively with law enforce-ment to ensure that all evidence is recovered. This is accomplished by discussion and mutual agreement on the order in which different types of evidence are collected.

### Points to consider

- Investigators must decide what type of evidence takes priority.
- Specimens should be collected for a sexual battery kit, but because fingerprints may also be present on the skin, the investigative agency and the pathologist must decide on the order of evidence collection.

- In some cases, the collection of one type of evidence, for example, tenting the body with Superglue fumes to reveal fingerprints, may delay the opportunity to take specimens for a sexual battery kit.
- It may be possible to collect some specimens without moving the body or contacting other parts of the body.

### References

1. Thogmartin JR. Fatal fall of an aircraft stowaway: a demonstration of the importance of death scene investigation. J Forensic Sci 2000;45(1):211–15.
2. Avis SP. An unusual suicide. The importance of the scene investi-gation. Am J Forensic Med Pathol 1993;14(2):148–50.
3. Moritz AR. Classical mistakes in forensic pathology: Alan R. Moritz (American Journal of Clinical Pathology, 1956). Am J Forensic Med Pathol 1981;2(4):299–308.
4. Rogers TL. Crime scene ethics: souvenirs, teaching material, and artifacts. J Forensic Sci 2004;49(2):307–11.
5. Yen K, Thali MJ, Kneubuehl BP, Peschel O, Zollinger U, Dirnhofer R. Blood-spatter patterns: hands hold clues for the forensic recon-struction of the sequence of events. Am J Forensic Med Pathol 2003;24(2):132–40.
6. Wagner GN. Crime scene investigation in child-abuse cases. Am J Forensic Med Pathol 1986;7(2):94–9.

# 3 The Forensic Autopsy

*David Dolinak, M.D.*
*Evan Matshes, M.D.*

THE HOSPITAL AUTOPSY    65
THE FORENSIC AUTOPSY    65
    Do all medical examiner cases need
      autopsies?    66
    "Sign-out" cases    66
    "Autopsy" cases    66

EVIDENCE COLLECTION    68
THE AUTOPSY REPORT    69
SUMMARY    70
REFERENCES    70

The term *autopsy* (Gr. *autopsia* for "seen by oneself") has been defined as "personal observation or examination; seeing with one's own eyes"[1] and "inspection of a dead body which has been opened so as to expose important organs either to ascertain the cause of death, or if this is known, the exact nature and extent of the lesions of the disease, and any other abnormalities present."[1] Autopsies in some form have been performed since the time of early civilization to determine why a person has died. The autopsy consists of an external examination, followed by internal examination of the organs. The organs are individually weighed and then examined by various dissecting techniques, evaluating not only for disease processes, but for malformation from birth, or deformation through infection, injury, or other conditions. The hospital autopsy and the forensic autopsy are goal-directed medical procedures performed to better understand how a death came about. Although they have similarities, the hospital autopsy and the forensic autopsy also have vast differences.

## The hospital autopsy

The *hospital autopsy* is performed by trained pathologists with the written permission of the next of kin to determine the cause of death, the extent of natural disease, or the combination of comorbidities that led to the person's death. Hospital autopsies also may examine what effect particular therapies had on the course of disease. Hospital autopsies may uncover previously unrecognized disease that might have impacted the person's well-being and demise. It also provides valuable information that helps clinicians better understand how disease led to a person's death. Ultimately, the hospital autopsy is a medical education tool that enables physicians to continue their lifelong process of learning and treating patients with increasingly honed skills.

Hospital autopsies focus on the internal examination and the correlation of findings with the clinical records. Even though imaging studies and laboratory testing are becoming increasingly refined, clinical tests are not without their limitations, and one should not assume that "tests are infallible" and, therefore, that there is nothing to be learned at autopsy. Recent studies have documented the value of autopsies (both hospital and forensic) in revealing previously undiagnosed diseases, sometimes revealing conditions that could have altered patient care and perhaps led to a more favorable outcome.[2–10] As such, in addition to physician education, autopsies are of value to the family, who with more information, may gain closure about their loved one's death. They may even become aware of inheritable conditions that could possibly impact their own lives.

## The forensic autopsy

The term *forensic* (L. *forensis* for "public place") has been defined as "belonging to courts of judicature or to public discussion and debate; used in legal proceedings, or in public discussions."[1] It has also been defined as "spe-

cializing in or having to do with the application of scientific, especially medical, knowledge to legal matters, as in the investigation of crime."[11] A *forensic autopsy* is performed to determine the cause and the manner of death in people dying sudden, unexpected, violent, drug-related, or otherwise suspicious deaths. The *cause of death* is the event or events that lead to anatomic or physiologic derangement, no matter how brief or prolonged, that results in the individual's demise.[12] The *manner of death* is a descriptor of the circumstance under which the person died. In most jurisdictions, this will be one of natural, accidental, suicidal, homicidal, or undetermined means. The forensic autopsy is not only performed when the cause of death is unknown, but also in some cases to confirm suspected causes of death, to verify particular conditions or injuries related to the cause of death, or to exclude injury or disease as having caused or contributed to the cause of death. The forensic autopsy is a problem-oriented, goal-directed procedure that seeks to provide answers to present and future anticipated questions.

The forensic autopsy is performed under local, state, provincial, or other governmental mandate by fully trained pathologists who have had an additional year of training in the field of forensic pathology. Although the autopsy is sometimes regarded as the forensic pathologist's only investigative tool, the autopsy should be regarded as but one piece of the medicolegal death investigative puzzle. The importance of historical information (including but not limited to medical, psychiatric, medication, and family histories), circumstantial information from the death scene and witnesses of the event, and information from family members, law enforcement, and others cannot be overemphasized. Similarly, investigation of the scene of injury or death is important in every medical examiners case. In fact, some causes of death (such as positional asphyxia) have scene-dependent diagnoses. Because every human being is unique, it should not be surprising that medical examiners may be faced with a limitless number of death scenarios. This provides a challenge that requires not only detailed investigation, but in some cases also the use of ancillary tests including radiology, cultures, and specialized laboratory techniques.

### Do all medical examiner cases need autopsies?

Simply, no. The decision as to whether or not a case needs to be autopsied depends largely on the circumstances of the death and the appearance of the body. Additional useful information includes the individual's medical history and the terminal event. At a minimum, *all* cases of homicide, suspected homicide, deaths occurring while in police custody, charred bodies from fires, cases where there is a possibility of criminal prosecution (such as hit-and-run accidents), and sudden and unexpected deaths in children should be autopsied. It is best to autopsy those cases in which evidence of injury may

be obscured or otherwise hidden, such as in cases of moderate to advanced decomposition. The decision to autopsy other cases depends largely on the local jurisdiction and office policy. Some offices choose to autopsy all nonnatural deaths and all natural deaths regardless of age, if there is either insufficient or no medical history to explain the deaths. Other jurisdictions will autopsy only select nonnatural deaths and natural deaths of individuals less than 50 or 60 years old who are without a sufficient medical history to explain their deaths.

### "Sign-out" cases

External examinations are performed on all forensic cases, including those that are not autopsied. During the external exam of unautopsied cases, the body is examined for evidence of disease, injury, or other signs of foul play. Photographs (including pertinent negatives) are obtained, toxicological specimens are collected, and the body is released to the funeral home without having been autopsied. The cause of death determination is based either on the known medical history or, when autopsy is not possible, from obvious injuries on the body. In some cases of elderly individuals without sufficient medical history, but with congruent historical and circumstantial investigative information, the medical examiner may choose to ascribe death to "atherosclerotic cardiovascular disease." As a general rule, due to the ubiquitous nature of cardiovascular disease, this diagnosis is a reasonable presumption in these cases. However, when the cause of death is not reasonably known, or when the death is nonnatural, we advocate for postmortem examination. Although this decision might be limited by practicality, funding, or political influence, the role of autopsy in these cases should not be subjugated.

### "Autopsy" cases

The forensic pathologist does not need written permission from the next of kin to perform a forensic autopsy. In fact, it is not unusual for individuals whose death falls under the medical examiner's jurisdiction to not have next of kin available, due to isolation, homelessness, or due to the person's identity not being known. When next of kin is known, they may at times request that no autopsy be performed. Although many times such a request may be complied with, occasionally, the medical examiner must perform an autopsy on an individual against the request of the next of kin, particularly in cases of homicide or suspected homicide, but also under other conditions, such as cases with potential public health hazards. The opposition to autopsy may be voiced for a variety of reasons, including religion. Many times, the situation can be resolved with thoughtful discussion and a mutually agreeable compromise reached. Further information on religious objections to autopsy is available.[13–15]

The forensic autopsy is a complete, professionally performed and accurately recorded procedure that is

performed not only to establish a cause and manner of death, but to obtain information that helps correlate or disprove facts and circumstances believed to be related to the death. Information obtained at autopsy may aid in identifying an unknown individual and provide evidence that may be used in future legal endeavors. The forensic autopsy also aims to determine if and when a person sustained any injuries and, if so, what significance they may have had in causing the person's death when considered alone or in combination with natural disease processes. If injuries are identified, many times the nature of them, in combination with case investigation, can be determined to be suicidal, accidental, or homicidal. Information gleaned from a forensic autopsy can help reconstruct a fatal incident. The forensic autopsy may also help answer when the person became ill and approximately when he or she may have died. Sometimes the forensic autopsy is performed on a person with significant natural disease that alone may be considered fatal, but one must be certain that there are no internal injuries.

By careful external and internal examination, including toxicological studies, the forensic autopsy can help distinguish between natural deaths of no public health concern and other natural and nonnatural deaths that may be of consequence to public safety or health, as well as the criminal and civil justice systems.

The external examination performed by forensic pathologists is typically more thorough and detail oriented than that performed during the course of routine hospital autopsies. In addition to documentation, evidence collection is of great importance. Examples of evidence that might be collected include gunshot residue on hands, DNA under fingernails, blood samples, sexual assault specimens, and trace evidence such as paint chips in hit-and-run cases. The evidence collected during a forensic autopsy is handled with the proper chain of custody. The attention to detail in this regard will prove helpful should the case ever go to trial and the chain of custody is called into question.

The nature of injuries is first identified on the external examination. Injuries such as gunshot wounds are differentiated from stab wounds, and patterned abrasions, fractures, contusions, lacerations, and other injuries are identified. However, the external examination has its obvious limitations, because the presence of external injury is not a reliable indicator that death resulted from trauma. Therefore, the internal examination is important to document the extent of any injury, the extent of natural disease, and possibly the interaction of the two in causing death. Injury and natural disease are not necessarily mutually exclusive. Documentation should not be limited to apparently "significant" trauma, because often the significance of a lesion is unknown until more thorough investigation and collaboration with outside agencies (such as law enforcement) is possible. One should consider documenting even very small injuries visible on the skin, eyes and eyelids, in the scalp and other hairy areas, in the mouth, on the genitals, around the anus, and so forth. Marks on the body that are not traumatic in nature (such as postmortem pressure marks or creases) should at least be documented photographically—such findings occasionally become the subject of intense judicial scrutiny and speculation.[16]

Photographs are taken at every forensic autopsy. Photographs can be invaluable in documenting the appearance of an injury such as a gunshot wound, stab wound, or laceration. Because forensic autopsies are often performed to rule out injury, "negative photographs" of uninjured tissues and organs can be as valuable as photographs of injuries. Although one can often accurately describe abnormalities in tissues and organs, photographs provide a permanent visual record of the finding, and they may capture the appearance of a finding in detail or reflect characteristics of a finding that escaped its original description. Because it is not unusual for bodies undergoing a forensic autopsy to be "unknown" or only "tentatively identified," a picture of a person's face may enable a loved one or acquaintance to positively identify the person.

The internal examination provides further documentation of the presence or absence of injury and/or disease. The internal examination also allows for the collection of specimens for toxicology such as heart blood, gastric contents, bile, and urine, as well as samples of solid organs that may prove useful in the toxicological analysis of certain cases. However, despite detailed investigation and a complete autopsy, sometimes the cause of death and/or the manner of death cannot be determined.

The forensic autopsy may extend the investigation of the case to many different agencies both in and out of the field of medicine. Consultants may include anthropologists and/or forensic osteologists, depending on the condition of the body and whether or not the identity is known. The body may be altered before the examination is performed by organ and/or tissue harvesting performed by proper agencies and with next of kin permission. The harvested organs and tissue help not only save lives, but help people live better lives. The medical examiner should be consulted in cases falling under its jurisdiction in which the family has consented for tissue and/or organ harvesting and donation. Although it is uncommon for such requests to be denied, it is important for the medical examiner to be notified ahead of time for approval to clear any potential problems with evidence collection, documentation of injuries, or other issues.

Forensic autopsies give family members and/or other loved ones closure, and also provide evidence to be used in a court of law. The forensic autopsy provides information that confirms or dispels previous information or accusations; it may provide information that helps to exonerate a falsely accused person or provide additional

incriminating evidence. Forensic autopsies may reveal a previously unrecognized infectious disease such as meningitis or tuberculosis that can help alert the still-living people who had close contact with the deceased to seek preventive treatment. The forensic autopsy may reveal hereditary conditions to which family members can be alerted before they are morbidly or mortally stricken. Sometimes in the sudden death of a person who previously appeared healthy, the autopsy will reveal a "silent" condition for which they could have been treated such as diabetes or hypertensive-type heart disease—conditions for which the surviving family members can be tested. Through communication with outside agencies, public safety is improved. Examples include improved motor vehicle safety devices (such as air bags) and new medical procedures and therapies, including medications. Trends in abuse of both prescription and illegal drugs are identified. The prospect is to live better, safer, and healthier lives through the knowledge gained from the deceased at autopsy.

## Evidence collection

The old adage "when two bodies come into forceful collision with one another, there is an exchange of traces"[17] often holds true in human physical altercations (i.e., pieces of one object are frequently left on another). Evidence to be collected from a body varies with the type of case and the circumstances of the death. The following is a useful listing of evidence that may be collected in particular circumstances. Personal judgment will determine what actually needs to be collected from a particular case. When a body is transported from a scene, it is advantageous to either place the body in a clean body bag or wrap the body in a clean sheet to prevent the loss of evidence or possibly the accumulation of unrelated debris.

- *Gunshot wound homicide:* bullet(s), blood standard, hair standard, clothing, fingernail clippings, scalp hair from around gunshot wound entrance (for gunpowder analysis)
- *Gunshot wound suicide:* same as in gunshot wound homicide
- *Sharp force injury homicide:* clothing, blood standard, hair standard, fingernail clippings
- *Strangulation:* clothing, blood standard, fingernail clippings, sexual activity kit, ligature
- *Suicidal hanging:* ligature, blood standard, clothing
- *Blunt force injury homicide:* hair standard, blood standard, clothing, fingernail clippings
- *Hit-and-run pedestrian:* hair standard, blood standard, clothing, paint chips on body or in wounds
- *Accidental gunshot wound (rare):* same as in gunshot wound homicide
- *Burns/decomposition:* as above according to type of death. In addition, clothing from burned bodies should

be placed in sealed metal cans. Any and all evidence related to personal identity should be documented and retained. One should note that burned teeth are extremely fragile—treatment of the teeth with Superglue or a similar agent might prove helpful
- *Child abuse:* blood standard, hair standard, clothing

In addition to the preceding list, in *industrial accidents* (work-related accidents) when there is an electrocution, fall (with possible malfunction of safety harness), blunt force injury, penetrating injury, or strangulation (in machinery), it is useful to collect the clothing and any object(s) that became embedded within the body or penetrated the skin. One must be vigilant about anticipating what evidence might be useful in future civil and/or criminal proceedings from any type of case. All collected evidence must be placed in properly sealed and labeled evidence envelopes, bags, or containers, and then signed, dated, and submitted with proper chain of custody. This allows the location of the evidence to be traced until its potential use in court.

Regarding the different types of evidence collected, the *blood standard* can be obtained by placing several drops of the individual's blood on prepackaged filter paper and then allowing it to dry. In this form, it does not need to be refrigerated. If liquid blood is not available (as in decomposed bodies), skeletal muscle is a good specimen for DNA, particularly if it still has a red tinge. Liver and spleen should be avoided because they have high levels of autolytic enzymes. With more advanced decomposition, teeth, ribs, and femurs are good specimens for DNA. The hard cortical bone is more useful than bone marrow, because marrow decomposes along with the rest of the body. The *hair standard* must be pulled, not cut. This is because valuable DNA is in the roots of the hair. *Fingernail clippings* should be collected with new fingernail clippers to minimize the possibility of DNA contamination.

*Handwipings* for gunshot residue analysis can be collected either by wiping the hands with a clean cotton-tipped applicator wetted with appropriate solution, or by repeatedly contacting the skin of the hands with a sticky applicator, depending on the technique that will be used to analyze the evidence. Note that if handwipings, fingernail clippings, and analysis for trace evidence on the hands are not performed at the scene or in the hospital, the hands should be placed in brown paper bags taped at the wrist for transport to the medical examiner department to help protect evidence that may be located on the hands. One should not place plastic bags on the wrists because when the body is placed in the body cooler, condensation may form within the plastic bags, possibly washing off some of the evidence.

In *arson cases*, it is important to store the clothing in sealed metal containers (clean new paint cans work well). This is because if the clothing is allowed to air dry

before analysis is performed, important volatiles possibly reflective of an accelerant might evaporate. The sealed can helps preserve the potential accelerants. *Bloody clothing* from cases with injury should be allowed to dry in a secure drying room before being packaged for delivery to the crime laboratory. Clothing should be packaged in a paper "breathable" bag.

A guide for collection of the *sexual activity kit* is included in the sexual battery chapter (Chapter 20). Although it is common to collect sexual activity kits in cases of strangulation or suspected strangulation, one must realize that victims of sharp force injury, blunt force injury, and gunshot wounds may also have been victims of unwanted sexual activity, either before or after death. One should collect a sexual activity kit (also known as a "rape" kit) when the circumstances of the case suggest sexual assault. Such kits can be performed on men and women of all ages. It is always better to collect evidence and ultimately not use it rather than to later regret a critical omission. As mentioned elsewhere in this book, in cases of suspected sexual assault, it may be advantageous to swab the individual's nipples, any stains on the body, and any bite marks with a clean cotton-tipped applicator wetted with sterile saline that is then allowed to air dry. These areas may have DNA from saliva and/or semen that can be matched to the suspect(s). In fact, in any case in which there has been close physical contact, any *blood droplets* on the body that seem out of place should be swabbed with a clean cotton-tipped applicator.

*Bullets* may either be individually photographed or individually inscribed with the case number and then placed in separate sealed evidence envelopes labeled with the bullet number (or letter) and the place where it was recovered. When inscribing bullets, one should try to avoid disrupting any markings on the sides of the bullet (the "lands and grooves"), an important location used by firearm analysts to make ballistic comparisons. Instead, the bullet is ideally inscribed either on its base or on a surface that was flattened on contact with the body. In cases of *shotgun wounds*, any plastic shot sleeve and fiber wadding should be collected. If buckshot was used, all of the large pellets must be collected, because they may resemble bullets on x-ray. However, with birdshot, only a representative sample of pellets needs to be collected.

If a person has been sprayed with *pepper spray*, this can be collected by swabbing the suspect area with clean cotton-tipped applicators wetted with methanol and then allowed to air dry. In these cases, one may see an orange/yellow or other colored residue on the skin. It is helpful to also prepare a "control" swab consisting of just the cotton-tipped applicator and methanol. *Trace evidence* such as fibers, hairs, and paint chips should be searched for and collected in appropriate cases. The trace evidence can be placed onto clear sticky tape, or taped to a small sheet of acetate paper and then placed into an evidence envelope. *Bone and cartilage with tool marks* can be saved in formalin for future comparison with a possible implement or knife. If *illicit drugs* are located in the clothing, on the body, or in the body, they should be confiscated and submitted to the investigative agency for possible analysis.

Occasionally, DNA must be collected from a decomposed body. Because blood is no longer an option, one may wish to use pulled scalp hair (with hair roots). If this is not available, bone is a valuable source of DNA. Of all the bones, a tooth is the best source of DNA, but other bones (e.g., femur, rib, vertebra) may be cut, frozen, and retained. When collecting bone for DNA purposes, if a bone saw is used, it is preferable to use a new blade each time to avoid DNA contamination. If this is not done, a used saw blade should be washed repeatedly with a bleach and soap solution.

## The autopsy report

The autopsy report should be a clear, concise, easy-to-read, and well-organized document that accurately states factual information collected at autopsy. The autopsy report usually contains the following separate sections for easy structured organization and reference:

- External examination
- Evidence of therapy
- Evidence of injury
- Internal examination
- Microscopic examination
- Toxicology
- Summary of findings
- Cause and manner of death

Concise wording is important so as not to confuse anyone reading the report. One should avoid repetitive statements such as "there is," "is located," "the presence of," "is revealed to be," and "is noted," which, if one is not careful, can easily be repeated many times over and over throughout the report. One should avoid redundant wording such as "brown in color," "firm in consistency," and similar phrases. One should avoid unnecessary wording such as "shows" and "demonstrates."

Typical autopsy procedures such as "the body is opened in a standard Y-shaped incision" and "the renal capsules strip with ease" should not be stated. However, unique autopsy procedures such as a posterior neck dissection, layer-wise anterior neck dissection, and incisions of the back, wrists, and ankles are appropriately and importantly described to document performance of such procedures. These suggestions are recommended to eliminate superfluous wording that adds nothing pertinent to the case.

It is important to clearly state all of the injuries and other significant findings discovered at autopsy. However, it is equally important, and sometimes even

more important to state *pertinent negatives* when they are deemed significant. For example, in a police custody death in which independent witnesses state that a choke hold was used, if there are no internal neck injuries, it should be so stated, according to the detailed neck dissection that was performed. Likewise, if someone sustains a tangential gunshot wound of the scalp, if there is no underlying head injury, it should be stated that the skull is not fractured, the brain is not bruised, and there is no epidural, subdural, or subarachnoid blood.

The autopsy report may be read by a variety of people, including other physicians, family members, law enforcement personnel, and attorneys. The number of people reading the autopsy report will have widely varying educations, reading levels, vocabularies, and familiarity with medical terminology. Although it may be impossible to use vocabulary that satisfies all levels of intellect, the medical examiner should at least be sure to use proper English and be sure that the information is communicated in an effective and readable manner. Each page of the autopsy report should contain the name of the decedent and the case number. When injuries such as gunshot wounds, stab wounds, or lacerations due to a beating are present, it is advantageous to neatly draw in the wounds on a clean body diagram labeled with the individual's name and case number. The body diagram is a neat, simple, and clean representation of the injuries that one could demonstrate in a courtroom setting.

Finally, the last page of the autopsy report commonly states the cause of death, the manner of death, and has the signature of the forensic pathologist.

## Summary

The differences between the hospital and forensic autopsy are evident, and can be summarized by the following generalities (although they may overlap to some extent).[18]

The hospital autopsy involves history from the hospital chart and an identified person with known disease processes, whereas the forensic autopsy involves history from the terminal event and scene, the identification of the person is sometimes not known, and the focus is on trauma with or without concomitant natural disease. The hospital autopsy may deal with drug reactions and seeks a mechanism of death, whereas the forensic autopsy often deals with toxicology issues and seeks a cause and manner of death. The hospital autopsy is academically oriented and medically confidential, whereas the forensic autopsy seeks evidentiary and confirmatory value and is for the public interest. The hospital autopsy often relies on histologic assessment, whereas the forensic autopsy utilizes histology for confirmation. The hospital autopsy utilizes clinical pathology correlation in the protocol, whereas the forensic autopsy report is objective and without interpretation.

Forensic pathology aids in helping protect public health and safety, enhance quality assurance, advance research and education in medicine, and help with jurisprudence, and the administration of justice.[19] In all, the forensic autopsy is performed for the well-being of the public, because society demands answers and explanation of death. Through the forensic autopsy, information is collected that allows us all to live better lives.

## References

1. Neilson W, editor. *Webster's New International Dictionary, unabridged*. 2 ed. Springfield, MA: G & C Merriam Co Publishers; 1956.
2. Silfvast T, Takkunen O, Kolho E, Andersson LC, Rosenberg P. Characteristics of discrepancies between clinical and autopsy diagnoses in the intensive care unit: a 5-year review. Intensive Care Med 2003;29(2):321–4.
3. Ong AW, Cohn SM, Cohn KA, Jaramillo DH, Parbhu R, McKenney MG, et al. Unexpected findings in trauma patients dying in the intensive care unit: results of 153 consecutive autopsies. J Am Coll Surg 2002;194(4):401–6.
4. Combes A, Mokhtari M, Couvelard A, Trouillet JL, Baudot J, Henin D, et al. Clinical and autopsy diagnoses in the intensive care unit: a prospective study. Arch Intern Med 2004;164(4):389–92.
5. Roosen J, Frans E, Wilmer A, Knockaert DC, Bobbaers H. Comparison of premortem clinical diagnoses in critically ill patients and subsequent autopsy findings. Mayo Clin Proc 2000;75(6):562–7.
6. Blosser SA, Zimmerman HE, Stauffer JL. Do autopsies of critically ill patients reveal important findings that were clinically undetected? Crit Care Med 1998;26(8):1332–6.
7. Podbregar M, Voga G, Krivec B, Skale R, Pareznik R, Gabrscek L. Should we confirm our clinical diagnostic certainty by autopsies? Intensive Care Med 2001;27(11):1750–5.
8. Mort TC, Yeston NS. The relationship of pre mortem diagnoses and post mortem findings in a surgical intensive care unit. Crit Care Med 1999;27(2):299–303.
9. Tai DY, El-Bilbeisi H, Tewari S, Mascha EJ, Wiedemann HP, Arroliga AC. A study of consecutive autopsies in a medical ICU : a comparison of clinical cause of death and autopsy diagnosis. Chest 2001;119(2):530–6.
10. Perkins GD, McAuley DF, Davies S, Gao F. Discrepancies between clinical and postmortem diagnoses in critically ill patients: an observational study. Crit Care 2003;7(6):R129–32.
11. Agnes M, editor. *Webster's New World College Dictionary*, 4 ed. Cleveland, OH: Wiley Publishing Inc.; 2002.
12. Adelson L. *The Pathology of Homicide*. Springfield, IL: C Thomas; 1974.
13. Mittleman RE, Davis JH, Kasztl W, Graves WM, Jr. Practical approach to investigative ethics and religious objections to the autopsy. J Forensic Sci 1992;37(3):824–9.
14. Davis GJ, Peterson BR. Dilemmas and solutions for the pathologist and clinician encountering religious views of the autopsy. South Med J 1996;89(11):1041–4.
15. Parks D. Religious beliefs and objections to autopsies. Lab Med 1996;27(8):511–13.
16. *Commission of Inquiry Into Matters Relating to the Death of Neil Stonechild*. Saskatoon, SK: The Wright Commission; 2004.
17. Adelson L. Symposium on autopsy and the law. The anatomy of justice. Bull NY Acad Med 1971;47(7):745–57.
18. Wetli C. Forensic pathology for the hospital pathologist: part 1. Lab Med 1989;20(4):233–40.
19. Randall BB, Fierro MF, Froede RC. Practice guidelines for forensic pathology. Members of the Forensic Pathology Committee, College of American Pathologists. Arch Pathol Lab Med 1998;122(12):1056–64.



# 4 Sudden Natural Death

*Graeme Dowling, M.D.*

ATHEROSCLEROTIC CARDIOVASCULAR
   DISEASE    72
HYPERTENSIVE CARDIOVASCULAR DISEASE    76
   Marfan's syndrome    78
VALVULAR DISEASE    79
   Aortic valve stenosis    80
   Membranous subaortic stenosis    80
   Supravalvular aortic stenosis    81
   Infective endocarditis    81
   Mitral valve prolapse    82
NONATHEROSCLEROTIC CORONARY ARTERY
   DISEASE    83
   Coronary artery spasm    84
   Spontaneous coronary artery dissection    84
MYOCARDITIS    86
CARDIOMYOPATHY    88
   Hypertrophic cardiomyopathy    88
   Arrhythmogenic right ventricular
     cardiomyopathy    90
   Dilated cardiomyopathy    90
   Alcoholic cardiomyopathy    91
   Myotonic dystrophy    92
CARDIAC CONDUCTION SYSTEM DISORDERS    93
   Preexcitation syndromes    94

CENTRAL NERVOUS SYSTEM DISEASE    95
   Sudden unexpected death
     in epilepsy (SUDEP)    95
   Spontaneous intracranial hemorrhage    97
   Arteriovenous malformations    98
   Meningitis    99
   Central nervous system tumors    100
   Colloid cysts    101
RESPIRATORY SYSTEM    102
   Lobar pneumonia    102
   *Pneumocystis carinii* pneumonia    102
   Hantavirus infection    103
   Pulmonary artery thromboemboli    104
   Reactive airway disease    104
GASTROINTESTINAL SYSTEM    108
   Perforation of gastric and peptic ulcers    109
   Complications of appendicitis    109
ENDOCRINE SYSTEM    110
   Diabetes mellitus    110
   Polyglandular autoimmune syndromes    110
SEPSIS    112
CHRONIC ETHANOL ABUSE    114
REFERENCES    116

Although a major component of forensic pathology is the ability to recognize and interpret injury and determine its role in causing death, the majority of cases investigated by medical examiners or coroners are sudden deaths caused by natural disease. In some instances, there will be a well-documented history of potentially lethal natural disease, allowing for a straightforward cause of death determination. Unfortunately, the majority of cases present without antemortem documentation of significant pathology.

"Sudden natural death" means different things to different people. Some believe that the term should be limited to those cases wherein the time from the onset of symptoms to collapse and death is seconds, whereas others will accept up to 24 hours of symptomatic illness prior to death. It is interesting to note that the spectrum of diseases causing a sudden natural death varies significantly with the definition used. The truly sudden or "instantaneous" death almost invariably involves diseases of the cardiovascular system, whereas broader

definitions can involve virtually any organ system or disease. This chapter will use a rather broad definition of the term "sudden natural death" in order to include as many disease processes as is reasonably possible.

The practice of forensic pathology is quite different from other branches of pathology and medicine in that the forensic pathologist will often accept the mere "association" of a natural disease with a sudden death, in the absence of any other significant findings, as meaning that particular disease caused the death. Varying degrees of certainty exist when drawing conclusions about a cause of death. The finding of significant coronary artery disease with a coronary thrombus and acute myocardial infarct in a person who died while complaining of chest pain results in a high degree of certainty as to the cause of death. The isolated finding of significant atherosclerotic narrowing of one or more coronary arteries in a person who was simply found dead, and who has no significant past medical history, may make a pathologist leery about attributing the death to coronary artery disease, yet that conclusion is reasonable. As always, the forensic pathologist must draw conclusions based on the most reasonable explanation of the complete investigative findings.

## Atherosclerotic cardiovascular disease

Diseases of the heart account for approximately 90 percent of all sudden deaths due to natural disease, with atherosclerotic coronary artery disease being the underlying cause of approximately 75 to 90 percent of sudden cardiac deaths. This is the predominant pathology seen in natural deaths investigated by medical examiners and coroners in North America. The remaining cardiac-related deaths can be attributed to hypertension, valvular disease, nonatherosclerotic coronary artery disease, myocarditis, cardiomyopathy, or conduction system disorders.

Death due to atherosclerotic coronary artery disease is of greatest incidence in the 35- to 64-year age range. Only 25 to 40 percent of individuals dying suddenly of atherosclerotic coronary artery disease will have evidence of an acute myocardial infarct. The remainder have suffered a cardiac arrhythmia, usually ventricular tachycar-

dia degenerating to ventricular fibrillation, originating from an ischemic (but not infarcted) focus of myocardium. They can be symptomatic for as little as 6 to 10 seconds, representing the time from the onset of their terminal arrhythmia to loss of consciousness. In those who are symptomatic, overwhelming tiredness is the most common complaint, followed by shortness of breath. Chest pain is only the third most commonly reported symptom. Sudden death is the first and only symptom of the underlying atherosclerotic coronary artery disease in approximately 25 to 40 percent of individuals who die in this way. The only significant finding at autopsy is severe atherosclerotic narrowing of the coronary arteries, which can be extensive or can be localized to as little as a single focus of greater than 75 percent narrowing in one vessel. In some there may even be less than 75 percent atherosclerotic narrowing of the coronary arteries. Attributing the death to atherosclerotic coronary artery disease is reasonable in this instance if the death is sudden and there are no other significant autopsy or toxicology findings. A coronary thrombus may be present (**Image 4.1**), in which case an infarct may have developed had the individual survived longer. The myocardium is generally histologically unremarkable, although there may be sites of contraction band necrosis (**Image 4.2**), which are not specific for acute ischemia, and sites of patchy nontransmural myocardial fibrosis (**Image 4.3**), suggesting the presence of chronic ongoing ischemia.

Although underlying risk factors, such as hypertension, smoking, diabetes mellitus, hypercholesterolemia, and a family history of cardiovascular disease should be searched for in all cases, this is particularly relevant if significant atherosclerotic coronary artery disease is found in males less than 35 years of age or in premenopausal women. A search for a history of cocaine abuse and postmortem screening of blood for cocaine is advisable in these cases, as cocaine use has been associated with the early onset of atherosclerosis and with acute coronary thrombosis. In addition, cholesterol and triglyceride levels can be measured in postmortem blood samples. The results of such postmortem screenings must be interpreted with caution, because it is often not possible to establish when individuals last ate prior to their death. Family members should be advised of significantly ele-



Normal    10–15%    25–35%    50–60%    75–85%    90–95%

**Figure 4.1**   Cross-sectional anatomy of variably narrowed atherosclerotic blood vessels.

vated cholesterol or triglyceride levels so that they themselves can seek medical attention in order to rule out a familial hyperlipidemia.

A 29-year-old male was playing hockey when he left the ice complaining of chest discomfort. He collapsed on the bench and was in ventricular fibrillation when paramedics arrived. All attempts at resuscitation were unsuccessful. He smoked one package of cigarettes per day, but had no other significant past medical history. At autopsy, there was greater than 75 percent atherosclerotic narrowing of the left anterior descending coronary artery (**Image 4.4**). There were no other cardiac abnormalities.

### So what is significant coronary artery narrowing?

It is generally accepted that 75 percent narrowing of a coronary artery, by any disease process, is significant and can result in clinical expression of disease, including sudden death. One must then ask, "Does 75 percent refer to the *area* or *diameter* of the vessel and what does 75 percent narrowing look like?" Estimates of coronary artery narrowing are made with respect to the *cross-sectional luminal area of the vessel*. When one considers that the area of a circle = $\pi r^2$ (where $r$ = the radius), then one can calculate that reducing the diameter of a coronary artery by 50 percent with a concentric plaque is the equivalent of reducing its area by 75 percent. This is why radiologists look for a site of 50 percent narrowing of the diameter of a coronary artery on an angiogram when trying to establish the presence or absence of significant coronary artery disease. The schematic diagrams of Figure 4.1 illustrate varying degrees of luminal narrowing produced by concentric plaques. Although it is nice to be able to accurately estimate various degrees of coronary artery narrowing, the most important point is recognizing whether the narrowing is greater than or equal to 75 percent.



4.1

4.3

4.2

4.4

A 35-year-old hypertensive male collapsed and died suddenly in his prison cell after complaining of recent flu-like symptoms associated with left shoulder and back pain. At autopsy an occlusive antemortem thrombus was found at a site of significant atherosclerotic narrowing within the left circumflex coronary artery (**Image 4.5**). Histologically, there was evidence of a plaque fissure (**Image 4.6**), which is thought to play a role in the pathogenesis of atherosclerosis-associated thrombi. There was gross (**Image 4.7**) and histologic (**Image 4.8**) evidence of an acute transmural myocardial infarct extending from the base to the apex of the lateral free wall of the left ventricle, with slight extension onto the anterior and posterior walls.

This is the more classic presentation of atherosclerotic coronary artery disease, associated with an acute myocardial infarct, known to clinicians and pathologists in patients admitted to hospital with persistent chest pain. As previously mentioned, an acute myocardial infarct is seen much less frequently in individuals who

die suddenly as a result of atherosclerotic coronary artery disease.

A 58-year-old male collapsed suddenly in the emergency room of a rural hospital where he had presented complaining of upper back pain. An ECG obtained prior to his collapse was interpreted as normal. At autopsy, approximately 500 milliliters of fluid and clotted blood was found within the pericardial sac (**Image 4.9**). There was significant narrowing of each major coronary artery, together with occlusive antemortem thrombus in the proximal third of the right coronary artery. A transmural infarct extended from the base to the apex of the posterior free wall of the left ventricle, with dissection of blood from the left ventricular chamber through the necrotic myocardium and into the pericardial sac (**Image 4.10**).

Rupture of an acute myocardial infarct (i.e., cardiorrhexis) through a free wall of the left ventricle is one of the two most common causes of hemopericardium complicating natural disease seen by forensic pathologists



4.5

4.7

4.6

4.8

(the second is aortic dissection). Most commonly, the rupture occurs within 3 to 7 days of the onset of the terminal infarct.

In some cases of arrhythmic sudden cardiac death due to atherosclerotic coronary artery disease, wherein there is an apparent lack of any previous cardiac history, definitive evidence of chronic ischemic heart disease may be found. Apart from significant atherosclerotic narrowing of coronary arteries, there may be evidence of previous infarcts or of more widespread myocardial fibrosis with left ventricular hypertrophy and dilatation (**Image 4.11**). In these cases, the question is not so much why the person died, but how he or she managed to live so long in the face of such serious cardiac disease.

Apart from atherosclerotic coronary artery disease, atherosclerosis can also present as the underlying cause of a sudden natural death in the form of a ruptured abdominal aortic aneurysm. This 81-year-old male was complaining of back and abdominal pain. He became unresponsive as his family transported him to hospital, and he subsequently died in the emergency room. At autopsy, a large retroperitoneal hematoma was identified (**Image 4.12**). An atherosclerotic abdominal aortic aneurysm, which measured approximately 7 centimeters in diameter, was found just proximal to the bifurcation of the abdominal aorta. There was an obvious rupture of the right anterolateral surface of the aneurysm (**Image 4.13**), thus accounting for the retroperitoneal hematoma.



4.9



4.11



4.12



4.10



4.13



4.15



4.14

***Don't***

- Assume that the absence of an acute myocardial infarct means a death cannot be attributed to atherosclerotic coronary artery disease.
- Be surprised by the extent of atherosclerosis and ischemic heart disease that can be found at autopsy in individuals with no prior cardiac symptoms or history.

## Hypertensive cardiovascular disease

Although hypertension is well known as a significant risk factor for the development of atherosclerosis, and is often found in association with sudden death due to atherosclerotic coronary artery disease, one must also recognize that hypertension can be the underlying cause of death. In particular, hypertensive left ventricular hypertrophy can be associated with sudden arrhythmic deaths, or with dissecting aortic aneurysms and spontaneous/nontraumatic intracerebral hemorrhage (to be discussed later in the section on central nervous system disease).

Concentric left ventricular hypertrophy is generally a reflection of underlying hypertension. However, histologic sections, including sections of the interventricular septum, should be examined in these cases to rule out other causes of left ventricular hypertrophy, most notably hypertrophic cardiomyopathy. In the absence of other explanations for concentric left ventricular hypertrophy, it is reasonable to attribute the underlying cause of the hypertrophy to hypertension.

Holter monitor studies have shown that individuals with hypertensive left ventricular hypertrophy can have intermittent arrhythmias, including nonsustained ventricular tachycardia. Furthermore, hypertensive hypertrophy may play a role in causing myocardial ischemia, irrespective of the presence or absence of atherosclerotic coronary artery disease. Therefore, it is not surprising

The intimal surface of the aneurysm exhibited the typical appearance of extensive complicated atherosclerotic plaque associated with adherent laminated antemortem thrombus (**Images 4.14** and **4.15**).

***Do***

- Remember that the majority of sudden deaths caused by atherosclerotic coronary artery disease are not associated with a coronary thrombus or an acute myocardial infarct.
- Remember that the first and only symptom of significant coronary artery disease can be sudden death.
- Look for risk factors of atherosclerosis (including cocaine abuse) in the medical history and at autopsy, particularly when significant disease is found in males less than 35 years of age and in premenopausal females.
- Have a clear image in your mind of what 75 percent narrowing (i.e., significant narrowing) of a coronary artery actually looks like.



4.16



4.17



4.18



4.19

that hypertensive left ventricular hypertrophy can be the sole anatomic finding in some sudden deaths.

A 39-year-old male complained of feeling unwell and left work early. He was found dead several minutes later collapsed in his car with his fist clenched over his chest. His medical history was significant only for untreated hypertension. Autopsy demonstrated a 610-gram heart significant only for concentric left ventricular hypertrophy (**Image 4.16**). Histologically, the myocardium exhibited hypertrophy of myocytes and a generalized increase in interstitial fibrous tissue (**Image 4.17**). There was benign nephrosclerosis of the kidneys, visible both grossly (**Image 4.18**) and histologically (**Image 4.19**). This death was attributed to hypertensive cardiomyopathy.

The majority of dissecting aortic aneurysms are thought to arise as a complication of hypertension. Those dissections associated with sudden death are most commonly limited to the ascending aorta (Stanford Type A dissection) with tearing of the adventitia and extension of blood into the pericardial sac. Less commonly, there will be dissection into the left pleural cavity or retroperi-

toneum. Histologically, one will often find cystic medial necrosis of the aorta (**Image 4.20**; elastic stain). There is some debate as to whether cystic medial necrosis is a primary histologic abnormality that can cause dissection or whether it is a secondary change produced by hypertension or by connective tissue diseases, such as Marfan's syndrome.

A 76-year-old male complained of chest pains before collapsing. He was taken to hospital, treated for minor injuries, and released. He returned to hospital 3 days later with complaints of chest and stomach pain. Because there was no laboratory evidence of myocardial ischemia, he was once again discharged home. He was found dead at home the next day. At autopsy, 1 liter of



4.20



4.21



4.22

fluid and clotted blood was present within the pericardial sac, surrounding a dilated and hemorrhagic ascending aortic arch, which bore a small adventitial tear. Further evaluation revealed an intimal tear located just above the aortic valve, with a large dissecting aortic aneurysm extending down the complete length of the aorta and into major aortic arch branches. Biventricular hypertrophy was also noted (**Image 4.21**).

## Marfan's syndrome

*Marfan's syndrome* must be considered in the differential diagnosis of the underlying cause of an aortic dissection, particularly in a young individual with no known history or anatomic features of hypertension. Recognition of Marfan's syndrome is important because it is an autosomal dominant disorder of connective tissue (although it can also occur as a new mutation in 25 to 30 percent of cases).

A 17-year-old female with an unremarkable past medical history collapsed and died suddenly at her home after a 5-day history of chest pain. At autopsy, she was noted to be of tall stature (183 centimeters), had a long arm span (174 centimeters), arachnosyndactyly (**Images 4.22** and **4.23**), high arched palate, shoulder and buttock striae, and mild pectus excavatum. Internally, examination demonstrated hemopericardium arising from an aortic dissection. Both the intimal (**Image 4.24**) and adventitial tears (**Image 4.25**) were located on the ascending aorta. Finally, one must also recognize that dissecting aortic aneurysms may also be associated with congenitally bicuspid aortic valves (**Image 4.26**), even in the absence of valvular stenosis or hypertension.

### Do

- Remember that hypertensive left ventricular hypertrophy can be a cause of sudden death even in the absence of significant atherosclerotic coronary artery disease.
- Remember that hypertension is the most common underlying cause of concentric left ventricular hypertrophy.
- Remember that hypertensive left ventricular hypertrophy is not always associated with a clinical history



4.23



4.25



4.26





4.24

of hypertension and/or with other hypertensive end-organ pathology (e.g., benign nephrosclerosis).

- Rule out hypertrophic cardiomyopathy as a cause of concentric left ventricular hypertrophy.
- Look for a dissecting aortic aneurysm with the heart still *in situ* when hemopericardium is found at autopsy. If a dissecting aortic aneurysm is identified, try not to cut through the ascending aorta or the aortic arch when removing the heart, because this is the most likely site of an intimal tear.
- Look for both historical and/or autopsy evidence of hypertension, Marfan's syndrome, and congenitally bicuspid aortic valve when a dissecting aortic aneurysm is found.

***Don't***

- Presume that you cannot make a diagnosis of hypertension when concentric left ventricular hypertrophy is found in the absence of a history of hypertension and in the absence of any other hypertensive end-organ pathology.

## Valvular disease

The most common valvular abnormalities associated with sudden death involve the aortic valve and, in particular, aortic outflow tract stenosis. Spontaneous bacterial endocarditis is seen on occasion, although endocarditis associated with intravenous drug abuse may be seen more frequently in larger centers. Mitral valve prolapse, although said to be present in about 2 percent of the population, is actually quite rare as a cause of sudden death.

A 63-year-old male was driving a taxicab when he pulled over to the side of a roadway, collapsed, and died.

Autopsy revealed a hypertrophied and dilated left ventricle caused by congenitally bicuspid stenosis of the aortic valve (**Image 4.27**). The residual valve orifice would not admit the tip of a small finger, which is a common finding in aortic valvular stenosis of any etiology.

## Aortic valve stenosis

Examination of the aortic valve from above is the best way to establish the etiology of aortic valvular stenosis. The congenitally bicuspid aortic valve has two cusps, one of which is slightly larger than the other. The slightly larger cusp often has a partially calcified ridge, the median raphe, extending across its midpoint. The median raphe can be mistaken for the fused edges of two adjoining valve cusps, as seen in acquired postinflammatory aortic valvular stenosis. Unlike postinflammatory fusion, however, the median raphe does not extend to the free edge of the valve cusp and does not extend up to the height of the valve commissures on the aortic wall. Congenitally bicuspid aortic valves, which occur in approximately 2 percent of all births, are the most common congenital abnormality of the heart valves. They can be seen as incidental findings in children and young adults, but are not usually stenotic. Stenosis of the valve develops with calcification of its cusps over time, such that sudden death due to congenitally bicuspid valvular stenosis is usually seen in individuals between 60 and 75 years of age.

Acquired postinflammatory aortic valvular stenosis (**Image 4.28**), the second most common cause of aortic valvular stenosis, is usually seen as a cause of sudden death in individuals between 50 and 60 years of age. When viewed from above, the valve will exhibit varying degrees of fusion of its commissures. In some cases, two cusps can be fused in such a manner that the valve appears quite similar to a congenitally bicuspid valve (**Image 4.29**). One of the cusps will be twice the size of the second cusp on a postinflammatory valve. Unlike the median raphe of the congenitally bicuspid valve, fusion of the cusps extends up to the free edge of the valve and extends up to the full height of the valvular commissures. In the absence of associated mitral valve disease, isolated postinflammatory aortic valvular stenosis is no longer thought to be rheumatic in origin, but rather is thought to be the result of some other inflammatory process, the etiology of which remains unknown.

Senile calcific aortic valvular stenosis is usually seen in individuals over 70 years of age. The commissures of the valve are generally free of adhesions, but deposits of calcium are found on the aortic surfaces of the cusps (**Image 4.30**). The calcification produces reduced mobility of the cusps, resulting in valvular stenosis. Although the stenosis may be associated with left ventricular hypertrophy, the advanced age of individuals with senile calcific stenosis is such that there are often other lethal natural disease processes present. Thus, it is often difficult to attribute the sole cause of a sudden death to senile calcific aortic valvular disease.

## Membranous subaortic stenosis

Membranous subaortic stenosis, an uncommon cause of left ventricular outflow tract obstruction, is usually



4.28



4.27



4.29

detected clinically in children and adolescents. The subaortic membrane is usually a thin or broad "discrete" band of fibroelastic tissue, or can be a broader fibromuscular band referred to as tunnel subaortic stenosis. The aortic valve itself may be normal, but may also exhibit thickening of its cusps, which predisposes it to the development of infection or insufficiency.

## Supravalvular aortic stenosis

Supravalvular aortic stenosis, which can take the form of membranous stenosis, an hourglass deformity, or hypoplasia of the ascending aorta, is a decidedly rare cause of sudden death in adults.

A 42-year old male collapsed during an exercise class. All attempts at resuscitation were unsuccessful. He had a history of an aortic valve lesion of unknown etiology since the age of 16. He had been investigated 1 year previously for syncopal episodes while running and for shortness of breath on exertion. He was told to modify his exercise program, but he was running 6 miles a day and participating in four exercise classes per week at the time of his death. At autopsy, there was left ventricular hypertrophy and dilatation together with the presence of a thin fibrous membrane extending around the circumference of the left ventricular outflow tract below the aortic valve (**Image 4.31**).

## Infective endocarditis

Infective endocarditis is a rare cause of sudden death, although it may be seen more commonly in chronic intravenous drug abusers. In those cases not related to drug abuse, one will often find abnormal heart valves with superimposed infection by bacterial organisms, such as alpha-hemolytic *Streptococcus viridans*, which tend to produce a subacute clinical presentation (i.e., so-called subacute bacterial endocarditis). More clinically aggressive organisms, such as *Staphylococcus aureus*, can infect normal cardiac valves and will usually create a more acute clinical picture. On occasion, however, organisms usually associated with subacute disease will infect normal valves. In those instances where infective endocarditis is found involving the tricuspid and pulmonary valves, careful attention should be paid to either historical or autopsy evidence of intravenous drug abuse. Cultures and Gram stains of the vegetations should be taken in all cases of infective endocarditis.

A 44-year-old male presented to hospital with a 1-week history of left lower quadrant abdominal pain associated with anorexia. He had a history of chronic ethanol abuse and homozygous hemoglobin C disease. Shortly after his admission, he became bradycardic and hypotensive. He deteriorated rapidly and died shortly thereafter. At autopsy, the left and right coronary ostia were located adjacent to each other above the left coronary cusp. There was no gross evidence of chronic valvular disease, however vegetations were present on each cusp of the aortic valve, and the left and right coronary cusps were ruptured. The vegetation on the left coronary cusp extended upward into the left main coronary artery (**Image 4.32**). Gram-positive cocci were found in the vegetations (**Image 4.33**; Gram stain). Mycotic aneurysms were found in the right coronary artery and the right



4.31



4.30

4.32









middle cerebral artery (**Image 4.34**), and there was purulent transmural infarction of the posterior free wall of the left ventricle. An antemortem blood culture grew alpha-hemolytic *Streptococcus viridans*.

## Mitral valve prolapse

Mitral valve prolapse is the most common congenital heart disease, occurring in approximately 5 percent of persons over 15 years of age. It occurs at a higher frequency in individuals with Marfan's syndrome. Features of mitral valve prolapse, which include a redundant "accordion"-like widening of the valve leaflets, excessive length of the posterior valve leaflet, thickening of the central spongiosa portion of the valve leaflets with excessive deposits of acid mucopolysaccharide material, and thickening and rupture of chordae tendineae, are usually incidental findings in cases where there is another obvious cause of death. On very rare occasions, mitral valve prolapse will be the only anatomic abnormality present to account for a sudden death. Some individuals with mitral valve prolapse experience chest pain and/or cardiac arrhythmias, although the anatomic basis for this is not understood (referred to eponymously as Barlow's syndrome). There is also a higher rate of infective endocarditis involving these valves.

A 40-year-old female collapsed suddenly and died while shopping. Clinically she was known to have mitral valve prolapse. At autopsy, the mitral valve, when viewed from above, was noted to have thickened and redundant leaflets (**Image 4.35**). Individual chordae tendineae were ruptured (**Image 4.36**). Histologic sections confirmed the presence of excessive acid mucopoly-saccharide material within the central spongiosa of the leaflets (**Image 4.37**).

### *Do*

- Examine the cardiac valves (especially the aortic and mitral valves) from above prior to opening.
- Try to establish the underlying pathology of a stenotic aortic valve, rather than just attributing a death to "aortic stenosis."



4.37



4.38



4.39

- Obtain cultures and Gram stains of the vegetations in cases of infective endocarditis in order to properly identify the responsible organism.

***Don't***

- Assume that mitral valve prolapse must be the cause of a sudden natural death when it is identified at autopsy: It is the most common congenital heart disease, but is a rare cause of sudden death; and, as always, this autopsy finding must be considered in conjunction with the history, scene, and circumstances of the death before drawing a conclusion about the cause of death.

## Nonatherosclerotic coronary artery disease

The progressive increase in prevalence of atherosclerotic coronary artery disease has led to the unspoken agreement that "coronary artery disease" is synonymous with "atherosclerotic coronary artery disease." However, there are a variety of nonatherosclerotic diseases and congenital abnormalities of the coronary arteries that are potential causes of sudden death. Some of these can be easily missed due to their more subtle gross appearances. Because they tend to manifest within the childhood and adolescent years, they should be part of any differential diagnosis of sudden apparent natural death in subadults.

There are a variety of congenital abnormalities of the coronary ostia and arteries, including abnormal location of the ostia, ostial stenosis and/or ostial ridges, and acute angle take-off of the proximal portion of a coronary artery. Quite often, more than one of these abnormalities will occur in one patient. Anomalous origin of the coronary arteries can be found in approximately 1 in 200 individuals, such that it is very clear these are not necessarily lethal entities. Chest pain, myocardial infarction, syncope, and sudden death do occur in some individ-

uals, albeit rarely, and the actual mechanisms that produce these signs and symptoms are not particularly clear. Theories include decreased blood flow through the narrowed ostium caused by expansion of the aorta during systole and compression of an anomalous left mainstem coronary artery extending between the aorta and the pulmonary artery during systole.

A normal life span is quite possible for individuals with these anomalies, as illustrated in **Images 4.38** and **4.39**, which show an ostial ridge and acute angle take-off of the left mainstem coronary artery, located above the commissure between the left and right coronary cusps in a 66-year-old male who died of atherosclerotic coronary artery disease. *The bottom line is that examination of the coronary ostia is an essential part of the examination of the heart in cases of sudden cardiac death, particularly in those instances where the cause of death is not readily apparent.*

An 8-year-old male collapsed suddenly and died while playing video games at his home. He had no significant past medical history, although his parents expressed concern about the fact that he had recently fallen and struck his head against a coffee table. At



4.40



4.41

autopsy, there was no evidence of a head injury, however the ostium of the left mainstem coronary artery was found immediately adjacent to that of the right coronary artery in the right sinus of Valsalva (**Image 4.40**). A ridge of tissue extended partially around the left coronary ostium (coronary ostial ridge), and the proximal portion of the vessel was angled at less than 45 degrees to the adventitial surface of the aorta (acute angle take-off of the coronary artery). Furthermore, the left mainstem coronary artery extended between the pulmonary trunk and the aorta (**Image 4.41**). No other abnormalities were identified to account for death.

### Coronary artery spasm

Coronary artery spasm, also referred to as Prinzmetal's angina and variant angina, is typically seen as angina at rest accompanied by ST-segment elevation on ECG with a reversible decrease in the luminal diameter of a coronary artery on angiogram. Although coronary artery spasm can occur in those with atherosclerotic coronary artery disease, it is also found in individuals with otherwise normal coronary arteries. Myocardial infarction and rare cases of sudden death do occur. The difficulty for the forensic pathologist is that a diagnosis of coronary artery spasm is not possible based on autopsy findings, but requires previous clinical documentation of the spasm. Without this, the cause of death will be "undetermined." However, one can speculate that disease of the heart would be the most likely cause of death, based on the suddenness of the collapse and death, with coronary artery spasm mentioned in the differential of possible underlying disease entities.

A 43-year-old male collapsed suddenly and died while at work. No anatomic abnormality of the heart or any other organ was identified at autopsy and postmortem toxicology was negative. His past medical history was significant for episodic angina at rest. Coronary angiograms had revealed no evidence of significant ath-



4.42

erosclerotic coronary artery disease, however, spasm of the right coronary artery could be induced by an injection of ergonovine. **Image 4.42** shows the right coronary artery prior to injection of ergonovine, whereas **Image 4.43** illustrates spasm of the right coronary artery subsequent to injection.

### Spontaneous coronary artery dissection

Spontaneous coronary artery dissection is a rare cause of death and is a separate entity from dissecting aneurysms of the aorta. It has no known association with either hypertension or Marfan's syndrome, but tends to affect women (about 85 percent preponderance) with about



one-third of these women being either pregnant or post-partum. The dissection occurs in the outer third of the media or between the media and adventitia. Although it is not uncommon to see an adventitial eosinophilic inflammatory cell infiltrate (**Image 4.44**), the significance of this is uncertain. Cystic medial necrosis is seen in only a minority of cases. Traumatic dissection of a coronary artery is exceptionally rare, but will be associated with a history and/or autopsy evidence of blunt impact injury involving the anterior chest wall.

A 42-year-old female collapsed and died after complaining of the sudden onset of chest pain. She had no sig-

nificant past medical history. At autopsy, the adventitial surface overlying the left anterior descending coronary artery appeared to be hemorrhagic (**Image 4.45**), however, on sectioning, an isolated dissection of this portion of the vessel was discovered (**Images 4.46** and **4.47**). There was no evidence of acute myocardial ischemia.

A 23-year-old male was found dead on the floor beside his bed. His past medical history was significant for investigations of chest pain for a number of days prior to his death. His family history was significant for premature atherosclerotic heart disease with the death of other family members between 30 and 40 years of age.



4.47



4.49



4.48

The only autopsy finding of note was a 1.5-cm-long intramural segment of the midportion of the left anterior descending coronary artery (**Images 4.48** and **4.49**). There was no evidence of acute myocardial ischemia or of myocardial fibrosis within the distribution of this vessel.

This case illustrates the conundrum faced by a forensic pathologist when a sudden death is associated with a relatively common anatomic abnormality. An intramural coronary artery, also referred to as myocardial bridging, is simply a segment of coronary artery covered by a layer of myocardium. They are common enough to be considered a normal anatomic variant, yet, on occasion, one will be found in an individual who has died suddenly where there is no other identifiable cause of death. Whether or not intramural coronary arteries are a legitimate cause of death is still somewhat controversial, but there does appear to be clinical evidence that these vessels can cause myocardial ischemia. In some cases, surgical ablation of a myocardial bridge has relieved symptoms of ischemia. Given this, it is conceivable that

they are a cause of sudden death, an idea supported by rare case reports in the literature. Depending on one's own level of comfort, the cause of death in this example could be ruled due to intramural coronary artery (particularly given the previous history of intermittent chest pain) or undetermined. There are no easy answers to cases like this and, as always, one must try to put the autopsy findings in the context of the medical history, the scene, and the circumstances of the death in order to establish the most reasonable death certification.

### Do

- Examine the coronary ostia and the pathway of the proximal portions of the coronary arteries, particularly in children, teenagers, and young adults who have died suddenly.

### Don't

- Ignore the seemingly trivial nature of coronary ostial and arterial abnormalities (e.g., ostial ridges, intramural coronary arteries) when faced with a sudden natural death where no other cause of death has been identified—these subtle abnormalities can be the cause of death.
- Assume that a pathologist cannot make a definitive conclusion about the cause of death in the absence of any significant anatomic findings—if the clinical history fits with the scene and the circumstances of the death, the diagnosis can be made even when there is nothing to see at autopsy (e.g., coronary artery spasm).

## Myocarditis

Myocarditis is generally associated with prodromal symptoms of fever and flu-like illness that can last for several days, such that these deaths are arguably not as sudden as many of those previously described in this



4.50



4.51



4.52



4.53

chapter. Cases of myocarditis do, however, come to the attention of death investigation systems primarily because they often involve younger individuals who were thought to be healthy, apart from their recent vague flu-like symptoms. Although the heart usually has some congestion or petechiae of the epicardial surface, associated with pallor and softening of the myocardium, there are instances, such as the case discussed here, where the heart is completely unremarkable to gross examination or the gross changes are subtle enough to be missed.

A 20-year-old male had a 2-day history of intermittent fever and vomiting. He was assessed in the emergency room of a hospital and was thought to have a mild gastroenteritis. He was discharged home, but deteriorated during the next several hours, developed shortness of breath, and then became unresponsive. All attempts at resuscitation were unsuccessful. At autopsy, there was no visible abnormality to account for death. In particular, the heart appeared grossly unremarkable. A postmortem blood culture did not grow any bacterial organisms. Histologic examination of the heart revealed patchy mixed inflammatory cell infiltrates of the myocardium associated with myocyte necrosis (**Image 4.50**). The cause of death was attributed to viral myocarditis.

A 14-year-old boy had felt unwell for the past 3 or 4 days. While delivering newspapers, the teenager became short of breath and was witnessed to collapse on the sidewalk. Although neighbors called 911, he died. A postmortem radiograph of the chest showed an enlarged cardiac silhouette (**Image 4.51**). The most notable autopsy finding was cardiomegaly (**Image 4.52**). A transverse section through the ventricles showed subtle circumferential subendocardial pallor (**Image 4.53**). Microscopically, a prominent predominantly lympho-

cytic interstitial inflammatory infiltrate was associated with focal myofiber destruction (**Image 4.54**).

For the most part, myocarditis in North America and Western Europe is thought to have a viral etiology, with the coxsackie A and B viruses being most common. The difficulty is that routine viral serology, cultures, and even DNA hybridization techniques almost inevitably fail to detect a virus, such that they are of little assistance in establishing a diagnosis. For the forensic pathologist, the diagnosis rests in the histologic appearance of the myocardium. Typical inflammatory cell infiltrates are predominantly lymphocytic, but polymorphs can be present. Hypersensitivity myocarditis, which is usually caused by an allergic reaction to drugs, should be suspected when eosinophils are a prominent part of the myocardial inflammatory cell infiltrate.

Apart from its presentation as a fulminant illness with death, viral myocarditis can be subacute, chronic, and even clinically silent, and is now recognized as one of the underlying causes of dilated cardiomyopathy. Subclinical myocarditis can be an incidental finding in some cases. **Image 4.55** shows an active viral myocarditis in the heart of an 8-year-old male who suffered a lethal penetrating head injury when he was struck by the leg of a chair that had been flung at him by an adult. The cause of death was clearly his head injury, yet the degree of inflammation of the myocardium was histologically in excess of that seen in **Image 4.50**, where the cause of death was attributed solely to viral myocarditis.

***Do***

- Consider viral myocarditis in the differential diagnosis of anyone dying following a short flu-like illness.

***Don't***

- Assume that a normal gross appearance of the myocardium means myocarditis cannot be present.

- Diagnose myocarditis simply because inflammatory cells are found in the myocardial interstitium. There must be evidence of myocyte necrosis before such a diagnosis can be made.
- Worry about obtaining viral cultures and serology in cases of viral myocarditis because they are rarely of any assistance in making the diagnosis.

## Cardiomyopathy

Although many cases of cardiomyopathy come to clinical attention due to signs and symptoms of heart failure, in some individuals their first symptom will be sudden death or their symptoms will be so insidious as to be ignored until death occurs. This is particularly true for hypertrophic cardiomyopathy and right ventricular cardiomyopathy, but can occasionally be seen in cases of dilated cardiomyopathy.

### Hypertrophic cardiomyopathy

Hypertrophic cardiomyopathy is a relatively common cardiac disease, said to occur in about 1 in 500 individuals in the general population, yet it remains a relatively uncommon cause of sudden death when compared to its overall frequency. Its etiology lies in mutations of one of a number of genes that produce proteins necessary for the structural integrity, contractile function, or regulation of the cardiac sarcomere. Unfortunately, DNA analysis for hypertrophic cardiomyopathy is not widely available and, as such, the autopsy diagnosis still relies on anatomic features. The heart will exhibit either concentric or asymmetric left ventricular hypertrophy. Asymmetric hypertrophy is said to be present when the interventricular septal thickness is 1.3 times greater than that of the posterolateral free wall. Left ventricular outflow tract obstruction is a feature of some cases, such



4.54



4.55

that hypertrophic cardiomyopathy has also been referred to as hypertrophic obstructive cardiomyopathy (HOCM) and idiopathic hypertrophic subaortic stenosis (IHSS).

Anatomic features that suggest the presence of outflow tract obstruction include thickening of the anterior mitral valve leaflet and formation of a fibrous plaque, reflecting a mirror image of the mitral valve leaflet, on the adjacent left ventricular outflow tract endocardium. Histologically, most cases will exhibit a fairly characteristic bizarre branching of myocytes, particularly prominent in the interventricular septum. It is very important that histologic sections of the interventricular septum and the left ventricular free walls be taken perpendicular to the long axis of the heart in order to properly demonstrate these myocytes. Another characteristic feature is the presence of thickened intramural coronary arteries. Each of these features can be present in variable degrees, such that the diagnosis may be difficult. Because hypertrophic cardiomyopathy is inherited as an autosomal dominant disorder, when the diagnosis is established, it is important to recommend that close family members undergo clinical testing for this disease.

A 43-year-old female collapsed and died suddenly in her home. She had no significant past medical history, but a sibling had died suddenly several years previously with an autopsy diagnosis of "cardiac death of undetermined etiology." At autopsy, the heart weight was 590 grams and there was evidence of asymmetric hypertrophy of the left ventricle, particularly prominent in the anterior portion of the interventricular septum (**Image 4.56**). This produced left ventricular outflow tract obstruction with thickening of the anterior mitral valve leaflet and mirror image fibrous thickening of the left ventricular outflow tract adjacent to the anterior mitral valve leaflet (**Image 4.57**). Another view of anterior mitral valve leaflet thickening, from a different case, is shown in **Image 4.58**. Histologically, bizarre branching myocytes were found throughout the left ventricular

myocardium, but were most prominent within the interventricular septum (**Image 4.59**). Characteristic endothelial and medial thickening of intramural coronary arteries was noted (**Image 4.60**). A diagnosis of hypertrophic cardiomyopathy was made. Review of the histologic sections from the sibling who died previously



4.57



4.58

4.56





4.59



4.60



4.61



4.62



4.63

also revealed the characteristic findings of hypertrophic cardiomyopathy.

## Arrhythmogenic right ventricular cardiomyopathy

Arrhythmogenic right ventricular cardiomyopathy (also referred to as ARVD or arrhythmogenic right ventricular dysplasia) is a relatively rare disorder that presents pathologically as either paper-like thinning of the right ventricular myocardium associated with replacement of the myocardium by a mixture of fibrous tissue and fat, or as transmural fatty infiltration of the right ventricular myocardium extending from the epicardium to the endocardium. There may be evidence of patchy myocardial fibrosis and chronic inflammatory cell infiltrates. Occasionally, fatty infiltration will be found within the myocardium of the left ventricle. In some cases, such as the one discussed next, the diagnosis is relatively straightforward. In others, assessing the degree of fatty infiltration as being abnormal can be challenging, particularly in the elderly. As such, referral to a cardiac pathologist is warranted. Because arrhythmogenic right ventricular cardiomyopathy can be a familial disorder (primarily autosomal dominant inheritance), family members should undergo clinical examination for the disease when the diagnosis is made.

A 42-year-old female was found dead on a bed in a hotel room that she had been cleaning. There was no known significant past medical history. At autopsy, there was transmural fatty infiltration and thickening of the right ventricular myocardium (**Image 4.61**). Histologically, the fatty infiltration extended completely through the myocardium to the endocardium (**Image 4.62**), with formation of islands of myocardium completely surrounded by adipose tissue (**Image 4.63**). A diagnosis of arrhythmogenic right ventricular cardiomyopathy was made.

## Dilated cardiomyopathy

In cases of dilated cardiomyopathy, there is dilatation of all four cardiac chambers, with predilection for more severe disease in the left ventricle. Although there will



4.64



4.65



4.66

be left ventricular hypertrophy, ventricular dilatation can produce a normal or even reduced free wall thickness. The endocardium will exhibit variable degrees of fibrous thickening and mural thrombi are often present. The histologic changes are nonspecific, but include endocardial fibrosis, interstitial fibrosis within the myocardium, hypertrophy and/or actual thinning of myocytes (as a result of ventricular dilatation), myocytolysis, and occasional chronic inflammatory cell infiltrates. The diagnosis can only be made in the absence of hypertension, coronary artery disease, and valvular disease. Silent or subclinical viral myocarditis is thought to be the underlying cause of many cases of dilated cardiomyopathy. So-called *alcoholic cardiomyopathy* is a form of dilated cardiomyopathy that occurs in alcoholics, usually in the absence of alcoholic cirrhosis. This is one of the more common reasons for a dilated cardiomyopathy to come to the attention of a forensic pathologist. Peripartum cardiomyopathy is a form of dilated cardiomyopathy of unknown etiology arising in the third trimester of pregnancy or the first 6 months postpartum.

A 35-year-old female, who lived in a remote northern community, was found dead in bed. She had apparently felt unwell for an unspecified number of days prior to her death. Her eighth child had been delivered 6 weeks previously without complications. There was no clinical history of hypertension. At autopsy, the atrial and ventricular chambers were dilated, and the myocardium was uniformly pale in color (**Image 4.64**). There was increased trabeculation of the left ventricle, such that it

had a morphologic appearance similar to that of the right ventricle. Histologic examination of the myocardium revealed variable degrees of myocardial fibrosis, with some myocyte hypertrophy and occasional chronic inflammatory cell infiltrates (**Image 4.65**). The cause of death was attributed to peripartum cardiomyopathy.

## Alcoholic cardiomyopathy

Alcohol and its metabolites are directly toxic to the heart. In addition, chronic ethanol abusers may have some element of thiamine deficiency, raising the possibility of additional cardiac pathology. Although an association between chronic ethanol abuse and dilated cardiomyopathy is known, a mechanism is not, and the morphology of alcoholic dilated cardiomyopathy is no different than any other form of dilated cardiomyopathy.

A 65-year-old known alcoholic was found collapsed in the hallway of his apartment building. His buttocks were in the air and his pants were around his ankles (**Image 4.66**). There was no evidence of trauma on the body. At autopsy, the only finding of note was a prominent dilated

cardiomyopathy (**Image 4.67**). Toxicology showed only a negligible amount of alcohol. His cause of death was attributed to dilated cardiomyopathy arising as a result of chronic ethanol abuse.

## Myotonic dystrophy

Myotonic dystrophy is an autosomal dominant disease of skeletal muscle that can be associated with cardiomyopathy and occasionally with sudden death. The pathologic appearance of the heart is actually quite nonspecific (in fact, the heart can appear to be normal), with histologic abnormalities appearing in skeletal muscle rather than cardiac myocytes. DNA hybridization is used to detect an increased number of repeats of a trinucleotide sequence (CTG) in the gene that encodes myotonin protein kinase. These studies can be performed on postmortem blood, ideally collected in a tube containing EDTA, although definitive results become less likely with increasing postmortem period.

A 45-year-old male collapsed and died suddenly while carrying plywood at his worksite. Although he was suspected to have myotonic dystrophy, this diagnosis had never been confirmed. At autopsy, there was evidence of left ventricular hypertrophy and slight dilatation, together with dilatation of the right ventricle. Histologically, the myocardium appeared to be relatively unremarkable, however, sections of skeletal muscle exhibited some central nuclei (**Image 4.68**) and nuclear chains (**Image 4.69**), as can be seen in myotonic dystrophy. Ring fibers, which are most characteristic of this disease, were not seen. Postmortem DNA hybridization studies were consistent with a diagnosis of myotonic dystrophy.

***Do***

- Search for any past medical history or histologic findings that might suggest the underlying etiology of a dilated cardiomyopathy.

- Examine the right ventricle of the heart, looking for evidence of hypertrophy, thinning, and/or significant fatty infiltration.
- Consider the diagnosis of hypertrophic cardiomyopathy in cases of concentric, as well as asymmetric, left ventricular hypertrophy.
- Take histologic sections of the interventricular septum at right angles to its long axis in order to identify the abnormal myocytes seen in hypertrophic cardiomyopathy.
- Look for evidence of intramural coronary artery abnormalities as an additional histologic sign of hypertrophic cardiomyopathy.
- Recommend clinical screening of a family when you make a diagnosis of hypertrophic cardiomyopathy or right ventricular cardiomyopathy.

***Don't***

- Make a diagnosis of "cardiomyopathy" in the presence of hypertension, significant coronary artery disease, or valvular disease.



4.68



4.69

4.67



4.70



4.71



4.72

## Cardiac conduction system disorders

For those forensic pathologists who are adventurous, and who have a very well-paid, enthusiastic histotechnologist, microscopic examination of the cardiac conduction system can be of merit in establishing an underlying cause of death in select cases. This is particularly true when there is gross or histologic evidence of a disease process that is also capable of affecting the conduction system. It is far less likely to be of assistance when there is no other gross or histologic abnormality of the heart and no past medical history to suggest the presence of a conduction system disorder. Examination of the conduction system can be superficial or detailed, depending on the nature of the case at hand. Obvious gross abnormalities involving the conduction system will only need a few sections to establish the histology of the disease process. A more detailed examination generally involves processing and viewing 40 to 80 slides, while highly detailed studies, involving hundreds to thousands of slides from a single case, are far beyond the capabilities of most forensic pathologists and their histology laboratories.

A 35-year-old male with a history of alcohol abuse was found dead on a sofa. At autopsy, the heart muscle was somewhat soft and gray-white tissue was noted infiltrating the interventricular septum, particularly in the vicinity of the atrioventricular node and the bundle of His (**Image 4.70**). Histologically, this proved to be sar-

coidosis (**Images 4.71** and **4.72**), with additional sarcoid granulomata being found in the lungs and the hilar lymph nodes.

This represents one of those unusual cases wherein the decision to examine the cardiac conducting system histologically is easily made due to the presence of a grossly identifiable abnormality in the vicinity of the atrioventricular node. Cardiac sarcoidosis will more commonly present clinically as a restrictive or infiltrative type of cardiomyopathy, but it can involve the cardiac conducting system and can therefore be a rare cause of sudden cardiac death. Sarcoid infiltration of the conducting system is virtually always associated with grossly visible infiltration of other portions of myocardium.

A 46-year-old female, with a history of hypertension and ECG evidence of Wolff-Parkinson-White Syndrome (WPW), was found dead in her bedroom. Previous ECGs suggested that an accessory pathway was located somewhere around the right atrioventricular ring. The ring was serially sectioned, and a single thin accessory bundle of cardiac muscle (a so-called bundle of Kent) was found extending through the epicardial soft tissues



4.73

between the right atrium and ventricle (**Image 4.73**). This provided anatomic confirmation of the clinical diagnosis.

### Preexcitation syndromes

Wolff-Parkinson-White (WPW) syndrome is the best known of the preexcitation syndromes. It is caused by an accessory pathway, or more commonly multiple pathways, of conducting tissue extending between the atria and ventricles, either within or outside of the atrioventricular node. The accessory pathways are thought to allow more rapid transmission of a sinoatrial node impulse to the ventricles than normally occurs through the atrioventricular node. This results in shortening of the PR interval and "slurring" of the upward or downward slope of the QRS complex (i.e., the delta wave), which are the ECG hallmarks of classical WPW syndrome. On occasion, the accessory pathways also permit retrograde transmission of an electrical impulse from the ventricles to the atria, creating a reentrant circuit and potentially lethal tachyarrhythmias. Electrophysiologic testing is used to find these accessory pathways so they can be surgically ablated.

If sudden death occurs, but a diagnosis of WPW syndrome has not been established clinically, it is not feasible for a forensic pathologist to serially section both atrioventricular rings in hopes of finding accessory atrioventricular connections. Such studies require the preparation and examination of hundreds, if not thousands, of slides. Unfortunately, the cause of death must usually be certified as "undetermined" with the suggestion that a cardiac conduction disorder, such as WPW syndrome, is part of the differential diagnosis. This is particularly true when the person was known to have had previous syncopal events. Wolff-Parkinson-White syndrome can be familial, with autosomal dominant inheritance. A mutation of the gene that encodes a regulatory subunit of AMP-activated protein kinase has now been identified in some families with WPW syndrome. As a result, it is wise to recommend clinical and ECG examination of close family members when a diagnosis of WPW, or any of the preexcitation syndromes for that matter, is suspected in a sudden cardiac death.

A variety of other cardiac conduction disorders may present to a forensic pathologist as a case of sudden cardiac death. The best known of these is the long QT syndrome (LQTS). Although prolongation of the QT interval can be acquired, there are a variety of congenital forms that are now known to be genetic ion-channel disorders of variable penetrance and expression. Affected individuals can develop a complex tachycardia, referred to as *torsades de pointes*, as well as ventricular fibrillation, such that syncope and sudden death do occur. Another more recently described disorder is the Brugada syndrome, wherein there is sudden onset of ventricular fibrillation thought to arise from abnormal electrical activity in the right ventricle. This has been linked to an ion-channel gene mutation.

Of particular note, the lethal arrhythmias seen in cases of LQTS and other cardiac conduction disorders often occur during exercise and, in particular, during swimming. One should always consider the possibility of a cardiac conduction disorder when a good swimmer "drowns" for no apparent reason. Experimental studies in molecular genetics can now detect gene abnormalities in approximately 50 percent of those with ECG evidence of LQTS. Unfortunately, these genetic tests are only available on an experimental basis. Once again, unless the clinical diagnosis of LQTS is made prior to a sudden death, the forensic pathologist will not be able to establish this diagnosis at autopsy. As with WPW syndrome, if a forensic pathologist suspects that LQTS, or any other form of cardiac conduction disorder, is a potential cause of death, it is always wise to recommend that close family members undergo clinical and ECG examinations to rule out the possibility of familial disease. This is particularly true for any family member who has experienced "seizures," syncopal episodes, or palpitations for which no underlying cause has been established.

### Do

- Consider keeping appropriate blocks of tissue from the sinoatrial and atrioventricular nodes as "stock" when you have a sudden death where no obvious cause is identified at autopsy; this should be considered even more seriously if there is a past history of syncope, "seizures," or palpitations.

- Perform histology of the conducting system when there is a grossly visible abnormality of the interventricular septum.
- Consider the diagnosis of a cardiac conduction system disorder (particularly the long QT syndrome) when a good swimmer suddenly "drowns" or when an athletic person dies suddenly during exercise.
- Recommend clinical screening of a family when you diagnose a cardiac conduction system disorder. In addition, give serious consideration to recommending clinical screening of a family when you suspect there is such a disorder present but cannot definitively prove it.

***Don't***

- Be scared to suggest the presence of a cardiac conduction system disorder when the history and the circumstances of the death are right, but you are unable to find any histologic abnormality of the conducting system—often no histologic abnormality is seen in these disorders.
- Assume that a history of "seizures" means the primary pathology will be found in the brain—cardiac conducting system disorders can present as recurrent "seizures."

## Central nervous system disease

A number of the diseases traditionally considered as primary central nervous system pathologies are, in reality, diseases of the cardiovascular system (e.g., ruptured cerebral artery berry aneurysm, hypertensive intracerebral hemorrhage). Sudden death due to diseases of the central nervous system can be broadly classified into seizure-related disorders, intracranial hemorrhage of varying etiologies, meningitis, and tumors.

### Sudden unexpected death in epilepsy (SUDEP)

Epileptics can die suddenly in a variety of circumstances. Postictal unconsciousness can leave the individual in a position that compromises the airway, as illustrated in the case shown in **Images 4.74** through **4.76**. A more common variation of this is the epileptic who drowns as a result of having a seizure while taking a bath (**Image 4.77**). Seizures may also lead to secondary trauma including falls, fires, and motor vehicle collisions. Quite apart from these trauma-related deaths, status epilepticus is a recognized medical emergency that can cause death if the seizures are not brought under control. Although most physicians are aware of these types of seizure-related deaths, many are unaware of the fact that one of the most common means by which epileptics die is following a seizure that is no different from any other they have previously suffered in their lifetime. The actual mechanism by which these deaths occur is not currently understood, but would appear to be related to some



4.74



4.75



4.76

physiologic disruption of brainstem cardiac and/or respiratory function.

A 27-year-old male was found dead slumped against a bed in his room, with his head and neck hyperextended as shown earlier in **Image 4.74**. He had a history of poorly controlled seizures of unknown etiology that

arose while he was in his teens. At autopsy, there was ecchymosis of the tongue (**Image 4.75**) and an abrasion on the undersurface of the chin consistent with his terminal position (**Image 4.76**). No other injuries or natural disease processes were identified to account for death. In particular, there was no gross or histologic abnormality of the brain to account for a seizure disorder. The immediate cause of death was certified as "postural asphyxia" with the underlying cause of death being "idiopathic epilepsy."

Historical and circumstantial (scene and other) information are generally far more revealing than autopsy findings in cases of SUDEP. This is particularly true for traumatic deaths. Those individuals who simply die following a seizure often do so while sleeping. They may have a history of poorly controlled seizures and/or recently witnessed seizure activity, but in some cases the family will indicate that the decedent was seizure free for months, or even years, prior to the sudden death. If the person was in bed, he will usually be found on the floor beside it or with the bedding in a state of disarray (**Image 4.78**). There may be a small amount of white or blood-tinged foam on the mouth (**Image 4.79**) and within the airways. This is thought to be a sign of terminal respiratory failure and is a fairly common finding in deaths caused by central nervous system disease or injury, drowning, drugs, and sudden infant death syndrome. The tongue may have injuries consistent with biting, as shown in **Image 4.75**, but this is not universally present. Bite injuries of the tongue do not necessarily mean that a person had epilepsy; rather, they are simply an indicator of seizure-like activity, of any cause, close to the time of death. Another nonspecific but supportive finding is terminal urinary incontinence.

In the majority of epileptic deaths, no gross or histologic abnormality of the brain will be identified. These deaths are most common when the epilepsy arose in childhood or adolescence and can be attributed to "idio-

pathic epilepsy." The older a person is when seizure activity starts, the more likely there is to be some identifiable underlying disease process (e.g., tumor) to account for it, in which case that entity becomes the underlying cause of death. Postmortem toxicology often reveals subtherapeutic levels of anticonvulsant medications or even a complete absence of these medications.

A 53-year-old female with a history of intermittent seizures since the age of 12 was found dead in her bed. She had had a witnessed seizure earlier in the day. The only finding at autopsy was unilateral hippocampal sclerosis (**Images 4.80** and **4.81**). There was a subtherapeutic level of valproic acid in the postmortem blood.



4.78



4.79

4.77

Although repetitive seizures can cause bilateral hippocampal sclerosis, presumably due to hypoxic/ischemic injury of these watershed structures, unilateral hippocampal sclerosis is accepted as an underlying cause of seizures.

## Spontaneous intracranial hemorrhage

Berry aneurysms are generally located at the bifurcation points of major vessels in the circle of Willis. Those that rupture and cause sudden death are most commonly found in the anterior half of the circle of Willis. Ruptured aneurysms can vary from millimeters to centimeters in diameter, with smaller ones being easily missed without a diligent search. Although pathologists have long been taught to fix brains in formalin prior to neuropathologic examination, an exception should be made in the case of nontraumatic basal subarachnoid hemorrhage. It is much easier to remove the meninges and gently wash away subarachnoid blood to expose the circle of Willis in the fresh state. The aneurysm will generally be found in the vicinity of the heaviest concentration of subarach-noid blood. On occasion, berry aneurysms can rupture into the subdural space, producing a subdural hematoma that can appear to be traumatic in origin. Likewise, a berry aneurysm can also rupture primarily into the cerebral hemispheres, with extension into the lateral ventricles, thereby simulating a hypertensive intracerebral hemorrhage. Careful examination of the circle of Willis is therefore necessary to establish definitively the presence or absence of a ruptured berry aneurysm. Individuals who die of a ruptured berry aneurysm will often have a history of, or autopsy findings suggestive of, hypertension. Hypertension is thought to promote both the enlargement and rupture of berry aneurysms. Berry aneurysms can also be found in association with adult polycystic kidney disease. On occasion, large intact berry aneurysms can be found as completely incidental findings in deaths attributable to other causes (**Image 4.82**).

A 62-year-old morbidly obese female went outside to smoke a cigarette when she suddenly collapsed and died. At autopsy, there was basal subarachnoid hemorrhage concentrated primarily over the brainstem (**Image 4.83**). This was washed away, in the fresh state, to reveal a berry aneurysm located at the bifurcation of the basilar artery into the two posterior cerebral arteries (**Image 4.84**). There was a tiny perforation of the apex of the aneurysm (**Image 4.85**).

Spontaneous hemorrhage within the central nervous system, attributable to hypertension, arises primarily within the basal ganglia, but can also be found in the



4.80

Gliosis



4.81

Gliosis

Hippocampal Neurons



4.82