# **EXHIBIT B**


4.83


4.85


4.86


4.84

large intracerebral hematoma centered over the left basal ganglia (**Image 4.86**). This finding, together with concentric left ventricular hypertrophy, was in keeping with the history of hypertension.

## Arteriovenous malformations

Arteriovenous malformations are most frequently found within the distribution of the middle cerebral artery (**Images 4.87** and **4.88**), but can also occur in the midbrain, cerebellum, and spinal cord. They should be looked for whenever there is subarachnoid and/or intracerebral hemorrhage not clearly related to hypertension or a ruptured berry aneurysm. Although they are often large enough to be identified grossly, there are occasions where histologic examination of numerous sections of the blood within a hematoma will be needed in order to identify the malformation. Histologically, these lesions are composed of a collection of closely spaced arteries and veins often with intervening gliotic tissue and evidence of remote hemorrhage. The vessels themselves can be dilated or can have thickened walls with duplication of internal elastic lamina in arteries and "arteriolization" of the veins.

cerebellar hemispheres and the brainstem. Postmortem toxicology should be performed in order to rule out the presence of drugs that might cause an acute elevation of blood pressure (e.g., cocaine or methamphetamine), but there is more likely to be a clinical history of hypertension and/or autopsy evidence of concentric left ventricular hypertrophy. If none of these is present, it is still reasonable to attribute spontaneous hemorrhage in one of these three sites to hypertension, in the absence of any other vascular pathology, because hypertension is often clinically silent and does not always produce classical concentric left ventricular hypertrophy and benign nephrosclerosis.

A 57-year-old hypertensive male was found dead on the ground at his workplace. At autopsy, there was a









A 57-year-old female was found unconscious in her bathroom and died shortly after admission to hospital. She was reported to have had a bad cold for 2 weeks. She complained of a sinus headache and then started to vomit on the day of her death. At autopsy, there was an intracerebral hematoma, with intraventricular extension, arising from a large arteriovenous malformation centered over the right caudate nucleus (**Images 4.89** and **4.90**).

## Meningitis

The forensic pathologist will usually see bacterial meningitis in those who do not seek medical attention or in situations where a person seeks medical attention but is discharged home after a clinical diagnosis of viral flu-like illness is made. The diagnosis is normally quite easy to make on gross examination of the brain. Occasionally, however, purulent material will not be visible beneath the meninges, and the finding of meningitis will come as a surprise when histologic sections are examined. It is important for the pathologist to have a high index of suspicion for meningitis (or any form of overwhelming sepsis for that matter) in individuals who die following a flu-like illness. Postmortem blood cultures and/or cerebrospinal fluid cultures should be taken whenever the diagnosis is suspected. Intracranial cerebrospinal fluid is most easily obtained by puncture of the cisterna magna, following sterilization of the skin with iodine and alcohol (**Image 4.91**). A swab of the purulent meninges can also be submitted for culture if cerebrospinal fluid is not obtained. The three organisms that account for the majority of cases of bacterial meningitis in the adult population are *Streptococcus pneumoniae*, *Neisseria meningitidis*, and *Listeria monocytogenes*. It is important to report cases of meningitis to local public health officials, particularly if infection with *N. meningitidis* is suspected, because close contacts of the decedent (often including autopsy personnel) will require antibiotic prophylaxis.

A 38-year-old male was found dead in his home after a brief flu-like illness with headaches, nausea, and vomiting. At autopsy, purulent material was visible beneath the meninges (**Image 4.92**). Histologically, acute inflammatory cell infiltrates were found throughout the



4.91



4.92



4.93



4.94

meninges (**Image 4.93**) and Gram stains revealed gram-positive diplococci (**Image 4.94**). Postmortem cerebrospinal fluid cultures grew *S. pneumoniae.*

## Central nervous system tumors

The majority of tumors involving the central nervous system are diagnosed clinically. On occasion, the foren-sic pathologist will see primary or secondary involvement of the central nervous system by tumor in individuals whose deaths appear to be sudden and without much in the way of prior signs or symptoms. On other occasions, extremely large tumors will be incidental findings in individuals with another cause of death. **Image 4.95** shows a subependymoma in the fourth ventricle of a police officer who was shot in the line of duty. He had no known previous symptomatology. Likewise, **Image 4.96** shows an exceptionally large meningioma compressing the right cerebral hemisphere in a 62-year-old female who died of heart disease. She did not have any documented symptoms related to the meningioma.

This 55-year-old female was found dead on the floor of her residence. She had recently complained of dizziness and numbness on her left side, but was otherwise healthy. At autopsy, there was a tumor arising within the right side of the midbrain (**Image 4.97**) that was histologically proven to be a glioblastoma multiforme (**Image 4.98**).



4.95



4.96



4.97



4.98



4.99

## Colloid cysts

Colloid cysts are a rare cause of sudden death. They are often found in the anterior portion of the third ventricle, and usually present clinically in adulthood, causing severe headache that may be related to changes in the position of the head. Their location and relative mobility allow them to intermittently obstruct the foramen of Monro, such that they can cause hydrocephalus. This is also thought to be the mechanism by which they cause sudden death.

A 22-year-old female IV drug abuser was admitted to hospital complaining of severe frontal headache associated with nausea and vomiting over a 12-hour period. A CT scan revealed enlargement of the ventricles together with a mass in the vicinity of the pineal gland. She became comatose shortly after her admission and died. At autopsy, there was a colloid cyst of the third ventricle with hydrocephalus and cerebral edema (**Image 4.99**). The cyst had a low cuboidal epithelium on a thin

collagenous wall and was filled with PAS-positive amorphous material (**Image 4.100**; PAS stain).

***Do***

- Understand that epileptics can die suddenly after a seizure that appears no different from any other seizures they have had in their lifetime.
- Look for the underlying cause of seizures in those who die of a seizure disorder, because this will be the actual underlying cause of death.
- Wash away basal subarachnoid blood and examine the basal cerebral arteries at the time of autopsy, rather than after fixation, in order to identify the source of hemorrhage.
- Look for the source of subarachnoid hemorrhage in proximity to the heaviest concentration of subarachnoid blood.
- Look for historical or autopsy evidence of hypertension with a ruptured berry aneurysm and with a "spontaneous" intracerebral, intracerebellar, or brainstem hemorrhage.
- Look for gross or histologic evidence of an arteriovenous malformation when you encounter a "spontaneous" intracerebral, intracerebellar, brainstem, or spinal cord hemorrhage.
- Perform toxicology in order to rule out drugs, such as cocaine and amphetamines, as the underlying cause of a "spontaneous" intracerebral, intracerebellar, or brainstem hemorrhage.
- Perform cerebrospinal fluid, blood, and/or meningeal cultures whenever meningitis is suspected or found at autopsy.
- Inform a public health official whenever a diagnosis of meningitis is made.

***Don't***

- Assume that a bitten or injured tongue means an individual died as a result of a seizure or of "epilepsy."
- Assume that grossly normal meninges rule out meningitis.

## Respiratory system

The majority of diseases involving the respiratory system will present clinical signs and symptoms that result in a clinical diagnosis, such that if and when death occurs it is neither sudden nor unexpected. This is particularly true for chronic obstructive pulmonary disease and for most pulmonary malignancies. On occasion though, diseases of the respiratory system can cause sudden death and can even be quite dramatic in their presentation.

### Lobar pneumonia

Lobar pneumonia, which is most commonly caused by *Streptococcus pneumoniae*, is usually diagnosed clinically. In those who do not seek medical attention and proceed to die, a postmortem chest x-ray can be used to detect consolidative changes (**Image 4.101**).

A 58-year-old male alcoholic was found dead in his residence. He had a 2-day history of productive cough and had complained of feeling unwell, but did not seek medical attention. At autopsy, there was complete consolidation of the lower left lobe (**Image 4.102**), with histologic evidence of polymorph infiltrates filling the alveolar airspaces (**Image 4.103**). A Gram stain revealed the presence of gram-positive diplococci consistent with *S. pneumoniae*.

### *Pneumocystis carinii* pneumonia

Forensic pathologists must be aware of the numerous infections that can arise secondary to human immunodeficiency virus (HIV) infection and attempt to confirm the diagnosis with postmortem serology. Public health officers must be notified of either a possible or a con-



4.100



4.101

firmed diagnosis of HIV infection so that follow-up of close contacts of the decedent can be undertaken.

A 45-year-old male was found dead in his residence after he failed to show up for work. He had no recent medical history. At autopsy, both lungs exhibited complete consolidation of each lobe. Histologically, foamy eosinophilic material filled the alveoli (**Image 4.104**) and Grocott stains confirmed the presence of *Pneumocystis carinii* (**Image 4.105**). Significant postmortem hemolysis interfered with establishing a serological diagnosis of HIV infection, although this would be the most likely underlying cause of the pulmonary disease.

## Hantavirus infection

Some pulmonary infections (particularly those due to viruses) can present as diffuse alveolar damage. Hantavirus is transmitted to humans when they contact infected deer mouse (*Peromyscus maniculatus*) feces or urine. As such, it is most commonly encountered in rural settings. As with many viral infections, the affected individual will initially have nonspecific symptoms of a flu-like illness, but will then develop rapid onset of respiratory symptoms and hypotension. Death can occur within hours to days of the onset of symptoms. The lungs have the typical gross and histologic appearance of diffuse alveolar damage, without features specific for hantavirus. However, the diagnosis can be made by postmortem serology. Confirmatory serologic tests require nonformalin fixed lung tissue, so it is wise to freeze a small amount of fresh lung at autopsy if hantavirus pulmonary syndrome is suspected.

An 18-year-old male was found dead in bed at his rural home. He had a brief history of a flu-like illness, but had not sought medical attention. At autopsy, the



4.102



4.104



4.103



4.105

lungs weighed in excess of 1,000 grams each and exhibited histologic findings of diffuse alveolar damage (**Image 4.106**). Postmortem serology revealed IgG antibody to the Sin Nombre hantavirus. The diagnosis of hantavirus pulmonary syndrome was suspected prior to serological confirmation, due in part to a recent regional outbreak of hantavirus. Public health physicians discovered deer mouse droppings in the decedent's bedroom.

## Pulmonary artery thromboemboli

Traditionally thromboemboli are discussed in the context of diseases of the respiratory system, even though they are vascular in origin and their underlying causes generally have nothing to do with the respiratory system. It is not sufficient to simply determine that an individual has died of a pulmonary artery thromboembolus. Pulmonary thromboemboli and deep venous thrombi are immediate and intermediate causes of death, respectively, but do not reflect the actual underlying cause of death. Although natural disease processes can cause pulmonary thromboemboli, as in the case illustrated next,

they can also be caused by injury (e.g., deep venous thrombosis and embolization complicating immobilization of a fractured ankle in a cast).

When a pulmonary thromboembolus is found, one should attempt to identify the source of the embolus. Lethal pulmonary thromboemboli arise from large veins above the level of the knees, including the inferior vena cava, the renal veins, the common iliac veins, the external iliac veins, and the deep veins of the thighs. The latter can be examined by making an incision that extends from the medial third of the inguinal ligament down to the medial surface of the knee, reflecting the muscle, and opening the femoral and popliteal veins (**Image 4.107**). The only difficulty with this procedure is that the entire thrombus may embolize, such that the primary site of thrombosis cannot be seen. Another common method for examination of deep leg veins is to incise the midline of the calf, expose and reflect the gastrocnemius muscle, and then cross section and squeeze it to see if thrombi can be expressed from the veins at this level (**Image 4.108**). If thrombi are present in these smaller veins, the presumption is made that thrombi are also present in the large veins above the knee.

A 51-year-old male diabetic and previous alcoholic was found dead at home. Family members reported that he had been losing weight in recent months and that he appeared "sickly." At autopsy, a large coiled pulmonary thromboembolus was found within the pulmonary trunk and both main pulmonary arteries (**Image 4.109**). This arose from thrombi in the femoral vein of the right leg (**Image 4.110**). Furthermore, there was evidence of adenocarcinoma of the pancreas (**Images 4.111** and **4.112**) with metastases to the liver.

## Reactive airway disease

Extrinsic asthma is a relatively common disease, particularly in children, which both patient and parent often regard to be more of an inconvenience than a serious



4.106



4.107



4.108

illness. The reality is that asthma can be lethal within minutes of symptom onset. The typical findings at autopsy include hyperinflation of the lungs with thick mucous plugging of the bronchi. The chronicity of the disease is reflected by protrusion of bronchi above the cut surfaces of the lungs, produced by parabronchial hyperplasia, and by thickening of basement membranes and parabronchial inflammation, which usually includes numerous eosinophils. Difficulty is sometimes encountered in cases where hyperinflation of the lungs and mucous plugging are not particularly pronounced. In these cases, determining the cause of death lies, as always, in providing the most reasonable opinion, taking into account the history, the circumstances of the death, and the pathologic findings.

A 49-year-old male with a long history of asthma collapsed and died after complaining of shortness of breath and tightness of his chest. At autopsy, both lungs were hyperinflated such that they filled the pleural cavities (**Images 4.113** and **4.114**). There was gross evidence of mucous plugging within bronchi, which protruded



4.109



4.110



4.111



4.112



4.113



4.114



4.115



4.116



4.117

above the cut surfaces of the lungs (**Image 4.115**). Histologic examination confirmed the presence of mucous plugs within bronchi, thickening of bronchial basement membranes, parabronchial muscular hyperplasia, and parabronchial mixed inflammatory cell infiltrates, including numerous eosinophils (**Images 4.116** and **4.117**).

The forensic pathologist tends to see chronic obstructive pulmonary disease as an incidental finding in individuals dying of injuries or other natural diseases, rather than as the underlying cause of a sudden death. Emphysema (**Image 4.118**) and chronic bronchitis can be the underlying cause of cor pulmonale, with right ventricular hypertrophy (**Image 4.119**) and other clinical or autopsy findings of right-sided heart failure. These individuals may have terminal arrhythmias that would make their death seem "sudden." They are also prone to developing pulmonary thromboemboli, pneumothorax, and bronchopneumonia. The latter two entities can be identified by postmortem chest x-ray (**Images 4.120** and **4.121**).

One of the more dramatic ways that pulmonary disease may make itself known is by massive hemoptysis with sudden death. This is usually caused by a malignant lung tumor, but can also be caused by tuberculosis (**Image 4.122**) or conceivably by any other necrotizing pulmonary disease.

A 58-year-old female was found dead in her bed with blood emanating from her mouth (**Image 4.123**). The blood was found to arise from a previously undiagnosed



4.118



4.119



4.120



4.121



4.122



4.123

squamous cell carcinoma of the lung that had invaded a pulmonary artery branch and an adjacent bronchus (**Image 4.124**), thus forming a bronchoarterial fistula with rapid exsanguination.

### Do

- Consider the use of postmortem chest x-rays as a means of diagnosing significant and/or lethal pulmonary disease, particularly if the next of kin are objecting to an autopsy.
- Perform histology, lung tissue or blood cultures, and postmortem serology, and also freeze a small piece of fresh lung, in cases where there is gross evidence of an "atypical" pneumonia or diffuse alveolar damage.
- Remember that acute asthmatic exacerbations can rapidly progress to death in some cases.
- Search for the thrombotic source and the underlying cause of pulmonary thromboemboli.

### Don't

- Forget that the incidence of tuberculosis is on the rise and that it can be spread more easily to the unwary pathologist and autopsy personnel than some of the viruses that most people are more conscious and fearful of (e.g., HIV).

## Gastrointestinal system

Diseases of the gastrointestinal system tend not to present as sudden death, but rather with signs and symptoms that warrant medical attention. In some cases, however, avoidance of physicians, ignoring of symptoms, or vagueness of symptoms can create situations where there is at least an appearance that the death was sudden. Bleeding gastric or duodenal ulcers (usually benign, but occasionally malignant) are one of the most common gastrointestinal diseases that will present in this manner, and the scene can be as dramatic as that for massive hemoptysis. Coffee-ground emesis is a good indicator of hemorrhage arising from an ulcer, because the blood must pass through the acid of the stomach, but occasionally the rapidity of hemorrhage can produce the same bright red bleeding that one would see with hemoptysis or bleeding esophageal varices. In cases where the bleeding is slower, there may not be any hematemesis but altered blood will extend throughout the small bowel and colon.

A 56-year-old female was found dead in her bedroom. Her face and the bed were covered with thick coffee-ground emesis (**Image 4.125**) and a pail located adjacent to the bed contained similar material. At autopsy, the upper gastrointestinal tract contained a large quantity of altered blood. The blood was found to originate from a large chronic duodenal ulcer that had eroded into the lumen of an artery in its base (**Images 4.126** and **4.127**).



4.125



4.126

4.124

## Perforation of gastric and peptic ulcers

Another presentation of gastric and duodenal ulcers as a cause of "sudden death" is peritonitis arising from ulcer perforation (**Image 4.128**). In fact, whenever peritonitis is encountered at autopsy it is wise to check the *gastric antrum* and the *duodenum* first as the most likely sites of gastrointestinal perforation. As with any perforated viscus, one will tend to see tense abdominal distention on external examination. If a postmortem x-ray is obtained, free air will be present in the peritoneal cavity, although it may not necessarily be located below the diaphragm as seen in an upright antemortem abdominal x-ray.

An 8-year-old female child presented to the emergency room of a hospital with a 2-day history of fever, abdominal pain, and vomiting. Her parents took her home after waiting 2 hours without seeing a physician. Several hours later, they took her to a walk-in clinic where a diagnosis of peritonitis was made. She was transferred to hospital for an emergency laparotomy and was found to have a ruptured acutely inflamed appendix (**Image 4.129**). Postoperatively she developed sepsis and subsequently died.

## Complications of appendicitis

Although not regarded as sudden death, the forensic pathologist may come across rare cases of ruptured appendix with peritonitis, typically when there are concerns about the medical care that a patient received in an emergency room or walk-in medical clinic. Clinically differentiating acute appendicitis and other acute gastrointestinal inflammations (e.g., diverticulitis) from viral flu-like illnesses can be difficult, occasionally leading to the discharge of a patient with an incorrect diagnosis and significant risk of dying with peritonitis and/or sepsis.

Finally, as a further comment on how some individuals can simply adjust to or put up with the symptoms of acute-on-chronic disease, this 41-year old male was found dead in his chair while he was watching television. His family was home at the time, and he had not complained to them about feeling unwell. At autopsy, there was an extremely large indirect inguinal hernia (**Image 4.130**), which both the patient and the family had known about for quite some time, although medical treatment had not been sought. The small bowel within



4.127



4.128



4.129



4.130

the hernia was strangulated and perforated, such that there was generalized peritonitis.

## Endocrine system

### Diabetes mellitus

Although endocrine diseases do not account for a large number of sudden natural deaths, it is surprising how, on occasion, an individual can ignore the symptoms of a serious endocrine imbalance and subsequently be found dead. The family may be completely unaware of any illness or may only know of vague complaints made by the decedent. In addition, those with known endocrine disorders can die rapidly of an acute exacerbation of their disease, usually brought on by infection or by poor compliance with treatment.

Undiagnosed diabetes mellitus may be discovered unintentionally when high levels of acetone appear in a postmortem blood ethanol screen. Previously diagnosed insulin-dependent diabetics who develop viral flu-like illnesses, with vomiting and diarrhea, may decide not to take insulin simply because they do not feel well enough to eat. These individuals will develop rapid onset of diabetic ketoacidosis and may die in as little as a few hours without medical attention. One may see death caused by a nonketotic hyperosmolar state in a non-insulin-dependent diabetic. Therefore, it is always wise to check the postmortem vitreous glucose level in known diabetics, even when there seems to be another plausible cause of death.

A 34-year-old male was found dead on a sofa in his home (**Image 4.131**). He had a recent history of weight loss, but had not seen a physician for quite some time. At autopsy, he had an inflamed ulcer over the back of his right shoulder and significant atherosclerotic coronary artery disease. A blood ethanol concentration was performed as a matter of routine. No ethanol was present, but high levels of acetone were detected. The postmortem vitreous glucose was subsequently found to be 315 mg/100 mL (17.5 mmol/L), in keeping with a diagnosis of ketoacidosis arising secondary to undiagnosed type I diabetes mellitus.

Blood glucose concentrations decrease rapidly after death and are therefore not reliable for detecting hyperglycemia. The vitreous glucose, which correlates well with antemortem blood glucose, is more stable postmortem and is therefore a better test to perform. Vitreous glucose is only good for detecting hyperglycemia. Hypoglycemia cannot be reliably established because the blood and vitreous glucose levels decline after death. Standard visual blood (not urine) glucose strips can be used as a rapid screen for determining postmortem vitreous glucose levels at the time of external examination or autopsy (**Image 4.132**). Unfortunately, many of the inexpensive electronic monitors, used by diabetics to monitor their blood glucose levels, do not work well with vitreous.

### Polyglandular autoimmune syndromes

The polyglandular autoimmune syndromes are autoimmune disorders that affect two or more endocrine organs. Type II polyglandular autoimmune syndrome typically occurs in adult females and is defined as any combination of Hashimoto's thyroiditis, hypoparathyroidism, adrenal insufficiency, and gonadal failure. Type I diabetes mellitus and a myriad of autoimmune disorders are also common in these individuals. The possibility of type II polyglandular autoimmune syndrome with acute adrenal failure should be considered in any individual with a history of diabetes and thyroid disease who dies rapidly during the course of a flu-like illness. Gross and histologic examination of the adrenal glands, together with postmortem plasma cortisol levels, will confirm the diagnosis. Most cases are sporadic, but there



4.131



4.132

is some indication that the disorder is autosomal dominant with variable penetrance. It is also known to be associated with HLA alleles B8 and DR3.

A 28-year-old diabetic female with hypothyroidism was found dead in her home after 24 hours of nausea and vomiting for which she had not sought medical attention. At autopsy, the thyroid gland was small and showed the typical histologic appearance of Hashimoto's thyroiditis (**Image 4.133**). The adrenal glands were very difficult to find, with **Image 4.134** depicting a cross section of one entire gland. The cortices were depleted and contained chronic inflammatory cell infiltrates. The residual cortical cells had abundant eosinophilic cytoplasm and atypical nuclei (**Image 4.135**). The postmortem vitreous glucose was elevated, but there was no ketoacidosis. The postmortem plasma cortisol level was 6.2 μg/100 mL or 171 nmol/L (normal a.m. = 5 to 25 μg/100 mL or 140 to 690 nmol/L; normal p.m. = 3 to 12 μg/100 mL or 80 to 330 nmol/L). Although the cortisol level was in the lower range of normal, it should have been much higher given the history of a recent flu-like illness. A diagnosis of acute Addisonian

crisis arising in an individual with type II polyglandular autoimmune syndrome (Schmidt syndrome) was made.

This 38-year-old male was admitted to hospital in heart failure, with a 1-week history of fever, orthopnea, and peripheral edema. He suffered a cardiac arrest shortly after admission. Prior to his cardiac arrest, a clinical diagnosis of thyrotoxicosis was considered. Antemortem thyroid function tests showed depressed thyroid-stimulating hormone and elevated serum thyroxine. Autopsy demonstrated left ventricular hypertrophy and dilatation of the heart with patchy fibrous expansion of the myocardium. The diffusely enlarged thyroid weighed 115 grams. The thyroid follicles were small, lacked colloid, and were lined by tall columnar epithelial cells with formation of papillae (**Image 4.136**). These features are quite typical of diffuse toxic goiter in Grave's disease.

This death would not be considered sudden in the strictest sense of the term, but it does illustrate how rapidly thyrotoxicosis can progress to serious illness, and rarely death, if left untreated. Cardiac signs and


4.133


4.135


4.134


4.136

symptoms, including tachycardia, atrial fibrillation, and cardiomegaly are frequent presenting features in hyperthyroidism, with possible progression to congestive heart failure. Cardiac pathology is not particularly specific, but includes left ventricular hypertrophy, a generalized increase in interstitial fibrous tissue, and occasional focal lymphocytic and eosinophilic inflammatory cell infiltrates. Thyroid function tests, particularly thyroid-stimulating hormone and serum thyroxine levels, can be performed on postmortem blood samples.

### Do

- Consider undiagnosed diabetes mellitus as a potential cause of death in cases of "sudden" death where there are no significant anatomic findings, particularly if there is a recent history of weight loss, polyuria, and/or polydipsia.
- Examine the adrenal glands carefully in cases of death following a "flu-like" illness in individuals with a combination of diabetes mellitus and hypothyroidism; order postmortem plasma cortisol levels if the adrenals appear to be small.

### Don't

- Measure postmortem glucose levels in blood; instead, use the vitreous humor.
- Make a diagnosis of hypoglycemia based on postmortem vitreous glucose levels.

## Sepsis

An overwhelming variety of bacterial and viral infectious diseases can present as sudden death. The key to making a diagnosis at autopsy is to have a high index of suspicion for sepsis and to order appropriate postmortem tests, including blood cultures and occasionally blood or cerebrospinal fluid serology. An indication of potential sepsis at autopsy is the finding of extremely

rapid decomposition, particularly if the body has been properly refrigerated. In **Image 4.137** marbling is evident on the legs in spite of the fact that the decedent had died only 4 hours previously and his body had been refrigerated during most of that time.

A young child was admitted to hospital with a history of vomiting, diarrhea, and cough. She was febrile and dehydrated. Although intravenous fluids were started, she deteriorated rapidly and died within hours of admission. At autopsy, there were skin and visceral petechiae, together with purpura (**Image 4.138**). The adrenal glands were hemorrhagic (**Image 4.139**), but no localized site of infection was identified. In particular, there was no evi-



4.138



4.137

4.139

dence of meningitis. The death was reported to a public health officer on the presumption that this was a case of meningococcemia with Waterhouse-Friderichsen syndrome, however the postmortem blood cultures grew *Streptococcus pneumoniae*.

Investigation of possible sepsis-related deaths should include inquiries at the hospital laboratory as to the results of any antemortem blood cultures. Postmortem blood cultures do work, though, particularly if one obtains a pure culture of a pathogenic organism that fits with the clinical picture and the autopsy findings. Postmortem blood cultures can be taken via subclavian or femoral puncture, after sterilization of the skin with poviodine followed by an alcohol swab (**Image 4.140**). Blood cultures can also be obtained internally by opening the pericardial sac, having an assistant lift the heart by its apex, and obtaining blood from the right atrium (**Image 4.141**). Because the pericardial sac is sterile, with the possible exception of any bacteria causing a septic process, there is no need to sterilize the pericardial surface of the atrium with poviodine and alcohol or with heat.

A 40-year-old female was admitted to hospital with abdominal pain and hypotension. She was thought to be septic. She had been seen in the same emergency room on three different occasions over the previous couple of days, complaining of left-sided flank pain. Antemortem blood work including blood cultures were collected, but failed to grow any bacterial organisms. Her symptoms had been attributed to renal colic and she had been discharged on each occasion after receiving pain relievers. At the time of her final admission, she deteriorated rapidly and died. At autopsy, both kidneys exhibited the typical gross and histologic findings of acute pyelonephritis (**Images 4.142** and **4.143**). Antemortem blood cultures were collected after antibiotics had been started and failed to grow any bacterial organisms.



4.142



4.140



4.141



4.143

Urosepsis is most commonly encountered in those with neurogenic bladders or obstructive uropathy. On occasion, the forensic pathologist will see the sudden death of a previously healthy person caused by sepsis arising from undiagnosed acute pyelonephritis. Use of the diagnosis "urosepsis" and other infections as cause of death statements on clinician-provided death certificates should cause death investigators to ask for more information as to the proximate cause of death. Such phraseology is commonplace amongst clinicians, particularly those who are involved in the treatment of paraplegic and quadriplegic patients. This particular group of patients is most likely to have an underlying cause of death of unnatural origin (motor vehicle accidents, gunshot wounds, etc.).

### Do

- Obtain postmortem blood cultures whenever you have reason to believe an individual has died as a result of sepsis.
- Interpret postmortem blood cultures with caution, paying particular attention to whether an organism grown in a postmortem culture makes clinical sense and whether it grows as a pure or mixed culture.
- Report any death where you suspect infection with *Neisseria meningitidis* to a public health official.

### Don't

- Assume that an individual dying with autopsy evidence of the Waterhouse-Friderichsen syndrome will always have sepsis due to *N. meningitidis*.

## Chronic ethanol abuse

Deaths arising from the acute toxic effects of ethanol and from the wide variety of injuries that acutely intoxicated individuals can inflict upon themselves and others presented elsewhere in this volume. This discussion will be limited to those diseases that reflect the chronic abuse of ethanol. The propensity of chronic alcoholics to develop lobar pneumonia has been covered previously under diseases of the respiratory system, while alcoholic cardiomyopathy was briefly mentioned in the cardiovascular system.

As with bleeding peptic ulcers and bronchoarterial fistulas, bleeding esophageal varices can produce a dramatic scene that may initially appear to be suspicious for violence. It will be rapidly evident that the blood originates from the mouth, as opposed to any injury, and the autopsy findings of bleeding esophageal varices associated with micronodular cirrhosis of the liver will confirm this impression.

A 68-year-old male with a history of chronic ethanol abuse was found dead in his washroom with blood spattered on his clothing, the floor, and in a small bucket at his feet (**Image 4.144**). At autopsy, he was found to have micronodular cirrhosis and diffuse fatty change of the liver (**Images 4.145** and **4.146**). The blood arose from esophageal varices (**Image 4.147**).



4.144



4.145



4.146

Chronic alcoholics can die suddenly and unexpectedly, with the only significant findings at autopsy being diffuse fatty change of the liver (and occasionally cirrhosis and/or background alcoholic hepatitis) together with toxicologic findings of either no or a nonlethal ethanol level in the blood. These deaths are attributed to chronic ethanol abuse; however, the exact mechanism by which death occurs is still not clearly understood. In some cases, there may be evidence of alcoholic ketoacidosis, whereas in others there may be an observation of seizure-like activity, suggestive of withdrawal seizures, prior to death. In most, however, no clear pathophysiologic derangement can be identified. Theories as to potential mechanisms of death include QT prolongation with cardiac arrhythmias, hypoglycemia, electrolyte imbalances, and even pulmonary fat emboli arising from the liver.

A 52-year-old female with a history of alcohol abuse was found dead in her motel room. At autopsy, there was diffuse fatty change of the liver, together with Mallory's hyaline within hepatocytes and some acute inflammation consistent with alcoholic hepatitis (**Image 4.148**).

The postmortem blood alcohol concentration was 0.24 g percent (52 mmol/L). The cause of death was attributed to chronic ethanol abuse.

Ethanol abuse is one of the major causes of both acute and chronic pancreatitis, but acute hemorrhagic pancreatitis is seen less commonly as an immediate cause of death in alcoholics than those deaths associated with diffuse fatty change of the liver or with complications of cirrhosis.

A 38-year-old female, with a history of chronic ethanol abuse, was found dead in her home. She had been complaining of abdominal pain associated with nausea and vomiting, but had not sought medical attention for this. At autopsy, there was retroperitoneal hemorrhage (**Image 4.149**) arising as a result of acute hemorrhagic pancreatitis (**Images 4.150** and **4.151**).

### Do

● Realize that chronic alcoholics can die suddenly and unexpectedly with the only significant findings at autopsy being diffuse fatty change of the liver and a nonlethal level of ethanol in the blood. The cause of death is chronic ethanol abuse; the mechanism of death is not known.

### Don't

● Automatically assume that a chronic alcoholic has died as a result of their ethanol abuse—some proportion of alcoholics die of completely unrelated disease.
● Automatically assume that a chronic alcoholic with an upper gastrointestinal hemorrhage has cirrhosis and



4.147

4.148



4.149



4.150



4.151

bleeding esophageal varices—many will have other causes of upper gastrointestinal hemorrhage.

- Automatically assume that a chronic alcoholic has diffuse fatty change of the liver and/or micronodular cirrhosis—many chronic alcoholics have grossly and histologically normal livers at autopsy.

## Acknowledgments

The author would like to acknowledge and thank Deanna van Dusen of the Office of the Chief Medical Examiner in Edmonton, Alberta, Canada, for her assistance in the preparation of the manuscript for this chapter; Dr. Bernard Bannach of the Office of the Chief Medical Examiner in Edmonton, Alberta, Canada, and Katherine Peden, a medical student at the Faculty of Medicine, Dentistry and Nursing of the University of Dundee in Dundee, Scotland, for their assistance in reviewing the manuscript; Dr. Dan Straathof of the Department of Pathology and Laboratory Medicine at the Royal Columbian Hospital in New Westminster, British Columbia, Canada, for his assistance in obtaining a number of the images; and Matthew Spidell and Cyril Chan-Chiang (retired) of the Office of the Chief Medical Examiner in Alberta, Canada, who took most of the photographs used in this chapter.

## References

### ATHEROSCLEROTIC CARDIOVASCULAR DISEASE

Buja LM, Willerson JT. The role of coronary artery lesions in ischemic heart disease: insights from recent clinicopathologic, coronary arteriographic, and experimental studies. Hum Pathol 1987;18(5):451–61.

Buja LM, Willerson JT. Relationship of ischemic heart disease to sudden death. J Forensic Sci 1991;36(1):25–33.

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

Davies MJ. Anatomic features in victims of sudden coronary death. Coronary artery pathology. Circulation 1992;85(1 Suppl):I19–24.

Davies MJ, Popple A. Sudden unexpected cardiac death—a practical approach to the forensic problem. Histopathology 1979;3(4):255–77.

Davis JH, Wright RK. The very sudden cardiac death syndrome—a conceptual model for pathologists. Hum Pathol 1980;11(2):117–21.

DiMaio V, DiMaio D. *Forensic Pathology*, 2 ed. Boca Raton, FL: CRC Press; 2001.

Farb A, Tang AL, Burke AP, Sessums L, Liang Y, Virmani R. Sudden coronary death. Frequency of active coronary lesions, inactive coronary lesions, and myocardial infarction. Circulation 1995;92(7):1701–9.

Frishman WH, Del Vecchio A, Sanal S, Ismail A. Cardiovascular manifestations of substance abuse part 1: cocaine. Heart Dis 2003;5(3):187–201.

Fuster V, Badimon L, Badimon JJ, Chesebro JH. The pathogenesis of coronary artery disease and the acute coronary syndromes (1). N Engl J Med 1992;326(4):242–50.

Fuster V, Badimon L, Badimon JJ, Chesebro JH. The pathogenesis of coronary artery disease and the acute coronary syndromes (2). N Engl J Med 1992;326(5):310–18.

Knight B. *Forensic Pathology*, 2 ed. London: Arnold; 1996.

Roberts WC. Sudden cardiac death: a diversity of causes with focus on atherosclerotic coronary artery disease. Am J Cardiol 1990;65(4):13B–19B.

Roberts WC, Kragel AH, Gertz SD, Roberts CS. Coronary arteries in unstable angina pectoris, acute myocardial infarction, and sudden coronary death. Am Heart J 1994;127(6):1588–93.

Shirani J, Berezowski K, Roberts WC. Out-of-hospital sudden death from left ventricular free wall rupture during acute myocardial infarction as the first and only manifestation of atherosclerotic coronary artery disease. Am J Cardiol 1994;73(1):88–92.

Virmani R, Roberts WC. Sudden cardiac death. Hum Pathol 1987;18(5):485–92.

Virmani R, Burke AP, Farb A. Sudden cardiac death. Cardiovasc Pathol 2001;10(5):211–18.

Worthley SG, Osende JI, Helft G, Badimon JJ, Fuster V. Coronary artery disease: pathogenesis and acute coronary syndromes. Mt Sinai J Med 2001;68(3):167–81.

### HYPERTENSIVE CARDIOVASCULAR DISEASE

Anderson KR. Hypertension and sudden cardiac death. NZ Med J 1982;95(700):33–4.

Beighton P, de Paepe A, Danks D, Finidori G, Gedde-Dahl T, Goodman R, et al. International Nosology of Heritable Disorders of Connective Tissue, Berlin, 1986. Am J Med Genet 1988;29(3):581–94.

Borhani NO. Left ventricular hypertrophy, arrhythmias and sudden death in systemic hypertension. Am J Cardiol 1987;60(17):13I–18I.

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

DeSanctis RW, Doroghazi RM, Austen WG, Buckley MJ. Aortic dissection. N Engl J Med 1987;317(17):1060–7.

DiMaio V, DiMaio D. *Forensic Pathology*, 2 ed. Boca Raton, FL: CRC Press; 2001.

Frohlich ED. Cardiac hypertrophy in hypertension. N Engl J Med 1987;317(13):831–3.

Frohlich ED, Apstein C, Chobanian AV, Devereux RB, Dustan HP, Dzau V, et al. The heart in hypertension. N Engl J Med 1992;327(14):998–1008.

Gilchrist D, Hunter A, MacDonald I, Chan K. Marfan syndrome: experience of the multidisciplinary Canadian Marfan Association National Clinic. Ann Roy Coll Physicians Surgeons Canada 1995;28:348–52.

Knight B. *Forensic Pathology*, 2 ed. London: Arnold; 1996.

Larson EW, Edwards WD. Risk factors for aortic dissection: a necropsy study of 161 cases. Am J Cardiol 1984;53(6):849–55.

McLenachan JM, Henderson E, Morris KI, Dargie HJ. Ventricular arrhythmias in patients with hypertensive left ventricular hypertrophy. N Engl J Med 1987;317(13):787–92.

Roberts WC. Aortic dissection: anatomy, consequences, and causes. Am Heart J 1981;101(2):195–214.

Scully R, Mark E, McNeely W, McNeely B. Case records of the Massachusetts General Hospital. Case 28-1987. N Engl J Med 1987;317:99–108.

## VALVULAR DISEASE

Atkinson JB, Virmani R. Infective endocarditis: changing trends and general approach for examination. Hum Pathol 1987;18(6):603–8.

Buchbinder NA, Roberts WC. Left-sided valvular active infective endocarditis. A study of forty-five necropsy patients. Am J Med 1972;53(1):20–35.

Cohle SD, Graham MA, Dowling G, Pounder DJ. Sudden death and left ventricular outflow disease. Pathol Annu 1988;23 Pt 2:97–124.

Cohle SD, Graham MA, Sperry KL, Dowling G. Unexpected death as a result of infective endocarditis. J Forensic Sci 1989;34(6):1374–86.

Davies M. Non-rheumatic disorders of the heart valves. In: Anthony P, Woolf N, editors. *Recent Advances in Histopathology*, No. 10. Edinburgh: Churchill Livingstone; 1978; pp. 139–58.

DeMaria AN, Amsterdam EA, Vismara LA, Neumann A, Mason DT. Arrhythmias in the mitral valve prolapse syndrome. Prevalence, nature, and frequency. Ann Intern Med 1976;84(6):656–60.

Dollar AL, Roberts WC. Morphologic comparison of patients with mitral valve prolapse who died suddenly with patients who died from severe valvular dysfunction or other conditions. J Am Coll Cardiol 1991;17(4):921–31.

Dowling GP, Buja ML. Sudden death due to left coronary artery occlusion in infective endocarditis. Arch Pathol Lab Med 1988;112(9):932–4.

Knight B. *Forensic Pathology*, 2 ed. London: Arnold; 1996.

Pomerance A. Pathogenesis of aortic stenosis and its relation to age. Br Heart J 1972;34(6):569–74.

Roberts WC. Anatomically isolated aortic valvular disease. The case against its being of rheumatic etiology. Am J Med 1970;49(2):151–9.

Roberts WC. The congenitally bicuspid aortic valve. A study of 85 autopsy cases. Am J Cardiol 1970;26(1):72–83.

Roberts WC. Congenital cardiovascular abnormalities usually "silent" until adulthood: morphologic features of the floppy mitral valve, valvular aortic stenosis, discrete subvalvular aortic stenosis, hyper-

trophic cardiomyopathy, sinus of Valsalva aneurysm, and the Marfan syndrome. Cardiovasc Clin 1979;10(1):407–53.

Scheurman EH. Myxoid heart disease: a review with special emphasis on sudden cardiac death. Forensic Sci 1989;40(3):203–10.

Scully R, Mark E, McNeely W, McNeely B. Case records of the Massachusetts General Hospital. Case 28-1988. N Engl J Med 1988;319:101–8.

Sung CS, Price EC, Cooley DA. Discrete subaortic stenosis in adults. Am J Cardiol 1978;42(2):283–90.

Virmani R, Atkinson JB, Forman MB, Robinowitz M. Mitral valve prolapse. Hum Pathol 1987;18(6):596–602.

## NONATHEROSCLEROTIC CORONARY ARTERY DISEASE

Brody GL, Burton JF, Zawadzki ES, French AJ. Dissecting aneurysms of the coronary artery. N Engl J Med 1965;273:1–6.

Buja LM, Hillis LD, Petty CS, Willerson JT. The role of coronary arterial spasm in ischemic heart disease. Arch Pathol Lab Med 1981;105(5):221–6.

Cheitlin MD, McAllister HA, de Castro CM. Myocardial infarction without atherosclerosis. JAMA 1975;231(9):951–9.

Claudon DG, Claudon DB, Edwards JE. Primary dissecting aneurysm of coronary artery. A cause of acute myocardial ischemia. Circulation 1972;45(2):259–66.

Cohle SD, Graham MA, Pounder DJ. Nonatherosclerotic sudden coronary death. Pathol Annu 1986;21 Pt 2:217–49.

Dowling GP, Buja LM. Spontaneous coronary artery dissection occurs with and without periadventitial inflammation. Arch Pathol Lab Med 1987;111(5):470–2.

Eggebrecht H, Möhlenkamp S. Images in clinical medicine. Myocardial bridging. N Engl J Med 2003;349(11):1047.

Morales AR, Romanelli R, Boucek RJ. The mural left anterior descending coronary artery, strenuous exercise and sudden death. Circulation 1980;62(2):230–7.

Mulvany NJ, Ranson DL, Pilbeam MC. Isolated dissection of the coronary artery: a postmortem study of seven cases. Pathology 2001;33(3):307–11.

Myerburg RJ, Kessler KM, Mallon SM, Cox MM, deMarchena E, Interian A, Jr., et al. Life-threatening ventricular arrhythmias in patients with silent myocardial ischemia due to coronary-artery spasm. N Engl J Med 1992;326(22):1451–5.

Roberts WC, Curry RC, Jr., Isner JM, Waller BF, McManus BM, Mariani-Constantini R, et al. Sudden death in Prinzmetal's angina with coronary spasm documented by angiography. Analysis of three necropsy patients. Am J Cardiol 1982;50(1):203–10.

Robinowitz M, Virmani R, McAllister HAJ. Spontaneous coronary artery dissection and eosinophilic inflammation: a cause and effect relationship? Am J Med 1982;72(6):923–8.

Scully R, Mark E, McNeely W, McNeely B. Case records of the Massachusetts General Hospital. Case 22-1989. N Engl J Med 1989;320:1475–83.

Virmani R, Chun PK, Goldstein RE, Robinowitz M, McAllister HA. Acute takeoffs of the coronary arteries along the aortic wall and congenital coronary ostial valve-like ridges: association with sudden death. J Am Coll Cardiol 1984;3(3):766–71.

Virmani R, Forman MB, Robinowitz M, McAllister HA, Jr. Coronary artery dissections. Cardiol Clin 1984;2(4):633–46.

## MYOCARDITIS

Claydon SM. Myocarditis as an incidental finding in young men dying from unnatural causes. Med Sci Law 1989;29(1):55–8.

Feldman AM, McNamara D. Myocarditis. N Engl J Med 2000; 343(19):1388–98.

Scully R, Mark E, McNeely B. Case records of the Massachusetts General Hospital. Case 18-1986. N Engl J Med 1986;314(19):1240–47.

Theleman KP, Kuiper JJ, Roberts WC. Acute myocarditis (predominately lymphocytic) causing sudden death without heart failure. Am J Cardiol 2001;88(9):1078–83.

Weinstein C, Fenoglio JJ. Myocarditis. Hum Pathol 1987;18(6):613–18.

## CARDIOMYOPATHY

Clark CE, Henry WL, Epstein SE. Familial prevalence and genetic transmission of idiopathic hypertrophic subaortic stenosis. N Engl J Med 1973;289(14):709–14.

Davies MJ. The cardiomyopathies: a review of terminology, pathology and pathogenesis. Histopathology 1984;8(3):363–93.

Davies MJ. The investigation of sudden cardiac death. Histopathology 1999;34(2):93–8.

Edwards WD. Cardiomyopathies. Hum Pathol 1987;18(6):625–35.

Gallo P, d'Amati G, Pelliccia F. Pathologic evidence of extensive left ventricular involvement in arrhythmogenic right ventricular cardiomyopathy. Hum Pathol 1992;23(8):948–52.

Goodin JC, Farb A, Smialek JE, Field F, Virmani R. Right ventricular dysplasia associated with sudden death in young adults. Mod Pathol 1991;4(6):702–6.

Gravanis MB, Ansari AA. Idiopathic cardiomyopathies. A review of pathologic studies and mechanisms of pathogenesis. Arch Pathol Lab Med 1987;111(10):915–29.

Grigg LE, Chan W, Mond HG, Vohra JK, Downey WF. Ventricular tachycardia and sudden death in myotonic dystrophy: clinical, electrophysiologic and pathologic features. J Am Coll Cardiol 1985;6(1):254–6.

Homans DC. Peripartum cardiomyopathy. N Engl J Med 1985;312(22):1432–7.

Lobo FV, Heggtveit HA, Butany J, Silver MD, Edwards JE. Right ventricular dysplasia: morphological findings in 13 cases. Can J Cardiol 1992;8(3):261–8.

Marcus F, Ott P. Arrhythmogenic right ventricular dysplasia/cardiomyopathy. In: Berul C, Towbin J, editors. *Molecular Genetics of Cardiac Electrophysiology*. Boston: Kluwer Academic Publishers; 2000; pp. 239–50.

Maron BJ. Hypertrophic cardiomyopathy: a systematic review. JAMA 2002;287(10):1308–20.

Maron BJ, Bonow RO, Cannon RO, 3rd, Leon MB, Epstein SE. Hypertrophic cardiomyopathy. Interrelations of clinical manifestations, pathophysiology, and therapy (1). N Engl J Med 1987;316(13):780–9.

Maron BJ, Bonow RO, Cannon RO, 3rd, Leon MB, Epstein SE. Hypertrophic cardiomyopathy. Interrelations of clinical manifestations, pathophysiology, and therapy (2). N Engl J Med 1987;316(14):844–52.

Maron BJ, Epstein SE. Hypertrophic cardiomyopathy. Recent observations regarding the specificity of three hallmarks of the disease: asymmetric septal hypertrophy, septal disorganization and systolic anterior motion of the anterior mitral leaflet. Am J Cardiol 1980;45(1):141–54.

Maron BJ, Lipson LC, Roberts WC, Savage DD, Epstein SE. "Malignant" hypertrophic cardiomyopathy: identification of a subgroup of families with unusually frequent premature death. Am J Cardiol 1978;41(7):1133–40.

Maron BJ, Wolfson JK, Epstein SE, Roberts WC. Morphologic evidence for "small vessel disease" in patients with hypertrophic cardiomyopathy. Z Kardiol 1987;76 Suppl 3:91–100.

Okia Z, Wetli C. Arrythmogenic right ventricular dysplasia and sudden death. Am Soc Clin Pathologists Forensic Pathology Check Sample 1999;41:75–92.

Phillips MF, Harper PS. Cardiac disease in myotonic dystrophy. Cardiovasc Res 1997;33(1):13–22.

Roberts WC. Congenital cardiovascular abnormalities usually "silent" until adulthood: morphologic features of the floppy mitral valve, valvular aortic stenosis, discrete subvalvular aortic stenosis, hypertrophic cardiomyopathy, sinus of Valsalva aneurysm, and the Marfan syndrome. Cardiovasc Clin 1979;10(1):407–53.

Thiene G, Nava A, Corrado D, Rossi L, Pennelli N. Right ventricular cardiomyopathy and sudden death in young people. N Engl J Med 1988;318(3):129–33.

## CARDIAC CONDUCTION SYSTEM DISORDERS

Gollob MH, Green MS, Tang AS, Gollob T, Karibe A, Ali Hassan AS, et al. Identification of a gene responsible for familial Wolff-Parkinson-White syndrome. N Engl J Med 2001;344(24):1823–31.

Gussak I, Antzelevitch C, Bjerregaard P, Towbin JA, Chaitman BR. The Brugada syndrome: clinical, electrophysiologic and genetic aspects. J Am Coll Cardiol 1999;33(1):5–15.

Hudson R. The conducting system: anatomy, histology, pathology in acquired heart disease. In: Silver M, editor. *Cardiovascular Pathology*. New York: Churchill Livingstone; 1983; pp. 633–82.

Lev M, Bharati S. Lesions of the conduction system and their functional significance. Pathol Annu 1974;9(0):157–207.

Ludwig J. *Handbook of Autopsy Practice*, 3 ed. Totowa, NJ: Humana Press; 2002.

Moss AJ. Long QT Syndrome. JAMA 2003;289(16):2041–4.

Pollanen MS, Chiasson DA, Cairns J, Young JG. Sudden unexplained death in Asian immigrants: recognition of a syndrome in metropolitan Toronto. CMAJ 1996;155(5):537–40.

Thiene G, Pennelli N, Rossi L. Cardiac conduction system abnormalities as a possible cause of sudden death in young athletes. Hum Pathol 1983;14(8):704–9.

Vidaillet HJ, Jr., Pressley JC, Henke E, Harrell FE, Jr., German LD. Familial occurrence of accessory atrioventricular pathways (preexcitation syndrome). N Engl J Med 1987;317(2):65–9.

## CENTRAL NERVOUS SYSTEM DISEASE

Black M, Graham DI. Sudden unexplained death in adults caused by intracranial pathology. J Clin Pathol 2002;55(1):44–50.

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

de Villiers J. Unexpected natural death of cerebral origin in medicolegal practice. Forensic Sci 1975;5(1):11–19.

Demick DA. Cerebrovascular malformation causing sudden death. Analysis of three cases and review of the literature. Am J Forensic Med Pathol 1991;12(1):45–9.

DiMaio SM, DiMaio VJ, Kirkpatrick JB. Sudden, unexpected deaths due to primary intracranial neoplasms. Am J Forensic Med Pathol 1980;1(1):29–45.

Dolinak D, Matshes E. *Medicolegal Neuropathology: A Color Atlas*. Boca Raton, FL: CRC Press; 2002.

Dolinak D, Matshes E, Waghray R. Sudden unexpected death due to a brainstem glioma in an adult. J Forensic Sci 2004;49(1):128–30.

Ficker DM. Sudden unexplained death and injury in epilepsy. Epilepsia 2000;41 Suppl 2:S7–12.

Filkins JA, Cohle S, Levy BK, Graham M. Unexpected deaths due to colloid cysts of the third ventricle. J Forensic Sci 1996;41(3):521–3.

Freytag E, Lindenberg R. 294 Medicolegal autopsies on epileptics, cerebral findings. Arch Pathol 1964;78:274–86.

Hirsch CS, Martin DL. Unexpected death in young epileptics. Neurology 1971;21(7):682–90.

Langan Y, Nashef L, Sander JW. Sudden unexpected death in epilepsy: a series of witnessed deaths. J Neurol Neurosurg Psychiatry 2000;68(2):211–13.

Leestma JE, Konakci Y. Sudden unexpected death caused by neuroepithelial (colloid) cyst of the third ventricle. J Forensic Sci 1981;26(3):486–91.

Rubinstein L. *Atlas of Tumor Pathology, Second Series: Tumors of the Central Nervous System*. Bethesda, MD: Armed Forces Institute of Pathology; 1972.

Schievink WI. Intracranial aneurysms. N Engl J Med 1997;336(1):28–40.

Shields LB, Hunsaker DM, Hunsaker JC, 3rd, Parker JC, Jr. Sudden unexpected death in epilepsy: neuropathologic findings. Am J Forensic Med Pathol 2002;23(4):307–14.

Terrence CF, Jr., Wisotzkey HM, Perper JA. Unexpected, unexplained death in epileptic patients. Neurology 1975;25(6):594–8.

**RESPIRATORY SYSTEM**

Benatar SR. Fatal asthma. N Engl J Med 1986;314(7):423–9.

Campbell S, Hood I, Ryan D, Biedrzycki L, Mirchandani H. Death as a result of asthma in Wayne County Medical Examiner cases, 1975–1987. J Forensic Sci 1990;35(2):356–64.

Colby TV, Zaki SR, Feddersen RM, Nolte KB. Hantavirus pulmonary syndrome is distinguishable from acute interstitial pneumonia. Arch Pathol Lab Med 2000;124(10):1463–6.

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

Katzenstein A, Askin F. *Katzenstein and Askin's Surgical Pathology of Non-Neoplastic Lung Disease*, 2 ed. Philadelphia: W. B. Saunders; 1990.

Knight B. *Forensic Pathology*, 2 ed. London: Arnold; 1996.

Nolte KB, Feddersen RM, Foucar K, Zaki SR, Koster FT, Madar D, et al. Hantavirus pulmonary syndrome in the United States: a pathological description of a disease caused by a new agent. Hum Pathol 1995;26(1):110–20.

Spitz W. Selected procedures at autopsy. In: Spitz W, editor. *Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation*, 3 ed. Springfield, IL: Charles C. Thomas; 1993.

Tough SC, Green FH, Paul JE, Wigle DT, Butt JC. Sudden death from asthma in 108 children and young adults. J Asthma 1996;33(3):179–88.

**GASTROINTESTINAL SYSTEM**

Armstrong CP, Whitelaw S. Death from undiagnosed peptic ulcer complications: a continuing challenge. Br J Surg 1988;75(11):1112–14.

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

Knight B. *Forensic Pathology*, 2 ed. London: Arnold; 1996.

**ENDOCRINE SYSTEM**

Braunwald E, Fauci A, Kasper D, Hauser S, Longo D, Jameson J, editors. *Harrison's Principles of Internal Medicine*, 15 ed. New York: McGraw Hill; 2001.

DiMaio VJ, Sturner WQ, Coe JI. Sudden and unexpected deaths after the acute onset of diabetes mellitus. J Forensic Sci 1977;22(1):147–51.

Irwin J, Cohle S. Sudden death due to diabetic ketoacidosis. Am J Forensic Med Pathol 1989;10:269–70.

Meyerson J, Lechuga-Gomez EE, Bigazzi PE, Walfish PG. Polyglandular autoimmune syndrome: current concepts. CMAJ 1988;138(7):605–12.

Neufeld M, Maclaren NK, Blizzard RM. Two types of autoimmune Addison's disease associated with different polyglandular autoimmune (PGA) syndromes. Medicine (Baltimore) 1981;60(5):355–62.

Rozin L, Perper JA, Jaffe R, Drash A. Sudden unexpected death in childhood due to unsuspected diabetes mellitus. Am J Forensic Med Pathol 1994;15(3):251–6.

**SEPSIS**

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

Jindrich EJ. Splenectomy and sudden death. J Forensic Sci 1977;22(3):610–13.

Reay DT, Nakonechny D. Sudden death and sepsis after splenectomy. J Forensic Sci 1979;24(4):757–61.

**CHRONIC ETHANOL ABUSE**

Cotran R, Kumar V, Collins T. *Robbins Pathologic Basis of Disease*, 6 ed. Philadelphia: W. B. Saunders; 1999.

Day CP, James OF, Butler TJ, Campbell RW. QT prolongation and sudden cardiac death in patients with alcoholic liver disease. Lancet 1993;341(8858):1423–8.

Denmark LN. The investigation of beta-hydroxybutyrate as a marker for sudden death due to hypoglycemia in alcoholics. Forensic Sci Int 1993;62(3):225–32.

Durlacher SH, Meier JR, Fisher RS, Lovitt WV. Sudden death due to pulmonary fat embolism in chronic alcoholics with fatty liver. Acta Med Leg Soc (Liege) 1958;11(2):229–30.

Kuller LH, Perper JA, Cooper M, Fisher R. An epidemic of deaths attributed to fatty liver in Baltimore. Prev Med 1974;3(1):61–79.

Laurie W. Alcohol as a cause of sudden unexpected death. Med J Aust 1971;1(23):1224–7.

Lynch MJ, Raphael SS, Dixon TP. Fat embolism in chronic alcoholism; control study on incidence of fat embolism. AMA Arch Pathol 1959;67(1):68–80.

Perper JA. Sudden, unexpected death in alcoholics. Leg Med Annu 1974;••:101–10.

Pounder DJ, Stevenson RJ, Taylor KK. Alcoholic ketoacidosis at autopsy. J Forensic Sci 1998;43(4):812–16.

Randall B. Fatty liver and sudden death. A review. Hum Pathol 1980;11(2):147–53.

Thomsen JL, Felby S, Theilade P, Nielsen E. Alcoholic ketoacidosis as a cause of death in forensic cases. Forensic Sci Int 1995;75(2–3):163–71.

# 5 Blunt Force Injury

*David Dolinak, M.D.*
*Evan Matshes, M.D.*

EXTERNAL EXAMINATION    122
ABRASION    122
   Patterned abrasions    123
   Dating of abrasions    124
CONTUSION    125
   Documentation of contusions    126
   Patterned contusions    127
   Not a bruise    128
   Dating of contusions    128
LACERATION    129
   Avulsion    130
CRUSH AND CHOP INJURIES    130
   Extremes of crushing injury    130
WEAPON IDENTIFICATION    133
EXPLOSIVE INJURY    134
INTERNAL EXAMINATION    135
LETHAL BLUNT CHEST TRAUMA AND THE NEGATIVE
   (OR NEARLY NEGATIVE) AUTOPSY    136

MEDICAL COMPLICATIONS OF INJURIES    136
   Infection    136
   Disseminated intravascular
      coagulation/coagulopathy    137
   Acute respiratory distress syndrome/diffuse alveolar
      damage    137
   Deep venous thromboses/pulmonary artery
      thromboemboli    137
   Acute tubular necrosis    138
   Compartment syndrome    138
   Fat embolism    138
   Necrotizing fasciitis    138
   Physiologic stress ulcers (Cushing's ulcer, Curling's
      ulcer)    138
   Neurogenic pulmonary edema    139
   The open abdomen    139
   Multiple system organ failure    139
REFERENCES    139

Blunt force injuries are possibly the most common injuries documented and interpreted by forensic pathologists. These injuries are routinely discovered in deaths of all causes and manners, whether it be bruising that follows a heart attack–related collapse, or tearing of tissue with a violent beating. The three key manifestations of the blunt force injury spectrum are *abrasions*, *contusions*, and *lacerations*, each of which is created in response to the direct application of force to the body. One must not forget that there is wide variation in the amount of force needed to create an injury and that the external appearance of some wounds may either grossly under- or overestimate the severity of an impact. Therefore, it is advantageous to examine, document, and ponder the significance of underlying soft tissue, bony, vascular, and visceral injury. Careful correlation with cir-

cumstantial data is important in the interpretation of findings, a fact emphasized in the discussion of deaths related to *commotio cordis*.

Multiple factors influence the final appearance and severity of a blunt force injury. These can be arbitrarily viewed as being *subject* dependent, *object* dependent, or some combination of the two. Subject- or decedent-dependent factors include the anatomical region being impacted, the age of the individual (there is great variation in the fortitude of cutaneous and subcutaneous structures as we age), and their medical status (certain medical conditions and drugs may alter physiology, including blood clotting). Impacting object-related factors include the type of instrument or surface making contact with the body, the body surface area impacted, and the amount of time it makes contact. Because both

the object and the subject may be moving at the time of impact, the amount of force involved in the creation of the injury is multifactorial.

## External examination

External injuries should be carefully documented both diagrammatically and photographically. The photography of injuries should always include an overall (orientation) picture and a series of macroscopic images to draw out necessary detail. A case number should always appear in autopsy photographs and, where applicable, a ruler or other scale. One must not blindly examine injuries for the purpose of autopsy report description. It is key that the autopsy pathologist look for patterns or orientation to the injury. For example, *in a motor vehicle accident victim, is there an oblique abraded contusion over the chest from a seat belt? In a hit-and-run accident, are there any paint chips in the pedestrian's lacerations? In a bludgeoning, are there any tool marks on the calvarium from where the implement struck the head?*

## Abrasion

An abrasion or *scrape* occurs when the skin contacts an opposing surface and the movement of either the skin or the surface results in friction that pulls away the superficial layer(s) of skin. Although some authors arbitrarily classify abrasions into categories according to their appearance or causatory factors, this is not nearly as vital as recognizing and documenting that an abrasion exists, noting the presence of a pattern, and making some indication as to whether the wound is likely ante- or postmortem.

The 40-year-old woman shown in **Image 5.1** was ejected from her motor vehicle when she crashed at highway speeds into a parked car. She survived for 4 hours in hospital before dying of a closed head injury. Note the dark red-brown abrasions over her left chin and cheek. The reddish appearance of this injury indicates an antemortem origin with vital reaction occurring in the traumatized tissue.

A 25-year-old man was witnessed to collapse and die of a previously undiagnosed cardiac abnormality. At the scene, a large round abrasion was observed over the right malar prominence (**Image 5.2**). As is typical of peri- and postmortem abrasions, this had yellow-brown coloration and a texture somewhat like parchment. There was no evidence of a vital reaction. At autopsy, this same abrasion had dried, was red-brown in color (**Image 5.3**), and mimicked the appearance of the smaller, more posterior (antemortem) abrasion, thus illustrating the need for examination of injuries at the scene of death, and careful correlation of the history with autopsy findings.

**Image 5.4** shows a middle-aged man who was found at the base of a 19-story building with multiple traumatic injuries consistent with a fall from a great height. Note the obvious fracture and deformity of the right arm and forearm, and the roughly rectangular peri- or postmortem abrasion at the antecubital fossa.



5.1



5.2

## Patterned abrasions

Adequate study of injuries includes interpretation of their possible significance. Although the importance of an individual injury may not be readily apparent, thorough documentation and recognition of primary and associated injuries (contusions, lacerations, etc.) can avert unforeseeable problems. One must remember that injuries which have no potential in and of themselves to cause death may have evidentiary value at some later date.

Occasionally, one is able to glean important information from wounds such as in the 19-year-old female featured in **Image 5.5**. This individual was one of four people killed in a single-vehicle accident. The patterned abrasion on her chest is consistent with that left by a passenger-side seat belt. This feature proved key to the ultimate identification of the driver because severe body fragmentation and commingling at the scene led to confusion among investigators.

**Images 5.6** and **5.7** show a 21-year-old man who was witnessed to skid with his motorcycle and roll into a ditch. Notice the large confluent areas of abrasion commonly referred to as *road rash*. The patchy, nearly full-thickness abrasions across his torso, right shoulder and back, and face are consistent with the historical circumstances of rolling against the rough asphalt and coming to rest within dense brush.



5.3



5.4



5.5



5.6

Subtleties in abrasion morphology can be of great supportive value during the investigation of a death. The middle-aged man of **Image 5.8** was beaten and allegedly stomped to death. Note the small wavy abraded lines on the right malar prominence that resemble the sole of a shoe.

Allegations of brutality at the hands of police are not infrequent in today's litigious society. This young man (**Image 5.9**) was shot by police officers after a robbery led to a street-side gun battle. After viewing medical examiner identification photographs, family members expressed concern that this individual had not only been shot, but beaten as well. Photographic documentation of the injuries, and of the rough ground at the scene, adequately demonstrated that the abrasions resulted because of a terminal collapse onto asphalt, and not police brutality.

**Image 5.10** represents the sole autopsy photograph taken from a poorly documented case of apparent natural death in the 1970s in which a 58-year-old man was found dead next to a piece of farm equipment. Autopsy demonstrated "significant" coronary artery disease without acute occlusion or obvious myocardial infarction. More than 20 years later, after allegations that the individual was murdered by his brother, further investigation revealed that the man had died unexpectedly after being hit in the chest repeatedly with a farming implement. New information from witness interviews, combined with a single photograph from an inquisitive pathologist, was paramount to a successful—albeit delayed—investigation.

### Dating of abrasions

The literature contains multiple different techniques or approaches to the dating of abrasion healing.[1–4] We believe, however, that due to interpersonal variability in human physiology, underlying pathology, and mechanisms of trauma, it is not possible to provide accurate dating of abrasions based on gross morphologic or microscopic appearances.



5.7



5.9



5.8



5.10

## Contusion

A contusion or *bruise* occurs when a blunt impact tears capillaries and larger blood vessels, resulting in the escape of blood into the extravascular space. Bruises can be differentiated from *livor mortis* in that livor involves the settling of blood to dependent portions of the vascular system, and not the surrounding tissues. As such, incised areas with dependent lividity will not appear hemorrhagic.

Various terms exist to describe the gross appearance of a contusion. These include *petechiae* (small punctate hemorrhages), *ecchymoses* (generally small contusions), and *hematoma* (focal space-occupying collection of blood that expands and/or distorts the tissue configuration).

**Image 5.11** demonstrates a right flank bruise in a 60-year-old man who died of an acute myocardial infarct approximately 20 minutes after being hit with a baseball at a recreational game. **Image 5.12** illustrates the densely hemorrhagic nature of the affected area and the distinct margins between *normal* and *abnormal* tissue.

One must remember that the appearance of a contusion may not adequately reflect the degree of force used to cause the injury. For example, many elderly individuals (particularly those on systemic steroids) develop senile ecchymoses (**Image 5.13**) all over their bodies, but most characteristically on their extremities. These are known to occur with little force, and even spontaneously as a result of thinning of the perivascular connective tissue.[5,6] One must also consider blood thinning medications such as warfarin that may accentuate hemorrhages. On the opposite end of the spectrum is the individual who has been the victim of significant violence and has significant internal injury, but with little to no external evidence of injury. Young children frequently fall into this category.[7]

Examine the abdomen of this 2-year-old female (**Images 5.14** and **5.15**) who died suddenly in the emergency department after presenting with an alleged single episode of vomiting. With the exception of two contusions each less than 1 centimeter, the abdomen is devoid of gross trauma (**Image 5.14**). Opening of the abdomen revealed near transection of the jejunum, multiple omental lacerations, and more than 200 milliliters of blood (**Image 5.15**). Police questioning of the father ultimately revealed a history of repeated blunt abdominal abuse.

As previously mentioned, a large focal collection of blood is frequently referred to as a *hematoma*. Although hematomas may occur anywhere in the body, they are of particular interest and significance when found in the connective tissues of the scalp and subgaleal space. Examine the reflected and densely hemorrhagic scalp of the 56-year-old man in **Image 5.16**. In the absence of significant antemortem disorder of hemostasis, injuries of this variety represent the application of significant force to the head. As such, the intracranial contents are at particular risk of trauma. Additionally, note the large area of blood-stained periosteum of the right parietal bone,



5.11



5.12



5.13



5.14



5.16



5.17



5.15

consistent with an area of impact on the scalp in a man who was beaten about the head with a brick.

## Documentation of contusions

The full extent of bruising (and even the presence of a bruise) may not be readily apparent on external exami-

nation.[8–10] This is particularly true when the decedent has darker skin tones. Exposure of the subcutaneous tissues and subsequent photographic documentation can be helpful. Few situations exemplify this necessity as much as investigations of possibly battered children.

When the autopsy pathologist is interested in demonstrating the presence and/or severity of contusions, a layered approach to body wall dissection may be appropriate. The 2-year-old child abuse victim of **Image 5.17** died as a result of multiple blunt force injuries. In this case, the skin and subcutaneous fat were carefully dissected away from the underlying musculature, thus allowing for easy visualization of hemorrhagic areas. Some authors state that this has altered their pattern of death certification by clarifying the etiology of some cases of blunt trauma.[10]

It is not always necessary to perform thorough dissections to demonstrate bruising. In this example (**Image 5.18**), a 16-year-old female died in hospital 12 hours after being thrown from a motor vehicle at a high rate of speed. A small area of contusion in her upper midline











back was incised to illustrate significant underlying hemorrhage and intramuscular hematoma, thus demonstrating a lack of concordance between external appearance of injuries and their actual severity.

## Patterned contusions

As previously mentioned, the examination of an obviously traumatized victim should include an attempt to recognize patterns or orientation of individual or grouped injuries. Occasionally, such patterns will be so distinctive as to allow little room for interpretation. For example, the individual in **Image 5.19** was run over by a motor vehicle. Note the prominent imprint of the tire over his back. Other injuries may have an appearance highly suspicious for a specific etiology. The individual featured in **Image 5.20** was struck multiple times with an asp. In these circumstances, the impact of such an object causes crushing of the tissue immediately subjacent to the site of contact, and an area of contact pallor typically results. Adjacent to this pale region, one finds contusion—in this case, present as large, confluent areas of hemorrhage. A classical example of beating with a pipe is pictured in **Image 5.21**.

Following the recognition of possible patterned injuries, thorough documentation should occur. This might include photography of wounds opposing alleged weapons. However, this must only occur after the responsible police agency has cleared this evidence for use in the morgue because contamination with foreign fingerprints, DNA, and so forth, is a possibility.

Smaller, seemingly less important bruises should also be properly documented. Examine the small linear contusions on the left arm of the young female pictured in

**Image 5.22**. These marks have an appearance consistent with "finger grab marks," as might be seen if someone were forcefully restrained. This young woman was beaten and possibly sexually assaulted—as such, this finding could be of importance at trial.

## Not a bruise

As previously mentioned, not every instance of subcutaneous hemorrhage can be attributed to impact trauma (e.g., senile ecchymoses). In cases of basilar skull fracture, particularly with orbital plate involvement, or with a fractured nose, blood can dissect along fascial planes, creating the appearance of contusion.[11] This is particularly common in the periorbital region, giving the decedent "raccoon eyes." This has concerned many a police officer and uninitiated death investigator into believing that the person was involved in a fistfight with resultant "black eyes" (**Image 5.23**), such as this young woman who died in a motor vehicle accident. She had a massive basilar skull fracture. **Image 5.24** demonstrates prominent hemorrhage subjacent to the fractured orbital plate.

Clinicians refer to *Battle's sign* as bleeding into the mastoid air cells due to basilar skull fracture with a resultant bluish coloration of the skin overlying the affected mastoid process. This may mimic a bruise. The young male featured in **Image 5.25** died as a result of massive closed head injury and had a "positive Battle's sign."

## Dating of contusions

Multiple investigators have studied contusions from the perspective of determining their age.[9,12–18] Although we believe that many of these publications allow for interesting debate in the scientific arena, there is currently no technique that provides examiners with useful, dependable, highly accurate information. Underlying our dissatisfaction with current techniques, which primarily consist of determining age by bruise color, as well as histologic and immunohistochemical methods, is the basic fact that *every human being has his or her own spectrum of unique physiologic responses. Because healing is a physiologic process, it is not possible to precisely determine age of contusions.*



5.22



5.24



5.23



5.25

## Laceration

A laceration forms when an object impacts the body with a force that exceeds the elastic capacity of the skin and underlying tissues. Thus, a laceration is a *forceful tearing* of the skin. This is in contradistinction to the vague and varied usage of the word by clinicians and lay public in which it commonly refers nonspecifically to all cuts or tears of skin.

The individual shown in **Image 5.26** was beaten with a metal pipe, resulting in multiple linear lacerations on the vertex of the scalp. As is true with all injuries, shaving of involved hair can allow for greater visualization of injury. Fear of shaving should not be an excuse for inadequately visualizing and documenting an important injury.

On external examination, one must not forget to inspect *hidden* areas of the body for evidence of blunt force injury. As such, the oral cavity and anogenital regions deserve scrutiny (additionally, see Chapter 20). Blunt impact to any bony area of the body is likely to result in laceration when overlying tissues are forcibly and rapidly compressed against the bone. The orofacial and scalp regions are at particular risk because of the complex, bony nature of the skull and the relative thinness of overlying soft tissue.

Impact to the mouth is likely to result in contusion and laceration of the overlying labial and buccal mucosa as the nonkeratinized epithelium is crushed against the teeth and bony jaws. In addition to their value in death certification, such contusions and lacerations may also be important for courtroom testimony when degree of violence and suffering are discussed.

The 2-year-old child shown in **Image 5.27** died as a result of multiple homicidal blunt force injuries. A large, gaping laceration of the buccal and alveolar vestibules is clearly visible with retraction of the lips. This finding played a part in demonstrating to the jury that due to the multiplicity and complexity of injuries, including those to the mouth and face (in combination with historical and circumstantial evidence), an *accidental* manner of death was unlikely.

Just as it is important to recognize and document healing injuries externally, one must have adequate knowledge of normal oral anatomic variation to recognize healing injuries in the mouth (**Image 5.28**). This 3-month-old child died as a result of severe closed head injuries. Notice the healing laceration of the maxillary frenum. A finding such as this can provide supportive evidence of ongoing abuse.



5.27



5.28

5.26

## Avulsion

The term *avulsion* refers to the tearing away of tissues from their attachments. Avulsion may be a minor, local injury, or it may be severe and involve large areas of the body. In the individual in **Image 5.29**, note the relatively small area of scalp avulsed from the calvarium.

This woman (**Images 5.30** and **5.31**) was a pedestrian who was run over by a large, heavy truck. Note the severe amount of tissue disruption of her back, buttock, and leg (**Image 5.30**). The wheel of the truck tore a large area of tissue off of her leg and avulsed most of the tissue of her buttock. Note the large amount of avulsed tissue that can be reflected (**Image 5.31**).

## Crush and chop injuries

A particular type of blunt force injury that may also have a component of sharp force injury is the "chop" injury, which is caused by objects such as a lawnmower blade, a propeller, sword, or axe. In a chop injury, the skin and soft tissues are lacerated and the underlying bone may be fractured.

These chop injuries (**Image 5.32**) were sustained by a man who was injured by the blades of a large industrial lawnmower. Note the large, deep injuries of the buttock and leg. There were also multiple fractures of the pelvis and femur.

The child shown in **Images 5.33** through **5.35** was thrown from the boat he was riding in and was subsequently injured by the propeller of another boat. Note the roughly parallel deep chop injuries of the torso and arm (**Image 5.33**). Closer examination of the arm (**Image 5.34**) and the hand (**Image 5.35**) shows extensive soft tissue disruption and fractures.

## Extremes of crushing injury

This pedestrian (**Image 5.36**) was transected through the torso when he was run over by a train. Note the large, wide abrasion extending nearly horizontally across his lower chest and the extensive disruption of the abdominal soft tissues.


5.29


5.31


5.30


5.32

The elderly man shown in **Images 5.37** through **5.42** was found down in a parking lot near the apartment building in which he lived. Based on the investigation and the injuries, it was determined that he had jumped from his fifth-story balcony, instead of being a pedestrian run over by a motor vehicle, as had been considered. At autopsy, there was convincing evidence that he had landed on his feet after descending from a great height. Both of his legs were fractured below the knees (as is commonly seen in pedestrians struck by motor vehicles), but there were also contusions and tears on the bottom of his feet (**Image 5.37**). Incisions into the soles of the feet reveal multiple fractures and blood extravasation (**Image 5.38**). The top of the foot also had contusions (**Image 5.39**) and displaced fractures with blood extravasation (**Image 5.40**). Furthermore, there was bleeding in the lower pelvis (**Image 5.41**) associated with multiple pelvic fractures. In fact, the head of a femur had been displaced into the pelvis (**Image 5.42**). This is all convincing evidence that he had landed on his feet, with severe forces transmitted through his feet and into his legs, where his femur either fractured, or was pushed through the

acetabulum and into the lower pelvis. The mechanism of injury is clearly from impact to the ground following descent from a significant height,[19] and not from being run over by a motor vehicle.

Sometimes, a person is found down in a parking lot or on or near a roadway, and it is not clear whether the person was a pedestrian struck by a motor vehicle or someone who was already down on the ground for one reason or another and was subsequently run over. In this scenario, the legs can be examined for evidence of an impact. A man was found dead in a parking lot. Externally, there was no evidence of injury of his legs (**Image 5.43**). Dissection showed no injury posteriorly (**Image 5.44**), however a large contusion was unexpectedly found



5.35



5.33



5.36



5.34





5.43



5.45



5.44



5.46

in the lateral aspect of his left thigh (**Image 5.45**) and was consistent with having been hit by a motor vehicle. Leg dissection can be helpful in locating contusions in the legs that may not be visible on the surface of the skin.

## Weapon identification

Wounds of the skin and bone may provide information about the implement used in a beating. An excellent example of patterned injury to the skin is the marks left by teeth. Human bite mark evaluation has become an important part of the forensic dentistry realm. Use of a variety of techniques, impressions left in skin,[20–26] and inanimate objects at the scene[27,28] can provide useful information about the dental characteristics of the person who made the bite mark. By swabbing areas of suspected bite marks, DNA may be lifted from saliva deposited in the wound.[29] For more information on bite marks, see Chapter 27.

When an implement strikes a victim, it may impart a distinctive pattern to the skin and, in some cases, to the underlying bone. Many authors have reported thoughtful techniques and principles for documentation and evaluation of tool marks.[30–39] Others have demonstrated the success of tool mark examination in the identification of unique implements in unusual cases.[40–43] Ultimately, however, the discovery and processing of tool marks follows the same principles as those for any other injury found at death. These include recognition of an abnormality and documentation through diagrams, photography, and a written report. Where applicable, retention of specimens that demonstrate physical evidence of trauma, particularly injury to cartilage and bone, is appropriate. This will allow for more thorough examination by tool marks experts at some later date, if necessary.

The specimen of **Image 5.46** represents a portion of calvarium removed from an individual who was beaten to death with an unidentified implement. Notice the distinctive marks left in the bone.

This man (**Images 5.47** and **5.48**) was beaten with a hammer. On his scalp, note the two rectangular defects (**Image 5.47**). With the scalp reflected, note the same two defects, producing tool marks in the calvarium (**Image 5.48**), and the other associated skull fractures. These tool marks are characteristic of the "claw" end of a hammer.

## Explosive injury

Explosion injuries consist of blunt force injury caused by physical objects and from the concussive pressure wave (shock wave) that sweeps over the body. The physical objects may be from numerous sources including the exploding device, other objects that are fragmented and impact the body, and structural material from a residence that collapsed onto the body. The clothing may be shredded or torn/blown off the body. It is important to obtain x-rays before the clothing is removed to document bomb pieces such as springs, rivets, and wires that may be either in the clothing or on/in the body. The clothing

may also be analyzed for bomb chemicals. The clothing and body may be burned if the bomb/explosion was of an incendiary nature. If the body is burned, one may see linear streaks of unburned skin at the outer edges of the eyes (resembling crow's feet) and unburned horizontal creases in the forehead. These findings are consistent with the individual squinting (and hence being alive) at the time of the explosion.

At autopsy, the tympanic membranes may be ruptured. The physical injuries should be documented with consideration for what particular body position the individual may have been in when the explosion occurred. One should also examine for radiolucent bomb components that may have not been previously recognized. External injury may consist of amputations and gaping areas of pulpified tissue and scattered areas of epidermal denudations. Internally, the shock wave will more heavily damage air-containing organs such as the lungs and the bowel, which may have extensive blood extravasation. The bowel may be ruptured.

Two young men were killed in a residence when a military-type explosion device detonated. The extent of the explosive nature of the event is evident by buckling and partial separation of the walls of the residence from the roof. Note the extensive fragmented debris that cluttered the room (**Image 5.49**). One of the victims was located in the middle of the debris and had severe injuries (**Image 5.50**). The other victim was taken to the hospital.

Before the autopsy was begun, x-rays were taken. Note the multiple radiopaque fragments of shrapnel in



5.47



5.48



5.49

the thigh and leg (**Image 5.51**). At autopsy, note the extensive injury of the side of the torso with partial evisceration, extensive tissue disruption, and also scattered burns (**Image 5.52**). The radiopaque fragments of shrapnel were recovered (**Image 5.53**). The other fatality had multiple severe injuries, including burns and

amputation of his hand and forearm (**Image 5.54**). Wooden dowel rods were placed in the penetrating and perforating wounds to demonstrate the path of the projectiles.

Explosions in residences are infrequent, but are mainly due to natural gas ignitions. Also, one must consider chemical explosions related to the manufacture of illicit drugs such as methamphetamine, propane tank explosions, and explosions related to industrial equipment. Also possible is an explosion from a primary explosive device. When this is the case, careful collection of embedded shrapnel and investigation of the scene may allow for the identification of the exploding device.

## Internal examination

As is the case in all medicolegal autopsies, internal examination entails measurement of blood/fluid volumes in body cavities, descriptions of fractures, vascular injury, and visceral organ damage. One must also remember



5.50



5.51



5.52



5.53



5.54

what resuscitative and therapeutic procedures were performed and not mistake these for traumatic injuries. As illustrated in Chapter 24, postmortem changes can affect—and even mimic—the appearance of antemortem injuries, a fact necessitating careful interpretation of findings in *altered* human bodies. Some cases may require the use of additional autopsy procedures such as a posterior neck dissection (see Chapter 29) of a pedestrian struck by a car, or leg dissections (anterior and/or posterior) on a person found down on or near a road and one must attempt to rule in or out vehicular involvement that is not immediately obvious.

Fatal blunt force injuries are most commonly the result of motor vehicle accidents, beatings, or falls from great height. The internal ramifications of severe blunt trauma are also covered in Chapter 11. Because the phenomenon of *commotio cordis* is not usually considered to be an injury associated with extremes of force, such as those in motor vehicle accidents, we have chosen to include the following brief discussion.

## Lethal blunt chest trauma and the negative (or nearly negative) autopsy

Few areas of forensic pathology exemplify the need for collateral history as much as those involving witnessed collapse and death following impact to the chest. Blunt cardiac trauma can be classified as being either *structural* or *functional* in origin.[44] Structural causes are easily diagnosed by the autopsy pathologist who finds cardiac contusion, myocardial and/or valvular laceration, papillary muscle rupture, or coronary artery injury with resultant infarction.[45] Sudden death occurring after low to moderate impact to the chest has been termed *commotio cordis* or *cardiac concussion*.[46–48] Children, particularly males aged 5 to 18 years, seem to be at increased risk,[44,46] possibly because the marked pliability of the adolescent rib cage[49] allows for greater inbending and contact with mediastinal structures.

The instantaneous nature of deaths of this type has been attributed to ventricular fibrillation (or other ventricular arrhythmias degenerating to fibrillation) and secondary trauma-induced apnea.[50–53] Studies of rare survivors have also brought forth evidence of concurrent coronary artery vasospasm with secondary changes in myocardial contractility.[54,55] At a cellular level, Link et al. have demonstrated possibly altered K⁺-ATPase channel activity.[56]

Typical cases of *commotio cordis* involve a young athlete playing hockey, baseball, or lacrosse who is hit *directly* in the chest—a finding confirmed by animal research which showed that death is most likely to occur only after a direct precordial impact.[57] Although rare examples of successful resuscitation exist, this has only

been possible with very early defibrillation.[58] When resuscitation is not successful, medical examiners should endeavor to obtain ECG or rhythm strips from EMT or hospital staff, because documentation of ventricular dysrhythmia and fibrillation are diagnostically supportive.

At autopsy there is generally no evidence of chest impact, a fact that again drives home the importance of circumstantial investigative information. Internal examination will reveal no anatomic cause of death, although careful study of the cardiac anatomy is mandated to rule out underlying abnormality.[59]

## Medical complications of injuries

Many people who die as the result of traumatic injury do so soon after the injury is sustained, often within seconds, minutes, or hours of injury. However, many others die after some period of survival, from days or weeks to months, and even years after the injury. If a person's death can be attributed to the original injury, then that original injury must be considered the proximate cause of death (see Chapter 30). This has important considerations from the perspective of death certification. The following medical complications in injury can all be associated with natural disease processes. As such, it is important that the individual certifying these deaths consider the condition or injury that initiated the sequence of events leading to the medical complications and eventual death of the individual. A homicidal, accidental, or suicidal death can easily be overlooked if one does not seek out what initiated the complications.

Although the trauma itself is stressful to the body, oftentimes the stress developed in the recovery period is more pronounced, particularly if the injuries are severe and the recovery period long. Severe injury requiring surgical treatment and life-sustaining medical devices such as mechanical respirators is frequently complicated by the body's response to trauma and its attempts to heal. One will encounter a multitude of healing responses and complications in people who die while attempting to recover from traumatic injuries. This is not meant to be an all-encompassing review of complications associated with injuries, but rather a concise review of some of the more common and/or significant conditions.

### Infection

Infection is the most common complication of injury leading to serious morbidity and/or mortality. Although *pneumonia* occurs less commonly than local wound infections and urinary tract infections, it is associated with a much higher mortality rate. Factors that predispose to pneumonia include immobility/hypomobility, atelectasis, mechanical ventilation, aspiration, and sepsis, and less commonly intra-abdominal or soft tissue *abscesses*.

Infection risk is increased with invasive procedures and with indwelling catheters and tubes such as central lines and Foley catheters.

The spleen is an important immune organ. If an injured spleen is removed, the body has an increased propensity for infection, especially with encapsulated organisms. Postsplenectomy sepsis can complicate surgical removal of an injured spleen months to years after the injury. This most commonly occurs with bacteria such as *Streptococcus pneumoniae* and *meningococcus*. Those status postsplenectomy also appear to have a higher incidence of viral infections and infections from nonencapsulated organisms.

## Disseminated intravascular coagulation/coagulopathy

*Hemostasis* is a complex process dealing with the fluidity and clotting of blood. Trauma affects various tissue substances, platelets, and coagulation proteins, causing defects in the platelet, clotting, and fibrinolytic systems. Coagulation abnormalities resulting from trauma are characterized by decreased clotting ability in the blood. This is due to a multitude of factors, some of which are unknown. With a large amount of blood loss and extensive blood replacement, one is likely to develop thrombocytopenia and a loss of other coagulation factors. Also, hypothermia, alcohol intoxication, and various electrolyte abnormalities likely decrease the effectiveness of blood coagulation.

Disseminated intravascular coagulation (DIC) is a condition in which the body quickly uses up ("consumes") various clotting factors, eventually resulting in decreased clotting ability of the blood. DIC may occur in patients with a wide variety of tissue damage and necrosis, such as shock, burns, and trauma, but also in sepsis and malignancy. DIC may also arise in those with severe, nonspecific stress. DIC is well known to complicate severe traumatic brain injury. The brain has the highest concentration of tissue thromboplastin. Severe head injury often leads to the release of thromboplastin, initiating coagulation, consuming various clotting factors, and resulting in decreased clotting ability of the blood. There appears to be a direct relationship between the severity of head injury and the development of DIC.[60] As such, remember that when a person with brain injury dies, an associated coagulopathy is most likely secondary to the head injury and not a preexisting coagulopathy if none was known to previously exist.[61]

## Acute respiratory distress syndrome/diffuse alveolar damage

Acute (or adult) respiratory distress syndrome (ARDS) is the most important cause of acute respiratory failure in surgical patients of all ages.[62] ARDS is a complex entity characterized by clinical evidence of respiratory failure

with diffuse alveolar capillary injury. This involves loss of alveolar capillary membrane integrity with resultant increased microvascular permeability with leaking of plasma protein into the interstitium, and subsequent atelectasis, hypoventilation, shunting, and hypoxemia. ARDS is nonspecific and reflects the response of the lung to acute injury, whether it is trauma, endotoxin, or some other insult that is followed by an inflammatory response. Although the onset of ARDS is generally rapid, the resolution of ARDS is typically slow, with recovery (if recovery occurs) over days to weeks. Those with ARDS frequently have secondary pneumonia and sepsis. Sepsis may be regarded as the most common predisposing factor to ARDS, but other factors include chronic alcohol abuse, chronic lung disease, and mechanical ventilation.[62]

At autopsy of individuals with early ARDS, the lungs are bloody red/maroon, congested, and heavy, with the combined lung weight often exceeding 2,000 grams. With survival of a few days or a week, the lungs become diffusely firm and consolidated and may resemble liver tissue in appearance. The cut edge of lung tissue tends to retain its shape, rather than weeping or collapsing as occurs with edema and congestion alone. In the acute phase (a few days or so), microscopy of the lungs will demonstrate alveolar and interstitial edema, neutrophils, alveolar blood, and eosinophilic hyaline membrane formation.[62–64] The hyaline membranes arise from condensed plasma proteins that have leaked into the alveolar space following injury to the endothelial–epithelial barrier.[63] After the acute phase, the tissues proceed into the organizing phase, characterized at first by pneumocyte hyperplasia, and then accompanied by fibroblastic proliferation and interstitial chronic inflammation.[62,64] The chronic/healed stage consists primarily of fibrosis and chronic inflammation and may be described nonspecifically as "interstitial fibrosis."[64]

Other complications of the pulmonary system include atelectasis, aspiration, neurogenic pulmonary edema, and effects of prolonged ventilatory support. Those undergoing prolonged mechanical ventilation can accumulate a large amount of mucus in their airways, and a large mucus plug can cause obstruction of airflow.

## Deep venous thromboses/pulmonary artery thromboemboli

The three main predisposing factors to the development of vascular thrombi are hypercoagulability, venous stasis, and vascular injury (Virchow's triad). The trauma patient is particularly prone to the development of deep venous thromboses, especially with lower extremity fractures. Although there are many avenues of prophylaxis, including anticoagulation, vena cava filter, and sequential compression devices/stockings or other squeezing or compressional treatments of the legs, these

are not always applicable to a particular patient. Deep venous thromboses may develop covertly and quickly break away, travel to the lungs, and cause catastrophic pulmonary emboli with resultant sudden and unexpected death.

When pulmonary artery thromboemboli are detected, dissection of the legs should be performed to look for deep venous thromboses (see Chapter 4). When dissecting for venous thrombi, one also has a chance to document contusions, fractures, or other injuries of the legs. Although the incision and dissection of the legs is most easily performed with the body prone, it can also be performed with the body supine. With this technique, incisions are made in the medial aspects of the lower legs from the ankle through the popliteal fossa, or more proximal, if needed. After the skin and subcutaneous tissue are reflected, the Achilles tendon is cut, and the muscles of the lower leg pulled upward (toward the head) along their fascial plane. Horizontal incisions can then be made in the reflected muscle and in the deep veins coursing along the tibia and fibula. Venous thromboses will protrude out a short distance from the cut surface of muscle as formed cylindrical blood clots that hold their shape. Thromboses that have been present for longer periods of time and have fibrous tissue will remain in place and may have a tan appearance. Postmortem blood clots are soft, maroon, partially liquid, and may drain from the tissue.

### Acute tubular necrosis

Acute tubular necrosis is the most common pathologic finding in those with acute renal failure and most often results from ischemia to the renal parenchyma. Histologic examination will reveal casts of cellular debris occluding the tubules and necrosis of tubular epithelial cells. Acute renal failure in surgical patients usually carries a grave prognosis because it often occurs along with the failure of other organ systems.

### Compartment syndrome

Compartment syndrome is a condition in which injured muscles swell, increasing pressure in an area of closed tissue space, resulting in a compromise of the circulation to the associated muscles and nerves. Typically, this occurs within fascial compartments in the lower leg, but can also occur in the forearm, thigh, hand, and buttock. In the leg, compartment syndrome may follow fracture of the tibia, combined arteriovenous injury of the knee, severe muscle contusion, or prolonged compression.[65] Abdominal compartment syndrome is also recognized and can lead to respiratory insufficiency and ischemia of the abdominal contents. Common causes of compartment syndrome include fracture with bleeding, contusion of muscle, burns, but also snake bites and electrical injury. Untreated, compartment syndrome may lead to necrosis of muscle and other tissues.

### Fat embolism

Fat embolism should be considered in the trauma patient who develops tachypnea, dyspnea, and confusion from a few hours to a few days after an injury. There may also be petechiae on the chest, axilla, and conjunctiva. Laboratory testing may also indicate thrombocytopenia. Although fat embolism is commonly attributed to fractures of the pelvis or long bones such as the femur, with marrow (and fat) forced into the circulation via torn blood vessels, it may also occur in the absence of fractures, in which fatty tissue is pulpified and forced into torn blood vessels. Alternatively, rather than being mechanical in nature, fat emboli might be physiologic, due to biochemical alterations associated with shock with the precipitation of plasma lipids into fat droplets. In most cases of fat embolism syndrome, there is likely a combination of both mechanical and biochemical factors of fat embolus formation. Fat embolism may also occur in those with burns, severe infections, and liposuction. Fat emboli in the pulmonary arteries can be easily overlooked, but special stains such as oil red O stain on fresh/frozen tissue and osmium tetroxide on fixed tissue can highlight intravascular fat.

### Necrotizing fasciitis

Necrotizing fasciitis is an infection of the fascia that spreads along the fascia and can lead to gangrene of the skin and/or muscle as blood vessels supplying these regions thrombose. It usually involves the extremities, groin, and abdomen, although virtually any part of the body can be involved. It may be indolent, and initial signs may include edema or cellulitis. Systemic toxicity may have a rapid onset.

### Physiologic stress ulcers (Cushing's ulcer, Curling's ulcer)

Ulcers may occur in the gastric mucosa in critically ill patients and develop in the setting of severe physiologic stress. The term *stress ulcer*, unlike peptic ulcer, is not a primary disease, but rather is a manifestation of underlying illness and is most frequent in the body of the stomach. Stress ulcers are believed to result from a combination of physiologic factors including decreased blood flow, hypoperfusion/reperfusion injury,[66] and coagulopathy.[67,68] Shock is believed to result in gastric mucosal ischemia that, when combined with gastric acid and possible duodenal contents, can cause acute ulcerations in as little as 2 to 3 days. Many of those who develop stress ulcers have been on mechanical ventilation for more than 2 days.[67,68] The risk of developing ulcers with significant gastrointestinal bleeding increases with the severity of the illness, the duration of mechanical ventilation, and the length of stay in the intensive care unit.[67] Cushing's ulcers occur following head trauma or surgery and are deep ulcers of the esophagus, stomach, or duodenum and do not require shock or

sepsis for their development.[65] Curling's ulcer is stress ulceration of the duodenum or stomach in those with large burn injuries.

## Neurogenic pulmonary edema

Neurogenic pulmonary edema (NPE) is a condition in which increased interstitial or alveolar lung water occurs in those with acute diseases of the central nervous system, most commonly acute severe head trauma, intracerebral hemorrhage, and subarachnoid hemorrhage. By definition, those who develop NPE do not have hypervolemia or any cardiac or other pulmonary disorders. Clinically, NPE presents as a sudden onset of congestion, alveolar hemorrhage, and a protein-rich exudate. Its etiology and pathogenesis are not definitively known, but it is theorized to develop from massive sympathetic discharge that produces a marked increase in peripheral vascular resistance, which in turn shifts blood centrally into the pulmonary vasculature. The increased pressure in the pulmonary capillaries and venules likely causes structural damage and altered structural permeability.[65]

## The open abdomen

In those undergoing emergency abdominal surgery for trauma, it is not unusual for the surgeons to leave the abdomen open after completion of the operative procedure. The reasons for not closing the abdomen are varied, but include physically not being able to close the abdomen and to allow for healing by secondary intent. After severe blunt abdominal trauma, particularly following fluid resuscitation of many liters of crystalloid solution and blood, the intestines, mesentery, and retroperitoneal tissues may swell extensively, precluding physical approximation of the surgical margins. If the surgical margins were forcibly and tightly reapproximated, the resultant increased intra-abdominal pressure would likely attenuate hepatic, renal, and intestinal blood flow.[65] A tight abdomen may also cause respiratory compromise by limiting diaphragmatic excursion and may also cause fascial necrosis.[65] Alternatively, if there is abundant spillage of fecal material or other gross contamination of the abdomen, the surgical incision may be left open to allow for repeated washouts. The procedures to cover an open abdomen will vary by location, but often include placing a clear plastic wrap directly over the bowel, covered by a surgical towel, which is in turn covered by adhesive surgical wrap.

## Multiple system organ failure

Multiple system organ failure (MSOF) is a condition describing the failure of multiple organs that usually occurs in a progressive fashion, is self-perpetuating, and often terminates in death. It most frequently involves the pulmonary system first, followed variably by the hepatic, gastrointestinal, and renal systems. It is believed to be closely related to sepsis, because up to 90 percent of those with MSOF can be found to eventually have evidence of advanced sepsis.[69] Although it is believed to be primarily due to sepsis, blood cultures are not uncommonly negative. The pulmonic failure is usually characterized by ARDS, the hepatic failure by elevated liver enzymes, the renal failure by acute tubular necrosis, the cardiovascular failure by vasodilation and increased cardiac output, the neurologic failure by coma, gastrointestinal failure by ileus, and by the onset of endocrine, metabolic, and immunologic failure.[65]

### Do

- Document blunt force injuries with a combination of photographs and body diagrams.
- Look for patterned abrasions. If they are not obvious, they will often be missed unless specifically looked for. Patterned abrasions should be photographed with an ABFO ruler when appropriate.
- Recognize the characteristic linear bruise caused by impact with a long firm object.
- Incise the legs to identify deep leg bruises in a pedestrian found in or around a road (in appropriate cases).
- Remember that abrasions and lacerations can occur over bony facial prominences in those who collapse.

### Don't

- Confuse a blunt force injury such as a laceration with a sharp force injury such as an incised wound.
- Forget that the skin of an elderly person is more fragile and more easily torn and bruised than that of a younger person.
- Forget that periorbital ecchymoses are often secondary to internal injury with fractures of the orbital plates.

## References

1. Di Maio V, Dana S. *Handbook of Forensic Pathology.* Georgetown, TX: Landes Bioscience; 1998.

2. Di Maio V, Di Maio D. *Forensic Pathology,* 2 ed. Boca Raton, FL: CRC Press; 2001.

3. Spitz WU. Blunt force injury. In: Spitz WU, editor. *Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation,* 3 ed. Springfield, IL: Charles C. Thomas; 1993; pp. 199–251.

4. Robertson I, Hodge PR. Histopathology of healing abrasions. Forensic Sci 1972;1(1):17–25.

5. Handin R. Disorders of hemostasis. In: Braunwald E, Fauci A, Kasper D, Hauser S, Longo D, Jameson J, editors. *Harrison's Principles of Internal Medicine,* 15 ed. New York: McGraw-Hill; 2001; p. 750.

6. Giles TE, Williams AR. The postmortem incidence of senile ecchymoses. Am J Forensic Med Pathol 1994;15(3):208–10.

7. Dolinak D, Matshes E. *Medicolegal Neuropathology: A Color Atlas,* Boca Raton: CRC Press; 2002.

8. Hiss J, Kahana T, Kugel C. Beaten to death: why do they die? J Trauma 1996;40(1):27–30.

9. Vanezis P. Interpreting bruises at necropsy. J Clin Pathol 2001;54(5): 348–55.

10. Hiss J, Kahana T. Medicolegal investigation of death in custody: a postmortem procedure for detection of blunt force injuries. Am J Forensic Med Pathol 1996;17(4):312–4.

11. Betz P, Lignitz E, Eisenmenger W. The time-dependent appearance of black eyes. Int J Legal Med 1995;108(2):96–9.

12. Bariciak ED, Plint AC, Gaboury I, Bennett S. Dating of bruises in children: an assessment of physician accuracy. Pediatrics 2003;112(4):804–7.

13. Kibayashi K, Honjyo K, Higashi T, Tsunenari S. Differentiation of discolouration in a body by an erythrocyte membrane component, glycophorin A. Ann Acad Med Singapore 1993;22(1):28–32.

14. Kibayashi K, Hamada K, Honjyo K, Tsunenari S. Differentiation between bruises and putrefactive discolorations of the skin by immunological analysis of glycophorin A. Forensic Sci Int 1993;61(2–3):111–7.

15. Langlois NE, Gresham GA. The ageing of bruises: a review and study of the colour changes with time. Forensic Sci Int 1991;50(2): 227–38.

16. Sawaguchi T, Jasani B, Kobayashi M, Knight B. Post-mortem analysis of apoptotic changes associated with human skin bruises. Forensic Sci Int 2000;108(3):187–203.

17. Stephenson T, Bialas Y. Estimation of the age of bruising. Arch Dis Child 1996;74(1):53–5.

18. Thornton RN, Jolly RD. The objective interpretation of histophological data: an application to the ageing of ovine bruises. Forensic Sci Int 1986;31(4):225–39.

19. Gupta SM, Chandra J, Dogra TD. Blunt force lesions related to the heights of a fall. Am J Forensic Med Pathol 1982;3(1):35–43.

20. Aksu MN, Gobetti JP. The past and present legal weight of bite marks as evidence. Am J Forensic Med Pathol 1996;17(2):136–40.

21. Fischman SL. Bite marks. Alpha Omegan 2002;95(4):42–6.

22. Furness J. A general review of bite-mark evidence. Am J Forensic Med Pathol 1981;2(1):49–52.

23. Pretty IA, Hall RC. Forensic dentistry and human bite marks: issues for doctors. Hosp Med 2002;63(8):476–82.

24. Rothwell BR. Bite marks in forensic dentistry: a review of legal, scientific issues. J Am Dent Assoc 1995;126(2):223–32.

25. Wright FD, Dailey JC. Human bite marks in forensic dentistry. Dent Clin North Am 2001;45(2):365–97.

26. Whittaker DK. Principles of forensic dentistry: 2. Non-accidental injury, bite marks and archaeology. Dent Update 1990;17(9):386–90.

27. Bernitz H, Piper SE, Solheim T, Van Niekerk PJ, Swart TJ. Comparison of bitemarks left in foodstuffs with models of the suspects' dentitions as a means of identifying a perpetrator. J Forensic Odontostomatol 2000;18(2):27–31.

28. McKenna CJ, Haron MI, Brown KA, Jones AJ. Bitemarks in chocolate: a case report. J Forensic Odontostomatol 2000;18(1):10–4.

29. Sweet D, Hildebrand D. Saliva from cheese bite yields DNA profile of burglar: a case report. Int J Legal Med 1999;112(3):201–3.

30. Barsley RE, West MH, Fair JA. Forensic photography. Ultraviolet imaging of wounds on skin. Am J Forensic Med Pathol 1990;11(4): 300–8.

31. Bonte W. Tool marks in bones and cartilage. J Forensic Sci 1975; 20(2):315–25.

32. Bromage TG, Boyde A. Microscopic criteria for the determination of directionality of cutmarks on bone. Am J Phys Anthropol 1984;65(4):359–66.

33. Bruschweiler W, Braun M, Dirnhofer R, Thali MJ. Analysis of patterned injuries and injury-causing instruments with trace 3D/CAD supported photogrammetry (FPHG): an instruction manual for the documentation process. Forensic Sci Int 2003;132(2):130–8.

34. Davis GJ. Patterns of injury. Blunt and sharp. Clin Lab Med 1998;18(2):339–50.

35. Feldman KW. Patterned abusive bruises of the buttocks and the pinnae. Pediatrics 1992;90(4):633–6.

36. Rao VJ. Patterned injury and its evidentiary value. J Forensic Sci 1986;31(2):768–72.

37. Rees PO, Cundy KR. A method for the comparison of tool marks and other surface irregularities. J Forensic Sci Soc 1969;9(3):153–5.

38. Tuthill H. Discussion of "Patterned injury and its evidentiary value." J Forensic Sci 1987;32(2):312–3.

39. West MH, Barsley RE, Hall JE, Hayne S, Cimrmancic M. The detection and documentation of trace wound patterns by use of an alternative light source. J Forensic Sci 1992;37(6):1480–8.

40. Clark EG, Sperry KL. Distinctive blunt force injuries caused by a crescent wrench. J Forensic Sci 1992;37(4):1172–8.

41. Hanzlick R, Zaki SA. Unusual blunt force wound produced by a gun muzzle. Am J Forensic Med Pathol 1986;7(3):252–3.

42. Takizawa H, Nakamura I, Hashimoto M, Maekawa N, Yamamura M. Toolmarks and peculiar blunt force injuries related to an adjustable wrench. J Forensic Sci 1989;34(1):258–62.

43. Zugibe FT, Costello JT. Identification of the murder weapon by intricate patterned injury measurements. J Forensic Sci 1986;31(2): 773–7.

44. Abrunzo TJ. *Commotio cordis*. The single, most common cause of traumatic death in youth baseball. Am J Dis Child 1991;145(11): 1279–82.

45. Frazer M, Mirchandani H. *Commotio cordis*, revisited. Am J Forensic Med Pathol 1984;5(3):249–51.

46. Link MS, Wang PJ, Maron BJ, Estes NA. What is *commotio cordis*? Cardiol Rev 1999;7(5):265–9.

47. Thakore S, Johnston M, Rogena E, Peng Z, Sadler D. Non-penetrating chest blows and sudden death in the young. J Accid Emerg Med 2000;17(6):421–2.

48. Kohl P, Nesbitt AD, Cooper PJ, Lei M. Sudden cardiac death by *commotio cordis*: role of mechano-electric feedback. Cardiovasc Res 2001;50(2):280–9.

49. Besson A, Saegesser F. Blunt trauma of the chest wall. In: Besson A, F S, editors. A Colour Atlas of Chest Trauma and Associated Injuries. Weert, Netherlands: Wolfe Medical; 1982; pp. 153–98.

50. Bir CA, Viano DC. Biomechanical predictor of *commotio cordis* in high-speed chest impact. J Trauma 1999;47(3):468–73.

51. Crown LA, Hawkins W. *Commotio cordis*: clinical implications of blunt cardiac trauma. Am Fam Physician 1997;55(7):2467–70.

52. Lateef F. *Commotio cordis*: an underappreciated cause of sudden death in athletes. Sports Med 2000;30(4):301–8.

53. Link MS, Wang PJ, Pandian NG, Bharati S, Udelson JE, Lee MY, et al. An experimental model of sudden death due to low-energy chest-wall impact (*commotio cordis*). N Engl J Med 1998;338(25): 1805–11.

54. Link MS, Ginsburg SH, Wang PJ, Kirchhoffer JB, Berul CI, Estes NA, 3rd, et al. *Commotio cordis*: cardiovascular manifestations of a rare survivor. Chest 1998;114(1):326–8.

55. Wang JN, Tsai YC, Chen SL, Chen Y, Lin CS, Wu JM. Dangerous impact—*commotio cordis*. Cardiology 2000;93(1–2):124–6.

56. Link MS, Wang PJ, VanderBrink BA, Avelar E, Pandian NG, Maron BJ, et al. Selective activation of the K(+)(ATP) channel is a mechanism by which sudden death is produced by low-energy chest-wall impact (*commotio cordis*). Circulation 1999;100(4):413–8.

57. Link MS, Maron BJ, VanderBrink BA, Takeuchi M, Pandian NG, Wang PJ, et al. Impact directly over the cardiac silhouette is necessary to produce ventricular fibrillation in an experimental model of *commotio cordis*. J Am Coll Cardiol 2001;37(2): 649–54.

58. Link MS. Mechanically induced sudden death in chest wall impact (*commotio cordis*). Prog Biophys Mol Biol 2003;82(1–3):175–86.

59. Froede RC, Lindsey D, Steinbronn K. Sudden unexpected death from cardiac concussion (*commotio cordis*) with unusual legal complications. J Forensic Sci 1979;24(4):752–6.

60. Chiaretti A, Pezzotti P, Mestrovic J, Piastra M, Polidori G, Storti S, et al. The influence of hemocoagulative disorders on the outcome of children with head injury. Pediatr Neurosurg 2001;34(3):131–7.

**61.** Hymel KP, Abshire TC, Luckey DW, Jenny C. Coagulopathy in pediatric abusive head trauma. Pediatrics 1997;99(3):371–5.

**62.** Ware LB, Matthay MA. The acute respiratory distress syndrome. N Engl J Med 2000;342(18):1334–49.

**63.** Tomashefski JF, Jr. Pulmonary pathology of the adult respiratory distress syndrome. Clin Chest Med 1990;11(4):593–619.

**64.** Anderson WR, Thielen K. Correlative study of adult respiratory distress syndrome by light, scanning, and transmission electron microscopy. Ultrastruct Pathol 1992;16(6):615–28.

**65.** Wilson R, Walt A. *Management of Trauma—Pitfalls and Practice*, 2 ed. Baltimore, MD: Williams and Wilkins; 1996.

**66.** Fennerty MB. Pathophysiology of the upper gastrointestinal tract in the critically ill patient: rationale for the therapeutic benefits of acid suppression. Crit Care Med 2002;30(6 Suppl):S351–5.

**67.** Steinberg KP. Stress-related mucosal disease in the critically ill patient: risk factors and strategies to prevent stress-related bleeding in the intensive care unit. Crit Care Med 2002;30(6 Suppl):S362–4.

**68.** Cook DJ, Fuller HD, Guyatt GH, Marshall JC, Leasa D, Hall R, et al. Risk factors for gastrointestinal bleeding in critically ill patients. Canadian Critical Care Trials Group. N Engl J Med 1994;330(6):377–81.

**69.** Fry DE. Multiple system organ failure. Surg Clin North Am 1988;68(1):107–22.

# 6 Sharp Force Injuries

*Emma Lew, M.D.*
*Evan Matshes, M.D.*

PHYSICAL FEATURES OF A KNIFE    144
ANATOMY OF A STAB WOUND    144
    Single-edge    144
    Double-edge    144
    Serrated    144
    Scissors    144
NOTANDA ABOUT STAB WOUNDS    146
    Wound track    147
    Depth of stab wound    147
    Direction of the incised wound    147
    Handedness of the assailant    147
    Knives left *in situ*    147
DEFENSIVE INJURIES    149
    Defensive injury posturing    149
DOCUMENTING STAB WOUNDS    150

CHOP WOUNDS    150
SHARP FORCE INJURIES CAUSED BY OTHER
    OBJECTS    151
SUICIDE    154
    Hesitation marks    155
DISSECTION OF INCISED WOUNDS    155
POSTINJURY ACTIVITY    156
TOOL MARK ANALYSIS    156
DISMEMBERED BODIES    158
POSTMORTEM WOUNDS    160
DECOMPOSING BODIES/BODIES IN WATER    161
REFERENCES    162

Sharp force injuries span the spectrum of incised and stab wounds. These distinctive injuries, by their very nature, are produced by specific implements and weapons, as contrasted with blunt force injuries, which can be sustained by simply falling. The term *laceration* is used frequently to indicate all cuts, tears, or disruptions of human tissue. In the forensic pathology world, a laceration differs markedly from incised and stab wounds in that lacerations are forceful tears of tissue due to blunt force impact. Unlike the sharp edges of a sharp force injury, the margins of a laceration tend to be irregular. Lack of distinction between the etiology of these two types of wounds could lead to profound medicolegal consequences.

Sharp force injuries add another dimension of evidentiary value when implements leave markings on cartilage or bone. Such *tool marks* have been used to successfully identify causative weapons and may (indi-rectly) link perpetrators to crimes. This is particularly true in the study of dismembered remains where cutting instruments are typically required to disarticulate, disfigure, or mutilate a body, thereby potentially leaving a variety of tool marks.

An incised wound made by a sharp instrument such as a knife, scalpel blade, or razor blade has defined, nonabraded edges with no tissue bridging. It is a slicing wound that is longer than it is deep. A stab wound is deeper than its surface length. Knife stab wounds may have a blunt end as well as a tapered end, indicating a single-edge blade. The width of the blunt end will approximate the thickness of the back (noncutting edge) of the blade. Stab wounds may gape on some areas of the body. Reapproximation of the skin edges will provide a more accurate measurement (the edges can be held in apposition by clear tape).

## Physical features of a knife

Knives have physical features that are of importance to the forensic investigation of sharp force injuries (**Image 6.1**). These features include the handle, crossguard (flared area of protection between the handle and blade; arrow A), ricasso (blunt segment of blade adjacent to crossguard; arrow B) and blade. Important features of the blade include its length, width, thickness, whether it has one or two cutting edges (i.e., single or double-edge), and whether one or both edges are serrated. The significance of the ricasso is that it has two blunt ends so that if the knife blade is inserted up to the ricasso, the stab wound may have two blunt ends. If the blade is thrust with force into the body so that the crossguard impacts the skin, a patterned contusion or abrasion consistent with the crossguard may be seen. Although knives are usually used to inflict incised and stab wounds, the handle can be used as a blunt force weapon and may leave patterned injuries from a beating.

## Anatomy of a stab wound

### Single-edge

Wounds from a single-edge blade typically have a sharp or tapered end and a blunt end (**Image 6.2**), but may also have two tapered ends if the blade is inserted superficially. In this example, the wound is slightly gaping. Stab wounds made from the same knife may appear variably slit-like or widely gaping based on their orientation to elastic fibers in the skin. If the stab wound happens to be oriented parallel to the elastic fibers, the wound will appear slit-like. If the stab wound is perpendicular to the elastic fibers, the edges of the wound will be pulled away from each other, creating a gaping wound. A stab wound oriented obliquely to the elastic fibers may appear variably or irregularly gaped.

The wound edges can be pushed together and held in place for measurement of the width of the wound, or they can be reapproximated with tape (**Image 6.3**) to provide a more accurate determination of the wound size. Some sharp force injuries are large and gape widely, distorting their true shape. The wound edges should be reapproximated manually or with tape to reconstruct the shape of the wound.

### Double-edge

The wounds produced by a double-edge blade are typically pointed or tapered at both ends (**Image 6.4**). However, two tapered ends do not always indicate a double-edge knife.

### Serrated

The large curvilinear stab wound on the left side of the neck has subtle serration of the posterior edge (**Image 6.5**). A serrated blade does not necessarily leave a serrated wound. Macroscopic photographs of each wound at autopsy will capture subtle details that may be missed by the pathologist during the performance of the autopsy. In this example, subtle serrations are seen along the inferior edge of the gaping stab wound (**Image 6.6**). The same knife caused these parallel curvilinear abrasions as the edge of the knife scraped across the skin (**Image 6.7**).

### Scissors

A stab wound from scissors leaves a wound that is more broad than the typical stab wound with a knife because the scissor blades are so much thicker. This wound will have a small "step" along one or both edges to reflect the normal approximation of one scissor blade overtop of the other (**Images 6.8** and **6.9**).



6.1



6.2



6.3

6.6

6.4

6.7

6.5

6.8









The patterned stab wounds on the right side of the forehead and the chest (**Image 6.10**) resemble four-point stars consistent with a Phillips screwdriver (**Image 6.11**). Other wounds on the chest had a different configuration and were consistent with having been inflicted by a pair of scissors (**Image 6.12**).

## Notanda about stab wounds

Stab wounds by the same knife can vary in size and shape, depending on the type of blade, the body region stabbed, the depth of insertion, and the angle of withdrawal. A single cutaneous stab wound may have more than one pathway in the body because it may be partially withdrawn and reinserted without being completely withdrawn out of the skin. Therefore, the wound track(s) of each cutaneous wound must be followed internally.

The presence of an abrasion around the stab wound, especially a patterned abrasion, may indicate that the knife has been inserted up to the handle or crossguard, with the handle producing the abrasion. In the example of **Image 6.13**, the victim was stabbed with a single-edge blade. The stab wound on the far right side of the photograph best shows the superior blunt end and the inferior sharp end. Similarly, ecchymosis surrounding the stab wound might be representative of impact with the knife's crossguard or with the assailant's thrusting hand. A V-shaped, chevron-shaped or check mark appearance of a wound suggests an angle of withdrawal that is different from the angle of insertion into the body.

Academically, a chest x-ray prior to the autopsy on a victim with stab and/or incised wounds may be used to evaluate for an air embolus, which would appear as an area of radiolucency in the right side of the heart. Procedures on documenting an air embolus are described in more detail in Chapter 29. An air embolus may be created if a vein is cut (particularly in the neck or upper chest), allowing air to enter the venous system and become lodged in the right side of the heart, resulting in an air lock so that blood cannot pass through on its way to the lungs.



6.13

X-rays should be taken of all stab and incised wounds to evaluate for broken-off knife blades or knife blade tips that may injure the pathologist. The broken blade should be recovered as evidence.

## Wound track

Knife wounds on the head should *never* be probed before the intracranial contents are examined at autopsy. This will prevent artifactual tracks through the soft brain tissue. Following photographic documentation, stab wounds on other parts of the body may be gently probed through the subcutaneous tissues to get a general impression of the direction of the wound path. Probes should never be thrust into deeper tissues prior to examination of the intrathoracic and intraperitoneal organs *in situ*. Never eviscerate until the organs are examined *in situ* for injuries associated with the wound track. In fact, the best way to estimate the length of the wound track is to insert a probe through the skin and wound track through the injured organs and tissues to the track's termination prior to evisceration. An additional pair of hands from an assistant is helpful at this stage.

Most stab wounds are penetrating but they can be perforating. The features of the exit wound in perforating stab wounds should be described with as much detail (location, size, orientation, etc.) as the entrance wound and the direction of the wound path. The distance through the body from the entrance wound to the exit wound should be recorded.

## Depth of stab wound

The length (or depth) of the entire wound track, beginning from the skin surface, should be measured or estimated to best approximation; this measurement will give an estimate of the length of the blade (as far as it was inserted into the body). It is emphasized that measurement of wound track length is a best estimate in the chest and the abdomen. It is an estimate in the chest because once the sternum is removed, the mediastinal structures drop toward the back of the thoracic cavity. Wound tracks through the heart and lungs should also be measured. It is also only an estimate in the abdomen because the knife can be plunged into the soft abdominal wall, compressing the intraperitoneal organs and tissues and creating a wound track that is artifactually longer than the inserted length of the blade. In children and young adults where the chest wall and ribs are relatively elastic, the same principle applies that a forcefully plunged knife or continued exerted pressure on the knife by the assailant may compress the chest wall and again result in wound tracks that are artifactually longer than the inserted length of the blade. Conversely, the instrument (weapon or object) causing a stab wound may be longer than the wound track in the body because it may not have been inserted completely.

## Direction of the incised wound

The direction of infliction of an incised wound may be difficult to interpret with certainty. Minute skin tags pointing towards the *beginning* end or tiny amounts of "heaped up" epithelium at the *terminating* end may provide a clue to directionality.

## Handedness of the assailant

The handedness (right- or left-handed) of the assailant cannot be determined by the wounds alone. If the relative positions of the victim and assailant are known at the moment of the stabbing, an opinion may be rendered that one is more consistent than the other, but such opinions are entirely contingent on each individual case.

## Knives left *in situ*

If a knife (or other weapon) is left inserted in the body, discuss with the investigating police agency whether they want to process the handle of the weapon (or exposed portion of the weapon) for trace evidence and fingerprints prior to the autopsy. The body is radiographed to verify the size, appearance, and position of the blade inside the body (**Image 6.14**). Photography should document the knife from different angles (**Image 6.15**). The knife or weapon should be marked at the level of the skin; this provides the depth of the stab wound on the weapon itself. Depending on where the knife is embedded, it may be possible to view and photograph the weapon in place, after making the standard autopsy incisions in the chest and abdomen, before withdrawing the













knife. Slowly withdraw the knife, noting the direction of the wound path relative to the victim (for example, from the victim's front toward his back, from his left side toward his right side, and downward toward the feet). You now have the depth of the wound (unless the knife had already been partially withdrawn by the assailant) and the direction of the wound path. The extricated knife should be photographed with a scale (**Image 6.16**). The knife should be receipted uncleaned to the investigative agency. The wound can now be documented in routine fashion for a stab wound, including photography of the stab wound itself (**Image 6.17**). If an abrasion is associated with the stab wound, compare the abrasion with the crossguard of the knife, and photograph the wound and

the crossguard with a scale if the abrasion is consistent with having been caused by the crossguard.

This radiograph of the head is ominous (**Image 6.18**). Note that the handle of this metal knife has five round ornamental holes. This man survived one day in hospital after being stabbed in the head. Only three of the five



6.19



6.21



6.20



6.22

ornamental holes in the knife handle were exposed externally, and the tip of the blade reached the brainstem. After the knife was extricated from the head, it left this slightly gaping stab wound that is filled with blood clot (**Image 6.19**). The ends of the wound appear blunt and slightly abraded, consistent with the knife being thrust into the head up to the handle. The blade of the knife had a double edge, with fine serration of one edge, but the handle was rectangular, consistent with the shape of the wound (**Image 6.20**).

## Defensive injuries

Defensive injuries are injuries sustained by victims as they are trying to protect themselves from an assailant. The diagnosis of a defensive injury is not an anatomic or pathologic one, but is actually a circumstance-dependent designation. For example, one may sustain an incised wound across the volar aspects of the fingers from the knife slipping as one slices a tomato held in the hand—that wound is anatomically consistent with a defensive

injury, but is not a defensive injury by circumstance. Classically, defensive injuries refer to sharp force injuries on the hands, forearms, and even upper arms, potentially involving both the extensor and flexor aspects. By definition, defensive injuries may also be sustained on the legs and feet as the victim is on the ground kicking away an assailant. Defensive injuries are not restricted to sharp force injuries, but include blunt force injuries, gunshot wounds, and chop wounds.

### Defensive injury posturing

As the left arm comes up to ward off a stab to the torso, an incised wound could be inflicted on the extensor aspect of the forearm (**Image 6.21**). If the knife blade is grabbed, incised wounds may result on the palm and the volar aspects of the fingers (**Image 6.22**). When the arms are put up to protect the face and chest, a stab wound may be inflicted on the palm of the hand (**Image 6.23**) or on the lateral aspect of the upper arm (**Image 6.24**). A slashing motion may produce an incised wound across the ulnar border of the forearm (**Image 6.25**).









**Image 6.26** shows an incised wound to the proximal middle finger, sustained during a homicidal knife attack.

The body of a man found in a car had multiple stab wounds on the chest. The defensive injury on his right hand was an incised wound to the right thumb that extended into the thenar eminence (**Image 6.27**).

## Documenting stab wounds

The following wound features should be documented:

- Location on the body
- Measurements from a landmark such as the top of the head and distance from the midline of the body
- Size and shape of the wound
- Orientation (use the face of a clock for reference, for example, the ends of a transverse wound are at 3 o'clock and 9 o'clock)
- Associated abrasions and ecchymoses
- Tissues injured (wound track)
- Direction through the body (wound path)

- Length of wound track through tissues beginning from the skin
- Associated findings such as hemothorax, hemoperitoneum, etc.
- Presence of tool marks on cartilage and bone.

## Chop wounds

Chop wounds are intermediary between blunt and sharp force injuries in that they involve both tissue laceration and slicing. Among the most common objects causing chop wounds are axes (**Image 6.28**; note the abraded edges), machetes, and propeller and machinery blades. The chop wounds from boat propeller blades are typically parallel and curvilinear.

A man drove his personal watercraft into the port side of a boat. The propeller wounds begin on the face and continue down the neck onto the left shoulder and left upper arm (**Image 6.29**). A wound across the forehead fractured the frontal bone, including the orbital plates (**Image 6.30**). This wound also transected the frontal lobes. Experimentation with the port propeller on a block









of clay reproduced the wounds (**Images 6.31** and **6.32**) and allowed the determination to be made that the young man went feet first into the port propeller and not the starboard propeller.

A man's body was found floating in the ocean approximately one-half mile offshore. A gaping head wound was interpreted initially by police investigators to be propeller injuries sustained after the victim drowned (**Image 6.33**). Attempted reconstruction of the scalp disclosed multiple curvilinear lacerations on the left side and back of the head (**Image 6.34**). Examination of the underlying remaining skull disclosed multiple linear "chop" injuries that were oriented in different planes, not consistent with the parallel wounds expected from a propeller strike (**Image 6.35**). In this example, notice the clearly defined, linear wounds on the left lateral side of the skull, which span the temporo-occipital skull, and extend onto the left ramus of the mandible. The linear chop-type injuries are consistent with the machete that was used to kill the victim.

## Sharp force injuries caused by other objects

Stab wounds can be caused by noncutting objects (instruments/weapons) such as wires, skewers, pokers, screwdrivers, and glass. Meticulous photography with a scale will preserve the wound characteristics and allow comparison with proposed weapons.

A man was shot by police after he created a disturbance and fled. In addition to abrasions on the right side of the forehead, and multiple wounds on the lower half of the face and neck from buckshot, he has a sharp force injury on his nose. The disturbance he created was a fight during which he was struck on the face with a bottle.

The injury on the nose is an incised wound with clean edges produced by the glass of the bottle that was broken on his face (**Image 6.36**). Shards or splinters of glass in the wound may be of evidentiary value and should be preserved.



6.31

6.34

6.32

6.35

6.33

6.36

An unrestrained right rear seat passenger was propelled forward during a front-end collision. She landed in the right front passenger seat with her face impacting the front windshield. In **Image 6.37**, her chin is resting on the dashboard and her face is just inside the shattered windshield. Multiple abrasions and superficial lacerations from the broken glass of the windshield cover her face. If the broken glass is sharp enough, the edges of the wounds may be clean enough to be considered incised wounds.

**Images 6.38** through **6.41** are of a man who was impaled by wires because of a malfunction of equipment during the production of prestressed concrete. The wires

in the radiograph correspond with wires perforating the left forearm and other wires penetrating the abdomen (**Image 6.38**). The wire penetrating the abdomen impaled the left kidney (**Image 6.39**). The victim had pulled out two wires from his chest at the scene before he was transported to hospital. Those two wires had perforated the trachea and descending thoracic aorta. In **Image 6.40**, the green probe is through the wound in the aorta. In **Image 6.41**, the probe is through the perforating wound in the trachea; note the associated ecchymosis in the trachea. When the wires were pulled out, they left a traumatic aortotracheal fistula. He coughed up blood at the scene.

Puncture wounds can result from multiple objects, including teeth. A white tiger pounced on a zoo employee who was inattentive and making too much noise while cleaning the tiger's den (**Image 6.42**). A bite on the man's head and neck left multiple irregular wounds (**Image 6.43**). One of the tiger's teeth was deeply imbedded in a puncture wound from the bite (**Images 6.44** and **6.45**).











6.41



6.42



6.43



6.44



6.45

## Suicide

Most suicidal stab wounds are easily differentiated from homicidal stab wounds on the basis of the history, terminal events, scene, and autopsy findings. A stab or incised wound on a part of the body that is accessible to the victim's own hand, that is, a wound that is anatomically possible to self-inflict (e.g. stab wound to the chest), will require examination of the factors listed above to help in determining the manner of death. A stab wound to most areas on the back is usually impossible to self-inflict. It cannot be emphasized enough that the autopsy findings should be correlated with the history, terminal events, and scene findings. Such comprehensive correlation should help dispel the allegation that a homicidal stab wound victim actually died through accidental or suicidal means by "falling on or walking into the knife" again and again.









This young man incised the flexor aspects of his forearms before hanging himself (**Image 6.46**). People who commit suicide by sharp force injuries frequently have multiple incised wounds of variable depth, which may be found on the neck, arms (especially the antecubital fossae and flexor aspects of the forearms), and the flexor aspects of the wrists. Look for scars in the same areas to indicate previous attempts (**Image 6.47**). The wrists must be extended to expose delicate scars in the flexor creases.

Although the discovery of a body with multiple sharp force injuries can be alarming, the location/distribution of injuries is important in the differentiation between suicidal and homicidal injuries. The stab wounds on the chest and abdomen in **Image 6.48** were self-inflicted, along with the incised wound on the left side of the neck and the incised wounds in the left antecubital fossa and on the left wrist. Typical self-inflicted incised wounds may be on the neck, in the antecubital fossae, and on the flexor aspects of the forearms, as well as on the wrists (**Image 6.49**).

## Hesitation marks

Hesitation marks are multiple superficial, usually parallel incised wounds that are seen in cases of self-inflicted sharp force injuries, often adjacent to a larger, deeper, and potentially lethal wound.

In **Image 6.50**, numerous hesitation marks accompany the self-inflicted gouges to the neck by a broken bottle. Hesitation marks are not always present with self-inflicted incised wounds such as in this man who had no injuries anywhere else on the body (**Image 6.51**).

## Dissection of incised wounds

Self-inflicted incised wounds that result in death should be dissected to determine which major vessels were injured. At times, the wounds may be relatively superficial, but if there are a high number of wounds, all of which are bleeding, every wound will contribute to eventual hemorrhagic shock and death. Postinjury func-

tion or capability may be an issue if, for example, a subject incised his wrists and allegedly pointed a gun at police before he was shot and killed. A dissection of the incised wounds would clarify which muscle tendons were transected and help determine the functional capability that would remain following the incised wound (**Image 6.52**). In other words, after the wounds were self-inflicted, would the subject have the physical capability to pick up a firearm and point it at the police? An anatomy atlas is a useful companion at the autopsy.

## Postinjury activity

Stab wounds are usually not immediately incapacitating (unless they sever the spinal cord or medulla oblongata), and the victim may be capable of movement for some time after the injury. This, of course, is dependent on the vessels and other tissues injured. For example, a stab wound of the heart, aorta, and pulmonary arteries will lead to a more rapid death than injury of smaller or lower pressure vessels such as veins, but may still permit continued activity by the victim for a limited time.

Research has illustrated marked variability in human capability to function after a fatal injury. In one study, 22 percent of stab wound victims were observed to have some physical efforts (ranging from walking to running several hundred meters).[1] Other studies showed that after such an injury, between 24.5 percent[2] and 71 percent[3] of victims survived at least 5 minutes after injury, including some individuals with injuries to the heart and aorta. When asked to estimate the possibility of postinjury survival, one should consider multiple factors, including the blood vessels and tissues injured, the age and health of the individual, the results of toxicological analyses, and all other pertinent findings.

A man was stabbed in the chest while he was in the middle of the street (**Image 6.53**), but managed to walk at least 30 feet before collapsing and dying on his front doorstep (**Image 6.54**). Autopsy disclosed a stab wound to the left ventricle of the heart.

## Tool mark analysis

The forceful impact of an object against human tissue may lead to the development of recognizable patterned injury.[4,5] Although these patterns can be present on the skin, they are indelibly preserved in dense tissue like cartilage and bone where the shape and texture of the implement may be imprinted. Classical examples of tool marks from the blunt force injury spectrum include blows to the head with hammers and wrenches. Discrete markings may be left on cartilage or cortical bone in deaths due to sharp force injury; tool marks are much less distinct on medullary bone. In **Image 6.55**, note the linear indentations found on the skull of a homicidal stabbing victim. Like the tool marks found in some blunt force injury deaths, those resulting from sharp force



6.50



6.51



6.52

> **So you've found tool marks . . .**
>
> If your evaluation of a stabbing victim has revealed possible tool marks, great care must be taken when handling the specimen. Artifactual distortion of these marks can limit the success of later studies. Once marks have been identified, described, and photographed the piece of cartilage or bone should be removed without handling the surface with the tool marks. It is often helpful to label your own resection margin with India ink or other marker. Excess soft tissue should be removed carefully without adding artifactual marks. If removal artifact is created, the autopsy marks should be identified and documented as such. After the specimen has been trimmed and rephotographed, it should be placed in 10 percent formalin and submitted to tool mark examiners for proper evaluation.

trauma may be used to identify suspect weapons. In **Image 6.56**, note the fine striations present on the cut surface of the costal cartilage from a stabbing victim. Such striations can be documented photographically for later comparison against the striations of a suspect's weapon; the cartilage itself may be retained as evidence.

During the autopsy of a homicidal stabbing, tool marks were visualized on the cut surface of a costal cartilage (**Image 6.57**). The cartilage was carefully removed, trimmed, fixed in formalin, and submitted to a tool mark examiner for study. The examiner created clay impressions of both the cartilage surface and the cutting edge of a suspect's knife (**Image 6.58**). Through comparison microscopy, the striations were seen to be highly consistent in appearance and, therefore, the stab wounds through the cartilage were determined to be consistent with having been caused by the suspect's knife.



6.53



6.55



6.54



6.56



6.57



6.58

## Dismembered bodies

The investigation of cases of dismembered human bodies can be complex and, as such, mandate careful documentation and an organized approach.[6] The type of processing required will be contingent on the preservation of the recovered remains. Scenes with dismembered human body parts, like any other scene, are under the jurisdiction of the investigating police agency, and the pathologist must work in cooperation with law enforcement. The containers in which dismembered remains are found may harbor evidence and need to be processed separately. The scene should be photographed before anything is disturbed. Once the remains are uncovered or exposed, additional photography is required. The remains must be examined to determine whether they are from one victim or are commingled remains from more than one victim.

After transportation of the remains back to the morgue, all body parts are radiographed. The body parts should be arranged in anatomic order. All remains should be examined with the primary objectives of establishing identification and determining the cause of death. A specific search should be made for tool marks, particularly on articular cartilage, other cartilages, and smooth cortical bone (tool marks are less evident on medullary bone). Precise descriptions should be made of identifying features such as tattoos and scars. Appropriate specimens should be obtained for toxicologic analysis, DNA profiling, and a sexual battery kit. Samples for DNA analysis might include muscle, a segment of the shaft of a long bone, and plucked hair, depending on the remains available and the degree of preservation.

The best body part for potential identification is the head, especially if the dentition is intact. Depending on the state of preservation, a photograph may be taken for legal identification; the dentition should be charted by

a forensic odontologist. With advanced decomposition, the skull should be defleshed to allow for the creation of a forensic osteologic profile and for possible three-dimensional facial reconstruction. If the hands are present and preserved, fingernail scrapings/clippings are taken prior to fingerprinting and palmprinting. Keep in mind that foreign DNA may be present under the nails.

After radiography, collection of specimens for a sexual battery kit, autopsy, collection of specimens for toxicologic analysis and DNA profiling, and documentation and preservation of tool marks, the remains should be carefully defleshed for osteologic analysis and profiling.

Dismembered remains may be found combined in a single container for disposal or be discarded and distributed widely in individual portions. The zippered blue bag in **Image 6.59** was retrieved from a dumpster by a man throwing out his trash. Inside were two packages wrapped identically in black garbage bags and masking tape. Each package contained a relatively muscular thigh from a white adult (**Images 6.60** and **6.61**). Because the blue bag was in a dumpster, this mandated that the rest of the contents of the dumpster be examined. The last item to be examined from the dumpster was a white plastic supermarket bag that was knotted. The plastic bag was heavy and contained a yellow sponge, two white Styrofoam cups, and three yellow rubber gloves. A small amount of blood was on the sponge. At the bottom of the bag was an ovoid package the size of a small turkey, wrapped in a black garbage bag and masking tape (**Image 6.62**). Investigators were excited, anticipating that this package would contain the victim's head. Once unwrapped, the buttocks of a white adult were displayed (**Image 6.63**). This package was the dismembered pelvis of a white adult male; the penis was not circumcised. The following day, a maintenance man was emptying garbage cans along the front of a hotel. The contents of one of the garbage cans included two











packages wrapped in black garbage bags and masking tape. What terrified the maintenance man was that the shape of each package was that of a lower leg and foot (**Image 6.64**). The hotel where these packages were found was several blocks from where the blue bag containing the pelvis and thighs was recovered.

It appeared that all five body parts were from the same victim. The body parts were photographed and described and then assembled on a single body tray for a composite photograph. The edges of the skin on adjacent body parts were sutured to reapproximate the parts (**Images 6.65** and **6.66**). Notice that the proximal incised edge on the right knee matches the distal incised edge. Even better evidence that the two portions of right lower extremity were from the same individual is the vertical incision that begins on the thigh portion and continues downward, crossing the transverse, dismembering incision onto the lower leg.

Tool marks on the articular cartilage of the joints were photographed (**Image 6.67**). The waist size was estimated from the pelvis. The shoe size was obtained by measuring the feet in a shoe scale used in shoe stores.

The DNA profiles from all five body parts were identical. The bones were defleshed and examined. The age of the victim was estimated to be in the thirties based on examination of the symphyseal surfaces of the pubic bones. The antemortem stature was estimated by measuring the long bones. The medical examiner noted that the left ankle was more rigid than the right, and the cir-



6.64



6.66



6.65



6.67

cumference of the left calf was smaller than the circumference of the right calf; these findings suggested that the victim may have had a limp. The cause of death was not evident from the recovered remains, and no additional remains from the victim have been found.

## Postmortem wounds

Decomposing bodies will have associated postmortem color changes. Following photography, wounds should be incised to disclose a hemorrhagic track that is still visible in the subcutaneous fat of antemortem wounds, even in decomposing bodies. The subcutaneous fat surrounding the injury should not be the hemorrhagic red of the antemortem wound, but should still be yellow.

The naked body of a young man was found at an illegal dump site (**Image 6.68**) along with blood-stained sheets and a large black garbage bag (**Image 6.69**). The black garbage bag contained loops of small bowel, utility knife blades, and the ends of ruptured latex packets

(**Image 6.70**). When the bloody body was turned supine, a wound was noted on the abdomen. A gaping, longitudinal midline incision ran the entire length of the abdomen (**Image 6.71**). Examination of the abdominal incision at autopsy disclosed lack of a vital reaction along the edges of the wound, indicating that this was a postmortem incision (**Image 6.72**). This young man was a body packer or drug mule who had swallowed an unknown number of latex-wrapped packets of heroin in Colombia before flying to the United States. Circumstances suggest that he had met with the people who were to receive the packets; however, he died before he could pass all of the packets from his gastrointestinal tract. These individuals wanted to retrieve the packets still inside the body and simply incised the abdomen, extracted the loops of small bowel, and milked whatever packets were palpable out of the bowel to retrieve them. Several packets in other portions of the gastrointestinal tract were found at autopsy. Toxicology confirmed heroin toxicity.









## Decomposing bodies/bodies in water

With prolonged submersion in water, antemortem wounds on the body will become pale and lose the expected red vital reaction typical of antemortem wounds. This is because blood is gradually leached out of the wounds by the water over time. Antemortem wounds may be difficult to distinguish from postmortem wounds on the basis of surface appearance alone. Features that could distinguish antemortem from postmortem wounds, such as hemorrhage along the wound track, may be discovered during dissection of the wound. All wounds should be evaluated in the context of the remainder of the autopsy findings, history, terminal events, and scene findings. For example, multiple stab wounds found at the root of the neck in the torso discussed in the next paragraph were likely antemortem because of their location and nature, as opposed to the postmortem wounds from dismemberment.

The decomposing torso of a man was seen floating in a canal. The head, hands, and lower extremities were absent. Although alligators were known to be in the



canal, the absence of the head and the symmetrical loss of extremities concerned investigators (**Image 6.73**). The suspicion of foul play was confirmed when they saw the concrete cinder block tied to the waist. Multiple stab wounds were around the roof of the neck, and were presumed to be the cause of death.


6.73

- Measure the length of the wound track (i.e., depth) of stab wounds.
- Describe the direction of the wound path through the body.
- Retain all tool marks on cartilage and cortical bone.
- Submit all possible tool marks to tool mark examiners.

***Don't***

- Thrust probes into stab wounds prior to document of the organs *in situ*.
- Cut out stab or incised wounds and retain them; instead, photograph wounds with a scale to preserve their shape, size, and orientation.
- Forget to examine cartilage and bone for the presence of tool marks.
- Alter tool marks by rubbing, cutting or otherwise mutilating the evidence.

***Do***

- X-ray all sharp force injuries to look for broken knife blades or knife blade tips.
- Obtain a chest x-ray to evaluate for possible air embolism.
- Describe the location, size, shape, and orientation of stab and incised wounds.
- Describe ecchymoses and especially patterned abrasions associated with stab wounds.
- Photograph patterned injuries with a scale.
- Examine the injuries along the wound track prior to evisceration of the organs.

## References

1. Thoresen SO, Rognum TO. Survival time and acting capability after fatal injury by sharp weapons. Forensic Sci Int 1986;31(3):181–7.
2. Spitz W, Petty C, Fischer R. Physical activity until collapse following fatal injury by firearms and sharp pointed weapons. J Forensic Sci 1961;6:290–300.
3. Levy V, Rao VJ. Survival time in gunshot and stab wound victims. Am J Forensic Med Pathol 1988;9(3):215–7.
4. Rao VJ. Patterned injury and its evidentiary value. J Forensic Sci 1986;31(2):768–72.
5. Clark EG, Sperry KL. Distinctive blunt force injuries caused by a crescent wrench. J Forensic Sci 1992;37(4):1172–8.
6. Hyma BA, Rao VJ. Evaluation and identification of dismembered human remains. Am J Forensic Med Pathol 1991;12(4):291–9.

# 7 Firearm Injuries

*Emma Lew, M.D.*
*David Dolinak, M.D.*
*Evan Matshes, M.D.*

FUNDAMENTALS OF WOUND BALLISTICS    164
ENTRANCE GUNSHOT WOUNDS    164
   Indeterminate range    164
   Contact range    165
   Intermediate range    168
   Graze wounds    171
   Ricochet wounds    172
   Intermediary targets    173
DISTINGUISHING ENTRANCE FROM EXIT
   WOUNDS    176
EXIT GUNSHOT WOUNDS    178
   Low-velocity exit    179
   Supported exit    179
GUNSHOT WOUNDS IN BONE    180
   Internal ricochet    183
DELAYED GUNSHOT WOUND DEATHS    184
OTHER INJURIES ASSOCIATED WITH FIREARMS    185
   Pistol whipping    185
GLASER SAFETY SLUG    185

TASER    186
TECHNICAL APPROACH TO GUNSHOT
   WOUNDS    186
   Radiography of gunshot wounds    186
   Probes    188
   Projectiles    188
   How to approach a multiple gunshot wound
      case    189
   Things to consider for multiple gunshot
      wounds    189
SHOTGUNS    190
   Shotgun ammunition    190
   Shotgun wounds    192
   Radiography of shotgun wounds    196
RIFLES    197
   Tips for autopsying a case with high-velocity rifle
      wounds    198
REFERENCES    200

Gunshot wounds are the most common cause of death in homicides in the major metropolitan regions of the United States. Therefore, the pathologist who performs forensic autopsies should have a working knowledge of gunshot wounds and their proper documentation. Regardless of which of the innumerable and ever increasing variety of firearms is used, gunshot wounds have basic characteristics that help to distinguish entrance wounds from exit wounds and determine category of range of fire. Intermediary targets, ricochet bullets, and postmortem artifacts will add features that may complicate interpretation. Modern generations of the Taser® are gaining in popularity with police agencies as a less lethal weapon and, anecdotally, have decreased the number of SWAT callouts and police-involved shootings. However, the Taser is not without its own controversy.[1–3]

Among the many different types of firearms are the shotgun and the rifle, both of which are available in an array of different models and with a variety of ammunition. The shotgun is a smooth-bore firearm with a long barrel, designed to fire a shell containing a single large lead slug or lead pellets that, on exiting the barrel, spread out in a cone-like distribution to cover a large surface area. The shotgun is used mainly for hunting game, and common ammunition is appropriately named, ranging from tiny lead pellets (birdshot), to large pellets (buckshot), to a single large lead projectile (slug).

Rifles also are long-barreled firearms that can be divided into two general categories: rimfire (low power) and centerfire (high power). The rimfire rifle is most commonly of .22 caliber, is used in hunting small game, and has muzzle velocities of less than 1400 feet/second. The centerfire rifle is used in hunting and in war and has a much higher muzzle velocity, typically in the 2000 to 3500 feet/second range.

Wounds produced by shotguns and high-powered rifles are highly destructive when fired at close range. The high-powered rifle often produces devastating wounds at distant ranges, also. The shotgun, however, at increasingly distant ranges, loses its destructive nature, and with increasing range of fire over longer distances, the pellets may penetrate tissues only superficially.

## Fundamentals of wound ballistics

Pathologists who investigate deaths due to gunshot wounds should have at least an elementary understanding of wound ballistics (the study of the effects of penetrating projectiles on the body). Much of the scientific knowledge in this area is the work product of Dr. Martin Fackler and others at the Letterman Army Institute of Research. For more information on this topic, refer to the literature published by this group, or the volume on gunshot wounds written by Dr. V. DiMaio.[4]

The morphology of a gunshot wound, its pathway through the body, and even its exit are dependent on multiple factors. Before a projectile makes contact with the body, it is affected by its own shape, size, weight (manufacturing specifications), the weapon it was fired from, the presence of intermediary targets, etc. The nature of the gunshot wound in tissue is affected by the angle of impact, the type of tissues through which the projectile travels (e.g., bone versus fat), how deep the projectile penetrates, whether the missile fragments, and the nature of the permanent and temporary cavities.[5–7] The permanent cavity is the actual track of crush (laceration) injury caused by the passage of the projectile. The temporary cavity occurs when a projectile passes through the tissue with sufficient speed to cause the tissue to stretch and deform.[8] The projectile creates a pressure wave that expands radially around the projectile track, deforming the tissues with decreasing magnitude more distant from the projectile track. The pressure wave is caused by energy transfer from the projectile to the tissues as its velocity is reduced. Although this has been compared with the splash seen after throwing a stone into water (i.e., a "harmless tissue splash"),[9] practical experience has shown that the rapid and violent expansion of tissues adjacent to a permanent cavity can have serious sequelae. This is particularly evident when high-velocity projectiles pass near solid organs, lacerating them, as commonly occurs with the liver, kidneys, spleen, and even aorta (**Image 7.1**). Velocity is not everything however. The muzzle velocities of a 12-gauge shotgun (approximately 1350 feet/second), .44-caliber Magnum revolver (approximately 1390 feet/second), and .22-caliber long rifle (1255 to 1280 feet/second) are similar, yet the wounds produced by each are vastly different. Studies performed by the Federal Bureau of Investigation demonstrate that wounding potential

depends on placement and penetration of the projectile, degree of cavitation of tissues, deformity, yaw and fragmentation of the projectile, and character of the target tissue.[10] Elastic tissues such as lungs may have relatively small wounds, whereas solid organs such as liver and kidney will rupture and lacerate.

Although the projectile did not perforate the aorta (**Image 7.1**), the temporary cavity caused by the projectile passing in the near vicinity resulted in stretch lacerations.

Studies with ordnance gelatin have demonstrated that impact of the projectile with tissue (simulated with the gelatin) creates a sonic shock wave (**Figure 7.1**). This wave travels faster through tissue than the projectile itself, but plays no role in wound track formation.[5,7,11]

Projectile velocity is not the sole predictor of wound severity,[6,8] because the projectile's tendency to deform and/or fragment and become unstable along its path through the body (*yaw* or rotation about its horizontal axis) also causes significant injury. Although a bullet's yaw may play a contributory role in wound morphology, it is a projectile's tendency to fragment that plays a more significant role in wound ballistics.[6,12,13] Bullet yaw through tissue should not be confused with yaw through the air—a concept considered by Fackler to be fallacious.

## Entrance gunshot wounds

### Indeterminate range

The classical indeterminate range entrance gunshot wound has a central defect/perforation surrounded by a margin of abraded skin (abrasion margin; **Image 7.2**). The apparent shape of the central defect can vary depending on the nature of the subcutaneous tissue that can protrude into and out of the defect. The shape of the



7.1



**Figure 7.1**   Diagram of a projectile track through tissue showing the sonic wave preceding the bullet. The projectile track itself is the permanent cavity, whereas the temporary cavity is formed by a stretching of the surrounding areas. Reproduced with permission from Fackler ML. Ballistic injury. Ann Emerg Med 1986;15(12):1451–5.



wound can be distorted by its location on the body. The shape of the abrasion margin can vary and be asymmetrical or irregular. An eccentric elliptical abrasion margin can be a clue to the direction of the projectile path. An eccentric abrasion margin results from one side of the obliquely oriented projectile contacting and abrading the skin more on that side than on the other. The term

*indeterminate range* is preferable and more accurate than *distant range* gunshot wound. An indeterminate range gunshot wound is one that lacks features that define an intermediate range or a contact gunshot wound, regardless of the range of fire. An intermediary target (including clothing) can shield the skin and screen or filter out gunpowder and soot.

The smallest defect from any one projectile results from a perpendicular strike to the skin. An angled projectile, for example, from a ricochet, presents a larger surface area to the target skin and results in a larger wound.

## Contact range

Contact gunshot wounds are recognized by several features. Soot and gunpowder residue expelled along with the fired projectile will stain the wound edges dark gray to black. The degree of dark discoloration is contingent on the firearm and the ammunition. Soot on the skin around the wound indicates that there was some space between the muzzle of the firearm and the skin in order to allow the escape of soot. The end of the barrel (muzzle) of a firearm can leave an ecchymotic or abraded muzzle imprint on the skin around a contact gunshot wound. The muzzle imprint will mirror the contours of the

muzzle (**Images 7.3** and **7.4**). Muzzle imprints may be partial (**Images 7.5** and **7.6**).

Hard contact gunshot wounds, where the muzzle is pressed firmly into the skin, can result in tears that impart a stellate configuration to the wound. This is most frequently seen in gunshot wounds to the head where the hot expanding gases forced between the scalp and calvarium are released by creating tears in the scalp.

**Image 7.7** shows a hard contact gunshot wound of the right temporal scalp with a large gaping stellate tear, soot deposition on the temporalis muscle and on the outer table of the skull around the entrance wound, and comminution of the temporal bone.

A hard contact entrance gunshot wound with laceration of the skin and deposition of residue in the edges of the wound is on the forehead of a young homicide victim (**Image 7.8**).

This is a near (loose) contact gunshot wound through hair in the sideburn area (**Image 7.9**). A layer of hair











allows just enough room for soot to deposit on the skin. Hair around such a gunshot wound may be submitted to the firearm examiner for residue analysis. In loose contact or near-contact gunshot wounds, there may also be searing of the skin by the heated gases expelled from the muzzle. The searing can impart a black/dark brown discoloration around the edges of the wound.

This contact gunshot wound to the left temporal region (**Image 7.10**) has tearing of the skin and some deposition of soot and gunpowder residue in the wound edges. The woman was killed as she slept.

Contact gunshot wounds through thin intermediary targets, like clothing, are still frequently recognizable as contact wounds. It would be optimal if the bullet hole in the clothing, or other intermediary target, could be examined for tears, soot, and gunpowder residue.

Intraoral gunshot wounds into the head are best visualized and demonstrated after the tongue is resected (**Images 7.11** and **7.12**). Once the brain has been removed, the projectile path may be demonstrated by inserting a probe along the wound track (**Image 7.13**).


7.10


7.8


7.9


7.11


7.12



7.13



7.15



7.14



7.16

Abrasion margins around entrance wounds dry and may turn a dark red-black; this drying artifact may be misinterpreted as soot and residue in the wound edges, and the entire wound may be erroneously designated as a contact wound (**Image 7.14**). The true nature of the dark discoloration may be resolved by taking a histological section and looking for gunpowder microscopically. **Image 7.15** is a low-power section from a gunshot wound in a burnt body—it was not possible to determine whether the wound was contact range. At low power, dark pigmentation is seen along the skin surface. With higher power (**Image 7.16**) translucent, nonrefractile particulate foreign material consistent with gunpowder was present. The wound was consistent with a contact range wound.

### Intermediate range

When a gun is fired, pieces of burnt and unburned gunpowder and soot are expelled along with the projectile.

Intermediate-range gunshot wounds are defined by the presence of punctate abrasions caused by pieces of gunpowder striking and abrading the skin. These red punctate abrasions are collectively termed *stippling* and are not washed away, although gunpowder deposited on the skin and embedded in the abrasions can be washed away. Stippling is important in that the radius of the stippling pattern can help to determine the range of fire. Intermediate range is usually within 2 to 3 feet, but the stippling pattern is contingent on the firearm and the ammunition. Test firing with the same weapon and identical ammunition is recommended, whenever feasible, to estimate the range of fire. Soot can be deposited on the skin around the intermediate-range gunshot wound and is usually not visible beyond a several-inch radius. Soot and stippling are most concentrated immediately around the gunshot wound and decrease in concentration away from the wound. Increasing the range of fire will increase the area of stippling but decrease the density of the stippling. Soot and stippling can be eccentrically deposited



7.17



7.19



7.18



7.20

if the firearm is angled or if an intermediary target shields the skin.

The man shown in **Image 7.17** first grazed his right parietal scalp with an intermediate-range gunshot wound, then repositioned the muzzle against his right temple and died from the hard contact gunshot wound that was inflicted next.

The stippling around an intermediate-range gunshot wound will vary with the firearm and ammunition used. This is an exceptionally prominent pat-tern of confluent punctate abrasions from a .44-caliber Magnum revolver (**Image 7.18**).

Test firing will help to approximate the range of fire in an intermediate-range gunshot wound if the actual firearm used is available and the exact type of ammunition used is known. Test fire patterns at different ranges of fire can then be compared with the stippling around the intermediate-range gunshot wound.

A jealous boyfriend shot this man in the head (**Image 7.19**). The range of fire was important to the prosecuting attorney, so test firing of the weapon used by the shooter was performed with the identical type of ammunition. Test fire patterns into cardboard, especially at close or near-contact range, will differ from those into skin because the two mediums are obviously different. However, it was still evident that at the 1-inch range (**Image 7.20**), the gunpowder was more concentrated (over a smaller area) than the stippling around the gunshot wound. The test fire pattern at 2 inches (**Image 7.21**) closely approximated the pattern of stippling

around the actual gunshot wound. The test fire pattern at 6 and 12 inches showed gunpowder patterns that were obviously more sparse and wider than the stippling pattern around the gunshot wound.

Stippling can occur through a layer of clothing (**Images 7.22** and **7.23**). The stippling is sparse around the gunshot wound, but is definitely present (**Image 7.24**). If the range of fire needs to be estimated more accurately, test firing should be performed if the actual weapon used is available; the test fire patterns are compared with the gunpowder pattern on the outer layer of clothing and not with the stippling around the gunshot wound on the skin. The identical ammunition, if known, should also be used in the test firing.

An intermediate-range gunshot wound was on the left temple of a female homicide victim (**Image 7.25**). The man who shot the woman had an intermediate-range gunshot wound to the right temple (**Image 7.26**). The wounds in both the woman and the man were inflicted with the same firearm and ammunition. Note the presence of black soot and residue and increased concentration of stippling immediately around the gunshot wound in the female as compared with minimal soot residue and a wider, less concentrated stippling pattern around the gunshot wound in the male. The range of fire was slightly greater in the male.

The woman shown in **Image 7.27** has an intermediate-range gunshot wound on the right side of the forehead.



7.21



7.22



7.24



7.23



7.25

The stippling terminates abruptly along the right. The interrupted pattern of stippling is explained by the presence of stippling and prominent soot deposition on the medial aspect of the right upper arm, which was obviously up by the side of the face at the time she was shot (**Image 7.28**).

This man has a gunshot wound to the medial aspect of the right eye, surrounded by stippling over most of the face (**Image 7.29**). The left eyeball also has stippling, indicating that his eyes were open at the time he was shot (**Image 7.30**).

The abrasions from *pseudostippling* are less regular in size, configuration, and pattern of distribution. The causes of pseudostippling include insect bites, intermediary targets (such as glass or wood), and fragmentation of the projectile.

This man has a gunshot wound on the right side of the chin (**Image 7.31**). Stippling is evident immediately around the gunshot wound, but additional irregular, discrete to focally confluent punctate abrasions are on the left side of the face and the neck. These additional irregular abrasions demonstrate pseudostippling from ant bites.

## Graze wounds

Graze gunshot wounds are usually superficial. Graze wounds have skin tags that point toward the firearm. In other words, the skin tags point opposite to the direction



7.26



7.27



7.29



7.28



7.30



7.31



7.33



7.34



7.32

of travel of the projectile. Tiny skin tags can frequently be seen in entrance gunshot wounds, and in exit wounds to indicate direction of travel of the projectile.

As mentioned, a graze gunshot wound has skin tags that point toward the gun. In this case, the firearm is on the right, with the projectile passing from right to left (**Image 7.32**).

The skin tears on this graze wound point to the left, indicating that the projectile is traveling from left to right (**Image 7.33**).

This is a superficial, tangential gunshot wound to the back of the head (**Image 7.34**). The entrance wound on the right has an abrasion margin along the right edge,

and skin tags that point to the right, consistent with a right-to-left pathway. The crescentic wound on the left is the exit wound. Scalp wounds like this are often associated with keyhole wounds in the underlying skull.

## Ricochet wounds

Ricochet gunshot wounds may consist of a single entrance wound or multiple, often irregular and frequently superficial entrance wounds. The superficial wounds may contain fragments of projectile or material from the object which the projectile ricocheted off. Ricochet wounds may occur, for example, if the victim is down on the sidewalk and the shooter stands over the victim and fires multiple shots. Some of the fired rounds may strike the sidewalk and fragment. These projectile fragments and fragments from the chipped sidewalk may then strike the body. *Consider an intermediary target or a ricochet projectile if the projectile recovered from the body is more deformed and more superficially located than would be expected.* For example, it would not be consistent to recover a flattened/deformed copper-jacketed 9-









millimeter projectile from the subcutaneous fat deep to an entrance wound on the upper arm because, first, the projectile should not be deformed from going through just skin and, second, that projectile should have been able to perforate the soft tissues of the upper arm and enter the chest, or fracture the humerus in its path.

### Intermediary targets

Intermediary targets can modify the appearance of entrance wounds.[14] Intermediary targets include clothing, jewelry, items in pockets, furniture, doors, windows, walls, vehicle parts, and any object that is interposed between the muzzle of the firearm and the skin. Foreign material from the intermediary target(s) may be carried into the body by the projectile. The nose of a projectile fired through the metal of a vehicle will typically flatten.

This man was shot through an intermediary target, the rear window of a car (**Image 7.35**). The irregular pseudostippling associated with the gunshot wound to the outer end of the left eyebrow was caused by splinters and fragments of broken glass from the rear window.

A policeman died in a firefight involving multiple shooters. He sustained a number of gunshot wounds and although there was a lethal shot to the head, rounds fired at his torso also resulted in injuries even though he was wearing a bulletproof vest (**Image 7.36**). A projectile entering beneath the left upper edge of the vest was associated with a superficial perforating gunshot wound to



the left upper back (**Image 7.37**) and a tear in the lining of the vest when the projectile exited the back (**Image 7.38**). Because the vest was snug against the skin, as the projectile perforated the upper back, the tissues were crushed between the temporary cavity formed by the

passing projectile and the overlying vest, resulting in prominent contusions not normally seen with superficial perforating gunshot wounds. A gunshot wound to the central midback penetrated the vest and caused an abrasion surrounded by a prominent contusion (**Image 7.39**). Although no projectiles perforated the vest, the force of the projectile strike to the midback was diffused by the vest, resulting in a contusion much larger than the actual strike area of the projectile. The projectile from the gunshot to the midback penetrated the vest and can be seen on the radiograph of the vest (**Image 7.40**).

A bullet hole in a victim's left front shirt pocket (**Image 7.41**) was associated with an entrance gunshot wound and a circular abrasion. Although no soot or residue was around the bullet hole, and there was no blackening of the edges of the gunshot wound, a contact gunshot wound was considered because with the circular abrasion, the two lesions together appeared consistent with a contact wound from the offending weapon (**Image 7.42**). The gunshot wound itself would be consistent with the muzzle (end of the barrel) and the circular abrasion would be consistent with the recoil spring guide rod. In fact, the circular abrasion was actually from the projectile jacket separating from the core after the projectile perforated the shirt; the separated jacket struck the skin adjacent to the indeterminate range entrance wound from the projectile core (**Image 7.43**).


7.41


7.39


7.40


7.42


7.43

The entrance gunshot wound shown in **Image 7.44** is not immediately recognizable as a gunshot wound because of its large, irregular nature. The associated peripheral lacerations and abrasions resulted from the projectile passing through an intermediary target (pane of window glass) before striking the victim. It is important to collect any fragments of glass that are found within such wounds because they may be of evidentiary value. Glass and other intermediary targets may not be visible on radiographs so always exercise caution while dissecting wound tracks; projectile jackets and fragments may also be sharp.

This apparent contact gunshot wound (**Image 7.45**) has a muzzle imprint and residue in and around the wound edges. However, the wound was actually produced by firing the gun through a pillow compressed up against the chest. The pillow had a torn contact bullet hole surrounded by abundant soot and residue. The separate patch on the right is likely from soot and residue

escaping between the cylinder and the frame of the revolver, or cylinder flare (**Image 7.46**). A hollow point projectile was retrieved from the body. The hollow point nose did not deform (mushroom) because the nose was plugged with material from the pillow (**Image 7.47**). Similarly, hollow point projectiles plugged with bone will not mushroom.

This robbery victim was wearing a shirt with a collar and a necklace. The necklace was broken during the assault. Wounds are visible on the neck and left clavicular region (**Image 7.48**). At autopsy, two irregular wounds were in proximity on the front of the neck and left clavicular region. Both were entrance gunshot wounds. Their atypical nature results from the projectiles passing through the necklace and shirt (intermediary targets) before entering the body (**Image 7.49**). The chest radiograph shows a projectile lodged in the upper thoracic spine. Adjacent to the projectile are two irregular metallic objects which were links from the yellow metal



7.44



7.46



7.45



7.47









projectile had distinct indentations that conformed exactly to the links from the necklace.

## Distinguishing entrance from exit wounds

The clothing over a gunshot wound can provide additional information about the range of fire. The shirts of this gunshot victim had been cut by Fire-Rescue personnel (**Image 7.52**); a gunshot wound is on the left chest laterally (**Image 7.53**). Although the outer shirt is black, the white undershirt shows definite soot associated with the bullet hole (**Image 7.54**). Gunpowder and soot may be seen as gray on black clothing. Clothing is submitted to the firearms examiner for analysis of residue.

If two or more gunshot wounds on a body are difficult to interpret for entrance or exit characteristics, the corresponding bullet holes in the clothing may assist in that determination. Fibers around a bullet hole may be clearly inverted or everted. A gray ring of bullet wipe (grease and dirt from the projectile) may be seen around

necklace around the victim's neck that were carried into the body by the projectile as it perforated the necklace (**Image 7.50**). A copper-jacketed medium caliber projectile and two links from the necklace were recovered from the cervical spine (**Image 7.51**). The deformed nose of the



7.52



7.53



7.54



7.55



7.56

entrance holes. On rare occasion, the features of a gunshot wound are so uncharacteristic that the entrance wound cannot be differentiated from the exit wound, and examination of the clothing does not help. However, internal clues may exist such as bullet wounds in bone that may show internal beveling associated with an entrance wound. Interestingly enough, the entrance wounds in solid organs and even hollow organs such as the stomach are frequently smaller than the exit wounds. The radiograph may also provide clues if projectile or bone fragments are distributed along the direction of bullet travel.

The premise that exit wounds are larger than entrance wounds is a generality only. A man was found in early decomposition on his bed with a rifle next to his body. A gaping stellate wound on the right side of the forehead extended posteriorly to the right parietal region (**Image 7.55**). A smaller stellate wound was on the occipitoparietal region (**Image 7.56**). Examination of the right forehead wound disclosed central blackening of the wound edges, consistent with a contact wound. Examination of the calvarium disclosed external beveling of the edges

of the skull wound deep to the occipitoparietal scalp wound (**Image 7.57**), confirming that the posterior, smaller wound was the exit. Skull wounds may be comminuted and, as such, require reapproximation of the bony fragments to allow confirmation of the nature of the beveling.

This 3-year-old was shot at intermediate range in the right frontal region (**Image 7.58**). The intracranial gunshot was associated with orbital plate fractures, laceration of the medial aspects of the eyelids (**Image 7.59**), and extrusion of the left eyeball at the scene (**Image 7.60**). All of these findings are associated with the gunshot

wound, and not from direct blunt trauma. Similarly, in some cases of gunshot wounds to the head, prominent unilateral or bilateral periorbital ecchymoses are due to fractures of the orbital plates (blowout fracture) and tracking of blood through the fascial planes, and not due to direct blunt trauma to the eyes. These blow-out fractures associated with intracranial gunshots are related to the pressure wave and energy transfer (of the temporary cavity) to the brain and soft tissues, and will not occur if an empty defleshed skull is shot.

## Exit gunshot wounds

Exit wounds are more irregular than entrance wounds and are not associated with muzzle imprinting, searing, soot deposition, or stippling. The edges are often torn, resulting in a stellate configuration or ragged appearance. There may not be a central defect once the skin edges are approximated. A stellate, hard contact entrance wound is differentiated from a stellate exit wound by the



7.57



7.59



7.58



7.60

presence of a central round defect and blackening of the central wound edges in the entrance wound.

Exiting projectiles that have lost their energy and velocity may just lacerate the skin or stay subcutaneous. An abrasion may overlie the subcutaneous projectile and results from clothing or other objects abutting the site of attempted exit of the projectile. The subcutaneous projectile may be surrounded by ecchymosis and have associated palpable crepitus in the surrounding tissues. **Image 7.61** shows a classical stellate exit gunshot wound where the edges can be reapproximated.

### Low-velocity exit

A slit-like exit gunshot wound that resembles a stab wound is a low-velocity exit. The significance of a low-velocity exit wound is that the projectile is likely to be in the vicinity of the body or even within the clothing.

This woman was shot in the left temple during sleep. The slit-like exit wound behind the right ear (**Image 7.62**)

indicates that this was a low-velocity exit and that the projectile should be in the vicinity of the body. The projectile was ensnared in her hair close to the exit wound (**Image 7.63**).

**Image 7.64** shows the ultimate low-velocity projectile—it did not have enough energy perforate or even lacerate the skin.

### Supported exit

A supported or shored exit wound has an abrasion margin that is usually less regular than the abrasion margin around the associated entrance wound. Supported exit wounds result from the exit site being in contact with another object as the projectile is attempting to exit the body, thereby crushing the skin.[15] Such objects include common items like walls, chairs, floors, pavement, and clothing, but can be anything that is up against the body at the site of the exiting projectile. When the projectile does not have enough energy to exit the



7.61



7.63



7.62



7.64

body, it will crush the skin against the opposing surface and result in an abrasion over the location of the subcutaneous projectile.[16]

This man's entrance gunshot wound (**Image 7.65**) has circumferential abrasion margin with no searing, soot deposition, muzzle imprinting, or stippling, making it consistent with an indeterminate-range gunshot wound. Ecchymosis surrounds the wound. The gunshot wound in **Image 7.66**, on the same man as is depicted in **Image 7.65**, also has a circumferential abrasion margin, but it is irregular. This wound is actually the supported (shored) exit wound that corresponds with the previously demonstrated entrance wound. These wounds illustrate the difficulty of differentiating some exit gunshot wounds from entrance wounds.

The man in **Image 7.67** received a perforating gunshot wound to the left upper arm with the entrance on the extensor (posterior) aspect and the exit on the medial aspect of the arm. The exit is surrounded by a prominent abraded ecchymosis. In **Image 7.68**, a reentry gunshot wound to the left side of the chest has an irregular circumferential abrasion. The irregular abrasion results from the left upper arm being against the side of the chest when the shot was fired. The projectile crushed the skin of the arm against the skin of the chest as it passed from one to the other. This explains the prominent abraded ecchymosis around the exit wound on the left upper arm as well as the irregular abrasion around the reentry wound on the left side of the chest. Clothing probably contributed to the abrasion.

## Gunshot wounds in bone

Entrance wounds in bone demonstrate *beveling*. Beveling refers to the funnel shape of the wound, with the funnel opening up in the direction in which the projectile is traveling. Exit wounds in bone also demonstrate beveling, again with the funnel opening up in the direction in which the projectile is traveling. Beveling is best seen in the cal-



7.65



7.66



7.67



7.68

varium of the skull and in ribs. The beveling effect manifests also in glass, plaster, and probably other materials.

Valuable information can be gained about the direction of bullet travel in a defleshed skull. Evidence of a perforating gunshot wound was found on this skull (**Image 7.69**). The entrance wound was in the right squamous temporal bone, and the exit was along the left side of the coronal suture. Note the fracture originating from the entrance wound and crossing the frontal bone to the left. The entrance wound was obviously comminuted with many of the bony fragments absent. The left coronal exit wound has obvious external beveling (**Image 7.70**). Apart from the external beveling, another clue exists that identifies the left coronal defect as the exit wound. A fracture radiating from the exit wound across and down to

the left squamous temporal bone stops at a transverse fracture that originated from the right-sided entrance wound and crossed the orbital plates and the left side of the sphenoid bone (**Image 7.71**).

This projectile had enough energy to fracture the calvarium but not enough energy to push out the bony fragments and perforate the scalp (**Images 7.72** and **7.73**).


7.71


7.69


7.72

7.70


7.73


7.74


7.75


7.76


7.77

Note the external beveling and subgaleal hematoma over the fractured calvarium. **Image 7.74** shows a circular strike mark surrounded by fractures on the endocalvarial surface representing the site of impact of a projectile which did not have enough energy to perforate the calvarium. This is an incomplete skull exit wound.

*Keyhole gunshot wounds* are tangential, relatively superficial gunshot wounds of the head where the projectile may exit through the same cutaneous wound or through a separate exit wound close to the entrance wound. The distinctive calvarial feature is the presence of both entrance and exit characteristics in a single skull wound.

Keyhole wounds (**Images 7.75** and **7.76**) in the skull typically have features of both entrance (internal bevel-

ing) and exit wounds (external beveling). They are called keyhole wounds because their shape is reminiscent of an old-fashioned keyhole (**Image 7.77**). The rounded end of the wound will have internal beveling, consistent with the entrance portion of the wound (**Image 7.78**).









The externally beveled end is obviously the exit portion.

This calvarium (**Image 7.79**) from an individual who had neurosurgical intervention after a gunshot wound to the head has multiple circular defects that are approximately the same size. The true entrance gunshot wound is above one of the smooth-edged burr holes. Although the circular defects on the outer table of the skull appear similar, the internal beveling associated with the entrance gunshot wound clearly differentiates the true gunshot wound from the adjacent burr hole (**Image 7.80**).

## Internal ricochet

Strike marks on the endocalvarium are clues that the projectile has undergone an internal ricochet.

Examination discloses that the pathway of the projectile into the left occiput was from back to front, left to right, and upward (**Image 7.81**). One would expect that the projectile would be located within the right side of the head in a penetrating gunshot wound. However, the radiograph of the head shows the projectile in the left side of the cranium (**Image 7.82**). One must then consider the possibility of an internal ricochet. A very careful examination of the pathway through the brain will usually disclose the direction of projectile travel within the skull (**Images 7.83** through **7.85;** the string is used to demonstrate the path of projectile travel within the skull). Look for strike marks on the endocalvarial surfaces to locate the point of impact of an internal ricochet (**Image 7.86**). Remember that it is the initial pathway of the projectile (prior to internal ricochet) that is important and of evidentiary value, and not the terminal post-ricochet pathway, which is artifact.



7.82



7.84



7.85



7.83



7.86

## Delayed gunshot wound deaths

Deaths from gunshot wounds may be so long delayed that the network of health care workers around a chronic patient has forgotten the original history. Consider the case of a 51-year-old man whose death certificate was sent to the medical examiner for cremation approval. The cause of death of urosepsis prompted the medical examiner to request more history. A man was shot in the back 12 years prior to death and became paraplegic, with subsequent complications including decubitus ulcers, osteomyelitis requiring a right above-knee and a left below-knee amputation, and neurogenic bowel and bladder problems. Once the remote gunshot wound

history was uncovered, the body was requested by the medical examiner department for proper certification. A chest radiograph of the embalmed body disclosed a projectile on the left side of the thoracic spine. The autopsy disclosed an ascending purulent meningitis that was associated with sacral osteomyelitis due to a large sacral

ulcer. The meningitis extended up to the brain, with exudate covering the brainstem and the medial aspects of the cerebellar hemispheres. The old projectile was recovered from the spine and receipted to the police. The cause of death was ascending purulent meningitis due to remote gunshot wound of the back. The manner of death was homicide. There is no statute of limitations on homicides in most jurisdictions (see Chapter 30).

## Other injuries associated with firearms

### Pistol whipping

Firearms are not restricted to inflicting injuries by just shooting projectiles. They are predominantly metallic objects that can be used to deliver blunt force injuries, as in pistol whipping. Different parts of the firearm will leave different patterned injuries. All patterned injuries should be described, measured, and photographed with a scale.

The man in **Image 7.87** was killed by gunshot wounds during an attempted robbery. In addition to the gunshot wounds on the body, an unusual laceration was found on the left frontal scalp. The laceration consisted of a linear component and a small, stellate component. The etiology and significance of this laceration were unknown, but the injury was described, measured, and photographed.

Three years later during the pretrial conference, the prosecuting attorney asked whether the body had any injuries that could be attributable to pistol whipping because the accused had confessed to pistol whipping the victim prior to shooting him. The pathologist examined the actual weapon used during the crime (**Image 7.88**) and noted that the edge of the slide was the same distance from the protruding oval button as the distance between the two components of the left frontal scalp laceration; the button was consistent with the small stellate laceration. She was therefore able to comment that the scalp laceration was consistent with having been inflicted by the firearm.

## Glaser safety slug

The Glaser safety slug is designed to penetrate the body and destroy tissues, but not exit the body. They have been used by U.S. air marshals because of this safety feature. Glaser rounds look like other projectiles except for the small blue plastic ball located in the hollow point nose. The rest of the projectile is filled with small metal pellets. The blue or gray plastic ball is not visible on a radiograph, therefore, if it is known that a Glaser round was used, the pathologist must search for the little blue or gray ball (as well as the small metal pellets and the jacket) during the autopsy.



7.87



7.88



7.89

A man died from two gunshot wounds to the abdomen. A postmortem radiograph disclosed the round shadow of a projectile in the left upper quadrant of the abdomen, a fragment of projectile jacket in the left mid-abdomen, and multiple small metal pellets, mostly in the left side of the abdomen (**Image 7.89**). A copper-jacketed

medium caliber projectile, portions of a separate copper jacket, a few tiny metal pellets, and a small blue plastic ball were recovered during the autopsy (**Image 7.90**).

## Taser

The Taser is considered to be less lethal than a firearm. It affects neuromuscular control in subjects who are struck and has been used by law enforcement as a means to subdue violent and uncontrollable individuals. The Taser M26 comes in a carrying case with three replaceable air cartridges (**Image 7.91**). Each cartridge contains two probes or electrodes that are connected by high-voltage insulated wire (**Image 7.92**); the probes deploy up to 21 feet when fired. The cartridge attaches to the front of the Taser. The deployed probes may attach directly to skin or to clothing. An electrical charge is applied through the probes and is effective through up to 2 inches of clothing. Neuromuscular function is affected by the 50,000 volts of electricity discharged through the probes, and the subject drops in a state of temporary paralysis. Both probes must strike their target to close the circuit in order to function. Without the air cartridge, the Taser may be applied directly to a subject and the electrical charge is applied through two electrodes in the "muzzle" of the device. (Also see Chapter 13.)

Small burns were inflicted on the right buttock by direct application of the Taser through the denim jeans worn by this subject (**Image 7.93**).

## Technical approach to gunshot wounds

### Radiography of gunshot wounds

Radiographs should be obtained on all gunshot wound cases. Radiographs are especially important when there is an apparent exit wound because the exit wound may have been caused by only a portion of the projectile or by a fragment of fractured bone. Should a jacketed projectile separate inside the body, the projectile core may exit, leaving the jacket which has the rifling marks; the



7.90



7.92



7.91



7.93

rifling marks represent crucial evidence and, hence, the jacket must be recovered.

Radiographs demonstrate the number and location of projectiles in the body and thereby assist in their recovery. A lateral radiograph (in addition to an anteroposterior radiograph) will localize a projectile along the parasagittal plane and facilitate recovery. Not all projectiles (fragments) on the radiograph are necessarily current; remember that projectiles from old gunshot wounds will also appear.

A bullet embolus should be searched for when a bullet enters the body but does not exit and was not recovered during surgery. Multiple radiographs may be required to locate the projectile in the body.[17] The entrance gunshot wound on the left upper chest (**Image 7.94**) of this innocent bystander is associated with an entrance wound in the descending thoracic aorta and a small laceration in the posterior aspect of the thoracic aorta (**Image 7.95**). The chest radiograph did not show a projectile, and although trauma surgeons had performed a thoracotomy, they did not retrieve a projectile. Additional radiographs of the rest of the body disclosed a projectile

in the right thigh (**Image 7.96**). The projectile had embolized down the aorta and into the right femoral artery where it became lodged (**Image 7.97**).

The chest radiograph (**Image 7.98**) of a man who was shot once in the chest shows a single projectile in the left side of the chest. The projectile was recovered from the



7.96



7.94



7.97



7.95



7.98

left pleural cavity during autopsy. As the left lung was being examined, a second foreign object was found embedded on the lateral surface of the lower lobe. This second object was an aluminum jacket from the recovered projectile (**Image 7.99**). Aluminum jackets cannot be seen on radiographs.

Two metallic objects of varying radiodensity are in demonstrated in this x-ray (**Image 7.100**) from an individual who was shot in the head. Projectile cores are typically radiodense and appear white. Metallic jackets are usually more radiolucent or gray. In this example, the projectile core is on the right, and the metallic jacket is on the left.

## Probes

Probes are effective in demonstrating the paths of projectiles through the body. All cutaneous wounds must be photographed at low and high power prior to any physical intervention such as the insertion of probes. Wounds on the extremities (**Image 7.101**) may be probed unless dissection is required to identify injuries to specific structures such as the femoral artery; the dissection must come first to prevent artifactual injury by the probe.

Wounds on the torso may be probed as far as through the chest and abdominal walls, but not any deeper into the body cavities until after the organs and tissues have been examined *in situ* and the injuries photographed. After photography, probes may then be placed even through perforated organs to demonstrate the projectile track and direction, and another photograph taken with the probe in place.

Wounds through the head must *never* be probed prior to examination of the intracranial contents because the injured brain is even softer than usual and artifactual tracks can be made easily. Probes may be placed only after removal of the brain and examination of the intracranial surfaces.

## Projectiles

Projectiles fired from a weapon with rifling (lands and grooves in the barrel) will acquire rifling marks (longitudinal striations), which have the potential to be matched to a specific firearm. Metal instruments may distort and obliterate rifling marks and, therefore, should never be used to recover or handle projectiles. If the projectile is metal-jacketed, the rifling marks will be on the jacket. If the projectile is manufactured without a metal jacket, the rifling marks will be on the lead projectile itself. Some projectiles are coated with a copper wash that does not separate from the projectile.

Recovered projectiles should be described as small, medium, or large caliber. The presence and color of a projectile jacket should be included. The degree of deformity is noted in general terms only. Recovered projectiles should be gently cleaned of blood and soft tissue (tiny slivers of bone may embed in the deformed projectile) and placed in separate envelopes or containers individually labeled with the pathologist's case number, the name of the decedent, the case number of the investigative agency, the anatomic location from which the projectile was recovered, the date, and the pathologist's signature or initials.



7.99



7.100



7.101

| Documenting gunshot wounds |
|---|

*All gunshot wounds, both entrance and exit, should be photographed and described. The following features should be included in your protocol and your file:*

- Photographs of all gunshot wounds with orientation shots and close-up shots
- Location of the wound on the body (both the region of the body and measurements from head or heel and midline of the body)
- Size of the wound
- Shape of the wound
- Presence or absence of searing, soot deposition, muzzle imprinting, and stippling around entrance wounds
- Path of the projectile through the organs and tissues before you eviscerate the body
- Description of the track of injured organs and tissues through the body
- Direction of the projectile path through the body
- Description of the projectile fragments recovered and the locations from which they were recovered

- Photographs of the projectile fragment(s) recovered.

Additional important procedures include the following:

- Establishing a chain of custody for the projectile(s)
- Examining intermediary targets if available
- Taking a section of an apparent contact range gunshot wound for histology to confirm the presence of gunpowder on microscopic examination
- After initial photography, cleaning the gunshot wound to remove extraneous blood and replacing extruded, dangling tissue back into the wound so that the true characteristics of the wound can be seen; the clean gunshot wound is rephotographed
- Making a separate "clarification" body diagram to document the location and pathways (direction) of the gunshot wound(s) only, without other autopsy notes cluttering the page.

### Caliber of projectiles

The caliber of a projectile cannot be determined from the cutaneous wound because skin is elastic, and wounds from the same weapon with identical ammunition may vary in appearance from one area of the body to another. The size of the cutaneous wound is still measured and documented. The size of circumscribed gunshot wounds in bone is more reflective of the caliber of the projectile (because bone is a hard substance), but only the measurement of the wound should be documented in the autopsy report without opining about the exact caliber of the projectile. Examples of small caliber projectiles include .22, .223 and .25; examples of medium caliber projectiles include .32, .38, 380, .40, .357, and 9 and 10 millimeter; examples of large caliber projectiles include .44, .45, and .50.

### How to approach a multiple gunshot wound case

Proper documentation of a multiple gunshot wound case cannot be rushed. The body must be photographed from the front and the back. For expediency, following the front overall body photographs, orientation and close-up photographs of gunshot wounds on the front of the body may be obtained and the wounds described prior to turning the body and documenting the back. As the body is turned, blood may gush or dribble out of wounds and require additional cleaning before the wounds on the back are photographed and described.

Never match up cutaneous entrance wounds with cutaneous exit wounds without verifying their pathways through the body. All projectile paths in the torso should be followed through the body cavities. Unless all pathways are followed, the pathologist may, for example, miss the path of a projectile that enters the lower thigh and terminates in the neck. The author had a case where

multiple gunshot wounds were on both the front and the back of the thorax. The projectile from one frontal gunshot wound ricocheted off the spine to exit the front, and the projectile from one back gunshot wound ricocheted off the spine to exit the back. The clues to the proper wound tracks were seen as strike marks on the spine and associated perforating injuries in the lungs.

### Things to consider for multiple gunshot wounds

- Use letters to denote multiple gunshot wounds, doubling the letters (AA, BB, etc.) beyond the 26th wound. Numbering the wounds may erroneously connote the order in which the wounds were received.
- Do not dissect the organs before all projectile paths through the torso have been verified because the organ injuries frequently assist in determining the wound path(s).
- Intersecting (criss-crossing) gunshot wounds through the torso are especially challenging; determination of the wound paths is crucial if more than one shooter is involved, and absolutely essential if the shooters represent a combination of suspects and law enforcement.
- Where multiple gunshot wounds are in close approximation on the torso, or there are many intersecting gunshot wounds, individual pathways may be difficult to follow and it may be possible to only describe and list the injuries to the organs and tissues and not possible to assign specific tracks to the many tissue perforations; general directions of the projectile paths should still be given.
- Where there are numerous projectile fragments on the radiographs of a certain area of the body, repeat the radiographs following the autopsy; you may be surprised at how many large fragments remain to be recovered.

---

**Gunshot wound protocol example**

The following is a sample description that documents a perforating intermediate-range gunshot wound (X):

X is a perforating gunshot wound to the torso that has the entrance wound on the left lower back laterally, 23 inches below the top of the head, and 6 inches to the left of the lumbar spine. The 1-centimeter wound has a 2–millimeter-wide abrasion margin inferiorly and is surrounded by punctate abrasions (stippling) that extend out to a radius of 3/4 inch from the center of the wound superiorly, 1 1/4 inches inferiorly, and 1 3/4 inches laterally at the 9:30 o'clock position. The projectile perforates the posterolateral aspect of the left tenth intercostal space, left leaflet of the diaphragm, spleen, stomach, posterior border of the left lobe of liver, inferior aspect of the pericardial sac, heart, anterior aspect of the pericardial sac, right upper lobe of lung, and the right second rib anteriorly before exiting the right upper chest through a 1.1-centimeter irregular wound with no abrasion margin that is located 4 1/2 inches superior to the right nipple, 12 1/4 inches below the top of the head, and 3 3/4 inches to the right of the midline. The projectile path is from back to front, left to right, and upward. No projectile fragments are along the wound track.

Gunshot wound X is associated with 950 milliliters of clotted and fluid blood in the left pleural cavity, 825 milliliters of clotted and fluid blood in the right pleural cavity, and 20 milliliters of clotted and fluid blood in the pericardial sac. The spleen is extensively lacerated. The gunshot wound is along the anterior greater curvature of the stomach. The peritoneal injuries are associated with a small amount of extravasated blood. A 3-centimeter gaping perforation is on the posterior basal aspect of the left ventricle, associated with a perforation of the interatrial septum, and a gaping 6 by 4 centimeter defect involving the anterior root of the aorta and the right atrium. The defect in the aorta is adjacent to the right coronary ostium. A dark red contusion involves the medial aspect of the left lower lobe of lung.

## Shotguns

Shotguns have a long barrel with a smooth bore and are designed to fire a shell containing multiple lead pellets that, on exiting the barrel, spread out over a large area. This allows one to fire the weapon in the general direction of a target and have a better chance of hitting the target if it is small or moving. The common types of ammunition are birdshot and buckshot. Although there are many different types of shotgun ammunition, only the more common types are presented here.

Shotguns differ in the width of the barrel, with most calibers described by the term *gauge*, which refers to the number of lead balls of the given bore diameter that add up to 1 pound. Shotgun gauges range from 10 (the largest—only 10 lead balls of that bore size add up to 1 pound) to 28 (the smallest—28 lead balls are needed to add up to 1 pound). The only exception is the .410 shotgun, which has a bore 0.410 inch in diameter.

### Shotgun ammunition

#### *Birdshot*
Birdshot ammunition consists of many tiny lead pellets that are held within a plastic shot sleeve (**Image 7.102**). The plastic shot sleeve (white) sits on top of gunpowder, which in turn sits on top of primer and a metal base. This sleeve is enclosed by a plastic casing (green). The relationship of the bottom of the plastic sleeve, the gunpowder, and the metal base is seen in **Image 7.103**.

As the charge exits the end of the barrel, all of the birdshot pellets exit as a group (**Image 7.104**). Note the orange flame at the end of the barrel, which produces the searing seen in close-range wounds and the small cloud

7.102



7.103



of soot and gunpowder that produces the soot and stippling seen in close and medium-range wounds. Note the ruler in the background marking the distance from the end of the barrel.

As the charge travels away from the end of the barrel, the pellets initially are contained within the plastic shot sleeve (**Images 7.105** and **7.106**). Soon, the air resistance pulls the shot sleeve back as its petals open (**Image 7.107**). It is at about this point that if the charge strikes the skin, the entrance wound may have a unique cross-shaped abrasion from the petals of the shot sleeve. With increasing distance, the plastic shot sleeve falls back further (**Image 7.108**) and the lead pellets begin to spread out in a progressively wider distribution (**Image 7.109**).



7.104



7.107



7.105



7.108



7.106



7.109

With a close-range shotgun wound, the shot sleeve is likely to follow the lead pellets into the wound. As the range of fire increases, the shot sleeve is likely to deviate off course and strike the skin, leaving an abrasion. If the range of fire increases even more, then the shot sleeve may not leave an abrasion on the skin, or may not even strike the skin at all. A plastic shot sleeve may leave a skin abrasion from a range of fire up to approximately 10 to 15 feet.

### Buckshot
Buckshot consists of large lead pellets, often packed along with filler material (white), and encased in a plastic sleeve (**Image 7.110**). If fired at close range, the filler material may produce stippling-type marks in the skin around the entrance wound. This should not be confused with true stippling from gunpowder. The filler material may also be seen in the wound and on the clothing. In **Image 7.110**, the gunpowder remains in the metal base and is not shown. Uncommonly, the buckshot pellets are copper or nickel plated to minimize distortion and

increase range (**Image 7.111**). These plated pellets must be distinguished from bullets.

Lead pellets in shotgun ammunition are often separated from the gunpowder by cardboard or fiber disks of material called *wadding*. The wadding serves several functions, including cushioning the pellets from the blast of hot gases, preventing heat from the charge from fusing or distorting the pellets, and helping form a gas seal between the gunpowder and pellets.

### Shotgun slugs
Slugs are large, single lead projectiles such as the Foster round (**Image 7.112**) and the sabot (**Image 7.113**). The sabot is an unusual shape, but theorized to be fired with a greater velocity.

## Shotgun wounds

### Contact
Shotgun wounds impart a large amount of energy to the tissues, particularly if fired at contact or close range. In this intraoral 12-gauge shotgun wound, note the blowout



7.110



7.111



7.112



7.113

and overall destruction of the top of the head (**Image 7.114**). Contact range shotgun wounds of the head often produce devastating injuries with extensive tissue disruption. In these situations, it may seem impossible at first to determine where the entrance wound is located. However with careful and meticulous reapproximation of the tissues, the entrance wound and exit wound are often revealed.

In this intraoral shotgun wound, note the tissue tears extending from the sides of the mouth (**Image 7.115**). These tears result from the large amount of gases exiting the end of the barrel at high pressures.

In contrast to the head, contact shotgun wounds of the torso often have a fairly innocuous appearance, likely related to the elastic nature of the tissues of the body walls and the ability of the chest or abdominal cavities to be able to accommodate a large amount of expelled gas.

A man shot himself in the chest with a 20-gauge shotgun. In **Image 7.116** note the circular entrance wound with circumferential marginal abrasion and the eccentric rim of soot on this contact wound. In another example, this .410 self-inflicted contact shotgun wound

of the chest shows searing of the skin from the cloud of hot gas/flame that exited the end of the barrel (**Image 7.117**).

A man used a 12-gauge shotgun to inflict a contact shotgun wound on his chest using buckshot ammuni-


7.116


7.114


7.117


7.115


7.118

tion. Note the unique circular abrasion adjacent to the entrance wound (**Image 7.118**). This is seen in double-barrel shotguns in which only one of the barrels fires.

Like gunshot wounds, shotgun wounds can be tangential. Note the large, gaping shotgun wound of the neck in this man (**Image 7.119**). Note the dark soot deposition at the inferior edge of the wound, which gives information as to the range of fire (close) and the direction (upward).

### Intermediate (medium) range to distant range
In this medium-range shotgun wound of the shoulder (**Image 7.120**), note the somewhat scalloped margin of the wound, the large amount of stippling, and the scattered tiny white particles of filler material. In a close-range shotgun wound, the wound is generally circular with sharp margins because all of the pellets are together and have not yet spread out. As the range of fire increases, the pellets gradually spread out, at first producing a "scalloping" of the edge of the wound (at approximately 2 to 4 feet), then producing separate "satellite" defects close to the central wound (at approximately 3 to 5 feet); when far enough away, the pellets no longer produce a central main wound, but create a general spread of pellets (**Image 7.121**). This occurs at a range of approximately 8 to 10 feet.

As the range of fire increases and the pellets spread out, they create a wider spread of entrance wounds on the body. In this buckshot shotgun wound (**Images 7.122** and **7.123**), note not only the wider spread of entrance wounds, but also the spiral-shaped abrasion on the skin produced by a component of the shotgun shell, likely the plastic sleeve or wadding. The plastic sleeve or wadding may leave characteristic abrasions on the skin that may give important clues as to the range of fire. These "petal mark" abrasions can be obvious if the plastic sleeve was



7.119



7.121



7.120



7.122

fully expanded when it struck the skin (**Image 7.124**), or may be fairly subtle, present only as small squared-off abrasions at the margin of the wound (**Images 7.125** and **7.126**). The edges of the plastic sleeve expand in the air to form a "cross" that causes four abrasions. The exception to this is the .410 ammunition in which the plastic sleeve expands into only three petals and, hence, will leave only three abrasions.

In this spread of buckshot wounds that perforated the torso (**Image 7.127**), note how one can easily differentiate the entrance from the exit wounds (**Image 7.128**). The entrance wounds are circular and have circumferential marginal abrasions (**Image 7.127**). The exit wounds are



7.125



7.126



7.123



7.124



7.127