# **EXHIBIT B**

generally slit-like tears in the skin and, at least in this example, do have some marginal abrasion, likely representing shored exits (**Image 7.128**).

The spread of the pellet wounds on the body should be measured. This will be helpful in determining the range of fire. During the course of investigation, if the original shotgun is recovered, the identical ammunition can be loaded and the weapon test-fired at varying distances until a similar spread of pellet markings is achieved on the target (**Image 7.129**).

Shotgun slugs usually produce large, gaping circular to ovoid defects (**Image 7.130**) that not uncommonly have irregular margins. On x-ray, the lead slug is often deformed into the shape of a comma. The internal injury created by shotgun slugs is highly destructive and similar to that created by high-velocity rifles.

One must collect a representative sample of birdshot pellets to be submitted for analysis. However, all buckshot pellets must be collected because buckshot pellets appear similar to bullets on radiographs, and one needs to rule out a concomitant gunshot wound(s). Occasionally, apparent multiple gunshot wounds on a body with multiple bullets on x-ray, will be discovered at autopsy to be a distant-range shotgun wound with buckshot simulating bullets on the x-ray.

## Radiography of shotgun wounds

Radiographs are helpful in determining where pellets are and the size of those pellets. Note the chest radiograph of this person shot with birdshot (small pellets, left) and buckshot (large pellets, right) (**Image 7.131**). The differential diagnosis for small pellets on a radiograph should include shotgun birdshot, Glaser safety slugs, and ratshot/snakeshot (varmint shot). In this person, note the characteristic comma-shaped fragments of projectile in this person shot with a shotgun slug (**Image 7.132**).


7.128


7.129


7.130


7.131

Although radiographs will demonstrate pellets, they will not demonstrate other components of the shotgun charge that may enter the body at medium, close, and contact range. One must search manually for other components of the ammunition such as the plastic sleeve or plastic wadding and for cardboard or felt wadding. Identifying these components of the ammunition in the tissues gives more information as to the range of fire and the type of ammunition used.

Note the numerous small, scattered, superficially excavated scars identified on the hip of this middle-aged man who died of natural causes (**Images 7.133** and **7.134**). A radiograph revealed a remote shotgun wound of the hip with birdshot (**Image 7.135**). The small scars were healed pellet entrance wounds.

## Rifles

Rifles can be divided into lower velocity (such as the .22-caliber rimfire rifle) and high velocity, which includes the .30–30, .308, .30–06, .223, and AK-47 centerfire rifles. These high-velocity rifles have muzzle velocities that range from 2000 to 3500 feet/second, as opposed to the lower velocity .22 rifle and most handguns, which have muzzle velocities on the order of 1200 feet/second or less. The high-velocity rifles can produce a range of destructive wounds. The entrance wound is typically small, but the internal injuries often show extensive tissue disruption.

The projectile often fragments in the body and the x-ray may show a "lead snowstorm" of fragments scattered along the projectile path as bits of the projectile are stripped off during its passage through the tissues. The projectile need not strike bone for this to occur. Such fragmentation translates into destructive energy imparted to the tissues, and with such a high bullet velocity (recall the equation that energy equals one-half the mass of an object multiplied by the square of its velocity: $E = 1/2mc^2$), it is no wonder that such destruction results. Tissue destruction away from the direct path of the bullet arises from the large temporary cavity (and pressure



7.132



7.134



7.133



7.135

wave), which is created as the bullet is slowed by the tissues, and from the energy imparted to the tissues. Organs may be lacerated and tissues injured distant from the actual track of the bullet.

Contact wounds of the head, chest, and abdomen are particularly devastating, with extensive tissue destruction resulting from the jet of high-pressure gas exiting the muzzle, and the large temporary cavity produced by the bullet. Distant-range wounds usually have small entrances that are in contrast to the extensive internal tissue destruction. Related to the high velocity, many of these wounds from high-power rifles are perforating wounds (depending on the ammunition, tissues injured, etc.), and the exit wounds are typically irregular and larger than the entrance wound.

In the high-power rifle wound of **Images 7.136** and **7.137,** note the circular entrance wound with the marginal abrasion on the front of the chest and the extensive, gaping exit wound in the axilla.

When a high-velocity rifle round first perforates an intermediary target, the bullet becomes deformed and is more irregular in its orientation in flight. This will typically result in a larger, more irregular entrance wound, accompanied by satellite defects due to partial fragmentation of the bullet or fragments of the intermediary target striking the skin. This is often the case in individuals shot while in their motor vehicles or through the door or wall of a building.

Because fragments of bullet remaining in the body are usually severely deformed, one may not find larger pieces of lead and/or jacketing as seen in regular, lower velocity gunshot wounds. Efforts must be made to recover larger fragments of projectile and jacketing.

Shotguns and high-power rifles often have long barrels, and in cases of self-inflicted wounds, it may be questioned as to whether the individual's arms were of sufficient length to have been able to pull the trigger themselves. One should take measurements of the arms at autopsy. The distance from the entrance wound to the tip of the middle finger of the outstretched arm should also be measured. But remember that people are resourceful and that there are many different ways of pulling the trigger, whether by using a toe, a stick (**Images 7.138** and **7.139**), or some other object.



7.136

| Tips for autopsying a case with high-velocity rifle wounds |
| --- |
| - First, identify the possibility of high-velocity rifle wounds based on casings found at the scene.<br>- Expect to see a lead snowstorm on x-ray.<br>- Recover the larger fragments of projectile and rule out any other type of gunshot wounds.<br>- Expect to see a small entrance wound coupled with extensive internal tissue destruction. |



7.138



7.137

**Do**

- Look at radiographs before beginning the autopsy to identify types of projectiles (and fragments) and their location.
- Look under the breasts in women, and around and under the scrotum in men, to identify hidden perforating wounds and reentry wounds.
- Look in the axillae, natal cleft, and intertriginous regions of the groin/perineum for hidden exit and reentry wounds.
- Consider a possible reentry wound in the chest or abdomen when there is a perforating gunshot wound to the upper extremity.
- Examine all gunshot wounds yourself for interpretation of entrance and exit wounds even though emergency room physicians or trauma surgeons may have already documented their interpretation in the hospital records.[18]
- Remember that not all holes in a gunshot victim who dies in hospital are projectile wounds—some may be iatrogenic.
- Remember that not all projectiles on a radiograph are necessarily current but may be from old gunshot wounds.
- Establish the path of the projectile through the organs and tissues before you eviscerate the body.
- Measure the spread of pellet wounds (from a shotgun) so that if the weapon becomes available, it may be test-fired to determine a more accurate range of fire.

- Recover all buckshot-sized shotgun pellets to exclude concomitant bullet wounds.
- Use probes in body cavities to aid in demonstration of the projectile's pathway (**Image 7.140**).
- Reapproximate wounds to aid in their characterization (**Images 7.141** and **7.142**).



7.140



7.141



7.142

7.139

### *Don't*

- Match entrance and exit wounds based on the external examination alone—the internal pathways must be verified.
- Put probes through the head, chest, or abdomen before examination of the organs *in situ*.
- Push probes through loose tissue because this can result in artifactual tracks with incorrect directionality.
- Place probes until the track of injured tissues has been verified; probes may be placed following evisceration to demonstrate the projectile's path.
- Accept interpretation of entrance and exit wounds from the hospital record; make your own determination from examination of the wounds directly.
- Dissect the eviscerated organs until you have finished documenting the paths of the projectiles because you may need the organs for reference.
- Forget to search for components of a shotgun charge that are not visible on a radiograph such as a plastic sleeve and fiber wadding.
- Be deterred by a large amount of tissue damage caused by a contact shotgun wound or rifle wound; careful reconstruction of the tissues will often reveal the entrance (and exit) wounds.
- Ever handle projectiles with metal instruments because forceps, scalpel blades, clamps, etc., can distort rifling marks on lead projectiles and metal jackets.

## References

1. Associated Press. Man dead following use of Taser to subdue him. Seattle, WA: Seattle Post Intelligencer; 2004.
2. Associated Press. Taser death links. Toronto, ON: Toronto Sun; 2004.
3. Allen TB. Discussion of "Effects of the Taser in fatalities involving police confrontation." J Forensic Sci 1992;37(4):956–8.
4. DiMaio V. *Gunshot Wounds*. Boca Raton, FL: CRC Press; 2002.
5. Fackler ML, Malinowski JA. The wound profile: a visual method for quantifying gunshot wound components. J Trauma 1985;25(6):522–9.
6. Fackler ML. Wound ballistics. A review of common misconceptions. JAMA 1988;259(18):2730–6.
7. Fackler ML. Ballistic injury. Ann Emerg Med 1986;15(12):1451–5.
8. Fackler ML, Bellamy RF, Malinowski JA. A reconsideration of the wounding mechanism of very high velocity projectiles—importance of projectile shape. J Trauma 1988;28(1 Suppl):S63–7.
9. Fackler ML. Civilian gunshot wounds and ballistics: dispelling the myths. Emerg Med Clin North Am 1998;16(1):17–28.
10. Patrick U. *Handgun Wounding Factors and Effectiveness*. Quantico, VA: US Department of Justice, Federal Bureau of Investigation; 1989.
11. Fackler ML. Gunshot wound review. Ann Emerg Med 1996;28(2):194–203.
12. Fackler ML, Surinchak JS, Malinowski JA, Bowen RE. Bullet fragmentation: a major cause of tissue disruption. J Trauma 1984;24(1):35–9.
13. Fackler ML, Surinchak JS, Malinowski JA, Bowen RE. Wounding potential of the Russian AK-74 assault rifle. J Trauma 1984;24(3):263–6.
14. Donoghue ER, Kalelkar MB, Richmond JM, Teas SS. Atypical gunshot wounds of entrance: an empirical study. J Forensic Sci 1984;29(2):379–88.
15. Dixon DS. "Foreshoring": characteristics of shored entry wounds and corresponding wounds with shoring material as an intermediate target. J Forensic Sci 1980;25(4):750–9.
16. Druid H, Ward ME. Incomplete shored exit wounds: a report of three cases. Am J Forensic Med Pathol 2000;21(3):220–4.
17. Duncan IC, Fourie PA. Embolization of a bullet in the internal carotid artery. Am J Roentgenol 2002;178(6):1572–3.
18. Shuman M, Wright RK. Evaluation of clinician accuracy in describing gunshot wound injuries. J Forensic Sci 1999;44(2):339–42.

# 8 Asphyxia

*David Dolinak, M.D.*
*Evan Matshes, M.D.*

PETECHIAE    202
SUFFOCATION    203
   Entrapment    204
   Smothering    206
   Choking    206
VAGAL STIMULATION AND RAPID DEATH    207
POSITIONAL, MECHANICAL, AND TRAUMATIC
   ASPHYXIA    208
   Mechanical asphyxia    208
   Positional asphyxia    208
HANGING AND STRANGULATION    209
   The layered neck dissection    210
   Hanging    211
   Homicidal hanging    214

Judicial hanging    214
Strangulation    215
Differentiating suicidal from homicidal
   asphyxia    221
AUTOEROTIC DEATHS    222
   The scene    222
   The body at the scene    222
INCAPRETTAMENTO    223
CAROTID SINUS STIMULATION    223
ASPHYXIAL DEATHS IN MOTOR VEHICLE
   ACCIDENTS    223
RESUSCITATION ARTIFACT    223
REFERENCES    224

Technically speaking, everyone dies of asphyxia. There comes a point, arising from either natural disease, injury, drug toxicity, or some combination thereof, at which blood flow to and from the brain, heart, and other organs is insufficient, and terminal asphyxia is the end point of life. However, in the majority of these cases, the death is not attributed to asphyxia, but rather to the underlying condition leading to a cessation of respirations (such as myocardial infarct, ruptured cerebral artery berry aneurysm, drug toxicity, or multiple gunshot wounds). A death is attributed to asphyxia only when the asphyxia itself is the condition that directly causes the death.

Asphyxia may result from a number of varied circumstances. It may arise from breathing air that is low in oxygen, from compression of the external airways (nose and mouth), from obstruction of the internal airways, from external compression of the neck or chest, or from awkward positioning of the body. "Chemical" asphyxia has been attributed to toxins such as carbon monoxide and cyanide that act on the molecular and cellular level by hindering the delivery of oxygen to the tissues. It is not unusual for different mechanisms of asphyxia to occur together in the same case. Because some types of asphyxia may leave no observable findings at autopsy, proper scene investigation can be crucial. In some cases of asphyxia, if the scene has been altered, and the manner by which asphyxia was produced removed, one may not be able to determine the cause of death.

*Asphyxia* (Greek for "breathlessness") is defined as *the lack of oxygen in the blood or the failure of cells to utilize oxygen, and a failure of the body to eliminate carbon dioxide.* Asphyxial deaths are commonly divided into different categories based on the nature of the cause for inadequate respiration. Asphyxial deaths include suffocation, smothering, choking, positional asphyxia, mechanical asphyxia, traumatic asphyxia, hanging, strangulation, and "chemical" asphyxia. Asphyxial deaths span the spectrum from the obvious to the inconspicuous. The autopsy findings of asphyxia are in general nonspecific, but may include such findings as petechiae and cyanosis. These findings may be subtle or not identified at all.

In fact, the information needed for the diagnosis of asphyxia and, hence, the cause of death, may lie entirely in the scene investigation and the circumstances of the death (see Chapter 2). In cases where the body is still at the scene of death, scene investigation should include visualization of the body and the immediate environmental factors producing the asphyxia prior to movement of the body. Photographs can be of great assistance in documenting the circumstances of asphyxial deaths.

## Petechiae

Autopsy findings in cases of asphyxia often include petechiae (pinpoint hemorrhages) of the bulbar and/or palpebral conjunctiva and less commonly of the eyelids or other areas of the face, neck, or other regions of the body. When petechiae are seen on the skin of the face or eyelids, coexistent petechiae of the conjunctiva are also almost always present. For example, the person in **Image 8.1** died an asphyxial death. Note the petechiae of the bulbar conjunctiva. In **Image 8.2**, note the petechiae

of the palpebral conjunctiva. Petechiae are believed to result from the rupture of venules and capillaries when the venous return from the head is obstructed, while the arterial blood flow to the head is maintained. This is not difficult to induce, because it takes considerably less pressure to compress and block the low-pressure thin-walled jugular veins than the high-pressure thick, muscular-walled carotid arteries. Selective compression of only the jugular veins results in increased pressure in the small blood vessels of the head, eventually leading to their rupture.[1,2] The same mechanism of petechiae formation is responsible for the formation of petechiae in the hand and wrist of this person (**Image 8.3**). In this scenario, the petechiae can be associated with venous compression and obstruction caused by a tourniquet or blood pressure cuff on the upper arm. Petechiae may also be seen in the mucosa lining the sphenoid sinus (**Image 8.4**).

One must remember that *although petechiae are commonly seen in cases of asphyxia, they are not diagnostic of an asphyxial death.*[1] They may be seen in nonasphyxial deaths such as some forms of fatal heart disease, some


8.1


8.3


8.2


8.4

burn victims, and in those with coagulopathy.[3,4] It is equally important to note that petechiae may be absent in an asphyxial death. Petechiae may also occur as a post-mortem artifact in bodies found in the prone position. This is because when the body is prone, blood pools in the facial tissues and may cause small blood vessels to distend and eventually rupture, forming petechiae. Note the extensive facial, periorbital, and conjunctival petechiae/hemorrhages in this older woman who died of atherosclerotic cardiovascular disease (**Images 8.5** and **8.6**). She was found dead, lying prone on her bed. An anterior neck dissection was negative (**Image 8.7**), and there was no evidence of injury and no suspicion of foul play.

In this example (**Images 8.9** through **8.10**), a middle-aged man was found prone after dying of a combination of heart disease and drug toxicity. Note the marked congestion of his face (**Image 8.8**), with scleral hemorrhage and conjunctival petechiae (**Image 8.9**). A detailed neck dissection was negative (**Image 8.10**).

Although they are nonspecific, petechiae in conjunction with appropriate investigative, scene, and other autopsy findings, are often considered to be additional evidence of asphyxia. In the absence of other investigative information, the value of petechiae is nebulous.

## Suffocation

*Suffocation* is a broad term encompassing many different types of asphyxia. It has been used to represent cases of entrapment, suffocating gases, smothering, choking, mechanical asphyxia, and traumatic asphyxia. Because the terms *suffocation* and *asphyxia* are very broad, medical examiners should endeavor to certify asphyxial deaths with descriptors that are as detailed as possible.



8.7



8.5

8.6



8.8



8.9



8.10



8.11



8.12

## Entrapment

*Entrapment* is a type of suffocation in which an individual is in an airtight or relatively airtight container and gradually consumes the available oxygen until there is no longer enough oxygen to sustain life. In years past, cases of entrapment occurred if a young child became trapped within an airtight refrigerator and was unable to get out. Today, with the advent of safer refrigerator designs, such deaths are rare. Entrapment may occur in stowaways or other travelers in railroad cars, particularly in hoppers designed to carry liquids or powders that have an airtight or a nearly airtight seal. The individual shown in **Image 8.11** was found in an empty cement rail car (hopper) with a tight hatch. Note that in entrapment deaths, elements of hyperthermia and/or

dehydration may also be present that, together with asphyxia, culminate in the person's demise.[5] These other factors may play a prominent role in the death, particularly when the person is in a hot environment. The manner of death in these cases may be accident or homicide, depending on whether someone else was responsible for the person's death or not, either through one's direct actions or through negligence.

Another form of suffocation involves the creation of a local hypoxic environment within a plastic bag securely fastened around the head. In this case of suicidal suffocation (**Images 8.12** and **8.13**), note the clear plastic bag that this young man placed over his head. The open end of the bag was secured with a rubber band around his neck. As is advocated in the assisted suicide book *Final Exit*,[6] note the mask over the nose and mouth (to keep the plastic bag from sticking to the face) and the washcloth on the back of the neck (soaked in cool water for comfort). In these cases, asphyxia is enhanced by the consumption of sleeping pills or other drugs that induce sleep or unconsciousness. The person is further instructed to hold the rubber band away from the neck so that they can breathe comfortably. As the drugs take



8.13



8.14



8.15

effect and the person falls asleep, their hands fall down, and the rubber band then cinches around their neck, producing an airtight seal, and eventual suffocation. Toxicology testing may reveal ethanol, anxiolytics, or sedatives that were taken not only to induce sleep or cause the person to lose consciousness, but also for relaxation and to help the person better tolerate the event.[6–8] This form of suicide may be more common in elderly or frail people because of its painlessness and ease of securing plastic bags.[7]

In cases of suffocation induced in this manner, because no significant mechanical compression of the neck occurs, petechiae are not expected. In a series of 30 plastic bag–related suffocation deaths, petechiae were found in only 5 cases.[8] In another series of similar deaths, only 7 of 93 cases had conjunctival or facial petechiae. One must be cautioned that if a person commits suicide through such means, and a caregiver, friend, or family member removes the plastic bag and any associated items, there will likely be no indication of the asphyxial event. If the person has significant age/natural disease, the death may be attributed to natural disease without the performance of an autopsy or toxicologic studies. Depending on the duration and tightness of rubber band application, a faint impression may remain on the neck (**Image 8.14**). This observation is of particular importance in cases where such an apparatus may have been used, but was removed prior to the arrival of the medical examiner.

The two general categories of *gaseous suffocation* are cases in which a gas displaces oxygen, leading to a hypoxic air mixture, and cases in which a substance prevents cells from utilizing oxygen. Gases such as helium may displace oxygen, creating a hypoxic air mixture and leading to death. Another type of gaseous suffocation may be found in individuals who work in a confined space in which oxygen may be gradually used up or displaced by other gases. An example is the worker who collapses shortly after descending into a vat or a sewer without an appropriate breathing apparatus. With a very

low concentration of oxygen, one can lose consciousness rapidly. Unknowing coworkers and rescue personnel responding to help can become quickly overcome by the insufficient oxygen and any possible combination of toxic gases. In some cases, the gas itself may be lethal.

In cases of *carbon monoxide toxicity*, increased amounts of carbon monoxide are inhaled, which binds to red blood cell hemoglobin, preventing oxygen from binding and being utilized by the body tissues. In cases of faulty residence heating units or vehicle exhaust fume inhalation, the tissues and blood have a bright cherry-red discoloration due to the decreased ability of the red blood cells to release oxygen. In cases of house or vehicle fires involving smoke production (and, hence, carbon monoxide) and inhalation, there may be the additional finding of black soot in the airways (**Image 8.15**). (See Chapters

10 and 21 for additional discussions on carbon monoxide deaths.)

## Smothering

*Smothering* is a form of suffocation in which the external airways (nose and mouth) are compressed or blocked, preventing the inspiration of air. Smothering comes in many forms, and may involve someone physically placing their hand(s) or some other object over an individual's nose and mouth, wrapping tape or other material over the face (**Image 8.16**), or compressing the external airways by virtually any other means. Tears and contusions in the labial, buccal, and/or gingival mucosa may be reflective of a struggle during the smothering process. Additionally there may be hemorrhage from the nose, abrasions on the nose or face, or fractures of the nasal complex. Because there may be a paucity of autopsy findings, scene examination may prove crucial. One should be cognizant of such things as bloody fluid or lipstick on a nearby pillowcase, other articles of bedding, or other material.

## Choking

*Choking* is a form of asphyxia in which the internal airways are obstructed. Choking may be homicidal if a gag is placed in the mouth and/or pharynx, but most cases of choking are accidental and often involve physically compromised or intoxicated people, often with no dentition or with dentures, eating inappropriate foods or eating too quickly. The food bolus is usually large, often too large to enter the trachea, and becomes lodged in the posterior hypopharynx, blocking the glottis and the esophagus. In this scenario, the person is sometimes able to exhale, but cannot inhale. In other cases, the obstructing bolus of food (or other object) passes into, and occludes, the trachea or bronchi. Particular attention should be called to the possibility of choking when screening cases reported to a medical examiner depart-

ment in which a death occurred while eating or while seated at a kitchen or dinner table with food on the table. This has classically been referred to as a "café coronary." Choking in adults can prove fatal, despite resuscitation attempts. When a death is due to choking, one must consider what conditions contributed to or predisposed the person to choking. Such conditions include intoxication with alcohol or drugs and various underlying physical and/or mental impairments.

Choking is not uncommon in infants and toddlers, because those in this age range may place a wide range of nonfood material in their mouths. Furthermore, their dentition is absent or rudimentary, their chewing skills are limited, and they may try to eat inappropriate foods. This toddler was fed a grape by his mother (**Image 8.17**). The grape was not chewed and became lodged in his oropharynx.

This young man, who was mentally challenged, choked on a plastic bag. Note how the bag became crumpled and wedged in his oropharynx (**Image 8.18**). With the esophagus opened (**Image 8.19**), note that the plastic bag was partially swallowed down the esophagus. In



8.17



8.16



8.18

healthy adults, choking often involves eating tough pieces of meat too quickly, sometimes while intoxicated.

In elderly people, neurodegenerative diseases such as Parkinson's disease and Alzheimer's disease, often in combination with loose or ill-fitted dentures or poor or absent natural dentition, may predispose to a choking episode.[9] In this elderly person (**Image 8.20**), note the poorly chewed orange wedged in the pharynx. In this elderly person (**Image 8.21**), note the small carrots occluding the trachea and bronchi. Also, consider whether someone may have been fed improper food based on their ability to eat, or fed too quickly. In all cases of suspected choking and other types of asphyxia (and ideally in *all* autopsies), the hypopharynx should be manually explored to examine for any obstructing object such as bubble gum or peanut butter that may cause choking. Keep in mind that obstructing materials may not be initially detected if they are displaced cephalad during the removal of the neck tissues.

One must be aware that in many cases, gastric contents may be redistributed after death from the stomach to the upper airway. This may also occur during resuscitation attempts or during disorganized muscular contractions and relaxations that occur during the agonal period. Its importance lies in recognizing it as such and not misinterpreting it as antemortem choking and a cause of death.

## Vagal stimulation and rapid death

It is interesting to note that food and foreign bodies can cause death not only by choking, but also rarely by acute and pronounced distention of the esophagus. In this scenario, the mechanism of death is *not* airway obstruction, but rather a vagally mediated event, namely, bradycardia, cardiac dysrhythmia, bronchospasm, seizure, or some other mechanism. The proposed mechanism is esophageal distention-mediated stimulation of tensoreceptors in the wall of the esophagus, causing vagal outflow that terminates in the medulla, where the impulse pathway overlaps with those of the respiratory and cardiac pathways, causing bradycardia, dysrhythmia, or bronchospasm. This is the mechanism by which significant esophageal distention may elicit a detrimental—and possibly fatal—cardiopulmonary response.[10–12] Vagal reflexes arise from not only the esophagus, but also from the pharynx and larynx. This may also help explain why in some cases of choking due to upper airway obstruction, death appears to ensue quicker than might be expected from an asphyxial event alone.[13]



8.19



8.20



8.21

## Positional, mechanical, and traumatic asphyxia

### Mechanical asphyxia

*Mechanical asphyxia* is a broad term used to cover a wide range of different asphyxial situations, but in most cases requires that either the body is positioned in such a way that respiration is compromised (*positional asphyxia*) or enough external pressure is placed on the chest, neck, or other areas of the body to make respiration difficult or impossible. In some cases, mechanical asphyxia may also refer to neck compression that results in compromised blood supply to the brain and/or impaired respiration. In cases in which there is severe compression of the chest (usually from a large, heavy object), the term *traumatic asphyxia* is used, although mechanical asphyxia would also be appropriate. One should consider the possibility that more than one asphyxial mechanism is involved in a given death. Also, as a result of varying definitions for the subtypes of asphyxia, death certification conventions for these types of deaths will vary greatly between offices and individual medical examiners.

In cases with significant external pressure on the chest, the uncompressed areas of the upper chest, the neck, and the face appear congested and cyanotic and there are often Tardieu spots and petechiae near the junction of the compressed/noncompressed tissues. Tardieu spots are larger petechiae seen in a variety of conditions and, like petechiae, are nonspecific. Although the amount of pressure actually applied to the chest may be small, it could be enough to prevent adequate expansion (excursion) of the rib cage during breathing. This may be seen in individuals wedged in tight environments such as in a chimney, small tunnel, or other narrow passageway. In this scenario, the most important information is gained from the scene investigation, because there may be no significant findings at autopsy.

The young woman shown in **Images 8.22** and **8.23** was trapped under her motor vehicle after it rolled over. She had petechiae of her face and conjunctivae and no internal injuries. She died of mechanical asphyxia (the term traumatic asphyxia may also be appropriate). In cases of traumatic asphyxia, severe compressive forces are applied directly to the chest, hindering respiration (as in a person wedged underneath a heavy object such as a toppled piece of equipment), and the individual usually has no significant internal traumatic injury. In some cases, however, rib fractures and other injuries have been reported.

### Positional asphyxia

Positional asphyxia occurs when an individual acquires a certain body position in which their breathing is compromised, often because of neck twisting with kinking or compression of the trachea and/or elevation of the tongue into the posterior hypopharynx. Although positional asphyxia can occur under a myriad of circumstances, classical positional asphyxia often involves inebriated individuals who collapse in a narrow space such that their neck is bent or twisted, therefore preventing adequate respiration.

In this case of positional asphyxia (**Image 8.24**), a young man became trapped under the wheel and in the wheel well of his truck as it was backing up after being left in gear. There were no significant internal injuries. In another case of positional asphyxia, this intoxicated young man fell into a pit-like area, wedging his neck between the "V" of tree trunks, occluding his airway and/or blood supply to his head (**Images 8.25** and **8.26**).



8.22



8.23

## Hanging and strangulation

Hanging and strangulation make up a category of asphyxial deaths characterized by external pressure on the neck that compresses the airway and/or blood vessels supplying and draining blood to the head. The carotid arteries are compressed between the force applied to the neck and the hard anterior surface of the cervical vertebrae. *Hanging involves compression of the neck structures by a ligature placed around the neck that is constricted with the help of all or part of the body weight.* Although most hangings are suicidal in manner, one should not expect to find suicide notes, because they are present in less than 50 percent of cases.

*Strangulation involves compression of the neck structures by a force other than the body's own weight by manual squeezing or by application of a ligature.* Strangulations are usually homicidal. An additional asphyxiating factor found in cases of hanging and strangulation is obstruction of the laryngeal inlet by upward displacement of the tongue and pharynx caused by the constricting force around the neck.


8.24


8.25


8.26

Although conjunctival and facial petechiae can be seen in both hangings and strangulations, they are more common and more prominent in strangulations. This is likely due to the violent nature of resistance put up by strangulation victims, with resultant intermittent and variable occlusion of the carotid arteries and jugular veins. When the jugular veins are occluded, but the carotid arteries remain patent, pressure builds up in the cephalic venules and capillaries (proximal to the jugular venous obstruction), favoring the formation of petechiae. This is in distinction to hangings, where there is more likely complete, simultaneous, and prolonged compression of both the carotid arteries and jugular veins. With compression of both the arteries and veins of the neck, there is no significant intravascular pressure differential, and the formation of cephalic petechiae is not favored.

The rapidity of the onset of unconsciousness and time until death are variable, depending to a large extent on how effectively the carotid arteries and/or airway are compressed. Neck compression may result in loss of consciousness in a matter of 5 to 10 seconds from occlusion of the carotid arteries, although the heartbeat is likely to remain for many minutes. Regardless of the manner of asphyxia, death will usually occur within 3 to 5 minutes of complete respiratory arrest. Because this estimate is greatly dependent on the effectiveness of the asphyxia and the individual's underlying natural disease, time to death is highly variable. Also, if the victims were to struggle violently, they may quickly consume their limited blood oxygen reserves and, therefore, have a shorter survival period.

In hangings and strangulations, one must perform careful external and internal examinations of the neck to properly document either the presence or absence of injuries. If a ligature is around the neck, it should be photographed circumferentially around the neck before it is removed. The ligature is then cut at a location away from any knot and removed from the body. Cutting the liga-

ture distant from the knot helps preserve the integrity of the knot. The ends of the cut ligature can then be tied to each other with string or taped back together and saved as evidence.

### The layered neck dissection

The neck dissection consists of several stages of careful tissue dissection performed to either document injury or the absence of injury. After careful inspection, documentation, and photographing of the neck and any injuries, the skin and subcutaneous tissues are reflected off the underlying skeletal muscles along a fascial plane (**Image 8.27**). Following exposure of the anterior cervical strap muscles, the muscles are then dissected off of each other in a layer-by-layer, stepwise fashion along fascial planes until the thyroid cartilage and trachea are exposed (**Image 8.28**). Following this, the tongue, hyoid bone, and larynx are removed as a unit. The tongue can then be cross sectioned and separated from the hyoid bone. The hyoid bone is then separated from the thyroid cartilage and the soft tissues carefully removed to expose any fractures. During the dissecting process, particular care should be given to any areas of hemorrhage, and photographs taken when appropriate. The superior horns of the thyroid cartilage are then gently palpated, and the pharyngeal tissues cut away. The thyroid laminae and the cricoid cartilage are examined for injury, and the cricoid cartilage is separated. Then, the thyroid cartilage is opened posteriorly, and the mucosa of the larynx examined.

It is preferable to perform neck dissection as one of the last autopsy procedures, after the thoracic and abdominal viscera and brain have been removed. This allows for drainage of blood from the neck tissues and provides a more bloodless and, therefore, cleaner anterior neck dissection. The anterior cervical strap muscle dissection and the subsequent dissection of the pharyngeal tissues, hyoid bone, and thyroid cartilage should be per-

formed by the prosector, and never delegated to an autopsy technician. In this way, injuries can be optimally identified, interpreted, and photographed as they are encountered. (See Chapter 29 for detailed neck dissection procedures.)

### Neck organ anatomic variations

There is considerable anatomic variability of the laryngohyoid complex. These variances have occasionally been mistaken for fractures; such confusion can be avoided by noticing the absence of extravasated blood (which would be expected in antemortem fractures). First, the hyoid bone has two symmetrical joints that separate the greater horns from the body of the hyoid bone. These joints are often flexible, particularly in younger individuals in whom they have not yet fused. Some pathologists have also been confused by the normal lesser horns of the hyoid bone. These two, roughly pyramidal structures are located on the superior half of the hyoid bone at the junction of the greater horns to the hyoid body. Again, these findings can be distinguished from fractures by the lack of associated blood extravasation.

One may also encounter triticeous cartilages, which are little cartilaginous nodules embedded in the thyrohyoid ligament. These may be confused with a fracture of the superior horns of the thyroid cartilage. They, however, are a normal anatomic variant and, in one study, were identified in 12 out of 40 cases.[14]

In the thyroid cartilage of **Image 8.29**, note the small triticeous cartilage at the tip of the superior horn of the thyroid cartilage. Although not evident in **Image 8.29**, the triticeous cartilages can be readily palpated as nodules, and because they are connected to the hyoid greater horns by only a small amount of tissue, they are easily moved in different directions (**Image 8.30**). Although the superior horn of the thyroid cartilage is a common location for fracture with significant neck com-



8.27



8.28

pression, the triticeous cartilage should not be misidentified as a fracture at this location. True fractures may have clearly irregular, fragmented bony ends, and would have associated hemorrhage into surrounding soft tissue. In decomposed bodies, blood extravasation at a fracture site may be indistinct or equivocal, making the distinction of a triticeous cartilage from a fracture somewhat more challenging, but easily done. In this decomposed thyroid cartilage (**Image 8.31**), note the triticeous cartilage at the tip of the right superior horn of the thyroid cartilage that is easily moved around and palpated as a nodule. Aside from dissection and direct visualization of fractures, radiography may help identify fractures of the greater horns and hyoid body and help differentiate fracture from a segment of cartilage. Refer to Chapter 29 for a pictorial review of the normal neck anatomic structures and a review of how to perform an anterior neck dissection.

## Hanging

The ligature usually consists of a rope, electrical cord, belt, or other material fashioned into a slip knot. A wide variety of material can be used as a ligature, and choice of ligature is limited only by what the person has access to and his or her imagination. Jail and prison hangings will often involve cloth ligatures torn from bedsheets or possibly from the prisoner's own clothing. In cases in which the ligature is fashioned out of linked metal chain or other very hard material, instead of being cut, the ligature can be loosened and lifted off of the head, again with preservation of the knot if possible. In some cases, the ligature has been previously removed from the body, either by family members or by medical rescue personnel. In these cases, the ligature should accompany the body to the medical examiner department for examination. If the scene is not attended by a medical examiner, the ligature should be left in place so that the medical examiner can view it as it is on the body. The entire ligature, as it envelops the neck's circumference, should be photographed. In some cases, the ligature in a hanging may form more than one loop around the neck.

In most hanging deaths, a near-circumferential ligature abrasion furrow wraps around the neck. In a typical hanging, the ligature extends roughly transversely across the midregion of the front of the neck, just above the level of the thyroid prominence. On the sides of the neck, the ligature abrasion extends upwards, and often forms an inverted "V" in the back of the neck. The inverted "V" represents where the knot of the noose was located (the point of suspension) and may also be to the side of the head, usually behind one of the ears. It is not unusual for the ligature abrasion to be incomplete, because it may not be detectable near the knot as a result of the point of suspension often pulling the ligature up off the surface of the skin. One should carefully examine the ligature abrasion to be sure that it is consistent with the ligature used. If the ligature was previously removed from the body and accompanied the body to the medical examiner department, it should be examined, photographed, and retained as evidence.



8.29



8.30

8.31

### Ligature variation

A variety of ligature materials may be used for hanging, ranging from a rope or a chain to a cord, belt, towel, bedsheet, and so forth. The narrower the ligature, the deeper and more pronounced the ligature furrow. The broader and softer the ligature, the more superficial and faint the ligature furrow. The ligature abrasion should always be carefully examined to make sure that it correlates with the ligature used, as in this case of a young man who hanged himself with a belt (**Images 8.32** and **8.33**). Note the similarity in the pattern of the belt and the abrasion on the neck. Note the similarities in the pattern of the ligature and abrasion pattern in this hanging with a beaded chain (**Image 8.34**) and in this hanging with a laid fiber rope (**Image 8.35**). Sometimes, more than one ligature furrow can be identified (**Image 8.36**). This may result from the ligature being wrapped more than one time around the neck, or may result from the body (and/or ligature) changing position while hanging. If the ligature consists of a broad flat sheet or some other soft material such as the sheet shown in **Image 8.37**, then there may be little, if any, ligature abrasion around the neck. Also,

if the person was rescued and hospitalized for some amount of time before dying, one may not see a ligature abrasion or other marks on the neck. In these cases, the cause of death is largely determined by the history/investigation and the exclusion of anything more definitive. In many cases, decomposition does not



8.34



8.32



8.35



8.33



8.36

preclude the documentation of important findings in hangings. In this decomposed body (**Image 8.38**), despite the skin discoloration and slipping, one can still appreciate a ligature furrow with a patterned abrasion similar to the laid fiber rope ligature.

Note that the body does not need to be fully suspended with the feet clear of the ground for a hanging to occur. In fact, oftentimes, the hanged person is in the standing position, with their feet clearly planted on the ground. Alternatively, they may have their knees on the ground, or they may be in a variety of slumped positions. Hangings may occur with the person in a sitting position with the body positioned in such a way that the weight of the head itself, in combination with neck flexion,

causes obstruction of blood flow through the neck. These types of hangings may be seen in jails with the use of a bedsheet or other cloth ligature passed though the lower rails of the cell wall or door, with the person found with the ligature still around his or her neck, sitting on the floor, or slumped over on the floor. Hanging may even occur with the person in a semisupine or prone position.

In deaths due to hanging, a variety of anatomic findings may be identified at autopsy. Sometimes, the tongue is partially protruded from the mouth and the tip of the tongue is dark from drying artifact. In hangings where the person is suspended, one may see prominent lividity and petechiae on the lower legs from blood pooling according to gravity and the bursting of small blood vessels (**Image 8.39**). Petechiae may also be seen on the bottoms of the feet (**Images 8.40** and **8.41**). Petechiae on the legs and feet are often referred to as Tardieu spots and are the result of pronounced lividity causing the distention and rupture of dependent blood vessels.[1] Tardieu spots are thus a postmortem phenomenon.

In hangings, the anterior neck dissection is usually negative. Because there is usually no struggle, hemor-



8.37



8.38



8.39



8.40



8.41

rhages rarely appear in the anterior neck cervical strap muscles, and the anterior neck dissection is unremarkable. The hyoid bone, thyroid cartilage, and cricoid cartilage are usually intact, but may occasionally be fractured. When present, the fractures almost exclusively involve the superior horns of the thyroid cartilage and the greater horns of the hyoid bone, and do not involve the body of the hyoid bone or the laminae of the thyroid cartilage. In a review of 307 accidental and suicidal hangings, fractures of the hyoid bone and/or thyroid cartilage were found in approximately 9 percent of cases and were more common in older individuals.[15] In this study, full suspension of the body was not necessary to produce fractures. Older people have more heavily calcified[14,15] and sometimes more "brittle" hyoid bone and thyroid cartilage that are more easily fractured than that of a young person whose cartilages are often quite pliable. Calcification of the thyroid and cricoid cartilage is highly variable, but starts around the age of 20 years and increases gradually with age.[14]

Fractures of the cervical spine are unusual in routine hangings, unless the decedent had osteoporosis or another bone disease. When fractures occur, they tend to be associated with judicial-type hangings in which the body is dropped some distance and then suspended. Osteologic trauma in such cases has been reported as fractures of the hyoid cornua, styloid process, occipital bone, body of the second cervical vertebra, and transverse process fractures of C1, C2, C3 and C5.[16]

## Homicidal hanging

Homicidal hangings are extremely rare,[17] but may be suspected when the investigation and autopsy findings appear more consistent with a struggle, such as an excessive amount of external and/or internal neck injury, possibly with a fracture of the cricoid cartilage, which is distinctly uncommon from a hanging. There may also be defensive-type injuries, or an inconsistent pattern of lividity. The investigative and autopsy information may reflect a strangled person who was subsequently placed into a hanging position to simulate a suicide, or a person who was intentionally hanged, perhaps after she had become subdued from ethanol or drug toxicity. Alternatively, one may rarely encounter a suicidal hanging staged as a homicide. Such staged crimes are rare, but these hangings may also have a gunshot wound, incised wounds, a gag, blindfold, ligature binding, or other unusual features. In such instances, one should determine if the person could have caused his death all by himself, and whether there is evidence of any struggle. The body should be closely examined for any hesitation marks or scars, and his medical, psychiatric, and social history obtained. Consideration of all of the case information will help resolve the case. The purpose of why one would attempt to disguise his suicide as a homicide is individual, but may include life insurance factors, an effort to gain notoriety, or to exact revenge against family or friends.[18]

## Judicial hanging

Judicial hangings are mainly a topic of historical interest, however, rare examples may be seen in modern society, or in unusual suicidal hangings, in which the body drops for some distance before the neck is caught by the taut rope. The appropriate distance for the body to drop in a judicial hanging has been the subject of much debate in history. If the drop distance is too short, the person hangs for a period of time, struggling as he slowly dies. If the drop distance is too great, the body is decapitated.[19] If the drop distance is just right, then the classic cervical vertebral injury, fracture of the neural arch of C2 vertebra with fracture-dislocation of C2 from C3 vertebra, occurs, with stretching or tearing of the cervical spinal cord and immediate loss of consciousness and rapid death.[20] A rapid death may also be explained by subarachnoid blood around the brainstem, which is likely a

| Sample autopsy protocol |
|---|
| "A ligature abrasion extends circumferentially around the neck, forming a shallow abraded ligature furrow. The ligature abrasion consists of dried, tan skin measuring from 1/8 to 3/8 inch wide and has fine longitudinal grooves. Anteriorly, the ligature abrasion extends transversely across the neck just above the level of the thyroid cartilage, 10 inches below the top of the head. The ligature abrasion tilts slightly upwards on each side of the neck. On each side of the neck, the liga-ture furrow extends superiorly. On the right side of the head, the ligature furrow is 9 inches below the top of the head. On the left side of the head, the ligature furrow is 9 inches below the top of the head. Posteriorly, the ligature furrow forms an inverted 'V' in the midline, 7 inches below the top of the head. There are no scratches, contusions, or any other marks on the neck." |

gross indication of spinal shock, with paralysis of vital centers in the brainstem and upper cervical spinal cord.[21]

The neck fracture is believed to result from a violent submental jerk that suddenly hyperextends the head. It is believed that the fracture is more prone to occur at the C2/C3 junction because this region is a possible area of mechanical weakness of the cervical vertebrae; the C2/C3 region is the junction between the fixed C1/C2 vertebrae (atlantoaxial complex) and the partly rotatory "typical" cervical vertebrae.[20] Cervical vertebral fractures, however, occur at variable rates in judicial hangings and have been reportedly demonstrated in 17 percent[22] to 100 percent[16] of cases. In judicial hangings, there usually is no fracture of the odontoid process.

## Strangulation

Strangulations are almost always homicidal (except in children where they tend to be accidental). A person may be strangled by another person's hands (manual strangulation) or by a ligature (ligature strangulation). Also, a person may be strangled by virtually any object that is pushed onto and compresses the neck, such as a forearm, a knee, or any type of fixed object such as a metal bar. In these cases, the assault may be referred to as manual strangulation, neck compression, or other similar wording.

In cases of strangulation (or hanging), the application of pressure to the neck, first and foremost, can occlude the carotid arteries. A surprisingly small amount of pressure is required to compress these vessels, and the literature has frequently cited pressures varying from 5 pounds[23] to 11 pounds.[24] Although descriptions of vertebral artery compression and quantification of required forces can be found in the literature, the location of those portions of the vertebral artery not enclosed by the vertebral column are very short, are buried within the supraclavicular fossae and low neck, and are unlikely to be involved in the majority of cases of mechanical asphyxia. Although unconsciousness due to arterial (carotid) compression has been documented at an average of 10 seconds, note that many fatal violent asphyxial events are prolonged and typically involve repeated periods of partial or complete occlusion of vessels. The duration of the attack is likely one of the variables determining the degree of physical findings discovered on anterior neck dissection.

In homicidal strangulations, there is usually a size and strength discrepancy between the victim and the assailant. The victim is usually a woman, an elderly person, or a person of small stature, and the assailant a comparatively larger, stronger man.[25] In all suspected strangulations (male and female), a sexual activity kit ("rape kit") should be among the evidence collected. As with all hangings, in all strangulations, the skin and soft tissues of the neck should be carefully evaluated for injuries. Detailed anterior and posterior neck dissections should be performed. The hyoid bone and thyroid cartilage should be carefully evaluated for fracture, both grossly and radiographically.

Suicidal strangulations are rare, but occasional reports have been published.[26] In suicides, self-strangulation is possible if the person is able to secure a ligature around her neck that will remain in place and remain tight on its own. Examples of suicidal strangulations may include tying a tight knot in a ligature or cinching a plastic cord with teeth that "lock" into place around the neck. In suicidal strangulations, the ligature must be able to remain in place and remain tight on its own, because once the person loses consciousness and loses his grip on the ligature, lessening its constriction, he will likely regain consciousness with subsequent reperfusion of his brain. This is why one cannot manually strangle oneself—as soon as one loses consciousness, there is a loss of grip on the neck, and reperfusion is established. Strangulations may rarely be accidental, as in workplace accidents in which a tie or other article of clothing is caught on machinery. In cases of suicidal and accidental strangulation, homicidal strangulation should be suspected first and ruled out.

Refer to Chapter 13 for discussions on choke holds and lateral vascular neck restraint ("carotid sleeper") holds associated with restraint deaths while in custody.

### Evidence collection

In all suspected strangulations, before the body is washed and before the autopsy is started, if the fingernails are of sufficient length, they should be clipped and saved. If a suspect is identified, that person's DNA could be potentially matched to DNA found under the victim's fingernails. Additionally, one should ensure that law enforcement officers have attempted to obtain trace evidence or latent fingerprints before the body is washed. Also, if a ligature is still in place, the ligature is saved. It may be used for possible DNA matching. Trace DNA of the assailant has been detected on ligatures.[27] This evidence is to be collected in strangulations and suspected strangulations along with the victim's clothing, blood, and hair standards, trace evidence such as loose hairs and fibers, and a sexual activity kit. Proper sexual activity examination is particularly important; in one review, rape was identified as the motive in 32 out of 54 (60 percent) female strangulations.[28] Evidence collected, such as semen, can be particularly important in linking an individual to the crime.

In this manual strangulation of a young woman (**Image 8.42**), note the scleral hemorrhages. In addition to petechiae, larger scleral hemorrhages can be seen in relation to neck compression. Aside from conjunctival and facial petechiae, one can also see petechiae in the mucosa of the sphenoid sinus in cases of asphyxia with neck compression. In this case of strangulation



8.42



8.44



8.43



8.45





8.46

(**Image 8.43**), note the petechiae of the sphenoid sinus. Petechiae can also be identified in the laryngeal mucosa and, like petechiae of the sphenoid sinus or elsewhere, are by themselves not diagnostic of anything, but are helpful when interpreted in the context of the entire case.

Note the small abrasions and contusions of the anterior neck (**Image 8.44**). The abrasions of the neck may be from the assailant's hands or from the victim's hands as the victim tried to pull the assailant's hands off of her neck. If the skin is wet, abrasions may not be readily apparent. However, they will usually become more prominent after the skin has been allowed to dry as occurs when the body is placed in a cooler overnight.

A step-by-step anterior neck dissection (see Chapter 29) is very important to identify and photographically document the extent of contusions to the neck muscles, which are reflective of violence. With the skin and subcutaneous tissues reflected, note the bruising of the anterior cervical strap muscles (**Image 8.45**), which becomes more and more apparent as each successive layer of neck muscle is reflected (**Image 8.46**).



8.47



8.49



8.48



8.50

Fractures of the larynx, which includes the hyoid bone, thyroid cartilage, and cricoid cartilage, are often identified in cases of strangulation. However, in the case shown in **Images 8.43** through **8.46**, the hyoid bone, thyroid cartilage, and cricoid cartilage were not fractured. This is not at all unusual, given that the person was 20 years old, and the hyoid bone and neck cartilages at this young age are not yet calcified and are still quite flexible and likely to be able to withstand a significant amount of compression before fracturing. As the age of a victim increases, the likelihood of hyoid bone and thyroid cartilage fractures increases, due to increased calcification of the bone and cartilage and possible increased brittleness of the structures. An x-ray of the hyoid bone and thyroid cartilage may aid not only in the detection of fractures, but in determining the degree of calcification (**Image 8.47**).

In this strangulation (**Image 8.48**), note fractures of each of the superior horns of the thyroid cartilage. In another case (**Images 8.49** and **8.50**), there is a fracture of the left superior horn of the thyroid cartilage. In strangu-

lations, fractures often involve the superior horns of the thyroid cartilage because they are relatively thin structures that are firmly compressed against the unyielding anterior surface of the cervical vertebrae. Also, the superior horns of the thyroid cartilage are firmly attached to the greater horns of the hyoid bone by the thyrohyoid ligaments and significant force applied to either structure can lead to the fracture of either or both structures.

In this strangulation (**Image 8.51**), note that both greater horns of the hyoid bone are fractured. The fractures are not visually apparent until the bloody soft tissues are dissected away (**Image 8.52**). In all cases of strangulation, be sure to remove the tongue and examine it for hemorrhages. In the same strangulation case, note the hemorrhages in the tongue (**Image 8.53**). In another case of strangulation (**Image 8.54**), note the fractures of the hyoid bone and the thyroid cartilage. True fractures of these structures have some amount of blood extravasation in the associated tissues and should therefore be easily differentiated from postmortem injury, occasionally related to organ removal.



8.51



8.53



8.52



8.54

In a review of 41 manual strangulation deaths, conjunctival/scleral petechiae were identified in 89 percent of cases. Fractures of the hyoid bone and/or thyroid cartilage were identified in all 14 of the male victims and in half of the female victims.[28] In the same study, in 48 ligature strangulation deaths, conjunctival/scleral petechiae were identified in 86 percent of the cases, and 5 of the 21 male victims and 1 of the 27 female victims had fractures of the hyoid bone and/or thyroid cartilage.[28] In a study of 20 strangulations (10 with fractures of the hyoid bone, 10 without), those with hyoid fractures tended to be older and more likely to have fused hyoid bones.[29] Certainly, one can be strangled without sustaining fractures of the hyoid bone or thyroid cartilage, but the chances of sustaining fractures of these structures increases with age and corresponding calcification, fusion, and brittleness of the hyoid and larynx. The extent of external injury and internal injury in strangulations varies with the intensity of the assault and the resistance provided by the victim. *On occasion, one may be strangled without any external or internal evidence of injury. This may occur if someone was obtunded, intoxicated, or otherwise unconscious and unable to put up much resistance, enabling the assailant to use a reduced amount of force.*

It is advisable in strangulations to perform a posterior neck dissection to identify additional injuries. When one encounters deep cervical hemorrhage and laryngeal fractures, one must also consider the possibility of other types of violent injury such as neck compression from an implement or a direct blow to the neck such as that inflicted by a "karate chop."

In decomposed strangled bodies, one often must rely less on the findings of petechiae, neck abrasions/contu-



8.55



8.56



8.57

*in hanging, it is usually located above the thyroid prominence and angles upward from the front to the back of the neck.* In ligature strangulations, the lethal neck constriction may be caused by several means, including manually pulling on both ends of the ligature, tightening a noose with a running knot, or occasionally placing a long, hard rod through a knot of a ligature around the neck or underneath a tied ligature. The rod is then twisted for several revolutions, which tightens the ligature's tautness around the neck.

The body of a strangled homicide victim may be burned in an attempt to destroy evidence. In such cases, even with significant charring of the body, remnants of the ligature may remain around the neck,[30] protected from the fire by the folds of skin in the neck. As this material is likely friable, one should photograph it before removing it, and then rephotograph the neck. Carbon monoxide testing should be performed, and should be expected to be low, because the victim (or surroundings) is usually set on fire after the assault has ended and the person is likely already dead. However, in some asphyxial deaths, a person may be strangled to unconsciousness, but not death, and may continue to maintain respiratory activity. If the fire is allowed to smolder for some time, the victim may attain an elevated carboxyhemoglobin level via agonal respirations, perhaps providing another element of asphyxia (carbon monoxide toxicity) to his or her death.

Per law enforcement investigation, the young lady shown in **Images 8.58** through **8.60** was strangled until she became unconscious. The assailant then set the bed next to her on fire and closed the door as he left the room. He had reportedly heard some breathing/gurgling sounds as he left the room. She was found unresponsive a short time later. Note the abrasions on her neck and on the undersurface of her jaw (**Image 8.58**). She also has conjunctival petechiae and a contusion of the tongue (**Image 8.59**)—findings that support the claim of stran-

sions, and anterior neck muscle hemorrhages, all of which can be very difficult or impossible to identify in decomposed tissue (**Image 8.55**). Careful dissection of the neck structures may reveal fractures. Note the fracture of the superior horn of the thyroid cartilage in this individual (**Image 8.56**).

In this ligature strangulation (**Image 8.57**), in which the body has decompositional changes, note the different types of ligatures that were wrapped around the neck and tied in the back of the neck. As in hangings, in ligature strangulation, the ligature and ligature furrow must be carefully photographed and described. *In ligature strangulations, the encircling ligature furrow is usually horizontal and located at or below the thyroid prominence, whereas*



8.58



8.60



8.59



8.61

gulation. She had thermal burns over approximately half of her body, and evidence of smoke inhalation, characterized by soot lining her airways (**Image 8.60**) and a blood carboxyhemoglobin saturation level of approximately 30 percent. Such autopsy findings are consistent with the scenario of someone being strangled to the point of unconsciousness, but able to maintain enough respiratory drive to inhale sufficient smoke (and carbon monoxide) to provide an added component of chemical asphyxia.

### Artifacts resembling strangulation ligature marks

Certain situations can produce neck findings that may be confused with ligature strangulation. Probably the most common is the bloated decomposed body in which the neck tissues swell to such an extent that they press against a shirt collar or necklace. When the shirt or necklace is removed, one may notice a blanched, horizontal impression extending circumferentially around the neck. This should not be confused with an antemortem injury and should be recognized as the body is undressed. Also, overlapping rolls of neck skin can be mistaken for a lig-

ature mark. This can be seen in infants, elderly individuals, and others with abundant neck tissue (see Chapter 24).

Other neck artifacts involve body positions attained during the person's collapse or activities performed shortly before his or her death. This decomposed man (**Image 8.61**) was found in the prone position, having collapsed to the ground face first near his kitchen table. He had collapsed onto electrical wiring that was extending from his computer and phone to the wall. Note how he had collapsed onto these wires and, in fact, became partially suspended by a telephone cord that passed underneath his neck, keeping his head, neck, and upper body off the ground (**Image 8.62**). At autopsy, note the ligature mark created by the telephone cord that extended roughly horizontally across the front and sides of his neck (**Images 8.63** and **8.64**). Without knowledge of how the body was positioned at the scene, the ligature mark from the telephone cord could be easily misidentified as a ligature mark associated with homicidal strangulation. At autopsy, he had heart disease, and no evidence of internal neck injury.



8.62



8.64





8.63

## Differentiating suicidal from homicidal asphyxia

Differentiating a suicide from a homicide can be challenging in some cases of asphyxia. The following are characteristics of each that should help guide one down the "suicide" or "homicide" path. However, one must be cautioned that many of the characteristics of suicidal asphyxias may also be found in the homicidal category, and vice versa. Also, the identification of characteristics typical of one is not necessarily "proof" of either homicide or suicide. One must consider the following *typical* characteristics of each category *within the context* of the complete case investigation.

### Suicide
- In secured residence
- Suicide note
- History of depression, schizophrenia, or other mental illness
- On psychiatric medications
- Prior suicide attempt/ideation
- Significant recent life-altering event (such as death of spouse, or to be placed in a nursing home, or to be sent back to jail)
- Hesitation marks or scars on wrists, neck, or elsewhere
- Ligature furrow above level of thyroid cartilage
- Little internal neck injury (reflecting no or mild struggle)
- Fracture of thyroid cartilage horns, hyoid bone, and cricoid cartilage very uncommon

### Homicide
- "Dumped" body
- Unlocked residence
- Evidence of burglary or belongings rummaged through
- Jewelry/belongings missing
- Inconsistent statements from acquaintance/witness/other
- Convincing motive(s) identified
- Recent life insurance policy started/significant recent shifts of money
- History of previous physical/sexual assault
- Ligature binding of extremities
- Body arranged for "display" purposes
- Evidence of possible sexual assault (legs apart, dried fluid in groin, injuries to genitals)
- Clothing in disarray—it may appear as if the body was redressed, or panties pulled back up
- Inconsistent pattern of lividity or rigidity—evidence the body has been moved
- Defense injuries on hands/arms (broken fingernails, contusions or abrasions)
- Ligature furrow at/below level of thyroid cartilage
- Fingernail-type abrasions of neck
- Large amount of external neck injury
- Often with more than a little internal neck injury
- "Date rape"–type drugs detected in blood, such as flunitrazepam (rohypnol), ketamine, GHB

## Autoerotic deaths

Autoerotic deaths are a distinct category of asphyxial death that occurs in young males, in which the person accidentally hangs or strangles himself while intentionally inducing hypoxia for the purpose of enhancement of orgasm experienced during masturbation. During such self-induced hypoxia, one may come close to unconsciousness, but avoid passing out by releasing the mechanism causing the asphyxia. Death occurs when the degree of hypoxia becomes too great, causing the person to lose consciousness and lose control of their voluntary muscular actions that are needed to prevent the strangulation or hanging from becoming lethal. Alternatively, there may be failure of an intricate release mechanism of ligatures that was designed to operate depending solely on a change in the body position. The victim is usually white, middle-class, educated, and commonly in the range of 15 to 30 years old,[31,32] although cases have been reported from 9 years to 80 years of age.[33]

### The scene

An autoerotic death should be considered at the scene of any asphyxial death. Although in some cases there are only subtle indications of autoerotic activity, in many cases, this type of death is often readily recognized when the body is first viewed at the scene. The person is in various stages of undress with the genitals exposed or may be clad in clothing of the opposite sex.[31] There is usually pornographic material within easy visual range, bondage, and evidence of masochism and masturbation.[31,33–35] Rectal foreign bodies may be found. There may be evidence of electric current applied to the genitals.[35] Also, mirrors or video cameras may be placed so that the person can see (and review) his own activities (**Image 8.65**).[32] No suicide note is found. It is important to be aware of the concept of autoerotic activity and its characteristics to avoid misclassifying such a case as a suicide or a homicide (and vice versa). One should first rule out suicide and homicide before determining that the death is autoerotic in nature. Evidence of previous similar activity is supportive of autoerotic activity.

### The body at the scene

In examining the body at the scene, it is important to be able to determine precisely how the hypoxia was induced and, importantly, what the "release mechanism" was that would allow the ligature to relax. Oftentimes in autoerotic cases, the person devises the neck ligature in such a way so that he can control the amount of constriction around his neck (and, hence, his degree of hypoxia) and be able to relax or release the ligature if he feels he is going to pass out. The apparatus can be simple or elaborate. Although the vast majority of cases employ ligatures around the neck as the means of inducing hypoxia, a series of three autoerotic asphyxia cases using propane gas has been reported.[36] Propane gas can be toxic as well as hypoxia inducing (because it displaces oxygen from hemoglobin). Also, suffocation via a plastic bag placed over the head or various degrees of smothering with tape or other material over the face may be encountered. One should entertain any means of hypoxia as possibly associated with autoerotic activity, not just the classic neck ligature binding scenario.

Autoerotic activities are usually solitary and clandestine, often taking place in remote areas such as garages, basements, or closets, although they may occur in situations of group sex. Because their activities are often intended to be kept hidden, one may notice a handkerchief or other soft material between the ligature and the skin of the neck, intentionally placed there to prevent any ligature abrasions or other suspicious marks.[32,35] Because these activities are usually kept secret, and the appearance of the body so graphic, a family member finding the body may be shocked and embarrassed. Because of this, they may attempt to "clean up the scene" and hide the evidence. This can be troubling in determining the cause and nature of the death, particularly if there was no injury to the body.

Autoerotic deaths in women are distinctly less common than in men, but do occur rarely.[32,37] In a review of six such cases, the evidence of sexual activity was characterized by foreign bodies adjacent to or in the vagina, vibrators, or ropes tied around the genitals and breasts.[37] The ritual is usually not as elaborate as that

8.65



seen in male cases. One must keep in mind that an asphyxial death in a woman caused by a ligature is suspicious for homicide and should be considered a strangulation homicide until one can convincingly prove that the death is associated with autoerotic activity.

## Incaprettamento

Incaprettamento is a rare form of homicidal asphyxia that has been reported to be applied by the Italian Mafia.[38] In this form of asphyxia, one end of a rope is tied in a noose and placed around the victim's neck. The other end of the rope is used to secure the victim's ankles behind their back. Victims can avoid constriction of the rope around the neck (and asphyxiation) if they are able to maintain their legs in the flexed position. However, once they tire, and are no longer able to maintain their legs in a flexed position, they relax, the noose around their neck tightens, and they strangle.[38] This particularly macabre method of asphyxia is regarded as intended to be an admonition to others.[38] However, in an autopsy series of 18 such cases, it was concluded that the death is usually caused by strangulation before incaprettamento, with the body subsequently bound after death, perhaps to facilitate disposal of the body and/or to communicate a motive/purpose of the homicide.[38]

## Carotid sinus stimulation

Whenever significant neck compression occurs, there may be compression and stimulation of the carotid sinus, which is situated just cephalad to the bifurcation of the common carotid arteries. Stimulation of this structure may lead to vagal effects such as bradycardia and hypotension or may lead to other types of dysrhythmia. The vagal effects may rarely be overwhelming and possibly lead to a rapid onset of cardiac standstill and sudden death.[39] Hence, one may not need to necessarily occlude the airway or vasculature in order to cause death by neck compression. This may be the mechanism of sudden death in individuals who collapse immediately during the application of a neck hold or an impact to the neck, and in whom no significant pathologic findings are identified at autopsy.[39] However, because during a struggle, most individuals are tachycardic and hypertensive, vagal stimulation will most likely lead to normal cardiovascular parameters or mild hypotension and/or bradycardia and not be a factor in causing sudden death. This is likely true because in normal individuals, stimulation of the carotid sinus produces only mild bradycardia and mild hypotension.

The individuals who are believed to be susceptible to rapid vagal death are likely older people with significant cardiovascular disease who were known to be sympto-

matic from previous episodes of carotid sinus stimulation such as fainting spells or dizziness associated with pressure on their neck. Additional evidence of violence such as abrasions resembling fingernail marks on the victim's neck and significant internal neck injury combined with conjunctival petechiae effectively rules out death by carotid sinus stimulation.

## Asphyxial deaths in motor vehicle accidents

Although most individuals who die in motor vehicle accidents die of blunt force injury, a small percentage of victims die from asphyxia, either by itself or in combination with other injuries. Accidental asphyxiation from seat belts is rare, but cases have been reported, and involve an incapacitated individual (likely from concussion and/or intoxication) who in some way had the seat belt caught around the neck.[40] In other cases, torso compression, neck flexion, facial occlusion, body inversion, and blood aspiration may act solely or in combination, often with concussion and/or alcohol intoxication, to cause death.[41] In these cases, additional factors relevant to an asphyxial death include the presence of petechiae, obesity, and natural disease. Obesity was particularly relevant in deaths due to body inversion.

## Resuscitation artifact

Resuscitation efforts may produce injuries of the neck that must be distinguished from true inflicted injury caused by neck compression. Resuscitation injuries are often related to intubation and may involve oral injury, pharyngeal injury, and injury of the tracheal mucosa.[42] The middle-aged man shown in **Images 8.66** and **8.67** was witnessed to collapse and die suddenly and unex-

8.66



pectedly. Resuscitation attempts were made, and he was a difficult intubation. His death was determined to be due to severe coronary artery atherosclerosis. Note the resuscitation-related hemorrhages of the tongue and the pharyngeal tissues caused by intubation attempts (**Image 8.66**). In addition, he had petechiae of the mucosa of his sphenoid sinus (**Image 8.67**), which is a nonspecific finding, but in the appropriate scenario, may provide additional evidence of asphyxia. In another case, note the contusions of the pharyngeal tissues in an individual who was difficult to intubate (**Image 8.68**).

In a study of 50 deaths in which there had been endotracheal intubation, 37 of the cases (74 percent) had airway injuries resulting from the intubation procedure.[42] In this study, there were no fractures of the hyoid bone or the thyroid cartilage, but there was a wide range of soft tissue injuries including contusions, lacerations, abrasions, and petechiae that most commonly involved the laryngeal and tracheal mucosa (64 percent), the mouth (28 percent), epiglottis (22 percent), posterior pharynx (16 percent), cervical strap muscles (14 percent), and piriform recesses (12 percent). There was cutaneous injury of the neck in 4 percent. Conjunctival petechiae were seen in 21 percent and facial petechiae in 6 percent. As such, one must be careful when interpreting subtle findings in the context of possible resuscitation artifact. For additional discussion on resuscitation artifact, refer to Chapter 14.

### Do

- Realize the importance of scene investigation in understanding asphyxial deaths, particularly in cases of suffocation and positional asphyxia/mechanical asphyxia.
- Perform a careful step-by-step layerwise neck dissection in all hangings and all suspected strangulations.
- Perform neck dissections yourself; do not delegate this procedure to an autopsy technician.
- Interpret autopsy findings in the context of the entire case investigation.
- Examine the hypopharynx for any type of obstructing material or object in all autopsies.
- Keep autoerotic asphyxia in mind during any scene of asphyxial death.
- Adequately photograph all internal neck injuries in hangings and strangulations.

### Don't

- Forget to collect proper evidence (including sexual activity evidence, fingernail clippings, and clothing) in cases of suspected strangulation.
- Forget about the nonspecific nature of petechiae.
- Forget to save the ligature for possible DNA collection in cases of ligature strangulations.
- Forget to properly photograph all ligatures and internal neck injuries; in some cases, photography to document the absence of injury is important.
- Confuse hyoid bone joints or triticeous cartilage in the thyrohyoid ligament with antemortem injury.



8.67



8.68

### References

1. Ely SF, Hirsch CS. Asphyxial deaths and petechiae: a review. J Forensic Sci 2000;45(6):1274–7.
2. Jaffe FA. Petechial hemorrhages. A review of pathogenesis. Am J Forensic Med Pathol 1994;15(3):203–7.
3. Rao VJ, Wetli CV. The forensic significance of conjunctival petechiae. Am J Forensic Med Pathol 1988;9(1):32–4.
4. Maxeiner H. Congestion bleedings of the face and cardiopulmonary resuscitation—an attempt to evaluate their relationship. Forensic Sci Int 2001;117(3):191–8.
5. deJong JL, Adams T. Entrapment in small, enclosed spaces: a case report and points to consider regarding the mechanism of death. J Forensic Sci 2001;46(3):708–13.
6. Humphrey D. *Final Exit: The Practicalities of Self-Deliverance and Assisted Suicide for the Dying*, 3 ed. Delta; 2002.
7. Bullock MJ, Diniz D. Suffocation using plastic bags: a retrospective study of suicides in Ontario, Canada. J Forensic Sci 2000; 45(3):608–13.
8. Jones LS, Wyatt JP, Busuttil A. Plastic bag asphyxia in southeast Scotland. Am J Forensic Med Pathol 2000;21(4):401–5.

9. Mittleman RE, Wetli CV. The fatal cafe coronary. Foreign-body airway obstruction. JAMA 1982;247(9):1285–8.

10. Cunningham ET, Jr, Ravich WJ, Jones B, Donner MW. Vagal reflexes referred from the upper aerodigestive tract: an infrequently recognized cause of common cardiorespiratory responses. Ann Intern Med 1992;116(7):575–82.

11. Paton JF, Li YW, Kasparov S. Reflex response and convergence of pharyngoesophageal and peripheral chemoreceptors in the nucleus of the solitary tract. Neuroscience 1999;93(1):143–54.

12. Nolte KB. Esophageal foreign bodies as child abuse. Potential fatal mechanisms. Am J Forensic Med Pathol 1993;14(4):323–6.

13. Byard RW. Mechanisms of unexpected death in infants and young children following foreign body ingestion. J Forensic Sci 1996;41(3):438–41.

14. Di Nunno N, Lombardo S, Costantinides F, Di Nunno C. Anomalies and alterations of the hyoid-larynx complex in forensic radiographic studies. Am J Forensic Med Pathol 2004;25(1):14–9.

15. Feigin G. Frequency of neck organ fractures in hanging. Am J Forensic Med Pathol 1999;20(2):128–30.

16. Spence MW, Shkrum MJ, Ariss A, Regan J. Craniocervical injuries in judicial hangings: an anthropologic analysis of six cases. Am J Forensic Med Pathol 1999;20(4):309–22.

17. Lew EO. Homicidal hanging in a dyadic death. Am J Forensic Med Pathol 1988;9(4):283–6.

18. Adair TW, Dobersen MJ. A case of suicidal hanging staged as homicide. J Forensic Sci 1999;44(6):1307–9.

19. Nokes LD, Roberts A, James DS. Biomechanics of judicial hanging: a case report. Med Sci Law 1999;39(1):61–4.

20. Schneider RC, Livingston KE, Cave AJ, Hamilton G. "Hangman's fracture" of the cervical spine. J Neurosurg 1965;22:141–54.

21. Reay DT, Cohen W, Ames S. Injuries produced by judicial hanging. A case report. Am J Forensic Med Pathol 1994;15(3):183–6.

22. James R, Nasmyth-Jones R. The occurrence of cervical fractures in victims of judicial hanging. Forensic Sci Int 1992;54(1):81–91.

23. Spitz W. Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation, 3 ed. Springfield, IL: C Thomas; 1993.

24. DiMaio J, DiMaio D. Forensic Pathology, 2 ed. Boca Raton, FL: CRC Press; 2001.

25. Rogde S, Hougen HP, Poulsen K. Asphyxial homicide in two Scandinavian capitals. Am J Forensic Med Pathol 2001;22(2):128–33.

26. McMaster AR, Ward EW, Dykeman A, Warman MD. Suicidal ligature strangulation: case report and review of the literature. J Forensic Sci 2001;46(2):386–8.

27. Wickenheiser RA. Trace DNA: a review, discussion of theory, and application of the transfer of trace quantities of DNA through skin contact. J Forensic Sci 2002;47(3):442–50.

28. DiMaio VJ. Homicidal asphyxia. Am J Forensic Med Pathol 2000;21(1):1–4.

29. Pollanen MS, Chiasson DA. Fracture of the hyoid bone in strangulation: comparison of fractured and unfractured hyoids from victims of strangulation. J Forensic Sci 1996;41(1):110–3.

30. Suarez-Penaranda JM, Munoz JI, Lopez de Abajo B, Vieira DN, Rico R, Alvarez T, et al. Concealed homicidal strangulation by burning. Am J Forensic Med Pathol 1999;20(2):141–4.

31. Breitmeier D, Mansouri F, Albrecht K, Bohm U, Troger HD, Kleemann WJ. Accidental autoerotic deaths between 1978 and 1997. Institute of Legal Medicine, Medical School Hannover. Forensic Sci Int 2003;137(1):41–4.

32. Gosink PD, Jumbelic MI. Autoerotic asphyxiation in a female. Am J Forensic Med Pathol 2000;21(2):114–8.

33. Uva JL. Review: autoerotic asphyxiation in the United States. J Forensic Sci 1995;40(4):574–81.

34. Byard RW, Botterill P. Autoerotic asphyxial death—accident or suicide? Am J Forensic Med Pathol 1998;19(4):377–80.

35. Tournel G, Hubert N, Rouge C, Hedouin V, Gosset D. Complete autoerotic asphyxiation: suicide or accident? Am J Forensic Med Pathol 2001;22(2):180–3.

36. McLennan JJ, Sekula-Perlman A, Lippstone MB, Callery RT. Propane-associated autoerotic fatalities. Am J Forensic Med Pathol 1998;19(4):381–6.

37. Byard RW, Hucker SJ, Hazelwood RR. Fatal and near-fatal autoerotic asphyxial episodes in women. Characteristic features based on a review of nine cases. Am J Forensic Med Pathol 1993;14(1):70–3.

38. Fineschi V, Dell'Erba AS, Di Paolo M, Procaccianti P. Typical homicide ritual of the Italian Mafia (incaprettamento). Am J Forensic Med Pathol 1998;19(1):87–92.

39. Reay DT. Death in custody. Clin Lab Med 1998;18(1):1–22.

40. James RA, Byard RW. Asphyxiation from shoulder seat belts: an unusual motor vehicle injury. Am J Forensic Med Pathol 2001;22(2):193–5.

41. Vega RS, Adams VI. Suffocation in motor vehicle crashes. Am J Forensic Med Pathol 2004;25(2):101–7.

42. Raven KP, Reay DT, Harruff RC. Artifactual injuries of the larynx produced by resuscitative intubation. Am J Forensic Med Pathol 1999;20(1):31–6.

# 9 Drowning

*Michael D. Bell, M.D.*

SIGNS OF DROWNING    228
    The effects of water on the skin    228
    Water and the aerodigestive systems    229
    Visceral congestion    230
NEAR DROWNING    230
OTHER ARTIFACTS OF WATER IMMERSION    231
    Diatoms    231
    Animal scavenging    231
    Injuries    232

AUTOPSIES OF BODIES FOUND IN WATER    233
DANGEROUS AQUATIC LIFE    234
SCUBA DIVING    234
    Barotrauma    235
REFERENCES    237

*Drowning* is defined as death from asphyxia within 24 hours of submersion in water. Drowning claims nearly 8000 lives annually. It is the fourth leading cause of accidental death in the United States. For children, it is the second leading cause of accidental death for school-age children and the number one cause for preschoolers. The overall drowning and submersion injury death rate was 1.93/100,000 people for all age groups in 1995. Peak incidence of 3.22/100,000 injury deaths occurred in children younger than 4 years. Two-thirds of drownings occur in the summer months and 40 percent occur on Saturday and Sunday. Some 90 percent occur in freshwater even in states with large coastal regions. More than half of these cases occur in home swimming pools. One-quarter to one-third of the drowning victims had swimming lessons. Although drowning affects both sexes, males have a rate three times higher than that of females because of increased reckless behavior and use of alcohol.

Drowning occurs when a person submerged in water attempts to breathe and instead aspirates water, leading to decreased oxygenation, hypoxemia, and hypoxic brain injury and death. Aspiration of only 1 to 3 mL/kg of fluid can result in significantly impaired gas exchange. Although differences observed between freshwater and saltwater aspirations in electrolyte and fluid imbalances are frequently discussed, they are of little clinical significance in drowning. Most patients aspirate less than 4 mL/kg of fluid. Eleven milliliters per kilogram is required for alterations in blood volume, and more than 22 mL/kg of aspiration is required before significant electrolyte changes develop.[1]

Freshwater is hypotonic relative to plasma and causes disruption of alveolar surfactant. This results in alveolar instability and atelectasis. Seawater, which is hyperosmolar relative to blood, increases the osmotic gradient and, therefore, draws fluid into the alveoli. This dilutes the surfactant. Both mechanisms injure the alveolar/capillary unit, resulting in a lower functional residual capacity and pulmonary edema. Acute respiratory distress syndrome (ARDS) may result from aspiration if the person survives the initial drowning. Increased airway resistance from debris plugging the patient's airway, as well as release of inflammatory mediators, causes vasoconstriction and impairs gas exchange. Hypovolemia is secondary to fluid losses from increased capillary permeability. Profound hypotension may occur during and after the initial resuscitation period. Hyponatremia may develop in young children from swallowing large amounts of freshwater. Myocardial dysfunction may result from ventricular dysrhythmias and asystole due to hypoxemia. In addition, hypoxemia may directly damage the myocardium, decreasing cardiac output. Metabolic acidosis may impair cardiac function.

Pulmonary hypertension may result from the release of pulmonary inflammatory mediators, which increase the right ventricular afterload, thus decreasing contractility.

Drowning is the frequent cause of death in bodies that are recovered from water. Drowning is, however, the final common pathway of different initiating causes of the person's incapacitation in water. When a body is discovered in water, one must question why the person was in the water initially and why the person was unable to get out of the water. Inability to swim, hazardous environment, trauma, seizure disorder, heart disease, exhaustion, alcohol and drug use, hypothermia, and other causes should be sought to answer the question of why this person drowned.

## Signs of drowning

### The effects of water on the skin

Maceration or softening of the skin begins within minutes after immersion in water. Forensic pathologists from temperate climates write that maceration may not appear for hours if the water is cold.[2] The hands **(Image 9.1)** and feet **(Image 9.2)** with their thick keratin layer are the first areas to macerate. Their surfaces become wrinkled, pale, and saturated with water.

If a body is removed from water (lake, ocean, bathtub), examination of the skin for blunt injuries should be delayed until the body is dry. Abrasions are not easily seen until drying occurs. When the body is allowed to dry, the abrasion becomes brown and is easily seen.[3] The body of a young female was pulled from a body of water **(Image 9.3)**. Although some trauma to the neck and lower jaw was visible at the scene, the extent of injury was evident after overnight drying of the tissues in the morgue refrigerator **(Image 9.4)**.



9.2



9.3



9.4



9.1

## Water and the aerodigestive systems

One of the signs of drowning is the appearance of foam issuing from the nose and mouth.[4] This foam is a mixture of proteinaceous liquid derived from the lungs and air whipped up by terminal respiratory movement. The foam is created and has the same appearance of whipped up egg whites. The foam is derived from the pulmonary tissue as seen in **Image 9.5**. The foam may be white as in **Image 9.6** or rose or red with the incorporation of blood as in **Image 9.7**.

The lungs from a drowned person are often hyper-inflated and meet at the midline, partially obscuring the pericardial cavity when the thorax is first opened at autopsy as seen in **Image 9.8**. The lungs fill the pleural cavities, and impressions created by the ribs may be seen on the pleural surfaces of the lungs. This pulmonary hyperinflation resembles that seen in obstructive lung disease and is called emphysema aquosum.[5]

Although water is inhaled into the lungs, it may also enter the respiratory sinuses including the ethmoid and sphenoid sinuses. The jugum sphenoidale is easily removed, exposing the contents of the sphenoid sinus. Any fluid residing in the sinuses can be withdrawn with a needle-bearing syringe and photographed for documentation as seen in **Image 9.9**.

Water, as well as silt, sand, and aquatic vegetation, may also be swallowed during drowning and fill the stomach as seen in **Image 9.10**. Some pathologists have argued that water may enter the mouth and pass down the esophagus into the stomach passively if the water is turbulent[6] rather than the more likely process of active swallowing. Other pathologists have argued that the postmortem relaxation of the gastroesophageal sphincter allows water to fill the stomach and, therefore, water in the stomach cannot be used as a sign of drowning.[7]



9.6



9.7



9.8



9.5

Middle ear and mastoid air cell hemorrhage has been used as a sign of drowning. Hemorrhage in the middle ear is often inferred by observing bilateral red discoloration in the petrous temporal bones as seen in **Image 9.11**. One can also see the same discoloration in the bones that overlay the frontal and sphenoid sinuses. This phenomenon has been ascribed to changes in the hydrostatic pressures in the ear when a body sinks and then is brought to the surface.[8]

### Visceral congestion

Congestion of the internal organs or viscera is a nonspecific finding in drownings and other asphyxial deaths. Some pathologists have argued that the degree of cerebral congestion depends on whether the drowning occurred in freshwater or saltwater with the gray matter more congested or hyperemic in saltwater immersion.[9] **Image 9.12** shows a coronal section of cerebrum with prominent congestion of the gray matter in a man who drowned in freshwater. This phenomenon is nonspecific for drowning and is seen in other conditions including drug overdose.[10]

## Near drowning

Drowning is death within 24 hours of immersion in water. Near drowning is survival beyond 24 hours after the patient is removed from the aqueous environment.[11] Near drowning patients may survive or die later. Central nervous system (CNS) injury is the major determinant of subsequent survival and long-term morbidity in near drowning. The most important contributions to morbidity and mortality resulting from near drowning are hypoxemia and a decrease in oxygen delivery to vital tissues, especially the brain. CNS damage occurs because of hypoxemia sustained during the drowning episode. In **Image 9.13**, the cortical and deep gray matter is thinner



9.9



9.11



9.10



9.12

than normal with tissue softening and loss at the gray–white junction. This laminar necrosis is not specific for drowning and can result from any cause that produces generalized brain hypoxemia. Near-drowning patients frequently develop pneumonia, either infectious or chemical.

## Other artifacts of water immersion

### Diatoms

Diatoms are microscopic algae with a siliceous exoskeleton first discovered in lung fluid in 1896. Diatoms are from the class Diatomaceae and are characterized by their two valves or frustule that encloses their cytoplasmic contents. At least 10,000 species have been subclassified based on their degree of halophilia. Diatom testing assumes that when a person drowns in diatom-containing water, these microscopic algae are inhaled, penetrate the alveolar capillaries, and circulate by a still beating heart to distant organs, such as the brain, kidney, liver, and bone marrow. These organs are removed at autopsy, acid digested, and examined for the presence of diatoms. The presence of diatoms in the lung is not diagnostic as in this microscopic image (**Image 9.14**) of a diatom in a pulmonary alveolus. The silica skeletons of diatoms are birefringent when viewed microscopically with polarized light. Most pathologists do not believe that the laborious and technically difficult diatom testing approach is sufficiently specific or sensitive for the diagnosis of drowning.

Bodies commonly float in the water face down with the head and extremities hanging downward as in **Image 9.15**. The body is susceptible to abrasion if the water is shallow and turbulent enough to allow the body to scrape against the stony bottom.

### Animal scavenging

With the face submerged, the drowned body will often attract aquatic animals such as fish, turtles, and crustacean creatures to this movable feast. Animals will feed on the soft bits of the face including the lips, nose, and ears[12] as seen in **Image 9.16**. Notice the circumoral loss of tissue with irregular scalloped edges indicative of postmortem animal predation.



9.13



9.15



9.14



9.16

Larger aquatic animals may bite or amputate the drowned body while it remains in the water. Alligators and crocodiles live in rivers and canals and may damage the body of a drowning victim. **Image 9.17** shows the characteristic pattern of punctures from an alligator. The large punctures are paired and get closer to each other as they approach the snout.

Sharks may also bite or amputate a body floating in the ocean. **Image 9.18** shows the characteristic pattern of a shark bite with a large oval section of skin, soft tissue, and skeletal muscle missing. The edges of the wound are focally scalloped and abraded. Along the inferior edge is an additional set of wounds created by the secondary rows of teeth that sharks carry in their jaws.

### Injuries

When a body floats in water that is shared by propeller-driven boats, characteristic injuries can be produced on the body. Propellers produce large incised cuts in the skin, soft tissue, and muscle. These cuts are sharp, well demarcated, and equidistantly separated by normal skin as seen in **Image 9.19**.

By virtue of being in water, a living person who sustains large open wounds from a shark or boat propeller will leach blood into the water and appear bloodless when the body is later discovered and removed for examination. This phenomenon makes the determination of whether the wound was made while the person was alive or dead all the more difficult because the usual sign of vitality, soft tissue hemorrhage, is absent.[13] The decedent in **Image 9.20** has obvious propeller injuries to his head and chest. The wounds appear bloodless and may be erroneously interpreted as occurring post-mortem or after death. The skin pallor and epidermolysis from a prolonged postmortem interval also confound the analysis. The proper interpretation is that one cannot tell if these wounds occurred while the person was alive or dead.

The decomposed body in **Image 9.21** with its putrefactive breakdown will obscure the usual findings found in drowned bodies. The lungs with their dark red hemolysis appearance will be collapsed and exude minimal red decomposition fluid from their parenchyma. Abundant dark red fluid accumulates in the pleural cavities pre-



9.17



9.19



9.18



9.20

sumably from transudation out of the water-filled lungs. Decomposed bodies that are recovered from the water should still be autopsied to detect occult homicides such as strangulation or natural disease.

## Autopsies of bodies found in water

Why should we perform a postmortem examination on a body found in the water if the most likely cause of death is drowning? Rarely is the pathologist presented with the classic story of a novice swimmer stranded in water, frantically struggling and flapping his arms in desperation before sinking to his death. Most decedents are found after having been submerged in water for an unobserved period. Without a history of the immediate circumstances surrounding the "drowning," the postmortem examination becomes important to rule out natural disease or injury as the cause of why the decedent was unable to escape the deadly aqueous environment. This is especially true in those individuals that we would consider unlikely to drown. In **Image 9.22**,

this woman was found with her head submerged in a bathtub in a hotel room. The decedent recently complained of severe headaches that were temporarily ameliorated by taking a hot bath. At autopsy, the decedent had metastatic breast cancer to the brain, causing cerebral edema as seen in **Image 9.23**. This presumably caused her to pass out or have a seizure while getting her bath ready and fall face down into the water, drowning to death.

Victims of homicidal violence may be placed in the water after death in order to dispose of the body. **Image 9.24** shows a man who was strangled to death, then weighted down with a concrete block and placed into the water.


9.23


9.21


9.22


9.24

Murder victims are not the only bodies recovered from the water with weights to keep them submerged. Occasionally suicidal individuals will place weights on their body to prevent themselves from reconsidering their self-destructive act and returning to the surface for air and survival. **Image 9.25** shows a suicidal man who left a suicide note in his car and weighed himself down with a concrete block and wire clothes hanger.

## Dangerous aquatic life

Drowning isn't the only danger in water—some aquatic animals can be deadly. Fatalities from coelenterate envenomation are rare. Fatal cases involving *Physalia physalis* (Portuguese man-of-war) and *Chiropsalmus quadrumanus* have been reported in the southeastern United States along the Gulf of Mexico and Atlantic Ocean. The autopsy findings in fatal cases were nonspecific (congested heavy lungs, acute passive congestion of the viscera, subendocardial hemorrhage) except for the skin injury, which consisted of linear eruptions. **Image 9.26** shows the characteristic skin lesions of a coelenterate or jellyfish sting. In living victims, jellyfish enveno-

mation produces a painful linear, erythematous, urticarial rash at the site of tentacle contact. In victims floating in the water who died from other causes, jellyfish contact produces no visible vital reaction, but the nematocysts may still be seen microscopically in the skin at the sites[14] of contact as seen in **Image 9.27**.

## Scuba diving

Scuba (self-contained underwater breathing apparatus) diving is a popular recreational activity with an estimated 2.5 to 3.1 million certified divers. The scuba diver who dies underwater poses a difficult diagnostic dilemma for investigating authorities and pathologists. The investigation should be thorough and follow a standardized outline. This investigation should include the victim's past medical and social history, dive profile, a detailed history of the terminal event and resuscitation efforts, environmental conditions, examination of the diving equipment, and finally the autopsy.[15] The utility of going to the scuba death scene not only involves examining the body but, more importantly, inventorying and impounding all scuba gear. **Image 9.28** shows a



9.25



9.27



9.26



9.28

scuba diver who was just recovered from the water. This diver's weight belt was tied in a knot around his waist because the safety buckle did not work. Inventory the equipment and photograph it, preferably while it is still attached to the victim. A visit to the death scene (or at least to the boat dock) is helpful for this purpose of documenting and gathering all the diving equipment. The cylinder's air valve should be closed at the scene to prevent air loss from the tank.

Not all scuba divers die from drowning. **Image 9.29** is a coronal section of brain with a large intracerebral hematoma. This brain belonged to a 37-year-old scuba diver who was discovered on the surface of the ocean, incoherent; his left side was moving and kicking, but his right side was immobile and limp. He was admitted to the hospital and died 2 days later. This is a case where the autopsy is helpful in determining the cause of this diver's sudden incapacitation and death.

Several medical conditions disqualify patients from diving. Coronary artery disease (especially if the person has had recent angina or a previous MI) is one such condition with its risk of sudden incapacitation by severe chest pain or rhythm disturbance. Approximately 10 to 20 percent of scuba fatalities involve individuals with severe coronary artery disease. Other conditions that normally disqualify a person from diving include seizure disorder, recurrent episodes of syncope, sickle cell disease, insulin-dependent diabetes mellitus, the presence of pulmonary cysts or blebs, severe chronic obstructive pulmonary disease with bullous emphysema, spontaneous pneumothorax, and certain middle-ear problems or surgery. Temporary disqualifying conditions include pregnancy and abdominal wall or inguinal hernias.

## Barotrauma

Barotrauma is tissue injury caused by the failure of a gas-filled body cavity to equalize its internal pressure with changes in the ambient pressure. The anatomic regions most commonly involved are the sinuses, middle ear, and lungs. Barotrauma of the lungs produces life-threatening extra-alveolar air syndrome. Extra-alveolar air syndrome can cause death or unconsciousness (and subsequent drowning) during ascent while breathing compressed air. The scuba regulator normally delivers air at ambient pressure and lung volume remains constant regardless of the depth. However, if you hold your breath and close your glottis (during a hasty or panicked ascent), then the obstructed alveoli will overexpand (from Boyle's law) and burst, with air dissecting into the pulmonary interstitium. This air can enter the pleural cavities (pneumothorax), mediastinum (pneumomediastinum), pericardial sac (pneumopericardium), subcutaneous tissues, or pulmonary veins. Air that enters the pulmonary veins can embolize to the coronary or cerebral arteries (CAGE or cerebral artery gas embolism). Radiography or computed axial tomography (CAT) can assist in diagnosing extra-alveolar air in the pleural or pericardial cavities or intravascular locations more easily than the standard postmortem examination.[16] **Image 9.30** shows a left pneumothorax (see left apex) on chest radiograph, and **Image 9.31** shows air in the subarachnoid space in a cranial CAT scan. Both imaging studies came from a 20-year-old man with no scuba diving training or experience who joined his three friends for a day of scuba diving. He was found unresponsive and transported to the nearest hospital where these imaging studies were done prior to his death.

Scuba diving equipment is examined in less than 25 percent of fatalities, but this examination is as important as the other investigations. The following procedures should be done with the scuba equipment:

- Immediately gather and impound *all* of the equipment.
- Inventory the equipment.
- If possible, photograph the victim with the equipment still on prior to removal.
- Record the final tank pressure and close the air valve to prevent air loss from the tank.



9.29



9.30



9.31



9.33



9.32

- Check the tank and regulator for defects.
- Check for a weight belt. Is one present? Weigh it if available.
- Record the condition of the buoyancy compensator. Is it inflated? Is it filled with water?
- Have the equipment examined by an unbiased knowledgeable diving expert who will provide a written report.
- Have air samples from the tank tested for correct partial pressures and presence of toxic gases.
- Have the internal lining of the tank inspected for corrosion.

In **Image 9.32**, visual inspection of the second stage of this regulator reveals a torn diaphragm or valve.

Examination of any computerized equipment carried by the deceased diver can be critical to the death investigation. A diver who died of air embolism used a DataMax Pro computer console during his dive, which provided important information about the dive. The computer console in **Image 9.33** indicated a maximal depth of 34 feet and a total bottom time of 7 minutes. The large number (6) of triangles underneath the number "34" indicated that ascent was very rapid and in excess of 120 ft/min. The recommended ascent rate is under 60 ft/min. Panic in this inexperienced diver led to a rapid uncontrolled ascent and fatal barotrauma.

Pneumothorax is one example of barotrauma. Different methods are available for demonstrating a pneumothorax at autopsy. For instance, one can use an Erlenmeyer flask assembly: A large Erlenmeyer flask is partially filled with water. A two-hole stopper plugs the opening of the flask. A glass tube is inserted into one of the holes until it ends within the water. The other end of the tube is connected to a large-bore needle or trocar by elastic tubing. The other hole is left open. When the trocar enters a cavity with air under pressure, the air will bubble in the water contained in the flask. One can also use the time-honored "water in flank pockets" trick as outlined by Kindwall and Pellegrine[17] and as seen in **Image 9.34**. If the pneumothorax is large and under tension, one can hear an audible hiss as one first cuts into the affected pleural cavity. This will be overlooked if someone other than the pathologist eviscerates the body. Radiography or direct observation of frothy air-filled intracardiac blood best identifies air emboli in the heart when the heart is first excised. The examination of the heart or other blood-filled organs for air emboli while underwater is impractical and a bloody mess. Air bubbles in mesenteric and subarachnoid veins are nondiagnostic.



9.34

### Do

- Perform a complete postmortem examination on all bodies recovered from the water.
- Remember that the postmortem findings in drowning are not specific for drowning.

### Don't

- Forget that blood can leach from large wounds in a body recovered from the water, making the determination of wound vitality difficult.
- Forget to impound all the scuba equipment in a scuba death and have the equipment examined by an independent knowledgeable expert.
- Fail to consider arterial gas embolism in the sudden death of a scuba diver.

### References

1. Modell JH, Davis JH. Electrolyte changes in human drowning victims. Anesthesiology 1969;30:414–20.
2. Knight B. *Forensic Pathology*, 2 ed. London: Arnold Publisher; 1996.
3. Wetli CV, Mittleman RE, Rao VJ. *An Atlas of Forensic Pathology.* Chicago: ASCP Press; 1999.
4. Polson CJ. *The Essentials of Forensic Medicine.* Springfield, IL: Charles C Thomas Publisher; 1965.
5. Kohlase C, Maxeiner H. Morphometric investigation of emphysema aquosum in the elderly. Forensic Sci Int 2003;134:93–8.
6. Spitz WU. *Medicolegal Investigation of Death*, 3 ed. Springfield, IL: Charles C Thomas Publisher; 1993.
7. Knight B. *Forensic Pathology*, 2 ed. London: Arnold Publisher; 1996.
8. Robbins RD, Sekhar HKC, Siverls V. Temporal bone histopathologic findings in drowning victims. Arch Otolaryngol Head Neck Surg 1988;114:1020–3.
9. Wetli CV, Mittleman RE, Rao VJ. *Practical Forensic Pathology.* New York: Igaku-Shoin Medical Publishers; 1988.
10. Wetli CV, Mittleman RE, Rao VJ. *An Atlas of Forensic Pathology.* Chicago: ASCP Press; 1999.
11. Froede RC. *Handbook of Forensic Pathology*, 2 ed. Northfield, IL: CAP Press; 2003.
12. Moar JJ. Drowning—postmortem appearances and forensic significance. South Afr Medical J 1983;64:792–5.
13. Di Maio VJM, Di Maio DJ. *Forensic Pathology*, 2 ed. Boca Raton, FL: CRC Press; 2001.
14. Ioannides G, Davis JH. Portuguese man-of-war stinging. Arch Dermatol 1965;91:448–51.
15. Brubakk AO, Neuman TS. *Physiology and Medicine of Diving*, 5 ed. New York: WB Saunders; 2003.
16. Haydon JR, Williamson JA, Anthony AJ, et al. A scuba diving fatality. Med J Aust 1985;143:458–62.
17. Kindwall EP, Pellegrini J. Autopsy protocol for victims of scuba diving accidents. Appendix G. In: 1990 Report on Diving Accidents and Fatalities, Divers Alert Network, 1990; pp. 94–100.

# 10 Environmental Injury

*David Dolinak, M.D.*
*Evan Matshes, M.D.*
*Emma Lew, M.D.*

THERMAL INJURY    239
   Artifacts of thermal injury    240
   Radiant heat    242
   Flame burns    243
   Scalding    244
   Pseudoburns    244
   Delayed fire deaths    244
   Caveats for certain types of burn cases    245
CREMATION    246
SPONTANEOUS HUMAN COMBUSTION    246
IDENTIFICATION OF FIRE VICTIMS    246
CARBON MONOXIDE    246
HYPERTHERMIA    247
   Infants left in cars    248
HYPOTHERMIA    248
   The hypothermia scene    249
   Autopsy findings    249

ELECTROCUTION    250
   The electrical burn    250
   Symptoms in electrocution    251
   The electrocution scene    251
   Principles of investigating electrocutions    252
   Lightning strike    252
CHEMICAL BURNS    253
ANAPHYLAXIS    254
   Testing for anaphylaxis    254
HYMENOPTERA AND VENOM-RELATED
   DEATHS    255
   Wasp sting    255
   Animal venom-related deaths    256
REFERENCES    257

One cannot engage in the activities of a typical day without interacting and being influenced by environmental factors. Many of these factors are considered a nuisance, and typically cause only a small amount of morbidity, such as burning one's finger on a hot pan, getting rained on, being scratched by a pet animal, getting shocked while unplugging a toaster, or shivering during a walk outside on a cold winter day. However, taken to an extreme, such environmental conditions can lead to sudden and unexpected death from a lightning strike, severe burns or smoke inhalation from a house fire, being bitten by a poisonous or toxic animal, being stung by a bee or wasp, being electrocuted while at work, or extremes of hot and cold temperatures. Such seemingly innocuous environmental factors, such as bee stings that elicit a deadly anaphylactic reaction or a devastating lightning strike, may quickly lead to death.

Alternatively, the individual may survive the initial event, only to eventually die days, weeks, or months later of medical complications stemming from the event. The cases and information presented in this chapter are but a representation of the vast, unending possibilities of physical and electrical injuries and toxins to which we may be exposed.

## Thermal injury

Fatal thermal injury spans a spectrum of scenarios, from the elderly person with multiple medical problems who spilled hot water on himself, resulting in a focal burn (but with fatal medical complications), to the young, previously healthy car crash–related burn victim who survived in the intensive care unit for weeks before

expiring, to the severely charred, unidentified torso found in an intentionally set house fire. The injured person may die within minutes to hours from his injuries or may die days or weeks later of complications. Death may ensue because of the burns themselves, smoke inhalation, or some combination of the two.

Depending on how the injury was sustained, fatal thermal injuries may engender an accidental, suicidal, or homicidal manner of death. Scene investigation is important and is often crucial in determining the manner of death. If a house fire is determined to be intentionally set (an arson fire), the death is ruled homicide, whereas if the house fire is determined to be the result of an electrical event, smoking, heating/cooking equipment, a portable heater, children playing with matches, or other unintentional cause, then the death is ruled accidental. In evaluating those with thermal injuries, one must attempt to determine whether or not the person was alive at the time of the fire and what actually caused the death: burns, smoke inhalation, natural disease process, injury, drug toxicity, or some combination of factors. Individuals who survive the initial effects of the burns will usually succumb to complications of the burns such as sepsis, shock, electrolyte and fluid abnormalities, and multisystem organ failure.

The skin is the largest and most recognizable organ of the body. The total body surface area burned is best estimated using the rule of 9s: The head and neck is 9 percent, the chest 18 percent, back 18 percent, each leg 18 percent, and each arm 9 percent of the total body surface area. Determining the depth of a burn (first degree, second degree, etc.) is difficult, especially if the person has undergone treatment and/or has skin sloughing. Many times, the most that can be said is that the burn is a "deep burn."

With any burned body, it is important to determine whether the decedent was *dead or alive at the time of the fire*. It is difficult, if not impossible, to grossly distinguish antemortem from postmortem burns, particularly in charred bodies. This issue arises frequently and in many different scenarios. Examples of postmortem burning/charring include homicide victims who are intentionally set on fire in attempts to destroy evidence, or victims of car crashes who die immediately from severe blunt force injuries, only to have the car subsequently ignite and become engulfed in flames. Evidence that the person was alive at the time of the fire includes soot lining the airways (**Image 10.1**) and an elevated blood carboxyhemoglobin saturation. Additional evidence, if the person has lived long enough, is the microscopic documentation of an inflammatory reaction to the burn.

The skin has the highest number of pain receptors of any region in the body. It is not uncommon to be asked by attorneys and family members if a person was alive or not at the time of the thermal injury. If he was alive, these parties may also ask whether or not the decedent was conscious while he was burned and, if so, for how long. The goal of this questioning is to gain a better understanding of the amount of pain/suffering experienced by the burn victim. Accordingly, autopsy of the burn victim should be performed with this in mind, although one must appreciate that these questions sometimes simply cannot be answered with any degree of certainty.

## Artifacts of thermal injury

It is important to recognize artifactual changes in charred bodies (fourth-degree burns) that may simulate antemortem injuries. The pugilistic attitude seen in charred bodies refers to the arched back, elevation of the arms, and mild flexion of the hips and knees that resemble the stance of a boxer. This posture is due to heat effect on the muscles, causing some muscle groups to contract as they cook or coagulate, pulling the parts of the body into this characteristic position (**Image 10.2**). Also, the skin may



10.1



10.2

split superficially in areas and resemble incised wounds. Splits in the abdominal wall allow loops of small bowel to protrude through the defect (**Image 10.3**). Charred bodies will have heat-related changes in the eyes. The corneas acquire a white translucency and the lenses become opaque (**Image 10.4**).

Commonly, one sees artifactual epidural blood. This is thought to be due to heat forcing blood out of the marrow of the calvarium through veins and out over the surface of the dura. Although epidural blood is often an artifact, subdural blood is often genuine. Extradural red-brown heat hematomas have a spongy, foamy appearance (**Image 10.5**) as opposed to the uniformly smooth, dark red appearance of an antemortem hematoma (**Image 10.6**).

As the body burns, the bones of the extremities become exposed where the soft tissues have burned away, and can fracture. The hands may burn down to small nubs of tissue and the feet may detach (**Image 10.7**). As the body continues to burn, portions of the scalp split and burn away, the skull fractures from the heat and

portions fall off, and the brain burns away. The head does not explode. The brain inside the intact cranium of a charred body appears swollen with widening and flattening of the gyri and obliteration of the sulci (**Image



10.5



10.3



10.6



10.4



10.7

10.8). Contrary to popular belief, this is not due to the creation of steam within the cranium with the expansion of brain tissue, but rather, the contraction of the coagulating dura against the surface of the brain. The tissues of the body walls can be burned away, exposing the organs inside the chest and abdominal cavities. The exposed organs also become charred (**Images 10.9** and **10.10**).

Other artifactual changes include fractures of charred bone, and fine, seemingly random heat fractures of the calvarium in which the calvarial bone is often friable with flaking of the outer table of bone. Many times, it may be difficult, if not impossible, to differentiate genuine from artifactual fractures of bone, particularly when it is fragile and fragmented from thermal artifact.

Thermal injury may alter or destroy preexisting injuries. Heat is known to shrink tissues as the water is released and the proteins coagulate. Because of this, gunshot wounds, stab wounds, and other injuries may be shrunken to a small size, so small that they may be easily overlooked at autopsy. In homicides, the body may be intentionally burned in an attempt to cover up or destroy the evidence. Despite these attempts, however, the injuries are oftentimes still identifiable.

Artifact created at the scene includes postmortem physical trauma or disruption of tissue caused by the high-pressure water hoses of fire fighters attempting to douse the fire. Additionally, the remains in a house fire may be damaged by falling debris from an unstable structure. A charred body may be inconspicuous, blending in nearly imperceptibly with the charred environment or may be underneath other charred debris; it can be unintentionally stepped on by investigators, creating artifactual trauma. With increasing severity of thermal injury, the remains become progressively charred and friable, and a certain amount of fracturing or separation of parts of the body can be created by simply moving the body into a body bag. Fragmentation or fractures may occur no matter how carefully or gently the body is removed.

## Radiant heat

The woman shown in **Image 10.11** fell asleep while sunbathing during the summertime while wearing shorts and socks. Note the darkened skin of the legs reflecting sunburn. This is generally regarded as a superficial burn.

A more severe burn is on the shoulder and chest of this individual who was found dead in his residence near a space heater (**Image 10.12**). The skin is charred centrally. At the periphery, the skin is variably leathery, discolored, and slipping. This is regarded as a deep burn. It is very difficult to determine if burns are antemortem or



10.9



10.10

10.8

postmortem, unless the individual has survived long enough to have an inflammatory reaction.

## Flame burns

This person was in a car crash after which her car became engulfed in flames. Note the black, crusty charring of the body (**Image 10.13**). In cases such as this, the arms and wrists are often in a flexed position—the aforementioned "pugilistic" stance—and the legs are flexed. The extremities are in these positions because the biceps and the quadriceps are the bulkier, stronger muscles and, when burned, undergo coagulation and contract with a greater force than their opposing muscles.

Skull fractures are a known artifact of thermal injury with charring, but one must always exclude antemortem injury before ascribing fractures to postmortem artifact. This middle-aged man was found dead in his burned house (**Image 10.14**). A scalp disruption/defect was identified in the right side of his charred forehead (**Image 10.15**). Reflection of the scalp disclosed displaced skull fractures that, when reapproximated, were shown to be



10.13



10.14



10.11



10.12



10.15

the result of an entrance gunshot wound (**Images 10.16** and **10.17**).

In motor vehicle accidents in which the victim becomes charred, it may be difficult to determine whether calvarial fractures are antemortem or postmortem, particularly if part or most of the calvarium is burned away and the remaining pieces of calvarium are flaking and charred. In the case of an elderly man in a motor vehicle accident (**Image 10.18**), although much of his calvarium was burned away, the cerebral hemispheres were largely intact, although they were shrunken and firm due to thermal artifact. There was blood in the posterior cranial fossa and along the brainstem anteriorly. Note the gaping basilar hinge fracture in the skull. This fracture is not related to heat artifact,[1] as attested to by the blood in the posterior fossa.

## Scalding

*Scalding* with hot gases or fluids results in desquamation of the skin and an intense erythema of the exposed areas (**Image 10.19**). Scalding by liquids may have a distinctive or pour pattern over specific areas of the body. The location and pattern of the scalded regions may help differentiate between accidental scalding and intentional scalding (see Chapter 17).

## Pseudoburns

A number of conditions can mimic burns. The woman in **Image 10.20** suffered from Stevens-Johnson syndrome and had an erythematous rash from small blisters that burst and became focally confluent. The differentiation between those conditions that mimic burns and true burns from various agents is inherent in the histories.

## Delayed fire deaths

Delayed deaths from burns have many secondary changes. Thorough documentation of external injury,



10.16



10.17



10.18



10.19

followed by proper evaluation of internal findings is key. Gauze dressings may cover the entire body if the burns are extensive. There may be evidence of debridements, fasciotomies, and application of skin grafts (**Image 10.21**). Large areas of desquamated skin may involve the palms of the hands and the soles of the feet (**Image 10.22**). Internally, consolidated lungs are a common finding. In the majority of cases, death is due to infection, however, there is often multisystem failure, and the cause of death is appropriately summarized as "complications of thermal injuries." As in any fire death, when determining manner of death, pathologists must communicate with arson investigators and other fire or law enforcement officers who can contribute valuable information about the circumstances of the fire.

## Caveats for certain types of burn cases

### Homicidal

When a charred body is found in a house, field, car trunk, or other suspicious locations, preautopsy full-body x-rays are useful to identify bullets and perhaps knife blades because the cutaneous wounds will often be obscured by thermal artifact. Despite the outside appearance of the body, the internal organs are often well preserved and injury paths are often easily followed.

Evidence supporting an arson fire (and homicidal designation) may include accelerants detected at the scene. Related to this, the clothing of fire victims should be saved in sealed metal cans for accelerant analysis. Because accelerants typically rapidly vaporize, they may be lost if not placed in a sealed, impermeable container. Clean, unused paint cans serve this function well.

### Accidental

Accidental deaths from thermal injury often involve victims of motor vehicle crashes and accidental house fires (caused by smoking in bed, portable space heater, etc.). The victim may be intoxicated with alcohol or some other drug(s).

It is useful to perform posterior neck dissections in victims of motor vehicle accidents, particularly if the body is charred and there are no devastating injuries. This may reveal neck fractures, atlanto-occipital injury, or other evidence of severe neck flexion/extension or torsion that was not previously recognized (see Chapters 19 and 29 for more on posterior neck dissection). If a residential fire is at all suspicious, it should be treated as a homicide to ensure proper evidence collection. If the manner of death is later determined to be nonhomicidal in nature, one can choose to turn over noncontributory evidence to the police for storage or disposal.

### Suicidal

Investigate the medical, psychiatric, and social history of the victim. Certain cultures and customs engage in self-immolation (self-burning) as a means of committing suicide. Self-immolation may be performed as an acute emotional reaction or by those with a fire fetish or those who are performing it for idealistic purposes.[2] Some of the victims have schizophrenia. The person often uses



10.20



10.21



10.22

an accelerant such as gasoline. Investigators must also determine if the person has ever threatened suicide or spoken of burning himself. Suicidal fire deaths are rare and, as such, before designating such cases as suicide, homicide and accident must be ruled out.

## Cremation

The cremation of a human body requires temperatures and durations that are out of the range of typical structural, automobile, or other fires. To cremate a human body, temperatures in the range of 670 to 810 degrees Celsius or higher are applied for 2 to 3 hours. Bodies subjected to this degree of thermal exposure will be reduced to ashes and small, easily fragmentable pieces of calcine, crumbling bone. **Image 10.23** depicts partially blackened bone fragments from a house fire which did not reach crematorium temperatures (see Chapters 24 and 26).

## Spontaneous human combustion

Spontaneous human combustion does not exist. The concept had gained acceptance in the past two centuries (and is perhaps still accepted) to explain fire deaths in which (classically) the torso and often the head were burned nearly completely to ashes, whereas the extremities were often preserved and nearby flammable objects paradoxically left intact and unburned. The victim was usually described as an obese elderly intoxicated woman, and the death always occurred indoors.[3,4] In such cases, there was almost always a greasy film coating the walls and ceiling of the residence. In all, or nearly all cases, the victim either smoked a pipe or was near a flame of some sort.[4]

Although it may appear as though the body had suddenly burst into flames, in the majority of purported cases, an ignition source could be identified.[4] It appears that after the person is rendered unresponsive (by a cardiac event, etc.), his or her clothing catches fire and burns the limited amount of oxygen available in the room, after which the flame is extinguished, and the body smolders, feeding off the fat as it melts. This is known as the *wick effect*, and is not too dissimilar to the action of a candle and its wick. This smoldering process would then cause the deposit of oily film that coats the walls and ceilings. The smoldering is believed to stop at the extremity joints, because of reduced fat at these locations. The smoldering can attain very high temperatures, as evidenced by the fact that it is not unusual for bones of the torso to be completely incinerated. The near-complete incineration of the bones may be aided by the fact that many such victims are elderly and likely have significant osteoporosis.[4]

## Identification of fire victims

Identification of fire victims is important, and because of a lack of recognizable facial features and fingerprints, it is often dependent on dental x-ray comparison. Other possible features of identity include unique bodily features, tattoos, comparison of body x-rays, old healed fractures, and DNA (see Chapter 25). Because the body of a charred person is often fragile and easily fractures/fragments, the teeth and mandible should be treated with care until x-rays have been taken to secure a possible identification. Without care and attention, the fragile teeth and mandible can be easily disrupted, and the teeth, fillings, or dental prostheses may become dislodged or lost. Because of this, one should be careful when removing the tongue or using an oscillating bone saw on the calvarium.

## Carbon monoxide

Aside from soot lining the airways, additional clues that a person was alive at the time of a fire is a bright cherry-red coloration of the skeletal muscle, viscera, and blood due to carbon monoxide (CO) inhalation and subsequent elevated blood carboxyhemoglobin level. Carbon monoxide forms from the incomplete combustion of hydrocarbons during a fire, and it is inhaled if someone is alive and breathing during the time of the fire. The blood carboxyhemoglobin level will also be elevated if someone is breathing motor vehicle exhaust fumes, as in a deliberate attempt to commit suicide. The carbon monoxide binds to hemoglobin with an affinity approximately 200 to 250 times that of oxygen, leading to the formation of carboxyhemoglobin, with impaired release of oxygen to tissues, and hypoxia at the cellular level.[5] Although the blood is rich in oxygen, the body is not able to utilize it, and the person dies a chemical asphyxial death.



10.23

The cherry-red coloration is evident in the skin (**Image 10.24**). The man figured in **Image 10.25** died from carbon monoxide toxicity and is not burnt but covered with black soot down to the waist.

With the exception of smokers (who may have a baseline blood carbon monoxide concentration of up to 10 or 15 percent), most individuals who die sudden unexpected deaths will have little to no carboxyhemoglobin in their blood. In deaths due solely to the toxicity of CO, the blood carboxyhemoglobin saturation levels are generally in the range of 50 to 80 percent. The higher levels of blood carboxyhemoglobin (in the range of 70 to 80 percent) are likely to be seen in otherwise healthy people breathing smoke or car exhaust fumes in an enclosed environment. Such examples include victims inside a residential house fire or in a car in an enclosed garage (such as is seen in a suicide attempt with deliberate inhalation of exhaust fumes). Because the car exhaust fumes are also hot, it is not unusual for those found dead of carbon monoxide toxicity inside a garage to have thermal-induced slipping of the skin and oftentimes early decompositional changes despite being dead a relatively short amount of time. Blood carboxyhemoglobin



10.24



10.25

saturation levels in car crash victims tend to be lower, likely from increased ventilation in an outdoor environment, often in combination with coexisting physical injuries that cause a faster death.

Older individuals and those with significant medical disease (in particular, heart disease) will have less physical reserve and may succumb to lower levels of carboxyhemoglobin saturation—sometimes even at levels as low as 20 percent. With the previously mentioned increase of carboxyhemoglobin in heavy smokers, one must be cautious in the interpretation of mildly elevated blood levels.[6] The presence or absence of soot in the airways will be an important indicator that the individual was alive at the time of the fire.

The carboxyhemoglobin saturation level will not be "artificially elevated" in a dead person simply by being in or near a fire; that is, carbon monoxide will not diffuse through the skin or otherwise be absorbed by a dead body. Likewise, soot will not enter the intact airways of a person already dead before the fire. The carboxyhemoglobin saturation level recorded in the blood reflects the extent of carbon monoxide inhaled during life. If the thermal injuries are minimal and the evidence of smoke inhalation is convincing, the death may be attributed to "smoke inhalation" or "toxic effects of carbon monoxide." One must also consider the converse—that a person may have been alive during a fire, yet have normal blood carboxyhemoglobin saturation levels. This has been described in flash fire victims.[7] *The interpretation of blood carboxyhemoglobin levels, like any toxicology value, must be interpreted in the context of the entire case.* It has been determined that there is no significant difference in the blood carboxyhemoglobin levels drawn from peripheral versus heart sites.[8]

Carbon monoxide is a colorless, odorless gas. As such, for safety purposes, one should exercise caution in scenes that are suspicious for carbon monoxide toxicity. Two or more people found dead in a residence with no obvious cause of death is suspicious for carbon monoxide toxicity, particularly if the deaths occur as the cold weather is approaching and residential heating units are being utilized. It is not uncommon for the rescue or investigating personnel initially at the scene to complain of headaches or nausea—symptoms that are often attributed to carbon monoxide. The scene should be adequately ventilated, and the possible source of carbon monoxide sought and extinguished.

## Hyperthermia

Humans need to maintain their body temperature within a fairly narrow range to allow for optimal function of bodily systems. The hypothalamus is the main structure that regulates heat loss and gain. A very high body temperature (*hyperthermia*) can be fatal. Hyperthermia is

more often seen in the summer months in particularly hot environments, and is more common in those with less medical reserve such as the young, elderly, and those with severe medical conditions such as significant heart disease. In fact, a significant number of heat-related deaths occurring during a heat wave will not be solely from hyperthermia, but will result from heat stress fatally exacerbating underlying significant medical disease.[9] Hyperthermia can also be fatal in healthy young people, particularly if they are exercising or laboring excessively in a hot environment. Even in fairly hot environments, the body will often adequately cool itself down by different means, including conduction, convection, radiation, and evaporation.[10] Although those dying of hyperthermia usually will have body temperatures of greater than 105 degrees Fahrenheit,[11] the preterminal or terminal body temperature is often not available, and the diagnosis of hyperthermia many times is based largely on scene investigation and the circumstances of the death. When the body temperature is not available, but the circumstances of the death suggest hyperthermia, hyperthermia may be listed as the cause of death or at least as a significant contributory condition.[10,11]

Predisposing factors that may limit one's ability to tolerate a hot environment include old age,[9] significant medical disease (particularly cardiovascular disease[9]), dementia, obesity, and medications such as antipsychotics and drugs with anticholinergic side effects.[12,13] Drugs with anticholinergic side effects such as tricyclic antidepressants, antihistamines, and chlorpromazine impair the sweating mechanism and hence hinder the body's ability to eliminate heat.[14] Diuretics cause volume depletion, limiting the body's ability to increase cardiac output and sweating. Sympathomimetic drugs such as cocaine, amphetamines, and ephedrine can increase the body temperature.[14] Diabetes (via peripheral neuropathy and peripheral vascular disease) can limit one's ability to peripherally vasodilate and release excessive heat. Dementia may hinder one's ability to adequately react to a hot environment such as taking off excessive clothing, avoiding the heat, or drinking adequate fluids. The excessive fat of obese people provides added insulation, making heat release more difficult. Obese people also have a higher baseline of heart stress, with resultant cardiac hypertrophy. The added stress of heat compounds the potential for dysrhythmia or heart failure. Medical conditions that may cause hyperthermia include thyrotoxicosis and sepsis, although the body temperatures reached often fall short of those with severe hyperthermia.

Because deaths from hyperthermia are due to cardiac dysrhythmia, seizure, or shock, gross and microscopic autopsy findings are nonspecific, and those who are resuscitated die from secondary, nonspecific findings.[10,15] One may see skin slippage. Survivors who eventually die from complications of hyperthermia will usually develop disseminated intravascular coagulation, shock, and multisystem organ failure.[16] Those with hyperthermia are not uncommonly dehydrated, a finding that can be detected by vitreous fluid electrolyte and urea nitrogen analysis (see Chapter 21).

### Infants left in cars

Infants and young children are more susceptible to developing hyperthermia from a hot environment because of their reduced capacity for sweating, their higher metabolic rate, greater thermolability, and larger body surface-to-volume ratio. Infants left in motor vehicles can die of hyperthermia in a relatively short amount of time. A car left under full sunshine in the summertime can rapidly reach very high internal temperatures. In one study, with an ambient temperature of 98 degrees Fahrenheit, the temperature inside of cars reached 124 to 152 degrees Fahrenheit within 15 minutes of closing the doors. Within 5 minutes of closing the doors, at least 75 percent of the final temperatures had been reached.[17] In another study, in cars left in direct sunlight with outside temperatures ranging from 82 to 97 degrees Fahrenheit, the temperatures inside of the cars ranged from 82 to 136 degrees Fahrenheit.[18] Each circumstance must be evaluated individually, for there is sure to be variation in the rate of internal vehicle temperature rise based on numerous factors, including the type of car, ambient temperature, and the amount of direct sunlight. What remains certain is that the inside temperature of a car left in the hot sun can increase quickly. Most of these infant/early childhood hyperthermic deaths are classified as accidental, but consideration may be given to homicide if it is believed that the caretaker acted with excessive negligence or disregard for the safety of the child.

Other medical causes of hyperthermia, such as neuroleptic malignant syndrome, serotonin syndrome, lethal catatonia, and malignant hyperthermia are covered in Chapter 22.

## Hypothermia

The discovery of a frozen body brings with it many challenges for the forensic pathologist. In addition to the obvious difficulties of storing and thawing the body, one is also challenged with an autopsy complicated by freezing artifact and progressively worsening decomposition. Some pathologists will "miss the big picture" by focusing on the autopsy as a means to certify death while in reality there are few, if any, diagnostic autopsy clues for hypothermia. Although postmortem examination is important, its role is not so much to confirm hypothermia, but to rule out natural disease and violence as incapacitating or lethal factors that led to the individual's discovery in a frozen state.

*Hypothermia* can be subclassified in different ways, the simplest of which is to divide fatalities into those occurring on land (dry), and those occurring in water (wet or immersion hypothermia). In cases of immersion hypothermia, the individual tends to succumb to the effects of the cold water more rapidly than on land. They quickly lose consciousness and drown. The investigation should determine how the victim came to be in the water. Because cases of dry hypothermia tend to be more complex to investigate, they will be the focus of the remaining discussion. One should note that the principles that govern dry hypothermia and immersion investigations are analogous.

## The hypothermia scene

Because hypothermia deaths are diagnosed primarily on circumstantial evidence, investigators must not fail to appreciate the value of thorough scene investigation and documentation. Because the "scene" itself was the causative factor leading to death, investigators must also determine what circumstances brought the decedent to the scene, and whether this was under his or her own volition. Such determinations are highly case dependent, but may include such things as characterization of the place of death (How did the decedent come to die here? Is it possible that he walked here on his own? Was he dropped off?); documentation of footsteps/track marks leading up to the body; thorough documentation of the presence or absence of trauma visible on the body, or blood on the clothing or surrounding scene; and so forth. **Image 10.26** is of a 50-year-old alcoholic man who was found frozen in an open field. Investigation revealed he had walked away from home in a drunken and disoriented state, eventually collapsing in this position.

Although we advocate for thorough documentation of the body at all death scenes (see Chapter 2), it is doubly important in cases of hypothermia because of artifactual distortion that will result because of the freezing and thawing process. In the course of freezing, water expands and therefore alters cells, tissues, and even the gross appearance of the body. For example, some decedents may appear much older than their actual age. Following this, the process of thawing in the morgue is slow and occurs at differential rates for different parts of the body. As such, some areas of the body will be starting to decompose, dry, and even mummify while others remain frozen. This freezing–thawing–decompositional artifact can markedly affect the appearance of markings and wounds on the body. Therefore, the most accurate representation of injuries will be at the time of body discovery, before the body undergoes this process.

### Archetypal features of the hypothermia scene

Rarity aside, two features of hypothermia death scenes have been cited in the literature: *terminal burrowing behavior* (also known as *hide and die syndrome*) and *paradoxical undressing*. Terminal burrowing behavior has been described as a perimortem act by the disoriented, dying hypothermia victim, who while attempting to protect himself from the cold, might attempt to burrow into snow, brush, or other constituent of the environment, and even under or within furniture if indoors.[19–21] Although this has been reported as a relatively frequent occurrence (as common as 25 percent of all cases),[19] our experience shows it to be a far more rare event. Similarly, paradoxical undressing is a perimortem act in which the victim removes his clothing,[22–24] reportedly as a physiologic failure of vasoconstriction where warm blood is allowed to flow back to the frozen skin, bringing with it a hot or burning sensation.[25] The literature reports paradoxical undressing as occurring in 50 percent[26] to 70 percent[23] of cases; our experience differs in that we have discovered this phenomenon with much less regularity. Common or not, one must be aware of this phenomenon because the scene of an undressed hypothermia victim can appear very suspicious. Investigators must caution, though, against treating cases of a naked frozen body as "not suspicious" based solely on the possibility that paradoxical undressing has occurred.

## Autopsy findings

Some of the literature suggests that autopsy-based findings can be diagnostic of hypothermia[26,27] when in fact the diagnosis of fatal hypothermia is primarily based on circumstance investigation. The role of the autopsy is to rule out other causes of death, to collect evidence as necessary, and to contribute to the identification process. Over time, a few physical findings have been noticed with increased regularity among hypothermia victims. Although none of these should be treated as diagnostic, they are supportive of circumstantial findings of a "body exposed to a cold environment." *Wischnevsky's gastric lesions* are simply gastric erosions, ulceration, and hemorrhage discovered in the context of a hypothermia



10.26



10.27



10.28

death (**Image 10.27**).[26,28,29] Takada et al. report locating this finding in approximately 88 percent of their studied hypothermia deaths, and report their pathophysiology as "a deterioration in the response to cold stress caused by local ischemia and reperfusion after microcirculatory collapse of the gastric mucosa."[29]

A supportive finding is purple or violet patches of skin, usually found on the extremities (**Image 10.28**).[26,28] Although these can be artifacts of refrigeration, their presence on a body found frozen outdoors is supportive of the hypothermia diagnosis. Along with this finding, one might infrequently notice that the coloration of the dependent lividity has changed to a bright pink or red, similar to that found in carbon monoxide toxicity or cyanide poisoning.[30]

Although some authors have developed complicated biochemical methods to diagnose hypothermia[31,32] and have even studied the difference in the color of blood from the right and left ventricles,[27] we maintain that the most practical and useful aspects of examination of the hypothermia victim are a thorough and well-documented investigation of the scene, personal and social histories, and other circumstantial information.

**Practical hint**: It is (obviously) impossible to autopsy a frozen body, and allowing it to thaw in a cooler can take days or even weeks. We have found that placing the body on a stretcher at room temperature, and allowing an oscillating fan to blow on it for 1 to 2 days, helps to promote rapid and uniform thawing of frozen remains.

## Electrocution

Electricity-related deaths result from an overwhelming transmission of electrical current to the body, most commonly causing ventricular dysrhythmia. Electrocutions can be challenging cases to solve and usually require detailed investigation to determine how and why an individual became electrically energized. In some cases, the assistance of an electrical engineer or person trained in another electrical field is desirable to help with the examination of a power tool or other electrical device. Older or poorly maintained electrical devices are often suspect, because they are prone to develop defects in their circuitry over time. As more and more modern homes become equipped with ground fault current interrupters (GFCIs) and tools and work environments are made safer, electrocutions should become less frequent.

Although most people are familiar with the term *volts*, a volt simply is a measure of electromotive force in a system. It is the amount of current flow per unit time, or *amperes*, that is the single most important factor to consider in human electrocution. How does the amount of amperes correlate with human symptoms and death? The following approximations for 60-hertz alternating current in humans is generally accepted: An ampere of 0.001 gives a barely perceptible tingle. An ampere of 0.020 can cause muscular paralysis. An ampere of 0.100 can cause ventricular fibrillation, and an ampere of 2.000 can cause ventricular standstill.[33] Most electrocutions involve alternating current.

### The electrical burn

Electrical burns arise if the temperature of the skin is raised long enough to produce structural damage to the skin. Oftentimes, one sees typical electrical burns only in high-voltage electrocutions (greater than 600 to 1000 volts).[33] One of the reasons that electrocutions can be challenging deaths to identify is that *in about one-half of low-voltage electrocutions, there are no electrical burns or other autopsy findings to suggest electrocution*.[33] Because residential houses are approximately 120 volts, one may not see skin burns, and scene investigation is the key to the diagnosis. Hence, if the circumstances at the scene are

not obvious, and an electrocution is not suspected, a low-voltage electrocution can be easily overlooked. This is particularly true in watery environments, such as in bathtubs, where cutaneous burns are rare because the water in the tub provides an energization of the body that is too diffuse to cause focal electrothermal skin damage.[34] The same principle holds true for deaths in the rain or swimming pool, where water greatly reduces the skin's resistance to electrical current.

## Symptoms in electrocution

Electrocution should be suspected in all work-related deaths and in all deaths in which an individual was either using a power tool or machine or was around an electrical device. The victim may be witnessed to have a variety of responses on being electrocuted. He may shout out from the trauma of the shock, but other times may simply be witnessed to walk around for 5 to 10 seconds while in ventricular fibrillation and then collapse. During this time, he may even state that he was shocked. Alternatively, he may simply slump or collapse and be unresponsive; whatever the individual's response, it occurs within seconds of the event.

## The electrocution scene

Death investigators should approach the scene carefully to avoid additional electrocutions, particularly in hazardous and watery environments. Many times, the electricity will already have been turned off, but one should be sure to verify this. Approaching the scene and body carefully is prudent if electrocution was not previously suspected in the case and if the electrical hazard is still active. The investigation of electrical burns should involve an attempt to discover the point of contact with the energized source and the point of contact with the ground. In each case, one must appreciate how the electrical circuit was completed from the source, through the victim, and to the ground. The clothing should be examined carefully for burns, areas of melting, or other evidence of thermal damage that represents points of contact with an electrically charged object.

  The man shown in **Images 10.29** through **10.31** was electrocuted while at work. Note the electrocution burn on the palm of his left hand (**Image 10.29**). On microscopic examination, note the bubbly coagulation necrosis of the epidermis (**Images 10.30** and **10.31**). **Image 10.31** shows a small amount of dark material on the surface of the burned skin. Sometimes, small particles of metal from the conducting surface will become deposited on the skin at the contact site. This may help in relating the potential source of electricity to the contact site on the body; however, such metallic material may also become deposited on the skin if the metal object is hot or from simple contact between the metal part and the skin.[34] Although a "streaming" appearance of cells and their nuclei in the epidermis has been advocated as

distinct in electrocution burns, similar appearances have been noticed in thermal injury from other conditions.[34] Although this histologic finding is supportive of an electrical contact site, it is not considered diagnostic of an electrical contact site.



10.29



10.30



10.31

### Principles of investigating electrocutions

Investigation of an electrocution begins with the scene, continues to the autopsy, and also includes the tools, appliances, or machinery involved in the incident. In this example (**Images 10.32** and **10.33**), a telephone worker was electrocuted while using an electric drill on a non-insulated cherry picker. Meticulous investigation disclosed a series of technical failures that allowed the electrocution to occur. The initial failure was in the drill where repeated bending led to stress fatigue of the multistrand wiring, and eventual continuity between energized strands and the ground wire strands. The GFCI had a broken internal ground, and the selenium diode rectifier had heated, failed, and disintegrated. The drill was radiographed to demonstrate broken wires (**Image 10.32**). The insulation had melted off and the wire strands inside the green ground wire had broken off and fused (**Image 10.33**).

Remember to examine the entire body carefully (front and back) in suspected electrocutions for electrical burns where the current entered and exited the body. Particularly careful attention should be directed at the hands, especially the fingers. Also be sure to examine the feet and the shoes for evidence of electrical burns.

### Lightning strike

Lightning strikes are high voltage—often in the range of 100,000 volts. When lightning strikes a person, the results are often devastating, and quickly fatal, although some victims survive. When examining the body, one should seek out the entrance and exit sites of the current. As the exit site is often in the feet, the lightning strike may rip apart a shoe, melt it, or blow it off the foot. Articles of clothing may be found some distance from the body (**Image 10.34**). All articles of clothing should be carefully examined for areas of burning, melting, and tearing. Additional findings on the body may include singed hair and burn marks underneath metal articles of jewelry. Lightning strikes are often not witnessed, because many involve people in remote areas or people in relatively populated areas in which the other people have taken shelter. If a lightning strike is suspected, but not witnessed, information on lightning strikes in the area can be obtained from the National Lightning Detection Network[35] or from local weather stations.

This victim of a lightning strike (**Image 10.35**) survived for a short amount of time in the hospital until his death. Note the extensive electrical burns over his torso. In lightning strikes, also look for ruptured tympanic membranes and Lichtenberg figures.[35] A *Lichtenberg figure*, also known as *ferning* or *keraunopathy*,[36] is a short-lived branching fern-like arborizing pattern of skin discoloration sometimes seen in lightning strikes. They are transient and usually disappear within 24 hours. Although they are associated with lightning strikes, and are even considered pathognomonic of lightning strikes, they are not fully understood. Lichtenberg figures may be due to necrosis and hemolysis of erythrocytes with an accelerated development of lividity.[33]



10.32



10.33



10.34

## Chemical burns

Chemical burns are uncommon. When they do occur, they cause skin damage that can lead to significant morbidity or death.

This elderly woman (**Images 10.36** and **10.37**) was cleaning her house when she slipped and fell in dilute household liquid bleach solution (sodium hypochlorite). She was not able to clean herself off right away and was eventually hospitalized for cutaneous chemical burns from the bleach. She died 2 weeks later. Note the chemical burns over most of her back and right side (**Image 10.36**). On microscopic examination, note the necrosis in the epidermis and dermis (**Image 10.37**).

This body (**Images 10.38** and **10.39**) had a bleach solution poured on and around it in an attempt to clean up blood after a shooting. Note the irregular maroon chemical cutaneous burns over the back. One can also see a horizontal patterned chemical burn mark in the area of the waistband of his shorts.

Lesions caused by bleach are due to its alkalinity and its oxidoreduction abilities, which cause coagulation of cutaneous proteins.[37] Bleach burns tend to develop slowly and are worsened if the bleach is not cleaned off the skin in a timely manner.[37] Because they do not immediately cause pain, the severity of the burn depends largely on the duration of exposure/contact.



10.35



10.36



10.37



10.38



10.39

## Anaphylaxis

The term *anaphylaxis* denotes an acute immunologic reaction characterized by cutaneous, gastrointestinal, respiratory, and cardiovascular signs and symptoms that can rapidly progress to shock and death. The postmortem diagnosis of anaphylactic deaths usually requires suspicion gleaned from the circumstances of the death, because autopsy findings are often inconspicuous. Because of this, some anaphylactic deaths, like certain toxic/drug-related deaths, may be undetected. Anaphylactic deaths are caused by a severe reaction to a variety of stimuli from many etiologies including insects (such as bees, wasps, and fire ants), ingested foods (such as peanuts or seafood), medications (such as penicillin), or radiologic contrast agents. The allergic reaction may result in symptoms such as hypotension, bronchospasm, airway obstruction, and shock.[38] At autopsy, one may see insect stingers in the skin, or swelling and erythema at an insect bite/sting location. One may also see findings such as laryngeal or epiglottic edema, and mucus plugging in the bronchi. Histologic examination may reveal tissue edema with mast cells and eosinophils. However, many times an anaphylactic death is due to rapidly developing shock rather than asphyxia and, therefore, there may be little time for tissue reaction and no significant findings at autopsy.[38] In diagnosing an anaphylactic death, it is necessary to synthesize information compiled from the circumstances of the death, the person's medical history, and blood testing, in the absence of a more convincing cause of death.

### Testing for anaphylaxis

During an anaphylactic reaction, blood levels of tryptase (released from mast cells) and histamine will rise, but their increase is transient, not necessarily specific, and may be delayed in onset.[39] Tryptase is a neutral protease that is present in secretory granules of mast cells and is released when mast cells are immunologically activated. Tryptase has a half-life of approximately 2 hours and tryptase levels correlate well with mast cell activation in anaphylaxis.[40] Postmortem blood testing for histamine and tryptase may be helpful, but the results are often equivocal and nonspecific. Histamine has a particularly short half-life (on the order of minutes), adding to its unreliability.[40,41] Testing for IgE antibodies (allergen-specific immunoglobulin E antibody levels) directed against the offending agent is more specific. Postmortem blood testing for IgE antibodies is available for a host of allergens, including bee stings,[42] fire ant stings,[43] and other insects[44,45] and foods.[46] One should keep in mind that an elevated IgE antibody level merely indicates prior exposure/sensitization to the allergen[45] and is not necessarily diagnostic of an acute allergic reaction. An elevated IgE antibody level does not by itself directly prove that death

was due to anaphylaxis.[44] However, when coupled with an elevated tryptase level (which is sensitive for an acute allergic reaction), the two values, interpreted in the total case context, may provide strong evidence of an acute anaphylactic death. However, in select severe anaphylactic deaths in which death occurs very rapidly (in minutes), the tryptase level may not have sufficient time to be significantly elevated and may paradoxically appear at a near-normal level.[44]

Most cases of fatal anaphylaxis occur with exposure to certain foods or other ingested substances. Among the most common food allergies are peanuts and shellfish, but anaphylaxis may occur with virtually any food. Specific testing for food-related IgE is available for many different foods. In select cases, one may wish to impound and save unconsumed portions of food eaten by the victim for the purpose of creating a custom reagent to search for food-specific IgE antibodies unique to the case.[46] The term *exercise-induced anaphylaxis* (EIAn) has been applied to those developing a hypersensitivity reaction following strenuous physical activity.[47] Many cases of EIAn follow the consumption of food containing an allergen-specific IgE, and the anaphylactic event is believed to result from a synergism of a food reaction and exercise.[47] Fatal anaphylaxis may also occur in reaction to medications, intravenous contrast dye solution, and other medical diagnostics/treatments. The most common medication allergy is to penicillin.[48]

If one does not consider an anaphylactic reaction at the time of autopsy, or even days, weeks, or months later, all is not lost, because delayed analysis of IgE appears to be fairly reliable.[44] When stored at –20 degrees Celsius or colder, IgE has shown to be stable for at least 12 months, even after four freeze–thaw cycles.[49] The levels of tryptase, however, appear more labile (and, hence, less reliable) with prolonged storage and have been shown in some cases to increase with the postmortem interval. A significantly elevated tryptase is probably best viewed as supportive, but not diagnostic, of an anaphylactic reaction.[39] In addition to the nonspecificity of the serum tryptase level, one report indicates that serum IgE may be elevated in the setting of trauma, sepsis, and other nonatopic conditions and that both tryptase and IgE increase with the postmortem interval.[50]

In a large number of cases, the diagnosis of fatal anaphylaxis remains challenging. Such cases require detailed scene investigation and medical history, and careful consideration of the entire case, including autopsy findings (gross and microscopic), toxicology results, and serum tryptase and IgE levels to arrive at a conclusion that anaphylaxis is the cause of death. One should not rely solely on blood testing results, which may yield potentially deceiving information when interpreted in isolation. Also, the magnitude of the IgE antibody elevation does not necessarily reflect the risk or severity of anaphylaxis, which also depends on the


10.40

quantity of allergen obtained, its distribution in the body, the body's response, and the promptness of medical therapy. Allergic reactions are unpredictable. A previously treatable mild to moderate allergic reaction may, on reexposure, be refractory to medical therapy and prove deadly.

A man who was allergic to mangoes decided to eat one anyway (**Image 10.40**). He started to have difficulty breathing, collapsed, and died. Compare the swollen edematous tongue of the man who ate the mango (top) to the normal tongue from a man dying of atherosclerotic heart disease (bottom).

## Hymenoptera and venom-related deaths

The term *hymenoptera* encompasses a variety of stinging insects, including honey bees, Africanized honey bees ("killer bees"), wasps, yellow jackets, hornets, and fire ants that together cause between 20 and 50 deaths annually in the United States.[43] Both allergic and toxic reactions can be fatal. The venom contains the enzymes phospholipase A2 and hyaluronidase, and vasoactive amines such as histamine and dopamine. The venom also contains a melittin protein that hydrolyzes cell membranes and a protein called *peptide 401* that triggers mast cells to degranulate.[42] Regarding honey bee stings, the venoms of the Western honey bee and the Africanized honey bee are of comparable toxicity. *Toxic envenomations* occur with massive envenomation from numerous stings and are caused by the direct toxic effects of the venom. It has been estimated that between 500 and 1,500 bee stings can provide a lethal dose of venom in an adult.[42] *Anaphylactic reactions* involve a prior sensitization to the toxin via a previous sting, and may be manifest as an immediate hypersensitivity reaction characterized by the rapid onset of urticaria, hypoten-

sion, dyspnea, and shock occurring within minutes of a sting.

Insects are the second most common cause of fatal anaphylaxis in the United States. Deaths due to toxic envenomation involving hundreds or thousands of stings are much less common; however, the initial symptoms can resemble anaphylaxis because of the vasoactive amines present in the venom. With large envenomations, one may develop hemolysis, rhabdomyolysis, and hepatocellular and myocardial necrosis, leading to shock and death. In contrast, those allergic to the toxin may develop anaphylaxis and possible death following a single sting. Most deaths related to bee stings are the result of anaphylaxis. Excluding anaphylactic reactions, a single sting will not inject sufficient toxin to produce a systemic toxic reaction. A single sting, can, nonetheless prove fatal if it occurs in the mouth, tongue, or throat and causes enough local tissue swelling to cause acute airway obstruction. This could occur if a bee settles on food or in a drink and is swallowed.

At autopsy, careful external examination may reveal one or more stingers from the honey bee remaining partially or fully lodged in the skin. Even if no stingers are found (as is the case most of the time with wasps and hornets whose stingers do not usually detach) and there are no areas of local tissue reaction, scene investigation, medical history, and other information should alert medical examiners to the possibility of an anaphylactic death. Bee or other insect stings should be considered in the sudden, unexpected, and unexplained death of an individual, particularly if occurring outdoors, in the summer months, or in the vicinity of such insects or nests. In this scenario, it is advantageous to obtain a serum tryptase level and an analysis of IgE to bee venom (or wasp venom or any other suspected insect venom). Elevated levels of both the tryptase and IgE antibody are indicative, under the appropriate circumstances, of an anaphylactic death.[42]

Deaths from insect stings appear to be more common in young children and older adults. The reason for this trend is unknown, but may be related to the smaller diameter of the airways in young children, which can more readily lead to respiratory compromise due to bronchoconstriction and/or obstruction with mucous secretions. Older adults may be more susceptible because of underlying heart disease and an inability to tolerate extremes of physiologic stress.

### Wasp sting

A middle-aged man was stung by a wasp in his residence a few weeks before his death. He developed a rash that eventually subsided. On the day of his death, he was dressing when he was again stung by a wasp. Soon after, he told his wife that he was having a reaction to the sting. He then collapsed, seized, and became still. Although he received prompt emergency care, he died.

At autopsy, he appeared fit, and had no rash, identifiable insect sting, or any other cutaneous lesions. Internally, there was no swelling of his pharyngeal tissues. Microscopically, there were no mast cells or eosinophils. Serum testing revealed a total tryptase level of 87 ng/mL and a beta-tryptase level of 23 ng/mL (normal <1 ng/mL). Two types of serum tryptase are measured: alpha tryptase and beta tryptase. Alpha tryptase is the form predominantly in blood at baseline, whereas beta tryptase is the predominant form increased during systemic anaphylaxis.[40,51] A beta tryptase level >10 ng/mL in postmortem serum is required before considering anaphylaxis as a cause of death. In this case, serum measurement of an allergen specific to IgE wasp venom was "highly positive."

Considering the circumstances of the death and the serum studies, his cause of death was listed as "anaphylaxis due to wasp envenomation." It is interesting that had the history not been provided, considering the absence of any cutaneous lesions and no pharyngeal tissue swelling, anaphylaxis would not have been considered as the cause of death.

## Animal venom-related deaths

### Pit vipers (rattlesnakes and other crotalids)
Snakes use their venom to kill their prey and also to aid digestion. The venom of rattlesnakes and other crotalids (cottonmouth, copperhead) contains enzymes that possess cytotoxic, hemorrhagic, and neurotoxic properties. Proteolytic enzymes such as collagenase and hyaluronidase result in marked swelling and local tissue necrosis at the envenomation site. The venom also contains phospholipases and proteases that cause additional tissue necrosis. The affected limb may develop compartment syndrome. Severe envenomation may lead to progressively worsening shock and multisystem organ failure in the ensuing hours to days, and may eventually cause death.[52]

### Coral snakes
A smaller number of deaths have been associated with coral snakes compared to the pit vipers. The venom of coral snakes has not been extensively studied, but is a neurotoxin, causing curare-like effects on the neuromuscular junction, and neurologic symptoms such as weakness, paresthesias, diplopia, and slurred speech. The venom may produce paralysis and act centrally on the respiratory center causing respiratory paralysis and death. Unlike the pit vipers, the venom contains little or no proteolytic cytotoxins and produces comparatively little local tissue reaction.[52]

### Brown recluse spider
The venom of the brown recluse spider contains hyaluronidase, alkaline phosphatase, and sphingomyelinase D, which cause local tissue necrosis as well as hemolysis.[53,54] Secondary to these substances, within a week, the bite mark classically develops a necrotic ulcer surrounded by extensive sloughing and necrosis of fat. In some cases, necrotizing fasciitis of varying severity may ensue.[53] In most cases, systemic manifestations are mild and self-limited, however, in some cases may include fulminant intravascular hemolysis and disseminated intravascular coagulation. Hemolysis may lead to hemoglobinuria, renal failure, shock, and death.[52,54]

Bites from a wide variety of different insects may have a surprisingly similar appearance, and if the insect is not seen when it bit the person and is not subsequently available for identification, one may not be able to classify the death as anything more specific than "insect bite." However, specific tests that utilize enzyme-linked immunosorbent assay (ELISA) are available for detecting the venom from a brown recluse spider bite.[55,56] The highest yield tissue sample for the venom is the skin tissue at the bite location, where venom has been detected at least 7 days after the bite.[55] The skin tissue at the bite site should be preserved by freezing prior to testing.

### Black widow spider
The venom of the black widow spider contains the neurotoxin alpha-latrotoxin, which acts on the presynaptic membrane, causing the opening of nonspecific cation channels and resulting in an increase in neurotransmitter release and a decrease in neurotransmitter reuptake. Symptoms are related to dysfunction of the autonomic nervous system and include nausea and vomiting, hypertension, sweating, and tachycardia. With supportive therapy, these bites are rarely fatal. They may, however, prove fatal with large envenomations in infants or elderly people with heart disease. A possible distinguishing feature is that the area of the bite may develop a "target-like" lesion.[52]

### Scorpion
There are many species of scorpion, but only *Centruroides exilicauda*, found in Mexico, Arizona, New Mexico, and Texas, possess venom potent enough to cause systemic toxicity. The venom acts at ion channels on neurons, causing massive release of neurotransmitter. The victim may develop a hyperadrenergic state followed by hypotension and shock, and possibly death. Tissue necrosis is notably absent, due to the lack of proteolytic enzymes in the venom.[52]

### Do
- Be aware of the artifacts that can result from thermal injuries, particularly when the body is charred.
- Treat suspicious burn injury/charred body cases as homicides with the appropriate performance of x-rays and collection of evidence.
- Consider electrical injury when the circumstances are appropriate, even if there are no recognizable electrical burns.

- Realize the subtlety of autopsy findings in anaphylactic deaths and the importance of medical history and scene investigation in such deaths.
- Be careful to take into account the scene investigation, medical and social histories, and autopsy findings when interpreting a blood carboxyhemoglobin saturation level.
- Anticipate that identification, cause of death, manner of death, and whether or not the person was dead or alive at the time of burning will be issues in the autopsy of a charred body.

### Don't

- Forget about the blood tests that are available in suspected anaphylactic deaths, including tryptase and IgE analyses.
- Forget to place clothing of a suspected arson case or any other case in which accelerants may have been used, in clean, sealed metal cans.
- Forget conditions that may predispose one to fatal effects of hyperthermia, such as heart disease, dementia, old age, and medications.
- Negate the importance of scene investigation in cases of fatal hypothermia.
- Forget that one may die of anaphylaxis, yet have a negative autopsy and microscopic examination.

## References

1. Bohnert M, Rost T, Faller-Marquardt M, Ropohl D, Pollak S. Fractures of the base of the skull in charred bodies—post-mortem heat injuries or signs of mechanical traumatisation? Forensic Sci Int 1997;87(1):55–62.
2. Sukhai A, Harris C, Moorad RG, Dada MA. Suicide by self-immolation in Durban, South Africa: a five-year retrospective review. Am J Forensic Med Pathol 2002;23(3):295–8.
3. Adelson L. Spontaneous human combustion and preternatural combustibility. J Criminal Law Criminol Police Sci 1952;42:792–809.
4. Christensen AM. Experiments in the combustibility of the human body. J Forensic Sci 2002;47(3):466–70.
5. Rodkey FL, O'Neal JD, Collison HA, Uddin DE. Relative affinity of hemoglobin S and hemoglobin A for carbon monoxide and oxygen. Clin Chem 1974;20(1):83–4.
6. Ernst A, Zibrak JD. Carbon monoxide poisoning. N Engl J Med 1998;339(22):1603–8.
7. Hirsch CS, Bost RO, Gerber SR, Cowan ME, Adelson L, Sunshine I. Carboxyhemoglobin concentrations in flash fire victims: report of six simultaneous fire fatalities without elevated carboxyhemoglobin. Am J Clin Pathol 1977;68(3):317–20.
8. Levine B, Moore KA, Titus JM, Fowler D. A comparison of carboxyhemoglobin saturation values in postmortem heart blood and peripheral blood specimens. J Forensic Sci 2002;47(6):1388–90.
9. Wainwright SH, Buchanan SD, Mainzer HM, Parrish RG, Sinks TH, Mainzer M. Cardiovascular mortality—the hidden peril of heat waves. Prehospital Disaster Med 1999;14(4):222–31.
10. Lifschultz BD, Donoghue ER. Forensic pathology of heat- and cold-related injuries. Clin Lab Med 1998;18(1):77–90.
11. Donoghue ER, Graham MA, Jentzen JM, Lifschultz BD, Luke JL, Mirchandani HG. Criteria for the diagnosis of heat-related deaths: National Association of Medical Examiners. Position paper. National Association of Medical Examiners Ad Hoc Committee on the Definition of Heat-Related Fatalities. Am J Forensic Med Pathol 1997;18(1):11–14.
12. Green H, Gilbert J, James R, Byard RW. An analysis of factors contributing to a series of deaths caused by exposure to high environmental temperatures. Am J Forensic Med Pathol 2001;22(2):196–9.
13. Kaiser R, Rubin CH, Henderson AK, Wolfe MI, Kieszak S, Parrott CL, et al. Heat-related death and mental illness during the 1999 Cincinnati heat wave. Am J Forensic Med Pathol 2001;22(3):303–7.
14. Martinez M, Devenport L, Saussy J, Martinez J. Drug-associated heat stroke. South Med J 2002;95(8):799–802.
15. Brunette DD, McVaney K. Hypothermic cardiac arrest: an 11-year review of ED management and outcome. Am J Emerg Med 2000;18(4):418–22.
16. Bouchama A, Knochel JP. Heat stroke. N Engl J Med 2002;346(25):1978–88.
17. King K, Negus K, Vance JC. Heat stress in motor vehicles: a problem in infancy. Pediatrics 1981;68(4):579–82.
18. Zumwalt R, Petty C, Holman W. Temperature in closed automobiles in hot weather. Forensic Sci Gazette 1976;7:7–8.
19. Rothschild MA, Schneider V. "Terminal burrowing behaviour"—a phenomenon of lethal hypothermia. Int J Legal Med 1995;107(5):250–6.
20. Saukko P, Knight B. Knight's Forensic Pathology, 3 ed. London: Arnold; 2004.
21. Carter N, Green MA, Milroy CM, Clark JC. Terminal burrowing behaviour—a phenomenon of lethal hypothermia. Int J Legal Med 1995;108(2):116.
22. Gormsen H. Why have some victims of death from cold undressed? Med Sci Law 1972;12(3):200–2.
23. Sivaloganathan S. Paradoxical undressing and hypothermia. Med Sci Law 1986;26(3):225–9.
24. Wedin B, Vanggaard L, Hirvonen J. "Paradoxical undressing" in fatal hypothermia. J Forensic Sci 1979;24(3):543–53.
25. Garry RC. Control of the temperature of the body. Med Sci Law 1969;9(4):242–6.
26. Hirvonen J. Necropsy findings in fatal hypothermia cases. Forensic Sci 1976;8(2):155–64.
27. Mizukami H, Shimizu K, Shiono H, Uezono T, Sasaki M. Forensic diagnosis of death from cold. Leg Med (Tokyo) 1999;1(4):204–9.
28. Albiin N, Eriksson A. Fatal accidental hypothermia and alcohol. Alcohol Alcohol 1984;19(1):13–22
29. Takada M, Kusano I, Yamamoto H, Shiraishi T, Yatani R, Haba K. Wischnevsky's gastric lesions in accidental hypothermia. Am J Forensic Med Pathol 1991;12(4):300–5.
30. DiMaio V, Dana S. Handbook of Forensic Pathology. Austin, TX: Landes Bioscience; 1998.
31. Hirvonen J, Huttunen P. Hypothermia markers: serum, urine and adrenal gland catecholamines in hypothermic rats given ethanol. Forensic Sci Int 1995;72(2):125–33.
32. Sadler DW, Pounder DJ. Urinary catecholamines as markers of hypothermia. Forensic Sci Int 1995;76(3):227–30.
33. Wright RK, Davis JH. The investigation of electrical deaths: a report of 220 fatalities. J Forensic Sci 1980;25(3):514–21.
34. Anders S, Matschke J, Tsokos M. Internal current mark in a case of suicide by electrocution. Am J Forensic Med Pathol 2001;22(4):370–3.
35. Cherington M, Kurtzman R, Krider EP, Yarnell PR. Mountain medical mystery. Unwitnessed death of a healthy young man, caused by lightning. Am J Forensic Med Pathol 2001;22(3):296–8.
36. Wetli CV. Keraunopathology. An analysis of 45 fatalities. Am J Forensic Med Pathol 2001;17(2):89–98.
37. Telmon N, Allery JP, Dorandeu A, Rouge D. Concentrated bleach burns in a child. J Forensic Sci 2002;47(5):1060–1.

38. Pumphrey RS, Roberts IS. Postmortem findings after fatal anaphylactic reactions. J Clin Pathol 2000;53(4):273–6.

39. Randall B, Butts J, Halsey JF. Elevated postmortem tryptase in the absence of anaphylaxis. J Forensic Sci 1995;40(2):208–11.

40. Schwartz LB, Metcalfe DD, Miller JS, Earl H, Sullivan T. Tryptase levels as an indicator of mast-cell activation in systemic anaphylaxis and mastocytosis. N Engl J Med 1987;316(26):1622–6.

41. Tanus T, Mines D, Atkins PC, Levinson AI. Serum tryptase in idiopathic anaphylaxis: a case report and review of the literature. Ann Emerg Med 1994;24(1):104–7.

42. Riches KJ, Gillis D, James RA. An autopsy approach to bee sting-related deaths. Pathology 2002;34(3):257–62.

43. Prahlow JA, Barnard JJ. Fatal anaphylaxis due to fire ant stings. Am J Forensic Med Pathol 1998;19(2):137–42.

44. Yunginger JW, Nelson DR, Squillace DL, Jones RT, Holley KE, Hyma BA, et al. Laboratory investigation of deaths due to anaphylaxis. J Forensic Sci 1991;36(3):857–65.

45. Schwartz HJ, Squillace DL, Sher TH, Teigland JD, Yunginger JW. Studies in stinging insect hypersensitivity: postmortem demonstration of antivenom IgE antibody in possible sting-related sudden death. Am J Clin Pathol 1986;85(5):607–10.

46. Yunginger JW, Sweeney KG, Sturner WQ, Giannandrea LA, Teigland JD, Bray M, et al. Fatal food-induced anaphylaxis. JAMA 1988;260(10):1450–2.

47. Flannagan LM, Wolf BC. Sudden death associated with food and exercise. J Forensic Sci 2004;49(3):543–5.

48. Delage C, Irey NS. Anaphylactic deaths: a clinicopathologic study of 43 cases. J Forensic Sci 1972;17(4):525–40.

49. Schwartz LB, Yunginger JW, Miller J, Bokhari R, Dull D. Time course of appearance and disappearance of human mast cell tryptase in the circulation after anaphylaxis. J Clin Invest 1989;83(5):1551–5.

50. Horn KD, Halsey JF, Zumwalt RE. Utilization of serum tryptase and immunoglobulin E assay in the postmortem diagnosis of anaphylaxis. Am J Forensic Med Pathol 2004;25(1):37–43.

51. Nishio H, Suzuki K. Serum tryptase levels in sudden infant death syndrome in forensic autopsy cases. Forensic Sci Int 2004;139(1):57–60.

52. Ford M, Delaney K, Ling L, Erickson T. *Clinical Toxicology*. Philadelphia, PA: WB Saunders Co; 2001.

53. Majeski J. Necrotizing fasciitis developing from a brown recluse spider bite. Am Surg 2001;67(2):188–90.

54. Williams ST, Khare VK, Johnston GA, Blackall DP. Severe intravascular hemolysis associated with brown recluse spider envenomation. A report of two cases and review of the literature. Am J Clin Pathol 1995;104(4):463–7.

55. Krywko DM, Gomez HF. Detection of *Loxosceles* species venom in dermal lesions: a comparison of 4 venom recovery methods. Ann Emerg Med 2002;39(5):475–80.

56. Gomez HF, Krywko DM, Stoecker WV. A new assay for the detection of *Loxosceles* species (brown recluse) spider venom. Ann Emerg Med 2002;39(5):469–74.



# 11 Motor Vehicle Collisions

*Dwayne A. Wolf, M.D., Ph.D.*

DEATH CERTIFICATION IN MOTOR VEHICLE
    ACCIDENTS    260
MOTOR VEHICLE CRASH SCENES    261
    High-speed, single-vehicle crash scene    262
INJURIES SUSTAINED IN MOTOR VEHICLE
    CRASHES    264
    Glass injuries    264
    Thoracic trauma and deceleration injuries    266
    Aortic injury    266
    Aortic laceration    266
    Blunt cardiac injuries    267
    Restraint injuries    268
    Shoulder harness injuries    269
    Lap belt injuries    269
    Seromuscular tear    270
    Air bag-related injuries    270
OTHER THORACOABDOMINAL VEHICULAR
    OCCUPANT INJURIES    271
    Blood aspiration and pulmonary contusion    271
    Rib fractures and pulmonary lacerations    271
    Traumatic diaphragmatic hernia    272
    Intercostal artery injuries    273
    Hepatic laceration    273
EJECTED VEHICULAR OCCUPANTS    273
    Road rash in an ejected occupant    274
    Head injury in an ejected occupant    274

AUTOMOBILE–PEDESTRIAN FATALITIES    274
    Bumper injuries    275
    Inguinal overstretch marks    276
RUN OVER BY VEHICLE    276
    Extremity degloving injury    276
    Thoracoabdominal crushing injuries in a pedestrian
        run over by a vehicle    277
    Asphyxiation in automobile–pedestrian
        fatalities    279
    Amputation/fragmentation in pedestrians    279
    Special considerations in pedestrian fatalities    280
    Pediatric pedestrian fatalities    280
VEHICULAR CONFLAGRATION    281
    Typical vehicular conflagration/accident    282
    Postmortem epidural heat hematoma versus
        antemortem subdural hematoma    282
MOTORCYCLE FATALITIES    283
    Pelvic injuries in a motorcyclist    283
    Patterned injuries in a motorcyclist    283
HEAD AND NECK INJURIES IN MOTOR VEHICLE
    FATALITIES    284
    Diffuse axonal injury    284
    Skull fractures parallel with the force vector    285
    Neck injuries    285
REFERENCES    288

The ubiquitous nature of motor vehicles in today's society is reflected in the practice of forensic pathology in that the majority of accidental deaths in most jurisdictions result from collisions involving cars, sport utility vehicles, trucks, and motorcycles. In 2001, highway fatalities accounted for 41,821 deaths in the United States.[1] Autopsy examination of motor vehicle fatalities has several objectives. First, autopsy may help determine, deny, or confirm facts of the crash. For example, are

injury patterns consistent with driver versus passenger? In automobile–pedestrian crashes, was the pedestrian struck from the front, rear, or side? In automobile–pedestrian crashes, was the pedestrian struck by the vehicle or run over by the vehicle? Other reasons for autopsy examination of vehicular deaths include, but are not limited to, the following: toxicological examination, determination of preexisting diseases that may have impaired the driver's ability to navigate the roadway, determination

of injury patterns with an eye to assessment of efficacy of vehicle safety features, and collection of trace evidence (e.g., paint chips) or documentation of patterned injuries in hit-and-run fatalities.

## Death certification in motor vehicle accidents

The manner of death in motor vehicle crash fatalities is classified as accident by convention.[2] Exceptions include cases where clear evidence indicates that intentional actions on the part of the driver (or pedestrian) led to the fatal outcome. Thus, if a pedestrian is intentionally run over by the driver of a car, the case may be properly classified as a homicide. Alternately, if a pedestrian intentionally dashes into the path of a moving vehicle, the case may be properly classified as a suicide. Of course, reliable evidence (including witness statements) is generally required to classify manner in one of these "unconventional" ways. Classification of motor vehicle fatalities as accidental does not affect the ability of the courts and legal system to prosecute cases as various degrees of manslaughter or homicide. For example, drunk drivers are frequently prosecuted for vehicular homicide when the corresponding death certificate lists the manner of death as accident. See Chapter 30 for more information.

The 24-year-old man of **Images 11.1** through **11.3** was the driver of a small sedan that was witnessed to be driving erratically at a high rate of speed. Moments later, the car was impaled on the rear end of a slower moving tractor trailer. Although a cause of death, blunt craniofacial trauma, was clearly evident on external examination (**Images 11.1** and **11.2**), a complete autopsy was performed. In addition to confirmation of the fatal injuries, a previously undiagnosed cerebellar primitive neuroectodermal tumor was identified. Note the variegated red

to yellow lesion infiltrating the right dentate nucleus and surrounding white matter in **Image 11.3**. Toxicology tests were negative. Thus autopsy was able to provide at least one possible explanation (seizures or altered consciousness) for loss of control of the vehicle.

The 34-year-old pedestrian of **Images 11.4** through **11.6** was struck by a pickup truck on the inside lane of a six-lane highway. Multiple witnesses described evasive maneuvers on the part of the vehicle, as the pedestrian ran from right to left, paused momentarily then darted back toward the truck. Witnesses indicated that the pedestrian "rolled" off the side of the truck. Multiple thoracoabdominal and extremity injuries were predominantly on the left side of the body. The left tibia and fibula were fractured and the fractured ends protruded through a laceration on the medial aspect of the left leg (**Image 11.4**). Patterned abrasions corresponded to glancing impacts with trim on the truck (**Image 11.5**). The pickup truck had no indication of frontal impact with the pedestrian, but cloth swipe marks were on the right side of the truck (**Image 11.6**) above the *rear* wheel well. Subsequent investigation revealed that the pedestrian had


11.2


11.1


11.3

been despondent over the breakup with his wife. The manner of death was classified as suicide.

## Motor vehicle crash scenes

Motor vehicular crash fatalities present an abundance of blunt force injuries for the pathologist. The injuries are frequently patterned and often distributed in characteristic ways depending on the circumstances and nature of the crash. A goal in the autopsy of a crash fatality is to correlate known circumstances of the crash with injuries sustained by the driver, passenger, or pedestrian in order to corroborate (or refute) witness statements. This serves, along with other physical evidence, to clarify or bolster arguments in civil or criminal proceedings regarding circumstances of the crash. Witness statements are generally accurate in broad terms, but frequently differ and conflict in various details. The details may be of minor or major significance. Moreover, autopsy findings may be misleading in the absence of adequate scene information.[3]

A pedestrian was struck by a motor vehicle at a busy intersection. His legs were fractured at a height corresponding to the bumper of a small sedan (**Image 11.7**). The patterned injury on the left shoulder bore a striking resemblance to the logo of a popular small vehicle (**Images 11.8** and **11.9**). Although the etiology of the


11.6


11.4


11.7


11.5


11.8

patterned injury is obscure, clear evidence at the scene indicated that he was struck by a different brand of car, confirming multiple eyewitness accounts. Therefore, scene evaluation prevented overinterpretation of a unique patterned injury at the autopsy table.

A 46-year-old man was last seen by his brother the prior evening, driving away from his brother's home. He and his car were found in a ditch the next morning by a passing motorist. Skid marks leading from a straight-away, across the roadbed (**Image 11.10**) at the curve and across the shoulder (**Image 11.11**) into the ditch (**Image 11.12**) indicated that the decedent was traveling at an excessive speed, applied brakes prior to the curve, skidded sideways, and plunged into the ditch. Evidence of impact against the windshield and steering wheel corresponded to forehead injuries and a C4 fracture, and aortic laceration, respectively. The rubberized brake pedal presented a series of vertical ridges (**Image 11.13**), corresponding to markings on the sole of his left shoe (**Image 11.14**).

## High–speed, single-vehicle crash scene

A group of four youths were in a sports car, drag racing on a city street. The driver lost control, skidded for an extended distance, and then collided with fixed objects. Analysis of the scene clearly indicated that the vehicle was traveling sideways as it crossed the curb since the width between the two sets of skid marks is wider than the width of the car (**Image 11.15**). An oval skid mark on the porch marks the impact site with a tire, with the tire impacting sideways (**Image 11.16**). The vehicle then impacted a tree and split into two pieces. One decedent and the front half of the car were on one side of the inter-section (**Image 11.17**, note decedent covered with yellow cloth; **Image 11.18**, front of the car). The rear half of the car was on the opposite side of the intersection (**Image 11.19**). The second decedent was deposited within the intersection (**Image 11.20;** note decedent covered with yellow cloth at the curb). Vehicular fragmentation and the lack of any patterned injuries precluded determination of which decedent, if either, was driving. Surpris-



11.9



11.11



11.10



11.12



11.13



11.16



11.14



11.17



11.15



11.18



11.19



11.20



11.21

ingly, the other two occupants survived. However, their statements conflicted with regard to occupant positions within the car.

## Injuries sustained in motor vehicle crashes

Analysis of injury patterns and types in motor vehicular fatalities sometimes allows conclusions regarding the mechanism of injury, i.e., that impact with a specific object created a certain injury, that the specific direction of forces caused a certain injury, and so forth. Although certain types of injuries occur with greater frequency in

certain types of crashes, specific injuries are not exclusive of one type of crash. Injuries are classified here both according to type of crash, as well as injuries caused by particular mechanisms. Many of these topics overlap—obviously, injuries such as windshield injuries may be seen in an occupant of a vehicle, as well as in a pedestrian struck by a vehicle.

### Glass injuries

Much of the interior compartment of modern motor vehicles is surrounded with glass. Impact with glass and fragments of glass may produce characteristic injury patterns and distribution of injuries.

The windshield of modern vehicles consists of two panes of glass that are laminated to either side of a relatively flexible sheet of plastic. This construction is meant to prevent the windshield from completely fragmenting when damaged (such as is common in highway driving). However, this construction also limits the likelihood that occupants will penetrate into or through the pane during a crash.

As a result of the relatively impenetrable nature of windshields, occupants who impact the glass may break the outer glass layers, deform the plastic layer, and sustain only relatively minor incised wounds. These are typically vertically oriented and clustered on the forehead.

Conversely, if the windshield *is* penetrated, the penetrating body part (typically head or neck) may sustain deep incised wounds as it bobs against the broken edge of the glass. The 29-year-old driver of this small sedan (**Image 11.21**) collided head-on with a full-sized pickup truck (**Image 11.22**). His head and neck perforated through the windshield. Blood and brain matter were visible on the intact windshield remnant (**Image 11.23**), and deep incised wounds were on the forehead (**Image 11.24**). Note the hesitation-like marks on the edges of the wound, indicating the "bobbing" action of the head.









In contrast to windshield construction, the side and rear windows of most vehicles are tempered glass. These windows, by virtue of their relatively "sheltered" location, are not meant to withstand rock chip damage (a painfully evident fact to anyone who has done a significant amount of lawn-mowing or edging around a parked vehicle). The tempered glass is designed to completely break into small rectangular, square or cube-shaped fragments (**Image 11.25**). In fact, some modern windows (for example, the rear glass panel on some modern minivans) are installed under some degree of stress, further facilitating complete shattering. When a vehicle occupant impacts one of these tempered glass windows during a crash, the fragmented cubes of glass will produce a cluster of short linear, angular, rectangular, and square incised wounds. Such wounds are referred to as *dicing* injuries to connote their origin from "dice"-shaped fragments of glass.

A 43-year old man was the driver of a sedan that was struck from the driver's side by a full-sized pickup truck (a "T-bone" crash). A cluster of short angular and linear incised wounds was on the left side of the face and a few cubes of glass were embedded in some of the



wounds (**Image 11.26**). The location of the dicing injuries can occasionally provide information as to whether the occupant was on the left or right side of the vehicle. A driver or left passenger more frequently sustains dicing injuries on the left, whereas an occupant of the right side of the vehicle will sustain such injuries on the right.

## Thoracic trauma and deceleration injuries

The term *deceleration injury* has evolved to encompass a variety of thoracic injuries resulting when the moving thorax decelerates rapidly as a result of impact against a stationary or relatively stationary object. Five of the most severe injuries in this category are (1) aortic laceration/transection, (2) myocardial contusion/laceration, (3) sternal fracture, (4) flail chest, and (5) tracheobronchial disruption. In clinical series, these lesions tend to occur exclusive of one another,[4] apparently because the likelihood of death at the scene or before presentation to the hospital is extremely high when two or more of the injuries occur in combination. The frequency with which these lesions are seen in combination in forensic autopsies further supports this conclusion.

## Aortic injury

The "classic" deceleration lesion in this category is aortic injury, including both laceration and transection. The most common location of injury is the aortic isthmus, a few centimeters distal of the ostium of the left subclavian artery. Aortic injuries are associated with large-magnitude forces and are most frequently found in the setting of frontal and near-side crashes.[5] Although seat belts reduce the risk of aortic injuries, the same is not true of side impact crashes.[6,7] Multiple mechanisms of aortic injury have been proposed, including differential deceleration of the heart and aortic arch relative to the anchored segments of the thoracic aorta, and increased intravascular pressure and hemodynamic forces in the setting of vehicular crashes.

An alternative and frequently cited mechanism for aortic laceration/transection is the *osseous pinch*, whereby the aorta is crushed or "pinched" between the vertebral column and the inner surface of the manubrium, first rib, and clavicle during anteroposterior thoracic compressive deformation.[8] The latter mechanism explains the consistent location of aortic injury, since the aortic isthmus will be compressed between the bony anterior thoracic structures and the fourth vertebral body. Moreover, this mechanism provides an explanation for aortic injuries occurring in the setting of low-speed crushing injuries.[9] This mechanism is also consistent with the frequent evidence of impact against an interior vehicle component and significant compartment intrusion.[5–7]

## Aortic laceration

A 19-year-old male was driving a pickup truck that collided with another pickup truck in an oblique frontal manner. He was not wearing a seat belt, the driver's side air bag did deploy, and intrusion in the driver's compartment was severe (**Image 11.27**). External evidence of thoracoabdominal impact consisted of a patterned abrasion, corresponding to the ribbed cloth of the decedent's shirt, along the left anterolateral thorax (**Image 11.28**). The aorta was nearly transected 2 centimeters distal to the left subclavian ostium (**Images 11.29** and **11.30**; the latter shows the detail of the nearly circumferential laceration and its relation to the subclavian ostium).



11.27



11.28



11.29

A 40-year-old man was the sole driver and occupant of a sedan that impacted an overpass embankment. A series of anterior rib fractures was under the diagonal abrasion corresponding to the shoulder harness (**Image 11.31**). The aorta was lacerated several centimeters distal to the "typical" location (note the position of the left subclavian artery), but directly underlying the row of anterior rib fractures (**Image 11.32**).

### Blunt cardiac injuries

Cardiac injuries comprise another frequent complication of blunt thoracic trauma. In a series of 546 autopsy examples of blunt cardiac trauma,[10] the most frequent lesion was myocardial rupture, with each ventricle rupturing at approximately the same frequency; the right atrium was also frequently breached. Myocardial contusion/laceration was the second most frequent category of cardiac injury. Although valvular injuries were infrequent, the aortic valve was the most frequently damaged—and was frequently abnormal before the injury (e.g., bicuspid).

A 56-year-old man was the driver of a sedan that lost control and flipped. He was unrestrained and received

multiple bilateral rib fractures (**Image 11.33**). A transmural ragged laceration was in the right atrium, with extension of an endocardial laceration through the tricuspid annulus, into the adjacent right ventricle (**Image 11.34**).

A 58-year-old motorcyclist was changing lanes on the highway when he struck another vehicle and then a


11.32


11.33


11.34


11.30


11.31

guardrail. Multiple bilateral rib fractures were associated with a gaping irregular transmural right ventricular laceration (**Image 11.35**). In **Image 11.36** note exposure of the trabeculae carneae. The pericardial sac was lacerated and blood was in the thorax. The man was still gurgling and gasping for air when initial witnesses arrived on the scene.

An 18-year-old driver involved in a single-vehicle, high-speed crash sustained multiple bony thoracic injuries, including bilateral rib fractures and a left clavicular fracture. The aortic valve had multiple lacerations on the right and noncoronary cusps (**Image 11.37**).

A 47-year-old driver of a full-sized pickup truck collided with a parked tractor-trailer at highway speed. His thoracic injuries included multiple bilateral posterior rib fractures, with bilateral pulmonary contusions. The posterior leaflet of his prosthetic tricuspid valve was avulsed from the annulus. Note suture material on the annulus, which is avulsed from the surrounding cardiac tissue (**Image 11.38**).

A 46-year-old driver of a midsized sedan was struck obliquely in the front by a similar sized vehicle. Six hours after presentation to hospital, she had a cardiac arrest. During an emergent thoracotomy, the surgeon indicated that her "right ventricle was beating but the left ventricle was motionless." At autopsy, she had no bony thoracic abnormalities and on initial inspection, her heart was unremarkable. On examination of the myocardium in the upper interventricular septum (in the vicinity of the atrioventricular node and bundle branches) a hemorrhagic contusion was noted (**Image 11.39**). Microscopic examination revealed a brisk inflammatory response, as expected for an injury incurred 6 hours earlier.

A 40-year-old motorcycle passenger was treated for multiple extremity and abdominal injuries for several hours in the hospital before death. The endocardial laceration of the right atrium, between the coronary sinus and tricuspid valve (**Image 11.40**) was not associated with any hemodynamic abnormality.

### Restraint injuries

Modern motor vehicles are equipped with a variety of safety devices. Air bags, shoulder restraints, and lap belts all have proven life-saving properties. Many of the



11.35



11.37



11.36



11.38

injuries described elsewhere in this chapter such as aortic laceration are less common in restrained occupants.[5] Additionally, head injuries resulting from impact of the head with the windshield are reduced with effective restraints. However, certain types of injuries are more frequent with use of seat belts, especially lap belts alone, and especially when the belts are worn improperly. Injuries of the intestines in particular are associated with the use of lap belts. Intestinal perforations, mesenteric lacerations, and seromuscular tears are associated with seat belt use.[11] Additionally, cutaneous injuries produced by seat belts may have characteristic features allowing determination of position of decedent in the vehicle (e.g., front left versus front right).

Perhaps the most recognizable patterned injury in motor vehicle crashes results from a shoulder belt harness. The shoulder restraint in the driver's side of the vehicle courses over or in front of the left shoulder, obliquely downward across the chest and abdomen to the right. Conversely, the shoulder harness courses in front of the right shoulder and obliquely downward to the left in occupants of the front right side of the vehicle.

## Shoulder harness injuries

A 50-year-old female was the driver of a compact car that swerved into the oncoming lane of traffic on a two-lane highway, impacting a pickup truck. A band of abrasions corresponded in location to the shoulder harness (**Image 11.41**). Note the asymmetry of the breasts caused by forceful displacement of the right breast implant.

## Lap belt injuries

A lap belt restraint, found in the front as well as rear seat of modern vehicles, produces a horizontal band of abrasions, contusions, or abraded contusions across the lower abdomen and/or upper thighs. A 93-year-old woman drove a large sedan into the path of a large truck and was struck on the driver's side. In addition to the shoulder harness restraint injury extending downward from the left shoulder, a horizontal band of contusions extended horizontally across the lower abdomen (**Image 11.42**).

A 3-year-old child was the rear-seat center passenger of a midsized four-door sedan in a frontal collision with a half-ton pickup truck. The child sustained fatal neck



11.39



11.41



11.40



11.42

injuries and was maintained in a comatose state for 12 hours prior to death. Abrasions on either side of the abdomen indicated the position of the lap belt restraint. Note the "fanned" configuration of the abrasions posteriorly, indicating the movement of the child relative to the seat during the collision. (**Image 11.43**, right flank; **Image 11.44**, left flank). The force of the child's pelvis against the lap belt caused fractures of the bilateral iliac wings (**Image 11.45**). In addition, the small intestinal mesentery was lacerated, and free blood, totaling 150 milliliters, was in the peritoneal cavity (**Image 11.46**).

### Seromuscular tear

A 19-year-old was driving a Ford F150 pickup truck and collided head-on with a Ford F250 pickup truck. The descending colon had a typical seromuscular tear,[12] with separation of the bowel wall along the submucosal plane, and J-shaped retraction of the torn muscularis propria and serosa; an intact tube of mucosa and submucosa remained in the involved segment (**Image 11.47**).

Seromuscular tears may also occur in other hollow viscera, including the small intestine and the stomach (**Image 11.48**).

### Air bag-related injuries

Air bags deploy with a significant, explosive force. The force of an expanding air bag or air bag module cover has been associated with thoracic and/or craniocervical trauma. The types of injuries are similar to injuries described earlier that occur in the absence of an air bag



11.45



11.43



11.46



11.44



11.47

(aortic or pulmonary artery injuries or flail chest), or they may be unusual types of injuries (pulmonary blast-type injuries for example). Air bag deployment may be suspected as causative in examples of severe thoracic injuries occurring in relatively low-speed crashes or in instances of unusual injuries occurring in high-speed crashes. As with belt-type restraints, air bags are much more likely to cause or contribute to injuries if the occupant is out of position relative to the air bag. Specifically, the risk of injury is increased when the occupant is unusually close to the deploying air bag. For example, drivers of short stature are more likely to sustain such injuries because they frequently position the seat forward in order to reach the foot pedals. Intoxicated drivers or passengers may slump forward over the deploying air bag. Pre-impact braking may also position an occupant unusually forward prior to air bag deployment.[6,7]

## Other thoracoabdominal vehicular occupant injuries

A seemingly endless variety of thoracoabdominal blunt trauma occurs in traffic fatalities. Examples include serial (in-line) and nonserial rib fractures, sternal fractures, and vertebral column fractures. The parietal and visceral pleura may be punctured or lacerated. The diaphragm may be lacerated with associated herniation of abdominal contents. Various solid and hollow viscera may sustain contusions. A few of these examples are illustrated here.



11.48

### Blood aspiration and pulmonary contusion

Any injury of the airways, the base of skull (with opening into the naso/oropharynx), or the lungs themselves may be associated with aspirated blood. Aspirated blood is deposited in the pulmonary parenchyma in a patchy distribution, surrounding the airways. The deposited blood outlines the secondary interlobular septa in the subpleural zone, forming a mosaic appearance on the pleural surface (**Image 11.49**). Aspirated blood may therefore be difficult to distinguish from a pulmonary contusion, which consists of confluent blood extravasation over an area of lung in a region of thoracic impact. Further, a contusion may also be surrounded by aspirated blood, as demonstrated in these contusions of the left upper and lower lobes (**Image 11.50**).

### Rib fractures and pulmonary lacerations

Rib fractures may be jagged and irregular (**Image 11.51**), indicating chest impact with an object or objects, or the fractures may be serial, that is, occurring in a linear distribution. The latter may result from direct thoracic impact or from thoracic deformation in the context of



11.49



11.50



11.51



11.53



11.52



11.54

## Traumatic diaphragmatic hernia

A 43-year-old man was the driver of a car that was struck on the driver's side (T-bone crash) by a full-size pickup truck. Moderate front compartment intrusion was noted and the steering wheel was bent, indicating driver impact with the latter. The stomach was herniated through a laceration in the left hemidiaphragm into the left thorax (**Image 11.55**). The man's 36-year-old brother was the front right seat passenger in the same crash. His injuries were strikingly similar, with herniation of the stomach through a laceration in the left hemidiaphragm. This scenario of strikingly similar injuries in multiple occupants of a crash is fairly common and probably represents the consequence of similar forces acting on the victims at the time of the collision, regardless of occupant position within the vehicle.

In addition to left hemidiaphragmatic herniation (of usually the stomach), the liver or portions thereof may be herniated through a laceration of the right hemidiaphragm. This driver of a small sedan was involved in a

chest wall impact. Note serial right rib fractures occurring in this 21-year-old driver and sole occupant of a car that traversed a ditch and struck a tree (**Image 11.52**). Deformation of the thoracic cavity caused forceful shearing of the lung lobes relative to one another, tearing the pleura of the interlobar fissure (**Image 11.53,** interlobar lacerations). Serial and nonserial fractured rib ends may protrude through the parietal pleura and puncture the overlying lung (**Image 11.54**). Multiple rib fractures along the same rib(s) will result in a segment of chest wall with loss of structural stability, a condition clinically termed *flail chest*.



11.55



11.57



11.56



11.58

frontal collision. The right dome of the liver was herniated through a laceration in the right hemidiaphragm; the herniated part of the liver was also lacerated (**Image 11.56**).

### Intercostal artery injuries

Thoracic trauma may be associated with injuries of the major vessels, including the aorta (as described earlier) and the vena cavae. These injuries are frequently associated with catastrophic exsanguination into the thoracic cavities and/or the pericardium. Frequently, however, one will find hemorrhage in the paravertebral retropleural soft tissues, with or without associated hemothorax. A source of bleeding is sometimes difficult to demonstrate. In cases of extreme deformation of the thorax, the descending aorta may be pulled (or pushed) away from the vertebral column. The proximal intercostal arteries may be lacerated or avulsed. Such injuries are frequently difficult to demonstrate directly. A motor vehicle passenger was involved in a passenger-side T-bone crash. The paravertebral retropleural tissues were hemorrhagic and were associated with focal parietal

pleural laceration and right hemothorax. Avulsion of an intercostal artery was noted (adjacent to the tip of the forceps in **Image 11.57**).

### Hepatic laceration

Lacerations of the liver may consist of an isolated capsular rent (**Image 11.58**), deep lacerations, or complete transection (**Image 11.59**). The right lobe of the liver is more frequently injured than the left, in part because it is relatively less protected by the rib cage. The liver may be injured by compressive forces, with the anteroposterior axis crushed between the anterior abdominal wall and the vertebral column. Experimentally, an extensive laceration or bursting injury may be produced with a minor amount of abdominal compression, provided the velocity of the impact is sufficiently high.[13]

## Ejected vehicular occupants

Unrestrained vehicular occupants are subject to being ejected from the vehicle in the course of a collision. As

may be expected, ejected victims sustain more severe injuries than occupants who are not ejected. Head and neck injuries account for most of this difference.[14] The types of injuries sustained by ejected vehicular occupants are similar to those of nonejected victims. The primary difference is in the extensive nature of confluent abrasions or "road rash" that is so typical of ejected victims.

### Road rash in an ejected occupant

The 42-year-old man of **Image 11.60** was driving a pickup truck that flipped and ejected him through the driver's side window. Confluent abrasions (road rash) were over the right side of the face, the chest, and the abdomen.

### Head injury in an ejected occupant

In addition to exposure of vulnerable body parts to the environment, ejection also subjects the victim to the possibility of injury caused by crushing a body part (e.g., the head) between the vehicle and the pavement. This

22-year-old driver lost control of her four-door sedan, skidded sideways, and flipped before coming to rest upside down (**Image 11.61**). The driver was ejected from the passenger window and her head was crushed under the roof of the vehicle (**Image 11.62**).

## Automobile–pedestrian fatalities

Many of the injuries and types of injuries sustained in occupant fatalities are the same injuries as are found in pedestrian fatalities. However, certain patterns of injuries are characteristic in the pedestrian.



11.61



11.59



11.60



11.62

## Bumper injuries

Injuries of the legs at a location corresponding to impact with the front end of a vehicle are known as bumper injuries. In the majority of pedestrian fatalities, the bumper is the first point of contact with the vehicle. Of course, one should keep in mind that other parts of the vehicle (e.g., hood or front/rear side panel) may be the initially impacting vehicular component. Bumper injuries may include fractures of the tibia and/or fibula, the femur, contusions of the leg muscles, and abrasions and/or lacerations of the skin of the legs. Characteristic injuries involving fractures of both tibia and fibula are shown in **Image 11.63**.

If no injuries are identified on the skin of the legs in a pedestrian, the skin and subcutaneous tissues should be reflected to evaluate for the presence of deep contusions. A 37-year-old flagman was struck by a pickup truck; minimal injuries were evident on the skin of both legs. However, extensive contusions were evident in the underlying skeletal muscles and subcutaneous tissues (**Image 11.64**). The distribution of contusions clearly indicated that the direction of impact was from the posterolateral left side.

Conversely, in some instances cutaneous injuries are characteristic, but minimal internal injuries are identified. A 30-year-old man exited his parked vehicle on the side of the highway to assist another motorist when he was struck by a car that did not stop at the scene. Although cutaneous abrasions are on the bilateral calves and popliteal fossae (**Image 11.65**), minimal injuries were visible in the underlying connective tissues. The impact in this case was directly from the back. The posterior location of the impact is further supported by the presence of a left occipital scalp contusion, which was accompanied by a wide ring fracture (**Image 11.66**).



11.65



11.63



11.66



11.64



11.67



11.68

In all instances where bumper injuries are identified, the height of the injury from the sole of the foot should be measured. It is also helpful to include a measuring device in the photograph. If the decedent's clothing is available, the height of the insole of the shoes to the bottom of the heel should also be taken. These measurements provide a height of the impact point relative to the pavement. This information can be potentially useful for several reasons. First, in hit-and-run cases with no witnesses and no suspect vehicles such height measurements may help to narrow the search. For example, the bumper of a small sports car is closer to the ground than the bumper of a full-sized pickup truck. The latter would leave a bumper injury at a greater height than the former. Second, if a vehicle is identified, this information may give some information as to whether the vehicle was accelerating or decelerating at the time of impact. In sharp acceleration the front of the vehicle raises, whereas sharp deceleration has the opposite affect. As a caveat to the latter, if a vehicle is in a sharp turn, the inside edge of the front bumper will be higher than the outside edge of the bumper.

### Inguinal overstretch marks

When a pedestrian is struck directly or obliquely from the back, the skin of the inguinal region may be pulled and torn, producing a characteristic series of superficial parallel linear and irregularly linear tears (**Image 11.67**).

## Run over by vehicle

Medical examiners are frequently asked whether a pedestrian was struck and/or run over by a vehicle and, if so, how many times. If a patterned injury corresponding to a tire tread mark is visible, then *at least* one run-over may be concluded. If no patterned injury is evident, one must evaluate internal injuries to assess the possibility of a crushing-type mechanism. As with all motor vehicular fatalities, assessment of witness statements, scene findings, and the vehicle are often helpful in such determinations.

The 33-year-old man depicted in **Images 11.68** through **11.72** was riding his bicycle on the interstate highway when he was struck by a tractor-trailer. A patterned mark on the anterior left pants leg clearly indicated that the leg was run over by one of the wheels of the truck or trailer (**Image 11.68**, front of pants; **Image 11.69**, detail of front of left thigh). When a large vehicle runs over an extremity, the extremity frequently has little evidence of injury. In this case, the man's thigh and leg had superficial abrasions and contusions, with no fracture, no deep contusions, and no hemorrhagic pocket formation (**Image 11.70**). Impact of a pedestrian or bicyclist by a large vehicle often produces extensive comminuted fractures of the head, as in this instance (**Image 11.71**). A more clear view of the nature of injuries can often be obtained if the head is stuffed with paper or cloth towels, then sewn back to reapproximate the edges of the lacerations (**Image 11.72**).

### Extremity degloving injury

Depending on the angle that the tire pulls across the extremity, the skin and subcutaneous tissues may be pulled or sheared off on the leading edge of the extremity. A 35-year-old fireman was attempting to board a moving fire truck when he lost his footing and was run over by the rear wheels of the truck. In addition to hemorrhagic pocket formation along the lateral aspect of the left thigh, his left calf had a degloving injury, in which


11.69


11.70


11.71


11.72


11.73

the skin and subcutaneous tissues were stripped from the medial and posterior aspects of the leg. In **Image 11.73**, note the flap of skin along the lateral left thigh; the skin of the calf has been stripped downward, so that the skin below the degloving injury is "lax."

## Thoracoabdominal crushing injuries in a pedestrian run over by a vehicle

According to witness statements and cutaneous patterned abrasions, the left side of this man's chest (**Image 11.74**) was run over by a vehicle. Extreme fragmentation of the left ribs was evident. Such extensive fracturing and fragmentation can occur with a single pass of the wheels over the thorax, or with multiple passes. The degree of

fragmentation alone cannot be used to argue for multiple passes.

A 14-year-old girl was run over by the tire of a road grader. A band of abrasions coursed upward from the lower back toward the right hemithorax (**Image 11.75**). As a result of the innate anatomic plasticity of youth, none of the ribs was fractured. However, as evidence of extreme thoracic deformation, the right mainstem bronchus was avulsed (**Image 11.76**) and the right lung was fragmented (**Image 11.77**). Such deformation of the thorax with or without rib fractures is often accompanied by laceration of the intercostal tissues (parietal pleura and skeletal muscles), as one rib moves relative to the nearest rib, shearing the connecting tissues (**Image 11.78**).

A 37-year-old female was knocked down and then run over by a logging truck. External evidence of injury was limited. A degloving injury was on the right medial thigh (**Image 11.79**) and a laceration on the left hip corresponded to an underlying pelvic fracture (**Image 11.80**). The tire crossed the pelvis and abdomen, with displace-



11.76



11.74

11.75



11.77



11.78