# **EXHIBIT B**

ment of the left hemicolon and multiple loops of small intestine through a laceration of the left hemidiaphragm into the left thoracic cavity (**Image 11.81**).

## Asphyxiation in automobile–pedestrian fatalities

In cases where a pedestrian is run over by a vehicle, in addition to crushing injuries, one should also assess for evidence of traumatic asphyxia. A 48-year-old man was working at a construction site when he tripped and fell into the path of a dump truck that was moving in reverse. A patterned injury (tire mark) extended upward from the right buttock and across the back toward the left shoulder (**Image 11.82**). In addition to multiple rib fractures and other internal injuries, he had florid conjunctival and oral mucosal petechiae (**Image 11.83**), indicating a component of traumatic asphyxia.

## Amputation/fragmentation in pedestrians

Several investigators have attempted to correlate particular injuries, injury patterns, or distance thrown with speed of the vehicle. Such studies are difficult because

the interaction of a pedestrian with a vehicle is complex and variable depending on the direction of impact, position of pedestrian, size of vehicle, size of pedestrian, etc.[15] Nevertheless, some conclusions have been drawn from such large series. For example, spinal fractures become almost constant once the vehicular speed exceeds 43



11.81



11.79



11.80



11.82



11.83



11.84



11.85

miles per hour. Therefore, the absence of a spinal fracture suggests a speed of less than 43 miles per hour. However, spinal fractures can occur at lower speeds, so the presence of a spinal fracture cannot be used to surmise a vehicular speed. Aortic and inguinal ruptures become nearly universal when vehicular speeds exceed 62 miles per hour, and rarely occur when the speed is less than 31 miles per hour. Dismemberment generally does not occur with vehicular speeds of less than 56 miles per hour.[16] Dismemberment as used here refers to amputation of an extremity or transection of a torso. In some cases the whole body may be fragmented, generally as a result of being impacted and run over by multiple vehicles at highway speed. A 24-year-old man ran out into the street while being chased by security guards, after being caught shoplifting. In an attempted evasive maneuver, he dashed onto a six-lane interstate highway and was struck by multiple vehicles. The body was received in multiple pieces (**Image 11.84**). A fragmented body should be arranged in order as much as possible, in order to assess for patterned injuries or other distinc-tive features. Moreover, arrangement will allow accurate inventory of body parts (**Image 11.85**).

### Special considerations in pedestrian fatalities

In cases where a vehicle strikes a pedestrian then flees the scene, the body should be carefully examined for trace evidence. The clothing should be inspected for paint chips or glass fragments. Once the clothing is removed, the body should again be inspected for paint chips or glass fragments. Bright daylight spotlights and alternate light source examinations can also be considered for these studies. Scalp hair should be collected as well, because evidence may also be transferred from the pedestrian to the vehicle.

### Pediatric pedestrian fatalities

Injuries occurring when children are struck by vehicles are frequently quite severe. Most of the fatalities involve head injuries.[17]

The 2-year-old boy depicted in **Images 11.86** through **11.89** was struck by an unidentified vehicle on a rural road. He was maintained on a respirator in a comatose state for 1 day. The back of the head had evidence of impact (**Image 11.86**). A subdural hematoma was over each cerebral convexity (**Image 11.87**). Hemorrhage extended along the optic nerve sheaths (**Image 11.88**). The body of the sixth cervical vertebra was fractured (**Image 11.89**). The brain was massively swollen with evidence of transtentorial and cerebellar tonsillar hernia-tion, but there was no intraparenchymal hemorrhage. This constellation of findings indicates a large-magnitude force and is typical of the types of injuries sustained in motor vehicle–pedestrian crashes. The similarity of the intracranial injuries to findings in the all-too-frequent homicidal pediatric blunt head trauma cases is striking.


11.86


11.87


11.88


11.89

## Vehicular conflagration

Although automobile manufacturers attempt to minimize risks of vehicular conflagration, the very nature of motor vehicles makes them prone to fires: a combustion engine, with heated parts, mounted on a rapidly moving vessel, along with a tank of fuel. In crashes involving fire the body is frequently not extracted until burning is advanced. In cases of vehicular conflagration the tasks of the pathologist are to identify the decedent, to evaluate for the presence of blunt trauma, the severity of the blunt trauma injuries, and to evaluate for evidence of smoke inhalation or other indicators that the person was alive and/or conscious during the fire. These questions frequently become pivotal in subsequent civil litigation.

In cases of charred remains, postmortem x-rays must be obtained in order to assess for the unexpected foreign object such as a bullet or knife blade. Postmortem x-rays may also be helpful in decedent identification if unique orthopedic hardware or surgically implanted devices are identified. Injuries resulting from blunt trauma as described elsewhere in this chapter may be identified and must be differentiated from artifacts of burning. For example, direct heat to the calvarium may cause congealed denatured blood to collect in the underlying epidural space. Caution must be exercised when inter-



11.90



11.92



11.91



11.93

preting any epidural collection of blood in a charred body. However, heat does *not* cause accumulation of blood in the subdural space. When identified, a subdural hematoma indicates trauma.

### Typical vehicular conflagration/accident

The driver of a van was approaching a toll plaza at a high rate of speed in dense fog. A sharp leftward evasive maneuver was unsuccessful in avoiding impact with the concrete canopy support. The impact point on the vehicle was the right side—the same side of the vehicle as the fuel tank and exhaust system. The fuel tank was ruptured. The vehicle flipped onto its left side, spun around counterclockwise into the adjacent lane, and burst into flames (**Image 11.90** is a view from the rear of the vehicle). The body was charred (**Image 11.91**). Severe charring made determination of injuries difficult. Soot in the distal airways (**Image 11.92**) was correlated with a carboxyhemoglobin concentration of 25 percent.

### Postmortem epidural heat hematoma versus antemortem subdural hematoma

Direct thermal stress on the calvarium will cause extrusion of congealed blood into the epidural space. This postmortem artifact can be recognized by its denatured, friable consistency (**Image 11.93**). In contrast, an antemortem subdural hematoma subjected to the effects of a fire in the course of a vehicular conflagration will have a denatured appearance, but will not have the same peculiar consistency as an artifactual epidural hematoma (**Image 11.94**).

Note also that as a result of direct thermal effect, the dura mater becomes thick, denatured, and actually "shrinks" away from the inner table of the skull. As the dura shrinks, the underlying brain will develop flattened gyri and compressed sulci (**Image 11.95**). This flattened cortical surface should not be confused with flattening as a result of brain swelling.

Postmortem thermal burns cannot be differentiated from antemortem burns. Therefore, evaluation of the



11.94



11.95

fire's contribution to death rests in documentation of severity of injuries, balanced against evidence of smoke inhalation. The latter is assessed by presence and quantity of carbonaceous sputum in the airways (**Image 11.96**) and carboxyhemoglobin concentration in the blood. Carboxyhemoglobin should be determined in all fire-related deaths, including vehicular conflagrations. One should also keep in mind that other toxic gases may be produced as a by-product of burning vehicular components.

See Chapter 10 for additional discussion of fire-related fatalities.

## Motorcycle fatalities

By virtue of their exposed position, motorcyclists are functionally similar to ejected vehicle occupants. Similar types of injuries are often seen, including extensive road rash. In addition, pelvic and leg injuries are often severe because of the rider's exposed position and because of the interaction between the motorcycle and rider in the course of attempted evasive maneuvers. Motorcyclists are also unique in the extent of interaction with the *other* vehicle during collisions. Either the motorcycle or the colliding vehicle may produce patterned injuries on the body of the rider.

### Pelvic injuries in a motorcyclist

This 43-year-old motorcycle rider swerved to avoid another vehicle, lost control, and crashed at highway



11.96

speed (**Image 11.97**). The symphysis pubis was widely separated, as were the bilateral sacroiliac joints. The vaginal wall was lacerated and multiple loops of small intestine were extruded through the vaginal laceration.

### Patterned injuries in a motorcyclist

This 36-year-old man was found on the street, lying next to his motorcycle (**Image 11.98**). The investigating police jurisdiction asked about the possible involvement of other vehicle(s) in the crash. At autopsy a distinctive patterned injury was on the forehead (**Image 11.99**). The motorcycle was subsequently transported to the medical examiner facility and was examined for the presence of



11.97



11.98



11.99



11.100

components corresponding to the patterned injury. No motorcycle part matched the injury. Furthermore, first-hand examination of the motorcycle revealed clear evidence of impact with another vehicle—the frame was bent (**Image 11.100**), the front forks were broken from the frame, and the front fender had clear evidence of impact with another vehicle. The identity of the other vehicle remains unknown.

## Head and neck injuries in motor vehicle fatalities

Head injuries are frequently severe in vehicular fatalities. The forces generated in crashes are of adequate severity

to produce subdural hemorrhage and diffuse axonal damage. Four of the five patients originally described with this lesion were delayed vehicular fatalities.[18]

### Diffuse axonal injury

The teenage driver of a pickup truck struck a tree. He had comminuted calvarial and basilar skull fractures, including a diastatic component that extended along the sagittal suture (**Images 11.101** and **11.102**). Showers of intraparenchymal punctate hemorrhage are gross markers of diffuse axonal injury in adults,[19] and in this case were seen in the right basal ganglia (**Image 11.103**) and diffusely through the pons (**Image 11.104**). Diffuse brain injury as in this case may occur with or without skull fractures.

Skull fractures often follow particular patterns in vehicular fatalities. Linear fractures tend to occur in line with the direction of force. Accordingly, lateral head impacts will frequently produce transverse convexity or basilar (hinge-type) skull fractures. Impacts at the chin are often transmitted to the sides of the base of the skull through the temporomandibular joints and therefore









An underlying comminuted depressed fracture was contiguous with a diastatic fracture along the coronal suture (**Image 11.105**). A 27-year-old motorcycle passenger impacted her chin during a collision. A transverse basilar (hinge) fracture resulted from transmission of the impact force through the temporomandibular joints (**Image 11.106**). A 21-year-old man was driving a sedan that struck a curb and rolled. The left frontal region of the head sustained an impact, as evidenced by external injuries (**Image 11.107**). The resultant basilar skull fracture (**Image 11.108**) extended from the point of impact, transversely across to the right petrous ridge forming a diagonal hinge fracture.

## Neck injuries

Neck injuries are frequent findings in motor vehicular crashes. Obvious injuries may be readily apparent. The 7-year-old pedestrian of **Images 11.109** through **11.111** was struck by a sedan. Malposition of his head with respect to the neck was evident on external examination (**Image 11.109**). Internal examination confirmed atlanto-occipital dislocation (**Images 11.110** and **11.111**; note that

are also frequently associated with transverse basilar fractures.

## Skull fractures parallel with the force vector

The 17-year-old passenger of a pickup truck that struck a tree had an impact site on the right frontoparietal scalp.



11.105



11.108



11.106



11.109



11.107



11.110









C1 and the upper cervical spinal cord are on a different focal plane than the foramen magnum).

In other cases, one may seemingly finish an autopsy without obvious evidence of clearly fatal internal injuries. In such cases, one must consider more subtle neck injuries. The demonstration of ligamentous cervical injuries is best accomplished through a posterior approach.[20] The individual in **Image 11.112**, a 31-year-old white male, was the sole occupant of a sports car that failed to navigate a curve and struck a concrete culvert. He was restrained with a lap belt, but the air bag did not deploy. Minimal thoracoabdominal injuries included avulsion of right rib heads 4 through 7, and superficial capsular lacerations of the liver. The thoracoabdominal injuries were not of sufficient severity to explain the death. A left frontoparietal facial and scalp contusion (**Image 11.112**) was associated with a thin film of left convexity subdural hemorrhage.

A posterior neck dissection revealed extravasated blood throughout the left splenius capitis and deeper muscles with a nondisplaced fracture of the left lateral lamina of C1. Deep muscular hemorrhage overlying the right atlanto-occipital joint was associated with avulsion of the right occipital condyle (**Images 11.113** and **11.114**). The avulsed fragment of bone is lifted posteriorly by the metal probe—the right alar ligament is thus lax and folded medially (not visible). The force of traction of the alar ligament between the odontoid process and the occipital condyle causes the condylar avulsion. Even in the absence of an anatomically demonstrable cervicomedullary contusion, forces of sufficient magnitude to produce such bony/ligamentous injuries are associated with underlying neural damage, and are sufficient to explain death.

*Do*

- Attend motor vehicle crash scenes where feasible.
- Examine the involved motor vehicle(s)—even if remote from the accident site.
- Correlate patterned injuries and patterns of injuries with known circumstances of the crash.
- Incise and reflect skin to demonstrate, measure, and photograph the presence or absence of bumper injuries in pedestrian fatalities.
- X-ray charred bodies and test carboxyhemoglobin levels in fatalities from vehicular conflagrations.
- Arrange fragmented remains in anatomic position to evaluate injury patterns and inventory remains.

*Don't*

- Overinterpret patterned injuries and patterns of injuries without evaluation of other evidence and witness statements regarding details of the crash.
- Forget to examine the clothing for potentially useful clues and/or evidence (e.g., glass fragments, paint chips, brake pedal marks on the soles of shoes).
- Forget to collect scalp hair and save clothing from hit-and-run pedestrian fatalities.
- Overlook the possibility of a significant ligamentous or atlanto-occipital neck injury when other injuries do not seem severe enough to account for death.

## References

1. National Transportation Statistics. US Bureau of Transportation Statistics Publication No. BTS02-06; 2001.
2. Hanzlick R, Hunsaker J, Davis G. *A Guide for Manner of Death Classification*. National Association of Medical Examiners; 2002.
3. Lau IV, Viano DC, Gamero F. Invalidity of speculated injury mechanism in autopsy reports. Injury 1989;20(1):16–21.
4. Swan KG, Jr., Swan BC, Swan KG. Decelerational thoracic injury. J Trauma 2001;51(5):970–4.
5. McGwin G, Jr., Metzger J, Moran SG, Rue LW, 3rd. Occupant- and collision-related risk factors for blunt thoracic aorta injury. J Trauma 2003;54(4):655–60; discussion 60–2.
6. Shkrum MJ, McClafferty KJ, Nowak ES, German A. Driver and front seat passenger fatalities associated with air bag deployment. Part 1: A Canadian study. J Forensic Sci 2002;47(5):1028–34.
7. Shkrum MJ, McClafferty KJ, Nowak ES, German A. Driver and front seat passenger fatalities associated with air bag deployment. Part 2: A review of injury patterns and investigative issues. J Forensic Sci 2002;47(5):1035–40.
8. Crass JR, Cohen AM, Motta AO, Tomashefski JF, Jr., Wiesen EJ. A proposed new mechanism of traumatic aortic rupture: the osseous pinch. Radiology 1990;176(3):645–9.
9. Javadpour H, O'Toole JJ, McEniff JN, Luke DA, Young VK. Traumatic aortic transection: evidence for the osseous pinch mechanism. Ann Thorac Surg 2002;73(3):951–3.
10. Parmley LF, Manion WC, Mattingly TW. Nonpenetrating traumatic injury of the heart. Circulation 1958;18(3):371–96.
11. Williams JS, Kirkpatrick JR. The nature of seat belt injuries. J Trauma 1971;11(3):207–18.
12. Slavin RE, Borzotta AP. The seromuscular tear and other intestinal lesions in the seatbelt syndrome: a clinical and pathologic study of 29 cases. Am J Forensic Med Pathol 2002;23(3):214–22.
13. Lau VK, Viano DC. Influence of impact velocity on the severity of nonpenetrating hepatic injury. J Trauma 1981;21(2):115–23.
14. Gongora E, Acosta JA, Wang DS, Brandenburg K, Jablonski K, Jordan MH. Analysis of motor vehicle ejection victims admitted to a level I trauma center. J Trauma 2001;51(5):854–9.
15. Zivot U, Di Maio VJ. Motor vehicle–pedestrian accidents in adults. Relationship between impact speed, injuries, and distance thrown. Am J Forensic Med Pathol 1993;14(3):185–6.
16. Karger B, Teige K, Buhren W, DuChesne A. Relationship between impact velocity and injuries in fatal pedestrian–car collisions. Int J Legal Med 2000;113(2):84–8.
17. Byard RW. Accidental childhood death and the role of the pathologist. Pediatr Dev Pathol 2000;3(5):405–18.
18. Strich SJ. Diffuse degeneration of the cerebral white matter in severe dementia following head injury. J Neurochem 1956;19(3):163–85.
19. Adams JH, Doyle D, Ford I, Gennarelli TA, Graham DI, McLellan DR. Diffuse axonal injury in head injury: definition, diagnosis and grading. Histopathology 1989;15(1):49–59.
20. Dolinak D, Matshes E. *Medicolegal Neuropathology: a color atlas*. Boca Raton, FL: CRC Press; 2002.

# 12 Aviation

*David Dolinak, M.D.*
*Emma Lew, M.D.*
*Evan Matshes, M.D.*

WHAT TYPE OF ACCIDENT IS IT?    289
WHY DID THE PLANE CRASH?    289
WHO SHOULD BE AUTOPSIED AND WHAT ARE
    THE GOALS OF THE AUTOPSY?    290
    The pilot    290
    The flight crew and passengers    290
IDENTIFICATION OF VICTIMS    291
TOXICOLOGY (THE TOXBOX)    291

MANNER OF DEATH DETERMINATION    291
    Small plane crash    291
FALLS TO EARTH    291
    Stowaways    291
    Parachute deaths    291
INVESTIGATION OF MASS DISASTERS    293
REFERENCES    296

Aviation crashes cover a wide spectrum of scenarios, ranging from the crash of a small vehicle such as a helicopter, personal airplane, hang glider, or hot air balloon, with only one or a small number of deaths, to the mass disaster of a commercial airliner with hundreds of fatalities. Death may occur not only in those individuals aboard an aircraft, but also to individuals on the ground. Medicolegal death investigation of commercial airliners is usually a multifaceted investigative process that involves many different agencies, with the National Transportation Safety Board (NTSB) assuming the central role of determining why the crash occurred.

The forensic pathologist examines the scene and the body, performs a complete autopsy, and collects samples for toxicology. Two central themes are present in aviation deaths: (1) Identify the dead and document their injuries and disease processes and (2) determine the cause of the crash and how the deceased's injuries and disease processes might have factored into the circumstances of the crash.[1] Also important is toxicological analysis, in particular what drugs might be present in the pilot's body fluids and/or tissues. Although the majority of such crashes are accidents, investigators may rarely encounter suicides and homicides. Major disasters involving commercial airliners with hundreds of deaths involve disaster planning procedures that are likely already implemented in a medical examiner department.

## What type of accident is it?

When one is alerted to an airplane crash, among the first questions that should be asked are (1) the location of the crash, (2) the size of the plane, (3) the estimated number of passengers and crew, and (4) the estimated number of survivors and fatalities. This initial information will help determine the jurisdiction of the cases and whether disaster planning is in order, and whether the morgue and morgue staff can effectively handle the added workload. More than 90 percent of fatal crashes involve powered aircraft, with the remainder involving hot air balloons, hang gliders, and the like.[2] Regardless of whether the local medical examiner office can handle the case(s) by itself or not, the NTSB handles the majority of the investigation. The NTSB is an independent federal agency that serves to oversee not only airplane crashes and fatalities, but also deaths in other manners of transportation.[3]

## Why did the plane crash?

Investigation of an aviation accident must be undertaken according to the medicolegal frame-work of the state in which the crash occurred. An organized, methodical approach to the examination of

the crash scene and the associated human remains is necessary.[4]

The scene investigation will vary according to the nature of the crash and the number of fatalities, however, some constants remain. The scene should be secured and evidence protected for investigation agencies. Bodies should not be moved until the scene is photographed, the bodies photographed and tagged, and the location of the bodies charted, ideally on a grid pattern of the area or in relation to a major fixed landmark.[4,5] A sealed body bag is ideal for the removal of each deceased, because it will contain all of the body parts which may be fragmented, some of which may be necessary for identification.[4] If the number of dead is large, a temporary morgue may be established near the crash site and refrigerated trailers utilized to store the bodies. This and other mass disaster planning will ideally be shared with other agencies when the crash occurs in jurisdictions with smaller facilities.

There are numerous possible explanations for the crash of an airplane. These include pilot error, pilot incapacitation, pilot intoxication, mechanical defects, weather, or, more likely, a combination of these factors. One must also consider sabotage. However, the majority of airplane crashes occur during takeoff or landing.

## Who should be autopsied and what are the goals of the autopsy?

### The pilot

Although the autopsy is only one component of the entire case investigation, no investigation is complete without evaluation and consideration of the pilot's pre-existing disease, toxicological findings, and other factors revealed by thorough postmortem examination. Careful prelicense screening of pilots is conducted to identify individuals with serious medical conditions such as epilepsy, impaired vision or hearing, or other conditions that might render them a risk to themselves or others. Typically, people with such impairments are prohibited from piloting an aircraft.[6]

It is certainly necessary to autopsy the pilot and/or copilot for evidence of natural disease or toxicological issues that may have impaired their ability to fly the plane or even incapacitated them. The finding of a recent or remote myocardial infarct or severe coronary artery atherosclerosis could be evidence to support a theory that the pilot became unresponsive and lost control of the plane. Of course, the medical evidence must be combined with the investigative information and the findings evaluated in the context of the complete case evaluation. If the pilot has significant cardiac disease, and there are no witnesses to the incident, the possibility remains in most cases that the pilot may have become incapacitated.[7] However, autopsy findings may not necessarily guarantee that the crash was caused by natural disease.

Evaluation of the hands and feet of the pilot should be directed at injuries consistent with these appendages having been on the controls of the plane (*control surface injuries*). Such injuries include lacerations and fractures; however, one must be cautioned that these are non-specific. Examination of the hands and feet can be aided by radiography.

### The flight crew and passengers

Ideally, all victims of aviation crashes should be autopsied. It is important to autopsy aircraft passengers for three main reasons: to help with accident reconstruction, to help with the evaluation of safety equipment, and to help with the resolution of civil and/or criminal processes that may occur in the future.[8]

In crashes of planes with many passengers, the pattern of injuries in the passengers is usually either uniform or has a steady logical gradation of injury.[8] Any deviation from these patterns may reflect that either different parts of the aircraft were subjected to differing stresses, or that there might have been an explosion. An in-flight explosion may be reflected on the body surface as specific lesions or as foreign material embedded in the body,[6] not unlike a bomb explosion on land, but complicated by additional injury from the subsequent crash. X-rays are useful to locate bomb fragments embedded in bodies. Injuries to specific areas of an intact body may be helpful in determining in-cabin hazards that proved fatal in an otherwise potentially survivable crash.[6]

Autopsies of the passengers of an aircraft can yield information useful to understanding how the crash occurred. In most cases, the victims are dead at the scene or died during transport and the cause of death is multiple blunt force injuries resulting from severe deceleration forces.[2] However, other factors to consider are whether or not there was a fire in the cabin (evidenced by elevated blood carboxyhemoglobin levels), and whether any of the victims drowned (if the crash occurred in a watery environment). Victims found dead in water may have also drowned or may have suffered from hypothermia if the immersion was in cold water for a prolonged amount of time.[9] Victims may have died before impact because of hypoxia resulting from high-altitude flight without adequate life-support oxygen systems.[6]

Because aircraft travel at high velocities and may crash to the earth with extremely rapid deceleration forces (often in the magnitude of several hundred g-forces), it is not surprising that the body is often severely fragmented, precluding a detailed examination of much of the tissue.[6,10] In cases such as this, the most significant challenges become body identification and collection of adequate toxicological specimens.

## Identification of victims

Visual identification is often of little, if any, value because of the severe degree of injury usually encountered. Dental examination has proven to be most useful in the positive identification of bodies from airplane crashes, particularly if the body is burned and/or fragmented.[4,11] Knowing this, recovery personnel should exercise caution in body removal and transport to help preserve the dental remains. Fingerprints are useful in noncharred bodies, and matches can be made to fingerprints on file or to latent prints obtained from the victim's possessions or residence. Other means of identification include x-ray comparison of bones, characteristic tattoos, or other unique physical features. Identification by DNA is the standby should other methods fail.

## Toxicology (the TOXBOX)

One of the most important aspects in the investigation of an airplane crash is toxicological analysis of the pilot's body fluids and/or organs. In aircraft fatalities occurring in the United States, liquid and solid biological samples recovered from autopsy are sent to the Federal Aviation Administration's Civil Aerospace Medical Institute for analysis.[12] The specimens are collected in prepackaged boxes containing test tubes (vacutainers), specimen bags, syringes, and needles. This type of box is referred to as a *TOXBOX* and can be supplied in advance to medical examiner departments so that they are available in the event of a crash.[12] If additional boxes are needed, they can be obtained by air courier the next day.[12] Collected biological samples include blood, urine, vitreous fluid, spinal fluid, bile, gastric contents, liver, muscle, spleen, lung, kidney, brain, and heart tissue.

In crashes of crop dusting or agricultural spraying planes, one should be aware of potential pilot intoxication by pesticides or other chemicals.[6] Intoxication by drugs and/or chemicals may not necessarily lead to incapacitation, but may cause impaired judgment and/or slowed response times. Cyanide gas produced by the combustion of plastic materials may cause rapid asphyxia. As mentioned earlier, elevated blood carboxyhemoglobin levels in the pilot and flight crew and/or passengers will be reflective of an in-cabin fire and vitality at the time of the fire.

## Manner of death determination

Investigators must entertain all manners of death during the course of their evaluation. Although uncommon, the pilot may have been killed, possibly by a suicidal passenger, or by a hijacker who failed to take adequate control of the airplane. Homicide and insurance fraud may be attempted with the crash intended to hide the evidence.[6] A case in which the pilot was shot has been the subject of a case report.[13] Sabotage/hijacking is not uncommon and must be considered in every unexplained crash.[8] Suicides have been identified in those where the plane was purposefully crashed.[6]

### Small plane crash

A twin-engine personal airplane rolled just after takeoff. Its engines made a sputtering sound, and then the plane was observed to dive nose first into the ground. The pilot (who was the only occupant) was killed instantly. At the scene, there was extensive damage to the front part of the plane (**Image 12.1**) and a depression consistent with an impact site had been made in the ground (**Image 12.2**). The pilot was located in the left seat of the cockpit, and a safety belt was around his waist (**Image 12.3**).

At autopsy, there was severe multiple blunt force injuries (**Image 12.4**) including severe crush injury of the head, lacerations of the liver (**Image 12.5**), and lacerations of the heart (**Image 12.6**).

The lower legs had open, displaced fractures (**Image 12.7**), as did the right wrist (**Image 12.8**). X-rays were taken of the hands (**Image 12.9**) and the feet (**Image 12.10**) to further document any injuries that might be consistent with his hands and feet having been at the controls when the plane crashed. The totality of investigative data suggested an accidental manner of death.

## Falls to earth

### Stowaways

A rare occurrence, but one that does happen occasionally near busy airports, is the discovery of a body with severe blunt force injuries of no convincing etiology. If investigators remain at the scene of such an occurrence long enough to hear airplanes passing overhead, one may realize that the body might be that of a wheel-well stowaway who either lost consciousness and fell to the ground or was dropped to the ground when the bottom compartment was opened to release the plane's landing gear. The wheel-well region is an inhospitable environment, and the stowaway may lose consciousness from a combination of hypoxia and hypothermia.[14]

### Parachute deaths

When one jumps from an airplane, helicopter, blimp, high bridge, or other great height, death is likely to occur unless the person's descent is slowed in a controlled manner by a parachute. A number of factors can lead to a death during parachuting, including improperly functioning equipment, hazardous environmental

292    Aviation



12.1



12.4



12.2



12.5



12.3



12.6



12.7



12.9



12.8



12.10

conditions, inexperience, entanglement with other parachuters, power lines, or other objects, and incapacitation by natural disease.

Two men were parachuting together when their lines became tangled, and they fell to the ground at high speeds. In one of the men, note the obviously broken bones in the legs (**Image 12.11**). An x-ray of the pelvis showed manifestations of severe vertical impact, including a displaced fracture of the shaft of the left femur and dislocation of the head of the right femur. Note the extensive displaced rib fractures and lung lacerations (**Image 12.12**).

Survival with only minor injury has occasionally been observed in people falling to the earth from damaged aircraft. In these instances, their diminished severity of injury is likely related to extended terminal deceleration time with softened impact from falls onto snow or plowed soil.[6] Suicide by skydiving has been reported in those who purposefully failed to open their parachutes and had left suicide notes.[6]

## Investigation of mass disasters

General principles apply to all mass disasters. After any catastrophic event, whether natural or man-made, once the scene is safe for emergency response personnel to enter, the *search and rescue* mission is undertaken to find all survivors. When it becomes obvious that no survivors remain, the *search and recovery* mission begins. Because airlines fly everywhere, airplane catastrophes can occur in the air, on land, or in the water. Search and recovery efforts must be tailored to the individual mass disaster, including airplane crashes, but some of the general principles that apply to all mass disasters are illustrated next by examining the crash of an airplane carrying 110 passengers and crew members into subtropic swamp land.

Search and recovery workers must first be protected against potential hazards of the scene to which they will be exposed. Appropriate personnel protective





equipment for the biohazards and jet fuel at this particular scene included Tyvek suits, chest-high waders, latex or rubber gloves, heavy duty work gloves, hats and sunblock for sun protection, safety goggles, and masks. Insect repellent was available for workers who wanted it. Life jackets were not used once it was determined that the water was no deeper than the upper thigh. Decontamination procedures were strictly enforced when workers returned to the staging area from the scene. Masks, latex gloves, and Tyvek suits were discarded, and hats, goggles, waders, and heavy-duty work gloves were decontaminated with a bleach solution and recycled (**Image 12.13**).

No intact bodies were recovered. Clothing and jewelry were kept on recovered body parts until they could be photographed and processed in the morgue, in order to maintain the association of specific personal effects with specific body parts; the integrity of this association greatly facilitated the identification of the remains.

This lower extremity was in a torn trouser leg that had a wallet remaining in a pocket (**Image 12.14**). A ring was on one of the fingers of this recovered hand (**Image 12.15**). The few portions of dental specimens recovered were radiographed and charted by a forensic odontologist (**Image 12.16**).

All remains that had portions of bone were radiographed. Radiographs were instrumental in identifying the seven children who were aboard the aircraft. A forensic anthropologist assisted in the interpretation of radiographs for such features as ossification centers, and also examined the bones from the children to correlate the findings (**Image 12.17**). The children were able to be distinguished according to osteologic age. Radiographs also identified orthopedic hardware in partially defleshed bones. Recovered hardware was compared with antemortem radiographs (**Image 12.18**). Specimens from appropriate remains were retained for DNA profiling. Relatively uncontaminated, preserved pink muscle

was located by incising the dorsum of the hand (**Image 12.19**).

Remains that were identified, regardless of the size of the body part, were treate in a dignified fashion and placed in a regular-size coffin before being shipped to families. Unidentifiable remains such as skin and connective tissue were placed in coffins and buried in a plot designated for the victims of the airplane crash (**Image 12.20**). Potentially identifiable remains such as fingers were entombed above ground at the same site.

Personal effects not associated with remains were cleaned and put on display at the memorial service held after the recovery efforts ceased. The items were receipted over to family members who could identify the items and wanted to have them as mementos (**Image 12.21**).

### Do

- Collect complete toxicology samples from the pilot (TOXBOX).
- Be aware of the many possible ways for identifying victims.
- Seek help when the scope of the disaster is greater than your department can handle.
- Consider that the crash may have been caused by natural disease in the pilot.
- Modify your department's mass disaster plan according to the disaster at hand.
- Collect pertinent information from the investigation performed by outside agencies (e.g., NTSB).

### Don't

- Forget to x-ray the hands and feet of the pilot.
- Exclude suicide or homicide until the investigation is completed.
- Panic in mass disasters.
- Forget to consider the safety of all personnel involved in the investigation.



12.13

12.16

12.14

12.17



12.15



12.18



12.19



12.20



12.21

## References

1. Mason JK. The importance of autopsy examination in major disasters. Ann Acad Med Singapore 1984;13:12–15.
2. Li G, Baker SP. Injury patterns in aviation-related fatalities. Implications for preventive strategies. Am J Forensic Med Pathol 1997;18:265–270.
3. McCormick MM. The National Transportation Safety Board and the investigation of civil aviation and transportation accidents. Am J Forensic Med Pathol 1980;1:239–243.
4. Dunne MJ, Jr., McMeekin RR. Joint Committee on Aviation Pathology: XV. Medical investigation of fatalities from aircraft-accident burns. Aviat Space Environ Med 1977;48:964–968.
5. McCormick MM. Joint Committee on Aviation Pathology: VIII. Medical investigator preparedness for aircraft accident investigation. Aviat Space Environ Med 1977;48:932–936.
6. Eckert WG, Reals WS. Air disaster investigation. Leg Med Annu 1978;57–70.
7. Ground KE. Joint Committee on Aviation Pathology: XIV. Ischaemic heart disease: a problem in aircraft accident reconstruction. Aviat Space Environ Med 1977;48:959–963.
8. Cullen SA, Turk EP. The value of postmortem examination of passengers in fatal aviation accidents. Aviat Space Environ Med 1980;51:1071–1073.
9. Thompson RL. Joint Committee on Aviation Pathology: VI. Cause of death in aircraft accidents: drowning vs. traumatic injuries. Aviat Space Environ Med 1977;48:924–928.
10. Hellerich U, Pollak S. Airplane crash. Traumatologic findings in cases of extreme body disintegration. Am J Forensic Med Pathol 1995;16:320–324.
11. Brannon RB, Morlang WM, Smith BC. The gander disaster: dental identification in a military tragedy. J Forensic Sci 2003;48:1331–1335.
12. Chaturvedi AK, Smith DR, Soper JW, Canfield DV, Whinnery JE. Characteristics and toxicological processing of postmortem pilot specimens from fatal civil aviation accidents. Aviat Space Environ Med 2003;74:252–259.
13. Gunther D, Ast FW, Troger HD, Kleemann WJ. Unexpected findings in the investigation of an airplane crash. Forensic Sci Int 1999;104:189–194.
14. Thogmartin JR. Fatal fall of an aircraft stowaway: a demonstration of the importance of death scene investigation. J Forensic Sci 2000;45:211–215.

# 13 Death in Custody

*David Dolinak, M.D.*
*Emma Lew, M.D.*
*Evan Matshes, M.D.*

TYPES OF DEATH IN CUSTODY    297
    Natural disease    297
    Drug-related (toxic) death    299
    Suicidal hanging    299
    Blunt force injuries    299
    Harbored injury resulting in death while
      incarcerated    300
INCONGRUITY BETWEEN INCIDENT ACCOUNT AND
    PHYSICAL INJURY    302
    Correlation of scene and autopsy
      findings    304
POLICE-INVOLVED SHOOTING    306
DEATHS OCCURRING DURING OR SHORTLY AFTER
    A VIOLENT STRUGGLE    307

The nature of the struggle and subsequent collapse
    and death    307
More on physiologic stress    308
More on cocaine and methamphetamine
    toxicity    308
"Hog-tying"    309
Neck holds    309
    Autopsy findings in struggle-related deaths    310
RESTRAINT AIDS    310
    Pepper (OC) spray    310
    Electrical weapons    310
    Summary of restraint deaths    311
"NEGATIVE" PHOTOGRAPHS    311
REFERENCES    316

The label *death in custody* refers to all deaths that occur while an individual is a prisoner or ward of the state. Although people most commonly envision "death in prison cells," any death that occurs during arrest, in the backseat of a police car, in a rehabilitation facility, or even in a hospital, days, weeks or months after an altercation qualifies as a death in custody. Although the majority of cases will be due to or somehow related to a natural process, others are the consequence of varying forms of violence or asphyxiation. Deaths that occur while being restrained by police are often due to a combination of factors and require a detailed case investigation.

Deaths in jail may also be related to drugs that were consumed just before being arrested, or drugs that were illicitly brought into jail and consumed while incarcerated. Because it is not uncommon for alcoholics to be arrested, custody deaths related to complications of chronic alcoholism are not uncommon and may include seizure disorder, delirium tremens, and other effects of chronic ethanolism that can lead to an unexpected death. Deaths that occur while in custody are varied and, based on the nature of the case, require graded degrees of thoroughness in investigation and autopsy detail. Regardless of the apparent nature of the case, one must evaluate whether or not foul play and/or injury was a factor in the death. The autopsy of a person who dies while in custody provides closure to the family and ends speculation as to the nature of his or her demise.

## Types of death in custody

### Natural disease

Many people who die while in custody die suddenly and unexpectedly of natural disease processes, the most common of which are atherosclerotic cardiovascular disease and hypertensive cardiovascular disease. The autopsy allows for proper certification of the cause and manner of death and ends speculation about other causes of death and possible injuries. The autopsy is also important from the infectious disease standpoint, because it may uncover tuberculosis, meningitis, or other

infectious diseases that might have been transmitted to others in close quarters.

People with significant known and documented natural disease who die while in jail or prison should also be autopsied, even though the likely cause of death may already be known. The autopsy is important not only to exclude unknown injury, but also to document the nature and extent of the known natural disease. Toxicologic analysis of these individuals is important not only to evaluate for drugs of abuse, but also to determine if they were consuming their prescribed medications while in custody. These factors are important to document, because family members may question whether or not they were receiving proper care while in jail or prison.

The prisoner should be monitored for signs of impending medical deterioration and changes in neurologic status that may accompany a variety of natural disease processes. A change in mental status may also alert one to the possibility of an expanding subdural hematoma or other traumatic brain injury, which can occur in alcoholics who are injured before being arrested.

A man was arrested for trespassing, and because he exhibited bizarre, irrational behavior, he was placed under suicide watch. Three days later, he stopped speaking and became incontinent of urine and stool. He was admitted to hospital, but deteriorated and died 4 days after admission. Autopsy disclosed intracranial pathology. Pale green purulent exudate filled the right subdural space (**Image 13.1**). The exudate originated from a right intracerebral abscess that had dissected through the cerebral cortex into the subdural space (**Image 13.2**). The soft, swollen brain had accentuated friability of the right cerebrum, which disintegrated with handling. Green and dark red discoloration is noted on the ventral aspect of the brain (**Image 13.3**). Purulent exudate in the right middle ear (**Image 13.4**) tracked through the base of the skull to the sella turcica (**Image 13.5**) and progressed

down the spinal canal to the cauda equina (**Image 13.6**). This inmate's behavioral abnormalities stemmed from an organic lesion in his brain. There was no evidence that trauma was a factor in his death.



13.2



13.3



13.1



13.4

### Drug-related (toxic) death

It is not unusual for those with illicit drugs in their possession to quickly swallow the drugs to avoid detection ("body stuffer") on confrontation with law enforcement officers. In this scenario, the toxic effects of the drugs may become evident only hours later, while in jail, where the person may die suddenly and unexpectedly from the toxic effects of drugs. Because the drugs involved most commonly are either cocaine or methamphetamine, the prisoner should be monitored for characteristic symptoms of cocaine and methamphetamine toxicity, which include sweating, hyperthermia, tremor, altered mental status, and seizure. Decreased responsiveness or coma may be induced by heroin. At autopsy, one must ensure that proper toxicologic specimens are collected, which includes gastric contents. One may also find small plastic drug baggies and/or little "rocks" of drug in the stomach, duodenum, or other segments of the intestine.

### Suicidal hanging

The suicide rate in jail is approximately 10 times higher than that of the general population, and suicides most commonly occur during the first 24 hours of confinement,[1] usually in an intoxicated person. In one review of 52 hanging deaths in jail, 33 (63 percent) occurred during the inmate's first day in jail.[1] The victim often does not have a history of mental illness or previous suicide attempts. Hanging is the most common means of committing suicide when in jail, followed by wrist cutting. When investigating hangings in jail, the resourcefulness and determination of a person to hang himself or herself becomes evident. Because any type of clothing that could be made into a ligature (such as a belt and shoestrings) is usually confiscated on confinement, the detainee must resort to making a ligature from articles of remaining clothing or bedding.

Hangings in jail using telephone cords have been described.[2] In this scenario, the telephone cord is looped around the neck and the receiver cinched underneath the chin while the person slumps to the ground under the phone. Note the telephone cord looped around the neck of this woman who hanged herself in jail (**Image 13.7**). Of course, the most important aspect of the autopsy in a jail hanging is to determine whether the autopsy findings are consistent with the scenario. Investigators must rule out other causes of death and ensure that there are no indications of foul play (see also Chapter 8).

### Blunt force injuries

People can sustain significant and even fatal injuries while incarcerated. Homicidal assault related to beatings from law enforcement officers, prison personnel or other inmates, and stabbings from other inmates are rare, but



13.5



13.6



13.7

fatal incidents do occur and need to be thoroughly investigated.

Inmates in neighboring cells were awakened in the middle of the night by screams and noise coming from one of the cells (**Image 13.8**). When the guards opened the electronic door of the cell, one of the two cellmates staggered out covered in blood (**Image 13.9**). He collapsed after taking a few steps past his cell door and was taken to the prison infirmary where he died. Blood was on the walls inside the cell and was more abundant on the floor near the door (**Image 13.10**). The heaviest blood stains were on the inside of the door and adjacent floor (**Image 13.11**).

Autopsy disclosed abrasions on the torso and extremities and facial ecchymoses, abrasions, and lacerations. The right posterior parietal scalp had a laceration, and there was subgaleal and temporalis muscle blood extravasation. He had a small amount of subarachnoid hemorrhage and cerebral swelling. The cause of death was attributed to blunt force head injury with a contributory condition of acute psychotic reaction associated with schizophrenia. The manner of death was homicide.

The decedent's cellmate was 6 feet 3 inches tall and weighed 260 pounds. The cellmate occupied the lower bunk bed, and was awakened by the younger, smaller inmate who was beating and trying to strangle the sleeping cellmate. The cellmate fought back, inflicting blunt trauma on his attacker before the prison guards opened the cell door. The decedent had a history of psychiatric problems.

## Harbored injury resulting in death while incarcerated

Those who are incarcerated may have injuries that were sustained before they were arrested or sustained during the arrest. They may harbor these injuries silently and unbeknownst to others, for some period of time, until their injury progresses enough to cause significant symptoms and lead to death. The individual may die while in jail or after admission from the jail to a hospital. The individual may be intoxicated by alcohol and/or drugs and may not be able to provide a reliable history. Additionally, it may be difficult to differentiate the symptoms due to injury from the effects of alcohol and/or drug toxicity. For this reason, it is important for jail personnel to monitor the physical and mental condition of the inmates.

A man was arrested for heroin possession and attempted to escape from the police station. He was forcibly subdued, and although he complained of left rib pain during the scuffle, he did not complain after he was



13.9



13.8

13.10

incarcerated. Over the course of 5 days in jail, he did not ask for medical attention. On the fifth day, he complained of abdominal pain and collapsed. Cardiopulmonary resuscitation was attempted but he died.

Autopsy disclosed no evidence of external injury, although the abdomen was distended. Internally, ecchymoses surrounded lateral fractures of the left lower ribs. The intraperitoneal organs and tissues were bathed in a 2,700-milliliter hemoperitoneum. A blood clot was lightly adherent to a splenic hilar laceration (**Image 13.12**). A splenic subcapsular laceration was more extensive intraparenchymally (**Image 13.13**). An ecchymosis surrounded the duodenum and head of the pancreas, indicating blunt trauma to the center of the abdomen (**Image 13.14**). A left retrosternal ecchymosis infiltrating

the anterior aspect of the pericardial sac was from the attempted cardiopulmonary resuscitation. Bilateral anterolateral rib fractures from attempted cardiopulmonary resuscitation were associated with little ecchymosis, but had to be differentiated from the lower left rib fractures (**Image 13.15**). Microscopically, the lower left



13.13



13.11



13.14



13.12



13.15



13.16



13.17

rib fractures showed evidence of early healing. The bilateral anterolateral rib fractures were fresh, with no evidence of healing.

A man who died in jail had a convoluted history. Prior to incarceration, the man borrowed a coat hanger from a homeowner, telling the homeowner that he needed the coat hanger to get into his locked vehicle. Minutes later, a neighbor telephoned the homeowner that a man was trying to break into the homeowner's vehicle. The homeowner chased the would-be thief into the street where the homeowner hit the other man on the head with a baseball bat, causing the struck man to collapse. The homeowner dragged the stunned man by his ankles off the road, out of traffic, bumping his head on the curb. He died a few days later in jail.

Autopsy disclosed not one, but two scalp lacerations. The second laceration was linear, sutured, and overlay a depressed linear skull fracture. The leptomeninges were clouded by exudate, indicative of meningitis (**Image 13.16**). A third laceration involved the right eyebrow. The eyes had no ecchymoses. Ecchymoses were on the extremities. Anterior and posterior neck dissections disclosed no injuries.

To retrace the events leading to this man's death, investigators went to the jail, and interviewed the employees who were working the night the decedent was booked into jail. One guard remembered the man tripping and falling, striking his head on the corner of a desk, thereby sustaining the eyebrow laceration. Inside his jail cell, the prisoner fell again, striking his head against the metal bars of the cell (**Image 13.17**), sustaining the compound linear skull fracture. A prison nurse had come to the cell to clean and suture the scalp laceration; the linear fracture was not diagnosed until autopsy.

Deaths occurring while in jail should be autopsied, not only to document physical injury and to estimate how long one might have had that injury and what the symptoms might have been, but also to document complications of the injury, other undetected injuries, and the absence of injury. This becomes particularly important in individuals who have had multiple traumatic events before arrest, during the arrest, and during incarceration. Sometimes, one cannot provide specific interpretation of the injuries, but an autopsy at least allows documentation and possible correlation of the injuries with their symptoms.

Alcoholics and other inmates may sustain a head injury before being arrested, and may have the effects of an enlarging subdural hematoma or other complication become evident hours or days later while incarcerated. Regardless of the nature of the head injury, which may have resulted from a fall, an assault, or from other mechanisms, the prisoner should be watched for signs of impending medical deterioration and changes in neurologic status due to drugs and/or injury. A significant change in neurologic status should be evaluated promptly.

## Incongruity between incident account and physical injury

An autopsy should not be performed without information about the circumstances of death. As such, medical examiners must trust in the accuracy of the initial investigative information. However, one must be aware of, and document, any anatomical findings that are out of keeping with the alleged history of events. Forensic pathologists should be knowledgeable of the proper chain of command through which to report findings consistent with maltreatment by law enforcement personnel.

Police officers gave statements that an injured man who was transported to hospital was a motorcyclist involved in a traffic accident. The intact helmet showed only scratches on the left side (**Image 13.18**) and the back (**Image 13.19**). The motorcyclist died in hospital and his









body was transported to the medical examiner for an autopsy. The head was wrapped in gauze dressings, somewhat unexpected for a motorcyclist whose helmet was intact (**Image 13.20**). Underneath the dressings were several sutured scalp lacerations that were on different locations on the head (**Image 13.21**). These multiple separate and distinct lacerations were not consistent with a motorcyclist wearing a helmet that sustained only scratches.

Intracranially, a comminuted fracture involved the left and right orbital plates. Another fracture extended posteriorly from the right anterior cranial fossa and crossed the right middle and posterior cranial fossae to the right occiput; this fracture was consistent with the back of the head being supported (probably on the ground) as a force was delivered to the forehead or frontal bones (**Image 13.22**). The findings were not consistent with a motorcycle accident, but were consistent with inflicted injuries from a beating.

It is important to correlate autopsy findings with the given accounts of an incident. In this case, it was important to recognize an incongruity between the reported



mechanism of injury (motorcycle accident) and the injuries identified at autopsy, which were more consistent with a beating. Examination of the helmet and the circumstances of the case provided information that contributed to proper interpretation of the autopsy findings.

### Correlation of scene and autopsy findings

Correlation of scene information and autopsy findings often helps provide a better understanding of a person's demise. In the following case, consideration of the scene or autopsy individually and in isolation would not have been as useful as the synthesis of the two together in gaining an understanding of the individual's death.

Undercover police officers paid a visit to the house of a drug dealer (**Image 13.23**). The visit left the drug dealer feeling unwell, and he was admitted to a hospital where he later died. The scene at the drug dealer's house was investigated. A significant amount of blood in suspicious patterns and distributions indicated a violent interaction between the drug dealer and his police visitors. A patch of blood was on the bed, by the head of the bed; blood was also on the wall by the head of the bed and along the right of the bed (**Image 13.24**). Another wall had blood in dripping trails and a smear with a smudge pattern consistent with hair (**Image 13.25**).

The body was bloody, with most of the blood covering the face. An abraded laceration was on the fractured bridge of the ecchymotic nose. Multiple other abrasions on the face were patterned focally. Because the patterned abrasions were suggestive of the treads from the sole of a shoe, the shoes of the officers involved in the home "visit" were impounded. The shoes of one of the officers had soles with a tread pattern that matched the patterned abrasions on the dead man's face (**Image 13.26**).

The autopsy and scene both provided important information leading to the resolution of this case. The bloody scene was evidence of violence. The autopsy documented physical injuries, the most significant of which was a patterned abrasion that helped link a person to the assault. If the scene was considered without the autopsy



13.23



13.25



13.24



13.26

findings (and vice versa), resolution of the case would have been more difficult.

A man was arrested in his high-rise apartment. After he was handcuffed behind his back, he ran to the balcony and hurled himself over the balcony wall, landing on the ground eight stories below (**Images 13.27 and 13.28**). The right forearm was fractured and the handcuff bracelet was still around the right wrist (**Image 13.29**). The left handcuff bracelet was broken (**Image 13.30**). A patterned injury with abrasions and focal laceration on the lower back was consistent with the broken edges of the left handcuff bracelet, indicating that he landed on his back, on top of his handcuffed wrists (**Image 13.31**). An abraded laceration on the occipital scalp was associated with an occipital fracture. A swollen purple ecchymosis

of the left upper eyelid (**Image 13.32**) was associated with a fracture of the left orbital plate (**Image 13.33**), and was not from direct blunt trauma to the eye. As discussed in Chapter 5, this is a consequence of blood tracking through fascial planes after orbital plate fracture.

Recognizing that the injuries related to the fall were consistent with the man landing on his back, and that the



13.29



13.27



13.30



13.31

13.28













left eye ecchymosis was also related to the fall, helped to exclude the possibility of inflicted injury. Although the autopsy findings are consistent with a fall from eight stories, the circumstances of the fall are clarified through meticulous investigation.

## Police-involved shooting

A prisoner with a long criminal history escaped custody. Several days later, he was spotted in the right front seat of his girlfriend's car. Police surrounded the vehicle. Once one shot was fired from inside the vehicle, the surrounding officers all fired into the vehicle (**Image 13.34**). When the shooting stopped, the escapee was dead in the right front seat; his girlfriend fled from the vehicle before the first shot was fired. Because so many rounds had been fired into the car, the body was left inside the vehicle while dowels were positioned to demonstrate the paths of projectiles through the vehicle (**Image 13.35**). This also facilitated the demonstration of gunshot wounds through the body, allowing for the correlation of specific projectile paths into the car with the placement

of specific gunshot wounds on the body (**Image 13.36**). The exact pathways of all gunshot wounds were determined at autopsy.

In addition to multiple gunshot wounds inflicted by the shooting officers, there was a single contact gunshot



13.37

wound to the left front of the chest (**Image 13.37**) that perforated the left cardiac ventricle. This contact gunshot wound was self-inflicted and would have been lethal in and of itself; it was also the first shot that was fired, coming from inside the vehicle. It was evident that he bled from the gunshot wounds fired by the officers. Because he was alive when he sustained the wounds inflicted by the officers, and those wounds therefore contributed to death, the manner of death was homicide.

In police-related shootings, it is important to know how many shooters there were, how many shots each officer fired, what type of ammunition was used, and the location of the shooters in relation to the victim. If the subject is dead at the scene, photographic documentation from multiple vantage points will help in the reconstruction and analysis of the events leading up to the shooting. If the injured subject has been transported to the hospital, it may still be advantageous to visit the scene to gain a better appreciation of the events that transpired. In this scenario, be sure that all of the clothing that might have been removed during resuscitation attempts are accounted for and that no clothing was discarded by hospital personnel, because the clothing may prove valuable in sorting out entrance/exit wounds and help determine range of fire.

## Deaths occurring during or shortly after a violent struggle

Whereas the autopsy will usually identify *structural* changes to the body such as physical injuries and natural disease, *functional* mechanisms of death or functional contributors to death such as physiologic and psychologic stress may be less apparent or undetectable at autopsy, yet their overall contribution may be significant to the demise of the individual. That is, some deaths may be structural in origin and easily demonstrable at autopsy, whereas other deaths may be combined structural and functional or predominantly/entirely functional in origin and have few or no demonstrable gross findings (the "negative" autopsy).[3] As such, complete and detailed investigation of the course of events in a custody or restraint death will help guide one along the proper chain of events that led to the demise of an individual. This is important, because *in many custody or restraint-related deaths, physiologic processes have a prominent role in the death and are not necessarily identifiable at autopsy*. In fact, many of these deaths are the result of the combined effects of drugs and violent physical activity. (See also Chapters 21 and 22 for more on deaths occurring during or shortly after a violent struggle.)

### The nature of the struggle and subsequent collapse and death

Occasionally, an individual will become unresponsive and die either during or shortly following a physically intense struggle with law enforcement officers and/or other individuals. The struggle often arises when an agitated, excited, psychotic, or otherwise hyperactive person resists arrest. Often, such people are also hyperthermic and show great strength and resistance to pain.[4] These effects are not uncommonly due to the toxic effects of cocaine and/or methamphetamine abuse. In these cases, the most important factors in the death are likely endogenous physiologic effects of the struggle, combined with the effects of sympathomimetic drug abuse, the cumulative effects of which can cause acute cardiac dysrhythmia and sudden cardiac death. The individual may or may not have underlying heart disease, which could make him or her even more susceptible to such a sudden cardiac death.

Many times, the mechanism in these deaths is not known exactly. It is known, however, that during a struggle, an individual becomes tachycardic and hypertensive because of the release of catecholamines. These endogenous influences are stressful on the heart—a stress that is worsened by the sympathomimetic effects of drugs such as cocaine or methamphetamine, which act to further increase the epinephrine and norepinephrine levels. Cocaine promotes increased activity of catecholamines such as norepinephrine and epinephrine and increases the activity of dopamine and serotonin.[5] Specifically, cocaine inhibits the reuptake of norepinephrine in the synaptic cleft.[6] Methamphetamine promotes increased release of norepinephrine from the synaptic cleft into the general circulation.[5,6] Methamphetamine also promotes the release of dopamine and serotonin.[5]

In addition to the increased physiologic and drug-induced stress placed on the heart, the physical activity of a violent struggle increases the oxygen demand of the heart. For various reasons, including antecedent disease and various forms of asphyxia associated with forceful restraint by law enforcement officers, the heart may have

a limited supply of oxygen.[4,7] These deaths often involve police personnel and sometimes a myriad of other people trying to help subdue an agitated or violent person. Such situations occasionally occur in mental health facilities.[8]

Physical restraint may induce some degree of asphyxia in the individual, especially if he is in the prone position, is obese, and if his face is directly on the ground. The mechanism of asphyxia in many restraint cases generally often includes the effects of compression of the chest, restriction of chest movement, and body position. Any one of these three mechanisms of asphyxia, or a combination of any of them, may lead to a significant degree of asphyxia during physical restraint. The prone position may be particularly deleterious to an obese person following a struggle, because the pressure on the abdomen may impair excursion of the diaphragm, leading to impairment of the abdominal component of respiration and resultant asphyxia.

The individual often continues to struggle against restraint, further increasing his myocardial oxygen demand, which, when combined with the additive deleterious effects of sympathomimetic drug abuse and possible limited oxygen supply related to restraint-associated asphyxia, leads to metabolic acidosis and associated electrolyte abnormalities such as rapid fluctuations in potassium concentration.[9-12] These physiologic, drug, toxic, and asphyxial factors may synergistically culminate in acute cardiac dysrhythmia and sudden cardiac death. *The death often occurs not* **during a** *physical restraint procedure, but rather, soon* **following** *the restraint.* Often, the person will have lapsed into unconsciousness and then cardiopulmonary arrest soon *after* the struggle has ended. Fatal respiratory collapse may occur suddenly and without warning,[13] and sudden tranquility is a clue of possible impending cardiorespiratory arrest.

This "delayed" onset of cardiopulmonary arrest may be related to the fact that the highest level of catecholamines occurs during the first few minutes after cessation of physical activity, not during physical activity,[10,14] and this increase occurs at a time during which electrolyte fluctuations may be manifest. In human exercise studies, although the plasma epinephrine increased 7-fold and plasma norepinephrine increased 5-fold during exercise, both levels increased further during the first minute after cessation of exercise.[10] In another study involving humans, the plasma norepinephrine level in the recovery period increased 10-fold over baseline.[14] In the same study, plasma potassium levels rose during exercise and then fell rapidly minutes after exercise stopped.[10] The rise of plasma potassium during exercise and the rapid decline of plasma potassium after exercise has been identified in other human trials.[9,11] Hence, it is likely that the heart is most vulnerable to the combined effects of sympathomimetic activity and acute electrolyte changes (mainly potassium, which shows rapidly fluctuating levels) during the early minutes of the recovery phase. This has been termed the *post-exercise peril*[14] and the *vulnerable period*[10] and is believed to be implicated in sudden cardiac death.[9]

## More on physiologic stress

Metabolic acidosis may arise from numerous conditions, including stimulant drug use, physical exertion, and positional/mechanical asphyxia, in which the person is not able to ventilate adequately.[15] The metabolic acidosis (likely augmented by more than one condition) can then lead to rapid electrolyte fluctuations (including hypokalemia and/or hyperkalemia) and cause significant negative cardiovascular effects, including autonomic instability and the development of dysrhythmias, which may culminate in sudden cardiac death.[15] This is an important consideration because a hyperactive, psychotic, and/or delirious individual with an increased tolerance to pain may be able to achieve an incredible amount of exertion, perhaps near his physiologic limit, resulting in a dangerous, severely acidotic state.[15]

A person's physical limitations may compromise his ability to recover from severe physical exertion with all of its sequelae. In a study of 18 consecutive excited delirium sudden deaths after struggle and physical restraint, stimulant drug use was found in 78 percent, obesity in 56 percent, and significant natural disease in 56 percent of the cases.[16] In all of the cases, cardiopulmonary arrest was preceded by a short period of tranquility lasting an estimated 5 minutes or less in which the person developed a shallow or labored breathing pattern.[16]

## More on cocaine and methamphetamine toxicity

Although the complications of cocaine use are covered in the toxicology chapter and the excited delirium section, more detailed mention of its effects are worth noting again in this section, because it is commonly a significant factor in the demise of a restrained person in custody. Cocaine may cause coronary artery spasm and thrombosis,[17,18] although the exact mechanism of how this occurs is unknown. Coronary artery vasospasm and/or thrombosis, when combined with the increased myocardial oxygen demand induced by the sympathomimetic effects of cocaine and the physiologic stress of resisting restraint, contributes to myocardial ischemia and increases the risk of a fatal dysrhythmia.[17,19,20] Even though no critical coronary artery atherosclerosis may be demonstrable at autopsy, coronary artery vasospasm may make a previously minimally stenotic atherosclerotic lesion functionally significant. Cocaine has also been determined to prolong the QT interval and lead to lethal ventricular dysrhythmias.[21] Chronic cocaine use also appears to contribute to an increase in heart

weight,[22] further increasing the oxygen demands of the heart. Other sympathomimetic drugs such as methamphetamine may have similar effects and can precipitate bizarre, violent behavior followed by sudden death.

In summary, many factors need to be considered that either alone or in combination may lead to the death of a person either during or, more commonly, shortly after a violent struggle. These factors include drug toxicity, the physiologic effects of stress, mechanical, positional, or other forms of asphyxia ("restraint asphyxia"), trauma, natural disease, and occasionally psychiatric illness. Every situation is unique, and classification depends on a thorough investigation that includes a detailed, complete autopsy and toxicology. Depending on the circumstances of the case, the death may be attributed to the effects of asphyxia, drug toxicity, natural disease, or another factor. However, most of the time, the situation is more complex, involving different factors in combination, and the challenge lies in identifying which factors are significant and how they cumulatively resulted in the death of an individual.

## "Hog-tying"

Hog-tying, also known as the *total appendage restraint procedure* (TARP),[16] is a type of physical restraint in which subjects are placed in the prone position with their wrists and ankles bound behind their back and secured by a cord.[7] During or shortly after the restraining process, the subject may rarely develop difficulty breathing or may be found unresponsive. When this occurs, his or her condition is often refractory to resuscitation attempts.

Asphyxia is reported to be a significant factor in this type of death, whether from the hog-tying position itself, from chest compression, from the prone position, or from a combination of these and/or other types of asphyxia. However, in some studies, experiments with healthy unintoxicated human volunteers have demonstrated that those undergoing hog-tying or hobble restraints do not develop hypoxia or hypercapnia.[23,24] This is not to say that prone positioning of an individual or hog-tying of an individual is without deleterious effects on the body, because each situation must be analyzed on its own merits. Quite often, these deaths are not solely asphyxial in nature, but rather, there is an interplay between varying degrees of asphyxia with heart disease, sympathomimetic drug abuse, and the body's physiologic response to stress and exertion. During patient transport by emergency medical services, the supine or lateral body position is encouraged rather than the prone position to limit the possible deleterious effects that mechanical/positional asphyxia may have on respiration.[25]

## Neck holds

Two general types of neck holds are used to help restrain violent people: the choke hold and the lateral vascular neck restraint (LVNR) or "carotid sleeper."

### Choke hold

A *choke hold* compresses and obstructs the airway. It is usually applied by standing behind a person, wrapping one's arm around the neck of the person, and then pulling one's forearm onto the front of the person's neck, compressing it (**Image 13.38**). The person becomes subdued due to a lack of adequate oxygen because of compression of the trachea, which hinders breathing.

### Lateral vascular neck restraint

The LVNR is usually applied by standing behind a person and wrapping an arm around his or her neck so that the neck is within the angle of the upper arm and the forearm (**Image 13.39**). The forearm is then pulled toward the upper arm, compressing the carotid arteries (and jugular veins) at the sides of the neck. A transient state of unconsciousness occurs because of inadequate blood flow to the brain[26]; on release of the hold, blood flow is reestablished, and consciousness is restored. In one study, the LVNR caused symptoms within seconds



13.38



13.39

of application to human volunteers. It also caused decreased blood flow to the face by 89 percent within an average of 6 seconds, with a quick return to baseline blood flow after release of the hold.[27] The LVNR may cause unconsciousness in 10 to 15 seconds.

### Note on carotid sinus stimulation

A factor to consider with any type of neck compression is stimulation of the carotid sinus, which is located just cephalad to the bifurcation of the common carotid arteries. Compression of the carotid sinus may result in bradycardia and rarely cardiac arrest.[26] As such, carotid sinus stimulation may be used to explain sudden death occurring rapidly after the application of a neck hold.[28] However, most descriptions of vagal stimulation under controlled conditions lead only to mild bradycardia and/or mild hypotension, and because most individuals involved in struggles are tachycardic and hypertensive, vagal stimulation will likely lead only to more normalized cardiovascular parameters or only mild bradycardia and hypotension.

*Death attributed to excessive vagal stimulation is not likely, and if it does occur, is probably restricted to an older individual with significant cardiovascular disease who was known to be symptomatic from previous episodes of carotid sinus stimulation such as fainting spells or dizziness associated with pressure on his or her neck.*

### Autopsy findings in struggle-related deaths

In cases involving restraint asphyxia, there may be no injury identified at autopsy. In cases involving physical restraint of an individual in the prone position, multiple factors can contribute to asphyxia, including compression of the chest, abdomen, or other body part, restriction of chest expansion, and positional asphyxia. Because either one of these factors, or a combination of these or other factors, may cause asphyxia, in such cases, a descriptive phrase such as "restraint asphyxia" may be used.[28] At autopsy of any cases suspected to involve at least some component of restraint asphyxia, one should perform detailed anterior and posterior neck dissections, noting and photographing hemorrhages in skeletal muscles and other soft tissues, and fractures of cartilage and/or bone. As in any other asphyxial death, petechiae and neck abrasions or contusions should be carefully documented. Deaths in which choke holds and/or the LVNR have been employed will often have evidence of internal neck injury such as blood extravasation in the subcutaneous tissues and/or anterior cervical strap muscles, possibly in combination with fractures of the hyoid bone and/or thyroid cartilage. This is not unusual, because when an individual struggles violently against restraint, injury of the neck very often results.

Incisions into the skin of the wrists, ankles, and any other regions bound by handcuffs or other ligatures may demonstrate blood extravasation (or the absence of blood), which may help support or refute a struggle. In addition, photography and examination of the anus, scrotum, testicles, or vagina will help confirm or refute allegations of sexual assault or other genital trauma.

## Restraint aids

Pepper spray and electrical weapons such as the Taser® and stun gun have been developed and utilized to provide sublethal means of subduing an individual. They are generally considered nonlethal and effective in temporarily incapacitating violent, potentially dangerous people, with minimal risk of injury to police officers or others using the devices and minimal risk to the subjects.

### Pepper (OC) spray

Oleoresin capsicum (OC) is an irritating, naturally occurring oil extract of hot pepper plants. Packaged and known as *pepper spray* or *OC spray*, it can be used in some circumstances to provide a less-than-lethal force to help subdue a violent person. Pepper sprays typically contain a 10 percent solution of OC diluted in a solvent and a gaseous propellant.[29] Exposure occurs via the eyes, through the skin, or inhalation with resultant skin pain and erythema, lacrimation, blepharospasm, and stinging in the eyes, coughing, rhinorrhea, and may possibly induce bronchospasm.[28,30,31] The effects last approximately 20 to 30 minutes.[31] In one study on human volunteers, some with asthma, lung disease, and smoking history, OC spray did not induce changes on pulmonary function tests, oxygenation, or ventilation.[32] There are no convincing data to indicate that OC spray is inherently lethal or otherwise dangerous.[28]

### Electrical weapons

Electrical weapons are designed to quickly shock and immobilize an individual, but not to inflict any serious bodily injury or cause death.[33] They are available in two basic forms: those that require the electrodes to be physically placed against a subject, that is, *stun guns*, and those that can shoot two electrodes from a gun-like device that can attach to a subject from a distance, the most common of which is referred to as the *Taser®* (Thomas A. Swift's Rifle). A stun gun is considered an electrical self-defense weapon, because its two electrodes must be physically placed on the skin or clothing of an individual to deliver an electrical current. In close encounters, a Taser can also function as a stun gun.

The Taser is a handheld device that is fired like a gun, using compressed nitrogen to shoot two small metal probes at 180 feet per second to a target. The two probes each remain individually attached to the gun by high-voltage insulated wire measuring either 15 or 21 feet long.[34] The probes superficially embed in the skin or

clothing, and the battery-powered gun then delivers an electrical charge for a few seconds or so along the two wires connecting the gun and the two probes. The probes do not need to make contact with skin; they can transmit the powerful electrical impulses through up to 2 inches of clothing.[34] However, both probes do need to make contact with the body or clothing for the electrical charge to be delivered.

Several models of the Taser and the stun gun have been produced. They generally deliver an electrical charge of up to approximately 50,000 volts and approximately 2 to 10 milliamps.[33,35,36] The electrical weapons are designed to stun individuals, causing them to lose control of their voluntary muscles, collapse, and remain dazed and sluggish for a few minutes.[33,37] The electrical current discharged by these weapons is not considered lethal when used on a healthy adult, but is not without potential risks. The capacity of an electrical weapon to cause death is the subject of much debate. Because they function by delivering an electrical shock, in certain susceptible people (such as those with severe heart disease), and under "the right circumstances," it is possible that these weapons might contribute to death. Their role in causing a cardiac dysrhythmia may be more convincing if the electrical current is delivered to the chest directly over the heart, as opposed to an arm or a leg,[35] and if the individual dies suddenly on discharge of the electrical shock. At autopsy, if the probes from a Taser have penetrated the skin and have been removed from the body, one will see two small superficial puncture wounds. After the firing of a stun gun, one may see two small red dot-like skin lesions approximately 2 centimeters apart[35] (see Chapter 7 for more information).

As in all deaths, and custody deaths in particular, all findings should be considered within the context of the complete case investigation before the pathologist offers opinions about their significance (or lack thereof). This would include the possible deleterious effects of electrical weapons. As mentioned earlier, individuals who die during physical restraint usually do so from a combination of factors, which often includes drug toxicity, physiologic stress, heart disease, and asphyxia.

### Summary of restraint deaths

Deaths that occur during or shortly after a violent struggle with physical restraint may have a single, clear cause of death. Most of the time, however, these types of death have many contributing factors that combine to result in an individual's demise, only some of which may be identifiable at autopsy. It is not unusual for these deaths to be multifactorial in etiology and attributable to a combination of factors including cocaine, methamphetamine, and/or other drug toxicity, the physiologic effects of stress, obesity, coronary artery disease, cardiac hypertrophy, physical injury, and various types of asphyxia. Detailed investigation from many sources will increase

one's ability to understand the entire dying process, including the factors that led to the need for restraint and why the death occurred.

In cases involving struggle with physical restraint, it is important to have a detailed timeline of the events, including both the duration and sequence of events, noting specifically what position the person was in when he became unconscious, how long he was in that position, and what resuscitative efforts were performed. Ideally, minute-by-minute accounts of the events as they unfolded are obtained as soon as possible after the incident has occurred, while the details are still fresh in the minds of the witnesses. Witness information may include police and fire rescue personnel and any independent witnesses to the event. The EMS and medical records, including vital signs, heart rhythms, level of consciousness, and other symptoms, should be carefully reviewed. Detailed investigation is necessary if one is to properly understand the circumstances of the death.

If a physical confrontation or altercation between an individual and one or more law enforcement officers results in injury or impairment that is clearly contributory to death, the manner of death can be ruled homicide. Medical examiners must understand that this is not reflective of *intent* to kill (murder) or indicative of culpability. As discussed in Chapter 30 and elsewhere, the certification of a death as a homicide is a medical decision (diagnosis) and not a decision with any direct legal implications.

## "Negative" photographs

As mentioned previously, photography is important to document the presence and absence of injury ("negative" photographs). This is particularly pertinent for in-custody or restraint-associated deaths. It is not possible to take too many photographs, and the autopsy should be approached and performed as if it were part of a homicide investigation.[28] The following is a collection of autopsy photographs that are useful for documenting pertinent negatives for in-custody death cases. The number of negative photographs taken will vary according to the circumstances of the case.

Complete, full-body, front and back photographs should be obtained. Do not attempt to document the whole "front" or "back" in one photograph; these regions of the body can be photographed in overlapping thirds, thus ensuring high-quality, well-lit, undistorted images that include the entire body from head to feet (**Images 13.40** through **13.45**).

A close-up facial photograph demonstrates the absence of any smaller injuries and may be used for legal identification (**Image 13.46**). Photographs of the mucosa of the upper and lower lips show a lack of injury to the



13.40



13.43



13.41



13.44



13.42



13.45









mouth (**Images 13.47** and **13.48**). Photographs of both eyes show the lack of petechiae (**Images 13.49** and **13.50**). In some cases, it may be advantageous to obtain photographs of the front, sides, and back of the neck to show the absence of external injury.

Photographs of the dorsal and palmar surfaces of *both* hands (**Images 13.51** and **13.52**) and the backs of *both* forearms (**Image 13.53**) show the absence of defensive-type injuries and handcuff marks.

A photograph of the chest plate and opened abdominal cavity show no bruising or hemorrhage (**Image 13.54**).

Photographs of the external genitalia show no injury (**Images 13.55** and **13.56**). A photograph of the anus shows no injury (**Image 13.57**). A photograph of the bottom of the feet shows no injury (**Image 13.58**).

Additional negative photographs can be tailored to individual cases. Photographs of the wrists and ankles can show the absence of handcuff marks. Furthermore, the medial and lateral aspects of the wrists and/or ankles and soles of the feet can be incised (approximately 2-inch incisions) to document the absence of underlying subcutaneous or skeletal muscle injury.

Additional negative photographs internally include the reflected scalp, the brain, the internal chest cavity (both before and after the removal of the parietal pleura), and photographs of the intact and cut surfaces of the testicles, showing no hemorrhage.


13.50


13.53


13.51


13.54


13.52


13.55

| Investigative questions for deaths related to physical restraint | |
|---|---|
| Determine the circumstances of the arrest/why the person needed restraining. | What were the person's respirations like and was he or she sweating an abnormal amount? |
| What was the person's behavior like and how did it change over time? | How do independent witnesses describe the events? |
| Who was doing the restraining (police, paramedics, family members, bystanders)? | What was the person's position during medical transport? (prone versus supine) |
| How many people were doing the restraining? | Was pepper spray or a Taser device used? |
| What was the position of the person when he or she was being restrained? | **Factors potentially not observable in a functional death** |
| | Hormone surges (epinephrine, norepinephrine) |
| What was the position of the restrainers? | Acute electrolyte fluctuations (particularly potassium) |
| How much was the person struggling? | Abnormalities in dopamine-related functions |
| What was the position of the person's body and the bodies of the restraining person(s) when he or she had a decrease in responsiveness? | Physiologic stress |
| | Psychologic stress |
| | Inherent cardiac dysrhythmia (Wolff-Parkinson-White syndrome, prolonged QT syndrome) |
| Was pressure placed on the upper torso? | Toxic effects of drugs (cocaine, methamphetamine) |
| How did the person's symptoms change over time and what treatment was administered? | Toxic drug–drug interactions |
| | Carotid sinus stimulation |



13.56

### Do

- Perform a complete autopsy, including a detailed, layered anterior neck dissection and a posterior neck dissection when indicated.
- Correlate all information including investigative data, autopsy results, and toxicology results before ruling on the cause of death and manner of death.
- Consider making a detailed timeline of the events leading to the person's death.
- Realize that cocaine and other drugs may be at a low level or metabolized, particularly if the person has been hospitalized after an event; analyzing hospital admission blood may be helpful.
- Carefully photograph not only injuries, but also the absence of certain injuries (pertinent negative photographs).



13.57



13.58

- Consider the influences of natural disease processes.
- Consider obtaining a core body temperature as close to the time of death as possible.
- Perform autopsies on inmates who died of suspected natural disease to verify natural disease and to exclude trauma or other foul play.
- Perform toxicologic studies of those who died while in custody.
- Consider the potential deleterious effects of rapid fluctuations of plasma potassium and other electrolytes and increased catecholamine concentrations on the heart following a violent struggle.

### Don't

- Expect the autopsy to provide all of the answers.
- Forget that these deaths are usually due to the combination of many factors, some of which are not identifiable at autopsy.
- Forget about potential psychiatric factors in the death.
- Forget to incise the wrists and/or ankles to help support or refute allegations of a struggle.
- Forget to examine the anus, scrotum, and testicles, or vagina for evidence of sexual assault.

## References

1. McKee GR. Lethal vs nonlethal suicide attempts in jail. Psychol Rep 1998;82(2):611–4.
2. Quinton RA, Dolinak D. Suicidal hangings in jail using telephone cords. J Forensic Sci 2003;48(5):1151–2.
3. Mirchandani HG, Rorke LB, Sekula-Perlman A, Hood IC. Cocaine-induced agitated delirium, forceful struggle, and minor head injury. A further definition of sudden death during restraint. Am J Forensic Med Pathol 1994;15(2):95–9.
4. Ross DL. Factors associated with excited delirium deaths in police custody. Mod Pathol 1998;11(11):1127–37.
5. Levine B, editor. *Principles of Forensic Toxicology*, 2 ed. Washington DC: AACC Press; 2003.
6. Karch S. *Karch's Pathology of Drug Abuse*, 3 ed. Boca Raton, FL: CRC Press; 2002.
7. O'Halloran KL, Lewman LV. Restraint asphyxiation in excited delirium. Am J Forensic Med Pathol 1993;14(4):289–95.
8. Siebert CF, Jr., Thogmartin JR. Restraint-related fatalities in mental health facilities: report of two cases. Am J Forensic Med Pathol 2000;21(3):210–2.
9. Lindinger MI. Potassium regulation during exercise and recovery in humans: implications for skeletal and cardiac muscle. J Mol Cell Cardiol 1995;27(4):1011–22.
10. Young DB, Srivastava TN, Fitzovich DE, Kivlighn SD, Hamaguchi M. Potassium and catecholamine concentrations in the immediate post exercise period. Am J Med Sci 1992;304(3):150–3.
11. Medbo JI, Sejersted OM. Plasma potassium changes with high intensity exercise. J Physiol 1990;421:105–22.
12. Lindinger MI, Heigenhauser GJ, McKelvie RS, Jones NL. Blood ion regulation during repeated maximal exercise and recovery in humans. Am J Physiol 1992;262(1 Pt 2):R126–36.
13. Wetli CV, Fishbain DA. Cocaine-induced psychosis and sudden death in recreational cocaine users. J Forensic Sci 1985;30(3):873–80.
14. Dimsdale JE, Hartley LH, Guiney T, Ruskin JN, Greenblatt D. Postexercise peril. Plasma catecholamines and exercise. JAMA 1984;251(5):630–2.
15. Hick JL, Smith SW, Lynch MT. Metabolic acidosis in restraint-associated cardiac arrest: a case series. Acad Emerg Med 1999;6(3):239–43.
16. Stratton SJ, Rogers C, Brickett K, Gruzinski G. Factors associated with sudden death of individuals requiring restraint for excited delirium. Am J Emerg Med 2001;19(3):187–91.
17. Virmani R, Robinowitz M, Smialek JE, Smyth DF. Cardiovascular effects of cocaine: an autopsy study of 40 patients. Am Heart J 1988;115(5):1068–76.
18. Kolodgie FD, Virmani R, Cornhill JF, Herderick EE, Smialek J. Increase in atherosclerosis and adventitial mast cells in cocaine abusers: an alternative mechanism of cocaine-associated coronary vasospasm and thrombosis. J Am Coll Cardiol 1991;17(7):1553–60.
19. Isner JM, Estes NA, 3rd, Thompson PD, Costanzo-Nordin MR, Subramanian R, Miller G, et al. Acute cardiac events temporally related to cocaine abuse. N Engl J Med 1986;315(23):1438–43.
20. Lange RA, Hillis LD. Cardiovascular complications of cocaine use. N Engl J Med 2001;345(5):351–8.
21. Gamouras GA, Monir G, Plunkitt K, Gursoy S, Dreifus LS. Cocaine abuse: repolarization abnormalities and ventricular arrhythmias. Am J Med Sci 2000;320(1):9–12.
22. Karch SB, Green GS, Young S. Myocardial hypertrophy and coronary artery disease in male cocaine users. J Forensic Sci 1995;40(4):591–5.
23. Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17(5):777–82.
24. Chan TC, Vilke GM, Neuman T, Clausen JL. Restraint position and positional asphyxia. Ann Emerg Med 1997;30(5):578–86.
25. Stratton SJ, Rogers C, Green K. Sudden death in individuals in hobble restraints during paramedic transport. Ann Emerg Med 1995;25(5):710–2.
26. Reay DT, Eisele JW. Death from law enforcement neck holds. Am J Forensic Med Pathol 1982;3(3):253–8.
27. Reay DT, Holloway GA, Jr. Changes in carotid blood flow produced by neck compression. Am J Forensic Med Pathol 1982;3(3):199–202.
28. Reay DT. Death in custody. Clin Lab Med 1998;18(1):1–22.
29. Reilly CA, Crouch DJ, Yost GS. Quantitative analysis of capsaicinoids in fresh peppers, oleoresin capsicum and pepper spray products. J Forensic Sci 2001;46(3):502–9.
30. Steffee CH, Lantz PE, Flannagan LM, Thompson RL, Jason DR. Oleoresin capsicum (pepper) spray and "in-custody deaths." Am J Forensic Med Pathol 1995;16(3):185–92.
31. Busker RW, van Helden HP. Toxicologic evaluation of pepper spray as a possible weapon for the Dutch police force: risk assessment and efficacy. Am J Forensic Med Pathol 1998;19(4):309–16.
32. Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, et al. The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function. J Forensic Sci 2002;47(2):299–304.
33. Kornblum RN, Reddy SK. Effects of the Taser in fatalities involving police confrontation. J Forensic Sci 1991;36(2):434–8.
34. 2004. Website http://www.taser.com.
35. Anders S, Junge M, Schulz F, Puschel K. Cutaneous current marks due to a stun gun injury. J Forensic Sci 2003;48(3):640–2.
36. Bleetman A, Steyn R, Lee C. Introduction of the Taser into British policing. Implications for UK emergency departments: an overview of electronic weaponry. Emerg Med J 2004;21(2):136–40.
37. O'Brien DJ. Electronic weaponry—a question of safety. Ann Emerg Med 1991;20(5):583–7.

# 14 Artifacts of Resuscitation and Complications of Medical Therapy

*Michael D. Bell, M.D.*
*David Dolinak, M.D.*

**ARTIFACTS OF RESUSCITATION    317**
   Medical tape    318
   Needle punctures    318
   Endotracheal intubation    318
   Combitube    320
   Tracheostomy/cricothyroidotomy    320
   Cardiac defibrillation    321
   Cardiopulmonary resuscitation/chest injury    322
   Liver injury    322
   Blood pressure cuff    322
   Chest tube insertion    323
   Emergency thoracotomy    323

**ARTIFACTS OF MEDICAL INTERVENTION    324**
   Nasogastric tube    324
   Percutaneous gastric feeding tube    324
   Central line    325
   Pulmonary artery wedge catheter    325
   Operative electrolyte abnormalities from irrigation
      fluid absorption    326
   Liposuction    326
   Side note on toxicology/hospital blood
      specimens    326
   References    327

An artifact is a structure or substance not normally present but produced by some external agency or action. In this chapter, we examine those injuries or findings that are produced by medical therapy. This topic could fill an entire book so we will confine the medical therapy to that involving cardiopulmonary resuscitation and a few select complications of therapy. In this 21st century, most of the bodies examined by the medical examiner have had some attempt at cardiopulmonary resuscitation (CPR) before pronouncement of death. Forensic pathologists should therefore be able to recognize those postmortem findings that are the result of CPR. Likewise, an unending variety of therapeutic procedures are performed on people for either the maintenance of good health or for the treatment of illness or injury. It is inevitable that even with the best of care, unintended consequences may occur during treatment procedures. Only a few of these complications will be discussed,

knowing that an all-inclusive discussion could fill an entire text.

## Artifacts of resuscitation

Resuscitation attempts are replete with artifacts that occur simply as a result of attempts to save lives. The recognition of many of the artifacts related to resuscitation attempts is most easily realized when one views the body with the medical therapy still in place. The recognition of injury or other marks as artifact from therapy can be more challenging if the therapeutic material is removed from the body before the medical examiner has had an opportunity to view the body. This is why it is important that all therapeutic devices be left on any bodies destined for the medical examiner's office. Review of the medical records, in

particular emergency medical services run sheets and emergency room records, can be helpful in sorting out artifacts due to resuscitation and other therapeutic procedures.

## Medical tape

Tape has many useful purposes, one of which is to stabilize an endotracheal tube after its insertion. This tape, after removal, can abrade the skin in a linear fashion and mimic a ligature abrasion. This may confuse the postmortem pathologist if he or she did not directly supervise the removal of the decedent's clothing and medical paraphernalia. After the decedent is pronounced dead, the extremities may be bound by string or tape to facilitate transport, producing artifactual marks that become apparent after the ligature is removed.[1] **Images 14.1** and **14.2** show two parallel curvilinear abrasions on the posterolateral neck that fade and disappear as they approach the anterior neck. **Image 14.3** was a photograph taken before the decedent was stripped of his medical paraphernalia. The abrasions are at the same location of a piece of masking tape that is compressed along the posterolateral neck and normally opened and flat anteriorly.

A cervical neck collar used to stabilize the head and neck may produce linear impressions in the skin of the neck that may also resemble a ligature furrow.

## Needle punctures

Needle punctures from attempted intravenous access should not be confused with self-induced punctures associated with intravenous drug abuse. Needle punctures may cause a large amount of blood extravasation in the associated underlying tissues. In this man (**Image 14.4**), note the needle puncture from an intravenous catheter site in the left side of his neck. Upon reflection of the skin, note the large amount of associated blood extravasation (**Image 14.5**). In cases of suspected strangulation, hanging, or other blunt force neck injury, one must consider the possibility that a hemorrhage may be related to a therapeutic procedure.

## Endotracheal intubation

*Endotracheal intubation* is routinely performed during CPR to maintain a patent airway and prevent aspiration of orogastric contents. Most endotracheal tubes have an inflatable cuff near the end of the tube. Overinflation of



14.1



14.3



14.2



14.4

the cuff can cause trachea rupture or pressure necrosis if left in place over time. Most of the time the endotracheal cuff leaves a focal area of laryngeal mucosa pallor compared to the red hyperemic mucosa above and below it.

Intubation of the esophagus by an endotracheal tube is one of the more common resuscitative findings, although this is not by definition an artifact. *Esophageal intubation* as seen in **Image 14.6** occurs when the endotracheal tube is not visualized to pass between the vocal cords. In this image, the swollen outline of the endotracheal cuff is easily seen through the muscular esophagus. Esophageal intubation prevents the delivery of concentrated oxygen from reaching the pulmonary alveoli.

Esophageal intubation can produce gastric dilatation as seen in **Image 14.7.** On opening the peritoneal cavity, the pathologist should note the distended stomach and confirm that the endotracheal tube (as seen protruding from the decedent's mouth in this image) does indeed end in the trachea rather than the esophagus. *Endobronchial intubation* occurs if too long a tube is used and inserted into one of the mainstem bronchi. The nonintubated lung does not contribute to gas exchange and the large volume of blood flowing through this lung results in a substantial right to left shunt.

Resuscitative intubation can produce injuries to the cervical strap muscles, oropharynx, epiglottis, larynx, and trachea. The majority of these injuries are mucosal petechiae or larger contusions. Endotracheal intubation may cause artifactual hemorrhage in the pharyngeal tissues, as in this middle-aged man (**Image 14.8**). In such cases, the hospital records may note difficulty with attempts to place the endotracheal tube.



14.5



14.7



14.8

14.6

**Image 14.9** shows a submucosal contusion in the right posterior pharynx at its junction with the esophagus. The contusion is at the base of the superior horn of the thyroid cartilage. Conjunctival and skin petechiae were seen in 21 and 6 percent, respectively, of cases in one prospective study.[2] Mucosal lacerations are less common than mucosal hemorrhage. **Image 14.10** shows a mucosal laceration of the pyriform sinus and extensive extravasated blood at the base of the tongue. **Image 14.11** shows a mucosal laceration of the vocal cords. The tongue base, pyriform sinus, and vocal cords have crevices that catch the tip of the approaching endotracheal tube and produce injuries that range from mucosal contusions to transmural perforation.

### Combitube

The *combitube* is a double-lumen ventilation tube that resembles an endotracheal tube, however it differs in that it is more rigid and contains two cuffs—one proximal (in the oropharynx) and one distal (in the trachea or the esophagus). It is designed to be able to provide ventilation whether inserted into the trachea or into the esophagus. Injuries identified with the use of the com-

bitube have included contusion and hematoma of the pharynx, and laceration of the pharynx and esophagus with perforation.[3] These injuries likely result from either overinflation of the cuffs of the combitube or a purely mechanical perforation.[3] One should be aware of these therapeutic injuries, and consider their possibility when internal neck injury is seen in those who have been resuscitated.

### Tracheostomy/cricothyroidotomy

A more direct method of inserting an endotracheal tube is to surgically create a *tracheostomy* or *cricothyroidotomy* and insert an endotracheal tube directly into the trachea. This is particularly useful when oral and nasal attempts to insert the tube fail. However, sometimes even this fails for a variety of reasons. In this person (**Image 14.12**), note



14.11



14.9



14.12



14.10

that the tracheostomy tube was inserted through the tissues between the hyoid bone and the thyroid cartilage. The insertion site is too high, because the tracheostomy tube is ideally placed lower, between the thyroid cartilage and the cricoid cartilage, which forces the tube into the trachea. The high insertion allowed the tracheostomy tube to enter the pharynx, where it then was directed into the esophagus (**Image 14.13**).

### Cardiac defibrillation

External or transthoracic defibrillation involves the application of direct current electrical discharge to terminate ventricular fibrillation and hopefully reestablish sinus rhythm. Defibrillation is accomplished through electrode pads placed on the front and side or back in order to deliver a transthoracic electrical discharge that passes through the heart. Superficial skin burns and skeletal muscle necrosis can be caused by transthoracic defibrillation. **Image 14.14** shows a typical defibrillator burn involving an adherent defibrillator pad with the thermal injury occurring at the edge of the defibrillator pad. The defibrillator pad may leave a characteristic burn pattern that matches the shape of the conductive material. Defibrillator paddles produce overlapping hyperemic oval burns clustered over the precordium and left lateral chest wall. Rarely, the skeletal muscle immediately beneath the defibrillator burn will appear pale and dull grossly from myonecrosis. Microscopically, the injured myocytes appear fragmented with irregular eosinophilic aggregates of protoplasm (**Images 14.15** and **14.16**) compared to the intact fibers of normal skeletal muscle (**Image 14.17**).



14.13



14.15



14.14

14.16



14.17



14.19

14.18

## Cardiopulmonary resuscitation/chest injury

Cardiopulmonary resuscitation with closed chest massage is now the rule, rather than the exception, for all persons found without a pulse or respiration. In adults, the sternum should be depressed 1.5 to 2 inches with the heel of the hand placed over the lower half of the sternum. Closed chest compression produces blood movement by raising intrathoracic pressure rather than by direct compression of the heart by the sternum.[4] Epicardial petechiae have been described in autopsied patients given CPR and are attributed to traumatic compression. Direct myocardial injury should not ordinarily be produced unless there is a penetrating rib or sternal fracture. Rib and sternum fractures are seen in 31 to 35 percent[5–9] and 21 to 24 percent[10] of autopsied patients who were given CPR.

An anterior pericardial or mediastinal contusion (**Image 14.18**) may be seen in association with resuscitation-induced sternum fracture. Cardiac injury is rare and usually the subject of case reports.[11] The largest postmortem study of victims given CPR reported hemopericardium in 8.4 percent, epicardial hematoma in 2.7 percent, myocardial contusion in 1.3 percent, vena cava injury in 0.9 percent, and myocardial laceration in only one case. Myocardial laceration or rupture is an extremely rare complication of external chest massage and does not appear in most autopsy studies.[12,13]

Pericardiocentesis or intracardiac injection of epinephrine or other drugs during resuscitation can produce a small hemopericardium. The pericardial blood is typically unclotted and less than 100 milliliters in volume, although Davison et al.[14] described two cases with hemopericardium volumes of 120 and 150 milliliters. Aortic rupture has also been attributed to closed chest massage.[15–17] Unfortunately, premortem nontraumatic aortic dissection or rupture cannot be eliminated from the differential diagnosis based on the information provided in these case reports. Valvular or papillary muscle rupture has been attributed to closed chest massage.[18]

## Liver injury

Closed chest compressions during cardiopulmonary resuscitation can also lacerate the liver. When this occurs in a dead, nonrevived person, little or no blood is found in the peritoneal cavity. The small amount of liquid blood discovered in the abdominal cavity from a postmortem liver laceration contrasts with the large amount of liquid and clotted blood found when the laceration occurs antemortem. **Image 14.19** shows a horizontal laceration of the anterolateral right liver lobe in a 32-year-old obese woman who died of a pulmonary thromboembolism. Liver lacerations following CPR have been reported in the clinical literature, often in patients receiving thrombolytic therapy.[19]

## Blood pressure cuff

Noninvasive blood pressure monitoring involves the use of an automated pneumatic cuff placed around the upper arm. Reported complications of this instrument include petechiae, ecchymoses,[20] and compartment syndrome[21]


14.20


14.22


14.21

**Recovery of evidence from people who die during resuscitation attempts**

If handwipings or hand swabbings for gunshot residue and fingernail clippings are not performed by law enforcement personnel in the hospital, it is advantageous for the hands to be placed in brown paper bags taped at the wrists to help preserve evidence when the body is transported to the medical examiner department. This will also help preserve other evidence such as trace fibers. It is important to use paper, rather than plastic bags, because paper will allow air to circulate around the hands, whereas plastic will not. When a warm body is placed in a cooler, water will condensate in plastic bags and possibly rinse off a portion of the evidence.

from an intramuscular hematoma. **Image 14.20** shows a well-demarcated band of redness encircling the right upper arm from the use of an automated sphygmomanometer.

## Chest tube insertion

Inserting chest tubes is usually a relatively benign procedure, often with great immediate clinical benefit. However, occasionally, a chest tube may be directed into the lung tissue, particularly if there are preexisting fibrous pleural adhesions. If the chest tube is placed too low in the chest wall, it may puncture the diaphragm and/or the liver. This motor vehicle accident victim (**Image 14.21**) had a traumatic rupture of the right hemidiaphragm that forced the liver into the right pleural cavity. When the chest tube was inserted into its normal location in the chest, it lacerated the herniated liver.

Of note, a chest tube may have been placed through a conveniently located preexisting stab wound or gunshot wound. During cases with such inflicted injuries it is important to consider that possibility, especially if internal injury suggests that the skin defect was more than a superficial therapeutic incision. Close examination of the wound and its path and a review of medical records or discussion with the treating physician will help solve the issue. Alternatively, more than one incision may be made in an attempt to insert a chest tube. These other incisions should not be confused with inflicted stab or incised wounds from an assault.

## Emergency thoracotomy

The rib spreader used during emergency thoracotomy can cause a patterned laceration that mimics an incised wound or graze gunshot wound.[22] The rib spreader consists of two opposing blades, one of which is attached to a bar containing evenly spaced teeth. This adjustable blade can be moved or tightened in place using a ratchet device and thumbscrew. Because left thoracotomy provides access to the heart, most rib spreader lacerations are found on the left axilla, upper arm, and costal margin. **Image 14.22** shows a rib spreader laceration in the left upper arm opposite the left thoracotomy incision. This thoracotomy incision was performed after the decedent

was stabbed in the chest. Parallel linear abrasions from the tooth pattern of the rib spreader aid in recognition.

As with the chest tube, a thoracotomy incision or a laparotomy incision may be performed through a gunshot wound or stab wound. A review of the medical records will help determine if this has been the case. Should questions still arise, discussion with the treating personnel may provide important information. Many times the edges of the wound can be reapproximated to allow a better description of the injury.

Because resuscitation attempts are often rapid and involve quick body surveys and treatment, some evidence such as bullets located in the clothing or on the body can be easily overlooked. In such cases, it is advantageous to have the body transported with the hospital sheet still beneath it. This will help ensure that any loose bullets or other evidence is properly collected. For this reason, it is best to x-ray the body with the clothing and therapeutic devices still on the body, to help determine whether or not any loose projectiles are present and where they are located. Sometimes, some or all of the clothing that was cut off of the body remains in the hospital and is not transported with the body. If articles of clothing appear to be missing, it is important to ensure that the investigating agency has collected the clothing at the hospital, or else, it may be mistakenly discarded by hospital personnel.

## Artifacts of medical intervention

### Nasogastric tube

The toddler shown in **Images 14.23** through **14.25** sustained a devastating blunt force head injury after being struck by a motor vehicle and arrived in the emergency room without any vital signs. Resuscitation attempts continued and included the placement of a nasogastric tube. At autopsy, her head x-ray showed a tube curled in her head (**Image 14.23**). The nasogastric tube had entered her intracranial cavity and had curled up and terminated in her head (**Image 14.24**). With the dura stripped, note that the nasogastric tube had passed through a gaping hinge fracture at the base of the skull (**Image 14.25**). This case highlights the potential hazards of inserting a nasogastric (or nasotracheal tube) in a person with a head injury. A basilar skull fracture could allow the tube to be directed into the intracranial cavity.

### Percutaneous gastric feeding tube

*Gastric feeding tubes* may become dislodged, particularly if they are pulled on with force. In this young man (**Images 14.26** and **14.27**), note that the end of the gastric feeding tube is free in the peritoneal cavity, not where it should terminate, in the stomach. Note the tan liquid tube feed located in the peritoneal cavity. The bulb at the



14.23



14.24

end of the gastric feeding tube is still inflated. The feeding tube entry site in the stomach is still relatively intact (**Image 14.28**). In a series of deaths due to peritonitis from gastric tube malpositioning or displacement, none of the gastric tubes were checked for position and proper function after insertion.[23]

### Central line

A potential complication of placing a subclavian or internal jugular central venous catheter is the development of a pneumothorax, a collection of air between the visceral pleura of the lung and the parietal pleura of the chest cavity. In **Image 14.29**, note the collapsed lung from a pneumothorax. This can lead to dyspnea, or if large enough, can create a tension pneumothorax, which may impair venous return to the heart. For more information on autopsy detection of a pneumothorax, see Chapter 29.

### Pulmonary artery wedge catheter

*Pulmonary artery wedge catheters* are becoming increasingly more common in the treatment of very sick individuals. Complications from their insertion and use range from arterial rather than venous insertion with hemothorax, pneumothorax, and pulmonary artery tear. The end of the catheter has a balloon that can be inflated to temporarily block the blood flow in a pulmonary



14.25



14.26



14.28



14.27



14.29

artery and a measurement of the "wedge" pressure can then be obtained. This is not without its potential hazards, because a tear in the pulmonary artery may occur as the balloon is inflated, particularly if it is inserted too far into the pulmonary artery, into a segment of small caliber.

## Operative electrolyte abnormalities from irrigation fluid absorption

Urologic surgical procedures, including transurethral resection of the prostate gland (TURP) and nephrolithotomy for nephrolithiasis, and certain gynecological surgeries such as endometrial resection/ablation, require the use of irrigating solution to aid in the removal of tissue fragments and blood clots and to help provide a clear surgical field. Because these surgeries often entail the use of electrocautery devices, the irrigation solution must be nonconductive and be devoid of typical electrolytes such as sodium and chloride that are routinely present in intravenous fluid solutions. The irrigation fluid must also be approximately isosmotic, to avoid large shifts of body fluids with irrigation. The solution used most commonly contains an isosmotic concentration of glycine.[24,25]

During these surgeries, the patient may absorb a large amount of irrigation fluid—up to 6 to 8 liters or so.[26–28] The volume load alone may be detrimental, particularly in those with heart disease. This rapid absorption of irrigation fluid may acutely dilute plasma electrolytes, resulting in profoundly low levels of sodium, chloride, or other electrolytes. This may lead to mental status changes, cerebral edema, seizures, cerebral herniation, cardiac dysrhythmia, and death.[27] In two series of cases of intraoperative dilution from irrigation fluid, the serum sodium in 33 patients averaged 107 mEq/L. In addition to the deleterious effects of acute volume overload and electrolyte abnormalities, the glycine itself may have some degree of toxicity in high concentrations.

## Liposuction

Tumescent liposuction is a surgical procedure for the removal of excessive fat that is performed under local anesthesia. It requires the use of repeated subcutaneous injections of lidocaine (with epinephrine) to provide adequate pain control during the aspiration of fat through small cannulas. The lidocaine provides analgesia, and the epinephrine helps minimize blood loss by vasoconstricting local blood vessels. It is considered safer than liposuction performed under general anesthesia and may be performed outside of the standard operating room arena. However, it is not without its potential for morbidity and mortality.

Liposuction-related deaths have been attributed to the toxic effects of lidocaine or lidocaine-related drug interactions.[29] Lidocaine toxicity may be manifest as mental status changes or seizure, but at higher levels may cause

hypotension and cardiovascular collapse. The toxic effects of lidocaine may not be initially apparent, but the lidocaine "depots" in the tissue may continue to be absorbed and to increase the blood lidocaine levels for up to a day or so after the surgery.[30] Lidocaine-induced seizures may be prevented by the intraoperative administration of midazolam, which may mask the potential side effects of lidocaine toxicity until profound cardiorespiratory compromise results.[29] Although the half life of lidocaine is only 90 minutes, it is metabolized in the liver to monoethylglycinexylidide (MEGX) and glycinexylidide (GX). MGEX is 83 percent as active as lidocaine.[31] Additional potential complications of liposuction surgery include fat embolization to the lung and fluid overload.[32]

## Side note on toxicology/hospital blood specimens

When a hospital death is suspected to be drug or medication related, it is advantageous to collect all of the person's blood and urine that may still be in storage in the hospital. Although the person's hospital admission blood would be most important in deaths suspected to be overdoses from outside the hospital, patient blood obtained days, weeks, or months into their hospital stay may also be important. This blood may be particularly important should someone become unresponsive or have an adverse reaction following the administration of a medication or in patients who are on pumps that administer pain medications who are suddenly found unresponsive. Toxicological analysis of these specimens may provide the best evidence to explain the patient's death, and the hospital will hold these specimens for only a certain number of days before discarding them.

### Do

- Investigate the cause of gastric distention by air.
- Review the medical records or consult the treating physician when you have unresolved questions about possible therapeutic/resuscitation artifacts.
- Be cognizant of the varied complications that can arise from therapy, both medical and surgical.
- Obtain medical records, discuss with treating personnel, and utilize any other resources that would help clarify autopsy findings or correlate autopsy findings with the clinical history.

### Don't

- Forget to take a chest x-ray when it may help demonstrate a pneumothorax or air embolus.
- Forget to obtain toxicology specimens that may be helpful to the case.
- Allow the removal of medical paraphernalia from a hospitalized or resuscitated decedent without your direct supervision.

- Confuse hemorrhage related to intubation attempts or needle punctures in the neck with trauma from strangulation or other assault.
- Confuse a rib spreader injury for an incised knife wound.

## References

1. Froede R. *Handbook of Forensic Pathology.* Northfield, IL: College of American Pathologists; 2003.
2. Raven KP, Reay DT, Harruff RC. Artifactual injuries of the larynx produced by resuscitative intubation. Am J Forensic Med Pathol 1999;20:31–6.
3. Stoppacher R, Teggatz JR, Jentzen JM. Esophageal and pharyngeal injuries associated with the use of the esophageal-tracheal Combitube. J Forensic Sci 2004;49:586–91.
4. Hurst J. *The Heart.* New York: McGraw-Hill; 1986; p. 547.
5. Krischer JP, Fine EG, Davis JH, Nagel EL. Complications of cardiac resuscitation. Chest 1987;92:287–91.
6. Ayers WR, Doyle JT. Cardiopulmonary resuscitation. Review of one year's experience in a general hospital. NY State J Med 1964;64:1929–32.
7. Baringer JR, Salzman EW, Jones WA, Friedlich AL. External cardiac massage. N Engl J Med 1961;265:62–5.
8. Himmelhoch SR, Dekker A, Gazzaniga AB, Like AA. Closed-chest cardiac resuscitation. A prospective clinical and pathological study. N Engl J Med 1964;270:118–22.
9. Jackson CT, Greendyke RM. Pulmonary and cerebral fat embolism after closed-chest cardiac massage. Surg Gynecol Obstet 1965;120:25–7.
10. Henriksen H. Rib fractures following external cardiac massage. Acta Anaesth Scand 1967;11:57.
11. Wolfe WG, Dudley AW, Jr., Wallace AG. A pathological study of unsuccessful cardiac resuscitation. Arch Surg 1968;96:123–6.
12. Paaske F, Hansen JP, Koudahl G, Olsen J. Complications of closed-chest cardiac massage in a forensic autopsy material. Dan Med Bull 1968;15:225–30.
13. Powner DJ, Holcombe PA, Mello LA. Cardiopulmonary resuscitation-related injuries. Crit Care Med 1984;12:54–5.
14. Davison R, Barresi V, Parker M, Meyers SN, Talano JV. Intracardiac injections during cardiopulmonary resuscitation. A low-risk procedure. JAMA 1980;244:1110–1.
15. Nelson DA, Ashley PF. Rupture of the aorta during closed-chest cardiac massage. JAMA 1965;193:681–3.
16. Bodily K, Fischer RP. Aortic rupture and right ventricular rupture induced by closed chest cardiac massage. Minn Med 1979;62:225–7.
17. Patterson RH, Burns WA, Jannotta FS. Rupture of the thoracic aorta: complication of resuscitation. JAMA 1973;226:197.
18. Gerry JL, Jr., Bulkley BH, Hutchins GM. Rupture of the papillary muscle of the tricuspid valve. A complication of cardiopulmonary resuscitation and a rare cause of tricuspid insufficiency. Am J Cardiol 1977;40:825–8.
19. Froment P, Savioz D, Robertson M, Morel P. [Hepatic lesions after effective external cardiac massage—an iatrogenic complication not to be overlooked]. Swiss Surg 1998:225–7.
20. Pedley CF, Bloomfield RL, Colflesh MJ, Porcel MR, Novikov SV. Blood pressure monitor-induced petechiae and ecchymoses. Am J Hypertens 1994;7:1031–2.
21. Alford JW, Palumbo MA, Barnum MJ. Compartment syndrome of the arm: a complication of noninvasive blood pressure monitoring during thrombolytic therapy for myocardial infarction. J Clin Monit Comput 2002;17:163–6.
22. Dixon DS, Champion HR. Rib spreader laceration: a confusing artifact of emergency thoracotomy. J Forensic Sci 1983;28:255–62.
23. Platt MS, Roe DC. Complications following insertion and replacement of percutaneous endoscopic gastrostomy (PEG) tubes. J Forensic Sci 2000;45:833–5.
24. Ellis RE, Carmichael JK. Hyponatremia and volume overload as a complication of transurethral resection of the prostate. J Fam Pract 1991;33:89–91.
25. Byard RW, Harrison R, Wells R, Gilbert JD. Glycine toxicity and unexpected intra-operative death. J Forensic Sci 2001;46:1244–6.
26. Desmond J. Serum osmolality and plasma electrolytes in patients who develop dilutional hyponatremia during transurethral resection. Can J Surg 1970;13:116–21.
27. Arieff AI. Hyponatremia, convulsions, respiratory arrest, and permanent brain damage after elective surgery in healthy women. N Engl J Med 1986;314:1529–35.
28. Ayus JC, Arieff AI. Glycine-induced hypo-osmolar hyponatremia. Arch Intern Med 1997;157:223–6.
29. Rao RB, Ely SF, Hoffman RS. Deaths related to liposuction. N Engl J Med 1999;340:1471–5.
30. Burk RW, 3rd, Guzman-Stein G, Vasconez LO. Lidocaine and epinephrine levels in tumescent technique liposuction. Plast Reconstr Surg 1996;97:1379–84.
31. Baselt R. *Disposition of Toxic Drugs and Chemicals in Man.* Foster City, CA: Biomedical Publications; 2002.
32. Platt MS, Kohler LJ, Ruiz R, Cohle SD, Ravichandran P. Deaths associated with liposuction: case reports and review of the literature. J Forensic Sci 2002;47:205–7.

# 15 *Apparent* Natural Death in Infants

*David Dolinak, M.D.*
*Evan Matshes, M.D.*
*Emma Lew, M.D.*

SUDDEN INFANT DEATH SYNDROME    329
    The "complete" autopsy    330
    Theories about SIDS    331
    Common autopsy findings in SIDS deaths    336
    Nonfatal findings in the context of an apparent
        SIDS death    337

COSLEEPING/OVERLAY    339
WEDGING    341
CHOKING    342
REFERENCES    343

Sudden unexpected death in childhood can be immensely traumatizing to parents who have lost an apparently healthy child. Through careful investigation, detailed autopsy and ancillary examination, and thoughtful, caring communication, forensic pathologists can have a positive impact on the lives of living relatives and provide benefit to society on the whole. Unfortunately, by being unaware of the objectives of a medicolegal autopsy, by not knowing which questions to ask, or by misinterpreting artifact as injury, forensic pathologists can have an equally profound negative effect by damaging the lives and reputations of innocent loved ones. Furthermore, making liberal or carefree use of the term *SIDS* is disrespectful of the decedent, and living or future siblings are put at risk of dying of treatable or preventable conditions that *may* have been identified by more thorough investigation of the first sibling's death.

It is not uncommon for an infant to die unexpectedly while cosleeping (sharing a bed) with one or more adults or other children. In these situations, one usually cannot exclude the possibility of overlay. As a result, certification of the cause of death as sudden infant death syndrome (SIDS) is not appropriate. Where investigative information indicates overlay, the death may be certified as "overlay" or some other descriptor phase based on the degree of suspicion of overlay, such as "undetermined infant death while cosleeping." Accordingly, the manner of death will vary from accident to undetermined. One should be cognizant of the possibility of homicidal asphyxia or other forms of fatal child abuse. Furthermore, because very serious injuries may not be evident externally, the medical examiner should never be prevented from performing an autopsy in cases of sudden death in infancy and childhood.

## Sudden infant death syndrome

A quick literature search reveals at least 6,400 in-print scientific articles that discuss SIDS in some fashion. Mixed within these many publications are theories on the pathogenesis of this "condition." Articles describe SIDS deaths in identical twins, simultaneous SIDS deaths in fraternal twins, the involvement of laryngeal mucous gland excess in SIDS deaths, and even disseminated intravascular coagulation secondary to SIDS. During the past few decades, there has been great debate over the existence of this "syndrome." On one hand, societal benefit accrues from the use of the term SIDS, because parents whose infants die unexpectedly and of natural causes can be socially, legally, and emotionally cleared of personal wrongdoing[1]: "There's nothing you could have done. . . . Your baby died of SIDS." Unfortunately, with suboptimal investigation, the term SIDS becomes a

wastebasket diagnosis, with negative sequelae. Even if we overlook the tragedy of misidentifying inadequately investigated homicides as SIDS deaths, we should be further frustrated at the thought of missing diagnoses of hereditary conditions or of diagnoses related to unhealthy living conditions. Telling parents that their child died of SIDS when the investigation failed to reveal fatal cosleeping could lead to the death of subsequent children by overlay. After all, the caregiver "didn't do anything wrong"; the baby died of SIDS, so therefore it was "not preventable." In some jurisdictions the term SIDS even aborts law enforcement investigations at the scene because some officers relax at the thought of a SIDS death: "The baby looks peaceful and normal, there's no trauma, it must be a SIDS death."

Most board-certified forensic pathologists now agree that *SIDS is a diagnosis of exclusion*. Although definitions vary somewhat, use of the term SIDS is generally accepted to indicate "the sudden death of a normal, healthy infant under one year of age which remains unexplained after a thorough case investigation, including performance of a complete autopsy, examination of the death scene and review of the clinical history."[2,3] Unfortunately, this definition is itself controversial because there is little agreement on what constitutes a "complete autopsy," and there is great variability in the qualifications of the individuals who perform scene investigations.

After a review of a limited portion of the literature, as well as cases of sudden/unexpected childhood death within our own files, we believe that a proportion of apparent SIDS cases actually have plausible findings that support an alternative cause of death. Many of these are cases of accidental (and occasionally homicidal) asphyxia, admixed with natural disease. After reviewing medicolegal autopsies performed by both forensic and non-forensic-trained pathologists, a disconcerting practice has been observed with some regularity: SIDS is being diagnosed in the autopsy room. This is surprising, because the determination of SIDS requires complete examination of *all* possible contributing factors including medical and social histories, circumstantial data (from scene examination and caregiver interviews), autopsy, and additional examinations to be directed as necessary. Therefore, SIDS cannot be diagnosed in the morgue based on autopsy findings (or lack thereof) alone. Individuals working in the vacuum of autopsy pathology, without the opportunity to participate in all of the components of the SIDS investigation (such as those who perform autopsies for coroners), should not make the diagnosis of SIDS without the exclusion of other causes of death.

We believe that pathologists choosing to make the diagnosis of SIDS should do so only after careful collection of data and thoughtful contemplation of an individual case in which *no alternative cause of death has been identified*. Rather than making use of the term SIDS, some individuals choose to certify death as being of undetermined causation and manner—an approach we support. For years, the statement "first death—SIDS; second death—undetermined; third death—homicide" has floated around the forensic pathology community in regards to repeat SIDS deaths in a single family. Although Byard and Krous[4] believe that this dictum cannot be supported, we feel that due to the tenuousness of SIDS diagnosis on the whole, any cases of repeat SIDS demand *red flagging* within individual death investigation systems. As such, *undetermined* cause and manner of death statements are appropriate.

### The "complete" autopsy

For good reason, the definition of a complete autopsy varies widely between pathologists, institutions, and cases. It is generally agreed that at a minimum, forensic autopsies include an external examination, radiography,[5] an examination of all major internal organs including the brain, anatomy of the anterior neck, the oropharynx, and toxicology,[6] microbiology,[7] and other tests of various fluids and tissues.[8,9] Using this as a basis, autopsies need to be tailored with additional procedures utilized to address specific concerns in individual autopsies.

| Scene/investigational aspects in infant deaths |
| --- |
| - Look for unsafe sleeping environment: fluffy or torn pillows, mattress, blankets, or other bedding. Are there toys, bottles, or other items in the crib? Photograph. |
| - In what position was the infant placed to sleep (prone/supine) and in what position was the infant found? |
| - Was the infant found underneath bedding? Was the infant's face visible? |
| - Request that the caretakers recreate the infant's sleeping situation/body position with a doll. Photograph. |
| - In cases of cosleeping, what is the approximate height and weight of the caretakers/siblings? Does the bed clothing of the caretakers have any stains? Were the cosleepers unusually fatigued that night? What was the infant's body position in relation to the other cosleepers (both when put to sleep and when found)? |
| - If put to sleep on a couch, chair, or other non-bed surface, what was the nature of the fabric? |
| - When was the infant last known alive, and when (and what) did he or she last eat? |
| - Has the infant been sick recently? (If so, what were the symptoms?) Was the infant on any medications? (If so, which ones?) |
| - Were the caretakers intoxicated? |
| - Do the infant's siblings have any medical problems? |
| - Are there indications of drug abuse or smoking in the residence? |
| - Is there a history of children's protective services involvement with the family? |

- What is the general condition of the residence (neat/dirty, peculiar odors, etc.)?
- What is the infant's medical history (including immunization)?
- Is there a history of other SIDS-type deaths in the family?
- Have you obtained and reviewed pregnancy and birth records?

| Important autopsy procedures for infants |
| --- |

- Perform complete body radiographs.
- Perform additional body measurements (head circumference, crown–heel and crown–rump length, chest circumference, abdominal circumference, foot length).
- Carefully examine external genitalia, anus, frenula, and oral mucosa for injury.
- Carefully examine and photograph any rashes. If a rash is present, determine if it has a pattern.
- Perform widespread histologic sampling including all major organs, gastrointestinal tract, salivary glands, and tonsils.
- Consider obtaining viral cultures (respiratory, intestinal) and bacterial cultures (blood, cerebrospinal fluid).
- Examine the middle ears for signs of infection.

Proper autopsy documentation includes pertinent negative photographs. These images may be of use in future case review and, occasionally, will highlight findings not noticed at autopsy. The following is a selection of pertinent negative photographs that one may find useful (**Images 15.1** through **15.19**).

## Theories about SIDS

Currently, there is no scientific explanation for the sudden, unexpected deaths of infants who meet SIDS criteria. That said, countless theories abound, including occlusion of vertebral arteries,[10] neuronal degeneration as characterized by ALZ-50 immunoreactivity in the hippocampus and medulla,[11] severe hypoplasia of the medullary arcuate nucleus,[12] decreased kainate receptor binding in the arcuate nucleus,[13] and subtle developmental abnormalities in the inferior olive.[14] Many of the studies have focused on the brainstem, particularly the arcuate nucleus of the medulla, because it is believed that the arcuate nucleus is involved in chemoreception, respiratory drive, gasping/upper airway reflexes, and cardiovascular responses.[15] A protocol has even been devised to aid in sampling of the brainstem.[16] However, as of yet, no satisfactory anatomic explanation exists for deaths meeting the criteria for SIDS.

It is unlikely that enzyme defects, in particular those of fatty acid oxidation, are an explanation for the sudden and unexpected deaths of a significant number of infants, at least with our current capacity to detect these abnormalities and our present understanding of these diseases. In one study, only 14 out of 313 SIDS cases had the biochemical profiles found in specific fatty acid oxidation disorders.[17] Clues that the infant might have a disorder of fatty acid oxidation include hepatic microvesicular steatosis, low carnitine concentration, glucose depletion, and elevated concentrations of C8–C16 fatty acids.[17] A metabolic screen can be



15.1

15.2



15.3



15.5



15.6



15.4



15.7



15.9



15.8



15.10



15.11



15.14



15.12



15.15



15.13



15.16



15.18



15.19



15.17

performed on dried blood on filter paper. One can easily prepare this at the time of autopsy by placing drops of fresh blood onto filter paper provided by the testing center. It does not need to be refrigerated.

In a prospective, controlled and blind study, Dettmeyer et al.[18] obtained impressive data that appear to attribute a large proportion of SIDS deaths to virus-induced myocarditis. Using the accepted premise that myocarditis is an explanation for some causes of sudden death in infants and children,[19] and using immunohistochemical and molecular methods, they studied the rate of myocardial viral infections. In doing so, they were able to demonstrate more than double the rate of cryptic viral myocarditis in apparent SIDS cases than in the control group (43.5 percent versus 16.8 percent), providing a plausible alternative cause of death in some cases.

## Common autopsy findings in SIDS deaths

Although research and experience have failed to identify any anatomic etiology for SIDS-type deaths, several autopsy findings can be discovered with some regular-ity. One must be cautioned that none of these features is pathognomonic of SIDS (particularly true, seeing as we do not actually know what SIDS is). Perioral/perinasal blood-tinged fluid has been observed, reportedly in as many as 50 percent of cases (**Image 15.20**).[20] Intrathoracic petechiae, particularly of the thymus (**Image 15.21**), epicardium, and visceral pleura, are reported to occur with greater frequency and intensity in SIDS-type deaths.[20–22] However, petechiae of the face, conjunctivae, and upper chest are not typical of this scenario and should raise serious questions about the circumstances of death.[21] (**Image 15.22** shows petechiae on a 10-month-old girl who was accidentally hanged on drapery cords.) The discovery of such petechiae should, at a minimum, denote an undetermined cause and manner of death. Visceral congestion and edema are common findings in infant deaths of multiple etiologies and are too nonspecific to be of diagnostic value.

Diaper dermatitis (diaper rash) is a common clinical entity encountered with some frequency in the autopsy room. The discovery of a rash may lead some investigators to question the quality of care and attention received by the child and even to opine child abuse. Cutaneous candidiasis can look very "angry" and still be within the realm of acceptable child care. Most cases of diaper dermatitis will present as illustrated in **Images 15.23** and **15.24**. In severe cases where the rash is a well-circumscribed erythematous area, the pathologist may have difficulty differentiating between thermal injury and candida. A KOH preparation and cultures can be obtained to provide supportive data.



15.20



15.21



15.22

After death there is a loss of tissue tone and turgor. This may alarm the medical examiner who observes a patulous or dilated anus (**Image 15.25**). Although the anus should be carefully examined to rule out evidence of acute or chronic trauma, sexually transmitted disease, or other pathology, one should caution against overinterpretation because even grossly dilated anal sphincters can be a normal finding in the postmortem setting.

### Nonfatal findings in the context of an apparent SIDS death

The investigation of SIDS-type deaths can be frustrating. One major difficulty is interpreting the significance of pathologic and traumatic findings that are not themselves fatal. From the perspective of death certification, we offer a simplified approach: investigative *red flags* demand scrutiny of the appropriateness of a SIDS diagnosis; therefore, *unknown* cause and/or manner of death certification might be appropriate. Each such case must be judged on its own merits, in the context of data derived from all facets of the investigation.

Much research and discussion in the SIDS realm has focused on the respiratory system. The finding of bronchiolitis, or vague inflammatory changes of the small airways, is unlikely to be a cause of sudden and unexpected death of a recently healthy infant. Research has confirmed the absence of a relationship between bronchiolitis and SIDS.[23] Investigators encountering this entity as the sole abnormality of their investigation commonly label the death as SIDS. We would also support labeling the cause and manner of death as undetermined. Similarly, one must cautiously approach the issue of pulmonary siderophages. Investigators have indicated that cases of asphyxia, and not SIDS, are associated with the presence of a prominent population of intra-alveolar siderophages.[24,25] Although there is likely an association between asphyxial-type insults and this histologic finding, pathologists can be troubled by the discovery of only a few siderophages. The discovery of a prominent population of these cells will likely demand consideration of a non-SIDS diagnosis; as an isolated finding, a few cells is not likely to influence the seasoned diagnostician.

The identification of significant intrinsic structural abnormalities, such as an abnormally shaped head (**Images 15.26** and **15.27**; dolichocephaly), or the absence of major anatomic structures (such as the corpus callosum[26]) warrant elimination of SIDS as the cause of death because the accepted definition of SIDS is an entity that affects "normal healthy infants." If historical data or



15.23



15.24



15.25



15.26



15.28



15.29



15.27

autopsy evidence reveal preexisting abnormalities, the child does not fit the diagnostic criteria.

What should be done with the autopsy discovery of nonfatal trauma? **Image 15.28** is from an infant with ecchymosis of the right antecubital fossa, and **Image 15.29** is from an infant with a deep contusion of the right ankle. Both of these injuries are inconsistent with the

normal daily activities of an infant. In the absence of recent medical intervention (including attempted or successful intravenous or intraosseous access), previous documented and explained trauma, or diagnosed bleeding diathesis, these atypical injuries require further investigation and explanation, and require death certification outside of the SIDS spectrum. As revealed by experience and aptly stated in the literature,[27] subtle findings of infanticide can be extremely difficult or impossible to discover. In the case of a child with preexisting unexplained injury, the likelihood of accidental or inflicted death is greater and, therefore, utilization of the term SIDS is inappropriate. This is especially true in cases with nonlethal but suspicious injuries, such as the bite mark in **Image 15.30** and the radiograph of multiple healing rib fractures in **Image 15.31**. We have encountered examples of each that have been certified as SIDS deaths because, after all, "in the absence of other findings, rib fractures surely didn't kill him." For the aforementioned reasons, we wholeheartedly disagree with this diagnosis.



15.30



15.31

## Cosleeping/overlay

The sudden and unexpected death of an infant is followed by a forensic autopsy, which, by itself, many times does not reveal a cause of death. In these situations, the scene investigation often yields useful information that may eventually help certify the death. Because most of these deaths occur after the infant has been put to sleep, the sleeping arrangement and bedding must be closely examined. An infant should be placed to sleep on its back, alone, in its own crib, and with appropriate infant bedding. Anything deviating from this baseline normal sleeping arrangement makes for a potentially hazardous sleeping environment that could lead to sudden and unexpected asphyxia of an infant. Such hazards include abundant fluffy bedding or pillows, adult-type bedding, being placed to sleep on an adult bed, sofa, chair, or other unusual apparatus, and cosleeping with other sibling(s) or adult(s).

An infant is more vulnerable to asphyxia because it does not yet have much strength or dexterity, and it cannot free itself from hazardous situations. Accordingly, an infant cannot extricate itself from a wedged position, or push away from a sleeping adult who has rolled over against it. Infants rely on others to provide a safe environment for them.

Asphyxial hazards are exaggerated in premature infants because their weaker musculature may lead to respiratory insufficiency by merely being in an upright position. In one study, such premature infants had a decrease in oxygen saturation when placed upright in a car seat.[28] As such, car seats or other similar apparatuses should not replace the crib for a sleeping environment, particularly in premature infants.

Cosleeping with an infant on an adult bed poses many risks, including overlay, wedging between a mattress and wall, and entrapment in bedding with suffocation and/or strangulation or smothering. A common scenario is the sudden death of an infant while cosleeping (sharing a bed) with one or more siblings and/or adults. In this situation, one often cannot exclude the possibility of overlay, and because of this, the designation of SIDS does not adequately explain the sudden death of the infant. The cause of death listed in cases of cosleeping will vary from region to region and depends largely on the investigative information available and the opinion of the medical examiner. Depending on the factors of the case, the cause of death statement may range from a convincing "overlay," to a descriptive phrase based on the degree of suspicion of overlay, such as "undetermined infant death while cosleeping," or "undetermined (cosleeping)," or simply "undetermined." Some will overlook the hazards of cosleeping and certify such a death as SIDS. Interestingly, one study notes that cosleeping with an infant on an adult bed or a sofa is associated with a particularly high risk of SIDS.[29]

The true incidence of overlay is not known, because it is not known how often people will admit to cosleeping. Also, because a person's body position changes many times during the night, it is not known how readily an adult's body, or at least part of the body, may compress the infant, and if it did, the person is usually not awake to have a recollection of the event. Investigators should be aware, though, that complete overlay is not necessary to asphyxiate an infant. Direct airway obstruction and/or restrictive compression of the infant's chest can occur by either full or partial compression by even a single body part of a larger person. Factors that are believed to increase the risk of overlay include more than one adult or child cosleeping with the infant, obesity,[30] drug abuse, alcohol intoxication, and fatigue. Scene investigation should include examination of the clothing of the adult(s) for stains that might have been transmitted from the nose and/or mouth of the infant while being overlaid. Regardless of exactly how often overlay occurs, many authors maintain that cosleeping is a dangerous practice and increases the risk of overlay or at least the number of unexplained deaths.[30–35]

Particular features of adult beds may increase the risk of an asphyxial death in an infant, even if the infant is sleeping alone. Such hazards include suffocation and/or smothering/entrapment in fluffy, heavy adult bedding that is not designed for infants. Particularly hazardous adult beds include waterbeds (which have a soft, non-permeable surface) and daybeds (on which the infant may become wedged between the mattress and railing). Bed rails may also pose a hazard because the infant could get caught between the bed rail and the mattress with resultant neck compression.[35] In one study, a conservative estimate showed that the risk of suffocation increased by 20 times when infants coslept in adult beds.[34] With increased awareness of the hazards of cosleeping in adult beds, there has been an increase in the number of infant deaths diagnosed as suffocation in adult beds and on sofas, chairs, or other unsafe sleeping environments.[9,34]

An infant was cosleeping with his father in an adult bed. The father was of muscular build and had large, muscular arms. When the supine father awoke, he noticed that his arm was resting on the face of the infant who was lying supine at his side. This case of smothering/overlay would have been very difficult to determine without the investigative history. As is often the situation in asphyxial deaths in infants, there were no petechiae of the face or conjunctiva (**Image 15.32**). Although nonspecific, exaggerated internal thoracic petechiae (thymus, lungs, heart) and pulmonary edema and congestion may be reflective of an asphyxial death.

A mother fed her 3-month-old baby girl and brought the infant to bed with her. She awakened early in the morning and found her daughter unresponsive. The baby was pronounced dead at the scene. The anterior aspect of the baby showed livor mortis with areas of contact pallor on the abdomen and the knees (**Image 15.33**). The face had contact pallor that covered the nose, mouth, and left cheek (**Image 15.34**). The pattern of lividity and pallor on the face was consistent with the baby being prone on the soft bedding. Autopsy disclosed pulmonary edema with foamy fluid in the upper airways



15.33



15.32



15.34

(**Image 15.35**) and thymic petechiae. The pattern of lividity and contact pallor at the scene in conjunction with the autopsy findings indicated that death was due to asphyxia.

## Wedging

Wedging occurs most frequently when an infant is caught between the side of a mattress and a wall, but may involve other scenarios, such as an infant slipping and wedging between two mattresses that were placed next to each other, or being wedged between a sleeping adult and the backrest of a sofa. A 5-month-old infant suffocated when he became wedged between the mattress of an adult bed and the wall. At autopsy, there were no indications of an asphyxial death (no petechiae, no evidence of thoracic compression). The cause and manner of death were based largely on the investigative information and the exclusion of a more convincing cause of death.

Infants put to sleep on couches or makeshift beds or other potentially dangerous sleeping environments are at increased risk of becoming wedged between two surfaces. Wedging may limit the amount of chest excursion, causing an impaired and insufficient respiratory effort. Wedging may also smother by compressing the nose and/or mouth. In one review of asphyxial deaths in infants, wedging was the most common type of asphyxia and occurred predominantly in the 3- to 6-month-old age group, presumably because at this age, infants have begun to develop motor skills and move about on a bed, but are not yet able to extricate themselves from a wedged position.[36]

There is an endless variety of common and unique situations that can lead to the accidental asphyxial death of an infant. It is impossible to cover even the majority of them, but the preceding examples and those listed next should serve as a baseline for appreciation of the types of situations that may prove hazardous for an infant:

1. An infant was put to bed in a playpen, face down on a fluffy adult comforter that was folded over four times to fit inside the playpen. The infant was noted to "sink down" into the comforter when placed onto it.
2. An infant was placed face down on a fluffy adult pillow on an adult bed. He was found unresponsive a short time later. When removed from the pillow, the weight of the infant's body left a deep impression in the soft material.
3. An infant was cosleeping with three other siblings and an adult on an adult bed. She was found unresponsive under the leg of a sibling.
4. An infant was lying prone on the chest of his father who was napping face up on a couch. When the father awoke, the infant had slipped off his chest and was found wedged between his body and the backrest of the couch.
5. A mother was breast-feeding her infant when she fell asleep. When she awoke, she noticed that the infant had slumped into the crook of her arm, with its face pressed firmly against the side of her chest.
6. An infant was put to sleep between two obese parents in an adult bed and was found dead in the morning.

A father came home after partying and bottle fed his 2-week-old baby girl as he sat on the sofa. The father fell asleep. When the mother came out to check on her husband several hours later, the baby had slipped out of the father's arms and was alongside his right thigh (**Image 15.36**). The baby was unresponsive and attempted cardiopulmonary resuscitation was not successful. At autopsy, a rectangular indentation was noted on the baby's right cheek (**Image 15.37**). Although the significance of the indentation was not known, it was measured and photographed (**Image 15.38**). Autopsy findings included a few tiny subgaleal ecchymoses and a few epicardial petechiae. The medical examiner and the homicide detective agreed that additional information was required from the father. When asked whether he had anything in his right trouser pocket at the time he was feeding the baby, the father pulled out a key ring with a rectangular metallic tag. The metallic tag was the same size as the indentation on the baby's right cheek (**Image 15.39**). The consistency of the seat cushions of the sofa was described by the detective as being like pillows.



15.35











It appears that the father fell asleep, and the baby slipped out of his arms, landing alongside the father's right thigh. As the baby snuggled and/or the father shifted his position, the baby's face became wedged underneath the father's thigh, suffocating the baby.

## Choking

An infant was placed in his crib to go to sleep. Also in the crib was a package of plastic diaper bags. When the infant was later checked on, he was unresponsive. When emergency medical services personnel tried to intubate the infant, they discovered a wadded up plastic bag in the oropharynx (**Image 15.40**). This death was certified as choking because of the history provided. Hazardous materials in the crib include anything that the infant can place in its mouth and choke on. A plastic bag, in particular, can also cover the nose and mouth, causing suffocation. In infant autopsies (as in adult autopsies), it is important to evaluate the entire oropharynx and mouth,



because part of a plastic object, a coin, marble, piece of food, and so on, may become lodged in the oropharynx or the roof of the mouth and be responsible for choking.

Because the preceding cases of accidental asphyxia had no specific autopsy findings and, in fact, in such

cases, because the autopsy is typically negative, any injuries should be carefully documented. Findings such as multiple abrasions, contusions, or oral–intraoral injuries are unlikely to result from accidental asphyxia.[32] Inflicted asphyxia in this age group can easily leave no findings or very subtle findings. Hence, one must be alert to any clues that may be suggestive of homicidal asphyxia. The quick designation of SIDS in such cases without adequate detailed investigation prematurely excludes other causes of death, namely, asphyxia.

### Do

- Perform a scene investigation in all SIDS-type cases.
- Realize the possible hazards of cosleeping and of other sleeping environments outside of a crib.
- Realize the subtle nature of asphyxial deaths—many times there are no autopsy findings.
- Perform histology, cultures, and metabolic (enzyme) studies in SIDS-type cases.

### Don't

- Diagnose SIDS in the autopsy room; the diagnosis of SIDS requires a complete case investigation.
- Be afraid to label a cause and/or manner of death as "undetermined" when appropriate.
- Forget to take full-body x-rays in SIDS-type cases.

## References

1. Sawaguchi T, Nishida H. SIDS doesn't exist. Am J Forensic Med Pathol 2001;22(2):211–12.
2. Willinger M, James LS, Catz C. Defining the sudden infant death syndrome (SIDS): deliberations of an expert panel convened by the National Institute of Child Health and Human Development. Pediatr Pathol 1991;11(5):677–84.
3. Krous HF, Beckwith JB, Byard RW, Rognum TO, Bajanowski T, Corey T, et al. Sudden infant death syndrome and unclassified sudden infant deaths: a definitional and diagnostic approach. Pediatrics 2004;114(1):234–8.
4. Byard RW, Krous HF. Sudden infant death syndrome: overview and update. Pediatr Dev Pathol 2003;6(2):112–27.
5. Thomsen TK, Elle B, Thomsen JL. Post-mortem radiological examination in infants: evidence of child abuse? Forensic Sci Int 1997;90(3):223–30.
6. Langlois NE, Ellis PS, Little D, Hulewicz B. Toxicologic analysis in cases of possible sudden infant death syndrome: a worthwhile exercise? Am J Forensic Med Pathol 2002;23(2):162–6.
7. Sadler DW. The value of a thorough protocol in the investigation of sudden infant deaths. J Clin Pathol 1998;51(9):689–94.
8. Mitchell E, Krous HF, Donald T, Byard RW. An analysis of the usefulness of specific stages in the pathologic investigation of sudden infant death. Am J Forensic Med Pathol 2000;21(4):395–400.
9. Mitchell E, Krous HF, Donald T, Byard RW. Changing trends in the diagnosis of sudden infant death. Am J Forensic Med Pathol 2000;21(4):311–14.
10. Pamphlett R, Raisanen J, Kum-Jew S. Vertebral artery compression resulting from head movement: a possible cause of the sudden infant death syndrome. Pediatrics 1999;103(2):460–8.
11. Sparks DL, Davis DG, Bigelow TM, Rasheed K, Landers TM, Liu H, et al. Increased ALZ-50 immunoreactivity in sudden infant death syndrome. J Child Neurol 1996;11(2):101–7.
12. Matturri L, Biondo B, Mercurio P, Rossi L. Severe hypoplasia of medullary arcuate nucleus: quantitative analysis in sudden infant death syndrome. Acta Neuropathol (Berl) 2000;99(4):371–5.
13. Panigrahy A, Filiano JJ, Sleeper LA, Mandell F, Valdes-Dapena M, Krous HF, et al. Decreased kainate receptor binding in the arcuate nucleus of the sudden infant death syndrome. J Neuropathol Exp Neurol 1997;56(11):1253–61.
14. Kinney HC, McHugh T, Miller K, Belliveau RA, Assmann SF. Subtle developmental abnormalities in the inferior olive: an indicator of prenatal brainstem injury in the sudden infant death syndrome. J Neuropathol Exp Neurol 2002;61(5):427–41.
15. Kinney HC, Filiano JJ, White WF. Medullary serotonergic network deficiency in the sudden infant death syndrome: review of a 15-year study of a single dataset. J Neuropathol Exp Neurol 2001;60(3):228–47.
16. Matturri L, Ottaviani G, Alfonsi G, Crippa M, Rossi L, Lavezzi AM. Study of the brainstem, particularly the arcuate nucleus, in sudden infant death syndrome (SIDS) and sudden intrauterine unexplained death (SIUD). Am J Forensic Med Pathol 2004;25(1):44–8.
17. Boles RG, Buck EA, Blitzer MG, Platt MS, Cowan TM, Martin SK, et al. Retrospective biochemical screening of fatty acid oxidation disorders in postmortem livers of 418 cases of sudden death in the first year of life. J Pediatr 1998;132(6):924–33.
18. Dettmeyer R, Baasner A, Schlamann M, Padosch SA, Haag C, Kandolf R, et al. Role of virus-induced myocardial affections in sudden infant death syndrome: a prospective postmortem study. Pediatr Res 2004;55(6):947–52.
19. Rasten-Almqvist P, Eksborg S, Rajs J. Myocarditis and sudden infant death syndrome. APMIS 2002;110(6):469–80.
20. Berry PJ. Pathological findings in SIDS. J Clin Pathol 1992;45(11 Suppl):11–16.
21. Byard RW, Krous HF. Petechial hemorrhages and unexpected infant death. Leg Med (Tokyo) 1999;1(4):193–7.
22. Kleemann WJ, Wiechern V, Schuck M, Troger HD. Intrathoracic and subconjunctival petechiae in sudden infant death syndrome (SIDS). Forensic Sci Int 1995;72(1):49–54.
23. Gupta R, Helms PJ, Jolliffe IT, Douglas AS. Seasonal variation in sudden infant death syndrome and bronchiolitis—a common mechanism? Am J Respir Crit Care Med 1996;154(2 Pt 1):431–5.
24. Becroft DM, Lockett BK. Intra-alveolar pulmonary siderophages in sudden infant death: a marker for previous imposed suffocation. Pathology 1997;29(1):60–3.
25. Schluckebier DA, Cool CD, Henry TE, Martin A, Wahe JW. Pulmonary siderophages and unexpected infant death. Am J Forensic Med Pathol 2002;23(4):360–3.
26. Patel F. Acallosal brain in sudden infant death syndrome (SIDS). J Forensic Sci 1992;37(3):873–5.
27. Banaschak S, Schmidt P, Madea B. Smothering of children older than 1 year of age—diagnostic significance of morphological findings. Forensic Sci Int 2003;134(2–3):163–8.
28. Merchant JR, Worwa C, Porter S, Coleman JM, deRegnier RA. Respiratory instability of term and near-term healthy newborn infants in car safety seats. Pediatrics 2001;108(3):647–52.
29. Blair PS, Fleming PJ, Smith IJ, Platt MW, Young J, Nadin P, et al. Babies sleeping with parents: case-control study of factors influencing the risk of the sudden infant death syndrome. CESDI SUDI research group. BMJ 1999;319(7223):1457–61.
30. Carroll-Pankhurst C, Mortimer EA, Jr. Sudden infant death syndrome, bedsharing, parental weight, and age at death. Pediatrics 2001;107(3):530–6.
31. Person TL, Lavezzi WA, Wolf BC. Cosleeping and sudden unexpected death in infancy. Arch Pathol Lab Med 2002;126(3):343–5.

**32.** Collins KA. Death by overlaying and wedging: a 15-year retrospective study. Am J Forensic Med Pathol 2001;22(2):155–9.

**33.** Thogmartin JR, Siebert CF, Jr., Pellan WA. Sleep position and bed-sharing in sudden infant deaths: an examination of autopsy findings. J Pediatr 2001;138(2):212–17.

**34.** Scheers NJ, Rutherford GW, Kemp JS. Where should infants sleep? A comparison of risk for suffocation of infants sleeping in cribs, adult beds, and other sleeping locations. Pediatrics 2003;112(4):883–9.

**35.** Nakamura S, Wind M, Danello MA. Review of hazards associated with children placed in adult beds. Arch Pediatr Adolesc Med 1999;153(10):1019–23.

**36.** Drago DA, Dannenberg AL. Infant mechanical suffocation deaths in the United States, 1980–1997. Pediatrics 1999;103(5):e59.

# 16 Sudden Natural Death in Childhood

*David Dolinak, M.D.*
*Evan Matshes, M.D.*
*Emma Lew, M.D.*

**COMPLICATIONS OF PREMATURITY    346**
   Hyaline membrane disease/bronchopulmonary dysplasia    346
   Necrotizing enterocolitis    346
   Subependymal germinal matrix hemorrhages    346
**COMPLICATIONS OF CEREBRAL PALSY    346**
**COMPLICATIONS OF DOWN SYNDROME    346**
**CENTRAL NERVOUS SYSTEM PATHOLOGY    347**
   Meningitis    347
   Epilepsy    347
   Chiari malformation    348
   Dandy-Walker malformation    348
   Hydrocephalus    350
**CARDIOVASCULAR PATHOLOGY    350**
   Congenital heart disease    350
   Myocarditis    351
   Dysrhythmia    352
**RESPIRATORY AND ENT PATHOLOGY    353**
   Pneumonitis/bronchopneumonia    353
   Interstitial pneumonitis    353
   Influenza A viral infection, tracheobronchitis, and bronchopneumonia    354
   Influenza A viral infection, tracheobronchitis, and interstitial pneumonitis    354

Streptococcal pneumonia, possibly preceded by viral infection    355
**Asthma    355**
Pulmonary hemosiderosis and pulmonary hemorrhage    356
Idiopathic pulmonary hemosiderosis    357
Acute otitis media    357
Tonsillar asphyxia    357
**GASTROINTESTINAL PATHOLOGY    358**
   Intestinal obstruction    358
   Dehydration    358
   Undernutrition/malnutrition and failure to thrive    360
   Chronic gastroesophageal reflux    360
   Reye's syndrome    360
**ENDOCRINE PATHOLOGY    361**
   Diabetes and diabetic ketoacidosis    361
**HEMATOPATHOLOGY: SICKLE CELL ANEMIA    361**
**INFECTIOUS DISEASE    362**
   Sepsis    362
   AIDS    363
   Waterhouse-Friderichsen    363
   Kawasaki disease    363
**REFERENCES    366**

The scope of forensic pediatric pathology is enormous. In an attempt to identify those conditions of increased prevalence in a medical examiner's population, we undertook a retrospective review of all pediatric deaths investigated by the Miami-Dade County Medical Examiner Department between 1994 and 2003. This study included 1,515 deaths between the ages of 0 and 18 years. Of those, 414 were attributed to natural causes. These cases were subdivided by cause of death, and the 32 most common or interesting categories are included for discussion in this chapter.

SIDS-type cases form a large proportion of cases in pediatric forensic pathology—in our study, approximately 25 percent of natural deaths. These are discussed separately in Chapter 15 where a more thorough discussion of SIDS issues is appropriate. Although there is great interest in pursuing diagnostic schemas for the autopsy-based recognition of previously undiagnosed genetic and metabolic disorders, this is not covered here due to the rarity of such conditions. Our retrospective study revealed no single documented case of sudden death in such a scenario. Although sudden deaths that result from

genetic and metabolic disorders are rare, the value of postmortem testing for these disorders should not be negated, because with improved testing methods and understanding of disease, progressively larger numbers of cryptic conditions will be detectable via laboratory methods.

## Complications of prematurity

Prematurity may lead to chronic health problems, and the more premature an infant is, the more likely the infant will have serious medical conditions, and the more likely the infant will eventually die from complications of these conditions. The most common and serious complications of prematurity are hyaline membrane disease/bronchopulmonary dysplasia, necrotizing enterocolitis, and subependymal germinal matrix hemorrhage.

### Hyaline membrane disease/bronchopulmonary dysplasia

Hyaline membrane disease (HMD) is characterized by firm, atelectatic lungs that on histologic examination have pink hyaline membranes lining terminal and respiratory bronchioles and alveolar ducts. It is commonly associated with pulmonary surfactant deficiency. In infants who survive the initial manifestations of HMD, the development of bronchopulmonary dysplasia (BPD) may follow in weeks to months. BPD initially is characterized by organization of HMD that then transitions into chronic disease characterized by bronchial and bronchiolar metaplasia, a large amount of mucous secretion, atelectasis, and peribronchiolar smooth-muscle hypertrophy.

### Necrotizing enterocolitis

Necrotizing enterocolitis most commonly presents approximately 1 week after birth and is due to a combination of factors including intestinal ischemia, bacterial colonization, and inflammatory mediators. It is identified as coagulative and hemorrhagic necrosis in areas of the small and large intestine, most commonly affecting the terminal ileum and cecum. Perforation may lead to peritonitis, and it has an overall mortality of 20 to 30 percent.

### Subependymal germinal matrix hemorrhages

Subependymal germinal matrix hemorrhages usually arise in the germinal matrix region of the brain adjacent to the caudate nucleus. They usually develop and expand from a few hours to a couple of days after birth. The hemorrhage may rupture into the lateral ventricles, spread into the foramina of Luschka and Magendie, and extend into the subarachnoid space around the cerebellum and brainstem. Germinal matrix hemorrhages are

most common in premature babies, but their etiology is not fully understood and may include complications of hypoxia acting on immature cerebral blood vessels.

The majority of deaths resulting from complications of prematurity are natural in etiology and often involve premature rupture of membranes and/or chorioamnionitis. However, one must be vigilant in the investigation of death related to prematurity caused by maternal trauma or maternal drug abuse, because the circumstances of the premature labor and delivery may engender a nonnatural manner of death such as accident or homicide.

## Complications of cerebral palsy

Cerebral palsy is defined as a nonprogressive spastic paresis. In most cases, cerebral palsy is evident from the time of birth or shortly thereafter, and it is common not to be able to determine its etiology. It is important, however, to consider that the term *cerebral palsy* is sometimes used as a generic descriptor for almost any chronic encephalopathic condition in youngsters, and one must be vigilant to rule out traumatic or other nonnatural etiologies that may have been overlooked through the years.

Children with cerebral palsy frequently also have seizure disorders and, despite therapeutic levels of anticonvulsant medications, may die suddenly and unexpectedly related to seizures. This may happen despite good control of seizure activity including the absence of recent seizures. In some cases, the neuropathologic examination may be unimpressive, despite the functional limitations of the child. One must be reminded that cerebral palsy is a heterogeneous disorder and one should expect a spectrum of neuropathologic changes, which may range from the extreme of marked hydrocephalus with a paucity of brain tissue, to various identifiable conditions such as porencephaly, pseudopolymicrogyria, ulegyria, and various types of infarcts or ischemic lesions, to a paucity of gross and microscopic findings in a normal-appearing brain. Depending on the severity of the condition, those with cerebral palsy may develop bronchopneumonia related to inactivity or as a result of the aspiration of secretions and/or food.

A 10-year-old died from complications of cerebral palsy. Note the marked wasting away of skeletal muscle and soft tissues (**Image 16.1**). Note the hydrocephalus on coronal sections of the brain (**Image 16.2**).

## Complica tions of Down syndrome

Trisomy 21 (Down syndrome) is the most common abnormality of autosomal chromosomes. Children affected by this condition traditionally have a character-





istic grouping of morphologic abnormalities including microcephaly, flat occipital profile, epicanthal folds, a high arched palate, Brushfield spots (speckling of the iris), and transverse palmar (Simian) creases. In addition to varying levels of mental retardation, these children can have multiple significant pathologies. Research has shown that 15 percent[1] to 44 percent[2] of all Down syndrome children have some form of congenital heart disease. Although variation exists among publications,[1–3] atrial septal defects (ASDs) and ventricular septal defects (VSDs) are typically most common, followed by secundum atrial defects, isolated persistent ductus arteriosus, and tetralogy of Fallot. As a consequence of VSDs, affected children are at risk of developing Eisenmenger's syndrome—a right to left shunt because of pulmonary vascular disease with secondary persistent pulmonary hypertension.[4]

More than 60 percent of the Down syndrome population is reported to have vertebral anomalies,[5] and as many as one-quarter may have *atlanto-occipital dislocation*.[4] Although most patients will present to clinicians with incontinence or gait disturbance, death is an established outcome.[6,7] As a result, autopsies of individuals with Down syndrome may include radiographs of the cervical spine and, when necessary, dissection of the posterior neck (see Chapter 28).

## Central nervous system pathology

### Meningitis

More than 90 percent of childhood meningitis occurs in the 5-years-and-under age group.[8] Although viral infections tend to dominate, a wide spectrum of organisms can potentially infect the central nervous system. In neonates, these tend to be group B streptococci, *Escherichia coli*, and *Listeria monocytogenes*; in children, these are often *Neisseria meningitidis*, *Streptococcus pneumoniae*, and *Haemophilus influenzae*. More than 70 percent of all viral causes are due to enteroviruses.[9] Most children with meningitis will present to hospital with complaints of headache, altered level of consciousness, generalized poor feeding, and irritability. They may also have specific classical physical signs of meningismus. If such a child should die and then come to the attention of the medical examiner, the pathologist should be cognizant of the need to obtain cerebrospinal fluid (CSF) for microbiological purposes. Some investigators choose to obtain CSF samples on all children presenting with sudden death, with or without neurologic symptoms. Lumbar puncture can be easily performed with disinfection of skin in the lumbar region and the use of a sterile syringe (**Image 16.3**).

One must always consider traumatic etiologies in cases of meningitis. If such causation is identified, either through autopsy or evaluation of circumstances of death, the manner of death will likely not be classified as natural.

The adolescent shown in **Image 16.4** complained of progressively worsening headache, neck stiffness, photophobia, and vomiting over a 2-day period. Finally, she became obtunded and was transported to hospital where she died shortly thereafter. Autopsy demonstrated purulent exudate in the arachnoid space, with extension around the high cervical cord.

### Epilepsy

As in adults, sudden and unexpected death may occur in young children with epilepsy. The exact pathophysiology of the death is not well defined, but is likely related to seizure activity inducing a fatal dysrhythmia. Although most cases are natural deaths, with no defined epileptic etiology, proper investigation and certification of these deaths requires inquiry into any history of



16.3



16.4

significant traumatic head injury or hypoxic-ischemic brain injury (or a combination thereof) that could result in an accidental or homicidal manner of death. Depending on the type of head injury and its severity, remote head injury may or may not be identified at autopsy. Causes of epilepsy that are of a natural etiology include cerebral malformation, neoplasm, cerebral infarct, and remote meningitis or encephalitis, with resultant scarring of the brain parenchyma. Again, one must be reminded that the meningitis and/or infarct may be consequent to a remote head injury.

Analysis of the blood for anticonvulsant medications may indicate whether or not the patient was taking (or being administered) medication, *but fatal seizure activity can occur despite therapeutic drug levels and despite infrequent or rare seizure activity*. In these deaths, one may also consider positional asphyxia, or other manners of asphyxia based on how the body was positioned when found.

In the brain of this 2-year-old (**Image 16.5**) who died of epilepsy, note the gliotic white matter and abnormal-appearing gyri that have a ulegyric appearance. On additional cross sections, note the hydrocephalus ex vacuo. Also, the thalami are shrunken and pale (**Image 16.6**). She had developed perinatal asphyxia, and imaging studies had documented diffuse cerebral atrophy and periventricular leukomalacia.

#### Chiari malformation

Chiari malformation (also referred to as Arnold-Chiari malformation) is a congenital defect of the brain that is manifest in three different levels of severity. Type 1 is often asymptomatic and consists of a chronic conical displacement of cerebellar tonsils into the foramen magnum. It can be described as *chronic tonsillar herniation*, and affected children often have a slightly smaller posterior cranial fossa. In the type 1 malformation shown

in **Image 16.7**, note the prominent, herniated cerebellar tonsils. Owing to the chronicity of the herniation, the cerebellar tonsils are often sclerotic. Type 2 Chiari malformation involves elongation of the cerebellar vermis and brainstem and their displacement into the upper cervical canal. In **Image 16.8**, note the elongated appearance of the brainstem on sagittal sectioning of the brain. In type 2 malformation, spina bifida is often present, as is hydrocephalus, which is usually from aqueductal stenosis or from obstruction of the flow of cerebrospinal fluid through the fourth ventricle by compressive effects. As a result of the hydrocephalus, polygyria (an increase in the number of gyri) is often present (**Image 16.9**). Type 3 Chiari malformation is rare and is manifest as a high cervical bony defect with herniation of the cerebellum through the defect into an encephalocele. Other features often include elongation and kinking of the brainstem and lumbar spina bifida. The different types of Chiari malformation can cause sudden and unexpected death by means that are not entirely certain, but in some instances may involve acute obstruction of cerebrospinal fluid, resulting in acute hydrocephalus.

#### Dandy-Walker malformation

Dandy-Walker malformation is a congenital defect in the brain diagnosed by the presence of three findings: agenesis of the cerebellar vermis, cystic dilatation of the fourth ventricle, and enlargement of the posterior cranial fossa. These findings are often associated with some degree of hydrocephalus and polygyria. Additionally, one may see agenesis of the corpus callosum, cortical dysplasias, and other anomalies. This malformation may be similar to—and must be differentiated from—Chiari malformations (which have a small posterior cranial fossa) and a retrocerebellar arachnoid cyst (which compresses the brainstem, but does not communicate with the fourth ventricle). Death may occur because of the



16.5



16.7



16.6



16.8



16.9

malformation itself or its sequelae, such as seizures, pneumonia, or other events.

A 3-year-old child was born with a congenital cytomegalovirus infection and was treated with phenytoin and phenobarbital for recurrent seizures. She was discovered dead in bed by her mother after 3 seizure-free days and no recent illnesses. Autopsy demonstrated the classical features of Dandy-Walker malformation including agenesis of the cerebellar vermis (**Image 16.10**). Further neuropathologic examination showed hydrocephalus, absence of the corpus callosum, and polygyria.

### Hydrocephalus

The term *hydrocephalus* generally refers to increased cerebrospinal fluid in the cerebral ventricles. In **Image 16.11**, note the large, voluminous lateral ventricles in the brain of this child with hydrocephalus. Hydrocephalus is divided into different types, based on its etiology. *Obstructive (noncommunicating) hydrocephalus* occurs when a lesion or stricture prevents CSF from flowing freely from the lateral ventricles to the subarachnoid space. Lesions frequently affect the smaller CSF channels such as the cerebral aqueduct, and the foramina of Luschka and Magendie. Examples of obstruction include colloid cyst of the third ventricle, tumor compression of the third ventricle, tumors in the posterior cranial fossa, inflammatory infiltrate, and aqueductal stenosis. Cases with *communicating hydrocephalus* have freely flowing CSF, but impairment of CSF absorption. *Hydrocephalus ex vacuo* results from a loss of white matter and enlargement of the ventricular system secondary to brain atrophy, such as may occur in trauma and strokes. The term *external hydrocephalus* is applied when there is excessive CSF in the subarachnoid space, not in the ventricular system. This may be seen in cases of cerebral atrophy. Some reports indicate that young children with external hydrocephalus may be at increased risk of subdural hemorrhage with minor head injury, due to preexisting stretching of the bridging veins in the unusually widened subarachnoid spaces.[10–12]

## Cardiovascular pathology

### Congenital heart disease

Sudden unexpected infant death from congenital heart disease is an uncommon, but not rare, event. In our retrospective review, it accounted for approximately 1 percent of all child deaths. This is somewhat less than that found by other investigators who reported that 3 percent of their pediatric deaths could be attributed solely to congenital cardiac malformation.[13] This same group further analyzed the abnormality by specific diagnosis, and listed patent ductus arteriosus (PDA), aortic coarctation, ventricular septal defect (VSD), and aortic orifice stenosis as the most commonly occurring cardiac

anomalies. Cardiomegaly was noted in each of the hearts studied by this group, as was severe left interventricular septal subendocardial fibrosis. Each of these cardiac abnormalities is known to place infants at risk of sudden death as a result of congestive heart failure and arrhythmias including ventricular fibrillation.[14,15]

Many infants dying suddenly of congenital cardiac malformation have no antecedent symptomatology; some even die in the middle of normal activities of daily living. Others will die while sleeping, and thus will often present as apparent SIDS deaths. Careful cardiac dissection is necessary to identify, document, and interpret some cardiac lesions.[16] It is often helpful to fix speci-



16.10



16.11

mens in formalin prior to dissection, or to request consultation from a cardiac pathologist to better define the conditions.

The heart featured in **Image 16.12** is from a 9-year-old child who was witnessed to have "seizure-like" movements after collapsing to the ground. He was transported to hospital where he was pronounced dead. Autopsy demonstrated severe left ventricular hypertrophy associated with previously undiagnosed left ventricular outflow tract obstruction.

This 2-day old child (**Image 16.13**) was found cold and unresponsive 2 hours after breastfeeding. The maternal and neonatal histories were unremarkable. Autopsy showed a hypoplastic left ventricle with combined mitral and aortic valve atresia.



16.12



16.13

## Myocarditis

Myocarditis is recognized as a legitimate cause of sudden natural death in infants.[17–20] Depending on the study, rates vary from 1.2 percent[21] (our rate was 1.3 percent) to as high as 10 percent[22] of forensic autopsies. Recent research by Dettmeyer et al.[23] revealed that immunohistochemical and molecular (PCR) studies are successful in identifying more than twice as many cases of viral myocarditis as standard methods. In a cohort of histologically proven cases of myocarditis, Smith et al.[20] demonstrated the widely varying histories associated with cases of fatal infant myocarditis and the need to closely examine the heart for this disease state, even in the presence of other potentially lethal pathology. One study indicated that evidence of acute myocarditis was isolated to, or was significantly more prominent in, the anterior inferior segment of the interatrial septum,[18] highlighting the need for detailed study. In addition to standard retention of cardiac tissue, pathologists autopsying sudden infant deaths should endeavor to obtain tissue from the interatrial and interventricular septa for possible microscopic study of these specific sites.

An 8-month-old, otherwise normal child was noted by her mother to be wheezing. Because the child's older sibling suffered from asthma, the mother thought it appropriate to administer Ventolin. After 2 days, the wheezing had worsened, and the child was markedly congested. The infant then went into respiratory arrest and, although emergency medical services were summoned, the child died. Autopsy demonstrated a markedly enlarged and globular heart (**Image 16.14**) that, when sectioned, showed mild ventricular dilatation (**Image 16.15**). Microscopic examination showed a predominantly lymphocytic infiltration of the myocardial interstitium (**Image 16.16**).



16.14


16.15


16.16

## Dysrhythmia

### Cardiac dysrhythmia of undetermined etiology

The term *cardiac dysrhythmia* can be used as a cause of death, but is almost always a diagnosis of exclusion. It relates to a nonspecific, often presumed condition, and other more concrete and convincing causes of death should be eliminated. Evidence supporting a sudden death due to cardiac dysrhythmia includes previously documented dysrhythmic conditions such as prolonged QT interval or Wolff-Parkinson-White syndrome (if one is fortunate enough to have EKGs or medical records supporting such entities). Other clues may include family histories of such entities and other family members dying similar deaths. There may be a history of syncope or near-syncope or palpitations in the individual or in family members. At autopsy, there is no demonstrable cause of death. Because no structural cause of death can be identified, a functional cause of death is usually presumed and may be attributed to cardiac conduction abnormalities. Careful sectioning and evaluation of the conduction system may provide an answer, but all too often does not provide an anatomic abnormality.

### Differential diagnosis in dysrhythmic deaths of undetermined etiology

The *long QT syndrome*, like other dysrhythmic disorders, has no anatomic markers and can be manifest as syncope, seizures, or sudden death, although 30 percent of those who die of this syndrome do not experience any symptoms. It has both familial and acquired forms and is believed to affect 1 in 5,000 to 10,000 individuals.[24,25] Two of the genetic forms are seen in Jervell and Lange-Nielsen syndrome and Romano-Ward syndrome.[25,26] The acquired forms may be due to drugs or other toxins, electrolyte abnormalities, or other factors.[26] It is a disorder of cardiac repolarization that may lead to ventricular tachyarrhythmias such as *torsades de pointes* or cardiac arrest with exercise or emotional stress, often in those less than 15 years old.[24–26]

Genetic studies have identified multiple abnormalities in different chromosomes with genes related to sodium and potassium ion pumps; these pumps are believed to account for the lengthened action potential and prolonged QT on EKG and the propensity to ventricular fibrillation.[25,26] The mortality in untreated symptomatic patients has been reported to exceed 60 percent in 15 years.[27] A previous EKG may show a prolonged QT interval and is worth inquiring about. Although postmortem molecular analysis can identify long QT syndrome gene defects from paraffin-embedded tissue, if one is considering the diagnosis, more ideal specimens include either 10 to 15mL of EDTA-preserved blood and/or 5 to 10 grams of heart, liver, or spleen tissue flash-frozen and stored at −80 degrees Celsius.[24] The importance of making such a diagnosis has potential benefit for medical follow-up and treatment of surviving family members.

*Brugada syndrome* is a rare autosomal dominant disorder that is likely associated with defects in the cardiac sodium channels, leading most commonly to ventricular fibrillation. It can be diagnosed by electrocardiographic abnormalities. The QT interval is not prolonged.[26]

One may also consider other dysrhythmic syndromes such as *Wolff-Parkinson-White* and *atrioventricular block*.

A 15-year-old male was found dead in bed. A complete autopsy including toxicology failed to determine a

cause of death. Specifically, his 290-gram heart was grossly unremarkable. Microscopic examination of the heart was unremarkable except for a section of the atrioventricular (AV) node, which showed islands of scattered conduction fibers embedded within the central fibrous body (**Image 16.17**). This finding has been referred to as *persistent fetal dispersion of the AV node*. He had no known history of syncope, seizure, palpitations, or any other symptoms of a possible cardiac disorder. No such symptoms were admitted by any of his family members. His 11-year-old sister had died suddenly and unexpectedly the previous year after she collapsed while playing on a playground. Following an autopsy, no compelling cause of death could be identified and her cause of death was listed as "cardiac dysrhythmia of undetermined etiology." Her autopsy had been unremarkable, however she also had persistent fetal dispersion of the AV node. Following her death (and a year before his death) the deceased and his family members underwent thorough cardiac evaluations, including EKG, stress testing, echocardiography, and provocative testing for Brugada, all of which were negative. Specifically, there was no evidence of long QT syndrome. Despite the detailed antemortem cardiac testing, investigation still strongly suggested that he died from a sudden cardiac dysrhythmia, which, being functional and not structural in origin, could not be identified at autopsy. Hence, his death was also attributed to a cardiac dysrhythmia of undetermined etiology.

In two series of sudden and unexplained deaths in young to middle-aged people, an autopsy demonstrated the finding of persistent fetal dispersion of the AV node.[28,29] Although this finding may be the substrate for a dysrhythmia, it is also considered a normal variant, and it is difficult to determine what, if any, role this finding may have in precipitating a fatal dysrhythmia. In fact, there is no firm evidence linking persistent fetal dispersion of the AV node with any abnormal electrophysiological activity.[29] Although it is uncommon to attribute a death to "cardiac dysrhythmia of undetermined etiology," or similar wording, it may be appropriately listed after thorough case workup with consideration of the investigation, past medical history, family medical history, toxicology, and detailed gross and histologic examination.

## Respiratory and ENT pathology

### Pneumonitis/bronchopneumonia

When an infant or young child dies of pneumonia, a non natural death must be ruled out, such as rib fractures or other trauma or possible neglect with malnutrition. Causes of pneumonia and chronic interstitial lung disease include anything that may lead to aspiration such as tracheoesophageal fistulas, swallowing disorders, and gastroesophageal reflux. One may also consider an immunocompromising condition.[30]

### Interstitial pneumonitis

Interstitial pneumonitis is generally a mild infliction of the lungs that, in appropriate circumstances, may be a cause of sudden and unexpected death. It may have a varied histologic appearance, but generally is characterized by a hypercellular interstitium thickened by the accumulation of lymphocytes, plasma cells, macrophages, and other cells. The pneumocytes are hyperplastic and there may be varied amounts of amorphous proteinaceous alveolar debris. The histologic changes may be patchy or diffuse. One should avoid confusing interstitial pneumonitis with atelectasis, which may cause multiple alveolar septa to rest against each other, giving the impression of thickened septa. Although pneumonia is an acceptable and fairly common cause of death, interstitial pneumonitis usually requires a more critical analysis of the case and exclusion of other diagnoses or possibilities before it is given as the cause of death. The conditions of bronchitis and bronchiolitis are descriptive diagnoses and in most circumstances, in isolation, are not common causes of death.

*Viral infections* may lead to either pneumonitis or pneumonia. In each condition, upper respiratory symptoms are usually present. The medical examiner becomes involved when the child dies suddenly and unexpectedly. The more common viruses that may predispose to pneumonia and pneumonitis are respiratory syncytial virus (RSV), adenovirus, and influenza virus. The resulting pneumonitis and pneumonia may lead to apnea and sudden death. Although it is advantageous to obtain bacterial and viral cultures at autopsy, detection of viruses is often difficult and the cultures are often of questionable yield. The following cases demonstrate the spectrum of viral and bacterial lung infections that can lead to an infant's death.



16.17

### Influenza A viral infection, tracheobronchitis, and bronchopneumonia

A 1-year-old toddler was sick for a few days with flu-like symptoms when she developed respiratory distress and then became apneic and could not be resuscitated. At autopsy, the upper lobes of her lungs were pink and crepitant. Her lower lobes were congested with areas of consolidation and green mucus in the bronchi. On histology, note the innumerable acute inflammatory cells in the alveoli (**Image 16.18**). The trachea had marked acute, but also chronic, inflammation in the submucosa (**Images 16.19** and **16.20**). A blood culture was positive for *Streptococcus pneumoniae*. A rapid screen test for influenza A virus from a nasopharyngeal swab and a viral culture from lung tissue both were positive for influenza A virus. In this case, it is likely that a viral infection led to tracheobronchitis and superimposed bacterial bronchopneumonia, which caused her death.

### Influenza A viral infection, tracheobronchitis, and interstitial pneumonitis

An 8-month-old infant was found unresponsive after recent flu-like symptoms. A sibling was diagnosed with "the flu." At autopsy, the upper lobes of the lungs were pink and crepitant. The lower lobes of the lungs were congested and vaguely consolidated. Olive green mucus obstructed the bronchi. Histologically, the trachea and bronchi had marked chronic, but also acute, inflammation in the submucosa, with denuded epithelium and superficial ulceration (**Image 16.21**). The lungs had diffusely hypercellular interstitium with many mononuclear inflammatory cells (**Image 16.22**). There was abundant mucus and inflammatory cells in the bronchi and bronchioles and patchy atelectasis. A bacterial culture of the lungs was positive for *Streptococcus pneumoniae*. A lung viral culture was negative, however, immunohistochemical staining for influenza A virus was



16.18



16.20



16.19



16.21

positive in the bronchi and lung parenchyma. It is likely that an infection with influenza A virus led to necrotizing tracheobronchitis, interstitial pneumonitis, and the infant's death.

### Streptococcal pneumonia, possibly preceded by viral infection

A 2-month-old infant was found supine and unresponsive in his crib. He had a recent stuffy nose and congestion. An older sibling had a cold. There were no abnormal gross findings at autopsy. Histologically, the lungs had extensive chronic inflammatory infiltrate in the septa with some scattered atypical cells (**Image 16.23**), and the alveoli had areas of macrophage infiltration (**Image 16.24**). The trachea and bronchi had chronic inflammation in the submucosa. A bacterial blood culture was negative. A viral lung culture and nasopharyngeal viral culture were negative. Immunohistochemical staining for influenza A and B virus and RSV was negative. Immunohistochemical staining for *Streptococcus pneumoniae* bacteria in the lungs was focally positive. Although no virus could be detected, it is suggestive that

a viral infection preceded a superimposed bacterial infection, leading to the development of interstitial pneumonitis and pneumonia, and the infant's sudden and unexpected death.

A uniformly diffuse type of interstitial pneumonitis affecting infants has been termed *chronic pneumonitis of infancy*.[31] In these cases, which affect predominantly infants of average age 3 to 4 months, the lungs have marked alveolar septal thickening and pneumocyte hyperplasia, with alveolar exudates containing abundant macrophages and some eosinophilic debris. The alveolar septa were thickened by primitive mesenchymal cells and only scant inflammatory cells.

### Asthma

Asthma is the most common chronic disease in children and a significant cause of childhood morbidity and mortality. Asthma is a diffuse obstructive pulmonary disease characterized by airway inflammation and hyperreactivity that causes intermittent narrowing of the airways and difficulty breathing. Dyspnea is likely caused by a combination of factors including bronchospasm, airway mucosal inflammation, and mucous plugging of the airways. Asthmatic episodes may be progressive, ranging from a moderate degree of disability to life-threatening respiratory failure.

A toddler with a history of asthma developed dyspnea and became unresponsive while receiving breathing treatments at home. Grossly, the lungs appeared normal, although in asthma, they are often overinflated (**Image 16.25**) and have mucus in the bronchi. Histologically, note the mucus in the bronchioles and the acute and chronic peribronchiolar inflammation with a small number of scattered eosinophils (**Images 16.26** and **16.27**). Note how the histologic appearance of asthma in this toddler differs from that in an older child or an adult, in which years of the disease have allowed for the development of some of the more classic histologic hallmarks of asthma such as bronchial basement membrane thick-



16.22



16.23



16.24

ening, hypertrophy of smooth muscle in the bronchial wall (**Image 16.28**) and mucosal gland hypertrophy. In cases of chronic asthma, one will often see the gross manifestations of the disease such as overinflated lungs and mucus in the airways. Asthma can be unpredictable and severe, and may cause sudden and unexpected death in children despite medical therapy. *Status asthmaticus* is a term applied to a life-threatening form of asthma in which a progressively worsening asthma attack is unresponsive to the usual appropriate therapy.

## Pulmonary hemosiderosis and pulmonary hemorrhage

Pulmonary hemosiderosis is a diagnosis given when abundant hemosiderin-laden macrophages are in alveoli throughout the lungs. The hemosiderin is indicative of previous hemorrhage in the lungs or aspiration of blood, with the subsequent breakdown of hemoglobin and, as such, is nonspecific. Pulmonary hemosiderosis may occur as a primary process in which the etiology is unknown (idiopathic pulmonary hemosiderosis), or it may occur secondary to known pulmonary hemorrhage

resulting from a number of conditions known to cause bleeding in the lungs such as chronic heart failure, bleeding diathesis, complications of prematurity, hypoxia/ischemia, trauma, fungal infection by *Stachybotrys atra*, bacterial pneumonia, drowning, pulmonary hypertension, and neoplasia.[32–34] In a review of 60 infant autopsies, some degree of pulmonary hemorrhage was common and was usually patchy and sporadic, and such hemorrhage may be exacerbated by resuscitation attempts.[35] Because cases of sudden infant death syndrome (SIDS) and overlay occasionally have scattered areas of blood in the alveoli, it is theorized by some that increased alveolar hemosiderophages may be reflective of a previous event that has been repeated, causing the infant's sudden and unexpected death. An iron stain can be advantageous in detecting and confirming hemosiderophages.

Pulmonary macrophages may appear in 1.5 to 2 days to break down iron from hemoglobin in red blood cells to hemosiderin.[36] It can take up to 2 weeks for pulmonary hemosiderophages to be cleared from the lungs following acute hemorrhage.[36]


16.25


16.27


16.26


16.28

Increased pulmonary hemosiderophages have been documented in infants dying of asphyxia and trauma and, as such, it is believed that significantly increased numbers of pulmonary hemosiderophages can be viewed as a marker of repeated asphyxia or trauma.[33] In two series of cases, those diagnosed as "SIDS" did not have significantly increased pulmonary hemosiderophages.[32,33] In one of the series, general macrophage count alone was not increased in cases of "SIDS."[37]

### Idiopathic pulmonary hemosiderosis

A 2-month-old infant had respiratory problems for a few days before she was found dead. She was otherwise healthy and there were no significant gross autopsy findings. On histologic examination of the lungs, note the large numbers of hemosiderophages nearly filling the majority of the alveoli (**Image 16.29**). An iron stain highlights the hemosiderin component of the macrophages (**Image 16.30**). No etiology of the hemosiderophages could be determined, and this is an example of the uncommon condition of *idiopathic pulmonary hemosidero-sis*, which is a rare cause of death of infants and young children.

### Acute otitis media

Acute otitis media (AOM) has long been recognized as a common affliction of youth that in rare circumstances has the potential to be fatal.[38] Although the dawn of the antibiotic era brought with it a markedly decreased complication rate for AOM, immunocompromised children and those with certain anatomical abnormalities continue to be at increased risk of death. As a general rule, this occurs secondary to the direct spread of infection to the intracranial space with resultant epidural abscess, dural venous thrombophlebitis, meningitis, or cerebral abscess.[39] Therefore, if autopsy demonstrates an intracranial infection, we recommend evaluation of the middle and inner ears for a source of primary infection. This can be easily done by removal of the intracranial portion of the petrous temporal ridge with a skull saw (**Image 16.31**).

A 2-year-old child was discovered dead after being put to bed. He had no previous medical history, but a 1-month-old police report stated that the parents were under investigation for an alleged accident involving the child and an electric iron. This raised suspicion that this was a nonnatural death. Autopsy demonstrated a mildly edematous and injected brain (**Image 16.32**). Dissection of the petrous temporal bones showed bilateral purulent otitis media (**Image 16.33**). Microscopic examination of the brain showed diffuse neutrophilic infiltration of the leptomeninges. The cause of death was attributed to early meningitis associated with purulent otitis media.

### Tonsillar asphyxia

Although tonsillitis is generally regarded as a benign affliction, deaths may rarely occur with tonsillitis and usually arise from complications of tonsillectomy, whether related to an anesthetic procedure, medications,



16.29



16.30



16.31

or aspiration following surgery. Also, rarely, the pharyngeal tonsils can become so enlarged (tonsillar hypertrophy) as to obstruct the airway, causing an asphyxial death.

A 2-year-old toddler was found dead at home. Note the markedly enlarged tonsils that likely led to acute asphyxiation (**Image 16.34**).

## Gastrointestinal pathology

### Intestinal obstruction

Intestinal obstruction may be due to varied etiologies, including intussusception, volvulus, and bowel atresia.



16.32



16.33

An intussusception may have an associated anatomic abnormality that serves as the lead point, such as a Meckel's diverticulum, polyps, the appendix, a carcinoid tumor, submucosal hemorrhage, or a foreign body. However, the most common lead point is lymphoid hyperplasia in the ileal wall, likely associated with a recent upper respiratory tract infection or bout of gastroenteritis. In these cases, the swollen Peyer's patches protrude into the lumen of the bowel. Intestinal obstruction may also be caused by the rupture of an inflamed appendix and various congenital bowel disorders. Malrotation of the gut may predispose to volvulus. Intestinal obstruction may result from a strangled inguinal hernia. In cases of intestinal obstruction, death may occur from bowel infarction or bowel perforation with peritonitis. Alternatively, in some cases, the bowel obstruction may be apparent, but the bowel otherwise shows little abnormal morphology. Death in this scenario may arise from the combined effects of various electrolyte abnormalities and dehydration, possibly complicated by early sepsis. The sepsis may arise from early bowel ischemia, with translocation of bacteria into the systemic circulation, complicated by the deleterious effects of endotoxin or other agents.

In this 8-month-old infant, note the bowel herniated into the right pleural cavity (**Image 16.35**). The bowel had herniated spontaneously through a congenital defect in the right hemidiaphragm (**Image 16.36**) and became obstructed, resulting in the infant's death.

### Dehydration

The three types of dehydration are classified by electrolyte concentrations: isotonic, hypotonic, and hypertonic. The electrolyte concentrations are best determined by analysis of vitreous fluid because postmortem blood analyses are less accurate. Although vitreous urea nitrogen is often elevated in all types of dehydration (because of decreased intravascular volume, resulting in



16.34

decreased glomerular and tubular flow rates and hemo-concentration[40]), the concentration of sodium and chloride vary depending on different types of dehydration. Before determining that certain vitreous electrolyte and urea nitrogen concentrations are significantly deviated and suggestive of dehydration, one should be familiar with the range of normal values in one's own laboratory. Generally, the upper limit of normal for vitreous sodium is approximately 150 to 155 mEq/L and the upper limit for vitreous urea nitrogen (VUN) is approximately 25 mEq/L. *Although vitreous electrolytes and urea nitrogen concentrations can yield valuable information that is helpful in making a diagnosis of dehydration, even with significant dehydration, the vitreous electrolytes and urea nitrogen may not appear abnormal. This is particularly true if the dehydration was rapid.*

The diagnosis of dehydration should be made using all available antemortem and postmortem information, including a history of excessive fluid loss (vomiting, diarrhea) and/or decreased fluid intake, combined with physical signs of dehydration (reduced skin turgor, sunken appearance of the eyes, parched-appearing lips), and electrolyte and urea nitrogen concentrations supporting dehydration. Autopsy findings often include evidence of gastroenteritis or some other type of infection.

*Isotonic dehydration* is the most common form in children and is usually due to viral diarrhea. Loss of fluid and electrolytes from vomiting and/or diarrhea is the major cause of world infant mortality, although it is less common in the United States. Children can present with profound dehydration and shock from gastroenteritis. With fulminant gastroenteritis, a child may lose up to 10 to 20 percent of his circulating volume within a few hours. The most common etiology of gastroenteritis is viral, including rotavirus, enterovirus, and adenovirus. Profound dehydration can also be caused by bacterial gastroenteritis with organisms such as Salmonella, Shigella, Campylobacter, and Yersinia enterocolitica.

*Hypotonic dehydration* usually entails a sodium level of less than 130 mEq/L and can be seen in cystic fibrosis and in certain cases that involve excessive fluid loss through the gastrointestinal tract. *Hypertonic dehydration* is characterized by a sodium level of >155 mEq/L and is seen in excessive salt consumption or salt injection, water deprivation/water loss, and diabetes mellitus. The water loss may be due to fever, tachypnea, or a low-humidity environment. *Hypertonic dehydration has the highest mortality rate and is the type of dehydration most commonly seen in neglect.*

A 5-week-old infant died of hypertonic dehydration. She was admitted to the hospital with seizures and was soon diagnosed with severe dehydration. She was tachypneic, had tachycardia, and had the following laboratory abnormalities: sodium 204 mEq/L, chloride 171 mEq/L, blood urea nitrogen 25 mg/dL, and serum osmolarity of 417 mEq/L. It was estimated that she was approximately 15 percent dehydrated. She never regained consciousness, developed brain swelling, and died. At autopsy, note the thrombosis of her superior sagittal sinus, which also involved to some extent the cortical veins (**Image 16.37**). Thrombosis of the superior sagittal sinus is a known complication of severe dehydration.

A 1-month-old female infant was found unresponsive after a 1-week history of vomiting and diarrhea. She had recently been diagnosed with dehydration. Note the decreased skin turgor on her chest (**Image 16.38**). Her cause of death was "dehydration due to gastrointestinal illness, probably viral."



16.36

16.35

In another case of dehydration (**Image 16.39**), note the sunken appearance of the eyes and the parched-appearing lips of this infant who died of "dehydration associated with pneumonitis and enteritis of probable viral etiology."

## Undernutrition/malnutrition and failure to thrive

Infants and young children who are significantly under-sized and underweight may not be consuming enough food to grow in a healthy, robust manner. If an infant fails to grow despite conscientious and proper feeding and without a medical explanation, the term *failure to thrive* may be applied. Cases determined to be failure to thrive often involve significant investigation in addition to the autopsy findings, and include review of birth records, feeding procedures, diet, growth charts, medical records, metabolic workup, family history, health of siblings, and investigation of the home environment. Perhaps most significant to rule out are deliberate malnutrition, neglect, or any other malevolent acts.

At autopsy, aside from an undersized, thin infant, there is a paucity of subcutaneous fat. Related to this, the buttocks may appear flat or small. Body measurements should include the standards of body weight, crown–heel length, crown–rump length, head circumference, chest circumference, abdominal circumference, and foot length. Careful external examination may identify dirt caked on the skin, particularly in areas of skin folds such as the axilla and popliteal fossa, and there may be varying degrees of "diaper rash," which may be reflective of suboptimal care/attention. Internally, pneumonia is commonly detected and, in many cases, is the most likely terminal event leading to death.

## Chronic gastroesophageal reflux

Infants with chronic gastrointestinal reflux may aspirate feedings and develop aspiration pneumonia. In such cases, histologic sections of the lungs may show a chronic inflammatory reaction to foreign material such as multi-nucleate giant cells. Engulfed foreign material or recently aspirated foreign material may be more easily identified by viewing the slide under polarized light. However, the mere presence of food material in the bronchi or bronchioles without any tissue reaction is not necessarily evidence that food aspiration had recently occurred, because agonal aspiration of gastric contents may occur in the perimortem period or during resuscitative efforts.

## Reye's syndrome

Reye's syndrome is found exclusively in children less than 15 years of age, and is characterized clinically by signs of hepatic and central nervous system damage, as well as hypoglycemia. It is now relatively uncommon because of recognition of its association with salicylate administration in children. Rarity aside, it may still present to the medical examiner as a case of sudden unexpected death.[41] Autopsy findings of marked hepatic



16.37



16.38



16.39

steatosis with diffuse microvesiculation of hepatocytes, cerebral edema, and neuronal degeneration should prompt inquiries about salicylate administration to the child. Investigators should be reminded, though, that Reye's syndrome may occur in the absence of salicylate exposure.

A 1-year-old male showed signs of a flu-like illness over a period of 2 days. His mother attempted to treat his progressively worsening fever with "small doses" of aspirin. He continued to worsen, became pale, weak, and lethargic, and eventually expired. The most remarkable finding at autopsy was a yellow, fatty liver (**Image 16.40**). The cause of death was listed as Reye's syndrome and the manner of death was natural.

## Endocrine pathology

### Diabetes and diabetic ketoacidosis

The sudden and unexpected death of children from diabetes and diabetic complications is a relatively rare, but documented, event.[42,43] Our retrospective review showed a 10-year pediatric forensic autopsy population prevalence of approximately 0.2 percent. Although most children die secondary to the effects of glucose mismanagement during episodes of nonspecific or viral illness (nonadministration of insulin with resultant hyperglycemia and diabetic ketoacidosis), a small proportion of children presenting with sudden unexplained death will actually be undiagnosed type I diabetics.

As a result of rapid postmortem loss of serum glucose, hypoglycemia cannot be reliably detected or substantiated. Diagnostic evaluation of hyperglycemia from serum samples is easier, although for the same reason, they may be underestimated. Several groups have illustrated the utility of postmortem HbA1c determination for the evaluation of long-term glucose control and hyperglycemia.[44–47] Where such testing is available, HbA1c is likely to contribute to the diagnosis of diabetic deaths. Vitreous humor is also a source of diagnostic data in the evaluation of hyperglycemia and suspected diabetic ketoacidosis. Vitreous glucose is better preserved than serum glucose and is, therefore, an important facet of the laboratory evaluation. Vitreous beta-hydroxybutyrate (BHB) concentration may be of value in the diagnosis of diabetic ketoacidosis (DKA).[48] One should be cautioned, though, that BHB is also notably elevated in cases of alcoholic ketoacidosis[49] and other conditions. Quantification of serum ketone bodies has long been recognized as a useful method to detect cases of fatal DKA. Pounder et al.[50] demonstrated similarly useful results through evaluation of vitreous humor and pericardial fluid. Ultimately, investigators charged with the investigation of sudden death in youth should keep undiagnosed diabetes mellitus in the differential diagnosis.

A 13-year-old male complained of vague flu-like symptoms over a 3-day period. On the morning of the fourth day, he was found dead in bed. Autopsy showed a markedly injected and swollen brain with prominent tonsillar herniation. Postmortem urinalysis showed large amounts of sugar and ketones in the urine (**Image 16.41**)—a finding confirmed on analysis of the vitreous humor. The cause of death was determined to be diabetic ketoacidosis.

## Hematopathology: sickle cell anemia

Sickle cell anemia is one of the more common hemoglobinopathies and is known to primarily affect African blacks. As a result of a point mutation on the beta-globin chain, the altered hemoglobin (termed hemoglobin S) damages the red blood cell membrane, leading to sickling of cells when the hemoglobin is in a deoxygenated state. Sickling crises can be brought on by many factors including infection, dehydration, and physical



16.40



16.41

exertion.[51,52] During such crises, the formation of microthrombi can lead to cerebral and cardiac insult. Although myocardial infarction in children is rare, it should be considered in those who could possibly carry the sickle trait.[53] More commonly, though, sudden death will result secondary to ventricular arrhythmias after cardiac insult by microthrombi.

A 17-year-old IV drug abusing male was known to have sickle cell anemia. Although he died from complications of endocarditis, autopsy demonstrated the incidental finding of a markedly shrunken and fibrotic 7-gram spleen. The splenic capsule was remarkably thickened and the splenic parenchyma was firm and devoid of normal architecture (**Image 16.42**).

## Infectious disease

### Sepsis

Bacteremia is the presence of bacteria in the blood, as evidenced by positive blood cultures. Sepsis is a toxic condition resulting from the spread of a microbial organism or its products from a focus of infection. Those with sepsis typically have fever or hyperthermia, tachypnea, and tachycardia. Overwhelming systemic microbial infection can lead to septic shock and hypothermia. Most commonly, this is due to gram-negative bacterial infections that elaborate endotoxin (endotoxin shock), but may also be due to gram-positive bacteria and fungi. Septic shock is characterized by peripheral vasodilation, endothelial injury, disseminated intravascular coagulation, and the activation of cytokines. The etiology of sepsis and septic shock is varied. At autopsy, it is important to take cultures, identify the source of the sepsis, and determine whether it is due to natural or nonnatural causes.

A 16-year-old female developed *sepsis and coagulopathy associated with bronchopneumonia and bacteria pharyngitis* and died despite medical therapy. Note the areas of pulmonary hemorrhage (**Image 16.43**) and hemorrhages scattered throughout the brain (**Image 16.44**).

A 3-year-old female was sick with cold symptoms for about a week, then vomited and became unresponsive. At autopsy, note the exudative pericarditis (**Image 16.45**). She also had bilateral pneumonia. Her cause of death



16.42



16.44



16.43



16.45

was *sepsis due to exudative bacterial pericarditis and bilateral pneumonia.*

A 12-year-old boy complained of abdominal pain and vomiting. A few days later, he was taken to the emergency room where he was hypotensive and tachycardic, had a distended abdomen, and was unresponsive. He soon died. At autopsy, pus was in his peritoneal cavity. Note the ruptured appendix (**Image 16.46**). His cause of death was *sepsis due to peritonitis due to ruptured suppurative appendicitis.*

### AIDS

AIDS is one of the leading causes of death in children. The most common means by which children acquire HIV infection is perinatal transmission from infected mothers. Many children infected with HIV experience an asymptomatic phase before succumbing to overwhelming opportunistic infections or malignancy in association with severe immunosuppression. The most common AIDS indicator diseases among children with perinatally acquired infection are *Pneumocystis carinii* pneumonia, lymphoid interstitial pneumonitis, recurrent bacterial infections, HIV wasting syndrome, HIV encephalopathy, and candidal esophagitis.[54] Severe medical complications commonly include pulmonary disease, which is most often the cause of death. Pulmonary disease includes a wide range of infections such as *Pneumocystis carinii* pneumonia, respiratory syncytial virus, influenza virus, cytomegalovirus, herpes simplex virus, *Streptococcus pneumoniae*, *Haemophilus influenzae*, and *Cryptococcus*



16.46

*neoformans.* Other HIV-related conditions include dilated cardiomyopathy, pericardial effusions, various cardiac dysrhythmias, glomerular diseases, thrombocytopenia, coagulopathy, and central nervous system infections such as HIV encephalopathy, cryptococcal meningitis, and toxoplasmosis. Almost all children infected with HIV infection will develop malnutrition and growth failure before death.

### Waterhouse-Friderichsen

Waterhouse-Friderichsen syndrome is the term applied to the condition of overwhelming sepsis manifest grossly by cutaneous and visceral purpura and marked hemorrhage of the adrenal glands. Although it is most commonly attributed to *Neisseria meningitidis* bacteria, it may be seen with a variety of other bacterial organisms including pneumococci, staphylococci, and gonococci. It may have an acute presentation and a fulminant course, becoming fatal within hours.

In cases due to *Neisseria meningitidis*, there is usually no demonstrable meningitis, and the brain usually appears normal grossly and histologically. Further, cerebrospinal fluid cultures are often negative. The absence of involvement of the central nervous system is usually attributed to the rapid development of septic complications, with death occurring quicker than the bacteria can spread to the brain. The bacteria may be difficult to detect postmortem because of its labile nature; the difficulty is compounded by prolonged postmortem intervals and antibiotic administration prior to death. A gram stain may be useful in identifying the bacteria. Hospital blood, urine, and/or cerebrospinal fluid cultures, gram stains, and other studies may be of value in establishing the bacterial etiology. Latex agglutination studies may be performed, but have suboptimal sensitivity and specificity. Death is usually attributed to the effects of overwhelming sepsis, including the spread of endotoxins, that leads to disseminated intravascular coagulation and cardiorespiratory collapse. The massive bilateral adrenal gland hemorrhage likely causes adrenocortical insufficiency, which augments the septic complications of hypotension and shock.

A 2-year-old girl had felt unwell for 2 days before having a seizure at home. She was admitted to the intensive care unit, but died quickly despite resuscitation efforts. At autopsy, note the extensive purpura (**Image 16.47**) and the conjunctival petechiae (**Image 16.48**). Also, note the hemorrhagic adrenal glands (**Image 16.49**) and adrenal parenchymal hemorrhage (**Image 16.50**). There were petechiae scattered throughout the visceral organs (**Image 16.51**). She died of Waterhouse-Friderichsen syndrome due to *Neisseria meningitidis.*

### Kawasaki disease

Kawasaki disease is probably an infectious disease (the causal agent is unknown) of infants and young children