1   Nicole M. Goodwin (SBN 024593)
    Aaron J. Lockwood (SBN 025599)
2   **GREENBERG TRAURIG, LLP**
    2375 E. Camelback Road, Suite 800
3   Phoenix, AZ 85016
    Tel:  (602) 445-8000
4   Facsimile:  (602) 445-8100
    goodwinn@gtlaw.com
5   lockwooda@gtlaw.com

6
7   Lori G. Cohen *(pro hac vice)*
    Brandon D. Cox *(pro hac vice)*
8   **GREENBERG TRAURIG, LLP**
    3333 Piedmont Road NE, Suite 2500
9   Atlanta, GA 30305
    Telephone:  (310) 553-2100
10  Facsimile:  (310) 553-2212
    cohenl@gtlaw.com
11  coxb@gtlaw.com

12  Mary-Olga Lovett *(pro hac vice)*
    **GREENBERG TRAURIG, LLP**
13  1000 Louisiana Street, Suite 1700
    Houston, TX 77002
14  Telephone:  (713) 374-3541
    Facsimile:  (713) 754-7541
15  lovettm@gtlaw.com
16  *Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

17          **IN THE UNITED STATES DISTRICT COURT**

18            **FOR THE DISTRICT OF ARIZONA**

19
    Kathleen Courkamp, for herself and on behalf | No. 2:19-cv-02689-GMS
20  of other statutory beneficiaries,
                                                   **DEFENDANTS' MOTION FOR**
21          Plaintiff,                             **SUMMARY JUDGMENT**

22  v.
                                                   **ORAL ARGUMENT REQUESTED**
23  Fisher-Price, Inc., a foreign corporation;
    Mattel, Inc., a foreign corporation,
24
            Defendants.
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ....................... 5

    I.    The Fisher-Price Rock 'n Play Sleeper ............................... 5

        A.    Background of the Product and the Model at Issue: BHL58 ......... 5
        B.    Fisher-Price's Design Process Was Extensive. ........................... 7

            i.    Personnel involved in ensuring the safety of the RNPS ................................................................ 7
            ii.    The design process of the RNPS ........................... 8
            iii.    The development process of the RNPS ..................... 8

                1.    Hazard Analysis meetings (also referred to as Safety Audits); ........................... 9
                2.    Creation of the Product Requirements Documents ("PRD" or "PRDs"); ........................... 9
                3.    On-site and in-home testing coordinated by Fisher-Price's Play Lab; ........................... 9
                4.    External medical expert consultation; and .............. 9
                5.    Extensive certification testing performed by third party labs. ........................... 9

        C.    The RNPS Complied with and Exceeded All Applicable Industry and Government Safety Standards. ............................... 10

            i.    Compliance with ASTM Standards ..................... 10
            ii.    Compliance with AAP Policy Statements ................ 11

        D.    Fisher-Price Constantly Reviewed Consumer Field Data to Monitor the Safety of the RNPS. ................................... 11
        E.    Fisher-Price Voluntarily Recalled the RNPS in April 2019. ........ 12

    II.    Plaintiff's Allegations and the June 19, 2014 Incident ........................... 12

        A.    Plaintiff's Decedent, Z.O. ........................... 12
        B.    Z.O.'s Parents: Plaintiff Kathleen Courkamp and Andrew Olson ................................................................ 13
        C.    Z.O.'s Parents' Failure to Comply with the RNPS Warnings ...... 15
        D.    The June 19, 2014 Incident ........................... 17

            i.    Investigation of the scene ........................... 17
            ii.    The Reenactment ........................... 18
            iii.    Autopsy Findings of the Medical Examiner ................ 18

III.  Plaintiff's Experts and the Rule 702 Motions ........................................ 18

LEGAL STANDARD ........................................................................................ 19

ARGUMENT ..................................................................................................... 20

I.   All of Plaintiff's Claims Are Barred by the Applicable Statutes of
     Limitations. ............................................................................................. 20

     A.   Plaintiff's strict products liability and negligence claims are
          barred by the applicable two-year statute of limitations. ............. 20
     B.   Plaintiff's breach of express warranty claim is barred by the
          applicable four-year statute of limitations. .................................. 24

II.  All of Plaintiff's Claims Fail Because She Cannot Establish
     Causation. ................................................................................................ 25

III. Plaintiff's Strict Products Liability and Negligence Claims
     Substantively Fail Because She Cannot Prove the RNPS Was
     Defective and for Additional, Independent Reasons. ............................... 28

IV.  Plaintiff Cannot Prove the Elements of a Breach of Express
     Warranty Claim. ....................................................................................... 31

V.   Plaintiff's Punitive Damages Claim Fails Because All of Her
     Underlying Claims Fail and Because She Cannot Prove Through
     "Clear and Convincing" Evidence That Defendants Acted with An
     "Evil Mind." ............................................................................................. 32

CONCLUSION ................................................................................................. 35

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants Mattel, Inc. and Fisher-Price, Inc., (collectively "Defendants"), by and through the undersigned counsel, hereby move for summary judgment on all of Plaintiff's claims against them pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1. This Motion is supported by the following Memorandum of Law, as well as Defendants' Statement of Material Facts ("SOF") and its exhibits.[1]

## INTRODUCTION

On the morning of June 19, 2014, Z.O., an eight-month-old baby, was found unbuckled and unresponsive by her mother, Plaintiff Kathleen Courkamp ("Plaintiff"), and her father, Andrew Olson, in a Fisher-Price Rock 'n Play Sleeper, Model BHL58 (the "RNPS"). The undisputed factual evidence establishes that Z.O.'s death was wholly unrelated to the RNPS. Rather, it was entirely consistent with Sudden Infant Death Syndrome ("SIDS") or Sudden Unexplained Infant Death ("SUID")—an unpreventable phenomenon that unfortunately affects countless infants under the age of one, regardless of their sleeping environment. The records supports this conclusion:

- Z.O. was born with multiple health issues. She was also diagnosed with an upper respiratory infection and was noted to have a "raspy" cough shortly before her death, which is an extrinsic risk factor for the occurrence of SIDS/SUID.

- Investigators from Tempe Fire Department, the Tempe Police Department, and the Maricopa County Office of Medical Examiner identified several additional intrinsic and extrinsic SIDS/SUID risk factors, including an overheated sleep environment and exposure to second-hand smoke from Z.O.'s father's use of marijuana.

- The Maricopa County Medical Examiner at the time—Dr. Michael Ferenc—ruled Z.O.'s cause of death as "unknown" and her manner of

LAW OFFICES<br>**GREENBERG TRAURIG**<br>2375 EAST CAMELBACK ROAD, SUITE 700<br>PHOENIX, ARIZONA 85016<br>(602) 445-8000

---

[1] The Motion for Summary Judgment is 35 pages because the Court granted Defendants' request to exceed the page limit under LRCiv 7.2 at the October 15, 2021 pre-motion conference.

1

death as "undetermined." This finding was later confirmed by the subsequent Maricopa County Medical Examiner, Dr. Kevin Horn.

- Both Dr. Ferenc and Dr. Horn believed (and continue to believe) Z.O.'s death was consistent with SIDS or SUID.

The undisputed record evidence further definitively rules out any theory that Z.O. may have passed away from any form of suffocation, smothering, or positional asphyxia related to the RNPS:

- The rigor mortis and livor mortis pattern found on Z.O.'s body indicate she died supine (i.e., face-up on her back) with her mouth and nose unobstructed.

- Investigators and the medical examiner found no evidence of asphyxia or suffocation, much less positional asphyxia or smothering.

- None of the investigators of Z.O.'s death, including the Tempe Fire Department, the Tempe Police Department, and the Maricopa County Office of Medical Examiner, determined the RNPS caused or contributed to Z.O.'s death.[2]

Despite all of these facts demonstrating the RNPS played no causal role in Z.O.'s death, Plaintiff filed this action nearly five years after the June 2014 incident, blaming the RNPS. Plaintiff asserts causes of action for strict products liability, negligence, breach of express warranty, and punitive damages. The core theory underlying all of Plaintiff's claims is that the 30-degree incline on the RNPS rendered it defective and allegedly caused Z.O. to roll into a face-down or semi-prone position and die from positional

---

[2] A number of additional factors establish the RNPS was not defective and did not cause Z.O.'s death. First, Z.O. should not have been placed in the RNPS according to its clear and unambiguous warnings and instructions because she had aged out of the RNPS and was exhibiting developmental milestones beyond those of the intended user of the product. Second, she was found unbuckled, which means the RNPS's three-point restraint system was not used (despite the warnings and instructions requiring an infant to "ALWAYS" be restrained). The record evidence further establishes that neither Plaintiff nor Mr. Olson restrained Z.O. in the RNPS on the date of her death. Indeed, neither of them can dispute this as they have no recollection of restraining Z.O. Their failure to properly restrain Z.O. further undermines any notion that the RNPS was defective and caused Z.O.'s death.

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

2

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

asphyxia with her face smothered by the fabric of the product.[3] As explained in more detail below, Plaintiff does not have competent and reliable expert testimony to prove this theory, and thus all her claims fail as a matter of law. Defendants are therefore entitled to summary judgment for the following reasons.

**First**, Plaintiff's claims are time-barred by Arizona's applicable statutes of limitations. Specifically, Plaintiff's strict products liability and negligence claims are barred by the two-year limitations period under Ariz. Rev. Stat. § 12-542, because her claims unquestionably accrued on the date of Z.O.'s death—June 19, 2014. Plaintiff could have and should have exercised reasonable diligence at that time to investigate and discover her possible claims against Defendants. She did not, and instead waited until April 26, 2019—nearly five years later—to file her lawsuit.

Additionally, Plaintiff's claim for breach of express warranty is time-barred by the four-year limitations period under Ariz. Rev. Stat. § 47-2725, which states a claim accrues "when the breach occur[ed], **regardless of the aggrieved party's lack of knowledge of the breach**." *Moses v. Nordic Boats*, 2008 Ariz. App. Unpub. LEXIS 434, at *5 (Ariz. App. Oct. 16, 2008) (emphasis added). Importantly, "**[t]he discovery rule does not apply**" to this statute. *Id.* (emphasis added). Thus, Plaintiff's breach of express warranty claim accrued on June 19, 2014—the date of Z.O.'s death. It expired on June 19, 2018—nearly one year before she filed this lawsuit on April 26, 2019.

**Second**, even if Plaintiff's claims were timely (which they are not), all her causes of action fail for lack of causation. Despite extensive fact and expert discovery, the record evidence shows Plaintiff cannot meet her requisite burden of proving to a reasonable

---

[3] "Positional asphyxia" is a form of asphyxia that occurs when someone's position prevents the person from breathing adequately. Traditionally, this occurs the passage of air from mouth and nose to lungs is blocked because a baby's head is slumped over or a baby's chin is pressing into the baby's chest. (Laura Hubbs-Tait, *Protecting Infants and Toddlers from Positional Asphyxia: Car Seats and Sling Carriers*, Okla. State Univ. (March 2017), *available at*: https://extension.okstate.edu/fact-sheets/protecting-infants-and-toddlers-from-positional-asphyxia-car-seats-and-sling-carriers.html). In this case, however, Plaintiff and her expert, Dr. Christensen, are using this phrase to describe asphyxia through a prone position, which they claim resulted in Z.O.'s face being smothered by the fabric of the product.

degree of medical certainty or probability that any alleged defect or failure in the RNPS caused or contributed to Z.O.'s death. It is well-settled under Arizona law that a plaintiff in a products liability case must prove causation through competent and reliable expert testimony.

Here, Plaintiff has disclosed four experts: Dr. Erik Christensen (a pathologist), Dr. Michael Goodstein (a neonatologist), Dr. William Singhose (an engineer), and Dr. Alison Vredenburgh (a human factors/warnings expert). Three of these experts—Drs. Goodstein, Singhose, and Vredenburgh—unequivocally testified they have **no opinions about the cause of Z.O.'s death**, meaning Plaintiff relies solely on the opinions of Dr. Christensen to prove causation. But as explained more fully below, and in Defendants' Motion to Exclude Dr. Christensen—which is being filed contemporaneously with this Memorandum and incorporated by reference entirely—Dr. Christensen failed to employ a reliable methodology in reaching his purported opinion that Z.O. died of what he calls positional asphyxia from being smothered by the fabric of the RNPS. His opinion is completely inconsistent with the record evidence, which suggests her death was consistent with SIDS/ SUID. Once Dr. Christensen's purported causation opinion is properly excluded under Rule 702, Plaintiff cannot meet her burden of proving causation, and summary judgment is appropriate. Notably, the Northern District of Georgia has already addressed this same issue in another case involving the RNPS—the plaintiff's expert was excluded under Rule 702 and summary judgment was granted in Fisher-Price's favor. (*See Goodrich v. Fisher-Price, Inc.*, Civil Action No. 1:16-CV-3116-TWT (N.D. Ga. Nov. 14, 2018) Order Granting Summary Judgment, **Ex. A).**

***Third***, in addition to being time-barred and lacking proof of causation, each of Plaintiff's causes of action fail for additional, independent reasons. Plaintiff has provided no evidence to prove her strict products liability and negligence claims based on a manufacturing, design, or warnings defect theory because Plaintiff has no competent and reliable expert testimony that the RNPS was defective or unreasonably dangerous.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

4

Proving a defect in the RNPS is necessary for Plaintiff to prevail under any of her products liability and negligence claims.

As explained more fully below, none of Plaintiff's experts has offered any opinion that the RNPS was defectively manufactured, so the manufacturing defect claim should be dismissed on this basis alone. Additionally, and as detailed in Defendants' Motions to Exclude Drs. Singhose and Vredenburgh—which are being filed contemporaneously with this Memorandum and incorporated by reference entirely—Plaintiff's engineering and human factors/warnings experts failed to employ a reliable scientific methodology in reaching their purported opinions that the design and warning label of the RNPS were defective. Once Drs. Singhose's and Vredenburgh's purported defect opinions are properly excluded under Rule 702, Plaintiff cannot prove the RNPS was defective or unreasonably dangerous, and thus her strict liability and negligence claims fail for this reason alone. These claims also independently fail because Plaintiffs cannot prove the required elements of any of her strict products liability or negligence claims.

***Fourth***, as to Plaintiff's breach of express warranty claim, in addition to it being time-barred, Plaintiff cannot substantively prove this claim because she cannot point to an "affirmation of fact or promise" by Defendants to her that became the "basis of the bargain" for the purchase of the RNPS.

***Fifth and finally***, Plaintiff's claim for punitive damages fails because it is derivative of all of Plaintiff's underlying causes of action. Additionally, Plaintiff cannot prove by "clear and convincing evidence" that Defendants acted with an "evil mind" as required by Arizona law. Summary judgment is therefore appropriate on this claim.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Fisher-Price Rock 'n Play Sleeper

#### A.    Background of the Product and the Model at Issue: BHL58

The RNPS is an inclined sleeper designed for day use or overnight sleep for infants. An alternative sleeping environment to a crib, the RNPS puts infants at approximately a 30-degree angle from the horizontal. (SOF ¶ 1). It features a freestanding

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

metal rocking frame, an attached rigid plastic backing, and a removable seat cushion with a fabric cover.  The RNPS's restraint has two buckles that, when properly engaged, secure a strap between the infant's legs and across its torso.

There were various RNPS models with different features. The specific model at issue in this case is the Fisher-Price Newborn Rock 'n Play Sleeper – Berry, Model No. BHL58, first sold in 2013. (SOF ¶ 2). This model of the RNPS had a vibration feature and had breathable fabrics on the sides:



Fig. 1:  Photo of Fisher-Price® Newborn Rock 'n Play™ Sleeper – Berry, Model No. BHL58.

The RNPS also came with clear and unambiguous warnings and instructions for parents to safely use the product. These warnings were conspicuously sewn into the fabric of the RNPS, as shown below:

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

Fig. 2:  Photograph of the sewn-in warning label of the subject RNPS. (emphasis added).

Importantly, the warnings instructed parents to:

- ALWAYS use the restraint system.

- ALWAYS use the pad provided, which includes the restraint.  NEVER add a mattress, pillow, comforter, or padding.

- NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted; and

- Always provide the supervision necessary for the continued safety of your child.

(SOF ¶ 3). Identical warnings appeared in the instruction manual that accompanied the RNPS upon purchase. (SOF ¶ 4). Copies of the instruction manuals were also publicly available on Fisher-Price's website.

**B.    Fisher-Price's Design Process Was Extensive.**

i.    *Personnel involved in ensuring the safety of the RNPS*

Fisher-Price has an extensive history of designing products for infants placed in inclined positions. (SOF ¶ 5). In developing the RNPS, Fisher-Price employed a host of internal and highly experienced development and safety personnel from concept to creation that worked as an interdisciplinary team, including but not limited to, Catherine "Kitty" Pilarz and Michael Steinwachs—who combined had over 50 years of experience in the juvenile product industry. (SOF ¶ 6). Experts from Fisher-Price's Quality and Engineering departments were also involved, as well as its Early Childhood Development Research team (the "Child Research Team"), which included several staff members with advanced degrees in child development. (SOF ¶ 7). Further, Fisher-Price's Safety Committee also evaluated the RNPS throughout its product development. The Safety Committee is comprised of highly experienced individuals from Fisher-Price's Quality and Engineering Departments, among others.

Finally, Fisher-Price consulted with external experts when designing the RNPS. Specifically, Fisher-Price worked with Dr. Gary Deegear, an experienced and respected

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

7

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

family medicine physician whose background and training included pediatrics and biomechanics among other areas. (SOF ¶ 8).

### ii.    *The design process of the RNPS*

The original concept of the RNPS was developed by designer Linda Chapman. (SOF ¶ 9). From the outset and throughout the life of the product, the design intent was a product for, among other things, supine (face-up on the back) overnight sleep with an elevated head position for infants of a certain developmental stage. (SOF ¶ 10).

Fisher-Price's experience with many different products at many different angles informed it that an incline angle at 30 degrees was safe for a child beginning at birth, while greater angles of incline could pose a problem for the youngest infants if maintained for a long enough period of time. (SOF ¶ 11). It recognized, for example, that angles as much as 45 degrees posed a risk of chin-to-chest motion, while shallow angles would make it too easy for infants to push themselves up the back of the product. (SOF ¶ 12). The design team looked for, and could not identify, research that indicated an incline angle of 30 degrees or less presented a hazard for infants. (SOF ¶ 13). Similarly, there were no standards or regulations that recommended against a 30-degree incline. (SOF ¶ 14).

Additionally, Fisher-Price designed the RNPS to include a restraint system. With its deeper base, higher walls, and stable platform, the RNPS positions babies of the appropriate developmental level more securely than sitting products like a bouncer, making it appropriate for overnight sleep. (SOF ¶ 15). In contrast to a crib or bassinet, the RNPS was designed to hold the infant in one inclined position, without sliding down or to the side into a potentially compromising position, and a restraint is useful for this purpose. (SOF ¶ 16).

### iii.    *The development process of the RNPS*

In developing the RNPS, Fisher-Price followed a thorough and diligent design process, which included the following steps:

1.    Hazard Analysis meetings (also referred to as Safety Audits);

2.    Creation of the Product Requirements Documents ("PRD" or "PRDs");

3.    On-site and in-home testing coordinated by Fisher-Price's Play Lab;

4.    External medical expert consultation; and

5.    Extensive certification testing performed by third party labs.

(SOF ¶ 17).

The Hazard Analysis (also referred to as a Safety Audit) is the first phase of safety review of the product once the design concept is developed, typically conducted by the Fisher-Price Safety Committee. (SOF ¶ 18). The Safety Committee met seven times over the course of six months to analyze potential safety hazards posed by the RNPS, and identified numerous issues that were addressed during this process, including the head/torso alignment and child positioning, safety of the angle for sleep, preventing entrapment, preventing the infant from pushing out the top of the product seat, placement of the restraints, and the breathability of the seat back and sides. (SOF ¶ 19).

Once the product underwent the approval of the Safety Committee through the Hazard Analysis (or Safety Audit) process, a PRD was created, which is a "document that details the product specifications for safety, reliability, performance, aesthetic and packaging requirements of a product either directly or by reference to other specifications and procedures." (SOF ¶ 20). These documents address the requirements of numerous standards and regulations promulgated by various domestic and international organizations by referencing various Fisher-Price Quality and Safety Operating Procedures (QSOPs).  (*Id.*). The referenced QSOPs also impose internal Fisher-Price requirements, which are sometimes more rigorous in breadth and scope than applicable standards/regulations. (SOF ¶ 21).

After the development of the PRD, the product is then reviewed and tested by the Fisher-Price Child Research Team or Play Lab. The Play Lab conducted several on-site and in-home tests of the RNPS, analyzing the behavior of live infants in the product and the manner in which parents would use the product. (SOF ¶ 22). The initial set of in-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

9

home testing of the RNPS was conducted with the children and grandchildren of Fisher-Price employees, exemplifying the trust that the company placed in the safety of the product. (SOF ¶ 23).

Concurrent with the testing done by the Play Lab, the RNPS also underwent the review of an external medical consultant, Dr. Gary Deegear. This was not a mandated regulatory requirement, but a decision made by Fisher-Price to fully vet the product's safety. Dr. Deegear never voiced any concerns about the 30-degree angle. (SOF ¶ 24). Communications between Fisher-Price and Dr. Deegear indicated he was satisfied with the design of the RNPS and expressed no concerns about its safety for overnight sleep. (*Id.*).[4]

Finally, while testing to internal requirements was performed at Fisher-Price, the applicable external standards were tested by credible third-party testing laboratories, which included SGS and Bureau Veritas, thereby ensuring further approval of the product design by objective external entities. (SOF ¶ 25). Such compliance was certified through the certification program by the Juvenile Products Manufacturers Association ("JPMA"). (SOF ¶ 26).

### C.    The RNPS Complied with and Exceeded All Applicable Industry and Government Safety Standards.

#### i.    *Compliance with ASTM Standards*

When the RNPS was first designed, developed, and sold in October 2009, it complied with the American Society for Testing and Materials ("ASTM") standard F2194, which was applicable to bassinets and cradles, the most analogous product to the RNPS. (SOF ¶ 27). In addition to ensuring compliance with this standard, Fisher-Price conducted additional tests that were not required by the standard, such as, for example, buckle performance and rocking speed testing. (SOF ¶ 28).

---

[4] Many years after he consulted with Fisher-Price on the RNPS, Dr. Deegear experienced personal issues in his life that led him to retire from practicing medicine. (SOF ¶ 24, n. 1). At the time he rendered his consulting services to Fisher-Price about the RNPS, however, he was a well-respected physician within his field and had a history of working with the Fisher-Price design team. (*Id.*).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

The bassinet standard was developed by ASTM's Subcommittee tasked with creating safety standards for cribs, toddler beds, play yards, bassinets, cradles, and changing tables. (SOF ¶ 29). The ASTM subcommittee for this standard was comprised of representatives of the Consumer Product Safety Commission ("CPSC") and the American Academy of Pediatrics ("AAP"), testing laboratories, consumer safety groups, and manufacturers like Fisher-Price, among others. (SOF ¶ 30). ASTM eventually published a different standard in May 2015 that was specifically applicable to inclined sleepers such as the RNPS. (SOF ¶ 31). The RNPS continued to be manufactured in a manner consistent with this new standard up until its voluntary recall in April 2019.

ii.    *Compliance with AAP Policy Statements*

In October 2011, the AAP published an update to its policy statement about safe infant sleep practices. (SOF ¶ 32). These guidelines are intended to inform general pediatricians and parents about a safe sleep environment. The 2011 updated guidance states that infants should be placed in a supine position (on their backs) for sleep. (SOF ¶ 33). The AAP committee also recommended that infants be placed on a "firm," "flat" surface. (SOF ¶ 34) The AAP never stated at this time that inclined sleepers were unsafe. (SOF ¶ 35).

In November 2016, the AAP updated its recommendations on infant safe sleep, but again did not state that inclined sleepers were unsafe. (SOF ¶ 36).

**D.    Fisher-Price Constantly Reviewed Consumer Field Data to Monitor the Safety of the RNPS.**

Throughout the RNPS's time on the market, Fisher-Price monitored the safety of the RNPS through a large Consumer Relations/Services Department ("Consumer Services") that handles calls from consumers regarding their experience with the Fisher-Price's products. (SOF ¶ 37).

Data regarding any adverse incidents involving the RNPS was catalogued in the Consumer Affairs Tracking System ("CATS"), which is the central repository for all consumer correspondence. (SOF ¶ 38). CATS safety incidents were reviewed by the

11

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

safety team on a weekly basis, and incidents that are reportable to the CPSC were reviewed daily. (*Id.*) Fisher-Price never identified any safety signals that suggested a product defect or design issue that could be correlated to reported incidents. (SOF ¶ 39).

### E.    Fisher-Price Voluntarily Recalled the RNPS in April 2019.

On April 12, 2019, more than six years after the subject RNPS was manufactured, the CPSC and Fisher-Price jointly announced a voluntary recall (Recall 19-05) of the RNPS, and did so on a fast-track basis. For fast-track recalls, the CPSC does not decide whether a product is defective or presents a substantial product hazard, and the CPSC never reached any such conclusions regarding the RNPS.

## II.    Plaintiff's Allegations and the June 19, 2014 Incident

### A.    Plaintiff's Decedent, Z.O.

Z.O. was eight months and twenty-three days old when she died. (SOF ¶ 40). She had multiple complicated medical conditions throughout her life. At birth, Z.O. "took a gulp of amniotic fluid" and had "wet lung sounds," was admitted to level II Nursery for transient tachypnea newborn (TTN), and was also diagnosed with a heart murmur. (SOF ¶ 41). On April 21, 2014 (approximately two months before the incident), Z.O. was diagnosed with an upper respiratory infection. (SOF ¶ 42). Z.O.'s grandparents also stated she had "raspy breathing" days before her death. (SOF ¶ 43).

Developmentally, Z.O. was exhibiting motor skills that surpassed the milestones of the RNPS warning label. Z.O.'s pediatric records, as well as statements by her parents to the police, reflect that she was capable of pushing up, crawling, rolling over, sitting up unassisted, and standing. (SOF ¶ 44). The RNPS warning advises parents to discontinue use of the RNPS when an infant begins to exhibit these types of developmental milestones, including "when the infant begins to push up on hands and knees, can pull up or sit unassisted"—as Z.O. could do before she died. (*Id.*; SOF ¶ 3).

## B.      Z.O.'s Parents: Plaintiff Kathleen Courkamp and Andrew Olson

The Plaintiff in this case is Z.O.'s mother, Kathleen Courkamp (née Lawton), who filed this action on behalf of herself and the statutory beneficiaries of the estate of Z.O. Andrew Olson, Z.O.'s father, is one of these statutory beneficiaries. At the time Z.O. died, Ms. Courkamp and Mr. Olson were 20 and 19 years old, respectively. They were not married and lived in separate households, with Ms. Courkamp residing in Glendale, Arizona, and Mr. Olson residing in Tempe, Arizona. (SOF ¶ 45).

Mr. Olson has been arrested for possession of marijuana and multiple incidents of driving while under the influence of alcohol (DUI). (SOF ¶ 46). Indeed, Mr. Olson admitted during his deposition that the night before Z.O. died, he was driving his vehicle with Z.O. while having a suspended license because of his DUI convictions. (*Id.*). At the time Z.O. died, he was out on bail awaiting sentencing for his third aggravated DUI, for which he served eight months in prison after Z.O.'s death. (*Id.*). Mr. Olson further admitted to having experimented with hallucinogens such as mushrooms and LSD. (*Id.*). He purchased marijuana the day before Z.O. died from a medical dispensary and testified he received his medical marijuana card to treat tendinitis, which had been diagnosed by a physician when he was in the fifth grade. (*Id.*).

Plaintiff and Mr. Olson obtained the RNPS as a gift from Mr. Olson's mother. (SOF ¶ 47). Although neither Plaintiff nor Mr. Olson purchased the subject RNPS, they knew Fisher-Price manufactured it and knew and understood the warning that was sewn into the fabric of the product:

Q.  And you had seen warnings before; correct?

A.  Yeah.

* * *

Q.  And it says at the top failure to follow these warnings and the instructions to result in serious injury or death and you had seen that part; right?

A.  Yes.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1   Q.  And it says number one, always use restraint system.  Do

2   you see that?

3   A.  Yes.

4           * * *

5   Q.  And you understood that it was absolutely important to

6   use the restraint system; right?

7   A.  Yes.

8   (SOF ¶ 48).

9   Q.  Of course, you said you were familiar with the warnings

10  and you were constantly checking them against Z.O.'s

11  developmental age; right?

12  A.  Right.

13          * * *

14  Q.  So, for example, it says always use the restraint system in

15  all caps; correct?

16  A.  Yes.

17  Q.  And there aren't any -- it just says always use the restraint

18  system; correct?

19  A.  Yes.

20  Q.  And you knew that it was important to always use the

21  restraint systems; right?

22  A.  Yes.

23  Q.  And you understood the restraint systems to be the buckle

24  the crotch restraint which buckled around the baby's waist;

25  correct?

26  A.  Yes.

27  (*Id.*).

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

Indeed, Mr. Olson testified he conducted a "large amount of research" on safe infant sleep and SIDS before Z.O. died, confirming his knowledge of the product and its intended use. (SOF ¶ 49).

### C.    Z.O.'s Parents' Failure to Comply with the RNPS Warnings

Despite reading and understanding the warning label accompanying the RNPS, the undisputed record shows that Plaintiff and Mr. Olson failed to comply with the warning label.

As an initial matter, Plaintiff and Mr. Olson placed Z.O.–an infant capable of pushing up, crawling, rolling over, sitting up unassisted, and standing– in the RNPS. The warning label is clear a child that had reached those developmental milestones should not continue to use the product. (SOF ¶ 50).

Additionally, Plaintiff and Mr. Olson did not restrain Z.O. in the RNPS on the day she died, despite testifying they understood it was "absolutely important" to do so.[5] Z.O. was found unbuckled by her parents. (SOF ¶ 51). Both Plaintiff and Plaintiff's own experts agree that Z.O. could not unbuckle herself. (SOF ¶ 52). Indeed, even at the time of the incident, Plaintiff was under the impression Z.O. was not restrained in the RNPS. (SOF ¶ 53).  Z.O. was left unrestrained in the RNPS despite the warning indicating the failure to heed the warnings "could result in serious injury or death."

Taken as whole, it is undisputed that Z.O. was too developed for the RNPS and was unrestrained in the RNPS when she died. Even Plaintiff's own neonatology expert, Dr. Michael Goodstein, admits that Plaintiff and Mr. Olson's failure to abide by the warning label is significant and that they did not use the RNPS as intended:

> Q. Right. And what this article, I guess, under your task force
>
> is saying here and that you cited to is that the restraints are -

---

[5] For purposes of this Motion only, regardless of whether Z.O. was restrained or not, Defendants are entitled to summary judgment because Plaintiff cannot establish defect or causation to a reasonable degree of medical and/or scientific certainty though competent and reliable expert testimony.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1  **- the restraints have to be used and instructions and**

2  **warnings have to be followed.**

3  A. **Yes. No question about that.**

4  \* \* \*

5  Q. One of the things the warning says -- and I don't mean to

6  hold it; I just want to read it and I'll show you --

7  A. That's okay. I have it.

8  Q. -- is that, "Do not use this product when infant begins to

9  push up on hands and knees, can pull up, or sit unassisted or

10  has reached 25 pounds." **So that's when the babies age out**

11  **of this developmentally. Correct?**

12  A. **Correct**.

13  Q. And you noted here, from looking at Dr. Cleary's records,

14  this baby was able to pull up or sit unassisted --

15  A. Yeah.

16  Q. -- at that age as expected. Correct?

17  A. Correct.

18  Q. And the warning made clear that this bed should not be

19  used unsupervised in babies that could do that. Right?

20  A. Yes.

21  Q. And certainly not without restraints. It's a double mistake.

22  Right?

23  MR. OSBORNE: Form.

24  THE WITNESS: **I mean, you're supposed to use the**

25  **product as its intended to be used.**

26  (SOF ¶ 54) (emphasis added).

27

28

16

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

### D.    The June 19, 2014 Incident

On the evening before the incident, Z.O. accompanied Mr. Olson as he picked Plaintiff up from her job. (SOF ¶ 55). After picking Plaintiff up, they returned to Mr. Olson's residence in Tempe, Arizona. At approximately 1:30 a.m. on June 19, 2014, Mr. Olson took Z.O. from her car seat and put her into the RNPS. (SOF ¶ 56). Later that morning, at approximately 8:00 a.m., Plaintiff allegedly found Z.O. unrestrained, unresponsive, and cold to the touch. (SOF ¶ 57).

Plaintiff and Mr. Olson immediately called 911, moved Z.O. out of the RNPS, and began administering CPR until the Tempe Fire Department arrived at approximately 8:04 a.m. (SOF ¶ 58). The Tempe Fire Department indicated that, upon arrival, Z.O. already had rigor present in the upper and lower extremities, and some livor around her legs. (*Id.*). There was no lividity present on Z.O.'s face or upper body, as would be expected for a face-down or semi-prone position. (*Id.*). Z.O. was pronounced deceased soon after, at approximately 8:06 am. (*Id.*).

#### i.    *Investigation of the scene*

During their investigation of the scene, the Tempe police detectives identified drug paraphernalia, burnt marijuana, unsmoked marijuana, burnt cigarette butts, and empty alcohol bottles in the residence. Detective O'Brien specifically noted the room in which Z.O. slept was filled with drugs and paraphernalia and had a distinct odor of "burnt marijuana." (SOF ¶ 59). Most notably, the nightstand directly above Z.O.'s head contained an ashtray full of burnt cigarette butts and unsmoked marijuana. (SOF ¶ 60). During their investigation, the detectives also learned that, at some point during the night, the residence lost power and was without air conditioning for hours. (SOF ¶ 61). Indeed, a digital thermometer reading of the bedroom in which Z.O. slept measured the temperature of the room at 87 degrees Fahrenheit at approximately 10 a.m. (SOF ¶ 62).

At approximately 10:45 a.m., Maricopa County Office of the Medical Examiner Investigator Farrell Swope arrived at the scene to further investigate. When Investigator Swope examined Z.O.'s body (at approximately 11 a.m.), he described both rigor and

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

livor as "fixed," and the lividity limited to "anterior lower extremities" and "posterior," suggesting Z.O. died while in the supine (face-up) position, and not the prone (face-down) or semi-prone position. (SOF ¶ 63).

### ii.    *The Reenactment*

Mr. Swope also conducted a reenactment of the incident, during which Mr. Olson (using a doll) showed how he placed Z.O. in the RNPS before he went to bed, and how he discovered her the next morning.  (SOF ¶ 64). When asked to show investigators how he placed Z.O. in the RNPS, Mr. Olson placed the doll in the product without fastening the restraints. (SOF ¶ 65). Detective Reyes, who oversaw the reenactment with Investigator Swope, also testified Mr. Olson never restrained the doll during the reenactment. (SOF ¶ 66).

### iii.    *Autopsy Findings of the Medical Examiner*

On June 20, 2014, Medical Examiner Michael Ferenc conducted an autopsy on Z.O.'s body and examined the evidence as collected by the Tempe Police Department. Dr. Ferenc concluded the cause of death was "unknown" and the manner of death was "undetermined." (SOF ¶ 67). During his deposition, Dr. Ferenc testified that his findings are consistent with that of a SIDS or SUID death.[6] (SOF ¶ 68). Notably, years after Dr. Ferenc's report, his findings were reviewed by Dr. Kevin Horn on April 30, 2019, who also concluded that this case "appears to represent a SUID death." (SOF ¶ 69). Dr. Ferenc agreed with Dr. Horn's assessment during his deposition. (SOF ¶ 70).

## III.    Plaintiff's Experts and the Rule 702 Motions

All of Plaintiff's claims against Defendants center on the faulty premise that the 30-degree incline of the RNPS somehow enabled Z.O. to roll from supine (face-up) to a

---

[6] SUID is described as the sudden and unexpected death of an infant, where the cause is not apparent before an investigation. (CDC.  2020a.  About SUID and SIDS, Centers for Disease Control and Prevention (CDC). Page last reviewed:  April 29, 2020. Available at: https://www.cdc.gov/sids/about/index.htm.). A subcategory under SUID is SIDS, the term that is used when a cause of death cannot be identified even after a thorough medical and forensic investigation. (*Id.*). There are many intrinsic and extrinsic risk factors associated with SIDS.

prone (face-down) or semi-prone position, resulting in her face being smothered by the fabric of the product and causing her to suffocate. As discussed in Defendants' Rule 702 motions to exclude Plaintiff's experts, this premise is not based on competent and reliable expert testimony and ignores entirely the undisputed, objective physical evidence indicating Z.O. died in the supine position with her nose and mouth unobstructed by the fabric of the RNPS, and more likely than not died of SIDS/SUID—and that he death was not caused by any defect in the RNPS.

Plaintiff has hired four proposed experts who purport to offer expert testimony in support of Plaintiff's claims: (1) Erik Christensen (pathologist), (2) Michael Goodstein (neonatologist), (3) William Singhose (engineer), and (4) Alison Vredenburgh (human factors/warnings). (SOF ¶ 71). Defendants have filed motions to exclude the opinions of all four of Plaintiff's experts under Rule 702. Defendants do not repeat those arguments here, and instead fully incorporate the motions by reference herein. None of Plaintiff's experts has competently and reliably opined that the RNPS was defective, unreasonably dangerous, or proximately caused Z.O.'s death. Accordingly, Plaintiff cannot meet her burden of proof with the required expert testimony under Arizona law, and summary judgment is appropriate.

## LEGAL STANDARD

The court shall grant a motion for summary judgment when there "is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing summary judgment must establish that a genuine issue of material fact exists, *British Motor Car Distributors, Ltd. v. San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989), and in doing so may not merely rely on the assertions and allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating a "genuine issue" of material fact arises

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party"). If the opposing party does not meet its burden, summary judgment is appropriate. Fed. R. Civ. P. 56(e).

## ARGUMENT

**I.    All of Plaintiff's Claims Are Barred by the Applicable Statutes of Limitations.**

Defendants are entitled to summary judgment in full because all of Plaintiff's causes of action are barred by the applicable statutes of limitations under Arizona law. ***First***, Plaintiff's claims for strict products liability and negligence are barred by the two-year statute of limitations for personal injury. Ariz. Rev. Stat. § 12-542. ***Second***, Plaintiff's breach of express warranty claim is barred by the four-year statute of limitations for contracts for sale. Ariz. Rev. Stat. § 47-2725.

### A.    Plaintiff's strict products liability and negligence claims are barred by the applicable two-year statute of limitations.

Plaintiff's strict products liability and negligence claims fall within the broad definition of a "product liability action" under Ariz. Rev. Stat. § 12-681(3). The statute of limitations for a "product liability action" is Ariz. Rev. Stat. § 12-551, which provides (with a certain exception not applicable to this case) that a "product liability action . . . shall be commenced and prosecuted within the period prescribed in § 12-542."  Ariz. Rev. Stat. § 12-542, in turn, states that a product liability action "shall be commenced and prosecuted **within two years** after the cause of action accrues, and not afterward." Ariz. Rev. Stat. § 12-542 (emphasis added). *See Mack v. A.H. Robins Co., Inc.*, 573 F.Supp. 149 (D. Ariz. 1983), *aff'd*, 759 F.2d 1482 (9th Cir. 1985) (finding the two-year limitations period of Ariz. Rev. Stat. § 12-542(1) for "injuries done to the person of another" applicable to claims of negligence and products liability).

For these types of claims, Arizona courts have adopted the "discovery rule," under which actions accrue when the plaintiff knew, or by the exercise of reasonable diligence should have known, that a claim exists. *Davis v. Dow Chemical Corp.*, 819 F.2d 231, 233

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

20

(9th Cir. 1987) (applying Arizona law) (citations omitted); *see also Anson v. American Motors Corp.*, 155 Ariz. 420, 747 P.2d 581, 587 (Ariz. App. 1987) (holding the discovery rule applies in product liability cases where the alleged injury is death).

Plaintiff filed this lawsuit nearly five years after her claims accrued, on April 26, 2019. Thus, Plaintiff's products liability and negligence claims are plainly barred unless they were preserved by the discovery rule. But courts are clear that the discovery rule is not meant to save a plaintiff who "sit[s] around and do[es] nothing after he or she has been harmed." *Hannah v. GMC*, No. CIV 93-1368 PHX RCB, 1994 U.S. Dist. LEXIS 21997, at *11 (D. Ariz. May 31, 1994) (quoting *Bridgewaters v. Toro Co.*, 819 F. Supp. 1002, 1008 (D. Utah 1993)). Rather, injured parties are charged with conducting due diligence to pursue and investigate their claims. *Mack*, 573 F. Supp. at 154. In determining whether a plaintiff has exercised due diligence, the relevant inquiry is whether the plaintiff "should have known such facts that would have prompted a reasonable person to investigate and discover the [claim]." *Roulston v. Foree Tire Co.*, No. 88-2691, 1990 U.S. App. LEXIS 27759, at *8 (9th Cir. Mar. 29, 1990)*; see also Bridgewaters*, 819 F. Supp. at 1008.

In this regard, *Roulston v. Foree Tire Co.* is instructive. There, plaintiffs were independent truck drivers who owned and operated their own business. 1990 U.S. App. LEXIS 27759, at *1. On August 29, 1985, while traveling from California to Florida, their truck developed a flat tire. *Id.* Plaintiffs purchased a new truck tire from the defendants, but on the following day, the new tire blew out and caused the plaintiffs to lose control of their truck and crash. *Id.* Plaintiffs filed their action over two years after this accident, and the court affirmed the dismissal of the action based on the statute of limitations. The court reasoned that "[e]ven though [plaintiffs] may not have known that the tire was defective, they were put on reasonable notice to inquire into the condition of the tire." *Id.* at *8.

Here, Plaintiff likewise had a duty to investigate and exercise reasonable diligence as to her potential claims against Defendants. Plaintiff claims Z.O. was found deceased

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

in the RNPS. The Tempe Police Department impounded the RNPS as an item of evidence in their investigation of Z.O.'s death. At minimum, Plaintiff and Mr. Olson were both "placed on reasonable notice to inquire" about the RNPS's possible role in Z.O.'s death on the date she died (June 19, 2014).

While Plaintiff now claims that it wasn't until the RNPS was recalled that she had notice of her possible claims, here allegations and litigation positions tell a different story. For example, Plaintiff's experts say there were public documents and material well before the 2019 voluntary recall of the RNPS, such as the 2011 and 2016 AAP policy statements, that should have allegedly put Defendants on notice that the RNPS was unsafe for overnight sleep.  (*See, e.g.*, Michael Goodstein Expert Report, at COU_008228, **Ex. B**; *see also* William Singhose Expert Report, p. 38,**Ex. C**). While Defendants disagree with Plaintiff's interpretation and characterization of these materials, she simply cannot have it both ways. In other words, she cannot claim that such public information should have put Defendants on notice of an issue with the safety of the RNPS while also credibly claiming there was no way for her, through the exercise of reasonable diligence to learn about these claimed safety issues years ago (and far clear of the two year statute of limitations). These public documents—and Plaintiff's and her experts' reliance on them—show that Plaintiff was equally charged with the same constructive notice about alleged safety issues with the RNPS that she now claims Defendants should have known.

Plaintiff also cannot credibly claim she could not have exercised reasonable diligence to investigate her claims when Z.O.'s father, Mr. Olson, testified during his deposition that he conducted a "large amount of research" on safe infant sleep and SIDS **before** Z.O.'s death. (SOF ¶ 49). He was therefore familiar with researching infant safe sleep and SIDS well before Z.O.'s death, and could have conducted similar research to make a possible connection between the RNPS and Z.O.'s death much sooner than April 2019. Mr. Olson also admitted he knew Defendants had manufactured the subject RNPS, meaning he knew in June 2014 the possible source of Plaintiff's claims. (*Id.*). He further

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

admitted that nothing prevented him or Plaintiff from filing this action well before April 26, 2019:

> Q.   There was nothing that prevented you from filing a lawsuit in 2014; correct?
>
> A.  Nothing, no.
>
> Q.  Nothing that prevented you from filing a lawsuit in 2015; correct?
>
> A.  Correct.
>
> Q.  Nothing that prevented you from filing a lawsuit in 2016; correct?
>
> A.  Correct.

(*Id.*). In short, neither Plaintiff nor Mr. Olson appear to have conducted any of diligent inquiry into their potential claims until shortly before they filed their lawsuit in April 26, 2019 to file a lawsuit—nearly five years **after** Z.O.'s death and more than three years **after** the claims had expired under Arizona law.

Defendants anticipate Plaintiff will argue she could not have discovered her claims until the April 12, 2019 voluntary recall of the RNPS, at which time she allegedly learned the RNPS was defective or unsafe. But the Tenth Circuit very recently disposed of a similar argument in holding that a plaintiff need not know a product was allegedly *defective* for the statute of limitations clock to start, nor can a plaintiff "shift the burden concerning the discovery of the cause of her injury from her shoulders onto that of [others]." *Nowell v. Medtronic, Inc.*, No. 19-2073, 2021 U.S. App. LEXIS 32207, *15 (10th Cir. Oct. 27, 2021). Furthermore, Plaintiff has not shown and cannot show how the April 2019 recall gave her any information she could not have otherwise discovered through a reasonable investigation before April 2019.

Additionally, any argument by Plaintiff asserting that it would have been impossible to discover her claims without the recall is meritless as other individuals demonstrated capability of accomplishing this task. For instance, on July 21, 2015, a

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

23

similar lawsuit was filed by Liliana Coronado Torres in Hidalgo County, Texas, which was subsequently removed to the United States District Court for the Southern District of Texas. (*See Torres* Complaint, **Ex. D**). In the *Torres* case, the plaintiff blamed the RNPS for the asphyxiation of her daughter after finding her unresponsive in the product on October 19, 2013. (*See id.* at ¶ 12). Nothing prevented the *Torres* plaintiff from filing her lawsuit within the 2-year limitations period provided by Texas law for wrongful death and products liability matters. As Mr. Olson admitted during his deposition, nothing prevented him or Plaintiff from doing the same here. The only difference is that the *Torres* plaintiff satisfied her due diligence to investigate her claims against Defendants.

Plaintiff also cannot plausibly claim the two-year limitations period was tolled due to any wrongful or fraudulent concealment of alleged defects in the RNPS. "Wrongful concealment sufficient to toll a statute of limitations requires a **positive act** by the defendant taken **for the purpose of preventing detection of the cause of action**." *Logerquist v. Danforth*, 188 Ariz. 16, 932 P.2d 281, 286 (Ariz. App. 1996) (emphasis added); *see also Cooney v. Phoenix Newspapers, Inc.*, 160 Ariz. 139, 770 P.2d 1185, 1187 (Ariz. App. 1989) ("The defendant's conduct must be directed to obtaining the delay of which he **actively seeks to take advantage** by pleading the statute.") (emphasis added). There is simply no record evidence of any such conduct by Defendants.

For these reasons, Plaintiff's claims for strict products liability and negligence are time barred under Ariz. Rev. Stat. § 12-542, because Plaintiff filed her lawsuit nearly five years after her claims first accrued and more than three years after her claims expired under Arizona law. These claims should therefore be dismissed.

**B.    Plaintiff's breach of express warranty claim is barred by the applicable four-year statute of limitations.**

Unlike products liability and negligence claims, breach of express warranty claims are subject to a four-year limitations period under Ariz. Rev. Stat. § 47-2725. These claims accrue "**when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach**." *Moses v. Nordic Boats*, 2008 Ariz. App. Unpub. LEXIS 434,

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

24

at \*5 (Ariz. App. Oct. 16, 2008) (emphasis added). Importantly, "**[t]he discovery rule does not apply**." *Id.* (emphasis added).

Here, the four-year limitations period undisputedly accrued on the date of Z.O.'s death—June 19, 2014—the date on which Plaintiff claims to have been injured by the RNPS. *See Murrell v. Wyeth, Inc.*, No. CV-13-0290-PHX-DGC, 2013 U.S. Dist. LEXIS 63630, at \*15 (D. Ariz. May 3, 2013) (holding the plaintiff's breach of express warranty claim accrued on the date she sustained her injuries, regardless of when she discovered them). Thus, Plaintiff's breach of express warranty claim expired on June 19, 2018, at the latest—nearly a year before she filed this lawsuit. The breach of express warranty claim is therefore time-barred and should be dismissed.

## II.    All of Plaintiff's Claims Fail Because She Cannot Establish Causation.

In addition to being time-barred, all of Plaintiff's claims fail for lack of causation. Regardless of what theories Plaintiff pursues, she must prove, through competent and reliable expert testimony, that Z.O.'s death was **caused by a defect in the RNPS**. *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040 (Ariz. 1990) (holding that summary judgment is appropriate when the "plaintiff's evidence does not establish a causal connection"); *see also See Brown v. Sears, Roebuck & Co.*, 136 Ariz. 556, 560, 667 P.2d 750, 754 (Ariz. App. 1983) ("Before liability can be fixed, the plaintiff is required to prove . . . that plaintiff's injuries were proximately caused by the defect.").

Arizona law requires expert evidence in complex products liability cases where, as here, "factual issues are outside the common understanding of jurors." *Bailey v. Ethicon Inc.*, No. CV-20-00457-TUC-JAS (LCK), 2021 U.S. Dist. LEXIS 130075, at \*22 (D. Ariz. July 12, 2021) (quoting *Rossell v. Volkswagen of Am.*, 167, 147 Ariz. 160, 167, 709 P.2d 517, 524 (Ariz. 1985)). Other courts recently have reached this same conclusion in the product liability context. *See, e.g.*, *Lewis v. Johnson & Johnson*, 601 F. App'x 205, 210-12 (4th Cir. 2015) (affirming a directed verdict because expert testimony established only that the presence of the medical device, not a defect in the device, caused plaintiff's injury); *Ream v. Ethicon, Inc.*, No. 1:20-CV-00922, 2020 WL 6889238, at \*5

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

(M.D. Pa. Nov. 24, 2020) (granting summary judgment because the expert report did not link a product defect to plaintiff's injuries); *Nix v. Ethicon, Inc.*, No. 1:19-CV-04896-SCJ, 2020 WL 5525172, at *4 (N.D. Ga. Sept. 14, 2020) (granting summary judgment because the case-specific expert did not connect plaintiff's injuries to a product defect); *Abt v. Ethicon, Inc.*, No. 1:20-CV-0047 SRC, 2020 WL 4887022, at *3-4 (E.D. Mo. Aug. 20, 2020) (granting summary judgment because the case-specific expert's conclusion that the device caused the injuries was insufficient to link a design defect to the injuries as required for causation); *Lampron v. Johnson & Johnson & Ethicon, Inc.*, No. 20-CV-317-JD, 2020 WL 3452150, at *4 (D.N.H. June 24, 2020) (granting summary judgment because plaintiff's experts did not opine that a design defect caused her injuries).

Further, Plaintiff must present sufficient expert evidence from which a juror could determine that causation is **probable**, not merely **possible**. *Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605, 616 (1984) (noting the jury "must find for the defendant unless they find a probability that defendant's negligence was a cause of plaintiff's injury"); *Kreisman v. Thomas*, 469 P.2d 107, 110, 12 Ariz. App. 215, 218 (Ariz. 1970) (expert testimony that injury "could" or "may" have been caused by something is generally insufficient); *accord Craft v. Trainor*, No. 1 CA-CV 11-0761, 2013 Ariz. App. Unpub. LEXIS 639, 2013 WL 2446098, at *4 (Ariz. App. June 4, 2013) ("The parties do not dispute that for medical expert causation testimony to be admissible, it must be to a reasonable degree of medical certainty (or, more simply, more probably than not) and supported by an appropriate foundation.").

Here, none of Plaintiff's experts competently or reliably opine that the RNPS caused Z.O.'s death. Of Plaintiff's four disclosed experts, three of them unequivocally testified they are not offering any opinion about what caused Z.O.'s death:

> Q.  So you cannot offer an opinion to a reasonable degree of
>
> medical certainty that Zoey's death was proximately caused
>
> by the Rock 'n Play sleeper, correct?

26

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1    SINGHOSE:  No, I don't think that's my role in this matter.

2    (SOF ¶ 71).

3    Q.  You don't plan to come to trial and offer any opinions to

4    the jury about any of Zoey's medical conditions and her

5    cause of death; is that correct?

6    VREDENBURGH:  Yes.

7    (*Id.*).

8    Q.  Okay.  You don't address cause of death.  Correct?

9    GOODSTEIN:  No, I did not.

10    * * *

11    Q.  Okay.  And again, in your official report that you signed

12    off on April 1st, 2021, you do not address cause of death in

13    here.  Correct?

14    GOODSTEIN:  Correct.

15    * * *

16    Q.  And you don't get into cause of death [in your rebuttal

17    report] at all.  Correct?

18    GOODSTEIN:  Correct.

19    Q.  And in neither report -- just again to be very clear, in

20    neither report do you include a differential diagnosis of what

21    happened in this case.  True?

22    GOODSTEIN:  I was not asked to do that.

23    (*Id.*).

24    Only Dr. Christensen, Plaintiff's forensic pathologist, attempts to render a medical

25    opinion about the alleged cause of Z.O.'s death—that is, that she "died of [positional]

26    asphyxia after she rolled partially to her left and ended up in a respiratorily compromising

27    position." But the reliability of this opinion falls short of what is required under Federal

28    Rule of Evidence 702, as explained in more detail in Defendant's Motion to Exclude Dr.

27

Christensen's Expert Opinions, which is fully incorporated by reference herein. Once Dr. Christensen's purported causation opinion is excluded under Rule 702 because it is speculative and unreliable, the record evidence shows Plaintiff has **no** expert to prove a defect in the RNPS proximately caused Z.O.'s death. Summary judgment is therefore appropriate.

Indeed, this is precisely the outcome reached by another federal district court in a case involving similar allegations related to the RNPS. (*See Goodrich v. Fisher-Price, Inc.*, Civil Action No. 1:16-CV-3116-TWT (N.D. Ga. Nov. 14, 2018), **Ex. A**). In *Goodrich*, just like in this case, Fisher-Price moved to exclude the plaintiff's medical causation expert under Rule 702. That motion was granted, and the court then appropriately went on to grant summary judgment in Fisher-Price's favor because of the plaintiff's inability to prove a defect in the RNPS proximately caused the alleged injuries through competent and reliable expert testimony. The Court should reach the same result here.

### III.    Plaintiff's Strict Products Liability and Negligence Claims Substantively Fail Because She Cannot Prove the RNPS Was Defective and for Additional, Independent Reasons.

Under Arizona law, to establish a *prima facie* case of strict products liability, a plaintiff must prove through competent and reliable expert testimony that: (1) the product is defective and unreasonably dangerous, (2) the defective condition existed when it left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries. *Rocky Mountain Fire and Cas. Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 292, 640 P.2d 851, 854 (Ariz., 1982). The elements of a negligence claim are substantively the same as a strict products liability claim. *See Anguiano v. E.I. DuPont de Nemours and Co., Inc.*, 808 F.Supp. 719, 722 (D. Ariz. 1992). Thus, to prevail on any of her products liability and negligence claims, **Plaintiff must prove the RNPS was defective**. *Cox v. Yamaha Motor Corp.*, U.S.A., No. CV-06-519-TUC-DCB(JCG), 2008 U.S. Dist. LEXIS 113277, at *14 (D. Ariz. May 19, 2008). A product may be defective

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1    or unreasonably dangerous because of a manufacturing defect, a design defect, or an

2    informational defect encompassing its instructions and warnings. *Dillon v. Zeneca Corp.*,

3    202 Ariz. 167, 172, 42 P.3d 598, 603 (Ariz. App. 2002).

4                    *i.  Plaintiff cannot prove a manufacturing defect.*

5          Under Arizona law, "[a] defectively manufactured product is one that is flawed as

6    a result of something that went wrong during the manufacturing process." *Sw. Pet*

7    *Products, Inc. v. Koch Industries, Inc.*, 273 F. Supp. 2d 1041, 1051 n.15 (D. Ariz. 2003)

8    (internal quotation marks and citation omitted). Plaintiff has no evidence to support this

9    claim. There is no record evidence that the subject RNPS deviated from an objective

10   standard or from Defendants' specifications or design documents. Additionally, no expert

11   for Plaintiff has opined that a deviation from the manufacturer specifications caused an

12   injury to Plaintiff. Any manufacturing defect claim stemming from Plaintiff's strict

13   products liability claim (Count I) or negligence claim (Count II) should be dismissed as

14   a matter of law.

15                   *ii.  Plaintiff cannot prove a design defect.*

16         Plaintiff provides no admissible evidence to support her allegation that the RNPS

17   was defectively designed. Proof of a design defect is contingent on competent and

18   reliable expert testimony to a reasonable degree of scientific or medical certainty under

19   Arizona law. Arizona courts have held expert testimony is necessary "when a layman is

20   not competent to judge whether or not a particular practice is negligent." *Woodward v.*

21   *Chirco Constr. Co.*, 141 Ariz. 520, 522, 687 P.2d 1275, 1277 (Ariz. App. 1984). In

22   support of her design defect allegations, Plaintiff relies on the opinions of her engineering

23   expert—Dr. William Singhose—to support her position that the 30-degree incline of the

24   RNPS rendered it defective or unreasonably dangerous. As mentioned above, however,

25   Defendants have contemporaneously moved to exclude Dr. Singhose's unreliable

26   opinions on this point. If the Court excludes Dr. Singhose's opinions, as it should, the

27   record evidence shows Plaintiff has no evidence to prove the design of the RNPS was

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

defective. Any design defect claim stemming from Plaintiff's strict products liability claim (Count I) or negligence claim (Count II) should be dismissed as a matter of law.

### iii.  Plaintiff cannot prove a failure to warn claim.

Under Arizona law, to prove a strict products liability failure to warn claim, a plaintiff must establish: (1) a duty to warn; (2) the absence of a warning made the product "defective and unreasonably dangerous;" (3) the warnings were missing when the product left Defendants' control; and (4) Plaintiff's injuries were caused by the failure to adequately warn. *Gosewisch*, 737 P.2d at 379; Ariz. Rev. Stat. § 12-683; *Sw. Pet Prods.*, 273 F. Supp. 2d at 1060.

Plaintiff provides no admissible evidence to support her allegation that the warnings and instructions on the RNPS were defective. Proof of a failure to warn claim is also contingent on competent and reliable expert testimony to a reasonable degree of scientific or medical certainty under Arizona law. *Woodward*, 141 Ariz. 520 at 522. In support of her failure to warn allegations, Plaintiff relies on the opinions of her human factors/warnings expert—Dr. Alison Vredenburgh—to support her position that the warnings and instructions were inadequate and thus rendered the RNPS defective or unreasonably dangerous. As mentioned above, however, Defendants have contemporaneously moved to exclude Dr. Vredenburgh's unreliable opinions on this point. If the Court excludes Dr. Vredenburgh's opinions, as it should, the record evidence shows Plaintiff has no evidence to prove the warnings and instructions were defective. Any failure to warn claim stemming from Plaintiff's strict products liability claim (Count I) or negligence claim (Count II) should be dismissed as a matter of law. *See Harrison v. Howmedica Osteonics Corp.*, No. CIV 06-0745 PHX RCB, 2008 U.S. Dist. LEXIS 26197, at *62 (D. Ariz. Mar. 27, 2008) (granting summary judgment as to Plaintiff's warnings claim when he was unable to provide any expert opinion in support of the claim).

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

**IV.    Plaintiff Cannot Prove the Elements of a Breach of Express Warranty Claim.**

A breach of express warranty claim is rooted in contract law and arises when a product fails to perform as warranted. *Kennedy v. Linda Brock Automotive Plaza*, 175 Ariz. 323, 326 (Ariz. App. 1993). "[A] seller can create an express warranty in . . . [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." *Dillon*, 42 P.3d at 602 (citing Ariz. Rev. Stat. § 47- 2313(A)). To demonstrate an express warranty, a plaintiff must specifically identify the affirmation(s) of fact that became the basis of the bargain, i.e., advertisements, labels, and pamphlets, to show statements made by the defendant with respect to its product. *See, e.g.*, *Nomo Agroindustrial SA DE CV v. Enza Zaden N. Am., Inc.*, 492 F. Supp. 2d 1175, 1184 (D. Ariz. 2007).

Here, Plaintiff has failed to identify any specific affirmation of fact that became the basis of the bargain to sustain an express warranty claim. Plaintiff's Complaint cites to Defendants' packaging and contains images of an unidentified RNPS from which Plaintiff claims specific affirmations of fact arose. (Pl. Second Am. Redacted Compl., ¶ 51, Dkt. 17). As an initial matter, none of these images is of the subject RNPS in which Z.O. allegedly died, and therefore they are not relevant to Plaintiff's breach of express warranty claim. Furthermore, Plaintiff admitted she has **never seen any packaging or advertising of the RNPS** from which an affirmation of fact or promise could even arise:

> Q.  And, again, I can pull this out, if we need to, but there are pictures in the Second Amended Complaint of the boxes, the Fisher-Price Rock 'n Play boxes and stuff.  I take it you don't have any recollection of seeing those; correct?
>
> A.  Correct, I don't.
>
> Q.  You don't have any recollection of seeing any advertising about Rock 'n Play sleepers; correct?
>
> A.  Correct.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

* * *

2        Q.  Okay.  And even sitting here today in 2020, you still

3        haven't seen the Rock 'n Play box, to your knowledge;

4        correct?

5        A.  Correct.

6        Q.  And you still haven't seen any advertisements; correct?

7        A.  Correct.

(SOF ¶ 48).

Accordingly, none of the affirmations by Defendants presented by Plaintiff in her Complaint provided a "basis of the bargain" for Plaintiff to maintain her breach of express warranty claim against Defendants. Indeed, Plaintiff did not actually purchase the RNPS, so no alleged affirmation of fact or promise from Defendants could have ever served as the basis of the bargain for Plaintiff to *purchase* the product. (*Id.*) This claim should be dismissed as a matter of law.

**V.      Plaintiff's Punitive Damages Claim Fails Because All of Her Underlying Claims Fail and Because She Cannot Prove Through "Clear and Convincing" Evidence That Defendants Acted with An "Evil Mind."**

Because Plaintiff's underlying causes of actions fail as set forth above, her claim for punitive damages also fails because it is derivative of all her claims. *Edmond v. Fairfield Sunrise Vill., Inc.*, 132 Ariz. 142, 144, 644 P.2d 296 (Ariz. App. 1982) (noting that punitive damages are "derivative" and "may only be awarded if the plaintiff has recovered actual damages"). Even assuming Plaintiff could maintain such a claim (which she cannot), she has not proven a basis for punitive damages, and this claim should be dismissed as a matter of law.

In Arizona, punitive damages are assessed only in extreme cases. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986). The Arizona Supreme Court has long held that punitive damages are a remedy "only to be awarded in the most egregious of cases," requiring a "more stringent standard of proof." *Id.* at 331-

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

2, 723 P.2d at 680-681. As such, for punitive damages to be assessed under Arizona law, a plaintiff must prove by "clear and convincing evidence" that the defendant purposefully engaged in "outwardly aggravated, outrageous, malicious, or fraudulent conduct" with an "evil mind." *Volz v. Coleman Co., Inc.*, 155 Ariz. 567, 570-1, 748 P.2d 1191, 1194-5 (1987); *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680. "A tortfeasor manifests an 'evil mind' if he either 'intended to injure the plaintiff' or 'consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.'" *Quintero v. Rodgers*, 221 Ariz. 536, 541, 212 P.3d 874, 879 (Ariz. App. 2009).

Summary judgment against punitive damage claims is appropriate when the undisputed facts do not provide "clear and convincing evidence" that a defendant acted with an "evil mind." *See, e.g.*, *Hale v. Norcold Inc*., No. CV-18-03597-PHX-MTL, 2020 U.S. Dist. LEXIS 68682, at *14 (D. Ariz. Apr. 20, 2020) (granting summary judgment as to punitive damages claim against product manufacturer when the record did not clearly support the claim that the manufacturer consciously disregarded an unjustifiable risk of harm to the plaintiffs); *Spedale v. Constellation Pharm., Inc.*, No. CV-17-00109-PHX-JJT, 2019 U.S. Dist. LEXIS 139010, at *46 (D. Ariz. Aug. 16, 2019) (same); *Beville v. Ford Motor Co.*, No. 03-237-PHX-ROS, 2006 U.S. Dist. LEXIS 115932, at *23 (D. Ariz. Mar. 31, 2006) (same); *Adams Craig Acquisitions LLC v. Atain Specialty Ins. Co.*, No. CV-18-00817-PHX-GMS, 2019 U.S. Dist. LEXIS 150227, at *17 (D. Ariz. Sep. 4, 2019) (same) (Snow, J.).

A number of federal courts have also determined that punitive damages are generally not proper in products liability lawsuits if the manufacturer complies with federal and state regulations or industry standards—as is the case here. *See, e.g., Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) (compliance with federal regulations is evidence of due care demonstrating defendant's behavior did not exhibit wantonness); *Rogers v. Ford Motor Co.*, 925 F.Supp. 1413, 1423 (N.D.Ind. 1996) (granting summary judgment on punitive damage claim, based in part on vehicle's compliance with motor vehicle safety standards); *Mims v. Wright Med. Tech., Inc.*, No.

1:11-cv-213-TWT, 2012 U.S. Dist. LEXIS 66805, at *13 (N.D. Ga. May 11, 2012) (granting summary judgment on punitive damages claim, noting the medical device manufacturer had to comply with federal regulations in order to sell its medical device); *Sloman v. Tambrands, Inc.*, 841 F. Supp. 699, 703 n.8 (D. Md. 1993) (compliance with federal regulations is incompatible with the "actual malice" standard ordinarily applicable to punitive damages); *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 826 (Fla. 1986) (finding no basis for punitive damages in part because defendant satisfied the industry performance standards).

Here, there is no evidence that any conduct or actions on Defendants' part, or on the part of any of their employees or agents, "intended to injure the plaintiff" or "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Quintero*, 221 Ariz. 536 at 541. And there certainly is no record evidence that Defendants engaged in "outwardly aggravated, outrageous, malicious, or fraudulent conduct" with an "evil mind." *Volz*, 155 Ariz. 567 at 570-1; *Linthicum*, 150 Ariz. at 331. Thus, Plaintiff cannot prove the heightened standard of culpability required to impose punitive damages under Arizona law.

To the contrary, the record evidence demonstrates that Defendants acted appropriately, diligently, reasonably, and in accordance with all applicable laws, rules, regulations, and guidance in designing, manufacturing, marketing, and selling the RNPS, including, without limitation, the voluntary standards created by the ASTM, and any rules, regulations, and guidance promulgated by the CPSC. Defendants' extensive and multi-tiered process for the design, development, and ongoing monitoring of the safety of the RNPS precludes a finding of punitive damages. The Court should therefore grant summary judgment on Plaintiff's punitive damages claim and dismiss it as a matter of law.

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

1

## **<u>CONCLUSION</u>**

2

For all the foregoing reasons, Defendants respectfully request the Court enter

3

summary judgment in their favor on all of Plaintiff's claims and dismiss them in their

4

entirety.

5

SUBMITTED this 19th day of November, 2021.

6

7

GREENBERG TRAURIG LLP

8

By:   _/s/ Lori G. Cohen_
Lori G. Cohen*

9

Mary-Olga Lovett*
Brandon D. Cox*

10

Nicole M. Goodwin
Aaron J. Lockwood

11

*_Pro Hac Vice_
_Attorneys for Defendants Mattel, Inc. and_

12

_Fisher-Price, Inc._

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA  85016
(602) 445-8000

1

**Certificate of Service**

2

☒    I hereby certify that on November 19, 2021, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution

3    to the following registered participants of the CM/ECF System:

4                              John E. Osborne
                             William C. Bacon
5                        GOLDBERG & OSBORNE LLP
                        698 E. Wetmore Road, Ste. 200
6                           Tucson, Arizona 85705
                     josborne@goldbergandosborne.com
7                     wbacon@goldbergandosborne.com
                           *Attorneys for Plaintiff*
8

9

10                              By:  */s/ Lori G. Cohen*_____
                                      Greenberg Traurig, LLP
11

12    *60735213*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28