# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID GOODRICH
as next friend
Asher Luke Goodrich, et al.,

    Plaintiffs,

      v.

FISHER-PRICE, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:16-CV-3116-TWT

## OPINION AND ORDER

This is a products liability action that was removed by the Defendant from the Superior Court of Fulton County. It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 81]; the Defendant's Motion to Exclude the Expert Testimony of Roy Benaroch, M.D. [Doc. 84]; the Defendant's Motion to Exclude the Expert Testimony of Paul Gaudreau [Doc. 87]; the Defendant's Notice of Objection, or, In the Alternative, Motion to Disregard Plaintiffs' Amended Responses to Defendant's Motion to Exclude the Testimony of Expert Roy Benaroch, M.D., and Paul Gaudreau [Doc. 128]; and the Plaintiffs' Motion for Leave to File Amended Daubert Responses [Doc. 136]. For the reasons set forth below, the Defendant's Motion for Summary Judgment [Doc. 81] is GRANTED; the Defendant's Motion to Exclude the Expert

Testimony of Roy Benaroch, M.D. [Doc. 84] is GRANTED; the Defendant's Motion to Exclude the Expert Testimony of Paul Gaudreau [Doc. 87] is GRANTED; the Defendant's Notice of Objection, or, In the Alternative, Motion to Disregard Plaintiffs' Amended Responses to Defendant's Motion to Exclude the Testimony of Expert Roy Benaroch, M.D., and Paul Gaudreau [Doc. 128] is GRANTED; and the Plaintiffs' Motion for Leave to File Amended Daubert Responses [Doc. 136] is DENIED.

## I. Background

### A. The Product

The "Rock 'N Play Sleeper" is an "inclined sleep product" designed and manufactured by the Defendant Fisher Price.[1] The sleeping surface of the Rock 'N Play is inclined roughly thirty degrees from a horizontal plane.[2] Infants are placed on their backs on the sleeping surface and are secured by straps.[3] At the time of its design, development, and first sale the Fisher-Price Rock 'N Play Sleeper complied in all respects with ASTM International standard F2194-07, which was the cradle and bassinet standard applicable to the Rock 'N Play at the time.[4]

---

[1] Def.'s Statement of Material Facts ¶ 1 [Doc. 81-2].

[2] *Id.*

[3] *Id.* ¶¶ 1, 13.

[4] *Id.* ¶¶ 2, 8. The Plaintiffs' Objection to Paragraph 2 of the Defendant's Statement of Material Facts is disregarded as argumentative and not fairly addressing the substance of the facts asserted.

## B. The Incident

On July 25, 2014, the Plaintiff Courtney Goodrich took her seven-week-old newborn Asher Goodrich with her to set up her first grade classroom.[5] They were accompanied by Asher's grandmother, Jan Hinson. Asher fell asleep in his car seat on the way to the school, and when they arrived he was moved to the Rock 'N Play to continue his nap.[6] Mrs. Goodrich and Ms. Hinson did not utilize the straps because it was their belief that the straps were too large and loose to properly secure Asher in the Rock 'N Play.[7]

After some amount of time, Mrs. Goodrich left the room and Ms. Hinson went to check on Asher.[8] She discovered that Asher was not breathing and his head was tilted over to the side.[9] Asher's skin was ashen and he had blue lips and eyelids.[10] Ms. Hinson attempted to wake Asher by shouting and blowing in his face, but he was unresponsive.[11] Ms. Hinson then gathered him up to her

---

[5]        Compl. ¶ 9 [Doc. 1-1].

[6]        *Id.* The Plaintiffs borrowed the Rock 'N Play from their neighbors. *Id.* ¶ 6.

[7]        *Id.* ¶ 9.

[8]        *Id.* ¶ 10.

[9]        *Id.*

[10]       *Id.*

[11]       *Id.* ¶ 11.

chest and brought her hand up firmly to his rear.[12] Asher began to breathe again.[13] Mrs. Goodrich called Asher's pediatrician, who instructed them to take Asher to a local hospital.[14]

### C. Medical Treatment

Mrs. Goodrich took Asher to Children's Healthcare of Atlanta at Hughes Spalding Hospital.[15] Asher was admitted into the emergency room of that facility and underwent diagnostic testing. Asher was subsequently transferred to Children's Healthcare of Atlanta at Egleston Hospital.[16] While at Egleston, Asher was evaluated by apnea specialist Dr. Gary Freed. Dr. Freed wrote the following regarding the etiology of Asher's "apparent life-threatening event":

> Etiology at this time unclear. Family describes perioral and periorbital cyanosis and one arm looked very pale. Child was in bouncy seat at the time of the event. One possible etiology is upper airway obstruction from head being in flexed position; this can lead to an obstructive event which would consist of respiratory attempts and the appearance that the child was breathing, but unable to move air, leading to a color change. Another possibility is reflux (weak history) but bouncy seat can often exacerbate underlying reflux. A urinary tract infection or urosepsis is possible given the elevated number of white cells on the UA, but child is not acting septic and CBC is reassuring. Finally, it is important to remember that statistically, approximately 40%-50% of ALTE's have no clear

---

[12]  *Id.* ¶ 12.

[13]  *Id.*

[14]  *Id.*

[15]  Def.'s Br. in Supp. of Mot. for Summ. J., at 8.

[16]  *Id.*, at 8-9.

etiology.[17]

Asher was discharged on July 27. His parents were instructed to place Asher on an apnea monitor and to follow reflux precautions including elevating the head of the baby's bed.[18] Asher was seen by his pediatrician, Dr. Hilton, on July 31, 2014. During the physical exam Asher spit up at least three times and had one choking episode while lying on his back.[19] Dr. Hilton prescribed Zantac, which is a medication used to treat reflux.[20] To date, Asher has not had any further episodes like the one that gave rise to this litigation. There is also no indication that the episode caused permanent physical or developmental harm to Asher.

Plaintiffs David and Courtney Goodrich, Asher's parents suing as next friend, brought a products liability action in Georgia state court against Defendant Fisher Price. They brought claims for strict products liability, negligence, gross negligence, failure to warn, and punitive damages.[21] The Defendant timely removed the action to this Court pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441.[22] The Defendant now moves to exclude the Plaintiffs'

---

[17]    Goodrich Medical Records, at 27 [Doc. 82-1].

[18]    Def.'s Statement of Material Facts ¶ 22.

[19]    *Id.* ¶ 23.

[20]    *Id.* ¶ 24.

[21]    Compl. ¶¶ 17-49.

[22]    Def.'s Notice of Removal [Doc. 1].

expert testimony and for summary judgment.

## II. Legal Standards

### A. Daubert Standard

Federal Rule of Evidence 702 governs the admission of expert opinion testimony. Pursuant to that rule, before admitting expert testimony a court must consider: (1) whether the expert is competent to testify regarding the matters he intends to address; (2) whether the methodology used to reach his conclusions is sufficiently reliable; and (3) whether the testimony is relevant, in that it assists the jury to understand the evidence or determine a fact at issue.[23] Furthermore, "the Court must find that [the expert] used a valid methodology based on *reliable data* to reach his opinions."[24] If the expert predicates his testimony on an assumption that is belied by the evidence, the expert's testimony is properly excluded.[25] The party offering the expert's testimony has the burden to prove it is admissible by a preponderance of the evidence.[26]

### B. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions,

---

[23]     Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[24]     *Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1360 (M.D. Ga. 2009) (emphasis added).

[25]     *Ferguson v. Bombardier Services Corp.*, 244 Fed. Appx. 944, 949 (11th Cir. 2007).

[26]     *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[27] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.[28] The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.[29] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists.[30]

## III. Discussion

As a general rule, expert testimony is required to identify design defects and to establish proximate causation in products liability cases.[31] The Defendant's primary argument at summary judgment is that the Plaintiffs lack

---

[27]    Fed. R. Civ. P. 56(c).

[28]    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

[29]    *Celotex Corp. V. Catrett*, 477 U.S. 317, 323-24 (1986).

[30]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

[31]    *See Wheeler v. Novartis Pharm. Corp.*, 944 F. Supp. 2d 1344, 1352 (S.D. Ga. 2013) ("In products liability cases, proof of causation generally requires reliable expert testimony which is 'based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury.'") (quoting *Rodrigues v. Ga.-Pac. Corp.*, 290 Ga. App. 442, 444 (2008)); *Meade v. Ford Motor Co.*, No. 1:09-CV-1833-TWT, 2011 WL 4402539, at *2 (N.D. Ga. Sept. 20, 2011) ("In a product liability case, only experts may offer competent evidence of a defect because the existence of a design or manufacturing defect is not an inference a jury can reasonably draw solely from human experience.") (quoting *Gillis v. Toyota Motor Corp.*, No. 1:00-CV-3409CC, 2002 WL 34396718, at *5 (N.D. Ga. Jan. 22, 2002)).

admissible expert testimony showing that the Rock 'N Play is defective or that it was the proximate cause of the injury.[32] Therefore, this Court will resolve the Defendant's motions to exclude the expert testimony of Roy Benaroch, M.D., and Paul Gaudreau before turning to the Defendant's summary judgment motion.

Before proceeding, however, this Court must first address the timeliness of the Plaintiffs' responses to the Defendant's Daubert motions. On May 21, 2018, this Court issued an Order extending the deadline for the Plaintiffs to respond to the Defendant's summary judgment motion and to the Defendant's Daubert motions.[33] On May 28, 2018, the deadline set in the Order, the Plaintiffs filed abbreviated responses.[34] On May 29, 2018, the Plaintiffs apparently filed a different version of their response to the Defendant's motion to exclude the testimony of Roy Benaroch, M.D.[35] As originally filed, the Plaintiffs' response to the Gaudreau motion consisted of a review of the legal standard followed by a single paragraph of argument that did not meaningfully address any of the Defendant's arguments. The Plaintiffs' responses to the Benaroch motion are much the same. On June 7, 2018, ten days after the Plaintiffs' original responses were filed and shortly before the Defendant's reply briefs were due, the Plaintiffs filed "amended" responses that added exhibits and

---

[32]  Def.'s Br. in Supp. of Mot. for Summ. J., at 12-15 [Doc. 81-1].

[33]  [Doc. 99].

[34]  [Docs. 108, 110, 112].

[35]  [Doc. 117].

several pages of argument to their original responses.[36] The Defendant objected to these filings as untimely and submitted reply briefs responding to the Plaintiffs' original responses filed on May 28, 2018.

This Court agrees with the Defendant that the Plaintiffs' amended responses are untimely and that the Plaintiffs' explanations for the delay are unsatisfactory. The May 21 Order was clear that the Plaintiffs' response briefing was due on May 28, 2018. If the Plaintiffs were confused about the date on which their responses were due, the proper course of action would have been to seek clarification from this Court. This Court will not countenance the filing of placeholder briefs to be amended at the filing party's leisure. Doing so would prejudice the Defendant and contravene the purpose of the Local Rules. Therefore, this Court finds that only the Plaintiffs' briefs filed before the May 28 deadline are properly before this Court.

In resolving the dispute over the timeliness of the Plaintiffs' filings, however, the Court has necessarily read and considered the contents of the Plaintiffs' amended responses. The amended responses do not alter this Court's opinion, detailed below, that the expert testimony of Roy Benaroch, M.D. and Paul Gaudreau should be excluded.

### A. Motion to Exclude Testimony of Dr. Benaroch

Dr. Roy Benaroch has been a practicing pediatrician for over twenty

---

[36]     [Docs. 124, 126].

years. He received his M.D. from Emory University and completed an internship and residency in pediatrics at the same institution.[37] He is a board certified general pediatrician and is a fellow of the American Academy of Pediatrics.[38] Dr. Benaroch claims to be "as expert as any general pediatrician is likely to be" about Sudden Infant Death Syndrome.[39] He has "read extensively on [Sudden Infant Death Syndrome]" and professes a deep personal interest in the subject.[40] In order to maintain his status as an AAP fellow, he has taken several continuing education courses on the subject of Sudden Infant Death Syndrome.[41] Dr. Benaroch claims no additional specialty or subspecialty relevant to this case. Dr. Benaroch has not published in a peer-reviewed journal on, nor conducted independent research into, the issues raised in this litigation.[42]

The Plaintiffs rely on Dr. Benaroch's testimony to establish both design defect and causation. On the question of design defect, Dr. Benaroch states in his expert report that the Rock 'N Play is "not fit for its intended use as a sleeper, and is therefore a defective product."[43] Dr. Benaroch focuses on the ways

---

[37]   Benaroch Curriculum Vitae [Doc. 110-1].

[38]   *Id.*

[39]   Benaroch Dep., at 38 [Doc. 95].

[40]   *Id.*

[41]   Benaroch Dep., at 38.

[42]   Benaroch Dep., at 73-74.

[43]   Benaroch Expert Report, at 3 [Doc. 76-5].

in which the Rock 'N Play purportedly conflicts with safe sleep recommendations promulgated by the AAP.[44] In particular, Dr. Benaroch opines that the Rock 'N Play's inclined sleep surface and "sling-like" structure conflict with AAP recommendations that infants sleep supine and on firm sleep surfaces.[45] The Rock 'N Play's design, Dr. Benaroch asserts, can "allow a baby's head to tip forward" into a "flexed" position and can otherwise cause "potential mal-positioning of the head and neck."[46] As a result, the infant's upper airway can become "crimp[ed] shut," leading to death by suffocation.[47]

Dr. Benaroch opines that the flawed design of the Rock 'N Play caused Asher's apnea event. Dr. Benaroch bases his opinion on Ms. Hinson's recollections regarding Asher's position in the Rock 'N Play and from Asher's medical records from Hughes Spalding and Egleston. Asher's treating physicians listed "upper airway obstruction by head being flexed" among at least three possible causes for the incident. Dr. Benaroch opines that the second possible cause, gastroesophageal reflux, could not have caused the incident due

---

[44]    In 2011, the AAP issued a report entitled "SIDS and Other Sleep-Related Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment." The report consists of a brief Policy Statement [Doc. 95-13] and a more extensive Technical Report [Doc. 95-14].

[45]    Benaroch Expert Report, at 4.

[46]    *Id.*, at 5-6.

[47]    *Id.*, at 5.

to "weak history" in the records and the lack of subsequent reflux events.[48] As for the third possible cause, urosepsis, Dr. Benaroch notes that subsequent medical evaluation eliminated this as a possibility and it was never treated.[49] Based in part on Ms. Hinson's account of Asher's head position during the life threatening event, Dr. Benaroch concludes that the Rock 'N Play compromised Asher's airway and caused the injury.

As an initial matter, this Court has serious reservations regarding Dr. Benaroch's qualifications to testify as an expert on the design of the Rock 'N Play. Dr. Benaroch's expert opinion is that the Rock 'N Play's inclined sleeping surface can compromise infant airways. But Dr. Benaroch claims no expertise in pediatric specialties pertaining to infant respiration or anatomy. He has conducted no research into topics relevant to this litigation. And, while Dr. Benaroch claims to have treated "dozens" of infants who experienced "life threatening events,"[50] there is no indication in the record that these events were factually similar to the one that gave rise to this litigation. Dr. Benaroch's opinions on design defect and causation should ultimately be excluded, however, because they are not sufficiently reliable to present to a jury. The Plaintiffs have not demonstrated that Dr. Benaroch's testimony is based on reliable data, nor

---

[48]     *Id.*

[49]     *Id.*

[50]     Benaroch Dep., at 41-42.

that Dr. Benaroch adequately accounted for alternative explanations for the apnea event. Dr. Benaroch's testimony should also be excluded because it is too vague and imprecise to assist the trier of fact.

### 1. Reliability

The Plaintiffs have not demonstrated that Dr. Benaroch's opinions are based on reliable data. Dr. Benaroch's expert opinion is that the Rock 'N Play is defective because its angled sleep surface can cause an infant's head to tip forward or to the side, compromising the infant's airway and leading to death by suffocation.[51] Dr. Benaroch further testifies that Asher's airway was in fact compromised in this manner on July 25, 2014.[52] Dr. Benaroch's deposition testimony and expert report make clear that the primary basis for Dr. Benaroch's opinion is a 2011 Policy Statement summarizing the AAP's recommendations for safe sleep.[53] A substantial section of Dr. Benaroch's expert report consists of quotes from the 2011 Policy Statement, followed by brief explanations as to why the Rock 'N Play fails to comply with the AAP's recommendations.[54] The AAP Policy Statement recommends that infants sleep

---

[51]     Benaroch Expert Report, at 5.

[52]     *Id.*, at 5.

[53]     AAP Policy Statement [Doc. 95-13].

[54]     Benaroch Expert Report, at 4.

"supine" and cautions against allowing infants to sleep in "sitting devices."[55] Neither the Policy Statement nor its accompanying Technical Report, however, identifies head or neck flexion as a risk of inclined sleeping. Dr. Benaroch insists that this particular risk of inclined sleeping was considered by the AAP and that it would have been "silly" for the AAP to include all of the ways in which non-supine sleep could pose a risk to infants.[56] But Dr. Benaroch must support his preferred interpretation of the AAP guidelines with more than ipse dixit. Dr. Benaroch cites two other bases for his opinion in his expert report—a 2008 case study of 508 sudden infant deaths in the Canadian province of Quebec (the Côté study); and a 2009 study of deoxygenation of term infants in hospital cribs, car beds, and car seats (the Kornhauser study).[57]  Both of these studies are cited in the AAP's Technical Report.[58]  These studies, however, focus primarily on the risks associated with car seats. The Rock 'N Play is not angled as steeply as a car seat. And, as recognized by Dr. Benaroch in his deposition, the two products

---

[55]    *See* AAP Policy Statement, at 1031-33. The studies referenced in the Policy Statement all appear to have involved car seats and not bassinets like the Rock 'N Play.

[56]    Benaroch Dep., at 246-47.

[57]    *See* Expert Report of Roy Benaroch, M.D., at 3 (citing A Côté, A Bairam, M Deschenes & G Hatzakis, *Sudden infant deaths in sitting devices*, ARCH DIS CHILD 384-389 (2008); Lilijana Kornhauser Cerar, Christina V. Scirica, Irena Štucin Gantar, Damjan Osredkar, David Neubauer, & T. Bernard Kinane, *A Comparison of Respiratory Patterns in Healthy Term Infants Placed in Car Safety Seats and Beds*, PEDIATRICS e396-e402 (2009)).

[58]    AAP Technical Report, at e1350 n. 129, n. 130 [Doc. 95-14].

have various other design differences beyond the angle of incline.[59]  The Côté study does raise concerns about the risk of infants spending large amounts of time in "sitting devices," but that term appears to be a catch-all term for a wide variety of products at various degrees of incline.  Moreover, in his deposition Dr. Benaroch appears to concede that the Rock 'N Play is *not* a sitting device.[60]  When asked in his deposition to explain how being in a sitting position could cause airway compromise, Dr. Benaroch provided a few theories that he admitted were "speculative" and concluded that it was not his "job to prove why that's unsafe when there is [sic] plenty of observations to show that babies sleeping flat are sleeping safer and are less unlikely to succumb."[61] Neither the Côté nor the Kornhauser study provides direct support for Dr. Benaroch's theory of design defect or causation in this case, and Dr. Benaroch does not provide adequate support for his interpretations of the AAP recommendations or for the studies cited by the AAP. Dr. Benaroch has extrapolated from the "accepted premise" that infants should sleep supine to the unfounded conclusion that sleep at a thirty degree incline is dangerous because he says that it is.[62]  Dr.

---

[59]    Benaroch Dep., at 111.

[60]    Benaroch Dep., at 156.

[61]    *Id.*, at 222, 234.

[62]    *See Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1355 (M.D. Ga. 2007), *aff'd*, 300 F. App'x 700 (11th Cir. 2008) (quoting the advisory committee notes to Federal Rule of Evidence 702 to support the proposition that experts should not "unjustifiably extrapolate[] from an accepted premise to an

Benaroch's expert testimony on the Rock 'N Play's allegedly defective design should therefore be excluded due to lack of reliable data. And, because Dr. Benaroch has not reliably established the Rock 'N Play as a possible cause of the apnea event, it follows that Dr. Benaroch's testimony on the proximate cause of the event should be excluded as well.[63]

Dr. Benaroch's testimony on the cause of Asher's life threatening event should also be excluded because Dr. Benaroch has not adequately accounted for "obvious alternative explanations" for the apnea event.[64] In his expert report, Dr. Benaroch dismisses reflux as a possible explanation for the event because it was "not supported by the history (there had been no spit up or vomit), and not supported by the baby's subsequent course (there were no further events)."[65] Dr. Benaroch cites as corroborating evidence that the "child was not treated for

---

unfounded conclusion.").

[63]     *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005) (holding that, when conducting a differential diagnosis, an expert must demonstrate that the suspected cause is "actually capable of causing the injury") (quoting *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049 (1057-1058 (9th Cir. 2003)); *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1362 (N.D. Ga. 2001) (noting that experts must "rule in" their suspected cause using "scientifically valid methodology"), *aff'd sub nom. Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002) (quoting *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1413 (D. Or. 1996)).

[64]     *See id.*, at 1356 (quoting the advisory committee notes to Federal Rule of Evidence 702).

[65]     Benaroch Expert Report, at 5.

[gastroesophageal reflux disease]."[66] During Asher's follow-up visit with his pediatrician, however, he was observed to spit up and have a choking episode during the examination.[67] Asher's pediatrician, Dr. Hilton, diagnosed Asher with gastroesophageal reflux disease and prescribed anti-reflux medication.[68] When asked about Asher's subsequent medical history in his deposition, Dr. Benaroch indicated that he had not read these medical records and was unaware of Asher's gastroesophageal reflux disease diagnosis.[69] After being provided with the records, Dr. Benaroch indicated that his opinion would not change because infants are more likely to spit up while being manipulated during an examination, and because, in his view, Dr. Hilton "doesn't seem to be up on the current guidelines for the diagnosis or treatment of [gastroesophageal reflux disease]."[70] Nevertheless, Dr. Benaroch's failure to read Asher's medical records from a doctor's visit mere days after the life threatening event is troubling. These records would seem directly relevant to weighing which of the possible etiologies listed in Asher's emergency care records was the likeliest cause. Moreover, the fact that Dr. Hilton prescribed medication provides an alternative explanation as to why no further episodes occurred. Dr. Benaroch's failure to

---

[66]    *Id.*

[67]    Def.'s Statement of Material Facts ¶¶ 23-24.

[68]    *Id.*

[69]    Benaroch Dep., at 44, 204.

[70]    *Id.*, at 211-14.

read these records prior to conducting his differential etiology undermines the reliability of his analysis and warrants exclusion of his testimony. This is particularly true when the causes of most Sudden Infant Death type events are simply unknown.

### 2. Relevance

Dr. Benaroch's testimony should also be excluded because it is too vague and imprecise to assist the trier of fact. Under Georgia law, the trier of fact is called upon to balance the risk of the product at issue against the utility or benefit derived from it.[71] Dr. Benaroch does not attempt to engage in a risk-utility analysis in any meaningful sense—it is apparently his opinion that inclined sleep products are simply so dangerous that they should not exist at all. "It is only at their most extreme that design defect cases reflect the position that a product is simply so dangerous that it should not have been made available at all."[72] But, despite the severity of the risk that Dr. Benaroch insists the Rock 'N Play poses, he makes no attempt to quantify the likelihood of adverse events in inclined sleep products. In his deposition, Dr. Benaroch notes that "[m]ost babies will tolerate sleeping in a car seat most of the time just fine and most babies, obviously, will tolerate sleeping in a Rock 'N Play Sleeper at a lower incline than a car seat just fine, but that doesn't mean that it's safe for all babies. And the

---

[71]     *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 735 (1994).

[72]     *Id.*, at 736.

fact that we have a risk factor, an increased risk of death, is still a problem."[73] Later, Dr. Benaroch concedes that the same "twisting, rotating [neck] movement" that Dr. Benaroch opines is caused by the Rock 'N Play's incline can also occur when an infant is lying supine, but insists that the risk is "increased" by an inclined position.[74] Absent any testimony or underlying data indicating how much the risk is increased, however, the jury cannot meaningfully weigh the risks of the product against its utility.[75] Dr. Benaroch's testimony is therefore too vague and imprecise to assist the trier of fact and should be excluded.

### B. Motion to Exclude Paul Gaudreau

Paul Gaudreau is a mechanical engineer who has, for the past nine years, worked on developing sitting devices designed for infants.[76] Mr. Gaudreau asserts that the Defendant did not follow proper procedures in the development of the Rock 'N Play, resulting in a product that is "not fit for its intended use and is not safe for use as a sleeper for newborn children."[77] Like Dr. Benaroch,

---

[73]     Benaroch Dep., at 131.

[74]     *Id.*, at 132.

[75]     *See United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (upholding the exclusion of expert testimony where the expert could not say whether an expected result was "more likely than not," "substantially more likely than not," or "virtually certain[]" to occur).

[76]     Gaudreau Curriculum Vitae [Doc. 112-1].

[77]     Gaudreau Expert Report, at 2-3 [Doc. 112-2].

it is Mr. Gaudreau's opinion that the design of the product can cause an infant's head to list forward or to the side, compromising the airway.[78] It is unclear whether Mr. Gaudreau also offers an opinion on whether the Rock 'N Play was the proximate cause of the life threatening event. His expert report makes no mention of the particular event that gave rise to this litigation. In his deposition, however, Mr. Gaudreau appears to suggest that the design of the Rock 'N Play did, in fact, cause the apnea event.[79] Insofar as Mr. Gaudreau seeks to opine on the proximate cause of the event, he is unqualified to do so. Mr. Gaudreau has no formal medical training and did not review any of Asher's medical records in forming his opinion.[80] Therefore, any opinion that Mr. Gaudreau offers regarding the cause of the particular event that gave rise to this litigation should be excluded.

Mr. Gaudreau's testimony on the design of the Rock 'N Play should also be excluded. Mr. Gaudreau testifies that sleep at a thirty-degree incline—or, indeed, any incline—is inherently dangerous because it increases the risk of head or neck flexion. Like Dr. Benaroch, Mr. Gaudreau bases his opinion primarily

---

[78] *Id.*, at 2.

[79] Gaudreau Dep., at 160-61 [Doc. 88] ("I'm talking about the weight of the skull in conjunction with the protrusion of the skull from the back plane. Those two forces in conjunction caused the child's head to list or move. I mean, as we can see in this picture of Asher, you can see his head is tilted off to the side as well as it looks like his chin is quite close to his chest.").

[80] *Id.*, at 59.

on the AAP recommendations for safe sleep. But, as already discussed in the context of Dr. Benaroch's testimony, the AAP recommendations do not identify head or neck flexion as a risk of inclined sleep. Mr. Gaudreau offers little beyond the AAP recommendations to supplement his opinion. He demonstrates no particular familiarity with the research and data underlying the AAP recommendations. He readily admits that his experience lies principally in the field of car seat design, which is a product that is more steeply inclined than a Rock 'N Play.[81] He has no experience designing infant sleep products.[82] Mr. Gaudreau is not qualified to render the opinion proffered on the design of the Rock 'N Play, and has not demonstrated that his opinion is based on reliable data. Accordingly, Mr. Gaudreau's opinions on design defect should be excluded.

## C. Motion for Summary Judgment

### 1. Strict Products Liability

O.C.G.A. § 51-1-11 makes manufacturers liable in tort to any person who "suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained[.]" Georgia courts recognize causes of action arising from design defects and

---

[81]     *Id.*, at 16-17, 44, 181.

[82]     *Id.*, at 44-45.

manufacturing defects.[83] In a design defect case, the injured party seeks to prove that some element of the product's design was defective and was the proximate cause of the injury. In a manufacturing defect case, by contrast, the injured party seeks to show that the particular product that injured them deviated in some way from the manufacturer's intended design, and this deviation was the proximate cause of the injury.[84] The Plaintiffs have pursued both theories of liability in this suit.

### a. Design Defect

In products liability cases, proof of design defect and proximate cause generally requires admissible expert testimony.[85] Notwithstanding the Plaintiffs' assertions to the contrary, a jury could not reasonably infer a causal link between inclined sleep and infant airway compromise "solely from human experience."[86] The Plaintiffs also cannot substitute the diagnosis of apnea specialist Dr. Freed in the place of admissible expert testimony.[87] Despite the

---

[83]     *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 733-34 (1994).

[84]     *Id.*

[85]     *See Wheeler*, 944 F. Supp. 2d at 1352; *Meade*, No. 1:09-CV-1833-TWT, 2011 WL 4402539, at *2.

[86]     *Meade*, No. 1:09-CV-1833-TWT, 2011 WL 4402539, at *2.

[87]     *See* Pls.' Resp. to Def.'s Mot. for Summ. J., at 9 (arguing that "even if the experts are not used," the jury can rely on "eye witness testimony," the "treating apnea specialist's diagnosis," the "myriad of similar incident[s]," and the "common knowledge that newborns are unable to support the weight of their heavy heads" in order to find proximate cause).

Plaintiffs' insistence throughout their briefing that Dr. Freed "diagnosed" Asher with upper airway obstruction, the plain text of Dr. Freed's note in this case indicates that he came to no definitive conclusions regarding the etiology of the apnea event and that the causes of most such events are unknown.[88] Because the Plaintiffs lack admissible expert testimony to prove design defect or proximate cause, the Plaintiffs' claims alleging design defect should be dismissed.

### b. Manufacturing Defect

The Plaintiffs' claims alleging manufacturing defect should be dismissed because the Plaintiffs have put forward no evidence that the Rock 'N Play involved in this suit deviated from the Defendant's design for the product. To the contrary, the Plaintiffs' case is premised on the argument that all Rock 'N Plays, including the one involved in this suit, share the same fundamental design flaws. Accordingly, the Plaintiffs' claims alleging manufacturing defect should be dismissed.

### 2. Negligence

The essential elements of a negligence action in Georgia are "(1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between

---

[88]     *See id.*, at 8-9 (asserting that Dr. Freed "diagnosed Asher as having 'airway compromise due to head being in a flexed position'"); *but see* Goodrich Medical Records, at 27 (in which Dr. Freed lists airway compromise as being one of three possible causes of the life threatening event, and further stating that "40-50%" of such events have no known cause).

the breach and the injury."[89] The Plaintiffs' negligence claims are duplicative of their strict liability claims. Whether proceeding under strict liability or negligence under Georgia law, the key question is whether the defendant's design decisions were "reasonable."[90] Because the Plaintiffs' expert testimony has been excluded, the Plaintiffs cannot show that the Defendant's product design is unreasonable or that the Defendant's product was the proximate cause of the injury. Therefore, the Defendant's negligence claim should be dismissed.

### 3. Gross Negligence

O.C.G.A. § 51-1-4 defines gross negligence as the absence of "slight diligence," which is "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." Because the Plaintiffs cannot sustain their negligence claim, it follows that their gross negligence claim should also be dismissed. Even assuming that the Plaintiffs' negligence claims could be sustained, the Defendant points out the lack of evidence in the record to support the Plaintiffs' claim that the Defendant acted "without even slight care."[91] In their response briefing, the Plaintiffs do not identify which facts support their claim for gross

---

[89]     *Vaughan v. Glymph*, 241 Ga. App. 346, 348 (1999).

[90]     *Ogletree v. Navistar Int'l Transp. Corp.*, 269 Ga. 443, 445 (1998) (Noting that risk-utility analysis "incorporates the concept of 'reasonableness' and applies negligence principles to the determination of whether a product is defective for strict liability purposes.").

[91]     Def.'s Br. in Supp. of Mot. for Summ. J., at 18-19.

negligence. Instead, the Plaintiffs merely restate the statutory test for gross negligence.[92] Therefore, the Plaintiffs' gross negligence claim should be dismissed on the additional ground that the Plaintiffs have not identified facts bridging the gap between negligence and gross negligence.

### 4. Failure to Warn

Georgia law imposes a duty to warn on product manufacturers when they learn of danger arising from the use of their product.[93] In order to prevail, the injured party must show that the lack of an adequate warning was the proximate cause of the injury.[94] The Plaintiffs lack admissible expert testimony showing that the design of the product was defective or that the product was the proximate cause of the life threatening event. Because the Plaintiffs cannot prove that the use of the Rock 'N Play was the proximate cause of the life threatening event, it necessarily follows that the Defendant cannot be liable for negligent failure to warn, regardless of the contents and location of the warning. Accordingly, the Plaintiffs' claim for negligent failure to warn should be dismissed.

### 5. Punitive Damages

O.C.G.A. § 51-12-5.1 authorizes the award of punitive damages in tort

---

[92]     Pls.' Resp. to Mot. for Summ. J., at 18-19.

[93]     *DeLoach v. Rovema Corp.*, 241 Ga. App. 802, 804 (2000); O.C.G.A. § 51-1-11(c).

[94]     *Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 75 (1995).

actions "in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Claims for punitive damages are derivative of underlying tort claims.[95] Because the Plaintiffs' tort claims are due to be dismissed, it follows that the Plaintiffs' claim for punitive damages should also be dismissed.

## IV. Conclusion

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Doc. 81] is GRANTED; the Defendant's Motion to Exclude the Expert Testimony of Roy Benaroch, M.D. [Doc. 84] is GRANTED; the Defendant's Motion to Exclude the Expert Testimony of Paul Gaudreau [Doc. 87] is GRANTED; the Defendant's Notice of Objection, or, In the Alternative, Motion to Disregard Plaintiffs' Amended Responses to Defendant's Motion to Exclude the Testimony of Expert Roy Benaroch, M.D., and Paul Gaudreau [Doc. 128] is GRANTED; and the Plaintiffs' Motion for Leave to File Amended Daubert Responses [Doc. 136] is DENIED.

---

[95]    *Perkins v. Thrasher*, 701 F. App'x 887, 891 (11th Cir. 2017).

SO ORDERED, this 14 day of November, 2018.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

Goodrich et al v. Fisher-Price, Inc.

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Northern District of Georgia; United States District Court for the Northern District of Georgia |
| **Federal Nature of Suit** | Personal Injury - Product Liability[365] |
| **Docket Number** | 1:16-cv-03116 |
| **Status** | Closed |

Bloomberg Law ®

© 2019 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Services