Nicole M. Goodwin (SBN 024593)
Aaron J. Lockwood (SBN 025599)
**GREENBERG TRAURIG, LLP**
2375 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Tel: (602) 445-8000
Facsimile: (602) 445-8100
goodwinn@gtlaw.com
lockwooda@gtlaw.com

Lori G. Cohen *(pro hac vice)*
Brandon D. Cox *(pro hac vice)*
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2212
cohenl@gtlaw.com
coxb@gtlaw.com

Mary-Olga Lovett *(pro hac vice)*
**GREENBERG TRAURIG, LLP**
1000 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 374-3541
Facsimile: (713) 754-7541
lovettm@gtlaw.com

*Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>Plaintiff,<br><br>v.<br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation,<br><br>Defendants. | No. 2:19-cv-02689-GMS<br><br>**DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1(a), Defendants Mattel, Inc. and Fisher-Price, Inc. (collectively "Defendants") hereby submit their Statement of Material Facts in Support of their Motion for Summary Judgment.

**A. The Fisher-Price Rock 'n Play Sleeper**

1. The Fisher-Price Rock 'n Play Sleeper ("RNPS") is an inclined sleeper designed for day use or overnight sleep for infants that places them at approximately a 30-degree angle from the horizontal. (C. Pilarz 30(b)(6) Dep., at 69, 311, 316, 384, **Ex. 1**; L. Chapman Dep., at 137-138, **Ex. 2**; J. Taft Dep., at 262, **Ex. 3**).

2. The specific model at issue in this case is the Fisher-Price Newborn Rock 'n Play Sleeper – Berry, Model No. BHL58, first sold in 2013. (COU_005604, **Ex. 4**).

3. The RNPS also comes with a sewn-in warning label and instructions for parents to safely use the product. (COU_005582, **Ex. 5**). Pertinently, the warnings instructed parents to: "ALWAYS use the restraint system[;]" "ALWAYS use the pad provided, which includes the restraint[;]" "DO NOT use this product when the infant begins to push up on hands and knees, can pull up or sit unassisted or has reached 25 lbs (11.3 kg), whichever comes first[;]" and "Always provide the supervision necessary for the continued safety of your child." (*Id.*)

4. Identical warnings appeared in the instruction manual that accompanied the RNPS upon purchase. (*See* Mattel-COU0001786, **Ex. 6**).

**B. The Design Process of the RNPS**

5. Fisher-Price has an extensive history of designing products for infants placed in inclined positions. (C. Pilarz 30(b)(6) Dep., at 19-21, **Ex. 1**).

6. The team involved in the design and development process of the RNPS was an interdisciplinary team that included but was not limited to Catherine "Kitty" Pilarz and Michael Steinwachs, who combined had over 50 years' experience in the juvenile product industry. (C. Pilarz Ind. Dep., at 12, **Ex 7**; M. Steinwachs Ind. Dep., at 12, **Ex. 8**).

7. Members of the Fisher-Price Quality and Engineering departments were also involved, as well as its Early Childhood Development Research team (the "Child Research Team"). (L. Lohiser Dep., at 19-20, 167, **Ex. 9**).

8. Fisher-Price also consulted with external experts when designing the RNPS. Specifically, Fisher-Price worked with Dr. Gary Deegear, an experienced and respected family medicine physician whose background and training included pediatrics and biomechanics among other areas. (C. Pilarz 30(b)(6) Dep., at 39, **Ex. 1**).

9. The original concept of the RNPS was developed by designer Linda Chapman. (L. Chapman Dep., at 23, 204-205, **Ex. 2**).

10. From the outset and throughout the life of the product, the design intent was a product for, among other things, supine (face-up on the back) overnight sleep with an elevated head position for infants of a certain developmental stage. (L. Chapman Dep., at 16-17, 62, 70-71, 131-133, **Ex. 2**; M. Steinwachs Ind. Dep., at 101-102, **Ex. 8**).

11. Fisher-Price's experience with many different products at many different angles informed it that an incline angle at 30 degrees was safe for a child beginning at birth, while greater angles of incline could pose a problem for the youngest infants if maintained for a long enough period of time. (C. Pilarz 30(b)(6) Dep., at 245, **Ex. 1**).

12. It recognized, for example, that angles as much as 45 degrees posed a risk of chin-to-chest motion, while shallow angles would make it too easy for infants to push themselves up the back of the product. (J. Taft Dep., at 77-78, **Ex. 3**).

13. The design team looked for, and could not identify, research that indicated an incline angle of 30 degrees or less presented a hazard for infants. (C. Pilarz 30(b)(6) Dep., at 29-30, 245, 270-271, **Ex. 1**; M. Steinwachs 30(b)(6) Dep., at 92, **Ex. 10**).

14. Similarly, there were no standards or regulations that recommended against a 30-degree incline. (M. Steinwachs 30(b)(6) Dep., at 92-93, 95, 103, 123, **Ex. 10**).

15. Additionally, Fisher-Price designed the RNPS to include a restraint system. With its deeper base, higher walls, and stable platform, the RNPS positions babies of the

appropriate developmental level more securely than sitting products like a bouncer, making it appropriate for overnight sleep. (J. Taft Dep., at 246-247, **Ex. 3**).

16. The RNPS was designed to hold the infant in one inclined position, without sliding down or to the side into a potentially compromising position, and a restraint is useful for this purpose. (M. Steinwachs 30(b)(6) Dep., at 50-52, **Ex. 10**; C. Pilarz Ind. Dep., at 21, **Ex. 7**).

### C. The Development Process of the RNPS

17. In developing the RNPS, Fisher-Price followed a thorough and diligent design process, which included the following steps: (1) Hazard Analysis meetings (also referred to as Safety Audits); (2) Creation of the Product Requirements Documents ("PRD" or "PRDs"); (3) On-site and in-home testing coordinated by Fisher-Price's Play Lab; (4) External medical expert consultation; and (5) Extensive certification testing performed by third party labs. (C. Pilarz Ind. Dep., at 13-14, **Ex. 7**).

18. The Hazard Analysis (also referred to as a Safety Audit) is the first phase of safety review of the product once the design concept is developed, typically conducted by the Fisher-Price Safety Committee. (C. Pilarz 30(b)(6) Dep., at 12, **Ex. 1**; M. Steinwachs 30(b)(6) Dep., at 155, **Ex. 10**).

19. The Safety Committee met seven times over the course of six months to analyze potential safety hazards posed by the RNPS, and identified numerous issues that were addressed during this process, including the head/torso alignment and child positioning, safety of the angle for sleep, preventing entrapment, preventing the infant from pushing out the top of product seat, placement of the restraints, and the breathability of the seat back and sides. (Mattel-COU0000551, 576-577, 584, 587, 590, 592, **Ex. 11**).

20. Once the product underwent the approval of the Safety Committee through the Hazard Analysis (or Safety Audit) process, a PRD was created, which is a "document that details the product specifications for safety, reliability, performance, aesthetic and packaging requirements of a product either directly or by reference to other specifications and procedures." (M. Steinwachs 30(b)(6) Dep., at 24, 302, **Ex. 10**). The PRD addresses

the requirements of numerous standards and regulations promulgated by various domestic and international organizations by referencing various Fisher-Price Quality and Safety Operating Procedures (QSOPs). (*Id.*)

21. The referenced QSOPs also impose internal Fisher-Price requirements, which are sometimes more rigorous in breadth and scope than applicable standards/regulations. (J. Taft Dep., at 113-14, **Ex. 3**).

22. The Play Lab conducted several on-site and in-home tests of the RNPS, analyzing the behavior of live infants in the product and the manner in which parents would use the product. (L. Lohiser Dep., at 21, 24-25, **Ex. 9**).

23. The initial set of in-home testing of the RNPS was conducted with the children and grandchildren of Fisher-Price employees, exemplifying the trust that the company placed in the safety of the product. (*Id.* at 20-21).

24. Concurrent with the testing done by the Play Lab, the RNPS also underwent the review of an external medical consultant, Dr. Gary Deegear. Dr. Deegear never voiced any concerns about the 30-degree angle. (C. Pilarz 30(b)(6) Dep., at 286-287, **Ex. 1**; C. Pilarz Ind. Dep., at 191, **Ex. 7**; G. Deegear Dep., at 221, **Ex. 12**). Communications between Fisher-Price and Dr. Deegear also indicated he was satisfied with the design of the RNPS and expressed no concerns about its safety for overnight sleep. (C. Pilarz 30(b)(6) Dep., at 321-322, 383, **Ex. 1**).[1]

25. Finally, while testing to internal requirements was performed at Fisher-Price, the applicable external standards were tested by credible third-party testing laboratories, which included SGS and Bureau Veritas, thereby ensuring further approval of the product design by objective external entities. (M. Steinwachs 30(b)(6) Dep., at 125, **Ex. 10**).

---

[1] Many years after he consulted with Fisher-Price on the RNPS, Dr. Deegear experienced personal issues in his life that led him to retire from practicing medicine. (*See* G. Deegear Dep.; at 158, 263, **Ex. 12**). At the time he rendered his consulting services to Fisher-Price about the RNPS, however, he was a well-respected physician within his field and had a history of working with the Fisher-Price design team. (C. Pilarz 30(b)(6) Dep., at 281, **Ex. 1**).

4

26. Such compliance was certified through the program by the Juvenile Products Manufacturers Association ("JPMA"). (C. Pilarz Ind. Dep., at 40-41, **Ex. 7**).

**D. The RNPS's Compliance with ASTM Standards and AAP Policy Statements**

27. When the RNPS was first designed, developed, and sold in October 2009, it complied with the American Society for Testing and Materials ("ASTM") standard F2194, which was applicable to bassinets and cradles, the most analogous product to the RNPS. (J. Taft Dep., at 256-257, **Ex. 3**).

28. In addition to ensuring compliance with this standard, Fisher-Price conducted additional tests that were not required by the standard, such as, for example, buckle performance and rocking speed testing. (*Id.* at 256-257).

29. The bassinet standard was developed by ASTM's Subcommittee tasked with creating safety standards for cribs, toddler beds, play yards, bassinets, cradles, and changing tables. (*See* ASTM F2194-07, **Ex. 13**).

30. ASTM subcommittee for this standard was comprised of representatives of the Consumer Product Safety Commission ("CPSC") and the American Academy of Pediatrics ("AAP"), testing laboratories, consumer safety groups, and manufacturers like Fisher-Price, among others. (*Id.*; *see also* M. Steinwachs Ind. Dep., at 269-271, **Ex. 8**).

31. ASTM eventually published a different standard in May 2015 that was specifically applicable to inclined sleepers such as the RNPS. (ASTM F3118-15, **Ex. 14**).

32. In October 2011, the AAP published an update to its policy statement about safe infant sleeping practices. (*See* 2011 AAP Policy Statement, at 1030, **Ex. 15**).

33. These guidelines are intended to inform general pediatricians and parents about a safe sleep environment. The 2011 updated guidance states that infants should be placed in a supine position (on their backs) for sleep. (*Id.*)

34. The AAP committee also recommended that infants be placed on a "firm," "flat" surface. (*Id.*)

35. The AAP never stated at this time that inclined sleepers were unsafe. (*See id.*; *see also* M. Goodstein, MD, Dep., at 219, **Ex. 16**).

5

36. In November 2016, the AAP updated its recommendations on infant safe sleep, but again, never stated inclined sleepers were unsafe. The AAP again did not state that inclined sleepers were unsafe. (*See* 2016 AAP Policy Statement, **Ex. 17**).

### E. Fisher-Price's Monitoring of Incidents

37. Throughout the RNPS's time on the market, Fisher-Price monitored the safety of the RNPS through a large Consumer Relations/Services Department ("Consumer Services") that handles calls from consumers regarding their experience with the Fisher-Price's products. (M. Steinwachs Ind. Dep., at 18, **Ex. 8**).

38. Data regarding any adverse incidents involving the RNPS was catalogued in the Consumer Affairs Tracking System ("CATS"), which is the central repository for all consumer correspondence. (L. Martin Dep., at 9, 24, 29, 62-63, **Ex. 18**). CATS safety incidents were reviewed by the safety team on a weekly basis, and incidents that are reportable to the CPSC were reviewed daily. (C. Pilarz 30(b)(6) Dep., at 224, **Ex. 1**; J. Taft Dep., at 81-82, **Ex. 3**).

39. Fisher-Price never identified any safety signals that suggested a product defect or design flaw that could be correlated to reported incidents. (J. Taft Dep., at 83-86, **Ex. 3**; M. Steinwachs Individual Dep., at 18, **Ex. 8**).

### F. Plaintiff's Allegations and the June 19, 2014 Incident

40. Z.O. was eight months and twenty-three days old when she passed. (*See* Z.O. Death Certificate, **Ex. 19**).

41. At birth, Z.O. "took a gulp of amniotic fluid" and had "wet lung sounds," was admitted to level II Nursery for transient tachypnea newborn (TTN), and was also diagnosed with a heart murmur. (Z.O. Cert. Med. Recs. Phoenix Baptist Hosp., at ZO-PBH-MD-00008, 12, 29-30, 53, **Ex. 20**).

42. On April 21, 2014 (approximately two months before the incident), Z.O. was diagnosed with an upper respiratory infection. (Z.O. Cert. Med. Recs. Banner Thunderbird Med. Ctr., at ZO-BTMC-MD-000027-30, **Ex. 21**).

43. Z.O.'s grandparents also stated she had "raspy breathing" days before her death. (Cert. Recs. Tempe Police Dep't, at ZO-TempePD-000050, **Ex. 22**).

44. Z.O.'s pediatric records, as well as statements by her parents to the police, reflect that she was capable of pushing up, crawling, rolling over, sitting up unassisted, and standing. (ZO-TempePD-0000018, **Ex. 22**; Z.O. Cert. Med. Recs. ClearPath Family Healthcare, at ZO-ClearPFH-000031-34, **Ex. 23**).

45. At the time of Z.O.'s passing, her mother, Ms. Courkamp, and her father, Mr. Olson were 20 and 19 years old, respectively. They were not married and lived in separate households, with Ms. Courkamp residing in Glendale, Arizona, and Mr. Olson residing in Tempe, Arizona. (K. Courkamp Dep., at 23-24, 51-52, **Ex. 24**).

46. Mr. Olson has been arrested for possession of marijuana and multiple incidents of driving while under the influence of alcohol (DUI). (A. Olson Dep., at 29-42, **Ex. 25**). Mr. Olson admitted during his deposition that the night before Z.O.'s death, he was driving his vehicle with Z.O. while having a suspended license because of his DUI convictions. (*Id.* at 85-88). At the time of Z.O.'s passing, Mr. Olson was out on bail awaiting sentencing for his third aggravated DUI, for which he served eight months in prison after Z.O.'s death. (*Id.* at 37-38). Mr. Olson further admitted to having experimented with hallucinogens such as mushrooms and LSD. (*Id.* at 58-60). Mr. Olson purchased marijuana the day before Z.O.'s death from a medical dispensary and testified he received his medical marijuana card to treat tendinitis, which had been diagnosed by a physician when he was in the fifth grade. (*Id.* at 231-32).

47. Plaintiff and Mr. Olson obtained the RNPS as a gift from Mr. Olson's mother. (K. Courkamp Resp. to Defs' First Set of Interrogatories, p. 12, **Ex. 26**).

48. Although neither Plaintiff nor Mr. Olson purchased the subject RNPS and they had never seen any packaging or advertisements associated with the product, they knew Fisher-Price manufactured the product and knew and understood the warning label that was sewn into the fabric of the product. (K. Courkamp Dep., at 87-88, 101-02, **Ex. 24**; A. Olson Dep., at 199-204, **Ex. 25**).

7

49. Mr. Olson testified that he conducted a "large amount of research" on safe infant sleep and SIDS before Z.O.'s death, confirming his knowledge of the product and its intended use. (A. Olson Dep., at 140-41,167-68, **Ex. 25**). Mr. Olson also admitted he knew Defendants had manufactured the subject RNPS, meaning he knew in June 2014 the possible source of Plaintiff's claims. (*Id.* at 245). He further admitted that nothing prevented him or Plaintiff from filing this action well before April 26, 2019. (*Id.* at 246).

50. On June 19, 2014, Plaintiff and Mr. Olson placed Z.O.–an infant capable of pushing up, crawling, rolling over, sitting up unassisted, and standing–in the RNPS. (K. Courkamp Dep., at 104, **Ex. 24**; A. Olson Dep., at 143-44, **Ex. 25**).

51. Plaintiff and Mr. Olson did not restrain Z.O. in the RNPS on the date of her death. Z.O. was found unbuckled by her parents. (ZO-TempePD-000008, 17-18, **Ex. 22**).

52. Both Plaintiff and Plaintiff's own experts admit that Z.O. could not unbuckle herself. (K. Courkamp Dep., at 154, **Ex. 24**; M. Goodstein, MD, Dep., at 179, **Ex. 16**).

53. Even at the time of the incident, Plaintiff was under the impression Z.O. was not restrained in the RNPS. (Cert. Recs. Maricopa Cty. Office of Medical Examiner Rep., ZO-MCOME-000018, 20, **Ex. 27**).

54. Plaintiff's own neonatology expert, Dr. Michael Goodstein, admits that Plaintiff and Mr. Olson's failure to abide by these warnings is significant and that the product was not used as intended. (M. Goodstein, MD, Dep., at 202-204, **Ex. 16**).

**G. The June 19, 2014 Incident**

55. On the evening before the incident, Z.O. accompanied Mr. Olson as he picked up Plaintiff from her job. (ZO-TempePD-0000007, **Ex. 22**).

56. After picking up Plaintiff, they returned to Mr. Olson's residence in Tempe, Arizona. At approximately 1:30 a.m. on June 19, 2014, Mr. Olson took Z.O. from her car seat and put her into the RNPS. (ZO-TempePD-0000016, **Ex. 22**).

57. Later that morning, at approximately 8:00 a.m., Plaintiff claims to have found Z.O. unrestrained, unresponsive, and cold to the touch. (ZO-TempePD-0000008, **Ex. 22**).

58. Plaintiff and Mr. Olson immediately called 911, moved Z.O. out of the RNPS, and began administering CPR until the Tempe Fire Department arrived at approximately 8:04 a.m. (Cert. Recs. Tempe Fire Dep't, at ZO-TempeFD-000001, **Ex. 28**). The Tempe Fire Department indicated that, on arrival, Z.O. already had rigor present in the upper and lower extremities, and some livor around her legs. (*Id.*). There was no lividity present on Z.O.'s face or upper body, as would be expected for a prone (face-down) or semi-prone position. (*Id.*). Z.O. was pronounced deceased soon after, at approximately 8:06 am. (*Id.*).

59. During their investigation of the scene, the Tempe police detectives identified drug paraphernalia, burnt marijuana, unsmoked marijuana, burnt cigarette butts, and empty alcohol bottles in the residence. Detective O'Brien specifically noted the room in which Z.O. slept was filled with drugs and paraphernalia and had a distinct odor of "burnt marijuana." (ZO-TempePD-000045, **Ex. 22**).

60. The nightstand directly above Z.O.'s head contained an ashtray full of burnt cigarette butts and unsmoked marijuana. (ZO-Tempe-PD-000347, **Ex. 29**).

61. During their investigation, the detectives also learned that, at some point during the night, the residence lost power and was without air conditioning for hours. (ZO-TempePD-000050, **Ex. 22**).

62. A digital thermometer reading of the bedroom in which Z.O. slept measured the temperature of the room at 87 degrees Fahrenheit at approximately 10 a.m. (ZO-TempePD-000045, **Ex. 22**).

63. At approximately 10:45 a.m., Maricopa County Office of the Medical Examiner Investigator Farrell Swope arrived at the scene to further investigate. When Investigator Swope examined Z.O.'s body (at approximately 11 a.m.), he described both rigor and livor as "fixed," and the lividity limited to "anterior lower extremities" and "posterior," suggesting Z.O. died while in the supine (face-up) position, and not the prone (face-down) or semi-prone position. (ZO-MCOME-000015, 20, **Ex. 27**).

64. Mr. Swope also conducted a reenactment of the incident, during which Mr. Olson (using a doll) showed how he placed Z.O. in the RNPS before he went to bed,

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

9

1  and how he discovered her the next morning. (ZO-TempePD-000014, **Ex. 22**).

2  65. When asked to show investigators how he placed Z.O. in the RNPS, Mr. Olson placed the doll in the product without fastening the restraints. (F. Swope Dep., at 81-82, **Ex. 30**).

66. Detective Reyes, who oversaw the reenactment with Investigator Swope, also testified Mr. Olson never restrained the doll during the reenactment. (Det. M. Reyes Dep., at 106, **Ex. 31**).

67. On June 20, 2014, Medical Examiner Michael Ferenc conducted an autopsy on Z.O.'s body and examined the evidence as collected by the Tempe Police Department. Dr. Ferenc concluded the cause of death was "unknown" and the manner of death was "undetermined." (ZO-MCOME-000002, **Ex. 27**).

68. During his deposition, Dr. Ferenc testified that his findings are consistent with that of a SIDS or SUID death. (M. Ferenc, MD, Dep., at 35, **Ex. 32**).

69. Years after Dr. Ferenc's report, his findings were reviewed by Dr. Kevin Horn on April 30, 2019, who also concluded that this case "appears to represent a SUID death." (ZO-MCOME-000009, **Ex. 27**).

70. Dr. Ferenc agreed with Dr. Horn's assessment during his deposition. (M. Ferenc, MD, Dep., at 179, **Ex. 32**).

**H. Plaintiff's Experts**

71. Plaintiff has hired four proposed experts who purport to offer expert testimony in support of Plaintiff's claims: (1) Erik Christensen (pathologist), (2) Michael Goodstein (neonatologist), (3) William Singhose (engineer), and (4) Alison Vredenburgh (human factors/warnings). Of Plaintiff's four disclosed experts, three of them unequivocally testified they are not offering any opinion about what caused Z.O.'s death. (W. Singhose, PhD, Dep., at 331-32, **Ex. 33**; A. Vredenburgh, PhD, Dep., at 95, **Ex. 34**; M. Goodstein, MD, Dep., at 100-01; 143-44; **Ex. 16**).

SUBMITTED this 19th day of November, 2021.

GREENBERG TRAURIG LLP

By: */s/ Lori G. Cohen*
    Lori G. Cohen*
    Mary-Olga Lovett*
    Brandon D. Cox*
    Nicole M. Goodwin
    Aaron J. Lockwood
    *Pro Hac Vice*
    *Attorneys for Defendants Mattel, Inc. and Fisher-Price, Inc.*

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000

**CERTIFICATE OF SERVICE**

☒   I hereby certify that on November 19, 2021, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to the following registered participants of the CM/ECF System:

John E. Osborne
William C. Bacon
GOLDBERG & OSBORNE LLP
698 E. Wetmore Road, Ste. 200
Tucson, Arizona 85705
josborne@goldbergandosborne.com
wbacon@goldbergandosborne.com
*Attorneys for Plaintiffs*

By: */s/ Lori G. Cohen*
Greenberg Traurig, LLP

60735172

LAW OFFICES
GREENBERG TRAURIG
2375 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 445-8000