# **EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Kathleen Courkamp, for herself    )
and on behalf of other            )
statutory beneficiaries,          )
                                  )
                    Plaintiffs,   )
                                  )No. CV-19-02689-GMS
              vs.                 )
                                  )
Fisher-Price, Inc. A foreign      )
corporation; Mattel, Inc., a      )
foreign corporation,              )
                                  )
                    Defendants.   )
                                  )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF CATHERINE PILARZ

CONFIDENTIAL AND SUBJECT TO A PROTECTIVE ORDER


Phoenix, Arizona
November 9, 2020
9:03 a.m. (AZ Time)


CATHY J. TAYLOR, RPR, CRR, CRC

Certified Reporter 50111

MEYER, LUMIA & ASSOCIATES

2819 East 22nd Street

Tucson, Arizona 85713    Ph (520) 623-1100

Page 12

1  **including efficacy testing, comprehension testing,**

2  **compliance testing and human factors testing."**

3              **Are these all topics that you believe you**

4  **will be able to testify to as a knowledgeable person on**

5  **behalf of Fisher-Price and Mattel?**

6              MS. COHEN:  I'll just make an objection

7  subject to the objections that we served, but...

8  BY MS. SCHRINER:

9     **Q.   I'm sorry.  Did you answer?**

10    A.   Should I answer now?

11             MS. COHEN:  Yes.

12             THE WITNESS:  Okay.

13             Yes.

14  BY MS. SCHRINER:

15    **Q.   Okay.  So let's start with what, just in general,**

16  **was your involvement with the Rock 'n Play?**

17    A.   I was involved as the product concept was being

18  developed to review the product with a team of people for

19  safety concerns.  My team also is responsible for writing

20  the procedures for Mattel that determine how products are

21  tested and evaluated.  So I was involved in that way as

22  well.

23             And then throughout the product development,

24  there were a series of meetings where we did hazard

25  analysis of the product concept.  And I've been involved

1  incline of that product was --

2     A.   No.

3     Q.   -- in terms of degrees?

4     A.   No.

5     Q.   Did you -- did Fisher-Price manufacture any

6  inclined products at all at the time of the Rock 'n Play --

7  at the time the Rock 'n Play Sleeper was being developed?

8     A.   Intended for sleep?

9     Q.   No.  Just any.  Any products that would put a

10 child at an incline.

11    A.   We manufacture a number of products that put

12 babies at an incline.

13    Q.   And what were some of those types of products?

14    A.   Swings.  Bouncer seats.  Infant -- infant seats.

15 We have high chairs with a reclining seat.  We make an

16 infant-to-toddler rocker.

17         That might not be a complete list, but --

18    Q.   What about car --

19    A.   -- there's some --

20         I'm sorry.

21    Q.   What about car seats?

22    A.   We -- we were in the car seat business a number

23 of years ago.  We're not -- we don't manufacture car seats

24 now.

25    Q.   Have you ever personally been involved in the

1    development of a car seat at Fisher-Price?

2        A.   Yes.

3        Q.   Were any of these products intended for sleep?

4             MS. COHEN:  Objection to form.

5             THE WITNESS:  None of the products that we

6    just discussed were intended for overnight sleep.

7    BY MS. SCHRINER:

8        Q.   And by "overnight sleep," you mean unattended

9    sleep?

10       A.   Yes.

11       Q.   Do you remember when the Rock 'n Play first went

12   to the market to be sold?

13       A.   I believe it was 2009.

14       Q.   Do you remember the month?

15       A.   No.

16       Q.   I've read before that it could have been

17   October 2009.  Does that refresh your recollection by any

18   means?

19       A.   I just don't know that month offhand.

20       Q.   Did you review any of your prior depositions in

21   Rock 'n Play cases in preparation for today's deposition?

22       A.   Yes.

23       Q.   Do you recall reading October 2000 -- October 2009

24   in reviewing any of those depositions?

25       A.   As the date production started?

Page 21

1    **Q.    Correct.**

2    A.    Again, I -- I just don't remember.

3    **Q.    So what was the general process for making sure a**

4    **new product such as the Rock 'n Play was safe for babies to**

5    **use?**

6    A.    We -- we have a team of people who are highly

7    experienced that form a committee.  It's our safety

8    committee that reviews all of the product concepts.  For

9    the Rock 'n Play Sleeper, that committee reviewed the

10   products many times.

11           We also have a long history of making

12   products for children and babies, so we -- we gain a lot of

13   experience through our own knowledge of general products.

14   We assure that our products, like the Rock 'n Play, would

15   comply with relevant standards.  We participate in the

16   standards development pro- -- process, particularly ASTM,

17   where we become familiar with other experts related to

18   children's products through, you know, government experts,

19   testing labs, other manufacturers.

20           So that gives us experience and knowledge on

21   the safety of children products.  We do testing to assure

22   compliance with standards.  We have a robust system of

23   internal requirements to determine how we test and assure

24   the safety of our products.

25           Then through the production process, we have

Page 22

1   ongoing testing and evaluations.  We have our products

2   reviewed by third-party labs.

3                During the development of the Rock 'n Play

4   Sleeper, it was within the scope of the ASTM bassinet

5   standard, so it was tested as a bassinet.  And then

6   eventually there was a new standard developed at ASTM to

7   address inclined sleep products, and the product -- and so

8   we were involved in that standard development process.

9                And throughout that process, the consensus

10  ASTM standard process requires that incident data be

11  reviewed.  You know, government is involved.  So we were

12  always being informed about relevant data associated with

13  inclined sleepers, and we assured that our product met the

14  new ASTM standard as well.

15               I think that's an overview of how we assured

16  the safety of the product.  Oh, I should add --

17       **Q.   And that --**

18       A.   Oh, I'm sorry.

19       **Q.   Go ahead.  No.  Go ahead.**

20       A.   We have a child research group within Fisher-Price

21  that has a team of child development experts, and we work

22  closely with them in the child development -- or the

23  product development process to -- to assure that the

24  product works well for babies.  We test with babies within

25  the Fisher-Price facility, and we also do testing in

1   development.

2        **Q.    Do you know what those PhDs are in?**

3        A.    I do not.

4        **Q.    Turning back to your consultation with**

5   **Dr. Deegear, how was he chosen?**

6        A.    We worked with Dr. Deegear prior to the Rock 'n

7   Play Sleeper.  He was chosen because of his -- his medical

8   degree, his background in pediatrics, and his expertise in

9   biomechanics.  He worked for a consulting firm that -- that

10  was, you know, a noteworthy consulting firm.  And our -- so

11  he had a unique expertise as with the medical background

12  and biomechanical background.  So we worked with him

13  for years on a number of different products.

14       **Q.    When was the last time you worked with**

15  **Dr. Deegear?**

16       A.    It's been some years.  I don't know the exact

17  date.

18       **Q.    Do you know if he still has a medical license?**

19            MS. COHEN:  Objection to form.

20            THE WITNESS:  I have heard that he did not --

21  at some point he did not renew his medical license.

22  BY MS. SCHRINER:

23       **Q.    Had you ever consulted with him related to a**

24  **sleeping product before the Rock 'n Play?**

25       A.    We consulted with him on a product that attached

Page 69

1    **choosing back angles in keeping with our bouncer angle**

2    **requirements."**

3              **So at this point, had the back angle for the**

4    **Rock 'n Play not yet been chosen?**

5        A.   The concept for the Rock 'n Play was always a back

6    angle approximately 30 degrees.

7        **Q.   So what is this bouncer angle requirement that**

8    **you're talking about?**

9        A.   We make bouncer seats, and we have requirements

10   that specify the angle of the back of a bouncer seat.  And

11   one of the requirements is to keep the bouncer seat from

12   being so horizontal that a baby can push out the back.

13       **Q.   Is there a specific angle that your bouncers are**

14   **all manufactured at?**

15             MS. COHEN:  Objection.  Form.

16             THE WITNESS:  Actually, we -- we have a

17   number of requirements for bouncer angles based on how it's

18   tested, the load that is placed in the product, and how to

19   measure the angle.  I think we have a minimum and a maximum

20   angle.

21   BY MS. SCHRINER:

22       **Q.   What's the minimum angle?**

23       A.   I can't give you those angles right now.  I -- I

24   just don't know.  And -- and the angle is determined based

25   on assessment by a specific test method.

1    Q.   Is there any one specific person or a team of

2 people that are in charge of gathering this information?

3    A.   We have a team of people in Consumer Relations

4 that handle all reports that come into the company from a

5 consumer.  So that group would receive communications

6 directly from consumers.  Or if it comes in through social

7 media, if someone posts something, we will ask that

8 consumer to contact us directly so we can find out the

9 information about the incident.

10            If we receive a report from the government,

11 from the Consumer Product Safety Commission, we will also

12 have that report recorded in our Consumer Relations

13 database.

14    Q.   Is there an incident review team -- I'm using that

15 phrase.  It doesn't have to have the same name.  But is

16 there an incident review team that is charged with

17 reviewing these incidents for potential issues with the

18 product or safety-related issues?

19    A.   Yes.  My -- my team reviews all complaints of a

20 safety nature that come into the company.  And when a

21 fatality is reported, that is immediately communicated to a

22 number of people within the organization.  I also report

23 all fatalities to CPSC within 24 hours.  Even if the

24 fatality is reported to us from CPSC, I will report it back

25 to them, because I -- I report to their compliance group,

1   PhDs, though.

2       **Q.    Now, you were asked questions early on in the day**

3   **about whether you had any research confirming the safety of**

4   **a 30-degree incline.**

5           **Do you recall those questions?**

6       A.   Yes.

7       **Q.    And I know you -- you responded to these, but what**

8   **sources informed your knowledge that -- your knowledge and**

9   **understanding that 30-degree incline was safe?**

10      A.   Well, we certainly make millions of juvenile

11  products for children at various angles.  And all of our

12  experience would indicate that an incline less than

13  30 degrees is safe for a child starting at birth.

14          We also -- as I mentioned, we were in the car

15  seat business.  I was very familiar with the research

16  indicated -- indicating that holding a child too upright,

17  presumably the very youngest child, could be a problem.

18          Throughout my work in the ASTM standards,

19  if -- if there had been certain angles that were

20  troublesome for related products, I think that certainly

21  would have been raised in the ASTM process.

22          I have seen presentations and literature from

23  a medical perspective addressing many aspects of children's

24  products, and I -- I've never seen anything to indicate

25  that an angle of 30 degrees would be a problem.

Page 241

1                    MS. COHEN:  Okay.  And, again, as last time,

2    we're taking this deposition pursuant to the applicable and

3    entered protective order subject to our objections that we

4    interposed to the 30(b)(6)B re-notice.  And Ms. Pilarz

5    would like to read and sign the deposition as last time.

6                    So subject -- excuse me.  Subject to those

7    statements, we will proceed.

8

9                    EXAMINATION (Cont'd)

10   BY MS. COHEN:

11       Q.   Good morning, Ms. Pilarz.  We're just going to

12   pick up where we left off.

13                    As you remember, we are -- we are now in the

14   continuation of the November 9th -- it's been a long

15   time -- first part of your deposition, and I'm just going

16   to pick up again where I left off last time.

17                    Can you hear me okay?  Do I need to adjust --

18       A.   Yeah.

19       Q.   -- the volume?

20                    Okay.

21       A.   Yes.

22       Q.   Great.

23                    So just a few follow-up questions.  You know,

24   even to date, in 2021, have you seen any scientific studies

25   that establish that a 30-degree incline in a child product

Page 271

1    like the Rock 'n Play Sleeper is hazardous or unsafe?

2        A.    No.

3                 MS. SCHRINER:  Form.

4    BY MS. COHEN:

5        Q.    Now, Ms. Pilarz, I think you have your transcript

6    from day 1 in front of you there.  And, again, this is just

7    the sworn testimony given on November 9th, 2020.

8                 And I'll just have you turn to page 174, if

9    you don't mind.

10                MS. COHEN:  Kristin, I assume you have that

11   there as well?  You don't need --

12                MS. SCHRINER:  Yes.

13                MS. COHEN:  -- us to pull it out?

14                Sorry.

15                MS. SCHRINER:  Yeah, no.  Thank you.

16                MS. COHEN:  Yeah.

17   BY MS. COHEN:

18       Q.    Real quickly at 174.

19                Okay.  And if you are there, Ms. Pilarz, the

20   question was asked from -- Ms. Shiner was asking you

21   questions about the number of incidents in the Rock 'n

22   Play, and your answer said -- part of it said on line 10,

23   "I know how many reports we have received associating an

24   infant death with a Rock 'n Play."

25                I just want to ask you a quick question that

Page 281

1      A.   Yes.  I mean, in that -- in that general area.

2   You know, the angle -- the incline angle on the product is

3   measured in different ways depending on the product.  But

4   some of the products would have had, you know, similar

5   inclines.

6      **Q.   When you started consulting with Dr. Deegear on**

7   **the Rock 'n Play Sleeper, specifically in 2008, obviously**

8   **at that point in time he was known not just at**

9   **Fisher-Price, but to you; right?**

10     A.   I'm sorry.  Did you say he was known?

11     **Q.   Yes.  He was -- in other words, you knew him from**

12  **prior work with him, is that -- is that right?**

13     A.   That's right.

14     **Q.   And you had worked with him on what, 10 or so**

15  **prior products yourself?**

16     A.   Yes.

17     **Q.   You felt like you knew him well in terms of a**

18  **consultant?**

19     A.   Yes.

20     **Q.   You had a good working relationship?  In other**

21  **words, in back-and-forth communications, you felt**

22  **comfortable with him?**

23     A.   Yes.

24     **Q.   Did you have a good rapport with him, a good**

25  **communication style?**

Page 286

1     Q.   And we'll talk about this when we get to the

2    emails that were produced, Ms. Schriner went through

3    before.

4              Were your notes basically converted into

5    those emails?  Is that what you're telling us?

6     A.   Yes.

7     Q.   And are there places in those emails where you

8    know you are quoting him?  Using his words, for example?

9     A.   Yes.  And when I -- when I take notes, I'm trying

10   to capture as much as possible, you know, what he's telling

11   us in his words.

12    Q.   And do you know whether he took any notes?  Have

13   you seen any notes that he took to -- to record any of your

14   meetings?

15    A.   I have not seen his notes.

16    Q.   Do you know of any better record or recollection

17   of his meetings other than your notes which became your

18   emails?

19    A.   I'm not aware of other records of the meetings.

20    Q.   And, again, do you feel like you have a good

21   recollection of -- of your discussions using the notes to

22   refresh you?

23    A.   Yes.

24    Q.   Now, did Dr. Deegear at any time tell you, or to

25   your knowledge anybody else at Fisher-Price, that he had

Page 287

1    any safety concerns about a 30-degree angle?

2        A.    No.

3                    MS. SCHRINER:  Form.

4                    THE WITNESS:  Well, should I -- I'd like to

5    clarify that.

6                    There were discussions about a concern of

7    pushing out the back, which is, you know, related to the

8    angle, but in general his assessment of the product and the

9    30 degrees was fine.

10   BY MS. COHEN:

11       Q.    All right.  And that's covered in one of the

12   emails that --

13       A.    Yes.

14       Q.    -- you have?

15                   And we'll get to that.

16                   But in terms of the 30 degrees pre-market and

17   Fisher-Price proceeding with this product, did he ever

18   express any concerns about you proceeding with it to market

19   with a 30-degree angle?

20       A.    No.

21       Q.    And if he had said he had any concerns about that,

22   would that have stopped you in your tracks?

23       A.    Yes.  I would have certainly documented that, and

24   we would have had to address his concerns.

25       Q.    So let me jump through some of these emails again.

Page 311

1      A.   Oh, because we had made changes in the development

2   process, and we wanted him to be aware of those changes and

3   take another look at it.

4      **Q.   Okay.  Was it important to you to have him, again,**

5   **make sure that he approved and assessed any sort of**

6   **changes?**

7      A.   Yes.

8      **Q.   And on -- again, thinking about the angle issue,**

9   **was the angle still the same; that is -- you know, I guess**

10  **what you had in the first schematic?  Was it 30 -- 32?**

11     A.   The angle was always in the neighborhood of

12  30 degrees, but I think it -- it had some minor changes

13  through the development process.

14     **Q.   Okay.  So -- but did it remain roughly, again, in**

15  **the 30 -- 32 or lower range?**

16     A.   Yes.

17          MS. COHEN:  And let's go to the next one in

18  sequence, which would be a June email.  And this will be

19  Exhibit 24.

20          (Exhibit 24 marked for identification.)

21          MS. COHEN:  Kristin, I don't know if you have

22  this.  This is 556.  And, yeah, Exhibit 24, 556.  Tab G

23  hopefully.  Keeping us all on track here, and we'll pull it

24  up as well.

25          ///

Page 316

1  just don't remember the specifics of what changed that.

2      Q.  Okay.  And, again, from -- from your knowledge

3  overall, was the backrest angle always within the 30-degree

4  range?

5      A.  Yes.

6      Q.  And let's see.  Did Dr. Deegear then respond to

7  you at 4:29 p.m.?

8      A.  Yes.

9      Q.  All right.  And confirm that he received the

10  package; is that right?

11      A.  Yes.

12      Q.  And then you asked Joel, the next sequence, at

13  4:48 to follow up with him.  And -- and Joel confirmed --

14  that is, Joel Taft confirmed that he received it as well?

15      A.  Correct.

16              MS. COHEN:  That's Exhibit 25.  Let's go to

17  Exhibit 26.

18              (Exhibit 26 marked for identification.)

19              MS. COHEN:  This is on August 19th, and this

20  should be Tab L, it should be Exhibit 26.  And it should be

21  1 -- Courkamp 0012617.

22              MS. SCHRINER:  Just for the record, that's

23  marked as 6568 under Exhibit 3.

24              MS. COHEN:  Okay.

25              THE WITNESS:  Can I just raise something?

Page 321

1    also Fisher-Price and Dr. Deegear through Joel, discuss

2    whether a 30-degree angle was a safe angle for inclined

3    sleep?

4        A.    Yes.

5        Q.    And -- and did Dr. Deegear advise you and

6    Fisher-Price that, in fact, the angle added to its overall

7    safety?

8        A.    Did -- did you say the angle added to its overall?

9        Q.    That's bad.  Let me ask a better question.

10            Did Dr. Deegear advise you that the -- that

11    the Rock 'n Play Sleeper was safe for overnight sleep even

12    with a 30-degree angle?

13       A.    Yes.

14            MS. SCHRINER:  Form.  Foundation.

15   BY MS. COHEN:

16       Q.    And, again, looking back in his notes and emails,

17   did you have a -- did you and others have specific

18   discussions with Dr. Deegear about the 30-degree angle?

19       A.    Yes, we did.

20       Q.    And was Dr. Deegear aware from looking at the

21   product, looking at the schematics, looking at the

22   PowerPoint, and having discussions that this product had a

23   30-degree angle?

24       A.    Yes.

25       Q.    When you consulted with Dr. Deegear and hired him

Page 322

1    for this in December 2008, what was the purpose that you --

2    that you retained him, generally speaking?

3        A.    To -- to assess, you know, the safety of the

4    product -- of the product from a medical perspective.

5        Q.    And did he do so?

6        A.    Yes.

7        Q.    And did he confirm and reconfirm over the course

8    of time that this Rock 'n Play Sleeper was safe and

9    approved for overnight sleep?

10       A.    Yes, he -- excuse me.  Yes, he did.

11       Q.    And did you specifically discuss with Dr. Deegear

12   whether the Rock 'n Play Sleeper was safe for overnight

13   sleep in its design as he saw it?

14                MS. SCHRINER:  Form.

15                THE WITNESS:  In its design?

16   BY MS. COHEN:

17       Q.    In its -- with its -- with its design as he saw

18   it?

19       A.    I'm sorry.  Did you say as he saw it?

20       Q.    Yeah.  Let me ask -- let me ask it again.

21                So did you specifically discuss with

22   Dr. Deegear whether the Rock 'n Play Sleeper was safe for

23   over- -- overnight sleep?

24       A.    Yes.

25       Q.    And did he confirm that it was --

Page 363

```
 1    believe you said just one that you're aware of of the
 2    Rock 'n Play -- did you create any sort of summary like
 3    this?
 4                  MS. COHEN:  Objection.  Form.
 5                  THE WITNESS:  Not that I recall.
 6    BY MS. SCHRINER:
 7        Q.   Okay.  And, again, you only recall sending him
 8    that one out of the 94 incidents?
 9                  MS. COHEN:  Objection to form.
10                  THE WITNESS:  Yeah.  I don't recall that he
11    reviewed more than that.
12    BY MS. SCHRINER:
13        Q.   And you also know that he's not board certified in
14    pediatrics?
15                  MS. COHEN:  Objection to form.
16                  THE WITNESS:  I'm aware of that, yes.
17    BY MS. SCHRINER:
18        Q.   Earlier in the deposition, you told Ms. Cohen --
19    and I can take you there.  It's page 257.  You were talking
20    about the plastic shell in the Rock 'n Play.
21                  I'll let you grab the deposition.  And it's
22    257, and it'll start at line 9.
23        A.   Okay.
24        Q.   And it says, talking about the plastic shell,
25    "Does it also help maintain or I -- or, I guess, prevent
```

1  **kind of a flexion of the neck and airway while it's in**

2  **use"?**

3            **And your answer is, "Well, the angle being**

4  **less than 30 degrees prevents the -- the concern over a**

5  **head -- a child's head possibly falling forward."**

6            **What is all your evidence for that statement?**

7      A.    We have experience with many juvenile products

8  that hold babies at an angle, and we also are aware of

9  products where babies are too upright such that there is a

10 concern about the head falling forward.

11           And so our reliance on 30 degrees was based

12 on our own experience with products as well as the

13 literature we've seen indicating, you know, a more upright

14 angle, such as in a car seat, can be a problem.  But I've

15 never seen evidence that 30 degrees or less would cause a

16 baby's head to fall forward.

17     **Q.    And you talked about other products that you**

18 **relied on for the 30 degrees.  What specific products?**

19     A.    Well, as I've mentioned, we -- we make swings and

20 bouncer seats, gliders, and infant-to-toddler rockers.  And

21 there may be other products that I'm just not thinking of

22 right now that hold babies at an angle.

23     **Q.    And -- and here's my confusion, because you were**

24 **talking specifically about the 30 degrees.  And then today**

25 **when I asked you which of these are 30 degrees, you haven't**

Page 383

1    seen any evidence that that's a concern.

2    BY MS. COHEN:

3        Q.    **Thank you.**

4              **And so Dr. Deegear, did he -- you know, after**

5    **all the back and forth, the calls and emails and review**

6    **materials, did he ultimately sign off and approve this**

7    **product as safe for overnight sleep to you?**

8        A.    I can't say that --

9              MS. SCHRINER:  Form.

10             THE WITNESS:  -- there was a sign-off

11   process, but he certainly -- he certainly told us he was

12   satisfied with the product.

13   BY MS. COHEN:

14       Q.    **Okay.  Did he tell you he was satisfied that it**

15   **was safe as designed?**

16       A.    Well, the whole concept -- I mean, the whole

17   reason for talking to him was about the safety of the

18   product.

19       Q.    **Ms. Schriner asked you about -- she pulled out the**

20   **binder, Exhibit 27, that she marked, and she asked whether**

21   **you had seen reports of babies coming out of position.**

22             **Do you remember that -- that questioning?**

23       A.    Yes.

24       Q.    **And do you know in all those cases that she**

25   **pointed to whether those babies were properly restrained in**

Page 384

1   those cases?

2                   MS. SCHRINER:  Form.  Foundation.

3                   THE WITNESS:  I do not.

4   BY MS. COHEN:

5       Q.   Do you know if, again, they were the right

6   development levels to be put in the Rock 'n Play Sleeper?

7                   MS. SCHRINER:  Form.  Foundation.

8                   THE WITNESS:  I do not.

9   BY MS. COHEN:

10      Q.   Okay.  And so, again, when I asked you the

11  question about whether if a child was properly restrained,

12  could they roll over, are you still comfortable with your

13  answer that you gave earlier?

14      A.   Yes.

15      Q.   The 30-degree issue, just to clarify that -- so

16  it's the -- the 32 on the schematic, and then there was a

17  question about -- of telling Dr. Deegear that it had

18  increased.

19                   I just want to ask you this:  Ultimately the

20  product that went into -- the product that was put on the

21  market, was that always 30 degrees or less?

22      A.   It -- it was always in the neighborhood of -- of

23  30 degrees.  And the ASTM standard, which was eventually

24  developed, requires that it be less than 30 degrees.

25      Q.   The Mannen study that Ms. Schriner asked you