# **EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Kathleen Courkamp, for herself )
and on behalf of other )
statutory beneficiaries, )
)
              Plaintiff, )
)No.  CV-19-02689-GMS
     vs. )
)
Fisher-Price, Inc. A foreign )
corporation; Mattel, Inc., a )
foreign corporation, )
)
             Defendants. )
)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF JOEL TAFT

CONTAINS CONFIDENTIAL TESTIMONY

AND SUBJECT TO A PROTECTIVE ORDER

Phoenix, Arizona
November 12, 2020
9:04 a.m.

CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter 50111
MEYER, LUMIA & ASSOCIATES
2819 East 22nd Street
Tucson, Arizona 85713   Ph (520) 623-1100

Page 77

1  play mode, it might be more in the line of a -- you know, a
2  rocker or a bouncer, or things like that, where you'd still
3  want to make sure you'd never leave your child unattended.
4  We just wanted to reiterate that fact that if they're
5  playing, that you don't want to just leave them alone in
6  the product.
7      Q.   And would --
8           MR. COX:  Counselor, I just want to make
9  sure.  I interposed an objection on the last statement, and
10 it didn't get on the record.  Sorry about that.  It was --
11 it was late.  My fault.
12 BY MS. SCHRINER:
13     **Q.   Okay.  Was there any difference in the two modes**
14 **that you're describing in terms of the product?  Would the**
15 **parent have to shift any part of the product or change the**
16 **mode or do anything?**
17     A.   No there's -- there's no reason you'd change the
18 mode.  There's just one mode of the product.  It's just
19 different use pattern.
20     **Q.   Okay.  So nothing about the product changes in**
21 **terms of whether it's used for sleep or play; correct?**
22     A.   That's correct.
23     **Q.   Okay.  Do you know how the incline of the product**
24 **was determined?**
25     A.   I know in general that was discussed with regard

1  to the most appropriate incline.  A lot of that evaluation
2  was done through -- in the play lab to see how children,
3  you know, fit in the product and what the best comfort
4  level was for them.
5           We make a lot of other juvenile products,
6  such as swings, bouncers, rockers, that have similar
7  inclines, and we have no issues with regard to that
8  incline.  We recognize that if a child is too upright --
9  and I know it's -- car seats are sometimes cited.  They
10 have a 45-degree angle.  You don't want a child sleeping at
11 that high of an angle because you could end up with a chin
12 on a chest situation.  So we knew we wanted to be far away
13 from 45 degrees.  And on the lower end, if you make it too
14 shallow of an angle, that makes it much easier for a child
15 to push up and out the back of a product.
16          So we ended up with, I believe, around a 24-,
17 25-degree angle as the incline angle for the Rock 'n Play.
18   **Q.  And you mentioned swings and bouncers.  Are any of**
19 **those intended for unattended sleep?**
20   A.  No, they're not intended for unattended sleep, but
21 it's certainly recognized that children would nap in swings
22 and bouncers and things of that -- of that nature.
23   **Q.  Do you know if those products contain specific**
24 **warnings regarding sleep?**
25          MR. COX:  Objection to form.

Page 81

1          THE WITNESS:  Yes, I would recognize that it
2  is possible that babies beyond the warning statements
3  could -- could use the Rock 'n Play.
4  BY MS. SCHRINER:
5     Q.    And we talked a little bit earlier about how part
6  of your job was to look at I think you said incident
7  reports or incident data or field data.
8          Can you describe to me a little bit more
9  detail what your duties are in terms of -- you know what?
10 I'm going to stop sharing my screen so we can --
11    A.    Okay.
12    Q.    Since we're done with the warning.
13          Can you tell me a little bit about more about
14 what your duties are in terms of looking at the field data
15 of consumers who are using the product in the real world.
16    A.    Sure.  We have a -- a pretty extensive data
17 collection system with a number of consumer representatives
18 who interact with consumers and take emails and calls.  And
19 if any of those calls are identified, you know, as a safety
20 call, those -- I mean, all calls go into our system, but
21 the safety calls are separated out so they can be parsed
22 and reviewed.
23          So as part of my data, my charge and my
24 team's charge, is to constantly look at the data that's
25 coming in -- into our -- it's called our CAT system, which

Page 82

1  is our Consumer Affairs Tracking system.  And so every
2  consumer contact goes into that system.  And it would be
3  part of my -- my review process to continually review those
4  calls and consumer contacts that come in to try to
5  determine if there's anything that would need to be
6  addressed from a product perspective, a product improvement
7  perspective, in the calls and contacts we were receiving.
8       Q.   Okay.  And do you -- are you copied on each one of
9  those, or do you actually go into the database at a
10 prescribed time to look at what's come in?
11      A.   It's a pull report, so we'd have to pull that
12 information out of the system.
13      Q.   Okay.  And so how often would you look at pull
14 reports?
15      A.   Typically I look at reports on a weekly basis to
16 see what the previous week's reports look like.
17      Q.   And part of your job was to analyze if you saw any
18 trends related to the safety of a product?
19      A.   That's correct.
20      Q.   And that included the Rock 'n Play?
21      A.   Yes, that would include the Rock 'n Play.
22      Q.   And I believe you said in an effort to determine
23 if there was anything that needed to occur in terms of the
24 product design; is that right?
25      A.   Right.  If -- if you could discern that there was

Page 83

1  some issue or trend that you could see in the data that
2  we're collecting, and there was something in the product
3  that you could change in order to address that, we would
4  implement what we'd call a product improvement to the
5  product.
6     Q.   **What about would you ever look for trends or**
7  **issues that there needed to be changes in the warnings?**
8     A.   If it's not typical, essentially that would be
9  more in the ASTM process, which dictates warnings for
10 certain products.  And that is done on, you know, a more
11 broader consensus based level with regard to the data
12 that's supplied in those meetings by the CPSC to see if
13 there's warning changes that need to be made on a
14 particular product category.  But I don't recall ever
15 making warning changes based on -- internally on data that
16 we received.
17    Q.   **Were there ever any trends that you saw related to**
18 **the Rock 'n Play that you viewed as potentially needing a**
19 **design change?**
20    A.   The only one I can think of is associated with
21 mold growth on the product, where people were not aware
22 that they should actually, you know, clean and dry their
23 pad when they washed or didn't wash it apparently.
24         So we did some changes there to the --
25 there's a seat gel on the back of that product, so we tried

Page 84

1  to make it more -- not permeable, but we added some
2  openings to it to try to get more air under there.  And we
3  ended up actually changing the pad as well to make it more
4  easily removable for washing and changed our washing
5  instructions for that to try to adjust these issues of mold
6  growth in the product.
7      Q.  Other than the mold growth, do you recall ever
8  identifying any trends related to the Rock 'n Play?
9      A.  I was obviously able to identify any trends in the
10 data that would have warranted any product improvements to
11 the product outside of the mold issue.
12     Q.  And part of your review of data, that would have
13 included claims of injuries?
14     A.  Yes, it would have.
15     Q.  And would that have been -- would have included
16 claims that a baby stopped breathing in a product?
17     A.  Yes.
18         MR. COX:  Objection to form.
19         THE WITNESS:  Certainly we'd review any
20 product -- any cases like that, of, you know, potential
21 serious situation as -- as described of a stop breathing
22 case.
23 BY MS. SCHRINER:
24     Q.  And you -- it sounds like you absolutely would
25 have reviewed any situations of baby deaths.

Page 85

1    A.   Oh, certainly.  Any time that we would have
2 received a report of a fatality in the product, we'd review
3 that in detail with regard to -- I mean, a lot of those,
4 it's been -- were reported to us by the CPSC, because I'm
5 part of their in-depth investigation, they're called.
6         So we'd review those very carefully to see if
7 we could make any correlation between the incident
8 described in those -- in those cases and any potential
9 design defect that may have contributed to those
10 fatalities.  And we were never able to make any correlation
11 between the design of the product and the fatalities
12 that -- that we were seeing.
13   **Q.   And your review would have included claims that a**
14 **baby fell out of the product?**
15   A.   Yes.  Certainly that's still part of the review
16 process.
17   **Q.   Would have it -- would it have included the claims**
18 **that the baby came out of the belt or partially came out of**
19 **the belt?**
20   A.   Yes.  That would still be part of the data set, so
21 it would be part of the information I would review.
22   **Q.   Would it include looking up instances where the**
23 **belt was not in use on the Rock 'n Play and an injury**
24 **occurred?**
25   A.   Yes.  I mean, that would still be part of the data

1  set.
2     Q.   And looking at all of those data sets, you never
3  identified any trends other than a situation related to
4  mold growth?
5          MR. COX:  Objection to form.
6          THE WITNESS:  No trends that I could identify
7  that would require a product improvement to the product
8  that could address the incidents or the cases that we were
9  reviewing.
10 BY MS. SCHRINER:
11    Q.   Did you ever have or express any concerns related
12 to the safety of the Rock 'n Play at any point during your
13 involvement with the product?
14    A.   Well, insofar as receiving fatality complaints or
15 fatality reports?  Obviously any time we would receive a
16 fatality report, it's very, very concerning to us, and we
17 take that very seriously.
18          You know, it's a -- it's certainly a -- an
19 awful situation for that caregiver to go through that.  So
20 we took all those very seriously to make sure that we would
21 review those cases to ensure that, you know, the product
22 was not responsible for that case.
23          So, yeah.  Beyond that, obviously we wanted
24 to make sure that the product was not responsible for that
25 issue.  So it was a -- it was something we always struggled

1  development process through, you know, consulting with the
2  outside expert as well as all of our in-home testing and
3  analysis through the play lab that we evaluated that
4  incline to be appropriate.
5      Q.   And when you say "outside expert," is that
6  Dr. Deegear that you're referring to?
7      A.   Correct.
8      Q.   Let me take you briefly to Tab 37, and we'll
9  finish up pretty quick here.  And we're going to mark this
10 as Exhibit 19.  And this is 13188.
11           And do you recognize this document?
12     A.   I don't think I've ever seen this before.
13     Q.   Okay.  Are you aware of any of the advertising
14 that Fisher-Price produced as it relates to the Rock 'n
15 Play?
16     A.   No.  I did not follow closely what advertising we
17 used.
18     Q.   Okay.  And I'm just going to ask you about the
19 last sentence on the bottom.  It says, "Our safety experts
20 have taken extra steps to make sure baby can sleep safe and
21 sound in this seat all night long."
22           Have you told me everything that Fisher-Price
23 has done to make sure that a baby could sleep safely in the
24 Rock 'n Play seat all night long?
25                MR. COX:  Objection to form.

Page 247

1                THE WITNESS:  Yes, I think so through our
2    entire product development process and all the aspects that
3    we used in the evaluation, in the construction of the seat,
4    and the design of the seat to keep the baby in place with
5    the narrow hips and the -- the structure that we included
6    in the seat back to keep the baby in place as well as our
7    in-home testing and evaluations in the play lab and our
8    consulting through outside expert, as well as consulting
9    with the CPSC, human factors folks, I think we did
10   everything that we could to ensure that this product was,
11   indeed, safe for overnight sleep.
12   BY MS. SCHRINER:
13      Q.   **Do you agree that a product manufacturer should**
14   **monitor the safety performance of its product after it is**
15   **on the market and take corrective action where necessary?**
16               MR. COX:  Objection to form.
17               THE WITNESS:  Yes, I would agree with that.
18   BY MS. SCHRINER:
19      Q.   **Do you agree that once products are distributed on**
20   **the market to consumers that a manufacturer should**
21   **determine where injuries can occur and what could be done**
22   **to minimize or stop those injuries from occurring?**
23               MR. COX:  Objection to form.
24               THE WITNESS:  Yes, I would agree with that.
25                    ///

Page 256

1                MS. SCHRINER:  Form.
2                THE WITNESS:  No.  Certainly I think the
3    restraint system is -- is pretty clear that it's a very
4    important element.  It's right there.  It's clearly
5    visible.  And with regard to its use, and also the fact
6    that in our warning statement it's -- the first statement
7    in our entire warning statement is always use the
8    restraints in this product.
9                So I think it's pretty clear.  It's not like
10   a restraint system is unique to this product.  There's many
11   juvenile products that use restraint systems.  So I think
12   it's pretty clear its intent and function to use that
13   restraint system.
14   BY MR. COX:
15      Q.   **There was some questions about the ASTM standard**
16   **and how at least at one point it did not require the use of**
17   **restraints.**
18                **Do you recall that?**
19      A.   Yeah, that's correct.  I mean, the ASTM standard
20   still doesn't -- I mean, for the inclined sleepers does not
21   require the use of restraints.  Certainly we went above and
22   beyond that with regard to we felt it was necessary to have
23   restraints in the product to, you know, assist in keeping
24   that child in place in a safe position where they could not
25   get out and either fall out of the product or get out of

1   position in the product.

2           So we -- even though the -- the standard does
3   not require the use of restraints, we go above and beyond
4   and have restraints in our products.  Even with the -- also
5   when it was first developed and marketed, although there
6   was no inclined sleeper standard at that time, we applied
7   the bassinet standard, which was the most relevant standard
8   at the time the product was introduced to the market, and
9   our product, the Rock 'n Play Sleeper, met all of those
10  requirements of the bassinet standard.

11      **Q.   You mentioned just a few minutes ago how the**
12  **warning on the Rock 'n Play Sleeper included the**
13  **instruction to always use the restraint.**

14          **Do you remember that?**

15      A.   Yes, that's correct.

16      **Q.   And I want to talk a little bit about the**
17  **warnings, but you were asked some questions about it.  I**
18  **mean, you were even shown and looked at the warning that's**
19  **applicable to this particular product.**

20          **Do you remember that?**

21      A.   Yes, I do.

22      **Q.   Are the warnings that are contained on the Rock 'n**
23  **Play Sleeper clear?**

24              MS. SCHRINER:  Form.

25              THE WITNESS:  Yeah, they're -- I think the

Page 262

1  they were left unattended overnight under those conditions
2  is not something I think would be reasonably expected to
3  occur.
4          MS. SCHRINER:  I'm going to object to the
5  foundation of that question.  I'm sorry.  I didn't get a
6  chance.  I didn't want to interrupt Mr. Taft.
7  BY MR. COX:
8     Q.   **You were asked some questions about the incline,**
9  **and specifically there were questions about the rocking**
10 **feature of the incline.**
11         **And I just want to ask, even when the Rock 'n**
12 **Play Sleeper's in the rocking feature, does it stay less**
13 **than 30 degrees?**
14    A.   Yes.  It would be my understanding, as I think I
15 indicated before, that rocking -- you know, it's not a
16 significant rocking motion, and I think the Rock 'n Play
17 seat back angle is around 24 degrees.  And I think you
18 would only vary only a few degrees each direction as it
19 rocked.  So essentially you'd be going from potentially,
20 you know, 22 to 27 degrees potentially.  But we would never
21 design the product such that, you know, at the extreme end
22 of the one rock, would it exceed 30 degrees, because that
23 would be a violation of the standard.  And we wouldn't have
24 designed it that way.
25    Q.   I want to next transition to a topic about