# **EXHIBIT 10**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Kathleen Courkamp, for herself )
and on behalf of other )
statutory beneficiaries, )
)
       Plaintiff, )
)No.  CV-19-02689-GMS
   vs. )
)
Fisher-Price, Inc. A foreign )
corporation; Mattel, Inc., a )
foreign corporation, )
)
      Defendants. )
)


VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

FISHER-PRICE, INC.

TESTIMONY OF MIKE STEINWACHS

CONTAINS CONFIDENTIAL TESTIMONY

AND SUBJECT TO A PROTECTIVE ORDER



Phoenix, Arizona
November 11, 2020
8:35 a.m.


CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter 50111
MEYER, LUMIA & ASSOCIATES
2819 East 22nd Street

Tucson, Arizona 85713   Ph (520) 623-1100

1  product designer, also a soft goods engineer.  This was a
2  person who took care of the fabric end of the design.  And
3  we were the core team that -- that was charged with
4  designing and engineering the product
5      Q.   Do you recall back during that period of 2008-2009
6  who each one of those people were?
7      A.   I do.  The product development engineer, his name
8  was Justin Taton.  The product designer was Linda Chapman.
9  The soft goods engineer was Margo Moulin.
10     Q.   And what were your specific duties as it related
11  to the development of the Rock 'n Play?
12     A.   As a -- as a quality engineer, my responsibility
13  was to help guide the team into developing a product that
14  was safe and that would meet all regulatory and voluntary
15  standards, but also our own internal Fisher-Price standards
16  that would be related to a juvenile product of this nature.
17     Q.   At the time of its initial development, what
18  standards, if any, applied to the Rock 'n Play?
19     A.   At the time we introduced it to sale in late 2009
20  and early 2010, the only direct standard that applied to it
21  was the ASTM standard for bassinets, which was F2194-10.
22     Q.   In terms of what testing would be that
23  Fisher-Price decided it needed to conduct before selling
24  this product, was that in part based on the bassinet
25  standard?

Page 24

1    A.    The bassinet standard was one of many tests that
2    we did to determine whether the product was ready for sale
3    to the public.
4    Q.    What were -- what was the other testing?  You said
5    one of the tests.  So what were the other ones that would
6    have related to the safety of the product?
7    A.    Well, there were a number of tests.  Along with
8    doing a third-party test to the ASTM standard, we did a lot
9    of testing in our own internal test lab.  And those
10   requirements are called out in the PRD.  That's a Product
11   Requirement Document.  And perhaps you have a copy.  But
12   the one that was related to your plaintiff's product is a
13   PRD that was referenced to a Product Number X7314.
14         And I have a Bates number for that PRD, if
15   you'd like.
16   Q.    Yeah, why don't you go ahead and give it to me,
17   and then we can discuss that today.
18   A.    It's Bate number -- Bates number
19   Mattel-COU0040365.
20   Q.    Okay.  And we can -- we'll head back to that in a
21   minute.  I just want to get some more general information
22   from you about testing.
23         So you mentioned there was testing that was
24   described in -- in the PRD.  There was third-party testing
25   to ASTM standards.

1    A.    Because it's a -- it's a -- a good practice, and
2  it's in the instructions and the warning statements on our
3  product.
4    **Q.    Were there safety concerns about what could occur**
5  **if restraints were not used?**
6    A.    Well, in general, it's understood that you should
7  always use the restraints if they're provided, and
8  certainly if the instructions and the warning statements
9  call out to use the restraint.
10          And, again, it was always our practice when
11  we did any internal testing, if there was a restraint on
12  the model, we always made sure that the parents used it.
13  It wasn't an option for them not to.
14    **Q.    Were there any safety concerns if a restraint was**
15  **not used regarding the Rock 'n Play?**
16          MS. COHEN:   Objection to form and asked and
17  answered.
18          THE WITNESS:   Is that a general question or,
19  are you asking that question regarding this in-home test or
20  this play lab test?
21  BY MS. SCHRINER:
22    **Q.    I'm asking in general to follow up on your**
23  **statement that you would always have -- tell parents to use**
24  **the restraints.**
25          **Were there specific safety concerns related**

Page 51

1  **to not using the restraints.  Any particular hazards that**
2  **Fisher-Price was concerned with?**
3                MS. COHEN:  Objection to form.
4                THE WITNESS:  Well, when -- if we're talking
5    about restraints in general --
6    BY MS. SCHRINER:
7        Q.    **I'm talking about restraints on the Rock 'n Play.**
8        A.    Okay.
9                MS. COHEN:  Same objection.
10               THE WITNESS:  In -- well, I'll just start by
11   saying that in general, almost all of the juvenile products
12   that Fisher-Price makes have restraints.  And we've been
13   using restraints at Fisher-Price, well, as long as I was
14   with the product line, which goes back many, many years.
15   And during that time, we -- we have come to expect that
16   most parents, if you give them a restraint, will use the
17   restraint.
18               A restraint is there to help keep children in
19   many cases from getting into a position that isn't
20   beneficial to them or for falling out of a product.  And
21   it's there for their safety.
22   BY MS. SCHRINER:
23       Q.    **By "a position that isn't beneficial," do you mean**
24   **a position that could result in their death?**
25               MS. COHEN:  Objection to form.

1                    THE WITNESS:  Well, that -- in -- in regard
2     to the Rock 'n Play, the Rock 'n Play was designed to hold
3     a child in a very -- I'll say a -- it's not confining, but
4     we wanted to hold the child in a position where they were
5     not able to slide down or -- or slide to the side, which
6     could put them in a compromising position.
7                    And the restraint helped keep the children
8     from sliding down, but it also helped prevent the child
9     from rolling into a -- a compromising position and also
10    from possibly being able to climb up or fall out of the
11    product.
12    BY MS. SCHRINER:
13       Q.   **You said earlier that Fisher-Price's juvenile**
14    **products, many of them contained restraints.**
15                    **Does Fisher-Price make any other sleeping**
16    **products that contain restraints?**
17       A.   The only sleeping product that we made that has a
18    restraint's the Rock 'n Play.  We -- Fisher-Price at the
19    time I was working there, and during the production of --
20    of this particular Rock 'n Play, I believe we were also
21    making a bassinet at that time as well and also a play yard
22    that had a bassinet attachment on it.  Neither of the
23    bassinets had restraints.
24       Q.   **Is there a reason why the Fisher-Price Rock 'n**
25    **Play needed a restraint and the bassinets did not?**

1       **Are you aware of any testing or analysis that**
2   **was done to determine that the angle of the product is safe**
3   **for extended or overnight sleep?**
4       A.   The angle of the product and our choosing of the
5   angle goes back to development of the product in -- in 2008
6   and 2009.  And I'll give you as brief a reply as I can, but
7   it might be rather lengthy.
8               When we determined to come up with a product
9   for inclined sleep, our designer, Linda Chapman, did quite
10  a bit of research on her part and came away determining
11  that a child that seemed to find incline -- an incline
12  satisfactory, or they liked, when they didn't like lying
13  and sleeping flat, was an angle of around 30 degrees.
14              Myself and Kitty's team then looked into
15  whether 30 degrees was an appropriate angle.  On my part, I
16  looked into any current voluntary or federal regulations
17  that would -- that would prevent us or advise us not to use
18  30 degrees.  And at that point in time, I did not find
19  anything.
20              I know that Kitty also looked and didn't find
21  any published reports saying that 30 degrees was not
22  advisable.  And she also at that point contacted
23  Dr. Deegear and also asked Dr. Deegear, who was a general
24  practitioner, if he had any -- any concerns with that angle
25  and whether he thought that was an appropriate angle.

1               I would go on to say that during the
2    development of the ASTM standard, the experts on that
3    subcommittee also looked at what they thought was the
4    appropriate angle, and that's separate from the development
5    of the Fisher-Price product.  And they also agreed that
6    30 degrees or something less than that, between 10 to 30,
7    was an appropriate angle for inclined sleep if the product
8    met the other requirements in the ASTM standard that we
9    ultimately published.
10              And I should note that the experts on that
11   team also included a lot of safety experts, manufacturers
12   like Fisher-Price, and a very large contingent from the
13   CPSC, where they also had a lot of internal experts that
14   were able to research and give advice on whether or not
15   30 degrees was appropriate.
16              So I know that's a long way to answer your
17   question, but I'm hoping it did.
18   **Q.   And let me ask you some follow-ups about that.**
19            **Did Linda Chapman provide you any of her**
20   **research?**
21              MS. COHEN:  Objection to form.
22              THE WITNESS:  I don't remember Linda's --
23   the -- the summary of her research, but I do remember Linda
24   actually having -- I remember a lot of her idea for this
25   product came out of her own frustration, because she had an

1   best.
2   BY MS. SCHRINER:
3       Q.   And then your part of reviewing that was to check
4   for any government regulations or standards that 30 degrees
5   would provide for a sleeping device.
6               Did I understand that correctly?
7               MS. COHEN:  Objection to form.
8               THE WITNESS:  I think we probably looked at
9   it two ways:  One, is there any standard that would
10  specifically call out or reference 30 degrees?  And
11  alternate to that, is there a standard that would say, no,
12  you shouldn't use 30 degrees?
13              And we didn't find either.
14  BY MS. SCHRINER:
15      Q.   But your -- your specific part was looking at
16  standards; correct?
17              MS. COHEN:  Objection to form.
18              THE WITNESS:  And -- and -- and -- and
19  government regulations.  So, to the best of my knowledge,
20  at that point in time, there were no federal laws that
21  mandated rest angle limits for products like the Rock 'n
22  Play.
23  BY MS. SCHRINER:
24      Q.   And so you were not then involved in researching
25  medical articles or medical research; correct?

Page 103

1  BY MS. SCHRINER:
2      Q.   Do you have any memory at all of any discussion
3  with Joel Taft or Kitty Pilarz about the findings in this
4  study?
5      A.   I -- I don't remember specific discussions,
6  although we may have had some.  But I -- I do believe that
7  this particular study was probably reviewed by the bassinet
8  subcommittee.  And portions of -- of these findings may
9  have been taken into consideration when that standard was
10 revised prior to the release of the version that the CPSC
11 eventually adopted into a federal law.
12     Q.   And that ASTM standard did not permit an incline
13 above a certain degree; correct?
14          MS. COHEN:  Objection to form.
15          THE WITNESS:  That -- the version that they
16 finally adopted limited the incline to 10 degrees from the
17 horizontal.
18 BY MS. SCHRINER:
19     Q.   Let's move on to -- go to Tab 21.  Excuse me.  And
20 this will be marked Exhibit 11.  And this is Bates 7374.
21 And at the top it says, "Infant incline sleep products tack
22 group on restraints."
23          I believe that probably meant task group, but
24 you can tell me if there was something called the tack
25 group.

Page 123

1  actually, I'll leave it on for a minute.
2          So you're telling me that for the Rock 'n
3  Play there was this seat sacking testing that was
4  performed?
5      A.   Yes.
6      Q.   So that -- those results should be somewhere in
7  the file for the Rock 'n Play; correct?
8      A.   Yes.
9      Q.   And how often was that -- now I'm going to stop
10 sharing.
11         How often was that testing performed?
12     A.   If the test is in the PRD, every time you have a
13 new model that is going to be introduced, then all of those
14 requirements in the PRD have to be tested and validated at
15 our internal test lab.
16     Q.   And what is the name of the internal test lab, if
17 there is one?
18     A.   Well, this product was made in China.  So it was
19 most likely our test lab in either Hong Kong or Shenzhen.
20     Q.   So one of those tests -- test labs would do the --
21 what was it, the seat sacking test for the Rock 'n Play
22 every time a new model was being developed to go to market?
23     A.   That's correct.
24              MS. COHEN:  Objection to form.
25              ///

Page 125

1     **Q.   And would it be the same lab that would be in -- I**
2     **think you said China or maybe Hong Kong that would be**
3     **performing that test following the approval of the**
4     **standards?**
5     A.   Yeah.  And I actually -- I should probably strike
6     the reference to Hong Kong.  At that point in time we
7     weren't doing testing in Hong Kong any longer.  Our test
8     lab was in Shenzhen, and that was our primary test lab.
9              The answer to that is, yes, that test would
10    have been done prior to 2015 in our test lab.  Once we had
11    an ASTM standard and we were -- we were qualifying a new
12    product, which was sometime in 2015, we always sent the
13    product out to a third-party lab to have that product
14    evaluated to the ASTM standard.
15              So, in other words, we always had a third
16    party review the product that had a -- an ASTM standard.
17    **Q.   And who was that third party?  Who did that for**
18    **you?**
19    A.   There were two third-party labs that were equipped
20    to do that type of testing in China, and that was either
21    SGS or Bureau Veritas.  And I would have to look to see
22    what -- who -- who has done that testing for us.  I suspect
23    at that point in time it was most likely SGS.
24    **Q.   Okay.  Thank you.  I appreciate you going through**
25    **that with me, because -- so my understanding is seat**

```
 1      Q.   Are these documents, either the actual
 2   questionnaires or the summaries, items that were ever
 3   discussed as far as you know during a safety audit or a
 4   hazard analysis meeting?
 5              MS. COHEN:  Objection to form.
 6              THE WITNESS:  I -- the results or the summary
 7   of this would have been shared with the Product Development
 8   team, and that would also include certain members of the
 9   Safety Audit group being -- those members being Kitty and
10   Joel.
11              So, yes, they -- they would have been -- they
12   would have -- I and those members would have had an
13   opportunity to see the results of any of these in-home
14   studies.
15   BY MS. SCHRINER:
16      Q.   Okay.  And -- and my question was a little bit
17   more specific as to whether you recalled these studies ever
18   being discussed at a hazard analysis meeting or a safety
19   audit meeting, if you know?
20      A.   I don't recall it being discussed at that point.
21   And let me say why.  The safety audits and hazard analysis,
22   at least for this particular product, occurred prior to the
23   in-home tests.  So by the time we reached this milestone,
24   we already had safety audits behind us.  And in most cases,
25   we were given the green light to proceed.
```

Page 302

1   A.   Okay.
2   Q.   And --
3   A.   All right.  I've got Binder 5.
4   Q.   Yeah.  And this one -- just a quick question.  I
5   raised an objection, but under Tab 4, this is what's called
6   a Product Requirements Document.
7            And what does that mean?
8   A.   This is a document that lays out all of the
9   different requirements that we expect the product to meet.
10  It has everything from packaging requirements to
11  biochemical requirements, all of the specific performance
12  requirements that the product should perform to.  And it
13  references any regulatory requirements, voluntary
14  standards, so on.
15  Q.   And if you look at this, Ms. -- Ms. Schriner
16  marked this as Exhibit 29, as I recall.  And this PRD from
17  January 27th, 2009, do you agree that it's missing 18
18  pages, or it goes from page 1 to page 19 in there?
19  A.   Yes, this one only includes page 1 and page 19.
20  Q.   Okay.  Would those be helpful for someone like you
21  responding to questions about this document?
22  A.   And if the questions went beyond, that she asked
23  me, it certainly would have been helpful, yes.
24  Q.   I know what I wanted to ask you, Mr. Steinwachs.
25  I was about to ask this before.  When you had the warning

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Kathleen Courkamp, for herself )
and on behalf of other )
statutory beneficiaries, )
                                          )
                    Plaintiff, )
                                          )No.   CV-19-02689-GMS
          vs. )
                                          )
Fisher-Price, Inc. A foreign )
corporation; Mattel, Inc., a )
foreign corporation, )
                                          )
                   Defendants. )
                                          )


VIDEOTAPED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

FISHER-PRICE, INC.

TESTIMONY OF MIKE STEINWACHS

CONTAINS CONFIDENTIAL TESTIMONY

AND SUBJECT TO A PROTECTIVE ORDER



Phoenix, Arizona
November 11, 2020
8:35 a.m.


CATHY J. TAYLOR, RPR, CRR, CRC
Certified Reporter 50111
MEYER, LUMIA & ASSOCIATES
2819 East 22nd Street

Tucson, Arizona 85713   Ph (520) 623-1100