# EXHIBIT 30



Deposition of:
# Farrel Swope

*June 12, 2020*

In the Matter of:

# In Re: Fisher-Price/Mattel

Veritext Legal Solutions
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Farrel Swope                                      June 12, 2020
In Re: Fisher-Price/Mattel

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ARIZONA
 3
 4    Kathleen Courkamp, for herself )
      and on behalf of other         ) No. 2:19-cv-02689-GMS
 5    statutory beneficiaries,       )
                                     )
 6                   Plaintiff,      )
                                     )
 7    vs.                            )
                                     )
 8    Fisher-Price, Inc.,a foreign   )
      corporation; Mattel, Inc., a   )
 9    foreign corporation,           )
                                     )
10                   Defendants.     )
      _____)
11
12
13
14
15       VIDEOTAPED ZOOM DEPOSITION OF FARREL SWOPE
16                  Phoenix, Arizona
                    June 12, 2020
17                   12:02 p.m.
18
19
20
21
22
      Reported by:
23    JARDENE L. PLATT, RPR
      AZ Certificate No. 50937
24
25
```

Farrel Swope                                           June 12, 2020
In Re: Fisher-Price/Mattel

Page 2

1       DEPOSITION OF FARREL SWOPE commencing at
2  12:02 p.m. on June 12, 2020, at Phoenix, Arizona, before
3  JARDENE L. PLATT, a Certified Reporter, Certificate No.
4  50937, for the State of Arizona.
5
6            * * * *
7       A P P E A R A N C E S
8
9  FOR THE PLAINTIFF:
10
       GOLDBERG & OSBORNE LLP
11     BY:  KRISTIN J. SCHRINER, ESQ.
       698 East Wetmore Road, Suite 200
12     Tucson, Arizona  85705
       (520) 298-9962
13     kschriner@goldbergandosborne.com
14  FOR THE DEFENDANTS:
15
       GREENBERG TRAURIG, LLP
16     BY:  LORI G. COHEN, ESQ.
       3333 Piedmont Road NE, Suite 2500
17     Atlanta, Georgia  30305
       (310) 553-2100 (678) 553-2100
18     cohenl@gtlaw.com
19  ALSO PRESENT:
20     WILL RAIN, VIDEOGRAPHER
       ALLISON NG
21
22
23
24
25

Page 3

1            I N D E X
2  EXAMINATION                    PAGE
3  By Ms. Cohen                    5
4  By Ms. Schriner                101
5  By Ms. Cohen                   126
6  By Ms. Schriner                129
7  By Ms. Cohen                   131
8       E X H I B I T S
9  NO.         DESCRIPTION        PAGE
10  Exhibit 1  Maricopa County Office of Medical   18
              Examiner medical examiner's
11            records.
12  Exhibit 2  Maricopa County Office of Medical   19
              Examiner photographs.
13
     Exhibit 3  Death certificate.          20
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            Phoenix, Arizona
              June 12, 2020
2              12:02 p.m.
3
4       THE VIDEOGRAPHER:  We are now on the record
5  for the video deposition of Farrel Swope.  The date
6  is June 12, 2020.  The time is 1:02 p.m. Mountain
7  time.
8       This is the matter of Kathleen Courkamp
9  versus Fisher-Price, Incorporated, et al.  This is
10  being held in United States District Court for the
11  District of Arizona, case number CV-19-02689-PHX-GMS.
12       The court reporter is Jardene Platt.  The
13  videographer is Will Rain, both representatives of
14  Courtroom Connect.
15       Now, Counsel, please state your appearances
16  for the record.
17       MS. COHEN:  Yes.  Good afternoon.  This is
18  Lori Cohen and I'm representing the defendants in
19  this case, Fisher-Price, Inc. and Mattel, Inc.
20       MS. SCHRINER:  And this is Kristin Schriner
21  representing plaintiff Kathleen Courkamp and
22  statutory beneficiary Andrew Olson.
23       THE VIDEOGRAPHER:  And will the court
24  reporter please administer the oath.
25  ///

Page 5

1
2       FARREL SWOPE,
3  called as a witness herein, having been first duly sworn,
4  was examined and testified as follows:
5
6       MS. COHEN:  Thank you.  So this will be the
7  deposition of Investigator Farrel Swope taken by
8  party defendants in this matter pursuant to the
9  protective order that's governing this action.  Also
10  not waiving -- all objections are reserved except the
11  form of the question and responsiveness of the
12  answer.
13
14            EXAMINATION
15
16  BY MS. COHEN:
17       Q.  Mr. Swope, would you like to read and sign
18  this deposition at the end of it, that is, review it
19  for accuracy before it goes to final?
20       A.  No, I don't think so.
21       Q.  Okay.  All right.
22       So with that brief introduction, hopefully
23  you can hear me and see me okay, but let me know if
24  not.  I will try to go slow enough.
25       First of all, thank you for doing this

2 (Pages 2 - 5)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 6

1 because I know this is not an ideal situation doing
2 this by video virtually in this current climate in
3 which we find ourselves. We appreciate you
4 accommodating us and working with us to get this
5 scheduled since we have court deadlines.
6        Do you have with you the binder that we
7 sent to you today?
8     A. Yes.
9     Q. Okay. So when we get to some documents I
10 can direct you where to find things and you can pull
11 them out. We can also hold them up to the screen to
12 make it easy on you. I just wanted to make sure of
13 that.
14        Again, have you been deposed before?
15     A. I have.
16     Q. Approximately how many times?
17     A. This is the third time.
18     Q. Okay. And were the other times both in
19 your -- in the context of you being an investigator
20 for the medical examiner's office?
21     A. Yes.
22     Q. So I think you have been through the
23 process before. Again, if I speak too fast or if my
24 question doesn't make sense or it's hard to
25 understand, please just stop me and I will rephrase

Page 7

1 it or re-ask it. Okay?
2     A. Okay.
3     Q. And if you need anything at all, just
4 please let us know. Okay, sir?
5     A. Okay.
6     Q. Okay. One of the things that we sent I
7 think to you and to Cristlyn was, at least, a
8 subpoena and a notice of deposition which we can mark
9 but let me just ask you the question, we haven't
10 received any documents responsive to that. I take it
11 that's because you don't have anything outside of the
12 medical examiner's official certified records. Is
13 that correct?
14     A. Yes. I mean, the only thing I can testify
15 to is my own report. So, I mean, the other stuff you
16 sent, I can't really comment on something that I had
17 nothing to do with.
18     Q. Okay. We completely understand and agree
19 and we wouldn't want you to do that. So my question
20 is, do you have anything else other than your report
21 and the medical examiner's file? In other words, do
22 you have any notes or photos or anything outside of
23 the medical examiner's official file?
24     A. No.
25     Q. All right. Fair enough. Let me ask you

Page 8

1 before we get started, a -- just a few background
2 questions.
3        Can you state your full name, please, for
4 us.
5     A. Farrel Swope.
6     Q. All right. And I know you said this is
7 your third deposition. Have you ever had to testify
8 at trial?
9     A. No.
10     Q. Were the other two depositions taken years
11 ago or recently? Give us a sense of that.
12     A. The last one was probably about two years
13 ago and the one before that was probably, I don't
14 know, seven or eight years ago.
15     Q. Okay. I take it you don't have a
16 curriculum vitae or resume or anything like that to
17 produce?
18     A. No.
19     Q. Can you give us a little bit of background
20 about yourself just so we know how you got to the
21 point of being an investigator. Where did you grow
22 up, where did you go to school, that sort of thing.
23     A. I -- I'm from Baltimore, Maryland. I
24 attended college at Phoenix College here in Phoenix,
25 Arizona. I have been with the medical examiner's

Page 9

1 office since 2004.
2     Q. What degree did you get from Phoenix?
3     A. An associate's degree in criminal justice
4 and certifications in crime scene photography,
5 fingerprinting and evidence technology. I'm also
6 registered with the Board of Medicolegal Death
7 Investigators and have been since 2007.
8     Q. And you said you started at the medical
9 examiner's office there in 2007 as well?
10     A. No. I started in 2004 as an investigative
11 assistant and then was promoted to investigator. I
12 was part time for about two and a half years and then
13 full time for about six months and then I was
14 promoted in -- on March 27, 2007. So 13 years. More
15 than 13 years.
16     Q. Just to give us a little bit of background,
17 before 2004, what type of work or employment were you
18 involved in? Was it anything to do with medical
19 investigations or police work?
20     A. No. I was -- I was a behavioral health
21 technician 3 at a long-term residential treatment
22 center for sex offenders.
23     Q. How long did you hold that position?
24     A. I was there 12 years.
25     Q. When did you move from Baltimore to

3 (Pages 6 - 9)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 10

1 Arizona?
2    A.   1982.
3    Q.   What county do you live in there?
4    A.   Maricopa.
5    Q.   Have you always lived in Maricopa County
6 while you have been living in Arizona?
7    A.   No.  I lived in Pinal County for about four
8 years.
9    Q.   What is your current title today?  What --
10 I know you are an investigator.  What is your full
11 official title?
12    A.   Medicolegal death investigator.
13    Q.   And how long have you had that specific
14 title?
15    A.   Since 2007.
16    Q.   Roughly how many, would you say, deaths of
17 babies, you know, sadly and tragically as in this
18 case, have you found yourself investigating since
19 2007?
20    A.   Well, I have investigated more than 6,000
21 cases.  I have been involved in probably 8,000 at
22 least and, you know, I assisted in at least 2,000
23 others.  There's more than 6,000 cases with my name
24 on them, but as a lead investigator.
25        As far as babies, you know, it's been

Page 11

1 hundreds.
2    Q.   Now, in this one, you know from the autopsy
3 report, which we will look at in a bit, I mean,
4 the -- in the medical records, the examiner tab 11,
5 ultimately the doctor for -- is it "Fa-renk," is that
6 how you say his name?
7    A.   Ferenc -- Dr. Ferenc.
8    Q.   Right.  I got it completely wrong.  Okay.
9 Dr. Ferenc.
10        How often have you been on an investigation
11 where he was the medical examiner who did the
12 ultimate autopsy?  Is that a frequent thing?
13    A.   Yeah.  I mean, he wasn't here a really long
14 time, but I -- you know, I did, probably, I would say
15 a low-ball guess would be maybe 50 cases of his,
16 maybe more than that.  I couldn't tell you exactly.
17    Q.   Okay.  It looks like in this one he
18 ultimately said cause of death unknown and manner
19 undetermined on his autopsy report.
20        Is that something that you as the
21 investigator ultimately receive a copy of or know
22 what the determination is?
23    A.   You know, I -- I don't usually -- I mean, I
24 may go back and look at a case occasionally to find
25 out the cause and manner of death.  You know,

Page 12

1 sometimes it's obvious and you don't need to go back
2 and look at it.  Like, I didn't go back and look at
3 this case.  I -- I mean, we do anywhere from -- as an
4 investigator, you do anywhere from 350 to 500.  The
5 most I think I did in one year was 587 cases.  So, I
6 mean, you don't have a lot of time to go back and
7 look at findings.
8        I prepare the case for the doctor, give
9 them an idea of what kind of case it is and -- so he
10 knows what direction to go.  You know, what to be
11 looking for, you know, and then he may request
12 follow-up investigative work.  He might say, get me
13 this, get me that, you know.  That kind of stuff.
14 But I mean, you know, I hadn't looked at this case
15 until I received the subpoena.
16    Q.   So in this case obviously the events
17 happened in 2014.  The subpoena came in sometime this
18 year.  So it's been about five and a half or six
19 years since you thought about this case?
20    A.   That's right.
21    Q.   When you looked at the subpoena, did you
22 then pull out the records from the ME's office, the
23 file, whatever you call it?
24    A.   I read my own report and I looked at the
25 photos.  I did, you know, skim the autopsy report

Page 13

1 but, I mean, I can't testify to those kinds of
2 things.  It's beyond my expertise.
3        I just -- you know, I prepare -- like I
4 said, I prepare the case for the doctor.  I meet with
5 the witnesses, the police.  I do a scene
6 investigation.  I prepare a report and I take the
7 photographs.  I do an examination of the body there,
8 just like a preliminary examination.  And then submit
9 everything to the doctor before the autopsy.  And
10 that's really my -- the end of my involvement in the
11 case.
12    Q.   We will focus today, like you said, on your
13 notes, your investigative notes and report and the
14 photos then.  That sounds like what you want to do as
15 well.
16    A.   Yeah.  That's -- that's all I can really
17 do.  Because, I mean, that other stuff -- I can't
18 testify as to what's in medical records because I'm
19 not the one who wrote them.  And I don't -- you know,
20 I'm not a doctor so, I mean, I can't go into that
21 kind of stuff.
22    Q.   Do you remember talking to the physician
23 about his opinions?  I mean, does anything like that
24 ring a bell?  Dr. Ferenc, do you remember ever
25 talking to him about this case or is that vague?

4 (Pages 10 - 13)

Farrel Swope
In Re: Fisher-Price/Mattel

Page 14

1    A.  No.  I don't think he requested anything of
2  me afterwards, you know, after I submitted my report.
3  I don't think -- he was a very intense doctor.  Very
4  good doctor.  And so, I mean, he knew his business,
5  in my opinion, my humble opinion.  He was, he was
6  very top notch.
7        So rarely did he ever ask for more.  You
8  know, I could give him a case right on my report, as
9  long as the photographs and I got all the -- like I
10  may request medical records for him and stuff.  As
11  long as he had everything that he felt like he
12  needed, he was -- he was pretty good to go.
13    Q.  Well, that's helpful.
14        So in this case, once you got the subpoena
15  and you pulled out the medical examiner's file and
16  looked at it, did it -- a light bulb go off?  Did you
17  remember anything about it or given the number that
18  you do was it again not something you recall
19  specifically?
20    A.  I remember the case now.  I mean, you know,
21  I remember -- you know, I remember talking with the
22  father on this a little bit and I remember, you
23  know -- Detective O'Brien, you know, I don't remember
24  him.  You know, if he walked in here I wouldn't know
25  it was him.

Page 15

1    Q.  Okay.
2    A.  I do remember Reyes, but I had -- if it's
3  the Reyes I'm thinking of, I had a few cases with
4  her.  But yeah.  I remember after I looked at the
5  photos, the case and being there, yeah.  I recognized
6  it.
7    Q.  So it brought back some of the
8  recollections, the memories looking at the report and
9  the photos.
10    A.  Yeah.
11    Q.  Okay.  My question is, I think you said you
12  had done -- I think you said hundreds of
13  investigations with babies.  Is that -- is that what
14  you said?
15    A.  I would say that's pretty close to
16  accurate, yeah.
17    Q.  Some of them are like -- sorry.  Some of
18  them are like this one where it's a cause of death
19  unknown and some of them go into a homicide
20  investigation.  So it's either --
21        MS. SCHRINER:  Form.
22  BY MS. COHEN:
23    Q.  I mean, is that something you are aware of
24  at the time that it becomes a homicide or something
25  beyond, you know, kind of a cause of death unknown,

Page 16

1  manner undetermined?
2        MS. SCHRINER:  Form.
3        THE WITNESS:  You know, if something
4  like -- I might hear about that, you know, if, say,
5  it's an unclear situation and they -- after the
6  autopsy, and it can be any kind of case, where, you
7  know, sometimes things aren't so clear.
8        You know, I mean, anything can happen once
9  they get down an autopsy.  They run through
10  radiology.  Sometimes they find surprises there.  You
11  know, projectiles and things like that they weren't
12  expecting to find.  You know.
13        I mean, I may hear about it, like they
14  might say, "Wow, your case turned into a homicide,"
15  or whatever, you know.  So, I mean, you know, they --
16  especially with these kind of cases, they -- you
17  know, we -- we try to look at everything possible,
18  you know, to make sure that's not the situation,
19  so --
20  BY MS. COHEN:
21    Q.  In your training and experience, did you
22  have to learn about SIDS or near SIDS cases as part
23  of what you do?
24    A.  Well --
25        MS. SCHRINER:  Form.

Page 17

1        THE WITNESS:  You know, SIDS is
2  something -- it depends on the doctors around -- a
3  lot of doctors have different opinions on that.  On
4  SIDS, I mean.  Some doctors don't believe in that
5  diagnosis.  They think there's always something
6  there.  You just didn't find out what it was or you
7  are not able to prove, you know, what it -- what it
8  was.
9        So, you know, that's something I don't see
10  on -- I haven't seen on a death certificate in, I
11  don't know -- I can't say I have never seen it on
12  there.  I think I have seen it, but not something
13  that I see a lot.  It's usually just something
14  determined.
15  BY MS. COHEN:
16    Q.  Is that something -- that was my question.
17  Is that something you were trained on or was that
18  left to the doctors that it's SIDS?
19    A.  Yeah.  That's their -- their opinions in
20  the end.  I don't -- you know, I don't say wow, this
21  is a SIDS case, I think.  I don't put that in my
22  report.
23    Q.  You stay away from that yourself as the
24  investigator.  Is that right?
25    A.  We just make observations, not really

5 (Pages 14 - 17)

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

Page 18

1 determinations.
2    Q.  Okay.  Do you remember ever talking to
3 Dr. Ferenc in this case about his cause of death
4 opinions --
5    A.  No.
6    Q.  -- specifically?
7    A.  No.
8    Q.  I want to go ahead and mark a couple of
9 exhibits while I'm thinking about it.
10       So I notice for the record the first one I
11 will mark is what we have in our binder as
12 Exhibit 11, but it is the medical examiner's record,
13 a certified set, and it is, let's see, MCOME-000001
14 through the last page, 000109.
15       So it's basically the certified medical
16 record.
17         (Exhibit 1 was marked for
18          identification and is attached
19          hereto.)
20 BY MS. COHEN:
21    Q.  If you need this in front of you, in your
22 binder it's exhibit -- it is tab 3 in your binder.
23 You will have that in front of you, Doctor.  I'm
24 sorry, Investigator Swope.
25    A.  Yeah.

Page 19

1    Q.  Tab 3.
2       And then while we are doing the marking
3 exhibits just to make this easier on us, I will also
4 go ahead and designate and mark as the second exhibit
5 for this deposition, is the set of photos.  You will
6 be able to access those, and for the court reporter
7 and videographer and counsel, these are again the
8 medical MC -- MCOME-000110 through last page 182.  So
9 we will have those sets of photos out as well as
10 Exhibit 2.
11         (Exhibit 2 was marked for
12          identification and is attached
13          hereto.)
14 BY MS. COHEN:
15    Q.  And that is in tab -- which tab in his
16 binder?
17    MS. NG:  Four.
18 BY MS. COHEN:
19    Q.  Tab 4 in your binder.  So those two will be
20 ones we will go through with you.
21       Then you did mention a death certificate
22 and so -- see if I can find that real quick.  The
23 death certificate has the Bates number at the end of
24 000108.  352754-000108.  Which tab is that of his?
25    MS. NG:  That is tab 7.

Page 20

1    MS. COHEN:  Tab 7 in yours.
2         (Exhibit 3 was marked for
3          identification and is attached
4          hereto.)
5 BY MS. COHEN:
6    Q.  So is the death certificate something that
7 you would see at the time you are investigating?
8    A.  No.
9    Q.  Would you get sometime later?  Would you
10 actually get it at some point or is it something the
11 doctor would see?
12    A.  It would -- you know, we -- I mean, the
13 death certificates are handled by vital statistics.
14 I mean, they are the ones that supply it to the
15 family through the funeral home.
16    Q.  Okay.
17    A.  So we have it listed in our database, you
18 know, of the cause and manner of death.  And then the
19 reports and everything are saved in our database, but
20 as far as the actual death certificate, no, I would
21 never see it or have a reason to have it in my
22 possession.
23    Q.  So the medical examiner's records which we
24 have as Exhibit 1, the photos are 2, we are marking
25 the death certificate as 3 for purposes of the

Page 21

1 record.
2       We talked already about the -- you see on
3 the medical examiner's records on page 2, it says
4 "cause of death unknown, manner undetermined."
5       Again, is that something that you would
6 have known back in 2014 or is that something you may
7 have just learned when you received the subpoena and
8 pulled this from the file?
9    A.  Yeah.  I didn't -- I had no knowledge of
10 what the cause of death was until I received the
11 subpoena.
12    Q.  Now, we have also a full set of police
13 records.  We have the full police file.  We have the
14 police photos, some of which cover the same things
15 your photos cover but, you know, separately produced
16 to us.
17       Would you have ever seen those records,
18 that is police report, police file or police photos?
19    A.  No.
20    Q.  I think that makes it easy.  We are not
21 going to probably go over those with you unless we
22 have a specific question because you haven't seen
23 them.  Okay.  We included them in your package.
24       Again, to prepare for today, other than I
25 guess talking about logistics with your colleague

6 (Pages 18 - 21)

Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

Page 22

1 there, did you go to the -- you read through the
2 materials in the binder there a little bit?
3     A.  No.  No.  I mean, like I said, this kind of
4 stuff like you were talking about, police
5 investigation, is a -- is a completely separate, you
6 know, investigation from what we do.  We don't get
7 involved in what they do.  They don't get involved in
8 what we do.  They present their facts to us.  We give
9 them our findings and that's basically how it goes.
10 It's -- it's -- you know, we are -- I'm only involved
11 in the medical aspects of the case.
12     Q.  Other than speaking with Cristlyn again
13 about logistics and setting up the date today, have
14 you talked to anybody at all in advance of today's
15 deposition about your testimony or opinions?
16     A.  Just my supervisor.  You know, I just set
17 it up with him to make this happen and everything.
18 Talked to him about it briefly but that's -- no one
19 else.
20     Q.  You haven't talked -- you haven't talked to
21 any of the police?
22     A.  No.  No.
23     Q.  You haven't talked to Dr. Ferenc?
24     A.  No.
25     Q.  You haven't talked to any attorney, whether

Page 23

1 from my firm or counsel for the plaintiffs, I take
2 it.
3     A.  No.
4     Q.  And you are here again just to talk about
5 your observations in your investigation.  Right?
6     A.  Yes.
7     Q.  You don't have any opinions one way or
8 another about the issues in the lawsuit?  You
9 probably don't even know about them.  Right?
10     A.  No, I don't.
11     Q.  Okay.  I take it you are not -- just to
12 make perfectly clear, you don't have any criticisms
13 or negative opinions about my clients, Fisher-Price
14 or Mattel, in this case.  True?
15     A.  No.
16     Q.  That's accurate?
17     A.  Yeah.
18     Q.  And you don't have any opinions about
19 whether -- again, about what happened to cause the
20 baby's death in this case.  Correct?
21     A.  No.
22     Q.  No opinion?
23     A.  No opinion.
24     Q.  In other words, you are not going to come
25 to trial some day and offer an opinion that -- that

Page 24

1 somehow my clients caused the death.  Correct?
2     A.  I have no way -- I wouldn't have a way to
3 prove it.  If the doctor doesn't know what happened,
4 then, you know, I mean, I don't have -- no.  I
5 wouldn't have -- I don't think I would get called for
6 that kind of opinion.
7     Q.  Okay.  I just wanted to make sure.
8         Let's take a quick look at the -- we will
9 pull up Exhibit 1 and turn to that, what's contained
10 in there your investigation as well.
11         Do you recall when you were first
12 contacted --
13         Thank you for putting that up.
14         What will our video show now?  Will it show
15 the exhibit or the witness?
16         THE VIDEOGRAPHER:  It will be picture in
17 picture.
18         MS. COHEN:  Okay.
19         THE VIDEOGRAPHER:  Do you want me to take
20 it off?  I'm sorry.
21         MS. COHEN:  Yeah, take it off for now.  I
22 will ask you to pull it up if we need it.  I don't
23 think we need it.  There you go.
24         THE VIDEOGRAPHER:  Sorry about that.
25         MS. COHEN:  Thank you for that.  No, no,

Page 25

1 no.  That's fine.
2     Q.  So Mr. Swope, I hope you can still see us
3 okay.  If you -- flipping through this Exhibit 1, do
4 you see on the bottom right corner here's little
5 numbers there?  They are actually page numbers 1, 2,
6 3.  Do you see those okay?  Right-hand corner there?
7     A.  I don't see that, no.
8     Q.  I'm sorry.  So on the -- do you have the
9 medical examiner's file in front of you?
10     A.  I do.
11     Q.  Okay.  That's our Exhibit 1.  Do you see in
12 the bottom right corner it has little numbers on the
13 bottom right corner?
14     A.  Yes.  Starting 00002 and then 3 and then 4,
15 et cetera?
16     Q.  Exactly.  So when I refer to page numbers
17 that's what I will be focusing on.  Okay?  Got it
18 pretty easily.  They are called Bates numbers.
19         So I will have you look at page -- the
20 little page 9 at the bottom.  That's the first I
21 think that has your name on it.
22     A.  Page 9.  Okay.  Yeah, I see my name at the
23 top.
24     Q.  Okay.  What I'm going to do is take us
25 through Exhibit 1 and just kind of focus in on places

7 (Pages 22 - 25)

Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

Page 26

1 where I see your name and talk with you. Okay, sir?
2     A.   Okay.
3     Q.   This is the case notes part. This pages 9,
4 10, 11 are called case notes. Who prepared these
5 notes? Are those yours or somebody else's?
6     A.   No. These are different entries and the
7 names are underneath. These are -- well, this is a
8 new database. The database was changed at the
9 beginning of this year. So what this would have
10 actually been called before was phone log entries.
11 Okay? Now it's called case notes entries.
12       So those are usually, you know,
13 documentation of various phone calls that are either
14 received or were made. So it's just update
15 information as the case evolves. So, you know, none
16 of these were made by me, I don't see. Let me see.
17     Q.   Possibly the first one. I might just
18 direct you to the first top one on page 9, 6-20-2014.
19 It has your name and says entered by you. I direct
20 you to that.
21     A.   Okay.
22     Q.   Would that be your entry?
23     A.   Okay. Okay. Yeah. That one I did make.
24 That one was mine, right. Um-hmm.
25     Q.   I think we are getting a sense about this.

Page 27

1 So here it says -- in terms of the timeframe, and
2 again, we will get to your investigative report in a
3 moment, but this talks about you contacting the Child
4 Protective Services of Arizona hotline and running a
5 search on the subject's name as well as --
6     A.   Right.
7     Q.   Yeah.
8     A.   Yes.
9     Q.   At what point in the investigation would
10 you have done it? Would that have been at the
11 beginning, or the middle or the end?
12     A.   That would have been like post-scene
13 investigation. Like that's something that's
14 routinely done on a baby case. You know, it may be
15 even an adult case if it -- you know, like an adult
16 protective services report might be requested by the
17 doctor or, you know, a search to make sure there's
18 no, you know, abuse, neglect or open cases, you know.
19 And that's what we routinely do.
20       A lot of times the police will do this. If
21 I go to a -- sometimes I will go to a call and I
22 might say, "Have you contacted adult protective
23 services regarding this family," and they might say
24 "Yeah, we already did that. Everything is good or
25 everything is not good." Then I would document that

Page 28

1 in my report.
2       If that wasn't the case, when I got back to
3 the office, I might send a subpoena for any open --
4 or any records or I can contact them by telephone
5 sometimes. And nowadays it's easier to just send a
6 subpoena.
7     Q.   Just to make it easier on you, your report,
8 we will get to in a moment, is back on page 19,
9 looking at the lower numbers. So we know the date of
10 your report and your investigation was on June 19th.
11       So given that, looks like this first entry
12 that you made and calling DPCS was the day after.
13 Does that make sense?
14     A.   Um-hmm.
15     Q.   Is that yes?
16     A.   Yes.
17     Q.   Sorry. Just for the court reporter.
18       Going back to page 9 for a minute, I want
19 to go through this chronologically, further down
20 the -- does that look to be your only -- specifically
21 your entry on that sheet, that's the only one you
22 did?
23     A.   Yeah. That's the only one I see on here
24 that was entered by me.
25     Q.   Do you know the other names on here?

Page 29

1 There's several from 2014 and then we get up to 2019.
2 Deborah Madrigal, Judith Waters, Laura Leyva.
3     A.   Um-hmm.
4     Q.   Are they all investigators or who are they?
5     A.   No. These -- well, some -- I know Judith
6 is in the front desk. Deborah is still here. She's
7 downstairs. I'm not sure about Laura. Dr. Horn.
8 And it looks like -- yeah. Dr. Horn has an entry
9 down there on the 30th and Melanie Rouse is the chief
10 investigator.
11     Q.   Is Dr. Horn still there at your office?
12     A.   He is. Yes.
13     Q.   Did he take Dr. Ferenc's place?
14     A.   No. He's been here since I have been here.
15 He's been here before I came, so he's been here a
16 very long time.
17     Q.   Let me pause there for a minute on this
18 page. This is now April 30, 2019, Dr. Horn's entry.
19     A.   Yes.
20     Q.   Again, is this something you would have
21 seen when he entered it or you only have seen it
22 because of this deposition?
23     A.   I wasn't aware of this entry, no.
24     Q.   And it looks like he was called in to
25 review this case in 2019. When that happened did he

8 (Pages 26 - 29)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 30

1 reach out to you or have any discussions with you, do
2 you know?
3     A.   No, he did not.
4     Q.   One of the things he says is, "After review
5 of this case, including scene photos with doll
6 reenactment."
7         Now, that would have been yours, right, the
8 photos with the doll reenactment?
9     A.   Yes.
10     Q.   And autopsy examination photographs.  Would
11 those have been yours as well?
12     A.   Not autopsy photographs.  Just the scene
13 photographs.
14     Q.   Okay.  Somebody else would have done the
15 autopsy photographs other than you?
16     A.   Yes.
17     Q.   Who would have -- do you know who would
18 have done those?
19     A.   No.  Not -- no.  Because, I mean, it was
20 such a long time ago, I -- we have had a few people
21 come and go so I couldn't say who that was.  It
22 should be documented somewhere, though.
23     Q.   Yeah.  We can find it.  It says "radiograph
24 and lab reports."  Obviously those are not yours.
25         It says:

Page 31

1         "Appears to represent an SUID,"
2     sudden unexplained infant death, "during
3     sleep in an infant without any
4     significant external or internal trauma
5     or any toxicologic findings."
6         Do you see that?
7     A.   Yes, I do.
8     Q.   Are you familiar with -- I mentioned SIDS
9 before.  Are you familiar with SUID, S-U-I-D, as a
10 term?
11     A.   Sure.  Um-hmm.
12     Q.   Yes?
13     A.   Yes.  Yes.
14     Q.   That's something you read on reports from
15 time to time?
16     A.   Well, no.  What I see is a SUID or
17 sudden -- there's a form that gets filled out, sudden
18 unexpected infant death checklist, which, you know,
19 the police fills out.  I mean, we don't do that.
20 So --
21     Q.   Okay.
22     A.   They would fill that out on any death, you
23 know, of a child that didn't have an explanation that
24 was, you know, in this age range.  So, you know,
25 the -- it looks like Dr. -- like it says in here,

Page 32

1 Dr. Horn reviewed it, so --
2     Q.   Yeah.  He goes on to say:
3         "I offer the opinion that homicide
4     is not an expected or reasonable manner
5     based on the available information from
6     this report and Dr. Ferenc's
7     examination."
8         Finish that right.  That would have been
9 Dr. Horn's ultimate opinion there?
10     A.   Yes.
11         MS. SCHRINER:  Foundation.
12 BY MS. COHEN:
13     Q.   There's some entries coming up on the
14 bottom of 9 and top of 10 about calls different
15 people had with the Consumer Product Safety
16 Commission, the CPSC.  Were you aware of any of those
17 or involves in any of those for any reason?
18     A.   I was not aware of it but I did remember
19 hearing something about this case before, you know,
20 that there was some kind of involvement like that.
21 And, you know, in this specific case.  Now beyond I
22 heard about it, that's -- I don't know what any of
23 the questions were or the issues were.  So I'm not --
24 I'm not aware.
25     Q.   The opinion by Dr. Horn about SUID death,

Page 33

1 is that something you had heard as well back in
2 either 2014 or 2019?
3     A.   No.
4         MS. SCHRINER:  Form.
5 BY MS. COHEN:
6     Q.   Okay.  So the next page that, at least by
7 my review, has your name on it, and actually we have
8 to go through this, I think is on 17.
9     A.   Okay.
10     Q.   Stop me if you see anything between 10 and
11 17 that you think has your name on it.  Will you let
12 me know that, sir?
13     A.   Okay.  I see my initials on the admission
14 records on page 12.  It just shows that, you know, I
15 transported the body here to the medical examiner's
16 office, weighed it and was responsible for admitting
17 it to the receiving morgue.
18     Q.   Where are your initials on that one?  If
19 you could -- is it towards the bottom?
20     A.   At the top.  At the top under where it says
21 "record of admission" and then you --
22     Q.   Yes.
23     A.   -- see "admitted" and then that's me, FS.
24 FS.
25     Q.   Okay.

9 (Pages 30 - 33)

Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

Page 34

1    A.   Okay.
2    Q.   That's the OME representative right there?
3    A.   Well, yeah.  Where it says "admitted by
4 OME -- to OME by OME representative," yeah, that's
5 me.
6    Q.   Okay.  Again, that means you were the one
7 accepting the body, did you say?
8    A.   No.  It means I was the one that
9 transported to the body to the medical examiner's
10 office and admitted it to the receiving morgue.
11    Q.   You would have actually carried the body
12 that night, or that morning, rather, in your vehicle?
13    A.   That's right.  Transported it in our
14 vehicle back to the office and then on admission, you
15 can see where it says body weighed, that tells you
16 the body was weighed when it arrived here and it was
17 time stamped, which is kind of illegible.  Looks like
18 the body arrived here at 1519 hours, is what it looks
19 like.  And then, you know, it was weighed at
20 16 pounds.  And then it tells you where the body was
21 transported from and then, you know, the bag
22 weight -- the bag type and then an exchange would be
23 required by the funeral home for the bag.
24    Q.   Was anybody -- would anyone have been with
25 you from the medical examiner's office, either at the

Page 35

1 parents' house in your car or did you meet the police
2 and a team there?
3    A.   No.  There was -- I had -- Investigator
4 Newman was also with me.
5    Q.   He drove with you in your car?
6    A.   In the vehicle, in the van, yeah.  He was
7 with me.
8    Q.   Does Investigator Newman still work there?
9    A.   He does.
10    Q.   Have you and he talked at all about this
11 case or this deposition?
12    A.   Only that, you know, I was going to do it.
13 I saw him this morning.  He asked me why I was here
14    Q.   Got it.  From your review of the file, we
15 will get to that, did he prepare any notes or
16 reports?  I know he's referenced in yours, but did he
17 do any of his own writing?
18    A.   No.  I don't see him -- no.  He didn't
19 write anything in the report.
20    Q.   Was he junior to you?  Was he like your
21 assistant or what was the relationship?
22    A.   Well, I was the lead investigator.  He was
23 assisting me.
24    Q.   Okay.  That's why you did the report and he
25 was there with you but you did the report yourself or

Page 36

1 you actually wrote the report.
2    A.   Right.
3    Q.   What about the photos?  Did you take them
4 or would Investigator Newman have taken them?
5    A.   You know, I don't recall.  I think he
6 probably took the photographs.  I can't recall
7 exactly.  I may have taken some of them.  You know, I
8 really don't remember.
9    Q.   It could be either one of you took them or
10 you might have shared that duty?
11    A.   That's right.
12    Q.   The camera that you used, you or
13 Mr. Newman, Investigator Newman, is that the same
14 camera you use today or has it been upgraded over
15 time?
16    A.   It's been upgraded.
17    Q.   Let me flip to page 13, which is the -- I
18 think the next one.  It talks about the inventory of
19 personal property.  Is your name anywhere on that
20 page or initials?
21    A.   No.
22    Q.   Would you have carried those items back
23 separately or were they on the body?
24    A.   On the body.
25    Q.   What about where it says the white baby

Page 37

1 blanket?  Was that inside the bag, so to speak, or
2 would you have carried it separately?
3    A.   It would have been in the bag.
4    Q.   Okay.  So you again would have transported
5 the body in a bag but nothing separate from the bag.
6    A.   No.
7    Q.   Is that fair?
8    A.   Yeah.
9    Q.   Okay.  On 14, the sign-in form, that
10 doesn't appear to have your name, does it?
11    A.   No.
12    Q.   15 or 16, do either of those have your name
13 or initials?
14    A.   No.
15    Q.   And then we get to 17.  Is this now the
16 preliminary report of death, is this something that
17 you would have prepared or somebody else prepare this
18 page?
19    A.   I put this together.  Not all of it.  But
20 let's see here.  No.  I did this -- I did this whole
21 thing.  Like I say, things have changed a lot since
22 then.  This is something that would have been saved,
23 you know, to the medical record.  There was -- yeah.
24 So -- yeah.  I --
25    Q.   Did you -- I'm sorry, go ahead, sir.

10 (Pages 34 - 37)

Farrel Swope
In Re: Fisher-Price/Mattel

1    A.   Yeah.  I did this -- I prepared this whole
2  document.  I put all this stuff in there.
3    Q.   And then at the bottom it has FS number 51.
4  That's you.  Right?
5    A.   Um-hmm.
6    Q.   Then it says, "Records requested from
7  Dr. Cleary, Banner Thunderbird Medical Center,
8  Phoenix Baptist hospital."
9        That's for your follow-up to the date of
10  the investigation similar to your asking for reports
11  on the baby, sort of the DPCS.  Is that what you did
12  subsequent to --
13    A.   Right.
14    Q.   -- that day?
15        Do you remember if you got those records at
16  any time?
17    A.   No.  I -- you know, I wouldn't review the
18  records.  You know, I mean, they would come in -- if
19  they did come in, I might receive an email from the
20  doctor saying, "Hey, I didn't get the records."  And,
21  you know, as long as they came in, I wouldn't -- in a
22  case like this, I wouldn't go back and review
23  anything else to my preliminary investigation there
24  for the doctor.
25    Q.   So we are going to get to the photos

1  eventually, the other set of exhibits there and I
2  know it contains photos of the reenactment.
3        Would you and the other investigator,
4  Newman, have brought with you like the reenactment
5  doll and things to do the reenactment or did you have
6  them in the van already?
7    A.   We would -- yeah, we would have had it with
8  us.  Um-hmm.
9    Q.   Did you specifically bring them because you
10  knew it was a baby death call or did you keep those
11  in the van for all investigations?
12    A.   They are kept in the van.
13    Q.   Okay.  Do you bring -- did you bring with
14  you a bassinet or chair to photograph the baby in or
15  was that something that --
16    A.   No.  They had -- you know, there was two --
17  I reviewed this.  So there was -- they had two of
18  basically the same bassinets there at the house.  The
19  actual one that was -- the baby was found in was not
20  used in the reenactment because they were worried
21  about evidence contamination, so they requested we do
22  it in the other one, so -- and that's based on, you
23  know, I mean, what I'm reading here.  If you would
24  have asked me that without reading a report, I mean,
25  I wouldn't have remembered it.  So, I mean, I'm only

1  going by what I'm seeing here.
2    Q.   Okay.  And again, when you say "they," I
3  assume you mean the police, that --
4    A.   Right.
5    Q.   -- they wanted to keep that clean, if you
6  will, for evidence purposes.
7    A.   Yeah.
8    Q.   Okay.  So let's look at this preliminary
9  report of death this minute, and is this something
10  you would have filled out after the -- after you got
11  back at the office based on your memory?
12    A.   No.  Like some -- I would take a blank copy
13  of this with me.  Then I would do it by hand there
14  and then come back and do it, a final one, typing it
15  or using -- I use voice recognition software so
16  that's why there's a few typos in the report.
17    Q.   No problem.  So it says there, call date
18  time 6-19-2014 at 9:41.  Is that when you all
19  received a call about coming to the scene?
20    A.   That's right.
21    Q.   And did you receive the call from the
22  police or how did you get the call?
23    A.   The call came in, yeah, from the police.
24    Q.   Detective O'Brien?
25    A.   O'Brien is the one that reported the death.

1    Q.   Then you were dispatched to the scene
2  because of that call.
3    A.   Right.
4    Q.   Did you know Detective O'Brien prior to
5  that time, do you recall?
6    A.   I don't remember him, to be honest with
7  you.  Like I say, I wouldn't recognize him, I don't
8  think.  I haven't, you know, had any recent contact
9  with him.
10    Q.   It says here "type of death,
11  sudden/unexpected."  I assume, that was your -- you
12  put that there?
13    A.   Yeah.  Um-hmm.
14    Q.   And it says:
15        "The eight month old female was
16    found deceased by her mother in a
17    bassinet beside their bed."
18        Is that based on what the mom told you,
19  Ms. Lawton?
20    A.   That's right.
21    Q.   Did you talk to both the mom and the dad
22  together or separately or both together and then
23  separately, if you remember?
24    A.   I can't recall.  I remember talking to the
25  father outside briefly by himself.  I mean, I

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 42

1 explained to him, you know, the procedure and as far
2 as like them needing to pick a funeral home and
3 things like that. And, you know, I told him what he
4 needed to do as far as, you know, having Z▮▮▮▮
5 released from the medical examiner's office.
6    Q.  Does this identify here Investigator Newman
7 as well somewhere on this page?
8    A.  His initials are -- if you look down below
9 the first big black box there, you will see the
10 dispatch time and miles and then, you know, his
11 initials are beside mine.
12    Q.  He's number 36.
13    A.  That's right.
14    Q.  It looks like by our analysis you spent
15 approximately two hours at the scene.
16    A.  Yeah. Something like that. Um-hmm. Yeah.
17    Q.  Other than the mom and the dad, did you
18 speak to any other family members who were there?
19    A.  I don't recall anyone else being there.
20    Q.  I know when we -- again, when we look at
21 the police report and such we see references, and I
22 know you have seen them, to the brother who was
23 living there as well, people like that, maybe some
24 family members. Your recollection you only spoke
25 with the mom and dad?

Page 43

1    A.  Yeah.
2       MS. SCHRINER:  Form. Foundation.
3       THE WITNESS:  I don't remember having
4 contact with anyone else.
5 BY MS. COHEN:
6    Q.  Let's go to the next page, which is 18.
7 Again is this put together based on your handwritten
8 notes that you then go back and transcribe by typing
9 them when you get back to the office later?
10    A.  That's right.
11    Q.  Okay. It says -- is this all of your
12 entries on this, so then your preparation?
13    A.  Yep. Yes.
14    Q.  So it says last seen by Andrew Olson, the
15 father. Is that something that the father reported
16 to you, that he was the last one that saw her?
17    A.  Yes.
18    Q.  And it talks about -- let's see -- the room
19 air temperature being 81 degrees. Why was that
20 important to note?
21    A.  Well, that's something we document all the
22 time. Living here in Arizona, you know, you want to
23 make sure that heat is not a contributing factor in
24 someone's death.
25    Q.  In the baby deaths that you have been

Page 44

1 involved investigating, do you recall other instances
2 where the heat was as high as 81 or is that --
3 that --
4       MS. SCHRINER:  Form.
5       THE WITNESS:  I'm sorry.
6       MS. SCHRINER:  I was just making an
7 objection for the record. You can go ahead.
8       THE WITNESS:  Okay.
9       Yes. I have seen it, you know, in cases
10 where kids are left in cars and things like that,
11 yeah. I've seen it. But, I mean, as far as room
12 temperature, I would have to think about that a
13 while, you know. If it -- it would -- you know, I
14 can't say for sure either way.
15 BY MS. COHEN:
16    Q.  It's obviously something important to note
17 when you have a temperature of 81. Correct?
18       MS. SCHRINER:  Form.
19       THE WITNESS:  You know, I don't know
20 that -- 81 wouldn't be a temperature that I would
21 consider unreasonable. But, you know, I mean -- in
22 other words, like I would -- say if the temperature
23 would have been something that I would have felt was
24 unreasonable, instead of putting sudden unexpected on
25 there on the front there where you made that notation

Page 45

1 where I put that there, it would have been suspicious
2 unusual, possible heat related. That's the way I
3 would have documented it if I felt like wow, this is
4 something we need to look at as a possibility.
5 BY MS. COHEN:
6    Q.  And ultimately whether the heat played a
7 role in the death here, you will defer that to other
8 people like physicians.
9    A.  Yeah. I would just have made -- it was my
10 observation that I felt like it was an unreasonable
11 room temperature. Or not -- not say temperature.
12 Let me rephrase that. It would have been an un- -- I
13 would have put it as an unsafe room temperature.
14    Q.  If you -- if you thought it was, you know,
15 a hundred degrees or something higher is what you are
16 saying, you might have noted --
17    A.  Yeah. If it was beyond -- I would say if
18 it was beyond 95 degrees, I would say, then I would
19 have marked it as -- differently.
20    Q.  What you are saying is that if you think
21 that some factor that is creating an unsafe
22 environment, that is something you would make note of
23 in your report?
24       MS. SCHRINER:  Form.
25       THE WITNESS:  Sure.

12 (Pages 42 - 45)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 46

BY MS. COHEN:

2    Q.    Okay.  And you do do that when you do
3 investigations.  If you think that something is
4 dangerous or unreasonable you note it down.  Right?
5    A.    Of course.
6    Q.    Okay.  Now, safe to say here, looking at
7 this and we will go through it, you didn't note
8 anything you thought was dangerous or unreasonable.
9        MS. SCHRINER:  Form.
10       THE WITNESS:  No.  I didn't -- I didn't see
11 anything that pointed to something, you know, that
12 might not be natural.  You know, I mean, it -- beyond
13 sudden unexpected.  That's what I -- we were looking
14 at the death as, something that was not expected and
15 the determinations would be made by the doctor.  But
16 I would just point out to the doctor if I felt like
17 there was anything I thought might have contributed
18 to the death and I would have let the doctor know.
19 And then he would decide whether it was relevant or
20 not.
21 BY MS. COHEN:
22    Q.    You would make note of that somewhere on
23 this form and then in your investigative report as
24 well?
25    A.    That's right.

Page 47

1    Q.    All right.  So it goes on to say rigor and
2 livor consistent and you have no.  Can you tell us
3 what that means when you check that.
4    A.    Let me see here.
5    Q.    I skipped a part.  It says, "rigor fixed
6 and livor fixed."
7    A.    Okay.
8    Q.    What did you mean by that?
9    A.    I've got to look at it here.  Let me see
10 here.
11        I don't see where you are saying no, where
12 I checked no.
13    Q.    Okay.  So on page -- you are on 18, right,
14 with me?
15    A.    Oh, yeah.  Okay.
16    Q.    On the right.
17    A.    Let me see here.  Okay.  Right.  Where I
18 put no is where you are talking about, present in the
19 jaw?
20    Q.    Yeah.  Let me take one question back.  The
21 first was rigor fixed.  What does that mean?
22 Let's start with that.
23    A.    All right.  That just means that, you know,
24 the stiffening of the body is present.  In other
25 words, it's fixed.  It's in the -- in the joints of

Page 48

1 the body.  So -- you know, and that's something that
2 happens postmortemly, so yeah, it's present.  I'm
3 saying it's there.  When I try to manipulate the
4 joints, that I -- they are stiff.
5    Q.    I know there are people, experts in
6 different fields who get involved in timing of -- the
7 timing of death and they look at things like rigor.
8 Is again that something that you are -- that you have
9 an opinion on or are you just noting this
10 observation?
11    A.    Well, I'm just noting the observation.
12    Q.    Yeah.  Do you ever note if you think, you
13 know, the body has been -- that the person has been
14 dead for a long time, do you ever put anything down
15 about timing or duration of death or do you leave
16 that to other people?
17        MS. SCHRINER:  Form.
18        THE WITNESS:  Then I would just -- that
19 stops -- everything is subject to environment, so as
20 far as when things are present and when things are
21 not present, can have a lot to do with environment.
22 So I would just simply say if it -- if I felt like it
23 was before rigor mortis had a chance to set in, like
24 say if the death was minutes ago or within, you know,
25 a certain amount of time, I would say rigor mortis

Page 49

1 was absent.
2        If it was to the point -- because
3 eventually when the body starts to break down, those
4 things passed.  Rigor mortis would be then what you
5 would -- the way I would say it is rigor mortis had
6 lysed.  In other words, they had gone through rigor
7 mortis.  They were past that point.  And that would
8 be, you know, and something that was obvious where
9 you would have like a decomposed body, you know,
10 that's been dead for days, you know, then you would
11 say rigor mortis has lysed.
12 BY MS. COHEN:
13    Q.    So based on --
14    A.    Passed.
15    Q.    Finish.  Go ahead.  We will finish going
16 through this.
17        Then you also said "present in jaw no."
18 What was -- what is the significance of that?
19    A.    Well, because that's where rigor mortis is
20 known to set up initially.  Now, like I say, I'm just
21 making an observation that it's not there.  So it
22 could mean, you know, that it's past that point
23 because when it -- when rigor mortis -- when they
24 start coming out of rigor mortis, it also starts in
25 the jaw.

13 (Pages 46 - 49)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 50

1    In other words, it sets up in the jaw first
2 and then it lyses in the jaw first.  It passes there
3 first.  So that's the first place you look when you
4 check rigor mortis, is you check the jaw first.  And
5 then can give you an idea.
6    Now I'm -- note when you have a case like
7 this, it's better -- you know, I mean, I wouldn't be
8 giving a -- an opinion to which it is.  The doctor --
9 I'm just telling the doctor it isn't there and it's
10 up to him to figure out whether its lysed or not.  I
11 would always say lysed in a case where it was
12 obvious.  You know, like it would be a decomposed
13 body.  So I'm just telling the doctor basically
14 there's no rigor mortis in the jaw but it is present
15 in the extremities.
16    Q.  Does that tell you anything, that finding
17 you just described as not present in the jaw and it's
18 present in the body and it's in the extremities, does
19 that tell you anything as an investigator in terms of
20 the timing of death or how many hours prior to this
21 investigation it occurred?
22    MS. SCHRINER:  Foundation.  Form.
23    THE WITNESS:  I -- like I say, I can't
24 really say for sure.  All I can tell you is, I mean,
25 I'm not -- I wouldn't be called as an expert to

Page 51

1 say --
2 BY MS. COHEN:
3    Q.  Right.
4    A.  -- you know, rigor mortis -- you know, the
5 timing of the rigor mortis says whatever.  I don't
6 think.  You know what I mean?  I know what I know
7 about it, but, I mean, I'm just telling the doctor
8 it's not there and that it is in the extremities.
9 And it's up to him --
10    Q.  I understand that -- I'm sorry, go ahead.
11 Asking him to make --
12    A.  Figure out what stage that is based on his
13 findings, or, you know, his expertise.
14    Q.  As an investigator, knowing you are not a
15 doctor, but as an investigator, do you have sort of
16 standard timeframes that you use or that you are
17 aware of from your own training that look at a point
18 where there's no rigor present in the jaw yet, there
19 is rigor in the extremities, that means that the
20 death must have happened, you know, X hours before
21 that?  Is there any kind of standard you use as an
22 investigator?
23    MS. SCHRINER:  Form.  Foundation.
24    THE WITNESS:  You can't really do that
25 because, like I said, everything is based on

Page 52

1 environment and they are only guesstimations, even,
2 you know, by the experts.  It's a -- you know, I
3 mean, they have places that study that, you know,
4 body farms and all that where they look at these kind
5 of things, but, you know, based on my experience,
6 everything is subject to change and based on
7 environment.  That's as far as I can go.
8 BY MS. COHEN:
9    Q.  So you also state, just to kind of move
10 through it, "rigor/livor consistent," you say "no."
11 And I guess you are meaning when you looked at the
12 body, and we have photos showing this, it wasn't sort
13 of consistent throughout the body.  Is that -- or you
14 can explain it how you see it.  What do you mean by
15 that, that is, "rigor/livor consistent, no"?  What
16 does that mean?
17    A.  Well, it would -- it would -- it could
18 mean, you know, that the body had been moved, you
19 know, from its original place of death, which we know
20 that happened because it can change.  In other words,
21 if you have a person who is found dead, face down, in
22 other words, in a prone position, and you have livor
23 mortis that is unfixed, in other words, it's not
24 completely set, and then you roll that person into a
25 supine position, then all the blood can fall to the

Page 53

1 other side and it would set up on the other side
2 versus where it was initially found.  And that
3 happens a lot.
4    Q.  When the body is moved.  That can happen
5 when the body is moved, you are saying?
6    A.  That's right.
7    Q.  And then looking at the -- looking at the
8 livor and rigor, is not going to give you the
9 accurate picture of how the body looked at the time
10 of death then.  Is that what you are saying?
11    A.  Well, I'm saying it can change from the
12 original livor -- the livor patterns can change if
13 the body is moved before the -- before livor mortis
14 is set.  In other words, if it's not set or fixed
15 completely, then, you know, it could change
16 significantly.  A lot of times bodies that are found
17 in a prone position, when you put them into a supine
18 position and admit them here to the office, when they
19 bring them out for autopsy, you will see that
20 everything is on the other side now.
21    Q.  If a body is -- if a person or a baby or a
22 person dies and is lying on one side or lying on
23 their face, would you expect to see markings in terms
24 of rigor and livor on that side of the face?
25    A.  Yes.  Well, to the side of the face, it's

14 (Pages 50 - 53)

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

Page 54

1 not dependent. Like if you have seen -- if a
2 person's face, say, is lying against a -- you know,
3 any kind of object, you will have a void where the
4 pressure was and then the livor mortis will be around
5 that spot everywhere that -- you know, it is
6 independent as far as, you know, on the ground or
7 whatever surface it was against.
8    Q.  I guess what you are saying is somebody
9 is -- dies, unfortunately, and is leaning on the side
10 of the face, the side of the head, you would expect
11 to see some telltale markings of that.  Is that true?
12        MS. SCHRINER:  Form.
13        THE WITNESS:  It would be a void.
14 BY MS. COHEN:
15    Q.  That is a white spot that where the leaning
16 was?
17    A.  Right.
18    Q.  Then you see the rigor or the color
19 markings around that void.  Is that what you are
20 saying?
21    A.  That's right.
22    Q.  It says under here "rigor/livor is
23 consistent, if no, explain below."  Then you list
24 the -- kind of the -- I guess the items of clothing
25 there.  Do you describe anywhere the rigor/livor or

Page 55

1 is that just in the photographs?
2    A.  In the report down below under "body
3 description," everything -- I -- what page were we
4 on?  I'm sorry.  I should --
5    Q.  We were on 18 and we are going to move to
6 19 soon, but we are on 18.
7    A.  Good job.  All right.  18.
8    Q.  It says "rigor/livor consistent," it says
9 "no."  See that part where you checked no?
10    A.  Yeah.  Yeah.
11    Q.  Then it says "if no, explain below," and
12 then you seem to be shifting to listing the items of
13 clothing.  Right?
14    A.  Okay.  Yeah.  Well, yeah.  Yeah.  That's --
15 that's correct.  I didn't -- I didn't do that
16 correctly, I guess.  I also -- but in -- this report
17 here, this document itself, was something that was --
18 at this time when we were doing things the way we
19 were doing them back then, it was saved in a folder
20 where we had information stored.  Not necessarily in
21 our database.  The other report beyond that is the
22 one that's in the actual database on page 19.  So on
23 that report would have been my -- this would have
24 been my final, you know, preliminary summary.
25    Q.  And the body -- we will get to it.  On page

Page 56

1 20 is where you give the body description you are
2 mentioning in your final report.  Right?
3    A.  It looks like it was on page 20, yes.  Page
4 20.  That's right.
5    Q.  Let's just go back to 18 and finish up 18
6 before we get to your official report -- your final
7 report.  I just want to make sure I cover this part.
8        So does the part that says "medical
9 history," do you see that line on the left side
10 there?
11    A.  Yes.
12    Q.  The part of the form, medical history?  And
13 then there's a paragraph there.  Is that basically
14 your taking down what the mom told you as what she
15 thought was significant?
16    A.  Yes.
17    Q.  It talks about 42-week gestation.  It goes
18 on to say:
19        "Subject was treated for a cough and
20    wheezing at Banner Thunderbird Medical
21    Center in March 2014 and current on all
22    vaccinations."
23        That came from the mother?
24    A.  That's right.
25    Q.  Do you know if the dad was listening while

Page 57

1 you were getting that report?  Was he there?
2    A.  I can't recall.
3    Q.  So then at the bottom part, the
4 circumstances part, it looks like -- again, this is
5 part of your preliminary description and then it
6 carries over to the investigative summary, so a
7 little bit repetitive between the pages, right, 18
8 and 19?
9    A.  Okay.  Okay.  Yeah.  18, 19, yeah.  This is
10 actually -- 19 is where -- the information that was
11 stored in the database that we had then, this is
12 where I would have filled it out.
13    Q.  Okay.
14    A.  Yeah.  I would have put everything in here.
15    Q.  I will ask you a few more questions on 18
16 and then we will get into your final report.
17        This box on circumstances, again, this is
18 coming from I guess sources, as you say here, from
19 Detective Reyes from the Tempe police, Mr. Olson, the
20 father, and the mom, Ms. Lawton.  Right?
21    A.  Right.  Basically what I -- what I did was
22 I took everything from page 19 and 20 and I cut and
23 pasted it onto -- onto page 18.
24    Q.  Okay.  Just a couple questions on this and
25 we will go to 19.  So it looks like it says:

Veritext Legal Solutions
800.808.4958                                      770.343.9696

Farrel Swope
In Re: Fisher-Price/Mattel

Page 58

1          "Andrew Olson, father, and the
2     subject's mother live in separate
3     residences but share responsibility in
4     taking care of their daughter."
5          That was something you learned from the
6  family that night, or that morning. Right?
7     A.  Yes.
8     Q.  It looks like it was 1:40 a.m. in the
9  morning when the dad, Mr. Olson, put his daughter in
10  the bassinet by his -- by the bed?
11     A.  Yes. That's what it says in there. That's
12  what he told me, yeah.
13     Q.  And it says that he told you that he used
14  the bassinet seat belt to secure his daughter.
15  Right?
16     A.  That's right.
17     Q.  And then it says that the mom, Kathleen, is
18  the one who found her daughter the next morning in a
19  semi-prone, semi-left lateral position with the seat
20  belt undone. Do you see that?
21     A.  Yes.
22     Q.  Did you have -- do you recall any
23  explanation as to how that could have or did happen
24  from the family or was that something reported to
25  you?

Page 59

1     MS. SCHRINER:  Form.
2     THE WITNESS:  They told me.
3  BY MS. COHEN:
4     Q.  Okay. Did you see any markings on the
5  baby's face, either the white sort of absence or the
6  rigor or livor to indicate that the baby was found
7  with her face leaning into the bassinet on the side?
8     MS. SCHRINER:  Form.
9     THE WITNESS:  Whatever I've got documented
10  here is what I saw, you know, in -- you know, as far
11  as the body examination itself. I do recall a small
12  bruise on the forehead. I remember that.
13  BY MS. COHEN:
14     Q.  Okay. What was the word you used when the
15  face was pressed into some object, when the person
16  died? Void. Okay. Did you see any --
17     A.  Right.
18     Q.  Did you mention the word void anywhere
19  related to the baby's face?
20     A.  No, I did not.
21     Q.  Is that something that you would -- you
22  would note when you are giving your description if
23  you noticed it?
24     A.  Not -- not always. I would say most of the
25  time, no, I would not. I would just either say that

Page 60

1  the patterns appeared consistent or they did not
2  appear consistent with the position.
3     Q.  With --
4     A.  Right.
5     Q.  Did you make note of that anywhere here?
6     A.  Let me see. No, I did not in the -- in my
7  body description, I didn't on this one.
8     Q.  You didn't say consistent or inconsistent
9  with how the body was found. Correct?
10     A.  Not in that bottom report. But on that --
11  over here, I put not consistent and I -- you know, I
12  don't recall exactly -- recall --
13     Q.  What page is that, sir?
14     A.  Excuse me?
15     Q.  Where did you put not consistent?
16     A.  Well, when I checked --
17     Q.  Oh, I see.
18     A.  -- "no." Again -- that's only present in
19  the jaw. That's all I -- I did not put it anywhere,
20  I guess, on here, no, whether it was consistent or
21  not. We knew -- you know, based on the information
22  that I already documented, as far as how the baby was
23  found and, you know, they had placed it in a supine
24  position, I already documented it earlier in the
25  report that it was found in semi-left lateral,

Page 61

1  semi-prone position, I think I wrote.
2          And so, you know, it's already there for
3  the doctor to see that, you know, what -- what they
4  were seeing in the photos and that's what I'm trying
5  to let them know, is that, you know, it was
6  inconsistent with the way when we got there. In
7  other words, the body had been moved into another
8  position.
9     Q.  Okay. I think I understand this that
10  basically if you look back at 18, when you describe
11  found the subject in a semi-prone, semi-left lateral
12  position, and then you check no up above, you are
13  saying that the rigor/livor was not consistent.
14     A.  No. I've got -- no. Where I've got "no"
15  checked is under the -- okay. All right. Yeah. You
16  are right. Okay. Yeah. That's what I mean.
17          In other words, I mean, you know, that the
18  body was found in a different position even -- in the
19  amount of time that, you know, had passed, from the
20  time that we were notified of the death and from when
21  the baby was found, things could have changed because
22  they moved the baby, in other words. So it's not
23  what you would -- probably expected to see. It could
24  have been a little different, and that's what I'm
25  letting him know.

16 (Pages 58 - 61)

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

Page 62

1    Q.  Okay.  In other words, I think what I
2  understand you saying is when you say rigor/livor
3  consistent, no, you are saying the rigor/livor was
4  inconsistent with the description of the body being
5  in a semi-prone, semi-left lateral position?
6    A.  That's right.
7       MS. SCHRINER:  Form.
8  BY MS. COHEN:
9    Q.  We will look at the photos in a little bit.
10  Let me just -- let's turn to page 19, which is the --
11  your investigative report and go through that.
12  Obviously it has scene investigators, your name.
13  That means you are the lead investigator and this
14  report is written by you.  Correct?
15    A.  Yes.
16    Q.  Under the antemortem events part down
17  there -- let's see.
18    A.  Okay.
19    Q.  It talks about -- second paragraph -- some
20  of this we covered already.  Sort of repeating, but
21  the talks about last visit two months ago and then it
22  says she developed a cough and wheezing and was
23  treated at Banner Thunderbird.  This is similar to
24  what you wrote before.  Correct?
25    A.  Yeah.  I cut and pasted it.

Page 63

1    Q.  Okay.  Then it describes kind of the
2  events, the sequence of events that it says the
3  parents were living in separate residences but shared
4  responsibility of the baby.  Correct?
5    A.  That's right.
6    Q.  And then it says then:
7       "Mr. Olson drove to Kathleen's
8  residence, took her to work at Applebee's
9  restaurant and then both said -- both he
10  and his daughter then returned to
11  Kathleen's residence with the address at
12  Olive Avenue until she got off work."
13       Correct?
14    A.  That's what I was told, yes.
15    Q.  And then:
16       "Mr. Olson picked Kathleen up and
17  the couple drove to the residence."
18       Does it say whether the baby was with the
19  dad when he went to pick up his wife at the end of
20  the work shift?
21       MS. SCHRINER:  Form.
22       THE WITNESS:  It does not say.
23  BY MS. COHEN:
24    Q.  Do you know one way or another, was the
25  baby at home or was in the car?

Page 64

1    A.  I don't know.
2       MS. SCHRINER:  Form.  Foundation.
3       THE WITNESS:  Well, hold on a minute.
4  BY MS. COHEN:
5    Q.  Yes.
6    A.  Yeah, I didn't document whether the baby
7  was with them at the time when they were at
8  Applebee's.
9    Q.  And that may be in other reports anyway.  I
10  am trying to get what you put down here.
11       So then it says at 1:40 a.m. in the morning
12  is when the dad put the baby in the bassinet by their
13  bed.  Correct?
14    A.  That's -- that's correct.
15    Q.  It looks like the next morning after you
16  were called and you and Investigator Newman arrived,
17  Mr. Olson, at least when the police arrived, rather,
18  Mr. Olson was holding the baby in his arms that
19  morning when they showed up?
20       MS. SCHRINER:  Foundation.
21       THE WITNESS:  That's what I was told.
22  BY MS. COHEN:
23    Q.  In terms of this antemortem events
24  paragraph, is that information from the police,
25  Detective Reyes, the mom and the dad all combined?

Page 65

1    A.  No.  This -- this information came from the
2  mom.  I've got -- let's see here.  Okay.  Yeah.  At
3  the bottom where it changes sources, you will see
4  where it says Kathleen called 911 and according to
5  Detective Reyes, he was standing outside with the
6  baby in his arms.  So there's two sources there.
7    Q.  You know, one thing I forgot to ask earlier
8  but I want to ask of you now, would you agree that
9  this, the documents we have gone through with you,
10  your preliminary investigative report and this
11  investigative summary, these are ones that you made
12  in the ordinary course of your job?
13    A.  Yes.
14    Q.  These were standard approach to how you
15  made these?
16    A.  Yes.
17    Q.  And you followed your normal practice and
18  procedure in putting these together?
19    A.  Yes.
20    Q.  These are authentic in terms of you having
21  authored and written them?
22    A.  Yes.
23    Q.  And is it fair to say that you as an
24  investigator making these notes and report, that you
25  try to include what you think is pertinent or

17 (Pages 62 - 65)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 66

1 relevant?  In other words, you don't take every word
2 down but you try to highlight the things you think
3 are significant?  Is that fair?
4     A.  Yes.
5     Q.  And the investigative summary paragraph,
6 let's go to that part.  It refers to O'Brien and
7 Reyes there.  They were both part of this
8 investigation.  Right?
9     A.  Okay.  Yes.  That's actually part of my
10 scene description, if you are talking about the
11 beginning of page 20.
12     Q.  Yes.  Yes, sir.
13     A.  Yeah.  It starts on 19 and then it goes to
14 20.
15     Q.  Got it.  Okay.  You are right.  So it
16 describes that the residence is a one-bedroom guest
17 quarters for the main residence, and that the baby
18 was found wrapped in a blanket in the supine position
19 in a bassinet beside the bed.
20     MS. SCHRINER:  Form.
21     THE WITNESS:  That's correct.
22 BY MS. COHEN:
23     Q.  The diaper bag with the baby bottle,
24 formula and diapers found in the living room was
25 logged into evidence by the Tempe Police Department.

Page 67

1     A.  That's correct.
2     Q.  There was a car seat found on the floor in
3 front of the bassinet which contained a pacifier.
4        Now was that -- looks like you talk about
5 there were two different bassinets.  Was that the one
6 in the bedroom or the main room?  Let me try that
7 again.
8        It describes one bassinet in the bedroom
9 and one in the kitchen area.
10     A.  Right.
11     Q.  It says:
12        "A second pacifier was found in the
13     nightstand and was reportedly found in
14     the bottom of the bassinet where the baby
15     was found."
16        Do you know who reported that to you?
17     A.  I believe -- I can't recall.  I believe it
18 was the Detectives O'Brien and Reyes, but I can't say
19 for sure.
20     Q.  Is it clear in your mind based on your
21 writings in your report that the baby was found dead
22 in the bassinet that was in the bedroom versus the
23 kitchen?
24     A.  Yes.
25     Q.  Then it goes on to say again:

Page 68

1        "A second bassinet found in the
2     kitchen area.  Multiple empty bottles of
3     alcohol found in the residence along with
4     marijuana and marijuana paraphernalia."
5        That's something you thought was relevant
6 to note.  Correct?
7     A.  Yes.
8     Q.  It says:
9        "The subject's father Andrew Olson
10     does have a medical marijuana card."
11        It talks about the temperature being
12 81 degrees and it talks about Mr. Olson's brother
13 living there.  Do you see that?
14     MS. SCHRINER:  Form.
15     THE WITNESS:  Yes.
16 BY MS. COHEN:
17     Q.  It says that:
18        "The electricity went out during the
19     night for a short period of time."
20        Do you recall any details about that?
21     A.  I do not.  I -- I did not remember that.
22     Q.  Let's look at the body description now
23 because we alluded to that before.  It says:
24        "The body is that of an
25     eight-month-old Caucasian female which

Page 69

1 appears well-nourished and has a body of
2 approximately 16 inches and a wait of
3 approximately 16 pounds."
4        That's what you described.  Right?
5     A.  Um-hmm.
6     Q.  You probably meant weight, W-E-I-G-H-T.
7     A.  Yeah.
8     Q.  Okay.
9     A.  Like I said, it's voice recognition, so --
10     Q.  Right.  "Hair" is blonde and eyes are
11 blue."  That's pretty clear.
12        "The head, neck and torso appear
13     normally formed with a small transverse
14     bruise on the forehead above the left
15     eye."
16        Did you ever get any intelligence or
17 information about why that was there or what
18 happened?
19        Did you find out any more about that, sir?
20 No?  You have to say no for the court reporter.
21     A.  No.
22     Q.  Okay.  It says here now, "rigor mortis is
23 absent in the jaw" -- the prior page -- "and fixed in
24 the extremities."  What you said before.
25     A.  Right.

18 (Pages 66 - 69)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 70

1    Q.   And the livor mortis -- what is that --
2  tell me the difference between livor mortis and rigor
3  mortis.
4    A.   The rigor mortis has to do with the
5  stiffening of the body and livor mortis has to do
6  with pooling of the blood.  After, you know, the
7  heart stops beating, the blood will settle to the
8  lowest portion.
9    Q.   Okay.  It says:
10        "Livor mortis is fixed to the
11     anterior lower extremities and to the
12     posterior.  The body is supine, cold to
13     the touch and clothed in a blue shirt,
14     red shorts, diapers and two yellow metal
15     earrings."
16        That was all your description as well, sir?
17    A.   Yes.
18    Q.   Now, again, in this paragraph of the body
19  description, you do address your examination of the
20  face where you noted the small transverse bruise.
21  Correct?
22    A.   Yes.
23    Q.   You don't note anywhere that -- any kind of
24  void noted.  Correct?
25    A.   Correct.

Page 71

1    Q.   And you don't notice -- make note of any
2  specific livor mortis anywhere in the face around the
3  void area or anything like that around a void area.
4  Correct?
5    A.   Correct.
6    Q.   Then we will get into the doll reenactment
7  part next.  Let me just move on to that.
8        Do you know -- do you know who was present
9  for the doll reenactment part?
10    A.   It would have been myself, the two
11  detectives and Investigator Newman.
12    Q.   And you have the -- I'm not going to ask
13  you about the police photos because I will let them
14  testify about those separately.
15        But the photographs that we talked about
16  before, which are Exhibit 2, do you have those out?
17  I think there is a section of these that relate to
18  the reenactment, and you will correct me if I get
19  this wrong, probably starting -- again, these have
20  numbers at the bottom as well -- starting at 169, is
21  that about where the reenactment photos start?
22    A.   I've got it on -- let me see here.  Yeah.
23  It looks like that's where it starts.
24    Q.   Okay.  Now, before we get to the
25  reenactment, and we can flip through the different

Page 72

1  photos that are in Exhibit 2 -- I'm sorry?
2    A.   I want to back up a little bit here --
3    Q.   Sure.
4    A.   -- as far as the reenactment.  The parents
5  would have been present also.
6    Q.   Okay.  Yes.  Good point.  Obviously they
7  need to be.
8        So the picture of the -- let's take a look
9  at this.  Can we pull those up, page 141 of
10  Exhibit -- we are going to pull this picture up for a
11  minute, a picture of what it looks like.  One second.
12        I'm sorry, Mr. Videographer.  I thought we
13  were able to do that from our end.
14        Are you able to pull up on Exhibit -- that
15  same exhibit, Bates number 141 is what I was going
16  for.  So Exhibit -- can you do it?
17        MS. NG:  I can do it.
18        MS. COHEN:  We are going to do that on our
19  end, Mr. Videographer.  If you just give us a second
20  here.
21        THE WITNESS:  Is it all right if I take a
22  break for a minute?
23        MS. COHEN:  Absolutely.
24        THE WITNESS:  Can I take a five-minute
25  break?

Page 73

1        MS. COHEN:  Good idea.  Thank you.
2        THE VIDEOGRAPHER:  We are off the record at
3  2:34 p.m. [sic].
4        (Recess taken 1:34 p.m. to
5        1:41 p.m.)
6        THE VIDEOGRAPHER:  We are back on the
7  record at 1:41 p.m.
8  BY MS. COHEN:
9    Q.   Thank you very much.
10        Mr. Swope, just a few questions on what we
11  have pulled up here, which is Exhibit 2, page 141, as
12  you see on the bottom.  It is a picture of, from our
13  understanding, the bassinet where the baby was found
14  in the morning by her mom deceased.  Is that your
15  understanding, is that pink one that's there is the
16  one where she was found?
17    A.   Yes.
18    Q.   And then let's flip to -- I think we are
19  going to get into the reenactment description and
20  your notes.  169 is the photo of those just to show
21  you.  It looks like -- is this where the beginning
22  photos, 169, start of the reenactment using a
23  different bassinet from where she was found?
24    A.   Yes.
25    Q.   And is this the one that was found in the

19 (Pages 70 - 73)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 74

1 kitchen, you know, the one that was in the kitchen as
2 opposed to the bedroom?
3    A.  Yes.
4    Q.  Okay.  I think we are good on that.
5       Let's pull up -- let's go back to
6 Exhibit 1.  Let's see.  Let's pull this up real quick
7 to show this.  So Exhibit 1, page 20, just one second
8 and you can the page we are looking at.
9       So basically this is -- the page we are
10 looking at it has the description, the scene
11 description, the body description and then the doll
12 reenactment is a specific portion of your
13 investigative report.  Is that correct, sir?
14    A.  Yes.
15    Q.  This is where you put down your
16 observations of what happened in the reenactment part
17 of your investigation.  Is that correct?
18    A.  Yes.
19    Q.  Okay.  So let's go back to seeing your face
20 on here.  We have to look at your face.  There we
21 are.
22       Just continuing on here, it says:
23       "At the request of the Detectives
24    O'Brien and Reyes, a substitute bassinet
25    was used in the doll reenactment to avoid

Page 75

1 evidence contamination," which is what
2 you said before.
3       Correct?
4    A.  That's right.
5    Q.  The subject doll -- now, the doll again was
6 what you had in your van with you?
7    A.  Yes.
8    Q.  And I have never seen one of these medical
9 examiner investigative vans.  Do they have dolls of
10 all different sizes and types, gender and such or --
11 I mean, can you give us a sense of how many dolls you
12 carry around with you?
13    A.  We carry more than one doll.  Most of --
14 they are all the same size.  But we will carry more
15 than one doll in case there's more than one child
16 involved.  Sometimes you have co-sleep situations
17 where you might have more than one kid in the bed.
18    Q.  This doll that we are looking -- that we
19 can see on page 169, the photos in front of you, is
20 this a standard crime scene or investigative scene
21 reenactment doll?
22    A.  It is.
23    Q.  You still use that same one today?
24    A.  Yes.
25    Q.  And same -- going through your notes, it

Page 76

1 says:
2       "The subject doll was placed by
3    Mr. Olson in a supine position in the
4    bassinet and photographs were taken."
5       Did he do the placing or did someone do it
6 for him?
7    A.  He did.
8    Q.  And would those be -- obviously in your
9 photos you have three photos, 169, 170 and 171, that
10 say "placed" on it and those are the photographs
11 where Mr. Olson placed the baby -- the doll, rather.
12 Is that right?
13    A.  That's right.
14    Q.  And then the same with I guess 173 also?
15    A.  Yes.  Yes.
16    Q.  Then you have a series of photos coming up
17 of where it says "found" on it.  Is this where you
18 had the baby's mother go through and place the baby
19 as she recalled finding her?
20    A.  That's right.
21    Q.  It says:
22       "The mother then placed the subject
23    doll in a semi-left lateral, semi-prone
24    position as she stated she found the
25    subject."

Page 77

1    A.  That's right.
2    Q.  And that's what is reflected in 147 -- I'm
3 sorry, 174 and 175 and 176, those photographs?
4    A.  That's right.
5    Q.  177, 178 as well as 179?
6    A.  Yes.
7    Q.  180?  181?
8    A.  Yes.
9    Q.  Did you see in your examination of the
10 body, did you see any sign or evidence that the baby
11 had been on -- in this semi-lateral -- semi-left
12 lateral, semi-prone position?
13       MS. SCHRINER:  Form.
14       THE WITNESS:  I mean, no.  I mean, I can't
15 say that for sure.  Like I say, livor mortis patterns
16 can change once a person has been moved, so that's
17 why, you know, I mean, I documented that the body had
18 been moved and placed in a different position prior
19 to my arrival.
20 BY MS. COHEN:
21    Q.  But specifically just again in terms of the
22 question, you didn't see anything specifically that
23 was consistent with or supported the baby being in
24 the semi-left lateral, semi-prone position.  Is that
25 true?

20 (Pages 74 - 77)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 78

1    A.   Other than the mother's statement that
2 that -- you know, that's what I was told.
3    Q.   But in terms of your examination and
4 observations of the body, you didn't see anything
5 that was consistent with that specifically.  Is that
6 right?
7    A.   I didn't document anything that may --
8 yeah.  That said that, no.
9    Q.   Okay.  And sitting here today, you don't
10 have any specific recollection of anything.  Correct?
11    A.   Let me -- hold on a minute.  I want to -- I
12 want to go back.  Hold on.
13         Actually, yeah.  There -- there is stuff
14 here that suggests that is the case.  If you look at
15 the livor mortis patterns on page 146, 147, that
16 seems to indicate that, you know, the baby was in a
17 prone position for some time.
18         So just -- if you look at the legs on page
19 146, 147, that says to me, if I look at that -- and
20 like I say, this is six years ago, so --
21    Q.   Right.
22    A.   -- I mean, I have done a lot of cases since
23 then.  But if I look at that I say to myself, yes,
24 you know, this -- this kid was in that position, was
25 in a at least partially prone position for some

Page 79

1 period of time.
2    Q.   What does it tell you about her clothing,
3 if anything, that is -- you know, does that tell you
4 anything about the restrictiveness of the clothing or
5 anything like that?
6         MS. SCHRINER:  Form.
7         THE WITNESS:  No.
8 BY MS. COHEN:
9    Q.   We will go through the photos in a little
10 bit.  Let me finish the reenactment part on page 20
11 of Exhibit 1.  It says "subject's mouth" -- let's
12 see -- says:
13         "She stated that subject's mouth was
14         not obstructed by the cushion of the
15         bassinet."
16         That's something she told you, the mom?
17    A.   That's correct.
18    Q.   And then it says:
19         "Mr. Olson stated he believed his
20         daughter unfastened the seat belt
21         sometime through the night."
22         Do you recall him saying that?
23    A.   Yeah.  I recall him saying that he used the
24 seatbelt and that, you know, when the baby was found,
25 the seat belt wasn't on.  So -- and I remember there

Page 80

1 being some discrepancy between what he said and what
2 she said.  She thought that it hadn't been used.  He
3 seemed to think that he did use it.
4    Q.   That's what I am going to ask you about.
5 The next sentence in your report I'm going to read
6 after it says:
7         "Kathleen seemed to be under the
8         impression the seat belt was not used
9         when the baby was placed at 140 hours."
10         That's what you wrote down.  Correct?
11    A.   That's right.
12    Q.   That was a discrepancy between the mother
13 and father that you just mentioned?
14    A.   Yeah.  They had, you know, different
15 memories of what occurred.
16    Q.   And her memory as she reported to you was
17 that he did not use the restraint or the belt.
18 Correct?
19         MS. SCHRINER:  Form.
20         THE WITNESS:  That was her recollection of
21 it.
22 BY MS. COHEN:
23    Q.   Were they fighting at the time?
24         MS. SCHRINER:  Form.
25         THE WITNESS:  Not -- I didn't see any of

Page 81

1 that going on.
2 BY MS. COHEN:
3    Q.   They were obviously both upset, I'm sure --
4    A.   Oh, yeah.
5    Q.   -- about their daughter.  Did they do any
6 kind of finger pointing or accusations?  I'm just
7 trying to understand about the note there.
8    A.   Didn't see anything like that.  Wasn't told
9 anything like that by the detectives either.
10    Q.   When the father, you know, in the photos,
11 in the reenactment photos that you just looked at, is
12 it -- let me see.  Let me get the pages here.  So
13 this will be pages 169 through 173, the set of photos
14 that had those cards that says "placed."  These are
15 the ones that the father used to show how he placed
16 the baby?
17    A.   Right.
18    Q.   And is it fair to say that he did not put
19 the belt or the restraint around the doll in those
20 photographs?
21    A.   He did not.
22    Q.   Do you know, how many times did he place
23 the doll?  Do you know that?
24    A.   Just once.
25    Q.   Just once.  Okay.  I assume when -- do you

21 (Pages 78 - 81)

Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

Page 82

1 give like a specific direction of speech, that speech
2 was -- you know, to the -- to anyone who is doing
3 reenactment about the importance of being accurate?
4     A.  I do.  I mean, I tell -- I give them the
5 doll.  That's why I -- even if say the placer and the
6 finder were the same person, after the placement, I
7 would pick the doll up and then hand it back to the
8 person, say, "Now, show me how you found the child."
9 I wouldn't move it into what they said the found
10 position was or leave it there.  I would have -- you
11 know, it would be like a fresh start.  Like, "Here is
12 the doll.  Now show me where -- how you found it."
13     Q.  What would you say -- what would you have
14 said to the dad about placing?  What would be -- what
15 you would say?  Show me how --
16     A.  How you placed the doll.  Now, I don't
17 recall anything other -- about the seat belt other
18 than, you know, he told me that he used it when he
19 placed the kid initially before mom found it.
20     Q.  But when you gave him a chance to reenact
21 it and said "place the doll," he did not buckle the
22 belt.  Correct?
23     A.  That's right.  And I don't tell them beyond
24 that because that's -- I'm not trying to coach them
25 into doing something that didn't happen.  So I said

Page 83

1 to him, "Place it how you placed it," and he didn't
2 use the belt.  So I didn't tell him you need to use
3 the belt, in other words.  You know what I mean?
4     Q.  Yes.  You wanted him to do it on his own
5 without you guiding him.
6     A.  That's exactly right.
7     Q.  That's an important thing to do as an
8 investigator.  Right?
9     A.  I feel it is.
10     Q.  You don't want to -- you don't want to, you
11 know, guide them or influence them to do something
12 that -- suggesting it.
13     A.  That's right.  I don't want to tell him,
14 "You forgot to use the belt."  I want him to show me
15 what he did.  He didn't use it, so --
16     Q.  And the mom didn't think he used it as she
17 told you.  Correct?
18         MS. SCHRINER:  Form.
19         THE WITNESS:  That's what she said, yeah.
20 BY MS. COHEN:
21     Q.  Okay.  Now, I think that it is on that
22 summary.  I wanted to flip through the rest of the ME
23 file and go through the pictures with you and tell
24 you what we are doing.
25         Let's see.  The next page where I think

Page 84

1 your name comes up is -- I think it's on page 63.  If
2 I have that right.  Yeah.  That page seems to have
3 your name at the top.  It's a laboratory progress
4 note.
5     A.  Yeah.
6     Q.  Maybe it's nothing more than a listing of
7 the investigator, but would you have had anything to
8 do with this form?
9     A.  No.
10     Q.  All right.  And then if you look at --
11 let's go down to 67, looks to be the same.  It's
12 another one that has your name on and your initials
13 on at the bottom.  Do you see that, sir?  Tell me
14 when you are there.
15     A.  Yeah.  I see.  That's not my -- well, my
16 initials are there.  That's where you are saying,
17 where it says "records requested from."  Now that's a
18 notation down there that I was not involved in.  I
19 don't know who did that.
20     Q.  Okay.  And then let's go to page 69.  I
21 don't think this has a name on it.  Is this something
22 that you -- that you wrote?
23     A.  Yeah.  This is -- this is my report again.
24 This is showing -- you know, this is the back part of
25 that -- I cut and pasted this from the other one.

Page 85

1     Q.  Okay.  So it's the same report.
2     A.  It is.  The reason we would do that -- the
3 reason we were doing that back then was this report
4 was forwarded to Donner network.  It was an easier
5 way.  We would just save it to a folder and then you
6 would forward it to Donner network and then the other
7 stuff is in the actual database.
8     Q.  Let me have you look at page 73 for a
9 minute.  And that -- do you know who wrote this --
10 whose writing that was?
11     A.  No.
12     Q.  What is this form?  It says "ADHS UNEX
13 preliminary autopsy findings."
14     A.  It looks like this was something --
15 clarify.  Yeah, I don't -- I can't really say for
16 sure what this is about.
17     Q.  It does say there in whoever's handwriting
18 it is in this file, "eight-month-infant girl crib
19 death, possibly SIDS."  Do you see that?
20     A.  I do.
21     Q.  And you don't know whose signature that is
22 there?
23     A.  I do not.
24     Q.  Then down under -- down at the bottom under
25 "infectious disease findings," it says, "Suspect

22 (Pages 82 - 85)

Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

Page 86

1 infectious disease process. Preliminary diagnosis
2 possible SIDS." Do you see that?
3      A.  I do.
4      Q.  And you don't know who wrote that.
5      A.  I do not.
6      Q.  I know your report on page 20 talks about
7 the multiple empty bottles of alcohol, the marijuana,
8 the marijuana paraphernalia. When you as an
9 investigator find illegal substances in the house and
10 alcohol, drugs, you know, legal or -- and/or illegal,
11 does that change anything you do in your
12 investigation?
13      A.  No.  No.  Not really.
14      Q.  Back in 2014, was marijuana illegal in
15 Maricopa County?
16      A.  It's still illegal.  I mean, you know, it's
17 not legal for recreational use.
18      Q.  Do you -- does finding marijuana or
19 marijuana paraphernalia in a house prompt any
20 additional toxicology testing or screens or is that
21 somebody else that makes the decision?
22      A.  The doctor orders whatever tox he feels is
23 necessary.
24      Q.  You don't weigh in on that and give them
25 guidance, like, "Hey, we found a lot of marijuana

Page 87

1 here.  You might want to add some testing"?
2      MS. SCHRINER:  Form.
3      THE WITNESS:  I would only list, like, say,
4 if it was a prescription issue.  I would list all
5 medications and everything I see that's found that
6 could be relevant.  Because to -- and that in a sense
7 would help him -- guide them in what kind of tests
8 are required because some labs aren't equipped to do
9 testing for certain things.  So they would have to
10 figure out whether it was necessary or not.  So it's
11 important to document anything a person might have
12 had access to medication-wise or otherwise.  It could
13 be a factor.
14 BY MS. COHEN:
15      Q.  Have you ever, you know, gone back to the
16 doctor or made any specific suggestion like, "Hey,
17 you better check -- you better add the following.  We
18 saw drug paraphernalia.  You better add, you know,
19 testing for TCH," or anything like that or is that
20 something you just leave to other -- the rest of the
21 team to deal with?
22      A.  It would be up to the doctor.  I would just
23 document everything I thought was relevant in my
24 report.
25      Q.  So let's take a quick look at the -- I'm

Page 88

1 going to move to Exhibit 2, which is the photographs,
2 and let's take a -- these are the ones again from
3 the -- from the medical examiner's office, not the
4 police ones, which are separate.
5      Did you have -- would you have seen
6 these -- once -- I know it was you and Investigator
7 Newman that either took these, you know, together or
8 separate or, you know, some combination.  Would you
9 have looked at the actual photographs themselves
10 after they were taken and printed back in 2014?
11      A.  Well, in -- when I'm writing my report, a
12 lot of times I will use the photos.  When I'm doing
13 my scene description, I would review the photos again
14 to make sure I've got everything in the report that I
15 feel is pertinent.
16      Q.  Let's flip through these and go through
17 some of this.
18      So 113, we will jump to that one.
19      A.  You mean 133?
20      Q.  1-1-3, 113.
21      A.  113.  Okay.  Okay.  These are not
22 photographs that we would have taken.  These are
23 autopsy photos.
24      Q.  Oh, okay.  I see.  So this is -- 113 would
25 not have been part of what you and Investigator

Page 89

1 Newman did.  Is this -- does this show to you though
2 the rigor and livor?
3      MS. SCHRINER:  Form and foundation.
4      THE WITNESS:  It shows it at the time of
5 the examination, just the rigor.  I mean, the livor
6 mortis.  Rigor mortis wouldn't necessarily.  It can
7 be, you know, something you can't see sometimes in
8 photographs that -- you know, at autopsy.  Depending
9 on what position the person was found in and how soon
10 the exam begins after that.
11      Our photos start after 119.  From 119 is
12 the scene photos.
13 BY MS. COHEN:
14      Q.  Right.  Thank you.  Okay.  So let's jump
15 there, to 121.  And I take it this is a picture of
16 sort of the living room area looking into the kitchen
17 area?
18      A.  It is.
19      Q.  And then 122 is showing the kitchen as you
20 found it?
21      A.  Correct.
22      Q.  This bassinet as it's described in your
23 report in the kitchen is the one that the reenactment
24 took place in?
25      A.  That's correct.

23 (Pages 86 - 89)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 90

1    Q.  123 appears to show the diaper bag that was
2  described?
3    A.  Correct.
4    Q.  124 is showing the area walking into the
5  bedroom and where the baby was found?
6    A.  That's correct.
7    Q.  Is that a car seat down at the bottom there
8  as well on the bottom left-hand side?
9    A.  Yes.
10   Q.  125 appears to show the bedroom again?
11   A.  That's correct.
12   Q.  126 shows the bedroom and then one of the
13 pacifiers up on the night table?
14   A.  Yes.
15   Q.  127, same, shows the bedroom and the
16 pacifier up on the night table?
17   A.  Correct.
18   Q.  128 shows the bedroom again.  And the
19 blanket, that's not -- on 130 -- let's see.  Look at
20 that one.  That again shows a white blanket that I
21 think was part of what was listed on the items that
22 went to the medical examiner?  That's the white
23 blanket there?
24   A.  That's my recollection, yeah.  That's it.
25   Q.  Page 134, do you know whether this is a

Page 91

1  photo of the kitchen or bedroom or do you have any
2  idea where that is?
3    A.  I believe it's in the bedroom.
4    Q.  This is the photo of various alcohol
5  bottles in the bedroom closet?
6    A.  Yes.
7    Q.  And then let's look at page 135.  It looks
8  like this is at least some of the drug paraphernalia
9  that you found?
10   A.  Correct.
11   Q.  That's a bong on the left side there?
12   A.  Yes.
13   Q.  That's in the closet of the bedroom?
14   A.  Yes.
15   Q.  Did you ask the parents anything about the
16 drug paraphernalia or the marijuana or anything of
17 that specifically or did you just note it in your
18 report and take photos of it?
19   A.  Just -- yeah.  I just took pictures of it.
20   Q.  You didn't ask -- you didn't ask the
21 family, the parents or anyone else any specific
22 questions.  You -- you left that to the police team?
23   A.  Yeah.  They told me that he had a medical
24 marijuana card.  That's it.
25   Q.  And then on page 136, is that the actual

Page 92

1  marijuana in there in the --
2    A.  Yes.
3    Q.  And, again, your understanding was that the
4  father was not living at this house at the time.
5  Correct?
6    A.  No.  This is his place.
7    Q.  Oh.  Sorry.  Okay.  This is his --
8  obviously his place where you are taking photos?
9    A.  Right.
10   Q.  Then let me rephrase that question.  You
11 understood the parents were not living together at
12 the time.
13   A.  Correct.
14   Q.  The -- going back to -- let's see -- the
15 semi-prone, semi-left lateral position, which was
16 what, again, the mom told you that she found the baby
17 in that position.  Turn to page 144, if you would,
18 sir.
19       Allison, pull this up.  We are going to
20 pull the picture up.
21       Is that the -- again, the baby's left side
22 of her face shown in this photograph and where she
23 would have been lying?
24       MS. SCHRINER:  Form.  Foundation.
25       THE WITNESS:  Well, yeah.  I mean,

Page 93

1  that's -- she described it in that position, yeah,
2  left lateral, so it would have been on the left side
3  of the face.
4  BY MS. COHEN:
5    Q.  Okay.  Take that back down.
6       Let's look at 148.  That may give a clear
7  shot of that.  That's again the left side of the face
8  at 148?
9       Pull up that one, too, Allison.
10      Would that be the side where -- if she was
11 in the semi-prone, semi-left lateral position, that
12 would be on that side showing there?
13      MS. SCHRINER:  Form.  Foundation.
14      THE WITNESS:  Correct.
15 BY MS. COHEN:
16   Q.  Is that the bruise showing at the top of
17 her forehead there in this picture on 148?
18   A.  Yes.
19   Q.  From your -- again, you may defer this to
20 somebody else.  Did it seem to be a fresh bruise, an
21 aged bruise?  Do you have any information about the
22 timing of it or the duration of it?
23      MS. SCHRINER:  Form.  Foundation.
24      THE WITNESS:  Yeah.  I mean, I'm going
25 to -- I'm going to just say that's beyond my

24 (Pages 90 - 93)

Page 94

1 expertise on that.
2 BY MS. COHEN:
3    Q.  Okay.  Fair enough.
4        Let's look at 153.  And again, is that --
5 so we looked at some photographs showing the autopsy
6 photos.  Now these are the ones that were taken at
7 the home residence.  And again, does this show the
8 livor, I think you described, Mr. Swope?  This would
9 be the livor?
10    A.  That's right.
11    Q.  And 153 and 154.  And that's on the baby's
12 lower back.  Is that right?  Or middle -- middle
13 back?
14    A.  Yeah.  On the torso.
15    Q.  Okay.  Does that show that the baby, at
16 least some period, was again supine --
17        MS. SCHRINER:  Form.
18        THE WITNESS:  Correct.
19 BY MS. COHEN:
20    Q.  -- orientation?
21        And 154 similarly, does that also show the
22 baby would have been supine for a period of time that
23 resulted in livor?
24    A.  Yes.
25        MS. SCHRINER:  Form.

Page 95

1 BY MS. COHEN:
2    Q.  On 155, there is -- this shows, I guess,
3 part of the back and part of the back legs and back
4 of the left arm.  Does that again show livor in those
5 areas?
6    A.  Yes.
7    Q.  And 156 as well.  We can look at the back
8 of the thigh there and back of the legs.  Does that
9 show livor?
10    A.  Yes.
11    Q.  Does that mean the baby would have been
12 lying again supine in order to have that signing of
13 livor --
14        MS. SCHRINER:  Form.  Foundation.
15 BY MS. COHEN:
16    Q.  -- for a period of time?
17    A.  Very possible at some point, yes.
18    Q.  At some point before the baby died.
19 Correct?
20    A.  After.
21    Q.  After?  All of it after?
22    A.  After the baby died.  At some point it
23 appears to have been in a supine position.
24    Q.  Okay.  Could you -- okay.  At some point
25 after the baby died, that would -- that would have

Page 96

1 formed there.
2    A.  Yes.
3    Q.  In the photos that we looked at, did you
4 see any -- flip back through them, did you see any
5 evidence of livor on the baby's -- the side of the
6 baby's face -- on the left side of the baby's face?
7    A.  Let's see.  Hold on a minute.  Okay.  On
8 page 149, if you look under the chin there, you can
9 see on the left side below the ear there's some livor
10 mortis in that area.  And then --
11    Q.  Under the chin you are looking at there?
12    A.  Under the chin there's some livor mortis
13 there.
14    Q.  Let me ask you a question.  Can you get
15 that from the head being bent down with the chin
16 touching the chest?
17    A.  It just means at some point that was the
18 lowest point for the blood to fall, so --
19    Q.  Okay.
20    A.  If you look on page 146, again, you will
21 see, you know, livor mortis on the anterior side
22 which appears to suggest at some point that was the
23 lowest point.
24    Q.  If you look again at pages, let's see, 144
25 and the other pages, you don't see any livor on the

Page 97

1 side of the face on any of the photos.  Is that
2 right?
3    A.  Yes.  But like I said before, that doesn't
4 mean that that side of the face wasn't against
5 something.  If you are -- if -- you know, if the
6 weight of the body is against an object, then, you
7 know, you can have a void, which it could be.  I'm
8 not saying it is, but it could be.  So it doesn't
9 necessarily mean that because there's no livor mortis
10 there, that that side wasn't down.  It just means
11 that -- you know, that there's nothing showing there.
12    Q.  Yeah.  Fair to say that in all the photos
13 you have seen there's no livor showing in these
14 photos on the facial area on either side.
15        MS. SCHRINER:  Form.
16        THE WITNESS:  Other than where I showed you
17 on --
18 BY MS. COHEN:
19    Q.  Under the chin.
20    A.  Under the chin on 149.
21    Q.  Okay.  Fair enough.  One second.
22        Did you talk -- do you remember talking at
23 all to the parents about the baby's abilities, you
24 know, in terms of what developmental skills or
25 abilities the baby had at the time?

25 (Pages 94 - 97)

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

Page 98

1    A.  I don't recall, no, if I did or not.
2    Q.  Now, it looks like -- again, this may be
3  something you don't know, looks like in terms of
4  items seized as part of the investigation the police
5  seized four glass bongs or pipes, actual marijuana
6  containers and marijuana.  Do you recall seeing all
7  of that when you were there?
8        MS. SCHRINER:  Foundation.
9        THE WITNESS:  I don't recall seeing.  They
10  didn't seize those items in my presence.
11  BY MS. COHEN:
12    Q.  And we did mark the death certificate --
13    A.  If we can go back a minute.  1 -- page 157.
14    Q.  Yes.
15    A.  If you look at the orbits, which I'm
16  talking about the eyelids, you can see in that photo
17  and -- that there's some livor mortis in those areas.
18  Okay?  157 you will see on both eyelids and below the
19  eyes we can see where there was livor mortis in that
20  area.
21    Q.  Okay.  Is that noted in your report
22  anywhere?
23    A.  No.
24    Q.  Your report on page 20, which is your
25  investigative summary part of Exhibit 1, describes --

Page 99

1  in terms of livor mortis that you noted, you noted
2  fixed to the anterior lower extremities and
3  posterior.
4    A.  Um-hmm.
5    Q.  Correct?  Is that yes?
6    A.  Right.
7    Q.  And also if you look at page 18, which is
8  the one with the photos where you described the fixed
9  livor, you have it at anterior posterior.  Correct?
10    A.  Yes.  Yeah.
11    Q.  And jaw, you have -- you obviously saw that
12  it was absent in the jaw.  Correct?
13    A.  Yes.
14    Q.  Okay.  I think I'm about to wrap up my
15  part.
16        So there's nothing anywhere in the medical
17  examiner report about, again, any type of unsafe
18  sleep environment or anything.  Correct?
19        MS. SCHRINER:  Objection.  Foundation.
20        THE WITNESS:  I can't comment on that
21  because I didn't read the entire thing.  I would have
22  to go back.
23  BY MS. COHEN:
24    Q.  Let me ask it this way.  Nothing in your
25  investigative portion, anything you wrote, that talks

Page 100

1  about an unsafe sleep environment.  Is that correct?
2    A.  No.
3    Q.  That's true?
4    A.  There's nothing in there that says, yeah,
5  this is an unsafe sleep environment.
6    Q.  Okay.  And you -- I guess you specifically
7  don't really have any information on where, you
8  know -- exactly all the places the baby was sleeping
9  that night.  Correct?
10    A.  I have only what I was told by the parents.
11    Q.  In terms of when -- the medical records
12  that you requested as you put in your report on page
13  20 from Banner Thunderbird, Phoenix Baptist Hospital,
14  and Dr. Cleary, they would have gone to the doctor,
15  the medical examiner to review, Dr. Ferenc?
16    A.  Yes.  That's correct.
17    Q.  And I know you talked earlier about some of
18  your postdate of incident investigation also included
19  calling the Department of Family and Children
20  Services.
21    A.  Correct.
22    Q.  What else did -- last question.  What other
23  kind of postmortem investigation, if any, did you do?
24  Was that kind of the end of it back in 2014 until
25  today?

Page 101

1    A.  That was it.
2        MS. COHEN:  Those are all the questions I
3  have at this time.  I'm going to let counsel follow
4  up and ask some questions.  If I have any additional
5  ones, I will come back to you.  But thank you very
6  much.
7        THE WITNESS:  Okay.
8        MS. SCHRINER:  Would you like to take
9  another short break before we start?
10        THE WITNESS:  Sure.
11        MS. SCHRINER:  Okay.  Let's take five
12  minutes and let you stretch.
13        THE WITNESS:  All right.
14        THE VIDEOGRAPHER:  We are off the record at
15  2:24 p.m.
16        (Recess taken 2:24 p.m. to
17        2:30 p.m.)
18        THE VIDEOGRAPHER:  We are back on the
19  record at 2:30 p.m.
20
21            EXAMINATION
22
23  BY MS. SCHRINER:
24    Q.  So I apologize.  I'm going to have to jump
25  around a little bit because I am filling in some of

26 (Pages 98 - 101)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 102

1 the blanks from some of your prior questions.
2     A.   Okay.
3     Q.   We didn't really go over a lot of the rules
4 of the deposition, but if I ask you something that
5 doesn't make sense, let me know and I will go ahead
6 and rephrase it.  And you are doing a great job
7 letting us know things that are, you know, outside of
8 your scope so let me know.  I don't want you to
9 speculate about anything.
10     A.   Okay.
11     Q.   You mentioned in the earlier part of your
12 deposition that you don't generally review police
13 photos.  Is that correct?
14     A.   True.
15     Q.   And is it fair to say that the police
16 photos are something that you would not send on to
17 the medical examiner?
18     A.   They may request those photos, but -- you
19 know, and they would bring them.  I might call the
20 police and say, "Hey, do you mind burning a copy of
21 that and bringing it, you know, with you to the exam
22 for the doctor to review."
23     Q.   Do you know in this case if that happened?
24     A.   I do not.
25     Q.   Okay.  Do you know the name of the product

Page 103

1 that Z█ was found in when she died?
2     A.   I do not.
3     Q.   Have you ever heard of the Rock 'n Play?
4     A.   I have not.
5     Q.   Have you ever heard of inclined sleepers?
6     A.   No.
7     Q.   Okay.  So have you heard of -- seen any
8 news reports or media regarding a recall of the Rock
9 'n Play?
10     A.   I have heard that -- you know, here at the
11 office this case was talked about briefly in a
12 training -- or a meeting we had a while ago and I
13 wasn't even aware that it was my case they were
14 talking about, but they mentioned something to that
15 effect that, you know, I guess my report had been,
16 you know, requested and, you know, there was a recall
17 and things like that.  But I didn't -- they never
18 said my name or this case or anything.  They just
19 said there was a case involving some type of, you
20 know, bassinet that had been recalled.
21     Q.   Do you recall anything specific in this
22 training that told you what to look out for in the
23 future investigations, if anything?
24     A.   No.  They just weren't -- they basically
25 were going over the importance of the doll

Page 104

1 reenactment.  That's what it was actually.  We were
2 going over doll reenactments and stuff and they were
3 talking about, you know, the importance of them, how
4 to do them.  That we had a lot of new people then and
5 they were going over these kind of things.
6     Q.   Were you told anything about looking for
7 inclined sleepers or Rock 'n Plays in future
8 investigations with baby deaths?
9         MS. COHEN:  Objection to form.
10         THE WITNESS:  No.  No.
11 BY MS. SCHRINER:
12     Q.   So earlier you also were asked -- the term
13 SIDS came up.  Do you have in your mind a definition
14 of what SIDS encompasses?
15     A.   Yes.  You know, it's based on a diagnosis
16 of exclusion.  You know, there's -- nothing is found
17 and so that is a term that has been used.  Now, like
18 I said, there's doctors around here that won't use
19 that.  They are the -- of the opinion that -- you
20 know, that there's -- you just didn't find out what
21 happened, that there is always a reason.  It just,
22 you know -- and that's just basically a diagnosis of
23 exclusion.  They ruled out everything they can figure
24 on.
25     Q.   And then you were also asked about sudden

Page 105

1 unexplained infant death.  Are you able to
2 distinguish those two for me?
3     A.   Well, anything unexpected in a child like
4 that -- like if you say, for instance, if you had a
5 child that had a lot of congenital birth defects,
6 could be anything, heart issues or whatever it might
7 be, and that child died, then you wouldn't consider
8 that to be unexpected.
9         Where you have a kid that is obviously
10 healthy with no issues and then all of a sudden, you
11 know, they are -- they are dead, whether it be unsafe
12 sleep environment or not, you would still -- it would
13 still be considered unexpected.  But, I mean, they
14 would make the determination whether it was unsafe
15 sleep environment or not.  I would base all my -- I
16 would put all the information I have gathered and
17 submit that to the doctor and then they decide what
18 it is.
19     Q.   Is your understanding that the sudden
20 unexplained infant death can include things such as
21 suffocation?
22     A.   Sure.
23     Q.   And asphyxiation?
24     A.   Yes.
25         MS. COHEN:  Objection.  Foundation.

27 (Pages 102 - 105)

Farrel Swope
In Re: Fisher-Price/Mattel

1 BY MS. SCHRINER:
2    Q.  When you spoke to -- I'm going to refer to
3 her as Katie.  Kathleen is actually -- she goes by
4 Katie, so I'm just used to using that name.  So when
5 I say Katie I'm talking about the mother of the baby.
6        When you spoke to Katie, did you ask her,
7 if you can recall, about the baby's general health?
8    A.  Yeah.  I did and I documented, you know,
9 what she had told me about wheezing and coughing and
10 being seen at the emergency room and being current on
11 vaccinations and things like that.
12   Q.  Do you ask if the baby was premature?
13   A.  I did.  I put in there the gestation
14 period.
15   Q.  And you weren't informed anything about any
16 congenital issues.  Correct?
17   A.  No.
18   Q.  Did you in any of your interviews with
19 Katie or Andrew learn anything about the baby
20 experiencing apnea in the past or anything like that?
21   A.  No.
22   Q.  Anything about seizures?
23   A.  No.
24   Q.  Let's go to your report, which was -- I
25 think we marked as Exhibit 1.  If you have that in

1 front of you.
2    A.  What page are we talking about here?
3    Q.  Look at page 9.  And that's the case notes
4 which I think you said used to be called a phone log.
5    A.  Right.
6    Q.  Okay.  Are you there?
7    A.  Yeah, I'm there.
8    Q.  Right before the break you were asked again
9 if child protective services were called but you
10 didn't -- you weren't asked what the actual
11 conclusion of that call was.  I'm going to go ahead
12 and read this section.  It says:
13       "On June 20, 2014 I contacted Dianne
14    Andrade at the Child Protective Services
15    of Arizona hotline and she ran a search
16    on the subject's name, Z██ Olson, as
17    well as the name Z██ Lawton, and stated
18    that there were no open cases or reports
19    of abuse regarding the child."
20       Is that your memory of that call?
21   A.  Yes.
22   Q.  Have you ever learned of any CPSC reports
23 or issues of abuse regarding Z██?
24   A.  No.
25   Q.  Let's move on to page 12.  And I note

1 there's a weight here.  I didn't know if that was an
2 estimate or if you actually weighed Z██'s body.
3    A.  The body was weighed, yes.
4    Q.  Then you -- and this is your handwriting?
5    A.  It is.
6    Q.  Okay.  So Z██ was at the time of her death
7 or shortly after 16 pounds.
8    A.  Correct.
9    Q.  Let's move on to page 17.  So -- I will let
10 you get there.  I'm sorry.
11   A.  I'm there.
12   Q.  All right.  I'm just going to take you to
13 the part that says "dispatch."  It's kind of halfway
14 down.  It says "1018" and then it looks like time on
15 scene is 10:47.  So would your arrival time then be
16 10:47 a.m. that morning?
17   A.  That's right.
18   Q.  Do you know what time Z██ was declared
19 deceased?
20   A.  That's up here.  Yeah.  It says 8:06 in the
21 morning.
22   Q.  Your arrival would have been approximately
23 2 hours and 40 minutes after she was declared?
24   A.  That's about right, yeah.
25   Q.  And you -- by the time you arrived, is it

1 your understanding that the EMTs had already been
2 there?
3    A.  That is correct.
4    Q.  And some of the officers were already on
5 scene?
6    A.  Oh, yeah.
7    Q.  Did you ever come to learn that Andrew
8 attempted CPR on the baby?
9    A.  I -- I don't recall.
10   Q.  Let's see.  Let's just go on to the next
11 page, to 18.  So you were asked questions about the
12 air room temperature.
13       How would the -- did you actually have a
14 device to measure it?
15   A.  We did measure it -- the body temperature
16 of the baby, but no.  I don't recall if I looked at
17 the thermostat or if I made an estimation there.
18 Beyond what's noted I don't recall.
19   Q.  That's okay.  I know it was a long time
20 ago.  Do you know what time it was that you noted the
21 temperature?
22   A.  It would have been about -- well, during
23 the scene investigation.  I would have made a mental
24 note or I might have wrote it down.  So like I say,
25 this whole thing here was done by hand before it was

28 (Pages 106 - 109)

Farrel Swope
In Re: Fisher-Price/Mattel

Page 110

1  done this way.  And a lot of notes and stuff I would
2  have based a report on those notes that I took at the
3  scene.
4      Q.  So 81 degrees though would have been
5  sometime after 10:47.  We can at least assume that.
6      A.  Right.
7      Q.  Okay.  Do you recall if the door was open
8  at the time you arrived to the residence?
9      A.  I do not recall.
10     Q.  All right.  Let's move down to -- we are
11 going to go to the medical history part and go over
12 some of the things we haven't talked about it yet on
13 the same page.
14     A.  Okay.
15     Q.  So it says:
16         "According to Kathleen Lawton,
17     mother, the subject was 42 weeks
18     gestation period baby that was born
19     without complications at Phoenix Baptist
20     hospital."
21         So that was something important for you to
22 note.  Correct?
23     A.  Yes.
24     Q.  If she had been premature or had
25 complications, that would have also been important

Page 111

1  for you to note.  Is that true?
2      A.  True.
3      Q.  Okay.  It then says:
4         "The subject was treated for a cough
5     and wheezing at Banner Thunder Medical
6     Center in March of 2014 and was current
7     on all her vaccinations."
8         Do you know if you ended up providing the
9  Banner records to the medical examiner?
10     A.  I requested those records.  I couldn't tell
11 you if they were received or not.  But usually if
12 they are not received, they would -- they would let
13 me know and I don't have any recollection that
14 happened.
15     Q.  Okay.  But you did note she was current on
16 her vaccinations.  Correct?
17     A.  According to her mom, yes.
18     Q.  I'm just going to go down to the
19 circumstances.  I just want to ask you questions you
20 haven't already been asked.  Okay.
21         So is it fair to say that when you asked
22 Andrew about whether or not he belted Z███ in, you
23 don't recall if you are talking to him alone or if
24 Katie was also there?
25     A.  I don't.

Page 112

1      Q.  And that's okay.  I'm just going to read
2  kind of down at the bottom.  It says:
3         "The following morning Kathleen woke
4     up at approximately 800 hours and found
5     the subject in a semi-prone, semi-left
6     lateral position with the seat belt
7     undone."
8         Were those Katie's words, semi-prone,
9  semi-left lateral?
10     A.  No.  She just described on her side, you
11 know -- partially face down and on her side.  So
12 yeah.  Head turned, on her side so I -- you know,
13 those were terms that most people wouldn't use.
14     Q.  And you didn't record any of these
15 conversations.  Right?
16     A.  No.
17     Q.  Okay.  And then it says:
18         "The subject was cold to the touch
19     and without respiration."
20         Does that mean that when Katie first
21 touched her she was cold?
22     A.  Yeah.  That's right.
23     Q.  And then it says:
24         "Kathleen called 911 and emergency
25     service personnel responded to the scene

Page 113

1     and according to Detective Reyes upon
2     arrival found Mr. Olson with the baby in
3     his arms."
4         So we knew at least at that point that the
5  baby had been moved if she was in Andrew's arms.  Is
6  that right?
7      A.  That's correct.
8      Q.  Then the next sentence says:
9         "Emergency service personnel
10     pronounced the subject dead at 806 hours
11     without resuscitative efforts."  And then
12     it says, "They wrapped the baby in a
13     blanket and placed it back in the
14     bassinet in a supine position."
15         Do you know where that information came
16 from?
17     A.  I -- from detective -- the detectives.
18 Everything beyond that point where it changed
19 sources, came from that detective.
20     Q.  Okay.  So based on this, it is your
21 understanding that emergency services wrapped the
22 baby up in that white blanket?
23     A.  That's what I was told.
24     Q.  And then they placed her on her back in the
25 bassinet?

29 (Pages 110 - 113)

Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

Page 114

1    A.  That's correct.
2    Q.  And just to -- not everyone talks like we
3  do.  Supine means on your back.  Is that correct?
4    A.  Right.
5    Q.  Okay.  Let's see.  Okay.  Let's talk about
6  your -- the reenactment.
7        You did this in conjunction with the
8  detectives.  Correct?
9    A.  Correct.
10    Q.  Meaning they didn't do their own separate
11  one.  Everyone was in the same room?
12    A.  That's right.
13    Q.  All right.  Do you recall, was the
14  bassinet -- and I'm calling it a bassinet, although
15  I'm going to switch to calling it a Rock 'n Play.
16  Was the Rock 'n Play that Z█ died in in the room at
17  the time you did the reenactment?
18        MS. COHEN:  Objection to form.  Foundation.
19        THE WITNESS:  The actual one or the one we
20  used?
21  BY MS. SCHRINER:
22    Q.  No, the actual one.  The one that she was
23  found in.
24    A.  I don't recall really.
25    Q.  When you did the doll reenactment, first

Page 115

1  off, can you tell me the size of the doll, if you
2  know it?
3    A.  I don't know the dimensions, no.
4    Q.  Can you tell me, did you ask Katie, you
5  know, when you asked her how the baby was found, did
6  you ask her to position the arms and legs?
7    A.  I said, "Position the baby exactly how you
8  found her."
9    Q.  Okay.
10    A.  Or place it.  I said, "Place the baby
11  exactly how you found it."  And she -- she did all
12  that.
13    Q.  Did Katie tell you if she had touched Z█
14  prior to -- I guess prior to looking at her face or
15  anything like that?
16    A.  No.  I don't recall.
17    Q.  Talking about your reenactment, I'm going
18  to just get to that part, which I think is -- okay.
19  We are going to go to page 20 of -- that's Exhibit 1
20  still.
21    A.  Okay.
22    Q.  Okay.  So it says:
23        "At the request of Detectives
24  O'Brien and Reyes a substitute bassinet
25  was used in the doll reenactment to avoid

Page 116

1  evidence contamination."
2        And that's true with your memory.  Correct?
3    A.  Yes.
4    Q.  Do you know what evidence was on the
5  original Rock 'n Play that they didn't want to
6  contaminate?
7    A.  They didn't get specific as to what.  They
8  just didn't want any cross-contamination, I guess,
9  from one to the other using -- from the doll to the,
10  you know, the Rock 'n Play.
11    Q.  Okay.  You have under the doll reenactment
12  that:
13        "She stated the subject's mouth was
14    not obstructed by the cushion of the
15    bassinet."
16        What did you mean by "cushion," if you can
17  recall?
18    A.  Well --
19        MS. COHEN:  I'll object.  It wasn't his
20  word.
21        THE WITNESS:  Yeah.  I -- I don't recall
22  exactly.
23  BY MS. SCHRINER:
24    Q.  Do you know if you asked her if the baby's
25  mouth was obstructed by the cushion of the bassinet?

Page 117

1    A.  I did ask her if the baby's mouth was
2  obstructed in any way when she found the baby.  She
3  said no.
4    Q.  Did you ask her about the baby's nose?
5    A.  No.
6    Q.  And then the next sentence says -- hold on,
7  before I go do that.
8        But again, you don't recall if you asked
9  Katie if Z█ had been moved at all before Katie saw
10  her face.  Is that true?
11    A.  I'm not sure I understand your question.
12    Q.  Sure.  Did you ask Katie if when she first
13  rolled over and felt Z█ and she was cold, if Katie
14  shook her or, you know, moved her in any manner?
15    A.  No.  I didn't ask that.
16    Q.  So the next sentence says, "Mr. Olson
17  stated he believed his daughter was" -- wait.  Sorry.
18        "Mr. Olson stated he believed his
19    daughter unfastened the seat belt
20    sometime throughout the night."
21        Do you know if he said the word unfastened
22  or did he say something along the lines of get out of
23  the belt?
24        MS. COHEN:  Objection to form.
25  Mischaracterizes the evidence and the testimony.

30 (Pages 114 - 117)

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

Page 118

1    MS. SCHRINER:  If you -- if we can keep
2 objections to nonspeaking and not suggestive.
3    MS. COHEN:  You are mischaracterizing the
4 testimony and evidence, is what my objection is.
5    THE WITNESS:  The word he used, to my
6 recollection, was unfastened.
7 BY MS. SCHRINER:
8    Q.  And then the next sentence was:
9    "Kathleen came to be under the
10    impression the seat belt was not used
11    when the baby was placed at 140 hours."
12    So this seems to be under the impressions.
13 Do you know what her exact word were?
14    A.  I don't recall.
15    Q.  Okay.  When you did the reenactment, did
16 you ask Katie and Andrew to do everything they did
17 that night in terms of placing the baby in the Rock
18 'n Play?
19    A.  During the doll reenactment I -- you know,
20 I asked her husband -- the father, to place the baby
21 as he had placed it.  And then I gave the doll to her
22 and I said, "Place the baby how you found it."  Or
23 the doll, how you found the baby.
24    Q.  And they didn't include -- they didn't
25 place a blanket over her or anything like that during

Page 119

1 the reenactment.  Correct?
2    A.  I -- no.
3    Q.  If they had, would you have photographed
4 that?
5    A.  Well, you know, I have done -- I would
6 say -- in the beginning I would say, you know, "We
7 are going to do this.  We want to re-create the
8 environment exactly as it was."
9    You can have different scenarios where you
10 might have a bed situation where you have five
11 different pillows and three blankets and three people
12 sleeping in the bed.  So you would want to re-create
13 that to be as accurate as possible.  So that's what
14 we did.  We set it up as accurately as we could.
15    Q.  Did you ever personally examine the
16 original Rock 'n Play that Z▇▇ passed away in?
17    A.  I photographed it, you know, as she was
18 when I got there and after she was removed from it.
19    Q.  Did you ever speak to the Tempe Fire
20 Department about what they found when they got there?
21    A.  I did not.
22    Q.  Let's -- I want to take a look at a couple
23 of your -- a couple of the scene photographs.  Let me
24 direct you to -- okay.
25    So let's talk about the actual reenactment

Page 120

1 ones.  They start on 169.
2    A.  Go ahead.
3    Q.  I understand based on your prior testimony
4 this is how Andrew placed the doll in the Rock 'n
5 Play.  Correct?
6    A.  Correct.
7    Q.  And you note that this Rock 'n Play had
8 this monkey cushion in the back.
9    A.  It is there.  I see it.
10    Q.  Do you know if the original one that Z▇▇
11 passed away in had this cushion in it?
12    A.  I don't recall.  I don't believe it did.
13    Q.  Looking at -- let's see.  172.  Do you know
14 what this photo is meant to show?  I see there's a
15 tape measure and then there's kind of a shot from --
16 from the bottom of the bassinet, of the Rock 'n Play.
17    A.  Yeah.  It's just showing the dimensions of
18 the Rock 'n Play, that's all.  The depth of it.
19    Q.  And then going to the next one, 173, what
20 was this measurement?  Was it meant to measure the
21 doll or the actual product?
22    A.  Just the product.  Just showing the
23 dimensions.
24    Q.  Because we don't know at this point if Z▇▇
25 was the same size as the doll.  Is that true?

Page 121

1    MS. COHEN:  Objection to form.
2    THE WITNESS:  True.
3 BY MS. SCHRINER:
4    Q.  Let's go to the next one, 174.  This is how
5 Katie placed the doll.  Correct?
6    A.  That's correct.
7    Q.  And it looks like -- it's kind of hard to
8 tell because there's not necessarily a belly button
9 on the doll, but is it fair to say that the stomach
10 of the baby is pointing towards the bottom of the
11 Rock 'n Play?
12    A.  True.
13    Q.  And then the hands, is that how Katie
14 placed them to the best of your knowledge?
15    A.  Yes.
16    Q.  Okay.  And then did you ask Katie to place
17 the baby's neck in any sort of way or did you just
18 give a general instruction, place the baby as you
19 found them?
20    A.  That's what I did.
21    Q.  Okay.
22    A.  "Place the baby as you found it."
23    Q.  Did you ask Katie about the baby's neck?
24    A.  No.  I just said, "Place the baby as you
25 found it."

31 (Pages 118 - 121)

Farrel Swope
In Re: Fisher-Price/Mattel

1    Q.   Okay.  But at any time in your
2 investigation, I mean, did you ask about her neck?
3    A.   No.
4    Q.   Okay.  Let's see.  Turning to the next one,
5 175, this looks like a picture from above the doll.
6 I notice the doll has a -- I guess the eyes and ears
7 and the nose and mouth are just drawn on.  Is that
8 correct?
9    A.   Correct.
10    Q.   So there's no actual protruding nose or
11 mouth?
12    A.   True.
13    Q.   Let's go to 177.  So -- I'm sorry.  I will
14 wait for you to get there.
15    A.   I'm there.
16    Q.   So looking at this photo, it looks to me
17 like the bed is on the left of the Rock 'n Play.  Is
18 that how you recall the scene?
19    A.   True.
20    Q.   And the baby's face -- I'm sorry, the
21 doll's face is pointed towards the right.
22    A.   Depending on -- yeah.  You could say that.
23 If you were in the Rock 'n Play, it's to the left.
24 If you are -- if you are the baby, it's to the left.
25 If you are standing outside of it, looking that way,

1 yeah, then it's on the right.
2    Q.   You are absolutely correct and I made a
3 very confusing question.  Let me just say, the baby's
4 face is away from the bed.
5    A.   True.
6    Q.   Okay.  Let's go to page 179.  In this photo
7 it looks like the baby's face is not visible.  Is
8 that the best you can see?
9    A.   Yes.
10    Q.   And again, this was based on Katie's
11 positioning of the baby?
12    A.   Something's -- I can't explain that.
13 There's something weird about that photograph.  You
14 know, I don't know.  I don't know how that happened.
15 It doesn't appear consistent with the other
16 photographs.  I can't explain it.
17    Q.   Did you ever ask Andrew to place the baby
18 as he found her?
19    A.   I can't recall.  I don't think so, no.  I
20 don't think I did because he wasn't the finder.
21    Q.   That's based on your --
22    A.   That's based on my recollection from six
23 years ago.  I -- you know --
24    Q.   It's been a long time.
25    A.   It -- I don't believe that would be

1 something I would do.  And if I did, then I would
2 have -- I would have certainly made a notation of it
3 if there was some discrepancy there, but, you know, I
4 don't -- I don't recall.
5    Q.   So let me turn your attention to the photos
6 of the subject bassinet, which is the Rock 'n Play
7 that Z▮▮ was found in.  So if you could just go to
8 164.
9    A.   Okay.
10    Q.   You notice that there is some sort of
11 discoloration or looks like a stain shown in this
12 photo.
13    A.   Yes.
14    Q.   Do you recall looking at that or noting
15 that during your investigation?
16    A.   I did not note that in my report.  It
17 would -- if I can add anything to that answer, I
18 would say, you know, it would be -- you know, I can't
19 say that that stain's involved in this, you know,
20 so -- it should have probably been noted but if I
21 would have got there and, you know, I would have
22 found the baby exactly how it was, then I would have
23 likely noted that stain.  I would have said, the
24 stain's consistent with the position of where the
25 nose and mouth was.  But because the body was moved,

1 it's difficult to, you know -- it would be
2 speculation, you know, for me to say this is what
3 happened, so --
4    Q.   I'm going to direct you to some of the
5 photos of Z▮▮.  You took photos of her body.  Was
6 that before or after the reenactment, if you know?
7    A.   Before.
8    Q.   Before?
9    A.   Um-hmm.
10    Q.   Okay.  Let's look at the photos.  Trying to
11 find the one that I marked.  Okay.  Let's look at
12 157.
13    A.   Okay.
14    Q.   Are you there?
15    A.   Yeah, I'm there.
16    Q.   Okay.  Do you see anything around the
17 baby's nose --
18    A.   I do.
19    Q.   -- in the photo?
20        What do you see?
21    A.   Well, I would describe that as, you know,
22 bloody purge from the nose.
23    Q.   You mentioned that you saw some evidence of
24 livor under her chin when you were looking at the
25 photos.  If somebody or a baby's face down when they

32 (Pages 122 - 125)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 126

1 pass, is that where you would expect to find livor?
2    A.  Possibly.
3        MS. COHEN: Objection to form.  Objection
4 to form and foundation.
5 BY MS. SCHRINER:
6    Q.  Let me just make sure there is nothing else
7 in these photos.  I think I'm almost done.  Okay.
8        I think I'm going to be done and let you go
9 on unless Ms. Cohen has any additional questions for
10 you.
11       MS. COHEN: I just have a few.  If you can
12 bear with me.  On the bright side, at least it's not
13 6:00 o'clock where you guys are so I'm all
14 incentivized to move quickly.
15
16       FURTHER EXAMINATION
17
18 BY MS. COHEN:
19    Q.  Just a couple of follow-up questions, if
20 you can bear with me, Mr. Swope --
21    A.  Sure.
22    Q.  -- and then we will be done.
23       So I think the question was asked by
24 counsel whether the doctors use the word SIDS or
25 SUIDS.  I think your answer is some do and some

Page 127

1 don't.  Is that a fair question?
2    A.  That is true.
3    Q.  She asked some questions -- you know,
4 again, counsel asked some questions about -- I think
5 she used the word suffocation and affixation.  You
6 know from looking at Dr. Ferenc's autopsy report that
7 he doesn't use any of those words.  Correct?
8    A.  He didn't -- no.  I mean, I didn't -- I
9 didn't read every word of the report, but it's not
10 included in the cause and manner of death and it
11 certainly would be if, you know, that was what he
12 felt happened.
13    Q.  There were questions posed to you about the
14 mom's reporting the baby's medical history.  I wanted
15 to ask you, did either parent ever give you any
16 indication that the baby had a cardiac history?
17    A.  No.
18       MS. SCHRINER: Form.
19 BY MS. COHEN:
20    Q.  Did either -- let's see -- parent advise
21 you that -- one second.  Did anyone mention to you
22 that the father was researching sudden infant death
23 syndrome online a couple weeks before this incident?
24       MS. SCHRINER: Form.
25       THE WITNESS: No one advised me of that,

Page 128

1 no.
2 BY MS. COHEN:
3    Q.  Did anybody advise you that the father --
4 did you hear him reporting to anyone, the police or
5 anyone, that the baby had a heart murmur which may
6 have been associated with breathing issues at birth?
7    A.  I was not told that.
8    Q.  Did anyone tell you that when the baby was
9 born that she had fluid in her lungs and was not
10 breathing?
11       MS. SCHRINER: Form.  Foundation.
12       THE WITNESS: No.  No one ever told me
13 that.
14 BY MS. COHEN:
15    Q.  The question about the blanket, there's
16 been a couple questions about that.  Suffice it to
17 say, is it fair, Mr. Swope, that whether the baby was
18 put to bed with a blanket under her or around her,
19 you just have no idea one way or another?  Correct?
20    A.  I was not told that a blanket was used.
21    Q.  Were you told that a blanket was not used
22 during the night?
23    A.  Well, I -- in the beginning when we did the
24 doll reenactment, I said, "We are going to want to
25 create the exact sleep environment," and I said, you

Page 129

1 know, "Place the baby as you placed it," and then as
2 you found it, and no blanket was included or
3 mentioned.
4    Q.  That's based on the reenactment, as you
5 said.  Right?
6    A.  Right.
7    Q.  But whether at some point during the night
8 the baby had a blanket under her or over her,
9 obviously you haven't seen any kind of video footage
10 or surveillance footage or anything to show that.
11 Correct?
12    A.  Correct.
13       MS. COHEN: That's all I have.
14       MS. SCHRINER: I have just one follow-up
15 based on that since it's some new questioning.
16
17       FURTHER EXAMINATION
18
19 BY MS. SCHRINER:
20    Q.  Would you consider a normal echocardiogram
21 a heart condition that you would be concerned about
22 to note in your investigative report?
23    A.  In the absence --
24       MS. COHEN: Objection.  Foundation.
25       MS. SCHRINER: A normal.

33 (Pages 126 - 129)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

Page 130

1    MS. COHEN: I'm going to ask -- again,
2 foundation. I don't see a cardiology expert here
3 but --
4    MS. SCHRINER: You asked him about a heart
5 condition, so let's -- he's allowed to answer.
6    MS. COHEN: My question was whether
7 somebody told him she had a heart condition, not what
8 it means.
9    MS. SCHRINER: So that's assuming that
10 there is a heart condition.
11    Q. So if somebody told you she had a normal
12 echocardiogram, would that be important in your
13 investigation in terms of determining a cause of
14 death?
15    MS. COHEN: Objection. Foundation.
16    THE WITNESS: Well -- can I answer?
17 BY MS. SCHRINER:
18    Q. Yes.
19    MS. COHEN: Yes. Sorry about that.
20    THE WITNESS: I would -- you know, I -- if
21 I was told that, I would say, "Well, what was the
22 reason for an echocardiogram?" You know, why would
23 one be done? And then I would note that, why a test
24 like that was done and then the results of it. I
25 wouldn't just put in my report that there was a

Page 131

1 normal echocardiogram because the doctor would say,
2 "Well, why? What was this done for?" You know, they
3 would want to know that.
4 BY MS. SCHRINER:
5    Q. If there was no diagnosis following that of
6 any heart conditions, is that something that you
7 would note that would be important?
8    A. Sure. I would place that in -- a test was
9 done for this reason and the outcome, there the
10 results were negative.
11    Q. Thank you. No further questions for me.
12    MS. COHEN: Just one last question.
13
14    FURTHER EXAMINATION
15
16 BY MS. COHEN:
17    Q. Did either of those parents mention that
18 their daughter had allergies and breathing issues?
19    MS. SCHRINER: Form and foundation.
20    THE WITNESS: I don't recall that ever
21 being said to me, no.
22    MS. COHEN: Okay. That's all I have then
23 as well.
24    THE WITNESS: Again, wheezing and a cough
25 that she was treated for at Thunderbird.

Page 132

1    MS. SCHRINER: I'm sorry, were you able to
2 get that, for the court reporter, the final answer?
3    THE REPORTER: I'm sorry?
4    MS. COHEN: He said wheezing and coughing
5 is what she was treated for. Right?
6    MS. SCHRINER: Can you please restate your
7 answer, the witness.
8    THE WITNESS: I would say other than the
9 wheezing and coughing she was treated for at Banner
10 Thunderbird.
11    MS. SCHRINER: Thank you.
12 BY MS. COHEN:
13    Q. So the -- so you were aware of that piece
14 of it but not anything about allergies. Correct?
15    A. Correct.
16    MS. COHEN: Okay. Thank you very much.
17 That's all I have.
18    Anything further?
19    MS. SCHRINER: No.
20    You do have the option to read and sign. I
21 mean, you can make that decision now. That's up to
22 you.
23    THE WITNESS: Is that me you are talking
24 to?
25    MS. SCHRINER: Yeah. Yeah. Just if you

Page 133

1 want to put it on the record if you changed your
2 mind.
3    THE WITNESS: I don't have a reason to sign
4 it. You know, I mean, without review. I mean, I
5 gave it. It's videotaped. That should be good.
6    MS. COHEN: We appreciate it. Thank you so
7 much for your time. We really appreciate this.
8    MS. SCHRINER: Thank you.
9    THE VIDEOGRAPHER: We are off the record at
10 3:12 p.m.
11    (Discussion off the record.)
12    THE REPORTER: Ms. Schriner, are you going
13 to want a copy of the transcript?
14    MS. SCHRINER: Yes, please. I think we are
15 getting an E-tran.
16    (At the hour of 3:13 p.m., the
17    proceedings were adjourned.)
18
19
20
21
22
23
24
25

34 (Pages 130 - 133)

Farrel Swope                                    June 12, 2020
In Re: Fisher-Price/Mattel

Page 134

```
 1  STATE OF ARIZONA      )
                          ) SS
 2  COUNTY OF MARICOPA    )
 3
 4       BE IT KNOWN that the foregoing deposition was
 5  taken by me, Jardene L. Platt, Certificate No. 50937, a
 6  certified reporter for the state of Arizona; that prior to
 7  being examined, the witness named was duly sworn to
 8  testify to the whole truth; that the questions propounded
 9  and the answers of the witness thereto were taken down by
10  me and thereafter reduced to computerized transcription
11  under my direction and supervision; that the foregoing is
12  a true and correct transcript of all proceedings had upon
13  the taking of said deposition, all done to the best of my
14  skill and ability.  Read and sign was waived by the
15  witness.
16       I further certify that I am in no way related to
17  any party to said action nor in any way interested in the
18  outcome thereof.
19       DATED at Phoenix, Arizona, this 25th day of
20  June, 2020.
21
22       _____
         JARDENE L. PLATT, RPR
23       Certificate No. 50937
24
25
```

Page 135

```
 1       COURT REPORTER AND
 2       REGISTERED REPORTING FIRM DISCLOSURE
 3
 4
 5  The foregoing deposition was taken in compliance with the
 6  Arizona Code of Judicial Administration,
 7  Section 7-206(F)(3) and (J)(1)(g)(1) and (2).
 8
 9
10  _____
11  JARDENE L. PLATT          BARTELT REPORTING, LLC
    Court Reporter        Registered Reporting Firm
12  Certificate No. 50937     RRF No. R1028
13
14
15
16
17
18
19
20
21
22
23
24
25
```

35 (Pages 134 - 135)

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

**[& - 587]**

Page 1

**&**

**&**   2:10

**0**

**000001**   18:13
**00002**   25:14
**000108**   19:24
**000109**   18:14
**000110**   19:8
**02689**   1:4

**1**

**1**   3:10 18:17 20:24
  24:9 25:3,5,11,25
  74:6,7 79:11
  98:13,25 106:25
  115:19 135:7,7
**1-1-3**   88:20
**10**   26:4 32:14
  33:10
**101**   3:4
**1018**   108:14
**10:47**   108:15,16
  110:5
**11**   11:4 18:12 26:4
**113**   88:18,20,21,24
**119**   89:11,11
**12**   1:16 2:2 4:1,6
  9:24 33:14 107:25
**121**   89:15
**122**   89:19
**123**   90:1
**124**   90:4
**125**   90:10
**126**   3:5 90:12
**127**   90:15
**128**   90:18
**129**   3:6
**12:02**   1:17 2:2 4:2
**13**   9:14,15 36:17
**130**   90:19

**131**   3:7
**133**   88:19
**134**   90:25
**135**   91:7
**136**   91:25
**14**   37:9
**140**   80:9 118:11
**141**   72:9,15 73:11
**144**   92:17 96:24
**146**   78:15,19 96:20
**147**   77:2 78:15,19
**148**   93:6,8,17
**149**   96:8 97:20
**15**   37:12
**1519**   34:18
**153**   94:4,11
**154**   94:11,21
**155**   95:2
**156**   95:7
**157**   98:13,18
  125:12
**16**   34:20 37:12
  69:2,3 108:7
**164**   124:8
**169**   71:20 73:20,22
  75:19 76:9 81:13
  120:1
**17**   33:8,11 37:15
  108:9
**170**   76:9
**171**   76:9
**172**   120:13
**173**   76:14 81:13
  120:19
**174**   77:3 121:4
**175**   77:3 122:5
**176**   77:3
**177**   77:5 122:13
**178**   77:5
**179**   77:5 123:6

**18**   3:10 43:6 47:13
  55:5,6,7 56:5,5
  57:7,9,15,23 61:10
  99:7 109:11
**180**   77:7
**181**   77:7
**182**   19:8
**19**   3:12 28:8 55:6
  55:22 57:8,9,10,22
  57:25 62:10 66:13
**19-02689**   4:11
**1982**   10:2
**19th**   28:10
**1:02**   4:6
**1:34**   73:4
**1:40**   58:8 64:11
**1:41**   73:5,7

**2**

**2**   3:12 19:10,11
  20:24 21:3 25:5
  71:16 72:1 73:11
  88:1 108:23 135:7
**2,000**   10:22
**20**   3:13 56:1,3,4
  57:22 66:11,14
  74:7 79:10 86:6
  98:24 100:13
  107:13 115:19
**200**   2:11
**2004**   9:1,10,17
**2007**   9:7,9,14
  10:15,19
**2014**   12:17 21:6
  29:1 33:2 56:21
  86:14 88:10
  100:24 107:13
  111:6
**2019**   29:1,18,25
  33:2
**2020**   1:16 2:2 4:1
  4:6 134:20

**2500**   2:16
**25th**   134:19
**27**   9:14
**298-9962**   2:12
**2:19**   1:4
**2:24**   101:15,16
**2:30**   101:17,19
**2:34**   73:3

**3**

**3**   3:13 9:21 18:22
  19:1 20:2,25 25:6
  25:14 135:7
**30**   29:18
**30305**   2:17
**30th**   29:9
**310**   2:17
**3333**   2:16
**350**   12:4
**352754-000108**
  19:24
**36**   42:12
**3:12**   133:10
**3:13**   133:16

**4**

**4**   19:19 25:14
**40**   108:23
**42**   56:17 110:17

**5**

**5**   3:3
**50**   11:15
**500**   12:4
**50937**   1:23 2:4
  134:5,23 135:12
**51**   38:3
**520**   2:12
**553-2100**   2:17,17
**587**   12:5

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**[6,000 - arrival]**

Page 2

| 6 |
|---|
| **6,000** 10:20,23 |
| **6-19-2014** 40:18 |
| **6-20-2014** 26:18 |
| **63** 84:1 |
| **67** 84:11 |
| **678** 2:17 |
| **69** 84:20 |
| **698** 2:11 |
| **6:00** 126:13 |

| 7 |
|---|
| **7** 19:25 20:1 |
| **7-206** 135:7 |
| **73** 85:8 |

| 8 |
|---|
| **8,000** 10:21 |
| **800** 112:4 |
| **806** 113:10 |
| **81** 43:19 44:2,17 |
| 44:20 68:12 110:4 |
| **8176** 134:21 135:9 |
| **85705** 2:12 |
| **8:06** 108:20 |

| 9 |
|---|
| **9** 25:20,22 26:3,18 |
| 28:18 32:14 107:3 |
| **911** 65:4 112:24 |
| **95** 45:18 |
| **9:41** 40:18 |

| a |
|---|
| **a.m.** 58:8 64:11 |
| 108:16 |
| **abilities** 97:23,25 |
| **ability** 134:14 |
| **able** 17:7 19:6 |
| 72:13,14 105:1 |
| 132:1 |
| **absence** 59:5 |
| 129:23 |

**absent** 49:1 69:23
99:12
**absolutely** 72:23
123:2
**abuse** 27:18
107:19,23
**accepting** 34:7
**access** 19:6 87:12
**accommodating**
6:4
**accuracy** 5:19
**accurate** 15:16
23:16 53:9 82:3
119:13
**accurately** 119:14
**accusations** 81:6
**action** 5:9 134:17
**actual** 20:20 39:19
55:22 85:7 88:9
91:25 98:5 107:10
114:19,22 119:25
120:21 122:10
**add** 87:1,17,18
124:17
**additional** 86:20
101:4 126:9
**address** 63:11
70:19
**adhs** 85:12
**adjourned** 133:17
**administer** 4:24
**administration**
135:6
**admission** 33:13
33:21 34:14
**admit** 53:18
**admitted** 33:23
34:3,10
**admitting** 33:16
**adult** 27:15,15,22

**advance** 22:14
**advise** 127:20
128:3
**advised** 127:25
**affixation** 127:5
**afternoon** 4:17
**age** 31:24
**aged** 93:21
**ago** 8:11,13,14
30:20 48:24 62:21
78:20 103:12
109:20 123:23
**agree** 7:18 65:8
**ahead** 18:8 19:4
37:25 44:7 49:15
51:10 102:5
107:11 120:2
**air** 43:19 109:12
**al** 4:9
**alcohol** 68:3 86:7
86:10 91:4
**allergies** 131:18
132:14
**allison** 2:20 92:19
93:9
**allowed** 130:5
**alluded** 68:23
**amount** 48:25
61:19
**analysis** 42:14
**andrade** 107:14
**andrew** 4:22 43:14
58:1 68:9 106:19
109:7 111:22
118:16 120:4
123:17
**andrew's** 113:5
**answer** 5:12
124:17 126:25
130:5,16 132:2,7

**answers** 134:9
**antemortem** 62:16
64:23
**anterior** 70:11
96:21 99:2,9
**anybody** 22:14
34:24 128:3
**anyway** 64:9
**apnea** 106:20
**apologize** 101:24
**appear** 37:10 60:2
69:12 123:15
**appearances** 4:15
**appeared** 60:1
**appears** 31:1 69:1
90:1,10 95:23
96:22
**applebee's** 63:8
64:8
**appreciate** 6:3
133:6,7
**approach** 65:14
**approximately**
6:16 42:15 69:2,3
108:22 112:4
**april** 29:18
**area** 67:9 68:2
71:3,3 89:16,17
90:4 96:10 97:14
98:20
**areas** 95:5 98:17
**arizona** 1:2,16 2:2
2:4,12 4:1,11 8:25
10:1,6 27:4 43:22
107:15 134:1,6,19
135:6
**arm** 95:4
**arms** 64:18 65:6
113:3,5 115:6
**arrival** 77:19
108:15,22 113:2

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**arrived** 34:16,18
64:16,17 108:25
110:8
**asked** 35:13 39:24
104:12,25 107:8
107:10 109:11
111:20,21 115:5
116:24 117:8
118:20 126:23
127:3,4 130:4
**asking** 38:10
51:11
**aspects** 22:11
**asphyxiation**
105:23
**assistant** 9:11
35:21
**assisted** 10:22
**assisting** 35:23
**associate's** 9:3
**associated** 128:6
**assume** 40:3 41:11
81:25 110:5
**assuming** 130:9
**atlanta** 2:17
**attached** 18:18
19:12 20:3
**attempted** 109:8
**attended** 8:24
**attention** 124:5
**attorney** 22:25
**authentic** 65:20
**authored** 65:21
**autopsy** 11:2,12
11:19 12:25 13:9
16:6,9 30:10,12,15
53:19 85:13 88:23
89:8 94:5 127:6
**available** 32:5
**avenue** 63:12

**avoid** 74:25
115:25
**aware** 15:23 29:23
32:16,18,24 51:17
103:13 132:13
**az** 1:23

**b**

**b** 3:8
**babies** 10:17,25
15:13
**baby** 27:14 36:25
38:11 39:10,14,19
43:25 53:21 59:6
60:22 61:21,22
63:4,18,25 64:6,12
64:18 65:6 66:17
66:23 67:14,21
73:13 76:11,18
77:10,23 78:16
79:24 80:9 81:16
90:5 92:16 94:15
94:22 95:11,18,22
95:25 97:25 100:8
104:8 106:5,12,19
109:8,16 110:18
113:2,5,12,22
115:5,7,10 117:2
118:11,17,20,22
118:23 121:10,18
121:22,24 122:24
123:11,17 124:22
125:25 127:16
128:5,8,17 129:1,8
**baby's** 23:20 59:5
59:19 76:18 92:21
94:11 96:5,6,6
97:23 106:7
116:24 117:1,4
121:17,23 122:20
123:3,7 125:17
127:14

**back** 11:24 12:1,2
12:6 15:7 21:6
28:2,8,18 33:1
34:14 36:22 38:22
40:11,14 43:8,9
47:20 55:19 56:5
61:10 72:2 73:6
74:5,19 78:12
82:7 84:24 85:3
86:14 87:15 88:10
92:14 93:5 94:12
94:13 95:3,3,3,7,8
96:4 98:13 99:22
100:24 101:5,18
113:13,24 114:3
120:8
**background** 8:1
8:19 9:16
**bag** 34:21,22,23
37:1,3,5,5 66:23
90:1
**ball** 11:15
**baltimore** 8:23
9:25
**banner** 38:7 56:20
62:23 100:13
111:5,9 132:9
**baptist** 38:8
100:13 110:19
**bartelt** 135:11
**base** 105:15
**based** 32:5 39:22
40:11 41:18 43:7
49:13 51:12,25
52:5,6 60:21
67:20 104:15
110:2 113:20
120:3 123:10,21
123:22 129:4,15
**basically** 18:15
22:9 39:18 50:13

56:13 57:21 61:10
74:9 103:24
104:22
**bassinet** 39:14
41:17 58:10,14
59:7 64:12 66:19
67:3,8,14,22 68:1
73:13,23 74:24
76:4 79:15 89:22
103:20 113:14,25
114:14,14 115:24
116:15,25 120:16
124:6
**bassinets** 39:18
67:5
**bates** 19:23 25:18
72:15
**bear** 126:12,20
**beating** 70:7
**bed** 41:17 58:10
64:13 66:19 75:17
119:10,12 122:17
123:4 128:18
**bedroom** 66:16
67:6,8,22 74:2
90:5,10,12,15,18
91:1,3,5,13
**beginning** 26:9
27:11 66:11 73:21
119:6 128:23
**begins** 89:10
**behalf** 1:4
**behavioral** 9:20
**believe** 17:4 67:17
67:17 91:3 120:12
123:25
**believed** 79:19
117:17,18
**bell** 13:24
**belly** 121:8

**belt** 58:14,20 79:20,25 80:8,17 81:19 82:17,22 83:2,3,14 112:6 117:19,23 118:10
**belted** 111:22
**beneficiaries** 1:5
**beneficiary** 4:22
**bent** 96:15
**best** 121:14 123:8 134:13
**better** 50:7 87:17 87:17,18
**beyond** 13:2 15:25 32:21 45:17,18 46:12 55:21 82:23 93:25 109:18 113:18
**big** 42:9
**binder** 6:6 18:11 18:22,22 19:16,19 22:2
**birth** 105:5 128:6
**bit** 8:19 9:16 11:3 14:22 22:2 57:7 62:9 72:2 79:10 101:25
**black** 42:9
**blank** 40:12
**blanket** 37:1 66:18 90:19,20,23 113:13,22 118:25 128:15,18,20,21 129:2,8
**blankets** 119:11
**blanks** 102:1
**blonde** 69:10
**blood** 52:25 70:6,7 96:18
**bloody** 125:22

**blue** 69:11 70:13
**board** 9:6
**bodies** 53:16
**body** 13:7 33:15 34:7,9,11,15,16,18 34:20 36:23,24 37:5 47:24 48:1 48:13 49:3,9 50:13,18 52:4,12 52:13,18 53:4,5,9 53:13,21 55:2,25 56:1 59:11 60:7,9 61:7,18 62:4 68:22,24 69:1 70:5,12,18 74:11 77:10,17 78:4 97:6 108:2,3 109:15 124:25 125:5
**bong** 91:11
**bongs** 98:5
**born** 110:18 128:9
**bottle** 66:23
**bottles** 68:2 86:7 91:5
**bottom** 25:4,12,13 25:20 32:14 33:19 38:3 57:3 60:10 65:3 67:14 71:20 73:12 84:13 85:24 90:7,8 112:2 120:16 121:10
**box** 42:9 57:17
**break** 49:3 72:22 72:25 101:9 107:8
**breathing** 128:6 128:10 131:18
**brief** 5:22
**briefly** 22:18 41:25 103:11

**bright** 126:12
**bring** 39:9,13,13 53:19 102:19
**bringing** 102:21
**brother** 42:22 68:12
**brought** 15:7 39:4
**bruise** 59:12 69:14 70:20 93:16,20,21
**buckle** 82:21
**bulb** 14:16
**burning** 102:20
**business** 14:4
**button** 121:8

**c**

**c** 2:7
**call** 12:23 27:21 39:10 40:17,19,21 40:22,23 41:2 102:19 107:11,20
**called** 5:3 24:5 25:18 26:4,10,11 29:24 50:25 64:16 65:4 107:4,9 112:24
**calling** 28:12 100:19 114:14,15
**calls** 26:13 32:14
**camera** 36:12,14
**car** 35:1,5 63:25 67:2 90:7
**card** 68:10 91:24
**cardiac** 127:16
**cardiology** 130:2
**cards** 81:14
**care** 58:4
**carried** 34:11 36:22 37:2
**carries** 57:6
**carry** 75:12,13,14

**cars** 44:10
**case** 4:11,19 10:18 11:24 12:3,8,9,14 12:16,19 13:4,11 13:25 14:8,14,20 15:5 16:6,14 17:21 18:3 22:11 23:14,20 26:3,4,11 26:15 27:14,15 28:2 29:25 30:5 32:19,21 35:11 38:22 50:6,11 75:15 78:14 102:23 103:11,13 103:18,19 107:3
**cases** 10:21,23 11:15 12:5 15:3 16:16,22 27:18 44:9 78:22 107:18
**caucasian** 68:25
**cause** 11:18,25 15:18,25 18:3 20:18 21:4,10 23:19 127:10 130:13
**caused** 24:1
**center** 9:22 38:7 56:21 111:6
**certain** 48:25 87:9
**certainly** 124:2 127:11
**certificate** 1:23 2:3 3:13 17:10 19:21,23 20:6,20 20:25 98:12 134:5 134:23 135:12
**certificates** 20:13
**certifications** 9:4
**certified** 2:3 7:12 18:13,15 134:6

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**[certify - correct]**

Page 5

**certify** 134:16
**cetera** 25:15
**chair** 39:14
**chance** 48:23
  82:20
**change** 52:6,20
  53:11,12,15 77:16
  86:11
**changed** 26:8
  37:21 61:21
  113:18 133:1
**changes** 65:3
**check** 47:3 50:4,4
  61:12 87:17
**checked** 47:12
  55:9 60:16 61:15
**checklist** 31:18
**chest** 96:16
**chief** 29:9
**child** 27:3 31:23
  75:15 82:8 105:3
  105:5,7 107:9,14
  107:19
**children** 100:19
**chin** 96:8,11,12,15
  97:19,20 125:24
**chronologically**
  28:19
**circumstances**
  57:4,17 111:19
**clarify** 85:15
**clean** 40:5
**clear** 16:7 23:12
  67:20 69:11 93:6
**cleary** 38:7 100:14
**clients** 23:13 24:1
**climate** 6:2
**close** 15:15
**closet** 91:5,13
**clothed** 70:13

**clothing** 54:24
  55:13 79:2,4
**coach** 82:24
**code** 135:6
**cohen** 2:16 3:3,5,7
  4:17,18 5:6,16
  15:22 16:20 17:15
  18:20 19:14,18
  20:1,5 24:18,21,25
  32:12 33:5 43:5
  44:15 45:5 46:1
  46:21 49:12 51:2
  52:8 54:14 59:3
  59:13 62:8 63:23
  64:4,22 66:22
  68:16 72:18,23
  73:1,8 77:20 79:8
  80:22 81:2 83:20
  87:14 89:13 93:4
  93:15 94:2,19
  95:1,15 97:18
  98:11 99:23 101:2
  104:9 105:25
  114:18 116:19
  117:24 118:3
  121:1 126:3,9,11
  126:18 127:19
  128:2,14 129:13
  129:24 130:1,6,15
  130:19 131:12,16
  131:22 132:4,12
  132:16 133:6
**cohenl** 2:18
**cold** 70:12 112:18
  112:21 117:13
**colleague** 21:25
**college** 8:24,24
**color** 54:18
**combination** 88:8
**combined** 64:25

**come** 23:24 30:21
  38:18,19 40:14
  101:5 109:7
**comes** 84:1
**coming** 32:13
  40:19 49:24 57:18
  76:16
**commencing** 2:1
**comment** 7:16
  99:20
**commission** 32:16
**completely** 7:18
  11:8 22:5 52:24
  53:15
**compliance** 135:5
**complications**
  110:19,25
**computerized**
  134:10
**concerned** 129:21
**conclusion** 107:11
**condition** 129:21
  130:5,7,10
**conditions** 131:6
**confusing** 123:3
**congenital** 105:5
  106:16
**conjunction** 114:7
**connect** 4:14
**consider** 44:21
  105:7 129:20
**considered** 105:13
**consistent** 47:2
  52:10,13,15 54:23
  55:8 60:1,2,8,11
  60:15,20 61:13
  62:3 77:23 78:5
  123:15 124:24
**consumer** 32:15
**contact** 28:4 41:8
  43:4

**contacted** 24:12
  27:22 107:13
**contacting** 27:3
**contained** 24:9
  67:3
**containers** 98:6
**contains** 39:2
**contaminate** 116:6
**contamination**
  39:21 75:1 116:1
  116:8
**context** 6:19
**continuing** 74:22
**contributed** 46:17
**contributing**
  43:23
**conversations**
  112:15
**copy** 11:21 40:12
  102:20 133:13
**corner** 25:4,6,12
  25:13
**corporation** 1:8,9
**correct** 7:13 23:20
  24:1 44:17 55:15
  60:9 62:14,24
  63:4,13 64:13,14
  66:21 67:1 68:6
  70:21,24,25 71:4,5
  71:18 74:13,17
  75:3 78:10 79:17
  80:10,18 82:22
  83:17 89:21,25
  90:3,6,11,17 91:10
  92:5,13 93:14
  94:18 95:19 99:5
  99:9,12,18 100:1,9
  100:16,21 102:13
  106:16 108:8
  109:3 110:22
  111:16 113:7

114:1,3,8,9 116:2
119:1 120:5,6
121:5,6 122:8,9
123:2 127:7
128:19 129:11,12
132:14,15 134:12
**correctly** 55:16
**cough** 56:19 62:22
111:4 131:24
**coughing** 106:9
132:4,9
**counsel** 4:15 19:7
23:1 101:3 126:24
127:4
**county** 3:10,12
10:3,5,7 86:15
134:2
**couple** 18:8 57:24
63:17 119:22,23
126:19 127:23
128:16
**courkamp** 1:4 4:8
4:21
**course** 46:5 65:12
**court** 1:1 4:10,12
4:23 6:5 19:6
28:17 69:20 132:2
135:1,11
**courtroom** 4:14
**cover** 21:14,15
56:7
**covered** 62:20
**cpr** 109:8
**cpsc** 32:16 107:22
**create** 119:7,12
128:25
**creating** 45:21
**crib** 85:18
**crime** 9:4 75:20
**criminal** 9:3

**cristlyn** 7:7 22:12
**criticisms** 23:12
**cross** 116:8
**current** 6:2 10:9
56:21 106:10
111:6,15
**curriculum** 8:16
**cushion** 79:14
116:14,16,25
120:8,11
**cut** 57:22 62:25
84:25
**cv** 1:4 4:11

**d**

**d** 3:1 31:9
**dad** 41:21 42:17
42:25 56:25 58:9
63:19 64:12,25
82:14
**dangerous** 46:4,8
**database** 20:17,19
26:8,8 55:21,22
57:11 85:7
**date** 4:5 22:13
28:9 38:9 40:17
**dated** 134:19
**daughter** 58:4,9
58:14,18 63:10
79:20 81:5 117:17
117:19 131:18
**day** 23:25 28:12
38:14 134:19
**days** 49:10
**dead** 48:14 49:10
52:21 67:21
105:11 113:10
**deadlines** 6:5
**deal** 87:21
**death** 3:13 9:6
10:12 11:18,25
15:18,25 17:10

18:3 19:21,23
20:6,13,18,20,25
21:4,10 23:20
24:1 31:2,18,22
32:25 37:16 39:10
40:9,25 41:10
43:24 45:7 46:14
46:18 48:7,15,24
50:20 51:20 52:19
53:10 61:20 85:19
98:12 105:1,20
108:6 127:10,22
130:14
**deaths** 10:16
43:25 104:8
**deborah** 29:2,6
**deceased** 41:16
73:14 108:19
**decide** 46:19
105:17
**decision** 86:21
132:21
**declared** 108:18
108:23
**decomposed** 49:9
50:12
**defects** 105:5
**defendants** 1:10
2:14 4:18 5:8
**defer** 45:7 93:19
**definition** 104:13
**degree** 9:2,3
**degrees** 43:19
45:15,18 68:12
110:4
**department** 66:25
100:19 119:20
**dependent** 54:1
**depending** 89:8
122:22

**depends** 17:2
**deposed** 6:14
**deposition** 1:15
2:1 4:5 5:7,18 7:8
8:7 19:5 22:15
29:22 35:11 102:4
102:12 134:4,13
135:5
**depositions** 8:10
**depth** 120:18
**describe** 54:25
61:10 125:21
**described** 50:17
69:4 89:22 90:2
93:1 94:8 99:8
112:10
**describes** 63:1
66:16 67:8 98:25
**description** 3:9
55:3 56:1 57:5
59:22 60:7 62:4
66:10 68:22 70:16
70:19 73:19 74:10
74:11,11 88:13
**designate** 19:4
**desk** 29:6
**details** 68:20
**detective** 14:23
40:24 41:4 57:19
64:25 65:5 113:1
113:17,19
**detectives** 67:18
71:11 74:23 81:9
113:17 114:8
115:23
**determination**
11:22 105:14
**determinations**
18:1 46:15
**determined** 17:14

**determining** 130:13
**developed** 62:22
**developmental** 97:24
**device** 109:14
**diagnosis** 17:5 86:1 104:15,22 131:5
**dianne** 107:13
**diaper** 66:23 90:1
**diapers** 66:24 70:14
**died** 59:16 95:18 95:22,25 103:1 105:7 114:16
**dies** 53:22 54:9
**difference** 70:2
**different** 17:3 26:6 32:14 48:6 61:18 61:24 67:5 71:25 73:23 75:10 77:18 80:14 119:9,11
**differently** 45:19
**difficult** 125:1
**dimensions** 115:3 120:17,23
**direct** 6:10 26:18 26:19 119:24 125:4
**direction** 12:10 82:1 134:11
**disclosure** 135:2
**discoloration** 124:11
**discrepancy** 80:1 80:12 124:3
**discussion** 133:11
**discussions** 30:1
**disease** 85:25 86:1

**dispatch** 42:10 108:13
**dispatched** 41:1
**distinguish** 105:2
**district** 1:1,2 4:10 4:11
**doctor** 11:5 12:8 13:4,9,20 14:3,4 18:23 20:11 24:3 27:17 38:20,24 46:15,16,18 50:8,9 50:13 51:7,15 61:3 86:22 87:16 87:22 100:14 102:22 105:17 131:1
**doctors** 17:2,3,4 17:18 104:18 126:24
**document** 27:25 38:2 43:21 55:17 64:6 78:7 87:11 87:23
**documentation** 26:13
**documented** 30:22 45:3 59:9 60:22 60:24 77:17 106:8
**documents** 6:9 7:10 65:9
**doing** 5:25 6:1 19:2 55:18,19 82:2,25 83:24 85:3 88:12 102:6
**doll** 30:5,8 39:5 71:6,9 74:11,25 75:5,5,13,15,18,21 76:2,11,23 81:19 81:23 82:5,7,12,16 82:21 103:25 104:2 114:25

115:1,25 116:9,11 118:19,21,23 120:4,21,25 121:5 121:9 122:5,6 128:24
**doll's** 122:21
**dolls** 75:9,11
**donner** 85:4,6
**door** 110:7
**downstairs** 29:7
**dpcs** 28:12 38:11
**dr** 11:7,9 13:24 18:3 22:23 29:7,8 29:11,13,18 31:25 32:1,6,9,25 38:7 100:14,15 127:6
**drawn** 122:7
**drove** 35:5 63:7,17
**drug** 87:18 91:8 91:16
**drugs** 86:10
**duly** 5:3 134:7
**duration** 48:15 93:22
**duty** 36:10

## e

**e** 2:7,7 3:1,8 69:6 133:15
**ear** 96:9
**earlier** 60:24 65:7 100:17 102:11 104:12
**earrings** 70:15
**ears** 122:6
**easier** 19:3 28:5,7 85:4
**easily** 25:18
**east** 2:11
**easy** 6:12 21:20
**echocardiogram** 129:20 130:12,22

131:1
**effect** 103:15
**efforts** 113:11
**eight** 8:14 41:15 68:25 85:18
**either** 15:20 26:13 33:2 34:25 36:9 37:12 44:14 59:5 59:25 81:9 88:7 97:14 127:15,20 131:17
**electricity** 68:18
**else's** 26:5
**email** 38:19
**emergency** 106:10 112:24 113:9,21
**employment** 9:17
**empty** 68:2 86:7
**emts** 109:1
**encompasses** 104:14
**ended** 111:8
**entered** 26:19 28:24 29:21
**entire** 99:21
**entries** 26:6,10,11 32:13 43:12
**entry** 26:22 28:11 28:21 29:8,18,23
**environment** 45:22 48:19,21 52:1,7 99:18 100:1,5 105:12,15 119:8 128:25
**equipped** 87:8
**especially** 16:16
**esq** 2:11,16
**estimate** 108:2
**estimation** 109:17
**et** 4:9 25:15

Case 2:19-cv-02689-GMS    Document 196-38    Filed 11/19/21    Page 45 of 63

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

[events - findings]

Page 8

**events** 12:16 62:16
  63:2,2 64:23
**eventually** 39:1
  49:3
**evidence** 9:5 39:21
  40:6 66:25 75:1
  77:10 96:5 116:1
  116:4 117:25
  118:4 125:23
**evolves** 26:15
**exact** 118:13
  128:25
**exactly** 11:16
  25:16 36:7 60:12
  83:6 100:8 115:7
  115:11 116:22
  119:8 124:22
**exam** 89:10
  102:21
**examination** 3:2
  5:14 13:7,8 30:10
  32:7 59:11 70:19
  77:9 78:3 89:5
  101:21 126:16
  129:17 131:14
**examine** 119:15
**examined** 5:4
  134:7
**examiner** 3:10,12
  11:4,11 75:9
  90:22 99:17
  100:15 102:17
  111:9
**examiner's** 6:20
  7:12,21,23 8:25
  9:9 14:15 18:12
  20:23 21:3 25:9
  33:15 34:9,25
  42:5 88:3
**examiner's** 3:10

**exchange** 34:22
**exclusion** 104:16
  104:23
**excuse** 60:14
**exhibit** 3:10,12,13
  18:12,17,22 19:4
  19:10,11 20:2,24
  24:9,15 25:3,11,25
  71:16 72:1,10,14
  72:15,16 73:11
  74:6,7 79:11 88:1
  98:25 106:25
  115:19
**exhibits** 18:9 19:3
  39:1
**expect** 53:23 54:10
  126:1
**expected** 32:4
  46:14 61:23
**expecting** 16:12
**experience** 16:21
  52:5
**experiencing**
  106:20
**expert** 50:25 130:2
**expertise** 13:2
  51:13 94:1
**experts** 48:5 52:2
**explain** 52:14
  54:23 55:11
  123:12,16
**explained** 42:1
**explanation** 31:23
  58:23
**external** 31:4
**extremities** 50:15
  50:18 51:8,19
  69:24 70:11 99:2
**eye** 69:15
**eyelids** 98:16,18

**eyes** 69:10 98:19
  122:6

**f**

**f** 135:7
**fa** 11:5
**face** 52:21 53:23
  53:24,25 54:2,10
  59:5,7,15,19 70:20
  71:2 74:19,20
  92:22 93:3,7 96:6
  96:6 97:1,4
  112:11 115:14
  117:10 122:20,21
  123:4,7 125:25
**facial** 97:14
**factor** 43:23 45:21
  87:13
**facts** 22:8
**fair** 7:25 37:7
  65:23 66:3 81:18
  94:3 97:12,21
  102:15 111:21
  121:9 127:1
  128:17
**fall** 52:25 96:18
**familiar** 31:8,9
**family** 20:15 27:23
  42:18,24 58:6,24
  91:21 100:19
**far** 10:25 20:20
  42:1,4 44:11
  48:20 52:7 54:6
  59:10 60:22 72:4
**farms** 52:4
**farrel** 1:15 2:1 4:5
  5:2,7 8:5
**fast** 6:23
**father** 14:22 41:25
  43:15,15 57:20
  58:1 68:9 80:13
  81:10,15 92:4

118:20 127:22
  128:3
**feel** 83:9 88:15
**feels** 86:22
**felt** 14:11 44:23
  45:3,10 46:16
  48:22 117:13
  127:12
**female** 41:15
  68:25
**ferenc** 11:7,7,9
  13:24 18:3 22:23
  100:15
**ferenc's** 29:13
  32:6 127:6
**fields** 48:6
**fighting** 80:23
**figure** 50:10 51:12
  87:10 104:23
**file** 7:21,23 12:23
  14:15 21:8,13,18
  25:9 35:14 83:23
  85:18
**fill** 31:22
**filled** 31:17 40:10
  57:12
**filling** 101:25
**fills** 31:19
**final** 5:19 40:14
  55:24 56:2,6
  57:16 132:2
**find** 6:3,10 11:24
  16:10,12 17:6
  19:22 30:23 69:19
  86:9 104:20
  125:11 126:1
**finder** 82:6 123:20
**finding** 50:16
  76:19 86:18
**findings** 12:7 22:9
  31:5 51:13 85:13

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

85:25
**fine** 25:1
**finger** 81:6
**fingerprinting** 9:5
**finish** 32:8 49:15
  49:15 56:5 79:10
**fire** 119:19
**firm** 23:1 135:2,11
**first** 5:3,25 18:10
  24:11 25:20 26:17
  26:18 28:11 42:9
  47:21 50:1,2,3,3,4
  112:20 114:25
  117:12
**fisher** 1:8 4:9,19
  23:13
**five** 12:18 72:24
  101:11 119:10
**fixed** 47:5,6,21,25
  53:14 69:23 70:10
  99:2,8
**flip** 36:17 71:25
  73:18 83:22 88:16
  96:4
**flipping** 25:3
**floor** 67:2
**fluid** 128:9
**focus** 13:12 25:25
**focusing** 25:17
**folder** 55:19 85:5
**follow** 12:12 38:9
  101:3 126:19
  129:14
**followed** 65:17
**following** 87:17
  112:3 131:5
**follows** 5:4
**footage** 129:9,10
**foregoing** 134:4
  134:11 135:5

**forehead** 59:12
  69:14 93:17
**foreign** 1:8,9
**forgot** 65:7 83:14
**form** 5:11 15:21
  16:2,25 31:17
  33:4 37:9 43:2
  44:4,18 45:24
  46:9,23 48:17
  50:22 51:23 54:12
  56:12 59:1,8 62:7
  63:21 64:2 66:20
  68:14 77:13 79:6
  80:19,24 83:18
  84:8 85:12 87:2
  89:3 92:24 93:13
  93:23 94:17,25
  95:14 97:15 104:9
  114:18 117:24
  121:1 126:3,4
  127:18,24 128:11
  131:19
**formed** 69:13 96:1
**formula** 66:24
**forward** 85:6
**forwarded** 85:4
**found** 10:18 39:19
  41:16 52:21 53:2
  53:16 58:18 59:6
  60:9,23,25 61:11
  61:18,21 66:18,24
  67:2,12,13,15,21
  68:1,3 73:13,16,23
  73:25 76:17,24
  79:24 82:8,9,12,19
  86:25 87:5 89:9
  89:20 90:5 91:9
  92:16 103:1
  104:16 112:4
  113:2 114:23
  115:5,8,11 117:2

118:22,23 119:20
  121:19,22,25
  123:18 124:7,22
  129:2
**foundation** 32:11
  43:2 50:22 51:23
  64:2,20 89:3
  92:24 93:13,23
  95:14 98:8 99:19
  105:25 114:18
  126:4 128:11
  129:24 130:2,15
  131:19
**four** 10:7 19:17
  98:5
**frequent** 11:12
**fresh** 82:11 93:20
**front** 18:21,23
  25:9 29:6 44:25
  67:3 75:19 107:1
**fs** 33:23,24 38:3
**full** 8:3 9:13 10:10
  21:12,13
**funeral** 20:15
  34:23 42:2
**further** 28:19
  126:16 129:17
  131:11,14 132:18
  134:16
**future** 103:23
  104:7

### g

**g** 2:16 69:6 135:7
**gathered** 105:16
**gender** 75:10
**general** 106:7
  121:18
**generally** 102:12
**georgia** 2:17
**gestation** 56:17
  106:13 110:18

**getting** 26:25 57:1
  133:15
**girl** 85:18
**give** 8:11,19 9:16
  12:8 14:8 22:8
  50:5 53:8 56:1
  72:19 75:11 82:1
  82:4 86:24 93:6
  121:18 127:15
**given** 14:17 28:11
**giving** 50:8 59:22
**glass** 98:5
**gms** 1:4 4:11
**go** 5:24 8:22 11:24
  12:1,2,6,10 13:20
  14:12,16 15:19
  18:8 19:4,20
  21:21 22:1 24:23
  27:21,21 28:19
  30:21 33:8 37:25
  38:22 43:6,8 44:7
  46:7 49:15 51:10
  52:7 56:5 57:25
  62:11 66:6 74:5
  74:19 76:18 78:12
  79:9 83:23 84:11
  84:20 88:16 98:13
  99:22 102:3,5
  106:24 107:11
  109:10 110:11,11
  111:18 115:19
  117:7 120:2 121:4
  122:13 123:6
  124:7 126:8
**goes** 5:19 22:9
  32:2 47:1 56:17
  66:13 67:25 106:3
**going** 21:21 23:24
  25:24 28:18 35:12
  38:25 40:1 49:15
  53:8 55:5 71:12

Farrel Swope
In Re: Fisher-Price/Mattel

72:10,15,18 73:19
75:25 80:4,5 81:1
88:1 92:14,19
93:24,25 101:3,24
103:25 104:2,5
106:2 107:11
108:12 110:11
111:18 112:1
114:15 115:17,19
119:7 120:19
125:4 126:8
128:24 130:1
133:12
**goldberg** 2:10
**goldbergandosb...**
2:13
**good** 4:17 14:4,12
27:24,25 55:7
72:6 73:1 74:4
133:5
**governing** 5:9
**great** 102:6
**greenberg** 2:15
**ground** 54:6
**grow** 8:21
**gtlaw.com** 2:18
**guess** 11:15 21:25
52:11 54:8,24
55:16 57:18 60:20
76:14 95:2 100:6
103:15 115:14
116:8 122:6
**guesstimations**
52:1
**guest** 66:16
**guidance** 86:25
**guide** 83:11 87:7
**guiding** 83:5
**guys** 126:13

**h**

**h** 3:8 69:6
**hair** 69:10
**half** 9:12 12:18
**halfway** 108:13
**hand** 25:6 40:13
82:7 90:8 109:25
**handled** 20:13
**hands** 121:13
**handwriting**
85:17 108:4
**handwritten** 43:7
**happen** 16:8 22:17
53:4 58:23 82:25
**happened** 12:17
23:19 24:3 29:25
51:20 52:20 69:18
74:16 102:23
104:21 111:14
123:14 125:3
127:12
**happens** 48:2 53:3
**hard** 6:24 121:7
**head** 54:10 69:12
96:15 112:12
**health** 9:20 106:7
**healthy** 105:10
**hear** 5:23 16:4,13
128:4
**heard** 32:22 33:1
103:3,5,7,10
**hearing** 32:19
**heart** 70:7 105:6
128:5 129:21
130:4,7,10 131:6
**heat** 43:23 44:2
45:2,6
**held** 4:10
**help** 87:7
**helpful** 14:13

**hereto** 18:19 19:13
20:4
**hey** 38:20 86:25
87:16 102:20
**high** 44:2
**higher** 45:15
**highlight** 66:2
**history** 56:9,12
110:11 127:14,16
**hmm** 26:24 28:14
29:3 31:11 38:5
39:8 41:13 42:16
69:5 99:4 125:9
**hold** 6:11 9:23
64:3 78:11,12
96:7 117:6
**holding** 64:18
**home** 20:15 34:23
42:2 63:25 94:7
**homicide** 15:19,24
16:14 32:3
**honest** 41:6
**hope** 25:2
**hopefully** 5:22
**horn** 29:7,8,11
32:1,25
**horn's** 29:18 32:9
**hospital** 38:8
100:13 110:20
**hotline** 27:4
107:15
**hour** 133:16
**hours** 34:18 42:15
50:20 51:20 80:9
108:23 112:4
113:10 118:11
**house** 35:1 39:18
86:9,19 92:4
**humble** 14:5
**hundred** 45:15

**hundreds** 11:1
15:12
**husband** 118:20

**i**

**idea** 12:9 50:5
73:1 91:2 128:19
**ideal** 6:1
**identification**
18:18 19:12 20:3
**identify** 42:6
**illegal** 86:9,10,14
86:16
**illegible** 34:17
**importance** 82:3
103:25 104:3
**important** 43:20
44:16 83:7 87:11
110:21,25 130:12
131:7
**impression** 80:8
118:10
**impressions**
118:12
**incentivized**
126:14
**inches** 69:2
**incident** 100:18
127:23
**inclined** 103:5
104:7
**include** 65:25
105:20 118:24
**included** 21:23
100:18 127:10
129:2
**including** 30:5
**inconsistent** 60:8
61:6 62:4
**incorporated** 4:9
**independent** 54:6

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**indicate** 59:6
78:16
**indication** 127:16
**infant** 31:2,3,18
85:18 105:1,20
127:22
**infectious** 85:25
86:1
**influence** 83:11
**information** 26:15
32:5 55:20 57:10
60:21 64:24 65:1
69:17 93:21 100:7
105:16 113:15
**informed** 106:15
**initially** 49:20
53:2 82:19
**initials** 33:13,18
36:20 37:13 42:8
42:11 84:12,16
**inside** 37:1
**instance** 105:4
**instances** 44:1
**instruction** 121:18
**intelligence** 69:16
**intense** 14:3
**interested** 134:17
**internal** 31:4
**interviews** 106:18
**introduction** 5:22
**inventory** 36:18
**investigated** 10:20
**investigating**
10:18 20:7 44:1
**investigation**
11:10 13:6 15:20
22:5,6 23:5 24:10
27:9,13 28:10
38:10,23 50:21
66:8 74:17 86:12
98:4 100:18,23

109:23 122:2
124:15 130:13
**investigations**
9:19 15:13 39:11
46:3 103:23 104:8
**investigative** 9:10
12:12 13:13 27:2
46:23 57:6 62:11
65:10,11 66:5
74:13 75:9,20
98:25 99:25
129:22
**investigator** 5:7
6:19 8:21 9:11
10:10,12,24 11:21
12:4 17:24 18:24
29:10 35:3,8,22
36:4,13 39:3 42:6
50:19 51:14,15,22
62:13 64:16 65:24
71:11 83:8 84:7
86:9 88:6,25
**investigators** 9:7
29:4 62:12
**involved** 9:18
10:21 22:7,7,10
44:1 48:6 75:16
84:18 124:19
**involvement** 13:10
32:20
**involves** 32:17
**involving** 103:19
**issue** 87:4
**issues** 23:8 32:23
105:6,10 106:16
107:23 128:6
131:18
**items** 36:22 54:24
55:12 90:21 98:4
98:10

**j**

**j** 2:11 135:7
**jardene** 1:23 2:3
4:12 134:5,22
135:11
**jaw** 47:19 49:17
49:25 50:1,2,4,14
50:17 51:18 60:19
69:23 99:11,12
**job** 55:7 65:12
102:6
**joints** 47:25 48:4
**judicial** 135:6
**judith** 29:2,5
**jump** 88:18 89:14
101:24
**june** 1:16 2:2 4:1,6
28:10 107:13
134:20
**junior** 35:20
**justice** 9:3

**k**

**kathleen** 1:4 4:8
4:21 58:17 63:16
65:4 80:7 106:3
110:16 112:3,24
118:9
**kathleen's** 63:7,11
**katie** 106:3,4,5,6
106:19 111:24
112:20 115:4,13
117:9,9,12,13
118:16 121:5,13
121:16,23
**katie's** 112:8
123:10
**keep** 39:10 40:5
118:1
**kept** 39:12

**kid** 75:17 78:24
82:19 105:9
**kids** 44:10
**kind** 12:9,13 13:21
15:25 16:6,16
22:3 24:6 25:25
32:20 34:17 51:21
52:4,9 54:3,24
63:1 70:23 81:6
87:7 100:23,24
104:5 108:13
112:2 120:15
121:7 129:9
**kinds** 13:1
**kitchen** 67:9,23
68:2 74:1,1 89:16
89:19,23 91:1
**knew** 14:4 39:10
60:21 113:4
**know** 5:23 6:1 7:4
8:6,14,20 10:10,17
10:22,25 11:2,14
11:21,23,25 12:10
12:11,13,14,25
13:3,19 14:2,8,20
14:21,23,23,24,24
15:25 16:3,4,7,8
16:11,12,15,15,17
16:18 17:1,7,9,11
17:20 20:12,18
21:15 22:6,10,16
23:9 24:3,4 26:12
26:15 27:14,15,17
27:18,18 28:9,25
29:5 30:2,17
31:18,23,24,24
32:19,21,22 33:12
33:14 34:19,21
35:12,16 36:5,7
37:23 38:17,18,21
39:2,16,23 41:4,8

Case 2:19-cv-02689-GMS   Document 196-38   Filed 11/19/21   Page 49 of 63
Farrel Swope
June 12, 2020
In Re: Fisher-Price/Mattel

[know - looks]
Page 12

42:1,3,4,10,20,22
43:22 44:9,13,13
44:19,19,21 45:14
46:11,12,18 47:23
48:1,5,13,24 49:8
49:9,10,22 50:7,12
51:4,4,6,6,6,13,20
52:2,2,3,5,18,19
52:19 53:15 54:2
54:5,6 55:24
56:25 59:10,10
60:11,21,23 61:2,3
61:5,5,17,19,25
63:24 64:1 65:7
67:16 70:6 71:8,8
74:1 77:17 78:2
78:16,24 79:3,24
80:14 81:10,22,23
82:2,11,18 83:3,11
84:19,24 85:9,21
86:4,6,10,16 87:15
87:18 88:6,7,8
89:7,8 90:25
96:21 97:5,7,11,24
98:3 100:8,17
102:5,7,7,8,19,21
102:23,25 103:10
103:15,16,16,20
104:3,15,16,20,22
105:11 106:8
108:1,18 109:19
109:20 111:8,13
112:11,12 113:15
115:2,3,5 116:4,10
116:24 117:14,21
118:13,19 119:5,6
119:17 120:10,13
120:24 123:14,14
123:14,23 124:3
124:18,18,19,21
125:1,2,6,21 127:3

127:6,11 129:1
130:20,22 131:2,3
133:4
**knowing** 51:14
**knowledge** 21:9
121:14
**known** 21:6 49:20
134:4
**knows** 12:10
**kristin** 2:11 4:20
**kschriner** 2:13

**l**

**l** 1:23 2:3 134:5,22
135:11
**lab** 30:24
**laboratory** 84:3
**labs** 87:8
**lateral** 58:19
60:25 61:11 62:5
76:23 77:11,12,24
92:15 93:2,11
112:6,9
**laura** 29:2,7
**lawsuit** 23:8
**lawton** 41:19
57:20 107:17
110:16
**lead** 10:24 35:22
62:13
**leaning** 54:9,15
59:7
**learn** 16:22 106:19
109:7
**learned** 21:7 58:5
107:22
**leave** 48:15 82:10
87:20
**left** 17:18 44:10
56:9 58:19 60:25
61:11 62:5 69:14
76:23 77:11,24

90:8 91:11,22
92:15,21 93:2,2,7
93:11 95:4 96:6,9
112:5,9 122:17,23
122:24
**legal** 86:10,17
**legs** 78:18 95:3,8
115:6
**letting** 61:25 102:7
**leyva** 29:2
**light** 14:16
**line** 56:9
**lines** 117:22
**list** 54:23 87:3,4
**listed** 20:17 90:21
**listening** 56:25
**listing** 55:12 84:6
**little** 8:19 9:16
14:22 22:2 25:4
25:12,20 57:7
61:24 62:9 72:2
79:9 101:25
**live** 10:3 58:2
**lived** 10:5,7
**living** 10:6 42:23
43:22 63:3 66:24
68:13 89:16 92:4
92:11
**livor** 47:2,6 52:10
52:15,22 53:8,12
53:12,13,24 54:4
54:22,25 55:8
59:6 61:13 62:2,3
70:1,2,5,10 71:2
77:15 78:15 89:2
89:5 94:8,9,23
95:4,9,13 96:5,9
96:12,21,25 97:9
97:13 98:17,19
99:1,9 125:24
126:1

**llc** 135:11
**llp** 2:10,15
**log** 26:10 107:4
**logged** 66:25
**logistics** 21:25
22:13
**long** 9:21,23 10:13
11:13 14:9,11
29:16 30:20 38:21
48:14 109:19
123:24
**look** 11:3,24 12:2
12:2,7 16:17 24:8
25:19 28:20 40:8
42:8,20 45:4 47:9
48:7 50:3 51:17
52:4 61:10 62:9
68:22 72:8 74:20
78:14,18,19,23
84:10 85:8 87:25
90:19 91:7 93:6
94:4 95:7 96:8,20
96:24 98:15 99:7
103:22 107:3
119:22 125:10,11
**looked** 12:14,21
12:24 14:16 15:4
52:11 53:9 81:11
88:9 94:5 96:3
109:16
**looking** 12:11 15:8
28:9 46:6,13 53:7
53:7 74:8,10
75:18 89:16 96:11
104:6 115:14
120:13 122:16,25
124:14 125:24
127:6
**looks** 11:17 28:11
29:8,24 31:25
34:17,18 42:14

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

**[looks - morgue]**

56:3 57:4,25 58:8
64:15 67:4 71:23
72:11 73:21 84:11
85:14 91:7 98:2,3
108:14 121:7
122:5,16 123:7
124:11
**lori**  2:16 4:18
**lot**  12:6 17:3,13
27:20 37:21 48:21
53:3,16 78:22
86:25 88:12 102:3
104:4 105:5 110:1
**low**  11:15
**lower**  28:9 70:11
94:12 99:2
**lowest**  70:8 96:18
96:23
**lungs**  128:9
**lying**  53:22,22
54:2 92:23 95:12
**lysed**  49:6,11
50:10,11
**lyses**  50:2

**m**

**madrigal**  29:2
**main**  66:17 67:6
**making**  44:6 49:21
65:24
**manipulate**  48:3
**manner**  11:18,25
16:1 20:18 21:4
32:4 117:14
127:10
**march**  9:14 56:21
111:6
**maricopa**  3:10,12
10:4,5 86:15
134:2
**marijuana**  68:4,4
68:10 86:7,8,14,18

86:19,25 91:16,24
92:1 98:5,6
**mark**  7:8 18:8,11
19:4 98:12
**marked**  18:17
19:11 20:2 45:19
106:25 125:11
**marking**  19:2
20:24
**markings**  53:23
54:11,19 59:4
**maryland**  8:23
**materials**  22:2
**mattel**  1:8 4:19
23:14
**matter**  4:8 5:8
**mc**  19:8
**mcome**  18:13 19:8
**me's**  12:22
**mean**  7:14,15 11:3
11:13,23 12:3,6,14
13:1,17,20,23 14:4
14:20 15:23 16:8
16:13,15 17:4
20:12,14 22:3
24:4 30:19 31:19
38:18 39:23,24,25
40:3 41:25 44:11
44:21 46:12 47:8
47:21 49:22 50:7
50:24 51:6,7 52:3
52:14,16,18 61:16
61:17 75:11 77:14
77:14,17 78:22
82:4 83:3 86:16
88:19 89:5 92:25
93:24 95:11 97:4
97:9 105:13
112:20 116:16
122:2 127:8
132:21 133:4,4

**meaning**  52:11
114:10
**means**  34:6,8 47:3
47:23 51:19 62:13
96:17 97:10 114:3
130:8
**meant**  69:6 120:14
120:20
**measure**  109:14
109:15 120:15,20
**measurement**
120:20
**media**  103:8
**medical**  3:10,10
3:12 6:20 7:12,21
7:23 8:25 9:8,18
11:4,11 13:18
14:10,15 18:12,15
19:8 20:23 21:3
22:11 25:9 33:15
34:9,25 37:23
38:7 42:5 56:8,12
56:20 68:10 75:8
88:3 90:22 91:23
99:16 100:11,15
102:17 110:11
111:5,9 127:14
**medication**  87:12
**medications**  87:5
**medicolegal**  9:6
10:12
**meet**  13:4 35:1
**meeting**  103:12
**melanie**  29:9
**members**  42:18,24
**memories**  15:8
80:15
**memory**  40:11
80:16 107:20
116:2

**mental**  109:23
**mention**  19:21
59:18 127:21
131:17
**mentioned**  31:8
80:13 102:11
103:14 125:23
129:3
**mentioning**  56:2
**metal**  70:14
**middle**  27:11
94:12,12
**miles**  42:10
**mind**  67:20 102:20
104:13 133:2
**mine**  26:24 42:11
**minute**  28:18
29:17 40:9 64:3
72:11,22,24 78:11
85:9 96:7 98:13
**minutes**  48:24
101:12 108:23
**mischaracterizes**
117:25
**mischaracterizing**
118:3
**mom**  41:18,21
42:17,25 56:14
57:20 58:17 64:25
65:2 73:14 79:16
82:19 83:16 92:16
111:17
**mom's**  127:14
**moment**  27:3 28:8
**monkey**  120:8
**month**  41:15
68:25 85:18
**months**  9:13 62:21
**morgue**  33:17
34:10

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**morning** 34:12 35:13 58:6,9,18 64:11,15,19 73:14 108:16,21 112:3
**mortis** 48:23,25 49:4,5,7,11,19,23 49:24 50:4,14 51:4,5 52:23 53:13 54:4 69:22 70:1,2,3,4,5,10 71:2 77:15 78:15 89:6,6 96:10,12,21 97:9 98:17,19 99:1
**mother** 41:16 56:23 58:2 76:18 76:22 80:12 106:5 110:17
**mother's** 78:1
**mountain** 4:6
**mouth** 79:11,13 116:13,25 117:1 122:7,11 124:25
**move** 9:25 52:9 55:5 71:7 82:9 88:1 107:25 108:9 110:10 126:14
**moved** 52:18 53:4 53:5,13 61:7,22 77:16,18 113:5 117:9,14 124:25
**multiple** 68:2 86:7
**murmur** 128:5

**n**

**n** 2:7 3:1 103:3,9 104:7 114:15,16 116:5,10 118:18 119:16 120:4,7,16 120:18 121:11 122:17,23 124:6
**name** 8:3 10:23 11:6 25:21,22 26:1,19 27:5 33:7 33:11 36:19 37:10 37:12 62:12 84:1 84:3,12,21 102:25 103:18 106:4 107:16,17
**named** 134:7
**names** 26:7 28:25
**natural** 46:12
**ne** 2:16
**near** 16:22
**necessarily** 55:20 89:6 97:9 121:8
**necessary** 86:23 87:10
**neck** 69:12 121:17 121:23 122:2
**need** 7:3 12:1 18:21 24:22,23 45:4 72:7 83:2
**needed** 14:12 42:4
**needing** 42:2
**negative** 23:13 131:10
**neglect** 27:18
**network** 85:4,6
**never** 17:11 20:21 75:8 103:17
**new** 26:8 104:4 129:15
**newman** 35:4,8 36:4,13,13 39:4 42:6 64:16 71:11 88:7 89:1
**news** 103:8
**ng** 2:20 19:17,25 72:17
**night** 34:12 58:6 68:19 79:21 90:13

90:16 100:9 117:20 118:17 128:22 129:7
**nightstand** 67:13
**nonspeaking** 118:2
**normal** 65:17 129:20,25 130:11 131:1
**normally** 69:13
**nose** 117:4 122:7 122:10 124:25 125:17,22
**notation** 44:25 84:18 124:2
**notch** 14:6
**note** 43:20 44:16 45:22 46:4,7,22 48:12 50:6 59:22 60:5 68:6 70:23 71:1 81:7 84:4 91:17 107:25 109:24 110:22 111:1,15 120:7 124:16 129:22 130:23 131:7
**noted** 45:16 70:20 70:24 98:21 99:1 99:1 109:18,20 124:20,23
**notes** 7:22 13:13 13:13 26:3,4,5,11 35:15 43:8 65:24 73:20 75:25 107:3 110:1,2
**notice** 7:8 18:10 71:1 122:6 124:10
**noticed** 59:23
**notified** 61:20
**noting** 48:9,11 124:14

**nourished** 69:1
**nowadays** 28:5
**number** 4:11 14:17 19:23 38:3 42:12 72:15
**numbers** 25:5,5,12 25:16,18 28:9 71:20

**o**

**o'brien** 14:23 40:24,25 41:4 66:6 67:18 74:24 115:24
**o'clock** 126:13
**oath** 4:24
**object** 54:3 59:15 97:6 116:19
**objection** 44:7 99:19 104:9 105:25 114:18 117:24 118:4 121:1 126:3,3 129:24 130:15
**objections** 5:10 118:2
**observation** 45:10 48:10,11 49:21
**observations** 17:25 23:5 74:16 78:4
**obstructed** 79:14 116:14,25 117:2
**obvious** 12:1 49:8 50:12
**obviously** 12:16 30:24 44:16 62:12 72:6 76:8 81:3 92:8 99:11 105:9 129:9
**occasionally** 11:24

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**occurred** 50:21
80:15
**offenders** 9:22
**offer** 23:25 32:3
**office** 3:10,12 6:20
9:1,9 12:22 28:3
29:11 33:16 34:10
34:14,25 40:11
42:5 43:9 53:18
88:3 103:11
**officers** 109:4
**official** 7:12,23
10:11 56:6
**oh** 47:15 60:17
81:4 88:24 92:7
109:6
**okay** 5:21,23 6:9
6:18 7:1,2,4,5,6,18
8:15 11:8,17 15:1
15:11 18:2 20:16
21:23 23:11 24:7
24:18 25:3,6,11,17
25:22,24 26:1,2,11
26:21,23,23 30:14
31:21 33:6,9,13,25
34:1,6 35:24 37:4
37:9 39:13 40:2,8
43:11 44:8 46:2,6
47:7,13,15,17
55:14 57:9,9,13,24
59:4,14,16 61:9,15
61:16 62:1,18
63:1 65:2 66:9,15
69:8,22 70:9
71:24 72:6 74:4
74:19 78:9 81:25
83:21 84:20 85:1
88:21,21,24 89:14
92:7 93:5 94:3,15
95:24,24 96:7,19
97:21 98:18,21

99:14 100:6 101:7
101:11 102:2,10
102:25 103:7
107:6 108:6
109:19 110:7,14
111:3,15,20 112:1
112:17 113:20
114:5,5 115:9,18
115:21,22 116:11
118:15 119:24
121:16,21 122:1,4
123:6 124:9
125:10,11,13,16
126:7 131:22
132:16
**old** 41:15 68:25
**olive** 63:12
**olson** 4:22 43:14
57:19 58:1,9 63:7
63:16 64:17,18
68:9 76:3,11
79:19 107:16
113:2 117:16,18
**olson's** 68:12
**ome** 34:2,4,4,4
**once** 14:14 16:8
77:16 81:24,25
88:6
**ones** 19:20 20:14
65:11 81:15 88:2
88:4 94:6 101:5
120:1
**online** 127:23
**open** 27:18 28:3
107:18 110:7
**opinion** 14:5,5
23:22,23,25 24:6
32:3,9,25 48:9
50:8 104:19
**opinions** 13:23
17:3,19 18:4

22:15 23:7,13,18
**opposed** 74:2
**option** 132:20
**orbits** 98:15
**order** 5:9 95:12
**orders** 86:22
**ordinary** 65:12
**orientation** 94:20
**original** 52:19
53:12 116:5
119:16 120:10
**osborne** 2:10
**outcome** 131:9
134:18
**outside** 7:11,22
41:25 65:5 102:7
122:25

**p**

**p** 2:7,7
**p.m.** 1:17 2:2 4:2,6
73:3,4,5,7 101:15
101:16,17,19
133:10,16
**pacifier** 67:3,12
90:16
**pacifiers** 90:13
**package** 21:23
**page** 3:2,9 18:14
19:8 21:3 25:5,16
25:19,20,22 26:18
28:8,18 29:18
33:6,14 36:17,20
37:18 42:7 43:6
47:13 55:3,22,25
56:3,3 57:22,23
60:13 62:10 66:11
69:23 72:9 73:11
74:7,8,9 75:19
78:15,18 79:10
83:25 84:1,2,20
85:8 86:6 90:25

91:7,25 92:17
96:8,20 98:13,24
99:7 100:12 107:2
107:3,25 108:9
109:11 110:13
115:19 123:6
**pages** 26:3 57:7
81:12,13 96:24,25
**paragraph** 56:13
62:19 64:24 66:5
70:18
**paraphernalia**
68:4 86:8,19
87:18 91:8,16
**parent** 127:15,20
**parents** 35:1 63:3
72:4 91:15,21
92:11 97:23
100:10 131:17
**part** 9:12 16:22
26:3 47:5 55:9
56:7,8,12 57:3,4,5
62:16 66:6,7,9
71:7,9 74:16
79:10 84:24 88:25
90:21 95:3,3 98:4
98:25 99:15
102:11 108:13
110:11 115:18
**partially** 78:25
112:11
**party** 5:8 134:17
**pass** 126:1
**passed** 49:4,14
61:19 119:16
120:11
**passes** 50:2
**pasted** 57:23
62:25 84:25
**patterns** 53:12
60:1 77:15 78:15

Farrel Swope                                                          June 12, 2020
In Re: Fisher-Price/Mattel

**[pause - postmortem]**                                              Page 16

pause 29:17
people 30:20
  32:15 42:23 45:8
  48:5,16 104:4
  112:13 119:11
perfectly 23:12
period 68:19 79:1
  94:16,22 95:16
  106:14 110:18
person 48:13
  52:21,24 53:21,22
  59:15 77:16 82:6
  82:8 87:11 89:9
person's 54:2
personal 36:19
personally 119:15
personnel 112:25
  113:9
pertinent 65:25
  88:15
phoenix 1:16 2:2
  4:1 8:24,24 9:2
  38:8 100:13
  110:19 134:19
phone 26:10,13
  107:4
photo 73:20 91:1,4
  98:16 120:14
  122:16 123:6
  124:12 125:19
photograph 39:14
  92:22 123:13
photographed
  119:3,17
photographs 3:12
  13:7 14:9 30:10
  30:12,13,15 36:6
  55:1 71:15 76:4
  76:10 77:3 81:20
  88:1,9,22 89:8
  94:5 119:23

123:16
photography 9:4
photos 7:22 12:25
  13:14 15:5,9 19:5
  19:9 20:24 21:14
  21:15,18 30:5,8
  36:3 38:25 39:2
  52:12 61:4 62:9
  71:13,21 72:1
  73:22 75:19 76:9
  76:9,16 79:9
  81:10,11,13 88:12
  88:13,23 89:11,12
  91:18 92:8 94:6
  96:3 97:1,12,14
  99:8 102:13,16,18
  124:5 125:5,5,10
  125:25 126:7
phx 4:11
physician 13:22
physicians 45:8
pick 42:2 63:19
  82:7
picked 63:16
picture 24:16,17
  53:9 72:8,10,11
  73:12 89:15 92:20
  93:17 122:5
pictures 83:23
  91:19
piece 132:13
piedmont 2:16
pillows 119:11
pinal 10:7
pink 73:15
pipes 98:5
place 29:13 50:3
  52:19 76:18 81:22
  82:21 83:1 89:24
  92:6,8 115:10,10
  118:20,22,25

121:16,18,22,24
  123:17 129:1
  131:8
placed 60:23 76:2
  76:10,11,22 77:18
  80:9 81:14,15
  82:16,19 83:1
  113:13,24 118:11
  118:21 120:4
  121:5,14 129:1
placement 82:6
placer 82:5
places 25:25 52:3
  100:8
placing 76:5 82:14
  118:17
plaintiff 1:6 2:9
  4:21
plaintiffs 23:1
platt 1:23 2:3 4:12
  134:5,22 135:11
play 103:3,9
  114:15,16 116:5
  116:10 118:18
  119:16 120:5,7,16
  120:18 121:11
  122:17,23 124:6
played 45:6
plays 104:7
please 4:15,24
  6:25 7:4 8:3 132:6
  133:14
point 8:21 20:10
  27:9 46:16 49:2,7
  49:22 51:17 70:8
  72:6 95:17,18,22
  95:24 96:17,18,22
  96:23 113:4,18
  120:24 129:7
pointed 46:11
  122:21

pointing 81:6
  121:10
police 9:19 13:5
  21:12,13,14,18,18
  21:18 22:4,21
  27:20 31:19 35:1
  40:3,22,23 42:21
  57:19 64:17,24
  66:25 71:13 88:4
  91:22 98:4 102:12
  102:15,20 128:4
pooling 70:6
portion 74:12
  99:25
posed 127:13
position 9:23
  52:22,25 53:17,18
  58:19 60:2,24
  61:1,8,12,18 62:5
  66:18 76:3,24
  77:12,18,24 78:17
  78:24,25 82:10
  89:9 92:15,17
  93:1,11 95:23
  112:6 113:14
  115:6,7 124:24
positioning 123:11
possession 20:22
possibility 45:4
possible 16:17
  45:2 86:2 95:17
  119:13
possibly 26:17
  85:19 126:2
post 27:12
postdate 100:18
posterior 70:12
  99:3,9
postmortem
  100:23

postmortemly 48:2

pounds 34:20 69:3 108:7

practice 65:17

preliminary 13:8 37:16 38:23 40:8 55:24 57:5 65:10 85:13 86:1

premature 106:12 110:24

preparation 43:12

prepare 12:8 13:3 13:4,6 21:24 35:15 37:17

prepared 26:4 37:17 38:1

prescription 87:4

presence 98:10

present 2:19 22:8 47:18,24 48:2,20 48:21 49:17 50:14 50:17,18 51:18 60:18 71:8 72:5

pressed 59:15

pressure 54:4

pretty 14:12 15:15 25:18 69:11

price 1:8 4:9,19 23:13

printed 88:10

prior 41:4 50:20 69:23 77:18 102:1 115:14,14 120:3 134:6

probably 8:12,13 10:21 11:14 21:21 23:9 36:6 61:23 69:6 71:19 124:20

problem 40:17

procedure 42:1 65:18

proceedings 133:17 134:12

process 6:23 86:1

produce 8:17

produced 21:15

product 32:15 102:25 120:21,22

progress 84:3

projectiles 16:11

promoted 9:11,14

prompt 86:19

prone 52:22 53:17 58:19 61:1,11 62:5 76:23 77:12 77:24 78:17,25 92:15 93:11 112:5 112:8

pronounced 113:10

property 36:19

propounded 134:8

protective 5:9 27:4,16,22 107:9 107:14

protruding 122:10

prove 17:7 24:3

providing 111:8

pull 6:10 12:22 24:9,22 72:9,10,14 74:5,6 92:19,20 93:9

pulled 14:15 21:8 73:11

purge 125:22

purposes 20:25 40:6

pursuant 5:8

put 17:21 37:19 38:2 41:12 43:7

45:1,13 47:18 48:14 53:17 57:14 58:9 60:11,15,19 64:10,12 74:15 81:18 100:12 105:16 106:13 128:18 130:25 133:1

putting 24:13 44:24 65:18

q

quarters 66:17

question 5:11 6:24 7:9,19 15:11 17:16 21:22 47:20 77:22 92:10 96:14 100:22 117:11 123:3 126:23 127:1 128:15 130:6 131:12

questioning 129:15

questions 8:2 32:23 57:15,24 73:10 91:22 101:2 101:4 102:1 109:11 111:19 126:9,19 127:3,4 127:13 128:16 131:11 134:8

quick 19:22 24:8 74:6 87:25

quickly 126:14

r

r 2:7

r1028 135:12

radiograph 30:23

radiology 16:10

rain 2:20 4:13

ran 107:15

range 31:24

rarely 14:7

reach 30:1

read 5:17 12:24 22:1 31:14 80:5 99:21 107:12 112:1 127:9 132:20 134:14

reading 39:23,24

real 19:22 74:6

really 7:16 11:13 13:10,16 17:25 36:8 50:24 51:24 85:15 86:13 100:7 102:3 114:24 133:7

reason 20:21 32:17 85:2,3 104:21 130:22 131:9 133:3

reasonable 32:4

recall 14:18 24:11 36:5,6 41:5,24 42:19 44:1 57:2 58:22 59:11 60:12 60:12 67:17 68:20 79:22,23 82:17 98:1,6,9 103:8,16 103:21 106:7 109:9,16,18 110:7 110:9 111:23 114:13,24 115:16 116:17,21 117:8 118:14 120:12 122:18 123:19 124:4,14 131:20

recalled 76:19 103:20

receive 11:21 38:19 40:21

Farrel Swope                                                      June 12, 2020
In Re: Fisher-Price/Mattel

**[received - review]**                                              Page 18

received  7:10
12:15 21:7,10
26:14 40:19
111:11,12
receiving  33:17
34:10
recess  73:4 101:16
recognition  40:15
69:9
recognize  41:7
recognized  15:5
recollection  42:24
78:10 80:20 90:24
111:13 118:6
123:22
recollections  15:8
record  4:4,16
18:10,12,16 21:1
33:21 37:23 44:7
73:2,7 101:14,19
112:14 133:1,9,11
records  3:11 7:12
11:4 12:22 13:18
14:10 20:23 21:3
21:13,17 28:4
33:14 38:6,15,18
38:20 84:17
100:11 111:9,10
recreational  86:17
red  70:14
reduced  134:10
reenact  82:20
reenactment  30:6
30:8 39:2,4,5,20
71:6,9,18,21,25
72:4 73:19,22
74:12,16,25 75:21
79:10 81:11 82:3
89:23 104:1 114:6
114:17,25 115:17
115:25 116:11

118:15,19 119:1
119:25 125:6
128:24 129:4
reenactments
104:2
refer  25:16 106:2
referenced  35:16
references  42:21
refers  66:6
reflected  77:2
regarding  27:23
103:8 107:19,23
registered  9:6
135:2,11
relate  71:17
related  45:2 59:19
134:16
relationship  35:21
released  42:5
relevant  46:19
66:1 68:5 87:6,23
remember  13:22
13:24 14:17,20,21
14:21,22,23 15:2,4
18:2 32:18 36:8
38:15 41:6,23,24
43:3 59:12 68:21
79:25 97:22
remembered
39:25
removed  119:18
renk  11:5
repeating  62:20
repetitive  57:7
rephrase  6:25
45:12 92:10 102:6
report  7:15,20
11:3,19 12:24,25
13:6,13 14:2,8
15:8 17:22 21:18
27:2,16 28:1,7,10

32:6 35:19,24,25
36:1 37:16 39:24
40:9,16 42:21
45:23 46:23 55:2
55:16,21,23 56:2,6
56:7 57:1,16
60:10,25 62:11,14
65:10,24 67:21
74:13 80:5 84:23
85:1,3 86:6 87:24
88:11,14 89:23
91:18 98:21,24
99:17 100:12
103:15 106:24
110:2 124:16
127:6,9 129:22
130:25
reported  1:22
40:25 43:15 58:24
67:16 80:16
reportedly  67:13
reporter  2:3 4:12
4:24 19:6 28:17
69:20 132:2,3
133:12 134:6
135:1,11
reporting  127:14
128:4 135:2,11,11
reports  20:19
30:24 31:14 35:16
38:10 64:9 103:8
107:18,22
represent  31:1
representative
34:2,4
representatives
4:13
representing  4:18
4:21
request  12:11
14:10 74:23

102:18 115:23
requested  14:1
27:16 38:6 39:21
84:17 100:12
103:16 111:10
required  34:23
87:8
researching
127:22
reserved  5:10
residence  63:8,11
63:17 66:16,17
68:3 94:7 110:8
residences  58:3
63:3
residential  9:21
respiration  112:19
responded  112:25
responsibility
58:3 63:4
responsible  33:16
responsive  7:10
responsiveness
5:11
rest  83:22 87:20
restate  132:6
restaurant  63:9
restraint  80:17
81:19
restrictiveness
79:4
resulted  94:23
results  130:24
131:10
resume  8:16
resuscitative
113:11
returned  63:10
review  5:18 29:25
30:4 33:7 35:14
38:17,22 88:13

Farrel Swope                                                June 12, 2020
In Re: Fisher-Price/Mattel

**[review - second]**                                                Page 19

100:15 102:12,22
133:4
**reviewed** 32:1
39:17
**reyes** 15:2,3 57:19
64:25 65:5 66:7
67:18 74:24 113:1
115:24
**right** 5:21 7:25 8:6
11:8 12:20 14:8
17:24 23:5,9 25:4
25:6,12,13 26:24
27:6 30:7 32:8
34:2,13 36:2,11
38:4,13 40:4,20
41:3,20 42:13
43:10 46:4,25
47:1,13,16,17,23
51:3 53:6 54:17
54:21 55:7,10,13
56:2,4,24 57:7,20
57:21 58:6,15,16
59:17 60:4 61:15
61:16 62:6 63:5
66:8,15 67:10
69:4,10,25 72:21
75:4 76:12,13,20
77:1,4 78:6,21
80:11 81:17 82:23
83:6,8,13 84:2,10
89:14 92:9 94:10
94:12 97:2 99:6
101:13 107:5,8
108:12,17,24
110:6,10 112:15
112:22 113:6
114:4,12,13
122:21 123:1
129:5,6 132:5
**rigor** 47:1,5,21
48:7,23,25 49:4,5

49:6,11,19,23,24
50:4,14 51:4,5,18
51:19 52:10,15
53:8,24 54:18,22
54:25 55:8 59:6
61:13 62:2,3
69:22 70:2,4 89:2
89:5,6
**ring** 13:24
**road** 2:11,16
**rock** 103:3,8 104:7
114:15,16 116:5
116:10 118:17
119:16 120:4,7,16
120:18 121:11
122:17,23 124:6
**role** 45:7
**roll** 52:24
**rolled** 117:13
**room** 43:18 44:11
45:11,13 66:24
67:6 89:16 106:10
109:12 114:11,16
**roughly** 10:16
**rouse** 29:9
**routinely** 27:14,19
**rpr** 1:23 134:22
**rrf** 135:12
**ruled** 104:23
**rules** 102:3
**run** 16:9
**running** 27:4

**s**

**s** 2:7 3:8 31:9
**sadly** 10:17
**safe** 46:6
**safety** 32:15
**save** 85:5
**saved** 20:19 37:22
55:19

**saw** 35:13 43:16
59:10 87:18 99:11
117:9 125:23
**saying** 38:20 45:16
45:20 47:11 48:3
53:5,10,11 54:8,20
61:13 62:2,3
79:22,23 84:16
97:8
**says** 21:3 26:19
27:1 30:4,23,25
31:25 33:20 34:3
34:15 36:25 38:6
40:17 41:10,14
43:11,14 47:5
51:5 54:22 55:8,8
55:11 56:8 57:25
58:11,13,17 62:22
63:2,6 64:11 65:4
67:11 68:8,17,23
69:22 70:9 74:22
76:1,17,21 78:19
79:11,12,18 80:6
81:14 84:17 85:12
85:25 100:4
107:12 108:13,14
108:20 110:15
111:3 112:2,17,23
113:8,12 115:22
117:6,16
**scenarios** 119:9
**scene** 9:4 13:5
27:12 30:5,12
40:19 41:1 42:15
62:12 66:10 74:10
75:20,20 88:13
89:12 108:15
109:5,23 110:3
112:25 119:23
122:18

**scheduled** 6:5
**school** 8:22
**schriner** 2:11 3:4
3:6 4:20,20 15:21
16:2,25 32:11
33:4 43:2 44:4,6
44:18 45:24 46:9
48:17 50:22 51:23
54:12 59:1,8 62:7
63:21 64:2,20
66:20 68:14 77:13
79:6 80:19,24
83:18 87:2 89:3
92:24 93:13,23
94:17,25 95:14
97:15 98:8 99:19
101:8,11,23
104:11 106:1
114:21 116:23
118:1,7 121:3
126:5 127:18,24
128:11 129:14,19
129:25 130:4,9,17
131:4,19 132:1,6
132:11,19,25
133:8,12,14
**scope** 102:8
**screen** 6:11
**screens** 86:20
**search** 87:5,17
107:15
**seat** 58:14,19 67:2
79:20,25 80:8
82:17 90:7 112:6
117:19 118:10
**seatbelt** 79:24
**second** 19:4 62:19
67:12 68:1 72:11
72:19 74:7 97:21
127:21

Farrel Swope
In Re: Fisher-Price/Mattel

June 12, 2020

**[section - small]**

Page 20

**section** 71:17
107:12 135:7
**secure** 58:14
**see** 5:23 17:9,13
18:13 19:22 20:7
20:11,21 21:2
25:2,4,6,7,11,22
26:1,16,16 28:23
31:6,16 33:10,13
33:23 34:15 35:18
37:20 42:9,21
43:18 46:10 47:4
47:9,11,17 52:14
53:19,23 54:11,18
55:9 56:9 58:20
59:4,16 60:6,17
61:3,23 62:17
65:2,3 68:13
71:22 73:12 74:6
75:19 77:9,10,22
78:4 79:12 80:25
81:8,12 83:25
84:13,15 85:19
86:2 87:5 88:24
89:7 90:19 92:14
96:4,4,7,9,21,24
96:25 98:16,18,19
109:10 114:5
120:9,13,14 122:4
123:8 125:16,20
127:20 130:2
**seeing** 40:1 61:4
74:19 98:6,9
**seen** 17:10,11,12
21:17,22 29:21,21
42:22 43:14 44:9
44:11 54:1 75:8
88:5 97:13 103:7
106:10 129:9
**seize** 98:10

**seized** 98:4,5
**seizures** 106:22
**semi** 58:19,19
60:25 61:1,11,11
62:5,5 76:23,23
77:11,11,12,24,24
92:15,15 93:11,11
112:5,5,8,9
**send** 28:3,5 102:16
**sense** 6:24 8:11
26:25 28:13 75:11
87:6 102:5
**sent** 6:7 7:6,16
**sentence** 80:5
113:8 117:6,16
118:8
**separate** 22:5 37:5
58:2 63:3 88:4,8
114:10
**separately** 21:15
36:23 37:2 41:22
41:23 71:14
**sequence** 63:2
**series** 76:16
**service** 112:25
113:9
**services** 27:4,16
27:23 100:20
107:9,14 113:21
**set** 18:13 19:5
21:12 22:16 39:1
48:23 49:20 52:24
53:1,14,14 81:13
119:14
**sets** 19:9 50:1
**setting** 22:13
**settle** 70:7
**seven** 8:14
**sex** 9:22
**share** 58:3

**shared** 36:10 63:3
**sheet** 28:21
**shift** 63:20
**shifting** 55:12
**shirt** 70:13
**shook** 117:14
**short** 68:19 101:9
**shortly** 108:7
**shorts** 70:14
**shot** 93:7 120:15
**show** 24:14,14
73:20 74:7 81:15
82:8,12,15 83:14
89:1 90:1,10 94:7
94:15,21 95:4,9
120:14 129:10
**showed** 64:19
97:16
**showing** 52:12
84:24 89:19 90:4
93:12,16 94:5
97:11,13 120:17
120:22
**shown** 92:22
124:11
**shows** 33:14 89:4
90:12,15,18,20
95:2
**sic** 73:3
**side** 53:1,1,20,22
53:24,25 54:9,10
56:9 59:7 90:8
91:11 92:21 93:2
93:7,10,12 96:5,6
96:9,21 97:1,4,10
97:14 112:10,11
112:12 126:12
**sids** 16:22,22 17:1
17:4,18,21 31:8
85:19 86:2 104:13
104:14 126:24

**sign** 5:17 37:9
77:10 132:20
133:3 134:14
**signature** 85:21
134:21 135:9
**significance** 49:18
**significant** 31:4
56:15 66:3
**significantly** 53:16
**signing** 95:12
**similar** 38:10
62:23
**similarly** 94:21
**simply** 48:22
**sir** 7:4 26:1 33:12
37:25 60:13 66:12
69:19 70:16 74:13
84:13 92:18
**sitting** 78:9
**situation** 6:1 16:5
16:18 119:10
**situations** 75:16
**six** 9:13 12:18
78:20 123:22
**size** 75:14 115:1
120:25
**sizes** 75:10
**skill** 134:14
**skills** 97:24
**skim** 12:25
**skipped** 47:5
**sleep** 31:3 75:16
99:18 100:1,5
105:12,15 128:25
**sleepers** 103:5
104:7
**sleeping** 100:8
119:12
**slow** 5:24
**small** 59:11 69:13
70:20

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

**software** 40:15
**somebody** 26:5
　30:14 37:17 54:8
　86:21 93:20
　125:25 130:7,11
**someone's** 43:24
**something's**
　123:12
**soon** 55:6 89:9
**sorry** 15:17 18:24
　24:20,24 25:8
　28:17 37:25 44:5
　51:10 55:4 72:1
　72:12 77:3 92:7
　108:10 117:17
　122:13,20 130:19
　132:1,3
**sort** 8:22 38:11
　51:15 52:12 59:5
　62:20 89:16
　121:17 124:10
**sounds** 13:14
**sources** 57:18 65:3
　65:6 113:19
**speak** 6:23 37:1
　42:18 119:19
**speaking** 22:12
**specific** 10:13
　21:22 32:21 71:2
　74:12 78:10 82:1
　87:16 91:21
　103:21 116:7
**specifically** 14:19
　18:6 28:20 39:9
　77:21,22 78:5
　91:17 100:6
**speculate** 102:9
**speculation** 125:2
**speech** 82:1,1
**spent** 42:14

**spoke** 42:24 106:2
　106:6
**spot** 54:5,15
**ss** 134:1
**stage** 51:12
**stain** 124:11,23
**stain's** 124:19,24
**stamped** 34:17
**standard** 51:16,21
　65:14 75:20
**standing** 65:5
　122:25
**start** 47:22 49:24
　71:21 73:22 82:11
　89:11 101:9 120:1
**started** 8:1 9:8,10
**starting** 25:14
　71:19,20
**starts** 49:3,24
　66:13 71:23
**state** 2:4 4:15 8:3
　52:9 134:1,6
**stated** 76:24 79:13
　79:19 107:17
　116:13 117:17,18
**statement** 78:1
**states** 1:1 4:10
**statistics** 20:13
**statutory** 1:5 4:22
**stay** 17:23
**stiff** 48:4
**stiffening** 47:24
　70:5
**stomach** 121:9
**stop** 6:25 33:10
**stops** 48:19 70:7
**stored** 55:20 57:11
**stretch** 101:12
**study** 52:3
**stuff** 7:15 12:13
　13:17,21 14:10

22:4 38:2 78:13
　85:7 104:2 110:1
**subject** 48:19 52:6
　56:19 61:11 75:5
　76:2,22,25 110:17
　111:4 112:5,18
　113:10 124:6
**subject's** 27:5 58:2
　68:9 79:11,13
　107:16 116:13
**submit** 13:8
　105:17
**submitted** 14:2
**subpoena** 7:8
　12:15,17,21 14:14
　21:7,11 28:3,6
**subsequent** 38:12
**substances** 86:9
**substitute** 74:24
　115:24
**sudden** 31:2,17,17
　41:11 44:24 46:13
　104:25 105:10,19
　127:22
**suffice** 128:16
**suffocation** 105:21
　127:5
**suggest** 96:22
**suggesting** 83:12
**suggestion** 87:16
**suggestive** 118:2
**suggests** 78:14
**suid** 31:1,9,16
　32:25
**suids** 126:25
**suite** 2:11,16
**summary** 55:24
　57:6 65:11 66:5
　83:22 98:25
**supervision**
　134:11

**supervisor** 22:16
**supine** 52:25
　53:17 60:23 66:18
　70:12 76:3 94:16
　94:22 95:12,23
　113:14 114:3
**supply** 20:14
**supported** 77:23
**sure** 6:12 16:18
　24:7 27:17 29:7
　31:11 43:23 44:14
　45:25 50:24 56:7
　67:19 72:3 77:15
　81:3 85:16 88:14
　101:10 105:22
　117:11,12 126:6
　126:21 131:8
**surface** 54:7
**surprises** 16:10
**surveillance**
　129:10
**suspect** 85:25
**suspicious** 45:1
**switch** 114:15
**swope** 1:15 2:1 4:5
　5:2,7,17 8:5 18:24
　25:2 73:10 94:8
　126:20 128:17
**sworn** 5:3 134:7
**syndrome** 127:23

**t**

**t** 3:8 69:6
**tab** 11:4 18:22
　19:1,15,15,19,24
　19:25 20:1
**table** 90:13,16
**take** 7:10 8:15
　13:6 23:1,11 24:8
　24:19,21 25:24
　29:13 36:3 40:12
　47:20 66:1 72:8

Farrel Swope                                    June 12, 2020
In Re: Fisher-Price/Mattel

**[take - told]**                                    Page 22

72:21,24 87:25
88:2 89:15 91:18
93:5 101:8,11
108:12 119:22
**taken** 5:7 8:10
36:4,7 73:4 76:4
88:10,22 94:6
101:16 134:5,9
135:5
**talk** 23:4 26:1
41:21 67:4 97:22
114:5 119:25
**talked** 21:2 22:14
22:18,20,20,23,25
35:10 71:15
100:17 103:11
110:12
**talking** 13:22,25
14:21 18:2 21:25
22:4 41:24 47:18
66:10 97:22 98:16
103:14 104:3
106:5 107:2
111:23 115:17
132:23
**talks** 27:3 36:18
43:18 56:17 62:19
62:21 68:11,12
86:6 99:25 114:2
**tape** 120:15
**tch** 87:19
**team** 35:2 87:21
91:22
**technician** 9:21
**technology** 9:5
**telephone** 28:4
**tell** 11:16 47:2
50:16,19,24 70:2
79:2,3 82:4,23
83:2,13,23 84:13
111:10 115:1,4,13

121:8 128:8
**telling** 50:9,13
51:7
**tells** 34:15,20
**telltale** 54:11
**tempe** 57:19 66:25
119:19
**temperature**
43:19 44:12,17,20
44:22 45:11,11,13
68:11 109:12,15
109:21
**term** 9:21 31:10
104:12,17
**terms** 27:1 50:19
53:23 64:23 65:20
77:21 78:3 97:24
98:3 99:1 100:11
112:13 118:17
130:13
**test** 130:23 131:8
**testified** 5:4
**testify** 7:14 8:7
13:1,18 71:14
134:8
**testimony** 22:15
117:25 118:4
120:3
**testing** 86:20 87:1
87:9,19
**tests** 87:7
**thank** 5:6,25 24:13
24:25 73:1,9
89:14 101:5
131:11 132:11,16
133:6,8
**thereof** 134:18
**thereto** 134:9
**thermostat** 109:17
**thigh** 95:8

**thing** 7:14 8:22
11:12 37:21 65:7
83:7 99:21 109:25
**things** 6:10 7:6
13:2 16:7,11
21:14 30:4 37:21
39:5 42:3 44:10
48:7,20,20 49:4
52:5 55:18 61:21
66:2 87:9 102:7
103:17 104:5
105:20 106:11
110:12
**think** 5:20 6:22
7:7 12:5 14:1,3
15:11,12 17:5,12
17:21 21:20 24:5
24:23 25:21 26:25
33:8,11 36:5,18
41:8 44:12 45:20
46:3 48:12 51:6
61:1,9 62:1 65:25
66:2 71:17 73:18
74:4 80:3 83:16
83:21,25 84:1,21
90:21 94:8 99:14
106:25 107:4
115:18 123:19,20
126:7,8,23,25
127:4 133:14
**thinking** 15:3 18:9
**third** 6:17 8:7
**thought** 12:19
45:14 46:8,17
56:15 68:5 72:12
80:2 87:23
**three** 76:9 119:11
119:11
**thunder** 111:5
**thunderbird** 38:7
56:20 62:23

100:13 131:25
132:10
**time** 4:6,7 6:17
9:12,13 11:14
12:6 15:24 20:7
29:16 30:20 31:15
31:15 34:17 36:15
38:16 40:18 41:5
42:10 43:22 48:14
48:25 53:9 55:18
59:25 61:19,20
64:7 68:19 78:17
79:1 80:23 89:4
92:4,12 94:22
95:16 97:25 101:3
108:6,14,15,18,25
109:19,20 110:8
114:17 122:1
123:24 133:7
**timeframe** 27:1
**timeframes** 51:16
**times** 6:16,18
27:20 53:16 81:22
88:12
**timing** 48:6,7,15
50:20 51:5 93:22
**title** 10:9,11,14
**today** 6:7 10:9
13:12 21:24 22:13
36:14 75:23 78:9
100:25
**today's** 22:14
**told** 41:18 42:3
56:14 58:12,13
59:2 63:14 64:21
78:2 79:16 81:8
82:18 83:17 91:23
92:16 100:10
103:22 104:6
106:9 113:23
128:7,12,20,21

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

**[told - waived]**

Page 23

130:7,11,21
**top** 14:6 25:23
26:18 32:14 33:20
33:20 84:3 93:16
**torso** 69:12 94:14
**touch** 70:13
112:18
**touched** 112:21
115:13
**touching** 96:16
**tox** 86:22
**toxicologic** 31:5
**toxicology** 86:20
**tragically** 10:17
**trained** 17:17
**training** 16:21
51:17 103:12,22
**tran** 133:15
**transcribe** 43:8
**transcript** 133:13
134:12
**transcription**
134:10
**transported** 33:15
34:9,13,21 37:4
**transverse** 69:13
70:20
**trauma** 31:4
**traurig** 2:15
**treated** 56:19
62:23 111:4
131:25 132:5,9
**treatment** 9:21
**trial** 8:8 23:25
**true** 23:14 54:11
77:25 100:3
102:14 111:1,2
116:2 117:10
120:25 121:2,12
122:12,19 123:5
127:2 134:12

130:7,11,21
**truth** 134:8
**try** 5:24 16:17
48:3 65:25 66:2
67:6
**trying** 61:4 64:10
81:7 82:24 125:10
**tucson** 2:12
**turn** 24:9 62:10
92:17 124:5
**turned** 16:14
112:12
**turning** 122:4
**two** 8:10,12 9:12
19:19 39:16,17
42:15 62:21 65:6
67:5 70:14 71:10
105:2
**type** 9:17 34:22
41:10 99:17
103:19
**types** 75:10
**typing** 40:14 43:8
**typos** 40:16

**u**

**u** 31:9
**ultimate** 11:12
32:9
**ultimately** 11:5,18
11:21 45:6
**um** 26:24 28:14
29:3 31:11 38:5
39:8 41:13 42:16
69:5 99:4 125:9
**un** 45:12
**unclear** 16:5
**underneath** 26:7
**understand** 6:25
7:18 51:10 61:9
62:2 81:7 117:11
120:3

**understanding**
73:13,15 92:3
105:19 109:1
113:21
**understood** 92:11
**undetermined**
11:19 16:1 21:4
**undone** 58:20
112:7
**unex** 85:12
**unexpected** 31:18
41:11 44:24 46:13
105:3,8,13
**unexplained** 31:2
105:1,20
**unfastened** 79:20
117:19,21 118:6
**unfixed** 52:23
**unfortunately**
54:9
**united** 1:1 4:10
**unknown** 11:18
15:19,25 21:4
**unreasonable**
44:21,24 45:10
46:4,8
**unsafe** 45:13,21
99:17 100:1,5
105:11,14
**unusual** 45:2
**update** 26:14
**upgraded** 36:14
36:16
**upset** 81:3
**use** 36:14 40:15
51:16,21 75:23
80:3,17 83:2,2,14
83:15 86:17 88:12
104:18 112:13
126:24 127:7

**usually** 11:23
17:13 26:12
111:11

**v**

**vaccinations** 56:22
106:11 111:7,16
**vague** 13:25
**van** 35:6 39:6,11
39:12 75:6
**vans** 75:9
**various** 26:13 91:4
**vehicle** 34:12,14
35:6
**versus** 4:9 53:2
67:22
**video** 4:5 6:2
24:14 129:9
**videographer** 2:20
4:4,13,23 19:7
24:16,19,24 72:12
72:19 73:2,6
101:14,18 133:9
**videotaped** 1:15
133:5
**virtually** 6:2
**visible** 123:7
**visit** 62:21
**vitae** 8:16
**vital** 20:13
**voice** 40:15 69:9
**void** 54:3,13,19
59:16,18 70:24
71:3,3 97:7
**vs** 1:7

**w**

**w** 69:6
**wait** 69:2 117:17
122:14
**waived** 134:14

Farrel Swope
In Re: Fisher-Price/Mattel
June 12, 2020

**[waiving - zoom]**

waiving  5:10
walked  14:24
walking  90:4
want  7:19 13:14
  18:8 24:19 28:18
  43:22 56:7 65:8
  72:2 78:11,12
  83:10,10,13,14
  87:1 102:8 111:19
  116:5,8 119:7,12
  119:22 128:24
  131:3 133:1,13
wanted  6:12 24:7
  40:5 83:4,22
  127:14
waters  29:2
way  23:7 24:2,2
  44:14 45:2 49:5
  55:18 61:6 63:24
  85:5 99:24 110:1
  117:2 121:17
  122:25 128:14
  134:16,17
week  56:17
weeks  110:17
  127:23
weigh  86:24
weighed  33:16
  34:15,16,19 108:2
  108:3
weight  34:22 69:6
  97:6 108:1
weird  123:13
went  63:19 68:18
  90:22
wetmore  2:11
wheezing  56:20
  62:22 106:9 111:5
  131:24 132:4,9
white  36:25 54:15
  59:5 90:20,22

113:22
whoever's  85:17
wife  63:19
wise  87:12
witness  5:3 16:3
  17:1 24:15 43:3
  44:5,8,19 45:25
  46:10 48:18 50:23
  51:24 54:13 59:2
  59:9 63:22 64:3
  64:21 66:21 68:15
  72:21,24 77:14
  79:7 80:20,25
  83:19 87:3 89:4
  92:25 93:14,24
  94:18 97:16 98:9
  99:20 101:7,10,13
  104:10 114:19
  116:21 118:5
  121:2 127:25
  128:12 130:16,20
  131:20,24 132:7,8
  132:23 133:3
  134:7,9,15
witnesses  13:5
woke  112:3
word  59:14,18
  66:1 116:20
  117:21 118:5,13
  126:24 127:5,9
words  7:21 23:24
  44:22 47:25 49:6
  50:1 52:20,22,23
  53:14 61:7,17,22
  62:1 66:1 83:3
  112:8 127:7
work  9:17,19
  12:12 35:8 63:8
  63:12,20
working  6:4

worried  39:20
wow  16:14 17:20
  45:3
wrap  99:14
wrapped  66:18
  113:12,21
write  35:19
writing  35:17
  85:10 88:11
writings  67:21
written  62:14
  65:21
wrong  11:8 71:19
wrote  13:19 36:1
  61:1 62:24 80:10
  84:22 85:9 86:4
  99:25 109:24

**x**

x  3:1,8 51:20

**y**

yeah  11:13 13:16
  15:4,5,10,16 17:19
  18:25 21:9 23:17
  24:21 25:22 26:23
  27:7,24 28:23
  29:8 30:23 32:2
  34:3,4 35:6 37:8
  37:23,24 38:1
  39:7 40:7,23
  41:13 42:16,16
  43:1 44:11 45:9
  45:17 47:15,20
  48:2,12 55:10,14
  55:14,14 57:9,9,14
  58:12 61:15,16
  62:25 64:6 65:2
  66:13 69:7 71:22
  78:8,13 79:23
  80:14 81:4 83:19
  84:2,5,15,23 85:15

90:24 91:19,23
92:25 93:1,24
94:14 97:12 99:10
100:4 106:8 107:7
108:20,24 109:6
112:12,22 116:21
120:17 122:22
123:1 125:15
132:25,25
year  12:5,18 26:9
years  8:10,12,14
  9:12,14,15,24 10:8
  12:19 78:20
  123:23
yellow  70:14
yep  43:13

**z**

z█  42:4 103:1
  107:16,17,23
  108:6,18 111:22
  114:16 115:13
  117:9,13 119:16
  120:10,24 124:7
  125:5
z█'s  108:2
zoom  1:15

Arizona Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

Rule 30(e)Review by the Deponent; Changes. (1)
Review; Statement of Changes.  If requested by
the deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript  or recording is available in which:
(A) to review the transcript or recording; and (B)
if there are changes inform or substance, to sign
and deliver to the officer a statement listing the
changes and the reasons for making them.  (2)
*Officer's Certificate to Attach Changes*. The
officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
made during the 30-day period.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.
PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.