# EXHIBIT 33

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

KATHLEEN COURKAMP, for   )
herself and on behalf of )
other statutory          )
beneficiaries,           )
                         )
    Plaintiff,           )
                         )
vs                       )  CASE NO
                         )
FISHER-PRICE,INC , a     )  2:19-CV-02689-GMS
foreign corporation;     )
MATTEL, INC , a foreign  )
corporation,             )
                         )
    Defendants           )

VIDEOTAPED DEPOSITION OF WILLIAM E SINGHOSE, Ph D
(Taken by Defendant)
September 14, 2021
9:50 a m

Suite 2500
3333 Piedmont Road
Atlanta, Georgia

Reported by:  Debra M Druzisky, CCR-B-1848

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:
    JOHN E. OSBORNE , Esq.
    Goldberg & Osborne
    698 East Wetmore Road, Suite 200
    Tucson, Arizona  85705
    (520) 620-3975
    josborne@goldbergandosborne.com

On behalf of the Defendants:
    ROBERT BRADY HERMAN, Esq.
    BRANDON D. COX, Esq.
    3333 Piedmont Road, Suite 2500
    Atlanta, Georgia  30305
    (678) 553-2100
    hermanb@gtlaw.com
    coxb@gtlaw.com
    MARY-OLGA LOVETT, Esq.
    Greenberg Traurig
    1000 Louisiana Street, Suite 1700
    Houston, Texas  77002
    (713) 374-3541
    lovettm@gtlaw.com

Also Present:
    David Ramirez, videographer
        --oOo--

## Page 3

INDEX TO EXAMINATION

Witness Name:                              Page
WILLIAM E. SINGHOSE, Ph.D.
By Ms. Lovett                                5


INDEX TO DEFENDANT'S EXHIBITS

No.       Description               Page
Exhibit 1   8-25-21, Notice of Videotaped   79
            Deposition  of William Singhose,
            Ph.D. re: The above-captioned
            action.

Exhibit 2   Curriculum vitae of William     84
            Singhose, Ph.D.
Exhibit 3   4-2-21, Report of William       89
            Singhose, Ph.D. re: The
            above-captioned action.
Exhibit 4   7-16-21, Rebuttal Report of     91
            William Singhose, Ph.D. re: The
            above-captioned action.
Exhibit 5   COU 5582, Photograph of warning 182
            label.

Exhibit 6   6-9-20, MomJunction.com article 191
            re: When Do Babies Start to Roll
            Over and Tips to Encourage Them,
            by Dr. Nikolina Zdraveska.
Exhibit 7   ZO-ClearPFH 1 thru 41, ClearPath 199
            Family Healthcare Medical
            Records Re: Z█ Olson.
Exhibit 8   COU 7092, Photographs of Z█     203
            Olson.

## Page 4

INDEX TO DEFENDANT'S EXHIBITS (Continued.)
No.       Description               Page
Exhibit 9   8-8-20, Journal of Biomechanics 208
            article re: Do inclined sleeping
            surfaces impact infants' muscle
            activity and movement, by Wang,
            et al.
Exhibit 10  Mattel-COU 12444 thru 476,      213
            4-6-18, Exponent PowerPoint re:
            Fisher-Price Rock 'n Play
            Sleeper Assessment.

Exhibit 11  COU 8143, video file.           241

Exhibit 12  COU 8144 thru 8154, Photographs 244
            of doll in exemplar
            Rock 'n Play.

Exhibit 13  American Academy of Pediatrics  250
            Policy Statement re: SIDS and
            Other Sleep-Related Infant
            Deaths.
Exhibit 14  10-25-19, University of Arkansas 255
            for Medical Sciences letterhead
            from Erin Mannen to U.S.
            Consumer Product Safety
            Commission re: Biomechanical
            analysis of inclined sleep
            products.
Exhibit 15  ZO-TempePD 355 thru 362,        271
            Photographs of exemplar
            Rock 'n Play with doll.
Exhibit 16  Mattel-COU 23498, video file.   296

Page 5

```
 1          THE VIDEOGRAPHER:  We are on the
 2    record, and the time is approximately 9:51
 3    a.m.  This is the beginning of the
 4    videotaped deposition for Dr. William
 5    Singhose.
 6          Would counsel present please identify
 7    themselves and who they represent for the
 8    record?
 9          MR. OSBORNE:  This is John Osborne on
10    behalf of Katie Courkamp and Andrew Olson.
11          MS. LOVETT:  Mary-Olga Lovett,
12    Brandon Cox and Brady Herman for
13    defendants Mattel and Fisher-Price.
14          THE VIDEOGRAPHER:  Thank you,
15    Counsel.
16          Would the court reporter please swear
17    in the witness?
18          WILLIAM E. SINGHOSE, Ph.D.,
19    having been first duly sworn, was examined and
20    testified as follows:
21               EXAMINATION
22    BY MS. LOVETT:
23      Q.  Would you give us your full name, sir?
24      A.  My name is William Singhose.
25      Q.  And Dr. Singhose -- is it correct to call
```

Page 6

```
 1    you Dr. Singhose?
 2      A.  Yes.  That would be fine.
 3      Q.  By virtue of a Ph.D. that you have?
 4      A.  Yes.  That's correct.
 5      Q.  All right.  And tell me your current
 6    professional address.
 7      A.  My professional address would be 813 Ferst
 8    Drive, that's F-E-R-S-T, Atlanta, Georgia, 30322.
 9      Q.  And you've been deposed before, so we can
10    dispense with the normal, I think, deposition rules
11    of the road, shall --
12      A.  Okay.
13      Q.  You agree?
14      A.  Sure.
15      Q.  And I'm happy to give you the spiel, but I
16    think you know it quite well.
17      A.  I think it's fine.  We can proceed.
18      Q.  Thanks.
19          All right.  How many times have you been
20    deposed, Doctor, total?
21      A.  Probably about 25 to 30 times.
22      Q.  Okay.  How many of those were product
23    cases?
24      A.  I'd say roughly half of those.
25      Q.  Okay.  You also do work in patent cases?
```

Page 7

```
 1      A.  Yes.  That's correct.
 2      Q.  Would that make up the other half or is
 3    there a third component?
 4      A.  That would make up most of the second
 5    half.  I mean, I've been deposed as a -- as a fact
 6    witness or a material witness before.
 7      Q.  As an inventor?
 8      A.  Yes.
 9      Q.  All right.
10      A.  That's right.
11      Q.  And by patent -- patent work's my day job.
12    So about how -- so you say about half the
13    depositions have been patent-related as in your
14    capacity as an expert, half product-related, and
15    then you've also been deposed as an inventor in
16    your individual capacity?
17      A.  Yes.  That's correct.
18      Q.  Deposed in your individual capacity in any
19    other type of litigation?
20      A.  No.
21      Q.  So you have created, obviously, reports
22    and given deposition, sworn testimony, both --
23    well, let me start with that.
24          You've created reports; correct?
25      A.  Yes.
```

Page 8

```
 1      Q.  That have been filed with courts; correct?
 2      A.  Yes.
 3      Q.  In the patent context you've used --
 4    you've filed Markman reports or expert reports,
 5    similar to that?
 6      A.  Yes.
 7      Q.  And then you've given depositions both --
 8    or you've given testimony both in deposition and at
 9    trial; true?
10      A.  Yes.
11      Q.  And you stand by everything you've said in
12    your prior reports?
13      A.  You mean --
14          MR. OSBORNE:  Form.
15          THE WITNESS:  -- the entire history
16    of my life?
17    BY MS. LOVETT:
18      Q.  In your --
19      A.  Or in this case?
20      Q.  Well, that's -- well, let's break that
21    down.  So are there some profession -- in your
22    capacity as an expert witness, are there some
23    reports that you don't stand by anymore?
24      A.  Nothing comes to mind, but I hadn't
25    actually reflected on that question before.
```

Page 9

1    Q.  Okay.  I think I assumed that, as a
2  professional expert witness, that you'd stand by
3  every opinion you've given.
4        Am I wrong?
5    A.  I think if I was provided wrong, I
6  wouldn't stand by that opinion anymore.
7    Q.  All right.  So you agree that you may be
8  proven wrong although you're an expert?
9    A.  I think it's possible that one could be
10  proven wrong.  And I would take that information
11  into account and consider it.  I just can't recall
12  anything like that happening.
13    Q.  Okay.  Do you think you've ever been
14  proven wrong in a professional capacity?
15    A.  As an expert witness, I don't think I've
16  been proven wrong, no.
17    Q.  Not a single time, you're always right?
18    A.  Nothing's coming to mind right now where
19  someone has proven one of my opinions was wrong.
20    Q.  Okay.  You understand the importance of
21  the question, I think, because you're under oath
22  here and you've been under oath in the other
23  context.
24        So if I ask you about other testimony
25  you've given in other cases, you agree with me that

Page 10

1  the testimony that you've given under oath you
2  certainly took seriously and as you're taking your
3  deposition seriously here today; true?
4    A.  Yes.  That's correct.
5    Q.  All right.  So we've got one day to ask
6  you questions.  I hope that it will not be a
7  terribly long one.  But you understand this is
8  Mattel and Fisher-Price's one opportunity to learn
9  all of your opinions in this case and figure out
10  everything that you're going to say when you come
11  to trial.
12        You understand that concept?
13    A.  I, yes, I understand --
14        MR. OSBORNE:  Well, I'll --
15        THE WITNESS:  -- the concept.
16        MR. OSBORNE:  -- object to the form.
17  And remember, there are a bunch of reports
18  in this case.  Go ahead.
19        MS. LOVETT:  Yeah.  I think I said,
20  John, it's my only chance to ask questions
21  before trial.  Because that is true, at
22  least for my 28 years' worth of doing
23  this.  But you may -- you may know some
24  other -- some other way.  Let me know.
25  BY MS. LOVETT:

Page 11

1    Q.  So let me ask you, Doctor, is there
2  anything that might affect your ability to testify
3  today?
4        I took Claritin, so there may be problems
5  with me taking your deposition, but is there any
6  reason you may not be able to give your best,
7  clearest testimony today?
8    A.  No.
9    Q.  If you don't answer -- understand a
10  question that I ask, I'm not an engineer, which
11  will become rapidly apparent, if you don't
12  understand my question, would you ask me to
13  rephrase it?
14        Otherwise, I'm going to assume that you've
15  understood it and meant your answer.  Okay?
16    A.  Okay.
17        MS. LOVETT:  John, you want to read
18  and sign?
19        MR. OSBORNE:  Let me listen to the
20  deposition and how I think our ebullient
21  court reporter will do, and I'll make my
22  decision at the end.
23        MS. LOVETT:  All right.  We're open
24  to read and sign under the rules.
25  BY MS. LOVETT:

Page 12

1    Q.  Doctor, have you ever been a party to a
2  lawsuit in your individual capacity?
3    A.  I don't think so as an individual, no.
4    Q.  All right.  You hesitate.  Is there
5  something as a -- as part of a company or a group?
6    A.  Yes.  I worked for a start-up company for
7  several years, and that start-up company became
8  involved in patent litigation involving one of my
9  patents.
10    Q.  Okay.
11    A.  And that's why I was deposed before on
12  that issue.
13    Q.  Right.  What was the name of the start-up?
14    A.  Convolve, Incorporated.
15    Q.  And what was the technology of Involve
16  [sic], Incorporated?
17    A.  That technology involved controlling
18  machines so they would not vibrate.
19    Q.  What type of machines?
20    A.  A whole range of machines from very small,
21  accurate manufacturing machines to cranes to
22  satellite.
23    Q.  Anti-sway control?
24    A.  That's correct.
25    Q.  Were you the lead inventor on that patent?

Page 13

1      A.  I was the lead inventor on one of the
2  patents involved in that litigation.  I think there
3  was initially three.  But I didn't follow it all
4  the way through, and I'm not sure what the final
5  disposition of what that was after -- but I know it
6  went on for 17 or 18 years, something like that.
7      Q.  Did -- what went on for 17 or 18 years?
8      A.  Litigation involving the technology that I
9  was involved in developing at Convolve.
10      Q.  Okay.  So did the patent issue?
11      A.  Yes.  The patent that I was the lead
12  author on issued and it became involved in that
13  case.
14      Q.  Okay.
15      A.  There were other patents involved in that
16  case.
17      Q.  And do you recall the name or description
18  in the Patent Office of that patent?
19      A.  The name was something like minimizing
20  residual vibration.
21      Q.  And give me a brief description of the
22  claims of that patent.
23      A.  I'm not sure I can do that.  I think that
24  was back in the day when you could have, like, a
25  hundred claims.

Page 14

1      Q.  You still can.
2      A.  A brief description of the claims would be
3  methods of controlling machines by generating
4  inputs into those machines such that they respond
5  without residual vibration.
6      Q.  And how was that patent put into use as a
7  functional device?
8      A.  The technology in that patent is
9  programmed into a control computer that is
10  controlling a machine.  And that control
11  commuter -- computer has to issue voltages or
12  currents to the machine's motors or actuators.  And
13  the technology properly shapes those voltages or
14  currents so that the machine moves and doesn't
15  vibrate.
16      Q.  And in the litigation, were you a party as
17  well as deposed?  Was your start-up a party?
18      A.  I mean, I was deposed a couple of times in
19  that case, but I'm not sure what you mean by "a
20  party."  I didn't have a personal stake in it.  The
21  patent was assigned to the company.
22      Q.  Right.  And so the -- then that's what I
23  was asking is whether you had any stake in the
24  company.
25      A.  No, I did not.

Page 15

1      Q.  You were an employee of the company --
2      A.  Yes.  I was --
3      Q.  -- and had a standard assignment agreement
4  as an engineer?
5      A.  I guess.  I mean, I was employee number
6  one.  It was just a few of us starting it.  But my
7  friend who was the C.E.O., he brought all the money
8  to the table and got the company off the ground.
9      Q.  So how did that -- how did that litigation
10  come out?  Was your friend's company the plaintiff,
11  Involve, or the defendant?
12      A.  My company was the plaintiff.
13      Q.  All right.
14      A.  Yes.
15      Q.  And where was the suit brought?
16      A.  The lawsuit was actually initiated after I
17  left the company.
18      Q.  Uh-huh.
19      A.  So I'm not sure that I can testify with
20  100 percent accuracy on the details.
21      Q.  Sure.
22      A.  But I think it was filed in maybe the,
23  something like the Western District of New York.
24      Q.  Okay.  And do you know how that case came
25  out?  Who was the defendant?

Page 16

1      A.  The initial defendants were C8 and Compaq
2  Computer.  Compaq Computer was acquired by H.P., so
3  I think H.P. became a defendant.  There was also
4  auxiliary lawsuits that were filed against Western
5  Digital.  I did not be deposed in that case, but I
6  think it was the same sort of technology was being
7  asserted.
8         So the cast -- the case got quite
9  extensive and messy.  And like I -- like I said, I
10  think it went for 17 or 18 years.  And it was,
11  portions of it were passed up to the Supreme Court
12  for consideration.  I didn't follow all of --
13      Q.  I --
14      A.  -- those details.
15      Q.  I know the second case rather well.
16      A.  Yeah?
17      Q.  Tell me -- so tell me the name of the
18  company one more time.
19      A.  My company was Convolve.
20      Q.  Convolve.  I was -- I wrote down Involve.
21  This is why I like to have the -- but C8, the C8
22  case I certainly know.  It set a lot of standards
23  for us.
24         Do you know how your -- is your friend
25  still your friend?

Page 17

1    A.  Yes.
2    Q.  And how did -- how did the case ultimately
3    end?
4    A.  That, I actually don't know.  I mean, it
5    went on so long, he stopped sending me updates.
6    After the lawyers made 30 or 40 million dollars, I
7    think he became annoyed with it.
8    Q.  In patent law, the case, you'll be
9    interested to know, or you may not be, affirms that
10   contractual terms override trade secret law.
11   That's why it's important for us.
12       But was that something that you did -- was
13   that something that you did -- I know that you
14   started out at the University of Oregon; is that
15   right?
16   A.  Yes.
17   Q.  What was your major there?
18   A.  I guess track and field.  I mean, I was
19   undeclared.
20   Q.  You were a Prefontaine?
21   A.  Yeah.  I was on the track and field team.
22   So at that time, you didn't declare a major --
23   Q.  Right.
24   A.  -- because it was complicated in terms of
25   the N.C.A.A. rules.

Page 18

1    Q.  What was your event?
2    A.  I was a decathlete.
3    Q.  All right.  And --
4    A.  So I did all of the events, basically.
5    Q.  That sounds -- I'm familiar with my -- the
6    Greek meaning of that term.  So you transferred to
7    M.I.T. why?
8    A.  To be an engineer.  There's no engineering
9    at the University of Oregon.
10   Q.  Like, zero?
11   A.  Exactly zero.  It's at Oregon State, which
12   is up the road.
13   Q.  Okay.
14   A.  And no Oregon Duck would ever transfer to
15   Oregon State.
16   Q.  Now, that I can understand.
17       So, but so there's literally not any
18   engineering classes available at the University of
19   Oregon or there aren't any that suited your needs?
20   A.  I think at that time there was actually no
21   engineering program at all.  They may have started,
22   say, environmental engineering or something since
23   that time.
24   Q.  Okay.  And then you transferred to M.I.T.;
25   is that correct?

Page 19

1    A.  Yes.
2    Q.  By the end you had declared a major, and
3    that was?
4    A.  Mechanical engineering.
5    Q.  And when you arrived at M.I.T., is your
6    friend in the start-up, was this an M.I.T.
7    connection?
8    A.  Yes.  I started doing research my first
9    term as an undergraduate at M.I.T., and he was a
10   graduate student that I worked directly with.  I
11   basically worked for him.
12   Q.  Okay.  And what was his name?
13   A.  Neil Singer.
14   Q.  And so while you were at M.I.T., did
15   you -- well, was this your only patent, the
16   Convolve patent that was assigned?
17   A.  Oh, no.
18   Q.  Oh, you have many patents?
19   A.  Maybe seven or eight.
20   Q.  All right.  Are you the lead inventor on
21   all of those patents?
22   A.  I don't think so, no.
23   Q.  Have all those patents been assigned to
24   others?
25   A.  I think most of them are assigned to

Page 20

1    Georgia Tech.
2    Q.  Okay.  That's part of your employment
3    agreement with Georgia Tech?
4    A.  Yes.  I have an employment agreement with
5    Georgia Tech that says the work that I do as a
6    professor gets assigned to them.  One of those I
7    worked on while I was on a leave of absence, so I'm
8    not sure who that was assigned to.
9    Q.  What was the cause of your leave of
10   absence?
11   A.  I was teaching at Tokyo Tech.
12   Q.  So when you have a -- and you say seven or
13   eight patents.  Have any of those patents resulted
14   in products that were marketed?
15   A.  Yes.
16   Q.  Tell me about those.
17   A.  Well, one of those patents is a patent
18   that controls multi-mode vibration, such as a
19   double pendulum crane.
20   Q.  All right.
21   A.  So if you pick up a payload with a crane,
22   that payload might swing independent of the hook.
23   So instead of getting one nice pendulum swing back
24   and forth that can be controlled easily, you would
25   get a double pendulum, which is two different

Page 21

1  frequencies. It would be very complicated motion.
2      And so we developed a technology for
3  moving cranes that gets rid of that double pendulum
4  vibration. And that technology is integrated into
5  a control system used by one of my companies I
6  started and sold, so it's currently licensed by a
7  system -- by a company called PaR.
8      Q. Okay. And is that the company that you
9  started?
10     A. I started a company called CAMotion
11 Cranes, which was acquired by --
12     Q. Right.
13     A. -- PaR --
14     Q. Okay.
15     A. -- maybe eight or ten years ago.
16     Q. Okay.
17     A. And they acquired the, essentially the
18 rights to that patent when they bought our company.
19     Q. And what did they -- what did they pay for
20 your company?
21     A. That's hard to say, because there was an
22 initial pay-out of one million dollars plus monies
23 based on how much profit the subsidiary company
24 made.
25     Q. Right.

Page 22

1      A. And it was, like, a three- or four-year
2  payout.
3      Q. Uh-huh.
4      A. And I don't really know what that was.
5      Q. Do you have a ballpark of what you
6  realized in total on that invention?
7      A. What I realized --
8      Q. Yes.
9      A. -- personally?
10     Q. Yes.
11     A. Probably several hundred --
12        MR. OSBORNE: Are you asking for his
13 income from the invention?
14        MS. LOVETT: Yes, I am. I'm asking
15 about the terms of the licensing deal. I
16 want to see --
17        MR. OSBORNE: Well, then --
18        MS. LOVETT: -- how valuable --
19        MR. OSBORNE: -- I will object. I
20 will object and instruct him not to answer
21 that question.
22        MS. LOVETT: Well, John, I think it's
23 relevant to how good of an inventor he is.
24 It's --
25        MR. OSBORNE: How what?

Page 23

1         MS. LOVETT: Yes, to -- I'm
2  interested in how valuable his inventions
3  are. If you're going to parade around
4  patents or talk about what a great
5  inventor he is, I'm going to find out how
6  good they are. So I'm entitled to ask
7  that question.
8         MR. OSBORNE: Okay. Well, you bring
9  it up to the Court, then.
10 BY MS. LOVETT:
11     Q. Did you start any other companies, Doctor?
12        I'm sorry, is something funny?
13     A. Yeah. It's kind of funny going back and
14 forth and --
15     Q. Oh. Well --
16     A. -- and having these --
17     Q. -- this is what --
18     A. -- having these legal arguments.
19     Q. Yeah, this is what --
20     A. Kind of funny.
21     Q. This is what we do.
22        So tell me, do you -- have you -- you said
23 you -- one of several companies you've started.
24     A. Okay. I'm not sure I said several. So
25 the Convolve company that we started that we talked

Page 24

1  about before I wasn't -- I didn't have an
2  ownership, but I helped start that. I mean, I was
3  employee number one. It was me and my friend.
4      Q. Right.
5      A. Then I started CAMotion Cranes --
6      Q. Right.
7      A. -- which got acquired by PaR Systems. I
8  am currently the C.T.O. of InVekTek, which is
9  another start-up.
10     Q. That would be the, for the jury, that's
11 the chief technology officer?
12     A. Yes.
13     Q. And how are you spelling InVekTek?
14     A. I-N-V-E-K-T-E-K, InVekTek.
15     Q. Got it.
16        And what is the -- is there more than one
17 patent that's owned by InVekTek?
18     A. InVekTek was started with one of my other
19 patents.
20     Q. All right.
21     A. That has to do with, again, controlling
22 machines so that they move very quickly and very
23 accurately.
24     Q. Right. And so did you -- as -- was
25 InVekTek acquired or is it still your company?

Page 25

```
 1        A.  Oh, it's still my company.  I mean, I own
 2   part of it.
 3        Q.  Right.
 4        A.  I have a C.E.O. that runs it.  And I have
 5   other investors, so they have parts of the company.
 6        Q.  Who co-owns it with you?
 7        A.  Well, my C.E.O., Rob Loomis.  We have a
 8   lawyer who's part of our team, Ralph Loomis.  He
 9   owns a share of it.  He did a lot of work starting
10   it up.  Part of our company is owned by the
11   Illinois Energy Foundry --
12        Q.  Right.
13        A.  -- which is an investment firm that helps
14   start-ups that's based in Illinois.  Those are the
15   people that I know own part of it.
16           We've gotten some investments lately.  And
17   my C.E.O. handles all that, so I'm not sure if
18   small parts of the company are now owned by our
19   investors.
20        Q.  Right.  And you have a trademark portfolio
21   with that company; true?
22           That may be too lawyer-ese.  Do you know
23   something called SwayMaster?
24        A.  Oh, yes.  Yes.  Yes.
25        Q.  Yeah.  SwayMaster is your trademark -- the
```

Page 26

```
 1   trademark for your technology.
 2        A.  Okay.  That's, yeah, I think that's one of
 3   our trademarks.  I mean, we have various names for
 4   things that we've developed.
 5        Q.  Sure.  And these are -- these are huge
 6   industrial cranes; right?
 7        A.  Well, InVekTek's controller can be used on
 8   a variety of machines, but they are used on some
 9   large cranes, yes.
10        Q.  And when we say "large," tell me, what
11   would be the largest crane or apparatus that you --
12   your invention would have impact upon?
13        A.  The largest one that -- again, I'm trying
14   to narrow it down to InVekTek.  I assume that's
15   what you're talking about.
16        Q.  Yes.
17        A.  Okay.
18        Q.  We're -- I'm going to get into your other
19   companies, too --
20        A.  Okay.
21        Q.  -- but yeah.
22        A.  The largest crane that I know that
23   InVekTek has installed a controller on is a -- is a
24   big crane in South America that handles steel.  And
25   it's actually a multi-hoist crane, which means that
```

Page 27

```
 1   it has more than one drum that can lift stuff up.
 2   And each of those drums have a different amount
 3   that they can lift.
 4        Q.  Right.
 5        A.  And I think that that crane may be rated
 6   in total for something like 40 to 50 tons of
 7   lifting capacity.
 8        Q.  In total for --
 9        A.  Yeah.
10        Q.  -- all three --
11        A.  For the --
12        Q.  -- drums?
13        A.  -- two or --
14        Q.  -- two drums?
15        A.  It has two or three hoists on it.
16        Q.  That's a huge crane.
17        A.  It's pretty big.
18        Q.  Yeah.
19        A.  I mean, cranes lift thousands of tons.
20        Q.  Yes.  Yes.
21        A.  So 40 or 50 tons doesn't make it one of
22   the biggest cranes in the world, but it's a large
23   device.
24        Q.  Sure.
25           Okay.  What other companies are you
```

Page 28

```
 1   involved in as either an owner or inventor with
 2   interest?
 3        A.  I think currently that -- that would be
 4   it --
 5        Q.  All right.
 6        A.  -- that I had --
 7        Q.  Have you had any others in the past that
 8   we haven't covered?
 9        A.  Certainly.
10        Q.  Let's go through those.
11        A.  Do you want to start at the beginning?
12        Q.  I want to -- I want to know -- this is my
13   one shot.
14        A.  Okay.  I guess the first company that I
15   owned that had a bank account was a golf ball
16   recovery business back in Oregon.  So me and my
17   friends started a company where we would go out and
18   scuba dive and collect golf balls and then process
19   those golf balls and sell them to golf courses.
20        Q.  That's quite inventive.  Why don't
21   we -- I'll narrow my scope to get to --
22        A.  Okay.
23        Q.  -- things you've actually invented.
24        A.  Well, I --
25        Q.  I thought -- I thought was -- that was the
```

Page 29

1  realm we were in, but --
2      A.  I invent --
3      Q.  -- perhaps we spoke past one another.
4      A.  I invented a lot to pull that off.
5      Q.  I bet.
6      A.  How to -- how to -- how to carry 800 golf
7  balls at one time out of a pond is -- took an
8  invention.  In fact, one time I got stuck in the
9  pond with 800 balls on me.
10     Q.  Some people would say --
11     A.  I couldn't pull all that up.
12     Q.  Some would say you assumed that risk,
13  Doctor.
14     A.  I did.
15         Let's see.  So we talked about Convolve.
16  I -- if you have any questions on that, we can
17  follow up.  We talked about CAMotion Cranes.  We're
18  in InVekTek.  I helped start another company in
19  South Korea called SeAH Mecatec.
20     Q.  You're going to have to really spell that
21  one.
22     A.  S-E-A-H, and then Mecatec --
23     Q.  Okay.
24     A.  -- with a T-E-C at the end.
25         That company, I didn't have an ownership

Page 30

1  interest, but I had an agreement based on the sales
2  of that company.  So I helped them develop a Korean
3  patent using on my technology.  The patent was
4  assigned to the Korean company, but part of that
5  was I got 5 percent of the sales of this technology
6  for X number of years.
7      Q.  All right.  And how -- has that agreement
8  terminated?
9      A.  Yeah.  After -- that agreement was for
10  five years.
11     Q.  And when --
12     A.  So it was --
13     Q.  Do you recall ballpark when that was?
14     A.  That would have been about 2005 or '6 to
15  about 2010.  It was -- the company was actually
16  acquired by a Japanese company, and that
17  essentially coincided with the termination of my
18  agreement.
19     Q.  Were you a listed patent -- a listed
20  patentor on the Korean patent?
21     A.  Yeah, I think I was.  Yeah, I don't have a
22  copy of that.  I should try to find that.
23     Q.  Probably.
24         What was the technology of that patent?
25     A.  That technology was associated with

Page 31

1  controlling old types of machines that can only be
2  controlled with on/off actuators, like, you push a
3  button and the motor turns on immediately.
4         So those are notoriously difficult to
5  control, because you can't give it a variable
6  command.  You can't ramp up the speed or ramp down.
7  So it's going full speed forward or zero or full
8  speed in reverse.
9         So we developed a technology to control
10  those kinds of machines.  And there are many of
11  those machines in South Korea.
12     Q.  Give me an example of some of the types of
13  machines you're talking about.
14     A.  Most of these turned out to be cranes, but
15  there are also engine-moving machines in the
16  Hyundai factory.  So they pick up an engine and
17  they move it over and put it into the car.  That's
18  an overhead gantry robot.
19     Q.  All right.
20     A.  And the operator would just push a button
21  that would say go right, and it would pick up this
22  engine and go right.  And it would sit there and
23  vibrate over the top of the car, and they'd have to
24  wait until it stopped vibrating and then drop it
25  down into the car.

Page 32

1      Q.  So I'm sensing a theme in your patented
2  technology, this -- the anti-vibration.  I know
3  there may be other degree -- may be other areas of
4  interest, but it seems that the patents we've
5  discussed so far involve that technology.
6      A.  Anti-vibration is certainly a part of a
7  lot of these.  In the bigger sense it's making
8  machines move in the way that you want them to.  So
9  you tell a machine to move in a certain way, it's
10  going to move that way, rather than going too far
11  to the right or too far to the left.
12     Q.  And if I asked your -- you to describe to
13  the jury your body of work as a -- as a -- as an
14  inventor, would that be a fair way to describe it,
15  telling machines how to move in a certain way?
16     A.  I'm trying to reflect on all my patents.
17  I think my patents generally have that kind of a
18  theme in them where we try to control the motions
19  of the machine so they don't do something we don't
20  want.
21         A lot of my inventions haven't been
22  patented.  In fact, most of the technology, for
23  example, at my current company InVekTek we've
24  decided to keep as trade secret.
25     Q.  Sure.  Because if you make it patented,

Page 33

1  then you have to make it public and teach it to the
2  world.
3       A.  Yes.  And as you know, patent lawyers --
4       Q.  As --
5       A.  -- cost a lot of money.
6       Q.  Patent lawyers do cost a lot of money.
7  And we're worth it.
8           But all right.  So, so you have -- your
9  current company is protected by trade secret and
10  you do not share, for example, your SwayMaster
11  technology.
12          Tell me what types of patents you have
13  that don't deal with vibration or telling
14  machines -- keeping machine -- big machines from
15  doing something you don't want them to do.
16      A.  Oh, most of them have to -- don't have to
17  do with big machines.  They're any kinds of
18  machines.  So for example, the Convolve lawsuit,
19  the technology we talked about --
20      Q.  Right.
21      A.  -- was controlling very small machines.
22  In fact, the vibration that we were controlling is
23  so small you wouldn't be able to see it.
24      Q.  Right.  What were you con -- and then in
25  what context was that being controlled?

Page 34

1       A.  That particular lawsuit, although the
2  patent was bigger than that particular application,
3  that lawsuit had to do with controlling hard disk
4  drives.  So the reading had hard disk drives move
5  just microns at a time.
6       Q.  Right.  In computers?
7       A.  Yes.  That's right.
8       Q.  Right.  So again, machines?
9       A.  Yes.
10      Q.  All right.  What other types of inventions
11  have you patented or created that are different
12  from telling machines what to do or stopping
13  vibration?
14      A.  I don't have my patents in front of me, so
15  I'm not sure I can give a complete answer to that
16  without looking at my patent portfolio, but a lot
17  of them have that.
18          A lot of my inventions have to do with
19  just product development, so developing features in
20  products.  And a lot of times, that type of
21  material is kept trade secrets and is not patented.
22      Q.  Right.  So --
23      A.  So a lot of my inventions would be in that
24  domain, essentially, developing new features for
25  consumer products.

Page 35

1       Q.  Have you ever invented a consumer product
2  for an infant?
3       A.  I have invented products for invent -- for
4  infants, yes.  They haven't been commercialized and
5  sold.
6       Q.  All right.  So have they been patented?
7       A.  I know that we filed invention disclosures
8  on some of those developments, but I don't think
9  that we pushed those all the way through to a
10  patent.
11      Q.  No applications?
12      A.  I don't understand that question, "no
13  applications."
14      Q.  You haven't filed a patent --
15      A.  Oh.
16      Q.  -- application, a formal patent
17  application with the United States Patent and
18  Trademark Office?
19      A.  That, I'm not sure of.  Because I have
20  co-authors on those patents, other professors and I
21  worked with them.  And we made the invention.  We
22  file invention disclosures.
23          And then I know I went on a leave of
24  absence during that period, and I'm not sure if we
25  followed up and did an application that was -- got

Page 36

1  rejected.  But I'm sure that we don't have an
2  issued patent.
3       Q.  Okay.  Who was your co-applicant?
4       A.  One of them was Dr. Stephen Sprigle.
5       Q.  How are you spelling that?
6       A.  S-P-R-I-G-L-E.
7       Q.  One G?
8       A.  Yes, Sprigle.
9       Q.  And so who else worked with you and
10  Dr. Sprigle on the patent that you came up with for
11  infants, or the idea for infants?
12      A.  I'm not sure who would also be listed on
13  that.  We had a team work on it for a couple of
14  years, and there were some grad students that
15  played a critical role in the development of that
16  technology.  But since we don't have an issued
17  patent, I couldn't remember their names, so I'm not
18  sure how many or which of those got on the
19  invention disclosure.
20      Q.  Dr. Sprigle's patent portfolio appears to
21  be largely wheelchair braking and also spectral
22  technology.  Were you involved in any of that work?
23      A.  Yes.  I was involved in -- with
24  Dr. Sprigle for several years, maybe even what you
25  might call many years, on designing wheelchair

Page 37

1  features.
2      Q.  All right.  And so that's an area of
3  interest for him?
4      A.  Yes.  And myself as well.
5      Q.  And for you.  So what was the product that
6  you were working on with him for infant use?
7      A.  Well, we did several products that were in
8  the infant space.  Let me see.  I'll just list
9  them, and we can discuss whether or not they're
10  infants or toddlers or what the age range is.
11      But I initially started working with him
12  on designing wheelchair seating systems for young
13  children, because wheelchairs are normally designed
14  for adults.
15      Q.  Right.
16      A.  And so it's notoriously challenging to
17  have small children or toddlers in wheelchairs.
18  And so we worked on seating systems for in --
19  toddlers, small children.
20      We have focused one of those projects on
21  children that have a certain kind of disease where
22  they essentially, their entire body fires all their
23  muscles at once and they go like a plank, and they
24  tend to fall out of wheelchairs.
25      So we designed a seating system that moved

Page 38

1  to keep the -- to keep the child from falling out
2  of the seat, so sort of a movable cradle or a
3  movable --
4      Q.  Right.
5      A.  -- seat.
6      Q.  For a neuro -- a neuromuscular disorder?
7      A.  Yes.  That's correct.
8      Another project that we worked on for a
9  while was a swing for infants.  It turns out that,
10  when infants are sick, the best thing for them is
11  to go to sleep often so they can rest.  And every
12  baby wants to be swung in a somewhat different
13  manner in terms of being swung at a different
14  frequency and also a different motion.
15      And babies don't necessarily like the
16  straight pendulum swing that you see at a
17  playground swing.  That's not how parents
18  traditionally swung their children for thousands of
19  years.  Parents cradle their children in their arms
20  and then twist their torso.
21      So the directional motion of the swing
22  that a lot of babies like is not a pendulum swing,
23  but rather a torsional motion.  And so we developed
24  a swing that makes that type of motion.  And the
25  swing is also able to change its frequency.

Page 39

1      And so that project we worked with
2  actually C.H.O.A., Children's Hospital of Atlanta.
3  So we went over there and talked to those
4  caregivers and saw the swings that they were using
5  at the time and developed some prototype swings to
6  address that need.
7      Q.  Did any of those prototypes ever become
8  products?
9      A.  No.
10      Q.  Did any of the infant wheelchair products
11  that you were working on -- or maybe those were
12  more toddler products -- I mean, the neuromuscular
13  focused products become products?
14      A.  No.
15      Q.  Do you -- tell me about any other
16  inventions that you did for infants or children.
17      A.  Another one that we did that I can recall
18  is that we developed a, sort of a play scooter for
19  children with, like, muscular dystrophy that can't
20  play very well, so they tend to be stuck in a
21  wheelchair and off to the side of a playground.
22      So we developed a, sort of a scooter that
23  partially elevates the child so that they're a
24  little bit taller but still doesn't fall over.  And
25  so that's one of the inventions that we developed

Page 40

1  that we submitted an invention disclosure on.
2      Q.  Right.
3      A.  And so that idea was sponsored by a
4  company, I don't remember the name right now, but
5  the C.E.O. had a child with muscular dystrophy and
6  he wanted this product developed.  So we developed
7  it to a prototype stage, and then I think that we
8  turned it over to him.
9      Q.  All right.
10      A.  But this is when I went on leave.
11      Q.  Right.
12      A.  And so I'm not exactly sure the final
13  resolution of that project.
14      Q.  Okay.  Who was the C.E.O. or company that
15  you were working with there, do you know?
16      A.  I can't remember that name right now.
17      Q.  Okay.  And you can't testify as to whether
18  or not that prototype became an actual product?
19      A.  I'm pretty confident that it did not
20  become an actual product.  I think I would have
21  heard of it.
22      Q.  All right.
23      A.  But we did turn it over to him.  And what
24  he did with it I'm not sure.
25      Q.  Any other inventions or projects directed

Page 41

1  at products for children?
2      A.  Another project that we did was to try to
3  leverage off of the hoverboards.  The hoverboard
4  craze hit about five or six years ago, and they
5  sold so many of them that they were able to develop
6  a pretty interesting device that was low cost.
7         And so it has a lot of motors, controllers
8  and batteries in there, and you can purchase them
9  quite cheaply, like, for a couple hundred dollars.
10  And so what we did with that was we tried -- now, I
11  wouldn't put a child on a hoverboard.
12      Q.  I was going to say, you wouldn't put a
13  child on the -- on a hoverboard.
14      A.  No.
15      Q.  So I want you to tie this up for me.
16      A.  Yeah.  So what we did is we used that
17  device, those motors, controllers and batteries, in
18  essentially a go-cart, so that way you stabilize
19  it.
20         And again, you can put a child in there,
21  and the child is able to move around in kind of a
22  fun play way at low speed.  And there's really no
23  way for them to tip over if you design the base of
24  that correctly.
25      Q.  What --

Page 42

1      A.  And so it became a very low cost way to
2  get a, sort of an expensive product.  Because if
3  you designed that from the ground up without the
4  hoverboard, you would be in it for a lot of money.
5      Q.  So you'd be leveraging, of course
6  ethically patently, but you'd be leveraging off the
7  hoverboard concept?
8      A.  Yeah.  I mean, it wouldn't operate like a
9  hoverboard at all.  Hoverboards, you move them by
10  standing on them and flexing your calves.
11      Q.  Right.
12      A.  That part of it goes away, so you don't do
13  that anymore.  But you're using the motors,
14  controllers and the batteries in there, and you
15  acquire those for a low cost.
16      Q.  And were you envisioning this type of
17  product as a -- as a play device for children with
18  disabilities or for all children or children of a
19  certain age?  Give me some context.
20      A.  We initially started with children with
21  disabilities.  That's one of the things that we
22  focused on.  But we quickly realized that it was
23  fun for all children, so we sort of expanded the
24  scope of it.
25         And what that allows you to do is to make

Page 43

1  the seat and the seating system and the restraint,
2  you know, a seatbelt and stuff different, because
3  you're no longer designing it just for a situation
4  where parents have to lower their child physically
5  in there and strap them on.
6         You can expand it and allow a version
7  where children, like, six years old could climb in
8  and strap themselves in and go.
9      Q.  Right.  What would be the youngest child
10  that could be in that product, you think?
11      A.  We never did those tests.  But I have a
12  three-year-old currently, and he would have been
13  fine in that product.  It was low speeds, so you --
14      Q.  Right.
15      A.  -- you can't go take off and go cruising
16  real fast in these.
17      Q.  Yeah.  That's -- I'm picture -- I'm trying
18  to picture a low speed hoverboard, but.
19      A.  Yeah, you just -- you just cruise in --
20      Q.  I'm a Greek mother, so we have different
21  standards of tolerance on that sort of thing.  I'm
22  not scuba diving for golf balls.
23         Tell me, did that product ever make it to
24  the prototype stage?
25      A.  Yeah.  We made some prototypes of that.

Page 44

1  And then we found out that a lot of people were
2  doing it.  So if you just go to YouTube and you
3  YouTube that, you're actually going to see a lot of
4  people had that idea and sort of prototyping it
5  out.
6      Q.  Okay.  So that that product, that did not
7  become a product for -- that you developed?
8      A.  Yeah, it's not a product that I developed.
9  But they're actually out there.  You can buy these
10  kits on-line --
11      Q.  Sure.
12      A.  -- with using the same kind of idea.
13      Q.  Sure.
14         Any other inventions directed -- or
15  projects directed at children or infants?
16      A.  So I was kind of answering this question
17  with the assumption that you were talking about
18  what I do with Stephen Sprigle.  Have we -- have we
19  diverged from that requirement?
20      Q.  We have.
21      A.  Okay.
22      Q.  I just -- you mentioned Dr. Sprigle as one
23  of your collaborators on those projects, and so I
24  had his patent portfolio and I wanted to start
25  talking to you about it.  Now I want to know about

Page 45

1  any work that you -- any projects or inventions
2  upon which you've worked that were directed at
3  children or infants.
4      A.  Okay.  Leaving Stephen Sprigle aside --
5      A.  Yes.
6      A.  -- let's see, I've worked a lot on
7  juvenile products in general, such as rockers and
8  swings and playpens.
9      Q.  Right.  Have any of the product -- when
10  you say you've worked on, let's define that for the
11  jury.  Have any of the products that you have,
12  quote, worked on become actual products that are
13  marketed to the con -- to consumers?
14      A.  Well, those projects that I were doing --
15  that I did, I'm referring to, were on products that
16  were on the market.  So I would be investigating a
17  product that was currently on the market.
18      So yeah, they were products in use --
19      Q.  All right.
20      A.  -- and I would be investigating them and
21  establishing how they worked and the problems that
22  they had and specifications they were meeting,
23  things like that.
24      Q.  Sure.
25      For whom were you doing these

Page 46

1  investigations?
2      A.  I think a lot of those investigations were
3  done for Kids2 --
4      Q.  What is --
5      A.  -- which is a company actually in this
6  building.
7      Q.  All right.  So, so I want to -- I want to
8  talk about this part of your work.  Because I was
9  really asking about what you were developing or a
10  product that you were trying to create directed at
11  children or infants.
12      I think what you're telling me about is
13  that you, when you say you worked with a lot of
14  products, you were investigating for a consumer
15  product safety group.
16      Is that -- is that -- is that how you
17  would define Kids2?  Or how would you define it?
18      A.  How would I define Kids2?  Kids2 is a
19  juvenile products company.  They make --
20      Q.  Oh, I'm sorry.  So they --
21      A.  Yeah.
22      Q.  You're -- they're a competitor, I guess,
23  of my client?
24      A.  That's right.
25      Q.  And so they get you to go out and test

Page 47

1  their competitors' products to see if there's
2  anything that they could do better?
3      A.  I certainly tested their competitors'
4  products.  And I think that's generally what you
5  would do is try to understand what other people are
6  doing and then see if you're doing as well or can
7  you do better.  That was, I think, some part of it,
8  not the main part.
9      The main part of the investigations were
10  whether or not these products practiced patents.
11      Q.  Ah.  So to see if any of the in -- of the
12  products of the competitors might be infringing on
13  any patents held by Kids2?
14      A.  And -- yes.  And the opposite of that
15  where do Kids2 products practice --
16      Q.  Other patents?
17      A.  -- patents.
18      Q.  Other parties' patents?
19      A.  Yes.
20      Q.  Yes.  So you were -- you're essentially,
21  you weren't doing -- these are investigations for,
22  let's break it down.  Are you still -- do you have
23  a retainer agreement with Kids2?
24      A.  No, I do not.
25      Q.  Okay.  So they retain you on a per project

Page 48

1  basis?
2      A.  Yes.
3      Q.  And how long have you worked with Kids2?
4      A.  I think I probably started working with
5  them ten years ago.
6      Q.  All right.  Do you still work with them
7  today?
8      A.  I haven't worked with them I think in
9  three or four years.
10      Q.  All right.  And how are you -- how are you
11  compensated by them?  On an hourly basis?  On a
12  project basis?
13      A.  I mean, normally that would be on an
14  hourly basis.  I, I mean, I would do some
15  consulting, essentially, for free, if you will,
16  just meet with them and talk about the issues and
17  decide whether I would give them some initial
18  feedback, and then I would decide whether I wanted
19  to do more work on that project.
20      But essentially, I think it would boil
21  down to an hourly basis.
22      Q.  Your -- so your -- what is your rate for
23  acting in an expert in -- as an expert witness in the
24  capacity that you are here today on behalf of the
25  plaintiffs?

1       A. Oh, I would have to look up -- I think for
2  this case it's probably 600 or 650 an hour.
3       Q. All right. And is that for depositions
4  and trial work?
5       A. Yeah. It's all the same.
6       Q. All the same for -- no matter what you're
7  doing, investigating, making a report --
8       A. If --
9       Q. -- being deposed?
10      A. Yes. I think probably if I travel, I
11 wouldn't charge that much. I don't know. I don't
12 have the contract in front of me.
13      Q. Sure.
14         What do you charge Kids2?
15      A. Well, I haven't worked with them for
16 several years, so that would have been an older
17 rate, probably in the four or five hundred dollar
18 an hour range.
19      Q. All right. And you -- so you've testified
20 that Kids2 -- in your work for Kids2, as I
21 understand it, you've done basically two kinds of
22 work:
23         One, looking at ways to make their
24 products -- to see if their products are as good or
25 better than their competitors or to get new ideas;

1  and two, to see if in patent prac -- patent
2  practice either way, whether someone's practicing
3  their patents or whether they're practicing or
4  infringing potentially on anyone else's patents.
5         Is that a fair statement? And if not,
6  correct it.
7       MR. OSBORNE: Form.
8       THE WITNESS: I think it's a fair
9    statement. I did one project with them
10   that was essentially just developing a
11   patent. So to the extent that that one
12   doesn't fall in those two categories.
13 BY MS. LOVETT:
14      Q. Okay. So I want to take those one at a
15 time. I'll -- we'll start with the first category,
16 which is where you were investigating other
17 project -- products to compare them to the Kids2
18 products in terms of whether Kids2 could be doing
19 something new or different and comparing products.
20         Did you on behalf of Kids2 investigate any
21 Fisher-Price or Mattel products?
22      A. That, I don't remember. One of the first
23 projects I did a long time ago with them, or one of
24 the first projects, was investigating swing
25 dynamics. Whether or not that was a -- whether

1  there was a Fisher-Price product in there, I don't
2  recall.
3         But if Fisher-Price made a swing that was
4  a non-standard swing -- we talked about pendulum
5  swings like at playgrounds or the more torsional
6  swings. If Fisher-Price had made a torsional
7  swing, I may have looked at it at some point.
8       Q. All right. Do you recall specifically
9  looking at any Fisher-Price products in your
10 assignment for Kids2, either on the patent side or
11 on the -- on the product development side?
12      A. I've done so many products for them, I
13 can't remember all the brands. I mean, the ones
14 that are coming to mind are Graco and Wonderland
15 products. But there could have been a Fisher-Price
16 product in that mix at some point.
17      Q. Had you --
18      A. I don't recall.
19      Q. Did -- had you -- had you seen the in --
20 the concept of an incline sleeper before you became
21 involved with this case?
22      A. Yes.
23      Q. And where had you seen that?
24      A. There's at least a couple places that I
25 saw this concept before. This incline sleeper or

1  incline bassinet is, of course, it's not yes or no
2  incline. It's zero degrees, five, ten, 20. Right?
3  There's a whole range of --
4       Q. Uh-huh.
5       A. -- these products.
6         There is a type of playpen that has
7  auxiliary units that you essentially clip on or
8  attach to the top. And those can be various kinds
9  of things, like diaper holders and stuff.
10         But one of those, for example, is a
11 changing table that you can pop on to the top of
12 your playpen, change your child, and then put him
13 back in the playpen.
14         Another one of those is a bassinet. So
15 for a young child that's not ready for the full
16 playpen, for the first couple of months you could
17 put them in a bassinet, which also clips on the
18 top.
19      Q. Right.
20      A. And some of those clip-ons actually
21 have -- they're not exactly flat. They can come in
22 various degrees. So a lot of them are flat, but
23 some of them have slight inclines of five or ten
24 degrees.
25         So I remember looking at that issue quite

Page 53

1   a few years ago, about the fact that some of these
2   bassinets had a somewhat inclined sleeping surface.
3   And then I reviewed the drafts of the F -- the 3118
4   incline sleeper product.  I reviewed the drafts of
5   those proposed standards back in 2015 or something
6   like that.
7        Q.   And --
8        A.   So I heard of -- I saw that trying to be
9   formalized --
10       Q.   Right.
11       A.   -- through that -- through that process.
12       Q.   That's a -- through the A.S.T.M. process?
13       A.   Yes.
14       Q.   Let's tell the jury what that is.
15       A.   The A.S.T.M. standard process is a -- it's
16  a process wherein groups of people get together and
17  they try to come up with standards such that
18  products within a certain sphere or certain area
19  have sort of consistent features so that someone
20  that buys one of these products, they can be
21  assured that it has a consistent feature from all
22  these different companies.
23       So it's kind of a consistency exercise.
24       Q.   So if -- you recall seeing that when the
25  standard was proposed for development a few years

Page 54

1   ago and reviewing it?
2        A.   Yeah.  I saw, I think it -- I think the
3   first one was -- that actually was approved, I
4   think it was 2015.  And it updated in 2017 is my
5   recollection.
6        But I saw drafts of it before it was
7   approved.  Or I -- or I saw drafts of it before it
8   was approved.  So that would have been in the 2014,
9   2015 time frame I saw those drafts.
10       Q.   And I'm assuming that you don't -- you
11  don't review all the drafts for all the A.S.T.M.
12  standards in every category.  So I'm assuming, but
13  you should correct me, that your particular
14  interest in that standard was related to your work
15  for Kids2.
16       Is that correct?
17       A.   Yes, I think that's correct.  I mean,
18  during that same time frame, I was working not for
19  Kids2 on the baby swing to help comfort sick
20  children.
21       And so I -- there's a chance I also was
22  interested in that standard at the time, because we
23  were considering what sleeping surface that swing
24  should have.  Should you take a child and put him
25  perfectly flat and swing them through this

Page 55

1   rotational motion or should they be slightly
2   inclined?
3        So I think during that time I reviewed the
4   bassinet standards and playpens and swing standards
5   and all those kinds of things to make sure that we
6   were going forward with ideas that were consistent
7   with standards.
8        Q.   The jury's going to learn a lot about the
9   A.S.T.M. process, and probably more than they
10  thought they would ever know.  So they'll be --
11  they'll be somewhat familiar with this by the time
12  that you testify.
13       But in your review of the standard and as
14  an engineer, did you -- did you -- did -- was it --
15  was there an immediate affront to you in terms of
16  safety?  Did you look at it and say, oh, no, this
17  is a bad idea, I must tell someone, or I must tell
18  Kids2?
19       A.   Well, Kids2 knew about it.  I can't
20  testify for certain, but I think there was probably
21  a Kids2 person on that committee --
22       Q.   I think you're right.
23       A.   -- if I had to guess.  They would want to
24  have their hand in that process.
25       I remember my response to this was that

Page 56

1   the draft had a lot of changes.  So I had a red
2   line version.  And so I remember it being very
3   confusing, like, what are they trying to do here.
4   That was my initial response.
5        And I think when I understood it, I
6   wasn't -- I don't remember being affronted, but I
7   remember thinking this is strange, it's -- this is
8   a departure from what they're supposed to be doing.
9        And since I wasn't on the committee at
10  that time, I kind of just left it there, like, I
11  don't know why they're trying to do this.  So I was
12  left with a question more than -- like, I wasn't
13  outraged.
14       Q.   Well, did --
15       A.   I didn't have that response.
16       Q.   Did you think it was dangerous?
17       A.   I don't remember thinking it was
18  dangerous.  I remember thinking this is just a
19  departure from how this is supposed to work.
20  They're supposed to be flat.  And I just couldn't
21  figure out how this standard was going to -- to be
22  consistent with sleeping on a flat surface.
23       So basically, I was left with confusion, I
24  remember, when I first read it.  And I was left
25  with confusion in -- because I was, like, trying to

Page 57

1  use this in the design work I was doing. And so I
2  had this feeling of that, well, they're not
3  finished with this, it's all messed up and I don't
4  understand where they're going with it.
5      So I'd say my main reaction was confusion.
6      Q. Right. But I want to be clear. The
7  responsibility of the committee members is to
8  ensure that the pro -- that the standard provides
9  for a safe product; true?
10      A. That's certainly --
11      MR. OSBORNE: Form.
12      THE WITNESS: That is certainly, I
13  think, one of the goals that they would be
14  shooting for. I mean, I think primarily
15  they're shooting for some conformity.
16  BY MS. LOVETT:
17      Q. Yes. But is there any more important
18  consideration in the execution of that conformity
19  than safety for babies?
20      A. In my opinion, no.
21      MR. OSBORNE: Form.
22  BY MS. LOVETT:
23      Q. All right. So you have been a member of
24  this committee?
25      A. Yes.

Page 58

1      Q. And you were not a member at the time.
2  Had you been a member previously?
3      A. No.
4      Q. And are you a member now?
5      A. No.
6      Q. When were you a member?
7      A. I was a member a few years ago, I think
8  20 -- in the time frame of 2017 to 2019.
9      Q. All right. So while the Rock 'n Play was
10  still on the market?
11      A. Yes.
12      Q. At any time while you were on the
13  committee, did you go to anyone on the committee or
14  go to Kids2 or anyone in the world and say, the
15  standard that was issued by this body is a -- is a
16  dangerous standard, the incline sleeper is a
17  dangerous product?
18      A. I remember having, you know, thoughts
19  along that line. But the truth is, when I was on
20  the committee, the -- that standard, the 3118 never
21  came up for debate in the meetings.
22      There's a lot of other standards that that
23  committee works on. And so the -- when you go to
24  these committees, like you -- I think we went to
25  one in Las Vegas, for example, you meet all these

Page 59

1  people, you go into a room, and there's an agenda
2  that's set by the chairman of the committee, and
3  you go through those agenda items.
4      And at that time when I was serving on
5  this, the meetings that I went to, the 3118 never
6  came up for a debate. It wasn't part of the
7  agenda.
8      Q. Sure.
9      But you'd seen the standard prior to its
10  issuance?
11      A. I saw a draft of it, like I said, that red
12  line draft.
13      Q. Right. You were familiar with it. And so
14  you don't strike me, sir, as the type of man who
15  would be confined to an agenda if you thought there
16  was a real danger to babies in a standard in a
17  committee on which you sat.
18      Fair statement?
19      A. I think that would be fair, yes.
20      Q. All right. So in 2017 to 2019 while you
21  were on the very committee that created that
22  standard, you at no time expressed concerns about
23  its safety to anyone; is that right?
24      A. I'm not sure about to anyone, but
25  certainly not on the committee. Again, it wasn't

Page 60

1  on the agenda, and we were dealing with other
2  issues.
3      And truthfully, I'm not sure that I
4  actually read the 20 -- I think the one that would
5  have been in play at that time was the 2017-A. I
6  don't think I read it during that time frame. We
7  were working on other standards.
8      Q. You were -- you were aware that incline
9  sleepers were on the market?
10      A. Yes.
11      Q. You were -- you were aware of that how?
12      A. Well, I was aware because they were
13  developing the standard. And I knew the reason why
14  they were developing it, because they were already
15  on the market and they were trying to justify the
16  existence of these products. I understood that.
17      Q. Was Kids2 involved in trying to develop a
18  similar product?
19      A. Yeah, I think they were. I didn't work on
20  that, but they -- I believe they came out with a
21  similar product.
22      Q. Do you know the name of it?
23      A. No.
24      Q. At any time did you express to Kids2, hey,
25  I think that product you put out on the market is

Page 61

1    dangerous, and I'm on the committee, I think you
2    shouldn't sell it?
3        A.  No.  In fact, I've never reviewed those
4    products that Kids2 have that are in the same --
5    the same style.  I don't know anything about them.
6        Q.  To whom, before this case, to whom have
7    you expressed an opinion that incline sleepers were
8    unsafe?
9        A.  My wife.
10       Q.  When?
11       A.  Numerous times.  Because we have young
12   babies, two of them.  And we went through this
13   whole process of selecting -- an arduous process of
14   selecting the playpens and the car seats and the
15   strollers.
16       Q.  Right.
17       A.  And my wife is a mechanical engineer, and
18   she's an expert in this area.  And we had long
19   talks about how we were not going to put our kid in
20   a sleeper that was inclined.  So the one that we
21   had that's closest, we had a -- it's, like, a ten
22   degree angle.
23       Q.  Right.
24       A.  That's the steepest that she would allow
25   our kids to be put in.

Page 62

1        Q.  So your children are how old?
2        A.  Three and a half and 22 months.
3        Q.  Wow.  Little ones.
4        A.  Yeah.
5        Q.  You are --
6        A.  Little ones.
7        Q.  All right.  So, so you and your wife
8    discussed that you thought the incline sleeper was
9    unsafe for your own children, but it never occurred
10   to you to go to the committee on which you sat and
11   say, these are unsafe projects, my wife, a
12   mechanical engineer, and I think they're unsafe,
13   let's do something about this?
14       A.  That's right.  I think I wasn't even on
15   the committee at that time when we had the young
16   boys.  I think I was getting off of it.  And during
17   that process, my head was spinning trying to keep
18   the boys --
19       Q.  Yeah.  If --
20       A.  -- there.
21       Q.  If you --
22       A.  But I don't recall, yeah, ever having that
23   opportunity or actually thinking about that.  There
24   was just a lot of other issues to deal with during
25   that time.

Page 63

1        Q.  But certainly no one stopped you?
2        A.  No, no one -- I don't think anyone said
3    you can't talk about it.
4        Q.  Right.  Well, certainly you were --
5    certainly you were -- you're holding yourself out
6    as qualified to talk about it.
7        A.  Yes.  Certainly, I am.
8        Q.  And it was something that you discussed
9    with your wife.  But while you were on the
10   committee, or on your segue off the committee, for
11   example, you didn't say, hey, guys, I'm looking at
12   this through fresh eyes, I'm a new dad, and we need
13   to take a hard look at incline sleepers because I
14   have serious concerns.
15       You said that to no one on the A.S.T.M.
16   committee, did you?
17       A.  Oh, that's correct.  That's, yeah, that's
18   not something I would do.  I wasn't in that
19   position to set an agenda item or anything like
20   that.
21       Q.  Well, I'm not talking really about an
22   agenda.  I mean, you and your wife had a hard stop
23   on a sleeper of more than a ten degree incline
24   because of your comfort level for the safety of
25   your own babies; right?

Page 64

1        A.  That's correct.
2        Q.  As a member of the committee, you
3    understand that there was no more important concern
4    than the safety of all of the babies that were --
5    in enacting these standards; true?
6        A.  That's my view of the committee activity,
7    yes.
8        Q.  Okay.  So I want to be clear for the
9    record.  At the time you were aware of incline
10   sleepers on the market for your own children.  You
11   did not consider them safe.  But you did not go to
12   the committee on which you sat which controlled the
13   standard for the incline sleeper and say, we have
14   to get this thing off the market, I wouldn't put my
15   kid in it.
16       A.  That's correct.  I mean, there's a lot of
17   products that I wouldn't use for my kids, but I
18   don't go around telling everyone to get them off
19   the market.  That's --
20       Q.  Sure.
21       A.  That's just an impossible job.
22       Q.  Well, sure.  But I mean, in fairness, not
23   everybody gets to sit on the committee where they
24   get to say that I think this is unsafe.  And you
25   told me you put your three-year-old on the

## Page 65

1  hoverboard thing.  So.
2     A.  No, I did not put my three-year-old --
3     Q.  No, I said you --
4     A.  -- on a hoverboard.
5     Q.  You said you would -- I think what you
6  said was you would, you'd feel comfortable putting
7  him on the hoverboard concept because it's slow
8  motion.
9     A.  Yes.  It's a go-cart.  It's no longer a
10  hoverboard.
11     Q.  Right.
12     A.  It's now a slow moving -- it's now a slow
13  moving go-cart.
14     Q.  Right.
15     A.  And there's lots of slow moving products I
16  put my three-year-old on that putt around at one
17  mile an hour.
18     Q.  Yeah.
19     A.  That's a common children's product.
20     Q.  It struck me when you said it just because
21  I think you saw something in my face, and you said,
22  no, it's going to go very slowly, so I'd be
23  comfortable putting my three-year-old in it.
24     A.  Yes.  The hoverboards actually have a low
25  speed mode.

## Page 66

1     Q.  Right.
2     A.  So that's the mode it would be operating
3  in.
4     Q.  All right.  So when was the first time --
5  well, I guess so the first time you had criticisms
6  of the safety, that you expressed to anyone outside
7  of your wife, of the Rock 'n Play sleeper or other
8  incline sleep products was as in conjunction with
9  your retention in this case; correct?
10     A.  No.
11     Q.  When was the first time?
12     A.  The first time outside of my wife?
13     Q.  Yes.
14     A.  Oh, okay.  We have very good friends
15  that -- well, the man is a professor of biomedical
16  engineering at Georgia Tech, and we're very good
17  friends with him and his wife.  And they had a
18  child the same week as ours.  And so we went
19  through this together, and we often had discussions
20  of children's products together.
21     And so me and the husband, Professor David
22  Frakes for the record, we've had a lot of
23  discussions on children products over the years,
24  because he's concerned about that.  And he had a
25  boy the exact same age as mine.  So him and I have

## Page 67

1  definitely talked about incline sleepers.
2     Q.  All right.  Did you talk to them -- did
3  you talk about them as your -- does he have a child
4  the same age as your three-year-old or as your
5  22-month-old?
6     A.  He has a child born the same week five
7  days earlier than my three and a half-year-old.  He
8  has twins that are currently one year old.
9     Q.  All right.
10     A.  So.
11     Q.  You guys are --
12     A.  We've got it --
13     Q.  -- all in this together.
14     A.  We've got it covered, yeah.
15     Q.  Yes.  All right.  So in your -- in your
16  discussions with Dr. -- I want to pronounce it
17  correctly, and I'm trying to read it, Dr. -- can
18  you say it for me?  Because I've got it
19  phonetically.
20     A.  David --
21     Q.  Yeah.
22     A.  -- Frakes.
23     Q.  Frakes.
24     A.  F-R-A-K-E-S.
25     Q.  Dr. Frakes.  Okay.

## Page 68

1  So in your discussions with Dr. Frakes
2  around the time that your oldest kids were being
3  born, the two that are three and a half, you
4  discussed that you didn't think incline sleepers
5  were safe?
6     A.  Yes.  We both actually bought a similar
7  product that rocks a child sort of back and forth,
8  and it's about a -- it's about a ten degree
9  incline.  So we actually ended up buying the same
10  product via these discussions --
11     Q.  Do you --
12     A.  -- with --
13     Q.  Do you remember what the product was?
14     A.  No.  We actually didn't use it that long.
15  Our baby didn't really like it.  But we actually
16  bought, I think we bought exactly the same model.
17  And it's essentially for, again, young infants.
18  You put them on there, and there's a slight
19  incline, and it rocks them sort of side to side
20  rather than forward and back.
21     And actually, you can program it to
22  different kinds of motions, like simulating a car
23  ride and stuff like that, so it's got a knob to
24  turn.
25     Q.  Right.

Page 69

```
 1        A.  So we both bought that same product for
 2   our children.
 3        Q.  And you -- but it was during that time
 4   frame when you had the young children that you had
 5   the discussion with Dr. Frakes about that certain
 6   incline sleeper products were not safe?
 7        A.  That's correct.  We talked about that.  We
 8   talked about, I remember not wanting to use a
 9   belted restraint because we were concerned about
10   the child getting it wrapped around their neck.
11             And also, it's just much less convenient
12   to use.  You want to be able to set an infant down
13   and just watch them there rather than kind of strap
14   them in.  So we talked about things like that.  I'm
15   not going to be able to remember word for word
16   those --
17        Q.  Sure.
18        A.  -- kinds of conversations, but.
19        Q.  This would have been, I bet you can tell
20   me in ten seconds your son's birth date.
21        A.  Yeah.  I mean, he was born on March 6th,
22   2018.  So it would have been after that.
23        Q.  All right.  So sometime around the March
24   6th, 2018 timeframe while you were still on the
25   A.S.T.M. committee you had expressed to your
```

Page 70

```
 1   wife -- what is your wife's name?
 2        A.  Dooroo Kim.  D-O-O-R-O-O, last name Kim.
 3        Q.  Dr. Kim, I assume?
 4        A.  Not yet.  She's working on it.
 5        Q.  She has two babies.
 6        A.  That's right.  She had a little bit of a
 7   delay.
 8        Q.  So you spoke to your wife, Ms. Kim, and
 9   then you also spoke to Dr. Frakes, your colleague
10   who's a biomedical engineer.  You expressed
11   concerns in 2018 to both of them while you were on
12   the A.S.T.M. committee, but you never told anyone
13   on the A.S.T.M. committee of those concerns at that
14   time.
15        A.  Yes.  That's correct.  I think during that
16   time frame the 3118 standard never came up for
17   discussion in the meetings that I went to.
18        Q.  And I understand that you have an agenda.
19   Any member can put something on the agenda or
20   request to have something put on the agenda; true?
21        A.  I think that's correct, yeah.  I mean,
22   during that time frame, obviously, I wasn't trying
23   to actively put stuff on the committee.  I was
24   dealing with young children.
25        Q.  No.  I understand.  I know the --
```

Page 71

```
 1        A.  So I would go to the committee and I would
 2   just follow along with what was already planned and
 3   have discussions --
 4        Q.  I mean --
 5        A.  -- on those and vote on those kinds --
 6        Q.  Yeah.
 7        A.  -- of issues.
 8        Q.  I understand the pull to your children
 9   away from your work, trust me.  I've got three of
10   my own, but.
11             But the question I'm asking you is --
12        A.  Uh-huh.
13        Q.  -- while you're a new dad, you're dealing
14   with this every day, you've already personally
15   decided and talked to your very qualified friend
16   and wife and decided it's not safe, and it did not
17   occur to you to say to the committee that you sat
18   on, because you were in a unique position as a dad
19   and a member of that committee, you never -- it
20   never occurred to you to say, I think these
21   products are [sic] safe, we should revisit this
22   standard or put it on the agenda.
23             That never happened, did it, Dr. Singhose?
24        A.  I can't say that it didn't occur to me.
25        Q.  You just didn't do it?
```

Page 72

```
 1        A.  I just didn't do it.  I --
 2             MR. OSBORNE:  Form.
 3             THE WITNESS:  I didn't know the full
 4        extent of the dangers associated with this
 5        product at the time.  That's just the
 6        truth.  I didn't have all the information
 7        that I have now.
 8   BY MS. LOVETT:
 9        Q.  But in your mind, you thought it was too
10   dangerous for your child?
11        A.  That's correct.
12        Q.  So other than talking to Dr. Frakes and
13   your wife, was the first time you decided to opine
14   that the incline sleeper was unsafe for this case?
15        A.  Yeah.  I mean, you're using kind of this
16   legal term opined.
17        Q.  Well, you're giving --
18        A.  And --
19        Q.  Well, you're giving an opinion.
20        A.  And I'll just say that, yeah, the first
21   time I've opined in a report and done an analysis
22   of this and got all the data and analyzed it and
23   made a clear determination that this was dangerous
24   was for this case.  I just didn't have all this
25   information before this case.
```

Page 73

1    Q.  Right.  So what I'm -- but I'm saying you
2   did not seek to get more information or data as a
3   member of the committee when you had concerns about
4   it for your own child, the first time that you
5   reviewed it was in your con -- the context of your
6   work as an expert witness for the plaintiffs in
7   this case; correct?
8    A.  That was a long question.  Could you --
9    Q.  Sure.
10   A.  -- ask that again?
11   Q.  Sure.
12   A.  There's a lot going on there.
13   Q.  Yeah.  No, I agree with you.  I'll clean
14  it up.
15       The first time that you pulled together
16  data and did any research or study on this, despite
17  having your own concerns about it before, was for
18  this case?
19   A.  I think that's a fair assessment, yes.
20   Q.  And you know that when I -- I hate to go
21  to legalese, because I'm really not that
22  lawyer-like.  But if -- when I say "opined," you're
23  here -- the jury knows you're here to give an
24  expert opinion; correct?
25   A.  Yes.

Page 74

1    Q.  And you are now telling us in 2021 you
2   have several criticisms of the Rock 'n Play.  There
3   are several things that you find -- that you
4   believe were dangerous about the Rock 'n Play
5   sleeper.
6       And you're giving -- you're here to give
7   that opinion to the jury; true?
8    A.  That's correct.
9    Q.  And you are going to tell the jury that
10  under oath, and these are opinions that you've
11  developed in conjunction with, not your work on the
12  very committee that created this standard, but in
13  conjunction with your work as an expert witness in
14  this case?
15   A.  Yes.  That's correct.  I had nothing to do
16  with the 3118 standard when I was on that
17  committee.
18   Q.  Right.  So how did -- how did you come to
19  be acquainted with Mr. Osborne, our friend on the
20  screen?
21   A.  Well, he's obviously a lawyer at the law
22  firm that contacted me about this.  I'm not sure
23  that the law firm contacted me about.  It may have
24  been a -- some sort of medical expertise company,
25  if I recall.

Page 75

1       I think they reached out to me and they
2   said, you seem like you're an expert in this area,
3   would you be interested in talking to these lawyers
4   about this Rock 'n Play sleeper situation.
5    Q.  Do you --
6    A.  And I think that's how I was then
7   introduced ultimately to this law firm.
8    Q.  All right.  Do you remember what year that
9   was?
10   A.  Probably near the end of 2019 or maybe
11  even the beginning of 2020.
12   Q.  Are you listed with any expert referral
13  services?
14   A.  Not that I'm aware of.
15   Q.  All right.  Do you remember the name of
16  the one that connected you with Mr. Osborne and his
17  colleague, Ms. Schriner?
18   A.  No.  I think it had something like Medical
19  Experts or something like that in its name, but I
20  can't remember exactly.
21   Q.  All right.  Had you been contacted with
22  them -- by them before?
23   A.  No.
24   Q.  And we'll get to your entire file in this
25  case, because I know you have a large file.  Can

Page 76

1   you -- can you ballpark for us, prior to your
2   deposition today, approximately how many hours
3   you've spent working on this case, in your review,
4   in the preparation of your report, and any other
5   work that you've done?
6    A.  Well, in some sense -- in some sense my
7   entire career, you know, was preparing me for this.
8   We talked about all those projects that I worked
9   on.  I can't forget all that stuff I learned.
10   Q.  No.  Sure.  But I'm -- you're not --
11   A.  But --
12   Q.  I don't think Mr. Osborne's going to be
13  very happy if you decide to bill him 650 --
14       MR. OSBORNE:  Whoa, whoa, whoa, whoa.
15  BY MS. LOVETT:
16   Q.  -- dollars --
17       MR. OSBORNE:  That's almost an
18  interrupt.  Please let him finish his
19  answer.
20       MS. LOVETT:  No.  I was --
21       MR. OSBORNE:  Thank you.
22       MS. LOVETT:  John, I was just saying
23  I don't think you're going to be very
24  happy if he sends you a bill for
25  650 dollars an hour for his entire career.

Page 77

1    So I'm trying to confine it to his work in
2    the case and what he's -- what he's going
3    to bill you for.
4  BY MS. LOVETT:
5    Q.  Can you tell me that, Doctor?
6    MR. OSBORNE:  Well, I'm happy with
7    your inquiring into that area.  But if
8    he's making an answer, I'd prefer you
9    don't start talking.
10    MS. LOVETT:  Well, John, you're
11    not --
12    MR. OSBORNE:  Thank you.
13    MS. LOVETT:  I'm sorry.  You're not
14    in the room with us.  We're having a
15    laugh, and so we were, like, we were both
16    paused.  But I do appreciate the
17    instruction.
18  BY MS. LOVETT:
19    Q.  Dr. Singhose, how many hours have you
20  spent in your preparation for this case, not -- I'm
21  not talking about your whole life, obviously, but
22  what you've done that you're going to bill the
23  Kelly -- the parties for?
24    A.  Okay.  Just focusing on the work
25  specifically on this Rock 'n Play sleeper, I would

Page 78

1  estimate 250 hours.
2    Q.  All right.  Before your deposition today?
3    A.  Yeah.  I mean, 250 is just a ballpark
4  number.
5    Q.  Sure.  No, I -- and we have -- we'll have
6  your invoices, and we'll go through that.  But I
7  just wanted to get a ballpark of the time you've
8  spent over the course of from late 2019 through
9  today.
10    And that's your estimate.  I'm not -- I
11  promise I won't hold you to that estimate, but
12  that's a fair --
13    A.  I think that's a fair estimate.
14    Q.  -- estimate.
15    If we -- if we broke that down into
16  40-hour workweeks, which no one has anymore, I
17  know, but probably eight or nine weeks' worth of
18  work?
19    A.  Yeah.  I mean, six or seven.
20    Q.  Six or seven?  See, this is how much math
21  I can do, Dr. Singhose.  But thank you for letting
22  me off the hook on that.  My team is -- my team is
23  already laughing.
24    MS. LOVETT:  So why don't we take a
25    quick restroom break, if that's okay.

Page 79

1    THE WITNESS:  Sure.
2    MS. LOVETT:  And by the way, anytime
3    that you need a break --
4    MR. OSBORNE:  Sure.
5    MS. LOVETT:  -- anytime you need a
6    break, feel free.  And also, you have two
7    babies at home, so anytime you needed a
8    break just to check in, feel free.
9    THE WITNESS:  Okay.
10    THE VIDEOGRAPHER:  Stand by.
11    The time is 10:59 a.m.  We are off
12    video record.
13    (Whereupon, a discussion ensued
14    off the record.)
15    (Whereupon, there was a brief
16    recess.)
17    THE VIDEOGRAPHER:  The time is 11:11
18    a.m., we are back on video record.
19  BY MS. LOVETT:
20    Q.  Dr. Singhose, we're going to mark what is
21  going to be Exhibit 1 to your deposition.
22    (Whereupon, Defendant's
23    Exhibit 1 was marked for
24    identification.)
25    MR. OSBORNE:  And I should say that

Page 80

1  I've gotten an E-mail indicating I'm
2  getting a login, but I haven't gotten that
3  specific login.  So I am following along
4  on exhibits on-line --
5    MS. LOVETT:  All right.
6    MR. OSBORNE:  -- with you.
7  BY MS. LOVETT:
8    Q.  All right.  So Exhibit 1 to your
9  deposition, Dr. Singhose, is called a notice of
10  deposition.  Have you seen this document before?
11    (Whereupon, the document was
12    reviewed by the witness.)
13    THE WITNESS:  Yeah, I've seen this
14    one.  It just doesn't seem to be the
15    correct one.  I'd received a couple of
16    these.
17  BY MS. LOVETT:
18    Q.  We've had -- we've had a couple of changes
19  of schedule; fair to say?
20    A.  This one appears, the one I'm holding
21  right now appears to be for the other date, the
22  Thursday last week when we were supposed to have
23  it.
24    Q.  Right.  Let's look at the Exhibit A to
25  the -- to the back of that.  That may not be the

## Page 81

```
 1    controlling notice, but I know the request for
 2    documents has not changed.
 3         Have you reviewed that portion of the
 4    exhibit?
 5    A.  Yes, I have.
 6    Q.  And can you tell me what that is, or what
 7    you perceive it to be?  A request for you to bring
 8    certain documents to your deposition?
 9    A.  Yes.  I mean, that's the way I understand
10    this.  Of course, there's a bunch of depositions --
11    definitions here that I reviewed so I could
12    understand the terms in the request.
13         And then starting on Page 6 going on to I
14    think seven and eight, there are these requests
15    that were made of me.
16    Q.  Have you done your best to comply with
17    those requests today?
18    A.  Yes, I have.
19    Q.  Have you provided --
20         MR. OSBORNE:  And Counsel, just for
21    the record, best -- Dr. Singhose's file
22    was produced in compliance with Rule
23    26(b)(4).  And we have told you in writing
24    what our objections were to your requests.
25         So within that -- those parameters,
```

## Page 82

```
 1    these questions are being answered.
 2         MS. LOVETT:  Yes.  That's understood,
 3    Counsel.  We have a digital copy of the
 4    doctor's file and have that.  We'll be
 5    going through that with him today, but
 6    giving him the --
 7         MR. OSBORNE:  Of course.
 8         MS. LOVETT:  -- chance to tell us on
 9    the record that he formally reviewed the
10    definitions and feels that he has provided
11    you with everything that you -- that he
12    needed to provide that was
13    non-objectionable.
14    BY MS. LOVETT:
15    Q.  Is that correct, Dr. Singhose?
16    A.  I didn't follow that.  What I did was I
17    read all this --
18    Q.  There you go.
19    A.  -- and did my best to come up with these
20    materials, and I turned them over to the law firm.
21    And there was some discussion about what was
22    discoverable.  I didn't make that final call, they
23    did.
24    Q.  Understood.
25    A.  Okay.
```

## Page 83

```
 1    Q.  All right.  So you have to the best of
 2    your ability produced everything that's on the
 3    list.  Let's go through some categories that you
 4    reviewed for the file.
 5         And I want to put this into sort of two
 6    categories as we go through, that there'll be
 7    things that you've reviewed, and then afterwards
 8    there'll be things that you have independently done
 9    or research that you have pulled.
10         Do those categories make sense to you?
11    A.  Sure.  Somewhat.
12    Q.  Okay.
13    A.  I mean, we'll probably have to clarify
14    it --
15    Q.  Yeah.
16    A.  -- as we go on.
17    Q.  Well, should I add any other categories?
18         I'm looking at your scope of work.  I know
19    that you were provided with a vast amount of
20    information by plaintiff's counsel.  Then you also
21    did, you undertook some independent study and
22    research and testing.
23         Is there any other category I should add
24    to the scope of your work in this case prior to
25    your deposition today?
```

## Page 84

```
 1    A.  Well, one thing that's jumping out at me,
 2    and I don't know how this was resolved, was the --
 3    if the subject Rock 'n Play sleeper and the
 4    exemplar Rock 'n Play sleeper are subject to being
 5    turned over to you.  That doesn't sound like any of
 6    the two columns you were -- the two groups you --
 7    Q.  Right.
 8    A.  -- were just talking about.
 9    Q.  Okay.  That's a good distinction to me.
10    A.  Okay.
11    Q.  Okay.  All right.  So we're going to talk
12    about everything that you -- that you reviewed.
13    Let's start with the categories of documents.  You
14    obviously provided us with your C.V.  Do you know
15    whether -- have you provided your most current C.V.
16    to Mr. Osborne?
17    A.  Yes.  Since I thought this was going to be
18    last Thursday, I think I tried to get all this
19    material to them on, like, over the Monday and
20    Tuesday time frame of last week.  And one of the
21    first things I did was provided an updated C.V. at
22    that time.
23    Q.  Right.
24         (Whereupon, Defendant's
25         Exhibit 2 was marked for
```

1          identification.)
2    BY MS. LOVETT:
3         Q.   So this is -- Exhibit 2 to your deposition
4    is your curriculum vitae.  And it's updated as of
5    last Thursday, which would have been September, oh,
6    goodness, 9th.
7              Are there any additions we need to make to
8    it in the ensuing six or seven days?
9         A.   I don't think so.
10        Q.   All right.  I wouldn't be surprised.  I'm
11   just checking.
12             So let's talk about articles.  Did you
13   independently pull any articles or research any
14   articles in conjunction with your work in this
15   case?
16        A.   Independent from whom?
17        Q.   Independent -- well, that's a good
18   question.  Just on your own.  Did you -- did you
19   pull some articles in conjunction with the lawyers
20   with whom you're working?
21        A.   I think I made requests to them to send me
22   certain documents.
23        Q.   All right.
24        A.   And so obviously he's provided me with
25   hundreds of thousands of pages, I think.

1         Q.   Yes.  Yes.
2         A.   I didn't count them up, but --
3         Q.   Right.
4         A.   -- as you know.  Yeah, so a lot of the
5    documents came from the law firm.
6         Q.   Right.
7         A.   But you were asking me a question about
8    independent.
9         Q.   Yeah.  So I know the law firm provided you
10   with documents and also at your request may have
11   provided additional documents.
12             Did you do any independent research, in
13   other words, pull learned treatises, journal
14   articles, peer reviewed studies, anything of that
15   nature, to support your opinions and conclusions in
16   this case?
17        A.   Yes.
18        Q.   And tell me briefly what areas you focused
19   on in that process.
20        A.   Well, one area that I looked into was
21   patents on these devices.  So I think the one or
22   two patents that I relied on I cited in my report
23   and turned those over.
24             So that's one area that the lawyers -- I
25   did independent from the lawyers, I guess --

1         Q.   Right.
2         A.   -- is what you're asking.
3         Q.   Right.
4         A.   So that's one area.  I also looked at the
5    Mannen report and the Wang paper.  Now, I may have
6    gotten that from the lawyers at some point, but I
7    think I independently just downloaded that again.
8         Q.   Okay.
9         A.   Because I had kind of a version that was
10   marked up or something, and I just wanted to make
11   sure that the public version was the same as that.
12   I think it's -- I think the public version is,
13   like, a redacted version.
14        Q.   Right.
15        A.   And so I think I independently got the
16   public version just to verify that it was basically
17   what I was getting.
18        Q.   Right.
19        A.   And then the Wang paper, again, I think I
20   just downloaded that because I have access to it.
21             And then there was -- the other category,
22   I think, of things I did independently was the
23   publications by Ms. Drago -- is that how you
24   pronounce her name?
25        Q.   Yes.

1         A.   Okay.
2         Q.   Drago, actually.
3         A.   Drago.  Okay.  So Ms. Drago, I
4    independently located some of her publications --
5         Q.   All right.
6         A.   -- on my own.
7         Q.   Okay.
8         A.   I also independently located a textbook
9    that describes safe sleeping practices, like, the
10   most current up-to-date sleeping practices.  I
11   think that was independent from the lawyers.
12        Q.   All right.
13        A.   Those are the things that are coming to
14   mind right now.
15        Q.   Okay.  Any other articles or peer reviewed
16   papers or anything that you can think of, any other
17   category other than what we've discussed?
18        MR. OSBORNE:  Form.
19        THE WITNESS:  I think, you know,
20        what's coming to mind right now, those are
21        the things that I would characterize as
22        independent from the law firm.
23   BY MS. LOVETT:
24        Q.   All right.  And I'm not going to ask you
25   about things that you -- in other words,

Page 89

1    independent materials that you did not receive from
2    the law firm?
3        A.  That's my understanding of your question,
4    yes.
5        Q.  All right.  Is there -- is there anything
6    as we sit here today that you still, that you feel
7    you are lacking or you would still like to see to
8    finalize or confirm your opinion?
9        MR. OSBORNE:  Form.
10       THE WITNESS:  I don't think I need
11       anything additional to finalize or confirm
12       my opinion, but there is stuff I would
13       like to see.
14   BY MS. LOVETT:
15       Q.  Okay.  So your report, I'll go ahead and
16   mark that.  We have a copy of your April 2, 2021
17   report which was produced to us in this case in
18   compliance with the Court's scheduling order.  And
19   that will be Exhibit 3 to your deposition.
20           (Whereupon, Defendant's
21           Exhibit 3 was marked for
22           identification.)
23   BY MS. LOVETT:
24       Q.  This is my work-out carrying around your
25   report, actually.

Page 90

1        So as we discussed at the beginning of the
2    deposition, today's my only day to ask you
3    questions.  The counsel with whom you're working,
4    Mr. Osborne said we also have this report, which we
5    have here in front of us as Exhibit 3.  It's my job
6    to ask you questions and ascertain as many of your
7    opinions as I can.
8        Did you intend for this report to be at
9    least your proffer to the Court and to me, to
10   Fisher-Price and Mattel, of your full opinions in
11   this case?
12       A.  Well, the report I have in front of me is
13   what I'll call my first report.
14       Q.  Yes.  That's your --
15       A.  And the --
16       Q.  -- initial report.
17       A.  -- that was the extent of the opinions
18   that I was offering at that point in time.  But as
19   you know, your experts returned to me even bigger
20   reports, and they introduced new issues and new
21   information.  And so then I needed to respond to
22   that in a rebuttal report.
23       Q.  Yes.
24       A.  And I would think that the combination of
25   this report and the rebuttal report includes the

Page 91

1    sum total of the opinions that I would be pro -- I
2    would be -- did you say pro offering? -- I would
3    be --
4        Q.  Proffering.  That's another --
5        A.  -- I would be proffering.
6        Q.  That's another lawyer word.
7        A.  Okay.
8        Q.  Here's your July 16th, 2021 rebuttal
9    report, which will be Exhibit 4 to your deposition.
10           (Whereupon, Defendant's
11           Exhibit 4 was marked for
12           identification.)
13   BY MS. LOVETT:
14       Q.  And so, Doctor, as we sit here today, your
15   complete opinions are contained, for your work in
16   this case are contained in Exhibits 3 and 4, your
17   report and rebuttal report; correct?
18       A.  Yes.  I think that's the opinions I put in
19   paper and offered in this matter.
20       Q.  Sure.  Okay.  So what else is it as we sit
21   here today that you would still like to see, having
22   offered these reports?
23       A.  Well, in these rebuttal reports I received
24   from, I'll just call them your experts, I don't
25   know if they're yours or Fisher-Price's, they

Page 92

1    presented a lot of experimental data that I don't
2    think was complete, and so it was a bit hard for me
3    to understand some of that.
4        So for example, a lot of the videotapes
5    that I received to review those testings didn't
6    include audio.  So I would -- I would really like
7    to see [sic] the audio of those.
8        Also, many of the video clips seem to be
9    cut off right when interesting things were
10   happening, so I would have liked to see more of
11   those video clips, like, all the way through a test
12   rather than just the cut-off versions of it.
13       Then there's some other experimental
14   protocols in here that aren't clear to me.  Such as
15   when they secured a baby in the Rock 'n Play with
16   the restraint, I would like to have understood how
17   tight that restraint was.
18       So there's several things like that.  I
19   think I'd have to review my report to make a full,
20   complete list of what I would still be interested
21   in seeing, but those are some examples of things I
22   would like to see.
23       Q.  All right.  You felt that you had
24   sufficient information to author the July 16th
25   surrebuttal report -- or rebuttal report?

Page 93

1    A.  Yeah.  Certainly.  I mean, as you know, in
2  these cases --
3        MR. OSBORNE:  Form.
4        THE WITNESS:  -- we never get all of
5    the information.
6  BY MS. LOVETT:
7    Q.  Sure.
8    A.  But I did have enough to confidently put
9  forth these opinions.
10   Q.  All right.  So let's talk about the --
11 you've given me another -- a number of categories
12 of the work you did.  In addition to your reports
13 and contained within your reports, you did some
14 testing, independent testing; true?
15   A.  Yes.  I mean, testing in the sense that I
16 measured geometry of the device.  I put dolls and
17 live infants in various positions to photograph how
18 they interacted with the device.  I observed live
19 infants and how they pushed and wiggled and moved
20 around in the device.  That's what I think that
21 you're referring to as my testing.
22   Q.  Yes.
23   A.  Yes.
24   Q.  And so when we talked about the exemplars,
25 the subject product or the exemplar product, were

Page 94

1  those tests conducted with an exemplar
2  Rock 'n Play?
3    A.  Yes.  Some of the tests I actually used
4  the subject Rock 'n Play, the actual --
5    Q.  Yes.
6    A.  -- one.
7    Q.  Yes.
8    A.  But I'm not going to put live babies in
9  that, so I asked for an exemplar.  And they sent me
10 one that is quite similar.  And that's when I would
11 put the live babies in that one.
12   Q.  Right.  You -- and to be -- I want to
13 clarify your question.  You wouldn't put live
14 babies in the subject Rock 'n Play because Z███ had
15 passed away in it?
16   A.  Yes.
17   Q.  But you were comfortable putting the live
18 babies in the exemplar Rock 'n Play for the
19 purposes of your testing?
20   A.  Yes.  For the purpose of my short-term
21 testing and photographing and measuring, yes.
22   Q.  Right.  And was your -- and did you take
23 audio recordings of your -- were there video and
24 audio recordings of your testing?
25   A.  I don't think I took any video of those.

Page 95

1  Basically, I just took pictures in order to show
2  the various positions they were in.  And I believe
3  I also took pictures of my measurements.  I would
4  put a measuring tape there and take a picture of it
5  to record what number it was reading.  But I don't
6  recall videotaping it.  Because basically, I'd be
7  really close to the infant when I was putting them
8  there.
9    Q.  Right.
10   A.  I didn't then step back and do a
11 videotape --
12   Q.  Right.
13   A.  -- of that test.
14   Q.  You had said that you would be interested
15 in seeing or having the audio portions of some of
16 our experts' testing.  And I'm just curious how
17 that would -- might impact your analysis one way or
18 the other.
19   A.  Well, to get these babies to roll over or
20 to partially roll, they attempted to entice them.
21 And they used a toy and they used verbal cues, and
22 also it looked like they were using their parents.
23   Q.  Right.
24   A.  I can't tell who those people are, but
25 some of them looked like parents or --

Page 96

1    Q.  Right.
2    A.  -- caregivers.  And so I know from my own
3  personal experience or just common sense that the
4  way that you tempt the baby to move or to roll or
5  to turn is going to determine how much it tries to
6  roll.
7    Q.  Right.
8    A.  And so if I put a baby in this
9  Rock 'n Play sleeper and I stood in front of it and
10 I didn't say anything, the baby's not going to
11 probably move much.
12   Q.  Right.
13   A.  But if I went around to the side and I had
14 a toy and I was shaking it and I was saying come
15 here and I was tempting it with my voice and stuff,
16 then I -- obviously the baby would be more likely
17 to turn over.
18       So I would just like to see that the
19 stimulus to the baby, whether or not that was
20 consistent across all the testing.
21   Q.  All right.
22   A.  And I think there was also important
23 comments made by the parents.  The parents seemed
24 to indicate the level of skill that their infant
25 had, like I think they can turn over or I've seen

Page 97

1  them turn over. And I think that that kind of
2  information was missing.
3      Q. All right. We know in baby Z███'s case,
4  we know her level based on her parents and her --
5  or her parents relating her level of development
6  and her medical records, we know approximately
7  where she was at eight months and 20 days old in
8  terms of benchmarks; correct?
9      A. Yeah, I think we have some approximate
10 information of what she was capable of doing.
11     Q. We know that Z███ could roll over?
12     A. I think that we know that she could
13 possibly roll over on certain kinds of surfaces
14 that may be flat. Like, to me it wasn't clear when
15 they said Z███ can roll over. Like, rolling over
16 on a flat surface is different than rolling over on
17 a couch or rolling over in the Rock 'n Play.
18     So I'm not -- I don't have a clear
19 understanding of just where she could roll over.
20     Q. All right.
21     A. But I think that there are certain
22 conditions that indicate that she might have been
23 able to roll over.
24     Q. Yeah. Her father said she could roll
25 over.

Page 98

1      A. Yes.
2      Q. Her pediatrician said she could roll over
3  two months before she passed away when she was six
4  months old.
5      A. Yeah. So I mean, a pediatrician might see
6  that baby, you know, up on an elevated examination
7  table and be very worried that it was going to roll
8  over and say, that baby can roll over. I mean,
9  that's how our kids are examined.
10     Q. Right.
11     A. And so I know that pediatricians are
12 pretty scared about the baby rolling off the exam
13 table.
14     Q. Uh-huh.
15     A. So certain configurations, I think
16 there's -- people are saying that she could roll
17 over.
18     Q. Right. But also, the pediatrician is
19 noting that as a developmental marker, you realize
20 that; right?
21     A. Yes. I think that's what the pediatrician
22 is saying is that, from their assessment --
23     Q. Right.
24     A. -- she could roll over in some place.
25     Q. Right.

Page 99

1      A. I wasn't sure where the pediatrician was
2  referring to.
3      Q. Okay. The testimony was -- of Z███'s
4  father was that she could sit up.
5      A. Yeah. I remember seeing stuff like that.
6  Again, I have a question of whether -- does that
7  mean you can take the baby and sit it up and plop
8  it down and it not fall over for a while.
9      Q. Right.
10     A. I mean, that's how they start.
11     Q. Right.
12     A. Is that sitting up?
13     Or I think in this case you want to be
14 looking for kids that can be on their back and can
15 sit up. Because that's what would cause the
16 problem here is they would be on this 30 degree
17 incline, and when they're on their back underneath
18 their own power they could then sit up. That, I
19 don't know whether she could do or not.
20     Q. Do you -- did you consult with any other
21 experts or specialists in the area of child
22 development to assess what would be average ages
23 for the benchmarks involved in the time -- the
24 lifetime use of this product?
25     A. I don't think I consulted with other

Page 100

1  experts. I mean, I've reviewed that kind of
2  information for years now --
3      Q. Right.
4      A. -- in my career, so I'm generally
5  knowledgeable about when babies can do certain
6  things. And I happen to know there's a large
7  range --
8      Q. Right.
9      A. -- of which things can happen. I mean,
10 having our boys grow up with our close friends, you
11 can see the development different in your child
12 than somebody else's.
13     Q. Right.
14     A. So I have this practical experience as
15 well. But I've also read many of the papers and
16 texts and descriptions about the general stages
17 through which babies develop.
18     Q. Right.
19     So let's talk about what you did in
20 preparation for your -- for your deposition. Did
21 you review any deposition transcripts prior -- for
22 the purpose of giving your deposition today?
23     A. I think just for the purpose of clarity, I
24 feel like the entire 250 hours --
25     Q. Right.

Page 101

```
 1        A.  -- was preparing for this.
 2        Q.  Fair enough.
 3        A.  So yeah, I read a lot of depositions.
 4        Q.  Okay.
 5        A.  But it seems like you may be asking a
 6    slightly different question.
 7        Q.  No.  That's fine.  We can -- we can
 8    certainly --
 9        A.  Okay.
10        Q.  We can certainly -- for example, an expert
11    who testified yesterday said, I didn't look at all
12    the depositions again recently.  That gave me some
13    clarity on whether or not he would be -- have
14    details at his fingertips.
15        A.  Okay.
16        Q.  So what -- but let's do this along the
17    250-hour continuum that you've described.  Which
18    deposition transcripts did you review?
19        A.  I think the vast majority that were sent
20    to me.  And that would maybe be in that case file
21    if they turned those over to you.
22        Q.  Yes.
23        A.  I certainly reviewed most of those.  Any
24    ones that I relied on, though, I would have
25    specific quotes from in my -- in my report.  So we
```

Page 102

```
 1    could just go through there and search for
 2    citations of depositions --
 3        Q.  Yes.
 4        A.  -- and I certainly would have read those.
 5        Q.  Yes.
 6        A.  I may have read, you know, one or two
 7    others that I didn't cite to, but I don't -- if I'm
 8    relying on them --
 9        Q.  Right.
10        A.  -- then I would have had a citation to
11    them or a description to them in my report.
12        Q.  We know from your report that you read the
13    depositions of Z███ s parents; correct?
14        A.  Yes.
15        Q.  And of Mr. Olson, Z███'s uncle; correct?
16        A.  That's probably correct.
17        Q.  All right.
18        A.  That was a -- this would have been one of
19    those I read a long time ago.
20        Q.  Sure.
21            Did you read the depositions of the first
22    responders -- or of the detectives, I should say?
23        A.  I'm not sure I read their depositions.  I
24    mean, I read the police reports and the incident
25    reports.
```

Page 103

```
 1        Q.  Okay.
 2        A.  So I have quotes from them.
 3        Q.  Right.
 4        A.  And also one of your experts, Dr. Rundell,
 5    also has a factual, detailed factual description,
 6    or what I'll call a list of quotes --
 7        Q.  Right.
 8        A.  -- from all those, and I actually reviewed
 9    that recently.
10        Q.  All right.
11        A.  So I'm familiar with a lot of stuff that
12    they said.
13        Q.  But don't know specifically whether you
14    reviewed their entire depositions?  And I'm talking
15    most specifically here about Detective Reyes and
16    Sergeant Akey.
17        A.  Yes.  I know that I read what I'll call
18    statements from them.  Whether those were in
19    deposition form, I can't remember.
20        Q.  All right.  Did you review any of the
21    Mattel -- any of the Fisher-Price company
22    witnesses' depositions?
23        A.  Yes.
24        Q.  Which ones do you recall having reviewed?
25        A.  Kitty Pilarz.  I think I reviewed a couple
```

Page 104

```
 1    of hers, right, I think for this case.  And I may
 2    have also been provided one from an earlier case.
 3        Q.  All right.
 4        A.  I don't remember.  But depositions by her.
 5    Depositions by Michael Steinwachs, if that's how
 6    you pronounce it.
 7        Q.  It is.
 8        A.  Depositions by Joel Taft.  Depositions by
 9    Linda Chapman.  Those are the ones I can remember
10    off the top of my head.
11        Q.  Okay.  Did you review the deposition of
12    Lisa Loheiser?
13        A.  Yes, I did.
14        Q.  Any other corporate depositions that you
15    can review off of -- that you can recall off the
16    top of your head?
17        A.  Well, of course I reviewed the deposition
18    or depositions, however you want to define it, of
19    Dr. Deegear.
20        Q.  All right.
21        A.  I'm not sure you're associating him
22    directly with Fisher-Price or not.
23        Q.  Well, I guess the quest -- I'm not
24    currently because he's not worked with Fisher-Price
25    in a while.
```

Page 105

1    But there were three separate depositions.
2    Did you review the depositions or did you review
3    summaries of those depositions?
4        A.  I think I reviewed all of those
5    depositions.  It was a little confusing, I mean,
6    because it seemed like one was interrupted or
7    something like that --
8        Q.  That's correct.
9        A.  -- and started again.  So I'm not sure how
10   you're defining three different ones, but I think I
11   did receive three different chunks of depositions
12   from him that I reviewed.
13       Q.  All right.  Any other depositions that
14   you -- that you recall reviewing that you would
15   associate with Fisher-Price or Mattel?
16       A.  Not off the top of my head.  But again, if
17   I relied on them, I would -- I would have cited to
18   them --
19       Q.  Sure.
20       A.  -- in my report.
21       Q.  Have you -- have you spoken with or
22   reviewed the report of any of the plaintiff's other
23   experts in this case?
24       A.  I haven't spoken to them.  I was provided
25   at least some of their reports, but I didn't study

Page 106

1    them.  I think I what I'll say perused them or
2    looked at just some parts of them.
3        Q.  All right.  Did you use any of the reports
4    of any of the other plaintiff's experts in this
5    case to form any conclusions in your own reports?
6        A.  I'm not sure I used them to come to any
7    conclusions.  But certainly the -- like, for
8    example, the medical doctor's --
9        Q.  Right.
10       A.  -- report tends to coincide with my
11   opinion, but I can't say that I relied on it
12   heavily.
13       Q.  You reviewed medical records, obviously?
14       A.  Yes.
15       Q.  And obviously you're not a medical doctor,
16   so you were looking for certain specific things, I
17   would think.
18       A.  Yes.  I mean, even though I'm not a
19   medical doctor, you can look at a medical report
20   and you can see mechanical engineering issues in
21   there.
22       Q.  Yes.
23       A.  For example, you can see fluid flow
24   problems --
25       Q.  Right.

Page 107

1        A.  -- and things like that or notes on fluid
2    flow, and that's a mechanical engineering issue.
3    So I would look for things like that.
4            Honestly, if they're making a medical
5    opinion using some fancy medical terms, I probably
6    would just trust them --
7        Q.  Right.
8        A.  -- you know.
9        Q.  Right.  So did -- which of Z███'s medical
10   records do you recall -- because you weren't
11   looking at them from a medical perspective, which
12   of Z███'s medical records do you recall having
13   reviewed?
14       A.  Well, I think the -- I'm not sure exactly
15   how this breaks down, but I think there was
16   basically an initial medical examination or a try
17   to -- an attempt to -- at determining her cause of
18   death and -- soon after.
19       Q.  Yes.
20       A.  And they just attribute it to sudden
21   unexpected infant death.
22       Q.  Actually, I believe they, you're right, in
23   the preliminary report they said they suspected
24   S.I.D.S. and the ultimate manner of death was
25   undetermined.

Page 108

1        A.  Okay.  Yeah.  It was something like that.
2        Q.  Yes.  You're talking about --
3        A.  And I think --
4        Q.  -- her post-mortem reports --
5        A.  Okay.
6        Q.  -- correct, post-mortem medical records?
7        A.  If that's what you call them.  I mean, I
8    don't know if it said "post-mortem" on it.  I'm
9    reading a description of a doctor that was
10   investigating what happened and did some
11   examination in trying to determine what happened.
12           And then I think there's another one, an
13   autopsy report that may be different.  Or I'm not
14   sure if those are separate or part of the same
15   investigation --
16       Q.  Right.
17       A.  -- but I recall those sort of two
18   different things.
19       Q.  Yes.  Did you review any of Zoey's records
20   from when she was alive, her medical records?
21       A.  Yes.  There's a couple of brief reports of
22   her visiting the doctor a couple months before her
23   death.
24       Q.  Yes.
25       A.  I remember reading that.

Page 109

1    Q.  Okay.  Did you review any of her birth
2  records?
3    A.  Yes.
4    Q.  Okay.  Did you -- for what purpose did you
5  read her neonatal records?
6    A.  I think generally to just understand her,
7  her life, like, what was going on in her life up to
8  that point, again, probably wanting to just
9  understand the accident, the situation, her
10  capabilities.
11    Q.  Have you met or spoken with either of
12  ███ s parents in an attempt to determine her
13  capabilities or her day-to-day life?
14    A.  No.
15    Q.  Do you think there's anybody more,
16  probably more -- in the -- with more information on
17  that than her parents?
18    A.  No.
19    Q.  Were you provided with any talking points
20  or outlines to use in your deposition?
21    A.  No.
22    Q.  How many times did you meet with
23  Mr. Osborne or someone at his firm in the -- in the
24  course of your engagement?
25        And understanding that we transitioned to

Page 110

1  a virtual world quite early in your engagement, and
2  so you may have been meeting by Zoom or telephone,
3  can you give us an approximation of those meetings?
4    A.  Yeah, I've never met them in person.
5    Q.  All right.
6    A.  Mr. Osborne, I probably met with him via
7  Zoom or telephone calls five to ten times.  And
8  then there was a lawyer that was working on this
9  more detailed in the initial phases, Kristen
10  Schriner.
11    Q.  Yes.
12    A.  I probably met with her a few times more
13  than that.
14    Q.  All right.
15    A.  So eight to 15 meetings with her.
16    Q.  All right.  I want to -- so we've got your
17  qualifications, and we're going to go through your
18  opinions in detail.  And I think it's important for
19  the jury to understand what you will not be
20  addressing since we all can't be experts in
21  everything, mercifully.
22        So you -- the -- your opinions are limited
23  in this case to the design process of the
24  Rock 'n Play sleeper; correct?
25    A.  No.

Page 111

1    Q.  All right.  You're not a medical
2  professional; true?
3    A.  That's correct.
4    Q.  You will not be offering medical opinions?
5    A.  No.
6    Q.  You are not an expert in neonatology?
7    A.  What is neonatology?
8    Q.  I think that answers the question.  It's
9  the treatment of neonates or very new babies.
10    A.  Okay.  So medical treatment, no.
11    Q.  Yes.
12    A.  Yes.
13    Q.  You are not an expert in pediatric
14  pulmonology?
15    A.  Yeah, well, there's a legal definition of
16  expert.
17    Q.  Yes, there is.
18    A.  And I think we should clarify that.  So it
19  turns out that I've been involved in auxiliary and
20  in research that examines the hearts and lungs of
21  children or babies that are -- that are born with
22  deformities.
23        So I mentioned Dr. David Frakes before.
24  He's a close colleague I've been working with for
25  20 years.  He actually started a company that takes

Page 112

1  M.R.I. scans of infants and 3D reconstructs their
2  hearts so that some surgeons can plan how they're
3  going to operate on these babies' hearts to change
4  them so they're more efficient, because they're
5  born with a defect.
6        I have some of those 3D hearts in my
7  office sitting on my desk.  So.
8    Q.  The ones that Dr. Frakes made, your
9  friend?
10    A.  Yeah.  He started a company that makes
11  these.  So I've been involved in that in the sense
12  that I've discussed it with him many times and I've
13  gone to his lab and I've saw the M.R.I. machines
14  and how they're 3D printing them.  So in that
15  sense, I know quite a bit about infant hearts.
16    Q.  Okay.  I -- and I understand.  And I have
17  a dear friend who's a hedge fund trader, but I
18  promise you -- and I've been to the floor, but I
19  promise you I can't do it, and I wouldn't hold
20  myself out as an expert in doing it.
21        So to be clear, you are not telling the
22  jury that you are a pediatric pulmonologist or
23  specialist in the treatment of lung ailments in
24  children, are you?
25    A.  No, I'm not a pediatrician.

Page 113

1  Q. Nor are you a pathologist?
2  A. No, I'm not a pathologist.
3  Q. And you are not holding your out --
4  yourself out as an expert in pathology?
5  A. No.
6  Q. You are not an expert in S.I.D.S. or
7  sudden unexplained infant death, are you, sir?
8  A. I mean, I think I would have to be at this
9  point. I know a great deal about those.
10  Q. Well, via your -- via your engagement in
11  this case?
12  A. Oh, no. Well before that. I mean, I've
13  been dealing with these kinds of products for a
14  decade now. And like I said, one of the products I
15  worked on many years ago was the swing that tries
16  to comfort sick children.
17  Q. How did that make you an expert in sudden
18  infant death or sudden unexplained infant death?
19  A. Well, those sick children died
20  unexpectedly. So I've studied this issue for a
21  long time, like, what is S.I.D.S., what causes
22  S.I.D.S., what are the contributing factors to
23  S.I.D.S. I know a great deal about that.
24  Q. Have you authored any peer reviewed
25  articles on S.I.D.S.?

Page 114

1  A. No.
2  Q. Have you conducted any research on
3  S.I.D.S.?
4  A. I've done a lot of research in terms of
5  determining how many children have it, what causes
6  it, what are -- well, I mean, by definition the
7  causes are unclear. So there's contributing
8  factors and there's correlations. I know a lot of
9  that material.
10  Q. All right. And when you say you know it,
11  outside of this case, apart from what you've
12  learned in this case, what specific research have
13  you conducted on S.I.D.S. or S.U.I.D.?
14  A. Well, I read a lot of articles describing
15  the amount of S.I.D.S., articles describing how,
16  when recommendations were changed to put infants on
17  their back, how S.I.D.S. decreased.
18      I have read articles about the
19  ramifications of putting kids on their back for --
20  so when you put kids on their back, different
21  things happen to them. And one thing that happens
22  to them, for example, is their heads can be
23  deformed, because they're now resting on this back
24  of their head and their --
25  Q. Plagiocephaly.

Page 115

1  A. Yeah. My son had that, so I went through
2  that. And we 3D printed him a helmet, for example,
3  to reshape his head. So yeah, I just know a great
4  deal about this issue.
5  Q. Do you think because you read a lot of
6  articles about something it makes you an expert in
7  it?
8  A. It can, yes.
9  Q. So do you consider yourself an expert in
10  S.I.D.S. or S.I.D. as you sit here today? Are
11  you -- do you intend to offer opinions to the Court
12  and to the jury that you are an expert in S.I.D.S.
13  and S.U.I.D.?
14  A. I'm an expert in the sense that I can
15  comment on contributing factors to it, the way that
16  it's changed over the years by different sleep
17  practices.
18      I'm not going to offer myself as a medical
19  expert on trying to track down, you know, the
20  detailed medical reasons why S.I.D.S. occurs or
21  S.U.I.D. occurs. But the truth is I know a lot
22  about this topic.
23  Q. Doctor, I want to be clear. Do you -- do
24  you hold your out as -- you hold yourself out as a
25  bio -- as a mechanical engineer as an expert --

Page 116

1  A. Yes.
2  Q. -- clearly?
3  A. Certainly.
4  Q. You think you're equally a
5  S.I.D.S./S.U.I.D. expert because you've read a lot
6  of articles?
7  A. Equally? No, I'm not saying that I have
8  the equal expertise in S.I.D.S. as related to
9  mechanical engineering. But the truth is I know a
10  lot about S.I.D.S. and S.U.I.D.
11  Q. What is the American S.I.D.S. Institute?
12  A. What is it?
13  Q. Yes, what is it?
14  A. It's probably a group of people. I mean,
15  I've never --
16  Q. It probably is?
17  A. I've never been a part of that.
18  Q. Okay.
19  A. So.
20  Q. You know nothing about it?
21  A. It just came out of your mouth and you're
22  describing it, so I know something about it there.
23  But no, I've never been a part of that institute.
24  Q. Have you been a member of any organization
25  that studies or researches S.I.D.S.?

Page 117

1    A. Yeah. I mean, my research group at
2  Georgia Tech studies S.I.D.S. and sick children and
3  tries to come up with products that will help them.
4    Q. All right. Let's break it down. You said
5  studies S.I.D.S. in sick children. S.I.D.S. is, of
6  course, Sudden Infant Death Syndrome. What
7  products does your -- you said S.I.D.S. in sick
8  children.
9     Are you --
10    A. S.I.D.S. and --
11    Q. And. Okay. S.I.D.S. and --
12    A. -- sick children.
13    Q. -- sick children. What products have you
14  specifically tried to come up with to help or to
15  stop S.I.D.S.?
16    A. Well, again, I don't think I was directly
17  targeting S.I.D.S. I was targeting young children
18  and making them more comfortable, helping them
19  recover. There's a correlation between S.I.D.S.
20  and children of low birth weight, children who have
21  respiratory infections and things like that.
22     So there's all these contributing factors
23  that you can't -- S.I.D.S. just means that you
24  don't -- you can't put a finger on it. Right? You
25  don't know --

Page 118

1    Q. Right.
2    A. -- exactly what -- it doesn't mean there's
3  not contributing factors. And so I've studied
4  those issues and tried to come up with products and
5  inventions and understandings that would help aid
6  those young children so they would not become
7  victims of S.I.D.S.
8    Q. All right. Well, I understand. But I
9  am -- I am focusing in on S.I.D.S. and whether you
10  are holding yourself out as an expert on Sudden
11  Infant Death Syndrome and sudden unexplained infant
12  death.
13    A. I don't know what you mean by holding
14  my --
15     MR. OSBORNE: Object to the form.
16     THE WITNESS: I don't know what you
17  mean by holding myself out as an expert.
18  I think I've made it very clear I know a
19  great deal about these subjects.
20  BY MS. LOVETT:
21    Q. I understand you -- Dr. Singhose, what
22  I -- what I mean is, are you going to come in and
23  tell the jury whether or not you believe Z██ died
24  of S.I.D.S. and tell them that you -- they can rely
25  on your vast experience in S.I.D.S. and sudden

Page 119

1  unexplained infant death syndrome to reach the
2  conclusion, the factual conclusion that she did not
3  die of S.I.D.S.?
4    A. Well, maybe I should clarify my
5  understanding of S.I.D.S. S.I.D.S. is sudden
6  infant death, when a child dies unexpectedly. And
7  usually that term is associated when the sudden --
8  the child dies unexpectedly and you can't -- or the
9  doctor at that time can't put their finger on
10  exactly what caused it.
11     That doesn't mean they didn't get
12  suffocated. As you know, Ms. Drago has already
13  written about this, and she said that sometimes
14  children suffocate and it's attributed to S.I.D.S.
15  I feel perfectly knowledgeable about that area, and
16  that's the kind of thing I would certainly say to a
17  jury.
18     MS. LOVETT: Okay. Objection.
19     Non-responsive.
20  BY MS. LOVETT:
21    Q. Let me ask the question. I'm asking very
22  specific questions about your work with S.I.D.S.
23  You've been able to tell me chapter and verse today
24  about your work with biomechanical products,
25  engineering products, products for cranes, projects

Page 120

1  that you've brought to prototype for infants.
2     I'm asking you to apply that lens to your
3  work with S.I.D.S. or sudden unexplained infant
4  death. Have you conducted any formal research in
5  that area?
6    A. I've conducted --
7     MR. OSBORNE: Form.
8     THE WITNESS: I've conducted a lot of
9  formal investigations into this area in
10  terms of understanding S.I.D.S., how it
11  comes to be, what are the factors that
12  contribute to it, why doctors assign
13  something as a S.I.D.S. when it's
14  actually, for example, suffocation.
15     I know a great deal about those
16  topics.
17  BY MS. LOVETT:
18    Q. Okay. Can you direct the -- me to those
19  in your curriculum vitae, which is Exhibit 2?
20    A. My curriculum vitae doesn't list
21  everything that I've done. But for example, if --
22  I can direct you to some indications of those
23  activities.
24    Q. Please.
25    A. For example, I served on the A.S.T.M.

Page 121

1    F15.18.  That is called Cribs, Toddlers [sic] Beds,
2    Play Yards, Bassinets, Cradles and Changing Tables.
3        Q.   Could you -- could you do -- could you
4    give me the page number, please?
5        A.   42.
6        Q.   All right.  So let's --
7            MR. OSBORNE:  And wait a minute.
8    Wait a minute.  You asked him a question
9    to find where he's worked in this area,
10   and now you've gone on after he provided
11   you one.  I don't know whether he finished
12   that question back then.
13           MS. LOVETT:  John, you don't need
14   to --
15           MR. OSBORNE:  So --
16           MS. LOVETT:  -- coach him.
17           MR. OSBORNE:  -- I object.
18           MS. LOVETT:  I'm asking him to direct
19   me to the page in his report.  That's what
20   I just asked.  And he told me 42.
21           MR. OSBORNE:  No.  It's the question
22   before then.  Do you want to read that
23   back from the court reporter?
24           MS. LOVETT:  You can take your
25   deposition when I'm finished.

Page 122

1            MR. OSBORNE:  So what -- I'm not
2    going to let him answer questions that are
3    interrupted that are basically a
4    purpose -- a strategy to interrupt him in
5    his answer.
6            MS. LOVETT:  John, I don't need
7    strategy in this deposition.  I'm asking
8    him whether he's a S.I.D.S. expert.  He
9    told me he's done formal research, and
10   I've asked him to direct me to it in his
11   C.V., which he'd started to do before you
12   started this.
13           MR. OSBORNE:  Which he's doing, but
14   he started with a list, and you broke him
15   up in the middle of his listing.
16           MS. LOVETT:  Then there's something
17   called redirect where you can fix that.
18           MR. OSBORNE:  Well, there's something
19   called not interrupting the witness, which
20   is common courtesy and professionalism.
21           MS. LOVETT:  John, again, I've done
22   this for 28 years, I know that's not as
23   long as you, but I know how to be
24   courteous and professional.  And if you
25   don't like how the deposition is going,

Page 123

1    this is not the way to disrupt it.
2            I'll ask you to please --
3            MR. OSBORNE:  All right.  Well,
4    I'll --
5            MS. LOVETT:  -- refrain from
6    prompting --
7            MR. OSBORNE:  -- direct him to
8    complete his answer to the question that
9    preceded the one as to page and line
10   number.
11           MS. LOVETT:  And you may ask him that
12   when it is your turn to ask his questions.
13   I don't even recall it.  And this is a
14   waste of my time and the witness's.
15   BY MS. LOVETT:
16       Q.   Doctor, you directed me to --
17           MR. OSBORNE:  I think it's --
18           MS. LOVETT:  I --
19           MR. OSBORNE:  -- the purpose of
20   interrupting him.
21           MS. LOVETT:  John, I'm not interested
22   in your opinions on my advocacy.  Thank
23   you.
24   BY MS. LOVETT:
25       Q.   Page 42, Doctor, you directed me to as --

Page 124

1        A.   So certainly one of these indications of
2    my work in this area is on Page 42, but it's
3    something we already talked about --
4        Q.   Right.
5        A.   -- which is serving on the A.S.T.M. F15.18
6    group, which the F3118 is the subset or produced by
7    that committee.
8        Q.   Yes.  Is that part of your expertise in --
9        A.   Yes.
10       Q.   -- as a S.I.D.S. expert?
11       A.   Certainly the S.I.D.S. is a big part of
12   what's discussed in those committees.  It's a big
13   part of what those committees are directed towards
14   trying to eliminate or to reduce.
15       Q.   Right.  To eliminate or reduce S.I.D.S.?
16       A.   Yes.
17       Q.   And as you testified earlier, despite the
18   fact that you and your wife and your friend,
19   Dr. Frakes, had concerns about incline sleepers
20   while you were on the committee serving as an
21   expert on S.I.D.S., you did not at any time raise
22   the danger of incline sleepers?
23           MR. OSBORNE:  Form.
24           THE WITNESS:  That's correct.
25   Because at that time, I wasn't provided

1    all the information that Fisher-Price was
2    hiding from that committee.
3           MS. LOVETT: Objection.
4    Non-responsive.
5    BY MS. LOVETT:
6       Q. So now you're an advocate, aren't you,
7    Doctor? You take the position that Fisher-Price
8    was hiding information from the committee?
9       A. I believe that they did not turn over
10   relevant information to the committee.
11      Q. Did you think that all incline sleepers
12   were unsafe or just Fisher-Price?
13      A. Again, I didn't do that investigation. I
14   just didn't have the information.
15      Q. Well, when you were sitting on the
16   committee and you already felt that for your own
17   children incline sleepers over ten degrees were not
18   safe, you did not contribute a single agenda item
19   to raising that concern before the committee, did
20   you, sir?
21      A. That's correct. I didn't --
22          MR. OSBORNE: Form.
23          THE WITNESS: -- have the -- that's
24   correct. I did not have the information
25   that I have now.

1    BY MS. LOVETT:
2       Q. But you --
3       A. I didn't know the full extent of their
4    danger.
5       Q. You knew enough to not want to put your
6    own child in one and have concerns about it and
7    raise those concerns with two other very qualified
8    professionals, but you were in a unique position to
9    do so as an expert, as you say, on S.I.D.S. in this
10   committee and you didn't do it --
11          MR. OSBORNE: Form.
12   BY MS. LOVETT:
13      Q. -- did you, sir?
14      A. No, I did not do that. I don't --
15          MR. OSBORNE: Form.
16          THE WITNESS: I did not have the
17   information available to me that I have
18   now. I didn't have the avail -- the
19   information available to me then that I
20   have now.
21   BY MS. LOVETT:
22      Q. Well, as a -- as a -- as a member of the
23   committee, you certainly could have asked for
24   information. Did you ask for any information as a
25   member of the committee when you were concerned

1    about the safety of incline sleepers in 2018?
2       A. That's not the way these committees work.
3       Q. I understand --
4       A. So I don't --
5       Q. -- how they work.
6       A. -- I don't have a way -- I don't have a
7    way of forcing Fisher-Price to turn over to me
8    incident reports I don't even know about. Right?
9    They had these incident reports that were
10   indicating this was a very dangerous product.
11          I didn't know about them. The committee
12   didn't know about them -- well, I take that back.
13   Certain members of the committee didn't know about
14   them. How would I know to ask for something that I
15   don't even know exists? That's an --
16      Q. Have you seen this --
17      A. That's an unreasonable expectation of my
18   activities on that committee.
19      Q. All right. Well, I'm asking if you did
20   anything on that committee at this point. Did you
21   ever raise a concern about safety?
22          You had concerns about your own child who
23   was of the age. You made the determination with
24   your -- with your very qualified wife, who is also
25   a mechanical engineer, and discussed it with

1    Dr. Frakes, who you've discussed is a biomedical
2    engineer.
3          What did you do on this committee, which
4    purpose for which was to lower the incidence of
5    S.I.D.S., what did you personally do one way or the
6    other to influence these safety standards?
7       A. Well, first of all --
8          MR. OSBORNE: Form.
9          Go ahead.
10          THE WITNESS: First of all, you're
11   mischaracterizing these as safety
12   standards. I made a point that these are
13   more like conformity standards.
14          A lot of these standards don't
15   control safety. There's a lot of other
16   stuff in there. So they're not safety
17   standards; they're industry standards.
18          What did I do? I received the
19   agenda. I reviewed the agenda. I would
20   go to the meetings. I would listen to the
21   discussion of various points that were
22   under consideration.
23          Usually those discussions were about
24   how to change a standard, the wording in
25   the standard, and updating the

Page 129

1    standard.
2        At no point during my time did we
3    discuss the 3118 standard.  There were
4    many other standards that were being
5    discussed.  And then I would vote on
6    whether or not changes to those standards
7    should be made.
8    BY MS. LOVETT:
9        Q.  I asked you earlier this morning, I'm
10   reading you the question from Page 40, Line 8 of
11   your draft deposition this morning:
12          "Yes, but is there any more
13       important consideration in the
14       execution of that conformity than the
15       safety of babies?"
16          And your answer was:
17          "Not in my opinion."
18          You stand by that answer?
19       A.  Yes, I do.
20       Q.  All right.  So you, I know you corrected
21   me on conformity, but the reality that is you
22   didn't consider there to be any greater mission of
23   what the committee was doing than safety; true?
24       A.  Correct.  That's my personal opinion.
25       Q.  Is it different from your professional

Page 130

1    opinion?
2        A.  No.  It's my personal opinion.  But the
3    work of the committee, I'm trying to get this
4    across because we'll be explaining this to a jury,
5    that this committee is not a committee directed
6    primarily at safety.  It's a committee directed
7    primarily at conformity.
8        Q.  Can you explain to me or show me any other
9    work that you've done as a S.I.D.S. expert here in
10   your C.V.?
11       A.  Oh, the work that I've done that leads me
12   to my knowledge about S.I.D.S.; is that --
13       Q.  To classify --
14       A.  We're returning to that question?
15       Q.  Yes.
16       A.  Sure.
17       Q.  To classify yourself as a S.I.D.S. expert.
18       A.  Sure.  We'll just stay on 42.  The next
19   committee down that I've served on is the A.S.T.M.
20   D13 committee, which is textiles.
21       Q.  All right.
22       A.  This committee is directed at
23   understanding textiles, how to represent textiles,
24   how to evaluate and test textiles.
25          So for example, you know in this case that

Page 131

1    Fisher-Price has a quality safety operating
2    U.S.O.P., if you will, directed at what kind of
3    fabrics they should use in these products.  That's
4    the kind of topic that would be covered by that
5    A.S.T.M. committee, how to test for that kind of
6    thing.
7        So I served on that.  And certainly
8    S.I.D.S. is highly correlated to the type of
9    materials or fabrics or sleeping surfaces that
10   these children are placed on.
11       Q.  What specific work did you do on that
12   committee related to adopting statements -- safety
13   standards for S.I.D.S., or to prevent S.I.D.S.?
14   I'm limiting this to S.I.D.S.
15       A.  Well, I know that you're limiting it to
16   S.I.D.S. -- and I'm just complaining that that
17   committee examines textiles and the properties of
18   textiles.
19       Q.  Yes.
20       A.  And the properties of textiles are
21   important in terms of S.I.D.S.  For example, you
22   want to have these sleeping products made out of
23   breathable materials so that, when the infants move
24   around and they get into a position, they don't get
25   suffocated.

Page 132

1        And as you know by your own expert, that
2    suffocation can be misinterpreted as S.I.D.S.  So
3    there's a direct line to understanding textiles is
4    understanding causation of S.I.D.S.
5        Q.  The A.S.T.M. textile standards cover many
6    things other than infant products, too, don't --
7    true?
8        A.  Yes.
9        Q.  Products found in clothing; yes?
10       A.  Yes.
11       Q.  Home furnishings?
12       A.  Yes.
13       Q.  Vehicles?
14       A.  Yeah.
15       Q.  Cell phones?
16       A.  That, I don't know about.  It could.  It
17   could.  There's a lot of standards under these
18   committees.
19       Q.  Sure.
20       A.  I haven't read them all.
21       Q.  Sure.  Well, can you point me to any
22   specific standard on which you worked related to
23   the prevention of S.I.D.S. via your service on the
24   A.S.T.M. textile committee?
25       A.  Again, I don't think that we had a

Page 133

1  standard under consideration at that time that was
2  directed to developing fabrics to eliminate
3  S.I.D.S. That's, again, not how this works.
4        But the topics of the committee are
5  measuring the characteristics of fabrics. And
6  those characteristics of fabrics are very
7  important, you know, in relation to S.I.D.S.
8     Q. There are agendas for these meetings. Did
9  you include or rely on any agenda from any A.S.T.M.
10  textile meeting in your report?
11     A. No.
12     Q. Are there any other -- is there anything
13  else in your 43-page C.V. that qualifies you as an
14  expert in S.I.D.S. in your opinion?
15     A. Well, again, stuff --
16        MR. OSBORNE: Form.
17        THE WITNESS: -- stuff in my
18  S.I.D.S. -- stuff in my C.V. doesn't
19  qualify me for it. I don't think that's
20  the question.
21        I think where -- you're asking me to
22  state where my activities or my studies or
23  my acquiring of knowledge in the area of
24  S.I.D.S. would appear in my C.V., and I
25  mentioned a lot of it won't be in my C.V.

Page 134

1        But we're going through my C.V. and
2  we're looking for things that indicate how
3  I've developed an expertise in this area,
4  so that's what we're doing right now.
5  BY MS. LOVETT:
6     Q. Yes. And Doctor, I'll tell you this --
7  these are important questions. Because before you
8  ever speak to the jury, the Court is going to make
9  a determination about whether or not you're
10  qualified as an expert to give testimony to lay
11  people on certain topics.
12        The Court is the gatekeeper, and that's a
13  very important function. So that may be something
14  I need to predicate for you in these questions,
15  that we're entitled to probe and test your
16  knowledge so that we can ask the Court to exclude
17  opinions that you may give that are outside your
18  area of expertise.
19        Have you ever been asked to speak at a --
20  at any conference or meeting as an expert on
21  S.I.D.S.?
22        MR. OSBORNE: Form.
23        THE WITNESS: No.
24  BY MS. LOVETT:
25     Q. Have --

Page 135

1     A. I've never spoken as an expert on S.I.D.S.
2  And again, you're trying to take what I'm saying
3  and pushing it too far. I'm simply saying I know a
4  lot about S.I.D.S.
5        And I understand the relationship between
6  S.I.D.S. and the design of juvenile products.
7  That's the expertise that I have that I will be
8  going forward and explaining to the jury.
9        I won't be holding myself as an expert on
10  knowing every single thing about S.I.D.S. I
11  understand how S.I.D.S. is related to these
12  sleeping products.
13     Q. Understood.
14     A. That's my area of expertise.
15     Q. And that's -- and that's where I'm trying
16  to get to, Doctor --
17     A. Yes.
18     Q. -- is to find the scope of your opinions.
19  Because I'm entitled to know and my client's
20  entitled to know and the Court is certainly
21  entitled to know it as it considers your expertise.
22        So for example, if I asked you if you were
23  a chemical engineer, I think you -- an expert in
24  chemical engineering, you would probably tell me
25  that you are not.

Page 136

1     A. No, I'm not an expert in chemical
2  engineering.
3     Q. Okay. So this is something -- I'm looking
4  specifically at S.I.D.S., the epidemiology behind
5  S.I.D.S., the research into S.I.D.S. And you've
6  shown me the two things on your curriculum vitae,
7  which you updated for us last week, that you
8  believe qualify you to have some expertise in that
9  area.
10     A. That's incorrect. But we're working
11  through it. I've identified two things for you.
12     Q. Identify some more.
13     A. And we're still going through this.
14     Q. Okay. I was on Page 42 of 43, so I
15  thought that you were --
16     A. I was.
17     Q. -- I thought that you were finished?
18     A. I started at the back. So again, we're
19  looking for things on my résumé that indicates that
20  I know a lot about S.I.D.S. as it's related to
21  juvenile products, juvenile sleeping products. So
22  that's what we're -- that's the exercise that we're
23  undertaking at this point.
24     Q. Yes. Let's go.
25        (Whereupon, the document was

Page 137

1    reviewed by the witness.)
2        THE WITNESS:  So another indication
3    of my knowledge in this area appears on
4    Page 36.  On Page 36 it lists one of the
5    projects I've worked on, the R.E.R.E.C.
6    [sic] on wheeled mobility for everyday
7    life.  This is with Dr. Steven Sprigle.
8    Again, this is the project, as you can
9    see, it went on for five years, that we
10   worked on seats for young children.
11       During that investigation, I started
12   looking at car seats for infants, because
13   that's one of the possible things we could
14   do.  We could take a car seat for infants
15   or for lung -- young children, we could
16   put that into a wheelchair and we could
17   strap the child in there.
18       So that's one of the things that we
19   considered, and so we studied that issue.
20   And during that investigation, it became
21   very clear that there was association
22   between S.I.D.S. and babies sleeping in
23   car seats.
24       And of course, the distinguish -- one
25   of the distinguishing characteristics is

Page 138

1    that car seats have a steep back angle.
2    And so I certainly learned through that
3    process that you shouldn't have babies
4    sleeping at highly inclined angles.  And
5    babies sleeping at those highly inclined
6    angles had an association with S.I.D.S.
7        So that was starting almost 20 years
8    ago I was, again, learning and studying
9    about that issue there.
10   BY MS. LOVETT:
11       Q.  Did you -- so, so tell me if you -- are
12   you -- what opinions do you intend to give to the
13   jury about S.I.D.S. specifically?
14       A.  I'm not sure that I have any opinions in
15   this case specifically about S.I.D.S. except that
16   Ms. Drago has written that suffocation can be
17   incorrectly classified as S.I.D.S.  That's
18   something that's in my report.
19       But I'm not here saying -- I don't think I
20   have any opinions directed at S.I.D.S.
21       Q.  All right.  So that's the question with
22   which I started, which is whether you considered
23   yourself an expert at S.I.D.S.  And I'm asking you
24   whether you intend to offer any opinions to the
25   jury whatsoever about S.I.D.S., other than to

Page 139

1    compare it to what Ms. Drago says in her report.
2        A.  Okay.  That's a very different question --
3        MR. OSBORNE:  Form.
4        THE WITNESS:  -- than what I
5    understood before.  You were asking
6    whether I was an expert and knew a lot
7    about S.I.D.S.  I'm saying I do know a lot
8    about S.I.D.S., but I'm not offering an
9    opinion anywhere in this report or
10   rebuttal report specifically about
11   S.I.D.S.
12   BY MS. LOVETT:
13       Q.  All right.  And you are not going to come
14   to court and offer any opinions about S.I.D.S. to
15   the jury?
16       A.  Again --
17       MR. OSBORNE:  Form.
18       THE WITNESS:  -- I think that my --
19   again, my opinions are in these reports.
20   And one of those opinions or one of my
21   discussions of those opinions is Ms. Drago
22   has contradicted herself or been
23   misleading in the sense that she's written
24   and saying children suffocate in these
25   devices and doctors -- or they suffocate

Page 140

1    in sleeping environments and doctors don't
2    figure that out and they just say S.I.D.S.
3        I'm perfectly happy to have that
4    opinion or that discussion with the jury.
5    That's the only thing that comes to mind
6    in terms of how S.I.D.S. is going to come
7    into my opinion.
8        MS. LOVETT:  Okay.  Objection.
9    Non-responsive.
10   BY MS. LOVETT:
11       Q.  To be clear, you've now told us all of
12   your formal work with S.I.D.S., or are we still
13   working our way through your --
14       A.  Oh, we're still going to be working on
15   that question for a while.
16       Q.  Okay.  Let's go.
17       A.  Okay.  Because again, your question is how
18   did I develop an expertise in S.I.D. or a high
19   level of understanding in it, and so I've just
20   worked on it for 20 years.
21       And so --
22       Q.  You worked on S.I.D.S. for 20 years?
23       A.  I've worked in areas where S.I.D.S. played
24   a prominent role for 20 years, yes, in juvenile
25   products.  So that's what we're -- we're working

Page 141

1  through that question right now.
2       Again, I started the answer, just to
3  reiterate, that a lot of that work is not going to
4  show up in a C.V.  But to the extent that it does
5  show up in the C.V., I'm trying to direct you to
6  where that would show up.
7       (Whereupon, the document was
8       reviewed by the witness.)
9       THE WITNESS:  So another place that
10  that shows up is on Page 33.  You can see
11  the third entry on Page 33 is a grant that
12  I received from International Diversified
13  Products.  And the title of that is Design
14  and Development of a Pediatric Personal
15  Transporter for Children With
16  Disabilities.
17       This speaks to that project about
18  having a transporter for a child that
19  can't move very well on their own.
20       And again, part of that investigation
21  was can we take a standard product that's
22  already on the market and can we convert
23  it to be used on one of these
24  transporters.
25       And so again, in that investigation

Page 142

1  we looked at car seats.  And again, you
2  run into the same sort of information,
3  that car seats have certain angles and
4  they have certain restraints and they're
5  applicable to certain kinds of children,
6  but they're not applicable to sleep.
7       So again, that would be another
8  investigation where I would have studied
9  that issue.
10  BY MS. LOVETT:
11       Q.  Did you -- did you produce any work
12  product as a result of that grant?  I mean, there
13  was -- obviously there was a study and there were
14  work papers.
15       A.  Yes.  We probably submitted a final report
16  to International Diversified Products.  This was
17  quite a while ago.  I know what we definitely re --
18  produced was we had a team of graduate students
19  working on that, and they reduced -- they produced
20  a final report on the prototypes that they
21  developed for that.
22       Q.  Did you rely on or cite to the work done
23  in conjunction with this grant anywhere in your
24  expert report or rebuttal report?
25       A.  No.  Only in the sense that I quoted my

Page 143

1  C.V.
2       Q.  Yes.  But I mean, did you specifically
3  refer to this part of your C.V. anywhere in the
4  conclusions and opinions contained in your expert
5  report and rebuttal report?
6       A.  No.
7       Q.  I'm with you and at your leisure.
8       (Whereupon, the document was
9       reviewed by the witness.)
10  BY MS. LOVETT:
11       Q.  Doctor, I'm going to make a suggestion
12  since our time here is limited by the rules and
13  your C.V. is lengthy.  If you like, we can take a
14  break and go off the record while you peruse it,
15  and you can come back with a list of your findings.
16       And that's the way I prefer to proceed
17  since this is eating into my time and I know you're
18  attempting to answer my question.  But I think we
19  can do this more efficiently and perhaps --
20       MR. OSBORNE:  That's fine with me.
21  BY MS. LOVETT:
22       Q.  -- get you lunch if you want.
23       MR. OSBORNE:  I'm sorry.  I didn't
24  mean to interrupt.
25       MS. LOVETT:  No worries.

Page 144

1       MR. OSBORNE:  We can go off the
2  record.
3       MS. LOVETT:  All right.
4       THE VIDEOGRAPHER:  Stand by.
5       THE WITNESS:  Okay.
6       THE VIDEOGRAPHER:  The time is 12:13
7  p m.  We are off video record.
8       (Whereupon, a discussion ensued
9       off the record.)
10       (Whereupon, there was a brief
11       recess.)
12       THE VIDEOGRAPHER:  The time is 12:36
13  p m.  We are back on video record.
14  BY MS. LOVETT:
15       Q.  All right.  Dr. Singhose, before the break
16  I had asked you to peruse your curriculum vitae and
17  identify for me anything in it that you believe
18  gives you or references or shows your credentials
19  as a person with expertise in S.I.D.S. or sudden
20  unexplained infant death.
21       Have you done so?
22       A.  Yes, I have.  I made it through most of
23  it.
24       Q.  Okay.  So I think when we stopped, the
25  last reference was the grant reference on Page 33;

Page 145

1 is that correct?
2      A.  Okay.  I'll just go.  I went from the
3 front.  So again, I'm looking for, just to clarify
4 for the record, I'm looking for indications of my
5 experience in how S.I.D.S. interacts with juvenile
6 products.  Right?  We've narrowed it down to that's
7 what I'm saying I know a lot about is how S.I.D.S.
8 interacts with juvenile products.
9      And so if we look on the first page of my
10 C.V., you can see under Georgia Tech, Georgia
11 Institute of Technology, that I developed
12 curriculum and teach courses in rehabilitation
13 engineering.  And rehabilitation engineering has to
14 do with this area of sick children.
15      And then also below that, you'll see that
16 I've done a lot of work in active seating
17 technology.  And this is, again, where you are
18 providing a seat for people and moving it around or
19 changing its configuration to accomplish various
20 things.
21      So again, S.I.D.S. is directly tied to
22 infant seats, so I've had to know a lot about
23 S.I.D.S. when working in those areas.  In addition
24 to those two --
25      Q.  Let me stop you just one --

Page 146

1      A.  Sure.
2      Q.  I want to ask you a question.  And I may
3 do this just to understand.  So when you say
4 S.I.D.S. is tied to infant seats, what -- upon what
5 are you basing that statement?
6      A.  Well, I mean, it's well known that there's
7 a relationship between S.I.D.S. and infants being
8 asleep in seats.  So you'll -- S.I.D.S. will occur
9 when babies are in seats and they die, and there's
10 not a direct causal relationship to that, but there
11 is a correlation between having children in seats,
12 in car seats, for example.
13      So that's why they recommend you don't let
14 infants sleep in seats.  That upright configuration
15 has a correlation with the incidence of S.I.D.S.
16      Q.  Is that a -- is that something that, that
17 specific infant seat issue related to S.I.D.S., is
18 that anything that you discussed in either of your
19 two reports?
20      A.  I'm not sure it's -- I don't think I
21 discussed it directly, no.
22      Q.  All right.
23      A.  Yeah.
24      Q.  Let's go to the next reference.
25      A.  Okay.  And then if we turn to Page 5,

Page 147

1 which has some of my publications on it, if you
2 look near the bottom, you'll see that I published a
3 paper in Clinical Biomechanics.  And the title of
4 that paper is Identification of Human Generated
5 Forces on Wheelchairs During Total Body Extensor
6 Thrusts.
7      This is an investigation of what we talked
8 about before, which is trying to design seats that
9 keep infants or children from falling out of them
10 when they have extensor thrusts.
11      And this particular paper is about
12 analyzing the forces, much like I did in this case
13 where I analyzed the forces that would be required
14 to roll over on the incline plane.  So that would
15 be related to that topic.
16      And again, I had to know quite a bit about
17 S.I.D.S. or look into that issue to make sure that
18 what we were proposing would not develop a strong
19 correlation with S.I.D.S. for those seats that we
20 were working on.
21      Q.  Were those -- were those seats for infants
22 under a year old?
23      A.  You know, I don't think we actually got
24 that specific.  We were really targeting young
25 children, probably in the three-year-old range.

Page 148

1 But we were definitely considering using this for a
2 range of children.  I don't recall us saying let's
3 use this for a six-month-old.
4      Q.  Well, you're using it as a mobility
5 device, and six-month-olds are not that --
6      A.  That's right.
7      Q.  -- mobile.
8      A.  Right.
9      Q.  Right?
10      A.  Well, I mean, that's true.  And it's -- at
11 that point, it becomes kind of like a stroller.
12      Q.  Right.
13      A.  Because their peop -- caregivers are
14 pushing these around.  But you want to have a seat
15 in there that effectively cradles the child so they
16 don't fall out.
17      So in that case, you need to know that
18 what you're proposing for the seat does not have a
19 strong correlation to S.I.D.S.  Because as this
20 person's pushing this baby around for two or three
21 hours in the wheelchair, you don't want to, you
22 know, trigger a S.I.D.S. event.
23      Q.  So but with this specific reference,
24 Doctor, the work that you were doing was really
25 targeted at children in wheelchairs, and these

Page 149

1  would be children who would be older than those who
2  would likely die of S.I.D.S.; true?
3       A.  Yeah, I think that's true.  I mean,
4  S.I.D.S. there's no end game to it.  It goes on for
5  a while.  And of course, as children get older,
6  they tend to have less and less S.I.D. events.
7       But when you're designing seats for
8  children, you need to understand S.I.D.S. so that
9  what you're proposing, what you're developing does
10 not have these known factors or correlations with
11 S.I.D.S.
12      That's what I'm pointing out is that,
13 during this time frame, I had to study this issue
14 and understand it.
15      Q.  What is your understanding of the
16 definition of Sudden Infant Death Syndrome with
17 regard to age?
18      A.  It's generally for young children, young
19 babies.  It's really for babies.  And as you get
20 older and older and older, the incidence of
21 S.I.D.S. goes way down.
22      Q.  It's the sudden unexplained death of a
23 child less than one year old; true?
24      A.  That may be a definition you see
25 somewhere, yeah.  But basically --

Page 150

1       Q.  Like in --
2       A.  -- unexplained death.
3       Q.  -- National Institutes of Health?
4       A.  Sure.  I think that people talking about
5  S.I.D.S., if some child was 13 months old, they
6  wouldn't say you couldn't have died from S.I.D.S.
7  It would be an infant that died unexpectedly
8  without a known cause.
9       Q.  All right.  Let's go to your next
10 reference, please.
11      A.  Well, 31 under it is a very similar kind
12 of paper, so I won't go into it.  It's essentially
13 the same kind of investigation.
14      If we go further on to some other papers,
15 I think I had found some more.  Yeah, if we go to
16 Page 15, for example, if you look at paper 190
17 there, again, this is a paper that was presented at
18 a Rehabilitation Engineering and Assistive
19 Technology conference, and the title is Motion
20 Measurement and Force Determination During
21 Uncontained Extensor Thrust.
22      This is actually related to the other
23 research area where we're studying the forces that
24 are generated on seats and attempting to ensure
25 those forces aren't large enough for the -- for the

Page 151

1  child to fall out.
2       And then the paper below it is also
3  related.  It's in a biomedical engineering
4  conference, and it's basically talking about an
5  efficient method to identify these forces that
6  occur between the child and the wheelchair seat.
7       Q.  All right.  And again, we're talking about
8  children here who are not infants; correct?
9       A.  Again, we didn't make that -- the method
10 that we developed would not be limited to, say,
11 three-year-olds or something.  It would be any
12 human that was in there.  Of course, the forces
13 would scale with the ability of the child to move
14 around --
15      Q.  Right.
16      A.  -- forcefully.  So it's not a method
17 specifically for three or four or five years old.
18 It's a method for children in there.
19      Q.  Yes.
20      A.  But we didn't specifically try to target,
21 like, six-month-old kids for this.
22      Q.  Yeah.  This is -- and this is the
23 non-engineering common-sense mom part of me
24 thinking about it, that if you're -- if you're
25 targeting a child under a year old with a

Page 152

1  wheelchair, or you -- as you said, I think very
2  appropriately, you're really talking about a
3  stroller at that point since many children can't
4  walk at that stage, or at least don't walk.
5       I -- my last one walked on his first
6  birthday.  So their -- the mobility issues are not
7  the same as you might have children with
8  disabilities or who are other abled but who are
9  older.  And this would be a way for them to get
10 around without using an alt -- an adult
11 alternative.
12      That was your -- that was the thrust of
13 this research; correct?
14      A.  Well, no.  This is -- these are actually
15 children, a lot of this was developed for children
16 who can't walk.
17      Q.  No.  That's what I meant.
18      A.  Yeah.
19      Q.  Yeah, that's what --
20      A.  Okay.
21      Q.  -- I meant.  But I meant for children who
22 can't walk, this was a mobility -- a mobility
23 device for them that would not put them in an adult
24 sized device that was wrong sized for them?
25      A.  Yeah.  That's a fair assessment.  I mean,

Page 153

1  we were trying to design seating systems for young
2  children that would be wheelchairs that the
3  caregiver would push around.  So it's a seating
4  system for small children.
5      Q.  All right.  Let's go to your next
6  reference, please, with regard to expertise in
7  S.I.D.S. as it relates to juvenile products.
8      A.  I mean, I think that's it.  I mean,
9  that's --
10     Q.  Okay.
11     A.  -- a representative...
12     Q.  All right.
13     A.  That kind of points out where I've worked
14 in this area for a long time.
15     Q.  All right.  So moving on to, I think we've
16 talked about your -- the work that you've done in
17 designing products for children.
18         Have you ever specifically designed an
19 infant sleep product?  And I'm defining infant as a
20 child 12 months or under.
21     A.  Yeah, I mean, specifically designed has a
22 connotation we should clarify.  I mean, products
23 aren't designed by one person.  Right?  You're part
24 of a team.
25     Q.  Right.

Page 154

1      A.  So I've certainly generated data and
2  provided analysis that has been involved in the
3  development process for juvenile products.
4      Q.  Have you -- you are not an expert in
5  C.P.S.C. regulations regarding infant products, are
6  you?
7      A.  Yeah, I've never -- I've never really been
8  that involved with the Consumer Product Safety
9  Commission.  I'm not exactly sure what their
10 process is.  I understand it sort of generally, but
11 I don't think I'm an expert in that process.
12     Q.  Okay.  You do not have inform -- expertise
13 in infant product labeling or warnings; correct?
14     A.  That's not true.
15     Q.  Okay.
16     A.  I am an expert in warnings and labels.
17     Q.  All right.
18     A.  I mean, on this case I wasn't asked to do
19 that, but I am.
20     Q.  Okay.  So you won't be offering any
21 opinions in this case on warnings or labeling;
22 correct?
23     A.  I don't think those are any of my
24 opinions.  Except, again, I think if we looked at
25 my response to Ms. Drago, she may have, you know,

Page 155

1  made statements about the warnings in this product,
2  and I may have found contradictions between those
3  and her previous writings.
4         But I'm not -- I haven't been hired to be
5  the warnings expert on this.  I didn't have time to
6  do all that, so they hired someone else to do that.
7      Q.  You understand there is a warnings expert
8  in this case who will be giving the expert -- the
9  opinion to the jury?
10     A.  That's my understanding, yes.
11     Q.  All right.  And have you reviewed those
12 opinions?
13     A.  Not in any kind of detail.  I think I was
14 provided the report and just basically perused
15 them, but I did not study that in any meaningful
16 way.
17     Q.  Do you know which expert that is?
18     A.  No.
19     Q.  Okay.  You don't know the name?
20     A.  No.  Not off --
21     Q.  All right.
22     A.  -- the top of my head.
23     Q.  Okay.
24     A.  I mean --
25     Q.  All right.

Page 156

1      A.  -- if you told me, I would recognize it.
2      Q.  Sure.  Okay.
3         So but fair to say that you will not be
4  offering any opinions on product warning or
5  labeling to the jury other than as you've
6  described, pointing out what you think are
7  inconsistencies in Ms. Drago's testimony?
8      A.  I think that's what my role would be.  I
9  mean, if you ask me a question about it, I might
10 have an opinion, I mean.  But no, I haven't
11 pro-offered one of those opinions in my reports
12 here.
13     Q.  All right.  You have no expertise in
14 packaging of infant products; correct?
15     A.  What do you mean by "packaging"?
16     Q.  I mean by putting them in the box, putting
17 pictures on them, securing them with tape and
18 putting them on a shelf.
19     A.  I mean, I've never worked as an engineer
20 in that area, no.
21     Q.  All right.  No expertise in accident
22 reconstruction?
23     A.  No, that's not true.  I've reconstructed a
24 lot of accidents.
25     Q.  I know -- I read in some of your previous

1  testimony, I've read a lot about you to get ready
2  for this deposition, you testified that you're an
3  expert in accident reconstruction because I think
4  around 30 years ago you worked in an automobile
5  crash testing site in Detroit.
6      A.  Oh, that's not the reason that I'm a
7  reconstruction expert.  But I did do that, yes, I
8  worked in automobile crash testing.
9      Q.  Okay.  What else is your accident
10 reconstruction expertise?  And I'm not talking
11 about automobiles, but general accident
12 reconstruction.
13     A.  Oh, well, one area that I could speak for
14 hours on is the Segway.  I've been asked to
15 investigate numerous accidents with the Segway
16 that -- you know, the transportation device.
17     Q.  Right.
18     A.  And as part of the -- my efforts in that
19 matter, I studied all manner of accidents, accident
20 videos, developed complex simulations of those
21 devices.  And I'll use those simulations to induce
22 a wheel slip.
23          Suppose that you're going on a Segway and
24 you go over sand and one wheel will slip, and
25 I'll -- my simulations will predict what the Segway

1  does, how it tips forward and turns sideways.  And
2  those simulations have been used to re-enact
3  accidents that people have had.
4          My simulations of the Segway also allow
5  you to simulate running into the obstacle.  So I've
6  done that both simulation, I've also physically
7  conducted a number of tests on the Segway where
8  I'll run it over different obstacles and measure
9  what it does.
10         At Georgia Tech I have a room filled with
11 very high precision cameras that can track you down
12 to a millimeter a thousand times a second.  So
13 we've gone into that room and we've essentially
14 reconstructed Segway accidents before by putting --
15 arranging obstacles in the same way that occurred
16 in an accident, and we'll run them through there
17 and measure what happens.
18         I've done accident reconstruction on
19 Segway tours where I've gone to the tour site where
20 somebody has hit a root, for example, and I'll
21 reconstruct that accident.  I've reconstructed
22 crane accidents.
23     Q.  Maybe this will narrow it down.  Have you
24 done any accident reconstruction involving infant
25 products?

1      A.  No.  I don't think I've reconstructed an
2  infant accident before.
3      Q.  All right.  You do -- I noticed that you
4  do not have a law degree?
5      A.  No.
6      Q.  You will not be offering legal opinions;
7  correct?
8      A.  I hope not.
9      Q.  Some of the -- some of these are -- some
10 of these are pro forma questions, Doctor.  So they
11 don't -- I think you've been deposed enough
12 probably to have heard some of them before.
13         I'd like you to tell us -- well, let me --
14 let me get one other, one other.  Any expertise in
15 marketing of infant products?
16     A.  No.
17     Q.  All right.  Tell us, and I'm asking you a
18 general question, what are your criticisms of the
19 BHL58 Rock 'n Play sleeper, which is the sleeper at
20 issue in this case?
21     MR. OSBORNE:  Form.
22     THE WITNESS:  My criticisms of it?
23 Well, I mean --
24 BY MS. LOVETT:
25     Q.  Do you have any criticisms of it?

1      A.  Yes.  And they're documented in these two
2  reports.
3      MR. OSBORNE:  Object to form.
4  BY MS. LOVETT:
5      Q.  I understand.  So Doctor, this is -- this
6  is where you can't just tell me to go read the
7  report, because I have, both of them many times.
8  So I want to hear your criticisms on the record and
9  have a dialogue with you about them in your -- in
10 your words.
11         Because the jury will not see your reports
12 and will not be reading your reports.  They're not
13 admissible before the jury.  So I'd like to hear
14 you tell me like you're going to tell the jury what
15 your criticisms are.
16     MR. OSBORNE:  Form.  And I object to
17 the colliloquy [sic].  Dr. Singhose is
18 here to answer questions, not be
19 instructed on how to answer them.
20     MS. LOVETT:  Did you -- did you say
21 colloquy?
22     MR. OSBORNE:  Go ahead.
23     MS. LOVETT:  Sorry.  It's one of my
24 favorite words.  I just didn't -- I just
25 was happy to hear it.

Page 161

1  BY MS. LOVETT:
2    Q.  Go ahead.
3    A.  I'm not sure I understand how I'm supposed
4  to answer the question.  Because my understanding
5  of being to trial, and maybe I haven't been to
6  trial as many times as you, certainly I haven't, is
7  that I get asked questions and I answer questions.
8      So how I -- you're asking me how I
9  would -- how I would tell the juries about this.  I
10  think I would have to tell the jury about this in
11  response to questions.
12    Q.  Okay.  So I'm asking you the question,
13  what are the criticisms that you have of the
14  BL58 [sic] Rock 'n Play sleeper?
15    A.  Okay.  Again, I'm just prefacing this with
16  my criticisms --
17      MR. OSBORNE:  Form.
18      THE WITNESS:  -- are in these two
19  reports.  But from the top of my head, I
20  will start making that list for you.
21  BY MS. LOVETT:
22    Q.  All right.
23    A.  One of my -- and just I'm focusing on the
24  product now, not just the design, not the design
25  process, which I also have opinions on --

Page 162

1    Q.  Yes.
2    A.  -- but just the product itself.
3      One of the criticisms is that, and this is
4  maybe the most important one, is that when the
5  infant gets turned over into the prone position, it
6  traps them in that position in the sense it's very
7  difficult to get out of it.  And while they're in
8  that position, their face is directed towards
9  non-breathable fabric.
10    Q.  All right.  Any other criticisms of the
11  product itself?
12    A.  Sure.  When they're face down in that
13  product, because of the shape of it, because of
14  these steep side walls, their arms, the infant's
15  arms can be trapped either to their sides or under
16  their body.  And that makes it very difficult for
17  them to lift their head out of the fabric.
18      Children will normally be able to lift
19  their head up at an early age, at just a couple of
20  months, but they put their hands up in front of
21  them to do that, and they kind of do a little
22  push-up, a little baby push-up.  It's more of a
23  sort of a back arch.  But because their arms can be
24  trapped to the sides in this device, they're not --
25  they can't bring their arms forward into that

Page 163

1  position.
2      Related to that is that babies will try to
3  move and turn over using their feet.  And again,
4  given the geometry of this device, when the baby's
5  face down in it, their feet are often pointing up
6  in the air behind them.
7      Because your knees only bend -- and
8  babies' knees only bend in one direction,
9  backwards.  And so when they're face down in this,
10  their knees get bent up and their feet are sticking
11  up in the air.
12      And so you'll see these babies kicking
13  around trying to move, but they're not hitting any
14  surface.  They can't push off of stuff at -- in
15  that configuration.  So again, that is part of this
16  trapping process where the -- basically, it's the
17  geometry of this device.
18      Another geometry of the device is that,
19  when their face is down in this, it conforms, that
20  is, it wraps around their face.  It's not a flat
21  surface.  It's these two angled surfaces.  So those
22  are sort of the criticisms of the device when the
23  child is in the prone position.
24    Q.  All right.
25    A.  That probably is a complete list, but I

Page 164

1  might have missed one.  The other criticisms I have
2  is that, when you put this -- when you put a baby
3  in this device on their back --
4    Q.  Uh-huh.
5    A.  -- like you should, it doesn't stop the
6  baby from rolling over.  So given that the rolling
7  over or prone position is obviously very, very
8  dangerous, this device should, if they're going to
9  have this device, it should really not allow babies
10  to roll over but, in fact, it does.
11      And there are several aspects of the
12  design that facilitate the baby turning over.  One
13  is the incline slope.  Basically, because it's
14  inclined, it's a little bit easier for the baby to
15  roll over as opposed to -- if the Rock 'n Play had
16  just a flat surface instead of a 30 degree incline,
17  it would actually be harder for the baby to roll
18  over.
19      The other problem with it is that it has
20  the foot plate.  The foot plate is at an angle of
21  about 65 to 70 degrees relative to the baby's body.
22  And that means it's a really good platform for them
23  to push off.  They can push off with their feet
24  with a lot of force.
25      And because they have that surface to push

1  off with and they're squirming around and moving
2  how babies do, they're able to create torques,
3  because they're unequal forces, they're able to
4  create torques that rotate their body.
5      Another problem with that foot plate is
6  that, even if the restraint was used, put around
7  the belt, that foot plate allows the baby to push
8  their hips up and out of that restraint.
9      And that's how we're -- these incident
10 reports are explaining that, you know, the
11 restrained infants themselves are pushing up and
12 out the top.  In fact, Fisher-Price had to put a
13 head blocker at the top to try to stop that
14 behavior of the baby pushing up and sliding up.
15     Another problem with this is that the
16 restraint is easily not used.  It's a -- it's a
17 flexible, a fat piece of fabric in that it just
18 lays down flat in the bottom of the Rock 'n Play.
19 So a parent can very easily just put their child in
20 there and it goes on top of the restraint.
21     You know, an alternate to that would be
22 sort of like the high chairs that we have at our
23 house where you have to slide the baby's legs in.
24 There's no way to not use the restraint around the
25 belly.

1      So those are -- those are some of them.
2  I'm not sure that's a complete list, but I think
3  that's pretty representative.
4      Q.  All right.  And you also said you had --
5  and we're going to come back to each of those in
6  detail as you would expect.  You also said that you
7  had some criticisms of the design process of the
8  Rock 'n Play.
9      Why don't you walk me through those in
10 general, please?
11     A.  Okay.  In general, without consulting my
12 reports here, off the top of my head, I'm
13 designing a -- I've been on these teams, so you get
14 all these different things.  I know what kind of
15 discussions go on and what kind of processes
16 usually you go through.
17     They're proposing a product that is, quite
18 frankly, deviating from a long period of products
19 in its domain.  Like, there's decades of
20 development in children's sleeping products, and
21 they're deviating from this in a couple of
22 important ways.
23     They're putting this angle in there of 30
24 degrees, and they're putting in a restraint in
25 around the waist.  And they're putting this foot

1  blocker in -- or I'm sorry, the foot plate and the
2  head blocker.  So they're adding quite a bit of new
3  features to an otherwise existing let's call it
4  flat bassinet.
5      Given those number of new features, they
6  know that they're introducing possibilities of new
7  kinds of hazards, or they're making existing
8  hazards more prevalent, or the probability goes up
9  of those hazards being -- occurring.
10     And so one of those things they certainly
11 know -- knew was that babies getting in the prone
12 position was a very dangerous thing.  They appear
13 not to have really considered that much in their
14 design process.
15     There are these hazard meetings that they
16 had.  I don't see any record of them saying this is
17 really an important hazard, the baby getting turned
18 over in this, so what are we going to do about it.
19 And in fact, there seems to be testimony that they
20 just very -- considered it very little.
21     The other thing that they didn't do in the
22 design process was apply their own quality safety
23 operating procedures.  For example, the fabric,
24 they have these procedures in place at Fisher-Price
25 that says, if a baby's face can get near this

1  fabric, can be pressed into it, then that fabric
2  needs to be breathable.  And they, I don't know if
3  they ignored it or didn't know about it, but they
4  didn't integrate that procedure into the design of
5  this product.
6      And then, again, during the design
7  process, especially of a product of this nature,
8  you should have extend -- you should have
9  extensively tested it, because you have multiple
10 new features in it.
11     And the amount of testing that they did
12 was very, very small.  And additionally, in
13 addition to it being a small amount of testing,
14 they just didn't test for known hazards.
15     They knew these hazards exist, and they
16 didn't set up tests to test for them.  And they
17 didn't even ask, for example, the in-home users
18 whether these hazards appeared or they thought
19 these hazards might appear.
20     So that's some of -- I think that's a good
21 representation of my criticisms of the design
22 process.
23     Q.  All right.  Now, if we turn to your
24 report, which is Exhibit 2 -- oh, sorry, Exhibit 3,
25 your April 2, 2021 report, and if you'll -- I'm

Page 169

1  going to orient us by paragraph rather than page
2  number.  But I can do that difficulty --
3  differently if you prefer.
4       Page 34 of your report -- or Page 30 --
5  Paragraph 34 of your report, which is on Pages 11
6  and 12, you discuss certain issues in Paragraph 34
7  pertaining to the incline angle of incline
8  sleepers; correct?
9       A.  Yes.
10      Q.  And you tell us that the two main -- you
11  say the two main features were added to secure the
12  sleeping infant.  That would be the seat bite -- I
13  think you meant -- that may be a typo.
14      A.  B-I-G-H-T would be one --
15      Q.  Yeah.
16      A.  -- way of spelling it.
17      Q.  Yes.  Okay.
18      A.  I saw the B-I-T-E in somebody's depo, and
19  so I actually just adopted that.  But it --
20      Q.  It --
21      A.  -- quite frankly, you could use either
22  one.  It sounds the same.
23      Q.  Homonyms are fine.
24      A.  But yeah.
25      Q.  Yes.  All right.  So it's the seat bight,

Page 170

1  B-I-T-E or B-I-G-H-T?
2       A.  B-I-G-T-H [sic] is the one that's
3  used the most for that feature.
4       Q.  All right.  And then the belt restraint
5  was the other feature, main feature that was added
6  that you reference in Paragraph 34; correct?
7       A.  Let's see.  Yes.  I think I -- I mean,
8  this whole section I think I mentioned four.  We
9  just -- I actually mentioned there was four
10  features, but this part I start out with the two
11  what I'll call the main ones.
12      Q.  Right.  These are the main features that
13  were added.  So if you -- I believe this goes to
14  the issue that you raised earlier.  The issue that
15  you had with the seat bight is that it provides a
16  platform for the infant to push off, as you were
17  describing in your general description of your
18  opinions; is that right?
19      A.  Yes.  That's correct.
20      Q.  In Paragraph 37, you say:
21      "The result of unequal forces is
22      that the infant would be propelled not
23      only upward, but would also be
24      subjected to movements that would
25      cause the infant to turn toward the

Page 171

1       side of the sleeper and also to roll
2       onto their stomachs."
3       Are you saying that, here that the infants
4  can push off the seat bight and roll over in the
5  Rock 'n Play?
6       A.  Yes.
7       Q.  And have you seen an infant do this?
8       A.  Yes.
9       Q.  Where?
10      A.  One of the infants that I placed in this,
11  I placed them on their side and I just watched them
12  wriggle around for a couple of minutes.  And they
13  were pushing with their feet a lot.
14       And it turns out that this baby was kind
15  of missing with one foot a lot and just kicking
16  randomly.  And because they were missing with one
17  foot, they tend to sort of pulse themselves around
18  with the one that was getting good traction, and
19  they rolled all the way over.
20       I also saw similar behavior in the videos
21  that were presented by Exponent.
22      Q.  Okay.  Did you take any videos of the work
23  that you did with the children?
24      A.  No.  I just put them in there for very
25  short periods of time to, you know, assess the

Page 172

1  design relative to a few babies.
2       Q.  How did you locate subjects for your, I'll
3  call it your study if that's an okay word --
4       A.  Sure.
5       Q.  -- for me to use?
6       A.  Sure.  You can say study.  I mean, it's
7  just a, you know, a design evaluation.
8       Q.  Design eval -- let's call it design
9  evaluation.
10      A.  Right.
11      Q.  (Inaudible).
12      A.  So if we look at -- if we look at Page
13  13 -- we're on Page 13; right?
14      Q.  Yes.
15      A.  And we were talking about Page [sic] 37.
16  At the top of that is a -- is a picture of one of
17  these infants at Figure 5.
18      Q.  Yes.  I have it.
19      A.  That's the cutest baby in my report.  And
20  that's Nicholas James Singhose.
21      Q.  That is your baby?
22      A.  Which is my baby.
23      Q.  Now, he's 22 months old now.  How --
24      A.  He --
25      Q.  He is adorable, I will tell you.

Page 173

1    A.  He was -- he was right at four -- he was
2    between four and five.  I have it written down, but
3    I think he was just before his five months.
4    Q.  Okay.
5    A.  He was four months and something.
6    Q.  All right.
7    A.  Yeah.
8    Q.  And at this point -- so he is really
9    adorable.  You're distracting me.  At this point
10   was Nicholas able to roll over?
11   A.  Yeah.  He was able to roll over on a flat
12   surface at about one month before this.
13   Q.  All right.
14   A.  I did coach him a lot.  I must admit that.
15   And I actually have his first roll-over captured in
16   pictures, because I could see he was getting close.
17   Q.  Right.
18   A.  And so on a flat surface, he could raise
19   his knees up to his -- towards his chest, and then
20   he would just wobble and he would fall over to the
21   side.  And that's how he did his first turn.
22   He's one of the babies that learned to
23   turn from laying on their back to their face
24   earlier than he did from his face.  He didn't like
25   being on his face, and he just would -- he would

Page 174

1    just cry and not do that.  So he did not learn to
2    turn from face to back until after he learned to go
3    from back to face.
4    Q.  All right.  So in this picture -- so
5    you're showing that here infant pushing off seat
6    bight with their feet.  And that's cute, adorable
7    Nicholas pushing with his feet.  I -- from what I
8    can see, he's not restrained in the system at this
9    time.
10   Is that right?
11   A.  That's right.  He did -- I did not put the
12   restraint on him there.
13   Q.  And what specific videos or -- and perhaps
14   you can direct me in your report to the reference,
15   but what specific videos from the studies of our
16   experts did you -- did you see infants replicating
17   the behavior that you tell us you observed with
18   your son here?
19   A.  Those would be two classes that I saw.
20   One is the Exponent videos.  And Exponent, they
21   took all their videos, and as I understand it, they
22   spliced them into three separate videos.
23   One video they put a collection of what
24   they would call non-rolling infants.  And then they
25   had a -- that was, you know, 40 or 50 minutes of

Page 175

1    clips.
2    And then they had another video that was,
3    I think they called it something like partial
4    rollers.  And so you start seeing that behavior in
5    those videos.
6    But certainly the third one, which they
7    said here are the rolling infants, so there's
8    actually video showing these infants squirming
9    around in various ways and rolling over from supine
10   to prone, or from let's just call it back to front.
11   Q.  Have you seen an infant roll over or push
12   up as you're describing here in Figure 5 when
13   restrained by the sys -- by the belt system as
14   intended?
15   A.  I've never seen them roll over when the
16   belt was on them fully.  I just saw them wiggling
17   around and turning and twisting.  But I only have
18   sort of short duration videos of those tests.  So I
19   don't have anything that's, like, here's a baby for
20   ten hours wiggling around in the restraint.
21   We know it happens from the -- for
22   example, from the incident reports tell us that
23   that does happen.  But it requires apparently long
24   duration testing, which wasn't done.
25   Q.  Well, let's break that down.  What --

Page 176

1    you're aware that Fisher-Price tested these
2    products with their own employees in their
3    employees' homes for long durations?
4    A.  I mean, I'm aware of some in-home testing
5    that involved employees, yes.  And I think that
6    they could have used them overnight, yes.  Is that
7    what you're referring to?
8    Q.  Yes.
9    A.  Yes.
10   Q.  I just -- because you made the statement
11   that no long duration testing was done.  Would you
12   agree with me that overnight is long duration
13   testing?
14   A.  I mean, in some sense it's long duration.
15   It's one incident of long duration, right, that one
16   test of ten hours.  There's not a long duration in
17   terms of we're testing this for ten million
18   infinite weeks of use, which is what would be
19   expected sort of in sort of one year of use of
20   this.
21   But you asked me a question, I thought,
22   about do I have videos of that.  I don't have
23   videos of that in-home testing.
24   Q.  No.
25   A.  That's what your question was.

Page 177

1    Q.  Right.
2    Correct?
3    Q.  No.  My question was directed at
4  whether -- I was actually responding to something
5  that you said about the -- that long duration
6  testing was not done by Fisher-Price.
7        That's not a correct statement, is it?
8    A.  They didn't do long duration testing
9  that's videoed.
10   Q.  Right.
11   A.  Okay.  That's what I thought I was
12  answering.
13   Q.  Okay.
14   A.  And they did long duration in the sense
15 that they did loan this out to people who
16 apparently had some babies sleep in it overnight.
17   Q.  Yes.
18   A.  Each one of those incidents is long
19 duration, I'll say.  If your baby was in it for ten
20 hours, I'll call that a long duration test.
21   Q.  Sure.  Starting with Fisher-Price's own
22 employees?
23   A.  Yes.
24   Q.  All right.
25   A.  I think that's how they started.

Page 178

1    Q.  I think you read maybe Mr. Steinwachs had
2  nine grandchildren that slept in the Rock 'n Play.
3  I think he had one that was not -- had aged out
4  before it was on the market.
5        Do you recall that testimony?
6    A.  I do recall him testifying to that.
7    Q.  All right.  So have you -- you say, you
8  talk about then, you go on to talk about the third
9  restraint.  You told me there were four.  And then
10 you say that the fourth -- the third restraint in
11 the product is the head dam, which is designed to
12 keep the infant in the product and prevent pushing
13 out.
14       I think you referenced that earlier when
15 you said Fisher-Price put something up here above
16 the head.  Is that the third restraint to which --
17   A.  Yeah, I think --
18   Q.  -- you refer?
19   A.  -- that's what I called the third
20 restraint in there.
21   Q.  Okay.  And then in Paragraph 39, you note
22 that the fourth restraint is keeping the infant
23 secure, which you call steep and high side walls.
24   A.  Yes, that's the -- what I call the fourth
25 restraint, keeping them from falling out sideways,

Page 179

1  basically, as they're wiggling around.
2    Q.  Okay.  So when you look at those four
3  things, and we're talking about the seat belt, the
4  belt restraint, the head dam and the fourth
5  restraint, you say none of these four restraints
6  prevent an infant from rolling onto -- over onto
7  their stomachs.
8    A.  Yeah.  That's correct.
9    Q.  All right.  But you --
10   A.  (Inaudible).
11   Q.  Go ahead.
12   A.  We know that -- we know that babies roll
13 over in this, so we know that they don't work all
14 the time.
15   Q.  You told me you've never seen a restrained
16 baby roll over in this.
17   A.  You know, I think the videos that I --
18 again, I don't have very many videos of restrained
19 babies wiggling around in this for a long duration.
20 So I don't recall a video that showed a restrained
21 baby pushing up the slope that they -- the way they
22 can, getting their hips above and then kind of
23 rotating out.  I don't think I have a video of
24 that.
25   Q.  Did you restrain Nicholas and see if he

Page 180

1  could roll in it?
2    A.  He didn't like this at all.  And I tried
3  to restrain him and he just started crying.  So he
4  was restrained only for a couple of minutes.
5    Q.  Okay.  So but while -- but he was rolling
6  over at this point, but while restrained he did
7  not, you did not observe him roll over either?
8    A.  Right.  I mean, I had him in the restraint
9  for, like, two minutes.
10   Q.  Okay.  You --
11       THE VIDEOGRAPHER:  Excuse me.  Your
12   paper is on the mike.
13       MS. LOVETT:  I'm sorry.
14 BY MS. LOVETT:
15   Q.  You have not observed any infant at any
16 time properly restrained in the device used as
17 intended roll over, you in your personal experience
18 as an expert in this case?
19   A.  I mean, you threw -- you threw a lot of
20 words in there and you said "used as intended."
21 It's pretty clear that a lot of parents, a lot of
22 caregivers use this without the restraint.
23       So to the extent that you're saying that's
24 not an intended use --
25   Q.  Yes.

Page 181

1   A. -- let's just make that definition, no, I
2  haven't seen a baby that was restrained in there.
3  I haven't, I just haven't seen many babies
4  restrained in there for very long periods of time.
5  So no, I have not seen that.
6   Q.  All right.  Let's go to -- is it your
7  position that, based on what you have seen, the
8  restraint system does inhibit rolling over in the
9  product?
10   A.  Yes.  From what I've seen, the restraint
11  definitely provides some restraint to rolling over.
12  They have to -- they'll have to sort of wiggle out
13  of it to some degree before they can roll over.  If
14  it's cinched down tight, I don't think they're
15  going anywhere.
16   Q.  Right.  I think --
17   A.  Yeah.
18   Q.  Yeah, if it's cinched down tight, they're
19  definitely not moving anywhere.
20   A.  Yeah.
21   Q.  You're not suggesting that the restraint
22  system only prevents rolling from the prone to
23  supine -- from the prone to supine and not the
24  other way around, are you?
25   A.  I don't understand the question.

Page 182

1   MR. OSBORNE:  Form.
2  BY MS. LOVETT:
3   Q.  Yeah.  Well, so no reasonable parent would
4  place an infant in the product prone and then
5  restrain the baby; right?
6   A.  I wouldn't call that a reasonable parent.
7   Q.  Okay.  So before we get to the next
8  section of the report, I want to talk about sort of
9  the intended use.  Because that -- we were starting
10  down that road.
11   MS. LOVETT:  So let's get to Tab 10,
12  please.
13  BY MS. LOVETT:
14   Q.  Dr. Singhose, I'm -- this is going to be
15  Exhibit 5 to your deposition.
16   (Whereupon, Defendant's
17   Exhibit 5 was marked for
18   identification.)
19  BY MS. LOVETT:
20   Q.  I know you've seen this before.  This is
21  the BHL58 R.N.P.S. warning label.  This is the
22  warning label that was on the Rock 'n Play involved
23  in this case.
24   Did you consider this in rendering your
25  opinions in this case?

Page 183

1   A.  Yes.
2   MR. OSBORNE:  I don't see an Exhibit
3  5 in my list here of marked exhibits.
4   MR. HERMAN:  It's coming in, John.
5   MS. LOVETT:  It should pop up any
6  second.  It's the warning label.
7   MR. OSBORNE:  So let me take a look
8  at it before we answer that question,
9  then.
10   MS. LOVETT:  It's the warning label.
11   MR. OSBORNE:  There's a delay and --
12   MS. LOVETT:  Yeah, it's the warning
13  label.
14   MR. OSBORNE:  -- it hasn't come in
15  yet.
16   MS. LOVETT:  Yeah.  It's just the
17  warning label.
18   MR. OSBORNE:  Then please proceed.
19   MS. LOVETT:  Thank you.  All right.
20   MR. OSBORNE:  I have it now.
21   MS. LOVETT:  Okay.
22  BY MS. LOVETT:
23   Q.  You see at the very top -- and I'm reading
24  you the English -- the English version, although we
25  can see the Spanish version corresponding on the

Page 184

1  right.  At the very top, it says:
2   "Always use the restraint system."
3   Do you see that?
4   A.  Yes, I do.
5   Q.  And you see in the -- the international
6  symbol for warning there, the exclamation point in
7  the triangle, it says:
8   "Failure to follow these warnings
9   and the instructions could result in
10   serious injury or death."
11   Do you see that?
12   A.  Yes.
13   Q.  And you see that the very first
14  instruction is:
15   "Always use the restraint system."
16   Correct?
17   A.  Yes, I see that.
18   Q.  So the intended use for the product was
19  that the baby be used with the crotch restraint --
20  the product be used with the crotch restraint?
21  Sorry.
22   A.  I mean, I think that's a desired way of
23  using it.  I think the intended use, what I call
24  the intended use is long duration sleeping.  That's
25  what they intended this for.

Page 185

1    So from my perspective and my analysis in
2  this case, the intention of this device is to put a
3  baby in there and have them sleep for ten or 12
4  hours.  That's the intended use.
5    Q.  Right.  That's an -- it's an unequivocal
6  instruction, though, "always use the restraint"?
7    A.  Yeah.  I mean, I'm reading the words, and
8  it says "always," and it's even capitalized.
9    Q.  Yeah, in all caps "always"?
10   A.  And it says:
11       "Always use the restraint system."
12   Yeah, I see that.
13   Q.  Okay.  And you would also agree with me
14 that the warning system says in all caps:
15      "Do not," those are the all caps
16      words, "use this product when the
17      infant begins to push up on hands and
18      knees, can pull up or sit unassisted
19      or has reached 25 pounds, whichever
20      comes first."
21      Correct?
22   A.  Yes.  I think you read that correctly.
23   Q.  All right.  According -- so according to
24 the intended use, if an infant has reached any of
25 these developmental mind -- milestones, they should

Page 186

1  not even be in this product; true?
2    A.  I mean, I think this is --
3      MR. OSBORNE:  Form.
4      THE WITNESS:  I think this is the
5  warning.  The intended use, as I said, is
6  overnight sleep.  I think this is a
7  warning saying you shouldn't use this --
8  "when the infant begins to push up on
9  their hands and knees."
10     I mean, I'm really not sure what that
11 means.  And "can pull up or sit
12 unassisted," I'm not exactly sure what
13 that means.  "Or has reached 25 pounds."
14 I understand that one.
15 BY MS. LOVETT:
16   Q.  All right.
17   A.  If your baby is 25 -- over 25 pounds,
18 don't put it in here.  I understand that one
19 perfectly well.
20   Q.  Okay.  So you understand what pulling up
21 is?  I'm sure you've seen some of that recently.
22   A.  Yeah.
23     MR. OSBORNE:  Form.
24     THE WITNESS:  But I -- I mean, I
25 understand "pull up."  I, you know, I do

Page 187

1  pull-ups as an exercise, and I see babies
2  pulling up on stuff.
3      What I'm not sure here is whether
4  this warning means when your baby is,
5  like, going around your house, can they
6  pull themselves up on the edge of the
7  couch.
8  BY MS. LOVETT:
9    Q.  Yes.
10   A.  Or does it mean that, when the baby's in
11 here, can they, I mean, can they reach across their
12 body and grab this deep side wall and pull up
13 there.  It might mean that.
14   Q.  All right.
15   A.  And that's the same problem I have with
16 not quite understanding -- oh, and "sit up
17 unassisted," again, does that mean -- we talked
18 about this before.  Does "sit unassisted" mean that
19 the baby can be lying in this device and sit up on
20 their own or would you -- would the parent sit them
21 up and they could stay there?
22     And then I also have some uncertainty with
23 the "hands and knees."  Is that on the flat surface
24 or is that in this product or something?  So I
25 didn't study these warnings in great detail.

Page 188

1    Q.  Right.  No.
2    A.  I'm just saying that --
3    Q.  I'm just asking your -- yeah.
4    A.  -- I don't quite understand that part of
5  it.  I do understand the "25 pounds" part.
6    Q.  All right.  If you -- if we look at it
7  further down, it says:
8      [As read]  "To reduce the risk of
9      Sudden Infant Death Syndrome," and it
10     has the parenthetical there for
11     S.I.D.S., "pediatricians recommend
12     healthy infants be placed on their
13     backs to sleep unless otherwise
14     advised by their physician -- by your
15     physician."
16     Do you see that?
17   A.  Yes.
18   Q.  So absent an instruction by the physician,
19 and there may be reasons for this, no parent
20 according to the intended use of this product
21 should put their infant in the Rock 'n Play sleeper
22 prone or on his or her side; correct?
23   A.  Yeah.  I mean, again, I think if you're
24 trying to put your baby to sleep for ten or 12
25 hours, it should definitely be on their back.

Page 189

1  Q. All right. And in the restraint?
2  A. Yeah. I mean, that's what this warning
3  label says. It says, "always use the restraint."
4  Q. All right. So I want to talk about the
5  section of your report called Infant Rolling.
6  A. Okay.
7  Q. So you told me about precious Nicholas.
8  What is his big brother's name?
9  A. Oliver Yung. Oliver Yung Singhose.
10  Q. Okay. That's equally cute and
11  distracting. I'm going to show you pictures of my
12  kids on a break, but they're all very large men.
13     Okay. So starting with your -- we've
14  talked about when -- the milestones. So Nicholas
15  was around four months old. He was rolling over on
16  a flat surface at that time.
17     What about his big brother, did -- was
18  there variance there? When did -- when did Oliver
19  start rolling over?
20  A. He started rolling over actually later.
21  He wasn't -- he never learned to crawl really. He
22  didn't want to roll. From the time he was two
23  months old, he wanted to stand and walk, and that's
24  all he would do. So he was a late crawler and a
25  late roller. He just insisted on trying to walk

Page 190

1  everywhere.
2  Q. There are big expectations on him,
3  Dr. Singhose. And I'm sure you -- I'm sure you
4  realize this as we go along.
5     So in Paragraph 44, you say in your
6  report:
7     "One method that infants use to
8     achieve prone to supine rolling is to
9     push upwards with both arms like a
10     push-up."
11     Do you see that?
12  A. Yes.
13  Q. And we agreed earlier, on the warning
14  label the product instructed the parents to stop
15  using the product if the infant can push up on
16  hands or knees; correct?
17  A. Yes.
18  Q. And then you seem to cite this Mom
19  Junction article on the -- as in support for the --
20  how to teach your -- tips to teach your baby to
21  roll over?
22  A. Yeah. This was just an example of -- just
23  to -- it's hard to describe this in words so.
24  Q. Yeah. No.
25  A. So in case you wanted to kind of clarify

Page 191

1  what I was talking about, you could just jump to
2  that Web site and look at it.
3  Q. No. I have a feeling you've been to this
4  Web site on your own before.
5  A. Yeah.
6  Q. Let's mark this as Exhibit 6 to your
7  deposition, please.
8     (Whereupon, Defendant's
9     Exhibit 6 was marked for
10     identification.)
11  BY MS. LOVETT:
12  Q. So this is -- this is not your average
13  mommy blog. This is -- this is actually one
14  medically reviewed by someone named Dr. Nicolina
15  Zdraveska, Ph.D., M.D. and Paed.
16     Do you see that? I'm reading her
17  credentials from the face page of Exhibit 6.
18  A. Yes.
19  Q. Is this a Web site that you and your wife
20  found or one of you found?
21  A. I don't remember the source of this, but
22  it's very likely that my wife found this.
23  Q. Yes.
24  A. She sends me a lot of baby Web sites.
25  Q. Yes. Well, and so this -- and this one is

Page 192

1  almost a peer reviewed one. So let's look at Page
2  5. There's a section there -- there are 15 pages
3  to this exhibit. Page 5, there's a section that
4  says, she says:
5     "How will your baby learn rolling
6     over?"
7     Do you see that?
8  A. Yes.
9  Q. And it discusses developmental milestones
10  for each month leading up to the rolling over. So
11  here doctor -- double Dr. Zdraveska reviewed
12  article says, at one month, it can raise the head
13  for a moment, going all the way through to the
14  motions that lead to that.
15     So for example, at three months, it says:
16     "Can bear little weight while
17     standing on both the legs."
18     And you've seen that with your children;
19  right?
20  A. Yes.
21  Q. "Can raise head and shoulders for
22     45 to 90 degrees while lying on the
23     belly."
24     And you've seen that with both of your own
25  children; right?

Page 193

```
 1       A.  Head and shoulders to 90 degrees?  I don't
 2  recall seeing that.  That's a pretty steep rise.
 3  But certainly at three to four months they were
 4  raising their heads and shoulders.
 5       Q.  Okay.
 6       A.  I can't verify these degrees.
 7       Q.  Sure.  It also says at three months the
 8  baby can carry weight on the forearms; correct?
 9       A.  Yep.  That's what it says.
10       Q.  And this, and again, this is something
11  that you provided to us in your report.  By four
12  months, you'd expect your baby to have good head
13  control.  Do you see that?
14       A.  Yes.
15       Q.  Can carry up to a certain weight when held
16  upright on the legs?
17       A.  Yes.
18       Q.  Again, can raise head and chest to 90
19  degrees?
20       A.  Yep.  I see that.
21       Q.  And then here you may start to see some
22  babies rolling from back to side.  Do you see that?
23       A.  Yes.
24       Q.  By five months, the baby can hold the head
25  up while sitting and roll from belly to back;
```

Page 194

```
 1  right?
 2       A.  Yes, I see that.
 3       Q.  We're not -- so and I'm going to tell you
 4  that, when we're talking to the jury, we're
 5  probably going to use belly to back more than prone
 6  and supine, but --
 7       A.  Sure.
 8       Q.  -- I know you're interchangeably versed in
 9  those words.
10       At six months, a baby can raise the chest
11  and a part of the belly while lying on the stomach,
12  can lift the head while in a sitting position, and
13  rolls over from back to belly; is that right?
14       A.  Yeah.  I think you read those correctly.
15       Q.  Okay.  So we're seeing that, at two
16  months, some babies can hold their head up and
17  begin to push up while lying on their tummy.
18  That's what some moms call "tummy time," right, why
19  you encourage tummy time; right?
20       THE WITNESS:  Actually, dads call it
21  that --
22       MR. OSBORNE:  Form.
23       THE WITNESS:  Dads call it that, too.
24  BY MS. LOVETT:
25       Q.  That was sexist of me.  Dads call it tummy
```

Page 195

```
 1  time, too.
 2       So at two months you, I'm sure with Oliver
 3  and definitely with Nicholas, were encouraging
 4  tummy time; right?
 5       A.  Yes.  We had to do a lot of tummy time
 6  with Oliver, because he had the flattening of the
 7  back of his head.
 8       Q.  Mine, too.  We didn't have a 3D printed
 9  helmet for it, though.  But he's 16.  He turned out
10  okay.
11       Agree that this is a developmental
12  milestone, that -- do you agree that that
13  milestone, once exhibited, beginning to push up
14  should signal a parent to stop using the
15  Rock 'n Play sleeper at the time they start seeing
16  any of the milestones such as pushing up or rolling
17  over?
18       A.  That's not really how I was interpreting
19  the warning label.  I mean, this is at two months
20  old.
21       Q.  Right.
22       A.  I think that this, what they're talking
23  about at two months old is sort of the
24  beginnings --
25       Q.  Right.
```

Page 196

```
 1       A.  -- of this.
 2       Q.  Z███ was -- Z███ was -- do you know how
 3  old Z███ was when she --
 4       A.  Eight months.
 5       Q.  -- passed away?
 6       She was eight months and 20 days; right?
 7       A.  (Whereupon, there was no audible response
 8  by the deponent.)
 9       Q.  She was -- she was far past these
10  milestones based on the records you've reviewed;
11  correct?
12       MR. OSBORNE:  Form and foundation.
13       THE WITNESS:  I mean, I think she was
14  well past the two-month ones.  Yeah, when
15  we get into these things like 90 degrees,
16  since I'm an engineer, I'd like to see
17  that.
18  BY MS. LOVETT:
19       Q.  Right.
20       A.  That seems like a really steep angle now
21  that I think about it.
22       Q.  Sure.
23       A.  But certainly she was -- she was past a
24  lot of these milestones.
25       Q.  The hardest roll is the from back to
```

Page 197

1  belly, that's the most difficult roll; right?
2      A.  Not really.  It depends on the baby.  Like
3  I said, my son actually did that roll first.  In
4  certain populations, they've actually studied this,
5  for example, like in Singapore --
6      Q.  Right.
7      A.  -- babies roll from back to front before
8  front to back.  And I think it's just --
9      Q.  Cultural?
10     A.  -- yeah, cultural, how -- what you're
11 doing with your baby, what you're expecting them to
12 do.  But I think a lot of babies learn to roll from
13 front to back first, because they just push up and
14 they just fall over accidentally.
15     Q.  Right.  So and that's kind of the -- and
16 that's the -- I think the -- you just explained
17 this for me perfectly.  The sequence is you push
18 up, then you roll?
19     A.  Yeah.  You push up, and then they just
20 fall over to one side.
21     Q.  Right.  It's not a -- it's not a full
22 roll, it's sort of a default roll, but it comes
23 from the action of pushing up; right?
24     A.  That's right.
25     Q.  Pushing up on their arms?

Page 198

1      MR. OSBORNE:  Form.
2      THE WITNESS:  Yeah.  I think that's
3  where you have to start with for that kind
4  of a roll, you have to -- the baby has to
5  push up and lift their -- they have to
6  raise their center of gravity up so that
7  it can then have some energy to fall over.
8  BY MS. LOVETT:
9      Q.  Right.  Right.  It's the momentum caused
10 by the pushing up?
11     A.  I will choose not to correct that, but I
12 will agree with the general concept.
13     Q.  Again, I'm talking as a political
14 scientist and --
15     A.  Okay.
16     Q.  -- and a lawyer and not -- and by the way,
17 that's my undergrad degree.  That's not -- I'm
18 not -- I don't hold myself out as a political
19 scientist.
20     A.  Yeah.
21     Q.  -- but not as a mechanical engineer.  So I
22 saw you cringe at me saying "momentum."
23     A.  Okay.
24     Q.  But for the jury's benefit, what has to
25 happen first is you push up, and then that gives

Page 199

1  you the ability to start rolling?
2      A.  That's correct.  When you push up, you
3  raise your center of gravity, and that gives you
4  potential energy.
5      Q.  Right.
6      A.  So you have this potential amount of
7  energy, and then the rolling is the release of that
8  potential, giving you the momentum at that point to
9  roll over.
10     Q.  All right.  This is Exhibit 7 to your
11 deposition.
12     MS. LOVETT:  And John, these will
13 come through.
14 BY MS. LOVETT:
15     Q.  These are Dr. Cleary's medical records for
16 Z███.  This is Z███'s pediatrician.
17     MR. OSBORNE:  Very well.
18 BY MS. LOVETT:
19     Q.  And if you'll look with me in the --
20     THE REPORTER:  Wait, wait.
21     MS. LOVETT:  Oh.  Sorry about that.
22          (Whereupon, Defendant's
23          Exhibit 7 was marked for
24          identification.)
25 BY MS. LOVETT:

Page 200

1      Q.  Litigators did not design these conference
2  tables, I'll just tell you that right now, because
3  we would not make them these wide -- this wide.
4      So these are some of Z███'s pediatric
5  records with doc -- from Dr. Kevin Cleary.  And I'd
6  like you to look at Bates label 34.
7      MR. OSBORNE:  I haven't -- I -- oh, maybe
8  I have now.  What number is this?
9      MS. LOVETT:  This is Exhibit 7.  And
10 it's Bates label -- I'm going to Bates 34,
11 John.
12     MR. OSBORNE:  Okay.  Hang on.
13 Because it's -- I'm only up to five, at
14 least as the last time I refreshed.  I'm
15 refreshing again.
16     All right.  Seven and -- one minute.
17 And page number again, please?
18     MS. LOVETT:  Bates 34.
19     MR. OSBORNE:  All right.  Stand by.
20 I'm looking at Bates 30 and 31.  Am I
21 close?
22     MS. LOVETT:  34 is the --
23     MR. OSBORNE:  Oh.
24     MS. LOVETT:  You got it?
25     MR. OSBORNE:  Yeah.  Got it.

Page 201

1    MS. LOVETT:  All right.  Okay to go?
2    MR. OSBORNE:  Yes, you are.
3  BY MS. LOVETT:
4    Q.  All right.  So Doctor, you've got Page 34.
5  And the date at the bottom here is February 4th of
6  2014; right?
7    A.  Yes.
8    Q.  It's a little over four months before Z██
9  passed away; correct?
10   A.  Yes.
11   Q.  And you obviously would defer to
12 Dr. Cleary, who was her pediatrician, his physical
13 assessment of her, what was going on at that time
14 as reflected in these records; right?
15   A.  Certainly.
16   Q.  And if we start looking at the
17 developmental, there's a Developmental Screen which
18 is contained under the second box that says
19 Nutritional Screen.
20     Do you see that?
21   A.  Yes.
22   Q.  And it says, a mark, "indicates
23 accomplishments."  Do you see that?
24   A.  I -- seems like that's what that would
25 indicate.

Page 202

1    Q.  Okay.  And here at -- on February 4th of
2  2014, which is when she was roughly four months
3  old, we see it says that the -- it's been checked
4  off "begins to roll front to back."
5      Do you see that?
6    A.  Yes.
7    Q.  And that's actually exactly what you'd
8  expect from the Mom Junction blog, roughly that's
9  right about the right time when you start to see
10 the belly to back roll; right?
11   A.  Yeah.  I think she would -- she's about
12 two months old at this time.  Right?
13   Q.  This is February of 2014, and so -- she
14 was born in September.  So this would be --
15   A.  Four months?
16   Q.  Yes.
17   A.  Okay.
18   Q.  Late September, yeah, little over four
19 months.
20   A.  Okay.
21   Q.  All right.  Let's look at some
22 photographs.  And these are hard ones, I know, but.
23     MS. LOVETT:  And these are going to
24 be Exhibit 8, John.  These are photographs
25 of Z██ --

Page 203

1    MR. OSBORNE:  All right.
2    MS. LOVETT:  These are photographs of
3  Z██ that her parents provided for us.
4  This will be Exhibit 8.  And she is
5  precious.
6         (Whereupon, Defendant's
7         Exhibit 8 was marked for
8         identification.)
9    MR. OSBORNE:  Refreshing.  It hasn't
10 come up yet.  I'll refresh again.
11 I've got it now.  Hang on.
12   MS. LOVETT:  Okay.
13   MR. OSBORNE:  Opening.
14     All right.  They're painted.  We can
15 go.
16 BY MS. LOVETT:
17   Q.  All right.  So Dr. Singhose, you have here
18 what I'll represent for you are three pictures of
19 baby Z██ that her parents gave us.  And you'll see
20 in each of them she appears to be sitting up;
21 right?
22   A.  Yes.
23   MR. OSBORNE:  Ah, what a cutie pie.
24   MS. LOVETT:  Isn't she precious?
25   THE WITNESS:  Yes.

Page 204

1    MS. LOVETT:  I mean, she's a really
2  precious baby.  Have you not seen these
3  before, John?
4    MR. OSBORNE:  I just think she's a
5  cutie pie.
6    MS. LOVETT:  She's adorable.
7  BY MS. LOVETT:
8    Q.  Okay.  So in the --
9    MR. OSBORNE:  We've talked about
10 Nicholas and Oliver, I just thought we
11 should give her --
12   MS. LOVETT:  It was just --
13   MR. OSBORNE:  -- her due.
14   MS. LOVETT:  I said it when I passed
15 it over.  You probably couldn't hear me.
16 She's just precious.
17 BY MS. LOVETT:
18   Q.  So in the first para -- or in the first
19 photograph here, she's sitting -- looks like she's
20 sitting on a sofa or something.  She's sort of
21 maybe leaning on it; right?
22   A.  Yeah.  I mean, it almost looks like a
23 bed --
24   Q.  Yeah.
25   A.  -- because of the --

1    Q.  You're right.
2    A.  -- the headboard in the back.  It looks
3    like they sat her on there and she's sitting.
4    Q.  Okay.  In the second photo, she's sitting
5    up without anything behind her back; right?
6    A.  I couldn't tell from this picture, but I
7    don't see anything.
8    Q.  Okay.  And the third picture, maybe that's
9    a better angle, she appears to be sitting up on the
10   floor and not falling over.
11   A.  That's correct.
12   Q.  And --
13   A.  Looks like they sat her there and she's
14   not falling over.
15   Q.  She's sitting there by herself.
16   A.  I mean, she might have fell over right
17   after this picture, but it looks like she's sitting
18   there not falling over.
19   Q.  All right.  Sit -- but she's sitting there
20   unassisted without anybody holding her up?
21   A.  Yes.
22   Q.  All right.
23   A.  That's what it looks like.
24   Q.  Okay.  So I want to talk next to you about
25   rolling on inclined surfaces.  And you start off in

1    that section by saying:
2         "Case evidence collected by the
3    C.P.S.C. indicates that some infants
4    that are not capable of rolling on a
5    flat surface can roll on an inclined
6    surface."
7         And this is where you cite to the article
8    that's published in the Journal of Biomechanics.
9    Do you see that?
10   A.  You jumped ahead of me.  I -- what page
11   were you --
12   Q.  Oh, I'm sorry.  I'm sorry.  I was
13   looking --
14   A.  Can you --
15   Q.  -- at the section of your report on
16   Rolling on Inclined Surfaces, and I didn't give
17   you --
18   A.  Yeah.  We -- I think --
19   Q.  -- the page number.
20   A.  -- you're talking about Page 21?
21   Q.  Yes.
22   A.  Or Paragraph 56.
23   Q.  Paragraph 56.
24   A.  Okay.  I just got there.
25   Q.  There we go.

1    A.  Okay.
2    Q.  All right.  So reading from that para --
3         MR. OSBORNE:  On Exhibit 4; correct?
4         MS. LOVETT:  Yes.  Of exhibit --
5    actually, it's Exhibit 3, John.  This is
6    the first report, not the rebuttal.
7         MR. OSBORNE:  I thought it was the
8    rebuttal.  Sorry.  Go ahead.
9    BY MS. LOVETT:
10   Q.  You start off saying here:
11        "Case evidence collected by the
12   C.P.S.C. indicates that some infants
13   that are not capable of rolling on a
14   flat surface can roll on an inclined
15   surface."
16        And then you cited to an article published
17   in the Journal of Biomechanics for that statement;
18   correct?
19   A.  Yes.
20   Q.  And I have that article, actually.  We're
21   going to make that Exhibit 9.  This is the Wang
22   article that you've referenced earlier.
23        MS. LOVETT:  That's Tab 14.
24        MR. HERMAN:  Yeah, you have it.
25        MS. LOVETT:  Oh, I have it in my lap.

1    Sorry.  You were a step ahead of me.
2         MR. HERMAN:  No worries.  I think you
3    said nine.
4         MS. LOVETT:  I sat it down to keep
5    it --
6         MR. HERMAN:  And I already marked it
7    for you, John.
8         MS. LOVETT:  You should have it.
9    BY MS. LOVETT:
10   Q.  Here you go.  This is Exhibit --
11        MR. OSBORNE:  All right.  Let me go
12   look.
13        MS. LOVETT:  -- Exhibit 9.
14        MR. OSBORNE:  I was reading the
15   report there.
16        MS. LOVETT:  Exhibit 9.
17             (Whereupon, Defendant's
18             Exhibit 9 was marked for
19             identification.)
20        MR. OSBORNE:  Let me refresh.
21   Got it.  Opening.
22   Okay.  I have it open.  Thank you.
23        MS. LOVETT:  All right.
24   BY MS. LOVETT:
25   Q.  So here in the Journal of Biomechanics,

Page 209

1  which I'm going to refer to as the Wang paper if
2  that's all right with you, Doctor, so, but its full
3  title is Do Incline Sleeping Surfaces Impact
4  Infants' Muscle Activity and Movement?  A Safe
5  Sleep Product Design Perspective.
6        Is that the correct title?
7  A.  Yes.
8  Q.  And in the abstract, we see that:
9        "The purpose of the study was to
10       assess muscle activity of healthy
11       infants when they lie supine and prone
12       on different inclined crib mattress
13       surfaces."
14       Right?
15  A.  I didn't follow that exactly, but I know
16  that that's one of the reasons for the study.  I
17  didn't follow where you were reading, but.
18  Q.  It's in the middle, I'm sorry, of the
19  abstract.  It's sort of hard to highlight it for
20  you.
21  A.  Okay.  I see that.  It's actually only,
22  like, the second --
23  Q.  The second --
24  A.  -- sentence.
25  Q.  -- sentence there, yes.  It's some long

Page 210

1  sentences.
2        Now, you've read this article thoroughly.
3  Wang did not use -- or did not test using a
4  Rock 'n Play sleeper or any other inclined sleep
5  product; correct?
6  A.  Well, that I can't attest to, because I
7  think that he probably did.  But he didn't report
8  on that in this paper.
9  Q.  All right.  And again, we're -- it's the
10  paper that you're directing us to for your opinion.
11  So if we look under Methods, which is Section 2.2,
12  it says Experimental Procedure.  The description
13  is:
14       "A," quote, "crib mattress with a
15       cotton fitted crib sheet was placed
16       inside the crib to serve as the lying
17       surface."
18       Do you see that?
19  A.  Yes.
20  Q.  And then it says:
21       [As read]  "The crib enabled zero
22       degree, ten degree, 20 degree and 30
23       degree inclines, which were chosen to
24       represent a flat crib mattress surface
25       (zero degree) and the range of

Page 211

1  inclines (ten to 30 degree) of the
2  inclined sleep products."
3        Correct?
4  A.  Yes.
5  Q.  And this is what we call an inclined
6  planar surface; right?
7  A.  Yes.
8  Q.  It does not have the closed heightened
9  walls that the Rock 'n Play provides; right?
10  A.  That's correct.
11  Q.  And you agree with me that the
12  Rock 'n Play would provide far less lateral
13  clearance for rolling than this open planar
14  surface?
15  A.  What do you mean by "lateral clearance"?
16  Q.  Well, this is me using, you know, using
17  terms that may mean something different to you.
18  But I mean it would be much easier for a baby to
19  roll over without the high walls than with them.
20  A.  With everything else staying the same, you
21  mean like they still have the foot blocker to push
22  off of and stuff like that?
23  Q.  Yes.
24  A.  Okay.
25  Q.  And they're wearing the restraints,

Page 212

1  presumably.
2  A.  Oh, and wearing the restraints?
3  Q.  Yes.
4  A.  Yeah, I think if they've got the
5  restraints cinched down, it's going to be pretty
6  hard for them to roll over.
7  Q.  Okay.  And then would that -- is it --
8  let's take away the restraint for a minute.  You
9  agree that it's easier to roll when you don't have
10  walls to your right and left keeping you from
11  rolling?
12  A.  I think in certain -- that would be true
13  for certain kinds of rolling maneuvers like we were
14  talking about.  But if the infant chose to pull on
15  the edge, then they actually have extra force that
16  they wouldn't have if the wall wasn't there.
17       So if you're talking about the kind of
18  roll where they don't pull on the wall, I think it
19  would be harder, because the wall would kind of
20  push them back.
21  Q.  Right.
22  A.  But if they had thrown their arm over and
23  grabbed on the wall, then in that sense it's easier
24  because they have this additional force that helps
25  roll them over.

Page 213

1  Q.  All right.  Understand.
2      We're going to go to Exhibit 10 to your
3  deposition, which is the Exponent report.  Are you
4  familiar with the Exponent report?
5  A.  Yes, I am.
6      (Whereupon, Defendant's
7          Exhibit 10 was marked for
8          identification.)
9      THE WITNESS:  Can we take a short
10  break at some point?
11  BY MS. LOVETT:
12  Q.  Oh, sure.  Absolutely.  Do you need a
13  little --
14  A.  Yeah.
15  Q.  -- restroom --
16  A.  It's been a --
17  Q.  -- break?
18  A.  It's been a while.
19  Q.  Sorry.
20      THE VIDEOGRAPHER:  The time is 1:38
21  p.m.  We are off video record.
22      (Whereupon, a discussion ensued
23  off the record.)
24      (Whereupon, there was a brief
25  recess.)

Page 214

1      THE VIDEOGRAPHER:  The time is 1:52
2  p.m.  We are back on video record.
3  BY MS. LOVETT:
4  Q.  So Dr. Singhose, you told us beforehand
5  that you're familiar with Exhibit 10, which is the
6  April 6th, 2018 Exponent report; correct?
7  A.  Yes.
8  Q.  And this is the -- Exponent's analysis of
9  infant roll-over behavior in the Rock 'n Play
10  sleeper; right?
11  A.  Yes.
12  Q.  And let's skip to the testing, which is --
13  the results of the testing you can find at Bates
14  label 12465.
15      Now, if we look at the section entitled
16  Observations and Interactions, the report tells us
17  that:
18      "More spontaneous rolling was
19      observed in the crib environment."
20      Correct?
21  A.  I'm not seeing that.  Where?
22  Q.  It's under Observations and Interactions,
23  and the Bates label is 12465.
24  A.  Oh, okay.  Yes.  I can't really read that
25  title.  It's in yellow.  It's --

Page 215

1  Q.  Oh.
2  A.  I couldn't see the --
3  Q.  Oh, you're right.
4  A.  -- label to -- okay.
5  Q.  No.  You're right.
6  A.  I see it now.
7  Q.  Okay.
8  A.  It's actually the very first line --
9  Q.  Right.
10  A.  -- is what --
11  Q.  First line.
12  A.  -- you're reading.  Yes, I see that line.
13  Q.  And then there are some bullet points.
14  The Exponent report tells us that:
15      "Children who were able to roll in
16      the Rock 'n Play also demonstrated the
17      ability to roll in the crib."
18      Correct?
19  A.  Yes.  That's one of their observations.
20  Q.  And so I want to go back to your precious
21  son Nicholas.  When -- the photo that we saw of you
22  taking him, did you observe him rolling, his
23  rolling capability in crib versus Rock 'n Play?
24  A.  No, I didn't make that comparison.
25  Q.  Okay.  If we move on to the other

Page 216

1  observations in this section, the "observations of
2  rolling behavior in the Rock 'n Play," it says:
3      "This behavior was volitional and
4      for many required effort."
5      Do you see that?
6  A.  Yes, I do see that.
7  Q.  And it also says that:
8      "No accidental rolling was
9      observed."
10      Right?
11  A.  Yes.  That's what it says here.
12  Q.  And then if you look down the third -- the
13  third -- the third [sic] bullet point says:
14      "The Rock 'n Play restraint system
15      prevented rolling (even for children
16      whose use of the product was
17      contraindicated given their
18      development)."
19      You've certainly not seen anything to
20  contradict that, based on your prior testimony;
21  right?
22      MR. OSBORNE:  Form.
23      THE WITNESS:  Oh, I've seen a lot of
24  stuff to contradict that.
25  BY MS. LOVETT:

1      Q.  Well, hang on.  I'm not talking about --
2  and I think I asked you and you answered me quite
3  directly that you had not observed any instance of
4  a restrained child in the Rock 'n Play rolling
5  over.
6      A.  Oh, that's correct.
7         MR. OSBORNE:  Form.
8         THE WITNESS:  You were talking about
9  my personal observations.
10  BY MS. LOVETT:
11     Q.  Well, I'm talking -- and I know this is
12  hard to sort of dissect, because you've got
13  personal observations of your children.  And you,
14  like our expert, had used your child, we're going
15  to have a lot of cute babies to look at, in -- as a
16  test subject.
17        So but we've seen the photographs that you
18  took of Nicholas.  And the question I had for you
19  is, as it says in the Exponent report, the
20  restraint system prevents rolling over, this is
21  their observation, even for children whose use of
22  the product was contraindicated.
23        You only observed it with Oliver.
24        MR. OSBORNE:  Form.
25  BY MS. LOVETT:

1      Q.  Right?
2         MR. OSBORNE:  Sorry.  Form.
3  BY MS. LOVETT:
4      Q.  I'm sorry.  Not with Oliver.  With
5  Nicholas.  I'm sorry.  You only observed the
6  rolling over with your child.
7      A.  Okay.  I'm a little confused.  Just to
8  verify --
9         MR. OSBORNE:  Form.
10        THE WITNESS:  -- I didn't
11  observe rolling in the Rock 'n Play with
12  Nicholas because he wasn't in there very
13  long.
14  BY MS. LOVETT:
15     Q.  Right.
16     A.  And I only had him restrained for a couple
17  minutes because he just started fighting and
18  crying.
19     Q.  Right.  So --
20     A.  So I did not see it with him.
21     Q.  All right.  And you have not seen, as you
22  testified before, any baby roll over because I
23  think your exact words were, once you're cinched
24  down in there, you're not going anywhere; right?
25     A.  Yeah, I'm not sure that's my exact

1  testimony.  But my testimony is that, if you
2  cinched them down hard enough, they obviously
3  couldn't get away.  And I think what I was
4  referring to is I haven't seen in videos --
5      Q.  Right.
6      A.  -- of a baby wiggling all the out and
7  turning over.  Because that takes some amount of
8  time, and the videos that I've seen are all short
9  duration videos.
10     Q.  Right.
11     A.  That's what I testified to.
12     Q.  And but you also haven't seen it in your
13  own observation, because you -- the testing that
14  you did with Oliver -- sorry, I mix them up now --
15     A.  That's okay.
16     Q.  -- because I feel like I know them.  Let
17  me make that cleanly for the record.
18        The testing that you did with Nicholas did
19  not give you -- did not give you an opportunity to
20  see him roll over while restrained?
21     A.  That's correct.  I only had him in there
22  for a very short period of time.
23     Q.  All right.  And that is -- that is the
24  extent of the testing that you did to support your
25  opinion was the testing with Nicholas; right?

1      A.  No.  I did a lot --
2         MR. OSBORNE:  Form.
3         THE WITNESS:  I did a lot more
4  testing than that.
5  BY MS. LOVETT:
6      Q.  Okay.  In terms of observing infant
7  behavior, the work that you did, and there may be
8  more cute babies that I missed in here, but I
9  didn't realize he was yours when I was looking at
10  him before, in terms of your opin -- by doing
11  observations of infants where you're laying eyes on
12  infants yourself to assess and make your opinions
13  in this case, did you do anything other than your
14  interactions with Nicholas?
15     A.  Yes.
16     Q.  All right.  What else did you do?
17     A.  Okay.  Just to clear -- I mean, yes, I did
18  a lot of other stuff.  Are you -- but are you
19  trying to focus me down on what other I --
20  observations I did with live infants?
21     Q.  Yes.  I'm not --
22     A.  Okay.
23     Q.  -- talking about dolls.  So I'm talking
24  about --
25     A.  That's fair.

Page 221

1    Q. -- what -- I'm talking about with in --
2    with -- that's a much better way to -- the precise
3    question.
4         In testing with live infants, and of
5    course the Exponent study that you're looking at
6    there is observations of live infants, are the
7    exhibits that we previously looked at in your
8    report, the photographs of your son Nicholas in the
9    Rock 'n Play and those interactions, is that the
10   only testing that you did in terms of observing a
11   live infant?
12   A.  No.
13   Q.  What else did you do?
14   A.  I put two other infants into the
15   Rock 'n Play sleeper and observed them and their
16   motions.
17   Q.  All right.  And so where will we find
18   photographs of them in your report?  And you're
19   looking at, for the record, Exhibit 3.
20   A.  Yes.  I was -- I'm looking at my first
21   report.  I think that they're in my rebuttal
22   report, but I'm going to look at my first report.
23   I have a bunch of pictures of other live infants.
24   I think those start -- well, I see one on Page 28.
25   Q.  Are you looking at Exhibit 3?

Page 222

1    A.  Yes.  So Exhibit 3 on Page 28 at the top,
2    Figure 22 has a picture of a live infant.  That may
3    be -- oh, I'm sorry.  The first ones I think are on
4    Page 27.
5    Q.  Okay.  So if we look at 27, okay, I see
6    Nicholas and one of his friends.
7    A.  That's actually two of his friends.
8    Q.  Two of his friends?
9    A.  Those are twins.
10   Q.  Oh, those are the twins.  Are those Dr. --
11   A.  Frakes.
12   Q.  -- Frakes' twins?
13   A.  Uh-huh.
14   Q.  Yes.  All right.  And so you've got a
15   five-month-old, who is Nicholas; a four-month-old
16   there in the middle.  What is his name?
17   A.  That's Huxley.  And he's a big boy.  So
18   he's 18 pounds at four months, believe it or not.
19   Q.  He's a linebacker?
20   A.  And then his sister Palmer is on the
21   right.  And she's also the same age, of course, but
22   she's only 12 pounds.  So they're actually very
23   different size --
24   Q.  She's --
25   A.  -- babies.

Page 223

1    Q.  She's four months.  You've got a six-pound
2    differential --
3    A.  Yeah.
4    Q.  -- there between those two babies.  All
5    right.
6    A.  It's big.
7    Q.  All right.  And so these are -- so in
8    your -- in your -- well, I'm looking at there are
9    pictures there on Page 27 and then on Page 28.  And
10   that looks like Huxley.
11   A.  Yep.
12   Q.  And then are there any other live
13   infant --
14   A.  20 --
15   Q.  -- observations?
16   A.  Page 29 has Palmer is actually the really
17   active one.  The smaller one is more active.  And
18   that's actually her doing a rolling movement.
19   Q.  Page 29?
20   A.  Yeah.  The top of Page 29.
21   Q.  Okay.  And that is Palmer doing a rolling
22   movement unrestrained?
23   A.  Yes.
24   Q.  Could Palmer roll over?
25   A.  She -- I placed her in that initial

Page 224

1    position on the side.
2    Q.  Okay.  So you put her in on the side?
3    A.  Yeah.  I mean, her face wasn't there.  I
4    put her on her side.  But as soon as I got the
5    picture, she had turned her face.  I mean, she
6    started wiggling around and pushing with her legs.
7         So you can see her actually, in this
8    middle one, you can see her pushing up the incline.
9    You can see her head is almost at the head blocker.
10   And then she just basically pushed around a little
11   bit and ended up essentially mostly prone --
12   Q.  But she --
13   A.  -- as you can see.
14   Q.  -- she started out on her side?
15   A.  Yeah.  I put her on her side -- well, her
16   mother.
17   Q.  Yeah, her mother placed her.
18   A.  Her mother was there and --
19   Q.  Yeah.
20   A.  -- she was observing all this.  And I
21   said, can you put her on the side?  And she just --
22   yes, and let's let her wiggle around and see what
23   she does.
24   Q.  And the caption here at the top of the
25   page in Figure 23 is Rolling Movements; right?

Page 225

```
 1        A.  That's correct.
 2        Q.  So from your observation, could Palmer
 3   roll over?
 4        A.  Yes.  I mean, provided I put her on the
 5   side.  I didn't test her for that long.  This
 6   testing was about 45 minutes --
 7        Q.  Okay.
 8        A.  -- of testing.  I went to their house and
 9   I made measurements and put them in there and
10   observed them, so again, not long duration.  Just
11   part of my evaluation of this product is put babies
12   in and see what they do --
13        Q.  Right.
14        A.  -- just what is possible.
15        Q.  Right.  So other than -- I'm going to run
16   out of adjectives, so I'll just stop saying
17   precious, adorable and everything.
18        But other than Nicholas, Huxley and his
19   sister Palmer, did you in your initial report have
20   any other interactions with live infants that you
21   did to form the conclusions for your report?
22        A.  Those were the three live infants that I
23   used.
24        Q.  Did you put Huxley -- did you restrain
25   either Huxley or Palmer?
```

Page 226

```
 1        A.  Yes.  I did for a short period of time.  I
 2   have a picture of that.  I think it's on Page 36,
 3   if I recall.
 4        Q.  And again, that looks like Huxley.
 5        A.  That's Palmer.
 6        Q.  Oh, is that Palmer?
 7        A.  Yeah.  If you look at the top, you can see
 8   her head barely gets into the horizontal marks.
 9        Q.  Right.
10        A.  And his head goes way up into the
11   horizontal --
12        Q.  Yes.
13        A.  -- marks.
14        Q.  Although she's the more active of the
15   two --
16        A.  That's right.
17        Q.  -- I think you said?
18        A.  Yeah.
19        Q.  All right.  So I'm looking here at very
20   active Palmer.  She is -- but with the crotch
21   restraint, as you said, she's not going anywhere?
22        A.  Yeah.  I mean, she actually was pretty
23   calm during this time, and I didn't really try to
24   get her to move.  And I was actually trying to get
25   her to not move so I could take the measurements.
```

Page 227

```
 1        Q.  Right.
 2        A.  So I had her mother try to keep her calm.
 3   And I think her mother was standing in front of
 4   her --
 5        Q.  Right.
 6        A.  -- and, say, just cooing at her so I could
 7   get the measurements.
 8        Q.  Sure.
 9        And that's something that we don't -- I
10   guess one of the things that you'd said earlier
11   about some of the videos that didn't have audiotape
12   was you wanted to hear what the interactions were
13   or what was going on.
14        So you didn't videotape any of the live
15   babies in your study; correct?
16        A.  I don't think I did.  I mean, basically, I
17   was just visually watching them.  And then when --
18   I was holding a camera and I wanted to take
19   pictures of them in various positions, so I had it
20   on the picture mode, not the video mode.
21        Q.  Right.  So other than the interactions
22   with your son Nicholas and the Frakes twins, you
23   did not observe any of -- you did not do any other
24   testing of live infants to form your opinions;
25   correct?
```

Page 228

```
 1        A.  Yeah, those are the three babies I used.
 2   I think that was it.
 3        Q.  Okay.  And then are there any different
 4   babies in your rebuttal report?
 5        A.  I don't -- no, not different babies.  I
 6   think I reproduced some of the pictures in
 7   response.
 8        Q.  Okay.  So those came --
 9        A.  I think they're actually all the same
10   pictures.  I don't think I --
11        Q.  Yeah.
12        A.  -- even had new pictures.
13        Q.  Okay.  I wanted to see if you had new
14   pictures because --
15        A.  Let me see.
16        Q.  -- I thought you may have alluded to that
17   earlier.  So let me ask it this way.  Did you --
18   did you perform more than one observational session
19   with Nicholas, Huxley and Palmer?
20        A.  Yes.
21        Q.  All right.  And are -- were all of those
22   observations available to you at the time of your
23   initial report?
24        A.  Yes.
25        Q.  All right.
```

Page 229

1    A. I see what you're saying there.
2    Q. Yes. Okay. So in other words, there
3 wasn't anything that you saw in the reports of our
4 experts that caused you to go back and do more live
5 interaction and take photographs?
6    A. No, I don't think so.
7    Q. All right. And so the extent of your
8 testing with live infants is limited to, completely
9 limited to Nicholas, Huxley and Palmer?
10    A. Yes. I think that's a fair assessment.
11    Q. And the photographs that you took of them?
12    A. Yes.
13    Q. All right. So I want us to talk about
14 the -- and you talk about this in your report. If
15 you look at -- oh, by the way, did you -- did you
16 evaluate whether or not or how Huxley and Palmer
17 rolled over in cribs?
18    A. No. I did observe them on a carpet before
19 we started all this. I mean, I went over there and
20 I -- we were planning to do this, and they were
21 just on a carpet, and so I observed what they were
22 capable of.
23       Quite frankly, the boy, Huxley, is not
24 capable of moving himself around. He's too big.
25    Q. He's too big. He's a big boy. Right.

Page 230

1    A. So he just --
2    Q. He just kind of lies there and eats?
3    A. He would just lie there and eat. In about
4 a ten-minute period, the girl, she could -- they
5 were sitting down --
6    Q. Right.
7    A. -- you know, on the carpet. She could
8 wiggle around and change her position. I think she
9 kind of rotated about 90 degrees --
10    Q. Right.
11    A. -- on her back. That's what I observed.
12       So I didn't do a detailed study of what
13 they were capable of. But I did talk to the
14 parents, and they said Huxley can't move himself at
15 all. And Palmer's starting to wiggle around and
16 do -- and do motions, but they didn't say that she
17 could completely roll over at that point.
18    Q. Right. No. So this is what I'm going to
19 ask you. Did you -- you know, given that you say
20 in your report -- and this is in Paragraph 70 of
21 your report if you want to have it in front of you?
22    MS. LOVETT: And for you, John, this
23 is Paragraph 70 of Exhibit 3.
24    MR. OSBORNE: I'm going there.
25 BY MS. LOVETT:

Page 231

1    Q. You say:
2       "Given that the product can be
3    used for infants up to 25 pounds, I
4    placed three infants of various sizes
5    into the device to evaluate its
6    design, measure its geometry relative
7    to the infants, and to observe the
8    infants' positioning and movements."
9    Correct?
10    A. Yes.
11    Q. All right. So now, we've talked about the
12 various developmental milestones. Did you try to
13 control for any other developmental milestones when
14 selecting the subjects?
15       And that was my original question for you,
16 but I think you selected the subjects because
17 proximity, familiarity and cuteness.
18    A. Yes.
19    Q. All right.
20    A. And COVIDness. I mean --
21    Q. And COVIDness.
22    A. -- we weren't going to launch a --
23    Q. Well, again --
24    A. -- baby study during COVID --
25    Q. Of course.

Page 232

1    A. -- I guess.
2    Q. Right.
3    A. Yeah.
4    Q. We had the exact same issue, of course.
5       So could Nicholas push up on his hands and
6 knees at this point?
7    A. At the picture at five months old, he
8 could not push up on his knees.
9    Q. Okay. I guess --
10    A. But he was definitely pushing up and
11 arching his back.
12    Q. Because that's how you start to roll?
13    A. Yeah.
14    Q. And you've told us he could definitely
15 roll at that point.
16    A. Well, he could -- I actually don't think
17 he could roll from -- still from front to back at
18 this point. He could roll from back to front,
19 which he could do at very early on --
20    Q. Right.
21    A. -- like at three and a half months or
22 something.
23    Q. Right.
24    A. I think at this point he still could
25 not -- or he still did not --

Page 233

```
1        Q.  Right.
2        A.  -- roll from front to back.
3        Q.  Could Huxley push up or push up on hands
4    at all?
5        A.  I don't think so.  I mean, he -- he's
6    just, like, this big guy who would just sit
7    there --
8        Q.  Right.
9        A.  -- and he couldn't move much.  Basically,
10   when I asked the parents what were they capable of,
11   I didn't ask that specific question.
12       Q.  Okay.  Could Palmer -- you said Palmer was
13   wiggling around and starting to -- starting to
14   roll; right?
15       A.  Yeah.  What I saw her do was essentially
16   rotate on her back about 90 degrees --
17       Q.  Right.
18       A.  -- by wiggling around, but I did not see
19   her roll over.
20       Q.  Okay.
21       A.  And the parents said that she wasn't
22   capable of rolling over, but definitely squirming
23   and turning and stuff like that.  Like, I think the
24   assessment was she's likely to roll at some point
25   soon.
```

Page 234

```
1        Q.  Right.  Could any of them, and if we look
2    at these sweet pictures of Z███ here in Exhibit 8,
3    could any of them, and I'm really focused on the
4    second and third photos, could any of them sit up
5    like she's doing here in Exhibit 8 on the third
6    page?
7        A.  Oh, certainly my son could do that.  And
8    the girl, Palmer, could do that.  I think Huxley
9    was not capable of that.  He would fall over.
10       Q.  Right.  Right.
11       A.  So if you plopped them down --
12       Q.  Right.
13       A.  I mean, I know at this time I was still
14   watching Nicholas to make sure he wouldn't fall
15   over.
16       Q.  Right.
17       A.  But I could sit -- I could sit him and he
18   would sit for a long time.
19       Q.  All right.
20       A.  And he --
21       Q.  Unassisted?
22       A.  Yeah.  And -- well, he could sit there
23   unassisted.  He couldn't sit up unassisted.  Right?
24   He couldn't do a sit-up.
25       Q.  Right.
```

Page 235

```
1        A.  And neither could Palmer.  Her parents
2    would sit her, you know, manually sit her in a
3    position and she could stay stable for a while.  I
4    think she was a lot more tippy than my son.
5    Because my son was about a month older at this
6    time.
7        Q.  Right.  Right.  He was a little bit ahead
8    of them.
9        So if we're looking at -- I want to look
10   at Figure 23 in your report.  And we now know this
11   is Palmer.  And you've told us that you placed her
12   on her side; right?
13       A.  Her mother.
14       Q.  Her -- I'm sorry.
15       A.  Yeah.
16       Q.  You told me her mother placed her on her
17   side.
18       Other than Palmer, you have not
19   independently seen the -- any infant replicate this
20   behavior; true?
21       A.  Well, no.  This kind of behavior appears a
22   lot in the Exponent videos.
23       Q.  Yes.  In the Exponent.  I'm talking about
24   in your personal observation.
25       A.  Oh, no.  I just tested -- yeah, I just had
```

Page 236

```
1    these three infants, and she's the only one that
2    did that.  My son, I did not do that test with him.
3        Q.  All right.  In either case you can agree
4    with me that, if the baby was properly restrained,
5    and in fact we saw that with Palmer, there's no way
6    she could execute this maneuver?
7        MR. OSBORNE:  Form.
8        THE WITNESS:  I mean, I think there's
9    a question of what "properly restrained"
10   is.  I think if Palmer was restrained in
11   the way that a lot of people would
12   restrain them, which is to put the lap
13   belt on kind of loose because they don't
14   want to cinch their baby down and they
15   want their baby to go to sleep, and I sat
16   there and watched her for a couple hours,
17   I would not be surprised if she could
18   wiggle out, but that's not a test I did.
19   BY MS. LOVETT:
20       Q.  In fact, when you photographed her, she
21   was cinched down; correct?
22       A.  When I photographed her -- again, I'm not
23   sure what "cinched down" means.
24       Q.  Well --
25       A.  And we're kind of using that
```

Page 237

```
 1   laxadaisically [sic].
 2       Q.  Yeah.
 3       A.  But she had the restraint across her
 4   waist.
 5       Q.  Right.
 6       A.  And I think I left it to the mother or --
 7   actually, I think the grandmother did that part.
 8   The grandmother was there, too.  I think they're
 9   the ones who basically put the lap restraint around
10   her.
11       Q.  Yes.  And so -- but you did -- she was not
12   able to roll over in your observation when she was
13   in the restraints; correct?
14           MR. OSBORNE:  Form.
15           THE WITNESS:  I don't know if she was
16   able to.  We didn't do that test.  Again,
17   she was only in that position for a couple
18   of minutes, and we tried to keep her calm
19   so I could take the measurements.
20           The point is I was taking
21   measurements of the belt restraint at that
22   time.
23   BY MS. LOVETT:
24       Q.  Right.  You've --
25       A.  I wasn't testing her for whether she could
```

Page 238

```
 1   wiggle out of it.
 2       Q.  Right.  You -- we looked at the warning
 3   label, which says "always use the restraint."
 4   Correct?
 5       A.  Yes.  That's what it says.
 6       Q.  And when you photographed Palmer, she was
 7   photographed with the restraint on, the crotch
 8   restraint on and fastened in a manner at --
 9   consistent with the instructions for use; correct?
10           MR. OSBORNE:  Form.
11   BY MS. LOVETT:
12       Q.  You may answer.
13       A.  Yeah, I mean, I -- in con -- it's
14   inconsistent in the sense that we're using the
15   restraint --
16       Q.  Right.
17       A.  -- in some way.
18       Q.  Right.
19       A.  The restraint doesn't tell us how -- that
20   warning or those instructions don't tell us how
21   much to cinch her down.
22       Q.  Right.
23       A.  So I left it to the grandmother, I think,
24   to put her in there and strap her in.
25       Q.  Okay.  So the grandmother strapped her in.
```

Page 239

```
 1   And you agree with me that if -- when she was
 2   strapped in, there was no way that she could find
 3   herself in the position that she was in in Figure
 4   24?
 5           MR. OSBORNE:  Form.
 6           THE WITNESS:  No, I wouldn't agree
 7   with that.  I mean, she was pretty wiggly.
 8   So I think if she was there for several
 9   minutes or an hour, I would not be
10   surprised at all if she could wiggle out
11   of that.
12           Because I remember looking, and the
13   grandmother did not really cinch it down
14   very tight.
15   BY MS. LOVETT:
16       Q.  Did you give her an instruction --
17       A.  No.
18       Q.  -- on how to cinch it?
19       A.  No.
20       Q.  Did you adjust it?
21       A.  I did not.  I left --
22       Q.  Did you --
23       A.  I left it to her, I believe.
24       Q.  Did you take your tape measure and measure
25   how much of the strap was pulled or how tightly it
```

Page 240

```
 1   was cinched at her waist?
 2       A.  No, I didn't do that measurement.  What I
 3   was trying to do was to measure the distance from
 4   the -- from the belt to the foot plate and then
 5   also from her head to the -- to the head blocker.
 6   I mean, that's -- that was my goal in this test.  I
 7   wasn't trying to do a test of how securely she was
 8   cinched in.
 9       Q.  Right.
10           MS. LOVETT:  All right.  Tab 17,
11   please, Mr. Herman.
12           MR. HERMAN:  17 is the video.
13           MS. LOVETT:  Well, how do we want to
14   do video?
15           MR. HERMAN:  I can give you this to
16   be marked, and then I have the video
17   uploaded on my --
18           MS. LOVETT:  Okay.
19           MR. HERMAN:  -- laptop.
20           MS. LOVETT:  Perfect.  We'll start
21   with that.  So we are going to Exhibit 11?
22           MR. HERMAN:  That's correct.
23           (Whereupon, Defendant's
24           Exhibit 11 was marked for
25           identification.)
```

1    MS. LOVETT:  That is going to be --
2  we, John, we got that video on a flash
3  drive.  This is the, it's the Rock 'n Play
4  Example Roll MP4.  And that's Courkamp
5  008143.  It's a flash drive.
6    MR. HERMAN:  I sent it to him, too.
7    MS. LOVETT:  Brady sent it to you.
8  He sent the M.P.E. video so you can watch
9  it.
10    MR. OSBORNE:  When did he send it?
11    MR. HERMAN:  27 seconds ago.
12    MS. LOVETT:  27 seconds ago.
13    MR. OSBORNE:  Oh, gracious.  Okay.
14  Let me refresh.
15    (Whereupon, a discussion ensued
16  off the record.)
17    MR. HERMAN:  Mo, do you want me to
18  E-mail it to you?
19    MS. LOVETT:  Yes, please.  Or you can
20  just show it to me.  Because I've got, I
21  was putting it in my drive, but I've got
22  something else in my drive that I'm using.
23  So.
24    So John, just let me know when --
25    MR. OSBORNE:  Do you have a projector

1  or how are you showing this to the --
2    MS. LOVETT:  It's --
3    MR. OSBORNE:  -- witness --
4    MS. LOVETT:  It's on a laptop.
5    MR. OSBORNE:  -- to Dr. Singhose?
6    MS. LOVETT:  It's on a laptop, and
7  we're putting it -- we're giving it --
8  Dr. Singhose the laptop to use.
9    MR. OSBORNE:  I'm just trying to
10  figure out if there's a way to speed
11  things up for you, but --
12    MS. LOVETT:  Well --
13    MR. OSBORNE:  -- it hasn't come in
14  yet.
15    MS. LOVETT:  We can E-mail it to you,
16  John.
17    MR. OSBORNE:  And you sent it to
18  J-O-S-B-O-R-N-E at Goldberg & Osborne.com;
19  right?
20    MR. HERMAN:  I shared it with you.
21    MR. OSBORNE:  The E was left off one
22  of the E-mails earlier.
23    MS. LOVETT:  No.  He shared it -- he
24  shared it with you in the Exhibit Share.
25  So if you can't access it there, we can

1  send you a direct E-mail of it.
2    MR. OSBORNE:  Oh, I'm sorry.  I
3  thought you meant that you had sent me a
4  direct E-mail.
5    MS. LOVETT:  Oh, I'm sorry.  It --
6    MR. OSBORNE:  I apologize.
7    MS. LOVETT:  That's --
8    MR. OSBORNE:  I have it.
9    MS. LOVETT:  No.  That's terminology.
10  I'm sorry.
11    MR. OSBORNE:  So I got stills.  Say
12  again the exhibit number.  11?
13    MS. LOVETT:  11.
14    MR. OSBORNE:  11.  Yeah, it's a
15  movie.  Hang on.  I've got it.  I'm sorry
16  to have caused that by my misunderstanding
17  what you said.
18    MS. LOVETT:  No.
19    MR. OSBORNE:  All right.  I've got
20  the "play video" ready to go.
21    MS. LOVETT:  Okay.  No problem.  So
22  John, you -- we played the video for
23  Dr. Singhose.  He's obviously familiar
24  with it.  He did this.
25  BY MS. LOVETT:

1    Q.  Dr. Singhose, here the --
2    MR. OSBORNE:  It's only 18 seconds.
3  So.
4    MS. LOVETT:  Yes.
5    MR. OSBORNE:  I got it.
6    (Whereupon, the video recording
7  was reviewed by the witness.)
8  BY MS. LOVETT:
9    Q.  All right.  The video is a doll; correct?
10    A.  Yes.  It's a doll in the subject
11  Rock 'n Play.
12    Q.  Okay.  And then Exhibit 12 is going to be
13  the still photographs that accompany this?
14    (Whereupon, Defendant's
15    Exhibit 12 was marked for
16    identification.)
17    MR. OSBORNE:  Got it.
18  BY MS. LOVETT:
19    Q.  All right.  So and again, Exhibit 12 is
20  you manipulating the doll into these positions;
21  correct?
22    A.  Okay.  So just so I understand, Exhibit 12
23  is the pictures.  Yeah, I took -- I put the doll in
24  these positions and took pictures of it.  Is that
25  what you're asking?

Page 245

1    Q.  Yes.
2    A.  Okay.  Yes.
3    Q.  Right.  And this is not the position in
4  which Z█████ was found?  If you -- and I'm looking at
5  your -- the last -- the last two or three
6  photographs where the baby is face down.
7        MR. OSBORNE:  You mean pages -- what
8  I have are pages.
9        MS. LOVETT:  151, 152.
10       MR. OSBORNE:  Page, what, nine
11  through 11?
12       MS. LOVETT:  One -- oh, mine are
13  numbered with a Bates 151, 152, 153 and
14  154.
15       MR. OSBORNE:  Okay.  Thank you.
16  BY MS. LOVETT:
17   Q.  Now, you placed the doll in these
18  positions; correct?
19   A.  That's correct.
20   Q.  This is not how Z█████ was found, is it?
21   A.  Which -- well, she was, the position that
22  she was found in is, quite frankly, a little
23  uncertain.  But we know that she was partially
24  prone, I guess is the term that people want to use,
25  and her face was, you know, in the fabric.

Page 246

1        So none of these are exactly the
2  representation because we don't know exactly how
3  she was found.
4    Q.  Well, I'm looking at all the pictures.
5  And starting with 147, all of them are the baby
6  completely prone, completely face down, right, the
7  doll?
8    A.  Completely?  I would say they're largely.
9  Yeah, she's -- the doll is largely face down.  It's
10  impossible to put it exactly face down --
11   Q.  Right.
12   A.  -- because it's this valley design, so
13  it's always tilting one way or the other.
14   Q.  But you put the -- you put the doll in
15  these positions; right?
16   A.  Yes.
17   Q.  And you're not telling the jury that this
18  is what Z█████ definitively did?
19   A.  That's correct.  She -- we don't know
20  exactly.
21   Q.  We have -- we have no way of knowing;
22  right?
23   A.  Yeah, we don't know exactly how she was,
24  but we do know she was basically in a prone
25  position.

Page 247

1    Q.  All right.  Well, you're saying "basically
2  in a prone position," but you're not suggesting to
3  the jury that you placing the doll in the
4  Rock 'n Play is an approximation of what Z█████ did;
5  right?
6    A.  This is an illustration --
7        MR. OSBORNE:  Form.
8        THE WITNESS:  This is an illustration
9  of what could happen.  And something
10  similar to this happened.  But these
11  are -- I did not try to place her exactly
12  how she was found or -- you know, I mean,
13  she was found in a position, but obviously
14  she was moving before that.  Right?
15       So we don't have any information on
16  that except that she got turned over onto
17  her face.  So this is just an illustration
18  of what could happen in this kind of a
19  device, but I'm not saying this is what
20  she did do.
21  BY MS. LOVETT:
22   Q.  Okay.  I want to -- I want to look at
23  Section 8.3 of your report.  This is Page 37 of
24  Exhibit 3.
25       MR. OSBORNE:  Stand by.

Page 248

1        Okay.  Go ahead.
2        MS. LOVETT:  I'm dropping papers
3  everywhere.
4  BY MS. LOVETT:
5    Q.  So if we go to Page 37 of Exhibit 3, this
6  is where we start to get into your analysis of the
7  Rock 'n Play; correct?
8    A.  Yes.
9    Q.  This is where we start to get your
10  opinions.  And so you begin by analyzing the
11  incline sleeping surface; right?
12   A.  Yes.
13   Q.  Your measurement of the Rock 'n Play
14  sleeper yielded a 27 degree incline; correct?
15   A.  Yeah.  When it's nominally flat, you know,
16  it can rock back and forth.  So when it's in its
17  nominal flat position, the back is about 27
18  degrees.
19   Q.  Were these measurements from the subject
20  Rock 'n Play or from an exemplar?
21   A.  You know, I measured them both, and they
22  were about the same.  Let me see what it says in my
23  report.
24       Well, you can see on Page 31 that I
25  measured the actual Rock 'n Play, and I -- you can

Page 249

```
 1    see I made a measurement of 27.1 degrees there.
 2    Then I did a whole series of examinations of that,
 3    measuring it many times rocking it back and forth.
 4         I think I did that with the exemplar.
 5    Basically, I didn't want to use the actual one that
 6    much because it has the stain in it.
 7         Q.  Right.  Right.
 8         A.  So I did it, showed it was 27.1, and then
 9    I did -- then I did the many tests rocking it back
10    and forth.  I did the exemplar one.
11         Q.  Okay.  So that's where you got the -- the
12    combination of those measurements is where you
13    arrived at 27 degrees; correct?
14         A.  Yeah.
15         Q.  Were you aware of the and have you
16    reviewed the American Academy of Pediatrics policy
17    statement in effect at the time of Z███s death?
18         A.  That sounds like something I would have
19    read.
20         Q.  Sure.  It's -- excuse me.
21         A.  Bless you.
22         Q.  I did not sneeze on the documents.  I'm
23    going to hand you --
24         A.  Okay.
25         Q.  -- Exhibit 12 for the record.
```

Page 250

```
 1              MR. HERMAN:  13.
 2    BY MS. LOVETT:
 3         Q.  Sorry.  13.
 4              (Whereupon, Defendant's
 5              Exhibit 13 was marked for
 6              identification.)
 7    BY MS. LOVETT:
 8         Q.  Exhibit 13 is the 2011 American Academy of
 9    Pediatrics Policy Statement on S.I.D.S. and Other
10    Sleep-Related Deaths.  Do you see that?
11         A.  Yes.
12         Q.  And --
13         A.  And just to speed things along in my
14    recollection, isn't this a document that was cited
15    by Dr. Fuller or --
16         Q.  It was a document that was cited by you.
17         A.  Okay.
18         Q.  And I'm looking at, on Page 1033 of the
19    report, if you look at it.
20         A.  Okay.
21         Q.  You see -- if you look where it says the
22    letter E --
23         A.  Yes.
24         Q.  -- it says:
25              "Sitting devices, such as car
```

Page 251

```
 1    safety seats, strollers, swings,
 2    infant carriers, and infant slings,
 3    are not recommended for routine sleep
 4    in the hospital or at home."
 5         Correct?
 6         A.  Yes.
 7         Q.  And in 2011, we don't see incline sleepers
 8    listed here, do we?
 9         A.  No.  Because I think that, as you know,
10    there hadn't been a standard set up using that
11    terminology.  But you know, a sling would probably,
12    you know, have an incline to it, and that would be
13    a sleeper.
14         So I don't think that terminology was
15    being used in this kind of a document at that time.
16         Q.  The Rock 'n Play was on -- a sleeper was
17    on the market at that time?
18         A.  Yes, it was.
19         Q.  We see car seats, strollers, swings,
20    infant carriers, infant slings; right?
21         A.  Yes.
22         Q.  You agree with me that the angle of a car
23    seat is much steeper than 27 degrees?
24         A.  Well, you know, there's a great variety of
25    those angles.  In fact, they're adjustable --
```

Page 252

```
 1         Q.  Sure.
 2         A.  -- usually.  But I think they would
 3    generally be larger than 30 degrees.
 4         Q.  Right.  And they could be as high as 45
 5    degrees; true?
 6         A.  That sounds about right to me.  I haven't
 7    reviewed that --
 8              MR. OSBORNE:  Form.
 9              THE WITNESS:  -- standard in a while.
10    But it -- that would be a good estimate,
11    of a little more than 30, but not 60.  The
12    kid would fall forward all the time.
13    BY MS. LOVETT:
14         Q.  You -- nothing in this statement talks
15    about roll-over risk; correct?
16              (Whereupon, the document was
17              reviewed by the witness.)
18              MR. OSBORNE:  Excuse me.  While he's
19    reading that, what statement are you
20    referring to?
21              MS. LOVETT:  The statement of the
22    American Academy of Pediatrics that is
23    Exhibit 13.
24              MR. OSBORNE:  All right.  It's not up
25    on my list yet.  Stand by.
```

1          All right.  I refreshed once and it
2     didn't come up, but it's here now.
3          (Whereupon, the document was
4     reviewed by the witness.)
5          THE WITNESS:  Okay.  I've reviewed E.
6     BY MS. LOVETT:
7          Q.  Yes.
8          A.  Can you repeat your question?
9          Q.  Yeah.  The question was that E doesn't
10    mention any sort of roll-over risk; correct?
11         A.  Well, I think there's two places that it
12    might.  For example, it says they might assume
13    positions that can create a risk of suffocation.
14    That's clearly a roll-over into the prone position.
15    They may not have used those words --
16         Q.  All right.
17         A.  -- but that's a description that
18    corresponds to that.
19            They're also citing to 19 through 23 and,
20    in fact, 25 through 29.  And there -- those
21    citations may for all I know talk about roll-over.
22    I don't know.  I didn't review all those.
23         Q.  Well, that's what I was going ask.  That's
24    my, actually, my next question.  Because you cite
25    to all of these A.A.P. sources for the statement in

1     Footnote 9 of your report, but you said for all I
2     know they could say it.
3            So you didn't review all of the studies in
4     the A.A.P. statement; right?
5          A.  Not all of them.  Let me take a, just a
6     real quick look.  I don't want to waste your time.
7          Q.  Sure.
8            (Whereupon, the document was
9     reviewed by the witness.)
10           THE WITNESS:  I definitely didn't
11    review it in the sense that I relied on
12    it.  I actually may have seen those papers
13    before at some point in my life.  But I'm
14    not citing to there's some piece of
15    evidence in there.
16    BY MS. LOVETT:
17         Q.  All right.  Do you know if any of them
18    analyzed an incline sleeper?
19         A.  I don't know that right now.
20         Q.  Okay.  In Paragraph 99 of your report, you
21    say that, once an infant is rolled over into a
22    prone position, the incline surface poses a
23    hazardous condition; right?
24         A.  Yes.
25         Q.  You then say, you go on to say you

1     witnessed this helpless condition for two of three
2     infants you placed in the Rock 'n Play; right?
3          A.  Yes.
4          Q.  But to be clear, they were placed prone in
5     the Rock 'n Play; right?
6          A.  That's certainly true for one of them.  As
7     we talked about, the girl, Palmer, I placed her on
8     her side and she had worked herself into that
9     position prone.
10         Q.  Right.  But none of the infants rolled
11    from supine to prone or from back to belly
12    independently and achieved that position in your
13    observation of live infants; right?
14         A.  Right.  That's correct.  I didn't observe
15    them for that long of a period for them to be able
16    to do that.
17         Q.  Further down in your report, Paragraph
18    100, you talk about the Mannen report.  And this
19    is -- Exhibit 14 will be the 2019 C.P.S.C.
20    commissioned Mannen report.  A copy for you.
21         (Whereupon, Defendant's
22         Exhibit 14 was marked for
23         identification.)
24         MR. OSBORNE:  Are we going to it now?
25    Should I leave Exhibit 3 behind?

1          MS. LOVETT:  I'm going to be
2     toggling, John.  So I wish you could see,
3     I mean, just my work space right now.  But
4     I'm toggling back and forth between his
5     report and his finding -- his findings
6     related to the Mannen report, as you'd
7     probably expect I'd do.
8          MR. OSBORNE:  Thank you.
9     BY MS. LOVETT:
10         Q.  All right.  Have you reviewed the Mannen
11    report and relied on it in forming your opinions?
12         A.  I definitely reviewed it.  Did I rely on
13    it?  I think that's a different question.  I don't
14    really think I relied on it except that I cited to
15    it saying it's complementary to my analysis.  But
16    I'm not pointing my finger and saying I needed them
17    to do this --
18         Q.  Right.
19         A.  -- to arrive at my opinions.
20         Q.  Right.  That's a fair point.  This is
21    the -- this is a report that was actually
22    commissioned by the Consumer Product Safety
23    Commission; right?
24         A.  That's my understanding.
25         Q.  I understand that Dr. Mannen has other

1    work published in peer review journals on this
2    topic, but this specific study and conclusions that
3    you're citing to here was not published; right?
4        A.  I mean, in a sense -- it was published in
5    the sense that you can go on-line and get it.  It's
6    publicly available.
7        Q.  Right.  I'm talking about --
8        A.  But do you mean it -- was it peer --
9        Q.  Peer reviewed.
10       A.  -- reviewed and go?  Not that I'm aware,
11   but some parts of it were.  The Wang paper, you
12   know, has some of this material in it.
13       Q.  Some of the things that she cited to, but
14   this report actually to your knowledge has not been
15   peer reviewed; right?
16       A.  The entirety of this review -- report as
17   far as I know has not been re -- peer reviewed and
18   published.
19       Q.  All right.  And Dr. Mannen did not
20   evaluate infant behavior in incline sleepers while
21   restrained; right?
22           MR. OSBORNE:  Form.
23           THE WITNESS:  That, I'm not sure of
24       without reviewing all of this.  If you
25       want to point me to the paragraph --

1    BY MS. LOVETT:
2        Q.  Sure.
3        A.  -- says we didn't do it, I'll agree with
4    you.
5        Q.  Let's do that.  Let's look at Para -- look
6    at Page 3.
7        A.  Okay.
8        Q.  Dr. Mannen states:
9            "Parents are advised to always use
10       restraints in the products and to
11       discontinue use once an infant has the
12       ability to roll over."
13           Do you see that?
14       A.  No.  Could you tell me --
15       Q.  Yes.
16       A.  -- kind of --
17       Q.  It's on Page 3.  I can --
18       A.  Yep.
19       Q.  I'm going to have to give you a directive.
20       A.  There's a big paragraph at the top.  Is it
21   in that one?
22       Q.  Hang on.  I'm just starting -- this is
23   where the guys start shaking their heads.
24           If you look at -- in the portion about
25   Background, now, it says -- it's about -- there's

1    one line that starts with "30 degree incline"?
2        A.  Okay.
3        Q.  Do you see that?  And right after that, it
4    says:
5            [As read]  "Parents are advised to
6        always use the restraints in the
7        products and to discontinue use once
8        an infant has rolled over."
9            Right?
10       A.  "Has the ability to roll over," yes, I see
11   that.
12       Q.  Okay.  If we go back to Page 38 and 39 of
13   your report and Paragraph 100, you cite to
14   Dr. Mannen's statement that, quote:
15           [As read]  "If an infant rolls
16       over within an inclined sleep product,
17       the product design of limited
18       horizontal space and a non-rigid
19       concave surface makes rolling prone to
20       supine difficult or impossible."
21           Right?
22       A.  Yes.  That's -- I'm just quoting from Page
23   47 of this report.
24       Q.  Right.  And the same principle should
25   apply for supine to prone rolling; correct?

1            MR. OSBORNE:  Form.
2            THE WITNESS:  No.
3    BY MS. LOVETT:
4        Q.  Why not?
5        A.  Well, when the baby is supine, or let's
6    just say --
7        Q.  On her belly?
8        A.  -- on her back.
9        Q.  On the back, sorry.
10       A.  On her back.
11       Q.  On her back.
12       A.  When the baby's on the back, they're in a
13   biomechanically different position, and their
14   natural motion of pushing with their feet like
15   they -- like the motions they would use for walking
16   or standing, which is already being developed at
17   that age, they're pushing off forming a walking or
18   even a crawling motion, their feet are pushing
19   against the foot blocker.  And they're relatively
20   strong in that position, so they can push off and
21   they can generate forces and torques.
22           When they're on their belly, when they're
23   face down, the biomechanics of a baby would then
24   have them bend at the knee, and the legs would be
25   up in the air.  So if they do this kicking motion,

Page 261

1   they're just kicking in air and they're not
2   generating any significant forces or torques.
3       So just looking at the lower body force
4   generation of an infant, it's much more efficient
5   for them to generate rolling torques when they're
6   on their back than when they're on their stomach.
7       Q.  Well, where Dr. Mannen -- and we're
8   talking about sort of a limited horizontal space in
9   the sense that, unlike a flat crib or a crib
10  without with walls, the baby would not have as much
11  horizontal space to maneuver because of the high
12  walls; right?
13      A.  I think that's what she's referring to
14  here --
15      Q.  And then a --
16      A.  -- yes.
17      Q.  -- non-rigid concave surface would be
18  that, those walls; right?
19      A.  Yeah.  It's really the walls.  You know,
20  the two walls are about 50 degrees, but they come
21  down and the angle starts changing and it really
22  creates, like, sort of a parabola or a valley, as
23  I've described it.
24      And that's what she's pointing to there
25  is, when the baby's face down in that, it's very

Page 262

1   hard to turn out of that hammock-like -- they're
2   basically in a hammock configuration.  And when
3   you're on your belly in a hammock, it's just very
4   hard to turn over back on your back.
5       Q.  Let's look at Paragraph 102 where you're
6   discussing the seat bight.  And here you say:
7       "Using repeated leg motions, the
8    infant can make incremental rotations
9    to achieve a supine to prone roll."
10      Again, you've not witnessed any infant
11  display this behavior; right?
12      A.  No, I did see that behavior.
13      Q.  What is your basis for the opinion?
14      A.  I saw that in the Exponent videos.  And I
15  also saw it on the test that I did when the baby
16  started from a side position.
17      Q.  All right.  So we're talking here about a
18  supine to prone roll started on -- starting in the
19  back.  Where did you see in the Exponent data, and
20  did you cite in your report to any of the Exponent
21  data specifically, that references an infant
22  rolling from supine to prone while being placed
23  fully supine?
24      A.  Yes.  I mean, that -- remember, the third
25  video that Exponent gave to us are the cases where

Page 263

1   the babies were able to do that.  Right?  They
2   broke their baby results down into not being able
3   to roll --
4       Q.  Right.
5       A.  -- being able to roll partially and then
6   rolling all the way over.
7       So that's the characterization of it on
8   videos is that they put babies in here, and they
9   were able to tempt them with the toy to get them to
10  roll over, and it's in those videos.
11      Q.  And your -- and your contention is that
12  the videos, in the third set of the Exponent videos
13  show the babies using repeated leg motions to make
14  incremental rotations to achieve a supine to prone
15  roll?
16      A.  Yeah.  I mean, they were wiggling all
17  around.  But they were doing other things.  It
18  wasn't just their legs --
19      Q.  Now you sound --
20      A.  -- that that's --
21      Q.  -- like me, wiggling all around.
22      A.  Right.
23      Q.  I'm talking about, I'm trying to use
24  your --
25      A.  Yeah.

Page 264

1       Q.  -- your very precise --
2       A.  Sure.
3       Q.  -- engineering language:
4       "Using repeated leg motions, the
5    infant can make incremental rotations
6    to achieve a supine to prone roll."
7       Is it -- are you telling the jury that you
8   see that in the Exponent video you described?
9       A.  Yes.  I see the babies pushing with their
10  legs multiple times and rolling over.  Now, that's
11  not the only thing that they're doing.  I didn't
12  mean to say that, that they just sit there and
13  don't use their arms or they don't use their head.
14      But that's certainly part of what the baby
15  is doing.  They're kicking their legs and pushing
16  off and -- no baby just magically jumped onto their
17  face in those videos.  Right?
18      Q.  Right.
19      A.  They squirmed.
20      Q.  Right.  It takes more than the leg
21  motions; right?
22      A.  Yeah.  It's -- that's -- but that's part
23  of it.  That's what I'm trying to point out here is
24  that they're able to use their legs to create these
25  torques.  And I just use "torques" to make it clear

Page 265

1    that they're -- it's a rotational motion they're
2    doing, so you need torques for that.
3        So they generate these leg motions and
4    their little bits of torque, and they keep inching
5    over.  They're moving their arms and legs and head
6    and all that kind of stuff, and that's how they get
7    turned over.
8        Q.  All right.  On Paragraph 104 of your
9    report, you agree that the walls do act to impede
10   rolling; correct?
11       A.  Again, we talked about this actually
12   before.  And I think that in some cases, yes, they
13   definitely impede it.  But again, we talked about
14   how they can reach over and grab the wall.
15       Q.  Right.
16       A.  And we saw that's in the videos, too.
17       Q.  Yes.
18       A.  But if they're not doing that, then yeah,
19   as they turn to roll, there seems to a force coming
20   from the side that's kind of keeping them from
21   rolling over.  So in those cases, I agree the side
22   walls are impeding some rolling.
23       Q.  Yeah.  And you certainly agree that, if
24   the restraint is used as instructed, then none of
25   this is an issue; right?

Page 266

1        A.  No, I don't agree with that.
2        MR. OSBORNE:  Form.
3    BY MS. LOVETT:
4        Q.  Well, you, I believe you -- we talked
5    about this at length.  But if the baby is using the
6    restraint as instructed and is in -- and you said
7    this early in the deposition, the baby's not going
8    anywhere; right?
9        A.  No, I didn't use --
10       MR. OSBORNE:  Form.
11       THE WITNESS:  -- that term.  I was
12   pretty careful about this.  If the baby is
13   cinched down really tight, then clearly
14   they can't go anywhere.  You're strapping
15   them down.  You're gluing them down.
16   BY MS. LOVETT:
17       Q.  Yeah, I'm reading your testimony from Page
18   81 of the --
19       MR. OSBORNE:  Form.
20   BY MS. LOVETT:
21       Q.  -- rough draft.
22       MS. LOVETT:  Excuse me.  I'm just
23   talking.
24   BY MS. LOVETT:
25       Q.  I'm reading your testimony from Page 81 of

Page 267

1    the rough draft at Line 23 from this morning:
2        "But my testimony is that, if you
3        cinch it down hard enough, they're
4        obviously not going to get away."
5        And that was what you said this morning.
6        A.  That's right.  If you cinch them down
7    really tight --
8        MR. OSBORNE:  Form.
9        THE WITNESS:  -- they won't get away.
10   But that's not how that's intended to be
11   used, and that's not how a lot of people
12   do use them.
13       So we have plenty of reports that
14   said we restrained our child with the
15   restraint and they worked out of it.
16   BY MS. LOVETT:
17       Q.  Well, you said it's not how it's intended
18   to be used.  Are you purporting to say how
19   Fisher-Price intended their product to be used, not
20   to be using the restraint securely?
21       A.  The intended use of this, as I said --
22       MR. OSBORNE:  Form.
23       THE WITNESS:  -- I think very
24   clearly, is for overnight sleep.
25       Now, there may be a desire from

Page 268

1    Fisher-Price that people use the restraint
2    all the time, and I respect that and I
3    agree that they've said that.
4        But the intended use is certainly not
5    to restrain your child so much that it
6    makes them uncomfortable, they can't
7    breathe properly, and it would make them
8    squirm even more.
9        So that's clearly not their intent of
10   the restraint to be cinched down really
11   tightly.
12   BY MS. LOVETT:
13       Q.  Well, okay.  That -- but -- and your --
14   that's your word.  What you saw clearly on the
15   warning label was "always use the restraint."
16   Right?
17       A.  Yes.  That's what the re -- that's what
18   the warning label says, "always use the restraint."
19   How exactly we should use it is not clear in the
20   instructions.
21       Q.  Well, and Mr. Olson, I don't know if you
22   recall his deposition testimony, he has quite the
23   engineering background himself, he testified that
24   he had gone on-line, looked at all the instructions
25   for use and had benchmarked Z███'s development to

Page 269

```
 1    not only the Rock 'n Play but other devices that
 2    she used.
 3           So you would agree with me that someone
 4    like you or your wife or someone like Mr. Olson
 5    who's coming at this from an engineering
 6    perspective may take a look at the instructions,
 7    but generally the restraints are intuitive, you
 8    know.
 9           Have you ever had to look at --
10           MR. OSBORNE: Form.
11    BY MS. LOVETT:
12       Q. -- the manual to know how to put, for
13    example, Oliver in the car seat?
14           MR. OSBORNE: Form.
15           THE WITNESS: I did not look at the
16       manual. I think my wife did. My wife
17       instructed me on how to do that one.
18    BY MS. LOVETT:
19       Q. Right.
20       A. But I know, when you put straps on, you
21    normally have to adjust them. The babies are
22    vastly different size.
23       Q. Right.
24       A. And so there's some adjustment there, and
25    it's not clear how a user should adjust that so the
```

Page 270

```
 1    baby can't get out of that.
 2           And I think it's perfectly reasonable that
 3    parents are going to put this restraint on their
 4    baby and leave it kind of loose, because they want
 5    the baby to be comfortable. And in those
 6    situations, it's very clear that the baby can work
 7    their -- themselves out of the restraint.
 8       Q. Just nothing you've seen on any video or
 9    in any live observation?
10       A. No. I don't think anyone has video --
11           MR. OSBORNE: Form.
12           THE WITNESS: I don't think anyone
13       has done a test and videotaped that.
14       Clearly it's happened, though. We have a
15       lot of incident reports that parents are
16       saying that's what happened.
17    BY MS. LOVETT:
18       Q. Yes. And there are no photographs or --
19    you're relying on reports that are made by parents
20    in different situations but not with observation;
21    correct?
22       A. That's right. I'm relying on those
23    parental reports, as Ms. Drago instructed me that I
24    should. I mean, those are important pieces of
25    information that are very useful in assessing the
```

Page 271

```
 1    hazards of a product.
 2       Q. In your report where you talk about
 3    breathability, you spend some time discussing that
 4    and we've talked about that. The investigative
 5    records and the re-enactment photos show that
 6    Z█████s face was not obstructed by the Rock 'n Play
 7    fabric; correct?
 8       A. That's not my interpretation.
 9           MR. OSBORNE: Form.
10           MS. LOVETT: Let's get the
11       re-enactment photos, please.
12           MR. OSBORNE: Are we going to a new
13       exhibit?
14           MS. LOVETT: We are. This is going
15       to be Exhibit 14 --
16           THE REPORTER: 15.
17           MS. LOVETT: 15. Sorry.
18           MR. OSBORNE: Stand by. One moment.
19                (Whereupon, Defendant's
20                Exhibit 15 was marked for
21                identification.)
22           THE WITNESS: I don't know what this
23       is.
24           MS. LOVETT: Oh, you know what that
25       is? That's -- I think that got printed
```

Page 272

```
 1    out and -- I'll take that. I don't know
 2    what it is, but I'm sure it's highly
 3    privileged.
 4           It's a totally different case.
 5    Sorry.
 6           THE WITNESS: Yes.
 7           MR. OSBORNE: I have it open.
 8    BY MS. LOVETT:
 9       Q. All right. So Exhibit --
10           MR. OSBORNE: Exhibit 15.
11    BY MS. LOVETT:
12       Q. -- 15, these are the re-enactment photos
13    from the medical examiner's office in Maricopa
14    County of Z████. Have you -- have you seen this
15    before, this file, reviewed it?
16       A. I think a -- you know, I've seen a lot of
17    these photos. I've seen something very similar to
18    them. I think I've seen these.
19       Q. Okay. You understand that this is how --
20    Mr. Olson was asked several times to show how Z███
21    was placed and then how Z███ was found; correct?
22       A. I don't know that he was asked several
23    times. I know he was asked to do it.
24       Q. And did you use these re-enactment photos
25    to form a basis of your opinion?
```

Page 273

```
 1        A.  Yeah, I mean, I considered them.  I
 2   don't -- you know, you value stuff differently.  I
 3   mean, clearly this is showing that Z███ was found
 4   in a prone position.  There's no indication here
 5   this some sort of accurate representation of her
 6   arms and legs and exactly where her face was.
 7        I mean, her arms are shown under her body.
 8   So that would show that maybe she was entrapped by
 9   her arms if that's accurate.
10        But I'm not sure that this is that
11   accurate.  I mean, you're asking parents who just
12   lost their child to do this.  They're not going to
13   do an accurate job of this.  They're going to give
14   you a relative representation --
15        Q.  Sure.
16        A.  -- of what happened.
17        Q.  Sure.  And you see --
18        THE VIDEOGRAPHER:  The paper.
19        MS. LOVETT:  I'm sorry.  In my work
20   space here.
21   BY MS. LOVETT:
22        Q.  If you look at Exhibit 15 and look with me
23   at the -- if you -- the page numbered 357, this is
24   a, for reasons I'm sure you can understand, this is
25   a doll that doesn't even have really human
```

Page 274

```
 1   features, because you're dealing with the very
 2   distraught parent.
 3        And so you can see that there are
 4   eyelashes basically there to indicate the face of
 5   the doll that were sort of drawn on.  Do you see
 6   that?
 7        A.  Yes.
 8        Q.  And so on Page 357, you can see that the
 9   eyelashes are facing up, and the placard above that
10   says "placed."  So that indicates how Mr. -- and
11   when it was the freshest in his memory, although
12   certainly traumatic, Mr. Olson says that he placed
13   Z███.
14        Do you see that?
15        A.  Yes.
16        Q.  And then if you go with me to --
17        MR. OSBORNE:  Form.
18   BY MS. LOVETT:
19        Q.  If you go with me to Page 361 where it
20   shows how Z███ was found, you can see that -- you
21   can see the eyelashes, so her face is turned to the
22   side, and her arm, her left arm is underneath her.
23        Do you see that?
24        A.  I mean, the -- I don't want to call this
25   Z███, so I'm not going to say "her."
```

Page 275

```
 1        Q.  I'm sorry.  I'm sorry.
 2        A.  The mannequin.
 3        Q.  The mannequin, the doll.
 4        A.  This mannequin, yeah, has -- the left arm
 5   is completely obscured, and the right one is kind
 6   of tucked under a little bit.  The legs are kind of
 7   extended.  It looks like they're indicating she had
 8   pushed up, you know, up the incline like we know
 9   that children do, or babies do when they escape
10   these restraints.
11        And then the head is just turned in some
12   weird way.  I mean --
13        Q.  Well, it --
14        A.  -- it's hard for me to tell what's going
15   on there.  I kind of see the ear coming out the
16   side.
17        Q.  Right.  And if you look at the -- if you
18   look at Page 362, which is the last page, it's a
19   little more of a close-up, you can see the ear and
20   you can see the eyelash.
21        So her face is turned to the side; right?
22        A.  Yeah.  I mean, turned to the side right
23   into that 50 degree side wall.
24        Also we need to, you know, point out here
25   for clarity, this isn't the same Rock 'n Play
```

Page 276

```
 1   sleeper.  It has different soft goods.  It looks to
 2   be substantially different in terms of how the soft
 3   goods would conform to the face.
 4        Q.  So this is a diff -- this is a different
 5   sleeper that the -- that the Olsons had in the
 6   home.  It's another Rock 'n Play.  For reasons I'm
 7   sure that you understand, it was preferable to use
 8   this sleeper for Mr. Olson's re-enactment.
 9        But you can see here -- you did not test
10   the impact of breathability in the Rock 'n Play for
11   an infant that was -- had her face turned to the
12   side like this as displayed in the "found" placard
13   on Page 362 of Exhibit 15, did you?
14        A.  That was a long question.  Could you
15   repeat that?
16        Q.  Sure.
17        A.  There was a lot going on there.
18        Q.  When testing for the impact of
19   breathability in the Rock 'n Play in your report,
20   you did not test for an infant found in this
21   position in Exhibit 15 at Page 362 with her face
22   turned to the side?
23        A.  Well, I tested, you know, breathing.  As
24   you know, I placed my face into this Rock 'n Play
25   sleeper at about the middle and breathed through
```

Page 277

1  it.
2        This one has the mannequin turned in some
3  sort of unnatural, you know, way to the right. I
4  don't think I could even turn my neck that much.
5  So no, I didn't replicate this exact position.
6        And also I don't have these particular
7  soft goods. This has, like, a monkey in there
8  that, if I had to guess, was a little bit more
9  breathable than --
10       Q. You're guessing?
11       A. Yeah. I'm guessing just based on my
12 knowledge of fabrics is that when you -- this
13 fabric would be a little bit more plush. But yeah,
14 I'm not -- I didn't -- I don't have this
15 Rock 'n Play.
16       Q. Right.
17       A. And I couldn't contort my neck like that
18 and make a breathability test. So I did not do
19 that.
20       Q. All right. Let's talk about rebreathing.
21 You're discussing the potential for rebreathing
22 while prone in the Rock 'n Play in your report. I
23 think that's in Paragraph 118. You also mention it
24 in Paragraphs 182 and 183. I'm not suggesting --
25 I'm just, I'm orienting you. You don't have to go

Page 278

1  to any of those.
2        So you agree with me that, for a
3  rebreathing event to occur, what we call
4  rebreathing, there has to be an interstitial space
5  that traps expired air, and the space itself has to
6  have restricted air flow?
7        A. Yep. That sounds about right.
8        Q. So for example, an example we all could
9  understand as lay people is like breathing into a
10 paper bag?
11       A. Yes. Or breathing into a paper bag that
12 has holes in it, but still it's still restricted
13 air. You can't get fresh air in.
14       Q. You can't get fresh air, so you're
15 rebreathing expired air. And that inter -- that
16 interstitial space is unable to be replenished with
17 fresh air and, instead, you're getting $CO_2$; right?
18       A. Yes. But of course, that -- there's a
19 range of that. Right? You could -- you could get
20 some fresh air. But rebreathing hinges on the fact
21 that you expired some air and you breathed at least
22 some of that back in.
23       Q. So in Paragraph 183 of the report -- your
24 report, which is at Page 68, you indicated that you
25 tested the product.

Page 279

1        Your test for rebreathing was pressing
2  your face into the fabric and trying to breathe for
3  a minute; right?
4        A. Yes. I mean, I'm doing a test very
5  similar to what the people at Fisher-Price did when
6  they tested the swatches. I just put my face into
7  it and breathed.
8        Q. Yeah. What scientific article or standard
9  is that test for rebreathing based on?
10       A. I don't think it's based on anything.
11 It's based on common sense.
12       Q. Right. So this isn't a scientific
13 standard of testing rebreathing or evaluating for
14 rebreathing; right?
15       A. No. This is the best kind of science,
16 which is based on common sense. And I'm just doing
17 what Fisher-Price did, only in a slightly different
18 way. Because instead of just breathing through a
19 swatch that they held to their face, I'm breathing
20 through it actually deployed into the product.
21 It's a great test.
22       Q. Well, let's talk about how great a test it
23 is. Because I know in -- you said in your lab that
24 you've got all kinds of cameras and all kind of
25 gadgets and all kinds of different ways to measure

Page 280

1  things.
2        You're an adult male. How tall are you?
3        A. Six foot tall.
4        Q. How much do you weigh?
5        A. Do I have to disclose that? 190.
6        Q. I think that's perfectly acceptable.
7        You are -- you agree with me that the head
8  and nasal passages of an adult male such as
9  yourself are not the same as those of an infant;
10 true?
11       A. Well, I mean, they're largely the same.
12 What do you mean by different? Different size?
13 Different strengths of breathing?
14       Q. Size? Anatomy?
15       A. Yeah. I mean, my kid has a big head, so
16 mine's a little bit bigger than his, but. My son
17 at two years old had a head as big as a lot of
18 people.
19       Q. So with all of the resources available to
20 you at the University of Georgia and your friend
21 Dr. Frakes --
22       A. Object to form.
23       Q. You don't get to do that.
24       A. Georgia Tech.
25       Q. Oh, my gosh. You can -- so oh, my gosh.

Page 281

1    I did say that. Georgia Tech. I'm from Texas.
2    You're all the same.
3        A. Yeah, that's right.
4        Q. So let me -- let me -- let me rephrase.
5        With all of the information that you have
6    available to you at Georgia Tech with your good
7    friend Dr. Frake, who is -- Frakes, who is a
8    medical -- biomedical engineer, the best test that
9    you could come up with for rebreathing was placing
10   your face in the Rock 'n Play and attempting to
11   breathe for a minute?
12       A. I'm not --
13       MR. OSBORNE: Form.
14       THE WITNESS: I'm not sure it's the
15   best test I could have came up with, but
16   it's a test that I did. And I basically
17   just looked at what Fisher-Price had done
18   and did something similar to them.
19       But I think I did it better, because
20   I'm breathing through the fabric in the
21   way that it's used in the product. So I'm
22   doing something similar to Fisher-Price,
23   but better.
24   BY MS. LOVETT:
25       Q. All right. So it's -- but that is the

Page 282

1    only test that you did for breathability?
2        A. Well, I mean, I did the test multiple
3    times. That's the only kind of test.
4        Q. That's the only kind of test that you did?
5        A. Yes.
6        Q. All right. Let's look at your analysis of
7    the restraint. I want to -- that starts at Section
8    8.3.5 of your report, which is Exhibit 3.
9        A. Do you have a page number?
10       Q. Now you're going to test me. Because I
11   just threw it on the floor for about the tenth
12   time. Section 8.3.5.
13       A. Okay.
14       Q. I will try to find the page number for
15   you.
16       A. 8.3.5.
17       MR. OSBORNE: I've got it close on
18   37, so --
19       MS. LOVETT: 36?
20       MR. OSBORNE: -- getting close.
21       MS. LOVETT: 46.
22       MR. OSBORNE: I should -- there you
23   go.
24       THE WITNESS: Okay. I've got it.
25   BY MS. LOVETT:

Page 283

1        Q. All right. So you start out by saying
2    here:
3            "Belt restraints are not generally
4        considered safe for use in overnight
5        sleepers because the infant can become
6        entangled in the belts."
7        What's your basis for the statement that
8    "belt restraints are not generally considered
9    safe"? Because I didn't see a citation here?
10       A. Okay. Yeah. That's just, that's general
11   knowledge. I didn't put a citation there. But I
12   think this is probably specifically pointed out in
13   the standards for certain bassinets and certain
14   cribs.
15       Q. Probably?
16       A. Yeah. Probably. I mean, I don't -- I'm
17   not going to be able to pull that for you right
18   now. But you wouldn't have belts where babies were
19   sleeping because they could roll around, and then
20   the belt could get between their, you know,
21   their -- under their chin and then --
22       Q. Right.
23       A. -- they become entangled. So it's kind of
24   just common knowledge that you wouldn't have
25   entanglement hazards in a sleeping environment.

Page 284

1        Q. Entanglement wasn't an issue in this case;
2    right?
3        A. I don't think so.
4        Q. In Paragraph 122 of your report, you say:
5            "The geometric design of the
6        Rock 'n Play allows the infant to push
7        upward and out of the belt restraint."
8        What's the basis for that statement?
9        A. I measured the geometry of it --
10       Q. Okay.
11       A. -- and I observed live infants pushing
12   around. I saw many videos by Exponent, for
13   example. And then there's numerous incident
14   reports of this happening, and I think that there
15   was 30 before Z███ s death.
16       Q. Now --
17       A. Those are the 30 I focused on, but I think
18   there's ones after that as well.
19       Q. Well, again, that's not really applying to
20   Z███ s death, though, because Z███ wasn't buckled
21   in and she wasn't found buckled; right?
22       A. I, yeah, I don't think she was found --
23       MR. OSBORNE: Form.
24       THE WITNESS: -- buckled.
25       MR. OSBORNE: I didn't --

Page 285

```
 1          THE WITNESS:  Oh.  Sorry.
 2          MR. OSBORNE:  Sorry.  I didn't hear
 3     that.  I didn't hear the question.  But it
 4     sounds like you did, so go ahead.
 5          THE WITNESS:  Yeah, I don't think
 6     that she was found restrained.  There's
 7     some conflicting testimony about whether
 8     she was originally restrained.
 9     BY MS. LOVETT:
10          Q.  Right.  The -- Ms. -- you -- Mrs. Courkamp
11     testified, and I think you'd agree with me, that
12     Z___ could not have unbuckled herself from that
13     restraint; right?
14          A.  Yeah, I don't think there's any way a baby
15     can unbuckle.  But they can push out of the
16     restraint with their legs, as we talked about
17     previously.
18          Q.  Right.  But if you -- if you look at
19     the -- the issue that you're talking about with the
20     restraint was not an issue for Z___, because Z___
21     to the best of our knowledge was not restrained and
22     not entangled in the restraints; right?
23          A.  I didn't get any evidence that she was
24     entangled.  But like I said, there is this
25     possibility that she was restrained and pushed out
```

Page 286

```
 1     of it.  And I'm just pointing out here that that's
 2     clearly possible.
 3          Q.  That's possible, your -- Mrs. Courkamp
 4     says that she found Z___ unbuckled; right?
 5          A.  Maybe she did.  I don't remember it with
 6     that clarity.  I mean, I think they found her
 7     outside of the restraint.  That's what I recall.
 8          Q.  Well --
 9          A.  But as far as unbuckled, I don't know if
10     she used that terminology.
11          Q.  Is it your testimony that you said --
12     well, was it your testimony that Z___ at -- that
13     there was -- you've seen some photograph where the
14     restraint was buckled with -- and Z___ had wiggled
15     out.  In other words, after the baby was taken out,
16     they performed C.P.R.
17          Is there any evidence that there were
18     photographs taken at the scene that showed the
19     restraints buckled?
20          MR. OSBORNE:  Form.
21          THE WITNESS:  I don't recall seeing
22     such photographs.
23     BY MS. LOVETT:
24          Q.  And you would expect to see that if Z___
25     had wriggled out; correct?
```

Page 287

```
 1          MR. OSBORNE:  Form and foundation.
 2          THE WITNESS:  I'm not sure why I
 3     would expect to see that.  I mean, I think
 4     they were probably trying to, you know,
 5     save her, and that's probably the main
 6     focus.
 7          And whether they moved -- they, when
 8     they pulled her out of there, I'm sure
 9     they dis -- they moved the sleeper in some
10     fashion.
11          I mean, those are soft, flexible
12     goods.  So I guarantee that, when they
13     took her out, that the restraint wasn't
14     exactly in the same place as when they
15     found her.  This is not realistic.  It was
16     moved around to some extent.
17          But I don't remember them taking
18     photographs focusing in on that.
19     BY MS. LOVETT:
20          Q.  You're -- but you're speculating what
21     happened when the restraint was moved around and
22     all that, that's not something you have any --
23          MR. OSBORNE:  Form.
24     BY MS. LOVETT:
25          Q.  -- knowledge of; right?
```

Page 288

```
 1          A.  I don't --
 2          MR. OSBORNE:  Oops.  Sorry.
 3          THE WITNESS:  I don't think it's
 4     speculation.
 5          MR. OSBORNE:  Form.
 6          THE WITNESS:  It's just I'm saying
 7     when you pick a baby out of this, it's
 8     flexible.  There's no way that all of
 9     those soft goods would stay in the same
10     place.  It's not realistic.
11     BY MS. LOVETT:
12          Q.  But if the buckle --
13          A.  There would be some movement of the soft
14     goods.
15          Q.  Right.  I understand that.  But if the
16     buckle were buckled and the baby had wriggled out,
17     you would expect the buckle to still be buckled;
18     correct?
19          MR. OSBORNE:  Form.
20          THE WITNESS:  Yes, I would expect
21     that.
22     BY MS. LOVETT:
23          Q.  Okay.  I want to talk about Section 9 of
24     your report.  It talks about Fisher-Price's testing
25     of the Rock 'n Play.  And we're folking -- we're
```

1  focusing about -- we start with pre-release testing
2  before the product was released to the market.  And
3  I think -- I see your first critique here in
4  Paragraph 133 starting with the play lab testing.
5  And you say, quote:
6        "...the ability of an infant to
7        roll from supine to sideways to prone
8        should have been tested."
9        Do you see that?
10  A.  Yes.
11       Q.  And then you later claim that a proper
12  design would have been a test like the ones you
13  conducted.  What exactly are you referring to by
14  the tests you conducted?  Are those the pictures of
15  Nicholas and his friends?
16       A.  Can you point me to where you're referring
17  to that?
18       Q.  Sure.  Paragraph 133.  If you look at --
19  so go one, two, three, four, five -- six lines up,
20  and there's a sentence that starts with:
21       "A proper design process would
22       have certainly involved analyses and
23       tests similar to those I presented
24       above during my evaluation of the
25       Rock 'n Play sleeper in Section 8."

1        Correct?
2   A.  Yes.  That's correct.
3        Q.  And those are the pictures of Nicholas and
4  Huxley and Palmer; right?
5        A.  Well, there I'm presenting -- I mean, I'm
6  referring to Section 8 --
7        Q.  Yes.
8        A.  -- which is a big section --
9        Q.  Yes.
10       A.  -- of stuff.  So I'm referring to all of
11  that.
12       Q.  Well, and I guess I'm asking you which
13  designed -- which test design are you referring to
14  if not the interactions with the doll, you placing
15  the doll and taking the video and Huxley, Palmer
16  and Nicholas being photographed in the
17  Rock 'n Plays?  What other tests or studies did you
18  design?
19       A.  Well, I point, first of all, to analysis.
20  So as you know, I analyzed the effect of laying on
21  an incline plane.  They could have easily done
22  that.  That's within the realm of any engineer.
23       They should have -- they should have done
24  that and noted that we're putting these babies on
25  an incline and it's actually easier to roll over on

1  an incline than a flat surface.
2        They should have done rebreathing tests.
3  They should have noted that the arms babies [sic]
4  could be blocked when they're in the prone
5  position.  I actually don't even --
6        Q.  Do you know what you meant there?
7   A.  Yeah.  I'm --
8        MR. OSBORNE:  Wait.  Wait.  He hasn't
9  done.  "I actually don't," and you
10  interrupted.
11       Please --
12       THE WITNESS:  You --
13       MR. OSBORNE:  -- continue the answer.
14       THE WITNESS:  Yeah.  I mean, I'm
15  telling you that I referred to the entire
16  Section 8.  And I'm just basically -- we
17  talked about this for, like, an hour of
18  the things that are in there, so I'm
19  referring to Section 8.
20       And you said what is that, and I'm
21  just kind of refreshing your memory of all
22  the stuff that I did in Section 8.
23       I measured its geometry.  I put
24  babies in there, I measured how far they
25  had to push to get out of the belt

1  restraint.  I breathed through the fabric.
2        I mean, all of that is in Section 8
3  should have been done.  And quite frankly,
4  they should have done a lot more than
5  that.
6  BY MS. LOVETT:
7        Q.  You're -- there's another criticism here
8  in Paragraph 134.  You say:
9        "...the ramifications of infant
10       rolling should have been tested."
11       Correct?
12  A.  Yes.
13       Q.  You saw the warning label.  Fisher-Price
14  had already warned consumers to always place the
15  infant on his or her back; correct?
16       A.  Yes.
17       Q.  And Fisher-Price had already warned
18  consumers to always use the restraint; correct?
19       A.  Yes.
20       Q.  You're not suggesting that Fisher-Price
21  should have put infants in a prone position in the
22  Rock 'n Play in testing of live infants, are you?
23       A.  They should certainly have done that.
24       Q.  And you say that the -- you're suggesting
25  that Fisher-Price should have placed infants in a

1   prone position and then evaluated the ability of
2   the infant to turn over; that's your testimony?
3       A.  Yes.
4           MS. LOVETT:  Can we take a quick
5   break?  Because I just need to walk around
6   for a second.  My leg fell asleep.
7           MR. OSBORNE:  We need to take five
8   minutes --
9           MS. LOVETT:  Oh, yeah, five.  Just
10  five.  I've got to --
11          MR. OSBORNE:  -- or less?
12          MS. LOVETT:  I'm just trying to
13  flex -- my foot's fallen asleep.  It's
14  distracting me.  So.
15          THE VIDEOGRAPHER:  The time is 3:01
16  p.m.  We are off video record.
17          (Whereupon, a discussion ensued
18  off the record.)
19          (Whereupon, there was a brief
20  recess.)
21          THE VIDEOGRAPHER:  The time is 3:07
22  p.m.  We are back on video record.
23  BY MS. LOVETT:
24      Q.  Doctor, if you'd find with me Section 9.2
25  of your report.  Discusses -- this discusses

1   Fisher-Price's post-release testing; right?
2       A.  Yes.
3       Q.  And you first discuss case history report
4   data you've been referring to, which is in
5   Paragraph 144, which in your opinion reflects what
6   you call real world usage of the Rock 'n Play;
7   right?
8       A.  Yes.  Those case histories, you know, are
9   reports coming from users of this using it as a --
10  you know, it's naturally used in the real world.
11      Q.  Yes.  The reports do not really provide a
12  full picture, though, do they?
13          MR. OSBORNE:  Form.
14          THE WITNESS:  Yeah, I mean, of course
15  those reports are various lengths of a
16  couple of sentences to a couple of pages.
17  I don't think that any kind of reports --
18  BY MS. LOVETT:
19      Q.  Okay.
20      A.  -- like that could give a full picture,
21  but they give a good picture.
22      Q.  Well, as an example, most don't discuss
23  the age of the infants, do they?
24      A.  I think most of them do.  I know that some
25  of them don't.

1       Q.  Most don't note whether the infant was
2   restrained, although some do?
3       A.  Yes.  That's right.  There's
4   inconsistent --
5           MR. OSBORNE:  Form.
6           THE WITNESS:  -- reporting on whether
7   or not it was restrained.  I think I
8   picked out a lot of cases where there was
9   definitive use of the restraint.
10  BY MS. LOVETT:
11      Q.  Some of the reports involve products by
12  other manufacturers which end up erroneously being
13  involved -- identified as Fisher-Price products;
14  right?
15      A.  That, actually, I'm not sure of.
16      Q.  Okay.
17      A.  Yeah.
18      Q.  You certainly would agree with me that,
19  given the variability among the reports, a prudent
20  manufacturer should vet this data before relying on
21  or discarding any of it?
22      A.  That's correct.
23          MR. OSBORNE:  Form.
24  BY MS. LOVETT:
25      Q.  So I want to look at your critique of the

1   Exponent testing, which you'll find at Page 60 of
2   your report.  You believe that the testing is
3   flawed.  And I'd like to look at the video that you
4   claim shows the flaws.  This will be Exhibit 16.
5   It is Bates stamp COU 23498.
6           (Whereupon, Defendant's
7   Exhibit 16 was marked for
8   identification.)
9           MS. LOVETT:  John, that has been
10  shared with you.
11          MR. HERMAN:  Do the same thing, just
12  press "play."
13  BY MS. LOVETT:
14      Q.  And Doc, I'm going to -- you can -- you
15  can -- I want to watch it with you so that we can
16  talk about it afterward.
17          (Whereupon, the video recording
18  was reviewed by the witness.)
19          MR. HERMAN:  It's pretty long,
20  though.
21          MS. LOVETT:  Yeah.  I -- how long is
22  this one?
23          MR. HERMAN:  I think in total it's
24  around an hour.
25          MS. LOVETT:  Yeah.  I'm not going to

Page 297

1    watch it the whole hour.
2    BY MS. LOVETT:
3        Q. But this video is the -- you're critical
4    of this video. And I want to walk through the
5    criticisms, and then we can discuss it. So why
6    don't you press "pause."
7        Have you watched this video in its
8    entirety?
9        A. Yes.
10       Q. Your first criticism is that the toy was
11   not lowered enough. And we can see in the video a
12   toy being sort of used to entice the baby. Your
13   first criticism is that the toy was not low enough
14   when the infant was in the Rock 'n Play to motivate
15   a full roll-over; is that right?
16       A. Yes. You can see here in this video that
17   we're seeing, the toy is brought all the way down
18   to the horizontal. So to keep it focused on it,
19   the baby has to turn essentially all the way over,
20   all the way onto the side.
21       Q. Right.
22       A. And that wasn't done in the Rock 'n Play.
23       Q. Now, if it -- if you bring it down too
24   low, it's outside the baby's field of vision,
25   though; right?

Page 298

1        A. That's right. You only bring it down to
2    about 40 degrees, and then the baby can't really
3    see it anymore.
4        Q. Okay. We're going to move to time stamp
5    11:30.
6            MS. LOVETT: So John, that's where
7    we're going is 11:30.
8            MR. OSBORNE: Okay.
9            THE WITNESS: I don't know how to
10   click and drag this one over to 11:30.
11   BY MS. LOVETT:
12       Q. That's okay.
13       A. Usually you can click and forward --
14       Q. Mr. Herman can help you.
15       A. Okay. I got it going now.
16       Q. There you go. Okay.
17       A. Oops. Whoa. Okay. I have it, like, at
18   11 --
19           MR. OSBORNE: This is the supine to
20   prone roll; right?
21           MS. LOVETT: I don't know.
22           MR. OSBORNE: Or am I --
23           MS. LOVETT: I'm --
24           MR. OSBORNE: -- one too early?
25           THE WITNESS: That's 11:10.

Page 299

1            MR. OSBORNE: Okay.
2    BY MS. LOVETT:
3        Q. We're going to 11:30, supine to prone
4    roll. There you go. So here you're going to see
5    the infant stimulated, not restrained; right?
6        A. Correct.
7        Q. But when stimulated, the infant eventually
8    does a supine to prone roll; correct?
9        A. Yeah. I mean, that's what I would call
10   the prone. I think some of your experts are saying
11   that's not prone. But whenever they're kind of
12   face down to the fabric, I would call that prone.
13       Q. Well, you point out a time stamp, and we
14   might have to go back. It's 11:35 to 15:27, so
15   it's kind of a long stamp. But you say the
16   infant's arm is pinned down by her side, making it
17   unable for her to roll back over.
18       A. I can't get it to go the back. But yeah,
19   so at some point her arm is pinned under, and that
20   could stop her from rolling back over. I mean, you
21   can also possibly pull it out --
22       Q. Well, so when I --
23       A. -- and roll over.
24       Q. When I first looked at your report,
25   because it seemed like a long time, you say -- you

Page 300

1    say in your report in Paragraph 163, you say that
2    that condition exists from 11:35 to 15:27. But
3    actually, if you'll go to from 11:35, go to right
4    at minute 12.
5        A. Okay. I'm getting there. This is 11:40.
6        Q. Okay.
7        Q. Okay. We're coming up on 12.
8        Q. Right. There's minute 12. No arm is
9    pinned by any side there, is it, Doctor?
10       A. Not in this case, no.
11       Q. Okay. So it does not exist in the
12   condition from 11:35 to 15:27, as you say in
13   Paragraph 163 of your report, that the infant's
14   arms are pinned?
15       A. Oh, I don't think I was meaning that the
16   infant's arms were pinned the entire time. In that
17   case I'm referring to that they're in that prone
18   position for that entire time. So I'm sorry if
19   that was confusing.
20       Q. Okay. That, yeah, that did confuse me.
21       You agree that the same -- let's go to
22   time stamp ten to 10:07. Because what I -- what I
23   think we just saw was a sort of temporary arm
24   pinning. And if you go back to 10:07 in this
25   video, we're going to see infant in a crib.

Page 301

1      A. 10:07?
2         MR. OSBORNE: Do you want him to play
3      on from 10:07?
4         MS. LOVETT: Yeah, he's manipulating
5      it to 10:07, yes. And I can see it and he
6      can see it.
7         THE WITNESS: Well, I'm just going to
8      let it play on. I'm at 9:40.
9         MS. LOVETT: He's at 9:40. He's
10     going to let it -- he's going to let it...
11        THE WITNESS: But you want to start
12     talking about ten oh, what?
13     BY MS. LOVETT:
14     Q. 10:00.
15     A. Okay. We're almost there. It's at 9:40.
16     Q. All right. So here we have a 4.7-month
17     old, subject nine, in a crib, supine to prone roll.
18     And what we see is, in the crib do you see the arm
19     gets temporarily pinned there also; right?
20     A. Yes.
21     Q. And that's seven seconds there, you see
22     the baby's arm getting pinned under her in a crib.
23     A. Yes.
24     Q. Right?
25     A. That's right.

Page 302

1      Q. All right. So you agree with me, just
2      because this particular baby chose not to roll back
3      does not mean that she was incapable of doing so,
4      because she's moving around pretty good there?
5      A. Which baby?
6      Q. The baby in the -- I'm sorry. The baby in
7      the -- that first sat in the Rock 'n Play, the baby
8      who was pulling up.
9      A. Oh, yeah, that baby couldn't get out. I
10     mean, they sat there for, like, four minutes and
11     they were, like, trying to do everything they could
12     to get her to roll back and she couldn't. So they
13     had to rescue her. They had to pick her up and
14     pull her out of there.
15     Q. The babe -- they had to rescue the baby?
16     A. Yeah. I mean, the baby was breathing
17     really hard. And it looks like, you know, the
18     experimenters were getting pretty anxious. So they
19     had to -- they had to rescue her, take her out of
20     there.
21     Q. Well, going back on this, so you -- you're
22     the person that told me a little bit before the
23     break that you think Fisher-Price should have
24     tested babies in the prone position.
25     A. Yeah. That's right.

Page 303

1      Q. So just how long should they have left
2      them there struggling? How would you design that
3      study?
4      A. That's a good question. I mean, I've
5      designed a lot of studies when I have to do what's
6      called an insti -- an I.R.B., an Institutional
7      Review Board plan. And so you plan out the studies
8      and.
9      Q. I'm familiar.
10     A. You make those plans, and other people
11     review them, and you go back and forth.
12        So I don't know exactly how they should
13     have done it. I think they should have done it
14     maybe similar to the way Mannen did it, which was
15     they had oxygen monitors and they limited the
16     amount of time that they were in the prone
17     position.
18        But Mannen was able to do testing like
19     this, so certainly Fisher-Price should have been
20     able to. The exact details I think need to be
21     worked out with a team of people discussing, you
22     know, how to do this safely.
23     Q. You didn't attempt to put together any
24     protocol or tempt -- or attempt to test babies. In
25     fact, you said you only had Palmer in there for

Page 304

1      maybe 45 seconds in the prone position; right?
2      A. I don't think I testified on how long I
3      had Palmer in the prone position.
4      Q. How long --
5      A. But --
6      Q. -- was she there?
7      A. -- it was probably only a couple of
8      minutes.
9      Q. All right.
10     A. Yeah.
11     Q. And that's all you were comfortable with?
12     A. Yeah, I saw -- again, I wasn't testing for
13     her to roll back over. I wanted to see what kind
14     of motions she would make in that position,
15     how she would push off and how she would interact
16     with it. So after a couple of minutes I got a
17     good -- I got a good idea --
18     Q. Right.
19     A. -- of how babies interact with it. So I
20     wasn't trying to see if she could roll back over.
21     Q. We don't have a video of Palmer, we have
22     just a video of the doll; right?
23     A. Yeah. I mean, that video isn't -- you
24     know, that video is not even a video.
25     Q. Right.

Page 305

1    A.  It's stop action pictures that I put
2  together just to demonstrate the sequence a little
3  bit easier.
4    Q.  In Paragraph 165 you've got a list of
5  similar related infants -- similar related
6  incidents.  Were the incidents in that list
7  provided to you by counsel?
8    A.  In which paragraph?
9    Q.  165.
10    A.  Well, I mean, I have all these reports,
11  and there's hundreds of them, I guess, that were
12  turned over to me, and I reviewed some of them.
13  And we as a team, the lawyers, Kristen Schriner and
14  myself, we found this list.  She definitely gave me
15  some of them.
16    Q.  All right.  Are you aware that, in at
17  least 20 of these incident reports, the infant was
18  placed in the Rock 'n Play with a blanket or
19  additional object?
20    A.  That's not some -- I don't recall that.  I
21  didn't check for that.
22    Q.  Okay.  Do you know that many of the
23  infants in these similar incident reports were
24  swaddled?
25    A.  I know some of them were swaddled, yes.  I

Page 306

1  don't know how many.
2    Q.  Did you know that the majority of them
3  were not restrained?
4    A.  I didn't count that up --
5    MR. OSBORNE:  Form.
6    THE WITNESS:  -- but I'm aware that a
7  fair number were not restrained.  And
8  that's what I would expect.  People use
9  this without the restraints.  That's the
10  expected use.
11  BY MS. LOVETT:
12    Q.  The expected use of Fisher-Price on that
13  warning label is that people are going to ignore
14  the warning that says this can cause injury or
15  death, always use the restraints?
16    A.  Yeah.  Fisher-Price knew they wouldn't use
17  it.  Their testing proved that to them.
18    Q.  That's your interpretation of what
19  Fisher-Price knows?
20    A.  That's not an interpretation of what they
21  know.
22    MR. OSBORNE:  Form.
23    THE WITNESS:  That's exactly what
24  they know.
25  BY MS. LOVETT:

Page 307

1    Q.  And your testimony is, for example, that
2  Mike Steinwachs knowing that let nine of his
3  grandchildren sleep in this product?
4    A.  That's my understanding.  Yeah, he knew
5  that --
6    MR. OSBORNE:  Form.
7    THE WITNESS:  He knew that these
8  restraints would not be used by a large
9  number of people.  Whether or not his
10  grandparent -- his grandkids were
11  restrained, I do not know.
12  BY MS. LOVETT:
13    Q.  Let's look at your rebuttal report,
14  Exhibit 4.  When --
15    MR. OSBORNE:  Since we're kind of in
16  a transition and we're ten minutes away,
17  what, if any, proposal do you make?
18  You're just starting the rebuttal report.
19    MS. LOVETT:  Yeah, my --
20    MR. OSBORNE:  So.
21    MS. LOVETT:  I'm going to have some
22  questions.  But I mean, I'm not going to
23  be pushed on this, John.  I mean, this
24  is -- I didn't agree to waive two and a
25  half hours of deposition time with the

Page 308

1  witness.
2    MR. OSBORNE:  I appreciate that, but
3  I have a hard deadline.  So considering
4  the amount of time that remains in your --
5  in your allowed deposition, it seems
6  likely that we need to come back.
7    I'm not in favor of it, but I'm not
8  denying that you got maybe four-sevenths,
9  a little over four-sevenths of your
10  allotted time.
11    MS. LOVETT:  So well, I'm going to --
12    MR. OSBORNE:  So.
13    MS. LOVETT:  I'm going to move to a
14  different -- I'm going to move to a
15  different area.  But in order to do so, I
16  need to get some basic understandings of
17  his rebuttal report.
18    MR. OSBORNE:  All right.  Well, we
19  don't want to be rude.  And I also want to
20  indicate that, considering the time, I'm
21  open to further deposition.
22    But it needs to happen really soon.
23  Because it's not fair to -- you know,
24  it'll be more of a second bite at the
25  apple if it's too far off in time.

Page 309

1        MS. LOVETT: Right. No, I --
2        MR. OSBORNE: But go ahead.
3    BY MS. LOVETT:
4        Q. All right. So, so with the -- your
5    rebuttal report, when did you write this report?
6        A. Well, I turned it in on July 16th, so I'm
7    sure I spent the three weeks before that writing
8    it.
9        Q. Okay. In Section 3, you outline
10   additional material that was provided to you since
11   the original report; right?
12       A. Yes.
13       Q. And I see that you were provided with five
14   of the defendant's seven expert reports. Do you
15   see that? Or I count five there.
16       A. Yes.
17       Q. Are you aware of the -- Mattel and
18   Fisher-Price's expert Dr. Goldsmith?
19       A. I've heard the name.
20       Q. You've never seen Dr. Goldsmith's report?
21       A. I think I've seen it.
22       Q. All right. And do you know that
23   Dr. Goldsmith's report addressed some of the issues
24   you raised in your report regarding the A.A.P.
25   policy statement?

Page 310

1        A. I don't recall knowing that.
2        Q. Did you ask to see the report of
3    Dr. Goldsmith?
4        A. I think they gave it to me.
5        Q. Okay. Is --
6        A. So I don't think I asked. I think they
7    gave it to me.
8        Q. Okay. Do you -- but you don't list it as
9    something that was provided to you in advance of
10   your rebuttal, do you?
11       A. No. What I'm here -- I think what I'm
12   doing here is listing the stuff that I'm directly
13   rebutting in this report. That's what this -- this
14   is what I'm considering for the opinions in this
15   report.
16       Q. Okay. So you were not choosing to attempt
17   to rebut Dr. Goldsmith's conclusions in his report?
18       A. Yeah. I mean, I think I took a brief look
19   at it and didn't see anything that needed rebutting
20   I guess maybe is my answer to that.
21       Q. Were you provided the report of Dr. Gibb,
22   Mattel's epidemiologist?
23       A. I probably was provided that, but I don't
24   think I looked at that at all.
25       Q. Okay. I want to talk about your rebuttals

Page 311

1    to Dr. Rundell's report for just a second. You've
2    already talked about this. You were talking about
3    that you rather have had the audio.
4        Do you remember that?
5        A. Yes.
6        Q. Your counsel were provided with full video
7    in this case, audio and video. Were you aware of
8    that?
9        A. No. I mean, the -- some of the -- some of
10   the clips that I have actually have audio. I got a
11   big mess of different kinds of videos --
12       Q. Right.
13       A. -- and some of them did have audio. The
14   main three that I interpreted was their where they
15   had -- where they had cut the different things
16   together and made the video for what they called
17   non-rollers and medium rollers and rollers. My
18   video -- my version of that doesn't have the audio.
19       Q. Yeah, the Mannen study --
20       MR. OSBORNE: And without -- wait a
21   minute. Before we get moving on too far,
22   I'm not by my silence agreeing that we
23   have received all that material or not in
24   the, you know, scads of material we've
25   received.

Page 312

1    I'm going to be -- to shut up now and
2    let you continue, but I'm certainly not
3    agreeing to that assertion that you just
4    made.
5        MS. LOVETT: I'm representing by my
6    assertion that we did, indeed, produce
7    that to you. So I'm not being silent
8    about it.
9        MR. OSBORNE: Okay.
10       MS. LOVETT: But that --
11       MR. OSBORNE: Thank you.
12       MS. LOVETT: Since -- I just want you
13   to know that.
14   BY MS. LOVETT:
15       Q. So in Paragraph 49, you're talking about
16   the Fox, Shaffer and the Exponent data, Explico
17   data, E.S.I. data, and you criticize all of them
18   because the infant, each infant was only in there
19   for a span of roughly ten to 60 minutes; right?
20       A. I believe Paragraph 49 I'm just speaking
21   to the Fox and Shaffer --
22       Q. Okay.
23       A. -- I think. I mean, I haven't read all
24   the progress leading up to that, but I think that's
25   what...

Page 313

```
 1        Q.  But your criticism is that the -- these
 2   weren't long enough observation periods, because
 3   the child was only observed for a span of roughly
 4   ten to 60 minutes; correct?
 5        A.  Yes.  If what you're trying to prove is
 6   that -- a negative, you're trying to prove a
 7   negative, this cannot happen, then observing
 8   children or babies in these products for very short
 9   periods of time is not going to get that done.
10        Q.  Did you know that the Mannen study was
11   based on one-minute increments?
12        A.  Yes, I did.
13        Q.  Does that make the Mannen study deficient?
14        A.  No.  They were testing something
15   different.  They were testing muscle activity, and
16   they were testing oxygen content.  They weren't
17   testing, you know, the ability of the student -- of
18   the babies to roll over.  So it depends on what
19   you're testing for as how long your duration should
20   be.
21        Q.  What were you testing for?
22        A.  I was testing for the geometry, for
23   example, the angles.
24        Q.  When you had the babies in the sleepers,
25   what were you testing for?
```

Page 314

```
 1        A.  I was testing for the geometry, or the
 2   distance from the head to the head blocker, the
 3   distance from the belt to the foot blocker.  I was
 4   testing for the kinds of motions that a baby would
 5   make on their back and on their side and in the
 6   prone position.
 7        Q.  And you were testing for the ability of
 8   infants to push up and roll over; correct?
 9        A.  No.  Not really.  I was just testing for
10   what kinds of motions they would make.  I didn't --
11   I didn't try to sit there and tempt them to roll
12   over.  I'm not -- I wasn't doing that test.
13            I was seeing what kinds of forces they
14   would generate and what kind of motions they would
15   make while they were in various positions.
16        Q.  So it was okay for your studies to be 45
17   minutes or under?
18        A.  Yeah.  I'm not trying to test for a
19   negative.  I'm not trying to prove something
20   doesn't happen over a million week uses.  I'm
21   trying to evaluate what does happen when babies are
22   in these positions so you can observe them for
23   shorter periods of time.
24        Q.  You also criticize in your rebuttal report
25   Explico's use of an Owlet Smart Sock monitor.  Do
```

Page 315

```
 1   you remember that?
 2        A.  Yes, I do.
 3        Q.  You understand that Dr. Mannen used the
 4   same pulse oximeter; right?
 5        A.  I know that she used it for part of her
 6   tests.  But I think that she used a different one
 7   to collect a lot of her data.  I know a lot of
 8   people tried to use that Sock several years ago,
 9   and sometimes it works, sometimes it doesn't.
10            So I think that she tried to use it, but
11   ultimately she used a different oxygen sensor.
12   That's my understanding.
13        Q.  Are you aware that it has been recently
14   praised as an -- in peer reviewed journals as an
15   excellent pulse oximeter?
16        A.  I've read several journals that talk about
17   the use of it and how it could possibly be useful.
18   Yes, I'm aware of that.
19        Q.  You've -- we've talked about Dr. Drago and
20   your rebuttals to Dr. Drago's report.  On Page 71,
21   you discuss --
22        A.  Just to clarify, is she a doctor?
23        Q.  I'm sorry.  Mrs. -- Ms. Drago.
24        A.  Okay.
25        Q.  I know some people are picky about that.
```

Page 316

```
 1   I could go by doctor, but I don't.
 2        A.  Oh, yeah, I just didn't know --
 3        Q.  Brady does.
 4        A.  I missed that she was a medical doctor if
 5   that's what she was.
 6        Q.  No.
 7        A.  I didn't think she was.
 8        Q.  I'm sorry.  I usually just defer.
 9            Page 71 you're talking about Ms. Drago's
10   book From the Crib to Kindergarten; right?
11        A.  Yes.
12        Q.  You understand that the passage you had
13   to -- you quote there had to do with a swinging
14   cradle and not a Rock 'n Play; correct?
15        A.  Yes.  This was written before the
16   Rock 'n Play.
17        Q.  And then Section 6.2 of your rebuttal
18   talks about Ms. Drago's opinion on foreseeability
19   of parental misuse; right?
20        A.  Yes.
21        Q.  You also provide extensive criticism on
22   the foreseeability of the opinions of Mattel's
23   human factors expert, Dr. Arndt; correct?
24        A.  Yes.
25        Q.  You are not a human factors expert, are
```

Page 317

1  you, sir?
2      A. Oh, I certainly am.
3      Q. From personal observation?
4      A. What?
5      Q. From personal observation?
6      A. I don't understand what your -- is that a
7  question?
8      Q. Yes. Have you taken any classes of human
9  factors?
10     A. Human factors, not only have I taken
11 classes, I teach classes that have human factors in
12 them. I teach the material.
13     Q. In Section 6.3, Paragraph 203, have you --
14 have you ever taught any material -- any classes on
15 human factors in parents and infants?
16     A. Yes.
17     Q. Related to use of sleep products?
18     A. Yes.
19     Q. What products? What classes?
20     A. The classes that I teach that have the
21 material in there are called Rehabilitation
22 Engineering. That's a graduate course -- a
23 graduate course at Georgia Tech.
24     I also introduce that material in the
25 introductory design class I teach at Georgia Tech

Page 318

1  which is ME 2110. It has about 300 students a
2  term. And it's also in a biomedical engineering
3  course that I co-teach with Dr. Frakes.
4      So in three different courses --
5      Q. Dr. Frakes we discussed.
6      A. Yeah, in three different courses I
7  actually discuss human factors as related to
8  juvenile products, and specifically sleeping
9  products and playpens and swings.
10     Q. Look at Paragraph 2 --
11     MR. OSBORNE: Okay. At this point --
12 at this point we've reached 3:30 in the
13 afternoon. Dr. Singhose has emphasized to
14 me for a week how important it is for him
15 to leave at -- now.
16     And we'll have to go off the record
17 and probably do whatever you want to do
18 next, but the sooner the better as far as
19 any further deposition.
20     MS. LOVETT: All right. We'll do
21 that, Dr. Singhose.
22     THE VIDEOGRAPHER: Stand by.
23     The time is approximately 3:30 p.m.
24 This concludes today's videotaped
25 deposition for Dr. William Singhose. We

Page 319

1  are off video record.
2      (Whereupon, a discussion ensued
3  off the record.)
4      (Whereupon, the reading and
5  signing of the deposition by the
6  witness was reserved.)
7          - - -
8      (Witness excused.)
9          - - -
10     (Whereupon, the deposition
11 concluded at 3:30 p.m. Eastern
12 Standard Time.)
13         --oOo--
14
15
16
17
18
19
20
21
22
23
24
25

Page 320

1      VERITEXT LEGAL SOLUTIONS
2    FIRM CERTIFICATE AND DISCLOSURE
3
4      Veritext represents that the foregoing
transcript as produced by our Production
5  Coordinators, Georgia Certified Notaries, is a
true, correct and complete transcript of the
6  colloquies, questions and answers as submitted by
the certified court reporter in this case.
7
8      Veritext further represents that the
attached exhibits, if any, are a true, correct and
complete copy as submitted by the certified
9  reporter, attorneys or witness in this case;
10     And that the exhibits were handled and
produced exclusively through our Production
11 Coordinators, Georgia Certified Notaries. Copies
of notarized production certificates related to
12 this proceeding are available upon request to
litsup-ga@veritext.com.
13
14     Veritext is not taking this deposition
under any relationship that is prohibited by OCGA
15-14-37(a) and (b). Case-specific discounts are
automatically applied to all parties at such time
15 as any party receives a discount. Ancillary
services such as calendar and financial reports are
16 available to all parties upon request.
17
18
19
20
21
22
23
24
25

## Page 321

```
 1        R E P O R T E R   C E R T I F I C A T E
 2   STATE OF GEORGIA )
     COBB COUNTY     )
 3
 4        I, Debra M  Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
 5   certify:
          That prior to being examined, the witness
 6   named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
 7   nothing but the truth;
          That said deposition was taken before me
 8   at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
 9   computerized transcription under my direction and
     supervision  And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken
11        Review of the transcript was requested
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto
13        I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case
          IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 28th day of September,
     2021
17
18
19
20        <%13053,Signature%>
21        _____
          Debra M  Druzisky
          Georgia CCR-B-1848
22
23
24
25
```

## Page 322

```
 1   To:  Mr. Osborne
 2   Re:  WILLIAM E. SINGHOSE, Ph.D.
 3   Date Errata due back at our offices:  30 Days
 4
 5   Greetings:
 6
 7        This deposition has been requested for read and
     sign by the deponent.  It is the deponent's
 8   responsibility to review the transcript, noting any
     changes or corrections on the attached PDF Errata.
 9   The deponent may fill out the Errata electronically
     or print and fill out manually.
10
          Once the Errata is signed by the deponent and
11   notarized, please mail it to the offices of
     Veritext (below).
12
          When the Errata is returned to us, we will seal
13   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of
14   the Errata to all ordering parties.
15        If the signed Errata is not returned by the
     above date, the original transcript may be filed
16   with the court without the signature of the
     deponent.
17
18   Please send completed Errata to:
19   Veritext Production Facility
20   20 Mansell Court, Suite 300
21   Roswell, Georgia  30076
22   (770) 343-9696
23
24
25
```

## Page 323

```
 1   ERRATA FOR ASSIGNMENT # 4797857
 2        I, the undersigned, do hereby certify that I
     have read the transcript of my testimony, and that
 3
 4   _____ there are no changes noted; or
 5   _____ the following changes are noted:
 6
 7        Pursuant to Rule 30(7)(e) of the Federal Rules
     of Civil Procedure and/or OCGA 9-11-30(e), any
     changes in form or substance which you desire to
 8   make to your testimony shall be entered upon the
     deposition with a statement of the reasons given
 9   for making them.
10        To assist you in making any such corrections,
     please use the form below.  If additional pages are
11   necessary, please furnish same and attach hereto.
12   Page____Line____Change:_ _____
13   Reason for change:_____
14   Page____Line____Change:_ _____
15   Reason for change:_____
16   Page____Line____Change:_ _____
17   Reason for change:_____
18   Page____Line____Change:_ _____
19   Reason for change:_____
20   Page____Line____Change:_ _____
21   Reason for change:_____
22   Page____Line____Change:_ _____
23   Reason for change:_____
24   Page____Line____Change:_ _____
25   Reason for change:_____
```

## Page 324

```
 1   Page____Line____Change:____ _____
 2   Reason for change:_____
 3   Page____Line____Change:____ _____
 4   Reason for change:_____
 5   Page____Line____Change:____ _____
 6   Reason for change:_____
 7   Page____Line____Change:____ _____
 8   Reason for change:_____
 9   Page____Line____Change:____ _____
10   Reason for change:_____
11   Page____Line____Change:____ _____
12   Reason for change:_____
13   Page____Line____Change:____ _____
14   Reason for change:_____
15   Page____Line____Change:____ _____
16   Reason for change:_____
17   Page____Line____Change:____ _____
18   Reason for change:_____
19
          _____
          DEPONENT'S SIGNATURE
20
21   Sworn to and subscribed before me this _____ day of
22   _____, 2021.
23   _____
     NOTARY PUBLIC
24   My Commission Expires: _____.
25              _____ Notary Public
```

Page 325

```
 1        R E P O R T E R   D I S C L O S U R E
 2    DISTRICT COURT  )  DEPOSITION OF
      NORTHERN DISTRICT)   WILLIAM E. SINGHOSE, Ph.D.
 3    ATLANTA DIVISION )
 4         Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
 5    Judicial Council of Georgia, I make the following
      disclosure:
 6         I am a Georgia Certified Court Reporter.
      I am here as a representative of Veritext Legal
 7    Solutions.
           Veritext Legal Solutions was contacted by
 8    the offices of Greenberg Traurig to provide court
      reporting services for this deposition.  Veritext
 9    Legal Solutions will not be taking this deposition
      under any contract that is prohibited by O.C.G.A.
10    9-11-28 (c).
           Veritext Legal Solutions has no contract
11    or agreement to provide court reporting services
      with any party to the case, or any reporter or
12    reporting agency from whom a referral might have
      been made to cover the deposition.
13         Veritext Legal Solutions will charge its
      usual and customary rates to all parties in the
14    case, and a financial discount will not be given to
      any party in this litigation.
15
16              <%13053,Signature%>
17              Debra M. Druzisky
                Georgia CCR-B-1848
18
19
20
21
22
23
24
25
```

**A**

**A.A.P** 253:25
254:4 309:24
**a.m** 1:16 5:3
79:11,18
**A.S.T.M** 53:12
53:15 54:11
55:9 63:15
69:25 70:12,13
120:25 124:5
130:19 131:5
132:5,24 133:9
**ability** 11:2 83:2
151:13 199:1
215:17 258:12
259:10 289:6
293:1 313:17
314:7
**able** 11:6 33:23
38:25 41:5,21
69:12,15 97:23
119:23 162:18
165:2,3 173:10
173:11 215:15
237:12,16
255:15 263:1,2
263:5,9 264:24
283:17 303:18
303:20
**abled** 152:8
**above-caption...**
3:10,14,16
**absence** 20:7,10
35:24
**absent** 188:18
**Absolutely**
213:12
**abstract** 209:8
209:19
**Academy** 4:11
249:16 250:8
252:22
**acceptable**
280:6
**access** 87:20
242:25
**accident** 109:9
156:21 157:3,9
157:11,19
158:16,18,21

158:24 159:2
**accidental** 216:8
**accidentally**
197:14
**accidents**
156:24 157:15
157:19 158:3
158:14,22
**accompany**
244:13
**accomplish**
145:19
**accomplishme...**
201:23
**account** 9:11
28:15
**accuracy** 15:20
**accurate** 12:21
273:5,9,11,13
**accurately**
24:23
**achieve** 190:8
262:9 263:14
264:6
**achieved** 255:12
**acquainted**
74:19
**acquire** 42:15
**acquired** 16:2
21:11,17 24:7
24:25 30:16
**acquiring**
133:23
**act** 265:9
**acting** 48:23
**action** 3:10,14
3:16 197:23
305:1
**active** 145:16
223:17,17
226:14,20
**actively** 70:23
**activities** 120:23
127:18 133:22
**activity** 4:4 64:6
209:4,10
313:15
**actual** 40:18,20
45:12 94:4
248:25 249:5

**actuators** 14:12
31:2
**add** 83:17,23
**added** 169:11
170:5,13
**adding** 167:2
**addition** 93:12
145:23 168:13
**additional** 86:11
89:11 212:24
305:19 309:10
323:10
**additionally**
168:12
**additions** 85:7
**address** 6:6,7
39:6
**addressed**
309:23
**addressing**
110:20
**adjectives**
225:16
**adjust** 239:20
269:21,25
**adjustable**
251:25
**adjustment**
269:24
**admissible**
160:13
**admit** 173:14
**adopted** 169:19
**adopting** 131:12
**adorable** 172:25
173:9 174:6
204:6 225:17
**adult** 152:10,23
280:2,8
**adults** 37:14
**advance** 310:9
**advised** 188:14
258:9 259:5
**advocacy**
123:22
**advocate** 125:6
**affect** 11:2
**affirms** 17:9
**affront** 55:15
**affronted** 56:6

**afternoon**
318:13
**afterward**
296:16
**age** 37:10 42:19
66:25 67:4
127:23 149:17
162:19 222:21
260:17 294:23
**aged** 178:3
**agency** 325:12
**agenda** 59:1,3,7
59:15 60:1
63:19,22 70:18
70:19,20 71:22
125:18 128:19
128:19 133:9
**agendas** 133:8
**ages** 99:22
**ago** 21:15 41:4
48:5 50:23
53:1 54:1 58:7
102:19 113:15
138:8 142:17
157:4 241:11
241:12 315:8
**agree** 6:13 9:7
9:25 73:13
176:12 185:13
195:11,12
198:12 211:11
212:9 236:3
239:1,6 251:22
258:3 265:9,21
265:23 266:1
268:3 269:3
278:2 280:7
285:11 295:18
300:21 302:1
307:24
**agreed** 190:13
**agreeing** 311:22
312:3
**agreement** 15:3
20:3,4 30:1,7,9
30:18 47:23
325:11
**Ah** 47:11 203:23
**ahead** 10:18
89:15 128:9

160:22 161:2
179:11 206:10
207:8 208:1
235:7 248:1
285:4 309:2
**aid** 118:5
**ailments** 112:23
16:6,11
260:25 261:1
278:5,6,13,13
278:14,15,17
278:20,21
**Akey** 103:16
**al** 4:5
**alive** 108:20
**allotted** 308:10
**allow** 43:6 61:24
158:4 164:9
**allowed** 308:5
321:12
**allows** 42:25
165:7 284:6
**alluded** 228:16
**alt** 152:10
**alternate** 165:21
**alternative**
152:11
**America** 26:24
**American** 4:11
116:11 249:16
250:8 252:22
**amount** 27:2
83:19 114:15
168:11,13
199:6 219:7
303:16 308:4
**analyses** 289:22
**analysis** 4:16
72:21 95:17
154:2 185:1
214:8 248:6
256:15 282:6
290:19
**analyzed** 72:22
147:13 254:18
290:20
**analyzing**
147:12 248:10
**Anatomy**
280:14

**Ancillary**
  320:15
**and/or** 323:7
**Andrew** 5:10
**angle** 61:22
  138:1 164:20
  166:23 169:7
  196:20 205:9
  251:22 261:21
**angled** 163:21
**angles** 138:4,6
  142:3 251:25
  313:23
**annoyed** 17:7
**answer** 11:9,15
  22:20 34:15
  76:19 77:8
  122:2,5 123:8
  129:16,18
  141:2 143:18
  160:18,19
  161:4,7 183:8
  238:12 291:13
  310:20
**answered** 82:1
  217:2
**answering** 44:16
  177:12
**answers** 111:8
  320:6
**Anti-sway** 12:23
**anti-vibration**
  32:2,6
**anxious** 302:18
**anybody** 109:15
  205:20
**anymore** 8:23
  9:6 42:13
  78:16 298:3
**anytime** 79:2,5
  79:7
**apart** 114:11
**apologize** 243:6
**apparatus** 26:11
**apparent** 11:11
**apparently**
  175:23 177:16
**appear** 133:24
  167:12 168:19
**APPEARAN...**

2:1
**appeared**
  168:18
**appears** 36:20
  80:20,21 137:3
  203:20 205:9
  235:21
**appended**
  321:12
**apple** 308:25
**applicable** 142:5
  142:6
**application** 34:2
  35:16,17,25
**applications**
  35:11,13
**applied** 320:15
**apply** 120:2
  167:22 259:25
**applying** 284:19
**appreciate**
  77:16 308:2
**appropriately**
  152:2
**approved** 54:3,7
  54:8
**approximate**
  97:9
**approximately**
  5:2 76:2 97:6
  318:23
**approximation**
  110:3 247:4
**April** 89:16
  168:25 214:6
**arch** 162:23
**arching** 232:11
**arduous** 61:13
**area** 37:2 53:18
  61:18 75:2
  77:7 86:20,24
  87:4 99:21
  119:15 120:5,9
  121:9 124:2
  133:23 134:3
  134:18 135:14
  136:9 137:3
  145:14 150:23
  153:14 156:20
  157:13 308:15

**areas** 32:3 86:18
  140:23 145:23
**arguments**
  23:18
**Arizona** 1:1 2:4
**Arkansas** 4:14
**arm** 212:22
  274:22,22
  275:4 299:16
  299:19 300:8
  300:23 301:18
  301:22
**arms** 38:19
  162:14,15,23
  162:25 190:9
  197:25 264:13
  265:5 273:6,7
  273:9 291:3
  300:14,16
**Arndt** 316:23
**arranging**
  158:15
**arrive** 256:19
**arrived** 19:5
  249:13
**article** 3:18 4:3
  190:19 192:12
  206:7 207:16
  207:20,22
  210:2 279:8
  325:4
**articles** 85:12,13
  85:14,19 86:14
  88:15 113:25
  114:14,15,18
  115:6 116:6
**ascertain** 90:6
**aside** 45:4
**asked** 32:12
  94:9 121:8,20
  122:10 126:23
  129:9 134:19
  135:22 144:16
  154:18 157:14
  161:7 176:21
  217:2 233:10
  272:20,22,23
  310:6
**asking** 14:23
  22:12,14 46:9

71:11 86:7
  87:2 101:5
  119:21 120:2
  121:18 122:7
  127:19 133:21
  138:23 139:5
  159:17 161:8
  161:12 188:3
  244:25 273:11
  290:12
**asleep** 146:8
  293:6,13
**aspects** 164:11
**asserted** 16:7
**assertion** 312:3
  312:6
**assess** 99:22
  171:25 209:10
  220:12
**assessing** 270:25
**assessment** 4:7
  73:19 98:22
  152:25 201:13
  229:10 233:24
**assign** 120:12
**assigned** 14:21
  19:16,23,25
  20:6,8 30:4
**assignment** 15:3
  51:10 323:1
**assist** 323:10
**Assistive** 150:18
**associate** 105:15
**associated** 30:25
  72:4 119:7
**associating**
  104:21
**association**
  137:21 138:6
**assume** 11:14
  26:14 70:3
  253:12
**assumed** 9:1
  29:12
**assuming** 54:10
  54:12
**assumption**
  44:17
**assured** 53:21
**Atlanta** 1:20 2:9

6:8 39:2 325:3
**attach** 52:8
  323:11
**attached** 320:8
  322:8
**attempt** 107:17
  109:12 303:23
  303:24 310:16
**attempted** 95:20
**attempting**
  143:18 150:24
  281:10
**attest** 210:6
**attorney** 322:13
**attorneys** 320:9
**attribute** 107:20
**attributed**
  119:14
**audible** 196:7
**audio** 92:6,7
  94:23,24 95:15
  311:3,7,10,13
  311:18
**audiotape**
  227:11
**author** 13:12
  92:24
**authored** 113:24
**automatically**
  320:15
**automobile**
  157:4,8
**automobiles**
  157:11
**autopsy** 108:13
**auxiliary** 16:4
  52:7 111:19
**avail** 126:18
**available** 18:18
  126:17,19
  228:22 257:6
  280:19 281:6
  320:12,16
**average** 99:22
  191:12
**aware** 60:8,11
  60:12 64:9
  75:14 176:1,4
  249:15 257:10
  305:16 306:6

309:17 311:7
315:13,18

**B**
**b** 320:14
**B-I-G-H-T**
169:14 170:1
**B-I-G-T-H**
170:2
**B-I-T-E** 169:18
170:1
**babe** 302:15
**babies** 3:19
38:15,22 57:19
59:16 61:12
63:25 64:4
70:5 79:7 94:8
94:11,14,18
95:19 100:5,17
111:9,21
129:15 137:22
138:3,5 146:9
149:19,19
163:2,12 164:9
165:2 167:11
172:1 173:22
177:16 179:12
179:19 181:3
187:1 193:22
194:16 197:7
197:12 217:15
220:8 222:25
223:4 225:11
227:15 228:1,4
228:5 263:1,8
263:13 264:9
269:21 275:9
283:18 290:24
291:3,24
302:24 303:24
304:19 313:8
313:18,24
314:21
**babies'** 112:3
163:8
**baby** 38:12
54:19 68:15
92:15 96:4,8
96:16,19 97:3
98:6,8,12 99:7

148:20 162:22
164:2,6,12,14
164:17 165:7
165:14 167:17
171:14 172:19
172:21,22
175:19 177:19
179:16,21
181:2 182:5
184:19 185:3
186:17 187:4
187:19 188:24
190:20 191:24
192:5 193:8,12
193:24 194:10
197:2,11 198:4
203:19 204:2
211:18 218:22
219:6 231:24
236:4,14,15
245:6 246:5
260:5,23
261:10 262:15
263:2 264:14
264:16 266:5
266:12 270:1,4
270:5,6 285:14
286:15 288:7
288:16 297:12
297:19 298:2
302:2,5,6,6,7,9
302:15,16
314:4
**baby's** 96:10
163:4 164:21
165:23 167:25
187:10 260:12
261:25 266:7
297:24 301:22
**back** 13:24
20:23 23:13
28:16 52:13
53:5 68:7,20
79:18 80:25
95:10 99:14,17
114:17,19,20
114:23 121:12
121:23 127:12
136:18 138:1
143:15 144:13

162:23 164:3
166:5 173:23
174:2,3 175:10
188:25 193:22
193:25 194:5
194:13 195:7
196:25 197:7,8
197:13 202:4
202:10 205:2,5
212:20 214:2
215:20 229:4
230:11 232:11
232:17,18
233:2,16
248:16,17
249:3,9 255:11
256:4 259:12
260:8,9,10,11
260:12 261:6
262:4,4,19
278:22 292:15
293:22 299:14
299:17,18,20
300:24 302:2
302:12,21
303:11 304:13
304:20 308:6
314:5 322:3
**background**
258:25 268:23
**backs** 188:13
**backwards**
163:9
**bad** 55:17
**bag** 278:10,11
**ball** 28:15
**ballpark** 22:5
30:13 76:1
78:3,7
**balls** 28:18,19
29:7,9 43:22
**bank** 28:15
**barely** 226:8
**base** 41:23
**based** 21:23
25:14 30:1
97:4 181:7
196:10 216:20
277:11 279:9
279:10,11,16

313:11
**basic** 308:16
**basically** 18:4
19:11 49:21
56:23 87:16
95:1,6 107:16
122:3 149:25
151:4 155:14
163:16 164:13
179:1 224:10
227:16 233:9
237:9 246:24
247:1 249:5
262:2 274:4
281:16 291:16
**basing** 146:5
**basis** 48:1,11,12
48:14,21
262:13 272:25
283:7 284:8
**bassinet** 52:1,14
52:17 55:4
167:4
**bassinets** 53:2
121:2 283:13
**Bates** 200:6,10
200:10,18,20
214:13,23
245:13 296:5
**batteries** 41:8
41:17 42:14
**bear** 192:16
**bed** 204:23
**Beds** 121:1
**beginning** 5:3
28:11 75:11
90:1 195:13
**beginnings**
195:24
**begins** 185:17
186:8 202:4
**behalf** 1:3 2:2,7
5:10 48:24
50:20
**behavior** 165:14
171:20 174:17
175:4 214:9
216:2,3 220:7
235:20,21
257:20 262:11

262:12
**believe** 60:20
74:4 95:2
107:22 118:23
125:9 136:8
144:17 170:13
222:18 239:23
266:4 296:2
312:20
**belly** 165:25
192:23 193:25
194:5,11,13
197:1 202:10
255:11 260:7
260:22 262:3
**belt** 165:7 170:4
175:13,16
179:4 236:13
237:21 240:4
283:3,8,20
284:7 291:25
314:3
**belted** 69:9
**belts** 283:6,18
**benchmarked**
268:25
**benchmarks**
97:8 99:23
**bend** 163:7,8
260:24
**beneficiaries** 1:4
**benefit** 198:24
**bent** 163:10
**best** 11:6 38:10
81:16,21 82:19
83:1 279:15
281:8,15
285:21
**bet** 29:5 69:19
**better** 47:2,7
49:25 205:9
221:2 281:19
281:23 318:18
**BHL58** 159:19
182:21
**big** 26:24 27:17
33:14,17
124:11,12
189:8,17 190:2
222:17 223:6

229:24,25,25
233:6 258:20
280:15,17
290:8 311:11
**bigger** 32:7 34:2
90:19 280:16
**biggest** 27:22
**bight** 169:25
170:15 171:4
174:6 179:3
262:6
**bill** 76:13,24
77:3,22
**bio** 115:25
**biomechanical**
4:16 119:24
**biomechanica...**
260:13
**biomechanics**
4:3 147:3
206:8 207:17
208:25 260:23
**biomedical**
66:15 70:10
128:1 151:3
281:8 318:2
**birth** 69:20
109:1 117:20
**birthday** 152:6
**bit** 39:24 70:6
92:2 112:15
147:16 164:14
167:2 224:11
235:7 275:6
277:8,13
280:16 302:22
305:3
**bite** 169:12
308:24
**bits** 265:4
**BL58** 161:14
**blanket** 305:18
**Bless** 249:21
**blocked** 291:4
**blocker** 165:13
167:1,2 211:21
224:9 240:5
260:19 314:2,3
**blog** 191:13
202:8

**Board** 303:7
325:4
**body** 32:13
37:22 58:15
147:5 162:16
164:21 165:4
187:12 261:3
273:7
**boil** 48:20
**book** 316:10
**born** 67:6 68:3
69:21 111:21
112:5 202:14
**bottom** 147:2
165:18 201:5
**bought** 21:18
68:6,16,16
69:1
**box** 156:16
201:18
**boy** 66:25
222:17 229:23
229:25
**boys** 62:16,18
100:10
**Brady** 2:8 5:12
241:7 316:3
**braking** 36:21
**Brandon** 2:8
5:12
**brands** 51:13
**break** 8:20
47:22 78:25
79:3,6,8 117:4
143:14 144:15
175:25 189:12
213:10,17
293:5 302:23
**breaks** 107:15
**breathability**
271:3 276:10
276:19 277:18
282:1
**breathable**
131:23 168:2
277:9
**breathe** 268:7
279:2 281:11
**breathed** 276:25
278:21 279:7

292:1
**breathing**
276:23 278:9
278:11 279:18
279:19 280:13
281:20 302:16
**brief** 13:21 14:2
79:15 108:21
144:10 213:24
293:19 310:18
**briefly** 86:18
**bring** 23:8 81:7
162:25 297:23
298:1
**broke** 78:15
122:14 263:2
**brother** 189:17
**brother's** 189:8
**brought** 15:7,15
120:1 297:17
**buckle** 288:12
288:16,17
**buckled** 284:20
284:21,24
286:14,19
288:16,17
**building** 46:6
**bullet** 215:13
216:13
**bunch** 10:17
81:10 221:23
**business** 28:16
**button** 31:3,20
**buy** 44:9
**buying** 68:9
**buys** 53:20

_____
**C**
_____

**c** 321:1,1 325:1
325:10
**C.E.O** 15:7 25:4
25:7,17 40:5
40:14
**C.H.O.A** 39:2
**C.P.R** 286:16
**C.P.S.C** 154:5
206:3 207:12
255:19
**C.T.O** 24:8
**C.V** 84:14,15,21

122:11 130:10
133:13,18,24
133:25 134:1
141:4,5 143:1
143:3,13
145:10
**C8** 16:1,21,21
**calendar** 320:16
**call** 5:25 36:25
82:22 90:13
91:24 103:6,17
108:7 167:3
170:11 172:3,8
174:24 175:10
177:20 178:23
178:24 182:6
184:23 194:18
194:20,23,25
211:5 274:24
278:3 294:6
299:9,12
**called** 21:7,10
25:23 29:19
80:9 121:1
122:17,19
175:3 178:19
189:5 303:6
311:16 317:21
**calls** 110:7
**calm** 226:23
227:2 237:18
**calves** 42:10
**camera** 227:18
**cameras** 158:11
279:24
**CAMotion**
21:10 24:5
29:17
**capabilities**
109:10,13
**capability**
215:23
**capable** 97:10
206:4 207:13
229:22,24
230:13 233:10
233:22 234:9
**capacity** 7:14,16
7:18 8:22 9:14
12:2 27:7

48:24
**capitalized**
185:8
**caps** 185:9,14,15
**caption** 224:24
**captured** 173:15
**car** 31:17,23,25
61:14 68:22
137:12,14,23
138:1 142:1,3
146:12 250:25
251:19,22
269:13
**career** 76:7,25
100:4
**careful** 266:12
**caregiver** 153:3
**caregivers** 39:4
96:2 148:13
180:22
**carpet** 229:18
229:21 230:7
**carriers** 251:2
251:20
**carry** 29:6 193:8
193:15
**carrying** 89:24
**case** 1:6 8:19
10:9,18 13:13
13:16 14:19
15:24 16:5,8
16:15,22 17:2
17:8 49:2
51:21 61:6
66:9 72:14,24
72:25 73:7,18
74:14 75:25
76:3 77:2,20
83:24 85:15
86:16 89:17
90:11 91:16
97:3 99:13
101:20 104:1,2
105:23 106:5
110:23 113:11
114:11,12
130:25 138:15
147:12 148:17
154:18,21
155:8 159:20

180:18 182:23
182:25 185:2
190:25 206:2
207:11 220:13
236:3 272:4
284:1 294:3,8
300:10,17
311:7 320:6,9
321:13,15
325:11,14
**Case-specific**
320:14
**cases** 6:23,25
9:25 93:2
262:25 265:12
265:21 295:8
**cast** 16:8
**categories** 50:12
83:3,6,10,17
84:13 93:11
**category** 50:15
54:12 83:23
87:21 88:17
**causal** 146:10
**causation** 132:4
**cause** 20:9 99:15
107:17 150:8
170:25 306:14
**caused** 119:10
198:9 229:4
243:16
**causes** 113:21
114:5,7
**CCR-B-1848**
1:25 321:21
325:17
**Cell** 132:15
**center** 198:6
199:3
**certain** 32:9,15
37:21 42:19
53:18,18 55:20
69:5 81:8
85:22 97:13,21
98:15 100:5
106:16 127:13
134:11 142:3,4
142:5 169:6
193:15 197:4
212:12,13

283:13,13
**certainly** 10:2
16:22 28:9
32:6 47:3
57:10,12 59:25
63:1,4,5,7 93:1
101:8,10,23
102:4 106:7
116:3 119:16
124:1,11
126:23 131:7
135:20 138:2
154:1 161:6
167:10 175:6
193:3 196:23
201:15 216:19
234:7 255:6
264:14 265:23
268:4 274:12
289:22 292:23
295:18 303:19
312:2 317:2
**CERTIFICA...**
320:2
**certificates**
320:11
**certified** 320:5,6
320:8,11 321:4
325:6
**certify** 321:5,9
321:13 323:2
**chairman** 59:2
**chairs** 165:22
**challenging**
37:16
**chance** 10:20
54:21 82:8
**change** 38:25
52:12 112:3
128:24 230:8
323:12,13,14
323:15,16,17
323:18,19,20
323:21,22,23
323:24,25
324:1,2,3,4,5,6
324:7,8,9,10
324:11,12,13
324:14,15,16
324:17,18

**changed** 81:2
114:16 115:16
**changes** 56:1
80:18 129:6
321:11 322:8
323:4,5,7
**changing** 52:11
121:2 145:19
261:21
**Chapman** 104:9
**chapter** 119:23
**characteristics**
133:5,6 137:25
**characterizati...**
263:7
**characterize**
88:21
**charge** 49:11,14
325:13
**cheaply** 41:9
**check** 79:8
305:21
**checked** 202:3
**checking** 85:11
**chemical** 135:23
135:24 136:1
**chest** 173:19
193:18 194:10
**chief** 24:11
**child** 38:1 39:23
40:5 41:11,13
41:20,21 43:4
43:9 52:12,15
54:24 66:18
67:3,6 68:7
69:10 72:10
73:4 99:21
100:11 119:6,8
126:6 127:22
137:17 141:18
148:15 149:23
150:5 151:1,6
151:13,25
153:20 163:23
165:19 217:4
217:14 218:6
267:14 268:5
273:12 313:3
**children** 37:13
37:17,19,21

38:18,19 39:16
39:19 41:1
42:17,18,18,20
42:23 43:7
44:15 45:3
46:11 54:20
62:1,9 64:10
66:23 69:2,4
70:24 71:8
111:21 112:24
113:16,19
114:5 117:2,5
117:8,12,13,17
117:20,20
118:6 119:14
125:17 131:10
137:10,15
139:24 141:15
142:5 145:14
146:11 147:9
147:25 148:2
148:25 149:1,5
149:8,18 151:8
151:18 152:3,7
152:15,15,21
153:2,4,17
162:18 171:23
192:18,25
215:15 216:15
217:13,21
275:9 313:8
**children's** 39:2
65:19 66:20
166:20
**chin** 283:21
**choose** 198:11
**choosing** 310:16
**chose** 212:14
302:2
**chosen** 210:23
**chunks** 105:11
**cinch** 236:14
238:21 239:13
239:18 267:3,6
**cinched** 181:14
181:18 212:5
218:23 219:2
236:21,23
240:1,8 266:13
268:10

**citation** 102:10
283:9,11
**citations** 102:2
253:21
**cite** 102:7
142:22 190:18
206:7 253:24
259:13 262:20
**cited** 86:22
105:17 207:16
250:14,16
256:14 257:13
**citing** 253:19
254:14 257:3
**Civil** 323:7
**claim** 289:11
296:4
**claims** 13:22,25
14:2
**clarify** 83:13
94:13 111:18
119:4 145:3
153:22 190:25
315:22
**Claritin** 11:4
**clarity** 100:23
101:13 275:25
286:6
**class** 317:25
**classes** 18:18
174:19 317:8
317:11,11,14
317:19,20
**classified** 138:17
**classify** 130:13
130:17
**clean** 73:13
**cleanly** 219:17
**clear** 57:6 64:8
72:23 92:14
97:14,18
112:21 115:23
118:18 137:21
140:11 180:21
220:17 255:4
264:25 268:19
269:25 270:6
**clearance**
211:13,15
**clearest** 11:7

**clearly** 116:2
253:14 266:13
267:24 268:9
268:14 270:14
273:3 286:2
**ClearPath** 3:21
**Cleary** 200:5
201:12
**Cleary's** 199:15
**click** 298:10,13
**client** 46:23
**client's** 135:19
**climb** 43:7
**Clinical** 147:3
**clip** 52:7
**clip-ons** 52:20
**clips** 52:17 92:8
92:11 175:1
311:10
**close** 95:7
100:10 111:24
173:16 200:21
282:17,20
**close-up** 275:19
**closed** 211:8
**closest** 61:21
**clothing** 132:9
**co-applicant**
36:3
**co-authors**
35:20
**co-owns** 25:6
**co-teach** 318:3
**CO2** 278:17
**coach** 121:16
173:14
**COBB** 321:2
**coincide** 106:10
**coincided** 30:17
**collaborators**
44:23
**colleague** 70:9
75:17 111:24
**collect** 28:18
315:7
**collected** 206:2
207:11
**collection**
174:23
**colliloquy**

160:17
**colloquies** 320:6
**colloquy** 160:21
**columns** 84:6
**combination**
90:24 249:12
**come** 10:10
15:10 52:21
53:17 74:18
82:19 96:14
106:6 117:3,14
118:4,22
139:13 140:6
143:15 166:5
183:14 199:13
203:10 242:13
253:2 261:20
281:9 308:6
**comes** 8:24
120:11 140:5
185:20 197:22
**comfort** 54:19
63:24 113:16
**comfortable**
65:6,23 94:17
117:18 270:5
304:11
**coming** 9:18
51:14 88:13,20
183:4 265:19
269:5 275:15
294:9 300:7
**command** 31:6
**comment**
115:15
**comments** 96:23
**commercialized**
35:4
**Commission**
4:16 154:9
256:23 324:24
**commissioned**
255:20 256:22
**committee**
55:21 56:9
57:7,24 58:13
58:13,20,23
59:2,17,21,25
61:1 62:10,15
63:10,10,16

64:2,6,12,23
69:25 70:12,13
70:23 71:1,17
71:19 73:3
74:12,17 124:7
124:20 125:2,8
125:10,16,19
126:10,23,25
127:11,13,18
127:20 128:3
129:23 130:3,5
130:5,6,19,20
130:22 131:5
131:12,17
132:24 133:4
**committees**
58:24 124:12
124:13 127:2
132:18
**common** 65:19
96:3 122:20
279:11,16
283:24
**common-sense**
151:23
**commuter** 14:11
**companies** 21:5
23:11,23 26:19
27:25 53:22
**company** 12:5,6
12:7 14:21,24
15:1,8,10,12
15:17 16:18,19
21:7,8,10,18
21:20,23 23:25
24:25 25:1,5
25:10,18,21
28:14,17 29:18
29:25 30:2,4
30:15,16 32:23
33:9 40:4,14
46:5,19 74:24
103:21 111:25
112:10
**Compaq** 16:1,2
**compare** 50:17
139:1
**comparing**
50:19
**comparison**

215:24
**compensated**
48:11
**competitor**
46:22
**competitors**
47:12 49:25
**competitors'**
47:1,3
**complaining**
131:16
**complementary**
256:15
**complete** 34:15
91:15 92:2,20
123:8 163:25
166:2 320:5,8
**completed**
322:18
**completely**
229:8 230:17
246:6,6,8
275:5
**complex** 157:20
**compliance**
81:22 89:18
**complicated**
17:24 21:1
**comply** 81:16
**component** 7:3
**computer** 14:9
14:11 16:2,2
**computerized**
321:9
**computers** 34:6
**con** 33:24 45:13
73:5 238:13
**concave** 259:19
261:17
**concept** 10:12
10:15 42:7
51:20,25 65:7
198:12
**concern** 64:3
125:19 127:21
**concerned** 66:24
69:9 126:25
**concerns** 59:22
63:14 70:11,13
73:3,17 124:19

126:6,7 127:22
**concluded**
319:11
**concludes**
318:24
**conclusion**
119:2,2
**conclusions**
86:15 106:5,7
143:4 225:21
257:2 310:17
**condition**
254:23 255:1
300:2,12
**conditions** 97:22
**conducted** 94:1
114:2,13 120:4
120:6,8 158:7
289:13,14
**conference**
134:20 150:19
151:4 200:1
**confident** 40:19
**confidently** 93:8
**configuration**
145:19 146:14
163:15 262:2
**configurations**
98:15
**confine** 77:1
**confined** 59:15
**confirm** 89:8,11
**conflicting**
285:7
**conform** 276:3
**conformity**
57:15,18
128:13 129:14
129:21 130:7
**conforms**
163:19
**confuse** 300:20
**confused** 218:7
**confusing** 56:3
105:5 300:19
**confusion** 56:23
56:25 57:5
**conjunction**
66:8 74:11,13
85:14,19

142:23
**connected** 75:16
**connection** 19:7
**connotation**
153:22
**consider** 9:11
64:11 115:9
129:22 182:24
**consideration**
16:12 57:18
128:22 129:13
133:1
**considered**
137:19 138:22
167:13,20
273:1 283:4,8
**considering**
54:23 148:1
308:3,20
310:14
**considers**
135:21
**consistency**
53:23
**consistent** 53:19
53:21 55:6
56:22 96:20
238:9
**consult** 99:20
**consulted** 99:25
**consulting** 48:15
166:11
**consumer** 4:15
34:25 35:1
46:14 154:8
256:22
**consumers**
45:13 292:14
292:18
**contacted** 74:22
74:23 75:21
325:7
**contained** 91:15
91:16 93:13
143:4 201:18
**content** 313:16
**contention**
263:11
**context** 8:3 9:23
33:25 42:19

73:5
**continue** 291:13
312:2
**Continued** 4:1
**continuum**
101:17
**contort** 277:17
**contract** 49:12
325:9,10
**contractual**
17:10
**contradict**
216:20,24
**contradicted**
139:22
**contradictions**
155:2
**contraindicated**
216:17 217:22
**contribute**
120:12 125:18
**contributing**
113:22 114:7
115:15 117:22
118:3
**control** 12:23
14:9,10 21:5
31:5,9 32:18
128:15 193:13
231:13 317:22
**controlled** 20:24
31:2 33:25
64:12
**controller** 26:7
26:23
**controllers** 41:7
41:17 42:14
**controlling**
12:17 14:3,10
24:21 31:1
33:21,22 34:3
81:1
**controls** 20:18
**convenient**
69:11
**conversations**
69:18
**convert** 141:22
**Convolve** 12:14
13:9 16:19,20

19:16 23:25
29:15 33:18
**cooing** 227:6
**Coordinators**
320:5,11
**copies** 320:11
322:13
**copy** 30:22 82:3
89:16 255:20
320:8
**corporate**
104:14
**corporation** 1:7
1:8
**correct** 5:25 6:4
7:1,17,24 8:1
10:4 12:24
18:25 38:7
50:6 54:13,16
54:17 63:17
64:1,16 66:9
69:7 70:15,21
72:11 73:7,24
74:8,15 80:15
82:15 91:17
97:8 102:13,15
102:16 105:8
108:6 110:24
111:3 124:24
125:21,24
129:24 145:1
151:8 152:13
154:13,22
156:14 159:7
169:8 170:6,19
177:2,7 179:8
184:16 185:21
188:22 190:16
193:8 196:11
198:11 199:2
201:9 205:11
207:3,18 209:6
210:5 211:3,10
214:6,20
215:18 217:6
219:21 225:1
227:15,25
231:9 236:21
237:13 238:4,9
240:22 244:9

244:21 245:18
245:19 246:19
248:7,14
249:13 251:5
252:15 253:10
255:14 259:25
265:10 270:21
271:7 272:21
286:25 288:18
290:1,2 292:11
292:15,18
295:22 299:6,8
313:4 314:8
316:14,23
320:5,8 321:10
**corrected**
129:20
**corrections**
322:8 323:10
**correctly** 41:24
67:17 185:22
194:14
**correlated** 131:8
**correlation**
117:19 146:11
146:15 147:19
148:19
**correlations**
114:8 149:10
**corresponding**
183:25
**corresponds**
253:18
**cost** 33:5,6 41:6
42:1,15
**cotton** 210:15
**COU** 3:17,23
4:8,9 296:5
**couch** 97:17
187:7
**Council** 325:5
**counsel** 2:1 5:6
5:15 81:20
82:3 83:20
90:3 305:7
311:6 321:13
321:14
**count** 86:2 306:4
309:15
**County** 272:14

321:2
**couple** 14:18
36:13 41:9
51:24 52:16
80:15,18
103:25 108:21
108:22 162:19
166:21 171:12
180:4 218:16
236:16 237:17
294:16,16
304:7,16
**Courkamp** 1:2
5:10 241:4
285:10 286:3
**course** 42:5 52:1
78:8 81:10
82:7 104:17
109:24 117:6
137:24 149:5
151:12 221:5
222:21 231:25
232:4 278:18
294:14 317:23
318:3
**courses** 28:19
145:12 318:4,6
**court** 1:1 5:16
11:21 16:11
23:9 90:9
115:11 121:23
134:8,12,16
135:20 139:14
320:6 321:4
322:16,20
325:2,4,6,8,11
**Court's** 89:18
**courteous**
122:24
**courtesy** 122:20
**courts** 8:1
**cover** 132:5
325:12
**covered** 28:8
67:14 131:4
**COVID** 231:24
**COVIDness**
231:20,21
**Cox** 2:8 5:12
**coxb@gtlaw.c...**

2:11
**cradle** 38:2,19
316:14
**cradles** 121:2
148:15
**crane** 20:19,21
26:11,22,24,25
27:5,16 158:22
**cranes** 12:21
21:3,11 24:5
26:6,9 27:19
27:22 29:17
31:14 119:25
**crash** 157:5,8
**crawl** 189:21
**crawler** 189:24
**crawling** 260:18
**craze** 41:4
**create** 46:10
165:2,4 253:13
264:24
**created** 7:21,24
34:11 59:21
74:12
**creates** 261:22
**credentials**
144:18 191:17
**crib** 209:12
210:14,15,16
210:21,24
214:19 215:17
215:23 261:9,9
300:25 301:17
301:18,22
316:10
**cribs** 121:1
229:17 283:14
**cringe** 198:22
**critical** 36:15
297:3
**criticism** 292:7
297:10,13
313:1 316:21
**criticisms** 66:5
74:2 159:18,22
159:25 160:8
160:15 161:13
161:16 162:3
162:10 163:22
164:1 166:7

168:21 297:5
**criticize** 312:17
314:24
**critique** 289:3
295:25
**crotch** 184:19
184:20 226:20
238:7
**cruise** 43:19
**cruising** 43:15
**cry** 174:1
**crying** 180:3
218:18
**cues** 95:21
**cultural** 197:9
197:10
**curious** 95:16
**current** 6:5
32:23 33:9
84:15 88:10
**currently** 21:6
24:8 28:3
43:12 45:17
67:8 104:24
**currents** 14:12
14:14
**curriculum** 3:11
85:4 120:19,20
136:6 144:16
145:12
**customary**
325:13
**cut** 92:9 311:15
**cut-off** 92:12
**cute** 174:6
189:10 217:15
220:8
**cuteness** 231:17
**cutest** 172:19
**cutie** 203:23
204:5

_____
**D**

**D** 2:8 325:1
**D-O-O-R-O-O**
70:2
**D13** 130:20
**dad** 63:12 71:13
71:18
**dads** 194:20,23

194:25
**dam** 178:11
179:4
**danger** 59:16
124:22 126:4
**dangerous**
56:16,18 58:16
58:17 61:1
72:10,23 74:4
127:10 164:8
167:12
**dangers** 72:4
**data** 72:22 73:2
73:16 92:1
154:1 262:19
262:21 294:4
295:20 312:16
312:17,17
315:7
**date** 69:20 80:21
201:5 322:3,15
**David** 2:17
66:21 67:20
111:23
**day** 7:11 10:5
13:24 71:14
90:2 321:16
324:21
**day-to-day**
109:13
**days** 67:7 85:8
97:7 196:6
322:3
**deadline** 308:3
**deal** 22:15 33:13
62:24 113:9,23
115:4 118:19
120:15
**dealing** 60:1
70:24 71:13
113:13 274:1
**dear** 112:17
**death** 107:18,21
107:24 108:23
113:7,18,18
117:6 118:11
118:12 119:1,6
120:4 144:20
149:16,22
150:2 184:10

188:9 249:17
284:15,20
306:15
**Deaths** 4:13
250:10
**debate** 58:21
59:6
**Debra** 1:25
321:4,21
325:17
**decade** 113:14
**decades** 166:19
**decathlete** 18:2
**decide** 48:17,18
76:13
**decided** 32:24
71:15,16 72:13
**decision** 11:22
**declare** 17:22
**declared** 19:2
**decreased**
114:17
**Deegear** 104:19
**deep** 187:12
**default** 197:22
**defect** 112:5
**defendant** 1:14
15:11,25 16:3
**defendant's** 3:7
4:1 79:22
84:24 89:20
91:10 182:16
191:8 199:22
203:6 208:17
213:6 240:23
244:14 250:4
255:21 271:19
296:6 309:14
**defendants** 1:9
2:7 5:13 16:1
**defer** 201:11
316:8
**deficient** 313:13
**define** 45:10
46:17,17,18
104:18
**defining** 105:10
153:19
**definitely** 67:1
142:17 148:1

181:11,19
188:25 195:3
232:10,14
233:22 254:10
256:12 265:13
305:14
**definition**
111:15 114:6
149:16,24
181:1
**definitions**
81:11 82:10
**definitive** 295:9
**definitively**
246:18
**deformed**
114:23
**deformities**
111:22
**degree** 32:3
61:22 63:23
68:8 99:16
159:4 164:16
181:13 198:17
210:22,22,22
210:23,25
211:1 248:14
259:1 275:23
**degrees** 52:2,22
52:24 125:17
164:21 166:24
192:22 193:1,6
193:19 196:15
230:9 233:16
248:18 249:1
249:13 251:23
252:3,5 261:20
298:2
**delay** 70:7
183:11
**demonstrate**
305:2
**demonstrated**
215:16
**denying** 308:8
**departure** 56:8
56:19
**depends** 197:2
313:18
**deployed** 279:20

deponent 196:8
321:11 322:7,9
322:10,16
deponent's
322:7 324:19
deposed 6:9,20
7:5,15,18
12:11 14:17,18
16:5 49:9
159:11
deposition 1:13
3:9 5:4 6:10
7:22 8:8 10:3
11:5,20 76:2
78:2 79:21
80:9,10 81:8
83:25 85:3
89:19 90:2
91:9 100:20,21
100:22 101:18
103:19 104:11
104:17 109:20
121:25 122:7
122:25 129:11
157:2 182:15
191:7 199:11
213:3 266:7
268:22 307:25
308:5,21
318:19,25
319:5,10
320:13 321:6,7
321:10 322:7
323:8 325:2,8
325:9,12
depositions 7:13
8:7 49:3 81:10
101:3,12 102:2
102:13,21,23
103:14,22
104:4,5,8,8,14
104:18 105:1,2
105:3,5,11,13
describe 32:12
32:14 190:23
described
101:17 156:6
261:23 264:8
describes 88:9
describing

114:14,15
116:22 170:17
175:12
description 3:8
4:2 13:17,21
14:2 102:11
103:5 108:9
170:17 210:12
253:17
descriptions
100:16
design 41:23
57:1 110:23
135:6 141:13
147:8 153:1
161:24,24
164:12 166:7
167:14,22
168:4,6,21
172:1,7,8,8
200:1 209:5
231:6 246:12
259:17 284:5
289:12,21
290:13,18
303:2 317:25
designed 37:13
37:25 42:3
153:18,21,23
178:11 290:13
303:5
designing 36:25
37:12 43:3
149:7 153:17
166:13
desire 267:25
323:7
desired 184:22
desk 112:7
despite 73:16
124:17
detail 110:18
155:13 166:6
187:25
detailed 103:5
110:9 115:20
230:12
details 15:20
16:14 101:14
303:20

Detective
103:15
detectives
102:22
determination
72:23 127:23
134:9 150:20
determine 96:5
108:11 109:12
determining
107:17 114:5
Detroit 157:5
develop 30:2
41:5 60:17
100:17 140:18
147:18
developed 21:2
26:4 31:9
38:23 39:5,18
39:22,25 40:6
40:6 44:7,8
74:11 134:3
142:21 145:11
151:10 152:15
157:20 260:16
developing 13:9
34:19,24 46:9
50:10 60:13,14
133:2 149:9
development
34:19 36:15
51:11 53:25
97:5 99:22
100:11 141:14
154:3 166:20
216:18 268:25
developmental
98:19 185:25
192:9 195:11
201:17,17
231:12,13
developments
35:8
deviating
166:18,21
device 14:7
27:23 41:6,17
42:17 93:16,18
93:20 148:5
152:23,24

157:16 162:24
163:4,17,18,22
164:3,8,9
180:16 185:2
187:19 231:5
247:19
devices 86:21
139:25 157:21
250:25 269:1
dialogue 160:9
diaper 52:9
die 119:3 146:9
149:2
died 113:19
118:23 150:6,7
dies 119:6,8
diff 276:4
different 20:25
27:2 34:11
38:12,13,14
43:2,20 50:19
53:22 68:22
97:16 100:11
101:6 105:10
105:11 108:13
108:18 114:20
115:16 129:25
139:2 158:8
166:14 209:12
211:17 222:23
228:3,5 256:13
260:13 269:22
270:20 272:4
276:1,2,4
279:17,25
280:12,12,13
308:14,15
311:11,15
313:15 315:6
315:11 318:4,6
differential
223:2
differently
169:3 273:2
difficult 31:4
162:7,16 197:1
259:20
difficulty 169:2
digital 16:5 82:3
direct 120:18,22

121:18 122:10
123:7 132:3
141:5 146:10
174:14 243:1,4
directed 40:25
44:14,15 45:2
46:10 123:16
123:25 124:13
130:5,6,22
131:2 133:2
138:20 162:8
177:3
directing 210:10
direction 163:8
321:9
directional
38:21
directive 258:19
directly 19:10
104:22 117:16
145:21 146:21
217:3 310:12
dis 287:9
disabilities
42:18,21
141:16 152:8
discarding
295:21
disclose 280:5
disclosure 36:19
40:1 320:2
325:5
disclosures 35:7
35:22
discontinue
258:11 259:7
discount 320:15
325:14
discounts
320:14
discoverable
82:22
discuss 37:9
129:3 169:6
294:3,22 297:5
315:21 318:7
discussed 32:5
62:8 63:8 68:4
88:17 90:1
112:12 124:12

127:25 128:1
129:5 146:18
146:21 318:5
**discusses** 192:9
293:25,25
**discussing** 262:6
271:3 277:21
303:21
**discussion** 69:5
70:17 79:13
82:21 128:21
140:4 144:8
213:22 241:15
293:17 319:2
**discussions**
66:19,23 67:16
68:1,10 71:3
128:23 139:21
166:15
**disease** 37:21
**disk** 34:3,4
**disorder** 38:6
**dispense** 6:10
**display** 262:11
**displayed**
276:12
**disposition** 13:5
**disrupt** 123:1
**dissect** 217:12
**distance** 240:3
314:2,3
**distinction** 84:9
**distinguish**
137:24
**distinguishing**
137:25
**distracting**
173:9 189:11
293:14
**distraught**
274:2
**District** 1:1,1
15:23 325:2,2
**dive** 28:18
**diverged** 44:19
**Diversified**
141:12 142:16
**diving** 43:22
**DIVISION**
325:3

**doc** 200:5
296:14
**doctor** 6:20 11:1
12:1 23:11
29:13 77:5
91:14 106:15
106:19 108:9
108:22 115:23
119:9 123:16
123:25 125:7
134:6 135:16
143:11 148:24
159:10 160:5
192:11 201:4
209:2 293:24
300:9 315:22
316:1,4
**doctor's** 82:4
106:8
**doctors** 120:12
139:25 140:1
**document** 80:10
80:11 136:25
141:7 143:8
250:14,16
251:15 252:16
253:3 254:8
**documented**
160:1
**documents** 81:2
81:8 84:13
85:22 86:5,10
86:11 249:22
**doing** 10:22 19:8
33:15 44:2
45:14,25 47:6
47:6,21 49:7
50:18 56:8
57:1 97:10
112:20 122:13
129:23 134:4
148:24 197:11
220:10 223:18
223:21 234:5
263:17 264:11
264:15 265:2
265:18 279:4
279:16 281:22
302:3 310:12
314:12

**doll** 4:10,19
244:9,10,20,23
245:17 246:7,9
246:14 247:3
273:25 274:5
275:3 290:14
290:15 304:22
**dollar** 49:17
**dollars** 17:6
21:22 41:9
76:16,25
**dolls** 93:16
220:23
**domain** 34:24
166:19
**Dooroo** 70:2
**double** 20:19,25
21:3 192:11
**downloaded**
87:7,20
**Dr** 3:20 5:4,25
6:1 36:4,10,20
36:24 44:22
67:16,17,25
68:1 69:5 70:3
70:9 71:23
72:12 77:19
78:21 79:20
80:9 81:21
82:15 103:4
104:19 111:23
112:8 118:21
124:19 128:1
137:7 144:15
160:17 182:14
190:3 191:14
192:11 199:15
200:5 201:12
203:17 214:4
222:10 242:5,8
243:23 244:1
250:15 256:25
257:19 258:8
259:14 261:7
280:21 281:7
309:18,20,23
310:3,17,21
311:1 315:3,19
315:20 316:23
318:3,5,13,21

318:25
**draft** 56:1 59:11
59:12 129:11
266:21 267:1
**drafts** 53:3,4
54:6,7,9,11
**drag** 298:10
**Drago** 87:23
88:2,3,3
119:12 138:16
139:1,21
154:25 270:23
315:19,23
**Drago's** 156:7
315:20 316:9
316:18
**drawn** 274:5
**drive** 6:8 241:3
241:5,21,22
**drives** 34:4,4
**drop** 31:24
**dropping** 248:2
**drum** 27:1
**drums** 27:2,12
27:14
**Druzisky** 1:25
321:4,21
325:17
**Duck** 18:14
**due** 204:13
322:3
**duly** 5:19 321:6
**duration** 175:18
175:24 176:11
176:12,14,15
176:16 177:5,8
177:14,19,20
179:19 184:24
219:9 225:10
313:19
**durations** 176:3
**dynamics** 50:25
**dystrophy** 39:19
40:5

———————
E
———————
**E** 1:13 2:3 3:3
5:18 242:21
250:22 253:5,9
321:1,1,1,1

322:2 325:1,1
325:1,2
**E-mail** 80:1
241:18 242:15
243:1,4
**E-mails** 242:22
**E.S.I** 312:17
**ear** 275:15,19
**earlier** 67:7
104:2 124:17
129:9 170:14
173:24 178:14
190:13 207:22
227:10 228:17
242:22
**early** 110:1
162:19 232:19
266:7 298:24
**easier** 164:14
211:18 212:9
212:23 290:25
305:3
**easily** 20:24
165:16,19
290:21
**East** 2:4
**Eastern** 319:11
**eat** 230:3
**eating** 143:17
**eats** 230:2
**ebullient** 11:20
**edge** 187:6
212:15
**effect** 249:17
290:20
**effectively**
148:15
**efficient** 112:4
151:5 261:4
**efficiently**
143:19
**effort** 216:4
**efforts** 157:18
**eight** 19:19
20:13 21:15
78:17 81:14
97:7 110:15
196:4,6
**either** 28:1 50:2
51:10 109:11

146:18 162:15
169:21 180:7
225:25 236:3
**electronically**
322:9
**elevated** 98:6
**elevates** 39:23
**eliminate**
124:14,15
133:2
**else's** 50:4
100:12
**emphasized**
318:13
**employ** 321:14
**employee** 15:1,5
24:3
**employees** 176:2
176:5 177:22
**employees'**
176:3
**employment**
20:2,4
**enabled** 210:21
**enacting** 64:5
**encourage** 3:19
194:19
**encouraging**
195:3
**ended** 68:9
224:11
**energy** 25:11
198:7 199:4,7
**engagement**
109:24 110:1
113:10
**engine** 31:16,22
**engine-moving**
31:15
**engineer** 11:10
15:4 18:8
55:14 61:17
62:12 70:10
115:25 127:25
128:2 135:23
156:19 196:16
198:21 281:8
290:22
**engineering**
18:8,18,21,22

19:4 66:16
106:20 107:2
116:9 119:25
135:24 136:2
145:13,13
150:18 151:3
264:3 268:23
269:5 317:22
318:2
**English** 183:24
183:24
**ensued** 79:13
144:8 213:22
241:15 293:17
319:2
**ensuing** 85:8
**ensure** 57:8
150:24
**entangled** 283:6
283:23 285:22
285:24
**entanglement**
283:25 284:1
**entered** 323:8
**entice** 95:20
297:12
**entire** 8:15
37:22 75:24
76:7,25 100:24
103:14 291:15
300:16,18
**entirety** 257:16
297:8
**entitled** 23:6
134:15 135:19
135:20,21
214:15
**entrapped** 273:8
**entry** 141:11
**environment**
214:19 283:25
**environmental**
18:22
**environments**
140:1
**envisioning**
42:16
**epidemiologist**
310:22
**epidemiology**

136:4
**equal** 116:8
**equally** 116:4,7
189:10
**Erin** 4:15
**Errata** 322:3,8,9
322:10,12,14
322:15,18
323:1
**erroneously**
295:12
**escape** 275:9
**especially** 168:7
**Esq** 2:3,8,8,12
**essentially** 21:17
30:17 34:24
37:22 41:18
47:20 48:15,20
50:10 52:7
68:17 150:12
158:13 224:11
233:15 297:19
**establishing**
45:21
**estimate** 78:1,10
78:11,13,14
252:10
**et** 4:5
**ethically** 42:6
**eval** 172:8
**evaluate** 130:24
229:16 231:5
257:20 314:21
**evaluated** 293:1
**evaluating**
279:13
**evaluation**
172:7,9 225:11
289:24
**event** 18:1
148:22 278:3
**events** 18:4
149:6
**eventually** 299:7
**everybody**
64:23
**everyday** 137:6
**evidence** 206:2
207:11 254:15
285:23 286:17

**exact** 66:25
218:23,25
232:4 277:5
303:20
**exactly** 18:11
40:12 52:21
68:16 75:20
107:14 118:2
119:10 154:9
186:12 202:7
209:15 246:1,2
246:10,20,23
247:11 268:19
273:6 287:14
289:13 303:12
306:23
**exam** 98:12
**examination** 3:1
5:21 98:6
107:16 108:11
**examinations**
249:2
**examined** 5:19
98:9 321:5
**examiner's**
272:13
**examines**
111:20 131:17
**example** 31:12
32:23 33:10,18
52:10 58:25
63:17 92:4
101:10 106:8
106:23 114:22
115:2 120:14
120:21,25
130:25 131:21
135:22 146:12
150:16 158:20
167:23 168:17
175:22 190:22
192:15 197:5
241:4 253:12
269:13 278:8,8
284:13 294:22
307:1 313:23
**examples** 92:21
**excellent** 315:15
**exclamation**
184:6

**exclude** 134:16
**exclusively**
320:10
**excuse** 180:11
249:20 252:18
266:22
**excused** 319:8
**execute** 236:6
**execution** 57:18
129:14
**exemplar** 4:10
4:18 84:4
93:25 94:1,9
94:18 248:20
249:4,10
**exemplars** 93:24
**exercise** 53:23
136:22 187:1
**exhibit** 3:9,11
3:13,15,17,18
3:21,23 4:3,6,8
4:9,11,14,18
4:20 79:21,23
80:8,24 81:4
84:25 85:3
89:19,21 90:5
91:9,11 120:19
168:24,24
182:15,17
183:2 191:6,9
191:17 192:3
199:10,23
200:9 202:24
203:4,7 207:3
207:4,5,21
208:10,13,16
208:18 213:2,7
214:5 221:19
221:25 222:1
230:23 234:2,5
240:21,24
242:24 243:12
244:12,15,19
244:22 247:24
248:5 249:25
250:5,8 252:23
255:19,22,25
271:13,15,20
272:9,10
273:22 276:13

276:21 282:8
296:4,7 307:14
**exhibited**
195:13
**exhibits** 3:7 4:1
80:4 91:16
183:3 221:7
320:8,10
**exist** 168:15
300:11
**existence** 60:16
**existing** 167:3,7
**exists** 127:15
300:2
**expand** 43:6
**expanded** 42:23
**expect** 166:6
193:12 202:8
256:7 286:24
287:3 288:17
288:20 306:8
**expectation**
127:17
**expectations**
190:2
**expected** 176:19
306:10,12
**expecting**
197:11
**expensive** 42:2
**experience** 96:3
100:14 118:25
145:5 180:17
**experimental**
92:1,13 210:12
**experimenters**
302:18
**expert** 7:14 8:4
8:22 9:2,8,15
48:23,23 61:18
73:6,24 74:13
75:2,12 101:10
111:6,13,16
112:20 113:4,6
113:17 115:6,9
115:12,14,19
115:25 116:5
118:10,17
122:8 124:10
124:21 126:9

130:9,17 132:1
133:14 134:10
134:20 135:1,9
135:23 136:1
138:23 139:6
142:24 143:4
154:4,11,16
155:5,7,8,17
157:3,7 180:18
217:14 309:14
309:18 316:23
316:25
**expertise** 74:24
116:8 124:8
134:3,18 135:7
135:14,21
136:8 140:18
144:19 153:6
154:12 156:13
156:21 157:10
159:14
**experts** 75:19
90:19 91:24
99:21 100:1
103:4 105:23
106:4 110:20
174:16 229:4
299:10
**experts'** 95:16
**expired** 278:5
278:15,21
**Expires** 324:24
**explain** 130:8
**explained**
197:16
**explaining**
130:4 135:8
165:10
**Explico** 312:16
**Explico's** 314:25
**Exponent** 4:6
171:21 174:20
174:20 213:3,4
214:6 215:14
217:19 221:5
235:22,23
262:14,19,20
262:25 263:12
264:8 284:12
296:1 312:16

**Exponent's**
214:8
**express** 60:24
**expressed** 59:22
61:7 66:6
69:25 70:10
**extend** 168:8
**extended** 275:7
**extensive** 16:9
316:21
**extensively**
168:9
**extensor** 147:5
147:10 150:21
**extent** 50:11
72:4 90:17
126:3 141:4
180:23 219:24
229:7 287:16
**extra** 212:15
**eyelash** 275:20
**eyelashes** 274:4
274:9,21
**eyes** 63:12
220:11

---

**F**

**F** 53:3 321:1
**F-E-R-S-T** 6:8
**F-R-A-K-E-S**
67:24
**F15.18** 121:1
124:5
**F3118** 124:6
**fabric** 162:9,17
165:17 167:23
168:1,1 245:25
271:7 277:13
279:2 281:20
292:1 299:12
**fabrics** 131:3,9
133:2,5,6
277:12
**face** 65:21 162:8
162:12 163:5,9
163:19,20
167:25 173:23
173:24,25
174:2,3 191:17
224:3,5 245:6

245:25 246:6,9
246:10 247:17
260:23 261:25
264:17 271:6
273:6 274:4,21
275:21 276:3
276:11,21,24
279:2,6,19
281:10 299:12
**facilitate** 164:12
**Facility** 322:19
**facing** 274:9
**fact** 7:5 29:8
32:22 33:22
53:1 61:3
124:18 164:10
165:12 167:19
236:5,20
251:25 253:20
278:20 303:25
**factors** 113:22
114:8 115:15
117:22 118:3
120:11 149:10
316:23,25
317:9,10,11,15
318:7
**factory** 31:16
**factual** 103:5,5
119:2
**Failure** 184:8
**fair** 32:14 50:5,8
59:18,19 73:19
78:12,13 80:19
101:2 152:25
156:3 220:25
229:10 256:20
306:7 308:23
**fairness** 64:22
**fall** 37:24 39:24
50:12 99:8
148:16 151:1
173:20 197:14
197:20 198:7
234:9,14
252:12
**fallen** 293:13
**falling** 38:1
147:9 178:25
205:10,14,18

**familiar** 18:5
55:11 59:13
103:11 213:4
214:5 243:23
303:9
**familiarity**
231:17
**Family** 3:21
**fancy** 107:5
**far** 32:5,10,11
135:3 196:9
211:12 257:17
286:9 291:24
308:25 311:21
318:18
**fashion** 287:10
**fast** 43:16
**fastened** 238:8
**fat** 165:17
**father** 97:24
99:4
**favor** 308:7
**favorite** 160:24
**feature** 53:21
170:3,5,5
**features** 34:19
34:24 37:1
53:19 167:3,5
168:10 169:11
170:10,12
274:1
**February** 201:5
202:1,13
**Federal** 323:6
**feedback** 48:18
**feel** 65:6 79:6,8
89:6 100:24
119:15 219:16
**feeling** 57:2
191:3
**feels** 82:10
**feet** 163:3,5,10
164:23 171:13
174:6,7 260:14
260:18
**fell** 205:16 293:6
**felt** 92:23 125:16
**Ferst** 6:7
**field** 17:18,21
297:24

**fighting** 218:17
**figure** 10:9
  56:21 140:2
  172:17 175:12
  222:2 224:25
  235:10 239:3
  242:10
**file** 4:8,20 35:22
  75:24,25 81:21
  82:4 83:4
  101:20 272:15
  322:13
**filed** 8:1,4 15:22
  16:4 35:7,14
  322:15
**fill** 322:9,9
**filled** 158:10
**final** 13:4 40:12
  82:22 142:15
  142:20
**finalize** 89:8,11
**financial** 320:16
  325:14
**financially**
  321:14
**find** 23:5 30:22
  74:3 121:9
  135:18 214:13
  221:17 239:2
  282:14 293:24
  296:1
**finding** 256:5
**findings** 143:15
  256:5
**fine** 6:2,17 43:13
  101:7 143:20
  169:23
**finger** 117:24
  119:9 256:16
**fingertips**
  101:14
**finish** 76:18
**finished** 57:3
  121:11,25
  136:17
**fires** 37:22
**firm** 25:13 74:22
  74:23 75:7
  82:20 86:5,9
  88:22 89:2

109:23 320:2
**first** 5:19 19:8
  28:14 50:15,22
  50:24 52:16
  54:3 56:24
  66:4,5,11,12
  72:13,20 73:4
  73:15 84:21
  90:13 102:21
  128:7,10 145:9
  152:5 173:15
  173:21 184:13
  185:20 197:3
  197:13 198:25
  204:18,18
  207:6 215:8,11
  221:20,22
  222:3 289:3
  290:19 294:3
  297:10,13
  299:24 302:7
**Fisher-Price** 4:7
  5:13 50:21
  51:1,3,6,9,15
  90:10 103:21
  104:22,24
  105:15 125:1,7
  125:12 127:7
  131:1 165:12
  167:24 176:1
  177:6 178:15
  267:19 268:1
  279:5,17
  281:17,22
  292:13,17,20
  292:25 295:13
  302:23 303:19
  306:12,16,19
**Fisher-Price's**
  10:8 91:25
  177:21 288:24
  294:1 309:18
  **FISHER-PRI...**
  1:7
**fitted** 210:15
**five** 30:10 41:4
  49:17 52:2,23
  67:6 110:7
  137:9 151:17
  173:2,3 193:24

200:13 232:7
  289:19 293:7,9
  293:10 309:13
  309:15
**five-month-old**
  222:15
**fix** 122:17
**flash** 241:2,5
**flat** 52:21,22
  54:25 56:20,22
  97:14,16
  163:20 164:16
  165:18 167:4
  173:11,18
  187:23 189:16
  206:5 207:14
  210:24 248:15
  248:17 261:9
  291:1
**flattening** 195:6
**flawed** 296:3
**flaws** 296:4
**flex** 293:13
**flexible** 165:17
  287:11 288:8
**flexing** 42:10
**floor** 112:18
  205:10 282:11
**flow** 106:23
  107:2 278:6
**fluid** 106:23
  107:1
**focus** 220:19
  287:6
**focused** 37:20
  39:13 42:22
  86:18 234:3
  284:17 297:18
**focusing** 77:24
  118:9 161:23
  287:18 289:1
**folking** 288:25
**follow** 13:3
  16:12 29:17
  71:2 82:16
  184:8 209:15
  209:17
**followed** 35:25
**following** 80:3
  323:5 325:5

**follows** 5:20
**foot** 164:20,20
  165:5,7 166:25
  167:1 171:15
  171:17 211:21
  240:4 260:19
  280:3 314:3
**foot's** 293:13
**Footnote** 254:1
**force** 150:20
  164:24 212:15
  212:24 261:3
  265:19
**forcefully**
  151:16
**forces** 147:5,12
  147:13 150:23
  150:25 151:5
  151:12 165:3
  170:21 260:21
  261:2 314:13
**forcing** 127:7
**forearms** 193:8
**foregoing** 320:4
  321:6,9
**foreign** 1:7,8
**foreseeability**
  316:18,22
**forget** 76:9
**form** 8:14 10:16
  50:7 57:11,21
  72:2 88:18
  89:9 93:3
  103:19 106:5
  118:15 120:7
  124:23 125:22
  126:11,15
  128:8 133:16
  134:22 139:3
  139:17 159:21
  160:3,16
  161:17 182:1
  186:3,23
  194:22 196:12
  198:1 216:22
  217:7,24 218:2
  218:9 220:2
  225:21 227:24
  236:7 237:14
  238:10 239:5

247:7 252:8
  257:22 260:1
  266:2,10,19
  267:8,22
  269:10,14
  270:11 271:9
  272:25 274:17
  280:22 281:13
  284:23 286:20
  287:1,23 288:5
  288:19 294:13
  295:5,23 306:5
  306:22 307:6
  323:7,10
**forma** 159:10
**formal** 35:16
  120:4,9 122:9
  140:12
**formalized** 53:9
**formally** 82:9
**forming** 256:11
  260:17
**forth** 20:24
  23:14 68:7
  93:9 248:16
  249:3,10 256:4
  303:11 321:8
**forward** 31:7
  55:6 68:20
  135:8 158:1
  162:25 252:12
  298:13 322:13
**found** 44:1
  132:9 150:15
  155:2 191:20
  191:20,22
  245:4,20,22
  246:3 247:12
  247:13 272:21
  273:3 274:20
  276:12,20
  284:21,22
  285:6 286:4,6
  287:15 305:14
**foundation**
  196:12 287:1
**Foundry** 25:11
**four** 48:9 49:17
  151:17 170:8,9
  173:1,2,5

178:9 179:2,5
189:15 193:3
193:11 201:8
202:2,15,18
222:18 223:1
289:19 302:10
**four-month-old**
222:15
**four-sevenths**
308:8,9
**four-year** 22:1
**fourth** 178:10
178:22,24
179:4
**Fox** 312:16,21
**Frake** 281:7
**Frakes** 66:22
67:22,23,25
68:1 69:5 70:9
72:12 111:23
112:8 124:19
128:1 222:11
227:22 280:21
281:7 318:3,5
**Frakes'** 222:12
**frame** 54:9,18
58:8 60:6 69:4
70:16,22 84:20
149:13
**frankly** 166:18
169:21 229:23
245:22 292:3
**free** 48:15 79:6
79:8
**frequencies** 21:1
**frequency** 38:14
38:25
**fresh** 63:12
278:13,14,17
278:20
**freshest** 274:11
**friend** 15:7
16:24,25 19:6
24:3 71:15
74:19 112:9,17
124:18 280:20
281:7
**friend's** 15:10
**friends** 28:17
66:14,17

100:10 222:6,7
222:8 289:15
**front** 34:14
49:12 90:5,12
96:9 145:3
162:20 175:10
197:7,8,13
202:4 227:3
230:21 232:17
232:18 233:2
**full** 5:23 31:7,7
52:15 72:3
90:10 92:19
126:3 197:21
209:2 294:12
294:20 297:15
311:6 321:10
**Fuller** 250:15
**fully** 175:16
262:23
**fun** 41:22 42:23
**function** 134:13
**functional** 14:7
**fund** 112:17
**funny** 23:12,13
23:20
**furnish** 323:11
**furnishings**
132:11
**further** 150:14
188:7 255:17
308:21 318:19
320:7 321:13

————
**G**
————
**G** 36:7
**gadgets** 279:25
**game** 149:4
**gantry** 31:18
**gatekeeper**
134:12
**general** 45:7
100:16 157:11
159:18 166:10
166:11 170:17
198:12 283:10
**generally** 32:17
47:4 100:4
109:6 149:18
154:10 252:3

269:7 283:3,8
**generate** 260:21
261:5 265:3
314:14
**generated** 147:4
150:24 154:1
**generating** 14:3
261:2
**generation**
261:4
**geometric** 284:5
**geometry** 93:16
163:4,17,18
231:6 284:9
291:23 313:22
314:1
**Georgia** 1:20
2:9 6:8 20:1,3
20:5 66:16
117:2 145:10
145:10 158:10
280:20,24
281:1,6 317:23
317:25 320:5
320:11 321:2,4
321:21 322:21
325:5,6,17
**getting** 20:23
62:16 69:10
80:2 87:17
167:11,17
171:18 173:16
179:22 278:17
282:20 300:5
301:22 302:18
**Gibb** 310:21
**girl** 230:4 234:8
255:7
**give** 5:23 6:15
11:6 13:21
31:5,12 34:15
42:19 48:17
73:23 74:6
110:3 121:4
134:10,17
138:12 204:11
206:16 219:19
219:19 239:16
240:15 258:19
273:13 294:20

294:21
**given** 7:22 8:7,8
9:3,25 10:1
93:11 163:4
164:6 167:5
216:17 230:19
231:2 295:19
323:8 325:14
**gives** 144:18
198:25 199:3
**giving** 72:17,19
74:6 82:6
100:22 155:8
199:8 242:7
**gluing** 266:15
**go** 10:18 28:10
28:17 31:21,22
37:23 38:11
43:8,15,15
44:2 46:25
58:13,14,23
59:1,3 62:10
64:11,18 65:22
71:1 73:20
78:6 82:18
83:3,6,16
89:15 102:1
110:17 128:9
128:20 136:24
140:16 143:14
144:1 145:2
146:24 150:9
150:12,14,15
153:5 157:24
160:6,22 161:2
166:15,16
174:2 178:8
179:11 181:6
190:4 201:1
203:15 206:25
207:8 208:10
208:11 213:2
215:20 229:4
236:15 243:20
248:1,5 254:25
257:5,10
259:12 266:14
274:16,19
277:25 282:23
285:4 289:19

298:16 299:4
299:14,18
300:3,3,21,24
303:11 309:2
316:1 318:16
**go-cart** 41:18
65:9,13
**goal** 240:6
**goals** 57:13
**goes** 42:12 149:4
149:21 165:20
167:8 170:13
226:10
**going** 10:10
11:14 23:3,5
23:13 26:18
29:20 31:7
32:10,10 41:12
44:3 55:6,8
56:21 57:4
61:19 65:22
69:15 73:12
74:9 76:12,23
77:2,22 79:20
79:21 81:13
82:5 84:11,17
88:24 94:8
96:5,10 98:7
109:7 110:17
112:3 115:18
118:22 122:2
122:25 134:1,8
135:8 136:13
139:13 140:6
140:14 141:3
143:11 157:23
160:14 164:8
166:5 167:18
169:1 181:15
182:14 187:5
189:11 192:13
194:3,5 200:10
201:13 202:23
207:21 209:1
212:5 213:2
217:14 218:24
221:22 225:15
226:21 227:13
230:18,24
231:22 240:21

241:1 244:12
249:23 253:23
255:24 256:1
258:19 266:7
267:4 270:3
271:12,14
273:12,13
274:25 275:14
276:17 282:10
283:17 296:14
296:25 298:4,7
298:15 299:3,4
300:25 301:7
301:10,10
302:21 306:13
307:21,22
308:11,13,14
312:1 313:9
**Goldberg** 2:3
242:18
**Goldsmith**
309:18 310:3
**Goldsmith's**
309:20,23
310:17
golf 28:15,18,19
28:19 29:6
43:22
good 22:23 23:6
49:24 66:14,16
84:9 85:17
164:22 168:20
171:18 193:12
252:10 281:6
294:21 302:4
303:4 304:17
304:17
goodness 85:6
goods 276:1,3
277:7 287:12
288:9,14
gosh 280:25,25
gotten 25:16
80:1,2 87:6
grab 187:12
265:14
grabbed 212:23
gracious 241:13
Graco 51:14
grad 36:14

graduate 19:10
142:18 317:22
317:23
grandchildren
178:2 307:3
grandkids
307:10
grandmother
237:7,8 238:23
238:25 239:13
grandparent
307:10
grant 141:11
142:12,23
144:25
gravity 198:6
199:3
great 23:4 113:9
113:23 115:3
118:19 120:15
187:25 251:24
279:21,22
greater 129:22
Greek 18:6
43:20
Greenberg 2:12
325:8
Greetings 322:5
ground 15:8
42:3
group 12:5
46:15 116:14
117:1 124:6
groups 53:16
84:6
grow 100:10
guarantee
287:12
guess 15:5 17:18
28:14 46:22
55:23 66:5
86:25 104:23
227:10 232:1,9
245:24 277:8
290:12 305:11
310:20
guessing 277:10
277:11
guy 233:6
guys 63:11

67:11 258:23
_____
**H**
H.P 16:2,3
half 6:24 7:2,5
7:12,14 62:2
68:3 232:21
307:25
half-year-old
67:7
hammock 262:2
262:3
hammock-like
262:1
hand 55:24
249:23
handled 320:10
handles 25:17
26:24
hands 162:20
185:17 186:9
187:23 190:16
232:5 233:3
hang 200:12
203:11 217:1
243:15 258:22
happen 100:6,9
114:21 175:23
198:25 247:9
247:18 308:22
313:7 314:20
314:21
happened 71:23
108:10,11
247:10 270:14
270:16 273:16
287:21
happening 9:12
92:10 284:14
happens 114:21
158:17 175:21
happy 6:15
76:13,24 77:6
140:3 160:25
hard 21:21 34:3
34:4 63:13,22
92:2 190:23
202:22 209:19
212:6 217:12
219:2 262:1,4

267:3 275:14
302:17 308:3
harder 164:17
212:19
hardest 196:25
hate 73:20
hazard 167:15
167:17
hazardous
254:23
hazards 167:7,8
167:9 168:14
168:15,18,19
271:1 283:25
head 62:17
104:10,16
105:16 114:24
115:3 155:22
161:19 162:17
162:19 165:13
166:12 167:2
178:11,16
179:4 192:12
192:21 193:1
193:12,18,24
194:12,16
195:7 224:9,9
226:8,10 240:5
240:5 264:13
265:5 275:11
280:7,15,17
314:2,2
headboard
205:2
heads 114:22
193:4 258:23
Health 150:3
Healthcare 3:21
healthy 188:12
209:10
hear 160:8,13
160:25 204:15
227:12 285:2,3
heard 40:21
53:8 159:12
309:19
hearts 111:20
112:2,3,6,15
heavily 106:12
hedge 112:17

heightened
211:8
held 47:13
193:15 279:19
helmet 115:2
195:9
help 54:19 117:3
117:14 118:5
298:14
helped 24:2
29:18 30:2
helping 117:18
helpless 255:1
helps 25:13
212:24
hereto 321:12
323:11
hereunto 321:15
Herman 2:8
5:12 183:4
207:24 208:2,6
240:11,12,15
240:19,22
241:6,11,17
242:20 250:1
296:11,19,23
298:14
hermanb@gtl...
2:10
hesitate 12:4
hey 60:24 63:11
hiding 125:2,8
high 140:18
158:11 165:22
178:23 211:19
252:4 261:11
highlight 209:19
highly 131:8
138:4,5 272:2
hinges 278:20
hips 165:8
179:22
hired 155:4,6
histories 294:8
history 8:15
294:3
hit 41:4 158:20
hitting 163:13
hoists 27:15
hold 78:11

112:19 115:24
115:24 193:24
194:16 198:18
**holders** 52:9
**holding** 63:5
80:20 113:3
118:10,13,17
135:9 205:20
227:18
**holes** 278:12
**home** 79:7
132:11 251:4
276:6
**homes** 176:3
**Homonyms**
169:23
**Honestly** 107:4
**hook** 20:22
78:22
**hope** 10:6 159:8
**horizontal** 226:8
226:11 259:18
261:8,11
297:18
**hospital** 39:2
251:4
**hour** 49:2,18
65:17 76:25
239:9 291:17
296:24 297:1
**hourly** 48:11,14
48:21
**hours** 76:2
77:19 78:1
100:24 148:21
157:14 175:20
176:16 177:20
185:4 188:25
236:16 307:25
**house** 165:23
187:5 225:8
**Houston** 2:13
**hoverboard**
41:3,11,13
42:4,7,9 43:18
65:1,4,7,10
**hoverboards**
41:3 42:9
65:24
**huge** 26:5 27:16

**human** 147:4
151:12 273:25
316:23,25
317:8,10,11,15
318:7
**hundred** 13:25
22:11 41:9
49:17
**hundreds** 85:25
305:11
**husband** 66:21
**Huxley** 222:17
223:10 225:18
225:24,25
226:4 228:19
229:9,16,23
230:14 233:3
234:8 290:4,15
**Hyundai** 31:16

_____
**I**

**I-N-V-E-K-T-...**
24:14
**I.R.B** 303:6
**idea** 36:11 40:3
44:4,12 55:17
304:17
**ideas** 49:25 55:6
**identification**
79:24 85:1
89:22 91:12
147:4 182:18
191:10 199:24
203:8 208:19
213:8 240:25
244:16 250:6
255:23 271:21
296:8
**identified**
136:11 295:13
**identify** 5:6
136:12 144:17
151:5
**ignore** 306:13
**ignored** 168:3
**Illinois** 25:11,14
**illustration**
247:6,8,17
**immediate**
55:15

**immediately**
31:3
**impact** 4:4
26:12 95:17
209:3 276:10
276:18
**impede** 265:9,13
**impeding**
265:22
**importance** 9:20
**important** 17:11
57:17 64:3
96:22 110:18
129:13 131:21
133:7 134:7,13
162:4 166:22
167:17 270:24
318:14
**impossible**
64:21 246:10
259:20
**in-home** 168:17
176:4,23
**Inaudible**
172:11 179:10
**incapable** 302:3
**inching** 265:4
**incidence** 128:4
146:15 149:20
**incident** 102:24
127:8,9 165:9
175:22 176:15
270:15 284:13
305:17,23
**incidents** 177:18
305:6,6
**incline** 51:20,25
52:1,2 53:4
58:16 60:8
61:7 62:8
63:13,23 64:9
64:13 66:8
67:1 68:4,9,19
69:6 72:14
99:17 124:19
124:22 125:11
125:17 127:1
147:14 164:13
164:16 169:7,7
209:3 224:8

248:11,14
251:7,12
254:18,22
257:20 259:1
275:8 290:21
290:25 291:1
**inclined** 4:3,16
53:2 55:2
61:20 138:4,5
164:14 205:25
206:5,16
207:14 209:12
210:4 211:2,5
259:16
**inclines** 52:23
210:23 211:1
**include** 92:6
133:9
**includes** 90:25
**income** 22:13
**inconsistencies**
156:7
**inconsistent**
238:14 295:4
**Incorporated**
12:14,16
**incorrect** 136:10
**incorrectly**
138:17
**incremental**
262:8 263:14
264:5
**increments**
313:11
**independent**
20:22 83:21
85:16,17 86:8
86:12,25 88:11
88:22 89:1
93:14
**independently**
83:8 85:13
87:7,15,22
88:4,8 235:19
255:12
**INDEX** 3:1,7
4:1
**indicate** 96:24
97:22 134:2
201:25 274:4

308:20
**indicated**
278:24
**indicates** 136:19
201:22 206:3
207:12 274:10
**indicating** 80:1
127:10 275:7
**indication** 137:2
273:4
**indications**
120:22 124:1
145:4
**individual** 7:16
7:18 12:2,3
**induce** 157:21
**industrial** 26:6
**industry** 128:17
**infant** 4:12 35:2
37:6,8 39:10
69:12 95:7
96:24 107:21
112:15 113:7
113:18,18
117:6 118:11
118:11 119:1,6
120:3 132:6
144:20 145:22
146:4,17
149:16 150:7
153:19,19
154:5,13
156:14 158:24
159:2,15 162:5
169:12 170:16
170:22,25
171:7 174:5
175:11 178:12
178:22 179:6
180:15 182:4
185:17,24
186:8 188:9,21
189:5 190:15
212:14 214:9
220:6 221:11
222:2 223:13
235:19 251:2,2
251:20,20
254:21 257:20
258:11 259:8

259:15 261:4
262:8,10,21
264:5 276:11
276:20 280:9
283:5 284:6
289:6 292:9,15
293:2 295:1
297:14 299:5,7
300:25 305:17
312:18,18
**infant's** 162:14
299:16 300:13
300:16
**infants** 35:4
36:11,11 37:10
38:9,10 39:16
44:15 45:3
46:11 68:17
93:17,19 112:1
114:16 120:1
131:23 137:12
137:14 146:7
146:14 147:9
147:21 151:8
165:11 171:3
171:10 172:17
174:16,24
175:7,8 188:12
190:7 206:3
207:12 209:11
220:11,12,20
221:4,6,14,23
225:20,22
227:24 229:8
231:3,4,7
236:1 255:2,10
255:13 284:11
292:21,22,25
294:23 305:5
305:23 314:8
317:15
**infants'** 4:4
209:4 231:8
**infections**
117:21
**infinite** 176:18
**influence** 128:6
**inform** 154:12
**information**
9:10 72:6,25

73:2 83:20
90:21 92:24
93:5 97:2,10
100:2 109:16
125:1,8,10,14
125:24 126:17
126:19,24,24
142:2 247:15
270:25 281:5
**infringing** 47:12
50:4
**inhibit** 181:8
**initial** 16:1
21:22 48:17
56:4 90:16
107:16 110:9
223:25 225:19
228:23
**initially** 13:3
37:11 42:20
**initiated** 15:16
**injury** 184:10
306:14
**inputs** 14:4
**inquiring** 77:7
**inside** 210:16
**insisted** 189:25
**installed** 26:23
**instance** 217:3
**insti** 303:6
**institute** 116:11
116:23 145:11
**Institutes** 150:3
**Institutional**
303:6
**instruct** 22:20
**instructed**
160:19 190:14
265:24 266:6
269:17 270:23
**instruction**
77:17 184:14
185:6 188:18
239:16
**instructions**
184:9 238:9,20
268:20,24
269:6
**integrate** 168:4
**integrated** 21:4

**intend** 90:8
115:11 138:12
138:24
**intended** 175:14
180:17,20,24
182:9 184:18
184:23,24,25
185:4,24 186:5
188:20 267:10
267:17,19,21
268:4
**intent** 268:9
**intention** 185:2
**inter** 278:15
**interact** 304:15
304:19
**interacted** 93:18
**interaction**
229:5
**interactions**
214:16,22
220:14 221:9
225:20 227:12
227:21 290:14
**interacts** 145:5
145:8
**interchangeably**
194:8
**interest** 28:2
30:1 32:4 37:3
54:14
**interested** 17:9
23:2 54:22
75:3 92:20
95:14 123:21
321:14
**interesting** 41:6
92:9
**international**
141:12 142:16
184:5
**interpretation**
271:8 306:18
306:20
**interpreted**
311:14
**interpreting**
195:18
**interrupt** 76:18
122:4 143:24

**interrupted**
105:6 122:3
291:10
**interrupting**
122:19 123:20
**interstitial**
278:4,16
**introduce**
317:24
**introduced** 75:7
90:20
**introducing**
167:6
**introductory**
317:25
**intuitive** 269:7
**InVekTek** 24:8
24:13,14,17,18
24:25 26:14,23
29:18 32:23
**InVekTek's**
26:7
**invent** 29:2 35:3
**invented** 28:23
29:4 35:1,3
**invention** 22:6
22:13 26:12
29:8 35:7,21
35:22 36:19
40:1
**inventions** 23:2
32:21 34:10,18
34:23 39:16,25
40:25 44:14
45:1 118:5
**inventive** 28:20
**inventor** 7:7,15
12:25 13:1
19:20 22:23
23:5 28:1
32:14
**investigate**
50:20 157:15
**investigating**
45:16,20 46:14
49:7 50:16,24
108:10
**investigation**
108:15 125:13
137:11,20

141:20,25
142:8 147:7
150:13
**investigations**
46:1,2 47:9,21
120:9
**investigative**
271:4
**investment**
25:13
**investments**
25:16
**investors** 25:5
25:19
**invoices** 78:6
**involve** 12:15
15:11 16:20
32:5 295:11
**involved** 12:8,17
13:2,9,12,15
28:1 36:22,23
51:21 60:17
99:23 111:19
112:11 154:2,8
176:5 182:22
289:22 295:13
**involving** 12:8
13:8 158:24
**issuance** 59:10
**issue** 12:12
13:10 14:11
52:25 107:2
113:20 115:4
137:19 138:9
142:9 146:17
147:17 149:13
159:20 170:14
170:14 232:4
265:25 284:1
285:19,20
**issued** 13:12
36:2,16 58:15
**issues** 48:16
60:2 62:24
71:7 90:20
106:20 118:4
152:6 169:6
309:23
**it'll** 308:24
**item** 63:19

125:18
**items** 59:3

**J**

**J-O-S-B-O-R-...**
242:18
**James** 172:20
**Japanese** 30:16
**job** 7:11 64:21
90:5 273:13
**Joel** 104:8
**John** 2:3 5:9
10:20 11:17
22:22 76:22
77:10 121:13
122:6,21
123:21 183:4
199:12 200:11
202:24 204:3
207:5 208:7
230:22 241:2
241:24 242:16
243:22 256:2
296:9 298:6
307:23
**josborne@gol...**
2:5
**journal** 4:3
86:13 206:8
207:17 208:25
**journals** 257:1
315:14,16
**Judicial** 325:5
**July** 91:8 92:24
309:6
**jump** 191:1
**jumped** 206:10
264:16
**jumping** 84:1
**Junction** 190:19
202:8
**juries** 161:9
**jury** 24:10 32:13
45:11 53:14
73:23 74:7,9
110:19 112:22
115:12 118:23
119:17 130:4
134:8 135:8
138:13,25

139:15 140:4
155:9 156:5
160:11,13,14
161:10 194:4
246:17 247:3
264:7
**jury's** 55:8
198:24
**justify** 60:15
**juvenile** 45:7
46:19 135:6
136:21,21
140:24 145:5,8
153:7 154:3
318:8

**K**

**KATHLEEN**
1:2
**Katie** 5:10
**keep** 32:24 38:1
38:1 62:17
147:9 178:12
208:4 227:2
237:18 265:4
297:18
**keeping** 33:14
178:22,25
212:10 265:20
**Kelly** 77:23
**kept** 34:21
**Kevin** 200:5
**kicking** 163:12
171:15 260:25
261:1 264:15
**kid** 61:19 64:15
252:12 280:15
**kids** 61:25 64:17
68:2 98:9
99:14 114:19
114:20 151:21
189:12
**Kids2** 46:3,17
46:18,18 47:13
47:15,23 48:3
49:14,20,20
50:17,18,20
51:10 54:15,19
55:18,19,21
58:14 60:17,24

61:4
**Kim** 70:2,2,3,8
**kin** 321:13
**kind** 23:13,20
32:17 37:21
41:21 44:12,16
53:23 56:10
69:13 72:15
87:9 97:1
100:1 119:16
131:2,4,5
148:11 150:11
150:13 153:13
155:13 162:21
166:14,15
171:14 179:22
190:25 197:15
198:3 212:17
212:19 230:2,9
235:21 236:13
236:25 247:18
251:15 258:16
265:6,20 270:4
275:5,6,15
279:15,24
282:3,4 283:23
291:21 294:17
299:11,15
304:13 307:15
314:14
**Kindergarten**
316:10
**kinds** 31:10
33:17 49:21
52:8 55:5
68:22 69:18
71:5 97:13
113:13 142:5
167:7 212:13
279:24,25
311:11 314:4
314:10,13
**kits** 44:10
**Kitty** 103:25
**knee** 260:24
**knees** 163:7,8,10
173:19 185:18
186:9 187:23
190:16 232:6,8
**knew** 55:19

60:13 126:5
139:6 167:11
168:15 306:16
307:4,7
**knob** 68:23
**know** 6:16 10:23
10:24 13:5
15:24 16:15,22
16:24 17:4,9
17:13 22:4
25:15,22 26:22
28:12 32:2
33:3 35:7,23
40:15 43:2
44:25 49:11
55:10 56:11
58:18 60:22
61:5 70:25
72:3 73:20
75:25 76:7
78:17 81:1
83:18 84:2,14
86:4,9 88:19
90:19 91:25
93:1 96:2 97:3
97:4,6,11,12
98:6,11 99:19
100:6 102:6,12
103:13,17
107:8 108:8
112:15 113:9
113:23 114:8
114:10 115:3
115:19,21
116:9,20,22
117:25 118:13
118:16,18
119:12 120:15
121:11 122:22
122:23 126:3
127:8,11,12,13
127:14,15
129:20 130:25
131:15 132:1
132:16 133:7
135:3,19,20,21
136:20 139:7
142:17 143:17
145:7,22
147:16,23

148:17,22
154:25 155:17
155:19 156:25
157:16 165:10
165:21 166:14
167:6,11 168:2
168:3 171:25
172:7 174:25
175:21 179:12
179:12,13,17
182:20 186:25
194:8 196:2
202:22 209:15
211:16 217:11
219:16 230:7
230:19 234:13
235:2,10
237:15 241:24
245:23,25
246:2,19,23,24
247:12 248:15
248:21 251:9
251:11,12,25
253:21,22
254:2,17,19
257:12,17
261:19 268:21
269:8,12,20
271:22,24
272:1,16,22,23
273:2 275:8,8
275:24 276:23
276:24 277:3
279:23 283:20
286:9 287:4
290:20 291:6
294:8,10,24
298:9,21
302:17 303:12
303:22 304:24
305:22,25
306:1,2,21,24
307:11 308:23
309:22 311:24
312:13 313:10
313:17 315:5,7
315:25 316:2
**knowing** 135:10
246:21 307:2
310:1

**knowledge**
130:12 133:23
134:16 137:3
257:14 277:12
283:11,24
285:21 287:25
**knowledgeable**
100:5 119:15
**known** 146:6
149:10 150:8
168:14
**knows** 73:23
306:19
**Korea** 29:19
31:11
**Korean** 30:2,4
30:20
**Kristen** 110:9
305:13

**L**

**L** 325:1
**lab** 112:13
279:23 289:4
**label** 3:17
182:21,22
183:6,10,13,17
189:3 190:14
195:19 200:6
200:10 214:14
214:23 215:4
238:3 268:15
268:18 292:13
306:13
**labeling** 154:13
154:21 156:5
**labels** 154:16
**lacking** 89:7
**language** 264:3
**lap** 207:25
236:12 237:9
**laptop** 240:19
242:4,6,8
**large** 26:9,10
27:22 75:25
100:6 150:25
189:12 307:8
**largely** 36:21
246:8,9 280:11
**larger** 252:3

**largest** 26:11,13
26:22
**Las** 58:25
**late** 78:8 189:24
189:25 202:18
**lately** 25:16
**lateral** 211:12
211:15
**laugh** 77:15
**laughing** 78:23
**launch** 231:22
**law** 17:8,10
74:21,23 75:7
82:20 86:5,9
88:22 89:2
159:4
**lawsuit** 12:2
15:16 33:18
34:1,3
**lawsuits** 16:4
**lawyer** 25:8
74:21 91:6
110:8 198:16
**lawyer-ese**
25:22
**lawyer-like**
73:22
**lawyers** 17:6
33:3,6 75:3
85:19 86:24,25
87:6 88:11
305:13
**laxadaisically**
237:1
**lay** 134:10 278:9
**laying** 173:23
220:11 290:20
**lays** 165:18
**lead** 12:25 13:1
13:11 19:20
192:14
**leading** 192:10
312:24
**leads** 130:11
**leaning** 204:21
**learn** 10:8 55:8
174:1 192:5
197:12
**learned** 76:9
86:13 114:12

138:2 173:22
174:2 189:21
**learning** 138:8
**leave** 20:7,9
35:23 40:10
255:25 270:4
318:15
**Leaving** 45:4
**left** 15:17 32:11
56:10,12,23,24
212:10 237:6
238:23 239:21
239:23 242:21
274:22 275:4
303:1
**leg** 262:7 263:13
264:4,20 265:3
293:6
**legal** 23:18
72:16 111:15
159:6 320:1
325:6,7,9,10
325:13
**legalese** 73:21
**legs** 165:23
192:17 193:16
224:6 260:24
263:18 264:10
264:15,24
265:5 273:6
275:6 285:16
**leisure** 143:7
**length** 266:5
**lengths** 294:15
**lengthy** 143:13
**lens** 120:2
**let's** 8:20 28:10
29:15 45:6,10
47:22 53:14
62:13 80:24
83:3 84:13
85:12 93:10
100:19 101:16
117:4 121:6
136:24 140:16
146:24 148:2
150:9 153:5
167:3 170:7
172:8 175:10
175:25 181:1,6

182:11 191:6
192:1 202:21
212:8 214:12
224:22 258:5,5
260:5 262:5
271:10 277:20
279:22 282:6
300:21 307:13
**letter** 250:22
**letterhead** 4:14
**letting** 78:21
**level** 63:24
96:24 97:4,5
140:19
**leverage** 41:3
**leveraging** 42:5
42:6
**licensed** 21:6
**licensing** 22:15
**lie** 209:11 230:3
**lies** 230:2
**life** 8:16 77:21
109:7,7,13
137:7 254:13
**lifetime** 99:24
**lift** 27:1,3,19
162:17,18
194:12 198:5
**lifting** 27:7
**liked** 92:10
**limited** 110:22
143:12 151:10
229:8,9 259:17
261:8 303:15
**limiting** 131:14
131:15
**Linda** 104:9
**line** 56:2 58:19
59:12 123:9
129:10 132:3
215:8,11,12
259:1 267:1
323:12,14,16
323:18,20,22
323:24 324:1,3
324:5,7,9,11
324:13,15,17
**linebacker**
222:19
**lines** 289:19

**Lisa** 104:12
**list** 37:8 83:3
92:20 103:6
120:20 122:14
143:15 161:20
163:25 166:2
183:3 252:25
305:4,6,14
310:8
**listed** 30:19,19
36:12 75:12
251:8
**listen** 11:19
128:20
**listing** 122:15
310:12
**lists** 137:4
**literally** 18:17
**litigation** 7:19
12:8 13:2,8
14:16 15:9
325:14
**Litigators** 200:1
**litsup-ga@ver...**
320:12
**little** 39:24 62:3
62:6 70:6
105:5 162:21
162:22 164:14
167:20 192:16
201:8 202:18
213:13 218:7
224:10 235:7
245:22 252:11
265:4 275:6,19
277:8,13
280:16 302:22
305:2 308:9
**live** 93:17,18
94:8,11,13,17
220:20 221:4,6
221:11,23
222:2 223:12
225:20,22
227:14,24
229:4,8 255:13
270:9 284:11
292:22
**loan** 177:15
**locate** 172:2

**located** 88:4,8
**login** 80:2,3
**Loheiser** 104:12
**long** 10:7 17:5
  48:3 50:23
  61:18 68:14
  73:8 102:19
  113:21 122:23
  153:14 166:18
  175:23 176:3
  176:11,12,14
  176:15,16
  177:5,8,14,18
  177:20 179:19
  181:4 184:24
  209:25 218:13
  225:5,10
  234:18 255:15
  276:14 296:19
  296:21 299:15
  299:25 303:1
  304:2,4 313:2
  313:19
**longer** 43:3 65:9
**look** 49:1 55:16
  63:13 80:24
  101:11 106:19
  107:3 145:9
  147:2,17
  150:16 172:12
  172:12 179:2
  183:7 188:6
  191:2 192:1
  199:19 200:6
  202:21 208:12
  210:11 214:15
  216:12 217:15
  221:22 222:5
  226:7 229:15
  234:1 235:9
  247:22 250:19
  250:21 254:6
  258:5,5,24
  262:5 269:6,9
  269:15 273:22
  273:22 275:17
  275:18 282:6
  285:18 289:18
  295:25 296:3
  307:13 310:18

318:10
**looked** 51:7
  86:20 87:4
  95:22,25 106:2
  142:1 154:24
  221:7 238:2
  268:24 281:17
  299:24 310:24
**looking** 34:16
  49:23 51:9
  52:25 63:11
  83:18 99:14
  106:16 107:11
  134:2 136:3,19
  137:12 145:3,4
  200:20 201:16
  206:13 220:9
  221:5,19,20,25
  223:8 226:19
  235:9 239:12
  245:4 246:4
  250:18 261:3
**looks** 204:19,22
  205:2,13,17,23
  223:10 226:4
  275:7 276:1
  302:17
**Loomis** 25:7,8
**loose** 236:13
  270:4
**lost** 273:12
**lot** 16:22 25:9
  29:4 32:7,21
  33:5,6 34:16
  34:18,20,23
  38:22 41:7
  42:4 44:1,3
  45:6 46:2,13
  52:22 55:8
  56:1 58:22
  62:24 64:16
  66:22 73:12
  86:4 92:1,4
  101:3 103:11
  114:4,8,14
  115:5,21 116:5
  116:10 120:8
  128:14,15
  132:17 133:25
  135:4 136:20

139:6,7 141:3
  145:7,16,22
  152:15 156:24
  157:1 164:24
  171:13,15
  173:14 180:19
  180:21,21
  191:24 195:5
  196:24 197:12
  216:23 217:15
  220:1,3,18
  235:4,22
  236:11 267:11
  270:15 272:16
  276:17 280:17
  292:4 295:8
  303:5 315:7,7
**lots** 65:15
**Louisiana** 2:13
**Lovett** 2:12 3:4
  5:11,11,22
  8:17 10:19,25
  11:17,23,25
  22:14,18,22
  23:1,10 50:13
  57:16,22 72:8
  76:15,20,22
  77:4,10,13,18
  78:24 79:2,5
  79:19 80:5,7
  80:17 82:2,8
  82:14 85:2
  88:23 89:14,23
  91:13 93:6
  118:20 119:18
  119:20 120:17
  121:13,16,18
  121:24 122:6
  122:16,21
  123:5,11,15,18
  123:21,24
  125:3,5 126:1
  126:12,21
  129:8 134:5,24
  138:10 139:12
  140:8,10
  142:10 143:10
  143:21,25
  144:3,14
  159:24 160:4

160:20,23
  161:1,21
  180:13,14
  182:2,11,13,19
  183:5,10,12,16
  183:19,21,22
  186:15 187:8
  191:11 194:24
  196:18 198:8
  199:12,14,18
  199:21,25
  200:9,18,22,24
  201:1,3 202:23
  203:2,12,16,24
  204:1,6,7,12
  204:14,17
  207:4,9,23,25
  208:4,8,9,13
  208:16,23,24
  213:11 214:3
  216:25 217:10
  217:25 218:3
  218:14 220:5
  230:22,25
  236:19 237:23
  238:11 239:15
  240:10,13,18
  240:20 241:1,7
  241:12,19
  242:2,4,6,12
  242:15,23
  243:5,7,9,13
  243:18,21,25
  244:4,8,18
  245:9,12,16
  247:21 248:2,4
  250:2,7 252:13
  252:21 253:6
  254:16 256:1,9
  258:1 260:3
  266:3,16,20,22
  266:24 267:16
  268:12 269:11
  269:18 270:17
  271:10,14,17
  271:24 272:8
  272:11 273:19
  273:21 274:18
  281:24 282:19
  282:21,25

285:9 286:23
  287:19,24
  288:11,22
  292:6 293:4,9
  293:12,23
  294:18 295:10
  295:24 296:9
  296:13,21,25
  297:2 298:6,11
  298:21,23
  299:2 301:4,9
  301:13 306:11
  306:25 307:12
  307:19,21
  308:11,13
  309:1,3 312:5
  312:10,12,14
  318:20
**lovettm@gtla...**
  2:14
**low** 41:6,22 42:1
  42:15 43:13,18
  65:24 117:20
  297:13,24
**lower** 43:4 128:4
  261:3
**lowered** 297:11
**lunch** 143:22
**lung** 112:23
  137:15
**lungs** 111:20
**lying** 187:19
  192:17 194:11
  194:17 210:16

---

**M**

**M** 1:25 321:4,21
  325:17
**M.D** 191:15
**M.I.T** 18:7,24
  19:5,6,9,14
**M.P.E** 241:8
**M.R.I** 112:1,13
**machine** 14:10
  14:14 32:9,19
  33:14
**machine's** 14:12
**machines** 12:18
  12:19,20,21
  14:3,4 24:22

26:8 31:1,10
31:11,13,15
32:8,15 33:14
33:14,17,18,21
34:8,12 112:13
**magically**
264:16
**mail** 322:11
**main** 47:8,9
57:5 169:10,11
170:5,11,12
287:5 311:14
**major** 17:17,22
19:2
**majority** 101:19
306:2
**making** 32:7
49:7 77:8
107:4 117:18
161:20 167:7
299:16 323:9
323:10
**male** 280:2,8
**man** 59:14 66:15
**maneuver** 236:6
261:11
**maneuvers**
212:13
**manipulating**
244:20 301:4
**Mannen** 4:15
87:5 255:18,20
256:6,10,25
257:19 258:8
261:7 303:14
303:18 311:19
313:10,13
315:3
**Mannen's**
259:14
**mannequin**
275:2,3,4
277:2
**manner** 38:13
107:24 157:19
238:8
**Mansell** 322:20
**manual** 269:12
269:16
**manually** 235:2

322:9
**manufacturer**
295:20
**manufacturers**
295:12
**manufacturing**
12:21
**March** 69:21,23
**Maricopa**
272:13
**mark** 79:20
89:16 191:6
201:22
**marked** 79:23
84:25 87:10
89:21 91:11
182:17 183:3
191:9 199:23
203:7 208:6,18
213:7 240:16
240:24 244:15
250:5 255:22
271:20 296:7
**marker** 98:19
**market** 45:16,17
58:10 60:9,15
60:25 64:10,14
64:19 141:22
178:4 251:17
289:2
**marketed** 20:14
45:13
**marketing**
159:15
**Markman** 8:4
**marks** 226:8,13
**Mary-Olga** 2:12
5:11
**material** 7:6
34:21 84:19
114:9 257:12
309:10 311:23
311:24 317:12
317:14,21,24
**materials** 82:20
89:1 131:9,23
**math** 78:20
**Mattel** 8 5:13
10:8 50:21
90:10 103:21

105:15 309:17
**Mattel's** 310:22
316:22
**Mattel-COU** 4:6
4:20
**matter** 49:6
91:19 157:19
**mattress** 209:12
210:14,24
**mean** 7:5 8:13
14:18,19 15:5
17:4,18 24:2
25:1 26:3
27:19 39:12
42:8 48:13,14
51:13 54:17
57:14 63:22
64:16,22 69:21
70:21 71:4
72:15 78:3,19
81:9 83:13
93:1,15 98:5,8
99:7,10 100:1
100:9 102:24
105:5 106:18
108:7 113:8,12
114:6 116:14
117:1 118:2,13
118:17,22
119:11 142:12
143:2,24 146:6
148:10 149:3
152:25 153:8,8
153:21,22
154:18 155:24
156:9,10,15,16
156:19 159:23
170:7 172:6
176:4,14 180:8
180:19 184:22
185:7 186:2,10
186:24 187:10
187:11,13,17
187:18 188:23
189:2 195:19
196:13 204:1
204:22 205:16
211:15,17,18
211:21 220:17
224:3,5 225:4

226:22 227:16
229:19 231:20
233:5 234:13
236:8 238:13
239:7 240:6
245:7 247:12
256:3 257:4,8
262:24 263:16
264:12 270:24
273:1,3,7,11
274:24 275:12
275:22 279:4
280:11,12,15
282:2 283:16
286:6 287:3,11
290:5 291:14
292:2 294:14
299:9,20 302:3
302:10,16
303:4 304:23
305:10 307:22
307:23 310:18
311:9 312:23
**meaning** 18:6
300:15
**meaningful**
155:15
**means** 26:25
117:23 164:22
186:11,13
187:4 236:23
**meant** 11:15
152:17,21,21
169:13 243:3
291:6
**measure** 158:8
158:17 231:6
239:24,24
240:3 279:25
**measured** 93:16
248:21,25
284:9 291:23
291:24
**measurement**
150:20 240:2
248:13 249:1
**measurements**
95:3 225:9
226:25 227:7
237:19,21

248:19 249:12
**measuring**
94:21 95:4
133:5 249:3
**Mecatec** 29:19
29:22
**mechanical** 19:4
61:17 62:12
106:20 107:2
115:25 116:9
127:25 198:21
**medical** 3:21
4:14 74:24
75:18 97:6
106:8,13,15,19
106:19 107:4,5
107:9,11,12,16
108:6,20 111:1
111:4,10
115:18,20
199:15 272:13
281:8 316:4
**medically**
191:14
**medium** 311:17
**meet** 48:16
58:25 109:22
**meeting** 45:22
110:2 133:10
134:20
**meetings** 58:21
59:5 70:17
110:3,15
128:20 133:8
167:15
**member** 57:23
58:1,2,4,6,7
64:2 70:19
71:19 73:3
116:24 126:22
126:25
**members** 57:7
127:13
**memory** 274:11
291:21
**men** 189:12
**mention** 253:10
277:23
**mentioned**
44:22 111:23

133:25 170:8,9
**mercifully**
110:21
**mess** 311:11
**messed** 57:3
**messy** 16:9
**met** 109:11
110:4,6,12
**method** 151:5,9
151:16,18
190:7
**methods** 14:3
210:11
**Michael** 104:5
**microns** 34:5
**middle** 122:15
209:18 222:16
224:8 276:25
**mike** 180:12
307:2
**mile** 65:17
**milestone**
195:12,13
**milestones**
185:25 189:14
192:9 195:16
196:10,24
231:12,13
**millimeter**
158:12
**million** 17:6
21:22 176:17
314:20
**mind** 8:24 9:18
51:14 72:9
88:14,20 140:5
185:25
**mine** 66:25
195:8 245:12
**mine's** 280:16
**minimizing**
13:19
**minute** 121:7,8
200:16 212:8
279:3 281:11
300:4,8 311:21
**minutes** 171:12
174:25 180:4,9
218:17 225:6
237:18 239:9

293:8 302:10
304:8,16
307:16 312:19
313:4 314:17
**mischaracteri...**
128:11
**misinterpreted**
132:2
**misleading**
139:23
**missed** 164:1
220:8 316:4
**missing** 97:2
171:15,16
**mission** 129:22
**misunderstan...**
243:16
**misuse** 316:19
**mix** 51:16
219:14
**Mo** 241:17
**mobile** 148:7
**mobility** 137:6
148:4 152:6,22
152:22
**mode** 65:25 66:2
227:20,20
**model** 68:16
**mom** 151:23
190:18 202:8
**moment** 192:13
271:18
**momentum**
198:9,22 199:8
**MomJunction...**
3:18
**mommy** 191:13
**moms** 194:18
**Monday** 84:19
**money** 15:7 33:5
33:6 42:4
**monies** 21:22
**monitor** 314:25
**monitors** 303:15
**monkey** 277:7
**month** 173:12
192:10,12
235:5
**months** 52:16
62:2 97:7 98:3

98:4 108:22
150:5 153:20
162:20 172:23
173:3,5 189:15
189:23 192:15
193:3,7,12,24
194:10,16
195:2,19,23
196:4,6 201:8
202:2,12,15,19
222:18 223:1
232:7,21
**morning** 129:9
129:11 267:1,5
**mother** 43:20
224:16,17,18
227:2,3 235:13
235:16 237:6
**motion** 21:1
38:14,21,23,24
55:1 65:8
150:19 260:14
260:18,25
265:1
**motions** 32:18
68:22 192:14
221:16 230:16
260:15 262:7
263:13 264:4
264:21 265:3
304:14 314:4
314:10,14
**motivate** 297:14
**motor** 31:3
**motors** 14:12
41:7,17 42:13
**mouth** 116:21
**movable** 38:2,3
**move** 24:22
31:17 32:8,9
32:10,15 34:4
41:21 42:9
96:4,11 131:23
141:19 151:13
163:3,13
215:25 226:24
226:25 230:14
233:9 298:4
308:13,14
**moved** 37:25

93:19 287:7,9
287:16,21
**movement** 4:4
209:4 223:18
223:22 288:13
**movements**
170:24 224:25
231:8
**moves** 14:14
**movie** 243:15
**moving** 21:3
65:12,13,15
145:18 153:15
165:1 181:19
229:24 247:14
265:5 302:4
311:21
**MP4** 241:4
**multi-hoist**
26:25
**multi-mode**
20:18
**multiple** 168:9
264:10 282:2
**muscle** 4:4
209:4,10
313:15
**muscles** 37:23
**muscular** 39:19
40:5

---
**N**
---
**n** 4:7,10,19 58:9
66:7 74:2,4
75:4 77:25
84:3,4 92:15
94:2,4,14,18
96:9 97:17
110:24 159:19
161:14 164:15
165:18 166:8
171:5 178:2
182:22 188:21
195:15 210:4
211:9,12 214:9
215:16,23
216:2,14 217:4
218:11 221:9
221:15 241:3
244:11 247:4

248:7,13,20,25
251:16 255:2,5
269:1 271:6
275:25 276:6
276:10,19,24
277:15,22
281:10 284:6
288:25 289:25
290:17 292:22
294:6 297:14
297:22 302:7
305:18 316:14
316:16
**N.C.A.A** 17:25
**name** 3:2 5:23
5:24 12:13
13:17,19 16:17
19:12 40:4,16
60:22 70:1,2
75:15,19 87:24
155:19 189:8
222:16 309:19
321:16
**named** 191:14
321:6
**names** 26:3
36:17
**narrow** 26:14
28:21 158:23
**narrowed** 145:6
**nasal** 280:8
**National** 150:3
**natural** 260:14
**naturally**
294:10
**nature** 86:15
168:7
**near** 75:10
147:2 167:25
**necessarily**
38:15
**necessary**
323:11
**neck** 69:10
277:4,17
**need** 39:6 63:12
79:3,5 85:7
89:10 121:13
122:6 134:14
148:17 149:8

213:12 265:2
275:24 293:5,7
303:20 308:6
308:16
**needed** 79:7
82:12 90:21
256:16 310:19
**needs** 18:19
168:2 308:22
**negative** 313:6,7
314:19
**Neil** 19:13
**neither** 235:1
**neonatal** 109:5
**neonates** 111:9
**neonatology**
111:6,7
**neuro** 38:6
**neuromuscular**
38:6 39:12
**never** 43:11
58:20 59:5
61:3 62:9
70:12,16 71:19
71:20,23 93:4
110:4 116:15
116:17,23
135:1 154:7,7
156:19 175:15
179:15 189:21
309:20
**new** 15:23 34:24
49:25 50:19
63:12 71:13
90:20,20 111:9
167:2,5,6
168:10 228:12
228:13 271:12
**nice** 20:23
**Nicholas** 172:20
173:10 174:7
179:25 189:7
189:14 195:3
204:10 215:21
217:18 218:5
218:12 219:18
219:25 220:14
221:8 222:6,15
225:18 227:22
228:19 229:9

232:5 234:14
289:15 290:3
290:16
**Nicolina** 191:14
**Nikolina** 3:20
**nine** 78:17 178:2
208:3 245:10
301:17 307:2
**nominal** 248:17
**nominally**
248:15
**non-breathable**
162:9
**non-engineeri...**
151:23
**non-objection...**
82:13
**Non-responsive**
119:19 125:4
140:9
**non-rigid**
259:18 261:17
**non-rollers**
311:17
**non-rolling**
174:24
**non-standard**
51:4
**normal** 6:10
**normally** 37:13
48:13 162:18
269:21
**NORTHERN**
325:2
**Notaries** 320:5
320:11
**notarized**
320:11 322:11
**Notary** 324:23
324:25
**note** 178:21
295:1
**noted** 290:24
291:3 323:4,5
**notes** 107:1
321:10
**Nothing's** 9:18
**notice** 3:9 80:9
81:1
**noticed** 159:3

**noting** 98:19
322:8
**notoriously** 31:4
37:16
**number** 15:5
24:3 30:6 78:4
93:11 95:5
121:4 123:10
158:7 167:5
169:2 200:8,17
206:19 243:12
282:9,14 306:7
307:9
**numbered**
245:13 273:23
**numerous** 61:11
157:15 284:13
**Nutritional**
201:19

_____

**O**

**O** 321:1 325:1,1
**O.C.G.A** 325:9
**oath** 9:21,22
10:1 74:10
**object** 10:16
22:19,20
118:15 121:17
160:3,16
280:22 305:19
**Objection**
119:18 125:3
140:8
**objections** 81:24
**obscured** 275:5
**observation**
217:21 219:13
225:2 235:24
237:12 255:13
270:9,20 313:2
317:3,5
**observational**
228:18
**observations**
214:16,22
215:19 216:1,1
217:9,13
220:11,20
221:6 223:15
228:22

**observe** 180:7
215:22 218:11
227:23 229:18
231:7 255:14
314:22
**observed** 93:18
174:17 180:15
214:19 216:9
217:3,23 218:5
221:15 225:10
229:21 230:11
284:11 313:3
**observing** 220:6
221:10 224:20
313:7
**obstacle** 158:5
**obstacles** 158:8
158:15
**obstructed**
271:6
**obviously** 7:21
70:22 74:21
77:21 84:14
85:24 96:16
106:13,15
142:13 164:7
201:11 219:2
243:23 247:13
267:4
**occur** 71:17,24
146:8 151:6
278:3
**occurred** 62:9
71:20 158:15
**occurring** 167:9
**occurs** 115:20
115:21
**OCGA** 320:14
323:7
**offer** 115:11,18
138:24 139:14
**offered** 91:19,22
**offering** 90:18
91:2 111:4
139:8 154:20
156:4 159:6
**office** 13:18
35:18 112:7
272:13
**officer** 24:11

**offices** 322:3,11
325:8
**oh** 19:17,18
23:15 25:1,24
33:16 35:15
46:20 49:1
55:16 63:17
66:14 85:5
113:12 130:11
140:14 157:6
157:13 168:24
187:16 199:21
200:7,23
206:12 207:25
212:2 213:12
214:24 215:1,3
216:23 217:6
222:3,10 226:6
229:15 234:7
235:25 241:13
243:2,5 245:12
271:24 280:25
280:25 285:1
293:9 300:15
301:12 302:9
316:2 317:2
**okay** 6:12,22,25
9:1,13,20
11:15,16 12:10
13:10,14 15:24
18:13,24 19:12
20:2 21:8,14
21:16 23:8,24
26:2,17,20
27:25 28:14,22
29:23 36:3
40:14,17 44:6
44:21 45:4
47:25 50:14
64:8 66:14
67:25 77:24
78:25 79:9
82:25 83:12
84:9,10,11
87:8 88:1,3,7
88:15 89:15
91:7,20 99:3
101:4,9,15
103:1 104:11
108:1,5 109:1

109:4 111:10
112:16 116:18
117:11 119:18
120:18 136:3
136:14 139:2
140:8,16,17
144:5,24 145:2
146:25 152:20
153:10 154:12
154:15,20
155:19,23
156:2 157:9
161:12,15
166:11 169:17
171:22 172:3
173:4 177:11
177:13 178:21
179:2 180:5,10
182:7 183:21
185:13 186:20
189:6,10,13
193:5 194:15
195:10 198:15
198:23 200:12
201:1 202:1,17
202:20 203:12
204:8 205:4,8
205:24 206:24
207:1 208:22
209:21 211:24
212:7 214:24
215:4,7,25
218:7 219:15
220:6,17,22
222:5,5 223:21
224:2 225:7
228:3,8,13
229:2 232:9
233:12,20
238:25 240:18
241:13 243:21
244:12,22
245:2,15
247:22 248:1
249:11,24
250:17,20
253:5 254:20
258:7 259:2,12
268:13 272:19
282:13,24

283:10 284:10
288:23 294:19
295:16 298:4,8
298:12,15,16
298:17 299:1
300:5,6,7,11
300:20 301:15
305:22 309:9
310:5,8,16,25
312:9,22
314:16 315:24
318:11
**old** 31:1 43:7
62:1 67:8 97:7
98:4 147:22
149:23 150:5
151:17,25
172:23 189:15
189:23 195:20
195:23 196:3
202:3,12 232:7
280:17 301:17
**older** 49:16
149:1,5,20,20
149:20 152:9
235:5
**oldest** 68:2
**Oliver** 189:9,9
189:18 195:2,6
204:10 217:23
218:4 219:14
269:13
**Olson** 3:22,23
5:10 102:15
268:21 269:4
272:20 274:12
**Olson's** 276:8
**Olsons** 276:5
**on-line** 44:10
80:4 257:5
268:24
**on/off** 31:2
**once** 37:23
195:13 218:23
253:1 254:21
258:11 259:7
322:10
**one-minute**
313:11
**ones** 51:13 62:3

62:6 101:24
103:24 104:9
105:10 112:8
170:11 196:14
202:22 222:3
237:9 284:18
289:12
**oOo--** 2:18
319:13
**Oops** 288:2
298:17
**open** 11:23
208:22 211:13
272:7 308:21
**Opening** 203:13
208:21
**operate** 42:8
112:3
**operating** 66:2
131:1 167:23
**operator** 31:20
**opin** 220:10
**opine** 72:13
**opined** 72:16,21
73:22
**opinion** 9:3,6
57:20 61:7
72:19 73:24
74:7 89:8,12
106:11 107:5
129:17,24
130:1,2 133:14
139:9 140:4,7
155:9 156:10
210:10 219:25
262:13 272:25
294:5 316:18
**opinions** 9:19
10:9 74:10
86:15 90:7,10
90:17 91:1,15
91:18 93:9
110:18,22
111:4 115:11
123:22 134:17
135:18 138:12
138:14,20,24
139:14,19,20
139:21 143:4
154:21,24

155:12 156:4
156:11 159:6
161:25 170:18
182:25 220:12
227:24 248:10
256:11,19
310:14 316:22
**opportunity**
10:8 62:23
219:19
**opposed** 164:15
**opposite** 47:14
**order** 89:18 95:1
308:15
**ordering** 322:14
**Oregon** 17:14
18:9,11,14,15
18:19 28:16
**organization**
116:24
**orient** 169:1
**orienting** 277:25
**original** 231:15
309:11 322:13
322:15
**originally** 285:8
**Osborne** 2:3,3
5:9,9 8:14
10:14,16 11:19
22:12,17,19,25
23:8 50:7
57:11,21 72:2
74:19 75:16
76:14,17,21
77:6,12 79:4
79:25 80:6
81:20 82:7
84:16 88:18
89:9 90:4 93:3
109:23 110:6
118:15 120:7
121:7,15,17,21
122:1,13,18
123:3,7,17,19
124:23 125:22
126:11,15
128:8 133:16
134:22 139:3
139:17 143:20
143:23 144:1

159:21 160:3
160:16,22
161:17 182:1
183:2,7,11,14
183:18,20
186:3,23
194:22 196:12
198:1 199:17
200:7,12,19,23
200:25 201:2
203:1,9,13,23
204:4,9,13
207:3,7 208:11
208:14,20
216:22 217:7
217:24 218:2,9
220:2 230:24
236:7 237:14
238:10 239:5
241:10,13,25
242:3,5,9,13
242:17,21
243:2,6,8,11
243:14,19
244:2,5,17
245:7,10,15
247:7,25 252:8
252:18,24
255:24 256:8
257:22 260:1
266:2,10,19
267:8,22
269:10,14
270:11 271:9
271:12,18
272:7,10
274:17 281:13
282:17,20,22
284:23,25
285:2 286:20
287:1,23 288:2
288:5,19 291:8
291:13 293:7
293:11 294:13
295:5,23 298:8
298:19,22,24
299:1 301:2
306:5,22 307:6
307:15,20
308:2,12,18

309:2 311:20
312:9,11
318:11 322:1
**Osborne's** 76:12
**Osborne.com**
242:18
**outline** 309:9
**outlines** 109:20
**outraged** 56:13
**outside** 66:6,12
114:11 134:17
286:7 297:24
**overhead** 31:18
**overnight** 176:6
176:12 177:16
186:6 267:24
283:4
**override** 17:10
**Owlet** 314:25
**owned** 24:17
25:10,18 28:15
**owner** 28:1
**ownership** 24:2
29:25
**owns** 25:9
**oximeter** 315:4
315:15
**oxygen** 303:15
313:16 315:11

——————
**P**
**P** 321:1 325:1
**p.m** 144:7,13
213:21 214:2
293:16,22
318:23 319:11
**packaging**
156:14,15
**Paed** 191:15
**page** 3:2,8 4:2
81:13 121:4,19
123:9,25 124:2
129:10 136:14
137:4,4 141:10
141:11 144:25
145:9 146:25
150:16 169:1,4
169:4 172:12
172:13,15
191:17 192:1,3

200:17 201:4
206:10,19,20
221:24 222:1,4
223:9,9,16,19
223:20 224:25
226:2 234:6
245:10 247:23
248:5,24
250:18 258:6
258:17 259:12
259:22 266:17
266:25 273:23
274:8,19
275:18,18
276:13,21
278:24 282:9
282:14 296:1
315:20 316:9
323:12,14,16
323:18,20,22
323:24 324:1,3
324:5,7,9,11
324:13,15,17
**pages** 85:25
169:5 192:2
245:7,8 294:16
323:10
**painted** 203:14
**Palmer** 222:20
223:16,21,24
225:2,19,25
226:5,6,20
228:19 229:9
229:16 233:12
233:12 234:8
235:1,11,18
236:5,10 238:6
255:7 290:4,15
303:25 304:3
304:21
**Palmer's** 230:15
**paper** 87:5,19
91:19 147:3,4
147:11 150:12
150:16,17
151:2 180:12
209:1 210:8,10
257:11 273:18
278:10,11
**papers** 88:16

100:15 142:14
150:14 248:2
254:12
**PaR** 21:7,13
24:7
**para** 204:18
207:2 258:5
**parabola** 261:22
**parade** 23:3
**paragraph**
169:1,5,6
170:6,20
178:21 190:5
206:22,23
230:20,23
254:20 255:17
257:25 258:20
259:13 262:5
265:8 277:23
278:23 284:4
289:4,18 292:8
294:5 300:1,13
305:4,8 312:15
312:20 317:13
318:10
**Paragraphs**
277:24
**parameters**
81:25
**parent** 165:19
182:3,6 187:20
188:19 195:14
274:2
**parental** 270:23
316:19
**parenthetical**
188:10
**parents** 38:17
38:19 43:4
95:22,25 96:23
96:23 97:4,5
102:13 109:12
109:17 180:21
190:14 203:3
203:19 230:14
233:10,21
235:1 258:9
259:5 270:3,15
270:19 273:11
317:15

**part** 12:5 20:2
25:2,8,10,15
30:4 32:6
42:12 46:8
47:7,8,9 59:6
108:14 116:17
116:23 124:8
124:11,13
141:20 143:3
151:23 153:23
157:18 163:15
170:10 188:4,5
194:11 225:11
237:7 264:14
264:22 315:5
**partial** 175:3
**partially** 39:23
95:20 245:23
263:5
**particular** 34:1
34:2 54:13
147:11 277:6
302:2
**parties** 77:23
320:15,16
321:13,14
322:14 325:13
**parties'** 47:18
**parts** 25:5,18
106:2 257:11
**party** 12:1 14:16
14:17,20
320:15 325:11
325:14
**passage** 316:12
**passages** 280:8
**passed** 16:11
94:15 98:3
196:5 201:9
204:14
**patent** 6:25 7:11
7:11 8:3 12:8
12:25 13:10,11
13:18,18,22
14:6,8,21 17:8
19:15,16 20:17
21:18 24:17
30:3,3,19,20
30:24 33:3,6
34:2,16 35:10

35:14,16,17
36:2,10,17,20
44:24 50:1,1
50:11 51:10
**patent-related**
7:13
**patented** 32:1
32:22,25 34:11
34:21 35:6
**patently** 42:6
**patentor** 30:20
**patents** 12:9
13:2,15 19:18
19:21,23 20:13
20:13,17 23:4
24:19 32:4,16
32:17 33:12
34:14 35:20
47:10,13,16,17
47:18 50:3,4
86:21,22
**pathologist**
113:1,2
**pathology** 113:4
**pause** 297:6
**paused** 77:16
**pay** 21:19
**pay-out** 21:22
**payload** 20:21
20:22
**payout** 22:2
**PDF** 322:8
**pediatric** 111:13
112:22 141:14
200:4
**pediatrician**
98:2,5,18,21
99:1 112:25
199:16 201:12
**pediatricians**
98:11 188:11
**Pediatrics** 4:11
249:16 250:9
252:22
**peer** 86:14 88:15
113:24 192:1
257:1,8,9,15
257:17 315:14
**pendulum** 20:19
20:23,25 21:3

38:16,22 51:4
**peop** 148:13
**people** 25:15
29:10 44:1,4
47:5 53:16
59:1 95:24
98:16 116:14
134:11 145:18
150:4 158:3
177:15 236:11
245:24 267:11
268:1 278:9
279:5 280:18
303:10,21
306:8,13 307:9
315:8,25
**perceive** 81:7
**percent** 15:20
30:5
**Perfect** 240:20
**perfectly** 54:25
119:15 140:3
186:19 197:17
270:2 280:6
**perform** 228:18
**performed**
286:16
**period** 35:24
166:18 219:22
226:1 230:4
255:15 321:12
**periods** 171:25
181:4 313:2,9
314:23
**person** 55:21
110:4 144:19
153:23 302:22
**person's** 148:20
**personal** 14:20
96:3 129:24
130:2 141:14
180:17 217:9
217:13 235:24
317:3,5
**personally** 22:9
71:14 128:5
**perspective**
107:11 185:1
209:5 269:6
**pertaining**

169:7
**peruse** 143:14
144:16
**perused** 106:1
155:14
**Ph.D** 1:13 3:3,10
3:12,13,15
5:18 6:3
191:15 322:2
325:2
**phases** 110:9
**phones** 132:15
**phonetically**
67:19
**photo** 205:4
215:21
**photograph**
3:17 93:17
204:19 286:13
**photographed**
236:20,22
238:6,7 290:16
**photographing**
94:21
**photographs**
3:23 4:9,18
202:22,24
203:2 217:17
221:8,18 229:5
229:11 244:13
245:6 270:18
286:18,22
287:18
**photos** 234:4
271:5,11
272:12,17,24
**physical** 201:12
**physically** 43:4
158:6
**physician**
188:14,15,18
**pick** 20:21 31:16
31:21 288:7
302:13
**picked** 295:8
**picky** 315:25
**picture** 43:17,18
95:4 172:16
174:4 205:6,8
205:17 222:2

224:5 226:2
227:20 232:7
294:12,20,21
**pictures** 95:1,3
156:17 173:16
189:11 203:18
221:23 223:9
227:19 228:6
228:10,12,14
234:2 244:23
244:24 246:4
289:14 290:3
305:1
**pie** 203:23 204:5
**piece** 165:17
254:14
**pieces** 270:24
**Piedmont** 1:19
2:9
**Pilarz** 103:25
**pinned** 299:16
299:19 300:9
300:14,16
301:19,22
**pinning** 300:24
**placard** 274:9
276:12
**place** 98:24
141:9 167:24
182:4 247:11
287:14 288:10
292:14 321:8
**placed** 131:10
171:10,11
188:12 210:15
223:25 224:17
231:4 235:11
235:16 245:17
255:2,4,7
262:22 272:21
274:10,12
276:24 292:25
305:18
**places** 51:24
253:11
**placing** 247:3
281:9 290:14
**Plagiocephaly**
114:25
**plaintiff** 1:5 2:2

15:10,12
**plaintiff's** 83:20
105:22 106:4
**plaintiffs** 48:25
73:6
**plan** 112:2 303:7
303:7
**planar** 211:6,13
**plane** 147:14
290:21
**plank** 37:23
**planned** 71:2
**planning** 229:20
**plans** 303:10
**plate** 164:20,20
165:5,7 167:1
240:4
**platform** 164:22
170:16
**play** 4:7,10,19
39:18,20 41:22
42:17 58:9
60:5 66:7 74:2
74:4 75:4
77:25 84:3,4
92:15 94:2,4
94:14,18 96:9
97:17 110:24
121:2 159:19
161:14 164:15
165:18 166:8
171:5 178:2
182:22 188:21
195:15 210:4
211:9,12 214:9
215:16,23
216:2,14 217:4
218:11 221:9
221:15 241:3
243:20 244:11
247:4 248:7,13
248:20,25
251:16 255:2,5
269:1 271:6
275:25 276:6
276:10,19,24
277:15,22
281:10 284:6
288:25 289:4
289:25 292:22

294:6 296:12
297:14,22
301:2,8 302:7
305:18 316:14
316:16
**played** 36:15
140:23 243:22
**playground**
38:17 39:21
**playgrounds**
51:5
**playpen** 52:6,12
52:13,16
**playpens** 45:8
55:4 61:14
318:9
**Plays** 290:17
**please** 5:6,16
76:18 120:24
121:4 123:2
150:10 153:6
166:10 182:12
183:18 191:7
200:17 240:11
241:19 271:11
291:11 322:11
322:18 323:10
323:11
**plenty** 267:13
**plop** 99:7
**plopped** 234:11
**plus** 21:22
**plush** 277:13
**point** 51:7,16
87:6 90:18
109:8 113:9
127:20 128:12
129:2 132:21
136:23 148:11
152:3 173:8,9
180:6 184:6
199:8 213:10
216:13 230:17
232:6,15,18,24
233:24 237:20
254:13 256:20
257:25 264:23
275:24 289:16
290:19 299:13
299:19 318:11

318:12
**pointed** 283:12
**pointing** 149:12
  156:6 163:5
  256:16 261:24
  286:1
**points** 109:19
  128:21 153:13
  215:13
**police** 102:24
**policy** 4:12
  249:16 250:9
  309:25
**political** 198:13
  198:18
**pond** 29:7,9
**pop** 52:11 183:5
**populations**
  197:4
**portfolio** 25:20
  34:16 36:20
  44:24
**portion** 81:3
  258:24
**portions** 16:11
  95:15
**poses** 254:22
**position** 63:19
  71:18 125:7
  126:8 131:24
  162:5,6,8
  163:1,23 164:7
  167:12 181:7
  194:12 224:1
  230:8 235:3
  237:17 239:3
  245:3,21
  246:25 247:2
  247:13 248:17
  253:14 254:22
  255:9,12
  260:13,20
  262:16 273:4
  276:21 277:5
  291:5 292:21
  293:1 300:18
  302:24 303:17
  304:1,3,14
  314:6
**positioning**

231:8
**positions** 93:17
  95:2 227:19
  244:20,24
  245:18 246:15
  253:13 314:15
  314:22
**possibilities**
  167:6
**possibility**
  285:25
**possible** 9:9
  137:13 225:14
  286:2,3
**possibly** 97:13
  299:21 315:17
**post-mortem**
  108:4,6,8
**post-release**
  294:1
**potential** 199:4
  199:6,8 277:21
**potentially** 50:4
**pounds** 185:19
  186:13,17
  188:5 222:18
  222:22 231:3
**power** 99:18
**PowerPoint** 4:6
**prac** 50:1
**practical** 100:14
**practice** 47:15
  50:2
**practiced** 47:10
**practices** 88:9
  88:10 115:17
**practicing** 50:2
  50:3
**praised** 315:14
**pre-release**
  289:1
**preceded** 123:9
**precious** 189:7
  203:5,24 204:2
  204:16 215:20
  225:17
**precise** 221:2
  264:1
**precision** 158:11
**predicate**

134:14
**predict** 157:25
**prefacing**
  161:15
**prefer** 77:8
  143:16 169:3
**preferable**
  276:7
**Prefontaine**
  17:20
**preliminary**
  107:23
**preparation**
  76:4 77:20
  100:20
**preparing** 76:7
  101:1
**present** 2:16 5:6
**presented** 92:1
  150:17 171:21
  289:23
**presenting**
  290:5
**press** 296:12
  297:6
**pressed** 168:1
**pressing** 279:1
**presumably**
  212:1
**pretty** 27:17
  40:19 41:6
  98:12 166:3
  180:21 193:2
  212:5 226:22
  239:7 266:12
  296:19 302:4
  302:18
**prevalent** 167:8
**prevent** 131:13
  178:12 179:6
**prevented**
  216:15
**prevention**
  132:23
**prevents** 181:22
  217:20
**previous** 155:3
  156:25
**previously** 58:2
  221:7 285:17

**primarily** 57:14
  130:6,7
**principle** 259:24
**print** 322:9
**printed** 115:2
  195:8 271:25
**printing** 112:14
**prior** 8:12 59:9
  76:1 83:24
  100:21 216:20
  321:5
**privileged** 272:3
**pro** 57:8 91:1,2
  159:10
**pro-offered**
  156:11
**probability**
  167:8
**probably** 6:21
  22:11 30:23
  48:4 49:2,10
  49:17 55:9,20
  75:10 78:17
  83:13 96:11
  102:16 107:5
  109:8,16 110:6
  110:12 116:14
  116:16 135:24
  142:15 147:25
  159:12 163:25
  170:2 194:5
  204:15 210:7
  251:11 256:7
  283:12,15,16
  287:4,5 304:7
  310:23 318:17
**probe** 134:15
**problem** 99:16
  164:19 165:5
  165:15 187:15
  243:21
**problems** 11:4
  45:21 106:24
**procedure** 168:4
  210:12 323:7
**procedures**
  167:23,24
**proceed** 6:17
  143:16 183:18
**proceeding**

320:12
**process** 28:18
  53:11,12,15,16
  55:9,24 61:13
  61:13 62:17
  86:19 110:23
  138:3 154:3,10
  154:11 161:25
  163:16 166:7
  167:14,22
  168:7,22
  289:21
**processes**
  166:15
**produce** 142:11
  312:6
**produced** 81:22
  83:2 89:17
  124:6 142:18
  142:19 320:4
  320:10
**product** 4:15
  6:22 34:19
  35:1 37:5 40:6
  40:18,20 42:2
  42:17 43:10,13
  43:23 44:6,7,8
  45:9,17 46:10
  46:15 51:1,11
  51:16 53:4
  57:9 58:17
  60:18,21,25
  65:19 68:7,10
  68:13 69:1
  72:5 93:25,25
  99:24 127:10
  141:21 142:12
  153:19 154:8
  154:13 155:1
  156:4 161:24
  162:2,11,13
  166:17 168:5,7
  178:11,12
  181:9 182:4
  184:18,20
  185:16 186:1
  187:24 188:20
  190:14,15
  209:5 210:5
  216:16 217:22

225:11 231:2
256:22 259:16
259:17 267:19
271:1 278:25
279:20 281:21
289:2 307:3
**product-related**
7:14
**production**
320:4,10,11
322:19
**products** 4:17
20:14 34:20,25
35:3 37:7 39:8
39:10,12,13,13
41:1 45:7,11
45:12,15,18
46:14,19 47:1
47:4,10,12,15
49:24,24 50:17
50:18,19,21
51:9,12,15
52:5 53:18,20
60:16 61:4
64:17 65:15
66:8,20,23
69:6 71:21
113:13,14
117:3,7,13
118:4 119:24
119:25,25
131:3,22 132:6
132:9 135:6,12
136:21,21
140:25 141:13
142:16 145:6,8
153:7,17,22
154:3,5 156:14
158:25 159:15
166:18,20
176:2 211:2
258:10 259:7
295:11,13
313:8 317:17
317:19 318:8,9
**profession** 8:21
**professional** 6:6
6:7 9:2,14
111:2 122:24
129:25

**professionalism**
122:20
**professionals**
126:8
**professor** 20:6
66:15,21
**professors** 35:20
**proffer** 90:9
**proffering** 91:4
91:5
**profit** 21:23
**program** 18:21
68:21
**programmed**
14:9
**progress** 312:24
**prohibited**
320:14 325:9
**project** 38:8
39:1 40:13
41:2 47:25
48:12,19 50:9
50:17 137:8
141:17
**projector**
241:25
**projects** 37:20
40:25 44:15,23
45:1,14 50:23
50:24 62:11
76:8 119:25
137:5
**prominent**
140:24
**promise** 78:11
112:18,19
**prompting**
123:6
**prone** 162:5
163:23 164:7
167:11 175:10
181:22,23
182:4 188:22
190:8 194:5
209:11 224:11
245:24 246:6
246:24 247:2
253:14 254:22
255:4,9,11
259:19,25

262:9,18,22
263:14 264:6
273:4 277:22
289:7 291:4
292:21 293:1
298:20 299:3,8
299:10,11,12
300:17 301:17
302:24 303:16
304:1,3 314:6
**pronounce**
67:16 87:24
104:6
**propelled**
170:22
**proper** 289:11
289:21
**properly** 14:13
180:16 236:4,9
268:7
**properties**
131:17,20
**proposal** 307:17
**proposed** 53:5
53:25
**proposing**
147:18 148:18
149:9 166:17
**protected** 33:9
**protocol** 303:24
**protocols** 92:14
**prototype** 39:5
40:7,18 43:24
120:1
**prototypes** 39:7
43:25 142:20
**prototyping**
44:4
**prove** 313:5,6
314:19
**proved** 306:17
**proven** 9:8,10
9:14,16,19
**provide** 82:12
211:12 294:11
316:21 325:8
325:11
**provided** 9:5
81:19 82:10
83:19 84:14,15

84:21 85:24
86:9,11 104:2
105:24 109:19
121:10 124:25
154:2 155:14
193:11 203:3
225:4 305:7
309:10,13
310:9,21,23
311:6 321:12
**provides** 57:8
170:15 181:11
211:9
**providing**
145:18
**proximity**
231:17
**prudent** 295:19
**public** 33:1
87:11,12,16
324:23,25
**publications**
87:23 88:4
147:1
**publicly** 257:6
**published** 147:2
206:8 207:16
257:1,3,4,18
**pull** 29:4,11
71:8 85:13,19
86:13 185:18
186:11,25
187:6,12
212:14,18
283:17 299:21
302:14
**pull-ups** 187:1
**pulled** 73:15
83:9 239:25
287:8
**pulling** 186:20
187:2 302:8
**pulmonologist**
112:22
**pulmonology**
111:14
**pulse** 171:17
315:4,15
**purchase** 41:8
**purporting**

267:18
**purpose** 94:20
100:22,23
109:4 122:4
123:19 128:4
209:9
**purposes** 94:19
**Pursuant** 323:6
325:4
**push** 31:2,20
153:3 163:14
164:23,23,25
165:7 170:16
171:4 175:11
185:17 186:8
190:9,15
194:17 195:13
197:13,17,19
198:5,25 199:2
211:21 212:20
232:5,8 233:3
233:3 260:20
284:6 285:15
291:25 304:15
314:8
**push-up** 162:22
162:22 190:10
**pushed** 35:9
93:19 224:10
275:8 285:25
307:23
**pushing** 135:3
148:14,20
165:11,14
171:13 174:5,7
178:12 179:21
195:16 197:23
197:25 198:10
224:6,8 232:10
260:14,17,18
264:9,15
284:11
**put** 14:6 31:17
41:11,12,20
52:12,17 54:24
60:25 61:19,25
64:14,25 65:2
65:16 68:18
70:19,20,23
71:22 83:5

91:18 93:8,16
94:8,11,13
95:4 96:8
114:16,20
117:24 119:9
126:5 137:16
152:23 162:20
164:2,2 165:6
165:12,19
171:24 174:11
174:23 178:15
185:2 186:18
188:21,24
221:14 224:2,4
224:15,21
225:4,9,11,24
236:12 237:9
238:24 244:23
246:10,14,14
263:8 269:12
269:20 270:3
279:6 283:11
291:23 292:21
303:23 305:1
**putt** 65:16
**putting** 65:6,23
94:17 95:7
114:19 156:16
156:16,18
158:14 166:23
166:24,25
241:21 242:7
290:24

**Q**

**qualifications**
110:17
**qualified** 63:6
71:15 126:7
127:24 134:10
**qualifies** 133:13
**qualify** 133:19
136:8
**quality** 131:1
167:22
**quest** 104:23
**question** 8:25
9:21 11:10,12
22:21 23:7
35:12 44:16

56:12 71:11
73:8 85:18
86:7 89:3
94:13 99:6
101:6 111:8
119:21 121:8
121:12,21
123:8 129:10
130:14 133:20
138:21 139:2
140:15,17
141:1 143:18
146:2 156:9
159:18 161:4
161:12 176:21
176:25 177:3
181:25 183:8
217:18 221:3
231:15 233:11
236:9 253:8,9
253:24 256:13
276:14 285:3
303:4 317:7
**questions** 10:6
10:20 29:16
82:1 90:3,6
119:22 122:2
123:12 134:7
134:14 159:10
160:18 161:7,7
161:11 307:22
320:6
**quick** 78:25
254:6 293:4
**quickly** 24:22
42:22
**quite** 6:16 16:8
28:20 41:9
52:25 94:10
110:1 112:15
142:17 147:16
166:17 167:2
169:21 187:16
188:4 217:2
229:23 245:22
268:22 292:3
**quote** 45:12
210:14 259:14
289:5 316:13
**quoted** 142:25

**quotes** 101:25
103:2,6
**quoting** 259:22

**R**

**R** 321:1,1,1,1
325:1,1,1,1
**R.E.R.E.C**
137:5
**R.N.P.S** 182:21
**raise** 124:21
126:7 127:21
173:18 192:12
192:21 193:18
194:10 198:6
199:3
**raised** 170:14
309:24
**raising** 125:19
193:4
**Ralph** 25:8
**ramifications**
114:19 292:9
**Ramirez** 2:17
**ramp** 31:6,6
**randomly**
171:16
**range** 12:20
37:10 49:18
52:3 100:7
147:25 148:2
210:25 278:19
**rapidly** 11:11
**rate** 48:22 49:17
**rated** 27:5
**rates** 325:13
**re-enact** 158:2
**re-enactment**
271:5,11
272:12,24
276:8
**reach** 119:1
187:11 265:14
**reached** 75:1
185:19,24
186:13 318:12
**reaction** 57:5
**read** 11:17,24
56:24 60:4,6
67:17 82:17

100:15 101:3
102:4,6,12,19
102:21,23,24
103:17 109:5
114:14,18
115:5 116:5
121:22 132:20
156:25 157:1
160:6 178:1
185:22 188:8
194:14 210:2
210:21 214:24
249:19 259:5
259:15 312:23
315:16 322:7
323:2
**reading** 34:4
95:5 108:9,25
129:10 160:12
183:23 185:7
191:16 207:2
208:14 209:17
215:12 252:19
266:17,25
319:4
**ready** 52:15
157:1 243:20
**real** 43:16 59:16
254:6 294:6,10
**realistic** 287:15
288:10
**reality** 129:21
**realize** 98:19
190:4 220:9
**realized** 22:6,7
42:22
**really** 22:4
29:20 41:22
46:9 63:21
68:15 73:21
92:6 95:7
147:24 148:24
149:19 152:2
154:7 164:9,22
167:13,17
173:8 186:10
189:21 195:18
196:20 197:2
204:1 214:24
223:16 226:23

234:3 239:13
256:14 261:19
261:21 266:13
267:7 268:10
273:25 284:19
294:11 298:2
302:17 308:22
314:9
**realm** 29:1
290:22
**reason** 11:6
60:13 157:6
323:13,15,17
323:19,21,23
323:25 324:2,4
324:6,8,10,12
324:14,16,18
**reasonable**
182:3,6 270:2
**reasons** 115:20
188:19 209:16
273:24 276:6
323:8
**rebreathing**
277:20,21
278:3,4,15,20
279:1,9,13,14
281:9 291:2
**rebut** 310:17
**rebuttal** 3:15
90:22,25 91:8
91:17,23 92:25
139:10 142:24
143:5 207:6,8
221:21 228:4
307:13,18
308:17 309:5
310:10 314:24
316:17
**rebuttals** 310:25
315:20
**rebutting**
310:13,19
**recall** 9:11 13:17
30:13 39:17
51:2,8,18
53:24 62:22
74:25 95:6
103:24 104:15
105:14 107:10

107:12 108:17
123:13 148:2
178:5,6 179:20
193:2 226:3
268:22 286:7
286:21 305:20
310:1
**receive** 89:1
105:11
**received** 80:15
91:23 92:5
128:18 141:12
311:23,25
**receives** 320:15
**recess** 79:16
144:11 213:25
293:20
**recognize** 156:1
**recollection**
54:5 250:14
**recommend**
146:13 188:11
**recommendat...**
114:16
**recommended**
251:3
**reconstruct**
158:21
**reconstructed**
156:23 158:14
158:21 159:1
**reconstruction**
156:22 157:3,7
157:10,12
158:18,24
**reconstructs**
112:1
**record** 5:2,8
64:9 66:22
79:12,14,18
81:21 82:9
95:5 143:14
144:2,7,9,13
145:4 160:8
167:16 213:21
213:23 214:2
219:17 221:19
241:16 249:25
293:16,18,22
318:16 319:1,3

**recording** 244:6
296:17
**recordings**
94:23,24
**records** 3:22
97:6 106:13
107:10,12
108:6,19,20
109:2,5 196:10
199:15 200:5
201:14 271:5
**recover** 117:19
**recovery** 28:16
**red** 56:1 59:11
**redacted** 87:13
**redirect** 122:17
**reduce** 124:14
124:15 188:8
**reduced** 142:19
321:8
**refer** 143:3
178:18 209:1
**reference**
144:25,25
146:24 148:23
150:10 153:6
170:6 174:14
**referenced**
178:14 207:22
**references**
144:18 262:21
**referral** 75:12
325:12
**referred** 291:15
**referring** 45:15
93:21 99:2
176:7 219:4
252:20 261:13
289:13,16
290:6,10,13
291:19 294:4
300:17
**reflect** 32:16
**reflected** 8:25
201:14
**reflects** 294:5
**refrain** 123:5
**refresh** 203:10
208:20 241:14
**refreshed**

200:14 253:1
**refreshing**
200:15 203:9
291:21
**regard** 149:17
153:6
**regarding** 154:5
309:24
**regular** 321:14
**regulations**
154:5 325:4
**rehabilitation**
145:12,13
150:18 317:21
**reiterate** 141:3
**rejected** 36:1
**related** 54:14
116:8 131:12
132:22 135:11
136:20 146:17
147:15 150:22
151:3 163:2
256:6 305:5,5
317:17 318:7
320:11
**relates** 153:7
**relating** 97:5
**relation** 133:7
**relationship**
135:5 146:7,10
320:14
**relative** 164:21
172:1 231:6
273:14
**relatively**
260:19
**release** 199:7
**released** 289:2
**relevant** 22:23
125:10
**relied** 86:22
101:24 105:17
106:11 254:11
256:11,14
**rely** 118:24
133:9 142:22
256:12
**relying** 102:8
270:19,22
295:20

**remains** 308:4
**remember**
10:17 36:17
40:4,16 50:22
51:13 52:25
55:25 56:2,6,7
56:17,18,24
58:18 68:13
69:8,15 75:8
75:15,20 99:5
103:19 104:4,9
108:25 191:21
239:12 262:24
286:5 287:17
311:4 315:1
**rendering**
182:24
**repeat** 253:8
276:15
**repeated** 262:7
263:13 264:4
**rephrase** 11:13
281:4
**replenished**
278:16
**replicate** 235:19
277:5
**replicating**
174:16
**report** 3:13,15
49:7 72:21
76:4 86:22
87:5 89:15,17
89:25 90:4,8
90:12,13,16,22
90:25,25 91:9
91:17,17 92:19
92:25,25
101:25 102:11
102:12 105:20
105:22 106:10
106:19 107:23
108:13 121:19
133:10 138:18
139:1,9,10
142:15,20,24
142:24 143:5,5
155:14 160:7
168:24,25
169:4,5 172:19

174:14 182:8
189:5 190:6
193:11 206:15
207:6 208:15
210:7 213:3,4
214:6,16
215:14 217:19
221:8,18,21,22
221:22 225:19
225:21 228:4
228:23 229:14
230:20,21
235:10 247:23
248:23 250:19
254:1,20
255:17,18,20
256:5,6,11,21
257:14,16
259:13,23
262:20 265:9
271:2 276:19
277:22 278:23
278:24 282:8
284:4 288:24
293:25 294:3
296:2 299:24
300:1,13
307:13,18
308:17 309:5,5
309:11,20,23
309:24 310:2
310:13,15,17
310:21 311:1
314:24 315:20
**Reported** 1:25
**reporter** 5:16
11:21 121:23
199:20 271:16
320:6,9 321:4
321:12 325:6
325:11
**reporting** 295:6
325:4,8,11,12
**reports** 7:21,24
8:4,4,12,23
10:17 90:20
91:22,23 93:12
93:13 102:24
102:25 105:25
106:3,5 108:4

108:21 127:8,9
139:19 146:19
156:11 160:2
160:11,12
161:19 165:10
166:12 175:22
229:3 267:13
270:15,19,23
284:14 294:9
294:11,15,17
295:11,19
305:10,17,23
309:14 320:16
**represent** 5:7
130:23 203:18
210:24
**representation**
168:21 246:2
273:5,14
**representative**
153:11 166:3
325:6
**representing**
312:5
**represents**
320:4,7
**reproduced**
228:6
**request** 70:20
81:1,7,12
86:10 320:12
320:16
**requested**
321:11,11
322:7
**requests** 81:14
81:17,24 85:21
**required** 147:13
216:4
**requirement**
44:19
**requires** 175:23
**rescue** 302:13
302:15,19
**research** 19:8
73:16 83:9,22
85:13 86:12
111:20 114:2,4
114:12 117:1
120:4 122:9

136:5 150:23
152:13
**researches**
116:25
**reserved** 319:6
**reshape** 115:3
**residual** 13:20
14:5
**resolution** 40:13
**resolved** 84:2
**resources**
280:19
**respect** 268:2
**respiratory**
117:21
**respond** 14:4
90:21
**responders**
102:22
**responding**
177:4
**response** 55:25
56:4,15 154:25
161:11 196:7
228:7
**responsibility**
57:7 322:8
**rest** 38:11
**restained** 285:8
**resting** 114:23
**restrain** 179:25
180:3 182:5
225:24 236:12
268:5
**restrained**
165:11 174:8
175:13 179:15
179:18,20
180:4,6,16
181:2,4 217:4
218:16 219:20
236:4,9,10
257:21 267:14
285:6,21,25
295:2,7 299:5
306:3,7 307:11
**restraint** 43:1
69:9 92:16,17
165:6,8,16,20
165:24 166:24

170:4 174:12
175:20 178:9
178:10,16,20
178:22,25
179:4,5 180:8
180:22 181:8
181:10,11,21
184:2,15,19,20
185:6,11 189:1
189:3 212:8
216:14 217:20
226:21 237:3,9
237:21 238:3,7
238:8,15,19
265:24 266:6
267:15,20
268:1,10,15,18
270:3,7 282:7
284:7 285:13
285:16,20
286:7,14
287:13,21
292:1,18 295:9
**restraints** 142:4
179:5 211:25
212:2,5 237:13
258:10 259:6
269:7 275:10
283:3,8 285:22
286:19 306:9
306:15 307:8
**restricted** 278:6
278:12
**restroom** 78:25
213:15
**result** 142:12
170:21 184:9
321:15
**resulted** 20:13
**results** 214:13
263:2
**résumé** 136:19
**retain** 47:25
**retainer** 47:23
**retention** 66:9
**returned** 90:19
322:12,15
**returning**
130:14
**reverse** 31:8

**review** 54:11
55:13 76:3
92:5,19 100:21
101:18 103:20
104:11,15
105:2,2 108:19
109:1 253:22
254:3,11 257:1
257:16 303:7
303:11 321:11
322:8
**reviewed** 53:3,4
55:3 61:3 73:5
80:12 81:3,11
82:9 83:4,7
84:12 86:14
88:15 100:1
101:23 103:8
103:14,24,25
104:17 105:4
105:12,22
106:13 107:13
113:24 128:19
137:1 141:8
143:9 155:11
191:14 192:1
192:11 196:10
244:7 249:16
252:7,17 253:4
253:5 254:9
256:10,12
257:9,10,15,17
272:15 296:18
305:12 315:14
**reviewing** 54:1
105:14 257:24
**revisit** 71:21
**Reyes** 103:15
**rid** 21:3
**ride** 68:23
**right** 6:5,19 7:9
7:10 9:7,17,18
10:5 11:23
12:4,13 14:22
15:13 17:15,23
18:3 19:20
20:20 21:12,25
24:4,6,20,24
25:3,12,20
26:6 27:4 28:5

30:7 31:19,21
31:22 32:11
33:8,20,24
34:6,7,8,10,22
35:6 37:2,15
38:4 40:2,4,9
40:11,16,22
42:11 43:9,14
45:9,19 46:7
46:24 48:6,10
49:3,19 51:8
52:2,19 53:10
55:22 57:6,23
58:9 59:13,20
61:16,23 62:7
62:14 63:4,25
65:11,14 66:1
66:4 67:2,9,15
68:25 69:23
70:6 73:1
74:18 75:8,15
75:21 78:2
80:5,8,21,24
83:1 84:7,11
84:23 85:10,23
86:3,6 87:1,3
87:14,18 88:5
88:12,14,20,24
89:5 92:9,23
93:10 94:12,22
95:9,12,23
96:1,7,12,21
97:3,20 98:10
98:18,20,23,25
99:9,11 100:3
100:8,13,18,25
102:9,17 103:3
103:7,10,20
104:1,3,20
105:13 106:3,9
106:25 107:7,9
107:22 108:16
110:5,14,16
111:1 114:10
117:4,24 118:1
118:8 121:6
123:3 124:4,15
127:8,19
129:20 130:21
134:4 138:21

139:13 141:1
144:3,15 145:6
146:22 148:6,8
148:9,12 150:9
151:7,15 153:5
153:12,15,23
153:25 154:17
155:11,21,25
156:13,21
157:17 159:3
159:17 161:22
162:10 163:24
166:4 168:23
169:25 170:4
170:12,18
172:10,13
173:1,6,13,17
174:4,10,11
176:15 177:1
177:10,24
178:7 179:9
180:8 181:6,16
182:5 183:19
184:1 185:5,23
186:16 187:14
188:1,6 189:1
189:4 192:19
192:25 194:1
194:13,18,19
195:4,21,25
196:6,19 197:1
197:6,15,21,23
197:24 198:9,9
199:5,10 200:2
200:16,19
201:1,4,6,14
202:9,9,10,12
202:21 203:1
203:14,17,21
204:21 205:1,5
205:16,19,22
207:2 208:11
208:23 209:2
209:14 210:9
211:6,9 212:10
212:21 213:1
214:10 215:3,5
215:9 216:10
216:21 218:1
218:15,19,21

218:24 219:5
219:10,23,25
220:16 221:17
222:14,21
223:5,7 224:25
225:13,15
226:9,16,19
227:1,5,21
228:21,25
229:7,13,25
230:6,10,18
231:11,19
232:2,20,23
233:1,8,14,17
234:1,10,10,12
234:16,19,23
234:25 235:7,7
235:12 236:3
237:5,24 238:2
238:16,18,22
240:9,10
242:19 243:19
244:9,19 245:3
246:6,11,15,22
247:1,5,14
248:11 249:7,7
251:20 252:4,6
252:24 253:1
253:16 254:4
254:17,19,23
255:2,5,10,13
255:14 256:3
256:10,18,20
256:23 257:3,7
257:15,19,21
259:3,9,21,24
261:12,18
262:11,17
263:1,4,22
264:17,18,20
264:21 265:8
265:15,25
266:8 267:6
268:16 269:19
269:23 270:22
272:9 275:5,17
275:21,22
277:3,16,20
278:7,17,19
279:3,12,14

281:3,25 282:6
283:1,17,22
284:2,21
285:10,13,18
285:22 286:4
287:25 288:15
290:4 294:1,7
295:3,14
297:15,21,25
298:1,20 299:5
300:3,8 301:16
301:19,24,25
302:1,25 304:1
304:9,18,22,25
305:16 308:18
309:1,4,11,22
311:12 312:19
315:4 316:10
316:19 318:20
**rights** 21:18
**rise** 193:2
**risk** 29:12 188:8
252:15 253:10
253:13
**road** 1:19 2:4,9
6:11 18:12
182:10
**Rob** 25:7
**ROBERT** 2:8
**robot** 31:18
**rock** 4:7,10,19
58:9 66:7 74:2
74:4 75:4
77:25 84:3,4
92:15 94:2,4
94:14,18 96:9
97:17 110:24
159:19 161:14
164:15 165:18
166:8 171:5
178:2 182:22
188:21 195:15
210:4 211:9,12
214:9 215:16
215:23 216:2
216:14 217:4
218:11 221:9
221:15 241:3
244:11 247:4
248:7,13,16,20

248:25 251:16
255:2,5 269:1
271:6 275:25
276:6,10,19,24
277:15,22
281:10 284:6
288:25 289:25
290:17 292:22
294:6 297:14
297:22 302:7
305:18 316:14
316:16
**rockers** 45:7
**rocking** 249:3,9
**rocks** 68:7,19
**role** 36:15
140:24 156:8
**roll** 3:19 95:19
95:20 96:4,6
97:11,13,15,19
97:23,24 98:2
98:7,8,16,24
147:14 164:10
164:15,17
171:1,4 173:10
173:11 175:11
175:15 179:12
179:16 180:1,7
180:17 181:13
189:22 190:21
193:25 196:25
197:1,3,7,12
197:18,22,22
198:4 199:9
202:4,10 206:5
207:14 211:19
212:6,9,18,25
215:15,17
218:22 219:20
223:24 225:3
230:17 232:12
232:15,17,18
233:2,14,19,24
237:12 241:4
258:12 259:10
262:9,18 263:3
263:5,10,15
264:6 265:19
283:19 289:7
290:25 298:20

299:4,8,17,23
301:17 302:2
302:12 304:13
304:20 313:18
314:8,11
**roll-over** 173:15
214:9 252:15
253:10,14,21
297:15
**rolled** 171:19
229:17 254:21
255:10 259:8
**roller** 189:25
**rollers** 175:4
311:17,17
**rolling** 97:15,16
97:17 98:12
164:6,6 175:7
175:9 179:6
180:5 181:8,11
181:22 189:5
189:15,19,20
190:8 192:5,10
193:22 195:16
199:1,7 205:25
206:4,16
207:13 211:13
212:11,13
214:18 215:22
215:23 216:2,8
216:15 217:4
217:20 218:6
218:11 223:18
223:21 224:25
233:22 259:19
259:25 261:5
262:22 263:6
264:10 265:10
265:21,22
292:10 299:20
**rolls** 194:13
259:15
**room** 59:1 77:14
158:10,13
**root** 158:20
**Roswell** 322:21
**rotate** 165:4
233:16
**rotated** 230:9
**rotating** 179:23

**rotational** 55:1
265:1
**rotations** 262:8
263:14 264:5
**rough** 266:21
267:1
**roughly** 6:24
202:2,8 312:19
313:3
**routine** 251:3
**rude** 308:19
**Rule** 81:22
323:6
**rules** 6:10 11:24
17:25 143:12
323:6 325:4
**run** 142:2 158:8
158:16 225:15
**Rundell** 103:4
**Rundell's** 311:1
**running** 158:5
**runs** 25:4

**S**

**S** 325:1,1
**S-E-A-H** 29:22
**S-P-R-I-G-L-E**
36:6
**S.I.D** 140:18
149:6
**S.I.D.S** 107:24
113:6,21,22,23
113:25 114:3
114:13,15,17
115:10,12,20
116:8,10,11,25
117:2,5,5,7,10
117:11,15,17
117:19,23
118:7,9,24,25
119:3,5,5,14
119:22 120:3
120:10,13
122:8 124:10
124:11,15,21
126:9 128:5
130:9,12,17
131:8,13,13,14
131:16,21
132:2,4,23

133:3,7,14,18
133:24 134:21
135:1,4,6,10
135:11 136:4,5
136:5,20
137:22 138:6
138:13,15,17
138:20,23,25
139:7,8,11,14
140:2,6,12,22
140:23 144:19
145:5,7,21,23
146:4,7,8,15
146:17 147:17
147:19 148:19
148:22 149:2,4
149:8,11,21
150:5,6 153:7
188:11 250:9
**S.I.D.S./S.U.I.D**
116:5
**S.U.I.D** 114:13
115:10,13,21
116:10
**safe** 57:9 64:11
68:5 69:6
71:16,21 88:9
125:18 209:4
283:4,9
**safely** 303:22
**safety** 4:15
46:15 55:16
57:19 59:23
63:24 64:4
66:6 127:1,21
128:6,11,15,16
129:15,23
130:6 131:1,12
154:8 167:22
251:1 256:22
**sales** 30:1,5
**sand** 157:24
**sat** 59:17 62:10
64:12 71:17
205:3,13 208:4
236:15 302:7
302:10
**satellite** 12:22
**save** 287:5
**saw** 39:4 51:25

53:8 54:2,6,7,9
59:11 65:21
112:13 169:18
171:20 174:19
175:16 198:22
215:21 229:3
233:15 236:5
262:14,15
265:16 268:14
284:12 292:13
300:23 304:12
**saying** 73:1
76:22 96:14
98:16,22 116:7
135:2,3 138:19
139:7,24 145:7
148:2 167:16
171:3 180:23
186:7 188:2
198:22 206:1
207:10 225:16
229:1 247:1,19
256:15,16
270:16 283:1
288:6 299:10
**says** 20:5 139:1
167:25 184:1,7
185:8,10,14
188:7 189:3,3
192:4,4,12,15
193:7,9 201:18
201:22 202:3
210:12,20
216:2,7,11,13
217:19 238:3,5
248:22 250:21
250:24 253:12
258:3,25 259:4
268:18 274:10
274:12 286:4
306:14
**scads** 311:24
**scale** 151:13
**scans** 112:1
**scared** 98:12
**scene** 286:18
**schedule** 80:19
**scheduling**
89:18
**Schriner** 75:17

110:10 305:13
**science** 279:15
**Sciences** 4:14
**scientific** 279:8
279:12
**scientist** 198:14
198:19
**scooter** 39:18,22
**scope** 28:21
42:24 83:18,24
135:18
**screen** 74:20
201:17,19
**scuba** 28:18
43:22
**SeAH** 29:19
**seal** 322:12
**search** 102:1
**seat** 38:2,5 43:1
137:14 145:18
146:17 148:14
148:18 151:6
169:12,25
170:15 171:4
174:5 179:3
251:23 262:6
269:13
**seatbelt** 43:2
**seating** 37:12,18
37:25 43:1
145:16 153:1,3
**seats** 61:14
137:10,12,23
138:1 142:1,3
145:22 146:4,8
146:9,11,12,14
147:8,19,21
149:7 150:24
251:1,19
**second** 7:4 16:15
158:12 183:6
201:18 205:4
209:22,23
234:4 293:6
308:24 311:1
**seconds** 69:20
241:11,12
244:2 301:21
304:1
**secret** 17:10

32:24 33:9
**secrets** 34:21
**section** 170:8
182:8 189:5
192:2,3 206:1
206:15 210:11
214:15 216:1
247:23 282:7
282:12 288:23
289:25 290:6,8
291:16,19,22
292:2 293:24
309:9 316:17
317:13
**secure** 169:11
178:23
**secured** 92:15
**securely** 240:7
267:20
**securing** 156:17
**see** 22:16 29:15
33:23 37:8
38:16 44:3
45:6 47:1,6,11
49:24 50:1
78:20 89:7,13
91:21 92:7,10
92:22 96:18
98:5 100:11
106:20,23
137:9 141:10
145:10,15
147:2 149:24
160:11 163:12
167:16 170:7
173:16 174:8
174:16 179:25
183:2,23,25
184:3,5,11,13
184:17 185:12
187:1 188:16
190:11 191:16
192:7 193:13
193:20,21,22
194:2 196:16
201:20,23
202:3,5,9
203:19 205:7
206:9 209:8,21
210:18 215:2,6

215:12 216:5,6
218:20 219:20
221:24 222:5
224:7,8,9,13
224:22 225:12
226:7 228:13
228:15 229:1
233:18 248:22
248:24 249:1
250:10,21
251:7,19 256:2
258:13 259:3
259:10 262:12
262:19 264:8,9
273:17 274:3,5
274:8,14,20,21
274:23 275:15
275:19,20
276:9 283:9
286:24 287:3
289:3,9 297:11
297:16 298:3
299:4 300:25
301:5,6,18,18
301:21 304:13
304:20 309:13
309:15 310:2
310:19
**seeing** 53:24
92:21 95:15
99:5 175:4
193:2 194:15
195:15 214:21
286:21 297:17
314:13
**seek** 73:2
**seen** 51:19,23
59:9 80:10,13
96:25 127:16
171:7 175:11
175:15 179:15
181:2,3,5,7,10
182:20 186:21
192:18,24
204:2 216:19
216:23 217:17
218:21 219:4,8
219:12 235:19
254:12 270:8
272:14,16,17

272:18 286:13
309:20,21
**segue** 63:10
**Segway** 157:14
157:15,23,25
158:4,7,14,19
**selected** 231:16
**selecting** 61:13
61:14 231:14
**sell** 28:19 61:2
**send** 85:21
241:10 243:1
322:13,18
**sending** 17:5
**sends** 76:24
191:24
**sense** 32:7 76:6
76:6 83:10
93:15 96:3
112:11,15
115:14 139:23
142:25 162:6
176:14 177:14
212:23 238:14
254:11 257:4,5
261:9 279:11
279:16
**sensing** 32:1
**sensor** 315:11
**sent** 94:9 101:19
241:6,7,8
242:17 243:3
**sentence** 209:24
209:25 289:20
**sentences** 210:1
294:16
**separate** 105:1
108:14 174:22
**September** 1:15
85:5 202:14,18
321:16
**sequence** 197:17
305:2
**Sergeant** 103:16
**series** 249:2
**serious** 63:14
184:10
**seriously** 10:2,3
**serve** 210:16
**served** 120:25

130:19 131:7
**service** 132:23
**services** 75:13
320:16 325:8
325:11
**serving** 59:4
124:5,20
**session** 228:18
**set** 16:22 59:2
63:19 69:12
168:16 251:10
263:12 321:8
**seven** 19:19
20:12 78:19,20
81:14 85:8
200:16 301:21
309:14
**sexist** 194:25
**Shaffer** 312:16
312:21
**shaking** 96:14
258:23
**shape** 162:13
**shapes** 14:13
**share** 25:9 33:10
242:24
**shared** 242:20
242:23,24
296:10
**sheet** 210:15
**shelf** 156:18
**shooting** 57:14
57:15
**short** 171:25
175:18 213:9
219:8,22 226:1
313:8
**short-term**
94:20
**shorter** 314:23
**shorthand** 321:8
321:10
**shot** 28:13
**shoulders**
192:21 193:1,4
**show** 95:1 130:8
141:4,5,6
189:11 241:20
263:13 271:5
272:20 273:8

**showed** 179:20
249:8 286:18
**showing** 174:5
175:8 242:1
273:3
**shown** 136:6
273:7
**shows** 141:10
144:18 274:20
296:4
**shut** 312:1
**sic** 12:16 71:21
92:7 121:1
137:6 160:17
161:14 170:2
172:15 216:13
237:1 291:3
**sick** 38:10 54:19
113:16,19
117:2,5,7,12
117:13 145:14
**side** 39:21 51:10
51:11 68:19,19
96:13 162:14
171:1,11
173:21 178:23
187:12 188:22
193:22 197:20
224:1,2,4,14
224:15,21
225:5 235:12
235:17 255:8
262:16 265:20
265:21 274:22
275:16,21,22
275:23 276:12
276:22 297:20
299:16 300:9
314:5
**sides** 162:15,24
**sideways** 158:1
178:25 289:7
**SIDS** 4:12
**sign** 11:18,24
322:7
**signal** 195:14
**signature**
322:16 324:19
**signed** 322:10
322:15

**significant**
261:2
**signing** 319:5
**silence** 311:22
**silent** 312:7
**similar** 8:5
60:18,21 68:6
94:10 150:11
171:20 247:10
272:17 279:5
281:18,22
289:23 303:14
305:5,5,23
**simply** 135:3
**simulate** 158:5
**simulating**
68:22
**simulation**
158:6
**simulations**
157:20,21,25
158:2,4
**Singapore** 197:5
**Singer** 19:13
**Singhose** 1:13
3:3,9,12,13,15
5:5,18,24,25
6:1 71:23
77:19 78:21
79:20 80:9
82:15 118:21
144:15 160:17
172:20 182:14
189:9 190:3
203:17 214:4
242:5,8 243:23
244:1 318:13
318:21,25
322:2 325:2
**Singhose's**
81:21
**single** 9:17
125:18 135:10
**sir** 5:23 59:14
113:7 125:20
126:13 317:1
**sister** 222:20
225:19
**sit** 31:22 64:23
89:6 91:14,20

99:4,7,15,18
115:10 185:18
186:11 187:16
187:18,19,20
205:19 233:6
234:4,17,17,18
234:22,23
235:2,2 264:12
314:11
**sit-up** 234:24
**site** 157:5
158:19 191:2,4
191:19
**sites** 191:24
**sitting** 99:12
112:7 125:15
193:25 194:12
203:20 204:19
204:20 205:3,4
205:9,15,17,19
230:5 250:25
**situation** 43:3
75:4 109:9
**situations** 270:6
270:20
**six** 41:4 43:7
78:19,20 85:8
98:3 194:10
280:3 289:19
**six-month-old**
148:3 151:21
**six-month-olds**
148:5
**six-pound** 223:1
**size** 222:23
269:22 280:12
280:14
**sized** 152:24,24
**sizes** 231:4
**skill** 96:24
**skip** 214:12
**sleep** 4:16 38:11
66:8 115:16
142:6 146:14
153:19 177:16
185:3 186:6
188:13,24
209:5 210:4
211:2 236:15
251:3 259:16

267:24 307:3
317:17
**Sleep-Related**
4:12 250:10
**sleeper** 4:7
51:20,25 53:4
58:16 61:20
62:8 63:23
64:13 66:7
69:6 72:14
74:5 75:4
77:25 84:3,4
96:9 110:24
159:19,19
161:14 171:1
188:21 195:15
210:4 214:10
221:15 248:14
251:13,16
254:18 276:1,5
276:8,25 287:9
289:25
**sleepers** 60:9
61:7 63:13
64:10 67:1
68:4 124:19,22
125:11,17
127:1 169:8
251:7 257:20
283:5 313:24
**sleeping** 4:3
53:2 54:23
56:22 88:9,10
131:9,22
135:12 136:21
137:22 138:4,5
140:1 166:20
169:12 184:24
209:3 248:11
283:19,25
318:8
**slept** 178:2
**slide** 165:23
**sliding** 165:14
**slight** 52:23
68:18
**slightly** 55:1
101:6 279:17
**sling** 251:11
**slings** 251:2,20

**slip** 157:22,24
**slope** 164:13
179:21
**slow** 65:7,12,12
65:15
**slowly** 65:22
**small** 12:20
25:18 33:21,23
37:17,19 153:4
168:12,13
**smaller** 223:17
**Smart** 314:25
**sneeze** 249:22
**Sock** 314:25
315:8
**sofa** 204:20
**soft** 276:1,2
277:7 287:11
288:9,13
**sold** 21:6 35:5
41:5
**Solutions** 320:1
325:7,7,9,10
325:13
**somebody**
100:12 158:20
**somebody's**
169:18
**someone's** 50:2
**somewhat** 38:12
53:2 55:11
83:11
**son** 115:1
174:18 197:3
215:21 221:8
227:22 234:7
235:4,5 236:2
280:16
**son's** 69:20
**soon** 107:18
224:4 233:25
308:22
**sooner** 318:18
**sorry** 23:12
46:20 77:13
143:23 160:23
167:1 168:24
180:13 184:21
199:21 206:12
206:12 207:8

208:1 209:18
213:19 218:2,4
218:5 219:14
222:3 235:14
243:2,5,10,15
250:3 260:9
271:17 272:5
273:19 275:1,1
285:1,2 288:2
300:18 302:6
315:23 316:8
**sort** 16:6 38:2
39:18,22 42:2
42:23 43:21
44:4 53:19
68:7,19 74:24
83:5 108:17
142:2 154:10
162:23 163:22
165:22 171:17
175:18 176:19
176:19 181:12
182:8 195:23
197:22 204:20
209:19 217:12
253:10 261:8
261:22 273:5
274:5 277:3
297:12 300:23
**sound** 84:5
263:19
**sounds** 18:5
169:22 249:18
252:6 278:7
285:4
**source** 191:21
**sources** 253:25
**South** 26:24
29:19 31:11
**space** 37:8 256:3
259:18 261:8
261:11 273:20
278:4,5,16
**span** 312:19
313:3
**Spanish** 183:25
**speak** 134:8,19
157:13
**speaking** 312:20
**speaks** 141:17

**specialist** 112:23
**specialists** 99:21
**specific** 80:3
101:25 106:16
114:12 119:22
131:11 132:22
146:17 147:24
148:23 174:13
174:15 233:11
257:2
**specifically** 51:8
77:25 103:13
103:15 117:14
136:4 138:13
138:15 139:10
143:2 151:17
151:20 153:18
153:21 262:21
283:12 318:8
**specifications**
45:22
**spectral** 36:21
**speculating**
287:20
**speculation**
288:4
**speed** 31:6,7,8
41:22 43:18
65:25 242:10
250:13
**speeds** 43:13
**spell** 29:20
**spelling** 24:13
36:5 169:16
**spend** 271:3
**spent** 76:3 77:20
78:8 309:7
**sphere** 53:18
**spiel** 6:15
**spinning** 62:17
**spliced** 174:22
**spoke** 29:3 70:8
70:9
**spoken** 105:21
105:24 109:11
135:1
**sponsored** 40:3
**spontaneous**
214:18
**Sprigle** 36:4,8

36:10,24 44:18
44:22 45:4
137:7
**Sprigle's** 36:20
**squirm** 268:8
**squirmed**
264:19
**squirming** 165:1
175:8 233:22
**stabilize** 41:18
**stable** 235:3
**stage** 40:7 43:24
152:4
**stages** 100:16
**stain** 249:6
**stake** 14:20,23
**stamp** 296:5
298:4 299:13
299:15 300:22
**stand** 8:11,23
9:2,6 79:10
129:18 144:4
189:23 200:19
247:25 252:25
271:18 318:22
**standard** 15:3
53:15,25 54:14
54:22 55:13
56:21 57:8
58:15,16,20
59:9,16,22
60:13 64:13
70:16 71:22
74:12,16
128:24,25
129:1,3 132:22
133:1 141:21
251:10 252:9
279:8,13
319:12
**standards** 16:22
43:21 53:5,17
54:12 55:4,4,7
58:22 60:7
64:5 128:6,12
128:13,14,17
128:17 129:4,6
131:13 132:5
132:17 283:13
**standing** 42:10

192:17 227:3
260:16
**start** 3:19 7:23
23:11 24:2
28:11 29:18
44:24 50:15
77:9 84:13
99:10 161:20
170:10 175:4
189:19 193:21
195:15 198:3
199:1 201:16
202:9 205:25
207:10 221:24
232:12 240:20
248:6,9 258:23
283:1 289:1
301:11
**start-up** 12:6,7
12:13 14:17
19:6 24:9
**start-ups** 25:14
**started** 17:14
18:21 19:8
21:6,9,10
23:23,25 24:5
24:18 28:17
37:11 42:20
48:4 105:9
111:25 112:10
122:11,12,14
136:18 137:11
138:22 141:2
177:25 180:3
189:20 218:17
224:6,14
229:19 262:16
262:18
**starting** 15:6
25:9 81:13
138:7 177:21
182:9 189:13
230:15 233:13
233:13 246:5
258:22 262:18
289:4 307:18
**starts** 259:1
261:21 282:7
289:20
**state** 18:11,15

133:22 321:2,4
**statement** 4:12
50:5,9 59:18
146:5 176:10
177:7 207:17
249:17 250:9
252:14,19,21
253:25 254:4
259:14 283:7
284:8 309:25
323:8
**statements**
103:18 131:12
155:1
**states** 1:1 35:17
258:8
**statutory** 1:3
**stay** 130:18
187:21 235:3
288:9
**staying** 211:20
**steel** 26:24
**steep** 138:1
162:14 178:23
193:2 196:20
**steeper** 251:23
**steepest** 61:24
**Steinwachs**
104:5 178:1
307:2
**step** 95:10 208:1
**Stephen** 36:4
44:18 45:4
**Steven** 137:7
**sticking** 163:10
**stills** 243:11
**stimulated**
299:5,7
**stimulus** 96:19
**stomach** 194:11
261:6
**stomachs** 171:2
179:7
**stood** 96:9
**stop** 63:22
117:15 145:25
164:5 165:13
190:14 195:14
225:16 299:20
305:1

**stopped** 17:5
31:24 63:1
144:24
**stopping** 34:12
**straight** 38:16
**strange** 56:7
**strap** 43:5,8
69:13 137:17
238:24 239:25
**strapped** 238:25
239:2
**strapping**
266:14
**straps** 269:20
**strategy** 122:4,7
**Street** 2:13
**strengths**
280:13
**strike** 59:14
**stroller** 148:11
152:3
**strollers** 61:15
251:1,19
**strong** 147:18
148:19 260:20
**struck** 65:20
**struggling** 303:2
**stuck** 29:8 39:20
**student** 19:10
313:17
**students** 36:14
142:18 318:1
**studied** 113:20
118:3 137:19
142:8 157:19
197:4
**studies** 86:14
116:25 117:2,5
133:22 174:15
254:3 290:17
303:5,7 314:16
**study** 73:16
83:21 105:25
142:13 149:13
155:15 172:3,6
187:25 209:9
209:16 221:5
227:15 230:12
231:24 257:2
303:3 311:19

313:10,13
**studying** 138:8
150:23
**stuff** 27:1 43:2
52:9 68:23
70:23 76:9
89:12 96:15
99:5 103:11
128:16 133:15
133:17,18
163:14 187:2
211:22 216:24
220:18 233:23
265:6 273:2
290:10 291:22
310:12
**style** 61:5
**subject** 84:3,4
93:25 94:4,14
217:16 244:10
248:19 301:17
**subjected**
170:24
**subjects** 118:19
172:2 231:14
231:16
**submitted** 40:1
142:15 320:6,8
**subscribed**
321:16 324:21
**subset** 124:6
**subsidiary**
21:23
**substance** 323:7
**substantially**
276:2
**sudden** 107:20
113:7,17,18
117:6 118:10
118:11,25
119:5,7 120:3
144:19 149:16
149:22 188:9
**sufficient** 92:24
**suffocate** 119:14
139:24,25
**suffocated**
119:12 131:25
**suffocation**
120:14 132:2

138:16 253:13
**suggesting**
181:21 247:2
277:24 292:20
292:24
**suggestion**
143:11
**suit** 15:15
**Suite** 1:19 2:4,9
2:13 322:20
**suited** 18:19
**sum** 91:1
**summaries**
105:3
**supervision**
321:9
**supine** 175:9
181:23,23
190:8 194:6
209:11 255:11
259:20,25
260:5 262:9,18
262:22,23
263:14 264:6
289:7 298:19
299:3,8 301:17
**support** 86:15
190:19 219:24
**Suppose** 157:23
**supposed** 56:8
56:19,20 80:22
161:3
**Supreme** 16:11
**sure** 6:14 13:4
13:23 14:19
15:19,21 20:8
23:24 25:17
26:5 27:24
32:25 34:15
35:19,24 36:1
36:12,18 40:12
40:24 44:11,13
45:24 49:13
55:5 59:8,24
60:3 64:20,22
69:17 73:9,11
74:22 76:10
78:5 79:1,4
83:11 87:11
91:20 93:7

99:1 102:20,23
104:21 105:9
105:19 106:6
107:14 108:14
130:16,18
132:19,21
138:14 146:1
146:20 147:17
150:4 154:9
156:2 161:3
162:12 166:2
172:4,6 177:21
186:10,12,21
187:3 190:3,3
193:7 194:7
195:2 196:22
213:12 218:25
227:8 234:14
236:23 249:20
252:1 254:7
257:23 258:2
264:2 272:2
273:10,15,17
273:24 276:7
276:16 281:14
287:2,8 289:18
295:15 309:7
**surface** 53:2
54:23 56:22
97:16 163:14
163:21 164:16
164:25 173:12
173:18 187:23
189:16 206:5,6
207:14,15
210:17,24
211:6,14
248:11 254:22
259:19 261:17
291:1
**surfaces** 4:4
97:13 131:9
163:21 205:25
206:16 209:3
209:13
**surgeons** 112:2
**surprised** 85:10
236:17 239:10
**surrebuttal**
92:25

**suspected**
107:23
**swaddled**
305:24,25
**swatch** 279:19
**swatches** 279:6
**SwayMaster**
25:23,25 33:10
**swear** 5:16
**sweet** 234:2
**swing** 20:22,23
38:9,16,17,21
38:22,24,25
50:24 51:3,4,7
54:19,23,25
55:4 113:15
**swinging** 316:13
**swings** 39:4,5
45:8 51:5,6
251:1,19 318:9
**sworn** 5:19 7:22
321:6 324:21
**swung** 38:12,13
38:18
**symbol** 184:6
**syndrome** 117:6
118:11 119:1
149:16 188:9
**sys** 175:13
**system** 21:5,7
37:25 43:1
153:4 174:8
175:13 181:8
181:22 184:2
184:15 185:11
185:14 216:14
217:20
**systems** 24:7
37:12,18 153:1

─────── **T** ───────

**T** 321:1,1,1
325:1
**T-E-C** 29:24
**Tab** 182:11
207:23 240:10
**table** 15:8 52:11
98:7,13
**tables** 121:2
200:2

**Taft** 104:8
**take** 9:10 43:15
50:14 54:24
63:13 78:24
94:22 95:4
99:7 121:24
125:7 127:12
135:2 137:14
141:21 143:13
171:22 183:7
212:8 213:9
226:25 227:18
229:5 237:19
239:24 254:5
269:6 272:1
293:4,7 302:19
**taken** 1:14
286:15,18
317:8,10 321:7
321:8,10
**takes** 111:25
219:7 264:20
**talk** 23:4 46:8
48:16 63:3,6
67:2,3 84:11
85:12 93:10
100:19 178:8,8
182:8 189:4
205:24 229:13
229:14 230:13
253:21 255:18
271:2 277:20
279:22 288:23
296:16 310:25
315:16
**talked** 23:25
29:15,17 33:19
39:3 51:4 67:1
69:7,8,14
71:15 76:8
93:24 124:3
147:7 153:16
187:17 189:14
204:9 231:11
255:7 265:11
265:13 266:4
271:4 285:16
291:17 311:2
315:19
**talking** 26:15

31:13 44:17,25
63:21 72:12
75:3 77:9,21
84:8 103:14
108:2 109:19
150:4 151:4,7
152:2 157:10
172:15 179:3
191:1 194:4
195:22 198:13
206:20 212:14
212:17 217:1,8
217:11 220:23
220:23 221:1
235:23 257:7
261:8 262:17
263:23 266:23
285:19 301:12
311:2 312:15
316:9
**talks** 61:19
252:14 288:24
316:18
**tall** 280:2,3
**taller** 39:24
**tape** 95:4 156:17
239:24
**target** 151:20
**targeted** 148:25
**targeting** 117:17
117:17 147:24
151:25
**taught** 317:14
**teach** 33:1
145:12 190:20
190:20 317:11
317:12,20,25
**teaching** 20:11
**team** 17:21 25:8
36:13 78:22,22
142:18 153:24
303:21 305:13
**teams** 166:13
**Tech** 20:1,3,5,11
66:16 117:2
145:10 158:10
280:24 281:1,6
317:23,25
**technology**
12:15,17 13:8

14:8,13 16:6
21:2,4 24:11
26:1 30:3,5,24
30:25 31:9
32:2,5,22
33:11,19 36:16
36:22 145:11
145:17 150:19
**telephone** 110:2
110:7
**tell** 6:5 16:17,17
20:16 23:22
26:10 32:9
33:12 39:15
43:23 53:14
55:17,17 69:19
74:9 77:5 81:6
82:8 86:18
95:24 118:23
118:24 119:23
134:6 135:24
138:11 159:13
159:17 160:6
160:14,14
161:9,10
169:10 172:25
174:17 175:22
194:3 200:2
205:6 238:19
238:20 258:14
275:14
**telling** 32:15
33:13 34:12
46:12 64:18
74:1 112:21
246:17 264:7
291:15
**tells** 214:16
215:14
**temporarily**
301:19
**temporary**
300:23
**tempt** 96:4
263:9 303:24
314:11
**tempting** 96:15
**ten** 21:15 48:5
52:2,23 61:21
63:23 68:8

69:20 110:7
125:17 175:20
176:16,17
177:19 185:3
188:24 210:22
211:1 300:22
301:12 307:16
312:19 313:4
**ten-minute**
230:4
**tend** 37:24 39:20
149:6 171:17
**tends** 106:10
**tenth** 282:11
**term** 18:6 19:9
72:16 119:7
245:24 266:11
318:2
**terminated** 30:8
**termination**
30:17
**terminology**
243:9 251:11
251:14 286:10
**terms** 17:10,24
22:15 38:13
50:18 55:15
81:12 97:8
107:5 114:4
120:10 131:21
140:6 176:17
211:17 220:6
220:10 221:10
276:2
**terribly** 10:7
**test** 46:25 92:11
95:13 130:24
131:5 134:15
168:14,16
176:16 177:20
210:3 217:16
225:5 236:2,18
237:16 240:6,7
262:15 270:13
276:9,20
277:18 279:1,4
279:9,21,22
281:8,15,16
282:1,2,3,4,10
289:12 290:13

303:24 314:12
314:18
**tested** 47:3
168:9 176:1
235:25 276:23
278:25 279:6
289:8 292:10
302:24
**testified** 5:20
49:19 101:11
124:17 157:2
218:22 219:11
268:23 285:11
304:2
**testify** 11:2
15:19 40:17
55:12,20 321:6
**testifying** 178:6
**testimony** 7:22
8:8 9:24 10:1
11:7 99:3
134:10 156:7
157:1 167:19
178:5 216:20
219:1,1 266:17
266:25 267:2
268:22 285:7
286:11,12
293:2 307:1
323:2,8
**testing** 83:22
93:14,14,15,21
94:19,21,24
95:16 96:20
157:5,8 168:11
168:13 175:24
176:4,11,13,17
176:23 177:6,8
214:12,13
219:13,18,24
219:25 220:4
221:4,10 225:6
225:8 227:24
229:8 237:25
276:18 279:13
288:24 289:1,4
292:22 294:1
296:1,2 303:18
304:12 306:17
313:14,15,16

313:17,19,21
313:22,25
314:1,4,7,9
**testings** 92:5
**tests** 43:11 94:1
94:3 158:7
168:16 175:18
249:9 289:14
289:23 290:17
291:2 315:6
**Texas** 2:13
281:1
**textbook** 88:8
**textile** 132:5,24
133:10
**textiles** 130:20
130:23,23,24
131:17,18,20
132:3
**texts** 100:16
**thank** 5:14
76:21 77:12
78:21 123:22
183:19 208:22
245:15 256:8
312:11
**Thanks** 6:18
**theme** 32:1,18
**they'd** 31:23
**thing** 38:10
43:21 64:14
65:1 84:1
114:21 119:16
131:6 135:10
140:5 167:12
167:21 264:11
296:11
**things** 26:4
28:23 42:21
45:23 52:9
55:5 69:14
74:3 83:7,8
84:21 87:22
88:13,21,25
92:9,18,21
100:6,9 106:16
107:1,3 108:18
114:21 117:21
132:6 134:2
136:6,11,19

137:13,18
145:20 166:14
167:10 179:3
196:15 227:10
242:11 250:13
257:13 263:17
280:1 291:18
311:15
**think** 6:10,16,17
9:1,5,9,13,15
9:21 10:19
11:20 12:3
13:2,23 15:22
16:3,6,10 17:7
18:20 19:22,25
22:22 26:2
27:5 28:3
30:21 32:17
35:8 40:7,20
43:10 46:2,12
47:4,7 48:4,8
48:20 49:1,10
50:8 54:2,2,4
54:17 55:3,20
55:22 56:5,16
57:13,14 58:7
58:24 59:19
60:4,6,19,25
61:1 62:12,14
62:16 63:2
64:24 65:5,21
68:4,16 70:15
70:21 71:20
73:19 75:1,6
75:18 76:12,23
78:13 81:14
84:18 85:9,21
85:25 86:21
87:7,12,12,15
87:19,22 88:11
88:16,19 89:10
90:24 91:18
92:2,19 93:20
94:25 96:22,25
97:1,9,12,21
98:15,21 99:13
99:25 100:23
101:19 103:25
104:1 105:4,10
106:1,17

107:14,15
108:3,12 109:6
109:15 110:18
111:8,18 113:8
115:5 116:4
117:16 118:18
123:17 125:11
132:25 133:19
133:21 135:23
138:19 139:18
143:18 144:24
146:20 147:23
149:3 150:4,15
152:1 153:8,15
154:11,23,24
155:13 156:6,8
157:3 159:1,11
161:10 166:2
168:20 169:13
170:7,8 173:3
175:3 176:5
177:25 178:1,3
178:14,17
179:17,23
181:14,16
184:22,23
185:22 186:2,4
186:6 188:23
194:14 195:22
196:13,21
197:8,12,16
198:2 202:11
204:4 206:18
208:2 210:7
212:4,12,18
217:2 218:23
219:3 221:21
221:24 222:3
226:2,17 227:3
227:16 228:2,6
228:9,10 229:6
229:10 230:8
231:16 232:16
232:24 233:5
233:23 234:8
235:4 236:8,10
237:6,7,8
238:23 239:8
249:4 251:9,14
252:2 253:11

256:13,14
261:13 265:12
267:23 269:16
270:2,10,12
271:25 272:16
272:18 277:4
277:23 279:10
280:6 281:19
283:12 284:3
284:14,17,22
285:5,11,14
286:6 287:3
288:3 289:3
294:17,24
295:7 296:23
299:10 300:15
300:23 302:23
303:13,20
304:2 309:21
310:4,6,6,11
310:18,24
312:23,24
315:6,10 316:7
**thinking** 56:7,17
56:18 62:23
151:24
**third** 7:3 141:11
175:6 178:8,10
178:16,19
205:8 216:12
216:13,13
234:4,5 262:24
263:12
**thoroughly**
210:2
**thought** 28:25
28:25 55:10
59:15 62:8
72:9 84:17
136:15,17
168:18 176:21
177:11 204:10
207:7 228:16
211:11 56:10
**thoughts** 58:18
**thousand**
158:12
**thousands** 27:19
38:18 85:25
**three** 13:3 27:10

27:15 48:9
62:2 67:7 68:3
71:9 105:1,10
105:11 148:20
151:17 174:22
192:15 193:3,7
203:18 225:22
228:1 231:4
232:21 236:1
245:5 255:1
289:19 309:7
311:14 318:4,6
**three-** 22:1
**three-year-old**
43:12 64:25
65:2,16,23
67:4 147:25
**three-year-olds**
151:11
**threw** 180:19,19
282:11
**thrown** 212:22
**thrust** 150:21
152:12
**thrusts** 147:6,10
**Thursday** 80:22
84:18 85:5
**tie** 41:15
**tied** 145:21
146:4
**tight** 92:17
181:14,18
239:14 266:13
267:7
**tightly** 239:25
268:11
**tilting** 246:13
**time** 5:2 9:17
16:18 17:22
18:20,23 29:7
29:8 34:5 39:5
50:15,23 54:9
54:18,22 55:3
55:11 56:10
58:1,8,12 59:4
59:22 60:5,6
60:24 62:15,25
64:9 66:4,5,11
66:12 68:2
69:3 70:14,16

70:22 72:5,13
72:21 73:4,15
78:7 79:11,17
84:20,22 90:18
99:23 102:19
113:21 119:9
123:14 124:21
124:25 129:2
133:1 143:12
143:17 144:6
144:12 149:13
153:14 155:5
171:25 174:9
179:14 180:16
181:4 189:16
189:22 194:18
194:19 195:1,4
195:5,15
200:14 201:13
202:9,12
213:20 214:1
219:8,22 226:1
226:23 228:22
234:13,18
235:6 237:22
249:17 251:15
251:17 252:12
254:6 268:2
271:3 282:12
293:15,21
298:4 299:13
299:25 300:16
300:18,22
303:16 307:25
308:4,10,20,25
313:9 314:23
318:23 319:12
320:15 321:8
**timeframe**
69:24
**times** 6:19,21
14:18 34:20
61:11 109:22
110:7,12
112:12 158:12
160:7 161:6
249:3 264:10
272:20,23
282:3
**tip** 41:23

**tippy** 235:4
**tips** 3:19 158:1
190:20
**title** 141:13
147:3 150:19
209:3,6 214:25
**today** 10:3 11:3
11:7 48:7,24
76:2 78:2,9
81:17 82:5
83:25 89:6
91:14,21
100:22 115:10
119:23
**today's** 90:2
318:24
**toddler** 39:12
**toddlers** 37:10
37:17,19 121:1
**toggling** 256:2,4
**Tokyo** 20:11
**told** 64:25 70:12
81:23 121:20
122:9 140:11
156:1 178:9
179:15 189:7
214:4 232:14
235:11,16
302:22
**tolerance** 43:21
**tons** 27:6,19,21
**top** 31:23 52:8
52:11,18
104:10,16
105:16 155:22
161:19 165:12
165:13,20
166:12 172:16
183:23 184:1
222:1 223:20
224:24 226:7
258:20
**topic** 115:22
131:4 147:15
257:2
**topics** 120:16
133:4 134:11
**torque** 265:4
**torques** 165:2,4
260:21 261:2,5

264:25,25
265:2
**torsional** 38:23
51:5,6
**torso** 38:20
**total** 6:20 22:6
27:6,8 91:1
147:5 296:23
**totally** 272:4
**tour** 158:19
**tours** 158:19
**toy** 95:21 96:14
263:9 297:10
297:12,13,17
**track** 17:18,21
115:19 158:11
**traction** 171:18
**trade** 17:10
32:24 33:9
34:21
**trademark**
25:20,25 26:1
35:18
**trademarks**
26:3
**trader** 112:17
**traditionally**
38:18
**transcript** 320:4
320:5 321:10
321:11 322:8
322:13,15
323:2
**transcription**
321:9
**transcripts**
100:21 101:18
**transfer** 18:14
**transferred** 18:6
18:24
**transition**
307:16
**transitioned**
109:25
**transportation**
157:16
**transporter**
141:15,18
**transporters**
141:24

**trapped** 162:15
162:24
**trapping** 163:16
**traps** 162:6
278:5
**traumatic**
274:12
**Traurig** 2:12
325:8
**travel** 49:10
**treatises** 86:13
**treatment** 111:9
111:10 112:23
**trial** 8:9 10:11
10:21 49:4
161:5,6
**triangle** 184:7
**tried** 41:10
84:18 117:14
118:4 180:2
237:18 315:8
315:10
**tries** 96:5 113:15
117:3
**trigger** 148:22
**true** 8:9 10:3,21
25:21 57:9
64:5 70:20
74:7 93:14
111:2 129:23
132:7 148:10
149:2,3,23
154:14 156:23
186:1 212:12
235:20 252:5
255:6 280:10
320:5,8 321:10
**trust** 71:9 107:6
**truth** 58:19 72:6
115:21 116:9
321:6,6,7
**truthfully** 60:3
**try** 30:22 32:18
41:2 47:5
53:17 107:16
151:20 163:2
165:13 226:23
227:2 231:12
247:11 282:14
314:11

**trying** 26:13
32:16 43:17
46:10 53:8
56:3,11,25
60:15,17 62:17
67:17 70:22
77:1 108:11
115:19 124:14
130:3 135:2,15
141:5 147:8
153:1 163:13
188:24 189:25
220:19 226:24
240:3,7 242:9
263:23 264:23
279:2 287:4
293:12 302:11
304:20 313:5,6
314:18,19,21
**tucked** 275:6
**Tucson** 2:4
**Tuesday** 84:20
**tummy** 194:17
194:18,19,25
195:4,5
**turn** 40:23 68:24
96:5,17,25
97:1 123:12
125:9 127:7
146:25 163:3
168:23 170:25
173:21,23
174:2 262:1,4
265:19 277:4
293:2 297:19
**turned** 31:14
40:8 82:20
84:5 86:23
101:21 162:5
167:17 195:9
224:5 247:16
265:7 274:21
275:11,21,22
276:11,22
277:2 305:12
309:6
**turning** 164:12
175:17 219:7
233:23
**turns** 31:3 38:9

111:19 158:1
171:14
**twins** 67:8 222:9
222:10,12
227:22
**twist** 38:20
**twisting** 175:17
**two** 20:25 27:13
27:14,15 49:21
50:1,12 61:12
68:3 70:5 79:6
83:5 84:6,6
86:22 98:3
102:6 108:17
126:7 136:6,11
145:24 146:19
148:20 160:1
161:18 163:21
169:10,11
170:10 174:19
180:9 189:22
194:15 195:2
195:19,23
202:12 221:14
222:7,8 223:4
226:15 245:5
253:11 255:1
261:20 280:17
289:19 307:24
**two-month**
196:14
**type** 7:19 12:19
34:20 38:24
42:16 52:6
59:14 131:8
**types** 31:1,12
33:12 34:10
**typo** 169:13

_____
**U**

**U** 325:1
**U.S** 4:15
**U.S.O.P** 131:2
**Uh-huh** 15:18
22:3 52:4
71:12 98:14
164:4 222:13
**ultimate** 107:24
**ultimately** 17:2
75:7 315:11

**unable** 278:16
299:17
**unassisted**
185:18 186:12
187:17,18
205:20 234:21
234:23,23
**unbuckle**
285:15
**unbuckled**
285:12 286:4,9
**uncertain**
245:23
**uncertainty**
187:22
**uncle** 102:15
**unclear** 114:7
**uncomfortable**
268:6
**Uncontained**
150:21
**undeclared**
17:19
**undergrad**
198:17
**undergraduate**
19:9
**underneath**
99:17 274:22
**undersigned**
323:2
**understand** 9:20
10:7,12,13
11:9,12 18:16
35:12 47:5
49:21 57:4
64:3 70:18,25
71:8 81:9,12
92:3 109:6,9
110:19 112:16
118:8,21 127:3
135:5,11 146:3
149:8,14
154:10 155:7
160:5 161:3
174:21 181:25
186:14,18,20
186:25 188:4,5
213:1 244:22
256:25 272:19

273:24 276:7
278:9 288:15
315:3 316:12
317:6
**understanding**
89:3 97:19
109:25 119:5
120:10 130:23
132:3,4 140:19
149:15 155:10
161:4 187:16
256:24 307:4
315:12
**understandings**
118:5 308:16
**understood**
11:15 56:5
60:16 82:2,24
92:16 135:13
139:5
**undertaking**
136:23
**undertook**
83:21
**undetermined**
107:25
**unequal** 165:3
170:21
**unequivocal**
185:5
**unexpected**
107:21
**unexpectedly**
113:20 119:6,8
150:7
**unexplained**
113:7,18
118:11 119:1
120:3 144:20
149:22 150:2
**unique** 71:18
126:8
**United** 1:1 35:17
**units** 52:7
**University** 4:14
17:14 18:9,18
280:20
**unnatural** 277:3
**unreasonable**
127:17

**unrestrained**
223:22
**unsafe** 61:8 62:9
62:11,12 64:24
72:14 125:12
**up-to-date**
88:10
**updated** 54:4
84:21 85:4
136:7
**updates** 17:5
**updating** 128:25
**uploaded**
240:17
**upright** 146:14
193:16
**upward** 170:23
284:7
**upwards** 190:9
**usage** 294:6
**use** 14:6 37:6
45:18 57:1
64:17 68:14
69:8,12 99:24
106:3 109:20
131:3 148:3
157:21 165:24
169:21 172:5
176:18,19
180:22,24
182:9 184:2,15
184:18,23,24
185:4,6,11,16
185:24 186:5,7
188:20 189:3
190:7 194:5
210:3 216:16
217:21 238:3,9
242:8 245:24
249:5 258:9,11
259:6,7 260:15
263:23 264:13
264:13,24,25
266:9 267:12
267:21 268:1,4
268:15,18,19
268:25 272:24
276:7 283:4
292:18 295:9
306:8,10,12,15

306:16 314:25
315:8,10,17
317:17 323:10
**useful** 270:25
315:17
**user** 269:25
**users** 168:17
294:9
**uses** 314:20
**usual** 325:13
**usually** 119:7
128:23 166:16
252:2 298:13
316:8

---

**V**

**valley** 246:12
261:22
**valuable** 22:18
23:2
**value** 273:2
**variability**
295:19
**variable** 31:5
**variance** 189:18
**variety** 26:8
251:24
**various** 26:3
52:8,22 93:17
95:2 128:21
145:19 175:9
227:19 231:4
231:12 294:15
314:15
**vast** 83:19
101:19 118:25
**vastly** 269:22
**Vegas** 58:25
**Vehicles** 132:13
**verbal** 95:21
**verify** 87:16
193:6 218:8
**Veritext** 320:1,4
320:7,13
322:11,19
325:6,7,8,10
325:13
**verse** 119:23
**versed** 194:8
**version** 43:6

56:2 87:9,11
87:12,13,16
183:24,25
311:18
**versions** 92:12
**versus** 215:23
**vet** 295:20
**vibrate** 12:18
14:15 31:23
**vibrating** 31:24
**vibration** 13:20
14:5 20:18
21:4 33:13,22
34:13
**victims** 118:7
**video** 4:8,20
79:12,18 92:8
92:11 94:23,25
144:7,13
174:23 175:2,8
179:20,23
213:21 214:2
227:20 240:12
240:14,16
241:2,8 243:20
243:22 244:6,9
262:25 264:8
270:8,10
290:15 293:16
293:22 296:3
296:17 297:3,4
297:7,11,16
300:25 304:21
304:22,23,24
304:24 311:6,7
311:16,18
319:1
**videoed** 177:9
**videographer**
2:17 5:1,14
79:10,17 144:4
144:6,12
180:11 213:20
214:1 273:18
293:15,21
318:22
**videos** 157:20
171:20,22
174:13,15,20
174:21,22

175:5,18
176:22,23
179:17,18
219:4,8,9
227:11 235:22
262:14 263:8
263:10,12,12
264:17 265:16
284:12 311:11
**videotape** 95:11
227:14
**videotaped** 1:13
3:9 5:4 270:13
318:24
**videotapes** 92:4
**videotaping**
95:6
**view** 64:6
**virtual** 110:1
**virtue** 6:3
**vision** 297:24
**visiting** 108:22
**visually** 227:17
**vitae** 3:11 85:4
120:19,20
136:6 144:16
**voice** 96:15
**volitional** 216:3
**voltages** 14:11
14:13
**vote** 71:5 129:5
**vs** 1:6

---

**W**

**waist** 166:25
237:4 240:1
**wait** 31:24 121:7
121:8 199:20
199:20 291:8,8
311:20
**waive** 307:24
**walk** 152:4,4,16
152:22 166:9
189:23,25
293:5 297:4
**walked** 152:5
**walking** 260:15
260:17
**wall** 187:12
212:16,18,19

212:23 265:14
275:23
**walls** 162:14
178:23 211:9
211:19 212:10
261:10,12,18
261:19,20
265:9,22
**Wang** 4:4 87:5
87:19 207:21
209:1 210:3
257:11
**want** 11:17
22:16 28:11,12
28:12 32:8,20
33:15 41:15
44:25 46:7,7
50:14 55:23
57:6 64:8
67:16 69:12
83:5 94:12
99:13 104:18
110:16 115:23
121:22 126:5
131:22 143:22
146:2 148:14
148:21 160:8
182:8 189:4,22
205:24 215:20
229:13 230:21
235:9 236:14
236:15 240:13
241:17 245:24
247:22,22
249:5 254:6
257:25 270:4
274:24 282:7
288:23 295:25
296:15 297:4
301:2,11
308:19,19
310:25 312:12
318:17
**wanted** 40:6
44:24 48:18
78:7 87:10
189:23 190:25
227:12,18
228:13 304:13
**wanting** 69:8

109:8
**wants** 38:12
**warned** 292:14
292:17
**warning** 3:17
156:4 182:21
182:22 183:6
183:10,12,17
184:6 185:14
186:5,7 187:4
189:2 190:13
195:19 238:2
238:20 268:15
268:18 292:13
306:13,14
**warnings**
154:13,16,21
155:1,5,7
184:8 187:25
**wasn't** 24:1 56:6
56:9,12 59:6
59:25 62:14
63:18 70:22
97:14 99:1
124:25 154:18
175:24 189:21
212:16 218:12
224:3 229:3
233:21 237:25
240:7 263:18
284:1,20,21
287:13 297:22
304:12,20
314:12
**waste** 123:14
254:6
**watch** 69:13
241:8 296:15
297:1
**watched** 171:11
236:16 297:7
**watching** 227:17
234:14
**way** 10:24 13:4
32:8,9,10,14
32:15 35:9
41:18,22,23
42:1 50:2 79:2
81:9 92:11
95:17 96:4

115:15 123:1
127:2,6,7
128:5 140:13
143:16 149:21
152:9 155:16
158:15 165:24
169:16 171:19
179:21 181:24
184:22 192:13
198:16 221:2
226:10 228:17
229:15 236:5
236:11 238:17
239:2 242:10
246:13,21
263:6 275:12
277:3 279:18
281:21 285:14
288:8 297:17
297:19,20
303:14 321:14
**ways** 49:23
166:22 175:9
279:25
**we'll** 50:15
75:24 78:5,6
82:4 83:13
130:4,18
158:16 240:20
318:16,20
**we're** 11:23
26:18 29:17
33:7 66:16
77:14 79:20
84:11 110:17
130:14 134:1,2
134:4,15
136:10,13,18
136:22,22
140:14,25,25
150:23 151:7
165:9 166:5
172:13 176:17
179:3 194:3,4
194:4,15
207:20 210:9
213:2 217:14
235:9 236:25
238:14 242:7,7
261:7 262:17

288:25,25
290:24 297:17
298:4,7 299:3
300:7,25
301:15 307:15
307:16
**we've** 10:5 25:16
26:4 32:4,23
66:22 67:12,14
80:18,18 88:17
110:16 145:6
153:15 158:13
158:13 189:13
204:9 217:17
231:11 271:4
311:24 315:19
318:12
**wearing** 211:25
212:2
**Web** 191:2,4,19
191:24
**week** 66:18 67:6
80:22 84:20
136:7 314:20
318:14
**weeks** 176:18
309:7
**weeks'** 78:17
**weigh** 280:4
**weight** 117:20
192:16 193:8
193:15
**weird** 275:12
**went** 13:6,7
16:10 17:5
35:23 39:3
40:10 58:24
59:5 61:12
66:18 70:17
96:13 115:1
137:9 145:2
225:8 229:19
**weren't** 47:21
107:10 231:22
313:2,16
**Western** 15:23
16:4
**Wetmore** 2:4
**whatsoever**
138:25

**wheel** 157:22,24
**wheelchair**
36:21,25 37:12
39:10,21
137:16 148:21
151:6 152:1
**wheelchairs**
37:13,17,24
147:5 148:25
153:2
**wheeled** 137:6
**WHEREOF**
321:15
**whichever**
185:19
**whoa** 76:14,14
76:14,14
298:17
**wide** 200:3,3
**wife** 61:9,17
62:7,11 63:9
63:22 66:7,12
66:17 70:1,8
71:16 72:13
124:18 127:24
191:19,22
269:4,16,16
**wife's** 70:1
**wiggle** 181:12
224:22 230:8
230:15 236:18
238:1 239:10
**wiggled** 93:19
286:14
**wiggling** 175:16
175:20 179:1
179:19 219:6
224:6 233:13
233:18 263:16
263:21
**wiggly** 239:7
**William** 1:13
3:3,9,11,13,15
5:4,18,24
318:25 322:2
325:2
**wish** 256:2
**witness** 3:2 5:17
7:6,6 8:15,22
9:2,15 10:15

48:23 50:8
57:12 72:3
73:6 74:13
79:1,9 80:12
80:13 88:19
89:10 93:4
118:16 120:8
122:19 124:24
125:23 126:16
128:10 133:17
134:23 137:1,2
139:4,18 141:8
141:9 143:9
144:5 159:22
161:18 186:4
186:24 194:20
194:23 196:13
198:2 203:25
213:9 216:23
217:8 218:10
220:3 236:8
237:15 239:6
242:3 244:7
247:8 252:9,17
253:4,5 254:9
254:10 257:23
260:2 266:11
267:9,23
269:15 270:12
271:22 272:6
281:14 282:24
284:24 285:1,5
286:21 287:2
288:3,6,20
291:12,14
294:14 295:6
296:18 298:9
298:25 301:7
301:11 306:6
306:23 307:7
308:1 319:6,8
320:9 321:5,15
**witness's** 123:14
**witnessed** 255:1
262:10
**witnesses'**
103:22
**wobble** 173:20
**Wonderland**
51:14

**word** 69:15,15
91:6 172:3
268:14
**wording** 128:24
**words** 86:13
88:25 160:10
160:24 180:20
185:7,16
190:23 194:9
218:23 229:2
253:15 286:15
**work** 6:25 20:5
25:9 32:13
36:13,22 45:1
46:8 48:6,19
49:4,20,22
54:14 56:19
57:1 60:19
71:9 73:6
74:11,13 76:5
77:1,24 78:18
83:18,24 85:14
91:15 93:12
119:22,24
120:3 124:2
127:2,5 130:3
130:9,11
131:11 140:12
141:3 142:11
142:14,22
145:16 148:24
153:16 171:22
179:13 220:7
256:3 257:1
270:6 273:19
**work's** 7:11
**work-out** 89:24
**worked** 12:6
19:10,11 20:7
35:21 36:9
37:18 38:8
39:1 45:2,6,10
45:12,21 46:13
48:3,8 49:15
76:8 104:24
113:15 121:9
132:22 137:5
137:10 140:20
140:22,23
153:13 156:19

157:4,8 255:8
267:15 303:21
**working** 37:6,11
39:11 40:15
48:4 54:18
60:7 70:4 76:3
85:20 90:3
110:8 111:24
136:10 140:13
140:14,25
142:19 145:23
147:20
**works** 58:23
133:3 315:9
**workweeks**
78:16
**world** 27:22
33:2 58:14
110:1 294:6,10
**worried** 98:7
**worries** 143:25
208:2
**worth** 10:22
33:7 78:17
**wouldn't** 9:6
33:23 41:11,12
42:8 49:11
64:14,17 85:10
94:13 112:19
150:6 182:6
212:16 234:14
239:6 283:18
283:24 306:16
**Wow** 62:3
**wrapped** 69:10
**wraps** 163:20
**wriggle** 171:12
**wriggled** 286:25
288:16
**write** 309:5
**writing** 81:23
309:7
**writings** 155:3
**written** 119:13
138:16 139:23
173:2 316:15
**wrong** 9:4,5,8
9:10,14,16,19
152:24
**wrote** 16:20

**X**

**X** 30:6

**Y**

**Yards** 121:2
**yeah** 10:19
16:16 17:21
23:13,19 25:25
26:2,21 27:9
27:18 30:9,21
30:21 41:16
42:8 43:17,19
43:25 44:8
45:18 46:21
49:5 54:2
60:19 62:4,19
62:22 63:17
65:18 67:14,21
69:21 70:21
71:6 72:15,20
73:13 78:3,19
80:13 83:15
86:4,9 93:1
97:9,24 98:5
99:5 101:3
108:1 110:4
111:15 112:10
115:1,3 117:1
132:14 146:23
149:3,25
150:15 151:22
152:18,19,25
153:21 154:7
169:15,24
173:7,11
178:17 179:8
181:17,18,20
182:3 183:12
183:16 185:7,9
185:12 186:22
188:3,23 189:2
190:22,24
191:5 194:14
196:14 197:10
197:19 198:2
198:20 200:25
202:11,18
204:22,24
206:18 207:24
212:4 213:14

218:25 223:3
223:20 224:3
224:15,17,19
226:7,18,22
228:1,11 232:3
232:13 233:15
234:22 235:15
235:25 237:2
238:13 243:14
244:23 246:9
246:23 248:15
249:14 253:9
261:19 263:16
263:25 264:22
265:18,23
266:17 273:1
275:4,22
277:11,13
279:8 280:15
281:3 283:10
283:16 284:22
285:5,14 291:7
291:14 293:9
294:14 295:17
296:21,25
299:9,18
300:20 301:4
302:9,16,25
304:10,12,23
306:16 307:4
307:19 310:18
311:19 314:18
316:2 318:6
**year** 67:8 75:8
147:22 149:23
151:25 176:19
**years** 12:7 13:6
13:7 16:10
21:15 30:6,10
36:14,24,25
38:19 41:4
43:7 48:5,9
49:16 53:1,25
58:7 66:23
100:2 111:25
113:15 115:16
122:22 137:9
138:7 140:20
140:22,24
151:17 157:4

280:17 315:8
**years'** 10:22
**yellow** 214:25
**Yep** 193:9,20
223:11 258:18
278:7
**yesterday**
101:11
**yielded** 248:14
**York** 15:23
**young** 37:12
52:15 61:11
62:15 68:17
69:4 70:24
117:17 118:6
137:10,15
147:24 149:18
149:18 153:1
**youngest** 43:9
**YouTube** 44:2,3
**Yung** 189:9,9

———————
**Z**
———————
**Zdraveska** 3:20
191:15 192:11
**zero** 18:10,11
31:7 52:2
210:21,25
**ZO-ClearPFH**
3:21
**ZO-TempePD**
4:18
**Z**■ 3:22,23
94:14 97:11,15
118:23 196:2,2
196:3 199:16
201:8 202:25
203:3,19 234:2
245:4,20
246:18 247:4
272:14,20,21
273:3 274:13
274:20,25
284:20 285:12
285:20,20
286:4,12,14,24
**Z**■**'s** 97:3 99:3
102:13,15
107:9,12
108:19 109:12

199:16 200:4
249:17 268:25
271:6 284:15
284:20
**Zoom** 110:2,7

———————
**0**
———————
**008143** 241:5

———————
**1**
———————
**1** 3:9,21 79:21
79:23 80:8
**1:38** 213:20
**1:52** 214:1
**10** 4:6 182:11
213:2,7 214:5
**10-25-19** 4:14
**10.B** 325:4
**10:00** 301:14
**10:07** 300:22,24
301:1,3,5
**10:59** 79:11
**100** 15:20
255:18 259:13
**1000** 2:13
**102** 262:5
**1033** 250:18
**104** 265:8
**11** 4:8 169:5
240:21,24
243:12,13,14
245:11 298:18
**11:10** 298:25
**11:11** 79:17
**11:30** 298:5,7,10
299:3
**11:35** 299:14
300:2,3,12
**11:40** 300:5
**118** 277:23
**12** 4:9 153:20
169:6 185:3
188:24 222:22
244:12,15,19
244:22 249:25
300:4,7,8
**12:13** 144:6
**12:36** 144:12
**122** 284:4
**12444** 4:6

**12465** 214:14,23
**13** 4:11 150:5
172:13,13
250:1,3,5,8
252:23
**13053,Signatu...**
321:20 325:16
**133** 289:4,18
**134** 292:8
**14** 1:15 4:14
207:23 255:19
255:22 271:15
**144** 294:5
**147** 246:5
**15** 4:18 110:15
150:16 192:2
271:16,17,20
272:10,12
273:22 276:13
276:21
**15-14-37(a)**
320:14
**15:27** 299:14
300:2,12
**151** 245:9,13
**152** 245:9,13
**153** 245:13
**154** 245:14
**16** 4:20 195:9
296:4,7
**163** 300:1,13
**165** 305:4,9
**16th** 91:8 92:24
309:6
**17** 13:6,7 16:10
240:10,12
**1700** 2:13
**18** 13:6,7 16:10
222:18 244:2
**182** 3:17 277:24
**183** 277:24
278:23
**19** 253:19
**190** 150:16
280:5
**191** 3:18
**199** 3:21

———————
**2**
———————
**2** 3:11 84:25

85:3 89:16
120:19 168:24
168:25 318:10
**2.2** 210:11
**2:19-CV-0268...**
1:7
**20** 52:2 58:8
60:4 97:7
111:25 138:7
140:20,22,24
196:6 210:22
223:14 305:17
322:20
**200** 2:4
**2005** 30:14
**2010** 30:15
**2011** 250:8
251:7
**2014** 54:8 201:6
202:2,13
**2015** 53:5 54:4,9
**2017** 54:4 58:8
59:20
**2017-A** 60:5
**2018** 69:22,24
70:11 127:1
214:6
**2019** 58:8 59:20
75:10 78:8
255:19
**2020** 75:11
**2021** 1:15 74:1
89:16 91:8
168:25 321:16
324:22
**203** 3:23 317:13
**208** 4:3
**21** 206:20
**2110** 318:1
**213** 4:6
**22** 62:2 172:23
222:2
**22-month-old**
67:5
**23** 224:25
235:10 253:19
267:1
**23498** 4:20
296:5
**24** 239:4

**241** 4:8
**244** 4:9
**25** 6:21 185:19
186:13,17,17
188:5 231:3
253:20
**250** 4:11 78:1,3
100:24
**250-hour** 101:17
**2500** 1:19 2:9
**255** 4:14
**26(b)(4)** 81:23
**27** 222:4,5 223:9
241:11,12
248:14,17
249:13 251:23
**27.1** 249:1,8
**271** 4:18
**28** 10:22 122:22
221:24 222:1
223:9
**28th** 321:16
**29** 223:16,19,20
253:20
**296** 4:20

———————
**3**
———————
**3** 3:13 89:19,21
90:5 91:16
168:24 207:5
221:19,25
222:1 230:23
247:24 248:5
255:25 258:6
258:17 282:8
309:9
**3:01** 293:15
**3:07** 293:21
**3:30** 318:12,23
319:11
**30** 6:21 17:6
99:16 157:4
164:16 166:23
169:4 200:20
210:22 211:1
252:3,11 259:1
284:15,17
322:3
**30(7)(e)** 323:6
**300** 318:1

322:20
**30076** 322:21
**30305** 2:9
**30322** 6:8
**31** 150:11
    200:20 248:24
**3118** 53:3 58:20
    59:5 70:16
    74:16 129:3
**33** 141:10,11
    144:25
**3333** 1:19 2:9
**34** 169:4,5,6
    170:6 200:6,10
    200:18,22
    201:4
**343-9696** 322:22
**355** 4:18
**357** 273:23
    274:8
**36** 137:4,4 226:2
    282:19
**361** 274:19
**362** 4:18 275:18
    276:13,21
**37** 170:20
    172:15 247:23
    248:5 282:18
**374-3541** 2:14
**38** 259:12
**39** 178:21
    259:12
**3D** 112:1,6,14
    115:2 195:8

_____
**4**

**4** 3:15 91:9,11
    91:16 207:3
    307:14
**4-2-21** 3:13
**4-6-18** 4:6
**4.7-month**
    301:16
**40** 17:6 27:6,21
    129:10 174:25
    298:2
**40-hour** 78:16
**41** 3:21
**42** 121:5,20
    123:25 124:2

130:18 136:14
**43** 136:14
**43-page** 133:13
**44** 190:5
**45** 192:22 225:6
    252:4 304:1
    314:16
**46** 282:21
**47** 259:23
**476** 4:6
**4797857** 323:1
**49** 312:15,20
**4th** 201:5 202:1

_____
**5**

**5** 3:4,17 30:5
    146:25 172:17
    175:12 182:15
    182:17 183:3
    192:2,3
**50** 27:6,21
    174:25 261:20
    275:23
**520** 2:5
**553-2100** 2:10
**5582** 3:17
**56** 206:22,23

_____
**6**

**6** 3:18 30:14
    81:13 191:6,9
    191:17
**6-9-20** 3:18
**6.2** 316:17
**6.3** 317:13
**60** 252:11 296:1
    312:19 313:4
**600** 49:2
**620-3975** 2:5
**65** 164:21
**650** 49:2 76:13
    76:25
**678** 2:10
**68** 278:24
**698** 2:4
**6th** 69:21,24
    214:6

_____
**7**

**7** 3:21 199:10,23

200:9
**7-16-21** 3:15
**70** 164:21
    230:20,23
**7092** 3:23
**71** 315:20 316:9
**713** 2:14
**770** 322:22
**77002** 2:13
**79** 3:9

_____
**8**

**8** 3:23 129:10
    202:24 203:4,7
    234:2,5 289:25
    290:6 291:16
    291:19,22
    292:2
**8-25-21** 3:9
**8-8-20** 4:3
**8.3** 247:23
**8.3.5** 282:8,12
    282:16
**800** 29:6,9
**81** 266:18,25
**813** 6:7
**8143** 4:8
**8144** 4:9
**8154** 4:9
**84** 3:11
**85705** 2:4
**89** 3:13

_____
**9**

**9** 4:3 207:21
    208:13,16,18
    254:1 288:23
**9-11-28** 325:10
**9-11-30(e)** 323:7
**9.2** 293:24
**9:40** 301:8,9,15
**9:50** 1:16
**9:51** 5:2
**90** 192:22 193:1
    193:18 196:15
    230:9 233:16
**91** 3:15
**99** 254:20
**9th** 85:6



Deposition of:
## William Singhose, Ph.D., Vol. II

*September 27, 2021*

In the Matter of:

## In Re: Fisher-Price/Mattel

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 326

                    IN THE UNITED STATES DISTRICT COURT
 1
                      FOR THE DISTRICT OF ARIZONA
 2

 3

 4   KATHLEEN COURKAMP, for herself    )
     and on behalf of other statutory  ) Case No.
 5   beneficiaries,                    )2:19-cv-02689-GMS
                                       )
 6            Plaintiff,               )
                                       )
 7   vs.                               )
                                       )
 8   FISHER-PRICE, INC., a foreign     )
     corporation; MATTEL, INC., a      )
 9   foreign corporation,              )
                                       )
10            Defendants.              )
                                       )
11   - - - - - - - - - - - - - - - - - )
12                        VOLUME II
13            CONTINUED VIDEOTAPE DEPOSITION OF
14                 WILLIAM SINGHOSE, Ph.D.
15
16        Monday, September 27, 2021, 1:32 p.m.
17
18
19
20            HELD AT:
21            Greenberg Traurig, LLP
              3333 Piedmont Road, N.E., Suite 2500
22            Atlanta, Georgia  30305
23       ---------------------------------------------
24
          WANDA L. ROBINSON, CRR, CCR, No. B-1973
25       Certified Shorthand Reporter/Notary Public

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 327

1    APPEARANCES OF COUNSEL VIA ZOOM
2
3  Appearing on Behalf of the Plaintiff:
4
      JOHN E. OSBORNE, ESQUIRE
5     Goldberg & Osborne LLP
      698 East Wetmore Road, Suite 200
6     Tucson, Arizona  85705
      T:  520.620.3975
7     E-mail: josborne@goldbergandosborne.com
8
9
10 Appearing on Behalf of the Defendants:
11
      MARY-OLGA LOVETT, ESQUIRE
12    Greenberg Traurig LLP
      1000 Louisiana Street, Suite 1700
13    Houston, Texas  77002
      T:  713.374.3541  F:  713.754.7541
14    E-mail: lovettm@gtlaw.com
15        - and -
16    ROBERT BRADY HERMAN, ESQUIRE
      BRANDON D. COX, ESQUIRE (In Person)
17    Greenberg Traurig LLP
      Terminus 200
18    3333 Piedmont Road, N.E., Suite 2500
      Atlanta, Georgia  30305
19    T:  678.553.2100  F:  678.553.2212
      E-mail: hermanb@gtlaw.com
20        coxb@gtlaw.com
21
22
23 ALSO PRESENT:
24    JESS WIGGINS, Videographer
25    BEN JONES, Videographer

Page 328

1          INDEX OF EXAMINATIONS
2
3  WILLIAM SINGHOSE, Ph.D.
4  By Ms. Lovett               Page 329
5
6          INDEX OF EXHIBITS
7  DEFENDANTS'
8  Exhibit 17  Seventeenth Supplement To        337
        Plaintiff's Mandatory Initial Discovery
9       Responses And Plaintiff's Initial
        Disclosure Statement
10
11
12
13       INDEX OF EXHIBITS (Previously Marked)
14 DEFENDANTS'
15 Exhibit 3  Report of William Singhose, Ph.D.   344
        April 2, 2021
16
   Exhibit 4  Rebuttal Report of William Singhose  363
17       Ph.D., July 16, 2021
18
19
20
21
22
23
24
25

Page 329

1         THE VIDEOGRAPHER:  Today's date is
2  September 27, 2021, and we are on the record at
3  1:32 p.m.
4         This will be the videotape deposition of
5  Dr. William Singhose, Volume II.
6         Would counsel present please identify
7  themselves for the record.
8         MR. OSBORNE:  This is John Osborne on
9  behalf of Katie Courkamp and Andrew Olson.
10        MS. MARY-OLGA LOVETT:  Mary-Olga Lovett
11 and Brady Herman, along with Brandon Cox in
12 Atlanta, on behalf of Fisher-Price and Mattel.
13        THE VIDEOGRAPHER:  Thank you.
14        Would the court reporter please swear in
15 the witness.
16        I'm sorry, the witness is already under
17 oath.
18 EXAMINATION
19 BY MS. LOVETT:
20    Q   Dr. Singhose, you understand that this is
21 a continuation of your deposition, which we began
22 about 10 days ago, and that you are still under
23 oath?
24    A   Yes, I do.
25    Q   We do not need to swear you in again.  You

Page 330

1  acknowledge the oath and you are ready to go,
2  testifying truthfully, correct?
3     A   Yes.
4     Q   So as we've done throughout your
5  deposition, and as is appropriate, I refer to you as
6  Dr. Singhose, because you certainly have a Ph.D.
7         To be clear for the jury, you are not a
8  medical doctor, correct?
9     A   That is correct.
10    Q   You are not a pediatrician, right?
11    A   No.
12    Q   Not a neonatologist?
13    A   No.
14    Q   Not a pulmonologist?
15    A   No.
16    Q   Not a forensic atomic or clinical
17 pathologist, correct?
18    A   No.
19    Q   And you are not board-certified or
20 licensed to practice medicine in any capacity, are
21 you?
22    A   No.
23    Q   And you are not going to offer any opinion
24 regarding the cause of Z███ Olson's death, correct?
25    A   Well, I mean the cause of her death is

2 (Pages 327 - 330)

Page 331

1 turning into the prone position in the Rock 'n Play
2 sleeper that she was sleeping in.
3    Q   Okay.  So let me back up here.
4        You understand that there is medical cause
5 of death which is determined and has been determined
6 in this case by one medical examiner and then there
7 are experts on both sides.  You are aware of that,
8 right?
9    A   Yes.
10    Q   And you are not going to be testifying as
11 to the actual medical cause of Z███'s death,
12 correct?
13    A   I see what you're saying.  No, I'm not
14 going to be doing that.
15    Q   Thank you.
16        And anything regarding the cause of Z███'s
17 death in the medical sense, you would defer to a
18 board-certified medical expert in the appropriate
19 fields, correct?
20    A   Yes, I think so.
21    Q   So you can not offer an opinion to a
22 reasonable degree of medical certainty that Z███'s
23 death was proximately caused by the Rock 'n Play
24 sleeper, correct?
25    A   No, I don't think that's my role in this

Page 332

1 matter.
2    Q   All right.  Thank you.
3        During the first part of your deposition
4 back on September 14th -- just for the record, it is
5 now September -- I knew I was going to mess this up.
6 What day is it?  September 27th.
7        So 13 days ago, when you testified, you
8 represented to the jury that you are an expert in
9 sudden infant death syndrome, which as we call SIDS,
10 or sudden unexplained infant death syndrome, SUID.
11        Do you recall that testimony?
12    A   Yes, I think I clarified that --
13        MR. OSBORNE:  Object to form.
14    A   -- I clarified that, that I'm an expert in
15 terms of SIDS and the relationship to baby sleeping
16 products because I studied that a great deal.  That
17 was my testimony.
18    Q   I recall your testimony and we have it in
19 the record.
20        You are aware that you were disclosed as
21 an expert witness in this case and information about
22 you was provided to us, true?
23    A   Yes, I do understand that.
24    Q   And you've certainly been disclosed as an
25 expert witness in other cases, and we have your,

Page 333

1 your curriculum vitae, and also your list of cases,
2 correct?
3    A   I mean I don't know what you have.  I
4 submitted all that information.  I'm assuming you
5 had it.
6        MS. LOVETT:  I think we've got some --
7        there we go.
8        Thank you, John.
9 BY MS. MARY-OLGA LOVETT:
10    Q   So, Dr. Singhose, so it's clear for the
11 record, because we had some outside noise, I'll
12 represent to you that whatever -- I'm assuming that
13 whatever you provided to plaintiff's counsel we have
14 been provided with, but you have provided them with
15 a list of your prior testimony, correct?
16    A   Yes.
17    Q   And you have been an expert witness in
18 many other cases, true?
19    A   I'm not sure many.  I think I've been
20 doing this for 20 years and I've probably testified
21 30 times.  So if one and a half times a year is
22 many, then I'll go along with that.
23    Q   I mean many for them.  But 30 -- you've
24 been an expert at least 30 times.
25        You don't dispute that the disclosure of

Page 334

1 an expert witness sets the parameters of his or her
2 expertise, right?
3    A   I think that's -- again, you're asking me
4 a legal question, but my understanding is that I
5 disclosed the information that seems relevant.  If
6 you then ask me questions and elicit from me
7 additional experience, then I think that might
8 expand the envelope.
9    Q   Well, so I'll -- I'll represent for you
10 that under the Federal Rules of Civil Procedure, and
11 certainly in federal court, the report sort of sets
12 the scope.  For example -- I'll give you an example.
13        When we did your deposition on the 14th,
14 you testified that you have warnings expertise but
15 that you were not taking on that role in this case
16 because I think what you said was you didn't have
17 the bandwidth for -- you're very busy, you got a lot
18 going on.  So you were not taking on the role of the
19 labeling expert or the humans factors warning
20 expert, right?
21    A   That's correct.  I don't -- I'm not sure
22 what I said.  I think that they already had a
23 warnings expert chosen to pursue that part of it.  I
24 have of course looked at the warnings and responded
25 to certain aspects of the warnings when it

3 (Pages 331 - 334)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 335

1 overlapped with my analysis of the overall product
2 design.
3    Q    Yeah.  I think I put the warning label in
4 front of you and we had a colloquy about that,
5 right?
6    A    Yes.
7    Q    But clearly this was not -- you know, when
8 we look at your big report and your supplemental
9 report, clearly your, your role in this case was not
10 to take on that already, already addressed by other
11 experts on behalf of the plaintiffs, correct?
12    A    Yes, that's right.  I didn't take on the
13 role of being the co-warnings expert, although some
14 of your experts folded in warnings into their
15 analysis of the product design.  And to that extent,
16 I need to respond to that.
17    Q    I understand your position on that,
18 Doctor.  I'm going to give you an example.
19        For example, you guys have a medical
20 pathology expert, Dr. Christensen.  I deposed him on
21 the 13th, I believe, right before you, out in Salt
22 Lake City, and he gave us his credentials.  He is a
23 very scholarly man and he's got a lot of experience
24 but the one thing he is not is a biomechanical
25 expert, such as yourself.

Page 336

1        So you would expect him to stay in his
2 lane and not testify about your area, right?
3    A    Yeah, I think that's appropriate behavior,
4 but those lines are not always distinct.  There's
5 crossover in terms of this material.
6        So I'm not going to limit him to not being
7 able to, for example, match up the warnings that
8 he's reading to the physical design of the device.
9 I think he should be allowed to do that.
10    Q    Well, sure.  I'm going to tell you that in
11 his deposition he did not purport to have any
12 biomechanical expertise or anything to say about the
13 warnings.  He had limited himself to the review of
14 the medical examiner's report and associated
15 investigative reports, and so he left it -- he left
16 it that, that way.
17        You don't have any quibble with the fact
18 that he is confining his testimony to that relevant
19 to a medical pathologist, right?
20    A    Sure.  I don't think I have any grounds to
21 quibble with what he's saying.
22    Q    Yeah.  Well, I think -- look, and I'm
23 saying this for the benefit of the jury and for you.
24        When, when we see people who have
25 expertise outside that of a layperson, it might

Page 337

1 be -- you know, I think, no offense to all of the
2 great experts in this case, but I think the jury may
3 be seeing people sort of interchangeably.  So that's
4 why I've spent as much time as I have with you, both
5 on the 14th and today, defining the parameters of
6 what your assignment was in this case.
7        So let's talk about -- Exhibit 17 is going
8 to be -- this is a long title, Doctor -- the
9 "Seventeenth Supplement to Plaintiff's Mandatory
10 Initial Discovery Responses and Plaintiff's Initial
11 Disclosure Statement," and then there's a
12 parenthetical "(Rebuttal Expert Reports.)"
13        (Whereupon, Defendants' Exhibit-17 was
14     marked for identification.)
15        MS. LOVETT:  I'm going to ask Mr. Herman,
16     who is here with me, to put that up on the
17     screen.  You should have a hard copy in front
18     of you.
19        It's been shared in Exhibit Share, John,
20     if you want to access that.  Your own MIDR.
21 BY MS. LOVETT:
22    Q    It's a big one, so if you'll go to Page
23 60, Dr. Singhose.
24        Have you seen this disclosure statement
25 before?

Page 338

1        It's okay if you haven't.  This is a lot
2 of lawyer work, so you may not have seen this exact
3 document.
4    A    Yeah, I don't remember seeing this exact
5 document, but I mean I -- they're quoting some
6 material from me that I sent them about what my
7 areas of expertise, being product design,
8 biomechanics, juvenile products.
9        That's a -- those are quotes probably
10 coming from me, but this particular write-up of it
11 I'm not sure that I've seen before.
12    Q    Right.  You'll admit that nowhere in this
13 disclosure does it mention that you were an expert
14 in SIDS or SUID, right?
15    A    Well, it's saying that I'm an expert in
16 juvenile products, and to be an expert in juvenile
17 products you should have some expertise in SIDS.
18        So I think while that may not be stated
19 there, to the extent I'm an expert in juvenile
20 products, I'm an expert in the role of SIDS
21 interplayed with juvenile products.
22    Q    We did establish during your prior
23 deposition, the first part of your deposition, that
24 you had not designed any sleepers, right?
25    A    I mean, sure, I haven't designed them from

4 (Pages 335 - 338)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 339

1  the ground up. I've been involved in evaluating
2  them and using that data, feeding back into the
3  process of designing these. So since I was part of
4  a design team, feeding information back in there,
5  but it's never been my full-time job.
6      Q   Right. Part of your full-time job or at
7  least part of your focus both on the pat side and
8  also in your collaborative and project side, grant
9  side, has been working on mobility issues for
10 children, right?
11     For example, children who are disabled and
12 need wheelchairs or other assistance, specialty --
13 special to children with those sorts of needs,
14 right?
15     A   You kind of cut out there, but, yes, I've
16 been involved in, for example, the seating systems
17 that hold children in mobile products.
18     Q   Right. Exactly. And I recall that
19 testimony well. I looked over your deposition --
20 just so you know, I did re-read Part I of your
21 deposition so that we didn't cover any new ground
22 today.
23     You've never been disclosed as a SIDS or
24 SUID expert in a litigated matter before, correct?
25     A   I don't think that they've used that

Page 340

1  terminology before in disclosing me as an expert.
2  They may have said before that I'm a juvenile
3  products expert, which of course would include some
4  expertise on SIDS.
5      Q   And I understand that's your testimony.
6  So, to your knowledge, you have not offered sworn
7  testimony on the topic of SIDS or SUID in any prior
8  expert engagement, correct?
9      A   Honestly, I couldn't recall that because
10 I've testified a fair amount about children's
11 sleeping products. And whether there are questions
12 involving SIDS and how those relate to the
13 children's sleeping products, I can't remember all
14 those questions off the top of my head.
15     Q   Sure. Well, I mean since you -- I think
16 it follows, since you say you don't recall being
17 disclosed in exactly that way, I think you certainly
18 don't recall any specific testimony, true?
19     Not a case you could point to and say to
20 the jury, hey, in the Smith case I testified about
21 SIDS or SUID?
22     A   I do not recall specific testimony about
23 that. My testimonies have been about sleeping
24 products, cribs, play pens, and rockers, and things
25 like that, but I don't remember specific questions

Page 341

1  about SIDS as I sit here right now.
2      Q   Can you tell me the name of the plaintiff
3  in the last case you testified in where there was a
4  rocker or sleeper involved?
5      A   The plaintiff?
6      Q   Yes. That would be the person you're
7  representing. Anyone. Pick a name.
8      A   Oh, I'm not sure I represented the
9  plaintiffs. I might have represented defendants.
10     Q   Can you pick the name of a defendant you
11 represented as an expert in a sleeper or rocker
12 case?
13     A   Yes.
14     Q   Who is that?
15     A   Kids2.
16     Q   Where is that case pending?
17     A   I'm not sure that it's pending. I think
18 that -- I worked on a number of cases and projects
19 for Kids2, and my understanding is they're all
20 resolved at this point.
21     Q   Yeah. You told us that you did some
22 consulting work for them that was -- not even in the
23 litigation capacity, but can you give us any --
24 because I'd like to find the cases where you've
25 given -- where you've been an expert before, either

Page 342

1  plaintiff or defense, and while we have a list, I'm
2  not sure Kids2 hit my radar. That may be on me.
3      So how long ago were these cases?
4  Ballpark it.
5      A   Probably starting maybe 8 to 10 years ago,
6  and I think the last case I was involved with, or
7  the last project I was involved with with Kids2 was
8  maybe three, three years ago. So Probably 10 years
9  ago to three years ago, in that time frame.
10     Q   And do you remember where that case three
11 years ago for Kids2 was located?
12     A   The one -- the one three years ago that
13 settled most recently, I'm not sure where it was
14 located. It might have been located here in Atlanta
15 because I remember giving a deposition about it here
16 in Atlanta.
17     Q   But you don't know -- so this case --
18 you're giving a deposition here in Atlanta and this
19 case is in Nevada.
20     A   Yes.
21     Q   So any idea -- I'm sorry. Sorry. It's
22 not Nevada. Arizona.
23     MS. LOVETT: So sorry, John. It's kind of
24 funny. I didn't mean to say. I'm just so
25 proud that I --

5 (Pages 339 - 342)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 343

1    MR. OSBORNE:  Ourselves in Southern
2  Arizona to be a wholly part of the Maricopa
3  County stuff.
4    MS. LOVETT:  My husband is there on
5  business this week and owns a company there.
6  He's out there all the time.  I'm just proud
7  that I can say Nevada correctly.  Pardon my
8  bias on that.
9  BY MS. LOVETT:
10   Q   Dr. Singhose, let me clean the record up.
11      So this case is based in Arizona, and
12  you're still an expert -- even though you're deposed
13  in Atlanta, this case for Kids2 that was three years
14  ago, do you have a recollection, other than where
15  you were sitting when were you disposed, about
16  whether or not or where that deposition for Kids2
17  three years ago, where you testified about a sleeper
18  or rocker, was located in terms of the jurisdiction
19  of the proceeding?
20   A   You know, jurisdictions of proceedings
21  aren't usually that important to me, but because
22  that was Kids2 and Graco, I think Kids2 was the
23  defendant, and Graco is based in Atlanta, my guess
24  would be that would be based in the Northern
25  District of Georgia.

Page 344

1    Q   Wow.  Well, that's a specific yes, and we
2  will check that out.
3      So as you know, some of the questions I'm
4  asking are questions of elimination that may sound
5  odd to you, but for our purposes we need to make
6  some specific, some specific questions to sort of
7  delineate.  So if these sound like silly questions,
8  please forgive me, they are proforma at this point.
9      You say in your report -- and let's go
10  ahead.  Your report was previously entered as
11  Exhibit 3, I believe.  This is your original report.
12      (Whereupon, Defendants' Exhibit-3 was
13      previously marked for identification.)
14  BY MS. LOVETT:
15   Q   So before we kind of dive into the report
16  again, you have a section entitled, "Legal
17  Understanding" in your report.
18      Do you have a copy in front of you of your
19  report?
20   A   I don't have a copy of it.
21   Q   Okay. I'm going to, I'm going to -- I know
22  you're very familiar with your report and we know
23  it's voluminous.  We're going to pull it up for you
24  so you can see that page.
25    MS. LOVETT:  And, John, so you can see it.

Page 345

1    Q   I'm not going to get into the meat of this
2  in terms of --
3    MR. OSBORNE:  All right.
4    Q   -- your whole report.
5      You've got a section called "Legal
6  Understanding," and I know that we've covered before
7  that you never practiced law, which would explain
8  your youthful appearance.
9      There you go.  You got it.
10   A   The youthful appearance is because of the
11  low resolution of the camera.
12   Q   I need some of that because I would enjoy
13  that.
14      But you -- obviously you're -- you were
15  not a lawyer and do not practice law, correct?
16   A   That is correct.
17   Q   You are not offering legal opinions,
18  correct?
19   A   No.  I mean I offer opinions that I think
20  try to meet legal standards, but I'm not --
21   Q   Right.
22   A   -- not offering legal opinions as I think
23  that you're conveying the meaning.
24   Q   Yeah.  I mean so -- really, in terms of
25  instructing the jury and interpreting the law, I'll

Page 346

1  tell you that that's a job for our judge, the
2  Honorable Judge Snow.  And so you're not going to be
3  telling the jury how to interpret the law, correct?
4   A   I don't think so.  I mean I'll be -- if I
5  ask the right question, I will say this is my
6  understanding of the law, and then this is how my
7  analysis feeds into that understanding.
8   Q   Right.  I, I -- I can assure you there
9  will probably be an objection that stops you before
10  you get to that, but as long as we understand one
11  another.
12      You are not offering any opinions as to
13  the standard of care applicable to manufacturers,
14  are you?
15   A   Well, to prove that I'm not a lawyer, I'm
16  not exactly sure what you mean by that.
17   Q   Good.  So you wouldn't answer any
18  questions about something you don't understand,
19  right?
20   A   No.  I would ask for an explanation of
21  what that term meant before I tried to understand --
22  before I tried to answer it.
23   Q   I want to look at your report, in
24  Paragraph 25.  This sounds very legalese-ish to me.
25      You say: "Before a defendant can be found

6 (Pages 343 - 346)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 347

1 at fault on a claim, it must be established the
2 defendant manufactured or sold a product that was
3 defective and unreasonably dangerous at the time it
4 left the defendant's control, and that the defect
5 was a cause of the injury."
6       Do you see that?
7   A   Yes, I do.
8   Q   And I'll represent for you, Doctor, that
9 is completely a legal standard.  So where or how did
10 you learn this information that went into your
11 report?
12   A   I probably learned that concept in about
13 2003, when I first started working on product
14 liability.  The lawyer sent me the sort of, as I
15 recall, the Georgia statutes that cover product
16 liability, and I reviewed that and it probably
17 didn't have this exact same line but it had
18 something similar to that.  And then in each of the
19 cases I worked on, I normally get provided the state
20 statutes that describe product liability.  So I
21 reviewed those in a number of states.
22       And then there's something called, and my
23 understanding, it's sort of a unified code, which is
24 nominally applicable across the United States.  I've
25 also read that before.

Page 348

1       So that sentence there probably comes out
2 of my, I guess, 18-year study of these kind of
3 cases.
4   Q   Yes, understood.  You've got it -- you got
5 the standard from a statute.  You don't interpret
6 statutes in your day-to-day work, correct?
7   A   Again, I'm not sure what you mean by
8 interpret.  I have to understand them so that I can
9 then use them in my technical analysis.
10   Q   Interpret means apply legal training or
11 principles to -- this is my definition but it is the
12 definition -- apply legal training or principles to,
13 to interpret or give effect to statutory language or
14 other legal rights.
15       MR. OSBORNE:  Form.
16 BY MS. LOVETT:
17   Q   -- in your work day to day.
18       MR. OSBORNE:  Form.
19   Q   You may answer.
20   A   That was a long question and there was an
21 interruption.  So it wasn't clear to me what your
22 question is.
23   Q   He gets to interrupt.  Mr. Osborne gets to
24 interrupt and he'll probably interrupt again, but
25 I'll trial to make it more simple.

Page 349

1       In your day-to-day work, you do not look
2 at statutory language and apply legal principle
3 concepts to them, correct?
4       MR. OSBORNE:  Form.
5   A   Again, I'm not sure what it means to apply
6 legal concepts.  I look at these legal definitions a
7 lot, and then I try to do technical work that meets
8 those legal standards.  So I am interpreting them.
9 I guess I'm just not interpreting them using a law
10 degree.
11   Q   There you go.
12   A   If that's what -- if that's what you're
13 getting at.
14   Q   Or any other legal training, correct?
15   A   I'm not sure what any other legal training
16 is.  I mean as far as I'm concerned, reading
17 statutes is a kind of legal training, but if that
18 doesn't raise, to your bar, I'm perfectly willing to
19 admit that.
20   Q   Right.  Thank you.
21       So your, your -- based on your reading of
22 this, and you have it in your report, you agree that
23 any alleged defect in the product must also be shown
24 to cause the alleged injury, correct?
25   A   Yeah, that's my understanding.  I mean

Page 350

1 cause, there's often a percentage.  So I think maybe
2 I could have been clearer if I had written that
3 something like is a contributory cause of the
4 injury.
5   Q   So now we're getting into all kinds of
6 legal definitions, like contributory cause,
7 contributing cause, proximate cause, alternative
8 cause, superseding cause.
9       These are all legal concepts with which
10 you're unfamiliar, true?
11   A   Well, those may be legal concepts but
12 they're also technical concepts.  I mean we analyze
13 products all the time and figure out what percentage
14 of a phenomenon occurs from which component.
15       So they may be legal concepts but they are
16 related concepts that appear in technical analysis
17 all the time.
18   Q   I understand.  But I'm talking about from
19 a legal standard by which the jury is going -- at
20 the end of this trial, the jury is going to be asked
21 questions that the lawyers have carefully crafted
22 and that the court has taken a look at and the court
23 has interpreted and decided to issue based on legal
24 precedent.
25       So your testimony certainly is not that

7 (Pages 347 - 350)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 351

1 you are familiar with the concept of legal causation
2 in the way that the lawyers and the court are, true?
3        MR. OSBORNE: Form.
4     Q   You may answer.
5     A   No, I don't think I'm familiar with it in
6 the way that the lawyers and court are. I'm
7 familiar with it in the way that I use it in my
8 work.
9     Q   All right. So I'm going back to your
10 report, because you say in the report, it has to be
11 "established that the defendant manufactured and
12 sold a product that was defective and unreasonably
13 dangerous at the time it left the defendant's
14 control." There's one.
15        "That the defect was a cause of the" --
16 "and the defect was a cause of the injury."
17        You say that. What do you mean by that?
18     A   The second part of that sentence?
19     Q   Yeah. "That the defect was a cause." And
20 I'm focused on the word "cause" of the injury.
21 Right?
22     A   Yes. What I mean by that is that you --
23 when I analyze this product, I can see that it's got
24 properties that would be a cause of this injury.
25 For example, the fabric within the Rock 'n Play

Page 352

1 sleeper is not breathable. So when the infant gets
2 turned over in there and is trying to breathe, their
3 breathing is restricted by that material.
4        That's a cause of the injury.
5     Q   Okay. So that's -- that is -- that is
6 what you mean in your report. Your understanding of
7 the alleged industry -- injury in this case is
8 Z███'s death?
9     A   Yes.
10     Q   And you already told us that you're not
11 qualified to and will not provide any opinions
12 regarding Z███'s medical conditions or cause of
13 death, correct?
14     A   That's right, I'm not going to offer
15 medical opinions.
16     Q   And you haven't reviewed all of Z███'s
17 medical records? Or have you reviewed any of Z███'s
18 medical records?
19     A   To the best of knowledge, I reviewed all
20 of her medical records, but there may be stuff that
21 wasn't turned over to me.
22     Q   Okay. And the people that have been
23 turning over things to you have been Mr. Osborne,
24 Mr. Bacon, Ms. Shriner, plaintiff's lawyers, right?
25     A   There's also a couple other people that

Page 353

1 work at that firm that have sent me information.
2     Q   But in terms of controlling the
3 information you get, not turning things over to you
4 or turning things over to you, that's coming from
5 the plaintiff's lawyers, correct?
6     A   Yeah, that's my understanding. I haven't
7 received any information directly from you or
8 Fisher-Price, for example.
9     Q   Okay, yeah.
10        So in the time since we last met, just
11 given scheduling issues, the plaintiff's
12 biomechanical expert, Dr. Rundell, was deposed.
13        Have you had a chance to review his
14 deposition transcript?
15     A   I did review what seems like a very rough
16 transcript of that.
17     Q   Right. So -- and through the miracles of
18 modern court reporting, as Ms. Robinson can probably
19 tell you, we are able to get rough transcripts out,
20 but sometimes they are phonetic because of the hard
21 work these folks do and they do polish it up and
22 make it very pretty.
23        So you had a rough draft. Did you, from
24 that opinion, did you learn anything that impacts --
25 from his deposition did you learn anything that

Page 354

1 impacts your own opinions in this case?
2        MR. OSBORNE: Form, but go ahead.
3     A   I don't think so. I'm trying to think
4 back whether there was any new information provided
5 there. It seems like it was, you know, essentially
6 verbalizing Dr. Rundell's previous opinions and
7 analysis. I'm not sure that he brought forth
8 anything new in that.
9     Q   Mr. Osborne was -- was cross-examining
10 him, so it would be Mr. Osborne's job, or whoever
11 deposed him on the plaintiff's side, to elicit
12 opinions, right?
13        MR. OSBORNE: Form.
14     A   Again, I think that you're asking for a
15 legal about eliciting opinions. The transcript that
16 I saw, it was very unusual to me because it seemed
17 like Fisher-Price's lawyer was asking just a large
18 amount of questions and I hadn't seen that before.
19 So in that sense it seems like he was trying to
20 elicit --
21     Q   Yeah.
22     A   -- you know, statements into the record.
23     Q   It's true. We do -- this is called
24 redirect and we do it just like we do in trial, but
25 sometimes when opposing counsel either treetops it

8 (Pages 351 - 354)

William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

Page 355

1  -- and I'm not making -- I wasn't there, so I have
2  no idea how many questions Mr. Osborne asked, but
3  when opposing counsel asks questions that are pretty
4  broad, sometimes we go in to get other opinions
5  because, as you know -- well, you may not know --
6  there's motion practice before the court that we
7  have to do and it's important for us to get to get
8  the court some information that wouldn't necessarily
9  be, you know, germane to a jury inquiry.
10      Let's talk about some of the concepts
11 there.  We talked about this before the deposition,
12 but you agree that infants are capable of rolling
13 over on both inclined surfaces as well as flat
14 surfaces, true?
15   A   Some infants, yes.  Some are not.  But
16 infants --
17   Q   Right.
18   A   -- yeah, there are infants out there that
19 roll.  They roll a lot, some of them.
20   Q   Yeah.  Either on flat surfaces or on
21 inclined surfaces?
22   A   That's correct.
23   Q   -- baby, right?
24   A   That's correct.
25   Q   And in fact -- you know, we talked about

Page 356

1  how infants develop at different rates, and I think
2  you've seen that in your own family between -- is it
3  Oliver and Matthew?
4    A   Oliver and Nicholas.
5    Q   Oliver and Nicholas.  I'm so sorry.
6        Oliver and Nicholas, who are adorable.
7  But I think you told us that like, you know, even
8  they have been --
9        MS. LOVETT:  John, can you mute the ringer
10 on your phone.  Thank you.
11       Let me ask the question again.
12 BY MS. LOVETT:
13   Q   So you've seen within your own family that
14 infants develop at different rates, right?
15   A   Yes.
16   Q   You got two brothers with all the same DNA
17 and they're developing differently, right?
18   A   Well, I'm a scientist.  So I will say it's
19 not the same DNA.
20   Q   Oh, I'm sorry.
21   A   It came from the same sources but it's a
22 random mixture.
23   Q   Well, you know what, you're right.  I'm
24 saying -- I'm making a point for the jury because
25 what makes a family is not DNA, but from your

Page 357

1  testimony I'm assuming that they have the same two
2  parents.  That would be you and your wife?
3    A   That's correct.
4    Q   And so even brothers might exhibit
5  different development -- different developmental
6  milestones at different times, correct?
7    A   Yes.
8    Q   So you could have an infant who could roll
9  from supine to prone when he or she is three months
10 old and another infant might not be able to roll
11 supine to prone until he or she is six months old,
12 right?
13   A   That's correct.
14   Q   You agree that certain infants prefer the
15 prone position?
16   A   Yeah, I mean I -- you can't ask them
17 whether they prefer it, but you see what position
18 they gravitate towards.  So they're expressing a
19 preference in that way.
20   Q   Sure.  And so has the -- do you agree
21 that -- and this is a more general question.  I'm
22 not restricting it to this case -- that it's
23 difficult to -- if you don't know what the injury
24 is, if the injury hasn't been determined, it's
25 difficult to attribute a biomechanical mechanism to

Page 358

1  that injury?
2    A   Yeah, I think that would be pretty
3  difficult if you have no idea what the injury is.
4  That's kind of a starting point.
5    Q   So I tried to do my homework in deposing
6  you.  Obviously, I'm not a biomechanical engineer.
7  But I've tried to look at some of the steps that a
8  biomechanical engineer takes in formulating his or
9  her opinion, and understanding that you may have
10 taken many more steps than these, I want to walk
11 through a couple of steps because in so many cases
12 where you're acting as an expert in this capacity,
13 in the legal capacity, you're sort of working
14 backward from the injury to see what caused it.
15      Can we agree on that understanding?
16   A   That's part of my job here, yes.  I mean
17 the whole other part is, you know, analyzing design
18 process and the final process.  So that's kind of
19 divorced from the exact causation in this case, but
20 as far as the causation part, I think that's a good
21 characterization.
22   Q   Good.  Okay.
23      So, so in that case you want to
24 characterize the injury first, right?
25   A   Yes.  I think in this case, of course, we,

9 (Pages 355 - 358)

William Singhose, Ph.D., Vol. II                     September 27, 2021
In Re: Fisher-Price/Mattel

Page 359

1  we have testimony and understanding of where she
2  ended up at the end of her life, and so in that
3  sense we can start an analysis from there.  How did
4  she get into that position?  We can do that without,
5  you know, having to say exactly how she died.
6      Q   Well, I mean I think -- and that's kind of
7  the question.  So you think that you can give your
8  opinion without knowing exactly how Z█ died, fair
9  statement?
10     A   Yeah.  I mean as we talked about before,
11 I'm not a medical doctor, but I know how she ended
12 up, like what position she was in and the fact that
13 there was this fluid flow, the stain.
14         I don't need to know exactly how she died
15 in terms of how long it took her to suffocate or
16 what other internal injuries she may have suffered,
17 brain injuries from lack of oxygen.
18         I don't need all of that to do my
19 analysis.  I can start from the fact that she was
20 found in a position that all call prone or mostly
21 prone.  That's where I can start my investigation
22 and work back from that.
23     Q   All right.  And you've testified that you
24 rely on -- you know, you just circle back to what I
25 asked you earlier -- you rely on the medical experts

Page 360

1  to determine the actual cause or the actual injury
2  itself, right?  The medical cause?
3         MR. OSBORNE:  Object to form.
4      A   Yeah, in terms of the biological cause of
5  that, I didn't delve into that.  I'm starting from
6  the physical cause of where she was found.
7      Q   Okay.  So let's talk about -- and I'm
8  talking about basically -- I want to go back to the
9  steps that you take.
10         So the first -- one of the first things
11 you do is determine the biomedical environment, that
12 in which the injury took place, right?
13     A   I'm not sure what biomedical environment
14 means.
15     Q   Yeah.  So what I mean is the environment
16 in which -- sorry.  Biomechanical environment, I
17 should have said.
18     A   Okay.
19     Q   The biomedical -- biomechanical
20 environment is you assess where the baby was and
21 where Z█ was and what her surroundings were,
22 right?
23     A   That's correct.  I needed to know her body
24 position, roughly, relative to the Rock 'n Play
25 sleeper, but also the physical evidence of the Rock

Page 361

1  'n Play sleeper itself.  You can't do a
2  biomechanical analysis without understanding the
3  environment in which the body is interacting with.
4      Q   Sure.
5      A   So you have to know sort of both of those
6  aspects to start your investigation, to start your
7  understanding.
8      Q   Right.  And keeping in mind that you're
9  not offering any opinion about the medical injury
10 for the condition sustained by Z█, in your
11 original report you did list a cause of death for
12 Z█ Olson upon which you base your biomechanical
13 analysis, right?
14     A   Yeah, I'm not sure exactly what you're
15 referring to, but I think I made it clear that I'm
16 starting with the knowledge that she was turned
17 prone and her face was in this fabric or right up
18 close to this fabric.  I'm starting with that is the
19 cause.
20         Downstream from that, biologically,
21 exactly how she died, I'm not going to testify about
22 that.
23     Q   Okay.  So did you read the expert reports
24 of your co-experts on the plaintiff's side, Dr. Eric
25 Christensen, who is the pathologist, or Dr. Chris

Page 362

1  Fuller, who is our pathologist?
2      A   Yes, I did.
3      Q   Did you read the transcripts of Dr.
4  Christensen's testimony?
5      A   I don't think so.
6      Q   And --
7      Q   When did that happen?
8      Q   That happened the day before you, so
9  September 13.  I took his deposition in Salt Lake
10 City.
11     A   I don't think I read it.  It may have been
12 sent to me and I may have just taken a quick look at
13 it but I didn't study that.
14     Q   What about Dr. Chris Fuller, who is our
15 expert pathologist, has any of that been provided to
16 you?
17     A   May be provided, but again I didn't study
18 that.
19     Q   One of the things that I came across in
20 looking at your testimony from our first session was
21 you testified that Z█ was, quote -- the position
22 Z█ was found in, quote, "is quite frankly a little
23 uncertain."  Right?
24     A   Yes.  We have physical evidence, you know,
25 about the stain, for example, and then there's a

William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

Page 363

1 little bit of a discrepancy, in my opinion, there
2 about how the mother claims that she found Z███.
3        She claims that she found her, apparently,
4 sort of the body face down prone, and then the head
5 turned significantly to the side so that it wasn't
6 directly in contact with the fabric. I think that's
7 the confusing part of the testimony.
8    Q    Exactly, that Ms. Courkamp testified that
9 Z███'s face was free of obstructions, sort of turned
10 to the side, right?
11    A    Yeah, but at the same time she has her
12 body straight down. So in my mind those two things
13 are tough to accomplish without the head being
14 turned really sort of an unnaturally large amount
15 because the side wall of the Rock 'n Play sleeper is
16 so steep that to get the head turned so far as to
17 the mouth and nose to be unobstructed at all is a
18 really -- a large turn of the head, which seems a
19 little unrealistic to me.
20        MS. LOVETT: I'm going to ask Mr. Cox, if
21    you have a copy of Exhibit 4, which is Dr.
22    Singhose's rebuttal report.
23        (Whereupon, Defendants' Exhibit-4 was
24    previously marked for identification.)
25

Page 364

1 BY MS. LOVETT:
2    Q    And, Dr. Singhose, I'd like -- the
3 question I'm asking you, and we may have to go off
4 record if it's going to require a lengthy review of
5 your supplemental report, which is Exhibit 4, what
6 cause of death are you basing your biomedical --
7        MS. LOVETT: Let me strike that so the
8    question is clear.
9    Q    What cause of death are you basing your
10 biomechanical analysis on in this case?
11        If you can show us that in your expert
12 report, if it's in your expert report. I believe --
13 I have looked at it in your surrebuttal report, but
14 I want to make sure we're not talking past one
15 another.
16    A    Well, you're using terms about my report,
17 which I don't understand, because I have a rebuttal
18 report and a regular report, the first report.
19        But the cause of death is that her face
20 was -- she was face down in this fabric and it was
21 hard for her to breathe. That's what I think is the
22 cause of death.
23        Again, I'm not testifying beyond that as
24 to the biology that occurs under those situations.
25    Q    Right, and that's a -- that is a -- that

Page 365

1 is the biomechanical -- or that's the mechanism of
2 injury that you're attributing to Z███'s death, that
3 she had her face in something where she couldn't
4 breathe, simply put?
5    A    Yeah. I mean that's a little bit
6 stronger. I'm saying she had her face in something
7 that was hard to breathe.
8    Q    It wasn't she couldn't breathe, it was she
9 had her face in some soft goods in the product that
10 made it hard to breathe? That's your -- that's the,
11 that's the mechanism of injury that you've
12 identified in your report, correct?
13    A    Yeah, that's correct. So it takes a
14 while, you know, to die under those conditions.
15 It's not like an instantaneous death or it's not
16 like she got plastic stuck in her throat, but she's
17 in an environment where her breathing is restricted.
18    Q    And in terms of mechanical defect, you
19 contend that the Rock 'n Play sleeper makes it
20 easier for an infant to roll from supine to prone,
21 correct?
22    A    Easier than what?
23    Q    Easier than a flat surface.
24    A    Yeah, easier than a flat surface in the
25 Rock 'n Play sleeper. I mean if you have the Rock

Page 366

1 'n Play sleeper, and rather than having that 30
2 degree incline, if the Rock 'n Play sleeper had a
3 flat back, that would be harder to turn over.
4        But they've raised it up 30 degrees, and
5 during that raising up process, it becomes
6 progressively easier to perform a roll.
7    Q    And your opinion is also that the Rock 'n
8 Play sleeper makes it more difficult to roll back
9 from prone to supine, correct?
10    A    Again, you're saying makes it more
11 difficult. We don't have a comparison, but I'm
12 saying it makes it difficult.
13    Q    Sure. In other words -- yeah, and I think
14 that's, I think that's sort of the point.
15        And then you also, as you testified a
16 moment ago, that the infant's head in the Rock 'n
17 Play sleeper gets trapped or engulfed in the soft
18 goods of the --
19    A    Yes.
20    Q    -- product?
21    A    Yes, that's correct.
22    Q    Okay. So your opinion that it's easier to
23 roll from supine to prone than it would be, say, on
24 a flat surface, you base that opinion on your, your
25 2D statics analysis of a rectangular structure on a

11 (Pages 363 - 366)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 367

1  planar -- is it plainer or planar surface?
2      A   Most people say planar.
3      Q   Okay.  So the planar surface.  So you base
4  that analysis in part on your 2D statics analysis of
5  a rectangular structure on a planar surface,
6  correct?
7      A   We got broken up there quite a few times.
8  Can you repeat the question?
9      Q   Sure.  You base your opinion that it is
10 easier to roll supine to prone in a Rock 'n Play on
11 a flat surface in part on your 2D statics
12 analysis --
13     A   Again --
14     Q   -- of the rectangular structure on a
15 planar surface?
16     A   Again, you're phrasing your question in a
17 way that I think is, in my opinion, is distorting my
18 opinion.
19         I'm saying that the incline of the Rock 'n
20 Play sleeper, that single part of it, makes it
21 easier to roll over than if the Rock 'n Play had a
22 flat back surface.
23         So there's several aspects of design that
24 are problematic.  I'm just focusing in on that one
25 aspect where you take the Rock 'n Play sleeper,

Page 368

1  instead of laying it flat like you should, you
2  incline the back to 30 degrees.  That portion of it
3  makes it easier than if it was laying back flat.
4          And, yes, then my analysis is based on
5  Newton's laws of motion, and I'm showing quite
6  clearly that it's easier to roll over in that
7  configuration.
8      Q   So in addition to analyzing the data that
9  you had available to you, you -- your own data, the
10 data that you created, and I think we've seen all of
11 this in our prior deposition with your infant and
12 your friend's infants, were performed without -- in
13 part, without the proper use of cross restraint,
14 right?
15     A   Certainly I did some tests, I think like
16 almost everybody involved in this case, with infants
17 in the Rock 'n Play sleeper without the belt
18 constraint cinched down.  Yes, I did that.
19     Q   Right.  And as we've, as we've
20 established, I think the infants were -- the infants
21 used in your demonstration were placed prone or
22 partially prone at the beginning.  I think we
23 established that last time.  Not by you in one case,
24 but at least by -- whoever was there with them as a
25 caregiver.

Page 369

1      A   That's correct.
2          In tests involving my own son, I placed
3  him there.
4      Q   Right.
5      A   And the other two infants, the mother and
6  grandmother were there.
7      Q   Right.  And they were placed prone, they
8  didn't roll to prone or semi-prone?
9      A   Well, the girl in the testing, just
10 reminded me of her name, is Palmer.
11     Q   Palmer.
12     A   She was placed on her side, and through a
13 wiggling motion she then completed to turn over into
14 a prone position.
15     Q   Yes.  And then -- other than your own
16 data, do you have any other empirical evidence that
17 it is easier to roll from supine to prone in the
18 environment of the Rock 'n Play sleeper?
19     A   Again, you're -- you're basing this
20 question as.  Easier than what?
21     Q   Okay.  Easier to roll --
22         MS. LOVETT:  Let me strike the question
23     and start again.
24 BY MS. LOVETT:
25     Q   Do you have any empirical data -- I'm not

Page 370

1  talking about your own studies -- that supports your
2  conclusion that it is easier to roll from supine to
3  prone in the Rock 'n Play sleeper than in a flat
4  crib?
5      A   I don't understand the question because
6  that's not my opinion.  So I -- I'm not --
7      Q   Okay.  It is not your opinion that it is
8  easier to roll from a supine to prone position in
9  the Rock 'n Play sleeper than it is to roll from
10 supine to prone in a crib that's flat?
11     A   Yeah, that's, that's not my opinion.
12     Q   All right.
13     A   I'm not sure where you're getting that.
14     Q   Well, if that's not your opinion, that
15 fixes a lot of questions for me.  We'll be at more
16 quickly, Dr. Singhose.  So thank you.
17         Now, one of the other things we talked
18 about is that once an infant is prone in the Rock 'n
19 Play sleeper, it is more difficult to roll back to
20 supine in the Rock 'n Play sleeper than it might be
21 for that same infant to roll to a supine position
22 from prone in a crib with a flat incline.  Is that
23 your opinion?
24     A   Okay, yeah, that's my opinion, yes.
25     Q   All right.  And for that you -- for that

12 (Pages 367 - 370)

William Singhose, Ph.D., Vol. II          September 27, 2021
In Re: Fisher-Price/Mattel

Page 371

1 you observed your infant and your friend's infants,
2 correct?
3     A    That is certainly a part of the basis of
4 that opinion. Of course, that opinion also comes
5 from my analysis of the physical design of the Rock
6 'n Play sleeper in terms of its inclines and angles
7 and materials.
8         It also comes from me viewing, as you
9 know, hundreds of video clips that were produced in
10 this case.
11        So there's a large body of evidence that
12 goes into supporting that opinion.
13    Q    Yeah. So you didn't provide any of your
14 own video evidence of that, of the concept
15 underlying your report, nor did I see you
16 specifically cite to any snippets of the video
17 report, other than the ones that we played in our
18 last deposition, for that specific concept. Do you
19 agree on that?
20        MR. OSBORNE: Form.
21    Q    You may answer.
22    A    Yeah, I don't recall what we covered in my
23 last deposition, but there are a lot of video clips
24 of infants struggling to try to turn once they're
25 face down.

Page 372

1         So I didn't need to redo that
2 experimentation. That experimentation had already
3 been done.
4         Plus, I have other basis for that opinion.
5 For example, just the straight-up analysis of the
6 physical design, the double-V valley of the design,
7 and then when you put a baby in there, the fact that
8 geometric -- or biomechanically the baby's feet are
9 sticking up in the air. That makes it very hard for
10 them to generate forces. Also, biomechanically the
11 baby's arms can be pinned to its side by the steep
12 sidewalls.
13        So there's a whole host of evidence that I
14 provided to support that opinion.
15    Q    Yeah. And I guess in your placement of
16 infants and your observations of your infant, and
17 your friends' infants, on Page 240 of your prior
18 deposition, Lines 3 through 5 of your prior
19 deposition -- and you may not have that.
20        I'm reading you a quote. You said you
21 didn't -- quote: You didn't observe them for that
22 long of a period for them to be able to do that, and
23 you were referring to them rolling from supine to
24 prone.
25        MR. OSBORNE: Counsel -- counsel, if you

Page 373

1 want you to show him that section of his
2 deposition for context, he's entitled to it.
3     MS. LOVETT: You can show it to him when
4 you redirect him. I'm asking if that is
5 correct, that he did not leave them in that
6 position for any long period of time, as
7 discussed in his prior deposition.
8 BY MS. LOVETT:
9     Q    In other words, you didn't put Palmer face
10 down or your son face down and leave them to
11 struggle for any significant period of time?
12        MR. OSBORNE: Object to form.
13        You can go ahead.
14    A    Well, I placed them in that position -- or
15 in the case of Palmer, she worked herself into that
16 position.
17        And, no, I did not let them struggle for
18 long periods of time. I felt uncomfortable with
19 that because there's non-breathable fabrics there
20 where their face is at.
21        In the case of Palmer, the grandmother
22 also was wanting to grab her, and so I let her grab
23 her and take her out of there because it was
24 obviously not a good position for her to be in.
25    Q    And you didn't -- you did not test these

Page 374

1 infants, yours and your friend, Dr. Frakes',
2 children, you did not test them on a flat crib
3 surface, right?
4     A    Well, I've seen them on a lot of flat
5 surfaces. In fact, I started out the -- you know, I
6 observe my own son on flat surfaces all the time,
7 but when I went to Dr. Frakes' house to test his
8 infants, the very first thing I did was watch them
9 and observe them. They were laying on the floor, on
10 a carpeted area, and I specifically talked with him.
11 I want to observe your children to see what
12 capabilities they have.
13        I've actually seen his kids a lot.
14    Q    Now --
15    A    During, during that period of time I was
16 able to get an understanding of the physical
17 capabilities of those two children, those two
18 infants.
19    Q    Sure. And I understand, Doctor. I know
20 these are close friends of yours and these babies
21 have known you from the minute they drew their first
22 breath. So I -- I'm sure you've seen a lot.
23 Obviously, from our perspective coming in, you're
24 relying on the photographs you gave us. And so I
25 did not see any photographs of -- that's why I'm

13 (Pages 371 - 374)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 375

1 asking you. I didn't see any photographs as part of
2 your opinion of them on the floor or rolling over.
3        Those were not provided, correct?
4    A   That's correct. Actually, neither one of
5 them were able to roll over at that time, and I did
6 not photograph them laying on the carpet.
7    Q   Okay. So these are things I remember from
8 labs, because I didn't -- nowhere near -- like I
9 said, I'm a political scientist, according to my
10 B.A. and that's about it.
11        In order to perform a scientifically valid
12 test, you must also have -- you have to have a
13 control to test your theory against, right?
14    A   That really depends on the kind of test
15 that you're doing.
16    Q   Okay. And so it would have been -- you
17 can agree it would have been instructive for you to
18 include in your report -- I know you're telling us
19 now -- it would have been instructive to include in
20 your report whether or not these infants could roll
21 from prone to supine in another environment, true?
22    A   That's pretty much irrelevant to the
23 testing I was doing because I wasn't testing their
24 ability to roll. I was testing what would happen
25 when they got into various configurations.

Page 376

1        So I'm not doing a test on whether or not
2 they can roll. I'm doing a test on how their face
3 interacts with the Rock 'n Play sleeper and how
4 their body interacts with the Rock 'n Play sleeper.
5 This is -- I did not do a rollover test for this.
6    Q   So in the, in the video -- the video
7 evidence that you saw from the Exponent testing, did
8 you see any evidence that demonstrated that an
9 infant was trapped?
10        I think, quote, "trapped in the Rock 'n
11 Play sleeper after rolling from supine to prone."
12    A   Yes.
13    Q   And would that be -- and you may not
14 remember the baby number, but you actually -- you
15 referred to and we looked at a video of what I'll
16 call Infant No. 9, who you said struggled, turned
17 over, and was trying to reach out and appeared to be
18 trapped, right?
19    A   Yes, I believe that's Infant No. 9.
20        I think in -- I provided video of three
21 infants that were able to turn during the course of
22 their experimentation onto their face, and two of
23 them I think wiggled out a fair amount sideways.
24 And then one never wiggled out, so they had to
25 rescue her or him.

Page 377

1    Q   Yes. You used the word "rescue" and this
2 is Infant No. 9.
3        Did you read the survey and notes filled
4 out by the parents of Infant No. 9, do you recall?
5    A   I probably did at some point but I don't
6 recall what that is right now. I did focus on what
7 was shown to me in the video.
8    Q   If we show the jury evidence that Infant
9 No. 9, according to the parents, preferred to be in
10 the prone, and we talked about infants who might
11 prefer to be in the prone position, could be that
12 the infant remained in the prone position because
13 that was their preferred position and not that they
14 were trapped, true?
15    A   Sure. But that infant was trying to move
16 around, and you can see actually their arms and legs
17 moving, you could see the heavy breathing. But we
18 only have four minutes of that infant.
19    Q   And I just want to be clear because I'm
20 trying -- you're relying on the Exponent data for
21 this opinion, right?
22    A   Oh, I mean only a small part of it. As
23 you know, that Exponent data is not really collected
24 correctly, but what's on tape can be used as a
25 partial support of my opinion in this matter.

Page 378

1    Q   Yeah, I think that's the point. I think
2 you testified before and you say that you think the
3 Exponent data is unreliable and yet here you are
4 relying on it. You see the irony in that, don't
5 you, Doctor?
6    A   I don't see the irony at all. It's
7 unreliable for uses they were trying to do, which is
8 to prove that it's difficult to turn to the prone or
9 impossible and then somehow easy to turn back.
10        That's unreliable, but it's undisputable
11 that when Infant No. 9, for example, was face down,
12 it was struggling and pushing and pulling and it
13 could not or did not turn back to the safety of the
14 front position where their face is up. That's
15 useful. Their data doesn't support their hypothesis
16 at all. But, ironically, if you want to have an
17 irony here, it supports my hypothesis.
18    Q   I understand that you were selecting
19 things that support the conclusion that you have
20 reached.
21        Do you have -- do you have an
22 understanding of the concept of a reasonable degree
23 of scientific certainty?
24    A   Yes, I do.
25    Q   All right. Within a reasonable degree of

14 (Pages 375 - 378)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 379

1 scientific certainty, you cannot offer the opinion
2 that the design of the Rock 'n Play sleeper makes it
3 more difficult to roll from prone to supine than
4 other sleep surfaces can be?
5    A   Oh, I have a high degree of certainty of
6 that.
7    Q   Without testing any babies on any other
8 sleep surfaces?
9    A   I don't understand. Is that a question?
10   Q   Yeah. You didn't test -- you didn't test
11 the babies on any other sleep surfaces, did you,
12 sir?
13   A   A lot of babies were tested -- yes, I
14 tested my baby. I observed the Frakes' baby. I see
15 all kinds of testing in the Exponent videos.
16       But also there's just a basic, you know,
17 analysis of this product that is the -- that forms a
18 basis for my opinion here. So that's a test as
19 well.
20       There's huge amounts of data that support
21 my opinion in this case.
22   Q   Well, and I, I appreciate the broad brush,
23 but I'm asking you a specific question, which is
24 that the design of the Rock 'n Play, whether the
25 design of the Rock 'n Play makes it more difficult

Page 380

1 to roll from the baby's back to belly -- sorry, the
2 baby's belly to back --
3       MS. LOVETT: Let me strike that question.
4    Q   I'm asking you specifically whether the
5 Rock 'n Play design makes it more difficult for
6 babies to roll from their belly to their back than
7 other sleep surfaces?
8       What other sleep surfaces did you
9 personally test, Dr. Singhose, other than the Rock
10 'n Play sleeper?
11   A   Did I personally test?
12   Q   Yes.
13   A   And not -- so not, not using my analysis
14 of the videos that were -- the hundreds of videos?
15 So I'm supposed to ignore the hundreds of videos and
16 you want me to --
17   Q   -- because they're unreliable in some
18 parts.
19       I'm talking about what you personally did.
20 You had babies at your disposal. You had presumably
21 multiple sleep surfaces at your disposal.
22       Other than the Rock 'n Play sleeper, what
23 sleep surface did you test?
24   A   Well, I tested flat cribs via looking at
25 the videos produced by your experts.

Page 381

1       But in addition to that, I performed rolls
2 on --
3    Q   Sir --
4       MR. OSBORNE: Hang on. You're
5 interrupting him.
6       MS. LOVETT: I didn't hear that. I'm
7 interrupting him because he's not answering my
8 question.
9    A   I performed rolls --
10      MR. OSBORNE: That's not a reason to do
11 so. That's your opinion.
12   A   I performed --
13      MS. LOVETT: I'll stick with my opinion.
14   Q   Sorry, Dr. Singhose. Do go ahead.
15   A   I personally performed rolling myself on a
16 flat surface, as you saw, and I used that
17 demonstration to show how, for example, your arms
18 can be pinned in front of your body or to the back.
19      I also showed the arm pinning occurring in
20 the infants that I placed in the Rock 'n Play
21 sleeper.
22      Those are tests that clearly demonstrate
23 that the sidewalls do add some restrictions to
24 rolling.
25   Q   I want to make sure I got this right. You

Page 382

1 said -- and I think I heard you correctly before our
2 prior interruption.
3       You said you, you tested rolling yourself.
4 Meaning you yourself, right?
5    A   Yes, that's correct. I performed rolling
6 and I showed -- I did that to show biomechanically
7 how the human body is different in rolling from
8 prone to supine and supine to prone, because the way
9 that your arms are designed to go in front of your
10 body much more easily than behind your body.
11   Q   And I think --
12   A   So I used that as a demonstration.
13   Q   We may not have this in the record. How
14 old are you, Dr. Singhose?
15   A   54 years old.
16   Q   How tall are you?
17   A   Six foot tall.
18   Q   What do you weigh?
19   A   190. That's in the record already.
20   Q   Yes, I'm sorry, but that one I would be
21 proud of if I were you. No harm in getting that in
22 the record.
23      How long have you been rolling over on
24 your own?
25   A   Fifty-three and a half years, probably.

15 (Pages 379 - 382)

William Singhose, Ph.D., Vol. II                September 27, 2021
In Re: Fisher-Price/Mattel

Page 383

1   Q   Do you, do you do any sports?
2   A   Yes, I do, ma'am.
3   Q   Please tell me what you do.
4   A   Well, what I do currently or what I've
5   done during my life?
6   Q   Let's go with what you do currently since
7   that's when you were testing yourself as an exemplar
8   for babies.  What do you do now?
9   A   Oh, I basically run every day with my dog.
10  I play with my kids.  I lift weights.
11       Just play a variety of sports, ride bikes.
12  Q   You do a lot of things that an 8-1/2 month
13  old infant can't do, right?
14  A   Yes, that's correct.
15  Q   Including being able to roll over from
16  prone to supine on pretty much any surface you want
17  to given no instructions or anything pressing down
18  on you, correct?
19  A   That's correct.  I have a superior ability
20  to roll as compared to babies, but biomechanically I
21  have a similar structure in my arms and torso, and
22  that's what I was using, is that comparison of how
23  the human body in general moves, not any particular
24  skill at rolling.
25  Q   And I think in order to like talk about

Page 384

1   the momentum, you explained to us before how infants
2   start that process.  They start to push up on their
3   hands and then they push up on their knees, right,
4   and that creates the momentum to roll; is that
5   correct?
6   A   Well, babies actually roll in a variety of
7   ways, but one common way is for babies to do a
8   pushup.  They don't really have to get up on their
9   knees.
10  Q   Right.
11  A   They just raise their shoulders and torso
12  up and then they're wobbly.  And so they kind of
13  naturally fall over one way or the other.
14  Q   Right.
15  A   And the energy from that fall does power a
16  turn either partial or maybe even fully.
17  Q   So we talked about your -- that the
18  opinion that an infant's head could be stuck or
19  engulfed in the sockets of the Rock 'n Play.  You
20  did not conduct any testing to confirm that theory,
21  did you?
22  A   That's incorrect.
23  Q   What specific testing did you do?
24  A   Well, I guess starting with -- I don't
25  quite understand the question, but just to answer, I

Page 385

1   did breathability testing to show that when a face
2   was in that material, it was hard to breathe.
3   Q   Yes.
4   A   And then I placed infants in there and saw
5   that when they were struggling and moving around, it
6   was difficult for them to get their face completely
7   clear of that.
8       And then, of course, the hundreds of video
9   clips show babies, some of them, show the babies'
10  faces pressed into those soft goods or very close to
11  those soft goods as they're moving around.
12  Q   Yeah.  And so I'm talking about -- I'm
13  talking about testing that you did.  And I didn't
14  see --
15  A   That is testing I did.
16  Q   I'm sorry?
17  A   That is testing that I did.
18  Q   Yes.  I don't recall seeing any
19  photographs with either Palmer or her brothers or
20  Nicholas' face engulfed or blocked in goods.
21  A   Well, looking through my report right now,
22  I see a lot of pictures of babies' faces engulfed in
23  the soft goods.  A lot of those, of course, are from
24  the Exponent testing, but I think you were asking
25  specifically about the three infants that I put in

Page 386

1   there.  So I'm looking for those right now.
2       And I think those are in my initial
3   report.
4       Yeah, there's quite a few in my initial
5   report.  Let me just point you to them.
6       I think, for example, Figure 33 shows
7   that.
8       Yeah, 33 shows a couple of the infants
9   with their face engulfed in the fabric.
10      There's also Figure 34 and 35.
11  Q   Mr. Herman is pulling those up.
12      So that's -- so the infant on the left is
13  Matthew -- I mean Nicholas, right?  I don't know why
14  I'm calling him Matthew.
15      Is that Nicholas on the left, your son?
16  A   Which figure are we referring to?  I gave
17  you a lot of figures.
18  Q   In Figure 34.
19  A   Also, Figure 24 shows a lot of that as
20  well.
21  Q   Let me start with the one I've got on the
22  screen, Doc, because I don't have -- I don't have a
23  hard copy in front of me and I want to ask you about
24  the one we've got up on the screen, which is 34.
25  Then I'll go back to 24.

16 (Pages 383 - 386)

Page 387

1   A   Okay.  Okay, so, yeah, I'm looking at 34.
2   Q   Yes.  Okay.  So 34, is that Nicholas on
3 the left, your son?
4   A   Yes, on the left.
5   Q   Yes.  And as we've testified, you placed
6 -- the infants were placed in that prone position,
7 correct?
8   A   Well, I mean they were placed somewhere --
9 the baby does not stay in one spot.  So I didn't
10 place him exactly in this position, but I placed him
11 nominally in a prone position.  They're wiggling
12 around and pushing and doing all sorts of things.
13 And this is just a picture I took during that,
14 during that evaluation.
15   Q   That's Palmer on the right, correct?
16   A   Yes, that's Palmer.
17   Q   Dr. Frakes' daughter.  Okay.
18       So -- and, again, just to go back to what
19 you referred to as sort of a discrepancy in the
20 testimony, Ms. Courkamp, Z███'s mother, who found
21 her, has, has testified that, and I can show, that
22 the baby's head, that Z███'s head was turned in a
23 way that it was not obstructed by the soft goods,
24 correct?
25   A   No, I believe that to be incorrect.

Page 388

1   Q   I think you said in your deposition, Page
2 221, Lines 11 through 13, and we talked about this
3 already today, Doctor, that the position that Z███
4 was found in was, quote, "she was found in is quite
5 frankly a little uncertain."
6       Do you recall talking about that?
7   A   Yes, I do recall talking about.
8   Q   You reviewed the incident reports in this
9 case that came in, in various formats to, to
10 Fisher-Price and Mattel, right?
11   A   Yes.
12   Q   Is it your opinion that the incident
13 reports alone provide a scientific basis for
14 reaching a conclusion about the bio -- biomechanical
15 mechanism of injury in the Rock 'n Play sleeper?
16   A   I didn't follow that question.  Sorry.
17   Q   So do you believe that the incident
18 reports alone provide a scientific basis for your
19 conclusion about the biomechanical mechanism of
20 injury in this case?
21   A   Yes.  I mean I probably wouldn't call it a
22 scientific basis.  I would call it an engineering
23 basis.
24       You know, there's just a lot of reports
25 coming in from parents and caregivers that things

Page 389

1 are going wrong with this device, and there's
2 hundreds of those reports, and I pointed out to you
3 I think 30 reports that indicate, for example, the
4 infants are getting out of the restraint.
5       Those occurred before Z███'s death.
6       See, that's a large data set that has
7 important and valuable information and it has --
8 your own expert, Ms. Drago, has written about.
9       So, yeah, I think it's a real good data
10 set.
11   Q   And so your testimony is that, that only
12 the ones before Z███ s death would be instructive,
13 correct?
14   A   Oh, no.  I mean the whole -- any time you
15 get feedback from your customers, that's
16 instructive.  I'm just pointing out that
17 Fisher-Price knew about these problems well -- you
18 know, preceding Z███'s death, but they continued to
19 get good information after that, all the way up
20 until the recall, and they're probably still getting
21 good information about this because these are
22 probably still in use.
23   Q   When you, when you got the -- when you
24 looked at the incident reports, they were certainly
25 not uniform in terms of the information they

Page 390

1 provided, true?
2   A   Oh, that's correct.  Incident reports are
3 not like that.  You get --
4   Q   Anecdotal, right?  They're coming from
5 parents?
6   A   I'm not sure what you mean by anecdotal.
7 They are information provided by the customers who
8 are testing out this product and they are sending
9 some of that feedback back to Fisher-Price.
10   Q   Correct.  Some parents may tell you -- may
11 give more detail than other parents, right?
12   A   That's correct.
13   Q   So I want to shift briefly to your -- the
14 conclusions reached in your rebuttal report and also
15 following up on your, your opinion on cause of
16 death.
17       You essentially conclude that Z███ Olson
18 died of smothering, correct?
19   A   Yeah.  My opinion is that her face was
20 engulfed to some degree in the soft goods.  That's
21 pretty clear.
22   Q   And you know from Dr. Chris -- sorry, I
23 forget whether you read Dr. Christensen's deposition
24 transcript.  Did you?  He's the pathologist.
25   A   I don't think I read the depo transcript.

17 (Pages 387 - 390)

Page 391

1    Q    Were you aware that Dr. Christensen
2  testified that there was insufficient evidence to
3  categorize Zoey's death as asphyxia?
4         He couldn't rule out asphyxia, but he
5  couldn't state that that was the cause of death?
6    A    No, I --
7         MR. OSBORNE:  Form.
8    A    I didn't read his deposition.
9    Q    If Dr. Christensen testifies that he can't
10  categorize the cause of death as smothering, and you
11  are deferring to him on medical causation, there's
12  no basis for your conclusion that Z███ might have
13  smothered; is there, sir?
14   A    That's incorrect.
15   Q    So you're --
16        MR. OSBORNE:  Form and foundation.
17   Q    You're going to substitute your judgment
18  for Dr. Christensen's judgment, and even if he says
19  he can't definitively say it was smothering to a
20  reasonable degree of medical certainty, you think
21  that from a degree of scientific certainty as an
22  engineer you can say the cause of death was
23  smothering?
24   A    Well, if we're using that term --
25        MR. OSBORNE:  Form.

Page 392

1    A    -- smothering, yes, because we know her
2  face was in the soft goods and her airflow was
3  restricted by that.
4         Just because this particular doctor is not
5  an engineer and he doesn't understand that part,
6  maybe he can't reach full confidence in that it was
7  smothering.
8         I'm adding information, and that's my roll
9  here, is adding information he doesn't know.  And
10  apparently he doesn't know that her face was in this
11  unbreathable material and she was turned over in the
12  prone position.
13   Q    Or maybe he just listened to her mother,
14  who said that her face was not obstructed?  That's
15  possible, too, isn't it, Doctor?
16   A    I don't know what he based --
17        MR. OSBORNE:  Form.
18   A    -- his opinion on because I didn't read
19  his deposition transcript.
20        MS. LOVETT:  That's all the questions I
21  have for you, Dr. Singhose.  Thank you for your
22  time today.
23        THE WITNESS:  Thank you.
24        MR. OSBORNE:  Well, in that event, I'm
25  going to leave my questions for trial.

Page 393

1         Thank you very much, Dr. Singhose.
2         MS. LOVETT:  Thank you.  Take care, guys.
3         THE VIDEOGRAPHER:  The time is 2:40 p.m.
4  This concludes the videotape deposition.
5  We are off video record.
6         (Whereupon, the deposition concluded at
7  2:40 p.m.)

Page 394

1              C E R T F I C A T E
2
3  STATE OF GEORGIA:
4  FULTON COUNTY:
5
6         I hereby certify that the foregoing
7  transcript of WILLIAM SINGHOSE, Ph.D. was taken
8  down, as stated in the caption, and the questions
9  and answers thereto were reduced by stenographic
10  means under my direction;
11        That the foregoing Pages 326 through
12  393 represent a true and correct transcript of
13  the evidence given upon said hearing;
14        And I further certify that I am not of kin
15  or counsel to the parties in this case; am not in
16  the regular employ of counsel for any of said
17  parties; nor am I in anywise interested in the
18  result of said case.
19
20        IN WITNESS WHEREOF, I have hereunto
21  subscribed my name this 28th day of September, 2021.
22
       *Wanda L. Robinson*
23
24        Wanda L. Robinson, CRR, CCR No. B-1973
          My Commission Expires 10/11/2023
25

18 (Pages 391 - 394)

Page 395

1            D I S C L O S U R E
2  STATE OF GEORGIA  )  VIDEOTAPE DEPOSITION OF
                              WILLIAM SINGHOSE, Ph.D. 9/27/21
3  FULTON COUNTY    )
         Pursuant to Article 10.B of the Rules
4  and Regulations of the Board of Court Reporting
5  of the Judicial Council of Georgia, I make the
6  following disclosure:
7        I am a Georgia certified court reporter.
8  I am here as a representative of Veritext Legal
9  Solutions, and Veritext Legal Solutions was
10  contacted by the offices of Greenberg Traurig LLP to
11  provide court reporter services for this deposition.
12  Veritext Legal Solutions will not be taking this
13  deposition under any contract that is prohibited by
14  O.C.G.A. 9-11-28 (c).
15        Veritext Legal Solutions has no
16  contract/agreement to provide court reporter
17  services with any party to the case, or any counsel
18  in the case, or any reporter or reporting agency
19  from whom a referral might have been made to cover
20  this deposition.
21        Veritext Legal Solutions will charge the
22  usual and customary rates to all parties in the
23  case, and a financial discount will not be given to
24  any party to this litigation *Wanda L. Robinson*
25        Wanda L. Robinson, CRR, CCR No. B-1975

Page 396

1  To: JOHN E. OSBORNE, ESQUIRE
2  Re: Signature of WILLIAM SINGHOSE, Ph.D.
3  Errata due back at our offices: 30 Days
4
5  Greetings:
6        This deposition has been requested for read and
7  sign by the deponent. It is the deponent's
8  responsibility to review the transcript, noting any
9  changes or corrections on the attached PDF Errata.
10  The deponent may fill out the Errata electronically
11  or print and fill out manually.
12        Once the Errata is signed by the deponent and
13  notarized, please mail it to the offices of Veritext
14  (below).
15        When the signed Errata is returned to us, we
16  will seal and forward to the taking attorney to file
17  with the original transcript. We will also send
18  copies of the Errata to all ordering parties.
19        If the signed Errata is not returned within the
20  time above, the original transcript may be filed
21  with the court without the signature of the
22  deponent.
23        Please send completed Errata to:
               Veritext Production Facility.
24        20 Mansell Court East, Suite 300
               Roswell, GA 30076
25        (770) 343-9696

Page 397

1  ERRATA for ASSIGNMENT #4823674
2  I, the undersigned, do hereby certify that I have
3  read the transcript of my testimony, and that
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6  Pursuant to Rule 30(7)(e) of the Federal Rules of
7  Civil Procedure and/or OCGA 9-11-30(e), any changes
8  in form or substance which you desire to make to
9  your testimony shall be entered upon the deposition
10  with a statement of the reason given for making
11  them. To assist you in making any such corrections,
12  please use the form below. If additional pages are
13  necessary, please furnish same and attach.
14  Page _____ Line _____ Change _____
15
16  Reason For Change
17  _____
18  Page _____ Line _____ Change _____
19
20  Reason For Change
21  _____
22  Page _____ Line _____ Change _____
23
24  Reason For Change
25  _____

Page 398

1  Page _____ Line _____ Change _____
2
3  Reason For Change
4  _____
5  Page _____ Line _____ Change _____
6
7  Reason For Change
8  _____
9  Page _____ Line _____ Change _____
10
11  Reason For Change
12  _____
13  Page _____ Line _____ Change _____
14
15  Reason For Change
16  _____
17  Page _____ Line _____ Change _____
18
19  Reason For Change
20  _____
21  Page _____ Line _____ Change _____
22
23  Reason For Change
24  _____
25

19 (Pages 395 - 398)

William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

Page 399

1  Page _____ Line _____ Change _____

2

3  Reason For Change

4  _____

5  Page _____ Line _____ Change _____

6

7  Reason For Change

8  _____

9  Page _____ Line _____ Change _____

10

11  Reason For Change

12  _____

13

   _____

14  DEPONENT'S SIGNATURE

15

16  Sworn to and subscribed before me this _____ day of

17  _____, _____.

18  _____

19  NOTARY PUBLIC

20  My Commission Expires: _____.

21

22

23

24

25

Veritext Legal Solutions
800.808.4958                                        770.343.9696

## &

**&**   327:5

## 0

**02689**   326:5

## 1

**10**   329:22 342:5,8
**10.b**   395:3
**10/11/2023**   394:24
**1000**   327:12
**11**   388:2
**13**   332:7 362:9
  388:2
**13th**   335:21
**14th**   332:4 334:13
  337:5
**16**   328:17
**17**   328:8 337:7,13
**1700**   327:12
**18**   348:2
**190**   382:19
**1973**   326:24
  394:24 395:25
**1:32**   326:16 329:3

## 2

**2**   328:15
**20**   333:20 396:24
**200**   327:5,17
**2003**   347:13
**2021**   326:16
  328:15,17 329:2
  394:21
**221**   388:2
**24**   386:19,25
**240**   372:17
**25**   346:24
**2500**   326:21
  327:18
**27**   326:16 329:2
**27th**   332:6

**28th**   394:21
**2:19**   326:5
**2:40**   393:3,7
**2d**   366:25 367:4
  367:11

## 3

**3**   328:15 344:11,12
  372:18
**30**   333:21,23,24
  366:1,4 368:2
  389:3 396:3 397:6
**300**   396:24
**30076**   396:24
**30305**   326:22
  327:18
**326**   394:11
**329**   328:4
**33**   386:6,8
**3333**   326:21
  327:18
**337**   328:8
**34**   386:10,18,24
  387:1,2
**343-9696**   396:25
**344**   328:15
**35**   386:10
**363**   328:16
**393**   394:12

## 4

**4**   328:16 363:21,23
  364:5
**4823674**   397:1

## 5

**5**   372:18
**520.620.3975**
  327:6
**54**   382:15

## 6

**60**   337:23
**678.553.2100**
  327:19
**678.553.2212**
  327:19
**6961**   394:22
  395:24
**698**   327:5

## 7

**7**   397:6
**713.374.3541**
  327:13
**713.754.7541**
  327:13
**770**   396:25
**77002**   327:13

## 8

**8**   342:5
**8-1/2**   383:12
**85705**   327:6

## 9

**9**   376:16,19 377:2
  377:4,9 378:11
**9-11-28**   395:14
**9-11-30**   397:7
**9/27/21**   395:2

## a

**ability**   375:24
  383:19
**able**   336:7 353:19
  357:10 372:22
  374:16 375:5
  376:21 383:15
**access**   337:20
**accomplish**   363:13
**acknowledge**
  330:1

**acting**   358:12
**actual**   331:11
  360:1,1
**add**   381:23
**adding**   392:8,9
**addition**   368:8
  381:1
**additional**   334:7
  397:12
**addressed**   335:10
**admit**   338:12
  349:19
**adorable**   356:6
**agency**   395:18
**ago**   329:22 332:7
  342:3,5,8,9,9,11
  342:12 343:14,17
  366:16
**agree**   349:22
  355:12 357:14,20
  358:15 371:19
  375:17
**agreement**   395:16
**ahead**   344:10
  354:2 373:13
  381:14
**air**   372:9
**airflow**   392:2
**alleged**   349:23,24
  352:7
**allowed**   336:9
**alternative**   350:7
**amount**   340:10
  354:18 363:14
  376:23
**amounts**   379:20
**analysis**   335:1,15
  346:7 348:9
  350:16 354:7
  359:3,19 361:2,13
  364:10 366:25

William Singhose, Ph.D., Vol. II    September 27, 2021
In Re: Fisher-Price/Mattel

367:4,4,12 368:4
371:5 372:5
379:17 380:13
**analyze** 350:12
351:23
**analyzing** 358:17
368:8
**andrew** 329:9
**anecdotal** 390:4,6
**angles** 371:6
**answer** 346:17,22
348:19 351:4
371:21 384:25
**answering** 381:7
**answers** 394:9
**anywise** 394:17
**apparently** 363:3
392:10
**appear** 350:16
**appearance** 345:8
345:10
**appearances**
327:1
**appeared** 376:17
**appearing** 327:3
327:10
**applicable** 346:13
347:24
**apply** 348:10,12
349:2,5
**appreciate** 379:22
**appropriate** 330:5
331:18 336:3
**april** 328:15
**area** 336:2 374:10
**areas** 338:7
**arizona** 326:1
327:6 342:22
343:2,11
**arm** 381:19

**arms** 372:11
377:16 381:17
382:9 383:21
**article** 395:3
**asked** 350:20
355:2 359:25
**asking** 334:3
344:4 354:14,17
364:3 373:4 375:1
379:23 380:4
385:24
**asks** 355:3
**aspect** 367:25
**aspects** 334:25
361:6 367:23
**asphyxia** 391:3,4
**assess** 360:20
**assignment** 337:6
397:1
**assist** 397:11
**assistance** 339:12
**associated** 336:14
**assuming** 333:4,12
357:1
**assure** 346:8
**atlanta** 326:22
327:18 329:12
342:14,16,18
343:13,23
**atomic** 330:16
**attach** 397:13
**attached** 396:9
**attorney** 396:16
**attribute** 357:25
**attributing** 365:2
**available** 368:9
**aware** 331:7
332:20 391:1

**b**

**b** 326:24 394:24
395:25
**b.a.** 375:10
**babies** 374:20
379:7,11,13 380:6
380:20 383:8,20
384:6,7 385:9,9,22
**baby** 332:15
355:23 360:20
372:7 376:14
379:14,14 387:9
**baby's** 372:8,11
380:1,2 387:22
**back** 331:3 332:4
339:2,4 351:9
354:4 359:22,24
360:8 366:3,8
367:22 368:2,3
370:19 378:9,13
380:1,2,6 381:18
386:25 387:18
390:9 396:3
**backward** 358:14
**bacon** 352:24
**ballpark** 342:4
**bandwidth** 334:17
**bar** 349:18
**base** 361:12
366:24 367:3,9
**based** 343:11,23
343:24 349:21
350:23 368:4
392:16
**basic** 379:16
**basically** 360:8
383:9
**basing** 364:6,9
369:19
**basis** 371:3 372:4
379:18 388:13,18

388:22,23 391:12
**began** 329:21
**beginning** 368:22
**behalf** 326:4 327:3
327:10 329:9,12
335:11
**behavior** 336:3
**believe** 335:21
344:11 364:12
376:19 387:25
388:17
**belly** 380:1,2,6
**belt** 368:17
**ben** 327:25
**beneficiaries**
326:5
**benefit** 336:23
**best** 352:19
**beyond** 364:23
**bias** 343:8
**big** 335:8 337:22
**bikes** 383:11
**bio** 388:14
**biological** 360:4
**biologically**
361:20
**biology** 364:24
**biomechanical**
335:24 336:12
353:12 357:25
358:6,8 360:16,19
361:2,12 364:10
365:1 388:14,19
**biomechanically**
372:8,10 382:6
383:20
**biomechanics**
338:8
**biomedical** 360:11
360:13,19 364:6

**bit** 363:1 365:5
**blocked** 385:20
**board** 330:19
331:18 395:4
**body** 360:23 361:3
363:4,12 371:11
376:4 381:18
382:7,10,10
383:23
**brady** 327:16
329:11
**brain** 359:17
**brandon** 327:16
329:11
**breath** 374:22
**breathability**
385:1
**breathable** 352:1
373:19
**breathe** 352:2
364:21 365:4,7,8
365:10 385:2
**breathing** 352:3
365:17 377:17
**briefly** 390:13
**broad** 355:4
379:22
**broken** 367:7
**brothers** 356:16
357:4 385:19
**brought** 354:7
**brush** 379:22
**business** 343:5
**busy** 334:17

**c**

**c** 394:1,1 395:1,14
**call** 332:9 359:20
376:16 388:21,22
**called** 345:5
347:22 354:23

**calling** 386:14
**camera** 345:11
**capabilities**
374:12,17
**capable** 355:12
**capacity** 330:20
341:23 358:12,13
**caption** 394:8
**care** 346:13 393:2
**carefully** 350:21
**caregiver** 368:25
**caregivers** 388:25
**carpet** 375:6
**carpeted** 374:10
**case** 326:4 331:6
332:21 334:15
335:9 337:2,6
340:19,20 341:3
341:12,16 342:6
342:10,17,19
343:11,13 352:7
354:1 357:22
358:19,23,25
364:10 368:16,23
371:10 373:15,21
379:21 388:9,20
394:15,18 395:17
395:18,23
**cases** 332:25 333:1
333:18 341:18,24
342:3 347:19
348:3 358:11
**categorize** 391:3
391:10
**causation** 351:1
358:19,20 391:11
**cause** 330:24,25
331:4,11,16 347:5
349:24 350:1,3,6,7
350:7,8,8 351:15
351:16,19,20,24

352:4,12 360:1,2,4
360:6 361:11,19
364:6,9,19,22
390:15 391:5,10
391:22
**caused** 331:23
358:14
**ccr** 326:24 394:24
395:25
**certain** 334:25
357:14
**certainly** 330:6
332:24 334:11
340:17 350:25
368:15 371:3
389:24
**certainty** 331:22
378:23 379:1,5
391:20,21
**certified** 326:25
330:19 331:18
395:7
**certify** 394:6,14
397:2
**chance** 353:13
**change** 397:14,16
397:18,20,22,24
398:1,3,5,7,9,11
398:13,15,17,19
398:21,23 399:1,3
399:5,7,9,11
**changes** 396:9
397:4,5,7
**characterization**
358:21
**characterize**
358:24
**charge** 395:21
**check** 344:2
**children** 339:10
339:11,13,17

374:2,11,17
**children's** 340:10
340:13
**chosen** 334:23
**chris** 361:25
362:14 390:22
**christensen**
335:20 361:25
391:1,9
**christensen's**
362:4 390:23
391:18
**cinched** 368:18
**circle** 359:24
**cite** 371:16
**city** 335:22 362:10
**civil** 334:10 397:7
**claim** 347:1
**claims** 363:2,3
**clarified** 332:12
332:14
**clean** 343:10
**clear** 330:7 333:10
348:21 361:15
364:8 377:19
385:7 390:21
**clearer** 350:2
**clearly** 335:7,9
368:6 381:22
**clinical** 330:16
**clips** 371:9,23
385:9
**close** 361:18
374:20 385:10
**code** 347:23
**collaborative**
339:8
**collected** 377:23
**colloquy** 335:4
**comes** 348:1 371:4
371:8

William Singhose, Ph.D., Vol. II
September 27, 2021
In Re: Fisher-Price/Mattel

**[coming - death]**

**coming** 338:10 353:4 374:23 388:25 390:4
**commission** 394:24 399:20
**common** 384:7
**company** 343:5
**compared** 383:20
**comparison** 366:11 383:22
**completed** 369:13 396:23
**completely** 347:9 385:6
**component** 350:14
**concept** 347:12 351:1 371:14,18 378:22
**concepts** 349:3,6 350:9,11,12,15,16 355:10
**concerned** 349:16
**conclude** 390:17
**concluded** 393:6
**concludes** 393:4
**conclusion** 370:2 378:19 388:14,19 391:12
**conclusions** 390:14
**condition** 361:10
**conditions** 352:12 365:14
**conduct** 384:20
**confidence** 392:6
**configuration** 368:7
**configurations** 375:25
**confining** 336:18

**confirm** 384:20
**confusing** 363:7
**constraint** 368:18
**consulting** 341:22
**contact** 363:6
**contacted** 395:10
**contend** 365:19
**context** 373:2
**continuation** 329:21
**continued** 326:13 389:18
**contract** 395:13 395:16
**contributing** 350:7
**contributory** 350:3,6
**control** 347:4 351:14 375:13
**controlling** 353:2
**conveying** 345:23
**copies** 396:18
**copy** 337:17 344:18,20 363:21 386:23
**corporation** 326:8 326:9
**correct** 330:2,8,9 330:17,24 331:12 331:19,24 333:2 333:15 334:21 335:11 339:24 340:8 345:15,16 345:18 346:3 348:6 349:3,14,24 352:13 353:5 355:22,24 357:3,6 357:13 360:23 365:12,13,21 366:9,21 367:6

369:1 371:2 373:5 375:3,4 382:5 383:14,18,19 384:5 387:7,15,24 389:13 390:2,10 390:12,18 394:12
**corrections** 396:9 397:11
**correctly** 343:7 377:24 382:1
**council** 395:5
**counsel** 327:1 329:6 333:13 354:25 355:3 372:25,25 394:15 394:16 395:17
**county** 343:3 394:4 395:3
**couple** 352:25 358:11 386:8
**courkamp** 326:4 329:9 363:8 387:20
**course** 334:24 340:3 358:25 371:4 376:21 385:8,23
**court** 326:1 329:14 334:11 350:22,22 351:2,6 353:18 355:6,8 395:4,7,11,16 396:21,24
**cover** 339:21 347:15 395:19
**covered** 345:6 371:22
**cox** 327:16 329:11 363:20
**coxb** 327:20

**crafted** 350:21
**created** 368:10
**creates** 384:4
**credentials** 335:22
**crib** 370:4,10,22 374:2
**cribs** 340:24 380:24
**cross** 354:9 368:13
**crossover** 336:5
**crr** 326:24 394:24 395:25
**currently** 383:4,6
**curriculum** 333:1
**customary** 395:22
**customers** 389:15 390:7
**cut** 339:15
**cv** 326:5

**d**

**d** 327:16 395:1
**dangerous** 347:3 351:13
**data** 339:2 368:8,9 368:10 369:16,25 377:20,23 378:3 378:15 379:20 389:6,9
**date** 329:1
**daughter** 387:17
**day** 332:6 348:6,6 348:17,17 349:1,1 362:8 383:9 394:21 399:16
**days** 329:22 332:7 396:3
**deal** 332:16
**death** 330:24,25 331:5,11,17,23 332:9,10 352:8,13 361:11 364:6,9,19

364:22 365:2,15
389:5,12,18
390:16 391:3,5,10
391:22
**decided** 350:23
**defect** 347:4
349:23 351:15,16
351:19 365:18
**defective** 347:3
351:12
**defendant** 341:10
343:23 346:25
347:2 351:11
**defendant's** 347:4
351:13
**defendants** 326:10
327:10 328:7,14
337:13 341:9
344:12 363:23
**defense** 342:1
**defer** 331:17
**deferring** 391:11
**defining** 337:5
**definition** 348:11
348:12
**definitions** 349:6
350:6
**definitively**
391:19
**degree** 331:22
349:10 366:2
378:22,25 379:5
390:20 391:20,21
**degrees** 366:4
368:2
**delineate** 344:7
**delve** 360:5
**demonstrate**
381:22
**demonstrated**
376:8

**demonstration**
368:21 381:17
382:12
**depends** 375:14
**depo** 390:25
**deponent** 396:7,10
396:12,22
**deponent's** 396:7
399:14
**deposed** 335:20
343:12 353:12
354:11
**deposing** 358:5
**deposition** 326:13
329:4,21 330:5
332:3 334:13
336:11 338:23,23
339:19,21 342:15
342:18 343:16
353:14,25 355:11
362:9 368:11
371:18,23 372:18
372:19 373:2,7
388:1 390:23
391:8 392:19
393:4,6 395:2,11
395:13,20 396:6
397:9
**describe** 347:20
**design** 335:2,15
336:8 338:7 339:4
358:17 367:23
371:5 372:6,6
379:2,24,25 380:5
**designed** 338:24
338:25 382:9
**designing** 339:3
**desire** 397:8
**detail** 390:11
**determine** 360:1
360:11

**determined** 331:5
331:5 357:24
**develop** 356:1,14
**developing** 356:17
**development**
357:5
**developmental**
357:5
**device** 336:8 389:1
**die** 365:14
**died** 359:5,8,14
361:21 390:18
**different** 356:1,14
357:5,5,6 382:7
**differently** 356:17
**difficult** 357:23,25
358:3 366:8,11,12
370:19 378:8
379:3,25 380:5
385:6
**direction** 394:10
**directly** 353:7
363:6
**disabled** 339:11
**disclosed** 332:20
332:24 334:5
339:23 340:17
**disclosing** 340:1
**disclosure** 328:9
333:25 337:11,24
338:13 395:6
**discount** 395:23
**discovery** 328:8
337:10
**discrepancy** 363:1
387:19
**discussed** 373:7
**disposal** 380:20,21
**disposed** 343:15
**dispute** 333:25

**distinct** 336:4
**distorting** 367:17
**district** 326:1,1
343:25
**dive** 344:15
**divorced** 358:19
**dna** 356:16,19,25
**doc** 386:22
**doctor** 330:8
335:18 337:8
347:8 359:11
374:19 378:5
388:3 392:4,15
**document** 338:3,5
**dog** 383:9
**doing** 331:14
333:20 375:15,23
376:1,2 387:12
**double** 372:6
**downstream**
361:20
**dr** 329:5,20 330:6
333:10 335:20
337:23 343:10
353:12 354:6
361:24,25 362:3
362:14 363:21
364:2 370:16
374:1,7 380:9
381:14 382:14
387:17 390:22,23
391:1,9,18 392:21
393:1
**draft** 353:23
**drago** 389:8
**drew** 374:21
**due** 396:3

| e |
|---|

**e** 327:4,7,14,19
394:1,1 395:1
396:1 397:6,7

Case 2:19-cv-02689-GMS    Document 196-41    Filed 11/19/21    Page 155 of 171
William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

[earlier - feeding]                                              Page 6

**earlier** 359:25
**easier** 365:20,22
  365:23,24 366:6
  366:22 367:10,21
  368:3,6 369:17,20
  369:21 370:2,8
**easily** 382:10
**east** 327:5 396:24
**easy** 378:9
**effect** 348:13
**either** 341:25
  354:25 355:20
  384:16 385:19
**electronically**
  396:10
**elicit** 334:6 354:11
  354:20
**eliciting** 354:15
**elimination** 344:4
**empirical** 369:16
  369:25
**employ** 394:16
**ended** 359:2,11
**energy** 384:15
**engagement** 340:8
**engineer** 358:6,8
  391:22 392:5
**engineering**
  388:22
**engulfed** 366:17
  384:19 385:20,22
  386:9 390:20
**enjoy** 345:12
**entered** 344:10
  397:9
**entitled** 344:16
  373:2
**envelope** 334:8
**environment**
  360:11,13,15,16
  360:20 361:3

**365:17** 369:18
  375:21
**eric** 361:24
**errata** 396:3,9,10
  396:12,15,18,19
  396:23 397:1
**esquire** 327:4,11
  327:16,16 396:1
**essentially** 354:5
  390:17
**establish** 338:22
**established** 347:1
  351:11 368:20,23
**evaluating** 339:1
**evaluation** 387:14
**event** 392:24
**everybody** 368:16
**evidence** 360:25
  362:24 369:16
  371:11,14 372:13
  376:7,8 377:8
  391:2 394:13
**exact** 338:2,4
  347:17 358:19
**exactly** 339:18
  340:17 346:16
  359:5,8,14 361:14
  361:21 363:8
  387:10
**examination**
  329:18
**examinations**
  328:1
**examiner** 331:6
**examiner's** 336:14
**examining** 354:9
**example** 334:12
  334:12 335:18,19
  336:7 339:11,16
  351:25 353:8
  362:25 372:5

**378:11** 381:17
  386:6 389:3
**exemplar** 383:7
**exhibit** 328:8,15
  328:16 337:7,13
  337:19 344:11,12
  357:4 363:21,23
  364:5
**exhibits** 328:6,13
**expand** 334:8
**expect** 336:1
**experience** 334:7
  335:23
**experimentation**
  372:2,2 376:22
**expert** 331:18
  332:8,14,21,25
  333:17,24 334:1
  334:19,20,23
  335:13,20,25
  337:12 338:13,15
  338:16,19,20
  339:24 340:1,3,8
  341:11,25 343:12
  353:12 358:12
  361:23 362:15
  364:11,12 389:8
**expertise** 334:2,14
  336:12,25 338:7
  338:17 340:4
**experts** 331:7
  335:11,14 337:2
  359:25 361:24
  380:25
**expires** 394:24
  399:20
**explain** 345:7
**explained** 384:1
**explanation**
  346:20

**exponent** 376:7
  377:20,23 378:3
  379:15 385:24
**expressing** 357:18
**extent** 335:15
  338:19

**f**

**f** 327:13,19 394:1
**fabric** 351:25
  361:17,18 363:6
  364:20 386:9
**fabrics** 373:19
**face** 361:17 363:4
  363:9 364:19,20
  365:3,6,9 371:25
  373:9,10,20 376:2
  376:22 378:11,14
  385:1,6,20 386:9
  390:19 392:2,10
  392:14
**faces** 385:10,22
**facility** 396:23
**fact** 336:17 355:25
  359:12,19 372:7
  374:5
**factors** 334:19
**fair** 340:10 359:8
  376:23
**fall** 384:13,15
**familiar** 344:22
  351:1,5,7
**family** 356:2,13,25
**far** 349:16 358:20
  363:16
**fault** 347:1
**federal** 334:10,11
  397:6
**feedback** 389:15
  390:9
**feeding** 339:2,4

feeds  346:7
feet  372:8
felt  373:18
fields  331:19
fifty  382:25
figure  350:13
  386:6,10,16,18,19
figures  386:17
file  396:16
filed  396:20
fill  396:10,11
filled  377:3
final  358:18
financial  395:23
find  341:24
firm  353:1
first  332:3 338:23
  347:13 358:24
  360:10,10 362:20
  364:18 374:8,21
fisher  326:8
  329:12 353:8
  354:17 388:10
  389:17 390:9
fixes  370:15
flat  355:13,20
  365:23,24 366:3
  366:24 367:11,22
  368:1,3 370:3,10
  370:22 374:2,4,6
  380:24 381:16
floor  374:9 375:2
flow  359:13
fluid  359:13
focus  339:7 377:6
focused  351:20
focusing  367:24
folded  335:14
folks  353:21
follow  388:16

following  390:15
  395:6 397:5
follows  340:16
foot  382:17
forces  372:10
foregoing  394:6
  394:11
foreign  326:8,9
forensic  330:16
forget  390:23
forgive  344:8
form  332:13
  348:15,18 349:4
  351:3 354:2,13
  360:3 371:20
  373:12 391:7,16
  391:25 392:17
  397:8,12
formats  388:9
forms  379:17
formulating  358:8
forth  354:7
forward  396:16
found  346:25
  359:20 360:6
  362:22 363:2,3
  387:20 388:4,4
foundation  391:16
four  377:18
frakes  374:1,7
  379:14 387:17
frame  342:9
frankly  362:22
  388:5
free  363:9
friend  374:1
friend's  368:12
  371:1
friends  372:17
  374:20

front  335:4 337:17
  344:18 378:14
  381:18 382:9
  386:23
full  339:5,6 392:6
fuller  362:1,14
fully  384:16
fulton  394:4 395:3
funny  342:24
furnish  397:13
further  394:14

**g**

ga  396:24
general  357:21
  383:23
generate  372:10
geometric  372:8
georgia  326:22
  327:18 343:25
  347:15 394:3
  395:2,5,7
germane  355:9
getting  349:13
  350:5 370:13
  382:21 389:4,20
girl  369:9
give  334:12 335:18
  341:23 348:13
  359:7 390:11
given  341:25
  353:11 383:17
  394:13 395:23
  397:10
giving  342:15,18
gms  326:5
go  330:1 333:7,22
  337:22 344:9
  345:9 349:11
  354:2 355:4 360:8
  364:3 373:13
  381:14 382:9

383:6 386:25
  387:18
goes  371:12
going  330:23
  331:10,14 332:5
  334:18 335:18
  336:6,10 337:7,15
  344:21,21,23
  345:1 346:2
  350:19,20 351:9
  352:14 361:21
  363:20 364:4
  389:1 391:17
  392:25
goldberg  327:5
goldbergandosb...
  327:7
good  346:17
  358:20,22 373:24
  389:9,19,21
goods  365:9
  366:18 385:10,11
  385:20,23 387:23
  390:20 392:2
grab  373:22,22
graco  343:22,23
grandmother
  369:6 373:21
grant  339:8
gravitate  357:18
great  332:16 337:2
greenberg  326:21
  327:12,17 395:10
greetings  396:5
ground  339:1,21
grounds  336:20
gtlaw.com  327:14
  327:19,20
guess  343:23
  348:2 349:9
  372:15 384:24

guys  335:19 393:2

**h**

half  333:21 382:25
hands  384:3
hang  381:4
happen  362:7
    375:24
happened  362:8
hard  337:17
    353:20 364:21
    365:7,10 372:9
    385:2 386:23
harder  366:3
harm  382:21
he'll  348:24
head  340:14 363:4
    363:13,16,18
    366:16 384:18
    387:22,22
hear  381:6
heard  382:1
hearing  394:13
heavy  377:17
held  326:20
hereunto  394:20
herman  327:16
    329:11 337:15
    386:11
hermanb  327:19
hey  340:20
high  379:5
hit  342:2
hold  339:17
homework  358:5
honestly  340:9
honorable  346:2
host  372:13
house  374:7
houston  327:13
huge  379:20

human  382:7
    383:23
humans  334:19
hundreds  371:9
    380:14,15 385:8
    389:2
husband  343:4
hypothesis  378:15
    378:17

**i**

idea  342:21 355:2
    358:3
identification
    337:14 344:13
    363:24
identified  365:12
identify  329:6
ignore  380:15
ii  326:12 329:5
impacts  353:24
    354:1
important  343:21
    355:7 389:7
impossible  378:9
incident  388:8,12
    388:17 389:24
    390:2
incline  366:2
    367:19 368:2
    370:22
inclined  355:13,21
inclines  371:6
include  340:3
    375:18,19
including  383:15
incorrect  384:22
    387:25 391:14
index  328:1,6,13
indicate  389:3
industry  352:7

infant  332:9,10
    352:1 357:8,10
    365:20 368:11
    370:18,21 371:1
    372:16 376:9,16
    376:19 377:2,4,8
    377:12,15,18
    378:11 383:13
    386:12
infant's  366:16
    384:18
infants  355:12,15
    355:16,18 356:1
    356:14 357:14
    368:12,16,20,20
    369:5 371:1,24
    372:16,17 374:1,8
    374:18 375:20
    376:21 377:10
    381:20 384:1
    385:4,25 386:8
    387:6 389:4
information
    332:21 333:4
    334:5 339:4
    347:10 353:1,3,7
    354:4 355:8 389:7
    389:19,21,25
    390:7 392:8,9
initial  328:8,9
    337:10,10 386:2,4
injuries  359:16,17
injury  347:5
    349:24 350:4
    351:16,20,24
    352:4,7 357:23,24
    358:1,3,14,24
    360:1,12 361:9
    365:2,11 388:15
    388:20

inquiry  355:9
instantaneous
    365:15
instructing  345:25
instructions
    383:17
instructive  375:17
    375:19 389:12,16
insufficient  391:2
interacting  361:3
interacts  376:3,4
interchangeably
    337:3
interested  394:17
internal  359:16
interplayed
    338:21
interpret  346:3
    348:5,8,10,13
interpreted
    350:23
interpreting
    345:25 349:8,9
interrupt  348:23
    348:24,24
interrupting  381:5
    381:7
interruption
    348:21 382:2
investigation
    359:21 361:6
investigative
    336:15
involved  339:1,16
    341:4 342:6,7
    368:16
involving  340:12
    369:2
ironically  378:16
irony  378:4,6,17

Case 2:19-cv-02689-GMS    Document 196-41    Filed 11/19/21    Page 158 of 171

William Singhose, Ph.D., Vol. II
In Re: Fisher-Price/Mattel
September 27, 2021

[irrelevant - looking]

Page 9

**irrelevant** 375:22
**ish** 346:24
**issue** 350:23
**issues** 339:9
  353:11

**j**

**jess** 327:24
**job** 339:5,6 346:1
  354:10 358:16
**john** 327:4 329:8
  333:8 337:19
  342:23 344:25
  356:9 396:1
**jones** 327:25
**josborne** 327:7
**judge** 346:1,2
**judgment** 391:17
  391:18
**judicial** 395:5
**july** 328:17
**jurisdiction**
  343:18
**jurisdictions**
  343:20
**jury** 330:7 332:8
  336:23 337:2
  340:20 345:25
  346:3 350:19,20
  355:9 356:24
  377:8
**juvenile** 338:8,16
  338:16,19,21
  340:2

**k**

**kathleen** 326:4
**katie** 329:9
**keeping** 361:8
**kids** 374:13
  383:10

**kids2** 341:15,19
  342:2,7,11 343:13
  343:16,22,22
**kin** 394:14
**kind** 339:15
  342:23 344:15
  348:2 349:17
  358:4,18 359:6
  375:14 384:12
**kinds** 350:5
  379:15
**knees** 384:3,9
**knew** 332:5
  389:17
**know** 333:3 335:7
  337:1 339:20
  342:17 343:20
  344:3,21,22 345:6
  354:5,22 355:5,5,9
  355:25 356:7,23
  357:23 358:17
  359:5,11,14,24
  360:23 361:5
  362:24 365:14
  371:9 374:5,19
  375:18 377:23
  379:16 386:13
  388:24 389:18
  390:22 392:1,9,10
  392:16
**knowing** 359:8
**knowledge** 340:6
  352:19 361:16
**known** 374:21

**l**

**l** 326:24 394:24
  395:1,25
**label** 335:3
**labeling** 334:19
**labs** 375:8

**lack** 359:17
**lake** 335:22 362:9
**lane** 336:2
**language** 348:13
  349:2
**large** 354:17
  363:14,18 371:11
  389:6
**law** 345:7,15,25
  346:3,6 349:9
**laws** 368:5
**lawyer** 338:2
  345:15 346:15
  347:14 354:17
**lawyers** 350:21
  351:2,6 352:24
  353:5
**laying** 368:1,3
  374:9 375:6
**layperson** 336:25
**learn** 347:10
  353:24,25
**learned** 347:12
**leave** 373:5,10
  392:25
**left** 336:15,15
  347:4 351:13
  386:12,15 387:3,4
**legal** 334:4 344:16
  345:5,17,20,22
  347:9 348:10,12
  348:14 349:2,6,6,8
  349:14,15,17
  350:6,9,11,15,19
  350:23 351:1
  354:15 358:13
  395:8,9,12,15,21
**legalese** 346:24
**legs** 377:16
**lengthy** 364:4

**liability** 347:14,16
  347:20
**licensed** 330:20
**life** 359:2 383:5
**lift** 383:10
**limit** 336:6
**limited** 336:13
**line** 347:17 397:14
  397:18,22 398:1,5
  398:9,13,17,21
  399:1,5,9
**lines** 336:4 372:18
  388:2
**list** 333:1,15 342:1
  361:11
**listened** 392:13
**litigated** 339:24
**litigation** 341:23
  395:24
**little** 362:22 363:1
  363:19 365:5
  388:5
**llp** 326:21 327:5
  327:12,17 395:10
**located** 342:11,14
  342:14 343:18
**long** 337:8 342:3
  346:10 348:20
  359:15 372:22
  373:6,18 382:23
**look** 335:8 336:22
  346:23 349:1,6
  350:22 358:7
  362:12
**looked** 334:24
  339:19 364:13
  376:15 389:24
**looking** 362:20
  380:24 385:21
  386:1 387:1

**lot** 334:17 335:23
338:1 349:7
355:19 370:15
371:23 374:4,13
374:22 379:13
383:12 385:22,23
386:17,19 388:24
**louisiana** 327:12
**lovett** 327:11
328:4 329:10,10
329:19 333:6,9
337:15,21 342:23
343:4,9 344:14,25
348:16 356:9,12
363:20 364:1,7
369:22,24 373:3,8
380:3 381:6,13
392:20 393:2
**lovettm** 327:14
**low** 345:11

**m**

**ma'am** 383:2
**mail** 327:7,14,19
396:13
**making** 355:1
356:24 397:10,11
**man** 335:23
**mandatory** 328:8
337:9
**mansell** 396:24
**manually** 396:11
**manufactured**
347:2 351:11
**manufacturers**
346:13
**maricopa** 343:2
**marked** 328:13
337:14 344:13
363:24
**mary** 327:11
329:10,10 333:9

**match** 336:7
**material** 336:5
338:6 352:3 385:2
392:11
**materials** 371:7
**mattel** 326:8
329:12 388:10
**matter** 332:1
339:24 377:25
**matthew** 356:3
386:13,14
**mean** 330:25
333:3,23 338:5,25
340:15 342:24
345:19,24 346:4
346:16 348:7
349:16,25 350:12
351:17,22 352:6
357:16 358:16
359:6,10 360:15
365:5,25 377:22
386:13 387:8
388:21 389:14
390:6
**meaning** 345:23
382:4
**means** 348:10
349:5 360:14
394:10
**meant** 346:21
**meat** 345:1
**mechanical**
365:18
**mechanism**
357:25 365:1,11
388:15,19
**medical** 330:8
331:4,6,11,17,18
331:22 335:19
336:14,19 352:12
352:15,17,18,20

359:11,25 360:2
361:9 391:11,20
**medicine** 330:20
**meet** 345:20
**meets** 349:7
**mention** 338:13
**mess** 332:5
**met** 353:10
**midr** 337:20
**milestones** 357:6
**mind** 361:8 363:12
**minute** 374:21
**minutes** 377:18
**miracles** 353:17
**mixture** 356:22
**mobile** 339:17
**mobility** 339:9
**modern** 353:18
**moment** 366:16
**momentum** 384:1
384:4
**monday** 326:16
**month** 383:12
**months** 357:9,11
**mother** 363:2
369:5 387:20
392:13
**motion** 355:6
368:5 369:13
**mouth** 363:17
**move** 377:15
**moves** 383:23
**moving** 377:17
385:5,11
**multiple** 380:21
**mute** 356:9

**n**

**n** 331:1,23 351:25
360:24 361:1
363:15 365:19,25
366:1,2,7,16

367:10,19,21,25
368:17 369:18
370:3,9,18,20
371:6 376:3,4,10
379:2,24,25 380:5
380:10,22 381:20
384:19 388:15
**n.e.** 326:21 327:18
**name** 341:2,7,10
369:10 394:21
**naturally** 384:13
**near** 375:8
**necessarily** 355:8
**necessary** 397:13
**need** 329:25
335:16 339:12
344:5 345:12
359:14,18 372:1
**needed** 360:23
**needs** 339:13
**neither** 375:4
**neonatologist**
330:12
**nevada** 342:19,22
343:7
**never** 339:5,23
345:7 376:24
**new** 339:21 354:4
354:8
**newton's** 368:5
**nicholas** 356:4,5,6
385:20 386:13,15
387:2
**noise** 333:11
**nominally** 347:24
387:11
**non** 373:19
**normally** 347:19
**northern** 343:24
**nose** 363:17

Case 2:19-cv-02689-GMS    Document 196-41    Filed 11/19/21    Page 160 of 171
William Singhose, Ph.D., Vol. II                    September 27, 2021
In Re: Fisher-Price/Mattel

[notarized - people]                                                    Page 11

**notarized** 396:13
**notary** 326:25
  399:19
**noted** 397:4,5
**notes** 377:3
**noting** 396:8
**number** 341:18
  347:21 376:14

**o**

**o** 395:1
**o.c.g.a.** 395:14
**oath** 329:17,23
  330:1
**object** 332:13
  360:3 373:12
**objection** 346:9
**observations**
  372:16
**observe** 372:21
  374:6,9,11
**observed** 371:1
  379:14
**obstructed** 387:23
  392:14
**obstructions** 363:9
**obviously** 345:14
  358:6 373:24
  374:23
**occurred** 389:5
**occurring** 381:19
**occurs** 350:14
  364:24
**ocga** 397:7
**odd** 344:5
**offense** 337:1
**offer** 330:23
  331:21 345:19
  352:14 379:1
**offered** 340:6
**offering** 345:17,22
  346:12 361:9

**offices** 395:10
  396:3,13
**oh** 341:8 356:20
  377:22 379:5
  383:9 389:14
  390:2
**okay** 331:3 338:1
  344:21 352:5,22
  353:9 358:22
  360:7,18 361:23
  366:22 367:3
  369:21 370:7,24
  375:7,16 387:1,1,2
  387:17
**old** 357:10,11
  382:14,15 383:13
**olga** 327:11
  329:10,10 333:9
**oliver** 356:3,4,5,6
**olson** 329:9 361:12
  390:17
**olson's** 330:24
**once** 370:18
  371:24 396:12
**ones** 371:17
  389:12
**opinion** 330:23
  331:21 353:24
  358:9 359:8 361:9
  363:1 366:7,22,24
  367:9,17,18 370:6
  370:7,11,14,23,24
  371:4,4,12 372:4
  372:14 375:2
  377:21,25 379:1
  379:18,21 381:11
  381:13 384:18
  388:12 390:15,19
  392:18
**opinions** 345:17
  345:19,22 346:12

352:11,15 354:1,6
  354:12,15 355:4
**opposing** 354:25
  355:3
**order** 375:11
  383:25
**ordering** 396:18
**original** 344:11
  361:11 396:17,20
**osborne** 327:4,5
  329:8,8 332:13
  343:1 345:3
  348:15,18,23
  349:4 351:3
  352:23 354:2,9,13
  355:2 360:3
  371:20 372:25
  373:12 381:4,10
  391:7,16,25
  392:17,24 396:1
**osborne's** 354:10
**outside** 333:11
  336:25
**overall** 335:1
**overlapped** 335:1
**owns** 343:5
**oxygen** 359:17

**p**

**p.m.** 326:16 329:3
  393:3,7
**page** 328:4 337:22
  344:24 372:17
  388:1 397:14,18
  397:22 398:1,5,9
  398:13,17,21
  399:1,5,9
**pages** 394:11
  397:12
**palmer** 369:10,11
  373:9,15,21
  385:19 387:15,16

**paragraph** 346:24
**parameters** 334:1
  337:5
**pardon** 343:7
**parenthetical**
  337:12
**parents** 357:2
  377:4,9 388:25
  390:5,10,11
**part** 332:3 334:23
  338:23 339:3,6,7
  339:20 343:2
  351:18 358:16,17
  358:20 363:7
  367:4,11,20
  368:13 371:3
  375:1 377:22
  392:5
**partial** 377:25
  384:16
**partially** 368:22
**particular** 338:10
  383:23 392:4
**parties** 394:15,17
  395:22 396:18
**parts** 380:18
**party** 395:17,24
**pat** 339:7
**pathologist** 330:17
  336:19 361:25
  362:1,15 390:24
**pathology** 335:20
**pdf** 396:9
**pediatrician**
  330:10
**pending** 341:16,17
**pens** 340:24
**people** 336:24
  337:3 352:22,25
  367:2

[percentage - product]                                                    Page 12

**percentage** 350:1
350:13
**perfectly** 349:18
**perform** 366:6
375:11
**performed** 368:12
381:1,9,12,15
382:5
**period** 372:22
373:6,11 374:15
**periods** 373:18
**person** 327:16
341:6
**personally** 380:9
380:11,19 381:15
**perspective**
374:23
**ph.d.** 326:14 328:3
328:15,17 330:6
394:7 395:2 396:2
**phenomenon**
350:14
**phone** 356:10
**phonetic** 353:20
**photograph** 375:6
**photographs**
374:24,25 375:1
385:19
**phrasing** 367:16
**physical** 336:8
360:6,25 362:24
371:5 372:6
374:16
**pick** 341:7,10
**picture** 387:13
**pictures** 385:22
**piedmont** 326:21
327:18
**pinned** 372:11
381:18

**pinning** 381:19
**place** 360:12
387:10
**placed** 368:21
369:2,7,12 373:14
381:20 385:4
387:5,6,8,10
**placement** 372:15
**plainer** 367:1
**plaintiff** 326:6
327:3 341:2,5
342:1
**plaintiff's** 328:8,9
333:13 337:9,10
352:24 353:5,11
354:11 361:24
**plaintiffs** 335:11
341:9
**planar** 367:1,1,2,3
367:5,15
**plastic** 365:16
**play** 331:1,23
340:24 351:25
360:24 361:1
363:15 365:19,25
366:1,2,8,17
367:10,20,21,25
368:17 369:18
370:3,9,19,20
371:6 376:3,4,11
379:2,24,25 380:5
380:10,22 381:20
383:10,11 384:19
388:15
**played** 371:17
**please** 329:6,14
344:8 383:3
396:13,23 397:12
397:13
**plus** 372:4

**point** 340:19
341:20 344:8
356:24 358:4
366:14 377:5
378:1 386:5
**pointed** 389:2
**pointing** 389:16
**polish** 353:21
**political** 375:9
**portion** 368:2
**position** 331:1
335:17 357:15,17
359:4,12,20
360:24 362:21
369:14 370:8,21
373:6,14,16,24
377:11,12,13
378:14 387:6,10
387:11 388:3
392:12
**possible** 392:15
**power** 384:15
**practice** 330:20
345:15 355:6
**practiced** 345:7
**precedent** 350:24
**preceding** 389:18
**prefer** 357:14,17
377:11
**preference** 357:19
**preferred** 377:9
377:13
**present** 327:23
329:6
**pressed** 385:10
**pressing** 383:17
**presumably**
380:20
**pretty** 353:22
355:3 358:2
375:22 383:16

390:21
**previous** 354:6
**previously** 328:13
344:10,13 363:24
**price** 326:8 329:12
353:8 388:10
389:17 390:9
**price's** 354:17
**principle** 349:2
**principles** 348:11
348:12
**print** 396:11
**prior** 333:15
338:22 340:7
368:11 372:18
373:7 382:2
**probably** 333:20
338:9 342:5,8
346:9 347:12,16
348:1,24 353:18
377:5 382:25
388:21 389:20,22
**problematic**
367:24
**problems** 389:17
**procedure** 334:10
397:7
**proceeding** 343:19
**proceedings**
343:20
**process** 339:3
358:18,18 366:5
384:2
**produced** 371:9
380:25
**product** 335:1,15
338:7 347:2,13,15
347:20 349:23
351:12,23 365:9
366:20 379:17
390:8

**production** 396:23
**products** 332:16
338:8,16,17,20,21
339:17 340:3,11
340:13,24 350:13
**proforma** 344:8
**progressively**
366:6
**prohibited** 395:13
**project** 339:8
342:7
**projects** 341:18
**prone** 331:1 357:9
357:11,15 359:20
359:21 361:17
363:4 365:20
366:9,23 367:10
368:21,22 369:7,8
369:8,14,17 370:3
370:8,10,18,22
372:24 375:21
376:11 377:10,11
377:12 378:8
379:3 382:8,8
383:16 387:6,11
392:12
**proper** 368:13
**properties** 351:24
**proud** 342:25
343:6 382:21
**prove** 346:15
378:8
**provide** 352:11
371:13 388:13,18
395:11,16
**provided** 332:22
333:13,14,14
347:19 354:4
362:15,17 372:14
375:3 376:20
390:1,7

**proximate** 350:7
**proximately**
331:23
**public** 326:25
399:19
**pull** 344:23
**pulling** 378:12
386:11
**pulmonologist**
330:14
**purport** 336:11
**purposes** 344:5
**pursuant** 395:3
397:6
**pursue** 334:23
**push** 384:2,3
**pushing** 378:12
387:12
**pushup** 384:8
**put** 335:3 337:16
365:4 372:7 373:9
385:25

**q**

**qualified** 352:11
**question** 334:4
346:5 348:20,22
356:11 357:21
359:7 364:3,8
367:8,16 369:20
369:22 370:5
379:9,23 380:3
381:8 384:25
388:16
**questions** 334:6
340:11,14,25
344:3,4,6,7 346:18
350:21 354:18
355:2,3 370:15
392:20,25 394:8
**quibble** 336:17,21

**quick** 362:12
**quickly** 370:16
**quite** 362:22 367:7
368:5 384:25
386:4 388:4
**quote** 362:21,22
372:20,21 376:10
388:4
**quotes** 338:9
**quoting** 338:5

**r**

**r** 394:1 395:1
**radar** 342:2
**raise** 349:18
384:11
**raised** 366:4
**raising** 366:5
**random** 356:22
**rates** 356:1,14
395:22
**reach** 376:17
392:6
**reached** 378:20
390:14
**reaching** 388:14
**read** 339:20
347:25 361:23
362:3,11 377:3
390:23,25 391:8
392:18 396:6
397:3
**reading** 336:8
349:16,21 372:20
**ready** 330:1
**real** 389:9
**really** 345:24
363:14,18 375:14
377:23 384:8
**reason** 381:10
397:10,16,20,24
398:3,7,11,15,19

398:23 399:3,7,11
**reasonable** 331:22
378:22,25 391:20
**rebuttal** 328:16
337:12 363:22
364:17 390:14
**recall** 332:11,18
339:18 340:9,16
340:18,22 347:15
371:22 377:4,6
385:18 388:6,7
389:20
**received** 353:7
**recollection**
343:14
**record** 329:2,7
332:4,19 333:11
343:10 354:22
364:4 382:13,19
382:22 393:5
**records** 352:17,18
352:20
**rectangular**
366:25 367:5,14
**redirect** 354:24
373:4
**redo** 372:1
**reduced** 394:9
**refer** 330:5
**referral** 395:19
**referred** 376:15
387:19
**referring** 361:15
372:23 386:16
**regarding** 330:24
331:16 352:12
**regular** 364:18
394:16
**regulations** 395:4
**relate** 340:12

Case 2:19-cv-02689-GMS   Document 196-41   Filed 11/19/21   Page 163 of 171
William Singhose, Ph.D., Vol. II   September 27, 2021
In Re: Fisher-Price/Mattel

[related - saying]   Page 14

**related** 350:16
**relationship** 332:15
**relative** 360:24
**relevant** 334:5 336:18
**rely** 359:24,25
**relying** 374:24 377:20 378:4
**remained** 377:12
**remember** 338:4 340:13,25 342:10 342:15 375:7 376:14
**reminded** 369:10
**repeat** 367:8
**report** 328:15,16 334:11 335:8,9 336:14 344:9,10 344:11,15,17,19 344:22 345:4 346:23 347:11 349:22 351:10,10 352:6 361:11 363:22 364:5,12 364:12,13,16,18 364:18,18 365:12 371:15,17 375:18 375:20 385:21 386:3,5 390:14
**reporter** 326:25 329:14 395:7,11 395:16,18
**reporting** 353:18 395:4,18
**reports** 336:15 337:12 361:23 388:8,13,18,24 389:2,3,24 390:2
**represent** 333:12 334:9 347:8

394:12
**representative** 395:8
**represented** 332:8 341:8,9,11
**representing** 341:7
**requested** 396:6
**require** 364:4
**rescue** 376:25 377:1
**resolution** 345:11
**resolved** 341:20
**respond** 335:16
**responded** 334:24
**responses** 328:9 337:10
**responsibility** 396:8
**restraint** 368:13 389:4
**restricted** 352:3 365:17 392:3
**restricting** 357:22
**restrictions** 381:23
**result** 394:18
**returned** 396:15 396:19
**review** 336:13 353:13,15 364:4 396:8
**reviewed** 347:16 347:21 352:16,17 352:19 388:8
**ride** 383:11
**right** 330:10 331:8 332:2 334:2,20 335:5,12,21 336:2 336:19 338:12,14 338:24 339:6,10

339:14,18 341:1 345:3,21 346:5,8 346:19 349:20 351:9,21 352:14 352:24 353:17 354:12 355:17,23 356:14,17,23 357:12 358:24 359:23 360:2,12 360:22 361:8,13 361:17 362:23 363:10 364:25 368:14,19 369:4,7 370:12,25 374:3 375:13 376:18 377:6,21 378:25 381:25 382:4 383:13 384:3,10 384:14 385:21 386:1,13 387:15 388:10 390:4,11
**rights** 348:14
**ringer** 356:9
**road** 326:21 327:5 327:18
**robert** 327:16
**robinson** 326:24 353:18 394:24 395:25
**rock** 331:1,23 351:25 360:24,25 363:15 365:19,25 365:25 366:2,7,16 367:10,19,21,25 368:17 369:18 370:3,9,18,20 371:5 376:3,4,10 379:2,24,25 380:5 380:9,22 381:20 384:19 388:15

**rocker** 341:4,11 343:18
**rockers** 340:24
**role** 331:25 334:15 334:18 335:9,13 338:20
**roll** 355:19,19 357:8,10 365:20 366:6,8,23 367:10 367:21 368:6 369:8,17,21 370:2 370:8,9,19,21 375:5,20,24 376:2 379:3 380:1,6 383:15,20 384:4,6 392:8
**rolling** 355:12 372:23 375:2 376:11 381:15,24 382:3,5,7,23 383:24
**rollover** 376:5
**rolls** 381:1,9
**roswell** 396:24
**rough** 353:15,19 353:23
**roughly** 360:24
**rule** 391:4 397:6
**rules** 334:10 395:3 397:6
**run** 383:9
**rundell** 353:12
**rundell's** 354:6

**s**

**s** 395:1,1
**safety** 378:13
**salt** 335:21 362:9
**saw** 354:16 376:7 381:16 385:4
**saying** 331:13 336:21,23 338:15

356:24 365:6
366:10,12 367:19
**says** 391:18
**scheduling** 353:11
**scholarly** 335:23
**scientific** 378:23
379:1 388:13,18
388:22 391:21
**scientifically**
375:11
**scientist** 356:18
375:9
**scope** 334:12
**screen** 337:17
386:22,24
**seal** 396:16
**seating** 339:16
**second** 351:18
**section** 344:16
345:5 373:1
**see** 331:13 336:24
344:24,25 347:6
351:23 357:17
358:14 371:15
374:11,25 375:1
376:8 377:16,17
378:4,6 379:14
385:14,22 389:6
**seeing** 337:3 338:4
385:18
**seen** 337:24 338:2
338:11 354:18
356:2,13 368:10
374:4,13,22
**selecting** 378:18
**semi** 369:8
**send** 396:17,23
**sending** 390:8
**sense** 331:17
354:19 359:3

**sent** 338:6 347:14
353:1 362:12
**sentence** 348:1
351:18
**september** 326:16
329:2 332:4,5,6
362:9 394:21
**services** 395:11,17
**session** 362:20
**set** 389:6,10
**sets** 334:1,11
**settled** 342:13
**seventeenth** 328:8
337:9
**share** 337:19
**shared** 337:19
**shift** 390:13
**shorthand** 326:25
**shoulders** 384:11
**show** 364:11 373:1
373:3 377:8
381:17 382:6
385:1,9,9 387:21
**showed** 381:19
382:6
**showing** 368:5
**shown** 349:23
377:7
**shows** 386:6,8,19
**shriner** 352:24
**side** 339:7,8,9
354:11 361:24
363:5,10,15
369:12 372:11
**sides** 331:7
**sidewalls** 372:12
381:23
**sideways** 376:23
**sids** 332:9,15
338:14,17,20
339:23 340:4,7,12

340:21 341:1
**sign** 396:7
**signature** 394:22
395:24 396:2,21
399:14
**signed** 396:12,15
396:19
**significant** 373:11
**significantly** 363:5
**silly** 344:7
**similar** 347:18
383:21
**simple** 348:25
**simply** 365:4
**singhose** 326:14
328:3,15,16 329:5
329:20 330:6
333:10 337:23
343:10 364:2
370:16 380:9
381:14 382:14
392:21 393:1
394:7 395:2 396:2
**singhose's** 363:22
**single** 367:20
**sir** 379:12 381:3
391:13
**sit** 341:1
**sitting** 343:15
**situations** 364:24
**six** 357:11 382:17
**skill** 383:24
**sleep** 379:4,8,11
380:7,8,21,23
**sleeper** 331:2,24
341:4,11 343:17
352:1 360:25
361:1 363:15
365:19,25 366:1,2
366:8,17 367:20
367:25 368:17

369:18 370:3,9,19
370:20 371:6
376:3,4,11 379:2
380:10,22 381:21
388:15
**sleepers** 338:24
**sleeping** 331:2
332:15 340:11,13
340:23
**small** 377:22
**smith** 340:20
**smothered** 391:13
**smothering**
390:18 391:10,19
391:23 392:1,7
**snippets** 371:16
**snow** 346:2
**sockets** 384:19
**soft** 365:9 366:17
385:10,11,23
387:23 390:20
392:2
**sold** 347:2 351:12
**solutions** 395:9,9
395:12,15,21
**son** 369:2 373:10
374:6 386:15
387:3
**sorry** 329:16
342:21,21,23
356:5,20 360:16
380:1 381:14
382:20 385:16
388:16 390:22
**sort** 334:11 337:3
344:6 347:14,23
358:13 361:5
363:4,9,14 366:14
387:19
**sorts** 339:13
387:12

sound 344:4,7
sounds 346:24
sources 356:21
southern 343:1
special 339:13
specialty 339:12
specific 340:18,22
  340:25 344:1,6,6
  371:18 379:23
  384:23
specifically 371:16
  374:10 380:4
  385:25
spent 337:4
sports 383:1,11
spot 387:9
stain 359:13
  362:25
standard 346:13
  347:9 348:5
  350:19
standards 345:20
  349:8
start 359:3,19,21
  361:6,6 369:23
  384:2,2 386:21
started 347:13
  374:5
starting 342:5
  358:4 360:5
  361:16,18 384:24
state 347:19 391:5
  394:3 395:2
stated 338:18
  394:8
statement 328:9
  337:11,24 359:9
  397:10
statements 354:22
states 326:1
  347:21,24

statics 366:25
  367:4,11
statute 348:5
statutes 347:15,20
  348:6 349:17
statutory 326:4
  348:13 349:2
stay 336:1 387:9
steep 363:16
  372:11
stenographic
  394:9
steps 358:7,10,11
  360:9
stick 381:13
sticking 372:9
stops 346:9
straight 363:12
  372:5
street 327:12
strike 364:7
  369:22 380:3
stronger 365:6
structure 366:25
  367:5,14 383:21
struggle 373:11,17
struggled 376:16
struggling 371:24
  378:12 385:5
stuck 365:16
  384:18
studied 332:16
studies 370:1
study 348:2
  362:13,17
stuff 343:3 352:20
submitted 333:4
subscribed 394:21
  399:16
substance 397:8

substitute 391:17
sudden 332:9,10
suffered 359:16
suffocate 359:15
suid 332:10
  338:14 339:24
  340:7,21
suite 326:21 327:5
  327:12,18 396:24
superior 383:19
superseding 350:8
supine 357:9,11
  365:20 366:9,23
  367:10 369:17
  370:2,8,10,20,21
  372:23 375:21
  376:11 379:3
  382:8,8 383:16
supplement 328:8
  337:9
supplemental
  335:8 364:5
support 372:14
  377:25 378:15,19
  379:20
supporting 371:12
supports 370:1
  378:17
supposed 380:15
sure 333:19
  334:21 336:10,20
  338:11,25 340:15
  341:8,17 342:2,13
  346:16 348:7
  349:5,15 354:7
  357:20 360:13
  361:4,14 364:14
  366:13 367:9
  370:13 374:19,22
  377:15 381:25
  390:6

surface 365:23,24
  366:24 367:1,3,5
  367:11,15,22
  374:3 380:23
  381:16 383:16
surfaces 355:13,14
  355:20,21 374:5,6
  379:4,8,11 380:7,8
  380:21
surrebuttal
  364:13
surroundings
  360:21
survey 377:3
sustained 361:10
swear 329:14,25
sworn 340:6
  399:16
syndrome 332:9
  332:10
systems 339:16

t

t 327:6,13,19
  394:1,1
take 335:10,12
  360:9 367:25
  373:23 393:2
taken 350:22
  358:10 362:12
  394:7
takes 358:8 365:13
talk 337:7 355:10
  360:7 383:25
talked 355:11,25
  359:10 370:17
  374:10 377:10
  384:17 388:2
talking 350:18
  360:8 364:14
  370:1 380:19
  385:12,13 388:6,7

**[tall - turn]**                                                                    Page 17

**tall** 382:16,17
**tape** 377:24
**team** 339:4
**technical** 348:9
  349:7 350:12,16
**tell** 336:10 341:2
  346:1 353:19
  383:3 390:10
**telling** 346:3
  375:18
**term** 346:21
  391:24
**terminology** 340:1
**terminus** 327:17
**terms** 332:15
  336:5 343:18
  345:2,24 353:2
  359:15 360:4
  364:16 365:18
  371:6 389:25
**test** 373:25 374:2,7
  375:12,13,14
  376:1,2,5 379:10
  379:10,18 380:9
  380:11,23
**tested** 379:13,14
  380:24 382:3
**testified** 332:7
  333:20 334:14
  340:10,20 341:3
  343:17 359:23
  362:21 363:8
  366:15 378:2
  387:5,21 391:2
**testifies** 391:9
**testify** 336:2
  361:21
**testifying** 330:2
  331:10 364:23
**testimonies** 340:23

**testimony** 332:11
  332:17,18 333:15
  336:18 339:19
  340:5,7,18,22
  350:25 357:1
  359:1 362:4,20
  363:7 387:20
  389:11 397:3,9
**testing** 369:9
  375:23,23,24
  376:7 379:7,15
  383:7 384:20,23
  385:1,13,15,17,24
  390:8
**tests** 368:15 369:2
  381:22
**texas** 327:13
**thank** 329:13
  331:15 332:2
  333:8 349:20
  356:10 370:16
  392:21,23 393:1,2
**theory** 375:13
  384:20
**thereto** 394:9
**thing** 335:24 374:8
**things** 340:24
  352:23 353:3,4
  360:10 362:19
  363:12 370:17
  375:7 378:19
  383:12 387:12
  388:25
**think** 331:20,25
  332:12 333:6,19
  334:3,7,16,22
  335:3 336:3,9,20
  336:22 337:1,2
  338:18 339:25
  340:15,17 341:17
  342:6 343:22

345:19,22 346:4
  350:1 351:5 354:3
  354:3,14 356:1,7
  358:2,20,25 359:6
  359:7 361:15
  362:5,11 363:6
  364:21 366:13,14
  367:17 368:10,15
  368:20,22 376:10
  376:20,23 378:1,1
  378:2 382:1,11
  383:25 385:24
  386:2,6 388:1
  389:3,9 390:25
  391:20
**three** 342:8,8,9,10
  342:12 343:13,17
  357:9 376:20
  382:25 385:25
**throat** 365:16
**time** 337:4 339:5,6
  342:9 343:6 347:3
  350:13,17 351:13
  353:10 363:11
  368:23 373:6,11
  373:18 374:6,15
  375:5 389:14
  392:22 393:3
  396:20
**times** 333:21,21,24
  357:6 367:7
**title** 337:8
**today** 337:5
  339:22 388:3
  392:22
**today's** 329:1
**told** 341:21 352:10
  356:7
**top** 340:14
**topic** 340:7

**torso** 383:21
  384:11
**tough** 363:13
**training** 348:10,12
  349:14,15,17
**transcript** 353:14
  353:16 354:15
  390:24,25 392:19
  394:7,12 396:8,17
  396:20 397:3
**transcripts** 353:19
  362:3
**trapped** 366:17
  376:9,10,18
  377:14
**traurig** 326:21
  327:12,17 395:10
**treetops** 354:25
**trial** 348:25
  350:20 354:24
  392:25
**tried** 346:21,22
  358:5,7
**true** 332:22
  333:18 340:18
  350:10 351:2
  354:23 355:14
  375:21 377:14
  390:1 394:12
**truthfully** 330:2
**try** 345:20 349:7
  371:24
**trying** 352:2 354:3
  354:19 376:17
  377:15,20 378:7
**tucson** 327:6
**turn** 363:18 366:3
  369:13 371:24
  376:21 378:8,9,13
  384:16

**turned** 352:2,21
361:16 363:5,9,14
363:16 376:16
387:22 392:11
**turning** 331:1
352:23 353:3,4
**two** 356:16 357:1
363:12 369:5
374:17,17 376:22

**u**

**u** 395:1
**unbreathable**
392:11
**uncertain** 362:23
388:5
**uncomfortable**
373:18
**underlying** 371:15
**undersigned** 397:2
**understand**
329:20 331:4
332:23 335:17
340:5 346:10,18
346:21 348:8
350:18 364:17
370:5 374:19
378:18 379:9
384:25 392:5
**understanding**
334:4 341:19
344:17 345:6
346:6,7 347:23
349:25 352:6
353:6 358:9,15
359:1 361:2,7
374:16 378:22
**understood** 348:4
**undisputable**
378:10
**unexplained**
332:10

**unfamiliar** 350:10
**unified** 347:23
**uniform** 389:25
**united** 326:1
347:24
**unnaturally**
363:14
**unobstructed**
363:17
**unrealistic** 363:19
**unreasonably**
347:3 351:12
**unreliable** 378:3,7
378:10 380:17
**unusual** 354:16
**use** 348:9 351:7
368:13 389:22
397:12
**useful** 378:15
**uses** 378:7
**usual** 395:22
**usually** 343:21

**v**

**v** 372:6
**valid** 375:11
**valley** 372:6
**valuable** 389:7
**variety** 383:11
384:6
**various** 375:25
388:9
**verbalizing** 354:6
**veritext** 395:8,9
395:12,15,21
396:13,23
**video** 371:9,14,16
371:23 376:6,6,15
376:20 377:7
385:8 393:5
**videographer**
327:24,25 329:1

329:13 393:3
**videos** 379:15
380:14,14,15,25
**videotape** 326:13
329:4 393:4 395:2
**viewing** 371:8
**vitae** 333:1
**volume** 326:12
329:5
**voluminous**
344:23
**vs** 326:7

**w**

**walk** 358:10
**wall** 363:15
**wanda** 326:24
394:24 395:25
**want** 337:20
346:23 358:10,23
360:8 364:14
373:1 374:11
377:19 378:16
380:16 381:25
383:16 386:23
390:13
**wanting** 373:22
**warning** 334:19
335:3
**warnings** 334:14
334:23,24,25
335:13,14 336:7
336:13
**watch** 374:8
**way** 336:16 340:17
351:2,6,7 357:19
367:17 382:8
384:7,13 387:23
389:19
**ways** 384:7
**we've** 330:4 333:6
345:6 368:10,19

368:19 386:24
387:5
**week** 343:5
**weigh** 382:18
**weights** 383:10
**went** 347:10 374:7
**wetmore** 327:5
**wheelchairs**
339:12
**whereof** 394:20
**wholly** 343:2
**wife** 357:2
**wiggins** 327:24
**wiggled** 376:23,24
**wiggling** 369:13
387:11
**william** 326:14
328:3,15,16 329:5
394:7 395:2 396:2
**willing** 349:18
**witness** 329:15,16
332:21,25 333:17
334:1 392:23
394:20
**wobbly** 384:12
**word** 351:20 377:1
**words** 366:13
373:9
**work** 338:2 341:22
348:6,17 349:1,7
351:8 353:1,21
359:22
**worked** 341:18
347:19 373:15
**working** 339:9
347:13 358:13
**wow** 344:1
**write** 338:10
**written** 350:2
389:8

William Singhose, Ph.D., Vol. II     September 27, 2021
In Re: Fisher-Price/Mattel

| | |
|---|---|
| **wrong** | 389:1 |

**y**

**yeah** 335:3 336:3
336:22 338:4
341:21 345:24
349:25 351:19
353:6,9 354:21
355:18,20 357:16
358:2 359:10
360:4,15 361:14
363:11 365:5,13
365:24 366:13
370:11,24 371:13
371:22 372:15
378:1 379:10
385:12 386:4,8
387:1 389:9
390:19
**year** 333:21 348:2
**years** 333:20
342:5,8,8,9,11,12
343:13,17 382:15
382:25
**youthful** 345:8,10

**z**

**z**■■ 330:24 359:8
360:21 361:10,12
362:21,22 363:2
388:3 390:17
391:12
**z**■■**'s** 331:11,16
331:22 352:8,12
352:16,17 363:9
365:2 387:20,22
389:5,12,18 391:3
**zoom** 327:1

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.