# EXHIBIT 34



Deposition of:

**Alison Vredenburgh, Ph.D.**

*September 22, 2021*

In the Matter of:

**In Re: Fisher-Price/Mattel**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

4     KATHLEEN COURKAMP, FOR HERSELF    )

      AND ON BEHALF OF OTHER STATUTORY )

5     BENEFICIARIES,                    )

                                        )

6          PLAINTIFF,                   )No. 2:19-cv-02689-

                                        )    GMS

7     v.                                )

                                        )

8     FISHER-PRICE, INC., A FOREIGN     )

      CORPORATION; MATTEL, INC., A      )

9     FOREIGN CORPORATION,              )

                                        )

10         DEFENDANTS.                  )

      _____ )

11

12

13

14

15

16          VIDEO-RECORDED DEPOSITION OF

17           ALISON VREDENBURGH, Ph.D.

18          WEDNESDAY, SEPTEMBER 22, 2021

19

20

21

22    JOB NO. 4777696

23    REPORTED STENOGRAPHICALLY BY:

24

25    MARY K. MEDLEY, CSR NO. 9557

Alison Vredenburgh, Ph.D.                                September 22, 2021
In Re: Fisher-Price/Mattel

---

Page 2

```
 1   VIDEO-RECORDED DEPOSITION OF ALISON VREDENBURGH,
 2   Ph D , TAKEN ON BEHALF OF THE DEFENDANT, AT
 3   10:55 A M , WEDNESDAY, SEPTEMBER 22, 2021, AT
 4   3075 CARLSBAD BOULEVARD, CARLSBAD, CALIFORNIA,
 5   BEFORE MARY K  MEDLEY, CSR NO  9557
 6
 7   APPEARANCES OF COUNSEL:
 8
 9   FOR THE PLAINTIFF:
10       GOLDBERG & OSBORNE LLP
11       BY: JOHN E  OSBORNE, ESQ
             (PRESENT VIA VIDEOCONFERENCE)
             698 EAST WETMORE ROAD, SUITE 200
12       TUCSON, ARIZONA 85705
             (800) 843-3245
13       JOSBORNE@GOLDBERGANDOSBORNE COM
14
15   FOR DEFENDANTS MATTEL, INC , AND FISHER-PRICE, INC :
16       GREENBERG TRAURIG, LLP
         BY: BRANDON COX, ESQ
17       BY:  BRADY HERMAN, ESQ
             3333 PIEDMONT ROAD NE, SUITE 2500
18       ATLANTA, GEORGIA 30305
             (678) 553-2100
19       COXB@GTLAW COM
20
21   ALSO PRESENT:  JOHN SISSON, VIDEOGRAPHER
22
23
24
25
```

Page 3

```
 1              INDEX
 2   DEPONENT      EXAMINATION           PAGE
 3   ALISON VREDENBURGH, Ph D
 4           BY MR  COX            7
 5
 6
 7              EXHIBITS
 8   NO    PAGE      DESCRIPTION
 9   EXHIBIT 1   307    AMENDED NOTICE OF VIDEOTAPED
                        DEPOSITION OF ALISON
10                      VREDENBURGH, PHD
11   EXHIBIT 2   307    ALL DOCUMENTS PRODUCED BY
                        DR  VREDENBURGH FOR
12                      DEPOSITION
13   EXHIBIT 3   307    EXPERT REPORT, APRIL 1, 2021
14   EXHIBIT 4   307    SUPPLEMENTAL EXPERT REPORT,
                        JUNE 7, 2021
15
     EXHIBIT 5   307    REBUTTAL EXPERT REPORT,
16                      JULY 12, 2021
17   EXHIBIT 6   307    PHOTOGRAPH OF ROCK 'N PLAY
                        SLEEPER WARNING LABEL
18
     EXHIBIT 7   307    EXCERPTS OF DEPOSITION OF
19                      ROBERT RAUSCHENBERGER, PH D
20   EXHIBIT 8   307    ORDER GRANTING DAUBERT
                        MOTIONS AND DISMISSING
21                      THIRD-PARTY COMPLAINT IN
                        SHALABY V  IRWIN
22
     EXHIBIT 9   307    IN-HOME TESTING SURVEY,
23                      JUNE/JULY 2009
24   EXHIBIT 10A 307    INVOICE DATED 6-30-20
25   EXHIBIT 10B 307    INVOICE DATED 5-29-20
```

Page 4

```
 1           EXHIBITS (CONTINUED)
 2   NO       PAGE          DESCRIPTION
 3   EXHIBIT 10C   307      INVOICE DATED 4-30-20
 4   EXHIBIT 10D   307      INVOICE DATED 2-26-21
 5   EXHIBIT 10E   307      INVOICE DATED 4-1-21
 6   EXHIBIT 10F   307      INVOICE DATED 5-31-21
 7   EXHIBIT 10G   307      INVOICE DATED 7-1-21
 8   EXHIBIT 10H   307      INVOICE DATED 8-1-21
 9   EXHIBIT 10I   307      INVOICE DATED 11-30-20
10   EXHIBIT 10J   307      INVOICE DATED 12-30-20
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1       WEDNESDAY, SEPTEMBER 22, 2021; 10:55 A.M
 2           *****
 3       THE VIDEOGRAPHER:  Good morning.  We're on the
 4   record.  It's now 10:55 in the morning on
 5   September 22 of 2021.
 6       This begins the deposition of Alison
 7   Vredenburgh, Ph.D., taken by counsel for the
 8   defendants in the matter of Kathleen Courkamp versus
 9   Fisher-Price Incorporated and Mattel Incorporated in
10   U.S. District Court, District of Arizona, Case
11   Number 2:19-CV-02689GMS.
12       This deposition is being taken at Carlsbad
13   Inn Beach Resort, 3075 Carlsbad Boulevard in
14   Carlsbad, California.
15       My name is John Sisson with Veritext Legal
16   Solutions, and our court reporter today is Katie
17   Medley, also with Veritext.
18       Will counsels please now state your
19   appearances and whom they're here for.
20       MR. OSBORNE:  This is John Osborne on behalf of
21   Katie Courkamp and Andrew Olson.
22       MR. COX:  Brandon Cox from Greenberg Traurig on
23   behalf of Mattel and Fisher-Price.
24       MR. HERMAN:  Brady Herman on behalf of --
25       MR. OSBORNE:  Okay.
```

2 (Pages 2 - 5)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

---

Page 6

1     MR. HERMAN:  -- Fisher-Price and Mattel.
2     THE VIDEOGRAPHER:  Thank you very much --
3     MR. OSBORNE:  I'd like to go on the record to
4  just briefly say that, Brandon, you know, I know we
5  had a number of technical difficulties this morning.
6  I can hear Brandon actually pretty darn well, but
7  Dr. Vredenburgh is pretty -- is not as good as
8  Brandon.  I don't know why, but it's -- that's the
9  way it is.  So I just want to put on the record if I
10 don't think I heard something, I'm going to have to
11 interrupt, and I apologize in advance for that.
12    MR. COX:  That's no problem, John.  I
13 appreciate that.  I think it's just that I might be
14 speaking a little bit louder than Dr. Vredenburgh.
15    MR. OSBORNE:  Okay.  Thank you.
16    MR. COX:  You're welcome.
17    MR. OSBORNE:  Go ahead.
18
19         ALISON VREDENBURGH, Ph.D.,
20    having been first duly sworn by the reporter,
21       was examined and testified as follows:
22
23    (Continued on following page.)
24
25

---

Page 7

1              EXAMINATION
2  BY MR. COX:
3     Q.  Good morning, Dr. Vredenburgh.  How are
4  you?
5     A.  All right.  How are you?
6     Q.  I'm doing well.  Thank you.
7        My name is Brandon Cox, I'm an attorney
8  from Greenberg Traurig, and I represent Mattel and
9  Fisher-Price in a lawsuit that Plaintiff Katie
10 Courkamp has filed against them.
11       You understand that that's the purpose of
12 the deposition today?
13    A.  Yes.
14    Q.  I understand that you have been deposed
15 hundreds of times before today; is that right?
16    A.  Yes.
17    Q.  So I'll dispense with the normal rules of
18 the deposition assuming that you understand them.
19 The most important one is if for some reason you
20 don't understand a question that I ask, if you can
21 just let me know and I'll be more than happy to
22 rephrase it.  Otherwise, I'll assume that you
23 understood the question.  Is that fair?
24    A.  In the moment.  And if I didn't understand
25 it, I'll correct it.

---

Page 8

1     Q.  I appreciate that.
2        And just to clarify, this is the first time
3  that you and I are meeting today; correct?
4     A.  Yes.
5     Q.  Okay.  Can you let us know what your
6  professional address is for the record.
7     A.  2588 El Camino Real, Suite F353, Carlsbad,
8  92008.
9     MR. OSBORNE:  All right.  I'm not hearing
10 anything at all right now.
11    MR. COX:  I haven't asked anything, John.
12    MR. OSBORNE:  Oh, I'm sorry.
13    THE WITNESS:  The microphone's facing you --
14    MR. OSBORNE:  Turn it around.  That might be
15 better.  She's really bad.
16    THE WITNESS:  I think I have a thicker mask.
17    MR. OSBORNE:  That is much better.
18    MR. COX:  Awesome.  And I'll speak very, very
19 loudly.  Are you still able to hear me well?
20    MR. OSBORNE:  I am.
21    MR. COX:  Perfect.
22    Q.  I understand from Plaintiff's disclosure
23 that you've been identified as an expert in human
24 factors.  Is that fair?
25    A.  Yes.

---

Page 9

1     Q.  Before this particular case on which we'll
2  be talking today and that you've rendered opinions,
3  have you worked with John Osborne or anyone from his
4  firm?
5     A.  Yes.
6     Q.  On how many other occasions?
7     A.  I've testified in deposition once for him.
8     Q.  So one other deposition testimony that you
9  can --
10    A.  Yes.
11    Q.  -- think of?
12    A.  No trials, one deposition.
13    Q.  Did you also prepare an expert report in
14 that particular case?
15    A.  Yes.
16    Q.  What was the type of case for which you
17 provided expert opinions?
18    A.  A garbage truck.  An injury from a -- a
19 worker picking up green waste.
20    Q.  In that case, were you providing opinions
21 on behalf of the plaintiff or the defendant?
22    A.  Plaintiff.
23    Q.  If you remember, where was that case
24 pending?
25    A.  I think in Arizona.

---

3 (Pages 6 - 9)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 10

1     Q. State court or federal court, if you
2  remember?
3     A. I don't know.
4     Q. About how long ago was that?
5     A. The deposition?
6     Q. Yes.
7     A. A few weeks ago.
8     Q. And about how long has it been since you
9  prepared your expert report in that case?
10    A. Which one?
11    Q. Were there more than one expert reports
12 that you prepared in that case?
13    A. Yes.
14    Q. How many did you prepare?
15    A. Two.
16    Q. What were they?
17    A. A report and a rebuttal report.
18    Q. In general, approximately how long ago has
19 it been since you prepared the rebuttal report?  I
20 assume that came after the expert report.
21    A. Maybe a month and a half.
22    Q. And if you can take me back to the time, if
23 you remember, that you prepared the original report,
24 about how long ago has that been?
25    A. Within the year.

Page 11

1     Q. Before that particular case, had you ever
2  worked on any other cases that involved John Osborne
3  or anyone from his firm?
4     A. Before that, no.  Well, this case,
5  Clayton -- I mean Courkamp.
6     Q. I understand you worked on one other case
7  involving a garbage truck situation of sorts, and
8  you've also been retained to provide opinions in
9  this case.  Are there any other cases that you've
10 been retained by John Osborne or anyone at his firm
11 to serve as an expert witness?
12    A. I've been retained but have not testified
13 on one other case.
14    Q. And without telling me any of the substance
15 or conversations that you had with John or anyone at
16 his firm, when were you retained on that particular
17 case that you're referring to?
18    A. I'd say within a year.
19    Q. Do you know if that case is pending in
20 state or federal court?
21    A. I don't know.
22    Q. This is perhaps an obvious question, but
23 just want to make it clear.  Do any of the cases
24 that we discussed, except for the Courkamp case,
25 involve the Rock 'n Play Sleeper?

Page 12

1     A. Only the current case.
2     Q. So the other two cases that we discussed,
3  the one for which you've already testified and the
4  one that you've been retained but not yet testified,
5  neither of those involve the Rock 'n Play Sleeper;
6  correct?
7     A. Yes.
8     Q. Do you plan to serve as an expert witness
9  in any case involving the Rock 'n Play Sleeper
10 generally?
11    A. Yes.
12    Q. For whom?
13    A. For this case.
14    Q. Aside from this case that we're talking
15 about today, do you have any intentions on serving
16 as an expert witness for any other plaintiff's
17 counsel in a case involving the Rock 'n Play
18 Sleeper?
19    A. No.
20    Q. How were you first contacted about this
21 particular case?
22    A. Either by e-mail or a phone call.
23    Q. From who?
24    A. I believe Kristin Shriner contacted me.
25    Q. Do you know how Kristin Shriner got ahold

Page 13

1  of your contact information?
2     A. Usually they're referrals.  I don't
3  independently contact.
4     Q. Referrals by whom?
5     A. Other attorneys.  Possibly things I've
6  written.
7     Q. When approximately was the first time that
8  you were contacted by Kristin Shriner about this
9  case?
10    A. I'd say more than a year ago.
11    Q. What were you asked to do in terms of
12 serving as an expert in this case?
13    A. Give a human factors and safety evaluation
14 of the Rock 'n Play Sleeper.
15    Q. Before that conversation with Kristin
16 Shriner more than a year ago, had you ever heard of
17 the Rock 'n Play Sleeper?
18    A. Yes.
19    Q. How had you heard of it?
20    A. From conferences, from the news.  It's
21 pretty well-known.
22    Q. Had you personally ever used the Rock 'n
23 Play Sleeper?
24    A. No.
25    Q. And from the conferences that you have

4 (Pages 10 - 13)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 14

1   attended and heard about the Rock 'n Play Sleeper,
2   can you tell me generally what were you learning?
3       A. From the Human Factors and Ergonomics
4   Society, there's often presentations about products
5   that are unsafe for infants and children, and that
6   is one of the products that has been talked about.
7       Q. Are you a member of the Human Factors and
8   Ergonomics Society?
9       A. Yes.
10      Q. For how long have you been a member?
11      A. Probably close to 30 years.
12      Q. When would the presentation related to the
13  Rock 'n Play Sleeper have occurred at one of its
14  meetings?
15      A. I think it's been way more than once.
16  There's regular presentations. I don't remember
17  when the first or the last one was. But I've also
18  spoken with members of HFES, including the CPSC,
19  about the Rock 'n Play and a couple other products.
20      Q. What have you spoken to them about the
21  Rock 'n Play?
22      A. About the injuries and deaths to infants
23  and the design -- the human factors issues of it.
24      Q. And so what specific human factors issues
25  were you discussing with those individuals?

Page 15

1       A. The management or the lack of management,
2   the fact that it shouldn't be on the market,
3   essentially, and the process that was happening in
4   the background as far as removing it from the
5   market.
6       Q. Do you remember what specific CPSC
7   individuals with whom you spoke about that?
8       A. No, I don't. There were two women that
9   were there that I spoke with. It was probably more
10  than ten years ago, and I don't recall now who it
11  was. They were attending the HFES meeting, and we'd
12  been in a session, and I think they stopped me in
13  the hall afterwards, but I don't recall who now.
14      Q. You said this was about ten years ago?
15      A. Maybe a little less. It -- everything
16  feels like a time warp since COVID, so I don't
17  remember when, but it was, I'd say, more than four
18  years ago. I don't know how long.
19      Q. So approximately more than four years ago,
20  you were at a Human Factors and Ergonomics Society
21  meeting, and you recall having a discussion with two
22  women from the CPSC about the Rock 'n Play Sleeper;
23  true?
24      A. I know for sure one of them was from CS --
25  CPSC, and one of them may not have been from CPSC.

Page 16

1   We were talking as we walked to the next session,
2   and we spoke for a few minutes about it. And it had
3   been talked about in a session, but I don't recall
4   specifically who it was now.
5       Q. Are the Human Factors and Ergonomics
6   Society meetings annually?
7       A. Yes.
8       Q. How does one become a member of the Human
9   Factors and Ergonomics Society?
10      A. There's different levels. So to be a full
11  member, you need a certain level of education, and
12  then you apply, and if -- you need documentation and
13  you need work experience. There's level -- there's
14  lower levels as well, including a student level.
15      Q. Are all of the members, regardless of their
16  level, allowed to attend the meetings?
17      A. Yes. You don't have to be a member to
18  attend. You can also attend as a nonmember.
19      Q. Do you remember who was presenting
20  specifically about the Rock 'n Play Sleeper?
21      A. No. I think that it was a panel, and there
22  were -- there were maybe four different devices, and
23  that was one of them.
24      Q. Do you recall what the other three devices
25  were in that presentation?

Page 17

1       A. Think one might have been a sling. I can't
2   remember what the other ones are anymore.
3       Q. Were the other three products, to the best
4   of your memory, infant products?
5       A. Yes, or young child. I think one of them
6   might have been about magnets or something.
7       Q. Was the general nature of the presentation
8   to inform members who were present at the meeting
9   about certain risks or hazard associated with those
10  products?
11      A. Well, it's two other human factors
12  professionals and professors, and so it's to discuss
13  the issues, present the background. And again, it
14  depends. A lot of it is research, and then some of
15  it is also background of what's happening with --
16  with certain products.
17      Q. After that meeting and before you were
18  contacted by Ms. Shriner, did you conduct any
19  independent research about the Rock 'n Play Sleeper?
20      A. No.
21      Q. Did you conduct any independent research
22  about any of the three infant products about which
23  you learned that day?
24      A. I've worked on a magnet case.
25      Q. Other than the magnet case, had you

5 (Pages 14 - 17)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 18

1  conducted any independent research about any of the
2  infant products you heard at that particular
3  meeting?
4      A. I don't think so.
5      Q. Did you review the opinions of any of the
6  plaintiff's other experts to -- in preparing your
7  opinions in this case?
8      A. I did review a plaintiff's expert report.
9      Q. And my question might have been a little
10  bad there. I'm referring to you -- the process of
11  you preparing your own report, had you reviewed any
12  plaintiff's expert report during that process, so
13  before you signed your report and submitted it to
14  plaintiff's counsel.
15      A. I don't recall that I had it before I wrote
16  my report.
17      Q. Is it possible that you did have a
18  plaintiff's expert report before you --
19      MR. OSBORNE: I can't hear your question. "Is
20  it possible," and then it dropped off.
21      MR. COX:
22      Q. Is it possible that you did have another
23  plaintiff's expert's report before you completed
24  your own?
25      A. If I reviewed it, it would be listed in my

Page 19

1  list of documents reviewed.
2      Q. If another plaintiff's report is not listed
3  in your documents reviewed at the beginning of
4  any -- of your original report, would it be fair to
5  say that you likely did not review any of those
6  reports?
7      A. Yes.
8      Q. Did Kristin Shriner or anyone at her firm
9  provide you with any facts or assumptions for you to
10  consider in forming your opinions in this case?
11      A. She provided me with discovery that
12  included facts. She didn't tell me to make any
13  assumptions.
14      Q. After Ms. Shriner contacted you -- this is
15  about more than a year ago -- were you provided any
16  documents related to this case?
17      A. Yes.
18      Q. Did Ms. Shriner send you documents, or did
19  you specifically ask her for certain documents?
20      A. I was given a link with documents.
21      Q. After you were given that link with
22  documents, did you at any point follow up with
23  Ms. Shriner or anyone at her firm to ask for
24  additional documents?
25      A. I don't think I did in this case. They

Page 20

1  gave me a very large volume. It seemed complete at
2  that time. Obviously, after that, I've continued to
3  receive documents.
4      Q. And in general, your experience, 30 years
5  or so being an expert, if at any point you feel that
6  you need additional documents or something might be
7  missing, I assume you would ask the attorney about
8  those documents; true?
9      A. True. Like, sometimes I'll read a report
10  of someone, and they'll have read a deposition, and
11  then I'll ask for it. And oftentimes they'll think
12  they had sent it, and then they do send it at that
13  time. That would be an example.
14      Q. And the example you just provided, you
15  might read another report and see that a deposition
16  transcript has been mentioned. That might occur
17  after you've written your own report. Is that fair?
18      A. Yes.
19      Q. Do you know if that happened in this
20  particular case, that being you prepared your
21  report, you gave it to plaintiff's counsel, then you
22  reviewed some other reports and asked for additional
23  documents based on your review of those other
24  reports?
25      A. I don't recall that happening in this case.

Page 21

1      Q. After you prepared and turned in your
2  original report in this case, I think you mentioned
3  you started receiving additional documents. Did I
4  understand that correctly?
5      A. Yes.
6      Q. Are there specific documents that you
7  remember receiving after you prepared your original
8  report that you had not had before then?
9      A. I believe I received some deposition
10  transcripts from Dr. Deegear and other documents
11  that are listed in the supplemental report and
12  rebuttal report. So if they're listed, then I
13  received them after.
14      Q. And we'll get into both your original
15  report, your supplemental report, and your rebuttal
16  report. I'm just trying to get the general
17  landscape of what you remember.
18      MR. OSBORNE: That question was too low for me
19  to hear.
20      MR. COX:
21      Q. We'll get into your other reports. I just
22  wanted to understand generally what you remember
23  from memory. Is that fair?
24      A. Okay.
25      Q. Thanks.

6 (Pages 18 - 21)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 22

1    My understanding from researching you is
2    that you've been doing litigation consulting work
3    for about 30 years or so. Is that generally fair?
4       A. Yes.
5       Q. How did you get involved in doing
6    litigation consulting?
7       A. I was -- I met someone who worked for
8    Dr. Harvey Cohen, and he was recruiting somebody who
9    had the MS degree that I had, specifically the one I
10   had from USC, and she learned that I had that
11   degree, and she asked if she could contact Dr. Cohen
12   with my name. And then Dr. Cohen's office contacted
13   me and asked if I'd be willing to come in for an
14   interview. I had just moved down to San Diego at
15   that time.
16      Q. At some point, were you working with
17   Dr. Cohen's company or for him?
18      A. I was a vice president of his company when
19   I left there, so, yeah, I was recruited by him at
20   that point and was hired at that -- pretty much
21   right away and then worked my way up to vice
22   president and then started my own company.
23      Q. When you first started at Dr. Cohen's
24   company, was his company focused exclusively on
25   litigation consulting work?

Page 23

1       A. Well, his company and my company does
2    industry consulting, litigation consulting,
3    research, publishing. And I did all those with him.
4    I also ran their internship program. The Ph.D.
5    candidates did internships at his firm, which
6    started as Cohen and Associates and was Error
7    Analysis Incorporated at the time that I left.
8       Q. You talked about industry consulting. Is
9    there a difference, at least in your mind, between
10   industry consulting and litigation consulting?
11      A. Yes.
12      Q. What would you say is the difference
13   between the two?
14      A. The product or environment's not in
15   litigation. It could be a pharmaceutical company
16   that wants help with an issue, injuries that are
17   happening in a certain workplace where OSHA might
18   have come in, training -- they want us to come in
19   and do some training. But in each of those cases,
20   I'm not contacted by the attorney, I'm contacted by
21   the company.
22      Q. Do you still do that type of industrial
23   consulting today?
24      A. Yes. In fact, I'm currently working with a
25   company.

Page 24

1       Q. If you had to break down the amount of
2    work -- or amount of time, rather, you spend on
3    industry consulting versus litigation consulting,
4    what would that division of time be?
5       A. It really varies so much. It's hard to --
6    to quantify. This last month, we put a lot of time
7    into a certain new -- I can't really talk about it
8    at this point, but a new product that is sort of a
9    healthcare product that is not on the market yet,
10   and I'm working with the manufacturer on that, as
11   well as all of my people are.
12      So that would be an example. And it really
13   goes up and down, how much time I have, depending on
14   what's happening with conferences. And I've been a
15   leader of Human Factors and Ergonomics Society for a
16   good part of my 30 years in one capacity or another,
17   so mentoring, presenting, writing book chapters,
18   things like that in addition to the litigation work.
19      Q. And recognizing that it's variable and it
20   might depend from year to year, if we just were to
21   look at, say, for example, the last several years,
22   what would be your best estimate in terms of the
23   percentage of time spent on industry consulting work
24   versus litigation consulting work?
25      A. I'd say my litigation, timewise, would be

Page 25

1    somewhere between 40 and 60, but sometimes it's 70,
2    just depending on the month.
3       Q. And I don't want to assume that the
4    industry consulting and litigation consulting are
5    sort of the only two umbrellas of work. Are there
6    other areas of work that you do outside of those
7    two?
8       A. Yeah. I'd say a good part of my time is in
9    mentoring, speaking at conferences, leadership,
10   training the next generation. And come June, that's
11   going to be most of my time. I'm going to stop
12   taking most new work come June, so that will be when
13   I start doing a lot more mentoring and writing and a
14   lot less other work, and supervise the people
15   working under me and train them more.
16      Q. And this is June of 2022?
17      A. Correct.
18      Q. Is there a reason that that decision sort
19   of came about?
20      A. Yes. My husband's retiring, and it's time
21   for me to take a break. I've worked too hard.
22      Q. Fair enough.
23      In your litigation consulting work, what
24   would you say is the breakdown of the amount of time
25   you spend serving as an expert on behalf of the

7 (Pages 22 - 25)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 26

1  plaintiffs versus the defendants.
2      A. I'm retained about evenly. For whatever
3  reason, I've testified more --
4      MR. OSBORNE: All right. I could not hear
5  that.
6      THE WITNESS: Let me get closer.
7      MR. OSBORNE: I'm sorry. Dr. Vredenburgh, I --
8  your voice dropped below the mic level.
9      THE WITNESS: Sorry. I keep scooting back.
10     I'm retained about evenly, but for whatever
11 reason this last year I've testified more for the
12 plaintiff, and I think the year before I testified
13 more for the defense. But at the time of retention,
14 it's about even.
15     MR. COX:
16     Q. Does most of your work come from referrals?
17     A. I don't always know. I would say this last
18 year, it's almost all referrals. Sometimes it's
19 through the -- probably the website. So that --
20 that would be the two main ways that I know of.
21     Q. I've read in one -- several deposition
22 transcripts you've given in the past that you don't
23 really advertise yourself, but you, of course, have
24 a website, and if people want to go to the website
25 and learn about you, they can. But there's no

Page 27

1  service or anything like that where you specifically
2  advertise your services. Is that a fair
3  understanding?
4      A. Right. We don't optimize. We don't pay
5  Google anything to be up higher. It's just so that
6  people can pull the CV off and get the information
7  basically to cut the time we have to spend on the
8  phone for them to determine whether or not anyone in
9  my firm might be suitable for what they're looking
10 for.
11     Q. We'll take a look at your website, at least
12 some snippets of your website, a little bit later.
13     Are there particular products, services
14 that you provide where you'd consider yourself to be
15 more of an expert in as opposed to some others?
16     A. Well, I think we really know a lot about
17 disabilities; mobility assistive devices; a lot of
18 stuff relating to children, especially children with
19 differences; schools and consumer products and
20 industrial products, workplace injuries.
21     The user -- a lot of it's user interface
22 and hazard management and expectations, transfer of
23 learning between products and vehicle incidents,
24 vehicle collisions, especially between
25 vehicle-pedestrian, vehicle-bicycle, motorcycle.

Page 28

1      Q. I understand that you received your Ph.D.
2  in industrial organizational psychology; correct?
3      A. Yes.
4      Q. Can you tell the jury what that means.
5      A. Industrial organizational psychology is
6  broad. The -- my focus, because I was already the
7  vice president of a consulting firm at that time,
8  was for user interface, injury prevention, risk
9  management programs, which is what my dissertation
10 was on. And -- and my post doctoral work was also
11 in that area.
12     So if you're asking generally, some people
13 focus more on personnel issues and motivation,
14 things like that. My focus was on worker safety and
15 injury prevention and what management practices can
16 be used to reduce injuries for employees and also
17 patient safety for my post doc.
18     Q. And I know from having read many of your
19 transcripts from other cases that that appears to
20 have been an area of at least interest of yours at
21 some point. Did you become interested in products
22 liability cases such as the one that we're talking
23 about today?
24     A. I don't understand your question. Did I
25 become -- of course I became interested in them.

Page 29

1  I'm working on it.
2      Q. Perhaps a bad question, and I apologize.
3      At some point, did you decide that product
4  liability cases were an area of interest that you
5  wanted to pursue as well?
6      A. Well, I started with injury prevention
7  programs at Hughes Aircraft Company, which was my
8  first job out of college. They put me through my
9  master's at USC. And at this point, I was running
10 the emergency preparedness program at Hughes, as
11 well as performance improvement and injury
12 prevention issues at Hughes Aircraft Company at that
13 point in time, and some of it had to do with the
14 equipment. It wasn't consumer products generally,
15 it was equipment that was being used at Hughes.
16     And then, over time, attending human
17 factors and ergonomics society conferences, I
18 learned a lot about consumer products and the --
19 there's also the -- a big issue of home health. So
20 you take a lot of products that were initially used
21 in hospital environment by expert users, but now we
22 can order pretty much anything online. Even
23 prescription medical devices you could get online
24 very easily.
25     So all of a sudden, either the doctors are

8 (Pages 26 - 29)

Alison Vredenburgh, Ph.D.
September 22, 2021
In Re: Fisher-Price/Mattel

Page 30

1  sending it home or people are ordering these
2  devices. But we're taking devices that had been
3  used by very sophisticated people and are now being
4  used at home. And I got interested in that area of
5  home health and transfer, and then that spread on to
6  other devices.
7      I also got a lot into disability work, and
8  some of that had to do with the assistive devices
9  used there and limitations. Tip-over is a huge
10 issue for them. So it kind of just this -- over 30
11 years, it kind of spread into those different areas.
12     Q. Sure. When, if you remember, would have
13 been the first time that you were either hired to
14 consult on or serve as an expert in a case involving
15 a consumer product?
16     A. Probably 25 years ago.
17     Q. If we narrow that more specifically to a
18 case involving an infant product, would that time
19 frame vary?
20     A. I have no idea. I was at that time at
21 Error Analysis, or possibly Cohen and Associates at
22 that point in time, and I don't recall which cases
23 were my first cases as far as products.
24     Q. Does a particular infant product stand out
25 to you as being one of the first cases on which you

Page 31

1  were hired to either consult from an industry
2  consulting standpoint --
3      MR. OSBORNE: Brandon, you dropped -- your
4  voice dropped out completely in the middle of that
5  question. Would you please restart it. Thank you.
6      MR. COX:
7      Q. At some point, do you recall having first
8  worked on a product involving an infant -- an infant
9  product, either from a consulting standpoint or as
10 an expert in litigation?
11     A. I don't know which product or when. I
12 think we started with children first, and then we
13 moved to infants.
14     I do remember a children's -- like a
15 preschool case with scissors that were marketed to
16 children that were so sharp that they amputated a
17 finger, and then we did testing on them, and they
18 were sharper than the adult -- the ones marketed for
19 adults. That one really stands out in my mind. So
20 those weren't infants, they were preschoolers.
21     As -- I don't recall which is my first
22 infant product or when that was.
23     Q. And I've read some of your deposition
24 transcripts in those scissor cases, so I'm familiar
25 with them.

Page 32

1      Other than those children scissor cases,
2  can you tell me what type of other products you've
3  worked on related to children's, and then we'll
4  transition into infants. Is that fair?
5      A. Or batteries is one. A stroller case.
6      Q. Did you say "droller"?
7      A. Stroller.
8      Q. Stroller?
9      A. Stroller.
10     Oh -- well, a lot of times it's infants
11 being injured by products that aren't made for
12 infants or children, like a -- chemical burns where
13 it had to do with a top, you know, closing. So it's
14 consumer products that injure infants or children
15 is -- is often an issue.
16     Lots of children getting hit, very young
17 children being hit by motor vehicles. Very young
18 preschool cases. I can't remember now what the
19 issues were.
20     Q. And that was a helpful distinction you made
21 in terms of some product may injure infants but are
22 not necessarily marketed to infants. Did I
23 understand that correctly?
24     A. Correct.
25     Q. If we specifically now transition to

Page 33

1  talking about work -- either consulting or
2  litigation expert work that you've done on infant
3  products, can you tell us what that experience has
4  been.
5      A. I've turned down two jobs. We turn down
6  most of them. We will review any product for free,
7  our firm, and then we decide whether or not we're
8  willing to work with the manufacturer. And we
9  turned two down, and we're evaluating one now.
10     I'm very conservative about what products
11 I'm willing to work with and how much they're
12 willing to follow my advice, whether or not we will
13 consult. But I will give them all sorts of advice
14 for free, and they can take it if they don't want to
15 do everything I ask for.
16     Q. I understand from your previous deposition
17 testimony that a lot of times when you are hired to
18 consult on those type of products, there's some type
19 of disclosure agreements or confidentiality --
20     A. Always.
21     Q. -- agreements; is that true?
22     A. Always.
23     Q. The two instances you just described to me,
24 are they subject to some sort of confidentiality
25 agreement, or are you able to share with me what

9 (Pages 30 - 33)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 34

1  those companies were?
2      A.  A hundred percent cannot.  And in -- and
3  especially because I said we turned those two jobs
4  down, so I cannot expose them that way.
5      So I gave them my advice, what I think they
6  should do, but they weren't willing to do everything
7  I'm asking for.  And in order for me to feel
8  comfortable working with a company, if I feel like
9  there's hazards that need to be managed in a certain
10  way and they're wanting to just stick a warning on
11  there or something, then I will say that I don't
12  feel comfortable with that and outline for them what
13  I suggest they do, and maybe they can hire someone
14  else to do it.  And I would say that happens
15  probably 80 percent.  So we donate our time.  We
16  explain what's going on.  We pray that they make the
17  product safer and we don't get involved.
18      So it's a -- you know, money losing for us
19  perhaps, because we get on it.  I feel like it
20  trains my associates a lot, and I'm hoping to put
21  safer product out there.  But for the most part, I
22  don't want to put my name on it or get really
23  involved in it.
24      Q.  So other than those two companies that
25  reached out to you for consultation and you

Page 35

1  ultimately did not do any work for them, can you
2  tell me any other companies or products related to
3  infants on which you've either provided that kind of
4  consulting or served as a litigation expert?  And,
5  of course, that's other than the Rock 'n Play
6  Sleeper.
7      A.  That are designed for infants?
8      Q.  Yes, ma'am.
9      A.  I don't recall.  I know I have.  I just
10  can't recall.  In litigation -- I have not consulted
11  with companies for any products -- new products they
12  want to put on the market for infants that I've
13  continued with, and I've done some in litigation.
14  I -- I know I think a stroller case, and I'm drawing
15  a blank right now.
16      Toys, maybe young children, preschool -- a
17  lot of it's preschool age, not children's age.  I'd
18  say the majority of the cases.  A remote control
19  car, a Fisher-Price maybe fire truck.  It may not --
20  No.  Tonka, I think.  I don't remember.  Some sort
21  of fire truck.  I'm not remembering.  Lots of
22  different toys.  Sometimes I think it's parts that
23  come off.
24      Most of them settle quickly, so I haven't
25  given depositions.  I don't know that I've given

Page 36

1  depositions on any, which is probably why I'm having
2  a hard time remember.  I mean, a lot of times I will
3  just consult with them, write a report, or give them
4  advice, and the case goes away.
5      Q.  For purposes of this question, I'll limit
6  my inquiry to an infant product for, say, an infant
7  12 months and under.  Is that a -- are we on the
8  same page in terms of what we're talking about here?
9      A.  Yes.
10      Q.  Okay.  Have you consulted or served as an
11  expert in a case related to an infant product
12  involving a 12-month-old or younger, other than the
13  Rock 'n Play Sleeper case that we'll talk about
14  today?
15      A.  I think so.  I'm just drawing a blank.  I'm
16  trying to remember what the device was.  I'm
17  99 percent sure.  I'm just not remembering.  It was
18  not in the last four years.
19      Q.  That was going to be my next question.  Was
20  this, maybe, several years ago and perhaps that's
21  the reason why you don't remember?  And, by the way,
22  that's totally okay, of course.
23      A.  Yes.  There's been a few, and I'm just
24  drawing a blank right now.
25      Q.  Did any of those products, to the best of

Page 37

1  your memory, involve a crotch restraint such as the
2  Rock 'n Play Sleeper that we'll be talking about
3  later today?
4      A.  Okay.  I just thought of one.  The Bumbo
5  seat.
6      MR. OSBORNE:  I'm sorry, Brandon.  Let me --
7  involved blank, like the infant sleeper, like the
8  Rock 'n Play infant sleeper.  I'm sorry, it didn't
9  come across.
10      MR. COX:
11      Q.  Did any of those products, to the best of
12  your memory, involve a crotch restraint such as the
13  Rock 'n Play Sleeper that we'll be talking about
14  later today?
15      A.  Yes.  It's a seat.  I think it was not a
16  Bumbo.  It was one that looks like a Bumbo.  And
17  that did have -- I think that one may not have had
18  it -- there was something about the restraint in
19  that case, and I'm not remembering right now what it
20  was.
21      Q.  Appreciating that it's been a while and you
22  don't remember, but do you know if your opinions or
23  analyses in that case centered around the use or
24  nonuse of the restraint?
25      A.  That might have been part of it, but part

10 (Pages 34 - 37)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 38

1  of it was the way it was marketed.  In this case,
2  there was the adult put on a table, and then it had
3  the Bumbo birthday party with all of them sitting
4  around on a table with a bunch of the seats and
5  infants on it, and -- so there was some anti-warning
6  information.
7      I can't remember -- I think one of them
8  didn't have a restraint.  And I'm sorry, I'm not
9  remembering details right now.  But I don't want to
10 rule out restraint, because I think that was part of
11 it.  But I know the anti-warning and the Bumbo
12 birthday party was a big part of it.
13     Q.  In that particular case involving that
14 product, rather, were you asked to offer any
15 opinions related to the use or nonuse of the
16 restraint?
17     A.  I might have.  I don't -- I didn't testify
18 in trial.  I'm not sure if I even did in depo.  I
19 think it settled.  But I do remember that case
20 really well.
21     Q.  Do you remember writing an expert report
22 for that case?
23     A.  I don't -- No.  I think it might have been
24 a California case.  I might not have.
25     Q.  And that's because in California, you guys

Page 39

1  don't routinely write expert reports.  Is that your
2  understanding?
3      A.  In superior court.
4      MR. OSBORNE:  You're too low there, Brandon.
5  I'm sorry.  You're too low there.
6      MR. COX:
7      Q.  Is that because, based on your general
8  understanding in -- at least in state court in
9  California, expert reports are not a routine thing
10 that you all do here?
11     A.  That's correct.  We just get deposed and
12 present the information at that time.
13     Q.  The -- I think you said it was maybe a
14 Bumbo?
15     A.  It was not a Bumbo, but it looked like a
16 Bumbo, is what I'm recalling.
17     Q.  Do you know who the manufacturer of that
18 product was?
19     A.  I don't remember anymore.
20     Q.  Fair to say it was not Fisher-Price or
21 Mattel?
22     A.  It's possibly.  I'm not sure.  I don't
23 recall which one.  I'm just pretty sure it was a
24 look-alike but not the Bumbo.
25     Q.  You talked about a stroller case as well;

Page 40

1  right?
2      A.  Yes.
3      Q.  What do you remember specifically about the
4  analyses or opinions you offered in the case related
5  to a stroller?
6      A.  It's current, so I don't -- I haven't
7  testified or given a report yet, so I don't know
8  that I can give many details.
9      I can tell you it's a pinch point issue,
10 but I don't think I can say anything more without
11 contacting the attorney.
12     Q.  Did you say pinch point?
13     A.  Pinch point.
14     Q.  Okay.  And so just so I can clear that up
15 for the record, the stroller case on which you're
16 working is something that's new and you haven't
17 provided any opinions in that case and you haven't
18 given any deposition testimony; fair?
19     A.  Yes.
20     Q.  As far as you know, have you been retained
21 in that case?
22     A.  Yes.
23     Q.  Is that the case for which you've been
24 retained by John Osborne?
25     A.  No.

Page 41

1      Q.  What law firm are you working with on that
2  case?
3      A.  I don't know.
4      Q.  You said you don't know?
5      A.  I don't know.  I don't recall.
6      Can we take a quick break?  I --
7      MR. COX:  Of course.  Of course.
8      THE VIDEOGRAPHER:  At 11:41, we're off the
9  record.
10     (Interruption in proceedings.)
11     THE VIDEOGRAPHER:  At 11:55, we're back on the
12 record.
13     MR. COX:
14     Q.  Dr. Vredenburgh, before we broke, we were
15 talking about some of the infant products you've
16 worked on, at least that you remember.  We discussed
17 a Bumbo, then a stroller product that you can't
18 really talk about because you're currently hired for
19 that product; right?
20     A.  Yes.
21     Q.  The Bumbo product, I had some questions
22 about whether the use or nonuse of the restraint was
23 at issue there.  You may or -- recall that it might
24 have been, but you don't remember as we sit here
25 today; is that fair?

11 (Pages 38 - 41)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 42

1    A. I think there was something about the
2   restraint, either that there wasn't one or something
3   to do with a restraint. It was not Bumbo, it was a
4   copycat product, so I'm using Bumbo like Kleenex is
5   a generic term. But I know there was something to
6   do with a restraint. I just don't remember what
7   exactly the issue was.
8    Q. Do you know if that product and your work
9   in that product related to a suffocation hazard?
10   A. No.
11   Q. The stroller product --
12   A. I do know, and it did not. To answer the
13   question correctly, you asked if I knew. So yes, I
14   know; no, it did not.
15   Q. To clean that up for the record, the
16   Bumboish-type product on which you consulted did not
17   involve a suffocation hazard; true?
18   A. Yes.
19   Q. The stroller product that you're working
20   on, does that involve a suffocation hazard?
21   A. I think so. I'm just getting into the
22   case, so I believe so but I'm not sure.
23   Q. And without violating any attorney-client
24   information or relationship, what is your initial
25   thinking as to the suffocation hazard related to

Page 43

1   that product based just off of what you know so far?
2    A. I don't -- I'm just getting the
3   information, and my office is printing it out, and I
4   have not really had time to look at it yet. But it
5   had something to do with a pinch point and
6   suffocation, and I can't tell you anything beyond
7   that right now.
8    Q. Does that stroller involve a stroller
9   manufactured by Fisher Price or Mattel?
10   A. I don't know. I don't think so, but I'm
11   not sure.
12   Q. What is your hourly rate?
13   A. My regular rate is 420 -- 450 an hour.
14   Q. Is your rate for deposition $650 per hour?
15   A. Yes.
16   Q. And is that what you'll be charging my
17   clients for your deposition today?
18   A. Yes.
19   Q. Is that the same rate for your trial
20   testimony as well?
21   A. Yes.
22   Q. We'll look at some of your invoices a
23   little bit later today, but in general, do you know
24   how much you have billed to this case?
25   A. No.

Page 44

1    Q. Do you know how many hours you've spent on
2   your review and opinions in this case?
3    A. I would expect a lot. There's a lot of
4   material and several reports.
5    Q. And when you say, "a lot," do you
6   categorize that as more than perhaps other cases
7   you've reviewed?
8    A. Yes. I would say it's in maybe the top
9   30 percent timewise without travel, because some of
10   them are extensive travel, and those, of course,
11   would be a lot of time. But a no-travel case, I'd
12   say it's towards the top.
13   Q. And by that, we're talking about just the
14   amount of information and documents that you've
15   reviewed in terms of giving the opinions you've
16   offered in this case; fair?
17   A. And all of the reports I've written.
18   Q. Right. So the reports you've written,
19   three of them, in addition to the documents you've
20   reviewed, that forms the basis of your statement
21   that it's at the high end of the cases you've worked
22   on that you've spent a lot of time on?
23   A. Right. And the interviews with the
24   plaintiffs.
25   Q. Sure. And we'll get to all of that a

Page 45

1   little bit later in your deposition.
2    I know you've testified hundreds of times
3   in depositions. What would be your best estimate of
4   the number of times you've testified at trial?
5    A. Somewhere probably between 30 and 50.
6    Q. Earlier, we talked about how your general
7   breakdown of litigation consulting work is somewhere
8   around 50-50 plaintiff versus defendant. Of those
9   30 to 50 cases, if you know, what would be the
10   breakdown as it relates to testifying for the
11   plaintiff versus defendant?
12   A. Probably somewhat more plaintiff, I think.
13   Q. Is there a reason for that?
14   A. I have no idea. Just the cases that I was
15   retained on for the defense settled before trial
16   more often than the ones I was retained on for
17   plaintiff.
18   Q. The Bumboish-type case we talked about
19   earlier, were you retained to offer opinions on
20   behalf of the plaintiff or defendant in that
21   litigation?
22   A. Plaintiff.
23   Q. And the stroller case, are you being
24   retained on behalf of the plaintiff or the defendant
25   in that case?

12 (Pages 42 - 45)

Page 46

1      A. Plaintiff.
2      MR. COX: Let's mark for the record a copy of
3  your notice of videotaped deposition.
4      And so, John, like we've done before, this
5  will come up on your end on the Exhibit Share so
6  that you can see it. Okay?
7      MR. OSBORNE: I hear you.
8      MR. COX:
9      Q. I'll hand you a copy of what we'll mark as
10 Exhibit 1 to your deposition, which is a copy of the
11 amended notice of videotaped deposition that you
12 would have received or that we served on plaintiff's
13 counsel in this case.
14     Before today, have you seen a copy of this?
15     A. Yes.
16     Q. If we go to page 6 of this document, it
17 includes a number of requests. Do you see that?
18     A. Yes.
19     Q. And having been deposed hundreds of times
20 before, this is certainly not the first time you're
21 seeing a request for documents for you to bring
22 things with you to your deposition; true?
23     A. Yes.
24     MR. OSBORNE: Stand by, please, Brandon.
25     Okay. So the folder is empty in marked

Page 47

1  exhibits.
2      MR. HERMAN: Yeah. John, it's going to be on
3  its way. The wi-fi's just taking a second. It's
4  been introduced through the software.
5      MR. OSBORNE: I just wanted to let you know.
6  And, of course, this -- I'm not so ignorant. I know
7  what this exhibit is, so I don't mean to interrupt
8  unnecessarily. I just want to let you know. Thank
9  you.
10     Please proceed, Brandon. I'm sorry.
11     MR. COX: It's no problem.
12     Q. Can you tell me what you did to search for
13 and identify documents responsive to these requests.
14     A. Well, in this case, because there were
15 reports, it was kind of easy, because the plan- --
16 the attorneys had a lot of the documents. So I
17 asked that they upload everything that I submitted
18 to them.
19     However, on the reports, there's footnotes
20 that they would not necessarily have had, so I had
21 to go through each of the footnotes and find any
22 documents that were not Bates-stamped and get those
23 over to you so I provided those.
24     And then I looked at -- I also created
25 summaries of the depositions, and you should have

Page 48

1  those.
2      I did make a mistake that I corrected
3  yesterday when I printed -- I used them on screen,
4  but then I printed them to bring just in case I
5  needed to refer to them today. And I realized that
6  the ones from Dr. Deegear were not there, so I
7  immediately e-mailed them. But they were in a
8  different file, so inadvertently you didn't receive
9  them with the first batch, but you should have those
10 now.
11     And then I also, when I was going through
12 the file, realized that I had written some
13 handwritten notes on your expert reports, and I
14 realized at that time I hadn't produced them, so I
15 did shots of those and sent those over too.
16     So I made every effort to get them to you.
17 Some of them were -- came a little later than
18 others, but I believe you have everything now.
19     Q. And I see that you have in front of you two
20 binders; right?
21     A. Yes.
22     Q. Are the two binders that are in front of
23 you additional documents that you're bringing today?
24     A. No.
25     Q. What's in the two binders in front of you?

Page 49

1      A. Just what I told you. So it's just the
2  reports and the footnotes that go with the reports.
3  Just in case you ask me about them, I'd prefer for
4  you not to hand me so many things, so if you say,
5  "Your report, what is the document you're basing it
6  on?" I'd rather look at my copy than -- I didn't
7  know if you'd provide it. Sometimes they're not
8  provided.
9      So just -- I mean, I'm happy to flip
10 through them, but basically this binder is just the
11 reports that you have that are -- the Bates-stamped
12 that you have there, and then I printed out the
13 summaries here (indicating) that you should also
14 have. And then in here, these are just -- these
15 numbers here correspond and these little tabs that
16 are on the right of each page with the number of the
17 footnote in the report.
18     Q. That's what I was getting at. Let me just
19 make sure I understand.
20     What you sent to plaintiff's counsel to
21 give me should include everything that is in
22 front of you; is that fair?
23     A. Yes. You should have -- I should have
24 nothing here that you don't have.
25     Q. The reason I ask that is because I don't

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 50

1  know that I have all of the footnoted
2  non-Bates-numbered references that's in the binder
3  in front of you in the documents that were sent over
4  to me yesterday.
5      A. They weren't yesterday. They were sent in
6  the original. I sent those more than three days
7  ago.
8      Q. I'll restate that.
9          I don't think I have them in anything
10 that's been sent over to me, so that's why I was
11 asking for that clarification.
12     A. I did send them in several e-mails, and I
13 don't know how things then got shipped to you, but I
14 made every effort to get you every document that is
15 not Bates-stamped in my footnotes. You're welcome
16 to go through or --
17     Q. So my next question was going to be -- and
18 this can be with permission of counsel -- is
19 there -- is there a way for us to have a copy of the
20 documents that are contained in this particular
21 binder, which I understand from you are the
22 footnoted references of non-Bates-stamped documents
23 in all of your reports; fair?
24     A. Of course. I can resend the e-mails.
25     MR. OSBORNE: Counsel, let me intervene at this

Page 51

1  point.
2          I will permit you to compare what you've
3  received with what she has, but an additional copy
4  of what we've already provided is -- is excessive
5  and will waste time. So I -- with that -- you know,
6  that is what I offer. We certainly want to share
7  with you everything that you're legally entitled to
8  get, but I think your request to copy what she
9  brought with her is going to be excessive since
10 we've already provided it to you and you should be
11 able to match it up.
12     MR. COX: Thanks, John. I appreciate that, and
13 I think you know by now I'm not trying to be
14 difficult or anything, but I literally can look at
15 the binder that Dr. Vredenburgh has in front of her
16 and visually I can assure you that it is not
17 consistent with the documents that we have.
18         But I will, in fact, go through and try to
19 compare it. I just won't do it now, because I don't
20 want to waste my time on the record. So when we
21 break again, I'll -- with permission from
22 Dr. Vredenburgh, I'll do that comparison, and to the
23 extent that there's anything that appears that we
24 don't have, then I'll try to address that with you
25 after we do a break. Is that fair?

Page 52

1      MR. OSBORNE: That is fair.
2      THE WITNESS: I should clarify, the
3  Bates-stamped stuff is also in the binder. I just
4  didn't e-mail those separately so this is full of
5  Bates-stamped things plus the articles you were
6  sent.
7      MR. COX:
8      Q. I see. That actually helps and provides a
9  little bit of a helpful clarification. So let me
10 try to do this all over again.
11         You have two binders that are in front of
12 you; fair?
13     A. Yes.
14     Q. One of the binders is a little bit larger
15 than the other one; true?
16     A. Yes.
17     Q. It has a number of different -- I'd call
18 them tabs, but they're just, you know, handwritten
19 tabs throughout; right?
20     A. Right.
21     Q. And my understanding, as you've just
22 described it to me, is that those various tabs
23 correspond to both -- to all footnotes that are
24 within your report.
25     A. Right. So there's a lot of them that are

Page 53

1  Bates-stamped in here. It's just in order so that I
2  can find them. But I didn't resend you what's
3  already stamped.
4      Q. I got it.
5          What you sent over to us is only the
6  documents that are not Bates-stamped that were
7  footnoted in your report; fair?
8      A. Yes.
9      Q. If for some reason after this deposition we
10 determine that we don't have something that's
11 footnoted in your report but not Bates-labeled, we
12 can get that from you by requesting it; correct?
13     A. Of course.
14     Q. Okay. What's in the second binder?
15     MR. OSBORNE: And I agree to that. I agree to
16 that, just to be clear.
17     MR. COX: Sure, of course.
18     Q. And can you tell us what's in the second
19 binder, the smaller one of the two.
20     A. Oh, it's called the first one, this is just
21 the reports. I showed you that first. This is the
22 Bates-stamped reports that you -- I know you have as
23 well as your rebuttal reports, and then this is just
24 a printout of the summaries.
25     Q. And so while we're on this, let's go ahead

14 (Pages 50 - 53)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 54

1  and mark as Exhibit 2 the printout of all of the
2  documents that you sent to counsel and then they
3  sent to us which, for all intent and purposes, is
4  largely duplicative of what you have in front of
5  you; is that fair?
6      A. It should be a hundred percent duplicate.
7  But I may have additional things that are
8  Bates-stamped, but everything you have should be
9  what I have here.
10     Q. Correct. I appreciate that clarification,
11 because I did not print out anything that's
12 Bates-stamped because, of course, I have those
13 documents; right? So I didn't need those. So thank
14 you. That's a very helpful clarification.
15         And I understand that you don't want to
16 pass a bunch of documents over, and you don't have
17 to look at it, but I'll hand you a copy of what
18 we'll mark as Exhibit 2, which I'll just represent
19 to you is a copy of all of the documents that we
20 received from plaintiff's counsel related to the
21 file that you had. And so we'll mark that for the
22 record as Exhibit 2 as everything you brought with
23 you. Okay?
24     A. Okay.
25     Q. I will make one representation, that the

Page 55

1  invoices are not in that printout, but we're having
2  them printed. So my apologies. And we can clarify
3  that for you later, John. But other than that,
4  that's everything.
5         So you can --
6      MR. OSBORNE: -- representation, I understand.
7      MR. COX: Thanks.
8      Q. And you can put that notice of deposition
9  off to the side. We're done with that.
10         I'd like to go through a couple of these
11 documents. And for purposes of this, I'm really
12 just kind of doing an inventory -- right? -- without
13 really asking any substantive questions.
14         The first document that I see here appears
15 to be an article of sorts called "Warnings,
16 Anti-Warnings, and Pacifiers," by a Thomas Ayres.
17         Does this sound familiar to you?
18     A. Tom Ayres, yes.
19     Q. How did you obtain this article?
20     A. I had it. I mean, I don't know when I --
21 when I had it. I think that one's an HFES
22 proceedings article.
23     Q. What is the acronym you just described?
24     A. HFES.
25     Q. The Human --

Page 56

1      A. -- Factors and Ergonomics Society
2  proceedings article.
3      Q. Do you remember the reason why you used
4  this article in the context of the opinions you're
5  giving in your report?
6      A. The context would be in the footnotes. So
7  errors -- I would have to look at which footnote
8  number it is, and then I could tell you exactly the
9  context I used it for.
10     Q. And it looks like it's focused on warnings,
11 anti-warnings, and pacifiers. Is that --
12     A. I know the article and I know Tom
13 personally.
14     Q. That's great.
15     A. So if you want to go to my first report and
16 go to page 9, and then if you'd please go to
17 Footnote Number 70.
18     Q. I'm there.
19     A. So in this case, I'm citing that warnings
20 and instructions, when they're noticed and read, can
21 affect judgments about related consequences for
22 noncompliance. So they have to be noticed. In
23 other words, they need to be conspicuous and need to
24 be read, and then that can affect judgment.
25         Of course, the content of the warning would

Page 57

1  also be critical. But if you don't notice it, if
2  it's in an inconspicuous location, then it's not
3  going to be effective at all.
4      Q. Do I understand this article to be focused
5  on pacifiers?
6      A. It's about anti-warnings mostly, but it
7  also talks about that it needs to be read and
8  encoded. So in this case, if you want to go to the
9  article, it's that warnings are effective in
10 affecting judgments about severity and
11 consequence --
12     Q. Can you tell me where you're referring to,
13 please.
14     A. Oh, the first page.
15         So -- and -- so if you look at the second
16 paragraph under "Introduction" --
17     Q. Yes.
18     A. -- "[as read] It is clear that warnings,
19 when noticed and read, can affect judgments about
20 product characteristics including the likelihood and
21 severity of consequences for noncompliance, and it
22 is presumed that these perceptions or judgments
23 affect product-usage decisions."
24         So I think that second part is actually
25 really important. If we go to my later report where

15 (Pages 54 - 57)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 58

1    the plaintiffs were given additional information,
2    the ASTM warning, which would have had a big impact
3    on their judgment and purchase decision had they
4    been provided with that additional information that
5    was developed by ASTM.
6        Q.  When we're talking about judgments in the
7    context of this article as it's written here, what
8    do we mean here?
9        A.  How you judge the product.  For example, if
10   you have a warning such as in this case -- assume
11   that that warning was conspicuous and had the
12   colored background and was prominent.  Now let's
13   just only look at the content and not the location.
14       The warnings -- the bulk of the warning
15   information was under "Fall."  So if the user is not
16   concerned about the infant falling, they have a
17   padding underneath and they read it, in that case,
18   then, the judgment of the likelihood and severity of
19   consequences would be very much affected, as opposed
20   to if that information was under "Suffocation," then
21   that could very much change the perceptions of the
22   severity of consequence.
23       That's why -- that's essentially what he's
24   saying, is it affects our judgment.  So -- and in
25   this case, that really rings clear with the

Page 59

1    interviews I had with the plaintiffs.
2        Q.  We'll, of course, get to the interviews
3    later.
4        Just so that I'm clear as I leave the
5    deposition today, what judgments may have been
6    different if the information under "Fall Hazard" had
7    been under "Suffocation"?
8        MR. OSBORNE:  Form.
9        THE WITNESS:  That if -- let's go to the
10   warning.  I have it here.
11       MR. COX:
12       Q.  And we'll go ahead and mark -- just so that
13   we have a clear record, we'll mark Exhibit 3 as a
14   copy of your original April 1, 2021 report which you
15   are now referring to.  So I just want to make sure
16   the record is clear about that.
17       A.  Right.  I'm trying to throw the -- if you
18   go to page 16, please.
19       Q.  And this is of your original report; right?
20       A.  Yes.  So responding to your question.
21       Q.  Sure.
22       A.  If you were to move some of the questions,
23   like if they can sit up unassisted and -- obviously,
24   the ASTM information would greatly affect the
25   perceptions of the suffocation.  But even the

Page 60

1    developmental is all under "Fall Hazard," not under
2    "Suffocation."  The only thing under "Suffocation"
3    is just soft bedding, and the plaintiffs were clear
4    they didn't put the soft bedding, and they weren't
5    concerned about that.  They -- and they thought that
6    the hazard was fall, and they had padding
7    underneath.  And like the doctor -- think it was
8    Deegear -- said that the fall hazard wasn't that
9    much of a concern for him either.
10       Now, if you go to the ASTM warning, which
11   is on page 18, please, that gives very important
12   information that would affect judgments about
13   product characteristics, including the likelihood
14   and severity of -- of consequence.  The first part
15   has "Suffocation Hazard" underlined and said "Babies
16   have suffocated and died from rolling over."
17       So that is very different communication
18   that can greatly affect judgments of the risk, and
19   as a result, these perceptions and judgments can
20   affect product-usage decisions, whether or not to
21   use the product.  And again, when I gave the ASTM
22   warning to the plaintiffs, they said they wouldn't
23   have used it.
24       Q.  The ASTM warning you're referring to on
25   page 18, do you know whether this particular ASTM

Page 61

1    warning was in effect on the date of Z███ Olson's
2    death?
3        A.  These were draft warnings that were not in
4    effect.  However, had they been on and prominent,
5    then, according to both of the plaintiffs, they
6    would not have used it.  They both were very much
7    affected by that the babies had suffocated and died
8    from rolling over.  So both of them, just with that
9    statement alone, would have changed their judgment
10   about the product.
11       Q.  Before this case, have you worked on any
12   other cases involving ASTM warnings?
13       A.  I'm sure I have.
14       Q.  What is your general understanding of the
15   process by which the ASTM develops warnings?
16       A.  Well, ANSI and ASTM -- and often they
17   overlap -- are consensus standards.  They have reps
18   from various industries, sometimes from research
19   organizations, that discuss content, make drafts,
20   and ultimately approve draft warnings for various
21   context for various types of equipment.
22       Q.  And the warning that we're looking at here
23   on page 18, which I do believe you described
24   yourself as a draft warning, just to be clear for
25   the record, that was not in effect by the ASTM in

16 (Pages 58 - 61)

Page 62

1  June 2014 when Z███ Olson died; correct?
2      MR. OSBORNE:  Object to form.
3      THE WITNESS:  It was a draft warning, so it was
4  being discussed at that time.  And I believe that --
5  think it was Steinwachs was part of ASTM, so he was
6  aware of the draft warnings.
7      MR. COX:
8      Q.  What's your basis for saying that this
9  particular draft warning was being drafted in June
10 2014?
11     A.  When did I say June 2014?
12     Q.  Let me --
13     A.  You said June 2014.
14     Q.  Sure.  Let me ask my question again.
15         The warning that we are looking at right
16 now that you described as a draft warning, this
17 draft warning was not in effect in June 2014 when
18 Z███ died.  That's correct; right?
19     A.  It was being discussed.  It was not
20 implemented.
21     Q.  And my question to you is what is the basis
22 for your testimony that it was being discussed in
23 June 2014 but not yet implemented?
24     A.  I believe -- I'd have to go to the document
25 that it was attached to.

Page 63

1      Q.  Do you want to do that?
2      A.  So Steinwachs testified that he was a
3  member -- "[as read] As a member of the committee,
4  Fisher-Price knew as early as 2012 that the draft
5  standards would include a 5-month age limit
6  requirement" -- and I'm reading from page 17, the
7  first full paragraph -- "for inclined sleep
8  products," but it didn't add that age limit until
9  2015, which was just after her death.
10         So it was the testimony of Steinwachs, and
11 there's a talking points -- a Fisher -- Fisher-Price
12 talking point document from October 2012.
13     Q.  If we assume that the testimony of
14 Dr. Steinwachs as well as the talking point document
15 you referred to does not indicate that in June 2014
16 this warning was being developed, how would that
17 affect the opinion you just gave?
18     MR. OSBORNE:  Form and foundation.
19     THE WITNESS:  There was some warning being
20 developed according to his own testimony.  I don't
21 know it was this exact one, but the ASTM was
22 drafting, and they did have the five-month age
23 limit.  And that one -- the mom, she -- Z███'s
24 mother said that the five months, that she would
25 have used that.  I think the father also said he was

Page 64

1  looking for an age limit.  So I don't know the exact
2  document in 2012, but they were definitely
3  discussing an age limit.
4      MR. COX:
5      Q.  You said 2012.  Did you mean 2014?
6      A.  Well, according to Steinwachs' January 2021
7  deposition, Fisher-Price knew as early as 2012 that
8  the ASTM draft standards would include a five-month
9  age limit for the inclined sleep products.
10     Q.  So the 2012 reference is from page 17 of
11 your report; correct?
12     A.  Yes, sir.
13     Q.  Did you look into or research the warning
14 label from the ASTM that was in effect in 2014 when
15 Z███'s death occurred?
16     A.  The warning label that was in effect is the
17 warning label that I have copied in my report.
18     Q.  Correct.  The point that I'm making is that
19 that warning label and the one that we're looking at
20 on page 18 of your report are different; true?
21     A.  The ASTM one is different than the one that
22 was on the product.  However, prior to Z███s death,
23 there was discussions within ASTM about age and also
24 rollover even when -- Let's see.
25         Fisher-Price knew by early 2013 that a

Page 65

1  warning about stopping use once a baby could roll
2  over would be included, but they didn't add it for
3  the suffocation issue.
4      Q.  And all I want to know is the basis for
5  that statement comes from the testimony of Dr. --
6  Mr. Steinwachs, I'm sorry, as well as this talking
7  point document that you cite to in Footnote 105 of
8  your report; correct?
9      A.  Correct.
10     MR. OSBORNE:  Form.
11     THE WITNESS:  And then there's also a Bates
12 number that's footnoted in 107.
13     MR. COX:
14     Q.  And as I understand your expert testimony,
15 which we'll get into a lot more substantively in a
16 second, your opinion is that the ASTM label that's
17 on page 18 of your report is the label that should
18 have been on the product in June 2014 before Z███
19 passed; correct?
20     A.  Well, no, because I think that it should --
21 been fixed through design or not marketed because
22 it's an unsafe device.  And the hierarchy from a
23 human factors management perspective is to fix
24 things through design, not through a warning.  But
25 if -- let's assume it's going to be mitigated

17 (Pages 62 - 65)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 66

1  through warnings, then that should have been there.
2  But the ASTM didn't have the five months, so I just
3  added that to the bottom since they discussed
4  putting it in but it had not yet been added to the
5  label.
6        That label should have been on it if --
7  assuming it was appropriate to address their
8  warnings, it needed to be something like that, but
9  it would have to be tested by users after it was
10  drafted before it was implemented.
11      Q. The five months you mentioned that the ASTM
12  did not include that in their draft warning, do you
13  know the reasons why they didn't?
14      A. Well, they said that they might want older
15  kids with disabilities, and that's why they put the
16  25-pound issue. But the 25 pounds is confusing for
17  other issues, other reasons that I said. So that
18  was all I could find. I didn't see a good reason
19  not to include the five months.
20      Q. Dr. Vredenburgh, you have children of your
21  own; right?
22      A. I do.
23      Q. And you are aware as a parent that children
24  develop differently; true?
25      A. Yes.

Page 67

1      Q. One child who may have developmental
2  milestones at five months may differ from another
3  child who may not exhibit those same developmental
4  milestones at five months; correct?
5      A. Yes.
6      Q. You one thing that you talked about with
7  respect to the ASTM label on page 18 of your report
8  is that the ASTM -- or that there would need to be
9  testing conducted to understand how users and
10  consumers would respond to that label; is that fair?
11      A. Yes.
12      Q. Do you know if the ASTM conducted any of
13  that testing?
14      A. I don't know if ASTM did, but Fisher-Price
15  did not according to their testimony.
16      MR. COX: And I'll just strike the last part as
17  nonresponsive.
18      Q. Specifically as it relates to ASTM, do you
19  know if ASTM conducted any testing?
20      A. I was not given any testing done by them.
21      Q. Did you yourself conduct any testing to
22  assess how consumers would respond to the warning
23  that you contend could have been put on the product?
24      A. I could not ethically test parents with
25  their infants on that device, putting the label on

Page 68

1  there, because it's not safe. And at this point,
2  it's been recalled.
3        So the way to properly test it would be
4  that you would give consumers -- they would have
5  informed consent. You would give them -- you'd give
6  some other task, not directly what you're measuring,
7  and then watch what they do. But clearly I could
8  not do that in this case.
9        And the warnings are actually handed to
10  people, looks like, in the early testing done as
11  opposed to having -- seeing whether or not they saw
12  the warnings, they were handed separately. But to
13  do it properly, you would have it however the device
14  is going to be marketed in premarket testing, and
15  you would ask them to do something unrelated and
16  then videotape the parents and not give them cues
17  and see what they do. But clearly I'm not going to
18  expose infants to a recalled device.
19      Q. What is the basis for your testimony that
20  it would be ethically unsound for you to conduct
21  that type of testimony -- testing? I'm sorry.
22      A. No IRB is going to allow me to test infants
23  on a device that's been recalled.
24      Q. Did you review the expert report of
25  Dr. Sinkhose, plaintiff's engineering expert?

Page 69

1      A. I think I might have --
2      Q. Are you aware --
3      A. -- yes.
4      Q. Are you aware that Dr. Sinkhose conducted
5  testing in the Rock 'n Play Sleeper for purposes of
6  his biomechanical engineering analysis?
7      A. I don't know when or how. I don't recall
8  what specifically he did.
9      Q. As you sit here today, are you testifying
10  that you don't remember him conducting that type of
11  testing?
12      A. I'm not saying that he did or did not. I
13  read it, but it wasn't -- I didn't rely on him, I
14  don't believe, for my reports, and I'm not disputing
15  that he did it.
16      Q. Did you review the expert report of
17  Dr. Steven Rundell?
18      A. I don't think so.
19      Q. Are you aware that Dr. Steven Rundell,
20  defendant's engineering expert, also conducted
21  testing of infants in the Rock 'n Play Sleeper?
22      A. I don't know how they did or what they did.
23  In other words, the way that I would test labels --
24  and I don't know that they were testing labels, so I
25  don't know what they were testing.

18 (Pages 66 - 69)

Alison Vredenburgh, Ph.D.          September 22, 2021
In Re: Fisher-Price/Mattel

Page 70

1    But if you're testing labeling, you need to
2 give to the parents and try to have as realistic
3 scenario as possible and then record what they do
4 with it, having them do some other task unrelated to
5 the specific thing you want to see if they do.  So
6 you wouldn't hand them the warnings and you wouldn't
7 watch them, but that's how -- for example, if you
8 want to see if people use personal protective
9 equipment, you may have them build a birdhouse, and
10 you would watch what they do, and you'd put the
11 equipment in different places, and you'd see -- if
12 you were to put PPE in another room, does that
13 affect whether or not they comply with the warning
14 if, at the top of the warning to build the
15 birdhouse, it said, you know, to use the PPE.
16    That would be an example of what I'm
17 saying.  When you give them an alternate task, you
18 monitor what they do and then see -- and then you
19 study variables, whether or not they put the PPE on.
20 And so in this case, it might be -- the study
21 variable would be to see if they notice the warning
22 underside the back and whether or not they comply
23 with it without cuing them in on what you're looking
24 for.
25    Q.  Just so I understand your testimony as I

Page 71

1 walk away today from your deposition, the reason why
2 you did not conduct any testing related to a human
3 factors analysis on the Rock 'n Play Sleeper is
4 because you believe it would be ethically unsound
5 for you to do that; correct?
6    A.  That totally misstates my testimony.  This
7 is all a human factors analysis.  Everything I did
8 was a human factors analysis.  I did not test this
9 device by giving a recalled device to parents of
10 children and have them take it home and use it and
11 then find out what they did.  That would be
12 unethical, and I can't -- it's very hard to do human
13 testing, especially with infants, and I'm not going
14 to violate that by giving parents a device that I
15 know has been recalled.
16    Q.  And what organization standard, regulation,
17 or otherwise provides the basis for your testimony
18 that it would be unethical to conduct that type of
19 testing?
20    A.  Well, every IRB has different rules.  But
21 having gone through IRBs, they're pretty hard to get
22 through.  You have to talk about all the protections
23 of the subjects.  So when we did our wheelchair
24 research, we had a nurse on site, we had certain
25 breaks, we had a lot of things we needed to do to

Page 72

1 protect our subjects.
2    Q.  What -- I'm sorry.
3    A.  I'm sorry.
4    Q.  I didn't mean to cut you off.
5    What particular IRB standard are you
6 relying on for the proposition that it would be
7 unethical to test on a recalled product?
8    A.  My experience working with IRBs, you have
9 to say how you're protecting subjects, and I don't
10 know how you protect subjects on a device that I
11 know to be unsafe, that's been recalled, and --
12 well, for example, the wheelchair, we went through
13 Cornell's IRB.  So different university -- every
14 university has a different IRB, but they're all
15 pretty much the same as far as what you need to do
16 as far as protecting the human subjects.
17    Q.  And can you define for the jury what IRB
18 is.
19    A.  Institutional review board.  It's the
20 review board that you would submit the protocol.
21 You have to identify all the risks to the subjects
22 and then how you're going to mitigate those risks.
23 Sometimes you can only do a few subjects per day, or
24 you can only have them so much time for tests.  And
25 you have to look at the potential harm to them.

Page 73

1    And for -- surveys are considered low risk,
2 so it's pretty easy -- even that can be somewhat of
3 not immediate approval for IRB.  But those are the
4 lowest risk, would be to have someone complete a
5 survey, a questionnaire of some sort.
6    If you're actually having humans testing
7 something, especially infants, there's going to be
8 greater scrutiny, and I am going to assume, although
9 I've never asked the IRB, "Can I test on a recalled
10 device?" because I am 100 percent certain they're
11 going to say no, and I don't think I need to ask
12 that.  But I'm positive that they will not.  And no
13 IRB of any credible university is going to allow
14 testing on a infant with a recalled device.
15    Q.  That's an assumption you're making;
16 correct?
17    A.  I am absolutely certain, so I'm assuming it
18 based on absolute certainty, having dealt with IRBs,
19 that no IRB is going to -- when you're filling out
20 the potential harms and you say, "This device has
21 been recalled," no IRB is going to allow that.
22    Q.  Did you prepare a protocol of any sort to
23 submit to the IRB?
24    A.  No, because I know it's inappropriate.  And
25 even -- let's assume an IRB would approve it.  I

19 (Pages 70 - 73)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 74

1  would never do it, because I would feel like I'm
2  putting people at risk, and I would never ever
3  subject any of my subjects or participants to harm.
4  And while I'm a hundred percent certain no IRB would
5  approve it, if for some reason some IRB would
6  approve it, I would not do that because it's
7  inappropriate and unsafe.
8      Q. If we assume that the product had not been
9  recalled, I'd like to hear from you what type of
10  testing you would have conducted on the product to
11  assess how consumers would respond to the warnings
12  that you contend should have been on it.
13      A. You would need to contrive -- you'd have to
14  have the parents use the device as -- a wide range
15  of parents with a wide range of education and
16  experience, not employees but nonemployees with a
17  diverse potential user population, see how -- how
18  they use it.
19      But I think there was enough information,
20  even with the studies executed to the extent they
21  were, that people weren't using the belts regularly.
22  So that is enough information for Fisher-Price that
23  there was a risk with the product even with that low
24  level of testing that was done.
25      Q. You talked about earlier surveys, for

Page 75

1  example, that could have been conducted, and I think
2  you even described those as maybe low-level testing.
3  Did I hear your testimony correctly?
4      A. I said -- I was talking generically about
5  IRBs. That's considered the lowest risk and the
6  easiest. You can usually get through testing
7  university students like freshmen, that kind of
8  thing. You can usually get that approved reasonably
9  easily too as long as it's not -- they're not doing
10  a dangerous activity. And then it moves on, like,
11  if you're testing people with disabilities, and then
12  testing infants would be at that highest level.
13      So that's why I said surveys don't -- now,
14  there may be some content of certain surveys where
15  you're getting into something, and in that case
16  there may be some sort of emotional risk or trigger.
17  I've never done that, but I know there's something
18  to do with that. And so in that case, that might
19  also be a problem with IRB.
20      Q. You said you'd never done the survey
21  before?
22      A. No. An emotionally -- eliciting -- you
23  know, getting into something like abuse or something
24  like that. I think that IRBs -- in other words,
25  those kind of surveys also may not be approved, but

Page 76

1  assuming it's a survey that's not -- a
2  nonemotional-type risk, I think those would be the
3  easiest things to get through an IRB.
4      Q. So that I understand your testimony, is it
5  your position that there is no type of testing that
6  would have been ethically sound to conduct to assess
7  how consumers would respond to the warnings you
8  contend should have been on the product?
9      A. When?
10      MR. OSBORNE: Form.
11      THE WITNESS: Yeah. I don't understand. At
12  what point in time?
13      MR. COX:
14      Q. I'm referring to for purposes of your human
15  factors analysis and the opinions you reached in
16  this case. Are we okay on the timeline here?
17      MR. OSBORNE: Form.
18      THE WITNESS: I -- Go ahead, John.
19      MR. OSBORNE: I just said form. That's for the
20  record. You go ahead.
21      THE WITNESS: You have two studies that were
22  already done that showed people weren't wearing
23  belts all the time. That's more than enough
24  information for me to know that people were not
25  wearing -- even with the very limited information

Page 77

1  you had, that gives you critical information.
2      Now, with me, where it's the fed- -- you
3  know, the Congress is questioning Fisher-Price,
4  there's articles about it, et cetera, after the
5  fact, at this point in time, it's pretty well-known.
6  So it would be unfair or inappropriate for me to now
7  start surveying people. Yes, it could be low risk.
8  I could survey people I could find out who used it
9  and how.
10      But at this point in time, I don't know how
11  much information that I can gain when it really
12  should have been done premarket since it was a new
13  type of device. And I do consult with companies at
14  that point. That's the important point in time. If
15  you have something new, especially if there's a
16  transfer in learning from something else where
17  there's different and greater risk than that thing
18  where the transfer of learning may come from, that's
19  the point in time that those studies need to be
20  done.
21      At this point, after it's recalled, it's
22  not very useful for me to, but more importantly, I
23  have very useful information that you folks have
24  turned over that tell me what I need to know.
25      MR. COX:

20 (Pages 74 - 77)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 78

1    Q. So none of that answered my question, and
2  I'll ask it again.
3    MR. OSBORNE: I'll object to your form so far
4  right now, Brandon, because you're being
5  argumentative, and really that comment is
6  unnecessary. Ask your question, please. And
7  incorrect.
8    MR. COX: Just let me know when you're done.
9    MR. OSBORNE: It's been about eight seconds,
10 Brandon. I think you can tell.
11   MR. COX:
12   Q. For purposes of the opinions you are
13 offering in this case related to the warnings that
14 you contend should have been on the Fisher-Price
15 product in June of 2014, could you have conducted
16 some type of testing to assess whether consumers and
17 how consumers would have responded to those
18 warnings? And I want you, for purposes of my
19 question, to ignore entirely the information from
20 Fisher-Price related to the in-home testing. Are we
21 on the same page as to what I'm particularly asking
22 you?
23   MR. OSBORNE: Okay. Form. Brandon, she's
24 going to answer the question as she understands you
25 asked it, and you are attempting to manipulate her

Page 79

1  answer inappropriately. So she's not going to
2  follow some instruction. You can ask her questions,
3  she can answer it. That's the way the depositions
4  work. And I'm not going to have you shepherding her
5  answer in a manner that you want. That's
6  inappropriate. Ask the question, give no
7  instructions, and receive the answer.
8    MR. COX: John, let me know when you're done.
9    MR. OSBORNE: No.
10   MR. COX:
11   Q. Could you have conducted some type of
12 testing to assess how consumers would respond to the
13 Rock 'n Play Sleeper and the warnings you contend
14 should have been on it?
15   A. Well, I did do testing on the two key
16 people, and had they had that, they gave very
17 explicit responses about how those would have
18 affected them. I can't go back in time and erase
19 everyone's memories and do premarket testing, which
20 is when it needed to be done.
21   Q. Other than the interviews you conducted
22 with the plaintiffs, could you have conducted
23 testing of other consumers to assess how they would
24 or might respond to the warnings you contend should
25 have been on the Rock 'n Play Sleeper?

Page 80

1    A. That would have been useless because
2  there's too much information out there right now,
3  and I can't go back in time and erase people's
4  minds. And you had good information for me, so I
5  didn't need to, because I'm relying on the two
6  surveys that you folks did that were done early on,
7  and so I'm using that, relying on that as well as my
8  interviews with the plaintiffs.
9    Q. The surveys that you're referring to are
10 the in-home testing surveys that were conducted; is
11 that fair?
12   A. The employee and the nonemployee in-home
13 testing.
14   Q. And if I understand your opinions that
15 you've offered in this case, those testing surveys
16 indicated that users did not always use the
17 restraint system; is that correct?
18   A. That's correct.
19   Q. And that's what forms the basis of your
20 opinion that an additional or different warning
21 would have changed how consumers used the product?
22   MR. OSBORNE: Form.
23   THE WITNESS: Okay. You asked me about
24 Dr. Ayres' article, and we went back and we talked
25 about it, and I explained that he -- we read part of

Page 81

1  it saying that warning content can affect people's
2  judgments about the hazards of a product and that
3  can affect product decisions. And that was -- so
4  you're saying it was my opinion where we were
5  talking about an article. All that goes into the
6  basis of the opinions that I gave in my reports.
7    MR. COX:
8    Q. So I'm not talking about the article
9  anymore.
10   With respect to the in-home testing surveys
11 and the overall opinions that you're offering in
12 this case, do I understand those opinions to be that
13 the in-home testing surveys indicated to you that
14 consumers did not always use the restraint system?
15 Is that fair?
16   A. Yes.
17   Q. And it's the in-home testing, the results
18 of those testing, that you're relying on for your
19 overall opinions in this case that a different or
20 additional warning would have changed consumers'
21 behaviors; correct?
22   A. Well, that's a part of it. I mean,
23 that's -- that's one of the factors that I weighed
24 that went into my opinions, but there was quite a
25 bit more that went into them.

21 (Pages 78 - 81)

Veritext Legal Solutions

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 82

1    Q. What would be the other factors that go
2  into that particular part of your opinions?
3    A. All the other discovery, everything else.
4  I mean, it's written out in my opinions, the bases.
5  You have lots of footnotes.
6    Q. We've talked about the Ayres article, and
7  there's a couple of other things here in your file.
8  Just to round this out, you told us about some
9  deposition summaries that you prepared; correct?
10   A. Yes.
11   Q. And I assume that these are summaries that
12 you yourself prepared, or did someone in your office
13 assist you with the preparation of these?
14   A. I do them.
15   Q. There's also an article here called the
16 "Handbook of Warnings," with which I'm familiar, and
17 that's what I'm showing you now; correct?
18   A. Yes.
19   Q. Then I see that there's a -- what appears
20 to be an Internet article of "Graco Recalls Infant
21 Inclined Sleepers Due to Suffocation Risk." Do you
22 see this?
23   A. Yes.
24   Q. Can you tell me why this was relevant or
25 helpful to your opinions?

Page 83

1    A. I'd have to look up which footnote that is.
2  It might be a web address. Is there a web address
3  on that?
4    Q. I'll just hand it to you.
5    A. Rachel Peachman.
6    Q. Appears to be Footnote 50 -- 15. I'm
7  sorry.
8    A. Thank you.
9    Q. Thank you.
10   A. Okay. So this is a Consumer Reports
11 article, and it's talking about -- it does talk
12 about the Rock 'n Play, and I have a slightly
13 different format than you're looking at, I think.
14   Q. That might be the case. This is what I was
15 sent from your counsel.
16   A. Okay. I probably printed this out at a
17 different time and then sent you the link. It
18 should be the same article, but unfortunately we're
19 going to have different pages.
20   Q. That's fine. You can just generally tell
21 me what you relied on in this particular article for
22 your analyses and opinions.
23   A. So I think this is actually something that
24 I read before being involved in this case. I was
25 aware of Consumer Reports article, and it talks

Page 84

1  about Chapman and a development process. The
2  paragraph above where it says Fisher-Price marketing
3  where it starts what Chapman didn't know.
4    Q. I don't appear to have that. Let me just
5  ask you this. This article, the title of it is
6  about Graco; correct?
7    A. Not the one I have. I'm wondering if
8  that's the wrong article.
9    Q. It may very well be something different.
10   A. It's the same author. I think it's
11 slightly different. I'm going to show you.
12   Q. Sure.
13   A. If that's -- that might be a different
14 footnote. I'm thinking that's for a different
15 footnote, not this one. Do you have this one called
16 "While They Were Sleeping"?
17   Q. Yeah. According to your Footnote 15, this
18 is the Graco one.
19   A. Okay. So --
20   Q. Anyway. Then it's --
21   A. Must have sent the wrong one. I'm happy to
22 have you take a photocopy of this during a break or
23 something to give you, the one that I did refer to.
24 But this is about the Fisher-Price Rock 'n Play, and
25 perhaps I sent the wrong link.

Page 85

1    Q. It's no problem.
2    A. So if you want to make a note, during a
3  break, during 15, I'm happy to give this to the
4  hotel to get you a copy of the right one.
5    Q. The next article that I see in your file is
6  "Warnings and Risk Communication." Do you see what
7  I'm showing you now?
8    A. Oh, yes.
9    Q. I also see your testimony list with which
10 I'm familiar. And there appears to be a December
11 2019 printout of perhaps something from the Internet
12 about 73 infant deaths. Do you see this?
13   A. I can't really see that well.
14   Q. It's actually in your -- it's in that
15 Redweld, if you want to look at it, because these --
16   A. Do you want to give me a footnote number.
17   Q. I don't know what the footnote number is
18 because these are just the documents that are --
19 were sent so your counsel last night.
20   MR. OSBORNE: I'm not seeing any of these
21 documents that you're showing my -- the witness.
22   THE WITNESS: Rachel --
23   MR. OSBORNE: Nothing is coming across on
24 Veritext.
25   MR. COX: So, John, these are all of the

22 (Pages 82 - 85)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 86

1  documents that your office sent to us within the
2  last several days.
3      THE WITNESS:  Okay.  This is -- "While They
4  Were Sleeping," this is Footnote Number 15.  There
5  you go.
6      MR. OSBORNE:  And I don't know, Brandon, what,
7  you know, difference it makes.  I should be able to
8  see things that you're going to use in the
9  deposition once you've shown it to the witness.
10     MR. HERMAN:  John, he marked as Exhibit 2 the
11  entire file that Vredenburgh produced to our office.
12  So those documents that you sent to us, we're not
13  marking each one of the individual documents via
14  Exhibit Share.  We'll mark the entire file as
15  Exhibit 2, and inside of that file or contained in
16  that file are the articles and the documents that
17  Brandon is showing to Dr. Vredenburgh.
18     MR. OSBORNE:  So is Exhibit 2 inaccessible to
19  present on Veritext because of the volume or what?
20     MR. COX:  It's in your e-mail, John.
21     MR. OSBORNE:  My e-mail.
22     MR. COX:  Yes.  Your office sent it to us.  We
23  didn't bring these documents with us.
24     MR. OSBORNE:  Yeah.  Well, I didn't exactly
25  open Dr. Vredenburgh's entire file.

Page 87

1      MR. COX:  Then why don't you do that now.
2      MR. OSBORNE:  Normally you present the
3  exhibits, and I look at them.
4      Okay.  I've stated my position for the
5  record.  You can continue.
6      MR. COX:  Thanks.
7      Q.  There appear to be in your file a couple of
8  chapters from some books, so Chapter 32 and then
9  Chapter 31 about occupational risk management.  Do
10  you see the two documents that I'm showing you?
11     A.  Is that Zimolong?  That looks like Zimolong
12  on the right.
13     Q.  That's correct, ma'am.
14     A.  Okay.  And the other one?  Let me see.
15  Just hold it -- very well -- Who is that?  That is
16  Wogalter.  Okay.  Yes, I know them both.
17     Q.  The article or chapter from the book about
18  occupational risk management, how did that assist
19  you in your opinions in this case?
20     A.  Okay.  That's Footnote Number 18.  So if
21  you want to go to 18.  Or -- you're talking about
22  the Zimolong one; right?
23     Q.  Yes.
24     A.  So if you read the report at Footnote 18 --
25  so "[as read] Risk management is the reduction and

Page 88

1  control of adverse effects of the risks for which
2  people are exposed."
3      And if you want to go to page -- let's see
4  if I highlighted this.  I didn't highlight this one.
5      So essentially what this whole article's
6  about is how to manage risk and what the process is,
7  and it's essentially to prioritize approaches to
8  reduce exposure.  So it could be materials and
9  machinery, equipment, procedures, all these
10  different things.
11     Q.  We can generally agree that this case
12  doesn't involve any sort of workplace occupational
13  hazard; correct?
14     A.  It does not, but risk management is an
15  approach, and it could be applied to anything.  So
16  it's more the risk management principles that can
17  be -- basically, if you want to promote health and
18  foster well-being of the users, whether it's a
19  workplace environment or equipment or a consumer
20  product, that approach is still appropriate.
21     Q.  And then the rest of the documents that I
22  see in the file that counsel sent over to us appear
23  to be excerpts of reports from Dr. Arndt and
24  Ms. Drago.
25     A.  Okay.  So you can staple Arndt together.  I

Page 89

1  was having a lot of problems with my scanner with
2  jamming, so I did it in pieces after a while.
3      Q.  That's fine.
4      A.  And so I only ended up scanning the pages
5  that I wrote on.  So if I didn't scribble on it,
6  then I didn't send it.
7      Q.  I think I follow you, because there are
8  some notes on your --
9      A.  On those pages, they should have, you know,
10  notes in the margins or something.
11     Q.  Yes.
12     Since your June 2021 rebuttal report, have
13  there been any additional documents that you have
14  received and reviewed that we haven't discussed
15  already?
16     MR. OSBORNE:  Form.
17     THE WITNESS:  Not that I recall.
18     MR. COX:
19     Q.  What did you do to prepare for your
20  deposition today?
21     A.  I reviewed my reports and the two expert
22  reports that we just mentioned.
23     Q.  Did you have a chance to meet with either
24  Mr. Osborne or anyone from his office to prepare for
25  today?

23 (Pages 86 - 89)

Alison Vredenburgh, Ph.D.          September 22, 2021
In Re: Fisher-Price/Mattel

Page 90

1     A. No.
2     Q. Is that your usual MO, that you don't meet
3  with the attorney before your deposition?
4     A. Well, nothing's usual with COVID, but he
5  couldn't come out here, so we couldn't meet.
6     Q. That might have been a little bit of a bad
7  question on my part.
8        Did you have any conversations or
9  discussions with him before today to prepare for
10 your deposition? And, of course, I don't want to
11 know the substance of those, but just generally
12 whether they happened.
13    A. I spoke to him for a half hour yesterday
14 morning.
15    Q. Did you review -- did -- were you shown,
16 rather, any documents during that telephone
17 conversation? I assume not, but I'll ask anyway.
18    A. I wasn't shown anything.
19    Q. Did you reread any other documents other
20 than your three expert reports that we'll talk about
21 momentarily?
22    A. And your two expert reports, and I think I
23 looked through some of these documents that are in
24 my footnotes.
25    Q. Let me ask the question differently.

Page 91

1        In addition to the three reports that
2  you've written that you reviewed to prepare for
3  today, what else did you review?
4     A. At what point in time?
5     Q. Before today.
6     A. Any time before today?
7     Q. Sure.
8     A. I reviewed everything that's listed in all
9  the lists at the front of my reports as well as the
10 depositions of Dr. Deegear, and I think your expert
11 reports are listed in my report, so I think that's
12 it.
13    Q. And that was --
14    A. And then I spoke to the plaintiffs.
15    Q. And that was all in conjunction with you
16 preparing for your deposition today?
17    A. You said any point in time. So those are
18 the things I looked at.
19       To prepare for today, I reread the reports
20 and reread your expert reports.
21       Can we take a break at some point?
22    MR. COX: Sure. We can take a break now if you
23 want.
24    THE VIDEOGRAPHER: Okay. 1:02, we're off the
25 record.

Page 92

1     (Interruption in proceedings.)
2     THE VIDEOGRAPHER: At 1:17, we're back on the
3  record.
4     MR. COX:
5     Q. Dr. Vredenburgh, I'd like to now transition
6  into getting into your reports and the opinions that
7  you've rendered in this case. We've talked a little
8  bit about how you've been an expert witness many
9  times before in the past; correct?
10    A. Yes.
11    Q. You've prepared many different reports in
12 the past, I assume; correct?
13    A. Yes.
14    Q. And do you understand that when preparing
15 an expert report for litigation like you did in this
16 case, your purpose is to identify the opinions that
17 you're offering; true?
18    A. Yes.
19    Q. And it's also to provide the bases for the
20 opinions that you're offering; correct?
21    A. Yes.
22    Q. And in this particular case, the three
23 reports that you've prepared do just that. They
24 identify your opinions and they provide the bases
25 for those opinions; true?

Page 93

1     A. Yes.
2     Q. And you also provide a list of the
3  materials that you've relied on; correct?
4     A. Yes.
5     Q. And in this case, I understand from our
6  earlier questioning that it's both in the form of
7  the footnoted references in each of your reports as
8  well as the materials consulted or reliance lists
9  that's at the end of your reports; is that fair?
10    A. Yeah. I think the first report has a long
11 list of materials.
12    Q. Yes. And I'll call that a reliance list or
13 materials consulted list, however you'd prefer the
14 jargon to be. But in general, those sources of
15 information compile the bases of your opinions; is
16 that fair?
17    A. Yes, as well as the -- looking at a device
18 itself and talking to the parents.
19    Q. And that's a good point. So at least in
20 this case --
21       That's a fair point. And in this
22 particular case, you also reviewed both an exemplar
23 version of the product as well as the Rock 'n Play
24 Sleeper in which Z█████ Olson died; correct?
25    A. Yes.

24 (Pages 90 - 93)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 94

1    Q. And I also understand -- and we'll get into
2    this much later -- that you interviewed the parents
3    in this case; true?
4    A. Yes.
5    Q. And just so that -- sort of round that out,
6    that source or those sources, rather, of information
7    form the bases of the opinions that you've offered
8    in this case; correct?
9    A. Well, that and my education and my other
10   experience.
11   Q. All of which is listed and identified in
12   your report as well as your CV; true?
13   A. Yes.
14   Q. Is there anything that you considered in
15   developing your opinions that you did not include or
16   identify in any of the three reports that you've
17   given us?
18   A. No.
19   Q. I want to start by identifying some subject
20   areas that are not included within your opinions and
21   your education and expertise; is that fair?
22   A. I don't understand.
23   Q. Sure. So in this case, you are not, for
24   example, offering opinions as a pediatrician; true?
25   A. True.

Page 95

1    Q. You're not offering opinions as a
2    neonatologist; correct?
3    A. True.
4    Q. And you don't have any medical background
5    to offer those type opinions; is that correct?
6    A. I don't have background in that area. I
7    have medical background, but not in that area.
8    Q. And by "that area," I mean pediatrics and
9    neonatology; correct?
10   A. Correct.
11   Q. Pediatric pulmonology, that's not an area
12   in which you'll be offering opinions in in this
13   case; correct?
14   A. Correct.
15   Q. Okay. And you are not going to be offering
16   opinions in this case on SIDS, S-I-D-S, or SUIDS,
17   S-U-I-D-S; correct?
18   A. Yes, correct.
19   Q. You'd agree with me that you're not an
20   expert on infant safe sleep practices; is that fair?
21   A. Fair.
22   Q. You don't plan to come to trial and offer
23   any opinions to the jury about any of Z█ s medical
24   conditions and her cause of death; is that correct?
25   A. Yes.

Page 96

1    Q. And more specifically, you don't intend to
2    come to trial and offer to the jury any opinions
3    about what caused Z█ s cause -- what caused Z█'s
4    death; true?
5    A. Other than what we've talked about.
6    Anything as far as her being in a sleeper.
7    Q. And more specifically, what I mean by that
8    is you're not going to tell the jury that the reason
9    that Z█ died was because of X medical condition or
10   Y medical condition; true?
11   A. True.
12   Q. Nor will you come and tell the jury that
13   the reason that Z█ Olson died was related to some
14   design feature of the Rock 'n Play Sleeper; correct?
15   A. Only to the extent I discuss it in my
16   reports.
17   Q. You're not a biomechanical engineer, are
18   you?
19   A. I'm not.
20   Q. Do you have any engineering educational
21   background?
22   A. Yes. Human factors engineering.
23   Q. Other than human factors engineering,
24   you're not an expert on the biomechanical mechanisms
25   of injury related to the Rock 'n Play Sleeper; is

Page 97

1    that fair?
2    A. Yes.
3    Q. With that context in mind, you're not going
4    to come to trial and offer opinions to the jury that
5    there was a biomechanical defect in the design of
6    the Rock 'n Play Sleeper that caused Z█ Olson to
7    die; correct?
8    A. Correct.
9    Q. You've never personally designed an infant
10   sleep product before; correct?
11   A. Correct.
12   Q. You wouldn't consider yourself an expert on
13   inclined sleepers, would you?
14   A. To the extent that it's in my reports.
15   Only human factors evaluation of inclined sleepers,
16   yes; the safety of it, yes.
17   Q. We talked a bit earlier about the CPSC.
18   Other than the conversations you've had with some of
19   those women that we discussed earlier today, you'd
20   agree with me that you don't consider yourself to be
21   an expert in CPSC regulations; true?
22   MR. OSBORNE: Form.
23   THE WITNESS: That's pretty broad.
24   MR. OSBORNE: Foundation.
25   MR. COX:

25 (Pages 94 - 97)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

1    Q.  Have you testified and offered opinions in
2    any other cases related to CPSC standards and
3    regulations?
4    A.  Well, they're a part of lots of cases.  I'm
5    not testifying as a member of -- as an employee of
6    the CPSC, but CPSC issues come up all the time in
7    cases.
8    Q.  Before your work on this case that we're
9    going to be discussing today, have you ever offered
10   any opinions related to CPSC regulations specific to
11   infant inclined sleepers?
12   A.  No.
13   Q.  Before the opinions that you are offering
14   in today's case, have you ever offered opinions in
15   any other case related to ASTM standards pertaining
16   to infant inclined sleepers?
17   A.  No.
18   Q.  You've never published on the topic of
19   infant inclined sleepers, have you?
20   A.  I don't think so.
21   Q.  You've never lectured on the topic of
22   infant inclined sleepers before, have you?
23   A.  I think I've talked about -- on a panel.
24   We were talking about baby products, and I think
25   inclined speakers -- sleepers were one of the

1    devices that we were talking about on the panel.
2    Q.  What panel was that?
3    A.  I'm on panels almost every year on HFES.
4    There's -- there's a new -- or not new anymore, but
5    newish technical group.  The Human Factors and
6    Ergonomics Society's broken up into technical
7    groups, and one of -- the newest one is the
8    children's one, which includes infants.  And I
9    helped form that group, and I've been on some panels
10   for them, and prior to them forming a group I was on
11   concerning children products.
12   Q.  What --
13   A.  And again, that has included infant
14   products.  So I've been asked to be on various
15   panels.  It's an invited panel.  As far as which
16   one, I can't remember.  A few years ago I was on
17   one, and then often I'm on them, but I couldn't tell
18   you which ones.
19   Q.  What were you generally discussing related
20   to infant inclined sleep products?
21   A.  Well, it was more broad than that.  The
22   thing about infant products which is different than
23   a lot of other consumer products is that you're
24   using it for someone else, so it's almost like a
25   medical instrument where the infant's at the sharp

1    end as -- like a doctor isn't necessarily injured
2    but the patient would be.  So the infant, it's kind
3    of more that kind of relationship where the -- it's
4    not the infant that needs to read the warnings or
5    appreciate the hazard, it's the parent.  So we
6    talked a lot about that the diverse parent
7    population.
8        Also, infant products are passed around a
9    lot because they're not used very long.  So, say,
10   infant one's only used for a few months, so you have
11   to expect the resale market or the gift market.  And
12   so we talk a lot about the collateral materials,
13   because they don't get passed with them.  Often the
14   packaging is gone, so often it's on the product
15   itself.  So that's one thing.
16       And then the expected users, there's also
17   the nanny or babysitter population in addition to
18   the parents.  So it's a lot more complicated when
19   you're talking about infant products than other --
20   other products.
21   Q.  What specifically did you talk about on
22   that panel related to infant inclined sleep
23   products?
24   A.  Again, we were talking generically.  I
25   think we talked about that as one of the products

1    that were hazardous that we used as an example when
2    we were talk- -- I think slings were another one,
3    and I can't remember what the other products were.
4    I think Bumbo seat or one of the derivatives were
5    also one.
6        But there's the known dangerous products
7    that kids -- I think magnets were another one known
8    to cause problems that have incident reports.  And
9    generically what can be done, how do we inform
10   parents, what's the best way to communicate, what's
11   the best way to eliminate the hazards, and we also
12   looked at -- may have been different panel --
13   noninfant products that injure infants is another
14   one.  They get burned a lot.
15       So I think -- I don't remember specifically
16   what we said about inclined sleepers.  I think they
17   were one of the examples we used of a group of
18   products.
19   Q.  What were the hazards that you all were
20   discussing related to those products, including
21   infant inclined sleep product?
22   A.  Well, suffocation would be one.  Bumbo's
23   fall hazard.  Magnet swallowing hazard.  The magnets
24   connect to each other and then they can cause a lot
25   of problems.

26 (Pages 98 - 101)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 102

1    I'm not remembering all the different
2  products right now.  But those -- you know, each of
3  them might present different types of problems, but
4  we were talking more at a higher level conceptually
5  of protecting infants through different human
6  factors protocols.
7        Q.  And during those discussions, I assume
8  various manufacturers may have come up in the
9  conversation other than, for example, Fisher-Price
10  and Mattel; fair?
11        A.  I don't know that we really talked about
12  manufacturers so much as design.  We're more
13  interested in the design than the manufacturers.  I
14  think Bumbo was probably the one that was named,
15  even though it wasn't necessarily even a Bumbo
16  product, just because it's recognizable for them.
17        I don't know -- I can't recall specifically
18  talking about other manufacturers as opposed to
19  different kinds of positioners or sleepers or
20  products.  I think the Rock 'n Play was specifically
21  mentioned.  I think slings were used generically,
22  magnets were generic, and Bumbo was specifically
23  mentioned.  But I don't know that Fisher-Price was
24  mentioned.
25        Q.  You've never developed a warning for an

Page 103

1  infant inclined sleep product; correct?
2        A.  Other than for this case, no.
3        Q.  We marked as Exhibit 3 a copy of your April
4  2021 report, and I'll go ahead now and mark as
5  Exhibit 4 a copy of your June 7, 2021 supplemental
6  report, and then as 5 a copy of your July 12, 2021
7  rebuttal report.
8        And I understand you have a copy of those
9  in front of you, and you don't want me to pass one
10  to you; right?
11        A.  I don't need them.  I have them here.
12        Q.  Before I get into those, we talked a little
13  bit about how you don't plan to come to trial and
14  tell the jury or talk -- testify to the jury,
15  rather, about design defects within the Rock 'n Play
16  Sleeper.  Is that fair?
17        A.  I don't know if I would use the word
18  "defect," but I will talk about the user interface
19  and the placement of the warning on the sleeper and
20  the expected use environment.  So I'll talk about
21  the design and the limitations of the design, and
22  the jury can decide if it's defective or not.
23        Q.  Your opinions have been excluded by Courts
24  before related to the design of a product; is that
25  true?

Page 104

1        A.  I've been limited where I -- in a case I
2  could talk about warnings, and the engineer could
3  only talk about design.  I could talk about the
4  hierarchy, but I could not talk about a specific
5  design issue, and he couldn't talk about warnings.
6  They didn't want two people covering it.
7        Q.  And in this case, you're aware that there
8  is an expert, Dr. Sinkhose, hired by the plaintiffs,
9  who's been hired to offer specific biomechanical
10  engineering opinions; correct?
11        A.  Yes.
12        Q.  And he's been offered -- or hired, I'm
13  sorry, to offer opinions related to the design -- or
14  defective design, as he claims, of the Rock 'n Play
15  Sleeper; true?
16        A.  Yes.
17        Q.  And so you're aware that there is another
18  expert who's going to offer opinions in that
19  particular area; correct?
20        A.  Yes.
21        Q.  When you say that you are going to be
22  offering opinions from a human factors standpoint,
23  I'd like to know from you what exactly what means.
24        A.  Well, if you look at the first report, I
25  discuss the hierarchy, and that's the foundation of

Page 105

1  all human factors analysis approaches.  So the
2  theory is that if there's a hazard, that the best
3  way to address it is to eliminate it through design.
4  So that's pretty much how much I talk about design
5  is the approach to eliminate it through design.
6        As far as the specifics that you just
7  mentioned, I would rely on your -- the other expert
8  that will talk about those.  But I will talk about
9  the theory as far as that approach, and I will also
10  talk about the design as far as the user interface
11  that I talked about in my -- my report, because
12  that's very much the foundation of human factors, is
13  the expected use, the use environment, the user
14  interface.
15        Q.  And in terms of the hierarchy that you
16  discussed, with which we're all certainly familiar
17  by now, it's the design, guard and warn.  Is that --
18  I don't mean to simplify that, but in terms of a
19  hierarchy, that's what you're referring to?
20        A.  True.
21        Q.  Let's start by going through several of the
22  opinions that you have in your April 2021 report.
23        A.  April -- the April 1st one?
24        Q.  Yes.
25        A.  The main report.

27 (Pages 102 - 105)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 106

1    Q. And on page 3 of your report, the first
2    opinion there under findings and conclusions is that
3    "It is my opinion that the Fisher Price failed to
4    effectively manage the suffocation hazard created by
5    its design of the Rock 'n Play."
6        Do you see where I am?
7    A. Yes.
8    Q. What forms the basis of your opinion that
9    the Rock 'n Play sleeper has a suffocation hazard?
10    A. I'm relying --
11    MR. OSBORNE: Form.
12    THE WITNESS: -- on other -- Oh, go ahead,
13    John.
14    MR. OSBORNE: No. I stated my objection.
15    THE WITNESS: Okay.
16    That I'm relying on other people as far as
17    determining whether it's a hazard, but I've seen
18    lots of incident reports on -- on that as well as
19    read various articles about it, so my opinions are
20    based on the expectation that there was a
21    suffocation hazard created by the Rock 'n Play.
22    MR. COX:
23    Q. And that assumption or opinion -- I don't
24    want to mischaracterize it; that's not what I'm
25    intending to do -- but the existence of a

Page 107

1    suffocation hazard, as I understand it, that derives
2    from other experts such as the biomechanical
3    engineering expert, Dr. Sinkhose, hired by the
4    plaintiff; correct?
5    A. Yes, as well as lots of articles I've read
6    about it. And my understanding from conferences,
7    it's -- it's pretty well-known. Like I said, I was
8    aware of that before I was hired.
9    Q. I assume, then, you were also aware that
10    other sleep products may also expose an infant to a
11    suffocation hazard; true?
12    A. Well, generically. I mean, I've talked
13    about it -- it depends on the product, but there is
14    that possibility with some products, and some may
15    pose more than others. But this one is the one
16    that's known to be problematic and the one that's
17    been discussed the most as far as maybe publicly and
18    at conferences.
19    Q. And so the fact that other sleep products
20    also expose an infant to a suffocation hazard means
21    that that's not something that's specifically unique
22    to the Rock 'n Play Sleeper; correct?
23    A. Well, I think that whether or not other
24    products do is kind of not relevant to my analysis
25    of -- of this particular device. Other -- I guess

Page 108

1    that's sort of -- just because some other -- other
2    sleep product might also have problems does not
3    affect my opinions about this device.
4    Q. We can agree, though, that a crib, for
5    example, can expose an infant to a suffocation
6    hazard; true?
7    A. The crib itself probably does not.
8    Q. What's the basis for that?
9    A. It's usually what they put into the crib
10    that might cause a problem.
11    Q. Are you aware of incident reports or any
12    type of data where an infant has suffocated in a
13    crib?
14    A. I'm aware that there have been some SIDS
15    reports. I'm not looking at the etiology. Again,
16    the medical opinions can be determined by other
17    people. But again, that's not relevant to the
18    unique hazards posed by this that makes it different
19    than a crib. I'm focusing on -- on this case, not
20    if there might be other hazards in some other
21    device.
22    Q. Did you think to do any type of analysis to
23    understand the differences between the designs of,
24    say, a crib versus a Rock 'n Play Sleeper and how
25    they may or may not expose an infant to a

Page 109

1    suffocation hazard?
2    A. Well, again, limiting my design to the user
3    interface, the seat belt is the design issue, and
4    the slope is unique. Cribs don't require a seat
5    belt, and so -- or a restraint, so that is a unique
6    design feature that is part of my evaluation as well
7    as the incline, which also is different.
8        So to that -- to that extent, again, it's
9    the user expectations, transfer of learning, and the
10    unique use of the restraint for a sleep device.
11    Q. Are you aware of any data or testing that
12    suggests sleep environments such as a crib, bassinet
13    or playpen expose an infant to a greater risk of a
14    suffocation hazard than a Rock 'n Play Sleeper?
15    A. No.
16    Q. Would that type of data or testing at all
17    be relevant or helpful to the opinions that you're
18    offering in this case?
19    A. No. That's a different expert.
20    MR. OSBORNE: Could I interrupt for a second.
21    My view is basically down the table, and I cannot
22    see the witness. So if somebody could rotate
23    whatever the camera is and help me.
24    MR. COX: I think it's because your camera is
25    off, John.

28 (Pages 106 - 109)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

1    MR. OSBORNE: There you go. Thank you very
2    much.
3    MR. COX: Sure.
4    MR. OSBORNE: Just scoot it back the other way.
5    MR. COX: Just give me one second.
6    Q. You said that that would be for a different
7    expert. What type of expert?
8    A. The medical, the -- what we were just
9    discussing, the biomechanics or the medical expert
10   as far as the etiology of other incidents.
11   Q. Did you think to do any type of testing or
12   analysis to compare how consumers would respond to a
13   warning label on a crib versus a Rock 'n Play
14   Sleeper?
15   A. No. Again, the Rock 'n Play is a unique
16   device, it's a new device, and the differences are
17   important because of transfer-of-learning issues.
18   Q. What's the basis of your statement that
19   it's a new device?
20   A. It's -- there wasn't even a standard for it
21   initially. It took the bassinet standard. It's --
22   the incline and the seat belt is -- the only sleeper
23   I'm aware of that has those, at least at the time it
24   was introduced to the market.
25   Q. Do you know for how long the Rock 'n Play

1    Sleeper has been on the market?
2    A. I don't remember the year. I've read it.
3    I don't recall the year right now off the top of my
4    head.
5    Q. In the paragraph below that particular
6    heading, you talk about the methodology that you
7    used in forming your opinions. Can you describe for
8    the jury what is your methodology that you would
9    undertake to perform a human factors analysis like
10   the one you did here.
11   A. Any time that a risk has been identified --
12   and in this case, we're looking at the suffocation
13   risk -- then the best way to address a hazard such
14   as suffocation would be through changes to design to
15   eliminate the -- the risk, because if you eliminate
16   the risk, then there's nothing further that needs to
17   be done.
18   The worst way to address a hazard is
19   through a warning, because now you're pushing the
20   responsibility onto every single user a hundred
21   percent of the time. So if you eliminate the
22   hazard, then it's done. If you put a warning there,
23   then you're making all the users create the safe
24   environment or use of -- of the product, so it's the
25   least desirable because, as your data show, people

1    don't follow it all the time, and that's very
2    consistent with -- with how humans are, which is why
3    warnings are the least effective method to control a
4    hazard.
5    Q. How should the Rock 'n Play Sleeper have
6    been designed to eliminate the suffocation hazard
7    you say exists?
8    A. That would be a different expert to
9    address.
10   Q. When you are providing industrial
11   consultation to your clients, do you often advise
12   them on how they should design a product to avoid a
13   particular hazard?
14   A. Yes. So I do have a biomechanics engineer
15   with me at my firm, and we are currently doing that
16   for X device. So we would start at the top with
17   some issues that we know are known risks, and we
18   talk about possible design modifications, the
19   feasibility and what testing would need to be done.
20   And then the second level would be, if it
21   cannot be controlled through design because the risk
22   is inherent, like, let's say a table saw or
23   something where you have to have the risk in order
24   to have an effective device, then the next best way
25   would be to use a barrier to separate the users from

1    the hazard.
2    And then, as we said, warnings are the
3    least effective, because now you're forcing the
4    users to control the hazard as opposed to the
5    manufacturer.
6    MR. OSBORNE: May I interrupt for just a
7    moment. It's 13 minutes 'til the hour. I have a
8    conference with a different expert at 2:00 p.m.
9    Could we break for lunch or plan to break for lunch
10   just before 2:00?
11   MR. COX: We already decided that we were going
12   to break at 2:00 o'clock for lunch.
13   MR. OSBORNE: Well, I must have missed that.
14   Sorry.
15   MR. COX: That's no problem.
16   MR. OSBORNE: Go ahead.
17   MR. COX:
18   Q. Just so that I understand as I walk away
19   from this deposition, are you assuming for purposes
20   of your analysis and conclusions that the alleged
21   suffocation hazard could not have been designed out?
22   A. I'm not assuming one way or the other. I'm
23   saying that's the best and most effective approach
24   to manage it, and the engineers can determine
25   whether or not there is a way to manage it. But, of

29 (Pages 110 - 113)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 114

1    course, one way to manage it is to remove a product
2    from the market or to not buy the product, so that
3    would also remove people from it, if it's recalled,
4    et cetera. That would be another example of a
5    design where it's removed from the users.
6        Q. So as I understand your testimony, and you
7    tell me if I'm not right about this, you will defer
8    to other experts on whether and how the Rock 'n Play
9    Sleeper could have been designed to eliminate a
10   suffocation hazard. Is that fair?
11       A. Yes.
12       Q. We talked about how you're relying on other
13   experts for the existence of the suffocation hazard;
14   true?
15       A. Yes.
16       Q. We also talked a little bit about how
17   Courts have limited or excluded certain opinions of
18   yours in the past; correct?
19       A. Yes.
20       Q. And, in general, you're aware of that
21   process; correct?
22       A. Yes.
23       Q. That as a litigation expert, it may be the
24   case -- or could be the case, rather, that your
25   opinions could be limited or excluded via a Court;

Page 115

1    correct?
2        A. Yes.
3        Q. You'd agree with me that if for some reason
4    the engineering expert's opinion related to the
5    existence of a suffocation hazard is limited or
6    excluded, that affects the opinions that you're
7    offering; true?
8        MR. OSBORNE: Form, foundation.
9        MR. COX:
10       Q. You can answer.
11       A. No, because I am talking about the approach
12   and whether his -- if his opinion's excluded, that
13   does not change me describing the human factors
14   approach of the best way to address a hazard is
15   through eliminating it through design. That's true
16   no matter what engineering opinion is given.
17       Q. If the Court were to decide, for example,
18   that there's no scientific basis for an opinion that
19   the Rock 'n Play Sleeper presents a suffocation
20   hazard, what does that do with the opinions you've
21   offered today or --
22       MR. OSBORNE: Form and foundation.
23       MR. COX:
24       Q. -- your case, rather?
25       MR. OSBORNE: Go ahead.

Page 116

1        THE WITNESS: You're asking me if they
2    determined that there's no hazard associated with
3    the product -- if the Court does that? Is that what
4    your question is?
5        MR. COX:
6        Q. My question is specific to the suffocation
7    hazard.
8        If for some reason there is a determination
9    that there's no scientific basis for the opinion
10   that the Rock 'n Play Sleeper presents a suffocation
11   hazard, what, then, does that do to your opinions?
12       MR. OSBORNE: Form and foundation.
13       THE WITNESS: All of my opinions are about the
14   approach. So any hazards that are present, that
15   would be the approach to manage them. If there is
16   no hazard, then there is -- doesn't need to be
17   managed.
18       MR. COX:
19       Q. And just so that I understand as I walk
20   away today, is there any other hazard other than a
21   suffocation hazard that you identify in your reports
22   and I should know about?
23       MR. OSBORNE: Form.
24       THE WITNESS: So you're saying that -- I guess
25   I'm confused, because Fisher-Price says there's a

Page 117

1    suffocation hazard and ASTM says there's a
2    suffocation hazard, so I don't need to rely on the
3    plaintiff's experts that there's a suffocation
4    hazard?
5        So I don't know if that's what you asked
6    me, but I -- Fisher-Price had it in its warning,
7    ASTM had it in its draft warning, so I can rely on
8    both of them that that is a hazard. I think that
9    was your question.
10       MR. COX:
11       Q. No, that wasn't my question. I'm --
12       MR. OSBORNE: That's unnecessary and
13   argumentative. Try your question again.
14       MR. COX: John, all I was doing was just
15   clarifying for her that that wasn't my question.
16   I'm not arguing with her.
17       MR. OSBORNE: Sounded like an answer to your
18   question to me, so let's not be argumentative in
19   characterizing her question.
20       MR. COX: John, you're not in the room. She
21   was asking me to clarify my question. That's all
22   I'm doing.
23       MR. OSBORNE: No. She asked you if that was
24   your question, and you answered, "No, it's not."
25   But if it's not, then go ahead and ask -- ask it

30 (Pages 114 - 117)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 118

1  again.
2       MR. COX:  Let me know when you're done.
3       MR. OSBORNE:  No.  You can infer it from the
4  context.
5       MR. COX:
6       Q.  If for some reason my question was unclear,
7  let me try to ask it a little bit differently.
8            Other than the suffocation hazard that you
9  identify in the findings and conclusions section of
10  your report, is there some other hazard that you
11  have identified related to the Rock 'n Play Sleeper?
12       MR. OSBORNE:  Form.
13       THE WITNESS:  Well, the AAP -- look at page 23.
14  The AAP had a study that had the specification of a
15  firm, flat surface, but my evaluation showed it was
16  not firm or flat.
17       MR. COX:
18       Q.  Can you tell me how that answer identifies
19  a hazard for me?
20       A.  Because the AAP said that beds need to be
21  firm and flat, and this is not firm and flat and
22  thus posing a hazard.
23       Q.  What specifically is the hazard that you're
24  talking about there?
25       A.  That it's not firm or flat, and the AAP

Page 119

1  said that the safe sleep surface must be firm and
2  flat.  Other countries also said the same thing.
3       Q.  I assume, much like the suffocation hazard,
4  you're relying on another expert for the expertise
5  in that area; correct?
6       A.  In what area?
7       Q.  On whether the design of the Rock 'n Play
8  Sleeper and it being firm and flat or not being firm
9  and flat poses a hazard to infants.
10       A.  Well, the AAP says so.
11       Q.  I'm not asking about the AAP.  I'm asking
12  specifically as it relates to your opinions in this
13  case.  Are you relying on some other expert to offer
14  the scientific basis for an opinion that the Rock 'n
15  Play Sleeper is neither firm or flat?
16       MR. OSBORNE:  Form.
17       THE WITNESS:  I can evaluate that it's not firm
18  and flat and did so in my report.  So I'm not
19  understanding what your question is.  It's pretty --
20  it's -- we had the capability to determine whether
21  or not it's firm and flat through our testing, and
22  that's presented on pages -- starting on page 23
23  going on through page 26.
24       MR. COX:
25       Q.  And what's the specific hazard that that

Page 120

1  design feature exposes an infant to?
2       A.  Well, according to the AAP, they need --
3  beds need to be safe -- to be safe sleep
4  environment, it needs to be a firm, flat surface.
5       Q.  And in your expert opinion, what is the
6  specific hazard that an infant is exposed to by
7  virtue of that design or the lack of that particular
8  design?
9       MR. OSBORNE:  Form and foundation.
10       THE WITNESS:  That it's not safe according to
11  the AAP, pediatricians, foreign governments.  So
12  they -- that's an unsafe sleep environment if it's
13  not firm and flat.
14       MR. COX:
15       Q.  Not safe because of what reason?
16       MR. OSBORNE:  Form and foundation.
17       THE WITNESS:  The lack of being firm and flat.
18       MR. COX:
19       Q.  And what does the lack of being firm and
20  flat -- how does that expose an infant to a hazard
21  in the Rock 'n Play Sleeper?
22       MR. OSBORNE:  Form and foundation.
23       THE WITNESS:  Again, according to the AAP, that
24  it's necessary for a safe sleep environment.
25       MR. COX:

Page 121

1       Q.  Other than the AAP, are you able to tell me
2  how the design of the Rock 'n Play Sleeper, it not
3  being flat or firm, in your opinion, exposes an
4  infant to a hazard?
5       MR. OSBORNE:  Form.
6       THE WITNESS:  The European letters,
7  communications, also said that it can only be called
8  a soothing and not safe for a sleep environment.
9  Queensland, Australia, and New Zealand, Canada said
10  it's not safe for sleep, because the current
11  accepted safe sleep recommends a firm, flat surface
12  for unsupervised sleep.
13       MR. OSBORNE:  Counsel, can we take this up
14  after lunch?  It's two minutes 'til.
15       MR. COX:  As long as she's finished with her
16  question, we can do that.  I just want to make sure
17  it's done for the record.
18       MR. OSBORNE:  With her answer?
19       MR. COX:  I'm sorry.  Her answer.
20       MR. OSBORNE:  Dr. Vredenburgh, is there
21  anything further you had to provide in response to
22  the last question?
23       THE WITNESS:  Also, Kitty Pilarz was unaware of
24  any death that occurred in Canada where the Rock 'n
25  Play is only sold as a soother as opposed to a

31 (Pages 118 - 121)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 122

1  sleeping device. So several foreign countries have
2  said the RNP was not safe, could not be sold as a
3  sleeper.
4        MR. COX: You let us know when you're done.
5        THE WITNESS: I'm done. Take a break.
6        MR. COX: Okay.
7        THE VIDEOGRAPHER: Okay. At 1:58, we're off
8  the record.
9        (A lunch recess is taken.)
10       THE VIDEOGRAPHER: At 2:38, we're back on the
11  record.
12       MR. COX:
13       Q. Dr. Vredenburgh, before we broke, we were
14  talking about your report, and I think we're on
15  page 4 now, that I'd like to turn your attention to.
16       THE VIDEOGRAPHER: Counsel, your microphone.
17       MR. COX:
18       Q. Okay. The first full paragraph there
19  starts with "[as read] Fisher Price was informed of
20  the hazard through incident reports, communications
21  with internal distributors, as well as communication
22  with Dr. Benaroch, a pediatrician who contacted
23  Fisher Price on several occasions."
24       Do I understand that these incident
25  reports, case histories, and the communications that

Page 123

1  are listed here serve as at least one basis for your
2  opinion related to Fisher-Price's failure to manage
3  the suffocation hazard?
4        A. That's information that they had which
5  would certainly go to the identification of the
6  hazard, and then the management is what -- the next
7  step, which are the hierarchy steps that we talked
8  about.
9        Q. Would you agree with me that that
10  information is anecdotal?
11       A. Not necessarily. I mean, doctors can put
12  in incident reports of what happened with their
13  patients.
14       Q. Did you review the specific incident report
15  related to Dr. Benaroch?
16       A. I saw the communications with him. I think
17  it was e-mails or letters with him.
18       Q. I might have maybe used a bad question when
19  I said, "anecdotal." So what I'm meaning by that is
20  these are accounts of situations or incidents that
21  have happened to consumers. Is that fair?
22       A. To consumers or their -- their children or
23  their patients.
24       Q. Right. In your experience as a human
25  factors expert, do you generally rely on incident

Page 124

1  report data as a basis for your opinions?
2        A. Well, incident reports are critical. Near
3  misses are very important too. If they identify a
4  hazard, it's certainly something that needs to be
5  investigated, and incident reports are where
6  incidents actually occurred.
7        But they could also be near misses where a
8  product -- somebody was able to survive it or, you
9  know, they identified a hazard. So it's probably
10  some of the most important early market information
11  that a manufacturer can have as part of their
12  postmarket surveillance.
13       So after they do their due diligence where
14  they're testing evaluation that they should do prior
15  to introducing it to market, especially if it's a
16  new product category, those incident reports are
17  what we call critical incidents that would identify
18  there's a potential risk that needs to be addressed.
19       Q. They're incident -- I'm sorry. I didn't
20  mean to cut you off. My apologies.
21       Are incident reports scientific data?
22       A. Depends on how -- I mean, there's different
23  types of scientific data. There's qualitative and
24  quantitative. I would put it as qualitative data.
25  It's very important data that all the postmarket

Page 125

1  surveillance, whether it's put to the CPSC or
2  whether clinicians are reporting it to the FDA, are
3  critical, some of the most important information
4  that manufacturers can have to help them identify
5  hazards that they missed in their premarket studies.
6        Q. Can you point me to an authoritative source
7  that provides support for the proposition that
8  incident reports constitute scientific data.
9        A. Scientific data is data that's collected
10  that -- I mean, your question doesn't make a lot of
11  sense. We could talk about qualitative versus
12  quantitative, and qualitative data is more early.
13  It could be interviews, it could be ethnographic
14  studies. There's different ways to -- to evaluate
15  it.
16       But to -- as far as whether incidents are
17  important data for researchers to evaluate, when we
18  were going through those books, the readings, and
19  you particularly held up the Handbook of Warnings,
20  and it's in that Handbook of Warnings that you said,
21  "Oh, I'm familiar with this source," Wogalter's book
22  that you held up earlier, and that is kind of the
23  textbook for warnings. And I'm almost certain,
24  without going back and checking the index, that it
25  talks about incident reports, because we talk about

32 (Pages 122 - 125)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 126

1  that a lot, is that critical incidents are key
2  information that human factors experts would use to
3  help identify -- it's one of the ways to --
4  obviously, testing is another way to identify
5  hazards early and -- and continuing throughout a
6  product's life cycle.
7      Q. Is there some other source, aside from the
8  handbook, that you can point me to as we sit here
9  today that supports the proposition that incident
10 reports are scientific data?
11     A. Your word "scientific" is -- I mean, data
12 is -- can be scientific data.  If they're reporting
13 it, you can do analysis on it.  You can do
14 statistics on it.  It would be self-report.  It --
15 it's going to typically -- we call it "tip of the
16 iceberg."  The FDA calls it "tip of the iceberg."
17 It is really an indication that there's a much
18 bigger problem, and incident reports are often
19 considered to be somewhere between 1 to 5, sometimes
20 up to 10 percent of the actual incident rates that
21 are out there.
22     So what it is is it's -- it is giving
23 notice that there's a problem that's most likely
24 much bigger than the number of incident reports that
25 come in, and that's recognized on the FDA website,

Page 127

1  and it is very well known in our industry.
2      Q. You would agree with me that this case does
3  not involve the Food and Drug Administration;
4  correct?
5      A. It does not.
6      Q. In your 30 years of doing this, offering
7  opinions in the litigation context, have you ever
8  offered an opinion where your analysis relied solely
9  on incident report data?
10     MR. OSBORNE: Form.
11     THE WITNESS: I don't -- first of all, it's not
12 relying solely on incident report data now, that the
13 incident reports are consistent with other -- the
14 home testing and the other information you have, as
15 well as the foreign-country correspondence as far as
16 the safety of this device.  It's really a universe
17 of information.
18     What incident reports do is tell you that
19 they are the notice of a bigger problem.  So you can
20 multiply that by probably 90 -- you know, it's maybe
21 somewhere around 5 percent, maybe 10 percent of the
22 total incidents that are out there.
23     Q. So now focused on your opinions in this
24 particular case, can you tell me any other case in
25 which you've rendered opinions over your 30-year

Page 128

1  career where you've relied exclusively on incident
2  report data, if at all it's happened?
3      MR. OSBORNE: Form.
4      THE WITNESS: Again, this question implies I'm
5  relying exclusively on this case, and I said that
6  there's a universe of data, and that's part of the
7  data, and I would say that's consistent with many
8  cases.  When they produce their incident reports we
9  certainly consider them, and if there are incident
10 reports of similar -- or OSR, other similar
11 incidents, we certainly consider that as part of the
12 universe of documents that we consider.
13     MR. COX:
14     Q. Fair to say that you also considered other
15 scientific data that might be available in a
16 particular case; correct?
17     A. I consider the relevant discovery as well
18 as relevant research on the case.
19     Q. Would you consider incident data --
20 incident reports, I'm sorry, to be empirical data?
21     A. Well, it's not a controlled study, so if
22 you're using empirical in the sense that you have a
23 control group and you're giving one group, then no,
24 it's not, but it is critical data.
25     Q. What is your understanding of how incident

Page 129

1  reports are reported to the CPSC and/or to Mattel or
2  Fisher-Price?
3      A. Well, you can use the website, that's
4  probably the most -- that's -- the most common way,
5  you can call -- there's probably still someone -- I
6  don't know if they still have someone manning the
7  phones or not.  You used to be able to call the
8  CPSC.
9      Mattel probably gets contact through e-mail
10 as well.  Somebody may contact -- I don't know all
11 the different ways that all the people contact them
12 nowadays.  Most things are done online.  Earlier on,
13 it -- there was more -- I would see letters written.
14 Now it's more in the form of e-mails or website
15 forms.
16     Q. Did you review any of Fisher-Price's
17 policies or procedures related to how it collects or
18 learns about incident report data?
19     A. I read depositions about it.
20     Q. Other than -- I'm sorry.  Other --
21     A. It might have been attached as an exhibit.
22 I read the exhibits to depositions.  I don't recall
23 if I read it for this case.
24     Q. Other than deposition testimony, as we sit
25 here today, did you review any Fisher-Price policy

33 (Pages 126 - 129)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 130

1  or procedure related to how it receives and analyzes
2  incident report data?
3      MR. OSBORNE: Form.
4      THE WITNESS: I don't recall.
5      MR. COX:
6      Q. Do you have an understanding of the process
7  by which the CPSC undertakes to analyze incident
8  reports that it receives?
9      A. That's a broad question. So they have a
10 database, the CPSC does, and you can -- any member
11 of the public can actually access that. And I have
12 accessed that database through a FOIA request.
13     If there's a manufacturer's name in there,
14 it's more complicated as far as accessing it and how
15 it processes it. If it's generic, it's more readily
16 available.
17     And I'm not -- I'm not sure I'm
18 answering -- I'm not sure I understand your
19 question.
20     Q. In this particular case, did you access any
21 incident data through the CPSC website on your own?
22     A. No.
23     Q. Fair to say that the incident reports and
24 data that you received was sent to you by
25 plaintiff's counsel.

Page 131

1      A. Correct.
2      Q. Did you conduct any analysis of the
3  incident reports to assess whether they were
4  substantially similar to the incident involving Z███
5  Olson?
6      A. I went through them to see which ones
7  involved either being out of place or -- and I think
8  I gave it in my report. I had some analyses in
9  there. Looking at pre-, which would be notice, and
10 postincident, which identifies it's a dangerous
11 device. And there's a lot of incidents both pre
12 and post-███y.
13     Q. Why would the preincident report data --
14 this is pre Z███'s death -- provide notice to
15 Fisher-Price?
16     A. If they received the incident reports, then
17 they have notice.
18     Q. And so you'd agree with me that following
19 that same logic, any incident reports that
20 Fisher-Price received after Z███'s death wouldn't
21 provide it with notice in the way that you just
22 defined it.
23     A. Unless they learned it through being on the
24 ASTM or other surveillance methods, e-mails,
25 communications with doctors, et cetera, the other

Page 132

1  ways that they're additionally learning it. Also,
2  had they done appropriate testing before introducing
3  a new type of device, they could have identified
4  that themself, which typically is done before this
5  postmarket surveillance which, like I said, only
6  gives you the tip-of-the-iceberg incidents.
7      Q. Assuming that Fisher-Price did not know or
8  learn about certain incidents after Z███'s death,
9  would that not put them on notice of those
10 particular incidents?
11     A. Well, Consumer Reports was able to get it,
12 so I don't know how -- how Fisher-Price would not.
13 So had they searched CPSC, if they had -- that
14 information was available, so they -- it was known
15 or knowable to them.
16     Q. In general, though, we can agree on the
17 proposition that for purposes of notice and whether
18 Fisher-Price was on notice of certain incidents,
19 that time frame ends with Z███ Olson's death;
20 correct?
21     MR. OSBORNE: Form and foundation.
22     THE WITNESS: Well, no. It continues -- as far
23 as if it -- they're keeping the -- the product on
24 the market, it continues to be hazardous, that
25 gives -- Z███'s death gives them more information

Page 133

1  about how dangerous the device is.
2      MR. COX:
3      Q. You've offered opinions before in other
4  cases related to notice; correct?
5      A. Yes.
6      Q. And I just want to make sure that I
7  understand as we walk away from here today. Is it
8  your testimony that incident report data about which
9  Fisher-Price may have learned after Z███'s death
10 still puts them on notice in the same way that
11 incident report data before Z███'s death?
12     A. Two different -- on notice for Z███, no.
13 On notice that it's a dangerous product, yes.
14 There's -- if you look at my rebuttal report, I made
15 that distinction.
16     Q. And I think the distinction you're
17 referring to -- and we'll get into your rebuttal
18 report a little bit later, but since you brought it
19 up, you described it as a notice versus hazardous
20 condition?
21     A. Right.
22     Q. Distinction --
23     A. Right, that's --
24     Q. -- or notice of evidence. Excuse me. Let
25 me not try to do this from memory.

34 (Pages 130 - 133)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 134

1    A. Evidence of a hazardous condition.
2    Q. Yes. The distinction you make in your
3 rebuttal report is one of notice versus evidence of
4 a hazardous condition; correct?
5    A. Yes.
6    Q. Tell me what "evidence of a hazardous
7 condition" means.
8    A. That continues to get evidence as it gets
9 more and more reports that it's a hazardous
10 condition, yet that product stayed on the market and
11 continued to be on the market until it finally was
12 removed from the market.
13    Q. Well, we're talking about the hazard of
14 suffocation that we described earlier and whether an
15 infant can roll over in the product as the
16 engineering experts say. Would you agree with me
17 that if Fisher-Price did not know of that hazard
18 before Z███'s death, then they weren't on notice of
19 it?
20    A. Well, had they done testing -- the problem
21 is -- and I identified that in the first report and
22 in the rebuttal report -- is they didn't do the
23 testing, so failure to evaluate a product does not
24 exempt them from the notice issue, because they
25 should have detected it had they done the testing.

Page 135

1 And, in fact, they were on notice without having --
2 you don't have to have deaths to be on notice. They
3 had the premarket testing that gave them notice that
4 people weren't wearing seat belts or using the belts
5 all the time. So if they're not securing the
6 babies, they were on notice of that.
7    Q. Sure. And Mr. Osborne can totally follow
8 up with you on a lot of that stuff, because I know
9 you're eager so get it out on the transcript.
10    But going back to the specific question
11 that I asked you, if Fisher-Price did not know or
12 was not aware of incident reports involving an
13 infant rolling over in the product, is it fair to
14 say, then, that they were not on notice of that
15 issue from an incident report data perspective only?
16    MR. OSBORNE: Form and foundation. Counsel,
17 you've asked that question 15 times. Can you move
18 on?
19    MR. COX: No.
20    MR. OSBORNE: Okay. Form and foundation.
21    THE WITNESS: Again, incident reports aren't
22 the only thing. And if you're introducing a new
23 market -- product to market, you need to do
24 premarket testing, and that would have uncovered it,
25 just like they uncovered the fact they don't use

Page 136

1 belts.
2    MR. COX:
3    Q. You've talked about the premarket testing
4 quite a bit, and I know that's somewhere in your
5 report. But since you've discussed it now, let's
6 just talk about that.
7    What do you contend is the premarket
8 testing that should have been conducted here that
9 would have identified the suffocation and rollover
10 hazard you contend exists?
11    A. There was no testing done without belts,
12 but yet they know from their testing that the babies
13 didn't wear belts. And I did -- I listed, if you
14 want to go through them all, the tests that were not
15 done. So if we want -- instead of me relying on my
16 memory, I have a list of tests that could have been
17 done. So let's go through both of my first and my
18 rebuttal report.
19    Q. It's okay.
20    A. -- and we can talk about them so I can be
21 fully responsive to your question.
22    Q. Sure. And it's no problem, because I know
23 exactly the list you're referring to, and that list
24 talks about the testing they did not do. And so my
25 question is focused on what is the testing you

Page 137

1 contend they should have done?
2    A. The ones they didn't do.
3    Q. Such as?
4    A. Okay. Then we can go back. Let's go to
5 the list. So let's start with the first report
6 first.
7    Q. Think you're on page 5 of your report.
8    A. So the first report, I talk about what
9 testing had not been done. So before 2018, there
10 had not been any biomechanics analysis at all, and
11 so that would be one thing would be biomechanics
12 testing.
13    Second --
14    Q. I'm sorry. Can I just follow up on that?
15    So related to the biomechanic testing in
16 Number 1 of page 5 of your report, I think we've
17 already discussed this, but you defer biomechanic
18 opinions, analyses, and issues to an engineering
19 expert; is that correct?
20    A. Yes.
21    Q. And just to be clear, you yourself have
22 never conducted any type of biomechanical analyses
23 such as what you list here in Number 1 on page 5 of
24 your report; correct?
25    A. For this case?

35 (Pages 134 - 137)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 138

1    Q. For any case ever in your life.
2    A. No. I do biomechanics testing fairly
3  regularly with our biomechanics expert. The two of
4  us have done it on many cases.
5    Q. Have you ever done any type of
6  biomechanical analyses where the biomechanical
7  expert you just described was not present?
8    A. I think early, early in my career as far as
9  the mechanics of falling, way back in the early
10  '90s, those are biomechanics issues of people that
11  trip and fall or slip and fall. I talked about
12  that.
13    Q. And then --
14    A. It's stairway falls as well.
15    Q. And then specifically with this case, did
16  you yourself conduct any biomechanical analyses such
17  as what you describe in Number 1 on page 5 of your
18  report?
19    A. The testing I did with my engineer was
20  about the firm and flat that are in the pictures we
21  talked about earlier.
22    Q. And that's what you describe as
23  biomechanical analyses as you listed here in
24  Number 1?
25    A. You asked which testing I did with him for

Page 139

1  this test -- for this case, and that's the testing I
2  did with him for this case. I'm not testing this on
3  any babies or doing any kind of biomechanics with
4  babies for the reasons we've already talked about at
5  length earlier.
6    Q. I think that actually answers the question,
7  so I just want to make sure the record is clear. So
8  for purposes of this case, fair to say that you did
9  not conduct any biomechanical analyses regarding the
10  mechanical strength and respiration analyses of
11  infants in the prone or side positions as you
12  describe it in Number 1 on page 5 of your report?
13    A. I did not.
14    Q. And then Number 2 here, you say that
15  "Fisher-Price did not conduct any testing or other
16  analyses concerning infants rolling from the prone
17  or side positions to the supine position."
18        You also did not conduct any of that type
19  of testing in this particular case; correct?
20    A. Correct. Neither did Fisher-Price, and
21  that was -- the question you asked me earlier was
22  did they do any testing about that and what should
23  have been done specifically about them rolling over,
24  and that's where I address that specifically.
25    Q. How would Fisher-Price have conducted a

Page 140

1  test to determine whether infants roll from prone to
2  supine in the Rock 'n Play Sleeper as you contend
3  here in Number 2?
4    A. They would probably have to do video
5  analysis but somehow protect babies, which -- I
6  mean, I don't think they should put them in this
7  device. But prior to introduction to the market,
8  there's a lot of different ways to do that using a
9  lot of controls to see whether the -- it's really
10  the sloping of the issue makes it a little bit
11  easier to -- to rotate.
12    Q. Are you able to describe for me and the
13  jury what you believe the testing should have been,
14  though?
15    A. I'm not going to specifically say what
16  testing should have been done.
17    Q. And then on Number 3, "Fisher-Price did not
18  do any testing/analyses to determine whether infants
19  in prone position can self-correct to avoid injury."
20        You'd agree with me that you also did not
21  conduct any testing along those lines; correct?
22    A. I did not for those same reasons. But more
23  importantly, Fisher-Price did not.
24    Q. Tell me what type of testing or analyses
25  should Fisher-Price have conducted to determine

Page 141

1  whether infants in prone position can self-correct
2  to avoid injury.
3    A. Again, I'm going to leave that to the other
4  expert to respond to that question.
5    Q. Number 4, "Fisher-Price did not conduct
6  testing or analysis to determine whether side
7  constraints play a role in impeding an infant's
8  ability to self-correct."
9        You would agree with me that you did not
10  conduct any testing along those lines either;
11  correct?
12    A. Right.
13    Q. What type of testing should Fisher-Price
14  have conducted to determine whether side constraints
15  play a role in impeding an infant's ability to
16  self-correct?
17    A. I'll leave that to the other expert.
18    Q. Number 5, you say "Fisher-Price did not
19  conduct testing or analyses to determine whether
20  sleep stages/fatigue can impact an infant's ability
21  to self-correct."
22        You would agree with me that you did not do
23  any of that testing; correct?
24    A. Correct.
25    Q. What type of testing should Fisher-Price

36 (Pages 138 - 141)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 142

1  have conducted to determine whether sleep
2  stages/fatigue can impact an infant's ability to
3  self-correct?
4      A. Again, premarket, it should have been done
5  by Fisher-Price, and I'm going to leave the other
6  expert to discuss the specifics of it.
7      Q. And Number 6, "[as read] Fisher-Price did
8  not conduct positioning tests as part of development
9  of Rock 'n Play, but was on the ASTM F2194
10  committee."
11      You would agree with me that you did not
12  conduct any positioning tests as part of your
13  analyses; correct?
14      A. Yes.
15      Q. What type of positioning test should
16  Fisher-Price have conducted as part of the
17  development of the Rock 'n Play?
18      A. I'm going to leave that to Taft and the
19  other expert.
20      Q. We've talked a little bit about your
21  knowledge and understanding of the in-home testing
22  that occurred through Fisher-Price; correct?
23      A. Yes.
24      Q. Did you also receive documentation about
25  the Play Lab testing that Fisher-Price conducted

Page 143

1  before the product was put onto the market?
2      A. Yes.
3      Q. Is there anything about the Play Lab
4  testing that you believe was not done properly or
5  could have been done differently to determine
6  whether a suffocation hazard exists?
7      A. Again, just looking at the items we talked
8  about, according to Mattel, they did not evaluate
9  the -- they knew that people weren't using the
10  belts, and they didn't evaluate the safety of not
11  having restraints.
12      Q. Are you able to tell me and the jury what
13  should have been done during the Play Lab testing
14  that was not done?
15      A. They should -- I'm not saying Play Lab.
16  Prior to introduction to market, Fisher-Price should
17  have evaluated whether infants could roll over from
18  the prone position or side position, whether they
19  can self-correct, whether the side constraints play
20  a role in their ability to self-correct, whether
21  being fatigued or sleepy can affect their ability to
22  self-correct, and those -- those -- and
23  biomechanical testing of infants prior to
24  introduction to market that includes mechanical
25  strength, respiration analysis of infants in the

Page 144

1  prone or side.
2      I'm not saying during Play Lab. I'm saying
3  during introduction to market, whenever that may be,
4  it should have been done.
5      Q. You're aware that both the Play Lab testing
6  as well as the in-home testing occurred before the
7  product was introduced into the market; correct?
8      A. Yes.
9      Q. As you sit here today, are you able to tell
10  me and the jury what about the Play Lab testing you
11  believe was not done correctly?
12      A. Again, they didn't --
13      MR. OSBORNE: Form.
14      THE WITNESS: -- do the things I just said.
15      MR. COX:
16      Q. What's the -- I'm sorry.
17      A. The same answer. It didn't do -- it didn't
18  address those items that I said that are critical.
19  Since the at-home testing uncovered they don't wear
20  belts, they need to evaluate them not wearing belts,
21  and they didn't do that.
22      Q. What forms the basis of your testimony that
23  the Play Lab testing did not test for the various
24  things you list in Numbers 1 through 6 of your
25  report?

Page 145

1      A. The testimony that the Fisher-Price
2  officials that said they didn't test for those
3  things.
4      Q. As you sit here today, do you remember or
5  recall the basis or the rationale from those
6  employees as to why that particular testing may not
7  have been conducted?
8      A. I don't recall.
9      Q. You've talked about the in-home testing and
10  how those surveys indicated that consumers did not
11  always use the restraint. Is that fair?
12      A. Yes.
13      Q. Based on -- Strike that.
14      I assume that you reviewed all of the in-home
15  testing; correct?
16      A. Yes.
17      Q. Did you conduct any independent analysis of
18  your own as to the percentage or number of consumers
19  who participated in the in-home testing who did not
20  use the restraints?
21      A. I think I have the -- I think it was -- it
22  was four out of five of the employee testers, and
23  those were Fisher-Price employees, and that was
24  enough to tell me, considering they were
25  Fisher-Price employees that didn't use them all the

Veritext Legal Solutions
800.808.4958                                          770.343.9696

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 146

1    time, that testing needed to be done to find out the
2    safety of not using the restraints since it was
3    extremely foreseeable people are not going to use
4    them all the time. It was unnecessary to spend the
5    time to go through every single one of the Play Lab
6    and whether or not they used it, because it was
7    obvious that people weren't going to use it all the
8    time if Fisher-Price's own employees weren't using
9    it all the time.
10       Q. Did you review any documents or testimony
11   that told you the reasons why those individuals may
12   not have used the restraints?
13       A. Just whatever documents that I reviewed.
14   It doesn't really matter why. The fact is they
15   don't, and that's what's important, is that it's
16   foreseeable, and it needs to be expected that
17   they're not going to use it all the time. And if we
18   expect they're not, then that's an identified
19   hazard, and therefore testing needs to be done to
20   find out what risks are associated with not using
21   the restraint, and you can't assume every parent is
22   going to use the restraint all the time if
23   Fisher-Price's own employees don't.
24       Q. You would agree with me that there could be
25   circumstances in which a parent is interacting with

Page 147

1    their child in the Rock 'n Play Sleeper and
2    therefore not using the restraint; correct?
3        A. Yes.
4        Q. You would agree with me that there may be
5    circumstances in which an infant is otherwise being
6    attended to and therefore a parent is not using the
7    restraint; correct?
8        A. Yes.
9        Q. Based on your review of the testimony you
10   described earlier related to the Fisher-Price
11   employees, as well as the incident data, you'd agree
12   with me that none of that data suggested that
13   individuals did not use the restraints when the
14   infant was sleeping overnight?
15       A. I think I did see incident reports that
16   were infants that were not used overnight.
17       Q. Can you tell me what incident report you're
18   referring to?
19       A. I don't have incident reports with me, but
20   I know I've read that people have not had them
21   tightly restrained overnight.
22       Q. And the basis of that testimony comes from
23   your review of the in-home testing reports.
24       A. I'm not sure which reports. I know I've
25   read that people were not using them overnight all

Page 148

1    the time, that -- or that infants were turning over
2    and they weren't secured tightly overnight.
3        Q. And I realize that I actually just asked a
4    question that was a little bit confusing, so I'm
5    going to apologize about that.
6            I was referring to the in-home testing when
7    I said, "incident data," so that's probably the
8    reason why we're a bit confused here. Let me take a
9    step back.
10           Based on your review of the in-home testing
11   surveys that Fisher-Price conducted, did you see
12   anything in those surveys that suggested to you that
13   infants were unrestrained during overnight sleep?
14       MR. OSBORNE: Form.
15       THE WITNESS: I would need to see it. I don't
16   have it all memorized at this point. I don't have
17   it with me, so I'm not going to trust my recall on
18   that.
19       MR. COX:
20       Q. This next question will be a hypothetical,
21   because I don't want to make it seem like I'm being
22   argumentative, and I don't want to get yelled at by
23   Mr. Osborne.
24           Hypothetically speaking, if the in-home
25   testing surveys did not at all say anything about an

Page 149

1    infant being unrestrained for overnight sleep, does
2    that give Fisher-Price notice of that particular
3    misuse of the product?
4        A. If they --
5        MR. OSBORNE: Form and foundation.
6            Go ahead.
7        THE WITNESS: If it said that they left them
8    unrestrained, then it's an indication. Whether it's
9    a nap for a few hours, it's foreseeable that if an
10   infant's napping, the parents are going to walk out
11   of the room. So there's not enough information. It
12   doesn't have to be overnight; it could be under
13   other circumstances. The key element is they're not
14   restraining them all the time.
15       MR. COX:
16       Q. Not restraining what?
17       A. They're not restraining infants all the
18   time. That's important. Therefore, it's reasonable
19   to expect that infants are not going to be
20   restrained a hundred percent of the time, and
21   therefore testing needs to be done to determine the
22   effects of having unrestrained infants in the
23   sleeper.
24       Q. And so that I understand the logic that you
25   just gave to us, so the fact that the incident

38 (Pages 146 - 149)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 150

1  reports indicated that consumers did not always use
2  the restraint extrapolates to the conclusion that
3  they may not have used the restraint during
4  overnight unsupervised sleep; correct?
5      A. No. I said it could be a nap. And these
6  are people that know they're being tested. They
7  could be employees or they could be other people --
8  you know, the few that you tested before, but they
9  know they're being studied, and they're doing
10  self-report. So that's not the same as having a
11  camera or knowing exactly what they're doing.
12      But also there's the Hawthorne effect.
13  Just the fact you're being studied can change your
14  behavior if you know you're being studied. So just
15  the fact that they're self-reporting they're not
16  restraining all the time is enough information to
17  tell Fisher-Price they need to do testing of
18  unrestrained infants to find out whether they can
19  turn over and what -- identify the hazards, since
20  it's clear from the self-reports that they're not
21  securing them all the time.
22      Q. You would agree with me that based on your
23  review of the incident -- I'm sorry -- the in-home
24  testing surveys that none of those surveys concluded
25  or resulted in an infant who rolled over in the

Page 151

1  Rock 'n Play Sleeper; true?
2      MR. OSBORNE: Form.
3      THE WITNESS: Again, I think they were out of
4  position, is what some of them said, so -- I am not
5  going to rely on something that I read months ago,
6  so if you want to provide me with a document that I
7  can look at and respond to, I'm happy to. But I'm
8  not going to respond to questions about something I
9  haven't looked at in months off the top of my head.
10      MR. COX:
11      Q. And so I understand your testimony
12  correctly, you're saying that the in-home testing
13  surveys indicated that an infant was out of
14  position?
15      A. I know that some of the studies showed out
16  of position. Again, I'm not -- I read all of them
17  at one point in time months ago, whether it was
18  in-home or the various -- the incident reports,
19  et cetera. I know out of position is one of the
20  issues, but differentiating between which -- whether
21  it was in-home or whether it was the -- the
22  employees or whatever, I'm not mentally able to
23  separate those now since I read them all together
24  months ago.
25      So if you want to give me a document, I'm

Page 152

1  happy to look at it. But I am not -- since -- you
2  didn't read the rules of the depo to me, but I know
3  I'm not supposed to guess. I would have to guess of
4  what's in -- what's in which document, so I can't
5  answer those questions.
6      Q. If you go to page 6 of your report,
7  Number 7 says "Fisher-Price did not conduct any
8  studies/analyses related to the use of restraints,
9  whether consumers would use them."
10      Did you conduct -- you would agree with me
11  that you did not conduct any testing as to whether
12  infants or parents would use the restraints;
13  correct?
14      A. Correct. But the employees didn't use them
15  all the time.
16      MR. COX: I'll move to strike that.
17      Q. The next sentence there is "Moreover, the
18  In-home testing Fisher-Price did conduct revealed
19  that the majority of users would not use the
20  restraints all the time"; correct?
21      A. Right. That's what I just said, is that
22  that indicates that if their own employees that know
23  they're doing self-report revealed that the majority
24  of them didn't use them all the time, that's a good
25  indication that once you introduce it to the

Page 153

1  marketplace that there's going to be points when
2  they're not used.
3      Q. Number 8, "Fisher-Price did not conduct any
4  studies/analyses with the restraints off."
5      You'd agree with me that you did not
6  conduct any studies or analyses with the restraints
7  off; correct?
8      A. Yes.
9      Q. Tell me how Fisher-Price should have
10  conducted a study or analysis with the restraints
11  off.
12      MR. OSBORNE: Form.
13      THE WITNESS: We've already talked about this.
14  My answer is the same.
15      MR. COX:
16      Q. What's the answer?
17      A. That --
18      MR. OSBORNE: Form.
19      THE WITNESS: The specifics of that study I'm
20  going to leave to the biomechanics expert, but I
21  didn't see any evidence that they made any attempt
22  to find out what would occur without restraints.
23      MR. COX:
24      Q. Number 9, "Fisher-Price did not conduct
25  test to go see if sleep stages of infant affect

39 (Pages 150 - 153)

Page 154

1  their ability to self-correct or avoid injury."
2      You also did not conduct any testing along
3  those lines; correct?
4      A. Correct.
5      Q. What type of testing should Fisher-Price
6  have conducted?
7      A. Again, I'm going to leave that to the
8  biomechanics to answer. But all of these typically
9  would be done with video and collecting data,
10  analyzing -- I mean, I've done those kind of studies
11  as part of my post doc for anesthesiology and
12  intubation, and you analyze hours and hours of video
13  footage is what's typically done as far as the
14  protocol.
15      Q. Number 10, "Fisher-Price did not conduct
16  any tests to determine if warnings could be
17  recognized by consumers."
18      You'd agree with me that you also did not
19  conduct that type of testing; correct?
20      A. No. In fact, I discuss it at length, show
21  photographs, et cetera, about the conspicuity and
22  whether or not it's visible from all the different
23  locations and -- et cetera, whether it would be
24  apparent, and I provided you photos of those.
25      Q. Did you do any testing with actual

Page 155

1  consumers to assess that?
2      A. I did not take the device out to consumers,
3  no.
4      Q. What type of test do you contend
5  Fisher-Price should have conducted to determine if
6  warnings could be recognized by consumers?
7      MR. OSBORNE: Form.
8      THE WITNESS: Usually -- I've already discussed
9  that, but the typical way for warnings research
10  would be you'd have someone interact with it, so
11  you'd have it laying there, the device, and maybe
12  you'd say, "Here, put this doll into the device and
13  pretend to feed it," or something. In other words,
14  you'd give them a task that's not specific to what
15  you're looking for, and that surrogate task would
16  then probably be videotaped so that you're not in
17  the room while they do it.
18      And then often, when they walk out of the
19  room, you'd ask them questions like "Is there a
20  warning on the device? What did it say," et cetera,
21  et cetera. "Did you secure it?" And then the --
22  then you compare that to the video. That's
23  typically what's done.
24      MR. COX:
25      Q. You don't know one way or the other whether

Page 156

1  Fisher-Price did that type of testing or had that
2  type of interaction with consumers during the Play
3  Lab testing; correct?
4      A. Well, they -- if they did, they didn't
5  provide that data, and they didn't testify that they
6  did it.
7      Q. When you say, "they didn't provide that
8  data," do you mean it wasn't provided to you?
9      A. It wasn't in the deposition testimony of
10  the people that said they didn't do it. The
11  deposition said they didn't do it.
12      Q. Aside from the deposition testimony, are
13  you aware of any documentation that would support
14  that that type of testing during the Play Lab may
15  have been conducted?
16      A. Well, I would expect if they did it, that I
17  would receive the video footage or, you know,
18  whatever's there. I didn't receive it.
19      Q. Doesn't mean the documentation doesn't
20  exist; right?
21      MR. OSBORNE: Form.
22      THE WITNESS: If it does exist, I wasn't
23  provided it.
24      MR. COX:
25      Q. Based on any documents that you reviewed

Page 157

1  and relied on to form your opinions in this case,
2  are you able to tell me what the protocol or process
3  was for Fisher-Price during the Play Lab testing?
4      A. I think I looked at it at one point, but I
5  don't -- again, I looked at it months ago. If you
6  want to give me the document, I'm happy to look at
7  it, but I'm not going to recall from memory because
8  I'd be speculating, and you don't want me to do
9  that.
10      Q. Number 12, "Fisher-Price did not conduct
11  any test to determine if consumers would recognize
12  that not using restraints would could result in baby
13  rolling over and dying."
14      You would agree with me that you did not
15  conduct any testing along those lines; correct?
16      A. Other than talking to the parents and
17  providing the ASTM warnings.
18      Q. And when you say, "talking to the parents,"
19  I want to make sure that's clear for the record.
20  You're referring to the actual plaintiffs in this
21  case; correct?
22      A. Z█████'s parents.
23      Q. The plaintiffs in this case; correct?
24      A. Yes.
25      Q. Other than talking to the plaintiffs in

40 (Pages 154 - 157)

Alison Vredenburgh, Ph.D.                         September 22, 2021
In Re: Fisher-Price/Mattel

Page 158

1    this case, you would agree with me that you did not
2    conduct any tests to determine if consumers would
3    recognize that not using restraints could result in
4    a baby rolling over and dying.
5        A. Yes.
6        Q. What type of testing do you contend
7    Fisher-Price should have conducted to assess this?
8        A. The -- typically what's done for warnings
9    comprehension. First, finding the warning. That's
10   a conspicuity issue that we just talked about.
11       Second is comprehension of the warning, and
12   that's usually a series of questions that you would
13   give them to look at, first understanding key
14   issues, but also you want to identify if there's any
15   critical confusion. So if somebody is -- if you ask
16   questions that are the opposite and/or they somehow
17   respond to the opposite of the meaning of the
18   warning, that would be called critical confusion.
19   And so you want to -- to do that comprehension
20   testing after you've done the location
21   placement/conspicuity testing. So those are two
22   totally different issues.
23       Q. How exactly would Fisher-Price have tested
24   to determine if consumers would recognize that not
25   using restraints could result in a baby rolling over

Page 159

1    and dying?
2        A. You could ask them.
3        MR. OSBORNE: Form.
4        THE WITNESS: You would show them the device,
5    and then you would give them a series of questions.
6    What are the hazards of this device? How are you
7    supposed to do it? What happens if you don't use
8    it? And you find out whether they understand or
9    not.
10       MR. COX:
11       Q. Aside from asking them, is there any other
12   scientific testing, empirical testing that could
13   have been conducted?
14       A. Well, you can test different warnings. For
15   example, the ASTM warning versus the one on the back
16   as it is, and then empirically you would then give a
17   test to both groups. You would expose them to one
18   or the other, and then you would test -- Group A has
19   the ASTM, Group B is given the device that the
20   Courkamps had, and then -- you would then ask a
21   series of comprehension questions or basically a
22   test and see who gets a higher score, and that would
23   empirically test that against the ASTM warning and
24   then no warning at all, potentially.
25       Q. How would those questions identify whether

Page 160

1    a baby rolls over in the Rock 'n Play Sleeper?
2        MR. OSBORNE: Form --
3        THE WITNESS: You asked me about --
4        MR. OSBORNE: -- and foundation.
5        MR. COX:
6        Q. You can answer.
7        A. We're talking about comprehension testing.
8    So now you're changing to a totally different issue?
9        We're talking -- what I just -- you just
10   asked me about comprehension and testing, so I just
11   responded about comprehension testing. But then you
12   just asked me, "Well, what about rolling over?"
13   That's a totally different issue that goes back to
14   the earlier questions about doing the biomechanics
15   testing. That's not comprehension testing.
16       Q. Number 12 talks about "test to determine if
17   consumers would recognize that not using the
18   restraints could result in a baby rolling over and
19   dying."
20       Do you see that?
21       A. Right. So that's the question, if you give
22   them the ASTM warning, that talks about baby, if
23   they roll over, they could suffocate, and that
24   babies have died. That's one warning. And the
25   other one is the one in the back that doesn't tell

Page 161

1    you that, and you would ask them questions, "What
2    are the risks?" And you would expose them to the
3    two different devices, and you would test them both
4    and see which ones -- which warning better educates
5    or informs the users.
6        Q. You would agree with me that the ASTM
7    warning that you were describing did not exist
8    during the product development phase of the Rock 'n
9    Play Sleeper; true?
10       A. Yes.
11       Q. The in-home testing surveys that we've
12   talked about, you've reviewed those; right?
13       A. Yes.
14       Q. And there are a number of questions that
15   are on those surveys to the consumers; correct?
16       A. Again, there are. I'm not going to answer
17   any questions specific unless you want to hand them
18   to me. I have not read them for months.
19       Q. Just generally asking you from your memory,
20   you remember seeing various questions on the in-home
21   surveys; correct?
22       A. Yes.
23       Q. How are the questions that are on the
24   in-home survey any different from the questions you
25   just described to me that should have been conducted

41 (Pages 158 - 161)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 162

1  by Fisher-Price?
2      A.  Please pass me a survey or I will not
3  answer this question.  I've already asked you ten
4  times and told you I cannot recall the specifics of
5  the survey.  I do not have it with me, so I cannot
6  answer any of those questions.
7      Q.  Sure.  No problem.
8          You generally are aware, obviously, that
9  the surveys exist, of course; correct?
10     A.  Yes.
11     Q.  Number 13, "Fisher-Price did not conduct
12  any test to determine if consumers should be told of
13  the product rollover risk."
14         You would agree that you did not conduct
15  any testing along those lines either; correct?
16     A.  Yes.
17     Q.  What testing should Fisher-Price have
18  conducted to test if consumers should be told of the
19  product rollover risk?
20     A.  Is to determine whether they roll over.  If
21  they roll over, then they need to be told of the
22  risk if they can't change the design so they don't
23  roll over.
24     Q.  You would agree with me that several of the
25  tests you contend were not conducted, including

Page 163

1  Numbers 12 and 13 as an example, assume that
2  Fisher-Price knew or should have known of the
3  existence of a rollover risk during the product
4  development phase; correct?
5      A.  Or should have known.  Did you say, "should
6  have known"?
7      Q.  I did, ma'am.
8      A.  Should have known, yes.  Or should have
9  evaluated it.
10     Q.  And what's the basis for your testimony
11  that Fisher-Price should have known of a rollover
12  risk during the product development phase?
13     A.  Through evaluation, since they knew that
14  babies were not -- the testing we talked about,
15  since babies were not being secured, they needed to
16  know without -- testing them without the restraint.
17  And they said that they did not test without the
18  restraint, so they could not assess for the rollover
19  risk.  So it was -- it could have been evaluated,
20  but it wasn't evaluated at that point.
21         But certainly in early postmarket
22  surveillance, before Z███ died, there was
23  information of in -- information -- infants --
24  incident reports of infants out of position as well,
25  which would have given them that information at any

Page 164

1  time.  After the immediate introduction to the
2  market, it also could have been evaluated.
3      Q.  As a general proposition, can a
4  manufacturer evaluate or test for risks about which
5  they are unaware?
6      A.  Well, you can't negate your responsibility
7  if you don't test.  In other words, you can't just
8  ignore all possible risks and say, "Well, I wasn't
9  aware."
10         So they were aware people weren't wearing
11  restraints or not putting them on the infants, so
12  that awareness is enough to indicate a need to find
13  out what happens to infants if they're not wearing
14  the restraints.  And according to their depositions,
15  they did not do that testing.
16         I need to stop for water again.
17     MR. COX:  Sure.
18     THE VIDEOGRAPHER:  At 3:29, we're off the
19  record.
20     (Interruption in proceedings.)
21     THE VIDEOGRAPHER:  At 3:44, we're back on the
22  record.
23     MR. COX:
24     Q.  Dr. Vredenburgh, we were on page 6 of your
25  report, and we've gone through Numbers 1 through 13.

Page 165

1  And there's now a section that's called "Design."
2  Do you see that?
3      A.  Yes.
4      Q.  And the first sentence there says "the
5  first, and most effective way to eliminate a hazard
6  is to design out the hazards such that it is
7  eliminated or effectively removed."
8          Do you see that?
9      A.  Yes.
10     Q.  And I believe I understand from your
11  earlier testimony that any changes to the design of
12  the Rock 'n Play Sleeper, you're deferring those
13  opinions to the engineering experts; true?
14     A.  Any specifics to the design would be -- I'd
15  defer, yes.
16     Q.  And just because you couched it as "any
17  specifics to the design," maybe help me to
18  understand what components or aspects of the design
19  related to the Rock 'n Play Sleeper -- like what
20  opinions do you intend to offer in that area?
21     A.  As I said earlier, the user interface.
22     Q.  Ah, I understand.
23         So other than the user interface, any --
24  any testimony about what changes to the design
25  should be incorporated to remove the hazard,

42 (Pages 162 - 165)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 166

1  suffocation and rollover risk, those are being
2  deferred to the engineering experts; right?
3      A. Yes.
4      Q. In this particular section, if we go to
5  maybe page 7, for example, there's a number of
6  references here to incident report data, and we've
7  talked about incident report data generally.
8      There's a sentence that footnotes to
9  Number 52 in your report, and it starts with
10 "Fisher-Price was aware of at least 66 incidents
11 with the sleeper prior to Z█████'s death."  And then
12 you cite to an "Incident summary spreadsheet:
13 incident reports."  Do you see that?
14     A. Yes.
15     Q. Can you tell me what the incident summary
16 spreadsheet is?  Because I don't think I ever
17 received it.
18     A. It's a summary of incidents.
19     Q. Okay.  So it looks like this is --
20     A. It's not stamped.
21     Q. Did you prepare this yourself?
22     A. No.
23     Q. Who prepared this?
24     A. I don't know.
25     MR. OSBORNE:  Can you show me what it is?  Does

Page 167

1  it have Bates numbers, anything like that?
2      MR. COX:  Doesn't have a Bates number.  I can't
3  show it to you because I've never seen it, and I
4  don't have it.
5      Q. Do you mind if I take a look at it just to
6  see what it is?
7      MR. OSBORNE:  No, of course not.
8      MR. COX:  Yeah.  I was asking Dr. Vredenburgh.
9  Sorry.  Let me --
10     THE WITNESS:  (Indicating.)
11     Can I show it to a camera or something so
12 Mr. Osborne can see what it is?
13     MR. COX:  Sure.
14     THE WITNESS:  Where is he looking?  Up here or
15 here?
16     MR. COX:  I think he's looking right here.
17     THE WITNESS:  Do you want to hand it --
18     THE REPORTER:  Can we not do this on the
19 record?
20     THE WITNESS:  This one (indicating).
21     MR. OSBORNE:  Hang on.  Was I looking at your
22 report.  I gotta get back to looking at the screen.
23 Stand by.
24     Oh, come on.  Sorry.  Mad at my computer.
25     THE WITNESS:  You ready?

Page 168

1      MR. OSBORNE:  Coming back -- not yet.  Hang on.
2      All right.  Let's see.  I see Katie
3  Medley's screen in the middle.
4      THE REPORTER:  I am off the record.
5      (Interruption in proceedings.)
6      MR. COX:  John, I was going to point out that I
7  think this is now maybe the second document that we
8  don't have that was a part of the file that
9  Dr. Vredenburgh sent.  I'm not suggesting at all
10 that there's, you know, any issues here, but I think
11 we need to figure out a way for me to get a copy of
12 this binder that is in front of Dr. Vredenburgh.  So
13 I just want to put on the record my formal request
14 for that, because I'm nervous that I don't have
15 everything that's in that binder, like, for example,
16 this particular spreadsheet.
17     So we can talk about that after the
18 deposition, but I just wanted to make that clear
19 that we'd be requesting that in some way or another,
20 because I'm concerned that I don't have everything
21 in this binder.
22     THE WITNESS:  To clarify, you did have the
23 other document.  You held it up and I said, "Yeah,
24 that's the one," and you matched it up.  Remember?
25 And you marked it when it was the wrong 14.  But you

Page 169

1  did have it.  So that's the only one so far.  I'm
2  keeping a record --
3      MR. COX:  Oh, that's totally fine.
4      THE WITNESS:  -- because that other exhibit you
5  did end up having, and then you marked it, so that's
6  the first time that there's one you don't have.
7      MR. COX:  Thanks.  I hope you don't think --
8      MR. OSBORNE:  The other thing is, Brandon, she
9  can shove those notebooks over to your side, in a
10 nice way, and you can look through it.  You know,
11 I'm just -- I'm just trying to avoid killing trees.
12 Usually, you know, you're going to be as familiar as
13 anybody with what we produced, and you can see
14 anything like this that might be in there.
15     I'm more than happy to provide you the
16 notebooks.  I just think copying the whole GD thing
17 is kind of excessive.
18     THE WITNESS:  My problem with it is that I have
19 everything tagged with little flags, and they never
20 come back the way I have it, and I've spent a long
21 time getting it just the way I want it.
22     I'm happy to have that document taken out
23 and copied here.  They'll do it at the front desk or
24 whatever.  But that's the first time that there's
25 been a document that he didn't have already.

43 (Pages 166 - 169)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 170

1    MR. OSBORNE: We can go off the record if you
2    want to look through and just make sure you don't
3    see anything else you do not recognize.
4    MR. COX: I'll go ahead and keep going with the
5    questioning, and I'll maybe do that toward the end
6    of the deposition. If there's other things, then we
7    can talk about the best way to get them copied. Is
8    that okay with you both?
9    MR. OSBORNE: Well, we can certainly talk about
10   it when we get there if you'd like to go on, sure.
11   MR. COX:
12   Q. Dr. Vredenburgh, we were talking about this
13   spreadsheet of -- you call them incident summary
14   spreadsheet. That's 52 -- Footnote 52 to your
15   report.
16       You didn't prepare this; correct?
17   A. Correct.
18   Q. I assume this got to you from plaintiff's
19   counsel; right?
20   A. Yes.
21   Q. It's not a Bates-labeled document, so at
22   least it doesn't appear to be a Fisher-Price
23   document; true?
24   A. I don't know. I think it was in the
25   Dropbox. It was just printed out with the file.

Page 171

1    I'm not sure at this point in time. I received so
2    many documents, I'm not sure.
3    Q. Sure. And the way that this is organized,
4    it looks like there's a Mattel Bates range -- column
5    for the Bates range and then a couple of other
6    columns, including one that says date of incident.
7    Do you see that, the date-of-incident column?
8    A. Yes.
9    Q. And then you have some highlights
10   throughout on that particular column. Do you see
11   that?
12   A. That's how I counted the cases, was using
13   that column.
14   Q. And that's what I was going to ask you. So
15   when you say 66 incidents with the sleeper prior to
16   Z███s death, you're basing that off of this column
17   that says date of incident; correct?
18   A. Yes.
19   Q. Are you aware of whether the date of
20   incident is different from the date that the
21   incident was reported to Fisher-Price?
22   A. Well, I would expect there would be some
23   lag to it, but the -- that's the date of the
24   incident, is what I'm using.
25   Q. Sure. At least as I look at this

Page 172

1    particular spreadsheet, I don't see a column that
2    says, for example, "Date Reported to Fisher-Price."
3    Do you?
4    A. No.
5    Q. If it is the case that some or many of
6    these incident reports were reported to Fisher-Price
7    on a date different from when it occurred, how does
8    that change the 66 number that's in your report?
9    A. I don't know. You're asking me to
10   speculate, and I don't know if it was reported the
11   next day. Usually it's not long after. So I
12   don't -- I don't know if it makes any difference at
13   all.
14   Q. What's the basis for your testimony that
15   usually it's not long after?
16   A. Well, if you're -- typically, if you're
17   going to report, there's -- well, a couple different
18   ways, but you either do it right away or you later.
19   Or sometimes attorneys will do it later. Those are
20   the two ways that I've seen it done. So either the
21   person does it right away or the -- somebody else
22   does it later.
23   Q. Did you ask plaintiff's counsel to give you
24   the dates on which the reports -- I'm sorry, the
25   incidents were reported to Fisher-Price?

Page 173

1    A. No.
2    Q. Did you do an independent review of any of
3    these incident reports to determine the date on
4    which they were reported to Fisher-Price?
5    A. I had the binder, I think, with all the
6    reports, and that's the summary that I pulled out of
7    the front of the binder. And I don't -- I did look
8    at them. I don't recall now. I did not go one by
9    one and write it in.
10   Q. Have you since looked at those documents
11   and learned or realized that there is a date
12   reported and a date of incident on the reports?
13   A. Probably, there -- again, you're -- I'm not
14   looking at them, so I can't respond to what's on
15   them. That's -- often there is -- sometimes they're
16   blank, but that's often the. It's -- it could be
17   the same day. It could be a few days later.
18   Q. And just to round this entire discussion
19   out, the basis for the 66 incidents prior to Z███s
20   death is according to the date of the incidents
21   themselves; correct?
22   A. What footnote are we on?
23   Q. 52.
24   A. Yes. This is -- there were 66 incidents
25   prior to the death, so that means the incidents

44 (Pages 170 - 173)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 174

1    occurred prior to her death, which would be the
2    occurrence date.
3        Q.  Correct.  And now I'm asking you, did you
4    take into account the date that those incidents were
5    reported to Fisher-Price as opposed to the date on
6    which the incident occurred?
7        A.  I -- as we said, I don't have that on that
8    form.  I have the data.  I have the binder full of
9    all the reports.  I just didn't -- I just pulled
10   that out of the front of the binder.
11       Q.  The comment section that's on this, I also
12   assume that that's not something you yourself
13   prepared; right?
14       A.  Correct.
15       Q.  Did you prepare any comments, summaries,
16   analyses of the incident reports that are contained
17   on this particular spreadsheet?
18       A.  No.  I provided everything I prepared.
19       Q.  And do I understand the highlighting to be
20   the incidents that correspond to the 66 number in
21   your report?
22       A.  It's been a while, so -- you have it, I
23   don't, so I -- I believe so, but without having it
24   in front of me and not having looked at it for many
25   months, I can't be certain.

Page 175

1        Q.  Do you have -- as you sit here today, do
2    you know the significance of the highlighting that's
3    on this spreadsheet in the date of incident column?
4        A.  That's the date that it -- I highlighted
5    the date that it happened because it's footnoted to
6    the statement that these incidents happened before
7    Z███'s death.
8        Q.  And I'm on page 5 of your document, and it
9    looks like there's a Number 66 to the far left
10   column.  Do you see that?
11       A.  Yes.
12       Q.  Okay.  And again, I assume that 66
13   reference there is corresponding to the 66 incidents
14   that's in your actual report on page 7; correct?
15       A.  Yes.
16       Q.  Did you perform any analysis of the
17   incidents themselves to assess whether they were
18   substantially similar to the Z███ Olson incident?
19       A.  Yes.  I read the comments, and they have
20   things like wriggled out of restraints, found on the
21   floor, fell back out of the back, pushed through
22   straps, pushed out of restraints, suffocation risk.
23   So these all -- cessation of breathing, no -- says
24   no death, infant found under headrest.  So these are
25   relevant to -- to this case as far as the

Page 176

1    restraints.
2        Did you want to leave this out?  Or do you
3    want me to put it back?  This is -- I can leave it
4    out if you want to.
5        Q.  Yeah.  You can leave it out.  That's fine.
6    Thanks.
7        And you talked about how you relied on the
8    comments section, and that section was prepared by
9    someone other than yourself; correct?
10       A.  Right.  It's taken from the -- the comments
11   on the form.  I think I did look at it originally
12   just to see how this was put together, and then it
13   was in the front, and then all the sheets that -- of
14   these Bates -- it has the Bates stamps in one column
15   and then they were behind it, and so I started
16   looking at the correlation, and the comments were
17   taken off of those sheets.
18       Q.  And just to go over a couple of these, I'll
19   say the comment, and then I'll show this to you so
20   that I'm showing you the document.
21       But, you know, in Row Number 3, for
22   example, the comment here is CPSC report stated
23   child restrained, found child on floor, concussion.
24   And you can look at Row 3 to see that comment.
25       A.  I believe you can read that.  You don't

Page 177

1    have to show it to me.
2        Q.  Thank you.
3        You'd agree with me that that's not the
4    circumstances that we have in this case related to
5    the Z███ Olson incident; right?  In other words, she
6    was not found on the floor in a concussion; correct?
7        A.  She was not.
8        MR. OSBORNE:  Form and foundation.
9        THE WITNESS:  But that would indicate the
10   restraints were not secure enough to hold her in, so
11   she may have had them on really loose.
12       I've seen parents -- at one point, I was
13   checking car seats because people just were not
14   securing them enough, and I think that message got
15   out, and it's not a problem anymore.  But there was
16   a point in time, I think in the early '90s, where
17   people were putting -- were having a problem with
18   not securing the buckles on car seats.
19       So I would -- it appears in this case it is
20   relevant, because while they may have had the
21   restraint on, it might have been loose, and it was
22   obviously loose enough for the child to get out of
23   it.
24       MR. COX:
25       Q.  What's the basis of your testimony that it

45 (Pages 174 - 177)

Alison Vredenburgh, Ph.D.                          September 22, 2021
In Re: Fisher-Price/Mattel

Page 178

1    was obviously loose enough for the child to get out
2    of it when they were restrained?
3        A.  Because they said they were restrained and
4    the child got out, so obviously if it was tight
5    enough to hold them in, they wouldn't have gotten
6    out.  So the fact that they got out indicates that
7    it was loose enough for them to get out or they
8    wouldn't have gotten out.
9        Q.  And your testimony that if it were tight
10   enough they wouldn't have gotten out, that's based
11   off of common sense; right?
12       A.  I don't know if it's common sense, but off
13   of inference and experience working with restraints
14   on children's devices.  I don't know that laypeople
15   would understand how tight they need to be or why
16   they need to be that tight.  And, in fact, my work
17   indicates that it's not readily apparent, and they
18   think if they have it secured, it's secure even
19   though infants and children can get out of the
20   restraints if they're not secured tight enough.
21       Q.  So from your understanding and
22   perspective -- Strike that.
23           From your understanding of products like
24   this that have a restraint where an infant is
25   restrained and the restraint is tight enough, the

Page 179

1    restraint serves to prevent them from getting out of
2    the product; correct?
3        A.  If it does.  I'll let the bioengineers get
4    into all of the details and the three-point versus
5    the five-point harness and all of those issues and
6    infant shoulders.  There's a lot of biomechanics
7    issues but I will let the expert addressing those
8    issues address it in this case.
9        Q.  Sure.  Setting aside any biomechanical
10   engineering expertise, as a parent, based on your
11   experience with infant products that have restraint
12   systems, is that your general understanding, that as
13   a parent, if you restrained them tightly, they're
14   not going to get out of the restraint?
15       A.  Okay.  You probably --
16       MR. OSBORNE:  Form.
17       THE WITNESS:  -- don't want to ask me as a
18   parent, because I'm a parent of adults, so I have
19   not restrained a kid of my own as a parent in
20   decades.
21       MR. COX:
22       Q.  Sure.  I assume when you did have young
23   children that there were products in which they were
24   restrained; correct?
25       A.  They were.  They've changed substantially

Page 180

1    since the products I've used.
2        Q.  And when those children were younger and
3    you did use a restraint system, was it also your
4    understanding then that the restraint when used
5    tight would prevent them from getting out of that
6    particular product?
7        MR. OSBORNE:  Form.
8        THE WITNESS:  No.  Of course, I knew
9    differently.  I can't consider myself a layperson
10   since by the time I had children, I knew quite a bit
11   more probably than laypeople do about restraints in
12   children's devices.  But -- and the car seats
13   changed substantially between my two children.
14           But I think that my understanding of
15   restraints and items around restraints and how they
16   work is going to be very different, so asking me as
17   a parent I don't think is a fair representation of
18   other parents.
19       MR. COX:
20       Q.  On page 7 of your report, you talk about --
21   this is now in the third paragraph, by the way, the
22   one that starts with "The CPSC studied 451 incident
23   reports."
24           Do you see that?
25       A.  Yes.

Page 181

1        Q.  I don't see a footnote reference there, so
2    I was trying to understand what the basis of that
3    statement is, the 451 incident reports.
4        A.  I think it's 51.  You're talking about the
5    reports.  It keeps going.
6        Q.  And this -- if it's Footnote 51, that
7    appears to be a citation to an October 16, 2019
8    document; correct?
9        A.  Yes.
10       Q.  And we can agree that October 16, 2019 was
11   after Z███'s incident in June 2014; correct?
12       A.  Yes.
13       Q.  The fourth sentence down from the bottom,
14   there's a sentence that starts with "There were 5
15   potential suffocations in addition to 4 fatalities
16   from 2015 reports."
17           Do you see that?
18       A.  Yes.
19       Q.  We can also agree that reports from 2015
20   would have happened after Z███'s incident in June
21   2014; true?
22       A.  Right.
23       Q.  On page 8 of your report, at the very top,
24   there's a sentence that starts with "There were 30
25   fall-outs of product in 2015 report."  And there's a

46 (Pages 178 - 181)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 182

1    citation to Number 57.
2         Do you see that?
3         A. Yes.
4         Q. We can also agree here that any fall-out
5    reports -- excuse me, fall-out incidents in a 2015
6    report would have occurred after Z███'s incident in
7    June 2014; correct?
8         A. Yes.
9         Q. We can also agree that fall-outs of the
10   Rock 'n Play Sleeper would be a different situation
11   than what occurred with Z███ Olson; correct?
12        A. Not necessarily --
13        MR. OSBORNE: Form.
14        THE WITNESS: -- no.
15        MR. COX:
16        Q. Are you aware of any evidence that says
17   Z███ Olson fell out of the Rock 'n Play Sleeper?
18        A. There's a bigger issue. It could be that
19   they didn't wear a seat belt, and that's why they
20   fell out. So you can't just strike all fall-outs
21   because she didn't fall out and she died while she
22   was still in it, because the fall-outs could have
23   been relevant in the sense that either the belt
24   wasn't secured or it was secured very loosely and
25   the child got out of position, and that was

Page 183

1    relevant.
2         Q. The fall-outs could have also occurred
3    because the infant was too developmentally advanced
4    for the Rock 'n Play Sleeper; correct?
5         A. Well, it's unclear since they said up to
6    25 pounds on it, and the label was underneath. So
7    without having a conspicuous warning and unclear
8    that if it's from the location that it may or may
9    not have been -- had any conspicuity from the
10   position that the user accessed the user interface
11   where it was in the room.
12        Q. The 30 fall-outs that's listed in your
13   report, you would agree with me that those could
14   have occurred because an infant was too
15   developmentally advanced for the Rock 'n Play
16   Sleeper; correct?
17        A. I can't answer that question, because the
18   Rock 'n Play gave 25 pounds as well. And I don't
19   know if they were over 25 pounds. I don't know what
20   their capabilities were, so I don't have enough
21   information to answer that.
22        And "could have" isn't something I respond
23   to. It's just is it foreseeable children up to
24   25 pounds can use it since it has the 25-pound
25   weight limit. Yes, it didn't have an age limit, and

Page 184

1    it did not say rollover for suffocation on it. And
2    the warning, such as it was, was hidden underneath.
3         Q. You said you don't have enough information
4    to talk about those 30 fall-outs. Did you ask
5    plaintiff's counsel to provide you with any
6    documentation related to them?
7         A. I have the incident reports. I told you I
8    do have them. I said that I don't know specifically
9    what the capabilities were. The incident reports
10   don't say that.
11        Q. The 30 fall-outs that you're listing here
12   that are cited in this 2015 report, are those the
13   same that are on this particular spreadsheet we're
14   looking at right now?
15        A. You're talking about the 30 fatalities?
16        Q. Okay. Let's start over.
17        Page 8 of 14 of your report --
18        A. Right.
19        Q. -- are we there?
20        A. Yes.
21        Q. Sentence, "There were 30 fall-outs of
22   product in 2015 report."  Are we there?
23        I should probably start with this question.
24        What is the 2015 report that you're
25   referencing here?

Page 185

1         A. Taft testified to that. You're asking me
2    two different questions. So starting with the
3    fall-outs, here's the Bates-stamped document. So
4    this is signed by Joel, and he says fall-out --
5    falls out of product usually involves older infants
6    who should be out of product, known ages four months
7    and five months. But I don't know that four months
8    and five months should be out of the product, but
9    there was seven between just those two ages. Six,
10   seven -- it goes through the different ages.
11        Q. And the Bates range that you're referring
12   to is what?
13        A. It's page number. It's footnoted here.
14        Q. I don't know what footnote you're referring
15   to, ma'am.
16        A. The one you asked me about, the --
17        Q. Can you just tell me what the --
18        A. 57.
19        Q. 57 is the footnote?
20        A. Right.
21        Q. COU0048955; correct?
22        A. Yes.
23        Q. All right. The 30 fall-outs that are
24   listed on that particular e-mail, did you ask for
25   any of the incident reports mentioned in that

47 (Pages 182 - 185)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 186

1    e-mail?
2        A.  I think I had them in a binder.  I didn't
3    correlate them, but I had binders of incident
4    reports.
5        Q.  And those came to you from plaintiff's
6    counsel as well?
7        A.  Yes.
8        Q.  The binder of incident reports, is that the
9    same binder of incident reports that's in this
10   spreadsheet that we looked at earlier?
11       A.  Yes.
12       Q.  Based on the e-mail that you just showed
13   me, Footnote 57, do you know what 2015 report is
14   being referenced there?
15       A.  I'm confused.  It's a different footnote.
16   This is his deposition he's talking about.  It's not
17   this -- I don't know what e-mail you're talking
18   about.  It's two different exhibits.
19       Q.  Can I see what you're looking at, please.
20       A.  Sure.
21           (Indicating.)
22       Q.  Okay.  So I think here's the problem;
23   right?  The document that you have right here, this
24   is not from deposition testimony.  This is from an
25   e-mail.  It's just only one page of it; right?

Page 187

1        A.  Right.
2        Q.  So when I said, "e-mail," I was referring
3    to this particular e-mail.  I just want to make sure
4    we're on the same page.
5        A.  Okay.
6        Q.  Okay.  This particular e-mail or page from
7    an e-mail chain that we don't have in front of us
8    right now talks about various out-of-position
9    reports, and I just want to make sure that as I walk
10   away here today, the reports that are listed in that
11   e-mail you claim are in this spreadsheet that we
12   just looked at; correct?
13       A.  This summarizes them here, and it talked
14   about I think in his deposition as well and then
15   they referred to this exhibit in the deposition, and
16   so I did not copy pages of depositions in here.  I
17   have summaries.  But this is -- I gave you the Bates
18   stamp of the exhibit that was referred to in the
19   deposition.
20       Q.  Okay.  The next section of your report on
21   page 8 is about barrier; correct?
22       A.  Yes.
23       Q.  And there's a sentence here, "From 2013 to
24   2019, there were 81 reports of babies being out of
25   position in the Rock 'n Play.  In 42 of those cases,

Page 188

1    it was claimed that the restraint was used."
2            And then you cite to Footnote 68, which is
3    the deposition testimony of Joel Taft.  Do you see
4    that?
5        A.  Yes.
6        Q.  And that deposition testimony forms the
7    basis for those two particular sentences; true?
8        A.  Right, as well as I think he had an
9    exhibit, but I didn't include the exhibit.  I'm not
10   sure if he did or not, but he testified to that, so
11   I referred to that.
12       Q.  And then on page 9 of your report at the
13   very top, you say "Specific barrier remedies will be
14   addressed by other witness(es)"; right?
15       A.  Yes.
16       Q.  Deferring again here to the engineering
17   experts.  Is that my understanding?
18       A.  Yes.
19       Q.  Then you go into a section about the
20   warnings.  Do you see that?
21       A.  Yes.
22       Q.  The very bottom of page 9, in that last
23   paragraph, the last sentence is "[as read] Regarding
24   this issue on a similar product, the, quote, CPSC
25   does not believe that parents and caregivers

Page 189

1    appreciate the hazard associated with not using the
2    harness or not securing the harness snugly.  CPSC
3    believes that it is foreseeable that they will
4    continue to use the product without securing or
5    securing it snugly which can result in death and
6    injury."
7            And then you see that there's a footnote
8    to -- reference to Footnote 77; right?
9        A.  Yes.
10       Q.  And the footnote, at least what I have in
11   front of me, says that it's related to the Nap
12   Nanny.  Do you see that?
13       A.  Yes.
14       Q.  The Nap Nanny is not the product that's at
15   issue in this case; correct?
16       A.  Yes.
17       Q.  On page 11, there's a section of your
18   report that talks about the location.  In this
19   second paragraph, there's a sentence that says "In
20   this case, to the extent there were warnings, they
21   were located in a location unlikely to be detected
22   by the users."
23           Do you see that?
24       A.  Yes.
25       Q.  What is the basis for that statement?

48 (Pages 186 - 189)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 190

1    A. If you go to my -- I think the rebuttal, I
2    did the full analysis of where the conspicuity and
3    where people would use the device, the user
4    interface and the expected viewing positions when
5    standing around it, and at no position when standing
6    around it is it visible. And, in fact, in your
7    expert's report, he actually had it sitting up on a
8    conference table to show the warning. He did not
9    have it on the floor.
10    Q. The rebuttal report that you're referring
11    to is dated July 12, 2021; correct?
12    A. Yes.
13    Q. And that would have been about three months
14    after this April 1, 2021 report we're looking at
15    now; right?
16    A. Yes.
17    Q. So I want to know in April of 2021, what
18    was the scientific basis for your statement here
19    that to the extent there were warnings, they were
20    located in a location unlikely to be detected by the
21    users?
22    A. Okay. So go to Figures 1 and 2 on the next
23    page.
24    Q. Yes.
25    A. And I had -- I was seated on the floor.

Page 191

1    It's behind -- I discuss it. It's low conspicuity
2    colorwise. It's behind the head, which is not the
3    place that people would typically interface with it.
4         Then I talk about the principal panel, so
5    they could have had it on the side that was actually
6    visible to the users in an expected user interface
7    position in Figure 3, and there's plenty of room for
8    conspicuous warning in that location. And then
9    confirmed a typical user interface with the picture
10    of Z███ from the police, in fact, it is positioned
11    such that the user can interface with it, place a
12    baby in there, and the warning was not visible in
13    that location.
14    Q. Other than the parents, the plaintiffs in
15    this case, you didn't conduct any testing with
16    actual consumers to assess whether they could not
17    see this warning on the back of the product, did
18    you?
19    A. I didn't need to. If you continue, I did a
20    user interface analysis, Figures 5 and 6, about the
21    ways you would place a baby in what would be an
22    unsafe way. The only place that would be visible is
23    a place that people would not handle a newborn baby,
24    with the feet first.
25         And I have enough education experience to

Page 192

1    evaluate whether a warning would be visible in
2    foreseeable manners of use. And, in fact, that
3    would be not be visible in any of the foreseeable
4    positions in which someone might put a baby into a
5    sleeper. And in order for me to photograph it, I
6    had to get on the floor to -- to photograph it.
7    Standing at any location, the warning was not
8    readable.
9    Q. Your testimony --
10    MR. OSBORNE: I'd like to interrupt for just a
11    moment. My phone says that I've hung up on this
12    call. Obviously, I have not, but I'm going to hang
13    up or try to hang up and ask you please to call me
14    back from the conference line, because something
15    strange is happening, obviously, and I cannot mute.
16    THE VIDEOGRAPHER: Shall we go off the record
17    while we do that?
18    MR. COX: Yes, please.
19    MR. OSBORNE: Thank you.
20    THE VIDEOGRAPHER: Okay. At 4:22, we're off
21    the record.
22    (Interruption in proceedings.)
23    THE VIDEOGRAPHER: At 4:24, we are back on the
24    record.
25    MR. COX:

Page 193

1    Q. You were telling us how you conducted -- I
2    think you called it user face testing? Interface
3    testing?
4    A. User interface or user -- yeah.
5    Q. User interface testing.
6         First of all, tell me what is the
7    scientific methodology for conducting user interface
8    testing?
9    A. It's human factors testing, basically what
10    the foreseeable uses and misuses of -- of a product.
11    So where would you approach it where is the
12    principal display panel, where -- what could be seen
13    displayed from different positions, and so that
14    would be all part of usability testing.
15         And so given the baby's physiology -- their
16    heads are heavy, their necks need support -- so
17    you're typically going to place a baby, and you're
18    going to need to support the neck and head, and the
19    two ways to load it would be from the side or from
20    the front, not the back going feet first.
21         So then standing at the side, I stood in
22    various positions to see -- and photographed what
23    could be seen on the sleeper and whether or not the
24    warning was visible from those positions. And then
25    I did the same thing in more detail in the rebuttal

49 (Pages 190 - 193)

Page 194

1  report where I did add to the ANSI warnings for --
2  excuse me, the ASTM warnings to -- draft warnings to
3  the device.
4      Q. Other than the user interface testing you
5  conducted that's depicted in Figures 5 and 6 of your
6  report, did you conduct any other testing with
7  actual users or consumers to understand whether they
8  would not be able to view the product -- I'm sorry,
9  the label on the product if they were standing on
10  the side or in the front or some other area?
11     A. That doesn't make sense to me. It's either
12  visible or if it's not -- if you're standing there,
13  they can't see through it. They're not -- the
14  limitations, if they're standing at the side, it's
15  either visible or it's not. So I don't need other
16  people. And, in fact, the people in my office could
17  not see it either.
18     But I think looking at the pictures on 5A
19  and -B, you can see that it's not visible as well.
20  And then more detailed ones in the rebuttal report,
21  I basically did the same thing with the other
22  photos. But I don't need other people to tell me
23  they can't see underneath the back of the head.
24     Q. You'd agree with me that if the user is, in
25  fact, standing behind the product or in some other

Page 195

1  position where the back of the product is visible,
2  they can see the label; correct?
3      MR. OSBORNE: Form.
4      THE WITNESS: They'd have to be sitting on the
5  floor under it. The -- and again, they're -- your
6  expert had it sitting on a conference table for his
7  picture. It's -- he wasn't standing over it. In
8  his report, he said standing in the position. Yet
9  standing in the position, you can't see it.
10     MR. COX:
11     Q. Do you have any scientific support for the
12  proposition that a consumer who is standing behind
13  the product or the product is in front of them
14  positioned in the way that it's shown in your
15  pictures on page 12 of your report that they would
16  not be able to see the label?
17     MR. OSBORNE: Form.
18     THE WITNESS: If they're standing way behind
19  it, they can see there's a label. They wouldn't be
20  able to read it from there, and to be close enough
21  to see it, they'd need to sit or elevate it, whereas
22  if you place it in the positions that I suggested --
23  and, in fact, you folks had one on the crotch
24  restraint at some point and took off -- that --
25  would be a location that would be readily apparent.

Page 196

1  But underneath the back of the head is not readily
2  apparent. It's very -- the lowest -- very low
3  conspicuity location for a warning.
4      And it's important to consider
5  foreseeability, that the head's going to be up
6  against something, just like Z███'s was up against a
7  wall or a nightstand or something, because that is
8  the location that's not going to be accessed, so
9  it's not reasonable to assume that someone's going
10  to sit down on the floor under it, behind it, to
11  read the label. They can't expect users to do that.
12  They need to be in a position where you expect users
13  to be, and the foreseeable places would be on the
14  side or at the foot.
15     MR. COX:
16     Q. You'd agree with me that there would
17  certainly be instances in which an infant is not in
18  the Rock 'n Play Sleeper, let's say, for example,
19  during the course of a 24-hour period in the day;
20  right?
21     A. Right.
22     Q. And during those periods in which they are
23  not in the Rock 'n Play Sleeper, there certainly
24  could be situations in which the consumer could view
25  the warning label without actually placing the

Page 197

1  infant in the way you describe in Pictures 5 and 6.
2      A. If they know to look for it, they can. But
3  the point of a warning is it's supposed to be
4  prominent and conspicuous, and it's not.
5      If I say, "There's a warning around the
6  back of the head," sure, you could go back and look,
7  and, if there's no baby there, tip it up and read it
8  or put it up on something to read. But that's not
9  the point. All of the human factors research and
10  standards talk about location, prominence of
11  statements, conspicuity, and so it needs to be where
12  the expected user is going to interface with it.
13     Q. You didn't conduct any testing to assess or
14  determine whether -- how users would respond to a
15  label that was on the front as you claim it should
16  be versus the back where it was in Z███'s situation;
17  right?
18     A. No. However, it's readily apparent. And,
19  in fact, Fisher-Price has another device that has it
20  on the front, a similar type of sleeper where -- or
21  not a sleeper but another device that has a
22  prominent one on -- in a conspicuous location.
23     MR. COX: And I'll move to strike everything
24  after "No," and I'll reask my question so that it's
25  specific to just the Rock 'n Play Sleeper.

50 (Pages 194 - 197)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

1    Q. Did you do any testing of the Rock 'n Play
2 Sleeper to assess how consumers would respond to the
3 warning label in the product if the warning was on
4 the front versus on the back?
5    A. No. And I didn't need to, because I know
6 enough in human factors to know that one is far more
7 conspicuous than the other based on a huge body of
8 human factors research. And, in fact, the ASTM F31
9 rollover group specifically designates where
10 warnings need to be, and they highlight the
11 importance of the location consistent with where I
12 indicated in my report, and that's in my rebuttal
13 report, page 10.
14    Q. And you're aware that F318 is a standard
15 that existed years after Z███'s June 2014 incident;
16 correct?
17    A. Yes.
18    Q. The -- you'd also agree with me that the
19 Rock 'n Play Sleeper itself is a movable product;
20 true?
21    A. Yes.
22    Q. You don't know sitting here today the
23 reasons why Fisher-Price chose to put the label on
24 the back versus the front, do you?
25    A. Okay. Can you say your question one more

1 time.
2    Q. Sure.
3    You don't know sitting here today the
4 reasons why Fisher-Price chose to put the label on
5 the back of the product versus the front, do you?
6    A. Okay. So the only response I have is
7 there's a document that talks about marketing when
8 they're saying Fisher-Price acknowledges the
9 importance of conspicuity of labels on the principal
10 display panel.
11    Q. Can you tell me what page you're referring
12 to, please.
13    A. Rebuttal report, Footnote 196.
14    MR. OSBORNE: Can you let her finish her
15 answer, please.
16    MR. COX: I just want to know where we're at,
17 John. Calm down.
18    THE WITNESS: Tell me when you're ready.
19    MR. COX: I am ready.
20    THE WITNESS: And so they said "[as read] I
21 don't know why we decided to make this a requirement
22 on bassinets and RNPs and not other products. We
23 could probably move to a side panel if it's
24 important to marketing," so marketing concerns.
25 When -- in their discussion of where to place the

1 warnings, that might be an issue.
2    That's the only thing that -- the only
3 evidence I have in the documents as far as their
4 thinking.
5    MR. COX:
6    Q. And if I understand this section of your
7 report, it appears to be referring to a bouncer --
8 another product other than the Rock 'n Play Sleeper;
9 correct?
10    A. Correct.
11    Q. All right. Let's go back to your original
12 report.
13    A. Okay.
14    Q. There's a photograph here on page 13 which
15 looks like it's the Rock 'n Play Sleeper as it was
16 placed in the Courkamp residence. Do you see that?
17 Figure -- Figure 4.
18    A. Oh, yes.
19    Q. You didn't conduct any testing or surveys
20 to understand how users placed the Rock 'n Play
21 Sleeper in their bedrooms, did you?
22    A. You mean all users everywhere? No.
23    Q. Any user.
24    A. Well, I know this user. This was the
25 important user, and she placed it in a foreseeable

1 manner in a way that she could access it or he could
2 access it from the foot or from the side, which
3 would be the expected position.
4    Q. Aside from this user, the plaintiff.
5    A. I don't know how all users do it. However,
6 the Courkamps did it in a foreseeable manner.
7    Q. And just so my question is clear, there is
8 no testing that you conducted to understand whether
9 consumers would also place the Rock 'n Play Sleeper
10 in the same manner that the Courkamps did; right?
11    A. No. I said that I looked at the placement
12 of where you need to access it. You need to be able
13 to access it from the side or the foot, not the top,
14 so it's foreseeable, then, based on that analysis
15 that the head would be up against something, because
16 that's not the side you need to access it from.
17    Q. Other than the photo you took where the
18 Courkamps placed it, in your own user interface
19 testing, you didn't conduct any testing or surveys
20 from consumers to understand whether they would
21 place the Rock 'n Play in their bedroom the same way
22 as the Courkamps; correct?
23    A. No. Well, the users don't have them
24 anymore, and the time to have done that would have
25 been before it was introduced to market.

51 (Pages 198 - 201)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 202

1    Q. What's the basis for your testimony that
2    users don't have the product anymore?
3        A. They're being pulled off market, and, in
4    fact, I'm seeing it in communication groups. I
5    grabbed one that somebody was giving away. The
6    resale market's not selling them anymore because
7    they've been recalled.
8        And before I grabbed the one, someone
9    posted it and said, "Do you -- does anyone want
10   this?"
11       And then somebody else said, "Oh, that's
12   been recalled. Don't give it away."
13       And I said, "I'll take it." And I removed
14   it.
15       So that's why I'm saying people are not --
16   there are not many around, and when I see them, I
17   remove them. But I've seen only one so far that's
18   been available, and somebody else had already
19   flagged it as recalled before I even asked for it.
20       Q. Certainly consumers could still have the
21   Rock 'n Play Sleeper in their homes; correct?
22       A. A few might, but it doesn't make sense to
23   do a survey now. The time to have done that survey
24   was before introduction to market.
25       Q. You'd agree with me that you wouldn't need

Page 203

1    to do a survey of users who actually own the Rock 'n
2    Play Sleeper to assess how they would react with the
3    Rock 'n Play Sleeper; true?
4        A. I don't understand your question.
5        Q. If I understand your testimony, the only
6    testing you could do is on consumers who owned the
7    Rock 'n Play Sleeper currently; correct?
8        A. You asked me where they place it, and so if
9    I were to survey people -- there's not -- it's not
10   out there anymore where they place it, because it's
11   been primarily removed from the market. It's not
12   sold in stores, it's not sold in resale. And
13   when -- the only time I've seen it available, and I
14   am scanning so that I pull them, and I've only found
15   one, and somebody else had already flagged it before
16   I did.
17       Q. You had access to an exemplar Rock 'n Play
18   Sleeper in this case; correct?
19       A. I do.
20       Q. You could have used that exemplar
21   Rock 'n Play Sleeper to conduct the type of testing
22   I'm referring to; true?
23       MR. OSBORNE: Form.
24       THE WITNESS: I suppose I could have, but I
25   didn't see any reason to, because the user interface

Page 204

1    is readily apparent, and that would not provide any
2    additional information than what I already know.
3        MR. COX:
4        Q. On page 15 of your report, you talk about
5    the content of the warning. There's some discussion
6    here about --
7        A. Actually, going back, I couldn't really do
8    it because I'd have to give it to people with babies
9    and then have them go ahead and place it in their
10   house, and I wouldn't have them use it.
11       Q. Going to page 15 of your report, there's a
12   section about the content. And within that section,
13   halfway down there is a discussion about European
14   regulations. Do you see that?
15       A. Yes.
16       Q. You've also talked about Canada, and
17   Australia as well as Europe in the context of the
18   Rock 'n Play Sleeper. You would agree with me that
19   this particular device was manufactured in the
20   United States; correct?
21       A. Yes.
22       Q. We can agree that Europe, Canada and
23   Australia have different regulations and standards
24   related to consumer products; true?
25       A. They have almost universally more --

Page 205

1    stronger standards in those countries.
2        Q. But different from the United States;
3    correct?
4        A. Yes. And from my experience, I think
5    always safer, more -- more conservative than our
6    standards.
7        Q. There's no issue in this case regarding
8    where Z██'s Rock 'n Play Sleeper was manufactured;
9    correct?
10       A. Yes.
11       Q. Yes, there is an issue, or no, there isn't?
12       A. I said correct, yes. You were correct.
13       Q. In this content section, you talk about a
14   warning that discusses how a parent should never
15   leave their child unattended. Do you see that?
16       A. Yes.
17       Q. Did you review any documents to understand
18   why that particular language is included on non-U.S.
19   warnings versus U.S. warnings?
20       A. Because, like I said, they have different
21   standards, and they're more conservative.
22       Q. And we can agree as we sit here today that
23   that particular warning language was not required by
24   the CPSC for Z██'s Rock 'n Play Sleeper; correct?
25       A. Yes. We're not as safe here as other

52 (Pages 202 - 205)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 206

1    countries are on most products I've evaluated.
2        Q. Page 16 of your report is the actual
3    warning label itself. Give me one second. I have
4    that as a different exhibit.
5        A. How many more hours are you going to go? I
6    see a massive pile in front of you and a short pile
7    that looks like it's done, so I'm just trying to
8    evaluate if that's data that I should be relying on
9    or not.
10       Q. I don't know what --
11       A. You have a giant pile there and a small
12   pile there, and I don't know if the pile's moving
13   from there to here, and I don't know if that means
14   we have seven hours to go today.
15       Q. I only get seven hours on the --
16       A. You only have seven hours? Okay. No
17   problem. How many have we gone?
18   (Interruption in proceedings.)
19   MR. COX:
20       Q. The document that I just put in front of
21   you is marked as Exhibit 6, and it's just a larger
22   version of the label that's on page 16 of your
23   report. Do you see that?
24       A. Yes.
25       Q. You're welcome to refer to either one,

Page 207

1    whichever makes you more comfortable.
2        The label itself -- and we've kind of
3    talked about this, but I'd like to ask you some
4    specific questions about it. You'd agree with me
5    that this warning states that the user should always
6    use the restraint. That's the very first bullet;
7    correct?
8        A. Yes.
9        Q. You'd also agree with me that the second
10   bullet says "Always use the pad provided," which
11   includes the restraint. "Never add a mattress,
12   pillow, comforter, or padding."
13       Do you see that?
14       A. Yes.
15       Q. And then we get into a section or a bullet
16   called "Suffocation Hazard."
17       "Infants can suffocate in gaps between an
18   extra pad and the side of the product - on soft
19   bedding."
20       Do you see that?
21       A. Yes.
22       Q. And then the next bullet talks about fall
23   hazard. "To prevent falls, do not use this product
24   when the infant begins to push up on hands and
25   knees, can pull up or sit unassisted or has reached

Page 208

1    25 pounds, whichever comes first."
2        Do you see that?
3        A. Yes.
4        Q. There's a couple of other bullets that I'd
5    like to focus on, although you're welcome to read
6    the entire warning label itself.
7        The second to the bottom says "Always
8    provide the supervision necessary for the continued
9    safety of your child."
10       Do you see that?
11       A. Yes.
12       Q. And then the last bullet says "When used
13   for playing, never leave child unattended."
14       Do you see that?
15       A. Yes.
16       Q. I understand from all three of your reports
17   that you have some criticisms regarding the content
18   of the warning language; is that correct?
19       A. Yes.
20       Q. And I understand from your various
21   reports -- we'll get into them later -- that the
22   Rock 'n Play Sleeper warning label that we just
23   looked at should have warned specifically about the
24   risk of rollover; correct?
25       A. Well, it should have been under the

Page 209

1    suffocation hazard part. It could redundantly also
2    be under fall hazard, but the suffocation hazard is
3    right then, and that's where it's missing the key
4    information. So if somebody's not concerned about a
5    fall hazard and they want to prevent suffocation,
6    then they don't want extra padding on it.
7        Q. You say in your report on page 16 that
8    "there are no benchmarks mentioned for the
9    suffocation hazard."
10       Are the benchmarks you're referring to the
11   benchmarks that are listed under the fall hazard?
12       A. Yes, sir.
13       Q. Those being the developmental milestones of
14   a child; correct?
15       A. Yes.
16       Q. We can agree, though, that those
17   developmental milestones or benchmarks, as you refer
18   to them, they are, in fact, included on the warning
19   label; correct?
20       A. They are, but they're not under
21   suffocation. So if you're not concerned about
22   falling, then that doesn't help.
23       Q. The fall hazard language warns a user that
24   they should not use the product when an infant
25   reaches those particular benchmarks; true?

53 (Pages 206 - 209)

Alison Vredenburgh, Ph.D.    September 22, 2021
In Re: Fisher-Price/Mattel

Page 210

1  A. That's what it says.
2  Q. Based on that language, the benchmarks that
3  are listed here, an infant that can push up on his
4  or her hands and knees, can pull up or sit
5  unassisted, or has reached 25 pounds, whichever
6  comes first, is not an intended user of the Rock 'n
7  Play Sleeper according to the label; is that
8  correct?
9  A. If you're --
10  MR. OSBORNE: Form and foundation.
11  THE WITNESS: If you're worried about a fall
12  hazard. It's really important with warnings that
13  you identify the hazard, the nature and extent of
14  the hazard, and how to protect yourself from the
15  hazard. So the two hazards it mentions are
16  suffocation, and the way it says to protect them is
17  not to have extra pad and -- so it tells you
18  basically it's about padding and bedding. That's
19  it.
20  So the other hazard it identified is fall
21  hazard. So there's two different -- basically two
22  different warnings, so for the suffocation warning,
23  the nature and extent and how to protect themselves
24  does not give much information other than the
25  bedding.

Page 211

1  MR. COX:
2  Q. Other than the plaintiffs, who you
3  interviewed, did you conduct any testing or analyses
4  to assess whether consumers would respond
5  differently to the label if the benchmarks were
6  included under suffocation hazard versus fall
7  hazard?
8  A. Well, there's also the location of the
9  warning issue. But no, I did not do that
10  assessment. What I did know is even the employees
11  did not always secure the belt, and it does not have
12  anything about rollover or the restraint system
13  needed to prevent suffocation and death.
14  Q. You would agree with me that you also did
15  not conduct any testing or analyses to assess how
16  consumers would respond to the warning language if
17  rollover was included under fall hazard or in the
18  warning at all.
19  A. No. Time for that would be premarket, not
20  after it's been removed from the market.
21  Q. You'd agree with me that that's possible
22  testing that could have occurred but just didn't
23  occur here from your perspective; correct?
24  A. Again, the information in the climate, the
25  useful time would have been premarket, not now.

Page 212

1  Q. You've talked about how the useful time
2  would have been premarket --
3  A. And early postmarket surveillance, but not
4  after it's been removed from the market and there's
5  been all sorts of publicity about the product. It
6  needs -- in order to do the evaluation, that would
7  have been the time to do it, is early market,
8  postmarket surveillance, and premarket, done as it
9  was introduced and right after introduction with the
10  first incidents that they become aware of at that
11  point, either based on premarket testing or early
12  postmarket incidents.
13  Q. In your 30 years doing litigation expert
14  work such as what you're doing here, have you ever
15  offered an opinion in a case involving a recalled
16  product?
17  A. Yes.
18  MR. OSBORNE: Form.
19  MR. COX:
20  Q. In those cases involving a recalled product
21  where you've offered litigation expert testimony
22  such as what you're giving here, have you ever
23  conducted any testing or analyses on those recalled
24  products?
25  A. Not --

Page 213

1  MR. OSBORNE: Form.
2  THE WITNESS: -- post recall, no.
3  MR. COX:
4  Q. You're generally familiar with products
5  being recalled through or in cooperation with the
6  CPSC; correct?
7  A. That's one way, yes.
8  Q. Let me ask that question differently.
9  In general, you're familiar with the
10  process by which a company recalls a product in
11  conjunction with the CPSC; correct?
12  A. Yes.
13  Q. You're also aware, I assume, that the CPSC
14  has the power to make a finding that a particular
15  recalled product poses a product hazard; true?
16  A. Yes.
17  Q. You'd agree with me that no finding about a
18  product hazard -- Strike that.
19  You would agree with me that the CPSC never
20  made any finding in this case that the Rock 'n Play
21  Sleeper posed a product hazard; correct?
22  A. Now I'm confused. They were -- they were
23  aware of the recall. There's no question it was a
24  hazard. I'm completely confused by your question.
25  They don't recall products that don't pose a hazard.

54 (Pages 210 - 213)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

1    Q. That's your understanding; right?
2    A. The CPSC usually -- would not -- I don't
3  understand your question. It's not making sense.
4       If you're asking me does the CPSC require
5  recalls of safe products that don't have hazards,
6  no.
7    Q. You're aware that there could be a number
8  of different reasons why a product can be recalled;
9  correct?
10    A. Well, for safety reasons.
11    Q. You're aware that there are a number of
12  different reasons why a product can be recalled;
13  correct?
14    A. My only involvement is for safety reasons.
15  If there's any nonsafety reasons, I have no
16  involvement of it.
17    Q. Okay. In other words, you don't have an
18  awareness or understanding that there are various
19  circumstances in which a product may be recalled;
20  fair?
21    A. There may be other reasons, but I'm only
22  involved in the safety issues. And my understanding
23  is that the CPSC recall of this particular device
24  concerned safety.
25    Q. And that understanding is based on what?

1       We can look for that on a break, because I
2  don't want to take the time on the record. Happy
3  for you to do that on a break. I'll just move on
4  with the questioning.
5       The warning label that we were looking at,
6  which is Exhibit Number 6 that's in front of you, we
7  can agree that warning instructs users that
8  they should always use the restraint; right?
9       We can go off the record while she looks
10  for what she's looking for.
11    A. Oh, I just found the statement by Robert
12  Adler about the final rule that they just passed.
13  It's the strongest, most protective rules in my
14  years in the CPSC. And they had the word "safe"
15  underlined, so it's clearly a safety issue.
16       So that's Exhibit 162 and referenced in my
17  rebuttal report, so there's no question it's a
18  safety issue.
19    Q. You mean Footnote 162 in your rebuttal
20  report; right?
21    A. Yeah. What did I say?
22    Q. Exhibit.
23    A. Oh, I'm calling -- oh, my exhibits, not
24  your exhibits.
25    Q. The rule -- notice of rule-making that

1  you're referring to, that's from 2021; correct?
2    A. Yes.
3    Q. Several years after Z███ s incident; true?
4    A. Yes.
5    Q. All right. Going back to my questioning
6  about Exhibit Number 6, the warning label, we can
7  agree that this warning label instructs the user
8  that they should always use the restraint system;
9  true?
10    A. What page are we on on the report?
11    Q. Your report, it's also on page 16.
12    A. Thank you.
13       Yes.
14    Q. You would agree with me that "always" is
15  capitalized; correct?
16    A. Yes.
17    Q. From a human factors perspective, do you
18  have an opinion as to whether that particular
19  language, "always use the restraint," is
20  insufficient?
21    A. Yes.
22    Q. How so?
23    A. Because it doesn't define the nature and
24  extent of the problem and whether -- whether it's
25  used to stop the suffocation hazard or the fall

1  hazard. And the fall hazard is the one that has
2  most of the bullet items under it, so in order for
3  human factors -- you asked me from a human factors
4  position.
5       A warning has to have three things. First
6  it has to identify the hazard, which it doesn't do,
7  the nature and extent, and how to avoid it. So it's
8  got the third part, but it's missing the first two
9  parts for that statement.
10       So if it was under suffocation hazard, that
11  would make more sense or perhaps under both
12  suffocation and fall hazard or bulleted at the
13  front, "To prevent suffocation, always use the
14  restraint system." But it's not telling you
15  which -- so, again, if you're not concerned about
16  the fall hazard, as Ms. Courkamp said, then -- and
17  you have padding underneath it, then -- and also
18  the -- Dr. Deegear said the same thing, then you may
19  not appreciate that the restraint also is to prevent
20  suffocation.
21    Q. You didn't conduct any testing or analyses
22  to assess how consumers might respond to the "Always
23  use the restraint system" language being either
24  under suffocation, fall hazard, or both, did you?
25       MR. OSBORNE: Form.

55 (Pages 214 - 217)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 218

1    THE WITNESS: No. But what I do know is people
2  don't -- as a matter of fact, Fisher-Price knew
3  people don't always use the restraint system. So it
4  is a statement. However, we know there's low
5  compliance, because four out of five of their own
6  employees didn't always use the restraint system.
7  So that was enough early on for them to know that
8  they either needed to change that warning, explain
9  what the nature and extent of the hazard is, or
10  possibly address it through design or barrier in a
11  better way.
12    THE REPORTER: Mr. Osborne, did you object to
13  form on that one?
14    MR. OSBORNE: Yes.
15    MR. COX:
16    Q. You talk about in your report on page 16
17  how there is no age mentioned on the warning label
18  that we're looking at; correct?
19    A. Yes.
20    Q. And I understand from your other reports
21  that your opinion is that it should have warned that
22  the product should not be used after five months;
23  correct?
24    A. If the -- Yes. If Fisher-Price has
25  determined that about five months is the safe use,

Page 219

1  then this should say "Do not use after five months."
2  But instead they said 25 pounds, which is way past
3  five months.
4    Q. What's the basis for your testimony that
5  five months is the appropriate age by which they
6  should have warned?
7    A. The employee e-mail chain indicates that
8  they discussed it and why and that they even felt
9  that the 25 pounds was disingenuous and should not
10  have been part of the warning on a product that's
11  meant for infants zero to five months. So if it's
12  designed and meant for zero to five months, then it
13  should say five months maximum or, on the outside,
14  six months. But 25 pounds is way past that.
15    Q. What are you reading from?
16    A. My -- Report Number 2, the supplement, the
17  first page of the supplement.
18    Q. Is the citation for the statement you just
19  made Footnote 150?
20    A. Yes.
21    Q. And by that, I mean to support your
22  testimony that the product was meant for infants
23  zero to five months.
24    A. Yes. Is in the e-mail chain discussion of
25  it.

Page 220

1    Q. We talked a little bit about this earlier,
2  and you agreed with me that a five-month-old infant
3  could exhibit different benchmarks or developmental
4  milestones from a, say, six-month-old infant;
5  correct?
6    A. Yes. So if you want to protect infants,
7  you're going to have to be conservative, and maybe
8  some infants that could have used it later, you're
9  going to need to err on the side of caution and not
10  let them use it as long if five months is the --
11  deemed to be when infants cannot yet roll over.
12    Q. And what's the scientific support for that
13  testimony?
14    A. Error prevention, accident prevention.
15    If the potential injury is death of an
16  infant that's a high risk, extreme level of hazard,
17  then in order to prevent it, you -- if you're going
18  to fix it through warnings, you gotta have a very
19  clear warning and very clear cues. And most parents
20  are used to age warnings and --
21    Q. We talked -- Oh, sorry.
22    A. And, in fact, during our interview, I think
23  one of the parents mentioned that they looked for
24  the age, and if there was a age on there they would
25  stop using it. And that's a very common thing for

Page 221

1  all the clothing, toys. Age appropriateness is
2  something that parents look for.
3    Q. We talked a little bit about this earlier,
4  and I think you agreed with me that you're not, in
5  this case, going to be offering any medical or
6  pediatric expert opinions; correct?
7    A. Correct.
8    Q. You'd defer to some medical neonatologists
9  or pediatrician on whether the benchmarks listed
10  here under fall hazard are consistent with a
11  five-month-old, six-month-old, seven-month-old,
12  et cetera; correct?
13    A. Right. And that's not what I'm discussing.
14  My point is the employees said it's meant -- the
15  product is meant for zero to five months. And
16  assuming that's true, that that's what they agreed
17  on, then it should say on the label "From zero to
18  five months" on it, just like the clothing does.
19    Yes, there are some kids that if you buy a
20  newborn clothes, they're not going to fit in it.
21  But that doesn't mean they're not labeled that. And
22  it's very important to have that label "Do not use
23  after five months." And that would be one way to
24  help control. Now, warnings are not the best way to
25  help mitigate hazard, but "To avoid suffocation, do

56 (Pages 218 - 221)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 222

1  not use after five months" would be a pretty clear
2  message.
3      Q.  Did you conduct any testing to assess
4  whether users would continue to place their child in
5  the Rock 'n Play Sleeper after five months of age
6  even if five months old was included in the warning?
7      A.  Like I said, you're not going to get a
8  hundred percent warning compliance, which is why
9  warnings are not the best way to address a hazard
10 and -- but they have a right to know.  And if it's
11 designed for five months, then parents have a right
12 to know that the age limit is five months, and that
13 way they can make informed risk assessments.  But if
14 they're not given that risk information, then they
15 can't make informed decisions about the safety of
16 their children.
17     Q.  You would agree with me that you did not
18 conduct any testing or analyses to assess how
19 users -- or whether users would continue placing
20 their child in the Rock 'n Play Sleeper after five
21 months of age if five months had been included on
22 the warning; correct?
23     A.  Again, that's irrelevant.  The relevant
24 issue is they have a right to know, and they have a
25 right to make informed choices.  Warnings experts

Page 223

1  don't say, "Yeah, of course there's going to be
2  people that may not comply with the warning."  But
3  warnings -- they still have a right to know that
4  information.  They have a right to understand the
5  risk, and that is the point of putting it there.
6          We're not saying a hundred percent of
7  people are going to comply.  We're saying they have
8  a right to know, and that's why fixing it through
9  warnings or trying to address a hazard through
10 warnings is the least optimal, because now you're
11 forcing all the consumers to mitigate a hazard
12 that's part of a design.
13     Q.  You would agree with me that you did not
14 conduct any testing or analyses to assess whether
15 users would continue to use the Rock 'n Play Sleeper
16 after five months even if five months was included
17 in the Rock 'n Play Sleeper warning label; correct?
18     MR. OSBORNE:  Form.
19     THE WITNESS:  No.  It's irrelevant.
20          Can you please put your mask on.
21     THE VIDEOGRAPHER:  I was going to.  I just
22 drank some water.
23     MR. COX:
24     Q.  On page 18 of your report, there is the
25 ASTM F3118 proposed warning language.  Do you see

Page 224

1  that?
2      A.  Yes.
3      Q.  And I understand your testimony to be that
4  this language is what should have been included on
5  the warning related to the product in which Z███
6  died; correct?
7      A.  With the age limit that was discussed by
8  the employees, if it's zero to five months, then the
9  maximum five months.  And it should be in a
10 conspicuous location, not just on it, but on it
11 where ASTM said to put it, and they showed with a
12 CAMI where it needs to be.
13     Q.  And by the way, for purposes of your
14 original report, I know that you have the ASTM
15 warning label included here.  You would agree with
16 me that your supplemental report is where you
17 actually craft a warning statement that you believe
18 is more adequate; correct?
19     A.  All I did was take their label and add the
20 five months on it per the Internet or the e-mail
21 discussion.  It's their warning label, it's just
22 adding what Fisher-Price says should be on the
23 label -- or Fisher-Price employees discussed putting
24 on the label.
25     Q.  And that's what I wanted to sort of

Page 225

1  understand.  The proposed warning that you prepared
2  in this case is simply the ASTM warning language
3  from F3118 with the addition of the five-month
4  language; correct?
5      A.  Yes.
6      Q.  We've already discussed and you're aware
7  and you agree with me that the F3118 warning
8  language was not in effect at the time of Z███ s
9  death in June 2014; correct?
10     A.  I don't know if it was being considered.
11 Again, Steinwachs was on that question.  So if
12 Fisher-Price had people sitting in the committee and
13 it was being discussed, then he was aware of it.
14     Q.  You would agree with me that the warning
15 language from F3118 was not implemented in June 2014
16 when Z███ Olson died; correct?
17     A.  Yes.
18     MR. OSBORNE:  '14.
19     MR. COX:  June 2014.
20     MR. OSBORNE:  Form.
21     MR. COX:  Sorry.
22     Q.  On page 21 of your report, the last
23 paragraph says "Moreover, the warning does not
24 specify, in any manner, what to do to prevent
25 suffocation.  While the warning states," quote,

57 (Pages 222 - 225)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 226

1  "always use the restraint system," end quote, "it
2  does not describe the nature and extent of the
3  hazard."
4      What do you mean by "it does not describe
5  the nature and extent of the hazard"?
6      A. We -- I just talked about that. It's not
7  under suffocation. It says always use it, but it
8  doesn't say why, so it -- the -- most of that
9  warning's about the fall hazard, and it would be
10  logical to think you use the restraint to keep from
11  falling. It doesn't say that the restraint can in
12  any way be linked to suffocation.
13     Q. The warning also doesn't say that failure
14  to use the restraint is linked to a fall hazard;
15  right?
16     A. No. But most of the warning is about a
17  fall hazard, and that's exactly it. You just made
18  my point. It does not describe the nature or
19  extent. So all it's saying is what to do, but it
20  doesn't identify what the hazard is or the nature
21  and extent of that hazard.
22     Q. And you didn't conduct any testing to
23  assess how users would respond if that additional
24  language was included on the label; correct?
25     A. No. But they had a right to know that.

Page 227

1  The purpose of a warning is to inform people so they
2  understand the nature, extent, and how to protect
3  themselves. If they understand all that, and then
4  they can choose whether or not to comply. But I'm
5  here to talk about what they need in order to be
6  informed.
7      How much longer do you think you're going
8  to go? I'm going to need a break at some point.
9      MR. COX: We can take a break.
10     THE VIDEOGRAPHER: Shall we go off the record,
11  then?
12     MR. COX: Yes.
13     THE VIDEOGRAPHER: Okay. At 5:12, we're off
14  the record.
15     (Interruption in proceedings.)
16     THE VIDEOGRAPHER: At 5:25, we're back on the
17  record.
18     MR. COX: Back on the record.
19     Q. So, Dr. Vredenburgh, we were looking at the
20  warning label and then your report on page 16,
21  Exhibit 6, that I put in front of you. Want to just
22  revisit that again before we go on to another topic.
23     So the suffocation hazard that's listed
24  here, I think you agreed with me earlier that infant
25  sleep products can generally expose an infanto to a

Page 228

1  suffocation hazard; correct?
2      MR. OSBORNE: Form.
3      THE WITNESS: I'm not going to blanket respond
4  to that.
5      MR. COX:
6      Q. Maybe I'll ask it differently.
7      A suffocation hazard is not unique to the
8  Rock 'n Play Sleeper; correct?
9      A. True.
10     Q. One of the things that we talked about is
11  that you contend that the rollover language should
12  have been included in this warning consistent with
13  F3118; right?
14     A. The information that's in that warning that
15  was developed in the ASTM committee should have --
16  Well, back up.
17     If the hazard is going to be managed by a
18  warning, which I don't agree is the appropriate
19  level, then there needs to be enough information for
20  parents to be able to keep their kid safe in it. So
21  I -- if I was actually going to say that that
22  warning was enough, I would have to test it before
23  it was put, let's say, back on the market, if it was
24  going to, with the foreseeable users to check for
25  the comprehension.

Page 229

1      Let's just pretend like it's a new product
2  and you want to put it out. Fisher-Price called me
3  to evaluate the warnings that the ASTM committee
4  created, and it had not yet been introduced, and in
5  2022 you wanted to introduce it.
6      Then I would need to test it with the
7  foreseeable user population by having them do some
8  other task and see if they follow it. But I also
9  would have to talk to the SME, subject matter
10  experts, as far as the testing for respiration, the
11  testing of all those other things to make sure that
12  the warnings cover all the biomechanics and
13  physiological issues and hazards that the words in
14  the warnings, if complied with, would keep infants
15  from being injured.
16     So there could be clinicians,
17  physiologists, biomechanics experts. Everyone would
18  need to work together with the warnings expert.
19  Once we identify all the risks and how to protect
20  the infants, then we can develop the warnings
21  language. Just putting the warnings first is kind
22  of the cart before the horse if we're going to use
23  that to mitigate risk.
24     Q. I just want to know that -- confirm,
25  rather, that you contend that the word "rollover"

58 (Pages 226 - 229)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 230

1  should have been included in this language in the
2  warning and that would have made it a better
3  warning; correct?
4      A. Well, somewhat better, but I'm not going to
5  say that that would be enough. I mean, certainly
6  that was missing under the suffocation issue. It
7  needed to be under the suffocation issue, but --
8      Q. And is the reason that you're saying you
9  can't say it would have been enough because there is
10 no way to test from your perspective because of the
11 ethical issues?
12     A. No. I just told you how. I said assume
13 that this is a new product and we're going to
14 introduce it in 2022 and we wanted to determine what
15 warnings were going to make it such that infants
16 would not be injured. I would need to talk with the
17 physiologists, the medical experts, biomechanics
18 experts to make sure that whatever words are in the
19 warning would mitigate the risk.
20     Q. Can we go to page 18 of your report. Those
21 warnings that you contend should have been in the
22 Rock 'n Play Sleeper include the word "rollover";
23 correct?
24     A. Yes, now that you're mischaracterizing.
25 I'm not saying that they should have the sleeper on

Page 231

1  the market with those warnings on it. I said that
2  those warnings are a lot better than the warnings
3  that were on it. At a minimum, those should have
4  been there with the five-month limit, is what I
5  said. Those don't have the five months on it, but
6  the Fisher-Price employees were saying it was
7  designed zero to five months, so those warnings
8  should have also included that, which is what I
9  added to my warnings.
10     Q. You've been deposed a lot, and I understand
11 that you're aware that this is like the only time
12 that I get to ask you questions about your opinions;
13 right?
14     A. Yes.
15     Q. All right. I need to be able to walk away
16 from here understanding what the warnings opinion
17 is, and I don't know that I do right now. So let me
18 try to ask some questions to help develop that.
19 Okay? Okay?
20     A. Yeah. I'm waiting for the question.
21     Q. The -- page 18 and then also pages 2 and 3
22 of your supplemental report marked as Exhibit
23 Number 4 -- Okay? -- those are what I understand to
24 be the warnings you contend would have been more
25 adequate than the warnings that are currently on the

Page 232

1  Rock 'n Play Sleeper in which Z███ died; is that
2  true?
3      A. Yes.
4      Q. All right.
5      A. Well, especially on this because this
6  includes the five months.
7      Q. Perfect.
8      A. So the supplement's better than the --
9      Q. Perfect.
10     A. Okay.
11     Q. The suffocation -- the rollover -- the word
12 "rollover" that you contend should have been
13 included in the Rock 'n Play Sleeper -- Okay? Are
14 we there?
15     A. Yes.
16     Q. That particular word you're saying should
17 have been on the June 2014 warning because
18 Fisher-Price knew about that particular hazard; is
19 that fair?
20     A. Yes.
21     Q. All right. That presupposes that
22 Fisher-Price had information available to it that
23 infants could roll over in the Rock 'n Play Sleeper;
24 correct?
25     A. Well, they had information that people

Page 233

1  weren't using the belts.
2      Q. I'm asking a little bit of a different
3  question.
4          Just focused on the rollover hazard, your
5  opinion that it should have been included on the
6  warning for the product in which Z███ died in June
7  2014 presupposes that Fisher-Price knew of the
8  existence of a rollover hazard in June 2014;
9  correct?
10     MR. OSBORNE: Form.
11     THE WITNESS: Or should have known.
12     MR. COX:
13     Q. Just so that I'm also clear, you defer to
14 other experts on whether Z███ did or did not roll
15 over and therefore suffocate in the device; correct?
16     A. I think the parents found her rolled over.
17     Q. No, no, no. I'm asking from a
18 cause-of-death perspective. You defer to medical
19 experts on whether Z███ Olson died from rolling over
20 and therefore suffocating in the Rock 'n Play
21 Sleeper; correct?
22     A. Yes.
23     MR. OSBORNE: Form and foundation.
24     MR. COX:
25     Q. The first bullet, "Always use restraint,"

59 (Pages 230 - 233)

Alison Vredenburgh, Ph.D.    September 22, 2021
In Re: Fisher-Price/Mattel

Page 234

1  you've talked about how that should have been under
2  suffocation hazard or a fall hazard or both.
3  Wouldn't users understand based on that language
4  alone that an infant -- I'm sorry, that they should
5  always use the restraint regardless of the hazard?
6      A. Should and do are two different things, and
7  Fisher-Price was very much aware that people don't.
8  The question is did they know why they needed the
9  restraint. And in this warning, it's not clear, the
10  one on the product. But this one that was developed
11  by ASTM, it's very clear that it's under suffocation
12  hazard.
13      Q. And setting aside what Fisher-Price knew or
14  should have known, for purposes of this question,
15  the language "Always use restraint" puts users on
16  notice that they should use the restraint regardless
17  of the hazard that may or may not be posed by the
18  Rock 'n Play Sleeper; correct?
19      A. That's --
20      MR. OSBORNE: Form.
21      THE WITNESS: -- not meaningful. We know they
22  don't use it, and it's very, very important for
23  people, when you warn them, to tell them why they
24  need to comply. If you give someone an
25  instruction -- That's an instruction. In order for

Page 235

1  it to be a warning, you need to identify the hazard,
2  what you're protecting them from. Otherwise, it's
3  not -- it's not a warning.
4      MR. COX:
5      Q. What's the basis from a human factors
6  principle or tenet for your testimony that the
7  "Always use the restraint" is an instruction and not
8  a warning?
9      A. Because it doesn't identify the nature and
10  extent of the hazard, and in that book that you held
11  up the cover and said you were familiar with it,
12  talks at length about why that's important.
13      Q. But I'm asking more specifically for a
14  human factors principle or tenet to support that
15  testimony and proposition.
16      A. Because the research shows that
17  explicitness is very important. There's a lot of
18  work done by the late Ken "Mochrie" on explicitness
19  and why it's key to warnings and warning design and
20  why -- how it's linked to compliance.
21      So if you're not explicit, if you don't
22  explain what the hazard is, you don't tell people
23  what they're protecting them from, you're just
24  giving them an instruction to do something but they
25  don't know why, then it's going to have lower

Page 236

1  compliance.
2      So if you have, for example, the warning
3  that was on the back of the head here, the -- most
4  of the warning is about fall hazard, and it would be
5  reasonable to think that restraints are about falls,
6  so if -- they have to draw an inference, and no
7  warning should ever be vague to the point where
8  you're requiring the users to guess or speculate or
9  infer from them, which is what this one does.
10      Q. As a general principle, would you agree
11  that you can't quantify the difference in
12  instructions or warnings?
13      A. That doesn't make sense. I don't
14  understand your question.
15      They're two different things. Warnings
16  could be part of instructions, and there can be
17  instruction section below warnings. But warnings
18  have explicit things that they need in them. Often
19  there'll be warnings at the top of an instruction
20  book -- a booklet or owner's manual that goes with
21  each section.
22      Q. If we just specifically refer to the --
23  Exhibit 6, which says "warning" -- I understand you
24  refer to some of it as an instruction, but it says
25  "warning" -- you'd agree with me that you can't

Page 237

1  quantify the difference in the various warnings that
2  are bulleted there.
3      MR. OSBORNE: Form.
4      THE WITNESS: That doesn't make sense. What
5  warnings are bulleted there? You mean the two --
6  there's one warning there in two different
7  languages, and then there's bullets under it. Are
8  you saying each of those is a separate warning? I
9  really don't understand what you're asking me.
10      MR. COX:
11      Q. Is it your testimony that all -- Strike
12  that.
13      The various bullets that are listed there
14  comprise the warning that's on the product; correct?
15      A. Yes. There's -- normally what ANSI
16  standard such as these are for -- the ones on the
17  supplement, the ones -- the ASTM ones are formatted
18  per ANSI. Sometimes there's more than one warning.
19  Well, they'll be in separate boxes. So if there's a
20  fall protection warning and a suffocation warning,
21  they may be in different places, such as the
22  ones I put in the photograph. You may have one on
23  the restraint and one by the head.
24      They combined them in this warning with a
25  bunch of bullets. The two bold, capped headings are

60 (Pages 234 - 237)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 238

1  "Suffocation" and "Fall." Suffocation has one
2  item -- one bullet under it, and "Fall" has a list
3  of things under it.
4      Q. With respect to warnings, you would agree
5  that compliance is different than effectiveness;
6  true?
7      A. Yes.
8      MR. OSBORNE: Form.
9      MR. COX:
10     Q. You would agree that making the label more
11  conspicuous does not mean it will be complied with;
12  correct?
13     A. It means it'll be more effective. People
14  can choose to comply, and they make judgments based
15  on the content of the warning, and those judgments
16  can affect compliance. There's a lot of factors
17  that change or affect the cost of compliance, and
18  those can affect compliance.
19         So if they associate putting the belt with
20  a high cost and they don't understand the hazard,
21  they may not do it. But, however if you increase
22  the cost of noncompliance, like "Your baby could
23  die," then that's going to increase the compliance.
24     Q. But as a general warnings principle or
25  human factors principle, it's well accepted that not

Page 239

1  all users will read and heed the warnings; correct?
2      A. Those are two totally different things.
3      Q. Let's break it down.
4         As a general human factors principle, you'd
5  agree with me that not all users will read the
6  warning; correct?
7      A. Well, this case, they may not detect --
8      Q. I'm not asking about this case. I'm asking
9  a general question. In general. In general, not
10  specific to this case.
11     A. In general -- first they have to detect it.
12  Then they have to read it. Then they have to read
13  it in full. Then they have to understand, and they
14  can choose to comply with it. So there's a lot of
15  different steps that are involved with it.
16     Q. And there are users that will choose not to
17  read a warning; correct?
18     A. Correct.
19     Q. There are also users that will choose not
20  to heed a warning; correct?
21     A. What was the first thing you said?
22     Q. Read.
23     A. Oh, read. Yes, correct.
24     Q. And that's regardless of where the warning
25  is placed on the product; correct?

Page 240

1      A. Well, the -- whether they read it is
2  extremely correlated with whether they see it or
3  notice it and whether it's conspicuous on the
4  product. If it's under the product, then that
5  greatly decreases the first one you said about
6  whether or not they read it.
7      Q. It's possible for a warning to be totally
8  conspicuous and not heeded; correct?
9      A. Yes. And that would be the choice. They
10  have a right to have that information. They can
11  then form their own judgments, and then they can
12  determine doing their own cost-benefit analysis
13  whether or not they want to comply.
14         The issue I'm bringing forward is that they
15  have a right to that knowledge and how to
16  effectively warn people. If they are effectively
17  warned, understand the nature and extent of the
18  hazard, then choose not to comply, then the warning
19  was effective and the person chose not to comply.
20     Q. You agree that particularly what we're
21  talking about, the Rock 'n Play Sleeper, that users,
22  parents have different opportunities to see the
23  warning label -- the warning system, rather;
24  correct?
25     A. I don't understand your question.

Page 241

1      Q. Okay. So the Rock 'n Play -- first of all,
2  are you aware that the Rock 'n Play Sleeper has
3  instructions that come in the box in addition to the
4  on-product label?
5      A. Yes.
6      Q. Correct. So users of the Rock 'n Play
7  Sleeper, for example, a new product, will have
8  access to the warning system via both the warnings
9  that come in the product as well as the on-product
10  warning; correct?
11     A. Assuming they get it new, they may or may
12  not read the booklet depending on their perception
13  of the product. The greater the risk of a product,
14  the greater the complexity, the less the
15  familiarity, the more likely they'll look at it.
16         If they think the product is familiar or
17  not complex, if the use is readily apparent, then
18  they may not read it, and then they typically will
19  dispose of the packaging and the leaflet and leave
20  behind the -- whatever's on the product itself. And
21  then infant products, because they only last maybe a
22  few months, they get passed on without the
23  packaging.
24         So we can't infer reasonably that -- that
25  every user is going to have access to the packaging

61 (Pages 238 - 241)

Alison Vredenburgh, Ph.D.       September 22, 2021
In Re: Fisher-Price/Mattel

Page 242

1  or the leaflet that comes with it.
2      Q. On page 26 of your report --
3      A. Which one? The main one?
4      Q. Yes.
5      -- you talk about "The behavior of Z███'s
6  parents was foreseeable and expected." You see
7  that?
8      A. Yes.
9      Q. Aside from talking to the parents
10  themselves, the plaintiffs themselves, what testing
11  did you conduct to formulate your opinion that their
12  behavior was foreseeable and expected?
13      A. Reading the incident reports.
14      Q. Other than the incident reports, in talking
15  to the plaintiffs themselves, what testing or
16  analyses did you perform to support your opinion
17  that the behavior of Z███'s parents was foreseeable
18  and expected?
19      A. Reading news reports, reading --
20      Q. Other than --
21      A. -- the other incidents, attending
22  conferences. Human factors experts, pretty common
23  knowledge that the Rock 'n Play was a device where a
24  lot of infants died. It's kind of -- that and the
25  Bumbo seat are the two that are spoken about.

Page 243

1      Q. You didn't conduct any testing or analyses
2  to assess whether another -- other consumers would
3  behave the same way that Z███ s parents did;
4  correct?
5      A. I did an analysis. I looked at incident
6  reports.
7      Q. Did you do any scientific testing to assess
8  whether other users would react and respond the
9  same -- Strike that.
10      You didn't do any scientific testing to
11  determine whether other users would behave the same
12  way that Z███'s parents did; correct?
13      A. Well --
14      MR. OSBORNE: Form.
15      THE WITNESS: -- at this point, we can't go
16  back in time. And to be fair to Fisher-Price, it's
17  pretty much known about the problem with the Rock 'n
18  Play. I see it discussed. It's been on the news.
19  We can't now, at this point in time, conduct any
20  kind of knowledge study of what people know or how
21  they might respond because it is too well-known, the
22  hazard associated with it.
23      MR. COX:
24      Q. You didn't conduct any of that testing;
25  correct?

Page 244

1      A. No. It had to be done at the time of
2  product development or at the early postmarket
3  surveillance, not at this point.
4      Q. I assume you read both parents' deposition
5  testimony; correct?
6      A. Yes.
7      Q. Based on your review of their deposition
8  testimony, you agree that the Courkamp parents saw
9  the Rock 'n Play Sleeper label; correct?
10      A. Yes.
11      Q. You agree that both Courkamp parents read
12  the Rock 'n Play Sleeper label; correct?
13      A. Yes.
14      Q. You agree that based on their deposition
15  testimony, both parents understood the Rock 'n Play
16  Sleeper label; correct?
17      A. They understood the label that was
18  available to them as it was worded. I mean, they --
19  they understood it, that the benchmarks were under
20  fall protection because it is written under fall
21  protection. So their understanding was based on the
22  label as it was available to them.
23      Q. Sure. And just to make the record clear on
24  that, their testimony was that they understood the
25  language and the words that are on the Rock 'n Play

Page 245

1  Sleeper in which Z███ died in June 2014; correct?
2      A. Right. They understood those words. But
3  they also told me that they were missing key
4  information they needed to know that would have
5  affected their judgment about the product.
6      Q. You would also agree with me that at least
7  one of the parents, the father, researched the use
8  of the Rock 'n Play Sleeper; correct?
9      A. Yes. In fact, I should say that their
10  behavior was beyond what typical -- as far as being
11  careful because, because a lot of parents wouldn't
12  necessarily read and research to the extent that
13  they did, because it looks like a simple product, it
14  doesn't have complex parts, it doesn't have moving
15  parts, there's no computerization, there -- it's
16  deceptive in that it looks simple and easy to
17  understand and doesn't need to have directions --
18  step-by-step directions to use it.
19      Q. The fact that -- I'm sorry.
20      The fact that they researched the label
21  and -- suggests that they had knowledge independent
22  of the label that was on the Rock 'n Play Sleeper;
23  correct?
24      A. I don't understand "researched the label."
25  I don't know what you mean by the fact they

62 (Pages 242 - 245)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 246

1    researched the label.  They didn't do research on
2    the label.
3        Q.  The fact that they researched the use of
4    the Rock 'n Play Sleeper suggests that they had
5    independent knowledge about how to use the Rock 'n
6    Play Sleeper other than what's on the warning
7    itself; correct?
8        MR. OSBORNE:  Foundation.
9        THE WITNESS:  I don't know what other sources
10   or how much information they got outside of it, but
11   everybody has access to whatever's on the product.
12   We can't guess or speculate what other information
13   other people may have available to them.
14       All that tells me is that these were pretty
15   cautious parents, probably more so than usual, and
16   these are the exact people that need better
17   warnings, because these are actual warnings readers,
18   and they tried to comply.  So these are the exact
19   people that had the right to be fully informed so
20   that they could make accurate judgments in their
21   decisions of what products exposed their children or
22   child to.
23       MR. COX:
24       Q.  If we go to Appendix A of your report,
25   which is pages 28 through 44, does this list, in

Page 247

1    addition to the citations in all three of your
2    reports, comprise the universe of documents that
3    you've reviewed and received in this case?
4        A.  Yes, other than Deegear's depositions.
5        Q.  Let's transition to your supplemental
6    report, Number 4.  This report is dated June 7th,
7    2021; correct?
8        A.  Wait.  Yes.
9        Q.  In this report, there's three itemized
10   documents here on the first page; right?
11       A.  Yes.
12       Q.  My understanding is that these three
13   documents were sent to you or given to you, rather,
14   after you prepared your April 1, 2021 report; is
15   that right?
16       A.  Yes.
17       Q.  Did you ask counsel whether these documents
18   were available before you finalized your April 1,
19   2021 report?
20       A.  I don't think I asked, but I believe
21   Ms. Shriner said some new documents came in and sent
22   them to me.
23       Q.  So the basis of your understanding that
24   these are new documents is that Ms. Shriner sent
25   these to you after you had prepared your April 1,

Page 248

1    2021 report; correct?
2        A.  She did, yes.
3        Q.  They could have been available to
4    Ms. Shriner before you finished your April 1, 2020
5    report, you just don't know one way or the other;
6    right?
7        MR. OSBORNE:  Form and foundation.
8        THE WITNESS:  I don't know.
9        MR. COX:
10       Q.  All right.  This supplemental report --
11   first of all, let me ask you a question.
12       What is your understanding of what a
13   supplemental report is?
14       A.  It's a report sent after the initial report
15   to supplement it.
16       Q.  Other than the fact that you received these
17   three documents sometime after you finalized your
18   April 1, 2021 report, is there any other basis for
19   why you wrote this supplemental report?
20       A.  That e-mail chain.
21       MR. OSBORNE:  Form.
22       THE WITNESS:  Oh.  The e-mail chain in
23   particular was really important to me.
24       MR. COX:
25       Q.  And here you tell us that you have drafted

Page 249

1    two warnings for the Rock 'n Play Sleeper; correct?
2        A.  Well, I don't want to say I drafted them.
3    I amended the ASTM just to add the five months that
4    was in that e-mail chain.
5        Q.  Right.  And that's something that I want to
6    make clear.  Your proposed warnings are simply the
7    ASTM standard with the addition of the language
8    about five months; correct?
9        A.  Yes.  And then I placed it where they would
10   be conspicuous from my viewing position.  And I
11   showed it empty and then with a doll in it to show
12   that wherever the person placed the infant in it,
13   they'd be able to see the warnings.  And the one I
14   felt they'd interact with and the one above the head
15   they would see all -- both of them all the time
16   while the baby's in there.  And even if they put a
17   blanket over the bottom part on top, they would
18   still see the one above the head.
19       Q.  And you admitted earlier that you didn't
20   conduct any testing to assess how consumers might
21   respond to the placement of these warnings versus
22   how the warning was placed on the device that Z▮
23   Olson died in; correct?
24       MR. OSBORNE:  Form.
25       THE WITNESS:  No.  I've done 30 years of

63 (Pages 246 - 249)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 250

1    research, read numerous books, contributed to books.
2    All those books talk about placement and
3    conspicuity.
4        You're shaking your head at me.
5    MR. COX:
6        Q. Because that's not my question.
7        A. Yeah. Your question was I didn't do any
8    research. That research has been done in the book
9    chapters I've written and the books I've read and
10   the conferences I've attended, that it's readily
11   apparent that the more conspicuous it is -- and I
12   place in a principal display panel, which is key.
13   Conspicuity is key. The user interface is key.
14       It's in all of those books, all of the
15   conferences, in the standards. I don't need to
16   independently test something that has been written
17   about for 30 years.
18       Q. Got it.
19       I think I understand from your testimony
20   that you didn't need to independently test how
21   consumers would respond to the placement as you have
22   it on 3 and 4 of your supplemental report versus how
23   it was placed on the product in which Z█ Olson
24   died; correct?
25       A. You said 3 and 4, but I think you mean 3a

Page 251

1    and b, just to clarify.
2        Q. No. I mean pages 3 and 4 of your
3    supplemental report.
4        A. Oh, I'm sorry. Pages 3 and 4, correct.
5        Q. So to make the record clear on that, I
6    understand in your testimony that you didn't need to
7    independently test how consumers would respond to
8    the placement as you have it on pages 3 and 4 of
9    your supplemental report versus how the label is
10   placed on the product in which Z█ Olson died;
11   correct?
12       A. You're saying consumers respond, and I'm
13   talking about conspicuity. I am certain that these
14   positions are more conspicuous, and, in fact, ASTM
15   states that that's more conspicuous. The one above
16   the head is consistent with the ASTM placement above
17   that line. The other one is where you used to have
18   a warning on -- on the belt.
19       So Fisher-Price was aware of the placement
20   on the principal display, and, in fact, Fisher-Price
21   has an ANSI-formatted warning on another one of
22   their children's seats.
23       Q. We've already agreed that the location of
24   the warning doesn't in and of itself mean that a
25   reader will read the warning; correct?

Page 252

1        A. Well, the location --
2        Q. We've already agreed --
3        A. Well, no.
4    MR. OSBORNE: Wait, wait, wait. She didn't
5    answer, and you interrupted her. Please let her
6    answer.
7    THE WITNESS: If it's in a conspicuous
8    location, every single time the user interacts with
9    it, they're going to be exposed to the warning. So
10   if you have it up with the head against the wall and
11   occasionally close it up to move it, let's say,
12   while you're moving it, you're not necessarily going
13   to read the underside. You set it up again, and
14   it's back up against a wall or underside.
15       However, if you have it as I have it on
16   pages 3 and 4, you will see it 100 percent of the
17   time when you're putting an infant into it. That
18   gives many more opportunities to read it. So you
19   may not read it time one but you may read it time
20   three, and you may reread it six months later.
21       But what it does is it's also -- not only
22   does it identify the information, but one of the
23   purposes of warnings is to remind people of the
24   information. And if you start at one month and they
25   see the five-month warning, well, the one month is

Page 253

1    not -- the relevance is another issue of warnings.
2    So if you have a five-month, that may not be
3    relevant if you read it the first time, but if you
4    continue to use it, when you get to four months,
5    they'll think "Oh, I've only got, you know, one more
6    month to use it."
7        And also if -- so that's one really, really
8    important reason why it needs to be on the principal
9    display, is so that it's a reminder and it gives
10   them opportunities every single time they interface
11   with it.
12   MR. COX:
13       Q. You would agree with me that just because a
14   user may be exposed to the label -- a warning, I'm
15   sorry, doesn't mean that they will actually read it;
16   correct?
17       A. No. People say that they usually read it
18   the first time, and then it may serve as a reminder.
19   But the fact that it's there and they see it every
20   time is going to be a really good reminder to them,
21   and -- so it's critical, especially with life and
22   death information that's on this -- or should have
23   been on it, that this information be very
24   conspicuous to the users to help with the --
25   safeguard their children.

64 (Pages 250 - 253)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 254

1    Q. Let's transition to Exhibit Number 5, your
2  July 12, 2021 rebuttal report. And much of this
3  we've already talked about, so I'm just going to
4  touch on anything that's not been discussed here.
5        Page 4 in your report, there's a section or
6  discussion about FMEA testing. And just let me know
7  when you get there.
8    A. Okay.
9    Q. There's a statement here about how
10 Fisher-Price didn't conduct FMEA testing and if it
11 had, many critical hazards could have been avoided.
12       What standard or regulation are you relying
13 on for the proposition that Fisher-Price was
14 required to conduct FMEA testing for the Rock 'n
15 Play Sleeper?
16   A. I didn't say they were legally required; I
17 said that's the standard. You're asking me as a
18 human factors expert. Failure modes is important.
19 If you're going to identify what the hazards are,
20 you've got to identify and do an analysis of where
21 the potential failure modes are. It's fundamental
22 to human factors before you start the warnings.
23       It's kind of what I was talking about
24 earlier, is assume you're going to introduce the
25 product in 2022 and you want to provide a safe

Page 255

1  product to the users, then you start with a FMEA.
2  You start with identifying where all the potential
3  failure modes are. Then you identify what can be
4  done to protect the user. So does the belt, in
5  fact, protect them? And is there something else
6  that needs to be done? Does the incline need to be
7  changed? Is there a design change that needs to
8  happen?
9        All that should be done early on in the
10 FMEA process. Then after the hazards, all of them
11 have addressed the design, then at that point you
12 look at is there anything that needs to be warned of
13 that's not fixed through design? You identify those
14 and then develop the warnings.
15   Q. You're not aware of a particular regulatory
16 standard, for example, that requires Fisher-Price to
17 conduct FMEA testing; correct?
18   A. I'm not going to testify regulatory or
19 legal standards. I am here to talk about human
20 factors, and that's -- one of the fundamental
21 principles of human factors for hazard management is
22 the first part's identifying the hazards.
23   Q. We can agree that the discussion about FMEA
24 testing is nowhere in your original or supplemental
25 report; correct?

Page 256

1    A. Well, the original one did talk about
2  hazard management, and FMEA is part of the hazard
3  management hierarchy. It's -- the first part is to
4  identify the hazards.
5    Q. I'm specifically referring to the acronym
6  FMEA, failure modes and effects analysis. Can we
7  agree that that acronym is not in your original or
8  supplemental report?
9    A. No. It's indirectly in them talking about
10 the hierarchy.
11   Q. Indirectly but not directly; right?
12   A. That term wasn't used, but it's a
13 fundamental term and it's implied in the -- in the
14 first report.
15       THE REPORTER: Can we just go off the record
16 for a second.
17       THE VIDEOGRAPHER: 6:02, we're off the record.
18       (Interruption in proceedings.)
19       THE VIDEOGRAPHER: At 6:05, we're back on the
20 record.
21       MR. COX:
22   Q. If we go to page 7 of your rebuttal report,
23 I understand that this is a figure from Dr. Arndt's
24 report, Figure 4. Did you -- or were you aware,
25 rather, of this warning or instruction -- not sure

Page 257

1  which word you would use -- that's included with the
2  warning system?
3    A. It's in the leaflet. I have it here
4  somewhere. Where he took it from?
5    Q. Yes.
6    A. Yes.
7    Q. Do you have any criticisms about how this
8  warning -- or whether this warning properly
9  instructs a user on how to secure their child in the
10 crotch restraint?
11   A. Okay. I'm not going to agree it's a
12 warning because it's not. It doesn't say "Warning."
13 It does not have hazard information. It's an
14 instruction. It's clearly an instruction on
15 securing your child.
16   Q. I'll ask my question so that I use the word
17 "instruction." That's easy to do.
18       Do you have any criticisms about whether
19 this instruction properly tells a user how to secure
20 their child in the Rock 'n Play Sleeper using the
21 crotch restraint?
22   A. It tells them how to secure. It doesn't
23 say why, and this is a perfect missed opportunity
24 where there could have been a warning.
25       Remember, I said earlier that instructions

65 (Pages 254 - 257)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 258

1  usually include or often include warnings at the
2  beginning of each section. This would have been a
3  really good place to have made it a warning by
4  simply putting "Warning" at the top. "Failing to
5  secure your child can result in suffocation and
6  death." That totally changes the feeling of this
7  statement and turns it from an instruction into a
8  warning.
9      Q. You don't know one way or the other as we
10 sit here today the reasons Fisher-Price chose not to
11 include that particular language in this
12 instruction; right?
13     A. Correct.
14     Q. Page 13. Last question on the F3118
15 standard. The last bullet says "Stop using when
16 baby reaches 5 months."
17         Do you see that?
18     A. Yes.
19     Q. And I understand that the five months is
20 the language that you put here; right?
21     A. That last statement, I added. I
22 Photoshopped the ASTM, and that's -- you've now seen
23 the extent of my Photoshopping ability.
24     Q. I think I understand now.
25         So you put the ASTM label and then

Page 259

1  Photoshopped the last bullet, "Stop using with baby
2  reaches five months"; right?
3      A. Yes.
4      Q. And you believe that five-month language is
5  necessary even though the bullet above warns a
6  parent about -- or to stop using the product when
7  the baby begins to roll over or can pull up on
8  sides?
9      A. Yes, because as the Fisher-Price employees
10 described, it's designed for children zero to five
11 months. So they should have a five-month age
12 warning or age label, because most infant and
13 children's products are age-labeled, and parents
14 expect that.
15     Q. We've talked about the interviews that you
16 conducted with Andrew and Katie; correct?
17     A. Yes.
18     Q. And those are -- they're not -- there's no
19 page numbers to those sections of your report, but
20 they're Bates-labeled, and so it starts at Bates
21 label 9047 of Exhibit Number 5. And that's the
22 interview with Andrew Olson; right?
23     A. Yes.
24     Q. Was anyone other than yourself present for
25 the interview with Andrew Olson?

Page 260

1      A. It was --
2      THE REPORTER: Wait. Wait. What was the
3  objection?
4      (Interruption in proceedings.)
5      (The record is read by the reporter.)
6      THE WITNESS: I think it was just myself and
7  Andrew. I know Katie was not on -- I interviewed
8  them separately and did not have anyone listening
9  in. I don't recall if -- Ms. Shriner might have
10 been monitoring it. She certainly didn't say
11 anything. I don't know if she was dialed in.
12     MR. COX:
13     Q. Was this interview conducted by phone?
14     A. Yes.
15     Q. In your 30 years' experience doing
16 litigation expert work, can you tell me on how many
17 occasions you've interviewed the plaintiffs after
18 they have been deposed in a case?
19     A. It's not unusual. Sometimes I see them at
20 a site. Often there's missing information in the
21 depositions, and that's when I would interview them.
22 If -- if I feel like it's well covered, then there's
23 no reason to interview them.
24         If I feel like there's gaps, then I might
25 contact counsel and say, "Hey, can I ask a couple

Page 261

1  questions of the plaintiffs? There's some
2  information that's not there." And so that's what I
3  did in this case.
4      Q. In your 30 years of doing this type of
5  work, have you ever interviewed a plaintiff in a
6  particular litigation and the result of your
7  interview is that it differs from the testimony they
8  gave during their deposition?
9      MR. OSBORNE: Form.
10     THE WITNESS: I don't know that it differs.
11 It's more -- it's that information was missing in
12 the deposition. I didn't -- I tried to ask -- I
13 think I asked questions that were different than the
14 ones that were asked in the deposition. So it's not
15 that it's in conflict; it's just in addition.
16     MR. COX:
17     Q. And you're --
18     A. And that's not uncommon. I think
19 usually -- typically, but not always, it's in
20 person; but, of course, more recently, things are by
21 phone or Zoom.
22     Q. In your 30 years of doing litigation expert
23 work, you're familiar with the deposition process;
24 correct?
25     A. Yes.

66 (Pages 258 - 261)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 262

1    Q.  You're familiar and understand that counsel
2   is present during the deposition process; correct?
3       A.  Well, usually everything's -- well, I guess
4   by phone now.  But -- in the past, yes, counsel was
5   present.
6       Q.  Have you ever had a deposition where one
7   counsel for a party was not present?
8       A.  I don't think so.
9       Q.  Okay.  Counsel usually is present, whether
10  remotely or in person, for a deposition; true?
11      A.  Yes.
12      Q.  Those lawyers had the opportunity to ask
13  that witness questions under oath; correct?
14      A.  I think you're asking me legal questions
15  right now.  I -- none of that matters to me.  I just
16  had a couple questions I wanted to ask that weren't
17  covered in the deposition, so I asked if I could ask
18  them, and I do that often.
19          Often, at the time depositions are taken,
20  there are some holes in them, and then I'll say,
21  "Hey, can I ask a couple questions of the
22  plaintiff?"  It's not unusual.
23      Q.  In your interviews of Andrew and Katie, how
24  did you eliminate hindsight bias based on their
25  responses?

Page 263

1       A.  Same way it would be in a deposition.  I'm
2   asking them questions, and I then have them review
3   and sign that it's accurate what I documented that
4   they said.  I think any deposition, any statement
5   might have hindsight bias, but essentially I was
6   just trying to plug a few holes that were in the
7   deposition.
8       Q.  We can agree that the interviews of Andrew
9   and Katie occurred with their understanding that the
10  warning on the Rock 'n Play Sleeper, at least from
11  your perspective, was not sufficient; right?
12      A.  I don't know what they understood about me
13  or what they even knew who I was.  They knew
14  somebody was going to ask them some questions.
15      Q.  You showed -- did you show Katie and Andrew
16  a copy of the warning that you contend should have
17  been on the product?
18      A.  I e-mailed them to counsel and asked them
19  to get it to them just prior to the call separately,
20  and then my big stipulation is that they were
21  separate when I spoke to them.  So they each had
22  their own copy.
23      Q.  And so the purpose of the interviews was to
24  determine whether they would respond differently to
25  the warning you sent to them versus the warning that

Page 264

1   was on the Rock 'n Play Sleeper in which Z█████ died;
2   correct?
3       A.  Right.  Would it give them different
4   information and would that affect their judgment and
5   subsequently their behavior.
6       Q.  And both Andrew and Katie told you that if
7   the warning included the language in the warning
8   that you sent to counsel and gave to them that they
9   would have behaved differently or changed their
10  behavior; right?
11      A.  Yes.  Actually, both of them responded the
12  strongest from learning that babies had died --
13  suffocated and died from rolling over.  That babies
14  had died was the first thing they said, and that
15  affected them.
16      Q.  Did you ask Andrew or Katie anything about
17  the deposition testimony that they gave under oath?
18      A.  No.  I only asked -- this is the extent of
19  the questions I asked.  I did not ask any other
20  questions.  And these are the answers they gave me.
21  And then just to make sure that I didn't type wrong
22  while they were talking to me or they wanted to
23  change it or anything, I sent it to them to have
24  them sign it to make sure that I accurately
25  represented our conversation.

Page 265

1       Q.  The interviews that you had with Andrew and
2   Katie, you would agree with me that you could have
3   interviewed other individuals to ask them these very
4   same questions; correct?
5       A.  I don't understand.  What other
6   individuals?
7       Q.  Any American person.
8       A.  Whose child had died in a sleeper?  I'm
9   asking them had they had that as opposed to what
10  they had, would that have changed their behavior.
11  It makes no sense at this point since I want to know
12  specifically -- I'm rebutting -- this is a rebuttal
13  report.  This is rebutting the statements by
14  Dr. Arndt that they knew everything they needed to
15  know.  So the question is did they.  If they had
16  additional information, would that have affected
17  their judgment.
18          And because he's saying that if they -- if
19  they understood the existing warning, that's all
20  that mattered.  And that if they liked -- I think he
21  used the word if they liked the warning or approved
22  of it or something.  And it's completely irrelevant.
23          What's important is did it give them the
24  content they needed to make an accurate judgment
25  about the risk and assess it, whether or not the

67 (Pages 262 - 265)

Alison Vredenburgh, Ph.D.                September 22, 2021
In Re: Fisher-Price/Mattel

Page 266

1   reward of using the product is justified by the
2   risk. But they have to appreciate the risk in order
3   to do that.
4       Q. You could have asked those same questions
5   of someone who was not a plaintiff in this
6   litigation; correct?
7       A. That -- no, because this is a rebuttal
8   report, I need to stay within the four corners of
9   Dr. Arndt's report, and he's talking specifically
10  about them, so I needed to talk to them.
11      Q. What specifically were you attempting to
12  rebut with these interviews of Andrew and Katie?
13      A. Well, on the very last page, "[as read]
14  Additional or alternate warnings or instructions
15  would not have altered the behaviors of Andrew Olson
16  or Katie Courkamp sufficiently to prevent the issue
17  at incident in this case. Had either of the
18  warnings -- the parents followed the warnings that
19  they found, read and understood, the product could
20  have been used in a reasonably safe manner."
21          So the additional or alternate warnings,
22  that's what I'm rebutting. So he never spoke to
23  them, the depositions never addressed those issues,
24  and so when I read that, I said, "Oh" -- after I
25  received Arndt's report, "I need to talk to the

Page 267

1   Courkamps for my rebuttal."
2          And so that was when I asked counsel if
3   they would mind if I had a brief chat with them.
4       Q. You would agree with me that what's
5   contained in Dr. Arndt's report about the statements
6   that the Courkamps made during their depositions is
7   consistent with their deposition testimony; correct?
8       A. What?
9       MR. OSBORNE: Form.
10      THE WITNESS: That didn't make sense. What did
11  you say?
12      MR. COX:
13      Q. Not long ago, I think you and I agreed that
14  at their depositions, the parents testified that
15  they had read the warnings; correct?
16      A. Yes.
17      MR. OSBORNE: Form.
18      MR. COX:
19      Q. They testified that they had understood the
20  warnings; correct?
21      A. They thought they did --
22      MR. OSBORNE: Form.
23      THE WITNESS: -- as -- as it was worded. They
24  understood the English. That doesn't mean that they
25  understood the hazards.

Page 268

1       MR. COX:
2       Q. The opinions that Dr. Arndt provides in his
3   report about the Courkamps' deposition testimony, do
4   you disagree with the way that he characterized
5   their testimony?
6       A. Absolutely.
7       MR. OSBORNE: Form.
8       MR. COX:
9       Q. And that was the reason why you conducted
10  interviews of Andrew and Katie; correct?
11      A. Yes, because he made a statement saying no
12  additional information would have changed, but they
13  were never asked about additional information.
14      Q. And that's something that the lawyers who
15  were at the deposition could have asked, either or
16  both of them; correct?
17      A. Yes.
18          There's another statement he made in here
19  also that I'm trying to find from your earlier
20  question about what he said is the reason why I
21  wanted to interview them. I think there were two
22  things he said.
23      Q. Would it be important to you to know --
24      MR. OSBORNE: Counsel, can you wait and let her
25  find that, please, and then we can go on.

Page 269

1       MR. COX:
2       Q. Oh, you're looking for something?
3       A. Yes.
4       MR. COX: Can we go off the record, please.
5       THE VIDEOGRAPHER: Yes. 6:23.
6       (Interruption in proceedings.)
7       THE VIDEOGRAPHER: We are on the speakerphone
8   and on the record at 6:37.
9       MR. COX:
10      Q. Okay. We're talking about the interviews
11  with Andrew and Katie.
12          Just looking at the questions that you
13  asked Andrew and Katie, the plaintiffs in this case,
14  would you agree with me that those questions assume
15  a causal explanation for Z███'s death, that being
16  suffocation?
17      A. I will leave that to another expert. But
18  my understanding is that she suffocated.
19          I never finished answering my last
20  question, but if you'll just agree that there's more
21  in Dr. Arndt's report that triggered my desire to
22  speak with the -- Mr. -- Ms. Courkamp and Mr. Olson,
23  then we can move on.
24      Q. Sure.
25          Question Number 1 says -- this is for

68 (Pages 266 - 269)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 270

1  Andrew Olson, so page 9047 -- "In your mind, what
2  was the warning on the back of the sleeper telling
3  you to do to protect Z███ from a suffocation risk?"
4      Do you see that?
5  A. Wait. I'm sorry. You were on --
6  Q. I'm on your rebuttal report.
7  A. You're on my rebuttal report. Okay. So
8  we're done with Dr. Arndt. Okay. So there was more
9  there, but if you don't want to go there, that's
10 fine.
11     So we'll go back to my rebuttal report, and
12 you're on Andrew? Okay.
13 Q. The first question, "In your mind, what was
14 the warning on the back of the sleeper telling you
15 to do to protect Z███ from a suffocation risk?"
16     Doesn't that question assume that Z███ was
17 exposed to or died from a suffocation?
18 A. No. It's saying what is this warning?
19 They had a copy of it. What is this warning telling
20 you to do to protect her from a suffocation risk?
21 Q. And that question is the same as the first
22 question in Katie Courkamp's interview that starts
23 on Bates 9050; right?
24 A. I asked them the same four questions.
25 Q. These questions ask them to tell you how

Page 271

1  they would react to something that happened seven
2  years ago with the knowledge that they have today;
3  correct?
4  A. No. They -- I told them to look at this
5  warning and tell me what that warning says to them.
6  How do they interpret that warning? What does that
7  mean? And I wrote it down. It doesn't ask you,
8  "What did you think seven years ago?" I said, "What
9  does this warning tell you?"
10 Q. And you don't think at all that that
11 factored into the answers that they gave you?
12 A. That could be true of a deposition as well.
13 But my question is -- since nobody asked them, I
14 asked them what -- this is the information they had
15 available, this is the information that Dr. Arndt
16 said they knew and understood, so I wanted to know,
17 well, what exactly did they understand. So in my
18 rebuttal, I'm asking them those questions that
19 nobody else asked them.
20 Q. You read their deposition transcripts;
21 right?
22 A. I did.
23 Q. You understood from their deposition
24 transcripts that they were represented by an
25 attorney; correct?

Page 272

1  A. Yes.
2  Q. Their attorney could have asked these four
3  questions during the deposition; true?
4      MR. OSBORNE: Foundation.
5      THE WITNESS: I don't know that their attorneys
6  are human factors experts. But those are questions
7  I wanted in rebuttal to Dr. Arndt, so at that point
8  of the deposition, apparently those questions were
9  not asked. But in rebuttal to Dr. Arndt, since he's
10 making lots of assumptions about the thought process
11 of the parents, the only way to find out is to ask
12 them.
13     MR. COX:
14 Q. Even if the attorneys did not have any
15 human factors experience, you would agree with me
16 that they could have asked these four questions
17 during that deposition; correct?
18 A. If they had Dr. Arndt's report there. This
19 is in rebuttal to Dr. Arndt. This is -- he, for
20 whatever reason, thought that they knew what they
21 needed to know in that warning, so I wanted to know
22 what was their understanding. That was not asked.
23 So in rebuttal to him and his assumptions, I wanted
24 to find out what they actually did think.
25 Q. Even if the attorneys did not have any

Page 273

1  human factors experience and Dr. Arndt's report did
2  not exist, the lawyers representing Andrew and Katie
3  could have asked these four questions; correct?
4      MR. OSBORNE: Form and foundation.
5      THE WITNESS: If they knew what Dr. Arndt was
6  going to say in the future.
7      MR. COX:
8  Q. Even if they didn't know that, these are
9  four questions they could have asked those
10 individuals; correct?
11 A. They could have.
12     MR. OSBORNE: Form and foundation.
13     THE WITNESS: And the person taking the
14 deposition could have as well, but they weren't.
15 And the point was Dr. Arndt made assumptions, and as
16 a rebuttal, I wanted to ask them since he's assuming
17 what they think.
18     MR. COX:
19 Q. Wouldn't you agree that there is a
20 significant risk of hindsight bias in asking these
21 type of questions to parents who experienced a death
22 in the Rock 'n Play Sleeper and also litigants to
23 the case?
24     MR. OSBORNE: Form.
25     THE WITNESS: Wouldn't that also be true during

69 (Pages 270 - 273)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 274

1  their deposition?  Wouldn't that also be true in a
2  police report?  Wouldn't that also -- I mean, this
3  is supplementing the deposition, and this is
4  responding to assumptions made by Dr. Arndt.  That
5  would also be true of the employees of Fisher-Price.
6      MR. COX:
7      Q.  Are you familiar generally with the science
8  of hindsight bias?
9      A.  Yes.
10     Q.  How -- Or sorry.  Strike that.
11         Can you tell me whether that science
12  applies to this particular situation?
13     A.  Everybody has hindsight bias.
14     Q.  Is that your answer?
15     A.  It applies to every accident all the time,
16  everything you do.  Whether or not you're injured,
17  we all have hindsight bias, so it applies to every
18  situation everywhere.
19     Q.  When you interviewed Katie and Andrew, they
20  were aware that they were speaking to the hired
21  human factors expert on behalf of them; correct?
22     A.  I don't know what they were told.  I don't
23  know what they were aware of.  They knew they were
24  just talking to another person that was going to ask
25  them questions.  I don't know what they knew.  I

Page 275

1  just said I had some questions that I wanted to ask
2  them, would they mind talking to me for a few
3  minutes.  This was after I think we were given a
4  dial-in number, and I don't know what they were
5  told.
6      Q.  Did you introduce yourself?
7      A.  Yeah.  I said -- they had my name, and I
8  said that I would like to ask them a few more
9  questions.  I know that they'd already answered
10  questions and that they should have received -- I
11  confirmed they had received some documents.
12         I did not fill them in a lot on my
13  backward -- background intentionally.  I did not
14  want to intimidate them.  I did not use my doctor
15  title.
16         I just said, "This is Alison, and I have
17  some questions I'd like to talk to you about, and
18  you should have received some documents, and would
19  you please refer to," and then I told them which one
20  I wanted them to look at each time and just answer
21  the questions.
22     Q.  They knew that it was related to the
23  lawsuit that they filed against Fisher-Price and
24  Mattel; correct?
25     A.  Yes.

Page 276

1      MR. OSBORNE:  How many hours are we at?
2      THE VIDEOGRAPHER:  Approximately six.
3      MR. COX:
4      Q.  You -- I'm sorry.
5      THE WITNESS:  We were at --
6      THE REPORTER:  Wait, wait.
7      THE VIDEOGRAPHER:  Five hours, 55 minutes.
8      MR. COX:
9      Q.  You talked earlier about how their -- the
10  testimony or statements, rather, they gave to, say,
11  like, the police officers is really no different
12  than the questions that you asked them; right?
13     A.  I said in the deposition.
14     Q.  Or even in their deposition; right?
15     A.  Right.  They're going to have hindsight
16  bias.  Even right after an accident when they're
17  talking to the police, they're trying to reconstruct
18  or figure out what happened in a car accident, let's
19  say, and often will give statements about times and
20  distances that factually can't be accurate.
21     Q.  We can agree that the difference between
22  the statements they provided to the officers and
23  other objective investigators versus the statement
24  they gave to you is that when they gave their
25  statements to you, they knew that they were in

Page 277

1  litigation, whereas that was not the case when they
2  gave their statements to the officers; right?
3      A.  I don't think that -- I mean, officers can
4  be intimidating in other manners -- other manner,
5  and I object to you saying that police officers are
6  objective and I'm not.  I don't have a stake in the
7  outcome of this.  I am applying science -- you can
8  laugh, but I have no stake in the outcome.  I am
9  explaining the science.  I'm trying to explain it
10  and apply human factors, and I turn down quite a bit
11  of work.
12         But this case is very consistent from the
13  science of human factors, and if I -- I would not
14  say something that I disagree with or that's not
15  supported, and I would not make assumptions like
16  what I was trying to refute by interviewing them.
17  The only thing I could do to find out what they
18  thought was to interview them, and Dr. Arndt did not
19  interview them.  He just speculated about what they
20  were thinking.
21     Q.  When they were interviewed by police
22  officers and other objective investigators, at that
23  time they did not have a lawsuit pending; correct?
24     A.  Police officers --
25     MR. OSBORNE:  Object to form.

70 (Pages 274 - 277)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 278

1    THE WITNESS: -- did not show them warnings,
2  did not explain -- they were never asked those
3  questions, and yet Dr. Arndt made the assumption
4  that no additional information would have affected
5  their judgment.  The only way to find out if
6  additional information would affect their judgment
7  is to ask them.
8    MR. COX:
9    Q.  When they were interviewed by police
10 officers and other objective investigators, at that
11 time they did not have a lawsuit pending; correct?
12   MR. OSBORNE:  Object to form.
13   THE WITNESS:  Yes.
14   (Interruption in proceedings.)
15   MR. COX:
16   Q.  I'm going to hand you a copy of an article
17 that you authored.  And I'm just trying to find my
18 copy of it, so give me one second.
19   A.  If you told me the footnote, then I can use
20 my own copy.
21   Q.  I don't think it's a footnote to your
22 report.  It's called -- it's a chapter from a book
23 "Expectations" by Alison G. Vredenburgh and Ilene B.
24 Zackowitz from 2006.
25   A.  Okay.

Page 279

1    Q.  I found it.  So Tab 2 in the Daubert
2  binder.  You got it?  Cool.
3    This looks like -- John, we'll pull it up
4  on Exhibit Share.
5    Looks like it's a chapter in a book called
6  "Handbook of Warnings."  Do you so see that?
7    A.  Yes.
8    Q.  And there's a lot of information in here
9  but -- first of all, are you generally familiar with
10 this chapter that you and Ilene B. Zackowitz wrote?
11   A.  Yes.
12   Q.  And if we go to the last page of that, 353,
13 that's -- it's actually the last sentence of this,
14 and just let me know when you get there.
15   A.  Okay.
16   Q.  That last sentence says "Although no
17 warning can elicit absolute compliance, by
18 understanding how expectations influence
19 safety-related behavior, warning designers can
20 maximize the efficacy of product labeling."
21   I assume you still agree with that
22 statement; right?
23   A.  Right.  And it talks about perception of
24 hazardousness, which is something that I've been
25 talking about earlier, is the warning content --

Page 280

1    Q.  We have to move on with my -- I don't
2  want --
3    A.  Well, I want to be complete, because you
4  just took the very last take-home sentence of this
5  entire article, the last sentence of the whole
6  thing, but the article is about how perceptions of
7  hazardousness affects judgments about risk, and that
8  is one of the big things that I've been talking
9  about all along, and that is on page 346.  So I
10 think it would be remiss of me not to point that out
11 since that is such an important part of the
12 testifying.
13   Q.  Thank you.  And I wasn't intending to hide
14 that from you, so I appreciate you for pointing that
15 out to us.
16   A.  There you go.  Is that it for this one?
17   Q.  That's all.
18   A.  All right.
19   Q.  We talked a little bit earlier today about
20 instances in which your opinions have been either
21 excluded or limited by Courts.  Do you generally
22 remember us talking about that?
23   A.  Yes.
24   Q.  And I think you mentioned that there's been
25 situations that you can remember where your opinions

Page 281

1  have been limited or excluded as it relates to
2  design defect opinions when there's already a design
3  expert.  Did I understand that right?
4    A.  Yes.
5    Q.  We're Number 8?  Okay.  So this is 22.
6    Handing you what we'll mark as Exhibit 8,
7  and it's a copy of an order in a case from the
8  United States District Court for the Southern
9  District of California from 2009.
10   Do you see that?
11   A.  Yes.
12   Q.  And I'll refer specifically your attention
13 to page 18 of 25, and there's the page references at
14 the top.
15   First of all, does this -- do you -- are
16 you familiar with this case as I show it to you now?
17   A.  I know exactly what this is.
18   Q.  And you're generally aware that in this
19 case, your opinions were excluded by the Court;
20 correct?
21   A.  The Court granted summary judgment and
22 excluded all plaintiff's experts at the same time.
23 And, in fact, the plaintiff was a lawyer, and he
24 hired and fired multiple attorneys during these
25 motions so that there was no one defending it.  The

71 (Pages 278 - 281)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 282

1  defense made allegations about my purported
2  testimony that were inaccurate, and, in fact, we
3  were given some information that was inaccurate as
4  well.
5      Q.  In any event, the Court excluded your
6  opinions in this case; correct?
7      A.  The Court excluded everyone's opinions from
8  the defense and granted summary judgment.
9      Q.  In this case, you were testifying on behalf
10 of the defense?
11     A.  No.  Plaintiff.
12     Q.  You were testifying on behalf of the
13 plaintiff?
14     A.  Yes.
15     Q.  You said the Court excluded everyone's
16 opinions for the defense.
17     A.  For the plaintiffs.
18     Q.  For the plaintiffs.  In other words, you
19 weren't the only expert whose opinions were
20 excluded; right?
21     A.  At one -- in one motion, they excluded all
22 the plaintiff's experts and granted summary judgment
23 at the same time.
24     Q.  Sure.
25         On page 19 of this report the Court talks

Page 283

1  about the Daubert standards.  I understand you're
2  not a lawyer.  Not trying to ask you legal
3  questions.  You've been doing this long enough,
4  though, that I assume you are familiar with the
5  Daubert standard; right?
6      A.  Yes.
7      Q.  And in this particular case, page 19, the
8  Court found that your testimony should be excluded
9  as unreliable and irrelevant under the Daubert
10 standards because you admitted during your
11 deposition that you did not collect any empirical
12 data, did not conduct any testing, did not conduct
13 any surveys, did not seek data from the
14 manufacturers, did not review any peer-reviewed
15 literature, and did not conduct any other kind of
16 research prior to forming your opinion; is that
17 correct?
18     A.  That's what it says.  It's not accurate,
19 but that's what it says.
20     Q.  That's just what the Court ruled; right?
21     A.  Right.  And, like I said, the attorneys
22 were hired and fired during the motion, and it
23 wasn't defended.
24     Q.  It goes on to say that "Moreover,
25 Dr. Vredenburgh described a detailed process of how

Page 284

1  they would normally evaluate warnings for her
2  clients, but then admitted that because she was not
3  hired to develop any warnings in this case, she did
4  not follow this process in reaching her conclusion
5  that the warning was inadequate."
6          Do you remember that?
7      A.  That's what it says.  Again, that's not
8  necessarily accurate, but there was nobody defending
9  the motion.
10     Q.  The Court also goes on to say that "[as
11 read] Moreover, it is doubtful whether her opinion
12 would even be relevant.  Her opinions regarding the
13 torch and cylinder warnings do not speak clearly to
14 the issue of causation because she could not say
15 that the lack of warnings resulted in the
16 plaintiff's injury."
17         Do you remember that finding from the
18 Court?
19     A.  It says what it says.
20     Q.  In this case, you would agree with me that
21 you cannot say to a reasonable degree of scientific
22 certainty that if there had been different warnings
23 on the Rock 'n Play Sleeper, then Z███ Olson would
24 not have died.
25     A.  That's not even a human factors or

Page 285

1  scientific conclusion.  That would be God.  What I
2  can say is that the parents had a right to
3  understand the risk, and had they been given
4  accurate information, then more likely than not, or
5  to a scientific -- yes, to a scientific certainty
6  that based on my discussions with the parents, based
7  on my understanding of research, and given the
8  warning in a conspicuous location that, to a
9  scientific degree of certainty, that would have
10 changed their behavior and Z███ would not have died
11 that day.
12         I'm sorry.  Initially, I misunderstood your
13 question, and then I heard it as I was answering.
14         I need to say my answers going on today --
15 this is an endurance competition.  This is already
16 7:00 o'clock.  I've been here since 10:00 a.m. with
17 half hour for lunch, so if I make errors, I'm going
18 to correct them in the record.  But I'm exhausted.
19 Here (indicating).
20         And the court reporter also said she's
21 exhausted.
22     Q.  What is the scientific basis for your
23 opinion that a different warning would have changed
24 the parents' behavior and Z███ would not have died,
25 other than your interview with the parents?

72 (Pages 282 - 285)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 286

1    A. The research on warnings and warning
2  compliance. A different warning in a different
3  location too. So you take the ASTM warning with the
4  five month added, put it in the place that ASTM said
5  to put it, and, to a reasonable degree of scientific
6  certainty, Z█████s parents, who were warnings
7  readers, who said they read it, who said they even
8  looked for additional information, I -- in my
9  opinion, to a reasonable degree of scientific
10  certainty, they would have stopped using it or would
11  not have used it at all had they been exposed to the
12  ASTM warning.
13    Q. And your testimony that they would have
14  changed their behavior is true even in light of
15  their deposition testimony; correct?
16    A. Their deposition testimony doesn't address
17  it. Their depositions said they read the warnings
18  that were there, and they thought they understood
19  what was there, and no one ever asked them what did
20  it mean to them. Nobody ever asked them if they had
21  this ASTM warning, would that have changed their
22  behavior. Their deposition was silent on those
23  issues.
24    Q. We talked a little bit earlier about the
25  hazard of the Rock 'n Play Sleeper. Assuming that

Page 287

1  suffocation is a hazard resulting from rolling over
2  in the Rock 'n Play Sleeper, would you agree that
3  the restraint guarded against that hazard?
4    A. If it's tight enough. I think that's more
5  of a biomechanics answer. I'm not going to answer
6  that question. I'll let the biomechanics expert
7  answer that.
8    Q. Do you consider a safe product to be one
9  that never results in injury or death to a consumer?
10    A. A safe -- it -- Well, no. I think that
11  there is an approach to mitigate hazards to the
12  greatest extent possible and that some products are
13  going to continue to have some hazards associated
14  with their use.
15    If there's a high-benefit product, there
16  might be some risk. For example, an automobile.
17  You can't design out every single hazard of an
18  automobile, but you can make every effort to have
19  different kinds of collision avoidance systems. You
20  can have anti-lock brakes. You can have a lot of
21  different systems to reduce risk. But it's still
22  possible to have an accident. But most people would
23  agree the benefit of vehicle transportation exceeds
24  the risk involved in using it.
25    The issue here is, is the benefit of this

Page 288

1  sleeper so great that the risk -- fully informed of
2  the risk is worth -- is worth it, and parents need
3  that information to make that benefit-risk analysis,
4  and that's the point of the warnings.
5    Q. Is there such a thing as a product that
6  could not ever result in injury or death to a
7  consumer?
8    A. I mean, we can be silly. This piece of
9  paper. I might get a paper cut, depending upon what
10  you mean by injury. But death -- there's a lot of
11  products that probably won't result in -- in death.
12    Q. Can you name one?
13    A. This speaker.
14    Q. You said the telephone speaker; right?
15    A. Right.
16    Q. I just want to make sure that's on the
17  record.
18    A. The speaker that's in front of us, probably
19  that won't result in death if you're sitting in a
20  conference room.
21    Q. And that's your response as a 30-year
22  experienced --
23    A. I'm not aware of anyone dying from being in
24  a room with a speaker in a conference room.
25    Q. Great.

Page 289

1    A. I mean, I'm sure there's a lot of products,
2  but I haven't sat here and evaluated what products
3  would never result in death. But I'm sure there's a
4  lot of products that would not result in death with
5  any foreseeable use or misuse.
6    Q. Earlier, we talked about your view that it
7  would be unethical for you to conduct certain
8  testing from a human factors standpoint because the
9  IRB would not approve that kind of testing. Do you
10  remember those questions?
11    A. Right. The -- the testing would have to
12  pass the -- basically what used to be called the
13  human subjects committee, where you have to go
14  through long lists of all possible risks, and then
15  they discuss -- and then how you plan to protect the
16  human subjects, and then they evaluate whether the
17  benefit of the research surpasses the risk to the
18  subjects.
19    Q. Who is your IRB?
20    A. For which study?
21    Q. If you were to seek approval for a study in
22  this case, who is your IRB?
23    A. I pair with professors at universities. So
24  for the wheelchair, it was Alan Hedge, and we went
25  through Cornell. I did postdoc at UCSD med school,

73 (Pages 286 - 289)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 290

1    so sometimes the IRB was through there.  It depends
2    on where I am at the time, if I'm going to test
3    human subjects.
4            Right now, one of my associates is getting
5    his Ph.D. at Wright State and did research using
6    their IRB.  So it depends on which study and which
7    subjects and context.
8            So for this, I would -- if I were to test
9    the inclined sleeper, I would definitely pair with
10   somebody at a university.  Most studies like that,
11   there's a couple coinvestigators, so I may be the
12   lead, as I was with the wheelchair research, but
13   then I brought in Alan Hedge from Cornell, who -- we
14   went through his --
15       Q.  And as we sit here today, you can't tell me
16   what specific university that you would have
17   attempted to pair with?
18       A.  I have colleagues all over the country I
19   can pair with.  That's not a problem.  I would
20   choose the colleague that's best suited for the
21   research.  So with Hedge, he's an environmental
22   design expert, so I went to him.
23       Q.  Have you ever --
24       A.  Okay.  For one that was heavily stats
25   oriented, I paired with somebody at SUNY New York

Page 291

1    who's a stats professor there.
2            So again, it just depends on what the
3    subject is.  But I do have colleagues at
4    universities all over the country, and I would
5    choose the best person.
6        Q.  Have you ever performed any testing
7    approved through the IRB related to infants?
8        A.  No, I have not tested infants.  We did test
9    children in wheelchairs, but there were no infants.
10       Q.  What would be the risk to a child if the
11   parents are present and constantly monitoring the
12   child?  And I'm talking about a study in this
13   particular case involving this particular product.
14       A.  This particular product's been recalled, so
15   I cannot -- as I said, I cannot imagine an IRB
16   allowing a recalled product, especially this
17   product, to be approved for a study when it's very
18   hard to get research through an IRB.  It takes --
19   it's a long process, and I cannot imagine any IRB
20   accepting that.  And I haven't seen any evidence
21   that -- that there has been any -- well, at this
22   point in time, any study.
23           Now, Fisher-Price has its own Play Lab and
24   does its own way, and it's not going through
25   academia.  I don't know what process, if any, they

Page 292

1    use to get informed consent for their research for
2    their Play Lab.
3        Q.  What information would the IRB have to not
4    approve testing as you say they wouldn't?
5        A.  Risk.  They ask all the risks.  So in this
6    case that the item's been recalled would -- that
7    would be the end with the deaths.  In this case,
8    they would probably be familiar with the product,
9    and they would say no.  Certainly, if they know it's
10   been recalled, they're going to say no.  They're
11   probably going to be very uncomfortable with infants
12   in general, so they're going to ask extra questions.
13           There's a lot of different categories.  So
14   if you're doing something with like toxic chemicals,
15   it would be one branch of questions.  If you're
16   having them do certain activities, depending on what
17   they're exposed to, there's a long lists of things
18   you check off of what they're going to be exposed
19   to, and then there's different forms that you have
20   to fill out.
21       Q.  Has the IRB never approved a study related
22   to a recalled product?
23       A.  I don't know.  On infants, I doubt it.  I
24   don't know in the universe of products, and it
25   depends on why they were recalled and if it's going

Page 293

1    to be tested on human subjects.  Because they may do
2    research on a recalled product, but it may not be
3    tested on humans, and that an IRB may allow.
4        Q.  Earlier, we talked about the in-home
5    testing surveys, and you said that you didn't want
6    to answer any questions about the surveys unless you
7    had one in front of you.  Do you remember that?
8        A.  Yes.
9        Q.  We're on 9?
10           I'm handing you what we'll mark as
11   Exhibit 9, and it's just one of the in-home testing
12   surveys that you would have reviewed; right?
13       A.  Yes.
14       Q.  Earlier, I asked you whether there were,
15   you know, any questions in this in-home testing
16   survey that did not rise to the level of the type of
17   information you would expect a manufacturer to
18   gather during the product development process.
19           Can you tell me, looking at this survey,
20   what more information should have been asked?
21       A.  Nowhere does it ask about the warnings,
22   what their understanding was of the warnings.
23   Didn't present additional information.  There's
24   no -- no warning comprehension.  Matter of fact, it
25   doesn't address any of the issues that I spoke to

74 (Pages 290 - 293)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 294

1  the Courkamps about. Moreover, they said they don't
2  always use the restraints in this. Number 13. They
3  use it sometimes.
4      Q. Question Number 7 asks "Did you find the
5  instructions for this product easy to follow?"
6      Do you see that?
7      A. Right. But that doesn't tell them what
8  their understanding is of the warning. Just saying
9  whether or not you can follow the instructions does
10  not give you any information about what does this
11  warning mean and how do you protect your baby.
12      Q. They could have marked "No" on that
13  question, for example; right?
14      A. They can think that they're easy to follow,
15  but instructions being easy to follow has absolutely
16  no information telling me whether they understand
17  the nature and extent of the hazards associated with
18  use of the product. It's two totally different
19  things. There's absolutely nothing in this about
20  the warnings or risk or their perceived risks or
21  what they did to protect their children from the
22  risks.
23      MR. OSBORNE: If this is Exhibit 9, it's not
24  showing up in the exhibit -- marked exhibits list
25  yet.

Page 295

1      MR. COX: I assume it'll be coming your way
2  momentarily.
3      MR. HERMAN: It's been marked, John.
4      THE WITNESS: Can you see?
5      MR. OSBORNE: I have to switch to monitors.
6  Just a second.
7      MR. HERMAN: Maybe refresh.
8      THE WITNESS: What do I have to do?
9      MR. HERMAN: No, no, not you.
10      MR. OSBORNE: Show it to me again,
11  Dr. Vredenburgh.
12      THE WITNESS: I'm sorry?
13      MR. OSBORNE: You can show it to me again. I'm
14  now watching.
15      THE WITNESS: Okay. So I'm going to get it so
16  you can see the one. It's 675, if you want the
17  Bates number at the bottom.
18      MR. OSBORNE: Okay. No, I see it. Thank you.
19      THE WITNESS: Are we done with this?
20      MR. COX:
21      Q. Yes.
22      A. Here we go.
23      Q. We'll mark as Exhibit 10 a copy of the
24  invoices that we received from you. Can you just
25  look through these and let me know whether any

Page 296

1  invoice appears to be missing or if this appears to
2  be a full compilation of all of the invoices you've
3  billed in this case.
4      A. I don't know off the top of my head if
5  anything's missing.
6      MR. HERMAN: Just on the record, we're going to
7  have to mark them each individually.
8      THE WITNESS: They're not in order either, so
9  it's --
10      MR. COX: You can't --
11      MR. HERMAN: But I'll do it 1 through 10.
12      THE WITNESS: There's no way for me to know.
13  They're not in any particular order, and I don't
14  know if there's anything missing.
15      MR. COX: Okay.
16      Q. Let me ask you a more general question.
17      As of your deposition today, is there any
18  invoice that you're aware of that has not been paid
19  by plaintiff's counsel?
20      A. I don't know. I've been so incredibly
21  busy. They're not on a list of past due. I don't
22  know if there's something that just went out that
23  wasn't paid.
24      Q. Okay. I generally did some
25  back-of-the-napkin math, and it seems like these

Page 297

1  total approximately $44,500, roughly. Does that
2  generally sound about the amount to which you've
3  billed in this case?
4      A. My firm might have billed that. I mean,
5  I'm not going to dispute it. If you added up the
6  invoices, they say what they say.
7      Q. There's a timekeeper on here named
8  Zackowitz. I know I saw his name -- or her name on
9  the literature we just looked at. Sorry. This is
10  on the 4-30-20 invoice. Who's that?
11      A. Dr. Zackowitz, my associate.
12      Q. "Initial phone conference with attorney."
13      Can you tell me what that conference would
14  have been about?
15      A. So then that means that she took the first
16  call. She had the initial call with Mr. Osborne's
17  office.
18      Q. Sometime around February 28 of 2020 is --
19      A. Whatever date, that's the exact date that
20  it would have been.
21      Q. And then you would have taken over the file
22  after that?
23      A. Yes. She will often screen initial calls.
24      Q. One of the things that we talked about
25  moments ago is that in your opinion, to a scientific

75 (Pages 294 - 297)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 298

1  degree of certainty, a different warning would have
2  changed the plaintiff's behavior; is that correct?
3      A. Yeah, especially in this case.
4      Q. You're not testifying to the jury to a
5  reasonable degree of scientific certainty that the
6  allegedly improper placement of the warnings
7  proximately caused Z█ Olson's death; correct?
8      A. I'm saying it was in an inconspicuous
9  location and that it doesn't comport with any of the
10  human factors research and that putting it in the
11  location that ASTM said to put it -- and that's the
12  principal panel -- would increase the conspicuity
13  and -- and greatly increase the frequency that it's
14  read and thus complied with.
15      Q. You are not saying within a reasonable
16  degree of scientific certainty that the allegedly
17  improper placement of the warning caused Z█
18  Olson's death; correct?
19      MR. OSBORNE: Form.
20      THE WITNESS: I can't answer that question --
21      MR. COX:
22      Q. Why not?
23      A. -- one way or the other.
24      Q. Why not?
25      A. Because we don't know one way or the other.

Page 299

1  I -- I -- from a human factors perspective, a
2  warning that fully apprises people of the risk in a
3  conspicuous location is what everyone is entitled to
4  so that they can make proper judgments about the
5  safety of a product. And these particular users
6  were risk sensitive. They did read warnings, they
7  were careful, and they were entitled to full and
8  complete information about the hazards and how to
9  protect their daughter.
10      Q. You are not saying to the jury within a
11  reasonable degree of scientific certainty that the
12  lack of content of the warning label caused Z█
13  Olson's death; correct?
14      A. I am saying that. I'm saying that the --
15  that this warning -- the content of this warning,
16  according to the parents, they would not have used
17  it. If they would not have used it, then she
18  wouldn't have died. So the content did lead to it.
19      Q. What is your scientific basis to support
20  your opinion that the lack of content on the warning
21  proximately caused Z█ Olson's death?
22      MR. OSBORNE: Form.
23      THE WITNESS: If Z█ wasn't in the sleeper,
24  she wouldn't have died on the sleeper. That's the
25  proximate cause. If the warning was there, they

Page 300

1  wouldn't have used the sleeper. If they didn't use
2  the sleeper, she wouldn't have been in the sleeper,
3  and if she wasn't in it, she wouldn't have died in
4  it.
5      MR. COX:
6      Q. Is that a little bit of circular logic to
7  you, or is that just me?
8      MR. OSBORNE: Form.
9      THE WITNESS: That's the chain of information.
10  That's the whole point of a -- of a warning.
11      MR. COX:
12      Q. And just so that I understand as I walk
13  away from this deposition, that series of events
14  that you just described for me is the basis for your
15  testimony that the lack of warning proximately
16  caused Z█ Olson's death; right?
17      A. That and all the other things I've said
18  today, the warnings, research about location,
19  content, conspicuity, the purposes of a warning, how
20  warnings are used, as well as how generally people
21  use it, and specifically how these parents used it
22  and how they relied on the warning and how they were
23  not informed with information that they needed to
24  protect their daughter.
25      And all that information between my

Page 301

1  education, experience, knowledge, book chapters,
2  including the ones you've held up that I've written,
3  as well as that book -- the entire book that that
4  chapter was part of, as well as all my years of
5  education and experience, all sum total, say that to
6  a reasonable degree of scientific certainty, if a
7  effective warning was on that inclined sleeper in
8  this case, Z█ would not have been exposed to the
9  sleeper and thus would not have died.
10      Q. And that's based off of your interviews
11  with the parents; right?
12      A. I just said what it's based off of. Do you
13  want me to repeat everything I just said?
14      Q. That's based off of your interviews with
15  the parents; right?
16      MR. OSBORNE: Form.
17      THE WITNESS: It's based off interviews with
18  the parents, all of my education, the standards, the
19  development of the standards, the book chapters that
20  I read/I've written, my years of education,
21  including my Ph.D., all the documents here, all the
22  documents that I've reviewed in this case, the
23  discussion -- I mean, you're consolidating it down
24  to one thing. That's one of the things.
25      But there's a lot of information about how

76 (Pages 298 - 301)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 302

1  users use products. And they actually, as we've
2  discussed, did more than a lot of users would, and
3  they were relying on the warning. So in this case,
4  in addition to their interviews, in addition to
5  their depositions, there is all the warnings
6  research. It's more than just my interview.
7        MR. COX:
8        Q. You told me earlier today that you don't
9  even know the reason why Z█ Olson died; correct?
10       A. Well, I said if she wasn't in the sleeper,
11 then she wouldn't have died in the sleeper, is what
12 I just said.
13       Q. Correct. She wouldn't have died in the
14 sleeper; right?
15       A. If she wasn't in the sleeper, she would not
16 have died in the sleeper.
17       Q. That, of course, does not mean that had she
18 been in another sleep environment, she might not
19 have died then too; correct?
20       A. I'm not going to answer --
21       MR. OSBORNE: Form and foundation.
22       THE WITNESS: Yeah. I'm only answering about
23 her dying in the sleeper.
24       MR. COX:
25       Q. And we've already talked about and

Page 303

1  established that you are going to defer opinions on
2  the cause of Z█'s death to other experts who are
3  more qualified in that area; correct?
4        A. Of how she died in the sleeper. But if she
5  wasn't in the sleeper, then she would not have died
6  in the sleeper.
7        MR. OSBORNE: Where are we on time?
8        MR. COX:
9        Q. Have you ever --
10       THE VIDEOGRAPHER: We have 26 minutes left.
11       MR. OSBORNE: Okay. Go ahead.
12          That's about 30 seconds of silence,
13 Counsel, come on. Let's go.
14       MR. COX:
15       Q. And understanding that you're not going to
16 get into the medical issues, you would agree with me
17 that there could be a number of different reasons as
18 to why Z█ died in the Rock 'n Play Sleeper; right?
19       MR. OSBORNE: Form.
20       THE WITNESS: I am not going to give medical
21 opinions.
22       MR. COX:
23       Q. Are you aware that Fisher-Price and Mattel
24 moved to strike your supplemental and rebuttal
25 opinions in this case?

Page 304

1        A. I heard that you didn't like my opinions.
2  I don't know the legal process that you're working
3  on.
4        Q. Did anyone ever give you any of the legal
5  pleadings and documents that were filed related to
6  striking your supplemental and rebuttal opinions?
7        A. No.
8        Q. Did you ever ask for them?
9        A. No.
10       Q. Did you ever independently research them?
11       A. No.
12       MR. COX: Okay. I think I might be done. Can
13 we just take a really quick break so I can go
14 through all of my notes, talk to Mr. Herman here,
15 and we might be out of here soon.
16       THE VIDEOGRAPHER: At 7:28, we're off the
17 record.
18       (Interruption in proceedings.)
19       THE VIDEOGRAPHER: At 7:41, we're back on the
20 record.
21       MR. COX:
22       Q. Earlier, we talked about looking at the
23 file that you have, Dr. Vredenburgh, and making sure
24 that it contains everything that was sent to me
25 through your counsel, so do want to make sure that

Page 305

1  we have an opportunity to do that before we leave.
2        A. I'm sorry? You want me to go through that?
3  I'm going to just trust that counsel sent it to you.
4  I sent it to them, and I would expect they would
5  have forwarded it.
6        MR. COX: John, can you tell me what you want
7  me to do here? I'm trying to be super efficient.
8        MR. OSBORNE: Yeah. We discussed that you --
9  she can slide her notebooks across the table for you
10 to look through to see if there's anything that you
11 don't recognize, but she's going to take those
12 notebooks with her when she goes. Do you want to do
13 that?
14       MR. COX: Yeah, that's fine. Can you -- do you
15 mind handing me the notebook, Dr. Vredenburgh.
16       THE WITNESS: Yeah. I'm trying to reschedule
17 something, but -- I have to drop my car off to be
18 repaired, but they're going to close. I'm trying to
19 figure it out right now.
20       MR. COX: It's not this one.
21       MR. OSBORNE: We don't have to be on the record
22 for this. Never mind.
23       THE WITNESS: Are we on the record right now?
24       MR. COX: Yeah. You can go off the record.
25       THE VIDEOGRAPHER: Off?

77 (Pages 302 - 305)

Page 306

1    MR. COX: Sorry. Let me do this, and then
2  we'll finish.
3    THE REPORTER: So we're going off the record.
4    THE VIDEOGRAPHER: At 7:43, we're back off the
5  record.
6    (Interruption in proceedings.)
7    THE VIDEOGRAPHER: At 7:50, we're back on the
8  record.
9    MR. COX: So before we went off the record, I
10 was doing an inventory of the binder that
11 Dr. Vredenburgh brought with her that contains her
12 footnoted sources in her reports, and it looks like
13 we don't have three. And Dr. Vredenburgh has agreed
14 to send those to counsel, who will then get them to
15 us.
16    And for the record, they are Tab or
17 Footnote Reference 52, which is an incident
18 spreadsheet compilation that's 19 pages long.
19 There's an article that's 197, which is called
20 "Research on Warning Signs," by Gabrielle Rousseau,
21 R-O-U-S-S-E-A-U. And then Tab 67 -- or Footnote
22 Reference 67 for article entitled "Warning Source,"
23 by an Eli P. Cox III.
24    THE REPORTER: Cox like you?
25    MR. COX: Huh?

Page 307

1    THE REPORTER: Cox like you spell it?
2    MR. COX: Cox like I spell it, yes. Maybe he's
3  my cousin.
4    Other than that, Dr. Vredenburgh, I don't
5  have any additional questions for you. I'm not sure
6  if John does, but I'll pass the witness in case he
7  does.
8    MR. OSBORNE: I'll reserve my questions for
9  trial and reserve signature as we discussed.
10    MR. COX: Great. Thanks so much. See you
11 Friday.
12    THE VIDEOGRAPHER: At 7:52, we're off the
13 record.
14    (Whereupon the documents referred to
15    are marked by the reporter as
16    Defendant's Exhibits 1, 2, 3, 4, 5,
17    6, 7, 8, 9, 10A, 10B, 10C, 10D, 10E,
18    10F, 10G, 10H, 10I, and 10J for
19    identification.)
20    (The proceedings concluded at 7:52 p.m.)
21    *****
22
23
24
25

Page 308

1  STATE OF CALIFORNIA    )
                          ) ss.
2  COUNTY OF LOS ANGELES )
3
4    I, ALISON VREDENBURGH, Ph.D., hereby certify
5  under penalty of perjury under the laws of the State
6  of California that the foregoing is true and
7  correct.
8
9    Executed this _____ day of
10 _____, _____ at _____,
11 California.
12
13
14    _____
        ALISON VREDENBURGH, Ph.D.
15
16
17
18
19
20
21
22
23
24
25

Page 309

1  STATE OF CALIFORNIA    )
                          ) ss.
2  COUNTY OF LOS ANGELES )
3
4    I, MARY K. MEDLEY, CSR NO. 9557, in and for the
5  State of California, do hereby certify:
6    That prior to being examined, the witness named
7  in the foregoing deposition was by me duly sworn to
8  testify the truth, the whole truth, and nothing but
9  the truth;
10    That said deposition was taken down by me in
11 shorthand at the time and place therein named and
12 thereafter reduced to typewriting under my
13 direction, and the same is a true, correct, and
14 complete transcript of said proceedings;
15    That if the foregoing pertains to the original
16 transcript of a deposition in a Federal Case, before
17 completion of the proceedings, review of the
18 transcript { } was { } was not required.
19    I further certify that I am not interested in
20 the event of the action.
21 Witness my hand this _____ day of _____ 20 .
22
23                              R No. 9557
24    Certified Shorthand Reporter
25        State of California

78 (Pages 306 - 309)

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

Page 310

1  To: JOHN E. OSBORNE, ESQ.
2  JOSBORNE@GOLDBERGANDOSBORNE.COM
3          October 6, 2021
4  RE:  Mattel/Courkamp (186026-010100) v.
5  9/22/2021, Alison Vredenburgh, Ph.D. (#4777696)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  litsup-ga@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 311

1  Mattel/Courkamp (186026-010100) v.
2  Alison Vredenburgh, Ph.D. (#4777696)
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Alison Vredenburgh, Ph.D.          Date
25

Page 312

1  Mattel/Courkamp (186026-010100) v.
2  Alison Vredenburgh, Ph.D. (#4777696)
3       ACKNOWLEDGEMENT OF DEPONENT
4     I, Alison Vredenburgh, Ph.D., do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Alison Vredenburgh, Ph.D.          Date
13  *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

79 (Pages 310 - 312)

Case 2:19-cv-02689-GMS    Document 196-42    Filed 11/19/21    Page 82 of 144

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[& - 353]

Page 1

| & |
|---|
| **&** 2:10 |

| 0 |
|---|
| **02689** 1:6 |
| **02689gms** 5:11 |

| 1 |
|---|
| **1** 3:9,13 46:10 59:14 126:19 137:16,23 138:17 138:24 139:12 144:24 164:25 190:14,22 247:14 247:18,25 248:4 248:18 269:25 296:11 307:16 |
| **10** 126:20 127:21 154:15 198:13 295:23 296:11 |
| **100** 73:10 252:16 |
| **105** 65:7 |
| **107** 65:12 |
| **10:00** 285:16 |
| **10:55** 2:3 5:1,4 |
| **10a** 3:24 307:17 |
| **10b** 3:25 307:17 |
| **10c** 4:3 307:17 |
| **10d** 4:4 307:17 |
| **10e** 4:5 307:17 |
| **10f** 4:6 307:18 |
| **10g** 4:7 307:18 |
| **10h** 4:8 307:18 |
| **10i** 4:9 307:18 |
| **10j** 4:10 307:18 |
| **11** 189:17 |
| **11-30-20** 4:9 |
| **11:41** 41:8 |
| **11:55** 41:11 |
| **12** 3:16 36:7,12 103:6 157:10 160:16 163:1 |

190:11 195:15 254:2
**12-30-20** 4:10
**13** 113:7 162:11 163:1 164:25 200:14 258:14 294:2
**14** 168:25 184:17 225:18
**15** 83:6 84:17 85:3 86:4 135:17 204:4 204:11
**150** 219:19
**16** 59:18 181:7,10 206:2,22 209:7 216:11 218:16 227:20
**162** 215:16,19
**17** 63:6 64:10
**18** 60:11,25 61:23 64:20 65:17 67:7 87:20,21,24 223:24 230:20 231:21 281:13
**186026-010100** 310:4 311:1 312:1
**18710** 309:23
**19** 282:25 283:7 306:18
**196** 199:13
**197** 306:19
**1:02** 91:24
**1:17** 92:2
**1:58** 122:7
**1st** 105:23

| 2 |
|---|
| **2** 3:11 54:1,18,22 86:10,15,18 139:14 140:3 190:22 219:16 231:21 279:1 |

307:16
**2-26-21** 4:4
**20** 309:21 312:15
**200** 2:11
**2006** 278:24
**2009** 3:23 281:9
**2012** 63:4,12 64:2 64:5,7,10
**2013** 64:25 187:23
**2014** 62:1,10,11,13 62:17,23 63:15 64:5,14 65:18 78:15 181:11,21 182:7 198:15 225:9,15,19 232:17 233:7,8 245:1
**2015** 63:9 181:16 181:19,25 182:5 184:12,22,24 186:13
**2018** 137:9
**2019** 85:11 181:7 181:10 187:24
**2020** 248:4 297:18
**2021** 1:18 2:3 3:13 3:14,16 5:1,5 59:14 64:6 89:12 103:4,5,6 105:22 190:11,14,17 216:1 247:7,14,19 248:1,18 254:2 310:3
**2022** 25:16 229:5 230:14 254:25
**21** 225:22
**22** 1:18 2:3 5:1,5 281:5
**23** 118:13 119:22
**24** 196:19

**25** 30:16 66:16,16 183:6,18,19,24,24 208:1 210:5 219:2 219:9,14 281:13
**2500** 2:17
**2588** 8:7
**26** 119:23 242:2 303:10
**28** 246:25 297:18
**2:00** 113:8,10,12
**2:19** 1:6 5:11
**2:38** 122:10

| 3 |
|---|
| **3** 3:13 59:13 103:3 106:1 140:17 176:21,24 191:7 231:21 250:22,25 251:2,4,8 252:16 307:16 |
| **30** 14:11 20:4 22:3 24:16 30:10 44:9 45:5,9 127:6,25 181:24 183:12 184:4,11,15,21 185:23 212:13 249:25 250:17 260:15 261:4,22 288:21 303:12 310:17 |
| **30305** 2:18 |
| **307** 3:9,11,13,14 3:15,17,18,20,22 3:24,25 4:3,4,5,6,7 4:8,9,10 |
| **3075** 2:4 5:13 |
| **31** 87:9 |
| **32** 87:8 |
| **3333** 2:17 |
| **346** 280:9 |
| **353** 279:12 |

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[3:29 - accuracy]**

Page 2

**3:29**  164:18
**3:44**  164:21
**3a**  250:25

**4**

**4**  3:14 103:5
122:15 141:5
181:15 200:17
231:23 247:6
250:22,25 251:2,4
251:8 252:16
254:5 256:24
307:16
**4-1-21**  4:5
**4-30-20**  4:3 297:10
**40**  25:1
**42**  187:25
**420**  43:13
**44**  246:25
**44,500**  297:1
**450**  43:13
**451**  180:22 181:3
**4777696**  1:22
310:5 311:2 312:2
**4:22**  192:20
**4:24**  192:23

**5**

**5**  3:15 63:5 103:6
126:19 127:21
137:7,16,23
138:17 139:12
141:18 175:8
181:14 191:20
194:5 197:1 254:1
258:16 259:21
307:16
**5-29-20**  3:25
**5-31-21**  4:6
**50**  45:5,9 83:6
**50-50**  45:8

**51**  181:4,6
**52**  166:9 170:14,14
173:23 306:17
**55**  276:7
**553-2100**  2:18
**57**  182:1 185:18,19
186:13
**5:12**  227:13
**5:25**  227:16
**5a**  194:18

**6**

**6**  3:17 46:16 142:7
144:24 152:6
164:24 191:20
194:5 197:1
206:21 215:6
216:6 227:21
236:23 307:17
310:3
**6-30-20**  3:24
**60**  25:1
**650**  43:14
**66**  166:10 171:15
172:8 173:19,24
174:20 175:9,12
175:13
**67**  306:21,22
**675**  295:16
**678**  2:18
**68**  188:2
**698**  2:11
**6:02**  256:17
**6:05**  256:19
**6:23**  269:5
**6:37**  269:8

**7**

**7**  3:4,14,18 103:5
152:7 166:5
175:14 180:20
256:22 294:4

307:17
**7-1-21**  4:7
**70**  25:1 56:17
**73**  85:12
**77**  189:8
**7:00**  285:16
**7:28**  304:16
**7:41**  304:19
**7:43**  306:4
**7:50**  306:7
**7:52**  307:12,20
**7th**  247:6

**8**

**8**  3:20 153:3
181:23 184:17
187:21 281:5,6
307:17
**8-1-21**  4:8
**80**  34:15
**800**  2:12
**81**  187:24
**843-3245**  2:12
**85705**  2:12

**9**

**9**  3:22 56:16
153:24 188:12,22
293:9,11 294:23
307:17
**9/22/2021**  310:5
**90**  127:20
**9047**  259:21 270:1
**9050**  270:23
**90s**  138:10 177:16
**92008**  8:8
**9557**  1:25 2:5
309:4,23
**99**  36:17

**a**

**a.m**  5:1
**a.m.**  2:3 285:16
**aap**  118:13,14,20
118:25 119:10,11
120:2,11,23 121:1
**ability**  141:8,15,20
142:2 143:20,21
154:1 258:23
**able**  8:19 33:25
51:11 86:7 121:1
124:8 129:7
132:11 140:12
143:12 144:9
151:22 157:2
194:8 195:16,20
201:12 228:20
231:15 249:13
**absolute**  73:18
279:17
**absolutely**  73:17
268:6 294:15,19
**abuse**  75:23
**academia**  291:25
**accepted**  121:11
238:25
**accepting**  291:20
**access**  130:11,20
201:1,2,12,13,16
203:17 241:8,25
246:11
**accessed**  130:12
183:10 196:8
**accessing**  130:14
**accident**  220:14
274:15 276:16,18
287:22
**account**  174:4
**accounts**  123:20
**accuracy**  310:9

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[accurate - allotted]**

Page 3

**accurate** 246:20
263:3 265:24
276:20 283:18
284:8 285:4
**accurately** 264:24
**acknowledgement**
312:3
**acknowledges**
199:8
**acknowledgment**
310:12
**acronym** 55:23
256:5,7
**action** 309:20
**activities** 292:16
**activity** 75:10
**actual** 126:20
154:25 157:20
175:14 191:16
194:7 206:2
246:17
**add** 63:8 65:2
194:1 207:11
224:19 249:3
**added** 66:3,4
231:9 258:21
286:4 297:5
**adding** 224:22
**addition** 24:18
44:19 91:1 100:17
181:15 225:3
241:3 247:1 249:7
261:15 302:4,4
**additional** 19:24
20:6,22 21:3
48:23 51:3 54:7
58:1,4 80:20
81:20 89:13 204:2
226:23 265:16
266:14,21 268:12
268:13 278:4,6

286:8 293:23
307:5
**additionally** 132:1
**additions** 312:6
**address** 8:6 51:24
66:7 83:2,2 105:3
111:13,18 112:9
115:14 139:24
144:18 179:8
218:10 222:9
223:9 286:16
293:25
**addressed** 124:18
188:14 255:11
266:23
**addressing** 179:7
**adequate** 224:18
231:25
**adler** 215:12
**administration**
127:3
**admitted** 249:19
283:10 284:2
**adult** 31:18 38:2
**adults** 31:19
179:18
**advance** 6:11
**advanced** 183:3
183:15
**adverse** 88:1
**advertise** 26:23
27:2
**advice** 33:12,13
34:5 36:4
**advise** 112:11
**affect** 56:21,24
57:19,23 59:24
60:12,18,20 63:17
70:13 81:1,3
108:3 143:21
153:25 238:16,17

238:18 264:4
278:6
**age** 35:17,17 63:5
63:8,22 64:1,3,9
64:23 183:25
218:17 219:5
220:20,24,24
221:1 222:5,12,21
224:7 259:11,12
259:13
**ages** 185:6,9,10
**ago** 10:4,7,18,24
13:10,16 15:10,14
15:18,19 19:15
30:16 36:20 50:7
99:16 151:5,17,24
157:5 267:13
271:2,8 297:25
**agree** 53:15,15
88:11 95:19 97:20
108:4 115:3 123:9
127:2 131:18
132:16 134:16
140:20 141:9,22
142:11 146:24
147:4,11 150:22
152:10 153:5
154:18 157:14
158:1 161:6
162:14,24 177:3
181:10,19 182:4,9
183:13 194:24
196:16 198:18
202:25 204:18,22
205:22 207:4,9
209:16 211:14,21
213:17,19 215:7
216:7,14 222:17
223:13 224:15
225:7,14 228:18
236:10,25 238:4

238:10 239:5
240:20 244:8,11
244:14 245:6
253:13 255:23
256:7 257:11
263:8 265:2 267:4
269:14,20 272:15
273:19 276:21
279:21 284:20
287:2,23 303:16
**agreed** 220:2
221:4,16 227:24
251:23 252:2
267:13 306:13
**agreement** 33:25
**agreements** 33:19
33:21
**ah** 165:22
**ahead** 6:17 53:25
59:12 76:18,20
103:4 106:12
113:16 115:25
117:25 149:6
170:4 204:9
303:11
**ahold** 12:25
**aircraft** 29:7,12
**alan** 289:24
290:13
**alike** 39:24
**alison** 1:17 2:1 3:3
3:9 5:6 6:19
275:16 278:23
308:4,14 310:5
311:2,24 312:2,4
312:12
**allegations** 282:1
**alleged** 113:20
**allegedly** 298:6,16
**allotted** 310:20

Case 2:19-cv-02689-GMS    Document 196-42    Filed 11/19/21    Page 85 of 144

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

[allow - areas]

Page 4

**allow** 68:22 73:13
73:21 293:3
**allowed** 16:16
**allowing** 291:16
**altered** 266:15
**alternate** 70:17
266:14,21
**amended** 3:9
46:11 249:3
**american** 265:7
**amount** 24:1,2
25:24 44:14 297:2
**amputated** 31:16
**analyses** 37:23
40:4 83:22 131:8
137:18,22 138:6
138:16,23 139:9
139:10,16 140:18
140:24 141:19
142:13 152:8
153:4,6 174:16
211:3,15 212:23
217:21 222:18
223:14 242:16
243:1
**analysis** 23:7
30:21 69:6 71:3,7
71:8 76:15 105:1
107:24 108:22
110:12 111:9
113:20 126:13
127:8 131:2
137:10 140:5
141:6 143:25
145:17 153:10
175:16 190:2
191:20 201:14
240:12 243:5
254:20 256:6
288:3

**analyze** 130:7
154:12
**analyzes** 130:1
**analyzing** 154:10
**andrew** 5:21
259:16,22,25
260:7 262:23
263:8,15 264:6,16
265:1 266:12,15
268:10 269:11,13
270:1,12 273:2
274:19
**anecdotal** 123:10
123:19
**anesthesiology**
154:11
**angeles** 308:2
309:2
**annually** 16:6
**ansi** 61:16 194:1
237:15,18 251:21
**answer** 42:12
78:24 79:1,3,5,7
115:10 117:17
118:18 121:18,19
144:17 152:5
153:14,16 154:8
160:6 161:16
162:3,6 183:17,21
199:15 252:5,6
274:14 275:20
287:5,5,7 293:6
298:20 302:20
**answered** 78:1
117:24 275:9
**answering** 130:18
269:19 285:13
302:22
**answers** 139:6
264:20 271:11
285:14

**anti** 38:5,11 55:16
56:11 57:6 287:20
**anybody** 169:13
**anymore** 17:2
39:19 81:9 99:4
177:15 201:24
202:2,6 203:10
**anything's** 296:5
**anyway** 84:20
90:17
**apologies** 55:2
124:20
**apologize** 6:11
29:2 148:5
**apparent** 154:24
178:17 195:25
196:2 197:18
204:1 241:17
250:11
**apparently** 272:8
**appear** 84:4 87:7
88:22 170:22
**appearances** 2:7
5:19
**appears** 28:19
51:23 55:14 82:19
83:6 85:10 177:19
181:7 200:7 296:1
296:1
**appended** 312:7
**appendix** 246:24
**applicable** 310:8
**applied** 88:15
**applies** 274:12,15
274:17
**apply** 16:12
277:10
**applying** 277:7
**appreciate** 6:13
8:1 51:12 54:10
100:5 189:1

217:19 266:2
280:14
**appreciating**
37:21
**apprises** 299:2
**approach** 88:15
88:20 105:5,9
113:23 115:11,14
116:14,15 193:11
287:11
**approaches** 88:7
105:1
**appropriate** 66:7
88:20 132:2 219:5
228:18
**appropriateness**
221:1
**approval** 73:3
289:21
**approve** 61:20
73:25 74:5,6
289:9 292:4
**approved** 75:8,25
265:21 291:7,17
292:21
**approximately**
10:18 13:7 15:19
276:2 297:1
**april** 3:13 59:14
103:3 105:22,23
105:23 190:14,17
247:14,18,25
248:4,18
**area** 28:11,20 29:4
30:4 95:6,7,8,11
104:19 119:5,6
165:20 194:10
303:3
**areas** 25:6 30:11
94:20

Case 2:19-cv-02689-GMS    Document 196-42    Filed 11/19/21    Page 86 of 144
Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

[arguing - author]

Page 5

**arguing** 117:16

**argumentative**
78:5 117:13,18
148:22

**arizona** 1:2 2:12
5:10 9:25

**arndt** 88:23,25
265:14 268:2
270:8 271:15
272:7,9,19 273:5
273:15 274:4
277:18 278:3

**arndt's** 256:23
266:9,25 267:5
269:21 272:18
273:1

**article** 55:15,19,22
56:2,4,12 57:4,9
58:7 80:24 81:5,8
82:6,15,20 83:11
83:18,21,25 84:5,8
85:5 87:17 278:16
280:5,6 306:19,22

**article's** 88:5

**articles** 52:5 77:4
86:16 106:19
107:5

**aside** 12:14 126:7
156:12 159:11
179:9 201:4
234:13 242:9

**asked** 8:11 13:11
20:22 22:11,13
38:14 42:13 47:17
73:9 78:25 80:23
99:14 117:5,23
135:11,17 138:25
139:21 148:3
160:3,10,12 162:3
185:16 202:19
203:8 217:3

247:20 261:13,14
262:17 263:18
264:18,19 266:4
267:2 268:13,15
269:13 270:24
271:13,14,19
272:2,9,16,22
273:3,9 276:12
278:2 286:19,20
293:14,20

**asking** 28:12 34:7
50:11 55:13 78:21
116:1 117:21
119:11,11 159:11
161:19 167:8
172:9 174:3
180:16 185:1
214:4 233:2,17
235:13 237:9
239:8,8 254:17
262:14 263:2
265:9 271:18
273:20

**asks** 294:4

**aspects** 165:18

**assess** 67:22 74:11
76:6 78:16 79:12
79:23 131:3 155:1
158:7 163:18
175:17 191:16
197:13 198:2
203:2 211:4,15
217:22 222:3,18
223:14 226:23
243:2,7 249:20
265:25

**assessment** 211:10

**assessments**
222:13

**assist** 82:13 87:18

**assistive** 27:17
30:8

**associate** 238:19
297:11

**associated** 17:9
116:2 146:20
189:1 243:22
287:13 294:17

**associates** 23:6
30:21 34:20 290:4

**assume** 7:22 10:20
20:7 25:3 58:10
63:13 65:25 73:8
73:25 74:8 82:11
90:17 92:12 102:7
107:9 119:3
145:14 146:21
163:1 170:18
174:12 175:12
179:22 196:9
213:13 230:12
244:4 254:24
269:14 270:16
279:21 283:4
295:1

**assuming** 7:18
66:7 73:17 76:1
113:19,22 132:7
221:16 241:11
273:16 286:25

**assumption** 73:15
106:23 278:3

**assumptions** 19:9
19:13 272:10,23
273:15 274:4
277:15

**assure** 51:16

**astm** 58:2,5 59:24
60:10,21,24,25
61:12,15,16,25
62:5 63:21 64:8

64:14,21,23 65:16
66:2,11 67:7,8,12
67:14,18,19 98:15
117:1,7 131:24
142:9 157:17
159:15,19,23
160:22 161:6
194:2 198:8
223:25 224:11,14
225:2 228:15
229:3 234:11
237:17 249:3,7
251:14,16 258:22
258:25 286:3,4,12
286:21 298:11

**atlanta** 2:18

**attached** 62:25
129:21 310:11

**attempt** 153:21

**attempted** 290:17

**attempting** 78:25
266:11

**attend** 16:16,18,18

**attended** 14:1
147:6 250:10

**attending** 15:11
29:16 242:21

**attention** 122:15
281:12

**attorney** 7:7 20:7
23:20 40:11 42:23
90:3 271:25 272:2
297:12 310:13

**attorneys** 13:5
47:16 172:19
272:5,14,25
281:24 283:21

**australia** 121:9
204:17,23

**author** 84:10

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**authored**  278:17
**authoritative**
 125:6
**automobile**  287:16
 287:18
**available**  128:15
 130:16 132:14
 202:18 203:13
 232:22 244:18,22
 246:13 247:18
 248:3 271:15
 310:6
**avoid**  112:12
 140:19 141:2
 154:1 169:11
 217:7 221:25
**avoidance**  287:19
**avoided**  254:11
**aware**  62:6 66:23
 69:2,4,19 83:25
 104:7,17 107:8,9
 108:11,14 109:11
 110:23 114:20
 135:12 144:5
 156:13 162:8
 164:9,10 166:10
 171:19 182:16
 198:14 212:10
 213:13,23 214:7
 214:11 225:6,13
 231:11 234:7
 241:2 251:19
 255:15 256:24
 274:20,23 281:18
 288:23 296:18
 303:23
**awareness**  164:12
 214:18
**awesome**  8:18
**ayres**  55:16,18
 80:24 82:6

**b**

**b**  159:19 194:19
 251:1 278:23
 279:10
**babies**  60:15 61:7
 135:6 136:12
 139:3,4 140:5
 160:24 163:14,15
 187:24 204:8
 264:12,13
**baby**  65:1 98:24
 157:12 158:4,25
 160:1,18,22
 191:12,21,23
 192:4 193:17
 197:7 238:22
 258:16 259:1,7
 294:11
**baby's**  193:15
 249:16
**babysitter**  100:17
**back**  10:22 26:9
 41:11 70:22 79:18
 80:3,24 92:2
 110:4 122:10
 125:24 135:10
 137:4 138:9 148:9
 159:15 160:13,25
 164:21 167:22
 168:1 169:20
 175:21,21 176:3
 191:17 192:14,23
 193:20 194:23
 195:1 196:1 197:6
 197:6,16 198:4,24
 199:5 200:11
 204:7 216:5
 227:16,18 228:16
 228:23 236:3
 243:16 252:14
 256:19 270:2,11

 270:14 296:25
 304:19 306:4,7
**background**  15:4
 17:13,15 58:12
 95:4,6,7 96:21
 275:13
**backward**  275:13
**bad**  8:15 18:10
 29:2 90:6 123:18
**barrier**  112:25
 187:21 188:13
 218:10
**based**  20:23 39:7
 43:1 73:18 106:20
 145:13 147:9
 148:10 150:22
 156:25 178:10
 179:10 186:12
 198:7 201:14
 210:2 212:11
 214:25 234:3
 238:14 244:7,14
 244:21 262:24
 285:6,6 301:10,12
 301:14,17
**bases**  82:4 92:19
 92:24 93:15 94:7
**basically**  27:7
 49:10 88:17
 109:21 159:21
 193:9 194:21
 210:18,21 289:12
**basing**  49:5
 171:16
**basis**  44:20 62:8
 62:21 65:4 68:19
 71:17 80:19 81:6
 106:8 108:8
 110:18 115:18
 116:9 119:14
 123:1 124:1

 144:22 145:5
 147:22 163:10
 172:14 173:19
 177:25 181:2
 188:7 189:25
 190:18 202:1
 219:4 235:5
 247:23 248:18
 285:22 299:19
 300:14
**bassinet**  109:12
 110:21
**bassinets**  199:22
**batch**  48:9
**bates**  47:22 49:11
 50:2,15,22 52:3,5
 53:1,6,11,22 54:8
 54:12 65:11 167:1
 167:2 170:21
 171:4,5 176:14,14
 185:3,11 187:17
 259:20,20 270:23
 295:17
**batteries**  32:5
**beach**  5:13
**bedding**  60:3,4
 207:19 210:18,25
**bedroom**  201:21
**bedrooms**  200:21
**beds**  118:20 120:3
**beginning**  19:3
 258:2
**begins**  5:6 207:24
 259:7
**behalf**  1:4 2:2 5:20
 5:23,24 9:21
 25:25 45:20,24
 274:21 282:9,12
**behave**  243:3,11
**behaved**  264:9

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**behavior** 150:14 242:5,12,17 245:10 264:5,10 265:10 279:19 285:10,24 286:14 286:22 298:2
**behaviors** 81:21 266:15
**believe** 12:24 21:9 42:22 48:18 61:23 62:4,24 69:14 71:4 140:13 143:4 144:11 165:10 174:23 176:25 188:25 224:17 247:20 259:4
**believes** 189:3
**belt** 109:3,5 110:22 182:19,23 211:11 238:19 251:18 255:4
**belts** 74:21 76:23 135:4,4 136:1,11 136:13 143:10 144:20,20 233:1
**benaroch** 122:22 123:15
**benchmarks** 209:8 209:10,11,17,25 210:2 211:5 220:3 221:9 244:19
**beneficiaries** 1:5
**benefit** 240:12 287:15,23,25 288:3 289:17
**best** 17:3 24:22 36:25 37:11 45:3 101:10,11 105:2 111:13 112:24 113:23 115:14 170:7 221:24

222:9 290:20 291:5
**better** 8:15,17 161:4 218:11 230:2,4 231:2 232:8 246:16
**beyond** 43:6 245:10
**bias** 262:24 263:5 273:20 274:8,13 274:17 276:16
**bicycle** 27:25
**big** 29:19 38:12 58:2 263:20 280:8
**bigger** 126:18,24 127:19 182:18
**billed** 43:24 296:3 297:3,4
**binder** 49:10 50:2 50:21 51:15 52:3 53:14,19 168:12 168:15,21 173:5,7 174:8,10 186:2,8,9 279:2 306:10
**binders** 48:20,22 48:25 52:11,14 186:3
**bioengineers** 179:3
**biomechanic** 137:15,17
**biomechanical** 69:6 96:17,24 97:5 104:9 107:2 137:22 138:6,6,16 138:23 139:9 143:23 179:9
**biomechanics** 110:9 112:14 137:10,11 138:2,3 138:10 139:3

153:20 154:8 160:14 179:6 229:12,17 230:17 287:5,6
**birdhouse** 70:9,15
**birthday** 38:3,12
**bit** 6:14 27:12 43:23 45:1 52:9 52:14 81:25 90:6 92:8 97:17 103:13 114:16 118:7 133:18 136:4 140:10 142:20 148:4,8 180:10 220:1 221:3 233:2 277:10 280:19 286:24 300:6
**blank** 35:15 36:15 36:24 37:7 173:16
**blanket** 228:3 249:17
**board** 72:19,20
**body** 198:7
**bold** 237:25
**book** 24:17 87:17 125:21 235:10 236:20 250:8 278:22 279:5 301:1,3,3,19
**booklet** 236:20 241:12
**books** 87:8 125:18 250:1,1,2,9,14
**bottom** 66:3 181:13 188:22 208:7 249:17 295:17
**boulevard** 2:4 5:13
**bouncer** 200:7

**box** 241:3
**boxes** 237:19
**brady** 2:17 5:24
**brakes** 287:20
**branch** 292:15
**brandon** 2:16 5:22 6:4,6,8 7:7 31:3 37:6 39:4 46:24 47:10 78:4,10,23 86:6,17 169:8
**break** 24:1 25:21 41:6 51:21,25 84:22 85:3 91:21 91:22 113:9,9,12 122:5 215:1,3 227:8,9 239:3 304:13
**breakdown** 25:24 45:7,10
**breaks** 71:25
**breathing** 175:23
**brief** 267:3
**briefly** 6:4
**bring** 46:21 48:4 86:23
**bringing** 48:23 240:14
**broad** 28:6 97:23 99:21 130:9
**broke** 41:14 122:13
**broken** 99:6
**brought** 51:9 54:22 133:18 290:13 306:11
**buckles** 177:18
**build** 70:9,14
**bulk** 58:14
**bullet** 207:6,10,15 207:22 208:12 217:2 233:25

**[bullet - certainty]**

238:2 258:15
259:1,5
**bulleted** 217:12
237:2,5
**bullets** 208:4
237:7,13,25
**bumbo** 37:4,16,16
38:3,11 39:14,15
39:16,24 41:17,21
42:3,4 101:4
102:14,15,22
242:25
**bumbo's** 101:22
**bumboish** 42:16
45:18
**bunch** 38:4 54:16
237:25
**burned** 101:14
**burns** 32:12
**busy** 296:21
**buy** 114:2 221:19

**c**

**california** 2:4 5:14
38:24,25 39:9
281:9 308:1,6,11
309:1,5,25
**call** 12:22 52:17
93:12 124:17
126:15 129:5,7
170:13 192:12,13
263:19 297:16,16
**called** 53:20 55:15
82:15 84:15 121:7
158:18 165:1
193:2 207:16
229:2 278:22
279:5 289:12
306:19
**calling** 215:23
**calls** 126:16
297:23

**calm** 199:17
**camera** 109:23,24
150:11 167:11
**cami** 224:12
**camino** 8:7
**canada** 121:9,24
204:16,22
**candidates** 23:5
**capabilities**
183:20 184:9
**capability** 119:20
**capacity** 24:16
**capitalized** 216:15
**capped** 237:25
**car** 35:19 177:13
177:18 180:12
276:18 305:17
**career** 128:1 138:8
**careful** 245:11
299:7
**caregivers** 188:25
**carlsbad** 2:4,4
5:12,13,14 8:7
**cart** 229:22
**case** 5:10 9:1,14
9:16,20,23 10:9,12
11:1,4,6,9,13,17
11:19,24 12:1,9,13
12:14,17,21 13:9
13:12 17:24,25
18:7 19:10,16,25
20:20,25 21:2
30:14,18 31:15
32:5 35:14 36:4
36:11,13 37:19,23
38:1,13,19,22,24
39:25 40:4,15,17
40:21,23 41:2
42:22 43:24 44:2
44:11,16 45:18,23
45:25 46:13 47:14

48:4 49:3 56:19
57:8 58:10,17,25
61:11 68:8 70:20
75:15,18 76:16
78:13 80:15 81:12
81:19 83:14,24
87:19 88:11 92:7
92:16,22 93:5,20
93:22 94:3,8,23
95:13,16 98:8,14
98:15 103:2 104:1
104:7 108:19
109:18 111:12
114:24,24 115:24
119:13 122:25
127:2,24,24 128:5
128:16,18 129:23
130:20 137:25
138:1,15 139:1,2,8
139:19 157:1,21
157:23 158:1
172:5 175:25
177:4,19 179:8
189:15,20 191:15
203:18 205:7
212:15 213:20
221:5 225:2 239:7
239:8,10 247:3
260:18 261:3
266:17 269:13
273:23 277:1,12
281:7,16,19 282:6
282:9 283:7 284:3
284:20 289:22
291:13 292:6,7
296:3 297:3 298:3
301:8,22 302:3
303:25 307:6
309:16
**cases** 11:2,9,23
12:2 23:19 28:19

28:22 29:4 30:22
30:23,25 31:24
32:1,18 35:18
44:6,21 45:9,14
61:12 98:2,4,7
128:8 133:4 138:4
171:12 187:25
212:20
**categories** 292:13
**categorize** 44:6
**category** 124:16
**causal** 269:15
**causation** 284:14
**cause** 95:24 96:3
101:8,24 108:10
233:18 299:25
303:2
**caused** 96:3,3 97:6
298:7,17 299:12
299:21 300:16
**caution** 220:9
**cautious** 246:15
**centered** 37:23
**certain** 16:11 17:9
17:16 19:19 23:17
24:7 34:9 71:24
73:10,17 74:4
75:14 114:17
125:23 132:8,18
174:25 251:13
289:7 292:16
**certainly** 46:20
51:6 105:16 123:5
124:4 128:9,11
163:21 170:9
196:17,23 202:20
230:5 260:10
292:9
**certainty** 73:18
284:22 285:5,9
286:6,10 298:1,5

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[certainty - come]**

Page 9

298:16 299:11
301:6
**certified** 309:24
**certify** 308:4
309:5,19
**cessation** 175:23
**cetera** 77:4 114:4
131:25 151:19
154:21,23 155:20
155:21 221:12
**chain** 187:7 219:7
219:24 248:20,22
249:4 300:9
**chance** 89:23
**change** 58:21
115:13 150:13
162:22 172:8
218:8 238:17
255:7 264:23
311:4,7,10,13,16
311:19
**changed** 61:9
80:21 81:20
179:25 180:13
255:7 264:9
265:10 268:12
285:10,23 286:14
286:21 298:2
**changes** 111:14
165:11,24 258:6
310:10 312:6
**changing** 160:8
**chapman** 84:1,3
**chapter** 87:8,9,17
278:22 279:5,10
301:4
**chapters** 24:17
87:8 250:9 301:1
301:19
**characteristics**
57:20 60:13

**characterized**
268:4
**characterizing**
117:19
**charging** 43:16
**chat** 267:3
**check** 228:24
292:18
**checking** 125:24
177:13
**chemical** 32:12
**chemicals** 292:14
**child** 17:5 67:1,3
147:1 176:23,23
177:22 178:1,4
182:25 205:15
208:9,13 209:14
222:4,20 246:22
257:9,15,20 258:5
265:8 291:10,12
**children** 14:5
27:18,18 31:12,16
32:1,12,14,16,17
35:16 66:20,23
71:10 99:11
123:22 178:19
179:23 180:2,10
180:13 183:23
222:16 246:21
253:25 259:10
291:9 294:21
**children's** 31:14
32:3 35:17 99:8
178:14 180:12
251:22 259:13
**choice** 240:9
**choices** 222:25
**choose** 227:4
238:14 239:14,16
239:19 240:18
290:20 291:5

**chose** 198:23
199:4 240:19
258:10
**circular** 300:6
**circumstances**
146:25 147:5
149:13 177:4
214:19
**citation** 181:7
182:1 219:18
**citations** 247:1
**cite** 65:7 166:12
188:2
**cited** 184:12
**citing** 56:19
**claim** 187:11
197:15
**claimed** 188:1
**claims** 104:14
**clarification** 50:11
52:9 54:10,14
**clarify** 8:2 52:2
55:2 117:21
168:22 251:1
**clarifying** 117:15
**clayton** 11:5
**clean** 42:15
**clear** 11:23 40:14
53:16 57:18 58:25
59:4,13,16 60:3
61:24 137:21
139:7 150:20
157:19 168:18
201:7 220:19,19
222:1 233:13
234:9,11 244:23
249:6 251:5
**clearly** 68:7,17
215:15 257:14
284:13

**client** 42:23
**clients** 43:17
112:11 284:2
**climate** 211:24
**clinicians** 125:2
229:16
**close** 14:11 195:20
252:11 305:18
**closer** 26:6
**closing** 32:13
**clothes** 221:20
**clothing** 221:1,18
**cohen** 22:8,11 23:6
30:21
**cohen's** 22:12,17
22:23
**coinvestigators**
290:11
**collateral** 100:12
**colleague** 290:20
**colleagues** 290:18
291:3
**collect** 283:11
**collected** 125:9
**collecting** 154:9
**collects** 129:17
**college** 29:8
**collision** 287:19
**collisions** 27:24
**colored** 58:12
**colorwise** 191:2
**column** 171:4,7,10
171:13,16 172:1
175:3,10 176:14
**columns** 171:6
**combined** 237:24
**come** 22:13 23:18
23:18 25:10,12
26:16 35:23 37:9
46:5 77:18 90:5
95:22 96:2,12

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

[come - conflict]

97:4 98:6 102:8
103:13 126:25
167:24 169:20
241:3,9 303:13
**comes** 65:5 147:22
208:1 210:6 242:1
**comfortable** 34:8
34:12 207:1
**comforter** 207:12
**coming** 85:23
168:1 295:1
**comment** 78:5
174:11 176:19,22
176:24
**comments** 174:15
175:19 176:8,10
176:16
**committee** 63:3
142:10 225:12
228:15 229:3
289:13
**common** 129:4
178:11,12 220:25
242:22
**communicate**
101:10
**communication**
60:17 85:6 122:21
202:4
**communications**
121:7 122:20,25
123:16 131:25
**companies** 34:1,24
35:2,11 77:13
**company** 22:17,18
22:22,24,24 23:1,1
23:15,21,25 29:7
29:12 34:8 213:10
**compare** 51:2,19
110:12 155:22

**comparison** 51:22
**competition**
285:15
**compilation** 296:2
306:18
**compile** 93:15
**complaint** 3:21
**complete** 20:1
73:4 280:3 299:8
309:14 312:8
**completed** 18:23
310:17
**completely** 31:4
213:24 265:22
**completion** 309:17
**complex** 241:17
245:14
**complexity** 241:14
**compliance** 218:5
222:8 235:20
236:1 238:5,16,17
238:18,23 279:17
286:2
**complicated**
100:18 130:14
**complied** 229:14
238:11 298:14
**comply** 70:13,22
223:2,7 227:4
234:24 238:14
239:14 240:13,18
240:19 246:18
**components**
165:18
**comport** 298:9
**comprehension**
158:9,11,19
159:21 160:7,10
160:11,15 228:25
293:24

**comprise** 237:14
247:2
**computer** 167:24
**computerization**
245:15
**conceptually**
102:4
**concern** 60:9
**concerned** 58:16
60:5 168:20 209:4
209:21 214:24
217:15
**concerning** 99:11
139:16
**concerns** 199:24
**concluded** 150:24
307:20
**conclusion** 150:2
284:4 285:1
**conclusions** 106:2
113:20 118:9
**concussion** 176:23
177:6
**condition** 96:9,10
133:20 134:1,4,7
134:10
**conditions** 95:24
**conduct** 17:18,21
67:21 68:20 71:2
71:18 76:6 131:2
138:16 139:9,15
139:18 140:21
141:5,10,19 142:8
142:12 145:17
152:7,10,11,18
153:3,6,24 154:2
154:15,19 157:10
157:15 158:2
162:11,14 191:15
194:6 197:13
200:19 201:19

203:21 211:3,15
217:21 222:3,18
223:14 226:22
242:11 243:1,19
243:24 249:20
254:10,14 255:17
283:12,12,15
289:7
**conducted** 18:1
67:9,12,19 69:4,20
74:10 75:1 78:15
79:11,21,22 80:10
136:8 137:22
139:25 140:25
141:14 142:1,16
142:25 145:7
148:11 153:10
154:6 155:5
156:15 158:7
159:13 161:25
162:18,25 193:1
194:5 201:8
212:23 259:16
260:13 268:9
**conducting** 69:10
193:7
**conference** 113:8
190:8 192:14
195:6 288:20,24
297:12,13
**conferences** 13:20
13:25 24:14 25:9
29:17 107:6,18
242:22 250:10,15
**confidentiality**
33:19,24
**confirm** 229:24
**confirmed** 191:9
275:11
**conflict** 261:15

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[confused - copy]

confused  116:25
148:8 186:15
213:22,24
confusing  66:16
148:4
confusion  158:15
158:18
congress  77:3
conjunction  91:15
213:11
connect  101:24
consensus  61:17
consent  68:5 292:1
consequence
57:11 58:22 60:14
consequences
56:21 57:21 58:19
conservative
33:10 205:5,21
220:7
consider  19:10
27:14 97:12,20
128:9,11,12,17,19
180:9 196:4 287:8
considered  73:1
75:5 94:14 126:19
128:14 225:10
considering
145:24
consistent  51:17
112:2 127:13
128:7 198:11
221:10 228:12
251:16 267:7
277:12
consolidating
301:23
conspicuity
154:21 158:10,21
183:9 190:2 191:1
196:3 197:11

199:9 250:3,13
251:13 298:12
300:19
conspicuous  56:23
58:11 183:7 191:8
197:4,22 198:7
224:10 238:11
240:3,8 249:10
250:11 251:14,15
252:7 253:24
285:8 299:3
constantly  291:11
constitute  125:8
constraints  141:7
141:14 143:19
consult  30:14 31:1
33:13,18 36:3
77:13
consultation  34:25
112:11
consulted  35:10
36:10 42:16 93:8
93:13
consulting  22:2,6
22:25 23:2,2,8,10
23:10,23 24:3,3,23
24:24 25:4,4,23
28:7 31:2,9 33:1
35:4 45:7
consumer  27:19
29:14,18 30:15
32:14 83:10,25
88:19 99:23
132:11 195:12
196:24 204:24
287:9 288:7
consumers  67:10
67:22 68:4 74:11
76:7 78:16,17
79:12,23 80:21
81:14,20 110:12

123:21,22 145:10
145:18 150:1
152:9 154:17
155:1,2,6 156:2
157:11 158:2,24
160:17 161:15
162:12,18 191:16
194:7 198:2 201:9
201:20 202:20
203:6 211:4,16
217:22 223:11
243:2 249:20
250:21 251:7,12
contact  13:1 22:11
129:9,10,11
260:25
contacted  12:20
12:24 13:8 17:18
19:14 22:12 23:20
23:20 122:22
contacting  40:11
contained  50:20
86:15 174:16
267:5
contains  304:24
306:11
contend  67:23
74:12 76:8 78:14
79:13,24 136:7,10
137:1 140:2 155:4
158:6 162:25
228:11 229:25
230:21 231:24
232:12 263:16
content  56:25
58:13 61:19 75:14
81:1 204:5,12
205:13 208:17
238:15 265:24
279:25 299:12,15
299:18,20 300:19

context  56:4,6,9
58:7 61:21 97:3
118:4 127:7
204:17 290:7
continue  87:5
189:4 191:19
222:4,19 223:15
253:4 287:13
continued  4:1 6:23
20:2 35:13 134:11
208:8
continues  132:22
132:24 134:8
continuing  126:5
contributed  250:1
contrive  74:13
control  35:18 88:1
112:3 113:4
128:23 221:24
controlled  112:21
128:21
controls  140:9
conversation
13:15 90:17 102:9
264:25
conversations
11:15 90:8 97:18
cool  279:2
cooperation  213:5
copied  64:17
169:23 170:7
copies  310:14
copy  46:2,9,10,14
49:6 50:19 51:3,8
54:17,19 59:14
85:4 103:3,5,6,8
168:11 187:16
263:16,22 270:19
278:16,18,20
281:7 295:23

**[copycat - court]**

**copycat** 42:4
**copying** 169:16
**cornell** 289:25
  290:13
**cornell's** 72:13
**corners** 266:8
**corporation** 1:8,9
**correct** 7:25 8:3
  12:6 25:17 28:2
  32:24 39:11 53:12
  54:10 62:1,18
  64:11,18 65:8,9,19
  67:4 71:5 73:16
  80:17,18 81:21
  82:9,17 84:6
  87:13 88:13 92:9
  92:12,20 93:3,24
  94:8 95:2,5,9,10
  95:13,14,17,18,24
  96:14 97:7,8,10,11
  103:1 104:10,19
  107:4,22 114:18
  114:21 115:1
  119:5 127:4
  128:16 131:1
  132:20 133:4
  134:4 137:19,24
  139:19,20 140:19
  140:21 141:1,8,11
  141:16,21,23,24
  142:3,13,22
  143:19,20,22
  144:7 145:15
  147:2,7 150:4
  152:13,14,20
  153:7 154:1,3,4,19
  156:3 157:15,21
  157:23 161:15,21
  162:9,15 163:4
  170:16,17 171:17
  173:21 174:3,14

175:14 176:9
177:6 179:2,24
181:8,11 182:7,11
183:4,16 185:21
187:12,21 189:15
190:11 195:2
198:16 200:9,10
201:22 202:21
203:7,18 204:20
205:3,9,12,12,24
207:7 208:18,24
209:14,19 210:8
211:23 213:6,11
213:21 214:9,13
216:1,15 218:18
218:23 220:5
221:6,7,12 222:22
223:17 224:6,18
225:4,9,16 226:24
228:1,8 230:3,23
232:24 233:9,15
233:21 234:18
237:14 238:12
239:1,6,17,18,20
239:23,25 240:8
240:24 241:6,10
243:4,12,25 244:5
244:9,12,16 245:1
245:8,23 246:7
247:7 248:1 249:1
249:8,23 250:24
251:4,11,25
253:16 255:17,25
258:13 259:16
261:24 262:2,13
264:2 265:4 266:6
267:7,15,20
268:10,16 271:3
271:25 272:17
273:3,10 274:21
275:24 277:23

278:11 281:20
282:6 283:17
285:18 286:15
298:2,7,18 299:13
302:9,13,19 303:3
308:7 309:13
312:8
**corrected** 48:2
**corrections** 312:6
**correctly** 21:4
  32:23 42:13 75:3
  144:11 151:12
**correlate** 186:3
**correlated** 240:2
**correlation** 176:16
**correspond** 49:15
  52:23 174:20
**correspondence**
  127:15
**corresponding**
  175:13
**cost** 238:17,20,22
  240:12
**cou0048955**
  185:21
**couched** 165:16
**counsel** 2:7 5:7
  12:17 18:14 20:21
  46:13 49:20 50:18
  50:25 54:2,20
  83:15 85:19 88:22
  121:13 122:16
  130:25 135:16
  170:19 172:23
  184:5 186:6
  247:17 260:25
  262:1,4,7,9 263:18
  264:8 267:2
  268:24 296:19
  303:13 304:25
  305:3 306:14

310:14
**counsels** 5:18
**counted** 171:12
**countries** 119:2
  122:1 205:1 206:1
**country** 127:15
  290:18 291:4
**county** 308:2
  309:2
**couple** 14:19
  55:10 82:7 87:7
  171:5 172:17
  176:18 208:4
  260:25 262:16,21
  290:11
**courkamp** 1:4 5:8
  5:21 7:10 11:5,24
  200:16 217:16
  244:8,11 266:16
  269:22 310:4
  311:1 312:1
**courkamp's**
  270:22
**courkamps** 159:20
  201:6,10,18,22
  267:1,6 268:3
  294:1
**course** 26:23
  28:25 35:5 36:22
  41:7,7 44:10 47:6
  50:24 53:13,17
  54:12 56:25 59:2
  90:10 114:1 162:9
  167:7 180:8
  196:19 223:1
  261:20 302:17
**court** 1:5 5:10,16
  10:1,1 11:20 39:3
  39:8 114:25
  115:17 116:3
  281:8,19,21 282:5

Alison Vredenburgh, Ph.D.
September 22, 2021
In Re: Fisher-Price/Mattel

**[court - dealt]**                                                    Page 13

282:7,15,25 283:8
283:20 284:10,18
285:20
**courts** 103:23
114:17 280:21
**cousin** 307:3
**cover** 229:12
235:11
**covered** 260:22
262:17
**covering** 104:6
**covid** 15:16 90:4
**cox** 2:16 3:4 5:22
5:22 6:12,16 7:2,7
8:11,18,21 18:21
21:20 26:15 31:6
37:10 39:6 41:7
41:13 46:2,8
47:11 51:12 52:7
53:17 55:7 59:11
62:7 64:4 65:13
67:16 76:13 77:25
78:8,11 79:8,10
81:7 85:25 86:20
86:22 87:1,6
89:18 91:22 92:4
97:25 106:22
109:24 110:3,5
113:11,15,17
115:9,23 116:5,18
117:10,14,20
118:2,5,17 119:24
120:14,18,25
121:15,19 122:4,6
122:12,17 128:13
130:5 133:2
135:19 136:2
144:15 148:19
149:15 151:10
152:16 153:15,23
155:24 156:24

159:10 160:5
164:17,23 167:2,8
167:13,16 168:6
169:3,7 170:4,11
177:24 179:21
180:19 182:15
192:18,25 195:10
196:15 197:23
199:16,19 200:5
204:3 206:19
211:1 212:19
213:3 218:15
223:23 225:19,21
227:9,12,18 228:5
233:12,24 235:4
237:10 238:9
243:23 246:23
248:9,24 250:5
253:12 256:21
260:12 261:16
267:12,18 268:1,8
269:1,4,9 272:13
273:7,18 274:6
276:3,8 278:8,15
295:1,20 296:10
296:15 298:21
300:5,11 302:7,24
303:8,14,22
304:12,21 305:6
305:14,20,24
306:1,9,23,24,25
307:1,2,2,10
**coxb** 2:19
**cpsc** 14:18 15:6,22
15:25,25 97:17,21
98:2,6,6,10 125:1
129:1,8 130:7,10
130:21 132:13
176:22 180:22
188:24 189:2
205:24 213:6,11

213:13,19 214:2,4
214:23 215:14
**craft** 224:17
**create** 111:23
**created** 47:24
106:4,21 229:4
**credible** 73:13
**crib** 108:4,7,9,13
108:19,24 109:12
110:13
**cribs** 109:4
**critical** 57:1 77:1
124:2,17 125:3
126:1 128:24
144:18 158:15,18
253:21 254:11
**criticisms** 208:17
257:7,18
**crotch** 37:1,12
195:23 257:10,21
**cs** 15:24
**csr** 1:25 2:5 309:4
309:23
**cues** 68:16 220:19
**cuing** 70:23
**current** 12:1 40:6
121:10
**currently** 23:24
41:18 112:15
203:7 231:25
**cut** 27:7 72:4
124:20 288:9
**cv** 1:6 5:11 27:6
94:12
**cycle** 126:6
**cylinder** 284:13

**d**

**d** 95:16,17
**dangerous** 75:10
101:6 131:10
133:1,13

**darn** 6:6
**data** 108:12
109:11,16 111:25
124:1,21,23,24,25
125:8,9,9,12,17
126:10,11,12
127:9,12 128:2,6,7
128:15,19,20,24
129:18 130:2,21
130:24 131:13
133:8,11 135:15
147:11,12 148:7
154:9 156:5,8
166:6,7 174:8
206:8 283:12,13
**database** 130:10
130:12
**date** 61:1 171:6,7
171:17,19,20,23
172:2,7 173:3,11
173:12,20 174:2,4
174:5 175:3,4,5
297:19,19 311:24
312:12
**dated** 3:24,25 4:3
4:4,5,6,7,8,9,10
190:11 247:6
**dates** 172:24
**daubert** 3:20
279:1 283:1,5,9
**daughter** 299:9
300:24
**day** 17:23 72:23
172:11 173:17
196:19 285:11
308:9 309:21
312:15
**days** 50:6 86:2
173:17 310:17
**dealt** 73:18

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[death - designed]

Page 14

**death** 61:2 63:9
64:15,22 95:24
96:4 121:24
131:14,20 132:8
132:19,25 133:9
133:11 134:18
166:11 171:16
173:20,25 174:1
175:7,24 189:5
211:13 220:15
225:9 233:18
253:22 258:6
269:15 273:21
287:9 288:6,10,11
288:19 289:3,4
298:7,18 299:13
299:21 300:16
303:2
**deaths** 14:22
85:12 135:2 292:7
**decades** 179:20
**december** 85:10
**deceptive** 245:16
**decide** 29:3 33:7
103:22 115:17
**decided** 113:11
199:21
**decision** 25:18
58:3
**decisions** 57:23
60:20 81:3 222:15
246:21
**declare** 312:4
**decreases** 240:5
**deegear** 21:10
48:6 60:8 91:10
217:18
**deegear's** 247:4
**deemed** 220:11
312:6

**defect** 97:5 103:18
281:2
**defective** 103:22
104:14
**defects** 103:15
**defendant** 2:2
9:21 45:8,11,20,24
**defendant's** 69:20
307:16
**defendants** 1:10
2:15 5:8 26:1
**defended** 283:23
**defending** 281:25
284:8
**defense** 26:13
45:15 282:1,8,10
282:16
**defer** 114:7 137:17
165:15 221:8
233:13,18 303:1
**deferred** 166:2
**deferring** 165:12
188:16
**define** 72:17
216:23
**defined** 131:22
**definitely** 64:2
290:9
**degree** 22:9,11
284:21 285:9
286:5,9 298:1,5,16
299:11 301:6
**depend** 24:20
**depending** 24:13
25:2 241:12 288:9
292:16
**depends** 17:14
107:13 124:22
290:1,6 291:2
292:25

**depicted** 194:5
**depo** 38:18 152:2
**deponent** 3:2
310:13 312:3
**deposed** 7:14
39:11 46:19
231:10 260:18
**deposing** 310:13
**deposition** 1:16
2:1 3:9,12,18 5:6
5:12 7:12,18 9:7,8
9:12 10:5 20:10
20:15 21:9 26:21
31:23 33:16 40:18
43:14,17 45:1
46:3,10,11,22 53:9
55:8 59:5 64:7
71:1 82:9 86:9
89:20 90:3,10
91:16 113:19
129:24 156:9,11
156:12 168:18
170:6 186:16,24
187:14,15,19
188:3,6 244:4,7,14
261:8,12,14,23
262:2,6,10,17
263:1,4,7 264:17
267:7 268:3,15
271:12,20,23
272:3,8,17 273:14
274:1,3 276:13,14
283:11 286:15,16
286:22 296:17
300:13 309:7,10
309:16
**depositions** 35:25
36:1 45:3 47:25
79:3 91:10 129:19
129:22 164:14
187:16 247:4

260:21 262:19
266:23 267:6,14
286:17 302:5
**derivatives** 101:4
**derives** 107:1
**describe** 111:7
138:17,22 139:12
140:12 197:1
226:2,4,18
**described** 33:23
52:22 55:23 61:23
62:16 75:2 133:19
134:14 138:7
147:10 161:25
259:10 283:25
300:14
**describing** 115:13
161:7
**description** 3:8
4:2
**design** 14:23 65:21
65:24 96:14 97:5
102:12,13 103:15
103:21,21,24
104:3,5,13,14
105:3,4,5,10,17
106:5 109:2,3,6
111:14 112:12,18
112:21 114:5
115:15 119:7
120:1,7,8 121:2
162:22 165:1,6,11
165:14,17,18,24
218:10 223:12
235:19 255:7,11
255:13 281:2,2
287:17 290:22
**designates** 198:9
**designed** 35:7 97:9
112:6 113:21
114:9 219:12

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[designed - discuss]**

Page 15

222:11 231:7
259:10
**designers** 279:19
**designs** 108:23
**desirable** 111:25
**desire** 269:21
**desk** 169:23
**detail** 193:25
**detailed** 194:20
283:25
**details** 38:9 40:8
179:4
**detect** 239:7,11
**detected** 134:25
189:21 190:20
**determination**
116:8
**determine** 27:8
53:10 113:24
119:20 140:1,18
140:25 141:6,14
141:19 142:1
143:5 149:21
154:16 155:5
157:11 158:2,24
160:16 162:12,20
173:3 197:14
230:14 240:12
243:11 263:24
**determined**
108:16 116:2
218:25
**determining**
106:17
**develop** 66:24
229:20 231:18
255:14 284:3
**developed** 58:5
63:16,20 102:25
228:15 234:10

**developing** 94:15
**development** 84:1
142:8,17 161:8
163:4,12 244:2
293:18 301:19
**developmental**
60:1 67:1,3
209:13,17 220:3
**developmentally**
183:3,15
**develops** 61:15
**device** 36:16 65:22
67:25 68:13,18,23
71:9,9,14 72:10
73:10,14,20 74:14
77:13 93:17
107:25 108:3,21
109:10 110:16,16
110:19 112:16,24
122:1 127:16
131:11 132:3
133:1 140:7 155:2
155:11,12,20
159:4,6,19 190:3
194:3 197:19,21
204:19 214:23
233:15 242:23
249:22
**devices** 16:22,24
27:17 29:23 30:2
30:2,6,8 99:1
161:3 178:14
180:12
**dial** 275:4
**dialed** 260:11
**die** 97:7 238:23
**died** 60:16 61:7
62:1,18 93:24
96:9,13 160:24
163:22 182:21
224:6 225:16

232:1 233:6,19
242:24 245:1
249:23 250:24
251:10 264:1,12
264:13,14 265:8
270:17 284:24
285:10,24 299:18
299:24 300:3
301:9 302:9,11,13
302:16,19 303:4,5
303:18
**diego** 22:14
**differ** 67:2
**difference** 23:9,12
86:7 172:12
236:11 237:1
276:21
**differences** 27:19
108:23 110:16
**different** 16:10,22
30:11 35:22 48:8
52:17 59:6 60:17
64:20,21 70:11
71:20 72:13,14
77:17 80:20 81:19
83:13,17,19 84:9
84:11,13,14 88:10
92:11 99:22
101:12 102:1,3,5
102:19 108:18
109:7,19 110:6
112:8 113:8
124:22 125:14
129:11 133:12
140:8 154:22
158:22 159:14
160:8,13 161:3,24
171:20 172:7,17
180:16 182:10
185:2,10 186:15
186:18 193:13

204:23 205:2,20
206:4 210:21,22
214:8,12 220:3
233:2 234:6
236:15 237:6,21
238:5 239:2,15
240:22 261:13
264:3 276:11
284:22 285:23
286:2,2 287:19,21
292:13,19 294:18
298:1 303:17
**differentiating**
151:20
**differently** 66:24
90:25 118:7 143:5
180:9 211:5 213:8
228:6 263:24
264:9
**differs** 261:7,10
**difficult** 51:14
**difficulties** 6:5
**diligence** 124:13
**direction** 309:13
**directions** 245:17
245:18
**directly** 68:6
256:11
**disabilities** 27:17
66:15 75:11
**disability** 30:7
**disagree** 268:4
277:14
**disclosure** 8:22
33:19
**discovery** 19:11
82:3 128:17
**discuss** 17:12
61:19 96:15
104:25 142:6
154:20 191:1

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[discuss - e]**                                                                 Page 16

289:15
**discussed** 11:24
  12:2 41:16 62:4
  62:19,22 66:3
  89:14 97:19
  105:16 107:17
  136:5 137:17
  155:8 219:8 224:7
  224:23 225:6,13
  243:18 254:4
  302:2 305:8 307:9
**discusses** 205:14
**discussing** 14:25
  64:3 98:9 99:19
  101:20 110:9
  221:13
**discussion** 15:21
  173:18 199:25
  204:5,13 219:24
  224:21 254:6
  255:23 301:23
**discussions** 64:23
  90:9 102:7 285:6
**disingenuous**
  219:9
**dismissing** 3:20
**dispense** 7:17
**display** 193:12
  199:10 250:12
  251:20 253:9
**displayed** 193:13
**dispose** 241:19
**dispute** 297:5
**disputing** 69:14
**dissertation** 28:9
**distances** 276:20
**distinction** 32:20
  133:15,16,22
  134:2
**distributors**
  122:21

**district** 1:1,2 5:10
  5:10 281:8,9
**diverse** 74:17
  100:6
**division** 24:4
**doc** 28:17 154:11
**doctor** 60:7 100:1
  275:14
**doctoral** 28:10
**doctors** 29:25
  123:11 131:25
**document** 46:16
  49:5 50:14 55:14
  62:24 63:12,14
  64:2 65:7 151:6
  151:25 152:4
  157:6 168:7,23
  169:22,25 170:21
  170:23 175:8
  176:20 181:8
  185:3 186:23
  199:7 206:20
**documentation**
  16:12 142:24
  156:13,19 184:6
**documented** 263:3
**documents** 3:11
  19:1,3,16,18,19,20
  19:22,24 20:3,6,8
  20:23 21:3,6,10
  44:14,19 46:21
  47:13,16,22 48:23
  50:3,20,22 51:17
  53:6 54:2,13,16,19
  55:11 85:18,21
  86:1,12,13,16,23
  87:10 88:21 89:13
  90:16,19,23
  128:12 146:10,13
  156:25 171:2
  173:10 200:3

205:17 247:2,10
  247:13,17,21,24
  248:17 275:11,18
  301:21,22 304:5
  307:14
**doing** 7:6 22:2,5
  25:13 55:12 75:9
  112:15 117:14,22
  127:6 139:3 150:9
  150:11 152:23
  160:14 212:13,14
  240:12 260:15
  261:4,22 283:3
  292:14 306:10
**doll** 155:12 249:11
**donate** 34:15
**doubt** 292:23
**doubtful** 284:11
**dr** 3:11 6:7,14 7:3
  21:10 22:8,11,12
  22:17,23 26:7
  41:14 48:6 51:15
  51:22 63:14 65:5
  66:20 68:25 69:4
  69:17,19 80:24
  86:17,25 88:23
  91:10 92:5 104:8
  107:3 121:20
  122:13,22 123:15
  164:24 167:8
  168:9,12 170:12
  217:18 227:19
  256:23 265:14
  266:9 267:5 268:2
  269:21 270:8
  271:15 272:7,9,18
  272:19 273:1,5,15
  274:4 277:18
  278:3 283:25
  295:11 297:11
  304:23 305:15

306:11,13 307:4
**draft** 61:3,20,24
  62:3,6,9,16,17
  63:4 64:8 66:12
  117:7 194:2
**drafted** 62:9 66:10
  248:25 249:2
**drafting** 63:22
**drafts** 61:19
**drago** 88:24
**drank** 223:22
**draw** 236:6
**drawing** 35:14
  36:15,24
**droller** 32:6
**drop** 305:17
**dropbox** 170:25
**dropped** 18:20
  26:8 31:3,4
**drug** 127:3
**due** 82:21 124:13
  296:21
**duly** 6:20 309:7
**duplicate** 54:6
**duplicative** 54:4
**dying** 157:13
  158:4 159:1
  160:19 288:23
  302:23

| e |
|---|

**e** 2:10 12:22 48:7
  50:12,24 52:4
  86:20,21 123:17
  129:9,14 131:24
  185:24 186:1,12
  186:17,25 187:2,3
  187:6,7,11 219:7
  219:24 224:20
  248:20,22 249:4
  263:18 306:21
  310:1 311:3,3,3

**eager** 135:9
**earlier** 45:6,19
  74:25 93:6 97:17
  97:19 125:22
  129:12 134:14
  138:21 139:5,21
  147:10 160:14
  165:11,21 186:10
  220:1 221:3
  227:24 249:19
  254:24 257:25
  268:19 276:9
  279:25 280:19
  286:24 289:6
  293:4,14 302:8
  304:22
**early** 63:4 64:7,25
  68:10 80:6 124:10
  125:12 126:5
  138:8,8,9 163:21
  177:16 212:3,7,11
  218:7 244:2 255:9
**easier** 140:11
**easiest** 75:6 76:3
**easily** 29:24 75:9
**east** 2:11
**easy** 47:15 73:2
  245:16 257:17
  294:5,14,15
**educates** 161:4
**education** 16:11
  74:15 94:9,21
  191:25 301:1,5,18
  301:20
**educational** 96:20
**effect** 61:1,4,25
  62:17 64:14,16
  150:12 225:8
**effective** 57:3,9
  112:3,24 113:3,23
  165:5 238:13

  240:19 301:7
**effectively** 106:4
  165:7 240:16,16
**effectiveness**
  238:5
**effects** 88:1 149:22
  256:6
**efficacy** 279:20
**efficient** 305:7
**effort** 48:16 50:14
  287:18
**eight** 78:9
**either** 12:22 29:25
  30:13 31:1,9 33:1
  35:3 42:2 60:9
  89:23 131:7
  141:10 162:15
  172:18,20 182:23
  194:11,15,17
  206:25 212:11
  217:23 218:8
  266:17 268:15
  280:20 296:8
**el** 8:7
**element** 149:13
**elevate** 195:21
**eli** 306:23
**elicit** 279:17
**eliciting** 75:22
**eliminate** 101:11
  105:3,5 111:15,15
  111:21 112:6
  114:9 165:5
  262:24
**eliminated** 165:7
**eliminating**
  115:15
**emergency** 29:10
**emotional** 75:16
**emotionally** 75:22

**empirical** 128:20
  128:22 159:12
  283:11
**empirically**
  159:16,23
**employee** 80:12
  98:5 145:22 219:7
**employees** 28:16
  74:16 145:6,23,25
  146:8,23 147:11
  150:7 151:22
  152:14,22 211:10
  218:6 221:14
  224:8,23 231:6
  259:9 274:5
**empty** 46:25
  249:11
**encoded** 57:8
**ended** 89:4
**ends** 132:19
**endurance** 285:15
**engineer** 96:17
  104:2 112:14
  138:19
**engineering** 68:25
  69:6,20 96:20,22
  96:23 104:10
  107:3 115:4,16
  134:16 137:18
  165:13 166:2
  179:10 188:16
**engineers** 113:24
**english** 267:24
**entire** 86:11,14,25
  173:18 208:6
  280:5 301:3
**entirely** 78:19
**entitled** 51:7 299:3
  299:7 306:22
**environment**
  29:21 88:19

  103:20 105:13
  111:24 120:4,12
  120:24 121:8
  302:18
**environment's**
  23:14
**environmental**
  290:21
**environments**
  109:12
**equipment** 29:14
  29:15 61:21 70:9
  70:11 88:9,19
**erase** 79:18 80:3
**ergonomics** 14:3,8
  15:20 16:5,9
  24:15 29:17 56:1
  99:6
**err** 220:9
**errata** 310:11,13
  310:17
**error** 23:6 30:21
  220:14
**errors** 56:7 285:17
**es** 188:14
**especially** 27:18
  27:24 34:3 71:13
  73:7 77:15 124:15
  232:5 253:21
  291:16 298:3
**esq** 2:10,16,17
  310:1
**essentially** 15:3
  58:23 88:5,7
  263:5
**established** 303:1
**estimate** 24:22
  45:3
**et** 77:4 114:4
  131:25 151:19
  154:21,23 155:20

155:21 221:12
**ethical** 230:11
**ethically** 67:24
68:20 71:4 76:6
**ethnographic**
125:13
**etiology** 108:15
110:10
**europe** 204:17,22
**european** 121:6
204:13
**evaluate** 119:17
125:14,17 134:23
143:8,10 144:20
164:4 192:1 206:8
229:3 284:1
289:16
**evaluated** 143:17
163:9,19,20 164:2
206:1 289:2
**evaluating** 33:9
**evaluation** 13:13
97:15 109:6
118:15 124:14
163:13 212:6
**evenly** 26:2,10
**event** 282:5
309:20
**events** 300:13
**everybody** 246:11
274:13
**everyone's** 79:19
282:7,15
**everything's** 262:3
**evidence** 133:24
134:1,3,6,8 153:21
182:16 200:3
291:20
**exact** 63:21 64:1
246:16,18 297:19

**exactly** 42:7 56:8
86:24 104:23
136:23 150:11
158:23 226:17
271:17 281:17
**examination** 3:2
7:1
**examined** 6:21
309:6
**example** 20:13,14
24:12,21 58:9
70:7,16 72:12
75:1 94:24 101:1
102:9 108:5 114:4
115:17 159:15
163:1 166:5
168:15 172:2
176:22 196:18
236:2 241:7
255:16 287:16
294:13
**examples** 101:17
**exceeds** 287:23
**excerpts** 3:18
88:23
**excessive** 51:4,9
169:17
**excluded** 103:23
114:17,25 115:6
115:12 280:21
281:1,19,22 282:5
282:7,15,20,21
283:8
**exclusively** 22:24
128:1,5
**excuse** 133:24
182:5 194:2
**executed** 74:20
308:9
**exemplar** 93:22
203:17,20

**exempt** 134:24
**exhausted** 285:18
285:21
**exhibit** 3:9,11,13
3:14,15,17,18,20
3:22,24,25 4:3,4,5
4:6,7,8,9,10 46:5
46:10 47:7 54:1
54:18,22 59:13
67:3 86:10,14,15
86:18 103:3,5
129:21 169:4
187:15,18 188:9,9
206:4,21 215:6,16
215:22 216:6
220:3 227:21
231:22 236:23
254:1 259:21
279:4 281:6
293:11 294:23,24
295:23
**exhibits** 3:7 4:1
47:1 87:3 129:22
186:18 215:23,24
294:24 307:16
**exist** 156:20,22
161:7 162:9 273:2
**existed** 198:15
**existence** 106:25
114:13 115:5
163:3 233:8
**existing** 265:19
**exists** 112:7
136:10 143:6
**expect** 44:3 100:11
146:18 149:19
156:16 171:22
196:11,12 259:14
293:17 305:4
**expectation**
106:20

**expectations**
27:22 109:9
278:23 279:18
**expected** 100:16
103:20 105:13
146:16 190:4
191:6 197:12
201:3 242:6,12,18
**experience** 16:13
20:4 33:3 72:8
74:16 94:10
123:24 178:13
179:11 191:25
205:4 260:15
272:15 273:1
301:1,5
**experienced**
273:21 288:22
**expert** 3:13,14,15
8:23 9:13,17 10:9
10:11,20 11:11
12:8,16 13:12
18:8,12,18 20:5
25:25 27:15 29:21
30:14 31:10 33:2
35:4 36:11 38:21
39:1,9 48:13
65:14 68:24,25
69:16,20 89:21
90:20,22 91:10,20
92:8,15 95:20
96:24 97:12,21
104:8,18 105:7
107:3 109:19
110:7,7,9 112:8
113:8 114:23
119:4,13 120:5
123:25 137:19
138:3,7 141:4,17
142:6,19 153:20
179:7 195:6

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

212:13,21 221:6
229:18 254:18
260:16 261:22
269:17 274:21
281:3 282:19
287:6 290:22
**expert's** 18:23
115:4 190:7
**expertise** 94:21
119:4 179:10
**experts** 18:6 107:2
114:8,13 117:3
126:2 134:16
165:13 166:2
188:17 222:25
229:10,17 230:17
230:18 233:14,19
242:22 272:6
281:22 282:22
303:2
**explain** 34:16
218:8 235:22
277:9 278:2
**explained** 80:25
**explaining** 277:9
**explanation**
269:15
**explicit** 79:17
235:21 236:18
**explicitness**
235:17,18
**expose** 34:4 68:18
107:10,20 108:5
108:25 109:13
120:20 159:17
161:2 227:25
**exposed** 88:2
120:6 246:21
252:9 253:14
270:17 286:11
292:17,18 301:8

**exposes** 120:1
121:3
**exposure** 88:8
**extensive** 44:10
**extent** 51:23 74:20
96:15 97:14 109:8
189:20 190:19
210:13,23 216:24
217:7 218:9 226:2
226:5,19,21 227:2
235:10 240:17
245:12 258:23
264:18 287:12
294:17
**extra** 207:18 209:6
210:17 292:12
**extrapolates** 150:2
**extreme** 220:16
**extremely** 146:3
240:2

**f**

**f2194** 142:9
**f31** 198:8
**f3118** 223:25
225:3,7,15 228:13
258:14
**f318** 198:14
**f353** 8:7
**face** 193:2
**facing** 8:13
**fact** 15:2 23:24
51:18 77:5 107:19
135:1,25 146:14
149:25 150:13,15
154:20 178:6,16
190:6 191:10
192:2 194:16,25
195:23 197:19
198:8 202:4
209:18 218:2
220:22 245:9,19

245:20,25 246:3
248:16 251:14,20
253:19 255:5
281:23 282:2
293:24
**factored** 271:11
**factors** 8:24 13:13
14:3,7,23,24 15:20
16:5,9 17:11
24:15 29:17 56:1
65:23 71:3,7,8
76:15 81:23 82:1
96:22,23 97:15
99:5 102:6 104:22
105:1,12 111:9
115:13 123:25
126:2 193:9 197:9
198:6,8 216:17
217:3,3 235:5,14
238:16,25 239:4
242:22 254:18,22
255:20,21 272:6
272:15 273:1
274:21 277:10,13
284:25 289:8
298:10 299:1
**facts** 19:9,12
**factually** 276:20
**failed** 106:3
**failing** 258:4
**fails** 310:19
**failure** 123:2
134:23 226:13
254:18,21 255:3
256:6
**fair** 7:23 8:24 19:4
20:17 21:23 22:3
25:22 27:2 32:4
39:20 40:18 41:25
44:16 49:22 50:23
51:25 52:1,12

53:7 54:5 67:10
80:11 81:15 93:9
93:16,21 94:21
95:20,21 97:1
102:10 103:16
114:10 123:21
128:14 130:23
135:13 139:8
145:11 180:17
214:20 232:19
243:16
**fairly** 138:2
**fall** 58:15 59:6
60:1,6,8 101:23
138:11,11 181:25
182:4,5,9,20,21,22
183:2,12 184:4,11
184:21 185:3,4,23
207:22 209:2,5,11
209:23 210:11,20
211:6,17 216:25
217:1,12,16,24
221:10 226:9,14
226:17 234:2
236:4 237:20
238:1,2 244:20,20
**falling** 58:16 138:9
209:22 226:11
**falls** 138:14 185:5
207:23 236:5
**familiar** 31:24
55:17 82:16 85:10
105:16 125:21
169:12 213:4,9
235:11 241:16
261:23 262:1
274:7 279:9
281:16 283:4
292:8
**familiarity** 241:15

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**far** 15:4 30:23
40:20 43:1 72:15
72:16 78:3 96:6
99:15 105:6,9,10
106:16 107:17
110:10 125:16
127:15 130:14
132:22 138:8
154:13 169:1
175:9,25 198:6
200:3 202:17
229:10 245:10
**fatalities** 181:15
184:15
**father** 63:25 245:7
**fatigue** 141:20
142:2
**fatigued** 143:21
**fda** 125:2 126:16
126:25
**feasibility** 112:19
**feature** 96:14
109:6 120:1
**february** 297:18
**fed** 77:2
**federal** 10:1 11:20
309:16
**feed** 155:13
**feel** 20:5 34:7,8,12
34:19 74:1 260:22
260:24
**feeling** 258:6
**feels** 15:16
**feet** 191:24 193:20
**fell** 175:21 182:17
182:20
**felt** 219:8 249:14
**fi's** 47:3
**figure** 168:11
191:7 200:17,17
256:23,24 276:18

305:19
**figures** 190:22
191:20 194:5
**file** 48:8,12 54:21
82:7 85:5 86:11
86:14,15,16,25
87:7 88:22 168:8
170:25 297:21
304:23
**filed** 7:10 275:23
304:5
**fill** 275:12 292:20
**filling** 73:19
**final** 215:12
**finalized** 247:18
248:17
**finally** 134:11
**find** 47:21 53:2
66:18 71:11 77:8
146:1,20 150:18
153:22 159:8
164:12 268:19,25
272:11,24 277:17
278:5,17 294:4
**finding** 158:9
213:14,17,20
284:17
**findings** 106:2
118:9
**fine** 83:20 89:3
169:3 176:5
270:10 305:14
**finger** 31:17
**finish** 199:14
306:2
**finished** 121:15
248:4 269:19
**fire** 35:19,21
**fired** 281:24
283:22

**firm** 9:4 11:3,10
11:16 19:8,23
23:5 27:9 28:7
33:7 41:1 112:15
118:15,16,21,21
118:25 119:1,8,8
119:15,17,21
120:4,13,17,19
121:3,11 138:20
297:4
**first** 6:20 8:2
12:20 13:7 14:17
22:23 29:8 30:13
30:23,25 31:7,12
31:21 46:20 48:9
53:20,21 55:14
56:15 57:14 60:14
63:7 93:10 104:24
106:1 122:18
127:11 134:21
136:17 137:5,6,8
158:9,13 165:4,5
169:6,24 191:24
193:6,20 207:6
208:1 210:6
212:10 217:5,8
219:17 229:21
233:25 239:11,21
240:5 241:1
247:10 248:11
253:3,18 255:22
256:3,14 264:14
270:13,21 279:9
281:15 297:15
**fisher** 1:8 2:15 5:9
5:23 6:1 7:9 35:19
39:20 43:9 63:4
63:11,11 64:7,25
67:14 74:22 77:3
78:14,20 84:2,24
102:9,23 106:3

116:25 117:6
122:19,23 123:2
129:2,16,25
131:15,20 132:7
132:12,18 133:9
134:17 135:11
139:15,20,25
140:17,23,25
141:5,13,18,25
142:5,7,16,22,25
143:16 145:1,23
145:25 146:8,23
147:10 148:11
149:2 150:17
152:7,18 153:3,9
153:24 154:5,15
155:5 156:1 157:3
157:10 158:7,23
162:1,11,17 163:2
163:11 166:10
170:22 171:21
172:2,6,25 173:4
174:5 197:19
198:23 199:4,8
218:2,24 224:22
224:23 225:12
229:2 231:6
232:18,22 233:7
234:7,13 243:16
251:19,20 254:10
254:13 255:16
258:10 259:9
274:5 275:23
291:23 303:23
**fit** 221:20
**five** 63:22,24 64:8
66:2,11,19 67:2,4
145:22 179:5
185:7,8 218:5,22
218:25 219:1,3,5
219:11,12,13,23

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[five - frame]

Page 21

220:2,10 221:11
221:15,18,23
222:1,5,6,11,12,20
222:21 223:16,16
224:8,9,20 225:3
231:4,5,7 232:6
249:3,8 252:25
253:2 258:19
259:2,4,10,11
276:7 286:4
**fix** 65:23 220:18
**fixed** 65:21 255:13
**fixing** 223:8
**flagged** 202:19
203:15
**flags** 169:19
**flat** 118:15,16,21
118:21,25 119:2,8
119:9,15,18,21
120:4,13,17,20
121:3,11 138:20
**flip** 49:9
**floor** 175:21
176:23 177:6
190:9,25 192:6
195:5 196:10
**fmea** 254:6,10,14
255:1,10,17,23
256:2,6
**focus** 28:6,13,14
208:5
**focused** 22:24
56:10 57:4 127:23
136:25 233:4
**focusing** 108:19
**foia** 130:12
**folder** 46:25
**folks** 77:23 80:6
195:23
**follow** 19:22 33:12
79:2 89:7 112:1

135:7 137:14
229:8 284:4 294:5
294:9,14,15
**followed** 266:18
**following** 6:23
131:18
**follows** 6:21
**food** 127:3
**foot** 196:14 201:2
201:13
**footage** 154:13
156:17
**footnote** 49:17
56:7,17 65:7 83:1
83:6 84:14,15,17
85:16,17 86:4
87:20,24 170:14
173:22 181:1,6
185:14,19 186:13
186:15 188:2
189:7,8,10 199:13
215:19 219:19
278:19,21 306:17
306:21
**footnoted** 50:1,22
53:7,11 65:12
93:7 175:5 185:13
306:12
**footnotes** 47:19,21
49:2 50:15 52:23
56:6 82:5 90:24
166:8
**forcing** 113:3
223:11
**foregoing** 308:6
309:7,15 312:5
**foreign** 1:8,9
120:11 122:1
127:15
**foreseeability**
196:5

**foreseeable** 146:3
146:16 149:9
183:23 189:3
192:2,3 193:10
196:13 200:25
201:6,14 228:24
229:7 242:6,12,17
289:5
**form** 59:8 62:2
63:18 65:10 76:10
76:17,19 78:3,23
80:22 89:16 93:6
94:7 97:22 99:9
106:11 115:8,22
116:12,23 118:12
119:16 120:9,16
120:22 121:5
127:10 128:3
129:14 130:3
132:21 135:16,20
144:13 148:14
149:5 151:2
153:12,18 155:7
156:21 157:1
159:3 160:2 174:8
176:11 177:8
179:16 180:7
182:13 195:3,17
203:23 210:10
212:18 213:1
217:25 218:13
223:18 225:20
228:2 233:10,23
234:20 237:3
238:8 240:11
243:14 248:7,21
249:24 261:9
267:9,17,22 268:7
273:4,12,24
277:25 278:12
298:19 299:22

300:8 301:16
302:21 303:19
**formal** 168:13
**format** 83:13
**formatted** 237:17
251:21
**forming** 19:10
99:10 111:7
283:16
**forms** 44:20 80:19
106:8 129:15
144:22 188:6
292:19
**formulate** 242:11
**forward** 240:14
**forwarded** 305:5
**foster** 88:18
**found** 175:20,24
176:23 177:6
203:14 215:11
233:16 266:19
279:1 283:8
**foundation** 63:18
97:24 104:25
105:12 115:8,22
116:12 120:9,16
120:22 132:21
135:16,20 149:5
160:4 177:8
210:10 233:23
246:8 248:7 272:4
273:4,12 302:21
**four** 15:17,19
16:22 36:18
145:22 185:6,7
218:5 253:4 266:8
270:24 272:2,16
273:3,9
**fourth** 181:13
**frame** 30:19
132:19

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**free** 33:6,14
**frequency** 298:13
**freshmen** 75:7
**friday** 307:11
**front** 48:19,22,25
  49:22 50:3 51:15
  52:11 54:4 91:9
  103:9 168:12
  169:23 173:7
  174:10,24 176:13
  187:7 189:11
  193:20 194:10
  195:13 197:15,20
  198:4,24 199:5
  206:6,20 215:6
  217:13 227:21
  288:18 293:7
**full** 16:10 52:4
  63:7 122:18 174:8
  190:2 239:13
  296:2 299:7
**fully** 136:21
  246:19 288:1
  299:2
**fundamental**
  254:21 255:20
  256:13
**further** 111:16
  121:21 309:19
**future** 273:6

**g**

**g** 278:23
**ga** 310:15
**gabrielle** 306:20
**gain** 77:11
**gaps** 207:17
  260:24
**garbage** 9:18 11:7
**gather** 293:18
**gd** 169:16

**general** 10:18 17:7
  20:4 21:16 39:7
  43:23 45:6 61:14
  93:14 114:20
  132:16 164:3
  179:12 213:9
  236:10 238:24
  239:4,9,9,11
  292:12 296:16
**generally** 12:10
  14:2 21:22 22:3
  28:12 29:14 83:20
  88:11 90:11 99:19
  123:25 161:19
  162:8 166:7 213:4
  227:25 274:7
  279:9 280:21
  281:18 296:24
  297:2 300:20
**generation** 25:10
**generic** 42:5
  102:22 130:15
**generically** 75:4
  100:24 101:9
  102:21 107:12
**georgia** 2:18
**getting** 32:16
  42:21 43:2 49:18
  75:15,23 92:6
  169:21 179:1
  180:5 290:4
**giant** 206:11
**gift** 100:11
**give** 13:13 33:13
  36:3 40:8 49:21
  68:4,5,5,16 70:2
  70:17 79:6 84:23
  85:3,16 110:5
  149:2 151:25
  155:14 157:6
  158:13 159:5,16

  160:21 172:23
  202:12 204:8
  206:3 210:24
  234:24 264:3
  265:23 276:19
  278:18 294:10
  303:20 304:4
**given** 19:20,21
  26:22 35:25,25
  40:7,18 58:1
  67:20 94:17
  115:16 159:19
  163:25 193:15
  222:14 247:13
  275:3 282:3 285:3
  285:7 312:9
**gives** 60:11 77:1
  132:6,25,25
  252:18 253:9
**giving** 44:15 56:5
  71:9,14 126:22
  128:23 202:5
  212:22 235:24
**gms** 1:6
**go** 6:3,17 26:24
  46:16 47:21 49:2
  50:16 51:18 53:25
  55:10 56:15,16,16
  57:8,25 59:9,12,18
  60:10 62:24 76:18
  76:20 79:18 80:3
  82:1 86:5 87:21
  88:3 103:4 106:12
  110:1 113:16
  115:25 117:25
  123:5 136:14,17
  137:4,4 146:5
  149:6 152:6
  153:25 166:4
  170:1,4,10 173:8
  176:18 188:19

  190:1,22 192:16
  197:6 200:11
  204:9 206:5,14
  215:9 227:8,10,22
  230:20 243:15
  246:24 256:15,22
  268:25 269:4
  270:9,11 279:12
  280:16 289:13
  295:22 303:11,13
  304:13 305:2,24
**god** 285:1
**goes** 24:13 36:4
  81:5 160:13
  185:10 236:20
  283:24 284:10
  305:12
**going** 6:10 25:11
  25:11 34:16 36:19
  47:2 48:11 50:17
  51:9 57:3 65:25
  68:14,17,22 71:13
  72:22 73:7,8,11,13
  73:19,21 78:24
  79:1,4 83:19
  84:11 86:8 95:15
  96:8 97:3 98:9
  104:18,21 105:21
  113:11 119:23
  125:18,24 126:15
  135:10 140:15
  141:3 142:5,18
  146:3,7,17,22
  148:5,17 149:10
  149:19 151:5,8
  153:1,20 154:7
  157:7 161:16
  168:6 169:12
  170:4 171:14
  172:17 179:14
  180:16 181:5

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

**[going - hazards]**

192:12 193:17,18
193:20 196:5,8,9
197:12 204:7,11
206:5 216:5 220:7
220:9,17 221:5,20
222:7 223:1,7,21
227:7,8 228:3,17
228:21,24 229:22
230:4,13,15
235:25 238:23
241:25 252:9,12
253:20 254:3,19
254:24 255:18
257:11 263:14
273:6 274:24
276:15 278:16
285:14,17 287:5
287:13 290:2
291:24 292:10,11
292:12,18,25
295:15 296:6
297:5 302:20
303:1,15,20 305:3
305:11,18 306:3
**goldberg** 2:10
**goldbergandosb...**
2:13 310:2
**good** 5:3 6:7 7:3
24:16 25:8 66:18
80:4 93:19 152:24
253:20 258:3
**google** 27:5
**gotta** 167:22
220:18
**gotten** 178:5,8,10
**governments**
120:11
**grabbed** 202:5,8
**graco** 82:20 84:6
84:18

**granted** 281:21
282:8,22
**granting** 3:20
**great** 56:14 288:1
288:25 307:10
**greater** 73:8 77:17
109:13 241:13,14
**greatest** 287:12
**greatly** 59:24
60:18 240:5
298:13
**green** 9:19
**greenberg** 2:16
5:22 7:8
**group** 99:5,9,10
101:17 128:23,23
159:18,19 198:9
**groups** 99:7
159:17 202:4
**gtlaw.com** 2:19
**guard** 105:17
**guarded** 287:3
**guess** 107:25
116:24 152:3,3
236:8 246:12
262:3
**guys** 38:25

**h**

**h** 311:3
**half** 10:21 90:13
285:17
**halfway** 204:13
**hall** 15:13
**hand** 46:9 49:4
54:17 70:6 83:4
161:17 167:17
278:16 309:21
**handbook** 82:16
125:19,20 126:8
279:6

**handed** 68:9,12
**handing** 281:6
293:10 305:15
**handle** 191:23
**hands** 207:24
210:4
**handwritten**
48:13 52:18
**hang** 167:21 168:1
192:12,13
**happen** 255:8
**happened** 20:19
90:12 123:12,21
128:2 175:5,6
181:20 271:1
276:18
**happening** 15:3
17:15 20:25 23:17
24:14 192:15
**happens** 34:14
159:7 164:13
**happy** 7:21 49:9
84:21 85:3 151:7
152:1 157:6
169:15,22 215:2
**hard** 24:5 25:21
36:2 71:12,21
291:18
**harm** 72:25 74:3
**harms** 73:20
**harness** 179:5
189:2,2
**harvey** 22:8
**hawthorne** 150:12
**hazard** 17:9 27:22
42:9,17,20,25 59:6
60:1,6,8,15 88:13
100:5 101:23,23
105:2 106:4,9,17
106:21 107:1,11
107:20 108:6

109:1,14 111:13
111:18,22 112:4,6
112:13 113:1,4,21
114:10,13 115:5
115:14,20 116:2,7
116:11,16,20,21
117:1,2,4,8 118:8
118:10,19,22,23
119:3,9,25 120:6
120:20 121:4
122:20 123:3,6
124:4,9 134:13,17
136:10 143:6
146:19 165:5,25
189:1 207:16,23
209:1,2,2,5,9,11
209:23 210:12,13
210:14,15,20,21
211:6,7,17 213:15
213:18,21,24,25
216:25 217:1,1,6
217:10,12,16,24
218:9 220:16
221:10,25 222:9
223:9,11 226:3,5,9
226:14,17,20,21
227:23 228:1,7,17
232:18 233:4,8
234:2,2,5,12,17
235:1,10,22 236:4
238:20 240:18
243:22 255:21
256:2,2 257:13
286:25 287:1,3,17
**hazardous** 101:1
132:24 133:19
134:1,4,6,9
**hazardousness**
279:24 280:7
**hazards** 34:9 81:2
101:11,19 108:18

Case 2:19-cv-02689-GMS    Document 196-42    Filed 11/19/21    Page 105 of 144
Alison Vredenburg, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

[hazards - iceberg]                                                    Page 24

108:20 116:14
125:5 126:5
150:19 159:6
165:6 210:15
214:5 229:13
254:11,19 255:10
255:22 256:4
267:25 287:11,13
294:17 299:8
**head** 111:4 151:9
191:2 193:18
194:23 196:1
197:6 201:15
236:3 237:23
249:14,18 250:4
251:16 252:10
296:4
**head's** 196:5
**heading** 111:6
**headings** 237:25
**headrest** 175:24
**heads** 193:16
**health** 29:19 30:5
88:17
**healthcare** 24:9
**hear** 6:6 8:19
18:19 21:19 26:4
46:7 74:9 75:3
**heard** 6:10 13:16
13:19 14:1 18:2
285:13 304:1
**hearing** 8:9
**heavily** 290:24
**heavy** 193:16
**hedge** 289:24
290:13,21
**heed** 239:1,20
**heeded** 240:8
**held** 125:19,22
168:23 235:10
301:2

**help** 23:16 109:23
125:4 126:3
165:17 209:22
221:24,25 231:18
253:24
**helped** 99:9
**helpful** 32:20 52:9
54:14 82:25
109:17
**helps** 52:8
**hereto** 312:7
**herman** 2:17 5:24
5:24 6:1 47:2
86:10 295:3,7,9
296:6,11 304:14
**hey** 260:25 262:21
**hfes** 14:18 15:11
55:21,24 99:3
**hidden** 184:2
**hide** 280:13
**hierarchy** 65:22
104:4,25 105:15
105:19 123:7
256:3,10
**high** 44:21 220:16
238:20 287:15
**higher** 27:5 102:4
159:22
**highest** 75:12
**highlight** 88:4
198:10
**highlighted** 88:4
175:4
**highlighting**
174:19 175:2
**highlights** 171:9
**hindsight** 262:24
263:5 273:20
274:8,13,17
276:15

**hire** 34:13
**hired** 22:20 30:13
31:1 33:17 41:18
104:8,9,12 107:3,8
274:20 281:24
283:22 284:3
**histories** 122:25
**hit** 32:16,17
**hold** 87:15 177:10
178:5
**holes** 262:20 263:6
**home** 3:22 29:19
30:1,4,5 71:10
78:20 80:10,12
81:10,13,17
127:14 142:21
144:6,19 145:9,14
145:19 147:23
148:6,10,24
150:23 151:12,18
151:21 152:18
161:11,20,24
280:4 293:4,11,15
**homes** 202:21
**hope** 169:7
**hoping** 34:20
**horse** 229:22
**hospital** 29:21
**hotel** 85:4
**hour** 43:13,14
90:13 113:7
196:19 285:17
**hourly** 43:12
**hours** 44:1 149:9
154:12,12 206:5
206:14,15,16
276:1,7
**house** 204:10
**huge** 30:9 198:7
**hughes** 29:7,10,12
29:15

**huh** 306:25
**human** 8:23 13:13
14:3,7,23,24 15:20
16:5,8 17:11
24:15 29:16 55:25
65:23 71:2,7,8,12
72:16 76:14 96:22
96:23 97:15 99:5
102:5 104:22
105:1,12 111:9
115:13 123:24
126:2 193:9 197:9
198:6,8 216:17
217:3,3 235:5,14
238:25 239:4
242:22 254:18,22
255:19,21 272:6
272:15 273:1
274:21 277:10,13
284:25 289:8,13
289:16 290:3
293:1 298:10
299:1
**humans** 73:6
112:2 293:3
**hundred** 34:2 54:6
74:4 111:20
149:20 222:8
223:6
**hundreds** 7:15
45:2 46:19
**hung** 192:11
**husband's** 25:20
**hypothetical**
148:20
**hypothetically**
148:24

**i**

**iceberg** 126:16,16
132:6

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[idea - indicates]**                                                    Page 25

idea  30:20 45:14
identification
    123:5 307:19
identified  8:23
    94:11 111:11
    118:11 124:9
    132:3 134:21
    136:9 146:18
    210:20
identifies  118:18
    131:10
identify  47:13
    72:21 92:16,24
    94:16 116:21
    118:9 124:3,17
    125:4 126:3,4
    150:19 158:14
    159:25 210:13
    217:6 226:20
    229:19 235:1,9
    252:22 254:19,20
    255:3,13 256:4
identifying  94:19
    255:2,22
ignorant  47:6
ignore  78:19 164:8
iii  306:23
ilene  278:23
    279:10
imagine  291:15,19
immediate  73:3
    164:1
immediately  48:7
impact  58:2
    141:20 142:2
impeding  141:7,15
implemented
    62:20,23 66:10
    225:15
implied  256:13

implies  128:4
importance
    198:11 199:9
important  7:19
    57:25 60:11 77:14
    110:17 124:3,10
    124:25 125:3,17
    146:15 149:18
    196:4 199:24
    200:25 210:12
    221:22 234:22
    235:12,17 248:23
    253:8 254:18
    265:23 268:23
    280:11
importantly  77:22
    140:23
improper  298:6
    298:17
improvement
    29:11
inaccessible  86:18
inaccurate  282:2,3
inadequate  284:5
inadvertently  48:8
inappropriate
    73:24 74:7 77:6
    79:6
inappropriately
    79:1
incident  101:8
    106:18 108:11
    122:20,24 123:12
    123:14,25 124:2,5
    124:16,19,21
    125:8,25 126:9,18
    126:20,24 127:9
    127:12,13,18
    128:1,8,9,19,20,25
    129:18 130:2,7,21
    130:23 131:3,4,16

131:19 133:8,11
    135:12,15,21
    147:11,15,17,19
    148:7 149:25
    150:23 151:18
    163:24 166:6,7,12
    166:13,15 170:13
    171:6,7,17,20,21
    171:24 172:6
    173:3,12 174:6,16
    175:3,18 177:5
    180:22 181:3,11
    181:20 182:6
    184:7,9 185:25
    186:3,8,9 198:15
    216:3 242:13,14
    243:5 266:17
    306:17
incidents  27:23
    110:10 123:20
    124:6,17 125:16
    126:1 127:22
    128:11 131:11
    132:6,8,10,18
    166:10,18 171:15
    172:25 173:19,20
    173:24,25 174:4
    174:20 175:6,13
    175:17 182:5
    212:10,12 242:21
incline  109:7
    110:22 255:6
inclined  63:7 64:9
    82:21 97:13,15
    98:11,16,19,22,25
    99:20 100:22
    101:16,21 103:1
    290:9 301:7
include  49:21 63:5
    64:8 66:12,19
    94:15 188:9

230:22 258:1,1,11
included  19:12
    65:2 94:20 99:13
    205:18 209:18
    211:6,17 222:6,21
    223:16 224:4,15
    226:24 228:12
    230:1 231:8
    232:13 233:5
    257:1 264:7
includes  46:17
    99:8 143:24
    207:11 232:6
including  14:18
    16:14 57:20 60:13
    101:20 162:25
    171:6 301:2,21
inconspicuous
    57:2 298:8
incorporated  5:9
    5:9 23:7 165:25
incorrect  78:7
increase  238:21,23
    298:12,13
incredibly  296:20
independent  17:19
    17:21 18:1 145:17
    173:2 245:21
    246:5
independently
    13:3 250:16,20
    251:7 304:10
index  3:1 125:24
indicate  63:15
    164:12 177:9
indicated  80:16
    81:13 145:10
    150:1 151:13
    198:12
indicates  152:22
    178:6,17 219:7

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

**[indicating - interact]**

**indicating** 49:13
167:10,20 186:21
285:19
**indication** 126:17
149:8 152:25
**indirectly** 256:9
256:11
**individual** 86:13
**individually** 296:7
**individuals** 14:25
15:7 146:11
147:13 265:3,6
273:10
**industrial** 23:22
27:20 28:2,5
112:10
**industries** 61:18
**industry** 23:2,8,10
24:3,23 25:4 31:1
127:1
**infant** 17:4,22
18:2 30:18,24
31:8,8,22 33:2
36:6,6,11 37:7,8
41:15 58:16 73:14
82:20 85:12 95:20
97:9 98:11,16,19
98:22 99:13,20,22
100:2,4,8,10,19,22
101:21 103:1
107:10,20 108:5
108:12,25 109:13
120:1,6,20 121:4
134:15 135:13
147:5,14 149:1
150:25 151:13
153:25 175:24
178:24 179:6,11
183:3,14 196:17
197:1 207:24
209:24 210:3

220:2,4,16 227:24
227:25 234:4
241:21 249:12
252:17 259:12
**infant's** 99:25
141:7,15,20 142:2
149:10
**infants** 14:5,22
31:13,20 32:4,10
32:12,14,21,22
35:3,7,12 38:5
67:25 68:18,22
69:21 71:13 73:7
75:12 99:8 101:13
102:5 119:9
139:11,16 140:1
140:18 141:1
143:17,23,25
147:16 148:1,13
149:17,19,22
150:18 152:12
163:23,24 164:11
164:13 178:19
185:5 207:17
219:11,22 220:6,8
220:11 229:14,20
230:15 232:23
242:24 291:7,8,9
292:11,23
**infer** 118:3 236:9
241:24
**inference** 178:13
236:6
**influence** 279:18
**inform** 17:8 101:9
227:1
**information** 13:1
27:6 38:6 39:12
42:24 43:3 44:14
58:1,4,15,20 59:6
59:24 60:12 74:19

74:22 76:24,25
77:1,11,23 78:19
80:2,4 93:15 94:6
123:4,10 124:10
125:3 126:2
127:14,17 132:14
132:25 149:11
150:16 163:23,23
163:25 183:21
184:3 204:2 209:4
210:24 211:24
222:14 223:4
228:14,19 232:22
232:25 240:10
245:4 246:10,12
252:22,24 253:22
253:23 257:13
260:20 261:2,11
264:4 265:16
268:12,13 271:14
271:15 278:4,6
279:8 282:3 285:4
286:8 288:3 292:3
293:17,20,23
294:10,16 299:8
300:9,23,25
301:25
**informed** 68:5
122:19 222:13,15
222:25 227:6
246:19 288:1
292:1 300:23
**informs** 161:5
**inherent** 112:22
**initial** 42:24
248:14 297:12,16
297:23
**initially** 29:20
110:21 285:12
**injure** 32:14,21
101:13

**injured** 32:11
100:1 229:15
230:16 274:16
**injuries** 14:22
23:16 27:20 28:16
**injury** 9:18 28:8
28:15 29:6,11
96:25 140:19
141:2 154:1 189:6
220:15 284:16
287:9 288:6,10
**inn** 5:13
**inquiry** 36:6
**inside** 86:15
**instances** 33:23
196:17 280:20
**institutional** 72:19
**instruction** 79:2
234:25,25 235:7
235:24 236:17,19
236:24 256:25
257:14,14,17,19
258:7,12
**instructions** 56:20
79:7 236:12,16
241:3 257:25
266:14 294:5,9,15
**instructs** 215:7
216:7 257:9
**instrument** 99:25
**insufficient** 216:20
**intend** 96:1 165:20
**intended** 210:6
**intending** 106:25
280:13
**intent** 54:3
**intentionally**
275:13
**intentions** 12:15
**interact** 155:10
249:14

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**interacting** 146:25
**interaction** 156:2
**interacts** 252:8
**interest** 28:20 29:4
**interested** 28:21
  28:25 30:4 102:13
  309:19
**interface** 27:21
  28:8 103:18
  105:10,14 109:3
  165:21,23 183:10
  190:4 191:3,6,9,11
  191:20 193:2,4,5,7
  194:4 197:12
  201:18 203:25
  250:13 253:10
**internal** 122:21
**internet** 82:20
  85:11 224:20
**internship** 23:4
**internships** 23:5
**interpret** 271:6
**interrupt** 6:11
  47:7 109:20 113:6
  192:10
**interrupted** 252:5
**interruption** 41:10
  92:1 164:20 168:5
  192:22 206:18
  227:15 256:18
  260:4 269:6
  278:14 304:18
  306:6
**intervene** 50:25
**interview** 22:14
  220:22 259:22,25
  260:13,21,23
  261:7 268:21
  270:22 277:18,19
  285:25 302:6

**interviewed** 94:2
  211:3 260:7,17
  261:5 265:3
  274:19 277:21
  278:9
**interviewing**
  277:16
**interviews** 44:23
  59:1,2 79:21 80:8
  125:13 259:15
  262:23 263:8,23
  265:1 266:12
  268:10 269:10
  301:10,14,17
  302:4
**intimidate** 275:14
**intimidating** 277:4
**introduce** 152:25
  229:5 230:14
  254:24 275:6
**introduced** 47:4
  110:24 144:7
  201:25 212:9
  229:4
**introducing**
  124:15 132:2
  135:22
**introduction**
  57:16 140:7
  143:16,24 144:3
  164:1 202:24
  212:9
**intubation** 154:12
**inventory** 55:12
  306:10
**investigated** 124:5
**investigators**
  276:23 277:22
  278:10
**invited** 99:15

**invoice** 3:24,25 4:3
  4:4,5,6,7,8,9,10
  296:1,18 297:10
**invoices** 43:22
  55:1 295:24 296:2
  297:6
**involve** 11:25 12:5
  37:1,12 42:17,20
  43:8 88:12 127:3
**involved** 11:2 22:5
  34:17,23 37:7
  83:24 131:7
  214:22 239:15
  287:24
**involvement**
  214:14,16
**involves** 185:5
**involving** 11:7
  12:9,17 30:14,18
  31:8 36:12 38:13
  61:12 131:4
  135:12 212:15,20
  291:13
**irb** 68:22 71:20
  72:5,13,14,17 73:3
  73:9,13,19,21,23
  73:25 74:4,5
  75:19 76:3 289:9
  289:19,22 290:1,6
  291:7,15,18,19
  292:3,21 293:3
**irbs** 71:21 72:8
  73:18 75:5,24
**irrelevant** 222:23
  223:19 265:22
  283:9
**irwin** 3:21
**issue** 23:16 29:19
  30:10 32:15 40:9
  41:23 42:7 65:3
  66:16 104:5 109:3

  134:24 135:16
  140:10 158:10
  160:8,13 182:18
  188:24 189:15
  200:1 205:7,11
  211:9 215:15,18
  222:24 230:6,7
  240:14 253:1
  266:16 284:14
  287:25
**issues** 14:23,24
  17:13 28:13 29:12
  32:19 66:17 98:6
  110:17 112:17
  137:18 138:10
  151:20 158:14,22
  168:10 179:5,7,8
  214:22 229:13
  230:11 266:23
  286:23 293:25
  303:16
**it'll** 238:13 295:1
**item** 238:2
**item's** 292:6
**itemized** 247:9
**items** 143:7
  144:18 180:15
  217:2

**j**

**jamming** 89:2
**january** 64:6
**jargon** 93:14
**job** 1:22 29:8
**jobs** 33:5 34:3
**joel** 185:4 188:3
**john** 2:10,21 5:15
  5:20 6:12 8:11 9:3
  11:2,10,15 40:24
  46:4 47:2 51:12
  55:3 76:18 79:8
  85:25 86:10,20

106:13 109:25
117:14,20 168:6
199:17 279:3
295:3 305:6 307:6
310:1
**josborne** 2:13
310:2
**judge** 58:9
**judgment** 56:24
58:3,18,24 61:9
245:5 264:4
265:17,24 278:5,6
281:21 282:8,22
**judgments** 56:21
57:10,19,22 58:6
59:5 60:12,18,19
81:2 238:14,15
240:11 246:20
280:7 299:4
**july** 3:16,23 103:6
190:11 254:2
**june** 3:14,23 25:10
25:12,16 62:1,9,11
62:13,17,23 63:15
65:18 78:15 89:12
103:5 181:11,20
182:7 198:15
225:9,15,19
232:17 233:6,8
245:1 247:6
**jury** 28:4 72:17
95:23 96:2,8,12
97:4 103:14,14,22
111:8 140:13
143:12 144:10
298:4 299:10
**justified** 266:1

**k**

**k** 1:25 2:5 309:4
**kathleen** 1:4 5:8

**katie** 5:16,21 7:9
168:2 259:16
260:7 262:23
263:9,15 264:6,16
265:2 266:12,16
268:10 269:11,13
270:22 273:2
274:19
**keep** 26:9 170:4
226:10 228:20
229:14
**keeping** 132:23
169:2
**keeps** 181:5
**ken** 235:18
**key** 79:15 126:1
149:13 158:13
209:3 235:19
245:3 250:12,13
250:13
**kid** 179:19 228:20
**kids** 66:15 101:7
221:19
**killing** 169:11
**kind** 30:10,11 35:3
47:15 55:12 75:7
75:25 100:2,3
107:24 125:22
139:3 154:10
169:17 207:2
229:21 242:24
243:20 254:23
283:15 289:9
**kinds** 102:19
287:19
**kitty** 121:23
**kleenex** 42:4
**knees** 207:25
210:4
**knew** 42:13 63:4
64:7,25 143:9

163:2,13 180:8,10
218:2 232:18
233:7 234:13
263:13,13 265:14
271:16 272:20
273:5 274:23,25
275:22 276:25
**know** 6:4,4,8 7:21
8:5 10:3 11:19,21
12:25 13:3 15:18
15:24 20:19 26:17
26:20 27:16 28:18
31:11 32:13 34:18
35:9,14,25 37:22
38:11 39:17 40:7
40:20 41:3,4,5
42:5,8,12,14 43:1
43:10,23 44:1
45:2,9 47:5,6,8
49:7 50:1,13 51:5
51:13 52:18 53:22
55:20 56:12,12
60:25 63:21 64:1
65:4 66:13 67:12
67:14,19 69:7,22
69:24,25 70:15
71:15 72:10,11
73:24 75:17,23
76:24 77:3,10,24
78:8 79:8 84:3
85:17 86:6,7
87:16 89:9 90:11
102:2,11,17,23
103:17 104:23
110:25 112:17
116:22 117:5
118:2 122:4 124:9
127:20 129:6,10
132:7,12 134:17
135:8,11 136:4,12
136:22 147:20,24

150:6,8,9,14
151:15,19 152:2
152:22 155:25
156:17 163:16
166:24 168:10
169:10,12 170:24
172:9,10,12 175:2
176:21 178:12,14
183:19,19 184:8
185:7,14 186:13
186:17 190:17
197:2 198:5,6,22
199:3,16,21
200:24 201:5
204:2 206:10,12
206:13 211:10
218:1,4,7 222:10
222:12,24 223:3,8
224:14 225:10
226:25 229:24
231:17 234:8,21
235:25 243:20
245:4,25 246:9
248:5,8 253:5
254:6 258:9 260:7
260:11 261:10
263:12 265:11,15
268:23 271:16
272:5,21,21 273:8
274:22,23,25
275:4,9 279:14
281:17 291:25
292:9,23,24
293:15 295:25
296:4,12,14,20,22
297:8 298:25
302:9 304:2
**knowable** 132:15
**knowing** 150:11
**knowledge** 142:21
240:15 242:23

Alison Vredenburg, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[knowledge - listed]

Page 29

243:20 245:21
246:5 271:2 301:1
**known** 13:21 77:5
101:6,7 107:7,16
112:17 127:1
132:14 163:2,5,6,8
163:11 185:6
233:11 234:14
243:17,21
**kristin** 12:24,25
13:8,15 19:8

**l**

**lab** 142:25 143:3
143:13,15 144:2,5
144:10,23 146:5
156:3,14 157:3
291:23 292:2
**label** 3:17 64:14
64:16,17,19 65:16
65:17 66:5,6 67:7
67:10,25 110:13
183:6 194:9 195:2
195:16,19 196:11
196:25 197:15
198:3,23 199:4
206:3,22 207:2
208:6,22 209:19
210:7 211:5 215:5
216:6,7 218:17
221:17,22 223:17
224:15,19,21,23
224:24 226:24
227:20 238:10
240:23 241:4
244:9,12,16,17,22
245:20,22,24
246:1,2 251:9
253:14 258:25
259:12,21 299:12
**labeled** 53:11
170:21 221:21

259:13,20
**labeling** 70:1
279:20
**labels** 69:23,24
199:9
**lack** 15:1 120:7,17
120:19 284:15
299:12,20 300:15
**lag** 171:23
**landscape** 21:17
**language** 205:18
205:23 208:18
209:23 210:2
211:16 216:19
217:23 223:25
224:4 225:2,4,8,15
226:24 228:11
229:21 230:1
234:3,15 244:25
249:7 258:11,20
259:4 264:7
**languages** 237:7
**large** 20:1
**largely** 54:4
**larger** 52:14
206:21
**late** 235:18
**laugh** 277:8
**law** 41:1
**laws** 308:5
**lawsuit** 7:9 275:23
277:23 278:11
**lawyer** 281:23
283:2
**lawyers** 262:12
268:14 273:2
**laying** 155:11
**laypeople** 178:14
180:11
**layperson** 180:9

**lead** 290:12
299:18
**leader** 24:15
**leadership** 25:9
**leaflet** 241:19
242:1 257:3
**learn** 26:25 132:8
**learned** 17:23
22:10 29:18
131:23 133:9
173:11
**learning** 14:2
27:23 77:16,18
109:9 110:17
132:1 264:12
**learns** 129:18
**leave** 59:4 141:3
141:17 142:5,18
153:20 154:7
176:2,3,5 205:15
208:13 241:19
269:17 305:1
**lectured** 98:21
**left** 22:19 23:7
149:7 175:9
303:10
**legal** 5:15 255:19
262:14 283:2
304:2,4 310:23
**legally** 51:7
254:16
**length** 139:5
154:20 235:12
**letters** 121:6
123:17 129:13
**level** 16:11,13,14
16:16 26:8 74:24
75:2,12 102:4
112:20 220:16
228:19 293:16

**levels** 16:10,14
**liability** 28:22
29:4
**life** 126:6 138:1
253:21
**light** 286:14
**liked** 265:20,21
**likelihood** 57:20
58:18 60:13
**limit** 36:5 63:5,8
63:23 64:1,3,9
183:25,25 222:12
224:7 231:4
**limitations** 30:9
103:21 194:14
**limited** 76:25
104:1 114:17,25
115:5 280:21
281:1
**limiting** 109:2
**line** 192:14 251:17
311:4,7,10,13,16
311:19
**lines** 140:21
141:10 154:3
157:15 162:15
**link** 19:20,21
83:17 84:25
**linked** 226:12,14
235:20
**list** 19:1 85:9 93:2
93:11,12,13
136:16,23,23
137:5,23 144:24
238:2 246:25
294:24 296:21
**listed** 18:25 19:2
21:11,12 91:8,11
94:11 123:1
136:13 138:23
183:12 185:24

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[listed - mail]**                                                      Page 30

187:10 209:11
210:3 221:9
227:23 237:13
**listening** 260:8
**listing** 184:11
**lists** 91:9 93:8
289:14 292:17
**literally** 51:14
**literature** 283:15
297:9
**litigants** 273:22
**litigation** 22:2,6
22:25 23:2,10,15
24:3,18,24,25 25:4
25:23 31:10 33:2
35:4,10,13 45:7,21
92:15 114:23
127:7 212:13,21
260:16 261:6,22
266:6 277:1
**litsup** 310:15
**little** 6:14 15:15
18:9 27:12 43:23
45:1 48:17 49:15
52:9,14 90:6 92:7
103:12 114:16
118:7 133:18
140:10 142:20
148:4 169:19
220:1 221:3 233:2
280:19 286:24
300:6
**llp** 2:10,16
**load** 193:19
**located** 189:21
190:20
**location** 57:2
58:13 158:20
183:8 189:18,21
190:20 191:8,13
192:7 195:25

196:3,8 197:10,22
198:11 211:8
224:10 251:23
252:1,8 285:8
286:3 298:9,11
299:3 300:18
**locations** 154:23
**lock** 287:20
**logic** 131:19
149:24 300:6
**logical** 226:10
**long** 10:4,8,18,24
14:10 15:18 75:9
93:10 100:9
110:25 121:15
169:20 172:11,15
220:10 267:13
283:3 289:14
291:19 292:17
306:18
**longer** 227:7
**look** 24:21 27:11
39:24 43:4,22
49:6 51:14 54:17
56:7 57:15 58:13
64:13 72:25 83:1
85:15 87:3 104:24
118:13 133:14
151:7 152:1 157:6
158:13 167:5
169:10 170:2
171:25 173:7
176:11,24 197:2,6
215:1 221:2
241:15 255:12
271:4 275:20
295:25 305:10
**looked** 39:15
47:24 90:23 91:18
101:12 151:9
157:4,5 173:10

174:24 186:10
187:12 201:11
208:23 220:23
243:5 286:8 297:9
**looking** 27:9 61:22
62:15 64:1,19
70:23 83:13 93:17
108:15 111:12
131:9 143:7
155:15 167:14,16
167:21,22 173:14
176:16 184:14
186:19 190:14
194:18 215:5,10
218:18 227:19
269:2,12 293:19
304:22
**looks** 37:16 56:10
68:10 87:11
166:19 171:4
175:9 200:15
206:7 215:9
245:13,16 279:3,5
306:12
**loose** 177:11,21,22
178:1,7
**loosely** 182:24
**los** 308:2 309:2
**losing** 34:18
**lot** 17:14 24:6
25:13,14 27:16,17
27:21 29:18,20
30:7 32:10 33:17
34:20 35:17 36:2
44:3,3,5,11,22
47:16 52:25 65:15
71:25 89:1 99:23
100:6,9,12,18
101:14,24 125:10
126:1 131:11
135:8 140:8,9

179:6 231:2,10
235:17 238:16
239:14 242:24
245:11 275:12
279:8 287:20
288:10 289:1,4
292:13 301:25
302:2
**lots** 32:16 35:21
82:5 98:4 106:18
107:5 272:10
**louder** 6:14
**loudly** 8:19
**low** 21:18 39:4,5
73:1 74:23 75:2
77:7 191:1 196:2
218:4
**lower** 16:14
235:25
**lowest** 73:4 75:5
196:2
**lunch** 113:9,9,12
121:14 122:9
285:17

**m**

**ma'am** 35:8 87:13
163:7 185:15
**machinery** 88:9
**mad** 167:24
**magnet** 17:24,25
101:23
**magnets** 17:6
101:7,23 102:22
**mail** 12:22 52:4
86:20,21 129:9
185:24 186:1,12
186:17,25 187:2,3
187:6,7,11 219:7
219:24 224:20
248:20,22 249:4

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**mailed** 48:7 263:18

**mails** 50:12,24 123:17 129:14 131:24

**main** 26:20 105:25 242:3

**majority** 35:18 152:19,23

**making** 64:18 73:15 111:23 214:3 215:25 238:10 272:10 304:23

**manage** 88:6 106:4 113:24,25 114:1 116:15 123:2

**managed** 34:9 116:17 228:17

**management** 15:1 15:1 27:22 28:9 28:15 65:23 87:9 87:18,25 88:14,16 123:6 255:21 256:2,3

**manipulate** 78:25

**manner** 79:5 201:1,6,10 225:24 266:20 277:4

**manners** 192:2 277:4

**manning** 129:6

**manual** 236:20

**manufactured** 43:9 204:19 205:8

**manufacturer** 24:10 33:8 39:17 113:5 124:11 164:4 293:17

**manufacturer's** 130:13

**manufacturers** 102:8,12,13,18 125:4 283:14

**margins** 89:10

**mark** 46:2,9 54:1 54:18,21 59:12,13 86:14 103:4 281:6 293:10 295:23 296:7

**marked** 46:25 86:10 103:3 168:25 169:5 206:21 231:22 294:12,24 295:3 307:15

**market** 15:2,5 24:9 35:12 100:11 100:11 110:24 111:1 114:2 124:10,15 132:24 134:10,11,12 135:23,23 140:7 143:1,16,24 144:3 144:7 164:2 201:25 202:3,24 203:11 211:20 212:4,7 228:23 231:1

**market's** 202:6

**marketed** 31:15 31:18 32:22 38:1 65:21 68:14

**marketing** 84:2 199:7,24,24

**marketplace** 153:1

**marking** 86:13

**mary** 1:25 2:5 309:4

**mask** 8:16 223:20

**massive** 206:6

**master's** 29:9

**match** 51:11

**matched** 168:24

**material** 44:4

**materials** 88:8 93:3,8,11,13 100:12

**math** 296:25

**mattel** 1:8 2:15 5:9 5:23 6:1 7:8 39:21 43:9 102:10 129:1 129:9 143:8 171:4 275:24 303:23 310:4 311:1 312:1

**matter** 5:8 115:16 146:14 218:2 229:9 293:24

**mattered** 265:20

**matters** 262:15

**mattress** 207:11

**maximize** 279:20

**maximum** 219:13 224:9

**mean** 11:5 36:2 47:7 49:9 55:20 58:8 64:5 72:4 81:22 82:4 95:8 96:7 105:18 107:12 123:11 124:20,22 125:10 126:11 140:6 154:10 156:8,19 200:22 215:19 219:21 221:21 226:4 230:5 237:5 238:11 244:18 245:25 250:25 251:2,24 253:15 267:24 271:7

274:2 277:3 286:20 288:8,10 289:1 294:11 297:4 301:23 302:17

**meaning** 123:19 158:17

**meaningful** 234:21

**means** 28:4 104:23 107:20 134:7 173:25 206:13 238:13 297:15

**meant** 219:11,12 219:22 221:14,15

**measuring** 68:6

**mechanical** 139:10 143:24

**mechanics** 138:9

**mechanisms** 96:24

**med** 289:25

**medical** 29:23 95:4,7,23 96:9,10 99:25 108:16 110:8,9 221:5,8 230:17 233:18 303:16,20

**medley** 1:25 2:5 5:17 309:4

**medley's** 168:3

**meet** 89:23 90:2,5

**meeting** 8:3 15:11 15:21 17:8,17 18:3

**meetings** 14:14 16:6,16

**member** 14:7,10 16:8,11,17 63:3,3 98:5 130:10

**members** 14:18 16:15 17:8

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[memories - n]**                                                                                          Page 32

**memories** 79:19
**memorized** 148:16
**memory** 17:4
21:23 37:1,12
133:25 136:16
157:7 161:19
**mentally** 151:22
**mentioned** 20:16
21:2 66:11 89:22
102:21,23,24
105:7 185:25
209:8 218:17
220:23 280:24
**mentions** 210:15
**mentoring** 24:17
25:9,13
**message** 177:14
222:2
**met** 22:7
**method** 112:3
**methodology**
111:6,8 193:7
**methods** 131:24
**mic** 26:8
**microphone**
122:16
**microphone's** 8:13
**middle** 31:4 168:3
**milestones** 67:2,4
209:13,17 220:4
**mind** 23:9 31:19
97:3 167:5 267:3
270:1,13 275:2
305:15,22
**minds** 80:4
**minimum** 231:3
**minutes** 16:2
113:7 121:14
275:3 276:7
303:10

**mischaracterize**
106:24
**mischaracterizing**
230:24
**missed** 113:13
125:5 257:23
**misses** 124:3,7
**missing** 20:7 209:3
217:8 230:6 245:3
260:20 261:11
296:1,5,14
**misstates** 71:6
**mistake** 48:2
**misunderstood**
285:12
**misuse** 149:3
289:5
**misuses** 193:10
**mitigate** 72:22
221:25 223:11
229:23 230:19
287:11
**mitigated** 65:25
**mo** 90:2
**mobility** 27:17
**mochrie** 235:18
**modes** 254:18,21
255:3 256:6
**modifications**
112:18
**mom** 63:23
**moment** 7:24
113:7 192:11
**momentarily**
90:21 295:2
**moments** 297:25
**money** 34:18
**monitor** 70:18
**monitoring** 260:10
291:11

**monitors** 295:5
**month** 10:21 24:6
25:2 36:12 63:5
63:22 64:8 220:2
220:4 221:11,11
221:11 225:3
231:4 252:24,25
252:25 253:2,6
259:4,11 286:4
**months** 36:7 63:24
66:2,11,19 67:2,4
100:10 151:5,9,17
151:24 157:5
161:18 174:25
185:6,7,7,8 190:13
218:22,25 219:1,3
219:5,11,12,13,14
219:23 220:10
221:15,18,23
222:1,5,6,11,12,21
222:21 223:16,16
224:8,9,20 231:5,7
232:6 241:22
249:3,8 252:20
253:4 258:16,19
259:2,11
**morning** 5:3,4 6:5
7:3 90:14
**mother** 63:24
**motion** 282:21
283:22 284:9
**motions** 3:20
281:25
**motivation** 28:13
**motor** 32:17
**motorcycle** 27:25
**movable** 198:19
**move** 59:22
135:17 152:16
197:23 199:23
215:3 252:11

269:23 280:1
**moved** 22:14
31:13 303:24
**moves** 75:10
**moving** 206:12
245:14 252:12
**multiple** 181:24
**multiply** 127:20
**mute** 192:15

**n**

**n** 3:17 11:25 12:5
12:9,17 13:14,17
13:22 14:1,13,19
14:21 15:22 16:20
17:19 35:5 36:13
37:2,8,13 69:5,21
71:3 79:13,25
83:12 84:24 93:23
96:14,25 97:6
102:20 103:15
104:14 106:5,9,21
107:22 108:24
109:14 110:13,15
110:25 112:5
114:8 115:19
116:10 118:11
119:7,14 120:21
121:2,24 140:2
142:9,17 147:1
151:1 160:1 161:8
165:12,19 182:10
182:17 183:4,15
183:18 187:25
196:18,23 197:25
198:1,19 200:8,15
200:20 201:9,21
202:21 203:1,3,7
203:17,21 204:18
205:8,24 208:22
210:6 213:20
222:5,20 223:15

Case 2:19-cv-02689-GMS    Document 196-42    Filed 11/19/21    Page 114 of 144

Alison Vredenburg, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[n - number]

Page 33

223:17 228:8
230:22 232:1,13
232:23 233:20
234:18 240:21
241:1,2,6 242:23
243:17 244:9,12
244:15,25 245:8
245:22 246:4,5
249:1 254:14
257:20 263:10
264:1 273:22
284:23 286:25
287:2 303:18
**name** 5:15 7:7
22:12 34:22
130:13 275:7
288:12 297:8,8
**named** 102:14
297:7 309:6,11
**nanny** 100:17
189:12,14
**nap** 149:9 150:5
189:11,14
**napkin** 296:25
**napping** 149:10
**narrow** 30:17
**nature** 17:7
210:13,23 216:23
217:7 218:9 226:2
226:5,18,20 227:2
235:9 240:17
294:17
**ne** 2:17
**near** 124:2,7
**necessarily** 32:22
47:20 100:1
102:15 123:11
182:12 245:12
252:12 284:8
**necessary** 120:24
208:8 259:5 312:6

**neck** 193:18
**necks** 193:16
**need** 16:11,12,13
20:6 34:9 54:13
56:23,23 67:8
70:1 72:15 73:11
74:13 77:19,24
80:5 103:11
112:19 116:16
117:2 118:20
120:2,3 135:23
144:20 148:15
150:17 162:21
164:12,16 168:11
178:15,16 191:19
193:16,18 194:15
194:22 195:21
196:12 198:5,10
201:12,12,16
202:25 220:9
227:5,8 229:6,18
230:16 231:15
234:24 235:1
236:18 245:17
246:16 250:15,20
251:6 255:6 266:8
266:25 285:14
288:2
**needed** 48:5 66:8
71:25 79:20 146:1
163:15 211:13
218:8 230:7 234:8
245:4 265:14,24
266:10 272:21
300:23
**needs** 57:7 100:4
111:16 120:4
124:4,18 146:16
146:19 149:21
197:11 212:6
224:12 228:19

253:8 255:6,7,12
**negate** 164:6
**neither** 12:5
119:15 139:20
**neonatologist** 95:2
**neonatologists**
221:8
**neonatology** 95:9
**nervous** 168:14
**never** 73:9 74:1,2
75:17,20 97:9
98:18,21 102:25
137:22 167:3
169:19 205:14
207:11 208:13
213:19 266:22,23
268:13 269:19
278:2 287:9 289:3
292:21 305:22
**new** 24:7,8 25:12
35:11 40:16 77:12
77:15 99:4,4
110:16,19 121:9
124:16 132:3
135:22 229:1
230:13 241:7,11
247:21,24 290:25
**newborn** 191:23
221:20
**newest** 99:7
**newish** 99:5
**news** 13:20 242:19
243:18
**nice** 169:10
**night** 85:19
**nightstand** 196:7
**non** 50:2,22
205:18
**noncompliance**
56:22 57:21
238:22

**nonemotional**
76:2
**nonemployee**
80:12
**nonemployees**
74:16
**noninfant** 101:13
**nonmember** 16:18
**nonresponsive**
67:17
**nonsafety** 214:15
**nonuse** 37:24
38:15 41:22
**normal** 7:17
**normally** 87:2
237:15 284:1
**notary** 312:13,19
**note** 85:2 310:10
**notebook** 305:15
**notebooks** 169:9
169:16 305:9,12
**noted** 312:7
**notes** 48:13 89:8
89:10 304:14
**nothing's** 90:4
**notice** 3:9 46:3,11
55:8 57:1 70:21
126:23 127:19
131:9,14,17,21
132:9,17,18 133:4
133:10,12,13,19
133:24 134:3,18
134:24 135:1,2,3,6
135:14 149:2
215:25 234:16
240:3
**noticed** 56:20,22
57:19
**nowadays** 129:12
**number** 5:11 6:5
45:4 46:17 49:16

52:17 56:8,17
65:12 85:16,17
86:4 87:20 126:24
137:16,23 138:17
138:24 139:12,14
140:3,17 141:5,18
142:7 145:18
152:7 153:3,24
154:15 157:10
160:16 161:14
162:11 166:5,9
167:2 172:8
174:20 175:9
176:21 182:1
185:13 214:7,11
215:6 216:6
219:16 231:23
247:6 254:1
259:21 269:25
275:4 281:5 294:2
294:4 295:17
303:17
**numbered** 50:2
**numbers** 49:15
144:24 163:1
164:25 167:1
259:19
**numerous** 250:1
**nurse** 71:24

**o**

**o** 306:21
**o'clock** 113:12
285:16
**oath** 262:13
264:17
**object** 62:2 78:3
218:12 277:5,25
278:12
**objection** 106:14
260:3

**objective** 276:23
277:6,22 278:10
**obtain** 55:19
**obvious** 11:22
146:7
**obviously** 20:2
59:23 126:4 162:8
177:22 178:1,4
192:12,15
**occasionally**
252:11
**occasions** 9:6
122:23 260:17
**occupational** 87:9
87:18 88:12
**occur** 20:16
153:22 211:23
**occurred** 14:13
64:15 121:24
124:6 142:22
144:6 172:7 174:1
174:6 182:6,11
183:2,14 211:22
263:9
**occurrence** 174:2
**october** 63:12
181:7,10 310:3
**offer** 38:14 45:19
51:6 95:5,22 96:2
97:4 104:9,13,18
119:13 165:20
**offered** 40:4 44:16
80:15 94:7 98:1,9
98:14 104:12
115:21 127:8
133:3 212:15,21
**offering** 78:13
81:11 92:17,20
94:24 95:1,12,15
98:13 104:22
109:18 115:7

127:6 221:5
**office** 22:12 43:3
82:12 86:1,11,22
89:24 194:16
297:17
**officers** 276:11,22
277:2,3,5,22,24
278:10
**officials** 145:2
**oftentimes** 20:11
**oh** 8:12 32:10
53:20 57:14 85:8
106:12 125:21
167:24 169:3
200:18 202:11
215:11,23,23
220:21 239:23
248:22 251:4
253:5 266:24
269:2
**okay** 5:25 6:15 8:5
21:24 36:10,22
37:4 40:14 46:6
46:25 53:14 54:23
54:24 76:16 78:23
80:23 83:10,16
84:19 86:3 87:4
87:14,16,20 88:25
91:24 95:15
106:15 122:6,7,18
135:20 136:19
137:4 166:19
170:8 175:12
179:15 184:16
186:22 187:5,6,20
190:22 192:20
198:25 199:6
200:13 206:16
214:17 227:13
231:19,19,23
232:10,13 241:1

254:8 257:11
262:9 269:10
270:7,8,12 278:25
279:15 281:5
290:24 295:15,18
296:15,24 303:11
304:12
**old** 36:12 220:2,4
221:11,11,11
222:6
**older** 66:14 185:5
**olson** 5:21 62:1
93:24 96:13 97:6
131:5 175:18
177:5 182:11,17
225:16 233:19
249:23 250:23
251:10 259:22,25
266:15 269:22
270:1 284:23
302:9
**olson's** 61:1
132:19 298:7,18
299:13,21 300:16
**once** 9:7 14:15
65:1 86:9 152:25
229:19
**one's** 55:21 100:10
**ones** 17:2 31:18
45:16 48:6 99:18
131:6 137:2 161:4
194:20 237:16,17
237:17,22 261:14
301:2
**online** 29:22,23
129:12
**open** 86:25
**opinion** 63:17
65:16 80:20 81:4
106:2,3,8,23 115:4
115:16,18 116:9

119:14 120:5
121:3 123:2 127:8
212:15 216:18
218:21 231:16
233:5 242:11,16
283:16 284:11
285:23 286:9
297:25 299:20
**opinion's** 115:12
**opinions** 9:2,17,20
11:8 18:5,7 19:10
37:22 38:15 40:4
40:17 44:2,15
45:19 56:4 76:15
78:12 80:14 81:6
81:11,12,19,24
82:2,4,25 83:22
87:19 92:6,16,20
92:24,25 93:15
94:7,15,20,24 95:1
95:5,12,16,23 96:2
97:4 98:1,10,13,14
103:23 104:10,13
104:18,22 105:22
106:19 108:3,16
109:17 111:7
114:17,25 115:6
115:20 116:11,13
119:12 124:1
127:7,23,25 133:3
137:18 157:1
165:13,20 221:6
231:12 268:2
280:20,25 281:2
281:19 282:6,7,16
282:19 284:12
303:1,21,25 304:1
304:6
**opportunities**
240:22 252:18
253:10

**opportunity**
257:23 262:12
305:1
**opposed** 27:15
58:19 68:11
102:18 113:4
121:25 174:5
265:9
**opposite** 158:16
158:17
**optimal** 223:10
**optimize** 27:4
**order** 3:20 29:22
34:7 53:1 112:23
192:5 212:6 217:2
220:17 227:5
234:25 266:2
281:7 296:8,13
**ordering** 30:1
**organization**
71:16
**organizational**
28:2,5
**organizations**
61:19
**organized** 171:3
**oriented** 290:25
**original** 10:23
19:4 21:2,7,14
50:6 59:14,19
200:11 224:14
255:24 256:1,7
309:15
**originally** 176:11
**osborne** 2:10,10
5:20,20,25 6:3,15
6:17 8:9,12,14,17
8:20 9:3 11:2,10
18:19 21:18 26:4
26:7 31:3 37:6
39:4 40:24 46:7

46:24 47:5 50:25
52:1 53:15 55:6
59:8 62:2 63:18
65:10 76:10,17,19
78:3,9,23 79:9
80:22 85:20,23
86:6,18,21,24 87:2
89:16,24 97:22,24
106:11,14 109:20
110:1,4 113:6,13
113:16 115:8,22
115:25 116:12,23
117:12,17,23
118:3,12 119:16
120:9,16,22 121:5
121:13,18,20
127:10 128:3
130:3 132:21
135:7,16,20
144:13 148:14,23
149:5 151:2
153:12,18 155:7
156:21 159:3
160:2,4 166:25
167:7,12,21 168:1
169:8 170:1,9
177:8 179:16
180:7 182:13
192:10,19 195:3
195:17 199:14
203:23 210:10
212:18 213:1
217:25 218:12,14
223:18 225:18,20
228:2 233:10,23
234:20 237:3
238:8 243:14
246:8 248:7,21
249:24 252:4
261:9 267:9,17,22
268:7,24 272:4

273:4,12,24 276:1
277:25 278:12
294:23 295:5,10
295:13,18 298:19
299:22 300:8
301:16 302:21
303:7,11,19 305:8
305:21 307:8
310:1
**osborne's** 297:16
**osha** 23:17
**osr** 128:10
**outcome** 277:7,8
**outline** 34:12
**outs** 181:25 182:9
182:20,22 183:2
183:12 184:4,11
184:21 185:3,23
**outside** 25:6
219:13 246:10
**overall** 81:11,19
**overlap** 61:17
**overnight** 147:14
147:16,21,25
148:2,13 149:1,12
150:4
**owned** 203:6
**owner's** 236:20

**p**

**p** 306:23
**p.m.** 113:8 307:20
**pacifiers** 55:16
56:11 57:5
**packaging** 100:14
241:19,23,25
**pad** 207:10,18
210:17
**padding** 58:17
60:6 207:12 209:6
210:18 217:17

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[page - people]**

**page** 3:2,8 4:2
6:23 36:8 46:16
49:16 56:16 57:14
59:18 60:11,25
61:23 63:6 64:10
64:20 65:17 67:7
78:21 88:3 106:1
118:13 119:22,23
122:15 137:7,16
137:23 138:17
139:12 152:6
164:24 166:5
175:8,14 180:20
181:23 184:17
185:13 186:25
187:4,6,21 188:12
188:22 189:17
190:23 195:15
198:13 199:11
200:14 204:4,11
206:2,22 209:7
216:10,11 218:16
219:17 223:24
225:22 227:20
230:20 231:21
242:2 247:10
254:5 256:22
258:14 259:19
266:13 270:1
279:12 280:9
281:13,13 282:25
283:7 311:4,7,10
311:13,16,19
**pages** 83:19 89:4,9
119:22 187:16
231:21 246:25
251:2,4,8 252:16
306:18
**paid** 296:18,23
**pair** 289:23 290:9
290:17,19

**paired** 290:25
**panel** 16:21 98:23
99:1,2,15 100:22
101:12 191:4
193:12 199:10,23
250:12 298:12
**panels** 99:3,9,15
**paper** 288:9,9
**paragraph** 57:16
63:7 84:2 111:5
122:18 180:21
188:23 189:19
225:23
**parent** 66:23
100:5,6 146:21,25
147:6 179:10,13
179:18,18,19
180:17 205:14
259:6
**parents** 67:24
68:16 70:2 71:9
71:14 74:14,15
93:18 94:2 100:18
101:10 149:10
152:12 157:16,18
157:22 177:12
180:18 188:25
191:14 220:19,23
221:2 222:11
228:20 233:16
240:22 242:6,9,17
243:3,12 244:4,8
244:11,15 245:7
245:11 246:15
259:13 266:18
267:14 272:11
273:21 285:2,6,24
285:25 286:6
288:2 291:11
299:16 300:21
301:11,15,18

**part** 24:16 25:8
34:21 37:25,25
38:10,12 57:24
60:14 62:5 67:16
80:25 81:22 82:2
90:7 98:4 109:6
124:11 128:6,11
142:8,12,16
154:11 168:8
193:14 209:1
217:8 219:10
223:12 236:16
249:17 256:2,3
280:11 301:4
**part's** 255:22
**participants** 74:3
**participated**
145:19
**particular** 9:1,14
11:1,16 12:21
18:2 20:20 27:13
30:24 38:13 50:20
60:25 62:9 72:5
82:2 83:21 92:22
93:22 104:19
107:25 111:5
112:13 120:7
127:24 128:16
130:20 132:10
139:19 145:6
149:2 166:4
168:16 171:10
172:1 174:17
180:6 184:13
185:24 187:3,6
188:7 204:19
205:18,23 209:25
213:14 214:23
216:18 232:16,18
248:23 255:15
258:11 261:6

274:12 283:7
291:13,13,14
296:13 299:5
**particularly** 78:21
125:19 240:20
**parts** 35:22 217:9
245:14,15
**party** 3:21 38:3,12
262:7
**pass** 54:16 103:9
162:2 289:12
307:6
**passed** 65:19
100:8,13 215:12
241:22
**patient** 28:17
100:2
**patients** 123:13,23
**pay** 27:4
**peachman** 83:5
**pedestrian** 27:25
**pediatric** 95:11
221:6
**pediatrician** 94:24
122:22 221:9
**pediatricians**
120:11
**pediatrics** 95:8
**peer** 283:14
**penalty** 308:5
**pending** 9:24
11:19 277:23
278:11
**people** 24:11
25:14 26:24 27:6
28:12 30:1,3
68:10 70:8 74:2
74:21 75:11 76:22
76:24 77:7,8
79:16 88:2 104:6
106:16 108:17

Alison Vredenburg, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

111:25 114:3
129:11 135:4
138:10 143:9
146:3,7 147:20,25
150:6,7 156:10
164:10 177:13,17
190:3 191:3,23
194:16,16,22
202:15 203:9
204:8 218:1,3
223:2,7 225:12
227:1 232:25
234:7,23 235:22
238:13 240:16
243:20 246:13,16
246:19 252:23
253:17 287:22
299:2 300:20
**people's** 80:3 81:1
**perceived** 294:20
**percent** 34:2,15
36:17 44:9 54:6
73:10 74:4 111:21
126:20 127:21,21
149:20 222:8
223:6 252:16
**percentage** 24:23
145:18
**perception** 241:12
279:23
**perceptions** 57:22
58:21 59:25 60:19
280:6
**perfect** 8:21 232:7
232:9 257:23
**perform** 111:9
175:16 242:16
**performance**
29:11
**performed** 291:6

**period** 196:19
**periods** 196:22
**perjury** 308:5
**permission** 50:18
51:21
**permit** 51:2
**person** 172:21
240:19 249:12
261:20 262:10
265:7 273:13
274:24 291:5
**personal** 70:8
**personally** 13:22
56:13 97:9
**personnel** 28:13
**perspective** 65:23
135:15 178:22
211:23 216:17
230:10 233:18
263:11 299:1
**pertaining** 98:15
**pertains** 309:15
**ph.d.** 1:17 2:2 3:3
3:19 5:7 6:19 23:4
28:1 290:5 301:21
308:4,14 310:5
311:2,24 312:2,4
312:12
**pharmaceutical**
23:15
**phase** 161:8 163:4
163:12
**phd** 3:10
**phone** 12:22 27:8
192:11 260:13
261:21 262:4
297:12
**phones** 129:7
**photo** 201:17
**photocopy** 84:22

**photograph** 3:17
192:5,6 200:14
237:22
**photographed**
193:22
**photographs**
154:21
**photos** 154:24
194:22
**photoshopped**
258:22 259:1
**photoshopping**
258:23
**physiological**
229:13
**physiologists**
229:17 230:17
**physiology** 193:15
**picking** 9:19
**picture** 191:9
195:7
**pictures** 138:20
194:18 195:15
197:1
**piece** 288:8
**pieces** 89:2
**piedmont** 2:17
**pilarz** 121:23
**pile** 206:6,6,11,12
**pile's** 206:12
**pillow** 207:12
**pinch** 40:9,12,13
43:5
**place** 131:7 191:3
191:11,21,22,23
193:17 195:22
199:25 201:9,21
203:8,10 204:9
222:4 250:12
258:3 286:4
309:11

**placed** 200:16,20
200:25 201:18
239:25 249:9,12
249:22 250:23
251:10
**placement** 103:19
158:21 201:11
249:21 250:2,21
251:8,16,19 298:6
298:17
**places** 70:11
196:13 237:21
**placing** 196:25
222:19
**plaintiff** 1:6 2:9
7:9 9:21,22 26:12
45:8,11,12,17,20
45:22,24 46:1
107:4 201:4 261:5
262:22 266:5
281:23 282:11,13
**plaintiff's** 8:22
12:16 18:6,8,12,14
18:18,23 19:2
20:21 46:12 49:20
54:20 68:25 117:3
130:25 170:18
172:23 184:5
186:5 281:22
282:22 284:16
296:19 298:2
**plaintiffs** 26:1
44:24 58:1 59:1
60:3,22 61:5
79:22 80:8 91:14
104:8 157:20,23
157:25 191:14
211:2 242:10,15
260:17 261:1
269:13 282:17,18

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[plan - ppe]** Page 38

**plan** 12:8 47:15
95:22 103:13
113:9 289:15
**play** 3:17 11:25
12:5,9,17 13:14,17
13:23 14:1,13,19
14:21 15:22 16:20
17:19 35:5 36:13
37:2,8,13 69:5,21
71:3 79:13,25
83:12 84:24 93:23
96:14,25 97:6
102:20 103:15
104:14 106:5,9,21
107:22 108:24
109:14 110:13,15
110:25 112:5
114:8 115:19
116:10 118:11
119:7,15 120:21
121:2,25 140:2
141:7,15 142:9,17
142:25 143:3,13
143:15,19 144:2,5
144:10,23 146:5
147:1 151:1 156:2
156:14 157:3
160:1 161:9
165:12,19 182:10
182:17 183:4,15
183:18 187:25
196:18,23 197:25
198:1,19 200:8,15
200:20 201:9,21
202:21 203:2,3,7
203:17,21 204:18
205:8,24 208:22
210:7 213:20
222:5,20 223:15
223:17 228:8
230:22 232:1,13

232:23 233:20
234:18 240:21
241:1,2,6 242:23
243:18 244:9,12
244:15,25 245:8
245:22 246:4,6
249:1 254:15
257:20 263:10
264:1 273:22
284:23 286:25
287:2 291:23
292:2 303:18
**playing** 208:13
**playpen** 109:13
**pleadings** 304:5
**please** 5:18 31:5
46:24 47:10 56:16
57:13 59:18 60:11
78:6 162:2 186:19
192:13,18 199:12
199:15 223:20
252:5 268:25
269:4 275:19
**plenty** 191:7
**plug** 263:6
**plus** 52:5
**point** 19:22 20:5
22:16,20 24:8
28:21 29:3,9,13
30:22 31:7 40:9
40:12,13 43:5
51:1 63:12,14
64:18 65:7 68:1
76:12 77:5,10,14
77:14,19,21 91:4
91:17,21 93:19,21
125:6 126:8
148:16 151:17
157:4 163:20
168:6 171:1
177:12,16 179:4,5

195:24 197:3,9
212:11 221:14
223:5 226:18
227:8 236:7
243:15,19 244:3
255:11 265:11
272:7 273:15
280:10 288:4
291:22 300:10
**pointing** 280:14
**points** 63:11 153:1
**police** 191:10
274:2 276:11,17
277:5,21,24 278:9
**policies** 129:17
**policy** 129:25
**population** 74:17
100:7,17 229:7
**pose** 107:15
213:25
**posed** 108:18
213:21 234:17
**poses** 119:9
213:15
**posing** 118:22
**position** 76:5 87:4
139:17 140:19
141:1 143:18,18
151:4,14,16,19
163:24 182:25
183:10 187:8,25
190:5 191:7 195:1
195:8,9 196:12
201:3 217:4
249:10
**positioned** 191:10
195:14
**positioners** 102:19
**positioning** 142:8
142:12,15

**positions** 139:11
139:17 190:4
192:4 193:13,22
193:24 195:22
251:14
**positive** 73:12
**possibility** 107:14
**possible** 18:17,20
18:22 70:3 112:18
164:8 211:21
240:7 287:12,22
289:14
**possibly** 13:5
30:21 39:22
218:10
**post** 28:10,17
131:12 154:11
213:2
**postdoc** 289:25
**posted** 202:9
**postincident**
131:10
**postmarket**
124:12,25 132:5
163:21 212:3,8,12
244:2
**potential** 72:25
73:20 74:17
124:18 181:15
220:15 254:21
255:2
**potentially** 159:24
**pound** 66:16
183:24
**pounds** 66:16
183:6,18,19,24
208:1 210:5 219:2
219:9,14
**power** 213:14
**ppe** 70:12,15,19

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[practices - problems]** Page 39

**practices** 28:15
95:20
**pray** 34:16
**pre** 131:9,11,14
**prefer** 49:3 93:13
**preincident**
131:13
**premarket** 68:14
77:12 79:19 125:5
135:3,24 136:3,7
142:4 211:19,25
212:2,8,11
**preparation** 82:13
**prepare** 9:13
10:14 73:22 89:19
89:24 90:9 91:2
91:19 166:21
170:16 174:15
**prepared** 10:9,12
10:19,23 20:20
21:1,7 82:9,12
92:11,23 166:23
174:13,18 176:8
225:1 247:14,25
**preparedness**
29:10
**preparing** 18:6,11
91:16 92:14
**preschool** 31:15
32:18 35:16,17
**preschoolers**
31:20
**prescription** 29:23
**present** 2:11,21
17:8,13 39:12
86:19 87:2 102:3
116:14 138:7
259:24 262:2,5,7,9
291:11 293:23
**presentation**
14:12 16:25 17:7

**presentations** 14:4
14:16
**presented** 119:22
**presenting** 16:19
24:17
**presents** 115:19
116:10
**president** 22:18,22
28:7
**presumed** 57:22
**presupposes**
232:21 233:7
**pretend** 155:13
229:1
**pretty** 6:6,7 13:21
22:20 29:22 39:23
71:21 72:15 73:2
77:5 97:23 105:4
107:7 119:19
222:1 242:22
243:17 246:14
**prevent** 179:1
180:5 207:23
209:5 211:13
217:13,19 220:17
225:24 266:16
**prevention** 28:8
28:15 29:6,12
220:14,14
**previous** 33:16
**price** 1:8 2:15 5:9
5:23 6:1 7:9 35:19
39:20 43:9 63:4
63:11 64:7,25
67:14 74:22 77:3
78:14,20 84:2,24
102:9,23 106:3
116:25 117:6
122:19,23 129:2
129:25 131:15,20
132:7,12,18 133:9

134:17 135:11
139:15,20,25
140:17,23,25
141:5,13,18,25
142:5,7,16,22,25
143:16 145:1,23
145:25 147:10
148:11 149:2
150:17 152:7,18
153:3,9,24 154:5
154:15 155:5
156:1 157:3,10
158:7,23 162:1,11
162:17 163:2,11
166:10 170:22
171:21 172:2,6,25
173:4 174:5
197:19 198:23
199:4,8 218:2,24
224:22,23 225:12
229:2 231:6
232:18,22 233:7
234:7,13 243:16
251:19,20 254:10
254:13 255:16
258:10 259:9
274:5 275:23
291:23 303:23
**price's** 123:2
129:16 146:8,23
**primarily** 203:11
**principal** 191:4
193:12 199:9
250:12 251:20
253:8 298:12
**principle** 235:6,14
236:10 238:24,25
239:4
**principles** 88:16
255:21

**print** 54:11
**printed** 48:3,4
49:12 55:2 83:16
170:25
**printing** 43:3
**printout** 53:24
54:1 55:1 85:11
**prior** 64:22 99:10
124:14 140:7
143:16,23 166:11
171:15 173:19,25
174:1 263:19
283:16 309:6
**prioritize** 88:7
**probably** 14:11
15:9 26:19 30:16
34:15 36:1 45:5
45:12 83:16
102:14 108:7
124:9 127:20
129:4,5,9 140:4
148:7 155:16
173:13 179:15
180:11 184:23
199:23 246:15
288:11,18 292:8
292:11
**problem** 6:12
47:11 75:19 85:1
108:10 113:15
126:18,23 127:19
134:20 136:22
162:7 169:18
177:15,17 186:22
206:17 216:24
243:17 290:19
**problematic**
107:16
**problems** 89:1
101:8,25 102:3
108:2

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[procedure - provided]**

**procedure** 130:1
**procedures** 88:9
  129:17
**proceed** 47:10
**proceedings** 41:10
  55:22 56:2 92:1
  164:20 168:5
  192:22 206:18
  227:15 256:18
  260:4 269:6
  278:14 304:18
  306:6 307:20
  309:14,17
**process** 15:3 18:10
  18:12 61:15 84:1
  88:6 114:21 130:6
  157:2 213:10
  255:10 261:23
  262:2 272:10
  283:25 284:4
  291:19,25 293:18
  304:2
**processes** 130:15
**produce** 128:8
**produced** 3:11
  48:14 86:11
  169:13
**product** 23:14
  24:8,9 29:3 30:15
  30:18,24 31:8,9,11
  31:22 32:21 33:6
  34:17,21 36:6,11
  38:14 39:18 41:17
  41:19,21 42:4,8,9
  42:11,16,19 43:1
  57:20,23 58:9
  60:13,20,21 61:10
  64:22 65:18 67:23
  72:7 74:8,10,23
  76:8 78:15 80:21
  81:2,3 88:20

93:23 97:10
100:14 101:21
102:16 103:1,24
107:13 108:2
111:24 112:12
114:1,2 116:3
124:8,16 132:23
133:13 134:10,15
134:23 135:13,23
143:1 144:7 149:3
161:8 162:13,19
163:3,12 179:2
180:6 181:25
184:22 185:5,6,8
188:24 189:4,14
191:17 193:10
194:8,9,25 195:1
195:13,13 198:3
198:19 199:5
200:8 202:2
207:18,23 209:24
212:5,16,20
213:10,15,15,18
213:21 214:8,12
214:19 218:22
219:10,22 221:15
224:5 229:1
230:13 233:6
234:10 237:14
239:25 240:4,4
241:4,7,9,9,13,13
241:16,20 244:2
245:5,13 246:11
250:23 251:10
254:25 255:1
259:6 263:17
266:1,19 279:20
287:8,15 288:5
291:13,16,17
292:8,22 293:2,18
294:5,18 299:5

**product's** 126:6
  291:14
**products** 14:4,6,19
  17:3,4,10,16,22
  18:2 27:13,19,20
  27:23 28:21 29:14
  29:18,20 30:23
  32:2,11,14 33:3,10
  33:18 35:2,11,11
  36:25 37:11 41:15
  63:8 64:9 98:24
  99:11,14,20,22,23
  100:8,19,20,23,25
  101:3,6,13,18,20
  102:2,20 107:10
  107:14,19,24
  178:23 179:11,23
  180:1 199:22
  204:24 206:1
  212:24 213:4,25
  214:5 227:25
  241:21 246:21
  259:13 287:12
  288:11 289:1,2,4
  292:24 302:1
**professional** 8:6
**professionals**
  17:12
**professor** 291:1
**professors** 17:12
  289:23
**program** 23:4
  29:10
**programs** 28:9
  29:7
**prominence**
  197:10
**prominent** 58:12
  61:4 197:4,22
**promote** 88:17

**prone** 139:11,16
  140:1,19 141:1
  143:18 144:1
**proper** 299:4
**properly** 68:3,13
  143:4 257:8,19
**proposed** 223:25
  225:1 249:6
**proposition** 72:6
  125:7 126:9
  132:17 164:3
  195:12 235:15
  254:13
**protect** 72:1,10
  140:5 210:14,16
  210:23 220:6
  227:2 229:19
  255:4,5 270:3,15
  270:20 289:15
  294:11,21 299:9
  300:24
**protecting** 72:9,16
  102:5 235:2,23
**protection** 237:20
  244:20,21
**protections** 71:22
**protective** 70:8
  215:13
**protocol** 72:20
  73:22 154:14
  157:2
**protocols** 102:6
**provide** 11:8 19:9
  27:14 49:7 92:19
  92:24 93:2 121:21
  131:14,21 151:6
  156:5,7 169:15
  184:5 204:1 208:8
  254:25
**provided** 9:17
  19:11,15 20:14

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

[provided - react]                                                          Page 41

35:3 40:17 47:23
49:8 51:4,10 58:4
154:24 156:8,23
174:18 207:10
276:22
**provides** 52:8
71:17 125:7 268:2
**providing** 9:20
112:10 157:17
**proximate** 299:25
**proximately** 298:7
299:21 300:15
**psychology** 28:2,5
**public** 130:11
312:19
**publicity** 212:5
**publicly** 107:17
**published** 98:18
**publishing** 23:3
**pull** 27:6 203:14
207:25 210:4
259:7 279:3
**pulled** 173:6 174:9
202:3
**pulmonology**
95:11
**purchase** 58:3
**purported** 282:1
**purpose** 7:11
92:16 227:1
263:23
**purposes** 36:5
54:3 55:11 69:5
76:14 78:12,18
113:19 132:17
139:8 224:13
234:14 252:23
300:19
**pursue** 29:5
**push** 207:24 210:3

**pushed** 175:21,22
**pushing** 111:19
**put** 6:9 24:6 29:8
34:20,22 35:12
38:2 55:8 60:4
66:15 67:23 70:10
70:12,19 108:9
111:22 123:11
124:24 125:1
132:9 140:6 143:1
155:12 168:13
176:3,12 192:4
197:8 198:23
199:4 206:20
223:20 224:11
227:21 228:23
229:2 237:22
249:16 258:20,25
286:4,5 298:11
**puts** 133:10
234:15
**putting** 66:4 67:25
74:2 164:11
177:17 223:5
224:23 229:21
238:19 252:17
258:4 298:10

---

**q**

**qualified** 303:3
**qualitative** 124:23
124:24 125:11,12
**quantify** 24:6
236:11 237:1
**quantitative**
124:24 125:12
**queensland** 121:9
**question** 7:20,23
11:22 18:9,19
21:18 28:24 29:2
31:5 36:5,19
42:13 50:17 59:20

62:14,21 78:1,6,19
78:24 79:6 90:7
90:25 116:4,6
117:9,11,13,15,18
117:19,21,24
118:6 119:19
121:16,22 123:18
125:10 128:4
130:9,19 135:10
135:17 136:21,25
139:6,21 141:4
148:4,20 160:21
162:3 183:17
184:23 197:24
198:25 201:7
203:4 213:8,23,24
214:3 215:17
225:11 231:20
233:3 234:8,14
236:14 239:9
240:25 248:11
250:6,7 257:16
258:14 265:15
268:20 269:20,25
270:13,16,21,22
271:13 285:13
287:6 294:4,13
296:16 298:20
**questioning** 77:3
93:6 170:5 215:4
216:5
**questionnaire**
73:5
**questions** 41:21
55:13 59:22 79:2
151:8 152:5
155:19 158:12,16
159:5,21,25
160:14 161:1,14
161:17,20,23,24
162:6 185:2 207:4

231:12,18 261:1
261:13 262:13,14
262:16,21 263:2
263:14 264:19,20
265:4 266:4
269:12,14 270:24
270:25 271:18
272:3,6,8,16 273:3
273:9,21 274:25
275:1,9,10,17,21
276:12 278:3
283:3 289:10
292:12,15 293:6
293:15 307:5,8
**quick** 41:6 304:13
**quickly** 35:24
**quite** 81:24 136:4
180:10 277:10
**quote** 188:24
225:25 226:1

---

**r**

**r** 306:21 311:3,3
**rachel** 83:5 85:22
**ran** 23:4
**range** 74:14,15
171:4,5 185:11
**rate** 43:12,13,14
43:19
**rates** 126:20
**rationale** 145:5
**rauschenberger**
3:19
**reached** 34:25
76:15 207:25
210:5
**reaches** 209:25
258:16 259:2
**reaching** 284:4
**react** 203:2 243:8
271:1

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[read - record]**

Page 42

**read**  20:9,10,15
  26:21 28:18 31:23
  56:20,24 57:7,18
  57:19 58:17 63:3
  69:13 80:25 83:24
  87:24,25 100:4
  106:19 107:5
  111:2 122:19
  129:19,22,23
  142:7 147:20,25
  151:5,16,23 152:2
  161:18 175:19
  176:25 188:23
  195:20 196:11
  197:7,8 199:20
  208:5 239:1,5,12
  239:12,17,22,23
  240:1,6 241:12,18
  244:4,11 245:12
  250:1,9 251:25
  252:13,18,19,19
  253:3,15,17 260:5
  266:13,19,24
  267:15 271:20
  284:11 286:7,17
  298:14 299:6
  301:20 310:9
  312:5
**readable**  192:8
**reader**  251:25
**readers**  246:17
  286:7
**readily**  130:15
  178:17 195:25
  196:1 197:18
  204:1 241:17
  250:10
**reading**  63:6
  219:15 242:13,19
  242:19

**readings**  125:18
**ready**  167:25
  199:18,19
**real**  8:7
**realistic**  70:2
**realize**  148:3
**realized**  48:5,12
  48:14 173:11
**really**  8:15 24:5,7
  24:12 26:23 27:16
  31:19 34:22 38:20
  41:18 43:4 55:11
  55:13 57:25 58:25
  77:11 78:5 85:13
  102:11 126:17
  127:16 140:9
  146:14 177:11
  204:7 210:12
  237:9 248:23
  253:7,7,20 258:3
  276:11 304:13
**reask**  197:24
**reason**  7:19 25:18
  26:3,11 36:21
  45:13 49:25 53:9
  56:3 66:18 71:1
  74:5 96:8,13
  115:3 116:8 118:6
  120:15 148:8
  203:25 230:8
  253:8 260:23
  268:9,20 272:20
  302:9 310:11
  311:6,9,12,15,18
  311:21
**reasonable**  149:18
  196:9 236:5
  284:21 286:5,9
  298:5,15 299:11
  301:6

**reasonably**  75:8
  241:24 266:20
**reasons**  66:13,17
  139:4 140:22
  146:11 198:23
  199:4 214:8,10,12
  214:14,15,21
  258:10 303:17
**rebut**  266:12
**rebuttal**  3:15
  10:17,19 21:12,15
  53:23 89:12 103:7
  133:14,17 134:3
  134:22 136:18
  190:1,10 193:25
  194:20 198:12
  199:13 215:17,19
  254:2 256:22
  265:12 266:7
  267:1 270:6,7,11
  271:18 272:7,9,19
  272:23 273:16
  303:24 304:6
**rebutting**  265:12
  265:13 266:22
**recall**  15:10,13,21
  16:3,24 18:15
  20:25 30:22 31:7
  31:21 35:9,10
  39:23 41:5,23
  69:7 89:17 102:17
  111:3 129:22
  130:4 145:5,8
  148:17 157:7
  162:4 173:8 213:2
  213:23,25 214:23
  260:9
**recalled**  68:2,18
  68:23 71:9,15
  72:7,11 73:9,14,21
  74:9 77:21 114:3

202:7,12,19
  212:15,20,23
  213:5,15 214:8,12
  214:19 291:14,16
  292:6,10,22,25
  293:2
**recalling**  39:16
**recalls**  82:20
  213:10 214:5
**receipt**  310:18
**receive**  20:3 48:8
  79:7 142:24
  156:17,18
**received**  21:9,13
  28:1 46:12 51:3
  54:20 89:14
  130:24 131:16,20
  166:17 171:1
  247:3 248:16
  266:25 275:10,11
  275:18 295:24
**receives**  130:1,8
**receiving**  21:3,7
**recess**  122:9
**recognizable**
  102:16
**recognize**  157:11
  158:3,24 160:17
  170:3 305:11
**recognized**  126:25
  154:17 155:6
**recognizing**  24:19
**recommends**
  121:11
**reconstruct**
  276:17
**record**  5:4 6:3,9
  8:6 40:15 41:9,12
  42:15 46:2 51:20
  54:22 59:13,16
  61:25 70:3 76:20

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

[record - report]                                                      Page 43

87:5 91:25 92:3
121:17 122:8,11
139:7 157:19
164:19,22 167:19
168:4,13 169:2
170:1 192:16,21
192:24 215:2,9
227:10,14,17,18
244:23 251:5
256:15,17,20
260:5 269:4,8
285:18 288:17
296:6 304:17,20
305:21,23,24
306:3,5,8,9,16
307:13
**recorded** 1:16 2:1
**recruited** 22:19
**recruiting** 22:8
**reduce** 28:16 88:8
287:21
**reduced** 309:12
**reduction** 87:25
**redundantly**
209:1
**redweld** 85:15
**refer** 48:5 84:23
206:25 209:17
236:22,24 275:19
281:12
**reference** 64:10
175:13 181:1
189:8 306:17,22
**referenced** 186:14
215:16 310:6
**references** 50:2,22
93:7 166:6 281:13
**referencing**
184:25
**referrals** 13:2,4
26:16,18

**referred** 63:15
187:15,18 188:11
307:14
**referring** 11:17
18:10 57:12 59:15
60:24 76:14 80:9
105:19 133:17
136:23 147:18
148:6 157:20
185:11,14 187:2
190:10 199:11
200:7 203:22
209:10 216:1
256:5
**refresh** 295:7
**refute** 277:16
**regarding** 139:9
188:23 205:7
208:17 284:12
**regardless** 16:15
234:5,16 239:24
**regular** 14:16
43:13
**regularly** 74:21
138:3
**regulation** 71:16
254:12
**regulations** 97:21
98:3,10 204:14,23
**regulatory** 255:15
255:18
**related** 14:12
19:16 32:3 35:2
36:11 38:15 40:4
42:9,25 54:20
56:21 71:2 78:13
78:20 96:13,25
98:2,10,15 99:19
100:22 101:20
103:24 104:13
115:4 118:11

123:2,15 129:17
130:1 133:4
137:15 147:10
152:8 165:19
177:4 184:6
189:11 204:24
224:5 275:22
279:19 291:7
292:21 304:5
**relates** 45:10
67:18 119:12
281:1
**relating** 27:18
**relationship** 42:24
100:3
**relevance** 253:1
**relevant** 82:24
107:24 108:17
109:17 128:17,18
175:25 177:20
182:23 183:1
222:23 253:3
284:12
**reliance** 93:8,12
**relied** 83:21 93:3
127:8 128:1 157:1
176:7 300:22
**rely** 69:13 105:7
117:2,7 123:25
151:5
**relying** 72:6 80:5
80:7 81:18 106:10
106:16 114:12
119:4,13 127:12
128:5 136:15
206:8 254:12
302:3
**remedies** 188:13
**remember** 9:23
10:2,23 14:16
15:6,17 16:19

17:2 21:7,17,22
30:12 31:14 32:18
35:20 36:2,16,21
37:22 38:7,19,21
39:19 40:3 41:16
41:24 42:6 56:3
69:10 99:16 101:3
101:15 111:2
145:4 161:20
168:24 257:25
280:22,25 284:6
284:17 289:10
293:7
**remembering**
35:21 36:17 37:19
38:9 102:1
**remind** 252:23
**reminder** 253:9,18
253:20
**remiss** 280:10
**remote** 35:18
**remotely** 262:10
**remove** 114:1,3
165:25 202:17
**removed** 114:5
134:12 165:7
202:13 203:11
211:20 212:4
**removing** 15:4
**rendered** 9:2 92:7
127:25
**repaired** 305:18
**repeat** 301:13
**rephrase** 7:22
**report** 3:13,14,15
9:13 10:9,17,17,19
10:20,23 18:8,11
18:12,13,16,18,23
19:2,4 20:9,15,17
20:21 21:2,8,11,12
21:15,15,16 36:3

Case 2:19-cv-02689-GMS    Document 196-42    Filed 11/19/21    Page 125 of 144

Alison Vredenburgh, Ph.D.
September 22, 2021
In Re: Fisher-Price/Mattel

[report - respond]
Page 44

38:21 40:7 49:5
49:17 52:24 53:7
53:11 56:5,15
57:25 59:14,19
64:11,17,20 65:8
65:17 67:7 68:24
69:16 87:24 89:12
91:11 92:15 93:10
94:12 103:4,6,7
104:24 105:11,22
105:25 106:1
118:10 119:18
122:14 123:14
124:1 126:14
127:9,12 128:2
129:18 130:2
131:8,13 133:8,11
133:14,18 134:3
134:21,22 135:15
136:5,18 137:5,7,8
137:16,24 138:18
139:12 144:25
147:17 150:10
152:6,23 164:25
166:6,7,9 167:22
170:15 172:8,17
174:21 175:14
176:22 180:20
181:23,25 182:6
183:13 184:12,17
184:22,24 186:13
187:20 188:12
189:18 190:7,10
190:14 194:1,6,20
195:8,15 198:12
198:13 199:13
200:7,12 204:4,11
206:2,23 209:7
215:17,20 216:10
216:11 218:16
219:16 223:24

224:14,16 225:22
227:20 230:20
231:22 242:2
246:24 247:6,6,9
247:14,19 248:1,5
248:10,13,14,14
248:18,19 250:22
251:3,9 254:2,5
255:25 256:8,14
256:22,24 259:19
265:13 266:8,9,25
267:5 268:3
269:21 270:6,7,11
272:18 273:1
274:2 278:22
282:25
**reported** 1:23
129:1 171:21
172:2,6,10,25
173:4,12 174:5
**reporter** 5:16 6:20
167:18 168:4
218:12 256:15
260:2,5 276:6
285:20 306:3,24
307:1,15 309:24
**reporting** 125:2
126:12 150:15
**reports** 10:11 19:6
20:22,24 21:21
39:1,9 44:4,17,18
47:15,19 48:13
49:2,2,11 50:23
53:21,22,23 69:14
81:6 83:10,25
88:23 89:21,22
90:20,22 91:1,9,11
91:19,20 92:6,11
92:23 93:7,9
94:16 96:16 97:14
101:8 106:18

108:11,15 116:21
122:20,25 123:12
124:2,5,16,21
125:8,25 126:10
126:18,24 127:13
127:18 128:8,10
128:20 129:1
130:8,23 131:3,16
131:19 132:11
134:9 135:12,21
147:15,19,23,24
150:1,20 151:18
163:24 166:13
172:6,24 173:3,6
173:12 174:9,16
180:23 181:3,5,16
181:19 182:5
184:7,9 185:25
186:4,8,9 187:9,10
187:24 208:16,21
218:20 242:13,14
242:19 243:6
247:2 306:12
**represent** 7:8
54:18
**representation**
54:25 55:6 180:17
**represented**
264:25 271:24
**representing**
273:2
**reps** 61:17
**request** 46:21 51:8
130:12 168:13
**requesting** 53:12
168:19
**requests** 46:17
47:13
**require** 109:4
214:4

**required** 205:23
254:14,16 309:18
312:13
**requirement** 63:6
199:21
**requires** 255:16
**requiring** 236:8
**reread** 90:19
91:19,20 252:20
**resale** 100:11
202:6 203:12
**reschedule** 305:16
**research** 17:14,19
17:21 18:1 23:3
61:18 64:13 71:24
128:18 155:9
197:9 198:8
235:16 245:12
246:1 250:1,8,8
283:16 285:7
286:1 289:17
290:5,12,21
291:18 292:1
293:2 298:10
300:18 302:6
304:10 306:20
**researched** 245:7
245:20,24 246:1,3
**researchers**
125:17
**researching** 22:1
**resend** 50:24 53:2
**reserve** 307:8,9
**residence** 200:16
**resort** 5:13
**respect** 67:7 81:10
238:4
**respiration** 139:10
143:25 229:10
**respond** 67:10,22
74:11 76:7 79:12

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

[respond - risk]                                                              Page 45

79:24 110:12
141:4 151:7,8
158:17 173:14
183:22 197:14
198:2 211:4,16
217:22 226:23
228:3 243:8,21
249:21 250:21
251:7,12 263:24
**responded** 78:17
160:11 264:11
**responding** 59:20
274:4
**response** 121:21
199:6 288:21
**responses** 79:17
262:25
**responsibility**
111:20 164:6
**responsive** 47:13
136:21
**rest** 88:21
**restart** 31:5
**restate** 50:8
**restrained** 147:21
149:20 176:23
178:2,3,25 179:13
179:19,24
**restraining** 149:14
149:16,17 150:16
**restraint** 37:1,12
37:18,24 38:8,10
38:16 41:22 42:2
42:3,6 80:17
81:14 109:5,10
145:11 146:21,22
147:2,7 150:2,3
163:16,18 177:21
178:24,25 179:1
179:11,14 180:3,4
188:1 195:24

207:6,11 211:12
215:8 216:8,19
217:14,19,23
218:3,6 226:1,10
226:11,14 233:25
234:5,9,15,16
235:7 237:23
257:10,21 287:3
**restraints** 143:11
145:20 146:2,12
147:13 152:8,12
152:20 153:4,6,10
153:22 157:12
158:3,25 160:18
164:11,14 175:20
175:22 176:1
177:10 178:13,20
180:11,15,15
236:5 294:2
**result** 60:19
157:12 158:3,25
160:18 189:5
258:5 261:6 288:6
288:11,19 289:3,4
**resulted** 150:25
284:15
**resulting** 287:1
**results** 81:17
287:9
**retained** 11:8,10
11:12,16 12:4
26:2,10 40:20,24
45:15,16,19,24
**retention** 26:13
**retiring** 25:20
**return** 310:13,17
**revealed** 152:18
152:23
**review** 18:5,8 19:5
20:23 33:6 44:2
68:24 69:16 72:19

72:20 90:15 91:3
123:14 129:16,25
146:10 147:9,23
148:10 150:23
173:2 205:17
244:7 263:2
283:14 309:17
310:7
**reviewed** 18:11,25
19:1,3 20:22 44:7
44:15,20 89:14,21
91:2,8 93:22
145:14 146:13
156:25 161:12
247:3 283:14
293:12 301:22
**revisit** 227:22
**reward** 266:1
**right** 7:5,15 8:9,10
22:21 26:4 27:4
35:15 36:24 37:19
38:9 40:1 41:19
43:7 44:18,23
48:20 49:16 52:19
52:20,25 54:13
55:12 59:17,19
62:15,18 66:21
78:4 80:2 85:4
87:12,22 102:2
103:10 111:3
114:7 123:24
133:21,23 141:12
152:21 156:20
160:21 161:12
166:2 167:16
168:2 170:19
172:18,21 174:13
176:10 177:5
178:11 181:22
184:14,18 185:20
185:23 186:23,23

186:25 187:1,8
188:8,14 189:8
190:15 196:20,21
197:17 200:11
201:10 209:3
212:9 214:1 215:8
215:20 216:5
221:13 222:10,11
222:24,25 223:3,4
223:8 226:15,25
228:13 231:13,15
231:17 232:4,21
240:10,15 245:2
246:19 247:10,15
248:6,10 249:5
256:11 258:12,25
259:2,22 262:15
263:11 264:3,10
270:23 271:21
276:12,14,15,16
277:2 279:22,23
280:18 281:3
282:20 283:5,20
283:21 285:2
288:14,15 289:11
290:4 293:12
294:7,13 300:16
301:11,15 302:14
303:18 305:19,23
**rings** 58:25
**rise** 293:16
**risk** 28:8 60:18
73:1,4 74:2,23
75:5,16 76:2 77:7
77:17 82:21 85:6
87:9,18,25 88:6,14
88:16 109:13
111:11,13,15,16
112:21,23 124:18
162:13,19,22
163:3,12,19 166:1

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[risk - says]** Page 46

175:22 208:24
220:16 222:13,14
223:5 229:23
230:19 241:13
265:25 266:2,2
270:3,15,20
273:20 280:7
285:3 287:16,21
287:24 288:1,2,3
289:17 291:10
292:5 294:20
299:2,6
**risks** 17:9 72:21
72:22 88:1 112:17
146:20 161:2
164:4,8 229:19
289:14 292:5
294:20,22
**rnp** 122:2
**rnps** 199:22
**road** 2:11,17
**robert** 3:19 215:11
**rock** 3:17 11:25
12:5,9,17 13:14,17
13:22 14:1,13,19
14:21 15:22 16:20
17:19 35:5 36:13
37:2,8,13 69:5,21
71:3 79:13,25
83:12 84:24 93:23
96:14,25 97:6
102:20 103:15
104:14 106:5,9,21
107:22 108:24
109:14 110:13,15
110:25 112:5
114:8 115:19
116:10 118:11
119:7,14 120:21
121:2,24 140:2
142:9,17 147:1

151:1 160:1 161:8
165:12,19 182:10
182:17 183:4,15
183:18 187:25
196:18,23 197:25
198:1,19 200:8,15
200:20 201:9,21
202:21 203:1,3,7
203:17,21 204:18
205:8,24 208:22
210:6 213:20
222:5,20 223:15
223:17 228:8
230:22 232:1,13
232:23 233:20
234:18 240:21
241:1,2,6 242:23
243:17 244:9,12
244:15,25 245:8
245:22 246:4,5
249:1 254:14
257:20 263:10
264:1 273:22
284:23 286:25
287:2 303:18
**role** 141:7,15
143:20
**roll** 65:1 134:15
140:1 143:17
160:23 162:20,21
162:23 220:11
232:23 233:14
259:7
**rolled** 150:25
233:16
**rolling** 60:16 61:8
135:13 139:16,23
157:13 158:4,25
160:12,18 233:19
264:13 287:1

**rollover** 64:24
136:9 162:13,19
163:3,11,18 166:1
184:1 198:9
208:24 211:12,17
228:11 229:25
230:22 232:11,12
233:4,8
**rolls** 160:1
**room** 70:12
117:20 149:11
155:17,19 183:11
191:7 288:20,24
288:24
**rotate** 109:22
140:11
**roughly** 297:1
**round** 82:8 94:5
173:18
**rousseau** 306:20
**routine** 39:9
**routinely** 39:1
**row** 176:21,24
**rule** 38:10 215:12
215:25,25
**ruled** 283:20
**rules** 7:17 71:20
152:2 215:13
**rundell** 69:17,19
**running** 29:9

**s**

**s** 95:16,16,17,17
306:21,21 311:3
**safe** 68:1 95:20
111:23 119:1
120:3,3,10,15,24
121:8,10,11 122:2
205:25 214:5
215:14 218:25
228:20 254:25
266:20 287:8,10

**safeguard** 253:25
**safer** 34:17,21
205:5
**safety** 13:13 28:14
28:17 97:16
127:16 143:10
146:2 208:9
214:10,14,22,24
215:15,18 222:15
279:19 299:5
**san** 22:14
**sat** 289:2
**saw** 68:11 112:22
123:16 244:8
297:8
**saying** 58:24 62:8
69:12 70:17 81:1
81:4 113:23
116:24 143:15
144:2,2 151:12
199:8 202:15
223:6,7 226:19
230:8,25 231:6
232:16 237:8
251:12 265:18
268:11 270:18
277:5 294:8 298:8
298:15 299:10,14
299:14
**says** 84:2 116:25
117:1 119:10
152:7 165:4 171:6
171:17 172:2
175:23 182:16
185:4 189:11,19
192:11 207:10
208:7,12 210:1,16
224:22 225:23
226:7 236:23,24
258:15 269:25
271:5 279:16

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

283:18,19 284:7
284:19,19
**scanner** 89:1
**scanning** 89:4
203:14
**scenario** 70:3
**school** 289:25
**schools** 27:19
**science** 274:7,11
277:7,9,13
**scientific** 115:18
116:9 119:14
124:21,23 125:8,9
126:10,11,12
128:15 159:12
190:18 193:7
195:11 220:12
243:7,10 284:21
285:1,5,5,9,22
286:5,9 297:25
298:5,16 299:11
299:19 301:6
**scissor** 31:24 32:1
**scissors** 31:15
**scoot** 110:4
**scooting** 26:9
**score** 159:22
**screen** 48:3 167:22
168:3 297:23
**scribble** 89:5
**scrutiny** 73:8
**search** 47:12
**searched** 132:13
**seat** 37:5,15 101:4
109:3,4 110:22
135:4 182:19
242:25
**seated** 190:25
**seats** 38:4 177:13
177:18 180:12
251:22

**second** 47:3 53:14
53:18 57:15,24
65:16 109:20
110:5 112:20
137:13 158:11
168:7 189:19
206:3 207:9 208:7
256:16 278:18
295:6
**seconds** 78:9
303:12
**section** 118:9
165:1 166:4
174:11 176:8,8
187:20 188:19
189:17 200:6
204:12,12 205:13
207:15 236:17,21
254:5 258:2
**sections** 259:19
**secure** 155:21
177:10 178:18
211:11 257:9,19
257:22 258:5
**secured** 148:2
163:15 178:18,20
182:24,24
**securing** 135:5
150:21 177:14,18
189:2,4,5 257:15
**see** 20:15 46:6,17
48:19 52:8 55:14
64:24 66:18 68:17
70:5,8,11,18,21
74:17 82:19,22
85:5,6,9,12,13
86:8 87:10,14
88:3,22 106:6
109:22 129:13
131:6 140:9
147:15 148:11,15

153:21,25 159:22
160:20 161:4
165:2,8 166:13
167:6,12 168:2,2
169:13 170:3
171:7,10 172:1
175:10 176:12,24
180:24 181:1,17
182:2 186:19
188:3,20 189:7,12
189:23 191:17
193:22 194:13,17
194:19,23 195:2,9
195:16,19,21
200:16 202:16
203:25 204:14
205:15 206:6,23
207:13,20 208:2
208:10,14 223:25
229:8 240:2,22
242:6 243:18
249:13,15,18
252:16,25 253:19
258:17 260:19
270:4 279:6
281:10 294:6
295:4,16,18
305:10 307:10
**seeing** 46:21 68:11
85:20 161:20
202:4
**seek** 283:13
289:21
**seen** 46:14 106:17
167:3 172:20
177:12 193:12,23
202:17 203:13
258:22 291:20
**self** 126:14 140:19
141:1,8,16,21
142:3 143:19,20

143:22 150:10,15
150:20 152:23
154:1
**selling** 202:6
**send** 19:18 20:12
50:12 89:6 306:14
**sending** 30:1
**sense** 125:11
128:22 178:11,12
182:23 194:11
202:22 214:3
217:11 236:13
237:4 265:11
267:10
**sensitive** 299:6
**sent** 20:12 48:15
49:20 50:3,5,6,10
52:6 53:5 54:2,3
83:15,17 84:21,25
85:19 86:1,12,22
88:22 130:24
168:9 247:13,21
247:24 248:14
263:25 264:8,23
304:24 305:3,4
310:14
**sentence** 152:17
165:4 166:8
181:13,14,24
184:21 187:23
188:23 189:19
279:13,16 280:4,5
**sentences** 188:7
**separate** 112:25
151:23 237:8,19
263:21
**separately** 52:4
68:12 260:8
263:19
**september** 1:18
2:3 5:1,5

Veritext Legal Solutions

Alison Vredenburg, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[series - sleeper]**                                                          Page 48

**series** 158:12
159:5,21 300:13
**serve** 11:11 12:8
30:14 123:1
253:18
**served** 35:4 36:10
46:12
**serves** 179:1
**service** 27:1
**services** 27:2,13
**serving** 12:15
13:12 25:25
**session** 15:12 16:1
16:3
**set** 252:13
**setting** 179:9
234:13
**settle** 35:24
**settled** 38:19
45:15
**seven** 185:9,10
206:14,15,16
221:11 271:1,8
**severity** 57:10,21
58:18,22 60:14
**shaking** 250:4
**shalaby** 3:21
**share** 33:25 46:5
51:6 86:14 279:4
**sharp** 31:16 99:25
**sharper** 31:18
**sheet** 310:11
**sheets** 176:13,17
**shepherding** 79:4
**shipped** 50:13
**short** 206:6
**shorthand** 309:11
309:24
**shots** 48:15
**shoulders** 179:6

**shove** 169:9
**show** 84:11 111:25
154:20 159:4
166:25 167:3,11
176:19 177:1
190:8 249:11
263:15 278:1
281:16 295:10,13
**showed** 53:21
76:22 118:15
151:15 186:12
224:11 249:11
263:15
**showing** 82:17
85:7,21 86:17
87:10 176:20
294:24
**shown** 86:9 90:15
90:18 195:14
**shows** 235:16
**shriner** 12:24,25
13:8,16 17:18
19:8,14,18,23
247:21,24 248:4
260:9
**side** 55:9 139:11
139:17 141:6,14
143:18,19 144:1
169:9 191:5
193:19,21 194:10
194:14 196:14
199:23 201:2,13
201:16 207:18
220:9
**sides** 259:8
**sids** 95:16 108:14
**sign** 263:3 264:24
310:12
**signature** 307:9
309:23

**signed** 18:13 185:4
310:20
**significance** 175:2
**significant** 273:20
**signs** 306:20
**silence** 303:12
**silent** 286:22
**silly** 288:8
**similar** 128:10,10
131:4 175:18
188:24 197:20
**simple** 245:13,16
**simplify** 105:18
**simply** 225:2
249:6 258:4
**single** 111:20
146:5 252:8
253:10 287:17
**sinkhose** 68:25
69:4 104:8 107:3
**sir** 64:12 209:12
**sisson** 2:21 5:15
**sit** 41:24 59:23
69:9 126:8 129:24
144:9 145:4 175:1
195:21 196:10
205:22 207:25
210:4 258:10
290:15
**site** 71:24 260:20
**sitting** 38:3 190:7
195:4,6 198:22
199:3 225:12
288:19
**situation** 11:7
182:10 197:16
274:12,18
**situations** 123:20
196:24 280:25
**six** 185:9 219:14
220:4 221:11

252:20 276:2
**sleep** 63:7 64:9
95:20 97:10 99:20
100:22 101:21
103:1 107:10,19
108:2 109:10,12
119:1 120:3,12,24
121:8,10,11,12
141:20 142:1
148:13 149:1
150:4 153:25
227:25 302:18
**sleeper** 3:17 11:25
12:5,9,18 13:14,17
13:23 14:1,13
15:22 16:20 17:19
35:6 36:13 37:2,7
37:8,13 69:5,21
71:3 79:13,25
93:24 96:6,14,25
97:6 103:16,19
104:15 106:9
107:22 108:24
109:14 110:14,22
111:1 112:5 114:9
115:19 116:10
118:11 119:8,15
120:21 121:2
122:3 140:2 147:1
149:23 151:1
160:1 161:9
165:12,19 166:11
171:15 182:10,17
183:4,16 192:5
193:23 196:18,23
197:20,21,25
198:2,19 200:8,15
200:21 201:9
202:21 203:2,3,7
203:18,21 204:18
205:8,24 208:22

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

210:7 213:21
222:5,20 223:15
223:17 228:8
230:22,25 232:1
232:13,23 233:21
234:18 240:21
241:2,7 244:9,12
244:16 245:1,8,22
246:4,6 249:1
254:15 257:20
263:10 264:1
265:8 270:2,14
273:22 284:23
286:25 287:2
288:1 290:9
299:23,24 300:1,2
300:2 301:7,9
302:10,11,14,15
302:16,23 303:4,5
303:6,18
**sleepers** 82:21
97:13,15 98:11,16
98:19,22,25
101:16 102:19
**sleeping** 84:16
86:4 122:1 147:14
**sleepy** 143:21
**slide** 305:9
**slightly** 83:12
84:11
**sling** 17:1
**slings** 101:2
102:21
**slip** 138:11
**slope** 109:4
**sloping** 140:10
**small** 206:11
**smaller** 53:19
**sme** 229:9
**snippets** 27:12

**snugly** 189:2,5
**society** 14:4,8
15:20 16:6,9
24:15 29:17 56:1
**society's** 99:6
**soft** 60:3,4 207:18
**software** 47:4
**sold** 121:25 122:2
203:12,12
**solely** 127:8,12
**solutions** 5:16
310:23
**somebody** 22:8
109:22 124:8
129:10 158:15
172:21 202:5,11
202:18 203:15
263:14 290:10,25
**somebody's** 209:4
**someone's** 196:9
**somewhat** 45:12
73:2 230:4
**soon** 304:15
**soother** 121:25
**soothing** 121:8
**sophisticated** 30:3
**sorry** 8:12 26:7,9
37:6,8 38:8 39:5
47:10 65:6 68:21
72:2,3 83:7
104:13 113:14
121:19 124:19
128:20 129:20
137:14 144:16
150:23 167:9,24
172:24 194:8
220:21 225:21
234:4 245:19
251:4 253:15
270:5 274:10
276:4 285:12

295:12 297:9
305:2 306:1
**sort** 24:8 25:5,18
33:24 35:20 73:5
73:22 75:16 88:12
94:5 108:1 224:25
**sorts** 11:7 33:13
55:15 212:5
**sound** 55:17 76:6
297:2
**sounded** 117:17
**source** 94:6 125:6
125:21 126:7
306:22
**sources** 93:14 94:6
246:9 306:12
**southern** 281:8
**speak** 8:18 269:22
284:13
**speaker** 288:13,14
288:18,24
**speakerphone**
269:7
**speakers** 98:25
**speaking** 6:14
25:9 148:24
274:20
**specific** 14:24 15:6
21:6 70:5 98:10
104:4,9 116:6
119:25 120:6
123:14 135:10
155:14 161:17
188:13 197:25
207:4 239:10
290:16
**specifically** 16:4
16:20 19:19 22:9
27:1 30:17 32:25
40:3 67:18 69:8
96:1,7 100:21

101:15 102:17,20
102:22 107:21
118:23 119:12
138:15 139:23,24
140:15 184:8
198:9 208:23
235:13 236:22
256:5 265:12
266:9,11 281:12
300:21
**specification**
118:14
**specifics** 105:6
142:6 153:19
162:4 165:14,17
**specify** 225:24
**speculate** 172:10
236:8 246:12
**speculated** 277:19
**speculating** 157:8
**spell** 307:1,2
**spend** 24:2 25:25
27:7 146:4
**spent** 24:23 44:1
44:22 169:20
**spoke** 15:7,9 16:2
90:13 91:14
263:21 266:22
293:25
**spoken** 14:18,20
242:25
**spread** 30:5,11
**spreadsheet**
166:12,16 168:16
170:13,14 172:1
174:17 175:3
184:13 186:10
187:11 306:18
**ss** 308:1 309:1
**stages** 141:20
142:2 153:25

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[stairway - suffocation]**

Page 50

stairway  138:14
stake  277:6,8
stamp  187:18
stamped  47:22
  49:11 50:15,22
  52:3,5 53:1,3,6,22
  54:8,12 166:20
  185:3
stamps  176:14
stand  30:24 46:24
  167:23
standard  71:16
  72:5 110:20,21
  198:14 237:16
  249:7 254:12,17
  255:16 258:15
  283:5
standards  61:17
  63:5 64:8 98:2,15
  197:10 204:23
  205:1,6,21 250:15
  255:19 283:1,10
  301:18,19
standing  190:5,5
  192:7 193:21
  194:9,12,14,25
  195:7,8,9,12,18
standpoint  31:2,9
  104:22 289:8
stands  31:19
staple  88:25
start  25:13 77:7
  94:19 105:21
  112:16 137:5
  184:16,23 252:24
  254:22 255:1,2
started  21:3 22:22
  22:23 23:6 29:6
  31:12 176:15
starting  119:22
  185:2

starts  84:3 122:19
  166:9 180:22
  181:14,24 259:20
  270:22
state  5:18 10:1
  11:20 39:8 290:5
  308:1,5 309:1,5,25
stated  87:4 106:14
  176:22
statement  44:20
  61:9 65:5 110:18
  175:6 181:3
  189:25 190:18
  215:11 217:9
  218:4 219:18
  224:17 254:9
  258:7,21 263:4
  268:11,18 276:23
  279:22
statements  197:11
  265:13 267:5
  276:10,19,22,25
  277:2
states  1:1 204:20
  205:2 207:5
  225:25 251:15
  281:8
statistics  126:14
stats  290:24 291:1
statutory  1:4
stay  266:8
stayed  134:10
steinwachs  62:5
  63:2,10,14 64:6
  65:6 225:11
stenographically
  1:23
step  123:7 148:9
  245:18,18
steps  123:7 239:15

steven  69:17,19
stick  34:10
stipulation  263:20
stood  193:21
stop  25:11 164:16
  216:25 220:25
  258:15 259:1,6
stopped  15:12
  286:10
stopping  65:1
stores  203:12
strange  192:15
straps  175:22
strength  139:10
  143:25
strike  67:16
  145:13 152:16
  178:22 182:20
  197:23 213:18
  237:11 243:9
  274:10 303:24
striking  304:6
stroller  32:5,7,8,9
  35:14 39:25 40:5
  40:15 41:17 42:11
  42:19 43:8,8
  45:23
stronger  205:1
strongest  215:13
  264:12
student  16:14
students  75:7
studied  150:9,13
  150:14 180:22
studies  74:20
  76:21 77:19 125:5
  125:14 151:15
  152:8 153:4,6
  154:10 290:10
study  70:19,20
  118:14 128:21

153:10,19 243:20
  289:20,21 290:6
  291:12,17,22
  292:21
stuff  27:18 52:3
  135:8
subject  33:24 74:3
  94:19 229:9 291:3
subjects  71:23
  72:1,9,10,16,21,23
  74:3 289:13,16,18
  290:3,7 293:1
submit  72:20
  73:23
submitted  18:13
  47:17
subscribed  312:14
subsequently
  264:5
substance  11:14
  90:11
substantially
  131:4 175:18
  179:25 180:13
substantive  55:13
substantively
  65:15
sudden  29:25
sufficient  263:11
sufficiently  266:16
suffocate  160:23
  207:17 233:15
suffocated  60:16
  61:7 108:12
  264:13 269:18
suffocating  233:20
suffocation  42:9
  42:17,20,25 43:6
  58:20 59:7,25
  60:2,2,15 65:3
  82:21 101:22

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[suffocation - taken]**    Page 51

106:4,9,21 107:1
107:11,20 108:5
109:1,14 111:12
111:14 112:6
113:21 114:10,13
115:5,19 116:6,10
116:21 117:1,2,3
118:8 119:3 123:3
134:14 136:9
143:6 166:1
175:22 184:1
207:16 209:1,2,5,9
209:21 210:16,22
211:6,13 216:25
217:10,12,13,20
217:24 221:25
225:25 226:7,12
227:23 228:1,7
230:6,7 232:11
234:2,11 237:20
238:1,1 258:5
269:16 270:3,15
270:17,20 287:1
**suffocations**
181:15
**suggest** 34:13
**suggested** 147:12
148:12 195:22
**suggesting** 168:9
**suggests** 109:12
245:21 246:4
**suids** 95:16
**suitable** 27:9
**suite** 2:11,17 8:7
**suited** 290:20
**sum** 301:5
**summaries** 47:25
49:13 53:24 82:9
82:11 174:15
187:17

**summarizes**
187:13
**summary** 166:12
166:15,18 170:13
173:6 281:21
282:8,22
**suny** 290:25
**super** 305:7
**superior** 39:3
**supervise** 25:14
**supervision** 208:8
**supine** 139:17
140:2
**supplement**
219:16,17 237:17
248:15
**supplement's**
232:8
**supplemental** 3:14
21:11,15 103:5
224:16 231:22
247:5 248:10,13
248:19 250:22
251:3,9 255:24
256:8 303:24
304:6
**supplementing**
274:3
**support** 125:7
156:13 193:16,18
195:11 219:21
220:12 235:14
242:16 299:19
**supported** 277:15
**supports** 126:9
**suppose** 203:24
**supposed** 152:3
159:7 197:3
**sure** 15:24 30:12
36:17 38:18 39:22
39:23 42:22 43:11

44:25 49:19 53:17
59:15,21 61:13
62:14 84:12 91:7
91:22 94:23 110:3
121:16 130:17,18
133:6 135:7
136:22 139:7
147:24 157:19
162:7 164:17
167:13 170:2,10
171:1,2,3,25 179:9
179:22 186:20
187:3,9 188:10
197:6 199:2
229:11 230:18
244:23 256:25
264:21,24 269:24
282:24 288:16
289:1,3 304:23,25
307:5
**surface** 118:15
119:1 120:4
121:11
**surpasses** 289:17
**surrogate** 155:15
**surveillance**
124:12 125:1
131:24 132:5
163:22 212:3,8
244:3
**survey** 3:22 73:5
75:20 76:1 77:8
161:24 162:2,5
202:23,23 203:1,9
293:16,19
**surveying** 77:7
**surveys** 73:1 74:25
75:13,14,25 80:6,9
80:10,15 81:10,13
145:10 148:11,12
148:25 150:24,24

151:13 161:11,15
161:21 162:9
200:19 201:19
283:13 293:5,6,12
**survive** 124:8
**swallowing** 101:23
**switch** 295:5
**sworn** 6:20 309:7
312:14
**system** 80:17
81:14 180:3
211:12 216:8
217:14,23 218:3,6
226:1 240:23
241:8 257:2
**systems** 179:12
287:19,21

**t**

**t** 311:3,3
**tab** 279:1 306:16
306:21
**table** 38:2,4
109:21 112:22
190:8 195:6 305:9
**tabs** 49:15 52:18
52:19,22
**taft** 142:18 185:1
188:3
**tagged** 169:19
**take** 10:22 25:21
27:11 29:20 33:14
41:6 71:10 84:22
91:21,22 121:13
122:5 148:8 155:2
167:5 174:4
202:13 215:2
224:19 227:9
280:4 286:3
304:13 305:11
**taken** 2:2 5:7,12
122:9 169:22

176:10,17 262:19
297:21 309:10
**takes**  291:18
**talk**  24:7 36:13
41:18 71:22 83:11
90:20 100:12,21
101:2 103:14,18
103:20 104:2,3,3,4
104:5 105:4,8,8,10
111:6 112:18
125:11,25 136:6
136:20 137:8
168:17 170:7,9
180:20 184:4
191:4 197:10
204:4 205:13
218:16 227:5
229:9 230:16
242:5 250:2
255:19 256:1
266:10,25 275:17
304:14
**talked**  14:6 16:3
23:8 39:25 45:6
45:18 67:6 74:25
80:24 82:6 92:7
96:5 97:17 98:23
100:6,25 102:11
103:12 105:11
107:12 114:12,16
123:7 136:3
138:11,21 139:4
142:20 143:7
145:9 153:13
158:10 161:12
163:14 166:7
176:7 187:13
204:16 207:3
212:1 220:1,21
221:3 226:6
228:10 234:1

254:3 259:15
276:9 280:19
286:24 289:6
293:4 297:24
302:25 304:22
**talking**  9:2 12:14
16:1 28:22 33:1
36:8 37:2,13
41:15 44:13 58:6
63:11,12,14 65:6
75:4 81:5,8 83:11
87:21 93:18 98:24
99:1 100:19,24
102:4,18 115:11
118:24 122:14
134:13 157:16,18
157:25 160:7,9
170:12 181:4
184:15 186:16,17
240:21 242:9,14
251:13 254:23
256:9 264:22
266:9 269:10
274:24 275:2
276:17 279:25
280:8,22 291:12
**talks**  57:7 83:25
125:25 136:24
160:16,22 187:8
189:18 199:7
207:22 235:12
279:23 282:25
**task**  68:6 70:4,17
155:14,15 229:8
**technical**  6:5 99:5
99:6
**telephone**  90:16
288:14
**tell**  14:2 19:12
28:4 32:2 33:3
35:2 40:9 43:6

47:12 53:18 56:8
57:12 77:24 78:10
82:24 83:20 96:8
96:12 99:17
103:14 114:7
118:18 121:1
127:18,24 134:6
140:24 143:12
144:9 145:24
147:17 150:17
153:9 157:2
160:25 166:15
185:17 193:6
194:22 199:11,18
234:23 235:22
248:25 260:16
270:25 271:5,9
274:11 290:15
293:19 294:7
297:13 305:6
**telling**  11:14 193:1
217:14 270:2,14
270:19 294:16
**tells**  210:17 246:14
257:19,22
**ten**  15:10,14 162:3
**tenet**  235:6,14
**term**  42:5 256:12
256:13
**terms**  13:11 24:22
32:21 36:8 44:15
105:15,18
**test**  67:24 68:3,22
69:23 71:8 72:7
73:9 139:1 140:1
142:15 144:23
145:2 153:25
155:4 157:11
159:14,17,18,22
159:23 160:16
161:3 162:12,18

163:17 164:4,7
228:22 229:6
230:10 250:16,20
251:7 290:2,8
291:8
**tested**  66:9 150:6,8
158:23 291:8
293:1,3
**testers**  145:22
**testified**  6:21 9:7
11:12 12:3,4 26:3
26:11,12 40:7
45:2,4 63:2 98:1
185:1 188:10
267:14,19
**testify**  38:17
103:14 156:5
255:18 309:8
**testifying**  45:10
69:9 98:5 280:12
282:9,12 298:4
**testimony**  9:8
33:17 40:18 43:20
62:22 63:10,13,20
65:5,14 67:15
68:19,21 70:25
71:6,17 75:3 76:4
85:9 114:6 129:24
133:8 144:22
145:1 146:10
147:9,22 151:11
156:9,12 163:10
165:11,24 172:14
177:25 178:9
186:24 188:3,6
192:9 202:1 203:5
212:21 219:4,22
220:13 224:3
235:6,15 237:11
244:5,8,15,24
250:19 251:6

261:7 264:17
267:7 268:3,5
276:10 282:2
283:8 286:13,15
286:16 300:15
310:9,18 312:8
**testing** 3:22 31:17
67:9,13,19,20,21
68:10,14,21 69:5
69:11,21,24,25
70:1 71:2,13,19
73:6,14 74:10,24
75:2,6,11,12 76:5
78:16,20 79:12,15
79:19,23 80:10,13
80:15 81:10,13,17
81:18 109:11,16
110:11 112:19
119:21 124:14
126:4 127:14
132:2 134:20,23
134:25 135:3,24
136:3,8,11,12,24
136:25 137:9,12
137:15 138:2,19
138:25 139:1,2,15
139:19,22 140:13
140:16,18,21,24
141:6,10,13,19,23
141:25 142:21,25
143:4,13,23 144:5
144:6,10,19,23
145:6,9,15,19
146:1,19 147:23
148:6,10,25
149:21 150:17,24
151:12 152:11,18
154:2,5,19,25
156:1,3,14 157:3
157:15 158:6,20
158:21 159:12,12

160:7,10,11,15,15
161:11 162:15,17
163:14,16 164:15
191:15 193:2,3,5,8
193:9,14 194:4,6
197:13 198:1
200:19 201:8,19
201:19 203:6,21
211:3,15,22
212:11,23 217:21
222:3,18 223:14
226:22 229:10,11
242:10,15 243:1,7
243:10,24 249:20
254:6,10,14
255:17,24 283:12
289:8,9,11 291:6
292:4 293:5,11,15
**tests** 72:24 136:14
136:16 142:8,12
154:16 158:2
162:25
**textbook** 125:23
**thank** 6:2,15 7:6
31:5 47:8 54:13
83:8,9 110:1
177:2 192:19
216:12 280:13
295:18
**thanks** 21:25
51:12 55:7 87:6
169:7 176:6
307:10
**themself** 132:4
**theory** 105:2,9
**thicker** 8:16
**thing** 39:9 60:2
67:6 70:5 75:8
77:17 99:22
100:15 119:2
135:22 137:11

169:8,16 193:25
194:21 200:2
217:18 220:25
239:21 264:14
277:17 280:6
288:5 301:24
**things** 13:5 24:18
28:14 46:22 49:4
50:13 52:5 54:7
65:24 71:25 76:3
82:7 86:8 88:10
91:18 129:12
144:14,24 145:3
170:6 175:20
217:5 228:10
229:11 234:6
236:15,18 238:3
239:2 261:20
268:22 280:8
292:17 294:19
297:24 300:17
301:24
**think** 6:10,13 8:16
9:11,25 14:15
15:12 16:21 17:1
17:5 18:4 19:25
20:11 21:2 26:12
27:16 31:12 34:5
35:14,20,22 36:15
37:15,17 38:7,10
38:19,23 39:13
40:10 42:1,21
43:10 45:12 50:9
51:8,13 55:21
57:24 60:7 62:5
63:25 65:20 69:1
69:18 73:11 74:19
75:1,24 76:2
78:10 83:13,23
84:10 89:7 90:22
91:10,11 93:10

98:20,23,24
100:25 101:2,4,7
101:15,16 102:14
102:20,21 107:23
108:22 109:24
110:11 117:8
122:14 123:16
131:7 133:16
137:7,16 138:8
139:6 140:6
145:21,21 147:15
151:3 157:4
166:16 167:16
168:7,10 169:7,16
170:24 173:5
176:11 177:14,16
178:18 180:14,17
181:4 186:2,22
187:14 188:8
190:1 193:2
194:18 205:4
220:22 221:4
226:10 227:7,24
233:16 236:5
241:16 247:20
250:19,25 253:5
258:24 260:6
261:13,18 262:8
262:14 263:4
265:20 267:13
268:21 271:8,10
272:24 273:17
275:3 277:3
278:21 280:10,24
287:4,10 294:14
304:12
**thinking** 42:25
84:14 200:4
277:20
**third** 3:21 180:21
217:8

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel
September 22, 2021

**[thomas - true]**                                                        Page 54

**thomas** 55:16
**thought** 37:4 60:5
  267:21 272:10,20
  277:18 286:18
**three** 16:24 17:3
  17:22 44:19 50:6
  90:20 91:1 92:22
  94:16 179:4
  190:13 208:16
  217:5 247:1,9,12
  248:17 252:20
  306:13
**throw** 59:17
**tight** 178:4,9,15,16
  178:20,25 180:5
  287:4
**tightly** 147:21
  148:2 179:13
**time** 8:2 10:22
  13:7 15:16 20:2
  20:13 22:15 23:7
  24:2,4,6,13,23
  25:8,11,20,24
  26:13 27:7 28:7
  29:13,16 30:13,18
  30:20,22 34:15
  36:2 39:12 43:4
  44:11,22 46:20
  48:14 51:5,20
  62:4 72:24 76:12
  76:23 77:5,10,14
  77:19 79:18 80:3
  83:17 91:4,6,17
  98:6 110:23
  111:11,21 112:1
  132:19 135:5
  146:1,4,5,8,9,17
  146:22 148:1
  149:14,18,20
  150:16,21 151:17
  152:15,20,24

164:1 169:6,21,24
171:1 177:16
180:10 199:1
201:24 202:23
203:13 211:19,25
212:1,7 215:2
225:8 231:11
243:16,19 244:1
249:15 252:8,17
252:19,19 253:3
253:10,18,20
262:19 274:15
275:20 277:23
278:11 281:22
282:23 290:2
291:22 303:7
309:11 310:19
**timeframe** 310:8
**timekeeper** 297:7
**timeline** 76:16
**times** 7:15 32:10
  33:17 36:2 45:2,4
  46:19 92:9 135:17
  162:4 276:19
**timewise** 24:25
  44:9
**tip** 30:9 126:15,16
  132:6 197:7
**title** 84:5 275:15
**today** 5:16 7:12,15
  8:3 9:2 12:15
  23:23 28:23 36:14
  37:3,14 41:25
  43:17,23 46:14
  48:5,23 59:5 69:9
  71:1 89:20,25
  90:9 91:3,5,6,16
  91:19 97:19 98:9
  115:21 116:20
  126:9 129:25
  133:7 144:9 145:4

175:1 187:10
198:22 199:3
205:22 206:14
258:10 271:2
280:19 285:14
290:15 296:17
300:18 302:8
**today's** 98:14
**told** 49:1 82:8
  146:11 162:4,12
  162:18,21 184:7
  230:12 245:3
  264:6 271:4
  274:22 275:5,19
  278:19 302:8
**tom** 55:18 56:12
**tonka** 35:20
**top** 32:13 44:8,12
  70:14 111:3
  112:16 151:9
  181:23 188:13
  201:13 236:19
  249:17 258:4
  281:14 296:4
**topic** 98:18,21
  227:22
**torch** 284:13
**total** 127:22 297:1
  301:5
**totally** 36:22 71:6
  135:7 158:22
  160:8,13 169:3
  239:2 240:7 258:6
  294:18
**touch** 254:4
**toxic** 292:14
**toys** 35:16,22
  221:1
**train** 25:15
**training** 23:18,19
  25:10

**trains** 34:20
**transcript** 20:16
  135:9 309:14,16
  309:18 310:6,20
  312:5,8
**transcripts** 21:10
  26:22 28:19 31:24
  271:20,24
**transfer** 27:22
  30:5 77:16,18
  109:9 110:17
**transition** 32:4,25
  92:5 247:5 254:1
**transportation**
  287:23
**traurig** 2:16 5:22
  7:8
**travel** 44:9,10,11
**trees** 169:11
**trial** 38:18 43:19
  45:4,15 95:22
  96:2 97:4 103:13
  307:9
**trials** 9:12
**tried** 246:18
  261:12
**trigger** 75:16
**triggered** 269:21
**trip** 138:11
**truck** 9:18 11:7
  35:19,21
**true** 15:23 20:8,9
  33:21 42:17,18
  46:22 52:15 64:20
  66:24 92:17,25
  94:3,12,24,25 95:3
  96:4,10,11 97:21
  103:25 104:15
  105:20 107:11
  108:6 114:14
  115:7,15 151:1

Case 2:19-cv-02689-GMS  Document 196-42  Filed 11/19/21  Page 136 of 144

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[true - understood]

Page 55

161:9 165:13
170:23 181:21
188:7 198:20
203:3,22 204:24
209:25 213:15
216:3,9 221:16
228:9 232:2 238:6
262:10 271:12
272:3 273:25
274:1,5 286:14
308:6 309:13
312:8
**trust** 148:17 305:3
**truth** 309:8,8,9
**try** 51:18,24 52:10
70:2 117:13 118:7
133:25 192:13
231:18
**trying** 21:16 36:16
51:13 59:17
169:11 181:2
206:7 223:9 263:6
268:19 276:17
277:9,16 278:17
283:2 305:7,16,18
**tucson** 2:12
**turn** 8:14 33:5
122:15 150:19
277:10
**turned** 21:1 33:5,9
34:3 77:24
**turning** 148:1
**turns** 258:7
**two** 10:15 12:2
15:8,21 17:11
23:13 25:5,7
26:20 33:5,9,23
34:3,24 48:19,22
48:25 52:11 53:19
76:21 79:15 80:5
87:10 89:21 90:22

104:6 121:14
133:12 138:3
158:21 161:3
172:20 180:13
185:2,9 186:18
188:7 193:19
210:15,21,21
217:8 234:6
236:15 237:5,6,21
237:25 239:2
242:25 249:1
268:21 294:18
**type** 9:16 23:22
32:2 33:18,18
42:16 45:18 68:21
69:10 71:18 74:9
76:2,5 77:13
78:16 79:11 95:5
108:12,22 109:16
110:7,11 132:3
137:22 138:5
139:18 140:24
141:13,25 142:15
154:5,19 155:4
156:1,2,14 158:6
197:20 203:21
261:4 264:21
273:21 293:16
**types** 61:21 102:3
124:23
**typewriting**
309:12
**typical** 155:9
191:9 245:10
**typically** 126:15
132:4 154:8,13
155:23 158:8
172:16 191:3
193:17 241:18
261:19

## u

**u** 95:17 306:21,21
**u.s.** 5:10 205:18,19
**ucsd** 289:25
**ultimately** 35:1
61:20
**umbrellas** 25:5
**unassisted** 59:23
207:25 210:5
**unattended**
205:15 208:13
**unaware** 121:23
164:5
**unclear** 118:6
183:5,7
**uncomfortable**
292:11
**uncommon** 261:18
**uncovered** 135:24
135:25 144:19
**underlined** 60:15
215:15
**underneath** 58:17
60:7 183:6 184:2
194:23 196:1
217:17
**underside** 70:22
252:13,14
**understand** 7:11
7:14,18,20,24 8:22
11:6 21:4,22 28:1
28:24 32:23 33:16
49:19 50:21 54:15
55:6 57:4 65:14
67:9 70:25 76:4
76:11 80:14 81:12
92:14 93:5 94:1
94:22 103:8 107:1
108:23 113:18
114:6 116:19
122:24 130:18

133:7 149:24
151:11 159:8
165:10,18,22
174:19 178:15
181:2 194:7 200:6
200:20 201:8,20
203:4,5 205:17
208:16,20 214:3
218:20 223:4
224:3 225:1 227:2
227:3 231:10,23
234:3 236:14,23
237:9 238:20
239:13 240:17,25
245:17,24 250:19
251:6 256:23
258:19,24 262:1
265:5 271:17
281:3 283:1 285:3
294:16 300:12
**understanding**
22:1 27:3 39:2,8
52:21 61:14 107:6
119:19 128:25
130:6 142:21
158:13 178:21,23
179:12 180:4,14
188:17 214:1,18
214:22,25 231:16
244:21 247:12,23
248:12 263:9
269:18 272:22
279:18 285:7
293:22 294:8
303:15
**understands** 78:24
**understood** 7:23
244:15,17,19,24
245:2 263:12
265:19 266:19
267:19,24,25

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

[understood - versus]

Page 56

271:16,23 286:18
**undertake** 111:9
**undertakes** 130:7
**unethical** 71:12,18
72:7 289:7
**unfair** 77:6
**unfortunately**
83:18
**unique** 107:21
108:18 109:4,5,10
110:15 228:7
**united** 1:1 204:20
205:2 281:8
**universally** 204:25
**universe** 127:16
128:6,12 247:2
292:24
**universities**
289:23 291:4
**university** 72:13
72:14 73:13 75:7
290:10,16
**unnecessarily**
47:8
**unnecessary** 78:6
117:12 146:4
**unrelated** 68:15
70:4
**unreliable** 283:9
**unrestrained**
148:13 149:1,8,22
150:18
**unsafe** 14:5 65:22
72:11 74:7 120:12
191:22
**unsound** 68:20
71:4
**unsupervised**
121:12 150:4
**unusual** 260:19
262:22

**upload** 47:17
**usability** 193:14
**usage** 57:23 60:20
**usc** 22:10 29:9
**use** 37:23 38:15
41:22 60:21 65:1
70:8,15 71:10
74:14,18 80:16
81:14 86:8 103:17
103:20 105:13,13
109:10 111:24
112:25 126:2
129:3 135:25
145:11,20,25
146:3,7,17,22
147:13 150:1
152:8,9,12,14,19
152:24 159:7
180:3 183:24
189:4 190:3 192:2
204:10 207:6,10
207:23 209:24
215:8 216:8,19
217:13,23 218:3,6
218:25 219:1
220:10 221:22
222:1 223:15
226:1,7,10,14
229:22 233:25
234:5,15,16,22
235:7 241:17
245:7,18 246:3,5
253:4,6 257:1,16
275:14 278:19
287:14 289:5
292:1 294:2,3,18
300:1,21 302:1
**useful** 77:22,23
211:25 212:1
**useless** 80:1

**user** 27:21,21 28:8
58:15 74:17
103:18 105:10,13
109:2,9 111:20
165:21,23 183:10
183:10 190:3
191:6,9,11,20
193:2,4,4,5,7
194:4,24 197:12
200:23,24,25
201:4,18 203:25
207:5 209:23
210:6 216:7 229:7
241:25 250:13
252:8 253:14
255:4 257:9,19
**users** 29:21 66:9
67:9 80:16 88:18
100:16 111:23
112:25 113:4
114:5 152:19
161:5 189:22
190:21 191:6
194:7 196:11,12
197:14 200:20,22
201:5,23 202:2
203:1 215:7 222:4
222:19,19 223:15
226:23 228:24
234:3,15 236:8
239:1,5,16,19
240:21 241:6
243:8,11 253:24
255:1 299:5 302:1
302:2
**uses** 193:10
**usual** 90:2,4
246:15
**usually** 13:2 75:6
75:8 108:9 155:8
158:12 169:12

172:11,15 185:5
214:2 253:17
258:1 261:19
262:3,9

| **v** |
|---|

**v** 1:7 3:21 310:4
311:1 312:1
**vague** 236:7
**variable** 24:19
70:21
**variables** 70:19
**varies** 24:5
**various** 52:22
61:18,20,21 99:14
102:8 106:19
144:23 151:18
161:20 187:8
193:22 208:20
214:18 237:1,13
**vary** 30:19
**vehicle** 27:23,24
27:25,25 287:23
**vehicles** 32:17
**verify** 310:9
**veritext** 5:15,17
85:24 86:19
310:14,23
**veritext.com**
310:15
**version** 93:23
206:22
**versus** 5:8 24:3,24
26:1 45:8,11
108:24 110:13
125:11 133:19
134:3 159:15
179:4 197:16
198:4,24 199:5
205:19 211:6
249:21 250:22
251:9 263:25

Alison Vredenburg, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

276:23
**vice** 22:18,21 28:7
**video** 1:16 2:1
  140:4 154:9,12
  155:22 156:17
**videoconference**
  2:11
**videographer** 2:21
  5:3 6:2 41:8,11
  91:24 92:2 122:7
  122:10,16 164:18
  164:21 192:16,20
  192:23 223:21
  227:10,13,16
  256:17,19 269:5,7
  276:2,7 303:10
  304:16,19 305:25
  306:4,7 307:12
**videotape** 68:16
**videotaped** 3:9
  46:3,11 155:16
**view** 109:21 194:8
  196:24 289:6
**viewing** 190:4
  249:10
**violate** 71:14
**violating** 42:23
**virtue** 120:7
**visible** 154:22
  190:6 191:6,12,22
  192:1,3 193:24
  194:12,15,19
  195:1
**visually** 51:16
**voice** 26:8 31:4
**volume** 20:1 86:19
**vredenburgh** 1:17
  2:1 3:3,10,11 5:7
  6:7,14,19 7:3 26:7
  41:14 51:15,22
  66:20 86:11,17

92:5 121:20
122:13 164:24
167:8 168:9,12
170:12 227:19
278:23 283:25
295:11 304:23
305:15 306:11,13
307:4 308:4,14
310:5 311:2,24
312:2,4,12
**vredenburgh's**
  86:25

## w

**wait** 247:8 252:4,4
  252:4 260:2,2
  268:24 270:5
  276:6,6
**waiting** 231:20
**walk** 71:1 113:18
  116:19 133:7
  149:10 155:18
  187:9 231:15
  300:12
**walked** 16:1
**wall** 196:7 252:10
  252:14
**want** 6:9 11:23
  23:18 25:3 26:24
  33:14 34:22 35:12
  38:9 47:8 51:6,20
  54:15 56:15 57:8
  59:15 63:1 65:4
  66:14 70:5,8
  78:18 79:5 85:2
  85:15,16 87:21
  88:3,17 90:10
  91:23 94:19 103:9
  104:6 106:24
  121:16 133:6
  136:14,15 139:7
  148:21,22 151:6

151:25 157:6,8,19
158:14,19 161:17
167:17 168:13
169:21 170:2
176:2,3,4 179:17
187:3,9 190:17
199:16 202:9
209:5,6 215:2
220:6 227:21
229:2,24 240:13
249:2,5 254:25
265:11 270:9
275:14 280:2,3
288:16 293:5
295:16 301:13
304:25 305:2,6,12
**wanted** 21:22 29:5
  47:5 168:18
  224:25 229:5
  230:14 262:16
  264:22 268:21
  271:16 272:7,21
  272:23 273:16
  275:1,20
**wanting** 34:10
**wants** 23:16
**warn** 105:17
  234:23 240:16
**warned** 208:23
  218:21 219:6
  240:17 255:12
**warning** 3:17
  34:10 38:5,11
  56:25 58:2,10,11
  58:14 59:10 60:10
  60:22,24 61:1,22
  61:24 62:3,9,15,16
  62:17 63:16,19
  64:13,16,17,19
  65:1,24 66:12
  67:22 70:13,14,21

80:20 81:1,20
102:25 103:19
110:13 111:19,22
117:6,7 155:20
158:9,11,18
159:15,23,24
160:22,24 161:4,7
183:7 184:2 190:8
191:8,12,17 192:1
192:7 193:24
196:3,25 197:3,5
198:3,3 204:5
205:14,23 206:3
207:5 208:6,18,22
209:18 210:22
211:9,16,18 215:5
215:7 216:6,7
217:5 218:8,17
219:10 220:19
222:6,8,22 223:2
223:17,25 224:5
224:15,17,21
225:1,2,7,14,23,25
226:13,16 227:1
227:20 228:12,14
228:18,22 230:2,3
230:19 232:17
233:6 234:9 235:1
235:3,8,19 236:2,4
236:7,23,25 237:6
237:8,14,18,20,20
237:24 238:15
239:6,17,20,24
240:7,18,23,23
241:8,10 246:6
249:22 251:18,21
251:24,25 252:9
252:25 253:14
256:25 257:2,8,8
257:12,12,24
258:3,4,8 259:12

Alison Vredenburgh, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

263:10,16,25,25
264:7,7 265:19,21
270:2,14,18,19
271:5,5,6,9 272:21
279:17,19,25
284:5 285:8,23
286:1,2,3,12,21
293:24 294:8,11
298:1,17 299:2,12
299:15,15,20,25
300:10,15,19,22
301:7 302:3
306:20,22
**warning's** 226:9
**warnings** 55:15,16
56:10,11,19 57:6,9
57:18 58:14 61:3
61:12,15,20 62:6
66:1,8 68:9,12
70:6 74:11 76:7
78:13,18 79:13,24
82:16 85:6 100:4
104:2,5 112:3
113:2 125:19,20
125:23 154:16
155:6,9 157:17
158:8 159:14
188:20 189:20
190:19 194:1,2,2
198:10 200:1
205:19,19 210:12
210:22 220:18,20
221:24 222:9,25
223:3,9,10 229:3
229:12,14,18,20
229:21 230:15,21
231:1,2,7,9,16
231:24,25 235:19
236:12,15,17,17
236:19 237:1,5
238:4,24 239:1

241:8 246:17,17
249:1,6,13,21
252:23 253:1
254:22 255:14
258:1 266:14,18
266:18,21 267:15
267:20 278:1
279:6 284:1,3,13
284:15,22 286:1,6
286:17 288:4
293:21,22 294:20
298:6 299:6
300:18,20 302:5
**warns** 209:23
259:5
**warp** 15:16
**waste** 9:19 51:5,20
**watch** 68:7 70:7
70:10
**watching** 295:14
**water** 164:16
223:22
**way** 6:9 14:15
22:21 34:4,10
36:21 38:1 47:3
50:19 68:3 69:23
79:3 101:10,11
105:3 110:4
111:13,18 112:24
113:22,25 114:1
115:14 126:4
129:4 131:21
133:10 138:9
155:9,25 165:5
168:11,19 169:10
169:20,21 170:7
171:3 180:21
191:22 195:14,18
197:1 201:1,21
210:16 213:7
218:11 219:2,14

221:23,24 222:9
222:13 224:13
226:12 230:10
243:3,12 248:5
258:9 263:1 268:4
272:11 278:5
291:24 295:1
296:12 298:23,25
**ways** 26:20 125:14
126:3 129:11
132:1 140:8
172:18,20 191:21
193:19
**we've** 46:4 51:4,10
82:6 92:7 96:5
137:16 139:4
142:20 153:13
161:11 164:25
166:6 207:2 225:6
251:23 252:2
254:3 259:15
302:1,25
**wear** 136:13
144:19 182:19
**wearing** 76:22,25
135:4 144:20
164:10,13
**web** 83:2,2
**website** 26:19,24
26:24 27:11,12
126:25 129:3,14
130:21
**wednesday** 1:18
2:3 5:1
**weeks** 10:7
**weighed** 81:23
**weight** 183:25
**welcome** 6:16
50:15 206:25
208:5

**went** 72:12 80:24
81:24,25 131:6
289:24 290:14,22
296:22 306:9
**wetmore** 2:11
**whatever's** 156:18
241:20 246:11
**wheelchair** 71:23
72:12 289:24
290:12
**wheelchairs** 291:9
**whichever** 207:1
208:1 210:5
**wi** 47:3
**wide** 74:14,15
**willing** 22:13 33:8
33:11,12 34:6
**witness** 8:13,16
11:11 12:8,16
26:6,9 52:2 59:9
62:3 63:19 65:11
76:11,18,21 80:23
85:21,22 86:3,9
89:17 92:8 97:23
106:12,15 109:22
116:1,13,24
118:13 119:17
120:10,17,23
121:6,23 122:5
127:11 128:4
130:4 132:22
135:21 144:14
148:15 149:7
151:3 153:13,19
155:8 156:22
159:4 160:3
167:10,14,17,20
167:25 168:22
169:4,18 177:9
179:17 180:8
182:14 188:14

Alison Vredenburg, Ph.D.
In Re: Fisher-Price/Mattel

September 22, 2021

**[witness - z███'s]**

Page 59

195:4,18 199:18
199:20 203:24
210:11 213:2
218:1 223:19
228:3 233:11
234:21 237:4
243:15 246:9
248:8,22 249:25
252:7 260:6
261:10 262:13
267:10,23 272:5
273:5,13,25 276:5
278:1,13 295:4,8
295:12,15,19
296:8,12 298:20
299:23 300:9
301:17 302:22
303:20 305:16,23
307:6 309:6,21
310:8,10,12,19
**wogalter** 87:16
**wogalter's** 125:21
**women** 15:8,22
  97:19
**wondering** 84:7
**word** 103:17
  126:11 215:14
  229:25 230:22
  232:11,16 257:1
  257:16 265:21
**worded** 244:18
  267:23
**words** 56:23 69:23
  75:24 155:13
  164:7 177:5
  214:17 229:13
  230:18 244:25
  245:2 282:18
**work** 16:13 22:2
  22:25 24:2,18,23
  24:24 25:5,6,12,14

25:23 26:16 28:10
30:7 33:1,2,8,11
35:1 42:8 45:7
79:4 98:8 178:16
180:16 212:14
229:18 235:18
260:16 261:5,23
277:11
**worked** 9:3 11:2,6
  17:24 22:7,21
  25:21 31:8 32:3
  41:16 44:21 61:11
**worker** 9:19 28:14
**working** 22:16
  23:24 24:10 25:15
  29:1 34:8 40:16
  41:1 42:19 72:8
  178:13 304:2
**workplace** 23:17
  27:20 88:12,19
**worried** 210:11
**worst** 111:18
**worth** 288:2,2
**wriggled** 175:20
**wright** 290:5
**write** 36:3 39:1
  173:9
**writing** 24:17
  25:13 38:21
**written** 13:6 20:17
  44:17,18 48:12
  58:7 82:4 91:2
  129:13 244:20
  250:9,16 301:2,20
**wrong** 84:8,21,25
  168:25 264:21
**wrote** 18:15 89:5
  248:19 271:7
  279:10

**x**

**x** 96:9 112:16

**y**

**y** 96:10
**yeah** 22:19 25:8
  47:2 76:11 84:17
  86:24 93:10 167:8
  168:23 176:5
  193:4 215:21
  223:1 231:20
  250:7 275:7 298:3
  302:22 305:8,14
  305:16,24
**year** 10:25 11:18
  13:10,16 19:15
  24:20,20 26:11,12
  26:18 99:3 111:2
  111:3 127:25
  288:21
**years** 14:11 15:10
  15:14,18,19 20:4
  22:3 24:16,21
  30:11,16 36:18,20
  99:16 127:6
  198:15 212:13
  215:14 216:3
  249:25 250:17
  260:15 261:4,22
  271:2,8 301:4,20
**yelled** 148:22
**yesterday** 48:3
  50:4,5 90:13
**york** 290:25
**young** 17:5 32:16
  32:17 35:16
  179:22
**younger** 36:12
  180:2

**z**

**zackowitz** 278:24
  279:10 297:8,11
**zealand** 121:9
**zero** 219:11,12,23
  221:15,17 224:8
  231:7 259:10
**zimolong** 87:11,11
  87:22
**z███** 61:1 62:1,18
  65:18 93:24 96:9
  96:13 97:6 131:4
  131:12 132:19
  133:12 163:22
  175:18 177:5
  182:11,17 191:10
  224:5 225:16
  232:1 233:6,14,19
  245:1 249:22
  250:23 251:10
  264:1 270:3,15,16
  284:23 285:10,24
  298:7,17 299:12
  299:21,23 300:16
  301:8 302:9
  303:18
**z███'s** 63:23 64:15
  64:22 95:23 96:3
  96:3 131:14,20
  132:8,25 133:9,11
  134:18 157:22
  166:11 171:16
  173:19 175:7
  181:11,20 182:6
  196:6 197:16
  198:15 205:8,24
  216:3 225:8 242:5
  242:17 243:3,12
  269:15 286:6
  303:2

Alison Vredenburgh, Ph.D.                    September 22, 2021
In Re: Fisher-Price/Mattel

**[zoom - zoom]**                                                         Page 60

**zoom**   261:21

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.