**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, Arizona 85705
(520) 620-3975

John E. Osborne, Esq.
State Bar #07085
josborne@goldbergandosborne.com

William C. Bacon, Esq.
State Bar #04895
wbacon@goldbergandosborne.com

John A. Musacchio, Esq.
State Bar #037255
jmusacchio@goldbergandosborne.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>Plaintiff,<br><br>vs.<br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation.<br><br>Defendants. | No: CV-19-02689-GMS<br><br>**PLAINTIFF KATHLEEN COURKAMP'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF ERIK CHRISTENSEN, M.D.**<br><br>**ORAL ARGUMENT REQUESTED** |

The Court should deny in whole Defendants' Motion to Exclude the Opinions of Erik Christensen, M.D. Nothing in the Defendants' Motion allows for the exclusion of Dr. Christensen's opinions under Federal Rule of Evidence 702 ("Rule 702"), or any other Rule. Plaintiff incorporates herein by reference Plaintiff's Statement of Facts, Response to Defendants' Motion for Summary Judgment, and Motions to Exclude Alison Vredenburgh, Ph.D., Michael Goodstein, M.D., and William Singhose, Ph.D., in their entirety.

# **INTRODUCTION**

Defendants moved to exclude all of the opinions and testimony of Plaintiff's pathology expert, Erik Christensen, M.D. Defendants do so on the basis that his testimony will be "unreliable" as that term is understood under Rule 702. Their arguments rest on the assertions (1) that Dr. Christensen did not conduct a reliable differential diagnosis and (2) that his opinions are not based on a competent and reliable scientific methodology. These contentions are without merit.

Dr. Christensen is a highly qualified medical pathologist who is the Chief Medical Examiner for the Utah Department of Health. Dr. Christensen's Resume, attached as Exhibit "1" p. 1. He holds Board Certifications in Forensic Pathology and Anatomic and Clinical Pathology, and is also a Diplomate of the American Board of Medicolegal Death Investigators. *Id.* at 2.

Dr. Christensen is also the Assistant Program Director of the Forensic Pathology Fellowship Program at the University of Utah School of Medicine, and an Adjunct Professor in Pathology there. *Id.* Additionally, he is currently the Toxicology Laboratory Director for Select Laboratory Partners in Greensboro, North Carolina.

In addition to his thirty (30) years of clinical and forensic pathology experience, he has authored and/or co-authored twenty-eight (28) scholarly articles and abstracts and has given not less than sixty-one (61) invited lectures on topics including, but not limited to, Sudden Infant Death Syndrome ("SIDS"), Sudden Unexplained Infant Death ("SUID"), postmortem respiratory pathogen testing in pediatric decedents, postmortem pediatric toxicology, asphyxia deaths, non-cardiac causes of sudden unexplained death, drowning deaths, autopsy techniques and dissections, investigative findings from autopsies, identification of infections and disease in autopsies, analysis of pre- and post-synaptic structures in postmortem brain tissue, identifying cause of death in mass fatality incidents, and other forensic pathology topics. *Id.* at 4-11. He also filmed an instructional video for the Virginia Institute of Forensic Science and Medicine. *Id.* at 7.

Dr. Christensen has testified as an expert in twenty-nine (29) legal matters during the last four (4) years and he has never been excluded from testifying.

Dr. Christensen is being offered as an expert pathologist to demonstrate that Plaintiff's infant child, Z.O., died in the subject Rock 'n Play Sleeper ("RNPS") as a result of positional asphyxia. Dr. Christensen will also address how the RNPS deviated from the safe sleep guidelines published by the American Academy of Pediatrics (AAP).

Dr. Christensen performed all necessary independent investigation and research before arriving at his conclusions, sufficient to satisfy Rule 702.

In addition, Dr. Christensen's opinions rest on sound scientific authority, satisfying Rule 702. For example, Defendants completely ignored – and failed to inform the Court about – the eleven (11) scientific publications that Dr. Christensen referenced and relied upon in his expert report and rebuttal report. Dr. Christensen's Report, Def. Motion Exhibit "A" p. 6; Rebuttal Report, Def. Motion Exhibit "F" p. 8.

Defendants have also ignored Dr. Christensen's thorough review of the file in this matter, which includes, but is not limited to, the Medical Examiner's report, the complete Tempe Police Department report, the Tempe Fire Department report, the police photographs of Z.O. and of the scene of her death taken by Tempe Police, the autopsy photographs of Z.O.'s body taken by the Medical Examiner, Z.O.'s pre-mortem pediatric medical records, Z.O.'s newborn medical records, Plaintiff's antepartum and delivery medical records, the transcribed interviews of Z.O.'s parents and grandparents, Defendants' experts' reports, and several deposition transcripts, including, but not limited to, those of death investigator Farrel Swope (who performed the death investigation at the scene), Medical Examiner/pathologist Michael Ferenc, M.D., Fisher-Price's medical consultant Gary Deegear, M.D., and the Tempe Police officers at the scene. Dr. Christensen's Report, Def. Motion Exhibit "A" p. 1; Rebuttal Report, Def. Motion Exhibit "F" p. 1.

3

Dr. Christensen's analysis, opinions and conclusions both as to Z.O.'s cause of death and whether the RNPS deviated from the safe infant sleep guidelines published by the AAP are entirely reliable, satisfying Rule 702.

For these reasons and those below, Plaintiff asks the Court to deny this Motion.

### ARGUMENT

### I.  DR. CHRISTENSEN'S DIFFERENTIAL DIAGNOSIS IS RELIABLE AND BASED ON THE EVIDENCE, SATISFYING RULE 702.

A.   Dr. Christensen's Methods Meet the Standard for a Differential Diagnosis.

Plaintiff agrees with Defendants' contention that "a reliable differential diagnosis may form the basis of an expert's causation testimony." *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014). For the reasons discussed below, Dr. Christensen's testimony is entirely reliable and satisfies Rule 702.

Defendants imply that Dr. Christensen somehow "neglected" to consider a hypothesis that could explain Z.O.'s death. As explained in detail below, that contention is not true. Therefore, Defendants' false implication that the Ninth Circuit's decision in *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003) supports exclusion of Dr. Christensen is entirely misplaced. Importantly, in *Clausen*, the Court did ***not*** exclude the expert and did ***not*** find that he "utterly fail[ed] . . . to offer an explanation for why the proffered alternative cause was ruled out" *Id.* at 1058. Rather, the court found that his testimony was sufficiently reliable. *Id.* at 1061. Similar to the expert in *Clausen*, Dr. Christensen considered ***all*** of the potential, hypothetical diagnoses that may have explained Z.O.'s death, both in his reports and at his deposition, and explained why he ruled them out. Dr. Christensen's Report, Def. Motion, Exhibit "A" pp. 4-5. Further, he ultimately concluded that the evidence demonstrates that she died as a result of positional asphyxia after rolling in the RNPS. *Id.* As in *Clausen*, Dr. Christensen performed sufficient analysis and his testimony is reliable under Rule 702.

Defendants' reliance on this Court's decision in *Alsadi v. Intel Corp.*, No. CV-16-03738-PHX-DGC, 2019 WL 4849482 (D. Ariz. Sep. 30, 2019) is also misplaced. In *Alsadi*,

4

the excluded expert "cite[d] no medical literature or independent research . . . he describe[d] no clinical experience he may have . . . [and did not] identify the principles and methods he used to reach his conclusions." *Id.* at *2.

In stark contrast to the excluded expert in *Alsadi*, Dr. Christensen ***did*** rule out the alternative potential causes of Z.O.'s death. Dr. Christensen Report, Def. Motion Exhibit "A" pp. 2-5. He ***did*** cite several medical and scientific sources. *Id.*, p. 6. He ***did*** perform his own independent research and analysis of the extensive file in this case relating to Z.O.'s health and cause of death. *Id.*, pp. 1-2. He properly identified the principles and methods he used to reach his conclusions. *Id.*; *see also* Dr. Christensen's Deposition, Def. Motion Exhibit "E" throughout. Dr. Christensen's detailed analysis, reasoning, conclusions and opinions fully satisfy Rule 702.

Similar to the excluded expert in *Alsadi*, the expert in *Heck v. City of Lake Havasu*, No. CV 04-1810-PCT-NVW, 2006 WL 2460917 (D. Ariz. Aug. 24, 2006) was excluded because he "provided '***no*** scientific explanation for ruling out the [other possible causes of death]" and did not engage in nearly as comprehensive an analysis as Dr. Christensen has in this case. Def. Motion, 6:25-26 (emphasis added).

Here, by stark contrast, as explained above, Dr. Christensen detailed his review and analysis of the file materials to rule out all other potential causes of death before arriving at his conclusion that Z.O. died from positional asphyxia when she rolled from supine to prone in the RNPS. Dr. Christensen's Report, Def. Motion Exhibit "A" pp. 1-2, 4-5. In fact, Dr. Christensen even ruled out several additional potential causes of death that Defendants fail even to mention in their Motion. *Id.*, p. 4 ¶3, p. 5 ¶¶ 1-3.

Notably, in *Westberry v. Gislaved Gummi AB, et al.*, 178 F.3d 257, 265 (4th Cir. 1999), which Defendants also cite to support their faulty arguments, that Court held that the expert's differential diagnosis needs to be "so lacking that it cannot provide a reliable basis for an opinion on causation." In that case, the court actually denied the defendant's motion to exclude plaintiff's expert based upon the expert's sufficient report and deposition testimony.

5

Like the experts in *Westberry* and *Clausen*, Dr. Christensen performed a detailed scientific analysis of ***all*** the evidence in this case to form his opinions and rule out the other hypothetical causes of death which he found were not supported by the record. Dr. Christensen's Report, Def. Motion Exhibit "A", pp. 1-2, 4-5.

Defendants want this Court to believe that Dr. Christensen engaged in a mere cursory review of the file and failed to take the other potential causes of death into account. That is simply not true. In reality, Defendants have cited no case or other authority that provide grounds to exclude Dr. Christensen's differential diagnosis or his other testimony and opinions, so their Motion should be denied in its entirety.

B.  Dr. Christensen's Causation Conclusion is Reliable and Satisfies Rule 702.

Defendants' Motion is nothing more than a veiled attempt to have this Court decide issues of material fact that the jury needs to decide. As discussed in detail below, the "objective evidence" that Defendants claim Dr. Christensen allegedly "ignored" are actually highly disputed issues. Those pieces of evidence have multiple interpretations and raise genuine questions of material fact. Dr. Christensen took all the objective evidence into account before reaching his opinions in this case. Defendants' disagreement with Dr. Christensen's conclusions is not a reason to exclude him under Rule 702.

"Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *City of Pomona v. SQM North American Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Therefore, the weight that should be afforded to Dr. Christensen's opinions based on the contested evidence cited by Defendants is squarely a question for the jury and is not grounds for exclusion under Rule 702. *Id.*; *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Also, Defendants have taken a mere few lines of Dr. Christensen's quoted testimony out of context and have failed to inform the Court of his true opinions in this case, as well as the detailed analysis that he performed to arrive at his conclusions. In reality, Dr. Christensen

6

has relied on ample evidence, scientific sources and analysis to support his opinions, satisfying Rule 702. Dr. Christensen's Report, Def. Motion Exhibit "A" pp. 1-2.

        1.     Dr. Christensen adequately accounted for the post-mortem rigor mortis and lividity scientific evidence, satisfying Rule 702.

Defendants claim that "Dr. Christensen disregarded scientific evidence about the objective post-mortem findings," specifically evidence about rigor mortis and lividity. Def. Motion, 7:9-13. Dr. Christensen did not disregard that evidence. On the contrary, he reviewed, considered and provided detailed analysis of these factors. *See*, *e.g.*, Dr. Christensen's Rebuttal Report, Def. Motion Exhibit "F" p. 4-5 ¶ 18, p. 5 ¶ 19, p. 6 ¶ 25; Dr. Christensen's Dep., Def. Motion Exhibit "E" 135:4-138:16, 171-175.

Rather, Dr. Christensen has a different ***interpretation*** of that evidence than the Defendants' chosen interpretation. Dr. Christensen's interpretation of that evidence is based upon the scientific sources cited in his reports, as well as his thorough review of the file as explained above and in his report and rebuttal report. Dr. Christensen's Report, Def Motion Ex. "A" p. 1; Rebuttal Report, Def. Motion Exhibit "F" p. 1.

The position in which Z.O.'s body was found by her parents is a highly contested issue of material fact. Defendants claim that Z.O. was not face-down (prone) when she died and, therefore, did not roll or suffocate in the RNPS. Def. Motion, 7:25-8:4. Defendants want this Court to believe that the lividity patterns on her body ***definitively prove*** that she did not die face-down, while also claiming that the lividity patterns are "***strong evidence*** showing Z.O. was face-up, on her back when she died." Def. Motion, 7:25-8:6.

Regardless of how "strong" Defendants believe that evidence may be in favor of their arguments related to Z.O.'s cause of death, it is a hotly contested issue and is not grounds to exclude Dr. Christensen's opinions under Rule 702. *City of Pomona*, 750 F.3d at 1044 (9th Cir. 2014); *Primiano*, 598 F.3d at 564 (9th Cir. 2010).

Dr. Christensen analyzed the lividity patterns on Z.O.'s deceased body and came to a ***completely different conclusion*** from the Defendants. Specifically, when Defense Counsel

7

asked Dr. Christensen if he agreed that "the lividity patterns on [Z.O.] do not confirm that she was on her side," he answered, "I think the lividity patterns on [Z.O.] are non-contributory in terms of assessing her position." Dr. Christensen Dep., Def. Motion Exhibit "E" 135:12-16.

Dr. Christensen then confirmed that livor mortis is only sometimes a factor in determining the position in which someone died. Dr. Christensen Dep., Def. Motion Exhibit "E" 135:17-19. Moreover, Z.O. was not lying flat but was on a thirty-degree incline, which would have produced blood flow to the feet, if anywhere, following death, and the record is replete with reports of her body being moved after her death. Lividity, as Dr. Christensen opines in essence, is a red herring here.

Importantly, Dr. Christensen's opinion on the topic of lividity is entirely consistent with Medical Examiner Michael Ferenc, M.D.'s explanation of lividity, who testified that he could not use the lividity on Z.O.'s body to determine her position at the time of her death "because lividity changes . . . . I've watched lividity patterns change while I have been at the scene. I have seen marks on people that hang themselves disappear while I was at the scene writing reports." Deposition of Dr. Ferenc, Def. Motion Exhibit "H" 152:11-24, 156:11-14.

Dr. Christensen explained at his deposition that lividity is not a factor in this case because, "for example, facial livor . . . can certainly be compelling . . . but a lot of times there just isn't much . . . ." Dr. Christensen Dep., Def. Motion Exhibit "E" 89:25-90:4. He further explained that, "by the time we're at autopsy, we're quite, quite a ways after the fact in terms of assessing the significance of lividity." *Id.* at 135:4-6.

As Dr. Christensen explains in his reports and testified at his deposition, Z.O.'s body was moved and manipulated by several people for almost three (3) hours before Police Medical Examiner Farrel Swope arrived at the scene and took photographs of Z.O.'s body. During those several hours, Z.O. had been positioned on her back by her parents and the fire department personnel. Dr. Christensen Report, Def. Motion Exhibit "A" p. 2 ¶¶ 1-3.

When Z.O.'s parents found her laying on her side in the RNPS, not breathing, with her face pressed into the soft fabric, they didn't simply leave her there. They picked her up and

tried to revive her. Dr. Christensen Report, Def. Motion Exhibit "A" p. 2 ¶ 1. Z.O.'s father, Andrew Olson, quickly attempted to perform CPR by laying Z.O. on her back on the kitchen counter, at the instruction of 911 personnel. *Id.* When fire department personnel arrived, they continued to attempt CPR and Z.O. would have remained laying on her back. *Id.* After pronouncing Z.O. dead, she was then placed in the RNPS on her back. *Id.* at p. 2 ¶ 2. The blood then pooled on the back-side of her body. Frankly, it would be illogical to think that anyone would place the recently deceased baby in anything but a face-up position; rather, any sensible person would naturally lay her deceased body on her back.

Importantly, Defendants ignore the fact that Z.O. "clearly ha[d] lividity in both the front and back of her legs," as Dr. Christensen noted. Dr. Christensen Dep., Def. Motion Exhibit "E" 136:2-4. Therefore, by Defendants' own admission, the lividity on the front of Z.O.'s legs is evidence that the front of her legs were lower in terms of gravity than the back of her legs – i.e. in the prone position on an incline of 30 degrees – when she died. But, as Dr. Christensen explained, lividity is just not definitive in this case.

Dr. Christensen also explained that Z.O.'s lividity patterns would not have become "fixed" by the time Investigator Swope examined her, which was, at most, nine (9) hours after her death (and possibly only three (3) hours after her death). Dr. Christensen Dep., Def. Motion Exhibit "E" 136:11-17. This means the blood would have continued to shift and change location for all those hours until her body was completely at rest, at which time the lividity marks would have become "fixed."

As Medical Examiner Michael Ferenc explained during his deposition in this case:

> Lividity means settling of the blood. Your blood vessels are copious. . . . when the tension of blood vessels are released after death, blood just drains down to wherever gravity pulls it like the sands in an hourglass. And it just goes where gravity pulls it.
>
> If I turn the hourglass over before lividity fixes . . . then it starts pooling the other direction. It changes.
>
> As the body cools, eventually lividity becomes fixed. It stays in one spot. But that takes hours and hours usually and a lot of cooling.

9

> But it's whichever way you switch the hourglass is where lividity goes.

Dr. Ferenc Dep., Def. Motion Exhibit "H" 159:16-160:6.

Therefore, Defendants' argument is without merit that "[i]t defies credulity for Dr. Christensen to conclude that even though Z.O. did not have any lividity on her face, and did have lividity on her posterior and back, that she was somehow face-down or semi-prone in the RNPS when she died … ." Def. Motion, 9:7-9. Both Dr. Christensen and Medical Examiner Dr. Ferenc recognize that the multiple changes in Z.O.'s position for several hours after her death would have caused her lividity patterns to change. This opinion is based on reliable scientific analysis and is also completely logical. Dr. Ferenc Dep., Def. Motion Exhibit "H" 152:11-24, 156:11-14, 159:16-160:6.

Further, Dr. Christensen's interpretation and opinions about Z.O.'s positioning at the time her body was discovered are consistent with abundant eyewitness evidence, including Z.O.'s parents and multiple police reports, each of which indicate that her parents found her prone or semi-prone with her face pressed into the fabric, and Dr. Christensen cited these multiple sources in his report.[1] Dr. Christensen Report, Def. Motion Exhibit "A" p. 2 ¶ 3, p. 3 ¶ 1, p 4 ¶ 5. Dr. Christensen's interpretation is also consistent with her parents' reenactments of how they found her, which they performed with the police using a doll to show her position when she died. *Id.* at p. 3 ¶ 5 – p. 4 ¶ 1. Prone positioning is also consistent with the bloody exudate found in the fabric beneath Z.O.'s head and around her nose and mouth, where her mouth and nose would have exuded edema fluid.

Dr. Christensen's opinion that lividity analysis is not helpful in this case is also consistent with the testimony of responding Tempe Police Detective Thomas O'Brien. An experienced homicide detective, he testified that he could not make any determinations about the circumstances of Z.O.'s death based on the lividity in her body. Detective O'Brien Dep., attached as Exhibit "2" 149:11-21.

---

[1] Dr. Christensen also considered, noted, and ultimately dismissed the report of Police Officer Torin Williams, which is the only source that claims Z.O. was found on her back, because his account is contrary to all the other sources, including the other police officers' reports and the fire department report. Dr. Christensen Report, Def. Motion Ex. "A" p. 3 ¶ 5–p. 4 ¶ 1.

The portions of Dr. Christensen's testimony that Defendants quote in their Motion are *not* any sort of "admission" that Defendants' interpretation is correct, as Defendants disingenuously claim. Def. Motion, 8:7-23. Defendants falsely claim that Dr. Christensen testified that Investigator Swope's findings regarding the rigor and livor patterns do not support the position that Z.O. was found semi-prone, as Plaintiffs contend.

This claim is not accurate. Defendants failed to include Dr. Christensen's *complete* answer, in which he explained that would be true, "if you rely on the lividity findings alone." Dr. Christensen Dep., Def. Motion Exhibit "E" 178:24-25. But Dr. Christensen did *not* rely on lividity alone to determine Z.O.'s cause of death. He actually relied on the copious evidence described above before forming his opinions. Put differently, Dr. Christensen explained that lividity, alone, cannot be used to determine cause of death and has no evidentiary value in determining whether Z.O. died in a prone, semi-prone or supine position.

Also, importantly, the quoted portion of Dr. Christensen's testimony demonstrates that he recognizes – *and considered* – the conflicting evidence and interpretations with regard to the rigor and lividity patterns. *Id.* This portion of Dr. Christensen's testimony, which shows he considered this evidence (which Defendants incorrectly claim he did not), should be grounds enough to deny Defendants' Motion.

Defendants' argument is based on disputed material evidence that has differing scientific interpretations. Dr. Christensen's opinions are fully reliable under 702, and the Court should deny this Motion.

    2.  Dr. Christensen adequately accounted for SIDS, satisfying Rule 702, and SIDS is not a contrary hypothesis for Z.O.'s cause of death.

Sudden Unexplained Infant Death ("SUID") and Sudden Infant Death Syndrome ("SIDS") are not diagnostic in nature. Dr. Christensen Report, Def. Motion Exhibit "A" p. 4 ¶¶ 3-4. Rather, they are nonspecific conclusions that medical examiners often listed on death certificates and autopsy reports when they cannot determine specifically why an infant died. *Id.* SIDS/SUID and asphyxiation are not mutually exclusive; rather, a child may be said to

have died from SIDS or SUID when their death was caused by asphyxia. Michael Goodstein, M.D. Dep., attached as Exhibit "3" 66:20-23, 275:22-276:15.

Defendants' argument on this point is, again, an improper attempt to try to secure a Court ruling on a highly contested issue of material fact. Defendants hope to convince a jury that Z.O. did not die of suffocation in the RNPS because the police medical investigator at the scene Farrel Swope and the Medical Examiner Michael Ferenc, M.D. did not definitively determine that she died of suffocation.

However, the record in this case clearly establishes that Investigator Swope and Dr. Ferenc did not have access to all the evidence before using the broad, nondefinitive terms "SIDS" and "undetermined" and completing their reports. For instance, they did not review the police report, police photographs or fire department report. Farrel Swope Dep., attached as Exhibit "4" 19:19-21, 21:17-19; Dr. Ferenc Dep., Def. Motion Exhibit "H" 175:2-9, 200:4-23, 217:7-13, 226:1-227:1. Dr. Christensen has noted the deficiencies of Mr. Swope and Dr. Ferenc's examinations and findings. *See*, *e.g.*, Dr. Christensen Report, Def. Motion Exhibit "A" p. 4, ¶¶ 4-5.

Notably, unlike Investigator Swope and Dr. Ferenc, Dr. Christensen ***did*** have access to – and analyzed – all of the evidence in this case before reaching his conclusions, which satisfies Rule 702. Defendants' claim that "Dr. Christensen neglected to provide reasons for rejecting alternative hypotheses using scientific methods and procedures" is based on the fundamental misunderstanding that SIDS and SUID are mutually exclusive from asphyxia. Def. Motion, 10:14-19 (internal quotes omitted). After reviewing all of the evidence in this case, Dr. Christensen has determined and opined that Z.O.'s cause of death was positional asphyxia in the RNPS, not simply an "unexplained" infant death like SUID/SIDS.

Defendants' argument that Dr. Christensen ignored several potential factors which could have contributed to or caused Z.O.'s death is entirely false. Rather, Dr. Christensen ***did*** consider each of the potential factors identified by Defendants and ruled them out, which satisfies Rule 702.

For instance, he specifically mentioned the findings at the scene, which included the presence of marijuana, smoking devices, and Andrew Olson's medical marijuana card. Dr. Christensen Report, Def. Motion Exhibit "A" p. 2 ¶ 4.

Dr. Christensen also indicated that the temperature in the room – recorded by Investigator Swope after he arrived at 10:47 am – almost three (3) hours after Z.O. was found unresponsive – measured 81 degrees Fahrenheit. He also noted that the room was reportedly cooled by a portable room air conditioning unit. *Id.* He further explained in his report that there was "no indication of excessive wrapping, covering or swaddling and no indication of excessive heat in the indoor sleeping environment." *Id.* at p. 5 ¶ 3.

Dr. Christensen further explained at his deposition that "there was sort of mixed report . . . in the police documents that . . . maybe she had her blanket, maybe she didn't, [her parents] didn't give her a blanket, she didn't have a blanket." But regardless, he did not have any reason to believe heat or a blanket were factors in her death. Dr. Christensen Dep., Def. Motion Exhibit "E" 115:15-19, 116:5-17. Importantly, several other sources indicate that fire department personnel wrapped Z.O. in the blanket in which she is pictured after she was pronounced dead. Detective Michelle Reyes Dep., attached as Exhibit "5" 96:20-24; Detective O'Brien Dep., Exhibit "2" 109:1-8.

Dr. Christensen also noted in his report that even though Z.O. had fluid in her lungs at the time of her birth, "she had normal well-child visits" after being discharged from the hospital. Dr. Christensen Report, Def. Motion Exhibit "A" p. 3, ¶ 3. He also explained that Z.O.'s medical records indicated that she had "no residual effects" from the upper respiratory infection a few months before her death. *Id.*; Dr. Christensen Dep., Def. Motion Exhibit "E" 107:2-14. In fact, retained fetal lung fluid usually clears shortly after birth (as it did in Z.O.'s case) and does not typically have any residual effects; likewise, upper respiratory infections are extremely common in otherwise healthy babies and is not causal in Z.O.'s death. Deposition of Michael Goodstein, M.D., Exhibit "3" 187:7-12 ("On average, children the first year of life get diagnosed with eight to nine infections. So it would be nothing unusual. And it

13

could also make some people who are not primary caregivers think that the child is always sick when they're not"); *see also* Z.O.'s pediatrician Kevin Cleary, D.O. Dep., attached as Exhibit "6" 84:3-22, 209:13-17.

Defendants also criticize Dr. Christensen for allegedly failing to account for Z.O.'s measured weights between her last well child visit and her autopsy. This criticism is misplaced. Several medical professionals involved in this case have testified that Z.O.'s measured weights are not related to her death and, in fact, one of those two weight measurements was likely a simple mistake because she was otherwise reaching all of her expected milestones and was a healthy baby. Dr. Christensen Dep., Def. Motion Exhibit "E" 139:7-141:1; Dr. Ferenc Dep., Def. Motion Exhibit "H" 213:1-6, 23-214:16; Dr. Cleary Dep., Exhibit "6" 115:23-116:4, 186:8-187:5. This is, once again, nothing more than Defendants' veiled attempt to raise non-issues and obscure the key issues in this case.

In reality, Dr. Christensen actually evaluated several additional possible causes of death in his report, including hyperthermia, congenital molecular abnormalities, and seizures and ruled each of them out, which Defendants do not even mention in their Motion. Dr. Christensen Report, Def. Motion Exhibit "A" p. 4 ¶3, p. 5 ¶¶ 1-3.

As Dr. Christensen accounted for and ruled out these multiple other hypothetical causes of death and arrived at his conclusion that she died from positional asphyxia, his differential diagnosis and other opinions satisfy Rule 702 and should not be excluded.

        3.    Dr. Christensen considered the several witness accounts about Z.O.'s position before forming his opinions, satisfying Rule 702.

Defendants argue that Dr. Christensen did not give adequate weight to conflicting statements about Z.O.'s position when she was found. Again, as explained above, "[c]hallenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *City of Pomona*, 750 F.3d at 1044 (9th Cir. 2014). Therefore, whether Dr. Christensen gave enough weight to certain witness statements (which are contradicted by other

14

witness statements and scientific evidence) is squarely a question for the jury and is not grounds for his exclusion under Rule 702. *Id.*; *Primiano*, 598 F.3d at 564 (9th Cir. 2010).

Just because Dr. Christensen gave more weight to certain pieces of evidence than others when analyzing the circumstances surrounding Z.O.'s death and determining her cause of death does not mean, as Defendants falsely state, that he somehow "ignored" that other, less persuasive and less credible evidence. Def. Motion, 11:2, 11:7. In fact, contrary to Defendants' incorrect claim that Dr. Christensen "relies exclusively on certain of Plaintiff's and Mr. Olson's statements" Def. Motion, 10:28-11:1, while he failed to give sufficient weight to other evidence, is the countervailing fact that Dr. Christensen indeed considered all the evidence. This alone is sufficient to deny Defendants' Motion, as it shows that Dr. Christensen performed a sufficient analysis under Rule 702.

Indeed, as explained above, Dr. Christensen reviewed and analyzed all of the witness statements and a large amount of other evidence and reached his conclusions after analyzing each of those sources, satisfying Rule 702.

    4.    Dr. Christensen properly relied upon the stain on the subject RNPS as one piece of evidence, as well as the other evidence in the record, to reach his conclusions, satisfying Rule 702.

Defendants falsely claim that Dr. Christensen is the ***only*** person who believes the stain on the RNPS is significant. Def. Motion, 11:25-27. This is simply false. As explained in Dr. Christensen's Report, two Tempe Police Department Detectives found this stain to be significant enough to describe it in their respective police reports.

Detective Alan Akey stated in his report that the RNPS where Z.O. died had a "dark stain where her face was." Dr. Christensen Report, Def. Motion Exhibit "A" p. 4 ¶ 2. Likewise, Detective Thomas O'Brien wrote in his report that there was a "watery, pinkish red stain approximately where the infant's head had been." *Id.* Detective O'Brien's report went into further detail about the size and characteristics of the stain, and those details are also included in Dr. Christensen's report. *Id.* This stain resulted from exuded fluid as described above.

15

In reality, Defendants and their experts are the only ones who do not see the significance of this watery, pinkish red stain in the same spot where Z.O.'s face had been when she was found dead.

As with Defendants' other arguments, they want the Court to dismiss the importance of this evidence, when determining its weight is for the jury. *City of Pomona*, 750 F.3d at 1044 (9th Cir. 2014); *Primiano*, 598 F.3d at 564 (9th Cir. 2010). The fact that Dr. Christensen finds this piece of evidence to be one of several substantial pieces of evidence does not "cut to the heart of Dr. Christensen's credibility" and is not a valid basis to exclude his testimony under Rule 702. Def. Motion, 12:9-10.

Again, as explained above, Dr. Christensen's opinions in this case are based on multiple reliable sources. He did not "cherry pick" any evidence and is not "speculating" as to the significance of this particular evidence, as Defendants have falsely claimed in what can only be an effort to try to prejudice the Court against him. Def. Motion, 12:11-13:5. Rather, Dr. Christensen is allowed to review, analyze and consider all the evidence, and make his determinations on that evidence, as he has done. The fact that he places more weight on certain pieces of evidence than Defendants would like does not violate Rule 702, and he cannot properly be excluded under Rule 702 because Defendants refuse to agree that certain evidence is important, especially when that evidence is harmful to their position.

## II.  DR. CHRISTENSEN IS QUALIFIED TO OPINE ON AAP STANDARDS.

As explained above and as demonstrated on Dr. Christensen's extensive resume, he has significant experience and expertise in assessing, writing and lecturing about infant-related deaths. Dr. Christensen Resume, Exhibit "1" p. 4, 7, 9. He has lectured to pediatricians at an American Academy of Pediatrics conference about SIDS. Dr. Christensen Dep., Def. Motion Exhibit "E" 40:1-6. He has sat on the Utah Child Fatality Review Committee since 2008. Dr. Christensen Resume, Exhibit "1" p. 3. He is fully familiar with the AAP's safety standards and guidelines and is qualified to opine that the RNPS deviated from those guidelines by failing to provide infants with a firm, flat sleep surface.

16

### III. DR. CHRISTENSEN WILL NOT OFFER OPINIONS ON SUBJECTS FOR WHICH HE HAS NOT BEEN OFFERED BY PLAINTIFF.

This Court should not preemptively exclude Dr. Christensen from testifying to any topics, as it may lead to exclusion of opinions which are within his areas of expertise, prejudicing Plaintiff. Plaintiff will offer Dr. Christensen as an expert only in the areas for which he has been identified. Defendants' objections are premature, and if they raise any objections during his testimony they can be addressed at trial.

### CONCLUSION

Based upon the foregoing, the Court should deny Defendants' Motion To Exclude The Opinions of Erik Christensen, M.D. in its entirety.

DATED this 7th day of January, 2022.

GOLDBERG & OSBORNE

By: */s/John E. Osborne* _____
John E. Osborne, Esq.
William C. Bacon, Esq.
John A. Musacchio, Esq.
*Attorney for Plaintiffs*

17

# CERTIFICATE OF SERVICE

I certify that on the 7th day of January, 2022, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to the following participants of the CM/ECF System:

Nicole M. Goodwin
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Ste. 700
Phoenix, AZ 85016
(602) 445-8000
goodwinn@gtlaw.com

Lori G. Cohen (*pro hac vice*)
Brandon D. Cox (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Ste. 2500
Atlanta, GA 30305
(310) 553-2100
cohenl@gtlaw.com

Mary-Olga Lovett (*pro hac vice*)
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
*lovettm@gtlaw.com*

By: */s/ Karen M. Giacoletti*