**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, Arizona 85705
(520) 620-3975

John E. Osborne, Esq.
State Bar #07085
josborne@goldbergandosborne.com

William C. Bacon, Esq.
State Bar #04895
wbacon@goldbergandosborne.com

John A. Musacchio, Esq.
State Bar #037255
jmusacchio@goldbergandosborne.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>    Plaintiff,<br>vs.<br><br><br><br><br><br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation.<br><br>    Defendants. | No: CV-19-02689-GMS<br><br><br>**PLAINTIFF KATHLEEN COURKAMP'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT MICHAEL GOODSTEIN, M.D.**<br><br><br>**ORAL ARGUMENT REQUESTED** |

The Court should deny in whole Defendants' Motion to Exclude Plaintiff's Expert Michael Goodstein, M.D. Nothing in the Defendants' Motion allows for the exclusion of Dr. Goodstein's opinions under Federal Rule of Evidence 702 ("Rule 702"), or any other Rule. Plaintiff incorporates herein by reference Plaintiff's Statement of Facts, Response to Defendants' Motion for Summary Judgment, and Motions to Exclude Alison Vredenburgh, Ph.D., Erik Christensen, M.D., and William Singhose, Ph.D., in their entirety.

# INTRODUCTION

Defendants have moved to exclude all of Michael Goodstein, M.D.'s expert witness opinions and testimony. Defendants do so on the basis that his testimony will be "unreliable" and "irrelevant" as those terms are understood under Rule 702. Their arguments rest on the Defendants' claims (1) that Dr. Goodstein's opinions are not based on a competent and reliable scientific methodology and (2) that he did not give an opinion as to Z.O.'s cause of death. Def. Motion, 1:12, 18-19. These contentions are without merit.

Dr. Goodstein is a highly qualified medical doctor who is the Division Chief of Newborn Medicine with WellSpan Neonatology in York, Pennsylvania. Dr. Goodstein's Resume, attached as Exhibit "1", p. 25. He is also a Clinical Associate Professor of Pediatrics at Pennsylvania State University's College of Medicine. *Id.* at 25-26. He is Board Certified in Pediatrics and Neonatal-Perinatal Medicine and is also a Neonatal Resuscitation Program Instructor. *Id.* at 26.

He has authored two (2) chapters for textbooks and has published sixty (60) articles and abstracts on topics pertaining to infant sleep safety, safe infant sleep environments, infant breathing and rebreathing issues, infant sleep-related deaths, Sudden Infant Death Syndrome ("SIDS"), and Sudden Unexplained Infant Death ("SUID"). *Id.* at 27-31. He has also given not less than one hundred ninety-five (195) scholarly lectures on these topics. *Id.* at 33-44.

Dr. Goodstein has also served on the American Academy of Pediatrics ("AAP") Task Force on SIDS since 2010. Goodstein Dep., Def. Motion Exhibit "C" 43:7-9, 46:16-17. In that role, he has written clinical and technical reports for the AAP on the topics of SIDS and safe sleep environments for infants. *Id.* at 45:17-20; 75:2-11.

Dr. Goodstein received an award in 2014 from the Hospital Association of Pennsylvania for his role in "Saving Babies' Lives," and he has received several other awards during his more than 34-year career. Dr. Goodstein's Resume, Exhibit "1" at 26.

Dr. Goodstein is being offered as an expert in infant sleep safety to prove that the subject Rock 'n Play Sleeper ("RNPS") subjected babies like Plaintiff's infant child, Z.O., to

2

the unreasonable, unnecessary danger of suffocating and being seriously injured or killed, that the RNPS deviated from the safe sleep guidelines published by the AAP, and that Z.O. did not exhibit any risk factors that would have increased her risk for SUID or SIDS[1].

Dr. Goodstein performed the necessary independent investigation and research before arriving at his conclusions, which is sufficient to satisfy Rule 702.

Further, Dr. Goodstein's opinions rest on sound scientific authority, also satisfying Rule 702. Defendants have completely ignored – and failed to inform the Court about – the seventy-six (76) scientific publications that Dr. Goodstein referenced and relied upon in his expert report. Dr. Goodstein's Report, Def. Motion Exhibit "A" pages 21-24.

Defendants' argument that Dr. Goodstein's opinions in this case are irrelevant because he did not give an opinion on Z.O.'s cause of death is disingenuous. Def. Motion, 1:16-18; 3:2-6. Plaintiff did not retain Dr. Goodstein as her pathology expert and did not ask him to opine as to Z.O.'s cause of death; rather, the pathology involving Z.O.'s cause of death is the province of Plaintiff's pathology expert, Erik Christensen, M.D.

Dr. Goodstein's analysis, opinions and conclusions as to whether the RNPS constituted a safe sleep environment, whether the RNPS deviated from the safe sleep guidelines published by the AAP, and whether Z.O. had any heightened risk factors for SIDS do not require him to opine as to Z.O.'s cause of death to satisfy Rule 702.

For these reasons and those below, Plaintiff asks the Court to deny this Motion.

## ARGUMENT

**I.   DR. GOODSTEIN'S SIDS AND SUID OPINIONS ARE RELIABLE AND SATISFY RULE 702.**

Every one of Defendants' assertions to support their claim that Dr. Goodstein's SIDS opinions as unreliable are baseless and factually incorrect. They have repeatedly misstated the issues to which Dr. Goodstein will testify, taken Dr. Goodstein's deposition testimony out of

---

[1] Defendants claim that Z.O. died as a result of SIDS and/or SUID and not due to a defect involving the RNPS.

3

context, and omitted key testimony to attack Dr. Goodstein's proper scientific methodology. Defendants' contentions could not be further from the truth.

While Dr. Goodstein is tremendously qualified with extensive expertise in neonatology, SIDS, SUID and safe infant sleep (as explained above), he does not have any experience acting as an expert witness in litigation matters. In fact, Dr. Goodstein's deposition in this case is the ***only*** time he has ever testified. Dr. Goodstein Dep., Def. Motion Exhibit "C" 12:16-13:1. This is only the second time in his over 34 years of medical practice that Dr. Goodstein has consulted as an expert witness for litigation.[2] *Id.* at 12:16-13:1. Defendants are now unfairly trying to use Dr. Goodstein's lack of experience testifying to their advantage by manipulating and misrepresenting his testimony by omission and misdirection. The Court should discard Defendants' sly tactics.

When Dr. Goodstein was deposed in this case, he testified that when he was hired on behalf of the *Courkamp* Plaintiff, "I thought I was going to be writing a report . . . and it wouldn't go too much further than that. This has been a whole new world." *Id.* at 117:15-19.

Defense Counsel clearly took advantage of Dr. Goodstein's inexperience giving legal testimony in order to artificially cast doubt upon his opinions for use in Defendants' instant *Daubert* motion to try to have his testimony excluded. During Dr. Goodstein's deposition, Defense Counsel repeatedly attempted to misstate his testimony on the record, despite his detailed explanations and clarifications as well as numerous objections by Plaintiff's counsel. *See*, *e.g.*, Goodstein Dep., Def. Motion Exhibit "C" 196:9-199:15, 207:17-210:10, 215:4-217:9, 226:15-227:8. In addition, Defense Counsel repeatedly interrupted Dr. Goodstein's answers during his deposition and continuously attempted to cut off answers that she didn't like, which eventually led to a lengthy disagreement on the record between Counsel. *Id.* at 62:19-66:5; 234:22-237:11. Then when Dr. Goodstein was finally allowed to finish one of his answers, Defense Counsel spent an inordinate amount of time attempting to mischaracterize

---

[2] In the other case, he was hired by the defendant manufacturer to evaluate a different infant sleep product and the extent of his involvement was to write one report. Goodstein Dep., Def. Motion Exhibit "C" 12:16-13:1, 89:5-10.

4

his testimony by claiming that he "changed" his answer; Dr. Goodstein explained on the record that he was "not changing [his] answer," but was "being more specific about [his] answer." *Id.* at 63:21-66:6, 67:4-23.

At another point during Defense Counsel's examination, she apparently did not like Dr. Goodstein's answer to one of her questions and kept badgering him to try to get him to change his answer, which he refused to do. *Id.* at 214:5-224:25. Defense Counsel eventually threatened to "take it to the judge" – likely trying to intimidate Dr. Goodstein who, again, had never before testified in a legal matter – at which point Plaintiff's Counsel intervened. *Id.* at 216:25-7. Defense Counsel nonetheless continued badgering Dr. Goodstein for an additional seven (7) pages' worth of testimony, but he refused to change his answer.[3] *Id.* at 217:8-224:25.

Later, during Plaintiff's Counsel's direct examination, Dr. Goodstein testified that he couldn't remember all of Defense Counsel's questions that she had cut him off from answering earlier in his deposition and that he was, therefore, unable to give complete answers. *Id.* at 255:17-25.

A. Dr. Goodstein Analyzed the Relevant Risk Factors For SIDS/SUID, Satisfying Rule 702.

Defendants' argument that the Court should exclude Dr. Goodstein because he purportedly did not discuss "extrinsic" factors for SIDS/SUID in his report is meritless for at least three reasons.

---

[3] It is worth noting that the topic of Dr. Goodstein's testimony was in response to Defense Counsel's question on a key issue in this case, which is whether the RNPS deviated from the AAP's recommendation that infants should sleep on a flat surface. Dr. Goodstein repeatedly testified that the AAP recommended throughout the AAP's report that babies sleep on a "flat surface," which by definition means that the baby would not be positioned at an incline. Goodstein Dep., Def. Motion Exhibit "C" 214:5-224:25. Defendants' breach of the AAP's recommendation is a key issue in this case. Even after the lengthy dispute on the record, Defense Counsel revisited the "incline" issue again later in his deposition, and Dr. Goodstein again explained that the reports are written to give affirmative directions to caregivers, and could not possibly include every potential deviation from their clear direction to have the baby sleep on "a firm and flat surface. So anything that deviates from that is a concern . . ." including an inclined sleep surface. *Id.* at 243:24-244:10. He further illustrated his point by stating that "[i]t would be unsafe to put a knife in the bed with the baby. You know, that's kind of obvious. It's the same effect. You know, it's recommended that the baby sleep surface is flat. We just didn't include the inclines because products generally don't have inclines. And the ones that do we tell you not to use for sleep. They're used for other purposes." *Id.* at 250:2-9. Notably, Dr. Goodstein had previously defined the term "flat" as being horizontal during Defense Counsel's examination. *Id.* at 59:17-60:16.

5

First, Defendants have artificially created this purported issue as a straw man to knock down in an attempt to discredit Dr. Goodstein.  In fact, Dr. Goodstein even confronted Defense Counsel about this issue during his deposition by stating that "there is some mistaken understanding with your [defense] experts in terms of intrinsic and extrinsic factors."  Dr. Goodstein Dep., Def. Motion Exhibit "C" 120:14-16.  Yet rather than using the proper distinction between "extrinsic" and "intrinsic" risk factors of SIDS/SUID in this Motion, Defendants are continuing to improperly manipulate these terms.

Second, Dr. Goodstein *did* address several extrinsic risk factors in his initial report, despite Defendants' claim that he did not.  *See*, *e.g.*, Dr. Goodstein's Report, Def. Motion Exhibit "A" pp. 7-10 (discussing factors such as lying in the prone position, rebreathing, overheating, decreasing rate of heat loss, neurologic control of cardiovascular system and decreased oxygenation of the brain).  He clearly did not "choose to ignore" "the important role extrinsic risk factors play" as Defendants have disingenuously claimed.  Def. Motion, 10:19-22.  Even when Defense Counsel asked Dr. Goodstein if Plaintiff's Counsel told him to only discuss "intrinsic" risk factors in his initial report, he responded by explaining that he discussed "what went to the health of the baby [Z.O.]" in his initial report.  Dr. Goodstein Dep., Def. Motion Exhibit "C" 233:1-5.

Dr. Goodstein also went into significant detail about additional "extrinsic" risk factors in his rebuttal report, which he did not know would be necessary until he saw that Defendants' experts had raised so many purported, but nonsensical, "risk factors" which, according to Dr. Goodstein, do not have any relevance whatsoever to SIDS/SUID analysis.  Dr. Goodstein Rebuttal Report, Def. Motion Exhibit "B" p. 2 (rebutting Dr. Fuller's "risk factors"), p. 4 (rebutting Dr. Gibbs).  Accordingly, Dr. Goodstein properly and thoroughly addressed and rebutted the relevance of those purported "extrinsic risk factors" in his rebuttal report.  *See*, *e.g.*, Dr. Goodstein Rebuttal Report, Def. Motion Exhibit "B" pp. 3-4 (rebutting Dr. Fuller), p. 4 (rebutting Dr. Gibb's opinions that risk of SIDS can be reduced by using a fan; rebutting Dr. Gibb's opinion that Z.O.'s cold two months before her death was somehow causally related to

6

her death), p. 5, par. 2 (pointing out that Dr. Gibb ignores Z.O.'s low risk intrinsic factors and also ignores additional "extrinsic" factors that show she was at low risk of SIDS), p. 6, par. 1 (rebutting Dr. Gibb's opinions because his report ignores that sleeping in a prone position – an extrinsic factor which is central to this case – doubles the risk of SIDS, and that the risk increases up to 20-fold when the baby sleeps on soft surfaces like the fabric used in the RNPS), p. 6 (stating that Dr. Goldsmith discussed factors that are not routinely discussed in SIDS literature), p. 8 (rebutting Dr. Goldsmith's discussion of BRUE because there is no connection between BRUE and SIDS), p. 10, par. 1 (criticizing Dr. Goldsmith's definition of "SIDS"), p. 10 (rebutting Dr. Drago by explaining that elevating an infant's head for sleep is not safe).

Further, Dr. Goodstein recognized that Plaintiff's other experts, such as pathologist Erik Christensen, M.D., discussed some extrinsic risk factors that were pertinent to their analyses, but not within the scope of his analysis. Dr. Goodstein Dep., Def. Motion Exhibit "C" 120:9-12. Dr. Goodstein can properly rely upon the opinions of Plaintiff's other experts in their respective areas of expertise, including Dr. Christensen's opinions regarding the application of potential extrinsic risk factors for SIDS/SUID to Z.O.'s pathology and cause of death.

Put simply, Dr. Goodstein included the risk factors that he found relevant to his analysis of Z.O.'s risk for SIDS/SUID in his initial report, and he rebutted additional supposed risk factors that Defendants' experts subsequently raised in Dr. Goodstein's rebuttal report.

Importantly, Dr. Goodstein also testified about both extrinsic and intrinsic risk factors throughout his deposition in response to Defense Counsel's questions. For example, he testified that "[Z.O.'s] cold happened way too far out from when the baby's tragic death occurred to tie those two things together." Dr. Goodstein Dep., Def. Motion Exhibit "C" 261:12-14.

For Defendants to claim now that Dr. Goodstein's analysis of Z.O.'s risk factors is somehow deficient for purportedly failing to give opinions about "extrinsic" risk factors,

7

especially when Defense Counsel deposed him on several "extrinsic" risk factors, is simply untruthful, and does not create a basis for his exclusion under Rule 702 or any other Rule.

Third, Dr. Goodstein's opinions in this case are not impacted by his analysis of any additional "extrinsic" risk factors. Dr. Goodstein did not need to list every possible risk factor for SIDS/SUID in his report, whether extrinsic or intrinsic; indeed, the list of potential risk factors is virtually infinite and impossible for any expert to include in a report. Rather, Dr. Goodstein identified the risk factors that he believed were pertinent to Z.O.'s health based on her medical records and several other sources (which will be discussed in detail below), explained the significance of each of those risk factors, analyzed Z.O.'s risk for SIDS/SUID in connection with each of those factors, and explained his conclusions and opinions, essentially that Z.O. was not at heightened risk of SIDS/SUID. Dr. Goodstein's testimony thereby complies with Rule 702.

Defendants place a high degree of significance on statements in the police report that the room where Z.O. died smelled like smoke, and they incorrectly claim that Dr. Goodstein did not consider exposure to smoke as a potential extrinsic risk factor. Def.'s Mot. 5:12-15. That is simply untrue. Dr. Goodstein explained in detail at his deposition that he had considered potential exposure to smoke as a potential risk factor when analyzing the circumstances surrounding Z.O.'s death, but that smoke exposure had no bearing on causation in this case. Dr. Goodstein Dep., Def. Motion Exhibit "C" 169:14-19. He also testified that he saw no evidence that Z.O. had ever actually been exposed to second-hand smoke. For instance, he testified that his "understanding is -- from the depositions is that [Mr. Olson] always smoked outside." *Id.* at 167:18-22; Andrew Olson Dep., attached as Exhibit "2" 215:17-18, 261:7-11. He further explained that the mere notation in the police report of a smell of smoke in the room is insignificant because "[o]nce you get the small *[sic.]* [smell] of smoke in a room, it's there forever." Dr. Goodstein Dep., Def. Motion Exhibit "C" 191:1-2. Dr. Goodstein further explained that it was important that "Ms. Courkamp was not using any

8

of those things [cigarettes, alcohol or illicit drugs] . . . . She tried to have a very healthy pregnancy." *Id.* at 175:21-25.

Notably, Defense Counsel has again misrepresented Dr. Goodstein's testimony that he would have put smoking on his list of extrinsic risk factors "if he was asked to do so." Def. Motion Exhibit "C" 191:4-14.  In reality, smoke exposure was not a relevant factor in this case, as he repeatedly testified.  Dr. Goodstein Dep., Def. Motion Exhibit "C" 167:18-22, 169:14-19, 191:1-2.  This is yet another example of Defendants' misrepresenting by omission Dr. Goodstein's testimony, analysis and opinions.

There is nothing "insufficient" about Dr. Goodstein's analysis regarding potential smoke exposure.  He simply determined that it was not risk factor for Z.O.  Dr. Goodstein Dep., Def. Motion Exhibit "C" 175:18-23.  Since the Defendants disagree with Dr. Goodstein's opinion, the jury can decide whether they agree with his analysis, but it is not a basis to exclude him under Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, Inc., 738 F.3d 960, 969 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury"); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("The Advisory Committee Note [of FRE 702] further counsels that 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system'").  Perhaps Dr. Goodstein, himself, put it best during his deposition when asked to compare himself to Defendants' neonatology expert, Dr. Goldsmith, he responded: "You know, if you put ten neonatologists in a room -- just like if you put ten lawyers in a room, they wouldn't agree on every aspect of the law." Dr. Goodstein Dep., Def. Motion Exhibit "C" 148:6-10.

B.  <u>Dr. Goodstein Thoroughly Reviewed The Relevant Records and Materials In This Case to Form His Opinions, Satisfying Rule 702.</u>

Defendants argue that Dr. Goodstein should be excluded because he purportedly failed to review or address "critical record evidence like the relevant police reports and supporting investigation documents, the medical examiner's records, and deposition testimony from

9

investigating personnel associated with the police department and medical examiner's office" Def. Motion, 10:15-18. Defendants' argument is flawed for two reasons.

First, Dr. Goodstein did ***not*** "cherry-pick[] record evidence that was helpful to Plaintiff and ignore[] record evidence that was not," as Defendants disingenuously claim. Def. Motion, 10:19-22. In fact, Dr. Goodstein actually criticized Defendants' neonatology expert Dr. Goldsmith and epidemiology expert Dr. Gibb for doing just that. Dr. Goodstein Rebuttal Report, Def. Motion Exhibit "B" pp. 3, 6-7.

Rather, Dr. Goodstein ***did*** review, analyze and consider all of these sources. He explicitly testified that he reviewed the entire Tempe Police file and reports, the records from the death scene, the whole Medical Examiner's file, the autopsy photos, the toxicology report, the Tempe Fire Department records, and multiple deposition transcripts, and that he used those sources to determine Z.O.'s health and risk factors. Dr. Goodstein Dep., Def. Motion Exhibit "C" 94:18-95:13; 103:19-104:4; 106:5-14. He also "went through all of the details of that night [before Z.O. died]." *Id.* at 106:19-21.

Importantly, Dr. Goodstein explained that he did not list those materials in his report because, to him, "references generally are referring to medical, scientific journals" like the 76 scientific journals and publications that he cited in his report that support his opinions. *Id.* at 95:7-9. Dr. Goodstein also explained that those materials were "very relevant to discuss" in his rebuttal report after reading the defense experts' reports, which he did. *Id.* at 98:10-20. Dr. Goodstein also testified that he reviewed and "relied upon" all of Z.O.'s medical records in forming his opinions. *Id.* at 96:19-21, 102:12-103:1. Dr. Goodstein also explained at his deposition that the copious file and information he reviewed "helped [him] determine that [Z.O.] was a thriving child, which is what I stated in my report." *Id.* at 106:1-4.

Notably, Defense Counsel's questions about these multiple sources acknowledged that Dr. Goodstein had reviewed and relied upon these materials, the very same materials they now falsely claim he failed to review and consider. For example:

> Q. Okay. That's part of what you relied upon. Correct?

10

> A. Yes.

Goodstein Dep., 102:24-103:1.

> Q. You looked at it [the whole Medical Examiner's file] but you did not address that in your report. Correct?
>
> A. Correct.

Dr. Goodstein Dep., Def. Motion Exhibit "C" 103:19-24.

Second, Defendants' argument does not give the Court grounds to exclude Dr. Goodstein because much of the content of those sources go to Z.O.'s cause of death and pathology, which are both the province of Plaintiff's pathology expert, Dr. Erik Christensen, not Dr. Goodstein. Dr. Goodstein repeatedly testified that he is not a pathologist and was not retained to opine on Z.O.'s cause of death or pathology.[4] *Id.* at 139:3-10, 242:11, 18, 243:3-11. Notably, because Dr. Goodstein is not a pathologist and is not opining on what caused Z.O.'s death, he did not need to discuss the inapplicable portions of those records (or, as explained above, the purported extrinsic risk factors) in detail. The scope of his testimony is the AAP's safe sleep recommendations, safe sleep environments, and a review of Z.O.'s medical records to assess her health in relation to risk for SIDS, which he did in a completely valid, reliable manner under Rule 702.

## II. DR. GOODSTEIN'S TESTIMONY IS HIGHLY RELEVANT AND SATISFIES RULE 702.

Defendants argue that Dr. Goodstein should be excluded because his infant sleep safety recommendations do not "fit" the facts of this case and that he does not connect these recommendations to a defect in the RNPS. Def. Motion at 2:12. Defendants' claims are patently false.

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *SQM N. Am. Corp.*, 2014 WL 1724505, at *3; *see also Primiano*, 598 F.3d at 565, 568 (reversing District Court's exclusion of expert testimony).

---

[4] Note that if Dr. Goodstein were to opine as to cause of death and/or pathology in this case, Defendants would likely move to exclude those opinions as being outside the scope of Dr. Goodstein's expertise and as being duplicative of Dr. Christensen's opinions.

11

Dr. Goodstein's opinions are highly relevant and he will testify about several elements of the Plaintiff's claims about the RNPS's design defects.

Dr. Goodstein extensively analyzed the RNPS in connection with the AAP safe sleep recommendations and identified several ways in which the RNPS deviates from the AAP safe sleep recommendations. *See*, *e.g.*, Dr. Goodstein's Report, Def. Motion Exhibit "A" pp. 11-12, 15; Dr. Goodstein's Rebuttal Report, Def. Motion Exhibit "B" p. 3 (rebutting defense expert Dr. Fuller), p. 10 (rebutting defense expert Ms. Drago). Further, he testified at length at his deposition during Defense Counsel's examination about the AAP's safe sleep recommendations and his opinions about the RNPS's noncompliance. Dr. Goodstein Dep., Def. Motion Exhibit "C" 52:3-5, 59:17-20, 214:5-216:23.

As discussed above, Dr. Goodstein's opinions about safe infant sleep and the RNPS's deviations from the AAP's recommendations are based on his decades of experience as a neonatologist and his more than ten (10) years of experience authoring and co-authoring the very same AAP safe infant sleep recommendations that he references. One of the Plaintiff's key arguments in its design defect claim in this case is that the Defendants ignored the AAP's safe infant sleep recommendations (which, again Dr. Goodstein, himself, authored) when Defendant Fisher-Price designed, manufactured and sold the RNPS, which deviated from those guidelines. Notably, Defendants themselves produced experts Dr. Goldsmith and Dr. Gibb to offer a different interpretation of the AAP reports claiming that the RNPS did comply with the AAP safe sleep recommendations. Goldsmith Report, attached as Exhibit "3" at 6-7, 50-52; Gibb Report, attached as Exhibit "4" at 24. Therefore, Defendants, by their own actions, admit that the AAP recommendations are relevant to this case. Defendants' argument that Dr. Goodstein's opinions regarding infant sleep safety recommendations are somehow not relevant and do not "fit" the facts of this case is meritless.

Defendants also fault Dr. Goodstein again for not opining on Z.O.'s cause of death. As explained above, Dr. Goodstein did not opine on Z.O.'s cause of death because he is not a pathologist and Plaintiff's pathology expert, Dr. Christensen (Plaintiff's cause of death expert)

12

indeed opined that the defects and hazards inherent to the RNPS caused Z.O.'s death. Likewise, Dr. Goodstein identifies those same defects and hazards that are inherent to the RNPS and explains the several ways in which the RNPS deviated from the AAP's safe infant sleep guidelines. Dr. Goodstein's focus is entirely proper, fits the case, and Defendants' arguments provide no basis to exclude Dr. Goodstein's opinions under Rule 702.

Dr. Goodstein will help the jury understand the AAP's safe infant sleep recommendations and the intent of those recommendations, including the reasons why the AAP recommends that infants be placed on a "firm and flat surface" to sleep. He will also help the jury determine whether the RNPS (which positioned babies at approximately a 30 degree angle and contained soft fabric material) deviated from those recommendations and whether the RNPS provided infants with a "firm and flat surface" as defined by the AAP.

Dr. Goodstein will also testify about several additional key points of the Plaintiff's claims and Defendants' defenses that he covered in his reports, such as the fetal lung fluid retained in Z.O.'s lungs after birth, which he opines would be cleared within 2-3 days after birth, and which was not a factor in her death at over 8 months of age. Dr. Goodstein Dep., Def. Motion Exhibit "C" 257:2-25. He will testify consistently with his reports and his deposition, that the issues that occurred around the time of her first days of life were all common issues that completely resolved and have no "bearing whatsoever on the discussion about her death." *Id.* at 259:5-9. He will also testify that Z.O. was healthy from a cardiac standpoint, even though the defense experts try to say otherwise. *Id.* at 258:20-259:4.

Dr. Goodstein's testimony will help the jury understand many of the Plaintiff's arguments and the Defendants' defenses. He will help the jury decide key issues of both Plaintiff's case and the defenses. Therefore, his testimony is entirely relevant under Rule 702.

**III. DR. GOODSTEIN'S TESTIMONY ABOUT REBREATHING IS PROPER AND ADMISSIBLE UNDER RULE 702 BECAUSE HE DISCUSSED REBREATHING IN BOTH HIS INITIAL REPORT AND HIS REBUTTAL REPORT AND AT HIS DEPOSITION.**

Defendants falsely claim that the Court should not allow Dr. Goodstein to testify to the issue of "rebreathing" because he purportedly did not analyze rebreathing prior to his deposition. Dr. Goodstein has repeatedly discussed rebreathing throughout this case, satisfying Rule 702. Defendants know – and have long known – Dr. Goodstein's opinions on the issue of rebreathing in this case and should not be surprised in any way at trial.

Not only did Dr. Goodstein discuss rebreathing in his initial report, he also cited four (4) scientific publications detailing that topic. Dr. Goodstein Report, Def. Motion Exhibit "A" p. 7, line 3. Dr. Goodstein then rebutted the opinions of defense experts Dr. Gibb and Dr. Goldsmith regarding the issue of rebreathing in his rebuttal report. Dr. Goodstein Rebuttal Report, Def. Motion Exhibit "B" p. 5 (rebutting Dr. Gibb), p. 8 (rebutting Dr. Goldsmith). Dr. Goodstein also testified about rebreathing at length during his deposition. Dr. Goodstein Dep., Def. Motion Exhibit "C" 251:17-255:10.

Once again, the limited testimony quoted in Defendants' Motion does not accurately reflect Dr. Goodstein's analysis or the content of his reports. Def. Motion, 15:14-16:12. While Defendant quotes only a brief discussion about rebreathing taken at the end of Dr. Goodstein's deposition (transcribed at pages 270-271 out of 282 total pages), Def. Motion, 17:14-18:12, Defendant fails to cite the rest of Dr. Goodstein's testimony about rebreathing which was elicited by Defense Counsel. Dr. Goodstein Dep., Def. Motion Exhibit "C" 252:7-255:10.

Courts in this jurisdiction have long held that expert deposition testimony is proper and admissible when that testimony was elicited by opposing counsel performing the deposition, even if every detail of that testimony was not included in the expert's report(s). *See*, *e.g.*, *Massara v. U.S.*, No. CV-13-00269-TUC-BPV, 2014 U.S. Dist. LEXIS 199520 (D. Ariz. Sep. 19, 2014) (refusing to preclude expert deposition testimony which further explained the expert's opinion and the literature cited by the expert in his report). Therefore, Dr. Goodstein's testimony and opinions about rebreathing are entirely proper and admissible under Rule 702.

14

Further, even if the Court were to find that Dr. Goodstein first gave his opinions regarding rebreathing at his deposition, the Court should still admit his testimony, as its admission will be harmless to the Defendant.

To determine whether a violation is harmless, courts consider the following factors: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption at trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Wheatcroft v. City of Glendale*, No. CV-18-02347-PHX-MTL, 2021 WL 1056398 at *3 (D. Ariz. Mar. 19, 2021), *quoting Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1270 (D. Ariz. 2020); *cf. Jackson v. Allstate Ins. Co.,* 785 F.3d 1193, 1204 (8th Cir. 2015) (supplemental expert disclosure that reflected prior deposition testimony of expert based on new "field study" expert performed the day of the expert's deposition was a harmless supplement).

In addition, if exclusion of evidence under Rule 37(c)(1) will "deal[] a fatal blow" to a party's claim (*i.e.* case-dispositive evidence will be excluded) a district court must consider (1) "whether the claimed noncompliance involved willfulness, fault, or bad faith" and (2) "the availability of lesser sanctions." *Merch. v. Corizon Health, Inc*., 993 F.3d 733, 740-742 (9th Cir. 2021), *quoting R & R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012).

Here, there is no prejudice to the Defendants. The trial of this action has not yet been scheduled, and Defendants and their expert witnesses will have plenty of time to prepare to rebut Dr. Goodstein's opinions about rebreathing, if they have not done so already in their expert reports and expert sur-rebuttal reports. There was no bad faith or willfulness on the part of the Plaintiff or Dr. Goodstein in testifying to his opinions; rather, as explained above, Dr. Goodstein gave those opinions in response to questions asked by Defense Counsel.

The cases that Defendants cite in which this Court and other courts have excluded expert testimony have no bearing on this Motion. Unlike the plaintiffs in those cases, who egregiously disobeyed the Court's deadlines, the *Courkamp* Plaintiff fully complied with all of the Court's deadlines in this matter.

15

In *Krause v. Cty. Of Mohave*, 459 F. Supp. 3d 1258, 1268-70 (D. Ariz. 2020), this Court (Brnovich, J.) noted that "Plaintiff missed the deadline for initial expert reports by four months. In such instances, Rule 37(c)(1) acts as a 'self-executing,' 'automatic' sanction . . . ." By stark contrast, the *Courkamp* Plaintiff properly and timely served both Dr. Goodstein's initial report and rebuttal report within the deadlines set in this Court's Case Management Order. Plaintiff also produced Dr. Goodstein for his deposition in this case within the Court's expert deposition deadline.

Similarly, the plaintiff in *Universal Engraving, Inc. v. Metal Magic, Inc.*, NO. 08-1944-PHX-GMS, 2010 U.S. Dist. LEXIS 146741, at *7 (D. Ariz. Jan. 14, 2010), also missed its expert disclosure deadline by a month and a half before even requesting the Court's leave to supplement its expert's opinion, which led to this Court's denial of the extension request. Unlike the plaintiff in *Universal Engraving*, the *Courkamp* Plaintiff has not attempted to "supplement the opinions of [her] expert trial witness [Dr. Goodstein] after the time required for doing so in the Court's Case Management Order had expired." In fact, Plaintiff is not seeking to supplement Dr. Goodstein's opinions at all. Dr. Goodstein produced timely reports and Defense Counsel elicited an opinion from him during his timely scheduled deposition on the topic of rebreathing. Defendants now incorrectly claim Dr. Goodstein's rebreathing opinions were not contained within his reports. Defendants' facts are again wrong.

In *Ariz. Oil Holdings LLC v. BP W. Coast Prods. LLC*, 2015 U.S. Dist. LEXIS 194151, at *5 (D. Ariz. May 29, 2015), this Court struck the plaintiffs' expert's supplemental report after determining that the plaintiffs should have had the information relied on in a supplemental report before having even brought the lawsuit. In the instant case, Plaintiff is not attempting to submit a supplemental report. Rather, as explained above, all of Dr. Goodstein's reports and opinions were timely disclosed.

Therefore, Dr. Goodstein's opinions about rebreathing fully satisfy Rule 702 and should not be excluded.

16

## IV. ALLEGEDLY DISCLAIMED OPINIONS SHOULD NOT BE EXCLUDED.

This Court should not preemptively exclude Dr. Goodstein from testifying to any topics, as it may lead to exclusion of opinions which are within his areas of expertise, prejudicing Plaintiff. Plaintiff will offer Dr. Goodstein as an expert only in the areas for which Plaintiff has identified. Defendants' objections to the scope of his testimony are premature and should be addressed at trial.

## **CONCLUSION**

Based upon the foregoing, the Court should deny Defendants' Motion To Exclude Plaintiff's Expert Michael Goodstein, M.D. in its entirety.

DATED this 7th day of January, 2022.

GOLDBERG & OSBORNE

By: */s/John E. Osborne*
John E. Osborne, Esq.
William C. Bacon, Esq.
John A. Musacchio, Esq.
*Attorney for Plaintiff*

17

# CERTIFICATE OF SERVICE

I certify that on the 7th day of January, 2022, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to the following participants of the CM/ECF System:

Nicole M. Goodwin
Aaron J. Lockwood
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Ste. 700
Phoenix, AZ 85016
(602) 445-8000
goodwinn@gtlaw.com
lockwooda@gtlaw.com

Lori G. Cohen (*pro hac vice*)
Brandon D. Cox (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Ste. 2500
Atlanta, GA 30305
(310) 553-2100
cohenl@gtlaw.com

Mary-Olga Lovett (*pro hac vice*)
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
*lovettm@gtlaw.com*

By: */s/ Karen M. Giacoletti*