**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, Arizona 85705
(520) 620-3975
**John E. Osborne, Esq.**
State Bar #07085
josborne@goldbergandosborne.com
**William C. Bacon, Esq.**
State Bar #04895
wbacon@goldbergandosborne.com
**John A. Musacchio, Esq.**
State Bar #037255
jmusacchio@goldbergandosborne.com
**Attorneys for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>              **Plaintiff,**<br><br>        **vs.**<br><br>Fisher-Price, Inc., a foreign corporation; Mattel, Inc., a foreign corporation.<br><br>              **Defendants.** | No: CV-19-02689-GMS<br><br>**PLAINTIFF KATHLEEN COURKAMP'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF WILLIAM SINGHOSE, PH.D.**<br><br>**ORAL ARGUMENT REQUESTED** |

The Court should deny in whole Defendants' Motion to Exclude The Opinions of William Singhose, Ph.D. Nothing in Defendants' Motion allows for Dr. Singhose's exclusion under Federal Rule of Evidence 702 ("Rule 702") or any other Rule. Plaintiff incorporates herein by reference Plaintiff's Statement of Facts, Response to Defendants' Motion for Summary Judgment, and Motions to Exclude Alison Vredenburgh, Ph.D., Michael Goodstein, M.D., and Erik Christensen, M.D., in their entirety.

## INTRODUCTION

Defendants have moved to exclude the opinions and testimony of Plaintiff's mechanical engineering expert William Singhose, Ph.D. on the basis that his testimony will be "unreliable" and "irrelevant" under Rule 702. Their arguments rest on the assertion that Dr. Singhose's opinions are not based on scientifically reliable methodology. This contention is without merit.

Dr. Singhose is a highly qualified Ph.D. mechanical engineer who is a Professor of Mechanical Engineering at the Georgia Institute of Technology's George W. Woodruff School of Mechanical Engineering.  Dr. Singhose's Resume, attached as Exhibit "1", p. 1.  His extensive resume includes visiting professorships at the Massachusetts Institute of Technology and Stanford University.  *Id.* at 1-2.  He has won numerous academic awards.  *Id.* at 3.

Dr. Singhose has authored and/or co-authored not less than four hundred three (403) scholarly journals, articles, papers and publications on topics including, but not limited to, mechanical design, biomechanical design, distribution of weight loads, oscillatory dynamics, motion measurement, friction analysis, force determination, hazard analysis, identification of human-generated forces, human operator performance testing, operator behavior, dual-sensor and Vicon tracking of human motion, flexible structure analysis, mechanical slipping dynamics, human-operated flexible systems, vehicle seat design, helicopter suspended load dynamics, air traffic conflict resolution and algorithms, human-hoverboard dynamic behavior, human-Segway dynamic behavior and testing, and control of flexible spacecraft.  *Id.* at 3-27.

Dr. Singhose has given eighty-two (82) invited lectures around the world.  *Id.* at 27-30. He has been awarded seven (7) United States patents, including one entitled "Methods and Apparatus for Minimizing Unwanted Dynamics in a Physical System."  *Id.* at 36-37.

In addition to his own scholarly and professional accomplishments, he has also supervised eighteen (18) Ph.D. candidates and forty (40) M.S. candidates, and he has hosted fourteen (14) postdoctoral fellows and visiting scholars at his laboratory.  *Id.* at 37-41.  Dr. Singhose has testified as an expert witness in twenty-three (23) legal matters across this country, including nine (9) trials.  He has never been excluded from testifying, and his testimony has only been partially limited twice.[1]

Plaintiff is offering Dr. Singhose as an expert in mechanical engineering to prove that the subject Rock 'n Play Sleeper ("RNPS") suffered from serious, unreasonable design defects

---

[1] *Manitowoc Cranes, LLC v. Sany America, Inc.*, Case No. 13-CV-677 (E.D. Wis.; trial testimony March 27, 2014); *Williams v. Manitowoc Cranes, LLC*, 2016 WL 7670061 (SD Miss. September 21, 2016; trial testimony October 13, 2016).

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

which subjected babies like Plaintiff's infant child Z.O. to the unreasonable, unnecessary danger of rolling, becoming trapped with her face against the RNPS' fabric material, suffocating, and being seriously injured or killed.

Dr. Singhose performed the necessary independent investigation and research before arriving at his conclusions, which is sufficient to satisfy Rule 702.  Dr. Singhose's opinions also rest on sound scientific authority, further satisfying Rule 702.  Defendants have ignored – and failed to inform the Court about – the twenty-one scientific publications that Dr. Singhose referenced and relied upon in his expert report, as well as the plethora of additional documents and sources produced in the discovery of this matter, as explained in more detail below.  Dr. Singhose's Report, Exhibit. A-1 to Defendants' Motion, pp. 42-43 of 61.

Dr. Singhose's analysis, opinions and conclusions are entirely reliable and highly relevant, satisfying Rule 702, and Plaintiff asks the Court to deny this Motion.

## ARGUMENT

**I.    DR. SINGHOSE'S OPINIONS ABOUT THE DESIGN OF THE RNPS ARE BASED ON RELIABLE METHODOLOGY AND RELEVANT, SATISFYING RULE 702, AND SHOULD NOT BE EXCLUDED.**

Defendants argue that Dr. Singhose's opinions should be excluded "because his research methodology was flawed and because they are unreliable and irrelevant." Def. Motion, 4:13-15.  Defendants ignore the high volume of reliable evidence, scientific sources, information, and experience that Dr. Singhose used to form his opinions, satisfying Rule 702.

A.    <u>Dr. Singhose's Methodology to Analyze the Design of the RNPS Is Scientifically Reliable and Satisfies Rule 702.</u>

Defendants completely misrepresent Dr. Singhose's opinions about the ability of infants to roll over in the RNPS and disingenuously claim that he somehow "backtrack[ed]" during his deposition to cast doubt on his credibility.  Def. Motion, 5:11-6:2.  That is simply not true.  In fact, Defendants strategically misrepresent Dr. Singhose's opinions throughout their motion.

The two short sections of testimony that Defendants quote in this argument relate to two entirely different, distinct opinions that do not overlap or conflict with each other.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

3

In the first quote, Defense Counsel asked Dr. Singhose if he believed an infant could roll from supine to prone in the RNPS more easily than if the infant were on an ***unspecified*** "flat surface." Def. Motion, 5:11-14. Dr. Singhose answered specifically that it would be "easier than a flat surface ***in the Rock 'n Play sleeper***." Def. Motion, 5:15-16 (emphasis added). He went on to explain that, "***if the Rock 'n Play sleeper had a flat back***, that would be harder [for a baby] to turn over. But they've [Fisher-Price] raised it up 30 degrees . . . ." Def. Motion, 5:16-18 (emphasis added). This testimony accurately reflects Dr. Singhose's opinion that Defendants' design of the RNPS, which included a 30-degree incline, made it easier for babies to roll than if the RNPS, ***itself***, had been flat. *Id.* Dr. Singhose's answer did not reference any other infant sleep surfaces, such as cribs or bassinets, which are flat.

While at first glance this distinction may seem immaterial, it is actually of crucial importance. Defendants fail to mention in their Motion another key difference between the RNPS and virtually every other approved infant sleeping device on the market, such as cribs and bassinets: namely, the fact that the RNPS has a hard, curved molded plastic shell beneath the portion of the soft fabric where the baby's back/torso and head would be positioned. Patent Application dated June 23, 2011, attached as Exhibit "2", p. 5 ¶ 0069; Catherine "Kitty" Pilarz 30(b)(6) Dep., attached as Exhibit "3", 153:22-25, 257:6-8; Joel Taft Dep., attached as Exhibit "4", 107:16-19; Lisa Lohiser Dep., attached as Exhibit "5", 153:23-25. This hard, curved plastic shell is meant to hold the baby in place. Pilarz 30(b)(6) Dep., 257:4-8; Taft Dep., 247:1-6, 285:4-6; Linda Chapman Dep., attached as Exhibit "6", 106:1-4, 161:14-22. This curved back is part of the double-V shape that Dr. Singhose points to as the primary defect of the RNPS' design. By contrast, cribs and bassinets do not have any such curved, hard plastic shell, but instead have flat surfaces that allow babies to roll onto their stomachs, sides and backs without restriction.

Dr. Singhose is ***not*** of the opinion that it is easier for babies to roll in the RNPS than it would be on a flat crib, and Dr. Singhose has never claimed that the RNPS is defective ***just*** because the incline makes it easier for babies to roll, as Defendants incorrectly claim.

4

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Rather, Dr. Singhose's opinion is that babies could more easily roll in the RNPS despite its hard, curved plastic shell (which Dr. Singhose opines contributes to the hazardous "double-V geometry of the design") because of the RNPS' 30-degree incline and footrest, and it would not have been as easy for babies to roll in the RNPS' hard, curved plastic shell if the RNPS had laid babies flat instead of at the incline.  Dr. Singhose Report, Def. Motion Ex. "A" p. 21 ¶ 56–p. 23 ¶ 63; p. 28 ¶ 75; p. 29 ¶ 76; p. 38 ¶ 98 ("[t]he incline allows the roll to be performed with less energy because the center of gravity of the infant does not need to be elevated as high").

Importantly, Dr. Singhose's opinion on the RNPS' inherent defects does not end there. Defendants also fail to recognize that Dr. Singhose has further opined that once a baby has rolled in the RNPS from the intended supine position into the prone position, the RNPS' hard, curved plastic shell – which, by Defendants' own admission, is meant to hold the baby in place – would trap the baby in the unsafe prone or semi-prone position with the baby's face against the soft fabric, making it extremely difficult to roll back into the safe supine position before suffocating.  Dr. Singhose Report, Def. Motion Ex. "A" p. 21 ¶ 56–p. 23 ¶ 63; p. 28 ¶ 75; p. 29 ¶ 76; p. 38 ¶ 98.  By contrast, cribs and bassinets, which do not restrict babies from rolling, would allow a baby to roll back into the supine position without obstruction if the baby were to roll from supine to prone or semi-prone, and the flat surface of a crib or bassinet would not engulf the baby's face like the fabric and curved plastic shell of the RNPS. Dr. Singhose Report, Def. Motion Ex. "A" p. 72 ¶194-197.

Therefore, Defendants' mention of the rolling ability in cribs and bassinets is simply meant to obfuscate the real issue – that when a baby such as Z.O. rolled in the RNPS, the baby would become trapped in the unsafe prone position with its face pressed against the fabric.

Defendants also want this Court to believe that Dr. Singhose's opinions are not reliable because he did not perform sufficient tests.  Def. Motion, 4:26-5:4.  This is also not true.  Dr. Singhose based his opinions on tests Defendants and their consultants performed, as well as commonly used engineering methods including the Law of Conservation of Energy,

geometrical relationships, and his own accurate measurements – all of which are widely accepted as reliable measurement tools.

Defendants' argument essentially boils down to the proposition that Dr. Singhose has no grounds to testify unless he personally performed extensive testing on the RNPS by placing live babies into the RNPS, waiting an infinite amount of time to see if any of them would eventually roll over, and then allowing them to struggle for an indefinite period of time as they tried to correct themselves to see if they could still breathe. Otherwise, how can he know if babies could roll over in the RNPS?

The answer to this question, in addition to the other doubts expressed by Defendants in their Motion, are resolved by basic principles of mechanical engineering. As explained above, Dr. Singhose has outstanding knowledge, education and experience in mechanical engineering to examine the RNPS, its design drawings, Defendants' test protocols, Defendants' test results, and the vast other materials in this case with an educated eye, which he has done, and to further apply his tremendous experience to analyze the safety hazards and defects inherent to the RNPS. *See* Dr. Singhose's report, Ex. "A" to Def. Motion; Dep. transcript, Ex. "B" to Def. Motion; and Dr. Singhose's Rebuttal Report, Exhibit "C" to Def. Motion.

In fact, Defense Counsel even discredited the method of testing that Defendants are now faulting Dr. Singhose for avoiding by flippantly asking Dr. Singhose at his deposition, "So just how long should they [Fisher-Price] have left them [test subject-babies] there struggling?" Singhose Dep., 303:1-22. Nonetheless, despite Defendants' blatant misrepresentation that Dr. Singhose had no idea how Fisher-Price should have performed a study, he actually testified that Fisher-Price should have performed this testing similarly to the way another researcher, Dr. Mannen, did when she was commissioned by the United States Consumer Product Safety Commission (CPSC). Id. at 303:13-22. Notably, Dr. Singhose discusses the Mannen study frequently throughout his Report. Dr. Singhose Report, Def. Motion Ex. "A" p. 38 ¶ 100; pp. 44-46 ¶118; p. 51 ¶ 134; p. 58 ¶ 149-p. 60 ¶ 163.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Defendants blatantly misrepresent Dr. Singhose's testing by falsely implying that the extent of "Dr. Singhose's testing methodology was literally to roll on the floor himself." Def. Motion, 7:5-7. Rather, those rolls were simply to demonstrate the geometry of biomechanical positioning of any human's arm during rolling. Dr. Singhose Report, Def. Motion Ex. "A" pp. 19-21 ¶¶ 53-55. Defendants openly admit that Dr. Singhose performed additional tests, but argue that he did not perform *some* tests that the Defendants claim he should have done. Def. Motion, 7:16-27. Dr. Singhose did not need to perform every conceivable test in order to formulate a valid opinion in this case. If Defendants believe their experts' tests are more valid than the ones that Dr. Singhose performed, a jury should decide which tests and opinions are more credible. "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *City of Pomona v. SQM North American Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("*Pomona I*"). Therefore, the weight that should be afforded to Dr. Singhose's opinions is squarely a question for the jury and is not grounds for potential exclusion under Rule 702. *Id.*; *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

In reality, however, Dr. Singhose's analysis was not limited to only the tests he performed himself. Defendants' own tests and other publicly available tests (i.e. the Mannan study, mentioned above) showed that babies could roll over in the RNPS. *See* Dr. Singhose Report Def. Motion Ex. "A" pp. 50-63. Dr. Singhose reviewed and relied upon the extensive testing videos created by Exponent on behalf of the Defendants, all documents produced by Defendants pertaining to Defendant Fisher-Price's Play Lab testing and in-home testing of the RNPS, and Defendants' 2018 report and test results prepared by Exponent as consultants for Defendants. Dr. Singhose's Report, Def. Motion Ex. "A-2" pp. 27-45; pp. 61-63. Dr. Singhose did not need to re-create the tests that Defendants had already performed in order for his opinions based on those tests to be reliable under Rule 702.

In addition to these multiple tests performed by and at the direction of Defendants, Dr. Singhose had access to something arguably even better than theoretical tests and Defendants' tests – he had *empirical, real-world evidence that babies could roll over in the RNPS*. Dr.

7

Singhose's Report, Def. Motion Ex. "A-2" pp. 63 ¶ 165–p. 64 ¶ 167.  Dr. Singhose reviewed **dozens** of incident reports from parents informing Defendant Fisher-Price and/or the CPSC that their babies had rolled over in the RNPS, had been found on their sides or face-down in the RNPS, had been found struggling to breathe in the RNPS, and in some cases – as in the case of Plaintiff's baby, Z.O. – had died after rolling and suffocating in the RNPS.

Defendants' suggestion that *Daubert* is grounds to exclude Dr. Singhose when his opinions are based in part on Defendants' own test results and the significant amount of real-world incident reports made by real-world parents who used the RNPS with their babies – all of which were produced by Defendants in the discovery of this case – is simply disingenuous sleight of hand intended to misrepresent the record and unjustly discredit Dr. Singhose.

In addition to these multiple reliable sources, Dr. Singhose also based his opinions on his own scientific analysis and several more sources, which include his own inspection of the subject RNPS in which Z.O. died; his own measurements of the subject RNPS in which Z.O. died; his own calculations based upon those measurements (which he details throughout his Report); the Tempe Police and Medical Examiner inspection photographs and measurements; the Medical Examiner's report; the complete, unredacted Tempe Police Department file; the Tempe Fire Department file; all Tempe Police interviews; Defendants' experts' reports; the deposition transcripts and exhibits of each of Defendants' expert witnesses, as well as Maricopa County death investigator Farrel Swope (who performed the death investigation at the scene), Maricopa County Medical Examiner Michael Ferenc, M.D., the Tempe Police officers at the scene, Fisher-Price's medical consultant Gary Deegear, M.D., Fisher-Price employees Catherine "Kitty" Pilarz, Michael Steinwachs, Joel Taft, Linda Chapman, Lynn Martin and Linda Lohiser; transcripts of the depositions of Fisher-Price employees in other cases involving injuries claimed in the RNPS, including Kitty Pilarz, Linda Chapman, and Michael Steinwachs; and the relevant scientific literature on the issues in this case.  Dr. Singhose's Report, Def. Motion Ex. "A-2" pp. 27-45.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Dr. Singhose properly detailed his efforts and his findings in his reports and at his deposition.  Dr. Singhose Report, Ex. "A" to Def. Motion; Dr. Singhose Rebuttal Report, Exhibit "C" to Def. Motion, Dr. Singhose Dep., Exhibit "B" to Def. Motion.

Defendants also criticize Dr. Singhose for not sufficiently describing the additional testing Defendants should have done before placing the RNPS on the market.  Def. Motion, 11:25-12:13.  This criticism is misplaced.  Dr. Singhose explained that Fisher-Price should have done testing similar to the Mannen study detailed throughout his report.  Dr. Singhose Report, Def. Motion Ex. "A" p. 38 ¶ 100; pp. 44-46; p. 51 ¶ 134; p. 58 ¶ 149–p. 60 ¶ 163.

Significantly, Defendants do not claim that they ever tested whether babies could roll before they started selling the RNPS.  Rather, by Defendants' own admission, they failed to test whether babies could roll in the RNPS until 2018, which was nine (9) years after they had placed the RNPS on the market and after they had already received dozens of incident reports about babies having rolled, suffocated, and/or died in the RNPS.  Def. Motion, 9:10-11.

Dr. Singhose did not design the RNPS.  He did not market the RNPS as a safe sleeping device to parents of infant children.  He did not keep the RNPS on the market for a decade, even after receiving dozens of reports that babies had died or been injured in the RNPS and that dozens more had rolled or turned over in the RNPS, and even for a year after the CPSC began asking that the product be recalled because of these multiple incidents and safety hazards.

Rather, Defendants did those things.  Defendants had the responsibility to perform sufficient tests to find out if babies would be exposed to safety hazards in the RNPS, including rolling and being trapped with their faces against the fabric – like they finally attempted in 2018 – and either remedy the product's inherent hazards or decline to put it on the market at all.

Dr. Singhose's testimony is highly relevant and satisfies Rule 702, as it will help the jury determine whether the RNPS had inherent design defects that subjected babies to the unreasonably risk of rolling over in the product and becoming trapped in an unsafe position.

B.    <u>Dr. Singhose's Opinion that the RNPS's Fabric Was Not Sufficiently Breathable Is Reliable and Relevant, Satisfying Rule 702.</u>

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Defendants criticize Dr. Singhose for pressing the RNPS' fabric material against his own face to evaluate its breathability (or, in his opinion, lack of sufficient breathability).  Def. Motion, 8:10-9:3.  However, by their own admission, this is the exact same way the Defendants' employees evaluated the fabric in the RNPS before putting it on the market!  Michael Steinwachs Dep., attached as Exhibit "7" 261:15-17; Singhose Dep., Def. Motion Ex. "B" 279:1-7.  Defendants should not be allowed to criticize Dr. Singhose for using and analyzing the same method that Defendants used to evaluate whether the product's fabric would be safe for babies.

Importantly, Defendant Fisher-Price's former Senior Quality Engineering Manager Michael Steinwachs does not know if there is a test for rebreathing.  Steinwachs 30(b)(6) Dep., Ex. "7" 240:8-10.  Likewise, Fisher-Price's Vice President of Safety and Regulatory Compliance Catherine "Kitty" Pilarz does not know whether the RNPS' fabric was breathable because there was no test for breathability.  Pilarz Ind. Dep., attached as Exhibit "8", 94:7-19.

Defendants, which have manufactured children's products for decades, knew about breathability hazards in products that contain soft fabric like the RNPS.  Defendant Fisher-Price acknowledges that the RNPS is not intended for babies to be positioned in anything but the supine position and that there is a risk of rebreathing if a baby were to come out of position in the RNPS.  Chapman Dep., Ex. "6", 82:25-25, 83:2-5.

 Notably, in 2018 (nine (9) years after releasing the RNPS), Defendant Fisher-Price published a Quality, Safety and Operating Procedure ("QSOP") to evaluate rebreathing, but did not to use it to evaluate the fabric in the model of RNPS in which Z.O. died.  Taft Dep., Ex. "4", 114:9-14; Steinwachs 30(b)(6) Dep., Exhibit "7" 261:6-19, Dep. Exhibit "32".  Rather, Fisher-Price only applied the fabric breathability QSOP to a different version of the RNPS that had additional layers of fabric under the child's head, and they also applied that QSOP to Fisher-Price's bassinets.  *Id.*, 114:15-23, 115:4-18.  Defendant Fisher-Price admits that determining breathability of fabric is not a test, but, rather, it is a subjective evaluation.  *Id.*, 231:21-232:1.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Defendants cannot properly criticize Dr. Singhose for failing to perform some unknown test which Defendants' own lead safety executives – who were charged with ensuring the safety of the product before placing it on the market – admit does not exist.

Similar to their criticisms of Dr. Singhose's opinions about the RNPS' inherent rolling defects, Defendants' argument about his analysis of the fabric's breathability ignores the multitude of other materials that he reviewed and the extensive analysis that he performed to reach his conclusions about the breathability of the fabric in the RNPS.

Defendants' argument suggests that the only way Dr. Singhose could have tested the fabric's breathability would be to place a baby face-down in the RNPS in the same position in which Z.O. was found dead and evaluate how the baby was breathing (or not breathing) with its face pressed into the fabric. Def. Motion, 8:18-27. Not only would that test obviously be unethical, Dr. Singhose did not need to perform it because he reviewed, evaluated and analyzed the multitude of real-world data described above which demonstrates that babies were suffocating or nearly suffocating when their faces were pressed into the RNPS' fabric.  The materials and sources he used to reach his opinions – many of which, again, Defendants produced in the discovery of this action – are wholly reliable and satisfy Rule 702.

Defendants' contention that Dr. Singhose's testimony is irrelevant and does not "fit" the facts of this case is similarly without merit.  Def. Motion, 8:18-9:3.  Again, by suggesting that Dr. Singhose needed to replicate the exact position in which Z.O. was found dead for the purpose of assessing the breathability of the fabric is not only absurd and unethical, but also unnecessary.  Dr. Singhose did not need to place a baby with its face in Z.O.'s exact position to properly evaluate the breathability of the fabric.  Regardless of which particular area of the fabric Z.O.'s face was pressed against when she suffocated, Dr. Singhose can – and will – help the jury determine whether Defendants negligently designed the RNPS and created a defective an unreasonably dangerous product, whether the fabric made the RNPS defective, and whether it subjected babies to the unreasonable risk of suffocation if and when their faces became pressed up against it, which is entirely valid under Rule 702.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Defendants' Motion has no merit and should be dismissed in its entirety.

## II. DR. SINGHOSE'S OPINION THAT FISHER-PRICE DID NOT TEST THE RNPS DURING THE DESIGN PROCESS FOR CERTAIN CRUCIAL SAFETY HAZARDS IS BASED UPON AMPLE EVIDENCE IN THE RECORD AND IS THEREFORE RELIABLE, SATISFYING RULE 702.

Defendants admit that they did not test whether the RNPS' incline was safe for infant sleep devices until 2018, nine (9) years after putting the product on the market, and in response to growing scrutiny by the CPSC after receiving a large number of complaints that babies were rolling, suffocating, being injured and/or dying in the RNPS. Def. Motion, 9:10-11. The fact that Defendants attempted to perform these tests in 2018 demonstrate they had the ability to do so before they put the RNPS on the market, as Dr. Singhose opines they should have.

As above, Dr. Singhose based his opinions on multiple reliable sources, including this detailed review and analysis of Defendant Fisher-Price's Design Phase (Pre-Release) Testing, Post-Release Testing, and Testing Performed by Exponent, as detailed extensively in his report. Dr. Singhose Report, Def. Motion Exhibit "A-1", pp. 50-63, 66-71.

Dr. Singhose is not required to cite a "regulation, federal statute, international standard, industry standard, or scientific literature" for his opinion to be reliable under Rule 702, as Defendants wrongly argue. Def. Motion, 9:16-22. Arizona law is well settled that a defendant can be held liable for product liability even if it has shown that it complied with an industry standard. *See Bauerline v. Equity Residential Prop. Mgmt. Corp.*, 2006 WL 3834285, *8 (D. Ariz. 2006) (rejecting defendant's argument that compliance with ANSI standard supports a "state of the art defense"); *Dart v. Wiebe Mfg, Inc*., 147 Ariz. 242, 246, 709 P.2d 876, 880 (1985); *Mather v. Caterpillar Tractor Corp.*, 23 Ariz. App. 409, 411, 533 P.2d 717, 719 (1975) (company can be held liable "despite its best efforts to make or design a safe product").

Rather, Dr. Singhose properly and adequately detailed in his Report that Fisher-Price failed to test for the hazard of positional asphyxia even though it ***actually knew*** babies would be in danger if they rolled, and also that more than half of parents did not use the restraints during the in-home tests. Dr. Singhose Report, Def. Motion Exhibit "A-1", p. 50 ¶132.

**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Dr. Singhose even went so far as to quote Fisher-Price's Director of Quality and Product Safety Joel Taft, who testified, "we certainly recognize that there is a risk of – of a baby sleeping on – in the prone position, which is why we recommend . . . ***and make sure that the product keeps a child***, you know, ***on their back*** . . . . positional asphyxia would be the risk of – of being in the prone position." Dr. Singhose Report, Def. Motion Exhibit "A-1", pp. 50-51 ¶ 132 (emphasis added). Crucially, after analyzing Fisher-Price's testing materials, Dr. Singhose saw no evidence that Fisher-Price had performed any tests whatsoever before 2018 that would "make sure that the product keeps a child . . . on their back," as Mr. Taft falsely claimed. Dr. Singhose Report, Def. Motion Exhibit "A-1", p. 50-52 ¶¶ 132-135.

Further, contrary to Defendants' claim, Dr. Singhose does not have a duty to perform the tests that Fisher-Price failed to perform. As explained above, Fisher-Price had the duty to ensure the RNPS was safe before putting it on the market. Defendants breached that duty.

Defendants also do not claim that they even did any ***research*** to determine if the RNPS' incline would be safe before releasing it. Rather, Fisher-Price's Vice President of Safety and Regulatory Compliance Kitty Pilarz testified that she did not know of any studies saying that an incline of 30-degrees was ***unsafe***, and she could not remember the specifics of any purported recommendations that infants may benefit from sleeping at an incline (and certainly not a 30-degree incline). Pilarz 30(b)(6) Dep., Ex. "3", 30:3-34:2.

Dr. Singhose's opinions are not mere *ipse dixit*. Dr. Singhose, who has decades of experience designing, evaluating and – importantly – developing tests for products, as reflected in his *curriculum vitae*, has also done the extensive research and analysis to properly support his opinion under Rule 702 that Defendants failed to adequately test known safety hazards of the RNPS before marketing it to parents as a safe infant sleeping device.

Finally, Defendants' citations are misplaced and their case law has no application here. Unlike those cases, Dr. Singhose has amply supported his opinions with objective bases throughout his reports and testimony. First, unlike the plaintiff's expert in *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002), who the court found had not cited

"objective, verifiable evidence" to support his opinions, Dr. Singhose has provided his detailed analysis in his report and also testified extensively with regard to his analysis at his deposition.

*Johnson v. Wyeth, LLC*, 2012 WL 1204081 (D. Ariz. April 11, 2012), *Hynes v. Wyeth, LLC*, 2011 WL 2680842 (S.D.W.V. July 8, 2011), *In re Prempro Prods. Liab. Litig. (Scroggin v. Wyeth)*, 2010 WL 5663003 (E.D. Ark. Sept. 16, 2010) are all related actions involving nationwide litigation against the same pharmaceutical company. These decisions are inapplicable to the instant case involving the RNPS. Each of the *Wyeth* courts excluded the same experts in large part because the pharmaceutical defendant's testing requirements are highly regulated by the federal Food and Drug Administration and the plaintiffs' experts failed to establish a standard of care regarding ***additional, post-market*** testing. *Id.* Here, by stark contrast, Dr. Singhose has opined that Defendants – who operate in an unregulated industry[2] – also failed to perform ***any pre-market*** testing on the RNPS' rollover and suffocation risks.

Notably, the *Johnson* court mentioned that "expert opinions can be based on personal experience" but found the experts in that case did not have sufficient experience to conclude "that there is an objective standard of care for post-market testing." *Johnson*, 2012 WL 1204081, *1. Dr. Singhose has a great deal of experience testing a variety of products from a mechanical engineering and safety standpoint, as indicated on his resume, and he gives "lectures on the role of industry standards, especially as they relate to providing a certain level of safety and conformity within an industry." Singhose Report, Def. Motion Ex. "A" p. 6 ¶11.

Further, unlike the experts in *Johnson*, Dr. Singhose ***does*** identify two internal company standards that Fisher-Price failed to meet. The first standard is that babies should not be able to roll into the supine position due to the risk of positional asphyxia, as testified by Joel Taft, and Dr. Singhose demonstrates in his report that Fisher-Price deviated from this standard by failing to perform tests. Singhose Report, Def. Motion Ex. "A-1", p. 50-52 ¶ 132-135. Second, as

---

[2] As explained in Plaintiff's Statement of Facts submitted concurrently with this Response, three (3) of Defendant Fisher-Price's key executives who were involved with the development and marketing of the RNPS – Kitty Pilarz, Joel Taft and Michael Steinwachs – all sat on the American Society for Testing and Materials ("ASTM") Bassinet subcommittee, which creates ***voluntary*** safety standards (not requirements). The subcommittee determined that its bassinet safety standard did not apply to the RNPS, and the RNPS was not covered by any ASTM standard for years. Pilarz 30(b)(6) Dep., Ex. "3" 121:9-14.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

explained above, Defendant Fisher-Price unilaterally (and conveniently) determined that its fabric breathability QSOP – its own internal standard – did not apply to the RNPS involved in Z.O.'s death.  Taft Dep., Ex. "4", 114:9-14.  Therefore, under the court's reasoning in *Johnson*, Dr. Singhose's opinions should not be excluded because he based them upon the Defendants' failures to follow its own standards.  *Johnson*, 2012 WL 1204081, *1.

Finally, in *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005), the court found compelling that the expert "himself all but conceded that he had not applied 'reliable principles and methods'" and further found that "[h]e was relying on intuition." *Zenith*, 395 F.3d at 418, 419.  Here, in contrast, Dr. Singhose has not relied solely on his expertise or his intuition to form his opinions.  Rather, as explained in detail above, Dr. Singhose relied on a host of materials, evidence, calculations and scientific journals – in addition to his experience – to formulate his opinions, which is entirely proper under Rule 702.

For all of these reasons, Dr. Singhose's opinions regarding Defendants' lack of adequate testing are entirely valid and reliable and Defendants' Motion should be denied.

## III.    DR. SINGHOSE'S SAFER ALTERNATIVE DESIGN OPINIONS ARE RELIABLE AND SATISFY RULE 702.

Defendants also claim that Dr. Singhose did not sufficiently identify a safer alternative design as grounds to exclude his opinion that a safer alternative design existed.  Defendants incorrectly claim that "Dr. Singhose cannot even commit to whether his proposed design alternative includes a horizontal sleep surface or not."  Def. Motion, 12:22-23.  These allegations are patently false.  Dr. Singhose's Report explicitly "compares the Fisher-Price Rock 'n Play sleeper to the commonly-used design alternative of an infant sleeper with a level and firm sleeping surface."  Dr. Singhose Report, Def. Motion Exhibit "A", p. 4 ¶ 3.

Defendants are well aware of what a "bassinet" is.  Defendant Fisher-Price has made bassinets and other infant sleep products for decades.  Pilarz 30(b)(6) Dep., Ex. "3" 37:4-5, 64:3-8, 66:1-3, 179:5-6; Steinwachs Dep., Ex. "7" 264:12-18. In addition, as explained above, several of Fisher-Price's executives who designed and developed the RNPS, namely, Michael

15

Steinwachs, Kitty Pilarz and Joel Taft, sat on the ASTM Bassinet subcommittee, which developed bassinet safety standards.  For Defendants to claim that they somehow do not know what Dr. Singhose is referring to as a "bassinet" is entirely, intrinsically, unbelievable.[3]

Importantly, Dr. Singhose has given the opinion that an infant's risk of rolling increases as the degree of incline increases, which is a known safety hazard. Singhose Dep., Def. Motion Ex. "B" 366:4-6.  Dr. Singhose's definitions of "level" and "nearly level" are consistent with the CPSC's recommendation that infant sleep surfaces have no more than a ten (10) -degree incline.  Michael Goodstein, M.D. Dep., attached as Exhibit "9" 45:3-5.  Dr. Singhose has also consistently opined that, by contrast to the safe level of a bassinet, the RNPS' incline of approximately 30 degrees was unsafe and defective.  Dr. Singhose's Report, throughout.  Dr. Singhose's opinion that the RNPS' 30-degree incline was unsafe for infant sleep is consistent with the CPSC standard, the American Academy of Pediatrics' safe sleep guidelines, and the ASTM's bassinet safety standard.  Michael Goodstein, M.D. Report, attached as Exhibit "10" p. 11-12; ASTM definition of "Bassinet" 3.1.1.

Dr. Singhose's opinions are highly relevant in this case.  He has opined that "[g]iven that bassinets provide utility equal to, or greater than, the Rock 'n Play sleeper, it is my opinion that the utility of the Rock 'n Play sleeper is far outweighed by the significant hazards presented by the Rock 'n Play sleeper."  Dr. Singhose Report, Def. Motion Ex. "A-1", p. 72 ¶ 197.  Dr. Singhose will help the jury understand the differences between the RNPS and the commonly used bassinet, which is the industry standard for infant sleep, and will further help the jury determine whether the bassinet was a safer design compared to the RNPS.

As a final point, as the Court surely knows, Arizona law does not require Plaintiff to present evidence of a similar alternative design to succeed on a design defect claim.  *See*, *e.g.*, *City of Pomona v. SQM North American Corp.*, 801 Fed. Appx. 488, 490-91 (9th Cir. 2020)

---

[3] The ASTM defines definition of "bassinet" is: 3.1.1 *bassinet/cradle, n*—small bed designed primarily to provide sleeping accommodations for infants, supported by free standing legs, a stationary base/stand, a wheeled base, a rocking base, or a base which can swing relative to a stationary base. While in a rest (non-rocking or swinging) position, a bassinet/cradle is intended to have a sleep surface less than or equal to 10° from horizontal.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

("*Pomona II*") ("mechanical feasibility of a safer alternative design is **one factor** that **can** be considered as part of the risk-benefit test") (internal quote omitted, emphasis added); *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242 (1985) (reasoning that plaintiff's presentation of evidence of feasible design alternatives does not transform a strict liability claim into a negligence claim). Therefore, even if Dr. Singhose does not present evidence of a safer alternative design at trial, it does not provide grounds to exclude his testimony under Rule 702 or any other Rule.

## IV.    ALLEGEDLY DISCLAIMED OPINIONS.

This Court should not preemptively exclude Dr. Singhose from testifying to any topics, as it may lead to exclusion of opinions within his areas of expertise, prejudicing Plaintiff. Plaintiff will offer Dr. Singhose as an expert only in the areas Plaintiff has identified. Defendants' objections are premature and should be addressed at trial.

### <u>CONCLUSION</u>

Based upon the foregoing, the Court should deny Defendants' Motion To Exclude The Opinions of William Singhose, Ph.D. in its entirety.

DATED this 7th day of January, 2022.

GOLDBERG & OSBORNE

By: */s/John E. Osborne*

John E. Osborne, Esq.
William C. Bacon, Esq.
John A. Musacchio, Esq.
*Attorney for Plaintiffs*

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

17

**CERTIFICATE OF SERVICE**

I certify that on the 7th day of January, 2022, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to the following participants of the CM/ECF System:

Nicole M. Goodwin
Aaron J. Lockwood
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Ste. 700
Phoenix, AZ  85016
(602) 445-8000
goodwinn@gtlaw.com
lockwooda@gtlaw.com

Lori G. Cohen (*pro hac vice*)
Brandon D. Cox (*pro hac vice*)
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Ste. 2500
Atlanta, GA  30305
(310) 553-2100
cohenl@gtlaw.com

Mary-Olga Lovett (*pro hac vice*)
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, TX 77002
*lovettm@gtlaw.com*

By: */s/ Karen M. Giacoletti*