**GOLDBERG & OSBORNE**
**698 E. Wetmore Road, Suite 200**
**Tucson, Arizona 85705**
**(520) 620-3975**

**John E. Osborne, Esq.**
**State Bar #07085**
**PCC #44004**
**josborne@goldbergandosborne.com**

**William C. Bacon, Esq.**
**State Bar #04895**
**PCC #02320**
**wbacon@goldbergandosborne.com**

**John A. Musacchio**
**State Bar #037255**
**jmusacchio@goldbergandosborne.com**

**Attorneys for Plaintiff**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Courkamp, for herself and on behalf of other statutory beneficiaries,<br><br>        **Plaintiff,**<br>    **vs.**<br><br>Fisher-Price, Inc., a foreign corporation;<br>Mattel, Inc., a foreign corporation.<br><br>        **Defendants.** | No: CV-19-02689-GMS<br><br>**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT** |

Table of Contents

I.    Introduction. ........................................................................................................... 1

II.   Statement of Facts. ................................................................................................. 1

    A.    Fisher-Price's Novel Inclined Sleep Product Conflicted with Existing Guidelines and Research on Infant Sleep. ................................................................. 1

    B.    Fisher-Price Was Not Required to Prove the RNPS Was Safe Before Selling It, and Fended Off New Regulations ................................................................ 4

    C.    Fisher-Price Was Heavily Involved in Creating the Weak Voluntary Standards Governing Its Own Product ....................................................................... 5

    D.    Fisher-Price Developed The RNPS Without Adequate Research And Ignored Warnings About Its Safety. .................................................................................... 6

GOLDBERG & OSBORNE<br>698 E. Wetmore Road, Suite 200<br>Tucson, AZ 85705<br>(520) 620-3975

1. Fisher-Price's Product Development Process Skipped Needed Safety Analysis. ...... 6

2. Internal "Hazard Analysis" Process Did Not Establish the Product's Incline was Safe. 7

3. Fisher-Price Only Consulted One Doctor—Who Was Not a Pediatrician. ............... 8

4. Child Development Research Was Not Supervised by Medical Doctors ................. 9

E. Fisher-Price Ignored Repeated Warnings That the RNPS Was Unsafe ..................... 10

1. Foreign Regulators and Experts Raised Major Safety Concerns about the RNPS ... 10

F. Deaths Associated with the RNPS Raised Serious CPSC Concerns. ......................... 16

1. CPSC Received a Report on the RNPS from Fisher-Price. .................................... 16

G. The Public Remained in the Dark About RNPS Deaths ............................................... 17

H. Fisher-Price Pushed Back Against Concerns That the RNPS Was Unsafe So the CPSC Contracted with an Outside Doctor to Evaluate the Risk of Infants Sleeping at an Incline.. 17

I. Defendants Hugely Profited from the Ten Year Run of the Defective RNPS. .............. 19

III. The Law and The Facts Defeat Defendants' Motion. ............................................................. 19

A. Reasonable Minds Can Differ Whether Defendants Negligently Designed the RNPS and Created a Defective & Unreasonably Dangerous Product. ............................................. 19

B. Defendants Expressly Warranted the RNPS as a safe "Sleeper" for infants; the RNPS Was Not a Safe "Sleeper"; and Thereby Defendants Breached Defendants' Express Warranty that The RNPS was a Safe Sleeper. ........................................................................ 21

C. Reasonable Minds Can Differ Whether the Negligently Designed and Defective RNPS Caused Z.O. to Die Due to Positional Asphyxiation. ................................................. 22

1. Z.O. Was a Well Baby Not Susceptible to SIDS. ................................................. 22

2. Competent Evidence Supports Z.O.'s Cause of Death by Asphyxiation. ............... 23

D. The Discovery Rule Defeats Defendants' MSJ on the SOL issue. ............................. 23

E. Defendant's MSJ Based on the SOL for Breach of Express Warranty Fails Because the Commercial Code Also Incorporates a Discovery Rule. .................................................. 24

F. Defendant's MSJ Directed Towards Plaintiff's Punitive Damages Claim Fails Because The Record Demonstrates Clear and Convincing Evidence of Evil Mind Under Arizona Law Over Which Reasonable Minds Can Differ. .................................................................. 26

I. Statement of Facts. ....................................................................................................................... 1

A. Fisher-Price's Novel Inclined Sleep Product Conflicted with Existing Guidelines and Research on Infant Sleep. ...................................................................................................... 1

B. Fisher-Price Was Not Required to Prove the RNPS Was Safe Before Selling It, and Fended Off New Regulations ....................................................................................................... 5

C. Fisher-Price Was Heavily Involved in Creating the Weak Voluntary Standards Governing Its Own Product ...................................................................................................... 6

D. Fisher-Price Developed The RNPS Without Adequate Research And Ignored Warnings About Its Safety ....................................................................................................... 8

1. Fisher-Price's Product Development Process Skipped Needed Safety Analysis. ...... 8

2. Internal "Hazard Analysis" Process Did Not Establish the Product's Incline was Safe. 10

3. Fisher-Price Only Consulted One Doctor—Who Was Not a Pediatrician. .............. 12

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

    4.    Child Development Research Was Not Supervised by Medical Doctors ................ 14

    5.    Foreign Regulators and Experts Raised Major Safety Concerns about the RNPS... 15

II.   Deaths Associated with the RNPS Raised Serious CPSC Concerns. ................................. 22

   A.    CPSC Received a Report on the RNPS from Fisher-Price. ........................................ 22

   B.    The Public Remained in the Dark About RNPS Deaths ............................................. 24

   C.    Fisher-Price Pushed Back Against Concerns That the RNPS Was Unsafe. ................ 24

   D.    The CPSC Contracted with an Outside Doctor to Evaluate the Risk of Infants Sleeping at an Incline.................................................................................................................. 24

   E.    Defendants Hugely Profited from the Ten Year Run of the Defective RNPS............. 26

III.  Plaintiff's Controverting Statement of Facts. .................................................................... 26

**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Plaintiff, by and through counsel and pursuant to Rule 56, Fed.R.Civ.P., hereby opposes Defendant's Motion for Summary Judgment.  Plaintiff incorporates herein by reference its Oppositions to Defendants' Motions to Exclude Singhose, Vredenburgh, Christensen, and Goodstein.

## I.    Introduction.

Fisher-Price failed to ensure the Rock 'n Play Sleeper ("RNPS") was safe before bringing it to market, ignored critical warnings from pediatricians, parents, and foreign regulators that the product was dangerous, and continued to market it as a safe product for overnight sleep despite clear evidence that this put infants at risk of serious harm or death, which Fisher-Price kept secret from the public. Fisher-Price's poor safety practices allowed the RNPS to stay on the U.S. market for a total of 10 years, during which time more than fifty infants died using the product—while the company raked in at least $200 million in revenue.

Fisher-Price put the first inclined sleeper on the market when Fisher-Price, a wholly-owned subsidiary of Mattel, released the RNPS for sale in October 2009.  An inclined sleeper is a product designed for infants and marketed for all-night sleep. The sleeper holds the infant on its back at a thirty-degree angle, such that the infant's feet are at a downward slope from the infant's head. The name "sleeper" is given to a device in which a caregiver can be expected to leave a child without direct supervision while the child sleeps.

Unfortunately for the many infants killed by the RNPS, and contrary to the innocent demeanor presented by Defendants in their Motion for Summary Judgement (the "DMSJ"), this Opposition will demonstrate such egregious facts that reasonable minds will not differ. Defendants are not only liable, but acted with evil mind.

## II.    Statement of Facts.

### A. Fisher-Price's Novel Inclined Sleep Product Conflicted with Existing Guidelines and Research on Infant Sleep.

The RNPS was developed and sold by Fisher-Price, a wholly-owned subsidiary of Mattel and one of Mattel's top-performing brands. Plaintiff's Statement of Facts & Controverting Statement of Facts ("PSOF") 1. While Fisher-Price was the manufacturer of the RNPS rather than Mattel, Mattel was at all times in control of all key decisions made about the development, safety monitoring, and recall of the RNPS. *Id.* The two entities share key personnel, with some individuals employed by both entities. Mattel employees were in key positions of control throughout the development process for the RNPS. PSOF 2.

When the RNPS was launched in 2009, prevailing medical science held that infants should sleep flat on their backs on a firm, flat surface. PSOF 3. For decades, pediatricians and medical experts have recognized that infants need to be in a safe, horizontal, position while sleeping. PSOF 4.

During the early 1990s, pediatricians were concerned about the high number of infants dying from Sudden Infant Death Syndrome (SIDS), which occurs when infants die without explanation and is associated with sleep. PSOF 5. Research at the time found that if infants slept on their stomachs, they were at least twice as likely to die of SIDS. PSOF 6. As a result, the National Institute of Child Health and Development—part of the National Institutes of Health—and the American Academy of Pediatrics (AAP)—a widely respected organization comprised of 67,000 pediatricians—started the "Back to Sleep" campaign to educate parents and encourage them to put their babies to sleep on their backs. *Id.;* PSOF 7.

A 2005 Policy Statement by the AAP stated that infants should be placed wholly on their back for sleep, and that a "firm crib mattress, covered by a sheet, is the recommended sleeping surface." PSOF 8. The guidelines did not address the safety of infants sleeping at an angle because at the time, there were no inclined infant sleep products on the market. PSOF 9

The design of the RNPS, which is positioned on an incline, did not conform to the 2005 standard. *Id.* at pgs. 1; PSOF. 10. Publicly available studies warned that it is unsafe for infants to sleep in car seats, which have a slightly steeper angle than the RNPS. *Id.* at pgs. 1-2; PSOF 11. In 2006, a study in the British Medical Journal warned that infants sleeping in car seats could suffer potentially life-threatening breathing problems. *Id.*; PSOF 12.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Since 1992, the AAP has issued safe sleep recommendations.  PSOF 13.  In 2011 and 2016, the AAP updated its recommendations and recommended that babies be placed on firm, flat surfaces.  *Id.*  These recommendations have not materially changed.  *Id.*  Plaintiff's expert Michael H. Goodstein, M.D. wrote the AAP report containing AAP's the recommendations.  PSOF 14.  He stated in his report that since 2011, "The AAP recommends that infants should be placed on a firm, **flat** sleep surface (e.g., a mattress in a safety-approved crib) covered by a fitted sheet with no other bedding or soft objects to reduce the risk of SIDS, suffocation, and positional asphyxia."  *Id.* at 8229-30 (emphasis supplied).  Further, "The AAP has been clear and consistent over time that the infant sleep surface should be flat… ." *Id.* at 8230.  Further, "A 2015 article reviewing deaths in these [inclined] devices reported to the CPSC found that of the 31 deaths in car seats, 52% were due to strangulation and the rest were attributed to positional asphyxia."  *Id.* at 8231-32; Batra EK, Midgett JD, Moon RY. *Hazards associated with sitting and carrying devices for children two years and younger.* J Pediatr. 2015;167(1):183–187.

In fact, "The Fisher-Price Rock 'n' Play was particularly problematic. With an incline of 30 degrees, the product was not designed to meet the U.S. and international safe sleep standard of a flat surface." *Id.;* PSOF 15.

The AAP struggled to fight the RNPS and similar products.  PSOF 16.  As Dr. Goodstein will testify:

> In 2018, concerns were mounting regarding inclined sleepers (which are frequently advertised as being beneficial for infants with GER). The AAP, in conjunction with major consumer safety groups, wrote to the CPSC with concerns over a CPSC announcement to use restraints with inclined sleep products as a way to mitigate the risk of the product after reports of infant deaths. The concern was that the restraints may not prevent deaths and the more prudent decision would be to remove these products from the market. The inclined sleepers came under additional scrutiny in 2019 after a series of deaths were reported to the CPSC and additional deaths were uncovered in a *Consumer Reports* article. Concerned over the avoidable risk of death from sleeping in an inclined sleeper, the AAP put out a press release on 4/9/19 calling for an immediate recall of the products, specifically mentioning the Fisher-Price Rock 'n' Play Sleeper which was tied to 32 sleep-related deaths.

> Dr. Rachel Moon, chair of the AAP Task Force on SIDS stated that "The RNPS inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding."

*Id.* at COU_8234.

By 2017, Fisher-Price employees admitted in-house that Fisher-Price knew that the RNPS did not comply with AAP guidelines.  PSOF 17.  On September 22, 2017, Kitty Pilarz wrote to another FP employee, Dan Spitzer and stated, "I am flying to Philadelphia to meet with our medical consultants on the Rock "N Play Sleeper regarding the inclined sleep position and the fact it is at odds with the American Academy of Pediatrics." *Id*.  Still Fisher-Price proceeded to sell the RNPS to unsuspecting customers.

**B. Fisher-Price Was Not Required to Prove the RNPS Was Safe Before Selling It, and Fended Off New Regulations**

When Fisher-Price released the RNPS in October 2009, it was the only infant inclined sleep product on the market. PSOF 18.  The company aggressively marketed the new product, emphasizing that babies could sleep all night in the RNPS. PSOF 19.  At the time it was launched, the RNPS fell under CPSC's new mandatory standard for bassinets and cradles, but that standard was silent on the appropriate angle for a baby to sleep. PSOF 20.

Fisher-Price was not required to provide any information to CPSC or any third party showing that it was safe for babies to sleep at an incline before bringing the product to market. PSOF 21.

In 2010, the CPSC proposed a standard that would limit the angle for infant sleep products to five degrees.  PSOF 22.  Since the RNPS would not meet the new mandatory standard, Fisher-Price submitted a letter to CPSC requesting that the standard be revised to accommodate the design of the RNPS. *Id.*  Fisher-Price wrote that the new standard would "inadvertently prohibit[…] products that do not present the risks at which the rule is aimed" and serve a segment of the market that "reasonably desire[s] an inclined sleep position for their

infants. PSOF 23.  CPSC then decided to exclude inclined sleepers from the new mandatory standard.  PSOF 24.

### C. Fisher-Price Was Heavily Involved in Creating the Weak Voluntary Standards Governing Its Own Product

When CPSC decided to exclude inclined sleepers from the new mandatory standard for bassinets and cradles, CPSC wrote to Fisher-Price saying that because inclined sleepers would be "out of scope" for the new standard, they "should be in another or new ASTM standard." PSOF 27.  ASTM International is a non-governmental organization that develops voluntary standards for thousands of consumer products. PSOF 28.  ASTM standards are developed within committees that often include manufacturers, consumer safety advocates, testing labs, and other parties with interest in the standards being developed.  PSOF 29.  The resulting standards are entirely voluntary. *Id.*

The committee charged with developing the new standard for infant inclined sleepers was led by Mike Steinwachs, a Fisher-Price engineer (PSOF 30), giving the company a central role in setting the safety standard for its own product. *Id.*  According to ASTM bylaws, no more than 50% of a committee can be comprised of employees of the manufacturers who created the product in question.  PSOF 31.  Other committee participants, such as consultants for manufacturers and testing labs, may rely heavily on manufacturers for business, but do not count towards the 50% limit on manufacturer representatives.  PSOF 32.  As a result, manufacturers often have an outsized influence on the voluntary standards that govern their own products.  *Id.*

As a result, even though the standards process is intended to provide a forum for experts, consumer advocates, and medical professionals to provide input, manufacturers have a great deal of power to override their views and set the standards that will govern their own products. PSOF 33.  ASTM did not release a voluntary standard for infant inclined sleepers until May 2015 — nearly five years after the RNPS was released—which was then revised in January 2017.  PSOF 34; 82 Fed. Reg. 16963. The voluntary standard required that the seat back angle not exceed thirty degrees, the exact angle of the RNPS.  PSOF 35.

5

ASTM did not have a written rationale for the angle limit being set at thirty degrees, but "discussions early on in the development of the standard focused on car seat limits set at 45 degrees, so with a 'safety factor,' ASTM set the limit at 30 degrees."  PSOF 36.

### D. Fisher-Price Developed The RNPS Without Adequate Research And Ignored Warnings About Its Safety.

#### 1. Fisher-Price's Product Development Process Skipped Needed Safety Analysis.

Fisher-Price took advantage of its global reputation as a reliable child product manufacturer to market the RNPS. PSOF 37.  An internal presentation from 2016 stated that the company has "nearly 100% brand awareness globally" and is the "#1 most trusted and loved brand by moms." *Id.*  The presentation asserted, "Research has always been at the heart of product development at Fisher-Price."  *Id.*

The idea for the RNPS Sleeper was born in 2008 by a Fisher-Price industrial designer named Linda Chapman.  PSOF 38.  Although it was subsequently disproved, some pediatricians believed at the time that keeping babies' heads at an angle could prevent acid reflux. PSOF 39.  In 2008, Ms. Chapman felt that there was still no product on the market that allowed babies to sleep at an incline, and she pitched the idea for the RNPS to her supervisor at Fisher-Price.  PSOF 40.

The RNPS was designed as a free-standing bassinet that holds an infant on its back at a thirty-degree angle, so the infant's feet are at a downward slope from the infant's head. PSOF 41.

Ms. Chapman is a designer, not a doctor, and her team consisted of no doctors.  PSOF 42.  It was not her job to look at the laws and regulations regarding safe sleep, or to consult current guidelines from pediatricians to determine whether a product is safe. PSOF 43.  Chapman stated that she trusted that others within the company would do their due diligence to determine whether the product was in fact safe for infants to sleep. PSOF 44.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Once the idea for the RNPS had been proposed, the company set about building a prototype. PSOF 45.  Kitty Pilarz, Fisher-Price's Vice President of Product Safety and Regulatory Compliance, consulted only with Dr. Deegear.  PSOF 46.

Documents and interviews show that Fisher-Price undertook little if any independent research to confirm that the RNPS's thirty-degree angle was medically safe, and instead relied on knowledge about existing inclined products that were not intended for sleep, such as car seats. PSOF 47.  Although Ms. Chapman later recanted her statements to the CPSC and in other similar cases that Fisher-Price did no research at all (*Id.*), the CPSC was clear in its Congressional Report that, "Documents and interviews show that Fisher-Price did not undertake any independent research to confirm that the Rock 'n Play's thirty-degree angle was medically safe, and instead relied on knowledge about existing inclined products that were not intended for sleep, such as car seats."  PSOF 48. The company ultimately consulted only one doctor who did not specialize in pediatrics to evaluate the safety of inclined sleep. PSOF 49. Fisher-Price does not have any internal policies requiring that pediatricians review products designed for infant sleep. PSOF 50.

### 2. Internal "Hazard Analysis" Process Did Not Establish the Product's Incline was Safe.

After the prototype was built, Fisher-Price began what it calls its "hazard analysis process," which is intended to identify potential safety hazards with products in development and work to fix them.  PSOF 51.  This process is led by the Safety Committee, which includes approximately seven or eight members.  PSOF 52.  Although none of the members of the Safety Committee is a pediatrician or has any medical expertise, the group was tasked with determining whether the positioning of newborns in the RNPS Sleeper was medically safe. PSOF 53.  With an incline of thirty degrees, the design of the RNPS was a marked departure from infant sleep products on the market at the time, which were generally flat or had an incline under ten degrees. PSOF 54.

In three separate hazard analysis reports, from August 2008 through February 2009, the Safety Committee highlighted the need to research the positioning of infants in the RNPS.

PSOF 55.  For example, an October 6, 2008, Safety Audit Report for the RNPS found the product to be "Unacceptable" until two action items were completed. The first action was, "Must assure proper infant position."  PSOF 56.

Ms. Pilarz, who served as Chair of the Fisher-Price's Safety Committee for two decades, told CPSC that despite this warning, at the time the RNPS was launched, testified that the company found no research showing that the product's thirty-degree angle was safe for sleep. PSOF 57.  However, in her statements to the CPSC, Ms. Pilarz stated that this was not unusual:

> Q: Did you see any research specifically into the 30-degree angle indicating that it was safe?
>
> A: I can't say I've seen research like that. Typically, at least in my experience, you don't see research saying things are safe. You know, people research things that are not safe.31

PSOF 58.  Ms. Pilarz said Fisher-Price was not concerned by the lack of affirmative research showing that a 30-degree angle was safe:

> Again, because it's unlikely you would find research of that nature, we relied on the research that was available showing where angles had been a problem, like car seats, and on our own background with respect to angles in children's products and what angles are appropriate, as well as the knowledge we've gained through participating in standards development to – to feel comfortable with the angle.

PSOF 59.

Of the five Fisher-Price employees interviewed by the CPSC for its Congressional Report, none could articulate a reason why Fisher-Price chose thirty degrees as the angle for the RNPS, other than in reference to other products that were not intended for overnight sleep. PSOF 60.

### 3.  Fisher-Price Only Consulted One Doctor—Who Was Not a Pediatrician.

Fisher-Price consulted only one medical doctor regarding the safety of the RNPS—a family medicine doctor named Dr. Gary Deegear. PSOF 61.  Dr. Deegear is not a pediatrician.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

*Id.* The CPSC determined that Dr. Deegear's medical license expired in 2015, and the Texas Medical Board subsequently filed a cease-and-desist order against him for practicing medicine without a license and for conducting unsafe practices. PSOF 62. But Dr. Deegear was evasive or had poor recollection in his deposition, as he thought the foregoing happened in or around 2018. *Id.*

Defendants never formally consult any pediatricians for the RNPS. PSOF 63. When the CPSC asked in an interview whether Fisher-Price considered consulting a pediatrician for a product intended for infants, Ms. Pilarz said, "I did place a call to my own pediatricians, but I … don't think they ever called me back." PSOF 64.

Fisher-Price employees consulted Dr. Deegear numerous times from December 2008 to August 2009 about the safety of the design of the RNPS. PSOF 65. In some of these conversations, Dr. Deegear expressed views at odds with prevailing research about safe sleeping environments for infants. PSOF 66. For example, in a February 2009 email summarizing her conversation with him, Ms. Pilarz wrote:

> Dr. Deegear stated pediatricians recommend babies with reflux sleep at 30 degrees, this is just fine, or sleep in a car seat overnight for months or even a year. The Back to Sleep campaign places children on their backs, and elevated positions of the head is fine.38

PSOF 67.

Dr. Deegear's assertion that infants can sleep in a car seat "for months or even a year" directly contradicted pediatricians' recommendations. PSOF 68. When asked about the statement, Ms. Pilarz said that Dr. Deegear was simply relaying what he thought pediatricians were recommending. PSOF 69.

Ms. Pilarz said that Fisher-Price did not consult any pediatricians to confirm whether Dr. Deegear's statement was correct. PSOF 70.

### 4. Child Development Research Was Not Supervised by Medical Doctors

Ms. Pilarz explained in this case and to the CPSC that before products are released on the market, Fisher-Price conducts tests in its "Play Lab," and has parents take the products

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

9

home and report back with any issues they encounter.  PSOF 71.  According to Ms. Pilarz, the Play Lab is a special facility where Fisher-Price brought parents in to evaluate various features of the product. PSOF 72.  She stated that parents are present for parts of testing for infant products, where Fisher-Price evaluates how babies fit in products, how easy it is for parents to take babies in and out of products.  PSOF 73.  The employees monitoring the Play Lab typically have at least Bachelor's of Science ("BS") degrees in child development, which enables them to determine what age is appropriate for the products being tested. PSOF 74. However, Ms. Pilarz explained that these employees do not have any expertise about the medical safety of the products:

> Q: And so they would be able to tell you what age is appropriate for products. They do not have medical expertise about the safety of a product. Is that accurate?
>
> A: Yeah, I'm not aware that anybody has medical training.

PSOF 75.  For in-home tests, parents would take the product home, observe their children using the product, and answer a series of questions the following day.  PSOF 76.  In 2009, a total of 62 infants were tested at home using the RNPS.  PSOF 77.  There was no further in-home testing until 2012, when an additional six infants were tested.  PSOF 78.

Fisher-Price sold approximately 4.7 million RNPS Sleepers before the product was recalled in 2019.  PSOF 79.

### E.  Fisher-Price Ignored Repeated Warnings That the RNPS Was Unsafe

Shortly after releasing the RNPS, Fisher-Price was made aware of multiple indications that the RNPS was unsafe, including statements from international regulatory bodies that the RNPS was not safe for infant sleep, warnings from pediatricians, and concerns expressed by their own customers. Despite these warnings, the company chose to continue selling the RNPS and marketing it as a sleep product for infants.

### 1.  Foreign Regulators and Experts Raised Major Safety Concerns about the RNPS

The RNPS was released in the United States in October 2009. PSOF 80.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

**a. Australian regulators told Fisher-Price the RNPS was not safe for sleep.**

In May 2010, less than a year after the RNPS was released in the United States, regulators with the Australian Competition and Consumer Commission (ACCC) contacted Fisher-Price, stating that they understood that Fisher-Price planned to begin selling the RNPS in Australia. PSOF 81.  In response, Fisher-Price sent the ACCC a sample RNPS. PSOF 82. Several weeks later, in a June 18, 2010, email to Fisher-Price, the Australian regulator expressed serious concerns about the RNPS:

> The main concern with the Fisher Price Newborn Rock n Play Sleeper is that its promotion is at odds with widely accepted and promoted best practices that these types of products should not be used as an infant bedding alternative. Infants should not be left in these types of products without constant supervision and we recommend that the packaging and promotion be amended accordingly.

PSOF 82.  Despite the strong concerns from Australian regulators, Fisher-Price continued to sell the RNPS in Australia for another year, until June 2011. PSOF 83.

**b. Health Canada blocked Fisher-Price from marketing the RNPS as a sleeper in Canada.**

Fisher-Price tried to sell the RNPS in Canada but was informed that the product did not meet regulations for bassinets set by Canada's national health agency, Health Canada. PSOF 84.  As a result of Health Canada's concerns, Fisher-Price revised the Canadian label for the RNPS to read, "This product is not intended to replace a crib or bassinet for prolonged periods of sleep" and "NEVER leave child unattended." PSOF 85.  Officials at Health Canada also informed Fisher-Price that it would be required to market the RNPS as a Soother rather than a Sleeper.  PSOF **Error! Reference source not found.**.

To assess the impact of the change, Fisher-Price conducted a market research study with 327 expectant mothers, half of whom already had an older child and half of whom were having their first child. PSOF 86.  The study found that "[p]renatal moms previously unfamiliar with the RNPS who saw the product positioned as a Sleeper (original) expressed

11

significantly higher rates of purchase interest than moms who saw either of the alternate positions as a Soother." PSOF 87.

Fisher-Price decided on July 19, 2011, no longer to sell the RNPS in Canada. PSOF 88.

### c. United Kingdom medical professional organization strongly advised against using the RNPS for overnight sleep.

In May 2011, Fisher-Price received a report on the RNPS from the UK Royal College of Midwives, a professional organization for midwives. PSOF 89. The report, in which four midwives, two mothers, and two women without children all evaluated the safety of the RNPS, flagged four safety concerns:

(1) "this would not be suitable for a new born infant as babies cannot be placed in a semi-prone [face down] position;"

(2) "this should not be used for infants under six weeks;"

(3) "the lying surface is not suitable as an infant cot—and must not be used as infant cot to sleep next to mother's bed because babies must always sleep flat on their backs;" and

(4) "Unreservedly—this product must only be used for no more than two hours in a day and for the purpose of play/interaction with parents/siblings etc."

PSOF 90.

In his email forwarding the report, Mr. Johnston wrote to Ms. Pilarz and Mr. Steinwachs that it is "very limiting in what they say is the appropriate use for the product … I think this may put an end to our ability to sell the product in the UK as I understand this organization carries quite a bit of weight." PSOF 91. Mr. Johnston told the Committee that Fisher-Price did not consider marketing the RNPS differently in the UK to accommodate the concerns voiced by the Royal College of Midwives. PSOF92. Johnston told Committee staff that despite this warning, the "positioning and the benefits" of the RNPS had "proven successful here in the U.S., and there wasn't a desire to change that." PSOF 93.

### d. International Surveys Show Many Industrialized Countries Recommended Infants Sleep on Flat Surfaces and Not In Sitting Devices.

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

A prominent study looked at international recommendations for infant sleep surfaces. PSOF 94.  As described by Dr. Goodstein, "Four countries (Canada, Ireland, New Zealand, U.S.) additionally specify that the sleeping surface should be flat. PSOF 95.

**e.  Fisher-Price continued to seek expansion into international markets.**

The concerns expressed by the ACCC, Health Canada, and the UK Royal College of Midwives did not trigger any additional safety reviews of the RNPS within Fisher-Price. PSOF 96.

A 2013 Fisher-Price business development presentation shows that in the United States, RNPS sales were increasing every year, and that the company anticipated sales would continue to grow.  PSOF 97.  In 2011, Fisher-Price generated roughly $10 million in RNPS sales. *Id.* *Id.* By 2013, the company was projecting annual sales revenue would more than double, to $26.3 million:



*Id.*

With international sales near flat, Fisher-Price sought to expand sales internationally, despite concerns in foreign markets about the safety of the RNPS. PSOF 98.  However, as time progressed, a 2015 business development presentation noted, "Outside the US, inclined sleeping faces regulatory and perception hurdles."  PSOF 99.



*Id.*

### f.  Fisher-Price Received Death and Injury Reports for the RNPS

During the first five years the RNPS was on the market, Fisher-Price received dozens of reports from consumers of infants falling out of or getting out of position in the RNPS, resulting in injuries. PSOF 100.  In an internal email sent on February 4, 2014, a Fisher-Price employee categorized the forty-seven "out-of-position" reports received from consumers. PSOF 101.  A majority of parents submitting these reports specifically informed Fisher-Price that they had restrained their infant in the RNPS before the incident.  *Id.*

In response to this email, Mr. Taft claimed "There are more fall-out reports than I remembered." PSOF 102.  Even more alarming is that Fisher-Price only aggregated these reports to determine whether it would be safe to remove the restraints from a new version of the RNPS. *Id.*

Any incidents would have been reviewed by the Product Integrity team and the Safety Advisory Panel.  PSOF 103.  The Safety Advisory Panel would then determine whether there was a safety concern with the product that Defendants should address. PSOF 104.  There is no evidence that Defendants raised any concerns internally about the safety of the RNPS as a result of these two early incidents, and Defendants took no action to warn or inform parents about the incidents.  PSOF 105.

### g.  Independent Pediatrician Told Fisher-Price the RNPS Was "Unsafe".

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

In February 2013, Dr. Roy Benaroch, a board-certified pediatrician, wrote an email to Fisher-Price expressing concerns about the safety of the RNPS.  PSOF 106.  He wrote: "I am concerned that parents are using this product as a routine sleeping area for their babies. This is unsafe." *Id.*  He pointed Fisher-Price to the 2011 safe sleep guidelines from the American Academy of Pediatrics and explained how the RNPS violated multiple aspects of those guidelines.  *Id.*

Nearly three weeks later, after a follow-up email from Dr. Benaroch, Fisher-Price responded: "The RNPS Sleeper complies with all applicable standards. We encourage consumers who have questions or concerns about providing a safe sleeping environment for their babies to discuss these issues with their doctors or pediatricians."  PSOF 107.  In interviews with CPSC staff, Fisher-Price employees could not explain why they would encourage consumers to discuss safe sleeping environments with their pediatricians when the company itself had not consulted any pediatricians, and in fact did not address the clear, science-based warning from Dr. Benaroch. PSOF 108.  Pilarz told Committee staff that she did not believe that Dr. Benaroch was completely familiar with the features of the product and asserted that he may have only viewed it online. PSOF 109.  In crafting a response to Dr. Benaroch, Fisher-Price consulted its legal team, but did not have anyone with any medical training review his concerns.  PSOF110.

### h.  Moms Told Fisher-Price the RNPS Was Not Safe for Overnight Sleep

As early as 2017, Fisher-Price began to hear concerns from consumers that the RNPS was not safe for overnight sleep. PSOF 111.  In a December 2017 market research report, Fisher-Price reported the results of its qualitative research with mothers who were planning to or were currently sharing a bed with their babies. PSOF 112.  As part of the research, Fisher-Price asked mothers about their impressions of products from several different manufacturers. *Id.*  For the RNPS, prenatal moms had "concerns about using the product for unsupervised or overnight sleep as its surface was not flat."  *Id.*

In May 2018, Fisher-Price's marketing team circulated another report on consumer insights about the RNPS, which also pulled data from market research with mothers who were

15

planning to or currently shared a room with their babies. PSOF 113. The research found that 20% of moms disliked the RNPS, and about half of those stated that it was unsafe for overnight sleep. PSOF 114.  These mothers surveyed who disliked the RNPS represented a small 20% minority, however. *Id.*

### F.  Deaths Associated with the RNPS Raised Serious CPSC Concerns.

#### 1.  CPSC Received a Report on the RNPS from Fisher-Price.

Fisher-Price provided a report on its knowledge of infant deaths in the RNPS to CPSC 114on February 16, 2018.  PSOF 115.  In the report, Fisher-Price told CPSC that it was aware of fourteen fatalities associated with the RNPS and gave a description of each. PSOF 116.  The Fisher-Price report asserted, "The hazard patterns, including extra bedding and infants rolling over into a prone position, indicated that, although a nursery product was involved, many of the fatalities were not caused directly by failures of the product." PSOF 117.  Fisher-Price also reported that it was aware of eight incidents in which infants in the RNPS "stopped breathing, turned color, or exhibited some kind of distress.".  PSOF 118.  Despite those deaths and injuries, Fisher-Price concluded:

> Fisher-Price does not believe that the information in its possession reasonably supports the conclusion that the product is defective, presents a substantial product hazard or an imminent hazard, or creates an unreasonable risk of injury. Further, Fisher-Price denies that this information in any way supports the contention that the product caused or contributed to any death or bodily injury.

*Id.*[1]

The company's report included an incident report dated December 22, 2017, less than two months before the date of Fisher-Price's submission to CPSC. PSOF 119.  The incident report discussed an infant who died in the RNPS after his parents used it as directed, placing their son on his back with the restraints. *Id.*  In the morning, his parents found him face-down in the RNPS, having suffocated and died. *Id.*

---

[1] COU0012703.

When asked how the company could conclude that the RNPS did not create an unreasonable risk of injury less than two months after receiving this report, Mr. Steinwachs said he "cannot say conclusively that the product caused those deaths." [2]  PSOF 120. Mr. Taft said he was the reviewer of all consumer complaints but he "never identified a trend that warranted a change in the product."  PSOF 121.  Ms. Pilarz told the CPSC that while they could not eliminate the possibility that the infant's death had been caused by the RNPS, and CPSC's investigation was ongoing, the "information in [the] report does not lead to the conclusion that the product caused the death." PSOF 122.  In particular, she said police had interviewed the parents and thought the child may not have been wearing a restraint.  *Id.*

### G. The Public Remained in the Dark About RNPS Deaths

Although Fisher-Price confirmed to CPSC that it was aware of 14 deaths as of February 2018,[3] Fisher-Price continued to represent to the public until the recall that the RNPS was safe, and Fisher-Price continued to sell the RNPS.  PSOF 123.  The CPSC's hands were tied because under Section 6(b) of the CPSA, CPSC could not disclose any information provided by a manufacturer in its full report "unless the Commission has sued the manufacturer, has accepted a voluntary corrective action plan from the firm, [or] has the firm's permission to release the information or the Commission publishes a finding that public health and safety requires public disclosure."  PSOF 125.

### H. Fisher-Price Pushed Back Against Concerns That the RNPS Was Unsafe So the CPSC Contracted with an Outside Doctor to Evaluate the Risk of Infants Sleeping at an Incline.

The CPSC decided to contract with Dr. Erin Mannen, a biomechanics researcher and Assistant Professor of Orthopaedic Surgery at the University of Arkansas for Medical

---

[2] Steinwachs 01/22/21 Dep 314:9-16 ("cannot say conclusively that the product caused those deaths"); Taft Dep 11/12/20 86:2-87:6  (not specific to the report, but Taft was the reviewer of Pilarz 01/12/21 Dep 58:13-15 (no consumer complaint ever caused FP to change design of RNP).
[3] COU0012455 – Exponent Powerpoint slide w/ # of deaths from incident reports (2011-2018) [KAREN – FN 89-90 ARE EXS 13 AND 14 OF PILARZ 11/9/20 DEP]

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

17

Sciences, to conduct a study into whether infants sleeping at an incline increases the risk that they will roll over and suffocate.  PSOF 128.

Dr. Mannen and her team issued a final report on September 18, 2019, which concluded that none of the inclined sleep products evaluated were safe for infant sleep. The study further stated, "It is likely that in incidents where babies were found deceased in the prone position, that an accidental roll occurred, and after some amount of struggling, the baby was fatigued and could no longer move into a position to prevent suffocation."  PSOF 129.  The study included the following key findings:

• Inclined surfaces *and* incline sleep products resulted in significantly higher muscle activity of the turn core muscle (abdominals), which may lead to quicker fatigue and suffocation if an infant is in a prone position in an incline sleep product. PG 59.

• Muscle synergies (i.e., how muscles work together) are significantly different in inclined sleep products. If an infant rolls from supine (face up) to prone in an inclined sleep product, it is likely the first time the baby has experienced the position and the demands the position requires of the muscles. PG. 59

• Some inclined sleep products require greater neck and trunk adjustments during prone positioning, indicating that infants may struggle to adjust their posture to enable breathing and attempt to self-correct if a roll from supine to prone occurs. PG. 59

• Prone lying in the incline sleep products puts infant at higher risk of suffocation as evidenced by oxygen saturation results. PG. 59

• Some evidence was found that supports the idea that the inclined sleep products make the babies roll more easily from supine to prone. The flexed trunk and ease of head lifting during supine lying in an inclined sleep product may indicate that supine to prone rolling is achieved more easily. PG 59

18

- If babies roll from supine to prone in an inclined sleep product, then, due to the high musculoskeletal demands necessary to maintain safe posture to prevent suffocation, babies would fatigue faster than they would on a stable, flat surface. PSOF 130.

### I. Defendants Hugely Profited from the Ten Year Run of the Defective RNPS.

Defendants disclosed to the CPSC that Defendants earned $35 million in global sales from the RNPS in 2017 alone, according to an internal presentation obtained by the Committee. PSOF 131.

In the ten years that the RNPS was on the market, it generated at least $200 million in revenue for Fisher-Price. PSOF133.



*Id.*

### III. The Law and The Facts Defeat Defendants' Motion.

#### A. Reasonable Minds Can Differ Whether Defendants Negligently Designed the RNPS and Created a Defective & Unreasonably Dangerous Product.

The record is replete with facts to support the conclusion that Defendants negligently designed the product. The CPSC itself reached this conclusion and spent a year encouraging the Defendants to recall the RNPS. Only negative publicity about the deaths eventually forced the recall. Jurors will have little trouble arriving at the conclusion on their own. But Plaintiff's experts will assist them to do so.

The Court is now familiar with the excellent credentials of William Singhose and Alison Vredenburgh, which Plaintiff will not repeat again here, and their opinions. *See*

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

Oppositions to Defendants' Motions to Exclude Opinions of Drs. Singhose and Vredenburgh dated January 7, 2022.

In addition, Plaintiff's medical experts, pathologist Erik Christensen, M.D. and safe infant sleep expert Michael Goodstein, M.D., the latter of whom authored the applicable American Academy of Pediatrics safe sleep guideline which recommends that babies be placed to sleep on a firm, flat surface, will also help the jury understand the nature and reasoning behind the AAP's guidelines, the ways in which those guidelines apply to infant sleep products like the RNPS, as well as bassinets and cribs, the ways in which the RNPS differed and deviated from the recommended guidelines, and the factors that caused baby Z.O.'s death in the RNPS.

The opinions contained in these reports are certainly sufficient to raise a genuine issue of material fact.

Even without expert testimony, however, the detailed admissible facts set forth above would permit a jury to determine that the product was negligently designed and defective and unreasonably dangerous.

Arizona law is well settled that a plaintiff does not need to present expert testimony to prevail on a product liability design defect claim. *Walsh v. LG Chem America*, 2021 WL 5177864, at *3 (D. Ariz. Nov. 8, 2021) ("Without expert testimony, and without the incident batteries, Plaintiff has only circumstantial evidence to prove his case [for strict liability design defect]. This is not determinative, however, as Arizona courts have 'allowed plaintiffs to rely on circumstantial evidence to establish a defect that existed at the time the product left the defendant's control caused the injuries.'

Here, Plaintiff may rely on circumstantial evidence alone to establish his strict liability claim"), *quoting Philadelphia Indem. Ins. Co.*, 2015 WL 5693525, at *15, *citing Reader v. Gen. Motors Corp.*, 483 P.2d 1388, 1939-94 (Ariz. 1971); *see also Dietz v. Waller*, 141 Ariz. 107, 110 (1984) ("Plaintiffs, we have held, must be permitted to rely upon circumstantial evidence alone in strict liability cases, because it is unrealistic to expect them to otherwise be able to prove that a particular product was sold in a defective condition"). Similarly, "No

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

expert testimony is necessary to establish a design defect under the consumer expectation test because the test 'focuses on the safety expectations of an ordinary consumer rather than those of an expert.'"  *Long v. TRW Vehicle Safety Systems, Inc.*, 796 F.Supp.2d 1005, 1010 (D. Ariz. June 20, 2011), *quoting Bell v. BMW*, 181 Cal.App.4th 1108, 1129 (2010).  Therefore, even without one, or any, of Plaintiff's experts' testimony, the record in this case has plenty of evidence for a reasonable jury to find Defendants liable and hold them accountable for Z.O.'s death due to the defective design and warnings of the RNPS.

### B. Defendants Expressly Warranted the RNPS as a safe "Sleeper" for infants; the RNPS Was Not a Safe "Sleeper"; and Thereby Defendants Breached Defendants' Express Warranty that The RNPS Was a Safe Sleeper.

Defendants specifically and expressly marketed the RNPS as a safe sleeper.  The Arizona Commercial Code provides:

> 47-2313. Express warranties by affirmation, promise, description, sample
>
> A. Express warranties by the seller are created as follows:
>
> 1. Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> 2. Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> 3. Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> B. It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

*Id.*

By definition, Defendants made affirmations about the safety of the RNPS as a sleeper for infants and described the RNPS in this manner sufficiently to become a basis of the

21

bargain. Therefore, Defendants expressly warranted the RNPS. Special words or phrases such as "warrant" and "guarantee" were unnecessary on these facts.

### C. Reasonable Minds Can Differ Whether the Negligently Designed and Defective RNPS Caused Z.O. to Die Due to Positional Asphyxiation.

#### 1. Z.O. Was a Well Baby Not Susceptible to SIDS.

Several medical professionals involved in this case, including Z.O.'s pediatrician Dr. Kevin Cleary, Plaintiff's pathology expert Dr. Christensen, and even Dr. Ferenc – the Medical Examiner who performed her autopsy – have testified that Z.O. was a healthy baby who was reaching all of her expected milestones until her untimely death. Dr. Christensen Dep., Def. Motion Exhibit "E" 139:7-141:1; Dr. Ferenc Dep., Def. Motion Exhibit "H" 213:1-6, 23-214:16; Dr. Cleary Dep., Exhibit "6" 115:23-116:4, 186:8-187:5.

By contrast, Defendants' experts have given opinions that Z.O.'s medical history may have a link to her death. Plaintiff's experts Dr. Christensen and Dr. Goodstein vehemently disagree and have opined that Defendants' experts are raising issues that have no pathological or scientific link to Z.O.'s death.

Defendants also claim that Z.O. died from Sudden Infant Death Syndrome / Sudden Unexplained Infant Death ("SIDS" / "SUID"). To the contrary, Dr. Goodstein has opined, after reviewing all of Z.O.'s medical records, the Medical Examiner's report, the police reports, witness statements, and a host of other materials, that Z.O. had no indicators that would suggest she was at risk for SIDS, SUID or any other unexplainable infant death. In fact, as explained in Plaintiff's opposition to Defendants' Motion to Exclude Dr. Goodstein's testimony, Plaintiff explains that Dr. Goodstein has criticized Defendant's experts for obscuring the real issue by bringing up several purported "risk factors" that are not recognized in the medical community – or even written about in the relevant literature – as being actual risk factors for SIDS or SUID.

These disagreements between multiple medical professionals demonstrates a genuine question of material fact exists, precluding summary judgment

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

**2. Competent Evidence Supports Z.O.'s Cause of Death by Asphyxiation.**

Dr. Christensen reasons and strongly opines that Z.O.'s cause of death was positional asphyxia in the RNPS. He considered all of the available evidence and ruled out every other possible cause of death before reaching his conclusion and assessed – and dismissed – several possible risk factors that could have contributed to her death not related to the RNPS's inherent design defects. He relies on a significant amount of evidence, including Z.O.'s medical records, the Medical Examiner's autopsy report, eyewitness evidence, the several police reports, and the fire department reports, to reach his conclusion that Z.O. died of positional asphyxia when she rolled in the RNPS and her face became pressed against the RNPS's soft fabric. Notably, Dr. Christensen had access to – and analyzed – far more evidence than Medical Examiner Dr. Ferenc and Investigator Farrel Swope, who examined Z.O.'s body at the scene, had available to them. Dr. Ferenc and Mr. Swope, for instance, did not have access to the police reports, fire department reports, parents' statements, or other eyewitness evidence when they performed their examinations and decided that Z.O.'s cause of death was "undetermined." If they had reviewed and analyzed all the evidence surrounding Z.O.'s death, like Dr. Christensen has, perhaps they would have been able to assign Z.O. a definitive cause of death like Dr. Christensen has.

Again, this disagreement demonstrates an issue of material fact which a jury needs to decide, making summary judgment improper in this case.

**D. The Discovery Rule Defeats Defendants' MSJ on the SOL issue.**

Plaintiff properly filed suit within the statute of limitations ("SOL") because her cause of action did not accrue until April 9, 2019 when she first could discover its existence by means of the recall.

The statute of limitations for a "product liability action" is set forth in A.R.S. § 12–551, and provides, with a certain inapplicable exception, that a "product liability action as defined in § 12–681 shall be commenced and prosecuted within the period prescribed in § 12–542." Arizona Revised Statutes § 12–542, in turn, provides in relevant part:

[T]here shall be commenced and prosecuted within two years after the cause of action accrues, and not afterward, the following actions:

1. For injuries done to the person of another.

2. For injuries done to the person of another when death ensues from such injuries, which action shall be considered as accruing at the death of the party injured.

*Id.; Anson v. American Motors Corp.,* 155 Ariz. 420, 422-23, 747 P.2d 581 (Ct. App. 1987); *Cf., Mack v. A.H. Robins Co., Inc.*, 573 F.Supp. 149 (D.Ariz.1983), aff'd, 759 F.2d 1482 (9th Cir.1985) (holding the two-year limitations period of A.R.S. § 12–542(1) for "injuries done to the person of another" applicable to claims seeking damages for negligence, breach of warranty, products liability, and fraudulent misrepresentation arising from plaintiff's use of the "Dalkon Shield" intrauterine device).

Despite the language of Arizona Revised Statutes § 12–542, Section 2, the Arizona Supreme Court in *Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961 (1984) found the statute unconstitutional in this respect and held that the discovery rule applies to wrongful death actions, as well as injury actions.

In short, pursuant to the discovery rule, a cause of action does not "accrue" until a plaintiff discovers or by the exercise of reasonable diligence should have discovered that he or she has been injured by the defendant's negligent conduct. *Kenyon v. Hammer*, 142 Ariz. 69, 73, 688 P.2d 961, 965 (1984).

Here, Plaintiff could not reasonably have discovered the hazard posed by the RNPS and the identity of Defendants until the recall in April, 2019.  Within days, Katie Courkamp and Andrew Olson filed suit for their terrible loss.  Reasonable minds could certainly differ given this factual scenario.  On the basis of the statute of limitations, Defendants' instant Motion must fail.

**E.  Defendant's MSJ Based on the SOL for Breach of Express Warranty Fails Because the Commercial Code Also Incorporates a Discovery Rule.**

GOLDBERG & OSBORNE
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants failed to cite the Court to the applicable section of A.R.S. §47-2517B, which applies the discovery rule to breaches of warranty involving future performance of a good:

> A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

*Id.* Defendants then cite the Court to a distinguishable unpublished decision of the Arizona Court of Appeals that does not apply to the instant case either on the law or the facts. *Moses v. Nordic Boats,* 2008 WL 4672300 (Az.Ct.App. 2008).

The Arizona Supreme Court in *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of America,* 182 Ariz. 586, 898 P.2d 964 (1995) determined that generally, "the discovery rule can apply to breach of contract claims governed by [A.R.S.] section 12–548." *Id.* at 591, 969. As stated there, "The rationale behind the discovery rule is that it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists." *Id* at 589, 967. The court further noted that, "The defense of statute of limitations is never favored by the courts, and if there is doubt as to which of two limitations periods should apply, courts generally apply the longer. *Sato,* 123 Ariz. at 227, 599 P.2d at 183; *Andersen v. Thude,* 42 Ariz. 271, 274, 25 P.2d 272, 273 (1933); Charles M. Smith, *Arizona Practice: Civil Trial Practice* § 291 (1986)." *Id.* at 590, 968.

The *Gust* court included a footnote, however, to address the Uniform Commercial Code and other Legislative pronouncements to the contrary, stating, "Subject to any applicable constitutional limitations, the legislature may determine whether the discovery rule should apply to accrual of claims under any particular statute of limitations. *See, e.g.,* A.R.S. § 47–2725(B) (1988) (A cause of action for breach of a contract for sale of goods accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach) … ." *Id.,* footnote 1 at 588, 966.

Neither *Gust* nor *Moses* applied to a claim for personal injury such as at issue here. Further, neither involved the instant situation where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance. *Moses* involved damage to the hull of a boat that existed at the time of sale. *Gust* involved breach of a lease agreement that a jury determined reasonable efforts could not have identified earlier. Finally, if A.R.S. § 47–2725(B) (1988) did apply to bar Plaintiff's claim for personal injuries, it would violate ARIZ.CONST Article 18, § 6 and/or Article 2, § 31. As *Gust* rightly concluded, " However, whether a tort victim or a contract claimant, a blamelessly uninformed plaintiff cannot be said to have slept on his rights." *Id.* at 590-91, 968-69.

The RNPS was developed and marketed as a "sleeper". This constituted a warranty that infants could sleep safely in it. As detailed above, it was later discovered that the RNPS was not safe for use as a sleeper, and a product recall ensued. The RNP "Sleeper"'s failure to perform was not and could not reasonably be known until April of 2019. At the least, a genuine issue of material fact exists that precludes grant of summary judgment on this basis here.

**F. Defendant's MSJ Directed Towards Plaintiff's Punitive Damages Claim Fails Because The Record Demonstrates Clear and Convincing Evidence of Evil Mind Under Arizona Law Over Which Reasonable Minds Can Differ.**

In Arizona, in order to recover on a claim for punitive damages, a plaintiff must show by clear and convincing evidence that the "defendant's wrongful conduct was guided by evil motives or willful or **wanton disregard of the interests of others**." *Piper v. Bear Med. Systems Inc.*, 180 Ariz. 170, 180, 833 P.2d 407, 417 (App. 1993)(emphasis added). Clear and convincing evidence is defined as "that which may persuade that 'the truth of the contention is highly probable." *Thompson v. Better-Bilt Aluminum Products Co.*, 171 Ariz. 550, 557, 832 P.2d 203, 210 (1992). This burden is satisfied with indirect and circumstantial evidence. *Id.* This burden of proof for punitive damages is described as the following:

The required evil mind may be established by defendant's express statements or inferred from defendant's expressions, conduct, or objectives…For example, defendant may have conducted himself in an outrageous or egregiously improper manner, thus permitting the inference that he intended to injure, **or consciously disregarded the substantial risk that his conduct would cause significant harm**.

**Even if the defendant's conduct was not outrageous, a jury may infer evil mind if defendant deliberately continued his actions despite the inevitable or highly probable harm that would follow**... A jury certainly may infer evil mind when a defendant continues a course of conduct with knowledge of the past harm caused by the conduct.

*Id.* (emphasis added).

In a motion for summary judgment regarding punitive damages, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 210-11, 557-58. **If there is a reasonable view of the evidence that will support punitive damages the question should be left to the jury**." *Borland v. Safeco Ins. Co. of Am.*, 147 Ariz. 195, 200, 709 P.2d 552, 557 (App.1985) (emphasis added).

"An Arizona plaintiff may seek punitive or exemplary damages if a tortfeasor either 'intended to injure the plaintiff' or 'consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.'" *Hess v. Bumbo Int'l Tr.*, No. CV 13-944 TUC DCB, 2014 U.S. Dist. LEXIS 199387, at *24 (D. Ariz. Sep. 9, 2014) (quoting *Quintero v. Rodgers,* 221 Ariz. 536, 212 P.3d 874, 879 (Ariz. App. 2009)). A defendant's conduct need not be "outrageous," but a defendant must "'continue his actions in spite of the inevitable or highly probable harm that would follow.'" *Quintero v. Rodgers*, 221 Ariz. 536, 212 P.3d 874, 879 (Ariz. App. 2009) (quoting *Gurule v. Ill. Mut. Life and Cas. Co.*, 152 Ariz. 600, 734 P.2d 85, 87 (1987)). If a reasonable jury could find that a defendant acted with an evil mind, a court may not grant a motion for summary judgment on the issue of punitive damages. *Id.*

The punitive damages inquiry "focuses on the motive of the defendant and how those motives accentuate the risk of harm." *Hess*, 2014 U.S. Dist. LEXIS 199387, at *25. An improper motive can be inferred from "some combination of evil actions, spiteful motives or

outrageous oppressive or intolerable conduct that creates a substantial risk of tremendous harm to others." *Demetrulias v. Wal-Mart Stores*, 917 F. Supp. 2d 993, 1011 (Ariz. 2013).

The court in *Hess* denied summary judgment of the plaintiffs' claims for punitive damages against both the manufacturer of a child seat as well as a retailer of the child seat. *Hess* at *26. The court's decision was based on evidence that is substantially similar to the record evidence in this case.

For example, the defendant was aware of multiple reports of children suffering skull fractures during proper use of the child seat, and that such injuries were caused by movements natural to infants, such as arching their backs. *Id.* at *16. The defendant had received "223 complaints of accidents or incidents before it recalled the product." *Id.* at *21

The plaintiff claimed that the defendant should have conducted specific testing given its knowledge of the foreseeable risk of injury. *Id.* at *20. The defendant offered evidence that the child seat was "a unique product [and] no safety standards specifically apply to it." *Id.* at *20. The plaintiff disputed the defendant's argument with evidence that the defendant only tested the "the chemical composition… the absence of sharp corners, the flammability of the seat, **[but] not functional design such as whether a child in the seat would be properly restrained**." *Id.* at *19-20 (emphasis added).

The plaintiff also offered expert testimony that the product's marketing and advertising material encouraged the erroneous belief that the child seat could safely maintain an infant in a seated position. *Id.* at *11. Furthermore, the record contained evidence that the defendant's marketing gave consumers "a false sense of security that their child could not get out of the seat" because the defendant called the child seat the "Bumbo Baby Sitter," and repeatedly claimed "that the seat was manufactured with safety as the number one priority" and that it was "recommended by authority figures such as pediatricians, orthopedists, and physical therapists." *Id.*

The Court should deny Defendant's Motion for Summary Judgment in accordance with the court's holding in *Hess*. Ms. Courkamp's claim for punitive damages is based on the same four premises as the *Hess* Plaintiff's claim: (1) Defendant failed to adequately test the RNPS

with regard to the well-known and foreseeable hazards like efficacy of restraint belts and positional asphyxiation; (2) Defendant was alerted early on that infants were able to get out of position in the RNPS and sustaining serious injuries; (3) Defendant failed to undertake any investigation or redesign of the RNPS as a result of its knowledge of the significant harm the RNPS posed; and (4) Defendant continued to market the RNPS as safe for overnight sleep. *See Hess* at \*22.

Ultimately, Defendants knowingly and intentionally encountered a substantial risk of significant harm to infants with minimal testing, violation of competent pediatric recommendations, inadequate investigation, conscious disregard for massive evidence of its errors and its product's defects supplied it by governmental entities, competent physicians, and parents, ignored the deaths of many, many, children, actively resisted the best efforts of the CPSC to achieve a safe result, manipulated voluntary standards to justify its product, and hid the truth, all for profit, all until the light of day through Consumer Reports forced its hand to voluntarily recall the product.  Ten years of monetary gain was the benefit.  Reasonable minds can certainly differ that this is evil mind.

Wherefore, for the foregoing reasons, the Court should deny in whole Defendants' Motion for Summary Judgement.

DATED this 7th day of January, 2022.


GOLDBERG & OSBORNE


By:**/s/John E. Osborne**
John E. Osborne, Esq.
William C. Bacon, Esq.
John A. Musacchio, Esq.
Attorneys for Plaintiffs

**GOLDBERG & OSBORNE**
698 E. Wetmore Road, Suite 200
Tucson, AZ 85705
(520) 620-3975

1

2                    **CERTIFICATE OF SERVICE**

3        I certify that on the 7th day of January, 2022, I electronically transmitted the attached
document to the Clerk's Office using CM/ECF System for filing and distribution to the
4   following participants of the CM/ECF System:

5

6                          Nicole M. Goodwin
                           Aaron J. Lockwood
7                     GREENBERG TRAURIG, LLP
                     2375 E. Camelback Road, Ste. 700
                           Phoenix, AZ   85016
8                          (602) 445-8000
                          goodwinn@gtlaw.com
9                         lockwooda@gtlaw.com

10                       Lori G. Cohen (*pro hac vice*)
                      GREENBERG TRAURIG, LLP
11                  3333 Piedmont Road NE, Ste. 2500
                           Atlanta, GA  30305
12                          (310) 553-2100
                           cohenl@gtlaw.com
13
                       Mary-Olga Lovett (*pro hac vice*)
14                    GREENBERG TRAURIG, LLP
                   1000 Louisiana Street, Suite 1700
15                        Houston, TX 77002
                          *lovettm@gtlaw.com*
16

17
      By: */s/ Karen M. Giacoletti*
18

19

20

21

22

23

24

25

26

27

28

                                        30