**EXHIBIT 53**

```
                  VIDEO DEPOSITION
               MICHAEL PAUL STEINWACHS



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

----------------------------------------
DAVID GOODRICH and
COURTNEY GOODRICH,
Individually and Next Friends of
ASHER LUKE GOODRICH, a minor,

                   Plaintiffs,

            - vs -       Civil Action File No.
                         1:16-CV-03116-TWT
FISHER-PRICE, INC.,

                   Defendant.
----------------------------------------
```

          Video deposition of MICHAEL PAUL

STEINWACHS, taken pursuant to the Federal Rules of

Civil Procedure, in the law offices of GOLDBERG

SEGALLA LLP, 665 Main Street, Buffalo, New York, on

March 22, 2018, commencing at 10:29 a.m., before

ANNE T. BARONE, RPR, Notary Public.

COU_004047

```
 1        A.    Yes.

 2        Q.    And you were a senior manager of the

 3   quality engineers from 2012, until your retirement?

 4        A.    That's correct.

 5        Q.    And that was when?

 6        A.    December 1st, 2017.

 7        Q.    Well, congratulations on a great

 8   career.

 9        A.    Thank you.

10        Q.    It's rare you see one man spend his

11   whole career at the same place.  I think that's

12   wonderful.  Good for you.

13        What are you doing now, other than not

14   getting up early in the morning?

15        A.    Right.  I'm -- I'm not working right

16   now.  I'm -- I'm officially retired, and other than

17   taking part in this deposition, I'm not -- I'm not

18   involved in any other work.  I am still chairman of

19   an ASTM committee.

20        Q.    Okay.  Well, we're going to talk about

21   that.

22        A.    But that's not a paid position.  I'm

23   just doing it because I -- I like to do it.

24        Q.    Yeah.  Which committee is it?

25        A.    I am chairman of the F15 committee on
```

COU_004064

 1   infant inclined sleep products.

 2        Q.   Okay.  How often does that committee

 3   meet?  Once a month or twice a year, or -- or is it

 4   just basically by email?  Things of that nature?

 5        A.   The committee formally meets twice a

 6   year; however, the last four years they have been

 7   meeting four times a year.

 8        Q.   Is there a reason for that?

 9        A.   There is.  The CPSC has been adopting

10   most of the juvenile product standards into federal

11   laws, and prior to doing that, they have looked at

12   the standards and have asked the committees to make

13   revisions where they saw that the standard was not

14   addressing all of the incidents that were -- that

15   they were able to find -- you know, find in their

16   analysis.

17        Q.   Okay.  Did Fisher-Price ask you to stay

18   in that position?

19        A.   They did not.

20        MR. MOORE:  Okay.  Let me show you what I'm

21   going to mark.

22        The following was marked for Identification:

23        PLF. EXHIBIT 45 Plaintiffs' amended notice

24                        of deposition of Mike

25                        Steinwachs

COU_004065

```
 1          A.   Well, Kevin -- Kevin, maybe --
 2          Q.   What did you research?  What did you
 3    read?  Tell me.
 4          A.   Let me answer it this way:  When we
 5    were looking at what is the appropriate angle, we
 6    looked at what are existing products that are used
 7    currently for holding children that are from birth
 8    to maybe six months, and what are considered to be
 9    safe inclines to prevent a child from being too
10    upright when they're a newborn, and we know a
11    newborn does not have the necessary neck strength
12    to hold their head upright.
13          Q.   That's right.
14          A.   What would be an appropriate angle that
15    would -- that we could safely put a child at where
16    their head wouldn't fall forward onto their chest.
17          And the only standards or best practices
18    that we know are related to infant car seats.  And
19    infant car seats have the best practice is to never
20    have them angled with a seat back angle greater
21    than 45 degrees.  So we chose 30, which is well
22    below 45 degrees, and the 30 degrees was determined
23    to be a conservative safe angle.
24          Q.   By who?
25          A.   By the product integrity team.
```

COU_004087

```
 1          Q.    All right.  Of which you were a member?

 2          A.    Which I was a member.

 3          Q.    And so the product integrity team

 4    determined that a 30-degree angle was safe.

 5          A.    Yes.

 6          Q.    Based on what?

 7          MR. HINES:  I think just asked and answered.

 8          BY MR. MOORE:

 9          Q.    Based on what?  Where -- what -- how

10    did you base that on -- you just looked at a

11    car seat and said, well, we can't do it at 45, we

12    gotta do it at a point where the chin doesn't fall

13    down, and so 30 degrees sounds good?

14          I mean, where did you get that 30 degrees?

15          A.    Well, as I -- as I --

16          MR. HINES:  Object to form.

17          THE WITNESS:  As I noted before --

18          BY MR. MOORE:

19          Q.    Okay.

20          A.    -- that, again, this was not one person

21    coming up with this, but rather it was a group

22    looking at --

23          Q.    I understand.

24          A.    -- juvenile products in general, and

25    specifically what would be a good angle for a child
```

COU_004088

 1   who's going to be left unattended.

 2        And as I stated before, 30 degrees was

 3   chosen to be a conservative maximum angle,

 4   well below some of the more common-practice angles

 5   that are currently used on -- on products like

 6   bouncer seats and swings and infant car seats --

 7        Q.   All right.

 8        A.   -- where children are also placed in an

 9   inclined position, where if their head was to fall

10   forward onto their chest, they could have their

11   breathing compromised.

12        Q.   Are you a medical doctor?

13        A.   I am not.

14        Q.   Don't you think it would be prudent to

15   have counseled with the American Academy of

16   Pediatrics before you decided on a 30-degree angle?

17        MR. HINES:  Object to form.

18        BY MR. MOORE:

19        Q.   Well, let me ask you this:  Did you

20   contact the American Academy of Pediatrics and ask

21   them their opinion of a 30-degree angle inclined

22   sleeping product?

23        A.   I did not.

24        Q.   Did your team do that?

25        A.   I do not know.

COU_004089

1          Q.    Why not?  Why don't you know these

2    things?

3          MR. HINES:  Object to form.

4          THE WITNESS:  Well, let me go back to what I

5    said before.

6          BY MR. MOORE:

7          Q.    Sure.  I'm not finding fault with you.

8          A.    I'm just saying that as --

9          Q.    All right.  I'm just saying, I'm trying

10   to understand.

11         A.    -- as a member of the team, I was more

12   involved in making sure that we had addressed the

13   directive on the safety -- the safety audit action

14   item list, and the product integrity team made up

15   of our safety group, headed by Kitty Pilarz, as a

16   team, that was -- that research was done.

17         Looking at documents from the American

18   Academy of Pediatrics would have been more in the

19   role of our safety group to research and not the

20   quality engineer's role.  So I did not personally

21   do that.  That was done by the safety group headed

22   by Kitty.

23         Q.    Okay.  So we asked Kitty these

24   questions ad nauseam last night, and -- and so you

25   were just taking -- you had a safety group, and it

COU_004090

```
 1  was their -- they were supposed to do the research
 2  into the medicine as to whether or not 30 degrees
 3  was medically safe.
 4          MR. HINES:  Objection.
 5          BY MR. MOORE:
 6          Q.   And then they reported back to you, as
 7  the larger part of the team.  Is that how it
 8  worked?
 9          MR. HINES:  Object to form.
10          THE WITNESS:  As a team, we all agreed that
11  the 30 degrees was appropriate.
12          BY MR. MOORE:
13          Q.   But how did you come up with that, sir?
14  How did you come up with 30 degrees was
15  appropriate?
16          A.   I think I already answered that.
17          Q.   Because of car seats?
18          A.   I mentioned it was not just car seats.
19  I said it was also other juvenile products that are
20  appropriate for that same group of users.  For
21  example, a bouncer seat, an infant swing.  They all
22  have to hold children at an inclined position
23  that's not too inclined so that their heads might
24  fall forward and they might get into a compromised
25  breathing situation.
```

COU_004091

```
 1          Q.    Yes, sir.  But the products you
 2  compared it to aren't sleepers.
 3          You're asking the American public to put
 4  their child in a product to sleep all night
 5  unattended.  Big difference.
 6          A.    Let me -- let me add another thing.
 7          Q.    Okay.
 8          A.    I noted that car seats are recommended
 9  to have an angle not to exceed 45 degrees.  Infant
10  swings also have angles of incline not to exceed
11  I think 50 degrees and greater.  Bouncers don't
12  even have one, and most bouncer seats are much
13  greater than 30 degrees.
14          So if you step back and look at the
15  30 degrees as a maximum used on infant inclined
16  sleep products, it -- it is a -- I believe, a very
17  conservative incline compared with some of these
18  other products.
19          Q.    Well, instead of comparing it to other
20  products, wouldn't it behoove you to make a product
21  that is safe instead of compared to other products?
22          A.    I think we do make a product that's
23  very safe compared to other products, and I think
24  it is appropriate for sleep.
25          Q.    Okay.  All right.  Well, do you think
```

COU_004092

 1    you know more about it than the American Academy of
 2    Pediatrics?
 3           A.    I -- I don't think I've ever made that
 4    claim.
 5           Q.    All right.  Do you know what they
 6    recommend?  Have you looked it up since these
 7    depositions and lawsuits involving the product that
 8    you helped manufacture?
 9           A.    I -- I know some of their requirements.
10           Q.    Their requirements are that you lay
11    a -- a child down in a supine position, right?
12           A.    That's one of their requirements.
13           Q.    To sleep.
14           And that -- and they require that it be on
15    a supine position, not on an inclined position.
16           MR. HINES:  Object to form.
17           BY MR. MOORE:
18           Q.    Correct?
19           A.    That's one of their requirements.
20           Q.    All right.  And one of their
21    requirements is certainly -- nowhere are you going
22    to find, except one article written by your expert
23    in this case and his colleagues, that 30-degree
24    angle is a satisfactory incline for a child to
25    sleep.

COU_004093

1          MR. HINES:  Object to form.

2          MR. MOORE:  Supine.

3          MR. HINES:  Foundation.

4          BY MR. MOORE:

5          Q.   Do you understand supine?

6          A.   Yes, I do.

7          Q.   Okay.  Now, you place a sleeping

8    child -- when you, meaning Fisher-Price -- see,

9    this is a new product, an inclined sleeper,

10   correct?

11         A.   Correct.

12         Q.   A relatively new product to the market.

13         So -- all right.  You had mentioned that

14   y'all did -- did you do testing on the 30-degree

15   angle at Fisher-Price?

16         When I say testing, did you meet with a

17   group and y'all did testing and you -- you did a

18   prototype mockup and put a child in it?  Did you do

19   that?

20         A.   We did some prototype testing, yes.

21         Q.   All right.  Did anybody think, in the

22   group, to say, well, gee, medically, is that good

23   or bad for a child?  Other than to opine that, hey,

24   you know, here's a car seat, and there's an angle

25   there, and here is a sling, here's an angle there.

COU_004095

```
 1             I mean, did -- did you do any medical
 2    investigation at all other than with Dr. Deegear?
 3             A.   Dr. Deegear --
 4             MR. HINES:  Object to form.
 5             THE WITNESS:  -- was -- was the medical
 6    expert that was consulted --
 7             BY MR. MOORE:
 8             Q.   Yeah.
 9             A.   -- when we had a design that we thought
10    was appropriate for -- for infant inclined sleep.
11             Q.   He's worked with y'all for about the
12    last 20 years, right, on different products?
13             A.   I do not know how long he's been
14    associated with Fisher-Price.
15             Q.   All right.  If -- well, Ms. Pilarz said
16    she'd known him for 20 years, but I know he had
17    been a medical person on other -- on other
18    projects.  Had you ever met him before?
19             A.   I did not.  I've never personally met
20    Dr. Deegear.
21             Q.   All right.
22             MR. HINES:  Can we take a short break?
23             MR. MOORE:  Yes.
24             (A recess was then taken at 11:29 a.m.)
25             (On the record at 11:45 a.m.)
```

COU_004096

 1  standards that we typically adhere to.

 2          Q.   The standards that you typically adhere

 3  to for what?

 4          A.   Like an ASTM standard or maybe an

 5  existing government regulation or requirement.

 6          Q.   I want to know what your group or you

 7  personally did to discover or do research into the

 8  30-degree angle, other than what you've already

 9  testified to about car seats and bouncy seats.

10          A.   In addition to my understanding of

11  those products, Kitty's team also looked into

12  whether there was any research or -- or data

13  suggesting that 30 degrees was not an appropriate

14  angle, and we -- we did not find anything to

15  that -- to that nature.

16          Q.   All right.  So when you say you did

17  not -- y'all did not find anything of that nature,

18  meaning that nothing was ever reported back to you

19  from Ms. Pilarz' group or your integrity group

20  inconsistent with a finding that 30 degrees would

21  be medically appropriate?

22          A.   That's correct.

23          Q.   All right.  But you personally didn't

24  do any research into this area, right?

25          A.   I did not do any research into AAP

COU_004098

 1    with Dr. Deegear, or do you even know?

 2            A.    I don't disagree with Dr. Deegear.

 3            Q.    Okay.  All right.  You think 30 degrees

 4    -- recommend babies with reflux sleep at 30 degrees,

 5    right?

 6            A.    I think it's appropriate to allow

 7    infants to sleep in an inclined position up to

 8    30 degrees in a product like ours.

 9            Q.    But why do you think that?

10            A.    I think I've already mentioned why I

11    thought it.  I'm not going to repeat that again.

12    I've stated why.

13            Q.    All right.  I want to make sure that

14    I'm clear on why you think that.  Because Kitty

15    Pilarz was supposed to do medical research that you

16    never saw, and that you think that because car seats

17    are -- can go from up to 45-degree angle and

18    children go in car seats and bouncy seats.

19            That's what I've heard so far from you as

20    to your conclusion that 30-degree angle for an

21    all-night sleeping product is safe for children.

22            A.    Yes.

23            Q.    That's what I've heard you say.

24            A.    Yes.  In addition to that --

25            Q.    All right.

COU_004117

```
 1        A.    -- I'd say that our product prevents
 2   some of the other issues that are a concern to the
 3   medical community.
 4        For example, taking a crib or a bassinet and
 5   raising one end to achieve an angle, and we know
 6   that's a problem because then infants can fall to
 7   the side and fall forward and get into a compromised
 8   position.
 9        So our product prevents that, in addition to
10   having an angle that's no greater than 30 degrees.
11        Q.   Do you know how many people have
12   alleged that their children have died in your
13   product?
14        Do you know how they've alleged they've
15   died?
16        A.    No.
17        Q.   Do you know how Torres alleged that
18   their child died in your product?  In the
19   Fisher-Price product?
20        A.    I don't recall.
21        Q.    Exactly what you said that it couldn't
22   do.
23        MR. HINES:  Object to form.
24        BY MR. MOORE:
25        Q.    Dr. Deegear -- let me show you what we
```

COU_004118

```
 1  conditions could happen to a child?  Do you know?

 2        A.   I'm sorry.  Could you repeat that

 3  question?

 4        Q.   Yeah.  Dr. Deegear is saying, hey, even

 5  if the product allows the child to fall out, he's

 6  not going to hurt himself.  It's not that big a

 7  fall.

 8        A.   That -- that's what he's saying, yes.

 9        Q.   Okay.  Do you believe that?

10        A.   I believe it.

11        Q.   Okay.  Let me show you what we've

12  marked as Plaintiff's Exhibit 30 and have you look

13  at that document.

14        Now, that is not a Rock-n-Play but was a

15  similar device, and that child fell out of the

16  device and fractured its skull.

17        A.   Yes.

18        MR. HINES:  Yeah.  Let me just object.

19  I think, as I put on the record last night, this

20  is one page out of a multipage CPSC document.

21        MR. MOORE:  Yes.

22        MR. HINES:  We don't know the manufacturer.

23  We don't know anything other than what's written on

24  that paper.

25        MR. MOORE:  Yes, sir.
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

COU_004139

**DAVID GOODRICH, ET AL. - vs - FISHER-PRICE, INC.**
Michael Paul Steinwachs on 03/22/2018                    **Page 100**

```
 1  and rockers?
 2       A.   We manufacture both those products.
 3       Q.   Okay.
 4       A.   So I'm familiar with them.
 5       Q.   Okay.  And were you on the safety
 6  and -- safety team and the development team for
 7  bassinets?
 8       A.   Yes.
 9       Q.   Okay.  Tell me a little bit about your
10  knowledge of bassinets.
11       What -- what do they look like?
12       A.   Bassinets are similar to a crib only
13  they're generally smaller.
14       Q.   All right.
15       A.   And they have a firm flat sleeping
16  area.
17       Q.   Okay.  A firm flat --
18       A.   Horizontal sleep area.
19       Q.   Like this table, horizontal?
20       A.   That's correct.
21       Q.   Children's little feet hang up here.
22  They're elongated.  In other words, they're not in
23  a sitting or a prone position, right?
24       A.   That's correct.
25       Q.   Okay.  They're supine?
```

COU_004146

```
 1          A.   Yes.
 2          Q.   And what is -- do you know what the
 3   definition of supine is?
 4          A.   Supine is a flat horizontal position.
 5          Q.   Flat, yeah, horizontal.  Looking up.
 6          A.   Yes.
 7          Q.   Okay.  And so the -- the -- the -- the
 8   bassinets are -- are flat.  How about these -- so
 9   is it like a little like a crib you take with you,
10   a bassinet?
11          I don't know, so I'm not --
12          A.   Could be.
13          Q.   Okay.  I mean, is it portable?
14          A.   Could be.
15          Q.   Do y'all make portable ones?
16          A.   Yes.
17          Q.   Okay.  All right.  And was any medical
18   research done on the proper positioning of babies
19   when you made the bassinets?
20          A.   I don't remember a specific medical
21   research project.
22          Q.   Okay.  All right.  Okay.  Do you know
23   who was in charge of the -- were you there at
24   Fisher-Price when they made bassinets?
25          A.   Yes.
```

COU_004147

 1  warnings.

 2         Q.   Okay.  All right.  So let me show

 3  you -- did you receive a copy of this email, sir?

 4         A.   My name is on it under the copy list.

 5         Q.   Your name is?

 6         A.   Yes.

 7         Q.   Okay.  And it -- and it says there, if

 8  you read down, certain warnings placed on the

 9  product.

10         A.   Yes.

11         Q.   May I see it?  Thank you.

12         And it says here -- it's telling you what

13  you should do and what you should not do with the

14  product.  And it says, never leave the child

15  unattended.  Do you see that?

16         A.   Yes.

17         Q.   Okay.  If it's a sleeper, then you're

18  going to be leaving the child unattended when the

19  parents sleep, right?

20         A.   Yes.

21         Q.   Okay.  Let me show you what we marked

22  yesterday as Plaintiff's Exhibit number 47.

23         MR. HINES:  Let me just state on the record,

24  again, Kitty's been offered on warnings, and he is

25  not --

COU_004161

```
 1          MR. MOORE:  Okay.

 2          MR. HINES:  -- testifying on behalf of

 3   Fisher-Price with respect to warnings.

 4          BY MR. MOORE:

 5          Q.   Here's my question:  That document also

 6   says never leave the child unattended, correct?

 7          A.   Correct.

 8          Q.   But you market the product and you sell

 9   the product as a sleeper so that the mother and

10   father can sleep and the baby can sleep, so

11   therefore, the child is going to be unattended if

12   you market it as a sleeper, right?

13          A.   Correct.

14          Q.   All right.

15          MR. HINES:  Again, same point.  He's not --

16          MR. MOORE:  I -- I -- well, I already asked

17   her about that.

18          Here is -- all right.  Are there any --

19   exactly what -- I have a news release here.

20   Let's -- maybe you can help me with this.

21          The following was marked for Identification:

22          PLF. EXHIBIT 50 News releases, one page

23          BY MR. MOORE:

24          Q.   Are you familiar with that document?

25          A.   I'm going to take my glasses off just
```

COU_004162

```
 1   standard?

 2        A.   It's a standard.

 3        Q.   All right.  So they take individuals in

 4   the industry and -- like yourself, with knowledge

 5   and experience and education in the area, and try

 6   to coalesce a -- a standard by which products

 7   should be made?  Is that basically it?

 8        MR. HINES:  Object to form.

 9        THE WITNESS:  In the case of this product,

10   the ASTM committee is made up of manufacturers,

11   members of the CPSC, and members of Health Canada.

12   There are safety advocates on the committee.

13        There could be just -- there could be

14   consumers.  There could be -- you know, the mother

15   and father who are just interested could be on the

16   committee.

17        BY MR. MOORE:

18        Q.   How -- how do you become on the

19   committee?

20        A.   You notify ASTM that you would be

21   interested and -- and you join.

22        Q.   Okay.  You just join, or are you

23   selected?  Do you have to submit an application?

24   What's the process?

25        A.   It's been a while.  I don't remember
```

COU_004165

```
 1   exactly how the process worked.  But it's not --
 2   it's not difficult.  You don't have to be voted in
 3   or anything.  I think you apply and become a member
 4   of ASTM and -- and -- and ask to be part of a
 5   committee.
 6        Q.   Okay.  So here, on this news release
 7   entitled New ASTM Standard Addresses Increased Use
 8   of Infant Inclined Sleep Products, and they -- they
 9   quote you.
10        They say, ASTM member Mike Steinwachs,
11   senior manager, quality engineering, Fisher-Price,
12   notes that use of infant inclined sleep products
13   has become popular, as parents sometimes feel that
14   babies sleep better on an incline rather than a
15   flat surface.
16        Did you say that to someone?
17        A.   It sounds like something I said to
18   somebody, yeah.
19        Q.   Okay.  Don't know who it was?
20        A.   I don't recall.
21        Q.   Okay.  So -- so, clearly, you're aware
22   that -- that there's two views, a flat surface
23   versus an incline, that you feel like an incline is
24   just as good as a flat surface.  I mean, is that
25   your view?
```

COU_004166

```
 1         A.   I would view our product as -- as

 2   having a flat surface, yes.

 3         MR. MOORE:  All right.  All right.  Let's --

 4   let's go through this.  All right.  The question

 5   was -- maybe we could get you to read it back,

 6   Anne.  I'm sorry.

 7         (The above-requested portion was then read

 8   by the reporter.)

 9         BY MR. MOORE:

10         Q.   So do you view -- I didn't say, do you

11   view your product a flat surface?

12         I'm asking you:  Do you view the inclined

13   sleep product as equally as good as a -- as a

14   horizontal surface for babies to sleep on?

15         MR. HINES:  Object to form.

16         THE WITNESS:  I'm not exactly sure how to

17   answer, but I'm going to make a try at it.

18         The infant inclined sleep products that meet

19   this requirement that's stated in what -- what

20   you've just read have a flat serpentine sleep

21   surface that is inclined.  And I do believe that's

22   safe.

23         BY MR. MOORE:

24         Q.   Okay.  All right.  Let's -- let's look

25   at the definition.  This is Plaintiff's Exhibit 15,
```

COU_004167

1   and I want you to look at the definition of supine.

2          Okay.  And that is the -- if what you're

3   holding in your hand is the definition of supine,

4   your product certainly is not that, correct?

5          MR. HINES:  Object to form.

6          THE WITNESS:  It is certainly our -- the

7   infant is facing upward.  They're -- the -- the --

8   the surface they're resting on is flat.  And flat

9   is horizontal.  I mean, it's -- it's a flat

10  surface.

11         BY MR. MOORE:

12         Q.  Never mind.  Horizontal is horizontal,

13  correct?

14         If horizontal is horizontal, why do you have

15  the word incline?

16         It's because it's an incline, not horizontal

17  product, correct?

18         A.  I'm sorry.  Could you repeat the

19  question?

20         Q.  Yeah.  It's -- supine position is when

21  you have a horizontal -- see, that means like this.

22  Horizontal.  Horizon.  This way.  And face up is

23  looking up, this way, straight up, with the feet

24  out.  See, that's horizontal.  That's like laying

25  on this flat table.

COU_004168

1       What you have is not a supine position.  You
2  have an incline.  You used the word incline because
3  it's an incline, not horizontal, correct?
4       MR. HINES:  Objection to form.
5       THE WITNESS:  It's an inclined sleep
6  product.
7       BY MR. MOORE:
8       Q.   Right.
9       A.   It has a flat surface that's inclined.
10      Q.   Well, a flat surface, sir, could be
11 straight up vertical and that's a flat surface,
12 right?
13      A.   Right.
14      Q.   Okay.  All right.  All right.  What is
15 F3118?
16      A.   It's the ASTM standard for infant
17 inclined sleep products.
18      Q.   Okay.  All right.  Now, the Danny
19 Kaiser Act, are you familiar with it?
20      A.   Yes.
21      Q.   Okay.  The Danny Kaiser Act mandates
22 that the Consumer Product Safety Commission adopt
23 the ASTM standards or stricter standards.  Would
24 you agree with that?
25      A.   If that's what it says.

COU_004169

```
 1          A.    I don't know that.
 2          Q.    In other words, it wasn't just that you
 3   didn't want it to fall under 2194, the existing
 4   standard for bassinets and cradles, you didn't want
 5   to be part of that 2194 at all, but you just wanted
 6   to create your own so you could put a 30-degree
 7   angle on the incline and as a standard.
 8          Isn't that what you were doing?
 9          A.    Let me correct that.
10          Q.    Okay.
11          A.    Fisher-Price and myself personally did
12   not look to mandate a separate standard.  The ASTM
13   committee decided that we should have a separate
14   standard.
15          Q.    Okay.
16          A.    Fisher-Price wasn't -- wasn't solely
17   making that determination.
18          Q.    Wasn't solely.  But you were making
19   that play as being on the ASTM committee at that
20   time, right?
21          A.    As a member, yes.
22          Q.    But your position was that's what you
23   wanted, and you were doing that to help
24   Fisher-Price because y'all had already started
25   manufacturing the product, right?
```

COU_004177

1          A.    I think we did that because we felt

2    that would make a better standard that would force

3    better products to be made.

4          Q.    Do you know when that was?  Was that in

5    2008?  '9?  '10?  When was that?

6          A.    To the best of my recollection, I think

7    the standard -- we started work on a new standard

8    around 2010.

9          Q.    All right.  Well, by 2010, you had

10   approximately 180,000 units out there being

11   purchased by the consumer that were already at

12   a 30-degree inline, so it was in Fisher-Price's

13   best interest to create a new standard, as opposed

14   to going under the existing standard, so they

15   wouldn't have to recall those products for being

16   in violation of 2194-07, correct?

17          MR. HINES:  Object to form.  Foundation.

18          THE WITNESS:  When we introduced the

19   product, our product at the time was within the

20   scope of 2194.  Our product was tested to 2194 and

21   met all the requirements.

22          BY MR. MOORE:

23          Q.    Okay.  Then existing, but this is a new

24   product, right?

25          Your -- you were being judged through the

COU_004178

```
 1   version of the ASTM standard --

 2          BY MR. MOORE:

 3          Q.    Yeah.

 4          A.    -- applied only to products with

 5   inclined sleep surfaces up to 10 degrees but

 6   excluded products that were 10 degrees and greater.

 7          Q.    10 degrees what?

 8          A.    And greater.

 9          Q.    Okay.  In other words, you made a new

10   standard?

11          A.    Well, no.  We were exempted from

12   meeting the bassinet standard.

13          Q.    That's right.  And --

14          A.    ASTM exempted those products, and we

15   were working from 2010 till 2015 on a new standard

16   for products with sleep angles from 10 degrees to

17   30 degrees.

18          Q.    Okay.  Now, you helped author that

19   standard, did you not?

20          A.    Yes.

21          MR. MOORE:  Okay.  Because I remember

22   reading something where there was a footnote and

23   your name was at the bottom of the -- yes, at the

24   bottom of the ASTM standard -- I don't know if we

25   put this in.
```

COU_004197

```
1          Q.   All right.  Would it be just like one
2   that you would buy from the shelf?  Let me --
3          A.   Let me -- let me explain what I
4   observed.
5          I took the product out of the box.  I
6   confirmed that it was the model that we said it
7   was.
8          Q.   Which is?  6070?
9          A.   No.  I think we determined it --
10  there's three numbers --
11         Q.   Oh, yeah.
12         A.   -- noted on -- on the inside.  It's one
13  of the three.
14         I noted the date code and -- that was on it.
15  I noted that it was a product that had been
16  well-used.  This was not a brand-new product.  It
17  looked like it had been used quite a while.
18         Q.   All right.  Anything wrong with that?
19         A.   No.
20         I didn't notice anything that would make the
21  product nonusable.
22         Q.   Okay.
23         A.   That's what I -- we observed.
24         Q.   All right.
25         A.   We also looked, because we had heard
```

COU_004213

1  that your expert said that the seat back angle was

2  not correct, and we did verify that it was, indeed,

3  correct.

4          Q.    That it was not --

5          A.    We heard that your expert measured

6  it --

7          Q.    You heard or you read?

8          Have you read anything from our expert?

9          A.    No, but it was told to me.

10         Q.    Okay.

11         A.    It was told to me that your expert

12  measured the seat back, and I believe I saw a

13  picture of how he did it.

14         Q.    All right.

15         A.    Which was not consistent with how we do

16  it in the standard.

17         And we measured it as per F3118 and

18  determined that the angle was in compliance.  It

19  was below 30 degrees.

20         Q.    How -- how -- how below 30 degrees?

21         A.    We measured 27.8 degrees.

22         Q.    All right.  And that was the day before

23  yesterday?

24         A.    Yes.

25         Q.    And how did you measure it?  Show me

COU_004214

```
 1  how you did it.
 2       A.   I don't have the equipment with me to
 3  do it, but it was done exactly the way it's called
 4  out in F3118.
 5       Q.   All right.  Well, it's certainly more
 6  than five degrees, isn't it?
 7       A.   It is.  But it's well within the spec.
 8       Q.   The ones that you wrote.
 9       A.   The ones that ASTM wrote.
10       Q.   Of which you were the chairman of that
11  committee.
12       A.   Yes.
13       MR. MOORE:  No further questions.
14       MR. HINES:  I've got no questions of
15  Mr. Steinwachs at this time.
16       (Proceedings of 3/22/18 were then concluded
17  at 3:17 p.m.)
18
19                 *   *   *
20
21
22
23
24
25
```

COU_004215