**EXHIBIT 54**

VIDEO DEPOSITION
LINDA CHAPMAN


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

----------------------------------------
DAVID GOODRICH and
COURTNEY GOODRICH,
Individually and Next Friends of
ASHER LUKE GOODRICH, a minor,

                    Plaintiffs,

            - vs -      Civil Action File No.
                        1:16-CV-03116-TWT
FISHER-PRICE, INC.,

                    Defendant.
----------------------------------------


        Video deposition of LINDA CHAPMAN,

taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of GOLDBERG SEGALLA

LLP, 665 Main Street, Buffalo, New York, on

March 21, 2018, commencing at 10:24 a.m., before

ANNE T. BARONE, RPR, Notary Public.

COU_003788

Case 2:19-cv-02689-GMS   Document 29-14   Filed 05/28/07   Page 3 of 25

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018
Page 23

```
 1          Q.   And that was for an infant between
 2   six months and 18 months, and what are they
 3   supposed to do with the pinwheel choo-choo?
 4          A.   They push it on the ground --
 5          Q.   Okay.
 6          A.   -- to make a pinwheel that's under a
 7   plastic -- a clear plastic dome be able to spin
 8   around.
 9          The idea was to take the -- the sparkly
10   attention-grabbing nature of a pinwheel and make it
11   safe for a baby to play with.
12          So I took a pinwheel and put it on its end
13   and connected it to a gear that when the baby
14   pushed the choo-choo along, it spun the pinwheel,
15   but it was under the clear dome so that it wasn't
16   something that was unsafe for the baby or that they
17   could break.
18          Q.   Okay.  Now, when you develop a product,
19   there -- is there a certain protocol that you
20   follow --
21          A.   I don't know --
22          Q.   -- when you develop a product?
23          A.   -- what you're --
24          Q.   Well, you would assess that there is a
25   market or a need for the product to be -- to be
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

COU_003810

 1    made, right?

 2          A.   Yes.

 3          Q.   All right.  Do you do that, or does

 4    someone else do that?

 5          A.   I work with a team.

 6          Q.   Okay.

 7          A.   And typically marketing is the --

 8          Q.   All right.

 9          A.   -- driver of requests.

10          Q.   Driver request?

11          A.   The -- the -- the marketing person is

12    the one that leads the request.

13          Q.   Right.  He's like the driver of the

14    product?

15          A.   The business.

16          Q.   Yeah.  Sure.

17          And you would also want to look at probably,

18    I would think, current regulations and laws about

19    the product?  Would you do that?

20          A.   It's not my job to look at the laws.

21          Q.   Okay.  All right.

22          A.   I do make sure that products meet our

23    internal and -- and regulatory gauges.

24          Q.   Do you ever read the requirements in

25    the Federal Register or the ASTM standards?

COU_003811

```
 1          A.    I don't as a rule.

 2          Q.    Do you know what the ASTM stands for?

 3          A.    I do not.

 4          Q.    Okay.  Would -- would your job be that

 5    marketing and other individuals on the team would

 6    come to you and say, gee, we want to make a product

 7    that does this; design it for us?

 8          And then you would get out your pencil and

 9    pen and sheet of paper and you -- and you just

10    start designing something that you think would --

11    would fulfill it, and it just builds from there; is

12    that how it works?

13          A.    Sometimes.

14          Q.    Okay.  All right.  And would you --

15    would you ever look at what the Consumer Product

16    Safety Commission does when you design the product?

17          A.    No.

18          Q.    And so we don't look at the ASTM

19    standards or the Consumer Product Safety Commission

20    and what they say about it.

21          Do you ever research -- do you ever research

22    any of the medical or regulatory conditions of the

23    product?

24          A.    I do not.  There's a team of people at

25    Fisher-Price --
```

COU_003812

```
 1        Q.    Okay.

 2        A.    -- that that's their responsibility.

 3        Q.    All right.  Can you tell me who would

 4   normally be on a team to drive a product?

 5        You'd have -- you'd have a marketing person

 6   who's the driver, the design engineer or

 7   designer -- industrial designer.  Who else would

 8   you have on the team?

 9        A.    A product development engineer.

10        Q.    All right.  A product development

11   engineer.  And what -- what -- what does that

12   product development engineer do?

13        A.    They take the ideas that the designers

14   come up with and ensure that it can be manufactured.

15        Q.    Do you ever do any alpha or beta

16   testing?

17        A.    Yes.

18        Q.    Do you know what that is?

19        Tell me what that is.

20        A.    Maybe I shouldn't have said yes right

21   away.

22        Q.    That's all right.

23        A.    I'm assuming --

24        Q.    You're doing an alpha, beta testing of

25   a prototype.
```

COU_003813

Case 2:19-cv-00639-GMST   Document 129-14   Filed 05/23/22   Page 7 of 25

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018                                    Page 46

 1          Is that the Newborn Rock-n-Play Sleeper?

 2          MR. HINES:  Kevin, as she's looking

 3   through -- I don't have my Bates range -- is that

 4   the entirety of the patent application?

 5          MR. MOORE:  No.  I have the rest here.

 6          MR. HINES:  Okay.

 7          MR. MOORE:  Those are just the pictures.

 8          MR. HINES:  Okay.  All right.  I'm not

 9   looking at it.

10          THE WITNESS:  It does appear to be the

11   pictures.

12          BY MR. MOORE:

13          Q.  Okay.  Who drew those?

14          A.  I don't know.

15          Q.  Did you draw those, Ms. Chapman?

16          A.  No.

17          Q.  When you designed this product, tell me

18   everything that you did to design this product, if

19   you can do that.

20          Did you get out a piece of paper and a pen

21   and decide:  I'm going to design and inclined

22   chair?

23          A.  I didn't start out with it as a

24   independent frame that holds the inclined sleeping

25   seat.

COU_003833

```
 1        Q.    Speak up.

 2        A.    Okay.  Do I need to restate that?

 3        MR. HINES:  You -- that's okay.  Just speak

 4   up a little bit.

 5        THE WITNESS:  Okay.

 6        BY MR. MOORE:

 7        Q.    I -- I can't hear you.

 8        A.    Okay.  When I first designed this

 9   seat --

10        Q.    Yes, ma'am.

11        A.    -- it was not conceived as an

12   independent frame.  It was something that I -- I

13   looked on the market to see what already existed to

14   help people when their pediatricians had said, you

15   know, your child might be more comfortable --

16   whether they have congestion or they have reflux or

17   any issues with a stuffy nose, something like that,

18   there were often pediatric recommendations to

19   elevate the head temporarily for sleeping.

20        And I wanted to see what was out in the

21   market, because I didn't have anything back when I

22   had need of that.

23        And I knew that having a baby rest in a

24   car seat was not recommended for overnight sleeping

25   because it was --
```

COU_003834

1     Q.    Do you know why?

2     A.    -- too inclined.

3           I don't know specifically why, but I do know

4     that when you -- when I looked at my child sleeping

5     in the car seat, that it was -- it didn't -- it

6     didn't appear to be reclined enough.

7           So I looked at what was on the Internet for

8     inclined sleeping devices and found wedges that

9     were independent.  They were just foam wedges that

10    had fabric covers over them.

11          And they didn't appear to have any sort of

12    containment that would keep the baby in the proper

13    attitude for what was being recommended to me, back

14    when my child was younger, that about 30 degrees

15    was the proper angle.

16    Q.    Where did you get that number?

17    A.    That was something that I had -- I had

18    seen products on the market.  I had also --

19    Q.    You had seen products on the market --

20    A.    I had seen wedges and -- that were in

21    the Internet, as well as information that I had

22    found in looking at articles, but I don't know what

23    those articles are at this time, you know.

24    They're --

25    Q.    Okay.  If I asked you to name me the

COU_003835

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018

Page 49

```
 1   articles that you read that you learned that a

 2   30-degree incline angle was acceptable as a

 3   sleeper, could you tell me what you read?

 4        A.   I can't tell you the specific articles,

 5   no.

 6        Q.   Did you ever --

 7        A.   But I did --

 8        Q.   I'm sorry.

 9        A.   I did follow up with my hazard analysis

10   team.

11        Q.   I'm sorry.

12        A.   I did follow up with my hazard analysis

13   team.

14        Q.   Hazard analysis team.  Now, who are

15   they?

16        A.   They are who we bring ideas to that --

17   to see if they are safe products for children.

18        Q.   Who was on your hazard analysis team?

19        Give me the names of the people you brought

20   it to.

21        A.   There's -- we call them a safety

22   committee.

23        Q.   Okay.

24        A.   Or a hazard analysis team.  And I --

25        Q.   Was Mike Steinwachs on that safety
```

COU_003836

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018                            Page 50

 1  team?

 2       A.   I believe so, yes.

 3       Q.   Yes.

 4       And who -- were you on it?

 5       A.   I was the designer bringing the product

 6  to the committee, so I was not on the committee.

 7       Q.   Okay.  Who else was on the safety

 8  committee?

 9       A.   Kitty Pilarz.

10       Q.   Okay.  All right.  Who else?

11       A.   I would have to look at the hazard

12  analysis reports to see who the other team members

13  were because they rotate.

14       Q.   Okay.

15       A.   So each time you bring a product in for

16  review, it may be a slightly different group of

17  people.

18       Q.   Okay.  So you went on the Internet to

19  help develop your idea about an inclined sleeper.

20  Was there a preexisting inclined sleeper on the

21  market?

22       A.   No.

23       Q.   There was just a fabric and a foam that

24  was elevated a little bit; is that correct?  You

25  said it's a wedge?

COU_003837

Case 3:19-cv-02689-GMS-T Document 235-4 Filed 05/20/22 Page 12 of 25

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018                                    Page 51

```
 1        A.    Correct.  Yes.

 2        Q.    I want to know where you got your

 3   information, Ms. Chapman, that a 30-degree incline

 4   was a safe incline for a child to sleep.

 5        A.    Again, I brought my idea to the hazard

 6   analysis team.

 7        Q.    Okay.  All right.  So we go back to

 8   what I mentioned earlier.  You just bring the idea.

 9   As far as the pertinent regulations and checking

10   for materials testing with ASTM standards and the

11   Consumer Product Safety Commission and the federal

12   regulations, that would be something left up to the

13   hazard team, correct?

14        A.    Correct.

15        Q.    And so they would either give it

16   conditional approval or unconditional approval and

17   they would report back to you and say, well, this

18   product is fine at 30 degrees; or we can't make it

19   at 30 degrees, it's got to be at a different

20   degree; but you would take your further

21   implementation of your design from them giving

22   their research?

23        A.    Absolutely.

24        MR. HINES:  Object to form.

25        BY MR. MOORE:
```

COU_003838

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018                                    Page 53

```
 1          Q.    Okay.  Do you know what this -- this
 2    case is about?
 3          A.    Generally.
 4          Q.    Okay.  You know that our position is
 5    that the design of this product and placing
 6    children at an incline of 30 degrees will kill
 7    them.  You understand that.
 8          A.    I do now.
 9          Q.    Okay.  Do you understand how many
10    children have died in this product, Ms. Chapman?
11          A.    I do not.
12          Q.    You work for Fisher-Price.  Do you not
13    know?
14          A.    I do not know the amount.  I -- I don't
15    get access to those --
16          Q.    Okay.
17          A.    -- that piece of information.
18          Q.    When you were designing the product,
19    did you happen to go online and read anything, any
20    material from the American Academy of Pediatrics?
21          A.    No.  That's not my job.
22          Q.    And that's what I'm -- but that would
23    be a job that someone you would assume from the
24    hazard department would have done, right?
25          A.    Yes.
```

COU_003840

 1  Fisher-Price Newborn Rock-n-Play Sleeper.

 2        And if you will please turn toward Bates

 3  stamp number 66 on that document.  It will be

 4  highlighted, Ms. Chapman, in yellow.

 5        There you go.  Can you read that paragraph

 6  to yourself?  That's fine.

 7        Do you know who wrote that paragraph?

 8        THE WITNESS:  I don't know the lawyer's

 9  name.

10        BY MR. MOORE:

11        Q.   Is it correct?

12        A.   Yes.

13        Q.   Okay.  So the -- the trunk, it appears

14  as though it is written at 25 to 35 degrees,

15  correct?

16        A.   Yes.

17        Q.   All right.  And you don't have any

18  independent knowledge, when you were designing this

19  product, whether 25 or 35 degrees was dangerous for

20  a child or not, do you?

21        A.   I do not.

22        Q.   Who -- was it your idea to come up with

23  the 30-degrees or the 32-degrees incline?

24        A.   No.

25        Q.   Whose was it?

COU_003845

Case 3:19-cv-02689-WST  Document 235-4  Filed 05/07/22  Page 15 of 25

DAVID GOODRICH, ET AL. vs.  FISHER-PRICE, INC.
**Linda Chapman on 03/21/2018**                                    Page 59

```
 1          A.   I worked with a team.

 2          Q.   I'm sorry?

 3          A.   I worked with a team.

 4          Q.   Well, whose idea was it?

 5          A.   For the 30 degrees?

 6          Q.   Somebody came up with the idea of the

 7   32 degrees.  Who did that?

 8          MR. HINES:  Object to form.

 9          THE WITNESS:  I can't tell you.

10          MR. HINES:  32 degrees.  Go ahead.

11          BY MR. MOORE:

12          Q.   Well, 30 to 32.

13          A.   I can't tell you.  I don't know.

14          Q.   Well, you designed the product,

15   correct?

16          A.   I did.

17          Q.   Okay.  Well, who told you to design it

18   at 32 degrees or 30 degrees?  Or who told you to

19   make it incline at that degree?  Certainly somebody

20   did.

21          MR. HINES:  Object to form.

22          MR. MOORE:  Okay.  That's fine.

23          Who?  Was it you?  Was it Kitty?  Was it

24   Mike?  Who was it?

25          THE WITNESS:  I don't remember.  It was ten
```

COU_003846

```
 1   years ago.  We worked as a team.  I don't remember
 2   who the specific person was that said a specific
 3   angle.
 4        BY MR. MOORE:
 5        Q.   Okay.  When you testified earlier that
 6   this was your design and it was an incline, did you
 7   just have an idea of an incline, or did you have an
 8   idea that it would be such a very dramatic
 9   incline -- or let me rephrase that -- that it would
10   be a significant incline?
11        MR. HINES:  Object to form.
12        BY MR. MOORE:
13        Q.   Above 5 percent.
14        MR. HINES:  Object to form.
15        BY MR. MOORE:
16        Q.   You can answer.
17        In your mind's eye, go -- go back and tell
18   me, Ms. Chapman, when you have this product in your
19   mind that you want to develop, is the product that
20   you had in your mind's eye that you wanted to
21   develop pretty much the product that you
22   subsequently got to market and sold?
23        A.   It evolved.
24        Q.   Sure.  And we're -- and we're going to
25   get into that.  It's not a trick question.  It
```

COU_003847

DAVID GOODRICH, ET AL. vs.  FISHER-PRICE, INC.
Linda Chapman on 03/21/2018

Page 61

 1  evolved.  Sure.

 2        A.    Even in preproduction it evolved.

 3        Q.    Okay.  All right.  What we're trying to

 4  establish is who came up with the idea that the

 5  30- or 32-degrees or the 25-degree angle that the

 6  child rests on was a good idea.  And you don't know

 7  who that was, do you?

 8        A.    I don't know who specifically said

 9  30 degrees.

10        Q.    Was it you?

11        A.    I don't know if I was the first person

12  to say 30 degrees or not, because I work with a

13  safety committee that would tell me what would be

14  safe.  It's not -- I'm not a PI engineer.

15        Q.    Right.  Yeah.  I guess that's my point

16  is that you were relying on them to tell you

17  what -- what the correct medical issue was.

18        A.    Yes.

19        Q.    You just saw a need for a product that

20  you thought you could help people.

21        A.    Yes.

22        Q.    And so you wanted to design this

23  product, and you left it up to the safety committee

24  to determine if it was a safe product, so you just

25  went with that.

COU_003848

```
 1        A.    Correct.

 2        MR. MOORE:  Okay.  Let me show you what I'll

 3   mark as Plaintiff's Exhibit number 4.

 4        The following was marked for Identification:

 5        PLF. EXHIBIT 4  Drawing Bates stamped 564

 6        BY MR. MOORE:

 7        Q.    I'm going to show you what I'm going to

 8   mark as Plaintiff's Exhibit 4, Ms. Chapman.  Can

 9   you identify that document?

10        A.    It's a drawing of the frame of the

11   Rock-n-Play.

12        Q.    Okay.

13        A.    Or the --

14        Q.    It's the design of the frame, and what

15   angle does it appear as though the Rock-n-Play

16   incline is at?

17        A.    32.

18        Q.    Okay.  Who drew that document?

19        A.    I don't know.

20        Q.    Did you?

21        A.    I doubt it.

22        Q.    Okay.  We were given that document by

23   the lawyers that represent Fisher-Price.

24        MR. HINES:  No.  Let me object.  Part of

25   it's an attachment to an email.
```

COU_003849

```
 1          A.    Yes.
 2          Q.    Okay.  Well, if you did have an early
 3   model, would you have built it -- that model at
 4   your house, or would you have built it at work?
 5          A.    At work.
 6          Q.    Okay.  And who would have approved you
 7   to use the materials to do that?
 8          A.    I don't need approval to use materials.
 9          Q.    Okay.
10          A.    There's a model shop with supplies.
11          Q.    All right.  So you would just go and --
12   and cut the fabric yourself and do whatever you
13   could do yourself and just kind of build it
14   yourself with a team?
15          A.    Yes.
16          Q.    Okay.  And -- and -- but you don't
17   know, in this instance, whether or not you had
18   built a prototype or not; is that right?
19          A.    In this meeting, I -- I don't know
20   whether I had a model in this meeting or not.
21          Q.    Okay.  Who designed the plastic insert?
22          A.    I designed it with Justin Taton.
23          Q.    Okay.  When y'all -- was he working at
24   Fisher-Price with you at the time?
25          A.    Yes.
```

COU_003857

```
 1          A.    The first hazard analysis?

 2          Q.    Yes.

 3          A.    I can't.

 4          Q.    Okay.  It says action items, must meet

 5   applicable standards for bassinet and rockers.

 6          Okay.  Why -- do you know why that -- that

 7   action item is on there?

 8          A.    I was proposing that it be a sleeper,

 9   so that it would -- that would imply that it is

10   a place where baby can rest unattended overnight.

11          Q.    So was it your idea that it be a

12   sleeper, as opposed to a -- a place where the --

13   where the baby can just hang out for a while with

14   the parents?  You wanted it to be a sleeper?

15          A.    I wanted it to have that ability,

16   correct.

17          Q.    All right.  So you wanted a product

18   where you could put your child in it for extended

19   periods of time; would that be fair to say?

20          A.    Define extended.

21          Q.    Well, if it's a sleeper, how about

22   overnight sleeping?

23          A.    Yes.  I said that.

24          Q.    Did you research any medical

25   information regarding whether that is safe for
```

COU_003860

```
 1   a child?

 2          MR. HINES:  Whether what is safe for a

 3   child?

 4          MR. MOORE:  To be -- to be -- to be at an

 5   incline and to be a sleeper.  Did you personally

 6   do any research as to whether or not that would be

 7   a safe position for a child as a sleeper?

 8          THE WITNESS:  I did not.

 9          BY MR. MOORE:

10          Q.   Okay.  Did you look up any articles by

11   the American Academy of Pediatrics with respect to

12   whether you should even have an inclined sleeper?

13          A.   No.

14          Q.   Okay.  And did you look up what the

15   standards are for bassinets and rockers?

16          A.   I did not find that information myself.

17   That was provided to me by the team.

18          Q.   All right.  And it says, you must

19   look -- must lock in open position.  I'm assuming

20   that's where you unfold it and it has to lock,

21   right?

22          A.   Correct.

23          Q.   And then number 3, evaluate infant

24   position, head and torso alignment.  Do you see

25   that?
```

COU_003861

```
 1   not sleep in an inclined position more than

 2   five degrees?

 3          MR. HINES:  Object to form.

 4          THE WITNESS:  When --

 5          MR. HINES:  I don't know that there's a

 6   question.

 7          THE WITNESS:  Say that again.

 8          BY MR. MOORE:

 9          Q.   Do you understand what I'm saying?

10          A.   I'm sorry?

11          MR. HINES:  I'm just objecting to form.

12   Go ahead and reask.

13          MR. MOORE:  All right.

14          THE WITNESS:  Can you ask the question

15   again?

16          BY MR. MOORE:

17          Q.   Yeah.  I mean, that -- that was what I

18   was talking about was that there was -- you know,

19   there is medical evidence from the American Academy

20   of Pediatrics that says a child shouldn't sleep in

21   an inclined position but in a supine position.  Do

22   you know that?

23          MR. HINES:  Object to form.  Foundation.

24          THE WITNESS:  I do not -- I have not read

25   the American Academy of Pediatrics documents.
```

COU_003890

```
 1          All right.  Now, that pad does not provide
 2   the flexibility of a mattress, does it?
 3          A.    The flexibility of a mattress?
 4          Q.    Well, it doesn't -- it's not as thick
 5   as a mattress.
 6          A.    It is not as thick as a crib mattress.
 7          Q.    As a crib mattress.  All right.
 8          It's more of a cushion, right?
 9          A.    Correct.
10          Q.    All right.  Now, what age child did --
11   was this product designed for?
12          A.    Again, it was for a developmental
13   stage, but it starts at birth and then goes up
14   until the child is able to push up on their own or
15   be able to pull themselves up or can sit
16   unassisted, they should no longer be using the
17   product.
18          Q.    Just so I don't have to go through all
19   the medical, which I will have to go through with
20   someone at Fisher-Price, because I don't want to
21   take up your time having to do this, would it be
22   safe to say that you did no independent research on
23   any medical information on your own or you don't
24   have any medical information or didn't have it at
25   the time you designed that product?
```

COU_003904

```
 1          MR. HINES:  Object.  Are you talking
 2  about -- when you say you, are you talking about --
 3          MR. MOORE:  I'm talking about at the time
 4  that Fisher-Price -- well, at the time, that you
 5  personally, Ms. Chapman, did not research any of
 6  the medical aspects of this product prior to
 7  presenting it to Fisher-Price and the group.
 8          THE WITNESS:  Correct.
 9          BY MR. MOORE:
10      Q.   Okay.
11      A.   I did not do independent medical study.
12      Q.   Okay.  All right.  It is designed --
13  your design, as an industrial designer, was to have
14  a place for the baby to sleep in a environment
15  where they could not get out of that environment,
16  correct?
17          You have a strap, and the baby is encased in
18  a plastic half tube type thing, correct?
19          MR. HINES:  Object to form.
20          THE WITNESS:  Correct.
21          BY MR. MOORE:
22      Q.   All right.  All right.  Now, and you
23  designed this product for this baby to sleep
24  overnight, right?
25      A.   Correct.
```

COU_003905

Case 2:19-cv-02689-GMS    Document 23-14    Filed 05/28/22    Page 25 of 25

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Linda Chapman on 03/21/2018                     Page 126

 1  prototype, you had children that slid down --

 2        A.   No.

 3        Q.   -- and -- none of them did that?

 4        A.   We did not have any babies sliding out

 5  of position, but we did not want to ever have that

 6  happen.

 7        Q.   I see.

 8        A.   So we included that in the design.

 9        Q.   Okay.  All right.  All right.  So

10  you -- you're a mom twice over.

11        A.   Yes.

12        Q.   Okay.  All right.  So back to the

13  fragile newborn, when you pick up a newborn, how do

14  you hold it?

15        A.   By its bum and its head.

16        Q.   That's right.  And you hold its head,

17  do you not?

18        A.   Yes.

19        Q.   Okay.  And you hold its head because

20  the baby's head is heavy compared to the rest of

21  its body, right?

22        MR. HINES:  Object to form.  Foundation.

23        THE WITNESS:  You -- I mean, I hold a baby's

24  head -- I'm not a doctor, but I hold a baby's head

25  because their neck muscles aren't as developed as

COU_003913