**EXHIBIT 55**

```
                      VIDEO DEPOSITION
                      CATHERINE PILARZ




IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

----------------------------------------
DAVID GOODRICH and
COURTNEY GOODRICH,
Individually and Next Friends of
ASHER LUKE GOODRICH, a minor,

                      Plaintiffs,

          - vs -      Civil Action File No.
                      1:16-CV-03116-TWT
FISHER-PRICE, INC.,

                      Defendant.
----------------------------------------



        Video deposition of CATHERINE PILARZ,

taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of GOLDBERG SEGALLA

LLP, 665 Main Street, Buffalo, New York, on

March 21, 2018, commencing at 3:20 p.m., before

ANNE T. BARONE, RPR, Notary Public.
```

COU_004475

```
 1   to do -- all right.
 2          The -- the product is referred to or has
 3   been referred to, I know on at least one occasion,
 4   as a newborn sleeper.  Would you agree or disagree,
 5   or do you know?
 6          A.   Well, the -- the product name is
 7   Newborn Rock-n-Play Sleeper.
 8          Q.   All right.  So what does that tell you?
 9          A.   That it's intended for a newborn and
10   it's for sleeping or for being awake in.
11          Q.   It's a sleeper for a newborn, right?
12          A.   Yes.
13          Q.   Okay.  So you're intending the product
14   for a newborn -- for newborns to be put in this
15   product to go to sleep, correct?
16          A.   Correct.
17          Q.   In fact, the advertisement is you can
18   sleep all night long, correct?
19          A.   Correct.
20          Q.   All right.  And prior to selling this
21   product to the general public, you or your team did
22   all the adequate medical investigation into making
23   sure that an inclined position in sleeping was safe
24   for children, right?  You did that, right?
25          A.   We don't typically do a medical
```

COU_004528

 1    not a trick question.

 2          Okay.  Did we put -- did we introduce that?

 3    Okay.  All right.

 4          The reason it doesn't say anything in here,

 5    I would submit to you, is because bassinets and

 6    cradles are generally considered to be flat, are

 7    they not?

 8          A.   As I mentioned, there have existed

 9    bassinets that had an inclined position.

10          Q.   Okay.  Would you agree with me that the

11    vast majority, if not almost all bassinets and

12    cradles have a flat surface, horizontal surface?

13          A.   I would agree that the majority.

14          Q.   Okay.  In 2009 especially.

15          A.   I would agree that the majority in

16    2009 --

17          Q.   Okay.  All right.

18          A.   -- did not have an inclined surface.

19          Q.   So this doesn't make -- this article

20    doesn't state anywhere in here about -- it makes no

21    mention of flatness, right?

22          A.   You mean the standard?

23          Q.   Yes, the standard.

24          A.   You asked me to look at figure 3 and

25    the stability test, and I didn't see it there.

COU_004554

MR. HINES: Same objection.

THE WITNESS: I'm not recalling that we did that.

MR. MOORE: Okay. I'm going to show it to you.

The following was marked for Identification:

PLF. EXHIBIT 22 Documents Bates stamped 2042 through 2047

BY MR. MOORE:

Q. Who is Ian Johnson?

A. He's in marketing at Fisher-Price.

Q. With Fisher-Price?

A. Yes.

Q. Okay. Let me show you what I am going to -- what we have marked as Plaintiff's Exhibit number 22 and see if you've ever seen that document before. I believe it was emailed to you from Mr. Johnson.

Do you -- have you seen that document before?

A. Yes.

Q. And what is Mr. Johnson telling you?

A. Do you want me to read it?

Q. Sure.

A. The attached document below comes from

 1   the U.K.'s Royal College of Midwives and is their

 2   evaluation of the Newborn Rock-n-Play Sleeper.  It

 3   is very limiting in what they say is the

 4   appropriate use for the product.

 5        Let me know if you have any comments or

 6   questions.  I think this may put an end to our

 7   ability to sell the product in the U.K., as I

 8   understand this organization carries quite a bit

 9   of weight.

10        Q.   And you pulled your product from the

11   U.K., correct?

12        A.   I'm not aware that we ever sold it in

13   the U.K.

14        Q.   Okay.  But it -- okay.  All right.  But

15   he said that would prevent you from being able to

16   sell it in the U.K.; is that what he says?

17        MR. HINES:  Object to form.

18        BY MR. MOORE:

19        Q.   Mr. Johnson.

20        MR. HINES:  Object to form.

21        THE WITNESS:  He says, I think this may put

22   an end to our ability to sell the product in the

23   U.K., as I understand this organization carries

24   quite a bit of weight.

25        BY MR. MOORE:

COU_004580

DAVID GOODRICH, ET AL. vs.  FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                                    **Page 107**

```
 1          Q.   To put an end to our ability.  Does
 2   that mean that you were selling it or you weren't
 3   selling it?
 4          A.   We were not selling the product in the
 5   U.K.
 6          Q.   Okay.  That's what I'm trying to
 7   understand.
 8          And the reason why is because the college --
 9   the midwives -- do you -- the College of Midwives
10   found that your product would not be in the best
11   interest of its citizens, correct?
12          MR. HINES:  Object to form.
13          THE WITNESS:  I'd like to look at their --
14          BY MR. MOORE:
15          Q.   Sure.  You can certainly read that into
16   the record, if you'd like.
17          A.   It's kind of long.  Do you want me to
18   just read --
19          MR. MOORE:  No.  I -- you can -- we can sum
20   it up.
21          Here.  Let me -- if I can -- we can shorten
22   it, and I can get you to read a shorter version of
23   exactly what it says.  I think I know where I
24   can --
25          (Discussion off the record.)
```

COU_004581

```
 1            MR. MOORE:  This document was attached to
 2   Plaintiff's Exhibit 22 by error.  I want you to
 3   look at it.  It doesn't have anything to do with
 4   this document.
 5            MR. HINES:  I don't know where this -- I
 6   don't know where that came from.
 7            MR. MOORE:  She's not going to comment on --
 8   I mean, that was just inadvertently stapled onto
 9   that document.
10            MR. HINES:  That's fine.
11            MR. MOORE:  Okay.
12            MR. HINES:  It's not Bates labeled.  I don't
13   know where it came from.
14            MR. MOORE:  Yeah, I don't know.  All right.
15            (Discussion off the record.)
16            BY MR. MOORE:
17       Q.  It may be easier if you just read the
18   last page than the whole context.
19       A.  Do you want the conclusion or the whole
20   page?
21       Q.  You can read the whole page.
22       A.  Other important safety points.  It was
23   agreed that this would not be suitable for a
24   newborn infant as babies cannot be placed in the
25   semiprone position.  This should not be used for
```

COU_004582

1    infants under six weeks.  The lying surface is not

2    suitable as an infant cot and must not be used as

3    infant cot --

4           Q.   Is that C-O-T, cot?

5           A.   Yes.

6           Q.   That's what they call a little bed,

7    a cot.

8           A.   That's the British word for crib.

9           Q.   That's right.

10          A.   I'm sorry.  And must not be used as

11   infant cot to sleep next to mother's bed because

12   babies must always sleep flat on their backs.

13          Unreservedly, this product must only be used

14   for no more than two hours in a day and for the

15   purpose of play/interaction with parents/siblings,

16   et cetera.

17          Conclusion.  Overall, it was judged that the

18   product is promising in terms of its use for a

19   specific age group of infants, i.e., infants over

20   six weeks old, and for a limited period only under

21   adult supervision.

22          It is crucial that evidence-based guidance

23   for sleeping infants be adhered to.  In particular,

24   mothers are discouraged from sleeping their infants

25   in the prone position in most parts of Europe.

COU_004583

 1   Other guidance include co-sleeping, preventing

 2   sudden infant death, bed-sharing, and then it gives

 3   some reference information.

 4        The image on the information leaflet may be

 5   misleading in terms of the purpose of the product.

 6   It was suggested that this be removed/reworded.

 7        Consideration must be given to making some

 8   of the safety adjustments suggested, such as the

 9   base and any others that may be appropriate when

10   reviewing the product.

11        I would be happy to provide any further

12   clarification should this be required.

13        Please see related literature as follows on

14   page 3.

15        Q.   Okay.  And so the decision was made

16   that you weren't going to be able to sell the

17   product based on the College of Midwives, as well

18   as maybe many other factors, I don't know, but the

19   product was, therefore, never marketed in the U.K.,

20   correct?

21        MR. HINES:  Object to form.

22        THE WITNESS:  My understanding is this group

23   of midwives -- at the beginning it refers to --

24        BY MR. MOORE:

25        Q.   Yes, ma'am.

COU_004584

Case 2:19-cv-02689-GMS   Document 103-5   Filed 05/20/22   Page 11 of 52

**DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.**
Catherine Pilarz on 03/21/2018                    Page 111

1          A.    -- one person reviewing it, and she

2    asked seven other people to give their thoughts.

3          Q.    Okay.

4          A.    And based on our understanding that

5    this is an influential group, we chose not to

6    market it there.

7          MR. MOORE:  Sure.  All right.

8          Here is another document that was produced

9    by Fisher-Price.

10         The following was marked for Identification:

11         PLF. EXHIBIT 23 Oxygen Desaturation of

12                         Selected Term Infants in Car

13                         Seats, Bates stamped 370

14                         through 374

15         BY MR. MOORE:

16         Q.    Just a few other questions.

17         In reference to the midwives -- the College

18   of Midwives, they seemed to indicate that it is not

19   safe to have a child put in a prone position.

20   Would you agree with that?

21         A.    Can I -- oh, sorry.

22         Q.    Yeah.  You can look at it.

23         A.    Are you referring to the sentence that

24   says, in particular, mothers are discouraged from

25   sleeping their infants in the prone position in

COU_004585

Case 2:19-cv-02689-GMS Document 105-5 Filed 05/20/22 Page 12 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018       Page 126

```
 1        A.    Yes.

 2        Q.    Okay.  Ms. Pilarz, is that your

 3   signature on that document?

 4        A.    Yes.

 5        Q.    Did you, at any time, read this

 6   document prior to sending it to the office of the

 7   secretary, Consumer Product Safety Commission?

 8        A.    Yes.

 9        Q.    Did you send this letter on behalf of

10   Fisher-Price and/or Mattel?

11        A.    Yes.

12        Q.    Okay.  And at that time, you were the

13   senior director, Mattel product safety,

14   Fisher-Price, correct?

15        A.    Yes.

16        Q.    Okay.  And what you're telling them is,

17   on page 4, if I may -- well, let's go to page 1.

18   I'm sorry.

19        It says, the Commission rightly recognizes

20   a risk of positional asphyxia from hammocks and

21   combination bassinet/play yards that allow an

22   infant to roll into a compromising prone position.

23        A.    I'm sorry.  Where --

24        Q.    Do you see that?

25        A.    You're on page 1?
```

COU_004600

 1  pediatrician; he's not a baby doctor.

 2        A.   I believe he practices family medicine.

 3        Q.   Okay.  And he's not a pulmonologist.

 4        A.   It's family medicine, as far as I know.

 5        Q.   Okay.  All right.  And so is he the

 6  only physician that you -- that Fisher-Price

 7  inquired of on this product, the only physician?

 8        A.   At this time?

 9        Q.   Yes, ma'am.  2009, when y'all were

10  developing the product, getting information about

11  it.

12        A.   He's the only one I recall talking to.

13        MR. MOORE:  Okay.

14        The following was marked for Identification:

15        PLF. EXHIBIT 27 Email dated 2/9/09, Bates

16                      stamped 557

17        BY MR. MOORE:

18        Q.   Do you know, were you aware that

19  Dr. Deegear has been stricken, under court

20  documents, from being able to testify as an expert?

21  Were you aware of that?

22        A.   I was not.

23        MR. HINES:  Object -- object to form.

24  Foundation.

25        BY MR. MOORE:

COU_004617

Case 2:19-cv-02636-GMS    Document 1035-5    Filed 05/20/22    Page 14 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                    Page 144

1        Q.    In other cases, were you?

2        A.    I was not.

3        Q.    Okay.  All right.  What other products

4    did Dr. Deegear or Deegear help with at

5    Fisher-Price?  If you can recall.

6        A.    I recall discussions with him on our

7    crib soothers.

8        Q.    Okay.  The ones you sell in Canada?

9        A.    No.  They're like crib-attached toys

10   that make sound and lights.

11       Q.    Oh, okay.  All right.

12       Can you hand me that document?  I'm trying

13   to rush.

14       Let me show you what I'm going to mark as

15   Plaintiff's Exhibit number 27, and see if you

16   can -- will you tell me if you've seen that

17   document before.

18       A.    I have seen this before.

19       Q.    Okay.  And so you are writing the -- is

20   that the group -- is that the group you're writing

21   and reporting back with what Dr. Deegear told you?

22       A.    Yes.

23       Q.    And Dr. Deegear told you that that --

24   that an inclined position helped with GERD; is that

25   correct?  Or --

COU_004618

```
 1          A.    It says Dr. --

 2          Q.    -- acid reflux?

 3          Can you read me what you wrote?

 4          A.    Yes.

 5          Q.    Thank you.

 6          A.    I talked to Dr. Dare -- I'm sorry.

 7          Q.    That's okay.

 8          A.    I talked to Dr. Gary Deegear again

 9  today to follow up on the question that came up

10  during our preliminary in home.  Is there any issue

11  having a baby sleep all night every night at this

12  angle?  Does it cause spinal problems, et cetera?

13          Q.    All right.  That -- that was something

14  that Linda and Mike and Justin and Jerry and you,

15  y'all were discussing that at a meeting, I assume.

16  Is there an issue having a baby sleep all night

17  every night at this angle.

18          Now, what angle are you talking about?

19          A.    The angle of this product, 30 degrees.

20          Q.    30 degrees.  Okay.

21          A.    Well, it says --

22          Q.    I'm sorry.

23          A.    It says that we were -- I called

24  Dr. Deegear to follow up on the questions that came

25  up during our preliminary in home.  That means the
```

COU_004619

 1  in-home test.

 2        Q.   Okay.  The in-home test.  All right.

 3        A.   Dr. Deegear stated pediatricians

 4  recommend babies with reflux sleep at 30 degrees.

 5  This is just fine.  Or sleep in a car seat

 6  overnight for months or even a year.

 7        Q.   All right.  What -- okay.  I don't

 8  understand that.  Dr. Deegear stated pediatricians

 9  recommend babies with reflux sleep at 30 degrees.

10  This is just fine.  Or sleep in a car seat

11  overnight for months or even a year.

12        Now, you do understand that that is

13  absolutely medically false.  You understand that.

14        MR. HINES:  Object to form.

15        THE WITNESS:  It's medically false that

16  doctors --

17        BY MR. MOORE:

18        Q.   Absolutely.

19        A.   -- recommend that?

20        Q.   Absolutely.  That's why we're here.

21  Of course.

22        Have you ever spoken to the American Academy

23  of Pediatrics?

24        A.   No.

25        Q.   Okay.  Don't you think that would have

COU_004620

Case 2:19-cv-02689-GMS   Document 1835-5   Filed 05/20/22   Page 17 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                          Page 147

 1   been a -- probably a pretty good idea before you

 2   manufactured this product?

 3         MR. HINES:  Object to form.

 4         THE WITNESS:  I'm not aware that the

 5   American Academy of Pediatrics consults.

 6         BY MR. MOORE:

 7         Q.   I'm sorry.  Okay.

 8         Well, the -- the documents that we've talked

 9   about here that you produced, the pediatric --

10   American Academy of Pediatric records, they were

11   saying that as well going all the way back to 1995,

12   that -- that sleeping at an angle is not good for

13   a child.

14         That's what the very records that I put into

15   evidence and that you said that they were produced,

16   those records say that.

17         A.   Well, the records that you -- that we

18   looked at today talked about car seats.

19         Q.   About what?

20         A.   Car seats.

21         Q.   Well, in 1995, no one ever thought to

22   do an inclined sleeper, correct?

23         MR. HINES:  What was your question?  I

24   couldn't hear it.

25         MR. MOORE:  An inclined sleeper.  They

COU_004621

```
 1   didn't have inclined sleepers in 1995, until
 2   Fisher-Price decided to invent one.
 3          Dr. Deegear stated pediatricians recommend
 4   babies with reflux sleep at 30 degrees.  This is
 5   just fine.  Or sleep in a car seat overnight for
 6   months or even a year.
 7          Now, think about that.  Would you recommend
 8   a baby sleeping in a car seat overnight or for
 9   months or a year?
10          THE WITNESS:  No.
11          BY MR. MOORE:
12          Q.  Yes, that's right.  Because the
13   information that you have here from pediatricians
14   say, no, they shouldn't be used as a bassinet,
15   a cradle, and they should not be in a position for
16   a long time in an inclined position.
17          That's what they say, correct?  Even you
18   know that, right?
19          MR. HINES:  Object to form.
20          THE WITNESS:  Those studies we talked
21   about --
22          BY MR. MOORE:
23          Q.  Yes.
24          A.   -- other than the -- the study that
25   talked about babies in full-size beds, were, I
```

COU_004622

 1    think, very focused on car seats.

 2         Q.   Okay.  And, of course, the person that

 3    you're relying on, Dr. Deegear, is telling you that

 4    it is okay, and you don't seem to have an issue

 5    with it, because you didn't -- you didn't say

 6    anything negative about Deegear.

 7         You say that he says it's fine.  That

 8    pediatricians recommend babies with reflux can

 9    sleep in a car seat overnight for months or even

10    a year.  And -- and you even disagree with that,

11    right?

12         MR. HINES:  Object.  Object to form.

13         THE WITNESS:  This says that Dr. Deegear is

14    stating what pediatricians recommend.

15         BY MR. MOORE:

16         Q.   Ms. Pilarz, you made car seats, right?

17         A.   Yes.

18         Q.   You designed car seats.  I mean, you're

19    an engineer.  You think that it's fine to leave a

20    baby in a car seat if they have reflux?

21         A.   No.

22         Q.   Okay.  Well, then, so you knew that

23    that was wrong when you put that in here, even

24    though he said pediatricians recommend it.

25         A.   I am reporting what Dr. Deegear said.

COU_004623

1          Q.    Did that cause you to question his

2   competency in order -- who you're checking with?

3          A.    This says what he's saying

4   pediatricians are telling people.

5          Q.    Okay.  All right.  It says, the Back to

6   Sleep campaign places children on their backs and

7   elevated positions of the head is fine.

8          Is that Dr. Deegear, or is that you?

9          A.    I am reporting what he said.

10         Q.    Okay.  Then he says he is not aware of

11  research on this.  He will do a quick search.

12         So you're asking -- you asked him the

13  question the Back to Sleep campaign places children

14  on their backs and elevated positions of the head

15  is fine.  He's not aware of any research on that

16  issue, but he's going to do a quick search.  I

17  explained that we are also researching that issue.

18         So that's a question.  That's not what he

19  said.  That's what you're saying, right?

20         A.    I am reporting that Dr. Deegear said

21  the Back to Sleep campaign places children on their

22  backs and elevated positions of the head is fine.

23         Q.    But then the next sentence says, he is

24  not aware of research on this.

25         A.    Right.

COU_004624

```
 1          Q.    So he's just giving you that opinion,
 2   but he has no research on it, but he'll -- but
 3   he'll check.  He's just sort of telling you that
 4   as a --
 5          A.    And maybe I asked him if he had
 6   research to support it.
 7          Q.    Okay.  All right.  Well, that's -- you
 8   know.
 9          Did you do any research on it?  And if so,
10   what did you do?
11          A.    I don't recall the specific research
12   that I did.
13          Q.    Okay.  I explained that we were also
14   researching this issue.
15          And you can't -- you don't know what you
16   researched, if anything, right?
17          A.    Correct.
18          MR. MOORE:  Okay.  Thank you.
19          Let me show you what I'm going to mark.
20          The following was marked for Identification:
21          PLF. EXHIBIT 28 Email dated 12/12/08, Bates
22                         stamped 560
23          BY MR. MOORE:
24          Q.    Okay.  Let me show you, if I may, very
25   briefly, this is a December 12th, 2008 email from
```

COU_004625

 1   you to Gary.  Hi, Gary, we have a new product

 2   concept that we'd like you to take a look at and

 3   discuss your thoughts.  Are you available to

 4   discuss it?

 5        Is this the first email that you sent him

 6   regarding the Rock-n-Play Newborn Sleeper, if you

 7   recall?

 8        I'm trying to get a date that he actually

 9   got involved in the product.

10        A.  I don't know that this is the first

11   email, but it -- it looks like we're just starting

12   the discussion.

13        MR. MOORE:  Okay.  That's all I want to know

14   about that.

15        Let me show you what I'm going to -- if you

16   can mark that.

17        The following was marked for Identification:

18        PLF. EXHIBIT 29 Email dated 7/15/09, Bates

19                   stamped 559

20        BY MR. MOORE:

21        Q.  Let me show you what I've marked as

22   Plaintiff's Exhibit number 29, which is 000559, and

23   ask you if you've seen that document before.

24        Let me show you what we've marked I believe

25   as number 29.

COU_004626

```
 1          A.    Yes.

 2          Q.    And this is to -- this is you sending

 3   an email to Justin.  Is that Justin Taton,

 4   T-A-T-O-N?

 5          A.    Yes.

 6          Q.    What is his position now with -- is he

 7   still with Fisher-Price?

 8          A.    Yes.

 9          Q.    What does he do?

10          A.    He's -- I believe he's a director of

11   quality engineering.

12          Q.    Of quality engineering.  Okay.

13   All right.

14          So you were -- you were writing to him in

15   reference to the hammock.  And it says, I talked to

16   Dr. Deegear today about the concern that some child

17   pushed up the back of the product during in-home

18   testing.

19          What does that mean, pushed up the back of

20   the product?

21          A.    I believe we're talking about a child

22   who was in the product and actually pushed himself

23   toward the head of the product.  You know, kind of

24   like slid himself up.

25          Q.    Up?
```

COU_004627

```
 1        A.    Yes.

 2        Q.    Okay.  Pushing off with his feet from

 3   the bottom?

 4        A.    Correct.

 5        Q.    Okay.  Did he -- do you know whether or

 6   not he had on his restrictive belt?  Restrictive

 7   gear?

 8        A.    I don't know how he could do that if he

 9   had the restraint system on, but --

10        Q.    He had restraints?

11        A.    I'm saying, I don't know how a child

12   could do that if he had the restraint on.  But

13   it -- I don't think it says here one way or the

14   other.

15        Q.    Okay.  But you don't know whether the

16   child had on the restraints or not.

17        A.    Correct.

18        Q.    And you also know that -- do you know

19   about the -- the five-person study where they were

20   looking at how many people used the restraint

21   system?  Are you familiar with that?

22        A.    The five-person study?

23        Q.    Yeah.  Where one person used the

24   restraint all the time, two used it some, and two

25   didn't use it at all?
```

COU_004628

 1          A.   I don't know.

 2          Q.   Okay.  Have you read any article ever,

 3   ever that said that placing a child in an inclined

 4   position to sleep at a 30-degree angle was safe?

 5          A.   I don't believe I've seen an article

 6   like that.

 7          Q.   All right.  Okay.  Have you ever read

 8   an article or seen any medical literature that said

 9   that putting a child in a sleep incline of 30 degrees

10   was beneficial to that child?

11          Or was -- you just tell me, have you ever

12   seen an article that says that?  For reflux.

13          A.   Oh.

14          Q.   Have you ever seen an article that

15   says, hey, put the child at 30 degrees in a sleeper

16   to sleep all night and that that's going to help

17   the child with the child's reflux?

18          Have you ever seen an article that -- that

19   ever says that?

20          A.   I don't believe I've seen an article

21   like that.

22          MR. MOORE:  No.

23          Very quickly, let me -- if you can mark

24   that.

25          The following was marked for Identification:

COU_004636

Case 2:19-cv-02689-GMS   Document 1035-5   Filed 02/07/22   Page 26 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                    Page 182

```
 1          MR. MOORE:  Okay.  We will find it before
 2   the end of the night and I will give it to you.
 3          Did you -- you -- did you receive from
 4   Dr. Benaroch -- this document from Dr. Benaroch
 5   from Mrs. Strauss?
 6          THE WITNESS:  Yes.  I believe she forwarded
 7   this to me.
 8          BY MR. MOORE:
 9      Q.   Okay.  All right.  And did you ever get
10   back in touch with Dr. Benaroch?
11      A.   No.
12      Q.   Regarding this.  All right.
13          It says here that infants with
14   gastroesophageal reflux -- and you know what that
15   is, right?
16      A.   Yes.
17      Q.   -- should be placed for sleep in the
18   supine position.  Flat.  Correct?  That's what he
19   says.
20          Reflux is not a reason to sleep babies in an
21   upright position.  That's what he says, correct?
22      A.   Correct.
23      Q.   All right.  In your letter that you
24   wrote to the office of the secretary of Consumer
25   Product Safety Commission on July the 12th, 2010 --
```

COU_004656

**DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.**
Catherine Pilarz on 03/21/2018                              Page 183

```
 1   this is the letter that you had the lawyer write.

 2   Remember, that's what we're talking about?

 3         In that particular letter it says that, to

 4   date, this -- we're talking about a niche and why

 5   this product, this baby Rock-n-Play Sleeper was

 6   marketed and created was intended to calm colicky

 7   babies and to small firms supplying infant hammocks

 8   for colicky babies.

 9         A.   I'm sorry.  Where are you?

10         Q.   Yeah.  I'm at -- look on your letter --

11   your Mattel letter.

12         A.   I have it.

13         Q.   Okay.  Then I want you to go to page 4

14   and read the very top of the page.

15         See?  It says, referring to infant hammocks'

16   niche market.  See, you're trying to sell a product

17   in a niche market, right?

18         A.   I'm sorry.  I still don't see where you

19   are.

20         Q.   Okay.

21         A.   Oh, are you looking at Section A?

22         Q.   I'm looking -- can I see that, please?

23         All right.  Let's go to where it says -- go

24   to A and say, an important market exists for

25   products providing certain infants an inclined
```

COU_004657

**DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.**
Catherine Pilarz on 03/21/2018                      **Page 186**

1        Q.    Okay.  With its head turned to the left

2   or right in the prone position.  I mean, otherwise,

3   the child's face would be like in the pillow or in

4   the mattress, right?

5        MS. HINSON:  What was the question?

6        BY MR. MOORE:

7        Q.    If -- if a child is prone, that means

8   they're on their stomach, I guess is what I'm

9   saying to you.

10       A.    Right.

11       Q.    All right.

12       A.    I don't think it means anything about

13  the position of the baby's head.  Just that --

14       Q.    Okay.  All right.  Or -- okay.  I -- I

15  guess it -- I just thought that if a baby's in a

16  prone position, the baby's face isn't going to be

17  buried down into the mattress, but I guess I'm

18  wrong.

19       You know -- you know, I've never -- yeah,

20  I've never seen a baby in a prone position ever

21  with its face flat down.  Have you?

22       A.    I actually have.

23       Q.    Let me show you -- let me just show you

24  what I'm talking about.

25       See what I'm talking about?  See that little

COU_004660

 1  baby's face is turned to the side?

 2        A.   Yes.

 3        Q.   It's turned to the right side.

 4        A.   I see that.

 5        Q.   Or it can be turned to the left side.

 6  But if the baby's face is burrowed down into this

 7  little mattress pad, then the baby will probably

 8  suffocate or die.

 9        So I'm asking, when you say a prone

10  position, I mean, I'm just saying, usually they

11  have their little heads to one side or the other

12  so they can breathe.

13        MR. HINES:  Let me object to the form.

14        BY MR. MOORE:

15        Q.   All right.  Do you understand what I'm

16  saying to you?

17        A.   I do.

18        Q.   Okay.  Now, although the prone position

19  is best for reducing reflux -- and that very well

20  may be right -- that often makes infants colicky --

21  where did you get that information?  Who told you

22  that?

23        A.   I'm just checking the footnote here.

24  I don't know where that came from.

25        Q.   And -- and that's fine.  I just need to

COU_004661

Case 2:19-cv-02665-GMS   Document 635-5   Filed 05/20/22   Page 30 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                          Page 188

 1   try to understand it.

 2          That is rarely worth the risk of SIDS in

 3   newborns.  Where did you get that?

 4          A.   You know, I -- I can't cite the

 5   references here.

 6          Q.   So doctors often advise letting such

 7   colicky infants sleep in an inclined supine

 8   position of as much as 30 degrees.

 9          Now, tell me where you got that information.

10          A.   Again, I -- I don't have the references

11   for that.

12          Q.   All right.  So doctors often advise

13   letting such colicky infants sleep in an inclined

14   supine position of as much as 30 degrees.

15          Now, this is in here, so you're telling the

16   Consumer Product Safety Commission that doctors are

17   saying this.  What doctors told you that?

18          A.   I don't have the references.

19          Q.   I'm sorry?

20          A.   I said I don't have the references.

21          Q.   Well, don't you know without looking at

22   a reference?

23          A.   No, I don't.

24          Q.   Did Dr. Deegear tell you that?

25          A.   I just can't cite the reference.  I

COU_004662

1   don't know whose statement that was.

2        Q.   See, this lawsuit is -- is about the

3   incline of this Rock-n-Play Sleeper being at

4   30 degrees.  Or thereabouts.  And the issue is is

5   that it's not fit to be a sleeper.

6        And I would think that as a representative

7   of a major corporation in America that you would

8   come in here and at least know where you got your

9   information from that you wrote to a regulatory

10  agency that you're trying to get them to approve

11  your product.

12       Do you not know who told you these things?

13       MR. HINES:  Object to form.  I think if you

14  read on, that will answer your question.

15       MR. MOORE:  Well, I'm looking down here.  I

16  don't know -- it says -- it doesn't say who took --

17  for example, a newsletter made available by the

18  American Pediatric -- American Association of

19  Pediatrics states:  Keeping infants who regurgitate

20  upright at least 30 minutes after meals often

21  helps, along with elevating the head of the crib

22  and diaper changing table to 30 degrees so they

23  never lay flat.

24       That has absolutely nothing to do with an

25  inclined sleeper inclining a supine position of

COU_004663

Case 2:19-cv-02683-GMS   Document 1035-5   Filed 02/07/22   Page 32 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                        Page 209

1   a regulation, right?

2        I'm not trying to find that you're in

3   violation.  All right.  You're trying to make sure,

4   as I understand this, that there's going to be a

5   regulation that includes your product so that you

6   don't have to waste 200,000 units, so you want to

7   make sure it's 30 degrees and not 20, because

8   you've already made 200,000 of them.  Am I wrong?

9        MR. HINES:  Just object to the form.

10       THE WITNESS:  We wanted the revision to the

11  bassinet standard to allow for an inclined sleep

12  product.

13       BY MR. MOORE:

14       Q.   All right.

15       A.   Because the changes being made to the

16  bassinet standard were not to prevent inclined

17  sleep.  They were intended to address the angles

18  that could occur in segmented mattresses.

19       In the end, CPSC decided that we would be

20  changing the bassinet standard to require bassinets

21  be almost flat and to address inclined sleep

22  products with a new standard.

23       So they did not say that inclined sleep

24  products were not allowed.  They said, we will

25  address that.  We will develop a new standard for

COU_004683

1       A.   I do.

2       MR. MOORE:   Okay.  Give me one second.  I

3   think we're done.

4       (A recess was then taken at 9:46 p.m.)

5       (On the record at 9:49 p.m.)

6       BY MR. MOORE:

7       Q.   How many incidents where a child has

8   been injured or has died that you know of in your

9   product, or alleged?  Let's just say that.

10      There's the Torres case.  There's Becker.

11  Who else?

12      A.   I can't give you names.

13      Q.   You can't give me names.  All right.

14  Can you give me the number?

15      A.   I'm aware of 14 incidents reported to

16  us where there is a fatality associated with the

17  product.

18      Q.   Okay.  And that is only 14 that you're

19  aware of that have been associated while the child

20  was in the Rock-n-Play Sleeper; however, we don't

21  know how many have been reported as dying from SIDS

22  that were in the Rock-n-Play Sleeper.  Would

23  that -- is that correct?

24      A.   That includes reports that said were

25  SIDS.

COU_004706

```
 1          Q.   Does that include all the reports of
 2    SIDS deaths that -- where -- where they reported
 3    they were in a Rock-n-Play Sleeper, right?
 4          I mean, clearly you wouldn't -- if they were
 5    in a Rock-n-Play Sleeper and it was not reported
 6    that they were in the Rock-n-Play Sleeper and they
 7    died of sudden infant death syndrome, you wouldn't
 8    know whether that had anything to do with your
 9    product or not.
10          A.   Correct.
11          Q.   Do you understand what I'm saying?
12          You've had 14 reported deaths in your
13    product.  That's only because they reported it that
14    they were in your product.
15          A.   Yes.
16          Q.   A person in Arizona could have their
17    child die in your product and it be characterized
18    as a SIDS and your product name never came up.
19          A.   Well, of the --
20          MR. HINES:  Object to form.
21          MR. MOORE:  I'm just trying to explain my
22    question.
23          THE WITNESS:  The incidents that I know of
24    include reports where it was stated that the baby
25    was in our product.  Some of those were reported to
```

COU_004707

1  be SIDS, but the baby was in our product.

2       BY MR. MOORE:

3       Q.   Right.  Okay.  And those deaths, did

4  they occur -- were there allegations of positional

5  asphyxia?

6       A.   I saw that in at least one of the

7  cases, that that was stated.

8       Q.   Okay.  Do you know what the others were

9  alleging?

10      A.   Sometimes it was SIDS.  Sometimes it

11  was referred to as an unsafe sleep environment.

12      Q.   Okay.  Well, the --

13      A.   In some cases there were reports of

14  pillows in the products.  Various things.

15      Q.   Okay.  But you've had prior notice that

16  there have been allegations of positional asphyxia

17  in your product, correct?

18      A.   Yes.

19      Q.   And you're put on notice that it

20  could -- that it could become a fatal situation,

21  correct?

22      I mean, you just said that 14 babies were

23  found dead in your product.  I'm not getting -- I'm

24  not trying to get you to admit it was your product.

25  All I'm saying is that you're on notice that those

COU_004708

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                    Page 235

```
 1   are the allegations and that 14 children died

 2   unexpectedly in your product, right?

 3          MR. HINES:  Let me object to the form.

 4          BY MR. MOORE:

 5          Q.   Do you understand what I'm saying to

 6   you?

 7          You had notice that the babies were

 8   positionally asphyxed or had -- or had other

 9   problems related to your product.  14 of them have

10   died, correct?

11          MR. HINES:  Object to form.

12          THE WITNESS:  I'm aware of 14 --

13          BY MR. MOORE:

14          Q.   All right.

15          A.   -- reported --

16          Q.   All right.

17          A.   -- fatalities associated with the

18   product.

19          Q.   Sure.  Okay.

20          Now, prior to Asher being injured, you had

21   prior notice of either positional asphyxia or

22   problems happening to children in your product,

23   right?

24          MR. HINES:  Object to form.  Foundation.

25          BY MR. MOORE:
```

COU_004709

1        Q.   Fisher-Price knew that babies were

2   turning blue from lack of oxygen or deoxygenation

3   in -- in your product, right?  You knew that.

4        A.   We have had reports of that.

5        Q.   Oxygen desaturization is what they call

6   it.  And you've had issues with that, correct?

7        A.   I -- I don't know whether we have

8   reports that stated oxygen desaturization.

9        Q.   All right.  Well, the date of this

10  incident -- all right.

11       Prior to July of '14, you knew that there

12  were issues -- and I don't know how else to say

13  it -- that children have either died or there has

14  been positional asphyxia or there has been oxygen

15  desaturization.  There were issues with the product

16  prior to July of 2014, right?

17       MR. HINES:  Object to form.

18       THE WITNESS:  We were aware of reported

19  incidents.

20       MR. MOORE:  All right.  Let me just show

21  you -- this will be the last document.

22       The following was marked for Identification:

23       PLF. EXHIBIT 42 Case history for case

24                       21705348, Bates stamped 573

25                       and 572

COU_004710

      1         Q.   Or learn of a dangerous product.

      2         A.   I think it depends on how consumers

      3    report problems, as to whether they go directly to

      4    the manufacturer or they go --

      5         Q.   Well, let's take Fisher-Price.

      6    Fisher-Price is in the best position to -- to have

      7    obtained consumer information that there is an

      8    issue with their product.  Would that not be

      9    correct?

     10         You just read one.  You just read one.

     11         MR. HINES:  Object to form.

     12         THE WITNESS:  Fisher-Price is in the best

     13    position assuming the consumer comes to us.

     14         BY MR. MOORE:

     15         Q.   I understand that, but they're -- but

     16    who else is the public going to complain to other

     17    than the person who manufactures the product?

     18         A.   Well, they can certainly complain on

     19    retailer websites.  They can go directly to the

     20    Consumer Product Safety Commission.

     21         Q.   That's right.  And if they go to the

     22    Consumer Product Safety Commission or if they go to

     23    the retailer, then that retailer and that Consumer

     24    Product Safety Commission person is going to

     25    contact the manufacturer every time; isn't that

COU_004713

 1  right?

 2          A.   If a consumer goes to the Consumer

 3  Product Safety Commission, the CPSC will contact

 4  us.

 5          Q.   You know, this is just really a general

 6  question.

 7          A.   And I'm trying to answer it.

 8          Q.   All right.

 9          A.   If a consumer goes directly to a

10  retailer, typically the retailer -- we -- we expect

11  that they would contact us.  If they post on a

12  retailer's website, I'm not sure.

13          Q.   Okay.  The -- if you are notified in

14  2012 and 2013 that there is a danger with a

15  product, then you are in a superior position of

16  knowledge than a subsequent purchaser in '14, '15,

17  and '16, as to that product; would you not agree

18  with that?

19          MR. HINES:  Object to form.

20          THE WITNESS:  I'm sorry.

21          BY MR. MOORE:

22          Q.   All right.  I'm going to repeat it

23  again.

24          We're talking about who has higher

25  knowledge, the manufacturer or the consumer, as to

COU_004714

Case 2:19-cv-02689-GMS Document 85-5 Filed 05/20/22 Page 40 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                    Page 241

1   a dangerous defect with the product.  Are you with

2   me so far?

3         All right.  If Fisher-Price is informed in

4   2012 and 2013 that people have died or have been

5   injured in their product, they would have superior

6   knowledge of that danger, more so than a brand-new

7   consumer.

8         MR. HINES:  Object to form.  Go ahead.

9         THE WITNESS:  I think it's true that

10  Fisher-Price would be aware of the incident data

11  and the consumer may not be.

12        BY MR. MOORE:

13        Q.   Okay.  And so, I mean, you have notice

14  of defects because of consumer complaints,

15  lawsuits, people basically complaining, and things

16  of that nature.  Warranty suits, government

17  recalls, industry experience.  That type of thing.

18        MR. HINES:  Object to form.

19        BY MR. MOORE:

20        Q.   In this particular case, in 2012 and

21  2013, you had been notified by Roy Benaroch that he

22  had concerns over the product, right?

23        A.   Yes.

24        Q.   You had been, I think, notified by

25  another pediatrician, named Natasha, that you had

COU_004715

Case 2:19-cv-02863-GMS   Document 85-5   Filed 02/07/22   Page 41 of 52

DAVID GOODRICH, ET AL. vs.  FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                                    **Page 242**

```
 1   significant issues with this product.

 2           Natasha Burgert, M.D.  Do you remember

 3   getting a notice about her?

 4           A.   I don't recall that.

 5           Q.   Do you remember recalling her sending

 6   you a very long, very detailed email regarding that

 7   there may be an increased risk of upper airway

 8   obstruction and oxygen desaturization with this

 9   product?

10           MR. HINES:  Object to form.

11           THE WITNESS:  I don't recall seeing that.

12           BY MR. MOORE:

13           Q.   Okay.  I'm going to show it to you.

14           My point is that you would agree with me

15   that in -- that was in 2012.  You would agree with

16   me that you had been warned -- that Fisher-Price

17   had been warned by doctors, M.D.s, and by consumers

18   that there could be a serious problem with this

19   product, right?  Before 2014, before my client used

20   your product.

21           A.   We had been contacted by --

22           MR. HINES:  Object to form.

23           THE WITNESS:  -- Dr. Benaroch and we had

24   been informed of incident data, if that's what you

25   mean.
```

COU_004716

 1  there is a -- a danger with the product?

 2        A.   We conducted a recall to inspect

 3  related to mold, together with the CPSC.

 4        Q.   You subject a -- you didn't subject --

 5  you subject a recall so that people could find out

 6  how to wash the product, not a recall to deliver

 7  the product, correct?

 8        A.   I don't know what you mean by a recall

 9  to deliver the product.

10        Q.   Well, you know, a lot of people, like

11  automotive industry, when they do a recall, they

12  want you to bring your car in and they fix the

13  problem.

14        Or a lot of products, what they'll do is

15  they will recall the product and you send it in to

16  them and they send you a new one.

17        Sometimes when they recall a product, they

18  just take it and then they pay you for what it was

19  worth.  See?

20        What Fisher-Price did was say that there was

21  a mold issue, because you put a plastic piece into

22  a piece of fabric that moisture could get in, and

23  there's no way you can open it back up to get it

24  out, so you did a recall for mold, and the recall

25  was go online and we'll tell you how to wash it.

COU_004718

Case 2:19-cv-02683-GMS   Document 1085-5   Filed 02/07/22   Page 43 of 52

DAVID GOODRICH, ET AL. vs. FISHER-PRICE, INC.
Catherine Pilarz on 03/21/2018                                    **Page 245**

```
 1              That's what you did, right?

 2              MR. HINES:  Object to form.

 3              THE WITNESS:  Well, the -- the recall was

 4  actually called a recall to inspect, and we alerted

 5  consumers that they should inspect their product

 6  and see if it had grown mold after --

 7              BY MR. MOORE:

 8         Q.   Okay.

 9         A.   -- use.

10         Q.   All right.  So there was a reasonable

11  way to notify existing purchasers of the product

12  that there could be a mold issue.  Y'all notified,

13  I mean, either through email or recall notices or

14  whatever, right?

15         A.   Yes.

16         Q.   And that was the responsible thing to

17  do, right?

18              MR. HINES:  Object to form.

19              THE WITNESS:  Yes.  We worked with CPSC

20  to --

21              BY MR. MOORE:

22         Q.   You've got to answer.  Yes?

23         A.   Yes.

24         Q.   Okay.

25         A.   We worked with CPSC to come up with
```

COU_004719

 1   that resolution.

 2        Q.   Okay.  All right.  Well, I want to know

 3   what -- what warning did you give prior purchasers

 4   about positional asphyxia, oxygen desaturization,

 5   or the dangerous aspects of your product other than

 6   mold?

 7        MR. HINES:  Object to form.  Foundation.

 8        THE WITNESS:  We have not done that.

 9        MR. MOORE:  All right.  Can you just mark

10   those exhibits?  And I think that's it.

11        The following were marked for Identification:

12        PLF. EXHIBIT 43 Email dated 6/13/13, Bates

13                         stamped 2082

14        PLF. EXHIBIT 44 Natasha Burgert notice, five

15                         pages

16        BY MR. MOORE:

17        Q.   I'm just going to show you these, if

18   you could just identify those, and I think we're

19   done.

20        Do you ever recall -- it says, Dear

21   Fisher-Price.  Is that the --

22        A.   So you're starting on 44?

23        Q.   Mm-hmm.

24        A.   Not 43?

25        Q.   Mm-hmm.

COU_004720



MATTEL, INC.

July 12, 2010

Office of the Secretary
Consumer Product Safety Commission
Room 502
4330 East West Highway
Bethesda, MD 20814



Re: **_Comments on Proposed Safety Standard for Bassinets and Cradles_**
**_(CPSC-2010-0028)_**

Mattel applauds the Commission's thorough effort to implement § 104(b) of the Consumer Product Safety Improvement Act as to bassinets and cradles. As a participant in the ASTM process for setting voluntary standards, including the standard for bassinets and cradles, and in the certification program of the Juvenile Products Manufacturers Association ("JPMA"), Mattel also appreciates the large extent to which the proposed rule follows the lead of ASTM F 2194-07a (e1). While concurring in JPMA's technical concerns regarding the proposed test methods, Mattel considers most of the Commission's proposed modifications of the ASTM standard beneficial for further reducing the risk of injury associated with bassinets and cradles.

The proposed rule, however, would benefit from minor revision in one respect, to avoid inadvertently prohibiting products that do not present the risks at which the rule is aimed but do serve a useful portion of the market that the Commission itself recognizes. Consumers in this niche reasonably desire an inclined sleep position for their infants. As we explain, the Commission easily could retain some room for manufacturers to accommodate such consumers without compromising its effort to reduce the risk of injury that bassinets and cradles do present.

**I. THE COMMISSION RIGHTLY RECOGNIZES A RISK OF POSITIONAL ASPHYXIA FROM HAMMOCKS AND COMBINATION BASSINET / PLAY YARDS THAT ALLOW AN INFANT TO ROLL INTO A COMPROMISING PRONE POSITION.**

Sections 104(b) & (f) of the CPSIA direct the Commission to promulgate "consumer product safety standards" for "bassinets and cradles" that either are "substantially the same" as existing voluntary standards or "are more stringent . . . if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products." A consumer product safety standard for a product must be "reasonably necessary to prevent or reduce the risk of injury associated with such product." 15 U.S.C. § 2056(a). And a "risk of injury" is "a risk of death, personal injury, or serious or frequent illness." _Id._ § 2052(a)(14).

Thus, to determine the scope of the Commission's mandate and authority to regulate bassinets and cradles, it is essential to focus on any particular risks of death,

personal injury, or serious or frequent illness that those durable infant products present, and on the particular products presenting those risks. Such clarity will ensure that any "more stringent" standard than ASTM's does not inadvertently regulate beyond what the risks make reasonably necessary. The Supplementary Information accompanying the proposed rule ably articulates the relevant risks based on the incident data. This data confirms that, as relevant here, the risk of injury is positional asphyxia, and that this risk of injury comes overwhelmingly from rolling into a compromising prone position by infants using two sub-categories of bassinets and cradles: (1) those that are combined with a play yard, and (2) infant hammocks.

### A. The Risk of Injury Associated with Combination Bassinet / Play Yards: Rolling To the Edge of a Mattress Pad That Inadvertently Becomes Inclined.

The Commission has identified four fatalities involving bassinets and cradles that resulted from the design of the product—out of a market of 3.1 million units sold per year (a number that apparently does not include hammocks) and a total number of fatalities of 61. *See* 75 Fed. Reg. 22303, 22305-06 (Apr. 28, 2010). Of these four, three involved the spacing of the metal bars of a particular brand of convertible bassinet (Simplicity); the Commission recalled this product, and a design modification corrected the problem. *See id.* at 22305; Comm'n Rel. Nos. 08-381 (Aug. 28, 2008, rev. Apr. 7, 2009) & 08-378 (Aug. 27, 2008).

Thus, there is one known fatality involving positional asphyxia in a bassinet or cradle due to an infant's rolling. That death—involving a combination bassinet / play yard—"resulted from an infant suffocating in the corner of the bassinet when he rolled into that position due to the unlevel mattress pad." 75 Fed. Reg. at 22305. Too-short supports for the bassinet portion caused one side to drop five inches below the other, which caused the infant to roll onto his face and into the corner. *Id.* at 22306.

There have been two non-fatal injuries due to falling out of a bassinet or cradle—one fall caused by "non-level mattress issues" and the other by "problems with a bassinet's rocking feature." *Id.* at 22305. And there have been two "close calls" that produced no injury, both involving combination bassinet / play yards: (1) an incident in which the lock for the bassinet's swinging feature disengaged, causing the infant to slide down the side of the mattress and have the mattress cover his nose and mouth, and (2) an incident in which (similarly to the fatal incident) the sleep surface ended up at a steep angle due to a support strap's failure. *Id.* at 22306.

The Commission also has cited an Australian study that responded to the death of two infants in cradles that rocked side-to-side. *Id.* When the infants moved, the resulting tilting of the cradle caused them to roll into the prone position and end up "in the angle formed by the side bars and the base of tilted, freely rocking cradles." *See* S.M. Beal *et al.*, "The Danger of Freely Rocking Cradles," 31 J. Pediatric Child Health 38, 38-39 (1995). This study led to an Australian and New Zealand standard that (1) applies only to cradles having the ability to swing (specifically excluding hammocks) and (2) requires

CONFIDENTIAL

FPI_001045

COU_004430

rocking cradles either to have a "tilt limiting device designed so that the mattress base of the cradle cannot be tilted more than 5 degrees from the horizontal" or a "self-leveling device designed so that the mattress base of the cradle cannot be tilted more than 10 degrees from the horizontal." AS/NZS 4385:1996 §§ 1 & 6.5.

> **B.     The Risk of Injury Associated with Infant Hammocks: Rolling Into the Prone Position In a Corner, or Facing Into a Conforming Sleep Surface.**

The risk of injury that the evidence indicates is similarly focused with regard to infant hammocks. The Commission has identified two fatalities resulting from hammock design. (In a third, the cause of death of an over-age infant was unclear.) Both involved a single manufacturer (Amby). *See* Comm'n Rel. No. 10-056 (Dec. 8, 2009); 75 Fed. Reg. at 22305. And both involved positional asphyxia after an infant rolled into a prone position—one in which the infant "was found rolled into a corner . . . with the bed in an inclined position" and the other in which the infant "was found with her face flat against the foam mattress." *Id.* at 22305. The Commission deemed it sufficient to provide a repair kit, which apparently was a clipping mechanism limiting the swing angle. *See id.* at 22309; Comm'n Rel. No. 10-056 (Dec. 8, 2009).

The Commission has identified no non-fatal injuries presenting this risk. Although there have been six non-fatal injuries involving hammocks, five involved falls (whether due to product design is unclear), and the sixth involved the breaking of a hammock component. *Id.* at 22305.

There have been five "close calls" that produced no injury. Two involved an over-age infant's flipping in the hammock and then, due to shoulder restraints, being at risk of strangulation. *Id.*; *see* Commission Alert No. 08-604 (Aug. 29, 2008). The product apparently at issue (Yayita) was the subject of three subsequent recalls, although no injury or incident was involved in those. *See* Comm'n Alert No. 10-707 (Nov. 18, 2009); Comm'n Alert Nos. 09-760 & 09-761 (Aug. 4, 2009). The other three non-injury incidents involved the same risk at issue with the two fatalities: "near-suffocation incidents where the infant rolled into a position from which it was unable to move or free itself." 75 Fed. Reg. at 22305.

## II.     THE COMMISSION'S PROPOSED RULE, HOWEVER, REACHES BEYOND THIS RISK AND COULD LEAVE THE SLEEP NEEDS OF MANY INFANTS UNMET—OR EVEN LEAVE INFANTS AT GREATER RISK.

To address this risk from these two categories of products, the Commission would restrict bassinets and cradles (including hammocks) to a maximum rock/swing deflection angle of 20 degrees, a maximum rest angle of the sleeping surface of 5 degrees, and a maximum "flatness angle" of the sleep surface of 5 degrees after application of a compression force. *See* 16 C.F.R. §§ 1218.2(b)(5), (b)(10), & (b)(11) (proposed); *see also* 75 Fed. Reg. at 22309 ("The rock/rest angles and sleep surface angles are likely to

CONFIDENTIAL

disproportionately affect most of the thirteen infant hammock suppliers," and "[t]he maximum sleep surface angle requirement and test is primarily aimed at incidents involving bassinet / play yard combination products."). The proposed rule would effectively ban most infant hammocks. *See id.* at 22304, 22308. Eleven of the thirteen firms supplying them would likely go out of business. *Id.* at 22309. Moreover, not just combination bassinet / play yards but all bassinets and cradles would be barred from providing inclined sleeping surfaces. These restrictions would likely—and without a reasonable necessity—ban a category of products that uniquely serves an important segment of the market. The restrictions could even *increase* children's risk of injury, as parents reach for substitutes.

### A. An Important Market Exists for Products Providing Certain Infants an Inclined Sleeping Position.

The Commission in its Supplementary Information repeatedly and rightly recognizes that a "niche market" exists for "products intended to calm colicky babies." 75 Fed. Reg. at 22310; *see id.* at 22309 ("A niche market exists among parents with colicky babies . . . ."); *id.* at 22310 (referring to infant hammocks' "niche market" for products "intended to calm colicky babies," and to small firms "supplying infant hammocks for colicky babies").

To date, this niche has primarily been served by infant hammocks, which provide sleeping surfaces that "curve around babies' bodies and rock naturally." *Id.* at 22309; *see id.* at 22310 (referring to "naturally-rocking, flexible-sleep-surface products," and to infant hammocks "intended to lull colicky babies"). This characteristics also allows the helpful inclined sleep position. Although the prone position is best for reducing the reflux that often makes infants colicky, that is rarely worth the risk of SIDS in newborns; so doctors often advise letting such colicky infants sleep in an inclined supine position, of as much as 30 degrees. For example, a newsletter made available by the American Association of Pediatrics states: "Keeping infants who regurgitate upright at least thirty minutes after meals often helps along with *elevating the head of the crib* and diaper changing table to 30 degrees *so they never lay flat*."[1]

But this beneficial feature of infant hammocks also—by allowing the sleep surface to conform to the face of a prone infant—creates the risk of positional asphyxia, particularly when the swinging feature allows the hammock to tip to one side when the baby moves. *See* 75 Fed. Reg. at 22304, 22309. The risk of tipping also creates, together with the use of restraints, a risk of strangulation should the hammock flip. *Id.* at 22307.

Mattel, through its Fisher-Price subsidiary, has developed another option. We have been distributing since October 2009 a "Newborn Rock 'n Play Sleeper," which we market with our other bassinets.[2] It is both a "nighttime sleeper" and a "playtime seat,"

---

[1] http://www.aap.org/sections/GERD%20Newsletter11.pdf (emphasis added).

[2] http://www.fisher-price.com/fp.aspx?st=2002&e=demo&pid=51903&pcat=hgpy. The quotations in the remainder of this paragraph and in the following paragraph come from this web page.

CONFIDENTIAL

and a key feature is its "inclined seat, which makes sleeping more comfortable for babies who need their head elevated." The sleep surface is supported by an enclosed, rigid, plastic shell; the Sleeper allows moderate front-to-back rocking; and it includes a crotch-and-waist restraint system.

The Rock 'n Play Sleeper has received numerous favorable reviews from grateful parents of colicky infants. JPMA has certified it as complying with the ASTM standard, and we therefore also market it as "the only infant seat that meets industry safety standards for bassinets." The angle of the seat exceeds 5 degrees, yet, as far as Mattel is aware, there has been no incident with this product indicating that it presents any of the risks of injury that the proposed rule aims to address. There certainly have been no deaths or injuries.

**B.** **The Proposed Rule Would Abolish This Niche Market and Likely Increase the Risk of Injury for the Infants Whom the Market Otherwise Would Serve.**

Notwithstanding both the benefits and the safety of the Rock 'n Play Sleeper, the proposed rule may prohibit it—along with any other efforts by Fisher-Price or its competitors to develop additional products to safely accommodate this persistent market demand and parental need. As to infant hammocks at least, the Commission says as much, recognizing that only hammocks with flat sleep surfaces would remain. *See* 75 Fed. Reg. at 22310. As to the Rock n' Play Sleeper, the question of the effect causes concern. Section 1.3 of the ASTM standard, as proposed for revision, would apply to "products intended to provide sleeping accommodations *only* for infants up to approximately 5 months of age or when the child begins to push up on hands and knees" but not to "[p]roducts used in conjunction with an infant swing." 16 C.F.R. § 1218.2(b)(1)(i) (proposed) (emphasis added). And § 3.1.1 as revised would define a bassinet/cradle as a "small bed designed *exclusively* to provide sleeping accommodations for infants" but not including "[p]roducts such as swings, full and non-full size cribs, hand carrying baskets, and travel beds." § 1218.2(b)(3)(i) (proposed) (emphasis added). Perhaps the emphasized words ("only" and "exclusively") modify "sleeping accommodations," such that the rule would not apply to a product providing both sleeping and other accommodations, particularly when the product consists more of a seat than a "small bed." But the text (particularly that of § 1.3) does not put such a reading beyond doubt. The emphasized words may just modify "infants," in which case the rule would apply to a product designed only for infants up to 5 months of age even though it accommodates both sleep and play. The Commission's explanation of proposed § 1218.2(b)(1)(i) seems to suggest this latter reading. *See* 75 Fed. Reg. at 22305-06. And the specific exclusion of some products such as swings increases uncertainty as to others not listed.

If the latter reading is correct, the proposed rule would unreasonably prohibit the Rock 'n Play Sleeper and any similar product. Although our testing indicates that the Sleeper would comply with the maximum deflection angle of 20 degrees, it would not comply with the maximum rest angle of 5 degrees—even though it does not present the

CONFIDENTIAL

risk that the rest-angle rule aims to address. Nor would it comply with the maximum flatness angle of 5 degrees—even though this requirement is aimed at *changes* in the sleeping surface angle due to the application of force, and the Sleeper's rigid sleep support surface would preclude any such changes. The proposed rule also would prohibit the Sleeper's restraints—even though the risk of injury arises from shoulder restraints, which the Sleeper lacks, and in connection with a product's flipping, which is a risk peculiar to hammocks and otherwise addressed by § 6.4's stability requirement. In sum, the market niche that the Commission itself recognizes could well be left empty.

Moreover, the existence of this market serving desperate parents points to a further consequence of the proposed rule, one that may *increase* the risk of injury: Parents deprived of any appropriate product for calming their tired, colicky infants will look elsewhere—and substitute products dangerous for that purpose. The Commission recognizes this possible effect in analyzing the rule under the Regulatory Flexibility Act, but not in assessing the risk of injury. It notes that the rule may lead "caregivers to use similar products intended for older children instead, thereby creating a potentially new hazard." 75 Fed. Reg. at 22310. Caregivers also "may instead use unsuitable sleeping environments, such as bouncers, as substitutes." *Id.* at 22309. Or they may employ less sophisticated substitutions, such as pillows and blankets, creating another risk that the proposed rule identifies in requiring additional warnings. *See* 16 C.F.R. § 1218.2(b)(13) (proposed); 75 Fed. Reg. at 22307. Some parents are known to try car seats; that may avoid the risk of asphyxiation, but (like a swing) can exacerbate reflux.[3] Parents even could elevate an otherwise level cradle or bassinet by placing materials under the base or legs, directly re-creating the very risk the Commission aims to avoid with its angle restrictions.

A rule that may apply to products not presenting the risk of injury the Commission has identified should give the Commission pause. So also should a rule that could have the real-world effect of increasing rather than reducing overall risk to infants.

## III.  THE COMMISSION MAY EASILY AND SAFELY CORRECT THE OVERBREADTH OF ITS PROPOSED RULE.

Thus, it is both necessary and possible for manufacturers to provide a safe, inclined sleeping environment. The Commission should modify the rule to leave room for innovation by the industry, and it can do so easily with two minor changes. To limit itself to either the proposed rule or the current ASTM standard, as the analysis under the Regulatory Flexibility Act suggests, is to present a false choice. *See* 75 Fed. Reg. at 22310.

*First*, the Commission should clarify its proposed revisions of ASTM §§ 1.3 and 3.1.1 to establish that the proposed rule only applies to products that provide just sleeping

---

[3] *See* http://www.hsc.virginia.edu/internet/pediatrics/tutorials/reflux/treatment.cfm (warning against using infant seat or swing, and advising to "lie them down or place them in a seat that reclines a bit").

CONFIDENTIAL

accommodations. Given that § 3.1.1 as proposed for revision already suggests this meaning (as does the discussion of proposed § 1218.2(b)(4)(i), 75 Fed. Reg. at 22306, in referring to products "not intended exclusively for sleep"), the Commission could accommodate this concern by only modifying proposed § 1218.2(b)(1)(i), which would revise ASTM § 1.3. The Commission should just move "only" to correspond to the location of "exclusively" in § 3.1.1. Section 1.3 would thus read (with revisions noted in italics and brackets):

> This consumer safety performance specification covers products intended *only* to provide sleeping accommodations [ ] for infants up to approximately 5 months of age. . . .

If the Commission has concern for this clarification's effect on combination bassinet / play yards, it could adjust the definition of "bassinet/cradle accessory" (§ 3.1.2) to eliminate any doubt, although the proposed last sentence of § 3.1.1 already makes any confusion unlikely, by expressly including a "bassinet/cradle attachment" as a covered product.

*Second*, the Commission also should adopt a revision to allow more scope for innovation by manufacturers in designing products intended exclusively for sleep. We propose adding the following new definition to ASTM § 3.1:

> 3.1.x. *Inclined bassinet, n*—bassinet (a) that has a rigid sleep surface and (b) on whose sleep surface the block described in § 7.3.2 cannot be placed in the locations prescribed by the test methods in §§ 7.8 and 7.9. Inclined bassinets are exempt from the requirements of §§ 5.13, 6.7.2, and 6.8. Inclined bassinets may have a crotch-and-waist restraint system.

This second proposal has four simple elements: (1) The requirement of "a rigid sleep surface" addresses the risks of the sleep surface's either conforming to an infant's face (as a hammock does) or sagging and trapping a prone infant (as combination bassinet / play yards have). As the Commission puts it, most hammocks "do not have a rigid sleep surface." 75 Fed. Reg. at 22304. The Commission similarly refers to problems from "lack of rigid mattress support," *id.*, and to "rigid" sides or frames of bassinets and cradles, *id.* at 22306, 22307; *see* §§ 1218.2(b)(4)(i), (b)(8)(i), (b)(11)(i)(H) & (T), (b)(11)(ii)(C) (proposed). Other discussions in the Supplementary Information reinforce this concept, particularly by contrasting "rigid" sleep surfaces with "flexible" ones. *See* 75 Fed. Reg. at 22304 ("Most hammocks have mattresses that are flexible and conform to the body contours of the infant. . . ."); *id.* at 22310 (referring to "flexible-sleep-surface products"); *see also id.* at 22307 (referring to mattresses having "multiple seams" and that may "deform and create a depression"); *id.* at 22309 (explaining that most hammocks "have sleep surfaces that curve, molding to an infant's body").

CONFIDENTIAL

(2)  The requirement regarding the ability to place the 6" x 6" block in the sleep surface ensures that the sleep surface is small enough to avoid (when rigid) the risk of the infant's turning head down or rolling into a compromising position.  Again, both the concept and the language come from the Commission's proposed rule, in provisions concerning testing for rock/swing angle and flatness angle.  *See* §§ 1218.2(b)(11)(i)(H) ("If a block cannot be placed in the prescribed location inside the mattress bed area . . . ."); (b)(11)(i)(T) ("If the wood block cannot be placed in the prescribed location on the mattress bed area . . . ."); (b)(11)(i)(C) ("If the wood block cannot be placed inside the sleep surface . . . .") (proposed).

(3)  Proposed § 5.13's prohibition of "any restraints system which requires action on the part of the caregiver to secure the restraint" would not apply, and an inclined bassinet could have a crotch-and-waist restraint system.  That is because the proposed prohibition assumes that sleep surfaces will be level. 75 Fed. Reg. at 22307 ("Infants lying on a flat surface do not need restraints . . . ."); *id.* at 22308 (similar).  If the rule allowed inclined bassinets, that assumption would not apply; in such case, restraints could be beneficial and desired.  *See id.* ("[T]he lack of restraints could reduce product desirability from the consumer's perspective.").  But because shoulder restraints could in some situations present a strangulation hazard, our proposal still would prohibit those on inclined bassinets.  *See id.* at 22307, 22308.

(4)  Our proposal would not exempt inclined bassinets from the restriction on maximum deflection angle.  Continuing to apply this restriction would further reduce any residual risk of an infant's turning or rolling into a compromising prone position, while not significantly constraining product development.  *See id.* at 22309 (discussing cheap clipping mechanism to reduce swing angle of hammocks).

These two narrow proposals provide the Commission a simple means simultaneously to fulfill its statutory mandate of reducing actual risks of injury from bassinets and cradles and to allow innovation in helping caregivers and infants with special needs.  Thank you for your consideration.  Please do not hesitate to have staff contact me should you have any questions.

Sincerely,

Kitty Pilarz
Senior Director, Mattel Product Safety
Fisher-Price

CONFIDENTIAL