**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Courkamp, | No. CV-19-02689-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Fisher-Price Incorporated, et al., | |
| Defendants. | |

Pending before the Court are Mattel, Inc. and Fisher-Price Inc.'s ("Defendants") Motion to Strike the June 7, 2021, Supplemental Expert Report and July 16, 2021, Rebuttal Expert Report of Alison Vredenburgh, PhD, CPE (Doc. 154); Motion to Exclude Plaintiff's Expert, Michael Goodstein, M.D. (Doc. 191); Motion to Exclude the Opinions of William Singhose, Ph.D. (Doc. 192); Motion to Exclude Plaintiff's Expert, Alison Vredenburgh, Ph.D. (Doc. 193); Motion to Exclude the Opinions of Erik Christensen, M.D. (Doc. 194); and Motion for Summary Judgment (Doc. 195). Also pending before the Court is Kathleen Courkamp's ("Plaintiff") Motion to Supplement Record in Support of Opposition to Motion for Summary Judgment (Doc. 235). For the reasons below, Plaintiff's Motion to Supplement is denied. All other Motions are granted in part and denied in part.

## BACKGROUND

Defendant Fisher-Price, a wholly owned subsidiary of Defendant Mattel, Inc., developed and sold the Rock 'n Play Sleeper ("RNPS") from 2009–2019. The RNPS is an inclined sleeper "designed for day use or overnight sleep for infants that places them at

approximately a 30-degree angle from the horizontal." (Doc. 196 at 2.)  The RNPS warning label states that belt restraints should always be used, and the product should not be used when the infant is old enough "to push up on hands and knees" or sit unassisted.  (Doc. 196 at 2.)  At the time it was first released, the RNPS complied with ASTM International's ("ASTM") safety standard, a voluntary standard set by the industry.  (Doc. 196 at 6); (Doc. 244 at 29.)

When the RNPS was launched, the American Academy of Pediatrics ("AAP"), recommended that infants sleep on their backs.  (Doc. 244 at 2–3.)  Later AAP guidance, amended in 2011, included a further recommendation that infants sleep face-up on a flat surface.  (Doc. 196 at 6.)  After the RNPS was launched, regulators began to express concerns regarding the safety of inclined sleepers.  In 2010, the Consumer Product Safety Commission ("CPSC") sought to implement a regulation that would have limited infant sleeping products to angles of twenty degrees.  Defendants opposed the regulation and submitted a letter to CPSC requesting that the standard be revised to accommodate inclined sleepers, which were subsequently excluded from the regulation.  Similarly, the Queensland Government's Office of Fair Trading, Health Canada, and the UK Royal College of Midwives expressed safety concerns over the RNPS because it did not comply with prevailing guidelines for safe sleep.  Despite these concerns, the RNPS had "proven successful," and Defendants continued to market the RNPS in the United States as an overnight sleeper.  (Doc. 244-1 at 143.)  Two years later, Dr. Roy Benaroch, a board-certified pediatrician, wrote to Defendant Fisher-Price to raise his concerns regarding the RNPS's failure to comply with AAP guidelines.  By February 2014, Defendants had received at least forty-seven "out of position" reports from consumers, including reports that infants had "[sunk] down," rolled "to the side," and "rolled over" in the RNPS.  (Doc. 244-5 at 68.)

In June 2014, Plaintiff and her eight-month-old daughter ("Z.O.") were staying with Z.O.'s father's, Andrew Olson ("Mr. Olson"), at his apartment.  Mr. Olson placed Z.O. into an RNPS for the night.  The parties dispute whether Mr. Olson used the RNPS's built-in

restraint system.  When Plaintiff and Mr. Olson awoke the next morning, they found Z.O. unresponsive in the RNPS.  The parties dispute whether Z.O. was found supine (face-up), prone (face-down), or semi-prone (on her side).  Regardless, Plaintiff and Mr. Olson called 911.  The operator told Mr. Olson to begin administering CPR until paramedics arrived. Mr. Olson moved Z.O. from the RNPS to a flat surface and began performing CPR.  The Tempe Fire Department soon responded, and Z.O. was pronounced dead.  The autopsy determined that Z.O.'s cause of death was "unknown."  (Doc. 196-33 at 3.)

After Z.O. passed away, concerns continued to mount over the safety of the RNPS. Defendant Fisher-Price itself began receiving complaints from consumers that the RNPS was not safe for overnight sleep.  Due to these concerns, the CPSC sponsored a study by Dr. Erin Mannen, biomechanics researcher and Assistant Professor of Orthopaedic Surgery at the University of Arkansas for Medical Sciences, who found that inclined sleepers posed a suffocation hazard.  In April 2019, after an article in *Consumer Reports* publicized the CPSC's concerns with the RNPS, Defendant Fisher-Price voluntarily recalled the product. During its ten-year run, Defendants earned over $200 million from sales of the RNPS.

Plaintiff filed this lawsuit for wrongful death in April 2019, seeking damages against Defendants on behalf of herself and other statutory beneficiaries.  She alleges that defects in the design of the RNPS and Defendants' failure to warn caused Z.O.'s death.  Plaintiff also alleges a claim for breach of express warranty.  Defendants now move for summary judgment, which the Court considers below.

## DISCUSSION

Plaintiff has filed a Motion to Supplement (Doc. 235) the summary judgment record, which the Court will consider first.  The Court will then decide Defendants' four Motions to Exclude before reaching the merits of their Motion for Summary Judgment.

**I. Motion to Supplement**

Plaintiff asks to supplement the summary judgment record with documents in support of the Committee on Oversight and Reform's report on infant deaths in inclined sleepers.  (Doc. 235 at 2.)  She also asks that the Court "permit further supplementation if

and when Defendants disclose the listed information Plaintiff still seeks." (Doc. 235 at 6.) Whether to grant a motion to supplement is within a district court's discretion. *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1088 (9th Cir. 2015). "In deciding whether to grant a motion to supplement the record, district courts consider whether the evidence the party is seeking to admit is relevant and also consider whether the motion is made in good faith and whether allowing supplementation would unfairly prejudice the non-moving party." *Udd v. City of Phx.*, No. CV-18-01616-PHX-DWL, 2020 WL 1904638, at *2 (D. Ariz. Apr. 17, 2020). The motion to supplement may also be denied if the moving party did not act diligently in discovering the new information. *See Stucky v. Dep't of Educ.*, 337 F. App'x 611, 613 (9th Cir. 2009); *Nakanelua v. United Pub. Workers, AFSCME, Local 646, AFL-CIO*, No. 20-00442 JAO-KJM, 2022 WL 174098, at *2 (D. Haw. Jan. 19, 2022) (collecting cases).

Plaintiff does not contest that she has had some of the documents at issue since 2019. (Doc. 235 at 2); (Doc. 235-1 at 4–5.) And discovery for the documents that Plaintiff complains she doesn't have closed on October 1, 2021; yet she did not raise this issue until January 19, 2022. (Doc. 166 at 3); (Doc. 179); (Doc. 235-1 at 6.) Importantly, Defendants filed their Motion for Summary Judgment on November 19, 2021, and Plaintiff filed her Response on January 7, 2022. (Docs. 195, 205.) Nothing in the record suggests that Plaintiff attempted to meet and confer with Defendants regarding the missing documents at any point before January 19. And at no point did Plaintiff contact the Court to schedule a discovery dispute regarding this issue. The Court will not now decide a written discovery motion—that itself violates the Case Management Order, (Doc. 34 at 3–4)—so long after the deadline, and *after* the summary judgment motion has been fully briefed. Plaintiff has not shown diligence, and her Motion (Doc. 235) is DENIED.[1]

## II. Motions to Strike and Exclude

Defendants have filed one Motion to Strike and four Motions to Exclude, all of

---

[1] Plaintiff offers no explanation for why her issues with the missing or allegedly mislabeled documents were not brought up before discovery closed, before Defendants filed their Motion, or before Plaintiff filed her Response. Nor will the Court grant the Motion after giving Plaintiff a prior opportunity to supplement the record. (Doc. 223.)

which concern Plaintiff's retained experts.   (Docs. 154, 191, 192, 193, 194.) First, Defendants ask the Court to strike Dr. Alison Vredenburgh's rebuttal and supplemental reports. (Doc. 154.)  Specifically, Defendants argue that Dr. Vredenburgh's opinions are outside the scope of these reports. (Doc. 154.)  Additionally, Defendants ask the Court to exclude the testimony of Drs. Vredenburgh, Goodstein, Singhose, and Christensen.  The Court will examine the Motion to Strike and then turn to the Motions to Exclude.

### A.  Motion to Strike the Expert Report of Alison Vredenburgh

#### 1.  Rebuttal Report

First, the Court considers the admissibility of Dr. Vredenburgh's rebuttal report. Expert testimony constitutes rebuttal testimony if it "is intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed.R.Civ.P. 26(a)(2)(D) (ii).  By definition, rebuttal reports exist to counter the opinions outlined in an opponent's expert disclosures.  *Guadiana v. State Farm Fire & Cas. Co.*, No. CIV.07-326TUC FRZ GE, 2010 WL 582220, at *2 (D. Ariz. Jan. 27, 2010).   Rebuttal reports cannot be used to introduce new theories or to correct oversights in the plaintiffs' case in chief.  *Facciola v. Greenberg Traurig LLP*, No. CV-10-1025-PHX-FJM, 2012 WL 1242382, at *1 (D. Ariz. Apr. 11, 2012). "Offering a different, purportedly better methodology is a proper way to rebut the methodology of another expert."  Fed. R. Civ. P. 26(a)(2)(D)(ii).

#### (a) Notice and Evidence of a Hazardous Condition

In her rebuttal report, Dr. Vredenburgh responds to what she believes is a flawed premise in two defense experts' reports.  Both reports, in so many words, argue that no evidence existed to put Defendants "on notice" of a design flaw that would have allowed them to prevent Z.O.'s death. (Doc. 154-1 at 48); (Doc. 154-2 at 23–24, 44.)  In response, Dr. Vredenburgh opines that although the incidents before Z.O.'s death are relevant to notice, defense experts proceed from an improper premise because incidents after Z.O.'s death are still relevant to the idea that a hazardous condition existed at the time of Z.O.'s death.  (Doc. 154-3 at 2–4.)

The basis for Dr. Vredenburgh's opinions regarding this distinction is in her original report.  In the original report, Dr. Vredenburgh states that "Fisher Price was informed of the hazard through incident reports, case histories, communications with international distributors, as well as communication with Dr. Benaroch, a pediatrician, who contacted Fisher Price on several occasions. . . . [Fisher-Price] was aware of at least 66 [sic] incidents with the sleeper prior to [Z.O.'s] death."  (Doc. 154-1 at 5, 8.)  This statement is clearly relevant to notice.  (Doc. 154-1 at 5 ("Fisher Price *was informed of the hazard*").)  As for evidence of a hazardous condition, Dr. Vredenburgh states that "there continued to be incidents subsequent to [Z.O.'s] death, even after additional warnings were added per [the relevant regulation], *indicating an unsafe design* that should not have been 'remedied' through warnings." (Doc. 154-1 at 8 (emphasis added) (footnote omitted).)  This statement shows that though the subsequent issues were not relevant to Defendants' *notice* before Z.O.'s death, they do tend to show that the RNPS's design might have been defective.

Ultimately, Dr. Vredenburgh's report rebuts the methodology the experts used to determine whether Defendants were on notice of a design flaw by suggesting that they should have considered incidents that occurred after Z.O.'s death.  Given that this testimony is relevant and within the proper scope of a rebuttal report, Defendants' Motion is DENIED.

### (b) FMEA and Testing

Next, Defendants argue that Dr. Vredenburgh's opinions regarding Failure Modes and Effects Analysis should be excluded because it is outside the scope of a rebuttal report. (Doc. 154 at 11.)  Dr. Vredenburgh eventually disclaimed these opinions as beyond her expertise.  *See infra* Part II.B.4.  Therefore, the Court will not consider them when deciding the Motion for Summary Judgment, nor will they be admissible at trial.

### (c) Inappropriate Post-Deposition Interviews

Dr. Vredenburgh conducted two interviews of Plaintiff and Mr. Olson after their depositions that, according to Defendants, contradict their deposition testimony.  (Doc. 154 at 12.)  Dr. Vredenburgh relies on these interviews in her rebuttal report to dispute

Defendants' claims that the warnings were sufficient. (Doc. 154-3 at 19.) Plaintiff has not offered a plausible explanation for why these interviews were included in Dr. Vredenburgh's rebuttal report. Thus, it seems they were included to correct oversights in Plaintiff's case in chief, which is not within the proper scope of rebuttal evidence. Accordingly, the Court does not consider these interviews or Dr. Vredenburgh's opinions on this point in deciding the Motion for Summary Judgment, nor will it permit Plaintiffs' statements to her thereafter to be admitted at trial. Defendants' request is DENIED without prejudice.

### 2. Supplemental Report

Defendants similarly object to Dr. Vredenburgh's supplemental report because it allegedly contains new opinions outside the scope of her original report. (Doc. 154 at 10.) As explained in the Case Management Order (Doc. 34), "absent extraordinary circumstances, parties will not be permitted to supplement expert reports after [the expert disclosure deadline]." (Doc. 34 at 3.) There are no extraordinary circumstances in this instance. Plaintiff received the documents used in the supplemental report before Dr. Vredenburgh's initial report in April 2021, i.e., months before the expert disclosure deadline. (Doc. 158 at 13); (Doc. 159 at 6.) Additionally, Plaintiff argues that the supplemental report was necessary because of Defendants' "data dump" of voluminous discovery, however, Dr. Vredenburgh's supplemental report offers new conclusions by relying on largely the same information that she references in her initial report. [2] Thus, even if the Court accepted that voluminous discovery constituted an extraordinary circumstance, these facts suggest that the supplemental report does not come within the Court's narrow, emergency exception for supplementing expert reports after the disclosure deadline. Defendants' Motion is GRANTED.

### B. Motion to Exclude Dr. Vredenburgh

Defendants argue that Dr. Vredenburgh's testimony should be excluded because her

---

[2] For example, she introduces a "new" ASTM warning in her supplemental report. However, the sole difference between the two warnings is the addition of "Stop using when baby reaches 5 months" in the supplemental report. (Doc. 154-2 at 68.)

1    opinions about the content and location of the RNPS warning were unreliable and

2    irrelevant.  More specifically, they suggest that: Dr. Vredenburgh did not use scientifically

3    reliable methods to test her opinions, her testimony is irrelevant and will not help the jury,

4    and her proposed alternative warnings are not expert opinion but rather a recitation of the

5    ASTM warning.  (Doc. 193.)  Defendants also argue that Dr. Vredenburgh is unqualified

6    to offer opinions on the RNPS's alleged design defects and Defendants' knowledge of such

7    defects.  (Doc. 193.)

8                                    **1.  Legal Standard**

9        Pursuant to Federal Rule of Evidence 702,

10           A witness who is qualified as an expert by knowledge, skill,
             experience, training, or education may testify in the form of an
11           opinion or otherwise if:

12           (a)  the expert's scientific, technical, or other specialized
                  knowledge will help the trier of fact to understand the
13                evidence or to determine a fact in issue;

14           (b)  the testimony is based on sufficient facts or data;

15           (c)  the testimony is the product of reliable principles and
                  methods; and
16
             (d)  the expert has reliably applied the principles and methods
17                to the facts of the case.

18       The Court acts as a gatekeeper to ensure the proffered testimony is both relevant

19   and reliable.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).  The Court

20   is afforded broad discretion when acting in its gatekeeper role.  *United States v. Hankey*,

21   203 F.3d 1160, 1168 (9th Cir. 2000); *see also Kumho Tire Co. v. Carmichael*, 526 U.S.

22   137, 150–53 (1999).  However, "Rule 702 should be applied with a 'liberal thrust' favoring

23   admission."  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)

24   (quoting *Daubert*, 509 U.S. at 588).  "Shaky but admissible evidence is to be attacked by

25   cross examination, contrary evidence, and attention to the burden of proof, not exclusion."

26   *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

27       Expert opinion testimony is reliable "if the knowledge underlying it has a reliable

28   basis in the knowledge and experience of the relevant discipline."  *Primiano*, 598 F.3d at

565.  When making this determination, the Court should consider **(1)** whether the theory can be and has been tested, **(2)** whether the theory has been peer reviewed and published, **(3)** what the theory's known or potential error rate is, and **(4)** whether the theory enjoys general acceptance in the applicable scientific community.  *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017).  However, these factors are not exhaustive, nor are they "equally applicable (or applicable at all) in every case."  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).  "Applicability 'depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'"  *Murray*, 870 F.3d at 922 (quoting *Kumho Tire Co.*, 526 U.S. at 150).

### 2. Reliability

Defendants claim that Dr. Vredenburgh's testimony should be excluded because she did not conduct a scientifically reliable method to test her opinions.  However, Dr. Vredenburgh testified that she did not conduct any independent testing of the RNPS because it was "unsafe," and she preferred not to "giv[e] parents a device that I know has been recalled."  (Doc. 193-2 at 21.)  Although Dr. Vredenburgh's failure to test weighs against admissibility, it is not dispositive.  *Rodriguez v. JLG Indus., Inc.*, No. CV 11-04586 MMM (SHx), 2012 WL 12883784, at *10 (C.D. Cal. Aug. 3, 2012).  In lieu of independent testing, Dr. Vredenburgh applied "well-recognized" human factors principles to the facts of the case and her review of the record was extensive.  (Doc. 193-1 at 4–5.); (Doc. 193-1 at 29–45.)  Her report cites multiple scholarly sources and applies the "hazard control hierarchy," which is well-established in the human-factors field and has been admitted in other courts.  *Rodriguez*, 2012 WL 12883784, at *10–11; *Lister v. Hyatt Corp.*, No. C18-0961JLR, 2019 WL 6701407, at *12–13 (W.D. Wa. Dec. 9, 2019); *Nay v. BNSF Ry. Co.*, No. C19-5425-BHS-MLP, 2021 WL 5321979, at *3, 10–13 (W.D. Wa. Nov. 16, 2021); (Doc. 193-1 at 52–59.)  Thus, applying the liberal admissibility standard in Rule 702, her methodology is sufficient.  The Court DENIES Defendants' Motion on this ground.[3]

---

[3] In every Motion to Exclude, Defendants ask the Court to preemptively prohibit Plaintiff's experts from expressing certain opinions that have been disclaimed or are outside their area of expertise. (Doc. 191 at 19); (Doc. 192 at 15–16); (Doc. 193 at 18); (Doc. 194 at 16.) These requests are not relevant to the Motion for Summary Judgment, in which the Court is bound by the record as

### 3.  Relevancy

Next, Defendants contend that Dr. Vredenburgh's opinions on the content and location of the RNPS's warnings are irrelevant because Plaintiff and Mr. Olson testified that they read and understood the warnings.  (Doc. 193 at 10–14.)  Dr. Vredenburgh's opinion on these two issues is relevant to only one claim for which Defendants have moved for summary judgment: failure to warn.  (Doc. 195 at 33.)  To prevail on this claim, the plaintiff must prove that her injuries were caused by the failure to warn.  *Sw. Pet. Prods., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1060 (D. Ariz. 2003); Ariz. Rev. Stat. § 12-683.  Whether the warnings on the RNPS contained sufficient content to warn against the risk of suffocation—as opposed to a fall hazard—is highly relevant to causation.  It is not disputed that both Plaintiff and Mr. Olson read and understood the warning as written.  (Doc. 193 at 10–12); (Doc. 238 at 10).  Even so, their understanding would be meaningless if the jury found that the warning itself was insufficient to warn against a substantial risk of suffocation.  Dr. Vredenburgh's testimony will thus help the jury decide whether Plaintiff and Mr. Olson's having read the warnings is sufficient to break the causal chain.

But the same is not true for Dr. Vredenburgh's testimony regarding the deficient placement of the warnings.  If Plaintiff and Mr. Olson did, as they have testified, read and understand the warnings, Dr. Vredenburgh's opinion regarding the warning location has no bearing on this case.  (Doc. 193 at 10); (Doc. 238 at 10.)  Plaintiff read the warning regardless of its placement, and, thus, Z.O.'s injuries could *not* have been caused by the allegedly deficient placement.  At oral argument, Plaintiff acknowledged as much.  Defendants' Motion is GRANTED as to the location of the warnings, but it is DENIED as to content.

### 4.  Alternative Warning

Defendants argue that Dr. Vredenburgh's proposed alternative warnings should be excluded because she did not conduct independent research.  (Doc. 193 at 15.)  The Court

presented.  At trial, no witness will be permitted to testify as to matters he or she has disclaimed or which are outside their area of expertise except to the extent that Rule 702 allows an expert to consider some hearsay evidence.

1    has already determined that Dr. Vredenburgh's supplement, where she first presents her

2    alternative warnings, should be stricken.  As such, Defendants' Motion is GRANTED, and

3    Dr. Vredenburgh's opinion on the alternative warnings is excluded.

4                    **5.  Qualification**

5           Finally, Defendants contend that Dr. Vredenburgh should be excluded because she

6    is not qualified.  (Doc. 193 at 15–17.)  Neither Dr. Vredenburgh nor Plaintiff seem to

7    contest that Dr. Vredenburgh's opinions regarding the adequacy of Defendants' testing are

8    outside her area of expertise.  (Doc. 193-2 at 38–39); (Doc. 238 at 14.)  For that reason,

9    those opinions are not admissible, nor will the Court consider such opinions when deciding

10   the Motion for Summary Judgment.

11          However, to the extent that Defendants argue that Dr. Vredenburgh cannot rely on

12   Dr. Singhose's conclusions *at all*, this argument is contrary to law.  "[E]xpert opinions may

13   find a basis in part on 'what a different expert believes on the basis of expert knowledge

14   not possessed by the first expert.'"  *In re Toyota Motor Corp. Unintended Acceleration*

15   *Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013)

16   (citation omitted) (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613-14

17   (7th Cir. 2002)); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-

18   PHX-DGC, 2017 WL 6554163, at *2 (D. Ariz. Dec. 22, 2017).  Although Dr. Vredenburgh

19   relies on Dr. Singhose's finding that the RNPS was defective, such a finding was required

20   for her to opine on whether Defendants' warnings were sufficient to apprise consumers of

21   the potential risks of that defect.   As such, Dr. Vredenburgh does not "parrot" Dr.

22   Singhose's opinions but instead builds on them, which is permissible under Federal Rule

23   of Evidence 703.  *In re Bard*, 2017 WL 6554163, at *2 (collecting cases); *In re Toyota*,

24   978 F. Supp. 2d at 1073, 1078, 1082 (finding that if the underlying expert's opinion is

25   admissible, and the testifying expert is not merely a conduit for that opinion, the testifying

26   expert may rely on the underlying expert's opinion).  Defendants' Motion is DENIED.

27          Finally, the Court does not consider Dr. Vredenburgh qualified to opine on whether

28   Defendants knew or should have known of the RNPS' risk of suffocation.  (Doc. 193 at

17.)  District courts regularly exclude expert opinion on corporate knowledge, intent, or state of mind because such testimony invades the province of the jury.  *Gomez v. Am. Med. Sys., Inc.*, No. CV-20-00393-PHX-ROS, 2021 WL 1163087, at *4–5 (D. Ariz. Mar. 26, 2021); *Siring v. Or. State of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases); *Johnson v. Wyeth*, No. CV 10–02690–PHX–FJM, 2012 WL 1204081, at *3 (D. Ariz. Apr. 11, 2012); *In re Bard*, 2018 WL 495187, at *3; *Glaukos Corp. v. Ivantis, Inc.*, No. SACV 18-620 JVS (JDEx), 2020 WL 10501851, at *12–13 (C.D. Cal. July 23, 2020).  Accordingly, the Court did not consider Dr. Vredenburgh's opinion on this issue when deciding the Motion for Summary Judgment and will not permit Dr. Vredenburgh to testify to such opinions at trial.

### C.  Motion to Exclude Dr. Michael Goodstein

Defendants ask the Court to exclude Dr. Michael Goodstein's testimony regarding infant sleep safety recommendations, his opinions regarding rebreathing, and his opinion that Z.O. did not have an increased risk of sudden infant death syndrome ("SIDS").  (Doc. 191.)

### 1.  General Infant Sleep Safety Recommendations

Dr. Goodstein's opinions on the AAP safe sleep recommendations properly "fit" the facts of this case.  To prevail on her design defect claim, Plaintiff must prove the existence of a defective condition.  "A defective condition is a condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him."  *Hohlenkamp v. Rheem Mfg. Co.*, 134 Ariz. 208, 211, 655 P.2d 32, 35 (Ct. App. 1982).  "The term 'unreasonably dangerous' means 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it . . . .'"  *Id.*  Dr. Goodstein's testimony might aid the jury in deciding whether the RNPS contained such an unreasonably dangerous condition by deviating from AAP safe sleep recommendations.  Defendants' Motion is DENIED on this ground.

### 2.  SIDS and Rebreathing

Dr. Goodstein opines that Z.O. was not at an increased risk of SIDS based on her

medical history.  (Doc. 191-1 at 20.)  Defendants argue that Dr. Goodstein's methodology is flawed because he did not consider certain extrinsic risk factors for SIDS.  (Doc. 191 at 6.)  The Court will permit Dr. Goodstein to opine as to the internal or medical history risk factors of Z.O. only, but not as to extrinsic factors.  Dr. Goodstein may, of course, be cross-examined on the narrow focus of his opinion.

Defendants also argue that Dr. Goodstein's opinions on "rebreathing" should be excluded because they were first presented at his deposition and not in his initial report.  (Doc. 191 at 17–18.)  But Dr. Goodstein did not first opine on rebreathing at his deposition.  Dr. Goodstein clearly addressed rebreathing in his initial report: "[T]he prone position can increase the risk of *rebreathing expired gases* which can lead to increased carbon dioxide levels and low oxygen levels in the blood."  (Doc. 191-1 at 7 (emphasis added) (footnotes omitted).)  Dr. Goodstein will be permitted to opine on rebreathing to the extent he does so in his initial report.

### D.  Motion to Exclude Dr. William Singhose

Defendants ask the Court to exclude Dr. Singhose because his opinions regarding infants' ability to roll in the RNPS and breathe through the RNPS fabric lack pre- and post-market testing, and his proposed safer alternative design are not based on a reliable methodology.  (Doc. 192.)

#### 1.  Rolling from Supine to Prone

Dr. Singhose did not independently test his theory that it is easier for infants to roll from a supine to prone position on an inclined sleeping surface than it is for them to do so on a flat surface.  As explained above, however, the lack of independent testing alone does not merit exclusion.  *See supra* Part II.B.1.  Dr. Singhose applied his knowledge of the "well-studied" development and biomechanical processes of infant rolling to the RNPS to determine whether its design made it easier for infants to roll.  (Doc. 192-1 at 16.) Defendants take no issue with his sources but point to Dr. Singhose's lack of testing.  But Dr. Singhose explicitly explained why he did not perform this type of testing: Such testing would have taken several weeks and, therefore, was impossible to conduct during the

1    COVID-19 pandemic.  (Doc. 192-4 at 45–46, 59.)  In lieu of this long-term testing, Dr.

2    Singhose opted to take measurements of the various angles of the RNPS and studied how

3    differently sized infants moved while restrained or unrestrained.  (Docs. 192-1, 192-2.)

4    Based on that analysis, Dr. Singhose determined that the combination of the steep angle of

5    the footrest and the inclined surface allowed infants to extend their knees to push up and

6    out of the restraint, if one was used, and if unrestrained, the incline would "make[] it easier

7    for an infant to roll over, as compared to a level sleeping surface."  (Doc. 192-2 at 16.)  As

8    such, Dr. Singhose's lack of testing is not dispositive because other evidence supports Dr.

9    Singhose's conclusions.  Defendants' Motion is DENIED on this ground.

10                      **2. Breathability Analysis**

11           Defendants argue that Dr. Singhose's breathability testing was unreliable because

12   he merely breathed into the fabric to determine if he could breathe through it.  (Doc. 192

13   at 10.)  Defendants' own employees do not believe a test exists for "rebreathing" or

14   "breathability" and thus did not perform such tests when designing the RNPS.  (Doc. 237-7

15   at 3); (Doc. 237-8 at 3.)  But even if Dr. Singhose's breathability test standing alone would

16   not be "reliable," Dr. Singhose did not rely solely on this test in generating his opinions:

17   Dr. Singhose used a combination of his own tests, the testimony of Defendant Fisher-

18   Price's employees, the Mannen study's test results, and the RNPS measurements to

19   determine whether an infant in the "prone" position could adequately breathe through the

20   RNPS fabric.  (Doc. 192-2 at 9–13.)  Dr. Singhose opined that, based on the distance

21   between them, the "mesh" fabric on the sides of the RNPS would not have significantly

22   improved breathability for a child in the prone position, i.e., one whose face was pressed

23   into the back of the RNPS, not the side.  (Doc. 192-2 at 11.)  Moreover, portions of the

24   Mannen study also corroborate the idea that infants were more than twice as likely to

25   experience "oxygen saturation concerns" in an inclined sleep product than they were in a

26   crib.  (Doc. 192-2 at 11–13.)  These findings were further supported by Fisher-Price's

27   employees, one of which stated that "[T]he basic pad that the – that the child is resting on

28   in the plaintiff's product does not have breathable materials on it."  (Doc. 192-2 at 9.)  Thus,

Dr. Singhose's opinions are adequately supported by reliable evidence, and Defendants' Motion is DENIED.[4]

### 3. Opinions Regarding Defendants' Lack of Testing

Dr. Singhose offers several opinions assessing the adequacy of Defendant Fisher-Price's testing, both pre- and post-release of the RNPS to the market.  (Doc. 192-2 at 17-25.)  District courts agree that although an expert may opine regarding a manufacturer's deficient testing of a product, such opinions must be rooted in objective standards in the industry—as opposed to an expert's subjective opinion.[5]  *Johnson*, 2012 WL 1204081, at *1–2 (quoting *Daubert*, 509 U.S. at 590) ("Because plaintiff cannot point to any objective standard relied on by [the experts] that required defendants to perform additional testing, plaintiff has not shown that the failure to test opinions are anything more than 'subjective belief or unsupported speculation.'");  *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02-CV-22692, 2011 WL 7659333, at *6–8 (S.D. Fla. Aug. 4, 2011) (excluding expert's opinion on defendant's failure to test because they could identify no governmental or other objective standard by which to measure whether defendant conducted adequate testing); *In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12–MD–02327, 2014 WL 186872, at *18–19 (S.D. W. Va. Jan. 15, 2014) (excluding expert because she "[did] not explain the bases for her opinion that [defendant's] testing was inadequate" other than merely opining that certain hazards should have been tested for); *In re Prempro Prods. Liab. Litig.*, No. 4:03CV01507–WRW, 2010 WL 5663003, at *2 (E.D. Ark. Sept. 16, 2010)

---

[4] To the extent that Defendants contend that Dr. Singhose's opinion does not "fit" the facts of this case, their Motion is also denied.  The position in which Z.O. was found is a contested issue of fact.  Dr. Singhose doubted Mr. Olson's ability to accurately recreate the positioning so shortly after Z.O.'s death because of the recent trauma and because the RNPS and mannequin used were not representative of the actual circumstances of Z.O.'s death.  (Doc. 192-4 at 70–71.)  Defendants, of course, may challenge Dr. Singhose's version of the facts at trial, but the Court will not exclude Dr. Singhose's testimony based on disputes about the position of the child's head when she was discovered.

[5] Of course, an expert may rely on her own experience when determining whether a manufacturer failed to test a product, but she must cite to her relevant experience in the industry that, when applied, show that the product was not adequately tested.  *Johnson*, 2012 WL 1204081, at *1; *Kaufman*, 2011 WL 7659333, at *7 ("[The expert] must explain how her experiences led to the conclusions she reached, why her experiences are sufficient bases for her opinions, and how her experiences are reliably applied to the facts of the case.")

("Without some established industry standard, [an expert] would only be able to subjectively testify about what companies *could* do by the way of testing rather than what Defendants were required to do.")   The objective standard requirement goes not to relevancy—whether the expert's testimony will aid the jury—but to reliability. *Johnson*, 2012 WL 1204081, at *2 (excluded for unreliability); *Kaufman*, 2011 WL 7659333, at *9 (same); *In re Ethicon, Inc.*, 2014 WL 186872, at *18 (same).   *But see Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021) (deciding this issue under *Daubert*'s relevancy test); *In re Prempro*, 2010 WL 5663003, at *3 (deciding the issue under expert qualification rather than reliability).   Subjective opinion testimony, untethered to specific industry experience or other objective standards, is not reliable and, thus, inadmissible. *Johnson*, 2012 WL 1204081, at *1; *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 939 (N.D. Cal. 2015); *Daubert*, 509 U.S. at 590.

Although most district court authority—including in this very district—weighs against the admission of expert testimony on failure to test, this is not always the case. *See Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 3234240, at *3–7 (N.D. Ill. Aug. 6, 2012); *Eghnayem v. Boston Sci. Co.*, 57 F. Supp. 3d 658, 695 (S.D. W. Va. Oct. 27, 2014).   In these cases, however, the experts cited any relevant—even if not wholly applicable—regulations, as well as their own experience or other peer-reviewed research, to support their opinions on the defendant's failure to perform adequate testing.   Here, Dr. Singhose fails to connect his opinions regarding Defendant Fisher-Price's failure to test to any objective standard or his own relevant experience.   This section of his report merely states his findings regarding the risks posed by the RNPS's design, his opinion that Defendant Fisher-Price should have tested for those risks, and how Defendant Fisher-Price could have tested for those risks.   (Doc. 192-2 at 17–25.)   But, like in *Ethicon*, Dr. Singhose is not basing his opinions on any objective measurement other than the general reality that risks exist.[6]   This is insufficient.   Instead, Dr. Singhose was required to cite *some* objective

---

[6] At some points in his report, Dr. Singhose uses Defendants' own knowledge of RNPS's defects to argue that Defendants should have done additional testing.   (Doc. 192-2 at 32, 34–35, 37.) However, this analysis alone is insufficient, and to the extent Dr. Singhose opines about Defendants' corporate knowledge or state of mind, his opinion is likewise inadmissible.   *Johnson*,

evidence—any applicable industry regulations or peer-reviewed studies or his own relevant experiences—to support that Defendant Fisher-Price should have tested for these specific hazards.  He did not do so.  As such, Defendants' Motion is GRANTED as to Dr. Singhose's opinions regarding Defendant Fisher-Price's failure to test.[7]

### 4.  Safer Alternative Design

Defendants next argue that Dr. Singhose's opinions regarding a safer alternative design are unreliable.[8]  Dr. Singhose's proposed alternative design is "a bassinet with a level[] or nearly level sleeping surface."  (Doc. 192-2 at 39.)  Although Dr. Singhose did not test his alternative design, this is not dispositive, especially when, as here, the alternative design is an already-existing product that has been widely marketed, including by Defendants themselves.  *Ramirez v. ITW Food Equip. Grp.*, 686 F. App'x 435, 440 (9th Cir. 2017) ("[T]he reliability of an expert's theory turns on whether it 'can be tested,' not whether he has tested it himself.") (citation omitted).  Regardless, Dr. Singhose's alternative is *capable* of being (and has been) tested, even if he did not perform any testing.  Moreover, to the extent that Defendants take issue with Dr. Singhose's lack of specificity, the Court fails to see how an unclear articulation of an expert's *conclusion*—as opposed to his methodology—shows that the methodology is unreliable.  Even if that consideration is relevant, however, it does not weigh against Plaintiff here.  Dr. Singhose's report extensively argues that the RNPS's inclined sleeping surface of thirty degrees is a dangerous design defect.  Dr. Singhose did not opine as to how much of an angle is generally too steep for sleepers but limited his testimony to the RNPS.  Given this context,

---

2012 WL 1204081, at *3; *Miranda v. U.S. Sec. Asscs., Inc.*, No. 18-CV-00734-LHK, 2019 WL 2929966, at *1 (N.D. Cal. July 8, 2019) (collecting cases); *Lanard Toys Ltd. v. Anker Play Prods., LLC*, No. CV 19-4350-RSWL-AFMx, 2020 WL 6873647, at *7 (C.D. Cal. Nov. 12, 2020) (same).

[7] To the extent that Dr. Singhose's opinions pertain to the deficiencies in the testing that Defendant Fisher-Price actually *did* perform—as opposed to what Fisher-Price didn't perform—his opinions are admissible so long as they are relevant, properly disclosed, supported, and reliable.  Defendants do not seem to contest the reliability of these opinions, so the Court will not consider them here.  (Doc. 192 at 11–14.)

[8] Defendants attempt to make a relevancy argument in their Reply, which the Court will not consider.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

1    Dr. Singhose's proposed alternative design, though not a model of clarity, is sufficiently

2    clear to be admissible under *Daubert*.

3         **E.  Motion to Exclude Erik Christensen**

4         Defendants argue that Plaintiff's causation expert, Dr. Erik Christensen, should be

5    excluded because he failed to explain the posterior lividity found on Z.O. in the hours after

6    her death and assumes that a stain on the RNPS is a blood stain without having it tested.

7    Defendants thus urge that he failed to engage in appropriate differential diagnosis analysis

8    by failing to consider SIDS as an alternative cause of death.  (Doc. 194.)  "Differential

9    diagnosis is a common scientific technique, and federal courts, generally speaking, have

10   recognized that a properly conducted differential diagnosis is admissible under Daubert."

11   *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003).  "The first step in

12   the diagnostic process is to compile a comprehensive list of hypotheses that might explain

13   the set of salient clinical findings under consideration."  *Id.* (citing Jerome P. Kassirer &

14   Richard I. Kopelman, *Learning Clinical Reasoning* 112 (1991)).  Testimony that rules in a

15   potential cause that is not capable of causing the patient's symptoms or mortality, or

16   testimony that neglects to consider a hypothesis that might explain the clinical findings,

17   may be unreliable and, thus, inadmissible under *Daubert*.  *Id.* at 1057–58. The second step

18   requires "a process of elimination" that "eliminat[es] hypotheses on the basis of a

19   continuing examination of the evidence" to determine the most likely cause of the findings

20   in that particular case.  *Id.* at 1058.  "A district court is justified in excluding evidence if an

21   expert 'utterly fails . . . to offer an explanation for why [a] proffered alternative cause' was

22   ruled out."  *Id.* (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir.

23   2001)).  "The expert must provide reasons for rejecting alternative hypotheses 'using

24   scientific methods and procedures[,]' and the elimination of those hypotheses must be

25   founded on more than 'subjective beliefs or unsupported speculation.'"  *Id.* (quoting *Claar

26   v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).

27        Here, Dr. Christensen properly considered and excluded SIDS as a cause of Z.O.'s

28   death.  Dr. Christensen noted that a SIDS diagnosis "applie[s] when no other cause of an

infant death is identified following autopsy and investigation." (Doc. 194-1 at 5.) Clearly, however, Dr. Christensen *did* identify another cause: asphyxia. (Doc. 194-1 at 5.) According to Dr. Christensen, then, such a finding necessarily precludes a SIDS diagnosis. Indeed, Dr. Christensen specifically cites to Dr. Michael Ferenc's[9] deposition on this point, in which Dr. Ferenc also states that "SIDS is a diagnosis of exclusion." (Doc. 194-1 at 5); (Doc. 194-20 at 18.) Therefore, Defendants' contention that Dr. Christensen did not consider SIDS is erroneous. Moreover, in addition to SIDS, Dr. Christensen considered and excluded congenital molecular abnormalities and hyperthermia as potential causes. (Doc. 194-1 at 6.) In doing so, Dr. Christensen carefully considered whether these potential causes could explain the circumstances of the death, including the position in which Z.O. was found. (Doc. 194-1 at 6.) Dr. Christensen concluded that, based on his analysis of the documents and testimony, and his decades of experience, neither alternative cause explained the circumstances as well as asphyxia. (Doc. 194-1 at 5–6.)

Nor does Dr. Christensen's failure to consider the lividity of Z.O.'s body merit his exclusion. Dr. Christensen consistently distinguishes between "lividity" as defined and interpreted in textbooks and the lividity he has personally seen and investigated in his career. (Doc. 194-15 at 37, 46, 55.). As explained by the Ninth Circuit, "there is nothing wrong with a doctor relying on extensive clinical experience when making a differential diagnosis." *Messick*, 747 F.3d at 1198. Thus, Dr. Christensen's reliance on his experience may be sufficient alone to defeat Defendants' Motion. But Dr. Christensen is not solely relying on his own experience. Dr. Christensen also agreed with Dr. Ferenc that because so much time had passed between when Z.O. passed away and when her autopsy was performed, lividity was far less relevant. (Doc. 194-15 at 37); (Doc. 194-20 at 41.) As noted by Dr. Ferenc, lividity only becomes "fixed"—unchanging—after "hours and hours . . . and a lot of cooling." (Doc. 194-20 at 43.) Because the time of Z.O.'s death is unknown, it is far more difficult, according to Dr. Christensen and Dr. Ferenc, to determine when lividity became "fixed." This matters because it is undisputed that Z.O.'s body was

---

[9] Dr. Ferenc performed Z.O.'s autopsy. (Doc. 194-20 at 5.)

moved shortly after she was discovered.  (Doc. 196 at 10); (Doc. 206 at 33.)  Moreover, if the jury believes Plaintiff's version of events, not only was Z.O. moved after she was found deceased, she was moved from a *prone position to a supine position*.  Thus, depending on the progress of the lividity at that time, Z.O.'s body being moved "[c]ould certainly [have] allow[ed] for redistribution of lividity, and disruption of early rigor mortis."  (Doc. 194-16 at 6.)  In short, Dr. Christensen's choice to rely on his own experiences regarding lividity, Dr. Ferenc's opinions, and the fact that Z.O.'s body was moved, does not justify the exclusion of his testimony.

Finally, Dr. Christensen did not "cherry-pick" facts to support his conclusion.  "Cherry picking" occurs when an expert makes a conclusion first, and then considers only the evidence that supports that preconceived conclusion.  *Claar*, 29 F.3d at 502–03; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018).  Many of the facts surrounding Z.O.'s death are disputed.  They are also contradictory.  Dr. Christensen had to choose which facts to use in his diagnosis, and he did so.  (Doc. 194-15 at 49.)  Only two people observed Z.O.'s position before she was moved: Mr. Olson and Plaintiff.  Both told the Tempe Fire Department responders (who arrived *before* the police) that Z.O. was "prone" when they found her.  (Doc. 194-14 at 3.)  And, as Dr. Christensen points out, that fact is also supported by the stain found under Z.O.'s head and the lack of any evidence of liquid having run at an angle down Z.O.'s face. (Doc. 194-15 at 49.)  In a case like this in which the evidence is disputed and contradictory, the Court will not exclude Dr. Christensen's testimony and leave for the jury to decide how the facts they believe are true impact the weight of Dr. Christensen's opinions.  *IceMOS Tech. Corp. v. Omron Corp.*, No. CV-17-02575-PHX-JAT, 2019 WL 6075361, at *4 (D. Ariz. Nov. 15, 2019) ("[D]isagreement over which facts an expert decided to rely on is not an appropriate ground for exclusion of expert testimony."); *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 814–15 (N.D. Ill. 2020) (collecting cases); *Nucor Corp. v. Requenez*, --- F.Supp.3d ----, 2022 WL 36095, at *4 (S.D. Tex. Jan. 4, 2022).  Defendants' Motion is

1   DENIED.[10]

2   **III.  Motion for Summary Judgment**

3      The purpose of summary judgment is "to isolate and dispose of factually
4   unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary
5   judgment is appropriate if the evidence, viewed in the light most favorable to the
6   nonmoving party, shows "that there is no genuine dispute as to any material fact and the
7   movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Only disputes
8   over facts that might affect the outcome of the suit will preclude the entry of summary
9   judgment, and the disputed evidence must be "such that a reasonable jury could return a
10  verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
11  (1986).

12     "[A] party seeking summary judgment always bears the initial responsibility of
13  informing the district court of the basis for its motion, and identifying those portions of
14  [the record] which it believes demonstrate the absence of a genuine issue of material fact."
15  *Celotex*, 477 U.S. at 323.  Parties opposing summary judgment are required to "cit[e] to
16  particular parts of materials in the record" establishing a genuine dispute or "show[ ] that
17  the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P.
18  56(c)(1).  A district court has no independent duty "to scour the record in search of a
19  genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Here,
20  Defendants ask for summary judgment on Plaintiff's products liability claim, negligence
21  claim, breach of express warranty claim, and request for punitive damages.  (Doc. 195.)

22     **A.  Statute of Limitations**

23     Defendants argue that Plaintiff's products liability, express warranty, and
24  negligence claims are barred by the statute of limitations.  (Doc. 195 at 23.)  In Arizona, a
25  "product liability action" must be "commenced and prosecuted within the period prescribed

26  ---
[10] Dr. Christensen will not be permitted to opine on the AAP standards because he is not qualified.
27  Under Federal Rule of Evidence 702, a witness may be qualified as an expert by "knowledge, skill,
    experience, training, or education."  Dr. Christensen expressly disclaimed that he was an expert on
28  the "American Association of Pediatrics and its guidelines."  (Doc. 194-15 at 13.)  As such, the
    Court will not consider Dr. Christensen's testimony on this point, nor will it permit him to testify
    to it at trial.

in § 12-542." Ariz. Rev. Stat. § 12-551. Section 12-542 provides that actions for injuries or death to another must be "commenced and prosecuted within two years." § 12-542. Notwithstanding the statutory language, however, Arizona courts follow the discovery rule: "[A] cause of action does not accrue until the plaintiff knows or with reasonable diligence should know the facts underlying the cause." *Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951, 960 (1998). "[D]eterminations of the time when discovery occurs and a cause of action accrues 'are usually and necessarily questions of fact for the jury.'" *Kopacz v. Banner Health*, 245 Ariz. 97, 100, 425 P.3d 586, 589 (Ct. App. 2018) (quoting *Walk v. Ring*, 202 Ariz. 310, 316, 44 P.3d 990, 996 (2002)). Although an injured person need not know all the facts underlying their cause of action for the statute of limitations to begin to run, "[w]hen the 'fact of injury is known but the possibility of negligence is difficult to discern,' the cause of action may not accrue on the date the plaintiff learns of her injury." *Id.* (quoting *Walk*, 202 Ariz. at 314–15, 44 P.3d at 994–95). Thus, in addition to injury, "[t]he plaintiff must at least possess a minimum requisite of knowledge sufficient to identify that a wrong occurred." *Walk*, 202 Ariz. at 316, 44 P.3d at 996 (emphasis omitted).

Here, the medical examiner concluded that Z.O.'s cause of death was "unknown" but with "no suspicious or unusual circumstances surrounding the death scene." (Doc. 196-33 at 3, 21.) Plaintiff testified that she didn't contemplate investigating Z.O.'s death because she "wouldn't know what to even investigate." (Doc. 196-30 at 48.) It wasn't until April 2019, when a friend informed her of the recall, that Plaintiff decided to seek legal advice. (Doc. 196-30 at 23.) Plaintiff has provided evidence that in the interim, Defendants continued to market the RNPS as a "sleeper" despite knowledge that the RNPS was connected with multiple infant deaths. *See infra* Part III.E; (Doc. 244-1 at 151–159.) The governmental report on this issue, prepared for the House of Representatives by the Committee on Oversight and Reform, concludes that "Fisher-Price was permitted to . . . override attempts by CPSC to release important safety information about their product to the public." (Doc. 244-1 at 127.) It also states that "the public remained in the dark about safety issues involving the product" while CPSC continued to investigate the matter. (Doc.

244-1 at 149.)  Thus, even though there was evidence that the RNPS was dangerous before the recall in April 2019, there is a genuine issue of material fact as to when Plaintiff "should have known" of the "wrong" committed.  *Anson v. Am. Motors Corp.*, 155 Ariz. 420, 425, 427, 747 P.2d 581, 586, 588 (Ct. App. 1987) (holding that when plaintiffs "discovered" their claims was an issue of fact because the defendant had allegedly concealed dangers related to defects and continued to represent its product as safe even though "reports and tests" revealed otherwise).  Defendants' Motion is DENIED on this ground.

## B.  Causation

Defendants' sole argument that summary judgment should be granted as to causation rests on the exclusion of Dr. Christensen.  (Doc. 195 at 29–31.)  As explained above, Dr. Christensen's testimony is admissible.  *See supra* Part II.E.  Moreover, in addition to Dr. Christensen's opinion that Z.O. asphyxiated, Dr. Singhose also opined that the RNPS posed risks of rollover and suffocation, and Plaintiff and Mr. Olson maintain that they found Z.O. face-down in the RNPS.[11]  These facts are sufficient for a reasonable jury to conclude that Z.O.'s death was caused by her rolling over in the RNPS and, being unable to correct, suffocating.  Defendants' Motion is DENIED on this ground.

## C.  Strict Products Liability and Negligence

Defendants next assert that Plaintiff has failed to establish a genuine issue of material fact as to her strict products liability and negligence claims.  (Doc. 195 at 31.)  "To establish a prima facie case of strict liability, the burden is upon the plaintiff to show the following: the product is defective and unreasonably dangerous; the defective condition existed at the time it left defendant's control; and the defective condition is the proximate cause of plaintiff's injuries or property loss."[12]  *Rocky Mountain Fire & Cas. Co. v.*

---

[11] The evidence clearly conflicts as to whether Z.O. was found supine, prone, or semi-prone, but such conflicting evidence merely creates a genuine issue of material fact as to causation.  (Doc. 196-25 at 6, 9, 11 (various police reports stating Z.O. was found "on her back," "face down," and "laying on her side")); (Doc. 196-6 at 3 (Tempe Fire Department report noting Z.O. was found "prone")).

[12] Defendants make no separate arguments for Plaintiff's negligence claim.  (Doc. 195 at 31.) Although negligence and strict products liability claims are distinct, see *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 246, 709 P.2d 876, 880 (1985), the Court does not find that they require separate analyses.  As such, because Defendants' Motion is denied as to strict products liability, it is also

- 23 -

*Biddulph Oldsmobile*, 131 Ariz. 289, 292, 640 P.2d 851, 854 (1982).  "A defective condition is a condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him."  *Hohlenkamp*, 134 Ariz. at 211, 655 P.2d at 35.  "The term 'unreasonably dangerous' means 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'"  *Id.* (quoting *Brady v. Melody Homes Mfr.*, 121 Ariz. 253, 589 P.2d 896 (Ct. App. 1979)).  Plaintiff alleges that the RNPS was defective due to manufacturing defects, design defects, and a lack of adequate warnings.  (Doc. 17 at 3–4.)  Defendants move for summary judgment on each theory.

### 1. Manufacturing Defect

"A defectively manufactured product is one that is flawed as a result of something that went wrong during the manufacturing process."  *Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 241–42, 745 P.2d 986, 988–89 (Ct. App. 1987).  As explained by the Restatement, "[a] product . . . contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product."  Restatement (Third) of Torts: Prod. Liab. § 2(a) (Am. L. Inst. 1998).  Plaintiff has not presented any evidence that Z.O.'s RNPS was mis-manufactured.  Instead, Plaintiff argues that the RNPS's *design* was unreasonably dangerous.  (Doc. 205 at 23–24.)  Defendants' Motion is therefore GRANTED as to this theory.

### 2. Design Defect

"A product is defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner."  *Moorer v. Clayton Mfg. Corp.*, 128 Ariz. 565, 567–68, 627 P.2d 716, 718–19 (Ct. App. 1981).  Again, Defendants' sole argument for summary judgment on this theory is that Dr. Singhose's testimony is inadmissible.  (Doc. 195 at 32–33.)  Having found otherwise, a reasonable jury could find that the RNPS was defective

denied as to negligence.

and unreasonably dangerous based on Dr. Singhose's testimony.  Defendants' Motion is DENIED.

### 3. Failure to Warn

"[A] claim of strict products liability may be based on 'informational defects encompassing instructions and warnings' that render a product defective and unreasonably dangerous." *Watts v. Medicis Pharm. Corp.*, 239 Ariz. 19, 23 (2016) (quoting *Gosewisch v. Am. Honda Motor Co.*, 153 Ariz. 400, 403 (1987)).  To establish proximate cause in a failure-to-warn claim, the plaintiff "must submit evidence that the medical outcome would have been different had the manufacturer provided different warnings . . . ." *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 824411, at *3 (D. Ariz. Mar. 4, 2021).  "Ordinarily, what constitutes the proximate cause of any injury is a question of fact.  However, the jury is not entitled to make a decision absent a proper evidentiary foundation." *D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d 880, 890 (D. Ariz. 2013).

Arizona adheres to a "heeding presumption" regarding proximate causation in strict liability failure-to-warn claims.  *Golonka v. Gen. Motors Corp.*, 65 P.3d 956, 969 (Ariz. Ct. App. 2003).  The presumption "allow[s] the fact-finder to presume that the person injured by product use would have heeded an adequate warning, if given." *Id.* at 967.  Thus, the burden of production (but not persuasion) shifts to the manufacturer to rebut the presumption.  *Id.* at 971.  A manufacturer rebuts this presumption by introducing evidence that would permit reasonable minds to conclude that the injured party would not have heeded an adequate warning.  *Id.*  Introducing such evidence destroys the presumption and places the burden back on the plaintiff to produce evidence of proximate causation.  *Id.* at 971–72.  If the plaintiff cannot demonstrate that they would have heeded an adequate warning, then their claim must fail because there is no conceivable casual connection between the allegedly deficient warning and plaintiff's injury.  *See D'Agnese*, 952 F. Supp. 2d at 891 (quoting *Motus v. Pfizer Inc. (Roerig Div.)*, 358 F.3d 659, 661 (9th Cir. 2004)) ("a product defect claim based on insufficient warnings cannot survive summary judgment

if stronger warnings would not have altered the conduct . . . .").

The Court begins with the presumption that Plaintiffs would have heeded an adequate warning. Indeed, Plaintiff and Mr. Olson testified that they read and understood the warnings on the RNPS. And Mr. Olson, who put Z.O. into the RNPS the night before her death, testified that he took care to follow all warnings, which instructed parents to discontinue use after the infant reached five months old, when "the infant beg[an] to push up on hands and knees," pull up, sit unassisted, or "has reached 25 lbs. (11.3 kg)." (Doc. 193-4 at 44, 52); (Doc. 196-5 at 2.) However, at the time of her death, Z.O. was eight months old and could sit up unassisted (Doc. 196-30 at 28); (Doc. 196-31 at 38). Thus, because Mr. Olson testifies that he understood the warnings, he also understood that he was not complying with them. This is sufficient to permit reasonable minds to conclude that Z.O.'s parents would not have heeded an adequate warning. Thus, the burden shifts back to the Plaintiffs to establish proximate cause.

To support her claim, Plaintiff notes that the warning that said the sleeper should not be used if a child could sit unassisted was a warning that pertained to a "Fall Hazard." It did not come under the general warnings, such as the warning to "ALWAYS use the restraint system" or the warnings concerning the suffocation hazard. Thus, Plaintiff asserts summary judgment on this claim is not appropriate because while Mr. Olson was apparently prepared to run the risk of his child falling by using the sleeper, he would not have been willing to incur the suffocation risk. Plaintiff also introduces Dr. Vredenburgh's testimony that the warning label listed the developmental milestones under a "fall hazard" warning instead of a "suffocation" warning, which she opines was inadequate to warn against a suffocation risk. Thus, Plaintiff asserts that had Mr. Olson been warned of the suffocation and rollover risk, he would not have used the sleeper.

Of course, what risks Mr. Olson was willing to incur (or not incur) as to the health of his child is an issue of fact for the jury. There is a further issue of fact as to whether Mr. Olson appropriately used the restraint system. Yet, when reading the facts in Plaintiff's most favorable light, the Court finds that a reasonable jury might conclude that even though

he consciously ignored the Fall Hazard, he would have complied with warnings that sufficiently alerted him to a more serious kind of harm: suffocation.   Accordingly, Defendants' Motion is DENIED.

### D.  Breach of Express Warranty

An action for breach of express warranty can arise under the U.C.C. or from agreements between contracting parties. *De Shazer v. Nat'l RV Holdings, Inc.*, 391 F. Supp. 2d 791, 794 (D. Ariz. 2005).   In the amended complaint, Plaintiff says that her express warranty claim arises from Defendant Fisher-Price's warranties that "the Rock 'n Play was safe for infant sleeping."  (Doc. 17 at 5.)  Defendant Fisher-Price says Plaintiff's express warranty claim must fail because "no affirmation of fact or promise can form the 'basis of the bargain' in this case." (Doc. 239 at 3.)[13]

However, the "basis of the bargain" requirement only applies to express warranty claims brought under the U.C.C.   *Flory v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 581 (1981).  Common-law express warranty claims have no such requirement, even when a product is not obtained in a commercial transaction, e.g., when it is given as a gift.  *Flory*, 633 P.2d at 389. *See Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 294, 640 P.2d 851, 856 (1982) (quoting *Seekings v. Jimmy GMC of Tucson, Inc.*, 131 Ariz. —-, 638 P.2d 210 (1981)) (noting that "privity between the manufacturer and the consumer is not required" in a common-law breach of warranty claim); *Eck v. Helene Curtis Indus., Inc.*, 9 Ariz. App. 426, 429 (1969) (noting that express warranty claims can arise through mere advertisements).  Further, it does not matter whether Plaintiff or her husband actually saw Fisher-Price's warranties. To prevail on a common-law claim for breach of express warranty, Plaintiff must only show that: **(1)** a warranty existed, **(2)** the warrantor failed to perform pursuant to the express warranty, and **(3)** the plaintiff suffered damages as a result.  A.R.S. § 47-2313; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444 (2005) ("[A] cause of action on an express warranty asks only that a manufacturer

---

[13] Defendant Fisher-Price also raises a statute-of-limitations argument, but the Court does not address it for the reasons discussed in Part III.A.

make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product") (emphasis added).

Here, the Plaintiff has sufficiently shown that a warranty existed. (Doc. 17 at 5–6.) Additionally, Plaintiff offers a significant amount of expert testimony suggesting that Defendants failed to perform pursuant to these warranties and that this failure caused her to suffer damages. (Doc. 17 at 5–6.) A reasonable jury might find this evidence is sufficient to establish Plaintiff's claim.[14] Accordingly, the Court DENIES Defendant's motion for summary judgment on Plaintiff's breach of express warranty claims.

### E. Punitive Damages

"Punitive damages are appropriately awarded in tort cases to punish the wrongdoer and deter others from emulating the misconduct." *Hudgins v. Sw. Airlines, Co.*, 221 Ariz. 472, 486 (Ct. App. 2009). "Such damages, however, are awarded only in the most egregious cases." *Id.* "Thus, a jury may award punitive damages only if clear and convincing evidence exists that the tortfeasor possessed an 'evil mind' while engaging in aggravated and outrageous conduct" that proximately caused the plaintiff's injuries. *Hudgins*, 221 Ariz. at 486. Defendants rarely admit to this intent, so "[a]n 'evil mind' may be shown by evidence that the defendant intended to injure the plaintiff or 'consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.'" *Piper v. Bear Med. Sys., Inc.*, 180 Ariz. 170, 180, 883 P.2d 407, 417 (Ct. App. 1993) (quoting *Rawlings v. Apodeca*, 151 Ariz. 149, 162 (1986)). In determining whether

---

[14] Still, a common law express warranty claim in such a setting seems to be indistinct from Plaintiff's products liability claim. Strict liability runs from a manufacturer to a plaintiff by implication of law—not through any agreement between the parties. *See Bailey v. Montgomery Ward & Co.*, 6 Ariz. App. 213, 217 (1967); *Eck*, 9 Ariz. App. at 428, 453. Indeed, the elements for strict liability in Arizona are effectively identical to the elements of breach of express warranty. *See Rocky Mountain*, 131 Ariz. at 292 ("To establish a prima facie case of strict liability, the burden is upon the plaintiff to show the following: the product is defective and unreasonably dangerous; the defective condition existed at the time it left defendant's control; and the defective condition is the proximate cause of plaintiff's injuries or property loss"). With respect to Plaintiff's claims arising from Fisher-Price's advertisements, "the liability is not one governed by the law of contract warranties but by the law of strict liability in tort." *Nalbandian v. Byron Jackson Pumps, Inc.*, 97 Ariz. 280, 288 (1965) (Lockwood, J., concurring) (quoting *Greenman v. Yuba Power Prod., Inc.*, 59 Cal. 2d 57, 63 (1963). Nevertheless, because the Arizona Supreme Court seems to recognize the possibility of such a claim existing in a similar context, this claim survives the motion for summary judgment.

a defendant acted with an evil mind, courts may consider: **(1)** the nature of the defendant's conduct, including the reprehensibility of the conduct; **(2)** the severity of the harm likely to result; **(3)** the harm that has occurred; **(4)** [t]he duration of the misconduct; **(5)** the degree of defendant's awareness of the harm or risk of harm; and **(6)** any concealment of it. *Thompson v. Better-Bilt Aluminum Prod. Co*., 171 Ariz. 550, 556 (1992) (quoting *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 497 (1987)). If a reasonable jury could find that a defendant acted with an evil mind, a court may not grant a motion for summary judgment on the issue of punitive damages. *Quintero v. Rogers*, 221 Ariz. 536, 541 (Ct. App. 2009).

Plaintiff offers four premises to show that Defendant Fisher-Price acted with an evil mind:

> **(1)** Defendant failed to adequately test the RNPS with regard to the well-known and foreseeable hazards like efficacy of restraint belts and positional asphyxiation;
> **(2)** Defendant was alerted early on that infants were able to get out of position in the RNPS and sustained serious injuries;
> **(3)** Defendant failed to undertake any investigation or redesign of the RNPS as a result of its knowledge of the significant harm the RNPS posed; and
> **(4)** Defendant continued to market the RNPS as safe for overnight sleep.

(Doc. 205 at 31–32) (formatted for clarity).

Plaintiff notes that "Ms. Courkamp's claim for punitive damages is based on the same four premises" as the plaintiff in *Hess v. Bumbo*., No. CV 13-944 TUC DCB, 2014 WL 12527216, at *8 (D. Ariz. Sept. 11, 2014); (Doc. 205 at 31.) Indeed, in that case, the parents of a child who was injured in a defective car seat advanced four essentially identical premises to show that the car seat manufacturer acted with an evil mind. *Id*. On that basis, the court denied the defendant manufacturer's motion for summary judgment on punitive damages. *Id*. at *10. However, *Hess* is not dispositive because the opinion does not suggest that the car seat manufacturer offered direct evidence to rebut the plaintiff's four premises. *Id*. Here, Defendant Fisher-Price has directly contested Plaintiff's first two premises. Thus, the Court will consider those arguments and Defendant's alternative suggestion that

punitive damages should be unavailable because the company complied with industry standards and relevant regulations.

### 1. Premise One: Failure to Adequately Test Restraint Belt and Positional Asphyxiation

In response to Plaintiff's first premise, Defendant Fisher-Price argues that the RNPS's breathability was considered by a team of experts, the product was extensively tested, and included a built-in restraint system.  (Doc. 196-42 at 10–11.)  These facts are amply supported by both parties' Statement of Facts.  (Doc. 196-1 at 21); (Doc. 196-18 at 237); (196-41 at 12.); (Doc. 206 at 20).  And, in considering those facts in a light most favorable to Plaintiff, the Court finds that a reasonable jury could not conclude that Fisher-Price acted with an evil mind because of allegedly inadequate testing.

Defendant Fisher-Price thoroughly tested the RNPS according to then-prevailing industry standards and on their employee's own children. They carefully considered the RNPS's breathability and restraint system with a team of qualified internal and external experts and Fisher-Price's Safety Committee reviewed those findings.  Nothing in the record suggests that the duration of this testing was rushed or otherwise imprudent, although Plaintiff does argue that the initial testing was sub-optimal because no medical doctors were involved in the testing process.  (Doc. 244-1 at 126, 135, 282.)  However, a defendant does not act with an evil mind (or even negligence) simply because they did not employ the best possible means of avoiding harm.  Thus, even accepting that Fisher-Price's testing might have been improved by physician involvement, the nature of its conduct can only be described as responsible given the potential harm that would arise from inadequate testing, i.e., that infants might suffer serious injuries (or even death) while strapped in the company's new product.  Thus, no reasonable jury could conclude that Plaintiff's first premise supports an award for punitive damages.

### 2. Premise Two: Defendant's Knowledge of Other Incidents

Defendant argues, as a threshold matter, that Plaintiff's second premise fails because only incidents from before Z.O.'s death can be considered in the punitive damage's inquiry.

(Doc. 239 at 13.)  Preceding from this assumption, Defendant Fisher-Price then notes that the company carefully monitored every pre-2014 incident involving the RNPS and this internal investigation and reporting "did not identify any causal relation between the product and the very small number of reported incidents, particularly relative to the large number of products sold . . . and given the tragic prevalence of SIDS." (Doc. 239 at 13.)

In their Reply, Defendant cites no authority to support their assertion that only post-2014 incidents can support a claim for punitive damages and, thus, cannot affect whether Fisher-Price acted with an evil mind.  The reason Defendant cites no authority is simple: none exists.  When assessing the availability of punitive damages, Arizona courts routinely consider defendants' conduct both before and *after* injury causing incidents.  "Under Arizona law, post-accident conduct is admissible on the issue of punitive damages if the conduct has a reasonable relationship to the state of mind of the tortfeasor at the time of the accident." *Forquer v. Pinal County*, 526 P.3d 1064, 1068 (Ariz. 1974); *see also Readenour v. Marion Power Shovel, a Div. of Dresser Indus., Inc.*, 149 Ariz. 442, 448, 719 P.2d 1058, 1064 (1986) (noting that evidence of defendants sending warnings to owners of defective shovels after an incident that resulted in injury "would have been admissible for many purposes," including plaintiff's punitive damages argument); *Coulbourn v. Air & Liquid Sys. Corp.*, No. CV-13-08141-PCT-SRB, 2016 WL 5921255, at *3 (D. Ariz. Jan. 6, 2016) (holding that relevant evidence of post-incident conduct can be used to determine whether defendant acted "with conscious disregard of a substantial risk of harm"); *Hess v. Bumbo Int'l Tr.*, No. CV 13-944 TUC DCB, 2014 WL 12527216, at *9 (D. Ariz. Sept. 11, 2014) (considering facts surrounding a 2012 car-seat recall in punitive damages analysis when the plaintiff "was injured after the 2007 recall and before the 2012 recall.").

Next, Plaintiff has presented evidence that Fisher-Price received forty-seven incident reports involving the RNPS *before* Z.O.'s death in 2014, including reports that infants had "[sunk] down," rolled "to the side," and "rolled over" in the product.  (Doc. 244-5 at 68.)  And according to admissible portions of Dr. Singhose's testimony, in the years after Z.O.'s death, the company received hundreds of consumer reports involving

incidents with the RNPS.  (Doc. 196-41 at 78.)  Additionally, Plaintiff presents evidence that Defendant Fisher-Price received reports that the RNPS was possibly unsafe from at least four regulatory bodies before its 2019 Recall.  (Doc. 244-5 at 2–3, 25, 64–65.)  For example, three years before Z.O.'s death, the Queensland Government's Office of Fair Trading sent a letter to Fisher-Price that specifically referenced the risk of death by suffocation.[15]  (Doc. 244-5 at 3.)  In the face of this evidence, Defendants reiterate that their monitoring did not suggest a causal connection between infant deaths and the RNPS. (Doc. 239 at 13.)

In sum, the evidence suggests that Fisher-Price received multiple reports about incidents in the product before the death of Plaintiff's child.  It analyzed these reports and ultimately acted upon the conclusions it drew; specifically, by continuing to market the RNPS until its 2019 Recall.  (Doc. 195 at 15.)  And while the 2019 recall was voluntary, Defendants introduce evidence that Fisher-Price only pulled the RNPS off the market after considerable pressure from outside groups.  For example, Defendant's Exhibit B notes that "inclined sleepers came under additional scrutiny in 2019 after a series of deaths were reported to the CPSC and additional deaths were uncovered in a *Consumer Reports* article." (Doc. 195-2 at 12.)  Exhibit B then states that after this reporting, the AAP issued a press release in April 2019, "calling for an immediate recall of the products, specifically mentioning the Fisher-Price Rock 'n' Play Sleeper, which was tied to 32 sleep-related deaths." (Doc. 195-2 at 12.)  Fisher-Price recalled the product shortly thereafter.

Considering this evidence in the light most favorable to the Plaintiff, the Court finds that there are sufficient facts upon which a reasonable jury could find that Defendant Fisher-Price "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162.  As Defendant Fisher-Price notes, the company carefully monitored incident reports from the product's inception. And nothing suggests that the company did not have access to the information underpinning the

---

[15] Defendants object to this evidence for the purpose of proving a design defect.  (Doc. 239 at 9–10.)  The Court considers it only as to Defendants' state of mind and, thus, declines to rule on Defendants' objections at this time.

*Consumer Reports* article and the concerns that prompted the CPSC and AAP to demand the 2019 Recall. These two facts, when construed in a light most favorable to the Plaintiff, are sufficient to support her punitive damages claim.

Upon considering the RNPS incident reports, industry watch dogs, physicians, and regulatory bodies saw a dangerous product that posed serious harm to infants. So, they called for a unified course of conduct: recall the RNPS. Upon considering the same (if not more comprehensive) information, Fisher-Price chose a different course of conduct and continued to profit from a product that it knew was harming children like Z.O. The reports animating both courses of conduct were the same, however, a reasonable jury might conclude that the entities' motivations were markedly different; namely, that the RNPS "generated at least $200 million in revenue" for Fisher-Price. *See Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1011 (D. Ariz. 2013) (noting that the evil-mind inquiry in Arizona "focuses on the motives of the defendant and how those motives accentuate the risk of harm."); (Doc. 205 at 12.)

### 3. Defendant's Other Arguments

Nevertheless, Defendant Fisher-Price attempts to defeat Plaintiff's claim for punitive damages by arguing that their compliance with federal regulations or industry standards should be considered when assessing the availability of punitive damages. Indeed, some courts have considered "compliance with both federal regulations and industry practices is some evidence of due care." *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994). *See also Mims v. Wright Med. Tech., Inc.*, 2012 WL 1681810, at *5 (N.D. Ga. 2012) (noting that punitive damages are "typically not appropriate where the manufacturer has complied with regulatory standards."). In Arizona, courts have considered manufacturers' compliance with industry and regulatory standards when weighing the availability of punitive damages, but these considerations are not dispositive. *See, e.g.*, *Leavey v. UNUM/Provident Corp.*, No. CV-02-2281-PHX-SMM, 2005 WL 8165150, at *14 (D. Ariz. Mar. 31, 2005); *Hale v. Norcold Inc.*, No. CV-18-03597-PHX-MTL, 2020 WL 1911214, at *3 (D. Ariz. Apr. 20, 2020); *Hess v. Bumbo.*, No. CV 13-944

1  TUC DCB, 2014 WL 12527216, at *8 (D. Ariz. Sept. 11, 2014).  However, even if they

2  were, it would not be entirely helpful to Fisher-Price.

3       First, there have never been federal regulations concerning incline sleepers.  In fact,

4  Plaintiff has presented evidence that Defendant's publicly fought a regulation proposed by

5  CPSC that would have limited infant sleeping products to twenty degrees "maximum

6  rock/swing angle" and five degrees "for the mattress rest angle."  Safety Standard for

7  Bassinets and Cradles, 75 Fed. Reg. 22303, 22306 (Apr. 28, 2010); (Doc. 244-1 at 247–

8  54.)  Additionally, although Fisher-Price introduced evidence that it has adhered to

9  voluntary industry standards like the ASTM standard, Plaintiff has shown that, in 2011 the

10  company knew the RNPS did not comply with the prevailing AAP recommendation that

11  infants sleep supine on a flat surface.  (Doc. 196-17 at 5); (Doc. 244-1 at 106, 113); (Doc.

12  244-5 at 71 (describing an email Fisher-Price received from Dr. Roy Benaroch, a

13  pediatrician, about the RNPS's failure to comply with AAP standards, including his

14  observation that the product was "unsafe" and "inconsistent with the safe sleeping

15  guidelines.").)  At best, the evidence suggests that Defendant Fisher-Price was merely

16  semi-compliant with industry standards. Accordingly, the Court DENIES Defendant's

17  Motion for Summary Judgment on Plaintiff's punitive damages claims.

## CONCLUSION

19       Plaintiff's request to supplement the summary judgment record is denied because

20  she has not shown diligence.  Moreover, after consideration of Defendants' four Motions

21  to Exclude, the Court finds that Dr. Vredenburgh's and Dr. Singhose's opinions on

22  Defendants' failure to test; Dr. Vredenburgh's opinion on the location of the RNPS's

23  warnings; and Dr. Christensen's opinions on the AAP standards are improper under

24  *Daubert*.  The remaining Motions to Exclude are denied.  Plaintiff has failed to establish a

25  genuine issue of material fact as to privity, and as such her claim for breach of express

26  warranty is dismissed.  Likewise, Plaintiff's claim for manufacturing defect is dismissed.

27  Defendants' Motion for Summary Judgment is denied in all other respects.

28       **IT IS HEREBY ORDERED** that Defendants' Motion to Strike the June 7, 2021,

Supplemental Expert Report and July 16, 2021, Rebuttal Report of Alison Vredenburgh, PhD, CPE (Doc. 154) is **GRANTED** in part and **DENIED** in part.  It is granted as to Dr. Vredenburgh's opinions regarding Defendants' failure to test the RNPS and as to Dr. Vredenburgh's supplement, but it is denied on all other grounds.

  **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Plaintiff's Expert, Michael Goodstein, M.D. (Doc. 191) is **DENIED** without prejudice.

  **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Opinions of William Singhose, Ph.D. (Doc. 192) is **GRANTED** in part and **DENIED** in part.  Dr. Singhose's opinions regarding Defendants' failure to test the RNPS are excluded.  The Motion is denied without prejudice as to all other matters.

  **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Plaintiff's Expert Alison Vredenburgh, Ph.D. (Doc. 193) is **GRANTED** in part and **DENIED** in part. It is granted as to Dr. Vredenburgh's opinions regarding Defendants' failure to test the RNPS and the deficient location of the warnings, but it is denied on all other grounds.

  **IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Opinions of Erik Christensen, M.D. (Doc. 194) is **GRANTED** in part and **DENIED** in part.  Dr. Christensen may not opine on the AAP standards but may opine as to the other opinions contained in his initial report.

  **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 195) is **GRANTED** in part and **DENIED** in part.  Defendants' Motion is granted as to Plaintiff's claims for manufacturing defect.  It is denied on all other grounds.

  **IT IS FURTHER ORDERED** that Plaintiff's Motion to Supplement Record in Support of Opposition to Motion for Summary Judgment (Doc. 235) is **DENIED**.

  Dated this 23rd day of September, 2022.

G. Murray Snow
Chief United States District Judge